

**DLA Piper LLP (US)**
1251 Avenue of the Americas
27th Floor
New York, New York 10020-1104
www.dlapiper.com

March 31, 2022
*Via ECF*

The Honorable Valerie Caproni
United States District Court
Southern District of New York
40 Foley Square, Room 240
New York, New York 10007

**Re:**     ***Nike, Inc. v. StockX LLC*, Case No. 1:22-cv-00983-VEC (S.D.N.Y.)**

**Dear Judge Caproni:**

The undersigned counsel represent plaintiff Nike, Inc. ("Nike") and defendant StockX LLC ("StockX") in the above-referenced action.  Pursuant to the February 4, 2022 Notice of Initial Pretrial Conference (ECF 11) and Rules 2(A) and 3(A) of the Court's Individual Practices in Civil Cases, the parties jointly submit this letter and a proposed Case Management Plan and Scheduling Order, which is attached as Exhibit A.  The parties believe that a conference would be helpful and have no objection to proceeding by phone on April 8, 2022 at 2:00 PM.

I.      **Brief Description of the Case**

        A.      **Nike's Statement**

This trademark infringement and dilution action arises from StockX's unauthorized use of Nike's famous trademarks in connection with StockX's entry into the Non-Fungible Token or "NFT" market.  NFTs are commonly understood to be blockchain-based virtual goods that can be sold to and traded by downstream consumers.  NFTs can take a variety of forms, from digital artwork to video clips, wearables worn by video game avatars, to other types of collectibles such as trading cards.  Many brands—including Nike—have entered this popular and rapidly expanding marketplace.  Like any other commercial endeavor, market entrants are branding NFTs with their trademarks to differentiate them from those emanating from other sources.  For established brands with significant goodwill like Nike, the sale of NFTs is a valuable new way of interacting with consumers.  Unfortunately, the NFT market also presents a newfound means for infringers to freeride on that goodwill and confuse consumers into believing that Nike is associated with the creation and sale of unauthorized Nike-branded NFTs when it is not.

Enter StockX, whose core business is the operation of an online resale platform for various brands of sneakers, apparel, luxury handbags, electronics, and other collectible goods.  Unlike a passive reseller platform wherein consumers ship their products directly to one another, StockX acts as an intermediary, purporting to "authenticate" products prior to sending them along to the buyers.  StockX proudly touts that Nike products drive more sales on its platform than any other brand, so StockX knows firsthand the value of Nike's trademarks and accompanying goodwill.

On January 18, 2022, StockX entered the NFT market by "minting" (*i.e.*, creating and linking tokens on the Ethereum blockchain) and offering for sale 8 "editions" of Nike-branded NFTs, 3 of which are exemplified below.  StockX sold these NFTs at significantly higher price points than the physical shoes displayed on the NFT, and, indeed, several of these Nike-branded NFTs have sold on StockX for ***thousands*** of dollars.



Contrary to StockX's contention, its NFTs are more than just "claim tickets" to physical shoes; they are brand new products in and of themselves that were created, marketed, and sold in the first instance ***by StockX***.  (ECF 1 at ¶ 45.)  StockX's statement below that "Vault NFTs have no intrinsic value, are not promoted or bundled with any other 'services or benefits,'" is demonstrably false and belied by its own public statements.  From launch to the present, StockX states on its website that owners of its NFTs "may also receive exclusive access to StockX releases, promotions, events, as a result of ownership." (*Id*. at ¶ 48; https://stockx.com/lp/nfts/.) StockX also states that "[t]hese exclusive NFTs connect coveted physical products with *investable digital assets*"—*not* claim tickets.  (*Id*. (emphasis added).)  None of these Nike-branded NFTs—or investable digital assets, as StockX calls them—originate from or were otherwise approved by Nike.  Nike does not sell StockX's services or exclusive access to "StockX releases, promotions, [or] events."  Yet, StockX created and is offering for sale these entirely new products that prominently bear Nike's trademarks in such a way to suggest Nike's endorsement of the NFTs, without Nike's authorization or knowledge.  Moreover, as noted above, StockX has sold the infringing NFTs at prices many multiples above the price of the physical Nike shoe, conclusively demonstrating that the NFTs have intrinsic value.  (*Id*. at ¶¶ 46-47.)  Consequently, StockX's Nike-branded NFTs have already misled consumers into believing that Nike authorized or otherwise approved of their sale.  As alleged in the Complaint at Paragraphs 77-84, StockX's release of Nike-branded NFTs caused immediate confusion in the marketplace and subjected Nike to negative commentary, including that the NFTs were "just a stupid scam for ***Nike*** to make money." (ECF 1 at ¶ 84) (emphasis added).

Since this action was filed, StockX has revised some of the terms associated with NFT ownership referenced in Nike's Complaint, including the provision StockX highlights below. Regardless, StockX generally advertises to consumers that an owner of a Nike-branded NFT not only has possession of the NFT (which it can sell, trade, or collect in a portfolio), it also has access to a corresponding physical pair of new Nike shoes located in a "vault."  StockX also promotes the claim that "holders" of these "Vault NFTs" "will be eligible for exclusive StockX benefits, which may include access to limited promotions, early releases, and cultural events." (ECF 1 at 29, ¶ 64; https://stockx.com/lp/nfts/.)

In sum, StockX, through its unauthorized sale of NFTs that prominently display Nike's protectable and famous marks, is actively infringing and diluting Nike's trademarks.  Given that prominent use, StockX's fine print disclaimers do nothing to excuse its conduct, and "[i]n similar circumstances, courts have held that disclaimers are not only ineffective, but actually cut against the allegedly infringing party."  *Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 447-48

(S.D.N.Y. 2017) (citing *Cartier, Inc. v. Deziner Wholesale, L.L.C.,* 2000 WL 347171, at *4 (S.D.N.Y. Apr. 3, 2000); *Charles of the Ritz Group Ltd. v. Quality King Distrib.*, 636 F. Supp. 433, 437 (S.D.N.Y. 1986); *Invicta Plastics Ltd. v. Mego Corp.,* 523 F. Supp. 619, 623 (S.D.N.Y. 1981)).  Accordingly, Nike's complaint states claims for trademark infringement and dilution and seeks an injunction barring StockX from its unauthorized conduct, as well as related damages and attorneys' fees.

        B.      **StockX's Statement**

Nike's trademark infringement and dilution claims fail for three simple reasons: first, StockX's re-sale of genuine Nike products is protected by the first sale doctrine; second, StockX's use of images and names of genuine Nike products tied to "Vault NFTs" constitutes nominative fair use; and third, and most importantly, consumers are unlikely to be confused by StockX's Vault NFTs.  Nike misconstrues how StockX Vault NFTs work, and an examination of how this technology truly functions illustrates the futility of Nike's claims.

StockX is an online global marketplace through which users can safely trade in authentic items of current culture, including popular sneakers.  But trading does not come without costs and delay:  physical products must be shipped to StockX, authenticated through StockX's proprietary process, and then shipped again to the buyer.  Through the Vault NFT program, StockX mints and provides customers with Vault NFTs tied directly to specific physical goods to make trading more efficient.  Contrary to Nike's allegations, these Vault NFTs have no intrinsic value, are not promoted or bundled with any other "services or benefits," and are not new digital products, such as a virtual Nike collectible or any other "virtual good" bearing Nike trademarks.  StockX's Terms & Conditions expressly state that Vault NFTs are different than other types of NFTs— such as Experiential NFTs—which may grant the NFT holder rights to obtain certain additional products or benefits, and that "In addition, from time to time StockX may offer incentives and rewards for users of StockX Services generally, ***but not as a component of the value of any particular NFT***."  *See* www.stockx.com/terms.

Thus, Vault NFTs are merely "claim tickets" that serve to track ownership of, and provide access to, the associated physical goods, which StockX has authenticated and stores in its climate-controlled, high-security vault.  The buyer takes immediate title to the underlying physical goods and may choose to either (1) hold the shoes in the vault by keeping possession of the NFT "claim ticket" or (2) redeem the Vault NFT, in which case StockX will ship the product to its owner and remove the Vault NFT from the holder's digital wallet (and digital circulation, more generally).  While StockX sets the initial price for Vault NFTs, StockX does not set or control prices for subsequent trades, which are dictated completely by its users.

StockX's sale of Nike products and the associated Vault NFTs is legally protected under the first sale doctrine, which allows a purchaser of lawfully trademarked goods to display, offer, and sell those goods under their original trademark.  *See Ergowerx Int'l, LLC v. Maxwell Corp. of Am.*, 18 F. Supp. 3d 430, 450 (S.D.N.Y. 2014) (carving out an exception from trademark infringement and dilution for the resale of genuine, branded items); *Bel Canto Design, Ltd. v. MSS HIFI, Inc.*, 837 F. Supp. 2d 208, 222 (S.D.N.Y. 2011) ("[T]rademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner.") (internal

citations omitted). That is precisely what is happening here – StockX is reselling authentic, Nike products and the Vault NFT merely displays and acts as a key to access the trademarked good.

StockX's use of Nike trademarks in this fashion also constitutes nominative fair use, which occurs when a defendant has used a plaintiff's trademark to describe or identify the plaintiff's goods or services. *See Int'l Info. Sys. Sec. Certification Consortium, Inc. v. Sec. Univ., LLC*, 823 F.3d 153, 161, 167-68 (2d Cir. 2016) (recognizing nominative fair use and adding three factors to the traditional *Polaroid* likelihood of confusion factors: (1) whether the product or service is readily identifiable without use of the mark; (2) whether the defendant uses only so much of the mark as is necessary to identify the product or service; and (3) whether the defendant did anything that would, in conjunction with the mark, suggest sponsorship or endorsement by the plaintiff holder); *see also Chanel, Inc. v. The RealReal, Inc.*, 449 F. Supp. 3d 422, 439 (S.D.N.Y. Mar. 30, 2020) ("As the Second Circuit has made clear, the Lanham Act 'does not prevent one who trades a branded product from accurately describing it by its brand name, so long as the trader does not create confusion by implying an affiliation with the owner of the product'").

Because a Vault NFT purchaser can subsequently use the Vault NFT to transfer title to the associated physical good, displaying the product name and image on the Vault NFT is critical to describe and depict to subsequent purchasers the physical good they are buying. This use of Nike trademarks in this way is no different than any other product page on any other e-commerce website or marketplace that consumers see and understand on a regular basis. StockX Vault NFTs (and the associated product pages) are prominently branded with StockX's logos, and include clear and conspicuous disclaimers stating that StockX Vault NFTs are "not affiliated or associated with, sponsored by, or officially connected to Nike or any of its subsidiaries or affiliates," and that "[a]ny Nike names, uses, and trademarks are all the property of Nike and are used in the Vault NFT solely to refer to the physical product to which the Vault NFT corresponds." StockX Vault NFTs for Nike products, in addition, appear alongside Vault NFTs for other non-Nike shoes, and for trading cards that Nike does not sell. No reasonable consumer is thus likely to be confused into believing Nike is the source of or is affiliated with StockX Vault NFTs.

## II.     Any Contemplated Motions

Nike and StockX do not currently contemplate any motions but reserve all rights. In particular, StockX reserves the right to file a motion for summary judgment pursuant to the Court's Individual Rule H.

## III.    Basis for Subject Matter Jurisdiction

The parties agree that this Court has subject matter jurisdiction at least under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338 because this action arises under federal trademark law and that this Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367.

## IV.    The Prospect for Settlement

### A.     Nike's Statement

The parties have not yet engaged in formal settlement discussions, but Nike is open to exploring settlement at any time.  That said, at this time, Nike does not believe that immediate referral to dispute resolution or a magistrate judge would be fruitful until after fact discovery is substantially complete.

### B.    StockX's Statement

StockX believes an early settlement conference with the Magistrate Judge or a private mediator would be beneficial.  StockX's Vault NFTs are new, and StockX believes that if the parties had a chance to discuss and fully understand each other's positions, particularly with the involvement of the parties' principals, this matter is very likely to be resolved.

## V.    Other

The parties conferred but are unable to agree on a proposed case management plan and schedule.

### A.    Nike's Statement

Nike respectfully submits that this Lanham Act infringement and dilution action relating to the complexities of the NFT marketplace warrants a lengthier discovery schedule than the Court's standard timeframe and proposes six months for fact discovery and 112 days for expert discovery.  As demonstrated already by the parties' pleadings, the claims and defenses at issue are fact-intensive and heavily contested.  Nike's allegations concern novel technologies that may require discovery into computer source code, among other categories of information.  ESI discovery is also likely to be significant given the subject matter of the case and the nature of StockX's business.  Nike also anticipates that each side is likely to retain multiple experts on several different issues, including confusion, damages, and the underlying technologies.

In light of the above, Nike initially proposed 244 days for fact discovery, which StockX countered with 120 days.  The parties negotiated further and were ultimately only 30 days apart (StockX proposed 154 days, and Nike countered with 182 days as a final compromise) until late last evening when StockX reverted to the Court's standard 90-day period.

### B.    StockX's Statement

Defendant is ready to move forward with this litigation and discovery and have its chance to have the claims against it dismissed.  Despite the involvement of NFTs, the issues are straightforward, involve only a short period of time, and do not justify a discovery schedule double the time of the Court's standard order: Nike alleges that StockX's use of NFTs bearing Nike trademarks to track the ownership of re-sale physical goods constitutes infringement and dilution; StockX believes this is a protected fair use.  Whether and how StockX uses Nike marks is not in dispute.  While it had been StockX's hope that the parties could compromise, it does not believe a schedule that does not allow for a path to resolution (either through dispositive motions or mediation) for over 6 months is reasonable or fair.  As such, StockX proposes a 90-day fact discovery period (closing on July 7, 2022) and a 45-day expert discovery period (closing on August 21, 2022).

Respectfully submitted,

| | |
|---|---|
| */s/ Tamar Y. Duvdevani* | */s/ Megan K. Bannigan* |
| Tamar Y. Duvdevani | Megan K. Bannigan |
| Marc E. Miller | Jyotin Hamid |
| Jared Greenfield | Justin Ferrone |
| **DLA Piper LLP (US)** | Kathryn C. Saba |
| 1251 Avenue of The Americas, 27th Fl. | **Debevoise & Plimpton LLP** |
| New York, NY 10020 | 919 Third Avenue |
| Telephone: (212) 335-4500 | New York, New York, 10022 |
| Facsimile: (212) 335-4501 | Telephone: (212) 909-6000 |
| | |
| Michael Fluhr | David Mayberry |
| **DLA Piper LLP (US)** | Rob Potter |
| 555 Mission Street, Suite 2400 | **Kilpatrick Townsend & Stockton LLP** |
| San Francisco, CA 94105 | 1114 Avenue of the Americas |
| Telephone: (415) 836-2500 | New York, New York 10036 |
| Facsimile: (415) 836-2501 | Telephone: (212) 775-8733 |
| | |
| *Attorneys for Plaintiff Nike, Inc.* | *Attorneys for Defendant StockX LLC* |