# Exhibit A

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

NIKE, INC.,

                    Plaintiff,

        v.

STOCKX LLC,

                    Defendant.

Case No.  1:22-cv-000983-VEC

**[PROPOSED] FIRST AMENDED COMPLAINT**

**JURY TRIAL REQUESTED**

Plaintiff Nike, Inc. ("Nike" or "Plaintiff") for its First Amended Complaint ("FAC") against Defendant StockX LLC ("StockX" or "Defendant") for trademark infringement, trademark dilution, counterfeiting, false advertising, and related causes of action alleges as follows:

### PRELIMINARY STATEMENT

1.      On February 3, 2022, Nike filed its original Complaint (Plaintiff Nike, Inc.'s Complaint, February 3, 2022 [Dkt. No. 1] ("Complaint")) in this action because of Defendant StockX's unauthorized and infringing use of Nike's famous marks in connection with StockX's entry into the Non-Fungible Token market.  Non-Fungible Tokens or "NFTs" have quickly become pervasive in their use by brand owners seeking to enter the nascent marketplace of virtual or digital products connected to a token on the blockchain.  NFTs are commonly understood to be blockchain-based virtual products that can be collected, sold, and traded in the marketplace.  They are an exciting way for brands to interact with their consumers in and out of the "metaverse," and diverse commercial applications of NFTs have emerged throughout the past two years.  Far more than a fleeting trend, NFTs are part of the future of commerce.

2.      Unfortunately, novel product offerings, burgeoning technologies, and gold rush markets tend to create opportunities for third parties to capitalize on the goodwill of reputable brands and create confusion in the marketplace.  NFTs are, not surprisingly, no exception to the

rule, and this new frontier has swiftly become a virtual playground for infringers to usurp the goodwill of some of the most famous trademarks in the world and use those trademarks without authorization to market their virtual products and generate ill-gotten profits.

3.     Enter Defendant StockX, the operator of an online secondary market platform for the resale of various brands of sneakers, apparel, luxury handbags, electronics, and other collectible goods that purports to provide authentication services to its customers.  According to StockX's Answer to Nike's Complaint, StockX is different than other online marketplaces because it "uses a proprietary, multi-step authentication process for every product sold on its platform. This process ensures that items traded on StockX conform to the product descriptions and condition standards advertised by StockX, and that the products offered for sale are what they claim to be, and are not counterfeit, defective, or used—meaning StockX's customers can trust that transactions made through StockX are safe."  (Defendant StockX LLC's Answer, March 31, 2022 [Dkt. No. 21] ("Answer") at 2.)

4.     StockX publicly touts the fact that Nike products drive far more sales on its e-commerce platform than any other brand, and StockX advertisements and social media accounts are teeming with images of Nike goods.  StockX is even marketing and selling Nike goods on its secondary market platform *before* Nike releases those goods to the marketplace in the first instance.  *See*  https://stockx.com/new-releases/sneakers.  StockX built its secondary market business by exploiting the immense goodwill and reputation that Nike has amassed through many years as the world's leading designer, developer, marketer, and seller of athletic footwear and apparel.  Now, recognizing firsthand the immense value of Nike's brands, StockX chose to enter the lucrative NFT market, not by taking the time to develop its own intellectual property rights,

but rather by blatantly freeriding, almost exclusively, on the back of Nike's famous trademarks and associated goodwill.

5.      Specifically, without Nike's authorization or approval, StockX is "minting" NFTs that prominently use Nike's trademarks, marketing those NFTs using Nike's goodwill, and selling those NFTs at heavily inflated prices to unsuspecting consumers who believe or are likely to believe that those "investible digital assets" (as StockX calls them) are, in fact, authorized by Nike when they are not.  Unlike its e-commerce business which caters to buyers and sellers of goods originating from various companies, StockX launched its NFT venture almost exclusively with Nike-branded NFTs, yet none of those NFTs originates from Nike.  Examples of StockX's infringing NFTs appear below:



6.      StockX claims that its "100% Authentic" Nike-branded "Vault NFTs" do no more than track ownership of a specific physical Nike product that StockX has purportedly authenticated using its "proprietary, multi-step authentication process" and is safely securing in its "vault." StockX's post hoc rationalization that it is simply selling "claim tickets" with no value apart from the physical shoe is belied by its own statements, as well as the fact that those purported "claim tickets" have sold for thousands of dollars above the price of the physical shoe that said ticket supposedly claims.  Those statements—some of which StockX has modified or removed from its platform since this action was filed—reflect the fact that StockX's Nike-branded Vault NFTs, whose purchasers can trade or collect and admire in their "NFT Portfolios," are, in fact, new virtual

products that StockX has bundled with additional StockX services (e.g., "Vault Services") and unspecified benefits (e.g., "exclusive access to StockX releases, promotions, events"). Nike does not sell StockX's services or exclusive access to such benefits. Yet StockX's new virtual products have been created, marketed, offered for sale, and sold by StockX using Nike's trademarks without Nike's consent. And, according to StockX, it is "just getting started." *See* https://stockx.com/about/stockx-launches-vault-nfts/.

7.      Just as troubling have been other StockX statements that appear to negate StockX's primary claim that a Vault NFT can be readily traded in for the associated physical shoes stored in a StockX facility. For example, while StockX initially claimed that Vault NFT owners may "redeem" the NFT and take possession of the shoes (for an additional fee), it also sold the infringing Nike-branded NFTs while stating that "the redemption process is not currently available" to NFT owners. StockX also, shockingly, sold the infringing Nike-branded NFTs while retaining the right to ***unilaterally*** redeem a Vault NFT for a so-called "Experiential Component," and take away the NFT, completely depriving the Vault NFT owner of possession of the shoes that are supposedly connected to the NFT. In the short time since Nike initiated this action, StockX has repeatedly revised its statements to consumers, hoping to erase some of the unsavory conduct that Nike's Complaint identified. Those changes have done nothing to resolve Nike's claims. Regardless, upon information and belief, by that point StockX had already offered for sale and sold through its initial inventory of 558 infringing Nike-branded Vault NFTs. StockX continues to earn revenue on secondary trades of those infringing Nike-branded NFTs and, unless halted, StockX will continue minting, marketing, and selling thousands of additional infringing Nike-branded Vault NFTs.

8.      Nike did not approve of or authorize StockX's Nike-branded Vault NFTs.  Those unsanctioned products are likely to confuse consumers, create a false association between those products and Nike, and dilute Nike's famous trademarks.  Indeed, consumers are already questioning whether Nike authorized StockX to sell its infringing NFT products, asking how StockX received "the licensing to sell NFTs with [N]ike branding."  *See* Paragraph 101, *infra*. StockX's misappropriation of Nike's famous trademarks and goodwill to buoy its entry into the lucrative NFT and digital collectible market deprives Nike of its exclusive right to use its marks in connection with this new commercial medium.  In addition, the Vault NFTs' inflated prices and murky terms of purchase and ownership, as discussed further below, have already led to public criticism of StockX and allegations that the Vault NFTs are a scam.  StockX's prominent use of Nike's trademarks in connection with these dubious virtual products has already generated negative associations with Nike in a way that harms Nike's reputation and the immense goodwill that Nike has amassed in its brands.  Consumers have even attributed StockX's conduct to Nike, with one consumer expressing that the Vault NFTs are "just a stupid scam for ***Nike*** to make money."  *See* Paragraph 103, *infra* (emphasis added).

9.      Despite StockX's prominent use of Nike's trademarks in connection with the Vault NFTs, Nike has no control over the quality of the Vault NFTs whatsoever.  Nike has no say in how many Vault NFTs bearing its trademarks are released, where the Vault NFTs are released and traded, when the Vault NFTs are released, how the Vault NFTs are released, traded, or redeemed, and at what price the Vault NFTs are sold.

10.     Nike's widely publicized December 13, 2021 acquisition of RTFKT, a digital art and collectible creative studio, and Nike and RTFKT's very recent launch of the highly anticipated and revolutionary MNLTH and CryptoKicks™ NFTs, demonstrate Nike's recent investment in

NFT technology and services and its sophistication in the NFT space.  Prior to these recent developments, however, Nike has been using its famous trademarks in connection with virtual goods and digital applications for years.  Given Nike's longstanding use in this space, StockX's unauthorized and unapproved branding of Vault NFTs with Nike trademarks is all the more likely to confuse consumers, create a false association between the parties, jeopardize the capacity of Nike's famous marks to identify its own digital goods in the metaverse and beyond, and harm Nike's reputation through an association with inferior digital products.

11.    As noted, StockX has justified its minting and sale of Nike NFTs by claiming that the NFTs are associated with vaulted Nike shoes StockX has "authenticated" using a "proprietary, multi-step authentication process" to ensure "that the products offered for sale are what they claim to be, and are not counterfeit, defective, or used."  (Answer at 2.)  StockX's defense to Nike's Complaint has thus brought to the forefront its "100% Verified Authentic" claim, "proprietary, multi-step authentication process," and claim that "StockX's customers can trust that transactions made through StockX are safe."  (*Id.*)  To be sure, given the inflated prices of these so-called "claim tickets," consumers should be able to trust to a certainty that the vaulted Nike shoes purportedly associated with the Nike-branded NFTs are not counterfeit.

12.    Notwithstanding StockX's repeated guarantees that every item sold through its platform is "100% Verified Authentic," since December 2021 and continuing through the filing of this action, Nike has obtained from StockX four pairs of purportedly "authenticated" Nike-branded shoes that *Nike* has verified are, in fact, counterfeit.  Those four pairs of counterfeit shoes were all purchased within a short two-month period on StockX's platform, all had affixed to them StockX's "Verified Authentic" hangtag, and all came with a paper receipt from StockX in the shoe box stating that the condition of the shoes is "100% Authentic."  StockX's refusal to accept returns of

purportedly "100% Verified Authentic" products purchased through its platform make it all the more important for consumers to be able to absolutely trust that the Nike shoes purchased through StockX are not counterfeit.

13.    Nike has no visibility into the StockX "vault" and whether any Nike shoes contained therein are counterfeit.  However, at least one of the four counterfeit pairs of Nike shoes that Nike obtained from StockX is, in fact, a counterfeit pair of Air Jordan 1 Retro High OG in the Black/Varsity Red-White colorway.  StockX depicts the same shoe on one of the eight Nike-branded NFTs for sale on StockX's platform, which is also currently StockX's top-selling NFT by total volume sold:



Counterfeit Nike Goods Sold By StockX



Infringing Nike-Branded NFT Sold By StockX

14.    Given StockX's statements that its "vaulted" shoes are sourced from its marketplace and undergo the same "proprietary multi-step authentication process" as the shoes Nike recently discovered were counterfeit, Nike is all the more concerned that StockX has linked the infringing Nike-branded NFTs to counterfeit goods and sold those "claim tickets" to fake shoes at heavily-inflated prices to consumers who had no opportunity to inspect the shoes before reselling the NFT to another unsuspecting consumer.

15.     For these reasons, Nike supplements and amends its Complaint to include additional causes of action for counterfeiting and false advertising, and requests that the Court swiftly and permanently stop StockX from continuing to sell Vault NFTs bearing Nike's famous marks, selling counterfeit Nike goods, and making false and/or misleading claims regarding the purported authenticity of those goods.

## THE PARTIES

16.     Nike is a corporation organized under the laws of the State of Oregon with a principal place of business at One Bowerman Drive, Beaverton, Oregon 97005.

17.     On information and belief, StockX LLC is organized as a Michigan LLC with its principal place of business located at 1046 Woodward Avenue, Detroit, Michigan 48226.  StockX LLC is an online marketplace and reseller of sneakers, streetwear, electronics, luxury handbags, and other collectibles.  StockX maintains various offices and/or facilities located in New York, California, and Oregon, including a store and drop-off facility located at 237 Lafayette Street, New York, New York 10012.

18.     On information and belief, StockX is the owner and operator of https://stockx.com (the "StockX Website") and StockX mobile application (the "StockX App"), where StockX conducts, *inter alia*, its online commercial activities.

## JURISDICTION AND VENUE

19.     This action arises under the trademark, anti-dilution, counterfeiting, and false advertising laws of the United States, 15 U.S.C. § 1051, *et seq.*, and under statutory and common law unfair competition.  This Court has subject matter jurisdiction at least under 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 and 1338 because this action arises under federal trademark law.  This Court has supplemental jurisdiction over the remaining claims pursuant to 28 U.S.C. § 1367.

20.     This Court has personal jurisdiction over StockX because StockX has committed, and continues to commit, acts of infringement, dilution, counterfeiting, and false advertising in this District, has conducted, and continues to conduct, business in this District through the StockX Website, StockX App, and a physical store, offices and/or facilities located in this District, and/or has engaged in continuous and systematic activities in this District.

21.     Personal jurisdiction is proper pursuant to N.Y. C.P.L.R. § 302(a) because StockX regularly conducts, solicits, or transacts business in New York and in this District.  StockX created the StockX Website and StockX App, which are accessible to consumers in New York, and direct false and/or misleading claims, counterfeit Nike goods, and the unauthorized and infringing uses of Nike's trademarks into New York and this District.  StockX targets New York consumers by operating the StockX Website and StockX App, by operating a physical store and offices and/or facilities in New York, by employing employees in New York, and by advertising, selling, and offering for sale StockX Vault NFTs through the StockX Website, StockX App, and related social media accounts.  Moreover, StockX is actively recruiting employees for several open positions located in New York, New York, including a Director, Real Estate, a Sr. Engineering Manager – NFT and Checkout, a Senior Manager, NFT Partnerships, and a Technical Lead – Notifications.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because StockX conducts and continues to conduct a substantial and significant amount of business in this District, a substantial part of the events giving rise to these claims arose in this District, and customer confusion is likely to occur in this District.  Moreover, on information and belief, the locus of StockX's Vault NFT and Web3 initiative appears to be in this District.  For example, StockX's Director, Innovation along with the lead software engineer responsible for developing and launching StockX's NFT offering are, on information and belief, located in New York.  Moreover,

StockX's January 18, 2021 announcement of its Vault NFT offering was issued by its Editorial Director based in New York City.  *See* https://stockx.com/news/introducing-nfts-on-stockx/. StockX is also actively recruiting in this District for employees to join its NFT and Web3 program. As just one example, this year through the filing of this action StockX had postings for the following senior positions located in New York: Sr. Engineering Manager – NFT and Checkout; and Senior Manager, NFT Partnerships.

## FACTUAL BACKGROUND

### NFTs and Blockchain

23.     While blockchains have myriad actual and potential uses, a primary use is to serve as an ecosystem and ledger for blockchain-based assets, like cryptocurrencies (such as Bitcoin (BTC) and Ether (ETH)) and NFTs.  Much like banks track ownership of money in bank accounts and process transfers from one account to another, storing the information privately, blockchain technology enables the transfer of ownership of cryptocurrencies and NFTs between accounts, storing the information of the transfer of ownership in blocks of data visible for all to see.  A distinguishing and touted feature of blockchains is decentralization.  Unlike bank or other asset ledgers, which are typically maintained by one or more larger entities, blockchains can be maintained by innumerable individuals and entities, acting relatively independently but participating in a coordinated ecosystem.  Today there exist many blockchains, the largest of which supports the Bitcoin cryptocurrency, while the second largest of which, Ethereum, supports a much broader set of assets, including both the Ether cryptocurrency and NFTs that are stored and traded on the Ethereum blockchain network.

24.     Many blockchain-based assets, like cryptocurrencies, are "fungible."  Like money in a bank account, each individual coin (or "token") is not distinguishable from others and is divisible.  For this reason, cryptocurrencies may function as a medium of exchange.

25.     By contrast, certain tokens, referred to as "non-fungible tokens" or "NFTs," are both indivisible and uniquely identifiable.  Their movement can be tracked from one blockchain address to another via smart contracts.  This feature makes it possible to use NFTs to track ownership or licensed rights over assets, similar to a certificate of ownership or real estate title.

26.     NFTs have been widely used to track ownership over rights (often a limited license for personal use) to a new type of digital collectible, which may be a digital photograph, video, artwork, sound recording, avatar, digital clothing, footwear and other products, or other type of media.  These NFT collectibles can be bought, sold, resold, and generally traded on various platforms.

27.     While such NFT collectibles have existed for years, beginning in early 2021 interest exploded.  Many prominent apparel and consumer goods brands have successfully launched and sold NFT collections, incorporating their trademarks, trade dress, and other intellectual property into artwork associated with each NFT.  These NFTs have taken many different forms but have always closely connected the trademark owner with the digital asset.  As further discussed below, Nike is one such market entrant.

**Nike's Business and Valuable Trademark Rights**

28.     Nike's principal business activity is the design, development, and worldwide marketing and selling of athletic footwear, apparel, equipment, accessories, and services.

29.     As a result of decades of Nike's advertising, promotional, and marketing efforts, Nike has established itself as a multibillion-dollar brand and the world's leading designer,

marketer, and distributor of athletic footwear and apparel products which are sold in connection with Nike's famous trademarks.  In addition to spending significant amounts in support of advertising and promotion of its products and services, Nike conducts successful marketing campaigns across various social media platforms, including Facebook, Twitter, YouTube, Instagram, TikTok, and Snapchat, to further promote Nike's products, services, brands, and trademarks.

30.     Nike and its brands have achieved widespread recognition and fame throughout the United States and the world.  Among the purchasing public, Nike's products and services are instantly recognizable and are seen as high-quality, innovative, and dependable.

31.     Nike is the owner of the right, title, and interest in and to, *inter alia*, the following trademarks registered on the Principal Register of the United States Patent and Trademark Office (collectively, the "Asserted Marks"):

| Reg. No. | Title | Trademark Design | Reg. Date | Classes |
|---|---|---|---|---|
| 1,370,283 | AIR JORDAN | AIR JORDAN (word mark) | 11/12/1985 | 25- Clothing, footwear |
| 3,725,535 | Air Jordan & Wings Design*[1] |  | 12/15/2009 | 25- Clothing, footwear, headgear |
| 3,780,236 | DUNK | DUNK (word mark) | 4/27/2010 | 25- Footwear |
| 3,627,820 | JUMPMAN | JUMPMAN (word mark) | 9/11/2007 | 25- Clothing, footwear, headgear |
| 1,558,100 | JumpMan Design |  | 9/26/1989 | 25- Clothing, Footwear |

[1] * indicates unofficial, descriptive title.

| 1,742,019 | JumpMan Design |  | 12/22/1992 | 25- Clothing, footwear, headgear<br><br>18- Leather and imitations of leather |
|-----------|---------------|---------------------|------------|-----------------------------|
| 978,952 | NIKE | NIKE<br>(word mark) | 2/19/1974 | 25- Clothing, footwear, headgear |
| 1,214,930 | NIKE | NIKE<br>(word mark) | 11/2/1982 | 25- Footwear |
| 1,243,248 | NIKE | NIKE<br>(word mark) | 6/21/1983 | 42- Retail footwear and apparel services |
| 6,124,779 | NIKE | NIKE<br>(word mark) | 8/11/2020 | 35- Retail store services and on-line retail store services |
| 1,238,853 | NIKE & Swoosh Design* |  | 5/17/1983 | 42- Retail footwear and apparel services |
| 1,325,938 | NIKE & Swoosh Design* |  | 3/19/1985 | 25- Footwear |
| 5,286,596 | NIKE AIR VAPORMAX | NIKE AIR VAPORMAX<br>(word mark) | 9/12/2017 | 25- Footwear |
| 977,190 | Swoosh Design |  | 1/22/1974 | 25- Footwear |
| 1,264,529 | Swoosh Design |  | 1/17/1984 | 42- Retail footwear and apparel services |
| 1,323,343 | Swoosh Design |  | 3/5/1985 | 25- Footwear |

| 5,794,674 | Swoosh Design |  | 7/2/2019 | 35- Retail store services and on-line retail store services |
|---|---|---|---|---|

32.     The above U.S. registrations for Nike's Asserted Marks are valid, subsisting, unrevoked, uncancelled, and in full force and effect.

33.     Pursuant to 15 U.S.C. § 1065, of Nike's Asserted Marks, the following federally registered Nike trademarks are incontestable and constitute *prima facie* evidence their validity, Nike's ownership, and Nike's exclusive right to use these marks:

    a.     Reg. No. 1,370,283 (AIR JORDAN word mark)

    b.     Reg. No. 3,725,535 (Air Jordan & Wings Design mark);

    c.     Reg. No. 3,780,236 (DUNK word mark);

    d.     Reg. No. 3,627,820 (JUMPMAN word mark);

    e.     Reg. No. 1,558,100 (JumpMan Design mark);

    f.     Reg. No. 978,952 (NIKE word mark);

    g.     Reg. No. 1,214,930 (NIKE word mark);

    h.     Reg. No. 1,243,248 (NIKE word mark);

    i.     Reg. No. 977,190 (Swoosh Design mark);

    j.     Reg. No. 1,264,529 (Swoosh Design mark);

    k.     Reg. No. 1,323,343 (Swoosh Design mark);

    l.     Reg. No. 1,238,853 (Swoosh Design mark); and

    m.     Reg. No. 1,325,938 (Swoosh Design mark).

34.     Nike also owns extensive common law rights in the Asserted Marks for use in connection with Nike's goods and services.  Nike uses the Asserted Marks on or in connection with many of its products and services.

35.     Nike's Asserted Marks identify, in the United States and throughout the world, high-quality products and services designed, produced, and offered by Nike.

36.     Nike intends to continue to preserve and maintain its rights in the Asserted Marks. Nike has continuously used the Asserted Marks in interstate commerce in connection with the sale, distribution, promotion, and advertising of genuine Nike goods and services since their respective dates of first use as noted on the federal trademark registration certificates.  And, as discussed further below, Nike has also used the Asserted Marks in connection with virtual products and intends to further expand such use as reflected in its pending trademark applications.

37.     As a result of continuous and long-standing promotion, substantial sales, and consumer recognition, Nike has developed powerful trademarks rights, built substantial goodwill in the Asserted Marks, and has never abandoned that goodwill.  As a result, Nike's Asserted Marks have become distinctive and "famous" within the meaning of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

38.     Having distinctive trademarks that are readily identifiable is an important factor in creating and maintaining a market for Nike's products, in identifying Nike and its brands, and in distinguishing Nike's products from the products of others.

39.     Nike maintains strict quality control standards for products bearing the Asserted Marks.  Genuine Nike products bearing the Asserted Marks are inspected and approved by Nike prior to distribution and sale.

40.     Nike also maintains strict control over the use of the Asserted Marks in connection with its products so that the company can maintain control over its reputation and goodwill.  Nike, for example, carefully determines how many products bearing the Asserted Marks are released, and when, where, and how those products are sold.

**Nike's Activities in the Virtual Products Market**

41.     Nike has used the Asserted Marks in connection with a variety of physical goods and associated services for decades.  Nike has also for some time incorporated the Asserted Marks into its virtual products.   For example, in October 2019, Nike, through its SNKRS mobile application, partnered with 2K Sports, makers of the NBA 2K basketball videogame franchise, to offer "Gamer Exclusives," limited edition digital and physical Nike sneakers that NBA 2K20 players can unlock through gameplay.  *See* https://news.nike.com/news/nba-2k20-x-nike-gamer-exclusives.

42.     On October 27 and 28, 2021, Nike filed applications to register the following trademarks with the United States Patent and Trademark Office for use in connection with, *inter alia*, "[d]ownloadable virtual goods, namely computer programs featuring footwear," (*i.e.*, digital sneaker NFTs) and "[r]etail store services featuring virtual goods, namely footwear" (*i.e.*, a digital sneaker NFT trading platform):

      a.     NIKE (word mark) (Serial No. 97095855);

      b.     JORDAN (word mark) (Serial No. 97096950);



      c.     (Serial No. 97096952);



      d.     (Serial No. 97096945);



      e.     (Serial No. 97095944); and



f.                              (Serial No. 97096366).

43.     On December 13, 2021, Nike announced that it had acquired RTFKT, a leading digital art and collectible creative studio that has created some of the most popular apparel-related digital artwork NFT releases to date, including the CYBERSNEAKER, METAJACKET, and FEWO Shoes, collectible digital sneakers designed in collaboration with teenage pop artist FEWOCiOUS. *See* https://news.nike.com/news/nike-acquires-rtfkt.

44.     On or around January 18, 2022, Nike announced to its employees the formation of Nike Virtual Studios, a new division that will operate as an independent studio to further develop Nike's business around virtual products and partner with its core business to deliver best-in-class Web3, metaverse, and blockchain-based experiences.

45.      On February 7, 2022, Nike and RTFKT released the MNLTH NFT collection by "airdropping" each NFT directly to the then-current owners of RTFKT's Clone X and PodX NFTs. The MNLTH NFT is depicted below:



46.     On April 22, 2022, Nike and RTFKT released the Nike Dunk Genesis CryptoKicks™ NFTs, along with the Evo Skin Vial NFTs, which allow owners of the Nike Dunk

Genesis NFTs to customize the colorway of the digital shoes.  Examples of the Nike Dunk Genesis CryptoKicks™ and Evo Skin Vial NFTs are depicted below:



47.     The Nike initiatives discussed above have been highly publicized, and the recent release of the successful RTFKT x Nike Dunk Genesis CryptoKicks™ NFTs reflects Nike's deep understanding of the NFT market.  Upon information and belief, StockX has known about Nike's plans to expand into the NFT market long prior to its January 2022 "Vault NFT" launch.

**StockX's Resale Platform**

48.     StockX, like eBay, operates an online marketplace for the resale of sneakers, streetwear, electronics, luxury handbags, and other collectibles accessible to consumers on the StockX Website and StockX App.  Upon information and belief, StockX does not sell goods directly to consumers; rather, StockX's users buy and sell goods from each other on StockX's platform.  StockX is not an authorized distributor of Nike goods.

49.     Unlike the eBay model, however, StockX is an active intermediary for each transaction—the seller ships the item to StockX, StockX receives and purportedly verifies the item's authenticity, StockX then ships the item to the buyer with a StockX-branded verification badge, and StockX pays the seller (less its transaction fees).  *See* https://stockx.com/about/how-it-works/.

50.     In fact, as StockX alleged in its Answer to Nike's Complaint:

StockX uses a proprietary, multi-step authentication process for every product sold on its platform. This process ensures that items traded on StockX conform to the product descriptions and condition standards advertised by StockX, and that the products offered for sale are what they claim to be, and are not counterfeit, defective, or used—meaning StockX's customers can trust that transactions made through StockX are safe. StockX has authenticated tens of millions of products since its formation, combining its authentication team's expert knowledge with AI-enhanced technology to allow global customers to trade with confidence.

(Answer at 2.)

51.     StockX falsely and/or misleadingly claims on the StockX Website that every item StockX sells on its e-commerce platform—including those items purportedly associated with the Vault NFTs—has been independently verified by StockX as "100% Verified Authentic." Specifically, StockX states that "Every item sold goes through our proprietary multi-step verification process with our team of expert authenticators." https://stockx.com/about/how-it-works/. According to StockX, its rigorous, multi-step verification procedure uses "100+ data points," and that its "authenticators are better equipped than anyone to ensure a product's authenticity." https://stockx.com/about/authentication/. StockX misleadingly claims that this "multi-step verification process" authenticating products is somehow "proprietary," despite the fact that StockX is not the entity that designed, created, manufactured, packaged, or shipped in the first instance any genuine Nike goods, and despite the fact that much of the process itself is openly displayed in a video found on StockX's website. StockX prominently advertises this guarantee of "100% Verified Authentic" and the value its authentication services provide consumers throughout the StockX Website, as exemplified below:

# Guaranteed Authenticity.

Every item. Every time. Shop on StockX with complete confidence knowing every purchase is 100% Verified Authentic.

How does verification help me as a Buyer or a Seller?
4/8/2022

Part of the value when you buy or sell on StockX is our verification process performed at our Authentication Centers. StockX maintains rigorous internal guidelines to ensure that everything on the site meets our standards. This commitment to quality is one of the reasons you can feel empowered buying and selling on StockX, knowing that your item is in good hands.

**For Buyers**, the verification process means you can expect your item to arrive in perfect condition and know that it's been independently inspected for variations and more before it's sent to you.

**For Sellers**, the verification process marks the end of your transaction with the Buyer, getting you paid and leaving the customer service aspects of the transaction to us so you can get back to selling! When you sell on StockX, the verification process allows you to focus on the reason why you're there in the first place, while we take care of the logistics.

52.     On the StockX Website, StockX also advertises that it utilizes "Advanced Technology" and "Quality Assurance" with respect to its authentication services and claims that it employs quality assurance "experts" to ensure that only authentic goods are sold on its platform:



53.     StockX also claims that it has "compiled data from every fake product in the history of StockX to build a comprehensive database of fake techniques around the world."   It also

advertises an authentication accuracy rate of "99.95%" but does not explain how this number is substantiated.

54.     The confirmed purchase of counterfeit Nike goods on StockX's platform—including the same style purportedly associated with at least one of the infringing Nike-branded Vault NFTs—confirms that StockX's claims about its "proprietary multi-step verification process," "100% Verified Authentic," and authentication accuracy rate of "99.95%" are false and/or misleading.

55.     According to StockX's most recent annual report, Nike's brands and shoes dominate StockX's marketplace.  For example, three of Nike's brands—JORDAN, NIKE, and CONVERSE—were the among the top five trading footwear brands by volume on StockX's marketplace in 2021:



**StockX's Vault NFTs**

56.     On January 18, 2022, StockX's New York-based Editorial Director announced the launch of StockX Vault NFTs, a collection of NFTs that StockX's users purchase directly from StockX through the StockX Website and StockX App.  *See* https://stockx.com/news/introducing-nfts-on-stockx/.  StockX claims the Vault NFTs are associated with a unique physical product held in StockX's custody until the NFT owner "redeems" the NFT in exchange for the associated physical product or some other benefit.

57.     Unlike the physical goods StockX's users may sell through its online resale platform—which are manufactured and/or distributed in the first instance by Nike and other brands or their authorized distributors—StockX's Vault NFTs are virtual products, *i.e.*, digital collectibles, created and first offered for sale by *StockX*, and available direct to consumers for purchase and trade on the StockX Website and StockX App.

58.     StockX markets its Vault NFTs as exciting new product offerings.   StockX advertises to consumers that these "digital assets" can be traded or collected.   StockX markets the thrill of purchasing an NFT, not a "claim ticket" for goods available on its platform.   For example, StockX added a separate "NFT Portfolio" allowing owners of Vault NFTs to collect, track, and display their NFTs.



59.     StockX also modified its platform to allow consumers to shop for "NFTs" as a new product "Category."   The NFT "Category" is separate from the categories of physical goods that have been historically available for resale on StockX's platform.   Consumers can sort the "NFTs" listed in the Category by "Release Date."   Those "release" dates correspond to the dates that StockX first released each NFT, not the date that the original manufacturer first released any purportedly associated physical product.







60.      Upon purchase of a Vault NFT, the StockX Website confirms to the consumer that they have bought an NFT (not a pair of physical shoes) by stating: "Congratulations, you successfully bought StockX Nike Dunk Low Retro White Black (Vault NFT) on StockX.  The NFT has now been added to your StockX Portfolio" and allowing the consumer to "share" the NFT purchase via e-mail or social media:



61.      At the point of purchase StockX also e-mails the Vault NFT consumer confirmation that they have purchased an NFT (not a pair of physical shoes) by exclaiming in large, bold font at the top of the e-mail: "**You Bought an NFT!**"  The e-mail further states to the consumer: "Congratulations!  Your bid has been accepted.  The NFT transfer can take a few minutes.  When the transfer is complete, your NFT will be available in your StockX Portfolio."



62.     Nowhere on the StockX Order Confirmation Webpage or StockX Order Confirmation e-mail does StockX expressly state that the consumer purchased a physical item instead of an NFT.  StockX does not inform the consumer that it bought a "claim ticket" linked to an underlying physical item.  StockX does not state: "Congratulations, you just bought a pair of Nike or Jordan shoes."  Instead, StockX congratulates the consumer on purchasing an NFT because the NFT is the product that the consumer purchased.

63.     StockX has sold Nike-branded Vault NFTs at prices many multiples above the price of the physical Nike shoe.  For example, the 2022 version of the Nike Dunk Low – Retro White Black (*i.e.*, the physical pair of shoes) will retail for $100 from nike.com:



According to StockX's marketplace, as of February 2, 2022, the average sale price for the 2021 version of the shoes is $282:



Yet, as of February 2, 2022, the average price of the Vault NFT purportedly linked to these shoes is **$809,** with the highest trade being **$3500**:



64.    Another example is the sacai x KAWS Blazer Low Neptune Blue size 10 M which

retails for $140 from nike.com:



According to StockX's marketplace, as of February 2, 2022, the average sale price for the shoes is $205:



As of February 2, 2022, the average price, however, of the Vault NFT purportedly linked to these shoes is **$590**, with the highest trade being **$3995**:



65.     These significant price discrepancies continue, and as of the current date certain Nike-branded Vault NFTs are still selling for thousands of dollars above the price of the physical shoe.

66.     As of the date Nike filed this action, StockX stated that the Vault NFTs are minted on the Ethereum blockchain, "offering owners the opportunity to invest in current culture, with cross-platform liquidity on the horizon."  *See* https://stockx.com/lp/nfts/.  As of the date Nike filed this action, StockX also stated that Vault NFT owners may be granted exclusive access to StockX benefits, promotions, experiences, and rewards.  *Id*.

67.     As of the date Nike filed this action, StockX further stated that NFT owners may redeem the token to have the shoes delivered at any time.  But, as shown below, StockX also simultaneously stated that the "redemption process is not currently available," but may be sometime in the "near future."



Upon redemption, StockX states that it will remove the shoes from the vault, charge "a $35 withdrawal fee, a $14 shipping fee, and any applicable sales tax" on top of the price the owner paid for the Vault NFT, and ship them to the owner.  *See* https://stockx.com/help/articles/What-fees-are-associated-with-Vault-NFTs.  StockX will then remove the Vault NFT from circulation

by deleting it from the owner's portfolio (*i.e.*, StockX will "burn" the Vault NFT).  *See, e.g.*, https://stockx.com/retro-black-and-white-dunk-vault-nft.

68.     StockX's Terms and Conditions, as of the date Nike filed this action, included sections titled "Vault Terms" and "NFT Terms" (collectively, the "Vault NFT Terms") which govern the Vault NFT offerings.  *See* https://stockx.com/terms.

69.     According to the Vault NFT Terms in place as of the date Nike filed this action, when a consumer purchases a Vault NFT, the consumer gains title to both the purchased Vault NFT (*i.e.*, the digital collectible) and the Stored Item (*i.e.*, the physical goods) to which the NFT corresponds, and the consumer automatically makes use of StockX's Vault Services (*i.e.*, storage of the physical goods in StockX's facility).  *Id*.

70.     As of the date Nike filed this action, the Vault NFT Terms also stated that (i) a Vault NFT (*i.e.*, the digital collectible) has no value beyond that of the associated Stored Item (*i.e.*, the physical goods), and (ii) the Vault Services are currently provided by StockX at no additional cost; however, a Vault NFT owner may be required to pay additional fees if they elect to have a Stored Item shipped to them or if they use the Vault Services past January 31, 2023.  *Id.*

71.     Notably, under the Vault NFT Terms in place from launch through at least the date Nike filed this action, StockX also retained the right to *unilaterally* redeem a Vault NFT for a so-called "Experiential Component," and cancel or take away the NFT, *i.e.*, the Vault NFT owner never receives the physical version of the shoes or loses the opportunity to do so.  Specifically, the Vault NFT Terms stated, "Note that in some cases, per the applicable Additional NFT Terms, StockX may automatically redeem your NFT for an Experiential Component,[2] at its sole discretion,

---

[2] As of the date Nike filed this action, the phrase "Experiential Component" was explained and defined under the Vault NFT Terms as follows: "NFTs may take a variety of forms, and the holders of NFTs may be entitled to obtain certain products, benefits or engage in certain experiences, such

in which case StockX may remove the NFT from your portfolio and you will cease to own the NFT." *See* https://stockx.com/terms:

> iii. **NFT License**. Subject to your complete and ongoing compliance with these NFT Terms and the StockX Terms and Conditions of Use, StockX grants you a limited, non-exclusive, non-transferable (except in connection with a Secondary Sale), non-sublicensable, revocable license to (a) resell, solely on the Services, any NFT you purchase, (b) hold the NFT until it may be used or redeemed for its intended purpose, as decided by StockX in its sole discretion, and (c) use any intellectual property (or related intellectual property rights) included in the NFT ("**NFT IP**") solely as expressly permitted by the NFT Terms. For clarity, except for the foregoing license, neither your purchase of an NFT nor these NFT Terms grant you any other license or rights to any NFT or NFT IP. Note that in some cases, per the applicable Additional NFT Terms, StockX may automatically redeem your NFT for an Experiential Component, at its sole discretion, in which case StockX may remove the NFT from your portfolio and you will cease to own the NFT.

72.     Upon information and belief, the provision in Paragraph 70 stating that the Vault NFT has no value apart from the physical shoes directly conflicted with the terms described in Paragraph 71 above: because StockX retained the right to redeem the Vault NFT for an Experiential Component, the Vault NFT does, in fact, have value apart from the physical shoes. The provision likewise directly conflicted with StockX's other previous statement that the Vault NFT includes additional benefits beyond the physical shoes, such as "exclusive access to StockX releases, promotions, events, as a result of ownership."

> Every NFT is minted on the blockchain, offering owners the opportunity to invest in current culture, with cross-platform liquidity on the horizon. Owners may also receive exclusive access to StockX releases, promotions, events, as a result of ownership.

73.     Since Nike filed this action and, upon information and belief, after StockX already sold off and provided a platform for the resale of all the infringing Nike-branded NFTs, StockX repeatedly revised these terms and statements.  For example, from January 18, 2022 through at least April 25, 2022, StockX included the following statements on its NFT landing page, currently

---

as unlocking a prize or entry into an exclusive sale ("Experiential Component"), as determined by StockX in its sole discretion, subject to any additional terms provided by StockX with or in connection with the purchase of such NFT ("Additional NFT Terms")."  *See* https://stockx.com/terms.

located at https://stockx.com/lp/nfts/, which Nike pointed out to the Court in a statement filed on

March 31, 2022 [Dkt. No. 23]:



At some point on or around April 25, 2022, StockX removed this language, replacing it with

statements that attempt to align with its defensive theme:



74.     None of StockX's trivial, post-hoc changes have resolved its ongoing infringement and dilution of Nike's trademarks, and what StockX has opted *not* to change speaks volumes: to date, StockX has not removed or in any way modified the prominent use and display of Nike's marks from the infringing Nike-branded Vault NFTs.

75.     As of February 2, 2022, StockX's Vault NFT collection comprised nine NFTs, as shown below.  Eight of the nine prominently display Nike's marks and are associated with Nike products.  Upon information and belief, StockX almost exclusively used Nike's marks to launch its Vault NFTs because it knew that doing so would garner attention, drive sales, and confuse consumers into believing that Nike collaborated with StockX on the Vault NFTs.



76.     To date, upon information and belief, StockX has sold 558 individual Nike-branded Vault NFTs.  Some of the infringing Nike-branded Vault NFTs are editions of 1, others are editions of 100, and some are as many as editions of 250.  Upon information and belief, StockX has also minted—but not yet sold—at least another 2,000 infringing Nike-branded Vault NFTs purportedly linked to Nike's Air Jordan 11 Retro Cool Grey shoes.  Given that StockX is not an authorized Nike retailer, to the extent all corresponding physical Nike shoes exist at StockX's "vault" facility, it is not clear where or how StockX acquired that many pairs of "100% Authentic" Nike shoes.

77.    On the StockX product pages for its Vault NFTs, as shown below as of the date Nike filed its action, StockX prominently displayed Nike's word marks in large, bold text at the top of the page, and couples Nike's marks with its own "Vault NFT" designation in parentheticals in the same large, bold text.



78.    StockX also touted each Vault NFT as "100% Authentic," which, upon information and belief, is intended to explicitly mislead consumers that Nike has authorized, approved, sponsored, and/or endorsed StockX's Vault NFTs.



79.     Further down the StockX product page for each Vault NFT as of the date Nike filed this action, StockX provided "Product Details," which included a "Product Description," that also uses Nike's marks.  For example, StockX's description for the Nike Dunk Low Retro White Black (Vault NFT) opens with: "One of the most popular Nike Dunks of 2021 is now a part of StockX's Vault NFT experience."



If a consumer clicks on the "Read More" button, additional text appears, including "The Fine Print," which states: "If the physical item associated with this Vault NFT is redeemed by the owner, it is removed from the StockX Vault and shipped to the owner.  StockX will then remove the Vault

NFT from the owner's Portfolio and from circulation (*i.e.*, 'burn' the Vault NFT)."



80.     As shown above, each of the eight Nike-branded Vault NFT's is comprised of Nike marks, including the only prominent eye-catching feature, a vivid image of a bespoke Nike shoe. To the extent that the Vault NFT is merely supposed to function as a "digital receipt" for a physical Nike shoe, there is no legitimate reason for StockX to prominently feature Nike's trademarks on the Vault NFT and the StockX product page.  Indeed, when a consumer purchases Nike shoes from the StockX marketplace, the consumer receives a paper receipt from StockX in the package. Unlike a Vault NFT, upon information and belief, this paper receipt prominently uses StockX's *own* mark and only uses the Nike name in connection with the purchased shoe, yet somehow still manages to function as a receipt for that Nike shoe:



81.     In addition to the vivid image of the Nike shoe each Vault NFT purports to represent, the StockX product page for each Vault NFT, as of the date Nike filed this action, also displayed a second image, the "back" of the Vault NFT, as shown below:



82.     As of February 3, 2022, StockX stated, in large font, "How It Works," with four bolded bullet points explaining, in simple terms, what users can do with a Vault NFT. Below the

four bullet points, in comically and intentionally small, difficult-to-read font, StockX also stated:
"The purpose of the NFT is solely to track the ownership of and transactions in connection with
the associated product.  The NFT does not independently authenticate the associated product, nor
is it affiliated or associated with, sponsored by, or officially connected to Nike or any of its
subsidiaries or affiliates.  For more information on official Nike products, please visit Nike.com."
Putting aside the ineffectiveness of this tiny disclaimer and the additional small print disclaimers
added since this action was filed the "does not independently authenticate" language appears to
conflict with the "100% Authentic" on the product page.

83.     Upon information and belief, recognizing the tremendous value of the Nike brand
to consumers, StockX is also using Nike's trademarks and images of Nike's products to promote
its Vault NFTs on the StockX Website, StockX App, and on StockX's social media accounts.  For
example, as of the date Nike filed this action, StockX promoted its Vault NFTs on its website with
the following images incorporating Nike's products and trademarks:





84.     StockX was also using Nike's trademarks and images of Nike's products on paid Google Ads to promote its Vault NFTs:



85.     As of the present date, StockX's Twitter account displayed a banner image depicting two Nike shoes, which appears to be the same image used by StockX to promote the Vault NFTs on its website, as shown above:



86.     On January 18, 2022, to promote the launch of its Vault NFTs, StockX posted to its Instagram account a series of images depicting Nike's trademarks and products, including the two shown below:

 

87.     The full caption of the above Instagram post states: "NFTs are on StockX. Introducing #StockXVault: a digital NFT that's backed by a physical product and stored in a StockX facility.  This is just the beginning of our web3 future.  Available for trading now. Links to purchase in Product Tags and Stories.  Welcome to the future of culture. Learn more at the link in bio."

88.     On January 26, 2022, StockX again promoted its Vault NFTs by posting to its Instagram account a pair of images depicting Nike's trademarks and product, including the one shown below:



89.     The full caption of the above Instagram post states: "A new #StockXVault arrival: The Jordan 1 High Patent Bred.  Limited to 250 editions, each size 10, and available for trading immediately.  Links to purchase in the Product Tags and Stories.  Tap fast to add to your portfolio."

90.     Also on January 26, 2022, StockX tweeted a promotional video for the Jordan 1 Retro High OG Patent Bred Vault NFT:



91.     As shown above, as of the date Nike filed this action, StockX was using Nike's trademarks to market, promote, and attract potential purchasers to its Vault NFTs.  StockX's use of Nike's marks is, upon information and belief, intentionally deceiving consumers into believing that Nike sponsors or approves of the Vault NFTs.

92.     StockX's Vault NFTs are not Nike products.  There is no collaboration between Nike and StockX, Nike did not provide a license to StockX to use its trademarks in connection with the Vault NFTs, Nike did not create or inspect the Vault NFTs or authorize the confusing and misleading Vault NFT Terms, and Nike did not authorize StockX to make, promote, advertise, market, or sell the Vault NFTs.

93.     While StockX represents that the Vault NFTs are "backed by" and confer title to genuine Nike products, StockX has marketed them as bundled with additional digital goods, services, and unspecified benefits in such a manner that the Vault NFTs constitute new,

unauthorized products created, marketed, offered for sale, and sold by StockX, exclusively on the StockX Website and StockX App.

94.     Despite StockX's prominent use of Nike's trademarks and products in connection with the Vault NFTs, Nike has no control over the quality of the Vault NFTs whatsoever.  Nike has no say in how many Vault NFTs bearing its trademarks are released, where the Vault NFTs are released and traded, when the Vault NFTs are released, how the Vault NFTs are released, traded, or redeemed, and at what price the Vault NFTs are sold and traded.

95.     As noted in Paragraphs 63-65 above, the Vault NFTs are presently trading for inflated prices that are multiples higher than both the original retail price of the shoes and the current resale price on the secondary market.

96.     The Vault NFTs' inflated prices and murky terms of purchase and ownership have already led to public criticism of StockX and allegations that the Vault NFTs are a scam.  For example, on January 19, 2022, Input Magazine published an article on its website entitled "StockX's 'sneaker' NFTs are kind of a scam hidden in plain sight."  The article's author, Ian Servantes, highlights the Vault NFT Terms that suggest the benefits of Vault NFT ownership may be entirely illusory:

> Owner's [sic] of StockX's limited series of sneaker NFTs will be given exclusive access to the company's releases, promotions, and events, according to the announcement page. But if you dig further into the term's [sic] of service, as Sole Retriever did, you'll find that StockX has been given license to redeem your NFT for an 'experiential component' and even take away your ownership of the NFT as a result of the transaction.
>
> The initial offering for StockX's NFTs have already sold out, so let's say you decide to engage in a secondary purchase for an NFT. You purchase, say, the NFT for the Nike x Ben & Jerry's "Chunky Dunky," which has an ask of $100,000 and a highest bid of $3,000. Now that it's yours you don't get the actual sneaker, and at some

point StockX can come in say, Here's access to an early sale or a discount, and by the way, that NFT is no longer yours.

Even in a field as fishy NFTs, StockX's proposition smells like one of the most obvious grifts you're likely to see. In a bid to stand out as different as NFTs, StockX has instead made tokens that make it even more clear that you're the mark.

*See*   https://www.inputmag.com/style/stockx-vault-nfts-sneakers-shoes-nike-off-white-dunk-adidas-bad-bunny.

97.     The above impression of StockX's Vault NFTs demonstrates that they have been received by potential purchasers with suspicion and doubts about the integrity and trustworthiness of StockX's NFT business model.  This example also shows that StockX's prominent use of Nike's trademarks and products in connection with the Vault NFTs has already generated negative associations with Nike's trademarks and products that harm Nike's business reputation and the goodwill associated with its trademarks, in which Nike has invested immense resources to develop over the past five decades.

98.     Upon information and belief, StockX has attempted to capitalize on Nike's valuable reputation and goodwill by using Nike's Asserted Marks and/or confusingly similar marks in a manner that is likely to cause consumers to believe that StockX's Vault NFTs are associated with Nike, when they are not.  Indeed, as noted in Paragraph 80 above, if StockX merely intended to use NFTs as digital receipts as it claims, there would be no need to make such extensive and prominent use of Nike's trademarks.  Upon information and belief, this prominent use of Nike's marks was intended to free ride on Nike's immense goodwill and satisfy consumer desire to own Nike-branded virtual goods, which owners can display in their portfolios.

99.     StockX's use of Nike's trademarks and images of Nike's products to promote its Vault NFTs has already created confusion in the marketplace as to the Vault NFTs' source and

whether Nike is in any way involved or associated with StockX's Vault NFTs.  For example, immediately after StockX announced the Vault NFTs' release, on January 18, 2022, users on social media questioned the propriety of StockX's Vault NFTs and whether Nike is "in on it too," while others "feel safe assuming Nike gets a cut of the fees that StockX takes from each transaction."



Replying to @russbengtson @jay_shoefanatic and @airmaxtrin

Yeah I'd feel safe assuming Nike gets a cut of the fees that StockX takes from each transaction.

lol @ "save closet space & shipping cost"

2:36 PM · Jan 18, 2022 · Twitter Web App

100.     Consumer confusion as to whether Nike is associated with StockX's Vault NFTs was also immediately evident on Twitter, where, on January 18, 2022, a user replied to a StockX tweet promoting the launch of its Vault NFTs, asking whether the Vault NFTS are "endorsed/approved by Nike/Adidas etc?":



101.     The following day, January 19, 2022, Reddit users on another thread under the r/Sneakers subreddit wondered whether Nike had granted StockX a license to use Nike's "branding":



102.    On that same day, January 19, 2022, and same thread under the r/Sneakers subreddit, another confused user expressed their (incorrect) belief that "Nike gets a small commission every time an NFT is purchased," and that StockX's Vault NFTs are "a way for Nike to get a piece of the huge pie of the resale market" while not bringing any added benefit to the buyer:



103.    Additionally, on January 21, 2022, in response to a video posted earlier that same day discussing StockX's Vault NFTs, one confused TikTok user commented: "You can just cash out of the nft for the actual shoe but I think it's just a stupid scam for Nike to make money."



104.    Since the filing of this action, confusion has continued.  In fact, once Nike began sales of its own Nike-branded NFTs, the public has conflated the parties' offerings.  For example, in an article republished multiple times since May 2, 2022 titled "Nike Takes A Major Step Into The Metaverse," the author incorrectly reports that the Nike/RTFKT Cryptokicks™ "makes its debut on StockX":



The article goes on to report:

> StockX's The Vault fuses a digital token, which its users can trade with one
> another, to secure actual, physical shoes.  (StockX)
> Now, users of the platform can buy NFTs supported by Nike, a sportswear company many
> consider the gold-standard of physical sneakers in the real world.

*See* https://www.zenger.news/2022/05/02/nike-takes-a-major-step-into-the-metaverse/.

105.     But Nike's Dunk Genesis Cryptokicks™ NFTs did <u>not</u> debut on StockX, and users of StockX's platform <u>cannot</u> buy NFTs supported by Nike.  This was precisely the sort of confusion that Nike feared would ensue when it filed this action and began releasing genuine NFTs.

**<u>StockX's Counterfeit Sales and Claims of Authenticity</u>**

106.     In addition to the infringing and dilutive conduct related to the Vault NFTs, Nike's continuing investigation into StockX's conduct has also revealed that StockX has been and is currently dealing in counterfeit Nike goods.

107.     Between December 2021 and January 2022, Nike obtained from StockX's platform at least four pairs of counterfeit Nike shoes.  Since the filing of this action, Nike has confirmed that these four pairs of shoes are, in fact, counterfeit.  As noted above, one of the confirmed pairs of counterfeit Nike shoes is a counterfeit Air Jordan 1 Retro High OG in the Black/Varsity Red-White colorway—the exact same style that StockX has purportedly linked to one of its eight infringing Nike-branded Vault NFTs:





108.    In fact, as of the current date, StockX has sold 518 infringing Nike-branded Vault

NFTs that are purportedly linked to the same Air Jordan 1 Retro High OG in the Black/Varsity

Red-White colorway, making it StockX's top-selling NFT by total volume sold:



109.    Nike's discovery of StockX's recent dealing in counterfeit Nike goods is consistent

with numerous publicly available consumer complaints that Nike shoes guaranteed as "100%

Verified Authentic" by StockX turned out to be counterfeit, including complaints directed to

StockX on its social media channels.  Nike's investigation remains ongoing and, upon information and belief, StockX is selling and will continue to sell counterfeit Nike goods to unsuspecting consumers.

110.    StockX claims on the StockX Website that every item StockX sells on its e-commerce platform—including those items purportedly associated with the Vault NFTs—has been independently verified by StockX as "100% Verified Authentic."  The confirmed purchase of counterfeit Nike goods on StockX's platform—including the same style purportedly associated with at least one of the infringing Nike-branded Vault NFTs—directly undermines StockX's "100% Verified Authentic" claims and its claims about the "proprietary multi-step verification process" it employs to authenticate goods and renders these statements false and/or misleading.

111.    StockX's "100% Verified Authentic" claims and its claims about the "proprietary multi-step verification process" it employs to authenticate goods sold on its e-commerce platform are material because StockX is misrepresenting an inherent quality or characteristic of the Nike goods sold on its platform, *i.e.*, that they are not counterfeit and have been authenticated as genuine.  Moreover, StockX's claims are likely to influence consumer purchasing decisions because consumers shopping for real Nike goods are more likely to purchase from StockX than other channels based on StockX's prominent claims about the authenticity of the Nike goods for sale on its platform and based on its statements that its authentication process is proprietary, that StockX authenticators are "better equipped than anyone" to confirm the authenticity of a product.

112.    On information and belief, an unknown number of consumers have been deceived by and purchased counterfeit Nike goods or Nike-branded Vault NFTs based on StockX's false and/or misleading statements about the authenticity of the Nike goods for sale on its platform.

113.    On information and belief, StockX knows that its false and/or misleading statements about the authenticity of the Nike goods for sale on its platform deceives consumers. Nevertheless, StockX continues to engage in such improper and unlawful business practices to attract consumers to its platform and induce consumers to purchase supposedly genuine Nike goods and purchase and trade the infringing Nike-branded Vault NFTs.

114.    The continued sale of counterfeit Nike goods on StockX's platform and StockX's false and/or misleading claims about its authentication process and verified authenticity have caused and are causing Nike injury as a result of, *inter alia*, harm to reputation, diverted sales, consumer confusion, dilution, and tarnishment of its valuable trademarks.

115.    By virtue of the acts complained of herein, StockX has created a likelihood of injury to Nike's business reputation and goodwill, caused a likelihood of consumer confusion, mistake, and deception as to the source of origin or relationship of Nike's products and StockX's Vault NFTs, and has otherwise competed unfairly by unlawfully dealing in counterfeit Nike goods, making false and/or misleading statements, and trading on and using Nike's Asserted Marks without Nike's permission.

116.    Unless stopped, StockX's Vault NFTs, StockX's use of Nike's Asserted Marks, StockX's dealing in counterfeit Nike goods, and StockX's false and/or misleading statements will continue to confuse consumers in the marketplace and dilute Nike's famous marks by blurring and tarnishment.

117.    As noted above in Paragraph 6 above, StockX has already announced its plans to expand its Vault NFT business, which will likely include additional uses of Nike's famous trademarks and products.  In addition to StockX's announcement referenced above, StockX confirmed its plans to release additional Vault NFTs on Twitter:



118.    Indeed, since this action was filed, Nike discovered that StockX has also minted—but not yet sold—at least another 2,000 infringing Nike-branded Vault NFTs purportedly linked to Nike's Air Jordan 11 Retro Cool Grey shoes.

119.    StockX's acts complained of herein are willful and deliberate.

120.    StockX's acts complained of herein have caused damage to Nike in an amount to be determined at trial, and such damages will continue to increase unless StockX is preliminarily and permanently enjoined from their wrongful acts.

121.    StockX's acts complained of herein have caused Nike to suffer irreparable injury to its business. Nike will suffer substantial loss of goodwill and reputation unless and until StockX is permanently enjoined from the wrongful acts complained of herein.

<u>**FIRST CAUSE OF ACTION**</u>
**TRADEMARK INFRINGEMENT**
**15 U.S.C. § 1114**

122.    Nike repeats and realleges each and every allegation in the foregoing Paragraphs 1 to 121 as if fully set forth herein.

123.    Nike's Asserted Marks are on the Principal Register of the United States Patent and Trademark Office.

124.    Through extensive and continuous use, Nike's Asserted Marks and the goodwill of the businesses associated with them in the United States and throughout the world are of significant value, are highly distinctive and arbitrary or fanciful, and have become universally associated in the public mind with Nike, its products and services, and the very highest quality and reputation.

125.    StockX has knowingly used and continues to use in commerce, without Nike's permission or authorization, Nike's Asserted Marks, and/or confusingly similar marks, in connection with the sale, distribution, and advertising of its Vault NFTs.

126.    StockX's conduct is intended to exploit the goodwill and reputation associated with Nike's Asserted Marks.

127.    StockX's use of Nike's Asserted Marks is likely to confuse, mislead, or deceive potential consumers, purchasers, and the general purchasing public as to the source, origin, sponsorship, or affiliation of the Vault NFTs with Nike, and is likely to cause such people to erroneously believe that StockX's Vault NFTs have been authorized, sponsored, approved, endorsed, or licensed by Nike or that StockX is in some way affiliated with Nike.

128.    StockX's unauthorized use of Nike's Asserted Marks constitutes trademark infringement of Nike's federally registered trademarks, which has caused damage to Nike and the substantial business and good will embodied in Nike's trademarks in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114.

129.    As a direct and proximate result of StockX's wrongful acts, Nike has suffered, continues to suffer, and/or is likely to suffer damage to its trademarks, business reputation, and good will that money cannot compensate.  Unless enjoined, StockX will continue to use Nike's Asserted Marks and/or confusingly similar marks and will cause irreparable damage to Nike,

Nike's Asserted Marks, and to the business and good will represented thereby, for which Nike has no adequate remedy at law.

130.    Nike is further entitled to recover from StockX the actual damages Nike has sustained, is sustaining, and/or is likely to sustain as a result of StockX's wrongful acts.

131.    Upon information and belief, StockX has obtained gains, profits, and advantages as a result of its wrongful acts and will continue to do so in an amount yet to be determined.

132.    StockX's use of Nike's Asserted Marks and/or confusingly similar marks has been intentional and willful.  StockX's bad faith is evidenced, in part, by the egregious and prominent use of Nike's Asserted Marks in connection with the sale and promotion of the Vault NFTs, and the extensive nature of the infringement.  Because of the willful nature of StockX's wrongful acts, Nike is entitled to an award of treble damages and increased profits under 15 U.S.C. § 1117.

133.    Because this is an exceptional case, Nike is also entitled to recover its costs of suit and its attorneys' fees pursuant to 15 U.S.C. § 1117.

## SECOND CAUSE OF ACTION
## FALSE DESIGNATION OF ORIGIN / UNFAIR COMPETITION
## 15 U.S.C. § 1125(a)

134.    Nike repeats and realleges each and every allegation in the foregoing Paragraphs 1 to 121 as if fully set forth herein.

135.    StockX's unauthorized use of Nike's Asserted Marks and/or confusingly similar marks constitutes a false designation of origin that is likely to cause consumer confusion, mistake, or deception as to the origin, sponsorship, or approval of StockX's Vault NFTs by creating the false and/or misleading impression StockX's Vault NFTs are produced by, authorized by, or otherwise associated with Nike.

136.    As a direct and proximate result of StockX's wrongful acts, Nike has suffered, continues to suffer, and/or is likely to suffer damage to its trademarks, business reputation, and good will that money cannot compensate.  Unless enjoined, StockX will continue to use Nike's Asserted Marks and/or confusingly similar marks and will cause irreparable damage to Nike, Nike's Asserted Marks, and to the business and good will represented thereby, for which Nike has no adequate remedy at law.

137.    Nike is further entitled to recover from StockX the actual damages Nike has sustained, is sustaining, and/or is likely to sustain as a result of StockX's wrongful acts.

138.    StockX's use of Nike's Asserted Marks and/or confusingly similar marks has been intentional and willful.  StockX's bad faith is evidenced, in part, by the egregious and prominent use of Nike's Asserted Marks in connection with the sale and promotion of the Vault NFTs, and the extensive nature of the infringement.  Because of the willful nature of StockX's wrongful acts, Nike is entitled to an award of treble damages and increased profits under 15 U.S.C. § 1117.

139.    Because this is an exceptional case, Nike is also entitled to recover its costs of suit and its attorneys' fees pursuant to 15 U.S.C. § 1117.

### THIRD CAUSE OF ACTION
### TRADEMARK DILUTION
### 15 U.S.C. § 1125(c)

140.    Nike repeats and realleges each and every allegation in the foregoing Paragraphs 1 to 121 as if fully set forth herein.

141.    As a result of the duration, extent, and geographical reach of advertising and publicity, the amount, volume, and geographical extent of Nike's sales and trading areas, their channels of trade, their degree of recognition, and registration, Nike's Asserted Marks have

become distinctive and "famous" within the meaning of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

142.    Nike's Asserted Marks have become distinctive and famous prior to StockX's acts as alleged herein.

143.    StockX's unauthorized and wrongful use of Nike's Asserted Marks in commerce has diluted and will, unless enjoined, continue to dilute, and is likely to dilute the distinctive quality of Nike's Asserted Marks, in violation of Nike's rights under 15 U.S.C. § 1125(c)

144.    StockX's unauthorized and wrongful use of Nike's Asserted Marks in commerce has tarnished and will, unless enjoined, continue to tarnish, and is likely to tarnish the fame of Nike's Asserted Marks by undermining and damaging the valuable good will associated therewith, in violation of Nike's rights under 15 U.S.C. § 1125(c).

145.    StockX's acts as alleged herein are intentional and willful in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), and have already caused Nike irreparable damage and will, unless enjoined, continue to so damage Nike, which has no adequate remedy at law.

146.    Nike is further entitled to recover from StockX the actual damages Nike has sustained, is sustaining, and/or is likely to sustain as a result of StockX's wrongful acts.

147.    Upon information and belief, StockX has obtained gains, profits, and advantages as a result of its wrongful acts and will continue to do so in an amount yet to be determined.

148.    StockX's use of Nike's Asserted Marks and/or confusingly similar marks has been intentional and willful.  StockX's bad faith is evidenced, in part, by the egregious and prominent use of Nike's Asserted Marks in connection with the sale and promotion of the Vault NFTs, and the extensive nature of the infringement.  Because of the willful nature of StockX's wrongful acts, Nike is entitled to an award of treble damages and increased profits under 15 U.S.C. § 1117.

149.     Because this is an exceptional case, Nike is also entitled to recover its costs of suit and its attorneys' fees pursuant to 15 U.S.C. § 1117.

## FOURTH CAUSE OF ACTION
### INJURY TO BUSINESS REPUTATION AND DILUTION
### NEW YORK GENERAL BUSINESS LAW § 360-1

150.     Nike repeats and realleges each and every allegation in the foregoing Paragraphs 1 to 121 as if fully set forth herein.

151.     Nike, on behalf of itself and the general consuming public, seek recovery from StockX for violation of New York's Anti-Dilution Statute, N.Y. Gen. Bus. Law § 360-1, *et seq*.

152.     Nike's Asserted Marks are commercially and conceptually strong trademarks, which have become distinctive and acquired a secondary meaning capable of dilution.

153.     Nike's Asserted Marks have become distinctive and acquired a secondary meaning capable of dilution prior to StockX's acts as alleged herein.

154.     StockX's unauthorized and wrongful use of Nike's Asserted Marks has diluted and will, unless enjoined, continue to dilute, and is likely to dilute the distinctive quality of Nike's Asserted Marks, thereby diminishing the capacity of Nike's Asserted Marks to function as unique product identifiers for Nike's goods and services.

155.     StockX's unauthorized and wrongful use of Nike's Asserted Marks has tarnished and will, unless enjoined, continue to tarnish, and is likely to tarnish Nike's Asserted Marks by creating negative associations with Nike, its Asserted Marks, and the associated business reputation and good will.

156.     StockX's acts as alleged herein are intentional and willful in violation of New York's Anti-Dilution Statute, N.Y. Gen. Bus. Law § 360-1, *et seq.*, and have already caused Nike

irreparable damage and will, unless enjoined, continue to so damage Nike, which has no adequate remedy at law.

**FIFTH CAUSE OF ACTION**
**COMMON LAW TRADEMARK INFRINGEMENT**
**AND UNFAIR COMPETITION**

157.    Nike repeats and realleges each and every allegation in the foregoing Paragraphs 1 to 121 as if fully set forth herein.

158.    Through its prior and continuous use of its Asserted Marks in commerce, Nike's Asserted Marks have become widely known, and Nike has been identified in the public mind as the manufacturer of the products to which the Nike Asserted Marks are applied.

159.    Through its prior and continuous use of its Asserted Marks in commerce, Nike enjoys exclusive common law rights in the Asserted Marks.

160.    StockX's use of Nike's Asserted Marks is without any permission, license or other authorization from Nike.

161.    StockX, with knowledge and intentional disregard of Nike's rights, continues to advertise, promote, and sell Vault NFTs using Nike's Asserted Marks and/or confusingly similar marks. StockX's acts have caused, continue to cause, and/or are likely to cause confusion as to the source and/or sponsorship of the Vault NFTs.

162.    StockX's acts as alleged herein constitute common law trademark infringement, and have already caused Nike irreparable damage and will, unless enjoined, continue to so damage Nike, which has no adequate remedy at law.

163.    Upon information and belief, StockX committed the acts alleged herein knowingly, willfully, wantonly, oppressively, fraudulently, maliciously, and in conscious disregard of Nike's

rights, thereby entitling Nike to exemplary and punitive damages pursuant to the common law of the State of New York in an amount sufficient to punish, deter, and make an example of StockX.

### SIXTH CAUSE OF ACTION
### COUNTERFEITING
### 15 U.S.C. § 1114

164.     Nike repeats and realleges each and every allegation in the foregoing Paragraphs 1 to 121 as if fully set forth herein

165.     Nike's Asserted Marks are on the Principal Register of the United States Patent and Trademark Office.

166.     Through extensive and continuous use, Nike's Asserted Marks and the goodwill of the businesses associated with them in the United States and throughout the world are of significant value, are highly distinctive and arbitrary or fanciful, and have become universally associated in the public mind with Nike, its products and services, and the very highest quality and reputation.

167.     StockX is acquiring, offering for sale, selling and shipping directly to consumers shoes bearing counterfeits of the following Nike federally registered trademarks: Reg. No. 1,370,283 (AIR JORDAN word mark); Reg. No. 3,725,535 (Air Jordan & Wings Design mark); Reg. No. 3,627,820 (JUMPMAN word mark); Reg. No. 1,558,100 (JumpMan Design mark); Reg. No. 978,952 (NIKE word mark); Reg. No. 1,214,930 (NIKE word mark); Reg. No. 977,190 (Swoosh Design mark); Reg. No. 1,323,343 (Swoosh Design mark); and Reg. No. 1,325,938 (NIKE & Swoosh Design mark).

168.     StockX's counterfeiting activities are likely to cause and actually are causing confusion, mistake, and deception among the general consuming public as to the quality of Nike's authentic shoes.  StockX's unlawful acts are intended to reap the benefit of the immense goodwill that Nike has created in its goods and constitute counterfeiting of the following Nike federally

registered trademarks in violation of § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1): Reg. No. 1,370,283 (AIR JORDAN word mark); Reg. No. 3,725,535 (Air Jordan & Wings Design mark); Reg. No. 3,627,820 (JUMPMAN word mark); Reg. No. 1,558,100 (JumpMan Design mark); Reg. No. 978,952 (NIKE word mark); Reg. No. 1,214,930 (NIKE word mark); Reg. No. 977,190 (Swoosh Design mark); Reg. No. 1,323,343 (Swoosh Design mark); and Reg. No. 1,325,938 (NIKE & Swoosh Design mark).

169.    Unless enjoined, Nike will continue to suffer immediate and irreparable injury and StockX will continue to deceive the public unless enjoined from its counterfeiting conduct.  Nike has no adequate remedy at law.

170.    Because StockX's conduct was willful, Nike is entitled to statutory damages of up to $2 million per counterfeit mark per type of goods or services sold, offered for sale, or distributed, pursuant to 15 U.S.C. § 1117.

### SEVENTH CAUSE OF ACTION
### FALSE ADVERTISING
### 15 U.S.C. § 1125(a)(1)(B)

171.    Nike repeats and realleges each and every allegation in the foregoing Paragraphs 1 to 121 as if fully set forth herein.

172.    In its pervasive advertising and marketing, StockX explicitly claims and guarantees that every item it sells—including those items purportedly associated with the Vault NFTs—has been independently verified by StockX as "100% Verified Authentic" through its "proprietary" process.

173.    In connection with the advertising activities, StockX is falsely and/or misleadingly claiming that all Nike products sold on StockX's platform are "100% Verified Authentic" genuine, non-counterfeit goods manufactured by Nike, when, in fact, StockX is selling to consumers

counterfeit Nike shoes.  It is also claiming that its process for authenticating products is somehow "proprietary," despite the fact that StockX is not the entity that designed, created, manufactured, packaged, or shipped in the first instance any genuine Nike goods.  StockX is therefore misrepresenting the nature, characteristics, and qualities of its goods and services and is misleading consumers in the process.

174.    Upon information and belief, StockX made these false and/or misleading representations in order to take advantage of Nike's immense goodwill and to induce consumers to purchase Nike shoes on the StockX platform.  Nike has an intense interest in stopping StockX from deceiving and misleading consumers into believing consumers can blindly trust that all of the Nike shoes offered by StockX are genuine when they are not.  StockX's false and/or misleading statements are causing immediate and irreparable injury to Nike, by injuring Nike's reputation in the marketplace, diverting consumer purchases of genuine Nike goods, and will continue to damage Nike and deceive consumers unless enjoined by this Court.

175.    StockX's acts constitute false advertising and false representations in violation of 15 U.S.C. § 1125(a)(1)(B).  Nike has no adequate remedy at law.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Nike hereby demands a trial by jury of all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Nike respectfully prays for:

1.    A judgment and order that StockX has willfully (A) infringed Nike's Asserted Marks and engaged in counterfeiting in violation of 15 U.S.C. §1114, (B) used false designations of origin and made false and/or misleading statements in violation of 15 U.S.C § 1125(a), (C)

diluted at least the Nike Asserted Marks in violation of 15 U.S.C. § 1125(c), (D) injured Nike's business reputation and diluted at least Nike's Asserted Marks violation of New York's Anti-Dilution Statute, N.Y. Gen. Bus. Law § 360-1, *et seq.*, and (E) violated Nike's common law rights in Nike's Asserted Marks;

2. A judgment and order enjoining StockX and StockX's affiliates, officers, agents, employees, attorneys, and all other persons acting in concert with StockX, during the pendency of this action and permanently thereafter from:

a. Manufacturing, minting, transporting, promoting, advertising, publicizing, distributing, offering for sale, or selling any NFT products (including but not limited to the Vault NFTs) under Nike's Asserted Marks, any marks substantially indistinguishable therefrom, or any other marks, names, symbols, or logos which are likely to cause confusion or to cause mistake or to deceive persons into the erroneous belief that any products that StockX caused to enter the stream of commerce or any of StockX's commercial activities are sponsored or licensed by Nike, are authorized by Nike, or are connected or affiliated in some way with Nike or Nike's Asserted Marks;

b. Manufacturing, minting, transporting, promoting, advertising, publicizing, distributing, offering for sale, or selling any NFT products (including but not limited to the Vault NFTs) under Nike's Asserted Marks, any marks substantially indistinguishable therefrom, and/or confusingly similar marks;

c. Implying Nike's approval, endorsement, or sponsorship of, or affiliation or connection with, StockX's products, services, or commercial activities, passing off StockX's business as that of Nike, or engaging in any act or series of acts which,

either alone or in combination, constitutes unfair methods of competition with Nike and from otherwise interfering with or injuring Nike's Asserted Marks or the good will associated therewith;

d.      Engaging in any act which is likely to dilute the distinctive quality of the Nike Asserted Marks and/or injures Nike's business reputation;

e.      Representing or implying that StockX is in any way sponsored by, currently affiliated with, or licensed by Nike;

f.      Engaging in the sale of counterfeit Nike goods;

g.      Claiming that every item sold on its platform is "100% Verified Authentic" through a "proprietary" process or making any false and/or misleading statements about its product authentication or verification process; or

h.      Knowingly assisting, inducing, aiding, or abetting any other person or business entity in engaging in or performing any of the activities referred to in paragraphs 2(a) to (e) above;

3.      An order that StockX be required to deliver to Nike for destruction any and all Vault NFTs, associated footwear, digital files, packaging, printed graphics, promotional materials, business cards, signs, labels, advertisements, flyers, circulars, and any other items in any of their possession, custody, or control bearing Nike's Asserted Marks, any marks substantially indistinguishable therefrom, confusingly similar marks;

4.      An order granting an award of damages suffered by Nike according to proof at the time of trial;

5.      An order that StockX account to Nike for any and all profits earned as a result of StockX's acts in violation of Nike's rights;

6.     An award of three times the amount of compensatory damages and increased profits pursuant to 15 U.S.C. § 1117(a);

7.     An award of three times such profits or damages, whichever amount is greater, together with a reasonable attorneys' fees, pursuant to 15 U.S.C. § 1117(b);

8.     An award of statutory damages pursuant to 15 U.S.C. § 1117(c);

9.     An order granting an award of punitive damages for the willful and wanton nature of StockX's aforesaid acts under the New York General Business Law and the common law;

10.    An order granting pre-judgment interest on any recovery by Nike;

11.    An order granting an award of Nike's costs, expenses, and reasonable attorneys' fees; and

12.    Granting such other and further relief as is just and proper.

Dated: _____                    Respectfully submitted,

                                                     By: _____

                                                   **DLA PIPER LLP (US)**

                                                   Tamar Y. Duvdevani
                                                   Marc E. Miller
                                                   Jared Greenfield
                                                   1251 Avenue of the Americas 27th Fl.
                                                   New York, New York 10020-1104
                                                   tamar.duvdevani@us.dlapiper.com
                                                   marc.miller@us.dlapiper.com
                                                   jared.greenfield@us.dlapiper.com

                                                   Michael Fluhr
                                                   555 Mission Street
                                                   San Francisco, CA 9410
                                                   michael.fluhr@us.dlapiper.com

                                                   *Attorneys for Plaintiff Nike, Inc.*