David Bernstein
(dhbernstein@debevoise.com)
Megan K. Bannigan
(mkbannigan@debevoise.com)
Jyotin Hamid
(jhamid@debevoise.com)
Justin Ferrone
(jcferrone@debevoise.com)
Kathryn C. Saba
(ksaba@debevoise.com)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000

David Mayberry
(DMayberry@kilpatricktownsend.com)
Rob Potter
(RPotter@kilpatricktownsend.com)
KILPATRICK TOWNSEND &
STOCKTON LLP
1114 Avenue of the Americas
New York, New York 10036
(212) 775-8733

Jeffrey B. Morganroth
(Jmorganroth@morganrothlaw.com)
MORGANROTH & MORGANROTH
PLLC
167 East 61st Street, #23
New York, New York 10065
(248) 864-4000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                                   :

NIKE, INC.,                           :       No. 22-CV-983-VEC

              Plaintiff,     :

                           :     **ANSWER TO FIRST**
        v.                 :   **AMENDED COMPLAINT**

                           :     **JURY DEMANDED**
STOCKX LLC,                :

             Defendant.   :

                           :
------------------------------------------------------------X

      StockX LLC ("StockX"), by and through its undersigned counsel, hereby submits its Answer to the First Amended Complaint, filed by Nike, Inc. ("Nike") on May 25, 2022 (the "Amended Complaint").

## PRELIMINARY STATEMENT

Nike's First Amended Complaint is nothing more than a failed attempt to bolster its still meritless claims.  StockX is an online global platform that provides access to items of current culture, including coveted sneakers, apparel, collectibles, trading cards, and accessories, among other products, by connecting individual buyers and sellers from around the world.  Consumers use StockX's platform not only to sell or acquire physical products for consumption, but also to trade these physical products for investment purposes.  StockX's recent introduction of non-fungible tokens ("NFTs") to track ownership of, and essentially serve as a claim ticket for, frequently traded physical products, is transforming the trading experience on its platform by increasing efficiencies and decreasing transaction costs for buyers and sellers.  Using NFTs in this manner is lawful and violates no legitimate right of Nike or any of the manufacturers of the underlying physical goods.  Nike's trademark infringement and dilution claims lack merit, disregard settled doctrines of trademark law, including the doctrines of first sale and nominative fair use, and show a fundamental misunderstanding of the various functions NFTs can serve.

Nike's newly-added claims, contending that StockX knowingly and willfully sold counterfeit products and falsely advertised its authentication services, are equally meritless. While counterfeiting is rampant among other third-party marketplaces, StockX revolutionized the industry by creating a process in which 100% of products on its platform are authenticated by human beings trained by StockX before they are sent to the buyer.  During this process, authenticators combine their expert knowledge and training with proprietary, AI-enhanced machine learning technology to verify that products sold on the platform are what they claim to be.  StockX has one of the most—if not *the most*— rigorous authentication processes in the market today—and the steps it takes to protect its customers do not end there.  If any customer reasonably suspects a product purchased through StockX is counterfeit, StockX will investigate

and issue a refund or replacement in any instance where the product is determined to be counterfeit.  StockX's 100% Verified Authentic process is understood by its customers and has been praised by consumers, commentators and industry participants alike, ***__including Nike__***.

***StockX is at the forefront of combatting counterfeiting.***  StockX has invested millions of dollars to fight the proliferation of counterfeit products, employing over 300 authenticators across eleven authentication centers.  Since inception, StockX's authenticators have inspected more than 30,000,000 products and prevented over $60,000,000 in counterfeit sneakers from reaching buyers on the platform.  Through these steps, StockX has reduced the risk profile for consumers, elevated consumers' trust and enhanced the user experience for buying products on a secondary market.

Nike's suggestion that StockX is a bad actor that intentionally deals in counterfeits and misleads its consumers is not only contradicted by the facts, but by Nike's own dealings with StockX.  In the past, Nike has sought to collaborate with StockX and has communicated confidence in the StockX authentication process, including by inviting StockX to join an anti-counterfeiting counsel with the United States Department of Homeland Security.  Among other examples, prior to this lawsuit, Nike's Vice President of Global Litigation and Investigations also praised StockX in writing as a "good actor" in connection with efforts to remove a counterfeit listing, and in 2020, Nike's Brand Protection Director of Authentication and Innovation described StockX and Nike Brand Protection as "aligned on ensuring [] consumers only receive authentic product."  Despite numerous opportunities to offer feedback or criticisms, at no time in the past did Nike express concerns to StockX about its authentication processes.  The motive behind Nike's new-found litigation position is suspicious at best.

***StockX lawfully uses NFTs to allow users to more efficiently transact in authentic goods.*** StockX's authentication and anti-counterfeiting efforts are critical to its business and consumer trust, but they do not come without costs. Upon each sale on the platform, a seller ships the product to one of StockX's eleven authentication centers around the world; StockX performs its proprietary multi-step authentication process; and, if and only if the product meets StockX's quality standards, StockX then ships the product to the buyer and ensures that the seller is paid. Further, on each subsequent trade of the same item, consumers not only incur costs and fees associated with multiple legs of shipping and authentication, but also experience a delay in ownership and payout until the process is complete.

For many reasons, including StockX's reputation as a place to purchase authentic products, as well as the incorporation of stock market-like mechanics inspired by the world's financial exchanges, StockX's platform has attracted a significant number of customers who are interested in acquiring and trading current culture products, without any interest in immediately or ever wearing (or "consuming") those products or taking physical possession of those products. Until recently, these customers had to incur the transaction costs and shipping times commonly associated with e-commerce experiences, even though physical possession was unnecessary to these customers' goals and needs.

StockX's introduction of NFTs has innovated and expedited the process of trading physical products. NFTs are traded on a blockchain, which permanently and publicly stores records of each NFT transfer, making the process a transparent and secure way to track ownership of physical items. In contrast to most NFT projects to date, which consist of digital images (including JPEGs or GIFs) or goods created for the metaverse, with or without additional utility attached, StockX Vault NFTs are one of the first applications where the NFTs are tied

one-to-one to a physical product, and thus have no utility in the metaverse at all.  StockX's Vault NFT program simply improves efficiency of secondary trading on StockX, serves to track ownership of physical goods, and cuts out unnecessary costs and fees for customers.

StockX Vault NFTs *are absolutely not* "virtual products" or digital sneakers.  Rather, each Vault NFT is tied to a specific physical good that has been authenticated by StockX.  Consumers purchase the Vault NFTs and have two choices regarding ongoing possession: (1) retain digital possession of the Vault NFT and leave the authenticated physical good in StockX's climate-controlled, high-security vault (a "Stored Item"); or (2) take possession of the physical good from the vault at any time, in which case the Vault NFT is removed from the customer's digital portfolio and permanently removed from circulation.  The Vault NFT itself has no intrinsic value beyond this process—it is effectively a claim ticket, or a "key" to access the underlying Stored Item.  Further, the Vault NFT cannot be traded separately, or decoupled, from ownership of the underlying Stored Item.  As explained on StockX's product pages, a "Vault NFT represents and tracks proof of ownership of the actual sneaker stored within [the] StockX Vault."  The actual product of value is the underlying Stored Item, and there is no mark-up for the actual Vault NFT.  While StockX sets the initial price for Vault NFTs, StockX does not set or control prices for subsequent trades, which are dictated completely by StockX users.

The benefit of taking possession of the Vault NFT, rather than the Stored Item, is that the owner can make a future trade without incurring transaction costs, delay, or risk of damage or loss associated with shipping physical sneakers to StockX and then to the ultimate recipients.  Instead, the owner need only transfer the Vault NFT, which can be performed almost instantaneously through the Internet.  The Stored Item remains safe in the StockX vault, and the transfer of ownership to the buyer is immediate.  Because the Stored Item never leaves the

StockX vault, the product does not need to be authenticated again.  This novel process is ideal for a growing group of consumers (who already make up a significant portion of StockX's customer base), who trade current culture products and do not want to take physical possession of products for use.[1]

To date, StockX has released Vault NFTs associated with forty-three different types of physical products, including various sneakers, trading cards, watches, and other collectibles such as action figures.  Fifteen of these product types are styles of shoes originally manufactured and sold by Nike, adidas, New Balance, and Puma.  In selecting the styles of shoes to include in the Vault NFT program, StockX looked to best-selling products of which sufficient quantities in a certain shoe size were available for purchase.  Examples of Vault NFTs and Stored Items that StockX offers for sale are included below.



---

[1]    In addition, customers experiencing storage constraints due to their existing physical inventory may choose to purchase StockX Vault NFTs to take advantage of the convenience of storing physical goods in the StockX vault, allowing them to sell or hold the underlying physical goods without the inconvenience of managing the storage logistics or risks.



As shown above, each Vault NFT prominently includes the StockX trademark, as does the product page where the physical goods are offered for sale.  In addition, much like a product

page or advertisement on any other e-commerce site, Vault NFTs accurately depict and describe the underlying physical goods that the consumer is purchasing.  For example, the Vault NFT for the Nike Low Dunk Retro White Black shows an image (generated by StockX) of the Stored Item held in the StockX vault and the relevant product name.  Because the owner of the Stored Item need not take possession of the physical goods but can nevertheless use the Vault NFT to transfer title to the Stored Item, the image and product name on the Vault NFT play a critical role in describing what goods are actually being bought and sold.

Further, the product page for each Vault NFT displays a description of how the StockX Vault NFT functions, as well as a disclaimer of any association or affiliation with product brands, which is depicted below.



At every point in the process, consumers are made aware they are purchasing physical goods that StockX has authenticated, that StockX is storing such physical goods in its vault, that such physical goods may be traded via blockchain and tracked using a StockX-branded Vault NFT, and that the Vault NFT may be redeemed for the physical goods themselves.  To date,

consumers have enjoyed their experience, successfully completing 3,520 Vault NFT transactions through StockX's website since the Vault NFT program launched.  Consumers have therefore recognized, and will continue to recognize, that StockX's Vault NFTs are revolutionizing the trading of authenticated physical goods.  No one has been—or could be—confused as to the source.

Nike's lawsuit is nothing more than a baseless and misleading attempt to interfere with an innovative and efficient method to trade in current culture, part of the increasingly popular and lawful secondary market for the sale of its sneakers and other goods.  Nike's position is that resellers of products are legally prohibited from accurately describing the physical products they seek to trade using blockchain technology, contrary to trademark law.  StockX's use of images of Nike sneakers and descriptions of re-sale Nike products in connection with StockX Vault NFTs is nominative fair use.  StockX is no different than major e-commerce retailers and marketplaces who use images and descriptions of products to sell physical sneakers and other goods online, and which consumers see (and are not confused by) every single day.  Nike's suit threatens the legitimate use of NFTs as claim tickets not just by StockX, but by other innovators that also use NFTs to track title to physical goods held in a vault, such as fine art, whiskey, and wine.  The use of NFTs to digitally track ownership of physical products is not only lawful, but also increases efficiency for and decreases costs to consumers, promotes sustainability, and should not be disturbed.

*Nike's Anticompetitive Behavior Will Stifle the Secondary Market and Hurt Consumers.*  Beyond its threats to the usage of NFTs to trade and access physical goods, the counterfeiting and false advertising claims in Nike's Amended Complaint are an affront to the entire resale market.  Unlike the vast majority of marketplaces, who do not physically inspect

every product sold on their platforms or in their stores, StockX requires that every product sold through its platform passes its authentication process, and offers a refund policy for the rare case where a counterfeit product might find its way into a consumer's hands. This fact alone undercuts any allegation that StockX is knowingly or intentionally dealing in such goods. If Nike is willing to bring these claims against StockX—who they have praised as a "good actor" that is aligned with their anti-counterfeiting mission—then no marketplace is safe. The entire secondary market is perpetually at risk, without any ability for marketplaces or resellers to protect themselves from a frivolous lawsuit. Nike's true motive—to inflict damage on the resale market as a whole—is obvious.

Also striking are the significant gaps in Nike's amended pleadings regarding the alleged counterfeit shoes it purports to have purchased on the StockX platform. Nike has not pleaded *any* details as to how it identified the alleged counterfeits as inauthentic; how it came to possess these shoes; whether it can verify the chain of custody for the shoes from the time of purchase through the time it filed its Amended Complaint; whether it or its employees had anything to do with these shoes entering the StockX platform in the first instance; why Nike did not attempt to notify StockX or return the shoes upon allegedly discovering they were counterfeit; how many shoes Nike actually had to purchase before allegedly identifying a counterfeit; or why Nike has suddenly shifted its attentions to allegedly counterfeit shoes sold separate and apart from the Vault NFT program (which had been the sole focus of this lawsuit).

Perhaps most notably, Nike has also failed to explain why it did not bring counterfeiting and false advertising claims in its original complaint, or seek leave to amend until May (only after its original complaint had failed its anti-competitive purpose), despite claiming to have acquired the allegedly inauthentic shoes between December 2021 and February 3, 2022. Nor

does Nike explain what efforts it takes to prevent the sale of counterfeit shoes on other online platforms.   For example, the single pair of shoes that Nike has specifically identified in its Amended Complaint as allegedly inauthentic—the Air Jordan 1 Retro High OG Bred-Patent—is commonly sold all over the internet, including on eBay, Amazon, and other online marketplaces that do not even attempt to authenticate all products sold on their platforms.   StockX has authenticated approximately 55,000 pairs of this same shoe from sellers in 48 countries, and rejected over 1,300 pairs for failing to meet StockX's quality standards, including hundreds rejected for being counterfeits or as a result of manufacturing defects.   Yet, Nike seems only to care enough about protecting consumers from, and has launched these disingenuous allegations against, the one platform that has now dared to stand up to Nike's meritless NFT infringement claims.

StockX looks forward to defending its stellar reputation and to exposing why Nike, which once sought to collaborate in combatting counterfeits, now seeks anticompetitively to undermine StockX's business model for making the secondary market safer and more efficient for consumers.

## **GENERAL DENIAL**

Except as otherwise expressly admitted herein, StockX denies each and every allegation contained in the Amended Complaint, including, without limitation, any allegations contained in the preliminary statement, headings, subheadings, footnotes, or incorporated images within the Amended Complaint, and specifically denies any liability to Nike.   Pursuant to Rule 8(b) of the Federal Rules of Civil Procedure, allegations in the Amended Complaint to which no responsive pleading is required shall be considered denied.   StockX expressly reserves the right to seek leave to amend and/or supplement this Answer as may be necessary.

## RESPONSE TO SPECIFIC ALLEGATIONS

## NIKE'S PRELIMINARY STATEMENT

1.    Deny, except deny knowledge or information sufficient to form a belief as to whether NFTs are "pervasive in their use by brand owners" or as to how NFTs "are commonly understood," and admit that Nike filed its original Complaint on February 3, 2022; that NFTs have diverse commercial applications, including tracking title to physical goods; and that NFTs appear to be "[f]ar more than a fleeting trend," and "part of the future of commerce."

2.    Deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations.

3.    Deny, except admit that StockX is a secondary market platform through which products including sneakers, apparel, luxury handbags, electronics, and other collectible goods are resold, and refer to the contents of StockX's original Answer, filed March 31, 2022 (Dkt. No. 21), which speak for themselves.

4.    Deny, and refer to the contents of StockX advertisements and social media content, which speak for themselves, except admit that StockX provides a platform for the resale and authentication of sneakers, apparel, electronics, collectibles, trading cards and accessories, and that StockX lawfully sells Nike goods, as well as goods from brands including, but not limited to New Balance, Puma, adidas, Reebok, Asics, and Converse.

5.    Deny, except admit that StockX creates Vault NFTs, which include an image generated by StockX of the associated Stored Item that StockX offers for sale to consumers and to which the NFT is tied.  StockX further admits that the images included in paragraph five of the Amended Complaint appear to be images of StockX-branded Vault NFTs depicting the physical Nike SB Dunk Low Ben & Jerry's Chunky Dunky, Nike Dunk Low Retro White Black,

and KAWS Sacai Nike Blazer Low Blue shoes that StockX stores in its physical vault and offers for sale to consumers through the Vault NFT program.  StockX further avers that Vault NFTs have traded at values below that of the comparable physical product, not associated with the Vault NFT program; for example, as of March 22, 2022, the last sale price for a Vault NFT tied to an adidas Yeezy Boost 350 V2 Beluga Reflective was $273, whereas the last sale price for the comparable physical product was $282.

6.      Deny, and refer to the contents of StockX's public statements on its website, which speak for themselves, except admit that StockX plans to continue its Vault NFT program—which includes the sale of stored Nike, adidas, Puma, and New Balance shoes; trading cards; and other products such as watches, skateboard decks, and action figures—and that StockX has modified some of the statements on its platform in an effort to be as clear as possible as to its offerings.

7.      Deny, except admit that Vault NFT owners may redeem the NFT and take possession of the associated physical shoes for a small fee; that StockX has successfully completed redemptions; that, at the start of the Vault NFT program, the redemption process was temporarily unavailable and StockX stated as much in its terms; that in an effort to be as clear as possible as to its offerings, StockX has modified some of the statements on its platform, including its Terms and Conditions of Use, which speak for themselves and are attached hereto as Exhibit A; that StockX earns a 3% transaction fee for each resale, a portion of which goes to its payment processor; and that StockX plans to continue its Vault NFT program—which includes the sale of stored Nike, adidas, Puma, and New Balance shoes; trading cards; and other products such as watches, skateboard decks, and action figures.

8.      Paragraph 8 states a legal conclusion to which no response is required.  To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations regarding consumer perception and otherwise deny.

9.      Deny, except admit and aver that Nike is not entitled to play any role in decision-making regarding the StockX-branded Vault NFT program.

10.      Paragraph 10 states legal conclusions to which no response is required.  To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations regarding Nike's historical use of its trademark, investment in offering NFTs, and "sophistication" in the NFT space, and otherwise deny.

11.      Deny, except admit that Vault NFTs are associated with physical products stored in StockX's Vault and authenticated using StockX's proprietary, multi-step authentication process to ensure that the products offered for sale are what they claim to be, and are not counterfeit, defective, or used.

12.      Paragraph 12 states legal conclusions to which no response is required.  To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations regarding allegedly counterfeit shoes, which Nike has not alleged are tied to the Vault NFT program; deny that StockX does not accept returns of possible counterfeit products; and aver that every shoe sold on StockX's platform has been through its proprietary authentication process; that StockX offers returns on a case-by-case basis, depending on the reason for the requested return; and that StockX will accept returns from, or refund purchasers of, allegedly counterfeit products in the rare instances in which that is, or has been, necessary.

13.      Paragraph 13 states legal conclusions to which no response is required.  To the extent a response is required, deny, except admit that the StockX website includes listings of the

Air Jordan 1 Retro High OG in the Black/Varsity Red-White colorway, both as part of the Vault NFT program and as a product that is not part of the Vault NFT program, and that Nike has not inspected the shoes in the StockX Vault to determine if they are counterfeit.

14.     Deny that StockX has sold Vault NFTs "at heavily-inflated prices," and otherwise deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations regarding its own concerns.

15.     Paragraph 15 states legal conclusions to which no response is required.  To the extent a response is required, deny, except admit that Nike has purported to allege counterfeiting and false advertising claims in its Amended Complaint.

### THE PARTIES

16.     Admit.

17.     Admit.

18.     Admit.

### JURISDICTION AND VENUE

19.     Paragraph 19 states a legal conclusion to which no response is required.

20.     Paragraph 20 states a legal conclusion to which no response is required.

21.     Paragraph 21 states a legal conclusion to which no response is required.  To the extent a response is required, admit that the StockX Website and StockX App are accessible to consumers in New York and that StockX is recruiting employees for open positions based in New York, including Sr. Engineering Manager – NFT and Checkout, a Senior Engineering Manager, Category Expansion, and Staff Software Engineer – Marketplace.

22.     Paragraph 22 states a legal conclusion to which no response is required.  To the extent a response is required, admit that the StockX Editorial Director is based in New York and that StockX is recruiting employees for open positions based in New York.

## FACTUAL BACKGROUND

23.     Admit.

24.     Admit.

25.     Admit.

26.     Admit.

27.     Deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations.

28.     Deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations.

29.     Paragraph 29 states a legal conclusion as to the fame of Nike's trademarks, to which no response is required.  To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations.

30.     Paragraph 30 states a legal conclusion as to the fame of Nike and its brands, to which no response is required.  To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations.

31.     Paragraph 31 states a legal conclusion as to Nike's ownership of the right, title, and interest in and to the listed trademarks ("Asserted Marks"), to which no response is required. To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations and, to the extent relevant, refer to the United States Patent and Trademark Office records, which speak for themselves.

32.     Paragraph 32 states a legal conclusion as to the validity of the alleged U.S. registrations for the Asserted Marks, to which no response is required.  To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of Nike's

16

allegations and, to the extent relevant, refer to the United States Patent and Trademark Office records, which speak for themselves.

33.     Paragraph 33 states a legal conclusion as to the incontestability of the Asserted Marks, to which no response is required.  To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations and, to the extent relevant, refer to the United States Patent and Trademark Office records, which speak for themselves.

34.     Paragraph 34 states a legal conclusion as to common law rights in the Asserted Marks, to which no response is required.  To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations.

35.     Deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations.

36.     Deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations.

37.     Paragraph 37 states a legal conclusion as to the strength and fame of the Asserted Marks, to which no response is required.  To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations.

38.     Deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations.

39.     Deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations.

40.     Deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations.

41.      Deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations.

42.      Deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations and, to the extent relevant, refer to the relevant United States Patent and Trademark Office records, which speak for themselves.

43.      Deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations and refer to the linked announcement, the contents of which speak for themselves.

44.      Deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations.

45.      Deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations.

46.      Deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations.

47.      Deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations regarding its initiatives, and otherwise deny.

48.      Deny, except admit that StockX provides an online platform for the resale of sneakers, apparel, electronics, collectibles, trading cards and accessories; further admit that while StockX users can buy and sell goods from each other, they can also buy goods directly from StockX in limited circumstances; and further admit that StockX is not an authorized distributor of Nike goods but engages in the lawful resale of goods from brands including, but not limited to Nike, Puma, New Balance, adidas, Reebok, Asics, and Converse.

49.     Deny, except admit that when a sale of a good that is not associated with the Vault NFT program occurs, the seller ships the item to StockX, StockX authenticates the item using a proprietary, multi-step authentication process, StockX ships the item to the buyer, and StockX pays the seller less a transaction fee.  However, when the sale of a Vault NFT and associated Stored Item occurs, several of these steps are unnecessary and do not occur; the seller does not have to ship the product to StockX for authentication because the product is already authenticated and stored in the StockX vault, where it remains until an associated Vault NFT is redeemed for the physical good.

50.     Admit that Nike accurately quotes a portion of the Preliminary Statement to StockX's Answer to Nike's original Complaint.

51.     Paragraph 51 states legal conclusions to which no response is required.  To the extent a response is required, deny, except refer to the contents of the StockX website, which speak for themselves, and admit that every item sold on StockX's e-commerce platform has gone through StockX's authentication process and that StockX is not the entity that designed, created, manufactured, packaged, or shipped the products sold through its platform in the first instance.

52.     Deny, except refer to the contents of the StockX website, which speak for themselves.

53.     Deny, except refer to the contents of the StockX website which speak for themselves.

54.     Paragraph 54 states legal conclusions to which no response is required.  To the extent a response is required, deny.

55.     Deny, except admit that the Jordan, Nike, and Converse brands were among the top five trading footwear brands by volume on StockX's platform in 2021 and otherwise refer to the contents of StockX's most recent annual report, which speak for themselves.

56.     Admit and refer to the full contents of the January 18, 2022 announcement "StockX Launches Vault NFTs," which speak for themselves.

57.     Deny, except admit that consumers can purchase a Vault NFT that is created and first offered by StockX reflecting the "key" or "claim ticket" to the Stored Item depicted on the Vault NFT and held in StockX's vault, and further admit that by selling a Vault NFT, a user is transferring title to the associated Stored Item.

58.     Deny, except refer to the contents of StockX marketing, which speak for themselves, and admit that consumer portfolios include an "NFTs" section.

59.     Admit and refer to the full contents of the StockX website, which speak for themselves.

60.     Deny, except admit that StockX provides each purchaser with a confirmation message describing the physical shoe that has been purchased—not just a Nike Dunk Low Retro White Black—and refer to the full contents of StockX confirmation messages, which speak for themselves.

61.     Deny, except admit that StockX provides each purchaser with e-mail confirmation of purchase and refer to the full contents of the StockX e-mail confirmation, which speak for themselves.

62.     Deny and refer to the full contents of the order confirmation webpages and order confirmation emails, which speak for themselves.

63.    Deny, except admit that StockX sets the initial price for Vault NFTs and that StockX does not set or control prices for subsequent trades by its users, and that prices for subsequent trades fluctuate; for example, as of March 22, 2022, the last sale price for the Vault NFT product referenced in paragraph 63 of the Amended Complaint was $276.

64.    Deny, except admit that StockX sets the initial price for Vault NFTs and that StockX does not set or control prices for subsequent trades by its users, and that prices for subsequent trades fluctuate; for example, as of March 22, 2022, the last sale price for the Vault NFT product referenced in paragraph 64 of the Amended Complaint was $210.

65.    Deny, except admit that the asking and sale prices for subsequent trades of StockX Vault NFTs for Nike shoes, along with Vault NFTs for other brands and products, continue to fluctuate.

66.    Admit that Nike accurately quotes a portion of StockX's "Collect What's Next – Introducing NFTs on StockX" webpage, and refer to the full contents of that webpage, which speak for themselves.   Aver that Section 28 of the StockX Terms and Conditions of Use, available at https://stockx.com/terms, states that:

> Each Vault NFT is backed by a physical item held in StockX's custody and does not have value beyond that associated with the underlying physical good.  Other types of NFTs ("Experiential NFTs") may grant the NFT holder rights to obtain certain additional products, or benefits or to engage in certain experiences, such as unlocking a reward or access to an exclusive sale (collectively, "Experiences"). All NFTs on the Services may be subject to any additional terms provided by StockX from time to time ("Additional NFT Terms").  In addition, from time to time StockX may offer incentives and rewards for users of StockX Services generally, but not as a component of the value of any particular NFT, unless otherwise expressly stated in the applicable Additional NFT Terms.

A copy of the current StockX Terms and Conditions of Use are attached hereto as Exhibit A.

67.    Deny, except refer to the contents of StockX's webpages, which speak for themselves; admit that upon redemption of a StockX Vault NFT, StockX will charge a $35

withdrawal fee and between $5 and $14.95 for shipping and sales tax to send the Stored Item to its owner; that StockX will remove the associated Vault NFT from the owner's portfolio; that redemption is now available using the form at <https://stockx.com/help/contact/nft-redeem>; that redemptions have, in fact, occurred; and that, at the start of the Vault NFT program (and as of the filing of this action), the redemption process was temporarily unavailable and StockX stated as much in its terms.

68.     Admit that as of the date Nike filed this action and as of the filing of this Answer to Nike's Amended Counterclaims, the Terms and Conditions of Use include a section on "Vault Terms," (Section 29), which governs Vault NFTs and relatedly, use of StockX's vault services, and a section on "NFT Terms," (Section 28), which more broadly provides terms pertaining to the various types of NFTs that StockX offers or may offer in the future, which include not only Vault NFTs but also Experiential NFTs, which entitle holders to obtain certain additional products, benefits, or access to certain experiences, such as unlocking a reward or access to an exclusive sale, and refer to the full contents of the StockX Terms and Conditions, attached hereto as Exhibit A, which speak for themselves.

69.     Deny, except admit that, as of the date Nike filed this action, the StockX Terms and Conditions stated that a purchaser of a Vault NFT "gain[ed] title to both the Vault NFT [they] purchased and the Stored Item it corresponds to," and that a purchaser of a Vault NFT "automatically make[s] use of the Vault Services"; aver that the StockX has revised its Terms and Conditions since the filing of the Complaint; and refer to the contents of the current StockX Terms and Conditions attached hereto as Exhibit A, which speak for themselves.  Further aver that StockX FAQs, available at https://stockx.com/help/articles/What-are-Vault-NFTs, inform consumers that:

Vault NFTs are digital tokens that represent ownership of physical items and, therefore, do not have any intrinsic value beyond that of the underlying physical good. Each Vault NFT is backed by a physical item held in StockX's custody, tied directly one to one via the blockchain. Any item in the StockX Vault is Verified Authentic via StockX's authentication process. This means that if you buy an edition of a Vault NFT, you are the owner of the corresponding physical good which is secured and stored in StockX's Vault. You can trade that NFT to someone else, which will also transfer ownership of the corresponding physical good, you can hold it for any length of time, or you can redeem the item from the StockX Vault and take possession of the physical item.

A copy of the StockX FAQ article "What are Vault NFTs?" is attached hereto as Exhibit B. Further aver that by purchasing a Vault NFT, consumers agree that they will not attempt to sell a stored physical good to a buyer other than by selling the associated Vault NFT via the StockX platform; that the stored physical good and Vault NFT must always be traded together; and that all transactions will take place only via the StockX Platform.

70. Deny, except admit that, as of the date Nike filed this action, the StockX Terms and Conditions stated that Vault NFTs "have no inherent or intrinsic value," that "[t]hrough January 31, 2023, the Vault Services will be provided free of charge until and unless [a Vault NFT owner] elect[s] to have Stored Items shipped to [them] or [they] sell them to another buyer via the StockX platform," and that "[b]eginning February 1, 2023, StockX will charge [] a monthly fee for the provision of the Vault Services." Further, aver that StockX has revised its Terms and Conditions since the filing of the Complaint; and refer to the contents of the current StockX Terms and Conditions attached hereto as Exhibit A, which speak for themselves.

71. Deny, and state that by February 10, 2022, the Terms and Conditions stated the following:

NFTs may take a variety of forms, and the holders of NFTs may be entitled to obtain certain products, benefits or engage in certain experiences, such as unlocking a prize or entry into an exclusive sale ("Experiential Component"), as determined by StockX in its sole discretion, subject to any additional terms provided by StockX with or in connection with the purchase of such NFT ("Additional NFT Terms") . . .

> For the avoidance of doubt, Vault NFTs are not Experiential NFTs and do not contain an Experience that would give rise to automatic redemption, and Vault NFTs do not have an expiration date.

Further, aver that the StockX has revised its Terms and Conditions since the filing of the Complaint; and refer to the contents of the current StockX Terms and Conditions attached hereto as Exhibit A, which speak for themselves.

72.     Deny.

73.     Deny, except admit that StockX revised its Terms and Conditions and certain statements on its website, and refer to the contents of the current StockX Terms and Conditions and website, which speak for themselves.

74.     Paragraph 74 states legal conclusions to which no response is required.  To the extent a response is required, deny.

75.     Deny, except admit that as of February 2, 2022, StockX offered Vault NFTs for nine different types of products, and eight of the nine types of products were genuine Nike shoes. Aver that StockX's Vault NFT collection, as shown on the landing page available at https://stockx.com/lp/nfts/, has continued to evolve as StockX has released more Vault NFTs.  A copy of the current Vault NFT landing page is attached hereto as Exhibit C.

76.     Deny, except admit that StockX has sold 1,738 individual StockX-branded Vault NFTs; that some of the Vault NFTs associated with Nike products are offered in editions of 1, 3, 100, and 250, with each Vault NFT tied one-to-one to a physical pair of sneakers held in StockX's vault; that StockX is not an authorized Nike retailer; and that StockX previously minted NFTs for Nike Air Jordan 11 Retro Cool Grey shoes that it has not offered for sale.  Aver that each and every Vault NFT is backed by a physical product.  Further, deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations as to what is or is not apparent or clear to Nike.

77.     Deny, except admit that StockX product pages accurately state the name of the Stored Item and include an image that accurately depicts the Stored Item.

78.     Deny, except admit that StockX authenticates the Stored Items that are depicted in and associated with its Vault NFTs, that as of the date Nike filed this action StockX product description pages included the statement "100% authentic," that StockX informs consumers that StockX verifies the authenticity of the Stored Items, and that StockX's authentication process is in no way affiliated with Nike.  Refer to the full contents of prior product description pages, which speak for themselves, and aver that an example of a current product description page, available at https://stockx.com/retro-black-and-white-dunk-vault-nft, clearly indicates that the products are "StockX Verified."



79.     Admit that StockX product pages for Vault NFTs include (and included) "Product Details" and a "Product Description," which include (and included) a fair use of the Nike brand to accurately describe the underlying Stored Item; further admit that Nike accurately quotes

portions of a Vault NFT product page; and refer to the full contents of the Vault NFT product pages, which speak for themselves.

80.     Deny, except admit that when a consumer purchases a physical pair of Nike shoes via the StockX platform, the consumer receives a paper receipt; aver that a paper receipt is distinct from a Vault NFT, as it accompanies the physical product when shipped rather than acting as a claim ticket for the physical product; and refer to the contents of the Vault NFT product pages, which speak for themselves.

81.     Deny; except admit that Vault NFT product pages include a "How it Works" image, which disclaims association with any brand, and refer to the full contents of the Vault NFT product pages (current and prior), which speak for themselves.

82.     Deny, except refer to the contents of the Vault NFT product pages (current and prior), which speak for themselves.

83.     Deny, except refer to the contents of the StockX Website, StockX App, and StockX social media accounts, which speak for themselves.  A copy of the current StockX Vault NFT landing page is attached hereto as Exhibit C.

84.     Deny, except refer to the contents of StockX Google advertisements, which speak for themselves.

85.     Deny, except refer to the contents of the StockX Twitter account (@stockx) and website, which speak for themselves.

86.     Deny, except refer to the contents of the referenced StockX Instagram posts, which speak for themselves.

87.     Admit that Nike accurately quotes the caption of the referenced StockX Instagram post (which, when viewed in its entirety, displays multiple images of Nike and adidas products)

and refer to the full contents of the referenced StockX Instagram post and associated linked pages, which speak for themselves.

88.     Deny, except refer to the contents of the referenced StockX Instagram posts, which speak for themselves.

89.     Admit that Nike accurately quotes the caption of the referenced StockX Instagram post and refer to the full contents of the referenced StockX Instagram post and associated linked pages, which speak for themselves.

90.     Deny, except refer to the contents of the referenced StockX January 26, 2022 tweet, which speak for themselves.

91.     Deny.

92.     Admit that StockX's Vault NFTs are not Nike products, but that they are instead keys or claim tickets to access certain Stored Items, which include Nike products.  Further admit that StockX's Vault NFTs are tied to the lawful resale of physical Nike products, and that there is no collaboration between Nike and StockX as to Vault NFTs, StockX did not and does not need to obtain a license or authorization from Nike to accurately describe and depict the Stored Items underlying its Vault NFTs, and StockX disclaims any association or affiliation with Nike (or any other brand) as to its Vault NFT program.

93.     Deny, except admit that Vault NFTs confer title to genuine Nike products.

94.     Deny, except admit that Nike is not involved in decision-making regarding Vault NFTs, which are tied to physical Nike goods lawfully resold to consumers.

95.     StockX repeats and re-alleges each of its responses to Paragraphs 63, 64, and 65.

96.     Deny and refer to the contents of the referenced article, which speak for themselves.

97.     Deny.

98.     Deny.

99.     Deny, except refer to the contents of the referenced social media posts, which speak for themselves.

100.    Deny, except refer to the contents of the referenced social media post, which speak for themselves.

101.    Deny, except refer to the contents of the referenced social media post, which speak for themselves.

102.    Deny, except refer to the contents of the referenced social media post, which speak for themselves.

103.    Deny, except refer to the contents of the referenced social media post, which speak for themselves.

104.    Deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations and refer to the contents of any alleged social media posts or articles purportedly showing consumer confusion, which speak for themselves.

105.    Deny, except admit that Nike's Dunk Genesis Cryptokicks NFTs did not debut on StockX and deny knowledge or information sufficient to form a belief as to what Nike feared.

106.    Paragraph 106 states a legal conclusion as to the allegedly counterfeit nature of the shoes Nike purportedly purchased, to which no response is required.  To the extent a response is required, deny, except deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations regarding what its continuing investigation has revealed.

107.    Paragraph 106 states a legal conclusion as to the allegedly counterfeit nature of the shoes Nike purportedly purchased, to which no response is required.  To the extent a

response is required, deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations.

108.     Deny.

109.     Paragraph 109 states a legal conclusion as to the allegedly counterfeit nature of the shoes Nike purportedly purchased, to which no response is required.   To the extent a response is required, deny, except deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations regarding its purported discovery of allegedly counterfeit goods, the consumer complaints Nike purports to identify, and the vaguely described findings of Nike's investigation.

110.     Paragraph 110 states legal conclusions as to the allegedly counterfeit nature of the shoes Nike purportedly purchased and the falsity of StockX's claims, to which no response is required.   To the extent a response is required, deny, except deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations regarding its purported, vaguely-described purchase of counterfeit goods, and refer to the full contents of the StockX website, which speak for themselves.

111.     Paragraph 111 states legal conclusions regarding the alleged falsity and materiality of, and any resulting deception from, StockX's claims, to which no response is required.   To the extent a response is required, deny, except deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations regarding any allegedly counterfeit goods, and refer to the full contents of the StockX website, which speak for themselves.

112.     Paragraph 112 states legal conclusions regarding the alleged falsity and materiality of, and any resulting deception from, StockX's claims, to which no response is required.   To the extent a response is required, deny, except deny knowledge or information

sufficient to form a belief as to the "unknown number of consumers," who Nike identifies "on information and belief," and the truth of Nike's allegations regarding any allegedly counterfeit goods.

113.    Deny.

114.    Paragraph 114 states legal conclusions as to the allegedly counterfeit nature of the shoes Nike purportedly purchased, the alleged falsity of StockX's claims, and alleged harm or injury Nike has suffered, to which no response is required.  To the extent a response is required, deny, except deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations regarding any allegedly counterfeit goods.

115.    Paragraph 115 states a legal conclusion to which no response is required.  To the extent a response is required, deny.

116.    Paragraph 116 states a legal conclusion as to dilution to which no response is required.  To the extent a response is required, deny.

117.    Paragraph 117 states a legal conclusion as to the fame of Nike's trademarks to which no response is required.  Otherwise admit.

118.    Deny, except admit that StockX has minted Vault NFTs tied to Air Jordan 11 Retro Cool Grey shoes.

119.    Paragraph 119 states a legal conclusion to which no response is required.  To the extent a response is required, deny.

120.    Paragraph 120 states a legal conclusion to which no response is required.  To the extent a response is required, deny.

121.    Paragraph 121 states a legal conclusion to which no response is required.  To the extent a response is required, deny.

**FIRST CAUSE OF ACTION**
**TRADEMARK INFRINGEMENT**
**15 U.S.C. § 1114**

122.    StockX repeats and re-alleges each of its responses to Paragraphs 1 to 121, as if fully set forth herein.

123.    Deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations and, to the extent relevant, refer to the United States Patent and Trademark Office records, which speak for themselves.

124.    Paragraph 124 states a legal conclusion as to which no response is required.  To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations.

125.    Paragraph 125 states legal conclusions as to which no response is required.  To the extent a response is required, deny, except admit that StockX lawfully describes and depicts Nike products that it sells.

126.    Paragraph 126 states a legal conclusion as to which no response is required.  To the extent a response is required, deny, except admit that StockX lawfully describes and depicts the Nike products that it sells.

127.    Paragraph 127 states a legal conclusion as to which no response is required.  To the extent a response is required, deny.

128.    Paragraph 128 states a legal conclusion as to which no response is required.  To the extent a response is required, deny.

129.    Paragraph 129 states a legal conclusion as to which no response is required.  To the extent a response is required, deny.

130.    Paragraph 130 states a legal conclusion as to which no response is required.  To the extent a response is required, deny.

131.     Paragraph 131 states a legal conclusion as to which no response is required.  To the extent a response is required, deny.

132.     Paragraph 132 states a legal conclusion as to which no response is required.  To the extent a response is required, deny.

133.     Paragraph 133 states a legal conclusion as to which no response is required.  To the extent a response is required, deny.

**SECOND CAUSE OF ACTION**
**FALSE DESIGNATION OF ORIGIN / UNFAIR COMPETITION**
**15 U.S.C. § 1125(a)**

134.     StockX repeats and re-alleges each of its responses to Paragraphs 1 to 121, as if fully set forth herein.

135.     Paragraph 135 states a legal conclusion as to which no response is required.  To the extent a response is required, deny.

136.     Paragraph 136 states a legal conclusion as to which no response is required.  To the extent a response is required, deny.

137.     Paragraph 137 states a legal conclusion as to which no response is required.  To the extent a response is required, deny.

138.     Paragraph 138 states a legal conclusion as to which no response is required.  To the extent a response is required, deny.

139.     Paragraph 139 states a legal conclusion as to which no response is required.  To the extent a response is required, deny.

**THIRD CAUSE OF ACTION**
**TRADEMARK DILUTION**
**15 U.S.C. § 1125(c)**

140.     StockX repeats and re-alleges each of its responses to Paragraphs 1 to 121, as if fully set forth herein.

141.    Paragraph 141 states a legal conclusion as to which no response is required.  To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations.

142.    Paragraph 142 states a legal conclusion as to which no response is required.  To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations.

143.    Paragraph 143 states a legal conclusion as to which no response is required.  To the extent a response is required, deny.

144.    Paragraph 144 states a legal conclusion as to which no response is required.  To the extent a response is required, deny.

145.    Paragraph 145 states a legal conclusion as to which no response is required.  To the extent a response is required, deny.

146.    Paragraph 146 states a legal conclusion as to which no response is required.  To the extent a response is required, deny.

147.    Paragraph 147 states a legal conclusion as to which no response is required.  To the extent a response is required, deny.

148.    Paragraph 148 states a legal conclusion as to which no response is required.  To the extent a response is required, deny.

149.    Paragraph 149 states a legal conclusion as to which no response is required.  To the extent a response is required, deny.

**FOURTH CAUSE OF ACTION**
**INJURY TO BUSINESS REPUTATION AND DILUTION**
**NEW YORK GENERAL BUSINESS LAW § 360-l**

150.     StockX repeats and re-alleges each of its responses to Paragraphs 1 to 121, as if fully set forth herein.

151.     Deny, except admit that Nike purports to seek, on behalf of itself and the general consuming public, recovery from StockX for violation of New York's Anti-Dilution Statute, N.Y. Gen. Bus. Law § 360-l, *et seq*.

152.     Paragraph 152 states a legal conclusion as to which no response is required.  To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations.

153.     Paragraph 153 states a legal conclusion as to which no response is required.  To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations.

154.     Paragraph 154 states a legal conclusion as to which no response is required.  To the extent a response is required, deny.

155.     Paragraph 155 states a legal conclusion as to which no response is required.  To the extent a response is required, deny.

156.     Paragraph 156 states a legal conclusion as to which no response is required.  To the extent a response is required, deny.

**FIFTH CAUSE OF ACTION**
**COMMON LAW TRADEMARK INFRINGEMENT**
**AND UNFAIR COMPETITION**

157.     StockX repeats and re-alleges each of its responses to Paragraphs 1 to 121, as if fully set forth herein.

158.    Paragraph 158 states a legal conclusion as to which no response is required.  To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations.

159.    Paragraph 159 states a legal conclusion as to which no response is required.  To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations.

160.    Admit that permission, license, and/or authorization from Nike are not necessary and, accordingly, StockX has not obtained permission, license, and/or authorization.

161.    Paragraph 161 states a legal conclusion as to which no response is required.  To the extent a response is required, deny.

162.    Paragraph 162 states a legal conclusion as to which no response is required.  To the extent a response is required, deny.

163.    Paragraph 163 states a legal conclusion as to which no response is required.  To the extent a response is required, deny.

**SIXTH CAUSE OF ACTION**
**COUNTERFEITING**
**15 U.S.C. § 1114**

164.    StockX repeats and re-alleges each of its responses to Paragraphs 1 to 121, as if fully set forth herein.

165.    Deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations and, to the extent relevant, refer to the United States Patent and Trademark Office records, which speak for themselves.

166.    Paragraph 166 states a legal conclusion as to which no response is required.  To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations.

167.    Paragraph 167 states a legal conclusion as to which no response is required.  To the extent a response is required, deny knowledge or information sufficient to form a belief as to the truth of Nike's allegations.

168.    Paragraph 168 states a legal conclusion as to which no response is required.  To the extent a response is required, deny.

169.    Paragraph 169 states a legal conclusion as to which no response is required.  To the extent a response is required, deny.

170.    Paragraph 170 states a legal conclusion as to which no response is required.  To the extent a response is required, deny.

## SEVENTH CAUSE OF ACTION
## FALSE ADVERTISING
### 15 U.S.C. § 125(a)(1)(B)

171.    StockX repeats and re-alleges each of its responses to Paragraphs 1 to 121, as if fully set forth herein.

172.    Deny, except refer to the contents of StockX advertising and marketing, which speak for themselves.

173.    Paragraph 173 states a legal conclusion as to which no response is required.  To the extent a response is required, deny, except refer to the contents of StockX advertising and marketing, which speak for themselves.

174.    Paragraph 174 states a legal conclusion as to which no response is required.  To the extent a response is required, deny, except deny knowledge or information sufficient to form a belief as to Nike's allegations regarding the subject matter in which Nike has "intense interest."

175.    Paragraph 175 states a legal conclusion as to which no response is required.  To the extent a response is required, deny.

36

## ANSWER TO DEMAND FOR JURY TRIAL

No response is required to Nike's demand for a jury trial.

## ANSWER TO PRAYER FOR RELIEF

To the extent paragraphs 1–12 of Nike's "Prayer For Relief" could be construed as allegations that Nike is entitled to such relief, this is a legal conclusion to which no response is required.  To the extent a response is required, deny that Nike is entitled to the relief requested, or to any other relief.

## AFFIRMATIVE DEFENSES

StockX sets forth the below affirmative defenses.  Each affirmative defense is asserted as to all claims asserted against StockX in the Amended Complaint, unless stated otherwise.  By setting forth these defenses, StockX does not assume the burden of proving any fact, issue, or element of claim where such burden properly belongs to Nike.  StockX does not in any way waive or limit any defenses that are or may be raised by its denials and averments.  These defenses are pled in the alternative, to preserve the rights of StockX to assert such defenses, and are without prejudice to the ability of StockX to raise other and further defenses.  StockX reserves the right to seek leave to assert additional affirmative defenses based upon further investigation and discovery.

### FIRST AFFIRMATIVE DEFENSE
### (Failure to State a Claim)

1.      Nike's claims are barred, in whole or in part, for failure to state a claim upon which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE
### (Fair Use)

2.      Nike's claims are barred, in whole or in part, as the acts of StockX alleged in the

Amended Complaint constitute descriptive fair use and/or nominative fair use.

### THIRD AFFIRMATIVE DEFENSE
### (First Sale Doctrine)

3.      Nike's claims are barred, in whole or in part, by the first sale doctrine permitting

purchasers of lawfully trademarked goods to display, offer, and sell those goods under their

original trademark.

### FOURTH AFFIRMATIVE DEFENSE
### (No Injury)

4.      Nike's claims are barred because it has suffered no harm or damages.

### FIFTH AFFIRMATIVE DEFENSE
### (Failure to Mitigate)

5.      Nike's claims are barred, in whole or in part, because Nike failed to mitigate

damages, if such exist.

### SIXTH AFFIRMATIVE DEFENSE
### (Adequacy of Remedy at Law)

6.      The alleged injury or damage suffered by Nike, if any, would adequately be

compensated by damages.

### SEVENTH AFFIRMATIVE DEFENSE
### (Estoppel)

7.      Nike is barred from pursuing its counterfeiting and false advertising claims based

on the equitable doctrine of Estoppel.

8.      Nike has collaborated with StockX on authentication efforts, sent Nike

representatives to one of StockX's authentication centers in or around October 2018 and again in

2019, and has worked with StockX to combat counterfeiting.

9.      Prior to this lawsuit, StockX had worked with Nike to quickly remediate issues as to allegedly counterfeit goods users attempted to sell through the StockX platform.

10.      Prior to this lawsuit, Nike praised StockX as a "good actor" in connection with efforts to remove a counterfeit listing, described StockX and Nike Brand Protection as "aligned on ensuring [] consumers only receive authentic product," and sought StockX's assistance in identifying counterfeit sellers.

11.      On information and belief, Nike has been aware of StockX's "100% Verified Authentic" and "100% Authentic" claims since StockX began making those claims in or around 2018.

12.      StockX has detrimentally relied on Nike's praise and approval of StockX's authentication and anti-counterfeiting efforts.

13.      Nike is now equitably estopped from asserting counterfeit and related false advertising claims – without any warning to StockX, *months* after Nike purportedly purchased four pairs of allegedly counterfeit shoes, and *years* after Nike examined StockX's authentication process and learned of StockX's "100% Verified Authentic" and "100% Authentic" claims.

### EIGHTH AFFIRMATIVE DEFENSE
### (Acquiescence)

14.      Nike is barred from pursuing its counterfeiting and false advertising claims based on the equitable doctrine of Acquiescence.

15.      Nike has collaborated with StockX on authentication efforts, has sent representatives to one of StockX's authentication centers, and has worked with StockX in the past to combat counterfeiting.

16.      Prior to this lawsuit, Nike praised StockX as a "good actor" in connection with efforts to remove a counterfeit listing, described StockX and Nike Brand Protection as "aligned

on ensuring [] consumers only receive authentic product," and sought StockX's assistance in identifying counterfeit sellers.

17.     Nike's perceived support of StockX's business, including its authentication and anti-counterfeit efforts, and related delay in asserting any counterfeit claims has caused StockX undue prejudice.

**NINTH AFFIRMATIVE DEFENSE**
**(No Causation)**

18.     Nike is barred from pursuing its counterfeiting claim because StockX was not the cause, legal or proximate, of Nike's alleged injuries, to the extent that any exist.

19.     Nike has not alleged that StockX was the seller of, or was integrally involved in the sale of, the four pairs of allegedly counterfeit shoes.

20.     StockX is not directly liable for counterfeiting, and StockX has failed to allege claims of contributory or vicarious liability.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, StockX demands a trial by jury of this action.

**WHEREFORE**, StockX prays for judgment as follows:

1.     That Nike take nothing by way of its Amended Complaint;

2.     That the Amended Complaint be dismissed in its entirety with prejudice;

3.     The StockX be awarded its costs of suit incurred herein in connection with this action, including reasonable attorneys' fees; and

4.     For such other and further relief as the Court deems just and proper.

Dated:      June 6, 2022
             New York, New York

DEBEVOISE & PLIMPTON LLP

By: */s/ David H. Bernstein*
David H. Bernstein (dhbernstein@debevoise.com)
Megan K. Bannigan (mkbannigan@debevoise.com)
Jyotin Hamid (jhamid@debevoise.com)
Justin Ferrone (jcferrone@debevoise.com)
Kathryn C. Saba (ksaba@debevoise.com)
919 Third Avenue
New York, New York, 10022
(212) 909-6000

KILPATRICK TOWNSEND & STOCKTON LLP
David Mayberry (DMayberry@kilpatricktownsend.com)
Rob Potter (RPotter@kilpatricktownsend.com)
1114 Avenue of the Americas
New York, New York 10036
(212) 775-8733

MORGANROTH & MORGANROTH PLLC
Jeffrey B. Morganroth
(Jmorganroth@morganrothlaw.com)
167 East 61st Street, #23ª
New York, New York 10065
(248) 864-4000

*Attorneys for StockX LLC*

41