MBAYNIKC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   NIKE, INC,

4                   Plaintiff,

5            v.                          22 Civ. 983 (VEC) (SN)

6   STOCKX LLC,

7                   Defendant.

8   ------------------------------x
                                     New York, N.Y.
9                                    November 10, 2022
                                     10:45 a.m.
10
    Before:
11
                    HON. VALERIE E. CAPRONI,
12
                                     District Judge
13
                            APPEARANCES
14
    DLA PIPER LLP
15       Attorneys for Plaintiff
    BY:  MARC E. MILLER
16       TAMAR Y. DUVDEVANI
         GABRIELLE VELKES
17

18   DEBEVOISE & PLIMPTON LLP
         Attorneys for Defendant
19   BY:  MEGAN KATHLEEN BANNIGAN
         KATHRYN CAMPBELL SABA
20       HANNAH BEATTIE

21

22

23

24

25

MBAYNIKC

```
 1              (Case called)
 2              THE DEPUTY CLERK:  Counsel, please state your
 3    appearance for the record.
 4              MR. MILLER:  Good morning, your Honor.  Marc miller on
 5    behalf of Plaintiff Nike.
 6              THE COURT:  Good morning, Mr. Miller.
 7              MS. DUVDEVANI:  Good morning, your Honor.  Tamara
 8    Duvdevani.
 9              THE COURT:  Good morning, Ms. Duvdevani.
10              MS. VELKES:  And Gabrielle Velkes.
11              THE COURT:  Good morning, Ms. Vehicles.  The front
12    table can sit down.
13              MS. BANNIGAN:  Good morning, your Honor.  Megan
14    Bannigan on behalf of Stockx.
15              THE COURT:  Good morning, Ms. Bannigan.
16              MS. SABA:  Kathryn Saba also on behalf of Stockx.
17              THE COURT:  Good morning, Ms. Saba.  You have to talk
18    up.  If you want to be a litigator, you have to speak up nice
19    and loud.
20              MS. BEATTIE:  Hannah Beattie, also on behalf of
21    Stockx.
22              THE COURT:  Good morning, Ms. Beattie.  Please be
23    seated.
24              So I brought you in because, having reviewed the
25    documents, I was left with the following two questions:  To
```

MBAYNIKC

1    Nike, I don't get it; and to Stockx, I don't get it.

2            I don't understand why you're in a swivet but you

3    can't show it to your clients.

4            And, Nike, I really don't understand the redaction.  I

5    don't understand why that material is highly confidential,

6    outside attorneys' eyes only.

7            So who's going to answer?  Mr. Miller?

8            MR. MILLER:  Yes, your Honor.  I'd be happy to address

9    your question.  I think the context here is important.

10           THE COURT:  I get it that they are counterfeiters and

11   you can't trust them as far as you could throw them.

12           MR. MILLER:  Yes, your Honor.  The reason why that

13   document, in particular, was designated as outside counsel eyes

14   only is because Nike made test purchases.

15           THE COURT:  That's not a secret.  It's not a secret

16   that Nike makes test purchases.  Correct me if I'm wrong.  All

17   you have to do is look at the docket of the court and know that

18   people who are policing their trademarks are making test

19   purchases.

20           MR. MILLER:  Sure.  That's correct, your Honor.  The

21   particular test purchase that was done here, the information on

22   the label shows the number of the test purchase in the series

23   that was done and the timeframe.  So the reason why --

24           THE COURT:  So that gives a sense of approximately how

25   many test purchases are being made.

MBAYNIKC

1          MR. MILLER:  Yes.  It's a piece of the larger puzzle,

2     the mosaic that your Honor mentioned on the phone call last

3     week.  What our concern was, when we looked at those very

4     carefully -- and we looked at every document that we produced

5     with four members of our team.

6          And we thought very carefully about what pieces of

7     information we could safely share with Stockx or keep to their

8     outside counsel eyes only in order to essentially keep the

9     larger piece of the puzzle closely safeguarded.

10         Your Honor, our concern was that if Stockx employees

11    could see more information about the pieces of the puzzle, they

12    could piece together information about Nike's test purchases

13    and who was making them on their platform.

14         THE COURT:  How does this show who was making them?

15         MR. MILLER:  Well, this one particular document does

16    not in and of itself.  But once we start opening the door and

17    letting out more pieces, the puzzle becomes easier to put

18    together.

19         THE COURT:  You're talking in platitudes.  That is the

20    mosaic theory, that if you let out little pieces, you can put

21    the whole thing together.

22         MR. MILLER:  This says that there were a number of

23    test purchases.  I'm not clear during what timeframe.  I'm not

24    clear who made them.  And at least some of them were made in

25    January of this year.  Right?

MBAYNIKC

1          I am just lost as to why, again, recognizing, as I

2     say, that every counterfeiter knows that there are test

3     purchases being made and anybody who works in this area of the

4     law knows that test purchases are made.  And generally, they're

5     not being made under real names.

6          So help me understand what you're really protecting

7     here, other than the answer is maybe this is a tiny little

8     piece.  And, you know, what, in truth, if you lose on this

9     little piece, it doesn't matter.

10         MR. MILLER:  Yes, your Honor.  This is a tiny little

11    piece.  And perhaps you're right that on this one individual

12    document, that may be true.  But if there are more pieces that

13    come together, our concern is that Stockx will be able to

14    identify, by looking at the bigger picture and seeing all of

15    the different purchases that are made, the strategy that's

16    used, how many of each style, what sizes, when and look and see

17    and put all those pieces together to form the picture and

18    essentially try to evade or hinder the test purchases.  Right?

19         THE COURT:  I don't know how you do that.  Even if you

20    know that there are test purchases being made and that they're

21    being made of size X, which I presume varies from product to

22    product maybe.  I don't know what they're selling.

23         MR. MILLER:  These are all sneakers, your Honor.

24         THE COURT:  These were all the same size, but you

25    didn't block off the size.

MBAYNIKC

1          MR. MILLER:  That's right.  In our proposed

2     redactions, we are not proposing to redact the label that

3     appears on the original goods.

4          THE COURT:  Are these counterfeit goods?

5          MR. MILLER:  That one was confirmed to be a

6     counterfeit, your Honor.

7          THE COURT:  So I'm no closer to understanding.

8          Ms. Bannigan, now the attention shifts to you.  I

9     don't understand in a million years why, in order to adequately

10    represent your client, you need to provide the information to

11    the client of the information that Nike has indicated is

12    outside counsel's eyes only.

13         MS. BANNIGAN:  Thank you, your Honor.

14         Stockx has been having an unusual and surprisingly

15    difficult time nailing down what the allegations in the

16    complaint are.  Nike amended the complaint and said that they

17    conducted an investigation.

18         Through this investigation, they identified four

19    counterfeits.  Those are the allegations in the complaint.  We

20    served an interrogatory asking that they identify the

21    counterfeits shoes that they identified.

22         They referred to a document.  We actually had to go

23    back and forth with them and spent an exceedingly -- spending a

24    large amount of time and a lot of money getting them to simply

25    put the Bates numbers of the documents they're referring to.

MBAYNIKC

1          The Bates numbers that they're referring to, there

2     aren't that many of them.  And several of them are these

3     documents denying that was raised that are highly confidential,

4     outside counsel's eyes only.

5          We need this information to do an investigation.

6     Stockx takes very seriously these counterfeiting allegations.

7     We disagree that Stockx is a counterfeiter, and we need to

8     investigate them to be able to fully put together our defenses.

9          THE COURT:  Understood.  So how does the information

10    on the white tag advance that?

11         MS. BANNIGAN:  So the information on the white tag --

12    it includes a purchase date, which we need --

13         THE COURT:  No, it doesn't.  It includes a purchase

14    month.

15         MS. BANNIGAN:  Well, it includes a timeframe.  We

16    don't have a purchase date, but the best that we have --

17         THE COURT:  It's a month.  I assume you sold literally

18    thousands of items during the month of January.

19         MS. BANNIGAN:  Well, it at least narrows it down, your

20    Honor, and gives us something.  It includes the numerosity, how

21    many they purchased.  Nike is accusing us of being willful

22    infringers.  It matters how many they purchased and how many

23    they found.

24         Now, the other thing I note --

25         THE COURT:  I'm sorry.  Why?

MBAYNIKC

1        Why does it matter how many they purchased and how
2    many they found?
3        MS. BANNIGAN:  Well, there's an argument -- I believe
4    Nike's argument is that Stockx is knowingly selling or allowing
5    counterfeit shoes to be sold on its platform.  That's
6    absolutely not the case.  Stockx tries very hard to not allow
7    any counterfeiters' shoes to get through.
8        THE COURT:  I remember this involves non-fungible
9    tokens which I thought were done.  I thought we were done with
10   them.  But my law clerk tells me no; that at least boys in
11   college still think they're important.
12       So you are selling -- you are a marketplace for people
13   who collect Nike shoes, all kinds of shoes, all kinds of
14   things?
15       MS. BANNIGAN:  Yes, your Honor.  All kinds of things.
16   It's a marketplace for collectible goods where individuals can
17   buy and trade goods that they believe hold value.
18       THE COURT:  So you're like an Ebay?
19       MS. BANNIGAN:  Or a third-party marketplace in the way
20   that Ebay is a third-party marketplace, but there are obvious
21   differences from Ebay.
22       THE COURT:  I'm not an Ebay person.  So I wasn't
23   intending to diss you with that.
24       MS. BANNIGAN:  Yes, your Honor.
25       THE COURT:  So you are in the middle.  People are

MBAYNIKC

1    posting goods on your site, and you are the in-between to make

2    the deal go.  Nike says you're knowingly allowing counterfeits

3    to be sold on your site.

4              Now continue.  I sort of interrupted your flow.

5              MS. BANNIGAN:  Thank you, your Honor.

6              So the number of counterfeits that got through based

7    on how many were tests, that's going to be important.  But this

8    is a broader issue of allowing us to know that has been

9    identified.

10             We had sent over to Nike nine documents.  We, frankly,

11   thought they were mistakes; that they were just misdesignated.

12   That happens sometimes.  We were very surprised when they dug

13   in and said that this is the most sensitive trade secret

14   information.

15             The burden, frankly, is on Nike to show why they would

16   be harmed if we have this information.  They have not done

17   practice.  The sample that they gave you -- they gave you a

18   sample of the shoeboxes.

19             But the documents being identified are actually more.

20   There are pictures of the actual shoe.  There are tracking

21   numbers to show that would help us figure out when these were

22   purchased and the dates that they were shipped.  I have copies

23   of the documents.

24             THE COURT:  Why do you need to know the dates they

25   were purchased by Nike or by Nike's investigators?

MBAYNIKC

1      MS. BANNIGAN:  So Stockx can do an investigation to

2  see where did these shoes come from.  Did they go Stockx's

3  authentication process.  Did somebody from Stockx look at them

4  to determine are there any signs of counterfeiting.  There's a

5  lot that goes into Stockx's process to try to prevent

6  counterfeits.

7      THE COURT:  Isn't that going to be derived from the

8  bar code?

9      Again, I'm not trying to be difficult.  I just

10  don't -- it's like you are in a pitched battle over something

11  where I don't see either side's position.

12      MS. BANNIGAN:  I understand, your Honor.  It's part of

13  a broader issue for Stockx that it has just been so difficult

14  to get any information from Nike about these shoes.

15      We are concerned about -- we've raised concerns that

16  these are just a sample of documents.  We thought these were

17  the easy sample that we raised.  We do not want to be here

18  before your Honor bothering the Court with these disputes.

19      We are going to have several more disputes over

20  information.  We have several pending, not about just

21  designations but about information at all.

22      And it's about setting a standard that's in the

23  protective order and abiding by that standard as to what types

24  of information has to be turned over.  We're very

25  concerned that -- we highly negotiated this protective order.

MBAYNIKC

1          It actually took weeks to negotiate because there is a

2     difference of opinion as to whether there should be an

3     outside-counsel-only level at all.  We compromised because we

4     didn't want to burden the Court with that position.

5          But it was under the understanding that we would have

6     that level of confidentiality that it would seriously be trade

7     secret or the most sensitive commercial information that is

8     being designated.  We just don't understand how Nike has met

9     their burden to designate this.

10          But I hear your Honor.  We do not want to burden the

11     Court with disputes of this nature going forward.

12          THE COURT:  I don't want to be burdened with disputes

13     of this nature going forward.

14          Mr. Miller, did you want to add anything?

15          MS. DUVDEVANI:  If I may respond to that, your Honor.

16          THE COURT:  Sure.

17          MS. DUVDEVANI:  Our complaint allegations when we

18     amended -- and you're right.  This case started off over

19     non-fungible tokens.  And then after we filed, we saw indeed

20     Nike shopped the market.  It is not a secret that brands like

21     Nike shop a market.  What is not known is the volume, the

22     length of time, etc.

23          So, as Mr. Miller said, when we saw this whole piece

24     of the puzzle, everything that we did to investigate

25     counterfeiting activity on the Stockx platform, we looked at it

MBAYNIKC

```
1    holistically.  And then we had the difficult position to figure
2    out which piece of the puzzles that we could de-designate and
3    which would be kept as outside counsel's eyes only.
4           And in all honesty, your Honor, when we had to make
5    the judgment calls, we did err on the side of caution, given
6    the importance of the anti-counterfeiting initiatives that are
7    really Nike's most prized possessions to prevent
8    counterfeiting.
9           They work with intelligence organizations on this.
10   There is a very, very small subset of individuals at Nike that
11   even understands how this is done.
12           THE COURT:  How it's done is something more than
13   making test purchases and figuring out whether they're
14   counterfeits?
15           MS. DUVDEVANI:  Well, it's the figuring out whether or
16   not they're counterfeit that tends to be the really, really
17   secret information that nobody knows.
18           THE COURT:  That I get.  If this was telling me how
19   Nike can tell the difference between a really good counterfeit
20   and a real pair of Nike shoes, I'm there.
21           MS. DUVDEVANI:  This, in and of itself, does not.  But
22   what it does provide to somebody who is accused of
23   counterfeiting is the fact that there is a volume being shopped
24   in the same period of time.
25           We don't know Stockx's systems.  We don't know what we
```

MBAYNIKC

1   can decipher.  But I can represent to your Honor that these

2   test purchases were all made with the same alias to the same

3   P.O. box with the same credit card.

4          So once we start breaking it down and giving them more

5   pieces of the puzzle, they are potentially able to decipher

6   that.  When they see these volume of purchases going through,

7   they can do things like block the sale, which they do sometimes

8   because everything goes through the authentication process,

9   according to the Stockx platform.

10          Maybe they'll say, sorry.  You're not going to get

11   your product because it failed verification if they think it is

12   a right holder who is trying to make these purchases.  That is

13   why we designated these.

14          I will also say, your Honor, that when Stockx came to

15   Nike with this dispute, we almost immediately tried to offer

16   this compromise, as in somewhat robotic fashion --

17          THE COURT:  I'm sorry.  What compromise?

18          MS. DUVDEVANI:  Of redaction.  We would redact just

19   the label that the investigator put in.  We will give you the

20   rest of the imagery.  They would not even respond to the

21   proposal.

22          THE COURT:  Okay.  Again, I kind of don't want to get

23   into that, we said this.  They said that.  They didn't get back

24   to us.  I'm more concerned about sort of the Uber issue of is

25   this material and is this consistent with the decisions you

MBAYNIKC

1    were making.

2            These do not say that they were all made from the same

3    credit card with the same alias.  That may be evidence from

4    other documents that tie in to these.

5            Is that what you're telling me?

6            MS. DUVDEVANI:  Yes.  If you look at the larger piece

7    of the puzzle, yes.  I think that they could decipher that,

8    your Honor.  Yes.  I don't know how their systems work.  That's

9    my point.  If they know -- for example, one of the labels said

10   purchased --

11           THE COURT:  I'm sorry.  Just to interrupt.

12           The number of the purchases and the date does not tell

13   them that they're all made with the same credit card from the

14   same alias.  It doesn't even necessarily tell you that like

15   these were made -- number 1112 was made in January, but it's

16   unclear whether 1 to 1111 were also made in January or whether

17   they were made in December, November, or October.

18           MS. DUVDEVANI:  I agree with that, your Honor.  That

19   is true.  Our concern, when we were scrutinizing as to what to

20   designate as outside counsel's eyes only -- again, Stockx's

21   outside counsel received all of this documentation.

22           We disagree that we weren't being transparent.  Stockx

23   knows that we pointed them to the four counterfeits.  We know

24   that since this case began, we've identified almost a hundred

25   other pairs that Stockx has sold to downstream consumers, and

MBAYNIKC

1   they know every single one of the pairs.  I don't know why

2   they're saying that they don't.

3           THE COURT:  But that's out of how many test purchases?

4           MS. DUVDEVANI:  Well, the test purchases are besides

5   that.  Nike found four through their own test purchases in a

6   two-month period, which is certainly --

7           THE COURT:  Out of how many shoes did they sell?

8           MS. BANNIGAN:  I think a hundred.  I don't know

9   offhand, but that's basically 4 percent.  They say they have a

10  hundred percent guaranteed authenticity.  So right there, there

11  are four that went through.  When you think about the volume of

12  Nike shoes --And Ms. Bannigan is right.  They sell a lot of

13  other products.

14          The vast majority of Stockx products that are being

15  sold are Nike and Jordan shoes.  That's how the company was

16  founded.  That is how they make the vast majority of their

17  money.

18          Nike was very alarmed by that number.  And as I noted,

19  in May and June alone, we found one consumer who was sold 37

20  pairs of fake Jordans through the Stockx website.  And they

21  know because we approached Stockx immediately once we reached

22  out to that consumer.

23          We acknowledge, your Honor, that we are being

24  overcautious with this information, which is why, when Stockx

25  approached us, we immediately said we would redact the label

MBAYNIKC

1    and allow their folks to see the box, to the extent that gives

2    them information.

3            They haven't requested a notice to inspection the

4    shoes.  They could of course always do that.  We would make

5    them accessible.  I'm not sure what they would glean from it.

6    I know Ms. Bannigan noted that they wanted to see if the shoes

7    went through the authentication process.  But they claim every

8    shoe goes through an authentication process.

9            THE COURT:  Understood.

10           MS. DUVDEVANI:  Another thing I want to say, your

11   Honor -- and I do not want you to do a pox on both of our

12   houses if we did.

13           THE COURT:  You are so close to a pox on both of your

14   houses.

15           MS. DUVDEVANI:  But I'm not going to show you Stockx's

16   documents today, and I'm just going to keep my mouth shut.  It

17   really is a very important protective order.  Going forward, we

18   will try to be more discerning about what we designate.

19           Again, if Stockx raises disputes, we will offer

20   immediate compromises.  But we do think that the probation is

21   very important for Nike.

22           THE COURT:  I don't quarrel with the notion that

23   attorneys' eyes only serves useful purposes during discovery.

24   What I ask you to do is to work together cooperatively and

25   collegially.

MBAYNIKC

1          To the extent this is a good example of the sort of

2     disputes, you have my reaction.  I don't think either position

3     made a lot of sense to me.  I get the mosaic.  I just don't get

4     it on these particular materials, and I continue to not

5     understand why Stockx needed to see the labels.

6          So if you've got legitimate issues that you really

7     can't work out, you always have the Court available to you.

8     But I don't have a lot of tolerance for these sorts of disputes

9     where a neutral third party doesn't see either position.

10          That is not a good place for either of you to be in.

11     So there is not a pox on both of your houses.  I still love you

12     all dearly.  You can all come back any time you want to, but

13     try to work this out.

14          All of that said, where are we in the discovery of

15     this case?

16          MS. DUVDEVANI:  Yes, your Honor.  So substantial

17     completion of document discovery is done.  Nike has other

18     smaller productions to make.  Stockx may say the same.

19          Depositions are all being calendared right now.  It's

20     going to be a very busy holiday season for us.  But we are

21     working very hard to get dates for every single witness that's

22     been put on initial disclosures or that the parties need.

23          Whether or not we might beg for an extra week at the

24     end of January to finish some depositions up, as some of Nike's

25     witnesses in particular are overseas, may be the case.  But we

MBAYNIKC

1    took your Honor very serious when you said good cause at this

2    point, if we need more time.

3                (Continued on next page)

MBA5nikC2

```
1        THE COURT:  Look.  Obviously if you have got, there
2   are people that can't be rescheduled, that's fine.  I can duly
3   adjust schedules for that.  So, it sounds like -- but you
4   should be done with your fact discovery early next year.
5        MS. DUVDEVANI:  That is what we are aiming towards,
6   and so far, again, it will be a very busy holiday season but
7   that's what we are working towards, your Honor.
8        THE COURT:  Are the parties interested in a settlement
9   conference?
10        MS. DUVDEVANI:  We did have a settlement conference
11   before Judge Netburn.  She tried very hard to bring the parties
12   together.  We have had follow-up telephonic communications with
13   her and written communications.  Right now they're a bit at a
14   standstill, but certainly if we think there is more room for
15   compromise I have no problem calling Megan and letting her know
16   that.
17        THE COURT:  You have an open referral.
18        Ms. Bannigan, do you agree we are coming to the end of
19   the discovery period?
20        MS. BANNIGAN:  Yes, your Honor.
21        I think the parties still have some issues to work out
22   but we are trying very hard to work those out without Court
23   intervention.  We will take the Court's comments today about
24   working these out very seriously.  I will say I am still
25   personally a little perplexed about how what we are going to do
```

MBA5nikC2

1     about these pictures and whether I can show them to my client

2     and how Nike thinks that it is going to keep -- if Nike intends

3     to rely on these shoes that an investigator purchased of

4     evidence of counterfeits at trial, how they are going to do

5     that without naming the investigator or authenticating it or

6     how -- but as long as we can work together and Stockx can get

7     the information so we can identify these shoes so we can do a

8     full investigation, we are of course willing to work with Nike

9     but we haven't been able to get that information yet.  But we

10    will go back to them to work on this.

11         THE COURT:  OK.  Look they obviously need that

12    information, they're going to need to do that so that they

13    defend the case by showing, presumably, that they have got

14    reasonable processes in place and sometimes things get through

15    but their processes are good, but I don't know how they show

16    that unless they know what fell through the cracks.  So try to

17    work these things out between you.

18         I will see you again after fact discovery is complete.

19    I presume there is going to need to be expert discovery in this

20    case?

21         MS. DUVDEVANI:  Yes, your Honor.  There will be a lot

22    of experts during the expert discovery period in the case.

23         THE COURT:  Are NFTs now done?  The whole issue with

24    the NFTs is a moot point.

25         MS. DUVDEVANI:  No, your Honor.  NFTs are still a

MBA5nikC2

1    large component of this case.  At this point I would say there

2    is three buckets:  There is trademark infringement relating to

3    the NFTs, there is counterfeiting, and there is associated

4    false advertising relating to the counterfeiting.

5              THE COURT:  Great.  OK.  All right.  Everybody have a

6    wonderful holiday and I will see you early next year.

7              MS. DUVDEVANI:  Thank you, your Honor.

8              MS. BANNIGAN:  Thank you, your Honor.

9              THE COURT:  Thank you.

10                              o0o

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25