

**DLA Piper LLP (US)**
1251 Avenue of the Americas
27th Floor
New York, New York 10020-1104
www.dlapiper.com

December 12, 2022
*VIA ECF*

The Honorable Sarah Netburn
United States District Court, SDNY
40 Foley Square, Room 430
New York, New York 10007

**Re:** *Nike, Inc. v. StockX LLC*, Case No. 1:22-cv-00983-VEC (S.D.N.Y.)

**Dear Judge Netburn:**

Pursuant to the Court's December 9, 2022 Order, (Dkt. 79), Nike, Inc. respectfully submits this letter setting forth its positions on the pending discovery disputes with StockX, LLC.

**I.      StockX's Refusal to Answer Nike's Second Requests for Admission ("RFA").**

The Advisory Committee Notes for FED. R. CIV. P. 36 explain that the Rule "serves two vital purposes, both of which are designed to reduce trial time." These are to "facilitate proof with respect to issues that cannot be eliminated from the case" and "narrow the issues by eliminating those that can be." *Id., see also Diederich v. Dep't of Army*, 132 F.R.D. 614, 616 (S.D.N.Y. 1990). Nike's Second Set of RFAs accomplish both. Yet, StockX refuses to answer them, instead hiding behind objections based on burden and a mischaracterization that they seek a legal conclusion.

Nike alleges that StockX is "authenticating" and selling counterfeit "Nike"-branded shoes. (Dkt. 39 at ¶¶ 15, 164-75). Discovery to date shows that StockX recently "authenticated" and sold to consumers almost 80 counterfeit "Nike" shoes. Notably, StockX sold more than three dozen of these counterfeit "Nike" shoes (valued at almost $10,000) to a single consumer this year. StockX possesses the order numbers and other transactional information, establishing that it sold these fake shoes to consumers. Nike's RFAs break down each transaction for each good into discrete facts, which StockX can succinctly answer. For 78 fake shoes, Nike served 5 or 6 RFAs for each transaction, seeking confirmation that documents such as receipts are true copies that accurately reflect the transaction. This accounts for 421 of the 427 RFAs in the set. The remaining 6 RFAs require StockX to admit or deny other information regarding StockX's "authentication" process.

The RFAs exemplify Rule 36's purposes. Nike may have the burden to establish liability for counterfeiting, but StockX cannot avoid admitting basic, foundational facts: that it "authenticated" and sold non-genuine shoes. The RFAs will streamline the proofs by eliminating the undisputed material facts from those in genuine dispute, particularly on the threshold issue that StockX sold non-genuine goods, leaving the Court to focus on issues such as willfulness and damages.

The RFAs are not burdensome. Answering requires StockX to make a "reasonable inquiry" and admit or deny or assert lack of knowledge because "the information it knows or can readily obtain

is insufficient to enable it to admit or deny." FED. R. CIV. P. 36(a)(4). StockX makes no showing of burden (let alone undue burden) and fails to demonstrate that the RFAs cannot be fairly answered by looking up these recent orders in its records. *See e.g.*, *Sequa Corp. v. Gelmin*, 1993 WL 350029, at *1 (S.D.N.Y. Sept. 7, 1993) (1,441 RFAs reasonable in a case involving discrete financial transactions); *Gen. Elec. Co. v. Prince*, 2007 WL 86940, at *2 (S.D.N.Y. Jan. 10, 2007) (573 requests not burdensome where admissions were related to 573 invoices) (collecting cases).

StockX also objects to 84 RFAs on the basis that they "request[] that StockX admit to legal conclusions that go to the fundamental disagreement at the heart of Nike's lawsuit, as to which Nike bears the burden of proof." StockX is wrong. 78 of the 84 seek a *factual* admission regarding whether the 78 shoes are genuine. *See Fossil Grp., Inc. v. Angel Seller LLC*, 2021 WL 5409605, at *6 (E.D.N.Y. Aug. 27, 2021) ("Plaintiffs' arguments … are premised almost entirely on *an issue of fact*, *i.e.*, whether the watches Defendants sold were genuine or counterfeit….") (emphasis added). This is not a legal conclusion. Nike will prove that the goods are counterfeit, but "the mere fact that the RFAs concern a matter about which the requesting party has the burden of proof is not a proper ground for objection." *Jacobson Warehouse Co. v. Prestige Brands, Inc.,* 2022 WL 1617711, at *7 (S.D.N.Y. May 23, 2022) (compelling response to RFAs seeking confirmation that reports were accurate and whether party verified 162 orders). The other 6 RFAs seek admissions on highly relevant material facts concerning StockX's "authentication" process and whether StockX sourced goods from its marketplace, "authenticated" them, and put them in its "vault."

The RFAs are the most efficient means of eliminating undisputed facts (compared to, *e.g.*, testimony on each of the 78 transactions) and StockX may not disrupt the narrowing of genuine issues. The Court should thus order StockX to answer the RFAs or deem them admitted due to StockX's refusal to timely answer. *Myers v. Andzel*, 2007 WL 3010329, at *1 (S.D.N.Y. Oct. 12, 2007); *Beberaggi v. New York City Transit Auth.*, 1994 WL 18556, at *6 (S.D.N.Y. Jan. 19, 1994).

## II. Nike's complete production in response to RFP Nos. 6, 38, 40, 43, 52, 62, 64-66, 74-75.

StockX claims deficiencies in Nike's production but has not detailed the supposed deficiencies beyond a misguided hypothesis that more responsive documents should exist. StockX, for its part, engaged in the "document dump" strategy, producing to Nike hundreds of thousands of documents, including dozens of copies of the same documents and reams of irrelevant material. StockX appears to believe that Nike should be required to produce a commensurate number of documents.[1]

Nike has fully complied with its discovery obligations here. The parties stipulated to the sources, custodians, and methods of searching for ESI in this case. (Dkt. 47.) Nike searched for documents by running StockX's ESI search strings against the Nike custodial sources, which include the key Nike personnel relating to its NFT offerings and brand protection and anti-counterfeiting efforts. Nike also collected targeted documents from non-custodial sources most likely to have information relevant to the claims and defenses in this case. Nike engaged large teams of attorneys to review and produce documents responsive to StockX's RFPs.

---

[1] StockX ignores that "[d]iscovery is evaluated by quality, not quantity." *Funnekotter v. Agric. Dev. Bank of Zimbabwe*, 2014 WL 4630020, at *8 (S.D.N.Y. Sept. 11, 2014); *see also Hampton v. Diageo N. Am., Inc.,* 2006 WL 3020895, at *7 (D. Conn. Oct. 23, 2006) (denying motion to compel "[d]espite [moving party]'s disappointment in the relatively small number of documents produced" with no deliberate withholding of existing documents.).

- **RFP Nos. 6, 74, and 75:**  These seek documents sufficient to show Nike's NFT and "Digital Sneakers" offerings, including the prices of each, as well as the original retail prices of the physical Nike goods purportedly associated with StockX's Vault NFTs.  Nike produced documents sufficient to show the price for the physical Nike shoes associated with the Vault NFTs.  Nike also produced documents sufficient to show all NFTs bearing the asserted marks, and the price for each, sold since January 1, 2020.  While Nike maintains its objection to Request Nos. 74 and 75 related to "Digital Sneakers," *see* Sec. III *infra*, Nike is not withholding documents responsive to RFP Nos. 74-75 on the basis of that objection.

- **RFP No. 38:**  This seeks documents sufficient to show Nike's process for verifying whether a "Nike" product is genuine.  Nike produced responsive documents.  Nike is not withholding responsive documents and represented to StockX that additional information may be explored through depositions of Nike's witnesses.

- **RFP No. 52:**  This seeks consumer complaints regarding NFTs bearing the asserted Nike marks.  Nike produced responsive documents, including those from Nike's consumer services database and Nike's incoming social media messages.  Nike is not withholding responsive documents.

- **RFP Nos 40, 64-66:**  These seek documents related to Nike's investigation into StockX's sale of counterfeit "Nike" shoes.  Nike produced all non-privileged, responsive documents.  Nike is not withholding responsive, non-privileged documents.

  ### III.   Nike's objections and responses to RFP Nos. 54-56, 84, 85, 87, 88, 90, 93-95, 98-100, and 103-115, and related 30(b)(6) topics, are appropriate and proper.

  Nike served its responses to StockX's Fourth Set of RFPs (Nos. 84-102) on September 30, 2022 and its responses to StockX's Fifth Set of RFPs (Nos. 103-115) on October 31, 2022.  StockX raised concerns regarding the same on November 4 and 8, respectively.  The parties met and conferred on the same on November 18, 2022.  StockX served its 30(b)(6) deposition notice on November 8, 2022, and Nike served objections and designations on November 29, 2022.

- **Topic Nos. 2-6, 17-18:**  These topics seek information regarding Nike's future plans, channels of trade, prices, design, consumers, brand research, and infringement concerning Nike Digital Sneakers.  Nike does not sell "Digital Sneakers," *i.e.*, virtual sneakers that are not associated with a non-fungible token ("NFT").  Nike has partnered with other parties to make Nike-branded virtual goods available for use in video games, but these are not associated with NFTs.  As such, information on these virtual goods is not relevant here.  Nike's First, Second, Third, and Fourth claims concern StockX's infringing and dilutive use of Nike's marks in connection with StockX's Vault ***NFTs***.  Nike properly limited the scope of these topics to ***NFTs***.  Nike's overbreadth, burden, relevance, and proportionality objections are proper and its interpretation of the term "Digital Sneakers" to mean virtual sneakers that are tied to an NFT is appropriate.

- **RFP Nos. 54-56, Topics No. 15-16:**  These seek financial information for Nike's profits on sales of Nike-branded NFTs.  This information would be relevant only to actual damages (*i.e.*, lost profits) or disgorgement of StockX's ill-gotten profits on sales of the infringing NFTs.  But Nike is seeking only injunctive relief for its First, Second, Third, and Fourth Causes of Action.  Thus, Nike's NFT-related financials are not relevant.  *See e.g., City of New York v. Blue Rage Inc.,* 2018

WL 2709203, at *4 (E.D.N.Y. June 5, 2018) (plaintiff's revenue irrelevant to damages claim where "Plaintiff has stated it is not relying on actual damages to support its damages claim").

- **RFP Nos. 84-85:** These seek Nike's purported plans to acquire and/or designate StockX an official reseller of Nike goods. StockX claims that this somehow relates to its defense to willful counterfeiting. That position has no merit, given that internal Nike documents are not probative of StockX's *mens rea*. *See Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, 689 F. Supp. 2d 585, 599 (S.D.N.Y. 2010) ("[t]he standard for willfulness is whether the defendant had knowledge that his or her conduct represented infringement or recklessly disregarded the possibility."). Regardless, Nike is not withholding documents responsive to these requests.

- **RFP No. 87, Topic Nos. 20-21:** These seek technical specifications and manufacturing standards for Nike goods, which are highly commercially sensitive documents that Nike is loath to share with a party accused of counterfeiting. StockX advertised for years, without these documents, that its authentication process guarantees that 100% of the good sold on its platform are genuine. Yet, it now claims it needs Nike technical documents to establish baseline technical parameters to determine if the non-genuine "Nike" goods it sold are actually counterfeit. This position is spurious, and this information is not relevant. Nike's authentication of its goods does not rely on technical specifications. This is a clear fishing expedition into highly sensitive Nike information.

- **RFP Nos. 88, 90, 94, and 98-100, Topic Nos. 28-29, 31:** These requests and topics seek information about Nike's anti-counterfeiting efforts against parties ***other than*** StockX. Courts find such requests irrelevant where, as here, "[d]efendants have not adequately articulated how the specific, granular history of Plaintiffs' brand protection efforts, which involved test purchases from different sellers at different times over a span of years, are relevant to the claims in this case." *Fossil Grp., Inc. v. Angel Seller LLC*, 2021 WL 8168871, at *2 (E.D.N.Y. Nov. 10, 2021) (concluding that "Defendants' arguments suggest a fishing expedition involving non-parties.").

- **RFP Nos. 93 and 95, Topics No. 24-27:** These requests and related topics seek information regarding hypothetical "unauthorized" production of goods in authorized Nike factories, as well as provision of pre-release products to "select individuals." Nike has accused StockX of selling counterfeit "Nike" goods that were *not* manufactured by any authorized Nike factories, and whether Nike pre-releases genuine goods to "select individuals" is an irrelevant fishing expedition.

- **RFP Nos. 103-112:** StockX advances a legally infirm theory that *any* negative perception of Nike in the world at large impacts Nike's dilution claims against StockX's unauthorized Nike-branded NFTs. Putting aside the fact that StockX's business was built on Nike's strong reputation and famous marks, StockX's requests for unfettered discovery into the entirety of Nike's reputation is neither appropriate nor relevant. *See Starbucks Corp. v. Wolfe's Borough Coffee, Inc.,* 588 F.3d 97, 111 (2d Cir. 2009). And, of course, to the extent StockX attempts to argue that Nike somehow diluted its own NFT-related reputation, such an argument does not require any discovery from Nike (and any such evidence would also be subject to a future motion *in limine*). StockX's theory of "self-tarnishment" finds no support in the law and, even where a court accepted the theory "*arguendo*," that court nevertheless blocked defendant's efforts to take discovery *from plaintiff* on the matter. *See Virgin Enterprises Ltd. v. Am. Longevity*, 2001 WL 237379, at *2 (S.D.N.Y. Mar. 8, 2001) (granting a protective order on discovery that could provide a vehicle for harassment and

4

finding that "[i]f, as defendants' contention is intended to demonstrate, the conduct they describe causes confusion or disapproval with respect to plaintiff's mark among the consuming public, that proof can come only from the public; indeed, seemingly it is defendants' burden to produce such proof for their contention to succeed at trial.").

- **RFP Nos. 113-115, Topic No. 33:**  These seek information related to Nike's awareness, investigations, or actions against *other secondary marketplaces*, which StockX claims is somehow probative of the harm that Nike suffers as a result of *StockX's conduct*.  But where "the conduct which is said to be relevant is [Nike]'s inaction in pursuing…companies that are not parties to the action...the presumption of irreparable harm is not diminished because companies other than the plaintiff may be running advertisements which might run afoul of the Lanham Act."  *Ortho Pharm. Corp. v. Cosprophar,* Inc., 828 F. Supp. 1114, 1123 (S.D.N.Y. 1993), *aff'd*, 32 F.3d 690 (2d Cir. 1994) (rejecting as irrelevant and barring submission of ads run by other companies "to demonstrate that [Plaintiff]'s argument of suffering irreparable harm is belied by the plaintiff's decision to permit similar advertising by others to continue.").  With respect to a false advertising, "[t]he question is whether this defendant's conduct is prohibited by law."  *Id.* at 1123.

- **Topic No. 35:**  This topic seeks information regarding any actual or potential collaborations with StockX.  Nike properly limited this topic to collaborations on authentication and/or anti-counterfeiting, and otherwise has properly objected as overly broad, unduly burdensome, vague, and seeking information not relevant to this litigation nor proportional to the needs of the case.

- **Topic No. 36:**  StockX has not alleged an undue delay nor a laches defense, the only issues for which Nike's first awareness of StockX's advertising claims, which is the object of this topic, could have any bearing.  This topic has no relevance to Nike's claims or StockX's defenses.

- **Topic Nos. 37-38:**  These topics seek premature expert testimony concerning Nike's basis for alleging that StockX's advertising is false and material.  "'[D]epositions, including 30(b)(6) depositions, are designed to discover facts, not contentions or legal theories….'" *Liveperson, Inc. v. 24/7 Customer, Inc.,* 2015 WL 4597546, at *7 (S.D.N.Y. July 30, 2015) (quoting *JPMorgan Chase Bank v. Liberty Mut. Ins. Co.*, 209 F.R.D. 361, 362 (S.D.N.Y.2002)).  And, whether StockX's advertising claims are false is the subject of facts from *StockX*, not Nike.  *Johnson & Johnson * Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297 (2d Cir. 1992) (finding that the question at issue in a false advertising case based on implied falsity is "what does the public perceive the message to be?"); *Tiffany (NJ) Inc. v. eBay Inc.,* 600 F.3d 93, 112 (2d Cir. 2010) (injuries redressed in false advertising cases are the result of public deception.)

## IV.   Nike's redactions in two documents are appropriate.

Nike's redactions in NIKE0039801 and NIKE0040131 are appropriate for the same reasons successfully argued by StockX.  (Dkt. 62 at 3 (citing *LPD New York, LLC v. Adidas Am., Inc.*, 2020 WL 6784179, at *1 (E.D.N.Y. Nov. 17, 2020)).  Nike has good cause for its redactions, as the redacted information is unrelated to Nike's anti-counterfeiting methodology (the primary subject of these documents).  Nike also has good cause to withhold commercially sensitive information from a party engaged in the confirmed sale of counterfeit "Nike" goods, particularly where that information is unrelated to Nike's anti-counterfeiting methodology at issue in this case.

Respectfully submitted,

Tamar Y. Duvdevani
*Counsel for Plaintiff Nike, Inc.*


cc: Counsel of Record via ECF