MCEHNikC

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

NIKE, INC.,

              Plaintiff,

        v.                              22 Civ. 983 (SN)

STOCKX LLC,
                                        Conference

              Defendant.

------------------------------x
                                        New York, N.Y.
                                        December 14, 2022
                                        3:10 p.m.
Before:

                    HON. SARAH NETBURN,

                                        U.S. Magistrate  Judge

                          APPEARANCES

DLA PIPER LLP (US)
     Attorneys for Plaintiff
BY:  TAMAR Y. DUVDEVANI
     MARC MILLER
     GABRIELLE VELKES

DEBEVOISE & PLIMPTON, LLP (NYC)
     Attorneys for Defendant
BY:  CHRISTOPHER FORD
     MEGAN BANNIGAN
     KATHRYN SABA
     -and-
KILPATRICK TOWNSEND & STOCKTON LLP
BY:  ROBERT N. POTTER
```

MCEHNikC

1        (Case called)
2        THE DEPUTY CLERK:  This is the matter of
3   Nike v. StockX LLC, 22 Civ. 983.  Starting with plaintiff,
4   would you please state your appearance for the record.
5        MS. DUVDEVANI:  Good afternoon, your Honor.  Tamar
6   Duvdevani, DLA Piper, on behalf of plaintiff Nike, Inc.  I'm
7   joined today by Marc Miller and Gabby Velkes, also of DLA, and
8   we have observing in the courtroom our first-year law clerk
9   Megan Stanley.
10       THE COURT:  Good afternoon.
11       MR. MILLER:  Good afternoon, your Honor.
12       THE COURT:  Good afternoon.
13       For the defendant?
14       MR. FORD:  Good afternoon, your Honor.  Christopher
15  Ford, Debevoise & Plimpton, for defendant StockX.  I'm joined
16  by my colleagues Megan Bannigan and Kathryn Saba and cocounsel
17  Robert Potter from --
18       THE COURT:  If you're going to be speaking primarily,
19  or whomever will be speaking primarily -- exactly, please use
20  the microphone.  That will help the court reporter.
21       All right.  I'll begin by saying I'm disappointed to
22  see you all.  I know that's not a nice thing to say, but we had
23  made such progress on trying to settle this case, and it's my
24  view that settlement is always the best way to go, particularly
25  in these sort of commercial cases where there's a lot at stake

that the businesspeople care about in a way that maybe even the lawyers and certainly the Court may not fully appreciate. And I did think and hope that there was going to be a business solution to this case.

So it's nice to see you all, because you're all nice people, but I really thought we were making progress. My door is always open, as they say, so if you think it there's still a chance for settlement or if you think even putting a pause on some of the stuff we're here to talk about makes sense, I'm happy to take my lead from you all. Otherwise, Judge Caproni has now decided that I get the benefit of today's discovery issues and any ongoing discovery issues, but I did want to just begin by expressing my view that I did think we were pretty close, and so it's too bad that we're here.

MS. DUVDEVANI: If I could, maybe this will appease your Honor a little bit, is that the parties really are continuing to have conversations, and in fact, there is a tentative plan for principals to meet in the new year.

THE COURT: Terrific.

MS. DUVDEVANI: So we are still trying, but at least Nike's position is as we're trying, we really need to continue on this track given the fact that Judge Caproni does run a rocket docket, and we don't know if we're going to get any more extensions.

THE COURT: Right. She's now given me the authority

on that issue, and I'm not quite as rocket as she is.  So I want to go through some of these discovery disputes.  I confess that I didn't expect quite as many as I received, so I'm going to do my best with the limited time that we have today to focus on what I hope is our priority issues.  We may have ongoing discussions with respect to some of these discovery disputes as things go on.  I know your fact discovery deadline is the 20th of January, I believe.  I'm guessing, in light of what I read, that folks are going to need a little bit more time on that.  I'm sure that everybody feels that pressure is good.  It leads to settlement.  I know that this litigation is expensive, and the more time we spend litigating, the more money people are spending.  So there's a value to wrapping it up, but it seems like there's still a lot to handle.

All right.  With that as my preliminary remarks, I think I'm going to start with StockX, because I think it appears that the majority of the disputes are ones that StockX has raised with respect to Nike's productions.  I tried to start to categorize discovery disputes.  I'm not sure I made huge progress, but I think that that might be the most efficient way for us to proceed.  But maybe, Mr. Ford, if you can just lead us for a little bit.

MR. FORD:  Certainly, your Honor.  Do you mind if I sit just for ease?

THE COURT:  That's fine, as long as you just use the

mic and speak slowly.

MR. FORD: So your Honor is correct that there are a number of requests for production in areas where we are seeking 30(b)(6) testimony from Nike where Nike has refused to either produce documents or produce a witness, and we are similarly trying to group them for ease of reference. So I can start with disputes over documents and testimony relating to the technical specifications of the underlying products at issue here.

THE COURT: These are the counterfeiting issues?

MR. FORD: These are the counterfeiting issues, yes, your Honor.

THE COURT: OK.

MR. FORD: And for reference and for the reporter, this is primarily request for production 87 and 30(b)(6) topics 20 and 21.

This case is not a case where you have an accusation that defendant is themselves producing counterfeit product. StockX operates a secondary marketplace. It itself does not sell the shoes that are at issue in the counterfeiting allegations. It's more like eBay where buyers come to the marketplace, sellers come to the marketplace, and StockX stands in the middle. The counterfeiting allegations are accordingly premised not on the notion that we are producing counterfeits and we should have known that the shoes that we were producing

MCEHNikC

looked too much like Nike products, but rather that StockX's process of authenticating product that is sold on its marketplace should have identified allegedly counterfeit product that third-party sellers brought into the marketplace.

And if it were just a question of were there or were there not counterfeit products, that would be resolvable based on an understanding of the products themselves. But Nike has claimed that StockX's failure to identify these counterfeits and its allowance of counterfeit products were willful, and they're seeking millions of dollars in damages based on that allegation, and that puts at issue whether StockX knew or should have known that the products these third-party sellers were bringing to the marketplace were genuine or not genuine products.

In order to understand whether the specific products that Nike is challenging are products that StockX or any party in StockX's position should have known were counterfeits, we think it's very important that the trier of fact have a complete record as to the degree of deviation of these products from genuine articles, the degree to which they are obvious or not obvious, the degree to which the alleged defects or aspects of them that are counterfeit would have been reasonably identifiable because that goes to whether or not the conduct at issue was willful, whether we should have known that there were counterfeits on the site or not.

1          I think that goes to this question of the technical

2  specifications and why they're necessary, and Nike's primary

3  response to this is that the documents are commercially

4  sensitive.  We understand and appreciate that the documents are

5  commercially sensitive.  It's why there's a three-tiered

6  protective order in place in this case that will allow Nike to

7  designate any of the documents they produce such that my client

8  will never see them during the course of discovery while they

9  remain, as Nike is free to designate them, outside counsel's

10 eyes only.  Nike specifically negotiated for that additional

11 tier of protection on the theory that some of these highly

12 sensitive documents were going to be necessary to this case.

13 So --

14         THE COURT:  Can I ask a question?  So there's a trial.

15 You hold up a pair of shoes that everybody now -- that you

16 authenticated and that Nike says is counterfeit.  And

17 presumably you're going to show the jury this Nike shoe and

18 you're going to show the jury a Nike shoe that Nike represents

19 is authentic, and you're going to ask the jury whether or not

20 StockX was reasonable in its authentication of that document --

21 I mean of that shoe.  Is that the concept here?

22         MR. FORD:  In general, your Honor.  I think the reason

23 that what we're focused on is not just sort of a one-to-one

24 side-by-side comparison is that in Nike's own description of

25 the way that they themselves visually inspect potential

1  counterfeits, they describe looking at particular aspects of
2  the material or particular aspects of the construction, and
3  they, Nike itself, claim to use visual inspection in order to
4  do that.  So that visual inspection has to be against some
5  baseline, right?  This is what the genuine article looks like.
6  This is what the genuine material is.  And there also is surely
7  some quality standard and tolerance for deviation from those
8  baselines because not every product that's made is an exact
9  perfect replica of every other in the physical world.  So
10 understanding what is actually tolerated in terms of deviation
11 from the norm, what the genuine and authentic materials are and
12 look like and should look like, not only will help to
13 understand whether or not the authentication process that
14 StockX went through was willful, but will also allow for a
15 complete record on Nike's own visual inspection process that
16 they claim to rely upon.
17         THE COURT:  If I can, if I can just turn to Ms. --
18 remind me, it's Duvdevani?
19         MS. DUVDEVANI:  Duvdevani.  But this might be a
20 Mr. Miller one, your Honor, depending what the question is.
21         THE COURT:  All right.  Well, then, to
22 plaintiff's counsel.  Mr. Miller, maybe it's you.
23         Do you anticipate saying to the trier of fact:  Here's
24 how Nike tests its own shoes, and the fact that StockX didn't
25 do this means that it didn't do a good job authenticating?  Or

1  do you plan on saying to the trier of fact, here's what StockX
2  did, and we just don't think it's reasonable, and you decide?
3          MS. DUVDEVANI:  I can actually take that one.
4          I think there's a bit of hybrid there, your Honor.
5  I'm a little bit reluctant to go into the details now because
6  we're on the record, and something I'm going to say is
7  sensitive.  Is there an ability to seal part of the transcript
8  today?
9          THE COURT:  I think, Madam Court Reporter, can I say
10 this portion will be sealed?
11         THE REPORTER:  Yes.
12         (Pages 10 through 24 SEALED)

                THE COURT:  All right.  Mr. Ford, people have
referenced timing.  We've already spent 45 minutes here.  I'm
not actually sure how long I have the court reporter present.
                (Discussion off the record)
                THE COURT:  Let's see how we can proceed, and maybe
we'll get to spend the Christmas holiday together.
                All right.  Mr. Ford, what's next as far as your
priorities?
                MR. FORD:  I think a parallel issue, your Honor, since
we've already been speaking quite a bit about willfulness and
secondary marketplaces, goes to the request for production
asking Nike about the presence of counterfeits, its awareness
of the presence of counterfeits on other third-party
marketplaces, its efforts to police these activity.  For the
record, these are requests for production 88, 90, 98, 99, 100,
and 30(b)(6) topics 24, 28, 29, 31, and 33.
                So, here, in addition to refusing to produce
information about their own anti-counterfeiting process, Nike
refused to produce information about Nike's activities relating
to other third parties in the marketplace that are similarly
authenticating products, that are claiming that they have an
authentication process relating to products.  And here again, I
think there is no proprietary technology concern that Nike
could possibly be bringing to bear on this.  It goes to general
conditions in the marketplace, what Nike has determined those

1  general conditions in the marketplace to be, and whether
2  StockX's conduct measured against those conditions in the
3  marketplace is or is not willful.
4      The Second Circuit has held that reference to those
5  sorts of industry standards is relevant to willfulness.  Other
6  courts have held specifically in the anti-counterfeiting
7  context that those sorts of industry standards and what is
8  happening in an industry is relevant to willfulness.  And so,
9  again, here I think for essentially the same reason, as far as
10 relevance is concerned, we see the withholding of these
11 documents is again an attempt to paint a one-sided picture and
12 not allow a complete evidentiary record to go before the trier
13 of fact.
14      THE COURT:  Thank you.
15      I think what we've been talking, this most recent
16 subject, we can have not be under seal so we maintain the
17 public record.
18      Who from the plaintiff's team wants to respond?
19      MS. DUVDEVANI:  I think it's me, your Honor, Tamar
20 Duvdevani.
21      Generally speaking, first, I know Mr. Ford just
22 indicated that the Second Circuit has endorsed this view that
23 third-party counterfeiting investigations is somehow relevant.
24 I did not see that case law.  In fact, the only case that I saw
25 cited by StockX was *Cengage Learning v. Davis Textbooks*, where

an interrogatory was sought for current industry standards that were implemented to prevent the distribution of counterfeit textbooks.

THE COURT: I think it was the *Johnson & Johnson* case, is that correct, Mr. Ford?

MR. FORD: Yes, your Honor.

MS. DUVDEVANI: Even better. So the *Johnson & Johnson* case, StockX makes this argument that this is a case where there was a dispute over whether or not the district court was proper in terms of what Judge Cedarbaum did with the survey, and what the court explained is that it comes to a certain point after a survey where certain factors can be analyzed, including commercial context.

In StockX's letter, they then equate commercial context to something that the case doesn't say at all. They say -- bear with me. So they say commercial context of those claims, i.e., the prevalence and consumer perceptions of similar claims made by third parties -- this is on page 3 of their letter -- the court just says that *Merck* talks about three factors -- commercial conduct, the defendant's prior advertising history, and sophistication of the advertising audience -- and explain when those factors come into play.

Nowhere does the court explain that by commercial context the court means the prevalence and consumer perceptions of similar claims made by third parties. And in fact, I

1    Shepardized and looked for any evidence that that's what the
2    Second Circuit meant by commercial context as opposed to
3    something more like competition or just the context surrounding
4    the commercial dispute.
5        So I disagree with Mr. Ford that the Second Circuit
6    has ever said that any such evidence is relevant to claims
7    against a defendant, what a plaintiff might be doing vis-a-vis
8    other counterfeiting investigations.  In fact, the more on
9    point case is *Fossil Group V. Angel Seller* out of the Eastern
10   District of New York explaining that where parties seek
11   information regarding investigations against other third
12   parties, it usually amounts to no more than a fishing
13   expedition.  We don't believe --
14       THE COURT:  It seems like here you've got, one, a
15   question about whether or not StockX's behavior is reasonable,
16   is commercially reasonable, and there are other entities that
17   are doing the exact same thing; two, you have allegations that
18   StockX's conduct has harmed Nike's reputation, but if there are
19   other people in the marketplace who are doing the exact same
20   thing and Nike is aware of it or not aware of it may also
21   reflect that.  This seems to me to be probative to a number of
22   the claims that are at issue in this case.
23       MS. DUVDEVANI:  You know, I respectfully do not agree
24   that these are relevant for those reasons.  I think the case
25   law does not bear that out.  Most importantly, from a factual

standpoint, your Honor, they've continued to make these arguments, and we've had several meet and confers about this where if Nike is helping other parties authenticate products and there are industry standards, you need to provide them, and what we've said consistently is there are not.

We can have a scenario -- and this is the very hypothetical that I used with Mr. Ford some months ago when this issue was percolating -- that, if, for example, Amazon, a passive reseller platform that, at least at that time, did not purport to authenticate product had a lot of counterfeiting activity on its website, sellers that were engaged in counterfeiting that Amazon never touched, and Nike is unhappy with Amazon and sends them a demand letter and then, again, hypothetically tells them, well, here are some guidelines, some parties -- if you see sellers from China, take a closer look because there's a lot of counterfeiters out there in China, that has no bearing on what's going on in this case.

There are no documents where Nike has worked with any other parties that are similarly situated to StockX like, for example, the RealReal and a few others where they're providing some sort of industry guidelines. And this does go back to the *Cengage Learning* case that they cite. In that case it says specifically they were seeking current industry standards that plaintiff contends are implemented to prevent the distribution of counterfeit textbooks. Here, Nike is not contending that

there are industry standards.  Quite the opposite.  What Nike has been contending all along is that as the rights holder they are the only ones that can say whether or not counterfeit products are counterfeit or are indeed genuine.

Hopefully that answered all of your Honor's questions.

THE COURT:  I suppose.  I feel like I'm left with the conclusion that it's Nike's view that all of these -- anybody but Nike who's engaging in the sale of Nikes is doing something nefarious or improper.  That seems to be what Nike's position is.  That nobody can match Nike, and therefore everybody is engaged in improper conduct.

MS. DUVDEVANI:  Not at all, your Honor.  Nike's position is that Nike, like any other brand that has counterfeiting issues, they are the entity who is able to determine whether or not a product is genuine or counterfeit.  Nike has a whole distribution chain of authorized retailers that are doing nothing wrong as authorized retailers when they sell genuine Nike product.  There are issues within the secondary market where parties like StockX convey to a consumer that a product is 100 percent guaranteed authentic and then go ahead and sell those consumers $550 pairs of counterfeit shoes.  That, in Nike's view, is nefarious.

The world in general of parties that could sell genuine -- parties sell genuine Nike goods.  They're not doing anything nefarious at all, but the business model that StockX

1    is engaged in right now is a very different picture than what
2    we've seen in the past at the time the *eBay* decision came out
3    which gave some shielding of liability against these platforms.
4    You now see an evolution where -- you know, *Chanel v. RealReal*
5    where RealReal attempted to make arguments that StockX seems to
6    be making even here today saying that what they're doing is not
7    problematic because they're not the actual sellers of the
8    shoes.  The Court in *Chanel v. RealReal* shot that down
9    immediately and said this is no longer an eBay situation.
10   You're not a passive reseller.  You touch every shoe, and you
11   purport to authenticate every shoe.  That's really the main
12   nefarious activity here, along with the other information that
13   I noted to your Honor that's coming out in discovery with how
14   irresponsible StockX is being with regard to their processes,
15   their anonymous platform, etc.
16              THE COURT:  All right.  Nike, Mr. Ford on this issue?
17              MR. FORD:  The only thing I would note here, your
18   Honor, is the Ms. Duvdevani's making representations on the
19   record about what documents do or do not exist.  These aren't
20   RFPs where Nike responded by saying we've conducted a diligent
21   search, and no documents exist.  These are RFPs where Nike has
22   flatly refused to respond in substance at all, and I think that
23   changes the tenor of what the response was and what's at issue
24   here.
25              THE COURT:  OK.  I'm going to order that Nike produce

1  these documents.  To be clear, the third-party marketplace
2  documents are going to be those platforms that are not getting
3  their distribution directly from Nike.  To the extent that Nike
4  is selling its products through Dick's Sporting Goods,
5  presumably Dick's is getting those goods through a Nike
6  distribution channel.  So I'm thinking about StockX's
7  competitors.  GOAT, I think, is one of them.  As you know, my
8  kid is into this stuff, so I have some familiarity.  Flight, I
9  think, is another one of them.  I don't know all of them, but I
10 think that will hopefully give you some sense of the secondary
11 markets that I want to be searched for and responsive documents
12 to be produced.
13         OK.  It is 3:57.  We are in a major court reporter
14 crunch right now.  We can stay and go on the record on a
15 recording device.  I'm happy to do that, but I know that our
16 court reporters have a million trials and a million things
17 going on, so I'm going to dismiss the court reporter.
18         Thank you.
19                            o0o