

Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
+1 212 909 6000

December 23, 2022

Hon. Sarah Netburn, United States Magistrate Judge
United States District Court for the Southern District of New York
40 Foley Square, Room 219
New York, New York 10007

*Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) (SN)

Dear Judge Netburn:

    We represent Defendant StockX LLC ("StockX") in the above-captioned matter and write pursuant to the Court's December 15, 2022, Order (ECF No. 85), to describe the outstanding discovery and 30(b)(6) disputes that require the Court's intervention.

**I.     Nike Continues to Refuse to Produce Relevant Documents and 30(b)(6) Testimony.**

    ***a.   Discovery Relevant to Nike's Counterfeiting Claim (RFP Nos. 64-66, 84-85).***

    Notably—and perhaps tellingly—Nike's production to date has not established a chain of custody for all of the allegedly counterfeit products on which it bases this claim. Similarly, Nike has failed to produce documents that identify the persons who collected the information on which Nike bases its counterfeiting allegations (RFP No. 65); those persons' employment roles (RFP No. 66); or the dates on which Nike determined the products in question were allegedly counterfeits (RFP No. 64).

    It is unclear why Nike is unable or unwilling to produce this basic evidence in support of its allegations. If no such evidence exists, Nike can simply say so. But StockX is entitled to a complete evidentiary record on Nike's counterfeiting allegations, so that StockX can assess all of the facts and take appropriate depositions about the basis for Nike's claims. Nike cannot withhold evidence that will allow StockX to understand the basis for Nike's allegations, both as to the products themselves, and Nike's "investigation" into those products. Having placed the authenticity of StockX's products front and center in this case, Nike cannot withhold the information StockX needs to determine who has relevant knowledge about the alleged counterfeits.

    Relatedly RFP Nos. 84 and 85 seek discovery into Nike's historical confidence in StockX and its anti-counterfeiting measures, which is relevant to whether StockX acted willfully. Evidence that Nike perceived StockX to be a reliable investment and/or partner (including with respect to anti-counterfeiting efforts) is relevant to Nike's willfulness allegations and the lengths to which StockX goes to provide a safe and reliable marketplace. Nike's productions to date indicate that it considered StockX to be a reliable collaborator in the past, and in fact ████████████████████████████████████████████████████████████████████████████████████████████████████████████████. Nike cannot base its willfulness argument on assertions about the nature and quality of StockX's anti-counterfeiting efforts while

refusing to produce highly relevant evidence showing whether Nike has previously considered StockX to be a reliable partner and/or a sound financial investment.

These collaborations help to place StockX's conduct in the relevant context, shedding light on whether StockX acted within industry standards, and whether StockX's conduct was willful—a question which is not, as Nike has argued, solely to be answered by internal StockX documents. *See Cengage Learning, Inc. v. Davis Textbooks*, No. 15 CV 2401, 2016 WL 8730729, at *2 (E.D. Cal. Sept. 2, 2016) (compelling discovery from plaintiff of industry anti-counterfeiting standards, explaining that a defendant who showed it acted consistently with these standards could argue its infringing acts were not willful). As such, this information is relevant to StockX's defenses to Nike's counterfeiting claim and Nike must produce responsive documents.

### b. Discovery Relevant to Nike's Reputation (RFP Nos. 103-112).

Nike has put the reputation of its brands squarely at issue in this case; its pleading is replete with claims about the quality and reputation of Nike-branded products, and the accuracy of those allegations is critical to Nike's trademark infringement and dilution claims. Yet Nike is inappropriately refusing to allow discovery into its *own* reputational allegations—for which it bears the burden of proof at trial—including whether any associated harm can fairly be attributed to StockX specifically.

Nike's First Amended Complaint (FAC) alleges "harm to reputation" and "tarnishment of its valuable trademarks," Dkt. 39 ¶ 114, and asserts claims for trademark dilution and/or injury to business reputation under federal and state law. Nike broadly proclaims that its marks "have become universally associated in the public mind with Nike, its products and services, and *the very highest quality and reputation*." *Id.* ¶ 124 (emphasis added). To test whether StockX has, in fact, "harmed" Nike's "reputation," StockX is entitled to discovery into what that reputation is, and whether Nike's allegations are accurate. *See, e.g., Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 111 (2d Cir. 2009) (observing in the tarnishment context that "the similarity between Charbucks and Starbucks in that they are both '[v]ery high quality' coffees may be relevant in determining dilution"); *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F. Supp. 2d 410, 422–23 (S.D.N.Y. 2002) (holding that "the *sina qua non* of tarnishment is a finding that plaintiff's mark will suffer negative associations through defendant's use," and finding no dilution where there was "no evidence on whether there is a disparity in quality between" the parties' products).

Yet Nike has refused to produce documents concerning any negative impact to its public reputation due to Nike's historical failure to police the unauthorized sale and/or counterfeiting of Nike goods, or its prominent association with individuals (*e.g.*, Lance Armstrong) or issues (*e.g.*, conditions for Nike's global employees) that have received pointed public criticism. Nike's pleading alleges that StockX has "exploit[ed] the immense goodwill and reputation that Nike has amassed through many years," but Nike now refuses to engage in discovery into exactly what "reputation" Nike has in fact amassed. Dkt. 39 ¶ 4.

In seeking to have its cake and eat it too, Nike misleadingly argues that it is StockX's burden to produce evidence regarding Nike's reputation, and to do so based only on entirely public sources. This is not the law. Rather, "[t]o succeed on its tarnishment claim, *the [plaintiff] must show* a likelihood that the positive associations that the [plaintiff] has developed for its marks will

be replaced by negative associations as a result of the [defendant's] use." *N.Y. Stock Exchange, Inc. v. New York, New York Hotel, LLC*, 69. F. Supp. 2d 479, 492 (S.D.N.Y. 1999) (emphasis added). StockX must be permitted to review and test the evidence on which Nike will premise its tarnishment claims—including any internal communications or studies regarding the public's perception of Nike's brand before and after its association with numerous public scandals. Nike must be compelled to respond to these Requests.[1]

> **c. Discovery Relevant to Digital Sneaker Products (30(b)(6) Topic Nos. 2-6, 14-15, 17-18).**

StockX has defined Digital Sneakers as "virtual sneakers, whether or not tied to a non-fungible token, that can be used, for example, as wearables for an avatar in virtual spaces or can be seen through augmented reality filters." Notice of Deposition of Nike, Inc., Definitions ¶ 9. Nike objected to this definition on the grounds that the term "Digital Sneakers" and the inclusion of "virtual sneakers" that are "not tied to a non-fungible token" is not relevant and is overly broad and unduly burdensome. Nike's Responses and Objections to StockX's Notice of Deposition of Nike, Inc., p. 1. As a result, for any 30(b)(6) topic that includes the term "Digital Sneakers" (Topic Nos. 2-6, 14-15, and 17-18) Nike has designated a witness to speak only to the topic as it pertains to NFTs.

The distinction Nike has drawn here is inappropriate. Nike's FAC notes that "Nike has been using its famous trademarks *in connection with virtual goods and digital applications* for years." Dkt. 39 ¶ 10 (emphasis added). As discovery has revealed, (1) ████████████████ ████████████████████████████████████████████████ and (2) Nike has made the affirmative decision to ████████████████████████████████████████ ████████████████████████████████████████████████[2]

Understanding how consumers perceive these Nike digital products – not solely NFTs – will be core to the likelihood of confusion analysis in this case. Nike cannot resist discovery into its digital sneaker offerings based on an overly technical distinction that Nike itself does not make in its consumer-facing statements, since it is consumer perception that is most relevant in a trademark dispute. Nike's consistent treatment of these goods as a single category makes plain the relevance of 30(b)(6) testimony on Digital Sneakers broadly. Accordingly, Nike should be compelled to designate a 30(b)(6) witness to speak to all of the company's digital sneaker offerings.

---

[1] Nike has objected to producing documents predating January 2020. But the Federal Circuit, using "common-sense reasoning," has held that evidence "impact[ing] perceptions of the consuming public" dating back to "the last five years" is "most relevant" to the distinctiveness of a mark. *Converse, Inc. v. Skechers USA, Inc.*, 909 F.3d 1110, 1121 (Fed. Cir. 2018). Nike should be ordered to produce documents from January 2018 to the present.

[2] Nike's public statements refer to its NFTs simply as "virtual creations" that include "sneakers, apparel, accessories, and other collectibles you can wear in games or other immersive experiences. *See* "What are .SWOOSH and Nike Virtual Creations?" (Dec. 23, 2022), https://www.nike.com/help/a/dot-swoosh-and-nike-virtual-creations

### d. Discovery Relevant to Confusion (RFP Nos. 6, 74, 75).

Nike's production of documents to date does not include documents sufficient to show *all* digital sneaker products Nike has sold; the current, historic, and recommended retail prices for those products; and all channels of trade for those products. As a threshold matter, to meaningfully assess Nike's infringement claim, StockX needs to understand the full scope of Nike's digital goods offerings that bear the Asserted Marks, as is sought in RFP No. 74. It seems nearly impossible that Nike has no documents whatsoever relating specifically to the NFTs it (or its subsidiary RTFKT) has sold—not just slide decks discussing broad categories of product offerings—but documents showing the NFTs and their associated images or other content, such that StockX could meaningfully evaluate how the Asserted Marks have been used by Nike in the past.

The price of Nike's digital goods is also plainly relevant to assessing the proximity of the trademarks and the likelihood of confusion. *See Arrow Fastener Co. v. Stanley Works*, 59 F.3d 384, 396 (2d Cir. 1995) (in assessing proximity as part of likelihood of confusion, conducting "a comparison of the products' prices" before concluding that "these non-competitive products differ in both function and price"); *O'Keefe v. Ogilvy & Mather Worldwide, Inc.*, 590 F. Supp. 2d 500, 522 (S.D.N.Y. 2008) (finding very little confusion when a junior user is in an area of commerce that is not proximate to the senior owner's area). While StockX attempted to uncover this information via depositions, Nike's 30(b)(6) witnesses █████████████████
███████████████████████████████

### e. Discovery Relevant to Other Third-Party Marketplaces (RFP Nos. 113-115).

Given that the Court has ordered Nike to produce documents relating to its knowledge and efforts as to counterfeiting on secondary marketplaces that are StockX's competitors, StockX expects that Nike will produce documents that respond to these requests, but reserves its right to revisit the issue after reviewing Nike's production of documents due next week.

## II. Nike Cannot Redact "Commercially Sensitive Information" from Responsive Documents.

Nike has inappropriately redacted two documents for responsiveness—NIKE0039801 and NIKE0040131—based on an unsubstantiated assertion that these redactions hide "commercially sensitive information." But there is a Protective Order in this case that explicitly provides protection for such commercially sensitive information, including through an "Attorneys Eyes Only" tier (which is expressly for "commercially sensitive information") as well as an "Outside Counsel Only" tier. Nike has entirely failed to offer any explanation as to why that Protective Order does not provide adequate protection for whatever commercially sensitive material Nike is refusing to produce, which appears to provide important context as to highly relevant documents:

NIKE0040131 is  This presentation is highly relevant to the parties' claims and defenses because Nike's documents suggest that ███████████████
██████████████████████████████ In fact, during our conference on December 14, 2022, Nike explicitly stated that is has "█████████

██████████████████████████████████████████
████████████████████████████" Hearing Tr. 10:4–7.

NIKE0039801 is a presentation on ████████████████ and similarly contains redactions for responsiveness on nine of seventeen slides. In some instances, entire slides are redacted for responsiveness.

Nike has not offered any justification for these redactions, and its unilateral determination of relevancy is not enough. "In this Circuit the weight of authority goes against allowing a party's unilateral determinations of relevancy," and "unilateral redactions based on concerns about personal privacy or business sensitivity are routinely disallowed, particularly where a protective order is in place allowing the parties to designate that information 'confidential' and restrict its use." *Trireme Energy Holdings, Inc. v. Innogy Renewables US LLC*, No. 20 CV 5015, 2022 WL 621957, at *2 (S.D.N.Y. Mar. 3, 2022).

### III. The Parties Are Not at an Impasse Over Nike's Request for Financial Documents.

Nike informed StockX by email that it intends to raise with the Court a dispute as to which the parties are not at an impasse, regarding StockX's production in response to Nike's RFPs seeking StockX's financial documents. After StockX made an initial production of information responsive to Nike's RFPs, Nike indicated (without elaboration) that it considered that production insufficient, and the parties met and conferred for the first time regarding these RFPs by audio conference last Friday, December 16.

At that conference, Nike's counsel was unable to provide any legal authority supporting its extraordinarily broad requests for financial information beyond what StockX has already produced. StockX requested that Nike provide such authority after the conference and, after Nike sent an email containing several case citations, StockX informed Nike in writing that it is actively considering what additional financial documentation could be produced that is responsive to Nike's RFPs and relevant to this case, given the authority Nike provided.

StockX produced to Nike additional financial documents – including audited financial statements and additional detail supporting StockX's relevant revenues and costs – earlier today, December 23, 2022, and accordingly submits that there is no present dispute between the parties requiring the Court's intervention, given these continuing efforts to reach a resolution of this issue.

Respectfully submitted,

*/s/ Megan K. Bannigan*

Megan K. Bannigan

cc        All counsel of record (via ECF)