

Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
+1 212 909 6000

January 6, 2023

Hon. Sarah Netburn, United States Magistrate Judge
United States District Court for the Southern District of New York
40 Foley Square, Room 219
New York, New York 10007

*Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) (SN)

Dear Judge Netburn:

We represent Defendant StockX LLC ("StockX") in the above-captioned matter and write pursuant to the Court's December 15, 2022, Order (ECF No. 85) regarding outstanding discovery disputes. Having met and conferred with Nike Inc. ("Nike") by audio conference and reached an impasse, StockX asks the Court to compel Nike to remedy Nike's inadequate 30(b)(6) testimony and Nike's failure to review and produce several categories of relevant documents.

### I.  Nike Inadequately Prepared Its Designated 30(b)(6) Witness Ron Faris.

Ron Faris was Nike's designated 30(b)(6) witness for 11 topics. Yet Mr. Faris' preparation for his 30(b)(6) testimony was limited to [REDACTED]. Faris Tr. (Ex. A) 9:1–23. Unsurprisingly, Mr. Faris' testimony on topics for which he was Nike's designated 30(b)(6) witness was wholly inadequate, lacking basic facts about topics for which he was designated and limited to his personal knowledge, hallmarks of inadequate 30(b)(6) preparation. *See, e.g.*, *Fort Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*, No. 9 CV 3701, 2013 WL 6439069, at *3–4 (S.D.N.Y. Dec. 9, 2013) (30(b)(6) witness unprepared because his knowledge of the topics was general, not specific, and noting that "what is determinative is not how much the witnesses did testify about, it is whether they were unable to testify about pertinent subject matter within the scope of the notice").

While Nike has tacitly acknowledged the deficiencies in Mr. Faris' testimony by agreeing to designate a new 30(b)(6) witness for three topics for which Mr. Faris was originally designated, Nike has refused to designate a new witness to testify as to three others for which Mr. Faris' testimony was equally insufficient to satisfy Nike's obligations under Rule 30(b)(6) to put forth a witness who can "testify about information known or reasonably available to" Nike. Fed. R. Civ. P. 30(b)(6); *see* SEC v. Morelli, 143 F.R.D. 42, 45 (S.D.N.Y. 1992). Nike should be ordered to produce an appropriately prepared 30(b)(6) witness on these three topics, as set forth below.

1. <u>Mr. Faris was not adequately prepared to testify about the prices for Nike's NFTs.</u>

Mr. Faris' testimony on 30(b)(6) Topic No. 4 ("The prices at which Nike sells, has sold, or plans to sell NFTs and Digital Sneakers bearing the Asserted Marks") was uncertain and general, not the information known or reasonably available to the organization as required for a 30(b)(6)

witness. *Agniel v. Cent. Park Boathouse LLC*, No. 12 CV 7227, 2015 WL 463971, at *3 (S.D.N.Y. Jan. 23, 2015) (30(b)(6) witness unprepared because knowledge "was either uselessly general or nonexistent, even though the information sought was 'known or reasonably available to the organization.'"). Despite the fact that ████████████████████████████████████████████████████████, Mr. Faris testified that ████████████████████████████████████████████████████████████████████████████████████████████████████████ Faris Tr. 122:15-123:1.

StockX is not seeking to impose a memory test – to the contrary, StockX is seeking qualitative information about prices because StockX is entitled to testimony about more than the basic numerical fact of Nike's prices. Mr. Faris' deficient testimony went well beyond his lack of knowledge of specific price points. He could not offer testimony about elemental aspects of a digital asset product, such as why Nike priced its NFTs in cryptocurrency and why it has set certain prices for its NFTs over time. This information is relevant to the likelihood of confusion analysis, as StockX NFTs are offered only in US dollars. StockX is entitled to explore Nike's pricing decisions that led to that difference. Information about Nike's NFT prices is also essential to StockX's defense of Nike's trademark infringement claims, as it may distinguish the parties' products and show consumers are unlikely to be confused as to the origin of StockX's Vault NFTs. *See Jordache Enters., Inc. v. Levi Strauss & Co.*, 841 F. Supp. 506, 517 (S.D.N.Y. 1993) (in assessing the competitive proximity factor of the likelihood of confusion analysis, courts consider price of products). These questions are well within the scope of 30(b)(6) Topic 4, and Nike should be compelled to respond. *See Emplrs Ins. Co. v. Nationwide Mut. Fire Ins. Co.*, 2006 U.S. Dist. LEXIS 23419, at *4 (E.D.N.Y. Apr. 26, 2006) (finding witness was inadequately prepared to answer "questions concerning issues not specifically described in defendant's notice, but which were so clearly relevant to issues in this case and related to topics that were noticed").

2. <u>Mr. Faris was not adequately prepared to testify about analyses Nike has performed on the impact of the secondary market for sneakers on Nike's business.</u>

Mr. Faris' testimony on 30(b)(6) Topic No. 12 ("Any analyses Nike has performed, received, or reviewed of the impact of the secondary market for sneakers on Nike's current business, including but not limited to (i) analyses on secondary-market pricing and sales performance of Allegedly Counterfeited Products and (ii) whether Nike has benefited from the sale of the Allegedly Counterfeited Products in the secondary market.") was also inadequate, based only on his personal knowledge and rife with "I don't knows," reflecting his lack of preparation and illustrating a failure to meet the obligations of a 30(b)(6) witness.



Mr. Faris testified that there is ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Faris Tr. 187:7-12. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Faris Tr. 184:14-19.

As a result, Mr. Faris stated multiple times ████████████████████████████████████ Faris Tr. 185:4-11; 185:19-21. Mr. Faris' failure to investigate these topics or educate himself about the information reasonably available to Nike

(beyond his own basic knowledge) is a quintessential example of inadequate 30(b)(6) testimony. *See Agniel*, 2015 WL 463971 at *3 (30(b)(6) witness unprepared where his testimony "made it clear that he could have familiarized himself with the relevant subjects" but he did not do so). Given the range of statutory counterfeiting damages, StockX is entitled to argue that Nike's damages award (if any) should take into account the benefit to Nike of StockX's secondary marketplace.

    3. <u>Mr. Faris was not adequately prepared to testify about Nike's plans to enter the secondary market for physical sneakers.</u>

Mr. Faris was also inadequately prepared to testify about Topic No. 13 ("Nike's plans to enter the secondary market for physical sneakers."). Mr. Faris did not know the answers to basic questions on this topic, ███████████████████████████████████████ Faris Tr. 176:9-10. ███████████████████████████████████████ Faris Tr. 210:18-211:7. ███████████████████████████████████████ Faris Tr. 110:5-14.

While Nike has argued that it adequately prepared Mr. Faris to speak on this topic, stating that Mr. Faris' basic answer that ████████████████████████████ was a complete response to this topic, Mr. Faris' own testimony directly contradicts counsel's assertions. Mr. Faris' testimony (and testimony taken today from another Nike witness, Heather Paulson) made clear that ███████████████████████████████████████ within the scope of the 30(b)(6) topic. *Fort Worth Emps. Ret. Fund.*, 2013 WL 6439069 at *3 (30(b)(6) witness did not meet the standard of testifying "about pertinent subject matter within the scope of the notice" when able to testify about general due diligence procedures, but not due diligence performed in connection with the specific transactions at issue).

  **II.**  **Nike's Witnesses Revealed that Nike Failed to Collect and Produce Documents from Relevant Sources, Including Box, Telegram, and WhatsApp.**

During Mr. Faris' deposition, as well as from the deposition of Nike's Director of Strategy for Digital Goods, Mike Childs, StockX learned for the first time about substantial deficiencies in Nike's collection and production of documents. In particular, StockX learned that – contrary to Nike's counsel's past assertions – Nike employees regularly use a Box document repository for email attachments and other large files. StockX also learned about a highly relevant Telegram channel used by Nike employees to communicate about digital asset topics that had never been previously disclosed by Nike, and that Nike employees communicated with employees of its RTKFT subsidiary over the messaging application WhatsApp, which Nike did not search or produce. Further, Nike has refused to even *review for responsiveness* ████████████████ ███████████████, about which Mr. Faris testified only in generalities.

Months ago, at the outset of the discovery process, when Nike designated only five custodians and produced surprisingly few documents on highly relevant topics, StockX repeatedly

raised concerns about whether Nike had failed to identify locations where relevant documents were kept. Nike's counsel repeatedly responded to those concerns by refusing to search for additional documents, asserting that its productions should be measured by quality, not quantity. It is now clear that StockX's concerns were fully justified. Nike must be compelled to produce these highly relevant documents, now that their deposition witnesses have belatedly brought them to light.

1. Nike must search for and produce responsive documents stored in its Box repository.

StockX learned that Nike maintains a cloud storage instance using Box when links to Box documents began appearing in emails produced by Nike. In September and October, StockX repeatedly raised concerns that Nike had not adequately searched for or produced documents stored on Box. Nike initially responded by asserting that links to Box documents were not the same as email attachments, but ultimately agreed to produce linked Box documents appearing in documents that StockX identified and had already been produced. Nike refuses, however, to confirm that it has otherwise searched its Box instance for all potentially responsive documents, instead carefully and non-specifically asserting during the parties' meet-and-confer that it conducted a "targeted collection" of Box. Nike's counsel refused to confirm, for example, that Nike applied the parties' negotiated and agreed-upon search terms to the files in Nike's Box instance.

Nike's Box repository is plainly covered by the ESI Protocol in this case, which nowhere excludes cloud-based storage, and by Nike's basic obligations under Rule 26 to identify and search for relevant and responsive documents where Nike's employees keep them in the ordinary course of business, a search StockX readily conducted in its own documents.[1] The court should order Nike to conduct an adequate search of its Box instance, applying the parties' agreed-upon search terms to identify potentially responsive documents.

2. Nike must produce relevant Telegram and WhatsApp messages.

Despite the fact that the Parties' ESI Protocol explicitly encompasses Telegram and WhatsApp messages in its definitions of both "ESI" and "documents" (*see* ECF No. 47 at pp. 2–3), StockX learned only during depositions of Nike's witnesses that ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌ (Faris Tr. 138–140, Child Tr. (Ex. B) 104-108), and that ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌ (Child Tr. 109). This testimony establishes that the contents of these messaging services unquestionably contain relevant information to this litigation, and Nike's wholesale refusal to even *search* these services for relevant responsive information cannot be squared with its obligations under Rule 26. Nike should be ordered to search and produce relevant documents from Telegram and WhatsApp.

3. Nike must produce relevant analyses of the secondary market.

---

[1]  Nike's refusal to conduct these searches is particularly egregious when compared to the extensive, good faith effort StockX made to collect, search and produce documents from cloud-based Google Drives and Dropboxes. StockX also, in good faith, gathered and produced linked attachments in emails from StockX's shared Google Drive, at **significant** time and expense.

This Court has already determined that Nike's documents concerning secondary market platforms are relevant to this litigation insofar as they relate to counterfeiting, ordering Nike to search for and produce such documents. During Mr. Faris' deposition, StockX learned for the first time about ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Faris Tr. 182-83. Mr. Faris could not testify about these analyses in any detail, so StockX requested that Nike collect and search them, so that relevant analyses could be produced. Yet, during the parties' meet-and-confer, Nike's counsel refused to even *review* these materials for responsiveness, asserting (apparently without having seen the documents) that they could not possibly relate to counterfeiting and were not relevant. That is entirely inadequate to respond to the Court's order, and Nike should be ordered to review and produce relevant documents.

Even if that were true, the potential relevance of these documents extends **well** beyond the counterfeiting issues upon which this Court has already ruled. These documents are also highly relevant to whether Nike can state a claim for trademark infringement based on StockX's sale of Nike products on its secondary marketplace via Vault NFTs. In *Chanel, Inc. v. TheRealReal, Inc.*, a court in this District dismissed claims of trademark infringement stemming from the use of Chanel's trademarks in connection with the sale of Chanel handbags on the reseller platform TheRealReal. 449 F. Supp. 3d 422 (S.D.N.Y. 2020). In dismissing the plaintiff's claims, the court noted that Chanel had not adequately alleged the possibility of confusion in part because of "evidence suggesting that secondary fashion markets bolster primary markets." *Id.* at 438–39. Accordingly, in this case – where, similarly, a brand owner is suing a secondary marketplace for alleged trademark infringement – information about the secondary market's impact on Nike's primary offerings is relevant to StockX's defense. If Nike's data science team has produced reports explaining how the secondary market for sneakers affects Nike's primary sale business, that information is relevant discovery that Nike is obligated to produce under Rule 26. Accordingly, this Court should order Nike to produce any relevant documents from Nike's data science team.

### III.   StockX has agreed to produce the financial information requested by Nike.

Following an additional telephonic meet-and-confer and exchange of emails, StockX has agreed to produce the financial documentation requested by Nike, and understands this issue to be resolved. StockX will work to gather and produce the relevant documentation on a rolling basis.

StockX appreciates the Court's continued attention to this matter. The parties continue to make progress towards resolving other substantial deficiencies in Nike's 30(b)(6) testimony and production of documents that arose from Mr. Faris and Mr. Child's depositions, and StockX is hopeful that these issues can be resolved without the need for intervention from the Court.

Respectfully submitted,

*/s/ Megan K. Bannigan*

Megan K. Bannigan
Christopher S. Ford

cc		All counsel of record (via ECF)