MCUGnikC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   NIKE, INC.,

 4                   Plaintiff,

 5            v.                        22 Civ. 983 (VEC)(SN)

 6   STOCKX LLC,
                                        Remote Conference
 7
                    Defendant.
 8
     ------------------------------x
 9                                      New York, N.Y.
                                        December 30, 2022
10                                      9:00 a.m.

11   Before:

12                        HON. SARAH NETBURN,

13                                        Magistrate Judge

14                        APPEARANCES

15   DLA PIPER LLP (US)
          Attorneys for Plaintiff
16   BY:  TAMAR Y. DUVDEVANI
          MARC MILLER
17        GABRIEL VELKES

18   DEBEVOISE & PLIMPTON, LLP (NYC)
          Attorneys for Defendant
19   BY:  MEGAN BANNIGAN
          KATHRYN SABA
20
     KILPATRICK TOWNSEND & STOCKTON LLP
21        Attorneys for Defendant
     BY:  ROBERT POTTER
22

23

24

25
```

MCUGnikC

| | |
|---|---|
| 1 | (The Court and all parties present remotely) |
| 2 | THE COURT:  Can I ask counsel for Nike to state their |
| 3 | appearance. |
| 4 | MS. DUVDEVANI:  Yes, good morning, your Honor.  This |
| 5 | is Tamar Duvdevani, DLA Piper on behalf of Nike, Inc., also on |
| 6 | the call are my colleagues Marc Miller and Gabriel Velkes. |
| 7 | THE COURT:  Thank you. |
| 8 | And on behalf of StockX. |
| 9 | MS. BANNIGAN:  Good morning, your Honor.  This is |
| 10 | Megan Bannigan, Debevoise & Plimpton on behalf of StockX.  With |
| 11 | me is my colleague Kathryn Saba.  And I believe Rob Potter is |
| 12 | also on the line, but we should hear from him to be sure. |
| 13 | MR. POTTER:  Good morning, your Honor. |
| 14 | THE COURT:  Good morning.  I hope everybody spent some |
| 15 | time during the holidays not reading or writing letters.  I |
| 16 | hope everybody had a nice break. |
| 17 | Let me go over what I hope to accomplish today and |
| 18 | what I do not anticipate accomplishing today.  My intention is |
| 19 | to go over the issues raised in the parties' recent letters |
| 20 | filed on December 23rd, some of which relates to the letters |
| 21 | that were filed on December 12th.  I have read and reread all |
| 22 | of those. |
| 23 | What I do not intend to go over today are the issues |
| 24 | raised in the December 19th letters related to the disgorgement |
| 25 | and unjust enrichment discovery.  Just so folks know and have |

MCUGnikC

1    their expectations set, that's not going to be addressed today.

2          So let's jump in.  Let me remind everybody that, as

3    you heard, we do have a court reporter on the line.  To

4    facilitate her efforts, I'll ask that the lawyers state their

5    name each time that they speak so that the court reporter can

6    properly attribute statements.

7          So let's jump in and first address the issues related

8    to RFP 6, 74 and 75, which deal generally with documents

9    related to Nike's NFTs and digital sneakers.  And I know that

10   there's a dispute about what is digital sneakers.  But I

11   understand with respect to this discovery dispute that Nike has

12   not withheld documents on that grounds.

13         Can I just check with you, Ms. Duvdevani, is that

14   correct?

15         MS. DUVDEVANI:  That's actually a Mr. Miller issue, so

16   I will defer to him on that one.

17         MR. MILLER:  Yes, your Honor.  This is Marc Miller on

18   behalf of Nike.

19         I think with respect to the issue that you just asked

20   about, yes, we are not withholding documents on the basis of

21   that objection.  But I'm also happy to explain further the

22   basis and the reasoning behind our objection and why we're

23   narrowing the products that are at issue to products that are

24   related to NFTs, as opposed to other virtual goods that Nike

25   has offered in the marketplace through partners.

MCUGnikC

1      THE COURT:  I'm happy to switch to that.  I understand

2  that is notice topics 2 through 6, 14, 15, 17 and 18.  So my

3  understanding of the distinction -- and you can correct me if

4  I'm wrong -- is that there are NFTs, which are squarely at

5  issue in this case.  And then Nike has what are broadly being

6  called digital sneakers, which I understand are sneakers that

7  appear for use in video games or virtual reality games or

8  programs that are separate and apart from the NFTs which are at

9  issue in this case, which are in some ways like a piece of art.

10      Do I have a correct understanding of the scope of the

11  issues?

12      MR. MILLER:  Yes, your Honor.  That is basically

13  correct.

14      Nike has partnered with various video game developers

15  to make Nike branded virtual goods available in their games.

16  Those virtual goods are developed by those third parties, and

17  they're made available to users on those platforms.

18      One example is the popular video game Fortnite.  Nike

19  partnered with Epic Games, the developer of that game, to make

20  Air Jordan footwear and apparel -- virtual versions of them --

21  available for players to purchase in game and basically have

22  their Avatar play in the Fortnite universe wearing those shoes

23  and apparel.

24      Those are not connected to NFTs in any way.  They're

25  not sold by Nike.  Nike simply has a partnership to allow use

MCUGnikC

1    of its brand in those games.  There are other games that are

2    similarly situated.  But none of those virtual goods relate in

3    any way to NFTs.

4           THE COURT:  So your position is with respect to the

5    notice topics that you have not prepared a witness -- this

6    witness actually has testified already -- to answer questions

7    related to the non-NFT digital sneakers, the video games, the

8    VR, et cetera.  And with respect to the document productions

9    that we discussed -- 6, 74 and 75 -- you either are not

10   producing those documents or you have produced everything and

11   there's just no such documents available.  Is that correct?

12          MR. MILLER:  So with respect to the 30(b)(6) topics,

13   your Honor, I believe both of the Nike witnesses, Mr. Child and

14   Mr. Ferris that were deposed a few weeks back were asked about

15   these partnerships and answered basic questions about them.

16   But as it relates to producing prices for those or producing

17   other documents related to the likelihood of confusion

18   factors -- which StockX has served several requests in addition

19   to the ones that your Honor identified -- we have not produced

20   documents that are responsive to those requests, as it would

21   relate to those virtual goods that are available in Fortnite

22   and sold by Fortnite, if that answers your Honor's question.

23          THE COURT:  It does.  Thank you.

24          Who from StockX is going to be responding to the

25   digital sneaker issues?

MCUGnikC

1              MS. BANNIGAN:  This is Megan Bannigan, your Honor.

2              THE COURT:  Thank you.

3              So tell me, why are these sort of avatar Nike shoes

4       related to this case.

5              MS. BANNIGAN:  Thank you, your Honor.

6              StockX is specifically seeking this information

7       because Nike itself and consumers don't publicly distinguish

8       between virtual goods that are tied to NFTs and virtual goods

9       that are not.

10             THE COURT:  Sorry to interrupt.

11             What is the basis for that proposition?  How do you

12      know that?

13             MS. BANNIGAN:  How do I know that?  There are what few

14      different ways that we know it.

15             First, Nike's own witnesses have testified that Nike

16      is not going to actively market its virtual creations on its

17      new platform as NFTs and instead is actively avoiding the term.

18      I do believe if you go all the way to the terms of use or the

19      terms of service, you can see that it is NFT connected.  But

20      they will be selling -- and by the way, I will leave this to

21      Nike, but this portion of the transcript, they might request be

22      sealed, I'm not sure -- but they're going to be offering

23      digital speakers, and I believe digital sneakers that

24      ultimately might be able to be worn on avatars in video games

25      that aren't tied to NFTs and are in fact very similar to what's

MCUGnikC

being offered in Fortnite, the example that Mr. Miller used.

And a consumer itself is not able to see this and distinguish,

this one is an NFT, this one is not tied to the NFT.

What we're looking at here is, is there trademark

infringement, is there likelihood of confusion.  Will consumers

see StockX's NFTs and think that they come from Nike.  We need

to compare what consumers are actually seeing.  And there's no

evidence that consumers themselves say, well, that's a digital

sneaker, it has nothing to do with an NFT and there's no way

there can be confusion here or that there is confusion here.

We just need the full scope of what's going on to understand

and be able to fully assess the likelihood of confusion

factors.

StockX does not believe this is a big ask.  What we're

simply asking for is, show us, what digital goods are you

selling, how are the marks used, what do the sneakers look

like.  I don't think it's the super secret sauce in any way.

They're obviously available in the video games.  We shouldn't

have to subpoena third party video games when Nike obviously

helped design what these digital goods look like and similarly,

what the digital goods will look like that they're going to put

out.

And so that's my response on why the digital sneakers

themselves are relevant.  There's a little bit more to the

likelihood of confusion factors, but I take it your Honor wants

MCUGnikC

1      to address this issue of the relevancy of the digital sneakers

2      first.

3              THE COURT:  You just made a burden argument to me.

4      And your discovery requests, as I understand them, seek all

5      products in all channels and information about each digital

6      sneaker that Nike has sold.  So to the extent Nike has

7      significant relationship with Epic Games -- I don't know if you

8      are asking for every time a teenager purchased Air Jordans for

9      its Fortnite avatar, I don't know if that's what you're asking

10     for -- but it seems like you are asking for significant

11     discovery here.

12             MS. BANNIGAN:  We actually don't view it that way,

13     your Honor.  What we're looking for is what digital goods have

14     you sold.  We're not looking for a record of every transaction

15     and every time digital Air Jordans has been sold to a teenager.

16             What we're looking for is what designs have been sold,

17     what products have been for sale.  We don't need this has been

18     sold to Mr. Smith, this has been sold to Mr. Doe.  It's what do

19     the products look like?  What are you selling?  What are the

20     offerings?  It should be something that is easy to pull.

21             We don't know -- I mean, what we do know at this point

22     from the summary presentations that we've received is that some

23     kind of digital sneakers were sold or available for sale on

24     Roblox and on Fortnite.  We have no idea what those sneakers

25     looked like, were there different styles.  That's what we're

MCUGnikC

|     |                                                           |
|-----|-----------------------------------------------------------|
| 1   | looking for more information about.  I am happy to meet and |
| 2   | confer with Nike on what's reasonable, to the extent we can get |
| 3   | past this are we entitled to any of it. |
| 4   | THE COURT:  Thank you. |
| 5   | Mr. Miller, anything further? |
| 6   | MR. MILLER:  Yes.  Thank you, your Honor. |
| 7   | What I would like to remind the Court, your Honor, is |
| 8   | that this case is about StockX's unauthorized use of Nike's |
| 9   | trademarks with the sale of NFTs.  Nike has also sold NFTs that |
| 10  | bear the asserted trademarks and those are the relevant |
| 11  | products that are at issue and the relevant comparators with |
| 12  | respect to the likelihood of confusion factors that will |
| 13  | ultimately decide the outcome of the trademark infringement |
| 14  | claim. |
| 15  | The historical use that Nike has made with respect to |
| 16  | partnering with Epic Games and other companies like that to |
| 17  | make its goods available in the virtual realm is backdrop to |
| 18  | Nike's use of its marks in both the physical and virtual |
| 19  | realms, but it's really not the relevant products that are at |
| 20  | issue.  And your Honor is correct that the burden that StockX |
| 21  | seeks to impose here, to basically have us provide documents |
| 22  | and witnesses to testify about these products and these |
| 23  | partnerships would be immense and is really just not -- we |
| 24  | don't see that as being justified, given the basically no |
| 25  | relevance of these products to the issues that are really at |

MCUGnikC

1  hand in this case.

2          THE COURT:  Thank you.

3          Can I confirm, Mr. Miller, that you have produced

4  responsive documents in connection with Nike's own NFTs.

5          MR. MILLER:  Yes, your Honor.

6          MS. BANNIGAN:  I'm sorry, your Honor, to interrupt.

7  We disagree with that.

8          So there is more on the NFT side that I would like to

9  say.

10          THE COURT:  Let's table that for a second.

11          With respect to StockX's request for discovery into

12  what we have been broadly referring to as digital sneakers, VR

13  sneakers, sneakers that are being used in video games, I am

14  going to sustain Nike's objections.  I think that moving into

15  the realm of non-NFT digital sneakers is too far removed from

16  the issues at play in this case, which do focus on NFTs and

17  extending into another chain of commerce, essentially, into

18  this interactive digital world is beyond the scope of this

19  litigation.  So I'm going to sustain Nike's objections there.

20          Ms. Bannigan, do you want to speak on the question of

21  whether Nike has produced responsive documents of its NFT

22  program?

23          MS. BANNIGAN:  Yes, your Honor.

24          This relates to RFPs numbers 6, 74 and 75, relevant to

25  the likelihood of confusion considerations.  And so what Nike

MCUGnikC

has -- here, we're looking at what are the NFTs that Nike has

put out or will put out and what are the historical prices of

those NFTs or the digital goods attached to the NFTs.  And we

have not received specific information about either of those

categories.

        With respect to NFTs, we have received broad

information that there have been NFTs that have used Nike

asserted marks or that there will be NFTs that use Nike

asserted marks.  But what we haven't received specifically is

how have those asserted marks been used.

        Here, Nike is claiming that StockX is infringing its

trademarks based on the way StockX allegedly is using Nike's

asserted marks.  We need to see what do the NFTs that Nike is

selling look like or what do the NFTs that Nike plans to sell,

what will they look like, how are they using the mark.

Similarity of the mark is obviously a big factor with

likelihood of confusion and how they're being used.  So that's

something we see as very important.  We have received several

presentations saying that these NFTs do exist.  What we haven't

seen is what the NFTs look like.  And we don't believe that

that is a big thing to ask for.

        The second thing is historical prices.  Nike has sold

NFTs through RTFKT.  We have gotten information about the price

floor for these NFTs.  But what we haven't received is the

actual range of -- the range of prices or what price these are

MCUGnikC

1      actually selling for.

2              And as an example, one of the documents Nike produced

3      indicates that the price floor for the Cryptokicks NFT is .25

4      to 80 ETH cryptocurrency.  So it's not only problematic that

5      Nike has provided only the price floors and that the average

6      price as a range of prices, but that price floor is actually

7      incredibly broad.  Just yesterday, I did the calculation, and

8      one ETH was worth about $1,200, so that means this range of .25

9      to 80 ETH is around $300 to $95,000.  And so essentially what

10     Nike has produced tells us nothing about the prices of these

11     NFTs.  So we need more information there to really assess the

12     proximity, which is one of the likelihood of confusion factors.

13              THE COURT:  Mr. Miller.

14              MR. MILLER:  Yes, your Honor.

15              Nike disputes Ms. Bannigan's recapping of the record.

16     We have most certainly produced documents responsive to these

17     three RFPs.  We have produced captures of the Nike -- the Nike

18     through RTFKT NFTs that have been what's called air dropped to

19     holders of an RTFKT NFT.  And there's various different titles

20     of those NFTs that have both RTFKT and Nike branding on them.

21     The reason I say air dropped is because they were given to

22     holders of what's called the CloneX NFT, which is an RTFKT

23     product.  So they were not necessarily sold at a price, but

24     they were air dropped to holders of those NFTs, and then they

25     have been subsequently traded on platforms like OpenSea.

MCUGnikC

1          We have captured screenshots from OpenSea.  We have

2     produced those.  We have produced other documents that show the

3     historical prices of those Nike RTFKT NFTs.  We've produced

4     documents related to future plans, future drops.

5          So I'm not sure what else it is that StockX believes

6     it needs.  But from Nike's perspective, we have met our

7     obligations.  We have produced the documents that are

8     sufficient to show the various topics that were requested.  We

9     are not withholding additional documents.  The NFTs that have

10    been released by Nike and RTFKT are openly traded on OpenSea.

11    So if StockX wants to check the price, it certainly can go on

12    OpenSea and check the price and take a capture if it believes

13    it's relevant to something in the case.  But we have produced

14    what we believe to be responsive and necessary.

15          THE COURT:  Can you speak specifically to the issue

16    that Ms. Bannigan raised about a not helpful range of prices

17    and whether or not there is more detailed price information

18    that you can provide.

19          MR. MILLER:  I don't know the specific document

20    Ms. Bannigan was referencing when she talked about the range,

21    your Honor.  But as I mentioned, the NFTs that have been

22    essentially distributed to the public from Nike and RTFKT are

23    traded on OpenSea and NFTs are available on the blockchain, all

24    the transaction history is available on the blockchain.  So if

25    you were to pull up one of these NFTs on the OpenSea platform

MCUGnikC

1    and click the transaction history, you can view everything

2    about the transaction history.

3            And again, just to remind the Court, Nike didn't sell

4    those NFTs in the first instance.  They were air dropped or

5    essentially given away for free to holders of a CloneX NFT.  If

6    those owners decided to subsequently trade them for some value,

7    that value is recorded on the blockchain and publicly

8    available.

9            I think that information is out there.  We have taken

10   screenshots of all the NFTs that we believe are out on the

11   marketplace and produced them.  But the blockchain is a living

12   ledger of transactions, your Honor, and we have not taken a

13   screen capture of the transaction history for all of the

14   subsequent days that those have been traded on the marketplace,

15   but those are certainly available in the public realm.

16           THE COURT:  I am satisfied --

17           MR. MILLER:  I'm sorry.  Go ahead, your Honor.  I'm

18   done.

19           THE COURT:  I'm satisfied that Nike satisfied its

20   obligation here.

21           Obviously, if there are specific documents,

22   Ms. Bannigan, that you believe Nike has, you can identify those

23   specific documents.  But based on Mr. Miller's presentation, it

24   sounds like nothing has been withheld, everything available has

25   been produced and the type of information that you are seeking,

MCUGnikC

```
1    specifically related to pricing, is publicly available.  So I'm
2    going to sustain Nike's objections there.
3              MS. BANNIGAN:  Thank you, your Honor.
4              I have just one more comment, which is we haven't been
5    able to locate all of the screenshots.  So to the extent
6    they're able to give us Bates numbers that would be very
7    helpful so we can evaluate this.
8              And the other thing I would say is with respect to the
9    transaction history, it is extremely burdensome to have to go
10   to every NFT to look up the transaction history publicly.  To
11   the extent Nike has documents available which they could easily
12   produce, that's essentially what we're looking for.  But if
13   Nike is saying they don't track the price and they don't have
14   the information about the price, that's one thing.  But to the
15   extent they do keep this information, we see no reason that
16   they shouldn't have to produce it.
17             THE COURT:  We'll take the easiest one first.
18   Mr. Miller, can you, after today's conference, let StockX's
19   lawyers know the Bates numbers of the NFT screenshots that you
20   have produced?
21             MR. MILLER:  Yes, your Honor.  We can do that.
22             THE COURT:  And then with respect to the second
23   question, does Nike monitor or maintain information about how
24   these NFTs are being traded on the open market?
25             MR. MILLER:  Yes, your Honor.  And it's also my
```

MCUGnikC

1    understanding that we have produced -- what I was going to add

2    before, when I was cutting off your Honor -- we had produced a

3    historical price tracking record from RTFKT.

4            THE COURT:  Can you also identify that by Bates number

5    when you provide the other information.

6            MR. MILLER:  Yes, your Honor.

7            THE COURT:  Let's move on to issues related to Nike's

8    investigation into the StockX counterfeits.  These are RFPs 64

9    through 66.  I understand that Nike takes the position that it

10   has produced all responsive documents and StockX takes the

11   position that that is not possible because it hasn't identified

12   any documents to support its chain of custody burdens or

13   identified the people who are involved in that investigation.

14           Ms. Bannigan, are you going to take the lead for

15   StockX on this question?

16           MS. BANNIGAN:  Yes, your Honor.

17           THE COURT:  Have I correctly assessed the state of

18   play here?

19           MS. BANNIGAN:  Yes, your Honor.

20           The issue here is we haven't received enough

21   information about the actual investigation to fully explore

22   what the investigation entailed, who conducted it and to let us

23   explore whether there's any additional discovery we need.

24           THE COURT:  I understand that Nike's position -- which

25   I will probe in a minute -- is that it has produced everything

MCUGnikC

1  that it has.  Sometimes one party thinks it's surprising that

2  more documents are not available, and the other side says,

3  that's just the reality.

4          Do you have any basis to believe beyond your own shock

5  that there are more documents available?  Meaning, have you

6  seen other documents that reveal that there are documents that

7  haven't been produced?

8          MS. BANNIGAN:  Well, your Honor, for example, Nike has

9  produced a spreadsheet that catalogs 200 test purchases from

10  StockX and GOAT, which is another third-party platform, such as

11  product style and color and order number, QR code data and

12  whether the sneakers were flagged as counterfeit.  What the

13  document doesn't have is a listed author or any identifying

14  information as to who actually conducted the examination of

15  each pair of sneakers.  And we think that that information has

16  to exist somewhere.  There has to be some kind of information

17  that shows who conducted the investigation and who put together

18  this document.  It didn't just come and appear out of thin air.

19  So we don't know if there's a specific document that says X

20  person conducted the investigation.  There has to be some kind

21  of information to provide this information to us.

22          THE COURT:  Who from Nike is going to take the lead on

23  this issue?

24          MR. MILLER:  Yes, your Honor.

25          Before I respond, your Honor, I just wanted to note

MCUGnikC

1    that Nike does consider discussions about its

2    anticounterfeiting and brand protection efforts to be super

3    highly commercially sensitive.  I don't know if there are

4    members of the public on the teleconference line, but we would

5    certainly like to have this portion sealed and I suppose would

6    like to know if there are members of the public that are

7    listening in before we get into that detail.

8                THE COURT:  With respect to whether there is anybody

9    else listening in, I no longer have the capacity to determine

10   that, so I don't know the answer to that question.  If anybody

11   is listening in and is a member of the public, and wants to

12   speak up, they can identify themselves, but I don't know of

13   anybody who is on.

14                I may be able to answer some of the question.  I can

15   see now who is on the line.

16                I can see Ms. Bannigan's name appears.  Ms. Bannigan,

17   you are on a 609 area code phone number?

18                MS. BANNIGAN:  Yes, your Honor.

19                THE COURT:  We'll do a quick phone call.

20                We have somebody calling in from a 310 number.

21                MS. VELKES:  Yes, your Honor.  That's me, Gabriel

22   Velkes.

23                THE COURT:  And 646, there's just one of you here.

24                MS. SABA:  That's Kate Saba, your Honor.

25                THE COURT:  973.

MCUGnikC

1          MR. MILLER:  That's Mr. Miller, your Honor.

2          THE COURT:  Just one of you with a 917.

3          MR. POTTER:  That's Robert Potter, your Honor.

4          THE COURT:  I've got my law clerk on the line.  I have

5    the court reporter on the line.

6          And an 845 number.

7          MS. DUVDEVANI:  Your Honor, that's Tamar Duvdevani up

8    in the Catskills.

9          THE COURT:  Now I can tell you there's nobody else on

10   the call other than the people who have identified themselves,

11   my law clerk and the court reporter.

12         MR. MILLER:  Thank you, your Honor.

13         THE COURT:  You're welcome.

14         So to the extent we need -- why don't you see if you

15   can continue speaking without having to put something under

16   seal.  Obviously, as you know from our last conference, that is

17   possible.  But let's see if we can just have this

18   conversation -- I know we're going to be taking about the

19   redacted documents -- but right now, we're just talking about

20   investigations.

21         So I think there's two different categories here.

22   There is the specific investigation into StockX's counterfeits

23   and there are allegations about certain buyers from StockX that

24   Nike has been in touch with and identifying orders with a

25   question about chain of custody with respect to those actual

MCUGnikC

shoes that were purchased and who conducted the investigations

with respect to those purchases, and then more generally

investigations into other secondary market providers.  And

Ms. Bannigan referenced an investigation and documents that

were produced in connection with a GOAT and StockX

investigation.  It sounds like documents have been produced,

but there's a question about who authored that study and who

was involved in it.

            MR. MILLER:  Yes, your Honor.  First, thank you on

behalf of Nike for checking to see who was on the line.  We

certainly appreciate the Court indulging our efforts to

maintain our client's confidential information here.

            So with that, I will try to address the Court's

questions.  I think it might be helpful just to give a little

bit of context.  There are different categories, as your Honor

noted, of counterfeit pairs of shoes that have sort of become

at issue in this case.  There are, first, the four pairs of

shoes that were purchased by Nike's investigators as part of

the larger test purchase that Ms. Bannigan mentioned.  Nike has

produced all of the nonprivileged responsive documents that are

related to those four pairs of shoes.  We have identified the

relevant individuals at Nike through interrogatory responses

that are knowledgeable on that test purchase and those shoes.

We have disclosed who Nike's investigators, the outside

investigators were, in our initial disclosures.  So our view on

MCUGnikC

1        that is the production is complete.

2                If StockX is interested in knowing who authored the

3        Excel spreadsheet that sort of catalogs the investigative work

4        once those products reached Nike, I suppose we can do that.

5        The individuals that have been identified in our

6        interrogatories and on our initial disclosures and are up for

7        depositions are those people.  So they will have a chance to

8        speak with them.

9                The other two categories of counterfeit goods at issue

10       are -- I believe it's roughly 38 pairs that were purchased by

11       Roy Kim, who is a third-party consumer, Nike never had

12       possession of those goods, so we don't have any chain of

13       custody information to produce on that.  That information is

14       entirely within StockX's possession and the possession of

15       Mr. Kim.

16               Nike's brand protection team visited Mr. Kim, looked

17       at his shoes, documented our findings.  We produced a

18       spreadsheet related to that.  Again, we can identify -- to the

19       extent not already identified in the interrogatory responses --

20       who the author of that spreadsheet is.  But we don't have any

21       documents to produce beyond that on Mr. Kim's goods.

22               And the last pile of counterfeit goods at issue that

23       we're aware of at this point are those that were purchased by a

24       company called Zadeh Kicks and its principal, Michael

25       Malekzadeh, again, a third party.  Those goods are in the

MCUGnikC

1    custody of law enforcement in Portland.  The information that

2    related to chain of custody, again, Nike did not have chain of

3    custody over those goods.  That information, again, resides

4    with StockX or with Mr. Malekzadeh or the Zadeh Kicks receiver

5    who is essentially holding all of the assets of that business.

6    Nike's brand protection team visited the warehouse with law

7    enforcement, reviewed the shoes, documented the findings.  And

8    we produced that spreadsheet as well.  But those are all the

9    documents we have relating to those.

10           I hope that answers your Honor's question.  But if

11   not, I'm happy to address anything further.

12           THE COURT:  Given your offer, I think it is

13   appropriate, to the extent you haven't identified the authors

14   or investigators of the Kim investigation and the Zadeh Kicks

15   investigation, if you can both remind StockX of the Bates

16   number of the spreadsheets and simultaneously identify the

17   authors and investigators who are involved in those

18   investigations.  It sounds like they're going to be deposed,

19   but to let them know in advance who all is involved.  And the

20   same is true with respect to the test purchases that you

21   referenced.

22           MR. MILLER:  Yes, your Honor.  We can do that.

23           THE COURT:  Ms. Bannigan, anything additional that you

24   believe should have been produced that has not been produced?

25           MS. BANNIGAN:  With respect to the test purchases, we

MCUGnikC

1    just want to confirm that the information we're going to

2    receive goes beyond the four pairs of shoes that Nike claims

3    that they identified as counterfeit.  Our understanding is that

4    there were at least 200 test purchases that were involved in

5    that investigation and that some of the purchases were

6    originally identified as counterfeit, but then were found not

7    to be based on a visual inspection.  And so the information we

8    are looking for is who conducted that entire investigation, not

9    just limited to the four pairs of shoes.  We want to be able to

10   explore the entire investigation.  So to the extent Mr. Miller

11   and Nike will provide encompasses that, thank you very much.

12         THE COURT:  Mr. Miller, does it cover all of the

13   purchases?

14         MR. MILLER:  Let me just confer with my team, your

15   Honor.  One moment.

16         MS. BANNIGAN:  And then once Mr. Miller confirms, I

17   just have one more question just for the record.

18         MS. DUVDEVANI:  Your Honor, I think I can answer this

19   one.

20         Just to recap what Ms. Bannigan said regarding that

21   there were four pairs of counterfeits, and then we re-examined

22   and then we -- or six pairs, and then there were only four

23   pairs, so she's looking for information on the additional two.

24   I think I discussed that at the last conference.  That's not

25   true.  They're mischaracterizing the documents that we

MCUGnikC

1 produced.  But we produced those documents.

2   And as I mentioned at the last conference, to the

3 extent they really want to test that theory that we thought

4 there were six and then there were four, they have the deponent

5 to ask about that.  So the information has been produced.

6   To the extent Ms. Bannigan is asking for detailed

7 information about all 200 pairs, including products that were

8 not determined to be counterfeit, I would want to make sure

9 that that is not what is being sought here, because that would

10 be information that we would object to as not relevant.  But

11 with regard to the two additional pairs that were just

12 mentioned, yes, we produced information about that.  And it's

13 going to be the same individuals on initial disclosures that

14 they can ask about those products as well to confirm that they

15 have an incorrect understanding of what actually happened with

16 those two pairs.

17   THE COURT:  Now, why would it not be relevant if Nike

18 purchased 200 shoes from StockX to see whether or not they were

19 counterfeit and determined that only one percent or two percent

20 were, why would that not be relevant?

21   MS. DUVDEVANI:  I apologize, your Honor, it was 100

22 pairs.  I don't know why it changed that into 200 pairs.

23   But our view, and frankly, the view of Judge Caproni

24 when this came up briefly during a conference in front of her,

25 that they're not relevant.  This case is about counterfeit

MCUGnikC

1    shoes, counterfeiting is strict liability.

2              It might be relevant to the extent they have some

3    theory they have not articulated properly.  But right now,

4    what's relevant is the fact that Nike did test purchases over a

5    very short period of time.  And of those test purchases, four

6    shoes were determined to be counterfeit.

7              We certainly have produced the information that those

8    four purchases were from a group of 100.  We produced the dates

9    that those products were purchased by Nike's investigator.  So

10   to the extent that StockX is trying to make some sort of theory

11   that, it ain't so bad to sell four counterfeits out of a

12   hundred over a two-month period, they have the information they

13   need.

14             To the extent they're looking for detailed information

15   about each category of shoe, each order number, et cetera,

16   that's where we believe that the burden there outweighs any

17   potential relevance to those details.

18             THE COURT:  What is that burden?

19             MS. DUVDEVANI:  They even have order numbers, I

20   believe, actually, so I take that -- I don't know what else

21   they are looking for, your Honor, so I don't know what the

22   burden is.  Because at this point, we believe that we have done

23   a fairly comprehensive production of those test purchases.  And

24   we have put our two outside investigators on our initial

25   disclosures.  They are certainly capable of noticing those

MCUGnikC

1    depositions.  They have not done so yet.  But as we mentioned,

2    the brand protection specialists that were overseeing those

3    investigations are slated for deposition already.

4        If StockX thinks they need something more about those

5    90 odd pairs of shoes that were determined to be genuine, they

6    should talk to us about what they think they're missing.

7        MS. BANNIGAN:  We have been trying to talk to Nike

8    what we think we're missing.  And we have said it over and over

9    again.  We're looking for who conducted the scans, who

10   conducted the visual inspections, and were there any other

11   sneakers, apart from the six that we have referenced, that were

12   visually inspected.

13       I do think Ms. Duvdevani is mischaracterizing some of

14   the emails and some of the previous arguments.  This isn't

15   something that went to Judge Caproni before.  And really, to

16   the extent they're putting this investigation at issue, just

17   provide the information about who conducted the investigation;

18   who did the scans and the individual inspections.

19       THE COURT:  Thank you.

20       MS. BANNIGAN:  There has also been a repeated

21   reference to Nike's brand protection team and the role that

22   Nike's brand protection team has played in this.  So far we

23   have been given only two names from Nike's brand protection

24   team.  So the other clarification that we're seeking is, is it

25   simply just these two people who have been named in disclosures

MCUGnikC

1    and interrogatories that did all of this work from Nike's brand

2    protection team.  We don't believe that they're the ones who

3    did the scan, so that's a separate issue.  But those are the

4    two open issues.  Thank you, your Honor.

5            MS. DUVDEVANI:  Your Honor, there are three

6    individuals, all of which have been offered for deposition.

7    We're just trying to schedule the last one, a woman named Laura

8    Rizzo.  So I don't know why Ms. Bannnigan believes there are

9    just two.  We have produced this information.  We have

10   explained -- everything documentary that we have has been

11   produced.

12           We just indicated that to the extent they are looking

13   for the individuals that actually interacted with Allegiance

14   and Core Search, the investigators outside of Nike that helped

15   with those investigations, we'll tell them who it is and

16   they'll have them for deposition.

17           At this point, your Honor, I just don't understand

18   what else Ms. Bannigan believes is missing.  I really don't.

19   It behooves Nike to produce this information.

20           THE COURT:  It sounds like Nike has not produced the

21   full scope of its test purchase investigation, so I am going to

22   direct Nike to do that.  I don't think it's appropriate to

23   limit the production only to those shoes that were found to be

24   counterfeit, especially, I think, given the willfulness

25   argument that's being raised here.  So to the extent the full

MCUGnikC

1    scope of those 100 purchases has not been produced, that

2    investigation material should be produced.

3            With respect to the other investigations, it sounds

4    like everything that is in Nike's possession has been produced,

5    with respect to the Kim and Zadeh Kicks investigation.

6            MS. DUVDEVANI:  Your Honor, again, we have produced

7    everything in Nike's possession.  It is possible that our

8    outside investigators have additional pictures of the

9    additional test purchases.  We can work with them to see if

10   they have those.  Other than that, there's no additional

11   custodial documents that Nike has not produced.

12           THE COURT:  I want you to go back and just double

13   check because, Ms. Duvdevani, you started the presentation here

14   today that you thought the burden outweighed the relevance.

15   Then you said that you weren't actually sure what that burden

16   would be.  And now you are saying you have produced everything.

17   So I'm not quite sure where things land.

18           But so the record is clear, you are directed to

19   produce all of the investigative documents from Nike's test

20   purchases of StockX products, not just those shoes that were

21   deemed to be counterfeit.

22           MS. DUVDEVANI:  Understood, your Honor.

23           And by burden, it was that issue of going back to the

24   investigator and seeing if they still have pictures of the

25   other hundred or so pairs that were produced.  We will go ahead

MCUGnikC

1    and do that.  Thank you, your Honor.

2             THE COURT:  Thank you.

3             My next category are documents related to Nike's

4    potential acquisition plans of StockX or its designation of

5    StockX as an official seller.  These are RFPs 84 to 85.  Nike,

6    I think, says both that it has produced documents, but it

7    doesn't think the documents are relevant.

8             Why don't we start with StockX on this question here.

9    So tell me why these documents are relevant.

10            MS. BANNIGAN:  Thank you, your Honor.

11            So Nike contends that StockX is a willful

12    counterfeiter, that it knowingly created this safe haven for

13    counterfeiting by the way in which its website has been built

14    and operates.  If Nike itself has documents contradicting these

15    claims about StockX's website as a safe haven for

16    counterfeiters, so much so that it considered partnering with

17    StockX or even investing in or buying StockX, that's extremely

18    probative here in terms of whether StockX's entire website was

19    built to provide a safe haven for counterfeits, which is the

20    language that Nike used at our last conference.

21            There are documents that StockX considered making --

22    excuse me, Nike considered making StockX a partner for

23    authentications.  Nike has said that it's not withholding any

24    documents.  But I think throughout all these requests that we

25    have been discussing, Nike says that it's not withholding

MCUGnikC

1   documents, but it hasn't said that these documents don't exist.

2   And there has been a concern all along about whether Nike is

3   truly looking and collecting from the right sources.  It's been

4   an issue that we have been raising for months now.  So what we

5   want to make sure is that, to the extent these documents exist,

6   they're extremely probative and we're actually getting them and

7   looking in the right places for them.

8          THE COURT:  Let me see if I understand what you are

9   seeking.

10         And I'll note that I think somebody else has joined

11  our call.  Somebody just joined from a 917 --

12         MS. DUVDEVANI:  Yes.  Sorry, your Honor.  That's Tamar

13  Duvdevani.  I have an old school cordless phone in my mountain

14  home, which was about to die, so I hung up and dialed in on my

15  cell phone, so that's just still me.

16         THE COURT:  Okay.

17         So I interpret the discovery request as seeking all of

18  the information that Nike pulled internally about its decision

19  about whether or not to formally connect with StockX, whether

20  by acquisition or some sort of partnership.  And presumably,

21  that consideration on Nike's part involved a number of concerns

22  and questions.  Obviously, counterfeiting would have been one

23  of them, though I assume there were lots of things Nike was

24  considering in deciding whether to do that.  And we know, as

25  evidenced by today's lawsuit, that that relationship did not

MCUGnikC

1    formalize.  And so I have two separate concerns.

2            Concern number one is I'm not sure that StockX is

3    entitled to all of the internal thinkings of Nike about whether

4    or not to formally partner with StockX, which could be totally

5    unrelated to counterfeiting concerns.  So that's concern number

6    one.

7            And concern number two is that there's the possibility

8    of this trial within a trial, where evidence is being presented

9    about why Nike ultimately abandoned the idea and whether it was

10   because of these counterfeiting concerns or for some other

11   reasons and sort of what role the counterfeiting concerns may

12   have played.  And I don't think Judge Caproni wants to have

13   that mini-trial within this case.  So those are my two concerns

14   here.

15           Can I ask Ms. Bannigan to address both of those.

16           MS. BANNIGAN:  Thank you, your Honor.

17           To the extent that there is information out there

18   saying StockX is a reliable partner, that their website is

19   reliable, it is saying it's a good website for authentication.

20   I don't know personally what documents exist.  That is highly

21   probative of whether the website is a safe haven for

22   counterfeiters.

23           So StockX agrees with your Honor that not every reason

24   that Nike might not have partnered with StockX is probative to

25   that.  But what is probative is what did they think of the

MCUGnikC

1   website and the reliability of the website.  It might not

2   necessarily say the word counterfeit, but is this a reliable

3   website.  We've seen documents that that analysis was done.  So

4   I agree with your Honor that we don't want to make this a trial

5   within a trial, but we do have to find a way to -- what the

6   analysis was on reliability and authentication of the website

7   because it is so probative to willfulness here.  There's a lot

8   at stake, in terms of willfulness and StockX's business.

9           So we're happy to work with Nike on how to get this

10   information.  It can be deemed highly confidential.  I don't

11   know that I necessarily agree that it would turn into a trial

12   within a trial because I don't think the issue would be why

13   they didn't partner.  They would have partnered -- I don't

14   think we see it as an issue where it is going to be about why

15   they did or did not partner.  It's what did that result say and

16   what were they thinking about the website at the time.

17           THE COURT:  Do you know whether or not Nike was

18   granted access into the inner workings of the StockX website?

19   Meaning, was there a due diligence process where they were able

20   to look under the hood and evaluate?

21           MS. BANNIGAN:  They were granted access to StockX's

22   authentication center and they were given information about how

23   the authentication process runs.  What it means to be granted

24   under the hood of the website is a bit of a misnomer, because

25   everything is through the website, everything that's

MCUGnikC

authenticated goes through the website, and I believe the

complaints about the website is that it's anonymized.  I think

there were some others that Ms. Duvdevani and Mr. Miller

raised.  The short answer is, yes, they were given inside

information about how these processes work and they visited an

authentication center in London, I believe, in 2019.

THE COURT:  Who from the plaintiff is going to respond

to these questions?

MR. MILLER:  Yes, your Honor.  This is Mr. Miller.  So

a few points in response.

First, we share your Honor's concerns that you

expressed that this issue is essentially a sideshow and is

going to create a trial within a trial about an issue that's

really not relevant with respect to StockX's willfulness.

Whatever Nike thought or did not think about StockX has nothing

to do with whether StockX knew that it was selling counterfeits

and knew that it was deceiving the public with its advertising

claims.

Second of all, with respect to the past pilot program

that the parties engaged in in the 2019 and in an earlier

period leading up to that, your Honor, that was specifically

with respect to some anticounterfeiting efforts.  And Nike has

produced documents related to that.  We, I believe, don't have

anything left to produce on that subject.

Finally, with respect to StockX's stated concern that

MCUGnikC

```
 1    Nike has not looked in the right places.  We disagree strongly
 2    with that, your Honor.  We have the looked in the right places.
 3    We have spoken to the right people at Nike.  We have collected
 4    documents from the right people and we have produced whatever
 5    we believe would be relevant and responsive to this case.  I
 6    don't believe that we've seen anything in the documents that we
 7    have collected and reviewed that have anything to do with Nike
 8    either acquiring or investing in StockX.  And I don't believe
 9    that there's been any plans or proposals to make StockX an
10    official reseller of Nike's products either.
11          And again, to the extent that there was for some
12    business reason, I don't think that has anything to do with
13    what's at issue in this case, with respect to counterfeiting
14    and false advertising and willfulness.
15          THE COURT:  It sounds like you did produce some
16    documents in connection with the efforts to prevent
17    counterfeiting.  And Ms. Bannigan referenced a 2019 visit to
18    its authentication center.  Have you produced any internal
19    documents related to Nike's evaluation of that authentication
20    center or its authentication process more generally?
21          MR. MILLER:  Yes, your Honor, I believe that we have.
22    I don't have at my fingertips every document that we have
23    produced.  But certainly, we had a discussion and a
24    meet-and-confer with StockX fairly earlier on -- several months
25    ago at this point -- related to the past partnership or pilot
```

MCUGnikC

1   program that the a parties had entered into back in the 2019

2   and sort of the years leading up to that.  And we went back to

3   the 2017, I believe, and we searched for documents related to

4   that partnership.  We went beyond our identified custodians to

5   the individuals that were involved in that project.  And we

6   pulled documents from them, reviewed them and produced what was

7   essentially responsive and relevant to the request that we were

8   discussing at the time.  In a general sense, yes, we have

9   produced what we have related to that pilot project.

10       THE COURT:  So the record is clear, I am going to

11   direct Nike to produce documents related to any due diligence

12   it did with respect to StockX as a partner on its

13   anticounterfeiting efforts.  Mr. Miller, suggests that such

14   documents have been produced.  And if that is true, then it has

15   satisfied its obligations.  But I do think that StockX is

16   entitled to Nike's evaluation in real time as it had accessed

17   the information to StockX's authentication and

18   anticounterfeiting efforts.

19       But with respect to questions more broadly about

20   Nike's interest in acquiring StockX or designating it as some

21   sort of partner, those documents are beyond the scope of the

22   case and not relevant.

23       We are more than halfway done, but we still have a bit

24   to go.  Let me check with our court reporter to see whether she

25   needs a break or whether we can keep going.  Everybody else can

MCUGnikC

1    just work through it, but the court reporter is working all the

2    time.

3             I think that covers my first very detailed page of

4    notes.  I am turning to my second very detailed page of notes.

5    Let's turn to documents in connection with Nike's reputation.

6             I understand that StockX is arguing that Nike's

7    reputation globally is relevant if it is being accused, if

8    Nike -- excuse me -- if StockX is being accused of having

9    tarnished that reputation.  And Nike's argument is, as I

10   understand it, that it can't be that any harm to Nike's

11   reputation can be relevant.  And parties were using examples

12   like Nike having sponsored athletes who subsequently became

13   controversial or allegations about sweatshop labor.

14            So why don't we begin, again, with you, Ms. Bannigan,

15   since these are your requests.

16            MS. BANNIGAN:  I'm going to begin this with Mr. Potter

17   this time, your Honor.

18            THE COURT:  Mr. Potter.

19            MR. POTTER:  I am happy to address this.  I think you

20   sort of summarized it very accurately.

21            They put in a claim for tarnishment of their

22   reputation, for injury to business reputation.  And they have

23   alleged prominently throughout their pleadings that their

24   reputation is perfect, is fantastic and is strong and they're

25   well regarded.  Nike is a global company that's been involved

MCUGnikC

in a number of public issues over the years.  And to the extent
that their claim here is that somehow StockX has failed
allegedly -- allegedly counterfeit sneakers has harmed the Nike
brand in some kind of actionable way, when this list, this
laundry list of scandals and individuals who have been involved
in scandals that Nike has at one time sponsored or been
associated with, if that hasn't impacted their reputation
negatively, it's hard to believe that StockX's sale of sneakers
or its introduction of NFTs bearing images of Nike shoes has
harmed its reputation.  So that's all we want to try to do, is
sort of get a baseline here.

        If Nike's reputation has been harmed by something like
StockX's conduct, Nike can prove that, as is its burden to do.
They ought to be able to also show what harm it has sustained,
if any, from all of these other issues that seem -- at least as
a matter of common sense -- to affect public perception as
much, if not more, than the alleged StockX conduct.

        THE COURT:  So a couple of things, one is I think your
comment about common sense, the reference to common sense is
critical here.  Because, presumably, the trier of fact -- I
think this will be before a jury, but I don't recall anymore --
will be asked to use their common sense on these types of
questions.

        But more specifically, Nike, as a global company deals
with controversial concerns probably on a daily basis.  It

MCUGnikC

probably has a significant marketing and reputation team that

deals with these types of problems.  I'm not sure what exactly

you are seeking.  You could be flooded, presumably, with

documents related to how Nike deals with various issues as they

come up.  So I just don't understand what exactly you would be

seeking here.  Do you want every time that Nike concerns itself

with an athlete that is all of a sudden in the press and it

needs to decide whether it's going to distance itself or not

from that athlete, labor issues which come up -- not just in

the sweatshop context -- but in fair trade issues and global

trade negotiations.  I assume Nike is all over the place on

these type of hot button issues.  So I don't know what exactly

you would be seeking here.

            MR. POTTER:  Thank you, your Honor.

            And I agree.  We're not looking to get all of the

documents.  We don't care and we don't want to review what Nike

itself thinks internally about how it's going to respond to

this or what its PR is going to be.  What we're concerned about

is documents that measure public perception.  In my experience,

corporations the size of Nike -- in addition to all of the

other things you just articulated that they commonly do -- they

track these metrics.  And they presumably track them, whether

by design or by happenstance, before and after certain of these

scandals or other issues have arisen.

            So to the extent that Nike has documents internally

MCUGnikC

1    that show that their reputation is or is not impacted.  That

2    certainly seems relevant when it's their burden to show harm to

3    their reputation in this case.  It certainly seems relevant for

4    us to be able to say, look at all of these other documents that

5    show that it didn't or it did or whatever the answer is, we're

6    entitled to know that and certainly to see what information

7    Nike has about public perception, measured or assessed, public

8    perception.  Not someone that thought, this is going to be a

9    disaster for us, but actual metrics that measure that.

10         We have offered in our back and forth with Nike to

11   compromise and to work with them to find what is reasonably

12   accessible in this regard and to take that.  And their position

13   has been, this is simply completely irrelevant.  Somehow

14   they're able to plead a sterling reputation and it's our burden

15   to somehow prove that that's not the case.  They need to prove

16   up their allegations.  They also need to produce evidence that

17   may be relevant to disproving those allegations.  That's all

18   we're seeking.

19         THE COURT:  Who from the Nike side is going to tackle

20   this question?

21         MS. DUVDEVANI:  Thank you, your Honor.

22         What StockX is seeking with this set of RFPs is both

23   immensely burdensome and completely irrelevant.  They have not

24   demonstrated any entitlement under the law to any of this type

25   of information.

MCUGnikC

```
 1            Let me just first start off and say -- because
 2    Mr. Potter referenced Nike's counterfeit allegations -- the
 3    dilution claims are addressed solely with regards to Nike's
 4    NFTs.  StockX, let me talk about the relevance.  StockX has not
 5    produced or shared a single case that supports the idea that
 6    Nike is obligated to produce discovery related to public
 7    perception of its company as a whole.  The closest the case law
 8    possibly gets is with regard to the specific products at issue;
 9    NFTs to NFTs.  That information regarding NFT consumer
10    complaints was discussed at the last hearing.  Pursuant to your
11    Honor's order, it has been produced.  There might be some
12    stragglers that we are trying to collect, but overall, all of
13    those types of issues with regard to complaints about Nike's
14    NFTs have been produced.  And all the cases that StockX cited,
15    Starbucks and Hilfiger, relates to specific products, not a
16    giant company's reputation as a whole.
17            With regard to information that Nike would have that's
18    relevant, the one case that comes even close to this issue was
19    cited by Nike in its letter, Virgin Enterprises v. American
20    Longevity, where a similar argument was made against the
21    plaintiff trying to produce information regarding Virgin's
22    self-tarnishment issues.  The court didn't really buy the
23    argument, but what it said was accepting the contention
24    arguendo, there's nothing that Virgin should be producing, but
25    this all would be information within the public domain.
```

MCUGnikC

1          If, for example, taking one of StockX's requests for

2    information relating to Nike's sponsorship of Lance Armstrong

3    or the suspension or termination thereof, if StockX wants to

4    assess how that somehow impacted Nike's reputation, that would

5    be in the public.  That would not be in Nike's own documents.

6    And the court in *Virgin* specifically says that, it would be

7    proved through, quote, unquote, public sources.

8          The last case that they cited most recently trying to

9    support this position, the *New York Stock Exchange* case, was

10   actually reversed on appeal.  And what the Second Circuit

11   clearly said is that tarnishment occurs where a trademark is

12   linked to products of shoddy quality or is portrayed in an

13   unwholesome or savory context with the result that the public

14   will associate the lack of quality or lack of prestige in

15   defendant's goods with plaintiff's unrelated good.  It did not

16   confirm what the Southern District of New York did vis-a-vis

17   this theory of self-tarnishment.

18         With regard to burden, when you take a look at, just

19   for example, RFP 112, it seems like StockX decided to

20   cherry-pick seemingly bad press events like Lance Armstrong,

21   like labor practices and just decided they are just going to

22   ask Nike to try to figure out who would have information

23   related to some sort of impact on Nike's reputation on things

24   that happened potentially decades ago, in the case of Lance

25   Armstrong.

MCUGnikC

1          And I think there's something that your Honor might

2     have alluded to, Nike does a lot of cross-marketing, they work

3     with a lot of different athletes and everybody has a different

4     opinion.  Some people are unhappy that Nike dropped Kyrie

5     Irving, some people think that it took them too long.  Whether

6     or not the public is upset with Nike's decisions as a whole, A,

7     is not relevant to the issues in this case; B, can be

8     ascertained from public sources; and C, is just way too

9     overburdensome and not proportional to the needs of this case.

10    And frankly, your Honor, if StockX tries to make this type of

11    argument based on public information, it's going to be our

12    first motion *in limine* leading up to trial, because it is just

13    not relevant.

14          THE COURT:  Hold on one second.

15          Two questions for you.  Question number one is:  Have

16    you searched for documents in Nike's possession related to the

17    public's perception or view of Nike's anticounterfeiting

18    efforts?  Meaning whether or not there are any documents that

19    you hold that reflect its own investigation -- whether it's a

20    survey or something else -- about how Nike is doing on this

21    counterfeiting front.  That's question number one.

22          And question number two is:  Given that it's your

23    burden to prove that the reputation has been tarnished, how

24    does Nike intend to prove that, generally?

25          MS. DUVDEVANI:  With regard to documents regarding

MCUGnikC

consumer perception of our counterfeiting efforts, no, your
Honor.  We didn't specifically search that, because that's not
relevant to any issue in the case, including dilution.  Which,
again, is relating to Nike's NFT claims, not Nike's
counterfeiting claims.

           To the extent we have our dilution claim that we're
going to be advancing through summary judgment and trial, we're
planning on proving it the way any party typically proves it in
a tarnishment case, to prove that, as I cited, in Second
Circuit said in *New York Stock Exchange,* that Nike's trademarks
are being linked to StockX's NFTs, which consumers have called
a scam.  To the extent we can establish a likelihood of
tarnishment based on the appropriate legal factors, that is
what we are going to be promoting.  But this idea that it is
Nike's obligation to show through their own internal documents
that the company as a whole has a good reputation is just not
founded.

           Again, to the extent StockX wants to argue that Nike
has a smattering of consumer complaints about its MNLTH NFT
having issues with the forging of those NFTs can't be shipped
to Europe, which is, to my understanding, the one real negative
consumer complaint Nike has had regarding its NFT, StockX is
free to make that argument, the same way that argument was
advanced in the *Starbucks* case about the specific product.

           But the idea that Nike should have to produce

MCUGnikC

1    information about whethere or not it has information that

2    consumers were unhappy that it worked with Lance Armstrong or,

3    frankly, whether consumers are happy or unhappy or satisfied

4    with how Nike goes about doing its own brand protection, which

5    is, again, a highly confidential issue to the company, so it's

6    not like the public would even know what Nike is doing.  It's

7    just not relevant to Nike's burden on its dilution count.

8              THE COURT:  Thank you.

9              Just to close the loop, you have produced documents

10   related to NFT complaints that Nike has received, those have

11   been produced?

12             MS. DUVDEVANI:  Yes, your Honor.  They have been

13   produced.  That would be the one relevant area when it comes to

14   this idea of self-tarnishment under Second Circuit precedent.

15             THE COURT:  Thank you.

16             Anything further, Ms. Duvdevani?

17             MS. DUVDEVANI:  No.  I was just going to put a finer

18   point on it with some of the other requests, but I think I have

19   made my point.  Thank you.

20             THE COURT:  Mr. Potter.

21             MR. POTTER:  Thank you, your Honor.

22             Ms. Duvdevani raised a number of points that I would

23   like to try to address.  First of all, as to the case law, the

24   *Virgin* case is completely in opposite.  In that case, they

25   argue that Richard Branson himself had engaged in personal

MCUGnikC

conduct that he described that somehow harmed the Virgin brand

and they wanted to depose Mr. Branson to ask about the facts

behind those actions.  That is completely different than what

we're seeking here, which is Nike's own internal existing

information about its brand value.  It's hard for me to believe

that they're resisting it so strongly.  How are they going to

prove that, as your Honor asked.  In my experience, typically,

brands put forward evidence of the awards they've got and the

sales that they've got and the way that they introduced

products after, well received by the press.

          I assume Nike is going to put in some sort of evidence

to indicate that their brand has a strong reputation.  It's not

going to be based exclusively on NFTs.  This notion that it all

has to be product specific, that can't be true.  Dilution does

not require competitors.  There can be instances and there have

been instances of dilution where the parties don't even sell

the same product.  So it certainly can't be product based.

          To take sort of a more recent example, perhaps —— and

this is really our position, I think, in a nutshell —— let's

consider Southwest Airlines over the last week.  This has been

a pretty negative news cycle for Southwest.  Now, if Southwest

was to bring a lawsuit and allege that someone's sale of NFTs

with images of Southwest airplanes on them was tarnishing the

brand, and then the defendants would receive what harm the

brand may have suffered from the debacle of your flight

MCUGnikC

cancellations during the holidays.  To me, that would be

extraordinarily relevant.  If the brand has been harmed

tremendously by other factors, such that something as small as

the allegations against StockX simply cannot move the needle

one way or the other, that is very relevant.

Going back to the case law, the *Tommy Hilfiger* case

makes clear, the sine qua non of tarnishment, is the finding

that plaintiff's mark will suffer negative associations through

plaintiff's use.  It can't be, well, some people complained

about the NFTs, so therefore, Nike's brand is harmed.  It has

to be, here's the type of things that harm Nike's brand, here's

the status quo of where it was, and here's what we're alleging

your sales of NFTs did to it.  And Nike seems to want to come

forward and say -- without having to prove it -- our brand is

fantastic and not worry about any other negative associations

with their brand and then say -- without evidence -- the sale

of these NFTs that some members of the public refer to

negatively harmed the brand.  But other members of the public,

to Ms. Duvdevani's point, viewed them positively, so perhaps

that helped Nike's brand.  And all we're trying to do is test

that and get beyond what seems to be Nike's assumption and

really get into what's happening here.

Again, we're not seeking communications internally

about what Nike thought about various issues.  We're seeking

documents that they may maintain internally about publicly

MCUGnikC

1    measured perception.  So when Ms. Duvdevani talks about it is

2    going to come from the public, that's what we're seeking,

3    public information.  We're not trying to depose Mr. Branson.

4    We are trying to seek existing documents that show Nike's brand

5    reputation.

6          And I don't understand Ms. Duvdevani's point that

7    somehow it's our burden to demonstrate the public perception of

8    Nike, that they don't need to produce any documents about it

9    and that if we do get documents about public perception that

10   would be the subject of a motion *in limine*.  How are we

11   supposed to get in any information about Nike's reputation if

12   they won't produce it, even under the strictures that

13   Ms. Duvdevani claims are required by the law; public

14   information only, not a deposition of the CEO and then they are

15   going to move to exclude any information we found.  I am

16   honestly boggled, to be perfectly honest.

17         MS. DUVDEVANI:  Your Honor, if I might respond to that

18   with not a loud yelling voice.

19         Going to the *Virgin* case, regardless of the type of

20   discovery that the defendant was trying to seek, the court was

21   very clear, it didn't really buy this theory, but what it said

22   was, quote, one may readily accept that Branson's personal

23   knowledge of his personal acts and actions exceeds that of any

24   other source, but if those acts and actions have not been made

25   public, they cannot have affected public perceptions and are

MCUGnikC

consequently irrelevant of the issues in this case.  In those

circumstances, defendant's determination to question Branson on

such matters runs the risk of harassment -- and then

continues -- I am confirmed in that conclusion by the fact that

other circumstances defendants describe that showed

self-dilution or self-tarnishment of Virgin's mark may also be

proved through public sources.  If, as defendants contend,

plaintiff's mark has been diluted by, quote, the licensing of

the mark to a willy-nilly group of licensees, end quote, that

is readily proveable by a compilation of other uses of the

mark.  If, as defendants contend, self-dilution should be

inferred from plaintiff's lack of diligence and interdicting

pornographic website domain names using the word Virgin until

just recently, end quote, the factual predicate for the

inference presumably remains as available to defendants at

trial as it was when they drafted their answer.  If, as

defendants contend, Branson's inspired unsavory practices

continue today, the court then says, the availability of such

reading material on Virgin aircraft may be proved through

independent sources.

    There is not one case that StockX has set forth or

that Nike has found in the Second Circuit or beyond to prove

entitlement by StockX to go on this fishing expedition through

anything that they might believe might have harmed Nike's

reputation over the last couple of decades.  There's just no

MCUGnikC

1    support for these requests.

2              THE COURT:  Thank you everybody.

3              I want to be clear that Nike does need to produce

4    documents related to complaints of NFTs.  And to the extent it

5    also has documents related to perceived harm to its reputation

6    because of the NFT complaints, those documents as well need to

7    be produced.  But otherwise, I'm go to sustain Nike's

8    objection.  And it does not need to produce the type of

9    company-wide documents that are being sought related to its

10   reputation.  I think that that material is -- the cases support

11   that that type of evidence comes from the public and public

12   sources.

13             Obviously, to the extent Nike seeks at trial to rely

14   on documents, internal documents not produced, that's a risk to

15   it, that it won't be allowed to do that.  But otherwise, I

16   think the parties need to rely on public sourcing for this type

17   of information.

18             I think the last topic -- other than the financial

19   documents, which I'm going to get to last -- are the redacted

20   documents related to Nike's counterfeit presentations.  And I

21   know that these are areas of concern.  So can I ask the court

22   reporter to put this portion of the transcript under seal,

23   please.

24             (Pages 50 - 57 sealed)

25

MCUGnikC

1          THE COURT:  That leaves us with the issue of the

2    financial documents.  Which I appreciate we have been on the

3    call for an hour and 45 minutes already.  My read on where

4    things are is that there are documents that have been produced

5    that I don't hear at this point that there is a relevance

6    objection to these financial documents and, in fact, StockX has

7    agreed to produce documents.  It believes that it is not at an

8    impasse on this issue.  I know from the emails with my law

9    clerks that Nike takes a different position here.

10         I guess I wonder whether or not this issue -- given

11   that production was only recently made -- should be reset for

12   next week's status letter.  That's my view given sort of where

13   things stand today.  But maybe I'll ask Nike to begin and tell

14   me if they think that the issues really are ripe and we should

15   address them now.

16         MS. DUVDEVANI:  Yes, your Honor.

17         MR. MILLER:  Your Honor, I'll start.  Tamar, feel free

18   to chime in, if you like.

19         Your Honor, we do feel that the parties have reached

20   an impasse here and we would like the Court's assistance in

21   making sure that StockX produces the information that

22   essentially is basic financial information that's produced in

23   Lanham Act cases.  So we served a set of requests back in

24   August and we have gotten nothing but objections and

25   essentially evasions from producing this information.

MCUGnikC

1          StockX finally relented, produced a single spreadsheet

2     with some summary numbers related to revenues and costs, but

3     none of the underlying data that they used to calculate that.

4     It frankly, to us, looks like a document that was created by a

5     damages expert, but with none of the underlying material that

6     was considered and used to create those calculations.  We have

7     asked for additional documents.

8          As we noted in the letter, and as StockX noted in its

9     letter to your Honor, it produced three additional documents on

10    December 23rd; an updated version of that summary and some

11    audited financials.  But this is still insufficient to provide

12    Nike with all of the information that StockX itself is

13    apparently using to calculate revenues and claim deductions

14    when it comes time for the parties to prove or for Nike to

15    prove its damages claim with respect to false advertising and

16    profit disgorgement is a remedy we're seeking.  There is clear

17    case law on who has the burden on which side of that.  Nike has

18    to prove up based on StockX's information the revenues that are

19    attributable to the false advertising.  And StockX can claim

20    deductions from those revenues to reach a profits number.

21         We are asking for basic information that would allow

22    Nike and our expert to do our own independent analysis of both

23    revenues and costs so that we can meet our burden on the

24    revenue side and so that Nike can evaluate and challenge any

25    claimed deductions that StockX will seek to prove.  And that's

MCUGnikC

basically where we're at.  We feel, at this point, that StockX

has drawn this out.  Again, we served these in August.  We are

now almost in January.  Fact discovery is coming to a quick

close, expert discovery soon after that.

We need to depose a StockX 30(b)(6) witness on these

financials to understand how they work, authenticate the

documents, et cetera.  We just feel that StockX has essentially

been evading its obligations to produce this information.  And

we have met and conferred on it on multiple occasions over the

last few months and we still don't have this basic information.

We don't understand why that is.  And that's why we're coming

to the Court for a resolution.

MS. DUVDEVANI:  The only thing I was going to add,

your Honor, is while StockX did, for some reason, do this thing

where they produced the documents after we submitted our

letter, it was a busy few days for the team and for our

experts, so we already did examine the additional documents

they felt they needed to produce, and the email that was sent

to your clerk does reflect our position, our researched

position that those documents are still insufficient to meet

StockX's obligations.  That's all I wanted to add.

THE COURT:  Thank you.

Ms. Bannigan or Mr. Potter, who is going to take the

lead here?

MS. BANNIGAN:  Thank you, your Honor.

MCUGnikC

1          StockX completely disagrees with the assertion that
2     we're evading our obligations.  We have been meeting and
3     conferring about the requests, about the scope of the request.
4     These requests, like many of the 243 other requests we have
5     been striving to respond to, were very broad.  We met and
6     conferred.  We produced the initial documents.  Nike contended
7     that wasn't enough, they said.  We produced what we thought was
8     a nice summary that laid everything out.

9          We went back last week and we got the CFO on the phone
10    over the holiday and said, what are the underlying documents.
11    And we picked through the categories that Nike had set out at
12    that time.  We produced all of that information.

13         Ms. Duvdevani has an issue with the timing of our
14    production, that it came just after she submitted the letter.
15    Surely, she understands that it takes a while to get a
16    production ready, so it wasn't something that was purposefully
17    done on that timing.  Everybody has been working very hard to
18    get information produced and these discovery disputes wrapped
19    up.

20         After that information was sent, we received an email,
21    I believe, on Wednesday of this week from Nike.  Now, again,
22    moving the goal post -- which is a common theme that we have
23    seen throughout all of these negotiations -- and asking for
24    several other categories of documents.  And they're frankly
25    just categories of documents tht we need to meet-and-confer

MCUGnikC

1    over.

2           For instance, we submitted the underlying information

3    from the summary chart.  We submitted it in a form that is kept

4    by the client.  Nike says that this isn't sufficient, StockX

5    must produce the underlying data that was maintained in the

6    ordinary course of business.  Well, that would be hundreds of

7    thousands of purchase orders.  Is that really what Nike wants?

8           We need to meet-and-confer about what is actually

9    reasonable to produce and what is going to be useful for them.

10   Another demand they sent to me two days ago was that StockX

11   produce a detailed account of expenses by department, and then

12   they list several departments.  We don't understand the

13   relevance of that.  We need to discuss, why do they need that

14   and what exactly are they looking for.

15          They also, the other day, asked for some of the

16   information regarding revenues with global information, rather

17   than US-specific.  We thought that was a fair point.  But we

18   have gone back to StockX's -- the people who are responsible

19   for this, and it's actually not a simple answer about what is

20   global and what is not global when you are dealing with a

21   website.  Does global mean sale -- does the person have to be

22   located in the United States?  Does the address have to be in

23   the United States?  There are actually issues we need to

24   discuss, what they're looking for.

25          And so we have other questions about why they need a

1    chart of accounts and why they need cost allocations.  Again,

2    we feel this is a constantly moving goal post.  However, there

3    is absolutely no world in which StockX is attempting to evade

4    its responsibilities.  But what we do need is to work with Nike

5    within reason to figure out what is reasonable to produce and

6    what do they actually need, because this is a big company we

7    are dealing with and this information is kept in a lot of ways.

8            So we are happy to continue to meet-and-confer.  We do

9    need some more information from Nike, but we're hopeful that we

10   actually don't have a dispute here once we are able to discuss

11   further.

12           THE COURT:  Yes, Mr. Potter.

13           MR. MILLER:  Sorry, this is Mr. Miller, your Honor.

14           I just wanted to note, if your Honor would allow me, I

15   would like to note a few things in response to what

16   Ms. Bannigan raised.

17           THE COURT:  Okay.

18           MR. MILLER:  Which is that we strongly disagree that

19   we have moved the goal post in any way or imposed upon StockX

20   new requests.  The information that was sought in our requests

21   that were served in August are basic damages-related requests

22   that happen all the time in intellectual property cases.  I

23   find it very odd to hear Ms. Bannigan say she doesn't

24   understand why we are seeking information related to expenses,

25   whether those are fixed or variable expenses and cost pool

MCUGnikC

1    allocations.  These are basic pieces of the components that

2    StockX, as the party with the burden to prove deductions, has

3    to produce evidence on in order to carry its burden.  And Nike,

4    as the party that will seek to challenge that, has to be able

5    to see that as well to evaluate and respond to it.  We are not

6    moving the goal post in any way.  We have been giving StockX

7    more specific -- if they claim they don't understand what we're

8    asking for, the purpose of our emails is to get as granular as

9    we possibly can and tell them what it is that we are seeking.

10          To receive a single spreadsheet in response to these

11   various requests for which StockX told us for months that, oh,

12   yeah, we'll be producing this information, don't worry, it's

13   coming, to get a single spreadsheet and then be told in a

14   subsequent meet-and-confer that our requests were for documents

15   sufficient to show and that a single spreadsheet is a document

16   sufficient to show is frankly insulting.  And I think, from our

17   point of view, we do believe that the obligation to produce

18   this information has been evaded and dragged out.  It's been

19   many months since we served these.

20          And we're happy to meet-and-confer and continue the

21   discussion with StockX, but we would like a firm deadline by

22   which this information will be produced, so that we can

23   evaluate it with sufficient time to take a 30(b)(6) deposition

24   before the end of fact discovery and have our experts prepare

25   their analysis and produce their report by the affirmative

MCUGnikC

1    expert report deadlines.

2              THE COURT:  Thank you.

3              I think everybody agrees now, at least generally, that

4    these underlying financial documents are required to be

5    produced.  Producing just the summary document that StockX

6    began with is not sufficient.  So StockX does need to respond

7    with the underlying documents.  It sounds like it is open and

8    ready to do that.  I agree with StockX that Nike probably

9    doesn't want order confirmation receipts for every single item

10   that was purchased and so the parties should work together to

11   figure out what is the most efficient and manageable set of

12   documents that are responsive.  And I don't see why that can't

13   happen now.

14             So I want the parties to engage in those discussions

15   now.  I'm going to defer any further ruling and ask for an

16   update on this issue in the January 6th letters that the

17   parties are going to be producing to me.

18             I would like the meet-and-confer process to be fully

19   completed by January 4th.  It's possible that the documents

20   themselves cannot be produced by that deadline.  Though, if

21   that's possible, that would be my preference too.  I would like

22   the parties to fully exhaust their meet-and-confer efforts by

23   January 4th so that the parties can put the actual position

24   that they're in in the January 6th letter, so we don't have

25   another repeat of what happened here, where one side says

MCUGnikC

```
1    they're still engaging in the negotiation process.  So the
2    parties should continue those discussions today and complete
3    them by Wednesday the 4th and present to me in the January 6th
4    letters where they are if disputes remain at that point.
5             I think I have accomplished what I set out to
6    accomplish, which is to address the discovery disputes that
7    were set forth in the December 23rd letter and sort of what
8    remained from the December 12th letters.  As I indicated, I
9    didn't think I would be able to get to the December 19 letters,
10   and I stand by that position.  So I will get to that either by
11   written order or address it in the subsequent conference with
12   the parties.  But I think that satisfies my agenda for today.
13            Is there anything further that Nike wants to address
14   today?
15            MS. DUVDEVANI:  No, your Honor.  Just to thank the
16   Court for its time over a holiday period.  We appreciate it.
17            THE COURT:  You're welcome.
18            And anything further from StockX?
19            MS. BANNIGAN:  Not right now, your Honor.  Thank you
20   very much.
21            THE COURT:  So I will be receiving the unredacted
22   slides with highlights of that which was redacted and a letter,
23   two-page letter from Nike by January 4th.  And then I'll
24   receive letters from the parties on January 6th identifying any
25   ongoing discovery disputes.  And of course, if there are none,
```

MCUGnikC

1    the parties are welcome to submit the joint letter saying there

2    are no disputes at this time.

3              I hope everybody enjoys their final holiday weekend

4    for the year.  And thank you, again, to the court reporter for

5    her time.  We are adjourned.

6              (Adjourned)