# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NIKE, INC., | Civil Action No.: 1:22-cv-00983-VEC |
| Plaintiff, | |
| v. | **REDACTED PUBLIC VERSION** |
| STOCKX LLC, | |
| Defendant. | |

**NIKE, INC.'S OBJECTION TO MAGISTRATE JUDGE NETBURN'S MARCH 23, 2023 ORDER DENYING NIKE'S MOTION TO COMPEL STOCKX TO PRODUCE INFORMATION RELATED TO COUNTERFEIT "NIKE" GOODS SOLD TO ROY KIM**

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ................................................................................1

II.     FACTUAL BACKGROUND ................................................................................3

    A.   Roy Kim Purchases Suspected Counterfeit "Nike" Shoes from StockX.........................3

    B.   Nike Brand Protection Visits Mr. Kim to Inspect His Shoes ...........................................5

    C.   Nike Notifies StockX About Its Inspection of Mr. Kim's Counterfeit Shoes and Seeks Discovery from StockX on the Same ....................................................................5

    D.   StockX Suddenly Claims Its Reauthentication of Mr. Kim's Shoes is Protected Attorney Work Product...........................................................................................8

    E.   Mr. Kim is Interviewed by the Press and Discloses That StockX Conveyed the Results of Its Reauthentication of His Returned Shoes .................................................10

    F.   StockX Reauthenticates Returned Suspected Fakes as a Matter of Course .................11

III.    PROCEDURAL HISTORY................................................................................11

IV.     ARGUMENT .................................................................................................12

    A.   Applicable Legal Standards ...........................................................................................12

    B.   StockX's Reauthentication of Mr. Kim's Fake Shoes is Not Protected Attorney Work Product ......................................................................................................14

       1.   StockX's Reauthentication of Mr. Kim's Shoes Was Not Conducted Solely for Litigation .............................................................................................15

       2.   The Roy Kim Authentication Results are Discoverable Evidence Not Protected by the Work Product Doctrine ................................................................19

       3.   Even If Arguendo StockX's Reauthentication is Protected Work Product StockX Waived Any Protection Through Disclosure ...............................................21

V.      CONCLUSION ..............................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allied Irish Banks v. Bank of Am., N.A.*,
    240 F.R.D. 96 (S.D.N.Y. 2007) ...................................................................14, 15, 16, 17

*Arista Recs., LLC v. Doe 3*,
    604 F.3d 110 (2d Cir. 2010) ...................................................................................13

*Bowne of New York City, Inc. v. AmBase Corp.*,
    150 F.R.D. 465 (S.D.N.Y.1993) .........................................................................22, 25

*Clarke v. J.P. Morgan Chase & Co.*,
    2009 WL 970940 (S.D.N.Y. Apr. 10, 2009) ...........................................................15

*Connell v. Burlington Coat Factory*,
    2022 WL 1115403 (S.D.N.Y. Apr. 13, 2022) .........................................................15

*Fresh Del Monte Produce, Inc. v. Del Monte Foods, Inc.*,
    2015 WL 3450045 (S.D.N.Y. May 28, 2015) ........................................................15

*Fullerton v. Prudential Ins. Co.*,
    194 F.R.D. 100 (S.D.N.Y. 2000) .................................................................13, 22, 23

*Gelb v. New York State Bd. of Elections*,
    2003 WL 1907986 (S.D.N.Y. Apr. 17, 2003) .......................................................20

*In re Grand Jury Proceedings*,
    219 F.3d 175 (2d Cir. 2000) ..........................................................................22, 24, 25

*In re Grand Jury Subpoenas*,
    318 F.3d 379 (2d Cir. 2003) ...................................................................................14

*Gruss v. Zwirn*,
    2013 WL 3481350 (S.D.N.Y. July 10, 2013) ...................................................12, 13

*Hickman v. Taylor*,
    329 U.S. 495 (1947) ...............................................................................................19

*Jackson v. Nassau Cty.*,
    340 F.R.D. 539 (E.D.N.Y. 2022) ...........................................................................19

*Joffe v. King & Spalding LLP*,
    2019 WL 4722673 (S.D.N.Y. Sept. 25, 2019) .......................................................13

*Koch v. Greenberg*,
    2012 WL 1449186 (S.D.N.Y. Apr. 13, 2012).........................................................................17

*Kramer v. Time Warner Inc.*,
    937 F.2d 767 (2d Cir. 1991)...............................................................................................21

*Mercy v. Suffolk Cty.*,
    93 F.R.D. 520 (E.D.N.Y. 1982)..........................................................................................20

*Mira v. Kingston*,
    218 F. Supp. 3d 229 (S.D.N.Y. 2016), *aff'd*, 715 F. App'x 28 (2d Cir. 2017).......................21

*New York Times Co. v. U.S. Dep't of Just.*,
    939 F.3d 479 (2d Cir. 2019)....................................................................................... *passim*

*Ngono v. U.S.*,
    2022 WL 336963 (S.D.N.Y. Feb. 4, 2022) (Caproni, J.)......................................................13

*Noel v. City of New York*,
    2018 WL 6786238 (S.D.N.Y. Dec. 12, 2018) .......................................................................13

*Primetime 24 Joint Venture v. Echostar Commc'ns Corp.*,
    2000 WL 97680 (S.D.N.Y. Jan. 28, 2000) .....................................................................19, 20

*Roche Freedman LLP v. Cyrulnik*,
    2022 WL 17157670 (S.D.N.Y. Nov. 22, 2022)....................................................................21

*Rockwell Int'l Corp. v. U.S. Dep't of Justice*,
    235 F.3d 598 (D.C. Cir. 2001) ...........................................................................................21

*S.E.C. v. Alderson*,
    390 F. Supp. 3d 470 (S.D.N.Y. 2019)..................................................................................15

*S.E.C. v. Gupta*,
    281 F.R.D. 169 (S.D.N.Y. 2012) ........................................................................................22

*In re Steinhardt Partners, L.P.*,
    9 F.3d (2d Cir. 1993)....................................................................................................21, 22

*Strougo v. BEA Assocs.*,
    199 F.R.D. 515 (S.D.N.Y. 2001) ........................................................................................20

*In re Symbol Techs., Inc. Sec. Litig.*,
    2017 WL 1233842 (E.D.N.Y. Mar. 31, 2017)......................................................................20

*In re Terrorist Attacks on Sept. 11, 2001*,
    293 F.R.D. 539 (S.D.N.Y. 2013) ...................................................................................14, 21

*Thomas v. F.F. Fin., Inc.*,
128 F.R.D. 192 (S.D.N.Y. 1989) ...................................................................................22, 25

*U.S. v. Adlman*,
134 F.3d 1194 (2d Cir. 1998).......................................................................................15, 16, 19

*U.S. v. Bilzerian*,
926 F.2d 1285 (2d Cir. 1991).......................................................................................24, 25

*U.S. v. Nobles*,
422 U.S. 225 (1975).........................................................................................................13

*Weber v. Paduano*,
2003 WL 161340 (S.D.N.Y. Jan. 22, 2003) ...........................................................15

*Wultz v. Bank of China Ltd.*,
304 F.R.D. 384 (S.D.N.Y. 2015) .................................................................................14, 17

**Other Authorities**

Fed. R. Civ. P. 26(b)(3)............................................................................................................15

Fed. R. Civ. P. 72(a).........................................................................................................1, 13

Pursuant to FED. R. CIV. P. 72(a), Nike, Inc. ("Nike") respectfully objects to the portion of Magistrate Judge Netburn's March 23, 2023 Order denying Nike's Letter-Motion to overrule StockX LLC's ("StockX") privilege objections and compel the production of information concerning the results of its reauthentication of certain counterfeit "Nike" goods that StockX sold to Roy Kim.  (Dkt. No. 148 (the "Order").)  For the reasons set forth below, the Court should set aside this portion of the Order, overrule StockX's objection, and order StockX to produce: (1) the results of its reauthentication of shoes it sold to Mr. Kim and returned to StockX by Mr. Kim in 2022; and (2) witness John Lopez for an additional deposition relating to those results.

## I.     PRELIMINARY STATEMENT

Last summer, a StockX customer named Roy Kim complained to StockX about his belief that it "authenticated" and sold him over $10,000 of fake "Nike" shoes.  Nike found out about Mr. Kim's complaints because Mr. Kim, aggrieved that no one at StockX would respond to his complaints, published a post on Instagram that went viral.  Nike contacted Mr. Kim on July 10, 2022, and learned that StockX had also seen his post, finally contacted him on July 7, 2022, and offered to ship the suspected fake shoes back to reevaluate them for authenticity.  StockX did not contact Mr. Kim to reevaluate his shoes upon counsel's instruction.  To the contrary, reauthentication of suspected fake products is a typical StockX process; that is, if a consumer has the wherewithal to suspect a fake in the first place (Mr. Kim is a sophisticated sneaker collector) and the tenacity to try to reach someone at StockX who will actually respond to those concerns.

Before Mr. Kim shipped StockX the suspected fakes, Nike paid Mr. Kim a visit on July 22, 2022, inspected 42 of the 62 pairs of "Nike" shoes that Mr. Kim bought on StockX and had set aside, and confirmed that **38** of those pairs are counterfeit.  Nike never took possession of the shoes and Mr. Kim subsequently sent them back to StockX per its offer to reevaluate them.  Nike informed StockX on July 25, 2022 about its inspection, demanded that the shoes be preserved upon

their return, and served discovery relating to their sale and any subsequent reevaluation. Nike then deposed Mr. Amidon, the StockX customer service employee who contacted Mr. Kim, as well as Mr. Kim himself pursuant to a jointly served subpoena *ad testificandum*.

Mr. Amidon testified in some detail that StockX's reauthentication of the shoes resulted in a determination that they should not have been sold to Mr. Kim. Mr. Kim testified that Mr. Amidon conveyed the reauthentication results to him as well, offered him a refund, a $500 gift card for his troubles, and a free trip to StockX's Detroit headquarters. Mr. Kim's testimony was also fairly specific: "Russ [Amidon] called to let me know they had received the shoes, reviewed them, that they were not up to StockX's quality standards, that – and I believe the term 'UA' was utilized, unauthorized authentic, and that StockX would be taking the shoes back." However, when Nike deposed John Lopez, the StockX "authenticator" who ████████████████████████ ████████████████ StockX objected to disclosure of those results for the very first time on work product privilege grounds. Judge Netburn's Order upheld this objection.

Nike respectfully submits that Judge Netburn abused her discretion in sustaining StockX's work product objection to disclosure of the reauthentication results for three reasons, all of which demonstrate that the Order was clearly erroneous: (1) StockX did not meet its burden to show the reauthentication of Mr. Kim's shoes was conducted solely for litigation purposes, would only have been conducted because of this action, and that the results would have taken an essentially different form than the ordinary process; (2) those reauthentication results are discoverable, highly relevant information *not* comprised of counsel's mental impressions, legal advice, or strategy of the sort protected by the work product doctrine; and (3) StockX waived any such supposed protection through its specific disclosures to Nike and other third parties. Nike therefore requests that this

Court reverse Judge Netburn and order StockX to produce this highly relevant, non-privileged information that goes to the very heart of Nike's counterfeiting and false advertising claims.

## II.     FACTUAL BACKGROUND

### A.     Roy Kim Purchases Suspected Counterfeit "Nike" Shoes from StockX

Between March and July 2022, StockX customer Roy Kim, a sneaker collector and reseller, purchased 62 pairs of "Nike" shoes from the StockX platform.  (Dkt. No. 135-4 at STX0772988.) StockX "authenticated" each pair of those shoes, verified to Mr. Kim that they were "100% Authentic," and shipped them to Mr. Kim's ███████ address.  (Dkt. No. 80.)  Upon receipt, Mr. Kim, a highly sophisticated "sneakerhead," suspected that some of the shoes might be counterfeit after using two smartphone apps that purport to authenticate sneakers through transmission of photos.  *See* Brendan Dunne, *Nike v. StockX Lawsuit: How One Buyer Got 38 Fake Pairs of Sneakers*, COMPLEX (Mar. 21, 2023), https://www.complex.com/sneakers/stockx-fake-sneakers-nike-lawsuit-38-pairs (the "*Complex* Article"); Roy Kim (@sneakerstrut), INSTAGRAM (Jul. 5, 2022), https://www.instagram.com/p/CfprXUSpU-r/ (the "July 5 Instagram Post")); *see also* Dkt. No. 135-4 at STX0772988 ("The user @sneakerstrut is claiming that StockX has sold him over $10K worth of fake product, citing that he purchased 62 pairs of various AJ1s from us and 36 pairs have failed authentication via apps CheckCheck and LegitCheck").

After the two apps collectively flagged over half of the 62 pairs of shoes as fake, Mr. Kim contacted StockX to complain and seek a refund.  (*Complex* Article; July 5 Instagram Post.) StockX did not respond to Mr. Kim's multiple attempts to contact customer service.  (*Id.*; *see also* Dkt. No. 135-4 at STX0772987 ("I have found 3 cases . . . sitting in queue without answer.")   As a result, on July 5, 2022, Mr. Kim, using the handle "sneakerstrut" posted on Instagram his belief that StockX had sold him over $10,000 worth of counterfeit "Nike" shoes:



**7,804 likes**

**sneakerstrut** This is what $10,000+ of fake sneakers that passed through @stockx looks like. I bought about 62 pairs of Uni/Mocha/Hyper Royals through StockX over the last month. Of those, 36 have failed authentication at CheckCheck and LegitCheck app. I haven't tried to sell them through eBay or Goat, but somebody else who's been buying their pairs from StockX told me these pairs have been failing through Goat authentication at a very high rate.

This means that StockX's authentication on these pairs is only 42% accurate – 58% of pairs they are selling will be marked as "not legit" consistently by other sources.

There's a huge problem here.

Of course, StockX support is silent when brought up through support channels. Any human authentication system is gonna have errors, but whatever StockX is doing right now is not working. And the ability to fix these errors is nearly non-existent. #stockx

View all 61 comments

July 5, 2022

(July 5 Instagram Post.)

StockX became aware of the July 5 Instagram Post by the next day.  (Dkt. No. 140-3 at ¶ 3.)  Specifically, on July 6, 2022, StockX's "Social Media Coordinator" flagged the July 5 Instagram Post but had "not been able to identify any orders at this time."  (Dkt. No. 135-4.)  The StockX team located Mr. Kim's StockX user information, identified him as a "Power buyer out of ██████," and alerted Russ Amidon, StockX's then Senior Director of Account Management, to the situation.  (*Id.*)  The team added Mr. Amidon to the communication "for awareness" as he was the StockX employee who supported the return process for StockX "Power Buyers" who believe StockX sold them a fake pair of shoes—as Mr. Kim did here—to "make them happier," and so StockX "Operations" can "re-review that product."  (Dkt. 135-1 at 23:15-25:17.)  The StockX employees continued to email about Mr. Kim and the July 5 Instagram Post, admitting that no one responded to Mr. Kim's communications and that ████████████████████████ ████████████████████████████████████████ ████████████████████████  (Dkt. No. 135-4 at STX0772987.)

4

On July 7, 2022, this team of StockX employees met to develop a "path forward," and acted on several items, including contacting Mr. Kim.  (*Id.*)  Specifically, the StockX business team—not counsel—directed Mr. Amidon to contact Mr. Kim and request that he: (1) remove the July 5 Instagram Post; and (2) return all suspected fake shoes to StockX's Tempe, Arizona facility for "additional evaluation."  (*Id.*)  As directed, Mr. Amidon called Mr. Kim on July 7 and they "discussed returning the shoes [to StockX] for further inspection."  (Dkt. No. 135-1 at 88:24-25.)

StockX counsel did not participate in this business team's July 6 communications, the July 7 meeting, or the request that Mr. Kim return the shoes to Tempe for additional evaluation. StockX's General Counsel admitted that she was not even "made aware of" the July 5 Instagram Post until July 8, 2022.  (Dkt. No. 140-3 at ¶ 4.)

**B.      Nike Brand Protection Visits Mr. Kim to Inspect His Shoes**

Nike saw Mr. Kim's post a few days after StockX had seen it.  On July 10, 2023, Nike's outside counsel spoke to Mr. Kim about his recent experience with StockX.  Mr. Kim agreed to allow a member of Nike's Brand Protection team to travel to his home to inspect the shoes.  (Dkt. No. 140-2 at 2.)  Thus, on July 22, 2022, Joe Pallet, Nike's Director, Authentication and Innovation, accompanied by Nike's outside counsel, traveled to Mr. Kim's ███████ residence to inspect 42 pairs of "Nike" shoes that Mr. Kim purchased from StockX and set aside as suspected fakes.  Of those 42 pairs, which StockX "authenticated," represented to Mr. Kim were "100% Authentic," and shipped to Mr. Kim within a two-month period, Nike determined that **38** are counterfeit.  Nike never took custody of the shoes, which remained in Mr. Kim's possession until he returned them to StockX a day or two after Nike's inspection, using the labels Mr. Amidon provided.  (Dkt. Nos. 135 at 1; 135-3 at 92:15-93:12; 140-2 at 2.)

**C.      Nike Notifies StockX About Its Inspection of Mr. Kim's Counterfeit Shoes and Seeks Discovery from StockX on the Same**

On July 25, 2022, Nike sent a letter to StockX advising that Nike had inspected Mr. Kim's shoes and determined that at least 38 "Nike" shoes that StockX sold to Mr. Kim were counterfeit ("July 25 Letter").  (Dkt. No. 140-2.)  Nike relayed its understanding that Mr. Kim was shipping the shoes back to StockX and demanded that it preserve "all evidence relating to the shoes once they are received by StockX," including any reauthentication of the shoes.  (*Id.*)  Nike also enclosed with the July 25 Letter Nike's Third Set of Requests for Production to StockX ("Nike's 3d RFPs").  (*Id.*; *see also* Dkt. No. 135 at 2.)  Those RFPs seek discovery related to the events described above, including any reauthentication of the shoes:

- **Request No. 218**: "All documents and communications regarding Roy Kim's purchase of Nike-branded shoes on the StockX Website or the StockX App between March-July 2022, *including any purported "authentication" of those shoes by StockX both prior to original shipment to Mr. Kim and upon receipt of the shoes that Mr. Kim returned to StockX on or about July 23, 2022*." (emphasis added.)

- **Request No. 219**: "Images of the Nike Shoes returned to StockX by Roy Kim on or about July 23, 2022, including images of each product and its packaging and all labels affixed to each shoe box and shoe."

To date, StockX has produced a few emails in response to Nike's 3d RFPs, but StockX has not produced **any** documents related to StockX's reauthentication of Mr. Kim's returned shoes.

On October 28, 2022, Nike served its Second Set of Requests for Admission to StockX relating to Mr. Kim's returned shoes (the "2d RFAs," which were the subject of an earlier dispute before Judge Netburn)[1] and deposed both Mr. Amidon and Mr. Kim.  Approximately three months

---

[1] This is not the first time that StockX has withheld information regarding the 38 pairs of fake shoes StockX sold to Mr. Kim.  StockX previously objected and refused to respond to Nike's 2d RFAs.  (Dkt. No. 80.)  Judge Netburn ordered StockX to respond to the vast majority of the 2d RFAs but sustained StockX's objection on those relating to StockX's knowledge that it sold fake shoes to Mr. Kim.  Judge Netburn explained: "I find that RFAs from my perspective can be the most abused discovery device in many ways, and I don't think that they are particularly helpful when a party asks another party to admit the ultimate conclusion in a litigation."  (Dkt. No. 140-1 at 2-3.)  Pursuant to Judge Netburn's ruling, Nike used other discovery devices, *i.e.*, depositions and document requests, to ascertain StockX's knowledge of its sales of fake shoes to Mr. Kim, only to be met with the privilege objection at issue here.

after Mr. Kim returned the counterfeit "Nike" shoes to StockX, Nike deposed Mr. Amidon in Detroit, Michigan on November 30, 2022.  Nike questioned Mr. Amidon about Mr. Kim, asking about his discussions with Mr. Kim and StockX's reauthentication of Mr. Kim's returned shoes:

Q. Okay. Did you then call Roy Kim when he gave you his number?

A. I did.

Q. And what did you say to him and what did he say to you?

MR. FORD: Objection to form.

A. I spoke to him about his Instagram post and introduced who I was, this is the first time I spoke to him, and offered to assist in what he would like to proceed next with, and we discussed returning the shoes for further inspection.

Q. Anything else you remember about that conversation?

A. I remember him being very pleasant and said that he would -- would like to send some sneakers back and would get back to me with how many labels he would need because he would prefer to send them in bigger boxes then -- rather than individual labels.

Q. How many times have you spoken on the phone to Roy Kim?

A. I believe twice.

Q. Okay. So was that the first time that we just went over?

A. Yes.

Q. What was the second time?

A: ***The second time was after we received the items back, I called him to tell them they were items that indeed should not have passed our authentication process*** and apologized for the inconvenience, told him that we would be refunding him for the product and I did offer him to come visit us in Detroit because he appeared to be a long-time customer.

Q: When you told him that indeed they should not have passed authentication, did you mean they were fake?

MR. FORD: Objection to form.

A: I told him that they were at minimum a defect, and when I say "defect," I mean a -- a manufacturing defect and ***that they possibly could have been inauthentic and that was what I was told by our Authentication team***.

Q: Sorry. What were you told by your Authentication team?

A. My Authentication team told me that they were, at minimum, defective, which is a manufacturing defect, and that it was possible that they were inauthentic, but we should not have passed them along to the buyer.

Q: So your Authentication team did not know if they were fake or if they were a defect, is that right?

MR. FORD: Objection to form.

A: I'm not, as I mentioned before, I'm not the expert, so I was just relaying information.

Q: But that's what you were told by your Authentication team?

MR. FORD: Objection to form.

A: Yes.

(Dkt. No. 135-1 at 89:15-90:21 (emphasis added).)  StockX's counsel did not object to the above questions based on privilege and permitted Mr. Amidon to answer.

On February 8, 2023, following service of a jointly served subpoena, Nike and StockX deposed Mr. Kim.  (Dkt. No. 135-3.)  Like Mr. Amidon, Mr. Kim testified that Mr. Amidon shared with him the results of StockX's reauthentication of the fake shoes that Mr. Kim had returned:

Q: Can you please describe the content of that conversation?

A:  Russ called to let me know they had received the shoes, reviewed them, that they were not up to StockX's quality standards, that – and I believe the term "UA" was utilized, unauthorized authentic, and that StockX would be taking the shoes back.  They would be refunding me, they wanted to give me a gift card for my troubles and they offered to fly me out to Detroit to meet the team.

(*Id.* at 90:10-19.)

**D.    StockX Suddenly Claims Its Reauthentication of Mr. Kim's Shoes is Protected Attorney Work Product**

On February 23, 2023, Nike deposed John Lopez, a StockX "authenticator" with the title of "Knowledge Manager for Sneakers." (Dkt. No. 135-2.) Mr. Lopez confirmed that he re-evaluated the 38 counterfeit "Nike" shoes after Mr. Kim returned them to StockX. (*Id.* at 290:11-16.) Mr. Lopez testified, consistent with Mr. Amidon's prior testimony, that he reached a conclusion upon that "re-evaluation." (*Id.* at 291:15-292:4.) However, when Nike asked Mr. Lopez about the results of his re-evaluation, StockX's counsel objected on privilege grounds and instructed Mr. Lopez to not answer, claiming for the first time that the re-evaluation of Mr. Kim's shoes was performed at the direction of counsel and was thus protected work product:

> Q. Did you authenticate products that Mr. Kim returned once they were received?
>
> MR. FORD: You can give a yes-or-no answer to the question.
>
> THE WITNESS: Yes, I did.
>
> Q. And what was your findings?
>
> MR. FORD: And I'm going to direct the witness not to answer, because the investigation that was conducted into these documents was done at the direction of counsel. Sorry. By "documents," I mean products. Force of habit.

(*Id.* at 290:11-23; *see also id.* at 291:3-9; 291:18-21; 293:3-10; 293:20-294:10; 296:2-6.) Mr. Lopez followed counsel's instruction to not answer. (*Id.* at 290-296.)

StockX General Counsel, Laura Lewis, supported StockX's privilege objection by declaring that, sometime after receipt of the July 25 Letter, she "instructed StockX employees to remove these shoes from the normal StockX return process, because the July 25 Letter asserted the shoes at issue were considered counterfeit by Nike, and to ensure the shoes were preserved for litigation purposes." (Dkt. 140-3 at ¶¶ 5-6.) Ms. Lewis also claims that at that time, she "provided specific instructions to [a StockX employee] as to what we needed the authentication team in Tempe to do in order to understand the nature of Nike's claims that the shoes were counterfeit."

(*Id.* at ¶ 6.)  She does *not*, however, claim that she instructed the authenticators to conduct a reauthentication that differed in an essential way from StockX's ordinary reauthentication of suspected fake shoes, an action that was already contemplated for Mr. Kim's shoes before she was ever involved in the matter.  Nor does Ms. Lewis state that any attorneys were involved in the process of reauthenticating Mr. Kim's shoes.  (*Id.* at ¶¶ 6-7.)  Mr. Lopez likewise did not testify that any attorneys were involved in his "re-evaluation" of the shoes.  (Dkt. No. 135-3 at 290-296.)

### E.   Mr. Kim is Interviewed by the Press and Discloses That StockX Conveyed the Results of Its Reauthentication of His Returned Shoes

This action has been closely followed by the media, and especially by sneaker industry publications.  As a result, after Nike filed its March 15, 2023 Letter-Motion, several media sources reported on the filing.[2]  Without Nike's involvement, comment, or knowledge, and despite Nike's redactions, members of the media identified Mr. Kim, and *Complex* published an interview of Mr. Kim.  (*See Complex* Article.)  In that interview, published on March 21, 2023, Mr. Kim disclosed that StockX conveyed the results of StockX's reauthentication of his returned shoes, just like he testified at his deposition:

> . . . So I sent the shoes back to StockX, and, of course, they did their checks as well.  They reached out and they're like, 'Yep. Yeah, these are all falling under…'  They're kind of talking around it a little bit.  And at that point, I didn't really care.  I think based on their conversations, they knew what the situation was and I knew what the situation was as well.
>
> **They weren't trying to admit outright that they were fake?**
>
> Basically, yes. But they offered to fully refund me.  They gave me a $500 gift card for my troubles, and they offered to fly me out to Detroit so I can see the authentication process in person and stuff.

---

[2] *See, e.g.*, Joyce Li, *Nike and StockX Court Documents Indicate Reseller Received 38 Fake Pairs of Air Jordan 1s From the Platform,* HYPEBEAST (Mar. 19, 2023), https://hypebeast.com/2023/3/nike-stockx-court-documents-reseller-received-38-fake-pairs-air-jordan-1-news; O Mazariego, *Nike Says StockX Sold 38 Pairs Of Bogus Nike Sneakers To Reseller In Court Filing,* HIPHOPWIRED (Mar. 20, 2023), https://hiphopwired.com/1375705/nike-says-stockx-sold-38-pairs-of-fake-nike-sneakers-to-a-reseller/.

(*Complex* Article.)

### F.   StockX Reauthenticates Returned Suspected Fakes as a Matter of Course

StockX admits that it historically has had no return or refund policy.  StockX's "What is

the StockX Return Policy?" FAQ states: "StockX is a live marketplace and prices fluctuate based

on supply and demand in real-time.  As such, once a Bid and an Ask are matched, an order is

created and we are unable to offer returns, exchanges or swaps.  You can always resell the item on

our platform if you don't wish to keep it."[3]  However, if a customer can get through to StockX and

convince StockX that it may have sold a fake, StockX allows the customer to send the product

back to StockX for reauthentication and a possible refund.  (Dkt. No. 135-2 at 242:2-245:18, *see*

*also* Dkt. No. 140-4 at 246:8-11.)  This is especially true when StockX receives returns from high-

volume "Power Buyers," like Mr. Kim, whom StockX strives to "make . . . happier with the

return."  (Dkt. No. 135-1 at 24:2-25:17.)  Indeed, Mr. Lopez testified that StockX team members

**must** reauthenticate shoes upon return:

> Q. And so that means that the AQA [Authentication Quality Assurance]
> reviewed the product.  Did they authenticate it again?
>
> A: Yes.  *They have to authenticate each return that comes back.*
>
> Q. And they would disagree with the buyer's belief that it was a fake?
>
> A: That is correct.  They're disagreeing and pushing back.

(Dkt. No. 135-2 at 242:16-17) (emphasis added.)

## III.   PROCEDURAL HISTORY

Nike raised concerns about StockX's failure to produce documents responsive to Nike's

3d RFPs in early December 2022, but StockX repeatedly assured Nike that its production of

---

[3] *What is the StockX Return Policy?*, STOCKX, https://stockx.com/help/articles/What-is-the-StockX-Return-Policy (last updated Oct. 18, 2022).

responsive documents was complete.  (Dkt. No. 135 at 2.)  Nike first learned at Mr. Lopez's February 23, 2023 deposition—the last deposition taken during fact discovery—that StockX is withholding responsive information related to its reauthentication of Mr. Kim's returned "Nike" shoes on the basis of a privilege objection.  Nike promptly met and conferred with StockX, the parties reached an impasse on the propriety of StockX's objection and obstruction of testimony, and Nike moved to compel on March 15, 2023.  (Dkt. No. 135.)  StockX opposed the motion on March 20, 2023.  (Dkt. No. 140.)

After an exchange of letter briefs, on March 23, 2023, Magistrate Judge Netburn issued a short order denying Nike's motion without a hearing.  (Dkt. No. 148.)  On the instant issue, Judge Netburn stated only that StockX "contends that this investigation was directed through litigation counsel and is therefore privileged.  Defendant's privilege invocation is proper.  These documents were created at the request of counsel in preparation for litigation and were explicitly segregated from Defendant's normal procedures."  (*Id.*)  Yet Judge Netburn did not hold—and could not have held—that the StockX authenticators conducted a reauthentication of Mr. Kim's fake shoes that differed in a substantial way from StockX's ordinary reauthentication of suspected fake shoes because StockX failed to offer any such evidence, as was its burden.  (*See* Dkt. 140-3 at ¶¶ 5-7.)  Judge Netburn also did not address the facts that (1) by the time StockX's General Counsel issued any instructions or even became involved in this incident, the plans to reauthenticate Mr. Kim's shoes were already underway, and (2) StockX had already described the reauthentication results to Mr. Kim and to Nike without any privilege objection.

## IV.   ARGUMENT

### A.    Applicable Legal Standards

"Courts in this Circuit have held that a magistrate's ruling on a discovery dispute should be overturned only for an abuse of discretion."  *Gruss v. Zwirn*, 2013 WL 3481350, at *5 (S.D.N.Y.

July 10, 2013) (internal quotations omitted).   Although this is a heavy burden, it "is not insurmountable." *Roche Freedman LLP v. Cyrulnik*, 2022 WL 17157670, at *1 (S.D.N.Y. Nov. 22, 2022) (internal citations and quotations omitted).   Where a party timely objects to any part of the magistrate's discovery order, the district court "'must'" consider the objection and "'modify or set aside any part of the [magistrate's] order that is clearly erroneous or is contrary to law.'" *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 116 (2d Cir. 2010) (quoting FED. R. CIV. P. 72(a)).

"[A] ruling is clearly erroneous if the district court is left with the definite and firm conviction that a mistake has been committed and is contrary to law if it fail[s] to apply or misapplies relevant statutes, case law, or rules of procedure." *Ngono v. U.S.*, 2022 WL 336963, at *2 (S.D.N.Y. Feb. 4, 2022) (Caproni, J.) (internal quotations and citations omitted); *see also, e.g.*, *Joffe v. King & Spalding LLP,* 2019 WL 4722673, at *2 (S.D.N.Y. Sept. 25, 2019) (Caproni, J.) (quoting FED. R. CIV. P. 72(a)) (sustaining Rule 72(a) objection where court was "with the definite and firm conviction that the Magistrate Judge erred"); *Gruss v. Zwirn*, 2013 WL 3481350, at *5 (magistrate abused discretion in clearly erroneous finding that no privilege waiver occurred where allegedly protected material had been disclosed to an adversary); *Fullerton v. Prudential Ins. Co.,* 194 F.R.D. 100, 104 (S.D.N.Y. 2000) (finding that magistrate's "conclusion that the work-product privilege was not waived to be clearly erroneous."); *Noel v. City of New York,* 2018 WL 6786238, at *4 (S.D.N.Y. Dec. 12, 2018) (returning privilege issues to magistrate for further consideration where district court disagreed with interpretation of "deliberative process privilege.").

The attorney work product doctrine "shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." *U.S. v. Nobles*, 422 U.S. 225, 238 (1975).   "[T]hree conditions must be met to earn work product protection.   The material must (1) be a document or a tangible thing, (2) that was prepared in

anticipation of litigation, and (3) was prepared by or for a party, or by his representative." *Allied Irish Banks v. Bank of Am., N.A.*, 240 F.R.D. 96, 105 (S.D.N.Y. 2007) (internal quotations omitted).  To be eligible for work product protection, "the materials must result from the conduct of investigative or analytical tasks to aid counsel in preparing for litigation." *Wultz v. Bank of China Ltd.*, 304 F.R.D. 384, 394 (S.D.N.Y. 2015) (internal quotations omitted).  StockX, the party asserting work product protection, "bears the burden of establishing its applicability to the case at hand." *In re Grand Jury Subpoenas,* 318 F.3d 379, 384 (2d Cir. 2003) (collecting cases).

Where the claimed work product is disclosed to an adversary or in such a manner that it is likely to be revealed to an adversary, any protection is waived.  *New York Times Co. v. U.S. Dep't of Just.*, 939 F.3d 479, 494 (2d Cir. 2019) ("A party waives the work product protection by taking actions inconsistent with this its purpose, such as disclosing work product to its adversary . . . ."); *In re Terrorist Attacks on Sept. 11, 2001*, 293 F.R.D. 539, 544 (S.D.N.Y. 2013) ("[E]ven disclosure to non-adversaries waives work product protection if it materially increases the likelihood that an adversary can gain access to that information.").

**B.    StockX's Reauthentication of Mr. Kim's Fake Shoes is Not Protected Attorney Work Product**

Nike respectfully submits that the portion of Judge Netburn's Order sustaining StockX's work product objection is clearly erroneous for three reasons.  First, StockX did not meet its burden to show that the reauthentication of Mr. Kim's shoes was conducted solely for litigation purposes and that it was conducted in an essentially different form than StockX's ordinary reauthentication process.  Second, the results of the reauthentication of Mr. Kim's shoes is discoverable, highly relevant information not protected by the work product doctrine.  Third, even if *arguendo* the reauthentication results are deemed protected work product, StockX waived any such protection through its repeated disclosures to Nike and other third parties.

14

### 1.    StockX's Reauthentication of Mr. Kim's Shoes Was Not Conducted Solely for Litigation

"The work-product doctrine, codified in Rule 26(b)(3) of the Federal Rules of Civil Procedure, protects documents that 'can fairly be said to have been prepared or obtained because of the prospect of litigation.'" *S.E.C. v. Alderson*, 390 F. Supp. 3d 470, 476 (S.D.N.Y. 2019) (Caproni, J.) (quoting *U.S. v. Adlman*, 134 F.3d 1194, 1202 (2d Cir. 1998)).  "[D]ocuments that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation," are not protected attorney work product. *Adlman*, 134 F.3d at 1202; *see also, e.g.*, *Connell v. Burlington Coat Factory*, 2022 WL 1115403, at *2 (S.D.N.Y. Apr. 13, 2022) (ordering production of accident reports where they "would have been generated regardless of the prospect of this litigation, and they lack the content that ordinarily triggers work-product protection"); *Clarke v. J.P. Morgan Chase & Co*., 2009 WL 970940, at *7 (S.D.N.Y. Apr. 10, 2009) (e-mail not entitled to work product protection where "[d]efendant would have acted to accomplish these objectives, in much the same manner, regardless of whether the reclassification might itself result in litigation").  "Indeed, even where [t]here is little doubt under the evidence that [a party] had the prospect of litigation in mind when it directed the preparation of the [document] . . . or that such documents might [also] help in preparation for litigation, work product protection is not available for documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of litigation." *Allied Irish Banks*, 240 F.R.D. at 106; *see also Fresh Del Monte Produce, Inc. v. Del Monte Foods, Inc.,* 2015 WL 3450045, at *5 (S.D.N.Y. May 28, 2015) (no work product protection where no finding that "the communications would not have occurred in essentially similar form even if counsel had not anticipated litigation"); *Weber v. Paduano*,  2003 WL 161340, at *13 (S.D.N.Y.

Jan. 22, 2003) (no work product protection where documents created after litigation were not proven "to have been created because of the lawsuit").

To determine whether material is work product, courts "first consider whether there existed any reasons other than the anticipation of litigation for generating the materials." *Allied Irish Banks*, 240 F.R.D. at 106. If the court answers this question in the affirmative, it then considers "whether these documents would have been created in substantially similar form based on this non-litigation purpose." *Id.* (internal quotations omitted); *Adlman*, 134 F.3d at 1202 (documents that would have been created in an "essentially" similar form absent litigation not protected).

Such is the case here. First, the reauthentication of Mr. Kim's returned shoes would have been conducted—and indeed *was* conducted—for reasons other than litigation. As discussed in § II.C, *supra*, StockX employees made a ***business decision*** to reauthenticate Mr. Kim's suspected fake shoes ***before*** StockX counsel was even aware of Mr. Kim and ***long before*** Nike sent the July 25 Letter. Two StockX witnesses confirmed that the reauthentication in fact happened. (Dkt Nos. 135-1 at 89:14-90:21; 135-2 at 290:11-16.) This is not a surprise: Mr. Kim is a "Power Buyer" and StockX ordinarily accepts returns from Power Buyers who believe StockX sold them a fake pair of shoes to "make them happier." (Dkt. 135-1 at 23:15-25:17.) In other words, StockX accepted Mr. Kim's return to placate a high-volume buyer and valuable customer. And, StockX routinely reauthenticates products returned for counterfeit suspicions. (Dkt. No. 135-1 at 24:14-17; *see generally* Dkt. No. 135-2 at 242-245.) Mr. Lopez even testified that StockX Authentication Quality Assurance ("AQA") team members "***have*** to authenticate each return that comes back." (Dkt. No. 135-2 at 242:16-17 (emphasis added).)

Accordingly, while StockX contended that the July 25 Letter was the impetus for "re-authenticating" Mr. Kim's returned shoes (Dkt. No. 140 at 2), its position is belied by the evidence,

which shows that StockX employees decided to reauthenticate the shoes for business reasons
weeks before receiving Nike's letter and without any mention of this litigation.  Regardless, even
if StockX reauthenticated Mr. Kim's fake shoes because of Nike's July 25 Letter, this is not
dispositive because StockX failed to establish that it would not have, and did not, reauthenticate
Mr. Kim's returned shoes for other reasons as well.  *See Wultz*, 304 F.R.D. at 395; *Allied Irish
Banks*, 240 F.R.D. at 106.

Second, StockX failed to demonstrate that, because of this litigation or the July 25 Letter,
its reauthentication of Mr. Kim's fake shoes was not essentially or substantially similar than any
other reauthentication of suspected fake shoes returned to StockX.  While StockX in-house counsel
may have "provided specific instructions to [a StockX employee] as to what we needed the
authentication team in Tempe to do in order to understand the nature of Nike's claims that the
shoes were counterfeit," the record is devoid of evidence that counsel instructed the authenticators
to conduct a reauthentication of Mr. Kim's shoes that differed in any way from StockX's ordinary
process, let alone one that was "substantially" or "essentially" different as required to invoke work
product protection.  (*See* Dkt. 140-3 at ¶¶ 5-7.)  To the contrary, neither Mr. Lopez nor Mr. Amidon
testified that there was anything special about how StockX reevaluated Mr. Kim's shoes.

The *Koch v. Greenberg* decision is instructive.  2012 WL 1449186 (S.D.N.Y. Apr. 13,
2012).  There, defendant, like StockX here, sought to shield as work product a report regarding
whether any of his wines were counterfeit.  *Id.* at *5.  The *Koch* court stated that it did "not doubt
that, at the time of Edgerton's wine inspection and report, Greenberg was anticipating litigation"
and "his counsel directed Edgerton's work with that anticipated litigation in mind."  *Id.* at *6.
Nonetheless, the court rejected defendant's work product claim over the investigation, explaining:

> Greenberg, however, has not demonstrated that, but for the prospect of litigation,
> the Edgerton report would not have been prepared in the ordinary course of

business or in substantially the same form. Surely, if Greenberg had concerns regarding the authenticity of some of the wine in his inventory, then, as a business matter, he would have wanted to engage an expert to inspect the bottles, regardless of whether the results might be useful in anticipated litigation. Indeed, any prudent business owner would have been expected to take such a step. Under the circumstances, the report prepared by Edgerton could not be afforded work product immunity from disclosure, even if it were not already in Koch's hands.

*Id*. Here, regardless of the July 25 Letter, StockX would have reauthenticated Mr. Kim's shoes to make this valuable customer happy, to examine trends in the counterfeit shoes at issue, and, of course, because StockX authenticators are *required* to reauthenticate every product returned due to a counterfeit complaint. (*See* Dkt. Nos. 135-4 at STX0772986; 135-1 at 23:15-25:17; 135-2 at 242:16-17.) Indeed, StockX was already planning to do so by July 7, 2022. (Dkt. No. 135-4 at STX0772986; *see also* Dkt. No. 135-1 at 88:15-89:13.) The facts here are even stronger than those in *Koch*, where Judge Freeman surmised that such an investigation would have reasonably taken place if defendant had concerns about his inventory. Here, StockX specifically admitted that it: (1) *always* reauthenticates shoes that are returned due to counterfeit suspicions, especially from Power Buyers like Mr. Kim; and (2) decided, prior to counsel's involvement, to take a second look at Mr. Kim's shoes in the normal course anyway. (*See* Dkt. No. 135-4 at STX0772986.)[4]

Because StockX reauthenticated Mr. Kim's shoes for reasons other than litigation, admitted that it conducts such reauthentication as a matter of course, and failed to establish that the

---

[4] StockX attempts to refute these facts by claiming that "it had no reason to re-inspect the shoes in order to determine whether a refund was warranted," because Nike had already made a determination. This is an ironic position for StockX to take given its ongoing (and completely unsupported) theories that Nike's authentication processes are supposedly unreliable. Indeed, by this statement, StockX admits that when Nike says a product is fake, it is. Regardless, StockX testimony and documents confirm that this litigation is not the only purpose for which reauthentication is and was actually undertaken. (*See* Dkt. No. 135-4 at STX0772986.) The statements contained in the Lewis Declaration are consistent with StockX following Nike's instructions to preserve relevant evidence but do not turn otherwise discoverable evidence into shielded work product.

reauthentication was not essentially similar to those conducted in the ordinary course, the Order preventing discovery of the reauthentication results is clearly erroneous for this reason alone.

> ### 2.     The Roy Kim Reauthentication Results are Discoverable Evidence Not Protected by the Work Product Doctrine

The second reason that the Order is clearly erroneous is because the results of StockX's reauthentication of Mr. Kim's returned shoes are discoverable, underlying facts that cannot be protected as work product.  To be clear, Nike has no interest in and has not sought any privileged communications regarding that reauthentication or documents that would reveal counsel's mental impressions or litigation strategy; rather, Nike seeks the conclusions that StockX's authenticators reached upon review of Mr. Kim's returned shoes.  Those results are fundamentally relevant to Nike's counterfeiting and false advertising claims, and their importance underscores the reason why StockX does not want to produce them.  For example, if Mr. Lopez reviewed the shoes and agreed with Nike that they are fake, StockX has admitted liability for counterfeiting.  If, however, StockX admitted in those results that it could not tell whether the shoes are fake, despite years of "100% Authentic" advertising, this has a direct bearing on Nike's false advertising claims.

StockX cannot hide this highly relevant, likely damning evidence behind the work product doctrine, which "is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye toward litigation,' free from unnecessary intrusion by his adversaries."  *Adlman*, 134 F.3d at 1196 (quoting *Hickman v. Taylor*, 329 U.S. 495, 510–11 (1947)).  "With very limited exceptions, liberal civil discovery rules compel parties to disclose the purely factual information that they have gathered-if relevant to the issues in the case-regardless of the context in which it has been gathered."  *Primetime 24 Joint Venture v. Echostar Commc'ns Corp.*, 2000 WL 97680, at *2 (S.D.N.Y. Jan. 28, 2000); *see also, e.g.*, *Jackson v. Nassau Cty.*, 340 F.R.D. 539, 546 (E.D.N.Y. 2022) ("Documents containing only facts are

unquestionably not privileged."). "[W]hile documents prepared by an attorney in anticipation of litigation are not discoverable simply because they contain factual information, the factual information itself is not protected from discovery." *Gelb v. New York State Bd. of Elections*, 2003 WL 1907986, at *6 (S.D.N.Y. Apr. 17, 2003); *see also Primetime 24*, 2000 WL 97680 at *3 (facts not protected "by virtue of having been gathered by an attorney") (internal quotations omitted).

Mr. Lopez testified that, as is customary, he reevaluated Mr. Kim's returned shoes. (Dkt. No. 135-2 at 290:11-16.) The results of that reauthentication process are "primarily factual accounts of the events at issue in this case" that are "not protected by the attorney's work product privilege." *Mercy v. Suffolk Cty.*, 93 F.R.D. 520, 522 (E.D.N.Y. 1982). "Moreover, the [reauthentication results here] contain no evidence of counsel's legal analysis, theories of the case, or anticipated strategy should litigation ensue." *Id.* Those results are not legal analysis, legal opinion, nor any other category protected as work product.[5]

StockX cannot shield the results of Mr. Lopez's reauthentication by invoking attorney work product protection because the reauthentication results are not attorney work product, do not contain the substance of communications between counsel and client, and Nike's requests and deposition questions are focused on eliciting purely factual information, to wit, Mr. Lopez's determinations as to whether StockX initially authenticated and sold Mr. Kim inauthentic shoes, including any determination that StockX simply could not tell whether the shoes were fake. *See Primetime 24*, 2000 WL 97680 at *2. In sum, because the results of the reauthentication will neither invade the intended "zone of privacy" codified by the work product doctrine, nor reveal

---

[5] Opinion work product "comprises the attorney's opinions, judgments and thought processes." *Strougo v. BEA Assocs.*, 199 F.R.D. 515, 521 (S.D.N.Y. 2001). The Roy Kim reauthentication results were created by a StockX employee and are not "the mental impressions, conclusions, legal theories or opinions of Plaintiff's counsel, which would otherwise transform these memoranda from fact work product into opinion work product." *In re Symbol Techs., Inc. Sec. Litig.*, 2017 WL 1233842, at *19 (E.D.N.Y. Mar. 31, 2017).

"the mental processes of the attorney," the Order maintaining StockX's work product objection is clearly erroneous.

### 3.    Even If *Arguendo* StockX's Reauthentication is Protected Work Product StockX Waived Any Protection Through Disclosure

Even if the facts concerning StockX's reauthentication of Mr. Kim's returned shoes are protected work product—and they are not—StockX unequivocally waived any such protection at least when: (1) StockX communicated the results of the reauthentication to Mr. Kim in a July 2022 phone call, and took no steps to preserve the confidentiality of the reauthentication results and related information relayed to Mr. Kim; and (2) Mr. Amidon communicated the reauthentication results to Nike in his November 30, 2022 deposition without objection from StockX.[6]

As discussed in § VI.A, *supra*, a party waives work product protection by taking actions inconsistent with its purpose, such as disclosing work product to an adversary or third parties that may share that information with an adversary.  *New York Times Co.*, 939 F.3d at 494; *In re Terrorist Attacks on Sept. 11, 2001*, 293 F.R.D. at 544.  In the Second Circuit, courts look to "common sense" to "define the limits of the work product doctrine," *In re Steinhardt Partners*, *L.P.,* 9 F.3d at 235 (2d Cir. 1993), "and common sense suggests that verbal description of the contents of a document, if sufficiently specific, is as 'inconsistent with the maintenance of secrecy,' . . . of that document as would be disclosure of the document itself.'" *New York Times Co.*, 939 F.3d at 495 (quoting *Rockwell Int'l Corp. v. U.S. Dep't of Justice*, 235 F.3d 598, 605 (D.C. Cir. 2001)).  Also, "[i]n this Circuit, the privilege is waived where there is 'deliberate,

---

[6] Additionally, after the parties briefed the issue to Judge Netburn, the results of and facts concerning StockX's reauthentication of Mr. Kim's returned shoes were publicly disclosed in Mr. Kim's March 21, 2023 interview with *Complex*. *See* Complex Article.  While the interview need not be considered by the Court, it may take judicial notice of the fact that Mr. Kim has now told the public about the information StockX seeks to shield from Nike.  *Mira v. Kingston*, 218 F. Supp. 3d 229, 234 (S.D.N.Y. 2016), *aff'd*, 715 F. App'x 28 (2d Cir. 2017) (citing *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991)); *see also* FED. R. EVID. 201.

affirmative, and selective use of privileged work-product materials by a party.'" *S.E.C. v. Gupta*,

281 F.R.D. 169, 171 (S.D.N.Y. 2012) (quoting *In re Grand Jury Proceedings*, 219 F.3d 175, 191

(2d Cir. 2000); citing *In re Steinhardt Partners, L.P.*, 9 F.3d at 234).  Crucially, where, as here, a

witness in a deposition answered questions about a subject without a privilege claim, privilege

may not be claimed as to that subject in another witness's deposition—it has already been waived.

*Thomas v. F.F. Fin., Inc.*, 128 F.R.D. 192, 193 (S.D.N.Y. 1989); *see also Bowne of New York City,*

*Inc. v. AmBase Corp.*, 150 F.R.D. 465, 485 (S.D.N.Y.1993) ("[V]oluntary disclosure of privileged

communications by deposition testimony in one case operates as an implied waiver as to all such

communications concerning the particular matters addressed in the disclosed communications.").

Moreover, and just as StockX did here, where a party has voluntarily disclosed to an adversary

purportedly protected work product, a magistrate's failure to find waiver of such protection is

clearly erroneous.  *Fullerton.,* 194 F.R.D. at 104 (magistrate's "conclusion that the work-product

privilege was not waived to be clearly erroneous" where party asserting protection already

voluntarily produced related work product).

During his November 30, 2022 deposition, Mr. Amidon testified that after StockX had

received Mr. Kim's returned shoes, he called Mr. Kim and told Mr. Kim that the returned shoes

"should not have passed [StockX's] authentication process," and that "they were at a minimum a

defect . . . a manufacturing defect and that they possibly could have been inauthentic and that was

what I was told by our Authentication team."  (Dkt. No. 135-1 at 89:14-90:21.)  During his

February 8, 2023 deposition, Mr. Kim also testified that he was apprised of the results of the

reauthentication in mid-to-late July 2022, when Mr. Amidon called to confirm that the 38 returned

shoes had been received by StockX, reviewed, and "were not up to StockX's quality standards,

that -- and I believe the term 'UA' was utilized, unauthorized authentic, and that StockX would be

taking the shoes back." (Dkt. No. 135-3 at 90:10-19.)[7]  Yet when Mr. Lopez was subsequently asked the same questions about the same subject matter, StockX objected and instructed the witness to not answer.  StockX cannot shield as work product information it already voluntarily disclosed.  *Fullerton*, 194 F.R.D. at 104.  As such, Magistrate Judge Netburn's Order is clearly erroneous.

Additionally, both Mr. Amidon's and Mr. Kim's depositions confirm that StockX's disclosure to Mr. Kim of the reauthentication results was sufficiently specific as to waive the asserted work product protection.  In *New York Times Co.*, the Second Circuit held that former Attorney General Eric Holder's far more general public statements about legal memoranda "were specific enough to have effectuated disclosure of parts of the memoranda and accompanying exhibits, thereby waiving the work product . . . ."  939 F.3d at 496.  The statements at issue there— "Mr. Durham examined any possible CIA involvement with the interrogation of 101 detainees who were in United States custody subsequent to the terrorist attacks of September 11, 2001, <u>a number of whom were determined by Mr. Durham to have never been in CIA custody</u>" (emphasis in original) and "determined that a number of the detainees were never in CIA custody"— contained much less specific detailed information than what Mr. Amidon told both Nike and Mr. Kim.  (*See* Dkt. Nos. 135-1 at 89:14-90:21; 135-3 at 90:10-19.)

StockX was also aware, or should have been aware, that its disclosure to Mr. Kim materially increased the likelihood that Nike would gain access to the disclosed information.  By

---

[7] Moreover, although Mr. Kim was not StockX's adversary at the time of its disclosure, Mr. Kim and StockX did not and do not share common litigation interests.  At disclosure, StockX was aware that Mr. Kim may become an adversary in connection with its sale of dozens of counterfeit "Nike" shoes.  StockX also knew that Nike and Mr. Kim had already communicated.  Despite this risk, StockX made no effort to ensure the secrecy of the allegedly protected information it shared with Mr. Kim.  StockX's disclosure of "protected" information to a potential opponent without securing any guarantee of secrecy is inconsistent with its claim of work product protection and constitutes waiver.  *New York Times Co.*, 939 F.3d at 494.

the time Mr. Amidon called Mr. Kim to tell him that his returned shoes should not have passed StockX authentication, StockX had already received the July 25 Letter.  (*See* § II.C, *supra*; *see also* Dkt. No. 135-1 at 89:15-90:21.)   StockX therefore knew that Mr. Kim had already communicated with Nike's counsel on multiple occasions.  StockX had no reason to believe that Mr. Kim would not share the information Mr. Amidon disclosed about the results of StockX's reauthentication of his returned shoes.  Nor did StockX try to secure Mr. Kim's agreement to keep secret the purportedly "protected" information it disclosed to him, even after StockX learned that Nike was in contact with Mr. Kim and had inspected his shoes and determined that they were counterfeit.  To the contrary, Mr. Kim shared that information at his February 8, 2023 deposition—without work product objection from StockX's counsel—as well as in a recently published interview.  *See* Complex Article.

By disclosing the facts surrounding its reauthentication of Mr. Kim's returned shoes to Mr. Kim, and then later attempting to shield the same from Nike, StockX also does exactly what the Second Circuit forbids—selectively disclosing protected materials for a self-serving purpose.  *U.S. v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991) ("A defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes.").  StockX's customer service-related disclosure to Mr. Kim of the reauthentication results of his returned shoes was a "deliberate, affirmative, and selective use of privileged work-product materials," thereby resulting in a waiver of such materials and information.  *In re Grand Jury Proceedings*, 219 F.3d at 191.  StockX was also acutely aware that Mr. Kim is a social media influencer in the online "sneakerhead" community and had already shared several viral social media posts about the dozens of counterfeit "Nike" shoes he had purchased from StockX that had failed two separate third-party "authentication" apps.  (*See* Dkt. No. 135-4 at STX0772986.)

StockX also knew that Mr. Kim had shared in his viral posts that he had been unable to successfully connect with anyone at StockX to address and remedy the situation, and was actively monitoring those posts and any further dissemination thereof.  (*Id.*)

StockX's disclosure of the purportedly protected reauthentication results was therefore deliberate and self-serving—StockX disclosed this information to aggrieved "Power Buyer," Mr. Kim, to repair its relationship with an important customer and to repair its public image, *i.e.*, forestall Mr. Kim from continuing to publish viral social media posts that reflected poorly on StockX's "authentication" process and customer service.  To permit StockX to selectively disclose purportedly "protected" information to Mr. Kim for its own benefit and then withhold that same information from Nike does not accord with this Circuit's authority on waiver and would unfairly prejudice Nike.  *See New York Times Co.*, 939 F.3d at 494; *In re Grand Jury Proceedings*, 219 F.3d at 191; *Bilzerian*, 926 F.2d at 1292.

In sum, StockX waived work product protection as to the facts concerning its reauthentication of Mr. Kim's returned shoes when Mr. Amidon disclosed first to Mr. Kim and then to Nike sufficiently specific information about the same.  *New York Times Co.*, 939 F.3d at 494.  Because of this waiver, StockX's later assertion of privilege and work product objections to Nike's document requests and deposition questions about the same subject matter was improper and ineffective—it had already voluntarily waived the protection.  *Bowne of New York City, Inc.*, 150 F.R.D. at 485; *Thomas*, 128 F.R.D. at 193.  StockX's waiver is a separate reason the Order is clearly erroneous and contrary to law.

## V.   CONCLUSION

Nike respectfully requests the Court to set aside the Order and compel StockX to produce (1) the results of its reauthentication of shoes it sold to Mr. Kim and returned to StockX by Mr. Kim in 2022; and (2) witness John Lopez for an additional deposition relating to those results.

Date: April 4, 2023                                By:  */s/ Tamar Y. Duvdevani*_____

**DLA PIPER LLP (US)**

Tamar Y. Duvdevani
Marc E. Miller
Andrew J. Peck
Jared Greenfield
1251 Avenue of The Americas, 27th Fl.
New York, NY 10020
Telephone: (212) 335-4500
Facsimile: (212) 335-4501

Michael Fluhr
555 Mission Street, Suite 2400
San Francisco, CA 94105
Telephone: (415) 836-2500
Facsimile: (415) 836-2501

Melissa Reinckens
401 B Street, Suite 1700
San Diego, CA 92101
melissa.reinckens@us.dlapiper.com

Jane W. Wise
500 Eighth Street, NW
Washington, D.C. 20004
Telephone: (202) 799-4149
Facsimile: (202) 863-7849

*Attorneys for Plaintiff Nike, Inc.*