UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

NIKE, INC.,

                Plaintiff,

    v.

STOCKX LLC,

                Defendant.

No.: 1:22-cv-00983-VEC-SN

---

**STOCKX LLC'S RESPONSE TO NIKE, INC.'S OBJECTION TO
MAGISTRATE JUDGE NETBURN'S MARCH 23, 2023 ORDER
DENYING NIKE'S MOTION TO COMPEL DISCOVERY**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ....................................................................................... 2

I.      StockX Is a Marketplace that Facilitates Third-Party Trades. ..................... 2

II.     StockX's General Counsel Learns of Mr. Kim's Social Media Post and Begins
        an Investigation. ................................................................................ 4

III.    Nike Learns of Mr. Kim's Social Media Post and Conducts Its Own
        Investigation. ................................................................................... 4

IV.     Nike Informs StockX That Mr. Kim's Shoes Are Relevant Evidence in This
        Litigation. ...................................................................................... 5

V.      StockX Communicates with Mr. Kim About His Returns and Refund. ....................... 6

VI.     Judge Netburn Denies Nike's Motion to Compel Discovery. .......................... 7

LEGAL STANDARD ............................................................................................ 8

ARGUMENT ................................................................................................... 9

I.      StockX's Investigation into Allegedly Counterfeit Shoes Identified by Nike in
        Connection with This Litigation Is Protected Work Product. ......................... 9

        A.      StockX conducted its investigation at the direction of counsel and in
                connection with active litigation. ........................................... 9

        B.      StockX employees' investigation is absolutely protected as opinion work
                product. .................................................................. 12

        C.      StockX's investigation into Nike's legal claims was distinct from its ordinary
                return processes. ......................................................... 12

        D.      Nike's cited cases are outdated, inapposite, and involve privileges not at issue
                in this case. ............................................................. 13

        E.      Judge Netburn's order correctly upheld StockX's work product protection. ............. 14

II.     Nike Cannot Pierce StockX's Work Product Protection. ............................ 16

        A.      Nike investigated the shoes at issue and has no substantial need for StockX's
                protected work product. ................................................... 16

        B.      StockX has not waived protection over any of the details of its investigation. .......... 17

CONCLUSION ................................................................................................ 21

# TABLE OF AUTHORITIES

**Cases**

*Bowne of New York City, Inc. v. AmBase Corp.*,
  150 F.R.D. 465 (S.D.N.Y. 1993) ............................................................................. 19

*Cellco P'ship d/b/a Verizon Wireless v. Nextel Commc'n, In*c.,
  No. 15 CV 5236, 2004 WL 1542259 (S.D.N.Y. July 9, 2004)................................. 17

*Coach, Inc. v. Swap Shop, Inc*.,
  No. 12-60400-CIV, 2013 WL 12091618 (S.D. Fla. July 2, 2013) .......................... 10

*Falise v. Am. Tobacco Co.*,
  193 F.R.D. 73 (E.D.N.Y. 2000) ............................................................................... 20

*Fullerton v. Prudential Ins. Co.*,
  194 F.R.D. 100 (S.D.N.Y. 2000) ............................................................................. 19

*Gruss v. Zwirn*,
  No. 09 CV 6441, 2013 WL 3481350 (S.D.N.Y. Jul. 10, 2013)............................... 13

*In re Circle K. Corp*.,
  199 B.R. 92 (S.D.N.Y. 1996).................................................................................... 9

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Lit*.,
  336 F.R.D. 400 (S.D.N.Y. 2020) ............................................................................. 8

*In re Pfizer Inc. Sec. Litig*.,
  No. 15 CV 5236, 1993 WL 561125 (S.D.N.Y. Dec. 23, 1993)................................ 17

*Khatabi v. Bonura*,
  No. 10 CV 1168, 2017 WL 10621191 (S.D.N.Y. Apr. 21, 2017) ........................... 8

*Koch v. Greenber*g,
  2012 WL 1449186 (S.D.N.Y. Apr. 13, 2012)........................................................... 13

*Louis Vuitton Malletier v. Texas Int'l P'ship*,
  10 CV 2821, 2012 WL 5954673 (S.D. Tex. May 14, 2012) .................................... 10

*Mercy v. Suffolk Cty.*,
  93 F.R.D 520 (E.D.N.Y. 1982).................................................................................. 13

*Mitre Sports Int'l Ltd. v. Home Box Off., Inc*.,
  304 F.R.D. 369 (S.D.N.Y. 2015) .............................................................................. 19

*Noel v. City of N.Y.*,
  No. 15 CV 5236, 2018 WL 6786238 (S.D.N.Y. Dec. 12, 2018)............................. 14

*Pilkington North Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*,
   341 F.R.D. 10 (S.D.N.Y. 2022) ............................................................ 11

*Rodriguez v. Pataki*,
   280 F. Supp. 2d 89 (S.D.N.Y. 2003) .................................................... 14

*Schaeffler v. United States*,
   806 F.3d 34 (2d Cir. 2015) .................................................................... 11

*Sec. & Exch. Comm'n v. Collector's Coffee Inc.*,
   No. 19 CV 4355 (VM), 2021 WL 391298 (S.D.N.Y. Feb. 4, 2021) ........ 15

*Sec. & Exch. Comm'n v. Strauss*,
   2009 WL 3459204 (S.D.N.Y. Oct. 28, 2009) ....................................... 11

*Thai Lao Lignite (Thai.) Co. v. Gov't of Lao People's Dem. Rep.*,
   924 F. Supp. 2d 508 (S.D.N.Y. 2013) ................................................... 8

*Thomas E. Hoar, Inc. v. Sara Lee Corp.*,
   900 F.2d 522 (2d Cir. 1990) .................................................................. 8

*Thomas v. F.F. Fin., Inc.*,
   128 F.R.D. 192 (S.D.N.Y. 1989) ......................................................... 19

*United States v. Adlman*,
   134 F.3d 1194 (2d Cir. 1998) ................................................... 10, 13, 17

*United States v. Ghavami*,
   882 F. Supp. 2d 532 (S.D.N.Y. 2012) ................................................ 12

*United States v. Nobles*,
   422 U.S. 225 (1975) ......................................................................... 9, 11

*von Kahle v. Cargill, Inc.*,
   599 F. Supp. 3d 181 (S.D.N.Y. 2022) ................................................ 16

*Williams v. Rosenblatt Sec., Inc.*,
   236 F. Supp. 3d 802 (S.D.N.Y. 2017) .................................................. 8

*Winfield v. City of New York*,
   No. 15 CV 5236, 2018 WL 716013 (S.D.N.Y. Feb. 1, 2018) ................. 9

**Statutes**

28 U.S.C. § 636(b)(1)(A) ............................................................................ 8

**Rules**

Federal Rule of Civil Procedure 26(b)(3)(A)..............................................................................1, 9

Federal Rule of Civil Procedure 72(a) ...................................................................................8

## PRELIMINARY STATEMENT

StockX properly invoked work product protection over the substance of its investigation during this litigation into potential counterfeit shoes that Nike identified as relevant to its claims. Through this motion, Nike seeks to intrude into the core of what the work product doctrine and Rule 26(b)(3)(A) protect from discovery: its litigation adversary's work to evaluate legal claims and prepare its trial defenses.  StockX's General Counsel has explained that all of the information Nike seeks relates to an investigation she directed, conducted outside of any ordinary StockX business process, by which StockX employees analyzed potential counterfeit shoes identified by Nike to advise in-house and outside counsel.

In the face of that straightforward claim of work product protection – which mirrors Nike's own assertion of work product protection for its own investigations into potential counterfeits – Nike seeks to muddy the record with irrelevant facts and unsupported assertions. The facts are these: during several weeks in May and June 2022, an individual named Roy Kim bought 62 pairs of shoes on StockX's platform from third-party sellers.  After receiving his shoes, Mr. Kim suspected some of them might not be genuine, and contacted StockX's customer support and posted on social media about his experience.  After learning of Mr. Kim's claims and social media post, StockX's General Counsel began an investigation into the issue, directed by in-house and outside counsel in light of this litigation against Nike.  Nike also saw Mr. Kim's social media post and obtained Mr. Kim's permission to conduct a comprehensive, in-person inspection of Mr. Kim's shoes.  Nike told StockX in a letter that it had reviewed the shoes, considered 38 of them to be counterfeits, and demanded that StockX preserve the shoes as evidence in this litigation.  StockX thereafter told Mr. Kim that it was accepting his return, because the shoes did not meet StockX's standards, and provided Mr. Kim with a full refund, plus additional StockX credit for his inconvenience.

Nike now seeks discovery into StockX's investigation into the very shoes Nike claimed were evidence in this litigation – an investigation that was directed by StockX's General Counsel and whose results were communicated to in-house and outside counsel as part of StockX's development of its legal strategy in this case.  Judge Netburn properly ruled that such discovery is prohibited by the work product doctrine, and that testimony about the one conversation between a StockX customer service employee and Mr. Kim about his return did not waive protection over StockX's entire investigation.

Nike has failed to carry its heavy burden of showing that Magistrate Judge Netburn's discovery ruling was either clearly erroneous or contrary to law.  Judge Netburn's order was entirely consistent with the well-established law governing the work-product doctrine.  StockX employees investigated products at issue in this litigation at the direction of counsel.  Their work is at the core of what the work-product doctrine protects.  Since Nike already had an opportunity to examine the shoes in question, it has no substantial need for the information it seeks (unless Nike is now prepared to admit, as discovery has shown, that it cannot always reliably authenticate its own shoes), and StockX has not waived protection over any of the substance of its investigation.  Nike's Objection should be denied in its entirety.

## STATEMENT OF FACTS

**I.      StockX Is a Marketplace that Facilitates Third-Party Trades.**

Since 2016, StockX has operated a secondary resale marketplace for sneakers and other current culture products.  One of StockX's major innovations and improvements over other marketplaces is that StockX employees have physically inspected and verified every product sold on StockX.  The verification process determines what items are eligible to be sold on StockX's platform and protects both buyers and sellers.  Exhibit A, (B. Huber Tr.) at 19:11–16.  As part of that verification process, StockX rejects products sent by the seller that do not appear to be the

product purchased by the buyer – for example, if the product is the wrong size, lacks required accessories, appears to be worn, or has indications of being defective or inauthentic.  In the last year alone, StockX's verification process resulted in the rejection of over 330,000 products before they reached a buyer.

Because StockX is typically not the seller of products on its platform, StockX does not accept "buyer's remorse" returns.  That means that buyers cannot simply return a sneaker if they regret their purchase or decide they do not like the shoe after all.  However, if a buyer believes that StockX made a mistake in verification, and he or she should not have received the product, StockX will re-review the product in question to determine whether to accept a return.  *See* Exhibit B, What is the StockX Buyer Promise?, https://stockx.com/help/articles/What-is-the-StockX-Buyer-Promise.

As part of that return process, StockX determines if there is a potential issue based on initial information provided by the buyer, and if so, asks the buyer to send the product back to StockX for a second review.  When StockX receives the order, senior authenticators review the product to determine whether it meets StockX's standards.  If it does, StockX returns the product to the buyer; if not, StockX accepts the return, refunds the buyer, and takes appropriate action against the seller.  *See* ECF No. 140-4 (B. Huber Tr.) at 246:8–11.  For every accepted return, StockX takes a loss: it refunds buyers their full purchase price, even though that amount was originally paid to the seller, not to StockX.  StockX nevertheless accepts those returns as part of its "Buyer Promise" to ensure that customers get the products they expect from sellers on StockX's marketplace, and make it right for customers if a mistake was made.

**II.      StockX's General Counsel Learns of Mr. Kim's Social Media Post and Begins an Investigation.**

On July 6, 2022, months after Nike first asserted its counterfeiting claims in this case, StockX employees became aware of a July 5, 2022 Instagram post from the user @sneakerstrut, a/k/a Roy Kim.  Mr. Kim's Instagram post claimed he purchased "fake sneakers" on the StockX platform.  StockX's customer service representatives reached out to Mr. Kim the next day (July 7) upon seeing the Instagram post, and offered to provide Mr. Kim with shipping labels to send the shoes back to StockX, which Mr. Kim agreed to do.  *See* ECF No. 135-1 (R. Amidon Tr.) at 87:19–88:1, 89:2–7.

StockX's General Counsel learned of the July 5 Instagram post on July 8, and even before the shoes were sent back to StockX, given Nike's counterfeiting allegations, immediately initiated an investigation into Mr. Kim's purchases.  ECF No. 140-3 (Lewis Decl.) ¶ 4.  From July 8 forward, all work at StockX concerning Mr. Kim or his purchases was conducted under the supervision, and at the direction, of counsel.

**III.      Nike Learns of Mr. Kim's Social Media Post and Conducts Its Own Investigation.**

Shortly after Mr. Kim's Instagram post, Nike's litigation counsel contacted Mr. Kim and arranged for Nike's brand protection team to evaluate Mr. Kim's shoes.  Although Nike only briefly described the work done to inspect Mr. Kim's shoes (Obj. at 5), the complete record makes clear that Nike had a full and complete opportunity to conduct its own investigation and obtain any information it needed about Mr. Kim's shoes.  Joe Pallett, the Director of Brand Protection at Nike, ███████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████.  Exhibit C, (J. Pallett Tr.) at 308:5–18.  Mr. Pallett testified that ████████████



Exhibit C, (J. Pallett Tr.) at 308:22–309:23.[1]

## IV.  Nike Informs StockX That Mr. Kim's Shoes Are Relevant Evidence in This Litigation.

On July 25, 2022, Nike's counsel sent StockX a letter stating that Nike had inspected the shoes that Mr. Kim purchased from a third-party on StockX and (without providing evidence) "concluded that 38 [were], in fact, counterfeit."  ECF No. 140-2 (July 25 Letter).  Nike's letter stated plainly that Nike believed these 38 shoes were relevant evidence for its counterfeiting claim against StockX, and demanded that "StockX preserve all evidence relating to these shoes once they are received by StockX" and enclosed Nike's Third Set of Requests for Production relating to Mr. Kim's purchases.  Id.[2]

StockX's General Counsel took steps not only to comply with Nike's request to preserve all evidence, but to ensure that Nike's allegations were appropriately investigated as part of StockX's litigation defense.  StockX in-house counsel directed that Mr. Kim's shoes be diverted from the normal StockX return process, so that StockX could analyze the basis for Nike's claims and prepare to defend itself in this litigation.  ECF No. 140-3 (L. Lewis Decl.) ¶ 6.  Counsel

---

[1]  To date, Nike has not produced ███████████████████████████████████████
████████████████████████.  Exhibit C, (J. Pallett Tr.) at 300:21–301:13.

[2]  Despite Nike's assertions otherwise, StockX has already produced all responsive and non-privileged materials responsive to these requests.  (ECF No. 155, Nike Obj. at 11–12.)  Pursuant to the Parties' Stipulated Discovery Protocol, StockX (like Nike) did not identify any privileged documents on its privilege log that post-dated the filing of the lawsuit.  (ECF No. 47, Stip. Disc. Protocol at 6.)

specifically directed that (as Nike itself demanded) the shoes needed to be preserved by StockX upon their receipt, *id.*, meaning that StockX necessarily would accept Mr. Kim's returns. Counsel then provided specific instructions to StockX's Vice President for Operations as to what evaluation(s) of Mr. Kim's returned products was necessary for counsel to understand the nature of Nike's claims that the shoes were counterfeit. *Id.* Accordingly, immediately upon the shoes' return to StockX, they were segregated from the ordinary returns process and reviewed by specifically chosen StockX employees pursuant to counsel's instructions. *Id.* ¶ 7. Those employees' findings were reported directly to members of StockX's in-house legal team and shared with outside counsel in connection with their work to defend against Nike's claims in this litigation. *Id.* ¶¶ 8–9.

V.      **StockX Communicates with Mr. Kim About His Returns and Refund.**

Throughout this process, StockX kept in touch with Mr. Kim. On July 27, 2022, StockX confirmed to Mr. Kim that it received the returned shoes, and StockX ultimately told Mr. Kim that he would receive a full refund for the shoes he sent back, and offered him a $500 gift card and a trip to its Detroit Headquarters to get a firsthand look at StockX's extensive verification efforts.

During those conversations, all that StockX's customer account manager conveyed to Mr. Kim was that the shoes he returned did not meet StockX's standards, explaining that the shoes appeared to be either defective or possibly inauthentic. ECF No. 135-1 (R. Amidon Tr.) at 89:15–90:4. StockX's customer account manager did not provide any more detail or specifics about the conclusions of the investigation to Mr. Kim, because he did not have any direct knowledge of the investigation that was being conducted under Counsel's supervision. *See id.*

Mr. Kim, for his part, testified that he has purchased around 5,000 shoes from StockX's platform, and aside from the purchases at issue here, has had no issue with any of his purchases

on StockX before or since.  Exhibit D, (R. Kim Tr.) at 26:13-15, 27:20–23; 30:19–33:19, 157:1–23.  Mr. Kim also testified about his positive experiences with StockX's customer service, noting that ordinarily he hears back on any issue he raises with StockX within 24 hours, *id.* 31:3–6, and StockX made it easy for him to return his products, *id.* 31:19–21.  Since the refunds of these shoes, Mr. Kim has continued to use StockX's platform regularly, purchasing over 1,000 pairs of shoes on the platform (more than 90% of which were Nike products), all of which Mr. Kim believed were authentic.  *Id.* 157:1–23.

## VI.    Judge Netburn Denies Nike's Motion to Compel Discovery.

On March 15, 2023, Nike moved to compel, among other things, (1) the production of documents detailing StockX's investigation into Mr. Kim's purchases; and (2) additional deposition testimony from one of the StockX employees who conducted the investigation on the same subject (who Nike began questioning on this topic with less than 10 minutes remaining on the record).  (*See* ECF No. 135, Nike Mot. to Compel).  StockX filed a timely opposition, arguing that the materials Nike sought were protected work product and that Nike had no substantial need for the materials it sought, and attaching a declaration by its General Counsel attesting to the privileged nature of its investigation.

On March 23, 2023, Judge Netburn denied Nike's motion to compel in its entirety, specifically finding StockX's "privilege invocation [was] proper" as it provided evidence that the "investigation was directed through litigation counsel."  (ECF No. 148, Order at 1).  After reviewing the Parties' submissions, Judge Netburn specifically held that the privileged documents and testimony at issue "were created at the request of counsel in preparation for litigation and were explicitly segregated from Defendant's normal procedures."  (ECF No. 148, Order at 1).  Nike filed the instant objection to Judge Netburn's Order on April 4, 2023.

## LEGAL STANDARD

It is well settled that "orders involving discovery," such as Judge Netburn's Order denying Nike's motion to compel, "are considered nondispositive." *See Thomas E. Hoar, Inc. v. Sara Lee Corp.*, 900 F.2d 522, 525 (2d Cir. 1990) ("Matters concerning discovery generally are considered 'nondispositive' of the litigation."). Because Judge Netburn's Order is non-dispositive, it may be overruled only if Nike establishes that it was "clearly erroneous or is contrary to law." *See* Fed. R. Civ. P. 72(a); *see also* 28 U.S.C. § 636(b)(1)(A).

Under this "highly deferential" standard, "magistrate judges are afforded broad discretion in resolving nondispositive disputes and reversal is appropriate only if their discretion is abused." *Williams v. Rosenblatt Sec., Inc.*, 236 F. Supp. 3d 802, 803 (S.D.N.Y. 2017) (overruling plaintiff's objection to the magistrate judge's order regarding discovery disputes; citing *Thai Lao Lignite (Thai.) Co. v. Gov't of Lao People's Dem. Rep.*, 924 F. Supp. 2d 508, 511 (S.D.N.Y. 2013)). A ruling is "contrary to law if it fails to apply or misapplies relevant statutes, case law, or rules of procedure, and is clearly erroneous if the district court is left with the definite and firm conviction that a mistake has been committed." *In re Keurig Green Mountain Single-Serve Coffee Antitrust Lit.*, 336 F.R.D. 400, 403–04 (S.D.N.Y. 2020).

In addition, "Rule 72(a) precludes the district court from considering factual evidence that was not presented to the magistrate judge." *Thai Lao Lignite*, 924 F. Supp. 2d at 512 (confining its analysis to the factual analysis before the magistrate judge and overruling plaintiff's objection). In fact, "[n]ew arguments and factual assertions cannot properly be raised for the first time in objections to [a magistrate's discovery order], and indeed may not be deemed objections at all." *In re Keurig*, 336 F.R.D. at 404 (quoting *Khatabi v. Bonura*, No. 10 CV 1168, 2017 WL 10621191, at *5 (S.D.N.Y. Apr. 21, 2017) (collecting cases)). To the extent Nike's evidence improperly relies on facts that were not before Judge Netburn – including, but not

limited to, Mr. Kim's interview with Complex cited throughout its motion – that evidence should be disregarded.

The Federal Rules of Civil Procedure establish that Nike "may not discover documents and tangible things that [were] prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." Fed. R. Civ. P. 26(b)(3)(A); *see In re Circle K. Corp*., 199 B.R. 92, 98 (S.D.N.Y. 1996); *Winfield v. City of New York*, No. 15 CV 5236, 2018 WL 716013, at *20 (S.D.N.Y. Feb. 1, 2018) (sustaining counsel's privilege objection during deposition testimony and finding that "under the work product doctrine, [the witness would] not be required to describe the specifics of her analyses to the extent they were conducted at the direction of counsel"). The Supreme Court has held that that work product protection extends to materials created by those acting as agents of attorneys, as well as attorneys themselves. *United States v. Nobles*, 422 U.S. 225, 238–39 (1975) (recognizing that "attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial," and "the doctrine protect[s] material prepared by agents for the attorney[s] as well as those prepared by the attorney himself.").

**ARGUMENT**

I.    **StockX's Investigation into Allegedly Counterfeit Shoes Identified by Nike in Connection with This Litigation Is Protected Work Product.**

A.    StockX conducted its investigation at the direction of counsel and in connection with active litigation.

StockX conducted its investigation after Nike brought its counterfeiting claims and after Nike sent StockX a letter specifically identifying Mr. Kim's shoes as relevant to those claims. The work product doctrine protects the work StockX counsel and employees undertook to investigate Nike's claims in connection with this case. *Louis Vuitton Malletier v. Texas Int'l*

9

*P'ship*, 10 CV 2821, 2012 WL 5954673, at *4 (S.D. Tex. May 14, 2012) ("Clearly, once the lawsuit was initiated on August 9, 2010, any communications with regard to investigations of the sale or distribution of counterfeit Louis Vuitton merchandise . . . are work product related to the ongoing litigation.").

Nike tries to overcome this straightforward conclusion by improperly conflating StockX's ordinary returns process and StockX's litigation-driven investigation into shoes Nike identified as evidence in this case. But there is no evidence or testimony supporting Nike's theory: StockX's General Counsel made clear that the process StockX employees used to investigate Mr. Kim's shoes was distinct from the ordinary returns process and involved responding to specific questions from counsel and providing the answers back to counsel. *See Coach, Inc. v. Swap Shop, Inc.*, No. 12-60400-CIV, 2013 WL 12091618, at *2 (S.D. Fla. July 2, 2013) (investigative reports "concerning whether products identified in photographs [agent investigator] took during the course of his investigation are counterfeit" were held to be protected from disclosure under work product doctrine where "Coach represented to the Court that the reports contain the mental impressions of their [non-lawyer] representative, and they have no intention of introducing the reports into evidence").

The circumstances make clear that was the appropriate course of action: litigation had been underway for months, and Nike had specifically demanded preservation of the shoes at issue. Investigation done at the direction of counsel under those circumstances is protected work product. *See United States v. Adlman*, 134 F.3d 1194, 1195, 1202 (2d Cir. 1998) ("In anticipation of litigation" means "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation"). StockX employees with expertise in verifying shoes acted at the

direction of StockX's counsel in conducting their investigation, so the substantive findings of their investigation are entitled to absolute protection as opinion work product. *Nobles*, 422 U.S. at 238–39 (recognizing that "attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial," and therefore "the doctrine protect[s] material prepared by agents for the attorneys as well as those prepared by the attorney for himself"); *Sec. & Exch. Comm'n v. Strauss*, 2009 WL 3459204, at *6 (S.D.N.Y. Oct. 28, 2009) (interview notes prepared by non-attorney SEC employees acting at direction of attorneys found to be work product).

Nike attempts to argue that StockX cannot maintain work product protection because the investigation was not "solely" for litigation purposes, Obj. at 15–19, but it cites no cases in support of that proposition, because that is not the law. *See Pilkington North Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*, 341 F.R.D. 10, 13 (S.D.N.Y. 2022) (citing *Schaeffler v. United States*, 806 F.3d 34, 43 (2d Cir. 2015)) ("Documents prepared in anticipation of litigation ***are work product***, even when they are ***also*** intended to assist in business dealings." (emphasis added)). Nike also repeatedly speculates (without citation to anything in the record) that StockX decided to "re-authenticate" Mr. Kim's shoes "before StockX['s] counsel was even aware of Mr. Kim." Obj. at 16 (emphasis omitted). But that argument is directly contradicted by Ms. Lewis' declaration (which Nike fails to acknowledge) stating that she became aware of Mr. Kim's Instagram post and directed the team to investigate on July 8, long before StockX received any shoes from Mr. Kim (or even received Nike's July 25 letter). Ms. Lewis' declaration makes clear that StockX's normal returns processes were *not* employed in this case, and that these shoes were diverted and segregated for litigation purposes. That Nike wishes the facts were different is not a basis to find Judge Netburn's order clearly erroneous.

11

B.   StockX employees' investigation is absolutely protected as opinion work product.

Seeking to avoid the absolute protection afforded to opinion work product, Nike attempts

to classify the investigation's findings as facts, but Nike's arguments are contradicted by record

evidence and belied by the discovery Nike actually seeks.  As an initial matter, StockX's

investigator testified that his findings were his opinion about the products he reviewed.  *See* ECF

No. 140-7 (J. Lopez Tr.) at 161–164.  Opinion work product is "entitled to virtually absolute

protection."  *United States v. Ghavami*, 882 F. Supp. 2d 532, 540 (S.D.N.Y. 2012).  Despite

Nike's best efforts to mischaracterize the record, the employee investigator's conclusions were

not discoverable "facts."  For example, Nike did not seek testimony about which shoes were

investigated, what the color of the shoes was, what the box label said, or any similar facts.  Of

course, Nike already knows all of those facts, because it already inspected the same shoes.

Nike's Objection (like its original motion) makes clear that Nike wants to discover StockX's

*opinions* and *beliefs* about the shoes – opinions that were prepared in order to aid counsel in

defense of Nike's charges.

C.   StockX's investigation into Nike's legal claims was distinct from its ordinary
     return processes.

Nike is left to fall back on the argument that StockX would have reviewed Mr. Kim's

shoes upon their return even absent this litigation, but their argument ignores the basic fact that

StockX's General Counsel testified that the work done here did not involve StockX's ordinary

returns process.  Nike specifically identified these shoes as evidence in this litigation and

demanded that StockX preserve the shoes (meaning they could not possibly be returned to the

buyer without violating StockX's discovery obligations).  Under those circumstances, there was

no evaluation needed to determine whether a return would be accepted: StockX had to keep the

shoes, so it had to refund the buyer.  What work StockX did to evaluate the shoes in order to

understand Nike's legal claims was done through a specific, counsel-directed process that was
distinct from StockX's ordinary returns process, and StockX generated work product that would
not have been created and or shared with counsel but for Nike's claims and its July 25 Letter.
*See Adlman*, 134 F.3d at 1195 (noting that the work product privilege applies to documents that
"would not have been prepared in substantially similar form but for the prospect of that
litigation."). Nike's reliance on *Mercy v. Suffolk Cty.* fails because there was no actual litigation
in that case, so the documents at issue could only have been prepared according to ordinary
practices. 93 F.R.D 520, 522 (E.D.N.Y. 1982) (finding reports were "prepared pursuant to the
normal police practices of conducting such investigations after a complaint is filed. The 'mere
possibility' of litigation [was] insufficient to prevent disclosure."). Nike's reliance on *Koch v.
Greenber*g, 2012 WL 1449186 (S.D.N.Y. Apr. 13, 2012) is similarly unavailing. In *Koch*, the
Court found that the defendant failed to demonstrate the report at issue "would not have been
prepared in the ordinary course of business or in substantially the same form." *Id*. at *6. But the
unrebutted testimony establishes precisely the opposite here. Nike's unsupported speculation
that StockX would have created similar documents absent this litigation is directly contradicted
by Ms. Lewis' Declaration and legally insufficient to justify piercing work product protection.

    D.    <u>Nike's cited cases are outdated, inapposite, and involve privileges not at issue in
this case.</u>

    None of the cases Nike cited where a Magistrate Judge's Order to uphold work product
privilege was overturned compels a different conclusion. In *Gruss v. Zwirn*, the Court
considered the then-novel issue of whether voluntary disclosure of privileged documents to a
governmental agency, such as the SEC, pursuant to a confidentiality agreement, waives the
privilege as to underlying documents vis-à-vis third parties. No. 09 CV 6441, 2013 WL 3481350
(S.D.N.Y. Jul. 10, 2013). There, the court found that selectively quoting from interview notes

and summaries in presentations to the SEC was a waiver.  That is nothing like the question at

issue here.  StockX has not disclosed to anyone, pursuant to a confidentiality agreement or

otherwise, the substance of its privileged investigation.  Nor has StockX selectively quoted from

anything: all Nike points to is a single conversation between a StockX employee and Mr. Kim

that conveyed none of StockX's protected work product – indeed, it did not even convey a firm

conclusion as to the problems with the shoes Mr. Kim returned.  That is not waiver.

Nike's reliance on *Noel v. City of N.Y.* is similarly inapposite and demonstrates the

lengths to which Nike is reaching to find anything remotely in support of its arguments here.

No. 15 CV 5236, 2018 WL 6786238 (S.D.N.Y. Dec. 12, 2018).  In *Noel*, the Court reviewed the

defendant's claim of *deliberative process* privilege—a privilege that can only be invoked by

governmental agencies, which is analyzed by an entirely separate test under *Rodriguez v. Pataki*,

280 F. Supp. 2d 89, 99-101 (S.D.N.Y. 2003).  The district court in *Noel* disagreed with how the

Magistrate Judge applied the *Rodriguez* test and recommitted the case for further proceedings.

StockX is not claiming (and cannot claim) deliberative process privilege.  *Rodriguez* does not

apply, and neither does *Noel*, and so neither can provide a basis to find Judge Netburn's Order

clearly erroneous or contrary to law.

E.      Judge Netburn's order correctly upheld StockX's work product protection.

Judge Netburn considered and rejected all of Nike's arguments set out in the Objection

when she ruled that StockX's invocation of work product protection was privileged.  Nike has

not identified any statue, rule or binding legal precedent that Judge Netburn's decision ignored or

clearly violated.  This should not come as a surprise, as Nike itself has repeatedly relied upon the

work-product doctrine to shield its own investigations into potential counterfeit products, even

those done merely in anticipation of litigation.  *See* ECF No. 140-6 (October 11, 2022 Letter

from DLA Piper) at 1.  When StockX sought to understand the basis for Nike's privilege claims

14

over these materials, Nike argued that "communications among non-attorneys in a corporation may be privileged if made at the direction of counsel to gather information to aid counsel in providing legal services" and that "the work product doctrine protects not only materials which are prepared by attorneys themselves, but also their agents." *Id.* at 1–2.  Nike further justified withholding its own materials from production in this litigation where its non-legal employees had "act[ed] on the direction of Nike in-house counsel . . . and communicate[d] instructions to brand protection investigators . . . to assist Nike's in-house and/or outside counsel to prepare for potential litigation against parties engaged in the sale of suspected counterfeit 'Nike' goods." *Id.* at 1.  Nike does not mention its prior arguments in its Objection, but the fact that Nike has previously relied upon the same, straightforward legal arguments that support StockX's position on this motion only further demonstrates why Judge Netburn's ruling was not an abuse of discretion or clear error.

Judge Netburn's decision was, instead, entirely consistent with this Court's previous holdings that affidavits from the attorney who directed an investigation, stating that interviews and notes were conducted and prepared because of litigation, and would not have been conducted and prepared otherwise (like the declaration Ms. Lewis supplied here), are the "types of statements . . . sufficient to demonstrate anticipation of litigation under the Second Circuit's flexible standard" for work product protection.  *See Sec. & Exch. Comm'n v. Collector's Coffee Inc.*, No. 19 CV 4355 (VM), 2021 WL 391298, *4-*5 (S.D.N.Y. Feb. 4, 2021) (overruling defendant's Rule 72(a) objection to a Magistrate Judge's denial of a motion to compel production of SEC notes taken during interviews of witnesses in the course of the SEC's fact-finding investigation which the Magistrate Judge concluded were protected work product because "factual material, including the result of a factual investigation" can be protected work

product so long as the material was created "with an eye toward litigation.") (internal quotations omitted).

## II.     Nike Cannot Pierce StockX's Work Product Protection.

### A.     <u>Nike investigated the shoes at issue and has no substantial need for StockX's protected work product.</u>

Nike has already had a complete opportunity to examine the shoes at issue here, and has no substantial need to overcome StockX's work product protection. Whether StockX's protected work product would be 'relevant' to Nike's claims or StockX's defenses, as Nike repeatedly argues (Obj. at 2, 3, 19), is not the question. The applicable question under the law is whether Nike has a substantial need for the information sufficient to pierce StockX's work product protection. Nike does not. *See von Kahle v. Cargill, Inc*., 599 F. Supp. 3d 181, 186 (S.D.N.Y. 2022) (a "party may not discover documents and tangible things that are prepared in anticipation of litigation" unless "the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means").

Nike has already inspected the shoes Mr. Kim returned to StockX, reached its own conclusion as to the authenticity of the products, and gathered whatever materials Nike believed necessary to prepare its case. *See* Exhibit C, (J. Pallett Tr.) at 29:10–30:22, 314:7–317:10. Given that Nike has argued that ███████████████████████████, it cannot possibly have a need for StockX's conclusions about the shoes in question. *See* Exhibit E, (Dec. 14, 2022 Disc. Conf. Tr.) at 10 ███████████████████████████████████ ███████████.

Nike's true motivation appears to be a concern about its inability to meet its burden to prove that Mr. Kim's shoes were counterfeit at trial, and its "need" for the information in question appears to be a backdoor attempt to obtain a legal admission from StockX. With fact

discovery now closed, Nike may be concerned that it has failed to obtain sufficient evidence to prove its counterfeiting or false advertising claims. But that is not a basis to overcome StockX's work product protection or find Judge Netburn's reasoned decision clearly erroneous.

      B.    <u>StockX has not waived protection over any of the details of its investigation.</u>

      Nike's remaining argument, that StockX waived its work product protection, is without merit. Unlike the attorney-client privilege, work product privilege is not automatically waived by disclosing the material to a third party. *In re Pfizer Inc. Sec. Litig.*, No. 15 CV 5236, 1993 WL 561125, at *6 (S.D.N.Y. Dec. 23, 1993). In fact, work product may be shown to others "simply because there [is] some good reason to show it" without waiving the protection. *Adlman*, 134 F.3d at 1200 n.4.

      The basis for Nike's waiver argument is a single non-privileged communication between Mr. Kim and a StockX customer service employee who was not, and never claimed to be, part of StockX's investigation directed by counsel. This StockX employee had no direct knowledge of the investigation, nor about what was conveyed to counsel for litigation purposes. That employee was accordingly unable to provide any detail about StockX's investigation either to Mr. Kim or at his deposition, because he had none to give. All the StockX employee explained was that, in a phone call with Mr. Kim, he told Mr. Kim that the shoes did not meet StockX's standards because they were possibly either defective or inauthentic—nothing more. Mr. Kim's recollection of the conversation was consistent with the StockX employee's testimony.

      Neither the conversation with Mr. Kim nor the deposition testimony "substantially increase[d]" the likelihood that Nike might one day obtain the substantive information about StockX's investigation it now seeks. *See Cellco P'ship d/b/a Verizon Wireless v. Nextel Commc'n, In*c., No. 15 CV 5236, 2004 WL 1542259, at *1 (S.D.N.Y. July 9, 2004) (work-product privilege is waived only if disclosure to the third party "substantially increases the

opportunity for potential adversaries to obtain the information").  StockX did not reveal to Nike, Mr. Kim, or anyone else, the details of its investigative process, the findings of its investigation, or the mental impressions of StockX's employee investigators or StockX's counsel.

Nike's citation to *New York Times Co*. illustrates why the testimony at issue *cannot* be considered a waiver of the work product protection: StockX unquestionably did not "disclos[e] work product to its adversary . . . [or place] privileged documents 'at issue' in a litigation" or provide to Mr. Kim "sufficiently specific" details about the investigation so as to render the protection worthless. *New York Times Co. v. United States Dep't of Justice*, 939 F.3d 479, 494–97 (2d Cir. 2019) (finding that certain public statements about privileged memoranda were "sufficiently specific" to disclose their contents, while others did not "divulge[] the content of the memoranda with enough specificity to constitute waiver of the work product privilege"). Nike's argument that StockX "voluntarily disclosed to an adversary the purportedly protected work product," is a complete mischaracterization of the substance of the testimony on which Nike relies.  (Obj. at 22).  No employee with knowledge of the investigation or its findings disclosed information to Nike, and StockX has not disclosed or discussed the contents of any protected work product in depositions or elsewhere.

Nike next argues that the StockX employee who communicated with Mr. Kim and the StockX employee who conducted its privileged investigation were asked the "same questions about the same subject matter," Obj. at 23, but a comparison of the record shows that is demonstrably false.  The StockX employee who spoke with Mr. Kim was asked (1) what he told Mr. Kim and (2) what he was told to relay to Mr. Kim.  *See* Obj. at 7–8 (citing ECF. No. 135-1 at 89:15-90:21).  StockX permitted that testimony about a non-privileged conversation with a third party.  In stark contrast, the StockX employee who conducted the investigation was asked, with

less than ten minutes remaining on the record, (1) what he and the other employees conducting

the investigation "review[ed] Mr. Kim's returned products for?" (2) "what was the conclusion of

your re-authentication of Mr. Kim's shoes that he returned to StockX?" (3) "What [were] your

findings?" and (4) "did you agree with the original authentication determination that was done on

Mr. Kim's shoes?"  Exhibit F, (J. Lopez. Tr.), at 289–96.  These are not remotely the same types

of questions.  In the latter questions, Nike seeks the details of StockX's legal investigation and

StockX employees' mental impressions based on work done at counsel's direction that was

ultimately reported to in-house and outside counsel.

Judge Netburn considered Nike's waiver argument and StockX's arguments in

opposition, and agreed that StockX had not waived its work product protection.  Nike cites no

cases that establish that Judge Netburn's decision was clearly erroneous or contrary to law,

because it was not.  Nike's citation to *Fullerton v. Prudential Ins. Co.* – in which the documents

that were claimed to be protected via work product *were actually produced* – is inapplicable and,

in any event, recent cases indicate *Fullerton* is not good law.  194 F.R.D. 100, 104 (S.D.N.Y.

2000) (overruling Magistrate Judge's order and holding that production of privileged documents

concerning its investigation into an employees' claims waived attorney-client privilege as to

communications about the investigation); *see Mitre Sports Int'l Ltd. v. Home Box Off., Inc.*, 304

F.R.D. 369, 373 (S.D.N.Y. 2015) (noting that *Fullerton* "predates [Fed. R. Evid. 502], and its

discussion of the scope of a waiver resulting from the partial production of work-product

materials appears to be inconsistent with the terms of Rule 502").

Nike's remaining citations, to *Thomas v. F.F. Fin., Inc.*, 128 F.R.D. 192, 193 (S.D.N.Y.

1989) and *Bowne of New York City, Inc. v. AmBase Corp.*, 150 F.R.D. 465, 485 (S.D.N.Y. 1993),

fare no better, and are even more outdated than *Fullerton*.  In *Thomas*, the Court found that a

client's prior testimony about certain topics meant that an attorney could not invoke attorney-client privilege to refuse to answer certain deposition questions, is plainly inapplicable to the facts here, which does not involve the kind of broad testimony that could possibly implicate subject-matter waiver.  128 F.R.D. at 193.  *Bowne's* broad subject-matter waiver holding is an outlier that appears to have been cabined to its facts, which are entirely distinguishable.  In *Falise v. Am. Tobacco Co.*, the Court found that reliance on *Bowne* was misplaced because the movant "failed to identify any decisions by a court within the Second Circuit other than *Bowne* suggesting that a finding of subject matter waiver does not require a showing of tactical disclosure or other unfairness" and that "since *Bowne*, courts in this Circuit have addressed claims of subject matter waiver a number of times and have consistently examined the issue in light of the fairness concerns described above."  193 F.R.D. 73, 85 (E.D.N.Y. 2000).  Like here, *Bowne* was factually distinguishable from *Falise* because the party asserting privilege in *Bowne* "had, in previous litigation, by its counsel, *agreed to a limited wavier of all privilege and work product claims* in connection with the depositions of its witnesses" for tactical reasons.  *Id.* (emphasis added).  StockX has never agreed to a limited waiver of privilege, so *Bowne* is entirely inapplicable, even to the extent it remains good law.

Judge Netburn correctly concluded that there was no broad subject-matter waiver as to the details of StockX's investigation, and there are no facts or law that suggest (let alone require) a finding that her decision was clearly erroneous or contrary to law.

## CONCLUSION

For the foregoing reasons, Nike's Objection should be overruled in its entirety.

Dated:        April 12, 2023
              New York, New York

                     DEBEVOISE & PLIMPTON LLP

                     By: */s/ Megan K. Bannigan*
                     Megan K. Bannigan (mkbannigan@debevoise.com)
                     David H. Bernstein (dhbernstein@debevoise.com)
                     Jyotin Hamid (jhamid@debevoise.com)
                     Christopher S. Ford (csford@debevoise.com)
                     Justin Ferrone (jcferrone@debevoise.com)
                     Kathryn C. Saba (ksaba@debevoise.com)
                     66 Hudson Boulevard
                     New York, New York 10001
                     (212) 909-6000

                     KILPATRICK TOWNSEND & STOCKTON LLP
                     Rob Potter (RPotter@kilpatricktownsend.com)
                     Briggs Wright (briggs.wright@kilpatricktownsend.com)
                     1114 Avenue of the Americas
                     New York, New York 10036
                     (212) 775-8733

                     MORGANROTH & MORGANROTH PLLC
                     Jeffrey B. Morganroth
                     (Jmorganroth@morganrothlaw.com)
                     167 East 61st Street, #23ᵃ
                     New York, New York 10065
                     (248) 864-4000

                     *Attorneys for StockX LLC*