```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

NIKE, INC.,

            Plaintiff,

       v.                          22 Cv. 983 (VEC)

STOCKX LLC,

            Defendant.             Conference

------------------------------x
                                   New York, N.Y.
                                   April 7, 2023
                                   10:00 a.m.
Before:

              HON. VALERIE E. CAPRONI,

                                   District Judge

                  APPEARANCES

DLA PIPER LLP
     Attorneys for Plaintiff
BY:  TAMAR Y. DUVDEVANI
     MARC E. MILLER
     JARED GREENFIELD

DEBEVOISE & PLIMPTON LLP
     Attorneys for Defendant
BY:  MEGAN K. BANNIGAN
     KATHRYN C. SABA
     ANITA KAPYUR
```

    (In open court; case called)

    THE DEPUTY CLERK:  Counsel, please state your appearance for the record.

    MS. DUVDEVANI:  Good morning, your Honor.  Tamar Duvdevani, DLA Piper, on behalf of Nike.  I am joined by, and I can say this for the first time, my partner, as of yesterday, Marc Miller, and my colleague, still an associate, Jared Greenfield.

    THE COURT:  Good morning, Ms. Duvdevani, Mr. Miller, and Mr. Greenfield.

    MS. BANNIGAN:  Good morning, your Honor.  Megan Bannigan, from Debevoise & Plimpton, on behalf of StockX.  With me are my colleagues from Debevoise & Plimpton, Kathryn Saba and Anita Kapyur.

    THE COURT:  Good morning, Ms. Bannigan, Ms. Saba, Ms. Kapyur.

    OK.  So my recollection of this case was it started during COVID.  We had a long telephone conference, as I remember, and it was all about NFTs.  Are NFTs right now a thing of the past and we don't care about them anymore?

    MS. DUVDEVANI:  We still, your Honor, care about the NFT portion of this case.  Whether or not the world cares as much about NFTs remains to be seen.  My personal view is that it is an evolution, much like dot com was many years ago.  It's still our primary trademark infringement claims, but when we

1  amended our pleading -- and that was filed in January 2022, so
2  it was right after the pandemic, I suppose.  When we amended
3  our pleading in spring of that year, we added claims for
4  counterfeiting and false advertising.
5          THE COURT:  So, basically, your claim is they're
6  selling Nike sneakers as Nike sneakers that are in fact not
7  Nike sneakers.
8          MS. DUVDEVANI:  For the NFTs it's just trademark
9  infringement.  Counterfeiting, there are counterfeit shoes that
10 look like Nike shoes that are not that are being sold through
11 the StockX platform.  StockX for many, many years stated that
12 all of their products are 100 percent authentic, which is
13 basically the basic facts for the false advertising claims that
14 Nike brought as well.
15         THE COURT:  You sure you don't want to agree to Judge
16 Netburn?  She really has been involved in this.  As you can
17 tell, this is all sort of vague in my head.  I sent you off
18 there because my recollection is Nike does some testing.  So
19 you have bought shoes from StockX and you have bought
20 counterfeit shoes, is that correct?
21         MS. DUVDEVANI:  That was the initial counterfeits that
22 formed the basis of our amended complaint, your Honor, yes.
23 Since then we have found many more such counterfeits through
24 other sources.  I believe we are up to close to 100 at this
25 point.

1         THE COURT: I don't expect that StockX agrees to any
2  of that, so I will just accept that you say no, no, no. OK.
3         I just received, or whenever it came in, the request.
4  Nike, I guess, is appealing Magistrate Judge Netburn's denial
5  of one of your requests for an internal investigation that
6  StockX did. That will get briefed. So that's fine.
7         I don't understand the redactions. I don't understand
8  why any of this should be redacted. Tell me why any of it
9  should be redacted.
10        MS. DUVDEVANI: Certainly, your Honor. I will first
11 note that none of the redactions really relate to any of Nike's
12 information that's been confidentially designated.
13        THE COURT: You're just redacting because of their
14 confi rules?
15        MS. DUVDEVANI: Correct.
16        THE COURT: Then let me turn to Ms. Bannigan.
17        Ms. Bannigan, why is any of this confidential?
18        MS. BANNIGAN: Your Honor, obviously, StockX didn't
19 have a chance to review the motion before it was filed. Once
20 it was filed, we did review the motion and we have a proposal
21 to unredact several of the passages. We have talked to Nike
22 about it. We are in agreement on most of them I believe. I
23 believe Nike is contesting -- Ms. Duvdevani can speak to
24 whether she is contesting any of it, but all we have redacted
25 at this point are passages we believe involve confidential

1     business practices, confidential client communications, or
2     information about confidential investigations.
3          THE COURT:  Point me to a page where you would still
4     have redactions.
5          MS. BANNIGAN:  Your Honor, if it would be helpful to
6     the Court, I could hand up a copy where we have taken some of
7     the redactions out and show your Honor what we are keeping
8     redacted, or proposing to keep redacted.
9          THE COURT:  If you can just point me to the page that
10    will be fine.
11         MS. BANNIGAN:  Page 4, for instance, your Honor.
12         THE COURT:  Real page 4, not ECF page 4?
13         MS. BANNIGAN:  Roman numeral page 4.  Yes, your Honor.
14         THE COURT:  Yes.  What would you keep redacted in that
15    page?
16         MS. BANNIGAN:  Here we would keep most of this
17    paragraph redacted, your Honor.
18         THE COURT:  Why?
19         MS. BANNIGAN:  We believe that --
20         THE COURT:  I mean, the notion that you have somebody
21    who is scrolling through social media looking for posts about
22    your company, trust me, that's not confidential.  Every company
23    in the world does that.
24         MS. BANNIGAN:  But it reflects our internal processes
25    for responding.  This is a hotly contested area.

1          THE COURT: That's not a reason to redact. That it is
2  hotly contested is fine. The question is, how is it going to
3  harm you?
4          MS. BANNIGAN: So this passage is all about how StockX
5  treats what it calls power buyers. And power buyers are the
6  buyers who purchase the most amount of product through StockX's
7  platform. How they treat power buyers is a very confidential
8  process. And what the return process is, how they talk to
9  these power buyers, this is all procedures that -- I have
10 talked to my client about each of them -- that they do believe
11 would harm them if their competitors were able to see how they
12 are dealing with these customers at the time.
13         THE COURT: What is being contested? Where is there a
14 dispute?
15         MS. DUVDEVANI: Yes, your Honor. As I noted to Ms.
16 Bannigan, we are not going to die on this hill. It's their
17 information. The one area where we really think should not be
18 redacted is the --
19         THE COURT: That should not be redacted?
20         MS. DUVDEVANI: Should not be redacted, that StockX
21 believes should be, are portions of a third party deposition
22 taken of this power buyer. His name is Roy Kim.
23         THE COURT: Can you just point me to the page.
24         MS. DUVDEVANI: Sure.
25         MS. BANNIGAN: I believe it's page 8.

1           MS. DUVDEVANI:  It is page 8.

2           So there is a Q and A at the bottom of page 8.

3           THE COURT:  Hang on.

4           MS. DUVDEVANI:  I will need to give you a little bit

5    of context here as well.

6           THE COURT:  Let me reread it.

7           OK.

8           MS. DUVDEVANI:  Roy Kim was a third party, is a third

9    party, that posted on Instagram that he received $10,000 worth

10   of fake shoes from StockX.  I spoke to him.  We ended up

11   deposing him.  He gave this testimony.  Neither party

12   designated the deposition as confidential pursuant to the

13   protective order.  Even though we did redact his name for

14   privacy reasons before Judge Netburn, the sneakerhead community

15   has been following this case religiously.  They put dots

16   together.  They figured out who he was.  Two days before Judge

17   Netburn ruled he gave an interview in a publication called

18   Complex Magazine, where essentially he paraphrased everything

19   that he said at his deposition.  So it's really our view that

20   there is nothing left that is confidential, if there was

21   anything in the first place.

22          THE COURT:  The cat's out of the bag.

23          MS. DUVDEVANI:  Exactly.

24          THE COURT:  Ms. Bannigan.

25          MS. BANNIGAN:  Yes, your Honor.  We disagree that he

paraphrased everything that was said at his deposition.  In fact, we do agree that, for instance, the last sentence of this answer should be unredacted because he did say that in the article Ms. Duvdevani is referring to.  But right above that, when he is talking about certain terms that are used by StockX in their internal processes, terms that they use, the UA, all of that is confidential as to our competitors, and that's what StockX does not believe should be disclosed.  And that was not disclosed in the Complex interview that Ms. Duvdevani is referring to.  And, in fact, he specifically avoids that when you read the passage in the interview that he disclosed, and does not give the specific information as to exactly what was said to him.

THE COURT:  But his deposition itself is not marked confidential?

MS. BANNIGAN:  His deposition itself is not marked as confidential given that he was a third party.  But if you look at the law in the Second Circuit, it's not what has been marked under a protective order, it's whether the competing considerations outweigh the presumption of access here, which we believe they do.

THE COURT:  I will wait to see what you're sending in to me.  Take this back to your clients.  This is ridiculous.  If it's really confidential, that's fine.  But this just seems crazy.  So if you overdesignate, you run the risk of me saying,

1    a pox on both your houses, it's all going to be public.

2             MS. BANNIGAN:  Yes, your Honor, understood.

3             THE COURT:  That was sort of a sidelight of why you're
4    all here.

5             Both sides want to move for summary judgment.  That is
6    usually like a major red flag that there are huge numbers of
7    questions of fact.

8             Let me turn to Ms. Bannigan.

9             Ms. Bannigan, why do you think you are entitled to
10   summary judgment?

11            MS. BANNIGAN:  We believe, certainly, there is highly
12   contested issues of damages in this case.

13            THE COURT:  But you said you're going to cross-move
14   for summary judgment.

15            MS. BANNIGAN:  Summary judgment showing that --

16            THE COURT:  You're going to move.  I'm sorry.  You're
17   going to move for summary judgment.

18            MS. BANNIGAN:  On discrete issues that we think
19   actually will greatly narrow the issues for trial.

20            THE COURT:  Like what?

21            MS. BANNIGAN:  For instance, what type of damages Nike
22   is entitled to.  Whether they are entitled to disgorgement of
23   profits for false advertising, for example.  We think that the
24   law is clear that they are not.  To the extent that's an issue
25   at trial, that will involve likely multiple expert reports and

1   fact testimony. And to the extent we can --

2              THE COURT: That's a damages issue. What about as to
3   liability?

4              MS. BANNIGAN: As to liability, one of the issues that
5   we are considering moving for summary judgment on has to do
6   with the NFT claim and whether we can defend against the claims
7   using the first sale doctrine.

8              The facts really aren't in dispute about the NFTs.
9   What is in dispute is the law and what StockX was legally
10  allowed to do with the brands. So we do believe that is an
11  area that may be ripe for summary judgment.

12             THE COURT: What is Nike's view? You're going to
13  cross-move for summary judgment, right?

14             MS. DUVDEVANI: Your Honor, just like StockX, we will
15  very unlikely move on every claim, but there are certainly
16  claims that are very ripe for narrowing in this. The easiest
17  low-hanging fruit example is the counterfeiting claim.

18             For Nike to establish its sixth cause of action for
19  counterfeiting, all that it needs to be prove is that its marks
20  are on the principal register. Not disputed. That Nike has
21  made significant use of those marks. Not disputed. And that
22  StockX sold counterfeit products bearing those marks. Not
23  disputed.

24             THE COURT: Is that right, Ms. Bannigan, there is no
25  dispute that you sold counterfeit Nike shoes?

1          MS. BANNIGAN:  There actually is a dispute.  We are
2     not sure that Nike is going to be able to prove counterfeiting,
3     at least with respect to some of the shoes.  There are issues
4     of whether U.S. jurisdiction is involved.  Based on all of
5     these actions taking place out of the United States, there is
6     an issue of the chain of custody for the shoes.  So for at
7     least some of the counterfeit shoes, we absolutely will contest
8     it.
9          There are other issues, too.  There is a greater
10    issue --
11         THE COURT:  Hang on.  As to some of the shoes; that is
12    to say, there are shoes that you do not contest were
13    counterfeited?
14         MS. BANNIGAN:  I am not prepared to make that
15    statement today because we are contesting the counterfeit
16    shoes, yes.
17         THE COURT:  I love when there's summary judgments
18    where you're disputing something that you know you don't really
19    have a dispute on.
20         I guess what I am struggling for, is there a way to
21    short-circuit some of this to stage what has to be done?  For
22    instance, if there is a huge dispute about damages as to
23    certain claims, but the claims themselves are shaky, does it
24    make sense to postpone damages discovery and deal with
25    liability?  Maybe not.  This is all looking quite messy.

|   |   |
|---|---|
| 1 | MS. DUVDEVANI:  If I may, your Honor.  I don't think |
| 2 | it's as messy as it's looking to you this morning. |
| 3 | THE COURT:  OK. |
| 4 | MS. DUVDEVANI:  Let me just address damages for a |
| 5 | moment.  The only monetary damages that Nike is seeking is |
| 6 | disgorgement related to false advertising.  As an equitable |
| 7 | remedy, that's actually an issue for the Court anyway, unless |
| 8 | you seek an advisory opinion from a jury. |
| 9 | THE COURT:  That would mean the false advertising |
| 10 | would go to the counterfeits, not the legitimate shoes. |
| 11 | MS. DUVDEVANI:  There are a few claims.  But, |
| 12 | essentially, it is Nike's position that when StockX said for |
| 13 | many, many years that the shoes and products themselves, the |
| 14 | Nike-branded products, are 100 percent authentic, verified |
| 15 | authentic, guaranteed authentic, but many of them turned out to |
| 16 | be counterfeit, that is pretty basic literal false advertising. |
| 17 | THE COURT:  So let me push back just a little bit on |
| 18 | the "many."  They have been in business for years.  I assume |
| 19 | they have sold thousands upon hundreds of thousands of pairs of |
| 20 | shoes, and you have got 100 that were fake. |
| 21 | MS. DUVDEVANI:  That we have located.  That's correct. |
| 22 | THE COURT:  What is the evidence in terms of the |
| 23 | volume of fake to real? |
| 24 | MS. DUVDEVANI:  Part of the problem is that Nike is |
| 25 | never going to be able to know how many counterfeits have been |

flooding the market as a result of StockX's practices, because many, many consumers, the vast majority of the consumers will get a well crafted counterfeit and not know they are counterfeit in the first place. The real interesting issue with this third party named Roy Kim is he is a very highly sophisticated sneakerhead. So when he ordered --

THE COURT: The notion that there are people who are called sneakerheads is just baffling to me.

MS. DUVDEVANI: I am with you. I have now adopted the culture. This is an individual who, for better or for worse --

THE COURT: He collects sneakers.

MS. DUVDEVANI: Thousands of them. He resells some of them as well. Between, I believe, March and June, so just in a very short period of time in 2022, he bought 62 pairs of Jordans, of Nike product, from StockX. 38 of them turned out to be counterfeit. So you're right, we don't know the total volume, but the evidence we have certainly gives quite an eye-opening view as to how many counterfeits are actually not being caught by StockX.

Now, at the end of the day, we really only need one, but there are a lot more. And even StockX's own internal documents will admit that they have made some, what was called true misses, where they have acknowledged that --

THE COURT: A true miss?

MS. DUVDEVANI: A true miss. So StockX will

authenticate a shoe by doing things like smelling them, looking at the stitching, whatever they do, which I won't go too much into because it's been designated as confidential by StockX.

THE COURT: Let me just drop a footnote and then I will let you keep going. If we try the case, that's going to be out.

MS. DUVDEVANI: As will a lot of Nike's proprietary information. But it's not a reason not to bring a claim.

So StockX will purport to authenticate and then guarantee that these shoes are real. A consumer will get them, and if you're like me, a soccer mom that buys a pair of shoes and doesn't know the difference, maybe I will never even know. But if somebody has the wherewithal to really understand that something might be a fake, and the time and energy to reach out to StockX and complain, and StockX takes them back, they will take a second look at the shoes and make a determination if there was a true miss.

So in addition to the counterfeits that Nike has already found, we have also found evidence through their document production that they know that this was happening in the first place.

THE COURT: OK. Got it.

So the damages are going to be -- I am going to determine the damages.

MS. DUVDEVANI: For the counterfeiting claim, we are

just seeking statutory damages.  For the NFT claim, just injunctive relief.  And for false advertising, it's disgorgement, so that would be for the Court.

THE COURT:  The proposal that's in your joint letter is that you would make *Daubert* motions, which you don't know yet whether you are going to be making.

Do you know yet who each other's experts are?

MS. DUVDEVANI:  Not yet, your Honor.  May 5th is going to be the plaintiff's opening report.

THE COURT:  So the way you're proposing doing this is you're going to make your motion for summary judgment without knowing whether or not your expert's information can be used.  If I were you, I would rather know.  So my proposal would be to do *Daubert* motions first so that you know going into summary judgment what you have and what you don't have.

MS. DUVDEVANI:  That sounds great to me, your Honor.

THE COURT:  OK.  Good.

I can see, Ms. Bannigan, it's the first time the two of you have agreed on anything all day.

MS. DUVDEVANI:  Every once in a while we do agree on something.

THE COURT:  The clock is right twice a day, a stop clock.

What we are going to do is we are going to do another conference at the end of July.  This got everybody into the

1  office, and I am big proponent of people going into the office.
2  I have a feeling there are at least several people in this room
3  who would rather work at home in their pajamas.
4      So we will do a conference at the end of expert
5  discovery.  Hopefully you will have a much better sense of
6  whether you are or are not going to challenge the experts, what
7  you're challenging, and then we will talk about that at that
8  point, do the *Daubert* briefing, and then we will come back for
9  summary judgment.
10      According to the schedule that Judge Netburn has set,
11  you are going to be done with all of your expert discovery by
12  July 21.  Actually, July 14.  Is that doable?  Are you really
13  set up so that everything is going to be done by then?
14      MS. DUVDEVANI:  That's the hope, your Honor.  We don't
15  quite know how many experts are going to be involved.  We think
16  that June might be a bit tight in terms of getting all the
17  depositions done, but the parties have worked together before
18  to try to get it done.  If your Honor wants to give us more
19  time right now, no one will protest, I don't think, but we were
20  planning on trying to get it done.
21      MS. BANNIGAN:  That's the question, whether we can get
22  the expert depositions done.
23      THE COURT:  Let's do this.  I would rather go ahead
24  and give you time than have you come back.  So get your expert
25  discovery done by the end of August.  I am not going to set

1  internal deadlines for you.  Work them out between you.  I
2  don't care when you do anything as long as everything is done
3  by the last day of August, which is August 31.
4       Actually, let me backtrack on that.  So you have got
5  everything done by August 24.
6       I will have a conference with you on August 25.  And
7  we will talk about where we are going from there.
8       It will be August 25 at 10:00.
9       Are the parties at all -- your clients are spending a
10 ton of money on this case.  Are you at all interested in trying
11 to settle it?
12      MS. DUVDEVANI:  We have been actively working towards
13 that, your Honor, not only before Judge Netburn last July and
14 then a series of teleconferences with her, we actually even
15 engaged Judge O'Malley, a private mediator, and the parties met
16 in March, just a few weeks ago.  Before that they had met in
17 January.  Judge O'Malley is still engaged in working with the
18 parties.  So we are trying.  Unfortunately, the parties are
19 still quite far apart.
20      THE COURT:  OK.  I can't do anything to help you on
21 that beyond we will just keep going on this.
22      Anything further from the plaintiff?
23      MS. DUVDEVANI:  No, your Honor.
24      THE COURT:  Anything further from the defendants?
25      MS. BANNIGAN:  No, your Honor.

N478NIKC

1        THE COURT:  OK, everybody.  Have a nice weekend.
2        MS. DUVDEVANI:  Thank you.  You too, your Honor.
3        MS. BANNIGAN:  Thank you.
4        (Adjourned)