# EXHIBIT R



FEBRUARY 26, 2021

# FABIAN V. NANO, ET AL (3:19-CV-0054)

EXPERT REPORT

PREPARED BY
STEVEN S. MCNEW
SENIOR MANAGING DIRECTOR
BLOCKCHAIN, INFORMATION GOVERNANCE, PRIVACY & SECURITY
1301 MCKINNEY, SUITE 3500
HOUSTON, TX, 77010

PREPARED FOR
SCOOLIDGE, PETERS, RUSSOTTI & FOX, LLLP
COUNSEL FOR NANO

EXPERTS WITH **IMPACT**™

Table of Contents

Qualifications and Statement of Compensation ........................................................................... 1
I.    Introduction .......................................................................................................................... 3
II.   Executive Summary .............................................................................................................. 4
III.  Inability by Plaintiffs to Identify U.S. or California Based Holders of XRB on BitGrail ..... 4
IV.   Inability to Provide Records and Evidence of Holdings ...................................................... 5
V.    Plaintiff Claims; a Reliance on Social Media and Forums ................................................... 7
VI.   Demographic Trends of Cryptocurrency Use ....................................................................... 8
VII.  Conclusion ............................................................................................................................ 9

**Qualifications and Statement of Compensation**

As requested by Scoolidge, Peters, Russotti & Fox, LLP, I have prepared the following report regarding the review of the opinion by Plaintiff's expert, Mr. David Weisberger, in support of Plaintiff's motion for class certification and to provide an opinion about the reliability of Mr. Weisberger's conclusions and the soundness of his methodologies.

I, Steven S. McNew, am a Senior Managing Director and Blockchain & Cryptocurrency leader at FTI Consulting Technology LLC ("FTI") in the Blockchain, Information Governance, Privacy and Security practice of its Technology segment. FTI's Technology segment provides blockchain advisory services, cryptocurrency investigations, digital investigation, and electronic discovery services to assist organizations across a variety of industries to better govern, secure, find, and analyze information.

I completed blockchain and cryptocurrency coursework at Massachusetts Institute of Technology (MIT). I have also completed studies and passed the required examinations with the Blockchain Council to earn designations of Certified Bitcoin Expert, Certified Blockchain Expert, and Certified Smart Contracts Developer. Additionally, I am certified by CipherTrace as a Cryptocurrency Investigator and a member of the Wall Street Blockchain Alliance. I have thirty-three (33) years of experience performing various forensic and cybersecurity investigations. I am a frequent speaker on blockchain, cryptocurrency, and cybersecurity. I have also published numerous articles on blockchain, cryptocurrency, and cybersecurity topics. I'm quoted often as a blockchain and cryptocurrency expert by various publications.

A copy of my curriculum vitae is attached as Appendix L.

All of my opinions and conclusions presented in this Report are held to a reasonable degree of professional certainty. I have prepared my Report while employed by FTI Consulting. I have worked as a consultant and expert for 33 years.

I have been retained by Scoolidge, Peters, Russotti & Fox LLP as a testifying expert at the rate $500.00 per hour. My fee is not contingent on the outcome of this case.

I. **Introduction**

   a. Scope of Work

   I was retained by Scoolidge, Peters, Russotti & Fox, LLP to review the opinion by Mr. David Weisberger in support of the Plaintiff's motion for class certification and to provide an opinion about the reliability of Mr. Weisberger's conclusions and the soundness of his methodologies[1]. In forming this opinion, I reviewed Mr. Weisberger's report and various related documentation including statements by the Plaintiff and the former Plaintiff in this action. Specifically, I reviewed the following documentation.

   b. Documentation Reviewed for this Report:

   1. David Weisberger
      i. Appendix A - Expert Report of David Weisberger Regarding Nano, XRB, and BitGrail, dated August 3, 2020
      ii. Appendix B – Deposition Transcript of David Weisberger, dated October 20, 2020
   2. James Fabian
      i. Appendix C - Deposition Transcript of James Fabian dated August 7, 2020
      ii. Appendix D - Screenshot, Exhibit #9 of the Deposition of James Fabian
      iii. Appendix E – Screenshot, Exhibit #10 of the Deposition of James Fabian
      iv. Appendix F - Screenshot, Exhibit #11 of the Deposition of James Fabian
   3. Alec Otto
      i. Appendix G – Email, Exhibit #21 of the Deposition of Alec Otto
      ii. Appendix H – Email, Exhibit #22 of the Deposition of Alec Otto
      iii. Appendix I – Email, Exhibit #23 of the Deposition of Alec Otto
      iv. Appendix J – Deposition Transcript of Alec Otto, dated January 29, 2021
   4. Italian Bankruptcy Decision
      i. Appendix K – Italian Republic Court of Florence, Bankruptcy Decision, dated December 19, 2019

---

[1] In addition, I was also asked to give an opinion on certain demographic trends of cryptocurrency use

II. **Executive Summary**

As a cryptocurrency expert, blockchain advisor, and consultant, I am frequently asked to review statements, allegations, and assertions for completeness and accuracy. Having reviewed Mr. Weisberger's report and related documentation, my conclusions are as follows:
1. Mr. Weisberger has not identified any data, nor applied any recognizable methodology that would support his conclusions as to the size of the class, if any.
2. The materials that I reviewed contradict Mr. Weisberger's conclusion that it would be possible to determine the identity of holders of BitGrail XRB with balance.
3. There is no basis in fact or science for Mr. Weisberger's conclusions about the types of information BitGrail XRB holders consumed or relied upon, if any.

III. **Inability by Plaintiffs to Identify U.S. or California Based Holders of XRB on BitGrail**

In my experience consulting on litigation, disputes, and other forms of blockchain analytics within the cryptocurrency space, I am from time to time called upon to identify and assess the size of things. For example, I am often required as part of a digital asset tracing exercise to determine the individuals involved and the amounts of various types of cryptocurrencies. In so doing, I rely on data, and I apply a methodology. Sometimes the methodology is as simple as arithmetic. Other times more sophisticated mathematical calculations are required.

With respect to the size of the class, Mr. Weisberger neither provides data, nor applies any known methodology. He states, "I also conclude that, based on my knowledge of the market for XRB and BitGrail, the number of investors was numerous based in part on the number of initial XRB holders, the widespread effects of the BitGrail hack, and the lack of large holders in the BitGrail bankruptcy proceedings." He goes on to opine, "it is my conclusion that most investor harm was small, in that the effects of the BitGrail XRB hack were spread over a large and broad swath of investors." Mr. Weisberger further states, "BitGrail was, by far, the dominant exchange trading XRB during May through November of 2017, meaning that there were a great many people that were likely impacted by the loss of those coins." Lastly, he states, "In addition to the large number of initial holders, XRB volumes on BitGrail were significant and spread among a great many accounts. It is quite clear that there were many XRB holders impacted by the loss of roughly $170 million in XRB at the time the event was announced, particularly since there were few large holders involved in the bankruptcy proceedings."

There are several problems with these statements:
1. While Mr. Weisberger asserts that the number of purchasers was "numerous," he doesn't clearly state what "numerous" means. The use of the adjective "numerous" to justify numerosity is tautological. Mr. Weisberger does not point to any factual basis to assert that there were any number of purchasers, let alone that purchasers were "numerous." In attempting to count the number of BitGrail XRB holders, one would expect to see factual reports with comprehensive lists of purchasers and their addresses, dates of purchase, amounts, and holdings at the time of the

4

loss. Mr. Weisberger does not point to any such documentation. Additionally, he never states a number of U.S. or California based BitGrail XRB holders. When asked in his deposition on page 242, Appendix B to this report, if he had any insight into where the purchasers were located, Mr. Weisberger's response was, "No. And the truth is it would be very hard to know." Furthermore, even if reporting was available from BitGrail, geographic locations for purchasers would be inconclusive as its know your customer or know your client ("KYC") protocols were insufficient. As paraphrased for the court-appointed expert within the Italian Bankruptcy court's decision on page 78, Appendix K to this report, "the platform did not carry out any in-depth verification on the identity of the registering user, nor kept track of the IP addresses used for the registration or for subsequent accesses or operations."

2. Mr. Weisberger states that there is a lack of large holders in the BitGrail bankruptcy proceedings but does not provide any factual evidence to support his statement. Absent a list of specific purchasers who held assets at the time of the loss, dates, and specific amounts, there is no way to determine whether there was a small or large number of users. Just one example may be a single purchaser who owns hundreds of individual BitGrail accounts, which may appear to be hundreds of individual users but is in reality a single large holder. When asked in his deposition, on page 238, Appendix B to this report, about the list of claimants he stated he had seen in the BitGrail bankruptcy records, Mr. Weisberger failed to recall where he saw such a list. His response was, "I don't remember where I saw it." Absent the provision of evidence to clearly show the number of purchasers and their holdings, it is not possible to determine whether there are or are not large holders. It is also not factually possible to assert that "most investor harm was small, in that the effects of the BitGrail XRB hack were spread over a large and broad swath of investors." This is especially so since no understanding of the number of purchasers and amounts lost has been established.

3. Without factual evidence to prove the number of purchasers, dates, and amounts held, there is no factual basis to assert that "there were a great many people that were likely impacted by the loss of those coins." One would expect reports and data that show a minimum number of BitGrail XRB holders, but Mr. Weisberger did not rely on such evidence.

## IV. Inability to Provide Records and Evidence of Holdings

Mr. Weisberger claims within his expert report, Appendix A to this report, that "The class is almost certainly ascertainable through the records kept by investors, as well as through records from the BitGrail bankruptcy proceedings themselves." He then goes on to state that "There should be detailed records from the BitGrail bankruptcy proceedings of the account holders who should have had XRB in their accounts. In addition, most holders of crypto currencies are likely to maintain their own records of their holdings and should be able to prove the holdings that they were entitled to. In addition, all those who received distributions via the faucet and moved their coins to BitGrail should be able to prove those transactions."

There are several problems with these statements:
1. Of the Plaintiff and former Plaintiff deposed, neither have the type documentation that Mr. Weisberger asserts that purchasers should be able to reasonably provide.
2. Cryptocurrency is renowned by the industry as well as the community of users for its privacy and in many cases anonymity, especially for wallet and exchange services without comprehensive KYC practices in place to verify the identity of consumers. As previously noted within the Italian Bankruptcy Court's decision, Appendix K to this report, the court appointed expert concluded that BitGrail's KYC requirements were not sufficient to verify the identity of users. Many wallet and exchange services embrace their users' privacy expectations and limit the amount of information that is generated in the form of communications and reporting. As such, the automated communications and available reporting for many cryptocurrency services is limited and not as available as Mr. Weisberger supposes. Importantly, none of Mr. Weisberger's conclusions about the availability of documentation is based on evidence.
3. Neither Mr. Fabian nor Mr. Otto had any records of purchases on BitGrail. Mr. Otto states in his deposition, Appendix J to this report, on page 78, "BitGrail did not provide a lot of documentation to begin with."  When asked if Mr. Otto had "a record of a transaction of the purchase of 200 XRB on December 18th," Mr. Otto's response was, "There were no e-mails provided upon purchasing cryptocurrency on BitGrail." On page 142, Appendix C to this report, Mr. Fabian was asked in relation to the alleged purchase of XRB on September 1, 2017, "Do you have any records of your purchase of XRB on BitGrail?" Mr. Fabian's response was, "I don't believe so...." To Mr. Fox's question, "Would you have received an email from BitGrail confirming that purchase?" Mr. Fabian responded, "I don't recall getting one." Mr. Fabian's statements further illustrates the lack of evidence and the inability to provide relevant documentation confirming the time of active BitGrail account ownership and balances.
4. Additionally, the BitGrail records produced in discovery by Plaintiffs Fabian and Otto lack detail and the specifics needed to ascertain their respective account balances during the time period that they claim they maintained accounts at BitGrail. Their inability to provide pertinent account statements illustrates the difficulty in producing definitive evidence reflecting account ownership and dates of use with respect to the BitGrail exchange.
5. The only BitGrail documents Mr. Fabian produced in discovery were screenshots of the BitGrail user interface, Appendices D, E, and F to this report, each of which reflect holdings in several cryptocurrencies including XRB. However, Mr. Fabian testified on pages 152 to 154, Appendix C to this report, that he did not recognize the screenshots reflected in Appendices D or E. While Mr. Fabian did recognize Appendix F, from pages 154 to 155, there is no evidence to indicate the owner of the account or the date the screenshot was made. Thus, Mr. Fabian has not provided any definitive evidence to prove the timeframe of an active BitGrail account or the balance of XRB in any such account at any time, including at the time of BitGrail's collapse.

6. In review of Mr. Otto's BitGrail email documentation, Appendices G, H and I to this report and his deposition testimony, Appendix J to this report, he also has not provided sufficient evidence to quantify a balance of XRB at any given time, including the time of BitGrail's collapse.

Appendices H and I are two emails indicating BitGrail withdraws. There is no indication of what currency or how much was withdrawn in the respective transactions, and it is uncertain from the documents Mr. Otto produced whether any XRB balance would have remained after the withdraws.

Furthermore, Mr. Otto testified in his deposition that he did not remember the amount of currency he withdrew from BitGrail. In relation to the withdraw referenced in Appendix H, when asked by Mr. Fox, on page 90, Appendix J to this report, whether he recalled "how much XRB you withdrew through an -- through a conversion to Bitcoin or Ethereum from the BitGrail exchange?," Mr. Otto's response was "Unfortunately not." In relation to the other withdraw, referenced in Appendix I, when asked on page 92, Appendix J to this report, whether he recalled "how many XRB you withdrew from BitGrail," Mr. Otto's response was "Unfortunately, no."

From my review, Mr. Otto has not provided sufficient evidence to know what his balance was, if any, at the time of BitGrail's collapse.

## V. Plaintiff Claims; a Reliance on Social Media and Forums

In my capacity as a cryptocurrency expert, blockchain advisor, and consultant, I am aware social media platforms and forums are highly utilized to encourage discussion across the community of users. However, social media posts are just one of multiple types of information consumed by cryptocurrency users. Mr. Weisberger's conclusion that all BitGrail XRB purchasers read and relied on the same information is baseless, as Mr. Weisberger himself conceded during his deposition.

Mr. Weisberger states, "based on my knowledge of the market for cryptocurrencies in 2017 and early 2018, I conclude that the core development team's ongoing social media commentary supported the price of XRB and encouraged the claimants to maintain their position on BitGrail instead of selling or withdrawing XRB earlier." He goes on to say that "the main channels for investor information was primarily Twitter messages, Reddit threads and Telegram groups, most of which were monitored and participated in by the core development teams." He also states, "Additionally, widespread adoption of XRB and the harm that befell holders was likely due to identical reliance on identical representations by the Defendants through social media." Furthermore, Mr. Weisberger alleges that "the average investor in XRB was either a reader or participant in the Reddit threads that discussed XRB or a follower of the core developer group on Twitter. Many of them acquired some XRB via the faucet, but many believed the intensive marketing efforts of the developer team to create a market for the currency. The global retail market for

cryptocurrencies in 2017 was extremely reactive to social media and very broad based, and there is every reason to believe that the "hodlers"[5] of XRB acted on the same information sources."

As a cryptocurrency consulting expert, I cannot form an opinion about the sources of information that XRB holders consume or rely upon without adequate data. Moreover, it is imperative that the data on which opinions are based are from reputable and independent sources, collected in a methodologically sound way. One such example of a collection technique is a survey based on simple random sampling. Mr. Weisberger did not conduct such a survey, or use any data of any type.

Mr. Weisberger does not purport to base his conclusions about the information XRB users consumed on any evidence at all. He has not surveyed or even spoken with any XRB holders, nor reviewed any such surveys administered by anyone else. When asked in his deposition, Appendix B to this report, on page 233 to confirm he did not survey XRB holders as to what they read and relied upon, Mr. Weisberger's response was, "Correct." When asked to confirm he did not speak to any XRB holders about what information they read or relied upon, Mr. Weisberger's response was, "Correct."

Furthermore, even as pure conjecture, Mr. Weisberger's conclusion that all XRB holders read and relied upon the same information is not credible. Mr. Weisberger himself testified at his deposition that reliance would "vary from individual to individual." Additionally, there were numerous sources of information available in 2017 and early 2018 about cryptocurrencies, none of which to my knowledge included statements made by the defendants. For example, CoinDesk is a well-regarded, public website founded in 2013 that specializes in news within the cryptocurrency space. Another one is Bitdegree.org, which began in August of 2017 and is a public website focused on promoting digital technology providing informative articles and guides on an assortment of topics including cryptocurrency. Other potential sources of information for holders include CoinTelegraph, CCN, CryptoSlate, CNBC, Business Insider and Forbes to name a few. Mr. Weisberger points to no evidence to suggest XRB holders consumed the defendants' social media posts to the exclusion of these other sources of information.

## VI. Demographic Trends of Cryptocurrency Use

After review of publicly available studies on the subject, I conclude that a consensus is forming that cryptocurrency use is more widespread and accepted by men and younger generations. (Although cryptocurrency is used by all demographics.)

A U.K. law firm, Michelmores LLP performed a study which was cited within a BitcoinMagazine publication, **New Research Shows How Young Adults Drive The Cryptocurrency Revolution**. The study found that traditional forms of investment continue to be popular for millennial investors, though 20% of their portfolio was invested in cryptocurrencies. The publication goes on to discuss a study on "The State of Cryptocurrency Among Millennials and Generation Z" conducted by Paxful, a service provider for buying

and selling cryptocurrency, and BitcoinMagazine noted, "The data also shows that females have a greater lack of knowledge and are more distrustful of cryptocurrencies, citing regulation and volatility as their concerns more often than males did."

In a MarketWatch publication, **'Overconfidence': Why it's mostly men under 30 trading bitcoin**, MarketWatch was provided access to data from Mode, a U.K. Fintech company specializing in payments and investments of digital assets. Review of the data found, "The overwhelming majority of people using its app are men, making up 79% of users to just 21% women."

The Michelmores LLP and Paxful studies, as well as the analysis of the Mode data performed by MarketWatch support my opinion cryptocurrencies are more widely used and accepted by males and younger generations.

## VII. Conclusion

After a comprehensive review of Mr. Weisberger's report and related documentation, I conclude that Mr. Weisberger's statements discussed in my report are not based on fact and do not reflect the application of any recognized scientific methodology.

_____
Steven S. McNew

9