# EXHIBIT S

2009 WL 361055 (N.D.Tex.) (Expert Report and Affidavit)
United States District Court, N.D. Texas.

MARY KAY INC,

v.

WEBER et al.

No. 08CV00776.
January 5, 2009.

**Expert Report of Dr. Itamar Simonson**

**Name of Expert:** Itamar Simonson, M.B.A., Ph.D.
**Area of Expertise:** Accounting & Economics >> Merchandise, Advertising & Marketing
**Area of Expertise:** Psychiatry & Psychology >> Behavioral Sciences
**Representing:** Defendant
**Jurisdiction:** N.D.Tex.

### BACKGROUND AND QUALIFICATIONS

1. I am the Sebastian S. Kresge Professor of Marketing at the Graduate School of Business, Stanford University. A copy of my curriculum vitae, which includes a complete list of my publications, is attached as Exhibit A.

2. I hold a Ph.D. in Marketing from Duke University, Fuqua School of Business, a Master's degree in business administration (MBA) from the UCLA Graduate School of Management, and a Bachelor's degree from The Hebrew University with majors in Economics and Political Science.

3. My field of expertise is consumer behavior, marketing management, trademark infringement from the consumer's perspective, survey methods, and human judgment and decision making. Most of my research has focused on buyers' purchasing behavior, the effect of product characteristics (such as brand name, price, features), the competitive context, and marketing activities (such as promotions, advertising) on buying decisions, and trademark infringement from the customer's perspective.

4. I have received several awards, including (a) The award for the Best Article published in the *Journal of Consumer Research* (the major journal on consumer behavior) between 1987 and 1989; (b) The "Ferber Award" from the *Association for Consumer Research,* which is the largest association of consumer researchers in the world; (c) The 1997 O'Dell Award, given to the *Journal of Marketing Research* (the major journal on marketing research issues) article that has had the greatest impact on the marketing field in the previous five years; (d) The 2001 O'Dell award (and a finalist for the O'Dell Award in 1995, 2002, 2004, 2005, 2007, and 2008); (e) The award for the Best Article published in the *Journal of Public Policy & Marketing* (the major journal on public policy and legal aspects of marketing) between 1993 and 1995; (f) The 2007 *Society for Consumer Psychology* Distinguished Scientific Achievement Award; (g) The 2002 *American Marketing Association* award for the Best Article in the area of services marketing; and (h) I was a winner in a competition dealing with research on the effectiveness of direct marketing programs, which was organized by the *Direct Marketing Association* and the *Marketing Science Institute.*

5. I have published three articles relating to trademark surveys and trademark infringement from the customer's perspective, including two in the *Trademark Reporter* and one in the *Journal of Public Policy & Marketing.* The two articles published in the *Trademark Reporter* were: "The Effect of Survey Method on Likelihood of Confusion Estimates: Conceptual Analysis and

Empirical Test,"[1] and "An Empirical Investigation of the Meaning and Measurement of Genericness".[2] The *Journal of Public Policy & Marketing* article, titled "Trademark Infringement from the Buyer Perspective: Conceptual Analysis and Measurement Implications,"[3] was selected (in 1997) as the Best Article published in that journal between 1993 and 1995.

6. At Stanford University I have taught MBA and executive courses on Marketing Management, covering such topics as consumer behavior, developing marketing strategies, building brand equity, advertising, sales promotions, distribution, and retailing. I also taught an MBA course on Marketing to Businesses and a course on High Technology Marketing. In addition to teaching MBA courses, I have guided and supervised numerous MBA student teams in their work on company and industry projects dealing with a variety of markets.

7. I have taught several doctoral courses. One doctoral course examines methods for conducting consumer research. It focuses on the various stages involved in a research project, including defining the problem to be investigated, selecting and developing the research approach, data collection and analysis, and deriving conclusions. A second doctoral course that I have taught deals with buyer behavior, covering such topics as consumer decision making processes, influences on purchase decisions, and persuasion. A third doctoral course that I have taught deals with buyer decision making. Prior to joining Stanford University, during the six years that I was on the faculty of the University of California, Berkeley, I taught an MBA Marketing Management course, a Ph.D. course on buyer behavior, and a Ph.D. course on buyer decision making. I also taught in various executive education programs, including a program for marketing managers in high technology companies.

8. After completing my MBA studies and before starting the Ph.D. program, I worked for five years in a marketing capacity in a subsidiary of Motorola Inc., serving in the last two years as the product marketing manager for two-way communications products. My work included (a) defining new products and designing marketing plans for new product introductions, (b) customer and competitor analysis, and (c) sales forecasting.

9. I have conducted, supervised, or evaluated well over 1,000 marketing research surveys, including many related to consumer behavior and information processing, trademark, branding, marketing strategies, and advertising-related issues. I serve on eight editorial boards, including leading journals such as the *Journal of Consumer Research, Journal of Marketing Research,* and the *Journal of Consumer Psychology.* I am also a frequent reviewer of articles submitted to journals in other fields, such as psychology, decision making, and economics. I received (twice) the Outstanding Reviewer Award from the *Journal of Consumer Research.* As a reviewer, I am asked to evaluate the research of scholars wishing to publish their articles in leading scholarly journals. I have also worked as a consultant for companies and organizations on a variety of marketing and buyer behavior topics. And I have served as an expert in prior litigations involving various marketing and buyer behavior issues, trademark-related matters, false advertising, branding, and other areas. A list of cases in which I provided sworn testimony during the past four years is included in Exhibit B. I am being compensated at my standard rate of $650 an hour.

10. I was asked by counsel for Amy Weber, Scott Weber, and Touch of Pink ("TOP") to evaluate the survey submitted by Dr. Kent Van Liere ("Van Liere Survey") on behalf of Mary Kay, Inc. Documents that I reviewed in connection with preparation of this report are listed in Exhibit C.

*SUMMARY OF CONCLUSIONS*

11. The Van Liere Survey was irrelevant because it called for survey participants' legal conclusions. That is, no survey was needed to confirm that the great majority of consumers are not legal experts and are highly unlikely to be familiar with the First Sale Doctrine. Indeed, almost all of those who were counted in the Van Liere Survey report as "confused" based their answers largely on the (undisputed) fact that the Touch of Pink Cosmetics website sells Mary Kay products. Accordingly, had these respondents been educated regarding the pertinent law, there is little doubt that they would have recognized that the website has no business affiliation with Mary Kay.

12. Putting aside the survey's irrelevance, its methodology suffered from major flaws that would have made it unreliable even if it were not misguided. Among other biases and violations of basic survey standards:

a. The "control" website used in the Van Liere Survey did not sell any Mary Kay product and thus served no control purpose whatsoever.

b. In violation of standard protocol, respondents were first asked about the brands sold on the website, and only those who mentioned Mary Kay were allowed to continue. Considering that Mary Kay products are indeed sold on the TOP site but not on the "control" site, that filter virtually guaranteed that only those shown the TOP site could be counted as confused.

c. The one and only question relied upon to produce the "confusion estimate" explicitly singled out Mary Kay and only Mary Kay, which made the survey highly leading.

d. The one and only question relied upon asked respondents if the website was "affiliated" with Mary Kay, while failing to explain to respondents that the mere fact that a site sells Mary Kay products does not indicate that the site and Mary Kay have a business affiliation. Dr. Van Liere acknowledged that he did not know how an average consumer defines (or interprets) the term "affiliation" in this context.

e. In violation of standard protocol, the survey lacked control over the information and web pages shown to respondents; instead, respondents were exposed to different web pages during the survey, including while answering the questions.

13. Overall, the Van Liere Survey was completely misguided and suffered from fatal flaws, which made its findings irrelevant and uninformative.

### INTRODUCTION: THE MISGUIDED VAN LIERE SURVEY MERELY CONFIRMED RESPONDENTS' UNFAMILIARITY WITH THE FIRST SALE DOCTRINE

14. The stated objective of the Van Liere Survey was (Van Liere Report, page 3) "to evaluate the extent to which consumers in the relevant market are being misled into believing that the Touch of Pink site is affiliated with Mary Kay." When asked during his deposition (pages 177-178) about the definition of "affiliation," Dr. Van Liere answered, "I'll just say that as I generally understand it, it's something to the effect of partnership or mutual connection." Dr. Van Liere further acknowledged that "I don't specifically know what the average consumer - - how an average consumer would define it."

15. During his deposition (page 99), Dr. Van Liere was also asked about understanding of the First Sale Doctrine. He answered: "I'm not a lawyer, so this will be probably inarticulate, but the basic idea of the First Sale Doctrine is, as I understood it, is that you - - you don't retain exclusive rights to the - - to the mark once you've sold the product because you've earned your profit at that point, and the purchaser of it essentially has a right to resell that branded product."

16. The overwhelming majority of consumers, who are not legal experts, are highly unlikely to be familiar with the First Sale Doctrine. Accordingly, consumers cannot be expected to know that the mere fact that a website sells Mary Kay products is not sufficient to determine whether the site has any formal business affiliation or connection with Mary Kay, Inc. or is endorsed by Mary Kay. In other words, there is no point in conducting a consumer survey if the results of that survey will be completely determined by consumers' knowledge of the law, which they cannot be reasonably expected to possess.

17. Contrary to this straightforward principle, the Van Liere Survey was based completely on consumers' understanding of whether the fact that the TOP website sells Mary Kay products means that the site is "affiliated" with Mary Kay. The Survey failed to provide respondents with any explanation of the First Sale Doctrine and its implication with respect to the ability to reach any conclusions about "business affiliation" from the fact that a website sells the products of a particular company.

18. Of course, if consumers, who are not legal experts, mistakenly believe that any website selling a particular company's products must have a business affiliation with that company, then there is obviously no need to conduct a survey. That is, considering that there is no dispute that the TOP site does indeed sell Mary Kay products, there is no doubt that any survey respondent, who is unaware of the First Sale Doctrine, is likely to answer a survey question regarding affiliation by stating that the website must have some form of an "affiliation" with the company (e.g., because it sells that company's products).

19. Dr. Van Liere acknowledges that (deposition, page 117), "the presence of the product on the web site is one of the reasons consumers report for their answer that, yes, they believe Mary Kay is affiliated with Touch of Pink" (in fact, this was the most common reason given by respondents). However, he later argued that (page 179) "Respondents can't always tell all of their reasons." He further suggested that the respondents' explanations indicate that (page 180) it is not just that the Mary Kay products are on the site, but the ubiquity of the products on the site that helps them decide that it is affiliated with Mary Kay.

20. Dr. Van Liere's deposition testimony appears vague as to what, if anything, his survey proved. However, he is apparently suggesting that, even with an understanding of the First Sale Doctrine, the ubiquity of the Mary Kay products on the TOP site would have caused consumers to believe that it has a business affiliation with Mary Kay that goes beyond the implication of that Doctrine. This position seems consistent with the position of Mary Kay, which, in its Response in Opposition to Defendants' Motion for Summary Judgment" (page 25), alleges that consumer confusion regarding affiliation and sponsorship is likely "especially given the heavy use of Mary Kay's trademarks to drive Internet traffic to the Touch of Pink web site."

21. Of course, to the extent that the Plaintiff and Dr. Van Liere wanted to test the theory that the magnitude of use of the Mary Kay mark, rather than the mere fact that the Mary Kay products are sold, causes consumer confusion, they could have designed the survey accordingly. For example, the survey could have shown respondents the First Sale Doctrine and then expose them to one of two sites. One group would be presented with the current TOP site, whereas the control group would be presented with a revised TOP site that presents the upper limit (according to the Plaintiffs legal theory) of the amount of Mary Kay products that the site could offer under the First Sale Doctrine. While the parties may disagree that such an upper limit exists or what it is, such a survey design could potentially test the impact, if any, of the extent of Mary Kay's product content on consumer confusion.

22. Instead of relying on such a test or any other potentially relevant survey design,[4] the Van Liere Survey merely tested whether consumers believe that a web site that sells a particular company's products has a "business affiliation" with that company. Considering that most consumers (and survey respondents) are not legal experts, the survey became a meaningless exercise with predictable results. In other words, the survey did not test consumer confusion, but rather, it merely confirmed the obvious fact that consumers are not legal experts and are not familiar with the First Sale Doctrine. Given the irrelevance of the survey and its misguided objective and design, my evaluations of the details of the survey methodology and results will be brief.

### DID THE VAN LIERE SURVEY INCLUDE A (PROPER) CONTROL?

23. As explained above, considering that most consumers are not legal experts and cannot be expected to be familiar with the First Sale Doctrine, it is doubtful that any consumer survey would be capable of providing potentially pertinent information. Certainly, the Van Liere Survey was totally misguided and thus irrelevant. Putting that fundamental flaw aside, I will briefly examine the manner in which the Van Liere Survey was designed and analyzed.

24. A survey designed to estimate likelihood of confusion must include a (proper) "control."[5] A control is designed to estimate the degree of "noise" or "error" in the survey. Indeed, without a proper control, there is no benchmark for determining whether a likelihood of confusion estimate is significant or merely reflects guessing and the flaws of the survey methodology. For example, Professor McCarthy cites a case in which the "Seventh Circuit affirmed a finding of no infringement where a survey found that a 25% rate of confusion between the contesting products but the control survey using a radically different named and dressed product found 'noise' of 20 percent."[6] To fulfill its function, a control must be equivalent to the junior mark at issue, without infringing on the senior mark. For example, in a case involving Simon Property Group and mySimon, Inc., the court determined

that any likelihood of confusion survey with a control that does not include the "Simon" name component "amounts to little more than a meaningless word association or memory exercise."[7] Thus, to obtain an estimate of the net likelihood of confusion (after accounting for "noise"), the researcher subtracts the measured confusion level in the control from the measured confusion level in the "Test" version.

25. The Van Liere Survey's approach to a control condition appears rather bizarre, and as far as I am aware, has not been employed or accepted in any other trademark confusion survey. As the Van Liere Report points out (page 8), the "control" website that was used (*www.beautysteals.com*) was selected because it did not sell any Mary Kay products. Then, the Van Liere questionnaire was designed such that, after respondents reviewed the website, they were first asked:

"Q2. Which brand or brands of products do you think are sold on this site?" The Van Liere Report (page 7 or anywhere else) does not explain why that question was asked or what conceivable purpose it serves (other than guaranteeing that the survey results would not be inconsistent with Mary Kay's position in this dispute).

26. If a respondent did not mention Mary Kay when answering Question 2, they were skipped to the end of the questionnaire. In other words, if the "control" respondents did not mention that Mary Kay products were sold on the "control" site, they were not asked the subsequent questions and thus could not conceivably provide answers that could be counted as reflecting confusion. But given that the "control" website in fact does not present or mention any Mary Kay product or the Mary Kay name, any attentive respondent correctly did not mention Mary Kay as a brand sold on that "control" site. Of course, the "test" website (*www.touchofpinkcosmetics.com*) presents many Mary Kay products. Accordingly, any test group respondents who paid attention while reviewing that site were expected to name "Mary Kay." Indeed, it is surprising that a significant number of the test group respondents failed to state that the site shown to them sold Mary Kay products.

27. The extremely unusual design of the Van Liere Survey, whereby only respondents who falsely said that the "control" site sold Mary Kay products could be conceivably counted as confused, meant that the survey did not actually include any control. Putting aside the general irrelevance of the Van Liere Survey discussed above, the lack of any proper control is a fatal flaw that makes the survey unreliable.

### DID THE VAN LIERE SURVEY RELY ON PROPER QUESTIONS AND STIMULI?

28. The Van Liere Survey questions did not follow any recognized or accepted survey format that I am aware of.[8] Instead, as indicated above, respondents were asked about the brands of products sold on the website shown to them. If they did not mention "Mary Kay" (a brand that shown to those in the test group but not to those in the control group), they were not asked any further question. As indicated, the logic underlying this questionnaire design and what it was supposed to test are difficult to comprehend.

29. Respondents who did mention Mary Kay were next asked: (a) Do you think this website is affiliated with MARY KAY, not affiliated with MARY KAY or do you not know? and (b) What makes you say that?

Even though the survey's "confusion" estimate was entirely based on this question, no attempt was made to explain to respondents what "affiliated" meant, and whether it referred to a "business affiliation" or to the mere fact that the website sells Mary Kay products. As indicated above, during his deposition (pages 177-178), Dr. Van Liere was asked what "affiliation" meant, and he answered, "I'll just say that as I generally understand it, it's something to the effect of partnership or mutual connection." He acknowledged, however, that "I don't specifically know what the average consumer - - how an average consumer would define it."

30. Considering that this survey's "confusion" estimate was completely based on this one question (unlike virtually all other likelihood of confusion surveys that include multiple measures), one would have expected respondents to be told what

"affiliation" meant. In particular, given the unique characteristic of this case involving a company that sells the products of the company whose mark it allegedly infringes, it was critical to explain to respondents that the mere fact that a website sells another company's products does not mean that they are "affiliated." Indeed, if one assumes that any website that sells another company's products must be "affiliated" with it (the First Sale Doctrine and websites such as eBay notwithstanding), then there was no need to conduct the Van Liere Survey, considering that there is no dispute that the TOP website does indeed sell Mary Kay products.

31. Instead of trying to clarify the central survey question and making it potentially informative with respect to the issues in this particular case, the instructions to interviewers (Van Liere Report, Exhibit C) stated: "If a respondent indicates she does not understand a question or asks you to explain the question, simply repeat it exactly as worded." Thus, for example, a respondent who asked if the mere fact that the TOP site sold Mary Kay products meant that it was "affiliated" with Mary Kay, the interviewer just repeated the question.

32. Yet another major problem with the survey's affiliation question was that, as design, it was highly leading and suggested that the website was "affiliated" with Mary Kay. After deviating from standard protocol by asking first about the brands sold on the website (which highlighted the fact that Mary Kay products were sold on the TOP site but not on the "control" site), the affiliation question singled out Mary Kay as the one and only candidate for the affiliation question. This leading format violated the standard survey protocol involving business affiliation, such as the following:

"Does or doesn't the company that [operates this website/makes this product] have a business affiliation or connection with another company?

Yes, *does* have a business affiliation or connection

No, does *not* have a business affiliation or connection

Or, you have no opinion about that

[IF YES] Which other company has a business affiliation or connection with the company that [operates this website/makes this product]?

What makes you say that (INSERT COMPANY NAME GIVEN) has a business affiliation with the company that [operates this website/makes this product]?"

33. In other words, a question concerning business affiliation must begin with a "filter question," which does not single out any particular company (including the one sponsoring the survey). Only if a respondent indicates that the website has a business affiliation with another company and names it, s/he could be potentially counted as confused (putting aside the other major flaws of the Van Liere Survey noted above). Evidently, the Van Liere Survey did not want to leave anything to chance; rather than using a standard "filter question" and allowing the respondents to decide which, if any, company is "affiliated" with the TOP website, the key survey question asked about possible affiliation with just one company - Mary Kay. As is obvious, putting aside the irrelevance of the entire Van Liere Survey, this question format was leading and biased "in favor" of the position of the party on whose behalf the survey was conducted.

34. Yet another highly unusual characteristic of the Van Liere Survey was the fact that it lacked control over the web pages that respondents evaluated before and while answering questions. Normally, the survey is designed such that all respondents assigned to a particular group (e.g., the test group or a control group) are exposed to the exact same stimulus. By contrast, in the Van Liere Survey, respondents could click on any link, which meant that different respondents were exposed to different pages and information - that is, the survey lacked control over the information presented to the respondents. Furthermore, it is unclear from the questionnaire and interviewer instructions whether respondents could continue to click on links while answering the survey questions. When asked during his deposition (page 165) about that unusual procedure, Dr. Van Liere could not recall

what the interviewer instructions were with respect to allowing respondents to continue interacting with the website while answering the questions. He later confirmed that respondents could indeed continue to check the website while answering the questions (page 169).

### THE VAN LIERE SURVEY RESULTS

35. The only surprising aspect of the Van Liere Survey results is that the "confusion" estimate was not higher. Again, consumers (and survey respondents) are not legal experts, and no survey was needed to establish that fact. After respondents were (a) shown the TOP website, which sells Mary Kay products, (b) led to state that Mary Kay products are sold on the site, and (c) led to consider an "affiliation" between the site and Mary Kay (and only Mary Kay), one would have expected almost all respondents to provide answers that were counted as showing "confusion." However, many respondents "failed" to give the "right" answers they were fed and thus could not be counted as confused.

36. Not surprisingly, almost all of those counted in the Van Liere Report as "confused" referred to the (undisputed) fact that the TOP website sells Mary Kay products. As indicated earlier, these results underscore the total irrelevance of the Van Liere Survey, which merely proved the known fact that most consumers are not legal experts. Moreover, the survey's fatal flaws discussed above produced predictable and meaningless results that did not provide any relevant information.

Footnotes

1    Itamar Simonson (1993), "The Effect of Survey Method on Likelihood of Confusion Estimates: Conceptual Analysis and Empirical Test," *Trademark Reporter,* 83 (3), 364-393.

2    Itamar Simonson (1994), "An Empirical Investigation of the Meaning and Measurement of Genericness," *Trademark Reporter,* 84 (2), 199-223.

3    Itamar Simonson (1994), "Trademark Infringement from the Buyer Perspective: Conceptual Analysis and Measurement Implications," *Journal of Public Policy and Marketing,* 13(2), 181-199.

4    Given that legal matters (with which typical consumers are unfamiliar) determine whether it is permitted to sell previously sold Mary Kay products, it is doubtful that any consumer survey could provide pertinent evidence. As explained, at the very least, a potentially relevant survey would need to explain to respondents the First Sale Doctrine before testing whether certain characteristics of the website, such as the number of times the Mary Kay name is mentioned, affect their perceptions. However, even with an explanation of the pertinent law, one could very well argue that such a survey calls for or relies on the respondents' legal conclusions.

5    See, for example, S. Diamond, *Reference Guide on Survey Research,* in *Reference Manual on Scientific Evidence* 221, 226 n.8 (Federal Judicial Center ed., 1994).

6    4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* (September 2007) (*McCarthy*) at §32:187.

7    *Simon Property Group L.P. v. MySimon, Inc.,* 104 F. Supp. 2d 1033; 2000, U.S. Dist. S.D. Indiana.

8    See, for example, *McCarthy* at §32:174, 177; Itamar Simonson (1993), "The Effect of Survey Method on Likelihood of Confusion Estimates: Conceptual Analysis and Empirical Test," *Trademark Reporter,* 83 (3), 364-393.

**End of Document**                                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.