# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NIKE INC., | Civil Action No.: 1:22-cv-00983-VEC |
| Plaintiff, | |
| | **ORAL ARGUMENT REQUESTED** |
| v. | |
| | **REDACTED PUBLIC VERSION** |
| STOCKX LLC, | |
| Defendant. | |

### NIKE INC.'S OMNIBUS MOTION TO EXCLUDE
### THE PROFFERED EXPERT TESTIMONY AND OPINIONS OF
### SARAH BUTLER, ROBERT VIGIL, AND DEJONGH WELLS

**TABLE OF CONTENTS**

I.  INTRODUCTION ...................................................................................................1

II.  BRIEF FACTUAL BACKGROUND RELEVANT TO THE MOTION ...........................1

    A.  StockX Claimed 100% Authenticity Yet Sold Counterfeit "Nike" Shoes .............1

    B.  StockX's Proffered Experts Butler, Vigil, and Wells .............................................3

III.  LEGAL STANDARD ............................................................................................4

IV.  ARGUMENT .......................................................................................................5

    A.  Butler's Testimony Should Be Excluded.............................................................5

        1.  Butler's Testimony Is Not Relevant ....................................................6

        2.  Butler's Testimony Is Not Reliable ......................................................9

    B.  Vigil's Testimony On Apportionment Should Be Excluded ...............................17

        1.  Vigil Cannot Rely On Butler's Testimony ...............................................17

        2.  Vigil's Testimony On ███████████████ Is Unreliable .................18

        3.  Vigil's Testimony On "██████████████" Is Not Based on Any
            Quantitative or Economic Methodology...................................................20

    C.  Wells's Testimony Should Be Excluded As Irrelevant And Unreliable...............21

V.  CONCLUSION....................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*24/7 Recs., Inc. v. Sony Music Ent., Inc.*,
514 F. Supp. 2d 571 (S.D.N.Y. 2007)......................................................................20

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002)......................................................................................5

*Apotex Inc. v. Acorda Therapeutics, Inc.*,
823 F.3d 51 (2d Cir. 2016)....................................................................................7, 8

*Apple v. Atl. Yards Dev. Co.*,
2015 WL 11182422 (E.D.N.Y. Mar. 31, 2015) ....................................................18

*AU New Haven, LLC v. YKK Corp.*,
2019 WL 1254763 (S.D.N.Y. Mar. 19, 2019) .......................................................19

*Black & Decker (U.S.) Inc. v. Pro-Tech Power Inc.*,
26 F. Supp. 2d 834 (E.D. Va. 1998) ........................................................................8

*C=Holdings B.V. v. Asiarim Corp.*,
992 F. Supp. 2d 223 (S.D.N.Y. 2013)......................................................................8

*CCM Rochester, Inc. v. Federated Invs., Inc.*,
2016 WL 11617452 (S.D.N.Y. Aug. 31, 2016) (Caproni, J.)..................................4

*Chanel, Inc. v. RealReal, Inc.*,
449 F. Supp. 3d 422 (S.D.N.Y. 2020)......................................................................7

*Chanel, Inc. v. WGACA, LLC*,
2022 WL 902931 (S.D.N.Y. Mar. 28, 2022) ..........................................................8

*Chen-Oster v. Goldman, Sachs & Co.*,
2022 WL 814074 (S.D.N.Y. Mar. 17, 2022) ........................................................17

*Church & Dwight Co. v. S.C. Johnson & Son, Inc.*,
873 F. Supp. 893 (D.N.J. 1994) ............................................................................14

*Church & Dwight Co. v. SPD Swiss Precision Diagnostics GmbH*,
2018 WL 4253181 (S.D.N.Y. Sept. 5, 2018)........................................................18

*Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*,
843 F.3d 48 (2d Cir. 2016)..................................................................................6, 7

*CJ Prod. LLC v. Snuggly Plushez LLC*,
  809 F. Supp. 2d 127 (E.D.N.Y. 2011) ...............................................................5, 8

*Coty Inc. v. Excell Brands, LLC*,
  277 F. Supp. 3d 425 (S.D.N.Y. 2017)......................................................................7

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)............................................................................. *passim*

*Dreyer v. Ryder Auto. Carrier Grp., Inc.*,
  367 F. Supp. 2d 413 (W.D.N.Y. 2005) ...................................................................18

*In re Elysium Health-ChromaDex Litig.*,
  2022 WL 421135 (S.D.N.Y. Feb. 11, 2022)......................................................15, 16

*Farmer v. DirectSat USA, LLC*,
  2013 WL 1195651 (N.D. Ill. Mar. 22, 2013)..........................................................18

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
  2015 WL 539489 (S.D.N.Y. Feb. 10, 2015) ...........................................................17

*Financial Guaranty Ins. Co. v. Putnam Advisory Co., LLC*,
  2020 WL 3582029 (S.D.N.Y. July 1, 2020) ...........................................................24

*Grayson v. No Labels, Inc.*,
  2022 WL 1404172 (M.D. Fl. May 4, 2022)..............................................................21

*Hertz Corp. v. Avis, Inc.*,
  867 F. Supp. 208 (S.D.N.Y. 1994) ...........................................................................5

*Hi Ltd. P'ship v. Winghouse of Fla., Inc.*,
  2004 WL 5486964 (M.D. Fla. Oct. 5, 2004) ...........................................................20

*Jackpocket, Inc. v. Lottomatrix NY LLC*,
  645 F. Supp. 3d 185 (S.D.N.Y. 2022).................................................................11, 14

*Joffe v. King & Spalding LLP*,
  2019 WL 4673554 (S.D.N.Y. Sept. 24, 2019) (Caproni, J.)..................................5, 20

*Johnson & Johnson Vision Care, Inc. v. Ciba Vision Corp.*,
  348 F. Supp. 2d 165 (S.D.N.Y. 2004)........................................................................7

*Kargo Glob., Inc. v. Advance Mag. Publishers, Inc.*,
  2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007)........................................................11, 12

*Kars 4 Kids, Inc. v. Am. Can!*,
  2019 WL 1755912 (D.N.J. Apr. 18, 2019) ..............................................................12

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) ............................................................................................23

*Kurin, Inc. v. Magnolia Med. Techs., Inc.*,
  473 F. Supp. 3d 1117 (S.D. Cal. 2020) ...........................................................23, 24

*Malletier v. Dooney & Bourke, Inc.*,
  525 F. Supp. 2d 558 (S.D.N.Y. 2007) ...............................................................9, 10

*Mastercard Int'l Inc. v. First Nat. Bank of Omaha, Inc.*,
  2004 WL 326708 (S.D.N.Y. Feb. 23, 2004) ...........................................................10

*Medisim Ltd. v. BestMed LLC*,
  861 F. Supp. 2d 158 (S.D.N.Y. 2012), on reconsideration in part, 2012 WL
  1450420 (S.D.N.Y. Apr. 23, 2012) ...................................................................9, 10

*Merck Eprova AG v. Gnosis S.p.A.*,
  760 F.3d 247 (2d Cir. 2014) ...................................................................................8

*Nat'l Basketball Ass'n v. Motorola*,
  105 F.3d 841 (2d Cir. 1997) ...................................................................................7

*Nimely v. City of New York*,
  414 F.3d 381 (2d Cir. 2005) ...................................................................................5

*Pasternak v. Dow Kim*,
  961 F. Supp. 2d 593 (S.D.N.Y. 2013) ...................................................................20

*Playtex Prod., LLC v. Munchkin, Inc.*,
  2016 WL 1276450 (S.D.N.Y. Mar. 29, 2016) ........................................................14

*POM Wonderful LLC v. Purely Juice, Inc.*,
  2008 WL 4222045 (C.D. Cal. July 17, 2008), *aff'd*, 362 F. App'x 577 (9th Cir.
  2009) ....................................................................................................................8

*Procter & Gamble Co. v. Ultreo, Inc.*,
  574 F. Supp. 2d 339 (S.D.N.Y. 2008) ...............................................................14, 15

*Red Hawk, LLC v. Colorforms Brand LLC*,
  638 F. Supp. 3d 375 (S.D.N.Y. 2022) (Caproni, J.) .................................................4

*Rexall Sundown, Inc. v. Perrigo Co.*,
  707 F. Supp. 2d 357 (E.D.N.Y. 2010) ...................................................................17

*River Light V, L.P. v. Tan*
  *aka*, 2018 WL 5778234 (S.D. Fla. Nov. 2, 2018) ....................................................8

*S.C. Johnson & Son, Inc. v. Clorox Co.*,
 241 F.3d 232 (2d Cir. 2001)................................................................................7

*Sazerac Co., Inc. v. Fetzer Vineyards, Inc.*,
 265 F. Supp. 3d 1013 (N.D. Cal. 2017), *aff'd*, 786 F. App'x 662 (9th Cir.
 2019) ..................................................................................................................11

*Scentsational Techs., LLC v. Pepsi, Inc.*,
 2018 WL 1889763 (S.D.N.Y. Apr. 18, 2018).....................................................21

*Scott v. Chipotle Mexican Grill, Inc.*,
 315 F.R.D. 33 (S.D.N.Y. 2016) ....................................................................18, 19

*SEC v. Ferrone*,
 2016 WL 723017 (N.D. Ill. Feb. 22, 2016) .............................................21, 22, 23

*Simpson Strong-Tie Co. Inc. v. MiTek Inc.*,
 2023 WL 137478 (N.D. Cal. Jan. 9, 2023) .........................................................13

*Starter Corp. v. Converse, Inc.*,
 170 F.3d 286 (2d Cir. 1999)............................................................................6, 9

*Supply & Bldg. Co. v. Estee Lauder Int'l, Inc.*,
 2001 WL 1602976 (S.D.N.Y. Dec. 14, 2001) ....................................................19

*THOIP v. Walt Disney Co.*,
 690 F. Supp. 2d 218 (S.D.N.Y. 2010).........................................................12, 16

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
 497 F.3d 144 (2d Cir. 2007)......................................................................5, 7, 8

*Trouble v. Wet Seal, Inc.*,
 179 F. Supp. 2d 291 (S.D.N.Y. 2001)....................................................10, 14, 17

*U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*,
 800 F. Supp. 2d 515 (S.D.N.Y. 2011), *aff'd*, 511 F. App'x 81 (2d Cir. 2013)...................12, 13

*U.S. v. Castillo*,
 924 F.2d 1227 (2d Cir. 1991)...........................................................................22

*Universal City Studios, Inc. v. Nintendo Co.*,
 746 F.2d 112 (2d Cir. 1984)............................................................................16

*Unlimited Cellular, Inc. v. Red Points Sols. SL*,
 2023 WL 4029824 (S.D.N.Y. June 14, 2023) .....................................................7

*VBS Distribution, Inc. v. Nutrivita Lab'ys, Inc.*,
 697 F. App'x 543 (9th Cir. 2017)......................................................................8

*Vital Pharms. v. PhD Mktg., Inc.*,
  2022 WL 2952495 (C.D. Cal. July 26, 2022)..........................................................................18

**Statutes**

15 U.S.C. § 1117(a) .....................................................................................................................17

**Other Authorities**

Federal Rule of Evidence 403.............................................................................................. *passim*

Federal Rule of Evidence 702.............................................................................................. *passim*

Jacob Jacoby *The Psychology Foundations of Trademark Law: Secondary
  Meaning, Genericism, Fame, Confusion and Dilution*, 91 Trademark Rep.
  1013, 1022 (2001) .................................................................................................................16

Shari Diamond, *Reference Guide on Survey Research*, in Reference Manual On
  Scientific Evidence at 229, (2d ed. 2000) ............................................................................13

Shari Seidman Diamond*, Reference Guide on Survey Research,* in Reference
  Manual on Scientific Evidence (3d ed. 2011)........................................................................13

## I.      INTRODUCTION

Nike, Inc. ("Nike") respectfully submits this Motion to Exclude the expert testimony and opinions, in whole or in part, of three of StockX LLC's ("StockX") eight proffered experts: (1) Sarah Butler, who designed and conducted a consumer survey intended to measure StockX's literally false advertising claims' marketplace impact; (2) Robert Vigil, who rebuts Nike's damages expert and, in part, relies on Ms. Butler's survey for his opinion on apportionment of StockX's ill-gotten profits; and (3) DeJongh Wells, StockX's "sneakerhead expert."

## II.      BRIEF FACTUAL BACKGROUND RELEVANT TO THE MOTION

Nike initiated this case on February 3, 2022 due to StockX's unauthorized sale of Nike-branded NFTs that caused immediate confusion in the market.  (Dkt. 1.)  On May 25, 2022, Nike added counterfeiting and false advertising claims due to StockX offering for sale, "authenticating" and shipping counterfeit "Nike" shoes that it guaranteed as "100% Authentic."  (Dkt. 39.)

### A.      StockX Claimed 100% Authenticity Yet Sold Counterfeit "Nike" Shoes

Since 2016, StockX has operated an online platform for the sale of shoes and other goods. StockX ██████████████ from trading of supposedly genuine, new, and unworn Nike and Jordan shoes.  (*See* Declaration of T. Duvdevani ("TD Decl.") at ¶ 2, Ex. 1 at Ex. 5B; *see also id.* at ¶ 63.)  StockX plays an active role in every transaction by receiving, "authenticating," and shipping all goods sold on the platform.  StockX advertised that every good sold on its platform is "100% Verified Authentic" or "100% Authentic."  (Dkt. 41 at Aff. Def. ¶ 11; TD Decl. ¶¶ 3-4, Exs. 2-3.)  StockX also advertised that its "authenticators are better equipped than anyone to ensure a product's authenticity," (*id.,* Ex. 3 at NIKE0006786), and that a "final check in our authentication practice" ensures that "nothing slips through the cracks."  (*Id.* at NIKE0006787)

StockX's "Authentication" advertising claims are at the core of its business.  StockX states its "██████████████████████████," and "██████████████████████

██████████████████████████████████████████████████████." (*Id.* ¶ 5, Ex. 4 at STX0020523; *id.* ¶ 6, Ex. 5 at STX0039586.)  Consumers "████████████████████████████████████ ████████████" (*Id.* ¶ 7, Ex. 6 at STX0039440.)  StockX commissioned a study in 2022, which found that ████ of respondents said that ████████████████████████████" is ██████ ████████████████████████████████████████████" (*Id.* ¶ 8, Ex. 7 at STX0018465.)  StockX said its success depends on its "reputation as a place to purchase authentic products."  (Dkt. 21 at 2-3; Dkt. 41 at 4.)

Despite its years-long authentication campaign, StockX's witnesses now admit that it has repeatedly "████████████████████████████████████████████ ████████████████████████████████████."  (TD Decl. ¶ 9, Ex. 8 at 10:6-16; *id.* at ¶ 10, Ex. 9 at 90:15-91:8.)  StockX also admits that ████████████████████████████████ ████████████████████████████████████████" (*Id.* at ¶ 11, Ex. 10 at 178:18-179:1.)  One example of StockX passing counterfeit shoes to a consumer and falsely guaranteeing them as "100% Authentic," is the case of Roy Kim.  In Spring 2022, Kim purchased 62 pairs of Nike and Jordan-branded shoes on StockX, which StockX "authenticated" and guaranteed as "100% authentic."  (*Id.* ¶ 12, Ex. 11. at NIKE0036330-33; *see id.* ¶ 13, Ex. 12 at 35:19-63:2; *see also id.* at Ex. 8 at 7:19-8:6.)  Kim—a particularly sophisticated consumer—suspected many of the shoes were fake and posted on social media when he could not get StockX to respond to customer service complaints.  (*Id.* at Ex. 11; *see id.* at Ex. 12 at 77:3-82:14.)  Nike subsequently confirmed that at least 38 of the 62 pairs Kim purchased on StockX are not authentic.  (Declaration of J. Pallet ("JP Decl.") ¶¶ 4-5.)  StockX admits ████████████████████████████████████ ████████and even admits ████████████████████████████████████████████

█████████████.  (TD Decl. at Ex. 8 at 9:14-14:10; 42:2-13); *id.* ¶ 14, Ex. 13.)  The ██

██sold more than ██ products on StockX before being ████ (*Id.* at ¶ 15, Ex. 14.)

## B.    StockX's Proffered Experts Butler, Vigil, and Wells

StockX proffers eight experts, including Butler, Vigil, and Wells.  Butler claims that she designed a survey to respond to Nike's damages expert CPA John Hansen's opinion that StockX's profits from sales of Nike and Jordan-branded shoes are attributable to StockX's false advertising claims.  (*Id.* ¶ 16, Ex. 15 at ¶ 8.)  She admitted she designed a "materiality" survey, which sought to test whether StockX's "Authentication Statements"[1] impact "consumers' decision to use the site to purchase a pair of sneakers."  (*Id.* at ¶ 9; *see id.* at ¶ 20, Ex. 19 at 29:5-30:11, 105:21-106:3.)  Butler used a "Test-Control" design; respondents were randomly assigned to a Test Group (*i.e.,* those shown StockX webpages with the Authentication Statements) or a Control Group (*i.e.,* those shown the same webpages *without* the Authentication Statements).  (*Id.* at ¶ 29.)  Butler altered the Authentication Statements in the Control to replace "authentication" with "inspection."  (*Id.* at ¶ 35, Ex. F.)

Qualifying respondents (U.S. individuals who are over 18 and have used or planned to use StockX) were shown five StockX webpages.  (*Id.* at ¶¶ 18, 25, Ex. F.)  Respondents were asked how likely they would be to purchase shoes on StockX, and why.  (*Id.* at ¶ 26.)  Butler opines the Authentication Statements do not impact consumer behavior because a statistically equivalent number of Test and Control respondents indicated they are likely to purchase shoes on StockX.  (*Id.* at ¶¶ 10, 39.)  In addition, a similar number of Control and Test respondents indicated in their open-ended response that their interest was due "to authentication, guarantees, inspections or

---

[1] Butler defines these as "allegedly false statements related to the authentication and verification process…found on StockX's website during the relevant time period."  (TD Decl. at Ex. 15 at ¶ 9, fn. 6).

trusting the site," regardless of whether the Authentication Statements are present.  (*Id.* at ¶ 41.) Butler claims that this somehow confirms that "the Authentication Statements do not have a meaningful impact on respondents' interest in using StockX's site to purchase sneakers."  (*Id.*)

Relatedly, Vigil opines that " ████████████████████████████████████ ████████████ "  (TD Decl. at Ex. 1 at ¶ 10.)  Vigil's bases his "apportionment" of StockX's gross profit on U.S. Nike and Jordan shoes on: (1) Butler's testimony; (2) comparing ████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████ ; and (3) a factual recitation of ████ ████████████████████████████████████████ .  (*Id.* Ex.1 at ¶¶ 9-10, § II.B.3-4.; *id.* at ¶ 17, Ex. 16 at ¶ 9, § IV.C.)

Finally, Wells offers various anecdotes and opinions concerning a subgroup of consumers he calls "sneakerheads."  (*Id.* ¶ 18, Ex. 17 at ¶ 1.).

## III.    LEGAL STANDARD

Federal Rule of Evidence 702 provides that a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."  FED. R. EVID. 702.  "The proffering party bears the burden of establishing admissibility under Rule 702 by showing that (1) the expert is qualified; (2) the proposed opinion is based on reliable data and methodology; and (3) the proposed testimony would be helpful to the trier of fact."  *Red Hawk, LLC v. Colorforms Brand LLC*, 638 F. Supp. 3d 375, 380 (S.D.N.Y. 2022) (Caproni, J.).  "The district court acts as a gatekeeper under Rule 702 and is charged with 'ensuring that an expert's

testimony both rests on a reliable foundation and is relevant to the task at hand.'" *CCM Rochester, Inc. v. Federated Invs., Inc.,* 2016 WL 11617452, at \*3 (S.D.N.Y. Aug. 31, 2016) (Caproni, J.) (quoting *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 597 (1993)); *Joffe v. King & Spalding LLP,* 2019 WL 4673554, at \*3 (S.D.N.Y. Sept. 24, 2019) (Caproni, J.) ("At a minimum, the specialized knowledge being proffered must be relevant to the factual disputes in the case."). "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 266 (2d Cir. 2002).

Expert testimony is also "subject to Rule 403, and 'may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) (quoting FED. R. EVID. 403). Courts recognize "the uniquely important role that Rule 403 has to play in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations." *Id.*

## IV.    ARGUMENT

### A.    Butler's Testimony Should Be Excluded

Butler's testimony should be excluded for several reasons.  First, for the reasons discussed below, StockX's authenticity claims are literally false and material as a matter of law, *i.e.*, they impact consumer purchasing decisions.[2]  *See CJ Prod. LLC v. Snuggly Plushez LLC,* 809 F. Supp. 2d 127, 148 (E.D.N.Y. 2011) ("false statements regarding the provenance of the product…will

---

[2] "The Court may determine, based on its own review of an advertisement, that a literally true or a literally false message is conveyed or not conveyed.  The Court may rely on its own common sense and logic in interpreting the message of the advertisement."  *Hertz Corp. v. Avis, Inc.,* 867 F. Supp. 208, 212 (S.D.N.Y. 1994); *see also Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007) ("a district court evaluating whether an advertisement is literally false must analyze the message conveyed in full context, i.e., it must consider the advertisement in its entirety and not engage in disputatious dissection.").

influence the decision of customers to buy the product, and they are thus material."). Butler's survey is thus neither relevant nor helpful to whether StockX's false claims impact consumer purchasing decisions. Butler's testimony is also unduly prejudicial because it is at odds with the law and will confuse the jury. Second, even if a materiality survey were relevant here—it is not— hers is unreliable because it: (1) surveyed a biased population; (2) used an improper control; (3) failed to replicate purchasing conditions; and (4) tested all false statements at once and overwhelmed respondents by showing too many information-rich stimuli, making it unlikely any difference between the test and control groups would be observed.

### 1.      Butler's Testimony Is Not Relevant

To be admissible, expert testimony must "fit" the facts of the case and be "relevant to the task at hand." *Daubert*, 509 U.S. at 591-97. "Rule 702's helpfulness standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id*. Butler does not satisfy this standard. Her survey is neither relevant to the liability determination whether StockX's false advertising claims are "material," nor to the damages determination whether StockX's profits from sales of Nike-branded shoes are "attributable to" StockX's false advertising claims. Butler sought to create evidence at odds with Second Circuit law holding that unambiguously false claims involving an inherent or material quality of the product, like StockX's "Authentication" claims here, are likely to influence consumer purchasing decisions and thus material. *See* Note 3, *infra*. Because her survey "is irrelevant to the issues," it must be "kept from the jury's attention entirely," and excluded. *Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 297 (2d Cir. 1999).

To prevail on its Lanham Act false advertising claim, Nike must show that StockX's "Authentication" advertising claims are: "(1) either literally or impliedly false, (2) material, (3) placed in interstate commerce, and (4) the cause of actual or likely injury to [Nike]." *Church &*

*Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 65 (2d Cir. 2016).  "To establish literal falsity, [Nike] must show that the advertisement either makes an express statement that is false or a statement that is 'false by necessary implication,' meaning that the advertisement's 'words or images, considered in context, necessarily and unambiguously imply a false message.'" *Church & Dwight*, 843 F.3d at 65 (quoting *Time Warner Cable, Inc.*, 497 F.3d at 158).  To establish materiality, Nike must "demonstrate that the false or misleading representation involved an *inherent or material quality of the product*."  *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 63 (2d Cir. 2016) (emph. added.).[3]

StockX's advertising claims discussed in Section II.A., *supra*, and tested by Butler are precise, unambiguous statements of fact relating to the most inherent quality of a Nike shoe: that it is *actually* a genuine Nike shoe.  (TD Decl. at Ex. 15 at Fig. 11, *see also id.* at Exs. 2-3.)  Courts hold that advertising claims like these are indisputably unambiguous and literally false if untrue. In *Chanel, Inc. v. RealReal, Inc.*, for example, Chanel sued The RealReal—a resale platform—for selling counterfeit Chanel-branded goods and falsely advertising those goods as "100% authentic," and that it "ensure[s] that every item on The RealReal is 100% the real thing."  449 F. Supp. 3d 422, 443–44 (S.D.N.Y. 2020).  The court found that, if Chanel's counterfeit allegations are true, defendant's "100% authentic" claims are literally false.  *Id.* ("advertisements regarding the

---

[3] In other words, where the misrepresentation "involved an inherent or material quality of the product," the "materiality" element is satisfied.  *Time Warner Cable, Inc.*, 497 F.3d at 153 fn. 3 (materiality requirement met "as it is undisputed that picture quality is an inherent and material characteristic of multichannel video service."); *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 238 (2d Cir. 2001) ("[P]laintiff must also show that the defendants misrepresented an 'inherent quality or characteristic' of the product.  This requirement is essentially one of materiality'") (quoting *Nat'l Basketball Ass'n v. Motorola*, 105 F.3d 841, 855 (2d Cir. 1997)); *Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 462–63 (S.D.N.Y. 2017) ("consumers in the fragrance market undoubtedly care about the quality and longevity of their perfume or cologne, so it is fair to say that Excell's 'deception is material in that it is likely to influence purchasing decisions.'") (quoting *Johnson & Johnson Vision Care, Inc. v. Ciba Vision Corp.*, 348 F. Supp. 2d 165, 177 (S.D.N.Y. 2004)); *Unlimited Cellular, Inc. v. Red Points Sols. SL*, 2023 WL 4029824, at *7 (S.D.N.Y. June 14, 2023) (materiality met where misrepresentation pertained to "fundamental quality of Defendants' product").

authenticity of the products it sells, considered in context, are literally false."); *see also*, *C=Holdings B.V. v. Asiarim Corp.*, 992 F. Supp. 2d 223, 242–43 (S.D.N.Y. 2013) (literal falsity where "the unambiguous message sent by this promotion was that [defendant] offered for sale authentic Commodore products," and defendant sold counterfeits); *River Light V, L.P. v. Tan aka*, 2018 WL 5778234, at *6 (S.D. Fla. Nov. 2, 2018) (literally false where counterfeit products were "Guaranteed Authentic" and "100% Guaranteed Authentic").[4]

      StockX's unambiguous statements are literally false for the same reasons: it "authenticates" and ships goods to consumers that are not authentic.  It admits it ████████████████ ████████████████████████.  *See* Section II.A, *supra*.  The shoes "authenticated" and sold to Kim and others bear Nike's registered marks, but were neither manufactured, authorized for sale, nor sold by Nike or an authorized retailer.  (JP Decl. at ¶¶ 4-5.)  This undisputed evidence establishes that these shoes are counterfeit, rendering StockX's advertising claims literally false. *See Chanel, Inc. v. WGACA, LLC*, 2022 WL 902931, at *16 (S.D.N.Y. Mar. 28, 2022).

      StockX's literally false claims are also "material" because they "involve[] an inherent or material quality of the product."  *Apotex*, 823 F.3d at 63; *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 255 (2d Cir. 2014); *Time Warner*, 497 F.3d at 153, fn. 3.  There is no quality more inherent or material to a branded good—and to a consumer's decision to purchase that good—than its authenticity, which is why courts routinely hold that advertising claims that guarantee authenticity impact consumer purchasing decisions and thus are material as a matter of law.[5]  While

---

[4] "100%" advertising claims are also routinely found literally false when measuring inherent qualities.  *See e.g., VBS Distribution, Inc. v. Nutrivita Lab'ys, Inc.*, 697 F. App'x 543 (9th Cir. 2017) ("100% herbal"); *Black & Decker (U.S.) Inc. v. Pro-Tech Power Inc.*, 26 F. Supp. 2d 834, 846 (E.D. Va. 1998) ("100% ball-bearing construction").

[5] *See e.g., CJ Prod. LLC*, 809 F. Supp. 2d at 148  ("false statements regarding the provenance of the product … will influence the decision of customers to buy the product, and they are thus material."); *River Light*, 2018 WL 5778234, at *6 ("[defendant]'s deception is material in that it concerns an inherent quality or characteristic of her offerings and there can be no dispute that her statements influenced the purchasing decisions of her customers. [Defendant] sold her products within the same price range as genuine Tory Burch items, suggesting to buyers her goods were authentic. Her 'guarantee' that the items were authentic falsely assured consumers of the quality and craftsmanship of her goods

this is true as a matter of law, such a finding is consistent with ████████████

██████████████████████████████████████████████████████████. *See*

Section II.A, *supra*.

Because StockX's misrepresentations were likely to influence consumer purchasing

decisions as a matter of law, Butler's survey is inapposite to whether StockX's misrepresentations

are "material" and whether StockX's profits on sales of Nike-branded shoes are "attributable to"

its misrepresentations. It would be unhelpful—and very confusing—to the factfinder for StockX

to proffer an irrelevant, flawed (as discussed *infra*) consumer survey that is contrary to the law.

Butler's testimony should thus be excluded under both Rules 702 and 403. "Expert evidence can

be both powerful and quite misleading because of the difficulty in evaluating it." *Malletier v.*

*Dooney & Bourke, Inc*., 525 F. Supp. 2d 558, 566 (S.D.N.Y. 2007). And where a survey's

probative value is "so slight" that it is "easily outweighed" by the danger jury confusion, it should

be excluded under Rule 403. *Starter*, 170 F.3d at 297. Butler's survey and proffered testimony

are not probative here, and it would be highly prejudicial for StockX to introduce her as an expert

to mislead and confuse the jury. *Id*. Her testimony should be excluded in its entirety.

### 2. Butler's Testimony Is Not Reliable

Butler's testimony should also be excluded because it is premised upon an inherently

unreliable survey methodology. *See Medisim Ltd. v. BestMed LLC*, 861 F. Supp. 2d 158, 167

(S.D.N.Y. 2012), on reconsideration in part, 2012 WL 1450420 (S.D.N.Y. Apr. 23, 2012).

"[W]hile errors in survey methodology usually go to weight of the evidence, a survey should be

excluded under Rule 702 when it is invalid or unreliable, and/or under Rule 403 when it is likely

---

and thereby bolstered consumer confidence."); *see also*, *C=Holdings*, 992 F. Supp. 2d at 243 ("[defendant]'s falsehood was material, going to the very nature of the products [defendant] purported to sell."); *POM Wonderful LLC v. Purely Juice, Inc*., 2008 WL 4222045, at *11 (C.D. Cal. July 17, 2008), *aff'd*, 362 F. App'x 577 (9th Cir. 2009) ("The fact that Purely Juice's false advertising pertained to the very nature of its juice product establishes its materiality.").

to be insufficiently probative, unfairly prejudicial, misleading, confusing, or a waste of time." *Id.*; *Malletier*, 525 F. Supp. 2d at 581 ("[I]f the survey suffers from substantial methodological flaws, it will be excluded under both Rule 403 and Rule 702."); *Trouble v. Wet Seal, Inc.,* 179 F. Supp. 2d 291, 307 (S.D.N.Y. 2001) (collecting cases).[6]

Butler's survey suffers from multiple flaws that warrant exclusion: she used a biased survey population, an improper control, stimuli that failed to replicate purchasing conditions, and she overloaded the respondents with too much information. "[E]ach flaw goes to a fundamental element of the survey rather than an issue on the periphery, [and] their combined impact is too significant to overlook under *Daubert* and Rule 702." *Medisim*, 861 F. Supp. 2d at 180.

### a. Butler's Flawed Design Pre-Determined That Respondents Would Indicate A High Purchase Likelihood

StockX has blasted consumers with its Authentication Statements for years, yet Butler selected a survey universe comprised of StockX repeat customers since 2020 and/or consumers "likely to [use StockX] in the next year." (TD Decl. at Ex. 15 at ¶ 18; *id.* at Ex. D.) She even admitted that "[t]he vast majority of consumers who have purchased sneakers from a third-party site in the past would do so again in the future." (*Id.* at ¶ 38.) As such, all—or nearly all—respondents were likely already familiar with StockX and had already seen and internalized the Authentication Statements. As Dr. Simonson explains:

> Given that all respondents had been familiar with StockX prior to the survey and were thus unlikely to decide whether to make a purchase on that website based on webpages shown to them as part of a survey, one would not expect to find

---

[6] "Some of the factors courts consider in assessing the reliability of a survey are whether (1) the 'universe' was properly defined, (2) a representative sample of that universe was selected, (3) the questions to be asked of interviewees were framed in a clear, precise and non-leading manner, (4) sound interview procedures were followed by competent interviewers who had no knowledge of the litigation or the purpose for which the survey was conducted, (5) the data gathered was accurately reported, (6) the data was analyzed in accordance with accepted statistical principles and (7) the objectivity of the entire process was ensured." *Mastercard Int'l Inc. v. First Nat. Bank of Omaha, Inc.*, 2004 WL 326708, at *7 (S.D.N.Y. Feb. 23, 2004). "The failure to satisfy one of these criteria may result in the exclusion of the survey." *Id.,* at *8.

differences between the Test and Control groups; indeed, this was precisely what the survey results showed.

(*Id.* ¶ 19, Ex. 18 at ¶ 58.)

Also problematic, to qualify for Butler's survey, which purported to measure purchase interest, respondents had to have previously purchased or would be likely to purchase sneakers from StockX.  This pre-disposition of purchase interest was further aggravated by the survey design itself, which created both demand and ceiling effects, as demonstrated from the high percentage of purchase interest in both the control and test groups.  (*Id.* at Ex. 15 at ¶ 10.)  Where there is a high percentage in the control group results, courts have found that "[t]he only plausible explanation…is that the [] Survey was designed (successfully) to lead its respondents."  *Kargo Glob., Inc. v. Advance Mag. Publishers, Inc*., 2007 WL 2258688, at *9 (S.D.N.Y. Aug. 6, 2007).

Butler's survey is plagued by demand affects, which "arise when respondents use cues in the survey…to give what they perceive to be the 'correct' answer, instead of giving a truthful one." *Jackpocket, Inc. v. Lottomatrix NY LLC*, 645 F. Supp. 3d 185, 226 (S.D.N.Y. 2022).  Here, by screening respondents using StockX past or present purchase interest as a qualifier and presenting respondents with multiple webpages of overwhelmingly positive content regarding StockX, Butler effectively "cued" respondents that StockX was the survey's sponsor and that purchase likelihood was the correct answer.  *See Sazerac Co., Inc. v. Fetzer Vineyards, Inc*., 265 F. Supp. 3d 1013, 1026 (N.D. Cal. 2017), *aff'd*, 786 F. App'x 662 (9th Cir. 2019) (exposure to certain stimuli "created demand effects—that is, the methodology led respondents to pick the expected answer and rendered the survey's results completely unreliable.") (internal quotations omitted).  Her test and control groups both reported a very high and very similar rate of purchase interest—the control group reported 94.6% purchase interest—which demonstrates this favorable bias made it

extremely unlikely that any measurable difference would be observed in the results.  (TD Decl. at Ex. 18. at ¶ 59); *see also Kargo Glob., Inc.*, 2007 WL 2258688, at *9 (S.D.N.Y. Aug. 6, 2007).

Butler's survey results are similarly plagued by "ceiling effects," which Dr. Simonson explains "means that, if almost all survey respondents tend to provide a particular answer (e.g., likely to buy a product) given very favorable information shown to them, that it becomes highly unlikely that one will observe a significant difference between two groups (e.g., Test and Control). In a different context, if an exam is too easy, then it is unlikely that there will be differences between two groups (e.g., the score of an advanced class and the score of regular class)."  (*Id.* at Ex. 18 at ¶ 59.)  Courts find surveys tainted by ceiling effects where "[r]espondents in both cells (test and control) indicated similar levels of recognition," which demonstrates a "real probability" that another uncontrolled variable is animating the results.  *Kars 4 Kids, Inc. v. Am. Can!*, 2019 WL 1755912, at *9 (D.N.J. Apr. 18, 2019) (43% "Kars 4 Kids" and 39% "Gifts for kids").  Here, approximately 95% of the respondents in both groups indicated a high purchase interest, reflecting the ceiling effects' impact, and rendering Butler's survey unreliable.

### b.    Butler's Control Was Ineffective

"A control is designed to estimate the degree of background 'noise' or 'error' in the survey."  *THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 240 (S.D.N.Y. 2010).  Butler testified that she used a control—which replaced "authentication" with "inspection"—to eliminate noise and evaluate the impact of the authentication statements holding all else constant.  (*See e.g.*, TD Decl. at Ex. 19 at 89:11-91:14; *id.* at Ex. 15 at ¶ 10, fn. 8.)  Controls must be designed properly, otherwise "there is no benchmark for determining whether a likelihood of [purchase] estimate is significant or merely reflects flaws in the survey methodology."  *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 534 (S.D.N.Y. 2011), *aff'd*, 511 F. App'x 81 (2d Cir. 2013).

"[A] control should 'share[] as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed.'" *Id.* at 85 (quoting Shari Diamond, *Reference Guide on Survey Research*, in Reference Manual on Scientific Evidence at 229, (2d ed. 2000)). "If, for example, the control stimulus in a case of alleged trademark infringement is itself a likely source of consumer confusion, reactions to the experimental and control stimuli may not differ because both cause respondents to express the same level of confusion." Shari Seidman Diamond*, Reference Guide on Survey Research,* in Reference Manual on Scientific Evidence 359, 399-400 (3d ed. 2011). In false advertising surveys, if the control stimulus shares the feature at issue with the test, reactions to the stimuli may not differ. Where "the control group and test group produce similar survey results, the outcome may have been caused by 'noise,' including things like preexisting views, guessing, and boredom," rendering the results unreliable. *Simpson Strong-Tie Co. Inc. v. MiTek Inc.*, 2023 WL 137478, at *6 (N.D. Cal. Jan. 9, 2023).

Butler's survey yielded a control and test group that produced similar results, reflecting its ineffectiveness. Both groups were likely to purchase shoes on StockX (Test: 95.1% likely; Control: 94.6% likely) and indicated that their interest was due "to authentication, guarantees, inspections or trusting the site" (Test: 22.3%; Control: 20.7%). (TD Decl. at Ex. 15 at ¶ 39, 41.) Butler's control used "Inspected," which is "ambiguous, ill-defined, and its meaning to respondents was not tested," and respondents likely interpreted "Inspected" to mean "Authenticated." (*Id.* at Ex. 18 at ¶ 61.) Indeed, Control respondents were not shown the word "authentic," yet several still said "authenticity" was a factor in their purchase interest, showing that "the intended difference between the Test and Control was ineffective." (*Id.* at ¶ 56(b).) Butler failed to control for the possibility that respondents would conflate the terms and could not rule

out that Control respondents simply understood "Inspected" as a synonym for "Authenticated."  In fact, Butler admitted a Control respondent that answered "authentication" as a reason for their interest "may be interpreting a description of inspection as related to authenticity."  (*Id.* at Ex. 19 at 219:7-220:3.)  As such, Butler's Control did not effectively isolate the effects of the false advertising claims and instead artificially inflated the Control group's purchase interest to create a lower net percentage of purchase interest.

            **c.**       **Butler's Stimuli Failed To Replicate The Consumer Purchasing Experience**

Courts consider whether a survey "replicated marketplace conditions," *Playtex Prod., LLC v. Munchkin, Inc.*, 2016 WL 1276450, at *7 (S.D.N.Y. Mar. 29, 2016), a "crucial" part of survey design in false advertising cases.  *Church & Dwight Co. v. S.C. Johnson & Son, Inc.*, 873 F. Supp. 893, 910 (D.N.J. 1994).  "Although no survey can construct a perfect replica of 'real world' buying patterns, a survey must use a stimulus that, at a minimum, …roughly simulat[es] marketplace conditions."  *Trouble v. The Wet Seal, Inc.*, 179 F. Supp. 2d 291, 308 (S.D.N.Y. 2001).  A consumer survey that does not replicate marketplace conditions is of little, or no, probative value.  *See Procter & Gamble Co. v. Ultreo, Inc.,* 574 F. Supp. 2d 339, 352 (S.D.N.Y. 2008).

Butler's stimuli include five separate StockX webpages, (TD Decl. at Ex. 15 at ¶ 25; *see also id*. at Ex. F), yet Butler did not review *any* evidence showing that consumers view these pages before making a purchase on StockX, let alone that they view the pages in her selected order.  (*Id.* at Ex. 19 at 203:6-21.)  Butler's stimuli thus failed to replicate the purchasing experience.  *See Jackpocket,* 645 F. Supp. 3d at 264 (survey failed to replicate "actual marketplace conditions" where there was "no evidence or analysis to support that the display of full webpages, which [expert] uses for his survey…would mirror the marketplace reality that consumers are expected to encounter.").  Also, the first webpage in Butler's stimuli, the StockX Homepage, was created for

her survey—it never existed on the StockX website.  (TD Decl. at Ex. 15 at Ex. F, *id.* at Ex. 19 at 183:20-187:14.)  The stimulus that Butler allegedly attempted to recreate by "splicing" the "Buy & Sell Authentic Sneakers" banner with a more recent version of the homepage, lessened the banner's prominence and contained considerably more information than the webpage it attempted to "recreate."  (*Compare id.* at ¶ 21, Ex. 20 *with id.* at Ex. 15 at Ex. F.)  Because Butler did not show respondents the advertisements as they appeared to consumers, no reliable conclusion can be made as to how consumers reacted to StockX's *actual* advertisements.  *See Procter & Gamble,* 574 F. Supp. 2d at 352.  Butler's failure to recreate marketplace conditions warrants exclusion.

### d.      Butler Improperly Tested All Advertising Claims At Once

Butler ran one survey testing all StockX's advertising claims at once, as opposed to testing each claim individually.  "There is no claim that [StockX] combined each of the statements in a single advertisement or promotion or that any consumer would have seen the statements all together."  *In re Elysium Health-ChromaDex Litig.*, 2022 WL 421135, at *9 (S.D.N.Y. Feb. 11, 2022).  Thus, Butler's "opinions about the results of the survey 'as a whole,' for all of the challenged statements collectively, as opposed to for each category individually, are not helpful in assisting the factfinder to determine whether any category of tested statements is deceptive or is material, and they therefore are inadmissible."  *Id.* at *10; (*see also* TD Decl. at Ex 18 at ¶ 11 ("[T]here is no effective, unbiased methodology that is capable of testing simultaneously the impact of all' the Advertising Statements.")  Additionally, by testing all statements together in five information-rich webpages and requiring only 10 seconds to view each page, Butler exacerbates the problem of the overwhelming quantity of information that she exposed respondents to prior to answering any questions.  (*See* TD Decl. at Ex. 15 at ¶ 25, fn. 33; *id.* at Ex. F.)  "The information overload and unrealistic expectations regarding the cognitive capacity, motivation, and attention of survey respondents were clearly material and made it highly unlikely that any particular word

that appears on some of the pages, such as 'authentic,' would impact the one global measure of purchase likelihood that the survey relied on." (*Id.* at Ex. 18 at ¶ 11(b).). This "is obviously much more information than one might expect survey respondents to actually read," and "[a]s the survey completion time confirms, most of them did not and could not have paid attention to the great majority of the information presented to them."[7] (*Id.* at Ex. 18 at ¶ 57(a).) By overwhelming respondents with information, Butler's survey artificially diluted the impact of any single word. (*Id.* at ¶ 56.) "Thus, the ill-conceived attempt to test all of the claims in one survey based on exposure to so many webpages made the survey and its conclusions unreliable." (*Id.* at ¶ 57(b).); *see also* Jacob Jacoby *The Psychology Foundations of Trademark Law: Secondary Meaning, Genericism, Fame, Confusion and Dilution*, 91 Trademark Rep. 1013, 1022 (2001) ("Because of 'information overload,' the amount of information any person can consider, much less evaluate, at any one point in time is severely limited.").

In light of Butler's survey's serious flaws, it must be excluded under *Daubert*, under Rule 702 as unreliable, and/or under Rule 403 as it is insufficiently probative, unfairly prejudicial, and misleading. *See Universal City Studios, Inc. v. Nintendo Co.,* 746 F.2d 112, 118 (2d Cir. 1984) (excluding survey that used an improper universe and contained leading questions); *In re Elysium*, 2022 WL 421135, at *15 (excluding materiality survey in a Lanham Act false advertising case where multiple flaws cumulatively rendered it inadmissible); *THOIP*, 788 F. Supp. 2d at 183 (excluding survey that "failed to replicate actual marketplace conditions, lacked a proper control, improperly counted certain responses as indicating confusion, and suffered from demand effects");

---

[7] About 35% of respondents took between 3 and 6 minutes to complete the entire survey, including the screener questions, reviewing the stimuli, and answer the main survey questions. (TD Decl. at Ex. 18 at ¶ 56; *see also id.* at Ex. 15, at Ex. G (column F).) The average time for respondents to complete the survey, including the screener questions, reviewing the stimuli, and answer the main survey questions was under 11.5 minutes and the median time was less than 8 minutes. (*See id.* Ex. 15 at Ex. G.)

*Trouble,* 179 F. Supp. 2d at 308 (excluding survey for "lack of a proper universe and sample, …the lack of proper stimuli, and questions that have little or no relevance to issues in the case").

### B.    Vigil's Testimony On Apportionment Should Be Excluded

Once false advertising liability is established, Nike may seek to disgorge StockX's profits by establishing StockX's sales, while StockX "must establish any deductions, including costs and any apportionment for sales that were not due to the [] false [] statements." *Rexall Sundown, Inc. v. Perrigo Co*., 707 F. Supp. 2d 357, 363 (E.D.N.Y. 2010); 15 U.S.C. § 1117(a).  StockX "bears the burden of establishing what sales were not due to the conduct alleged to have violated the Lanham Act." *Rexall*, 707 F.Supp.2d at 359.  Vigil's testimony that " ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" must be excluded because it is unreliable.  (TD Decl. at Ex. 1 at ¶ 10.)

### 1.    Vigil Cannot Rely On Butler's Testimony

Vigil relies on Butler's survey to apportion StockX's gross profit on U.S. Nike and Jordan shoes.  (TD Decl. at Ex. 1 ¶¶ 10, 68-74.)  He uses her irrelevant, flawed survey to opine that "▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮," and thus "only $▮▮▮▮▮ to $▮▮▮▮▮" of StockX's $▮▮▮▮ gross profit is attributable to the false claims.  (*Id.* at ¶ 74; *see also id.* at Ex. 6, Ex. 7.)

If Butler's survey is excluded for the reasons explained *supra*, Vigil's opinion based on her survey must also be excluded.  *See Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 2015 WL 539489, at *11 (S.D.N.Y. Feb. 10, 2015).  Regardless, Vigil's reliance on Butler is inappropriate because her survey is not a "fair proxy" for the process he claims to be analyzing. *Chen-Oster v. Goldman, Sachs & Co.*, 2022 WL 814074, at *8 (S.D.N.Y. Mar. 17, 2022).

Vigil improperly relies on Butler's 409 respondents to opine that *all past purchases* of Nike-branded shoes on the platform are not attributable to StockX's misrepresentations.  (TD Decl.

at Ex. 1 at ¶ 70-74; *Id.* at, Ex. 21 at 260:10-261:3.)  "First, the [Butler] survey did not narrow respondents to actual purchasers of [Nike branded goods on StockX's platform], so it reveals nothing as to why actual [StockX] consumers decided to purchase [Nike-branded] products [from the platform]."  *Vital Pharms. v. PhD Mktg., Inc.*, 2022 WL 2952495, at *6 (C.D. Cal. July 26, 2022); *Church & Dwight Co. v. SPD Swiss Precision Diagnostics GmbH*, 2018 WL 4253181, at *7 (S.D.N.Y. Sept. 5, 2018) (survey "is not intended to be used and cannot fairly be used to project how many actual buyers were deceived").  Second, Vigil's opinion's admissibility depends on whether "the results derived from that small sample are statistically significant."  *Apple v. Atl. Yards Dev. Co.*, 2015 WL 11182422, at *9 (E.D.N.Y. Mar. 31, 2015) (collecting cases).  Butler admitted her survey data was not "extrapolated with a confidence interval around the results to some other population."  (TD Decl. at Ex. 19 at 126:6-127:11).  Vigil's "failure to confirm that the results of his calculations are statistically significant—combined with the tiny size of the sample he relies upon—provides an independent basis for exclusion."  *Apple*, 2015 WL 11182422, at *9; *see also Farmer v. DirectSat USA, LLC*, 2013 WL 1195651, at *6 (N.D. Ill. Mar. 22, 2013) (excluding expert who "conduct[ed] no analysis to test the reliability of the data he use[d] or to demonstrate the appropriateness of extrapolating results from this data to" a larger population.").

## 2.   Vigil's Testimony On ████████████████ Is Unreliable

"Where an expert fails to verify the accuracy of data upon which the expert creates a statistical analysis or renders an opinion, the resultant analysis and opinion are inherently unscientific requiring exclusion of such evidence under *Daubert*."  *Dreyer v. Ryder Auto. Carrier Grp., Inc.*, 367 F. Supp. 2d 413, 446 (W.D.N.Y. 2005) (collecting cases); *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 54–55 (S.D.N.Y. 2016) (excluding expert where "no indication that [expert] made any attempt[] to verify the benefits data" and reliance on data was "speculative and conjectural, and fails to comply with *Daubert's* reliability requirement.").  The expert may not

verify information with "conclusory statements of the expert's client." *Supply & Bldg. Co. v. Estee Lauder Int'l, Inc.*, 2001 WL 1602976, at *4 (S.D.N.Y. Dec. 14, 2001); *AU New Haven, LLC v. YKK Corp.*, 2019 WL 1254763, at *19 (S.D.N.Y. Mar. 19, 2019) (disgorgement opinion unreliable because it was supported only by executive's assurance that expert's assumption was reasonable).

Vigil offers a ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████ (TD Decl. at Ex. 1 at ¶ 76, fn.184.) His analysis is based ██████████ ████████████████████████████████████████ ██████████████████. (*Id.* ¶ 23, Ex. 22.) ████████████████ ████████████████████████████████████ (*Id.* at Ex. 21 at 229:4-233:22.) He merely assumed that StockX ██████████████████████. (*Id.* at 234:14-22.) This self-serving representation that the document contains the type of information StockX has relied on in the past cannot demonstrate that ██████████ data is reliable. *See Estee Lauder*, 2001 WL 1602976, at *4. Separately, the document does not identify whether ██████████████ ████████████████████████████████████████ ██████████████████████. (TD Decl. at Ex. 22.)

Vigil failed to show that this information was a reliable and reasonable comparator, yet he extrapolated from the data that StockX's ████████████████████████████████ ██████████. (*Id.* at Ex. 1 at ¶¶ 75-78.) Vigil's conclusions are thus based on the type of speculative, unverified data that courts exclude under Rule 702. *Scott*, 315 F.R.D. at 54–55.



---

[8] StockX produced the unverified ██████████████ data, STX0806054, after the close of fact discovery along with Vigil's Rebuttal Report. (TD Decl. at ¶ 23.) StockX did not ████████████████████████████████ (*Id.*)

**3.      Vigil's Testimony On "████████████████" Is Not Based on Any Quantitative or Economic Methodology**

While Vigil admits "████████████████████████████████

████████████████████, he proffers testimony that ███████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████. (TD Decl at Ex. 16. ¶ 9, § IV.C.; *id.* at Ex. 1 at ¶¶ 59-65, 82.)  But Vigil admits

he did not ████████████████████████████████████████

████████████████████████████████and further admits ██████████████████

████████████████████████████ (*Id.* at Ex. 21 at 243:22-256:8.)

This apportionment testimony is thus neither "based on sufficient facts or data," nor "the product

of reliable principles and methods."  FED. R. EVID. 702.  Vigil completely failed to apply any

economic methodology to apportion StockX's profits based on "████████████████," rendering

his testimony speculative and unreliable, and warranting exclusion.  *See 24/7 Recs., Inc. v. Sony*

*Music Ent., Inc.*, 514 F. Supp. 2d 571, 576 (S.D.N.Y. 2007); *Pasternak v. Dow Kim*, 961 F. Supp.

2d 593, 595 (S.D.N.Y. 2013); *Hi Ltd. P'ship v. Winghouse of Fla., Inc.*, 2004 WL 5486964, at *4

(M.D. Fla. Oct. 5, 2004) (no reliable methodology used to determine that 90% of defendant's

profits were attributable to factors other than the infringing trade dress).

Moreover, Vigil's testimony on this point does not convey opinions based on his

knowledge and expertise.  This testimony is nothing more than a factual narrative of other features

of the StockX platform.  Courts do not permit experts to rely as a factual narrator and offer such

*ipse dixit* testimony and it should therefore be excluded.  *See Joffe*, 2019 WL 4673554, at *16

(testimony "excluded as factual narrative and spin because they do not rely on any specialized

knowledge or expertise. The Court also agrees…that Green's opinion would not be helpful to the

jury."); *Scentsational Techs., LLC v. Pepsi, Inc.*, 2018 WL 1889763, at *8 (S.D.N.Y. Apr. 18, 2018) ("Acting simply as a narrator of the facts does not convey opinions that are based on an expert's knowledge and expertise; nor is such a narration traceable to a reliable methodology.").

### C.    Wells's Testimony Should Be Excluded As Irrelevant And Unreliable

Wells offers opinions concerning a vague subgroup of consumers he calls "sneakerheads." (TD Decl. at Ex. 17 at ¶ 1.)  His criteria for determining the "sneakerhead consumer" subgroup is elusive, requires his own personalized analysis, and is, by his own admission, completely subjective.  (*Id.* ¶ 24, Ex. 23 at 59:25-67:8, 73:2-75:22.)  His opinions on sneakerhead perception of counterfeits are based not on any testable methodology but rather on a small handful of anecdotal statements of strangers.  (*Id.* at 89:15-90:5; *see also id. at* Ex. 17 at ¶ 101, fn. 162-165.) He presents no opinion and relies on no data about what portion of StockX consumers fall within this sneakerhead subgroup, and admits he lacks the evidence needed to even attempt such a determination.  (*Id.* at Ex. 23 at 67:17-19, 69:21-72:21.)  His testimony is thus much more likely to confuse and distract the jury than to help them, and it should be excluded.

A summary of Wells's opinions concerning the subgroup of consumers he calls "sneakerheads" can be found in Paragraph 12 of his report.[9]  (TD Decl. at Ex. 17 at ¶ 12.)  None of these opinions are relevant to the issues in this case.  *See, e.g.*, *Grayson v. No Labels, Inc.*, 2022 WL 1404172, at *4 (M.D. Fl. May 4, 2022) (excluding expert testimony that, while "interesting," was "not relevant to any issue or fact in dispute"); *SEC v. Ferrone*, 2016 WL 723017, at *7 (N.D.

---

[9] In summary, his opinions comprise: (1) a "sneakerhead" is "a person who has a deep passion for buying, collecting, trading, and/or learning about sneakers," ¶12.a; (2) "sneakerhead culture" has grown and evolved over many years, ¶12.b; (3) sneakerheads have "various reasons" for purchasing shoes, ¶12.c; (4) scarcity of certain shoes is one driver of sneakerhead culture "and hype," ¶12.d; (5) online resale platforms, including StockX, facilitate the secondary market for shoes, including for sneakerheads, ¶12.e; (6) certain industry factors spur demand for counterfeit shoes, and sneakerheads "are often aware that counterfeit sneakers . . . are common," ¶¶12.f, 12.g; and (7) Vault NFTs offer sneakerheads benefits relative to traditional collecting and trading, ¶12.i. (TD Decl. at Ex. 17. at ¶ 12)

Ill. Feb. 22, 2016) (excluding expert testimony because "while it may be interesting to some-[it] is irrelevant to the facts in this case"). They do not meaningfully concern Nike's infringement and dilution claims relating to the Vault NFTs, a subject for which he has only superficial knowledge. Wells has never owned any NFTs and does not know what NFTs are. (TD Decl. at Ex. 23 at 56:4-7; 58:4-59:24.) These opinions are irrelevant to Nike's counterfeiting and false advertising claims, such as the volume of fake "Nike" shoes sold on StockX, StockX's false statements, and StockX's authentication process—all which Wells testified fall outside of his knowledge and expertise. (*See id.* at 93:15-20, 124:2-125:13.)

Nor are many of these opinions the proper subject of expert testimony, as they constitute a mix of banal truisms obvious to a lay juror (e.g., that "there are various reasons" certain consumers may purchase sneakers) and background on the StockX business model and benefits already covered by StockX lay witnesses. *See, e.g.*, *U.S. v. Castillo*, 924 F.2d 1227, 1232-33 (2d Cir. 1991) (expert testimony directed solely to lay matters a jury is capable of understanding and deciding without expert help is not helpful under Rule 702 and thus not admissible).

StockX appears to proffer Wells's opinion that sneakerheads know counterfeiting is common to undermine Nike's false advertising claim. Specifically, StockX may argue that, to the sneakerhead consumer subgroup, StockX's literally false and material authentication statements were neither likely to deceive a "substantial portion" of the intended audience nor material. This opinion would thus be irrelevant for the reasons discussed in Section IV.A.1, *supra*. Plus, StockX would presumably also have to argue that most of StockX's millions of consumers fit Wells's vague definition of sneakerheads, a fact that neither Wells nor StockX has established.

Wells's own definition of the sneakerhead subgroup, as those with "a deep passion for buying, collecting, trading, and/or learning about sneakers," is itself elusive and unreliable. He

admits that there is no standard definition of "sneakerhead," that there are "absolutely" other possible definitions, and that ultimately "[i]t's really up to the person how they want to define a sneakerhead and what is a sneakerhead or not." (TD Decl. at Ex. 23 at 61:8-22.) When pressed to give examples of specific metrics, he replied, "I can't cast a wide net like that and say, yeah that person is a sneakerhead or, no, that person is not." (*Id.* at 62:21-63:20.) He also explained that he could only decide if someone is a sneakerhead by speaking to that person to determine, e.g., the size of his or her shoe collection, the reasons for the collection, and, oddly, history of health issues. (*Id.* at 74:2-75:4.) Wells's starting premise that there exists some quantifiable sneakerhead subgroup is unsupported by anything resembling a reliable methodology and the sort of *ipse dixit* prohibited by *Daubert*. *See also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).

Moreover, Wells provides no reliable basis to opine that this subgroup has a widespread understanding with respect to the likelihood of receiving counterfeit sneakers on the secondary market or perception of authenticity guarantees. To support this opinion, Wells cites statistics showing the counterfeit sneakers are common in the market and anecdotal examples of counterfeit sneaker discussions in online forums. (TD Decl. at Ex. 17 at ¶¶ 100-103.) Neither provides a reliable basis for Wells to opine that "sneakerheads" widely perceive counterfeit sneakers as common. *See, e.g.*, *Kurin, Inc. v. Magnolia Med. Techs., Inc.*, 473 F. Supp. 3d 1117, 1141 (S.D. Cal. 2020) (excluding expert opinion of consumer perception of false advertising as neither based on a survey nor on other reliable bases, such as literature or more frequent interactions with consumers). Indeed, Wells opined that "[e]ach Sneakerhead is different," and testified it is possible that some unknown percentage of sneakerheads has a different perception about the risk of counterfeit sneakers. (TD Decl. at Ex. 23 at 86:21-87:1.) Wells also claims that certain sneakerheads told him that they are skeptical of StockX's claims, (*id.* at Ex. 17 at ¶ 103), but he

provides no other information about these "interactions" to allow any determination of their reliability. (*Id.*) Wells then contradicts himself and opines (again without evidence) that many sneakerheads *do* rely on authenticity guarantees. (*See id.* ¶103 ("[S]ecurity measures taken by online platforms have convinced many Sneakerheads, particularly younger ones, to more willingly purchase their sneakers through those platforms.")

Wells ultimately stops short of offering an opinion about how sneakerheads perceive the StockX authenticity guarantee either in terms of falsity or materiality. As he has not disclosed this opinion in his report, he may not offer it now. *See, e.g.*, *Financial Guaranty Ins. Co. v. Putnam Advisory Co., LLC*, 2020 WL 3582029, at \*6-7 (S.D.N.Y. July 1, 2020) (striking expert opinions not disclosed in report). Nor would Wells have any evidentiary basis to help StockX bridge the gap between alleged (but unsupported) sneakerhead perception of counterfeit frequency or authenticity guarantees generally and how sneakerheads perceive the StockX authenticity guarantee. Indeed, Wells testified that he has seen only "less than 10 people" online discussing StockX's authenticity guarantee and counterfeits. (TD Decl. at Ex. 23 at 105:16-110:21.) And according to Wells, several of these StockX customers expressed "surprise" at receiving counterfeit sneakers from StockX, a sentiment that undermines any argument that some StockX consumer subgroup was widely skeptical of the StockX guarantee. (*Id.* at 107:6-18; *see also id.* at Ex. 17 ¶ 12.h (StockX authenticity efforts "helps buyers feel confident that steps have been taken to verify the quality of the sneakers they purchase").)

Even if Wells could reliably opine on the understanding of some sneakerhead consumer subgroup, Wells does not and cannot provide an opinion, reliable or otherwise, about whether this subgroup comprises a "substantial portion" of StockX customers. He testified he had not seen any information about StockX consumer demographics, such as number of shoes owned, that would

inform his opinion about membership in the sneakerhead subgroup.  (TD Decl. at Ex. 23 at 72:1-14.)  He did not conduct any StockX customer interviews, which he stated were necessary to determine membership in the consumer subgroup.  In short, Wells does not and cannot provide an opinion about whether StockX customers are by and large sneakerheads, rendering his opinion about sneakerheads irrelevant to this dispute, even as general background.

Separately, Wells opines that StockX improves the resale experience "through verification services that decrease the probability of buying a counterfeit pair of sneakers."  (TD Decl. at Ex. 17 at ¶ 12.h.)  This opinion too lacks reliability and relevance.  On reliability, Wells's report discusses this opinion in more detail in paragraphs 104-107 but includes no basis for his belief that StockX can effectively authenticate (it cannot).  Wells admitted he had zero information about how StockX authenticates or how effectively it screens out counterfeits.  (*Id.* at Ex. 23 at 93:15-20, 124:2-125:13.)  Nor does he know its efficacy compared to those of other platforms.  (*Id.* at 93:2-25 (he says fakes are more common on eBay than StockX but has "no idea" what percentage of Nike sneakers sold on each platform are counterfeit).)  Conversely, he admitted that the probability of buying counterfeit sneakers on StockX is greater than when buying directly from Nike, which he admitted does not sell counterfeit sneakers at all.  (*Id.* at 91:11-16.)  Thus, his opinion that StockX's authentication process "decrease the probability of buying a counterfeit pair of sneakers" is incomplete, undisputedly inaccurate, and without any basis.  Furthermore, even if somehow true, this opinion is not relevant to any issue, such as the number of counterfeit Nike shoes that StockX sold or its efforts to avoid doing so (about which Wells admits he knows little).

## V.    CONCLUSION

For the foregoing reasons, the Court should grant Nike's Motion and exclude, in whole, the testimony of Butler and Wells, and exclude, in part, the testimony of Vigil disclosed in ¶ 9 and § IV.C of his Opening Report and ¶¶ 9-10 and § II.B.3-4 of his Amended Rebuttal Report.

Date: October 13, 2023                    By:  */s/ Tamar Y. Duvdevani*

                                              **DLA PIPER LLP (US)**

Tamar Y. Duvdevani
Marc E. Miller
Andrew J. Peck
Jared Greenfield
1251 Avenue of The Americas, 27th Fl.
New York, NY 10020
Telephone: (212) 335-4500
Facsimile: (212) 335-4501

Michael Fluhr
555 Mission Street, Suite 2400
San Francisco, CA 94105
Telephone: (415) 836-2500
Facsimile: (415) 836-2501

Melissa Reinckens
4365 Executive Drive
Suite 1100
San Diego, CA 92121
melissa.reinckens@us.dlapiper.com
Telephone: (858) 677-1400
Facsimile: (858) 677-1401

Jane W. Wise
500 Eighth Street, NW
Washington, D.C. 20004
Telephone: (202) 799-4149
Facsimile: (202) 863-7849

*Attorneys for Plaintiff Nike, Inc.*