# Exhibit 08

Redacted Public Version

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF NEW YORK

-ooOoo-

NIKE, INC.,                    :

     Plaintiff,          :

vs.                            : No. 1:22-cv-00983-VEC

STOCKX LLC,                    :

     Defendant.          :

_____ :

DEPOSITION OF BROCK HUBER
TAKEN THROUGH
ADVANCED REPORTING SOLUTIONS, a Veritext company

Taken on Thursday, June 29, 2023
9:30 a.m. to 12:38 p.m.

At HYATT CENTRIC PARK CITY
3551 North Escala Court
Park City, Utah 84098

Reported by: Abigail D.W. Johnson, RPR, CRR, CRC

Page 2

1    A P P E A R A N C E S
2
     For the Plaintiff:
3
         Tamar Y. Duvdevani
4        Marc E. Miller
         DLA PIPER
5        1251 Avenue of the Americas
         New York, New York 10020-1104
6        Tamar.duvdevani@dlapiper.com
         Marc.miller@dlapiper.com
7        (212) 335-4799
8
     For the Defendant:
9
         Christopher S. Ford
10       DEBEVOISE & PLIMPTON LLP
         650 California Street
11       San Francisco, California 94108
         Csford@debevoise.com
12       (415) 738-5705
13
     For StockX:
14
         Kevin Adams
15       Deputy General Counsel
         StockX
16
17   Also Present: McKayla Largin (videographer)
18              -ooOoo-
19
20
21
22
23
24
25

Page 3

1              I N D E X
2    EXAMINATIONS                          PAGE
3    Examination By Ms. Duvdevani........................ 5
4    Examination By Mr. Ford..............................95
5
6              E X H I B I T S
7    EXHIBIT NO.      DESCRIPTION              PAGE
8    Exhibit 1  Deposition Notice........................ 5
9    Exhibit 2  Worksheet printout....................... 6
10   Exhibit 3  Screenshot and video .................... 72
            [STX0806022 and STX0806023]
11
     Exhibit 4  Screenshot and video .................... 81
12          [STX0806003 and STX0806004]
13   Exhibit 5  Screenshot and video .................... 82
            [STX0806001 and STX0806002]
14
     Exhibit 6  Screenshot and video .................... 85
15          [STX0806015 and STX0806016]
16   Exhibit 7  Screenshot and video .................... 87
            [STX0805999 and STX0806000]
17
     Exhibit 8  Place holder and video .................. 89
18          [STX0806021]
19             -o0o-
20
21
22
23
24
25

Page 4

1    June 29, 2023              9:26 a.m.
2              P R O C E E D I N G S
3                 -o0o-
4        VIDEOGRAPHER: Good morning. We are going
5    on the record at 9:26 a.m. on June 29th, 2023. This is
6    the media deposition of the 30(b)(6) witness of Brock
7    Huber in the matter of Nike, Inc. versus StockX, LLC.
8    Case No. 1:22-cv-00983-VEC.
9        This deposition is held at the Hyatt in
10   Park City, Utah. My name is McKayla Largin. I am the
11   videographer, and Abby Johnson is the court reporter.
12       Will all counsel state who they represent
13   for the record?
14       MS. DUVDEVANI: Good morning. Tamar
15   Duvdevani, DLA Piper, on behalf of Plaintiff, Nike,
16   Inc. I am joined by my partner, Mark Miller, also of
17   DLA Piper.
18       MR. FORD: Good morning. Christopher Ford,
19   Debevoise & Plimpton for StockX, LLC. I am joined by
20   in-house counsel for StockX, Kevin Adams.
21   Thereupon --
22            BROCK HUBER,
23   was called as a witness, and having been first duly
24   sworn to tell the truth, the whole truth, and nothing
25        but the truth, testified as follows:

Page 5

1            EXAMINATION
2    BY MS. DUVDEVANI:
3    Q.  Good morning, Mr. Huber.
4    A.  Good morning.
5    Q.  I'm just going to first mark the deposition
6    notice that brings us all back together today.
7            (Exhibit No. 1 was marked
8             for identification.)
9    BY MS. DUVDEVANI:
10   Q.  Mr. Huber, the court reporter has just
11   handed you a document that's been designated as
12   Exhibit 1. It is Plaintiff Nike, Inc.'s Amended
13   Deposition Notice of Rule 30(b)(6) Deposition to
14   StockX, LLC.
15       On page 6 and page 7, there are a list of
16   deposition topics, which I can represent your counsel
17   objected to some of them.
18       But do you understand that you are the
19   designated witness to testify today pursuant to this
20   amended notice?
21   A.  Yes, I do.
22   Q.  Okay.
23       MS. DUVDEVANI: This is the big --
24       MR. FORD: You are just doing it at once?
25       MS. DUVDEVANI: Might as well.

Page 6

1 THE WITNESS: It looks different printed
2 out.
3 (Exhibit No. 2 was marked
4 for identification.)
5 BY MS. DUVDEVANI:
6 Q. Mr. Huber, the court reporter has handed
7 you a document that has been designated as Exhibit 2.
8 I note that you just said it looks a little different.
9 I assume you mean from you viewing the same documents
10 online.
11 A. Yes, that's right.
12 Q. Okay. We are certainly going to get into
13 details about Exhibit 2. What I'd like you to do first
14 and foremost, and feel free to leaf through it to make
15 sure it's everything that you recognize, is just very,
16 very generally describe what Exhibit 2 is.
17 A. Okay. This looks like the same document
18 that I reviewed on a computer. It's an Excel
19 spreadsheet. It features four tabs put together at
20 kind of different times, in some cases with different
21 purposes, in response to an incident regarding one of
22 our buyers, Mr. Roy Kim, who alleged to have received
23 some items that he suspected were inauthentic.
24 Q. Okay. And what -- starting with the first
25 tab -- and let me also just note for the record that

Page 7

1 Exhibit 2 was designated by StockX as having a Bates
2 stamp of STX0806024, even though it's not on the
3 printout. That is how it was produced.
4 You mentioned that there are several tabs.
5 Starting with the first tab, which I believe is just
6 the first two pages of the printout, can you generally
7 describe what this first tab of Exhibit 2 contains in
8 terms of content?
9 A. Yes. So this spreadsheet was primarily,
10 but not entirely, created by Abe Zurita, who manages --
11 or at the time was managing our Tempe, Arizona,
12 authentication center. And he was asked to receive and
13 reinspect some items that had made their way to an end
14 buyer.
15 And this initial sheet, this first tab
16 here, these first two pages, are primarily the work
17 product of that assignment that was given to him with a
18 few exceptions.
19 Q. You stated products made their way to an
20 end buyer. Was that end buyer Roy Kim?
21 A. Yes, I believe all 33 items listed here
22 were items received by Roy Kim.
23 Q. Okay. And when you say "made their way to
24 Roy Kim," how did they make their way to Roy Kim?
25 A. They made their way through the ordinary

Page 8

1 course of business at StockX. A seller was paired with
2 a buyer. The buyer in this case being Roy Kim. The
3 items were shipped from the seller to one of our
4 authentication centers, passed through our proprietary
5 verification process and were ultimately shipped out to
6 this buyer.
7 Q. Okay. And you stated in connection with
8 your testimony regarding Abe Zurita -- is that his last
9 name?
10 A. Mm-hmm.
11 Q. That the products that appear -- strike
12 that -- the order numbers associated with the products
13 that were shipped to Roy Kim were returned by Roy Kim;
14 is that correct?
15 A. Yes. That is correct. That is our policy
16 and has always been our policy. If an end buyer has an
17 issue with an order, they reach out to our customer
18 service. They suspect something they received is
19 inauthentic. We will initiate a review, which
20 typically starts with receiving some pictures of the
21 items in question. And after that photographic review,
22 if we continue to have doubts with the order, we will
23 ask the buyer to send it back to us for an inspection,
24 like the one that Abe did here.
25 Q. Okay. So it's your testimony that Abe

Page 9

1 reinspected all of the products associated with the
2 order numbers on the first tab of Exhibit 2; is that
3 correct?
4 A. So -- so both Abe, which you can see in
5 Column I, reauthenticated these, as well as John Lopez,
6 who coincidentally was out at that facility for the
7 week, but that was just luck -- as luck would have it,
8 he was there.
9 Q. And when you say "John Lopez," is that
10 referring to the name "Johnny" in exhibit --
11 A. That is Johnny --
12 Q. -- in Column J?
13 A. -- Yes.
14 Q. And did Abe and Mr. Lopez reach a
15 determination as to whether or not the product shipped
16 to Roy Kim and returned that appears in Exhibit 2 were
17 authentic?
18 MR. FORD: Objection to the form of the
19 question.
20 THE WITNESS: They -- they concluded that
21 these items were not fit to transact on our platform.
22 BY MS. DUVDEVANI:
23 Q. Did they conclude that these items were not
24 fit to transact on your platform because they were not
25 authentic?

| | |
|---|---|
| Page 10 | Page 12 |

Page 10
1  MR. FORD:  The same objection.
2  THE WITNESS:  They concluded that they were
3  not fit to transact because they were suspected to be
4  inauthentic.
5  BY MS. DUVDEVANI:
6  Q.  Okay.  Was there no definitive
7  determination by either Abe or Mr. Lopez regarding the
8  authenticity of the products associated with the order
9  numbers listed in Exhibit 2?
10  MR. FORD:  The same objection.
11  Sorry.  Go ahead.
12  THE WITNESS:  I would say there was a
13  definitive determination that they weren't fit to
14  transact.  But we don't make definitive legal
15  determinations as to whether something is considered
16  counterfeit or not.
17  BY MS. DUVDEVANI:
18  Q.  Putting a legal determination aside, did
19  StockX reach any conclusions upon the return of the
20  products listed in Exhibit 2 as to whether or not they
21  were fake?
22  MR. FORD:  Objection to the form of the
23  question.
24  THE WITNESS:  They -- again, we concluded
25  that they were not fit to transact on our platform.  We

Page 11
1  concluded that the buyer was entitled to a refund.  And
2  we had some suspicions that these items could
3  potentially be inauthentic.
4  BY MS. DUVDEVANI:
5  Q.  Is it your testimony that the StockX
6  employees, who re-authenticated these products, just
7  could just not tell whether or not these products were
8  authentic?
9  A.  Again, I think, you know, it's important to
10  always go back to the fact that this is our proprietary
11  verification process, the standards that we created.
12  And so it was very definitive that these did not meet
13  our standards.
14  Q.  Was it definitive whether or not the
15  products were genuine Nike products?
16  A.  I think we suspected they were inauthentic,
17  and that made us definitively say they could not be
18  transacted on our platform.
19  Q.  And we'll go through them one by one, but
20  generally speaking, what were your suspicions based on?
21  A.  So with the creation of this sheet and
22  having talked to Abe and John both, they were simply
23  given instruction to review these and say, "Hey, take
24  another look.  We are getting a return from a buyer."
25  And I believe if we look at Column R, they

Page 12
1  summarized, in relatively short form here, the issues
2  that they found upon reinspecting these items that made
3  them come to the conclusion that these were not fit to
4  transact on our platform.
5  Q.  I understand your testimony that your
6  employees determined that the products were not fit to
7  be -- to transact on your platform.  It sounds like
8  your testimony is that StockX could not determine, one
9  way or another, whether or not the products were
10  genuine.
11  Is that your testimony?
12  MR. FORD:  Objection to the form of the
13  question as to the characterization.
14  You can answer.
15  THE WITNESS:  No.  I think -- again, the
16  point of our proprietary verification process is to
17  determine if an item meets our standard, and if we want
18  to have that item to be eligible to transact on the
19  platform.
20  And so upon reinspection, the determination
21  was that these items did not meet our standard.
22  BY MS. DUVDEVANI:
23  Q.  And that StockX was suspicious that they
24  were fake; correct?
25  MR. FORD:  Objection to the form of the

Page 13
1  question.
2  THE WITNESS:  Yes, I believe both of these
3  authenticators suspected these items were not
4  authentic.
5  BY MS. DUVDEVANI:
6  Q.  What does the word "suspicious" mean when
7  you are using it in the context that you're testifying
8  today?
9  A.  Are you asking when I say it or where it
10  appears in the sheet?
11  Q.  Are those two different definitions?
12  A.  Yeah, the context would be a bit different.
13  Q.  Okay.  Let's start with your testimony.
14  A.  So when I say "suspicious," I mean there
15  are some issues, some -- it could be manufacturing
16  defects.  It could be some issues with the color.  It
17  could be some issues with the material, the shape.
18  And you know, with items that are created
19  and scaled, there's going to be some variation.  And so
20  there may be some tells that create suspicion.  And we
21  say, "We are not sure about this.  As a result, it may
22  not meet our standard."  And we may fail it due to
23  those suspicious attributes.
24  Q.  Suspicious of what?
25  A.  Potentially being inauthentic.

4 (Pages 10 - 13)

| | |
|---|---|
| Page 14 | Page 16 |

Page 14

1  Q. Okay. Am I correct that one element of
2  StockX's proprietary verification process is whether
3  the item is authentic?
4  A. So our -- our guarantee that we've always
5  had is that we verify every single item. And we
6  guarantee that you are going to get an item that is
7  exactly as expected. It's what you wanted. It's the
8  right size. It is the right colorway. It's in brand
9  new condition. It has the accessories. And that this
10 item would be a legitimate item from the manufacturer.
11  Q. Okay. Going through the first tab of
12 Exhibit 2 now in a little bit more detail, starting
13 with Column B, which is listed as Order number, what
14 does "Order Number" mean?
15  A. Order number is simply the database number
16 that is generated when a transaction is initiated. So
17 when a buyer's bid and a seller's ask meet, kind of the
18 language we use internally, a trade is initiated. And
19 when a trade is initiated, the database generates an
20 order number that we use to track all activity
21 associated with that transaction.
22  Q. Okay. I'm going to the next column, Column
23 C, "Sneaker Type," what does that mean?
24  A. So these names are -- most of the items
25 that we sell will have a brand, which is designated

Page 15

1  here by AJ, Air Jordan, have a model, designated by the
2  1, the Air Jordan 1. And then they will have a
3  nickname, which is often derived from the colorway. It
4  could be derived from some sort of cultural event, like
5  it was in a movie or something.
6      So on this sheet, there are three distinct
7  SKUs or sneaker types, the Air Jordan 1, Hyper Royal,
8  the Air Jordan 1 Mocha and the Air Jordan 1 UNC.
9  Q. Okay. Going to Column D, "Return Tracking
10 Number," what does "Return Tracking Number" mean?
11  A. When Mr. Kim contacted us and we asked him
12 to send them back -- send the items in question back to
13 us, he sent them back in -- I would have to
14 double-check here -- I believe four separate boxes with
15 multiple items inside of each box.
16      So these are the -- these numbers
17 correspond to which box they were returned in to. I
18 think 1Z is a UPS code. So they were shipped back via
19 UPS.
20  Q. Okay. Going to Column E, "Tagged Y/N."
21 What does "Tagged Y/N" mean?
22  A. Everything on this sheet is a sneaker. And
23 as part of our verification process, the authentication
24 team members put a StockX tag on each sneaker. In
25 Column E, Abe was verifying if the items that had been

Page 16

1  returned had StockX tags on them or not.
2  Q. And are you referring to the green circular
3  StockX tag that we have now all become familiar with?
4  A. Yes.
5  Q. Okay.
6  A. The green plastic tag with a -- I don't
7  know if it's vinyl or nylon string that holds it on to
8  the shoe eyelet.
9  Q. What does that tag state on it?
10 [redacted]
18  Q. All right. Going to Column F, which states
19 [redacted] What does that mean?
20 [redacted]

Page 17

[redacted]
9  A. Yes.
10  Q. Okay. Going to Column G "AC." What does
11 "AC" mean?
12  A. AC is an abbreviation for authentication
13 center. This column denotes which authentication
14 center the item was inspected at prior to being shipped
15 on to Mr. Kim.
16  Q. Okay. And I see that several of them say
17 "moon," m-o-o-n. What does that mean?
18  A. Moon is just an abbreviation for our
19 Moonachie facility, which at the time of this
20 inspection was in New Jersey.
21  Q. Is it no longer in New Jersey?
22  A. The Moonachie facility has been
23 subsequently been shut down and replaced by a larger
24 facility in West Caldwell, which is in New Jersey, but
25 not in Moonachie.

|  |  |
|---|---|
| Page 42 | Page 44 |
| 1  tabs on each order and making sure it was refunded.<br>2      Q.   Okay.  Column U, ▓▓▓▓▓▓▓▓▓▓▓▓<br>▓▓▓▓▓<br>4           What does that mean?<br>5      A.   Yeah.  So at the outset, I said most of<br>6  this sheet here was compiled by Abe Zurita with a<br>7  little bit of help from John Lopez.<br>8           Column U was compiled by entirely different<br>9  person, Mark Porteous, who runs our fraud team.  I<br>10  think, again, it is probably important to set a little<br>11  bit of context.  I know you want to get through this<br>12  sheet.<br>13 [redacted] | [redacted] |
| Page 43 | Page 45 |
| [redacted] | [redacted] |



12 (Pages 42 - 45)

Page 98

1    REPORTER'S CERTIFICATE
2   STATE OF UTAH    )
                     )
3   COUNTY OF SALT LAKE )
4          I, ABIGAIL D.W. JOHNSON, a Certified
5   Shorthand Reporter and Registered Professional
6   Reporter, hereby certify:
7          THAT the foregoing proceedings were
8   taken before me at the time and place therein set
9   forth, at which time the witness was placed under oath
10  to tell the truth, the whole truth, and nothing but the
11  truth; that the proceedings were taken down by me in
12  shorthand and thereafter my notes were transcribed
13  through computer-aided transcription; and the foregoing
14  transcript constitutes a full, true, and accurate
15  record of such testimony adduced and oral proceedings
16  had, and of the whole thereof.
17         I FURTHER CERTIFY that I am not a
18  relative or employee of any attorney of the parties,
19  nor do I have a financial interest in the action.
20       ( ) Review and signature was requested.
21       ( ) Review and signature was waived.
22       (X) Review and signature was not requested.
23         I have subscribed my name on this
24  6th day of Jul    *Abigail D.W. Johnson*

25       _____
         ABIGAIL D.W. JOHNSON, RPR, CRR, CRC

26 (Page 98)

| **Deposition Date:** 6/29/2023 **Deponent:** Brock Huber – Errata Sheet **Case Name:** *Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) (SN) | | | |
|---|---|---|---|
| **Page(s): Line(s)** | **Now Reads** | **Should Read** | **Reason** |
| 6:1-2 | THE WITNESS: It looks different printed out. | THE WITNESS: It looks **a little** different printed out, **doesn't it?** | Transcription Error |
| 8:18-19 | They suspect something they received is inauthentic**.** **W**e will initiate a review, | **If t**hey suspect something they received is inauthentic**, we** will initiate a review, | Transcription/Typographical Error |
| 13:18-19 | with items that are created **and scaled** | with items that are created **at scale** | Transcription Error |
| 14:17-18 | the language we use internally, a trade is initiated. | the language we use internally **is "**a trade is initiated.**"** | Transcription/Typographical Error |
| 15:7 | the Air Jordan 1**,** Hyper Royal, | the Air Jordan 1 Hyper Royal, | Typographical Error |
| 16:13-14 | ■■■■ | ■■■■ | Transcription Error |
| 16:22-17:2 | ■■■■ | ■■■■ | Clarification |

1

DocuSign Envelope ID: AAB56B95-F710-4C53-85F4-4A7C402DC03B

| **Deposition Date:** 6/29/2023<br>**Deponent:** Brock Huber – Errata Sheet<br>**Case Name:** *Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) (SN) | | | |
|---|---|---|---|
| **Page(s): Line(s)** | **Now Reads** | **Should Read** | **Reason** |
| 19:11 | ███████ | ███████ | Transcription Error |
| 19:25-20:1 | But in terms of reasons why a tag may not link to an order**.** **T**hat's a possibility. | But in terms of reasons why a tag may not link to an order**,** **t**hat's a possibility. | Typographical Error |
| 26:12-13 | And if there is a shortfall, he is making sure help comes in | And if there is a shortfall, he**'s trying to fill it,** making sure help comes in | Transcription Error |
| 26:17-18 | make sure that we are conducting the process | **to** make sure that we are conducting the process | Transcription Error |
| 27:3 | for many years. **And** he opened his own store | for many years. **He left Foot Locker,** he opened his own store | Transcription Error |
| 27:5-6 | people come in and sell shoes directly to him | people **would** come in and sell shoes directly to him | Transcription Error |
| 27:24-28:1 | He is checking the accessories to the extent that they are in there**. M**ake sure that they are the right ones | He is checking the accessories to the extent that they are in there **to m**ake sure that they are the right ones | Transcription Error |
| 28:13 | I **could** say that | I **can** say that | Transcription Error |

2

| **Deposition Date:** 6/29/2023<br>**Deponent:** Brock Huber – Errata Sheet<br>**Case Name:** *Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) (SN) | | | |
|---|---|---|---|
| **Page(s): Line(s)** | **Now Reads** | **Should Read** | **Reason** |
| 29:20 | someone on **a** management team | someone on **the knowledge** management team | Transcription Error |
| 30:16-19 | he'd seen and heard and knew that Nike was putting RFID tags and obviously you can see the QR codes into many, if not all, of their sneakers. | he'd seen and heard and knew that Nike was putting RFID tags—and obviously you can see the QR codes—into many, if not all, of their sneakers. | Typographical Error |
| 30:24 | verify all day | verify **items** all day | Transcription Error |
| 38:8-9 | **the** blacklisted | **that** blacklisted | Transcription Error |
| 40:1 | **this** was an issue | **there** was an issue | Transcription Error |
| 40:7-8 | **Depends** on where **the** item is produced | **Depending** on where **an** item is produced | Transcription Error |
| 40:24-25 | an issue **of** materials | an issue **with the** materials | Transcription Error |
| 42:8-9 | compiled by entirely different person | compiled by **an** entirely different person | Transcription Error |
| 42:18 | before **he** had ever heard from Roy Kim | before **we** had ever heard from Roy Kim | Transcription Error |

3

DocuSign Envelope ID: AAB56B95-F710-4C53-85E4-4A7C402DC03B
Case 1:22-cv-00983-VEC Document 294-3 Filed 10/18/23 Page 12 of 15
Case 1:22-cv-00983-VEC Document 404-3 Filed 07/08/24 Page 12 of 15

| **Deposition Date:** 6/29/2023<br>**Deponent:** Brock Huber – Errata Sheet<br>**Case Name:** *Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) (SN) | | | |
|---|---|---|---|
| **Page(s): Line(s)** | **Now Reads** | **Should Read** | **Reason** |
| 43:21 | bad actors will ship good product | bad actors will ship **a lot of** good product | Transcription Error |
| 44:3 | when following our operating procedures | when following our **standard** operating procedures | Transcription Error |
| 44:21 | he has never had an issue before | he has never had an issue **with** before | Transcription Error |
| 52:8 | Yes, it looks **like that.** | Yes, it looks **that way.** | Transcription Error |
| 53:15 | GM | GM**V** | Transcription Error |
| 56:3 | There is a potential **for** any technology company | There is a potential, **with** any technology company | Transcription Error |
| 57:14 | we **will** review it | we review it | Transcription Error |
| 58:1 | they could be **separate** | they could be **disparate** | Transcription Error |
| 58:25 | as we covered the past | as we covered **in** the past | Transcription Error |
| 59:23-24 | who is, you know, **is alleged** to have **a** good product | who is, you know, **alleging** to have good product | Transcription Error |
| 63:8 | We could look into that **possibly.** | We could look into that, **I'm not positive.** | Transcription Error |

4

| **Deposition Date:** 6/29/2023 <br> **Deponent:** Brock Huber – Errata Sheet <br> **Case Name:** *Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) (SN) | | | |
|---|---|---|---|
| **Page(s): Line(s)** | **Now Reads** | **Should Read** | **Reason** |
| 63:13-14 | I think two issues, that we don't know who the individual is | I think two issues **are** that we don't know who the individual is | Transcription Error |
| 67:8-9 | it's 6**3** products | it's **62** products | Transcription Error |
| 67:14-15 | Objection to the form of the question **as a** characterization of the document | Objection to the form of the question **and to the** characterization of the document | Transcription Error |
| 76:2-3 | Items that are cheaper, **and** are easier to verify, | Items that are cheaper, **or** are easier to verify, | Transcription Error |
| 78:23-24 | gone through each step **and** see if he followed every one of them | gone through each step **to** see if he followed every one of them | Transcription Error |
| 79:3 | are used **and** are damaged | are used **or** are damaged | Transcription Error |
| 80:2 | in **the** process | in **a** process | Transcription Error |
| 80:10 | **and** use the invisible ink | **or** use the invisible ink | Transcription Error |
| 82:5-6 | I saw some components that are standard operating procedure. | I saw some components **of our** standard operating procedure **for sure.** | Transcription Error |

5

DocuSign Envelope ID: AAB56B95-F710-4C53-85F4-4A7C402DC03B
Case 1:22-cv-00983-VEC Document 294-8 Filed 10/16/23 Page 14 of 15
Case 1:22-cv-00983-VEC Document 249-3 Filed 07/08/23 Page 14 of 15

| **Deposition Date:** 6/29/2023<br>**Deponent:** Brock Huber – Errata Sheet<br>**Case Name:** *Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) (SN) | | | |
|---|---|---|---|
| **Page(s): Line(s)** | **Now Reads** | **Should Read** | **Reason** |
| 82:7 | I **noted** that, as I referenced earlier, Jordan 1, | I **know** that **the,** as I referenced earlier, **Air** Jordan 1, | Transcription Error |
| 82:9 | He spent a fair **amount** of time looking at the back **of the** heel of the shoe | **It looked like** he spent a fair **bit** of time looking at the back heel of the shoe | Transcription Error |
| 82:18 | It's hard to say what **he does** | It's hard to say what **he's doing** | Transcription Error |
| 91:4-5 | And **off in the** text to the right, | And **there's often** text to the right, | Transcription Error |
| 91:5-6 | pay double attention to **the** doppelganger shoe | pay double attention to **that there's a** doppelganger shoe | Transcription Error |
| 92:20-21 | to very confidently **to** say, **"Hey, is inspected as** authentic | to very confidently say "**an item is real, is suspected** authentic | Transcription Error |
| 94:12-13 | a suspected authentic | a suspected **in**authentic | Transcription Error |
| 94:16 | could likely authentic something | could likely authentic**ate** something | Transcription Error |
| 95:13 | about review of the return of Roy Kim**'s** shoes | about **the** review of the return**ed** Roy Kim shoes | Transcription Error |

6

I, Brock Huber, do hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition taken on June 29, 2023; that I have made such corrections as appear noted herein; and that my testimony as contained herein, as corrected, is true and correct.

DATED this 2nd day of August, 2023.

DocuSigned by:

Brock Huber

ACFB101E33C94C7...

Brock Huber

7