# Exhibit 18

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

## SECOND REBUTTAL EXPERT REPORT OF DR. ITAMAR SIMONSON

1.      I am the Sebastian S. Kresge Emeritus Professor of Marketing at the Stanford University Graduate School of Business (while continuing to publish scientific articles and serving as the co-editor of the *Consumer Psychology Review* Journal).  A copy of my curriculum vitae, which includes a complete list of my publications, is attached as Exhibit A.  I previously submitted an expert report, dated May 5, 2023, which described the survey that I conducted in this matter.  I subsequently prepared a rebuttal report, dated June 2, 2023.

2.      I was asked by counsel for Nike, Inc. to evaluate the surveys submitted by Mr. Robert Klein, Dr. David Neal, and Ms. Sarah Butler on behalf of StockX LLC.  The Klein and Neal surveys are similar in key respects, and I will evaluate them first.  In particular, I will first evaluate the Klein and Neal Surveys where the same issues arise, followed by an evaluation of other aspects of each survey.  The Butler Survey, which addressed a different issue, was conducted in response to the report of Nike's damages expert, Mr. John Hansen.  I will evaluate the Butler Survey based on my expertise in the areas of survey research and consumer behavior.

## SUMMARY OF CONCLUSIONS

The Klein and Neal Surveys

3.      When preparing a rebuttal report and conducting a rebuttal survey in response to another expert's survey, it is important to first examine what the survey purportedly being rebutted actually tested.  There is no point in misinterpreting or distorting what another expert did and then running a survey in response to this misguided construction.  Notwithstanding clear statements in my report, such as (parag. 14) "the Main Survey tested if greater prominence of Nike's trademarks increases the mistaken belief that it is Nike that makes the Vault NFT offer,"

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

Mr. Klein and Dr. Neal apparently assumed that I conducted a traditional likelihood of trademark confusion survey (Klein Report, parag.11; Neal Report, parag. 2.2), rather than a survey that compared beliefs about the source of the product/NFT depending on the prominence of the image of Nike-branded shoes (i.e., contrasting a group that sees the shoe image prominently with a group that sees a "claim ticket").  This fundamental mistake explains many of the errors they made in the design of their rebuttal surveys and the analysis of their surveys' results.

4.      The two surveys suffered from additional serious methodological flaws.  Instead of testing whether the prominence of a Nike sneaker image and Nike branding affects the mistaken belief that Nike is the source of the NFT offer, their experimental manipulation was essentially a distraction gimmick whereby unrelated stimuli were used to dilute the effectiveness and minimize the impact of the difference between their designated "Test" and "Control" versions.  Thus, for example, the surveys led respondents to review a great deal of unrelated stimuli (including 100 products displayed on the StockX homepage as well as a great deal of information that separated the shoe image from the questions), which diluted and made ineffective the difference between the Test and Control stimuli.  This distraction manipulation completely ignored the reality in which StockX customers often received a direct link to StockX's Vault NFT offers, which did not require them to first study unrelated products on the StockX homepage or a menu of all products offered on StockX's platform.

5.      Although the Klein and Neal Reports claimed that it was important to focus on purchasers of NFTs that are tied to sneakers, (a) the overwhelming majority of their surveys' respondents were not purchasers of NFTs tied to sneakers, and (b) defining the survey universe so narrowly reflects a misunderstanding of the product/NFT that relevant consumers actually purchase under uncertainty (putting aside the testimony of one of StockX's employees who

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

indicated that the NFTs were just a "gimmick"[1]).  It is also noteworthy that, when the incidence rate of targeted consumers is extremely low (for example, if 0.1% of the adult population purchased NFTs tied to sneakers between April 2022 and April 2023), the great majority of actual respondents recruited through an online panel are likely to be those who falsely claim to meet the screening criterion (even if they represent just 1% of the prospective respondents).[2]

6.      Despite its misguided objective and its methodological flaws, the Klein Survey did provide some useful information.  In particular, the Klein Survey's results showed that, when focusing on the NFT offer by itself (disregarding the vaulted physical product), close to 25% of all respondents believed that Nike "created the NFT."  The finding that a quarter of the respondents, who were asked separately about the company that created the NFT and about the company that created the vaulted physical product, mistakenly believed that it is Nike that created the NFT provides strong evidence that StockX misled a substantial percentage of consumers into believing that it is Nike that created/offered the NFTs.  As the Klein study further showed, this mistaken belief holds even when the image of the Nike-branded shoe is replaced with the name of the Nike shoe.[3]

7.      It appears that Mr. Klein did not realize that the study he designed was not a likelihood of confusion survey at all.  Instead, it was a study that tested whether replacing the branded sneaker image with the brand/model name (putting aside the many included distractions) and focusing on the creation of the NFT eliminates the mistaken belief that it is Nike that created the NFT.  The findings showed that even without the image, the mistaken beliefs about the

---

[1] Deposition of Jacob Fenton 123:22-124:11.
[2] See, e.g., K. Wessling et al. (2017), "MTurk Character Misrepresentation: Assessment and Solutions," *Journal of Consumer Research*, 44, 211-230 (MTurk is an online survey panel).
[3] The other question regarding the company that created the vaulted physical product served no purpose, considering that Nike "creates" Nike branded sneakers.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

creation of the NFT persist.  The percentage of respondents in both the Control group and the

Test group is statistically significantly different from zero at the 99.9% confidence level.  That is,

as long as StockX is offering NFTs associated with Nike-branded products and using ineffective

disclosures (as shown in my survey report), a substantial percentage of consumers mistakenly

believe that Nike is responsible for the NFT.

8.      To reiterate, the Klein Survey did make a contribution, though not the one

claimed by Mr. Klein.  His survey had little to do with likelihood of trademark confusion.  But it

does teach us that, if one separates the NFT from the vaulted physical product, the mere fact that

the physical product was made by Nike causes about a quarter of consumers to believe that the

maker of the product (Nike in this case) is the company that is responsible for and creates the

NFT.

9.      Dr. Neal's survey was also apparently designed to test for traditional likelihood of

trademark confusion, notwithstanding the unique aspects of this case and the appearance of

Nike's name on each page of the Test and Control stimuli.  Indeed, it failed to test whether

decreasing the prominence of the image of a Nike-branded shoe by replacing it with a claim

ticket affects the perceived source of the product/NFT and the perceived relative roles of Nike

versus StockX.  His decision to conduct such a survey was puzzling because the survey he

presumably rebutted was not a traditional likelihood of confusion survey but one that was

tailored to this case, and because he apparently recognized that this was not a situation where a

traditional likelihood of confusion survey was called for or needed (Neal Report, parag. 3.4).

Putting aside the fair use argument, there is no doubt that most consumers believe that StockX's

Vault NFTs, which prominently display images of Nike-branded shoes, originate from Nike.  If

there were any doubts about that fact, the results of the Neal Survey (and my survey), regardless

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

of which experimental group one looks at, demonstrate it conclusively.  For example, according to Table 16 in the Neal Report, over half of the "control group" (and the "Test group") respondents said that it was Nike that offered "the product or service on the website you were just shown" (notwithstanding the fact that it was StockX that offered the product or service on its website).

10.     To reiterate, it appears that Dr. Neal did not carefully review my survey and report.  Had he done that, he should have recognized that my survey tested a very specific question, namely, whether the prominence of the Nike sneaker image and logo affects beliefs about the company that is the source of (i.e., offers) the displayed product/NFT.  For example, as pointed out in my report (e.g., parag. 32), the mere fact that the questions are the so-called *Eveready* questions does not mean that a survey is testing traditional likelihood of trademark confusion.  And as explained above, he should have recognized that, whether or not the StockX Vault NFT is just a "gimmick" (as testified by Mr. Fenton of StockX), the presented NFT offer provides "exclusive access" to certain StockX benefits of ownership, including the rights to own a vaulted physical product.  In conclusion, the Neal Report and survey were completely misguided, and the manner in which he analyzed his survey's results, as if it were a run-of-the-mill likelihood of confusion survey that does not involve NFTs and other unique circumstances of this case, demonstrates this fundamental misunderstanding.

The Butler Survey

11.     The Butler Survey failed to recognize that there is no effective, unbiased methodology that is capable of testing simultaneously the impact of all of the allegedly false

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

and/or misleading advertising claims on the likelihood of making a purchase on the StockX platform.  The bases of this conclusion include the following:

a. It is unrealistic to expect respondents/consumers to review 20 or so information-rich webpages in one survey.  Beyond the lack of any evidence that consumers review so many pages sequentially in reality, it is much more information than one might expect survey respondents to read.[4]  As the respondents' survey completion time confirms, they did not and could not have paid attention to the overwhelming majority of the information presented to them.

b. The information overload and unrealistic expectations regarding the cognitive capacity, motivation, and attention of survey respondents were clearly material and made it highly unlikely that any particular word that appears on some of the pages, such as "authentic," would impact the one global measure of purchase likelihood that the survey relied on.  Thus, the ill-conceived attempt to test all of the claims in one survey based on exposure to so many webpages made the survey and its conclusions unreliable.  Indeed, presenting too much information in the context of a single survey is likely to greatly dilute and minimize the potential impact of any particular element or word.[5]

c. If, under these artificial, information overload conditions, there is still a significant number of respondents who mention the word "authentic" (and other words containing

---

[4] It is well-established that consumers/respondents tend to use shortcuts, especially when faced with high information load; see, e.g., J. Bettman et al. (1991), "Consumer Decision Making," *Handbook of Consumer Behavior*; J. Krosnick (1991), "Response Strategies for Coping with the Cognitive Demands of Attitude Measures in Surveys," *Applied Cognitive Psychology*, 5, 213-36; J. Bergstrom and J. Stoll (1990), "An analysis of information overload with implications for survey design research," *Leisure Sciences*, 12, 265-80;  B. Lee and W. Lee (2004), "The effect of information overload on consumer choice quality in an on-line environment," *Psychology & Marketing*, 21, 159-83.

[5] For a review, see, e.g., P. Scalf et al. (2013), "Competition explains limited attention and perceptual resources: implications for perceptual load and dilution theories," *Frontiers in Psychology*, 10 (May).

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

"authentic") as a reason for making a purchase, it supports the conclusion that this advertised claim is important when consumers decide whether to purchase a Nike sneaker on the StockX platform.

d.  Moreover, if a significant number of respondents in the Control group, who were not shown the word "authentic" as part of the survey, still mention it as a factor in their decision, it means that the intended difference between the Test and Control groups was ineffective.  In particular, considering that all of the respondents had visited the StockX website and/or were planning to purchase products offered for sale on that website, those in the Control group could have remembered the word "authentic" based on their familiarity with StockX.

e.  An examination of the Butler Survey data indicates that references to "authentic" were among the more commonly mentioned purchase likelihood explanations.  Specifically, 11.5% of the respondents in the Test group and 7.5% in the Control group mentioned "authentic" in their explanations.  The difference in these frequencies is not statistically significant (whereas the 7.5% mention rate is statistically significantly greater than zero).

12.     The fact that "authentic" was a common mention in both the Test and Control groups reflects a more general problem with the Butler Survey's respondent universe.  Given that all respondents had been familiar with StockX prior to the survey and were thus unlikely to decide whether to make a purchase on that website based on webpages shown to them as part of a survey, one would not expect to find differences between the Test and Control groups; indeed, this was precisely what the survey results showed.

13.     Furthermore, the Butler Survey respondents were presented with a great deal of information (about 20 pages) that was uniformly favorable to StockX.  The resulting "demand

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

effects" and "ceiling effects" caused about 95% of the respondents to indicate a high purchase

likelihood, which was the key measure on which the Butler Survey's conclusion was based. This

overwhelmingly "favorable" bias made it extremely unlikely that any difference between the Test

and Control groups would be observed. That is, the survey's design predetermined its stated

conclusion.

### THE KLEIN AND NEAL SURVEYS WERE MISGUIDED DUE TO A
### MISUNDERSTANDING OF THE SURVEY THEY WERE PRESUMABLY REBUTTING
### (THOUGH THEY DID PROVIDE SOME USEFUL EVIDENCE)

14. When preparing a rebuttal report and conducting a rebuttal survey in response to

another expert's survey, it is important to first examine what the survey purportedly being

rebutted actually tested. There is no point in misinterpreting or distorting what another expert

did and then responding to this false construction. In particular, if the goal is to look for claimed

limitations of another survey and run a survey to correct them, understanding the survey being

rebutted is an important starting point.

15. I pointed out repeatedly in my survey report, including in the Summary of

Conclusions, the following:

(parag. 14) "In particular, the Main Survey tested if greater prominence of Nike's trademarks

increases the mistaken belief that it is Nike that makes the Vault NFT offer."

(parag. 20) "These findings are consistent with the conclusion that a change in the

prominence of the image of the Nike branded shoe on the Vault NFT (while keeping the

companies' names prominent) causes a substantial increase in consumers' perceptions

that it is Nike that offers the Vault NFT."

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

Thus, as should have been clear from a review of my survey report, I did not conduct a traditional likelihood of trademark confusion survey like the one presumed by Mr. Klein and Dr. Neal.  Indeed, I did not address or make assumptions regarding legal issues pertaining to fair use; but my survey did address a key issue emphasized in Nike's Complaint pertaining to the impact of the prominence in StockX's Vault NFT offerings using Nike products and branding on consumers' beliefs and confusion concerning the source of the Nike-branded Vault NFTs.  The goal of my survey was consistent with Nike's Complaint, which repeatedly highlighted StockX's unauthorized use of Nike's branding (e.g., Complaint parags. 4, 7, 56, 58, 61, 75, 78, 79, 102, 108).  It also based on StockX's litigation position that the NFT offer is just a "claim ticket."

16.     Mr. Klein and Dr. Neal explained their surveys' assignments based on the mistaken assumption that I conducted a traditional likelihood of trademark confusion survey. Mr. Klein wrote:

> 11. I was asked by counsel to respond to the May 5, 2023, Expert Report of Dr. Itamar Simonson, who conducted a likelihood of confusion survey on behalf of Nike.

Similarly, Dr. Neal wrote (parag. 2.2):

> I also designed and executed my own survey (hereafter, "the Neal Survey"), to correct for flaws in Dr. Simonson's surveys and to determine whether Defendant's alleged use of Plaintiff's marks causes a likelihood of confusion with Plaintiff.

17.     Mr. Klein asked respondents about the company that "created the <u>NFT</u>" and separately about the company that "created the <u>product</u>."  As explained below, the question about the creation of the NFT did provide useful, relevant information.  Dr. Neal analyzed his survey's results as if it were a run-of-the-mill likelihood of trademark confusion survey; but if the question his survey was designed to test was whether consumers believe that Nike is the source of the NFT offer (regardless of other legal issues that have been raised), then both his Test and

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

Control groups (like my Test and Control groups) showed that most respondents hold such a belief.[6]  That is, putting aside other legal issues, there is little doubt that the Neal Survey is consistent with a very high level of confusion whereby consumers mistakenly believe that Nike makes the presented NFT offer.

## THE KLEIN AND NEAL SURVEYS USED A DISTRACTION GIMMICK TO OBSCURE AND DILUTE THE DIFFERENCE BETWEEN THEIR "TEST" AND "CONTROL" STIMULI

18.     My understanding is that StockX created and sold a limited amount of Vault NFTs purportedly tied to sneakers for a relatively brief period, from around January 18, 2022, through May 2022.  During this period StockX relied heavily on emails and social media to promote its new Vault NFT offering.  These emails and social media posts typically included a link that took consumers directly to an offered Vault NFT, for Nike sneakers in particular.[7]  Accordingly, many of the prospective purchasers were likely to reach StockX's product display webpages for the Vault NFTs directly (i.e., by clicking on a provided link), without reviewing first and/or spending time looking at unrelated products one might purchase on the StockX platform or observe on its homepage.

---

[6] The respondents were told up front that: "The website also allows you to buy certain of those goods through an NFT that serves as a digital token representing ownership of the physical item that is stored in the company's vault for safe keeping."

[7] *See e.g.,* NIKE0040207; NIKE0040287; STX0001275; STX006202; s*ee also* @StockX, TWITTER (Jan. 18, 2022), https://twitter.com/stockx/status/1483501803182374922?lang=en; @StockX, TWITTER (Jan. 26, 2022), https://twitter.com/stockx/status/1486398583725305865?lang=en; @StockX, INSTAGRAM (Jan. 18, 2022), https://www.instagram.com/p/CY4aFcsOrjV/?igshid=MzRlODBiNWFlZA==; @StockX, INSTAGRAM (Jan. 26, 2022), https://www.instagram.com/p/CZM-2wcOXTK/?igshid=MzRlODBiNWFlZA==.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

19.     In addition, a simple Google search for "StockX NFT"[8] takes consumers to a page

showing a Nike shoe, without having to examine unrelated webpages

(https://stockx.com/lp/nfts//).  In general, based on my expertise in consumer behavior on the

Internet,[9] consumers normally search for particular products based on their priorities and prior

knowledge[10] rather than study webpages that do not include the item or category they are looking

for, such as all of the products displayed on the homepage of a company.

20.     Thus, when designing their surveys, Mr. Klein and Dr. Neal should not have led

respondents to review various unrelated products and webpages.  Distractions (e.g., 100

unrelated products) and presenting too much information are likely to dilute and effectively

neutralize the impact of stimuli differences that are likely to get lost in the "noise."  This

conclusion is supported by a great deal of research.[11]  As Scalf et al. state in the article's abstract:

> "Both perceptual load theory and dilution theory purport to explain when and why task-
>
> irrelevant information, or so-called distractors are processed. Central to both explanations is
>
> the notion of limited resources, although the theories differ in the precise way in which
>
> those limitations affect distractor processing."

The authors went on to review the extensive literature and evidence on this topic and proposed

another possible account for the effect of distractors.

---

[8] Performed on June 18, 2023.  The Nike shoe that is displayed is the same one that was shown to respondents in my survey (and the one that StockX's customers were led to when its entrance to the Vault NFT market was announced).

[9] I. Simonson and E. Rosen (2014), *Absolute Value: What Really Influences Customers in the Age of (Nearly) Perfect Information*, HarperCollins Publishers.

[10] For a review of prior research in the general area of consumer information search, see, e.g., I. Simonson, J. Huber, and J. Payne (1988), "The Relationship Between Prior Brand Knowledge and Information Acquisition Order", *Journal of Consumer Research*, (March), 14, 566-78; see also R. Grant, R.J. Clarke & E. Kyriazis (2007), "A review of factors affecting online consumer search behaviour from an information value perspective," *Journal of Marketing Management*, 23, 519-533.

[11] For a review, see, e.g., P. Scalf et al. (2013), "Competition explains limited attention and perceptual resources: implications for perceptual load and dilution theories," *Frontiers in Psychology*, 10 (May).

21.     Respondents in both the Klein and Neal Surveys were first taken to the StockX homepage, which displayed approximately 100 products.  They were informed that they could zoom-in on any of the products.  After confirming that they were able to view the page clearly, the Klein Survey respondents received the following explanation:

> Some collectible sneakers on the StockX digital marketplace are available through Vault NFTs. A Vault NFT represents and tracks proof of ownership of an actual pair of sneakers stored in a vault. A Vault NFT can be sold or redeemed for the physical sneakers at any time.

A comparable explanation was provided to the Neal Survey respondents (before they were shown the StockX homepage).

22.     The Klein Survey respondents were next shown the (Test or Control) product display webpage.  Above the presented image, they were told the following:

> *Viewing Instructions:* If you choose to do so, you may zoom by hovering your mouse over the picture below on a desktop or laptop computer, by pressing and holding the picture on a tablet, or by double-tapping the picture on a smartphone. You may also view the back of the picture by selecting the thumbnail image.

My understanding is that StockX did not mention to its customers who visited Vault NFT product display webpages that they could view the image of the "back" of the Vault NFT image by selecting the thumbnail picture.  As discussed below, the Neal Survey asked respondents if they wanted to see the images of the "back" of the Vault NFT image, which was also likely to promote checking the disclaimer text on the "back" of the Vault NFT image.

23.     Both the Klein and Neal Control group respondents were shown the same Control image, which consisted of the same Nike shoe model name as the one that appeared just above it (i.e., respondents saw the same model's name twice, about two inches apart).  In both the Test and Control groups, respondents were shown a great deal of additional information, including five other shoes and associated prices, product details and fine print, a chart with price history,

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

and a menu that displayed a listing of all product categories offered on StockX.  The questions appeared at the bottom of the page, following the listing of all product categories, which further decreased the likelihood that respondents would examine again the shoe image/name.

24.     Mr. Klein and Dr. Neal presented no evidence that there are any StockX customers in reality who would review all this information (e.g., the 100 products on the homepage) and the other included distractions before deciding whether they wish to purchase Vault NFT.  In particular, given the manner in which StockX promoted its Vault NFT products (e.g., through emailed links and social media posts) and other ways consumers were likely to reach a StockX product display webpage for a particular Nike-branded Vault NFT (e.g., by typing "StockX NFT" in Google), it is unclear why Mr. Klein and Dr. Neal found it appropriate to distract and dilute the impact of the shoe image.  That is, this flaw virtually guaranteed that the difference between the Test and Control image would get lost in the "noise."

## THE MISGUIDED KLEIN AND NEAL SURVEYS' UNIVERSE AND THE FAILED ATTEMPT TO FOCUS ON PURCHASERS OF NFTS TIED TO SNEAKERS

25.     Both Mr. Klein and Dr. Neal suggested that the appropriate survey universe, which they presumably implemented, includes purchasers of NFTs tied to sneakers.  As Mr. Klein wrote:

29. The appropriate universe for measuring the extent of consumer confusion, if any, caused by StockX's use of pictures of Nike sneakers in connection with the sale of Vault NFTs is past and potential consumers of the product (i.e., NFTs linked to sneakers or collectible sneakers or shoes). As noted above, I developed an Internet survey.

Dr. Neal similarly opined that the focus should be on purchasers of NFTs tied to sneakers, which he presumably used when deciding on his own survey's universe.  As he wrote:

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

"3.7. Fatal Flaw 1: Dr. Simonson failed to survey the proper universe. The majority of his Main Survey sample (i.e., 52.2%, or 215 out of 412) are individuals who confirmed they would not consider buying an NFT (an important component of the product at issue, and further, the component on which Nike focuses for its infringement claims). Accordingly, his sample is overwhelmingly overinclusive of consumers whose state of mind is not relevant to the particular legal issue at hand (i.e., non-NFT purchasers). The remaining sample size is too small to draw reliable inferences and may include no likely purchasers of the type of NFT at issue – specifically, NFTs corresponding to a physical pair of sneakers."

26.     Given these stated opinions, one would have expected Mr. Klein and Dr. Neal to focus on purchasers of Vault NFTs tied to sneakers.  However, as explained next, they did not.  In fact, for the reasons stated below, there is reason to believe that most of their respondents who suggested that they purchased NFTs tied to sneakers (or considered purchasing sneaker NFTs) did not in fact purchase such NFTs.

27.     First, it is puzzling that despite arguing that the finding that 52.2% of my respondents would not buy NFTs tied to sneakers supported his "Fatal Flaw #1," less than 10% of the Neal Survey respondents indicated that they would (or did) purchase NFTs tied to sneakers.  Specifically, according to Table 9 in the Neal Report (page 82), 1.3% of his respondents had purchased an NFT tied to a physical pair of sneakers or shoes.  And according to Table 10 in the Neal Report, 6.4% of the respondents said that they would consider purchasing an NFT tied to a physical pair of sneakers or shoes.  It thus appears that at most 7.7% of the Neal Survey respondents said that they had purchased or would consider purchasing an NFT tied to a physical pair of sneakers or shoes.  In light of Dr. Neal's opinion that purchasing an NFT tied to a physical pair of sneakers is "an important component of the product at issue," his survey's universe completely failed to meet his own test of a proper universe.

14

28.     I will explain below why narrowly focusing on purchasers of NFTs tied to a physical pair of sneakers is a mistake and reflects a misunderstanding of consumer decision making and surveys.  However, it is important to point out that there is reason to believe that most of those respondents who claimed to have purchased NFTs tied to sneakers (or considered purchasing such NFTs) did not actually do that.

29.     I understand that sales of NFTs that are tied to sneakers have been rather limited, even if one includes the brief period between StockX's January 18, 2023 announcement of Vault NFTs and its last release of the Vault NFTs tied to sneakers just a few months later.  As an aside, the Klein and Neal Surveys' respondents were asked about the 12 months that preceded the surveys, that is, between about April 2022 and April 2023, a period during which StockX created and sold a de minimis amount of Vault NFTs tied to sneakers and none after May 2022.  My understanding[12] is that the prices of the Vault NFTs tied to sneakers that were offered through StockX were at least initially greatly inflated (relative to retail prices of the corresponding sneakers).

30.     I reviewed data concerning sales of Vault NFTs by StockX and subsequent sales, though the data may not be complete.[13]  Although the precise number of sneaker Vault NFT sales during the 12 months about which the Klein and Neal Survey's respondents were asked is not known,[14] it is clear that the total StockX Vault NFTs tied to sneakers was likely less than 2,000 or so.  As explained next, even if such sales totaled a somewhat larger number, the conclusion regarding the survey respondents' qualifications does not change.

---

[12] See McNew Report, dated May 5, 2023 at page 59.
[13] Documents that I reviewed include STX0056686, STX0806025, and STX0090109 at STX0090200-1.
[14] My understanding is that there may have been limited sales of NFTs tied to sneakers from other sources, none comparable to StockX.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

31.     Before proceeding with this analysis of the Klein and Neal Surveys' universe, we should make a more general observation regarding online surveys that involve small niches with a very small number of relevant consumers.  Of course, online surveys using members of survey panels represent most surveys conducted nowadays, and such surveys have been found to be usually just as (or more) reliable than other data collection methods.  I have conducted many online surveys, both in my consulting work and my academic research.

32.     However, if the target universe is very narrow and there is no effective way to validate respondents' qualifications, a serious problem often arises.[15]  Suppose, for example, that the true incidence rate of relevant consumers in the population is 0.1% and 1.0% of prospective survey respondents (i.e., those who start the Screener) falsely claim to have the required qualifications; in that case, the resulting sample will include primarily unqualified and, therefore, likely irrelevant respondents.

33.     This problem has been a growing concern among survey experts.  For example, the *Journal of Consumer Research* article by Wessling et al,[16] reached the following conclusion (based on five studies) (taken from the article's Contribution Statement; similar conclusions appear in the article's abstract):

> "Relying on self-reports to qualify respondents for studies can result in bad science if large numbers of respondents are not who they say they are. This tutorial demonstrates that as many as 80% of those who complete a study for MTurk credit misrepresent their identities, their demographic characteristics, or what they own in order to qualify for studies. We show the rate of misrepresentation is particularly problematic when attempting to sample a rare

---

[15] In some cases, despite the small niche target, the survey panel has additional information about prospective respondents that they had provided when signing up to become members.  Such information can be used to target (i.e., invite for a given survey) only those who are known to or are likely to have the needed qualifications.

[16] K. Wessling et al. (2017), "MTurk Character Misrepresentation: Assessment and Solutions," *Journal of Consumer Research*, 44, 211-230 (MTurk is an online survey panel).

population. Additionally, responses from impostors to questions other than the qualification question can to be different from those of respondents who truly qualify for the study. Substantial distortion occurs when respondent can gain financially by misrepresenting, but importantly not when monetary reward is not offered."

Other researchers have documented and discussed similar concerns.[17]

34.     In the present case, the Klein Survey's screener asked respondents the following question:

QS7. You indicated that you personally purchased or considered purchasing an NFT in the past 12 months. Which of the following types of NFTs, if any, did you purchase or consider purchasing? *(Select all that apply)* [RANDOMIZE; ANCHOR NONE OF THE ABOVE]

❑ NFT corresponding to a physical pair of sneakers or shoes

…

According to the Klein Survey's data file, 162 of the actual respondents indicated that they did purchase or considered purchasing an NFT corresponding to a physical pair of sneakers or shoes during the 12 months preceding the survey.  Given that 11,113 prospective respondents started the survey (Klein Report, Appendix E), it means that 162/11,113 or 0.558% of the prospective respondents claimed to have purchased or considered purchasing such NFTs during that 12-months period.  The number of adults in the United States is a currently a little over 264 million.[18]  Accordingly, the reported screening results of the Klein Survey imply that close to 1.5 million people purchased or considered purchasing an NFT corresponding to a physical pair of sneakers or shoes during the 12 months preceding the Klein Survey.  In light of the actual sales of such NFTs, we can be confident that the overwhelming majority of actual respondents who

---

[17] See, e.g., J. Lawlor et al. (2021), "Suspicious and fraudulent online survey participation: Introducing the REAL framework," *Methodological Innovations*, 1-10; A. Bell and T. Gift (2023), "Fraud in Online Surveys: Evidence from a Nonprobability, Subpopulation Sample," *Journal of Experimental Political Science*, 10, 148-153.
[18] https://worldpopulationreview.com/countries/united-states-population.

claimed to have purchased or that they considered purchasing NFTs tied to sneakers during the

12 months prior to the survey did not actually purchase or considered purchasing such NFTs.  As

explained above, given the tiny niche targeted by this screening question and the evidence that

some respondents (even if they represent a very small percentage of prospective respondents)

misrepresent their qualifications, this conclusion about the Klein Survey respondents is

consistent with prior evidence.

35.      A similar conclusion applies to the Neal Survey respondents, though the number

of respondents claiming to have purchased such NFTs during the 12 months prior to the survey

was smaller (but respondents were asked only about actual purchases during the previous 12

months; see Neal Survey, Question S9).  According to the Neal Survey data, nine respondents

said that they had purchased NFTs tied to sneakers or shoes during the preceding 12 months.  It

appears from Exhibit D of the Neal Survey report that a total of 5,564 (including those who

completed the survey) started the survey.  Accordingly, 9/5,564 or 0.00162% of those who

started the survey said that they had purchased NFTs tied to sneakers or shoes during the

preceding 12 months.  Multiplying this rate by the adult U.S. population, it would suggest that

over 420,000 consumers purchased NFTs tied to sneakers or shoes during that 12-month period.

Once again, we can conclude with confidence that the great majority of the actual Neal Survey

respondents misrepresented their qualifications, which makes their answers to other questions

untrustworthy.


The Klein and Neal Surveys' Focus on Purchasers of NFTs Tied to Sneakers Was Misguided

36.      While the reliance on respondents who misrepresent their qualifications is

certainly concerning, it should be emphasized that the decision to put so much weight on finding

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

the small number of consumers who purchased NFTs tied to sneakers or shoes was misguided. NFTs tied to sneakers is an extremely small category, which does not appear to grow particularly fast.[19]  In fact, given that many of those who purchased such Vault NFTs from StockX apparently overpaid for them, a previous purchase is likely to be a poor indicator of future purchases.  A better alternative, which the Klein and Neal Surveys did to some extent, is to screen respondents based on related characteristics, such as looking for new investment opportunities, including NFTs or crypto-related, and collecting sneakers.

37.     It is also important to point out that the Klein and Neal Surveys mistakenly assumed that consumers/respondents, who were presented with Vault NFTs purportedly tied to sneakers, could know with certainty what they will end up doing with their purchase.  That is, consumers who buy a Nike-branded Vault NFT tied to a particular Nike shoe purchase the right to exclusive access to certain benefits, including the ownership rights to that shoe.  Whether and how they might use that Vault NFT is much less clear and, especially given the rather new, still evolving category, is associated with great uncertainty.  It may end up being just the ability to "flex" or show ownership of the Vault NFT; it may be the right to own "exclusive access" to StockX benefits, promotions, experiences, and rewards; it may be the right to be part of an exclusive group of Vault NFT owners; it may be the right to take physical possession of the sneaker; it may be a mere storage service for collectors; or it may be the ability to sell the Vault NFT at a higher (or lower) price to someone else.  Thus, at the time of purchase, especially considering the newness of the Vault NFT concept, a consumer purchases the NFT, with great uncertainty about what the asset will end up being used for.

---

[19] For an overview, see the McNew Expert Report, dated May 5, 2023.

38.     Furthermore, StockX has emphasized the link of the NFTs to the actual product

and the option to take possession of the product; for example:[20]

"If you decide you are ready to take possession of the physical product, you can

simply redeem your Vault NFT and we will deliver the product straight to your door."

Thus, Mr. Klein's and Dr. Neal's decision to define the relevant consumers based largely on

consumers who buy NFTs tied to sneakers ignored the more certain reality whereby they

purchased a NFT product and was therefore ill-defined and much too narrow.

39.     Moreover, it is unclear whether the StockX Vault NFT is merely a gimmick.  As

Mr. McNew pointed out in reference to the testimony of Mr. Fenton (McNew Report, dated May

5, 2023, at page 61):

"Indeed, as noted above, Jacob Fenton[21] stated in a March 13, 2022, email that the "NFT
aspect" of the Vault NFTs "is a marketing gimmick at this point."  During his deposition
on December 2, 2022, Mr. Fenton further elaborated on this point:

Q. And then you write, "Vault is a storage service that we offer for our customers. The NFT
aspect of it is a marketing gimmick at this point." What did you mean by that?

A. We didn't have, like, we didn't have to mint it as an NFT. We could have drawn up a
picture of a claim ticket, like in Willy Wonka, and said, "This is the claim ticket to the
shoe." So we chose to do it because, several reasons. One, there is a lot of fervor and
interest in NFTs at this time. And two, we also thought down the road, you know, as we
were trying to facilitate additional secondary trades, the technology of this would – would
help that process, make it easier for us." [Fenton Depo. Tr. at 123:22-124:11]

Overall, narrowly focusing on purchases of NFTs completely ignores the reality that StockX

created around the NFT offer where it is not possible for a consumer to know *a priori* whether the

---

[20] https://stockx.com/lp/nfts.
[21] Mr. Fenton is StockX's Vice President of Consumer Experiences.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

NFT will end up being just another product purchase or will function according to someone's vision of what NFTs may be.

<u>WHILE THE KLEIN SURVEY DID NOT TEST FOR LIKELIHOOD OF CONFUSION, IT DID TEST WHETHER, CONSIDERING THE NFT OFFER SEPARATELY FROM THE UNDERLYING PRODUCT/SNEAKER, STOCKX MISLEADS CONSUMERS INTO BELIEVING THAT IT IS NIKE THAT CREATED THE NFT</u>

40.     Although flaws of the Klein and Neal Surveys were similar in key respects, as explained above, there were some important differences between the two surveys and their design.  In the Klein Survey, the first substantive question that respondents were asked after being presented with the stimuli described above was the following:

"What company do you believe created the <u>NFT</u> referenced above, or don't you know?"

(respondents were also asked to explain their answers).

Respondents were then asked about the company that created the sneaker and explained their answer.

41.     Thus, importantly, the Klein Survey singled out and distinguished the "creation" of the <u>NFT</u>" from the creation of the sneaker; this bundle separation was evidently based on the assumption that consumers make a distinction in their minds between the creation of the Vault NFT and the creation of the product that is supposedly tied to the Vault NFT.  Although I am not aware of evidence that supports this assumption, given that Mr. Klein chose to make that distinction, we can examine the results generated by the questions.

42.     The survey's results showed that close to 25% of all respondents believed that Nike "created the <u>NFT</u>."  In other words, putting aside the artificial distractions (discussed

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

above) that distorted typical purchase conditions (e.g., consumers who simply click on a link

emailed to them or on links displayed in social media, without examining the 100 products on

the StockX homepage), which minimized the effective difference between the designated Test

and Control, close to a quarter of the Klein Survey respondents believed that it was Nike that

"created the NFT." This finding provides strong evidence that StockX misled a substantial

percentage of consumers into believing that it is Nike that created the Vault NFTs that were

displayed on the StockX website. As the Klein experiment showed, this mistaken belief holds

even when the image of the shoe is replaced with the name of the Nike shoe.[22]

43.     To reiterate, it appears that Mr. Klein did not realize that the study he created was

not a likelihood of confusion survey at all. Instead, it was a study that tested whether replacing

the sneaker image with the brand/model name and focusing on the <u>creation of the NFT</u>

eliminates the mistaken belief that it is Nike that creates the Vault NFT. The findings showed

that even without the image, the mistaken beliefs about the creator of the Vault NFT persist.

That is, as long as StockX is offering NFTs associated with Nike-branded products, a substantial

percentage of consumers mistakenly believe that Nike is responsible for the NFT. The

percentage of respondents in the Control group and the Test group is statistically significantly

different from zero at the 99.9% confidence level. Accordingly, as long as StockX is offering

NFTs associated with Nike-branded products, a substantial percentage of consumers mistakenly

believe that Nike is responsible for the NFT.

44.     In that regard, the Klein Survey did make a contribution, though not the one

claimed by Mr. Klein. It teaches us that, if one separates the NFT from the product, the mere fact

that the sneaker was made by Nike causes about a quarter of consumers to believe that the maker

---

[22] The question about the company that created the sneaker served no purpose, considering that Nike
"creates" Nike sneakers.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

of the sneaker (Nike in this case) is the company that is responsible for and creates the NFT arrangement.

## THE MISGUIDED NEAL SURVEY

45.     I pointed out above that the surveys of both Mr. Klein and Dr. Neal were misguided from the start.  Mr. Klein, however, did introduce a different experimental manipulation, which (putting aside the study's flaws) was designed to separate the NFT component of the StockX Vault NFTs from the shoe itself.  As indicated, the results of this study were informative.

46.     By contrast, Dr. Neal's survey was apparently designed to test for likelihood of confusion.  His decision to conduct such a survey was puzzling because the survey he presumably rebutted was not a traditional likelihood of confusion survey, and because he apparently recognized that this was not a situation where a traditional likelihood of confusion survey was called for (or needed).  As he wrote:

> 3.4. As a threshold matter, I acknowledge that the Eveready format has clear limitations in the context of a case involving the resale of trademarked goods, where doctrines like first sale and fair use may apply. To illustrate this point, it would be factually accurate for a survey respondent to indicate that Nike "offers" the Nike sneakers depicted in the stimuli that both Dr. Simonson and I used – as Nike sells these sneakers in the primary market. Such a response would not indicate confusion, and the classic Eveready questions do not capture that nuance of context.

47.     Indeed, there is no doubt that most consumers (mistakenly) believe that the Nike-branded Vault NFTs offered on the StockX platform originate from Nike.  If there were any doubts about that fact, the results of the Neal Survey and my Survey, regardless of which experimental group one looks at, demonstrate it conclusively.  For example, according to Table

23

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

16 in the Neal Report, over half of the "control group" (and the "Test group") respondents said that it was Nike that offered "the product or service on the website you were just shown" (notwithstanding the fact that it was StockX that offered the product or service on its website).

48.    It appears that Dr. Neal did not carefully review my survey and report.  Had he done that, he should have recognized that my survey/experiment tested a very specific question, namely, whether the prominence of the Nike sneaker image and branding affects beliefs about the company that is the source of (or offers) the displayed product/NFT.  For example, as pointed out in my report (e.g., parag. 32), the mere fact that the questions are the so-called *Eveready* questions does not mean that a survey is testing traditional likelihood of trademark confusion. And as explained above, he should have recognized that, whether or not the StockX NFT is just a gimmick (as testified by Mr. Fenton), the presented offer guaranteed owning a product, which may be just that or may function according to StockX's vision of its NFTs.

49.    Finally, Dr. Neal should have realized given that the name Nike appears on virtually each page of the main questionnaire, sooner or later (i.e., if not in answers to the first question, then in answers to a subsequent questions), the name Nike was likely to be mentioned by respondents.  I explained that in detail in my earlier survey report (see, e.g., parag. 36).

50.    Accordingly, the Neal Survey was completely misguided.  It merely demonstrated one more time that an experimental manipulation that is diluted and based on distractions that are detached from the typical consumer reality is ineffective.


## AN EVALUATION OF THE BUTLER SURVEY

51.    Ms. Butler's assignment (Report parag. 9) was the following:

I was asked by counsel for Defendant, StockX LLC (hereinafter "StockX"), to determine the extent to which, if at all, allegedly false statements related to the authentication and

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

verification process (hereafter, "Authentication Statements")6,7 found on StockX's website during the relevant time period influence consumers' decisions to use the site to purchase sneakers.

52.     The Butler Survey was described as designed to test all of the allegedly deceptive claims (as detailed in Nike's Interrogatory Response #22) together, in one test.  Respondents were shown a collection of webpages (about 20 pages in total) that respondents were expected to review before answering the key question.  The list of allegedly deceptive claims includes the following from Nike's Response to StockX's Interrogatory No. 22[23]:

☐ "100% Verified Authentic"

☐ "Verified Authentic"

☐ "Every item sold goes through our proprietary multi-step verification process with our team of expert authenticators"

☐ StockX's authentication process uses "100+ data points"

☐ "StockX "authenticators are better equipped than anyone to ensure a product's authenticity"

☐ StockX's "multi-step verification process"

☐ StockX's "proprietary" authentication process

☐ "Guaranteed Authenticity" as related to products sold on the StockX platform

☐ StockX's authentication process uses "Advanced Technology"

☐ StockX's authentication process uses "Quality Assurance;"

☐ "StockX has a 99.96% authentication accuracy rate"

☐ "Always Authentic, Never Fake"

☐ "Guaranteed Authenticity. Every item. Every time. Shop on StockX with complete confidence knowing every purchase is 100% Verified Authentic"

☐ "A final check in our authentication practice, our QA experts ensure nothing slips through the cracks"

---

[23] Plaintiff Nike Inc.'s Responses and Objections to Defendant StockX LLC's Third Set of Interrogatories

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

☐ "We Authenticate Every Item. Every Time"

☐ "Shop on StockX with complete confidence knowing every purchase is Verified Authentic."

53.     Thus, the Butler Survey's respondents were expected to evaluate approximately 20 StockX webpages before they were asked the key survey question regarding purchase likelihood, which was the basis for the survey's stated conclusions (see the Butler Report and Butler Exhibit E).  The webpages that respondents were expected to review contained thousands of words and numerous pictures, figures, and products.[24]  It is noteworthy that many of the respondents completed the entire survey (including the Screener) rather quickly, with about 35% of them taking between 3 and 6 minutes to review all the exhibits and answer the Screener and Main Questionnaire questions.

54.     The Butler Report describes the pages that respondents were told to review and the differences between the Test and Control versions of the 20 pages as follows:

24. Respondents were then randomly assigned to either the Test Group (shown a series of StockX.com webpages containing the Authentication Statements) or the Control Group (shown the same webpages, with all Authentication Statements removed or altered).32

25. Respondents were then shown five webpages: 1) the StockX homepage, 2) the StockX "How it Works" page, 3) the StockX "Process" page, 4) the StockX "Sneakers" page, and 5) the StockX "product description page" for Nike Dunk Low sneakers. The selected pages (1) represent the types of pages consumers might interact with when using StockX to purchase Nike sneakers (i.e., the home page, a list of products, and a specific product page), (2) include detailed information about StockX and how it works (which I understand to be relevant to the litigation), and, (3) include a version of every Authentication Statement that Nike has identified as allegedly false in their response to Interrogatory No. 22 that also appeared on the StockX website and app, where

---

[24] About half of the respondents completed the questionnaire, including the review of the 20 webpages, using a mobile phone.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

consumers can actually purchase shoes. Each webpage was presented on a separate screen, with the instruction, "Please select the ">" button at the bottom of the screen when you are ready to proceed."

55.     I will next evaluate the Butler Survey's methodology.  In particular, I will examine whether the decision to try to test all of the allegedly deceptive claims together predetermined the results, thereby making them unreliable. That is, a question that naturally arises is whether telling respondents to review many webpages sequentially, whether or not such an overwhelming amount of information can be reasonably expected to be considered in reality, made the survey unreliable.

56.     Indeed, requiring respondents to review and process so much information was a recipe for diluting the impact of any single word, including "authentic."  If under these conditions respondents still mentioned "authentic" as a factor affecting their purchase likelihood, that would be strong evidence that this term is influential.  It is also of interest to find out if any respondents in the Control group, who were not exposed to the word "authentic," still mentioned the word as a reason for purchase.  In particular, considering that all of the respondents had previously visited and/or expected to shop at the StockX website, they might have relied on the information they had been previously exposed to (in which case, the difference between the Test and Control groups was smaller than it should have been).  Finally, I will examine whether the exposure to so many webpages that present StockX in a favorable light virtually guaranteed that almost all respondents would indicate a high purchase likelihood, further diluting the difference between the Test and Control versions.

<u>The Consequences of the Failed Attempt to Test All Allegedly Deceptive Claims Simultaneously</u>

57.    Considering the allegedly deceptive claims at issue (e.g., "100% Authentic"), counsel for StockX could have decided to use surveys to test one, some, or all of these claims. But one thing should have been clear – there is no effective, unbiased methodology that is capable of testing simultaneously the impact of all of these claims on the likelihood of making a purchase on the StockX website.  The reasons for this conclusion include the following:

a.  It is completely unrealistic to expect respondents/consumers to review 20 or so information-rich webpages in one survey or in one visit to a website.  Beyond the lack of any evidence that consumers review so many pages sequentially in reality, it is obviously much more information than one might expect survey respondents to actually read.  As the survey completion time confirms, most of them did not and could not have paid attention to the great majority of the information presented to them.

b.  The information overload and unrealistic expectations regarding the cognitive capacity, motivation, and attention of survey respondents were clearly material and made it highly unlikely that any particular word that appears on some of the pages, such as "authentic," would impact the one global measure of purchase likelihood that the survey relied on.  Thus, the ill-conceived attempt to test all of the claims in one survey based on exposure to so many webpages made the survey and its conclusions unreliable.  Indeed, presenting too much information in the context of a single survey is likely to greatly dilute and minimize the potential impact of any particular element or word.[25]

c.  If, under these artificial, information overload conditions, there is still a significant number of respondents who mention the word "authentic" (and other words containing

---

[25] For a review, see, e.g., P. Scalf et al. (2013), "Competition explains limited attention and perceptual resources: implications for perceptual load and dilution theories," *Frontiers in Psychology*, 10 (May).

"authentic") as a reason for making a purchase, that is evidence supporting the conclusion that this claim is important when consumers decide to make a purchase on the StockX platform.

d.  Moreover, if a significant number of respondents in the Control group, who were not shown the word "authentic" as part of the survey, still mention it as a factor in their decision, it means that the intended difference between the Test and Control groups was ineffective.  In particular, considering that all of the respondents had visited the StockX website and/or were planning to purchase from that website, those in the Control group could have remembered the word "authentic" from their previous visits.

e.  An examination of the Butler Survey data indicates that references to "authentic" were among the more commonly mentioned purchase likelihood explanations.  In particular, 11.5% of the respondents in the Test group mentioned "authentic" in their explanations, compared with 7.5% in the Control group.  The difference in these mention frequencies is not statistically significant, whereas the percentage of respondents in the Control group who mentioned "authentic" is significantly (at the 95% confidence level) greater than zero.

The Survey Universe Largely Predetermined the Results

58.  The fact that "authentic" was a common mention in both the Test and Control groups reflects a more general problem with the Butler Survey's respondent universe.  Given that all respondents had been familiar with StockX prior to the survey and were thus unlikely to decide whether to make a purchase on that website based on webpages shown to them as part of

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

a survey, one would not expect to find differences between the Test and Control groups; indeed, this was precisely what the survey results showed.

<u>Presenting Respondents With a Great Deal of Information that is Uniformly Favorable to StockX Generated Demand and Ceiling Effects and Virtually Guaranteed that Almost All Respondents (in Both the Test and Control) Would Indicate a High Purchase Likelihood</u>

59.     Survey demand effects refer to surveys in which the questions, presented information, and stimuli suggest the "correct" or "expected" answer, which respondents tend to provide.[26]  A ceiling effect in this (and similar) cases means that, if almost all survey respondents tend to provide a particular answer (e.g., that they are likely to buy a product) given the very favorable provided information shown to them, that it becomes highly unlikely that one will observe a significant difference between two groups (e.g., Test and Control).  In a different context, if an exam is too easy, then it is unlikely that there will be differences between two groups (e.g., the score of an advanced class and the score of regular class).

60.     As pointed out, in the Butler Survey, the fact that survey participants were shown so much favorable information about StockX created demand effects – it was clear from the presented information that the survey was designed to elicit a favorable response (i.e., high purchase likelihood).  In addition, the survey reflected the impact of a ceiling effect. Approximately 95% of the respondents in both the Test and Control groups indicated a high purchase likelihood, making it highly unlikely that there would be differences between the two groups.

---

[26] See, e.g., I. Simonson and R. Kivetz (2012), "Demand Effects in Likelihood of Confusion Surveys: The Importance of Marketplace Conditions," Ch. 11 in *Trademark and False Advertising Surveys*, Edited by S. Diamond and J. Swann, American Bar Association.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

61.     The Butler Survey's Control Group stimulus replaced "Authenticated" with "Inspected."  The problem with "Inspected" is that it is ambiguous, ill-defined, and its meaning to respondents was not tested.  In particular, it could mean "Authenticated."  Consider, for example, the following quote of an "Inspector" that was prominently displayed in the Control version of the stimuli:

"In a community filled with uninspected items, I have the opportunity to protect our customers and their hard earned money."

Given such a statement, it is unclear what the term "uninspected items" refers to aside from unauthenticated items.


Date :  7/5/2023
_____
Itamar Simonson, Ph.D.

Itamar Simonson

**ADDRESSES**                                                                 January 2023

Home Office:                                          (University) Office:
  1561 Newlands Ave.                          Graduate School of Business
  Burlingame, CA 94010                        655 Knight Center, Stanford University
  Cell: (650) 387-7677                            Stanford, CA 94305-5015
  itamar.simonson@gmail.com                   itamars@stanford.edu


**EDUCATION**

Ph.D.                          Duke University, Fuqua School of Business
                               Major: Marketing;  May 1987


M.B.A.                         UCLA,  Graduate School of Management
                               Major: Marketing;  March 1978

B.A.                           Hebrew University, Jerusalem, Israel
                               Major: Economics, Political Science;  August 1976

**ACADEMIC POSITIONS**

July 1987 - June 1993          University of California, Berkeley
                                 Haas School of Business
                                 Assistant Professor

July 1993 – Aug. 1996          Stanford Graduate School of Business
                                 Associate Professor of Marketing

Sept. 1996 – Aug. 1999         Stanford Graduate School of Business
                               Professor of Marketing

Sept. 1999 –   Dec. 2020       Stanford Graduate School of Business
                               Sebastian S. Kresge Professor of Marketing

Jan. 2021 – Present            Stanford Graduate School of Business
                               Sebastian S. Kresge Emeritus Professor of Marketing

1994 – 2000                    Stanford Graduate School of Business
                               Marketing Group Head

2000, 2004, 2012               Visiting Professor of Marketing: MIT; NYU; Columbia

**AWARDS**

- Best Article in the *Journal of Consumer Research* during the period 1987-1989.

- The 1997 O'Dell Award (for the *Journal of Marketing Research* article that has had the greatest impact on the marketing field in the previous five years).

- The 2001 O'Dell Award.

- Honorary Doctorate: University of Paris II – Sorbonne Universities.

- The American Marketing Association Best Book in Marketing Award.

- Elected Fellow of the Association for Consumer Research.

- The 2007 Society for Consumer Psychology Distinguished Scientific Achievement Award.

- Finalist for the O'Dell Award:  1995;  2002;  2004;  2005;  2007;  2008; 2012.

- Best Article in the *Journal of Public Policy & Marketing*  during the period 1993-1995.

- The 2016 Association for Consumer Research Conference Best Paper Award.

- The 2002 American Marketing Association Award for the Best Article on Services Marketing.

- The Association for Consumer Research 1990 "Ferber Award."

- Finalist for the 2003 Paul Green Award (for the *Journal of Marketing Research* article with the greatest potential to contribute to the practice of marketing research).

- Runner-up for the 2005 *Journal of Consumer Research* Best Article Award.

- Winner in the Marketing Science Institute and Direct Marketing Association competition on "Understanding and Measuring the Effect of Direct Marketing."

- Runner-up for the 1993 *California Management Review* Best Article Award.

- National Science Foundation Grant (for 1996-8).

- Outstanding Reviewer Award, *Journal of Consumer Research*, 2005, 2009.

- Honorable Mention for the Sloan Executive Program Teaching Award.


**TEACHING EXPERIENCE**

<u>Stanford University</u>:

      Marketing Management  (for MBAs and the Sloan Executive Program)

      Marketing to Businesses (for MBAs);  Technology Marketing  (for MBAs)

      Critical Analytical Thinking (for MBAs)

      Research Methods for Studying Consumer Behavior  (a Ph.D. Course)

      Applied Behavioral Economics  (at the MBA and Ph.D. levels)

      Buyer Behavior (a Ph.D. course)

<u>University Of California, Berkeley</u>:

      MBA, Ph.D. and Executive Education Classes on Marketing Management and Consumer Behavior.

**BUSINESS EXPERIENCE**

October 1978-August 1983    Motorola, Inc.
Worked in an international subsidiary; responsibilities included marketing research and customer analysis, customer surveys, definition of new products, pricing, analysis of sales force performance, competitive intelligence, and forecasting.  Conducted studies of consumers and markets for various communications products.  Last two years served as Product Marketing Manager for communications products.

**Consulting**:

Consulted for clients from a wide range of industries such as technology, communications, services, and manufacturing sectors.
Expert witness assignments: trademark infringement, deceptive advertising, surveys, consumer behavior, marketing management, branding, retailing, distribution, assessment of demand drivers and feature value, and other marketing issues.

**PUBLICATIONS**

Ioannis Evangelidis, Jonathan Levav, and Itamar Simonson, "The Upscaling Effect," *Journal of Consumer Research*, Forthcoming.

Ioannis Evangelidis, Sudeep Bhatia, Jonathan Levav, and Itamar Simonson, "50 Years of Research on Context Effects: Historical Overview and Directions for Future Research," *Journal of Consumer Research*, Forthcoming.

Ioannis Evangelidis, Jonathan Levav, and Itamar Simonson (2022), "A Reexamination of the Impact of Decision Conflict on Choice Deferral," *Management Science*, Forthcoming.

Itamar Simonson (2022), "Experimentation, Serendipity, and Strategy in Research Discovery," *Review of Marketing Research.*

David Gal and Itamar Simonson (2021), "Predicting Consumers' Choices in the Age of the Internet, AI, and Almost Perfect Tracking: Some Things Change, the Key Challenges Do Not," *Consumer Psychology Review*, 4 (1), 135-152.

Itamar Simonson (2020), "The Real Time Cognitive Value of Eating Kale, Helping, and Doing Something Special: "Concurrent Experience Evaluation" (CEE), Its Drivers and Moderators, and Research Directions," *Journal of Consumer Psychology*, 30, 688-711.

Franklin Shaddy, Ayelet Fishbach, and Itamar Simonson (2021), "Tradeoffs in Choice," *Annual Review in Psychology*, 72, 181-206.

Haiyang Yang, Ziv Carmon, and Itamar Simonson (2020), "Preference for Practical versus Theoretical Knowledge: Conceptualization and Consumer Behavior Predictions," *Review of Marketing Research*, Vol. 17, Dawn Iaccabucci Editor.

Louise Twito, Salomon Israel, Itamar Simonson, and Ariel Knafo-Noam (2019), "The Motivational Aspect of Children's Delayed Gratification: Values and Decision Making in Middle Childhood," *Frontiers in Psychology*.

Itamar Simonson (2018), "Understanding Consumer Choices Involving Environmental and Utilitarian Attributes: The Role of Dimensional Comparability and Compromisibility," *Journal of Environmental Analysis & Ecology Studies*, Vol. 3.

Itamar Simonson and Ran Kivetz (2018), "Bringing (Contingent) Loss Aversion Down to Earth – A Comment," *Journal of Consumer Psychology*, *Journal of Consumer Psychology*, 28, 517-522.

Ioannis Evangelidis, Jonathan Levav, and Itamar Simonson (2018), "The Asymmetric Impact of Context Effects on Advantaged versus Disadvantaged Options," *Journal of Marketing Research*, 55, 239-253.

Itamar Simonson, Aner Sela, and Sanjay Sood (2017), "Preference-Construction Habits: The Case of Extremeness Aversion," *Journal of the Association for Consumer Research*, 2, 3, 322-332.

Itamar Simonson (2016), "Imperfect Progress: An Objective, Quality Assessment of the Role of User Reviews in Consumer Decision Making," *Journal of Consumer Research*, 42, 840-845.

Itamar Simonson (2016), "The Construction of the Consumer Decision Making Field by Jim Bettman – The Case of Preference Construction," in *Legends in Consumer Behavior*, I. Simonson, editor.

Leilei Gao and Itamar Simonson (2016), "The positive effect of assortment size on purchase likelihood: The moderating influence of decision order," *Journal of Consumer Psychology*, 26, 542-549.

Itamar Simonson (2015), "Mission (Largely) Accomplished:  What's Next for Consumer BDT-JDM Researchers?" *Journal of Marketing Behavior*, 1, 9-35.

Itamar Simonson (2015), "The BDT Effect and Future:  A Reply to John Lynch and Norbert Schwarz" *Journal of Marketing Behavior*, 1, 59-73.

Itamar Simonson (2014), "Vices and Virtues of Misguided Replications:  The Case of Asymmetric Dominance," *Journal of Marketing Research*; 51 (4), 514-9.

Itamar Simonson and Emanuel Rosen (2014), *Absolute Value: What Really Influences Customers in the Age of (Nearly) Perfect Information*, HarperCollins Publishers.

Itamar Simonson and Emanuel Rosen (2014), "What Marketers Misunderstand About Online Reviews," *Harvard Business Review*, January, 23-25.

(*HBR Blog*:  "Three Long-Held Concepts Every Marketer Should Rethink," January 22, 2014)

Leilei Gao, YanLiu Huang, and Itamar Simonson (2014), "The Influence of Initial Possession Level on Consumers' Adoption of A Collection Goal: A Tipping Point Effect," *Journal of Marketing,* 78, 143-156.

Aner Sela, Itamar Simonson, and Ran Kivetz (2013), "Beating the Market: The Allure of Unintended Value," *Journal of Marketing Research*, Vol. L (December), 691-705.

Itamar Simonson, James Bettman, Thomas Kramer, and John Payne (2013), "Comparison Selection: An Approach to the Study of Consumer Judgment and Choice," *Journal of Consumer Psychology*, 23(1), 137-149.

Itamar Simonson, James Bettman, Thomas Kramer, and John Payne (2013), "Directions for Judgment and Decision Making Research Based on Comparison Selection:  Reply to Arkes, Johnson, and Kardes," *Journal of Consumer Psychology*, 23(1), 161-3.

Itamar Simonson and Ran Kivetz (2012), "Demand Effects in Likelihood of Confusion Surveys: The Importance of Marketplace Conditions," Ch. 11 in *Trademark and False Advertising Surveys*, Edited by Shari Diamond and Jerre Swann, American Bar Association.

Thomas Kramer, Michal Maimaran, and Itamar Simonson (2012), "Asymmetric Option Effects on Ease of Choice Criticism and Defense," *OBHDP*, 117, 179-91.

Michal Maimaran and Itamar Simonson (2011), "Multiple Routes to Self Versus Other-Expression in Consumer Choice," *Journal of Marketing Research*, August, 755-66.

Itamar Simonson and Aner Sela (2011), "On the Heritability of Consumer Decision Making:  An Exploratory Approach for Studying Genetic Effects on Judgment and Choice," *Journal of Consumer Research*, 37, 951-66.

Stephen Nowlis, Ravi Dhar, and Itamar Simonson (2010), "The Effect of Decision Order on Purchase Quantity Decisions," *Journal of Marketing Research*, 40 (4), 725-737.

Chezy Ofir, Itamar Simonson, and Song-Oh Yoon (2009), "The Robustness of the Effects of Consumers' Participation in Market Research: The Case of Service Quality Evaluations," *Journal of Marketing*, 73 (November), 105-14.

Aimee Drolet, Mary Frances Luce, and Itamar Simonson (2009), "When Does Choice Reveal Preference? Moderators of Heuristic vs. Goal Based Choice," *Journal of Consumer Research*, 36 (1).

Itamar Simonson (2008), "Regarding Inherent Preferences," *Journal of Consumer Psychology*, 18, 191-196.

Itamar Simonson (2008), "Will I Like a 'Medium' Pillow?  Another Look at Constructed and Inherent Preferences," *Journal of Consumer Psychology*, 18, 155-169.

Song-Oh Yoon and Itamar Simonson (2008), "The Context of Construction as a Determinant of the Strength and Stability of Consumer Preferences," *Journal of Consumer Research*, 35, September, 324-336.

Itamar Simonson (2007), "Decision Making," *Encyclopedia of Social Psychology*; Sage.

Jonah Berger, Michaela Draganska, and Itamar Simonson (2007), "The Influence of Product Variety on Brand Perceptions, Choice, and Experience," *Marketing Science*, 26, July-August, 460-72.

Nathan Novemsky, Ravi Dhar, Norbert Schwarz, and Itamar Simonson (2007), "Preference Fluency in Choice," *Journal of Marketing Research*, XLIV, 347-356.

Chezy Ofir and Itamar Simonson (2007), "The Effect of Stating Expectations on Customer Satisfaction and Shopping Experience," *Journal of Marketing Research*, February, 164-174.

Ray Fisman, Sheena Iyengar, Emir Kamenica, and Itamar Simonson (2007), "Racial Preferences in Dating," *Review of Economic Studies*, 75, 1, 117-132.

Raymond Fisman, Sheena Iyengar, Emir Kamenica, and Itamar Simonson (2006), "Gender Differences in Mate Selection: Evidence from a Speed Dating Experiment," *Quarterly Journal of Economics*, 121 (2), 673-697.

Itamar Simonson (2005), "Determinants of Customers' Responses to Customized Offers: Conceptual Framework and Research Propositions," *Journal of Marketing*, 69 (January), 32-45.

Itamar Simonson (2005), "In Defense of Consciousness: The Role of Conscious and Unconscious Inputs in Consumer Choice," *Journal of Consumer Psychology*,15(3), 211-217.

Donnel Briley, Michael Morris, and Itamar Simonson (2005), "Cultural Chameleons: Biculturals, Conformity Motives, and Decision Making," *Journal of Consumer Psychology*, 15 (4), 351-362.

Uptal Dholakia and Itamar Simonson (2005), "The Effect of Explicit Reference Points on Consumer Choice and Online Bidding Behavior," *Marketing Science*, 24, 206-17.

Itamar Simonson, Thomas Kramer, and Maia Young (2004), "Effect Propensity," *Organizational Behavior and Human Decision Processes*, 95 (November), 156-74.

Itamar Simonson and Aimee Drolet (2004), "Anchoring Effects on Consumers' Willingness-to-Pay and Willingness-to-Accept," *Journal of Consumer Research*, 31 (December), 681-90.

Ran Kivetz and Itamar Simonson (2003) "The Idiosyncratic Fit Heuristic: The Role of Effort Advantage in Consumer Response to Loyalty Programs," *Journal of Marketing Research*, 40 (November), 454-67.

Dan Ariely and Itamar Simonson (2003), "Buying, Bidding, Playing, or Competing? Value Assessment and Decision Dynamics in Online Auctions," *Journal of Consumer Psychology*, 13(1&2), 113–123.

Ravi Dhar and Itamar Simonson (2003), "The Effect of Forced Choice on Choice," *Journal of Marketing Research*, 40 (May), 146-60.

Ran Kivetz and Itamar Simonson (2002), "Self Control for the Righteous: Toward a Theory of Luxury Pre-Commitment," *Journal of Consumer Research*, 29 (September), 199-217.

Ran Kivetz and Itamar Simonson (2002), "Earning the Right to Indulge: Effort as a Determinant of Customer Preferences Toward Frequency Program Rewards," *Journal of Marketing Research*, 39 (May), 155-70.

Chezy Ofir and Itamar Simonson (2001), "In Search of Negative Customer Feedback: The Effect of Expecting to Evaluate on Satisfaction Evaluations," *Journal of Marketing Research*, 38 (May), 170-82.

Itamar Simonson, Ziv Carmon, Ravi Dhar, Aimee Drolet, and Stephen Nowlis (2001), "Consumer Research: In Search of Identity," *Annual Review of Psychology*, 52, 249-275.

Donnel Briley, Michael Morris, and Itamar Simonson (2000), "Reasons as Carriers of Culture: Dynamic Vs. Dispositional Models of Cultural Influence on Decision Making," *Journal of Consumer Research*, 27 (September), 157-178.

Aimee Drolet, Itamar Simonson, and Amos Tversky (2000), "Indifference Curves that Travel with the Choice Set," *Marketing Letters*, 11(3), 199-209.

Stephen Nowlis and Itamar Simonson (2000), "Sales promotions and the Choice Context as Competing Influences on Consumer Decision Making," *Journal of Consumer Psychology*, 9(1), 1-17.

Ran Kivetz and Itamar Simonson (2000), "The Effect of Incomplete Information on Consumer Choice," *Journal of Marketing Research*, 37(4), 427-48.

Itamar Simonson and Stephen Nowlis (2000), "The Effect of Explaining and Need for Uniqueness on Consumer Decision Making:  Unconventional Consumer Choices Based on Reasons," *Journal of Consumer Research*, 27 (June), 49-68.

Itamar Simonson (1999), "The Effect of Product Assortment on Consumer Preferences," *Journal of Retailing*, 75(3), 347-70.

Ravi Dhar and Itamar Simonson (1999), "Making Complementary Choices in Consumption Episodes:  Highlighting Versus Balancing" *Journal of Marketing Research*, 36 (February), 29-44.

Houghton, David, ..., and Itamar Simonson (1999), "Correction Processes in Consumer Choice," *Marketing Letters*, 10(2),107-112.

Ziv Carmon and Itamar Simonson (1998), "Price-Quality Tradeoffs in Choice Versus Matching: New Insights into the Prominence Effect," *Journal of Consumer Psychology*, 7(4), 323-343.

Stephen Nowlis and Itamar Simonson (1997), "Attribute–Task Compatibility as a Determinant of Consumer Preference Reversals," *Journal of Marketing Research*, 34 (May), 205-218.

Joel Huber, ..., and Itamar Simonson (1997), "Thinking About Values in Prospect and Retrospect: Maximizing Experienced Utility," *Marketing Letters*, 7, 324-334.

Stephen Nowlis and Itamar Simonson (1996), "The Impact of New Product Features on Brand Choice," *Journal of Marketing Research*, 33 (February), 36-46.

Itamar Simonson (1994), "Trademark Infringement from the Buyer Perspective: Conceptual Analysis and Measurement Implications," *Journal of Public Policy and Marketing*, 13(2), 181-199.

Itamar Simonson, "Shoppers' Easily Influenced Choices," *NY Times*, 11/6/1994.

Itamar Simonson (1994), "An Empirical Investigation of the Meaning and Measurement of Genericness," *Trademark Reporter*, 84 (2), 199-223.

Itamar Simonson, Ziv Carmon, and Suzanne O'Curry (1994), "Experimental Evidence on the Negative Effect of Product Features and Sales Promotions on Brand Choice," *Marketing Science*, 13 (1), 23-40.

Itamar Simonson (1993), "Get Closer to Your Customers by Understanding How They Make Choices," *California Management Review*, 35 (4), 68-84.

Itamar Simonson (1993), "The Effect of Survey Method on Likelihood of Confusion Estimates: Conceptual Analysis and Empirical Test," *Trademark Reporter*, 83 (3), 364-393.

Itamar Simonson, Stephen Nowlis, and Katherine Lemon (1993), "The Effect of Local Consideration Sets on Global Choice Between Lower Price and Higher Quality," *Marketing Science*, 12 (4), 357-377.

Itamar Simonson, Stephen Nowlis, and Yael Simonson (1993), "The Effect of Irrelevant Preference Arguments on Consumer Choice," Journal of Consumer Psychology, 2 (3), 287-306.

Eldar Shafir, Itamar Simonson, and Amos Tversky (1993), "Reasons-Based Choice," *Cognition*, 49, 11-36.

Amos Tversky and Itamar Simonson (1993), "Context-Dependent Preferences," *Management Science*, 39 (10), 1179-1189.

Itamar Simonson (1992), "Influences of Anticipating Regret and Responsibility on Purchase Decisions," *Journal of Consumer Research*, 19 (June), 105-118.

Itamar Simonson and Peter Nye (1992), "The Effect of Accountability on Susceptibility to Decision Errors", *Organizational Behavior and Human Decision Processes*, 51 (3), 416-446.

Itamar Simonson and Amos Tversky (1992), "Choice in Context: Tradeoff Contrast and Extremeness Aversion," *Journal of Marketing Research*, 29 (August), 281-295.

Itamar Simonson and Barry Staw (1992), "De-Escalation Strategies: A Comparison of Techniques for Reducing Commitment to Losing Courses of Action," *Journal of Applied Psychology*, 77 (4), 419-426.

Itamar Simonson and Russell S. Winer (1992), "The Influence of Purchase Quantity and Display Format on Consumer Preference for Variety," *Journal of Consumer Research*, 19 (June), 133-138.

Ravi Dhar and Itamar Simonson (1992), "The Effect of the Focus of Comparison on Consumer Preferences," *Journal of Marketing Research*, 29 (November), 430-440.

William T. Ross and Itamar Simonson (1991), "Evaluations of Pairs of Experiences: A Preference for Happy Endings," *Journal of Behavioral Decision Making*, 4(4), 273-282.

Itamar Simonson (1991), "The Effect of Buying Decisions on Consumers' Assessments of Their Tastes", *Marketing Letters*, 2, 1, 5-14.

Itamar Simonson (1990), "The Effect of Purchase Quantity and Timing on Variety Seeking Behavior," *Journal of Marketing Research*, 27 (May), 150-162.

Itamar Simonson (1989), "Choice Based on Reasons: The Case of Attraction and Compromise Effects," *Journal of Consumer Research*, 16 (September), 158-174.

Itamar Simonson, Joel Huber, and John Payne (1988), "The Relationship Between Prior Brand Knowledge and Information Acquisition Order", *Journal of Consumer Research*, (March), 14, 566-78.

## ARTICLES UNDER REVIEW/REVISION

Franklin Shaddy, Ayelet Fishbach, and Itamar Simonson, "Why Invoking the Self Attenuates Variety Seeking, the Compromise Effect, and Balancing." (Revised for resubmission)

Wendy Liu and Itamar Simonson, "Shortlisting – Not Overwhelmed But Biased." (Revised for resubmission)

Aner Sela and Itamar Simonson, "The Feeling of Preference: Preference Expression in the Absence of Preferences." (Revised for resubmission)

Ioannis Evangelidis, Jonathan Levav, and Itamar Simonson, "The Upscaling Effect."

Jen Park and Itamar Simonson, "Rejection and Closure: Why Options that Survive Rejection Are More Attractive."


**Doctoral Dissertations Chaired:**

Ravi Dhar (Chaired Professor, Yale U.)
Aimee Drolet (Chaired Professor, UCLA)
Stephen Nowlis (Chaired Professor, Washington U., St. Louis)
Ziv Carmon (Chaired Professor, INSEAD)
Ran Kivetz (Chaired Professor, Columbia U.)
Donnel Briley (Professor, U.O. Sydney)
Thomas Kramer (Professor, U.O. California, Riverside)
Wendy Liu (Professor, U.O. California, San Diego)
Sanjay Sood (Professor, UCLA)
Song-Oh Yoon (Professor, Korea University)
Michal Maimaran (Clinical Professor, Kellogg School)
Leilei Gao (Professor, Chinese University, Hong Kong)
Wendy De La Rosa (Assistant Professor, Wharton School, U.O. Penn.)
Aner Sela (Professor, U. O. Florida)
Jonah Berger (Associate Professor, Wharton School, U.O. Penn.)
Jen Park (Assistant Professor, University of British Columbia)


**EDITORIAL ACTIVITIES**

Co-Editor of *Consumer Psychology Review*

Editorial Boards:  *Journal of Marketing Research, Journal of Consumer Psychology, Journal of Consumer Research, International Journal of Research in Marketing, Journal of Marketing in Emerging Economies, Marketing Letters*, *Journal of Academy of Marketing Science*, *Review of Marketing Research*.

Reviewer for *Marketing Science, Journal of Behavioral Decision Making, Science, Management Science, Journal of Retailing and Consumer Services, Journal of Marketing, Journal of Retailing, Organizational Behavior and Human Decision Processes, Journal of Experimental Psychology, Psychological Review, Psychological Bulletin, Journal of Personality and Social Psychology, Psychological Science, California Management Review, Journal of Economic Psychology,*

*European Journal of Social Psychology, Journal of Judgment and Decision Making, Medical Decision Making,* and National Science Foundation.

**PROFESSIONAL AFFILIATIONS**

Association for Consumer Research
Judgment and Decision Making Society

# Documents Considered

**Production Documents**

NIKE0040207

NIKE0040287

STX0001275

STX0006202

STX0019459

STX0020017

STX0020994

STX0056686

STX0088152

STX0090109

STX0116681

STX0806025

**Expert Reports**

June 2, 2023 Rebuttal Expert Report of Sarah Butler

June 2, 2023 Rebuttal Expert Report of Robert L. Klein

June 2, 2023 Rebuttal Expert Report of David T. Neal

May 5, 2023 Opening Expert Report of I. Simonson

May 5, 2023 Opening Expert Report of Steven S. McNew

**Deposition Transcripts and Exhibits**

December 2, 2022 Videotaped deposition of Jacob Fenton

**Articles**

A. Bell and T. Gift (2023), "Fraud in Online Surveys: Evidence from a Nonprobability, Subpopulation Sample," *Journal of Experimental Political Science*, 10.

B. Lee and W. Lee (2004), "The effect of information overload on consumer choice quality in an on-line environment," *Psychology & Marketing*, 21.

I. Simonson and E. Rosen (2014), *Absolute Value: What Really Influences Customers in the Age of (Nearly) Perfect Information*, HarperCollins Publishers.

I. Simonson, J. Huber, and J. Payne (1988), "The Relationship Between Prior Brand Knowledge and Information Acquisition Order", *Journal of Consumer Research*, (March), 14.

I. Simonson and R. Kivetz (2012), "Demand Effects in Likelihood of Confusion Surveys: The Importance of Marketplace Conditions," Ch. 11 in *Trademark and False Advertising Surveys*, Edited by S. Diamond and J. Swann, American Bar Association.

J. Bettman et al. (1991), "Consumer Decision Making," *Handbook of Consumer Behavior*.

J. Bergstrom and J. Stoll (1990), "An analysis of information overload with implications for survey design research," *Leisure Sciences*, 12.

J. Krosnick (1991), "Response Strategies for Coping with the Cognitive Demands of Attitude Measures in Surveys," *Applied Cognitive Psychology*, 5.

J. Lawlor et al. (2021), "Suspicious and fraudulent online survey participation: Introducing the REAL framework," *Methodological Innovations*, 1.

K. Wessling et al. (2017), "MTurk Character Misrepresentation: Assessment and Solutions," *Journal of Consumer Research*, 44.

P. Scalf et al. (2013), "Competition explains limited attention and perceptual resources: implications for perceptual load and dilution theories," *Frontiers in Psychology*, 10 (May).

R. Grant, R.J. Clarke & E. Kyriazis (2007), "A review of factors affecting online consumer search behaviour from an information value perspective," *Journal of Marketing Management*, 23

**Webpages**

https://stockx.com/lp/nfts//

https://worldpopulationreview.com/countries/united-states-population

@StockX, Instagram (Jan. 18, 2022);
https://www.instagram.com/p/CY4aFcsOrjV/?igshid=MzRlODBiNWFlZA==

@StockX, Instagram (Jan. 26, 2022), https://www.instagram.com/p/CZM-2wcOXTK/?igshid=MzRlODBiNWFlZA==

@StockX, Twitter (Jan. 18, 2022),
https://twitter.com/stockx/status/1483501803182374922?lang=en

@StockX, Twitter (Jan. 26, 2022);
https://twitter.com/stockx/status/1486398583725305865?lang=en

**Case Documents**

Defendant StockX LLC's Objections and Responses to Plaintiff Nike Inc.'s First Set of Interrogatories

Defendant StockX LLC's Objections and Responses to Plaintiff Nike Inc.'s Second Set of Interrogatories

Defendant StockX LLC's Objections and Responses to Plaintiff Nike Inc.'s Third Set of Interrogatories

Defendant StockX LLC's First Supplemental Objections and Responses to Plaintiff's Third Set of Interrogatories

Plaintiff Nike Inc.'s Supplemental Responses and Objections to Defendant StockX LLC's First Set of Interrogatories

Plaintiff Nike Inc.'s Responses and Objections to Defendant StockX LLC's Second Set of Interrogatories

Plaintiff Nike Inc.'s Supplemental Responses and Objections to Defendant StockX LLC's Second Set of Interrogatories

Plaintiff Nike Inc.'s Responses and Objections to Defendant StockX LLC's Third Set of Interrogatories

Plaintiff Nike Inc.'s Supplemental Responses and Objections to Defendant StockX LLC's Third Set of Interrogatories

Plaintiff Nike Inc.'s Responses and Objections to Defendant StockX LLC's Fourth Set of Interrogatories

Plaintiff Nike Inc.'s Supplemental Responses and Objections to Defendant StockX LLC's Fourth Set of Interrogatories

**Pleadings**

Dkt 1 - Complaint

Dkt 39 – First Amended Complaint