# Exhibit 19

1            UNITED STATES DISTRICT COURT

2       FOR THE SOUTHERN DISTRICT OF NEW YORK

3                ---oOo---

4

5 NIKE, INC.,

6              Plaintiff,

7    vs.            CASE NO. 1:22-CV-00983-VEC

8 STOCKX LLC,

9              Defendant.

_____

10

11

12      VIDEOTAPED DEPOSITION OF SARAH BUTLER

13         San Francisco, California

14         Tuesday, August 15, 2023

15

16

17

18

19

20

21

22

23 Stenographically Reported by:  Ashley Soevyn,

    CSR No. 12019

24 Job No. 5968272

25 Pages 1 - 224

Page 2

```
 1        UNITED STATES DISTRICT COURT
 2      FOR THE SOUTHERN DISTRICT OF NEW YORK
 3              ---0O0---
 4
 5   NIKE, INC.,
 6          Plaintiff,
 7      vs.        CASE NO. 1:22-CV-00983-VEC
 8   STOCKX, LLC,
 9          Defendant.
     _____
10
11
12
13
14
15        Videotaped Deposition of
16   SARAH BUTLER, taken on behalf of the Plaintiff Nike,
17   Inc., Pursuant to Notice, at the offices of DLA
18   Piper, 555 Mission Street, San Francisco, California
19   beginning at 8:56 a.m.  and ending at 4:51 p.m. on
20   Tuesday, August 15, 2023, before me, ASHLEY SOEVYN,
21   Certified Shorthand Reporter No. 12019.
22
23
24
25
```

Page 3

```
 1   A P P E A R A N C E S:
 2
 3   FOR THE PLAINTIFF NIKE INC.:
 4        DLA PIPER
 5        BY: MARC E. MILLER
 6        BY:  GABRIELLE VELKES
 7        Attorneys at Law
 8        1251 Avenue of the Americas, 27th Floor
 9        New York, New York 10020
10        marc.miller@dlapiper.com
11        gabrielle.velkes@dlapiper.com
12        (212) 335-4500
13
14   FOR THE DEFENDANT STOCKX LLC:
15        DEBEVOISE & PLIMPTON, LLP
16        BY: CHRISTOPHER S. FORD
17        BY:  MAI-LEE PICARD
18        Attorneys at Law
19        650 California Street
20        San Francisco, California 94108
21        csford@debevoise.com
22        mpicard@debevoise.com
23        (415) 738-5705
24   Also Present:
25   Cassie Leet, the Videographer
```

Page 4

```
 1        INDEX TO EXAMINATION
 2   WITNESS:  SARAH BUTLER
 3
 4
 5   EXAMINATION BY:                 PAGE
 6   MR. MILLER                    7
 7   MR. FORD                 220
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1        INDEX TO EXHIBITS
 2          SARAH BUTLER
 3          NIKE V. STOCKX
 4        Tuesday, August 15, 2023
 5        Ashley Soevyn, CSR No. 12019
 6   EXHIBIT NO.      DESCRIPTION          PAGES
 7   Exhibit 1    Expert Rebuttal Report of Sarah   18
              Butler
 8
     Exhibit 2    Expert Report of John L. Hansen   81
 9
     Exhibit 3    Plaintiff Nike Inc's        157
10        Supplemental Responses and
          Objections to Defendant StockX
11        LLC's Third Set of
          Interrogatories
12
     Exhibit 4    Document titled "Buy & Sell     185
13        Authentic Sneakers"
14   Exhibit 5    Document Bates No. NIKE281 -    191
              NIKE287
15
16
17
18
19
20
21
22
23
24
25
```

Page 6

```
 1        DEPOSITION PROCEEDINGS
 2           August 15, 2023
 3             -- --0o0---
 4
 5        THE VIDEOGRAPHER:  Going on the record at
 6  8:56 a.m. on August 15th, 2023.
 7        Please note that the microphones are
 8  sensitive and may pick up whispering and private
 9  conversations.  Audio and video recording will
10  continue to take place unless all parties agree to
11  go off the record.
12        This is Media Unit 1 of the video-recorded
13  deposition of Sarah Butler.  Taken by counsel for
14  plaintiff in matter of Nike Inc., versus StockX
15  Inc., filed in the United States District Court for
16  Southern District of New York, Case No.
17  1:22-CV-00983-VEC.
18        The location of this deposition is 555
19  Mission Street, Suite 2400, San Francisco,
20  California 94105.
21        My name is Cassia Leet, representing
22  Veritext Legal Solutions and I'm the videographer.
23        The court reporter is Ashley Soevyn from
24  the firm Veritext Legal Solutions.
25        I'm not related to any party in this
```

Page 7

```
 1  action nor am I financially interested in the
 2  outcome.  Would counsel and all present please state
 3  your appearances and affiliations for the record,
 4  beginning with the noticing attorney?
 5        MR. MILLER:  Good morning.  Marc Miller
 6  from DLA Piper, on behalf of Plaintiff Nike Inc.,
 7  and I'm joined by my colleague Gabrielle Velkes.
 8        MR. FORD:  Good morning.  Chris Ford,
 9  Debevoise & Plimpton, on behalf of StockX.  I'm
10  joined by my colleague Mai-Lee Picard.
11        THE VIDEOGRAPHER:  Thank you.  Will the
12  court reporter please swear in the witness.
13        THE REPORTER:  Ma'am, can I please have
14  you raise your right hand?  Do you solemnly state
15  that the testimony you are about to give in this
16  deposition will be the truth, the whole truth and
17  nothing but the truth?
18
19        THE WITNESS:  I do.
20        THE STENOGRAPHIC REPORTER:  Great.  Thank
21  you.
22           EXAMINATION
23  BY MR. MILLER:
24     Q   Good morning, Ms. Butler.
25     A   Good morning.
```

Page 8

```
 1     Q   How are you today?
 2     A   I'm doing well.  Thank you.
 3     Q   Good.  Ms. Butler, are you represented
 4  today?
 5     A   I have counsel here, yes.
 6     Q   Okay.  And that's Counsel sitting next to
 7  you?
 8     A   That's correct.
 9     Q   Okay.  Did you do anything to prepare for
10  today's deposition?
11     A   Yes.
12     Q   What did you do to prepare for today's
13  deposition?
14     A   I met with counsel who is here today,
15  briefly yesterday.  I reviewed my report.  I
16  reviewed the exhibits to my report.  I reviewed the
17  portion of Dr. Simonson's report that is responsive
18  to my report.  And I reviewed the portions of
19  Mr. Hansen's report that I cite in my report.
20     Q   You said you met yesterday briefly with
21  counsel?
22     A   Yes.
23     Q   Is that with Mr. Ford?
24     A   Yes.
25     Q   Anyone else?
```

Page 9

```
 1     A   Mai-Lee as well.
 2     Q   And for how long did you meet yesterday?
 3     A   Just maybe around three hours.
 4     Q   Other than yesterday's three-hour
 5  meeting, did you have any other meetings with
 6  counsel to prepare for today's deposition?
 7     A   No.
 8     Q   Any phone calls?
 9     A   No.
10     Q   You've been deposed before, correct?
11     A   Yes.
12     Q   About how many times have you been
13  deposed?
14     A   Probably over 100.
15     Q   Okay.  And you've testify at trial
16  before, correct?
17     A   Yes.
18     Q   How many times?
19     A   At trial, probably, maybe 15 or so times.
20     Q   In the matters for which you've been
21  designated as an expert, has a court ever found you
22  not qualified to serve as an expert report?
23     A   No.
24     Q   For the matters in which you've been
25  designated as an expert has the court ever found
```

Page 26

1    Q   Anything else in the expert analysis and
2 testimony category that you would add?
3    A   And I had a Daubert hearing -- sorry, for
4 the Florida Virtual School v. K-12 on the bottom of
5 page 4.
6    Q   Did you testify at that hearing?
7    A   I did.  I think that's it.
8    Q   Turning to page 15 of your CV, do you
9 have anything to add to the publications and
10 presentations of this CV since this was served?
11    A   No, I don't believe so.
12    Q   Okay.
13    A   Oh, sorry.  I -- I gave a presentation on
14 the use of surveys at the NABE, which I think is the
15 National Association of Business Economics, in
16 Washington, D.C. about two weeks ago.
17    Q   Okay.  Anything else?
18    A   No, I don't believe so.
19    Q   So turning back to page one of your CV.
20    A   Okay.
21    Q   The first paragraph says:
22    (As read):
23       "Ms. Butler is an expert in survey
24       research, market research sampling and
25       statistical analysis."

Page 27

1       Are you acting as an expert in any one of
2 those categories in this engagement?
3    A   Sure.  I conducted a survey, so I think
4 I'm presenting survey research in this matter.
5    Q   Are you presenting an expert opinion in
6 the field of market research in this matter?
7    A   Outside of the context of the survey that
8 I conducted?  I haven't conducted some other type of
9 market research.  I mean, certainly, surveys are
10 used in market research, and that's the information
11 and evidence I'm presenting here.
12    Q   Are you offering an expert opinion in
13 this matter in the field of sampling?
14    A   Well, I mean, every survey draws or
15 samples some particular population.  So -- but
16 independent of the survey I've conducted, I've not
17 drawn some other statistical sample and am
18 testifying to that.
19    Q   Okay.  And are you offering an expert
20 opinion in field of statistical analysis in this
21 case?
22    A   And I would say similarly, other than
23 this statistics that I present that are related to
24 the survey I've conducted, I have not done some
25 separate statistical analysis.

Page 28

1    Q   Turning back to page one of your CV,
2 underneath that first paragraph, there's a heading
3 that says Intellectual Property?
4    A   Yes.
5    Q   And the first bullet point says:
6    (As read):
7       "Trademark and trade dress
8       infringement.  Design analysis and
9       critique of surveys used to measure
10       consumer confusion, secondary meaning,
11       and dilution, and trademark and trade
12       design infringement cases."
13    Do you see that?
14    A   Yes.
15    Q   Are you offering an expert opinion in any
16 of those categories in this case?
17    A   If by "those categories," you mean
18 consumer confusion, secondary meaning, and dilution,
19 no, I'm not offering an opinion related to
20 confusion, secondary meaning, or dilution -- or I
21 should say, trademark or trade dress confusion.
22    Q   Okay.  And under the second bullet below
23 that, it says:
24    (As read):
25       "False and misleading advertising.

Page 29

1       Design analysis and critique of surveys
2       use to measure consumer perceptions,
3       and the materiality of advertising
4       claims."
5       Are you offering an expert opinion in
6 this matter related to those categories?
7    A   Yes.  The survey that I designed
8 evaluates the materiality, or the impact of the
9 authentication statements that Nike has alleged are
10 misleading to consumers.
11    Q   And are you offering an opinion in this
12 matter related to a survey that measures consumer
13 perceptions?
14    A   I have not conducted a consumer
15 perceptions survey in this matter, no.
16    Q   What types of surveys have you used to
17 measure materiality of advertising claims?  Can you
18 describe them?
19    A   Not sure what you mean by types of
20 surveys.
21    Q   Okay.  You don't have a way to describe
22 them, or do you call them by a certain name?
23    A   No, I mean, I think it depends on what
24 you're trying to evaluate what the claims are, what
25 hypothesis you're testing.

8 (Pages 26 - 29)

Page 30

1    Q   Okay.  What type of materiality of the
2  advertising claims in this case, what kind of
3  surveys did you design?
4    A   So I designed a survey that has both the
5  test and a control to evaluate whether the
6  authentication statements would have an impact on
7  consumers purchasing intentions.
8    Q   And would you describe that type of
9  survey with a certain name?
10   A   I think I probably describe it as I just
11 described it.
12   Q   Okay.  Are you familiar with the term
13 "purchase interest survey"?
14   A   As a general description, sure.
15 Questions that evaluate consumers' purchase
16 interest.  Those are types of questions one can ask,
17 yes.
18   Q   Is it fair to say that you conducted a
19 purchase interest survey in this case?
20   A   Again, I mean, I think the survey has an
21 experimental component, so it evaluates and isolates
22 the impact of particular statements related
23 certainly to consumers' purchasing intentions.
24   Q   Have you designed -- actually, strike
25 that.  Let me ask that a different way.

Page 31

1        Can you turn to page three of your CV
2  where you list expert analysis and testimony, and
3  identify any matters that involve designing a
4  consumer survey to measure consumer purchasing
5  interest, or intentions as you put it?
6    A   So I believe the matter on page four, the
7  Tamara Moore v. Mars Petcare.
8        Shenkman v. Tesla may have had some
9  purchasing questions.
10       And Vanzant and PetSmart.
11       I certainly looked at purchasing
12 intentions in the NFL League Sunday Ticket antitrust
13 litigation.
14   Q   Sorry, can you just back up a moment.
15 What was the first one did you say?  The vans or --
16   A   Sorry, Vanzant.
17   Q   -- Vanzant.
18   A   Sorry, so the one above the NFL.  So on
19 page six, at the bottom.
20   Q   I see.  So both the Vanzant matter and
21 the NFL matter involved a survey that was measuring
22 consumer purchasing intentions?
23   A   Yes.  In different ways, but, yes.  I
24 believe the -- on page eight, the Gross v. Vilore,
25 V-I-L-O-R-E, Foods and Company.

Page 32

1        The in re:  Marriott.  Perhaps the Morris
2  v. Walmart.  Page nine, Hartman v. Volkswagen.  I
3  believe the Blaufuss, B-L-A-U-F-U-S-S, v. Toyota.  I
4  believe Teststone, T-E-S-T-O-N-E, v. Barlean's. Lee
5  v. Stubhub.  I believe Benson v. Newell.  Bailey v.
6  Rite Aid.
7        On ten, Maldanado v. Apple.  Cardenas v.
8  Toyota.
9        Perhaps Lewis v. Rodan & Fields.
10       I think Stockinger v. Toyota.  Allegra v.
11 Luxottica.  Johannessohn, so it's
12 J-O-H-A-N-N-E-S-S-O-H-N, v. Polaris.
13       I think those are the majority of them.
14   Q   Okay.  So for each one of those matters
15 you identified, you designed and conducted a survey
16 that measured consumer purchasing intentions?
17   A   I -- it may have measured other things as
18 well, but there were certainly questions related to
19 purchase intentions, yes.
20   Q   Okay.  Excuse me.  Can you turn back to
21 page two of your CV please?
22   A   Okay.
23   Q   At the top there, under the heading
24 Antitrust.
25   A   Yes.

Page 33

1    Q   The first bullet says:
2        (As read):
3           "Design, analysis and critique of
4           surveys and other market research.
5           Used as evidence of consumer purchasing
6           and switching behavior in the areas
7           CPG, entertainment, automobiles, public
8           transportation, sports, and consumer
9           electronics."
10       Do you see where I'm reading from?
11   A   Yes.
12   Q   When you say "used as evidence of
13 consumer purchasing and switching behavior," what
14 does that mean?
15   A   So I think oftentimes -- at least it's
16 been my experience in antitrust cases there is a
17 question related to what products consumers would
18 see as substitutes.  So that's what that statement
19 is related to.
20   Q   Okay.  And that's different than the
21 consumer purchasing intentions survey that you ran
22 in this case, correct?
23   A   If you mean this survey was -- the survey
24 in this particular matter, meaning the Nike StockX
25 matter, was not designed to evaluate what products

9 (Pages 30 - 33)

1      Correct?
2      A   That's correct.
3      Q   What does that mean?
4      A   So experimental design means I can
5   isolate the impact of the authentication statements
6   relative to any other aspects of the stimuli or the
7   survey itself that could potentially affect
8   respondents' answers.
9      Q   And the other factors that could
10  potentially affect the respondents' answers are
11  those things that you listed here such as price of
12  the goods, variety of products or other sources of
13  survey noise?
14     A   Potentially.
15     Q   Okay.  What is "survey noise"?
16     A   Survey noise is the term that we
17  generally use for responses that are unrelated to
18  the things that we are trying to test.  They include
19  things like guessing, inattention, potential demand
20  effects.
21     Q   And how do you ensure that the survey
22  that you designed and implemented here was not
23  affected by survey noise such as demand effects or
24  guessing or inattention?
25     A   By using a test and a control.  That's

1   the purpose of the control.
2      Q   Okay.  And why is that important to use a
3   proper control?
4      A   Well, in this circumstance, using a
5   proper control allows me to isolate and evaluate the
6   impact of the authentication statements holding all
7   else constant.
8      Q   Are there other factors besides the ones
9   you listed in footnote 8 that could influence
10  respondents' answers to the survey?
11     A   Potentially.  But again, having a control
12  that changes nothing but the statements that are at
13  issue controls for whatever those other factors may
14  be.
15     Q   Does a control help to eliminate
16  alternative explanations for the survey results?
17     A   Not sure what you mean by "alternative
18  explanations."  I mean, what the control allows me
19  to do is to, again, evaluate the extent to which the
20  statements I'm trying to test have an impact on
21  consumer behavior.
22     Q   Are you familiar with the phrase
23  "alternative hypothesis," in the context of the
24  surveys?
25     A   Sure.

1      Q   What does that mean?
2      A   Well, if you have a hypothesis you can
3   have an alternative hypothesis.  So if your
4   hypothesis is coffee gives you energy, the
5   alternative hypothesis could be people with more
6   energy just tend to drink coffee, therefore, they
7   seem more energetic.
8      Q   What is your hypothesis in this case?
9      A   So the hypothesis I am testing is the
10  extent to which the authentication statements
11  have -- and not making any actual assumption as to
12  whether they do or don't, but I'm certainly testing
13  whether or not the authentication statements have an
14  impact on consumer behavior.
15     Q   Are there alternative hypothesis that you
16  could have tested to impact -- to determine the
17  impact of consumer behavior here?
18     A   If I understand your question.  I don't
19  know why I would have tested some other set of
20  alternative hypotheses.  I'm testing the impact of
21  the authentication statements.  So that's the goal
22  of the test.
23     Q   Would a consumer's preexisting beliefs
24  based on past experience with StockX impact the
25  hypothesis that you were testing?

1      A   Well, potentially.  But we have a test
2   and a control so to the extent that somebody comes
3   with a set of preexisting beliefs for whatever
4   reason, again, those people are randomly assigned to
5   test in the control.  And so that impact is held
6   constant across the two groups and only thing we're
7   testing is the impact of the authentication
8   statements.
9      Q   So you believe that the control that you
10  designed as part of your survey properly accounted
11  for any of the respondent's preexisting beliefs
12  based on their past experience with StockX?
13     A   Well, one, I think you're making an
14  assumption as to some set of preexisting beliefs
15  related to StockX.  I think we have -- I forget how
16  many, but a somewhat smaller number of respondents
17  who indicate they actually have used StockX in the
18  past.
19         But, yes.  The purpose of a control is to
20  control for any other explanations other than what
21  we're testing, because people are randomly assigned
22  to view the test stimulus or the control stimulus.
23     Q   How many respondents that qualified for
24  your survey had previously used StockX?
25     A   So respondents aren't qualified

24 (Pages 90 - 93)

Page 102

1    to what extent consumer purchasing
2    decisions were affected by the
3    allegedly false claims. And, I
4    understand from counsel, that no other
5    Nike expert submitted such a study."
6        Do you see that?
7    A    Yes.
8    Q    And based on your earlier testimony am I
9    understanding you correctly that you did not conduct
10   a consumer perception survey to evaluate or assess
11   whether or to what extent purchasing decisions were
12   affected by the allegedly false claims in this case?
13   A    I'm sorry. You're asking, I did not?
14   Q    Yes.
15   A    No. In fact, I did do a study to
16   evaluate the extent to which consumer purchasing
17   decisions would be affected by the allegedly false
18   claims.
19   Q    Okay. That seems to be different than
20   what you told me earlier this morning when I asked
21   you whether you conducted any consumer perception
22   studies as part of your work in this case. You said
23   no, correct?
24   A    Sorry. So by consumer perception studies
25   in that context.

Page 103

1    Q    Uh-huh.
2    A    I believe we were talking about
3    perceptions as to perceptions of a particular
4    statement, what is its meaning.
5    Q    Okay.
6    A    But certainly here, as I clarify or
7    indicate, a consumer perception study essentially
8    designed to assess whether or to what extent
9    consumer purchasing decisions were affected by the
10   allegedly false claims. That's, in fact, what I
11   studied.
12   Q    Okay. So you did conduct a consumer
13   perception study as part of your engagement in this
14   case. Yes?
15   A    I did not you conduct a perception study
16   to evaluate consumers' understanding of the
17   particular claims. I certainly conducted a consumer
18   purchasing or perception study or impact study as to
19   the false claims. I mean, that's what the study was
20   designed to do, is to evaluate the extent to which,
21   as I say in paragraph 15, whether or to what extent
22   consumer purchasing decisions were affected by the
23   allegedly false claims.
24   Q    Is your use of the phrase "consumer
25   perception study" in paragraph 15, is that -- is

Page 104

1    that accurate? Did you mean to say something else?
2    A    It's certainly not inaccurate, because
3    it's described as what is the perception or the
4    behavior we're trying to measure. And in this
5    context, it's whether or to what extent consumer
6    purchasing decisions were affected by allegedly
7    being false claims. And that's certainly what my
8    study evaluates.
9    Q    Okay. Mr. Hansen didn't undertake a
10   similar study, right?
11   A    That's correct.
12   Q    And you're offering your survey that you
13   designed and implemented as rebuttal to Mr. Hansen,
14   correct?
15   A    I think as we discussed at length, yes,
16   my study is responsive to Mr. Hansen.
17   Q    Okay. Is it fair to characterize the
18   survey that you designed and implemented in this
19   case as a purchase interest survey?
20   A    I'm not sure what you mean by that
21   characterization, but yes, certainly the survey asks
22   respondents how likely would they be to use the
23   website to purchase a pair of sneakers. It's not
24   just how interested you are. So it is how likely
25   would you use the site to make a purchase.

Page 105

1    Q    Is there a different characterization
2    other than purchase interest survey that you would
3    use?
4    A    I think it's a likelihood of purchase or
5    purchase intention.
6    Q    And I think earlier this morning when we
7    were going through your CV, you identified several
8    cases in which you had designed and implemented
9    similar likelihood of purchasing or purchase
10   intention studies; is that fair?
11   A    I don't want to necessarily represent
12   that they are similar. I mean, obviously they are
13   tailored to the particular products and the
14   particular survey design I used. But yes, I listed
15   a number of cases in which I evaluated purchase
16   interest and purchase intention.
17   Q    And are you aware for what purpose a
18   likelihood of purchase or purchase intention survey
19   has in a false advertising place?
20   A    Aware. Sorry?
21   Q    Sure. Are you aware of what purpose a
22   likelihood purchase or purchase intention survey has
23   in a false advertising case?
24   A    So it's been my experience that a
25   purchase intention survey tends to address claims of

27 (Pages 102 - 105)

Page 106

1 materiality, so the extent to which a particular
2 advertising claim has or has not had an effect on
3 consumer behavior.
4     Q   In this case did you test for the
5 importance of any particular product features on
6 consumer likelihood of purchase or purchase
7 intention?
8     A   So if I understand your question, no.
9 The survey is not designed to evaluate a particular
10 feature of a product.  It is evaluating, again,
11 whether or not the presence or absence of these
12 particular statements would have an effect on
13 consumer behavior.
14    Q   Okay.  And your survey doesn't test the
15 relative importance of any of the false and/or
16 misleading advertising claims on the consumer's
17 likelihood of purchase or purchase intention,
18 correct?
19    A   Well, it certainly tests the overall
20 extent to which the advertising claims would have an
21 effects on consumer purchasing behavior.
22    Q   But you didn't test the relative
23 importance of any one individual advertising claim
24 on a consumer's likelihood of purchase or purchase
25 intention, correct?

Page 107

1     A   So it's not designed to test the relative
2 impact of one claim versus another.  Given that the
3 results demonstrate the claims have no impact.
4 Again, zero to zero is zero.
5     Q   Okay.  If you were asked to design and
6 implement a study to determine whether a particular
7 advertising claim was the primary reason impacting a
8 consumer's likelihood of purchase or purchase
9 intention, what kind of survey would you design?
10    A   Well, I think certainly the results that
11 we have from this survey demonstrates it's not only
12 not primary it doesn't have an impact at all.  So
13 the results of this survey can answer the question
14 as to whether or not these claims are primary reason
15 or any reason for consumers' purchasing behavior.
16    Q   Okay.  So if you were asked to design and
17 implement the study to determine whether a
18 particular advertising claim was the primary reason
19 impacting a consumer's likelihood of purchase or
20 purchase intention, you would design the exact study
21 you created here?
22    A   Not necessary -- I mean, as a broad
23 hypothetical I don't know what other claims you're
24 talking about, what the advertising is, what other
25 evidence there is.  So as a broad hypothetical,

Page 108

1 maybe I would say it should be designed this way and
2 maybe it should be designed in a different way.  I
3 certainly think the results we have here demonstrate
4 that not only are these claims not primary, they
5 don't have an impact.
6     Q   Are you familiar with the term "purchase
7 driver survey"?
8     A   Yes.
9     Q   What is a purchase driver survey?
10    A   A purchase driver survey can list a whole
11 series of attributes.  I mean, it can be done
12 different ways.  But it can list a whole series of
13 attributes and ask respondents to kind of somehow
14 place them in terms of relative importance.
15    Q   And that's not the type of study that you
16 implemented and designed here, correct?
17    A   No.  It's not designed as a survey to
18 list a whole series of attributes that are unrelated
19 to the statements that we're testing and evaluate
20 the extent to which those other attributes are
21 important to consumers.  That's not relevant for
22 what I'm testing.  All I'm testing is whether or not
23 the authentication statements have an impact or
24 don't have an impact on consumers' purchasing
25 behavior.

Page 109

1     Q   Okay.  You would agree that you did not
2 design and implement a survey here to test any other
3 attributes of the StockX website to evaluate the
4 relative importance on consumer purchasing behavior,
5 correct?
6     A   That's correct.  Again, for my purposes,
7 evaluating other aspects of the StockX website,
8 other characteristics of its design, I mean, all of
9 those things are, in fact, purposely held constant
10 between the test and the control.  Because the
11 research is designed to answer the question as to do
12 these authentication statements have an impact on
13 consumer behavior or not.
14    Q   How does a purchase driver survey differ
15 from a likelihood of purchasing or purchase
16 intention study?
17    A   Well, as we've been describing, I mean,
18 the type of purchase intention study here is, again,
19 focused on evaluating whether a particular set of
20 claims does or does not have an impact.  For my
21 purposes here, again, I'm not trying to understand
22 whether consumers like the color of StockX's website
23 or the font it uses or the prices it offers.  I
24 mean, all of those things again are purposely held
25 constant between the test and the control, so I can

28 (Pages 106 - 109)

1 even at sample sizes of 50. So certainly 409, two
2 hundred in each group, is a sufficient amount of
3 data to evaluate whether there is a statistically
4 significant difference between the distribution of
5 responses between the two populations.
6    Q    Did you consider any factors about the
7 population to which you are trying to extrapolate
8 when deciding that 409 respondents were a sufficient
9 population for this study?
10    A    So if I'm understanding your question, I
11 have not extrapolated with a confidence interval
12 around the results here to some other population.
13 The study is designed to evaluate whether there is a
14 statistically significant difference between the two
15 groups that are being measured. And we have
16 sufficient amounts of data to allow us to evaluate
17 whether the variation between the purchase intention
18 between these two groups is statistically
19 significantly different.
20    Q    Okay. When you say you "have not
21 extrapolated with a confidence interval around
22 results here to some other population," what do you
23 mean?
24    A    Well, you're using the word extrapolation
25 which to me means I have a point estimate here

1 around which I've created some confidence interval
2 because I'm extrapolating it to some broader
3 population. That's not a calculation I have as part
4 of this report.
5    Q    Okay. So the results of your study, you
6 are not extrapolating them to apply to some broader
7 population; is that right?
8    A    I have not performed a statistical
9 extrapolation with a confidence interval. Again,
10 the word extrapolation to me means a very particular
11 thing.
12    Q    Okay.
13    A    So that's not an estimate. That's part
14 of my report.
15    Q    Uh-huh.
16    A    Do I think these results are applicable
17 to a consumer population? Of course, I mean, that's
18 purpose of having a sufficient sample size, random
19 assignment across a broad array of demographic
20 characteristics that allow you to test whether or
21 not these authentication statements would have
22 impact on consumer behavior or not.
23    Q    Okay. What did you do in this case to
24 identify the sample of the relevant population that
25 you wanted to test?

1    A    So the survey was designed -- or the
2 sample was selected using what we call click
3 balancing.
4    Q    Okay. What is click balancing?
5    A    So click balancing means that the
6 invitations to the survey are sent to a random
7 sample of U.S. adults, 18 years and older, whose
8 demographic characteristics broadly reflect the
9 demographic characteristic of the U.S. population.
10    Q    Okay. Anything else besides the click
11 balancing?
12    A    Well, then certainly we ask a series of
13 screening questions to ensure that respondents are
14 qualified.
15    Q    Okay. And, so, I believe you said this
16 earlier, the relevant population that you intended
17 to sample from was U.S. consumers that were 18 years
18 of age or older, who have purchased a pair of
19 sneakers from StockX since 2020, or who are likely
20 do so in the next year; is that right?
21    A    Not quite. No. So respondents needed to
22 indicate -- if you look at again, Exhibit D.
23    Q    So before you move onto Exhibit D?
24    A    Sure.
25    Q    I was reading from paragraph 18 of your

1 report. So is there something that I misstated
2 there?
3    A    Oh. So, no. But I think the population
4 includes individuals who have also purchased from
5 other online -- third-party online websites.
6    Q    That's not what it says here in paragraph
7 18; does it?
8    A    No, it doesn't include that it's possible
9 that respondents also purchased from other
10 third-party online websites, but that's certainly
11 clear from the screening questions that are
12 described -- if you go to paragraph 22 to qualify --
13 sorry. Third sentence, starting:
14        (As read):
15           "To qualify for the survey, respondents
16           needed to currently reside in the
17           United States and be 18 years or older.
18           Respondents also had to indicate they
19           have purchased a pair of sneakers from
20           a third-party online marketplace, e.g.,
21           Ebay or GOAT since 2020, or are likely
22           to do so within the next year.
23           Respondents also had to specifically
24           indicate that they had or would
25           consider purchasing a pair of sneakers

33 (Pages 126 - 129)

Page 182

1 indicates "Every item. Every time." Certainly on
2 page 8 we have, "we authenticate, we authenticate,
3 and you get paid." I think that's correct.
4     Q   Okay. So is it fair to say that you
5 didn't test this verbatim advertising claim in this
6 survey?
7     A   That is fair to say that we did not test
8 the exact statement, "We authenticate. Every item.
9 Every time." There is certainly a number of
10 iterations of we authenticate that I tested.
11    Q   Okay. How about the following bullet:
12       (As read):
13          "Shop on StockX with complete
14          confidence knowing that every purchase
15          is verified authentic, period."
16       Where does that appear on Exhibit F?
17    A   I don't believe that exact statement is
18 included in the test. Again, certainly there is a
19 number of references to verified authentic, but the
20 portion of this statement, "Shop on StockX with
21 complete confidence," I don't believe that was part
22 of the -- that verbatim statement was part of the
23 test.
24    Q   Okay. How about the next one,
25 "100 percent authentic"?

Page 183

1     A   Sure. That's on page 23. Page 12. Page
2 7. I think that's correct.
3     Q   And the next one, "Buy and sell authentic
4 sneakers"?
5     A   That's on page three, at the very top.
6     Q   Okay. Anywhere else?
7     A   No, I believe that's -- that's where it
8 appears at the top banner on the homepage.
9     Q   Again, I'm going to skip the following
10 one, "Buy authentic, be authentic" which you said
11 you didn't test that verbatim claim.
12    A   That's correct.
13    Q   Last one, "On StockX, comma, every
14 sneaker you want is always available and authentic"?
15    A   Yes. That's on page 20.
16    Q   Anywhere else?
17    A   I don't believe so.
18    Q   So turning to page 3 of Exhibit F.
19    A   Okay.
20    Q   You titled this one on page 2 as "The
21 Homepage," right?
22    A   Yes.
23    Q   Where did you get this stimulus from?
24    A   So the banner, I believe, is from the
25 Wayback Machine, and then the pages themselves are,

Page 184

1 I think, a more recent version of products that are
2 for sale.
3     Q   So if I'm understanding you correctly,
4 you took a Wayback Machine capture and then spliced
5 it together with a more recent capture of the StockX
6 homepage?
7     A   That's correct. In terms of the Wayback
8 image that was available associated with this
9 particular banner, the image was really poor. It
10 wasn't constructed. So we couldn't see the graphics
11 associated with it. So here we used a kind of more
12 recent image.
13    Q   So you created a stimulus that wasn't
14 actually used in the real world; is that correct?
15    A   So it's a stimulus, I think, that
16 certainly depicts how the -- this particular banner
17 appeared in the context of the StockX homepage. But
18 the products that are included as part of the
19 homepage, I think, are more recent products for
20 sale.
21    Q   Okay. And, so no consumer in the real
22 world saw this stimulus, correct?
23    A   That particular banner with these
24 particular products for sale? Not that I'm aware
25 of, but again, my understanding is that this banner

Page 185

1 appeared in this particular way on the homepage.
2       MR. MILLER: Can we mark that Exhibit 4.
3       THE STENOGRAPHIC REPORTER: Exhibit 4.
4       (Exhibit 4 marked for identification.)
5 BY MR. MILLER:
6     Q   Okay. So for this particular stimulus at
7 page 16, footnote 39 of your report.
8     A   Yes.
9     Q   You provided a URL for the Wayback
10 Machine, correct?
11    A   I believe so, yes.
12       Sorry. It's okay to look at the record
13 now.
14    Q   Yes.
15    A   Which page.
16    Q   Page 16, footnote 39.
17    A   Okay.
18    Q   Okay. The Exhibit 4 you've been handed
19 by the court reporter is a printout of that URL
20 that's referenced in your report, at exhibit -- I'm
21 sorry. At page 16, footnote 39.
22       Does that look accurate to you?
23    A   It may. I would have to go back and look
24 at it. I mean, certainly there is at least one of
25 the images that looks like it's unavailable.

47 (Pages 182 - 185)

Page 186

1    Q   Okay.
2    A   I believe when we looked at it maybe
3 there were more unavailable images.
4    Q   Okay.  Does this -- so this printout is,
5 at Exhibit 4, doesn't look like what you're
6 recalling seeing when you went to that same URL?
7    A   I don't want to represent that I recall
8 exactly what it looked like.  I certainly see here
9 there is an image that's missing.  I believe my
10 recollection was that there were more images that
11 were missing.
12    Q   And, so, the fact that there were images
13 missing from Wayback Machine capture at this URL was
14 reason why you spliced in a lower portion of the
15 StockX homepage from a more recent time; is that
16 fair?
17    A   Rather than guess or kind of create
18 images that we weren't able to identify?  Yes, we
19 added the homepage, or the banner that's at issue
20 here, in the exact same way it appeared to a more
21 recent version of the StockX page.
22    Q   Okay.  And why did you want to test this
23 particular banner?
24    A   So my understanding was it was a banner
25 that -- or a header that appeared on the homepage

Page 187

1 and it includes the buy and sell authentic sneakers
2 at the top of the page.  And that was one of the
3 statements Nike has claimed to be at issue in
4 interrogatory 22.
5    Q   Okay.  The stimulus that the respondents
6 saw for the StockX homepage that we see here in
7 Exhibit F, this is not -- the StockX homepage as it
8 exists today does not look like this, right?
9    A   My understanding is it does not, that it
10 includes buy and sell authentic sneakers at the top
11 of it.  That's correct.
12    Q   Do you know when that header was removed
13 by StockX?
14    A   I don't, no.
15    Q   Okay.  Do you know whether -- do you know
16 whether consumers -- actually, strike that.
17    As part of the design of your survey, you
18 required each respondent to spend a minimum of ten
19 seconds looking at this stimulus, correct?
20    A   Looking at each of the pages.  That's
21 correct, yes.
22    Q   And when you say "each of the pages,"
23 you're referring to the web pages --
24    A   That's --
25    Q   -- correct --

Page 188

1    A   Correct.  The --
2    Q   -- so that would be --
3    A   -- five pages.
4    Q   So with respect to homepage, that would
5 be contents that appears on page three, of Exhibit
6 5, four, and five, correct?
7    A   It is the content that appears across
8 those PDF pages, yes.  But it's not shown as
9 separate pages.  It's shown as a website would, so
10 you scroll up and down.
11    Q   Okay.  What was the -- what was the
12 reason for you selecting ten seconds as the minimum
13 of time that a respondent had to spend reviewing
14 each of the web pages in the stimuli?
15    A   So we certainly want a minimum delay.
16 Respondents could look at a page as long as they
17 wanted, and of course, when they are asked the
18 questions -- or the question as to their purchasing
19 intention, they are provided with all of the pages.
20 So ten seconds seemed like an appropriate minimum.
21 But respondents could certainly look at the pages
22 for longer than that.  And, of course, when they're
23 answering the question as to their likelihood of
24 purchasing, they are shown the thumbnails of each of
25 the pages and as well, they can click and open any

Page 189

1 of those pages to review them again.
2    Q   Did you track in your data whether any of
3 the respondents clicked on those thumbnails when
4 they were answering a question about purchase
5 interest?
6    A   So I believe we printed out the data.
7 I'm not sure if the data map is here.  But I believe
8 those data are recorded.
9    Q   Okay.
10    A   Sorry.  It looks like these are data but
11 maybe not the data map.  So I can't quite tell from
12 what you've printed out, but it should be in the
13 data.
14    Q   Okay.  Is a minimum of ten seconds delay
15 on each page of the stimuli a standard number that
16 you use in most surveys that you design?
17    A   No.  I mean, in some surveys I don't
18 require a minimum at all.  In this circumstance, I
19 wanted to be sure that at a minimum respondents were
20 examining each of the pages for at least ten
21 seconds.  Again, they certainly could take as much
22 time as they wanted and they had the ability to
23 review the pages when answering the question.
24    MR. MILLER:  We've been going about an
25 hour.  Let's just take a quick five-minute break off

48 (Pages 186 - 189)

1 represent pages consumers might see.  There are also
2 pages about the process and they include a whole
3 range of the different statements or variations of
4 statements that Nike has claimed to be false or
5 misleading.
6    Q    And why did you put these five web pages
7 in the particular order that you did in the survey?
8    A    So the homepage comes first, because
9 that's generally a kind of reasonable way that
10 consumers start looking at the site.  And the pages
11 then are the next -- sorry.  The next two pages are
12 obviously the pages about how the process works, as
13 if somebody were learning about how to purchase or
14 how the process works on the page.
15         And then they are shown an array of
16 products and then a specific product.  Again, of
17 course, all of these pages are available when the
18 respondent is answering the question in whatever
19 form they want to look at them.
20    Q    What is the basis for the testimony you
21 just gave that a user visiting the homepage first is
22 generally a kind of reasonable way that they start
23 looking at the website?
24    A    So, over 20 years of doing consumer
25 research, many consumers start by looking at a

1 homepage of a site that they might use to purchase a
2 product.
3    Q    Did you review any documents or data from
4 StockX that would support your belief that most
5 consumers start by visiting the StockX.com homepage?
6    A    I don't think I offered an opinion that
7 StockX's consumers necessarily start at StockX's
8 homepage.  Certainly the order in which these pages
9 are shown to respondents is held constant between
10 the test and the control.  And the pages display a
11 range of the statements Nike has alleged to be at
12 issue, held constant between the test and the
13 control and respondents can look at any of the pages
14 when answering the question that they are
15 particularly interested in.
16    Q    Did you look at any StockX documents that
17 would provide any information about how consumers
18 view these pages, if they view them at all?
19    A    So if your question is simply do I have
20 some data as to the rate at which people view
21 particular pages within StockX?  No.  Again, for the
22 purpose of my survey, I'm using these different
23 pages to evaluate Nike's claim, or perhaps more
24 specifically, Mr. Hansen's claim, that the types of
25 allegedly false or misleading statements have

1 driven, or have caused all consumers to purchase
2 products.  So I'm evaluating whether or not these
3 statements within the context which they occur on
4 the website would have an effect on consumers'
5 purchasing behavior.
6    Q    If you could turn to Exhibit D to your
7 report please.
8    A    Okay.
9    Q    And, so, question two in your survey,
10 this asks respondents to rank how likely they
11 would -- how likely they would be to use the StockX
12 website to purchase a pair of sneakers, correct?
13    A    That's correct.
14    Q    And for that you use the seven-point
15 scale --
16    A    That's correct.
17    Q    -- that's shown at the top of page 13,
18 right?
19    A    Sorry.  Yes, that's correct.
20    Q    Why did you decide to use a question like
21 question two for this survey?
22    A    So Likert scales, of which this is, are
23 well-researched, well-used in survey research and
24 psychological research as a means by which to
25 evaluate a whole series of behaviors or questions.

1 So they are well-founded.  It allows me to look at a
2 distribution across a range of data as opposed to
3 asking a question of -- as opposed to let's say,
4 asking a binary question.  So those are probably the
5 primary reasons.
6    Q    And question three, the respondents were
7 asked after question two, and this is an open-ended
8 question, right?
9    A    That's correct.
10    Q    And they were asked to explain what makes
11 you say that your likelihood of using this website
12 to purchase a pair of sneakers would be, and then it
13 fills in the ranking that they applied, correct.
14    A    That's correct.
15    Q    What is an open-ended question?
16    A    An open-ended question is a question that
17 does not provide respondents with a set of response
18 options.  It requires them to provide some kind of
19 narrative or verbatim response.
20    Q    And why did you decide to include an
21 open-ended question in your survey?
22    A    So open-ended questions provide a set of
23 data that can be used to evaluate respondents'
24 thinking or reasoning behind a prior answer.  I
25 mean, depending on the context, open-ended questions

Page 218

1 objection from Ms. Butler or from counsel, it's part
2 of her report.
3        MR. FORD:  That's fine.
4        THE WITNESS:  It's fine with me.  Thank
5 you.
6        MR. MILLER:  No problem.
7 BY MR. MILLER:
8    Q    Anyhow, back to Exhibit G.  If you could
9 turn to the printout and flip to Page 54.
10   A    Okay.
11   Q    And I want to focus on row 278.
12   A    Okay.
13   Q    Which is a respondent number 657551366,
14 which you can confirm by flipping back to the first
15 page.
16   A    You mean, like, actually page one?
17   Q    Well, the first page to see the -- I'm
18 sorry, not first page but the -- let me get you
19 the row number -- or the page number.  Page 14.
20   A    Okay.  So I see the respondents ID.
21   Q    Okay.  And this respondent was in the
22 control group, correct?  And for that I'm looking at
23 column CQ on Page 54.
24   A    I don't think you have the variable
25 names.  Are they on the first page?  No.  Oh, yes,

Page 219

1 they are.  Okay.  So CQ is the cell.  That is
2 correct.  Okay.  So CQ respondent that's in row.
3    Q    278.
4    A    278.
5    Q    Uh-huh.
6    A    Okay.  Is a control respondent.
7    Q    Column BW, of row 278, shows the verbatim
8 response to question three?
9    A    Yes.
10   Q    Okay.  And, so this control group
11 respondent's verbatim response to question three
12 says:
13        (As read):
14        "For authenticity, comma, StockX uses
15         it's authenticators to ensure that all
16         products on its shelves are properly
17         sourced and, sold as genuine."
18   A    I see that, yes.
19   Q    Can you explain why this control group
20 respondent provided that verbatim answer?
21   A    So I don't have a question that asks that
22 respondent why did you provide that answer.  I can
23 look to see what this particular respondent's other
24 experiences are.  But that's the answer they
25 provided for exhibit -- oh, sorry, question three.

Page 220

1 So that particular respondent may be interpreting a
2 description of inspection as related to
3 authenticity.
4        MR. MILLER:  Okay.  Subject to any
5 redirect from your counsel, I do not have any
6 further questions.
7        EXAMINATION
8 BY MR. FORD:
9    Q    Ms. Butler, just very briefly, Mr. Miller
10 asked you questions at the very beginning of the day
11 about your prior experience with the StockX website
12 before you were retained as an expert in this case.
13        Do you recall that?
14   A    Yes.
15   Q    Would you have qualified for your survey
16 based on the screener questions that you provided to
17 respondents?
18   A    No.
19        MR. FORD:  Nothing further from me.
20        MR. MILLER:  Okay.  No further questions.
21        MR. FORD:  Great.
22        THE VIDEOGRAPHER:  This concludes today's
23 deposition of Sarah Butler.  The number of media
24 used was four and will be retained by Veritext Legal
25 Solutions.  The time is 4:51 p.m.  We're off the

Page 221

1 record.
2
3 (Whereupon the deposition concluded at 4:51 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

56 (Pages 218 - 221)

Page 222

1    I, SARAH BUTLER, do hereby declare under
2    penalty of perjury that I have read the foregoing
3    transcript; that I have made any corrections as
4    appear noted, in ink, initialed by me, or attached
5    hereto; that my testimony as contained herein, as
6    corrected, is true and correct.
7        EXECUTED this_____ day
8    of_____,
9    20____, at_____, _____.
                (City)            (State)
10
11
12

    _____
13   SARAH BUTLER
14
15
16
17
18
19
20
21
22
23
24
25

Page 223

1        I, the undersigned, a Certified Shorthand
2    Reporter of the State of California, do hereby
3    certify:
4        That the foregoing proceedings were taken
5    before me at the time and place herein set forth;
6    that any witnesses in the foregoing proceedings,
7    prior to testifying, were duly sworn; that a record
8    of the proceedings was made by me using machine
9    shorthand, which was thereafter transcribed under my
10   direction; further, that the foregoing is a true
11   record of the testimony given.
12       I further certify I am neither financially
13   interested in the action nor a relative or employee
14   of any attorney or party to this action.
15       IN WITNESS WHEREOF, I have this August 18,
16   2023 subscribed my name.
17
18
19

    _____
20
    _____
21   ASHLEY SOEVYN
     CSR No. 12019
22
23
24
25

Page 224

1        * * *ERRATA SHEET* * *
2    NAME OF CASE:  NIKE V. STOCKX
3    DATE OF DEPOSITION:  8-15-23
4    NAME OF WITNESS:  SARAH BUTLER
5    Reason codes:
6      1. To clarify the record.
       2. To conform to the facts.
7      3. To correct transcription errors.
8    Page ____ Line ____ Reason____
     From _____ to_____
9
10   Page ____ Line ____ Reason____
     From _____ to_____
11
12   Page ____ Line ____ Reason____
     From _____ to_____
13
14   Page ____ Line ____ Reason____
     From _____ to_____
15
16   Page ____ Line ____ Reason____
     From _____ to_____
17
18   Page ____ Line ____ Reason____
     From _____ to_____
19
20   Page ____ Line ____ Reason____
     From _____ to_____
21
22
23           _____
             SARAH BUTLER
24
25

57 (Pages 222 - 224)

**Deposition Date**: 8/15/2023
**Deponent**: Sarah Butler – Errata Sheet
**Case Name**: *Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) (SN)

| Page(s): Line(s) | Now Reads | Should Read | Reason |
|---|---|---|---|
| 9:15 | you've **testify** at trial | You've **testified** at trial | Transcription Error |
| 10:12 | **Sketchers** | **Skechers** | Typographical Error |
| 10:15 | **Sketchers** | **Skechers** | Typographical Error |
| 10:20 | **Sketchers** | **Skechers** | Typographical Error |
| 11:2 | **Sketchers** | **Skechers** | Typographical Error |
| 11:10 | the names of **though** cases | the names of **those** cases | Transcription Error |
| 11:12 | **Maldanado**, M-A-L-D-A-N-A-D-O | **Maldonado**, M-A-L-D-**O**-N-A-D-O | Clarification |
| 11:16 | **Maldanado** v. Apple | **Maldonado** v. Apple | Clarification |
| 12:15 | **Maldanado** v. Apple | **Maldonado** v. Apple | Clarification |
| 13:15 | Mr. **Hanson's** | Mr. **Hansen's** | Typographical Error |
| 20:9 | race **in** ethnicity | race **and** ethnicity | Transcription Error |
| 21:5-6 | I started as research associate | I started as **a** research associate | Transcription Error |

1

**Deposition Date**: 8/15/2023
**Deponent**: Sarah Butler – Errata Sheet
**Case Name**: *Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) (SN)

| Page(s): Line(s) | Now Reads | Should Read | Reason |
|---|---|---|---|
| 21:11 | spent a year **in** Integrated Marketing | spent a year **at** Integrated Marketing | Transcription Error |
| 21:24-25 | mostly medical professionals | mostly **of** medical professionals | Transcription Error |
| 22:13 | other **expert's** survey work | other **experts'** survey work | Typographical Error |
| 25:1 | managing **director** | managing **directors** | Transcription Error |
| 26:24 | market research sampling | market research**,** sampling | Typographical Error |
| 27:23 | **this** statistics | **the** statistics | Transcription Error |
| 29:14-15 | consumer **perceptions** survey | consumer **perception** survey | Transcription Error |
| 29:24 | what you're trying to evaluate what the claims are, | what you're trying to evaluate**,** what the claims are, | Typographical Error |
| 30:4-5 | **the** test and a control | **a** test and a control | Transcription Error |
| 30:7 | **consumers** purchasing intentions | **Consumers'** purchasing intentions | Typographical Error |
| 30:10 | I think **I** probably describe it | I think **I'd** probably describe it | Transcription Error |

**Deposition Date**: 8/15/2023
**Deponent**: Sarah Butler – Errata Sheet
**Case Name**: *Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) (SN)

| Page(s): Line(s) | Now Reads | Should Read | Reason |
|---|---|---|---|
| 31:25 | Foods **and** Company | Foods Company | Transcription Error |
| 32:4 | **Teststone** | **Testone** | Transcription Error |
| 32:5 | **Stubhub** | **StubHub** | Typographical Error |
| 32:7 | **Maldanado** | **Maldonado** | Clarification |
| 33:3-6 | Design, analysis and critique of surveys and other market research. Used as evidence of consumer purchasing and switching behavior | Design, analysis and critique of surveys and other market research **used** as evidence of consumer purchasing and switching behavior | Typographical Error |
| 34:2 | In second bullet | In **the** second bullet | Transcription Error |
| 35:1-2 | one to evaluate the value attributable to a particular **attributes**. | one to evaluate the value attributable to a particular **attribute**. | Transcription Error |
| 35:23 | Journal: Applied Economic letters | Journal **of** Applied Economic**s** letters | Transcription Error |

**Deposition Date**: 8/15/2023
**Deponent**: Sarah Butler – Errata Sheet
**Case Name**: *Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) (SN)

| Page(s): Line(s) | Now Reads | Should Read | Reason |
|---|---|---|---|
| 35:24-36:1 | publications: The Survey Response Bias and The Privacy Paradox, and The Value of Non-Personally Identifiable Information to Consumers. | publications: "Survey response bias and the 'privacy paradox,'" and "The value of non-personally identifiable information to consumers." | Typographical Error |
| 36:4 | **intensions**. | **intentions**. | Typographical Error |
| 36:23-24 | National Advertising **Divisions** panel | National Advertising **Division's** panel | Typographical Error |
| 37:4 | Antitrust Trial Newsletter | Antitrust Trial Practice Newsletter | Transcription Error |
| 38:5 | that's **not just** listed | that's **just not** listed | Transcription Error |
| 38:6 | **actuals** sites | **actual** sites | Transcription Error |
| 39:10-12 | at the time I wrote the report, yes. It contains my full set of opinions. | at the time I wrote the report, yes**, it contained** my full set of opinions. | Transcription Error |
| 42:18 | **Ebay** | **eBay** | Typographical Error |
| 42:21 | **Goop.com** | **GOAT.com** | Transcription Error |

**Deposition Date**: 8/15/2023
**Deponent**: Sarah Butler – Errata Sheet
**Case Name**: *Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) (SN)

| Page(s): Line(s) | Now Reads | Should Read | Reason |
|---|---|---|---|
| 42:22 | **Ebay.com** | **eBay.com** | Typographical Error |
| 42:23 | I'm not | **I've** not | Transcription Error |
| 45:21 | its consumers **that** defines | its consumers **it** defines | Transcription Error |
| 45:25 | as sneaker head | as sneaker **heads** | Transcription Error |
| 48:14 | statistical **analysis** | statistical **analyses** | Transcription Error |
| 48:24 | this is list of materials | this is **the** list of materials | Transcription Error |
| 49:10-11 | in **anyway** | in **any way** | Typographical Error |
| 51:5-6 | **it's** authentication | **its** authentication | Typographical Error |
| 51:7-8 | Nike Jordan-branded sneakers | Nike/Jordan-branded sneakers | Typographical Error |
| 53:5 | experienced deposition **and** testifier | experienced deposition testifier | Transcription Error |
| 53:8 | requires coaching | requires **any** coaching | Transcription Error |
| 53:16 | **intensions** | **intentions** | Typographical Error |

**Deposition Date**: 8/15/2023
**Deponent**: Sarah Butler – Errata Sheet
**Case Name**: *Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) (SN)

| Page(s): Line(s) | Now Reads | Should Read | Reason |
|---|---|---|---|
| 58:10 | **consumers** willingness | **consumers'** willingness | Typographical Error |
| 59:14 | **consumers** interest | **consumers'** interest | Typographical Error |
| 60:22 | **misleading claim** | **misleadingly claiming** | Transcription Error |
| 61:9 | **I'm** not undertaken analysis | **I've** not undertaken **an** analysis | Transcription Error |
| 61:16 | analysis | **an** analysis | Transcription Error |
| 62:15 | mean by isolate. | mean by "isolate." | Typographical Error |
| 62:16-17 | **a** survey | **the** survey | Transcription Error |
| 62:19-20 | **consumers** interest | **consumers'** interest | Typographical Error |
| 63:2 | **consumers** willingness | **consumers'** willingness | Typographical Error |
| 63:15 | that tested | that **you** tested | Transcription Error |
| 65:1 | If there is some other **ways** | If there is some other **way** | Transcription Error |
| 66:3 | To inform response | To inform **a** response | Transcription Error |

6

**Deposition Date:** 8/15/2023
**Deponent:** Sarah Butler – Errata Sheet
**Case Name:** *Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) (SN)

| Page(s): Line(s) | Now Reads | Should Read | Reason |
|---|---|---|---|
| 66:9 | Robert V | Robert Vigil | Transcription Error |
| 68:16-18 | related to authentication and verification process | related to **the** authentication and verification process | Transcription Error |
| 68:20-21 | StockX's **websites** | StockX's **website** | Transcription Error |
| 68:21 | during relevant time period | during **the** relevant time period | Transcription Error |
| 70:2-4 | statements that Nike identified in its interrogatory response. But used the combination at times **over the words** "verification in conjunction with authentication." | statements that Nike identified in its interrogatory response **that** used the combination at times of the words "verification**"** in conjunction with **"**authentication." | Transcription Error / Clarification |
| 70:6-8 | That use the words "authentication process and verification process"? Or just authentication and verification process. | That use the words "authentication process and "verification process"? Or just "authentication and verification process"? | Typographical Error |
| 70:13 | also I indicate | also **as** I indicate | Transcription Error |
| 71:16 | **totally** different | **wholly** different | Transcription Error |

7

**Deposition Date**: 8/15/2023
**Deponent**: Sarah Butler – Errata Sheet
**Case Name**: *Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) (SN)

| Page(s): Line(s) | Now Reads | Should Read | Reason |
|---|---|---|---|
| 72:1 | beyond its **websites** | beyond its **website** | Transcription Error |
| 73:1-5 | I'm trying to understand why you phrased what your study was testing as influencing consumers' decisions to use the site to purchase sneakers as opposed to influencing consumers' decisions to purchase sneakers? | I'm trying to understand why you phrased what your study was testing as "influencing consumers' decisions to use the site to purchase sneakers" as opposed to "influencing consumers' decisions to purchase sneakers?" | Typographical Error |
| 73:18-19 | **consumers** likelihood | **consumers'** likelihood | Typographical Error |
| 73:25-74:3 | If your question is, is the survey designed to evaluate consumers' general interest in purchasing sneakers at all other places. That's not what the survey is focused on. | If your question is, "is the survey designed to evaluate consumers' general interest in purchasing sneakers at all other places," that's not what the survey is focused on. | Typographical Error |
| 74:11 | difference in test sneaker | difference in **the** test sneaker | Transcription Error |
| 75:5 | the StockX **websites** | the StockX **website** | Transcription Error |
| 75:22-23 | the StockX **websites** | the StockX **website** | Transcription Error |
| 76:7-8 | the StockX **websites** | the StockX **website** | Transcription Error |

**Deposition Date**: 8/15/2023
**Deponent**: Sarah Butler – Errata Sheet
**Case Name**: *Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) (SN)

| Page(s): Line(s) | Now Reads | Should Read | Reason |
|---|---|---|---|
| 79:2 | **Now** you've made it incorrect. | **No,** you've made it incorrect. | Transcription Error |
| 79:4-5 | asked **on** survey | asked **in the** survey | Transcription Error |
| 79:8 | Based on information you reviewed | Based on **the** information you reviewed | Transcription Error |
| 79:17-18 | using a **websites** | using a **website** | Transcription Error |
| 80:25-81:1 | were likely to purchase **or** had either used or are -- were willing to consider | were likely to purchase **and/**or had either used or were willing to consider | Transcription Error |
| 85:7 | Mr. **Hansen's** is articulating | Mr. **Hansen** is articulating | Clarification |
| 86:11 | Mr. **Hansen's** assesses | Mr. **Hansen** assesses | Clarification |
| 86:14 | every Nike and Jordan brand **goods** | every Nike and Jordan brand **good** | Transcription Error |
| 86:15 | sold on **it's** platform | sold on **its** platform | Typographical Error |
| 86:16 | Mr. **Hansen's** discusses | Mr. **Hansen** discusses | Clarification |
| 87:8 | **I layout** | **I lay out** | Typographical Error |

| Deposition Date: 8/15/2023 |
|---|
| Deponent: Sarah Butler – Errata Sheet |
| Case Name: *Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) (SN) |

| Page(s): Line(s) | Now Reads | Should Read | Reason |
|---|---|---|---|
| 92:18 | If I understand your question. I don't | If I understand your question, I don't | Typographical Error |
| 93:4-5 | those people are randomly assigned to test in **the** control | those people are randomly assigned to **the** test **and** the control | Transcription Error / Clarification |
| 94:3-4 | this is just based on open-ended, but | this is just based on **the** open-ended **responses**, but | Transcription Error / Clarification |
| 97:6 | how StockX defines **it's** authentication | how StockX defines **its** authentication | Typographical Error |
| 98:7 | asking me **to** do those three statements | asking me do those three statements | Transcription Error |
| 98:15 | so I simply meant that products | so I simply meant that **I understand that** products | Transcription Error |
| 100:1 | shipped **to** a seller | shipped **from** a seller | Clarification |
| 100:11-12 | I have not undergone an analysis | I have not **undertaken** an analysis | Clarification |
| 104:24-25 | How likely would you use the site | How likely would you **be to** use the site | Transcription Error |

10

**Deposition Date**: 8/15/2023
**Deponent**: Sarah Butler – Errata Sheet
**Case Name**: *Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) (SN)

| Page(s): Line(s) | Now Reads | Should Read | Reason |
|---|---|---|---|
| 105:16 | purchase interest **and** purchase intention | purchase interest **or** purchase intention | Transcription Error |
| 105:22 | likelihood purchase | likelihood **of** purchase | Transcription Error |
| 106:20-21 | the advertising claims would have **on effects** | the advertising claims would have **an effect** | Transcription Error |
| 107:14 | these claims are primary reason | these claims are **the** primary reason | Transcription Error |
| 107:22 | Not **necessary** | Not **necessarily** | Transcription Error |
| 111:3 | So we **can** ask consumers | So we **could** ask consumers | Transcription Error |
| 112:13 | So **that** the title suggests | So **like** the title suggests | Transcription Error |
| 112:14-15 | ensure again, the data are reliable | ensure **that** again, the data are reliable | Transcription Error |
| 112:15 | the survey is fielding the manner | the survey is fielding **in** the manner | Transcription Error |
| 116:17-18 | anything to do with **honest**. | anything to do with **honesty**. | Transcription Error |
| 117:18 | a company makes or manufactures shoes | a company **that** makes or manufactures shoes | Transcription Error |

**Deposition Date:** 8/15/2023
**Deponent:** Sarah Butler – Errata Sheet
**Case Name:** *Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) (SN)

| Page(s): Line(s) | Now Reads | Should Read | Reason |
|---|---|---|---|
| 121:21 | whether **respondent** could read | whether **the respondents** could read | Transcription Error |
| 122:23 | which encompasses **those** | which encompasses **both** | Transcription Error |
| 123:18-19 | they had to **be** at least be willing | they had to at least be willing | Clarification |
| 123:21 | likelihood **to perfect** or purchasing intention | likelihood **of purchase** or purchasing intention | Transcription Error |
| 123:24 | **My** understanding who you're intending to survey | **By** understanding who you're intending to survey | Transcription Error |
| 127:13-14 | So that's not an estimate. That's part of my report. | So that's not an estimate that's part of my report. | Typographical Error |
| 127:21-22 | would have impact | would have **an** impact | Transcription Error |
| 132:6-7 | Mr. **Hansen's** is characterizing | Mr. **Hansen** is characterizing | Clarification |
| 132:15 | Mr. **Hansen's** is using | Mr. **Hansen** is using | Clarification |
| 133:10-11 | a pair of **a** sneakers | a pair of sneakers | Transcription Error |

**Deposition Date:** 8/15/2023
**Deponent:** Sarah Butler – Errata Sheet
**Case Name:** *Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) (SN)

| Page(s): Line(s) | Now Reads | Should Read | Reason |
|---|---|---|---|
| 133:14 | My understanding is that | My understanding, **I think,** is that | Transcription Error |
| 133:18 | in real world | in **the** real world | Transcription Error |
| 134:21 | I guess I'm **in the** sure | I guess I'm **not** sure | Transcription Error |
| 135:12 | users of the **cite** | users of the **site** | Typographical Error |
| 139:9 | We can reweight the data | We can **also** reweight the data | Transcription Error |
| 139:21 | So I compared my population | So **have** I compared my population | Transcription Error |
| 141:25 | data defined **it** in **another** way | data defined in **some other** way | Transcription Error |
| 142:1 | geographic **portion** | geographic **proportion** | Transcription Error |
| 142:15 | defined in some **other** way | defined in some **different** way | Transcription Error |
| 142:20 | **to define it** in some other way | **defined** in some other way | Transcription Error |
| 144:10 | that's functionality | that's **a** functionality | Transcription Error |
| 145:4-5 | I don't believe. | I don't believe **so**. | Transcription Error |

**Deposition Date**: 8/15/2023
**Deponent**: Sarah Butler – Errata Sheet
**Case Name**: *Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) (SN)

| Page(s): Line(s) | Now Reads | Should Read | Reason |
|---|---|---|---|
| 145:15 | Who titled this shoe survey? | Who titled this **as "**shoe survey**"**? | Transcription Error |
| 145:21 | **attenuating** to the particular client | **attuning** to the particular client | Clarification |
| 145:23-24 | The survey, broadly speaking, **not** about shoes | **It's a** survey, broadly speaking, **that's** about shoes | Transcription Error |
| 149:17-18 | **respondents** understanding | **respondents'** understanding | Typographical Error |
| 149:21-22 | third **place** marketplace | third-**party** marketplace | Clarification |
| 150:24 | on **48E** | on **exhibit B** | Transcription Error |
| 152:18-19 | I think as I **indicate** my understanding | I think as I **indicated,** my understanding | Transcription Error |
| 153:15 | Because one of the questions **is** my survey | Because one of the questions **in** my survey | Transcription Error |
| 158:10 | the **prospective** order | the **protective** order | Clarification |
| 158:14 | exactly **callid** | exactly **called** | Typographical Error |
| 159:10-11 | on my exhibit, | on my exhibit **B**, | Transcription Error |

**Deposition Date**: 8/15/2023
**Deponent**: Sarah Butler – Errata Sheet
**Case Name**: *Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) (SN)

| Page(s): Line(s) | Now Reads | Should Read | Reason |
|---|---|---|---|
| 160:5-6 | I believe **the** quality assurance is not part of any of the statements | I believe **"quality assurance"** is not part of any of the statements | Transcription Error |
| 160:7-8 | I believe maybe the buy authentic be authentic was a statement that wasn't it tested. | I believe maybe **that** "buy authentic be authentic" **as** a statement wasn't tested. | Transcription Error |
| 160:18-22 | on page 15, I believe, there you will see -- and that's test version, under that, Committed to Quality, you see, Tens of millions -- tens of millions of products at 99.95 percent accuracy rate. | on page 15, I believe, there you will see -- and that's **the** test version **--** under that, "Committed to Quality," you see, "tens of millions of products at **a** 99.95 percent accuracy rate." | Transcription Error / Typographical Error |
| 160:25-161:1 | that's different **that** the statement | that's different **than** the statement | Transcription Error |
| 161:12-14 | So am I correct that you didn't test the verbatim advertising claim StockX has a 99.96 percent authentication accuracy rate? | So am I correct that you didn't test the verbatim advertising claim "StockX has a 99.96 percent authentication accuracy rate"? | Typographical Error |
| 161:21-22 | at 99.95 percent accuracy rate | at **a** 99.95 percent accuracy rate | Transcription Error |

**Deposition Date**: 8/15/2023
**Deponent**: Sarah Butler – Errata Sheet
**Case Name**: *Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) (SN)

| Page(s): Line(s) | Now Reads | Should Read | Reason |
|---|---|---|---|
| 161:24-162:1 | the verbatim advertising claim, authenticators maintain a 99.96 percent accuracy rate? | the verbatim advertising claim, "authenticators maintain a 99.96 percent accuracy rate"? | Typographical Error |
| 162:4-5 | the **tests** I have actually has | the **test** I have actually has | Transcription Error |
| 162:23 | 100 percent verified, authentic | 100 percent verified authentic | Typographical Error |
| 166:7-9 | Other than looking at their websites or testing their descriptions on websites; that's correct. | Other than looking at **the website** or testing the descriptions on **the website**; that's correct. | Transcription Error / Clarification |
| 167:12-14 | I have not asked consumers what their opinion is as to StockX's core value proposition is to them. | I have not asked consumers what their opinion is as to **what** StockX's core value proposition is to them. | Clarification |
| 167:21 | in **anyway** | in **any way** | Typographical Error |
| 172:12 | **Not** an analysis that I have undertaken | **It's not** an analysis that I have undertaken | Transcription Error |
| 173:10-11 | Again, I think **that's** Mr. **Hansen's** is drawing conclusions | Again, I think **that** Mr. **Hansen** is drawing conclusions | Transcription Error / Clarification |

**Deposition Date**: 8/15/2023
**Deponent**: Sarah Butler – Errata Sheet
**Case Name**: *Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) (SN)

| Page(s): Line(s) | Now Reads | Should Read | Reason |
|---|---|---|---|
| 173:11 | Mr. **Hansen's** is drawing conclusions | Mr. **Hansen** is drawing conclusions | Clarification |
| 173:16-17 | **New** Response Interrogatory Number 22 | **Nike** Response **to** Interrogatory Number 22 | Transcription Error |
| 174:20 | at **this** very top of the page | at **the** very top of the page | Transcription Error |
| 178:11-12 | authenticators are equipped **better** than anyone | authenticators are **better** equipped than anyone | Transcription Error |
| 185:12-13 | It's okay to look at the **record** now. | It's okay to look at the **report** now**?** | Transcription Error |
| 187:9-11 | My understanding is it does not**, that it** includes buy and sell authentic sneakers at the top of it. | My understanding is that it does not include "buy and sell authentic sneakers" at the top of it. | Clarification / Typographical Error |
| 192:24-193:1 | StockX currently uses StockX verified is our own designation and not endorsed by any brands sold on StockX, or uses some similar statement. | StockX currently uses "StockX verified is our own designation and not endorsed by any brands sold on StockX," or uses some similar statement. | Typographical Error |
| 195:11 | indicating that StockX inspected here | indicating that "StockX inspected" here | Typographical Error |

**Deposition Date**: 8/15/2023
**Deponent**: Sarah Butler – Errata Sheet
**Case Name**: *Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) (SN)

| Page(s): Line(s) | Now Reads | Should Read | Reason |
|---|---|---|---|
| 197:19 | From a consumers' perspective. I'm not evaluating what consumers understand the **word** authentic or inspected to mean. | From a consumers' perspective**?** I'm not evaluating what consumers understand the **words** authentic or inspected to mean. | Transcription Error / Clarification |
| 199:24-25 | And it makes sense within context of the pages being tested. | And it makes sense within **the** context of the pages being tested. | Transcription Error |
| 201:22 | they see project array page | they see **a** project array page | Transcription Error |
| 202:1 | **There** are also | **They** are also | Transcription Error |
| 206:19-21 | If you're asking, does it use exact language you articulated? No, it doesn't ask -- or doesn't tell respondents list every reason. | If you're asking, does it use **the** exact language you articulated? No, it doesn't ask -- or doesn't tell respondents **to** list every reason. | Transcription Error |
| 207:8 | to use the **platforms**. | to use the **platform**. | Transcription Error |
| 209:20-21 | your valuation of this data | your **evaluation** of this data | Transcription Error |

I, Sarah Butler, do hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition taken on August 15, 2023; that I have made such corrections as appear noted herein; and that my testimony as contained herein, as corrected, is true and correct.

DATED this 18th day of September, 2023.

_____

Sarah Butler