# Exhibit 21

Redacted Public Version

1

2   IN THE UNITED STATES DISTRICT COURT

    FOR THE SOUTHERN DISTRICT OF NEW YORK

3   Case No.  No. 1:22-cv-00983-VEC

    -------------------------------x

4   NIKE, INC.,

5                         Plaintiff,

6              -against-

7   STOCKX LLC,

8                         Defendant.

    -------------------------------x

9

10                    August 22, 2023

                      9:06 a.m.

11

12          Video-Recorded Deposition of

13   ROBERT L. VIGIL, Ph.D., an Expert Witness,

14   taken by Plaintiffs, located at DLA Piper,

15   1251 Avenue of the Americas, New York, New

16   York, taken before Dawn Matera, a Certified

17   Shorthand Reporter and Notary Public for the

18   State of New York.

19

20

21

22

23

24

25

| | |
|---|---|
| Page 2 | Page 4 |

**Page 2**

1
2 A P P E A R A N C E S :
3  DLA PIPER
     Attorneys for Plaintiff
4    1251 Avenue of the Americas
     New York, New York 10020
5    (212)335-4500
6  By:  MARC MILLER, ESQ.
       marc.miller@dlapiper.com
7
       -and-
8
   By:  JANE WISE, ESQ.
9      jane.wise@dlapiper.com
       500 Eighth Street, N.W.
10     Washington, D.C. 20004
11
12 DEBEVOISE & PLIMPTON LLP
     Attorneys for Defendant
13   66 Hudson Boulevard
     New York, New York 10001
14   (212)909-6000
15 By:  CARL RIEHL, ESQ.
       criehl@debevoise.com
16     CLARA CORREA, ESQ.
       ccorrea@debevoise.com
17
       -and-
18
   By:  CHRISTOPHER S. FORD, ESQ.
19     cford@debevoise.com
       650 California Street
20     San Francisco, California 94108
21
22 Also Present:
23   ADRIAN CHEMEL, Legal Videographer
24   LAURA LEWIS, ESQ., In-House Counsel
                    StockX
25          ~oOo~

**Page 4**

1        ROBERT L. VIGIL
2   Defendant StockX joined by Chris Ford,
3   and Clara Correa from Debevoise and
4   Laura Lewis from StockX.
5        THE VIDEOGRAPHER:  Will the
6   court reporter please swear in the
7   witness and then counsel may proceed.
8  R O B E R T   L.   V I G I L, Ph.D., the
9   Witness herein, having first been duly
10  sworn by the Notary Public, was examined
11  and testified as follows:
12  EXAMINATION BY
13  MR. MILLER:
14  Q.   Good morning, Dr. Vigil.
15  A.   Good morning.
16  Q.   Just a couple of housekeeping
17  matters before we get started.  Ms. Lewis
18  from StockX is here in the room so if at
19  any point my questions or your answers
20  touch on material that has been
21  designated by Nike as highly
22  confidential, outside counsel eyes' only,
23  let's try to be aware of that and we will
24  take a pause and ask Ms. Lewis to leave
25  the room.

**Page 3**

1
2        THE VIDEOGRAPHER:  Good morning.
3   We are going on the record at
4   a.m. on August 22nd, 2023.  This is
5   media unit 1 of the video-recorded
6   deposition of Robert Vigil in the
7   matter of Nike, Inc. versus StockX LLC
8   filed in the United States District
9   Court, Southern District of New York,
10  case number 1:22-CV-00983.  The
11  location of the deposition is DLA
12  Piper, 1251 Avenue of the Americas,
13  New York, New York.
14       My name is Adrian Chemel
15  representing Veritext and I am the
16  videographer.  The court reporter is
17  Dawn Matera from the firm Veritext.
18       Counsel will now state their
19  appearances for the record.
20       MR. MILLER:  Good morning.  Marc
21  Miller from DLA Piper on behalf of
22  Plaintiff Nike, Inc. and I am joined
23  by my colleague Jane Wise.
24       MR. RIEHL:  I am Carl Riehl from
25  Debevoise & Plimpton on behalf of

**Page 5**

1        ROBERT L. VIGIL
2        MR. MILLER:  If that's okay with
3   counsel?
4        MR. RIEHL:  Yes.
5        MR. MILLER:  Okay.
6   Q.   Okay with you, sir?
7   A.   Yes, I don't know specifically
8   what has been designated as outside
9   counsel only.  I am assuming counsel for
10  StockX will know that.
11  Q.   Understood, I just want
12  everyone in the room to be aware so we
13  can all have our antenna up for that,
14  okay?
15  A.   Okay.
16  Q.   The other business of
17  housekeeping.  I want to ask, I see you
18  have brought copies of expert reports in
19  front of you on the table?
20  A.   Yes.
21  Q.   Can you please identify what
22  those are?
23  A.   Yes, I bought a copy of my
24  first amended rebuttal report that was
25  submitted yesterday and a redline version

2 (Pages 2 - 5)

ROBERT L. VIGIL

1       ROBERT L. VIGIL
2   A.  I would answer that the same
3 way.  I don't know the specific
4 percentage other than to say in total I
5 am deducting about 36 percent of the
6 total category of expenses.  But it's
7 going to vary year by year.
8   Q.  And you would agree that there
9 is some amount of StockX's supply
10 acquisition expenses deducted in your
11 fixed operating cost calculation,
12 correct?
13   A.  Not that's unrelated to the
14 Nike and Jordan trades.  But there are,
15 in the larger category of fixed
16 operations and technology and SG&A
17 expenses, there are supply acquisition
18 costs that are unrelated to Nike and the
19 Jordan trades.  I am just not including
20 those.
21   Q.  You would agree that --
22   A.  And those costs are pretty
23 small in total anyway.  I believe that
24 the supply acquisition costs even in
25 later years, I think it was ██████ in

1       ROBERT L. VIGIL
2 total, I believe, in 2022.
3      And based on a conversation
4 with the people at StockX, they indicated
5 that early -- the amount of expenses in
6 that category earlier on was a lot less
7 than that.  So it's a pretty small amount
8 in total, anyway.
9   Q.  Would you agree that in or
10 around September 2022, StockX ceased
11 making or using the allegedly false
12 advertising claims?
13   A.  It's my understanding that they
14 started that process in September 2022.
15   Q.  And what's your understanding
16 of when that process was complete?
17   A.  It's my understanding that it
18 was complete by November of 2022.
19   Q.  Did you evaluate any of the
20 fixed costs, that you claim would become
21 variable over time, to determine whether
22 StockX continued to incur those costs
23 after it removed the allegedly false
24 advertising claims?
25   A.  My understanding is that these

1       ROBERT L. VIGIL
2 costs would have continued to be incurred
3 because the trades, the Nike and Jordan
4 trades, didn't change after StockX
5 changed the claims related to its
6 inspection and verification process.  And
7 as I mentioned earlier, costs are related
8 to trades, not claims.
9   Q.  Looking at Exhibit 5, page 2 of
10 Exhibit 5, are you aware of any of the
11 ops and tech fixed costs that are listed
12 on page 2 of Exhibit 5 that were avoided
13 as a result of StockX's decision to
14 remove the allegedly false advertising
15 claims?
16   A.  I am not aware of it one way or
17 the other.  It's my understanding that
18 the alleged false claims don't impact
19 costs at all.  So whether you make one
20 claim versus another claim, other than
21 the cost of making the change of the
22 website, I guess, that wouldn't impact
23 costs.  Costs are impacted by the volume
24 of trades.  And so if the volume of
25 trades changes, then costs would change.

1       ROBERT L. VIGIL
2 So if it were the case that making the
3 change with regard to the claims had
4 significantly decreased StockX's Nike and
5 Jordan sneaker trades, then I would
6 expect that they wouldn't incur all these
7 fixed costs.  But that's not what we see
8 in the data.  We see that their volume of
9 their trades did not decrease after the
10 change was made.
11   Q.  So the answer to my question is
12 no, that StockX did not avoid any of the
13 costs in the ops and tech and fixed cost
14 category as a result of StockX's decision
15 to remove the allegedly false advertising
16 statements, correct?
17   A.  I am not seeing any evidence
18 that that is the case.
19   Q.  And similarly, you have not
20 seen any evidence showing that StockX
21 avoided any of the costs in the SG&A
22 fixed cost category shown in Exhibit 5,
23 as a result of StockX's decision to
24 remove the allegedly false advertising
25 claims, correct?

57 (Pages 222 - 225)

1      ROBERT L. VIGIL
2      A.   Because when they remove the
3   alleged false advertising claims, the
4   volume of their trades didn't decrease as
5   Mr. Hansen suggests it would.  So yes,
6   they did not avoid incurring those
7   expenses that were related to the Nike
8   and Jordan trades.
9      Q.   Did StockX lay off any
10  employees as a result of its decision to
11  remove the allegedly false advertising
12  claims in September of 2022?
13     A.   I am not aware of that
14  happening.
15     Q.   Did StockX terminate any real
16  estate leases as a result of its decision
17  to remove the allegedly false advertising
18  statements in September of 2022?
19     A.   I am not aware of that and I
20  wouldn't expect that, given that the
21  volume of Nike and Jordan trades didn't
22  change.  Didn't decrease.
23     Q.   Did StockX decide not to renew
24  any real estate leases as a result of its
25  decision to remove the alleged false

1      ROBERT L. VIGIL
2   advertising claims in September of 2022?
3      A.   I am not aware of that, and I
4   wouldn't expect that in light of the fact
5   that the volume of Nike and Jordan trades
6   didn't decrease after that change.
7      Q.   Did StockX close any facilities
8   as a result of its decision to remove the
9   allegedly false advertising claims in
10  September of 2022?
11     A.   I am not aware of that, but I
12  wouldn't expect that in light of the fact
13  that the volume of Nike and Jordan trades
14  did not decrease after that change.
15     Q.   Did StockX avoid any tax
16  liabilities as a result of its decision
17  to remove the allegedly false
18  advertising claims in September of 2022?
19     A.   I am not aware of that, but I
20  wouldn't expect that to be the case in
21  light of the fact that the volume of Nike
22  and Jordan trades did not decrease after
23  that change was made.
24     Q.   Did StockX avoid any equipment
25  costs as a result of its decision to

1      ROBERT L. VIGIL
2   remove the alleged false advertising
3   claims in September of 2022?
4      A.   I am not aware of that, but I
5   would not expect that to be the case in
6   light of the fact that the volume of Nike
7   and Jordan trades did not decrease after
8   that change was made.
9      Q.   Did StockX avoid any
10  maintenance costs as a result of its
11  decision to remove the allegedly false
12  advertising claims in September of 2022?
13     A.   I am not aware of that, but you
14  also wouldn't expect that in light of the
15  fact that the volume of Nike and Jordan
16  trades did not decrease as Mr. Hansen
17  suggests that it would have after the
18  change was made.
19     Q.   Are you aware of any class of
20  categories that StockX avoided as a
21  result of its decision to remove the
22  allegedly false advertising statements in
23  September of 2022?
24     A.   No, but I wouldn't expect that
25  they would avoid costs if the volume of

1      ROBERT L. VIGIL
2   Nike and Jordan didn't change after the
3   change was made.
4          MR. Miller:  Let's mark this,
5      please, as Exhibit 6.
6          (Vigil Exhibit 6, Document Bates
7      stamped STX0806054, was so marked for
8      identification, as of this date.)
9      Q.   This is the slip sheet and the
10  native document behind it.  Dr. Vigil,
11  you have been handed a document marked as
12  Exhibit 6.  This is bearing Bates stamp
13  STX0806054.
14          Do you recognize this document?
15     A.   Yes.
16     Q.   What is this?
17     A.   This is a copy of data that was
18  produced by StockX, related to the weekly
19  sales and transactions on the GOAT and
20  StockX platforms from January 2021
21  through, I believe, April 2023.
22     Q.   And this document was produced
23  in connection with your rebuttal expert
24  report, correct?
25     A.   I don't know the circumstances

Page 230

```
1          ROBERT L. VIGIL
2  under which it was produced.
3     Q.   You have no understanding of
4  whether this document was produced for
5  the first time in connection with your
6  rebuttal expert report?
7     A.   I don't.
8     Q.   How was this document prepared?
9     A.   I don't know.
10    Q.   Who prepared this document?
11    A.   I don't know.
12    Q.   Did you speak with anyone at
13 StockX about this document?
14    A.   No.
15    Q.   What representations were made
16 to you about this document?
17    A.   That these represented the
18 weekly volumes of sales and transactions
19 on the GOAT and StockX platforms over the
20 relevant period.
21    Q.   Who made those representations
22 to you?
23    A.   It could have been someone from
24 StockX, I don't recall.
25    Q.   I just asked you if you spoke
```

Page 231

```
1          ROBERT L. VIGIL
2  to anyone at StockX about this document,
3  and you said no.  Are you changing your
4  testimony now?
5     A.   I don't recall one way or the
6  other.
7     Q.   Did you learn --
8     A.   I have an understanding of what
9  these data are.  I can't recall.
10    Q.   You just don't know how you
11 learned it?
12    A.   I can't recall the, where the
13 understanding came from.
14    Q.   In column B, I see the heading
15 "GOAT" in row 1, correct?
16    A.   Yes.
17    Q.   Where did the information on
18 column B on this sheet come from?
19    A.   Well, I think it's a little
20 hard to say by looking at this printout,
21 because my recollection is that the --
22 oh, I am sorry, I see it now.  If you
23 look at the bottom of the pages it says,
24 "Observed sales or observed
25 transactions."
```

Page 232

```
1          ROBERT L. VIGIL
2          And so my recollection is that
3  the Excel spreadsheet had two worksheets.
4  One that said "Observed Sales" and the
5  other said "Observed Transactions."  And
6  so I wasn't clear which was which.
7     Q.   Let's focus then on the sheets
8  that have the title "Observed Sales."
9  Where did the information regarding
10 GOAT's observed sales come from in column
11 B?
12    A.   It came from StockX.
13    Q.   Do you have any further
14 information beyond that where it came
15 from?
16    A.   No.
17    Q.   And no one at StockX told you
18 how they acquired this information?
19    A.   No.  It's my understanding that
20 this is information that they keep in the
21 normal course of business that I believe
22 they looked at in the past.  I just don't
23 recall specifically where they obtained
24 it.
25    Q.   In the observed transactions
```

Page 233

```
1          ROBERT L. VIGIL
2  sheets, where did the information in
3  column B come from?
4     A.   Same answer.
5     Q.   You just understand that it
6  came from StockX?
7     A.   StockX provided the
8  spreadsheet.  I don't remember where they
9  got the information that's contained in
10 the spreadsheet.
11    Q.   And you never asked anyone at
12 StockX how they obtained this information
13 from GOAT?
14    A.   No.
15    Q.   Did you ask them whether they
16 actually obtained this information
17 directly from GOAT?
18    A.   No, because whether they
19 obtained it from GOAT directly, or
20 whether they obtained it from some other
21 third-party source it doesn't really
22 matter.
23    Q.   Why not?
24    A.   Because it's not unusual to
25 rely on information that comes from third
```

Page 234

1           ROBERT L. VIGIL
2  parties, just like it's not unusual to
3  rely on information that comes from the
4  first source. So I routinely rely upon
5  information that comes from third
6  parties, data collection services.
7      Q.   Did you ask any questions or do
8  anything to confirm whether the
9  information in column B of the observed
10 sales sheets and the observed transaction
11 sheets was accurate?
12     A.   I didn't verify the numbers
13 that are shown on this document.
14     Q.   How do you know that it's
15 reliable to rely on this document?
16     A.   It's my understanding that this
17 is the type of information that StockX
18 obtains and has utilized in the past.
19 And so to the extent that they have
20 utilized this type of information, I
21 don't believe that they would utilize
22 information that's unreliable.
23     Q.   You're just speculating about
24 how StockX has obtained this information,
25 correct?

Page 235

1           ROBERT L. VIGIL
2      A.   No, I am not speculating one
3  way or the other. As I mentioned
4  earlier, it doesn't matter where they
5  obtained it, whether they obtained it
6  directly from GOAT or whether they
7  obtained it from a third-party service
8  that provided the information is not
9  necessary for my use of the data.
10     Q.   But you don't know where this
11 data came from, correct?
12     A.   I don't. And I don't need to
13 know where it came from.
14     Q.   And StockX didn't provide you
15 with any documents from GOAT regarding
16 its financials or the volume of sales or
17 transactions on its platform, correct?
18     A.   I don't believe that I have
19 information directly from GOAT.
20     Q.   And StockX didn't provide you
21 with any testimony from any GOAT
22 employees explaining the data that you
23 see here in the Observed Sales and
24 Observed Transactions column, correct?
25     A.   Correct, I wouldn't necessarily

Page 236

1           ROBERT L. VIGIL
2  expect that.
3      Q.   Why not?
4      A.   I rely on data collected from
5  third-party sources all the time. As an
6  example, if I am working on a case and I
7  need to identify what the market share of
8  a particular company is, then we will
9  obtain that data from any number of
10 different data sources such as IMS or
11 other sources. IMS doesn't tell me that
12 specific information about each company
13 whose data is included in the
14 spreadsheet.
15     Q.   And you trust data that you
16 receive from IMS, correct?
17     A.   I do. And the fact that StockX
18 would obtain this information and utilize
19 it itself tells me that it's reliable
20 information. Because it wouldn't make
21 sense that StockX would obtain and
22 utilize information that they believed
23 was inaccurate.
24     Q.   Do you know whether StockX
25 utilizes the information that's in column

Page 237

1           ROBERT L. VIGIL
2  B of the observed sales and observed
3  transactions?
4      A.   It's my understanding that the
5  information that's in this spreadsheet is
6  the type of information that StockX would
7  utilize. Whether they've utilized this
8  specific cut of the data, I don't know.
9  But it's not unusual for a company like
10 StockX to obtain and utilize data from
11 third parties that identify relative
12 sales over a period of time.
13          And I should note that data
14 that are included in Exhibit 10 are
15 consistent with other things that I have
16 seen. So as I note in my expert report,
17 this data shows that after the alleged
18 false claims were changed, there was no
19 impact on the relative sales of the two
20 companies and that is very consistent
21 with other evidence, including evidence
22 from Ms. Butler's survey. It's
23 consistent with evidence regarding the
24 repeat purchase rate of customers that
25 obtain a suspected inauthentic product.

60 (Pages 234 - 237)

1      ROBERT L. VIGIL
2  platform, correct?
3      A.   The documents that I reviewed
4  suggest that the existence of the
5  inspection and verification process that
6  StockX undertakes on its platform, that
7  that process can impact the purchase
8  decision.
9      Q.   You agree that you've reviewed
10 StockX documents that identify
11 authenticity as either very important or
12 as somewhat important reason for
13 consumers' purchasing decisions on the
14 StockX platform, correct?
15     A.   I reviewed a survey that
16 evidenced that for some consumers that
17 authenticity is important.
18     Q.   If you turn to paragraph 60 of
19 your first submitted rebuttal report,
20 please.
21     A.   I should clarify my last answer
22 for authenticity.  One can't infer that
23 that means no expectation of ever
24 receiving an inauthentic product.  It's
25 my understanding that there is evidence

1      ROBERT L. VIGIL
2  that that is not how those consumers view
3  the word "authentic."
4      Q.   That's okay, Dr. Vigil.  That's
5  not responsive to my question.  So I
6  believe you already answered my question,
7  and now you're just adding additional
8  stuff that wasn't responsive.  So let's
9  move on to my next question.
10     A.   Your question asked about
11 whether I saw evidence that authenticity
12 was important in the purchase decision.
13 And I said yes, but I think it's
14 important to clarify that what was meant
15 by authenticity wasn't necessarily that a
16 person was going to get with certainty an
17 authentic product.  I have not seen that
18 evidence.
19          You said paragraph 60?
20     Q.   I said paragraph 60.
21     A.   Okay.
22     Q.   In paragraph 60 you identify
23 what you believe to be several other
24 factors that may drive consumer
25 purchasing decisions on the StockX

1      ROBERT L. VIGIL
2  platform, correct?
3      A.   Correct.
4      Q.   And those are speed of
5  delivery, availability of scarce or
6  unique products, price transparency,
7  value for the price and customer
8  experience, correct?
9      A.   Correct.
10     Q.   Have you quantified the amount
11 that speed of delivery impacts a
12 consumer's decision to purchase sneakers
13 on the StockX platform?
14     A.   No.
15     Q.   What portion of StockX's
16 revenues of Jordan and Nike-branded
17 sneakers during the relevant time period
18 was due to speed of delivery?
19     A.   I don't know.
20     Q.   Have you quantified the amount
21 that scarcity of the product impacts
22 consumer's decisions to purchase sneakers
23 on a StockX platform?
24     A.   No.  The only thing that I
25 quantified is the amount of trades

1      ROBERT L. VIGIL
2  related to the at issue claims in this
3  case, which is what my assignment was.
4  My assignment wasn't to quantify the
5  amount of trades due to each of these
6  other factors.
7      Q.   What portion of StockX's
8  revenues for Jordan and Nike-branded
9  sneakers during the relevant time period
10 was due to scarcity of the product?
11     A.   I don't know the amount that
12 was due only and specifically to the
13 availability of scarce or unique
14 products, because the purchase decision
15 is multifaceted and people make decisions
16 for more than one reason.  So I don't
17 think it's possible to say how much was
18 specifically and only due to that factor.
19 And the only thing that I quantified as I
20 mention in this case is, as I mentioned
21 before, was the amount that's
22 specifically due to the at issue claims.
23     Q.   Okay.  Have you quantified the
24 amount that value for the price impacts
25 consumer purchase decisions of sneakers

ROBERT L. VIGIL
on the StockX platform?
    A.   My answer would be the same.
There is no way to specifically separate
the impact of that from other things.
And the only thing that I was able to
separate out was the impact of the at
issue claims.
    Q.   What portion of StockX's
revenues in Jordan and Nike-branded
sneakers during the relevant time period
was due to value for the price?
    A.   Same answer.  The information
that I received was insufficient to
separately identify how much was due to
that versus other factors.  The only
thing that I was able to separate out was
the impact of the alleged false claims.
    Q.   Have you quantified the amount
that customer experience impacts
consumer's purchasing decision of
sneakers on the StockX platform?
    A.   Same response.  There is not
enough data to separately identify how
much of the purchase decision was related

ROBERT L. VIGIL
to that factor compared to other factors.
The only thing that was possible was to
identify the impact of the at issue
claims.
    Q.   What portion of StockX's
revenue of Jordan and Nike-branded
sneakers during the relevant time period
was due to customer experience?
    A.   Same response.  Insufficient
data to be able to separate out how much
of an impact that factor had by itself,
compared to other factors, given that the
purchase decision is multifaceted.  The
only information that existed that would
have allowed this type of a comparison
would be such that I can separate out how
much was due to the at issue claims.
    Q.   Have you quantified the value
to StockX of having an authentication
process?
    MR. RIEHL:  Objection.
    A.   No.  I have identified how much
of the value that StockX received as a
result of the at issue claims.

ROBERT L. VIGIL
    Q.   What portion of StockX's
revenues of Nike and Jordan-branded
sneakers during the relevant time period
was due to StockX having an
authentication process?
    MR. RIEHL:  Objection.
    A.   I don't know specifically how
much was due to just the process.  The
only thing I know is how much was due to
the at issue claims.
    Q.   Have you quantified the value
to consumers for StockX performing a
verification that is unrelated to the
authenticity determination of the
sneaker?
    MR. RIEHL:  Objection.
    A.   I am sorry, can you repeat the
question?
    MR. MILLER:  Can you read that
back, please?
    [The requested portion of the
record was read back as follows:
    "Question:  Have you quantified
the value to consumers for StockX

ROBERT L. VIGIL
performing a verification that is
unrelated to the authenticity
determination of the sneaker?"]
    MR. RIEHL:  Objection.
    A.   I'm not sure how to answer that
question.  I don't think I understand the
question.
    Q.   What don't you understand?
    A.   I don't understand what you're
asking.
    Q.   Why not?  How can I clarify?
What don't you understand about it?
    A.   Maybe if you reworded it.  Not
just reread it but reworded it, I can try
to give you a better answer.
    Q.   Let's look at paragraph 62 of
your first amended rebuttal report.
    A.   Okay.
    Q.   The second sentence of
paragraph 62 you write, "Mr. Hansen
attributes no separate value to StockX's
authentication process apart from the
alleged false claims," okay?
    A.   I see that, yes.

Page 250

1    ROBERT L. VIGIL
2    Q.   So let me ask you a question
3 about that first.
4        Did you ascribe or calculate a
5 value to StockX's authentication process,
6 apart from the alleged false claims?
7    A.   Yes.  Most of the value that
8 I've seen comes from other aspects of the
9 inspection and verification process,
10 besides the alleged false claims.  And
11 you can see that by looking at the test
12 and control study that was performed by
13 Ms. Butler.
14   Q.   Have you quantified the value
15 of the other aspects of StockX's
16 inspection and verification process,
17 apart from the alleged false claims?
18   A.   I am relying on evidence
19 regarding that quantification that comes
20 from Ms. Butler's survey.  But her, the
21 control group of her study measures that
22 information.  And when compared to the
23 test group, you're able to determine how
24 much was due to the alleged false claims
25 as opposed to other factors.

Page 251

1    ROBERT L. VIGIL
2    Q.   Putting aside your reliance on
3 Ms. Butler's survey, have you quantified
4 the value of the other aspects of
5 StockX's inspection and verification
6 process apart from the alleged false
7 claims?
8    A.   Not separate from my reliance
9 on Ms. Butler's survey.
10   Q.   Have you quantified the amount
11 that StockX providing historical sales
12 data to consumers impacts consumer's
13 purchase decisions to purchase sneakers
14 on the StockX platform?
15   A.   No, there was insufficient
16 information to be able to identify how
17 much that one factor by itself impacted
18 the purchase decision.  The only thing
19 that was possible was to identify how
20 much of an impact the alleged false
21 claims had on the consumer's decision to
22 use the StockX platform.
23   Q.   What portion of StockX's
24 revenue for Nike and Jordan brand sneaker
25 trades for the relevant period was due to

Page 252

1    ROBERT L. VIGIL
2 StockX providing consumer historical
3 sales data?
4    A.   The same answer.  There was not
5 enough information to be able to
6 separately identify how much would impact
7 that factor by itself had on consumer's
8 decision to use the StockX platform.  The
9 only information that exists -- existed
10 only enabled me to identify how much of
11 the purchase decision was related to the
12 at issue claims.
13   Q.   And the only information that
14 existed that enabled you to identify how
15 much the purchase decision, was related
16 to the at issue claims was Sarah Butler's
17 survey; is that right?
18       MR. RIEHL:  Objection.
19   A.   In terms of quantifying the
20 specific percentage of trades related to
21 different factors, the only thing that
22 was possible was information -- sorry,
23 let me restate that.
24   Q.   Why don't I ask my question
25 again.  The only information that existed

Page 253

1    ROBERT L. VIGIL
2 that enabled you to identify how much the
3 purchase decision was related to the at
4 issue claims was Sarah Butler's survey;
5 is that right?
6       MR. RIEHL:  Objection.
7    A.   Can you repeat that one more
8 time?
9        [The requested portion of the
10    record was read back as follows:
11       "Question:  The only information
12    that existed that enabled you to
13    identify how much the purchase
14    decision was related to the at issue
15    claims was Sarah Butler's survey; is
16    that right?"]
17       MR. RIEHL:  Objection.
18   A.   No, that's not correct.  Ms.
19 Butler's survey was the information that
20 enabled a specific percentage, but there
21 is lots of information that I reviewed
22 that provided information about the value
23 or importance of lots of different
24 features on the StockX platform, and the
25 value or lack thereof regarding the at

64 (Pages 250 - 253)

1       ROBERT L. VIGIL
2   issue claims.
3       Q.   So despite having been provided
4   lots of information about the different
5   features on the StockX platforms, and the
6   value or lack thereof regarding the at
7   issue claims, you didn't independently
8   quantify the value of any of those
9   features, correct?
10      A.   The only quantification that I
11  did regarding how much of the --
12  regarding the specific percentage of the
13  at issue trades that were related to the
14  at issue claims came from Sarah Butler's
15  survey.  But there is a lot of
16  information that I relied upon that
17  supported quantitatively that result.
18  Actually, I should say that's not quite
19  right, because the other evidence that I
20  reviewed that helped me to quantify the
21  importance or value of the at issue
22  trades also included the StockX and GOAT
23  weekly transaction data.  So that
24  analysis that was performed allowed me to
25  determine how valuable or not the at

1       ROBERT L. VIGIL
2   issue claims were to the Nike trades at
3   issue.
4           So at least those two things
5   allowed me to quantify that impact.  And
6   both of those analyses, Ms. Butler's
7   survey and the GOAT StockX comparison,
8   that difference and difference
9   regression, resulted in similar results.
10  They confirmed each other's validity.
11      Q.   You're not offering an opinion
12  in this case that a certain percentage of
13  StockX's revenues on trades of Nike and
14  Jordan sneakers during the relevant time
15  period could be attributed to StockX
16  verifying that the sneakers were the
17  correct size, correct?
18      A.   No.
19      Q.   And you're not offering an
20  opinion in this case that a certain
21  percentage of StockX's revenues on trades
22  of Nike and Jordan sneakers during the
23  relevant time period could be attributed
24  to StockX verifying that the sneakers
25  that the customer purchased are actually

1       ROBERT L. VIGIL
2   the right make or model?
3       A.   Not specifically, no.  But in
4   some sense those things are related to
5   the at issue claims, but to the extent
6   they are related to the at issue claims,
7   then I am providing an opinion regarding
8   those things.
9       Q.   Have you quantified the number
10  of purchasers that have made repeat
11  purchases of Nike or Jordan sneakers on
12  the StockX platform after receiving a
13  counterfeit product from StockX?
14      A.   My recollection is that
15  percentage is 40 to 50 percent.
16      Q.   Sorry, 40 to 50 percent of
17  what?
18      A.   40 to 50 percent of customers
19  that receive a suspected inauthentic
20  product used the StockX platform again.
21  So their repeat purchase rate for those
22  consumers is 40 to 50 percent, which is
23  similar to the overall repurchase rate
24  for StockX.
25      Q.   To be more specific, 40 to 50

1       ROBERT L. VIGIL
2   percent of consumers that received a
3   counterfeit product from StockX and
4   complained to StockX about receiving the
5   counterfeit product, correct?
6       A.   No, I don't know that that's
7   correct.
8       Q.   Are you offering an opinion
9   that 40 to 50 percent of all consumers
10  that received a counterfeit product from
11  StockX, then went back and repurchased a
12  Nike shoe from StockX?
13      A.   I am offering an opinion that
14  StockX has determined that 40 to 50
15  percent of consumers that received a
16  product that StockX believes is suspected
17  of being inauthentic come back and used
18  the platform again.
19      Q.   And in order to be counted in
20  that pool of customers, a consumer has to
21  have realized that it received a
22  counterfeit product and complained to
23  StockX, correct?
24      A.   No, I don't think that's
25  correct at all.  I think a customer sends

65 (Pages 254 - 257)

Page 258

1    ROBERT L. VIGIL
2 -- the supplier sends the product to
3 StockX for inspection of and. And StockX
4 could, as part of that inspection and
5 verification, determine that it suspects
6 the product to be inauthentic before it's
7 even sent to the buyer. So I don't think
8 it's necessary that the buyer has to
9 receive the product and then complain.
10   Q.   But in that hypothetical you
11 just offered, there is no transaction.
12 If StockX stops the suspected counterfeit
13 from ever going to the buyer, there is no
14 buyer?
15   A.   There is a buyer, it's just
16 that the buyer is not buying the
17 suspected inauthentic product. The buyer
18 is buying another product.
19   Q.   What are they buying, what they
20 are receiving then?
21   A.   Another product that StockX
22 believes is authentic.
23   Q.   And you believe that StockX
24 informs that buyer that the reason they
25 didn't receive the shoe was because it

Page 259

1    ROBERT L. VIGIL
2 was stopped by StockX's authenticators as
3 being counterfeit?
4    A.   I don't know, one way or the
5 other.
6    Q.   Is it your opinion that a
7 consumer would be willing to spend a
8 thousand dollars on a counterfeit Nike or
9 Jordan sneaker?
10   MR. RIEHL: Objection.
11   A.   I don't have an opinion about
12 that, one way or the other.
13   Q.   Do you believe a sneaker-head
14 would be willing to pay a thousand
15 dollars on a counterfeit Nike or Jordan
16 sneaker?
17   MR. RIEHL: Objection.
18   A.   I don't have an opinion about
19 that, one way or the other.
20   Q.   Do you think a sneaker-head who
21 is willing to spend a thousand dollars on
22 a Nike or Jordan-branded sneaker believes
23 that getting an authentic sneaker is
24 important?
25   MR. RIEHL: Objection.

Page 260

1    ROBERT L. VIGIL
2    A.   I believe that for the
3 consumers that utilize the StockX
4 platform, that it's important to many of
5 them that the products that they are
6 purchasing have gone through an
7 inspection and verification process
8 whereby StockX expresses a belief that
9 the product is authentic.
10   Q.   Are you relying on Sarah
11 Butler's survey to offer an opinion that
12 past purchasers on the StockX platform of
13 Nike or Jordan-branded sneakers were not
14 influenced by the alleged false
15 advertising claims tested in her survey?
16   A.   I am relying on the results of
17 her survey which suggest that the alleged
18 false claims did not have an impact on
19 consumers' likelihood of using the StockX
20 platform.
21   Q.   Is that true for the past
22 purchasers of Nike and Jordan-branded
23 sneakers during the relevant time period?
24   MR. RIEHL: Objection.
25   A.   I believe her survey shows that

Page 261

1    ROBERT L. VIGIL
2 result for past purchasers as well as
3 just for future purchasers.
4    MR. MILLER: Subject to any
5 redirect from your counsel, I don't
6 have any further questions for you,
7 Dr. Vigil.
8    MR. RIEHL: No redirect from us.
9    THE VIDEOGRAPHER: This marks
10 the end of the deposition. We are
11 going off the record at 5:48 p.m.
12   (Time noted: 5:48 p.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

66 (Pages 258 - 261)

Page 262

```
1
2        ACKNOWLEDGMENT OF DEPONENT
3
4        I have read the foregoing
5   transcript of my deposition and except
6   for any corrections or changes noted on
7   the errata sheet, I hereby subscribe to
8   the transcript as an accurate record of
9   the statements made by me.
10
11      _____
12          ROBERT L. VIGIL, Ph.D.
13
14
15  SUBSCRIBED AND SWORN before
16  and to me this ____ day of _____,
17  2023.
18
19      _____
20          NOTARY PUBLIC
21
22
23  My Commission Expires:
24
25
```

Page 263

```
1
2            CERTIFICATION
3
4        I, DAWN MATERA, a Notary Public
5   for and within the State of New York, do
6   hereby certify:
7        That the witness whose testimony
8   as herein set forth, was duly sworn by
9   me; and that the within transcript is a
10  true record of the testimony given by
11  said witness.
12       I further certify that I am not
13  related to any of the parties to this
14  action by blood or marriage, and that I
15  am in no way interested in the outcome of
16  this matter.
17       IN WITNESS WHEREOF, I have
18  hereunto set my hand this 23rd day of
19  August,
20      Dawn Matera
21      DAWN MATERA
22
23
24
25
```

Page 264

```
1
2                I N D E X
3   Witness                          Page
4   ROBERT L. VIGIL, Ph.D.            4
5
6              E X H I B I T S
7   Vigil                            Page
8   Exhibit 1 Expert report of Dr. Vigil  32
            with attachments
9
    Exhibit 2 Rebuttal Expert Report of  108
10          Robert Vigil, June 2nd,
            2023
11
    Exhibit 3 First Amended Rebuttal    108
12          Expert Report of Robert L.
            Vigil, August 21st, 2023
13
    Exhibit 4 Redline report          110
14
    Exhibit 5 Document Bates stamped  114
15          STX0806055
16  Exhibit 6 Document Bates stamped  229
            STX0806054
17
18          ~oOo~
19
20
21
22
23
24
25
```

Page 265

```
1
2           ERRATA SHEET
            VERITEXT
3
    CASE NAME: Nike, Inc. v StockX LLC
4   DATE OF DEPOSITION: August 22, 2023
    WITNESS'S NAME: ROBERT L. VIGIL, Ph.D.
5
    PAGE/LINE(s)/   CHANGE        REASON
6   ___/___/_____
7   ___/___/_____
8   ___/___/_____
9   ___/___/_____
10  ___/___/_____
11  ___/___/_____
12  ___/___/_____
13  ___/___/_____
14  ___/___/_____
15  ___/___/_____
16  ___/___/_____
17  ___/___/_____
18  ___/___/_____
19  ___/___/_____
20  ___/___/_____
        _____
        Signature of Deponent
21
    Subscribed and Sworn To
22  Before Me This_____Day
    of_____, 2023.
23
    _____
24   Notary Public
25  My Commission Expires_____
```

67 (Pages 262 - 265)

| | | | |
|---|---|---|---|
| **Deposition Date:** 8/22/2023 | | | |
| **Deponent:** Dr. Robert L. Vigil – Errata Sheet | | | |
| **Case Name:** *Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) | | | |

| Page(s): Line(s) | Now Reads | Should Read | Reason |
|---|---|---|---|
| 10:12-13 | would be **the most important**. | would be **very well supported**. | Clarification |
| 20:25 | They **can** use | They **tend to** use | Clarification |
| 23:21 | **expect** report | **expert** report | Transcription Error |
| 24:5 | **sneaker-heads** | **sneakerheads** | Typographical Error |
| 24:7-8 | include the deposition | include, **I believe**, the deposition | Clarification |
| 29:8 | **conversation** with StockX | **conversations** with c**ounsel for** StockX | Transcription Error |
| 30:3 | do anything to | do anything **else** to | Transcription Error |
| 33:13 | Consulting**,** LLC | Consulting LLC | Typographical Error |
| 35:15 | Edwards **Life Sciences** | Edwards **Lifesciences** | Typographical Error |
| 35:16 | **Merrill** Life Sciences | **Meril** Life Sciences | Typographical Error |
| 37:16 | **Edward** | **Edwards** | Clarification |

| **Deposition Date**: 8/22/2023 | | | |
|---|---|---|---|
| **Deponent**: Dr. Robert L. Vigil – Errata Sheet | | | |
| **Case Name**: *Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) | | | |

| Page(s): Line(s) | Now Reads | Should Read | Reason |
|---|---|---|---|
| 37:16-17 | **Life Sciences** | **Lifesciences** | Typographical Error |
| 39:23 | **team's** | **Teams** | Typographical error |
| 40:16 | And does | And **what** does | Transcription Error |
| 44:11 | that **were related** to | that **relate** to | Transcription Error |
| 44:22-23 | or **to** the extent | or the extent | Transcription Error |
| 47:23-24 | mentioned related | mentioned **also** related | Transcription Error |
| 55:16 | **relative** | **relevant** | Transcription Error |
| 64:25 | variable and the fixed costs | variable **costs** and the fixed costs | Transcription Error |
| 66:22 | platform trading | platform**'s** trading | Transcription Error |
| 70:17 | determinative.  What is | determinative.  **That** what is | Transcription Error |
| 73:23 | actual | actually | Transcription error |
| 73:23-24 | believes whether | believes **regarding** whether | Transcription Error |

| Deposition Date: 8/22/2023<br>Deponent: Dr. Robert L. Vigil – Errata Sheet<br>Case Name: *Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) | | | |
|---|---|---|---|
| **Page(s):<br>Line(s)** | **Now Reads** | **Should Read** | **Reason** |
| 77:13 | **Brian** | **Ryan** | Transcription Error |
| 77:22-23 | **Diraj Chaudhry** | **Dheeraj Chaudhary** | Typographical Error |
| 100:5-6 | King **and Spaulding** | King **& Spalding** | Transcription Error |
| 100:7 | **TG** Linea | **TIGI** Linea | Transcription Error |
| 101:22 | **sneaker-heads** | **sneakerheads** | Typographical Error |
| 105:9 | premiums, to **such an** extent | premiums, **and so** to **the** extent | Transcription Error |
| 105:22 | **anything** | **any** | Transcription Error |
| 118:2 | contribution **market** | contribution **margin** | Transcription Error |
| 118:14 | categories data | categories **of** data | Transcription Error |
| 123:11 | **company's** | **companies** | Typographical Error |
| 126:21 | Other than I | Other than **that** I | Transcription Error |
| 129:6 | **there is** | **bears on** | Clarification |

| | **Deposition Date**: 8/22/2023<br>**Deponent**: Dr. Robert L. Vigil – Errata Sheet<br>**Case Name**: *Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) | | |
|---|---|---|---|
| **Page(s):<br>Line(s)** | **Now Reads** | **Should Read** | **Reason** |
| 136:22 | Stock**x**'s | Stock**X**'s | Typographical Error |
| 136:19 | Stock**x**'s | Stock**X**'s | Typographical Error |
| 136:20 | Stock**x**'s | Stock**X**'s | Typographical Error |
| 138:3 | Stock**x**'s | Stock**X**'s | Typographical Error |
| 138:7 | Stock**x**'s | Stock**X**'s | Typographical Error |
| 138:11 | Stock**x**'s | Stock**X**'s | Typographical Error |
| 138:17 | Stock**x**'s | Stock**X**'s | Typographical Error |
| 138:20 | Stock**x**'s | Stock**X**'s | Typographical Error |
| 138:23 | of false claims | of **the alleged** false claims | Transcription Error |
| 139:2 | Stock**x**'s | Stock**X**'s | Typographical Error |
| 139:8 | Stock**x**'s | Stock**X**'s | Typographical Error |
| 139:12 | for alleged | for **the** alleged | Transcription Error |
| 139:15 | Stock**x**'s | Stock**X**'s | Typographical Error |

| **Deposition Date**: 8/22/2023 |
| :--- |
| **Deponent**: Dr. Robert L. Vigil – Errata Sheet |
| **Case Name**: *Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) |

| Page(s):<br>Line(s) | Now Reads | Should Read | Reason |
| :---: | :---: | :---: | :---: |
| 139:20 | Stock**x**'s | Stock**X**'s | Typographical Error |
| 139:23 | Stock**x**'s | Stock**X**'s | Typographical Error |
| 139:16 | **Nike** | **StockX** | Clarification |
| 139:24 | sale **and** of | sale of | Transcription Error |
| 140:4 | Stock**x**'s | Stock**X**'s | Typographical Error |
| 141:10 | Stock**x**'s | Stock**X**'s | Typographical Error |
| 142:25 | **legitimate** | **illegitimate** | Transcription Error |
| 143:24 | Stock**x**'s | Stock**X**'s | Typographical Error |
| 144:4 | Stock**x**'s | Stock**X**'s | Typographical Error |
| 144:5 | **contain** 99.6 | **maintain a** 99.6 | Transcription Error |
| 145:10 | Stock**x**'s | Stock**X**'s | Typographical Error |
| 145:19 | Stock**x**'s | Stock**X**'s | Typographical Error |
| 146:25 | Stock**x**'s | Stock**X**'s | Typographical Error |

| **Deposition Date**: 8/22/2023<br>**Deponent**: Dr. Robert L. Vigil – Errata Sheet<br>**Case Name**: *Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) | | | |
|---|---|---|---|
| **Page(s):<br>Line(s)** | **Now Reads** | **Should Read** | **Reason** |
| 147:6 | Stock**x**'s | Stock**X**'s | Typographical Error |
| 147:12 | Stock**x**'s | Stock**X**'s | Typographical Error |
| 147:18 | Stock**x**'s | Stock**X**'s | Typographical Error |
| 147:22 | Stock**x**'s | Stock**X**'s | Typographical Error |
| 147:25 | Stock**x**'s | Stock**X**'s | Typographical Error |
| 148:4 | Stock**x**'s | Stock**X**'s | Typographical Error |
| 148:9 | Stock**x**'s | Stock**X**'s | Typographical Error |
| 149:12 | anything | an opinion | Transcription Error |
| 149:22 | Stock**x**'s | Stock**X**'s | Typographical Error |
| 150:4 | Stock**x**'s | Stock**X**'s | Typographical Error |
| 151:3 | Stock**x**'s | Stock**X**'s | Typographical Error |
| 151:4 | Stock**x**'s | Stock**X**'s | Typographical Error |
| 151:8 | that **the** evidence | that **there is** evidence | Transcription Error |

| **Deposition Date:** 8/22/2023 | | | |
| **Deponent:** Dr. Robert L. Vigil – Errata Sheet | | | |
| **Case Name:** *Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) | | | |

| Page(s): Line(s) | Now Reads | Should Read | Reason |
|---|---|---|---|
| 151:17 | Stock**x**'s | Stock**X**'s | Typographical Error |
| 151:22 | **my** footnotes | **these** footnotes | Transcription Error |
| 152:3 | Stock**x**'s | Stock**X**'s | Typographical Error |
| 153:16 | know about | know **beyond that** about | Transcription Error |
| 156:9 | Stock**x**'s | Stock**X**'s | Typographical Error |
| 156:18-19 | listing**."** A**nd | listing**, a**nd | Typographical Error |
| 156:19-21 | Nike's **b**rand **p**rotection **d**irector of **a**uthentication and **i**nnovation | Nike's **B**rand **P**rotection **D**irector of **A**uthentication and **I**nnovation | Typographical Error |
| 156:21-22 | StockX and Nike-**branded p**rotection | StockX and Nike **Brand Protection** | Transcription/Typographical Error |
| 157:2 | counterfeit | counterfeit**s** | Transcription Error |
| 157:23 | StockX Trading | StockX**'s** Trading | Transcription Error |
| 158:5 | Stock**x**'s | Stock**X**'s | Typographical Error |
| 158:17 | Stock**x**'s | Stock**X**'s | Typographical Error |

| | | | |
|---|---|---|---|
| **Deposition Date**: 8/22/2023 | | | |
| **Deponent**: Dr. Robert L. Vigil – Errata Sheet | | | |
| **Case Name**: *Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) | | | |

| Page(s): Line(s) | Now Reads | Should Read | Reason |
|---|---|---|---|
| 158:22 | Stock**x**'s | Stock**X**'s | Typographical Error |
| **159:3** | **Stockx's** | **StockX's** | **Typographical Error** |
| 159:5 | **The** opinions | **All of** the opinions | Transcription Error |
| 159:14 | Stock**x**'s | Stock**X**'s | Typographical Error |
| 159:20 | Stock**x**'s | Stock**X**'s | Typographical Error |
| 159:23 | **C**ourt | **c**ourt | Typographical Error |
| 159:23 | **may** | **might** | Transcription Error |
| 160:4 | Stock**x**'s | Stock**X**'s | Typographical Error |
| 160:6 | **I don't know** one | **I'm not sure** one | Transcription Error |
| 160:7 | **I don't know that** that | **I'm not sure what** that | Transcription Error |
| 160:10 | why **don't** you | why **do** you | Transcription Error |
| 161:19 | Stock**x**'s | Stock**X**'s | Typographical Error |
| 163: 23 | work**. W**ho | work**, w**ho | Typographical Error |

| | **Deposition Date**: 8/22/2023<br>**Deponent**: Dr. Robert L. Vigil – Errata Sheet<br>**Case Name**: *Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) | | |
|---|---|---|---|
| **Page(s):<br>Line(s)** | **Now Reads** | **Should Read** | **Reason** |
| 166:23 | of secondary | of **the** secondary | Transcription Error |
| 167:9 | **Nike's** | **StockX's** | Clarification |
| 169:5 | they **had** competitors | they **are** competitors | Transcription Error |
| 170:7 | **that** | **those same** | Clarification |
| 179:5 | the coefficient | the coefficient**s** | Transcription Error |
| 180:18 | concerning two | concerning **the** two | Transcription Error |
| 181:6-7 | trades**. T**hen, yes | trades**,** **t**hen, yes | Transcription Error |
| 183:7-8 | the level Nike and Jordan | the level **of** Nike and Jordan | Transcription Error |
| 189:12 | $13.8**7** | $13.8**2** | Transcription Error |
| 189:17 | 13.8**0 to** | 13.8**2** | Transcription Error |
| 190:18 | **of 43.32** | **before 3.32** | Transcription Error |
| 191:3 | it can be | you can think of it as | Transcription Error |
| 194:21 | specifically**,** to | specifically to | Typographical Error |

| Deposition Date: 8/22/2023 | | | |
| --- | --- | --- | --- |
| **Deponent**: Dr. Robert L. Vigil – Errata Sheet | | | |
| **Case Name**: *Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) | | | |

| Page(s): Line(s) | Now Reads | Should Read | Reason |
| --- | --- | --- | --- |
| 199:17 | you that the | you that**'s** the | Transcription Error |
| 200:7 | CM2**, they are not** deducting | CM2 **that I'm** deducting | Transcription Error |
| 201:7 | fluctuations **and** volume | fluctuations **in** volume | Transcription Error |
| 201:15-16 | the reason **is - - I could** clarify that | the reason **I** clarify that | Clarification |
| 201:17 | run, **but** | run, | Clarification |
| 208:24 | **find** | **identify** | Transcription Error |
| 218:21-22 | total **fixed operating,** fixed operations | total fixed operations | Clarification |
| 224:21 | **of** the | **on** the | Transcription Error |
| 225:13 | tech **and** fixed | tech fixed | Transcription Error |
| 228:13 | but **you** | but **I** | Transcription Error |
| 229:2 | Jordan didn't | Jordan **trades** didn't | Transcription Error |
| 229:22-23 | was produced in | was produced **to Nike** in | Transcription Error |

10

| **Deposition Date**: 8/22/2023<br>**Deponent**: Dr. Robert L. Vigil – Errata Sheet<br>**Case Name**: *Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) | | | |
|---|---|---|---|
| **Page(s): Line(s)** | **Now Reads** | **Should Read** | **Reason** |
| 235:5 | **it, whether** | **it. Knowing whether** | Clarification |
| 237:7 | utilize**. Whether** they've | utilize **or that** they've | Transcription Error |
| 238:2-3 | **a lot of other** | **lots of different** | Transcription Error |
| 242:15-16 | **a survey that evidenced** | **survey evidence** | Transcription Error |
| 246:21 | decision | decision**s** | Transcription Error |
| 252:2 | consumer | consumers | Transcription Error |
| 254:16 | **information** | **evidence** | Transcription Error |
| 254:22 | **trades** | **claims** | Transcription Error |
| 255:8 | difference **and** difference | difference **in** difference | Transcription Error |
| 258:3 | inspection **of and**. | inspection. | Transcription Error |
| 259:2 | **as** | **for** | Transcription Error |
| 259:13 | **sneaker-head** | **sneakerhead** | Typographical Error |
| 259:20 | **sneaker-head** | **sneakerhead** | Typographical Error |

I, Dr. Robert L. Vigil, do hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition taken on August 22, 2023; that I have made such corrections as appear noted herein; and that my testimony as contained herein, as corrected, is true and correct.

DATED this 26th day of September, 2023.

_____

Dr. Robert L. Vigil