**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| |
NIKE, INC., | |
| |
                 Plaintiff, | Civil Action No.: 1:22-cv-00983-VEC
| |
     v. | |
| Redacted Public Version
STOCKX LLC, | |
| |
             Defendant. | |

**NIKE, INC.'S OPPOSITION TO DEFENDANT STOCKX LLC'S**
**MOTION TO PRECLUDE THE TESTIMONY OF**
**JOHN HANSEN, JEFFERY STEC, KARI KAMMEL, STEVEN MCNEW,**
**AND ITAMAR SIMONSON**

# TABLE OF CONTENTS

I     INTRODUCTION ........................................................................................................ 1

II    ARGUMENT .............................................................................................................. 1

   A.    John Hansen's Testimony On Damages Is Relevant And Reliable .................................. 1

   B.    Jeffery Stec's Rebuttal Testimony Is Reliable And Should Not Be Excluded ............... 4

   C.    Kari Kammel's Testimony Is Relevant, Reliable, And Should Not Be Excluded........... 6

      1.    Kammel's Testimony Is Highly Relevant And Helpful Evidence ............................. 7

      2.    Kammel's Testimony Is Based On StockX's Conduct, Not Consumer Perception ... 10

      3.    Kammel's Assessment Of StockX's Conduct Is Reliable And Relevant................... 10

      4.    Kammel Is Qualified To Rebut Tucker's Opinions.................................................... 12

      5.    Kammel's Testimony Based On Information Produced During Discovery Should Not Be Excluded ........................................................................................................... 14

   D.    Steven McNew's Testimony On NFTs Is Reliable And Helpful................................... 15

      1.    McNew's Opinion That Consumers Perceived Vault NFTs As A Bundle Of Benefits Is Based On Reliable Evidence ................................................................................ 16

      2.    McNew's Opinion That Vault NFTs Were Shoddily Designed And Made Pretextual Use Of Blockchain Rests On Reliable Evidence .................................................... 18

   E.    Itamar's Simonson's Testimony Is Reliable And Should Not Be Excluded ................. 19

      1.    Simonson Reliably Measures The Relevant Type Of Confusion............................. 19

      2.    Simonson's Survey Is Methodologically Sound ...................................................... 22

      3.    Simonson's "Brand Extension" Rebuttal Is Proper .................................................. 25

III   CONCLUSION........................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adkins v. Morgan Stanley*,
  307 F.R.D. 119 (S.D.N.Y. 2015) (Caproni, J.) .......................................................13

*ARMOUR Cap. Mgmt. LP v. SS&C Techs., Inc.*,
  2020 WL 64297 (D. Conn. Jan. 5, 2020).........................................................11, 12

*In re AXA Equitable Life Ins. Co. COI Litig.*,
  595 F. Supp. 3d 196 (S.D.N.Y. 2022)..................................................................15

*Beastie Boys v. Monster Energy Co.*,
  983 F. Supp. 2d 354 (S.D.N.Y. 2014)....................................................................9

*Better Holdco, Inc. v. Beeline Loans, Inc.*,
  2023 WL 2711417 (S.D.N.Y. Mar. 30, 2023) .......................................................14

*Boucher v. U.S. Suzuki Motor Corp.*,
  73 F.3d 18 (2d Cir. 1996).................................................................................10

*Burberry Ltd. & Burberry USA v. Designers Imports, Inc.*,
  2010 WL 199906 (S.D.N.Y. Jan. 19, 2010) ........................................................7, 8

*Canon U.S.A., Inc. v. F&E Trading LLC*,
  2023 WL 5152448 (E.D.N.Y. June 6, 2023) .......................................................17

*Capri Sun GmbH v. Am. Beverage Corp.*,
  595 F. Supp. 3d 83 (S.D.N.Y. 2022)........................................................4, 18, 25

*Church & Dwight Co. v. SPD Swiss Precision Diagnostics GmbH*,
  2018 WL 4253181 (S.D.N.Y. Sep. 5, 2018)...........................................................3

*CJ Prod. LLC v. Snuggly Plushez LLC*,
  809 F. Supp. 2d 127 (E.D.N.Y. 2011) ..................................................................4

*Coty Inc. v. Excell Brands, LLC*,
  277 F. Supp. 3d 425 (S.D.N.Y. 2017)..............................................................20, 25

*Denimafia Inc. v. New Balance Athletic Shoe, Inc.*,
  2014 WL 814532 (S.D.N.Y. Mar. 3, 2014) ...........................................................20

*Dependable Sales & Serv., Inc. v. TrueCar, Inc.*,
  311 F. Supp. 3d 653 (S.D.N.Y. 2018)....................................................................3

*Deutsch v. Novartis Pharms. Corp.*,
  768 F. Supp. 2d 420 (E.D.N.Y. 2011) ...................................................................................14

*Dollman v. Mast Indus., Inc.*,
  2011 WL 3911035 (S.D.N.Y. Sept. 6, 2011)..........................................................................9

*Edmondson v. RCI Hosp. Holdings, Inc.*,
  2020 WL 1503452 (S.D.N.Y. Mar. 30, 2020) (Caproni, J.) ..................................................22

*In Re Elysium Health-ChromaDex Litig.*,
  2022 WL 421135 (S.D.N.Y. Feb. 11, 2022).......................................................................3, 23

*Friesland Brands, B.V. v. Vietnam Nat'l Milk Co.*,
  221 F. Supp. 2d 457 (S.D.N.Y. 2002)....................................................................................23

*Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.*,
  28 F.4th 35 (9th Cir. 2022) ....................................................................................................9

*Ideavillage Prod. Corp. v. Aarhus*,
  2019 WL 2290514 (S.D.N.Y. May 7, 2019) ...........................................................................7

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*,
  146 F.3d 66 (2d Cir. 1998).......................................................................................................3

*Kargo Glob., Inc. v. Advance Mag. Publishers, Inc.*,
  2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007).........................................................................23

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014)..................................................................................................................4

*Lifeguard Licensing Corp. v. Ann Arbor T-Shirt Co., LLC*,
  2017 WL 3142072 (S.D.N.Y. July 24, 2017) ........................................................................22

*LVL XII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
  209 F. Supp. 3d 612 (S.D.N.Y. 2016)....................................................................................17

*Mary Kay, Inc. v. Weber*,
  601 F. Supp. 2d 839 (N.D. Tex. 2009) ..................................................................................21

*In re Methyl Tertiary Butyl Ether Prod. Liab. Litig.*,
  2008 WL 1971538 (S.D.N.Y. May 7, 2008) ..........................................................................11

*Microban Prods. Co. v. API Indus., Inc.*,
  2014 WL 1856471 (S.D.N.Y. May 8, 2014) ..........................................................................16

*Milana v. MSC Cruises, S.A.*,
  2022 WL 4767701 (S.D. Fla. Aug. 8, 2022)..........................................................................12

*MyPlayCity, Inc. v. Conduit Ltd.*,
  2013 WL 4105698 (S.D.N.Y. Aug. 12, 2013) ........................................................................3

*N. Am. Olive Oil Ass'n v. Kangadis Food Inc.*,
  962 F. Supp. 2d 514 (S.D.N.Y. 2013) .................................................................................10

*Oracle Am., Inc. v. Google Inc.*,
  2016 WL 1743116 (N.D. Cal. May 2, 2016) ......................................................................24

*Otto v. LeMahieu*,
  2021 WL 1615311 (N.D. Cal. April 26, 2021) ...................................................................17

*Playtex Prod., Inc. v. Procter & Gamble Co.*,
  2003 WL 21242769 (S.D.N.Y. May 28, 2003) ............................................................13, 22

*POM Wonderful LLC v. Organic Juice USA, Inc.*,
  769 F. Supp. 2d 188 (S.D.N.Y. 2011) .................................................................................22

*Price v. L'Oreal USA, Inc.*,
  2020 WL 4937464 (S.D.N.Y. Aug. 24, 2020) ....................................................................17

*R.F.M.A.S., Inc. v. So*,
  748 F. Supp. 2d 244 (S.D.N.Y. 2010) .................................................................................12

*Red Hawk, LLC v. Colorforms Brand LLC*,
  638 F. Supp. 3d 375 (S.D.N.Y. 2022) (Caproni, J.) ...........................................................14

*Rexall Sundown, Inc. v. Perrigo Co.*,
  651 F. Supp. 2d 9 (E.D.N.Y. 2009) ....................................................................................22

*Rexall Sundown, Inc. v. Perrigo Co.*,
  707 F. Supp. 2d 357 (E.D.N.Y. 2010) ..............................................................................2, 3

*Rodgers v. Wright*,
  2011 WL 722772 (S.D.N.Y. Mar. 1, 2011) ..........................................................................3

*Romag Fasteners, Inc v. Fossil, Inc.*,
  140 S. Ct. 1492 (2020) .......................................................................................................8, 9

*Sazerac Co. v. Fetzer Vineyards, Inc.*,
  265 F. Supp. 3d 1013 (N.D. Cal. 2017) .........................................................................20, 23

*SEC v. Ripple*,
  2023 WL 5670711 (S.D.N.Y. March 6, 2023) ....................................................................17

*SourceOne Dental, Inc. v. Patterson Companies, Inc.*,
  328 F. Supp. 3d 53 (E.D.N.Y. 2018) ................................................................................4, 6

*TC Sys. Inc. v. Town of Colonie, New York*,
    213 F. Supp. 2d 171 (N.D.N.Y. 2002) ...................................................................................13

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
    497 F.3d 144 (2d Cir. 2007) .................................................................................................4

*U.S. v. Romano*,
    794 F.3d 317 (2d Cir. 2015) ...............................................................................................16

*United States v. Cruz*,
    363 F.3d 187 (2d Cir. 2004) ...............................................................................................14

*United States v. Percoco*,
    2018 WL 879499 (S.D.N.Y. Feb. 13, 2018) .......................................................................12

*Weight Watchers Int'l, Inc. v. Noom, Inc.*,
    403 F. Supp. 3d 361 (S.D.N.Y. 2019) ...............................................................................21

## Statutes

15 U.S.C. § 1117(a) ...............................................................................................................1, 2

15 U.S.C. § 1117(c) ....................................................................................................................8

15 U.S.C. § 1125(a) ..................................................................................................................25

# I    INTRODUCTION

StockX's *Daubert* Motion seeks to exclude every expert Nike proffers in this action.  It also uses its Motion to try to exclude key evidence of harm it has caused Nike.  StockX's exclusion arguments are largely premised on inapplicable law and skewed facts, and, on multiple occasions, address supposed flaws that go only to the weight of the testimony.  StockX's attacks (which are directed only to portions of each expert's testimony) lack merit, and its Motion should be denied.

# II    ARGUMENT

## A.    John Hansen's Testimony On Damages Is Relevant And Reliable

Nike proffers John Hansen—a highly credentialed financial and accounting expert[1]—to opine on StockX's profits on sales of Nike shoes that StockX falsely advertised as "100% Authentic."  His testimony is highly relevant, reliable, and helpful to the factfinder in calculating the appropriate amount of disgorgement of StockX's profits.  StockX's partial attack on Hansen is supported by misstatements of law and fact and therefore should be rejected.

Nike will establish that StockX is liable for false advertising because it claimed every good sold on its platform was "100% Authentic," yet shipped to consumers counterfeit "Nike" shoes, a fact StockX now admits.  A liability finding entitles Nike to recover StockX's profits, among other available remedies.  *See* 15 U.S.C. § 1117(a).  Nike thus retained Hansen "to assess disgorgement of StockX's profits related to the false advertising claims."  (Dkt. 201-1 ¶ 7.[2])  Nike did **not** retain him to assess Nike's lost sales, which is a distinct category of actual damages sustained by a plaintiff.  *See* 15 U.S.C. § 1117(a); (Declaration of Tamar Duvdevani ("TD Decl.") at ¶ 2, Ex. 1 at 130:20-131:2; Dkt. 201-1 at ¶¶ 52, 57.)

---

[1] StockX does not challenge Hansen's qualifications to testify as an expert witness in this case.

[2] Hansen was also retained by Nike "to calculate potential statutory damages related to Nike's claim that StockX acquired, offered for sale, sold, and shipped directly to consumers shoes bearing counterfeit Nike trademarks…." (Dkt. 201-1 ¶ 10.)  StockX's Motion is silent on Hansen's testimony on counterfeiting damages (Dkt. 201-1 ¶¶ 10, 19, 83-86), pre-judgment interest (*id.* at ¶ 87), and the background (*id.* at ¶¶ 20-44).

Hansen provides straightforward and legally sound profits disgorgement testimony. He follows the Lanham Act § 35(a)'s plain language on the burdens on profits disgorgement: "In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."  15 U.S.C. § 1117(a).  Nike thus uses Hansen's testimony to establish StockX's relevant sales, *i.e.*, the sales made in connection with its false advertising.  StockX then "must establish any deductions, including costs and any apportionment for sales that were not due to the [] false [] statements."  *Rexall Sundown, Inc. v. Perrigo Co.*, 707 F. Supp. 2d 357, 363 (E.D.N.Y. 2010).  Specifically, Hansen: (1) explained the uncontroverted fact that every single Nike shoe sold on StockX was advertised as "100% Authentic" (Dkt. 201-1 ¶ 55); (2) assumed, as damages experts do, that those advertising claims were false, and that StockX would be found liable (*Id.*; TD Decl. at ¶ 3, Ex. 2 at ¶ 17); and (3) quantified StockX's total revenues of ████████ on trades of Nike shoes that StockX advertised as "100% Authentic" between January 1, 2020 and September 30, 2022.[3]  (Dkt. 201-2 ¶ 17, Table 2.)

StockX ignores the law on disgorgement and contends that Hansen's opinion is unreliable because he did not establish "which sales, if any, were ***caused by*** the alleged false advertising." (Dkt. 190 ("Br.") at 3) (emph. added.))  This is not Nike's burden to prove.  "By [the Lanham Act's] plain terms then, the statute requires [Nike] to prove 'sales only.'  It does not say that it is [Nike]'s burden to prove, for example, 'sales due to the false advertising' or 'sales due to the violative conduct.'"  *Rexall*, 707 F. Supp. 2d at 359.  Once Nike establishes StockX's sales of falsely advertised Nike shoes, ***StockX*** may attempt to establish that its sales were ***not*** attributable

---

[3] StockX's Robert Vigil agrees with Hansen that StockX generated revenues of ████████ on trades of Nike shoes over this period. (Dkt. 194-1 at Exs. 4A-5A.)  Hansen and Vigil also agree that StockX earned gross profits of ████ on trades of Nike shoes over this period, and further agree that StockX earned profits of ████████ on such trades after deducing the cost of revenue and variable portion of StockX's operating expenses.  (Dkt. 201-2, ¶¶ 17-22).  Hansen, however, disagrees with Vigil's opinions on further deducting StockX's fixed costs and apportioning StockX's profits.  (*Id.* at ¶¶ 23-33.)  StockX's Motion does not seek to preclude this testimony either.

to its false advertising. *See id.* at 360; *see also Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 72 (2d Cir. 1998); *Rodgers v. Wright*, 2011 WL 722772, at *3 (S.D.N.Y. Mar. 1, 2011). StockX offers no contrary authority because, in this Circuit, the "near-consensus view of the parties' respective burdens of apportionment under Section 35(a)," is "plaintiff must establish only the amount of defendant's sales—i.e. defendant's profits in gross," and then "[i]t is defendant's burden to prove that any part of those sales is attributable other than to its infringing use." *MyPlayCity, Inc. v. Conduit Ltd.*, 2013 WL 4105698, at *3 (S.D.N.Y. Aug. 12, 2013).[4]

Instead of relying on relevant authority, StockX seeks support in Judge Netburn's January 9, 2023 discovery Order, claiming that she "held that Nike must 'show that StockX's sales were ill-gotten.'" (Br. at 3.) This mischaracterizes the Court's statement and takes it out of context. Rather, when Judge Netburn denied StockX's motion to compel discovery of Nike's revenue, she noted that, "to prevail on its false advertising claim and be awarded unjust enrichment profits, Nike does not need to establish that StockX's sales diverted sales from Nike–it will be sufficient to show that StockX sales were ill-gotten." (Dkt. 116 at 2.) Judge Netburn's discussion of the unjust enrichment rationale—one of three distinct rationales for profits disgorgement—in denying StockX's discovery motion for Nike sales data does not alter the parties' burdens under Section 35(a) and does not render Hansen's analysis unreliable.[5]

---

[4] StockX erroneously relies on cases discussing plaintiff's burden where it seeks **actual damages in the form of its own lost profits**. *See Church & Dwight Co. v. SPD Swiss Precision Diagnostics GmbH,* 2018 WL 4253181, at *3 (S.D.N.Y. Sep. 5, 2018); *Dependable Sales & Serv., Inc. v. TrueCar, Inc.,* 311 F. Supp. 3d 653, 657 (S.D.N.Y. 2018); *In Re Elysium Health-ChromaDex Litig.,* 2022 WL 421135, at *18 (S.D.N.Y. Feb. 11, 2022). These cases are inapplicable to Hansen's opinions on **disgorgement of StockX's profits**.

[5] Regardless, on the unjust enrichment rationale, Nike will show that StockX unjustly enriched itself by generating ill-gotten revenues of ▮▮▮▮▮▮▮ on sales of Nike shoes that it falsely guaranteed were "100% Authentic," when it repeatedly authenticated and sold to consumers fake "Nike" shoes and cannot even determine whether a Nike shoe is counterfeit. (Dkt. 193 at § II.A.; *see also* Dkts. 194-8, 194-10, 195.) As explained in Nike's Motion, StockX's literally false claims impacted consumer purchasing (*i.e.*, are material) as a matter of law. (Dkt. 193 at 6-9.) StockX's documents also show that consumers purchase Nike shoes on StockX because it guarantees the shoes' authenticity, as

StockX also contends that Hansen's opinions on harm to Nike are "unsupported" because he does not cite "evidence of any specific harm to Nike resulting from any particular StockX Nike sneaker trade." (Br. at 6-7.) That is not true and again misstates the law. Hansen's opinion is supported by record evidence showing that StockX's distribution of counterfeit "Nike" goods that it falsely advertised as "100% Authentic" harms Nike, including by harming its reputation. (Hansen Rpt. at ¶¶ 48-52.); *see also CJ Prod. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 149 (E.D.N.Y. 2011) (falsely advertising counterfeit toys as authentic harms brand owner by "impair[ing] plaintiff's reputation."). Regardless, StockX's disagreement with the evidence's sufficiency is not grounds to exclude Hansen. *See Capri Sun GmbH v. Am. Beverage Corp*., 595 F. Supp. 3d 83, 135 (S.D.N.Y. 2022) (jury, not court, determines weight and sufficiency of the evidence on which the expert relied). StockX's attacks on Hansen's proffered testimony fail.

### B. Jeffery Stec's Rebuttal Testimony Is Reliable And Should Not Be Excluded

While competition is not a required showing to establish false advertising liability, *see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 138 (2014), injury may be presumed where the parties compete. *See, e.g.*, *SourceOne Dental, Inc. v. Patterson Companies, Inc.,* 328 F. Supp. 3d 53, 62 (E.D.N.Y. 2018) (citing *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 161 (2d Cir. 2007)). StockX's expert Robert Vigil opines the parties do not compete because StockX consumers who purchase Nike shoes "ordinarily" cannot buy those shoes from Nike. (Dkt. 194-19 at ¶¶ 39, 50-53.) StockX's expert Catherine Tucker opines the parties operate in different markets and thus do not compete. (Dkt. 201-17 at 3, 13-33.)

Nike proffers economist Dr. Jeffery Stec— another highly credentialed financial expert[6]—

---

well as that it used authentication claims to gain a competitive edge. (Dkt. 201-1, ¶¶ 34-36, 57.) StockX thus unjustly enriched itself by generating revenues of ▮▮▮▮▮▮▮▮ supported by its false advertisements.

[6] StockX does not challenge Stec's qualifications to testify as an expert witness in this case.

to rebut Vigil and Tucker's opinions on competition. (Dkt. 201-4.) He explained why Vigil's and Tucker's economically unsound, narrow view of competition is flawed, and exposed as false Vigil's premise that a StockX consumer cannot purchase the same shoes on Nike.com. (*Id.* 10-13.) Stec applied the widely accepted "demand substitutability" method (*id.* at 8) and examined, *inter alia*, specific Nike shoes for sale on StockX on a specific date as compared to those on Nike.com on the exact same date. (*Id.*, § V.A.2.) He found that, on June 1, 2023, for example, 71 of Nike's "best-selling" styles were available on Nike.com and StockX at the same time in *at least* one size, 58 styles were available on both sites in five or more common sizes, and 28 styles were available on both sites in *all* the same sizes. (*Id.* 11-13.) He thus found that hundreds of identical Nike style and size combinations were *available* on both StockX and Nike.com, rebutting StockX's expert. (*Id.* Ex. 4.1.) Furthermore, of the 71 styles available on both sites in at least one common size, StockX composite data shows that it sold over 200,000 of those styles between June 2, 2022, and June 2, 2023. (*Id.* 18, Ex. 4.0.) Given the material overlap in availability, Stec opines these 200,000 units "were likely sold [on StockX] when these products were available for sale by Nike." (*Id.* 18.) Stec thus rebuts Vigil's opinion that the parties do not compete, as Vigil ignored "the marketplace reality that the parties both operate as retailers for the same products, at the same time." (*Id.* 7.) Stec also criticizes Vigil's opinion that it is highly unlikely StockX diverted sales from Nike given the wide availability of the same shoes on both sites. (*Id.* 6.)[7]

StockX first challenges Stec by quoting in its brief a *question* StockX posed to Stec at his deposition asking whether he showed "a single instance of a Nike shoe *sold* on StockX" when it was also available on Nike.com in the same size. (Br. at 7) (emph. added.) As Stec explained

---

[7] Stec also opines that: (1) Vigil ignored StockX harm to Nike; (2) Tucker ignored that the parties sell the same shoes at the same time; and (3) Tucker also ignored the harm to Nike from StockX's false advertising and sale of counterfeit "Nike" shoes. (Dkt. 201-4 at 5.) StockX's Motion does not challenge the bulk of this testimony.

when he responded to the question, he was not trying to assess actual sales but rather *availability* for purchase. (Dkt. 201-5 at 249:6-21.) Stec does not proffer an analysis of actual sales, nor must he to establish competition; what he clearly demonstrated was that both Nike.com and StockX were *offering* the same shoes at the same time and in the same size. (Dkt. 201-4 at 8.) StockX next attacks Stec's opinion that it sold "at least 200,000 shoes within the last twelve months alone that were simultaneously offered by Nike," with three unpersuasive objections. (Br. 6-7.) *First*, StockX argues this is an attempt "to fill in the gap created by Nike's failure to produce any ***actual*** evidence of lost sales." (*Id*. at 7.) Yet, as StockX concedes, Stec does not opine on lost sales, so there is no gap to fill. (*Id*.; Dkt. 201-5 at 27:25-28:5.) *Second*, StockX argues that Stec's analysis does not support his testimony that 200,000 Nike shoes sold on StockX were likely simultaneously available on Nike.com in the same size. (Br. 7-8.) Stec's analysis of the evidence is mathematically sound and supports his testimony (Dkt. 201-4 at 11); if anything, StockX's challenges go to weight. *Third*, StockX argues that Stec's testimony that "certain shoes were simultaneously available from Nike and StockX" is factual and not the province of experts. (Br. 8.) But Stec's (undisputed) factual investigation forms the basis for his opinion on competition. Competition is a proper subject of expert testimony (this is Vigil's and Tucker's subject too), and experts often conduct and testify about factual investigations. *See SourceOne Dental, Inc.,* 2018 WL 2172667, at *8. StockX's partial Motion to exclude Stec fails.[8]

### C. Kari Kammel's Testimony Is Relevant, Reliable, And Should Not Be Excluded

Kari Kammel is one of the country's leading experts in anticounterfeiting and brand protection.[9] StockX seeks to prevent the factfinder from hearing her helpful testimony relevant to

---

[8] Although it appears to move to exclude Stec entirely, StockX's Motion discusses only a fraction of his testimony (Dkt. 201-4 at §§V.A.2 and V.B), the remainder is unchallenged.
[9] Kammel, Director of Michigan State University's Center for Anti-Counterfeiting & Product Protection, has extensively studied the problem of counterfeiting, engaged with hundreds of stakeholders within anticounterfeiting or

Nike's counterfeiting and false advertising claims and the remedies flowing therefrom.  Kammel carefully analyzed the record, applied her deep experience and specialized knowledge, and reliably opines on: the problem of trademark counterfeiting on platforms like StockX; Nike's industry-leading anti-counterfeiting efforts (efforts StockX tried to attack throughout discovery); StockX's role in the counterfeit supply chain, how its platform encourages the distribution of counterfeits, and its inability to "authenticate" goods (contrary to its assertions that it helps anticounterfeiting); and the harm stemming from StockX's distribution of counterfeits and false authenticity guarantees.  (*See* Dkt. 201-6.)  She also critiques Vigil's harm analysis, Tucker's unsupported "consumer trust" theories, and Wells's unreliable opinion on the supposed causes of counterfeiting.  (*See* Dkt. 201-7.).  The Court should deny StockX's Motion.

### 1.    Kammel's Testimony Is Highly Relevant And Helpful Evidence

StockX is incorrect in its contentions that Kammel's testimony is irrelevant and prejudicial because counterfeiting is a strict liability offense, and Kammel is not opining on whether specific Nike shoes sold by StockX are fake.  (Br. 9.)  Her testimony on the problem of and harm caused by counterfeiting, brand protection measures, and authentication of products (*id.,* §§ II-V) provides the required Rule 702 reliable basis for her opinions concerning StockX harming Nike, Nike's brand protection efforts, and StockX's platform's design and "authentication" process.  (Dkt. 201-6 at §§ III.C, VI, and VII.)  Kammel's specialized knowledge will help the factfinder understand the evidence and determine whether StockX acted with reckless disregard and, thus, willfully.[10]

---

brand protection, and testified before Congress as an expert on counterfeiting on e-commerce platforms, including most recently at the October 3, 2023 hearing on the proposed SHOP SAFE Act.  (Dkt. 201-6 at § I); U.S. Senate Committee on the Judiciary, *Back to School with the SHOP SAFE Act: Protecting Our Families from Unsafe Online Counterfeits* (Oct. 3, 2023), https://www.judiciary.senate.gov/committee-activity/hearings/back-to-school-with-the-shop-safe-act-protecting-our-families-from-unsafe-online-counterfeits.

[10] Willful counterfeiting can be established by a defendant's reckless disregard.  *Burberry Ltd. & Burberry USA v. Designers Imports, Inc.*, 2010 WL 199906, at *9 (S.D.N.Y. Jan. 19, 2010).  "Such knowledge may be actual or constructive and may be inferred from a defendant's conduct."  *Ideavillage Prod. Corp. v. Aarhus*, 2019 WL 2290514, at *5 (S.D.N.Y. May 7, 2019).

F<small>ED</small>. R. E<small>VID</small>. 702(a).  The factfinder should hear Kammel's assessment of StockX's conduct in light of her experience and knowledge in anticounterfeiting and brand protection.  For example, contrary to StockX's position that it is part of solution to the problem of online counterfeiting, Kammel explains how StockX's chosen business model, centered on the false promise of "authentication," proliferates the sale of expensive fake Nike shoes and other goods.  (*See generally* Dkt. 201-6.)  She explains based on the evidence and her expertise how StockX does not use practices to keep consumers safe and instead created a platform highly attractive to predatory counterfeiters.  (*Id.,* §§ II.E., VII; Dkt. 201-7, §§ I.A.2., I.B. II-IV, VI-VIII.)

Kammel's testimony is also relevant to StockX's liability for false advertising and the associated reputational injury to Nike.  (*See* Dkt. 201-6 at § III, Dkt. 201-7 at § I, III, IV.)  For example, Kammel explains that StockX's false authenticity claims and "perception of legitimacy" are harmful to Nike's brand due to "consumers who believe they bought genuine Nike products but instead received a counterfeit and believe it is a quality issue instead."  (Dkt. 201-6 at 39-40.)  Kammel's testimony is likewise relevant to factors courts consider in determining statutory damages for counterfeiting under 15 U.S.C. § 1117(c).[11]  For example, Kammel opines on how: counterfeiters, the "unseen competitor" to Nike, thrive on StockX's platform (factor 2) (Dkt. 201-6 at 13; Dkt. 201-7 at 2-3); StockX created a conducive environment for bad actors and not implemented industry best practices to prevent counterfeiters (factor 5) (Dkt. 201-6 at 26-27); and StockX sold an unknown number of fake "Nike" shoes since it cannot authenticate Nike products, (factor 6) (Dkt. 201-6 at 12, 19, 39-40.)  In addition, StockX's willfulness "is a highly important

---

[11] The factors include: "(1) the expenses saved and the profits reaped; (2) the revenues lost by the plaintiff; (3) the value of the trademark; (4) the deterrent effect on others besides the defendant; (5) whether the defendant's conduct was innocent or willful; (6) whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced; and (7) the potential for discouraging the defendant."  *Burberry*, 2010 WL 199906, at *10.

consideration" in determining an award of profits. *Romag Fasteners, Inc v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020); *see also Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.*, 28 F.4th 35, 38 (9th Cir. 2022) (*Romag* applied to Lanham Act false advertising claim).

Kammel's testimony on harm StockX caused Nike is not unfairly prejudicial. StockX mischaracterizes Kammel's testimony and contends that "Nike seeks to impute the bad acts of third-party counterfeiters to StockX." (Br. at 10.) But StockX does not acknowledge that Kammel's proffered testimony on the problem of counterfeiting and harm caused by counterfeiting provides the required Rule 702 reliable basis for her testimony concerning harm to Nike caused by *StockX's* conduct. For example, Kammel will educate the factfinder on the profit motivations of bad actors that sell counterfeit "Nike" shoes online, which primarily originate from China, and compete with Nike's genuine products in the market. (Dkt. 201-6 at §§ II.A-D.) As Kammel explains, StockX participates in the counterfeit supply chain, operating a platform highly attractive to counterfeiters. (*Id.*, § II.E, VII.) Kammel opines StockX facilitates transactions that allow bad actors to flourish and reach consumers at Nike's reputation's expense. (*Id.*) Indeed, the factfinder will learn that StockX's policies allowed a Chinese counterfeiting "fraud ring" to operate undetected and sell over 1800 goods, including fake "Nike" shoes, before being caught. (Dkt. 193 at 2-3.)

Kammel relies on sufficient evidence to opine on harm to Nike caused by StockX's sale of counterfeits.[12] (Dkt. 201-6 §§ III.C, VII.F.; Dkt. 201-7 at 1-5, 7, 11.) Although StockX mischaracterizes Kammel's opinion as "general," she specifically opines "StockX's sale of Nike

---

[12] *Dollman v. Mast Indus., Inc.*, 2011 WL 3911035, at *4 (S.D.N.Y. Sept. 6, 2011), which StockX cites, is inapplicable. There, the court excluded evidence from an employment lawsuit related to allegations of plaintiff's company credit card misuse where the matter had been investigated and no evidence of misconduct was found. Here, Kammel's opinion regarding harm to Nike is well-founded. (Kammel Opening at §§ III.C, VII.F.) *Beastie Boys v. Monster Energy Co.*, 983 F. Supp. 2d 354 (S.D.N.Y. 2014), which StockX cites, is also inapplicable. There, the court excluded evidence of infringement of works not alleged in the complaint because of the risk of trial delay. *Id.* at 359.

products," with false authenticity claims, "threatens Nike's reputation, market and its consumers," as Nike bears the burden "to protect and repair its reputation from consumers who believe they bought genuine Nike products but instead received a counterfeit and believe it is a quality issue instead; lose consumers; and compete in the marketplace with counterfeiters." (*Id.* at § VII.F).

### 2. Kammel's Testimony Is Based On StockX's Conduct, Not Consumer Perception

Contrary to StockX's mischaracterizations, Kammel is not opining on consumer perception of StockX's false advertising.[13] (Dkt. 201-8 at 191:15-192:5.)  Rather, Kammel opines, based on evidence and reliable sources, that StockX's guarantee of authenticity and its similar advertising claims creates a haven for counterfeiters to sell fake "Nike" shoes, thereby harming Nike.  (*See e.g.*, Dkt. 201-6 at 29, 39-40; Dkt. 201-7 at 4.)  For example, she relies on the Department of Homeland Security's online counterfeiting report to explain that e-commerce platforms like StockX appeal to counterfeiters because they provide an "air of legitimacy" to consumers.[14]

### 3. Kammel's Assessment Of StockX's Conduct Is Reliable And Relevant

Kammel opines, based on her experience and on industry standards, on what authentication is (and what it is not).  This testimony is directly relevant to whether StockX's conduct is willful.  Kammel is not offering an opinion on what *consumers* perceive "authentication" to mean.[15]  Kammel instead opines on authentication based on her experience and practical knowledge in anticounterfeiting, her academic research, and the International Organization for Standardization

---

[13] Nor would any such opinion be relevant or necessary.  As set forth in Nike's pending Motion to Exclude, StockX's literally false advertising claims are precise, unambiguous statements of fact.  (*See* Dkt. No. 193 at 7.)

[14] *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18 (2d Cir. 1996), which StockX cites, is once again inapplicable. There, the court held "[w]here lost future earnings are at issue, an expert's testimony should be excluded as speculative if it is based on unrealistic assumptions regarding the plaintiff's future employment prospects."  *Id.* at 21. Here, Kammel's opinion is based on her practical experience, evidence, and well-respected literature.

[15] *N. Am. Olive Oil Ass'n v. Kangadis Food Inc.,* 962 F. Supp. 2d 514, 520 (S.D.N.Y. 2013), relates to consumer perception and is inapplicable to Kammel's opinion.

("ISO") 22383 standard.[16]  (Dkt. 201-6 at § V.)  The ISO 22383 standard is a reliable, reputable, and well-respected source in the anticounterfeiting field; even StockX's own counterfeiting "expert" agrees.[17]  (TD Decl. ¶ 5, Ex. 4 at 114:12-20.)

Where expert testimony is not scientific in nature, "the reliability determination in such a case should make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *In re Methyl Tertiary Butyl Ether Prod. Liab. Litig.,* 2008 WL 1971538, at *3 (S.D.N.Y. May 7, 2008).  Here, Kammel employs "the same level of intellectual rigor" as experts in the field of brand protection and anti-counterfeiting through her reliance on her research, experience, and on the ISO 22383 standard.  *Id.*

Further, Kammel's discussion of the ISO standard and the definition of authentication provide background to and context for her opinion that StockX chose a business model that does not meet this standard.  Without first explaining the industry standard, Kammel could not reliably opine under Rule 702 that StockX does not follow it.  *See ARMOUR Cap. Mgmt. LP v. SS&C Techs., Inc.,,* 2020 WL 64297, at *8–9 (D. Conn. Jan. 5, 2020) (denying "motion to the extent that it would preclude [expert] from testifying on the basis of his expertise about industry standards and customs" and allowing expert to "testify about ISO Technical Report…and why he believes the standards…are relevant to his testimony about industry standards").  Like in *ARMOUR,*

---

[16] Although StockX argues that Kammel's opinion on authentication best practices is based on a "single document" (Br. at 19), it ignores Kammel's testimony that, in addition to ISO 22383, she relied on her "eight years of experience working with brand owners, Customs agents, the IPR center and others in the field" in forming her opinion on "authentication."  (TD Decl. ¶ 4, Ex. 3 at 229:18-230:1.)

[17] ISO is "an independent, non-governmental international organization with a membership of 169 national standards bodies." *About Us,* ISO, https://www.iso.org/about-us.html.  "ISO Standards are sets of rules and criteria that have been internationally agreed by experts."  European Union Intellectual Property Office, *Anti-Counterfeiting Technology Guide* at pp. 7, 116 (2021) https://euipo.europa.eu/tunnel-web/secure/webdav/guest/document_library/observatory/documents/reports/2021_Anti_Counterfeiting_Technology_Guide/2021_Anti_Counterfeiting_Technology_Guide_en.pdf ("discussing latest ISO standards on anti-counterfeiting technologies – which provide guidelines and best practices for choosing authentication solutions").

"[StockX]'s objection to the use of the [ISO] standard goes to weight, not to admissibility."  *Id*.

StockX claims Kammel's testimony should be excluded as inconsistent, but this mischaracterizes her testimony.  In her report, Kammel states "IP right holders use a variety of techniques and technologies for their authentication of product or packaging, including overt, covert, semi-covert, forensic and digital technologies." (Dkt. 201-6 at 21.)  She did not later testify that her report was incorrect; instead, she clarified how an exemplar graphic was consistent with her opinion that "[w]hen an IP right holder authenticates the product or packaging, they will use a variety of factors in order to determine authenticity," and that "[t]hese factors can range from human authentication to a series of technologies.[18]  (*Id.* at 21; Dkt. 201-8 at 234:15-25.)

While Kammel identified and explained a typo in her report (the word "covert" appeared twice in a graphic), this is far from an "about-face" or "error in her analysis," as StockX charges (Br. at 12), and it is decidedly not grounds to exclude her testimony.[19]  StockX's *R.F.M.A.S., Inc. v. So,* 748 F. Supp. 2d 244, 252 (S.D.N.Y. 2010) case makes clear that "[m]inor flaws in an expert's analysis likewise can be probed through cross-examination and generally go to the weight to be accorded to the expert's testimony rather than admissibility."  *See also Milana v. MSC Cruises, S.A.,* 2022 WL 4767701, at *7 (S.D. Fla. Aug. 8, 2022) (same).

### 4.    Kammel Is Qualified To Rebut Tucker's Opinions

Kammel critiques Tucker's opinion that "StockX is transparent by providing detailed data about historical price…and it draws attention to low prices discouraging counterfeits," explaining

---

[18] StockX's reference to a decade old A-CAPP article is inapposite.  Kammel explained that she was "acting as a witness based on [her] position at A-CAPP, but not as…a representative of A-CAPP or Michigan State University." (Ex. 3 at 21:18-23.)  Moreover, brand protection has progressed significantly in the last 10 years with the advance of e-commerce.  (Dkt. 201-6. at 4-5.)  ISO 22383 was implemented in 2020, replacing the earlier 2012 standards, to account for the variety of challenges now faced by brand owners in this field.  *See* ISO 22383:20, https://www.iso.org/standard/50285.html.

[19] Unlike in *United States v. Percoco*, 2018 WL 879499, at *8 (S.D.N.Y. Feb. 13, 2018), Kammel has not "injected numerous assumptions into her analysis that lack support in data or common sense."  Rather, her analysis relies on reliable sources, extensive academic research, and practical experience.

how this feature conflicts with best practices for e-commerce platforms. (Dkt. 201-7 at § II.) Kammel explains why Tucker's reliance on StockX's "verification process" as a basis for "trust-building" is misplaced considering the industry standards. (*Id.,* § IV.A.) She then explains how Tucker's discussion of "coring" actions to maintain buyer and seller interactions on e-commerce platforms are largely inapplicable here as StockX's documents show that it does not engage in these trust-building measures and its conduct does not necessarily align with industry best practices. (*Id.,* § V.) Finally, based on her assessment of StockX's documents, Kammel rebuts Tucker's incorrect assertion that StockX ensures only reliable sellers use its platform. (*Id.,* § VI.)

Kammel's rebuttal of Tucker's opinions, which relate to StockX's actions to increase trust and accountability, *i.e.*, StockX's efforts to create a platform that is purportedly unattractive to counterfeiters, is well within Kammel's expertise. She has extensively researched the issue of counterfeiting on e-commerce platforms including e-commerce designs that contribute to that problem. She has testified on this issue before Congress. *See* Note 9, *supra.* That Kammel lacks an academic background in the narrow issue of "coring" does not merit exclusion given that Tucker's opinion relates to whether StockX is preventing the sale of counterfeits.[20] *See TC Sys. Inc. v. Town of Colonie, New York*, 213 F. Supp. 2d 171, 178 (N.D.N.Y. 2002) (rejecting proposition that a non-economist rebuttal expert is *per se* unqualified to rebut an economist).

StockX criticizes Kammel for purportedly not using a methodology, ignoring that she reviewed the evidence and applied the U.S. Department of Homeland Security's best practices,[21]

---

[20] *Playtex Prod., Inc. v. Procter & Gamble Co.,* 2003 WL 21242769 (S.D.N.Y. May 28, 2003), which StockX cites, is inapplicable. There the expert opined on "tampon testing procedure" but did not "have specialized knowledge, either through training or experience, with regard to tampon testing or design *in any regard*." *Id.* at *10-11. Here, Kammel rebuts Tucker's opinion on coring insofar as it involves an area of Kammel's expertise—counterfeiting on e-commerce platforms.

[21] Off. Of Strategy, Pol'y, and Plans, U.S. Dep't of Homeland Sec., *Combating Trafficking in Counterfeit and Pirated Goods* 4 (Jan. 24, 2020), https://www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goodsreport_01.pdf

as well as her own experience and specialized knowledge, to opine that StockX does not implement practices that dissuade counterfeiters and has instead created a counterfeiters' haven.  (Dkt. 201-6 at §§ V-VI.).  Unlike in *Adkins v. Morgan Stanley*, 307 F.R.D. 119, 149 (S.D.N.Y. 2015) (Caproni, J.), Kammel's analysis contains clear "benchmarks" and "comparators" from reputable sources, including DHS, and her extensive practical and academic experience.

Finally, there is nothing improper about Kammel's critique of Tucker.  "Here, [Nike] is not seeking to have their experts usurp the jury's role in assessing the credibility of the [StockX's] experts, but rather to refute the factual basis for their opinions."  *Deutsch v. Novartis Pharms. Corp.*, 768 F. Supp. 2d 420, 481 (E.D.N.Y. 2011).  Through expert rebuttal, "parties are free to question the...reliability of conclusions based on the underlying facts of the analysis."  *Id.* at 481.[22]

### 5.   Kammel's Testimony Based On Information Produced During Discovery Should Not Be Excluded

StockX violates the Court's Individual Rule 4(G) by using its Motion as an attempt to exclude evidence of harm it caused Nike's brand reputation and that Kammel discusses.  Specifically, Kammel rebuts StockX's experts' opinions on lack of harm (Dkt. 194-20 at § VII, Dkt. 194-19 at § III), by noting that StockX: (1) falsely told consumers who complained about purchasing obvious fakes that the shoes were authentic and that Nike simply releases shoddy products; (2) proliferating the sale of counterfeit goods; and (3) encouraging consumers to re-sell suspected fakes.[23]   (Dkt. 201-7 at 16).   Kammel properly bases her testimony, in part, on information provided to her by Joe Pallett, Nike's Director of Brand Protection, Authentication & Innovation.[24]  (*Id.* at § I.B.3.)  Pallett reviewed documents produced during discovery by StockX

---

[22] *Red Hawk, LLC v. Colorforms Brand LLC,* 638 F. Supp. 3d 375, (S.D.N.Y. 2022) (Caproni, J.) is inapplicable – there, the expert opined on the intended meaning of a contractual term.  Here, StockX focuses on Kammel's rebuttal on StockX's experts' assessment of the facts.

[23] *United States v. Cruz,* 363 F.3d 187, 195 (2d Cir. 2004), a case pertaining to "[t]he heightened risk that a law enforcement official will stray from the scope of his expertise if he also functions as a fact witness" is inapposite.

[24] "It is not uncommon for experts to rely on interviews with third parties in forming their opinions." *Better Holdco,*

and third-party Zadeh Kicks on May 31, 2023 and orally provided his findings to Kammel the following day.  He used Nike's proprietary system to confirm that consumers complaining to StockX about fakes ***did***, in fact, purchase fake shoes, despite StockX's reassurances that the shoes were authentic and that any visible flaws were due to Nike shoddy quality control.  (*Id.* at 15-16.)

The documents Pallett examined and Kammel cited were produced ***during discovery***.[25] Nike did not produce additional documents concerning Pallett's review and findings because there are none to produce.[26]  (Ex. 3 at 41:2-43:5.)  These fake shoes, unlike some of the other fakes discovered by Nike, were never in Nike's possession—Pallett looked at documents produced by other parties in this case, which "supplied enough images and other information for Nike to use its proprietary system to make the determination that these products were counterfeit."  (Dkt. 201-7 at 16.)[27]  StockX deposed Pallett and questioned him thoroughly about how he determines whether suspected counterfeit shoes are genuine or counterfeit using photographs of the shoes.  (Dkt. No. 150-5.)  StockX had ample opportunity to ask Pallett about documents produced during discovery, including the documents that he reviewed on May 31 and subsequently discussed with Kammel. Indeed, StockX extensively questioned Kammel about her May 31 and June 1 conversations with Pallet, including the details of his review.  (*See* Ex. 3 at 27:19-49:4.)

### D.    Steven McNew's Testimony On NFTs Is Reliable And Helpful

Nike proffers Steven McNew, an expert on NFT products, to opine on Nike's NFT-related claims.  (Dkt. 201-9.)  McNew has helped build many NFT projects and has conducted valuations

---

*Inc. v. Beeline Loans, Inc.*, 2023 WL 2711417, at *9 (S.D.N.Y. Mar. 30, 2023) (internal quotation omitted).  Indeed, StockX's experts also base their opinions on discussions with StockX personnel conducted during the expert discovery period. (*See* Dkt. 194-1 at. Ex. 2 (citing "Conversation with StockX personnel" in "Materials Considered)).

[25] StockX's *In re AXA Equitable Life Ins. Co. COI Litig.*, 595 F. Supp. 3d 196, 251-52 (S.D.N.Y. 2022) case is inapposite because there, unlike here, a party improperly withheld responsive evidence.

[26] As explained during a discovery dispute on the very issue of whether Nike's proprietary system generates documents, Nike does not generate "reports" as part of its investigative process (Dkt. No. 150) and therefore would have no documents to produce.

[27] *See* Dkt. No. 150-5 at ¶¶ 6-8 for a high-level explanation of how Nike's proprietary system operates.

of numerous other NFT projects.  (TD Decl. at ¶ 6, Ex. 5 at 102-104, 113-115, 119-120.)  He offers

several opinions: (1) NFTs are digital assets that commonly confer on the holder a bundle of

benefits; (2) Vault NFTs conferred on holders such a bundle and were perceived as such by

customers; (3) StockX's purported use of blockchain was pretextual and misleading; and (4) Vault

NFTs were shoddily designed and implemented.[28]  (Dkt. 201-9.)  StockX asserts a reliability

challenge to McNew's opinions that (1) customers perceived Vault NFTs as conferring multiple

benefits and (2) StockX's purported use of blockchain fell short of industry standards.

### 1.     McNew's Opinion That Consumers Perceived Vault NFTs As A Bundle Of Benefits Is Based On Reliable Evidence

StockX asserts first sale and fair use defenses to Nike's trademark claims.  (Dkt. 41.)  These

defenses raise whether StockX merely resold Nike shoes or instead sold a new product, *i.e.*, NFTs

with a bundle of benefits.  *See Microban Prods. Co. v. API Indus., Inc.*, 2014 WL 1856471, at *9-

14 (S.D.N.Y. May 8, 2014).[29]  McNew provides background on NFTs, explaining they comprise

digital assets conferring benefits, such as a license to associated artwork a holder can "flex" online,

access to events or social media, and giveaways.  (Dkt. 201-9 at 2-8.)  He documents consumer

demand for such NFTs with examples.  (*Id.* at 2-8, 40.)  These opinions show what NFT purchasers

seek and provide context for Vault NFT purchaser motivation.  *See U.S. v. Romano*, 794 F.3d 317,

322, 330-34 (2d Cir. 2015).[30]

McNew then opines Vault NFTs, like other NFTs, also comprised a bundle of benefits (not

just a "claim ticket" as StockX asserts) and were viewed as such.  He relies on: (1) StockX's

---

[28] Despite seeking to exclude McNew's testimony altogether, StockX does not challenge the first or third category. Nor does StockX challenge McNew's qualifications or the helpfulness of his opinions (with one exception).

[29] StockX has alleged Vault NFTs merely facilitate resale of Nike shoes. StockX Answer to FAC, Preliminary Statement. Conversely, StockX's experts label the Vault NFTs as "novel NFT products" and "new assets." (TD Decl. ¶ 7, Ex. 6 at 35-36; Dkt. 201-17 at 5, 53.)

[30] Indeed, StockX's own NFT expert offers similar opinions, with similar qualifications, and similar evidentiary bases. (*See* TD Decl. Ex. 6 at 1-22.)

assumptions that Vault NFT value derived from ongoing benefits; (2) Vault NFT marketing informing customers they would receive benefits like exclusive access and rewards; (3) StockX's marketing of Vault NFTs with an image that StockX contemplated users would find "worth sharing & showing off" and which users did "flex" on social media; and (4) Vault NFTs did indeed provide benefits such as art giveaways and Discord access.  (Dkt. 201-9 at 10-51; Dkt. 201-10 at 7-8.)

StockX challenges McNew's opinion that StockX customers perceived Vault NFTs as a bundle of benefits, arguing he cannot opine on consumer perception absent a survey or "formulaic approach."  (Br. at 15-18.)  But courts, including StockX's cases, reject this *per se* rule and recognize consumer perception testimony can rest on many types of evidence.  *See Canon U.S.A., Inc. v. F&E Trading LLC*, 2023 WL 5152448, at *3 (E.D.N.Y. June 6, 2023) (consumer studies, experience with similar consumers, product inspection); *Price v. L'Oreal USA, Inc.*, 2020 WL 4937464, at *3 (S.D.N.Y. Aug. 24, 2020) (experience with consumers and review of product); *cf. Otto v. LeMahieu*,[31] 2021 WL 1615311, at *4-5 (N.D. Cal. April 26, 2021) (excluding expert opinion that cryptocurrency purchasers relied on online postings absent evidence purchasers saw postings); *LVL XII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 639 (S.D.N.Y. 2016); *SEC v. Ripple*, 2023 WL 5670711, at *5 (S.D.N.Y. March 6, 2023) (expert provided only generic appeals to expertise).

StockX asserts scattershot challenges to the evidence above, calling it "limited" without addressing its scope.  (Br. at 16.)  StockX argues "McNew does not know whether anyone even *saw* the StockX representations" (*id.*), ignoring that he cites StockX's own customer discussion of promised Vault NFT benefits and StockX web pages with these benefits prominently displayed. StockX also argues McNew may not have reviewed certain versions of the StockX website Help

---

[31] While McNew criticized this excluded expert's opinions, he merely noted, as did the court, that the opposing expert lacked any reliable evidence that consumers saw the online posts at issue.  (Dkt. 201-18 at 7-8.)

and FAQ pages (*id.* at 17), but StockX does not demonstrate these versions were particularly relevant, let alone so crucial that a failure to review renders McNew's testimony inadmissible.[32] *See Capri Sun GmbH*, 595 F. Supp. 3d at 134-35.  StockX next argues McNew lacks required experience designing an NFT with rights to physical object.  (Br. at 16.)[33]  StockX provides no explanation why McNew's experience with consumer perception of myriad other NFT projects does not bear on Vault NFT customer perception here.  (*Id.*)  Finally, StockX claims McNew did not perform an expert analysis of the price gap between Vault NFTs and the associated shoe.  (*Id.* at 19-20.)  McNew has ample experience valuing NFTs; he did not perform one here because it is not relevant.  His opinion concerns not the value of the NFT but rather the reason for the undisputed material price difference between the shoe and the Vault NFT StockX now calls a "claim ticket."

### 2. McNew's Opinion That Vault NFTs Were Shoddily Designed And Made Pretextual Use Of Blockchain Rests On Reliable Evidence

McNew also offers opinions that Vault NFTs made pretextual use of blockchain and were shoddily designed, going directly to the *Polaroid* factors.  (Dkt. 201-10 at 43-49, 51-62.)  They find ample support in his analysis of Vault NFT smart contracts and other material and were shared by customers and StockX employees (including one who called the Vault NFTs a "gimmick" and testified the overall product "failed").  (*Id.*)  These opinions help jurors without blockchain expertise see StockX's deceptive marketing of the Vault NFT features and the harm to Nike.

StockX argues that McNew did not rely on industry standards. (Br. 18-19.)  But he explained that while NFT projects make different uses of blockchain, "project creators should take care to clearly represent to consumers the actual use and function of the underlying blockchain-

---

[32] StockX's NFT expert also offered opinions on Vault NFT customer perception but conducted no survey, provided no "formulaic approach," and reviewed **no** StockX internal documents. (TD Decl. Ex. 6 at ¶ 9; App'x 3.)

[33] McNew did consult with a StockX competitor on creating such NFT that offered its holders a right to an associated physical object.  But this project did not proceed, so McNew does not rely on this expertise here.

based NFTs." (Dkt. 201-10 at 8.) StockX does not address this standard or whether StockX met it. Indeed, StockX's expert cited examples of NFT projects accurately representing their blockchain use. (TD Decl. Ex. 6 at 29-30; Ex. 7 at 22-23.)

### E. Itamar's Simonson's Testimony Is Reliable And Should Not Be Excluded

#### 1. Simonson Reliably Measures The Relevant Type Of Confusion

Nike alleges StockX infringed its trademarks by marketing and selling NFTs bearing those marks and confusing consumers into believing that Nike was somehow affiliated with the offer. StockX claims, among other defenses, that this use is fair. Simonson, a well-known survey expert, designed and conducted two surveys to test Nike's theory of confusion and StockX's fair use defense: a "Main Survey" which tested consumer confusion that StockX's Vault NFTs originate from or are endorsed by Nike resulting from StockX's prominent use of Nike's trademarks in connection with the Vault NFTs; and a "Companion Survey" which tested the effectiveness of StockX's disclaimers in reducing consumer confusion. (Dkt. 201-12 ¶ 14.) Simonson's surveys used the standard Test and Control group experimental approach and the survey questions followed the widely accepted *Eveready* format modified to suit the particular facts of this case; namely, that StockX's Vault NFTs simultaneously use StockX's trademarks and prominent images of Nike's shoes and trademarks. (*Id.* ¶ 25.) Simonson designed reliable surveys that replicate marketplace conditions, exposing respondents to StockX's and Nike's trademarks simultaneously, and testing whether greater prominence of Nike's trademarks increases the mistaken belief that it is Nike that offers or otherwise endorses or approves of the Vault NFTs. (*Id.* at ¶¶ 14, 29.) Based on the results, Simonson concludes that, *inter alia*, StockX's prominent use of Nike's trademarks on the Vault NFTs causes the mistaken belief that Nike is the source of the Vault NFT offer and that StockX's disclaimers are ineffective and do not lower the level of confusion. (*Id.* at ¶¶ 63-95.)

StockX contends without any legal basis that Simonson's modified *Eveready* survey design

is somehow not appropriate to measure consumer confusion in this case.  (Br. at 20-22.)  To the contrary, Simonson's surveys were thoughtfully and conservatively designed to test the claims and defenses at issue here and, indeed, "[t]he majority of likelihood of confusion surveys conducted for trademark litigation are *adaptations* of either" the *Eveready* or *Squirt* format.  Jerre B. Swann, *Eveready and Squirt-Cognitively Updated*, 106 Trademark Rep. 727 (2016) (emphasis added); *see also Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 450 (S.D.N.Y. 2017) (*Eveready* "is generally accepted and represents the gold standard for cases involving strong marks.") (quotations and citations omitted); *Sazerac Co. v. Fetzer Vineyards, Inc.*, 265 F. Supp. 3d 1013, 1016 (N.D. Cal. 2017) (Simonson's analysis "using a modified *Eveready* survey was far superior").

The *Eveready* format asks respondents a series of questions about the "source (origin) of the presented offer/product" followed by questions about "affiliation and whether the source of the offer (or the company that put out the product/service) received permission from another company."  (Dkt. 201-12, ¶¶ 35-36); *see also Denimafia Inc. v. New Balance Athletic Shoe, Inc.*, 2014 WL 814532, at *7 (S.D.N.Y. Mar. 3, 2014) (*Eveready* format, asks questions of "the following type: 'Who puts out the product shown here?'; 'Why do you say that?'; and 'What other products does the company put out?'").  StockX retained two rebuttal survey experts that used the *Eveready* or modified *Eveready*-style format in their surveys.  Klein used an "open-end response test-control design" that follows the *Eveready* style.[34]  Neal employed a standard *Eveready* design and modified elements that he criticized in Simonson's analysis.  (Dkt. 201-20, ¶ 6.1.)  Their results demonstrate that the *Eveready* survey format is not only appropriate—it reveals significant levels of consumer confusion.  (*Id.*, ¶ 9.4 (showing 74.1% of respondents in test group and 70.9% of

---

[34] TD Decl. at ¶ 9, Ex. 8 at 34:6-20 ("Wouldn't you agree with me that the standard *Eveready* survey design is also a single stimulus open-ended response test control design? A Yes. I believe that it's – sort of a subset of this design, yes"); *id.* ¶ 10, Ex. 9 at ¶ 66 ("What company do you believe created the <u>NFT</u> referenced above, or do you not know?").

respondents in control group believe that Nike, not StockX, offered, approved of, or was affiliated with StockX's Vault NFT))[35]; Ex. 9 at ¶ 79 (showing 25% of respondents in the test group and 22.1% of respondents in the control group believe Nike created the Vault NFT)).

StockX also criticizes Simonson's survey design for "failing to account for the resale context," where StockX believes that its "first sale" and "fair use" defenses give it *carte blanche* to use Nike's trademarks in the "ordinary resale context" in whatever way it chooses. (Br. at 20.) While Nike will establish that StockX's defenses do not excuse its unauthorized sales of the Nike-branded Vault NFTs that it designed, created and sold to consumers, those issues are not currently before the Court. Contrary to StockX's position, Simonson designed his surveys in part to address StockX's defenses. (TD Decl. ¶ 11, Ex. 10 at 50:10-53:20.) His surveys tested StockX's "claim ticket" defense head-on, deploying a StockX "ticket" stimuli in the Control group that contained no Nike trademarks, in contrast to the beautiful, prominent images of Nikes shoe that StockX placed on the Vault NFTs. (Dkt. 201-12 at ¶¶ 26, 30.) Simonson's surveys are highly relevant to defeating StockX's fair use defense because they are evidence that StockX's prominent use of Nike's trademarks caused consumers to mistakenly believe that Nike sponsored or endorsed the Vault NFTs. *See, e.g., Weight Watchers Int'l, Inc. v. Noom, Inc.*, 403 F. Supp. 3d 361, 378 (S.D.N.Y. 2019). In addition, it would have been improper and confusing to explain the first sale doctrine to survey respondents, as StockX suggests Simonson should have done, because StockX is the party that created and *first sold* the brand-new Vault NFTs, as even StockX's experts admit.[36]

---

[35] Neal improperly concludes that net confusion resulting from subtracting the results of the control from the test is 3.2%. Although Neal acknowledged that "a control stimulus need[s] to be non-infringing" (TD Decl. ¶ 12, Ex. 11 at 136:16-20), Neal's survey showed 70.9% consumer confusion. (Dkt. 201-20 at 70.) Neal's study shows that both the test and control groups experienced significant levels of confusion. (*Id.*)

[36] Even StockX's *Mary Kay, Inc. v. Weber* case, which related to resold products (not new NFTS) held that "[t]he first sale doctrine [] will not protect [defendants] if they have given off the false impression that they are affiliated with or sponsored by Mary Kay." 601 F. Supp. 2d 839, 852 (N.D. Tex. 2009); *see also* Simonson Dep. Tr. 259:21-261:2 (explaining why Simonson survey in *Mary Kay, Inc. v. Weber* is irrelevant to the analysis of StockX's Vault NFTs).

(Ex. 8 at 27:6-14; Ex. 11 at 43:9-44:17.)

### 2.   Simonson's Survey Is Methodologically Sound

"When evaluating survey evidence, errors in a survey's methodology usually go to the weight accorded to its conclusions rather than its admissibility." *POM Wonderful LLC v. Organic Juice USA, Inc.,* 769 F. Supp. 2d 188, 197 (S.D.N.Y. 2011); *see also Lifeguard Licensing Corp. v. Ann Arbor T-Shirt Co., LLC,* 2017 WL 3142072, at *2 (S.D.N.Y. July 24, 2017) (collecting cases). "[StockX]'s objections in this particular case regarding the methodology of the study, even if proven and fully credited, clearly go to the weight of the [Simonson] Report, rather than its admissibility." *See Rexall Sundown, Inc. v. Perrigo Co.*, 651 F. Supp. 2d 9, 28 (E.D.N.Y. 2009). "The methodological flaws proffered by [StockX] are not so egregious or clear cut that the Court can conclude that the highly probative value of the survey to [Nike's claims] is outweighed by its prejudicial effect." *Playtex Prod.*, 2003 WL 21242769, at *2.[37]

### a.   Simonson Surveyed The Correct Universe.

Because purchasers of Vault NFTs make purchasing decisions based on a variety of considerations, the survey universe must represent purchasers interested in investment opportunities, purchasing products on a resale marketplace like StockX, and specifically in shoes. As such, Simonson's universe included respondents that "own and expect to purchase sneakers;" "expect to look for new investment opportunities and/or start a collection;" "would consider investing in NFTs, buying collecting items and/or investing in cryptocurrency;" and in the previous two years and during the subsequent 12 months "bought (and would buy) or invested (and would invest) in brand new products or collectibles from an online marketplace such as eBay, StockX,

---

[37] StockX's reliance on *Edmondson v. RCI Hosp. Holdings, Inc.,* 2020 WL 1503452, at *7 (S.D.N.Y. Mar. 30, 2020) (Caproni, J.) is misplaced.  There, the court properly excluded a "self-administered internet questionnaire" rife with methodological flaws, including failing to employ standard practices like: utilizing a control, instructing participants to avoid guessing, and representing only 4 of 52 models who had alleged misappropriation of their likeness.

The RealReal, Goat, or Poshmark."  (Dkt. 201-12, ¶ 18.)  Thus, to qualify, respondents had to indicate "characteristics [] such that they're more likely than most people to consider buying an NFT offered by StockX," *i.e.*, prospective purchasers.  (Ex. 10 at 72:10-12.)  That StockX defines the appropriate population differently does not provide a basis for excluding the survey.  *See In re Elysium Health-ChromaDex Litig.*, 2022 WL 421135, at \*7 ("questions regarding the appropriate universe to be surveyed goes to the weight of the evidence and not to its admissibility.").  Even "a survey with an 'overbroad' universe may still have probative value."  *Friesland Brands, B.V. v. Vietnam Nat'l Milk Co.*, 221 F. Supp. 2d 457, 461 (S.D.N.Y. 2002).

### b.   Simonson's Survey Used Context Effects And Non-Leading Questions To Ensure A Reliable Result.

As part of Simonson's survey protocol, "[a]ll respondents were first shown the same mock line-up of products that have been offered on the StockX website," which was informed by Simonson's award-winning research on "context effects" on consumer choice.  (Dkt. 201-12 at ¶ 32-33).  This is an accepted method.  *See Sazerac*, 265 F. Supp. 3d at 1027-28 (survey that "expose respondents at the beginning to an array of 13 bottles," including the bottle plaintiff contended was infringed, and then "continued with the standard Eveready survey questions.").  StockX's *Kargo Glob., Inc. v. Advance Mag. Publishers, Inc.*, 2007 WL 2258688, at \*11 (S.D.N.Y. Aug. 6, 2007) case does not compel a different result.  There, the stimulus was promotional material directed towards business-to-business purchasers.  Because the survey was intended to demonstrate end user confusion, the stimulus did not replicate the marketplace.  *Id.*  Here, Simonson's stimuli were screenshots of StockX's website showing a product display page for a Vault NFT.  As Simonson explained in his deposition, "the purpose of [the pre-survey lineup] was to decrease the difference between the test and control so that the control people would also have the opportunity to see the product they're asked about."  (Ex. 10 at 92:4-94:16).  "It was part of the protocol.  It was not the

23

stimulus that appeared while people were answering the questions." (*Id.* at. 92:6-12).

As a novel product or asset class, consumers—and by extension, survey participants— may never have encountered an NFT that purports to connect to a physical asset prior to StockX launching its Vault NFTs. Simonson's surveys capture the complexity of the marketplace for StockX's Vault NFT products by reflecting both the varied nature of the actual and potential consumers of StockX's products and by ensuring that survey participants understood the survey to ask about the "product/NFT" at issue. (Ex. 10 at 24:4-25:1.) Notably, StockX referred to its Vault NFTs as "NFTs," "products," an "NFT product," or as a "product-backed NFT." (*See, e.g.*, Dkt. 41 ¶¶ 63-64 ("last sale price for the Vault NFT product referenced")); TD Decl. ¶ 13, Ex. 12 at 18418 (illustrating the difference between a product-based NFT and a utility based NFT)). Although StockX objects to "product/NFT" (Br. 23-24), Simonson's use of the phrase was not leading and was consistent with actual marketplace conditions and StockX's own definition. (*See e.g.,* Dkt. 41 ¶¶ 63-64.)

### c.    Simonson Correctly Analyzed Informative Questions

StockX misstates that Simonson did not evaluate the responses to all survey questions.[38] Although StockX insists that he performed a traditional likelihood of confusion analysis, Simonson repeatedly clarified that his survey "tested if greater prominence of Nike's trademarks increases the mistaken belief that it is Nike that makes the Vault NFT offer." (Dkt. 201-12 ¶ 14; Dkt. 194-21, ¶ 10 (explaining his survey tests "a very specific question, namely, whether the prominence of the Nike sneaker image and branding affects beliefs about the company that is the source of (or

---

[38] StockX's reliance on the copyright case *Oracle Am., Inc. v. Google Inc.,* 2016 WL 1743116, at *10 (N.D. Cal. May 2, 2016) is inapposite. (Br. at 24.) There, Simonson "compar[ed] results from both the pretest of 23 respondents and the full-scale survey, [and] Simonson decided to include results from the pretest in his final results." *Id.* Here, Simonson did not ignore any data.

offers) the displayed product/NFT.")).[39]  StockX should understand the relevance, given that it has asserted a defense that puts prominence of the allegedly infringed mark squarely at issue.  *See, e.g., Coty Inc.*, 277 F. Supp. 3d at 457) (setting forth the factors and rejecting nominative fair use where infringing product "prominently displayed" plaintiff's mark).

### 3.    Simonson's "Brand Extension" Rebuttal Is Proper

Simonson opines that "[b]y entering the NFT market and prominently using the Nike brand and symbols, StockX effectively extended the Nike brand into a new category or asset class with no authorization from Nike" and StockX's use "preempted Nike's plans to enter that category using its brand" and bases this opinion on the theory of "brand extension" and his surveys.  (Dkt. 201-13, ¶ 20.)  Simonson's opinion explains why consumers might be more likely to associate Vault NFTs with Nike under the theory of brand extension and harm to Nike from that association.

Not only are Simonson's opinions relevant to the likelihood of confusion analysis, they rebut Kominers' opinion that "to the extent that the Vault NFTs have 'digital brand' features, the digital brand in question is unambiguously that of StockX itself," (Ex. 6 at 43) and Vigil's opinion that "Nike benefits from the existence of StockX's platform."  (Dkt. 201-15 at ¶ 58.)  *Capri Sun GmbH.*, 595 F. Supp. 3d at 141 (admitting rebuttal expert on "brand equity" in Lanham Act case).

## III    CONCLUSION

For the foregoing reasons, StockX's Motion should be denied in its entirety.

---

[39] To assess the impact of prominence on beliefs about which party made the offer, Simonson analyzed the "ratio of those who mention StockX relative to those who mention Nike" which informs "the relative attribution of the offer to Nike versus StockX in the Test group compared with the Control group." (Dkt. 201-12, ¶ 55.)  Simonson then compared the ratio of beliefs about which party made the Vault NFT offer to the results of the affiliation and approval questions.  (*Id.* ¶ 77-85 ("Nike was by far the largest response Net among those who had indicated that StockX offered the product/NFT" and that "Nike was by far the largest response Net (*i.e.*, it was mentioned the most often) among those who had indicated that StockX made the offer)).  In other words, even where consumers were correct that StockX made the Vault NFT offer, they demonstrated § 1125(a) confusion because they also believed that Nike was either affiliated, connected, or associated with StockX's offer or had sponsored or approved of StockX's offer.  (*Id.*)

Date: November 3, 2023                    By:  */s/ Tamar Y. Duvdevani*

**DLA PIPER LLP (US)**

Tamar Y. Duvdevani
Marc E. Miller
Michael D. Hynes
Andrew J. Peck
Jared Greenfield
1251 Avenue of The Americas, 27th Fl.
New York, NY 10020
Telephone: (212) 335-4500
Facsimile: (212) 335-4501

Michael Fluhr
555 Mission Street, Suite 2400
San Francisco, CA 94105
Telephone: (415) 836-2500
Facsimile: (415) 836-2501

Melissa Reinckens
4365 Executive Drive
Suite 1100
San Diego, CA 92121
melissa.reinckens@us.dlapiper.com
Telephone: (858) 677-1400
Facsimile: (858) 677-1401

Jane W. Wise
500 Eighth Street, NW
Washington, D.C. 20004
Telephone: (202) 799-4149
Facsimile: (202) 863-7849

*Attorneys for Plaintiff Nike, Inc.*