UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                                             :
NIKE, INC.,                                                  :
                                                             :
                              Plaintiff,                     :
                                                             :
                  v.                                         :        No. 22 CV 983 (VEC) (SN)
                                                             :
STOCKX LLC,                                                  :
                                                             :
                              Defendant.                     :
                                                             :
                                                             :
                                                             :
-------------------------------------------------------------x


**DEFENDANT STOCKX LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION TO PRECLUDE THE TESTIMONY OF JOHN HANSEN, JEFFERY STEC,
KARI KAMMEL, STEVEN MCNEW, AND ITAMAR SIMONSON**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ 2

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT ...................................................................................................................... 2

    I.      John Hansen's Testimony on Damages Is Irrelevant and Unsupported. ................ 3

    II.     Jeffery Stec's Unreliable Rebuttal Opinion Should Be Excluded. ........................ 7

    III.   Kari Kammel's Testimony Is Unreliable, Irrelevant, and Should Be
           Excluded. ............................................................................................................... 8

           A.     Prof. Kammel's General Opinions Regarding Counterfeiting,
                   Brand Protection, and Counterfeiting Harms Are Irrelevant and
                   Prejudicial. ................................................................................... 8

           B.     To the Extent Prof. Kammel Tries to Tie General Harm to
                   StockX's Conduct, Her Opinions Are Unreliable.................................... 11

           C.     Prof. Kammel's Opinions on the Meaning of "Authentication" and
                   StockX's Authentication Practices Are Unreliable and Irrelevant. .......... 11

           D.     Prof. Kammel Is Not Qualified and Lacks Reliable Methodology to
                   Opine on Platform Economics and Resale Marketplace Design. ............. 13

           E.     Prof. Kammel's New Factual Evidence Should Be Excluded. ................. 14

    IV.   Steven McNew's Testimony Is Unreliable and Should be Excluded. ................... 15

           A.     Mr. McNew Offers Opinions About Consumer Perception Without
                   Knowing What Consumers Saw or Thought. ........................................... 16

            B.     Mr. McNew's "Industry Standards" Opinions Have No Underlying
                   Methodology, Standards, or Benchmarks. ................................................ 18

           C.     Mr. McNew's Novel "Comparative Pricing Analysis" Is Not
                   Reliable. ..................................................................................... 19

    V.    Itamar Simonson's Survey and Marketing Opinions Should Be Excluded. ......... 20

           A.     Dr. Simonson's Surveys Do Not Reliably Measure Confusion. .............. 20

            B.     Dr. Simonson's "Brand Extension" Opinions Are Irrelevant and
                   Prejudicial. ................................................................................... 24

CONCLUSION ................................................................................................................. 26

# TABLE OF AUTHORITIES

**Cases**

*Adkins v. Morgan Stanley*,
307 F.R.D. 119 (S.D.N.Y. 2015) (Caproni, J.),
*aff'd*, 656 F. App'x 555 (2d Cir. 2016)............................................................... 14, 15, 18

*Algarin v. New York City Dep't of Corr.*,
460 F. Supp. 2d 469 (S.D.N.Y. 2015)........................................................................ 20

*BBK Tobacco & Foods, LLP v. Galaxy VI Corp.*,
408 F. Supp. 3d 508 (S.D.N.Y. 2019).......................................................................... 9

*Beastie Boys v. Monster Energy Co.*,
983 F. Supp. 2d 354 (S.D.N.Y. 2014)........................................................................ 10

*Boucher v. U.S. Suzuki Motor Corp.*,
73 F.3d 18 (2d Cir. 1996)............................................................................................ 11

*Burndy Corp. v. Teledyne Indus., Inc.*,
748 F.2d 767 (2d Cir. 1984)......................................................................................... 3

*Capri Sun GmbH v. Am. Bev. Corp.*,
595 F. Supp. 3d 83 (S.D.N.Y. 2022).......................................................................... 23

*Church & Dwight Co. v. SPD Swiss Precision Diagnostics GmbH*,
2018 WL 4253181 (S.D.N.Y. Sep. 5, 2018).................................................................. 3

*Conti v. Doe*,
2020 WL 6162104 (S.D.N.Y. Oct. 21, 2020) (Caproni, J.)......................................... 25

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993).................................................................................................. 2, 9

*Davis v. Carroll*,
937 F. Supp. 2d 390 (S.D.N.Y. 2013)........................................................................ 19

*Dependable Sales & Servs., Inc. v. TrueCar, Inc.*,
311 F. Supp. 3d 653 (S.D.N.Y. 2018)......................................................................... 6

*Dollman v. Mast Indus., Inc.*,
2011 WL 3911035 (S.D.N.Y. Sept. 6, 2011).............................................................. 10

*Donnelly v. Ford Motor Co.*,
80 F. Supp. 2d 45 (E.D.N.Y. 1999) ........................................................................... 18

*Edmondson v. RCI Hosp. Holdings, Inc.*,
2020 WL 1503452 (S.D.N.Y. Mar. 30, 2020) ........................................................................... 23

*In re AXA Equitable Life Ins. Co. COI Litig.*,
595 F. Supp. 3d 196 (S.D.N.Y. 2022),
*on recons. in part*, 2022 WL 3018104 (S.D.N.Y. July 29, 2022) ............................................... 15

*In Re Elysium Health-Chromadex Litig.*,
2022 WL 421135 (S.D.N.Y. Feb. 11, 2022) ................................................................................. 6

*In re Mirena IUD Prod. Liab. Litig.*,
169 F. Supp. 3d 396 (S.D.N.Y. 2016) ....................................................................................... 20

*In re Navidea Biopharm. Litig.*,
2022 WL 16833587 (S.D.N.Y. Nov. 9, 2022) (Caproni, J.) ....................................................... 25

*Jack Daniel's Properties, Inc. v. VIP Prods. LLC*,
599 U.S. 140 (2023) ................................................................................................................. 22

*Kargo Glob., Inc. v. Advance Mag. Publ'rs, Inc.*,
2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007) ...................................................................... 22, 24

*Lexmark Int'l Inc. v.  Static Control Components, Inc.*,
572 U.S. 118 (2014) ................................................................................................................ 5, 9

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
340 F. Supp. 2d 415 (S.D.N.Y. 2004),
*aff'd in part, vacated in part*, 454 F.3d 108 (2d Cir. 2006) ...................................................... 22

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
209 F. Supp. 3d 612 (S.D.N.Y. 2016) ....................................................................................... 17

*Mattel, Inc. v. www.fisher-price.online*,
2022 WL 2801022 (S.D.N.Y. Jul 18, 2022) ................................................................................ 9

*N. Am. Olive Oil Ass'n v. Kangadis Food Inc.*,
962 F. Supp. 2d 514 (S.D.N.Y. 2013) ....................................................................................... 11

*Nimely v. City of New York*,
414 F.3d 381 (2d Cir. 2005) ................................................................................................... 3, 14

*Oracle Am., Inc. v. Google Inc.*,
2016 WL 1743116 (N.D. Cal. May 2, 2016) ............................................................................. 24

*Otto v. LeMahieu*,
2021 WL 1615311 (N.D. Cal. Apr. 26, 2021) ........................................................................... 16

*Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*,
2020 WL 1322856 (S.D.N.Y. Mar. 20, 2020) (Caproni, J.),
*on recons. in part*, 2020 WL 2765044 (S.D.N.Y. May 28, 2020) ................................................. 18

*Playtex Prod., Inc. v. Procter & Gamble Co.*,
2003 WL 21242769 (S.D.N.Y. May 28, 2003),
*aff'd*, 126 F. App'x 32 (2d Cir. 2005) .............................................................................. 14

*Polaroid Cop. v. Polarad Elecs. Corp.*,
287 F.2d 492 (2d Cir. 1961) ....................................................................................... 25

*Price v. L'Oréal USA, Inc.*,
2020 WL 4937464 (S.D.N.Y. Aug. 24, 2020) .................................................................. 17

*R.F.M.A.S., Inc. v. So*,
748 F. Supp. 2d 244 (S.D.N.Y. 2010) ........................................................................... 13

*Red Hawk, LLC v. Colorforms Brand LLC*,
638 F. Supp. 3d 375 (S.D.N.Y. 2022) ........................................................................... 14

*Sec. & Exch. Comm'n v. Ripple Labs, Inc.*,
2023 WL 5670711 (S.D.N.Y. Mar. 6, 2023) .................................................................... 17

*TrafficSchool.com, Inc. v. Edriver Inc.*,
653 F.3d 820 (9th Cir. 2019) ......................................................................................... 5

*Union Carbide Corp. v. Ever-Ready, Inc.*,
531 F.2d 366 (7th Cir. 1976) ...................................................................................... 20

*United States v. Cruz*,
363 F.3d 187 (2d Cir. 2004) ....................................................................................... 15

*United States v. Dukagjini*,
326 F.3d 45 (2d Cir. 2003) ........................................................................................... 3

*United States v. Mejia*,
545 F.3d 179 (2d Cir. 2008) ......................................................................................... 8

*United States v. Percoco*,
2018 WL 879499 (S.D.N.Y. Feb. 13, 2018) .............................................................. 12, 17

*United States v. Williams*,
506 F.3d 151 (2d Cir. 2007) ........................................................................................... 2

**Statutes**

15 U.S.C. § 1117 ............................................................................................... 3, 5, 9

15 U.S.C. § 1125 ...................................................................................................... 25

**Other Authorities**

Restatement (Third) of Restitution and Unjust Enrichment  § 51 ................................. 5

William G. Barber & Giulio E. Yaquinto,
*The Universe* in *Trademark & Deceptive Advertising Surveys*
(Shari Seidman Diamond & Jerre B. Swann, ABA 2d ed. 2022) ................................. 23

**Rules**

Fed. R. Evid. 402 ...................................................................................................... 9

Fed. R. Evid. 403 ................................................................................................. 3, 10

Rule 702 ...................................................................................................................... 2

Defendant StockX LLC respectfully submits this memorandum in support of its motion to preclude John Hansen, Jeffery Stec, Kari Kammel, Steven McNew, and Itamar Simonson.

## PRELIMINARY STATEMENT

Nike asserted trademark infringement, counterfeiting, and false advertising claims against StockX. Nike's experts offer opinions as to Nike's trademark and counterfeiting claims, as well as false advertising damages. The vast majority of those opinions are unreliable or irrelevant.

Nike's trademark infringement claims relate to StockX's Vault NFTs. StockX operates a resale platform for consumers to buy and sell products they own. To improve the speed and ease of trading for consumers interested in holding products as investments, StockX launched the Vault NFTs: tradeable digital tokens representing ownership in an underlying physical good. Nike alleges that StockX's Vault NFTs representing ownership in resold Nike sneakers infringe Nike's trademarks. As to that claim, Nike offers testimony from Steven McNew, a consultant whose past expert opinions primarily involved tracing the movement of cryptocurrencies in fraud and bankruptcy cases, but who now seeks to opine about whether StockX's design of the Vault NFTs met industry standards, as well as how consumers perceived the Vault NFTs, including through an analysis of Vault NFT prices. Yet Mr. McNew offers no methodology or definition of NFT industry standards to support his opinions, and conducted no consumer perception research. Nike also offers Itamar Simonson, who performed two unreliable confusion surveys that failed to account for the fact that StockX is a resale marketplace and showed only that many consumers who were shown Nike shoes could identify them as Nike products.

Nike's counterfeiting claim alleges that a number of unknown third-party sellers sold products via StockX's platform that Nike later determined were counterfeit. As StockX will establish at trial, the shoes at issue were sold by a small number of third-party sellers, and

represent less than ███████ of the Nike shoes sold on StockX.  Nike also offers the testimony of Kari Kammel, a legal academic, to discuss harms caused by counterfeiting generally, and whether StockX's anti-counterfeiting efforts are best practices.  But Prof. Kammel's general counterfeiting opinions have no connection to Nike's alleged counterfeits, rendering them irrelevant and prejudicial.  Prof. Kammel has no reliable method to assess anti-counterfeiting best practices for resale marketplaces, with no standards by which her opinions could be tested.

Nike's false advertising claims are largely based on StockX's historical, discontinued descriptions of its "authentication" process of inspecting products resold on its platform.  Nike offers two experts—John Hansen and Jeffrey Stec—in connection with its request for disgorgement of StockX's profits were StockX found liable for false advertising.  Mr. Hansen seeks to offer a calculation of the amount of StockX's at-issue profits, but he did nothing to determine whether *any* of StockX's revenues were *attributable to* the alleged false advertising. Mr. Hansen did no analysis—likely because Nike has proffered no evidence—to establish that even one StockX transaction was caused by StockX's advertising.  Straining to fill the void of evidence of lost or diverted sales, Nike's other damages expert, Dr. Stec, assumed without any basis that if Nike contemporaneously offered a shoe in even just one size, then every sale of that shoe on StockX in any size was somehow diverted from Nike.

## ARGUMENT

Nike bears "the burden of establishing by a preponderance of the evidence that" its experts' opinions satisfy Rule 702.  *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). "[T]he trial judge must ensure that any and all [expert] testimony or evidence admitted is not only relevant, but reliable."  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). Expert testimony is admissible only if (i) the witness is "qualified as an expert" to testify on a

particular matter, (ii) the opinion is based upon reliable data and methodology, and (iii) the expert's testimony will "assist the trier of fact." *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005). Expert testimony must also satisfy Rule 403: its probative value must not be substantially outweighed by a danger of unfair prejudice, confusing the issues, or misleading the jury. *See United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003); Fed. R. Evid. 403.

## I.    John Hansen's Testimony on Damages Is Irrelevant and Unsupported.

Nike is seeking only injunctive relief for its trademark infringement claims and statutory damages for its counterfeiting claim. *See* Nike Letter, ECF No. 89, p. 1; First Am. Compl., ECF No. 39 ¶ 170. For its false advertising claim, Nike seeks disgorgement of StockX's profits, asserting StockX was unjustly enriched. *See* Nike Letter, ECF No. 89, p. 4, n.2. Nike has the burden of establishing the relevant amount of StockX's sales, subject to the statutory requirement that any disgorgement must be "compensation and not a penalty." 15 U.S.C. § 1117(a). Even if it "establishes liability for false advertising," Nike "will be entitled only to such damages as were *caused by* the violation." *Church & Dwight Co. v. SPD Swiss Precision Diagnostics GmbH*, 2018 WL 4253181, at *3 (S.D.N.Y. Sep. 5, 2018) (quoting *Burndy Corp. v. Teledyne Indus., Inc.*, 748 F.2d 767, 771 (2d Cir. 1984)) (emphasis in original). In this case, the Court held Nike must "show that StockX['s] sales were ill-gotten." Order, ECF No. 116, p. 2.

Nike's damages expert, Mr. John Hansen, purported to calculate "the amount of profits subject to disgorgement that [StockX] earned in connection with the alleged false advertising statements." Hansen Tr. 154:6-12.[1] But in doing so, he ignored the Court's ruling (and well-established law) that only **ill-gotten** profits are subject to disgorgement. Mr. Hansen instead assumed that **every** U.S. Nike sneaker sale on StockX was ill-gotten, without even considering—much less establishing—which sales, if any, were caused by the alleged false advertising.

---

[1] Ford Decl. Ex. C, Transcript of the deposition of John L. Hansen ("Hansen Tr.").

Because Mr. Hansen applied the wrong standard for disgorgement—tallying all profits, rather than just ill-gotten profits—his conclusion that disgorgement damages are ███████████, and his opinions supporting that conclusion, are irrelevant, prejudicial, and inadmissible.  Second Hansen Rebuttal ¶ 34; *see also* Hansen Am. Rep. ¶¶ 64, 70; Hansen Tr. 154:6-12.[2]  Mr. Hansen's remaining opinions concerning purported harm to Nike are unsupported speculation.

To arrive at his damages estimate, Mr. Hansen started by tallying the total revenue from ***all*** "resale trades of Nike and Jordan branded sneakers where at least one side of the trade included a U.S. individual."  Hansen Am. Rep. ¶ 64.  He did not determine what portion of those transactions would have occurred even if StockX had not made any of the allegedly false advertising claims.  *See* Hansen Tr. 168:19-169:7.  He then deducted from this over-inclusive pool of revenues his estimate of the "cost of revenues" for those trades, to reach a ███████████ estimate of "gross profit" purportedly subject to disgorgement.  Hansen Am. Rep. ¶ 64, 70.  In his second rebuttal report, Mr. Hansen arrived at his ultimate ███████████ damages estimate by deducting certain additional indirect costs associated with those same trades, which StockX's expert, Dr. Robert Vigil, had identified.  Second Hansen Rebuttal ¶¶ 22, 34.

Mr. Hansen's methodology was flawed from the first step.  By failing to limit his computations to ill-gotten sales and profits, he applied incorrect criteria for determining the profits subject to disgorgement.  His damages estimate and opinions are therefore irrelevant.

The causation requirement Mr. Hansen ignored is clearly established law.  The Court's ruling that only ill-gotten profits can be disgorged—and that Nike bears the burden of proof on this point—is grounded in the well-established principle that "the unjust enrichment . . . is the net profit ***attributable to the underlying wrong***."  *See* Restatement (Third) of Restitution and Unjust

---

[2] *Id.* Ex. B, Second Expert Rebuttal Report of John L. Hansen ("Second Hansen Rebuttal"); *id.* Ex. A, First Amended Expert Report of John L. Hansen ("Hansen Am. Rep.").

Enrichment ("Restatement") § 51(4) (emphasis added); *see generally Lexmark Int'l Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 135-36 (2014). Unjust enrichment requires "that the wrong has ***proximately resulted in an unjust gain*** to the defendant," and the plaintiff bears the burden to "show a ***causal connection*** between defendant's wrongdoing and a ***measurable increase*** in the defendant's net assets." Restatement § 51, cmt. f (emphasis added).

Disgorging profits to Nike that StockX would have earned even absent the allegedly false advertising would run contrary to the "object of restitution," an equitable remedy intended "to eliminate profit from wrongdoing while avoiding, so far as possible, the imposition of a penalty." *See* Restatement § 51(4). In the false advertising context, the Ninth Circuit noted that the Lanham Act also "allows an award of profits only to the extent the award 'shall constitute compensation and not a penalty,'" in affirming the denial of *any* disgorgement where "Plaintiffs didn't produce any proof of past injury or causation, so the district court had no way to determine with any degree of certainty what award would be compensatory." *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820, 831 (9th Cir. 2019) (quoting 15 U.S.C. § 1117(a)).

In light of these standards, Mr. Hansen's opinion does not support the award of any damages. He has not addressed causation at all, much less offered any facts or opinions suggesting there was a 'measurable increase' in StockX's profits caused by the allegedly false advertising statements. Indeed, Mr. Hansen is "***not*** opining . . . that [StockX's] sales would not have been made but for the [alleged] false advertising;" did not "offer an opinion about whether there would have been fewer trades of Nike sneakers on StockX if the false advertising claims at issue had not been made," and "ha[s]n't attempted to put a number on that." Hansen Tr. 172:24-173:10 (emphasis added); 116:14-116:25; 118:19-119:17; 168:8-169:7; 171:13-19. When asked whether some buyers might not have believed StockX's claims, Mr. Hansen testified that this

causation evidence would not be "relevant [to him] for purposes of identifying the sales that were subject to or in connection with a false statement."  Hansen Tr. 211:9-16.

*Dependable Sales & Servs., Inc. v. TrueCar, Inc.* is instructive as to why Mr. Hansen's approach is fatally flawed and unreliable.  311 F. Supp. 3d 653 (S.D.N.Y. 2018).  There, the plaintiff's damages expert made the same "unsupported conclusion that all [] purchases made through [defendant] . . . were motivated by the [allegedly false] claim, to the exclusion of any other factor."  *Id.* at 659.  In excluding that expert's testimony as "not reliable or relevant," Judge Castel noted that appropriate damages testimony in a false advertising case would "isolate losses caused by the false advertisements by controlling for 'external factors and market forces' and 'various lawful promotional activity' that influenced consumers."  *Id.* at 657, 659 (criticizing plaintiff's expert for failing to conduct "consumer research as to the influence of" the advertising claims at issue or consider other market factors that might have led to sales).

Here, as in *Dependable Sales*, Mr. Hansen "has failed to demonstrate that 100% of sales made through [defendant] were caused by [allegedly false] advertisements."  *Id.* at 662; *see also In Re Elysium Health-Chromadex Litig.*, 2022 WL 421135, at *18 (S.D.N.Y. Feb. 11, 2022) (excluding damages expert's report that "assumes that [defendant] would not have made any sales of [relevant product] but for the alleged misleading advertisements" and "did not do any independent analysis of how the allegedly deceptive statements in the case affected [defendant's] sales").  Indeed, although Mr. Hansen criticized StockX's damages expert for not surveying consumers about the impact of the allegedly false statements, Mr. Hansen himself did not rely on any such testing.  *See* Hansen Tr. 176:5-17; 215:14-216:20; 220:19-221:23; 222:16-223:12.

Mr. Hansen's remaining assertions—that StockX's actions caused direct harm to Nike— are unsupported.  Mr. Hansen confirmed at his deposition that ███████████████████████████

██████████████████████████████████████████████████████

████████████████████. Hansen Tr. 83:11-24; 87:6-23; 106:24-107:4 (no evidence identified

by Nike's 30(b)(6) witness, Prof. Kammel, or Mr. Hansen).

## II.    Jeffery Stec's Unreliable Rebuttal Opinion Should Be Excluded.

StockX's damages expert, Dr. Vigil, explained that "Nike has not cited or produced any

evidence of lost sales . . . resulting from" StockX's alleged conduct.  Vigil Rep. ¶ 36.[3]  On

rebuttal, Nike offers Dr. Jeffery Stec's opinion that "StockX has sold at least 200,000 shoes

within the last twelve months alone that were simultaneously offered by Nike for retail sale on

Nike.com" and which "were likely sold when these products were available for sale by Nike."

Stec Rep. p. 13, 18.[4]  While Dr. Stec stopped short of opining that StockX in fact diverted sales

from Nike, *see* Stec Tr. 27:25-28:5,[5] his 200,000 shoes opinions are a transparent attempt to fill

in the gap created by Nike's failure to produce any ***actual*** evidence of lost sales.

That attempt should fail.  Dr. Stec admitted at his deposition that "the work [he] did does

not show that there was even a single instance of a Nike shoe sold on StockX at a time when the

same shoe was available in the same size on Nike.com."  Stec Tr. 249:22-250:16.

Dr. Stec arrived at his 200,000 shoes figure through the following flawed methodology:

- *First*, he identified 71 styles of shoes that were available for purchase ***in as few as one
overlapping size*** both on Nike.com on June 1, 2023 and on StockX on June 2, 2023.  Stec
Rep. p. 11.

- *Second*, he consulted StockX's historical sales data for each of those 71 styles and added
up the total sales of those 71 styles on StockX ***in all sizes*** during the entire preceding
year—yielding his 200,000 number.  *Id.* at 13.

This analysis does not reliably support Dr. Stec's inference that 200,000 shoes sold on

StockX were "likely" simultaneously available from Nike.  Dr. Stec's failure to take shoe size

---

[3] Ford Decl. Ex. O, Expert Report of Robert L. Vigil ("Vigil Rep.").
[4] Ford Decl. Ex. D, Rebuttal Expert Report of Jeffrey A. Stec ("Stec Rep.").
[5] *Id.* Ex. E, Transcript of the Deposition of Jeffrey A. Stec ("Stec Tr.").

into account is fatal to his analysis: for example, he includes *all* 7,629 sales of *all* sizes of one particular Air Jordan shoe on StockX. Stec Tr. 232:22-233:9. That shoe was available in *twenty five different sizes* on StockX, but only *one* size from Nike: size *seventeen* (as Nike well knows, an extremely rare shoe size worn by NBA players like the 6'9" Larry Bird). Stec Tr. 232:18-233:9, 240:25-241:13; Stec. Rep. Exs. 4.1, 4.2. Dr. Stec has no reliable basis to opine that 7,629 sales of that shoe on StockX were likely of the one rare size available from Nike.

Nearly 15% of Stec's 200,000 figure—29,839 sales—are attributable to a mere three styles that were available in only one or two sizes on Nike.com, but in sixteen to twenty-five sizes on StockX.[6] Indeed, the vast majority of the 200,000 sales are of styles with more sizes available on StockX than on Nike.com. *See* Stec Rep. Exs. 4.1, 4.2.

Dr. Stec has no basis for his conclusion that these sales were of shoe sizes also available from Nike. All that Dr. Stec's analysis actually shows is that certain shoes were simultaneously available from Nike and StockX at one point in time. But such simple "factual testimony about matters that require[ ] no specialized knowledge" is not the province of experts and should be excluded. *United States v. Mejia*, 545 F.3d 179, 196 (2d Cir. 2008).

## III.    Kari Kammel's Testimony Is Unreliable, Irrelevant, and Should Be Excluded.

### A.    Prof. Kammel's General Opinions Regarding Counterfeiting, Brand Protection, and Counterfeiting Harms Are Irrelevant and Prejudicial.

Prof. Kammel—a legal academic who leads the Anti-Counterfeiting and Product Protection Center ("A-CAPP") at Michigan State University—purports to serve as a counterfeiting expert. However, Prof. Kammel offers no opinion about the alleged counterfeits in this case. Instead, she offers only general discussions of counterfeiting, harms resulting from counterfeiting, and anticounterfeiting measures. Her testimony is irrelevant and prejudicial.

---

[6] Stec Rep. Exs. 4.1-4.2, styles 554724-079 (15,547 sales), DZ5485-031 (7,629 sales), DV0831-101 (6,663 sales).

Prof. Kammel's testimony is irrelevant to counterfeiting liability.[7]  Counterfeiting is a strict liability offense.  *See BBK Tobacco & Foods, LLP v. Galaxy VI Corp.*, 408 F. Supp. 3d 508, 521-22 (S.D.N.Y. 2019).  Prof. Kammel does not offer any expert opinion that would make it more or less probable that any products at issue were in fact counterfeit and were sold by StockX.  Her views on the motives and strategies of counterfeiters *generally*, the harms that result from counterfeiting *at large*, and *general* anti-counterfeiting measures are divorced from the facts of this case and should be excluded as irrelevant.  *See Daubert*, 509 U.S. at 597 (testimony must be "relevant to the task at hand"); Fed. R. Evid. 402.

Prof. Kammel's testimony is also irrelevant as to counterfeiting damages.[8]  "Nike seeks only statutory damages, under 15 U.S.C. § 1117(c), for StockX's [alleged] sale of counterfeit 'Nike' shoes."  *See* Nike Letter, ECF No. 89, p. 5 (Dec. 19, 2022).  Enhanced statutory damages for counterfeiting are available only upon a showing of willful intent.[9]  15 U.S.C. §§1117(b), (c)(2).  Prof. Kammel conceded that she could not and is "not giving an opinion on whether [StockX is] trying or not" to prevent the sale of counterfeits on its platform.  Kammel Tr. 195:3-14.  Her testimony is accordingly irrelevant to StockX's willfulness.

Prof. Kammel's testimony should also be excluded as unfairly prejudicial.  She recites at length the evils of counterfeiting (which StockX does not dispute).  Without tying her opinions to the conduct at issue here, Prof. Kammel opines about the general ills of counterfeiting, including:

- Counterfeiting is "a ***national security issue***," Kammel Tr. 136:9-15 (emphasis added);
- "many bad actors who manufacture and sell counterfeit products are part of ***organized***

---

[7]  *See* Ford Decl. Ex. F, Expert Witness Report of Kari Kammel §§ II-VII ("Kammel Rep."); Ford Decl. Ex. G, Rebuttal Expert Witness Report of Kari Kammel §§ I.A, B ("Kammel Rebuttal"); Ford Decl. Ex. H, Transcript of the Deposition of Kari Kammel ("Kammel Tr.").
[8] To the extent Nike intends to rely upon these opinions in connection with false advertising damages, her opinions are similarly irrelevant.  Expert testimony about the general ills of counterfeiting lacks the required nexus to the advertising claims at issue.  *See Lexmark*, 572 U.S. at 133.
[9] Kammel's general testimony is also irrelevant to every one of the factors courts in this District consider when determining ordinary statutory damages for counterfeiting.  *See Mattel, Inc. v. www.fisher-price.online*, 2022 WL 2801022, at *9 (S.D.N.Y. Jul 18, 2022).

- ***criminal activity***, or other types of criminal activity, and even in some cases ***terrorism***";
- "***illicit trade***" such as "***weapons trafficking*** or ***drug trafficking***" often overlaps with trade in counterfeit products;
- "chemicals and materials used [in counterfeits] are often ***filthy***, ***hazardous***, or ***dangerous***"; and that
- concurrently charged offenses of individuals charged with counterfeiting include crimes such as "***drug-related crimes*** . . . and crimes against a person, including ***assault with a deadly weapon and attempted homicide***." Kammel Rep. pp. 5-6 (emphasis added).

StockX is not engaged in any such criminal activity, and such opinions are precisely the unfairly prejudicial testimony that Rule 403 precludes. Courts have excluded other alleged bad acts *by a defendant* as prejudicial. *See, e.g.*, *Beastie Boys v. Monster Energy Co.*, 983 F. Supp. 2d 354, 359 (S.D.N.Y. 2014) (excluding prior bad acts in a copyright case as "the probative value of any such hypothetical violations would be dwarfed by the risk of unfair prejudice"). The prejudice here is far greater, as Nike seeks to impute the bad acts of *third-party counterfeiters* to StockX.

Prof. Kammel also seeks to offer unfairly prejudicial testimony on general harms that third-party counterfeiters have caused to "the US economy, [] US brands, [and] US consumers." Kammel Tr. 136:9-15. Prof. Kammel seeks to testify that "counterfeiting harms an IP rights holder in several ways by (1) hurting its reputation in the marketplace and destroying consumers' trust in the brand, (2) taking sales and profits of genuine product away and diverting them to the counterfeiter, and (3) taking resources to combat the theft of its marks." Kammel Rep. p. 13. Without any ties to StockX's conduct, she then seeks to go further: alleging that counterfeiting generally causes ***Nike*** ███████████████████████████████████

████████████████████████████████████████████████████

Kammel Rep. p. 15. It is easy to see how the logical next step for a confused juror would be to think that "StockX caused these harms too." Prof. Kammel's attempts to mislead (***without any evidence of harm***) and to create guilt by association should be excluded as highly prejudicial. *Dollman v. Mast Indus., Inc.*, 2011 WL 3911035, at *4 (S.D.N.Y. Sept. 6, 2011) (excluding

"[a]ny evidence" related to defendant's alleged misconduct as unfairly prejudicial).

**B.    To the Extent Prof. Kammel Tries to Tie General Harm to StockX's Conduct, Her Opinions Are Unreliable.**

Prof. Kammel strains to tie general testimony on counterfeiting harms to StockX's conduct in this case, speculating that Nike may have been harmed by "the perception of legitimacy and language on the [StockX] website that creates the perception (*i.e.*, "trust us") that StockX gives to its consumers that they can guarantee the authenticity of the products sold on their platform." Kammel Rep. pp. 39-40; *see also id.* at 28-29 (referring to the "perceived legitimacy of the authentication to the consumer"); Kammel Rebuttal pp. 4-5 (referring to the "air of legitimacy" that e-commerce platforms present). But this consumer perception opinion is not grounded in any methodology. Prof. Kammel cites no literature, research, or studies showing how consumers perceive StockX's representations, and she did not "conduct any study in this case of what messages, if any, consumers took away from the language on StockX's website." Kammel Tr. 92:12-93:09; 191:23-192:5. Prof. Kammel's attempts to provide speculative testimony to link general harms of counterfeiting and harms to Nike in this case should be excluded as unreliable. *See Boucher v. U.S. Suzuki Motor Corp.,* 73 F.3d 18, 21 (2d Cir. 1996) (speculative or conjectural opinions are inadmissible).

**C.    Prof. Kammel's Opinions on the Meaning of "Authentication" and StockX's Authentication Practices Are Unreliable and Irrelevant.**

Prof. Kammel also seeks to offer a definition of the term "authentication"—central to her proffered opinions on authentication practices and whether or not StockX can authenticate products—that should be excluded as unreliable and irrelevant. This testimony cannot support Nike's false advertising claim, as Prof. Kammel offers no evidence of how consumers understand "authentication" in the context of StockX's advertising. *See N. Am. Olive Oil Ass'n v. Kangadis Food Inc.*, 962 F. Supp. 2d 514, 520 (S.D.N.Y. 2013) (even where literal falsity is

alleged, the issue is how a "reasonable ordinary consumer" would interpret the claim). Prof. Kammel has no expertise in consumer perception surveys and has never conducted consumer research. Kammel Dep. Tr. 93:1-6. Prof. Kammel's thoughts on what "authentication" may mean and how it can be done are irrelevant. *See, e.g.*, Kammel Rep. pp. 21-24.

Prof. Kammel also lacks any reliable methodology for her opinions on the definition of authentication and authentication best practices. *See* Kammel Rep. pp. 21-25; Kammel Rebuttal pp. 20-22. As to her definition of authentication, Prof. Kammel's lack of reliable methodology is evidenced by her own inconsistencies as to this point *during the course of this litigation*. Prof. Kammel's report included a graphic showing six authentication techniques and stated that *all six* techniques *must* be used "in order to truly verify whether a product is genuine and authorized." Kammel Rep. p. 22. Yet during her deposition, Prof. Kammel reversed course and testified that her report was incorrect. Kammel Tr. 231:23-235:3. Instead, Prof. Kammel testified, "authentication" means whatever the brand decides it means: "the IP rights holder has to decide which [techniques] they are going to use in their authentication process and who—[] within the brand has access and who, if anyone, outside of the brand would have access to [] those tools in order to authenticate a product." *Id*. at 231:18-22; *see also id*. at 238:7-239:17.[10] This about-face alone is enough to find that Prof. Kammel lacks a reliable methodology and her testimony should be excluded. *United States v. Percoco*, 2018 WL 879499, at *6, *8 (S.D.N.Y. Feb. 13, 2018) (excluding as "speculative or conjectural" an expert who "contradicted herself and admitted errors in her analysis").

---

[10] Neither of the definitions of "authentication" Kammel has put forth can be squared with the publications of her own research center. Despite Kammel's assertions that only the brand can determine authentication processes, A-CAPP's publications acknowledge that consumers can conduct "their own process of product authentication." *See, e.g.*, Ford Decl. Ex. P, A-CAPP, *The Cues in the Consumer Product Authentication Process* (2013), https://a-capp.msu.edu/article/the-use-of-cues-in-the-consumer-product-authentication-process/ (explaining that "[t]he studies [A-CAPP researchers] reviewed suggest that consumers use both intrinsic (tangible physical and performance attributes) and extrinsic (attributes external to the product) cues to authenticate a product").

Prof. Kammel also has no reliable methodology for her opinions on authentication best practices.  *See* Kammel Rep. pp. 20-25.  Without any expert analysis, Prof. Kammel bases her opinions as to authentication best practices on a single document released by the International Standards Organization, which Prof. Kammel nowhere stated is widely accepted or reliable.  *See* Kammel Rep. pp. 22-24.  Parroting a single document is not "the product of reliable principles and methods," and Prof. Kammel's opinions (to the extent that they can be characterized as such) should be excluded.  *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 248-50 (S.D.N.Y. 2010) (excluding expert testimony for "fail[ing] to . . . employ[ ] a reliable method").

### D.    Prof. Kammel Is Not Qualified and Lacks Reliable Methodology to Opine on Platform Economics and Resale Marketplace Design.

Prof. Kammel is not qualified to critique the opinions of StockX's expert Dr. Catherine Tucker—the Sloan Distinguished Professor of Management Science at MIT and an expert on platform and marketplace economics.  Prof. Kammel purports to respond to Dr. Tucker's analysis of marketplace incentives based on a platform economics concept called "coring."[11]  *See* Kammel Rebuttal pp. 22-25.  However, Prof. Kammel admitted having no expertise in the design or operation of resale marketplaces, "platform economics," or "general coring," and is "not offering an opinion as to platform economics in this case."  *See* Kammel Tr. 54:13-20, 204:01-04, 210:06-07.  She nonetheless seeks to offer unsupported assertions about the ways StockX "does not appear" to engage in coring and how StockX's management of buyer and seller interactions "might cause consumer trust to go down."  *See* Kammel Rebuttal pp. 16-25.  Prof. Kammel is not qualified to opine on coring, its implementation, or the design of StockX's resale

---

[11] Coring refers to the ability of marketplaces to actively manage and maintain buyer and seller interactions.  Dr. Tucker opines that "[a] platform acts as a 'core' for these interactions by adopting technology, policies, and procedures that facilitate the interaction taking place, build trust in the interaction, and provide incentives for interactions to stay on the platform."  *See* Ford Decl. Ex. Q, Expert Report of Catherine Tucker pp. 13-14, n.37.  Dr. Tucker further provides examples of the ways in which StockX does this.  *Id.*

marketplace; these opinions should be excluded.  *See Playtex Prod., Inc. v. Procter & Gamble Co.*, 2003 WL 21242769, at *10-11 (S.D.N.Y. May 28, 2003), *aff'd*, 126 F. App'x 32 (2d Cir. 2005) (excluding testimony where expert "lack[ed] specialized knowledge").

Prof. Kammel's testimony concerning marketplace design also lacks any reliable methodology.  Prof. Kammel did not "survey [any] e-commerce platform practices" to reach her conclusions in this case.  Kammel Tr. 134:12-15.  Instead—despite admittedly lacking expertise in platform economics or the design or operation of resale marketplaces—Prof. Kammel makes speculative assertions regarding StockX's website and how its structure and representations relate to counterfeit sales.  *See, e.g.*, Kammel Rep. p. 25.  These assertions are not grounded in any methodology beyond *ipse dixit* that should be excluded.[12]  *See Adkins v. Morgan Stanley*, 307 F.R.D. 119, 149 (S.D.N.Y. 2015) (Caproni, J.), *aff'd*, 656 F. App'x 555 (2d Cir. 2016) (excluding "ipse dixit" opinion where expert "conducted neither a scientific study nor a qualitive comparison with meaningful benchmarks").

### E.    Prof. Kammel's New Factual Evidence Should Be Excluded.

Prof. Kammel's testimony on the prevalence of manufacturing defects in certain sneaker styles (which relates to the difficulty of identifying counterfeits), and Nike's belated identification of counterfeit sneakers should be excluded because Prof. Kammel lacks the necessary expertise to offer this information and is providing fact testimony masquerading as expert opinion.  *See id.*  Prof. Kammel relays statements by a Nike employee about three alleged counterfeits that Nike did not identify at any time during discovery.[13]  She offers no opinions

---

[12] To the extent Prof. Kammel's critique is that StockX's experts' assessment of the facts is inaccurate, *see e.g.*, Kammel Rebuttal pp. 16-20, 22-25, Prof. Kammel's opinions should be excluded as usurping the role of the trier of fact.  *See Red Hawk, LLC v. Colorforms Brand LLC*, 638 F. Supp. 3d 375 (S.D.N.Y. 2022) (citing *Nimely*, 414 F.3d at 397 (experts may not "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it.").

[13] Pursuant to Individual Rule 4(g), StockX now seeks to exclude Prof. Kammel's expert testimony on this evidence.  StockX reserves the right to file a motion *in limine* seeking to exclude any related factual evidence that Nike may

about these shoes; she merely states Nike's findings.  *See, e.g.*, Kammel Rebuttal pp. 14-16.

Prof. Kammel is not an expert on the sneaker industry and has no formal education related to the sneaker industry; her *only* experience studying or working with a sneakerhead outside of this case is her experience working with "one student," a "self declared sneakerhead"; she has no experience examining sneakers to determine whether or not they are counterfeit. Kammel Tr. 51:14-16, 52:10-20, 91:04-14; *see also United States v. Cruz*, 363 F.3d 187, 194 (2d Cir. 2004) ("[C]ourts . . . must be ever vigilant against expert testimony that could stray from the scope of a witness' expertise.").  Further, having failed to produce this evidence during fact discovery, Nike should not be permitted to add it now under the pretense of expert opinion.  *See Adkins*, 307 F.R.D. at 149; *In re AXA Equitable Life Ins. Co. COI Litig.*, 595 F. Supp. 3d 196, 251-52 (S.D.N.Y. 2022), *on recons. in part*, 2022 WL 3018104 (S.D.N.Y. July 29, 2022) (excluding expert testimony relying on undisclosed evidence responsive to discovery requests).

## IV.    Steven McNew's Testimony Is Unreliable and Should be Excluded.

Mr. McNew seeks to testify about three topics: (1) consumers' perception of Vault NFTs, including how consumers understood StockX's representations concerning Vault NFTs, valued the Vault NFTs, and reacted to the launch of Vault NFTs; (2) whether StockX's product design decisions, including the selection of imagery and the relationship between Vault NFTs and the blockchain, aligned with industry standards; and (3) how a comparison of the single highest sale price for each Nike Vault NFT to the single highest sale price of the corresponding physical sneaker over a two-week period demonstrates consumers' perceptions of the value of Vault NFTs.[14]  Mr. McNew has no reliable methodology for any of the opinions he seeks to offer.

---

seek to admit at trial because Nike failed to disclose any facts or documents related to these alleged counterfeits, despite such evidence being responsive to numerous StockX discovery requests.

[14] *See* Ford Decl. Ex. I, Expert Report of Steven S. McNew ("McNew Rep."); Ex. J, Expert Rebuttal Report of Steven S. McNew ("McNew Rebuttal"); Ex. K, Transcript of the Deposition of Steven S. McNew ("McNew Tr.").

A.      **Mr. McNew Offers Opinions About Consumer Perception Without Knowing What Consumers Saw or Thought.**

Mr. McNew seeks to tell the jury a variety of things that consumers "appear to have understood" or "believed" or "perceived" about StockX's Vault NFTs—including how consumers understood StockX's representations about the Vault NFTs,[15] what value consumers ascribed to Vault NFTs,[16] and how consumers reacted to the launch of Vault NFTs[17]—but Mr. McNew *did not survey or speak to a single consumer* about the Vault NFTs.  *See, e.g.*, McNew Rep. pp. 30, 32, 38, 42, 62; McNew Tr. 78:15-81:22, 147:17-23.  Mr. McNew should not be permitted to offer the jury opinions about how consumers perceived the Vault NFTs when he did not conduct (indeed, has *never* conducted) consumer perception research.  *See* McNew Tr. 82:1-5, 121:8-22; *Otto v. LeMahieu*, 2021 WL 1615311, at *5 (N.D. Cal. Apr. 26, 2021) (excluding testimony based on cryptocurrency expert's "lack of knowledge" and lack of methodology apart from review of public materials and reliance on "general experiences").

Nor is Mr. McNew relying on any past experience to understand how consumers perceived the Vault NFTs: he has never designed or advised on the design of NFTs representing ownership of physical assets, like StockX's Vault NFTs.  McNew Tr. 80:11-24; 121:8-18.  Mr. McNew does not know whether anyone even *saw* the StockX representations that he claims led to consumers' expectations or beliefs.[18]  *Id*. at 43:1-44:1, 144:4-145:2, 192:16-193:6, 204:19-207:16, 207:22-208:12.  All Mr. McNew did was review a limited number of websites, social media posts, internal StockX documents, and testimony, but even when reviewing those

---

[15] McNew Rep. pp. 30, 32; McNew Rebuttal p. 13.

[16] McNew Rep. pp. 25, 30, 32, 38, 49-50; McNew Rebuttal pp. 3, 13-23; McNew Tr. 281:17-20.

[17] McNew Rep. pp. 45, 56, 61-62.

[18] Mr. McNew knows this is an unreliable methodology: he has directly criticized experts who tried to do the same. Ford Decl. Ex. R, Expert Report of Steven McNew in *Fabian v. Nano* (criticizing consumer perception opinions from expert who "ha[d] not surveyed or even spoken with [consumers], nor reviewed any such surveys administered by anyone else," and rejecting conclusion "that all [consumers] read and relied upon the same information [a]s not credible," where the expert "did not survey [consumers] as to what they read and relied upon").

materials, he had no "formulaic approach here that has measured weights and balances."

McNew Tr. 157:20-158:6; McNew Rep. p. 1; *see Price v. L'Oréal USA, Inc.*, 2020 WL 4937464,

at *4 (S.D.N.Y. Aug. 24, 2020) (excluding consumer perception testimony where expert did not

"have any experience from which he c[ould] opine on consumer knowledge" and relied instead

on Google searches and Defendant's documents and testimony).  Without an "objective

methodology" to support the "selection or weighing" of data, however, McNew's consumer

perception opinions are "arbitrary."  *Percoco*, 2018 WL 879499, at *4; *see also LVL XIII*

*Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 644-46 (S.D.N.Y. 2016)

(excluding expert who had not "identified any standards controlling the application" of

methodology used to opine on consumer perception).

Ultimately, Mr. McNew seeks to offer his own beliefs about the Vault NFTs based on an

incomplete review of the record.  For example, Mr. McNew could not say for certain whether he

reviewed all of StockX's Help and FAQ pages on the Vault NFTs, and could not recall whether

he had reviewed multiple StockX FAQ pages that were not included in his Materials Considered.

McNew Tr. 253:21-255:12.  When shown a document containing an extensive set of StockX's

public statements about Vault NFTs, Mr. McNew testified that it did not look familiar and could

not recall whether he saw those statements in the materials he did review.  *Id.* at 259:17-265:2.

Mr. McNew cannot reliably opine broadly about consumers' perceptions or understanding when

he does not know what anyone but himself saw or thought.  *See Sec. & Exch. Comm'n v. Ripple*

*Labs, Inc.*, 2023 WL 5670711, at *5 (S.D.N.Y. Mar. 6, 2023) (excluding testimony on

cryptocurrency purchasers' perceptions and behaviors from expert who did not speak to any

purchasers and relied only on past experience); *Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*,

2020 WL 1322856, at *7-8 (S.D.N.Y. Mar. 20, 2020) (Caproni, J.), *on recons. in part*, 2020 WL

2765044 (S.D.N.Y. May 28, 2020) (excluding opinion about what "market participants" would

find "important" based solely on anecdotal familiarity with market).

    **B.**    **Mr. McNew's "Industry Standards" Opinions Have No Underlying Methodology, Standards, or Benchmarks.**

    Mr. McNew seeks to offer a variety of opinions about the design and implementation of

StockX's Vault NFTs, but has no methodology for evaluating any of the design decisions he

critiques. Mr. McNew simply presents facts about how StockX designed and implemented the

Vault NFT imagery,[19] underlying technology,[20] and functionality,[21] and then offers conclusory

opinions about whether StockX's decisions were consistent with "industry standards." McNew

Rep. p. 43. But Mr. McNew did no specific analysis to support any of these opinions or define

the purported industry standards he was evaluating: he offered no benchmarks for appropriate or

inappropriate NFT product design, nor study of competitors' NFT offerings that would inform

any quantitative comparison. McNew Tr. 220:3-4 ("I didn't evaluate deeply any other NFT

platforms or projects."). When asked to explain industry practices, all Mr. McNew could say

was that he "generally considered" StockX's offering to those of unnamed and undescribed

"other NFT companies, platforms, and projects." *Id.* at 244:1-8; *see Adkins*, 307 F.R.D. at 149

(criticizing expert whose analysis "lacks any benchmarks or comparators" and "conducted

neither a scientific study nor a qualitative comparison with meaningful benchmarks"). This kind

of unconstrained, untestable opinion is not reliable. *Id.* (noting that, without a reliable

methodology, expert testimony should be excluded "irrespective of the validity or invalidity of

[the] conclusion"); *see also Donnelly v. Ford Motor Co.*, 80 F. Supp. 2d 45, 50 (E.D.N.Y. 1999)

(excluding expert who "does not identify any specific technique or method that he used, and cites

---

[19] McNew Rep. pp. 11, 25, 38-40, 61; McNew Rebuttal pp. 5-6, 9-11.
[20] McNew Rep. pp. 3, 8, 22-25, 43-49, 61-62; McNew Rebuttal pp. 3-4.
[21] McNew Rep. pp.7, 25-35, 51-54, 56, 58-62; McNew Rebuttal pp. 9-20.

no industry standards, surveys, or studies upon which he relied").

    **C.**    **Mr. McNew's Novel "Comparative Pricing Analysis" Is Not Reliable.**

    Mr. McNew offers a "comparative price analysis" to opine that "StockX customers and StockX employees clearly perceived the Vault NFT as independent and distinct from the underlying physical item." *See* McNew Rep., pp. 49-51. When asked how he ordinarily analyzes NFT value, Mr. McNew explained that he would do "a ton of data collection . . . related to its trading history, trading patterns, identifying comparables . . . there's a whole multitude of variables that come into that sort of valuation." McNew Tr. 114:22-115:15. But Mr. McNew did none of that here: he looked at only *one* data point—the difference between each Vault NFT's highest sale price and the highest sale price of the associated sneaker over a two-week period. *Id.* at 319:16-23 ("Q. Other than doing the subtraction . . . was there any other analysis you performed of either the NFT or non-NFT prices . . .?  A. I think that was the most notable effort." (Objection omitted)). Mr. McNew has never before used this methodology, and offers no argument it is generally accepted. *Id.* at 305:19-306:8; *see id.*, 302:24-303:3 ("I'm not an economist, so if [comparative price analysis is] a term of art, I'm unaware."); *Davis v. Carroll*, 937 F. Supp. 2d 390, 415 (S.D.N.Y. 2013) ("[W]hen presented with a novel methodology . . . courts must conduct with particular care their Rule 702 inquiry into reliability.").

    With just his one data point, and without doing anything to determine whether those maximum prices were reliable indicators of broader consumer perception, Mr. McNew seeks to tell the jury that *all* Vault NFT purchasers "clearly perceived the Vault NFT as independent and distinct from the underlying physical item." McNew Rep. pp. 49-51; *see also* McNew Tr. 308:1-10, 317:7-319:9. When asked to explain how his methodology supported his conclusions, Mr. McNew testified that it "seems illogical" prices would be so high, and that "it's reasonable to believe" consumers thought scarcity meant value. *Id.* at 284:1-12; 329:6-17. But opinions based

on alleged "common sense" or "simple logic" are not expert testimony, and "if the jury needs expert opinion because common sense will not suffice, it must come from an expert who is applying her expertise." *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396, 484 (S.D.N.Y. 2016); *see also Algarin v. New York City Dep't of Corr.*, 460 F. Supp. 2d 469, 477 (S.D.N.Y. 2015) (excluding expert whose conclusions were "not the product of the application of any analytic method" aside from "personal experience" and "allusions to 'common sense'"). Mr. McNew has no relevant expertise or experience to offer, especially not in connection with a "comparative price analysis"—a term he could not even define when asked.

## V.    Itamar Simonson's Survey and Marketing Opinions Should Be Excluded.

### A.    Dr. Simonson's Surveys Do Not Reliably Measure Confusion.

StockX is a resale marketplace for previously owned products, including Nike sneakers. This is not a standard trademark infringement case, where different companies are offering products using similar trademarks that may or may not be confusing to consumers. Here, StockX is facilitating the resale of Nike shoes by third parties; to describe and depict those shoes, StockX's Vault NFTs necessarily use Nike's trademarks. It is undisputed that StockX can use Nike's trademarks in this manner in the ordinary resale context under the well-established first sale and fair use doctrines, which permit the owner of a product to use trademarks to describe a product accurately when reselling it. Nike's contention in this case is that those doctrines somehow no longer apply when an NFT is used to represent ownership of physical shoes.

### 1.    Dr. Simonson's Surveys Failed to Account for the Resale Context.

Despite these factual circumstances, Dr. Simonson conducted his surveys using a methodology, commonly called *Eveready*, designed to determine in a standard trademark case whether a respondent seeing the defendant's product mistakenly believes it came from the plaintiff. *See Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366 (7th Cir. 1976); Simonson

Tr. 65:19-68:16.[22]  The problem with using that methodology in this case is that, in the resale

context that StockX provides, Nike's trademarks are used by StockX to show consumers a Nike

product.  The Vault NFTs provide proof of ownership of the Nike shoes purchased on StockX, so

Nike trademarks appear on the Vault NFT product page that Dr. Simonson's survey respondents

saw.  Simonson Rep. ¶ 52.[23]  By contrast, in a standard trademark case, *Eveready* survey

respondents are *not* shown the plaintiff's product or trademarks when they are asked who offers

the allegedly infringing product.  Simonson Tr. 67:12-13.

Here, however, Dr. Simonson showed respondents one of StockX's Vault NFT product

pages, which contains a picture of a Nike shoe, asked them who offered that product, and then

said respondents were confused if they answered "Nike."  Specifically, while showing his test

group a StockX Vault NFT containing an image of a Nike shoe and multiple Nike trademarks,

Dr. Simonson told them to "consider . . . *one of the shoes* . . . that is available for you to buy as a

NFT" (emphasis added), and then asked them "[w]hich company(ies) or brand(s) offer(s) the

product / NFT shown on the screen?"  *Id.* ¶¶ 52, 56.  If a test group respondent was considering

"the shoes" as Dr. Simonson instructed, and answered that "Nike" offers the shoes they saw, they

would be giving an accurate answer: they correctly identified a Nike shoe as having been offered

by Nike.  Dr. Simonson, however, thinks those consumers are confused.

Further, Dr. Simonson's survey did not explain that StockX was a resale marketplace,

that the shoes associated with Vault NFTs were being resold, or that the first sale doctrine

permits resellers to use trademarks to accurately depict or describe products being resold.  *See*

Simonson Rep. Ex. D; Simonson Tr. 272:18-22.  Dr. Simonson cannot determine whether his

respondents simply have a "mistaken belief" that the company offering to resell a product (here,

---

[22] Ford Decl. Ex. N, Transcript of the Deposition of Itamar Simonson ("Simonson Dep.").
[23] Ford Decl. Ex. L, Expert Report of Dr. Itamar Simonson ("Simonson Rep.").

StockX) "require[s] permission from the owner" of the product's trademarks (here, Nike). *Jack Daniel's Properties, Inc. v. VIP Prods. LLC*, 599 U.S. 140, 163-64 (2023) (Sotomayor, J., concurring) (in context of parody defense to trademark infringement, cautioning against treating survey respondents' "misunderstanding of the legal framework as evidence of consumer confusion"); *see also Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 340 F. Supp. 2d 415, 445 (S.D.N.Y. 2004), *aff'd in part, vacated in part*, 454 F.3d 108 (2d Cir. 2006) (noting that courts have rejected survey questions that "improperly ask respondents for a legal conclusion").

Dr. Simonson was well aware of the problems with using an *Eveready* survey in the context of a secondary marketplace, yet did nothing to control for them in this case. Dr. Simonson previously served as an expert on behalf of a defendant who operated an online secondary marketplace for resold cosmetics in a trademark infringement suit brought by Mary Kay. Dr. Simonson argued that "it is doubtful that any consumer survey could provide pertinent evidence" of confusion, because "legal matters (with which consumers are unfamiliar) determine whether it is permitted to sell previously sold [] products."[24] Dr. Simonson suggested that a survey would likely have to "explain to respondents the First Sale Doctrine" to even potentially overcome these issues. *Id.* Dr. Simonson provided no such explanation in his surveys in this case. Simonson Tr. 263:19-22; 272:15-17.

As there is no way to know whether Dr. Simonson's respondents were confused about the law or about who offered Vault NFTs, whatever limited probative value Dr. Simonson's surveys offer is entirely outweighed by the potential for unfair prejudice. *See, e.g.*, *Kargo Glob., Inc. v. Advance Mag. Publ'rs, Inc.*, 2007 WL 2258688, at *12 (S.D.N.Y. Aug. 6, 2007) (excluding likelihood-of-confusion survey when "its probative value is substantially outweighed by the risk

---

[24] Ford Decl. Ex. S, Expert Report of Dr. Itamar Simonson in *Mary Kay v. Weber*, 2009 WL 361055, at *7, n.4 (N.D. Tex. Jan. 5, 2009).

of unfair prejudice and the potential that the jury will be misled or confused" (collecting cases)).

### 2. Dr. Simonson's Surveys Were Methodologically Flawed.

Dr. Simonson's surveys are also not reliable. A survey should have "a properly-defined universe," questions that are not "ambiguous and leading," and data that is "accurately reported and analyzed." *Edmondson v. RCI Hosp. Holdings, Inc.*, 2020 WL 1503452, at *6 (S.D.N.Y. Mar. 30, 2020) (excluding survey with "undefined and ambiguous terms" and non-representative stimuli). Dr. Simonson's survey lacks all of these features.

Dr. Simonson did not survey the proper universe, which he concedes is likely purchasers of StockX's Vault NFTs representing ownership of a collectible shoe.[25] Simonson Tr. 72:05-17 (proper universe was respondents "more likely than most people to consider buying an NFT offered by StockX . . . [e]specially sneakers"). Dr. Simonson allowed respondents to participate in his surveys *even if they were not likely purchasers of NFTs* and, instead, merely indicated they would consider buying *any* collectibles or *any* cryptocurrencies. *Id*. at Ex. D p. 3 (Q75). As Dr. Simonson admits, it is impossible to know whether even *one* respondent in either of his surveys was willing to purchase collectible sneakers and NFTs. Simonson Tr. 163:24-164:3; *see Capri Sun GmbH v. Am. Bev. Corp.*, 595 F. Supp. 3d 83 (S.D.N.Y. 2022) (when "the wrong [universe is surveyed], the results are likely to be irrelevant.").

Dr. Simonson also showed respondents made-up stimuli and asked leading questions. Dr. Simonson created a fictitious product lineup, showing pictures of seven physical products (including the shoe only his test respondents saw as a Vault NFT), and told respondents "[b]elow are some of the *products* StockX offers on its website." *See* Simonson Rep. ¶ 50 (emphasis added). Having primed respondents to think the shoe is the "product," without otherwise

---

[25] *See also* William G. Barber & Giulio E. Yaquinto, *The Universe* in *Trademark & Deceptive Advertising Surveys* pp. 32-33 (Shari Seidman Diamond & Jerre B. Swann, ABA 2d ed. 2022).

defining what he meant by that term, Dr. Simonson then showed his test group a Vault NFT and asked: "[w]hich company(ies) or brand(s) offers the *product*/NFT shown on the screen."  *Id.* at ¶ 56 (emphasis added).  Answering "Nike" to that question would simply be accurately telling Dr. Simonson that Nike made the shoe—yet Dr. Simonson coded those responses as confused.  *See Kargo Glob., Inc. v. Advance Mag. Publ'rs, Inc.*, 2007 WL 2258688, at *7 (S.D.N.Y. Aug. 6, 2007) (excluding "impermissibly leading" survey that also "fail[ed] to approximate real world conditions" and used "improper and unrepresentative stimuli").

After asking the wrong population leading questions, Dr. Simonson then performed a flawed analysis of the results.  After completing his surveys, Dr. Simonson decided to ignore some of his data: he simply did not take some of the responses he collected into account when calculating confusion.[26]  Simonson Tr. 179:8-13.  This is not the first time Dr. Simonson has decided to collect and then ignore data: his testimony was deemed "unreliable" and excluded "insofar as Simonson improperly authorized himself to decide whether or not to include a particular set of data after he discovered how that data would affect his overall results."  *Oracle Am., Inc. v. Google Inc.*, 2016 WL 1743116, at *10 (N.D. Cal. May 2, 2016).

**B.    Dr. Simonson's "Brand Extension" Opinions Are Irrelevant and Prejudicial.**

Dr. Simonson also offers the opinion that the StockX's marketing of the Vault NFTs shows that they are an "unauthorized" Nike "brand extension," which he defines as a use of the Nike brand in connection with a new product category.  Simonson Rebuttal ¶¶ 3, 6.[27]  But whether or not the Vault NFTs are a "brand extension" makes no difference in this case.  The legal test for Nike's trademark claim is likelihood of confusion.  15 U.S.C. § 1125(a)(1)(A); *see*

---

[26] Nor was this error harmless: StockX expert Dr. David Neal calculated that had Dr. Simonson accounted for all of the data he collected, his net confusion rate would be *only 8.7%*, which is not indicative of a likelihood of confusion. *See* Ford Decl. Ex. T, Expert Rebuttal Report of David Neal, Ph.D. §§ 4.5.5-4.5.7.
[27] Ford Decl. Ex. M, Expert Rebuttal Report of Itamar Simonson ("Simonson Rebuttal").

*also Polaroid Cop. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961).  Dr. Simonson

could not explain how the Vault NFTs being a brand extension would be relevant to consumer

confusion.  Simonson Tr. 40:20-24 ("I don't -- I haven't thought about that. *I don't know that it

is.*" (emphasis added)).  Nor are Simonson's opinions regarding brand extensions relevant to

damages.  *Id.* at 41:4-19, 42:22-43:1 ("I'm not the damages person here. Didn't quantify, didn't

offer.").  His opinion is accordingly irrelevant and would only prejudice StockX by presenting

the jury with an alternative theory of liability that is not part of any of Nike's claims; it should be

excluded accordingly.  *See Conti v. Doe*, 2020 WL 6162104, at *18-19, 31 (S.D.N.Y. Oct. 21,

2020) (Caproni, J.) (excluding experts' opinions for irrelevance).

Dr. Simonson's discussion of brand extensions is also inadmissible because it is premised

on the idea that StockX's actions were an "unauthorized extension of the Nike brand," going on

to opine that StockX created various "risks" to Nike by launching the Vault NFTs without Nike's

approval.  *See, e.g.*, Simonson Rebuttal ¶¶ 2, 3, 6, 11, 19, 20.  This is a legal conclusion, not an

opinion.  Whether or not StockX needed Nike's approval for the Vault NFTs is the legal question

at issue in this litigation; Dr. Simonson's opinion *assumes* Nike's approval was required and that

the Vault NFTs were somehow "unauthorized."  In doing so, Dr. Simonson inappropriately seeks

to offer testimony about legal conclusions and their consequences.  *See In re Navidea Biopharm.

Litig.*, 2022 WL 16833587, at *6 (S.D.N.Y. Nov. 9, 2022) (Caproni, J.) ("[W]hile an expert may

opine on an issue of fact within the jury's province, an expert may not give testimony stating

ultimate legal conclusions based on those facts." (internal quotation marks omitted)); *accord

United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991).

## CONCLUSION

The Court should exclude John Hansen, Jeffery Stec, Kari Kammel, and Steven McNew in full, and exclude Itamar Simonson's surveys and marketing opinions.

Dated:        October 13, 2023
              New York, New York

By: /s/ *Megan K. Bannigan*
DEBEVOISE & PLIMPTON LLP
Megan K. Bannigan (mkbannigan@debevoise.com)
David H. Bernstein (dhbernstein@debevoise.com)
Jyotin Hamid (jhamid@debevoise.com)
Carl Riehl (criehl@debevoise.com)
Justin C. Ferrone (jferrone@debevoise.com)
Kathryn C. Saba (ksaba@debevoise.com)
66 Hudson Boulevard
New York, New York 10001
(212) 909-6000

Christopher S. Ford (csford@debevoise.com)
650 California Street
San Francisco, California 94108
(415) 738-5700

KILPATRICK TOWNSEND & STOCKTON LLP
Robert N. Potter (rpotter@kilpatricktownsend.com)
Briggs Wright (briggs.wright@kilpatricktownsend.com)
1114 Avenue of the Americas
New York, New York 10036
(212) 775-8700

MORGANROTH & MORGANROTH PLLC
Jeffrey B. Morganroth (jmorganroth@morganrothlaw.com)
344 N. Old Woodward Ave., #200
Birmingham, MI 48075
(248) 864-4000

*Attorneys for Defendant StockX LLC*