# Exhibit 03

Redacted Public Version

1

2                  UNITED STATES DISTRICT COURT

         FOR THE SOUTHERN DISTRICT OF NEW YORK

3

4      NIKE, INC.                        )

                                         )

5               Plaintiff,               )

                                         )

6      vs.                               ) No.

                                         ) 1:22-cv-00983-VEC

7      STOCKX LLC,                        )

                                         )

8               Defendants.              )

9

10              The videotaped deposition of

11                    KARI KAMMEL

12      taken before JO ANN LOSOYA, CSR, RPR, CRR, pursuant

13      to the provisions to the taking of depositions at

14      444 West Lake Street, Chicago, Illinois commencing

15      at 9:45 a.m. on July 18, 2023.

16

17

18

19

20

21

22

23

24

25

Page 2

```
 1  PRESENT:
 2
       DLA PIPER LLP
 3     TAMAR DUVDEVANI
       MARC MILLER
 4     1251 Avenue of the Americas
       New York, New York 10020
 5     tamar.duvdevani@dlapiper.com
       marc.miller@dlapiper.com
 6        Appeared on behalf of Plaintiff.
 7
       DEBEVOISE & PLIMPTON LLP
 8     MEGAN K. BANNIGAN
       KATHRYN SABA
 9     919 Third Avenue
       New York, New York 10022
10     mkbannigan@debevoise.com
       ksaba@debevoise.com
11        Appeared on behalf of Defendants.
12  ALSO PRESENT:
13     KIM VAN VOORHIS,
       Nike, Inc.
14
15  VIDEOGRAPHER: Milo Savich
16  STENOGRAPHICALLY REPORTED BY:
    JO ANN LOSOYA, CSR, RPR, CRR
17  LICENSE #:  084-002437
18
19
20
21
22
23
24
25
```

Page 3

```
 1              EXAMINATION
 2  Witness                 Page   Line
 3  KARI KAMMEL
 4    By Ms. Bannigan          7    6
 5    By Ms. Duvdevani       300   15
 6    By Ms. Bannigan        310    5
 7
 8          ***************
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1            INDEX OF EXHIBITS
 2  EXHIBIT        DESCRIPTION        PAGE
 3  Exhibit 1  Expert Witness Report of Kari     5
 4       Kammel
 5  Exhibit 2  Rebuttal Expert Witness Report     5
 6       of Kari Kammel
 7  Exhibit 3  Expert Report of Robert L        140
 8       Vigil, Ph.D.
 9  Exhibit 4  Kari Kammel testimony before     148
10       the US Senate Judiciary
11       Committee for the hearing on
12       cleaning up online marketplaces
13  Exhibit 5  Nike Brand Protection            240
14       PowerPoint
15  Exhibit 6  Expert rebuttal report of        265
16       Richard Lamagna
17  Exhibit 7  StockX policy, STX0021481        307
18
19
20
21
22
23
24
25
```

Page 5

```
 1           (Deposition Exhibit 1 was marked
 2           for identification.)
 3           (Deposition Exhibit 2 was marked
 4           for identification.)
 5      THE VIDEOGRAPHER:  Good morning.  We are
 6  going on the record at 9:45 a.m. on July 18, 2023.
 7           Please note that the microphones are
 8  sensitive and may pick up whispering and private
 9  conversation.  Please mute your phones at this time.
10           Audio and video recording will
11  continue to take place unless all parties agree to
12  go off the record.
13           This is Media Unit No. 1 of the
14  video-recorded deposition of Kari Kammel taken by
15  counsel for defendant in the matter of Nike, Inc.,
16  versus StockX LLC.  This case is filed in the United
17  States District Court for the Southern District of
18  New York.  The Case Number is 1:22-cv-00983-VEC.
19  The location of this deposition is DLA Piper LLP,
20  444 West Lake Street, Suite 900, Chicago,
21  Illinois 60606.
22           My name is Milo Savich representing
23  Veritext and I am the videographer.  The court
24  reporter is JoAnn Losoya also from Veritext.
25           I am not authorized to administer an
```

2 (Pages 2 - 5)

Page 6

1  oath, I am not related to any party in this action,
2  nor am I financially interested in the outcome.
3       If there are any objections to the
4  proceeding, please state them at the time of your
5  appearance.
6       Counsel and all present, including
7  those participating remotely, will now please state
8  their appearances and affiliations for the record,
9  beginning with the noticing attorney.
10      MS. BANNIGAN:  Good morning.  Megan
11  Bannigan from Debevoise & Plimpton representing,
12  Defendant, StockX.  With me is my colleague from
13  Debevoise & Plimpton Kathryn Saba.
14      MS. DUVDEVANI:  Good morning.  Tamar
15  Duvdevani, DLA Piper, on behalf of Nike, Inc.  I'm
16  joined by my partner Marc Miller of my firm and by
17  Kim Van Voorhis, in-house counsel at Nike.
18      I'll note right now that it's
19  possible that Ms. Bannigan will be showing the
20  witness documents that have been designated as the
21  highest level of confidentiality that Kim cannot see
22  in which case she will simply step out of the room.
23      (Witness sworn at 9:48 a.m.)
24
25

Page 7

1  WHEREUPON:
2       KARI KAMMEL,
3  called as a witness herein, having been first duly
4  sworn, was examined and testified as follows:
5       E X A M I N A T I O N
6  BY MS. BANNIGAN:
7    Q.   Please state your name for the record.
8    A.   Kari Kammel.
9    Q.   Are you represented by DLA Piper for the
10  purposes of today's deposition?
11   A.   Yes.
12   Q.   And is there any reason why you can't
13  testify completely and truthfully today?
14   A.   No.
15   Q.   Are you taking any medication or
16  suffering from any medical or other physical
17  condition that would prevent you from testifying
18  completely and truthfully?
19   A.   No.
20   Q.   Those are all just standard deposition
21  questions.
22       Have you ever been deposed before?
23   A.   Yes.
24   Q.   How many times?
25   A.   Twice.

Page 8

1    Q.   And what were the circumstances of those
2  depositions -- withdraw that.
3       What were the cases in which you were
4  deposed?
5    A.   So they were two immigration cases that
6  were involving asylum and withholding and removal.
7    Q.   About how long ago were those
8  depositions?
9    A.   I don't remember the exact dates but one
10  of them was probably about eight or nine years ago
11  and the second one was probably about four or five
12  years ago.
13   Q.   Okay.  So I take it you're aware of the
14  rules of the deposition.  But I'll go over them
15  quickly just to make sure we understand each other.
16       So your testimony today is under
17  oath.  It's being taken down by a stenographer.  It
18  is being videoed and it may be read or played at
19  trial or used for other purposes relating to this
20  lawsuit.
21       Any questions about that?
22   A.   No.
23   Q.   Okay.  You're required, as I know you're
24  aware, to give truthful answers to my questions and
25  complete answers.

Page 9

1       Any issues with that?
2    A.   No.
3    Q.   Because the court reporter is taking down
4  your testimony, it's important that all of my
5  questions and your answers are verbalized.  So
6  please always give a spoken answer.  And I'll try my
7  best not to talk over you, you try your best not to
8  talk over me, and we'll work together for the
9  stenographer.
10       Does that work for you?
11   A.   Yes.
12   Q.   We can take regular breaks during the
13  deposition.  If at any time you need to take a
14  break, just let me know.  I'm happy to accommodate
15  that.  I just ask that you not request a break while
16  a question is pending, or I might have a couple of
17  questions and a certain line of questioning to
18  finish up and then I have no problem taking a break.
19  Okay.
20       If you don't understand a question I
21  ask, please just tell me and we'll see what we can
22  do.  Okay?
23   A.   Okay.
24   Q.   Thank you.
25       Have you ever served as an expert

3 (Pages 6 - 9)

Page 18

1    Q.    Were these ███████████████
███████████
3    A.    As I understand, part of them were, yeah.
4    Q.    Other than the training that you have
5    just discussed, ██████████████████████
████████████████
7    A.    So, ██████████████ in New York
8    in March of 2020, about a week before the pandemic
9    was in full force, and we were discussing A-CAPP
10   Center research as well.
11   Q.    Who did you meet with?
12   A.    From my recollection, █████████████
████████████████████████████████████
████████████████████████████████████
██████████████████████████████████
16   I don't remember their names.
17   Q.    What did you discuss at that meeting --
18   well, actually, withdraw.
19          What was the purpose of that meeting?
20   A.    So the purpose of that meeting was to
21   talk about A-CAPP Center research.  This is a type
22   of meeting that we hold often with different
23   organizations to talk about our research and our
24   research capacity and capability to do different
25   projects.

Page 19

1    Q.    Were you talking about specific research
2    at the time or your general capabilities?
3    A.    So we had talked about specific projects
4    that we had done in the past as well as our general
5    capabilities at the time.
6    Q.    And do you recall any of the substance of
7    what you talked about, what projects you talked
8    about?
9    A.    Not details but definitely around
10   trademark counterfeiting.
11   Q.    Do you recall which projects you
12   discussed?
13   A.    I don't.
14   Q.    Prior to this case, have you worked with
15   DLA Piper in any capacity ████████████████
██████████████
17   A.    No.
18   Q.    ██████████████████████████
████████████████████████████████████
████████████ have you worked with Nike or anyone from
21   Nike in any capacity?
22   A.    The only other thing that I can think of
23   is that we run a lot of events and a lot of
24   trainings that we send information out to the larger
25   brand protection communities, so I'm sure Nike

Page 20

1    employees have received those invitations.  I'm sure
2    I have also seen them at different
3    anti-counterfeiting conferences and things like that
4    but nothing specifically with them.  It was more of
5    general mailings and things like that.
6    Q.    ██████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████
11   A.    No.
12   Q.    How many times have you met ██████████
████████████████████████████████
██████████████████
15   A.    Perhaps two or three times.
16   Q.    ██████████████████████████████
██████████
18   A.    Correct.
19   Q.    What were the other times?
20   ██████████████████████████████████
████████████████████████████████████
████████████████████████████████
██████████████████████████████
████████████ because we usually try to get information
25   about audience and try to tailor our presentations

Page 21

1    appropriately.
2    Q.    Do you recall what they were interested
3    in?
4    A.    Again, there was a lot of interest about
5    the A-CAPP Center, which is pretty common.  Some
6    organizations know about us, some don't.  And then
7    just general trends about counterfeiting which,
8    again, is a pretty standard request.
9    Q.    To date, do you know how many hours you
10   have billed Nike for your work as an expert witness
11   on this case?
12   A.    I don't know off the top of my head, but
13   I want to say maybe between like 60 and 80.
14   Q.    Have you been paid -- do you know how
15   much you have been paid to date for your work?
16   A.    I don't know the exact amount but I'm
17   guessing it's probably around 50,000, $60,000.
18   Q.    Are you acting as an expert witness in
19   your personal capacity or on behalf of A-CAPP?
20   A.    So I'm acting as an expert witness based
21   on my position at A-CAPP, but not as -- not as a
22   representative of A-CAPP or Michigan State
23   University.
24   Q.    So you're being paid personally.  The
25   $50,000 is going directly to you, correct?

6 (Pages 18 - 21)

<table>
<tr><td>

Page 26

1 drafting this report?
2     A.   I had my assistant, her name is Sara
3 Heeg, help with footnotes and citations.
4     Q.   What's her last name?
5     A.   Heeg, H-E-E-G.
6     Q.   What is Ms. Heeg's role?  She's your
7 assistant obviously, but is that her official title?
8     A.   Yes.
9     Q.   Is she a full-time employee of A-CAPP?
10     A.   She is, yes.
11     Q.   Other than Ms. Heeg, is there anyone who
12 assisted you in your work on the report?
13     A.   No.
14     Q.   And when you say that Ms. Heeg assisted
15 you with footnotes and citations, what exactly do
16 you mean by that?
17     A.   She reviewed the footnotes and citations
18 to make sure when I have an initial citation to a
19 document, and there are later references to it, that
20 it's referring to the correct footnote.
21     Q.   So she cite-checked it essentially?
22     A.   She didn't cite-check with the actual
23 document but within the footnotes within the
24 document itself.  So if I'm referring to Footnote 2,
25 she's just making sure Footnote 2 includes that

</td><td>

Page 28

1 conversations with?
2     A.   With Kim, with Joe Pallett.
3     Q.   How many conversations did you have?
4     A.   I believe one or two.
5     Q.   Did you have any communications with any
6 of Nike's other expert witnesses in this case?
7     A.   No, I did not.
8     Q.   Did you conduct any surveys or specific
9 research in connection with your work on these
10 reports?
11     A.   No.
12     Q.   Okay.  So in the last page of Exhibit 1,
13 your affirmative report, one of the sources you
14 listed as materials considered was a call with
15 Barbara Delli Carpini on February 2, 2023; is that
16 correct?
17     A.   Yes.
18     Q.   Who was on that call with Ms. Delli
19 Carpini?
20     A.   From my recollection, she and I were both
21 on it, Tamar and Marc and Gabby were on it, and I
22 believe Kim was on it too.
23     Q.   Is February 2, 2023, the correct date of
24 that call?
25     A.   Yes.

</td></tr>
<tr><td>

Page 27

1 source.
2     Q.   Did she pull any sources for you?
3     A.   No.
4     Q.   So you pulled all of the sources
5 yourself?
6     A.   Yes, that's correct.
7     Q.   Did anyone provide any comments or edits
8 to you on the drafts?
9     A.   Yes, the DLA attorneys.
10     Q.   That is Marc and Tamar?
11     A.   That's correct.
12     Q.   Anyone else?
13     A.   Not that I'm aware of.
14     Q.   Did you receive any comments from Nike or
15 anybody at Nike on the drafts?
16     A.   We had conversations afterwards, just
17 about some clarification questions.  But I don't
18 remember edits at all from them on the drafts.
19     Q.   Okay.  So you had clarification questions
20 with representatives of Nike?
21     A.   Yes, that's correct.
22     Q.   This was before the draft was submitted?
23     A.   I think it was in between the draft and
24 the rebuttal.
25     Q.   And who from Nike did you have those

</td><td>

Page 29

1     Q.   About how long did the call last?
2     A.   I believe it was around 30 to 45 minutes.
3     Q.   Who initiated the call?
4     A.   I had requested to talk to someone from
5 the Nike brand protection team.
6     Q.   Why was that?
7     A.   To learn about information about their
8 brand protection strategies that I later referenced
9 in the report.
10     Q.   When you say "brand protection" --
11 withdraw that.
12         Did you ask to speak to anyone
13 specific or just a representative of Nike who was
14 aware of that information?
15     A.   No, no one specific.
16     Q.   What did you discuss with Mrs. -- or
17 Ms. Delli Carpini?
18         MS. DUVDEVANI:  I'm just going to -- this
19 gets tricky between work product and not work
20 product, but facts that you spoke with a Nike
21 employee about are not work product.  If you have
22 any question while you testify whether or not
23 something is work product, we can go off the record
24 and discuss it.  But generally, I'm assuming
25 Ms. Bannigan is going to ask you about the facts

</td></tr>
</table>

8 (Pages 26 - 29)

Page 30

1  that you discussed with Barbara, in which case you
2  can certainly answer those questions.
3  BY MS. BANNIGAN:
4      Q.   Did you discuss any legal strategy with
5  Ms. Delli Carpini on this call?
6      A.   No, I did not.
7      Q.   Was the entire call purely to learn facts
8  to help you in writing your report?
9      A.   Yes.  That's correct.
10     Q.   Okay.  What did you discuss with
11 Ms. Delli Carpini?
12     A.   What I discussed is outlined in my
13 report, which is questions about their brand
14 protection strategies.
15     Q.   Did you take any notes when you were on
16 the call?
17     A.   I did not.
18     Q.   How did you recall all the information
19 that you state in the report that you learned from
20 the call without taking notes?
21     A.   I wrote that directly into the report.
22     Q.   As you were speaking to Ms. Delli
23 Carpini?
24     A.   Yes, that's correct.
25     Q.   Did you make edits to that section at any

Page 31

1  point?
2      A.   Perhaps grammatical ones but not
3  substantive ones.
4      Q.   The cites -- the information that cite
5  the call with Ms. Delli Carpini was -- that portion
6  of your report was written in real time while you
7  were on the call with her?
8      A.   Yes, that's correct.
9      Q.   Did you confirm with anyone at Nike that
10 your recollections from this call were correct?
11     A.   I did not specifically, no.
12     Q.   Were there any facts that you learned on
13 that call that you did not add to your report?
14     A.   No.
15     Q.   So everything that Ms. Delli Carpini told
16 you, you input into this report?
17     A.   Yes, that's correct.
18     Q.   Let's look at Page 15 of your report.
19         In the last paragraph on this page,
20 you say ███████████████████████████████████
   ███████████████████████████████████████████████
   ███████████████████████████████████████
   ████████████████████████████████████████; is
25 that correct?

Page 32

1      A.   Yes, that's correct.
2      Q.   Is it accurate to conclude that you
3  ████████████████████████████████████████████████
   █████████
5      A.   Yes, that's correct.
6      Q.   Do you know what Ms. Delli Carpini's
7  basis for asserting that ████████████████████
   ███████████████████████████████████████████████
   ████████████████████
10     A.   Can you repeat the question?
11     Q.   That was a bad question.  Thank you.
12         Do you know what Ms. Delli Carpini's
13 basis for asserting these facts were?
14     A.   I believe her basis was her experience in
15 her role at Nike.
16     Q.   Did you ask her for any underlying facts?
17     A.   I did not.
18     Q.   Did Ms. Delli Carpini tell you that
19 ███████████████████████████████████████████████
   ██████████████████████████████████████
   ███████████████████████████████████████████████
22     A.   So she told me what is in this sentence
23 which is that ███████████████████████████████
   ███████████████████████████████████████████████
   █████████████████████████████████████

Page 33

1  ██████████████████████████
2      Q.   You also mentioned that you reviewed
3  Ms. Delli Carpini's videotaped deposition, correct?
4      A.   No, I reviewed her deposition transcript.
5      Q.   Okay.  And did you review the entire
6  transcript or just portions?
7      A.   I did review the entire transcript.
8      Q.   Did you ask her any questions about her
9  deposition testimony?
10     A.   No, I did not.
11     Q.   Did you confirm any of the things that
12 Ms. Delli Carpini told you with any other sources?
13         MS. DUVDEVANI:  Objection.
14 BY THE WITNESS:
15     A.   No.
16         MS. DUVDEVANI:  Go ahead.
17 BY THE WITNESS:
18     A.   No, I did not.
19         MS. BANNIGAN:  What's the basis of your
20 objection?
21         MS. DUVDEVANI:  Vague.
22 BY MS. BANNIGAN:
23     Q.   Let's look at Exhibit 2 of your report,
24 your rebuttal report.
25         Here on the last page, flipping to

9 (Pages 30 - 33)

Page 34

1 the last page, you mention that you had two
2 conversations with Mr. Pallett from Nike, one on
3 May 31, 2023, and one on June 1, 2023; is that
4 accurate?
5     A.   Yes.
6     Q.   Are the dates of those calls correct?
7     A.   Yes.
8     Q.   Did you request to speak with
9 Mr. Pallett?
10     A.   Yes.
11     Q.   Why?
12     A.   I did not request him specifically but I
13 asked to speak to someone about authentication.
14     Q.   Had you ever spoken to Mr. Pallett other
15 than these two calls?
16     A.   No.
17     Q.   You mentioned earlier that you had
18 conversations with Nike about your report, you
19 thought that was in between the affirmative report
20 and the rebuttal report.  Are these the
21 conversations you are referring to or are there
22 other conversations?
23     A.   No, these are the ones I was referring
24 to.
25     Q.   Okay.  Other than these two

Page 35

1 conversations, did you have any conversations with
2 anyone from Nike about the substance in your report?
3     A.   No.
4     Q.   Let's start with the May 31 call.
5         Who was on that call?
6     A.   So I believe it was Joe Pallett and Kim
7 and Marc and Tamar and Gabby.
8     Q.   How long was the call?
9     A.   Again, I believe it was probably about
10 30 minutes.
11     Q.   Do you recall --
12     A.   Sorry.
13     Q.   Do you recall how long it was?
14     A.   I don't know exactly.  It was probably
15 around 30 minutes.
16     Q.   What did you discuss on the call?
17     A.   I don't remember exactly for this but I
18 did reference it in my report, in my rebuttal
19 report.
20     Q.   Let's look at, to make it easier for you,
21 Footnote 95 of your rebuttal report, Exhibit 2.
22         Does this help refresh your
23 recollection of what you discussed with Mr. Pallett
24 on May 31?
25     A.   Yes, that's correct.  We had talked

Page 36

1 about -- we had spoken about the Zadeh Kicks
2 organization, or case, and some of the shoes that
3 were involved in that.
4     Q.   Why did you speak with Mr. Pallett about
5 the Zadeh Kicks case or shoes?
6     A.   So that was to know if Nike had confirmed
7 that any shoes that were sold by StockX were
8 counterfeit and not authentic.
9     Q.   When you say "to know if Nike had
10 confirmed that any shoes that were sold by StockX
11 were counterfeit and not authentic," any shoes that
12 were sold to Zadeh or any shoes at all or what
13 exactly do you mean by that?
14     A.   I believe I had asked a general question
15 and these were some of the examples that they
16 shared.
17     Q.   When you say reviewed the set of emails
18 and images, how did you get the set of emails and
19 images?
20     A.   I got those from the Nike lawyers.
21     Q.   Prior to your call with Mr. Pallett?
22     A.   I believe I received them either during
23 the call or after the call.
24     Q.   Okay.  And did you -- so what did you
25 learn from Mr. Pallett?

Page 37

1     A.   The details of which are outlined in this
2 section.
3     Q.   What did you learn specifically about
4 whether if Nike had confirmed that any shoes were
5 sold by StockX that were counterfeit and not
6 authentic?
7     A.   That they had confirmed that some of --
8 some of the shoes that were supposedly genuine but
9 described as being defective Nike products were
10 indeed counterfeit.
11     Q.   Prior to this time, were you aware of any
12 other allegations that Nike had allegedly discovered
13 counterfeit shoes being sold at Nike?
14         MS. DUVDEVANI:  Objection.
15         MS. BANNIGAN:  Excuse me.  Obviously that
16 was wrong.  Withdraw that question.
17 BY MS. BANNIGAN:
18     Q.   Prior to this time, were you aware of any
19 other allegations that Nike had allegedly discovered
20 counterfeit shoes being sold through StockX?
21     A.   So, yes, in the documents that I reviewed
22 for my initial report.
23     Q.   Okay.  So what was the purpose of going
24 back to Mr. Pallett here?
25     A.   To ask if there were any specific ones

10 (Pages 34 - 37)

Page 38
1  that I could review and learn about.
2      Q.  Were you looking for a certain scenario
3  of how counterfeits were identified?  Were you
4  looking for any counterfeit that was identified?
5  Like what?  You know, help me understand what you
6  were looking for here.
7      A.  So in this -- so in this conversation, I
8  was interested in manufacturing defects.
9  Specifically, if you will note on Page 13, there
10  were a lot of examples that I had read in emails
11  about StockX employees responding to consumer
12  complaints of potential fake or counterfeit shoes,
13  and the responses in many of these cases that I saw
14  over and over again was that there were manufacturer
15  flaws, they were quality issues by Nike,
16  imperfections, manufacturing variances, those type
17  of things.
18          So I did want to ask him as well
19  about whether this was standard for these shoes, are
20  there manufacturing variances for these shoes, and
21  he confirmed that, ███████████████████████
███████████████████████████████████
█████████████████████████████████████
██████████████████████.
25      Q.  Mr. Pallett's statement was there were

Page 39
1  ████████████████████████████████
███████
3          MS. DUVDEVANI:  Objection.
4  BY THE WITNESS:
5      A.  So there were three shoes on here, ████
████████████████████████████████████s.
7      Q.  Got it.
8      A.  So he claimed that Nike does not have
9  ██████████████████████████████████
10      Q.  Did he mention ████████████████
████████████████
12      A.  No.
13      Q.  Did you ask if ███████████████████
███████████████████████████
15      A.  I asked about these specific shoes, and
16  he had told me ████████████████████████████
██████
18      Q.  Okay.  Spanning the entire time of their
19  release?
20      A.  Yes.
21      Q.  Did he show you -- withdraw.
22          Did he provide you any documentation
23  or any other information about what the basis of his
24  statements ████████████ was?
25      A.  No.

Page 40
1      Q.  Or work?
2      A.  So no, but he did tell me that Nike's
3  manufacturing policies are confidential.
4      Q.  So he didn't tell you what the
5  manufacturing policies were because they're
6  confidential?
7      A.  Correct.
8      Q.  Was there certain information that you
9  were looking for that he didn't tell you because the
10  information was confidential?
11      A.  No.
12      Q.  How did it come up that the
13  manufacturing -- withdraw.
14          What was the import of the statement
15  that the manufacturing policies are confidential?
16      A.  So the important part about that
17  statement is as I was reviewing the emails by
18  StockX, the employees were stating as if it was well
19  known that Nike had these manufacturing defects and
20  this was something that was well known.  So if
21  manufacturing policies are not public, that leads me
22  to think that they were -- they were just stating
23  something that they have nothing -- nothing to back
24  up on, to back up what they're saying to their
25  consumers when they're complaining about counterfeit

Page 41
1  goods.
2      Q.  Okay.  So back to -- you mentioned that
3  Mr. Pallett told you about shoes that he had
4  attempted to authenticate and determined were
5  counterfeit; is that correct?
6      A.  Yes, I believe it was -- it was him or
7  someone from his team.
8      Q.  Okay.  And do you know the circumstances
9  under which he or someone from his team
10  authenticated those shoes?
11      A.  Yes.  So, I reference that on Page 16.
12  So it's my understanding that they ████████████
██████████████████████████████████████████
14  were able to use their proprietary system in order
15  to determine that those shoes were indeed
16  counterfeit.
17      Q.  Did you request that Mr. Pallett or his
18  team conduct this analysis?
19      A.  No.
20      Q.  Do you know when the analysis occurred?
21  And by "analysis," I mean, the authentication
22  process that Mr. Pallett or his team conducted.
23      A.  No, I don't know exactly.
24      Q.  To confirm, you don't know who conducted
25  the authentication, correct?

11 (Pages 38 - 41)

Page 42

1   A.   That's correct.
2   Q.   Do you know what was done to determine
3   whether these shoes were counterfeit?
4   A.   My understanding from Joe Pallett was
5   that they used the Nike proprietary system in order
6   to determine that.
7   Q.   What is that?  What was done exactly?
8   A.   So my understanding of the Nike
9   authentication system is t█████████████████
████████████████████████████████████████████
██████████████████████████████
12  Q.   So your understanding is that somebody
13  ████████████████████████████████████████
████████████████ make the determination as to whether
15  the shoes were counterfeit?
16  A.   Yes.
17  Q.   Did Nike make a counterfeiting
18  determination solely based on █████████████ to
19  your knowledge?
20  A.   Yes, with their ████████████████
████████
22  Q.   Do you know whether Mr. Pallett or his
23  team attempted to authenticate any other shoes as
24  part of this analysis?
25  A.   The ones that I refer to on Page 16.

Page 43

1   Q.   Other than the shoes that you referred to
2   on Page 16, those are three shoes, the Cactus Jack
3   Air Max 270, the Air Jordan 1 Mocha, and the Chunky
4   Dunky; correct?
5   A.   That's correct.
6   Q.   Other than those three, are you aware of
7   any other shoes that consumers had raised to StockX
8   as potentially counterfeit that Mr. Pallett or his
9   team attempted to authenticate to determine whether
10  they were counterfeit or not?
11  A.   Yes.  I do believe there was a set of
12  counterfeits from a power buyer that they were able
13  to review some of those and confirm.  I think around
14  half of them were -- were indeed counterfeit.
15  Q.   Are those the Roy Kim shoes that you are
16  referring to?
17  A.   Yes.
18  Q.   Other than the three shoes identified on
19  Page 16, and the Roy Kim shoes, are you aware of
20  whether Mr. Pallett or his team attempted to
21  authenticate any other shoes under this scenario?
22  A.   Not that I recall, but I will add the
23  shoes on Page 14 as well.
24  Q.   What are the shoes on Page 14?
25  A.   Those are the Nike Dunks, the Nike Dunk

Page 44

1   Panda, and Christmas releases that I mentioned a few
2   minutes ago.
3   Q.   Can you explain this to me.  Nike
4   authenticated these shoes and determined they were
5   fake?  I want to make sure I understand your
6   testimony.
7   A.   No.  My apologies.  My apologies.  Those
8   were ones -- let me go back to my report here.
9       So those were ones that StockX had
10  claimed that there were manufacturing variances on,
11  and those were the ones that Joe Pallett ██
████████████████████████████████████████████
████████████es.
14  Q.   Are you aware of whether he attempted to
15  authenticate any of those shoes in this context?
16  A.   I'm not aware of that, no.
17  Q.   Did you ask him if he attempted to
18  authenticate any other shoes that were returned or
19  asked to be returned to StockX?
20  A.   I did not ask him that.
21      Would it be possible to take a rest
22  room break?
23  Q.   Yeah, actually, give me just a couple of
24  minutes and we'll finish this line of thinking and
25  that will be a good time for a break.

Page 45

1       Are you aware of any Nike testimony
2   offered in this case that there have been, in fact,
3   ████████████████████████████████████████
████████████
5   A.   I'm not aware of any.  No.
6   Q.   And would that contradict what
7   Mr. Pallett told you?
8   A.   No.  Not that I believe.
9   Q.   Why not?
10  A.   If I understand your question correctly,
11  you're asking if I know of any other Nike testimony
12  that ██████████████████████████████  So I
13  have not read any, and in my conversation with him,
14  ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
█████████████████.
18  Q.   What was -- why did you have another call
19  with Mr. Pallett the next day?
20  A.   So the call on the second day on June 1st
21  of 2023, that I reference in Footnote 99, was about
22  that confirmation that they were able to use their
23  proprietary system to confirm that those indeed were
24  counterfeit products.
25  Q.   Is that something you asked him to

12 (Pages 42 - 45)

Page 46
1  confirm on May 31 and then he confirmed it on
2  June 1st? What exactly do you mean by that?
3      A.  Yes. I believe so. I don't think he had
4  the answer on May 31 so he had to go back and...
5      Q.  Did you go and ask him on May 31 to see
6  whether any of these shoes were counterfeit, he did
7  that, and then came back to you on June 1st?
8      A.  I believe so, yes.
9      Q.  Okay. Or is that -- do you know when he
10  conducted the analysis? Was that something before
11  you talked to him? Like what were the
12  circumstances? Because I think that's a little
13  contrary to what you just said and I just want to --
14  maybe I'm misunderstanding it.
15          I thought you had testified earlier
16  that you didn't know when he did the analysis or why
17  he did the analysis but when you were on the phone
18  with him, he told you about it.
19      MS. DUVDEVANI:  Objection.
20  BY THE WITNESS:
21      A.  So I don't know when -- exactly when he
22  conducted the analysis.
23      Q.  Right.
24      A.  And I don't know who on the Nike team
25  conducted the analysis.

Page 47
1      Q.  Got it.
2      A.  But he confirmed that information with me
3  on June 1st.
4      Q.  Did he talk to you about it on May 31 as
5  well?
6      A.  Generally speaking, yes, and said he
7  needed to confirm.
8      Q.  So he said I think that there might be
9  counterfeits on May 31 but I'll confirm with you and
10  get back to you? I'm just trying to understand
11  whether this is something you asked him to do or how
12  it came up.
13      A.  So the questions about some of these
14  shoes including the Chunky Dunky, as you can see in
15  Footnote 95, came up in the conversation on May 31.
16  So, he, during that conversation, explained that
17  three of the Nike products that the consumer at the
18  time believed were fake were determined to be
19  counterfeits. So I believe I asked for confirmation
20  on that, and he came back the next day and told me
21  that indeed they had used -- they had used a
22  proprietary system to confirm that.
23      Q.  I see.
24          What did you mean when you said "I
25  asked him to confirm that"?

Page 48
1      A.  To confirm the determination of
2  counterfeits.
3      Q.  Do you mean like how did you make that
4  determination?
5      A.  Correct.
6      Q.  And he said, I don't know, let me check
7  and get back to you?
8      A.  I don't know if he said I don't know, but
9  he said I'd like to follow up tomorrow.
10      Q.  Understood.
11          Do you know who he talked to, to
12  confirm that information?
13      A.  I don't.
14      Q.  On the May 31 or June 1st calls, did you
15  take any notes?
16      A.  Only those that are directly in my
17  rebuttal report.
18      Q.  So did anyone else take notes that you
19  used at any point?
20      A.  No.
21      Q.  Did you discuss any legal strategy on
22  either of these calls?
23      A.  No.
24      Q.  Did you discuss any facts that are not
25  included in the report?

Page 49
1      A.  No.
2      Q.  So on both of these calls, everything
3  that Mr. Pallett told you, you put into your report?
4      A.  Yes.
5      MS. BANNIGAN:  Okay. Let's take a break.
6  Sorry about that timing.
7      THE VIDEOGRAPHER:  The time is 10:41 a.m.
8  This is the end of Media Unit 1 and we're going off
9  the video record.
10          (Whereupon, a break in the
11          proceedings was taken.)
12      THE VIDEOGRAPHER:  The time is 10:55 a.m.
13  This is the beginning of Media Unit 2, and we are
14  back on the video record.
15  BY MS. BANNIGAN:
16      Q.  Going back to Exhibit 1 -- your CV that's
17  attached to Exhibit 1, please. It appears just
18  after Page 40 of your report.
19          Is this an accurate depiction of your
20  background?
21      A.  Yes.
22      Q.  Is there anything that's missing on here
23  or anything that's occurred since June 2 that you
24  would add to it?
25      A.  I believe I had one conference speaking

13 (Pages 46 - 49)

Page 226

1 like everything on a platform, fraudsters will try
2 to manipulate -- manipulate information in some way.
3    Q.   Are you aware of any platform that has
4 taken steps to eliminate fraud with respect to
5 ratings and reviews?
6    A.   Again, I don't believe any criminal
7 activity can be entirely eliminated, but there are
8 platforms that have -- that have worked -- worked
9 extensively to deal with that issue.
10    Q.   How successful have they been?
11    A.   I have not seen their exact statistics
12 because they do not share them, but they continue to
13 have seller ratings on their platforms so consumers
14 can review those products.
15    Q.   What platforms are you talking about that
16 you know have taken steps to eliminate fraudulent
17 reviews?
18    A.   So, the one I'm thinking of in particular
19 is Amazon.
20    Q.   Do you know of any platforms that allow
21 reviews or ratings that haven't dealt with
22 fraudulent reviews or ratings?
23    A.   Again, I have not sat down with every
24 platform and asked them about that system.  My
25 assumption is again because we're dealing with

Page 227

1 e-commerce platforms that all types of criminal
2 activity target -- target those platforms looking
3 for weaknesses in their systems, whether that's
4 weaknesses in vetting sellers as they go up, whether
5 it's around payment processing, whether it's around
6 other types of fraudulent activity.
7    Q.   Fake reviews are, in fact, a common
8 scenario on e-commerce platforms, correct?
9    A.   In the same way that counterfeit products
10 are, I would say yes.
11    Q.   Do you agree that seller ratings are not
12 always reliable?
13    A.   Reliable to who?
14    Q.   To the consumers looking at them.
15    A.   So as we just discussed, there are
16 fraudsters that try to -- try to fraudulently put --
17 fraudulently put ratings up and fake reviews, but if
18 we look at this list that I have here, we see
19 counterfeiters in almost every situation attempting
20 to -- attempting to go around any methods of
21 transparency that any commerce platform might use.
22       So, one, if you don't know who the
23 seller is, as a buyer, you have no recourse nor do
24 you have the decisionmaking process of who you're
25 actually buying the good from but the platform.

Page 228

1       When we look at some of these others,
2 yes, there are times when counterfeiters are trying
3 to hide what they're actually selling, but that
4 doesn't mean that -- that none of these options
5 should be looked at.  And, in fact, it's not only my
6 opinion but the opinion of the federal government
7 and many others that these things all go towards
8 helping -- helping a platform to vet -- to vet
9 potential sellers of counterfeit as well as
10 counterfeit products or suspected counterfeit
11 products themselves.
12    Q.   Do you believe that there's only way to
13 structure an anti-counterfeiting program for an
14 online platform?
15    A.   No.  As I mentioned before, this is a
16 decision that would be very dependent on a platform,
17 the size, the nature of their business, what
18 products they decide to sell, what their target
19 consumers are, what country they're in or if they're
20 in multiple countries, what the risk level is for
21 the products that they're selling, whether it's in
22 an online -- an online pharmaceutical company or an
23 online pharmaceutical platform, excuse me, or one
24 that is selling pet meds, for example, or other
25 things.  So it depends very much on a lot of

Page 229

1 different factors.
2    Q.   Let's go -- I think -- I'm going to look
3 at Exhibit 1, page 21, and talk about your
4 definition of authentication.  So page 21 of your
5 affirmative report, please.
6    A.   Sure.  Give me just a minute.
7    Q.   Okay.  Does this section here contain all
8 of your opinions on the definition of product
9 authentication?
10    A.   To the best of my understanding, yes.
11    Q.   Under subsection A, you say that
12 "Authentication is the act by which the IP rights
13 holder verifies whether a product or package bearing
14 their trademark is genuine and authorized."
15       Is this an accurate statement of your
16 opinion on the definition of authentication?
17    A.   Yes.  That's correct.
18    Q.   Okay.  And then there you cite to
19 footnote 77, which refers back to footnote 72,
20 that's on page 20, and there you cite ISO 22383,
21 Section 4.1, as the source for your definition of
22 authentication, correct?
23    A.   So that is one of my sources.  The other
24 is in my eight years of experience of working with
25 brand owners, Customs agents, the IPR center and

58 (Pages 226 - 229)

Page 230

1 others in the field.
2     Q.   Okay.  And then staying on page 20, you
3 list six what you call technology categories that
4 are used in brand protection, and those are overt,
5 semi-covert, covert, forensic, digital, and human
6 experience, correct?
7     A.   Yes, that's correct.
8     Q.   And then again if we go to page 21 at the
9 bottom paragraph, this is the beginning of the last
10 paragraph, you state that "IP rights holders use a
11 variety of techniques and technologies for their
12 authentication of product and packaging including
13 overt, covert, semi-covert, forensic, and digital
14 technologies," correct?
15     A.   Yes, that's correct.
16     Q.   Is human experience one of the ways that
17 IP rights holders authenticate products?
18     A.   In some cases if that's part of their
19 authentication program.
20     Q.   Is that considered an overt tool?  Where
21 does that fit in?  Is that something separate than
22 what you're talking about here?
23     A.   So, in my understanding of it and all of
24 the work I have done is that usually that's a
25 separate item.  When I'm talking about overt items

Page 231

1 or overt, whether that's a technology or something
2 else, this is something intentionally put into the
3 product where the packaging that's obvious that
4 someone can look at to say, okay, this is part of
5 our authentication process, but regardless, any
6 of -- any of the items or technologies that are put
7 into an authentication program have to be -- have to
8 be put together by the brand intentionally and,
9 oftentimes, depending on the products.
10          So depending on the product,
11 depending on the industry, there may be different
12 technologies used for different product lines, for
13 example, or even, again, if it's a smaller company
14 or a start-up, they may not have money to invest in
15 technology at that point, so maybe they will rely
16 initially, at least, only on one or two of these.
17 So these vary.  But again, it's something that the
18 IP rights holder has to decide which ones they are
19 going to use in their authentication process and
20 who -- who within the brand has access and who, if
21 anyone, outside of the brand would have access to
22 those tools in order to authenticate a product.
23     Q.   So if you look at the next page, you have
24 this blue hexagon with the different triangles,
25 that's page 22.

Page 232

1     A.   Yep.
2     Q.   And is this a diagram of the six
3 technologies or methods that you just mentioned?
4     A.   Yes.
5     Q.   Okay.  So can you just explain to me --
6 just tell me which fits into these categories?
7     A.   Sorry.  Which fits into what categories?
8     Q.   Let's go through the hexagon.  I just
9 want to make sure I understand what you're talking
10 about in each of these triangles.
11     A.   Okay.
12     Q.   So let's start with covert technology.
13 Is this what you mentioned when you said they -- the
14 brand can put something obvious in the two that you
15 can see that will tell you if it's counterfeit or
16 not?
17     A.   Under covert?
18     Q.   Yes, covert technology.
19     A.   No.  Covert is something that can't be
20 seen by the naked eye.
21     Q.   That was my fault.  I get it.  It's been
22 a long day.  Okay.  So let me clean this up.
23          What are you referring as covert
24 technology?
25     A.   So covert technology, and I reference

Page 233

1 this, I believe, I think this is footnote 73 too, so
2 this is something that is not recognizable or
3 perceptible using human senses so it usually
4 requires a specialized tool or highly specialized
5 knowledge.
6     Q.   Okay.  ████████████████████████
7 ████████████████████████████████
8     A.   Yes.
9     Q.   And then to the right of that, it says
10 overt tool available to the public.  What do you
11 mean by that?
12     A.   So an overt tool is something that some
13 brands have used, something that is, for example,
14 obvious in their mark or obvious in a product.  I'm
15 thinking -- I can't remember exactly which brand
16 this is but they have a mark that if you turn it
17 sideways, you can see a different letter and they
18 share with their consumers this is something that
19 you can look at.  That also means counterfeiters can
20 see it too, but it is used, usually in conjunction
21 with another -- with another -- with another set of
22 tools, but oftentimes that is one of the things that
23 someone could decide to use, or if they choose, to
24 give that to the public something that they might
25 use that anyone could look at and tell.

59 (Pages 230 - 233)

Page 310

1    MS. DUVDEVANI:  I have no further
2  questions.
3    MS. BANNIGAN:  I have just a few.
4        E X A M I N A T I O N
5  BY MS. BANNIGAN:
6    Q.   Looking at this exhibit, what is it, 7,
7  looking at Exhibit 7, do you know who wrote this
8  document?
9    A.   I don't.  I don't have the name exactly,
10  but I know it was someone within StockX that was
11  looking -- looking to deal with some of the
12  requirements and different things that are mentioned
13  here throughout the document.
14    Q.   And when you received this document in
15  part of preparation for your report, did you ask any
16  questions about it?
17    A.   Not specifically.
18    Q.   Do you know if it was used by StockX ever
19  in any capacity?
20    A.   I don't have that information one way or
21  the other.
22    Q.   At the top of the first page, it says,
23  "If you are making any further edits, please comment
24  or slack me as I'm working in the confluent doc that
25  we will present."

Page 311

1        Do you have any understanding who
2  wrote that?
3    A.   I don't, minus the initials that are on
4  the page.
5    Q.   Do you know if this document was edited
6  after this current draft?
7    A.   I don't.
8    MS. BANNIGAN:  I have no further
9  questions.
10    THE VIDEOGRAPHER:  The time is 7:31 p.m.
11  This is the end of Media Unit 9, and it is also the
12  end of the deposition.  We're going off the video
13  record.  Thank you.
14        (Off the record at 7:31 p.m.)
15
16
17
18
19
20
21
22
23
24
25

Page 312

1        REPORTER CERTIFICATE
2
3      I, JO ANN LOSOYA, a Certified Shorthand
4  Reporter within and for the State of Illinois, do
5  hereby certify:
6          That previous to the commencement
7  of the examination of the witness, the witness was
8  duly sworn to testify the whole truth concerning the
9  matters herein; That the foregoing deposition
10  transcript was reported stenographically by me, and
11  the foregoing constitutes a true record of the
12  testimony given and the proceedings had; That the
13  said deposition was taken before me at the time and
14  place specified; That I am not a relative or
15  employee or attorney or counsel, nor a relative or
16  employee of such attorney or counsel for any of the
17  parties hereto, nor interested directly or
18  indirectly in the outcome of this action.
19      IN WITNESS WHEREOF, I do hereunto set my
20  hand this day, July 21, 2023.
21
22
      JO ANN LOSOYA, CSR, RPR, CRR
23      C.S.R. 84-002437
24
25

Page 313

1  Tamar Dudevani, Esq.
2  tamar.duvdevani@dlapiper.com
3        July 21, 2023.
4  RE: Nike, Inc. v. Stockx, LLC
5    7/18/2023, Kari Kammel (#6001080)
6    The above-referenced transcript is available for
7  review.
8    Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  cs-ny@veritext.com.
16
17  Return completed errata within 30 days from
18  receipt of testimony.
19    If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22      Yours,
23      Veritext Legal Solutions
24
25

79 (Pages 310 - 313)