# Exhibit 07

Redacted Public Version

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

NIKE, INC.,
Plaintiff,

vs.

STOCKX LLC,
Defendant.

Case No. 22-cv-983 (VEC)

# Rebuttal Expert Report of Scott Duke Kominers, Ph.D.
June 2, 2023

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY.

# Contents

Introduction and Assignment     **1**

Summary of Opinions     **2**

Information Considered     **3**

Methodology     **3**

The StockX Vault NFTs Are NFTs     **4**

StockX's Uses of the Blockchain Are Not Pretextual – The Fact that the Vault NFTs Are Minted on the Blockchain is Meaningful and Valuable for their Intended Market Design Function     **20**

Vault NFTs Are Not "Shoddily Designed" – "Minimum Viable Product" (MVP) Product Design and Iteration is Standard in Technology and Marketplace Entrepreneurship     **25**

Using Custodial Digital Asset Management is a Standard Design Paradigm, Especially for Non-Crypto-Native Customers     **32**

Vault NFTs Function as Tradeable "Claim Tickets" for the Associated Physical Assets, and this was their Intended Design     **35**

There are Many Distinct Use Cases for NFTs; In Particular, Not All NFTs are Digital Brand NFTs     **60**

Vault NFTs Were Neither Designed as Nor Generally Function Like Digital Brand NFTs     **61**

The Vault NFT Imagery is Important for their Function, as is Visual Differentiation of that Imagery from the Images Used in Ordinary StockX Product Listings     **64**

Internal Product Ideation is Standard, and Does Not Affect the Market Perception of the Product Except Inasmuch as it is Made Public or Reflected in the Final Design     **67**

The Methods of Mr. McNew's Pricing and Market Analysis Were Methodologically Unsound     **71**

Appendixes     **75**

1   ERC-1155 Collections that are Described as NFTs in the Market     **75**

2   Documents Considered     **81**
      Documents Considered By Mr. McNew: . . . . . . . . . . . . . . . . . . . . . . .   81
      Documents Not Considered by Mr. McNew . . . . . . . . . . . . . . . . . . . .   82

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY.

# Introduction and Assignment

1. I submitted an opening expert report on May 5, 2023 (my "Opening Report").[1] My Opening Report includes a description of my experience and qualifications, the compensation I am receiving in connection with this case, my recent testimony as an expert witness, and an overview of my opinions. A copy of my curriculum vitae and a list of my publications within the last ten years are respectively attached as Appendixes 2 and 4 to my Opening Report.

2. On May 5, 2023, Steven S. McNew submitted an expert report on behalf of Nike (the "McNew Report").[2] I have reviewed the McNew Report. While the McNew Report does not include a summary of Mr. McNew's opinions, it is my understanding that his report advances the following opinions:

   (a) StockX's decision to market Vault NFTs as "non-fungible tokens" is "inaccurate and misleading" because, as ERC-1155 tokens, Vault NFTs are fungible.[3]

   (b) StockX's use of the blockchain is "[p]retextual and [f]alls [s]hort of [b]oth its [o]wn [r]epresentations and [i]ndustry [s]tandards."[4]

   (c) StockX's Vault NFTs "were [s]hoddily [d]esigned and [i]mplemented", in part because StockX utilized the "Minimum Viable Product ("MVP") approach."[5]

   (d) "NFTs are not necessary to StockX's vault trading business,"[6] and furthermore, StockX believed this use of NFTs was "not necessary" and served only a marketing purpose.[7]

   (e) Vault NFTs do not act merely as "claim tickets" and, instead, carry additional value unrelated to ownership of the associated physical sneakers, including access to "unlocks," "vault services," and "a novel and enhanced trading experience."[8] Furthermore, StockX cultivated public perception that Vault NFTs had value and benefits beyond a claim ticket for a physical product "by employing an NFT strategy that mirrored what other widely-known projects in the NFT space were using at the time."[9]

   (f) StockX designed the images associated with Vault NFTs and used Nike trademarks to "show value independent and distinct from the associated physical shoes stored in the 'Vault.' The NFTs were designed with display in mind."[10]

   (g) Vault NFT prices show that Vault NFTs had value beyond that of a claim ticket for the associated physical products because they did not "sell at similar prices to the associated physical non-NFT shoes."[11] And, "based on the [ ] price analysis and StockX's internal

---

[1]Expert Report of Scott Duke Kominers, *Nike, Inc. v. StockX LLC*, No. 1:22-cv-00983-VEC, (May 5, 2023) ("Opening Report").

[2]Expert Report of Steven S. McNew, *Nike, Inc. v. StockX LLC*, No. 1:22-cv-00983-VEC, (May 5, 2023) ("McNew Report").

[3]See, e.g., McNew Report, pp. 3, 22-23, 27.

[4]McNew Report, p. 43; see also, e.g., McNew Report, pp. 8, 45, 47, and 61-62.

[5]McNew Report, p. 51; see also McNew Report, pp. 52-61.

[6]McNew Report, p. 61-62.

[7]McNew Report, p. 62.

[8]McNew Report, pp. 7, 20, 25, 29-30, 32, 34.

[9]McNew Report, p. 62; see also, e.g., McNew Report, pp. 7, 25, 27.

[10]McNew Report, p. 38; see also, e.g., McNew Report, pp. 11, 25, and 39.

[11]McNew Report, p. 49-51.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY.

reporting and discussion, StockX customers and StockX employees clearly perceived the Vault NFT as independent and distinct from the underlying physical item."[12]

3.  I was asked to evaluate Mr. McNew's opinions, including but not limited to, in the context of the opinions expressed in my Opening Report, as well as in reference to the broader NFT market.

4.  As with my Opening Report, in connection with this rebuttal report, no part of my compensation or that of my research assistant, Tynan Seltzer, is dependent upon the outcome of this action or the nature of the opinions that I express. Moreover, I do not hold—and have never held—NFTs from or associated with StockX. To my knowledge, I do not hold—and have never held—NFTs from or associated with Nike. Furthermore, the statuses of my NFT-related collaborations and advisory roles, mentioned above, are not dependent upon the outcome of this action or the nature of the opinions that I express.

# Summary of Opinions

5.  Overall, nothing in the McNew Report alters the opinions I offered in my Opening Report in any way. I found significant flaws in the McNew Report in terms of both methodology and conclusions. Mr. McNew's analysis reflects a narrow and sometimes inaccurate view of the NFT market. As a consequence, his analysis appears to fundamentally misunderstand the role of Vault NFTs within that market. Specific opinions to that effect are as follows:

    (a)  Vault NFTs are, in fact, NFTs. Their status as ERC-1155 tokens does not change that result, as ERC-1155 tokens are a form of NFT and the market regularly and consistently treats ERC-1155 tokens as NFTs.

    (b)  StockX's use of blockchain technology in creating the Vault NFTs was not pretextual, and StockX's decision to mint Vault NFTs on the Ethereum blockchain was both meaningful and valuable. The fact that the Vault NFTs were traded on a private StockX ledger, rather than on the Ethereum blockchain, does not in any way diminish their function, or change the fundamental fact that the Vault NFTs are in fact NFTs. In this sense, the communications about NFT functionality were not misleading. It is a standard NFT/crypto design paradigm to launch initially with custodial wallets and/or a private ledger, and progressively decentralize from there. StockX was clearly following that design paradigm.

    (c)  The launch of StockX Vault NFTs in the form of an MVP was appropriate, based on industry best practices, and consistent with advice I would give a firm considering launching a similar product.

    (d)  From the perspective of marketplace design, the visual distinction between the Vault NFT imagery and that of the corresponding sneakers sold for physical delivery was essential in order to enable prospective buyers to understand, at a glance, what they would be purchasing.

    (e)  The Vault NFTs decidedly function as "claim tickets" for their associated physical assets. This assertion is supported by the vast majority of the internal StockX correspondence discussed in the McNew Report. This conclusion is not undermined by any storage or

---

[12]McNew Report, p. 51.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY.

tradability benefits—which are integrally tied to the functionality of the "claim ticket" model—or by the limited "unlocks" and "giveaways" that StockX briefly experimented with providing to Vault NFT holders.

(f) Mr. McNew's characterization of the NFT market incorrectly treats all NFTs as "digital brand NFTs," and inaccurately conflates digital brand NFTs with the many other possible use cases for NFTs, including the wide range of ownership-only NFTs—such as those representing ownership of physical assets.

(g) Vault NFTs generally do not have the features commonly associated with digital brand NFTs.

(h) StockX's internal planning documents cannot be used to accurately categorize or characterize how Vault NFTs were perceived by the public.  Ideation and brainstorming is standard in the product design process, especially in the context of novel product entrepreneurship.  Such documents are not—as Mr. McNew suggests—evidence that the Vault NFT project was poorly thought through or executed; rather, they show precisely the opposite. Furthermore, such non-public communications do not affect the market perception of the Vault NFTs, except inasmuch as they are reflected in the form the Vault NFT product actually took.  As evidenced even through Nike's own internal documents, not all aspects of product ideation are always reflected in product design.

(i) The methods Mr. McNew used in his "pricing analysis" were inappropriate, and the conclusions Mr. McNew drew from that analysis are not borne out in the timeseries data. Moreover, Mr. McNew made a wide range of unfounded and speculative generalizations about consumer perception of the Vault NFTs without a reliable empirical basis.

## Information Considered

6. A complete list of the materials I have considered is attached as Appendix 2 to this report.

7. In addition to the McNew Report, I reviewed the documents Mr. McNew himself considered, which included a number of internal communications and presentations from StockX, as well as deposition transcripts of relevant fact witnesses.  I also reviewed internal and public documents from Nike, as well as the deposition transcripts of further relevant fact witnesses that Mr. McNew did not consider in his report.

8. In addition, just as in my Opening Report, I have relied on various information available on the StockX Website, Discord, Twitter feed, and Etherscan, as well as related Internet articles and examples from the broader NFT market, including imagery and social media messaging associated with other NFT projects.

## Methodology

9. My Opening Report includes a detailed description of my research on, and experience with, the design of marketplace businesses and NFTs, which informs the opinions set forth in this report as well.[13]

---

[13]Original Report, ¶¶ 22-26.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY.

10. As I did in connection with my Opening Report, I draw on my prior research on NFTs to provide background on the technology, market context, and market design aspects of NFTs, as well as the distinct business models that have emerged around NFTs. Particularly in my analysis around product innovation, ideation, and MVP strategy, I also draw upon my broader research, teaching, and advising experience in entrepreneurship and the economics of innovation. In addition, drawing on the various frameworks I describe in my Opening Report, I examine how the StockX Vault NFTs fit within the context of various NFT business models, and analyze the ways in which the design features of Vault NFTs serve their market design goals, including by comparing the Vault NFTs to other NFT projects, such as those released by Nike and its subsidiary RTFKT. In the context of this rebuttal report, I specifically rely on my prior research and background to respond to Mr. McNew's opinions concerning StockX's Vault NFTs.

## The StockX Vault NFTs Are NFTs

11. Mr. McNew asserts that the Vault NFTs are not in fact NFTs. Specifically, the McNew Report states that "[t]he tokens at issue in this lawsuit are marketed by StockX as 'non-fungible' tokens (though as explained below this marketing is inaccurate and misleading)."[14] His basis for this assertion is the fact that "StockX minted the Vault NFTs as ERC-1155 tokens on the Ethereum blockchain."[15] Mr. McNew further points to the substitutability of instances of the same type of token within ERC-1155 series as evidence that the tokens are fungible, stating, "StockX used its smart contract to create limited numbers of fungible token editions, one edition set per a given make, model, and size of shoe."[16] However, based on my research on, and experience in, the NFT market; my experience advising on NFT projects; and a review of the relevant literature, it is clear that Mr. McNew's analysis and conclusions here are incorrect.

12. Vault NFTs are indeed NFTs—even though they are ERC-1155 tokens. As a threshold matter, ERC-1155 tokens are well understood by the market to be a type of NFT.

    (a) NFT creators who issue ERC-1155 tokens often explicitly describe those tokens in the market as NFTs. Indeed, Nike itself has publicly described ERC-1155 tokens as NFTs, as evidenced by its marketing of RTFKT ERC-1155s as NFTs in a range of collections. For example, Nike does this with its RTFKT Clone X Forging SZN 1 (PRE-FORGE) NFTs, as I described in my Opening Report, and as illustrated in further detail in Figure 1. That these are ERC-1155 offerings can be understood from the fact that the number of "total items" is greater than the number of "unique items," representing the different ERC-1155 editions that have been released.

---

[14] McNew Report, p. 3.

[15] McNew Report, p. 22.

[16] McNew Report, p. 22.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY.



Figure 1: The "RTFKT Clone X Forging SZN 1 (PRE-FORGE)" is an ERC-1155 token created by RTFKT (a subsidiary of Nike) and directly referred to as an NFT on OpenSea.

Figure 2: The "RTFKT X RIMOWA Meta-Artisan Collection" is another ERC-1155 token collection under the Nike umbrella directly referred to as an NFT on OpenSea.

> (b) ERC-1155 tokens are sold and exchanged on top NFT marketplaces such as OpenSea and LooksRare. Figure 9 in my Opening Report shows examples of ERC-1155 tokens marketed as "NFTs" on OpenSea; Figure 3 below shows those same tokens on LooksRare.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY.



Figure 3: The same collections as those depicted in Figure 9 of my Opening Report as seen on LooksRare, instead of OpenSea.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY.

In addition, Appendix 1 to this report includes numerous additional examples of ERC-1155 tokens that are marketed as "NFTs," and are offered on platforms such as OpenSea and LooksRare. The examples in Appendix 1 include NFTs offered by major corporations and participants in the NFT market. For example, Appendix 1, shows examples of ERC-1155 NFT offerings from popular brands such as Adidas, TimeX, and Bored Ape Yacht Club, which I also picture in Figure 4 below for illustration. Again, that these are ERC-1155 offerings can be understood from the fact that the number of "total items" is greater than the number of "unique items," representing the different ERC-1155 editions that have been released.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY.



## adidas Originals Into the Metaverse ✓

By **adidas** ✓

Unique items **2** · Total items **11K** · Created **Dec 2021** · Creator earnings **10%** · Chain **Ethereum** · Category **Memberships**

##Into the Metaverse becomes ALTS by adidas. To evolve to this new chapter, burn your ITM Phase 1 or Phase 2 NFT now.

Phase 1 NFT physical product claims have closed. There is no further utility planned for Phase 1 and Phase 2 NFTs. Burn to ALTS by adidas now for future utility.



## Timex x Bored Ape Community Forge Pass ✓

By **TimexGoesApe** ✓

Unique item **1** · Total items **30** · Created **Dec 2022** · Creator earnings **10%** · Chain **Ethereum**

Timex, the #1 selling watch brand in the United States, is going bananas with the Bored Ape community as its first foray into Web3 by launching a BAYC customizable watch and digital collectible.

See less ∧

  

## Bored Ape Chemistry Club ✓

By **YugaLabs** ✓

Unique items **3** · Total items **525** · Created **Aug 2021** · Creator earnings **2.5%** · Chain **Ethereum** · Category **Art**

Bored Ape Chemistry Club consists of 10,000 Mutant Serums, to be airdropped to all Bored Apes. Handle with care. Instructions to follow at 6pm ET 8/28/21.

Figure 4: ERC-1155 collections by well known brands Adidas, TimeX, and Yuga Labs, all referred to by their creators as NFTs. (Adidas refers to the NFTs as such in the OpenSea description; TimeX and Yuga Labs do so in official documentation.)[18]

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY.

(c) Beyond the manner in which ERC-1155 tokens are marketed, it is clear that ERC-1155 tokens are NFTs based on the options available on minting platforms. As shown below, the ERC-1155 token standard is provided as a baseline option on top NFT minting platforms such as Manifold and Zora, through which millions of ERC-1155 tokens have been minted.[19]



Figure 5: Screenshots from the Manifold and Zora minting platforms, which both offer the ability to mint ERC-1155 NFTs and calls them as such. Note that the Manifold page explicitly uses the language "fungible NFTs" to refer to ERC-1155 tokens, in effect making a distinction between fungibility of the individual units of the same ERC-1155 token (what I refer to as substitutability) and the concept of a "fungible token" (which would contrast with the concept of an NFT).[21]

(d) As I discussed in my Opening Report, ERC-1155 NFTs are produced by NFT creators who also produce ERC-721 series NFTs, with those creators choosing which type of NFT to produce based on the specific use case they have in mind for the token.[22]

(e) Mike Child, Director of Digital Goods Strategy at Nike, repeatedly referred to ERC 1155 tokens as NFTs in his deposition taken on December 9, 2022. For example, he refers to a particular RTFKT/Nike "vial" digital asset[23] and states that "the vial is an NFT."[24] Referring to the standard used to mint the vial NFTs, he says "[he] do[esn't] remember if it was 1155 or 721,"[25] implicitly indicating that he thinks of both of these standards as appropriate for NFTs, and even to a degree somewhat interchangeable in specific applications such as with the vial NFT. In particular, there is no indication that he believes that the vials would somehow not be NFTs if they were implemented via ERC-1155 tokens. Later

---

[18]Timex US. *TIMEX GOES APE*. URL: https://www.timex.com/the-timex-blog/go-ape-with-timex-x-bayc.html; Yuga Labs. *MAYC info*. URL: https://boredapeyachtclub.com/#/mayc/info

[19]manifoldxyz. *Dune Query*. URL: https://dune.com/queries/1330690; Zora. *Zora Website*. URL: zora.co.

[21]Manifold. *Manifold Website*. URL: https://studio.manifold.xyz/home; Zora, *Zora Website*.

[22]Original Report, ¶ 31(d).

[23]I believe Mr. Child is referring to the "RTFKT SKIN VIAL: EVO X". https://opensea.io/collection/skinvial-evox.

[24]Transcript of the Deposition of Mike Child, *Nike, Inc. v. StockX LLC*, No. 1:22-cv-00983-VEC, 152:22-153:7 (Dec. 9, 2022) ("Child Transcript").

[25]Child Transcript, 153:8-14.

in the same deposition, Mr. Child testifies regarding the RTFKT "MNLTH NFT" series, which he explains were minted as ERC-1155 tokens because ███████████████ ████████"[26] Mr. Child later testifies that the RTFKT "Animus Egg NFT" also uses ERC-1155, with no claim that it consequently is not an NFT.[27] And finally when Mr. Child discusses the RTFKT "Space Pod NFT" series, like with the "vial" NFTs, he again cannot remember which token standard was used, and again, provides no indication that using ERC-1155 would somehow invalidate the tokens' status as NFTs.[28]

13. In addition to market perception evident from pervasive ERC-1155 NFT offerings and NFT minting options, a study of the underlying technology also reveals the flaws in Mr. McNew's opinion that Vault NFTs are not NFTs. While individual instances of the same type of ERC-1155 token are indeed substitutable, Mr. McNew's overly literal and simplistic interpretation of this property as meaning that ERC-1155 tokens, including the Vault NFTs, are "fungible tokens" is incorrect. As I described in my Opening Report, the substitutability of identical tokens within a series is akin to the idea that two of the same trading card may be substitutable for each other. This is very different from what is typically meant by "fungible tokens" in crypto. Fungible token units, for example those created under the Ethereum ERC-20 standard,[29] are commonly understood to be not only substitutable but also divisible (or available in such large quantities as to be effectively divisible).[30] They are typically traded on exchange platforms expressly designed for fungible token exchange, which make use of the token divisibility feature. Moreover, fungible tokens typically have no underlying functionality other than the ability to be exchanged.

14. Moreover, to the extent that individual units of the same Vault NFT are substitutable relative to each other, this is not a property unique to ERC-1155 collections. Many ERC-721 NFTs are also functionally substitutable with each other. For example, the "Skybrook" collection (Figure 6) comprises a series of ERC-721 NFTs that are visually and functionally identical.[31,32] Even though these tokens have individually unique token identifiers, they are no less substitutable than ERC-1155 tokens. Yet this degree of substitutability certainly does not make them "fungible tokens" in the sense of crypto.

---

[26]Child Transcript, 165:3-9.
[27]Child Transcript, 229:3-13.
[28]Child Transcript, 231:13-15.
[29]*ERC-20 Token Standard*. URL: https://ethereum.org/en/developers/docs/standards/tokens/erc-20/.
[30]Worldcoin. *A BEGINNER-FRIENDLY GUIDE TO FUNGIBLE VS. NON-FUNGIBLE TOKENS*. URL: https://worldcoin.org/articles/fungible-vs-non-fungible ("Fungible tokens are cryptocurrencies that exhibit all the standard traits of fungible assets. In other words, these crypto tokens should be non-unique, divisible, and have a clear market value. . . . While NFTs (non-fungible tokens) are on the same blockchains as many fungible cryptos, they're wholly unique digital assets. The data stored in an NFT is irreplicable and indivisible.").
[31]Skybrook. *Skybrook*. URL: https://opensea.io/collection/skybrook.
[32]*Disclosure: I hold Skybrook NFTs.*

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY.



Figure 6: The Skybrook NFT OpenSea page.[33]

15. The use of ERC-1155 tokens is a standard NFT design paradigm for a number of applications. As I described in my Opening Report, this approach is commonly used by a number of companies for NFTs that serve as "claim tickets"[34] that can be redeemed for another asset (potentially physical or digital or both), as well as for unnumbered edition series and blockchain-based games.

(a) Many NFTs associated with physical assets are created in this form because the physical assets themselves are substitutable in the same way as the associated ERC-1155 tokens. For example, as I described in my Opening Report, the Azuki NFT brand issued ERC-1155 tokens that give holders the right to claim copies of the "Twin Tigers Jacket."[35,36] The jackets themselves were functionally identical (up to the size, for which each holder had an option), and so it made sense to issue the associated tokens as a single series of substitutable ERC-1155 NFTs. The use of ERC-1155 in this context not only made the NFTs more clearly map to the associated physical assets, but also would have reduced the fees associated with minting and airdropping the tokens.

(b) In addition, such an approach makes the tokens (as well as associated bids and asks) display more intuitively on exchanges such as OpenSea. Indeed, compare the collection and item pages for the Twin Tigers Jacket NFTs (pictured in Figure 7) to those for the Skybrook NFTs described in paragraph 14 and pictured in Figure 6 above. Because the Twin Tigers Jacket NFTs are ERC-1155 tokens, the tokens of each type within the collection appear as a single entry on OpenSea with multiple units. If instead the Twin Tigers Jacket NFT had been minted as ERC-721 tokens, each unit would display separately, and so the collection page would, for example, display 5,409 individual copies of the "red" variety and 4,456 copies of the "blue" variety. It would be impossible to tell at a glance how

---

[33]Skybrook, *Skybrook*

[34]I used the language "claim check" in my Opening Report and use "claim tickets" here for consistency with the McNew Report, but I understand the terms to be substantively identical.

[35]Azuki. *Twin Tiger Jacket Opensea*. URL: https://opensea.io/collection/twintigersjacket.

[36]*Disclosure: I hold NFTs from the Azuki digital brand ecosystem.*

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY.

many of each token existed. It would likely also be difficult for a prospective buyer to figure out whether the different instances of similar-looking tokens were in fact substantively different—which does sometimes happen in the NFT market. Having each type of token within the collection appear as a single entry also simplifies the process of placing bids to purchase a token of a given type because it makes it possible to place a multi-unit bid for the token without having to make a full-collection offer scoped to tokens with specific metadata. And as an additional benefit, the use of the ERC-1155 standard further reduces transaction cost by making it possible for a given person to trade multiple copies of the token in a single blockchain transaction. Similar ERC-1155 token designs for NFTs associated to physical merchandise have been used, for example, by the Gutter Cat Gang,[37,38] as I described in my Opening Report. Once again, the ERC-1155 token standard is appropriate for these NFT applications because the physical assets associated with the tokens of a given type are fully substitutable for each other. Each Gutter Cat Gang, "Gutter Merch" bundle of a given type is functionally identical to each other one of the same type.

---

[37]Gutter Labs. *Gutter Merch Collection 1.0.* URL: `https : / / opensea . io / assets / ethereum / 0x2163f70d3b4de18a44e570309798e1fbbc916291/101212`.

[38]*Disclosure: I hold NFTs from the Gutter Cat Gang digital brand ecosystem.*

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY.



Figure 7: The Twin Tiger Jacket OpenSea page.[40] Note how each item has thousands of individual copies, but is "stacked" and thus OpenSea only shows two tokens, with multiple units of each.

(c) The aforementioned mechanism in which ERC-1155 tokens are minted to correspond to units of associated physical products is exactly the mechanism used in the case of the Vault NFTs—just as I described in my Opening Report.

(d) Meanwhile, NFT projects issue ERC-1155 NFTs that give their holders the right to claim some other digital asset after burning (i.e., deleting) or otherwise modifying the ERC-1155 token. The well-known NFT studio Truth Labs, for example, recently released a collection called "BiG iNC Letters of Acceptance" comprising 15,000 ERC-1155 tokens of six different types.[41,42] As Truth Labs has explained, these tokens will at some point in the future be burnable to claim BiG iNC character NFTs, with the different token categories corresponding to different claim rights. (For example, the "Executive Approval" tokens will apparently allow their holders to claim "C-Suite-level" characters.) Consistent with

---

[40]Azuki, *Twin Tiger Jacket Opensea*

[41]kingofthegoblin. *BiG iNC Letters of Acceptance*. URL: https://opensea.io/collection/biginc-letters.

[42]*Disclosure: I hold Truth Labs NFTs, including "BiG iNC Letters of Acceptance."*

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY.

this approach, the different token types are available in different quantities, and generally have different prevailing market prices. Once again, the use of ERC-1155 tokens for this purpose is the ideal market design choice because units of each given type of Letter of Acceptance NFT are fully substitutable with each other prior to the burn/redemption process. Moreover, individuals often trade multiple units of the same token in the series at the same time.

(e) As I described in my Opening Report, RTFKT and Nike use ERC-1155 tokens for precisely this "claim ticket" purpose in the context of their "Clone X Forging SZN" NFTs.[43] For example, RTFKT and Nike used the ERC-1155 standard for their "RTFKT Clone X Forging SZN 1 (PRE-FORGE)" NFTs. These NFTs could be redeemed for physical goods, which were depicted on an image linked to the NFT,[...] through a process known as "forging." In the forging process [...], an owner of one of these ERC-1155 NFTs connects their wallet to the RTFKT website, and redeems their ERC-1155 NFT by "burning" it; they are then shipped the physical good and additionally receive an ERC-721 NFT corresponding to the shipped physical good. The physical good typically bears a Near Field Communication (NFC) tag, which allows a user to link their corresponding ERC-721 NFT to the physical product. [...]"[44] RTFKT and Nike have used this same forging process for a number of products. For example, the "[UNFORGED] RTFKT x NIKE AR HOODIE ✨✔" ERC-1155 token could be redeemed for a physical Nike hoodie and associated ERC-721 token from the "RTFKT X NIKE AR HOODIE FORGED ⚒✅" collection. The description for the former collection states, "Holders are able to redeem the physical Hoodie via www.rtfkt.com from the 22nd of July -25th,"[45] while the latter collection states, "This collection NFTs [sic] that have already been redeemed for IRL hoodies, do not purchase if you want to redeem the physical hoodie."[46]

(f) More broadly, again as I described in my Opening Report, ERC-1155 tokens are frequently used in NFT applications where there are multiple equivalent editions of the same digital asset. NFT creator ripcache used ERC-1155 tokens for his "Data Swap" collection of unnumbered image editions.[47] Dolce & Gabbana issued their series of "Disco Drip" wearables NFTs using the ERC-1155 standard because the associated metaverse wearables are available in multiple identical units.[48]

(g) In addition, ERC-1155 tokens are commonly used in the context of blockchain-based games, where in-game items are represented as NFTs that are created and/or destroyed through gameplay. Like with the other applications described above, using ERC-1155 tokens in this context facilitates batch minting (as, for example, in the case of the "Scrumptious Sheep" NFTs that are regularly distributed as part of the Hungry Wolves game[49,50]) and batch transferring (which may occur frequently during gameplay)—saving on over-

---

[43]Original Report, ¶ 31(d)(v).

[44]Original Report, ¶ 31(d)(v).

[45]RTFKT. *RTFKT x NIKE AR HOODIE PRE FORGED*. URL: `https://opensea.io/collection/rtfkt-nike-ar-hoodie-preforged`.

[46]RTFKT. *RTFKT X NIKE AR HOODIE FORGED*. URL: `https://opensea.io/collection/rtfkt-nike-ar-hoodie`.

[47]*Disclosure: I hold a ripcache NFT.*

[48]*Disclosure: I hold a Dolce & Gabbana "Disco Drip" NFT.*

[49]Hungry Farm. *Hungry Farm Opensea*. URL: `https://opensea.io/collection/hungry-farm`.

[50]*Disclosure: I hold Hungry Wolves NFTs, and am an advisor to their team.*

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY.

all transaction costs. Moreover, using ERC-1155 tokens dramatically simplifies navigation through the token collection, which is essential when each item NFT is potentially available in very large quantities. The use of ERC-1155 tokens in these contexts is an intentional design choice—these games often also have ERC-721 NFT collections, for example, to represent player characters. Moreover, the collections do not distinguish between ERC-1155 and ERC-721 tokens in their branding or documentation. The Pirate Nation "Items" and "Founder's Pirates" are presented identically, and as NFTs, even though the former is an ERC-1155 token collection and the latter is an ERC-721 token collection.[51,52,53]

---

[51]ProofOfPlay. *Pirate Items Opensea*. URL: https://opensea.io/collection/piratenationitems.

[52]ProofOfPlay. *Pirate Founders Opensea*. URL: https://opensea.io/collection/piratenation.

[53]*Disclosure: I hold Pirate Nation NFTs, and have collaborated with their team.*

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY.



Figure 8: The Pirate Nation – Founder's Pirates and Pirate Nation – Items Opensea pages.[55] The former is an ERC-721 collection, while the latter is an ERC-1155 collection. Their descriptions, however, are identical.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY.

16. In the contexts just described, ERC-1155 tokens are marketed as NFTs, interpreted as NFTs by consumers, and traded on major NFT trading platforms. They are also interpreted and described as NFTs by developers.

   (a) OpenSea's Help Center, for example, describes ERC-1155 tokens as "semi-fungible NFTs" (where "semi-fungible" in context refers to the substitutability of different units of the same token; emphasis added). Further, the OpenSea Help Center features a page called "Will ERC-1155 NFTs appear in my wallet?" that explains, "Many NFTs use the ERC-1155 token standard [. . .]" (emphasis added).[55] In addition, numerous developer publications and blogs discuss the different design features and applications of ERC-1155 tokens versus ERC-721 tokens for NFT development.[57]

   (b) As mentioned above, Nike designs and markets ERC-1155 token products as NFTs. Once again, as illustrated in Figure 1, the "RTFKT Clone X Forging SZN 1 (PRE-FORGE)" series of ERC-1155 tokens are explicitly described as NFTs "pre-forged NFTs" in their OpenSea collection page. The ERC-1155 "RTFKT x RIMOWA Meta-Artisan Collection" is described the same way (see Figure 2). Buyers and sellers interpret and publicly discuss these tokens as an NFTs. As stated by Nike's own fact witness, Nike minted multiple NFTs using the ERC-1155 token standard because it was "███████████████████"[58]

   (c) Likewise, the Vault NFTs were marketed as NFTs by StockX. And consumers discussing the functionality of Vault NFTs understood them to be NFTs for tracking the ownership of a physical item, as illustrated, for example, in Figures 9 and 10.[59]

---

[55] ProofOfPlay, *Pirate Founders Opensea*; ProofOfPlay, *Pirate Items Opensea*.

[56] OpenSea. *ERC1155 in my wallet*. URL: https://support.opensea.io/hc/en-us/articles/1500003082561-Will-ERC-1155-NFTs-appear-in-my-wallet-; OpenSea. *What is an NFT*. URL: https://support.opensea.io/hc/en-us/articles/360063450733.

[57] Nikhil. *A practical comparison between ERC-1155 and ERC-721*. Apr. 2023. URL: https://celo.academy/t/a-practical-comparison-between-erc-1155-and-erc-721/62; Alchemy Team. *Your guide to ERC-1155: Comparing ERC-721 to ERC-1155*. URL: https://www.alchemy.com/blog/comparing-erc-721-to-erc-1155.

[58] Child Transcript, 164:24-165:17.

[59] *Disclosure: I hold Shwaz NFTs.*

17

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY.



**Shwaz** ✔
@theycallmeshwaz                                                           ...

I've been talking about this forever. Now sneaker resellers won't have to
go through the whole process of storing/ shipping shoes. They can just
trade the NFTs and then when someone actually wants the shoes they
can redeem for physical. Game changer.

> ✕ **StockX** @stockx · Jan 18, 2022
> NFTs are on StockX.
>
> Introducing #StockXVault: a digital NFT that's backed by a physical product
> and stored in an official StockX facility.

Figure 9: Prominent NFT creator Shwaz both recognized the Vault NFTs as NFTs and immediately
understood their market use.[61]

---

[61]Shwaz. *Shwaz on StockX NFTs*. Jan. 2022. URL: https://twitter.com/theycallmeshwaz/status/
1483517889147719689.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY.



Figure 10: Crypto Twitter user Chris AR Blauvelt immediately understood the Vault NFTs' market use. [63]

17. Mr. McNew's opinion that Vault NFTs are not NFTs suggests that he is unaware of these widespread applications of ERC-1155 tokens in the NFT market, both in general and in the specific context of NFTs redeemable for physical or digital assets. This unawareness suggests a significant degree of unfamiliarity with how the NFT market works in practice, especially considering the widespread attention that ERC-1155 "open edition" collections received in the first quarter of 2023.[64]

[63]Chris AR Blauvelt. *So Stockx's new vault NFT is basically like a valet ticket?* Jan. 2022. URL: https://twitter.com/arblauvelt/status/1483834728541208580.

[64]Rosie Perper. *What is an open edition NFT sale?* Feb. 2023. URL: https://www.coindesk.com/learn/what-is-an-open-edition-nft-sale/; Alex White-Gomez. *Open edition NFTs: New Fad or new opportunity?* Feb. 2023. URL: https://www.one37pm.com/nft/open-edition-nfts.

## StockX's Uses of the Blockchain Are Not Pretextual – The Fact that the Vault NFTs Are Minted on the Blockchain is Meaningful and Valuable for their Intended Market Design Function

18. Mr. McNew repeatedly asserts that the minting of the Vault NFTs on the Ethereum blockchain serves no purpose, and that the functionality of the Vault NFTs could be implemented just as effectively without use of a blockchain-based token. For example, the McNew Report includes an entire section under the heading that "StockX's [u]nderlying [b]lockchain-[b]ased NFTs [a]ppeared [w]holly [u]nnecessary and [i]ndeed [p]retextual to the [v]aulting [p]roduct,"[65] and he asserts that "initial purchase, ownership, transfer, and redemption are not recorded in any way on the blockchain," and "[t]here is nothing in the StockX smart contract that indicates that any of the NFTs have been burned upon redemption of the associated physical item."[66] Based on these facts, Mr. McNew opines that "'use' of blockchain technology [is] wholly pretextual and practically irrelevant to its Vault NFT offerings."[67] Further, Mr. McNew opines that "StockX promoted the use of blockchain and its benefits and claimed one-to-one representation of products as selling points, but failed to meet its own representations and industry standards upon closer examination."[68] In essence, Mr. McNew asserts that because the Vault NFTs were managed by way of a custodial wallet and trading system at launch, the underlying ERC-1155 tokens have no purpose.

19. Mr. McNew's opinion is flawed and fails to account for the market realities of developing a new product on-chain. Specifically, Mr. McNew fails to account for the ways in which StockX could further develop the Vault NFTs to make use of the blockchain functionality, which I discussed at length in my Opening Report, and on which internal StockX communications indicate that the company was actively working. Mr. McNew inappropriately fails to account for these marketplace expansion opportunities, and their potential benefits in terms of creating a transparent and efficient market.

20. StockX built a foundation upon which growth was possible. Minting the Vault NFTs as blockchain assets was a key step towards their intended full functionality and purpose in enhancing and increasing the efficiency of the market for physical collectibles as tradable assets. As I described in my Opening Report, "because Vault NFTs are recorded on a public blockchain, it can be made possible for third parties to audit how many of each type of Vault NFT are in circulation independently of StockX, thereby increasing transparency of the market. [. . .] An even greater transparency improvement could be made by adjusting the transaction processing from an internal ledger to processing on a blockchain, and then trade and potentially Vault NFT pricing could also be made fully public and auditable. In addition, working with NFTs on the Ethereum network provides the option for StockX to eventually allow trade in the Vault NFTs on outside marketplaces rather than just on the StockX platform. This again would serve to provide economic efficiency benefits, both by expanding potential market access to the products beyond just the users of the StockX platform, and by enabling prospective buyers and sellers to actively

---

[65]McNew Report, p. 61.
[66]McNew Report, p. 45.
[67]McNew Report, p. 45.
[68]McNew Report, p. 62.

choose the platform on which they wished to exchange (which in turn can lead to virtuous platform competition)."[69]

21. Although my Opening Report was not based on a review of any internal StockX communications or non-public documents from this litigation, having now reviewed such materials, it is clear that StockX saw and planned for precisely these two benefits.

   (a) Internal communications show that StockX was considering making the Vault NFTs withdrawable to third-party wallets and tradable on third-party exchanges. This would have required either explicitly burning Vault NFTs that have been redeemed, or moving them to a designated wallet representing units no longer in circulation, thus providing the specific transparency benefit I described in my Opening Report.[70]

      i. As Mr. Fenton, StockX's Vice President of Customer Experience, testified, StockX's future business plans involved Vault NFTs being able to trade off-platform.[71]

**Can I transfer my NFT to another crypto wallet?**
Transferring NFT's from StockX to another wallet is not available at this time.

NFT portability to customer wallets is one of the top priority features we intend to implement in the coming months. Once this feature is added, we will be sure to update our customers immediately.

**Can I resell my NFTs?**
Yes, you can resell your NFTs on the StockX platform. At this time, you cannot resell your NFT on other NFT marketplaces, but it's on our roadmap.

Figure 11: A Launch Copy of the Vault NFT Customer Service FAQs, demonstrating StockX had plans to allow for withdrawal and trading on other platforms.[73]

   (b) Contrary to what Mr. McNew claims, the fact that the Vault NFTs did not have these functions at the outset does not in any way diminish the value of minting the tokens on the blockchain for enabling them to have those functions in the future. And indeed, as I discussed in my Opening Report and elaborate on further below, many prominent NFT projects start with fully custodial trading models initially, and then later allow for export of the digital assets to non-custodial wallets.[74] Both DraftKings[75] and NBA Top Shot[76] did this with their NFTs.

---

[69]Original Report, ¶¶ 44(b)-44(c).

[70]Original Report, ¶ 44(b).

[71]Transcript of the Deposition of Jacob Fenton, *Nike, Inc. v. StockX LLC*, No. 1:22-cv-00983-VEC, 113:19-114:17 (Dec. 2, 2022) ("Fenton Transcript")

[73]STX0094175 at 77

[74]Original Report, ¶¶ 45(b)-45(c).

[75]DraftKings. *Who maintains custody of each NFT purchased on DraftKings marketplace? (US)*. URL: https://web.archive.org/web/20230205051001/https://help.draftkings.com/hc/en-us/articles/4404934462227-Who-maintains-custody-of-each-NFT-purchased-on-DraftKings-Marketplace-US-.

[76]NBA Top Shot. *Send moments to non-custodial wallets: NBA Top Shot blog*. URL: https://blog.nbatopshot.com/posts/send-moments-to-non-custodial-wallets.

(c) Furthermore, the testimony of Nike's own witnesses is inconsistent with Mr. McNew's suggestion that an off-chain model is not appropriate, or somehow an inferior product. Mike Child ████████████████████████████████████████████████████████ ██████████████████████████ as he described in his December 9, 2022, deposition: in reference to a slide he had prepared making this point (Figure 12), Mr. Child explained, ████████████████████████████████████████████████████████████████ ████████████████████████████████████[77] His reasoning for this—████████████ █████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████' He also speaks ████████████████████████████████████████████████████████████ ████████████████████████. Just as I described in my Opening Report, a centralized, custodial system can simplify the product purchasing process for customers, especially when those customers are relatively unfamiliar with the technology of crypto and blockchains.  And as Mr. Child pointed out, ████████████████████████████ ████████████████████████.



Figure 12: Exhibit 20, slide 15 from the Deposition of Mike Child, ████████████████████ ████████████████[80]

(d) Indeed, Nike's .SWOOSH NFT ecosystem launched with a custodial wallet and private ledger system much like that used for the Vault NFTs.  In particular, the .SWOOSH NFTs were minted to a blockchain (in this case, the Polygon blockchain), but managed purchases centrally through a private ledger.  During the .SWOOSH launch, customers expressed confusion about why their purchases had not been registered to the blockchain yet, and Nike responded with an explanation that their purchases had been confirmed on its private ledger, and the associated blockchain tokens would be produced later.  Nike also created and maintained custodial wallets for each .SWOOSH user, and at least initially disabled a

---

[77]Child Transcript, 136:4-7.
[78]Original Report, ¶ 45(b).
[80]NIKE0031045 at 59

number of features that would ordinarily be available for block chain-based tokens, such as trading and/or withdrawal to third-party wallets.[81]

(e) From the consumer perspective, the potential to trade the Vault NFTs on third-party platforms in the future increases the option value of the Vault NFT offering; from a market perspective, this serves the goal of enhancing the eventual transparency and efficiency of the market, as I described in my Opening Report.[82] And again, ██████████████████
████████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████[83] Furthermore, prospective .SWOOSH customers seem to have been interested in future trading opportunities, as well.[84]

(f) Likewise, and again contrary to Mr. McNew's statements, the fact that Vault NFT transactions are not currently settled on the blockchain does not mean it would not be useful for the Vault NFTs themselves to be on the blockchain, or for transactions in the Vault NFTs to be settled on the blockchain in the future. Fungible token exchanges manage many of their transactions internally and only settle on the blockchain at intervals. However, this practice does not in any way diminish the value of having the underlying tokens recorded on the blockchain infrastructure layer. And again, purchases of Nike's .SWOOSH NFTs were first confirmed on a private ledger, and then the tokens were subsequently issued on a blockchain (Polygon). Especially given that .SWOOSH NFTs at present cannot even be traded, under Mr. McNew's model of the world, there would be no reason to issue the .SWOOSH NFTs on a blockchain in the first place. But of course, just as with the Vault NFTs, putting the .SWOOSH NFTs on a blockchain even without immediately enabling on-chain activity creates a number of valuable expansion opportunities such as the ability to enable trading on third-party marketplaces, ███████████████████—and on which Nike has already capitalized with its RTFKT collections.

22. ███████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████ █████████████████████
████████████████████████████████████████████████████████████████████████████
███████████████████████ The use of blockchain technology for the Vault NFTs already makes certain aspects of the Vault NFT program auditable (specifically, the numbers, types, and metadata features of the tokens). In addition, as I described both above and in my Opening Report, StockX's use of blockchain technology has the potential to make even more aspects of the program auditable in the future.[86]

---

[81]Transcript of the Deposition of Ron Faris, *Nike, Inc. v. StockX LLC*, No. 1:22-cv-00983-VEC, 38:17-21 (Dec. 7, 2022) ("Faris Transcript").

[82]Original Report, ¶ 44(b).

[83]Child Transcript, 294:12-295:19.

[84]HansDieter26. *Convenient Marketplace*. May 2023. URL: https://twitter.com/HansDieter26/status/1661961757835907072; Frederick Wang. *When will secondary transfer open for those who haven't got membership?* May 2023. URL: https://twitter.com/CMoneyCaptain/status/1660791902411833345; Kirt.eth/tez. *Will there be a marketplace to trade?* May 2023. URL: https://twitter.com/myjpeg/status/1657133834679328768.

[85]STX0030506

[86]Original Report, ¶ 44(b).

23. Thus while, as Mr. McNew notes, it would in principle have been possible for StockX to implement the custodial asset trading functionality of the Vault NFTs *that was available at launch* without the use of blockchain tokens, such an implementation would not have supported the full functionality StockX intended and was actively developing for the Vault NFTs at scale.

    (a) Given that StockX did eventually plan to make use of the blockchain-based trading features, Mr. McNew's suggestion that the Vault NFTs could have achieved their full purpose without blockchain tokens is incorrect.

    (b) It would not necessarily even have made sense to start the Vault program without using blockchain tokens. Developing a completely internal system for trading claims on physical "vaulted" assets initially *and then later converting all of those claims into blockchain-based tokens* in order to achieve the full market purpose would have required unnecessarily duplicative effort. Again, as Nike's own fact witness, Mr. Child, testified, starting out with a private internal ledger to track ownership of blockchain-based assets allows for a later switch to tracking those assets via the blockchain at any time.[87]

24. Moreover, both public and internal StockX communications also show that the company had plans to expand its NFT operation beyond just the Vault NFTs to include other NFT categories such as experiential NFTs and creator NFTs. StockX even considered the possibility of having third-party NFTs become tradable on its platform.

25. Mr. McNew attempts to rely upon StockX internal documents and testimony to support the assertion that StockX believed NFTs were not necessary and served solely a marketing purpose.[88] However, this attempt is unavailing, as Mr. McNew misconstrues and cites only portions of those documents. And, as discussed above, StockX did think NFTs were necessary - to enable the full functionality StockX intended for its Vault NFTs.

    (a) As I discussed in detail above, StockX internal communications reveal the company had extensive plans to make use of blockchain functionality as it further developed the Vault NFT product. Moreover, participants in the market understood NFT technology as a natural and intuitive way to implement trading of physical sneakers and other collectibles, in the same way as NFT technology has been used to enable trading in other physical assets.[89],[90],[91] StockX also both internally and publicly planned to introduce additional types of NFT assets to its marketplace beyond the Vault NFTs.

    (b) Mr. McNew writes:

        "Internal StockX documents also show that the superfluousness of NFTs to a vaulted goods trading model was not just a post-hoc epiphany but rather was explicitly acknowledged by StockX at least one month prior to launch. In an early version of the 'NFT Go-to-Market' slide deck dated December 17, 2021, StockX wrote, '[t]hink of StockX (non-partner) NFTs as a promotional tactic . .

---

[87]Child Transcript, 136:4-7.

[88]McNew Report, p. 62.

[89]Sanj. *StockX NFT solved*. Sept. 2022. URL: https://twitter.com/bytebybit_/status/1571207885736087552.

[90]Blauvelt, *So Stockx's new vault NFT is basically like a valet ticket?*

[91]Advaykoranne.eth. *Stockx's new vault NFT tied to a sneaker*. Jan. 2022. URL: https://twitter.com/AdvayKoranne/status/1483889612720201730.

. .' StockX was therefore aware that its use of NFTs was purely cosmetic instead of functional and served as a marketing purpose rather than enhance or facilitate a vaulted goods trading model."

(c) Mr. McNew also quotes from the deposition of StockX Vice President of Consumer Experience Jacob Fenton in arguing that the use of NFTs was superfluous and just a marketing tactic. Mr. McNew writes, "In fact, StockX considered this option, but rejected it in favor of selling 'NFTs' due to the 'fervor and interest in NFTs at th[e] time.'"[92] The full quote though is as follows: "We didn't have, like, we didn't have to mint it as an NFT. We could have drawn up a picture of a claim ticket, like in Willy Wonka, and said, 'This is the claim ticket to the shoe.' So we chose to do it because, several reasons. One, there is a lot of fervor and interest in NFTs at this time. And two, we also thought down the road, you know, as we were trying to facilitate additional secondary trades, the technology of this would – would help that process, make it easier for us."[93] Mr. McNew selectively omits the second half of the statement, which explicitly references the potential value of NFT technology for facilitating efficient secondary-market trading, which was discussed extensively in StockX documentation, and which I also described in my Opening Report.

# Vault NFTs Are Not "Shoddily Designed" – "Minimum Viable Product" (MVP) Product Design and Iteration is Standard in Technology and Marketplace Entrepreneurship

26. Mr. McNew claims that "StockX failed to devote sufficient time and resources to deliver what it promised to consumers."[94] In supporting his claim, he draws upon myriad mentions of MVP product development referenced in StockX internal documentation and communications.

---

[92] McNew Report, p. 25.
[93] Fenton Transcript, 124:1-11.
[94] McNew Report, p. 54.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY.

Mr. McNew indicates that he thinks that launching a new product by way of an MVP is inappropriate.[95]   But in fact, MVP development and iteration—often referred to as "lean" development—a term introduced by Eric Ries, who popularized the approach in his book *The Lean Startup*[96]—is standard in technology and marketplace entrepreneurship, and considered a best practice for digital innovation.[97] Mr. McNew appears to be unaware of this.

27.  I first studied "lean startup" methods as a student in the "Launching Tech Ventures" elective course at Harvard Business School (HBS) while I was working toward my PhD. At that time, the course was almost entirely focused on lean product innovation and MVP design.  I also had the opportunity to meet Eric Ries and read an early draft of his book, a part of which I later reviewed for *Harvard Business Review*'s web series.[98] Lean product development was later added to the curriculum of HBS's first-year required course in entrepreneurship, "The Entrepreneurial Manager," which all MBA students in our program must take, and which I taught in Spring, 2016.  I cover lean development methods in my MBA marketplace design elective course ("Making Markets"), and I plan to teach them in my new elective course on crypto and web3 when it launches in Spring, 2024. In all of these teaching contexts, I explicitly train students on how to conceptualize and design MVPs with an eye towards maximizing the opportunity for market feedback and, in particular, learning about product-market fit through MVP launch.

  (a) The purpose of launching with an MVP is to deploy a product to the marketplace in a form that makes it possible to test core product hypotheses and functionality and gather market feedback that enables quick iteration.[99]

  (b) The specific form of the MVP is highly product-specific, and thus varies across technology and industry categories.  But in all cases, by its nature, reliance on MVP design entails launching with a product that is not fully ready to scale because the goal is precisely to hone product-market fit before finalizing a scalable model.

  (c) MVPs often also entail having at least some key components in interim stages of development.  For example, one standard MVP format, typically referred to as a "concierge" MVP, entails using a human intensively as a substitute for what might otherwise be software features, to avoid having to fully develop software until the ideal process functionality is determined.[100] Some MVPs are far less developed than the Vault NFTs were at launch; for example, a "smoke test"—posting a website about a product that has not even been developed yet as a way of collecting information about potential demand—is a form of MVP.[101]

---

[95]McNew Report, p. 56 (stating that, "The focus on MVP rather than a product that was mature from a planning, development, and support standpoint are some of the factors that led to an underwhelming and frustrating experience for consumers.").

[96]Eric Reis. "The Lean Startup". In: *New York: Crown Business* 27 (2011), pp. 2016–2020.

[97]Thomas Eisenmann, Eric Ries, and Sarah Dillard. *Hypothesis-Driven Entrepreneurship: The Lean Startup*. Harvard Business School Note 812-095. URL: https://hbsp.harvard.edu/product/812095-PDF-ENG.

[98]Scott Duke Kominers. "Digital Pioneers on Paper". In: *Harvard Business Review* (July 2014). URL: https://hbr.org/2011/07/digital-pioneers-on-paper.

[99]Reis, "The Lean Startup"; Eisenmann, Ries, and Dillard, *Hypothesis-Driven Entrepreneurship: The Lean Startup*.

[100]Reis, "The Lean Startup".

[101]Reis, "The Lean Startup"; Eisenmann, Ries, and Dillard, *Hypothesis-Driven Entrepreneurship: The Lean Startup*.

(d) The MVP approach is used both in the context of startup entrepreneurship (as in the original context of "the lean startup"), as well as in entrepreneurship within established companies, often referred to as "intrapreneurship."

(e) In particular, MVP-based entrepreneurship is especially critical in web3 contexts. Indeed, in such contexts, product decisions can become immutable (or at least very difficult to revise) after being encoded into blockchain assets and software—which reinforces the need to iterate and confirm product-market fit before scaling. For this purpose, my colleagues and I often recommend that web3 entrepreneurs start with MVPs comprising mostly or fully off-chain implementations of their protocols.

28. Thus, contrary to Mr. McNew's claim, StockX demonstrated best practices by launching an MVP that enabled it to test the market in a quick and simple way, observing how consumers reacted to their offerings, and iterating upon their offerings and design decisions. Moreover, the specific design of the Vault NFT MVP reflected a number of practices that I myself would have most likely advised in this product design context:

(a) StockX limited the number of products included in the Vault NFT launch, and focused the launch on products for which the company believed there to be consumer demand. The shoes chosen for the initial Vault NFT sale were top-selling shoes on the StockX platform; this would have raised the probability of transactions and market interaction sufficient to enable StockX to learn about overall demand for the Vault NFT offering, and consumers' willingness to trade the Vault NFTs.

(b) StockX varied the number of editions of the different Vault NFT products launched. This tested hypotheses about the role of scarcity in Vault NFT demand, which would have been especially natural to investigate given the role of scarcity in collectibles markets. (Additionally, due to difficulties in sourcing rarer collectibles, varying edition sizes may also have been necessary in order to test SKUs with varying rarity of the underlying asset as part of the MVP.)

(c) At the same time, StockX limited the number of SKUs of each product in the vault (in particular, limiting each to a single size). This both served the MVP purpose of reducing the number of SKUs that StockX had to order and store, and would have reduced idiosyncratic demand driven by prospective buyers having specific size preferences. ██████████

(d) Finally, StockX managed the Vault NFT purchasing and sale processes through its existing platform using a custodial wallet and trading system. As I mentioned in my Opening Report and will discuss in more detail below, the custodial wallet and trading system offers a number of direct market design benefits. But from the perspective of lean product development, this significantly reduced the number of software components StockX would have had to build in order to launch the MVP, and also removed a variable that may have otherwise confounded the demand analysis (specifically, whether prospective buyers and sellers could access some other, possibly crypto-native trading platform).

[102] STX0063402; STX0163292

29. It is clear that StockX's team managing the Vault NFT design and rollout was aware of process for and benefits of an MVP launch strategy.  Indeed, Mr. McNew quotes directly from Evan Thomas's deposition to this effect:

> "The customer experience is adequate and viable to test the market and what their consumer needs are, but the amount of technology and process and architecture built into it is tried to be minimized. So it's a balancing act of the lowest amount of scope or effort to achieve the greatest return on investment for that scope and effort.
>
> *****
>
> From a product management standpoint, it's beneficial to deliver MVP experiences quickly to be able to learn from them and iterate on them to make adjustments rather than bite off too much without getting anything in front of customers."[103]

This is a textbook description of how MVP entrepreneurship works, closely similar, for example, to the language we use to describe MVP design at Harvard Business School.[104]  Yet, Mr. McNew somehow interprets this as evidence of a poor innovation process.

30. And indeed, StockX *did* learn critical information relevant to the Vault NFTs' product design through its initial MVP launch.

   (a)


---

[103]McNew Report, p. 55, citing Thomas Deposition at 34:2-8; 73:11-19.
[104]Eisenmann, Ries, and Dillard, *Hypothesis-Driven Entrepreneurship: The Lean Startup*.
[105]McNew Report, p. 54, n. 197

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY.



Figure 13: McNew's cited slide (top). Three slides later in the deck, there was a slide explaining lessons learned from the initial launch (bottom)—which Mr. McNew had even cited elsewhere in his report.[107]

(b) 

(c) This is exactly how the MVP model is supposed to work: StockX, looking to enter an un-familiar market, and (as Mr. McNew points out[108]), believing time to be of great urgency, released a "minimum-viable" preliminary version of their product, gathered data about the market response to that MVP, analyzed that data, and immediately formulated plans to iterate on the product offering, guided by insights from that data.

---

[107]STX0022204 at 05, 08; citation of STX0022204 at 08 appears in McNew Report p. 28 (although as I describe below, Mr. McNew misinterprets the slide when he references it there).

[108]McNew Report, p. 56, n. 205.

(d) Incidentally, Mr. McNew repeatedly criticizes the Vault NFT program on the basis that it launched without all of the individual sneakers associated to the tokens already in storage. But as the preceding discussion makes clear, this would be well within the scope of an MVP—especially since StockX had apparently successfully ordered more than the full cohort of items prior to launch, and was simply waiting on delivery for some of them.

31. StockX is certainly not alone in using the MVP approach. Nearly every technology company I advise uses this approach. Many NFT projects release their early NFTs as MVPs and repeatedly iterate on those product offerings. And indeed, Nike uses this approach in its own NFT development.

(a) Many NFT projects, including many I advise on and/or am in the community of, release their initial products in MVP form—often even creating tokens without having fully built out the associated utility features. The Chain Runners NFT project, for example, launched its 3D "XR Runner" avatar series when only static images—and not fully-rigged 3D models for the avatars—were available.[109],[110],[111] Hungry Wolves, on which I advise, described their game mechanics at launch, but the full game itself was not available to play until several months later—and the team has repeatedly updated its game and other offerings based on market and community response.[112] Likewise, the NFT-based Pirate Nation game I mentioned above launched in a private "beta" format, and has issued virtually weekly updates to the game to improve or expand gameplay, and/or fix technical issues.[113]The the team explicitly messages regarding the in-progress state of the product, and any updates it deploys are frequently in direct response to user feedback and technical challenges discovered through the beta launch.[114]

(b) And as Mike Child explained in his December 9, 2022, deposition, ███████████████████████
████████████████████████████████████████████[115] As he explained, ████████████████ ████████████████████████████
████████████████ ██ ████████████ Mr. Child testified that he was aware that the concept of an MVP is "more broadly used" in entrepreneurship.[117]

(c) As I already described above, Nike's .SWOOSH NFT ecosystem launched with a custodial wallet system and fully centralized platform, with at least some promised future functionalities—most notably trading of .SWOOSH assets, as well as use of those assets in metaverse platforms—not yet available. Moreover, like with the Vault NFTs, .SWOOSH

---

[109]Chain Runners. *Chain Runners Discord Server.*

[110]Chain Runners. *Past the PFP.* Aug. 2022. URL: `https://twitter.com/chain_runners/status/1562886043648503808`.

[111]*Disclosure: I hold Chain Runners NFTs, and have collaborated with their team.*

[112]Adam Hollander. *Hungry wolves whitepaper.* Jan. 2022. URL: `https://hollanderadam.medium.com/hungry-wolves-whitepaper-69035ffff416`.

[113]Pirate Nation. *Pirate Nation Updates.* URL: `https://mirror.xyz/0x66CeCA466b503E757054bA20Fa21DB974eAFc062`.

[114]See, e.g., Pirate Nation. *Ship's Log Release 11 February 16th, 2023.* URL: `https://mirror.xyz/0x66CeCA466b503E757054bA20Fa21DB974eAFc062/uJP6o9vLA2MIyymdcqpdQPaSu2NF64bYQghQnvmGaC4`.

[115]Child Transcript, 131:20-133:18.

[116]Child Transcript, 131:20-132:15.

[117]Child Transcript, 132:9.

launched with a very small selection of products—first a single digital poster NFT, and then two distinct editions of an "Our Force 1 Box" (the Classic Remix Box and the New Wave Box).[118] Moreover, despite the fact that the "Our Force 1 Boxes" were fully digital assets, Nike constrained their total supply and also limited the set of prospective buyers.[119,120]

(d) The .SWOOSH "Our Force 1" sale also featured significant operational hiccups. Nike faced issues with website traffic during the First Access sale, leading the company to extend the sale window unexpectedly.[121] Nike also encountered what appeared to have been software issues in the process of minting the "Our Force 1" NFTs, posting the following on Twitter during the General Access sale: "If you attempted to purchase during the first hour of GA this message is for you - We ran into an unforeseen error that held up the minting process. This also blocked additional purchases. Our team is actively working their way through the backlog of orders now."[122]The team moreover appealed to their use of a private ledger for ensuring transaction security in the midst of the minting issues, posting "REMEMBER -If you made it to the order processing page and see a charge to your payment method, you WILL receive your OF1 Box,"[123] and "If you made it to the order processing page and are seeing a charge for your OF1 Box, the order is CONFIRMED. [. . . ] The minting process is taking longer than expected, but your OF1 Box is secured and will appear in your .SWOOSH profile."[124] An article in *CoinDesk* summarized the issues as follows: "The [Nike "Our Force 1"] sale, which began with 'First Access' on May 15 after numerous delays, faced multiple technical issues that hindered the user experience. The 'General Access' sale began on May 24—two weeks after its initially-proposed date—and also experienced issues with traffic and tech preventing many from minting."[125] The "Our Force 1" collection also lacks a verified smart contract,[126] something Mr. Mc-New repeatedly points out as an alleged failing in StockX's smart contract for the Vault NFTs.[127]

(e) These sorts of issues are common in the launch of novel technology MVPs. But they do not, as Mr. McNew apparently believes, somehow represent "shoddy design." Mr. Child's deposition makes it clear that ███████████████████████████████████
████████████████████████████████████████████████████████████████

---

[118]URL: `https://www.swoosh.nike/`.

[119].swoosh. *12 hours left*. May 2023. URL: `https : / / twitter . com / dotSWOOSH / status / 1663983759442739201`.

[120].swoosh. *GA*. June 2023. URL: `https://twitter.com/dotSWOOSH/status/1664747388517617664`.

[121].swoosh. *issues*. May 2023. URL: `https : / / twitter . com / dotSWOOSH / status / 1658527958381002752`.

[122].swoosh. *Unforseen errors*. May 2023. URL: `https : / / twitter . com / dotSWOOSH / status / 1661470965300367360`.

[123].swoosh. *Will receive*. May 2023. URL: `https : / / twitter . com / dotSWOOSH / status / 1661470966827065345`.

[124].swoosh. *Processing Page*. May 2023. URL: `https : / / twitter . com / dotSWOOSH / status / 1661425183893381120`.

[125]Rosie Perper. "Nike Trips Up .SWOOSH Launch While Bitcoin NFTs Soar". In: *CoinDesk* (2023). URL: `https://www.coindesk.com/web3/2023/05/26/nike-trips-up-swoosh-launch-while-bitcoin-nfts-soar/`.

[126]Polygonscan.com. *Nike: Our force 1 - box (OF1BOX) token tracker: PolygonScan.* URL: `https : / / polygonscan.com/token/0x851d5fa26636df46b6196879582324c311556b46`.

[127]McNew Report, pp. 3, 24.

███████████████████████ StockX did with the Vault NFTs. Contrary to Mr. Mc-New's assertions, the challenges inherent in optimizing the design of technology products are precisely the reason to use MVPs and iterative development in the first place. Launching early with a simplified version of the product makes it possible to detect technical and market issues that need to be iterated upon before scaling.

(f) Mr. McNew's belief that the launch of an MVP—with the product limitations and other operational challenges that entailed—is somehow an indication of shoddy or otherwise substandard product development indicates a tremendous lack of familiarity with how technology entrepreneurship works today. As I emphasized above, the launch of an MVP and iteration based on market feedback is a best practice for technology entrepreneurship, especially when entering a new market context and especially when working with somewhat immutable content on a blockchain. And in the case of the Vault NFTs specifically, the MVP was successful both at generating and testing demand and in identifying opportunities to improve the Vault NFT model.

## Using Custodial Digital Asset Management is a Standard Design Paradigm, Especially for Non-Crypto-Native Customers

32. Mr. McNew also argues that managing the Vault NFTs on a private ledger with custodial wallets was somehow inferior or even fundamentally inappropriate as a design for an early-stage NFT product. In particular, he describes StockX's management of an internal, private ledger as "less than ideal."[128] This is incorrect.

33. As I explained in my Opening Report and discussed in further detail above, the use of a private ledger system at the outset of the Vault NFT program in no way prevents the program from later transitioning to a decentralized ledger system, leveraging self-custodial wallets and even third-party exchanges. And indeed, internal communications reveal that StockX was actively planning to do this. The use of a private/centralized ledger at launch with a gradual transition to more decentralized trading is a standard design paradigm in crypto, and is especially appropriate when dealing with customers who are new to crypto.

34. Mr. McNew observes that at present, "no relationship exists between the blockchain-based Vault NFT smart contract and the internal database that StockX actually uses to sell, transfer, and track ownership over the Vault NFTs," and argues that "[a]s a result, Vault NFT holders lack many benefits of actual blockchain-based NFT ownership, including the ability to confirm and prove ownership publicly on an immutable public ledger (*i.e.*, a blockchain), the ability to view and confirm prior transfers, and the ability to independently hold and transfer the NFTs. StockX's use of the term 'NFT' and related terms (e.g., 'ERC-1155,' 'Ethereum,' etc.) thus conveys a use of blockchain that does not exist here in any meaningful way. For these reasons, the connection of StockX Vault NFTs to the blockchain was superficial."[129] This is not consistent with how the market would ordinarily perceive NFTs traded on private ledgers.

---

[128]McNew Report, p. 44.
[129]McNew Report, p. 47.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY.

(a) As I mentioned in my Opening Report, "both the DraftKings[130] and NBA Top Shot[131] initially used custodial wallet models for their NFT marketplaces, and then gradually expanded to allow non-custodial wallets."

(b) Moreover, as I explained in my Opening Report, trade in Ordinal NFTs has frequently relied on ledgers separate from the blockchain because of technological and user experience challenges in managing on-chain Ordinal transactions on their native blockchain, Bitcoin.[132] All of the Ordinal NFTs I myself own are held in the centralized, multi-user custodial wallets to which they were originally minted, much like in the case of the master wallet StockX uses to hold the Vault NFTs, with my ownership being simply registered in a spreadsheet. But this does not change the fact that those assets are NFTs, or that exchange of those assets is fundamentally meaningful as a transfer of ownership even when it is not recorded on-chain. Furthermore, the market understands this. Ordinal NFTs are currently one of the most popular NFT categories. There have been millions of Ordinal NFTs minted in the past few months, with many of them transacting multiple times.[133]

(c) As I mentioned above, Nike's own .SWOOSH NFTs are similarly held in a custodial wallet system that Nike alone controls at present. But again, this does not in any way diminish the .SWOOSH NFTs' function as NFTs. Indeed, in his December 9, 2022, deposition, Mike Child even expressed the view—which I share—that being an NFT does not even fundamentally require a blockchain-based ledger at all. He testified that an NFT is "a record on a ledger that can be tied to a virtual asset or something else that it represents that sort of serves as a record of ownership."[134] Mr. Child went on to explain that in his view, NFTs do not need to be on a blockchain: "there's nothing special about a blockchain; you can do NFTs on other kinds of databases as well." [135]

(d) And of course, as I mentioned in my Opening Report, centralized fungible token exchanges manage most of their transactions internally through a private ledger system. But even though this means that many fungible token trades are not formally recorded on the blockchain, this does not in any way diminish the value of crypto tokens being stored on blockchain infrastructure in the first place.

(e) Overall, Mr. McNew's view that NFTs are in effect useless unless all activity around them is managed on-chain is simply not true. The use of an NFT, in this context, comes from the ownership it represents. And it is fully possible for it to serve that use without self-custody and on-chain exchange.

35. Moreover, the use of a private ledger at launch is often especially appropriate during MVP development both because it simplifies the design exercise and because it avoids locking-in specific design features and protocols on-chain before they have been iterated upon sufficiently.

(a) As I explained in my Opening Report:

"StockX launched with decentralized storage of the Vault NFTs and their metadata, but with centralized trading. This is a highly sensible choice for a novel

---

[130]DraftKings, *Who maintains custody of each NFT purchased on DraftKings marketplace? (US)*.

[131]NBA Top Shot, *Send moments to non-custodial wallets: NBA Top Shot blog*.

[132]Original Report, ¶ 32(c).

[133]*Ordinals.com*. URL: https://ordinals.com/.

[134]Child Transcript, 29:21-24.

[135]Child Transcript, 127:3-9.

NFT product for which the precise trading protocols were still to be worked out, and whose prospective early adopters may not have had significant experience with decentralized trading of crypto assets. In particular, it is best practice for startups and other companies to implement and test novel trading protocols and designs off-chain initially, especially to the extent that their product audience is already centralized in a given platform that can be used to host the test proto-col."[136]

(b) In my work with various crypto companies, including NFT projects, I commonly recommend piloting with MVPs that are at least partially centralized, in order to hone designs, protocols, and other product features. And I also recommend custodial or otherwise heavily platform-managed digital asset management whenever a crypto platform's customers are unlikely to be crypto-native.

36. Mr. McNew also criticizes StockX for conducting the Vault NFT redemption process through a private, off-chain record-keeping system. However, this is common practice for tracking physical assets associated to blockchain tokens, and in particular is a sensible market design for the Vault NFTs.

(a) Mr. McNew criticizes the Vault NFTs on the basis that the redemption system will always involve physical record-keeping systems to track the vaulted assets. ██████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████[137] It is not clear why Mr. McNew thinks this is a product defect. But in any event, as a point of fact, given that the physical assets associated with the Vault NFTs are not themselves on the Ethereum blockchain—or any other blockchain—because they are physical rather than digital, it is not clear how the redemption process could possibly be managed fully on-chain as Mr. McNew seems to envision.

(b) Particularly given that StockX already had significant systems in place for receiving, storing, tracking, and distributing physical assets, it would make sense for the company to use those same systems for managing the physical assets associated with the Vault NFTs.

(c) Such an approach is standard in the management of physical assets associated with NFTs. I am not privy to the Gutter Cat Gang's system for producing and warehousing its "Gutter Merch" collectibles, for example, but presumably those physical assets are held in a warehouse or other storage system and the Gutter Gang tracks its inventory in a spreadsheet or private database. At minimum, I am not aware of any of the records of how many units the Gutter Cat Gang has in storage, being in any fashion public, much less on-chain. Even though the number of Gutter Merch tokens in circulation indicates the total number of merchandise units that can ever be redeemed, their linkage to the associated physical assets is managed privately by the Gutter Cat Gang team itself.

(d) As a side note, in the context of his discussions around Vault NFT physical asset storage and redemption, Mr. McNew once again misinterprets a StockX internal presentation

---

[136] Original Report, ¶ 45(d).
[137] McNew Report, p. 45.

slide. ██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████ ██ ██████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████████.

## Vault NFTs Function as Tradeable "Claim Tickets" for the Associated Physical Assets, and this was their Intended Design

37. Mr. McNew asserts that StockX's statement that Vault NFTs are merely "claim tickets" for physical assets is "inconsistent with [StockX's] internal discussions, its public representations to consumers, and the Vault NFT design."[139]

38. Based on my own review of the Vault NFT program and the plain meaning of associated internal documents (considered in their entireties), as well as my broader experience studying, advising on, and working with NFT projects, Mr. McNew's opinion is incorrect; indeed, it reflects fundamental mischaracterizations of StockX's internal documents and NFT market realities. Vault NFTs are, and were intended to be, NFTs serving as ownership records with claim to associated physical assets—"claim tickets," in effect. As I described above (paragraph 15), this is a standard and well-known NFT design paradigm, of which Mr. McNew, for some reason, appears to be unaware.

39. As I described in my Opening Report, the Vault NFTs unambiguously *do* serve as claim tickets, and StockX's public messaging about the Vault NFTs strongly supports this interpretation. I explained in my Opening Report:

"The StockX Vault NFTs serve primarily as a simple ownership record for an associated physical product, thus providing a new way to trade physical products through the StockX platform. Each Vault NFT corresponds to a unit of a physical product (e.g., a pair of sneakers) that is stored centrally by StockX. As the Vault NFT website explains: 'Each Vault NFT is tied to a physical product (as depicted on the NFT), which is stored in our brand new, climate-controlled, high-security vault [...] These exclusive StockX Vault NFTs connect coveted physical products with readily tradable digital tokens that track ownership of the physical product.' [...] Like with other NFTs representing ownership of physical assets, the linkage between the (digital) Vault NFT technology and associated physical assets is maintained by contract/terms of service. StockX guarantees the availability of the physical product associated with each Vault NFT, and the holder of any Vault NFT can redeem their NFT for the associated physical product at any time. Redemption entails the payment of processing and shipping fees, as well as associated taxes when appropriate, but—critically—does not require the NFT holder to make any further payment for

---

[138]McNew Report, p. 44.
[139]McNew Report, p. 25.

the physical asset itself[. . .]. As a result, ownership of a Vault NFT serves as a direct proxy for ownership of the associated physical product. Anyone holding a 'StockX Vault NFT Nike SB Dunk Low Ben & Jerry's Chunky Dunky – US M 10,' for example, is the owner of a physical pair of Nike SB Dunk Low Ben & Jerry's Chunky Dunky shoes, in U.S. Men's size 10, that is held securely in StockX's Vault storage. Alternatively, anyone holding a 'StockX Vault NFT LeBron James 2008 Topps #23 – PSA 9' is the owner of a physical PSA 9-graded LeBron James 2008 Topps #23 trading card that is held securely in StockX's Vault storage."[140]

40. While the conclusion in my Opening Report that the Vault NFTs serve as claim tickets for associated physical assets was based only on public information about the Vault NFTs, StockX's internal communications—which Mr. McNew had access to and considered in his report—emphatically support and reinforce this interpretation.

(a) 

---

[140]Original Report, ¶¶ 37-37(c).
[142]STX0022678 at 89



[145]

---

[143]McNew Report, pp. 4, 5, 6.
[145]STX0022204 at 07

(d) Additionally, numerous launch copy pages and other written documents clearly spelled out that the Vault NFTs were claim tickets and inextricably tied to the underlying physical good. Figures 17, 18, 19, and 20 all on their face demonstrate the nature of the Vault NFTs as claim tickets.

> This standard enables StockX to mint one smart contract on Ethereum with any number of NFT editions. When you buy an ERC-1155 NFT on StockX, you are buying one edition of the token, just like you could buy one quantity of a physical good.

Figure 17: An excerpt from StockX Launch FAQs, which tie each NFT to a unit of the underlying good.[149]

> **What are Vault NFTs?**
> Vault NFTs are digital tokens that represent ownership of physical items. Each Vault NFT is backed by a physical item held in StockX's custody, tied directly one-to-one via the blockchain.
>
> This means that if you buy an edition of a Vault NFT, you are the owner of the corresponding physical good which is secured and stored in StockX's Vault.
>
> You can trade that NFT to someone else, which will also transfer ownership of the corresponding physical good, you can hold it for any length of time, or you can redeem the item from the StockX Vault and take possession of the actual item.

Figure 18: An excerpt from StockX Launch FAQs, which explicitly spells out that each Vault NFT represents ownership of one underlying pair of shoes.[151]



Figure 19: A statement from a StockX internal slide that the Vault NFTs explaining that the claim tickets for physical items.[153]

---

[147]STX0019820 at 23
[149]STX0094175
[151]STX0094175 at 78
[153]STX0163937 at 86



Figure 20: A StockX internal slide explaining how Vault NFTs work, which highlighted their nature as claim tickets, as well as many of the features claim tickets possess.[155]

    (e) This understanding of the function of Vault NFTs was reiterated by StockX's Vice President of Customer Experience Jacob Fenton in his deposition (Figure 21).

```
Q.    How about generally, what were the key benefits of
      owning a Vault NFT?

A.    The key benefits of owning a Vault NFT is that you
      would be able to own the underlying sneaker but not
      have to pay for shipping.  You wouldn't have to pay to
      have it stored.  We would do all that for you, when
      you wanted to trade it.  It would be much easier, you
      wouldn't have to ship it in and incur all those fees,
      so for people who regularly like to trade sneakers, it
      was, you know, a key benefit.
```

Figure 21: An excerpt from Jacob Fenton's deposition, where he outlined the key benefits of a Vault NFT.[157]

    (f) 

---

[155]STX0163937 at 87
[157]Fenton Deposition, 69:4-13

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY.



[159]

---

[159] STX0022204 at 08



161

(g) Internal Vault NFT strategy and messaging documents were also consistent with the understanding the Vault NFTs were claim tickets. Yasir Malik's highlighted themes in Figure 24 concerning Vault NFT messaging, lower fees and faster transactions in trading are both inherently built into the Vault NFTs function as claim tickets. In Figure 25, StockX considered how to promote the NFT to consumers, and their language suggested just how substitutable the NFT and underlying physical goods were.



Figure 24: A Slack message from Yasir Malik highlighting two market design aspects Vault NFTs could help with: lowering fees and speeding up transactions.[163]

**Key Strategic Considerations**                                           13

★ How do we educate customers, specifically top-tier sellers, of the value of buying the NFT of a product instead of the physical product?
  ○ Do we offer the option to mint an NFT instead of listing an item?

Figure 25: Part of a slide from an internal StockX presentation considering how to popularize the Vault NFT, clearly demonstrating their belief that the Vault NFTs and the underlying physical shoes are substitutable.[165]

(h) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[161] STX0018406
[163] STX0545122 at 23
[165] STX0019820 at 32

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY.



41. Mr. McNew argues, somewhat bafflingly, that the fact that the Vault NFTs include the utility of "storage" of the associated physical assets means that they are somehow more than claim tickets.[168] But in fact, the storage functionality is core to the claim ticket function itself.

    (a) According to Dictionary.com, a "claim check" is "A receipt for property that has been left or deposited, as in *Give me your claim check and I'll pick up your laundry for you.*"[169] I used the term "claim check" in my Opening Report; the interpretation of "claim ticket" is synonymous.

    (b) The Vault NFTs serve precisely this function: they are a digital receipt for physical property that is in the care of StockX. Notably, the storage function is fundamentally integral to the ability of the Vault NFT to serve as a claim ticket in this fashion—if there were no stored physical asset, then the Vault NFT *a priori* could not (or would not need to) serve as a claim ticket for such an asset in the first place.

    (c) In this sense, the storage functionality associated with the Vault NFTs is not, as Mr. McNew claims, some additive utility that somehow makes the Vault NFTs more than claim tickets, but rather a defining feature that makes the asset into a claim ticket in the first place—what I refer to as "default utility" in my Opening Report (i.e., "a core function of the NFT defined from inception"[170]).

42. Mr. McNew also argues, that the fact that the Vault NFTs are tradable, or provide "enhanced trading services," means they have some utility over and above their intended role as claim tickets.[171] This is also incorrect. The Vault NFTs are claim tickets as I have described, and the principal market design purpose of issuing these digital assets is enhanced trading—to make the Vault NFTs (and thus the underlying assets associated with them) tradable and to improve trading efficiency of the underlying physical asset.

    (a) As I described in my Opening Report:

        "[T]he Vault NFTs are an intuitive and economically valuable use of NFT technology. In particular, they serve to simplify and reduce friction in a collectibles trading/exchange process that already has been prevalent on the StockX platform. [. . . T]he physical product categories covered by Vault NFTs correspond to

---

[167]STX0018406 at 07

[168]McNew Report, p. 34.

[169]*Claim Check*. URL: https://www.dictionary.com/browse/claim-check.

[170]Original Report, ¶ 35(b).

[171]McNew Report, p. 34.

established product categories on the StockX platform. These physical product categories (and indeed, the physical product categories on the StockX platform, more broadly) represent collectibles. People sometimes buy such items for the purpose of their own use and enjoyment. For such buyers, the Vault NFT model is unlikely to be attractive, because obtaining the physical product is essential to those buyers' intended use. However, many people also acquire these assets as investments, with an eye towards potentially reselling them in the future. For those buyers, mechanisms like the Vault NFTs that facilitate storage and later resale have a clear value proposition."[172]

(b) Tradability is not typically considered a "utility" in the context of the NFT market; rather, it is simply an intrinsic feature of (transferable) NFTs. But even if it were, it would clearly be a default utility of a transferable NFT, such as a Vault NFT, because tradability is an intrinsic part of the NFT's function. This is not, as Mr. McNew suggests in his report, an additive utility that gives the Vault NFTs a function beyond their fundamental purpose as claim tickets. Indeed, quite to the contrary, tradability is core to the claim ticket purpose.

(c) Again, not only is this how the Vault NFTs worked in the market in practice, but internal communications make it clear that creating a tradable claim ticket for associated physical assets was StockX's principal design goal for the Vault NFTs.

43. Further, the products underlying the Vault NFTs—including Nike sneakers—are also tradable. McNew has made no attempt to tease apart trading value of the Vault NFTs themselves from the underlying physical goods to which the Vault NFTs are integrally tied. The fact that consumers may want to trade Vault NFTs—as a proxy for trading the underlying physical sneakers—in no way undermines the fact that the Vault NFTs act as claim tickets for those underlying physical sneakers. Indeed, if anything, it could suggest that consumers trust the claim ticket function, making them willing to trade the Vault NFTs instead of trading the underlying physical assets directly.

44. Mr. McNew also argues that the fact that StockX referred to the Vault NFTs as "NFTs" somehow means that they are not claim tickets. For example, the McNew Report states, "[a]s described and exemplified above, from the Vault NFT PDPs (Product Detail Pages) to the StockX User Portfolio to Discord, StockX consistently and prominently referred to the Vault NFTs as 'NFTs,' 'digital assets,' and 'tokens.' Nowhere on StockX's website, social media, or marketing materials did it ever refer to the Vault NFTs as 'claim tickets.'"[173] In making this assertion, Mr. McNew confuses the mechanism of the Vault NFTs with their function.

(a) Vault NFTs *are* NFTs (and hence also digital assets and tokens) that *serve* as claim tickets. Marketing the Vault NFTs as NFTs does not in any way detract from their function as claim tickets. And indeed, marketing the Vault NFTs as NFTs serves a functional purpose of making clear to prospective buyers that and how the claim ticket is encoded as a digital asset—which may also at least be suggestive as to how the asset may be traded.

(b) In any event, StockX extensively marketed the claim ticket function of the Vault NFTs. Indeed, both internal communications and the marketing materials that were used in prac-

---

[172]Original Report, ¶¶ 42-42(a).
[173]McNew Report, p. 35.

tice suggest that StockX sought to make the market understand the Vault NFTs' role as granting holders a claim (via redemption) on the associated physical assets.

45. Mr. McNew also points to benefits and utility of Vault NFTs as evidence that Vault NFTs represent a bundle of physical goods and digital goods and services, beyond mere "claim tickets." For example, the McNew Report states that "StocKX [p]romised and [d]elivered [a]dditional [b]enefits/[p]erks [b]eyond [o]wnership of [p]hysical [g]oods," and points to various "unlocks" and giveaways.[174] However, as I already have described above, internal StockX communications—which Mr. McNew considered—clearly indicate that StockX aspired for the Vault NFTs to function simply as claim tickets. Moreover, to the extent that some individuals may have perceived other utilities or purposes for the Vault NFTs, internal communications make clear that StockX worked to adjust their product design to disabuse the market of that notion and encourage active trading of Vault NFTs. This is entirely consistent with the type of adjustments typical when a business has introduced and gained insight from an MVP.

(a) For example, StockX briefly experimented with coupons and giveaways for Vault NFT holders, and then almost immediately thereafter eliminated those benefits. I noted in my Opening Report (without having reviewed any internal StockX communications) that the decision to eliminate the giveaways was "consistent with a view that the primary purpose of the Vault NFTs was to enable and encourage trade—and that any utility attached to the Vault NFTs (other than the default utility of being able to redeem the associated physical asset) might actually reduce trade by encouraging people to hold their Vault NFTs for their standalone benefits."[175]

(b) Internal communications reveal that this is precisely why StockX eliminated the giveaways. StockX's Vice President of Trading, Shervin Moghaddam, prescribed a modified version of this strategy of giveaways to NFT holders to incentivize trading, writing: "And we should give prizes to anyone who has ever owned this NFT (incentivises trading) rather than who holds it at a point in time (incentivises holding)." ).[176] As Mr. Moghaddam explained when shown this email during his deposition, StockX's goal was to incentivize and increase trading, and, in realizing promotions for Vault NFTs holders was not incentivizing trading (and consistent with MVP design product iteration), StockX worked to fix that problem.[177,178]

(c) More broadly, internal communications clearly indicate that StockX's business model for the Vault NFTs was built around maximizing tradability. The company even tracked the number of daily trades as a key performance indicator (KPI) for the Vault NFT project, setting an ambitious goal of ███ trades per day.

(d) To this point, StockX noted in several internal communications that some buyers were treating the Vault NFTs more like limited-edition collectibles or digital brand NFTs than like claim tickets, and that this was a problem they needed to fix because it was distorting

---

[174] McNew Report, pp. 26-32.

[175] Original Report, ¶ 50(b).

[176] McNew Report, p. 27.

[177] Transcript of the Deposition of Shervin Moghaddam, *Nike, Inc. v. StockX LLC*, No. 1:22-cv-00983-VEC, 149:5-150:19 (Dec. 6, 2022) ("Moghaddam Transcript")

[178] As a side note, Mr. McNew misconstrues Mr. Moghaddam deposition testimony, arguing that it somehow reflects digital brand-style utility delivery, whereas in fact the testimony said precisely the opposite.

market pricing and may also have served to dis-incentivize frequent trading. Mr. McNew reviewed these documents and testimony transcripts and referenced many of them in his report. Bizarrely, however, he neglected to recognize that these communications were precisely about trying to reinforce the market's interpretation of Vault NFTs as claim tickets, rather than some other type of digital asset. ████████████████████████████

46. Mr. McNew also claims that StockX attempted to promote scarcity in the Vault NFTs to create a rare collectible, instead of a claim ticket. He supports these claims by repeatedly taking quotes out of context. Considering all the evidence, however, StockX intentionally rejected scarcity as it would have harmed its intention of a frequently traded claim ticket.

---

[179]McNew Report, p. 26.
[180]McNew Report, pp. 25-26.
[182]STX0019820 at 29

(a) For example, in his February 16, 2023, deposition, Aaron Salo, when asked directly, "in all your time building the [Vault NFTs], you never heard anyone ever talk about promoting scarcity?"[183] responded, "No. Definitely not promoting scarcity."[184] When asked "Why definitely not?",[185] Mr. Salo elaborated, "The idea was volume and not scarcity. Scarcity implies a small number of very dear items, but we wanted this to be a mass market consumable, not driven by scarcity but driven by improved unit economics for trading." [186]

(b) To try and undermine Mr. Salo, Mr. McNew points to a number of items, which, when analyzed in context, do not support his claim. Firstly, McNew points to edition counts associated with the Vault NFTs as promoting scarcity.[187] As shown in Figure 28, ████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████[189]

(c) Mr. McNew then goes on to quote Evan Thomas out of context.[190] The full context is shown as Figure 29. From the context, and as shown in other internal documents,

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████

---

[183]Transcript of the Deposition of Aaron Salo , *Nike, Inc. v. StockX LLC*, No. 1:22-cv-00983-VEC, 174:21-23 (Feb. 16, 2023) ("Salo Transcript")
[184]Salo Transcript, 174:24.
[185]Salo Transcript, 174:25.
[186]Salo Transcript, 175:1-5.
[187]McNew Report, p. 40.
[189]STX0018406 at 09
[190]McNew Report, p. 41, n. 146.



[191]

(d) Furthermore, Mr. McNew's next figure[192] supports my interpretation of ███████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████ is not evi-
dence of intentional scarcity, as Mr. McNew suggests.

(e) Confusingly, Mr. McNew then admits[193] that StockX saw the high Vault NFT prices as a
problem and sought to fix them. Once again as shown in Mr. McNew's figure, ███████
███████████████████████████████████████████████████████████████
██████ This directly contradicts Mr. McNew's own claim that StockX intentionally created
artificial scarcity to create a rare, collectible NFT.

(f) Subsequently, Mr. McNew claims "The fixed edition counts and the resulting artificial
scarcity communicated to the market are entirely StockX's invention, based on its ability
to purchase shoes off of its marketplace to place in the "vault" by the desired Vault NFT
launch date and its capacity to store the shoes."[194] The second half of his sentence, how-
ever, lists very concrete reasons why StockX would have to limit how many Vault NFTs it
could create. As I discussed further in the MVP section, it is best practice to start with a
smaller investment and judge market reaction before expanding, which in this case results

---

[191] STX0545122 at 23-25
[192] McNew Report, p. 41, n. 147.
[193] McNew Report, p. 41, n. 148
[194] McNew Report, p. 42.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY.

in a smaller physical vault and fewer physical shoes. The other concrete reason, an inability to source large quantities of shoes StockX was confident had long term value, was noted in McNew's next citation on page 43, citation 156. This, though, is not the fault of StockX, but rather a feature of the sneaker market at large, where sourcing large quantities of old, same size, popular shoes is difficult as a direct result of the quantity produced by original producer.

(g) Lastly, McNew claims that StockX imposed artificial scarcity by wanting to sell out quickly.[195] As discussed in the MVP section, gauging supply and demand and matching market demand are standard best practices in entering a new market, which is the only thing McNew's evidence demonstrates.

47. Mr. McNew also points to the metadata associated with the Vault NFTs, and specifically the description, "As an NFT owner, you will be granted exclusive access to StockX benefits, promotions, experiences, and rewards," as evidence of promised utility. This description Mr. McNew references existed solely in the metadata associated with the NFT collection; this language was not publicized or advertised; and in fact would have would have been quite difficult for a user to access. The Vault NFTs were managed within the StockX platform, which did not serve this metadata. And without the Vault NFT collection being shown on major NFT exchanges, to my knowledge, the only natural way to obtain the metadata would have been to use a blockchain scanner such as Etherscan. By contrast, as I discussed in my Opening Report and above, StockX made numerous public facing statements informing users as to the value proposition of the Vault NFTs.

48. In practice, as I discussed extensively in my Opening Report, Vault NFT utility—beyond the default utility associated with the claim ticket function—was minimal. But to the extent such utility was offered, my review of StockX internal documents indicate that such utility was not—as Mr. McNew claims—aimed at building a digital brand around the Vault NFTs; rather the utility experiments reflected a goal of increasing trading in the Vault NFTs. Internal communication demonstrates that these were experiments aimed to increase trading.

49. Mr. McNew points to the metadata associated with the Vault NFTs, and specifically the description, "As an NFT owner, you will be granted exclusive access to StockX benefits, promotions, experiences, and rewards," as evidence of promised utility. This description existed solely in the metadata associated with the NFT collection, but since these NFTs were kept within the walled garden of StockX, a user would have been very unlikely to find this metadata, and not without significant searching on a blockchain scanner. This sentence was not advertised to consumers at all. By contrast, as I discuss above, StockX made, numerous public facing statements informing users as to the value proposition of the Vault NFTs.

50. Mr. McNew also attempts to tie the few "unlocks," giveaways, and rewards StockX did offer to the form of ongoing utility that digital brand NFT projects provide, writing "StockX continued to promote the Vault NFTs on Discord by announcing subsequent NFT releases or 'drops.'"[196] But this either misunderstands or misconstrues the form of these activities.

---

[195]McNew Report, p. 43.
[196]McNew Report, p. 19.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY.

(a) Mr. McNew cites a StockX Help Center webpage which states that "owners of Vault NFTs may be eligible for certain incentives and rewards that StockX provides *to its users* from time to time for using StockX services" (emphasis added).[197] But these "benefits" were the type of marketing promotions used by StockX for all of its users (and before it launched Vault NFTs) in order to incentivize trading.

(b) An internal StockX email from Jacob Fenton (Figure 30), meanwhile, expresses doubts as to whether any forms of community and utility were even necessary for the Vault NFTs, and specifically contrasts that to digital brand NFT projects, which are heavily based around utility and community.



On Sun, Mar 13, 2022 at 11:10 AM Jacob Fenton <jacobfenton@stockx.com> wrote:
Hey guys - there's a specific item I'd like for us to tee up at the offsite, as I think there is still some general misalignment (at least from my side) as to the correct strategy. And that's the item of Secondary Trading Drivers and Unlocks.

First, let me state my point of view on the issue. There are different types of NFTs (Physical-Linked, Digital Fashion, Collectibles, and Pure Art). While "community and utility" are important across all of these types, I don't think they are required for our Vault use case. For example, the primary benefits of holding something in the vault are the speed of trading and lower fees. Could we stimulate secondary by subsidizing an engagement/loyalty program that will continuously drive secondary? Of course. However, the question is whether or not this is sustainable and cost-effective. Additionally, if our long-term vision for Vault is for it to live alongside physical on our product pages, it would confuse pricing if there are a series of benefits that accrue *only* to Vault NFT holders. Vault is a storage service that we offer for our customers. The "NFT" aspect of it is a marketing gimmick at this point. So what does this mean for our Vault moving forward? It means we should prioritize items that have high organic volatility; volatility that happens from perceived movements in the underlying intrinsic value of the item (e.g. think player perfomance for trading cards, new Marvel movie releases for comic books, new hype sneaker drops, death of a famous artist, etc.).

For Pure Art, Digital Collectibles, and Digital Fashion, the main difference is that they are partner-dependent. That means that **their** community and influence and whatever utility they dream up are driving volatility in the price of the NFT. I want StockX to support these efforts, but not subsidize them. I'm glad we're thinking through these concepts with Skee - and I think there are opportunities for us to create products that support a type of utility (e.g. splits, whitelisting, airdrops, etc.).

Figure 30: An email from Jacob Fenton suggesting that utility and community, ubiquitous in the digital brand NFT space, is unnecessary for the Vault NFTs due to their differentiated positioning.[199]

(c) Mr. McNew also cites internal StockX quotes out of context to suggest that StockX planned more holder utility when instead, it was simply looking for new ways to increase trading.

    i. On page 33, footnote 117 of Mr. McNew's report, he takes a single bullet point from an internal email from the former StockX Director of Product, Blockchain, and Category Expansion, Evan Thomas, which I show in Figure 31. Mr. McNew cites document STX0031290, which I reproduce in full, for context, as Figure 32.



---

197 McNew Report, p. 29.
199 STX0053450

49

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY.



[200]

[202]

[200]McNew Report p.33, n. 117.

ii. Other documents Mr. McNew considered very clearly demonstrate that Evan Thomas viewed "Drops/Unlocks" as a mechanism for increasing secondary trading. In STX0545122 at 25 (Figure 33), Shervin Moghaddam stated the company goal of "███ secondary trades per day" to which Evan Thomas immediately responded "So I need to prioritize airdropping is what I'm hearing if we want ███ secondary a day, we need mechanics." With context then, it is apparent the quote Mr. McNew references was simply Mr. Thomas looking for ways to drive secondary sales, rather than active digital brand-building.



Figure 33: Part of a Slack conversation highlighting an internal goal of ███ secondary trades per day StockX had for the Vault NFTs.[204]

iii. 

iv. The next document Mr. McNew considers,[205] "White Paper: Trading Mechanic Stimulation Tactics" is similarly mischaracterized. The quote he takes discussed what

---

[202]STX0031290
[204]STX0545122 at 25
[205]McNew Report, p.34, n. 118

StockX referred to as "classic" NFTs, which was a reference to digital brand NFTs, and not Vault NFTs. Indeed, the quote mentions how unlocks for these NFTs have focused on driving future primary sales, whereas StockX was interested in driving repeated *secondary* sales. The next line of the document after Mr. McNew's quote, accordingly, is "StockX is in a unique position to drive secondary market utility in ways that no company before us has had a unique position, audience, or tolerance to do."[206]  Additionally, there is a comment attached to the examples of utility below, stating "like these. There's no limit to ways we can try to make it interesting to transact, rather than to simply hodl[sic]". Figure 34 demonstrates Mr. McNew's snippet and the full context. "Hodl" is a common term in the NFT community to symbolize refusing to sell as a show of support to the specific community the NFT belongs to, and StockX clearly differentiated Vault NFTs from standard digital brand NFTs by explaining they wanted to encourage trading, rather than holding. Thus, by including a quote about the need for utility out of context, Mr. McNew fundamentally mischaracterizes the message of the document, which, on its face, expressly makes the opposite point regarding Vault NFTs.



Figure 34: Top: McNew Report citation 118
Bottom: The full context of the White Paper, indicating that utility for StockX was for a completely different purpose as compared to the "classic" NFTs. [208]

     v. Mr. McNew continues his claim that Vault NFTs are similar to digital brand NFTs by claiming StockX internally were using terms like "utility," "roadmap," and "un-

---

[206]STX0022670
[208]McNew Report, p.34, n. 118; STX0022669 at 70

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY.

lock" and that "[a]ll of this is consistent with NFT project marketing customs and conventions."[209]  While these terms are indeed used across the NFT space, as just mentioned, internal documents demonstrate StockX was not using these concepts in the same way that they are used in digital brand NFT projects. As already discussed, and as internal documents like Figures 35, 36, 37 demonstrate, the utility/unlocks that StockX provided beyond default utility was aimed at driving secondary trading, and discontinued once StockX concluded they were not serving this purpose effectively.  And the "roadmap" StockX presented described the evolution of their overall platform ecosystem, rather than the evolution of Vault NFT utility.

---

[209]McNew Report, pp. 37-38.



[211]

---
[211] STX0022204 at 08

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY.



.213



Figure 37: An internal StockX slide exemplifying StockX's desire to drive secondary trading, albeit at the time unsuccessful.[215]

(d) Similarly, Mr. McNew claims that consumers of the Vault NFT had expectations about ongoing utility of the Vault NFTs, but the evidence he offers to support this claim paints a very different picture. As discussed more in the pricing section, Mr. McNew points to two Reddit users who were upset at the secondary price of the Vault NFTs because they believed the scant utility didn't justify the price.[216] If users expected significant ongoing utility as McNew hypothesizes, however, they would use this to justify the secondary price, instead of characterizing the Vault NFTs pricing as "mak[ing] no sense" and "stupid" as these Reddit users do. The other evidence McNew points to similarly fails to support

---

[213]STX0022204 at 15

[215]STX0019820 at 21

[216]McNew Report, p. 30.

his hypothesis.  On the next page of his report,[217] he cites a Discord message from user Gollam.  What McNew omits, however, is that this message was a reply to a previous message, which, once again, on its face, illustrates the user did not believe that any sort of utility was to be expected, and that the NFT "was a placeholder for the shoe", (see Figure 39).  ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████  The next piece of evidence McNew cites is a Discord comment by user "1three."[218]  Mr. McNew again omits the message this message was replying to, which is the moderator comment from Figure 37 of my Opening Report, where the moderator "Oog" explicitly states, "while that may be so for most other nft drops this is a different entity in and of its own rights and is done according the policies and rules set in place by stockx not other marketplaces for nfts,"[219] in reference to NFT holders not receiving priority access. In this light, Mr. McNew's screenshot simply reflects the user's confusion about the structure and function of the Vault NFTs—which never promised to include early access to future Vault NFT drops—and choice to ignore a moderator explicitly spelling out that the traditional utility present in digital brand NFT collections is absent in the StockX Vault NFTs.  McNew's final piece of evidence is a disgruntled user nearly three months after the release of the Vault NFTs, wishing that there was more utility in the Vault NFTs – utility that was never promised.[220]  None of this is evidence that StockX incorporated in Vault NFTs type of utility-creation normally associated with digital brand NFTs, as McNew tries to claim—if anything, it reinforces the view that the Vault NFTs were perceived by market participants as not having additive utility in the way a digital brand NFT would.

---

[217] McNew Report, p. 31.
[218] McNew Report, p. 31.
[219] Original Report, ¶ 57(c).
[220] McNew Report, p. 32.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY.



.[222]



Figure 39: Discord user Eighties thought the Vault NFTs were only claim tickets, and the price was unjustified.[224]

(e) Overall, Mr. McNew's failure to recognize that storage and tradability are intrinsic features of the Vault NFTs rather than additive utilities reflects a fundamental misunderstanding of the Vault NFT product and market purpose, and also calls into question his understanding of the concept of "NFT utility," more broadly. He fails to note the copious communications regarding the design of the Vault NFTs that show that Vault NFTs serve (and were intended to serve) as ownership records for associated physical assets—quite literally, "claim tickets" for those assets. Finally, Mr. McNew appears to misunderstand or misconstrue the motivation underlying the Vault NFTs as discussed extensively in the internal

---

[222]STX0040143

[224]StockX #nft-chatter Discord channel

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY.

communications he considered. The Vault NFTs were not intended to serve a role beyond that of a claim ticket, and to the extent that the market perceived them otherwise, StockX was actively seeking to reengineer the product to correct this interpretation.

51. To the extent that Mr. McNew is arguing that Vault NFTs do not have a meaningful market purpose or function, this is incorrect. Physical-backed NFTs, in general, can improve the efficiency of markets for the associated physical assets by reducing friction and transaction costs inherent in trading physical items. The Vault NFTs, in particular, have this function.

    (a) As I described in my Opening Report, tradable claim tickets for physical assets are used not just in the context of physical-backed NFTs, but also in commodities markets.[225] These use cases exist because tradable claim tickets reduce friction in the trade of physical assets that are otherwise difficult to exchange, thus reinforcing overall market liquidity and efficiency.[226]

    (b) The physical assets underlying the Vault NFTs are assets for which trade is common, but for which there are ordinarily significant transaction costs, as described in my Opening Report:[227]

> There are significant market and environmental inefficiencies inherent in reselling assets purchased on StockX using the traditional purchase model. In particular, to account for the verification services StockX provides in connection with each transaction, the asset must be transported four times—shipped from the seller to StockX and then from StockX to the initial buyer at the time of purchase, and then from that buyer, now seller, to StockX, and then to the second buyer in connection with the resale. There are risks of damage or theft during each transit stage; moreover, shipping is both expensive and environmentally costly. Moreover, there are inefficiencies in the need for repeat verification as the product changes hands. StockX verifies each product sold via its platform. This means that the verification process that was completed for the initial sale must be conducted a second time in advance of resale, because the asset's quality or condition may have changed while it was in the possession of the most recent purchaser. And finally, there are inefficiencies associated with storage itself. The user must store the asset between initial purchase and subsequent resale—and users typically do not have access to the quality of storage facilities available to a large marketplace platform, let alone at economies of scale. Vault NFTs enable StockX users to acquire ownership of, and subsequently trade, the associated physical assets without any of the aforementioned inefficiencies."[228]

    (c) By creating a tradable claim ticket for the associated physical asset, StockX enabled holders to acquire and exchange collectibles without the need for repeated shipping or reauthentication, and also avoided the need for individual holders to maintain their own storage and inventory systems.

---

[225]Original Report, ¶ 43.
[226]Original Report, ¶ 42(f).
[227]Original Report, ¶ 43(c).
[228]Original Report, ¶¶ 42(b)-(d).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY.

   (d) As I described in my Opening Report, this function enhances market efficiency. And furthermore, as discussed in my Opening Report and above, the use of blockchain-based tokens creates opportunities for additional marketplace efficiency and transparency enhancements as StockX scales the Vault NFT program—and StockX was actively developing the product towards achieving these additional market benefits.

   (e) StockX internal communications clearly suggest that improving the efficiency of trade in physical assets on the platform was the primary motivation behind the Vault NFT concept.

52. Mr. McNew mentions in passing that "[s]ome NFT purchasers treat NFTs as investment assets."[229] However, he does not develop this point further, and he fails to examine how different NFT use cases lend themselves more or less to this or other purchasing motivations. This omission is significant, as Vault NFTs were expressly designed for the purpose of easing the acquisition and trade of collectibles as investment assets—rather than to appeal to the other purchasing drivers Mr. McNew describes in his report.

   (a) As I described in my Opening Report, StockX explicitly messaged the Vault NFTs as serving this purpose. As described above, numerous internal communications also emphasized the role of the Vault NFTs in enabling lower-friction, more transparent trading in the associated physical assets; and moreover, StockX's business model and metrics around the Vault NFTs were focused on the frequency of secondary market trading.

   (b) Moreover, a number of NFT market participants explicitly characterized the Vault NFTs as simplifying the process of holding and exchanging collectibles as alternative investments.

   (c) Mr. McNew writes:

> "[c]ommon things that NFT purchasers may look for when buying NFTs—and which NFT creators or issuers include as part of their NFT offering—include the appeal of any associated media (such as art, images, videos, or digital collectible items), the creator's marketing strategies, the creator's outreach on social media (including Twitter), whether NFT ownership will confer membership to an exclusive community such as a Discord (messaging app) server (which may include celebrities or well-known figures in business, tech, and culture), whether NFT ownership will confer social status or clout, the value of any associated physical assets or real-life benefits (such as event access), and the creator's promises of future utility, access, and/or value to be delivered at a later date. Some NFT purchasers treat NFTs as investment assets."[230]

> While Mr. McNew is correct that all of these factors can, in fact, drive NFT purchasing behavior, he fails to note (or is unaware) that these different sources of value carry more or less weight depending on the NFT use case, and that this is not an exclusive list of potential purchasing drivers. For example, consumers purchase the ownership-only ENS domain NFTs for their own personal use or as investment assets, not, for example, because of "exclusive community." Mr. McNew's characterization of NFT value focuses only on the digital brand NFT category (more on this below), inappropriately emphasizing these sources of value as if they should be the value drivers for NFTs like the Vault NFTs, which primarily serve to track ownership in a physical good.

---

[229]McNew Report, p. 7.
[230]McNew Report, p. 7.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY.

# There are Many Distinct Use Cases for NFTs; In Particular, Not All NFTs are Digital Brand NFTs

53. Mr. McNew's report also fails to acknowledge the reality of the diverse ecosystem of NFT use cases, despite pointing to examples of NFT projects that squarely represent use cases distinct from digital brand NFTs and citing to internal documents that clearly support this point. The McNew Report purports to give "a history of NFTs,"[231] but in fact focuses only on digital brand NFTs.

    (a) In particular, Mr. McNew declares that "the term 'NFT' refers to more than just a token on a blockchain— it is colloquially understood to encompass a collection of benefits, additional rights, and access to exclusive communities and builders in the Web3 space, as well as any visual representation of the token or associated artwork."[232]

    (b) First of all, my research and experience in the NFT market suggests that the "colloquial understanding" Mr. McNew references is at best an oversimplification, and to some degree simply incorrect. While the term "NFT" is sometimes colloquially understood to refer to more than simply the blockchain token that comprises the NFT itself, in my research and experience, market participants typically have only colloquially extended the term "NFT" to encompass directly associated assets and default utilities. (And even then, market participants often distinguish, for example, *the image associated with an NFT* from the *NFT itself* (i.e., the token). But in particular, contrary to Mr.McNew's assertion, NFT market participants typically distinguish additive functions built on top of the NFT as "NFT utility" rather than referring to those functions as part of the NFT itself. Additive utility typically includes many if not all of the "collection of benefits" and "additional rights" Mr. McNew references.

    (c) But more crucially, the types of utilities Mr. McNew references are just the functionalities associated with one particular NFT category: digital brand NFTs. While digital brand NFTs comprise a major NFT submarket, they are far from the only way in which NFTs are used.

54. As I explained in my Opening Report, "[b]ecause NFT technology can theoretically be used to record ownership of many different types of assets in the physical or digital worlds, there are a wide variety of actual and potential use cases for NFT technology" including "ownership-only NFT categories for digital goods", as well as "NFTs predominantly or entirely functioning as ownership records for physical goods or services."[233]

55. And indeed, Mr. McNew himself acknowledges the existence of ownership-only NFT categories, writing "[s]ince the late-2010's, NFTs have been used for a variety of purposes. NFTs can represent ownership of physical assets such as real estate and fine art, or more digitally native products like profile pictures, collectibles, games, membership tokens, generative art, and more."[234] However, Mr. McNew's subsequent discussion conflates all of these categories into a single business model—the digital brand NFT model.

---

[231] McNew Report, pp. 5,7.

[232] McNew Report, p. 7.

[233] Original Report, ¶¶ 33, 34(d)-(e).

[234] McNew Report, p. 3.

56. Furthermore, Mr. McNew's assertion that all NFTs have digital brand features is contradicted by examples he himself presents and references.

   (a) On page 7, McNew mentions one of the most expensive NFTs of all time, Beeple's "Everydays: The First 5000 Days." This is an example of an art-only NFT, where there is no utility beyond the default utility of the ability to display the associated image. This art-only NFT does not fit into the categories McNew lists on the top of page 5 of his report, nor is it "colloquially understood to encompass a collection of benefits, additional rights, and access to exclusive communities and builders in the Web3 space ",(McNew p.7) that McNew claims the term "NFT" encompasses.

57. Again, Mr. McNew's representation of the way in which NFTs and the NFT market work is at best narrowly selected and at worst could reflect lack of awareness of the broader NFT market. To the extent that Mr. McNew's characterization of NFTs as always being associated with digital brand-building frames his entire report, it fundamentally misinforms his analysis of the Vault NFTs.

## Vault NFTs Were Neither Designed as Nor Generally Function Like Digital Brand NFTs

58. As I discussed extensively in my Opening Report, Vault NFTs do not generally have the characteristics associated with digital brand NFTs, which is natural because that is not their market purpose. Further, the internal StockX communications referenced above, on their face, reinforce that the Vault NFTs are principally designed to serve as ownership records for associated physical assets, and to enable more efficient trade in those assets. This—physical-backed NFTs—is a standard use case for NFTs.

59. Mr. McNew had access to all of the public information about the Vault NFTs I considered, and moreover considered numerous internal StockX documents making this point. However, he nevertheless treated the Vault NFTs as if they were digital brand NFTs, and appears to have misunderstood or misinterpreted materials en route to this conclusion.

   (a) In one instance, Mr. McNew includes an image excerpting a StockX internal presentation that explains digital brand NFTs, and cites it as evidence to show that NFTs by definition have the digital brand features shown in Figure 27. But excerpting that image out of context fundamentally misrepresents the message of the slide. Whereas Mr. McNew cites the excerpt as an illustration of what the Vault NFTs *are*, with the full slide context, it is apparent that the excerpt Mr. McNew cited explicitly described what the Vault NFTs are *not*.

   (b) Indeed, the full slide explicitly differentiates the Vault NFTs from digital brand NFTs, explaining that unlike digital brand NFTs, the Vault NFTs represent a physical good (the value of which is determined by changes in trends for that good). with the purpose of simplifying the trade in that underlying good.

   (c) A different slide in the same document (see Figure 40) explicitly states that, "the drive to purchase [Vault NFTs] is not the same as the inspiration for purchase of a Bored Ape

[. . .]," owing to the difference in design and functionality of the two different types of NFTs. Yet Mr. McNew nevertheless conflates the two categories, and incorrectly treats the Vault NFTs as if they and their associated business model were the same as that of the Bored Ape Yacht Club and other digital brand NFT projects.



Figure 40: An internal StockX slide exemplifying StockX's desire to drive secondary trading and also differentiating the Vault NFTs from digital brand NFT projects.[236]

60. Mr. McNew also states that "[NFT] project creators should take care to clearly represent to consumers the actual use and function of the underlying blockchain-based NFTs and their relationship to the more broadly defined collectible NFT (*i.e.*, the set of rights and benefits conferred by ownership)."[237] He then asserts that "StockX took no such care."[238] But Mr. McNew is incorrect to suggest that StockX took no care to explain the form and value proposition of the Vault NFTs.

  (a) Mr. McNew's own examples highlight how StockX repeatedly made clear exactly what the Vault NFTs were. For example, Mr. McNew cites advertising from StockX's website, which says "Own the most popular releases digitally and start saving on fees (and closet space). Each Vault NFT is tied to the same physical item, stored in our brand new, climate-controlled, high-security vaults inside StockX facilities."[239] Furthermore, he highlights many pictures of the Vault NFTs, specifically highlighting where StockX explains what they are.[240]

  (b) Furthermore, as I described in my Opening Report, StockX extensively and clearly advertised the Vault NFTs as digital assets serving as ownership records for the associated physical assets.[241]

---

[236]STX0019820 at 30
[237]McNew Report, p. 8.
[238]McNew Report, p. 8.
[239]McNew Report, p. 10.
[240]McNew Report, pp. 11-16.
[241]Original Report, ¶¶ 48-49.

(c) Likewise, StockX clearly indicated the custodial nature of the Vault NFT purchasing process.

(d) Moreover, to the extent that the market misunderstood the value proposition of the Vault NFTs, StockX took active steps to provide clarification, such as updating their terms of service on February 10, 2022, to clearly differentiate between experiential and Vault NFTs. In addition, as I discussed in detail above StockX was actively updating the product design and messaging to further reinforce the market's understanding of the Vault NFTs as simple claim tickets.

61. Notably, Mr. McNew states no clear basis for his prescriptive assertion that "[NFT] project creators should take care to clearly represent to consumers the actual use and function of the underlying blockchain-based NFTs and their relationship to the more broadly defined collectible" (emphasis added).[242] While clearly expressing an NFT's function and design is often a core part of clarifying the NFT's value proposition in the market, many NFT projects to some degree intentionally avoid doing this.

(a) Digital brand NFT projects, in particular, often seek to unspool information about their NFTs' features and functions gradually—revealing the details of the various utilities associated with their NFTs over time. Many digital brand NFTs (as well as some art-only NFTs) even hide the imagery or other media associated with their NFTs prior to a "reveal," the date and time of which sometimes is not even announced in advance. These projects nevertheless encourage and often see significant trading in their NFTs even before full information is revealed.

(b) As I described in my Opening Report, for example, Nike itself has done this frequently in the context of its RTFKT collection: "the MNLTH X, is an NFT with an associated image showing an opaque box, with the OpenSea description reading 'Behold a mysterious MNLTH X that has appeared from a time thought lost.' Very few details are given, and even as of approximately five months later, the details of what is 'inside' the MNLTH X have not been explained."[243] To date, the RTFKT MNLTH X has seen almost 1200 ETH worth of trading (over $2 million in trading volume as of this writing), despite having provided no representations as their use or function.[244] ██████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████[245]

(c) Furthermore, as I explained in my report, the digital brand NFT business model explicitly supports this type of delayed-reveal: "This strategy of generating drawn-out interest by not immediately clarifying the utility of the offering encourages both ongoing buy-in and long-term ownership of the NFT. And both buy-in and long-term ownership are paramount for digital brand NFTs."[246]

62. Indeed, as I described in my Opening Report, the extent to which StockX *did* clearly document and explain the role and function of the Vault NFTs is in fact a point of differentiation between

---

[242]McNew Report, p. 8.
[243]Original Report, ¶ 54(c).
[244]RTFKT. *MNLTH X*. URL: https://opensea.io/collection/rtfkt-mnlth-x.
[245]Child Transcript, 166:5-9.
[246]Original Report, ¶ 54(c).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY.

the Vault NFTs and the digital brand NFT projects to which Mr. McNew improperly analogizes them.[247]

# The Vault NFT Imagery is Important for their Function, as is Visual Differentiation of that Imagery from the Images Used in Ordinary StockX Product Listings

63. Mr. McNew states that "If the[ Vault] NFTs were a claim ticket for a physical shoe, there would be no need to differentiate them from the traditional (non-NFT) marketplace versions of the identical shoes. A simple checkout option to vault the shoes rather than take immediate possession of them would have been sufficient."[248] This is a surprising assertion in light of his own statements about the importance of clearly explicating NFT products (discussed above in paragraph 61). In any event, using differentiated imagery to clearly separate the Vault NFTs from the associated physical goods is important for customers to be able to tell, at a glance, what they are buying, which is important for StockX brand reputation, consumer satisfaction, and lack of purchasing confusion. Here, Vault NFTs provide a different way to purchase physical sneakers and other collectibles, and it is reasonable for StockX to prioritize ensuring that customers know that

(a) If the Vault NFT PDPs had featured the same imagery as on the associated physical good PDPs, it would likely have been difficult for prospective buyers to tell, at a glance, which of the two items they were considering purchasing. This could result in customers unintentionally buying the wrong items. This is a standard reason to differentiate product presentation in marketplaces. Moreover, such differentiation is particularly important in the Vault NFT context, since in both prospective purchasing scenarios, buyers are in effect buying the same shoes just in different formats (*i.e.*, with immediate physical delivery or with vault storage).

(b) Moreover, the Vault NFT imagery also helped clarify the Vault NFT value proposition and function by explaining on the "How it Works" image how the Vault NFT program functioned.

(c) More broadly, it is exceedingly common practice for firms to visually differentiate different product offerings, including between physical and digital products. Nike recently released a series of digital sneakers through its .SWOOSH program. Even though at least some of the sneakers are apparently digital representations of physical sneakers that the company has sold, Nike has naturally differentiated the digital versions from the physical versions in its messaging. For example, in a May 31, 2023 Tweet, the company announced the inclusion of the "AF1 'White on White' or 'Triple White' or 'White/White[]'" in the "Our Force 1 Archive" collection. While White-On-White Air Force 1 physical sneakers exist, the company did not simply include a photograph of such shoes, but rather, produced an animation of digital versions of the sneakers walking on their own.[249] From a market

---

[247] Original Report, ¶ 54.

[248] McNew Report, p. 25.

[249] .swoosh. *AF1*. June 2023. URL: https : / / twitter . com / dotSWOOSH / status / 1663931295292948483.

design perspective, this visual differentiation is natural because the digital sneakers are a different good from the physical sneakers. Similarly, and more analogously to the Vault NFTs, the Gutter Cat Gang both sells the physical-backed merchandise NFTs I discussed in my Opening Report and above,[250] and also sells physical merchandise directly.[251] The merchandise available in both cases are similar. For example, in both cases, the Gutter Cat Gang offers hooded sweatshirts. On their marketplace for buying physical merchandise directly, they represent that merchandise via ordinary product photographs;[252] whereas in the case of their NFTs, which operate as claim tickets for associated merchandise, they use a stylized 3D rendering and animation.[253] This visual distinction makes intuitive the distinction between the product formats.

(d) Thus, it is unclear why Mr. McNew thinks it is a problem that "the StockX design and product teams not only used product titles to differentiate the Vault NFTs from the non-NFT products but also discussed how to visually differentiate the NFT offering from the physical offering."[254] Indeed, from a market design perspective, such differentiation is both standard and important. Moreover, Mr. McNew cites a number of internal communications about the effectiveness of the visual differentiation.[255] Whereas Mr. McNew apparently sees this as a negative, from the perspective of clearly indicating what StockX users would be buying, this was a positive.

(e) Specifically, the visual differentiation that Mr. McNew is criticizing primarily comprises the inclusion of a border and language indicating that the associated shoe was being sold as part of the Vault NFT program. While I understand from internal documents that StockX apparently used slightly different visual angles for presenting the shoes in their Vault NFT images, the use of Nike or other shoe imagery to represent the underlying shoes being purchased is in no substantive way different from the use of that shoe imagery on StockX's PDPs for physical shoes sold in the ordinary course, which, to my knowledge, Nike has not complained about. Under the model Mr. McNew envisions, in which the Vault NFT PDP imagery would not be differentiated from that of the ordinary shoe PDP imagery, imagery of Nike sneakers would still be used in association with the Vault NFTs. This, of course, makes sense from a market design perspective, because those are the shoes associated with the Vault NFTs.

64. Mr. McNew raises the example of BlockBar, "which partnered with luxury liquor and wine brands to bring access to unique and rare bottles of liquor and wine. BlockBar has established partnerships with 1800 Tequila, Dewars, Glenfiddich, and Penfold's, to name a few. Each limited-edition BlockBar NFT represents ownership of a rare bottle or barrel of liquor or wine stored in a secure facility and features an associated 3D animation of the bottle or barrel."[256] In my Opening Report, I also discuss BlockBar, and point to it as an example of an NFT serving the function of a claim ticket. McNew's argument is that unlike StockX's Vault NFTs, BlockBar

---

[250]Labs, *Gutter Merch Collection 1.0*.
[251]Gutter Labs. *Gutter Shop*. URL: https://shop.guttercatgang.com/.
[252]Labs, *Gutter Shop*.
[253]Labs, *Gutter Merch Collection 1.0*.
[254]McNew Report, p. 11.
[255]McNew Report, p. 13.
[256]McNew Report, p. 40.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY.

officially partners with the brands and is therefore "legitimately connected" to the brand.[257] This argument, however, is specious.

(a) With BlockBar, partners mint their own NFTs and ship liquor they still own to BlockBar, which simply acts as an intermediary. And in any event, the BlockBar imagery Mr. McNew references as exemplary has a number of features Mr. McNew criticizes in the case of the Vault NFTs. Mr. McNew complains that "the photographs incorporated into the Vault NFT images are not of the actual shoes held in StockX's 'vault' and supposedly uniquely linked to each NFT, but instead are stylized examples of the particular shoe style that prominently depict the product and manufacturer's trademarks, such as the Nike shoe and marks shown in the above example."[258] But of course the "3D animation[s] of the bottle[s] or barrel[s]"[259] associated to BlockBar NFTs are also not photos of the actual bottles or barrels—they are animated 3D renderings. And indeed, a quick look at the BlockBar OpenSea page reveals that the same image is used for many distinct bottles, often with a stylized BlockBar background, as well.[260] This is completely analogous to the way that imagery of the associated collectibles is used in the context of the Vault NFTs. Yet, in the case of the Vault NFTs, Mr. McNew criticizes it, whereas in the case of BlockBar, he seems to think it completely appropriate or even laudatory.

(b) Meanwhile, Baxus, which I also mention in my Opening Report,[261] also uses images of products on their NFTs and does not appear to have agreements with every brand for which an NFT is offered, as Baxus accepts private collectors' liquor and allows them to create their own NFTs.[262] (Figure 41 shows Baxus's OpenSea page and some representative NFTs.) Courtyard.io provides a similar service for vaulting and tokenizing trading cards, and likewise uses images of the products in their NFTs.[263] This is more directly analogous to the way the the Vault NFTs are structured, except insomuch as StockX, has filled the Vault with shoes StockX itself has purchased.

---

[257] McNew Report, p. 40.

[258] McNew Report, p. 11.

[259] McNew Report, p. 40.

[260] BlockBar. *BlockBar*. URL: https://opensea.io/collection/blockbar.

[261] Original Report, ¶ 34(e).

[262] **baxus**.

[263] Courtyard.io. *Courtyard.io*. URL: https://courtyard.io/; Jason Koeppel. "Enter the World of Physical Backed NFT's with Courtyard.io". In: *one37pm* (2023). URL: https://www.one37pm.com/popular-culture/courtyard-physical-collectible-backed-nfts.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY.



Figure 41: Baxus's OpenSea page, showing various NFTs with branded bottles as the associated imagery.[265]

## Internal Product Ideation is Standard, and Does Not Affect the Market Perception of the Product Except Inasmuch as it is Made Public or Reflected in the Final Design

65. Beyond the myriad ways in which Mr. McNew misunderstands or mischaracterizes the internal StockX communications and discussions regarding the Vault NFTs, there are more fundamental problems with the way he uses these documents in his analysis: In many places, he treats non-public internal discussion documents as if they were evidence for how the market perceives the Vault NFTs. Moreover, he treats the existence of internal discussions around potential variations on and challenges in developing the Vault NFTs (and other potential future StockX NFT products) as if they were evidence of poor design. This is inappropriate.

66. Ideation and brainstorming is standard in product development, as is problem-solving around specific issues before, at, or after launch. Products typically go through multiple stages of

---

[265]Baxus. *Baxus Opensea.* URL: https://opensea.io/collection/baxus

ideation, evaluation, and iteration both prior to and after the release of an MVP, as internal StockX communications clearly indicate that the Vault NFTs did.

(a) For example, Mr. McNew [266] as evidence that the Vault NFT product was somehow inferior or poorly designed.[267] ——is not evidence that the Vault NFTs themselves are poorly designed or inferior. Indeed, it is best practice to consider possible variations of a product and iterate over time in response to both internal and external feedback. Further, from the perspective of MVP design, the Vault NFTs are likely a better starting point because they test a number of important intermediate hypotheses about customers' willingness to purchase and trade claim ticket NFTs for stored assets.

(b) Every company I have worked with has engaged in ideation analogous to that StockX worked through. Indeed, I have been a party to and even led discussion sessions among product and leadership teams discussing and evaluating various aspects of their designs. These discussions are frequently supported by slide decks of the types seen in the StockX internal documents, laying out different options and strategies, as well as design goals and learnings from feedback to date. It is standard for some potential product features discussed in such conversations not to be reflected in the final product design because either their implementation was deferred until future iterations or they were discarded.

(c) Nike's own internal documents and fact witness depositions similarly indicate ideation around product features that are not reflected in the design initially brought to market— for example, Nike's internal, non-public brainstorming about possible future extensions does not affect Nike consumers until that brainstorming influences the product, and the same is true for StockX.

---

[266]McNew Report, p. 25.

[267]McNew Report p.55, commenting under the section header "StockX Failed to Devote Sufficient Time and Resources to Deliver What It Promised to Consumers," p. 54.



Figure 42: A slide from a Nike internal presentation showing different ideas with varying degrees of certainty.[269]

67.  And in any event, the substance of internal conversations around product design are not always reflected in the final product that is brought to market. Non-public internal planning documents cannot be used to accurately categorize or characterize how Vault NFTs were perceived by the public except inasmuch as they directly speak to public perception or to features that were incorporated in the final design.

   (a)  For example, in his discussion of the Vault NFT imagery, Mr. McNew references a slide from an internal StockX presentation "in a slide deck prepared prior to the January 18 launch," as stating that the Vault NFT images were "'[a]n image worth sharing & showing off unto itself.'"[270] But to the extent that shareability may have been considered by StockX at some point, this was not reflected in the final Vault NFT product. As illustrated in my Opening Report when I went through the exercise of purchasing a Vault NFT, the image itself was displayed in a private NFT portfolio to which only the user had access upon logging into the StockX website.[271] There are no "sharing" buttons to easily craft a Tweet or other post using the image. And furthermore, StockX has not actively encouraged Vault NFT holders to share or otherwise display the images. And moreover, whether the StockX team that *designed* the images with an eye towards making them worth sharing is irrelevant for understanding how the market responded to the images. In practice, buyers do not seem to have commented on the aesthetics of the images and, to the extent that Vault NFT purchasers posted about having bought the Vault NFTs, they often focused on sharing their purchase receipts—and in one such case, a user's share even sliced through the Vault NFT image.

---

[269]Nike0031045 at 48
[270]McNew Report, p. 12.
[271]Original Report, ¶ 52(b).



Figure 43: User k1ng sliced through the image of the shoe when displaying his Vault NFT purchase.[273]

(b) Similarly, Mr. McNew cites an internal planning document as evidence that "[i]nternal documents also indicate that StockX selected an accelerated launch date to work toward as a goal rather than deciding when to launch upon building a quality product."[274] He misunderstands this slide in context. The next slide in the deck is an "OKR Scorecard" slide (Figure 44). An OKR planning document—versions of which I myself have at times prepared and/or reviewed in the context of my work at Quora—specifies objectives and key results for a product. One of the targeted results listed was "███████████████ ████" While this confirms Mr. McNew's impression that an NFT launch in January 2022 was set as a goal, a "scorecard" like this is precisely about tracking progress towards those results—and if the team were facing issues that made such a launch inappropriate due to product quality issues, as Mr. McNew suggests they were, then they would have adapted the timeline. (Based on my impressions of the way StockX specifies its planning documents and my experience preparing and reviewing similar documents, I am under the impression that the image depicted below would have been adjusted if this goal were not feasible. The green rectangle next to the result would have been changed to yellow, or possibly red, in such a circumstance, and the "Target" column would have been updated to reflect a different date.) So the choice of a ██████████ target should not be interpreted as meaning that the StockX team felt they were launching with an inferior product. But in any event, the timeline on which the Vault NFTs were developed does not affect market perception, except inasmuch as it is reflected in the product and public messaging. And in practice, the market seems to have had substantial interest in purchasing the Vault NFTs (as in fact is discussed on precisely the slide Mr. McNew cites), repudiating Mr. McNew's concerns about the Vault NFTs not being "a quality product" at launch.

---

[273]StockX Discord #vault-flex channel.
[274]McNew Report, p. 54.



68. The examples just presented offer a nonexhaustive illustration of ways in which Mr. McNew inappropriately misinterprets product ideation and planning documents as evidence of poor design and/or of market perception of the Vault NFTs. Mr. McNew's misinterpretation of these materials suggests significant unfamiliarity with the form and frequency of product ideation, as well as a lack of understanding of how markets become informed about product features. It is virtually tautological that non-public internal communications that are not reflected in the final product design do not affect public perception of a product unless they are included in public messaging or otherwise become known to the market.

## The Methods of Mr. McNew's Pricing and Market Analysis Were Methodologically Unsound

69. Mr. McNew produces a graph that compares the max price of each vault NFT with the max price of the corresponding physical good over a date range (18 January - 2 February 2022), and then uses this comparison to make the unsupported claim that,"based on the above price analysis and StockX's internal reporting and discussion, StockX customers and StockX employees clearly perceived the Vault NFT as independent and distinct from the underlying physical item."[276] Mr. McNew's analysis is not only methodologically unsound, but also insufficient to support the conclusions Mr. McNew purports to draw from them.

   (a) First, looking simply at maximum attained prices does not provide a meaningful or complete description of market behavior over a time period. Putting aside other limitations of this approach, it is scientifically unsound to conduct such an analysis of market pricing in a volatile market with significant buying and selling activity using a sample size of one data point per product.

   (b) But moreover, the comparison Mr. McNew does make is inappropriate *as a comparison of maximum prices* because Mr. McNew compares newly released offerings with products

---

[275]STX058122 p. 3.
[276]McNew Report, pp. 50-51.

that already have been in the market for a considerable time. Of the eight physical products compared to the Vault NFTs, only two were released within six months of the February 2, 2022 date that ended Mr. McNew's analysis—the Jordan 1 Retro High OG Patent Bred and the KAWS Sacai Nike Blazer Low Blue, which were released on December 30, 2021, and November 27, 2021 respectively.[277] Furthermore, both of these products had significantly higher trading prices soon after their appearance on the StockX platform, reaching peaks of $1,080 and $1,999 respectively, the former of which is actually *higher* than the peak price Mr. McNew found for the peak of the respective Vault NFT.

(c) Simply put, investment assets with unknown market values often show price volatility when they are first introduced to the market. Neither the Vault NFTs nor their associated physical assets are exceptions to this general principle. But Mr. McNew's analysis overlooks this fact and seeks to compare assets that have just entered the market with assets that have been in the market for far longer and thus reached a more stable price point.

(d) In addition, the assumption underlying Mr. McNew's analysis—that if the Vault NFTs are claim tickets then their prices should immediately mirror the prices of the goods for which they are claim tickets—is flawed for multiple reasons. Being a claim ticket for an item does not make the Vault NFT identical to the item. The two are certainly distinct—and importantly so. As discussed repeatedly both in this report and in my Opening Report, as a function of being a claim ticket Vault NFTs provide, among other things, the ability to more easily and securely store the underlying shoe, as well as the ability to more quickly sell it in the future. These sources of added value, if anything, mean that the Vault NFTs could even in the long run have stable equilibrium prices that are distinct from those of the underlying assets.

(e) Moreover, the Vault NFTs certainly should not be expected to immediately mirror the underlying assets' prices. Especially with respect to the increased liquidity, there is economic research suggesting that as trading costs decrease, pricing momentum and volatility from investors looking to sell later at a higher price to other investors can increase.[278] The Vault NFTs undeniably lowered the trading cost associated with StockX products, and so higher volatility can be expected.

(f) But in any event, most of the Vault NFT prices *did* converge to prices close to those of the associated physical assets. I highlighted a couple examples of this in my Opening Report.[279] Because Mr. McNew only looked at maximum prices in his analysis, he completely fails to recognize that the long-run pricing trend for the Vault NFTs, overall, looks quite like what he argues *should* happen with a claim ticket NFT.

70. Moreover, in considering the broader context of the Vault NFTs, the NFT space is rife with speculative price spikes and subsequent decreases, especially when collections are early in their lifecycles. This is often driven by speculative investors, a buyer segment that Mr. McNew fails to fully recognize.

(a) As I describe above, the McNew Report lists reasons for why NFT purchasers may choose to make a purchase that only briefly mentions NFTs as investment assets. But in practice,

---

[277]StockX. *StockX Website*. URL: https://stockx.com/.
[278]See, e.g., Jose A Scheinkman and Wei Xiong. "Overconfidence and speculative bubbles". In: *Journal of political Economy* 111.6 (2003), pp. 1183–1220.
[279]Opening Report, ¶51(b), Figure 28.

short-term trading on the secondary market, i.e., flipping, comprised a significant share of NFT trading at the time the Vault NFTs launched, and continues to comprise a significant share of NFT trading today.

(b) A number of Vault NFT purchasers reflected this flipping mentality in their conversations in the StockX Discord, as shown in Figure 45.



Figure 45: StockX Discord users discussing "flipping."[280]

(c) Even StockX internal employees demonstrated their flipping focus in internal communications, as Mr. McNew himself points out.[281]  In a slack channel named #nft-drops-news[282] where StockX employees discussed the NFT space at large, Mr. McNew correctly and consistently notes that these employees "were very familiar with and kept abreast of emerging trends and topics in the NFT space"[283] and "used commonly known NFT purchasing terms such as "flipping," "HODLing," "diamond handing," etc".[284]  Mr. McNew goes on to point out that these individuals treated the StockX Vault NFTs similarly to how they had treated other NFTs they had discussed, quoting employees as focused on gains[285] and trying to sell for high prices.[286]  Indeed, Mr. McNew correctly points out that "[t]his form of discourse surrounding the buying and selling and trading of NFTs is prominent in NFT collection Discord servers and Twitter."[287]  What Mr. McNew fails to appreciate, however, is that this behavior he identifies is standard among NFT projects of all types, and can explain the price spikes he identifies for the Vault NFTs in the early trading.  In the presence of

---

[280]StockX #nft-chatter Discord channel

[281]McNew Report, pp. McNew Report, p.57, n. 209..

[282]STX0013215

[283]McNew Report, p. 57.

[284]McNew Report, p. 57.

[285]McNew Report, p. 57.

[286]McNew Report, p. 58.

[287]McNew Report, p. 58.

flipping, price momentum, and concomitant price spikes can arise without the need for customers to perceive significant value over and above a product's actual features.

71. In any event, Mr. McNew does not appear to have any basis for his assertion that "StockX customers and StockX employees clearly perceived the Vault NFT as independent and distinct from the underlying physical item."[288]

   (a) Mr. McNew credits this conclusion to "[his] price analysis and StockX's internal reporting and discussion."[289] However, price analysis alone cannot speak to the perceptions of customers or employees—it can at best to make arguments that prices are consistent with the view that people may have felt this way (although as I have already described above, Mr. McNew's analysis is in fact *not* consistent with that view).

   (b) Meanwhile, the public and internal discussions Mr. McNew references also do not reflect his conclusion—rather, he is referencing discussion about the prices, with both consumers and StockX employees if anything, expressing confusion at the high prices. This is certainly not evidence that "StockX customers and StockX employees clearly perceived the Vault NFT as independent and distinct from the underlying physical item."[290]

   (c) Mr. McNew has not spoken to any Vault NFT customers, and the public comments from customers he cites particularly fail to support his hypothesis. Repeatedly, users express the opportunity to hopefully flip Vault NFTs for a profit as a reason to purchase, and meanwhile dismiss other purported benefits as not in any way justifying the prices. Mr. McNew cites two Reddit users who are not fans of the Vault NFTs.[291] Importantly though, they dismiss the idea of "benefits" as sufficient to explain the price disparity. User "lofurealyh8redit" thinks it "is stupid" that a user would be "paying an extra $900 for 'benefits.'" User "nicknooodles" thinks the price disparity "makes no sense" and does not seem convinced that any purported benefits in the future would justify the cost. Discord user "Gollam," meanwhile, is replying to user "Eighties" who understands the "flipping" mentality of many NFT projects (Figure 39).[292]

Dated: June 2, 2023

Scott Duke Kominers

---

[288] McNew Report, p. 51.
[289] McNew Report, p. 51.
[290] McNew Report, p. 51.
[291] McNew Report, p. 30.
[292] McNew Report, p. 31.

# Appendixes

## 1 ERC-1155 Collections that are Described as NFTs in the Market

Name: Parallel Lore
OpenSea Page: https://opensea.io/collection/parallellore
Referred to as NFT: https://parallel.life/faq/

Name: Adidas Originals Into the Metaverse
OpenSea Page: https://opensea.io/collection/adidasoriginals
Referred to as NFT: OpenSea Description

Name: Aku's New Friend
OpenSea Page: https://opensea.io/collection/akus-new-friend-1
Referred to as NFT: OpenSea Description

Name: Alien Samurai Dino Warriors
OpenSea Page: https://opensea.io/collection/dinowarriors
Referred to as NFT: OpenSea Description

Name: AlphaGang
OpenSea Page: https://opensea.io/collection/alphagang
Referred to as NFT: https://opensea.io/collection/agog-1

Name: Animoca Brands Launchpad
OpenSea Page: https://opensea.io/collection/animocabrandslaunchpad
Referred to as NFT: OpenSea Description

Name: Ape-In Productions
OpenSea Page: https://opensea.io/collection/ape-in-productions
Referred to as NFT: OpenSea Description

Name: Benji Bananas: Membership Pass
OpenSea Page: https://opensea.io/collection/benji-bananas-membership-pass
Referred to as NFT: OpenSea Description

Name: Bored Ape Chemistry Club
OpenSea Page: https://opensea.io/collection/bored-ape-chemistry-club
Referred to as NFT: https://boredapeyachtclub.com/\#/mayc/info

Name: Bowie on the Blockchain
OpenSea Page: https://opensea.io/collection/bowie-on-the-blockchain
Referred to as NFT: OpenSea Description

Name: BROADSIDE Phase 1: Episodes
OpenSea Page: https://opensea.io/collection/broadside-episodes

Referred to as NFT: https://www.br0ads1de.com/

Name: BSTROY x Givenchy by Felt Zine
OpenSea Page: https://opensea.io/collection/givenchy-bstroy-feltzine
Referred to as NFT: OpenSea Description

Name: Bxnes Collection
OpenSea Page:
https://opensea.io/collection/unidentified-contract-xskal7wal1
Referred to as NFT:
https://twitter.com/superSZCZ4/status/1539357932034433030

Name: Cameo Pass
OpenSea Page: https://opensea.io/collection/cameo-pass
Referred to as NFT: OpenSea Description

Name: Capsule Community Curated Collection
OpenSea Page: https://opensea.io/collection/capsule-community-curated
Referred to as NFT: https://capsulehouse.io/

Name: CC Time Travel
OpenSea Page: https://opensea.io/collection/cc-time-travel
Referred to as NFT: https://www.cryptochicks.app/nft-collections

Name: Chads.Limited
OpenSea Page: https://opensea.io/collection/chads-limited
Referred to as NFT: OpenSea Description

Name: Chonker Finance
OpenSea Page: https://opensea.io/collection/chonknft
Referred to as NFT: OpenSea Description

Name: Cool Cats FC Rewards
OpenSea Page: https://opensea.io/collection/cool-cats-fc-rewards
Referred to as NFT: OpenSea Description

Name: CPG Genesis
OpenSea Page:https://opensea.io/collection/crypto-packaged-goods
Referred to as NFT: OpenSea Description

Name: CryptoSkulls Alchemy Lab
OpenSea Page: https://opensea.io/collection/cryptoskulls-alchemy-lab
Referred to as NFT: OpenSea Description

Name: truePengu
OpenSea Page: https://opensea.io/collection/truepengu
Referred to as NFT: OpenSea Description

Name: Cxllabs

OpenSea Page: https://opensea.io/collection/cxllabs
Referred to as NFT: https://twitter.com/ghxsts

Name: penguPins
OpenSea Page: https://opensea.io/collection/pengupins
Referred to as NFT: OpenSea Description

Name: Timex x Bored Ape Community Forge Pass
OpenSea Page:
https://opensea.io/collection/timex-x-bored-ape-community-forge-pass
Referred to as NFT:
https://www.timex.com/the-timex-blog/go-ape-with-timex-x-bayc.html

Name: RTFKT Clone X Forging SZN 1 (PRE-FORGE)
OpenSea Page: https://opensea.io/collection/clonexforging
Referred to as NFT: OpenSea Description

Name: Capsule – Zodiac Cards
OpenSea Page: https://opensea.io/collection/capsule-zodiac-cards
Referred to as NFT: https://capsulehouse.io/

Name: RTFKT x RIMOWA Meta-Artisan Collection
OpenSea Page: https://opensea.io/collection/rtfkt-x-rimowa
Referred to as NFT: OpenSea Description

Name: Degenz Access Pass
OpenSea Page: https://opensea.io/collection/degenzaccesspass
Referred to as NFT:
https://opensea.io/assets/ethereum/0xa56d1b415cb4b23e76910bb8c2f5a0a5b2c86a87/1

Name: DeNations
OpenSea Page: https://opensea.io/collection/decentralized-nations
Referred to as NFT: OpenSea Description

Name: Dispatch-Admin-ETH
OpenSea Page: https://opensea.io/collection/dispatch-admin-eth
Referred to as NFT:
https://opensea.io/assets/ethereum/0xf6fd4d88e97da2a0a574b3adb9d95fa662dca0bc/2

Name: Messages by Dispatch (ETH)
OpenSea Page: https://opensea.io/collection/dispatch-messages-eth
Referred to as NFT:
https://opensea.io/assets/ethereum/0xbc76cd93dbe8acfd5dd1583629ea210ea2df763e/1

Name: Doki Doki
OpenSea Page: https://opensea.io/collection/dokidoki
Referred to as NFT: OpenSea Description

Name: Doki Doki Legacy

OpenSea Page: https://opensea.io/collection/doki-doki-legacy
Referred to as NFT: OpenSea Description

Name:DuckDAO Hunters
OpenSea Page: https://opensea.io/collection/duckdao-hunters
Referred to as NFT: OpenSea Description

Name: eBoy Blockbob
OpenSea Page: https://opensea.io/collection/eboy-blockbob
Referred to as NFT:
https://twitter.com/eboyblockbob/status/1532435920313389061

Name:aft3rglow NFTees – ETH India 2022
OpenSea Page: https://opensea.io/collection/aft3rglow-nftees
Referred to as NFT: OpenSea Description

Name: ETH-MEN Comics
OpenSea Page: https://opensea.io/collection/eth-men-comics
Referred to as NFT: OpenSea Description

Name: EulerBeats Enigma
OpenSea Page: https://opensea.io/collection/eulerbeats-enigma
Referred to as NFT: OpenSea Description

Name: EulerBeats Genesis
OpenSea Page: https://opensea.io/collection/eulerbeats
Referred to as NFT: OpenSea Description

Name: Fantasy Collection – Yacht Rock Edition
OpenSea Page: https://opensea.io/collection/fantasy-collection-yacht
Referred to as NFT: OpenSea Description

Name: FEWOCiOUS x ComplexCon
OpenSea Page: https://opensea.io/collection/fewocious-complexcon
Referred to as NFT: OpenSea Description

Name: Fortune Media
OpenSea Page: https://opensea.io/collection/fortune-media
Referred to as NFT: OpenSea Description

Name: Hublot Classic Fusion Murakami NFT
OpenSea Page:
https://opensea.io/collection/hublot-classic-fusion-murakami-nft
Referred to as NFT: OpenSea Description

Name: LetsWalk
OpenSea Page: https://opensea.io/collection/letswalk
Referred to as NFT: OpenSea Description

Name: Lux Cards
OpenSea Page: https://opensea.io/collection/lux-cards
Referred to as NFT: OpenSea Description

Name: MINDDS COLLAB LAND
OpenSea Page: https://opensea.io/collection/minddds-collab-land
Referred to as NFT: OpenSea Description

Name: Miners
OpenSea Page: https://opensea.io/collection/miners
Referred to as NFT: OpenSea Description

Name: Morgan Heritage Digital Collectibles
OpenSea Page:
https://opensea.io/collection/morgan-heritage-digital-collectibles
Referred to as NFT: OpenSea Description

Name: Murakami.Flowers Seed
OpenSea Page: https://opensea.io/collection/murakami-flowers-seed
Referred to as NFT: OpenSea Description

Name: My Curio Cards
OpenSea Page: https://opensea.io/collection/curiocardswrapper
Referred to as NFT: OpenSea Description

Name: NobrainerFinance
OpenSea Page: https://opensea.io/collection/nobrainerfinance
Referred to as NFT: OpenSea Description

Name: Parallel Alpha
OpenSea Page: https://opensea.io/collection/parallelalpha
Referred to as NFT: OpenSea Description

Name: Pixlverse Items
OpenSea Page: https://opensea.io/collection/pixlverse-items
Referred to as NFT: OpenSea Description

Name: Reserva X Pistol Birds
OpenSea Page: https://opensea.io/collection/reservax
Referred to as NFT: OpenSea Description

Name: The Block Times
OpenSea Page: https://opensea.io/collection/the-block-times
Referred to as NFT: OpenSea Description

Name: The CryptoCards Collection (2018)
OpenSea Page: https://opensea.io/collection/cryptocards-collection
Referred to as NFT: OpenSea Description

Name: The Duck Song Meme
OpenSea Page: https://opensea.io/collection/theducksong
Referred to as NFT: OpenSea Description

Name: The Nifty Portal
OpenSea Page: https://opensea.io/collection/nifty-portal
Referred to as NFT: OpenSea Description

Name: TIME: Issue 01 - Vitalik Buterin
OpenSea Page: https://opensea.io/collection/timepieces-special-issues
Referred to as NFT: OpenSea Description

Name: TIMEPieces x FOTO
OpenSea Page: https://opensea.io/collection/timepieces-x-foto
Referred to as NFT: OpenSea Description

Name: Tom Sachs: Rocket Factory - Mars Rocks
OpenSea Page: https://opensea.io/collection/tom-sachs-mars-rocks
Referred to as NFT: OpenSea Description

Name: Tom Sachs: Rocket Factory - Mothership Tickets
OpenSea Page: https://opensea.io/collection/tom-sachs-mothership-tickets
Referred to as NFT: OpenSea Description

Name: Toshimon
OpenSea Page: https://opensea.io/collection/toshimon-minter
Referred to as NFT: OpenSea Description

# 2  Documents Considered

## Documents Provided By Counsel:

### Documents Considered By Mr. McNew:

Transcript of the Deposition of Evan Thomas, Nike, Inc. v. StockX LLC, No. 1:22-cv-00983-VEC (Jan. 18, 2023) ("Thomas Transcript")

Transcript of the Deposition of Shervin Moghaddam, Nike, Inc. v. StockX LLC, No. 1:22-cv-00983-VEC (Dec. 6, 2022) ("Moghaddam Transcript")

Transcript of the Deposition of Jacob Fenton, Nike, Inc. v. StockX LLC, No. 1:22-cv-00983-VEC (Dec. 2, 2022) ("Fenton Transcript")

Transcript of the Deposition of Aaron Salo, Nike, Inc. v. StockX LLC, No. 1:22-cv-00983-VEC (Feb. 16, 2023) ("Salo Transcript")

Transcript of the Deposition of Yasir Malik, Nike, Inc. v. StockX LLC, No. 1:22-cv-00983-VEC (Jan. 12 2023) ("Malik Transcript")

NIKE0000052
NIKE0000055
NIKE0000130
NIKE0000253
NIKE0000391
NIKE0000445
NIKE0000451
NIKE0005663
NIKE0006015
NIKE0006124
STX0001275
STX0013215
STX0013332
STX0013876
STX0014276
STX0014280
STX0018406
STX0018415
STX0019820
STX0022204
STX0022553
STX0022669
STX0022678
STX0026166
STX0030487
STX0031290
STX0039302
STX0039474
STX0039475
STX0039802

STX0040142
STX0041927
STX0043213
STX0046789
STX0052454
STX0052654
STX0053450
STX0055336
STX0056496
STX0056686
STX0057765
STX0060150
STX0063639
STX0069341
STX0080073
STX0082646
STX0094175
STX0104547
STX0112956
STX0138015
STX0139557
STX0158243
STX0163937
STX0178690
STX0283867
STX0365016
STX0443343
STX0443799
STX0443801
STX0443802
STX0443828
STX0443829
STX0445340
STX0453911
STX0537154
STX0545122
STX0581522


**Documents Not Considered by Mr. McNew**

Expert Report of Scott Duke Kominers, Nike, Inc. v. StockX LLC, No. 1:22-cv-00983-VEC, (May 5, 2023) ("Opening Report")

Expert Report of Steven S. McNew, Nike, Inc. v. StockX LLC, No. 1:22-cv-00983-VEC, (May 5, 2023) ("McNew Report").

Transcript of the Deposition of Ron Faris, Nike, Inc. v. StockX LLC, No. 1:22-cv-00983-VEC (Dec.

7, 2022) ("Faris Transcript")

Transcript of the Deposition of Mike Child, Nike, Inc. v. StockX LLC, No. 1:22-cv-00983-VEC (Dec. 9, 2022) ("Child Transcript")

Transcript of the Deposition of Brock Huber, Nike, Inc. v. StockX LLC, No. 1:22-cv-00983-VEC (Feb. 22, 2023) ("Huber Transcript")

NIKE0031045

STX0042064

STX0043724

STX0044099

STX0019269

STX0163285

STX0163292

STX0163291

STX0063402

STX0681630

STX0040143

## Further References

URL: https://www.swoosh.nike/.

.swoosh. *12 hours left*. May 2023. URL: https://twitter.com/dotSWOOSH/status/1663983759442739201.

— *AF1*. June 2023. URL: https://twitter.com/dotSWOOSH/status/1663931295292948483.

— *GA*. June 2023. URL: https://twitter.com/dotSWOOSH/status/1664747388517617664.

— *issues*. May 2023. URL: https://twitter.com/dotSWOOSH/status/1658527958381002752.

— *Processing Page*. May 2023. URL: https://twitter.com/dotSWOOSH/status/1661425183893381120.

— *Unforseen errors*. May 2023. URL: https://twitter.com/dotSWOOSH/status/1661470965300367360.

— *Will receive*. May 2023. URL: https://twitter.com/dotSWOOSH/status/16614709668270653

Advaykoranne.eth. *Stockx's new vault NFT tied to a sneaker*. Jan. 2022. URL: https://twitter.com/AdvayKoranne/status/1483889612720201730.

Azuki. *Twin Tiger Jacket Opensea*. URL: https://opensea.io/collection/twintigersjacket.

Baxus. *Baxus Opensea*. URL: https://opensea.io/collection/baxus.

Blauvelt, Chris AR. *So Stockx's new vault NFT is basically like a valet ticket?* Jan. 2022. URL: https://twitter.com/arblauvelt/status/1483834728541208580.

BlockBar. *BlockBar*. URL: https://opensea.io/collection/blockbar.

*Claim Check*. URL: https://www.dictionary.com/browse/claim-check.

Courtyard.io. *Courtyard.io*. URL: https://courtyard.io/.

DraftKings. *Who maintains custody of each NFT purchased on DraftKings marketplace? (US)*. URL: https://web.archive.org/web/20230205051001/https://help.draftkings.com/hc/en-us/articles/4404934462227-Who-maintains-custody-of-each-NFT-purchased-on-DraftKings-Marketplace-US-.

Eisenmann, Thomas, Eric Ries, and Sarah Dillard. *Hypothesis-Driven Entrepreneurship: The Lean Startup*. Harvard Business School Note 812-095. URL: https://hbsp.harvard.edu/product/812095-PDF-ENG.

— *Hypothesis-Driven Entrepreneurship: The Lean Startup*. Harvard Business School Note 9-812-095.

*ERC-20 Token Standard*. URL: https://ethereum.org/en/developers/docs/standards/tokens/erc-20/.

Farm, Hungry. *Hungry Farm Opensea*. URL: https://opensea.io/collection/hungry-farm.

HansDieter26. *Convenient Marketplace*. May 2023. URL: https://twitter.com/HansDieter26/status/1661961757835907072.

Hollander, Adam. *Hungry wolves whitepaper*. Jan. 2022. URL: https://hollanderadam.medium.com/hungry-wolves-whitepaper-69035ffff416.

kingofthegoblin. *BiG iNC Letters of Acceptance*. URL: https://opensea.io/collection/biginc-letters.

Kirt.eth/tez. *Will there be a marketplace to trade?* May 2023. URL: https://twitter.com/myjpeg/status/1657133834679328768.

Koeppel, Jason. "Enter the World of Physical Backed NFT's with Courtyard.io". In: *one37pm* (2023). URL: https://www.one37pm.com/popular-culture/courtyard-physical-collectible-backed-nfts.

Kominers, Scott Duke. "Digital Pioneers on Paper". In: *Harvard Business Review* (July 2014). URL: https://hbr.org/2011/07/digital-pioneers-on-paper.

Labs, Gutter. *Gutter Merch Collection 1.0*. URL: https://opensea.io/assets/ethereum/0x2163f70d3b4de18a44e570309798e1fbbc916291/101212.

— *Gutter Shop*. URL: https://shop.guttercatgang.com/.

Labs, Yuga. *MAYC info*. URL: https://boredapeyachtclub.com/#/mayc/info.

Manifold. *Manifold Website*. URL: https://studio.manifold.xyz/home.

manifoldxyz. *Dune Query*. URL: https://dune.com/queries/1330690.

Nation, Pirate. *Pirate Nation Updates*. URL: https://mirror.xyz/0x66CeCA466b503E757054bA20Fa

— *Ship's Log Release 11 February 16th, 2023*. URL: https://mirror.xyz/0x66CeCA466b503E757054 uJP6o9vLA2MIyymdcqpdQPaSu2NF64bYQghQnvmGaC4.

NBA Top Shot. *Send moments to non-custodial wallets: NBA Top Shot blog*. URL: https://blog.nbatopshot.com/posts/send-moments-to-non-custodial-wallets.

Nikhil. *A practical comparison between ERC-1155 and ERC-721*. Apr. 2023. URL: https://celo.academy/t/a-practical-comparison-between-erc-1155-and-erc-721/62.

OpenSea. *ERC1155 in my wallet*. URL: https://support.opensea.io/hc/en-us/articles/1500003082561-Will-ERC-1155-NFTs-appear-in-my-wallet-.

— *What is an NFT*. URL: https://support.opensea.io/hc/en-us/articles/360063450733.

Oracles, Supra. *ERC-721 vs. ERC-1155 NFTs: What's The Difference?* 2022. URL: https://supraoracles.com/academy/erc-721-vs-erc-1155/.

*Ordinals.com*. URL: https://ordinals.com/.

Perper, Rosie. "Nike Trips Up .SWOOSH Launch While Bitcoin NFTs Soar". In: *CoinDesk* (2023). URL: https://www.coindesk.com/web3/2023/05/26/nike-trips-up-swoosh-launch-while-bitcoin-nfts-soar/.

Perper, Rosie. *What is an open edition NFT sale?* Feb. 2023. URL: `https://www.coindesk.com/learn/what-is-an-open-edition-nft-sale/`.

Polygonscan.com. *Nike: Our force 1 - box (OF1BOX) token tracker: PolygonScan*. URL: `https://polygonscan.com/token/0x851d5fa26636df46b6196879582324c311556b46`.

ProofOfPlay. *Pirate Founders Opensea*. URL: `https://opensea.io/collection/piratenation`.

— *Pirate Items Opensea*. URL: `https://opensea.io/collection/piratenationitems`.

Reis, Eric. "The Lean Startup". In: *New York: Crown Business* 27 (2011), pp. 2016–2020.

RTFKT. *MNLTH X*. URL: `https://opensea.io/collection/rtfkt-mnlth-x`.

— *RTFKT Clone X forging SZN 1 (PRE-FORGE) - Collection*. URL: `https://opensea.io/collection/clonexforging`.

— *RTFKT X NIKE AR HOODIE FORGED*. URL: `https://opensea.io/collection/rtfkt-nike-ar-hoodie`.

— *RTFKT x NIKE AR HOODIE PRE FORGED*. URL: `https://opensea.io/collection/rtfkt-nike-ar-hoodie-preforged`.

Runners, Chain. *Chain Runners Discord Server*.

— *Past the PFP*. Aug. 2022. URL: `https://twitter.com/chain_runners/status/1562886043648503808`.

Sanj. *StockX NFT solved*. Sept. 2022. URL: `https://twitter.com/bytebybit_/status/1571207885736087552`.

Scheinkman, Jose A and Wei Xiong. "Overconfidence and speculative bubbles". In: *Journal of political Economy* 111.6 (2003), pp. 1183–1220.

Shwaz. *Shwaz on StockX NFTs*. Jan. 2022. URL: `https://twitter.com/theycallmeshwaz/status/1483517889147719689`.

Skybrook. *Skybrook*. URL: `https://opensea.io/collection/skybrook`.

Starbucks. *Starbucks Odyssey*. URL: `https://www.niftygateway.com/publishers/starbucks-odyssey`.

StockX. *StockX Website*. URL: `https://stockx.com/`.

Team, Alchemy. *Your guide to ERC-1155: Comparing ERC-721 to ERC-1155*. URL: `https://www.alchemy.com/blog/comparing-erc-721-to-erc-1155`.

US, Timex. *TIMEX GOES APE*. URL: `https://www.timex.com/the-timex-blog/go-ape-with-timex-x-bayc.html;`.

Vineet. *1.3M editions have been sold in 2022 using Zora NFT marketplace!* Dec. 2022. URL: `https://nftevening.com/1-3m-editions-have-been-sold-in-2022-using-zora-nft-marketplace/`.

Wang, Frederick. *When will secondary transfer open for those who haven't got membership?* May 2023. URL: `https://twitter.com/CMoneyCaptain/status/1660791902411833345`.

White-Gomez, Alex. *Open edition NFTs: New Fad or new opportunity?* Feb. 2023. URL: `https://www.one37pm.com/nft/open-edition-nfts`.

Worldcoin. *A BEGINNER-FRIENDLY GUIDE TO FUNGIBLE VS. NON-FUNGIBLE TOKENS*. URL: `https://worldcoin.org/articles/fungible-vs-non-fungible`.

Zora. *Zora Website*. URL: `zora.co`.