# Exhibit 10

Page 1

1          UNITED STATES DISTRICT COURT
2        FOR THE SOUTHERN DISTRICT OF NEW YORK
3                     ---oOo---
4
5   NIKE, INC.,
6              Plaintiff,
7      vs.            CASE NO. 1:22-CV-00983-VEC
8   STOCKX LLC,
9              Defendant.
   _____
10
11
12    VIDEOTAPED DEPOSITION OF ITAMAR SIMONSON, Ph.D
13            San Francisco, California
14             Tuesday, July 25, 2023
15
16
17
18
19
20
21
22
23  Stenographically Reported by:  Ashley Soevyn,
    CSR No. 12019
24  Job No. 6001088
25  Pages 1 - 284

Page 2

1  UNITED STATES DISTRICT COURT
2  FOR THE SOUTHERN DISTRICT OF NEW YORK
3          ---oOo---
4
5  NIKE, INC.,
6      Plaintiff,
7  vs.           CASE NO. 1:22-CV-00983-VEC
8  STOCKX LLC,
9      Defendant.
   _____
10
15      Videotaped Deposition of
16  ITAMAR SIMONSON, PH.D., taken on behalf of the
17  Defendant StockX, LLC,, Pursuant to Notice, at the
18  offices of Debevoise & Plimpton, 650 California
19  Street, San Francisco, California beginning at
20  9:07 a.m. and ending at 5:10 p.m. on Tuesday, July
21  25, 2023, before me, ASHLEY SOEVYN, Certified
22  Shorthand Reporter No. 12019.

Page 3

1  A P P E A R A N C E S:
2  FOR THE PLAINTIFF NIKE INC.:
3      DLA PIPER
4      BY: TAMAR Y. DUVDEVANI
5      BY: MARC E. MILLER
6      Attorneys at Law
7      1251 Avenue of the Americas, 27th Floor
8      New York, New York 10020
9      tamar.duvdevani@dlapiper.com
10     marc.miller@dlapiper.com
11     (212) 335-4500
12
13  FOR THE DEFENDANT STOCKX LLC:
14     DEBEVOISE & PLIMPTON, LLP
15     BY: CHRISTOPHER S. FORD
16     Attorney at Law
17     650 California Street
18     San Francisco, California 94108
19     csford@debevoise.com
20     (415) 738-5705
21  Also Present:
22  Abigail Liles, law clerk, Debevoise & Plimpton
23  Chester Dubov, summer associate, Debevoise &
24  Plimpton
25  Peter Yaroshuk, Videographer

Page 4

1       INDEX TO EXAMINATION
2  WITNESS: ITAMAR SIMONSON, PH.D.
3
4
5  EXAMINATION BY:                PAGE
6  MR. FORD                        8
7  MS. DUVDEVANI                  278
8
9
10 WITNESS INSTRUCTION NOT TO ANSWER
11 PAGE              LINE
12 130                8
13 131                14

Page 5

1        INDEX TO EXHIBITS
2        ITAMAR SIMONSON, PH.D.
3        NIKE V. STOCKX
4        Tuesday, July 25, 2023
5        Ashley Soevyn, CSR No. 12019
6  EXHIBIT NO.    DESCRIPTION          PAGES
7  Exhibit 1   Expert Report of Itamar Simonson   21
8  Exhibit 2   First Rebuttal Report of Itamar    32
               Simonson
9
   Exhibit 3   Second Rebuttal Report of Itamar   64
10             Simonson
11 Exhibit 4   Document Bates No. NIKE0000052     110
12 Exhibit 5   Document titled "#103-23022        150
               Sneaker Online Survey B"
13
   Exhibit 6   Document titled "Consumer          249
14             Perceptions of Iconicity and
               Indexicality and Their Influence
15             on Assessments of Authentic
               Market Offerings"
16
   Exhibit 7   Mary Kay Inc. v. Weber January     257
17             5, 2009
18 Exhibit 8   Pearlstein v. BlackBerry Ltd       275
               September 10, 2021

2 (Pages 2 - 5)

|  |  |
|---|---|
| Page 6<br>1  DEPOSITION PROCEEDINGS<br>2  TUESDAY, JULY 25, 2023<br>3  ---oOo---<br>4<br>5  THE VIDEOGRAPHER: Good morning. We are<br>6 going on the record at 9:07 a.m. on July 25th, 2023.<br>7  Please note that microphones are<br>8 sensitive and they may pick up whispering, private<br>9 conversations, and cellular interference. Please<br>10 turn off all cell phones or place them away from the<br>11 microphones as they can interfere with the<br>12 deposition audio.<br>13  Audio and video recording will continue<br>14 to take place unless all parties agree to go off the<br>15 record.<br>16  This is Media No. 1 of the video-recorded<br>17 deposition of Itamar Simonson, taken by counsel for<br>18 defendant in the matter of Nike, Inc., versus StockX<br>19 LLC, filed in the United States District Court for<br>20 the Southern District of New York, Case<br>21 No. 1:22-CV-00983-VEC.<br>22  This deposition is being held at<br>23 650 California Street, San Francisco, California<br>24 94108.<br>25  My name is Peter Yaroshuk from the firm | Page 8<br>1  THE REPORTER: Great. Thank you.<br>2  EXAMINATION<br>3 BY MR. FORD:<br>4  Q  Good morning, Dr. Simonson.<br>5  A  Good morning.<br>6  Q  You have been designated as an expert<br>7 witness by Nike in this action, correct?<br>8  A  Yes.<br>9  Q  And you've been deposed before, correct?<br>10  A  Yes.<br>11  Q  Many times; is that fair to say?<br>12  A  Yes.<br>13  Q  Is there any reason you can't give<br>14 truthful and accurate testimony here today?<br>15  A  No.<br>16  Q  How did you prepare for today's<br>17 deposition?<br>18  A  Reviewed the documents that I previously<br>19 received. I had a Zoom meeting with Ms. Duvdevani<br>20 and Mr. Miller. I think there might have been<br>21 someone else. Last -- it was last week, might have<br>22 lasted perhaps an hour and a half. And yesterday,<br>23 we met in the office of DLA Piper, I think from<br>24 about 10:30 until about 4:30 or so.<br>25  Q  And you said you reviewed documents that |
| Page 7<br>1 Veritext. I am the videographer. The court<br>2 reporter is Ashley Soevyn from the firm Veritext. I<br>3 am not related to any party in this action, nor am I<br>4 financially interested in the outcome.<br>5  Counsel present now, please state your<br>6 appearances and affiliations for the record. If<br>7 there are any objections to proceeding, please state<br>8 them at the time of your appearance, beginning with<br>9 noticing attorney.<br>10  MR. FORD: Christopher Ford,<br>11 Debevoise & Plimpton, for Defendant, StockX. I'm<br>12 joined by my colleague Abigail Liles, and Chester<br>13 Dubov a summer associate from our office.<br>14  MS. DUVDEVANI: Tamar Duvdevani, DLA<br>15 Piper, on behalf of Plaintiff, Nike, Inc. I am<br>16 joined by my partner, also DLA Piper, Marc Miller.<br>17  THE VIDEOGRAPHER: Thank you.<br>18  Will the court reporter please swear in<br>19 the witness.<br>20  THE REPORTER: Doctor, can I please have<br>21 you raise your right hand.<br>22  Do you solemnly state that the testimony<br>23 you're about to give in this deposition will be the<br>24 truth, the whole truth, and nothing but the truth?<br>25  THE WITNESS: I do. | Page 9<br>1 you had previously received as -- in preparation?<br>2  A  Yes.<br>3  Q  Those included your reports that you<br>4 filed in this action?<br>5  A  Yes.<br>6  Q  Or served in this action.<br>7  Other than your reports, did you review<br>8 any other documents?<br>9  A  Yes. As I said, the documents that I<br>10 previously received. I might have reviewed some<br>11 articles that I cited. So anything listed on my<br>12 consider -- consideration list and maybe some other<br>13 documents.<br>14  Q  Did you review any documents that aren't<br>15 listed in any of your materials considered or in<br>16 your CV?<br>17  A  I -- I don't think that I listed the<br>18 surrebuttal report of a Dr. Tucker. So I did review<br>19 that.<br>20  I'm trying to think. I don't recall<br>21 exactly what was listed.<br>22  Q  So other than the surrebuttal report of<br>23 Dr. Tucker, you don't recall reviewing any documents<br>24 in preparation for the deposition that aren't listed<br>25 in one of your three reports? |

3 (Pages 6 - 9)

|  |  |
|---|---|
| Page 22<br>1    THE REPORTER: Exhibit 1, for the record.<br>2        And you can see my copy, Doctor.<br>3        Thank you.<br>4  BY MR. FORD:<br>5    Q   So, Dr. Simonson, I've handed you a copy<br>6  of your expert report that's been marked as<br>7  Exhibit 1. And I believe the question you were<br>8  answering was: Is it your opinion that the<br>9  consumers taking your survey would not have<br>10 understood the term "offer" to potentially mean<br>11 manufacturer?<br>12   A   And I said I -- I don't think they --<br>13 they would. And let's take a look at page 31.<br>14   Q   Okay.<br>15   A   Which is where -- it's just a recreation<br>16 of where the question was asked.<br>17       Okay. And you look at the -- at the --<br>18 the screen the respondents saw, at the top it says:<br>19       (As read):<br>20          "StockX Vault NFT Nike SB Dunk."<br>21       Et cetera.<br>22       So that's the full name of this shoe<br>23 whose image we're looking at.<br>24       There is another mention here of StockX.<br>25 There is StockX to the left, the one that's | Page 24<br>1    A   Right.<br>2    Q   What is your intention that consumers<br>3  would understand the slash to mean?<br>4    A   I think it's -- it could be you -- you<br>5  can -- I know that it's the position of StockX that<br>6  this is all about product, and StockX merely<br>7  facilitates trades, making them more efficient. You<br>8  don't need to store your shoe. You can sell them<br>9  easily. You can take possessions of the physical<br>10 product. So the emphasis of StockX is on the<br>11 product. NFT is just a tool to facilitate having a<br>12 product.<br>13       So moreover, as I said in my report and<br>14 rebuttal report, a consumer was -- let's say, in<br>15 January or February of '22, sees this offer, he or<br>16 she does not know whether they'll end up with NFT,<br>17 that they may sell to someone or they'll just take<br>18 possession of the shoe. They'll have the physical<br>19 product. Therefore, it could be either one.<br>20       And suppose I just said NFT, you know,<br>21 you may come and say, Well, that's your position,<br>22 it's all just NFT. We believe that this is just a<br>23 product with some side benefits based on this<br>24 arrangement that we came up with.<br>25       So therefore, I thought that product/NFT |
| Page 23<br>1  presented vertically. And then it says absolutely<br>2  nothing about who made the shoe, who manufactured<br>3  the shoe. The question is:<br>4        (As read):<br>5           "Which company or companies brand or<br>6           brands offer/offers the product/NFT<br>7           shown on the screen?"<br>8        If you wanted to ask who manufactured<br>9  that the shoe, whose image you -- you are looking<br>10 at, that's a different question.<br>11       There's still a -- yeah. I think if you<br>12 ask manufacturer, then maybe you would expect people<br>13 to say Nike. But here, there is an offer, and<br>14 you -- you -- you can place a bid for it.<br>15       Earlier in the survey, Vault NFT was<br>16 defined. That looks very much like a vaulted NFT.<br>17 And we say who offers this vaulted NFT? The correct<br>18 answer is StockX, not Nike.<br>19   Q   So you didn't ask any of your survey<br>20 respondents who offers this Vault NFT, correct?<br>21   A   I -- I did not. I -- I asked the<br>22 question you see.<br>23   Q   And the question was: Which company or<br>24 companies or brand or brands offer or offers the<br>25 product/NFT shown on the screen, right? | Page 25<br>1  was exactly the way it should have been phrased.<br>2    Q   So I want to get to that in a moment.<br>3  But I do want to ask, because you mentioned what<br>4  consumers would understand in January or February of<br>5  2022: Did you survey any consumers in January or<br>6  February of 2022?<br>7    A   I did not.<br>8    Q   So what's your basis for offering an<br>9  opinion about what a consumer would or would not<br>10 have understand -- understood in January or February<br>11 of 2022?<br>12   A   What are you referring to that I --<br>13   Q   It -- in your testimony, you said:<br>14       (As read):<br>15          "ANSWER: A consumer, let's say, in<br>16          January or February of 2022, sees this<br>17          offer, he or she does not know whether<br>18          they will end up with an NFT that they<br>19          may sell to someone or they will just<br>20          take possession of the shoe."<br>21       What's the basis for that opinion?<br>22   A   Just that's -- doesn't involve a survey.<br>23 Because, as I said, NFT was an up-and-coming new<br>24 thing, and the specific NFT/product mechanism that<br>25 StockX came up with was a new thing. It's -- I |

|  |  |
|---|---|
| Page 50<br>1 media. This marks the end of Media No. 1 in the<br>2 deposition of Itamar Simonson. The time is 10:05,<br>3 and we're off the record.<br>4     (Recess.)<br>5     THE VIDEOGRAPHER: This marks the<br>6 beginning of Media No. 2 in the deposition of<br>7 Itamar Simonson. The time is 10:25 a.m. We're on<br>8 the record.<br>9 BY MR. FORD:<br>10   Q  Dr. Simonson, I'd like to turn back to<br>11 Exhibit 1, which is your opening report.<br>12   A  Yes.<br>13   Q  If you can turn with me to page 6,<br>14 paragraph 13.<br>15     Paragraph 13 says:<br>16     (As read):<br>17       "I was asked by counsel for Nike, Inc.,<br>18       to design and conduct a survey to<br>19       determine whether StockX's use of<br>20       several of Nike's trademarks in<br>21       connection with the sale of StockX's<br>22       Vault NFTs is likely to cause confusion<br>23       among an app -- an appreciable number<br>24       of relevant consumers."<br>25     Is that right? | Page 52<br>1 correctly believe that the offer is by StockX, which<br>2 did make the offer. Or they're confused because<br>3 they think that Nike made the offer. And as you<br>4 recall, I think in the summary of conclusions and<br>5 later, I talk about the ratio of mentions of Nike as<br>6 to one offering the -- the -- this NFT divided by<br>7 the percentage of people who mentioned StockX, which<br>8 is actually the one that made the offer.<br>9   Q  Did counsel for Nike ask you to design<br>10 and conduct a survey to determine what I think you<br>11 called your first component, the question of<br>12 prominence?<br>13   A  I don't recall exactly how it came about.<br>14 But I looked at the complaint. I saw that the issue<br>15 of prominence is very prominent, and I designed<br>16 the -- that part, that experiment, if you will,<br>17 accordingly. Did I -- I don't recall exactly --<br>18 yeah, we communicated, and I think they knew exactly<br>19 how I approached this.<br>20     And then there was this issue of, as I<br>21 said, the second component. How many people<br>22 believed that -- incorrectly, I should say, that<br>23 Nike made the offer relative to those who correctly<br>24 named StockX as the one making the offer.<br>25   Q  And is that second component likelihood |
| Page 51<br>1   A  Yes.<br>2   Q  And does that accurately lay out what you<br>3 were asked to do in this case in connection with<br>4 your opening report by counsel for Nike?<br>5   A  It's one sentence, so no, I don't think<br>6 it lays out -- I mean, you have to read the report<br>7 to know what's in the report. I wouldn't say that<br>8 this one sentence captures everything.<br>9   Q  So if this sentence doesn't capture<br>10 everything, what were you asked by counsel for Nike<br>11 to do in connection with the preparation of your<br>12 opening report?<br>13   A  I don't recall exactly what was said.<br>14 But there are two components here. There's the<br>15 issue of prominence, which I tested. You can call<br>16 that an experiment, which is you changed the<br>17 degree -- the prominence of Nike -- the Nike brand.<br>18 Be that the image of the shoe. And the image that I<br>19 show, there was a swoosh. So the question is how<br>20 changes in the prominence of Nike -- of the Nike<br>21 brand, whether that affects the confusion as to --<br>22 as to who offers this NFT. That's one component.<br>23     The other component for which the results<br>24 were so overwhelming, if you will, and we already<br>25 talked about that, is to what extent people | Page 53<br>1 of confusion?<br>2   A  It's confusion. The -- the relevant<br>3 measure of confusion in the context of this case.<br>4 As I explained earlier, we talked about the fact<br>5 that in this somewhat unusual case, we have both the<br>6 junior mark, StockX, and the senior mark, Nike on<br>7 the same page. Both in the test and the control,<br>8 they appear in every page. It's unusual. And that<br>9 is the -- the -- if you will, just -- if you --<br>10 that -- that's a big component of the confusion<br>11 here. But I think the impact of the prominence on<br>12 the mistaken belief that the offer is made by Nike<br>13 is another component of confusion.<br>14   Q  Are you offering an opinion in this case<br>15 as to whether StockX's Vault NFTs are likely to<br>16 cause confusion with Nike?<br>17   A  I -- yeah, I do offer the opinion that<br>18 the StockX NFT causes -- likely and does create<br>19 confusion with Nike as to the belief that Nike makes<br>20 the offer.<br>21   Q  And that opinion is based on the surveys<br>22 that you fielded in this case; is that right?<br>23   A  Yes. And I think it was replicated,<br>24 especially by Dr. Neal. So he got -- if you look<br>25 at -- while, you know, I understand that he -- he |

|  |  |
|---|---|
| Page 70<br>1  Q   And am I correct that your conclusion was<br>2  that the answers to those affiliation questions were<br>3  not relevant to your conclusions?<br>4     A   That's incorrect.<br>5     Q   Okay.  In what way did you incorporate an<br>6  analysis of your -- of the affiliation questions in<br>7  reaching your opinions?<br>8     A   So I can read from the report.  But as<br>9  you recall, I looked at the ratio of mentions of<br>10 Nike versus mentions of StockX.<br>11        I could have done it just for the first<br>12 question, the question about who offered it.  But I<br>13 thought it would be also informative to look across<br>14 all of those questions.  Let's include all mentions<br>15 of Nike, all mentions of Nike [sic], and if you look<br>16 at the -- at the ratio, you see that the ratio is<br>17 somewhat different if you count all of the mentions<br>18 across all of the questions.<br>19    Q   Was it important to you to count across<br>20 all of the questions?<br>21    A   I thought it was -- it was -- yeah, I<br>22 think it was worth asking the questions, yes.<br>23    Q   Even if you ultimately did not use the<br>24 data from the responses to all of the questions in<br>25 reaching your opinions? | Page 72<br>1  proper universe in this case is all prospective<br>2  customers of anything StockX offers or just<br>3  prospective customers of the Vault NFT product?<br>4     A   I focused on the Vault NFT.<br>5     Q   So it's your opinion that the proper<br>6  universe in this case is limited to prospective<br>7  customers of the Vault NFT product?<br>8         MS. DUVDEVANI:  Objection.<br>9         THE WITNESS:  People whose<br>10 characteristics are such that they're more likely<br>11 than most people to consider buying an NFT offered<br>12 by StockX.<br>13 BY MR. FORD:<br>14    Q   Any NFT?<br>15    A   Especially sneakers.<br>16    Q   Especially an NFT associated with<br>17 sneakers; is that what you're saying?<br>18    A   I think that -- well, I also included<br>19 people -- I said people who collect sneakers, they<br>20 may be interested in buying a -- an NFT that<br>21 involved a sneaker which could serve as part of<br>22 their collection even if they don't know yet exactly<br>23 what they'll do.  So people who are into crypto<br>24 currency, apparently these are people who are into<br>25 those kind of investments. |
| Page 71<br>1     A   That is --<br>2         (Cross talk.)<br>3         MS. DUVDEVANI:  Objection.<br>4         THE WITNESS:  That's incorrect.  I did.<br>5  I'm happy to go through my report and -- and let's<br>6  go back to Exhibit A.<br>7  BY MR. FORD:<br>8     Q   Well, we can -- we can get to it.  But<br>9  why don't we start by just talking about the<br>10 universe of people you surveyed.<br>11        So let's go -- Exhibit 1 I think you<br>12 should still have in front of you, to page -- let's<br>13 see -- page 30, paragraph 55.<br>14        Am I right that the relevant confusion in<br>15 this case, as you set out in paragraph 55, is<br>16 forward confusion?<br>17    A   It is forward confusion, yes.<br>18    Q   And what is the proper universe in a<br>19 survey testing forward confusion?<br>20    A   Prospective customers of the junior<br>21 party.<br>22    Q   And StockX is the junior party in this<br>23 case, correct?<br>24    A   Yes.<br>25    Q   And were -- is it your opinion that the | Page 73<br>1         Again, these are people who are more<br>2  likely than most to entertain these kind of offers.<br>3  Let's keep in mind, this is a novel idea with a<br>4  specific set of benefits, and, I think, most of the<br>5  actual future, at the time, purchasers of StockX NFT<br>6  are people who have not previously purchased StockX<br>7  NFT.  So you're looking for characteristics that are<br>8  likely to be correlated with likelihood of<br>9  considering investing in NFTs tied to sneakers.<br>10    Q   So what was the appropriate survey<br>11 universe in this case?<br>12    A   I think the one that I used is the -- is<br>13 a proper survey universe in this case.<br>14    Q   Okay.  So let's talk about that.<br>15        You eliminated all respondents who are<br>16 under the age of 18 from your survey population,<br>17 correct?<br>18    A   Right.<br>19    Q   And is it your understanding that no one<br>20 under the age of 18 purchased or could have been<br>21 interested in purchasing a Vault NFT?<br>22    A   You can never generalize.  But no one --<br>23 maybe someone inherited a lot of money and his or<br>24 her parents are very liberal and -- and saying,<br>25 "Okay, go ahead, do with your money whatever you'd |

Page 90

1 the marketplace. You -- you can approximate as
2 you -- as much as possible, given the particular
3 context.
4    Q   Setting aside that word, would you agree
5 that it's important to capture or approximate the
6 essential characteristics of the marketplace?
7    A   I think, again, generally speaking,
8 subject to -- to the specific context and -- and so
9 on.
10   Q   And would you agree that a survey that
11 does not accurately represent the manner in which a
12 consumer would see the product at issue would be
13 less reliable?
14   A   I -- I don't think you can generalize.
15 You have to look at -- at the specific case and the
16 specific context. Sometimes you can look at the
17 results. And to the extent that someone raises a
18 concern, you can look at the results and see is this
19 criticism -- criticism reflected in the results. If
20 it's not, then you know that this criticism really
21 is -- I wouldn't say -- I guess the word
22 relevance -- relevant, at times, is perceived by
23 some as a legal term. But it means that it did not
24 impact the actual results.
25   Q   I think that makes a lot of sense.

Page 91

1       Let's go to page 27 of your opening
2 report. Now, there's an image in the middle of the
3 page, of page 27, directly above paragraph 51,
4 right?
5    A   Yes.
6    Q   Am I correct that that image accurately
7 reproduces something that was shown to all of the
8 respondents of both your main and companion survey?
9    A   That's correct.
10   Q   Who designed this image?
11   A   I -- I -- I did in collaboration with
12 others. But yes, I -- I'm responsible for it.
13   Q   Okay. Who -- who did you design it in
14 collaboration with?
15   A   I -- I don't recall exactly. Could have
16 been with the research firm. I -- I don't recall
17 specifically.
18   Q   I believe in your report you identify
19 Quest -- is that right? -- as the panel firm that
20 you used?
21   A   They did not do anything other than
22 collect data. I think it's Que -- Quest Mindshare.
23   Q   Quest Mindshare, that's right.
24   A   But I was referring to Target Research
25 Group.

Page 92

1    Q   So someone at Target Research Group may
2 have helped you prepare this?
3    A   I don't recall specifically.
4    Q   Why did you prepare this? Is -- is --
5 well, let me back up a minute.
6       Would you consider it appropriate to call
7 this a stimulus or a part of the stimulus of your
8 survey?
9    A   It was part of the protocol. It was not
10 the stimulus that appeared while people were
11 answering the questions. But the purpose or my
12 purpose was very straightforward. We have the
13 difference between the test and control. So we have
14 the image of the shoe, you know what I'm referring
15 to, and -- and versus the token or ticket or NFT
16 ticket, however you call it.
17      Aside from that, I wanted to give both
18 the test and control group as much information that
19 is the same for both groups as possible. So first,
20 I wanted to tell him about what kind of products are
21 generally offered on the StockX platform. That was
22 one purpose.
23      In addition, given that the control group
24 did not see the image of the Nike shoe that was the
25 subject of the questions, when they were asked the

Page 93

1 questions, I wanted to give them the opportunity to
2 see that shoe with its name. And I explained
3 exactly how I came up with that methodology. And I
4 told them, look at the names. And I placed it. I
5 did -- I did no rotations. I placed this particular
6 shoe at the top left, because I know, based on prior
7 research, that that's the place respondents -- and
8 consumers, in many cases -- are most likely to look
9 at first. So that's specifically why I put it
10 there.
11      And -- and you see the name. And
12 therefore, when you go -- the control group
13 respondents, they go to the next page, and they see
14 the ticket, and they're asked the questions, they
15 know what shoe it is. They've seen it.
16      In other words, the purpose of this was
17 to decrease the difference between the test and
18 control so that the control people would also have
19 the opportunity to see the product they're asked
20 about. So it's not just the -- the name of the --
21 of the shoe but they've -- they all -- also saw it.
22   Q   Saw a picture of the shoe, right?
23   A   Exactly.
24   Q   So by -- by placing it in the top-left
25 corner and never rotating it for any of your

Page 94

1 respondents, your intention was to ensure that all
2 of your respondents saw an image of the Nike SB Dunk
3 Low Ben & Jerry's Chunky Dunky before completing the
4 survey.
5    A    I -- I wanted to be familiar with that
6 shoe so that later, when they see the image of that
7 shoe on this card, in the context of NFT, they will
8 know what the underlying shoe is.
9    Q    But you also showed it to people who did
10 not see an image of the shoe on the card, correct?
11    A    Yeah.  Those people -- exactly.  People
12 in the control who saw this NFT ticket.  Yes.
13    Q    It was important for you that they not
14 just be familiar with this shoe, but actually have
15 seen an image of the shoe itself.
16    A    Exactly.
17    Q    Has any consumer who ever purchased a
18 StockX Vault NFT seen this image that appears on
19 page 27?
20    A    Probably not.  They didn't participate in
21 a survey like this.
22          As I said, when you design a survey, you
23 have to approximate reality, but you also have to
24 take into consideration other factors.  And if you
25 decide that you want the control group to have the

Page 95

1 opportunity to see the image, that's what you do.  I
2 thought that was a good way of -- of doing it.  And
3 I don't -- can't think of any re -- any bias or any
4 issue that would arise because the respondents in
5 both groups, the test and control, in both surveys,
6 were shown a markup-like product line.  Nothing.
7          Yeah, it was not something that
8 respondents saw in reality.  But if someone can tell
9 me, "Okay, here is how it affected results," sure,
10 let's look at the results.
11    Q    And -- and --
12    A    I don't think there is any -- I -- I
13 looked at the reports of Klein and -- and Neal, and
14 they tried to make something out of that, especially
15 Neal, I think.  But I forget now which fatal flaw
16 number it was.  But out there somewhere between --
17    Q    One and nine.
18    A    -- between one -- one and nine, they
19 said, "Ah, well, it's not a reality."  Okay.  How
20 did that affect the results?  Did it affect the
21 likelihood that people would say -- would be more
22 likely to say Nike versus StockX just because I
23 showed a lineup of products sold on StockX?
24          It would -- if you look at the title:
25          (As read):

Page 96

1          "Below are some of the products StockX
2           offers on its website."
3          It's about StockX.  I don't think it
4 affected anything, but, if anything, it made StockX
5 even more prominent.
6    Q    How would you test whether it affected
7 anything?
8    A    Well, I -- I'm -- I'm curious to hear
9 from someone how it affected the results.
10    Q    That's not my question.
11          My question is:  You -- you said you
12 don't believe that it affected anything.
13    A    Right.
14    Q    And I'm asking:  Did you do anything to
15 test whether it affected anything?
16    A    There was no need to.
17          When you design research -- and I used
18 the methodology that I used previously in research
19 project with Amos Tversky, which happened to receive
20 the most prestigious award for an article in
21 marketing, I used the same methodology in -- in
22 terms of the basic principal.  I -- that's what I
23 used here.
24          And if someone can come up -- presumably,
25 if someone says, "Well, you showed it biased

Page 97

1 something."  Okay.  Show me how it biased something.
2 If you say --
3    Q    I think --
4    A    -- if you say that there was a particular
5 bias, sure.  You -- you can test it -- test the same
6 survey with this product page and without it and
7 show me that it makes a difference.
8    Q    I definitely could do that.
9          I think my question is:  Do you know for
10 sure that this didn't bias any of your
11 respondents --
12    A    Yes.
13    Q    -- without running the survey that you
14 just mentioned that doesn't include the stimulus?
15    A    What do you know -- we don't know
16 anything for sure.  But, as I said, based on my
17 research, it does not have an effect.  And, as I
18 said, it -- no one raised that issue when they
19 selected this article using the same methodology or
20 similar methodology as the article that had the
21 greatest impact on -- on the marketing field.
22    Q    So that's what you believe your research
23 proves, that there is no bias created by introducing
24 a third option like this?
25          MS. DUVDEVANI:  Objection.

Page 282

1    I, ITAMAR SIMONSON, do hereby declare
2  under penalty of perjury that I have read the
3  foregoing transcript; that I have made any
4  corrections as appear noted, in ink, initialed by
5  me, or attached hereto; that my testimony as
6  contained herein, as corrected, is true and correct.
7     EXECUTED this_____ day
8  of_____,
9  20____, at_____, _____.
         (City)           (State)
10
11
12
    _____
13  ITAMAR SIMONSON
14
15
16
17
18
19
20
21
22
23
24
25

Page 283

1    I, the undersigned, a Certified Shorthand
2  Reporter of the State of California, do hereby
3  certify:
4     That the foregoing proceedings were taken
5  before me at the time and place herein set forth;
6  that any witnesses in the foregoing proceedings,
7  prior to testifying, were duly sworn; that a record
8  of the proceedings was made by me using machine
9  shorthand, which was thereafter transcribed under my
10 direction; further, that the foregoing is a true
11 record of the testimony given.
12    I further certify I am neither financially
13 interested in the action nor a relative or employee
14 of any attorney or party to this action.
15    IN WITNESS WHEREOF, I have this July 28,
16 2023 subscribed my name.
17
18
19
20 [signature]
    _____
21 ASHLEY SOEVYN
   CSR No. 12019
22
23
24
25

Page 284

1    * * *ERRATA SHEET* * *
2  NAME OF CASE:  NIKE V. STOCKX
3  DATE OF DEPOSITION:  7/25/23
4  NAME OF WITNESS:  ITAMAR SIMONSON
5  Reason codes:
6     1. To clarify the record.
       2. To conform to the facts.
7     3. To correct transcription errors.
8  Page ____ Line ____ Reason____
   From _____ to_____
9
10 Page ____ Line ____ Reason____
   From _____ to_____
11
12 Page ____ Line ____ Reason____
   From _____ to_____
13
14 Page ____ Line ____ Reason____
   From _____ to_____
15
16 Page ____ Line ____ Reason____
   From _____ to_____
17
18 Page ____ Line ____ Reason____
   From _____ to_____
19
20 Page ____ Line ____ Reason____
   From _____ to_____
21
22
23          _____
               ITAMAR SIMONSON
24
25

*** ERRATA SHEET ***

CASE: NIKE V. STOCKX
DATE OF DEPOSITION: JULY 25, 2023
WITNESS: ITAMAR SIMONSON

| PAGE | LINE | FROM | TO | REASON |
|---|---|---|---|---|
| 17 | 16 | that | that it's | TE |
| 18 | 13 | ever-ready | Eveready | " |
| 19 | 4 | say | saying | TE |
| 20 | 9 | question | shoe | Accuracy |
| 22 | 22 | shoe | product | Accuracy |
| 23 | 9 | that the | the | TE |
| 26 | 15 | he | she | " |
| 33 | 15 | from | for | " |
| 38 | 3 | Resell | Resale | " |
| 42 | 4-5 | those shoes, Nike shoes, were extremely high | those NFTs tied to shoes, Nike shoes, were extremely high. | Accuracy |
| 44 | 3 | artifact | RTFKT | TE |
| 46 | 16 | can | can't | " |
| 47 | 5 | be the vaulting club | that be, the vaulting club? | " |
| 52 | 6 | to | to the | " |
| 54 | 7 | than as | as | " |
| 57 | 7 | Only | Only? | " |
| 57 | 21 | I'm | I'm also | " |
| 63 | 8 | appears | appear | " |
| 66 | 3 | Heinz | Hunt's | " |
| 66 | 4 | companies | company | " |
| 67 | 1 | the | a | " |

1

| PAGE | LINE | FROM | TO | REASON |
|------|------|------|-----|--------|
| 67 | 4 | what I just | or | " |
| 70 | 15 | Nike | Stockx | " |
| 84 | 13 | the position | deposition | " |
| 85 | 17 | South and | South | " |
| 90 | 18 | is | if | " |
| 92 | 25 | questions, when | questions when | " |
| 94 | 5 | to | them to | " |
| 95 | 6 | markup-like | mock-up | " |
| 101 | 23 | double | Nobel | " |
| 103 | 13 | expended | expanded | " |
| 112 | 6 | product | products | " |
| 113 | 23 | want | wanted | " |
| 114 | 2 | focus | focus on | " |
| 115 | 19 | products | products | " |
| 124 | 14 | their | the | " |
| 141 | 11 | you call it infringement | what you call infringement | " |
| 147 | 2 | made | showed | " |
| 152 | 12 | have used | use | " |
| 164 | 3 | with the | with | " |
| 164 | 16 | I'm | it's | " |
| 164 | 23 | who | those who | " |
| 164 | 125 | know | not know | " |
| 166 | 15 | options | auctions | " |
| 170 | 15 | hooka | Hoka | " |
| 172 | 24 | is as | as | " |
| 173 | 1 | comparative | compared | " |
| 181 | 13 | have | had | " |
| 183 | 21 | generic | general | " |

| PAGE | LINE | FROM | TO | REASON |
|------|------|------|-----|--------|
| 202 | 10 | that | is that | " |
| 206 | 21 | ranked orders, | rank ordered | " |
| 211 | 25 | criteria"? | criterion"? | " |
| 212 | 20 | criteria | criterion | " |
| 213 | 6 | in | on | " |
| 213 | 6 | criteria | criterion | " |
| 216 | 15 | there's | they're | " |
| 226 | 21 | futures | future | " |
| 231 | 25 | certainty | uncertainty | " |
| 243 | 16 | if there others | if others | " |
| 246 | 1 | deals | deal | " |
| 248 | 3 | go from as | go as | " |
| 260 | 10 | "Mary Kay" | "Mary Kay" in | " |
| 260 | 17 | of issue | an issue | " |
| 262 | 23 | it's a | it's | " |
| 270 | 1 | that that | that | " |
| 274 | 4 | Wall v. | moldy | " |
| 275 | 22 | or | about | " |
| 278 | 1 | in court | in part | " |

\* TE – Transcription error

I attest that all of the above is true.

Date: 8/21/2023

*I. Simonson*

Itamar Simonson, Ph.D.