# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| |  |
|---|---|
| NIKE, INC., | Civil Action No.: 1:22-cv-00983-VEC |
| Plaintiff, | **ORAL ARGUMENT REQUESTED** |
| v. | Redacted Public Version |
| STOCKX LLC, | |
| Defendant. | |

# NIKE, INC.'S REPLY OMNIBUS MOTION TO EXCLUDE THE PROFFERED EXPERT TESTIMONY AND OPINIONS OF SARAH BUTLER, ROBERT VIGIL, AND DEJONGH WELLS

**TABLE OF CONTENTS**

I. BUTLER'S TESTIMONY SHOULD BE EXCLUDED ........................................................ 1
  A. Butler's Testimony Is Irrelevant, Prejudicial, and Confusing ............................................. 1
  B. Butler's Testimony Is Not Reliable .................................................................................... 3
II. VIGIL'S TESTIMONY ON APPORTIONMENT SHOULD BE EXCLUDED ................... 5
  A. Vigil Cannot Rely On Butler's Flawed Survey .................................................................. 5
  B. Vigil's StockX and GOAT Sales Data Analysis Is Unreliable........................................... 7
  C. Vigil's "Other Considerations" Testimony Is Unreliable................................................... 8
III. WELLS'S TESTIMONY SHOULD BE EXCLUDED....................................................... 9
IV. CONCLUSION.................................................................................................................. 10

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adidas Am., Inc. v. Skechers USA, Inc.*,
   2017 WL 3319190 (D. Or. Aug. 3, 2017)..............................................................................6, 7

*Apotex Inc. v. Acorda Therapeutics, Inc.*,
   823 F.3d 51 (2d Cir. 2016)......................................................................................................2

*Arista Recs. LLC v. Lime Grp. LLC*,
   2011 WL 1674796 (S.D.N.Y. May 2, 2011) .......................................................................8, 9

*Boltex Mfg. Co., L.P. v. Ulma Piping USA Corp.*,
   2019 WL 2943230 (S.D. Tex. June 28, 2019) ........................................................................2

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.*,
   627 F. Supp. 2d 384 (D.N.J. 2009) .........................................................................................9

*C=Holdings B.V. v. Asiarim Corp.*,
   992 F. Supp. 2d 223 (S.D.N.Y. 2013)..................................................................................1, 2

*Chanel, Inc. v. RealReal, Inc.*,
   449 F. Supp. 3d 422 (S.D.N.Y. 2020)......................................................................................1

*Church & Dwight Co. v. SPD Swiss Precision Diagnostics GmbH*,
   2018 WL 4253181 (S.D.N.Y. Sept. 5, 2018)........................................................................6, 7

*CJ Prod. LLC v. Snuggly Plushez LLC*,
   809 F. Supp. 2d 127 (E.D.N.Y. 2011) .....................................................................................2

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)..............................................................................................................5, 7

*Dreyer v. Ryder Auto. Carrier Grp., Inc.*,
   367 F. Supp. 2d 413 (W.D.N.Y. 2005)..................................................................................7, 8

*In re Elysium Health-ChromaDex Litig.*,
   2022 WL 421135 (S.D.N.Y. Feb. 11, 2022)............................................................................4

*Gucci Am., Inc. v. Guess
   ?, Inc.*, 831 F. Supp. 2d 723 (S.D.N.Y. 2011) ........................................................................4

*Hertz Corp. v. Avis, Inc.*,
   867 F. Supp. 208 (S.D.N.Y. 1994) ..........................................................................................1

*JR Tobacco of America, Inc. v. Davidoff of Geneva (CT), Inc.*,
   957 F. Supp. 426 (S.D.N.Y.1997) ...................................................................................9

*Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*,
   2015 WL 5459662 (S.D.N.Y. Sept. 16, 2015) ................................................................8

*Mastercard Int'l Inc. v. First Nat. Bank of Omaha, Inc.*,
   2004 WL 326708 (S.D.N.Y. Feb. 23, 2004) ...................................................................3

*Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*,
   316 U.S. 203 (1942) ....................................................................................................6, 8

*Pacamor Bearings, Inc. v. Minebea Co.*,
   918 F. Supp. 491 (D.N.H. 1996) .....................................................................................1

*Reed Const. Data Inc. v. McGraw-Hill Cos., Inc.*
   49 F. Supp. 3d 385 (S.D.N.Y. 2014) ...............................................................................2

*Rexall Sundown, Inc. v. Perrigo Co.*,
   707 F. Supp. 2d 357 (E.D.N.Y. 2010) .............................................................................6

*River Light V, L.P. v. Tanaka*,
   2018 WL 5778234 (S.D. Fla. Nov. 2, 2018) ................................................................1, 2

*Saxon Glass Techs., Inc. v. Apple Inc.*,
   393 F. Supp. 3d 270 (W.D.N.Y. 2019) ............................................................................5

*Starter Corp. v. Converse, Inc.*,
   170 F.3d 286 (2d Cir. 1999) ............................................................................................3

## Statutes

15 U.S.C. § 1117(a) ...........................................................................................................5, 6

## Other Authorities

Fed. R. Evid. 403 ....................................................................................................................3

Fed. R. Evid. 702 ....................................................................................................................9

6 McCarthy § 32:171 (5th ed.) ...............................................................................................5

iii

I.      **BUTLER'S TESTIMONY SHOULD BE EXCLUDED**

      A.      **Butler's Testimony Is Irrelevant, Prejudicial, and Confusing**

As Nike's Motion shows, and StockX's Opposition fails to dispute, StockX's unambiguous authenticity claims are literally false as a matter of law because it sold consumers counterfeit "Nike" shoes.  (Dkt. 193 at §§ II, IV.A.1.)  StockX contends, without support, that claims like "100% Authentic," "100% Verified Authentic," "Verified Authentic," "Guaranteed Authenticity," "Always Authentic, Never Fake," and "Always Verified Authentic" are not literally false because they "conveyed the true message that every product offered on StockX's platform underwent an authentication inspection."  (Dkt. 209 ("Opp.") at 4.)  StockX's advertising claims did not convey that message, and Nike did not allege false advertising because StockX told consumers it inspects products.  The accused claims are unambiguous statements that, given StockX's counterfeit shoe sales and admission that ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ are demonstrably false.  (Dkt. 193 at § II.A.)  Courts agree with this conclusion, *Chanel, Inc. v. RealReal, Inc.*, 449 F. Supp. 3d 422, 443–44 (S.D.N.Y. 2020); *C=Holdings B.V. v. Asiarim Corp.,* 992 F. Supp. 2d 223, 242–43 (S.D.N.Y. 2013); *River Light V, L.P. v. Tan aka,* 2018 WL 5778234, at *6 (S.D. Fla. Nov. 2, 2018), and StockX provides no contrary authority because none exists.  StockX also provides no evidentiary support (not even Butler's survey[1]) for its contention that consumers perceive its authenticity guarantee as merely a message that every product "underwent an authentication inspection."  (Opp. at 4.)  The Court should "rely on its own common sense and logic in interpreting the message," *Hertz Corp. v. Avis, Inc.,* 867 F. Supp. 208, 212 (S.D.N.Y. 1994), to find StockX's claims literally false, a finding that while dispositive, has direct bearing on Nike's Motion to exclude Butler and Vigil's testimony.  *Cf. Pacamor Bearings, Inc. v. Minebea Co.*, 918 F. Supp. 491, 502–03 (D.N.H.

---

[1] Butler admits her survey did *not* test consumer perception or understanding of the meaning of StockX's advertising claims.  (Dkt. 194-22 at 29:11-15; 103:12-23.)

1

1996) (excluding evidence suggesting advertisements were misleading where they were found literally false); *Boltex Mfg. Co., L.P. v. Ulma Piping USA Corp.*, 2019 WL 2943230, at *1 (S.D. Tex. June 28, 2019) (materiality expert excluded as irrelevant if plaintiff establishes materiality as a matter of law).

Nike's Motion also shows that StockX's literally false authenticity guarantee is material as a matter of law because a product's authenticity is its most inherent quality, especially when it comes to branded products, like Nike and Jordan shoes, that counterfeiters target regularly. (Dkt. 193 at §§ II, IV.A.1.) Indeed, this is ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ proposition and competitive advantage in the marketplace. (*See id*. at § II.A.) False authenticity claims influence consumer purchasing decisions and are thus material, not merely presumed material. *See CJ Prod. LLC v. Snuggly Plushez LLC,* 809 F. Supp. 2d 127, 148 (E.D.N.Y. 2011); *River Light,* 2018 WL 5778234, at *6; *C=Holdings,* 992 F. Supp. 2d at 243. StockX neither distinguishes Nike's authority nor provides any of its own for its position that a defendant who falsely guaranteed a product's authenticity may "rebut a presumption of materiality" with any evidence, let alone with a flawed and unreliable materiality survey.[2] StockX does not even dispute that its authenticity guarantee involved the Nike shoes' most inherent or material quality, conceding materiality under Second Circuit authority. *See Apotex Inc. v. Acorda Therapeutics, Inc.,* 823 F.3d 51, 63 (2d Cir. 2016). A finding that StockX's false statements influenced consumer purchasing decisions renders Butler's survey irrelevant.[3] *See Boltex*, 2019 WL 2943230, at *1.

---

[2] StockX's *Reed Const. Data Inc. v. McGraw-Hill Cos., Inc.* is inapposite; it concerned a false advertising campaign that compared defendant's database product to plaintiff's product, not an authenticity guarantee or statement concerning the product's most inherent and material characteristic. 49 F. Supp. 3d 385 (S.D.N.Y. 2014). Moreover, defendant there proffered lay testimony from consumers that defendant's misrepresentations were immaterial to their purchasing decision. *Id*. at 418-19. The non-expert evidence here demonstrates that StockX's authenticity guarantee *is material* to consumer purchasing decisions. (Dkt. 193 at § II.A.) And Butler did not ask respondents whether StockX's authenticity guarantee was material to their purchasing decision.

[3] Nike addresses the damages issue in the sections on Vigil, *infra*.

2

StockX also fails to address Nike's argument that Butler's testimony should be excluded under Federal Rule of Evidence 403 because an irrelevant survey is prejudicial and very confusing to the factfinder. *See Mastercard Int'l Inc. v. First Nat. Bank of Omaha, Inc.*, 2004 WL 326708, at *7 (S.D.N.Y. Feb. 23, 2004). Despite the law that falsehoods regarding authenticity influence purchasing decisions and are thus material, *see supra*, StockX, through Butler, intends to tell the factfinder that its falsehoods did not influence consumers. The danger of jury confusion far outweighs any probative value. *See Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 297 (2d Cir. 1999).

### B.     Butler's Testimony Is Not Reliable

Butler's survey suffers from multiple flaws that warrant exclusion: she overloaded respondents with information, effectively hiding the claims that were being tested in unison, used a biased survey population predisposed to StockX, an improper control, and stimuli that failed to replicate purchasing conditions. (Dkt. 193 at § IV.A.2.) StockX's Opposition fails to refute any one of these flaws, let alone their combined impact on rendering Butler's survey unreliable.

StockX has no answer to a primary problem with Butler's survey design: she simultaneously tested all deceptive claims' impact and required respondents to review five information-rich webpages,[4] virtually guaranteeing inattention and a finding of no impact. Nike does not contend that Butler should have "dissect[ed] StockX's claims into phrases isolated from the context in which consumers saw them," as StockX incorrectly suggests. (Opp. at 9.) She should have tested each claim individually, or at least categorically, because there is no effective, unbiased methodology capable of simultaneously testing their impact at once. (Dkt. 193 at 15,

---

[4] StockX fails to respond to the problem that Butler showed respondents five StockX webpages, including one mock-up that did not exist in the real world, in a particular order, yet did not have any evidence showing that consumers view these pages—let alone in her selected order—before purchasing on StockX. (Dkt. 193 at 14.)

3

Dkt. 194-21 at ¶ 57). Since "[t]here is no claim that [StockX] combined each of the statements in a single advertisement or promotion or that any consumer would have seen the statements all together," Butler's design is "not helpful in assisting the factfinder to determine whether any category of tested statements is deceptive or is material." *In re Elysium Health-ChromaDex Litig.*, 2022 WL 421135, at *9 (S.D.N.Y. Feb. 11, 2022).[5]

StockX likewise fails to rebut that this design flaw was compounded by Butler's biased universe of respondents that were already familiar with StockX and interested in purchasing shoes on StockX. Respondents were already interested in purchasing on StockX before ever seeing Butler's survey and were thus unlikely to re-decide whether to use StockX based on the survey's stimuli. StockX also fails to refute that this high purchase likelihood shows that Butler's survey design was plagued by both demand and ceiling effects and is therefore unreliable. (Dkt. 193 at § IV.A.2.a.; Dkt. 194-21 at ¶¶ 13, 59-60.)

StockX contends that Butler's control was proper because it either removed the deceptive advertising claim or altered it to use the word "inspected" in place of "authenticated." Yet Butler did not seek to understand how consumers perceived the control phrase "StockX Inspected," which produced similarly high purchase interest. Unlike the unambiguous "100% Authentic," "StockX Inspected" is potentially misleading, a problem Butler failed to recognize yet subsequently admitted respondents might have thought "StockX Inspected" related to authenticity. (Dkt. 194-22 at 219:7-220:3.) Thus, her control could not effectively isolate the variable being tested, *i.e.*, whether authenticity claims affect purchase interest. Moreover, StockX's contention that the survey's results are consistent with the conclusion that the variable being tested simply has no

---

[5] StockX cites *Gucci Am., Inc. v. Guess?, Inc.*, 831 F. Supp. 2d 723, 740 (S.D.N.Y. 2011) as support for Butler's decision to test all deceptive advertisements simultaneously. The survey at issue in this trade dress case was designed to measure consumer confusion caused by allegedly infringing multi-element trade dress. Simultaneously testing all of the elements comprising a trade dress is not at all analogous to simultaneously testing discrete advertising claims.

effect on purchasing interest, fails to even address, let alone dispute, that the results are most likely attributable to respondents' pre-disposed purchase interest. StockX has (falsely) trumpeted its authentication prowess for years and Butler surveyed respondents that were already StockX users or fans. Indeed, of the 24 control group respondents Butler identified as StockX prior users, 8 answered that authentication was the reason for their interest. (Dkt. 194-18 at Ex. G.) Butler's respondents already internalized StockX's false authenticity claims, so her survey tested nothing.

Finally, to rebut a relatively minor point that many respondents rushed through the survey (Dkt. 193 at fn. 7), StockX filed Butler's new opinion that excludes from her results 120 respondents (approximately 35%). (Dkt. 210-2.) This new opinion brings Butler's sample size even further below the threshold required to extrapolate the results to a larger population. *See* 6 MCCARTHY § 32:171 (5th ed.) ("Conducting a survey with a number of respondents too small to justify a reasonable extrapolation to the target group at large will lessen the weight of the survey."). With only 289 respondents left, Butler's survey results are neither statistically significant nor reliable. *See Saxon Glass Techs., Inc. v. Apple Inc.*, 393 F. Supp. 3d 270, 287 (W.D.N.Y. 2019). Indeed, Butler recently testified in a different action that at least 400 respondents is appropriate to draw reliable conclusions from a survey. (Decl. of Tamar Duvdevani ¶ 2, Ex. 1 at 304:21-306:3.)

## II. VIGIL'S TESTIMONY ON APPORTIONMENT SHOULD BE EXCLUDED

### A. Vigil Cannot Rely On Butler's Flawed Survey

StockX does not dispute that if the Court excludes Butler's testimony and materiality survey, then it should also exclude Vigil's testimony relying on her survey (Opp. at § II.A.). Even if the Court does not exclude Butler, Vigil's opinions relying on her survey should still be excluded as unreliable and not "relevant to the task at hand," *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 591-97 (1993), because a materiality survey—and especially one that is contrary to the law—may not be used to reduce StockX's profits under § 1117(a).

5

As discussed in opening, under the Lanham Act's disgorgement framework, once Nike establishes StockX's sales of falsely advertised Nike shoes during the relevant period, "[t]he burden is [StockX's] to prove that [its false advertising] had no cash value in sales made by him. If [StockX] does not do so, the profits made on sales of [falsely advertised goods] properly belong to [Nike]." *See Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 207 (1942); *Rexall Sundown, Inc. v. Perrigo Co.,* 707 F. Supp. 2d 357, 361 (E.D.N.Y. 2010) (the same burdens in trademark and false advertising cases).

Because there is no evidence that StockX's false advertising had "no cash value in sales," Vigil attempts to apportion profits using Butler's materiality survey as a proxy for such evidence. (Dkt. 194-1 at ¶ 10, § II.B.4.a.) But courts do not permit *damages* experts, like Vigil here, to reduce profits using the results of a consumer survey designed to test *liability* issues, like Butler's materiality survey here. *See Church & Dwight Co. v. SPD Swiss Precision Diagnostics GmbH*, 2018 WL 4253181, at *8 (S.D.N.Y. Sept. 5, 2018); *Adidas Am., Inc. v. Skechers USA*, Inc., 2017 WL 3319190, at *28 (D. Or. Aug. 3, 2017). As noted above, Butler's survey included 58 respondents who had previously used StockX. At best, Butler's survey shows that some people, who likely did not actually purchase the falsely advertised Nike shoes, reported that they were interested in using StockX to purchase shoes for varied reasons. *Adidas*, 2017 WL 3319190, at *28 ("There is no support in the law for Skechers's theory that it can reduce its profits under 15 U.S.C. § 1117(a), by using the rate of confusion results from its likelihood of confusion surveys [which] only show that some people, who did not actually purchase the disputed footwear, reported that they were confused about the origin of a particular shoe in different contexts.") StockX bears the burden to prove that its false advertising "had no cash value in sales," *id*; *Mishawaka,* 316 U.S. at 206–7, and Butler's survey has no bearing on the cash value of StockX's sales of falsely

6

advertised shoes, nor does it measure the actual purchasing decisions in the marketplace among those who actually purchased falsely advertised Nike shoes. *See Adidas*, 2017 WL 3319190, at *28. Butler admitted that her survey's data could not be extrapolated to "some other population." (Dkt. 194-22 at 126:6-127:11.) Yet Vigil does exactly that: he extrapolates to actual consumers that purchased falsely advertised Nike shoes. This testimony should be excluded because it is unreasonable for Vigil to draw any conclusions from Butler's materiality survey about StockX's false advertising's actual impact on actual purchasers. *See Church & Dwight*, 2018 WL 4253181, at *8 (excluding damages expert for reducing profits using survey of prospective purchasers).

### B. Vigil's ▮▮▮▮▮ Analysis Is Unreliable



Vigil admitted that ▮▮▮▮ It was improper for Vigil to blindly accept this data from counsel, assume it was an accurate and proper comparator, and input it into his regression analysis. Vigil's failure to verify the data's accuracy or confirm its "fit" for the issue he tested renders his testimony "inherently unscientific," and "require[es] exclusion of such evidence under *Daubert*." *Dreyer v. Ryder Auto. Carrier Grp., Inc.*, 367 F. Supp. 2d 413, 446 (W.D.N.Y. 2005).

StockX tries to band-aid Vigil's failure by arguing that it will lay the foundation at trial for ▮▮▮ and that Vigil's list of materials considered includes ▮▮▮▮. (Opp. at 15.) But StockX cannot cure the legal flaw that, at the time Vigil conducted his analysis, he had no foundation for his assumption that this data was an accurate and proper comparator for his analysis.[6] Vigil admits ▮

---

[6] Moreover, Dkt. 210-3 at STX0090129, ▮▮▮▮ (Dkt. 194-25). Further, ▮

████████████████████████████ (Dkt. 194-24 at 229:6-237:12.) As Vigil made no attempt to verify this data at the time he performed his regression, "the resultant analysis and opinion are inherently unscientific requiring exclusion." *Dreyer*, 367 F. Supp. 2d at 446 (collecting cases).

### C. Vigil's "Other Considerations" Testimony Is Unreliable

StockX concedes that Vigil failed to quantify each other factor's contribution to StockX's sales of falsely advertised Nike shoes. (Opp. at § II.C.) This renders his testimony nothing more than narrative factual testimony under the guise of expert opinion, and it is "inappropriate for experts to become a vehicle for factual narrative." *Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 2015 WL 5459662, at *3 (S.D.N.Y. Sept. 16, 2015) ("Acting simply as a narrator of the facts does not convey opinions based on an expert's knowledge and expertise; nor is such a narration traceable to a reliable methodology.") StockX argues that Vigil was not obligated to quantify the factors' contribution because he is merely rebutting Hansen's opinion on StockX's sales. (Opp. at § II.C.) But StockX must prove that its false advertising "had no cash value in sales," *Mishakawa,* 316 U.S. at 206–7, and Vigil's apportionment opinions are not merely rebuttal testimony.[7] As StockX's expert on an issue for which it bears the burden, Vigil was required to do more than identify additional reasons that may factor into consumer purchasing decisions. *Arista Recs. LLC v. Lime Grp. LLC*, 2011 WL 1674796, at *10 (S.D.N.Y. May 2, 2011) (excluding economic expert who "does not offer any opinion quantifying the degree to which any of the causes to which he attributed the music industry's decline were responsible for that decline, either individually or in the aggregate."). He admits he did not use any methodology to determine each factor's contribution to consumer purchasing decisions or calculate the cash value in sales attributable to these other factors. This apportionment testimony is neither "based on sufficient

---

████████████████████████████████████████████████████████ (Dkt. 210-3 at STX0090129.)
[7] Vigil first disclosed this testimony in his *affirmative* report. (Dkt. 194-19 at ¶ 9, § IV.C., Dkt. 194-1 at ¶ 9, § II.B.3.)

8

facts or data," nor "the product of reliable principles and methods," FED. R. EVID. 702, rendering it unreliable and warranting exclusion. *Arista Recs. LLC,* 2011 WL 1674796, at *10.

### III.   WELLS'S TESTIMONY SHOULD BE EXCLUDED

In opposing Nike's challenges to the reliability and relevance of Wells's opinions about sneakerheads, StockX dodges Nike's point that Wells has no workable definition of "sneakerhead" and merely regurgitates his vague definition.[8] (Opp. at 20, 22.)  StockX does respond to Nike's argument that Wells lacks a reliable basis to opine on how many StockX consumers are sneakerheads, but only through citing examples of when StockX, Nike, and media have used the term when referring to some of the parties' customers. (*Id*. at 20-21.)  These sources provide no data on StockX's consumer base and how many of StockX's millions of customers fit Wells's vague definition, and simply use the term colloquially and without definition. (*Id*.)

Even if some StockX consumers are sneakerheads, Wells does not offer reliable and relevant opinions about them. In opposition to Nike's challenge to Wells's opinion that sneakerheads tend to be skeptical of authentication claims, StockX merely regurgitates Wells's opinion and refers to his "extensive experience," but provides no reliable basis for him to opine on sneakerhead perception of StockX's authentication claims. Regardless, Wells's opinion that sneakerheads are sophisticated and skeptical of StockX's authentication claims should be excluded because, "when determining whether a claim is literally false, audience sophistication is irrelevant." *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 465 (D.N.J. 2009) (citing *JR Tobacco of America, Inc. v. Davidoff of Geneva (CT), Inc.,* 957 F. Supp. 426, 432 (S.D.N.Y. 1997)). StockX then makes the incredible leap that Wells's opinion on sneakerhead sophistication is relevant to Nike's NFT-focused trademark claims, even though Wells testified

---

[8] Nike challenged only the reliability and relevance of Wells's opinions, but StockX inexplicably spends several pages describing Wells's sneaker expertise, which Nike did not challenge. (Opp. 17-20.)

that he knew nothing about NFTs generally and almost nothing about Vault NFTs specifically. (Opp. 20-21, Dkt. 194-26 at 56:2-7, 58:4-59:24.) Moreover, StockX does not explain how sneakerhead sophistication concerning sneakers (Wells's opinion) is relevant to Nike's claims regarding StockX's sales of unauthorized NFTs: indeed, Wells does not opine, because he has no ability to do so, that sneakerheads are sophisticated NFT consumers or that sneakerheads even purchased Vault NFTs. StockX then argues that Wells's opinions on the benefits of Vault NFTs somehow (1) show StockX did not create them in bad faith (a *Polaroid* factor) and (2) are relevant to Nike's tarnishment claims.[9] (Opp. 22-24.) Wells admits he does not know what benefits came with the Vault NFTs beyond shoe storage (Dkt. 194-26 at 58:4-59:24), and, regardless, any perceived benefit of "vaulting" a product does not bear on bad faith (whether StockX intended to freeride on Nike's goodwill) or tarnishment (whether StockX released a low quality product).[10]

Finally, StockX argues that Wells's opinions on the causes of counterfeiting and benefits of StockX's authentication are relevant to willfulness. (Opp. at 22-23.) Even if Wells's opinions were reliable and correct (they are not), they do not bear on whether StockX knowingly or recklessly engaged in counterfeiting or false advertising. For example, even if Wells had evidence to support his opinion that there is an incentive for counterfeiting due to scarcity, this is irrelevant to StockX's state of mind in recklessly disregarding the possibility that it authenticated and sold fakes in unknown quantities. Wells has no knowledge or expertise to make this determination.

## IV. CONCLUSION

For the reasons set forth in Nike's Motion, the Court should exclude Butler and Wells entirely and exclude the portions of Vigil's testimony outlined in Nike's Motion.

---

[9] Wells ignores that the Vault NFTs' other "benefits" contributed to the confusion and tarnishment. (Dkt. 193 at 22.)
[10] StockX also repeatedly argues that Wells can offer more general opinions about sneakerheads. (Opp. 2-3 (anticipated testimony on "the world of 'sneakerheads'"), 17, 19 ("traits and expectations"), 20, 22.) Absent specification of what these opinions comprise, StockX cannot defend either their reliability or relevance.

Date: November 17, 2023

By: */s/ Tamar Y. Duvdevani*

**DLA PIPER LLP (US)**

Tamar Y. Duvdevani
Marc E. Miller
Michael D. Hynes
Andrew J. Peck
Jared Greenfield
1251 Avenue of The Americas, 27th Fl.
New York, NY 10020
Telephone: (212) 335-4500
Facsimile: (212) 335-4501

Michael Fluhr
555 Mission Street, Suite 2400
San Francisco, CA 94105
Telephone: (415) 836-2500
Facsimile: (415) 836-2501

Melissa Reinckens
4365 Executive Drive
Suite 1100
San Diego, CA 92121
melissa.reinckens@us.dlapiper.com
Telephone: (858) 677-1400
Facsimile: (858) 677-1401

Jane W. Wise
500 Eighth Street, NW
Washington, D.C. 20004
Telephone: (202) 799-4149
Facsimile: (202) 863-7849

*Attorneys for Plaintiff Nike, Inc.*