# Exhibit 01

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

GOLO, LLC,

Plaintiff,

v.

GOLI NUTRITION INC., a Canadian Corporation, GOLI NUTRITION, INC., a Delaware Corporation, and MICHAEL BITENSKY,

Defendants.

C.A. No. 20-667-CFC

Trial Volume I

- - - - - - - - - - - - - - - - -

GOLI NUTRITION INC., a Canadian Corporation, GOLI NUTRITION INC., a Delaware Corporation and MICHAEL BITENSKY,

Counter-Plaintiffs,

V.

GOLO, LLC and CHRISTOPHER LUNDIN,

Counter-Defendants.

J. Caleb Boggs Courthouse
844 North King Street
Wilmington, Delaware

Tuesday, August 22, 2023
8:26 a.m.
Jury Trial

BEFORE: THE HONORABLE COLM F. CONNOLLY, U.S.D.C.J.

APPEARANCES:

BARNES & THORNBURG, LLP
BY: CHAD STOVER, ESQUIRE

-and-

SIDLEY AUSTIN LLP
BY: MARK HOPSON, ESQUIRE
BY: AMY LALLY, ESQUIRE
BY: BENJAMIN MUNDEL, ESQUIRE
BY: JACQUELINE FRADETTE, ESQUIRE

For the Plaintiff and Counter-Defendants

DLA PIPER
BY: STEPHANIE O'BYRNE, ESQUIRE

-and-

DLA PIPER
BY: MELISSA R. REINCKENS, ESQUIRE
BY: TAMAR Y. DUVDEVANI, ESQUIRE
BY: SAFRAZ W. ISHMAEL, ESQUIRE
BY: SUSAN N. ACQUISTA, ESQUIRE
BY: COLIN STEELE, ESQUIRE

For the Defendants and Counter-Plaintiffs

08:26:02
08:26:02

A. So, I surveyed U.S. residents who were 18 years or older, who have or are likely to purchase a vitamin or nutritional supplement. And they're sampled from all over the United States, and we collected data from 406 consumers.

Q. And how did you go about identifying the 406 people that were in your sample from that broader population?

A. Yeah. So -- so, when I started doing this kind of work, we used to do these surveys in shopping malls, but that's not how we do them anymore. What we typically use are what are called Internet panels.

So, these are consumers -- millions of Americans who have agreed to sign up and participate in the market research or survey research. And we go into those panels with millions and millions of people, and we randomly select individuals to participate. And then to make sure that people are qualified, we ask a series of screening questions, right.

So, we start basically with a random sample of the U.S. population and then find the people who are specifically qualified to participate.

Q. And are you sure, Ms. Butler, that you can take the results from the 406 randomly selected people and apply that to the broader population of customers that are likely or have purchased a vitamin or nutritional supplement?

A. Yes. So, a good rule of thumb is you can think that

a sample size of 100 has about a plus or minus of 10 percent. For 400, that's about 3 percent. And then that number continues to go down.

So, as the sample size gets bigger, you don't continue to get gains like that. So, 400 is a good number. It also allows me to collect data from men and women, all different age groups, all across the United States.

Q. And were you able to identify men and women and people in all different age groups across the United States in your sample?

A. Yes.

Q. All right. Let's talk about how the survey actually worked.

MR. MUNDEL: And we can go to the next demonstrative.

BY MR. MUNDEL:

Q. And, Ms. Butler, can you just explain the steps of the survey that you used in this case?

A. Yes. So, I mean, we talked about getting the right group of people and kind of a random selection of people.

The other thing that's really important in a survey like this is to make sure that what we're having people -- the exercise that we're having people undergo in the survey looks like the real world, right, because we want to be able to take our survey results and say something

about the real world. If there's not a connection, right, if what we have -- the exercise doesn't really look like the real world, then the results aren't going to be meaningful.

So, in this case, and I think we've heard about television advertising and Instagram advertising, we showed respondents a GOLO television commercial and then we showed them what's called a distractor. And that's because, of course, you might be watching TV and, I don't know, the doorbell rings, or the dog barks, or the kids yell your name. There's some distraction. And then we showed respondents a series of Instagram ads, including an ad from goli and some other ads, and then asked them confusion questions.

Q. To what extent is having respondents look at a television commercial and then a social media advertisement consistent with the way Americans consume media?

A. Sure. I mean, I think we probably all know that lots of us now sit and watch television and look through our phones, or have our phones right by our side. As well, we made sure that respondents in the survey indicated that they both watched television and look at social media. And we didn't have any problems finding consumers who do both of those things.

Q. All right. Now, let's run through each of those steps in a bit more detail. And we'll start with

standing.

THE COURT: Oh, okay. That's good.

All right. I'll see you tomorrow morning.

And, again, around 8:15 just because -- just in case an issue pops up.

Thank you very much.

DEPUTY CLERK: All rise.

(Court was recessed at 5:03 p.m.)

I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceeding.

/s/ Heather M. Triozzi
Certified Merit and Real-Time Reporter
U.S. District Court