# EXHIBIT C

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2         FOR THE SOUTHERN DISTRICT OF NEW YORK
 3
 4   NIKE, INC.,
 5
          Plaintiff,
 6
               vs.                  Case No. 1:22-cv-00983
 7                                  VEC
     STOCKX LLC,
 8
          Defendant.
 9   _____
10
11
12
13
14
15          VIDEO DEPOSITION OF JOHN L. HANSEN
16              San Francisco, California
17              Thursday, August 31, 2023
18                    Volume 1
19
20
     STENOGRAPHICALLY REPORTED BY:
21   REBECCA L. ROMANO, RPR, CSR, CCR
     California CSR No. 12546
22   Nevada CCR No. 827
     Oregon CSR No. 20-0466
23   Washington CCR No. 3491
24   JOB NO. 6015329
25   PAGES 1 - 286
```

```
                                             Page 2
 1              UNITED STATES DISTRICT COURT
 2          FOR THE SOUTHERN DISTRICT OF NEW YORK
 3
 4   NIKE, INC.,
 5
          Plaintiff,
 6
             vs.              Case No. 1:22-cv-00983
 7                                      VEC
     STOCKX LLC,
 8
          Defendant.
 9   _____
10
11
12
13
14
15
16
17            DEPOSITION OF JOHN L. HANSEN, taken on
18   behalf of the Defendant, at Debevoise & Plimpton
19   LLP, 650 California Street, 31st Floor,
20   San Francisco, California, commencing at 9:05 a.m.,
21   Thursday, August 31, 2023 before REBECCA L. ROMANO,
22   a Certified Shorthand Reporter, Certified Court
23   Reporter, Registered Professional Reporter.
24
25
```



Page 83

4    MR. MILLER:  Objection.

25    MR. RIEHL:  We can bring Mr. Adams back

Page 87



MR. MILLER:  Objection.

THE DEPONENT:  I am not certain I understand that question.



**Page 106**

1

4          MR. MILLER:  Objection.

5

14         MR. MILLER:  Objection.

15

```
 1  ███████████████████████████████████████
 2          MR. MILLER:  Objection.
 3          THE DEPONENT:  Not that I have
 4  quantified.  I do cite to some examples, again,
 5  where customers or consumers contacted Nike, and in
 6  at least one instance, they suspected they had an
 7  inauthentic good and StockX informed that it was of
 8  poor manufacturing quality on behalf of Nike.
 9      Q.   (By Mr. Riehl)  And are those examples
10  the examples that you have listed in footnote 109
11  to your first amended report?
12      A.   Yes, those are examples.
13          MR. RIEHL:  Okay.  Let's look at some.
14          (Exhibit 11 was marked for identification
15  by the Court Reporter and is attached hereto.)
16      Q.   (By Mr. Riehl)  The reporter has handed
17  you Deposition Exhibit 11.
18          This is one of the documents that you
19  cite in footnote 109, right?
20      A.   It is.
21      Q.   Do you see the sender of this email
22  writes:  "I purchased a pair of the new Oski SB
23  Dunks on stockx for about $200 and I fear they are
24  fake"?
25      A.   I see that.
```

1                   THE DEPONENT:  I do address the issue

2     that there is a guarantee of authenticity and that

3     that's important to consumers.  There's evidence

4     that I have reviewed -- documents, testimony --

5     that the authenticity of the good is important to

6     consumers and helps drive consumer purchases.

7                   So there is evidence and -- and

8     information related to that issue, but I haven't

9     independently tried to quantify the amount that

10    would be due specifically to that.

11         Q.   (By Mr. Riehl)  In your reports, you

12    didn't offer an opinion about whether StockX would

13    have sold -- I'm sorry, strike that.

14                  In your reports, you didn't offer an

15    opinion about whether there would have been fewer

16    trades of Nike sneakers on StockX if the false

17    advertising claims at issue had not been made,

18    right?

19                  MR. MILLER:  Objection to the form.

20                  THE DEPONENT:  I don't think I use those

21    words, no.

22         Q.   (By Mr. Riehl)  Did you offer that

23    opinion in other words?

24                  MR. MILLER:  Same objection.

25                  THE DEPONENT:  No.  I identified the

Page 117

1   volume of shoes that were subject to the false

2   advertising or sold in connection with the false

3   advertising.  That's what actually happened.  I

4   haven't attempted to compare that to some other

5   hypothetical world.

6       Q.   (By Mr. Riehl)  And you haven't tried to

7   compare the number of counterfeit Nike sneakers

8   that were traded on StockX to what might have

9   happened in any hypothetical alternative world in

10  your reports, right?

11           MR. MILLER:  Objection.

12           THE DEPONENT:  I don't think we know the

13  true volume or magnitude of counterfeits that have

14  actually transacted on StockX.  That -- that's part

15  of the challenge of the false advertising related

16  to authenticity and passing of inauthentic goods.

17      Q.   (By Mr. Riehl)  But you haven't offered

18  an opinion in your reports that that volume would

19  have been lower if StockX had not made the false

20  advertising claims at issue, right?

21           MR. MILLER:  Objection.

22           THE DEPONENT:  Is your question, do I use

23  those words?  I don't, but I do address, in my

24  expert reports, the importance of authenticity and

25  claims of authenticity to consumers.

Page 118

1    Q.   (By Mr. Riehl)  But you --

2    A.   So it does relate -- is responsive to

3  your question.  There is evidence and information

4  that that is something that is important to

5  consumers.  I don't think consumers on StockX go

6  there to purchase inauthentic goods, and when they

7  engage in a transaction, they are guaranteed an

8  authentic good.  They intend to purchase on that

9  authentic good, is my understanding.

10   Q.   But you haven't analyzed how many more

11 sales of Nike sneakers would have occurred on

12 StockX if they hadn't made the false advertising

13 claims at issue, right?

14        MR. MILLER:  Objection.

15        THE DEPONENT:  That's not the manner in

16 which I conducted my analysis.  I identified the

17 sales that actually occurred, that are connected to

18 the false statements.

19   Q.   (By Mr. Riehl)  And you don't present any

20 evidence in your reports that there would have been

21 any additional -- or, I'm sorry, any fewer sales of

22 Nike sneakers on StockX if StockX hadn't made the

23 allegedly false claims at issue, right?

24        MR. MILLER:  Objection to form.

25        THE DEPONENT:  It's not something I

1   attempted to quantify.  But, again, I cited to and

2   discuss evidence about the importance of

3   authenticity that goes to that issue.  It's just

4   not something I've attempted to reduce to

5   quantification.

6           Q.   (By Mr. Riehl)  And when you say you

7   haven't reduced it to quantification, you haven't

8   determined whether it actually happens at all, but

9   the trade-in volume would be affected, right?

10               MR. MILLER:  Objection to form.

11               THE DEPONENT:  I haven't attempted to put

12   a number on that.  There -- again, there's

13   information, documents that I cite that relate to

14   that issue, which indicates that authenticity is

15   important to consumers and is one of the driving

16   factors, so I would certainly expect that to impact

17   the level of commerce.

18           Q.   (By Mr. Riehl)  And in not putting a

19   number on it, you haven't ruled out that the number

20   is zero, right?

21               MR. MILLER:  Objection.

22               THE DEPONENT:  That's inconsistent with

23   the evidence and information I have seen.  It's

24   also inconsistent with Dr. Vigil's own opinion.

25               MR. RIEHL:  All right.  Mr. Adams, I'm

Page 154

```
 1    That, I would agree, are improperly deductible.
 2         Q.   (By Mr. Riehl)  I guess what I'm after
 3    though, in the language we just looked at in
 4    paragraph 55 of your first amended expert report,
 5    you refer to StockX earning ill-gotten profits.
 6              And what I'm wondering is whether that
 7    ████████████ is your opinion of the amount of
 8    those ill-gotten profits or if it's something else?
 9         A.   I would word this as, this is the amount
10    of profits subject to disgorgement that was earned
11    in connection with the alleged false advertising
12    statements.
13         Q.   And do you have an opinion about whether
14    the amount of ill-gotten profits StockX derived
15    from falsely and/or misleadingly claiming that
16    every Nike or Jordan good sold on its platform was
17    100 authentic [sic] was ████████████ as opposed
18    to some other figure potentially?
19              MR. MILLER:  Objection.
20              THE DEPONENT:  That's not how I
21    characterized it.  I'm not connecting those two
22    statements.
23              Paragraph 55 has the assumption of
24    liability, both for the false statements and that
25    counterfeit sales did occur.  In my view, those
```

Page 168

1    time.

2        Q.    Yes.

3            At this point, I'm trying to

4    understand -- I'm sorry.

5            At this point, I'm not trying to

6    understand why you did what you did.  I'm trying to

7    understand what you did.

8            And the question is:  The sales that you

9    looked at to generate the ███████████████████

10   figure did not pass through a filter of whether

11   they would have occurred but for the alleged false

12   advertising statements, right?

13           MR. MILLER:  Objection.

14           THE DEPONENT:  I believe I told you what

15   I did, which is I identified the sales that were

16   made in connection with the false advertising

17   statement.  That's what that figure represents, and

18   that's how I determined it.

19       Q.    (By Mr. Riehl)  Okay.  And to determine

20   that figure, you did not analyze whether those

21   sales would have occurred but for the false

22   advertising statements, right?

23           MR. MILLER:  Objection to form.  Asked

24   and answered.

25           THE DEPONENT:  Generally, I would agree

1    with that.  I identified the sales that are at

2    issue, the sales that were made in connection with

3    the false advertising statement.  I'm not opining

4    or putting forth the opinions that none of those

5    sales would have occurred but for.  After I

6    identified the sales, then it's subject to further

7    scrutiny and analysis.

8        Q.   (By Mr. Riehl)  In your reports, you did

9    not present analysis of how many of the trades of

10   Nike and Jordan shoes on StockX that actually

11   occurred would not have occurred if StockX had not

12   made the advertising statements at issue, right?

13             MR. MILLER:  Objection.  Asked and

14   answered.

15             THE DEPONENT:  Maybe I'm -- I'm failing

16   to appreciate that that's not the same question

17   that you just asked and I have answered, which is I

18   identified the sales that were made in connection

19   with the false advertising statement, and that's

20   the starting point of the analysis.

21       Q.   (By Mr. Riehl)  Sure.

22             Previously I asked what you did, but now

23   I'm asking about another thing to see if you did

24   that other thing.

25             And that other thing is:  Did you present

Page 170

1    analysis of how many of the sales of Nike sneakers

2    on StockX would not have occurred if StockX had not

3    made the advertising claims at issue?

4            MR. MILLER:  Objection to form.  Asked

5    and answered.

6            Counsel, this is starting to become

7    inappropriate, bordering on harassing, the same

8    question.

9            MR. RIEHL:  I -- this question --

10           MR. MILLER:  Would you like me to go back

11   and review how many times you've asked it --

12           MR. RIEHL:  This --

13           MR. MILLER:  -- and how many times he's

14   answered it?

15           MR. RIEHL:  Couns- --

16           MR. MILLER:  I can do that.

17           MR. RIEHL:  Counsel, you've made your

18   point.  This is definitely not harassing.  I have

19   not asked this question before.  I asked --

20           MR. MILLER:  Yeah, you have.

21           MR. RIEHL:  I asked an adjacent question,

22   Counsel.

23           MR. MILLER:  You have been asking it --

24   the same -- the same time --

25           MR. RIEHL:  You --

```
 1              MR. MILLER:  -- with slightly --
 2              MR. RIEHL:  The record is what it is.
 3              MR. MILLER:  -- different words --
 4              MR. RIEHL:  You -- Counsel, please.
 5              MR. MILLER:  -- expecting a different
 6     answer.
 7         Q.   (By Mr. Riehl)  Please answer the
 8     question.
 9              MR. MILLER:  He's already answered your
10     question.
11         Q.   (By Mr. Riehl)  You may answer the
12     question.
13         A.   I believe I have already answered this
14     question, and that's that I didn't and -- I'm not
15     opining what the level of sales would or would not
16     have been; that those sales would not have been
17     made but for the alleged false advertising.  So
18     it's the same -- the same answer to the question
19     you previously asked.
20         Q.   (By Mr. Riehl)  And in your reports, you
21     estimated that StockX's total revenue from trades
22     of Nike/Jordan shoes with the U.S. component during
23     the relative period -- relevant period was
24     ███████████████  right?
25         A.   That's correct.
```

1    Q.   And in your reports, you did not present

2  any analysis of how much of that revenue StockX

3  would have generated even if it had not made the

4  advertising statements at issue, right?

5            MR. MILLER:  Objection.

6            THE DEPONENT:  That's not the manner in

7  which I conducted the analysis.  I have described

8  what that number reflects already.

9    Q.   (By Mr. Riehl)  Right.

10            And so you did not present analysis of

11  whether that number would have been lower without

12  the advertising statements at issue, right?

13            MR. MILLER:  Objection.

14            THE DEPONENT:  That would be inconsistent

15  with the purpose of identifying the sales that were

16  made in connection with the false statements.

17    Q.   (By Mr. Riehl)  Whether or not it would

18  be inconsistent, you didn't do it, right?

19            MR. MILLER:  Objection.

20            THE DEPONENT:  As I previously stated,

21  that's not the basis for that number.

22    Q.   (By Mr. Riehl)  I'm not asking, right

23  now, about the basis for the number.

24            I'm asking you:  Did you present any

25  analysis of whether that ███████████████████

Page 173

1    revenue would have been lower if StockX had not

2    made the advertising statements at issue?

3              MR. MILLER:  Objection.  Asked and

4    answered.  That's the third time on that particular

5    variation of this question, Counsel.

6        Q.   (By Mr. Riehl)  You may answer the

7    question.

8        A.   I haven't opined, and I'm not opining,

9    that these sales would not have been made but for

10   the false advertising statement.  There are issues

11   of apportionment that have been set forth.  I do

12   have comments and analysis and opinions related to

13   the issue of apportionment.  But for purposes of

14   the ▮▮▮▮▮▮▮▮▮▮, that's the at-issue revenue as

15   agreed to between Dr. Vigil and myself.

16             (Exhibit 14 was marked for identification

17   by the Court Reporter and is attached hereto.)

18        Q.   (By Mr. Riehl)  The reporter has handed

19   you Deposition Exhibit 14, which I will represent

20   is your first rebuttal report in this case.

21             Does it look to you like your first

22   rebuttal report in this case?

23        A.   It does.

24        Q.   Please turn to page 10.

25             Do you see the section heading at the top

1    authentication capabilities were removed, right?

2            MR. MILLER:  Objection to form.

3            THE DEPONENT:  You read that correctly,

4    yes.

5        Q.   (By Mr. Riehl)  And you also, in your

6    reports, did not describe any consumer testing you

7    had done to demonstrate whether or not consumers

8    who would purchase products from StockX if false

9    and/or misleading statements about authentication

10   capabilities were removed, right?

11           MR. MILLER:  Objection.

12           THE DEPONENT:  I refer to and cite to a

13   number of different pieces of evidence related to

14   authentication and the importance of authentication

15   and having goods certified as authentic, but those

16   weren't consumer studies, per se, performed by me.

17   That's contemporaneous evidence from the record.

18       Q.   (By Mr. Riehl)  And were any of those

19   studies, consumer testing, to demonstrate whether

20   or not consumers would purchase products from

21   StockX if false and/or misleading statements about

22   its authentication capabilities were removed?

23           MR. MILLER:  Objection to form.

24           THE DEPONENT:  They related to the

25   importance of certain features, including customers

Page 211

1   relevant?

2          MR. MILLER:  Objection to form.

3          THE DEPONENT:  That's not a question I

4   have tried to answer, again, because it's not

5   relevant for purposes of the disgorgement analysis

6   that I have set forth and the work I've performed,

7   and I am not aware, separately, of any information

8   in that regard.

9      Q.   (By Mr. Riehl)  So you are saying whether

10  there are StockX buyers who don't believe StockX's

11  allegedly false advertising claims is not relevant

12  to the disgorgement analysis?

13         MR. MILLER:  Objection to form.

14         THE DEPONENT:  It wasn't relevant for

15  purposes of identifying the sales that were subject

16  to or in connection with a false statement.

17     Q.   (By Mr. Riehl)  Is it relevant to the

18  disgorgement analysis?

19         MR. MILLER:  Objection to form.

20         THE DEPONENT:  Not that I have seen

21  anyone allege at this point.

22     Q.   (By Mr. Riehl)  And aside from what you

23  have seen people allege, do you have a view about

24  whether or not it's relevant?

25         MR. MILLER:  Objection to form.

```
                                              Page 215
 1              Can you look at paragraph 33 of your
 2     second rebuttal report, please.
 3              In the sentence is where you say
 4     Dr. Vigil applies Ms. Butler's survey results even
 5     though he also relies upon contemporaneous StockX
 6     surveys that contradicts those results, right?
 7         A.    That's what I state.
 8         Q.    And then you -- the evidence you cite for
 9     that in some other propositions is in footnote 43;
10     is that right?
11         A.    Yes, for this particular footnote.  It's
12     an issue that's addressed in various places
13     throughout my reports.
14         Q.    And Deposition Exhibit 17 is one of the
15     documents you cited in footnote 43 as a survey that
16     contradicts Ms. Butler's survey results, right?
17         A.    I do identify this document, yes.
18         Q.    And you identify it as a document that
19     contradicts Ms. Butler's survey results, right?
20         A.    It's part of that sentence.
21         Q.    Deposition Exhibit 17 is not a survey
22     that measured the effects of specific StockX
23     advertising statements, right?
24              MR. MILLER:  Objection to form.
25              THE DEPONENT:  It's a customer survey
```

1   that considers various purchase drivers, and it

2   tests purchase drivers, which may relate to

3   marketing or advertising information, and this

4   would be the type of thing that would inform StockX

5   and their business judgments in how to market and

6   sell their products.

7        Q.   (By Mr. Riehl)  But this survey didn't

8   test whether StockX's sales were higher or lower

9   because of any particular advertising statements,

10  right?

11            MR. MILLER:  Objection to form.

12            THE DEPONENT:  I wouldn't characterize it

13  like that.  It certainly talks about purchase

14  drivers, which would relate to driving sales and

15  purchases.

16       Q.   (By Mr. Riehl)  It doesn't quantify the

17  effect of any StockX advertising statements, right?

18       A.   Yes.  It's my understanding it wasn't

19  designed to test sales with and without a

20  particular statement.

21       Q.   And so there is no inconsistency between

22  this survey, which didn't test, in a quantifying

23  sense, the effect on sales and Ms. Butler's survey,

24  right?

25            MR. MILLER:  Objection.

```
 1   StockX would retain its popularity if its false
 2   and/or misleading statements to consumers about
 3   authenticity were removed, right?
 4           MR. MILLER:  Objection to form.
 5           THE DEPONENT:  Within the context of
 6   critiquing Dr. Vigil's identification of issues in
 7   this as reasons for purchasing, so purchase
 8   drivers.
 9       Q.   (By Mr. Riehl)  Are you done answering?
10       A.   Yes.
11       Q.   Okay.  And within that context, you said,
12   in your first amended expert report, that
13   Deposition Exhibit 18 does not test the issue of
14   whether StockX would retain its popularity if its
15   false and/or misleading statements to consumers
16   about authenticity were removed, right?
17           MR. MILLER:  Objection to form.
18           THE DEPONENT:  I agree with that.
19       Q.   (By Mr. Riehl)  And in footnote 37, you
20   also cite Deposition Exhibit 17, right?
21           MR. MILLER:  Counsel, can you just
22   clarify which report you're referring to, that
23   paragraph -- I'm sorry, footnote 37?
24           MR. RIEHL:  Yes.  The same footnote 37
25   we've been looking at in Mr. Hansen's expert
```

```
 1   rebuttal report.
 2            MR. MILLER:  Thank you.
 3            THE DEPONENT:  I do identify Exhibit 17
 4   as well.
 5       Q.   (By Mr. Riehl)  Okay.  So in the same
 6   context you just referred to, in your expert
 7   rebuttal report, you stated that Deposition
 8   Exhibit 17 does not test the issue of whether
 9   StockX would retain its popularity if its false
10   and/or misleading statements to consumers about
11   authenticity were removed, right?
12            MR. MILLER:  Objection.
13            THE DEPONENT:  Yeah, that's part of my --
14   as I said, my evaluation of Dr. Vigil's
15   apportionment positions where his opinion appears
16   to be based on speculation about whether or not
17   StockX would retain its popularity due to the other
18   purchase drivers that are identified, so this
19   wasn't designed specifically to answer that
20   question.  I don't think he can use it as a basis
21   to answer that specific question; although, it
22   certainly goes to the importance of authentication
23   to consumers as a purchase driver.
24       Q.   (By Mr. Riehl)  And because Deposition
25   Exhibit 17 and Deposition Exhibit 18 do not test
```

Page 222

1    the issue of whether StockX would retain its

2    popularity if its false and/or misleading

3    statements to consumers about authenticity were

4    removed, those surveys cannot contradict any aspect

5    of Ms. Butler's survey that does test whether

6    StockX would retain its popularity if its false

7    and/or misleading statements to consumers about

8    authenticity were removed, right?

9              MR. MILLER:  Objection to form.

10             THE DEPONENT:  I don't agree with that.

11             MR. RIEHL:  Let's look at another one.

12             (Exhibit 19 was marked for identification

13   by the Court Reporter and is attached hereto.)

14             THE DEPONENT:  Thank you.

15             MR. RIEHL:  You are welcome.

16        Q.   (By Mr. Riehl)  The reporter has handed

17   you Deposition Exhibit 19.

18             This is another survey that, in your

19   second rebuttal, you say is inconsistent with the

20   results of Ms. Butler's survey, right?

21             MR. MILLER:  Objection.

22             THE DEPONENT:  Which paragraph are we

23   looking at?

24        Q.   (By Mr. Riehl)  Paragraph 32 of your

25   second rebuttal.

1      A.    Right.   Okay.   And your question was, is
2   this a document you identify?
3      Q.    Yeah.
4            Do you see, in footnote 40, you identify
5   this document?
6      A.    Yes.
7      Q.    And this also is not a survey that
8   measured the effects of specific StockX advertising
9   statements, right?
10           MR. MILLER:   Objection.
11           THE DEPONENT:   I don't believe it was
12   designed for that specific purpose.   But as I
13   indicate, one of the questions tested was whether
14   knowing the good is certified as authentic is the
15   most important when choosing an on side -- online
16   resell platform to buy good from -- goods from.   So
17   that's very aligned with the alleged false
18   advertising statement in the case.
19      Q.    (By Mr. Riehl)  Please look at the page
20   with the Bates number ending in -827.   That page
21   indicates that when the survey participants were
22   asked, "What is most important to you when choosing
23   an online reselling platform to buy goods?"
24   66 percent of them chose "Is a website or brand I
25   can trust," right?