# EXHIBIT G

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

REBUTTAL EXPERT WITNESS REPORT OF KARI KAMMEL

In the Matter of Nike, Inc. v. StockX LLC

Case No. 1:22-cv-000983-VEC (S.D.N.Y.)

June 2, 2023

Kari Kammel

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

## Table of Contents

I.   Contrary to Stockx's Experts' Opinions, StockX harms Nike by "Authenticating" and Selling Counterfeit Nike Goods While Falsely Guaranteeing Consumers that the Products Sold on Its Platform are "100% Verified Authentic" ................................................................................. 1

   A.   Vigil Fails to Acknowledge That the Sale of Counterfeit Goods Harms Nike .................................... 1

      1.   Counterfeit Products Are the "Unseen" Competitor of the IP Rights Holder ............................... 2

      2.   Nike is Harmed by StockX's "Authentication" and False "100% Verified Authentic" Guarantees. 3

   B.   Wells Incorrectly Identifies Several Drivers of Counterfeit Products in the Resale Sneaker Market 5

      1.   Wells' Opinion Incorrectly States that Success of a Product by the IP Rights Holder is the Cause for Counterfeiting, where Instead it is the Target of Counterfeiting. ........................................... 5

      2.   The Use of Technology by IP Rights Holders is also not a Cause of Counterfeiting, but Instead the Creation of E-Commerce Platforms is the Central Reason for the Explosion of Counterfeits in the Global Marketplace. ........................................................................................................ 8

      3.   Wells' Third Premise for Counterfeiting in the Resale Sneaker Industry - that Counterfeit Quality is Increasing - is not a Reason for Counterfeiting, but is rather Another Reason Why StockX Cannot "Authenticate" Genuine Products. ....................................................................... 9

II.  Tucker claims that StockX provides transparency to consumers, but StockX is not transparent with consumers about its sellers. ................................................................................................. 16

III. StockX's Experts opine that StockX claims to catch thousands of counterfeits, giving confidence to consumers, but StockX cannot authenticate products and it Even releases some Counterfeits back into the stream of commerce ................................................................................................. 19

IV.  Despite StockX Claiming it Can Authenticate Product and Create Consumer Trust, it cannot because only the IP Rights Holder Can Authenticate a Product Bearing Their Trademark ............................. 20

   A.   Tucker notes their "authentication process" is what creates consumer trust and is the "most salient trust-building" part of its business model. ........................................................................ 20

   B.   Wells incorrectly describes authentication as being able to see obvious, overt counterfeit. ........ 21

   C.   Wells incorrectly assumes that because other platforms do not attempt to verify authenticity and they have counterfeit sold on their website that StockX's has less of an issue because of their "Authentication" Process. ........................................................................................................ 21

   D.   Vigil incorrectly assumes that because other third-party platforms are imitating StockX's "authentication" process that StockX is creating a legitimate movement of Third-Party Platforms who Can Verify or Authenticate Product .................................................................................... 22

V.   Tucker discusses "Coring" as a way for Marketplaces to Manage Buyer and Seller Interactions, But StockX does not appear to do this. .......................................................................................... 22

VI.  Tucker Incorrectly States that StockX ensures only reliable sellers use its platform .......................... 24

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

VII.   Vigil notes the importance of alleviating the problems of asymmetric information in a two-sided marketplace, but StockX creates a marketplace with asymmetry for the buyer ............................... 25

VIII.  Vigil Incorrectly claims that StockX has a Clear Policy of Disposal of Counterfeit Products when Products either Fail "Authentication" Or are returned by a buyer as Suspected counterfeit ............ 25

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

## I. CONTRARY TO STOCKX'S EXPERTS' OPINIONS, STOCKX HARMS NIKE BY "AUTHENTICATING" AND SELLING COUNTERFEIT NIKE GOODS WHILE FALSELY GUARANTEEING CONSUMERS THAT THE PRODUCTS SOLD ON ITS PLATFORM ARE "100% VERIFIED AUTHENTIC"

### A. Vigil Fails to Acknowledge That the Sale of Counterfeit Goods Harms Nike

Vigil opines that there is no evidence of harm to Nike.[1]  To the contrary, Nike is harmed by the sale of counterfeit "Nike" products.  While Vigil claims lack of harm to Nike, he ignores the overwhelming amount of information available about the sale of counterfeit goods, particularly by third party sellers online.  In the U.S., as well as many other countries, the government protects intellectual property rights, including trademark rights.[2]

Vigil fails to note U.S. government studies and reports and international studies and reports that detail extensive evidence of harm to IP rights holders caused by sales of counterfeits.[3]  These reports collectively note that when an IP rights holder's trademark is counterfeited and non-genuine product sold, the IP rights holder is harmed in a number of ways,[4] including "losses in brand values and sales revenues, as well as increased business costs."[5]  U.S. businesses, such as

---

[1] Vigil at 17.

[2] *See e.g.,* 15 U.S.C. §§ 1051 et seq., ("Lanham Act"); 18 U.S.C. § 2320 ("Trademark Counterfeiting Act").

[3] *See e.g.* LIBRARY OF CONGRESS, Federal Research Division under an Interagency Agreement with the U.S. Patent and Trademark Office, U.S. Department of Commerce, *U.S. Intellectual Property and Counterfeit Goods— Landscape Review of Existing/Emerging Research* (Feb. 2020), https://www.uspto.gov/sites/default/files/documents/USPTO-Counterfeit.pdf. (hereinafter "U.S. IP and Counterfeit Goods Report"); U.S. DEP'T OF HOMELAND SEC., Off. Of Strategy, Pol'y, and Plans, *Combating Trafficking in Counterfeit and Pirated Goods,* at 4 (Jan. 24, 2020),https://www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goods-report_01.pdf (hereinafter "DHS Report"); Pres. Donald J. Trump, *Memorandum on Stopping Counterfeit Trafficking on E-Commerce Platforms Through Fines and Civil Penalties* (Oct. 13, 2020), at§ 1, https://trumpwhitehouse.archives.gov/presidential-actions/memorandum-stopping-counterfeit-trafficking-e-commerce-platforms-fines-civil-penalties/; U.S. GOV'T ACCOUNTABILITY OFFICE, Report to the Chairman, Committee on Finance, U.S. Senate, *INTELLECTUAL PROPERTY: Agencies Can Improve Efforts to Address Risks Posed by Changing Counterfeits Market* (January 2018), GAO-18-216 (hereinafter "U.S. GAO Report");  OFFICE OF THE WHITE HOUSE, Intellectual Property Enforcement Coordinator IPEC, *Annual Intellectual Property Report to Congress* (April 2023); U.S. CUSTOMS AND BORDER PROTECTION, *The Truth Behind Counterfeits,* (last modified: May 16, 2023) https://www.cbp.gov/trade/fakegoodsrealdangers ; U.S. CUSTOMS AND BORDER PROTECTION, *Priority Trade Issues: Intellectual Property Rights,* https://www.cbp.gov/trade/priority-issues/ipr;  OECD/EUIPO, *Global Trade in Fakes: A Worry Threat, Illicit Trade* (June 2021), https://read.oecd.org/10.1787/74c81154-en?format=pdf; FRONTIER ECONOMICS, Report for BASCAP and INTA, *The Economic Impacts of Counterfeiting and Piracy,* (2017), https://www.inta.org/wp-content/uploads/public-files/perspectives/industry-research/2017_Frontier_Report.pdf. (hereinafter "Frontier Economics Report").

[4] *See generally,* U.S. IP and Counterfeit Goods Report, *supra* note 3; *see also* Frontier Economics Report, *supra* note 3, at 11.

[5] U.S. IP and Counterfeit Goods Report, *supra* note 3.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

Nike, suffer an estimated $29 billion in lost sales revenue per year because of the sale of counterfeit goods.[6]

Vigil not only fails to acknowledge that counterfeiting directly harms the IP rights holder (i.e., lost sales revenue), but he also fails to acknowledge that sale of counterfeit goods harms consumer perception of the IP rights holder and consumer brand loyalty.[7]  Further, Vigil fails to account for the added business costs and a reduction in ability to innovate or compete that are also a consequence of counterfeit sales.[8]

### 1.    Counterfeit Products Are the "Unseen" Competitor of the IP Rights Holder

Vigil fails to acknowledge that StockX's business model,[9] which fosters the sale of counterfeit goods under the illusion of guaranteed authenticity, harms Nike because it allows the "unseen competitor," or the counterfeiter, into a supposedly safe online marketplace.  StockX is an online marketplace that consumers are repeatedly told is a safe, trustworthy place.  IP rights holders often lose sales revenue to the counterfeiter as an "unseen competitor" in the marketplace.[10] In other words, the counterfeiter, as the "unseen competitor," is not a typical competitor that operates fairly on a level playing field.  Instead, the "unseen competitor" steals the IP rights holder's intellectual property, goodwill, name recognition, research and development, and other investment in product creation, and then uses sub-standard, cheaper, and unregulated means for creating and selling the counterfeit good.[11]  The counterfeiter's business is directed at markets where there is demand for popular genuine products, with the goal of maximizing

---

[6] *Id.* at 11 (noting that "[c]urrent estimates suggest that at least 20 percent of counterfeit and pirated goods sold abroad displace sales in the United States. Based on the rudimentary estimate of $143 billion sold in such goods, these sales cost the U.S. economy around $29 billion a year.").

[7] U.S. IP and Counterfeit Goods Report, *supra* note 3, at 11 (citing MARKMONITOR, *Seven Best Practices for Fighting Counterfeit Sales Online*, at 3 (2017), https://www.markmonitor.com/download/wp/wp-Fighting_Counterfeit_Sales.pdf).

[8] *Id.* at 11-12; *see also* DHS Report, *supra* note 3, at 7 (noting that "Counterfeits also pose risks to human health and safety, erode U.S. economic competitiveness and diminish the reputations and trustworthiness of U.S. products and producers." And "Across all sectors of the economy, counterfeit goods unfairly compete with legitimate products and reduce the incentives to innovate, both in the United States and abroad." *Id.*); *see also* U.S. GAO Report, *supra* note 3, at 9; Frontier Economics Report, *supra* note 3, at 40.

[9] Vigil at 21-22.

[10] Rod Kinghorn & Jeremy Wilson, *Brand Protection as a Total Business Solution*, A-CAPP Center Report (2014), https://a-capp.msu.edu/article/brand-protection-as-a-total-business-solution/; *see also* Rod Kinghorn & Jeremy Wilson, *Anti-Counterfeit Strategy for Brand Owners*, A-CAPP Paper Series (2013), https://a-capp.msu.edu/wp-content/uploads/2018/05/BACKGROUNDER-Anti-Counterfeit-Strategy-for-Brand-Owners.pdf.

[11] DHS Report, *supra* note 3, at 10, 16; Kinghorn & Wilson, *Anti-Counterfeit Strategy for Brand Owners*, *supra* note 10.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

profit[12]—counterfeiters do not make and sell unsuccessful products or those for which there is no demand.[13]

The "unseen competitor" is thriving on online marketplaces, including StockX.  Counterfeiting used to be something that occurred in brick-and-mortar environments, such as flea markets, bodegas, street corners and other locations, including known counterfeiter hot spots like Canal Street in New York City, where many could easily tell that the products were not being sold by a reputable seller.[14]  Now, the online marketplaces that allow sales by third parties have allowed the "unseen competitor" to hide behind the platform's veil of legitimacy.[15]  With StockX's ease of access to consumers, little proactive vetting, use of stock photos, and high profit returns, the "unseen competitor" can sell more covertly and therefore "reduces the penetration of the authentic, [Nike] brand product in the marketplace."[16]

### 2.     Nike is Harmed by StockX's "Authentication" and False "100% Verified Authentic" Guarantees

Not only does Vigil incorrectly claim that Nike is not harmed by counterfeit that is sold on StockX, but Vigil notes that IP rights holders, such as Nike, "stand to benefit from StockX's verification efforts because consumers are less likely to receive inauthentic items featuring these brands' trademarks, meaning the theoretical harm that Nike speculated it might suffer is less likely to materialize."[17]

Vigil is wrong.  IP right holders do not benefit from a secondary market platform that they did not create, let alone one that has developed a business model susceptible to counterfeits and that benefits from a false promise of "authenticating" products that it cannot actually do.  Further, contrary to what Vigil seems to say, it is neither reasonable nor practical for Nike to authenticate shoes for customers or platform operators in the secondary market.[18]. If Nike were somehow required to respond to every consumer, or every third-party platform, globally who wanted to confirm whether a product was authentic, which is what Vigil seems to be suggesting, Nike would expend massive amounts of resources attempting to respond to every

---

[12] Wilson & Kinghorn, *Total Business Solution*, *supra* note 10.

[13] *Id.*

[14] Kari Kammel, Jay Kennedy, Daniel Cermak, & Minelli Manoukian, *Responsibility for the Sale of Trademark Counterfeits Online: Striking a Balance in Secondary Liability While Protecting Consumers,* 49 AIPLA Q. J. 206-207 (Spring 2021) (hereinafter "Kammel et al.").

[15] See Kammel et al, *supra* note 14, at 228; Jay Kennedy, *Counterfeit Products Online*, THE PALGRAVE HANDBOOK OF INT'L CYBERCRIME & CYBERDEVIANCE, at 7 (eds. Thomas J. Holt & Adam Bossler 2019).

[16] Wilson & Kinghorn, *Total Business Solution, supra* note 10.

[17] Vigil at 4, 51.

[18] Vigil at 51 (noting that: "3. Nike does not authenticate shoes for customers who wish to buy or sell products on the secondary marketplace, or provide any way for them to do so on their own. As a practical matter, this meant that for many years consumers purchasing in the secondary market had limited options to identify potentially inauthentic products prior to purchase, or getting their money back if they had legitimate concerns about a purchased item's authenticity.").

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

request and be beholden to anyone who decides to start a venture into third-party sales on e-commerce.  This is not only impractical, but also forcing an IP right holder into verification of authenticity of products so that other can profit is not a baseline for protecting one's trademarks.

Vigil fails to note that it is StockX, not Nike, who profits from all transactions on its platform, including the sale of counterfeits.  Nike cannot benefit from an online platform that is creating and profiting from an environment that makes it easier for counterfeiters to reach consumers, despite any efforts claimed by StockX to catch counterfeiting.  While e-commerce platforms, like StockX, have facilitated legitimate sales of products to consumers with the ease of online shopping, they have also created an environment where counterfeiters are thriving, particularly platforms that allow third-party sellers.[19]  Simply put, StockX has allowed more counterfeit products to enter the market, not less.

Counterfeiters thrive in the third-party sellers environment for many reasons: ease of reaching customers globally,[20] lower or no barriers to entry into the marketplace,[21] bad actors in China or other counterfeit provenance countries can now ship directly to consumers in the U.S. and other countries,[22] platforms prioritization on profits, instead of prevention of counterfeits,[23] and low cost of operating an online store or online sales compared to brick and mortar.[24] The "unseen competitor," or counterfeiter, is not simply a competitor filling demand, but is in many cases often part of organized crime and connected to other types of illicit activity. [25]

Part of why e-commerce platforms attract counterfeiters is the "air of legitimacy" that the platforms present to consumers for third-party sellers of counterfeit.[26] In this case, StockX has created a platform that does exactly this—claim to authenticate all goods that are sold and sent

---

[19] Indeed, the Department of Homeland Security notes:

> While the expansion of e-commerce has led to greater trade facilitation, its overall growth— especially the growth of certain related business models—has facilitated online trafficking in counterfeit and pirated goods. American consumers shopping on e-commerce platforms and online third-party marketplaces now face a significant risk of purchasing counterfeit or pirated goods. This risk continues to rise despite current efforts across e-commerce supply chains to reduce such trafficking.  DHS Report, *supra* note 3, at 7.

[20] *Id.* at 11-14.

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] *Id.* at 7; *see generally* Jay Kennedy, *A-CAPP Center Product Counterfeiting Database: Insights Into Converging Crimes*, A-CAPP CENTER (2019), https://a-capp.msu.edu/article/a-capp-center-product-counterfeiting-database-insights-into-converging-crimes/.

[26] DHS Report, *supra* note 3, at 10-11 ("Selling counterfeit and pirated goods through e-commerce is a highly profitable activity: production costs are low, millions of potential customers are available online, transactions are convenient, and listing on well-branded e-commerce platforms provides an air of legitimacy. Counterfeiters have taken full advantage of the aura of authenticity and trust that online platforms provide. While e-commerce has supported the launch of thousands of legitimate businesses, their models have also enabled counterfeiters to easily establish attractive 'store-fronts' to compete with legitimate businesses.")

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

to consumers, giving consumers the initial perspective that all their sellers are legitimate, including those that sell counterfeits, and thus harms Nike.

### B.     Wells Incorrectly Identifies Several Drivers of Counterfeit Products in the Resale Sneaker Market

Wells incorrectly opines that "certain industry factors" are the cause of counterfeits in the resale sneaker market: 1) "scarcity of some popular models of sneaker,"[27] 2) "the use of digital technology by some brands and resellers,"[28] and 3) "Sneakerheads commonly recognize that the gap in perceived quality between counterfeit and Nike sneakers has decreased in recent years."[29]  Wells' premise for counterfeiting in the resale sneaker market is incorrect for several reasons.  First, where there is a demand for a product and there are online marketplaces willing to allow third party sellers space to fill the demand with low barrier to entry, counterfeiting will flourish; to place the blame on a brand's decision to create a limited supply of product is without merit.  Second, the use of technology by brands is not the cause for counterfeiting, but instead StockX's creation of its "authentication" process, which cannot actually authenticate products, allows counterfeiting to occur.  Third, a perception by "sneakerheads," who cannot authenticate products, of an increase in the quality of counterfeit is not the cause for counterfeits in the resale market, but instead it is the online marketplace that allows sales by third parties with low barrier to entry.

### 1.     Wells' Opinion Incorrectly States that Success of a Product by the IP Rights Holder is the Cause for Counterfeiting, where Instead it is the Target of Counterfeiting.

Wells incorrectly claims that the first reason for counterfeits in the resale sneaker market is "scarcity of some popular models of sneaker,"[30] and discusses Nike's limited-edition releases as a cause for counterfeiting.[31]  While the popularity of any product, particularly a high-demand product with limited availability, may drive legitimate business, an IP rights holder's success is not the cause for criminal activity.  To the contrary, the IP rights holder is the legal *victim* of criminal counterfeiting,[32] not the cause of it.

---

[27] Wells at. 5.  Wells notes that "high demand and scarcity lead to counterfeits in the resale market."  *Id.* at 36.  Additionally, Wells notes: "In this context, high prices and low supply have driven fraudsters to manufacture and sell counterfeit sneakers." *Id.* at 38.

[28] *Id.*

[29] *Id.*

[30] *Id.*  Wells notes that "high demand and scarcity lead to counterfeits in the resale market."  *Id.* at 36.  Additionally, Wells notes: "In this context, high prices and low supply have driven fraudsters to manufacture and sell counterfeit sneakers." *Id.* at 38.

[31] *Id.* at 1, 3, 4-5, 20-21, 30-31, 33.

[32] Trademark Counterfeiting Act, 18 U.S.C. § 2320; U.S. DEP'T OF JUSTICE, Criminal Division, *Reporting Intellectual Property Crime: A Guide for Victims of Copyright Infringement, Trademark Counterfeiting, and Trade Secret Theft*, 3d Ed. (2018), https://www.justice.gov/criminal-ccips/file/891011/download.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

Routine criminal activity, using the opportunity triangle, posits that for a crime to occur, motivated offenders, suitable targets/potential victims, and the place where the offender and target meet and interact with each other must come together.[33]



"Figure 1. The crime, or opportunity, triangle is a visual representation of the basic elements of an ongoing criminal scheme."[34]

In e-commerce, the opportunity triangle for trademark counterfeiting consists of 1) trademark counterfeiters in the role of motivated offenders, 2) consumers in the role of suitable targets/potential victims, and 3) the platform itself as the place wherein the offender and target meet and interact.[35]  In this case, StockX has created the opportunity triangle by allowing the sale and pre-sale of high-heat Nike product without vetting the origin or sellers,[36] which has allowed the sale of counterfeits on its platform.



"Figure 2. The crime triangle or opportunity triangle with e-commerce showing the place, offender and target."[37]

---

[33] Kammel, et al, *supra* note 14, at 209, Figure 1, *citing* Kennedy, *supra* note 15, at 15.

[34] Kammel, et al, *supra* note 14, at 209, Figure 2.

[35] *Id.*

[36] Kammel Expert Report, May 5, 2023 (hereinafter "Kammel Report"), at 9-10, 27.

[37] Kammel, et al, *supra* note 14, at 253.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

The meeting of the place, offender and target on e-commerce occurs on the platform, where the platforms are the "handlers of motivated offenders, guardians of suitable targets, and managers of risky places wherein product counterfeiting can occur."[38]  In e-commerce platforms with sales by third parties, the platform has a "direct influence upon the elements of the crime triangle."[39]

Here, they can "de-motivate the potential offender", or counterfeiter, "protect suitable targets" from victimization" and "control the conditions and circumstances that allow offenders and targets to come together and interact."[40]

Because StockX is the entity who created the space where counterfeiters are motivated to sell counterfeit Nike product, they are responsible for those activities, including the sale of counterfeit Nike product that occurs in this space.

### a.  Wells Incorrectly Assumes that High Demand for New Nike Sneaker Drops Fuels Counterfeits, When Instead It is StockX's Pre-Release Sales

Wells notes that "product drops" or new sneaker releases create scarcity in the market[41] and later discusses how this is a driver for counterfeit.[42]  This is not the cause of counterfeits with high demand sneakers, unlike StockX's pre-sale of these sneakers, which is certainly a driver of counterfeiting.  A pre-sale on StockX's platform is when StockX allows sellers to list products that *have not yet been released by Nike* and allows buyers to place bids on them with StockX even including a Nike launch calendar with future launch dates.[43] This model of allowing sales is particularly egregious because it is a great motivator for counterfeiters who know there is a demand for products and they are allowed to post for and take bids before they can even access the product themselves. Further, not only can StockX not authenticate shoes generally,

---

[38] *Id.* (discussing the role of "crime controllers" and the guardianship structure on e-commerce to disrupt the criminal opportunity to sell counterfeit goods online).

[39] *Id.* at 251

[40] *Id.* at 251 (citing to Marie Skubak Tillyer & John E. Eck, *Getting a Handle on Crime: A Further Extension of Routine Activities Theory*, 24 SEC. J. 179, 180–81 (2011); John E. Eck et al., *Risky Facilities: Crime Concentration in Homogeneous Sets of Establishments and Facilities*, 21 CRIME PREVENTION STUDS. 225, 240 (2007); Jay P. Kennedy, *Sharing the Keys to the Kingdom: Responding to Employee Theft by Empowering Employees to Be Guardians, Place Managers, and Handlers*, 39 J. CRIME & JUST. 512, 519 (2015).

[41] Wells at 31-33.

[42] Wells at 36-37.

[43] *See e.g.,* STOCKX, *Air Jordan Release Dates* (Aug. 2, 2022), https://stockx.com/news/air-jordan-release-dates/ (noting Air Jordan release dates); STOCKX, *Nike,* https://stockx.com/nike/release-date (*last accessed* May 4, 2023) (actively selling Nike shoes that have not yet been released and will not be for weeks); NIKE0038818 ("Global Access "Whether it's pre-release, regionally limited, or "sold out" – our millions of customers from over 200 countries allow you to easily secure those hard-to-find, coveted items."); *see also* Amidon Depo Tr. at 32:21-34:16 (discussing pre-release product).

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

but its "authenticators" do not even know what overt counterfeits look like at this point because the product is not even in market yet.

In a space such as new sneaker releases that will have a high amount of counterfeit sales attempts (a typical occurrence with successful product launches),[44] no effort was made by StockX to verify how sellers were able to sell products or guarantee they had them before launch, or to verify the provenance of their products.[45] A best practice for e-commerce providers here is "Limitations on High Risk Products,"[46] which StockX does not do for new Nike product launches. DHS notes that "Platforms should have in place protocols and procedures to place limitations on the sale of products that have a higher risk of being counterfeited…"[47]

> **2.    The Use of Technology by IP Rights Holders is also not a Cause of Counterfeiting, but Instead the Creation of E-Commerce Platforms is the Central Reason for the Explosion of Counterfeits in the Global Marketplace.**

Wells incorrectly suggests that the second cause of counterfeiting is the use of technology by brands to sell their own branded products.[48]  Wells seems to be suggesting that because Nike sells its own products on its SNKRS app and bots purchase the products to sell on resale platforms,[49] such as StockX, that this is a cause of counterfeiting.  However, as Dr. Stec explains, the reason that bots attack the SNKRS app is that secondary market e-commerce platforms, like StockX, incentivizes the predatory use of bots by resellers and scammers to buy up popular, limited release Nike shoes so that they can turn around and sell those on StockX's platform for a substantial markup.[50]

The use of technology by IP rights holders to sell their products to consumers is in fact the safest type of online transaction, as it is the instance where the purchaser can be the surest that they are buying genuine product, because they are buying directly from the brand,[51] as is the case

---

[44] DHS Report, *supra* note 3, at 8 (noting: "Moreover, as costs to enter the online market have come down, such market entry is happening earlier and earlier in the product cycle, further enhancing risk. If a new product is a success, counterfeiters will attempt, often immediately, to outcompete the original seller with lower-cost counterfeit and pirated versions while avoiding the initial investment into research and design.").

[45] *See e.g.,* Amidon Depo Tr. at 26:22-28:18, 30:11-32:4 (discussing that StockX does not know sourcing of products from power sellers).

[46] DHS Report, *supra* note 3, at 34.

[47] *Id.* at 36 (noting: "Platforms can also place other types of restrictions on third-party sellers before certain high-risk categories of goods may be sold. For example, some platforms require prior approval for items such as automotive parts, jewelry, art, food, computers, sports collectibles, DVDs, and watches that are particularly prone to counterfeiting."). High heat Nike shoes would fall under "high-risk" goods, particularly since they are some of the most highly counterfeited products in the sneaker industry.

[48] Wells at 5.

[49] Wells at 33.

[50] Stec Report at § V.C.

[51] Kammel Report at 30.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

with the SNKRS app.  Wells actually agrees that the explosion of e-commerce has led to an increase in counterfeiting activity,[52] which it indeed has.  But the area of high risk for counterfeit sales is not IP rights holders' platforms or apps, but instead those that are based on third party sales, such as StockX's.

In fact, the driver is not the technology used by brands, but the profit made by counterfeiters:

> "The central economic driver of such trafficking is this basic reality: Selling counterfeit and pirated goods through e-commerce platforms and related online third-party marketplaces is a highly profitable venture."[53]

Moreover, as Dr. Stec explains, while the actions of bots are detrimental to retailers like Nike, companies like StockX benefit from bots.[54]  In addition to being attractive to counterfeiters, StockX's platform is attractive to bot resellers and, indeed, Dr. Stec explains bot makers indicate that StockX is one of the best places to makes a profit selling shoes while using their bots.[55]  The proliferation of bots on the SNKRS app, fueled in part by platforms like StockX, also works to prevent actual consumers from purchasing the shoes they wanted to purchase from Nike. Counterfeiters are motivated to fill the demand and profit from the high prices for these shoes on platforms like the StockX platform.

### 3. Wells' Third Premise for Counterfeiting in the Resale Sneaker Industry - that Counterfeit Quality is Increasing - is not a Reason for Counterfeiting, but is rather Another Reason Why StockX Cannot "Authenticate" Genuine Products.

Wells notes that the third industry reason for counterfeiting in the resale sneaker market is that "sneakerheads" perceive the gap in quality between counterfeits and authentic Nike's decreasing, or basically that counterfeits are increasing in quality.  Counterfeiting does not occur because consumers notice that counterfeits are improving in appearance, but because criminal activity is always evolving in order to be able to continue to get illegal proceeds.[56] Counterfeiters will evolve on StockX's platform to be able to pass "authentication" and are highly adaptable.  The counterfeiter quickly ingests information as to why a posting is taken

---

[52] Wells at 37-39.
[53] DHS Report, *supra* note 3, at 20.
[54] Stec Report at § V.C.
[55] Stec Report at § V.C.
[56] Corsearch, *How to Stay Ahead of the How to stay ahead of evolving counterfeiter behavior*, (July 15, 2020), https://corsearch.com/content-library/blog/how-to-stay-ahead-of-evolving-counterfeiter-behavior/; *see also* Kammel, et al, *supra* note 14, at 231 (citing Jay P. Kennedy, *Towards a More Proactive Approach to Brand Protection: Development of an Organizational Risk Assessment for Product Counterfeiting*, 18 GLOB. CRIME 329, 331 (2017)).

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

down or a product is not sold, is rejected or is returned and they alter their activities or their product.[57]

Counterfeiters who use the StockX platform are helped by StockX.  This is because StockX has actually educated those who appear to be selling obvious counterfeit, since their product was rejected.  Even worse, sellers that failed authentication/verification were told exactly what features were incorrect and why they were incorrect,[58]  given "notes from QA,"[59] and even shipped back failed product that might be counterfeit to a counterfeit seller.[60] This is even noted in StockX's appeals process improvements.[61]

This is a reckless practice when it comes to counterfeiting.  While those in the field of brand protection and anti-counterfeiting are acutely aware of the fact that counterfeiters are always improving and using entrepreneurial ways to pass off counterfeit product, they also know that anti-counterfeiting efforts should not necessarily be made public for the exact reasons we see here—the counterfeiter taking and using the information to improve.  When StockX notifies a seller of exactly why their particular product was rejected (based on what features of the product seemed off), if that seller is a counterfeiter, they will take the information back and make their own "process improvements" in order to better mimic the genuine product.

Ironically, StockX and other platforms that are following in its footsteps with claims of "authentication" and protection are one of the reasons that counterfeiting will continue on those platforms.  While their initial premise of the "authentication" is overt comparison of sneakers and looking at obvious flaws,[62] as the counterfeiters improve, their ability to detect obvious counterfeits will continue to decrease and more counterfeits will be let through.  Counterfeiters recognize that StockX has given consumers a false sense of security about products sold on its platform claiming to be 100% authentic, which is a strong incentive for them to try to use the platform.  Because StockX allows the sale of fake Nike products as though they were guaranteed authentic, counterfeits sell for hundreds if not thousands of dollars.  As a result, even if just one counterfeit pair of shoes makes it to a StockX buyer, the

---

[57] Id.
[58] STX0240741 (noting that "[l]ooking at this order I can see that this product is unable to be sent to the buyer due to uneven size label, fonts, format, Jumpman logo all look different.  Since this is your sixth verification fail. Failure to complete a sale may result in a $15 charge to your account, or a fee equal to 15% of the transaction price and/or indefinite suspension of your account"); see also STX0219752 (telling the sellers that the product did not pass due to "inconsistencies in the build of the packaging, specifically in regard to the box label and size tag").
[59] STX0021495 (noting "[i]f an item fails authentication that was previously purchased from StockX, we are completely transparent with the seller and share the notes from QA.")
[60] STX0021481 (noting that "[i]tems that fail authentication may or may not be shipped back to sellers."). Additionally, "[i]f StockX receives a package as a return to sender after attempting to ship out an item that failed authentication to a seller, StockX will contact the seller to ask for an updated address." STX0021494.
[61] STX0133183 (noting "When we buy a product from our sellers, there is a chance our authenticators will reject the item and receive an email which may contain notes from operations regarding reasoning for rejection.").
[62] See Kammel Report at 23-24 (describing inspection of overt features as what authentication is not).

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

counterfeiter makes a profit and StockX earns revenue from the sale of the counterfeit as well.[63]

The improved quality of counterfeits shoes is not the cause for the increased number of counterfeits in the resale sneaker market, but instead is the resulting problem that is impacting consumers who cannot distinguish between counterfeit and genuine and IP rights holders, such as Nike.  This problem is made exponentially worse because StockX falsely claims: "Guaranteed Authenticity.  Every item.  Every time.  Shop on StockX with complete confidence knowing every purchase is 100% Verified Authentic."[64]

> ### a. StockX incorrectly blames Nike quality control for the counterfeit shoes it sells

Some consumers who use the StockX platform believe that they were sold counterfeit products based on flaws or deviation in the product they received and complain to StockX's customer service representatives.  Often, these representatives claim that the products are indeed genuine despite the consumers' well-founded concerns, and – quite incredibly - blame Nike's quality control.  Nike has confirmed that in several of these instances, StockX has defended its "authentication" determination and blamed Nike for releasing defective products into the market *when the shoes were actually counterfeit*.

When StockX receives a complaint from a buyer who believes they received a counterfeit good from StockX, StockX responds to the buyer in several problematic ways, including defending its incorrect "authentication" of counterfeit goods by disparaging Nike.

StockX initially sends the complaining buyer a standard email requesting photos and other information along with the note: "We're sorry to hear that you are unsatisfied with the items that you received from StockX.  We know it can be disappointing when the item you receive isn't exactly what you expected."[65] StockX historically does not have any special complaint mechanism for consumers who think their purchases are fake, or counterfeit, despite this being the most egregious reason for a problem with a product and very different from whether, *i.e.,* the tissue paper was wrinkled, or the shoe was the wrong size.

---

[63] *See* STX0016912 ("On an average $240 order StockX earns ▮▮▮ in revenue from seller fees of ▮▮▮ and buyer fees of ▮▮▮ inclusive of shipping fees."); *see generally* Kammel et al, *supra* note 14, at 226, 234.
[64] NIKE0006785; *but see* Fenton Depo Tr. 140:5-143:8 (discussing fakes passed by StockX).
[65] *See e.g.,* STX0788793

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

Next, after the complaining buyer responds, StockX employees have both outright defended the authentication process[66] or told the consumer that they are checking with their authenticators and then defend what the authenticator determined.[67]

I have reviewed several examples of consumer complaints to StockX over low quality suspected counterfeit high heat Nike shoes, such as the "Chunky Dunky" (the Nike SB Dunk Low collaboration with Ben & Jerry's) or other popular Nike Dunk styles.  StockX's approach is highly problematic because StockX authenticators are motivated to defend their "authentication" determination and confirm their determination that the product is genuine is correct, because StockX penalizes authenticators for passing a product that is later returned because it should have "failed" authentication the first time.[68]

StockX's most egregious strategy is to defend its "authentication" process to consumers complaining that the product is poor quality and suspected counterfeit by blaming Nike. Specifically, StockX will tell its consumers that the suspected counterfeit is authentic and assures the consumer that the identified issue is just a "common" or "typical" Nike manufacturing flaw, discrepancy, or other quality issue.  StockX



[74]

---

[66] *See e.g.,* STX0776120 ("Prior to shipping the item to you, we verify it in-person with our authentication experts who inspect each item to ensure it meets our condition standards."); STX0801043 ("Prior to shipping the item to you, we verify it in-person with our authentication experts who inspect each item to ensure that it meets our condition standards.").

[67] *See e.g.,* STX0802850; STX0268088; STX0802850

[68] Lopez Depo Tr. 82:3-84:25.

[69] STX0190394

[70] STX0774265 (StockX's "███████████████████████" dated June 2022) at 71.

[71] STX0774265 at 71-72.

[72] STX0774265 at 72.

[73] *Id.*

[74] *See e.g.,* STX0776120, STX0801043, STX0787990.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

The following examples are statements that StockX employees made to consumers in response to a complaint of suspected Nike fake (counterfeit) shoes (emphasis added):

- "Some pairs will pass StockX's verification despite being unlaced, tried on for fit, and/or having *slight manufacturer flaws and imperfections* that are uncontrollable.  You can learn more here."[75]
- "When authenticating items on StockX we do not predict the *quality of the shoe* after long-term use, as that is *a quality issue by Nike*."[76]
- "When it comes to the appearance of the toe box and labeling, both were found to be *within the standards of quality* for authorized pairs of Jordan 1 sneakers that were recently released (past 2 years).  Over time, the *molds of sneakers are altered slightly between the production of different colorways.*  While it is believed that the missing size 12 stickers may be *a manufacturing variance* with your Patent Bred Jordan 1 sneakers being checked digitally by our Sr. Authenticator and ruled to be 100% authentic and free of major *uncommon* imperfections, I do understand that there is a concern about the odor you discovered on your pair."[77]
- "While I believe that this may be *a manufacturing variance* with your pair being checked by our authentication team and ruled to be 100% authentic and free of *major uncommon imperfections,* I do understand that there's a concern about the visibility of these points."[78]
- "I am sorry for the *minor imperfection* with the shoe.  It is *pretty common for dunks to look like this*."[79]
- "After reviewing your photos our team could see that this item is authentic and *within the production standards for Nike Dunks and were cleared for retail release.  Nike brand and Quality Control department passed these shoes to be sold on the retail level.  Meaning that these shoes passed their Quality Control standards and were shipped out.*  We unfortunately do not have control over the *manufacturer's production or quality control standards* and must work with product that they have cleared for release.  *Excess glue, stitching, and slight paint variances are common in mass-produced shoes*."[80]
- "After reviewing the images, I can see that these do meet our deadstock conditions, and that the issue you are referring to *has been a consistent manufacturing variance throughout its production.*  This is also *very common Nike quality for these Jordan 1s!*  Sneakers are created on a large scale and produced in major quantities *where some*

---

[75] STX0788793 at 795.
[76] STX0788156
[77] STX0776120 at 133-134.
[78] STX0268088
[79] STX0227488
[80] STX0802850 at 858.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

*variances may occur, such as the fraying of the stitching, excess glue, and even paint of soles of the shoe.*"[81]

StockX employees do not support their speculative statements to consumers with a credible source for information about Nike's confidential manufacturing practices.  Indeed, sometimes StockX employees rely on their own "savvy" and personal experience to persuade the consumer that the suspected counterfeit goods are genuine, and the poor quality is due to Nike manufacturing defects or quality control problems.  For example:

- "As a Dunk collector myself, I do know that the recent releases of the past couple years have *had slight inconsistencies including things like this as well as blemished from the manufacturer.* For this reason, *our stringent Authentication procedure has been changed to that common flaws like these are accepted,* just as if you were buying the sneaker from Nike."[82]

Even more problematic is that StockX employees will also encourage a complaining consumer to resell the suspected counterfeit on the StockX platform,[83] therefore putting the counterfeit product back into the stream of commerce.

Contrary to all of the statements that StockX makes to its consumers disparaging the quality of products Nike sells, ███████████████████████████████████████ ████████████████████████████████████████████████ ████████ ████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████ ██████████████████ ██████████████████ ████████████████ Further, Nike manufacturing policies are confidential,[88] so StockX's claim that all of the *typical* and *common* variances of high heat shoes that they are seeing are most likely overt signs of counterfeiting.

---

[81] STX0801043 at 48.

[82] STX0801783 at 785 (emphasis added).

[83] *See e.g.,* STX0787990 at 997 ("If the item is no longer wanted in this condition, we encourage you to re-sell the pair.  Since we are a live marketplace, you can *potentially make more of a profit out of this situation*. . . If the item passed authentication during the process of your purchase, if re sold, as it meets with the condition guidelines, it will pass again.") (emphasis added).

[84] Conversation with Joe Pallett, Director Brand Protection, Authentication and Innovation for Nike, Inc., May 31, 2023 (hereinafter "May 31, 2023 Conversation with J. Pallett").

[85] May 31, 2023 Conversation with J. Pallett (reviewing STX0777764) which had a consumer complaint of "Piling in the seams and leftover glue residue," where StockX staff noted this was "common manufacturing defects that are found in most, if not all, Nike Dunk releases."). ███████████████████████████████████

[86] *Id.* (reviewing STX0780464) which had customer complaint that the Nike Dunk Panda had 'fraying of the stitching, excess glue paint) and that was standard). ███████████████████████████████

[87] *Id.* (reviewing STX0796787). █████████████████████████████████████████████████████ ████████████████████████████

[88] May 31, 2023 Conversation with J. Pallett.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

StockX's responses to consumer complaints regarding suspected counterfeit Nike shoes often include the response along the lines of "it cannot be a counterfeit because we authenticated it and it is instead a poor-quality Nike product." StockX created an environment where counterfeiters proliferate, and where counterfeit product passes through StockX's "authentication" process.  And when consumers complain to StockX about suspected counterfeit goods, StockX has told consumers with no reasonable basis to do so that the suspected, and most likely, counterfeit goods are genuine Nike product and that the poor quality is because of Nike's manufacturing defects.  This conduct is directly harming Nike's reputation.

Of utmost note, **Nike has confirmed that some of the supposedly genuine but defective "Nike" products defended to consumers by StockX are in fact counterfeit**.  Nike has been able to make these determinations due to the information and images provided to StockX in the customer communication.  For example, StockX's one-time highest volume power buyer[89] complained in a series of emails to StockX employees Russ Amidon and An Do that StockX sold him counterfeit Chunky Dunkys.[90]  A reseller himself, he noted many problems with the shoes, such as color of the swoosh, thread, cow hair, padding on the swooshes, right and left shoes not being identical, sole imprint was different and the swooshes were different sizes.[91] Both Amidon and Do responded to say this was a Nike discrepancy and were not concerned about whether the product was fake.[92]  In another email, the buyer said that the shoe box had a drastic size difference, and Do replied that they were seeing that a lot lately (referring to genuine boxes and shoes).[93]  Amidon also responded to one of the email with a standard StockX response to consumers saying the shoes were fake by saying, "We touched base with the team, and can go into detail if needed, but have no reason to believe these are inauthentic.  We continue to see variances from this shoe."[94]

██████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████[95]  Mr. Pallett further explained that three of the "Nike" products that the power buyer believed were fake, specifically the

---

[89] STX0099160 (Michael Malekzadeh a/k/a Zadeh Kicks LLC was one of StockX's largest power buyers until his arrest for fraud).

[90] ZK_NIKE_004563; ZK_NIKE_004654 ("so we are pretty sure all these chunkys are fake!!").

[91] *Id.*

[92] *See e.g.,* ZK_NIKE_004531 (Do saying that "I'm not too concerns as Nike has done this in the past with various other shoes.")

[93] ZK_NIKE_004331; see also ZK_NIKE_004325-26 (photos)

[94] ZK_NIKE_004672

[95] May 31, 2023 Conversation with J. Pallett (reviewing cited ZK_NIKE documents)

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

Cactus Jack Air Max 270,[96] Air Jordan 1 Mocha,[97] and Chunky Dunky,[98] were determined by Nike to be counterfeits. While Nike did not have access to the physical shoes, the power buyer supplied enough images and other information for Nike to use its proprietary system to make the determination that these products were counterfeit.[99]

In sum, thee above-described facts provide concrete confirmation that StockX is harming Nike's reputation by (1) defending its own faulty authentication methods by falsely blaming Nike for releasing shoddy product; (2) allowing counterfeit goods to be sold; and (3) encouraging them to be resold back into the stream of commerce.

## II.  TUCKER CLAIMS THAT STOCKX PROVIDES TRANSPARENCY TO CONSUMERS, BUT STOCKX IS NOT TRANSPARENT WITH CONSUMERS ABOUT ITS SELLERS.

Tucker's opinion claims that StockX is transparent by providing detailed data about historical prices and live bids and it draws attention to low prices discouraging counterfeits.[100] While historical prices and live bids might be nice for a buyer or seller to consider on StockX, they are not among the recommended best practices for e-commerce platforms in regard to transparency. One of the factors of transparency for a platform, among others, is collecting and disclosing information about the seller and information about the product.[101]

---

[96] ZK_NIKE_004305 (initial complaint); ZK_NIKE_004306-12 (photos); ZK_NIKE_004353 (StockX response).
[97] ZK_NIKE_007831 (Initial Complaint); ZK_NIKE_007832 (photo); ZK_NIKE_007834 (photo); ZK_NIKE_007836 (photo); ZK_NIKE_007838 (photo); ZK_NIKE_007840 (photo); ZK_NIKE_007842 (photo); ZK_NIKE_007844 (photo); ZK_NIKE_007853 (StockX response/additional photos); ZK_NIKE_007865 (follow up response).
[98] ZK_NIKE_004654 (initial complaint); ZK_NIKE_004655 (photos); ZK_NIKE_004657 (photos); ZK_NIKE_004661 (photos); ZK_NIKE_004663 (photos); ZK_NIKE_004665 (photos); ZK_NIKE_004667 (photos); ZK_NIKE_004672 (StockX response); ZK_NIKE_004711 (follow up).
[99] Conversation with Joe Pallett, Director Brand Protection, Authentication and Innovation for Nike, Inc., June 1, 2023.
[100] Tucker at 4.
[101] Best Practices for E-Commerce Platforms and Third-Party Marketplaces can include: 1. Comprehensive "Terms of Service" Agreements, 2. Significantly Enhanced Vetting of Third-Party Sellers, 3. Limitations on High Risk Products, 4. Rapid Notice and Takedown Procedures, 5. Enhanced Post-Discovery Actions, 6. Indemnity Requirements for Foreign Sellers, 7. Clear Transactions Through Banks that Comply with U.S. Enforcement Requests for Information (RFI), 8. Pre-Sale Identification of Third-Party Sellers, 9. Establish Marketplace Seller ID, 10. Clearly Identifiable Country of Origin Disclosures. DHS Report, *supra* note 3, at 6.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

StockX is not transparent—it does not share with buyers who the seller is,[102] photographs of their actual products for sale,[103] the provenance of their products (including place of purchase, country of origin, etc.),[104] or allow a place where sellers can be rated[105] so consumers can see what other consumers' buying experience has been.

StockX's lack of necessary transparency to the consumer, as opposed to historical pricing, is one of the reasons counterfeiters are successful. DHS notes:

> "In some cases, counterfeiters hedge against the risk of being caught and their websites taken down from an e-commerce platform by preemptively establishing multiple virtual store-fronts. A key underlying problem here is that on at least some e-commerce platforms, *little identifying information is necessary for a counterfeiter to begin selling.* In the absence of full transparency, counterfeiters can quickly and easily move to a new virtual store if their original third-party marketplace is taken down."[106]

Additionally, StockX does not require a lot of information for a seller to get started.[107] In fact, StockX announced on June 1, 2023 that it would be making it even easier for "ALL Seller levels" to sell products on the platform, touting that there is "[n]o need" to "share personal information."[108]

---

[102] NIKE0040103; STX0021481 ("Policy Audit Framework Working Doc", noting "Sellers on StockX are anonymous. Buyers may not request their product come from a specific seller or region.") at 21483, 214941. *See also* StockX, *How do I sell on StockX?, https://stockx.com/help/articles/How-do-I-sell-on-StockX,* (*last accessed* May 4, 2023) (noting "StockX is a marketplace where Buyers and Sellers can make anonymous offers on a wide variety of current culture items such as sneakers, streetwear, electronics and collectibles, based both on the item's current valuation on the site, but also how much you're willing to sell it for. StockX's anonymous nature aims to make buying and selling a hassle-free experience: Buyers see the lowest available sale price, and Sellers see the highest available buying offer.")

[103] NIKE0038817 (stating "No BS: No chargebacks, no taking photos, no writing catchy descriptions, and no dealing with rogue buyers or sellers. We handle everything to make sure you can buy and sell with complete confidence"); STOCKX, *Selling on StockX, https://stockx.com/about/selling/* (*last accessed* May 4, 2023) (Selling on StockX: "Sell Quick with Zero BS: Just search for your product and set your price. You won't need to take product pictures, share personal information, or negotiate with potential Buyers.").

[104] *See. e.g.,* Amidon Depo Tr. at 26:22-28:18, and 30:11-32:4 (discussing that StockX does not know sourcing of products from power sellers).

[105] StockX does not have a review or rating system.  However, Tucker compares StockX's verification process with a rating system: "One of its most salient trust-building features is its verification process and the accompanying "StockX Verified" label for all products sold on the platform. Using a verification process has benefits relative to other trust-building practices, like ratings and review systems. Ratings and review systems are often relied upon by online marketplaces, but their informativeness varies, especially in situations where buyers cannot judge the quality of their purchase at the time they write the review." Tucker at 4.

[106] DHS report, at 22.

[107] *See e.g.,* for StockX selling requirements, STOCKX, *Here's How It Works,* https://stockx.com/sell; STOCKX, *How does StockX work?,* https://stockx.com/help/articles/how-does-StockX-work (last modified Oct. 19, 2022).

[108] STOCKX, Lower Base Fees for All Sellers and Other Exciting Updates to the StockX Seller Program (June 1, 2023), https://stockx.com/news/stockx-seller-program/.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

> We are excited to announce that on **July 1, 2023** we will launch updates to the StockX Seller
> Program, including lower base fees for ALL Seller levels.
>
> StockX makes selling easy; simply search for your product and set your price. No need to
> take product pictures, share personal information, or negotiate with potential Buyers. And
> the more you sell, the lower your rates.

Portion of StockX June 1, 2023 Seller Announcement[109]

This announcement is a beacon to counterfeiters.

This is not particularly surprising because there is almost complete disregard on StockX's part for the transparency of sellers, allowing sellers anonymity and StockX's lack of vetting of sellers and their products.  This has been so widespread in e-commerce and so detrimental to IP rights holders and consumers that Congress passed the INFORM Consumers Act, which will be implemented in June of 2023.[110]

The INFORM Consumers Act in part requires platforms who allow sales by high volume third-party sellers to collect the seller's name, email address, phone number, tax identification number, and banking account information within ten days of the seller meeting the transaction and revenue thresholds to qualify as a "high-volume third party seller" and for entity sellers, they must also get either a copy of a valid government-issued identification for an individual acting on the seller's behalf or a copy of a government-issued record or tax document that includes the business name and physical address of the seller.[111]  This information must then be disclosed to the consumer at the latest with a receipt after purchase.[112]  The INFORM Consumers Act was passed to address the exact type of lack of transparency regarding third party sellers that we see with StockX.

---

[109] *Id.*

[110] Integrity, Notification, and Fairness in Online Retail Marketplaces for Consumers Act ("INFORM Consumers Act"), Consolidated Appropriations Act of 2023, H.R. 2617, 117th Cong. Div. BB, Title III, § 301 (2022), https://www.govinfo.gov/content/pkg/BILLS-117hr2617enr/pdf/BILLS-117hr2617enr.pdf)

[111] *Id.* at §301(a).

[112] *Id.* at §301 (b)(1)(A)(ii) "disclose the information described in subparagraph (B) to consumers in a clear and conspicuous manner— (I) on the product listing page (including via hyperlink); or (II) in the order confirmation message or other document or communication made to the consumer after the purchase is finalized and in the consumer's account transaction history." *Id.*

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

### III.    STOCKX'S EXPERTS OPINE THAT STOCKX CLAIMS TO CATCH THOUSANDS OF COUNTERFEITS, GIVING CONFIDENCE TO CONSUMERS, BUT STOCKX CANNOT AUTHENTICATE PRODUCTS AND IT EVEN RELEASES SOME COUNTERFEITS BACK INTO THE STREAM OF COMMERCE

Wells notes that "StockX's verification process weeds out thousands of counterfeits each year, and the accompanying 'StockX Verified' label allows buyers to feel confident that steps have been taken to verify the quality of the sneakers they purchase."[113] StockX may have stopped some obvious, overt counterfeits from making it through to consumers.  However, noting that StockX stops "thousands of counterfeits each year" is a commonly used technique used by e-commerce platforms to give consumers confidence in their platform,[114] and give consumers an impression of "authenticity."  In fact, as explained above, StockX not only fails to find counterfeits, when customers complain about being sold fake products, StockX representatives assure the customer that StockX did not make a mistake, and it is simply that Nike allows defective products into the marketplace, causing Nike significant injury to its reputation.

While these numbers are used to tout that platforms are addressing counterfeiting successfully for public relations and consumer confidence, they are presented in a vacuum.  In the case of StockX, what we do not know is how many untold postings and sales of counterfeit products went through, since StockX cannot actually authenticate products; how much profit StockX made off the sales of those counterfeits; whether sellers of those products that were stopped were allowed to continue to sell and if so how much they sold; and how many of the suspected counterfeit discovered by consumers were resold into the StockX platform.

Vigil also notes that "[w]ere it to fail to guard against sales of counterfeits, StockX would risk losing the trust of its customers and tarnishing its reputation among buyers."[115]  However, that rests on the assumption that its consumers know that the product they are purchasing is counterfeit.  Given the large volume of sales made by StockX and the increasing quality of fake Nike products, a consumer likely does not know when they are sold a fake.  StockX does fail to appropriately guard against counterfeits, since it is motivated by the need for inventory from sellers on the platform and by increasing profits from the seller side of each sale.  StockX's June 1, 2023 announcement reflects the value StockX places on sellers, *not* buyers.  And as noted above, when a customer does complain, they are often told that the product is authentic and the issue lies with Nike quality control.

---

[113] Wells at 48.

[114] *See e.g.* NIKE000679-80 (noting that in the past year, StockX authentication has stopped over 300,000 products worth more than $1million in value, including 14% of that being fakes, as well as $60 million worth of fakes since 2016); *see also* AMAZON, *2022 Brand Protection Report,* at 2, 7 (2022) https://assets.aboutamazon.com/2c/9e/2e907d06477a88c5bc556f95d27c/amazon-brand-protection-report-3rd-annual.pdf (noting that "The number of bad actor attempts to create new selling accounts decreased from 6 million attempts in 2020 to 2.5 million attempts in 2021, to 800,000 in 2022, and "99% listings proactively blocked or removed before a brand had to report it"); eBay, *2021 Global Transparency Report*, at 4. (Apr. 2022), https://www.ebaymainstreet.com/sites/default/files/2022-04/ebay_Transparency-Report-2022_Letter_Social_v5.pdf (noting 88 million items proactively blocked by artificial intelligence technology).

[115] Vigil at 62.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

For example, StockX in its ████████████████████████████████
presentation notes that it will "██████████████████████████████████

████████.[116] StockX also notes in various places that it is ██████████████
████████████████████████████████████████████[117] to ████████████
██████████████████████████[118]or that ████████████████████████████
████████████████████████████████████████████[119]



When StockX does believe it catches counterfeits, according to their policies "███████████
█████████████████████ ████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████

Many changes that e-commerce platforms make to give the appearance of protecting IP and consumers often comes as a public relations campaign after either bad publicity because of counterfeiting, lawsuits, or as we will see after June's implementation of the INFORM Consumers Act, new legislation.

IV.   **DESPITE STOCKX CLAIMING IT CAN AUTHENTICATE PRODUCT AND CREATE CONSUMER TRUST, IT CANNOT BECAUSE ONLY THE IP RIGHTS HOLDER CAN AUTHENTICATE A PRODUCT BEARING THEIR TRADEMARK**

A.   **Tucker notes their "authentication process" is what creates consumer trust and is the "most salient trust-building" part of its business model.**

Tucker notes that "StockX relies on various features and technologies to increase trust and accountability on the platform. One of StockX's most salient trust-building features is its verification process and the accompanying 'StockX Verified' label for all products sold on its platform."[121]

Tucker goes on: "StockX would risk the success of its business if it meaningfully tolerated sale of counterfeit items, which could lead to an erosion of trust on its platform."[122] While consumers

---

[116] STX0058180 at 183.

[117] *Id.* at STX0058194

[118] *Id.* at STX0058199

[119] *Id.* STX0058185

[120] STX0069542: Counterfeit Items Policy – September 2021 (including "Counterfeit merchandise includes but is not limited to bootlegs, fakes, pirated copies, products that have been illegally replicated, reproduced, manufactured and products that infringe another party's intellectual property rights.").

[121] Tucker at 28 (citing to StockX's website) and using the phrase "Verified", which refers to the StockX "authentication" process.

[122] Tucker at 21 (noting "These examples underscore that StockX, like other similar platforms, has an incentive to ensure trust on its platform. StockX would risk the success of its business if it meaningfully tolerated sale of counterfeit items, which could lead to an erosion of trust on its platform.").

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

have been reliant on StockXs "authentication" process and "verification" label, they have put their trust in something that StockX cannot actually deliver.

StockX cannot actually authenticate, or prove that a product is genuine, only the IP Rights holder can do that.[123]  StockX even now admits that it cannot determine whether a product is genuine,[124] which is the entire basis of authentication; yet, this is the premise of their entire trust relationship with the consumer.

> **B.    Wells incorrectly describes authentication as being able to see obvious, overt counterfeit.**

Wells' descriptions as to what "authentication" is and how it is done is looking for obvious counterfeits with overt markers of poor quality or poor copying, such as logo differences, tag size differences and others.[125] While overt differences in quality or poor copying can allow a non-IP rights holder to see an obvious counterfeit, it is not the basis for authentication,[126] nor can any platform claim to do this with 100% accuracy as StockX does.[127]

> **C.    Wells incorrectly assumes that because other platforms do not attempt to verify authenticity and they have counterfeit sold on their website that StockX's has less of an issue because of their "Authentication" Process.**

Wells additionally insinuates that StockX's "authentication" process gives them an edge against their competitor third-party sales platforms, by showing a few examples of counterfeit product found on those platforms that do not use "intermediaries who can verify that the item is authentic," such as eBay.[128] Tucker additionally gives one example from over 20 years ago when

---

[123] *See* Kammel Report at 32-35 (discussing StockX's inability to authenticate product since they are not the IP rights holder).

[124] Huber Depo Tr. 25:24-26:5 (noting StockX does not know what Nike would consider authentic or inauthentic); Lopez Depo Tr. 178:10-179:6 (noting that an authenticator cannot determine whether a product was made in a Nike facility).

[125] *See e.g.,* Wells, at 44 (stating: "Antonio Linares, a Sneakerhead who specializes in authentication, explains that he looks at craftmanship, detail, material used, and fonts when authenticating sneakers. He adds that "a common difference amongst real from fakes is usually on inside size tags of sneakers, as well as on the box labels. The font style is 99.9 percent different, always.").  *See also* Wells, at 42 ("One article states that Nike's authentic products have even had issues with "mismatched logos, missing (or bolded) patterns, misshapen heels and more," which are all traits that might otherwise have been used to identify a counterfeit shoe. Indeed, these are some of the characteristics that experts have observed when comparing counterfeit shoes to authentic ones.)

[126] Kammel Report, at 33-35.

[127] NIKE0006785; *see also* Huber Depo Tr. 244:14-24 (discussing importance of authentication to consumers).

[128] Wells, at 38 ("Certain aspects of the transition to online resale markets have also made it easier to pass off counterfeit sneakers as authentic. First, many resale marketplaces do not have intermediaries who can verify that the item is authentic or in the condition described in the listing. For example, eBay is a popular consumer-to-consumer platform that facilitates sneaker resale"); *see also* Wells at 39 ("Counterfeiters reportedly attempt to sell sneakers via eBay on a daily basis, "utilizing e-commerce to further blur the lines between legal and illegal retail markets.").

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

e-commerce was just beginning in 2001,[129] which does not accurately reflect the sale of counterfeit goods today.

While Wells points out that there are counterfeits sold on other third-party marketplaces,[130] this has no bearing on whether StockX's "authentication" process can guarantee authenticity on its own platform. The reason for that is that none of these third-party marketplaces can guarantee authenticity of products sold by third-party sellers, whether or not they have an "authentication" or verification process, nor should they be claiming that they guarantee authenticity to the public.

      **D.**    **Vigil incorrectly assumes that because other third-party platforms are imitating StockX's "authentication" process that StockX is creating a legitimate movement of Third-Party Platforms who Can Verify or Authenticate Product**

Vigil claims that other platforms have followed in StockX's footsteps and created a whole movement of platforms that "authenticate" products, as though this were a positive development.[131]  As noted above, StockX and other platforms simply cannot authenticate or verify that a product is genuine.[132]  While it is not good for StockX to claim this, it is even worse that it has created a trend where other platforms are looking to capitalize on consumer perception of trust.  This StockX-led "authentication" movement is a Potemkin village.  It has led StockX and those who are following their process to convince consumers that they can guarantee that they are buying authentic product, but they cannot.

**V.**    **TUCKER DISCUSSES "CORING" AS A WAY FOR MARKETPLACES TO MANAGE BUYER AND SELLER INTERACTIONS, BUT STOCKX DOES NOT APPEAR TO DO THIS.**

Tucker discusses the act of "coring" as a term used by platform economists to describe the "ability of two-sided platforms, in general, and marketplaces, in particular, to actively manage and maintain buyer and seller interactions to ensure their quality."[133]

In the context of buyer behavior in relation to "coring", Tucker discusses buyer behavior based on a 1970s article on automobile lemons, insurance for people over the age of 65, employment of minorities, the cost of dishonesty in discussing *face to face* transactions, and credit markets in "underdeveloped" countries.[134]  Fraudulent transactions in the face-to-face environment, or a

---

[129] Tucker, at 14-15 (*citing* Linda Harrison, THE REGISTER, *"Empty Playstation Box Sold for $425,"* (Feb. 2, 2001), https://www.theregister.com/2001/02/02/empty_playstation_box_sold).

[130] Wells, *supra* note 127.

[131] Vigil at 56 ("Along with incentivizing other platforms to also begin offering authentication services, StockX's verification program appears to have led to greater demand for authentication services, as well as the development of a professional network around authenticators, professional development, and support staff.").

[132] Kammel Report, at 33-35.

[133] Tucker at 13.

[134] Tucker at 15 (*citing to* George Akerlof, *"The Market for 'Lemons': Quality Uncertainty and the Market Mechanism,"* 84 Q. J. of Econ. 3, 488-500 (1970)).

brick-and-mortar environment, cannot be compared to what we see on e-commerce platforms. In e-commerce, purchasers do not have a chance to physically inspect goods or products or show up for services, such as vacation house rentals, thus the comparison does not align to behavior of sellers of third-party goods online, or consumer purchasing behavior online. Tucker incorrectly assumes that buyers and sellers on StockX's platform will be influenced by the cost of the product in traditional ways.

For the sale of high-end items or collectibles, such as high heat shoes, buyers will not always opt to pay less, particularly in this case if they trust StockX's claims that all of the products sold on its platform are genuine. Tucker also relies on the notion that low prices are an indicator of counterfeits in the online space.[135] Unfortunately, relying on low prices as an indicator of counterfeits in the online space is not always an accurate indicator of counterfeit. Particularly with higher end goods, counterfeiters often offer goods at the same price as the genuine good or even slightly higher,[136] since they know that has been a red flag in the past and are evolving to evade detection.[137] Tucker's reliance on "low pricing" as an indicator for StockX means that counterfeit goods that are priced the same or higher than the genuine good are most likely evading detection. Transparent pricing and bids do not actually function as a deterrent, where the counterfeiters are reading the historical prices and live bids themselves and pricing their counterfeit goods in a range that would cause them to blend in with genuine goods, instead of stand out.[138]

Tucker goes on to attempt to analogize StockX's "authentication" with several examples of matching services platforms, such as Airbnb,[139] and art auction houses such as Sotheby's & Christie's.[140] While all of these most certainly deal with different types of fraud by sellers or those offering services, as well as some buyers too, they are not dealing with the sale of counterfeit goods. Verification of a home for rent, "authentication" of art,[141] or jewelry[142] is not the same process or even framework of authentication of a trademarked product.[143]

Tucker additionally gives a hypothetical on exposing a popular seller of counterfeiting goods, which she claims would ruin trust on the platform:

---

[135] Tucker at 4 (noting that transparency of historical prices and live bids on StockX "further discourages the sale of counterfeits by drawing attention to prices that are too low to be credible.").
[136] U.S. IP and Counterfeit Goods Report ("By setting the price of a counterfeit *at, or close to,* the retail price of a genuine good, counterfeiters are able to deceive consumers, who will pay the higher price because they believe the goods are real or who believe that they are getting a slight bargain on genuine goods.") (emphasis added); U.S. GAO Report, *supra* note 3, at 11.
[137] Corsearch, *supra* note 56.
[138] *See generally id.*
[139] Tucker at 13.
[140] *Id.* at 21-22.
[141] *Id.* (discussing authentication of items and art forgeries by Sotheby's & Christie's auction houses).
[142] *Id.* at 36-37.
[143] *See* Kammel Report, at 21-24 (outlining what authentication for genuine trademarked products is).

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

"Consider, as an illustrative example, an event that raises doubt over whether sellers on a platform can be trustworthy; for instance, a popular seller is exposed for selling counterfeit goods. Upon learning of this new information, many customers may stop trusting the platform and stop shopping on the platform, for fear that the goods sold by remaining sellers may also be counterfeits. As a result, remaining sellers will suffer a reputational externality, reducing their incentives to remain on the platform, and prospective sellers will be dissuaded from joining."[144]

However, on StockX, there are no popular sellers because seller identity is not shared with the buyer, and StockX has not exposed any of its sellers to say they are selling counterfeit. However, Tucker's hypothetical would seem to suggest that it would be in StockX's interest to not catch counterfeiters or to not be transparent as it might cause consumer trust to go down.

## VI.    TUCKER INCORRECTLY STATES THAT STOCKX ENSURES ONLY RELIABLE SELLERS USE ITS PLATFORM

Tucker notes that: "StockX works on ensuring that only reliable buyers and sellers use the platform. StockX provides a uniform product page on which items are listed for sale, and sellers who repeatedly do not complete sales or send in items that fail verification are liable to have their accounts suspended."[145]

However, from StockX's internal documents it appears that it is not ensuring reliable sellers use the platform, but instead prioritizes the incentivization of sellers, even when their products are rejected by the StockX process. StockX notes instances when a seller's product is rejected; and even with the possibility they are a counterfeiter, their direction to their team is to have "empathy" and "incentivize [the seller] to sell with us in the future."[146] Additionally, if a customer discovers their shoes are fake, StockX ████████████████████████████████
████████████████████████[147]

StockX further gives priority and more lax standards to so-called "power" sellers, treating them ████████████████████████████████████████████████
██████████████[148] Additionally, they ████████████████████████████████████
████████████████████████[149] despite no vetting prior to the first sale or proving reliability. The priority appears to be getting new sellers and keeping power sellers satisfied.

---

[144] Tucker at 15-16.
[145] Tucker at 29.
[146] STX0133185 (noting that "[i]f a seller's product is rejected by our AC's, regardless of their intent to sell something unauthentic or damaged, we should respond with empathy and incentivize the customer to sell with us in the future when they have additional stock").
[147] STX0133185 (noting that "[d]epends on the issue, but ████████████████████████████████████
████████████████████████████████████████████████████████████████ )
[148] STX0021481 at 497.
[149] *Id.* at STX0021496.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

This behavior by third-party platforms happens often, as DHS notes that platforms often allow sales by third parties without adequate scrutiny of sellers *in order to increase profits*,[150] which is exactly what we see in this case.

## VII.    VIGIL NOTES THE IMPORTANCE OF ALLEVIATING THE PROBLEMS OF ASYMMETRIC INFORMATION IN A TWO-SIDED MARKETPLACE, BUT STOCKX CREATES A MARKETPLACE WITH ASYMMETRY FOR THE BUYER

Vigil opines: "Thus, for a two-sided marketplace to flourish, it is necessary that both sides of the market trust each other, and for that, they need to have safeguards that alleviate the problems caused by asymmetric information."[151] However, this exact problem exists on StockX's platform. Problems are caused by asymmetric information, because the buyer has no basis in which to trust a seller since they never interact with them, but the buyer can only rely on StockX's guarantee of "authentication."

Vigil then contradicts his earlier note about it being "necessary that both sides of the market trust each other,"[152] and says that they do not need to "[a]s the sellers on StockX are anonymous to buyers (although sellers' identities are known to StockX, since it collects fees from sellers), StockX earns its customers' trust by ensuring that buyers receive the goods they expect."[153]  By taking on "authentication" and guaranteeing genuine goods, StockX has shifted the entire trust balance and taken on the responsibility for ensuring consumers' trust, which they cannot do based on their "authentication" or "verification" process.

## VIII.    VIGIL INCORRECTLY CLAIMS THAT STOCKX HAS A CLEAR POLICY OF DISPOSAL OF COUNTERFEIT PRODUCTS WHEN PRODUCTS EITHER FAIL "AUTHENTICATION" OR ARE RETURNED BY A BUYER AS SUSPECTED COUNTERFEIT

Vigil notes that:

> "StockX will fully refund a buyer in the unlikely event the buyer mistakenly receives a counterfeit product (or any other product that is not what the buyer expected to StockX currently codifies this policy in its "Buyer Promise," which states that if a customer purchases a product (e.g., a pair of sneakers) and upon receipt believes it is not the product they expected (e.g., because the product is of the wrong size, has a defect, or is not genuine), they can report the issue. If StockX confirms that they incorrectly verified

---

[150] DHS Report, at 11 (noting: "Platforms that recognize this strategy may incentivize seller listings to stimulate further growth and increase profits but do so without adequate scrutiny. As just one incentive, many platforms create "frictionless entry" by reducing the costs for sellers and buyers to join, thereby increasing the likelihood that the platform will reach an efficient and highly profitable scale.").

[151] Vigil at 63. (internal quotations omitted).

[152] *Id.*

[153] Vigil at 66.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

the product that was shipped to the buyer, StockX will refund the customer out of its own pocket, and does not recoup that cost from the original seller." [154]

StockX does not have returns; the "buyer promise" was only after the lawsuit was filed.[155]  They make it almost impossible for a consumer to return a product, making it difficult for them to work with customer service, argue with customers who believed they received a counterfeit and then tell them to resell it if they are not happy.[156]  Not only does Vigil have no basis to state that receiving a counterfeit product from StockX is "unlikely," the opposite in customer service responsiveness has been seen in practice.  Take for example, the Roy Kim case, where a StockX response came only after he posted on social media and StockX grew concerned that the post was going viral.[157] Kim noted at deposition that "I could not get official channels at StockX to respond to my issues, so the only way to get their attention was to make an Instagram post and make it go viral to have them reach out to me."[158] He further testified that StockX suggested to him that he resell the shoes through the platform if he was unhappy with their authenticity.[159]

And as discussed above, when the platform does engage with an aggrieved consumer, it will often claim the product is authentic and blame Nike.

StockX also has a policy in an internal memo, for ████████████████████████████████
██████████████████████████████████



[160]

---

[154] Vigil at 61-62.

[155] *See* NIKE0042394 (screenshot of https://stockx.com/help/articles/What-Is-the-StockX-Return-Policy showing that the "Buyer Promise" was added to the page on or around October 18, 2022); *see also*, Twitter, @StockX (Nov. 9, 2022), https://twitter.com/stockx/status/1590468671377354752 (earliest found reference to "Buyer Promise" on StockX's twitter account).

[156] *See supra* notes 65-99 and accompanying text.

[157] STX0774246-47; *see also* Kim Depo Tr. at 28:4-30:18 (purchase of suspected fakes from StockX); 69:22-74:19 (Instagram posts after not being able to get through official StockX channels); 77:3-82:14 (details of Instagram post); 86:18-92:13 (details of Roy Kim phone call with R. Amidon about return of suspected counterfeits); STX0774247; *see also* Amidon Depo Tr., 87:22-91:11 (Roy Kim returns); 83:11-24 (conversation with Roy Kim).  I understand that Nike's Brand Protection team inspected these suspected shoes and confirmed that 38 of the 62 pairs are counterfeit.  *See* Pallett Depo Tr. 30:4-15; 306:21-317:10; NIKE0029087; Roy Kim Depo Transcript, 83:13-85:9; *see also* Brendan Dunne, *Nike v. StockX Lawsuit: How One Buyer Got 38 Fake Paris of Sneakers,* Complex (Mar. 21, 2023), https://www.complex.com/sneakers/stockx-fake-sneakers-nike-lawsuit-38-pairs.

[158] Roy Kim Depo Tr. at 71:1-8.

[159] *Id.* at 73:2-20.

[160] STX0020225 at 231.  Later in this document, it is recommended to allow returns for eligible purchases. iId. *At* STX0020245. Interestingly, one of the ineligible purchases for return is "[p]urchases made before a product

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

StockX documents also show that: 

Vigil is further incorrect in noting that StockX will refund the buyer the cost of the purchase out of its own pocket as the following examples show partial refunds, discount codes and returns for re-authentication when the customer complains of the product being a counterfeit.[163]

These practices show, that contrary to Vigil's statement, returns are not easy for consumer's who purchase counterfeit on StockX, as sometimes they do not get their cost back with partial refunds, or receive discount codes, assuming the consumers are even aware that they have purchased counterfeit, and that StockX takes counterfeits back into its inventory.

---

release," which as stated above is a high potential area for counterfeits. *Id.* at STX0020260; *see also* STX0021484 (noting: "All sales are final. StockX does not allow for returns, exchanges, or cancellations").
[161] STX0018010; Fenton Depo Tr. 84:14-92:17.
[162] STX0021481 at 494.
[163] STX0208221; STX0227488; STX0251071; STX0268088; STX776134-37 (offering either a discount code or a return); STX0782855 (offering either a discount code, partial refund or return of purchase); STX0788156 (offering a $20 discount for fake shoes that fell apart); STX0788793 (offering a partial refund no return required).

## Kari Kammel Rebuttal Report
## Materials Considered

### Production Documents

NIKE0006776
NIKE0006785
NIKE0029087
NIKE0038817
NIKE0038818
NIKE0038958
NIKE0040103
NIKE0041218
NIKE0041221
NIKE0041233
NIKE0041262
NIKE0041300
NIKE0041326
NIKE0041350
NIKE0042394
STX0016912
STX0018010
STX0018101
STX0020231
STX0020245
STX0020260
STX0021481
STX0021484
STX0021494
STX0021495
STX0021496
STX0021497
STX0058180
STX0058183
STX0058185
STX0058194
STX0058199
STX0069542
STX0088473
STX0099158
STX0099160
STX0133183
STX0133185
STX0178024
STX0190394
STX0204960

STX0208221
STX0219752
STX0227488
STX0240741
STX0251071
STX0268088
STX0774244
STX0774265
STX0774271
STX0776120
STX0776134
STX0777119
STX0777764
STX0784484
STX0787990
STX0788156
STX0788793
STX0791799
STX0792375
STX0793973
STX0795215
STX0796209
STX0796783
STX0796787
STX0797786
STX0798549
STX0801043
STX0801783
STX0802850
STX0803943
STX0803951
ZK_NIKE_004305
ZK_NIKE_004306
ZK_NIKE_004307
ZK_NIKE_004308
ZK_NIKE_004309
ZK_NIKE_004310
ZK_NIKE_004311
ZK_NIKE_004312
ZK_NIKE_004325
ZK_NIKE_004326
ZK_NIKE_004327
ZK_NIKE_004331
ZK_NIKE_004353
ZK_NIKE_004528
ZK_NIKE_004529

ZK_NIKE_004530
ZK_NIKE_004531
ZK_NIKE_004534
ZK_NIKE_004535
ZK_NIKE_004536
ZK_NIKE_004537
ZK_NIKE_004538
ZK_NIKE_004539
ZK_NIKE_004540
ZK_NIKE_004541
ZK_NIKE_004562
ZK_NIKE_004563
ZK_NIKE_004565
ZK_NIKE_004566
ZK_NIKE_004654
ZK_NIKE_004655
ZK_NIKE_004657
ZK_NIKE_004661
ZK_NIKE_004663
ZK_NIKE_004665
ZK_NIKE_004667
ZK_NIKE_004672
ZK_NIKE_004711
ZK_NIKE_007831
ZK_NIKE_007832
ZK_NIKE_007834
ZK_NIKE_007836
ZK_NIKE_007838
ZK_NIKE_007840
ZK_NIKE_007842
ZK_NIKE_007844
ZK_NIKE_007853
ZK_NIKE_007865

**<u>Case Materials</u>**

May 5, 2023 Expert Report of Dejongh "Dee" Wells

May 5, 2023 Expert Report of Catherine Tucker, Ph.D.

May 5, 2023 Expert Report of Robert L. Vigil, Ph.D.

May 5, 2023 Expert Report of Kari Kammel

June 2, 2023 Expert Report of Jeffrey A. Stec., Ph.D.

November 30, 2022 Videotaped Deposition of Russell Amidon

December 2, 2022 Videotaped Deposition of Jacob Fenton

February 8, 2023 Videotaped Deposition of Joe Pallett

February 8, 2023 Videotaped Deposition of Roy Kim

February 22, 2023 Videotaped Deposition of Brock Huber

February 23, 2023 Videotaped Deposition of John Lopez


**Publications**

AMAZON, *2022 Brand Protection Report,* available at
https://assets.aboutamazon.com/2c/9e/2e907d06477a88c5bc556f95d27c/amazon-brand-
protection-report-3rd-annual.pdf

Brendan Dunne, *Nike v. StockX Lawsuit: How One Buyer Got 38 Fake Paris of Sneakers,*
COMPLEX (Mar. 21, 2023), https://www.complex.com/sneakers/stockx-fake-sneakers-nike-
lawsuit-38-pairs

CORSEARCH, *How to Stay Ahead of the How to stay ahead of evolving counterfeiter behavior*,
(July 15, 2020), https://corsearch.com/content-library/blog/how-to-stay-ahead-of-evolving-
counterfeiter-behavior/

EBAY, *2021 Global Transparency Report* (Apr. 2022),
https://www.ebaymainstreet.com/sites/default/files/2022-04/ebay_Transparency-Report-
2022_Letter_Social_v5.pdf.

FRONTIER ECONOMICS, Report for BASCAP and INTA, *The Economic Impacts of Counterfeiting
and Piracy*, (2017), https://www.inta.org/wp-content/uploads/public-files/perspectives/industry-
research/2017_Frontier_Report.pdf.

George Akerlof, *"The Market for 'Lemons': Quality Uncertainty and the Market Mechanism,"*
84 Q. J. OF ECON. 3, 488-500 (1970)

Integrity, Notification, and Fairness in Online Retail Marketplaces for Consumers Act
("INFORM Consumers Act"), Consolidated Appropriations Act of 2023, H.R. 2617, 117th Cong.
Div. BB, Title III, § 301 (2022), https://www.govinfo.gov/content/pkg/BILLS-
117hr2617enr/pdf/BILLS-117hr2617enr.pdf

Jay Kennedy, *Counterfeit Products Online*, THE PALGRAVE HANDBOOK OF INT'L CYBERCRIME &
CYBERDEVIANCE, at 7 (eds. Thomas J. Holt & Adam Bossler 2019)

Jay P. Kennedy, *Sharing the Keys to the Kingdom: Responding to Employee Theft by
Empowering Employees to Be Guardians, Place Managers, and Handlers*, 39 J. CRIME & JUST.
512 (2015)

Jay P. Kennedy, *Towards a More Proactive Approach to Brand Protection: Development of an
Organizational Risk Assessment for Product Counterfeiting*, 18 GLOB. CRIME 329, 331 (2017)

Jay Kennedy, *A-CAPP Center Product Counterfeiting Database: Insights Into Converging Crimes*, A-CAPP CENTER (2019), https://a-capp.msu.edu/article/a-capp-center-product-counterfeiting-database-insights-into-converging-crimes/.

John E. Eck et al., *Risky Facilities: Crime Concentration in Homogeneous Sets of Establishments and Facilities*, 21 CRIME PREVENTION STUDS. 225 (2007)

Kari Kammel, Jay Kennedy, Daniel Cermak, and Minelli Manoukian, *Responsibility for the Sale of Trademark Counterfeits Online: Striking a Balance in Secondary Liability While Protecting Consumers,* 49 AIPLA Q. J. 206-207 (Spring 2021)

LIBRARY OF CONGRESS, Federal Research Division under an Interagency Agreement with the U.S. Patent and Trademark Office, U.S. Department of Commerce, *U.S. Intellectual Property and Counterfeit Goods— Landscape Review of Existing/Emerging Research* (Feb. 2020), https://www.uspto.gov/sites/default/files/documents/USPTO-Counterfeit.pdf.

Linda Harrison, THE REGISTER, *"Empty Playstation Box Sold for $425,"* (Feb. 2, 2001), https://www.theregister.com/2001/02/02/empty_playstation_box_sold).

Marie Skubak Tillyer & John E. Eck, *Getting a Handle on Crime: A Further Extension of Routine Activities Theory*, 24 SEC. J. 179 (2011)

MARKMONITOR, *Seven Best Practices for Fighting Counterfeit Sales Online* (2017), https://www.markmonitor.com/download/wp/wp-Fighting_Counterfeit_Sales.pdf.

OECD/EUIPO, *Global Trade in Fakes: A Worry Threat, Illicit Trade* (June 2021), https://read.oecd.org/10.1787/74c81154-en?format=pdf

OECD/EUIPO, *Trends in Trade in Counterfeit and Pirated Goods, Illicit Trade* (Mar. 2019), https://read.oecd.org/10.1787/g2g9f533-en?format=pdf.

U.S. DEP'T OF HOMLAND SEC., Off. Of Strategy, Pol'y, and Plans, *Combating Trafficking in Counterfeit and Pirated Goods* (Jan. 24, 2020), https://www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goods-report_01.pdf

Office of the White House, Intellectual Property Enforcement Coordinator IPEC, *Annual Intellectual Property Report to Congress* (April 2023), https://www.whitehouse.gov/wp-content/uploads/2023/04/FY22-IPEC-Annual-Report_Final.pdf.

Pres. Donald J. Trump, Memorandum on Stopping Counterfeit Trafficking on E-Commerce Platforms Through Fines and Civil Penalties (Oct. 13, 2020), at§ 1, https://trumpwhitehouse.archives.gov/presidential-actions/memorandum-stopping-counterfeit-trafficking-e-commerce-platforms-fines-civil-penalties/

Rod Kinghorn & Jeremy Wilson, *Anti-Counterfeit Strategy for Brand Owners*, A-CAPP Paper Series (2013), https://a-capp.msu.edu/wp-content/uploads/2018/05/BACKGROUNDER-Anti-Counterfeit-Strategy-for-Brand-Owners.pdf

Jeremy Wilson & Rod Kinghorn*, Brand Protection as a Total Business Solution*, A-CAPP Center Report (2014), https://a-capp.msu.edu/article/brand-protection-as-a-total-business-solution/.

STOCKX, *Air Jordan Release Dates* (Aug. 2, 2022), https://stockx.com/news/air-jordan-release-dates/

STOCKX, *Here's How It Works,* https://stockx.com/sell.

STOCKX, *How do I sell on StockX?,* https://stockx.com/help/articles/How-do-I-sell-on-StockX

STOCKX, *How does StockX work?,* https://stockx.com/help/articles/how-does-StockX-work

STOCKX, *Lower Base Fees for All Sellers and Other Exciting Updates to the StockX Seller Program* (June 1, 2023), https://stockx.com/news/stockx-seller-program/.

STOCKX, *Nike,* https://stockx.com/nike/release-date

STOCKX, *Selling on StockX,* https://stockx.com/about/selling/ (*last accessed* May 4, 2023)

TWITTER, @StockX (Nov. 9, 2022), https://twitter.com/stockx/status/1590468671377354752.

U.S. CUSTOMS AND BORDER PROTECTION, *Priority Trade Issues: Intellectual Property Rights*, https://www.cbp.gov/trade/priority-issues/ipr

U.S. CUSTOMS AND BORDER PROTECTION, *The Truth Behind Counterfeits*, (last modified: May 16, 2023) https://www.cbp.gov/trade/fakegoodsrealdangers

U.S. DEP'T OF HOMLAND SEC., Off. Of Strategy, Pol'y, and Plans, *Combating Trafficking in Counterfeit and Pirated Goods,* at 4 (Jan. 24, 2020), https://www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goods-report_01.pdf

U.S. DEP'T OF JUSTICE, Criminal Division, *Reporting Intellectual Property Crime: A Guide for Victims of Copyright Infringement, Trademark Counterfeiting, and Trade Secret Theft*, 3d Ed. (2018), https://www.justice.gov/criminal-ccips/file/891011/download.

U.S. GOV'T ACCOUNTABILITY OFFICE, Report to the Chairman, Committee on Finance, U.S. Senate, *INTELLECTUAL PROPERTY: Agencies Can Improve Efforts to Address Risks Posed by Changing Counterfeits Market* (Jan. 2018) GAO-18-216, https://www.gao.gov/assets/gao-18-216.pdf

## Other Materials

Lanham Act, 15 U.S.C. §§ 1051 et seq.,

Trademark Counterfeiting Act, 18 U.S.C. § 2320

May 31, 2023 Conversation with J. Pallett, Director Brand Protection, Authentication and Innovation for Nike, Inc.

June 1, 2023 Conversation with J. Pallett, Director Brand Protection, Authentication and Innovation for Nike, Inc.