# EXHIBIT H

Page 1

1

2                    UNITED STATES DISTRICT COURT

              FOR THE SOUTHERN DISTRICT OF NEW YORK

3

4      NIKE, INC.                         )
                                          )
5                    Plaintiff,           )
                                          )
6      vs.                                ) No.
                                          ) 1:22-cv-00983-VEC
7      STOCKX LLC,                        )
                                          )
8                    Defendants.          )

9

10                The videotaped deposition of

11                      KARI KAMMEL

12     taken before JO ANN LOSOYA, CSR, RPR, CRR, pursuant

13     to the provisions to the taking of depositions at

14     444 West Lake Street, Chicago, Illinois commencing

15     at 9:45 a.m. on July 18, 2023.

16

17

18

19

20

21

22

23

24

25

```
                                              Page 2
 1     PRESENT:
 2
            DLA PIPER LLP
 3          TAMAR DUVDEVANI
            MARC MILLER
 4          1251 Avenue of the Americas
            New York, New York 10020
 5          tamar.duvdevani@dlapiper.com
            marc.miller@dlapiper.com
 6              Appeared on behalf of Plaintiff.
 7
            DEBEVOISE & PLIMPTON LLP
 8          MEGAN K. BANNIGAN
            KATHRYN SABA
 9          919 Third Avenue
            New York, New York 10022
10          mkbannigan@debevoise.com
            ksaba@debevoise.com
11              Appeared on behalf of Defendants.
12     ALSO PRESENT:
13          KIM VAN VOORHIS,
            Nike, Inc.
14
15     VIDEOGRAPHER: Milo Savich
16     STENOGRAPHICALLY REPORTED BY:
       JO ANN LOSOYA, CSR, RPR, CRR
17     LICENSE #:  084-002437
18
19
20
21
22
23
24
25
```

                                                              Page 51

1      publications, I believe.

2           A.    It is the sixth one down that I did

3      jointly with Jay Kennedy who is the former assistant

4      director of the A-CAPP Center, Daniel Cermak and

5      Minelli Manoukian who were two of my law students at

6      the time.

7           Q.    I see.  This is the responsibility for

8      the sale of trademark counterfeits online published

9      in the AIPLA Quarterly Journal?

10          A.    Yes, that's correct.

11          Q.    Do you have any formal education related

12     to counterfeiting?

13          A.    I don't, no.

14          Q.    Do you have any formal education related

15     to the sneaker industry?

16          A.    I don't.

17          Q.    Do you have any formal education related

18     to online marketplaces?

19          A.    I do not, no.

20          Q.    Have you ever worked in brand protection

21     for a company?

22          A.    I have not, no.

23          Q.    Have you ever worked in brand protection

24     for a resale marketplace?

25          A.    I have not.

```
                                              Page 52
 1        Q.    Have you ever worked for a resale
 2   marketplace?
 3        A.    No.
 4        Q.    How do you define resale marketplace?
 5   This is not a trick question.  I just want to make
 6   sure that we're not speaking past each other.
 7        A.    So I would define it as a marketplace
 8   where goods are sold after they've already been
 9   purchased once.
10        Q.    Have you ever worked for a firm that
11   investigates counterfeit activity?
12        A.    No.
13        Q.    Have you ever personally conducted
14   investigations into counterfeit activity on behalf
15   of a brand?
16        A.    No.
17        Q.    Have you ever personally conducted
18   investigations into counterfeit activity on behalf
19   of a resale marketplace?
20        A.    No.
21        Q.    Have you ever designed a company's brand
22   protection program?
23        A.    I have not designed, but I've consulted
24   on it in my role at the Center.
25        Q.    Have you ever designed a company's
```

Page 54

1     referring to when you're saying "two-sided

2     platform"?

3          Q.    Yeah.

4                When I say "two-sided platform," what

5     do you think I'm referring to?  Do you have an

6     understanding of what I'm referring to?  How would

7     you define it?

8          A.    So I have not heard that term

9     specifically before.

10          Q.    Have you ever heard the term two-sided

11     marketplace?

12          A.    No.

13          Q.    Are you an expert in the design of a

14     resale marketplace?

15          A.    No.

16          Q.    Are you an expert in the operation of a

17     resale marketplace?

18          A.    No.

19          Q.    Are you an expert in platform economics?

20          A.    No.

21          Q.    Are you an expert in price formation?

22          A.    No.

23          Q.    When you say you have consulted with

24     companies on the design of their brand protection

25     and anti-counterfeiting program, what do you mean by

Page 91

1    advisory board?
2         A.    Not since that time where it was briefly
3    mentioned so...
4         Q.    Have you studied or worked with
5    sneakerheads before?
6         A.    We had one student who went through our
7    program as a masters in criminology, who was a self
8    declared sneakerhead and I believe he actually wrote
9    a short -- I think it was part of his 'masters
10   thesis assists, which wasn't formally part of
11   A-CAPP, but he was writing about counterfeiting.  So
12   I have had a few conversations with him over the
13   years, but not really specific to -- to
14   sneakerheads.
15        Q.    What did you learn from him about
16   sneakerheads?
17        A.    Just that he's very passionate about it.
18   Like a lot of -- like a lot of other industries, I
19   mean we see a lot of passionate what we would say
20   fans across industries depending on the product
21   lines and what's out there.
22                    So I would say my discussions with
23   him sort of fell along those lines.
24        Q.    Did you learn anything else from him
25   about being a sneakerhead?

```
                                        Page 92

 1         A.    No.
 2         Q.    Have you learned any other thing about
 3    sneakerheads at any point during your work?
 4         A.    During my work at the Center?
 5         Q.    Sure.
 6         A.    No.
 7         Q.    How about other than at your work at the
 8    Center?
 9         A.    Only from the materials I reviewed.
10         Q.    In the context of this case?
11         A.    Yes.
12         Q.    Okay.  Have you ever studied advertising
13    or marketing?
14         A.    I have not, no.
15         Q.    So you are not an expert in advertising
16    or marketing, correct?
17         A.    That's correct.
18         Q.    Have you ever conducted a consumer
19    perception survey?
20         A.    I have not, but my research team, as I
21    mentioned before, is conducting one as we speak.
22         Q.    Other than that, do you have any
23    experience with conducting a consumer perception
24    survey?
25         A.    No.
```

```
                                        Page 93
 1        Q.    Are you an expert in consumer perception
 2   surveys?
 3        A.    No.
 4        Q.    Have you ever conducted any consumer
 5   research at all?
 6        A.    No.
 7        Q.    Are you an expert in conducting consumer
 8   research?
 9        A.    No.
10        Q.    Okay.  We went over the publications
11   listed on the fourth page of your CV.  Does that
12   list all of your publications?
13        A.    There are some on Page 5 as well that
14   goes onto the back side, and to the best of my
15   recollection, yes, they're all here.
16        Q.    Okay.  And does your CV accurately list
17   all of the courses you have taught and your
18   presentations and interviews other than, of course,
19   the one that the June presentation you mentioned
20   earlier?
21        A.    To the best of my recollection, yes, my
22   goal is to get all of them on here.
23        Q.    Have you ever taught any classes
24   specifically on counterfeiting in the footwear
25   industry?
```

Page 134

1      it's now out of their control.

2          Q.    Let's look at page 8 of your report.  In

3      the first paragraph of Section 4 -- actually, I

4      think it's the second paragraph of Section 4, you

5      say that e-commerce and social media platforms have

6      created the perfect environment for counterfeiters

7      since these platforms usually prioritize the speed

8      of getting products to consumers, satisfaction of

9      sellers, and profit for the platform instead of

10     safety and protection of consumers and their

11     purchasers.

12                 You didn't do any survey of

13     e-commerce commerce platform practices in connection

14     with your work on this case, correct?

15         A.    That's correct.

16         Q.    And you don't explain in your report

17     which e-commerce platforms you investigated in

18     support of your opinion that these platforms usually

19     prioritize in the way you describe in your report?

20         A.    So this is a statement that's partially

21     based on my experience.

22         Q.    My question was, you don't explain in

23     your report which e-commerce platforms you're

24     talking about, correct?

25                 MS. DUVDEVANI:  Objection.

Page 136

```
 1    extent that speed is often touted or not only speed
 2    but getting a seller up to sell as quickly as
 3    possible with as few barriers as possible, and then
 4    on the back end, we see some of the consequences of
 5    that, which is that counterfeit goods are
 6    proliferating on e-commerce sites of all kinds and
 7    that's continuing to grow and expand.  It's not
 8    getting better.
 9                   It's, in fact, getting worse to the
10    point where it's become a national security issue
11    that's being addressed by the White House, by DHS,
12    by the FBI, by DOJ, and a lot of other federal
13    agencies because it's rising to such a level that
14    it's harming the US economy, it's harming US brands,
15    it's harming US consumers.
16        Q.    What research have you done specifically
17    to look at this other than talk to individuals from
18    IPR, DHS, or other brands?
19        A.    So this statement is based on my
20    experience, not a specific research paper.
21        Q.    Your experience to talking to IPR, DHS,
22    and other brands?
23        A.    My experience in my role as the director
24    of the A-CAPP Center and all of the activities I
25    have conduct there, yes.
```

1    rebuttal report, which is any of these items that

2    were suspected to be potentially counterfeit by the

3    consumers they were told that these are

4    imperfections that must have been by Nike's

5    manufacturing team, even though they have no

6    evidence of what Nike's manufacturing processes are

7    or any quality issues around that, which means that

8    the consumers are left thinking that Nike has a

9    quality issue when, in fact, it's most likely a

10   potential counterfeit.

11        Q.    Did you investigate whether StockX has

12   ever suspended sellers from its platform?

13        A.    I did not do a separate investigation of

14   that.

15        Q.    Okay.  You testified earlier that you're

16   not a consumer perception expert, correct?

17        A.    I am not.

18        Q.    Do you have any experience analyzing what

19   messages consumers might takeaway from specific

20   language on websites?

21        A.    I don't, but my colleagues at A-CAPP

22   Center do specialize in that.

23        Q.    Did you conduct any study in this case of

24   what messages, if any, consumers took away from the

25   language on StockX's website?

```
                                        Page 192
 1          A.    I was not asked to.
 2          Q.    Are you aware of any study that Nike
 3     conducted regarding what messages, if any, consumers
 4     took away from the language on StockX's website?
 5          A.    I'm not aware of any.
 6          Q.    When did you first learn of StockX?
 7          A.    The company in general?
 8          Q.    Yeah.
 9          A.    Probably a few years ago.
10          Q.    Did you ever study or analyze StockX
11     before this case came up?
12          A.    No.
13          Q.    Prior to your work on this case, did you
14     ever look at the anti-counterfeiting efforts or the
15     brand protection efforts that StockX takes?
16          A.    No.  And I don't recall ever seeing them
17     at any of the conferences where e-commerce platforms
18     are most likely talking about that.  So and no, I
19     did not.
20          Q.    What did you know about StockX prior to
21     this case?
22          A.    So I knew that they sold essentially
23     high-end sneakers and that was mostly from, as I
24     mentioned, one of our former students, who was very
25     interested in that.
```

Page 195

1    they might exclude some counterfeits.  It's
2    certainly possible.
3         Q.    Your opinion is not that they're not
4    trying to exclude counterfeits but that they can't
5    guarantee products are 100 percent authentic?
6              MS. DUVDEVANI:  Objection.
7    BY THE WITNESS:
8         A.    I'm not giving an opinion on whether
9    they're trying or not, but their claim that they can
10   authenticate can't -- I mean, it's not possible
11   because they cannot authenticate any products, but
12   they may be able to exclude some obvious counterfeit
13   in the same way that, you know, other platforms
14   exclude counterfeit.  Some that view items, some
15   that don't view items.
16                   I mean, the whole point of this -- of
17   the laws that are being passed and everything going
18   on right now with best practices is to try to keep
19   platforms as safe as possible, but when a platform
20   is claiming that they can authenticate in the way
21   that only the brand can and to 100 percent accuracy
22   or 99 point, forget what it was, almost 100 percent
23   accuracy, that's not possible.
24        Q.    What if -- you also take issue with
25   StockX's -- well, withdraw that.

Page 204

1      Q.    You testified earlier that you're not
2    offering an opinion as to platform economics in this
3    case, correct?
4      A.    That is correct.
5      Q.    Are you aware that Dr. Tucker describes
6    coring as the ability of two-sided platforms in
7    general and marketplaces in particular to actively
8    manage and maintain buyer and seller interactions to
9    ensure their quality?
10     A.    So that is what it says on 22, correct.
11     Q.    In reaching your opinion that StockX does
12   not appear to be engaging in coring, what
13   methodology did you apply?
14     A.    So in regards to this section, it was in
15   the context of the sale of counterfeit goods and
16   protections that platforms take or should take
17   according to best practices so that was based on my
18   experience in the field of brand protection and
19   anti-counterfeiting.
20     Q.    So in reaching your opinion that StockX
21   does not appear to be engaging in coring, you
22   consider the context of the sale of counterfeit
23   goods and protections that platforms take or should
24   take according to best practices; is that accurate?
25     A.    According to best practices for

1    Airbnb or an art auction.

2         Q.    Can you say one way or the other whether

3    vetting sellers is a form of coring?

4              MS. DUVDEVANI:  Objection.

5    BY THE WITNESS:

6         A.    Again, I would have to have more context

7    and I am not an expert on general coring.

8         Q.    Do you know what StockX does to vet

9    sellers?

10        A.    So it is my understanding that they have

11   them fill out basic information with a credit card

12   and make sure that the credit card is verified, but

13   I don't believe there's any vetting that I know of

14   that I have seen that's more in-depth for that --

15   for that purpose until -- until maybe they become

16   a -- I'll get the right term, but a frequent seller,

17   a seller who is selling multiple -- multiple shoes,

18   high volume seller.

19        Q.    At that point, high volume sellers are

20   vetted using some other method?

21        A.    I don't know if they're -- I didn't see a

22   separate vetting process, but they are certainly

23   identified within the documents that I saw.

24        Q.    Flipping back to Exhibit 1, your

25   affirmative report, if you could go to page 27,

Page 231

1    or overt, whether that's a technology or something

2    else, this is something intentionally put into the

3    product where the packaging that's obvious that

4    someone can look at to say, okay, this is part of

5    our authentication process, but regardless, any

6    of -- any of the items or technologies that are put

7    into an authentication program have to be -- have to

8    be put together by the brand intentionally and,

9    oftentimes, depending on the products.

10                  So depending on the product,

11   depending on the industry, there may be different

12   technologies used for different product lines, for

13   example, or even, again, if it's a smaller company

14   or a start-up, they may not have money to invest in

15   technology at that point, so maybe they will rely

16   initially, at least, only on one or two of these.

17   So these vary.  But again, it's something that the

18   IP rights holder has to decide which ones they are

19   going to use in their authentication process and

20   who -- who within the brand has access and who, if

21   anyone, outside of the brand would have access to

22   those tools in order to authenticate a product.

23        Q.    So if you look at the next page, you have

24   this blue hexagon with the different triangles,

25   that's page 22.

1         A.    Yep.

2         Q.    And is this a diagram of the six

3    technologies or methods that you just mentioned?

4         A.    Yes.

5         Q.    Okay.  So can you just explain to me --

6    just tell me which fits into these categories?

7         A.    Sorry.  Which fits into what categories?

8         Q.    Let's go through the hexagon.  I just

9    want to make sure I understand what you're talking

10   about in each of these triangles.

11        A.    Okay.

12        Q.    So let's start with covert technology.

13   Is this what you mentioned when you said they -- the

14   brand can put something obvious in the two that you

15   can see that will tell you if it's counterfeit or

16   not?

17        A.    Under covert?

18        Q.    Yes, covert technology.

19        A.    No.  Covert is something that can't be

20   seen by the naked eye.

21        Q.    That was my fault.  I get it.  It's been

22   a long day.  Okay.  So let me clean this up.

23              What are you referring as covert

24   technology?

25        A.    So covert technology, and I reference

Page 233

1    this, I believe, I think this is footnote 73 too, so

2    this is something that is not recognizable or

3    perceptible using human senses so it usually

4    requires a specialized tool or highly specialized

5    knowledge.

6         Q.    Okay. ████████████████████████████

     █ ████████████████████████████████████████

     █         ██      ███

9         Q.    And then to the right of that, it says

10   overt tool available to the public.  What do you

11   mean by that?

12        A.    So an overt tool is something that some

13   brands have used, something that is, for example,

14   obvious in their mark or obvious in a product.  I'm

15   thinking -- I can't remember exactly which brand

16   this is but they have a mark that if you turn it

17   sideways, you can see a different letter and they

18   share with their consumers this is something that

19   you can look at.  That also means counterfeiters can

20   see it too, but it is used, usually in conjunction

21   with another -- with another -- with another set of

22   tools, but oftentimes that is one of the things that

23   someone could decide to use, or if they choose, to

24   give that to the public something that they might

25   use that anyone could look at and tell.

Page 234

1    Q.    ████████████████████████████

    ██████████████

    ███    ██    ████████████████████████

4    Q.    Next for continuing, there's a triangle

5    that says covert?

6    A.    That's an error and a typo.  I have that

7    on there twice actually.

8    Q.    Okay.  So what's supposed to be there?

9    A.    So I believe -- so it should match the

10   five that I refer to on the other page there.

11   Q.    Well, there's six here.

12   A.    Covert, overt, semi-covert, forensic, and

13   digital and then -- so the six that are supposed to

14   be in the image are the six that I talk about on

15   page 20.  The point of the graphic was to say that

16   if a brand is using all six of those, no one can

17   authenticate it unless they use all six of those

18   technologies.  So if a brand picks four types of

19   technologies to use in their authentication,

20   different people may have different access to those

21   tools, depending on who they determine, but the

22   final point of authentication can't be made unless

23   all four of those are checked by whoever would have

24   access to all four of those tools because I mean,

25   some -- some -- depending on what -- what the

1    product is may use multiple tools.  So this was

2    meant simply as a -- as a diagram to explain those

3    five plus the human experience.

4        Q.    Okay.  I'm just going to look at page 20

5    if that's the correct list.  We talked about overt.

6    We talked about covert, which those are numbers 1

7    and 3.  The second is semi-covert.  What do you mean

8    by that?

9        A.    Sure.  So that's a term actually that we

10   refer to in -- in the work of our Center, which

11   is -- which is something that is usually in between

12   overt and covert, which is something that often

13   might involve something that isn't very obvious when

14   you look at it but maybe there's, for example, a

15   rudimentary tool that might be needed to

16   authenticate whatever that is.

17       Q.    Can you give me an example?

18       A.    So, yeah, perhaps -- perhaps a brand, I

19   don't know, it tells someone -- this is totally

20   hypothetical but this is the idea, that, you know,

21   if you have our product and you put it in hot water,

22   you know, it may dissolve or something to that

23   effect.  So it's something that isn't necessarily

24   obvious at the first moment, but if someone was to

25   do something with it, not necessarily with the

Page 238

1           MS. DUVDEVANI:  Are you almost at a good

2    breaking point?

3           MS. BANNIGAN:  I have a couple of more

4    questions on this one and then we can break.

5           MS. DUVDEVANI:  Okay.

6    BY MS. BANNIGAN:

7       Q.    Okay.  So, looking -- I'm going to look

8    at the language next to the hexagon and maybe

9    this -- maybe or -- I don't know actually.  Let me

10   just ask my question.

11           You say, "authenticating.  However,

12   authenticating only one of the six does not mean

13   that the product is authentic.  All must be

14   authenticated in order to truly verify whether a

15   product is genuine or authorized."

16           And so by that, did you mean all that

17   the brand chooses to use must be authenticated?

18   Because I'll confess I read that to mean all six of

19   these need to be used when I first -- when I read

20   that.

21       A.    It's all that the brand chooses to

22   authenticate or chooses to put into their program.

23   So I had put on the next page, on page 23, this is

24   just a sample from the ISO report about control.

25   Control means access, but what -- what different

```
 1    technologies are used.  So here they give a couple
 2    of examples of overt, covert, and forensic analysis.
 3                    So if a brand was to choose those
 4    three authentication elements or whatever the
 5    technologies are that with those authentication
 6    elements, even if someone could use a covert tool
 7    such as, for example, US Customs and say we got a
 8    flag on this covert tool, you would still need to
 9    use all of the elements that the brand has
10    determined need to be used in order to authenticate
11    the good.
12        Q.    Okay.  Did you take these graphics from
13    somewhere, this hexagon graphic?  Where did it come
14    from?
15        A.    No, I created it.
16        Q.    You created it for this report?
17        A.    Correct.
18              MS. BANNIGAN:  Okay.  We can take a break
19    now if that works for you?
20              MS. DUVDEVANI:  Yep.
21              THE VIDEOGRAPHER:  The time is 4:58 p.m.
22    This is the end of Media Unit 6 and we're going off
23    the video record.
24                    (Whereupon, a break in the
25                     proceedings was taken.)
```