# EXHIBIT J



June 2, 2023

*NIKE V STOCKX*

Expert Rebuttal Report of Steven S. McNew

**<u>Nike V. StockX</u>**
**<u>CASE 1:22-CV-00983-VEC</u>**

Prepared By

Steven S. McNew, Senior Managing Director

Global Lead, Blockchain and Digital Assets
1301 McKinney, Suite 3500
Houston, TX 77002

Prepared For

DLA Piper LLP

Highly Confidential – Outside Counsel's Eyes Only

## Table of Contents

Background and Experience ................................................................................................................. 1

Assignment .......................................................................................................................................... 1

A Discussion of Topics Consistent Across Dr. Kominers's & Dr. Tucker's Expert Reports .......................... 2

StockX's Experts Characterize the Vault NFTs as Distinct New and Novel Technology Products ................ 2

StockX's Experts' Treatment of the Benefits and Utility Provided by the Vault NFTs is Inadequate and
Contradicted by StockX's Public Representations, Internal Documents, and Vault NFT Owner Discord
Messages .............................................................................................................................................. 3

StockX's Experts Fail to Address Additional Inconsistencies Between StockX's Representations of the
Vault NFT Program and What was Actually Delivered ............................................................................. 3

StockX's Experts Do Not Address StockX's Prominent Use of Nike Imagery and Its Creation of NFT-Specific
Imagery ................................................................................................................................................ 5

StockX's Experts Fail to Adequately Explain the Vault Pricing and Fail to Account for Numerous Important
Factors that Affect the Vault NFT Pricing .............................................................................................. 6

Dr. Scott Duke Kominers Opening Report .............................................................................................. 9

Dr. Kominers's Analysis is Incomplete and Presents an Inaccurate Account of the Facts Surrounding
StockX's Vault NFT Offering and Representations to Consumers ............................................................. 9

Dr. Kominers's Idiosyncratic NFT Taxonomies Represent Incomplete and Conflicting Analysis ................ 11

StockX's Actions and Public Representations About the Vault NFTs Directly Contradicts Dr. Kominers's
Assessment of Vault NFT Utility and Functionality ................................................................................ 14

StockX's Elevated NFT Prices are Indicative of Added Utility and Not Clearly Explained by General Market
"Uncertainty" ...................................................................................................................................... 20

Dr. Catherine Tucker Opening Report .................................................................................................. 21

Dr. Tucker's Analysis of the Vault NFT Pricing is Incomplete and Erroneous .......................................... 21

Conclusion .......................................................................................................................................... 25

Materials Considered ............................................................................................................................. i

Highly Confidential – Outside Counsel's Eyes Only

## Background and Experience

I, Steven S. McNew, am a Senior Managing Director and Global Practice Lead, Blockchain and Digital Assets at FTI Consulting Technology LLC ("FTI"). FTI provides blockchain advisory services, cryptocurrency investigations, digital forensic investigations, data governance, privacy and security, and electronic discovery services to assist organizations across a variety of industries to better govern, secure, find, and analyze information.

I have led hundreds of cryptocurrency and digital assets investigations and currently lead all cryptocurrency workstreams in some of the largest bankruptcies in the sector, including representation of the Unsecured Creditors Committee (UCC) in the FTX bankruptcy, representation of the Equity Committee in the Core Scientific bankruptcy, and I previously led all cryptocurrency workstreams in representation of the UCC in the Voyager bankruptcy. I routinely manage advisory and diligence engagements for businesses that are leveraging cryptocurrencies, NFTs, blockchains and other digit assets.

I completed blockchain and cryptocurrency coursework at the Massachusetts Institute of Technology (MIT). I have also completed studies and passed the required examinations with the Blockchain Council to earn designations of Certified Bitcoin Expert, Certified Blockchain Expert, and Certified Smart Contracts Developer. Additionally, I am certified by CipherTrace as a Cryptocurrency Investigator and a member of the Wall Street Blockchain Alliance, Texas Blockchain Council, Government Blockchain Association, and the Blockchain Council. I have thirty-four (34) years of experience performing various forensic and cybersecurity investigations, and other services mentioned above. I am a frequent speaker on blockchain, cryptocurrency, NFTs, metaverse, and cybersecurity. I have also published numerous articles on these topics. I'm quoted often as a blockchain and cryptocurrency expert by various publications. My Curriculum Vitae is attached to my opening report as Appendix B.

All of my opinions and conclusions presented in this Report are held to a reasonable degree of professional certainty. I have prepared my Report while employed by FTI Consulting. I have worked as a consultant and expert for 34 years.

I have been retained by DLA Piper as a testifying expert at the rate $910 per hour. My fee is not contingent on the outcome of this matter.

## Assignment

I was asked to provide an independent review, analysis, and comments regarding StockX's expert reports ("Expert Reports") offered by Dr. Scott Duke Kominers and Dr. Catherine Tucker.

## A Discussion of Topics Consistent Across Dr. Kominers's & Dr. Tucker's Expert Reports

### StockX's Experts Characterize the Vault NFTs as Distinct New and Novel Technology Products

Dr. Kominers's and Dr. Tucker's opening reports describe the Vault NFTs as distinct new product offerings based on novel technology. In Dr. Kominers's Summary of Opinions, he describes the Vault NFTs as "novel NFT products" or "novel crypto marketplace products."[1] Dr. Kominers describes the Vault NFTs as such in an attempt to justify StockX's flawed product launch and poor consumer experience by framing StockX's Vault NFT design and development process as "consistent with best practices for platforms that are launching novel crypto marketplace products" or "startups and other companies to implement and test novel trading protocols and designs."[2]

In an attempt to explain the Vault NFT pricing, Dr. Tucker similarly describes the Vaults NFTs as new assets and new technology:

> High initial prices followed by a price decline for traded assets are not an unusual phenomenon, particularly for *new technologies that investors find difficult to value in their early days. The price dynamics observed for StockX's Vault NFTs are therefore not unlike the ones seen for a range of assets linked to other new technologies, including other blockchain-based decentralized finance innovations. In the case of Vault NFTs, the uncertainty regarding the valuation of the new asset, the underlying technology, and the adoption rate of the new product* may have caused initial high demand followed by a rapid correction, possibly once uncertainty and initial over-excitement faded.[3] (emphasis added).

---

[1] Kominers Report at 35-36 ("The StockX Vault NFT market design is also consistent with best practices for platforms that are launching novel crypto marketplace products. . . . In this case, StockX launched with decentralized storage of the Vault NFTs and their metadata, but with centralized trading. This is a highly sensible choice for a novel NFT product for which the precise trading protocols were still to be worked out, and whose prospective early adopters may not have had significant experience with decentralized trading of crypto assets. In particular, it is best practice for startups and other companies to implement and test novel trading protocols and designs off-chain initially, especially to the extent that their product audience is already centralized in a given platform that can be used to host the test protocol.")

[2] *Id.*

[3] Tucker Report at 5; *see also id.* at 53 ("In the case of Vault NFTs, the uncertainty regarding the valuation of the new asset, the underlying technology, and the expected adoption rate of the new vault service may have caused high initial demand followed by a rapid correction, possibly once uncertainty and initial over-excitement faded."); *id.* at 58 ("To the extent that a new asset is seen by rational arbitrageurs as likely to achieve widespread adoption and likely to produce excitement and purchase interest, this perception can facilitate higher willingness to pay by the rational arbitrageurs. Similarly, it is possible that some early investors in Vault NFTs thought they were overvalued compared to the physical shoes but were expecting the demand to grow such that they could plan on reselling at an even higher price at a future date.")

## StockX's Experts' Treatment of the Benefits and Utility Provided by the Vault NFTs is Inadequate and Contradicted by StockX's Public Representations, Internal Documents, and Vault NFT Owner Discord Messages

Although Dr. Kominers and Dr. Tucker describe some of the benefits and utility provided by the Vault NFTs, both attempt to diminish and minimize many of these benefits, particularly those which StockX prominently promoted and consumers cited as reasons for purchasing Vault NFTs—and which are unhelpful to their analyses and opinions in support of StockX's litigation position that the Vault NFTs are merely "claim tickets" for associated physical items.

For example, although Dr. Kominers addresses on page 24 of his report some of the language StockX included in its original version of the "Collect What's Next" landing page, he critically glosses over StockX's express representations of additional and future benefits and utilities. Specifically, Dr. Kominers does not address StockX's representation that the Vault NFTs are "new digital tokens providing *unprecedented access and utility* for our global *community*" (emphasis added).[4] Dr. Kominers similarly does not address StockX's description of the Vault NFTs as "investable digital assets."[5] As he explains in his report, access,[6] community,[7] and investment opportunities[8] are kinds of NFT utility or features distinct from ownership record utility, yet Dr. Kominers does not address these advertised aspects of the Vault NFT offering and the value consumers ascribed to these utilities.

While Dr. Tucker acknowledges some additional benefits and utility—namely, "the new vault service"[9] and enhanced trading experience[10]—she does not mention, for example, the token-gated StockX NFT community Discord or exclusive "unlocks." Dr. Tucker's failure to account for the additional benefits of Vault NFT ownership beyond the "new vault service" and enhanced trading service ignores all the additional benefits StockX represented to consumers, and renders her opinion and pricing analysis incomplete.

## StockX's Experts Fail to Address Additional Inconsistencies Between StockX's Representations of the Vault NFT Program and What was Actually Delivered

Both Dr. Kominers and Dr. Tucker emphasize the purported benefits of blockchain and NFTs as they relate to a vaulted good service and/or enhanced collectibles resale trading service. However, because StockX did not use blockchain and NFT technology in any functionally relevant manner in connection with the Vault NFTs, this discussion is irrelevant to the actual consumer experience and flawed product StockX offered and delivered under prominent use of Nike's trademarks. Moreover, because neither StockX expert accounts for key

---

[4] NIKE0000244 at 1.
[5] NIKE0000451 at 1.
[6] Kominers Report at 20 ("Example utility formats include: *Access:* NFTs often grant various forms of exclusive access through 'token-gating'. . .").
[7] *Id.* at 22-23.
[8] *Id.* at 22, 32.
[9] Tucker Report at 53.
[10] *Id.* at *passim.*

inconsistencies between what StockX represented to consumers about its Vault NFT program and what it actually provided to consumers, their opinions are incomplete and misleading.

For example, when discussing how the StockX Vault NFTs work, Dr. Kominers critically omits StockX's own explanation of how the Vault NFTs work, as published on StockX's Help Center FAQs webpage: "Each Vault NFT is backed by a physical item held in StockX's custody, *tied directly one to one via the blockchain*."[11] As explained in my report, this is simply not true: the physical items associated with the Vault NFTs are not "tied directly one to one via the blockchain" because there is no specific link between the tokens and physical goods recorded or otherwise discernible from the blockchain data.[12]

Kominers glosses over another misrepresentation StockX made about its use of blockchain in connection with the Vault NFTs when he excerpts some language from StockX's "Collect What's Next" landing page on page 24 of his report, but omits the following portion:

> Welcome to the future of StockX, where authentic products of current culture are now on-chain.
>
> Introducing NFTs on StockX, new digital tokens providing unprecedented access and utility for our global community. These exclusive NFTs connect coveted physical products with investable digital assets, from sneakers to creators to experiences and more.

[13]

Although somewhat ambiguous, StockX represented that the physical items associated with the Vault NFTs are "on-chain." However, as discussed in my opening report, the physical items associated with the Vault NFTs are in no way "on-chain" in any meaningful way. ███████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████[14] Indeed, Dr. Kominers admits as much in paragraph 40 of his report: "Vault NFT transactions currently occur off-chain (i.e., not on a blockchain) with StockX maintaining an internal, digital ledger."[15] This is inconsistent with StockX's representations to consumers.

---

[11] "What are Vault NFTs?" StockX, last updated Sept. 27, 2022, https://stockx.com/help/articles/What-are-Vault-NFTs.
[12] McNew Report at 43-45.
[13] NIKE0000244 at 1.
[14] *See* McNew Report, at 43-45.
[15] Kominers Report at 28.

## StockX's Experts Do Not Address StockX's Prominent Use of Nike Imagery and Its Creation of NFT-Specific Imagery

Dr. Kominers and Dr. Tucker ignore StockX's extensive use of Nike's products and trademarks in the Vault NFT imagery and marketing materials, which materially transcended any reasonable use for a claim ticket product and was intentionally designed, advertised, and understood to be a utility of the Vault NFTs in and of itself. StockX developed custom imagery not just to exemplify the shoes to be purchased but as part of a larger creative design process to market the Vault NFTs as NFTs and make them visually appealing to consumers. This design strategy is consistent with other projects in the digital collectibles space.

Dr. Kominers and Dr. Tucker never address why StockX believes it was necessary to associate the Nike imagery in such a prominent way. ███████████████████████████████████████████████████ █████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████████████████████████████████[17] Indeed, StockX used Nike imagery extensively throughout their Vault NFT marketing materials, including in their "Collect What's Next" landing page, NFT project roadmap, promotional emails and messages sent to millions of StockX users highlighting the Nike Chunky Dunky shoe, and social media posts and profile images.[18] Dr. Kominers's and Dr. Tucker's price analyses do not even consider the impact the imagery may have had on the value consumers ascribed to the Vault NFTs. Their analyses are devoid of any mention related to these factors and puts into question their thoroughness in examining all inputs related to the case.

---

[16] STX0163937 at 15.

[17] ████████████████████████████████████████████████████████████ ██████████████████████████████████████

[18] STX0001275 at 1; STX0163937 at 25; NIKE0000055 at 1; https://twitter.com/stockx/status/1483501803182374922?lang=en; https://twitter.com/stockx; *see also* McNew Report at 18-22.



[19]

## StockX's Experts Fail to Adequately Explain the Vault Pricing and Fail to Account for Numerous Important Factors that Affect the Vault NFT Pricing

Notably missing from StockX's experts' price analyses is any mention of the highly-publicized lawsuit with Nike or the contemporaneous rollback of the additional benefits that StockX was conveying to consumers—both of which coincide with the decline of Vault NFT prices. Dr. Kominers and Dr. Tucker also fail to address consumer sentiment and actions in response to the lawsuit and benefits rollback, and the effects they may have had on the Vault NFT prices. Consistent with the NFT community practice of sharing and discussing news about the project within the project's Discord server, StockX users discussed their concerns over the news of the lawsuit and the potential impact it may have on the Vault NFT prices, including on the owner-only "x-nft-owner" StockX Discord channel.

---

[19] STX00163937 at 26.



---

[20] StockX Discord, x-nft-owner channel. For demonstrative purposes, this image has been modified to display StockX Discord messages dated February 3, 2022.



21

Newsworthy and otherwise highly influential intervening events are paramount when considering external variables that could contribute to NFT collection prices.

Also notably absent from both Dr. Kominers's and Dr. Tucker's Vault NFT pricing analyses is the impact of the technical issues that affected StockX's January 18, 2022 and January 26, 2022 releases of Nike-branded Vault NFTs. As I explained in my opening report—and further discussed below—these technical issues adversely affected several aspects of the consumer experience and prompted consumers to complain on social media.[22] Indeed, as detailed in my opening report, internal StockX documents discuss the negative consumer response to the shoddy consumer experience StockX delivered during the first two Vault NFT drops, including, for example, consumer complaints published on social media and observations by StockX Director of Data and Analytics, Steven Blaha, that the prices for the "Jordan 1 Retro High OG Patent Bred (Vault NFT)" "did not really recover" and that "sellers are bailing because of the mini crash."[23]

While Dr. Kominers and Dr. Tucker acknowledge the initial inflated Vault NFT prices, they both attempt to minimize their significance by examining prices over arbitrarily selected time periods—most of which took place *after* Nike filed its initial complaint against StockX on February 3, 2022. For example, the graphs presented in Figure 28 of Dr. Kominers's report track Vault NFT prices for two Nike Vault NFTs only for the time period of February 1 through February 12, 2022. Dr. Kominers offers no explanation for why he selected this time period. This omission is especially puzzling in light of the fact that the two Vault NFTs analyzed in the figure were first released on January 18, 2022, which means these graphs omit nearly two whole weeks of price data, including the critical period immediately following release. The initial period following the release (or mint) of NFTs is critical to gauge consumer demand and interest in an NFT project. Initial NFT prices can have many contributing factors, like overall product fit related to utility, any future benefits or additional releases, social media and community engagement, and a concentrated marketing campaign to emphasize the abovementioned factors. The initial price data period is especially relevant to this case given that StockX began substantively modifying the Vault NFT program as originally advertised, including its governing terms of use, within days of launch, and to an even greater degree following the commencement of the instant litigation.[24] From this favorable vantage point, Dr. Kominers concludes that prices later "converged to track closely with the value of the associated physical assets,"[25] without any consideration given to the impact of the lawsuit and StockX's modifications to the Vault NFT offering.

Dr. Tucker instead skews her price analysis longitudinally by examining the prices from the date of launch through the end of July 2022. Over this long-term period, Dr. Tucker observed that, "[t]he initial price spike that

---

[21] *Id.*

[22] McNew Report at 60.

[23] *Id.*; STX0443343 at 186.

[24] *See*, *e.g.*, Nike First Amended Complaint (ECF No. 39) at ¶¶ 73-74.

[25] Kominers Report at 42.

followed the introduction of the Vault NFTs gave way to a drop in both transactions and prices within a matter of weeks when prices stabilized and converged to a level close to the price of physical shoes."[26] Like Dr. Kominers, Dr. Tucker does not explain her reasoning for analyzing the price data over this time period—which minimizes the important initial price frenzy that followed launch—and reaches a conclusion about the Vault NFT prices without any consideration given to the impact of Nike's lawsuit and the other important factors I have discussed in this report and my opening report.

Dr. Kominers's and Dr. Tucker's quantitative price analyses also narrowly (and inexplicably) focus on a cherry-picked assortment of only three of the eight Nike Vault NFTs[27]—three of the most voluminous Vault NFT offerings, rather than the relatively scarcer (and more valuable) one-of-one or three-of-three edition offerings. Relatedly, neither Dr. Kominers nor Dr. Tucker addresses the artificial scarcity that StockX imposed on the Vault NFT supply and its effect on price. Nor do they address the impact on price of various promised and delivered utilities other than the vaulting and enhanced trading services. Supply analysis is critical when examining price action related to NFT collections. Neither Dr. Kominers nor Dr. Tucker address these potential impacts on the Vault NFT pricing.

Ultimately, Dr. Kominers's and Dr. Tucker's failures to even consider the numerous factors, including various Vault NFT utilities, the Nike lawsuit, and the technical issues that affected the first two Nike-centric Vault NFT releases, that could have and did affect the Vault NFT pricing—as was admitted by StockX internally, discussed by consumers, and expectedly consistent with the NFT market at that time—render their conclusions on the Vault NFT pricing materially incomplete and unreliable.

## Dr. Scott Duke Kominers Opening Report

### Dr. Kominers's Analysis is Incomplete and Presents an Inaccurate Account of the Facts Surrounding StockX's Vault NFT Offering and Representations to Consumers

Many of Dr. Kominers's statements about the vault mechanics, redemption process, blockchain-based functionality of the Vault NFTs, and Vault NFT PDP design reflect, at best, an incomplete analysis that glosses over key facts surrounding these features, and, at worst, a deliberate post-hoc revision of StockX's public representations to consumers.

In addition to Dr. Kominers's incomplete treatment of StockX's public claims about the blockchain-based functionality of the Vault NFTs discussed above, Dr. Kominers also misleadingly omits and misrepresents critical information about Vault NFT redemption and the availability of the associated physical item. For example, Dr. Kominers writes: "StockX guarantees the availability of the physical product associated with each Vault NFT, and the holder of any Vault NFT can redeem their NFT for the associated physical product at any time."[28] However, Dr. Kominers fails to acknowledge that StockX's original terms of use indicated that StockX reserved the right to unilaterally redeem a Vault NFT for something other than the allegedly associated physical item.[29] That directly

---

[26] Tucker Report at 50.
[27] Dr. Kominers examines the 100-edition "Nike Blazer Low Sacai KAWS Neptune Blue – US M 10" Vault NFT and the 100-edition "Air Jordan 4 Retro White Oreo 2021 – US M 10" Vault NFT (Kominers Report at 42-43). Dr. Tucker also examines the "Nike Blazer Low Sacai KAWS Neptune Blue – US M 10" Vault NFT, as well as the later-released 250-edition "Jordan 1 Retro High OG Patent Bred – US M 10" Vault NFT (Tucker Report at 50-52).
[28] Kominers Report at 24.
[29] NIKE0000253 at 8.

contradicts his statement that StockX guaranteed the availability of the associated physical item. Dr. Kominers also does not acknowledge that StockX sold Vault NFTs before all the corresponding associated physical items had been entered into the "vault."[30] StockX therefore could not have guaranteed availability of or process redemptions for physical items it did not have in its possession.[31] Dr. Kominers also fails to note that redemption was not available to Vault NFT owners until March 1, 2022, six weeks after the accused NFTs were first offered for sale on the StockX platform.[32] All of these facts render Dr. Kominers's statement that "the holder of any Vault NFT can redeem their NFT for the associated product at any time" inaccurate; especially so for the six-week period that immediately followed the Vault NFT launch when redemption was not yet available.

Similarly, Dr. Kominers's statement that "the Vault NFTs provide a particularly natural and intuitive inventory system through unified digital asset records," ███████████████████████████████████████████████████ ████████████████████████████████████████████████[33]

Dr. Kominers also asserts that "StockX's Vault NFT pages were highly similar to StockX's product display pages for the corresponding physical products, where a customer would go if they wanted to purchase the physical good directly."[34] But Dr. Kominers fails to acknowledge and address several material differences, which reflect a purposeful differentiation between the Vault NFT PDPs and the physical-only PDPs. These differences include, most notably and unsurprisingly, that the Vault NFT PDP prominently displays a specialized Vault NFT image ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ In addition to the distinctive specialized Vault NFT images, the Vault NFT PDPs also uniquely contain "Vault NFT" in the displayed product title, as well as specialized product badges indicating that the product is an NFT and a limited edition.[37] Dr. Kominers inexplicably ignores these patent and key differences, and conclusorily states the Vault NFT and physical item PDPs are "highly similar." The differences between the Vault NFT and physical item PDPs are even more apparent when viewed side-by-side:

---

[30] Defendant StockX LLC's Responses and Objections to Plaintiff Nike, Inc.'s First Set of Requests for Admission at 9 ("StockX had purchased all sneakers prior to the release of the associated NFTs, but in some instances, the sneakers had not made it to the StockX Vault prior to the release of the associated NFTs."); *see also* STX0041927.

[31] McNew Report at 51-52.

[32] *Id.*

[33] McNew Report at 43-45.

[34] Kominers Report at 30.

[35] STX0163937 at 15.

[36] ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ █████████████████████████████████████████

[37] McNew Report at 10-12.



38

## Dr. Kominers's Idiosyncratic NFT Taxonomies Represent Incomplete and Conflicting Analysis

Dr. Kominers's NFT taxonomies are in no sense accepted standards. On one front, Dr. Kominers divides the various functions of an NFT into a primary function (called the "default function") and ancillary functions (called "additive functions").[39] But this categorization is not standardized in this new industry and by using these labels Dr. Kominers attempts to provide a sheen of objectivity to his analysis that it does not actually possess.

As Dr. Kominers and I both note in our respective reports, NFTs may have many functions (*e.g.*, as a certificate of ownership for physical goods, license to associated media, certificate of membership in a community, benefits such as experiences or discounts, investment potential, etc.), and whether any given function is primary, or ancillary can be purely subjective and shifting over time. Thus, there often exists little basis to label a given NFT function as its "default utility" or an "additive utility."

Furthermore, Dr. Kominers repeatedly attempts to categorize NFTs as either "art NFTs" or "digital brand NFTs," defining "digital brand NFTs" as those that "use digital assets as a springboard for establishing a broader product ecosystem and brand, along with a community of NFT holders who self-identify with the brand as such."[40] Again, this is Dr. Kominers's own categorization, not an industry standard, and it creates a false dichotomy. As I explained in my opening report, and as Dr. Kominers elsewhere admits, NFTs can have a variety of functions, of which brand building is just one.

Moreover, even if we accept Dr. Kominers's "art NFT v. digital brand NFT" framework *arguendo*, Dr. Kominers's conclusion that "to the extent that the Vault NFTs have 'digital brand; features, the digital brand in question is

---

[38] NIKE0000016 at 1; NIKE0000026 at 1; For demonstrative purposes, this image has been modified to display the first two pages of the original document. Please refer to the link or document name to view the original
[39] Kominers Report at 21.
[40] *Id.* at 2.

unambiguously that of StockX itself,"[41] is incorrect and contradicted by overwhelming contrary evidence. As Nike's brand and marketing expert, Dr. Itamar Simonson, explains in his rebuttal report, StockX's prominent use of Nike's brand in connection with the sale and promotion of the Vault NFTs resulted in an extension of *Nike's brand* into the NFT space.[42] Dr. Kominers either ignores or was kept away from such evidence, including the non-exhaustive examples I discuss in my opening report, such as StockX's "Collect What's Next" landing page, the Vault NFT project roadmap, direct-to-consumer marketing emails and messages, StockX social media posts, StockX's Discord engagement (including a promotional giveaway of Nike shoes identified by StockX as "official StockX Vault sneakers"), the Nike-centric Vault NFT imagery StockX created specifically to appeal to consumers, and StockX's decision to launch the Vault NFTs with almost exclusively Nike products.[43]

Dr. Kominers's failure to consider such evidence is puzzling. For example, as I explained in my opening report, roadmaps are a customary marketing strategy employed by project creators in the NFT space and valued by consumers, who look to a project's roadmap to assess its legitimacy and prospective value.[44] Notwithstanding the ubiquity and importance of NFT project roadmaps, Dr. Kominers completely ignores StockX's Vault NFT roadmap. In fact, the word "roadmap" appears nowhere in Dr. Kominers's report despite the fact that StockX publicly marketed its roadmap on its "Collect What's Next" landing page and created an entire "roadmap" channel on its Discord server, which Dr. Kominers has evidently reviewed.[45]

---

[41] Kominers Report at 43; *see also id.* at 2 ("The StockX Vault NFTs generally do not have features commonly associated with 'digital brand' NFTs, which use digital assets as a springboard for establishing a broader product ecosystem and brand, along with a community of NFT holders who self-identify with the brand as such. But to the extent that the Vault NFTs do have any such features, the digital brand in question is unambiguously that of StockX alone.")

[42] Simonson Report at ¶¶ 6, 13-14.

[43] McNew Report at 9-20.

[44] *Id.* at 15.

[45] Kominers Report, *passim*. [Note: Figures 30 and 34 of Dr. Kominers's report contain screenshots of StockX's Discord server and clearly show the unacknowledged "roadmap" channel listed in the lefthand channel navigation pane.]



[46]

Although unacknowledged by Dr. Kominers, StockX's use of a roadmap is consistent with a strategy of marketing NFTs with a broader set of utilities to a community of NFT holders and would have been readily understood as such by the community of consumers who purchased or considered purchasing Vault NFTs.

Also absent from Dr. Kominers's Vault NFT analysis is any mention of the NFT influencers and consultants that StockX leveraged for its Vault NFT offering. As I noted in my opening report, this is another common strategy used to market and sell NFTs which StockX utilized by engaging artists, influencers, and investors active in the NFT space, such as WhIsBe and Josh Ong.[47] Dr. Kominers ignores not only internal StockX documents detailing StockX's pursuit of, negotiation with, and eventual partnership with these influencers, but also ignores the public social media posts these individuals published to promote the Vault NFT launch:

---

[46] StockX Discord, roadmap channel.
[47] McNew Report at 16-17.



48

Once again, Dr. Kominers's silence on this point is puzzling and suggests he may not have reviewed highly relevant internal StockX documents and public social media posts by the NFT influencers StockX partnered with to promote the Vault NFTs.[49] The absence of any mention of these partnerships again illustrates Dr. Kominers's failure to consider and address materially relevant materials in his analysis.

## StockX's Actions and Public Representations About the Vault NFTs Directly Contradicts Dr. Kominers's Assessment of Vault NFT Utility and Functionality

Dr. Kominers describes the features of NFTs as either "default utilities" or "additive utilities," and claims that "the opportunity to redeem a Vault NFT for the associated physical product is the 'default utility' of the Vault NFT,"[50] and that "the Vault NFTs' lack of identity, community, and additive utility features."[51] Through this arbitrary and idiosyncratic "default/additive" dichotomy, Dr. Kominers attempts to minimize many of the benefits of Vault NFT ownership that StockX prominently touted—and which consumers cited as reasons for

---

[48] https://twitter.com/WhIsBe/status/1482201110454542340;
https://twitter.com/beijingdou/status/1483506576761704459.
[49] It is also notable that even though StockX used WhIsBe's art in its Vault NFT project roadmap, Dr. Kominers is silent about both the use of a roadmap and StockX's engagement of WhIsBe to guide and amplify its NFT marketing strategy.
[50] Kominers Report at 25.
[51] *Id.* at 41.

purchasing Vault NFTs— to support his conclusion that the Vault NFTs are just claim tickets (*i.e.*, "[t]he StockX Vault NFTs serve primarily as a simple ownership record for an associated physical product . . . "[52]).

For example, Dr. Kominers's assessment of the token-gated Vault NFT-owner-only Discord channels and "unlocks" rewards ignores evidence that StockX specifically intended and advertised such exclusive benefits to its consumers. Dr. Kominers also does not address the centrality of these benefits to the Vault NFT offering as expressed by StockX's own consumers on Discord. Instead, Dr. Kominers attempts to downplay the significance of the token-gating mechanism StockX deployed to limit access to its Vault NFT-owner-only Discord channels and "unlocks" rewards by pointing out that StockX—unlike some other NFT project creators—did not use software that automatically authenticates owners based on their NFT holdings.[53] As discussed in my opening report, StockX instead used manual verification of Vault NFT ownership on its Discord channel to imitate token-gating and related practices used by many NFT project creators to manufacture exclusivity around their NFT collections.[54] While it is true that StockX mimicked token-gating through a low-tech, non-blockchain manual verification solution—for the simple fact that the Vault NFTs do not interact with the blockchain in any meaningful way—it does not alter or weaken the significance of this practice: exclusive owner-only Discord channels and rewards show yet again that StockX sold and consumers purchased Vault NFTs as a larger package of utilities, consistent with a typical NFT project and well beyond any utilities needed for a claim ticket. StockX's emphasis on token-gated exclusivity is further substantiated by the specialized "roles" and corresponding badges StockX Discord users received after verifying their ownership of a Vault NFT. Analysis of the StockX Discord roles issued to Vault NFT owners, like the one shown below, is non-existent in Dr. Kominers's report.



[55]

Dr. Kominers also acknowledges that StockX offered discounts and rewards to Vault NFT holders in the form of "unlocks," but attempts to downplay their significance and value to consumers, stating (incorrectly and misleadingly) "the StockX Vault NFT series was not, in general, a source of rewards . . . . StockX briefly experimented with coupons and giveaways for Vault NFT holders, but stopped these rewards soon after."[56] Contrary to Dr. Kominers's attempt to minimize the "unlocks," StockX repeatedly highlighted these exclusive

---

[52] Kominers Report at 24.
[53] *Id.* at 37.
[54] McNew Report at 27.
[55] StockX Discord.
[56] Kominers Report at 52; *see also id.* at 41 ("Early on, StockX experimented with providing platform discounts and rewards to Vault NFT holders. . . . . I also understand from counsel that StockX at one time experimented with giving Vault NFT holders $20 coupons for use on the StockX platform. However, StockX soon eliminated these benefits for Vault NFT holders")

rewards as a core benefit of Vault NFT ownership across its marketing channels, including explicit promises of weekly "unlocks" on Discord:



57

Dr. Kominers's description of the "unlock" utility of the Vault NFTs as a brief "experiment" is also inconsistent with the public guarantee of exclusive rewards and benefits StockX enshrined in the JSON text file linked to the actual blockchain token via the Vault NFT smart contract and minting information: "As an NFT owner, *you will be granted exclusive access to StockX benefits, promotions, experiences, and rewards*" (emphasis added).[58]

████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████

---

57 StockX Discord, x-nft-owner channel.
58 NIKE00005663 at 2.



---

[59] STX0439361 at 3.
[60] *See* McNew Report at 26-34.



61

Dr. Kominers also glosses over messages on StockX's Discord channel authored by apparent Vault NFT owners who identify the "unlocks" as the "best part about being a StockX NFT owner" and a source of consumer appeal:

61 STX0039475. For demonstrative purposes, this image has been modified to display the first two pages of the original document. Please refer to the link or document name to view the original

Highly Confidential – Outside Counsel's Eyes Only



62



63



64

Dr. Kominers's self-serving "default/additive" utility analysis has no industry precedent or consensus, misrepresents what StockX actually communicated to consumers, and is inconsistent with StockX's internal communications regarding the bundle of benefits contained in the Vault NFT offering, including token-gated

---

62 StockX Discord, x-nft-owner channel.
63 *Id.*
64 *Id.*

community development and engagement on StockX's Vault NFT-owner-only Discord channels, exclusive "unlocks," (i.e., rewards and giveaways) for owners, and the digital collectible Vault NFT imagery StockX intentionally created to appeal to consumers and used to foster community engagement through the "flexing" or sharing of one's Vault NFT image, as widely encouraged by StockX on its Discord server.[65] By Dr. Kominers's own terms, each of these benefits qualifies as a distinctly recognizable and valued utility of the Vault NFTs.

## StockX's Elevated NFT Prices are Indicative of Added Utility and Not Clearly Explained by General Market "Uncertainty"

The price analysis Dr. Kominers presents in his report is deficient. Specifically, Dr. Kominers performs virtually no analysis of numerous important factors that affected the Vault NFT prices, including common NFT project marketing tactics StockX employed, such as artificial scarcity, social media and Discord community engagement, and the use of a roadmap—all of which I discuss in my opening report, but which Dr. Kominers conclusorily dismisses or completely ignores without explanation. On the basis of this deficient analysis, Dr. Kominers concludes that the Vault NFT price spikes resulted from some unexplained market "uncertainty," but he neither explains the source or subjects of such uncertainty (who was uncertain, about what, and why did this impact the price?), nor does he consider alternative hypotheses. Dr. Kominers reasons that following an initial spike the prices of some Vault NFTs converged to the approximate price of the associated physical shoes. But he again ignores evidence and the obvious explanation that the prices moved in response to StockX's reversal and repudiation of various Vault NFT utilities as a result of the lawsuit by Nike. As noted above, Dr. Kominers also fails to account for the impact the Nike lawsuit and the technical issues that affected StockX's release of Nike-branded Vault NFTs had on the Vault NFT pricing. Instead, Dr. Kominers relies on a limited set of inputs in his price analysis to reason why the Vault NFT prices were so detached from the prevailing prices for just the physical items, such as: "The Vault NFTs appear to be successfully facilitating trade, with long-run pricing patterns consistent with market efficiency. Initial Vault NFT prices saw a spike, as happens with many novel NFT products as the market is discovering the value of the digital asset."[66]

As shown in the above statement, Dr. Kominers also attributes the price convergency to "market efficiency," implying (as Dr. Tucker states) that the price spike resulted from some unidentified inefficiency. But Dr. Kominers does not explain (nor Dr. Tucker) why he believes the market to have been inefficient or what caused such inefficiency. Put another way, Dr. Kominers does not address the likely explanation that the higher prices were reasonably reflective of the myriad utilities accompanying the Vault NFTs that StockX promised (and that consumers sought and holders expected) and the artificial scarcity that StockX created and communicated through the advertised limited supply of Vault NFT editions.

As explained above, the Vault NFTs were advertised to have and did have many benefits other than as a claim ticket or as a superior investment. In my opening report, I explained that the Vault NFT pricing was consistent with the value ascribed to other NFT assets at the time. Dr. Kominers provides no analysis or explanation of what supposed "market inefficiencies" lead to the elevated prices other than to ascribe them only in the most general fashion to "uncertainty." His failure to consider the obvious, alternative explanation renders his analysis deeply superficial and unreliable.

---

[65] *See, e.g.*, StockX Discord, vault-flex channel.
[66] Kominers Report at 42.

# Dr. Catherine Tucker Opening Report

## Dr. Tucker's Analysis of the Vault NFT Pricing is Incomplete and Erroneous

In discussing the factual background underlying her opinions on pricing, Dr. Tucker fails to consider the full Vault NFT product StockX was advertising and offering to consumers. Instead, she addresses only the vaulting and enhanced trading service elements. As explained in my opening report and above, StockX marketed and delivered a much larger bundle of benefits than just the vaulting and trading aspects that Dr. Tucker focuses on, including token-gated Discord channels, owner-only "unlocks," specialized Vault NFT imagery prominently featuring Nike's brand, and artificial scarcity through limited editions, among others. Although unacknowledged by Dr. Tucker, these are all strategies focused on driving consumer demand for a new NFT offering beyond vaulting and/or trading a physical product.

Yet, despite her report's silence on the impact that these unacknowledged benefits of Vault NFT ownership had on pricing, Dr. Tucker's analysis essentially concedes it. Specifically, Dr. Tucker states that "[h]igh initial prices followed by a price decline for traded assets are not an unusual phenomenon, particularly for new technologies that investors find difficult to value in their early days."[67] As an initial matter, like Dr. Kominers, Dr. Tucker provides no explanation for her implicit assumption that the initial high values investors placed on the Vault NFTs were the result of some mispricing. As I have discussed, they were instead likely the result of the additional utilities that StockX promised and provided, and that holders sought. More importantly, Dr. Tucker provides no explanation for why valuation of Vault NFTs would be "difficult" for investors if it depended only on the value of the associated shoe, the markets for which were liquid and ascertainable. Rather, her opinion that Vault NFTs were mispriced (an opinion with which I do not agree and believe lacks basis) depends on a premise that holders ascribed some other, more difficult-to-price value to the NFTs.

Dr. Tucker also observes that the Vault NFTs' price dynamics "are not unlike the ones seen for a range of assets linked to other new technologies," and suggests the Vault NFT price dynamics resemble a bubble.[68] Specifically, Dr. Tucker states, "[i]n the case of Vault NFTs, the uncertainty regarding the valuation of the new asset, the underlying technology, and the expected adoption rate of the new vault service may have caused high initial demand followed by a rapid correction, possibly once uncertainty and initial overexcitement faded."[69] However, the pricing of the underlying shoes was always relatively certain. Thus, any uncertainty must revolve around whether consumers understand the NFTs to offer something more than just a claim to the underlying shoes. Dr. Tucker avoids discussing any specific cause of this uncertainty (besides the novelty of the technology). This selective approach leads Dr. Tucker to an incomplete analysis and a flawed hypothesis around the price of the Vault NFTs.

Dr. Tucker further reasons that the cause for any observed reduction in uncertainty is ultimately the passage of time: "On the first day of trading, the prices of the first Vault NFTs linked to Nike sneakers spiked. But in a matter of weeks, transaction volume and prices dropped, and prices converged to a level close to the price of physical shoes, as expected by StockX's leadership."[70] As discussed above, Dr. Tucker's reasoning for the price spike and convergence over time, however, omits two highly influential intervening events: Nike's lawsuit and

---

[67] Tucker Report at 5.
[68] *Id.* at 53.
[69] *Id.*
[70] *Id.* at 3.

the corresponding elimination of certain Vault NFT utilities. As presented in my report, a quantitative price analysis that examines Vault NFT transactions between the January 18, 2022 Vault NFT launch and the filing of Nike's initial complaint on February 3, 2022 is a more neutral and pertinent examination of the Vault NFT price data as it reflects consumer response to the Vault NFT product offering as originally marketed and offered by StockX.

Although Dr. Tucker acknowledges that "a bug in the system" experienced during the January 18, 2022 launch resulted in StockX releasing nearly half of the 309 offered Vault NFTs the following day "at then-prevailing market prices," Dr. Tucker offers no meaningful analysis of this influential event.[71] Rather than actually analyze the impact of the bug on the Vault NFT prices, she merely suggests that the bug and resulting failed transactions "may have contributed to a sense of scarcity and price increases that were not intended by StockX's launch pricing model."[72]

Dr. Tucker's price analysis also fails to account for the continued substantial technical issues that affected the January 26, 2022 release of the "Jordan 1 Retro High OG Patent Bred (Vault NFT)," and ensuing negative consumer sentiment. As noted in my opening report, the technical problems that afflicted the January 26, 2022 Vault NFT release prompted StockX Director of Digital Strategy, Yasmin Tekyi-Mensah, to remark in an internal StockX Slack thread, "We're getting slammed on social. Would we consider making a statement, at least in Discord, acknowledging things?"[73] In another Slack thread, Ms. Tekyi-Mensah shared additional details about the social media response to the issues consumers experienced during the "Jordan 1 Retro High OG Patent Bred (Vault NFT)" release, noting that the issues caused "a lot of negativity, mostly: - payments declining – speculation that we allowed bots/allowed backdooring – 'horrible drop.'"[74] Dr. Tucker's analysis, however, accounts for none of these things.

The omission of these highly relevant facts about the technical issues that affected StockX's release of Nike-branded Vault NFTs from Dr. Tucker's price analysis is even more striking given that some of the technical issues experienced during the first two Vault NFT releases specifically affected StockX's transaction data user interface, a critically important feature of StockX's platform that influences consumer purchasing decisions and protects consumers.[75] As Dr. Tucker explains:

> StockX also builds trust into transactions by providing buyers and sellers with data so that neither feels like they traded at an unfair price on the platform. . . . Each product listing includes historical price data, as well as the 12-month trade range, all-tome trade range, price volatility, number of sales, price premium, and average sale price . . . *Such information on current and past prevailing prices of certain products helps buyers avoid overpaying for a purchase on the platform*.[76] (emphasis added).

Despite Dr. Tucker's recognition of the importance of such pricing data, her analysis does not account for StockX's failure to display accurate real-time Vault NFT transaction data caused by

---

[71] *Id.* at 49-50.
[72] *Id.* at. 49.
[73] STX0443343 at 174.
[74] STX0014280 at 5.
[75] STX0082646 at 10-15.
[76] Tucker Report at 30.

technical issues with StockX's system. This oversight is remarkable because even StockX employees—including StockX Director of Data and Analytics, Steven Blaha—observed issues with the transaction data interface during the initial release of Vault NFTs that rendered such data unreliable and effectively useless for the consumer protection reasons Dr. Tucker identifies:



77

Even StockX employees recognized the price distortion and ensuing risk of consumer harm that flowed from the transaction data interface failure:

78

---

[77] STX0443343 at 135.
[78] *Id.* at 136.

Nor does Dr. Tucker account for consumer responses to the technical bugs that affected StockX's display of important pricing data, which were readily available on StockX's Discord server:



79



80

Dr. Tucker's price analysis in "Exhibit 3: Summary Statistics of Vault NFTs Corresponding to Selected Nike Sneakers (2022)" also provides an incomplete and skewed representation of the data. This table fails to provide critical information on the premiums customers paid on the secondary market for the Vault NFTs relative to the

---

[79] StockX Discord, x-nft-owner channel.
[80] *Id.*

associated physical item. Absent from this table is any column that details the secondary sale price the Vault NFTs were fetching.

## Conclusion

Dr. Kominers and Dr. Tucker describe the Vault NFTs as new, novel technology products. Despite their attempts to minimize certain advertised utilities and benefits of the Vault NFTs, StockX's experts further validate that these products contained and offered additional benefits and utility beyond a claim to a physical product (*e.g.*, exclusive "unlocks," token-gated StockX Discord community, etc.). Dr. Kominers and Dr. Tucker also fail to address the full extent of these aspects of the Vault NFT offering and do not provide a complete picture of what StockX marketed to consumers before and after the Vault NFT launch. Dr. Kominers and Dr. Tucker also ignore StockX's prominent use of Nike-centric imagery StockX specifically created for the Vault NFTs, and StockX's use of marketing strategies commonly employed in the NFT space to promote a new offering. Their price analyses also fail to account for influential intervening events and phenomena, such as the technical issues that affected the first two Vault NFT releases, the highly publicized lawsuit with Nike, and StockX's elimination of certain Vault NFT benefits *after* Nike initiated the instant litigation. Dr. Kominers makes numerous incorrect statements about the vault mechanics, blockchain-based functionality of the Vault NFTs, redemption process, and Vault NFT PDP design, which are inconsistent with and misrepresent what StockX publicly represented to consumers. Dr. Kominers also attempts to buttress his incomplete analysis by applying idiosyncratic taxonomies—neither of which are accepted industry standards, but rather appear to have been invented and selectively employed to fit his (incomplete) factual account and analysis—and ignoring price data from the highly relevant timeframe immediately following the Vault NFT launch. Dr. Tucker provides an even more limited analysis that fails to take into account the full extent of what StockX was advertising and offering to consumers. Her price analysis also omits the Nike lawsuit and the technical issues that affected the first two Vault NFT releases, and focuses on an enlarged timeframe that minimizes the most relevant pricing data.

Dr. Kominers's and Dr. Tucker's failure to thoroughly address all the information at hand renders their opinions incomplete and misrepresentative of what StockX marketed and delivered as a much larger bundle of benefits than stated in their reports.

I reserve the right to supplement or amend the foregoing opinion if and as new information should become available.

*Steven S. McNew*
_____

Steven S. McNew

Dated: June 2, 2023

Appendix

# Materials Considered

**Nike Documents**

NIKE0000016
NIKE0000026
NIKE0000055
NIKE0000244
NIKE0000253
NIKE0000451
NIKE0005663

**StockX Documents**

STX0001275
STX0014280
STX0039475
STX0041927
STX0082646
STX0099953
STX0163937
STX0439361
STX0443343
STX0445340

**Expert Reports**

May 5, 2023 Opening Expert Report of Scott Duke Kominers, PhD.
May 5, 2023 Opening Expert Report of Steven S. McNew.
May 5, 2023 Opening Expert Report of Catherine Tucker, PhD.
June 2, 2023 Expert Rebuttal Report of Itamar Simonson, PhD.

**Other Sources Considered**

Nike, Inc. First Amended Complaint (ECF No. 39)
StockX LLC's Responses and Objections to Plaintiff Nike, Inc.'s First Set of Requests for Admission
StockX Discord Server
https://stockx.com/help/articles/What-are-Vault-NFTs
https://twitter.com/stockx
https://twitter.com/stockx/status/1483501803182374922?lang=en
https://twitter.com/WhIsBe/status/1482201110454542340
https://twitter.com/beijingdou/status/1483506576761704459