# EXHIBIT M

REBUTTAL EXPERT REPORT OF DR. ITAMAR SIMONSON

1. I am the Sebastian S. Kresge Emeritus Professor of Marketing at the Stanford University Graduate School of Business. I previously submitted an expert report, dated May 5, 2023, that described the survey that I conducted in this matter.

2. I was asked by counsel for Nike, Inc. to address certain opinions presented in StockX's expert reports that are within my area of expertise. Several of the reports discuss the accused non-fungible tokens ("Vault NFTs") that my opening report addressed, and state correctly that the Vault NFTs—including those accused by Nike of infringement—are new products. None of them, however, acknowledges that by rushing to the market with the accused Vault NFTs that prominently feature Nike's famous trademarks and imagery, StockX took Nike's strongest asset—its brand—and extended it into that new product category without Nike's authorization.

3. Brand extensions play an important role in marketing and are a subject that I have studied and taught for over 30 years. In this rebuttal report I explain the implications of StockX's unauthorized extension of the Nike brand into this new category, as well as why Dr. Kominers is incorrect that "to the extent that the Vault NFTs have 'digital brand' features, the digital brand in question is unambiguously that of StockX itself."[1]

NFTs Represent a New Line of Business and a Different Asset Category

4. NFTs represent both a new product category and a novel "asset class," a fact that two of StockX's experts, Dr. Catherine Tucker and Dr. Scott Kominers, acknowledge.[2]

---

[1] Kominers Report at 43.

[2] Tucker Report at 5 ("High initial prices followed by a price decline for traded assets are not an unusual phenomenon, particularly for *new technologies that investors find difficult to value in their early days*. The price dynamics observed for StockX's Vault NFTs are therefore *not unlike the ones seen for a range of assets linked to other new technologies*, including other blockchain-based decentralized finance

1

5.      Consistent with these experts' descriptions of NFTs as a new asset class and a novel product, NFTs are not just another way to trade or to collect shoes or other products, nor are they simply another form of investment in or collecting sneakers. They are a new category of goods and services, and one that many well-known brands have recently entered.[3]

6.      When StockX decided to enter this new category, it did so with a great emphasis on and prominently displayed the Nike brand, effectively extending the brand into a new category.[4] Unlike normal brand extensions, however, this "brand extension" was not done by or with the approval of the brand being extended. StockX rushed to market prior to Nike's own entry into the space, which I understand StockX knew was imminent due to Nike's acquisition of

---

innovations. In the case of Vault NFTs, *the uncertainty regarding the valuation of the new asset, the underlying technology, and the adoption rate of the new product* may have caused initial high demand followed by a rapid correction, possibly once uncertainty and initial over-excitement faded" (emphasis added).); *id.* at 58 ("To the extent that *a new asset* is seen by rational arbitrageurs as likely to achieve widespread adoption and likely to produce excitement and purchase interest, this perception can facilitate higher willingness to pay by the rational arbitrageurs. Similarly, it is possible that some early investors in Vault NFTs thought they were overvalued compared to the physical shoes but were expecting the demand to grow such that they could plan on reselling at an even higher price at a future date" (emphasis added).); Kominers Report at 35-36 ("The StockX Vault NFT market design is also *consistent with best practices for platforms that are launching novel crypto marketplace products*. . . . In this case, StockX launched with decentralized storage of the Vault NFTs and their metadata, but with centralized trading. This is a highly sensible choice *for a novel NFT product* . . . . In particular, it is best practice for startups and other companies to implement and test *novel trading protocols and designs* off-chain initially. . . " (emphasis added).); *id.* at 42 ("Initial Vault NFT prices saw a spike, *as happens with many novel NFT products* as the market is discovering the value of the digital asset" (emphasis added).).

[3] *See, e.g.*, McNew Report at 40 (discussing Blockbar NFTs released in partnership with luxury liquor and wine brands, as well as the Major League Baseball digital collectible NFTs released in partnership with NFT studio Candy, and the 10KTF Gucci Grail NFT collection).

[4] *See infra* ¶¶ 11-12.

2

NFT studio RTFKT[5] and trademark filings related to NFTs and the metaverse.[6]  StockX's experts, when analyzing the accused NFTs, completely ignore the fact that StockX's offer for sale of the accused NFTs is effectively a Nike brand extension, though the extender is not the source or owner of the brand, contrary to the normal use of brand extensions.

The Importance and Potential Value and Risks of Brand Extensions

7.  "**Brand Extensions:**  Many firms have decided to leverage their most valuable asset by introducing a host of new products under their strongest brand names."[7]  Given the importance of such brand extensions, a great deal of research has examined the determinants of successful and unsuccessful brand extensions, the potential harm to the core brand being extended, and related topics.[8]

8.  For example, one article explained the value of brand extensions as follows:[9]

> The costs of introducing a brand into a consumer market can be considerable, ranging above $50 million. It is a considerable investment and like most investments carries no guarantee of success. The recession of the early 1990s focused marketing

---

[5] *See, e.g.*, STX0012731 at STX0012742 (December 15, 2021 internal StockX Slack message from StockX employee Ryan Kolean: "With news of Nike purchasing RTFKT, which is looking to mint NFTs and sneakers in the metaverse, and knowing that we are working to add NFTs and supporting functionality to the StockX platform in early 2022. How are we position ourselves to engage with the Metaverse?").

[6] *See* U.S. Trademark Application Serial No. 97095855 for NIKE (filed October 27, 2021); U.S. Trademark Application Serial No. 97096366 for NIKE & Swoosh design (filed October 27, 2021); U.S. Trademark Application Serial No.97095944 for Swoosh design (filed October 27, 2021); U.S. Trademark Application Serial No. 97096950 for JORDAN (filed October 28, 2021); U.S. Trademark Application Serial No. 97096945 for the JUMPMAN design (filed October 28, 2021); and U.S. Trademark Application Serial No.97096952 for the AIR JORDAN & Wings design (filed October 28, 2021).

[7] P. Kotler and K. Keller (2012), *Marketing Management*, at 263, 14th ed., Pearson.

[8] *See, e.g.*, K. Keller et al. (2015), *Strategic Brand Management,* 4th ed., Pearson; B. Loken and D. John (1993), "Diluting Brand Beliefs: When Do Brand Extensions Have a Negative Impact?" *Journal of Marketing*, 57, at 71-84.

[9] D. Pitta and L. Kastanis (1995), "Understanding brand equity for successful brand extension," *Journal of Consumer Marketing*, 12, at 51-64.

> managers on cost-saving tactics to increase competitiveness. One of the most important effects was to make brand extensions more compelling. Leveraging the brand equity of a successful brand promises to make introduction of a new entry less costly by trading on an established name. In essence, companies can be tantalized by the prospect of reaping a second dividend from their initial investment in advertising, research, and product development costs. As support for this alternative, studies of consumer brands in different markets found that successful brand extensions spent less on advertising than comparable new name products. Against the costs and considering the savings, brand extension may seem like the only alternative for some companies.
>
> *****
>
> History shows the potential of brand extension problems which range from outright failure to partial failures such as brand cannibalism. Instead of success, the failed extension might tarnish the image and reduce the market share of the parent product.

9. Thus, while extending a high-equity, well-regarded, high-awareness brand can greatly enhance the extension and reduce the cost of introducing a product into a new category, it also poses significant risks to the parent brand. According to Dr. Robert Vigil's report, StockX's business offers just benefits to Nike; however, he ignores the risks associated with the unapproved use of the Nike brand in a new category such as NFTs, especially given the high-risk associated with this particular category (as discussed further below).[10] Moreover, if the extension to a new category is controlled by another company, without authorization of the owner of the core brand, the parent company loses control over its main asset, that is, its brand.

10. Brand prominence is important when consumers evaluate products and brand extensions.[11] In particular, the more prominent the core name is when presenting the extension,

---

[10] Vigil Report at ¶ 58.

[11] *See*, *e.g.*, T. Han et al. (2010), "Signaling Status with Luxury Goods: The Role of Brand Prominence," *Journal of Marketing*, 74, at 15-30; S. Sood and K. Keller (2012), "The Effects of Brand Name Structure on Brand Extension Evaluations and Parent Brand Dilution," *Journal of Marketing Research*; I. Grime,

4

the stronger the link to the parent brand. A successful brand extension can serve to make a strong brand even stronger, but there is also risk to that name and its equity to the extent the extension is looked upon unfavorably or is otherwise unsuccessful.

11. StockX's unauthorized use of Nike's brand to experiment with a new product category presented exactly such a risk of unearned harm to Nike's brand and its goodwill. Throughout his report, Dr. Kominers acknowledges that StockX's Vault NFT program was an active experiment in "launching novel crypto marketplace products," subject to ongoing changes.[12] Dr. Kominers compares StockX's approach to the development and release of the Vault NFTs to that of a "startup" attempting to "*implement and test* novel trading protocols and designs" (emphasis added), and notes that certain of StockX's design decisions were "a highly sensible choice for *a novel NFT product for which the precise trading protocols were still to be worked out . . . .*" (emphasis added).[13] During his deposition, former StockX Director of Product, Blockchain and Category Expansion, Evan Thomas, confirmed Dr. Kominers's observation and explained that StockX utilized a product development approach referred to as "minimum viable product," or "MVP."[14] As Mr. Thomas further explained, for a product developed through this process:

> The customer service experience is adequate and viable to test the market and what their customer needs are, but the amount of

---

A. Diamantopoulos, and G. Smith (2002) "Consumer evaluations of extensions and their effects on the core brand: Key issues and research propositions," *European Journal of Marketing*, 36 (11- 12), at 1415-1438.

[12] Kominers Report at 35; *see also id.* at 41 ("Early on, StockX *experimented* with providing platform discounts and rewards to Vault NFT holders. . . . I also understand from counsel that StockX at one time experimented with giving Vault NFT holders $20 coupons for use on the StockX platform" (emphasis added).).

[13] *Id.* at 35-36.

[14] Evan Thomas Tr. at 33:2-34:8.

technology and process and architecture build into it is tried to be minimized. So it's a balancing act of the lowest amount of scope or effort to achieve the greatest return on investment for that scope and effort.[15]

12. As Mr. McNew explains, StockX's failure to deliver functionality and features was a result of and consistent with StockX's conscious decision to pursue an "MVP" product development and design approach, in which StockX imposed artificial resource and time constraints in a rush to get the Vault NFTs to market while the NFT market was still hot.[16] Mr. McNew concludes that StockX's "MVP" approach and rush to get the accused NFTs to market resulted in a shoddy product and poor consumer experience.[17] Because of the prominence of StockX's use of Nike's brand in connection with the accused NFTs, such an unfavorable consumer reception and response likely reflected poorly on Nike, resulting in harm to Nike's brand.

13. As shown by the survey that I conducted and described in my opening report, StockX's prominent use of multiple elements of the Nike brand in connection with the accused NFTs makes a significant impact on consumer perception. As seen below, the Nike brand is far more prominent in the accused Vault NFTs than the StockX brand, which was by design.[18]

---

[15] *Id.* at 34:1-34:8.

[16] McNew Report at 54-56; 62.

[17] *Id.*

[18] STX0099953 (January 3, 2022 internal StockX email from Chris Lubin to members of StockX's Vault NFT design and marketing team: "**Product image:** Love the way it's hero'd and its prominence overall.").



Figure 1, the Vault NFT image depicting a Nike SB Dunk Low Ben & Jerry's Chunky Dunky shoe.[19]

14. As the survey's results showed, respondents in the Test group who saw the above accused NFT sold by StockX that prominently features a Nike-branded shoe (including also the "Swoosh" logo) were significantly more likely to mistakenly believe that the NFT offer was made by Nike compared to the control image of a "StockX ticket," despite the fact that both groups saw the Nike brand repeatedly throughout the survey.

15. Dr. Kominers's conclusion that "digital brand" of the Vault NFTs is "unambiguously that of StockX itself" cannot be reconciled with StockX's prominent use of the Nike brand in connection with the accused NFTs and is directly negated by the results of the survey I conducted.

---

[19] https://stockx.com/chunky-dunky-vault-nft.

The Risks to Nike Associated with Nike-Based NFTs that Are Controlled by StockX

16. In my research[20] and teaching,[21] I have examined risky decision making by consumers, managers, gamblers, and investors. NFTs represent a category involving opportunities as well as substantial risks.[22] For example, a consumer who purchases a Nike shoe as an NFT at an unusually high price (relative to the shoe's retail price) is likely betting that the price of the shoe will be even higher.

17. When StockX launched its NFT business, it pointed out the following:

> Today, we're launching Vault NFTs, an experience where our customers can invest in NFTs tied to physical products and trade them instantly with lower fees. We believe that the physical items that trade on our platform are part of a new alternative asset class that can be uniquely associated with NFTs.[23]

On its website, StockX further explains:

> So if you're bullish on a product but do not want to take possession of it immediately, consider copping a Vault NFT. You take possession of the NFT immediately after the transaction is complete, meaning it is the fastest way to flip.[24]

18. While StockX highlights the potential profit and the ease of "flipping," buying NFTs may also lead to substantial losses. And given the newness of this investment category, the

---

[20] *See, e.g.*, I. Simonson et al. (2004), "Effect Propensity," *Organizational Behavior and Human Decision Processes*," 95, at 156-174.

[21] For example, in my Applied Behavioral Economics MBA course and the Judgment and Decision Making doctoral course.

[22] *See, e.g.*, D. Chalmers et al. (2022), "Beyond the bubble: Will NFTs and digital proof of ownership empower creative industry entrepreneurs?" *Journal of Business Venturing Insights*, 17, at 1-8.

[23] https://stockx.com/about/stockx-launches-vault-nfts/.

[24] https://stockx.com/lp/nfts (Visited most recently on April 22, 2023).

likelihood of misunderstanding the drivers and likelihoods of returns and potential unexpected events is likely to make NFT investments particularly risky.

19. As my survey's results showed, when an NFT bearing a prominent image of a Nike shoe is offered by StockX, it is the Nike brand that is more strongly associated with the NFT offer and is seen by most as its source. Accordingly, if that Nike-branded NFT turns out to be disappointing, or purchasers believe that the provided information was incomplete or even misleading and deceptive, Nike's image is likely to suffer and get diluted.[25] Thus, in this case, StockX has entered a new category, which may be successful or unsuccessful, but it is Nike (and other brands sold as NFTs) that has the most to lose.

Conclusion

20. Contrary to the reports of the StockX experts, its NFT venture poses a significant risk to Nike. In particular, (a) By entering the NFT market and prominently using the Nike brand and symbols, StockX effectively extended the Nike brand into a new category or asset class with no authorization from Nike, (b) It preempted Nike's plans to enter that category using its brand, and (c) Given that StockX and not Nike controls how Nike-based NFTs are presented and implemented, especially considering the nature of the category, the inherent uncertainty, and the risks to NFT investors, Nike and its brand associations are at the mercy of StockX.

Date : 6/2/2023

*I. Simonson*

Itamar Simonson, Ph.D.

---

[25] *See, e.g.*, S. Bedi and D. Reibstein (2020), "Measuring Trademark Dilution by Tarnishment," *Indiana Law Journal*, 95, at 683-733; D. John et al. (1998), "The Negative Impact of Extensions: Can Flagship Products Be Diluted?", *Journal of Marketing*, Grime62, at 19-32; J. Lei et al. (2008), "Negative Spillovers in Brand Portfolios: …, " *Journal of Marketing*, 72, at 111-123; I. Grime, A. Diamantopoulos, and G. Smith (2002) at 1415-1438.

# Documents Considered

**Production Documents**

STX0012731

STX0099953

**Expert Reports**

May 5, 2023 Opening Expert Report of Catherine Tucker, Ph.D.

May 5, 2023 Opening Expert Report of Itamar Simonson, Ph.D.

May 5, 2023 Opening Expert Report of Robert L. Vigil, Ph.D.

May 5, 2023 Opening Expert Report of Scott Duke Kominers, Ph.D.

May 5, 2023 Opening Expert Report of Steven S. McNew

**Articles**

B. Loken and D. John (1993), "Diluting Brand Beliefs: When Do Brand Extensions Have a Negative Impact?," *Journal of Marketing*, 57.

D. Chalmers et al. (2022), "Beyond the bubble: Will NFTs and digital proof of ownership empower creative industry entrepreneurs?" *Journal of Business Venturing Insights*, 17.

D. John et al. (1998), "The Negative Impact of Extensions: Can Flagship Products Be Diluted?", *Journal of Marketing*, 62.

D. Pitta and L. Kastanis (1995), "Understanding brand equity for successful brand extension," *Journal of Consumer Marketing*, 12.

I. Grime, A. Diamantopoulos and G. Smith (2002), "Consumer evaluations of extensions and their effects on the core brand: Key issues and research propositions," *European Journal of Marketing*, 36.

I. Simonson et al. (2004), "Effect Propensity," *Organizational Behavior and Human Decision Processes*," 95.

J. Lei et al. (2008), "Negative Spillovers in Brand Portfolios: …, " *Journal of Marketing*, 72.

K. Keller et al. (2015), *Strategic Brand Management*, 4th ed., Pearson.

P. Kotler and K. Keller (2012), *Marketing Management*, 14th ed., Pearson.

S. Bedi and D. Reibstein (2020), "Measuring Trademark Dilution by Tarnishment," *Indiana Law Journal*, 95.

S. Sood and K. Keller (2012), "The Effects of Brand Name Structure on Brand Extension Evaluations and Parent Brand Dilution," *Journal of Marketing Research*, 49.

T. Han et al. (2010), "Signaling Status with Luxury Goods: The Role of Brand Prominence," *Journal of Marketing*, 74.

**Deposition Transcripts and Exhibits**

January 18, 2023 Videotaped deposition of Evan Thomas

**Webpages**

Collect What's Next - https://stockx.com/lp/nfts.

StockX Launches Vault NFTs - https://stockx.com/about/stockx-launches-vault-nfts/.

StockX Vault NFT Nikes SB Dunk Low Ben & Jerry's Chunky Dunky – US M10 - https://stockx.com/chunky-dunky-vault-nft.

**Other**

U.S. Trademark Application Serial No. 97095855 for NIKE (filed October 27, 2021)

U.S. Trademark Application Serial No. 97096366 for NIKE & Swoosh design (filed October 27, 2021)

U.S. Trademark Application Serial No.97095944 for Swoosh design (filed October 27, 2021)

U.S. Trademark Application Serial No. 97096950 for JORDAN (filed October 28, 2021)

U.S. Trademark Application Serial No. 97096945 for the JUMPMAN design (filed October 28, 2021)

U.S. Trademark Application Serial No.97096952 for the AIR JORDAN & Wings design (filed October 28, 2021).