# EXHIBIT N

Page 1

1          UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF NEW YORK

3                  ---oOo---

4

5    NIKE, INC.,

6              Plaintiff,

7       vs.              CASE NO. 1:22-CV-00983-VEC

8    STOCKX LLC,

9              Defendant.

_____

10

11

12     VIDEOTAPED DEPOSITION OF ITAMAR SIMONSON, Ph.D

13            San Francisco, California

14             Tuesday, July 25, 2023

15

16

17

18

19

20

21

22

23   Stenographically Reported by:  Ashley Soevyn,
     CSR No. 12019

24   Job No. 6001088

25   Pages 1 - 284

Page 2

1                UNITED STATES DISTRICT COURT

2           FOR THE SOUTHERN DISTRICT OF NEW YORK

3                       ---oOo---

4

5   NIKE, INC.,

6                   Plaintiff,

7      vs.                 CASE NO. 1:22-CV-00983-VEC

8   STOCKX LLC,

9                   Defendant.

_____

10

11

12

13

14

15                   Videotaped Deposition of

16   ITAMAR SIMONSON, PH.D., taken on behalf of the

17   Defendant StockX, LLC,, Pursuant to Notice, at the

18   offices of Debevoise & Plimpton, 650 California

19   Street, San Francisco, California beginning at

20   9:07 a.m. and ending at 5:10 p.m. on Tuesday, July

21   25, 2023, before me, ASHLEY SOEVYN, Certified

22   Shorthand Reporter No. 12019.

23

24

25

```
                                        Page 40
 1              names."
 2              I'm not sure that captures everything,
 3   but that's one definition.
 4       Q    Are there other aspects to the definition
 5   of a brand extension that aren't included in that
 6   paragraph 7?
 7              MS. DUVDEVANI:  Objection.
 8              THE WITNESS:  You know, there -- you --
 9   you open a marketing textbook, you open a branding
10   textbook, you'll find different definitions.  I
11   don't think there is one -- one definition that
12   everyone agrees on.
13   BY MR. FORD:
14       Q    And your opinion is that the Vault NFTs
15   in this case constituted a brand extension of the
16   Nike brand; is that right?
17       A    Yes.  As far as Nike is concerned.  It
18   might have been brand extension for other brands as
19   well.
20       Q    Is whether the Vault NFTs are or are not
21   a brand extension relevant to consumers' likelihood
22   of confusion in this case?
23       A    I don't -- I haven't thought about that.
24   I don't know that it is.
25       Q    In addition in your first rebuttal
```

```
                                                    Page 41
 1    report, you mention risk of harm.  For example, in
 2    paragraph 11, right?
 3         A    Right.
 4         Q    You write:
 5              (As read):
 6                   "StockX's unauthorized use of Nike's
 7                   brand to experiment with a new product
 8                   category presented exactly such a risk
 9                   of unarmed harm to Nike's brand and its
10                   good will."
11              Correct?
12         A    Right.
13         Q    In this report or otherwise, do you have
14    any other evidence that there was, in fact, harm to
15    Nike as a result of StockX's Vault NFTs?
16         A    I was --
17              MS. DUVDEVANI:  Objection.
18              THE WITNESS:  Yeah.  I -- I was not asked
19    to opine to quantify any damages to Nike.
20              Having said that, the mere fact that Nike
21    is losing control of its brand, that's harm.  At
22    least, potential harm.  Let's -- and it's not --
23    it's easy -- let me put it this way:  It's easy to
24    think about scenarios whereby Nike's brand would
25    be -- would have been damaged -- and again, I'm not
```

Page 42

```
 1   opining on specific damages -- we're talking about a
 2   new category and new idea that StockX came up with.
 3              And we know that initially, the prices
 4   that people paid for those shoes, Nike shoes, were
 5   extremely high.  Now, suppose that a customer
 6   purchased an overpriced, let's call it Nike shoe,
 7   and that -- that person has a press conference and
 8   nowadays with social media, it's very easy to say,
 9   "I trusted Nike, and I was willing to go along with
10   this seemingly attractive offer of StockX to invest
11   in Nike -- in a NFT tied to a Nike shoe because I'm
12   a great believer in Nike.  It turns out I lost
13   $5,000," or whatever.
14              I don't think it's the kind of
15   association that Nike would like to have.
16   BY MR. FORD:
17       Q    Does Nike have the right to set prices
18   for its shoes on the secondary market?
19              MS. DUVDEVANI:  Objection.
20              THE WITNESS:  I -- I don't think so.
21   BY MR. FORD:
22       Q    So you're not offering an opinion on
23   whether there was, in fact, actual harm to Nike in
24   this case, correct?
25       A    As I said, I'm not the damages person
```

Page 43

```
 1    here.  Didn't quantify, didn't offer.  I'm saying
 2    the mere fact that you lose control over your brand,
 3    especially in the context of such a risky novel
 4    category, where the rules are not set yet, and hard
 5    to predict what will happen.  We know that NFTs have
 6    been on the decline.  They may go back up.  So there
 7    is real risk here.  And if -- if I'm the brand
 8    owner, I don't want to be at the mercy of someone
 9    else who is using my product in the context of this
10    novel, perhaps untested, business idea.
11        Q    You call this a novel business idea.  But
12    elsewhere in your first rebuttal report -- I believe
13    it's your first rebuttal report.  Yes.
14             Paragraph 6 on page 2, you note that Nike
15    had also entered the NFT space, correct?
16        A    Yes.
17        Q    And so it's your understanding that Nike
18    also sells NFTs to consumers?
19        A    Yes.  Nike decided for itself to sell
20    sneakers as NFT.  Obviously, Nike does not need to
21    make a big deal out of authenti -- authentication,
22    given it is the -- the company that makes those
23    shoes, and they can -- if they say 100 percent
24    authentic, they can -- they can say it with
25    100 percent certainty.
```

1    survey work you did in your -- that's set out in

2    your opening report?

3          A    I -- I think it is.  We already talked

4    about the other component, which turned out to be so

5    clear and one-sided that is that most people believe

6    it is Nike that makes the offer, rather than StockX.

7    That those -- that was another -- another main

8    component.  And I think, if I recall correctly,

9    Dr. Neal, in his rebuttal report, indeed identified

10   these two components.  I think -- I don't remember

11   the exact wording, had something to do with

12   prominence and something to do with the ratio of

13   mentions of Nike and StockX.

14         Q    Is the component of -- which you say

15   turned out to be so clear, that most people believe

16   it is Nike that makes the offer rather than StockX,

17   the likelihood of confusion component?

18         A    In this context, it is.

19         Q    What's the difference between a

20   likelihood of trademark confusion survey and a

21   traditional likelihood of trademark confusion

22   survey?

23              MS. DUVDEVANI:  Objection.

24              THE WITNESS:  I -- we just discussed the

25   likelihood of confusion survey I did here, plus the

Page 66

1    test of the impact of prominence.  Traditional

2    likelihood of -- of confusion survey, let's stay in

3    the domain of ketchup, I show you Heinz ketchup, and

4    I ask you which companies makes this product, other

5    products, affiliation, permission, all the sort of

6    normal questions.  Or if you decide to use a

7    different format, you may ask different questions.

8              That is what I would call traditional

9    likelihood of confusion survey where, when you

10   answer the questions, you see the allegedly

11   infringing mark, but they're not side by side

12   together.

13   BY MR. FORD:

14        Q    And is another word for that kind of

15   survey that you just described an Eveready survey?

16        A    It could be a Squirt.  There are

17   different methodologies.  Squirt would be a

18   different sort of survey that would also fall in the

19   category of traditional likelihood of confusion

20   surveys.  I've used, in recent times, a variation of

21   these two.  I think it's -- has been called aided

22   Eveready.  So there are other methods and other

23   modifications of the two classic formats.

24              But when I'm talking about traditional

25   likelihood of confusion survey, it's a situation

Page 67

```
 1   where you see one mark, let's say in the forward
 2   confusion case, the allegedly infringing mark, and
 3   you ask a series of questions.
 4             And it may -- what I just may not include
 5   Squirt, but -- but yeah, you get -- I think you get
 6   the idea.
 7        Q    I think you understood exactly where I
 8   was going to go.
 9             So is another word for the kind of survey
10   you're describing where the respondent only sees one
11   mark an Eveready survey?
12        A    You mean classic Eveready?  You see one
13   mark, yes.
14        Q    And is it your opinion, as I understand
15   it, that you did not do an Eveready survey in this
16   case?
17        A    I did a -- you can call it a modified
18   Eveready, given the context of this particular case.
19        Q    In what way did you modify the
20   traditional Eveready survey, given the context of
21   this case?
22        A    I showed stimuli that placed both marks
23   at issue together throughout the questionnaire.
24   Respondents saw the two above each question.
25             That's a modification.  It's just
```

Page 68

```
 1   reality.  That's the marketplace.  That's how StockX
 2   offered its NFTs.
 3        Q    And that would be a modification to the
 4   nature of the stimulus; is that right?
 5        A    That would be a modification to the
 6   stimuli.  It also has implications for the questions
 7   and how you analyze the answers.  And I think I
 8   discussed it in my report.
 9        Q    Yeah.  And we'll get to that.
10             Did you modify the questions you asked in
11   any way from the traditional Eveready survey?
12        A    I think some minor wording changes.  We
13   already talked about the product/NFT.  It might have
14   been different.  But I think Eveready, as well as
15   Squirt, have been modified in all kinds of ways
16   depending on a particular case and context.
17        Q    And I'm -- I just want to focus on this
18   case and this context.
19             Other than modifying the questions to say
20   product/NFTs, did you modify the traditional
21   Eveready questions in any other way in this case?
22        A    As I explained -- and you said we'll talk
23   about it later, but I have to explain it now.
24             The meaning of the later questions that
25   are following the -- were following the Eveready
```

1   proper universe in this case is all prospective

2   customers of anything StockX offers or just

3   prospective customers of the Vault NFT product?

4        A    I focused on the Vault NFT.

5        Q    So it's your opinion that the proper

6   universe in this case is limited to prospective

7   customers of the Vault NFT product?

8             MS. DUVDEVANI:  Objection.

9             THE WITNESS:  People whose

10  characteristics are such that they're more likely

11  than most people to consider buying an NFT offered

12  by StockX.

13  BY MR. FORD:

14       Q    Any NFT?

15       A    Especially sneakers.

16       Q    Especially an NFT associated with

17  sneakers; is that what you're saying?

18       A    I think that -- well, I also included

19  people -- I said people who collect sneakers, they

20  may be interested in buying a -- an NFT that

21  involved a sneaker which could serve as part of

22  their collection even if they don't know yet exactly

23  what they'll do.  So people who are into crypto

24  currency, apparently these are people who are into

25  those kind of investments.

Page 163

```
 1   and were part of the data that you relied on in this
 2   opinion -- or in your opinion did not select
 3   number 2, investing in NFT?
 4        A    I -- I don't recall.
 5        Q    So you -- you represented that you
 6   reviewed Dr. Neal's expert report in this case --
 7   right? -- his rebuttal expert report.
 8        A    I did.
 9        Q    And do you recall that Dr. Neal
10   calculated, based on your data, that 52.2 percent of
11   your respondents did not select number 2?
12        A    Yes.
13        Q    Do you have any reason to disagree or
14   contest Dr. Neal's findings there?
15        A    No.
16        Q    Okay.  You didn't ask your respondents
17   anything specific to buying collectible sneakers in
18   particular, correct?
19             MS. DUVDEVANI:  Objection.
20             THE WITNESS:  I -- I did not --
21   BY MR. FORD:
22        Q    Let -- let me withdraw, and I'll ask the
23   question a different way.
24             Based on your screening questions, are
25   you able to determine whether any of your survey
```

Page 164

1    respondents was specifically interested in buying

2    collectible sneakers?

3        A    Not -- not with the certainty.  As I

4    said, I'm looking for all kinds of indicators that

5    make it more likely.  And I explain in my reports

6    why defining it narrowly based on purchases of NFTs

7    tied to sneakers was a mistake.  And you -- I'm sure

8    you read all the problems that arose.

9            And I did not even talk about the fact

10   that I think Dr. Neal found extremely high

11   percentage of people who said that they purchased

12   NFT and that they collect sneakers.  I mean, in any

13   case -- and -- and the fact that he, in his survey,

14   I think, something like 7 percent said that they

15   either purchased NFTs linked to sneakers or expect

16   to.  So if -- if I'm 7 percent, yet he's concerned

17   about the fact that, in my survey, 52 percent said

18   they didn't -- I mean, I -- anyway.  It's going

19   beyond your question.

20           But, yeah.  That's -- that's -- you're

21   right.  You -- it's not easy to define here the

22   exact universe.  And I think, as I explained in my

23   reports, realistically, consumers even who are

24   inclined to start collecting sneakers or invest in

25   something like these NFTs, they might know right

```
                                            Page 179
 1   BY MR. FORD:
 2        Q    Okay.  The -- your conclusion that the
 3   data here was not -- just going to make sure
 4   "informative" was the word that you used.  Did you
 5   reach that conclusion before looking at the
 6   responses that your respondents gave?
 7        A    Yes.
 8        Q    Did you, in fact, look at any of the
 9   responses that your respondents gave?
10        A    I -- I don't recall specifically that --
11   I -- I -- I probably did.  But I -- I don't remember
12   exactly what I looked at and whether any conclusions
13   or any findings seemed relevant.
14        Q    Did reviewing the data in any way affect
15   the opinions that you're offering in this case?
16        A    Absolutely not.
17        Q    Great.
18             Who coded your data?
19        A    There -- there is a firm working with
20   Target Research Group.  These are people who
21   specialize in coding.  And they are blind to both
22   the purpose of the survey and the identity of its
23   sponsor.  They just look at the responses and code
24   the verbatims.
25        Q    Did you personally review their coding?
```

```
                                        Page 263
 1    Mary Kay report.

 2              Are you with me?

 3        A    I'm with you.

 4        Q    Okay.  The first sentence here write --

 5    you write:

 6              (As read):

 7                   "As explained above, considering that

 8                   most consumers are not legal experts

 9                   and cannot be expected to be familiar

10                   with the first sale doctrine, it is

11                   doubtful that any consumer survey would

12                   be capable of providing potentially

13                   pertinent information."

14              Did I read that correctly?

15        A    You did.

16        Q    Is it still your understanding today that

17    most consumers are not legal experts?

18        A    It -- it is.

19        Q    Is it still your understanding today that

20    most consumers cannot be expected to be familiar

21    with the first sale doctrine?

22        A    Yes.

23        Q    Let's turn to page -- sorry -- paragraph

24    34.

25              Are you with me?
```

1           THE WITNESS:  As you recall, in my

2      report, I emphasized the question about who -- who

3      makes the offer -- the offer.  You remember the page

4      with StockX NFT -- Vault NFT, who makes the offer.

5      That was the question that I most relied on.  And

6      that was the -- the only question, really, that I

7      relied on with respect to the question of origin.

8      And I thought that that's completely different.

9      Obviously, it's not the affiliation question.

10          And I think I made that point in the

11     report where it said given that the names Nike and

12     StockX are on every page, you'd expect most people

13     to mention them sooner or later.

14     BY MR. FORD:

15          Q    Did you consider showing your survey

16     respondents the first sale doctrine?

17          A    No.

18          Q    Did you consider explaining anything

19     about the first sale doctrine to your survey

20     respondents?

21          A    No.  It would be completely improper

22     in -- in the context of this case.

23          MR. FORD:  All right.  Let's go off the

24     record.  I think I'm probably either done or almost

25     done, but I just want to make sure.