# EXHIBIT T

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NIKE, INC., | ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 22-CV-983-VEC |
| | ) |
| STOCKX LLC, | ) |
| | ) |
| *Defendant*. | ) |
| | ) |
| | ) |

**Expert Rebuttal Report of David Neal, Ph.D.,**

**in Response to Expert Report of Dr. Itamar Simonson**

1

**TABLE OF CONTENTS**

1.  QUALIFICATIONS ................................................................................................ 3

2.  BACKGROUND AND ASSIGNMENT ................................................................. 5

3.  SUMMARY OF OPINIONS REGARDING DR. SIMONSON'S SURVEYS ............ 12

4.  OPINIONS REGARDING DR. SIMONSON'S SURVEYS ..................................... 17

5.  INTERIM SUMMARY ............................................................................... 56

6.  THE NEAL SURVEY……………………………………………………………….61

7.  RECRUITMENT AND SAMPLING FOR NEAL SURVEY……………………….71

8.  DETAILED NEAL SURVEY RESULTS……………………………………………...76

9.  SUMMARY OF CONFUSION AS TO SOURCE, AFFILIATION, OR APPROVAL

    RESULTS IN NEAL SURVEY……………………………………………………….95

10. OTHER INFORMATION/MATERIALS REVIEWED…………………………………98

11. EXHIBIT A: CURRICULUM VITAE - DAVID NEAL, PH.D

12. EXHIBIT B: NEAL SURVEY DATA AND VERBATIMS

13. EXHIBIT C: NEAL SURVEY AND CODEBOOK

14. EXHIBIT D: NEAL SURVEY TERMINATION REPORT

15. EXHIBIT E: SIMONSON MAIN SURVEY DATA (EXHIBIT H TO DR.

    SIMONSON'S REPORT) WITH NEAL CODING

I, Dr. David T. Neal, hereby declare as follows:

**1. Qualifications**

1.1.    I am the Managing Partner of Catalyst Behavioral Sciences LLC, a research consulting firm specializing in the analysis of human decision making and consumer behavior, which includes extensive work in connection with consumer surveys. I also have a research affiliation with Duke University's Center for Advanced Hindsight. I have been asked to provide an expert report in the matter of NIKE, INC., (hereinafter, "Plaintiff" or "Nike") v. STOCKX LLC, (hereinafter, "Defendant" or "StockX") in the United States District Court for the Southern District of New York.

1.2.    At Catalyst Behavioral Sciences, I provide services for clients across a range of industries. Among others in the corporate sector, I act or have acted as a consultant regarding surveys and consumer behavior to Bayer, Microsoft, Procter & Gamble, Intel, and Unilever. Among others in the public and non-profit sector, I act or have acted as a consultant regarding surveys and health behavior to the World Bank, The Bill and Melinda Gates Foundation, The Centers for Disease Control and Prevention (CDC), USAID, and the Surgeon General of the U.S. Army.

1.3.    I have around twenty years' experience conducting consumer and other scientific surveys. I have been retained as an expert in a variety of trademark, patent, and false advertising matters. I have testified as a survey expert in federal court, the National Advertising Division (NAD), and the International Trade Commission (ITC) on multiple occasions. My Curriculum Vitae, attached

as **Exhibit A**, summarizes my education, publications, and experience spanning both academic and commercial marketing research. My Curriculum Vitae also lists all cases in which, during the previous four years, I testified as an expert in a deposition or at trial.

1.4.    I hold a Ph.D. in psychology from the University of Melbourne, Australia, awarded in 2005, and completed my post-doctoral training at Duke University, working in the psychology department and Fuqua School of Business. At Duke, I served as the Director of the Interdisciplinary Social Science Research Laboratories. I was then an assistant professor of psychology at the University of Southern California (USC). I have published extensively in the areas of consumer behavior and decision-making and have taught advanced research methods (including survey design), consumer behavior, and marketing courses at Duke University and USC. In 2012, I was the joint recipient (with Professor Wendy Wood) of the Park Outstanding Contributor Award presented by the Society for Consumer Psychology. This award recognizes the best peer reviewed paper published each year in the Journal of Consumer Psychology. I also have published specifically on the topic of surveys used in litigation.[1]

1.5.    For the preparation of this report, I am being compensated at my customary rate of $585 per hour by Defendant. Research assistants under my supervision are being compensated at their customary rates of $150 and $110 per hour. Compensation is not dependent in any way on the results of my work, my

---

[1] David Neal, "Psychological Considerations in Designing Trademark and False Advertising Survey Questionnaires" in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, 273-290 (Shari S. Diamond & Jerre B. Swann, eds. 2022).

opinions, or the outcome of this matter.

## 2. Background and Assignment

2.1.    I have reviewed Plaintiff's First Amended Complaint and Defendant's Answer to Plaintiff's First Amended Complaint. Based upon my review of these documents, I understand that:

    2.1.1.    First, Plaintiff owns federal trademark registrations[2] including AIR JORDAN,[3] the Air Jordan & Wings Design,[4] DUNK,[5] JUMPMAN,[6] the JumpMan Design,[7,] NIKE,[8] NIKE & the Swoosh Design,[9] NIKE AIR VAPORMAX,[10] and the Swoosh Design[11] (collectively, Nike's Asserted Marks[12]).

    2.1.2.    Second, Plaintiff alleges "StockX has knowingly used and continues to use in commerce, without Nike's permission or authorization, Nike's Asserted Marks, and/or confusingly similar marks, in connection with the sale, distribution, and advertising of its Vault NFTs."[13] Specifically, Plaintiff alleges that "StockX's use of Nike's Asserted Marks is likely to confuse, mislead, or deceive potential consumers, purchasers, and the general purchasing public as to the

---

[2] Plaintiff's First Amended Complaint, ¶ 31.
[3] Reg. No. 1,370,283.
[4] Reg. No. 3,725,535.
[5] Reg. No. 3,780,236.
[6] Reg. No. 3,627,820.
[7] Reg. No. 1,558,100, Reg. No. 1,742,019.
[8] Reg. No. 978,952, Reg. No. 1,214,930, , Reg. No. 1,243,248, Reg. No 6,124,779.
[9] Reg. No. 1,238,853, Reg. No. 1,325,938.
[10] Reg. No. 5,286,596.
[11] Reg. No. 977,190, Reg. No. 1,264,529, Reg. No. 1,323,343, Reg. No. 5,794,674.
[12] Plaintiff's First Amended Complaint, ¶ 31.
[13] Plaintiff's First Amended Complaint, ¶ 125.

source, origin, sponsorship, or affiliation of the Vault NFTs with Nike, and is likely to cause such people to erroneously believe that StockX's Vault NFTs have been authorized, sponsored, approved, endorsed, or licensed by Nike or that StockX is in some way affiliated with Nike."[14]

2.1.3.    Third, I understand that for years prior to Nike's filing of this lawsuit, consumers used StockX's platform to resell Nike shoes, and that Nike did not (and has not) complained about such sales concerning products featuring its marks. Nike's First Amended Complaint makes explicit that such sales of physical products with a receipt do not infringe any of Nike's trademark rights: "when a consumer purchases Nike shoes from the StockX marketplace, the consumer receives a paper receipt from StockX in the package. Unlike a Vault NFT, upon information and belief, this paper receipt prominently uses StockX's own mark and only uses the Nike name in connection with the purchased shoe, yet somehow still manages to function as a receipt for that Nike shoe . . ."[15]

2.1.4.    Finally, Defendant denies the likelihood of confusion allegations documented in paragraph 2.1.2 in connection with StockX's Nike-branded Vault NFTs[16] and also asserts that "Nike's claims are barred, in whole or in part, as the acts of StockX alleged in the

---

[14] Plaintiff's First Amended Complaint, ¶ 127.
[15] Plaintiff's First Amended Complaint, ¶ 80.
[16] Defendant's Answer to Plaintiff's First Amended Complaint, page 11.

Amended Complaint constitute descriptive fair use and/or nominative fair use,"[17] and because "the first sale doctrine permit[s] purchasers of lawfully trademarked goods to display, offer, and sell those goods under their original trademark."[18]

2.2.  In connection with this matter, I was asked by Defendant's Counsel to conduct a scientific review of two surveys conducted by Dr. Itamar Simonson, as documented in his Expert Report dated May 5, 2023.[19] I also designed and executed my own survey (hereafter, "the Neal Survey"), to correct for flaws in Dr. Simonson's surveys and to determine whether Defendant's alleged use of Plaintiff's marks causes a likelihood of confusion with Plaintiff.

2.3.  For reasons set out in more detail below, having reviewed Dr. Simonson's two surveys and his report, and having reanalyzed Dr. Simonson's underlying data, it is my opinion that the conclusions Dr. Simonson drew regarding likelihood of confusion and disclaimer effectiveness are not scientifically valid or reliable.

2.4.  By way of brief summary, Dr. Simonson conducted two likelihood of confusion surveys with the stated aim of determining "whether StockX's use of several of Nike's trademarks in connection with the sale of StockX's 'Vault NFTs' is likely to cause confusion among an appreciable number of relevant consumers."[20] Specifically, in his "Main Survey,"[21] Dr. Simonson claims to have "tested the likelihood of confusion between the Vault NFTs and Nike as a result of StockX's

---

[17] Defendant's Answer to Plaintiff's First Amended Complaint, page 38, ¶ 2.
[18] Defendant's Answer to Plaintiff's First Amended Complaint, page 38, ¶ 3.
[19] Hereafter, "Expert Report of Dr. Itamar Simonson" or "Simonson Report."
[20] Expert Report of Dr. Itamar Simonson, ¶ 13.
[21] Expert Report of Dr. Itamar Simonson, ¶ 14. Hereafter, "Simonson Main Survey."

prominent use of Nike's trademarks in connection with the Vault NFTs."[22] In his

"Companion Survey,"[23] he used the same survey design as his Main Survey

but "omitted disclaimers present on the StockX Vault NFT website (that were

shown in the Main Survey) to test the effectiveness of such disclaimers in

reducing consumer confusion."[24]

2.5.    I primarily discuss Dr. Simonson's Main Survey because (a) this survey forms

the basis of his opinions regarding likelihood of confusion, and (b) Dr.

Simonson concedes that his "Companion Survey" did not include any condition

in which he tested Defendant's website as it actually appears in the

marketplace (i.e., he omitted the disclaimers that appear on Defendant's

website in *both* his Test and Control groups). Because of the second factor, Dr.

Simonson cannot draw any conclusions regarding likelihood of confusion or the

effectiveness of the disclaimers from the Companion Survey, except by

comparing its results to the Main Survey.[25] Moreover, the flaws I identify

regarding the Main Survey generally also apply to the Companion Survey, as

the studies were identical in most regards.

2.6.    In his Main Survey, Dr. Simonson surveyed what he describes as "412

prospective purchasers of products/services/NFTs (non-fungible tokens)

offered on the StockX platform (found at www.stockx.com)."[26] Respondents in

---

[22] Expert Report of Dr. Itamar Simonson, ¶ 14.
[23] Expert Report of Dr. Itamar Simonson, ¶ 14. Hereafter, "Simonson Companion Survey."
[24] Expert Report of Dr. Itamar Simonson, ¶ 14.
[25] As I explain in the section entitled "Fatal Flaw 7" below, this comparison of results across studies is itself not a scientifically valid comparison since it occurred in the absence of a random assignment.
[26] Expert Report of Dr. Itamar Simonson, ¶ 14.

his survey were randomly assigned either to a Test group or a Control group. Respondents in both groups were first presented with an image, invented by Dr. Simonson and that appears nowhere on the StockX website. The image includes large text at the top stating, "[b]elow are some of the *products* StockX offers on its website," (emphasis added), and shows a small subset of products that StockX offers on its website, including four pairs of sneakers, a watch, a trading card, and an action figure (see below.)[27] The image does not include any NFTs. Of the four pairs of sneakers included in the image, one is Nike's SB Dunk Low Ben & Jerry's Chunky Dunky product; this product was always shown in the top left position of the display, as in the image shown below.

**(QUESTION 220)**
*{PROGRAMMING NOTE: BOTH CELLS WILL SEE FIRST THE PRODUCT LINEUP. SHOW FOR 15 SECONDS BEFORE ALLOWING THE RESPONDENT TO CONTINUE.}*
Shown below are examples of products offered by StockX as NFTs or for personal use.  Please review each product and its name before proceeding.  Please evaluate these products carefully as you would if you were actually considering them as a NFT.

**{PROGRAMMING: SHOW THE PRODUCT LINEUP (15 SECONDS)}**

Below are some of the products StockX offers on its website



---

[27] Expert Report of Dr. Itamar Simonson, Exhibit F, page 5.

2.7.   Next, respondents in the "Test group saw a Vault NFT with an image of the
       Nike branded shoe as sold by StockX whereas those in the Control group saw
       a Vault NFT with an image of a StockX-branded 'ticket.'"[28] Thus, the only
       difference between the Test and Control groups was, according to Dr.
       Simonson, "the prominence of the image of the Nike branded shoe."[29] The
       "Nike-branded shoe" displayed was the same Nike SB Dunk Low Ben & Jerry's
       Chunky Dunky that appeared in the upper left corner of Dr. Simonson's image
       of sample products shown above.

2.8.   Finally, respondents answered Eveready-style survey questions that addressed
       whether Plaintiff was perceived as (a) the source of the Vault NFT, or (b)
       having "a business affiliation or connection" with whoever offers the Vault NFT,
       or (c) giving "permission or approval" to whoever offers the Vault NFT.

2.9.   Dr. Simonson reported two principal findings from his Main Survey. First, he
       claims that "in the Main Survey, 72.7% of the Test group respondents named
       Nike as the company that offered the displayed Vault NFT, compared to 56.2%
       in the Control group (a difference of 16.5%)."[30] Second, he "compare[d] the
       ratio of respondents naming Nike and StockX in the Test group versus the
       Control group as the company that offers the Vault NFT" and found that
       "relative to the Control group, the Nike/StockX ratio was 23% higher in the Test
       group."[31]

---

[28] Expert Report of Dr. Itamar Simonson, ¶ 15.
[29] Expert Report of Dr. Itamar Simonson, ¶ 15.
[30] Expert Report of Dr. Itamar Simonson, ¶ 20.
[31] Expert Report of Dr. Itamar Simonson, ¶ 20.

2.10.  On the basis of these purported results, Dr. Simonson concluded that "these findings are consistent with the conclusion that a change in the prominence of the image of the Nike branded shoe on the Vault NFT (while keeping the companies' names prominent) causes a substantial increase in consumers' perceptions that it is Nike that offers the Vault NFT."[32]

2.11.  Dr. Simonson's Companion Survey was identical to his Main Survey with the only difference "that the Companion Survey omitted the StockX disclosures/disclaimers that consumers can see if they choose to click on the presented thumbnail (underneath the image) and by reviewing the 'Fine print.'"[33] Dr. Simonson argued that "a comparison of the results of the Companion Survey with the Main Survey assesses whether the StockX disclosures/disclaimers are effective in decreasing the mistaken belief that Nike is the company that offers the Vault NFTs."[34] Dr. Simonson concluded that the results of his Companion Survey are "similar to those of Main Survey"[35] and that, based on these results, "we can conclude that the StockX disclosures are ineffective at reducing consumer confusion regarding the source of the Vault NFTs."[36]

2.12.  By way of summary, of the two surveys reported, one is purported by Dr. Simonson to provide evidence for a likelihood of confusion (i.e., the "Simonson Main Survey," with a claimed net source confusion level of 16.5%), and one is

---

[32] Expert Report of Dr. Itamar Simonson, ¶ 20.
[33] Expert Report of Dr. Itamar Simonson, ¶ 17.
[34] Expert Report of Dr. Itamar Simonson, ¶ 17.
[35] Expert Report of Dr. Itamar Simonson, ¶ 22.
[36] Expert Report of Dr. Itamar Simonson, ¶ 22.

purported by Dr. Simonson to provide evidence for the ineffectiveness of StockX disclosures.

### 3. Summary of Opinions Regarding Dr. Simonson's Surveys

3.1. I note at the outset that I respect Dr. Simonson. However, having reviewed his two surveys, his report, and having reanalyzed his underlying data, it is my considered opinion that the conclusions Dr. Simonson drew regarding likelihood of confusion and disclaimer effectiveness are not scientifically valid or reliable. I base that opinion on (1) the existence of multiple design flaws in his surveys that introduced systematic bias in favor of Plaintiff, and (2) the fact that when his Main Survey is properly analyzed using standard Eveready methods, the results <u>do not</u> show a likelihood of confusion with Plaintiff caused by the appearance of Plaintiff's marks. Thus, despite its flaws, Dr. Simonson's Main Survey does not support Plaintiff's confusion allegations.

3.2. Below, I summarize the nine flaws. All of the flaws I identify are "fatal" in my judgment, i.e., so serious that, each flaw taken alone, renders Dr. Simonson's Main Survey scientifically unreliable to validly infer whether Defendant's alleged use of Plaintiff's marks causes a likelihood of confusion.[37] In Section 4, I elaborate on the bases for my opinions regarding each flaw.

3.3. In Section 6, I then describe and document results for my own likelihood of confusion survey, using the Eveready format, which eliminated the flaws in Dr.

---

[37] Or, in the case of his Companion Survey, infer that Defendant's disclosures are ineffective at correcting confusion. To be precise, Fatal Flaw 7 applies only to the Companion Survey. The remaining Fatal Flaws (Fatal Flaws 1-6 and 8-9, apply generally to both the Main Survey and the Companion Survey.

Simonson's approach.

3.4.  As a threshold matter, I acknowledge that the Eveready format has clear limitations in the context of a case involving the resale of trademarked goods, where doctrines like first sale and fair use may apply. To illustrate this point, it would be factually accurate for a survey respondent to indicate that Nike "offers" the Nike sneakers depicted in the stimuli that both Dr. Simonson and I used – as Nike sells these sneakers in the primary market. Such a response would not indicate confusion, and the classic Eveready questions do not capture that nuance of context. However, given that Eveready is the standard that Dr. Simonson chose to adopt, I elected to adhere to that overall model and to conduct an Eveready survey without the fatal flaws of Dr. Simonson's surveys.

3.5.  Correcting for the errors in Dr. Simonson's surveys, my survey shows that, even if one were to use the Eveready format, there is no likelihood of confusion stemming from Defendant's alleged use of Plaintiff's marks in connection with Defendant's Vault NFTs.

3.6.  The primary design flaws I identified in Dr. Simonson's surveys are as follows:

3.7.  **<u>Fatal Flaw 1</u>: Dr. Simonson failed to survey the proper universe. The majority of his Main Survey sample (i.e., 52.2%, or 215 out of 412) are individuals who confirmed they would not consider buying an NFT (an important component of the product at issue, and further, the component on which Nike focuses for its infringement claims). Accordingly, his**

13

**sample is overwhelmingly overinclusive of consumers whose state of mind is not relevant to the particular legal issue at hand (i.e., non-NFT purchasers). The remaining sample size is too small to draw reliable inferences and may include no likely purchasers of the type of NFT at issue – specifically, NFTs corresponding to a physical pair of sneakers.**

3.8.  **<u>Fatal Flaw 2</u>: Dr. Simonson's critical source confusion question (Q340) is leading and ambiguous in multiple ways that introduced bias in favor of Plaintiff and against Defendant. His question is especially leading because he taught respondents to associate the word "product" with physical products and specifically, the very same Nike SB Dunk Low Ben & Jerry's Chunky Dunky sneakers that Dr. Simonson includes in his Test group images. For example, question 220 of Dr. Simonson's survey provides a fictitious line-up of "products StockX offers," including four pairs of sneakers (among them, the Nike SB Dunk Low Ben & Jerry's Chunky Dunky sneakers) and no NFTs. In addition, question 225 for the Test group, which preceded the critical source confusion question (Q340), expressly directed respondents to "consider now one of the shoes" they just saw. Dr. Simonson's questionnaire also primed respondents to understand NFTs as products separate and apart from any underlying physical assets, through the language of his screening questions.**

3.9.  **<u>Fatal Flaw 3</u>: Before showing the stimuli, Dr. Simonson provided substantively different instructions for the Test and Control groups – with**

key distinctions likely to bias net confusion results in favor of Plaintiff (Q225). Dr. Simonson's use of varying instruction language deviates from well-established scientific methods and introduces a variable for which Dr. Simonson has not controlled.

3.10. **Fatal Flaw 4**: Dr. Simonson included standard Eveready questions (regarding affiliation/connection/permission/approval etc.) but then improperly ignored the data they generated. After re-analyzing his Main Survey data using the standard approach used in Eveready surveys, his data shows no likelihood of confusion. Dr. Simonson's justification for abandoning the standard approach is illogical, and deviates from well-established scientific methods.

3.11. **Fatal Flaw 5**: Dr. Simonson failed to replicate reality by inventing a fictitious "product line up" stimulus that no consumer has ever seen. This fictitious stimulus was problematic because it (a) deviates from marketplace reality, (b) taught respondents to associate the term "products" with "shoes" (thereby contaminating subsequent key questions, which use the word "product"), (c) improperly primed respondents to focus on physical shoes, and (d) did not control for order bias, since Dr. Simonson failed to randomize the order of the images in the stimulus.

3.12. **Fatal Flaw 6**: Dr. Simonson chose a highly atypical example of a Vault NFT in his Main Survey, i.e., the "Nike SB Dunk Low Ben & Jerry's Chunky Dunky." This stimulus is materially different from all other Vault

15

NFTs on multiple dimensions: (a) it uses outdated disclosure language (i.e., language used from January 18, 2022 to on or about February 14, 2022) whereas all other NFTs on StockX use updated language with substantially expanded disclosures, and (b) it is the only StockX Vault NFT to legibly show the Nike word mark on the product itself. Both of these differences logically would affect (and potentially increase) confusion. In addition, this stimulus references a third brand – Ben & Jerry's – which unnecessarily complicates the analysis of questions 340-377 for respondents and may encourage respondents to merely list, or "read back", all brand names they see. Thus, setting aside all other flaws, Dr. Simonson cannot generalize his purported confusion results in the Main Survey to all of the other Vault NFTs, during the entire period for which they have been offered. Accordingly, any informative value of Dr. Simonson's survey is limited to the Vault NFT for the Nike SB Dunk Low Ben & Jerry's Chunky Dunky, and Dr. Simonson's survey is otherwise fatally flawed with respect to the remaining Vault NFTs.

3.13. **Fatal Flaw 7**: Dr. Simonson draws a scientifically improper conclusion from the results of his Companion Survey—i.e., that "the StockX disclosures are ineffective at reducing consumer confusion regarding the source of the Vault NFTs."[38] This conclusion is invalid because (a) he did not conduct a randomized experiment in which consumers were randomly assigned to Test versus Control groups that vary, respectively,

---

[38] Expert Report of Dr. Itamar Simonson, ¶ 22.

in whether the StockX disclosures were present vs. absent,[39] and (b) the disclosure presented in the Main Survey was not the one typically used by StockX (see Flaw 6).

3.14. **Fatal Flaw 8: Dr. Simonson's Control stimulus removes far more than just the allegedly infringing elements, and increases the prominence of the StockX trademark, in a manner likely to suppress Control group confusion and thereby skew net results in Plaintiff's favor.**

3.15. **Fatal Flaw 9: Dr. Simonson included a follow-up question regarding "other products and services," (Q355). However, he then improperly ignored the data from this question. Once the data from this question is analyzed using the standard method used in Eveready surveys, the results show no likelihood of confusion even if one (improperly) chooses to consider only source confusion.**

3.16. In the following Section, I elaborate on each of these fatal flaws and provide the scientific bases for my opinions.

## 4. Opinions Regarding Dr. Simonson's Surveys

4.1. Dr. Simonson's surveys ultimately fail because of nine fatal flaws, described below.

4.2. **Fatal Flaw 1: Dr. Simonson failed to survey the proper universe. The majority of his Main Survey sample (i.e., 52.2%, or 215 out of 412 respondents) are individuals who confirmed they would not consider**

---

[39] As explained under Fatal Flaw 6, Dr. Simonson instead attempts to compare findings from his Main and Companion Surveys to draw his conclusion that "the StockX disclosures are ineffective at reducing consumer confusion regarding the source of the Vault NFTs." Expert Report of Dr. Itamar Simonson, ¶ 22.

**buying an NFT (an important component of the product at issue, and further, the component on which Nike focuses its infringement claims). Accordingly, his sample is overwhelmingly overinclusive of consumers whose state of mind is not relevant to the particular legal issue at hand (i.e., non-NFT purchasers). The remaining sample size is too small to draw reliable inferences and may include no likely purchasers of the type of NFT at issue – specifically, NFTs corresponding to a physical pair of sneakers.**

4.2.1.   The proper universe for a "forward" (as opposed to "reverse")[40] likelihood of confusion survey includes likely purchasers of the junior user's products or services. Given Plaintiff's claim that Defendant's use of Nike marks in connection with StockX's Vault NFTs is likely to cause confusion with Nike (i.e., the senior user),[41] the appropriate universe is likely purchasers of Defendant's (i.e., the junior user) products/services[42]—that is, likely purchasers of the accused NFTs.

4.2.2.   As Plaintiff puts it, "Vault NFTs are digital tokens that represent ownership of physical items."[43] As Defendant states, "StockX Vault

---

[40] The relevant universe for testing "forward" confusion is conventionally the junior user's potential customers given that forward confusion occurs when consumers believe that the junior user's products or services are put out by, sponsored by, or affiliated with the senior user. The relevant universe for testing "reverse" confusion is conventionally the senior user's potential customers given that reverse confusion occurs when consumers believe that the senior user's products or services are put out by, sponsored by, or affiliated with the junior user. *See* William G. Barber and Giulio E. Yaquinto. "The Universe" in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, 31-56, 32-33, 35 (Shari S. Diamond & Jerre B. Swann, eds. 2022).

[41] Plaintiff's First Amended Complaint, ¶ 127.

[42] See William G. Barber and Giulio E. Yaquinto. "The Universe" in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, 31-56, 33 (Shari S. Diamond & Jerre B. Swann, eds. 2022).

[43] StockX Help Center - What are Vault NFTs? - https://stockx.com/help/articles/What-are-Vault-NFTs, accessed May 9, 2023.

NFTs are one of the first applications where the NFTs are tied one-to-one to a physical product."[44] Thus, I understand that both Plaintiff and Defendant agree that purchasing the accused items involves purchasing an NFT.

4.2.3.    Deviating from this universe, Dr. Simonson's surveys used screening criteria that improperly included purchasers who confirmed they would not consider buying NFTs. That is, respondents could qualify to participate in Dr. Simonson's survey even if they did not indicate they would consider buying NFTs, but merely indicated they would consider "[b]uying [c]ollectibles (such as watches, trading cards, luxury handbags, sneakers or art)," or "[i]nvesting in [c]rypto [c]urrency (e.g., buying payment cryptocurrencies such as Bitcoin, tokens or other stablecoins)," (Q75). To help illustrate the over-inclusiveness of Dr. Simonson's survey universe, based on the criteria he applies, a respondent could be eligible to take the survey if they purchased an ordinary pair of sneakers (for example, to mow their lawn), and also happened to buy collectible vintage teacups. Such a respondent clearly cannot plausibly be construed as a likely purchaser of Defendant's Vault NFTs.

4.2.4.    The inclusion of non-NFT purchasers among respondents renders Dr. Simonson's surveys overinclusive of consumers whose state of mind is irrelevant to the particular legal issue at hand. In fact, in Dr. Simonson's

---

[44] Defendant's Answer to Plaintiff's First Amended Complaint, page 4-5.

Case 1:22-cv-00983-VEC     Document 246-20     Filed 07/03/24     Page 21 of 100

Main Survey, the majority of respondents—52.2%, or 215 out of 412 respondents[45]— _would not consider_ buying NFTs in the next year.

4.2.5.   I note that even defining the relevant universe as "purchasers of NFTs" is likely overinclusive because it is not clear whether all purchasers of NFTs would consider purchasing the specific kind of NFT at issue here. As Plaintiff notes, the accused goods are NFTs corresponding to collectible sneakers (see examples of Vault NFTs included in Plaintiff's First Amended Complaint below[46]).



4.2.6.   Thus, the proper universe is likely purchasers of NFTs who are also purchasers of collectible sneakers. Defined this way, it is impossible to know whether even a single respondent in Dr. Simonson's surveys falls into the relevant universe.

4.2.7.   An overinclusive universe is a fatal flaw since, as "the most likely fate for overbroad surveys lacking sufficient data to identify relevant subgroups is to be excluded from evidence or accorded little or no

---

[45] See Expert Report of Dr. Itamar Simonson, Exhibit I, Table 8, page 11.
[46] Plaintiff's First Amended Complaint, ¶ 5.

20

weight by the court."[47] Even adopting the most expansive universe definition (any NFT purchaser), only 47.8% of Dr. Simonson's sample falls into the relevant universe. Focusing on a more appropriate universe tied to the specific offering at issue (purchasers of NFTs for collectible sneakers), it is possible that 0% of respondents fall into this relevant subgroup, because, based on the screening questions Dr. Simonson asked, it is impossible to identify any respondent who falls into this relevant subgroup.

4.2.8.  Adopting the more expansive universe definition (i.e., any NFT purchaser), Dr. Simonson's Main Survey only has around 100 respondents in each group. Specifically, the Test and Control groups had only 101 and 96 respondents, respectively, who would consider purchasing an NFT. That is a very small sample size for a survey of this kind – too small to draw any scientifically reliable conclusions.[48]

4.2.9.  Critically, Dr. Simonson's overinclusive universe is also highly likely to be material in the present circumstances, and specifically favors Plaintiff. I say that because consumers in the proper universe, i.e., purchasers of NFTs and collectible sneakers, are more likely to have specialized knowledge of the products/services in question and therefore, logically, be less confused. By expanding his sample to those

---

[47] William G. Barber and Giulio E. Yaquinto. "The Universe" in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, 31-56 (Shari S. Diamond & Jerre B. Swann, eds. 2022), page 47.

[48] Matthew Kugler & Charles Henn Jr., "Internet surveys in trademark cases: Benefits, challenges, and solutions" in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, 291-314 (Shari S. Diamond & Jerre B. Swann, eds. 2012) page 308.

purchasing "Collectibles"[49] or "Crypto Currency,"[50] Dr. Simonson skewed his sample towards a specific subset of consumers (i.e., non-purchasers of NFTs) without the "specialized knowledge" that would logically reduce confusion.

4.2.10. Thus, not only is Dr. Simonson's Main Survey fatally flawed because the sample is overinclusive but the specific nature of the overinclusive sample logically biased his results in favor of Plaintiff, Nike, and against Defendant, StockX.

4.3. **Fatal Flaw 2: Dr. Simonson's critical source confusion question (Q340) is leading and ambiguous in multiple ways that introduced bias in favor of Plaintiff and against Defendant. His question is especially leading because he taught respondents to associate the word "product" with physical products and specifically, the very same Nike SB Dunk Low Ben & Jerry's Chunky Dunky sneakers that Dr. Simonson includes in his Test group images. For example, question 220 of Dr. Simonson's survey provides a fictitious line-up of "products StockX offers," including four pairs of sneakers (among them, the Nike SB Dunk Low Ben & Jerry's Chunky Dunky sneakers) and no NFTs. In addition, question 225 for the Test group, which preceded the critical source confusion question (Q340), expressly directed respondents to "consider now one of the shoes" they just saw. Dr. Simonson's questionnaire also primed respondents to understand NFTs as products separate and apart from**

---

[49] Expert Report of Dr. Itamar Simonson, ¶ 45.
[50] Expert Report of Dr. Itamar Simonson, ¶ 45.

**any underlying physical assets, through the language of his screening questions.**

4.3.1.  In his critical source confusion question (Q340, see below), Dr. Simonson referred to Defendant's Vault NFT as a "product / NFT."[51]

**(QUESTION 340)**
*{PROGRAMMING NOTE: ALLOW UP TO 4 RESPONSES. RECORD ONLY ONE RESPONSE AT A TIME.}*
Which company(ies) or brand(s) offer(s) the product / NFT shown on the screen? **(Record company(ies) or brand(s) on line(s) below.)**

Company/Brand #1_____

Company/Brand #2_____

Company/Brand #3_____

Company/Brand #4_____

Don't know/unsure   (   )→ **(SKIP TO Q.350)**

4.3.2.  Referring to Defendant's Vault NFT as a "product / NFT" is inherently ambiguous and leading because it implies that there are two separate objects—the "product" or the "NFT"—that the respondent should consider in formulating an answer. By doing so, the question explicitly prompted respondents to think of the source of the sneakers depicted (Nike), since those sneakers are the only "product" shown aside from the "NFT." Thus, the question nudged respondents to offer "Nike" as an answer when they may not have done so at the same rate in the absence of this leading question.

4.3.3.  Question 340 is highly problematic for two additional reasons:

---

[51] Expert Report of Dr. Itamar Simonson, Exhibit D, page 7-8.

4.3.3.1. First, by implying that the "product" and the "NFT" are separable objects, it becomes impossible to know whether any "Nike" answer provided was a reference to (a) the original manufacturing source of the sneaker (i.e., Nike), or (b) the source of the accused vault NFT (i.e., StockX). Linguistically, the formulation "product/NFT" as used in Dr. Simonson's survey means "product" <u>or</u> "NFT". Thus, we cannot know whether any respondent who said "Nike" was responding with respect to the original source of the sneaker or the source of the NFT. Respondents with the first interpretation in mind would not, logically, count as confused as to the source of the accused Vault NFT.

4.3.3.2. Second, without explanation, Dr. Simonson abandons the leading "product/NFT" language in his subsequent confusion questions concerning affiliation/connection (Q360) and permission/approval (Q370). For those questions, he uses more neutral language and refers to the Vault NFT as an "offer". As I explain below under Flaw 3, however, Dr. Simonson improperly casts aside and ignores this data when calculating his final confusion numbers. Thus, he selectively relies on the leading and flawed question 340, while ignoring the data from other, more standard, confusion questions that lack this particular flaw (Q360/Q370).

4.3.4.  The generally flawed nature of the critical source confusion question (Q340) is amplified by several connected design flaws in the questionnaire.

4.3.4.1.  For example, the leading nature of question 340 is amplified by the manner in which Dr. Simonson phrases screening questions 70 and 75, which ask respondents whether they are likely to "[s]tart a new collection," (Q70) and then ask about the "investment or collection opportunities" respondents will consider in the next twelve months (Q75). Question 70 (reinforced by the options in question 75) primes respondents to think of NFTs as a separate product worth collecting. Question 75 (shown below) provides five investment options. While four of those options (including NFTs) are phrased as "[i]nvesting in" the subject item, only one option – collectibles – is phrased as "buying" the subject item. This distinction primes respondents to think of NFTs an investment vehicle, source of value, and therefore a product, separate and apart from the underlying physical collectible sneakers tied to Vault NFTs. Further, the language of question 70 lacks a reliable connection to the targeted universe. It is unclear why Dr. Simonson thought it necessary to focus on respondents who expected to "[s]tart a *new* collection," (emphasis added), as opposed to build on a previously existing one or simply purchase a single item rather than a "collection."

25

**{QUESTION 75}**
***{PROGRAMMING NOTE: RANDOMIZE ANSWER CHOICES 1-5. RANDOMIZE PUNCH 3 OPTIONS. MUST SELECT PUNCH 2 "INVESTING IN NFT" OR PUNCH 3 "BUYING COLLECTIBLES" OR PUNCH 5 "CRYPTO CURRENCY" TO CONTINUE, OTHERWISE TERMINATE.}***
Which, <u>if any</u>, of the following investment or collection opportunities will you consider during the next 12 months?  If you don't know or are not sure, please indicate that you "Don't know/unsure." ***(Select all that apply)***

1: Investing in the Stock Market (such as buying stocks, bonds, mutual funds)
> A stock market is the aggregation of buyers and sellers of stocks (also called shares), which represent ownership claims on businesses; these may include securities listed on a public stock exchange, as well as stock that is only traded privately.

2: Investing in NFT ("non-fungible token") → **[CONTINUE]**
> A <u>NFT</u> ("non-fungible token") is an ownable <u>digital token</u> that is often offered by an online platform and may be linked to a specific product (such as art, a watch, or sneakers).  The NFT can be held, for example, in the online platform's (or retailer's) secure vault.  NFT can be traded, so in case its value goes up and you sell your NFT or token, you make a profit.

3: Buying Collectibles (such as watches, trading cards, luxury handbags, sneakers or art) → **[CONTINUE]**
4: Investing in Real Estate (such as buying land or a condominium for personal or commercial reasons)
5: Investing in Crypto Currency (e.g., buying payment cryptocurrencies such as Bitcoin, tokens or other stablecoins) → **[CONTINUE]**
6: Will not make any of these investments
7: Don't know/unsure [Single response]

     4.3.5.  In addition, the preceding question (Q220) primes respondents to understand "products" to mean sneakers – thereby amplifying concerns that question 340 asks respondents about the source of the "product" shown. Specifically, just prior to showing respondents a Vault NFT and asking the flawed question 340, Dr. Simonson presented respondents with an invented stimulus[52] array of "products StockX offers" (See question 220 below[53]).

---

[52] Under Flaw 4, I explain how the use of this invented stimulus violates marketplace reality.
[53] Expert Report of Dr. Itamar Simonson, Exhibit F, page 5.

**(QUESTION 220)**
*{PROGRAMMING NOTE: BOTH CELLS WILL SEE FIRST THE PRODUCT LINEUP. SHOW FOR 15 SECONDS BEFORE ALLOWING THE RESPONDENT TO CONTINUE.}*
Shown below are examples of products offered by StockX as NFTs or for personal use. Please review each product and its name before proceeding. Please evaluate these products carefully as you would if you were actually considering them as a NFT.

**{PROGRAMMING: SHOW THE PRODUCT LINEUP (15 SECONDS)}**

Below are some of the products StockX offers on its website



4.3.6.  Critically, this stimulus shows 4 different sneakers (including the Nike SB Dunk Low Ben & Jerry's Chunky Dunky, featured in connection with question 340) and no NFTs. The stimulus also repeatedly refers to the depicted items as "products," thereby teaching and priming them to associate the term "products" with physical sneakers (4 of which were shown) and not with NFTs (none of which were shown).

4.3.7.  In sum, Dr. Simonson's critical source confusion question is leading and fatally flawed[54] for multiple reasons. Specifically, it (a) improperly led

---

[54]As Professor Shari Diamond notes, "if the crucial question is sufficiently ambiguous or unclear, it may be the basis for rejecting the survey." Shari S. Diamond (2011), "Reference Guide on Survey Research," in *Reference Manual on Scientific Evidence*, Federal Judicial Center, p. 388.

respondents to differentiate the physical shoe from the NFT, (b) yielded

answers that cannot be tied to the accused goods (as opposed to the

manufacturer of the re-sold sneaker), and (c) deviates from less leading

language used in subsequent confusion questions (data from which is

then improperly abandoned).

4.4. **<u>Fatal Flaw 3</u>: Before showing the stimuli, Dr. Simonson provided
substantively different instructions for the Test and Control groups – with
key distinctions likely to bias net confusion results in favor of Plaintiff
(Q225). Dr. Simonson's use of varying instruction language deviates from
well-established scientific practice and introduces a variable for which Dr.
Simonson has not controlled.**

4.4.1. Dr. Simonson failed to use consistent instructions across his Test and

Control groups when introducing (Q225) the critical source confusion

question (Q340). I note that this general bias was also asymmetrical

across the Test and Control groups due to a material inconsistency

across the two conditions. Specifically, in the Test group, Dr. Simonson

instructed respondents in answering Q225 to "consider now one of the

shoes…". In the Control group, he instructed them to "consider now one

of the tokens…".

4.4.2. Thus, Dr. Simonson's Test group instructions nudged and primed

respondents to anchor their judgment in the physical shoe (originally

manufactured by Nike), whereas his Control group instructions did not

(see Question 225 below, highlighting added[55]).

**(QUESTION 225)**
*{PROGRAMMING NOTE: SHOW THE SINGLE SHOE PAGE (IN CELL 1) OR THE TOKEN DESCRIPTION PAGE (IN CELL 2) SHOW FOR 10 SECONDS BEFORE ALLOWING THE RESPONDENT TO CONTINUE.}*

**IF CELL 1 QUESTION TEXT SHOULD READ:** Please consider now one of the shoes you just saw that is available for you to buy as a NFT.

Please scroll down to view the entire page.
When you are finished viewing the page, click on the "NEXT" at the bottom of the screen to continue.

When you continue to the next screens, you will need to scroll to the bottom of each screen to answer the questions.

**IF CELL 2 QUESTION TEXT SHOULD READ:** Please consider now the token of one of the shoes you just saw that is available for you to buy as a NFT.

Please scroll down to view the entire page.
When you are finished viewing the page, click on the "NEXT" at the bottom of the screen to continue.

When you continue to the next screens, you will need to scroll to the bottom of each screen to answer the questions.

4.4.3.  On its own, this failure to use consistent instructions across conditions is not scientifically sound and introduces a new variable that fatally undermines comparison of the Test and Control groups. In addition, the way in which Dr. Simonson directed the Test group to consider "shoes" and the Control group to consider a "token," nudged and primed Test group respondents to anchor their judgment in the physical shoe (originally manufactured by Nike); whereas, Dr. Simonson's Control group instructions did not prime respondents in this way, and instead

---

[55] Expert Report of Dr. Itamar Simonson, Exhibit D, page 6.

nudged and primed Control group respondents to consider the NFT (see Question 225 above, highlighting added[56]). This logically contributed to the gravity of Fatal Flaw 2 and further biased the results in Nike's favor. "Nike" is technically an accurate answer to the question of "[w]hich company(ies) or brand(s) offer(s) the [shoes] shown on the screen?", and (based on his methods for coding confusion), Dr. Simonson counted any "Nike" responses as confused. To direct the Test group to consider the "shoes" shown is egregiously leading, especially when the Control group was directed to consider the "token."

4.5.  **Fatal Flaw 4: Dr. Simonson included Eveready questions regarding association/affiliation and permission/approval, but then improperly ignored the data they generated. If this data is included, an analysis of his Main Survey data using the standard approach used in Eveready surveys, shows no likelihood of confusion. Dr. Simonson's justification for abandoning the standard approach is illogical, and deviates from well-established scientific methods.**

4.5.1.  In standard practice, Eveready format surveys include questions that measure confusion not only as to source, but also confusion as to association/affiliation, and/or permission/approval.[57] This is because consumers can, for example, not be confused as to source but be

---

[56] Expert Report of Dr. Itamar Simonson, Exhibit D, page 6.

[57] For example, Professor McCarthy notes that "[a]n Eveready survey format can be combined with additional questions probing whether there is a likelihood of confusion as to sponsorship, affiliation or approval," and that such questions "are appropriate in light of specific language of the Lanham Act." McCarthy, J. Thomas (2023), *McCarthy on Trademarks and Unfair Competition.*

confused as to affiliation or permission. In the present matter, consumers may correctly believe that StockX is the source of Defendant's Vault NFTs, but also incorrectly believe that StockX received permission from Nike to put out the NFTs. In likelihood of confusion surveys, respondents count as confused if they express confusion as to <u>any one</u> of these elements.

4.5.2.   As Dr. Simonson notes in his report, "questions must be interpreted based on the specific characteristics of the case."[58] Here, an important contextual factor is that StockX is a resale marketplace. In the context of a resale marketplace, answers to Eveready questions are complex and logically may be vulnerable to bias favoring Plaintiffs. For example, I understand that where the doctrine of first sale applies, the standard Eveready questions as to source, affiliation, and approval may not elicit responses indicative of actionable consumer confusion, since resellers may offer branded products for resale and may not need affiliation with, or approval from, the brand responsible for creating the resold branded product in order to sell that product in the secondary market. Standard Eveready questions, however, do not instruct respondents to anchor their judgment specifically in the resale context (and further, even if they did, such questions would merely become a test on whether respondents understand the nuances of the law as it pertains to the resale of branded goods). Further, in this particular case, Eveready

---

[58] Expert Report of Dr. Itamar Simonson, ¶ 31, page 16.

questions on source, affiliation, and approval, that ask respondents about the "product/NFT" offered, and in no way sort out respondents who understand those questions to solely pertain to the *underlying physical sneakers*, are not an appropriate means of assessing consumer confusion stemming from uses of Nike marks in connection with *Vault NFTs*.

4.5.3.    Because of this ambiguity, the applicability and interpretation of Eveready questions is specifically an issue in this case, and is especially so in the context of Dr. Simonson's survey, through which he primed respondents to focus on the sneakers, rather than the NFT or composite Vault NFT offering.[59]

4.5.4.    Dr. Simonson seems to acknowledge this complexity, noting in his report that "subsequent Eveready questions should be examined carefully to determine their implications given the unique characteristics of this case and included stimuli."[60] Despite his reservations, Dr. Simonson included Eveready questions that purportedly allowed him to

---

[59] As described above, Dr. Simonson's survey teaches respondents to associate "products" with sneakers and therefore primes them to answer question 340 on source, with respect to the sneakers, rather than the overall Vault NFT offering (as discussed above). Although the language of Dr. Simonson's affiliation/connection and permission/approval connection (Q360-Q377) refer to the Vault NFT as an "offer" rather than a "product/service," the prior priming with respect to the initial source question is likely to carry over into these subsequent inquiries. As a result, as drafted, Dr. Simonson's survey is likely to prompt respondents to indicate whether StockX received permission or approval to offer, or whether another company was affiliated or connected with StockX's offering of, physical Nike sneakers.
[60] Expert Report of Dr. Itamar Simonson, ¶ 31.

measure confusion as to affiliation/connection,[61] and confusion as to permission/approval.[62]

4.5.5.   Once Dr. Simonson elected to include questions on affiliation/connection and permission/approval in his survey questionnaire, he should have analyzed, and included in his final results, the data from these questions. However, in contrast with standard practice, Dr. Simonson abandoned the results of his affiliation/connection[63] and permission/approval[64] questions to rely *only* on the results from his (flawed) source confusion question to draw his conclusion that "a change in the prominence of the image of the Nike branded shoe on the Vault NFT (while keeping the companies' names prominent) causes a substantial increase in consumers' perceptions that it is Nike that offers the Vault NFT."[65] That is, Dr. Simonson relied exclusively on[66] his source confusion results as the basis for his conclusion that his Main Survey supports Plaintiff's confusion allegation.

---

[61] Affiliation confusion (Question 360 and Question 365): "Does or doesn't the company that makes this offer have a business affiliation or connection with another company or brand?" and "With which other company(ies) or brand(s) does the company that makes this offer have a business affiliation or connection?" Expert Report of Dr. Itamar Simonson, Exhibit F, page 9.

[62] Permission confusion (Question 370 and Question 375): "Did or didn't the company that makes this offer receive permission or approval from another company or brand in order to make this offer?" and "From which other company(ies) or brand(s) did the company that makes this offer receive permission or approval from in order to make this offer?" Expert Report of Dr. Itamar Simonson, Exhibit F, page 10.

[63] Affiliation/connection confusion (Question 360 and Question 365): "Does or doesn't the company that makes this offer have a business affiliation or connection with another company or brand?" and "With which other company(ies) or brand(s) does the company that makes this offer have a business affiliation or connection?" Expert Report of Dr. Itamar Simonson, Exhibit F, page 9.

[64] Permission/approval confusion (Question 370 and Question 375): "Did or didn't the company that makes this offer receive permission or approval from another company or brand in order to make this offer?" and "From which other company(ies) or brand(s) did the company that makes this offer receive permission or approval from in order to make this offer?" Expert Report of Dr. Itamar Simonson, Exhibit F, page 10.

[65] Expert Report of Dr. Itamar Simonson, ¶ 20.

[66] I note that Dr. Simonson claims that, "It is also informative to compare the ratio of respondents naming Nike and StockX in the Test group versus the Control group as the company that offers the Vault NFT. The results indicate

4.5.6.   Critically, when the results from all three of Dr. Simonson's confusion questions[67] are considered, as is standard practice in assessing likelihood of confusion using the Eveready survey format (particularly, once that data already has been collected), his Main Survey yielded a net confusion rate of only "14%" per table 45 in his Expert Report.[68]

4.5.7.   A net confusion rate of 14% is a marginal result that does not clearly support an inference of likely confusion.[69] However, given the other major flaws in Dr. Simonson's survey—including Flaw 9, which is addressed in Section 4.10 below, and which supports a recalculation of results leading to 8.7% net confusion—the Main Survey cannot possibly support a finding of a likelihood of confusion.

4.5.8.   Dr. Simonson does attempt to provide a rationale for abandoning these results and relying only on answers to the flawed source confusion question. Specifically, he claims that "interpretation of the answers to these [affiliation and permission] questions is less straightforward in this case"[70] and that "because both the Nike name and the StockX name

---

that the Nike/StockX ratio in the Test group (which makes the image of the Nike branded shoe more prominent) is 2.025 compared to 1.648 in the Control group; accordingly, relative to the Control group, the Nike/StockX ratio was 23% higher in the Test group." See, Expert Report of Dr. Itamar Simonson, ¶ 20. In response, I note that the 23% figure is (a) merely a mathematical corollary of the Test and Control numbers he already reported (and thus does not convey additional information), and (b) is not a statistic that I am aware any Court to have relied upon. Instead, it appears merely to be mathematical sleight of hand designed to create a higher confusion number.

[67] Expert Report of Dr. Itamar Simonson, Exhibit D, page 7-10.

[68] I note that Dr. Simonson explicitly acknowledges this statistic in Expert Report of Dr. Itamar Simonson, ¶ 86: "Table 45 summarizes all name mentions, combining the source question, the affiliation question, and the permission question. In that table, 78% mentioned Nike in the Test group compared to 64% in the Control group (i.e., a 14% difference)."

[69] Matthew G. Ezell & AnnaBelle Sartore, "Survey Percentages in Lanham Act Matters" in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, 317-334 (Shari S. Diamond & Jerre B. Swann, eds., 2022).

[70] Expert Report of Dr. Itamar Simonson, ¶ 36 ("For example, suppose a respondent's answer to the source question is Nike, and the answer to one of the latter questions is that Nike received permission to make the NFT offer from

were displayed in both the Test and Control versions, the summary across all three key questions underestimates the difference between the Test and Control groups."[71]

4.5.9. I respectfully note that this explanation is illogical, and deviates from clearly accepted scientific practice.

4.5.10. With respect to its logical flaws, Dr. Simonson appears to be arguing that confusion in an Eveready survey should be tabulated not by summing confusion as to source and/or affiliation/connection and/or permission/approval, as is standard practice. Instead, he appears to be arguing that only certain patterns of confusion should count as legitimate and that survey experts should play the role of determining, on a case-by-case basis, which specific patterns they believe are legitimate vs. illegitimate after examining the collected data.

4.5.11. In apparent support for this argument, he describes one very specific hypothetical scenario that he claims is "less straightforward," and hence, presumably, should not count as confusion in this case even though it clearly would using the standard analytic approach used in Eveready surveys. On the basis of that specific hypothetical scenario, he then, wholesale, abandons all of the data from his affiliation/connection and/or permission/approval questions. That, of course, is

---

StockX. Such an answer can be seen as an indication of confusion with Nike because, not only is Nike not the one making the NFT offer on the StockX website, Nike also did not receive (or request) permission from StockX. And suppose alternatively that a Control group respondent's answer to the source question is StockX, and the answer to one of the later questions is that StockX received permission to make the NFT offer from Nike. In that case, the classification of such answers as confusion is straightforward, because Nike did not in fact give StockX permission to offer Nike branded NFTs.").

[71] Expert Report of Dr. Itamar Simonson, ¶ 86.

not logically supported even if one were, incorrectly, to accept his

hypothetical. Dr. Simonson's decision here is also at odds with

Plaintiff's own allegations in the First Amended Complaint, which state

(bolding added):

> "StockX's use of Nike's Asserted Marks is likely to confuse,
> mislead, or deceive potential consumers, purchasers, and the
> general purchasing public as to the source, origin, **sponsorship,**
> or **affiliation** of the Vault NFTs with Nike, and is likely to cause
> such people to erroneously believe that StockX's Vault NFTs
> have been **authorized, sponsored, approved, endorsed, or**
> **licensed** by Nike or that StockX is in some way affiliated with
> Nike."[72]

Thus, Dr. Simonson is not only abandoning standard practice in

Eveready Surveys but is also abandoning Plaintiff's own allegation

as documented in its First Amended Complaint.

4.5.12.  It is also unclear from his report if Dr. Simonson made the decision to

ignore his affiliation/connection data and his permission/approval data

before or after he became aware of the results. If Dr. Simonson thought

these two questions were inherently inappropriate in this case, he

should not have included them in the first place. Thus, it seems likely

(though I cannot say for certain), that the decision was made *after* he

became aware of the results and saw that they did not support Nike. If

so, his decision to abandon the data would be an example of the

improper scientific practice referred to as "HARKing,"[73] i.e.,

---

[72] Plaintiff's First Amended Complaint, ¶ 127.
[73] Kerr, N. L. (1998). HARKing: Hypothesizing after the results are known. *Personality and social psychology review*, *2*(3), 196-217.

"hypothesizing after the results are known." HARKing is considered to be scientifically improper because it involves violating the principle of *a priori* hypothesis testing, which forms the bedrock of the scientific method.[74]

4.5.13.  For the reasons identified above, Dr. Simonson's decision to abandon the results of his affiliation/connection question and his permission/approval question was clearly improper and unjustified. If one corrects this flaw (even retaining all other flaws), his Main Survey no longer supports Plaintiff's allegation of likely confusion. That is, even by Dr. Simonson's own tabulations, his Main Survey yields only a 14% net confusion result when one (properly) considers the results for all three confusion questions.[75]

4.5.14.  Finally, I note that, when I attempted to replicate Dr. Simonson's findings, I arrived at a net confusion level of 13.5% using the same coding scheme he purportedly used. Specifically, I found that 163 out of 209 (78.0%) of Test group respondents and 131/203 (64.5%) of Control group respondents mentioned either Nike or Nike's products (e.g., Air Jordan) at one or more of his three confusion questions.[76] In contrast,

---

[74] Kerr, N. L. (1998). HARKing: Hypothesizing after the results are known. *Personality and social psychology review*, *2*(3), 196-217.

[75] Expert Report of Dr. Itamar Simonson, ¶ 86, Table 45.

[76] See Exhibit E, which is Exhibit H to Dr. Simonson's Report (i.e., his Main Survey data) with three additional columns added at DH (Neal Coding 1), DI (Neal Coding 2) and DJ (Neal Coding 3). For "Neal Coding 1":1 = Mentioned Plaintiff or Plaintiff's Products/Services at Q340; 0 = Did not Mention Plaintiff or Plaintiff's Products/Services at Q340. For "Neal Coding 2": 1 = Mentioned Plaintiff or Plaintiff's Products/Services at Q340 AND Mentioned Plaintiff's Products/Services at Q355; 0 = Mentioned Plaintiff or Plaintiff's Products/Services at Q340 BUT DID NOT Mention Plaintiff's Products/Services at Q355. For "Neal Coding 3":1 = Mentioned Plaintiff or Plaintiff's Products/Services at Q340 AND/OR Q365 AND/OR Q375; 0 = Did Not Mention Plaintiff

Dr. Simonson reported 163/209 (78.0%) and 130/203 (64.0%) for the Test and Control respectively (hence 14% net). Deviating from standard reporting practices,[77] Dr. Simonson did not provide a data set with his coding (confused vs. not) for each respondent, thus it is not possible to identify the source of the discrepancy with certainty. However, I suspect that the difference stems from the fact that Dr. Simonson appears not to have counted "Nick," written by a Control respondent who wrote "Nick; New balance; Puma Sneakers"[78] at Q340, as a misspelling of "Nike." In contrast, I note that Dr. Simonson counted Test Group respondents who wrote "Jordon" as a misspelling and contraction of "Air Jordan."[79] Thus, by allowing Test group respondents to misspell Jordan as "Jordon" (and hence count as confused), but not allowing Control group respondents to misspell Nike as "Nick" (and hence not count as confused), Dr. Simonson inflated the net confusion result.

4.6.  **Fatal Flaw 5: Dr. Simonson failed to replicate reality by inventing a fictitious "product line up" stimulus that no consumer has ever seen. This fictitious stimulus was problematic because it (a) deviates from marketplace reality, (b) taught respondents to associate the term "products" with "shoes" (thereby contaminating subsequent key questions, which use the word "product"), (c) improperly primed**

---

or Plaintiff's Products/Services at Q340 AND/OR Q365 AND/OR Q375. I included obvious misspellings (e.g., Nick, Jordon).

[77] Jacob Jacoby (2013). Trademark Surveys: Designing, implementing, and evaluating surveys. p. 886.
[78] Subject ID 2369. Simonson Exhibit H.
[79] Subject IDs 2968 and 2981, Simonson Exhibit H.

**respondents to focus on physical shoes, and (d) did not control for order bias, since Dr. Simonson failed to randomize the order of the images in the stimulus.**

4.6.1. Failing to simulate marketplace reality in a survey can be fatal.[80] As noted authorities, G. Kip Edwards and J. David Mayberry, put it:

> "While the survey setting is necessarily artificial, the survey expert must make every reasonable effort to duplicate the marketplace conditions under which consumers are likely to encounter the mark at issue. At a minimum, this requires the survey expert to find out how the allegedly infringing product is typically encountered in the marketplace. The failure to discharge this obligation will often result in the exclusion of the survey. Not surprisingly, the failure to simulate marketplace conditions is a frequent basis for a *Daubert* challenge."[81]

4.6.2. Dr. Simonson included a stimulus in his survey that, to my knowledge, no consumer has ever seen, or could see, in the real-world marketplace. Specifically, Dr. Simonson included a stimulus with a line-up of specific products chosen by Dr. Simonson (see Question 220, shown below).

---

[80] G. Kip Edwards and J. David Mayberry "The Daubert Revolution and Lanham Act Surveys" in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, p. 354 (Shari S. Diamond & Jerre B. Swann, eds. 2022).

[81] G. Kip Edwards and J. David Mayberry "The Daubert Revolution and Lanham Act Surveys" in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, p. 354 (Shari S. Diamond & Jerre B. Swann, eds. 2022).

**(QUESTION 220)**
*{PROGRAMMING NOTE: BOTH CELLS WILL SEE FIRST THE PRODUCT LINEUP. SHOW FOR 15 SECONDS BEFORE ALLOWING THE RESPONDENT TO CONTINUE.}*
Shown below are examples of products offered by StockX as NFTs or for personal use.  Please review each product and its name before proceeding.  Please evaluate these products carefully as you would if you were actually considering them as a NFT.

**{PROGRAMMING: SHOW THE PRODUCT LINEUP (15 SECONDS)}**



4.6.3.  Dr. Simonson's inclusion of this fictitious stimulus fatally undermines the validity and reliability of his surveys in at least four distinct ways:

4.6.3.1.  First, this stimulus has not appeared, and does not appear, on the accused StockX website. Thus, it is impossible to generalize the results of Dr. Simonson's surveys to the real-world marketplace.[82]

---

[82] I note that according to what Dr. Simonson has stated in a previous publication—see Itamar Simonson and Ran Kivetz "Demand Effects in Likelihood of Confusion Surveys: The Importance of Marketplace Conditions" in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, p. 243, 249 (Shari S. Diamond & Jerre B. Swann, eds. 2012)—exposing survey respondents to stimuli that are fundamentally different from what they would encounter in the marketplace (i.e., the product array stimulus, here) would be categorized as an experimental demand effect that can bias survey results. Specifically, Dr. Simonson and Dr. Kivetz stated: "the suitable method and the determination of whether a survey creates experimental demand effects and biased results, relative to what is likely to occur in reality, depends largely on the pertinent marketplace conditions. That is, whether a survey creates responses that deviate from what naturally occurs in reality depends on whether the manner in which survey respondents are exposed to the stimuli at issue is fundamentally different from what consumers encounter in the marketplace."

4.6.3.2.  Second, as explained in detail under Flaw 2, the artificial stimulus created by Dr. Simonson introduced bias that specifically favored Plaintiff and worked against Defendant. Specifically, it (a) showed four physical shoes and no NFTs (thereby making physical shoes artificially salient in respondents' minds), and (b) taught respondents to associate the term "product" with physical shoes (thereby logically priming subsequent "Nike" answers).

4.6.3.3.  Third, based on Dr. Simonson's report, it appears he failed to randomize the order of the products in the Q220 stimulus array and thereby did not control for order bias.[83] This is problematic because the first element in any presented set of objects is generally given more attention.[84] Since the "Nike SB Dunk Low Ben & Jerry's Chunky Dunky" shoe (i.e., the physical product visually depicted in Defendant's Vault NFT subsequently shown to respondents in Dr. Simonson's survey) was shown first (top left), it logically received more attention. This, in turn, further amplified the artificial salience of Nike to respondents.

---

[83] Dr. Simonson justifies this placement by stating it is "consistent with prior research" that shows web users tend to look to the upper left portion of pages more often. Expert Report of Dr. Itamar Simonson, ¶ 33. Yet this research weighs against using a top left placement consistently; directing respondents to a single visual should be avoided as it may increase bias. Simonson confirms elsewhere in his report that "rotating the order" of options is the "accepted standard" for survey responses. Expert Report of Dr. Itamar Simonson, ¶ 49. Dr. Simonson's research with Amos Tversky also weighs against the use of this stimulus, insofar as it affirms that "[c]onsumer choice is often influenced by the context, defined by the set of alternatives under consideration." Expert Report of Dr. Itamar Simonson, ¶ 32, footnote 14. (citing Itamar Simonson and Amos Tversky (1992), "Choice in Context: Tradeoff Contrast and Extremeness Aversion," Journal of Marketing Research, 29 (August), 281).

[84] Orquin, J. L., Perkovic, S., & Grunert, K. G. (2018). Visual biases in decision making. *Applied Economic Perspectives and Policy*, *40*(4), 523-537, 528.

4.6.3.4. Finally, I note that, aside from introducing an entirely fictitious product array, Dr. Simonson also failed to show respondents the StockX landing page. This would have been a more appropriate stimulus to show respondents because it would have familiarized both Test and Control group respondents with the products/services put out by StockX in a context that accurately replicates what they would see in the real-world marketplace.

4.7. **Fatal Flaw 6: Dr. Simonson chose a highly atypical example of a Vault NFT in his Main Survey, i.e., the "Nike SB Dunk Low Ben & Jerry's Chunky Dunky." This stimulus is materially different from all other Vault NFTs on multiple dimensions: (a) it uses outdated disclosure language (i.e., language used from January 18, 2022, to on or about February 14, 2022)[85] whereas all other NFTs on StockX use updated language with substantially expanded disclosures, and (b) it is the only product to legibly show the Nike word mark on the product itself. Both of these differences logically would increase confusion. In addition, this stimulus adds a third brand – Ben & Jerry's – which unnecessarily complicates the analysis of questions 340-377 for respondents and may encourage respondents to merely list, or "read back", all brand names they see. Thus, setting aside all other flaws, Dr. Simonson cannot generalize his purported confusion results of the Main Survey to all of the other Vault NFTs, during the entire period for which they have been offered.**

---

[85] STX0127513; NIKE0003802.

**Accordingly, any informative value of Dr. Simonson's survey is limited to the Vault NFT for the Nike SB Dunk Low Ben & Jerry's Chunky Dunky, and Dr. Simonson's survey is otherwise fatally flawed with respect to the remaining Vault NFTs.**

4.7.1.  The image of the "How It Works" wrapper on the product description page ("PDP") for the Chunky Dunky Vault NFT uses outdated disclaimer language, rather than the updated language that is used for all other Vault NFTs associated with Nike sneakers. This selection limits the applicability of Dr. Simonson's survey to the Vault NFTs in their original, first iteration (available from January 18, 2022, to on or about February 14, 2022), other than the Chunky Dunky Vault NFT (which still includes the original disclaimer language). Further, the smaller text on the "How It Works" wrapper is blurry, making it difficult to read when zoomed in. The language appears more clearly on the website.

4.7.2.  Notably, the original version of the "How It Works" wrapper is less informative than the new version. The original language reads as follows: "Buy A StockX Vault NFT; All NFTs go to your StockX Portfolio and are tradable immediately; Sell your NFT on StockX; Or redeem it for the real pair stored in our vault… The purpose of the NFT is solely to track the ownership of and transactions in connection with the associated product. The NFT does not independently authenticate the associated product, nor is it affiliated or associated with, sponsored by, or officially connected to

Nike or any of its subsidiaries or affiliates. For more information on official Nike products, please visit Nike.com."

4.7.3.  For comparison, the new version of the "How It Works" wrapper reads as follows: "Buy A StockX Vault NFT – a token for the physical pair in our vault; All NFTs go to your StockX Portfolio and are tradable immediately; Sell your NFT on StockX; Or redeem it for the physical pair stored in our vault… The purpose of the Vault NFT is solely to track the ownership and transactions in connection with the associated product. The associated product is subject to StockX's own authentication process. The Vault NFT is not affiliated or associated with, sponsored by, or officially connected to Nike or any of its subsidiaries or affiliates. Any Nike names, use and trademarks used in a Vault NFT are all the property of Nike and are used in the Vault NFT solely to refer to the physical product to which the Vault NFT corresponds. For more information on official Nike products, please visit www.Nike.com."

4.7.4.  Both the outdated (top) and current (bottom) versions of the "How It Works" wrapper are depicted below.

44





4.7.5.   Further, the use of the Nike SB Dunk Low Ben & Jerry's Chunky Dunky

Vault NFT, is flawed in that it does not replicate market conditions for any

of the other NFTs at issue (and does not even perfectly replicate market

conditions for this particular product). This Vault NFT is the only Vault NFT

for which the word "NIKE" is visible in the image associated with the NFT,

because of the manner in which the shoe is angled. It is one of only two of the Vault NFTs that include two visible Nike marks.

4.7.6.   The Chunky Dunky poses the added problem of incorporating a third brand—Ben & Jerry's—which is evident in the verbatim responses. The presence of this additional brand in the stimulus, aside from departing from the more typical Vault NFT offerings (which do not feature three brands), may have prompted respondents to merely list, or "read back", all brands they saw on the page.

4.7.7.   In addition, without any acknowledgement or explanation in his report, Dr. Simonson appears to have altered the price for which this Vault NFT was sold to "$200" (although in reality, the lowest price for which this particular NFT ever sold was $900). Although he made this change, he did not adjust the "Sell for $1,255 or Ask for More" option under "Place Bid," creating an artificially significant gap between the purchase price and the sale price that could, for example, suggest to respondents that it would be easy to buy and sell the NFT to make money quickly. At the very least, Dr. Simonson offers no basis for partially altering the real-world marketplace conditions for the Vault NFT at issue.

4.8.   **Fatal Flaw 7: Dr. Simonson draws a scientifically improper conclusion from the results of his Companion Survey—i.e., "the StockX disclosures are ineffective at reducing consumer confusion regarding the source of the Vault NFTs."[86] This conclusion is invalid because (a) he did not**

---

[86] Expert Report of Dr. Itamar Simonson, ¶ 22.

**conduct a randomized experiment in which consumers were randomly assigned to Test versus Control groups that vary, respectively, in whether the StockX disclosures were present vs. absent,[87] and (b) the disclosure presented in the Main Survey was not the one typically used by StockX (see Flaw 6).**

4.8.1.  In a purported test of "…the effectiveness of [Defendant's] disclaimers in reducing consumer confusion,'"[88] Dr. Simonson compared the results from his Companion Survey to the results from his Main Survey. As noted earlier, Dr. Simonson's Companion Survey used the same survey design as his Main Survey but "omitted disclaimers present on the StockX Vault NFT website (that were shown in the Main Survey)." [89] On the basis that the "results of the Companion Survey were similar to those of Main Survey,"[90] Dr. Simonson concluded that "the StockX disclosures are ineffective at reducing consumer confusion regarding the source of the Vault NFTs."[91]

4.8.2.  The inference Dr. Simonson draws regarding StockX's disclosures is invalid for at least three reasons.

4.8.2.1.  First, Dr. Simonson cannot draw a scientific conclusion regarding the causal effect of a given variable (in this case, the presence vs. absence of disclosures) without having conducted

---

[87] As explained under Fatal Flaw 6, Dr. Simonson instead attempts to compare findings from his Main and Companion Surveys to draw his that "the StockX disclosures are ineffective at reducing consumer confusion regarding the source of the Vault NFTs." Expert Report of Dr. Itamar Simonson, ¶ 22.
[88] Expert Report of Dr. Itamar Simonson, ¶ 14.
[89] Expert Report of Dr. Itamar Simonson, ¶ 14.
[90] Expert Report of Dr. Itamar Simonson, ¶ 22.
[91] Expert Report of Dr. Itamar Simonson, ¶ 22.

a randomized experiment in which respondents were randomly assigned <u>on the variable at issue</u>.[92] Dr. Simonson did not conduct any such experiment. Instead, he is relying on a comparison of results from two different studies, where respondents were <u>not</u> randomly assigned to one or the other. Comparing, piecemeal, results from different groups in different surveys is not equivalent to a randomized Test vs. Control group design.

4.8.2.2.  Second, even setting aside the first issue, Dr. Simonson's inference is invalid because his Main Survey used disclosures that have not reflected StockX's standard disclosure language since on or around February 14, 2022. As explained under Flaw 6, Dr. Simonson chose a highly atypical Vault NFT that had not been updated with the expanded disclosure language, which I understand has been used since on or about February 14, 2022, for all other Vault NFTs.

4.8.2.3.  For this reason, Dr. Simonson can draw no conclusions about StockX's standard disclosure language (since he did not test it) and his results logically underestimate the current disclosure's effectiveness given he tested a prior version.

---

[92] For example, see: Lieberman, A., Morales, A. C., & Amir, O. (2019). Beyond the Lab: Using data from the field to increase research validity. In Handbook of Research Methods in Consumer Psychology (p. 41-60). Routledge; Norbert Schwarz, Surveys, Experiments, and the Psychology of Self-Report, in Frank R. Kardes, Norbert Schwarz, Paul M. Herr (eds.), Handbook of Research Methods in Consumer Psychology 17-40 (2019).

4.8.2.4.  Third, since Dr. Simonson's Companion Survey generally replicated all other aspects of his Main Survey, it exhibits the same design flaws noted throughout this report.

4.8.3.  For these reasons, Dr. Simonson's Companion Survey does not yield valid or reliable data and his inferences regarding disclosure effectiveness are, therefore, also invalid.

4.9.  **Fatal Flaw 8: Dr. Simonson's Control stimulus removes far more than just the allegedly infringing elements, and increases the prominence of the StockX trademark, in a manner likely to suppress Control group confusion and thereby skew net results in Plaintiff's favor.**

4.9.1.  The Control stimulus, or "claim ticket," in Dr. Simonson's surveys is flawed in that it has been changed far more than necessary to remove to the alleged cause(s) of confusion. Even elements of the Vault NFT (including the card design, ERC-1155 text, "Vault NFT" text, and purple background) that Nike has not alleged constitute infringement have been removed from the control. In his report, Dr. Simonson cites *Sazerac Co. v. Fetzer Vineyards, Inc.*, in which the court discounted a survey based in part on Dr. Simonson's testimony that the survey "used an improper control in that it was not as similar to the allegedly infringing product as possible with only the allegedly infringing aspect removed."[93] Dr. Simonson's Control in this case suffers from the same flaw. Worse, the Control stimulus appears to

---

[93] Expert Report of Dr. Itamar Simonson, ¶ 12, footnote 5. (citing *Sazerac Co. v. Fetzer Vineyards, Inc.*, 265 F. Supp. 3d 1013, 1026 (N.D. Cal. 2017)).

artificially increase the size and centrality of the StockX logo in comparison to the word "Nike," thereby having the likely effect of depressing "Nike" responses in the Control condition and thus artificially inflating Dr. Simonson's net confusion rate.

4.9.2.    Dr. Simonson attempts to justify the ticket design by claiming it was "inspired by a ticket used by StockX for a different purpose," namely the BreakX NFTs.[94] However, the BreakX NFTs, unlike the Vault NFTs, could not show the product consumers were purchasing because it would not be determined ahead of time—consumers were buying a spot in a live-streamed card drawing, and neither StockX nor the buyer would know what cards the buyer was buying until the drawing took place. In addition, as made clear by the Product Description, the BreakX NFT was neither tradable nor associated with an underlying physical product. As a result, there was no need for the BreakX NFT to depict a physical product in a manner that would inform subsequent purchasers what they had purchased and what they could access from a storage facility. However, putting all of this aside, the BreakX NFTs do show a pack of Pokémon cards in the carousel of images included on the PDP, allowing consumers to understand the offering obtained through event attendance.

---

[94]StockX BreakX June 4th 2022 featuring Infamous Wu and Breaking Swipes, StockX - https://stockx.com/stockx-breakx-june-4th-4packs-access-pass, last accessed May 30, 2023.

4.9.3.    Notably, the Control stimulus also suffers from price manipulation issues that mirror those of the Test stimulus, and similarly uses a "How It Works" wrapper that is outdated.

4.10.  **Fatal Flaw 9**: **Dr. Simonson included a follow-up question regarding "other products and services" (Q355). However, he then improperly ignored the data from this question. Once the data from this question is analyzed using the standard method used in Eveready surveys, the results show no likelihood of confusion even if one (improperly) chooses to consider only source confusion.**

4.10.1.   When there is a possibility that respondents are merely reading or "playing back" what is shown to them in an Eveready survey, experts may include a question that helps clarify what respondents are thinking so that only those who are truly confused (vs. merely "playing back") can be counted. Below, Jerre Swann explains what role this question played in the original Eveready case:

> "the 'please name any other products put out by the same concern that puts out the lamp shown here' question (which measured the *reach* of the *battery* brand to products in a different category) was likely necessary in *Eveready* to differentiate between respondents who were merely 'playing back' the Ever-Ready label on the lamp from those who believed the *lamp* was put out by the battery company."[95]

4.10.2.   Dr. Simonson included such an "other products or services" question in his survey, question 355, shown below:

---

[95] Jerre B. Swann, "Likelihood-of-Confusion Surveys" in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, 59-78 (Shari S. Diamond & Jerre B. Swann, eds. 2022), p. 61.

(QUESTION 355)
*{PROGRAMMING NOTE: ALLOW UP TO 4 RESPONSES. RECORD ONLY ONE RESPONSE AT A TIME.}*
What other products or services does/do the company(ies) or brand(s) that offer the product / NFT on this page offer? (Record product(s) or service(s) on line(s) below.)

Product/Service #1_____

Product/Service #2_____

Product/Service #3_____

Product/Service #4_____

Don't know/unsure

    4.10.3.   Accordingly, Dr. Simonson's "other products or services" question ostensibly allowed him to determine whether a respondent was merely reading/playing back what they saw on the Vault NFT stimulus or was genuinely confused. For example, following the standard approach when experts include this question, a respondent who wrote "Nike" at the source confusion question, question 340, but then failed to identify Nike's goods/services at question 355 would be classified as "merely playing back" and hence not confused. In contrast, a respondent would count as confused if they wrote "Nike" at question 340 and then correctly identified one or more of Nike's products /services at question 355.

    4.10.4.   Despite having the data from this follow-up question, Dr. Simonson seems to have simply ignored it when analyzing his data. Specifically, based on his Exhibit H, he did not code respondent's answers to question 355 to identify if respondents were plausibly thinking of the

Plaintiff (and hence were actually confused), as opposed to simply playing back (hence not confused).

4.10.5.  Dr. Simonson justifies his decision to ignore the data because "both Nike and StockX offer many of the same products, such as shoes and apparel; accordingly, the typically used Eveready question about 'other products/services sold by the same company that makes the focal offer' is less informative in this case and is unlikely to distinguish the two companies (but it was included in the current surveys)."[96] This begs the question as to why he chose to ask the question in this first place. One reason could be that his decision to ignore the data was made after seeing the data and realizing it would lower confusion rates if it were factored in, thereby constituting another instance of HARKing. In addition, I note that Dr. Simonson's rationale for ignoring his "other products/services" data leads him to give the benefit of all doubt to Plaintiff. That is, despite acknowledging that a respondent's answer to this question might be a reference to either party's goods, he nonetheless counts 100% of such instances as confusion with Plaintiff.

4.10.6.  More generally, given his decision to include the "other products or services" question, it was improper for Dr. Simonson to ignore the data it generated. Analyzing this data can only reduce overall confusion because it can only result in confused respondents being re-classified as not confused (if they fail to identify Plaintiff's goods/services). Thus,

---

[96] Expert Report of Dr. Itamar Simonson, ¶ 31.

Dr. Simonson's decision not to analyze the data favored the Plaintiff, who retained him. I note that in my own survey, I opted not to include this question, thereby giving all benefit of the doubt to Plaintiff, despite being retained by Defendant.

4.10.7. As Table 1a shows below, multiple respondents classified by Dr. Simonson as confused failed, in the "other products or services" questions, to identify any product or service put out by Nike. Moreover, many respondents entered no answer at all.

**Table 1a.** Representative Examples of Respondents Who Were Not Thinking of the Plaintiff based on their answer to Q355.

| Subject ID | Group | Respondent Verbatim to Dr. Simonson Q340: Which company(ies) or brand(s) offer(s) the product / NFT shown on the screen?" | Respondent Verbatim to Dr. Simonson Q355: What other products or services does/do the company(ies) or brand(s) that offer the product / NFT on this page offer? |
|---|---|---|---|
| 143 | Test | Nike | Offers to hold the Item while keeping the stock viable. |
| 443 | Test | Nike | Puma |
| 2766 | Test | Nike | New Balance 990v3 |
| 551 | Test | Nike | To sell |
| 2072 | Test | Nike | Stocks token |
| 27 | Test | NIKE | SERVICE (Product/Service #1) QUALITY (Product/Service #2) |

54

| 675 | Control | Nike | StockX |
|---|---|---|---|

4.10.8.  Following standard practice when analyzing the results from an "other products/service" question, respondents (such as those in Table 1 above) who failed to identify Plaintiff's goods should have been classified as "merely playing back" the name Nike, and therefore not counted as confused.

4.10.9.  To determine whether Dr. Simonson's choice to ignore the data from the "other products or services" question was material to the conclusions he drew from his source confusion question, I re-analyzed his data using the standard coding method. Specifically, I coded respondents as confused as to source if a respondent mentioned Plaintiff or Plaintiff's products/services (e.g., "Nike" or "Jordan")[97] at Q340 (i.e., the source confusion question) AND mentioned Plaintiff's products/services (e.g., shoes) at Q355 (i.e., the "other products or services" question). If a respondent mentioned "Nike" at Q340 but did not mention anything (i.e., did not provide a response to Q355) and/or mentioned a product/service not put out by Nike, they were coded as

---

[97] See Exhibit E, which is Exhibit H to Dr. Simonson's Report (i.e., his Main Survey data) with three additional columns added at DH (Neal Coding 1), DI (Neal Coding 2) and DJ (Neal Coding 3). For "Neal Coding 1":1 = Mentioned Plaintiff or Plaintiff's Products/Services at Q340; 0 = Did not Mention Plaintiff or Plaintiff's Products/Services at Q340. For "Neal Coding 2": 1 = Mentioned Plaintiff or Plaintiff's Products/Services at Q340 AND Mentioned Plaintiff's Products/Services at Q355; 0 = Mentioned Plaintiff or Plaintiff's Products/Services at Q340 BUT DID NOT Mention Plaintiff's Products/Services at Q355. For "Neal Coding 3":1 = Mentioned Plaintiff or Plaintiff's Products/Services at Q340 AND/OR Q365 AND/OR Q375; 0 = Did Not Mention Plaintiff or Plaintiff's Products/Services at Q340 AND/OR Q365 AND/OR Q375. I included obvious misspellings (e.g., Nick, Jordon). Products/services were coded as a reference to Nike if they included any item put out by Plaintiff (e.g., shoes, sneakers, sports equipment, apparel, clothing etc.).

not confused. As Table 1b below shows, this re-analysis yielded a net

confusion rate of 8.7% (i.e., 22.5% Test confusion minus 13.8%

Control confusion).

**Table 1b.** Results for Neal Re-Analysis of Simonson Main Survey Data Incorporating
Results from Q355.

|  | **Percent and Number of Respondents in Simonson Main Survey who Mentioned Plaintiff or Plaintiff's Goods or Services at Q340 AND Mentioned Plaintiff's Goods or Services at Q355** |
|---|---|
| **Test Group** | 22.5% (47/209) |
| **Control Group** | 13.8% (28/203) |
| **Net (Test – Control)** | **8.7%** |

    4.10.10.  As the results of Table 2 show, even if one chooses to accept Dr.

Simonson's (improper) decision to consider only source confusion, his

source confusion data only support a net confusion level of 8.7%. This

level of net confusion falls well below commonly accepted thresholds

for concluding that a likelihood of confusion exists.[98]


**5.  Interim Summary**

    5.1.  For the reasons articulated above, it is my considered opinion that the

conclusions Dr. Simonson drew regarding likelihood of confusion and

disclaimer effectiveness are not scientifically valid or reliable.

    5.2.  I identified nine flaws in total. All of these flaws are "fatal" in my judgment, i.e.,

---

[98] Matthew G. Ezell & AnnaBelle Sartore, "Survey Percentages in Lanham Act Matters" in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, 317-334 (Shari S. Diamond & Jerre B. Swann, eds., 2022).

so serious that, each flaw taken alone, renders it scientifically unreliable to validly infer whether Defendant's alleged use of Plaintiff's marks causes a likelihood of confusion.[99]

5.3.   The primary design flaws I identified in Dr. Simonson's surveys are as follows:

5.4.   **<u>Fatal Flaw 1</u>: Dr. Simonson failed to survey the proper universe. The majority of his Main Survey sample (i.e., 52.2%, or 215 out of 412) are individuals who confirmed they would not consider buying an NFT (an important component of the product at issue, and further, the component on which Nike focuses for its infringement claims). Accordingly, his sample is overwhelmingly overinclusive of consumers whose state of mind is not relevant to the particular legal issue at hand (i.e., non-NFT purchasers). The remaining sample size is too small to draw reliable inferences and may include no likely purchasers of the type of NFT at issue – specifically, NFTs corresponding to a physical pair of sneakers.**

5.5.   **<u>Fatal Flaw 2</u>: Dr. Simonson's critical source confusion question (Q340) is leading and ambiguous in multiple ways that introduced bias in favor of Plaintiff and against Defendant. His question is especially leading because he taught respondents to associate the word "product" with physical products and specifically, the very same Nike SB Dunk Low Ben & Jerry's Chunky Dunky sneakers that Dr. Simonson includes in his Test group images. For example, question 220 of Dr. Simonson's survey**

---

[99] Or, in the case of his Companion Survey, infer that Defendant's disclosures are ineffective at correcting confusion.

provides a fictitious line-up of "products StockX offers," including four pairs of sneakers (among them, the Nike SB Dunk Low Ben & Jerry's Chunky Dunky sneakers) and no NFTs. In addition, question 225 for the Test group, which preceded the critical source confusion question (Q340), expressly directed respondents to "consider now one of the shoes" they just saw. Dr. Simonson's questionnaire also primed respondents to understand NFTs as product separate and apart from any underlying physical assets, through the language of his screening questions.

5.6.  **Fatal Flaw 3**: Before showing the stimuli, Dr. Simonson provided substantively different instructions for the Test and Control groups – with key distinctions likely to bias net confusion results in favor of Plaintiff (Q225). Dr. Simonson's use of varying instruction language deviates from well-established scientific methods and introduces a variable for which Dr. Simonson has not controlled.

5.7.  **Fatal Flaw 4**: Dr. Simonson included standard Eveready questions (regarding affiliation/connection/permission/approval etc.) but then improperly ignored the data they generated. After re-analyzing his Main Survey data using the standard approach used in Eveready surveys, his data shows no likelihood of confusion. Dr. Simonson's justification for abandoning the standard approach is illogical, and deviates from well-established scientific methods.

5.8.  **Fatal Flaw 5**: Dr. Simonson failed to replicate reality by inventing a fictitious "product line up" stimulus that no consumer has ever seen. This fictitious stimulus was problematic because it (a) deviates from marketplace reality, (b) taught respondents to associate the term "products" with "shoes" (thereby contaminating subsequent key questions, which use the word "product"), (c) improperly primed respondents to focus on physical shoes, and (d) did not control for order bias, since Dr. Simonson failed to randomize the order of the images in the stimulus.

5.9.  **Fatal Flaw 6**: Dr. Simonson chose a highly atypical example of a Vault NFT in his Main Survey, i.e., the "Nike SB Dunk Low Ben & Jerry's Chunky Dunky." This stimulus is materially different from all other Vault NFTs on multiple dimensions: (a) it uses outdated disclosure language (i.e., language used from January 18, 2022 to on or about February 14, 2022) whereas all other NFTs on StockX use updated language with substantially expanded disclosures, and (b) it is the only StockX Vault NFT to legibly show the Nike word mark on the product itself. Both of these differences logically would increase confusion. In addition, this stimulus references a third brand – Ben & Jerry's – which unnecessarily complicates the analysis of questions 340-377 for respondents and may encourage respondents to merely list, or "read back", all brand names they see. Thus, setting aside all other flaws, Dr. Simonson cannot generalize his purported confusion results in the Main Survey to all of the

other Vault NFTs, during the entire period for which they have been offered. Accordingly, any informative value of Dr. Simonson's survey is limited to the Vault NFT for the Nike SB Dunk Low Ben & Jerry's Chunky Dunky, and Dr. Simonson's survey is otherwise fatally flawed with respect to the remaining Vault NFTs.

5.10. **Fatal Flaw 7**: Dr. Simonson draws a scientifically improper conclusion from the results of his Companion Survey—i.e., that "the StockX disclosures are ineffective at reducing consumer confusion regarding the source of the Vault NFTs."[100] This conclusion is invalid because (a) he did not conduct a randomized experiment in which consumers were randomly assigned to Test versus Control groups that vary, respectively, in whether the StockX disclosures were present vs. absent,[101] and (b) the disclosure presented in the Main Survey was not the one typically used by StockX (see Flaw 6).

5.11. **Fatal Flaw 8**: Dr. Simonson's Control stimulus removes far more than just the allegedly infringing elements, and increases the prominence of the StockX trademark, in a manner likely to suppress Control group confusion and thereby skew net results in Plaintiff's favor.

5.12. **Fatal Flaw 9**: Dr. Simonson included a follow-up question regarding "other products and services," (Q355). However, he then improperly ignored the data from this question. Once the data from this question is

---

[100] Expert Report of Dr. Itamar Simonson, ¶ 22.
[101] As explained under Fatal Flaw 6, Dr. Simonson instead attempts to compare findings from his Main and Companion Surveys to draw his conclusion that "the StockX disclosures are ineffective at reducing consumer confusion regarding the source of the Vault NFTs." Expert Report of Dr. Itamar Simonson, ¶ 22.

**analyzed using the standard method used in Eveready surveys, the results show no likelihood of confusion even if one (improperly) chooses to consider only source confusion.**

### 6. The Neal Survey

6.1. In this Section, I describe and document results for my own likelihood of confusion survey, using the Eveready format, which eliminated the flaws in Dr. Simonson's approach. My survey shows that there is no likelihood of confusion stemming from Defendant's alleged use of Plaintiff's marks on the StockX website.

6.2. The purpose of my survey was to determine whether Defendant's use of Plaintiff's marks on its Vault NFTs causes relevant consumers to be confused and believe that Defendant's Vault NFTs are offered by, affiliated/connected with, or needed permission/approval from Plaintiff.

6.3. To achieve this purpose, I designed and executed a likelihood of confusion survey with a total of 455[102] actual and potential purchasers of NFTs for collectible sneakers. The confusion survey I conducted employed the Eveready methodology. I describe the full methodology in Section 7 of this Report and I describe the results from the survey in Sections 8-9. The sample

---

[102] Following standard practice in the field, I excluded an additional 69 respondents who themselves or someone in their household works for a company that mints, sells, or distributes NFTs or shoes (see Q14, Exhibit B). I also excluded 25 respondents who provided gibberish or nonsense responses to open-ended questions. I then excluded five respondents that had duplicate IP addresses, had no IP address, or failed the attention check question (see S12, Exhibit B). Finally, I excluded three respondents were suspected of taking the survey multiple times. I note that including these additional respondents would not materially alter any of my conclusions. Note that the sum of respondents excluded is greater than the unique number of respondents excluded (95 respondents) as some respondents were excluded for more than one reason. The data from all additional respondents is provided in Exhibit B.

selection, questionnaire design, and data analysis procedures followed scientific best practices. The survey was designed to meet the criteria detailed in the Federal Judicial Center's <u>Manual for Complex Litigation, Fourth</u> and the <u>Reference Manual on Scientific Evidence, Third</u>. Accordingly, the survey provides valid and reliable scientific data regarding any likelihood of confusion as to source and/or affiliation, or approval that may be caused by Defendant's use of Plaintiff's marks on its Vault NFTs.

6.4. **Summary of Key Findings from Neal Survey**

6.5.  In my considered opinion, the results from my survey clearly establish that Defendant's use of Plaintiff's marks on its Vault NFTs does not cause a likelihood of confusion with Plaintiff.

6.6.  I base this conclusion on my academic and professional experience and my scientific survey of 455 U.S. adults, ages 18 or older, who are actual and potential purchasers of NFTs for collectible sneakers.

6.7.  Below, I briefly summarize the survey design and the main findings from my survey.

6.8.   After standard demographic questions and quality controls, I screened respondents to ensure that they were (a) purchasers or potential purchasers of NFTs corresponding to a physical pair of sneakers or shoes, and/or (b) purchasers or potential purchasers of NFTs and purchasers or potential purchasers of collectible sneakers or shoes.

6.9.   All respondents then viewed Defendant's homepage, shown in Figure 1

(For full version of website shown to respondents, see Exhibit C).

**Figure 1.** Defendant's homepage as seen by Test and Control Group respondents.



6.10.  After reviewing Defendant's homepage, respondents were randomly assigned

to a Test Group or a Control Group. Respondents in the Test Group were

shown the product page for one of Defendant's accused Vault NFTs (the Nike Dunk Low Retro White Black – US M 10), which included an allegedly confusing image of a Nike-branded shoe. Respondents in the Control Group saw an otherwise identical Vault NFT with the image of the allegedly confusing Nike-branded shoe removed. The Test and Control imagery is shown below (see also Exhibit C).

6.11.   For the Control imagery, I removed the image of the Nike Dunk Low Retro White Black sneaker associated with the Vault NFT, and I added the name of the product in a font mimicking that used on StockX paper receipts. I made this decision based on the allegations in Nike's First Amended Complaint, which acknowledge StockX's use of paper receipts bearing the name of the purchased product, and do not object to those receipts. Instead, the First Amended Complaint compares them to Vault NFTs, stating: "[u]nlike a Vault NFT, upon information and belief, this paper receipt prominently uses StockX's own mark and only uses the Nike name in connection with the purchased shoe, yet somehow still manages to function as a receipt for that Nike shoe."[103] The First Amended Complaint also visually depicts a StockX paper receipt, which is included for reference below.

---

[103] First Amended Complaint, ¶ 80.



[104]

---

**Figure 2**. Defendant's Vault NFT product for the Nike Dunk Low Retro White Black – US M 10, as seen by Test Group respondents.



**Figure 3**. Defendant's Vault NFT for the Nike Dunk Low Retro White Black – US M 10, as seen by Control Group respondents.



6.12.   For my stimuli, I selected the StockX Vault NFT Nike Dunk Low Retro White Black – US M 10, which is heavily featured in Plaintiff's First Amended Complaint.[105] This particular Vault NFT is representative of the Vault NFTs at issue, and does not suffer from the same flaws as the StockX Vault NFT Nike SB Dunk Low Ben & Jerry's Chunky Dunky – US M 10, which Dr. Simonson used for his surveys.

6.13.   Respondents in both groups (Test and Control) were able to view the "How It Works" disclosure associated with the Vault NFT, available for viewing on the PDP for each Vault NFT (see Exhibit C for image of the back of the Vault NFT and detailed description of instructions provided to respondents). I elected to use the typical and current version of the "How It Works" disclosure, rather than the atypical and outdated version Dr. Simonson used in his survey.

6.14.   After viewing their assigned Vault NFT, respondents in both Groups were then asked a series of standard Eveready-format questions to elicit their perceptions of confusion as to the source, affiliation, and permission of Defendant's Vault NFT. Respondents that mentioned Plaintiff or products put out by Plaintiff were coded as confused (including obvious misspellings). Below, I provide a summary of results from both Groups:

6.14.1. In the Test Group, 169 respondents out of 228 (i.e., 74.1%) indicated that Defendant's Vault NFT was offered by Plaintiff, or that the company or brand that offered Defendant's Vault NFT had a business affiliation with

---

[105] Plaintiff's First Amended Complaint, ¶¶ 5, 60; 63, 75, 77-78, 81, 83, 85-86, 108.

Plaintiff or that the company or brand that offered Defendant's Vault NFT needed to get permission or approval from Plaintiff.

6.14.2. In the Control Group (where images of Nike shoes were replaced with text descriptions of Nike shoes)**,** 161 respondents out of 227 (i.e., 70.9%) indicated that Defendant's Vault NFT was offered by Plaintiff, or that the company or brand that offered Defendant's Vault NFT had a business affiliation with Plaintiff or that the company or brand that offered Defendant's Vault NFT needed to get permission or approval from Plaintiff.

6.14.3. Following standard practice in Eveready surveys, I subtracted the confusion level found in the Control Group (70.9%) from the confusion level found in the Test Group (74.1%) to arrive at a "net level of confusion." This net confusion level tells us the amount of confusion that is being caused specifically by Defendant's use of the Plaintiff's marks, separate from other unrelated factors (e.g., guessing, general beliefs in the category, etc.). For my survey, the net confusion level is 3.2% (i.e., 74.1% minus 70.9% = 3.2%).

6.14.4. This level of net confusion falls far below the standard threshold used to determine that likelihood of confusion exists.[106]

---

[106] Matthew G. Ezell & AnnaBelle Sartore, "Survey Percentages in Lanham Act Matters" in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, 317-334 (Shari S. Diamond & Jerre B. Swann, eds., 2022).

6.15.  In my scientific opinion, the results from my survey clearly establish that Defendant's use of Plaintiff's marks on its Vault NFTs does not cause a likelihood of confusion with Plaintiff.

6.16.  In Sections 7-9 of my report, I describe the specific methodology, recruitment procedures, scientific controls, data analysis steps, and detailed findings for the survey.

## 7.  Recruitment and Sampling for Neal Survey

7.1.  In May 2023, I fielded a survey described in this Report and collected data from 550 respondents in the United States, aged 18 or older. **Exhibit B** is a copy of each survey respondent's verbatim answers to each survey question, including both their numeric and text responses. Attached as **Exhibit C** is a copy of the questionnaire reflecting the questions that survey respondents were asked and the imagery they saw. Following standard practice in the field, I excluded 69 respondents who indicated that they, or someone in their household, worked for a company that mints, sells, or distributes NFTs or shoes. I also excluded 25 respondents who provided gibberish or nonsense responses to open-ended questions. I then excluded five respondents that had duplicate IP addresses, had no IP address, or failed the attention check question (see S12 in Exhibit C). Finally, I excluded three respondents who were suspected of taking the survey multiple times based on providing identical answers. Thus, the final sample size for analysis was 455 (228 in the Test Group and 227 in the Control Group) and 455 will be considered the full sample for the presentation of the data in this report. I note, however, that none of my conclusions would materially change if

the 95 excluded respondents were included.[107] The data for all respondents, whether included or excluded in my data analysis, is included in **Exhibit B**.

7.2.    I was responsible for the design of the surveys and all procedures that were followed in conducting the survey. Data collection was conducted using the Qualtrics online survey platform. Respondents for the surveys were recruited from Dynata, an industry-leading provider of survey respondents for research studies. Dynata uses multiple methods to verify the identity of its panelists including validation of a panelist's physical address, email address, and mobile phone number against third-party databases and resources. Dynata sent survey invitations using the "click-balancing method" in which survey starts are matched to National Census data with respect to gender, age, and Census region.[108] By using this sampling frame and methodology, I ensured that the characteristics of the final survey sample matched known attributes of the broader target population and ruled out any concerns about non-response bias.[109] A termination report, identifying the number of respondents terminated for any reason, is provided as Exhibit D.

7.3.    The survey methodology exceeded the threshold of a double-blind survey protocol. Specifically, respondents were not informed of the purpose or sponsor of the survey, and thus were "blind" to this information. By virtue of being conducted through an automated online survey platform, the survey also

---

[107] Ninety-five unique respondents were excluded. Some respondents were excluded for more than one reason, so the sum of respondents excluded for the reasons noted is greater than 95.

[108] See Matthew Kugler & Charles Henn Jr., "Internet surveys in trademark cases: Benefits, challenges, and solutions" in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, 291-314, 310 (Shari S. Diamond & Jerre B. Swann, eds. 2012).

[109] For a general discussion of non-response bias and sample representativeness, see Shari S. Diamond, "Reference Guide on Survey Research," Reference Manual on Scientific Evidence (3rd ed. 2011).

removed any potential for interviewer bias or errors in data recording. Thus, the data collection method was also "blind" to the hypotheses being tested.

7.4.    The relevant universe for a "forward" (as opposed to "reverse")[110] likelihood of confusion survey includes actual and prospective purchasers of the Defendant's products or services, which, in this case is actual and prospective purchasers of NFTs corresponding to a physical pair of collectible sneakers or shoes (as approximated through respondents who either had purchased, or would consider purchasing, an NFT corresponding to a physical pair of collectible sneakers or respondents who had purchased, or would consider purchasing, both an NFT and a physical pair of collectible sneakers).[111] To narrow the sample to this universe, I first screened out individuals who were under 18 years of age or who would rather not select their age (S4, Exhibit C). I then screened individuals to ensure that they were using a laptop computer, desktop computer, tablet, or smartphone (S5, Exhibit C). I also screened to ensure that all respondents lived in the United States, including Puerto Rico and D.C. (S12, Exhibit C).

7.5.    I then screened to ensure that all respondents had purchased NFTs and/or were likely to purchase NFTs in the next year (S7 and S8, Exhibit C). In

---

[110] The relevant universe for testing "forward" confusion is conventionally the junior user's actual and potential customers given that forward confusion occurs when consumers believe that the junior user's products or services are put out by, approved by or affiliated with the senior user. The relevant universe for testing "reverse" confusion is conventionally the senior user's actual and potential customers given that reverse confusion occurs when consumers believe that the senior user's products or services are put out by, approved by or affiliated with the junior user. *See* William G. Barber and Giulio E. Yaquinto. "The Universe" in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, 31-56, 32-33, 35 (Shari S. Diamond & Jerre B. Swann, eds. 2022).

[111] Specifically, I screened respondents to ensure in the last or next 12 months they had/were likely to (a) purchase an NFT corresponding to collectible sneakers or shoes, or (b) purchase an NFT and purchase collectible sneakers or shoes.

addition, I screened all respondents to ensure that they either had purchased or were likely to purchase a collectible pair of sneakers or shoes (S7 and S8, Exhibit C) or had purchased or were likely to purchase an NFT corresponding to a physical pair of sneakers or shoes (S9 and S10, Exhibit C). As an additional quality control (sometimes termed a "red-herring" or "false-positive"),[112] I terminated any respondent who selected that they had purchased or were likely to purchase an NFT corresponding to a prescription medication (S9 and S10, Exhibit C).

7.6.   Finally, I screened out individuals who work for an advertising agency or market research firm or live in a household with someone who does (S6, Exhibit C). Through these screening items, I generated a representative sample of adults aged 18 or older who are purchasers or potential purchasers of NFTs corresponding to a physical pair of sneakers or shoes and/or purchasers or potential purchasers of NFTs and a collectible pair of sneakers or shoes.

7.7.   The survey also included three quality control items designed specifically to ensure respondents were paying attention and providing valid and reliable responses in the survey. First, the survey included a randomly generated "CAPTCHA" question (see S1, Exhibit C), which ensured respondents could clearly see the screen and the information being presented. Second, the survey included an "attention check" (see S12, Exhibit C) which ensured respondents were reading the survey questions put to them. Third, the survey included two

---

[112] Neal, "Psychological Considerations in Designing Trademark and False Advertising Survey Questionnaires" in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, 273-290 (Shari S. Diamond & Jerre B. Swann, eds. 2022).

questions about respondents' age, which ensured respondents were providing honest and consistent answers (see S2 and S4, Exhibit C). Respondents selecting two different ages were terminated. Respondents who failed one (or more) of these quality control metrics were terminated from the survey.

7.8.   In addition, survey respondents were required to complete the survey in one session without interruption, were not allowed to consult with any other website or sources of any kind and, if necessary to read clearly, were required to wear glasses or contacts throughout the survey (S13, Exhibit C). They were also explicitly instructed not to guess. All respondents consented and agreed to comply with these requirements.

7.9.   Survey respondents who met all of the screening criteria described in Paragraphs 7.1 to 7.8 above proceeded to the main survey. In Section 8 below, I describe the specific questions put to respondents in the same order in which they appeared in the survey. Under each question, I include a data table of results for that question. Programming instructions are shown in bold in brackets (see Exhibit C for the full survey along with all programming, skip, and display logic).

7.10.  As is my standard practice, I briefly paused fielding of the survey after collecting an initial number of respondents in order to review the data and survey administration platform. This step fulfills the function of a pilot or pretest[113] and, after observing no issues with the survey, I resumed fielding and completed data collection.

---

[113] Shari S. Diamond, "Reference Guide on Survey Research," Reference Manual on Scientific Evidence (3rd ed. 2011), p. 388.

8.  **Detailed Neal Survey Results**

8.1.  In this Section, I describe each question asked in the survey I conducted. I also provide a table of results for each question. The survey commenced with a series of questions designed to screen respondents to ensure they met the relevant universe.

8.2.  Tables 2-6 below provide the results of Screening Questions S2 (age), S3 (gender), S4 (age quality control), S5 (device), and S6 (advertising or marketing industry affiliation). Screening Question 1 was a CAPTCHA question used as a quality control metric and attention check, so no data was saved.

Question S2.

What year were you born?
**[DROP DOWN LIST OF YEARS 1925-2007; ELIMINATE IF UNDER 18]**

**Table 2.** Results for Question S2: Cross Checked with Age Group Selected in Q4 (Total N=455).

|                      | Number Matching and Percentage |
|----------------------|--------------------------------|
| **Yes, age matches** | 455 (100.0%)                   |
| **Total**            | 455 (100.0%)                   |

Question S3.

Are you…

**[RANDOMIZE EXCEPT IF ANCHORED; SINGLE-SELECT]**
1.  Male
2.  Female
3.  Non-binary **[ANCHOR]**
4.  Prefer not to say **[ANCHOR]**

76

**Table 3.** Results for Question S3: Gender Composition (Total N=455).

| Response Options | Number Selecting and Percentage |
|---|---|
| Male | 307 (67.5%) |
| Female | 144 (31.6%) |
| Non-binary | 4 (0.9%) |
| Prefer not to say | 0 (0.0%) |
| Total | 455 (100.0%) |

Question S4.

Which of these age ranges includes your age?
**[DON'T RANDOMIZE; SINGLE-SELECT]**

1. Under 18 **[TERMINATE]**
2. 18-24
3. 25-34
4. 35-44
5. 45-54
6. 55 or older

**Table 4.** Results for Question S4: Age Composition (Total N=455).

| Response Options | Number Selecting and Percentage |
|---|---|
| Under 18 | 0 (0.0%) |
| 18-24 | 61 (13.4%) |
| 25-34 | 125 (27.5%) |
| 35-44 | 149 (32.7%) |
| 45-54 | 99 (21.8%) |
| 55 or older | 21 (4.6%) |
| Total | 455 (100.0%) |

Question S5.

Please indicate below the device you are using to take this survey.
**[RANDOMIZE EXCEPT FINAL TWO OPTIONS; SINGLE-SELECT]**
1. Laptop computer
2. Desktop computer
3. Tablet
4. Smartphone
5. Other type of device not listed above **[ANCHOR; TERMINATE]**
6. Don't know/Not sure **[ANCHOR; TERMINATE]**

**Table 5.** Results for Question S5: Device (Total N=455).

| Response Options | Number Selecting and Percentage |
|---|---|
| **Laptop computer** | 82 (18.0%) |
| **Desktop computer** | 66 (14.5%) |
| **Tablet** | 13 (2.9%) |
| **Smartphone** | 294 (64.6%) |
| **Other type of device not listed above** | 0 (0.0%) |
| **Don't know/Not sure** | 0 (0.0%) |
| **Total** | 455 (100.0%) |

Question S6.

Do you, or does anyone in your household, work for any of the
following types of companies? Please select all that apply.
**[RANDOMIZE EXCEPT FINAL OPTION; MULTI-SELECT]**
1. An advertising agency **[TERMINATE]**
2. A market research firm **[TERMINATE]**
3. None of these **[ANCHOR; EXCLUSIVE]**

**Table 6.** Results for Question S6: (Total N=455).

|  | Number Matching and Percentage |
|---|---|
| **An advertising agency** | 0 (0.0%) |
| **A market research firm** | 0 (0.0%) |
| **None of these** | 455 (100.0%) |
| **Total** | 455 (100.0%) |

8.3.   Via Screening Questions 7-12 shown below, I then screened respondents to ensure that they had personally purchased either "[a] non-fungible token (NFT)" in the past 12 months (S7) or were likely to do so in the next 12 months (S8). If respondents also selected "[a] collectible pair of sneakers or shoes" at S7 or S8, they skipped to S11. Those who selected "a non-fungible token (NFT)" at S7 or S8 but did not select "[a] collectible pair of sneakers or shoes" were shown S9 or S10, respectively, which asked whether respondents purchased "[a]n NFT corresponding to physical pair of sneakers or shoes" in the past 12 months (S9) or were likely to do so in the next 12 months (S10). Respondents that did not purchase "[a]n NFT corresponding to physical pair of sneakers or shoes" in the past 12 months (S9) or were likely to do so in the next 12 months (S10), but purchased "a non-fungible token (NFT)" in the past 12 months (S7) or were likely to do so in the next 12 months (S8) AND purchased "a collectible pair of sneakers or shoes" in the past 12 months (S7) or were likely to do so in the next 12 months (S8), qualified for the survey. Thus, to qualify, respondents were required either to be (a) purchasers or potential purchasers of NFTs

corresponding to a physical pair of sneakers or shoes, or (b) purchasers or

potential purchasers of NFTs and also purchasers or potential purchasers of

collectible sneakers or shoes. Finally, all respondents were U.S. residents

(S11) and passed the attention check question (S12).

Question S7.

Which of the following, if any, have you purchased in the last year?
Please select all that apply.
**[RANDOMIZE EXCEPT FINAL OPTION; MULTI-SELECT]**
1. A painting or sculpture
2. A car, truck, or sports utility vehicle (SUV)
3. A life insurance policy
4. An exchange traded fund (ETF) listed on the US stock market
5. A non-fungible token (NFT)
6. A collectible pair of sneakers or shoes
7. None of the above/I don't recall **[ANCHOR; EXCLUSIVE]**

**Table 7.** Results for Question S7: Purchases Made in the Last Year (Total
N=455).

| Response Options | Number Selecting and Percentage |
|---|---|
| **A painting or sculpture** | 115 (25.3%) |
| **A car, truck, or sports utility vehicle (SUV)** | 202 (44.4%) |
| **A life insurance policy** | 180 (39.6%) |
| **An exchange traded fund (ETF) listed on the US stock market** | 239 (52.5%) |
| **A non-fungible token (NFT)** | 277 (60.9%) |
| **A collectible pair of sneakers or shoes** | 320 (70.3%) |
| **None of the above/I don't recall** | 33 (7.3%) |

Question S8.

And thinking about the next year, which of the following, if any, would
you consider purchasing? Please select all that apply.

80

**[RANDOMIZE EXCEPT FINAL OPTION; MULTI-SELECT]**
1. A painting or sculpture
2. A car, truck, or sports utility vehicle (SUV)
3. A life insurance policy
4. An exchange traded fund (ETF) listed on the US stock market
5. A non-fungible token (NFT)
6. A collectible pair of sneakers or shoes
7. None of the above/I don't know **[ANCHOR; EXCLUSIVE]**

**Table 8.** Results for Question S8: Purchases Considering in the Next Year (Total N=455).

| Response Options | Number Selecting and Percentage |
|---|---|
| A painting or sculpture | 217 (47.7%) |
| A car, truck, or sports utility vehicle (SUV) | 349 (76.7%) |
| A life insurance policy | 227 (49.9%) |
| An exchange traded fund (ETF) listed on the US stock market | 331 (72.7%) |
| A non-fungible token (NFT) | 398 (87.5%) |
| A collectible pair of sneakers or shoes | 348 (76.5%) |
| None of the above/I don't know | 2 (0.4%) |

Question S9.

You indicated that you purchased a non-fungible token (NFT) in the past year. Which of the following specific types of NFTs, if any, did you purchase in the last year?
Please select all that apply.
**[MULTI-SELECT AND RANDOMIZE; DON'T RANDOMIZE IF ANCHORED]**
1. An NFT corresponding to an artwork
2. An NFT corresponding to an avatar
3. An NFT corresponding to an event ticket
4. An NFT corresponding to a song or album
5. An NFT corresponding to a video game character or weapon

81

6. An NFT corresponding to physical pair of sneakers or shoes
7. An NFT corresponding to prescription medication **[FALSE POSITIVE; TERMINATE]**
8. None of the above; I don't recall **[ANCHOR]**

**Table 9.** Results for Question S9: Specific Types of NFTs Purchased in the Last Year (Total N=455).

| Response Options | Number Selecting and Percentage |
|---|---|
| **An NFT corresponding to an artwork** | 3 (0.7%) |
| **An NFT corresponding to an avatar** | 5 (1.1%) |
| **An NFT corresponding to event ticket** | 3 (0.7%) |
| **An NFT corresponding to a song or album** | 4 (0.9%) |
| **An NFT corresponding to a video game character or weapon** | 7 (1.5%) |
| **An NFT corresponding to a physical pair of sneakers or shoes** | 6 (1.3%) |
| **An NFT corresponding to a prescription medication** | 0 (0.0%) |
| **None of the above/I don't recall** | 0 (0.0%) |

Question S10.

You indicated that you would consider purchasing a non-fungible token (NFT) in the next year. Which of the following specific types of NFTs, if any, would you consider purchasing in the next year? Please select all that apply.
**[MULTI-SELECT AND RANDOMIZE; DON'T RANDOMIZE IF ANCHORED]**
1. An NFT corresponding to an artwork
2. An NFT corresponding to an avatar
3. An NFT corresponding to an event ticket
4. An NFT corresponding to a song or album
5. An NFT corresponding to a video game character or weapon
6. An NFT corresponding to physical pair of sneakers or shoes
7. An NFT corresponding to prescription medication **[FALSE POSITIVE; TERMINATE]**
8. None of the above; I don't know **[ANCHOR]**

**Table 10.** Results for Question S10: Specific Types of NFT Purchases Considering in the Next Year (Total N=455).

| Response Options | Number Selecting and Percentage |
|---|---|
| **An NFT corresponding to an artwork** | 21 (4.6%) |
| **An NFT corresponding to an avatar** | 8 (1.8%) |
| **An NFT corresponding to event ticket** | 11 (2.4%) |
| **An NFT corresponding to a song or album** | 9 (2.0%) |
| **An NFT corresponding to a video game character or weapon** | 11 (2.4%) |
| **An NFT corresponding to a physical pair of sneakers or shoes** | 29 (6.4%) |
| **An NFT corresponding to a prescription medication** | 0 (0.0%) |
| **None of the above/I don't know** | 0 (0.0%) |

Question S11:

In what state do you live?

**[PROGRAMMER: DROPDOWN MENU OF STATES PLUS D.C. AND PUERTO RICO. INCLUDE AN OPTION FOR "OTHER" AND TERMINATE IF IT IS SELECTED.]**

See Appendix, Exhibit C, for full list.

**Table 11.** Results for Question S11: State of Residence (Total N=455).

| Residency | Number Selecting and Percentage |
|---|---|
| **U.S. resident** | 455 (100.0%) |
| **Total** | 455 (100.0%) |

Question S12.

For quality assurance, please type the word "survey" in the blank next to the "Other" box below and then click to continue.
1. Strongly agree
2. Agree
3. Neutral
4. Disagree
5. Strongly disagree
6. Other _____ **[DO NOT FORCE TEXT BOX]**

**Table 12.** Results for Question S12: Pass Quality Assurance (Total N=455).

|  | Number Matching and Percentage |
|---|---|
| **Yes** | 455 (100.0%) |
| **No** | 0 (0.0%) |

8.4.  Question S13 presented a number of instructions to respondents and was displayed only if respondents had not been terminated. If the respondent did not understand or agree to the instructions at Question S13, they were excluded. The specific question wording for Question S13 is shown below.

Question S13.

You have qualified to take this survey. Before continuing, please carefully read these instructions:
- Please take the survey in one session without interruption.
- Please keep your browser maximized for the entire survey.
- While taking the survey, please do not consult any other websites or other electronic or written materials.
- Please answer all questions on your own without consulting any other person.
- If you normally wear eyeglasses or contact lenses when viewing a computer screen, please wear them for the survey.
- Please do not guess.

*Please select one response*
**[RANDOMIZE]**
1. I understand and agree to the above instructions
2. I do not understand or do not agree to the above instructions
   **[TERMINATE]**

**Table 13.** Results for Question S13: (Total N=455).

| | Number Matching and Percentage |
|---|---|
| **I understand and agree to the above instructions** | 455 (100.0%) |
| **Total** | 455 (100.0%) |

8.5.　Respondents who qualified (i.e., passed all screening criteria up to and including Screening Question S13) were randomly assigned either to the Test Group or Control Group. All respondents were first provided general instructions via Question 1 (see below). Defendant's website homepage was then presented in Question 2. Before advancing to the next screen, respondents were required to view the image for a minimum of twenty seconds. Respondents were free to view the image as long as they wished beyond this minimum. Then, in Question 3, respondents in the Test Group were shown an accused Vault NFT, as sold by StockX, which included the allegedly confusing image of a Nike-branded shoe. Respondents in the Control Group saw an otherwise identical Vault NFT, with the image of the allegedly confusing Nike-branded shoe removed.

8.6.　Before advancing to the next screen, respondents were required to view their assigned image for a minimum of twenty seconds. Respondents were free to view the image as long as they wished beyond this minimum. Respondents in

both groups were given the option to see the back of the Vault NFT by selecting "See back of product/service" or to "Continue to the next part of the survey" at Question 3. Respondents were then asked whether or not they were able to clearly see the pages from the website (Q4). Respondents who were unable to clearly view the website pages, were terminated. See below for the specific question wording for Questions 1-5 and the results for Questions 3 and 5.

Question 1.

On the next few screens we are going to show you the website for an online marketplace for the resale of sneakers, streetwear, electronics, luxury handbags, and other collectibles. The website also allows you to buy certain of those goods through an NFT that serves as a digital token representing ownership of the physical item that is stored in the company's vault for safe keeping. We will show you the website's homepage followed by the page for a specific product or service. Please carefully review the website just as you would if you were considering purchasing one or more of the items shown.

When you have finished, you will be asked some questions. You will not be able to go backwards. For any question, if you have no opinion or do not know then please indicate so. Please do not guess.

Question 2.

First, please take your time to review the website's homepage. Please scroll or zoom in as needed.
The "Continue" button will appear after 20 seconds, but you can spend as much time reviewing as you wish.
**[INSERT WEBSITE HOMEPAGE]**
**[CONTINUE BUTTON TO APPEAR AFTER 20 SECONDS]**

Question 3.

Now please take your time to review the page below, which shows a specific product or service offered on the same website you just reviewed. Please scroll or zoom in as needed.

After 20 seconds, two options will appear at the bottom of the page. You will have the option to either continue to the next part of the survey or to see a larger image of the back of the specific product or service, as shown in the thumbnail. Please select whichever option matches

what you would do in the real world. Again, you can spend as much time reviewing as you wish.

**[INSERT FRONT PRODUCT PAGE WEBSITE IMAGERY FOR TEST GROUP VS. CONTROL GROUP]**

**[IF RESPONDENT SELECTS "CONTINUE TO NEXT PART OF SURVEY," SKIP Q17]**
**[RANDOMIZE]**
1. Continue to next part of survey
2. See back of product/service

**Table 14.** Results for Q3: Continue or See Back of Product/Service (Total N=455).

| | | Number Matching and Percentage |
|---|---|---|
| **Continue to next part of survey** | Test Group | 83.8% (191/228) |
| | Control Group | 84.1% (191/227) |
| **See back of product/service** | Test Group | 16.2% (37/228) |
| | Control Group | 15.9% (36/227) |
| **Total** | Test Group | 100% (228/228) |
| | Control Group | 100% (227/227) |

Question 4.

Please take your time to review the page below, which shows the back of the specific product or service you just reviewed. The "Continue" button will appear after 20 seconds, but you can spend as much time reviewing as you wish. Please scroll or zoom in as needed.

**[INSERT BACK PRODUCT PAGE WEBSITE IMAGERY FOR TEST GROUP VS. CONTROL GROUP]**

**[CONTINUE BUTTON TO APPEAR AFTER 20 SECONDS]**

Question 5.

Before continuing with the survey, please indicate whether or not you were able to clearly see the pages from the website.
**[RANDOMIZE]**

1. Yes - I could clearly see the website pages
2. No - I was unable to clearly see one or more website pages
**[TERMINATE]**

**Table 15.** Results for Q5: Could Clearly See the Website Pages (Total N=455).

|  | **Number Matching and Percentage** |
|---|---|
| **Yes – I could clearly see the website pages** | 455 (100.0%) |
| **Total** | 455 (100.0%) |

8.7.  In this Section, I report the results of Questions 6-14, which are standard Eveready-method questions designed to test the extent, if any, of likely consumer confusion. Question 6 asked respondents what company or brand they think is offering the product or service on the website they were just shown. If respondents entered at least one company/brand, they were asked to explain why they thought the company they entered is offering the product or service on the website they were just shown (Q7).

8.8.  Next, Question 8 asked respondents if they thought the company or brand that is offering the product or service on the website they were just shown had a business affiliation or connection with any other companies or brands. If respondents thought that there was a business affiliation or connection with any other companies or brands, they were shown Question 9, which asked respondents to enter what other company or brand they believed has a business affiliation or connection with the company or brand that is offering the product or service on the website they were just shown. If respondents entered at least one company, they were asked to explain why they thought the

company/brand they entered has a business affiliation or connection with the company or brand that is offering the product or service on the website they were just shown (Q10).

8.9.   Next, in Question 11, respondents were asked whether they thought that the company or brand that is offering the product or service on the website they were just shown needed to get permission or approval from another company or brand. If respondents thought that the company or brand that is offering the product or service on the website they were just shown needed to get permission or approval from another company or brand in Question 11, they were shown Question 12, which asked respondents to enter what other company or brand they believe the company or brand that is offering the product or service on the website they were just shown needed permission or approval from. If respondents entered at least one company/brand, they were asked to explain why they thought that in Question 13.

8.10.  Respondents' text entries for the three confusion questions (Q6, Q9, and Q12) were coded independently by two coders, blind to condition. A respondent was classified as confused if they mentioned "Nike" or a product put out by Nike (e.g., "Air Jordan", "Converse"), including obvious misspellings, for any of the three confusion questions. In the Tables below, I break out the number and percentage of respondents classified as confused using these criteria for each question.

8.11. Finally, Question 14 asked whether respondents or anyone in their household works for a company that mints, sells, or distributes NFTs or a company that

makes, sells, or distributes shoes.

8.12. See below for the specific question wording and results for Questions 6 through

14. In each Table, results are broken down separately for the Test versus

Control Groups.

Question 6.

What company or brand do you think is offering the product or service on the website you were just shown?

If you are thinking of more than one company or brand, please enter each one in a separate box below.

**[5 SMALL TEXT BOXES & INCLUDE A "DON'T KNOW/NO OPINION" OPTION. FORCE AT LEAST ONE TEXT BOX OR DON'T KNOW/NO OPINION, BUT DO NOT ALLOW BOTH. ABOVE THE TEXT BOXES DISPLAY, "COMPANY/BRAND"]**

**Table 16.** Results for Q6: Respondents Identifying Plaintiff at Q6 (Total N=455).

| | | Percent and Number Mentioning Plaintiff or Plaintiff's Goods or Services |
|---|---|---|
| **Test Group** | Nike | 56.1% (128/228) |
| | Air Jordan/Converse | 14.5% (33/228) |
| | Nike and/or Air Jordan/Converse | 59.6% (136/228) |
| **Control Group** | Nike | 54.2% (123/227) |
| | Air Jordan/Converse | 14.5% (33/227) |
| | Nike and/or Air Jordan/Converse | 58.1% (132/227) |

Question 7.

What makes you say that **[COMPANY/BRAND]** is offering the product or service on the website you were just shown?

**[PIPE ANY ANSWER ENTERED IN Q19. REPEAT FOR EACH ANSWER TO Q19] [ONE-LINE TEXT BOX FOR EACH]**

See Exhibit B for Question 7 data.

Question 8.

Do you think that the company or brand that is offering the product or service on the website you were just shown…
**[RANDOMIZE FIRST TWO OPTIONS; SINGLE-SELECT]**
1. <u>Does have</u> a business affiliation or connection with any other companies or brands?
2. <u>Does not have</u> a business affiliation or connection with any other companies or brands?
3. Don't know/No opinion **[ANCHOR]**

**Table 17.** Results for Q8: Percentage and Number of Respondents Who Thought that the Company or Brand Offering the Product or Service on the Website They Were Just Shown Has a Business Affiliation or Connection with Another Company or Companies (Total N=455).

| Response Options | Group | Number Matching and Percentage |
|---|---|---|
| <u>**Does have**</u> **a business affiliation or connection with another company or companies** | Test Group | 64.0% (146/228) |
| | Control Group | 65.6% (149/227) |
| <u>**Does not have**</u> **a business affiliation or connection with another company or brand** | Test Group | 14.9% (34/228) |
| | Control Group | 17.6% (40/227) |
| **Don't know/No opinion** | Test Group | 21.1% (48/228) |
| | Control Group | 16.7% (38/227) |

91

Question 9.

What other company or brand do you believe has a business affiliation or connection with the company or brand that is offering the product or service on the website you were just shown?

If you are thinking of more than one company or brand, please enter each one in a separate box below.

**[5 SMALL TEXT BOXES & INCLUDE A "DON'T KNOW/NO OPINION" OPTION. FORCE AT LEAST ONE TEXT BOX OR DON'T KNOW/NO OPINION, BUT DO NOT ALLOW BOTH. ABOVE THE TEXT BOXES DISPLAY, "COMPANY/BRAND"]**

**Table 18.** Results for Q9: Respondents Identifying Plaintiff at Q9. (Total N=455).

| | | Percent and Number Mentioning Plaintiff or Plaintiff's Goods or Services |
|---|---|---|
| **Test Group** | Nike | 26.8% (61/228)_ |
| | Air Jordan/Converse | 6.1% (14/228) |
| | Nike and/or Air Jordan/Converse | 29.8% (68/228) |
| **Control Group** | Nike | 19.4% (44/227) |
| | Air Jordan/Converse | 9.7% (22/227) |
| | Nike and/or Air Jordan/Converse | 22.5% (51/227) |

Question 10.

What makes you say that **[COMPANY/BRAND]** has a business affiliation or connection with the company or brand that is offering the product or service on the website you were just shown?

**[PIPE ANY ANSWER ENTERED IN Q2. REPEAT FOR EACH RESPONSE TO Q22] [ONE-LINE TEXT BOX FOR EACH]**

See Exhibit B for Question 10 data.

Question 11.

Do you think that the company or brand that is offering the product or service on the website you were just shown…
**[RANDOMIZE FIRST TWO OPTIONS; SINGLE-SELECT]**
1. Did need to get permission or approval from another company or brand?
2. Did not need to get permission or approval from another company or brand?
3. Don't know/No opinion **[ANCHOR]**

**Table 19.** Results for Q11: Percentage and Number of Respondents Who Believed Plaintiff had a Business Affiliation or Connection with the Company or Brand Offering the Product or Service on the Website They Were Just Shown (Total N=455).

| Response Options | Group | Number Matching and Percentage |
|---|---|---|
| **Did need** to get permission or approval from another company or brand | Test Group | 48.7% (111/228) |
| | Control Group | 49.8% (113/227) |
| **Did not need** to get permission or approval from another company or brand | Test Group | 30.7% (70/228) |
| | Control Group | 29.1% (66/227) |
| **Don't know/No opinion** | Test Group | 20.6% (47/228) |
| | Control Group | 21.1% (48/227) |

Question 12.

93

What other company or brand do you believe the company or brand that is offering the product or service on the website you were just shown needed to get permission or approval from?

If you are thinking of more than one company or brand, please enter each in a separate box below. If you don't know, please select that option.

**[5 SMALL TEXT BOXES & INCLUDE A "DON'T KNOW/NO OPINION" OPTION. FORCE AT LEAST ONE TEXT BOX OR DON'T KNOW/NO OPINION, BUT DO NOT ALLOW BOTH. ABOVE THE TEXT BOXES DISPLAY, "COMPANY/BRAND"]**

**Table 20.** Results for Q12: Respondents Identifying Plaintiff at Q12. (Total N=455).

| | | Percent and Number Mentioning Plaintiff or Plaintiff's Goods or Services |
|---|---|---|
| **Test Group** | Nike | 14.9% (34/228) |
| | Air Jordan/Converse | 1.3% (3/228) |
| | Nike and/or Air Jordan/Converse | 15.8% (36/228) |
| **Control Group** | Nike | 14.5% (33/227) |
| | Air Jordan/Converse | 4.0% (9/227) |
| | Nike and/or Air Jordan/Converse | 16.3% (37/227) |

Question 13.

What makes you say that the company or brand that is offering the product or service on the website you were just shown needed to get permission or approval from **[COMPANY/BRAND]**?

**[PIPE ANY ANSWER ENTERED IN Q25. REPEAT FOR EACH ANSWER TO Q25] [ONE-LINE TEXT BOX FOR EACH]**

See Exhibit B for Question 13 data.

Question 14.

Do you, or does anyone in your household, work for any of the
following types of companies? Please select all that apply.
**[MULTI-SELECT; RANDOMIZE EXCEPT FINAL OPTION]**

1. A company that mints, sells, or distributes NFTs **[FLAG AS
INDUSTRY AFFILIATED]**
2. A company that makes, sells, or distributes shoes **[FLAG AS
INDUSTRY AFFILIATED]**
3. A company that makes, sells, or distributes cars, trucks, or SUVs
4. A company that makes, sells, or distributes paintings or sculptures
5. None of these **[ANCHOR; EXCLUSIVE]**

**Table 21.** Results for Q14: Industry Affiliation (Total N=455).

| Industry Affiliation | Yes | | No | | Total |
|---|---|---|---|---|---|
| | N | % | N | % | N |
| **A company that mints, sells, or distributes NFTs** | 38 | 7.4% | 479 | 92.6% | 517 |
| **A company that makes, sells, or distributes shoes** | 38 | 7.4% | 479 | 92.6% | 517 |
| **A company that makes, sells, or distributes cars, trucks, or SUVs** | 23 | 4.4% | 494 | 95.6% | 517 |
| **A company that makes, sells, or distributes paintings or sculptures** | 23 | 4.4% | 494 | 95.6% | 517 |
| **None of these** | 436 | 84.3% | 81 | 15.7% | 517 |

**9. Summary of Confusion as to Source, Affiliation, or Approval Results in Neal
Survey**

9.1.   In this final results Section, I report on the confusion rates from my survey by

combining results from across the questions reported in Section 8. That is, I

report the total number of respondents in the Test and Control Groups who

perceived that Plaintiff specifically was the source of Defendant's Vault NFT <u>or</u>

has a business affiliation/connection with Defendant's Vault NFT <u>or</u> needed to

give permission/approval to Defendant's Vault NFT. By comparing these

combined confusion numbers across the Test and Control Groups, we can

determine whether people are more likely to be confused when the alleged causes of confusion are present in Defendant's Vault NFT (Test Group) than when they are absent (Control Group).

9.2.   To arrive at this overall confusion rate for my survey, I followed standard practice in Eveready confusion surveys. That is, I first calculated the number and percentage of respondents who were either confused as to source (Q6), and/or confused as to affiliation/connection (Q9), and/or confused as to approval/permission (Q12). As noted earlier, respondents' verbatim entries for each question were coded to identify the number of respondents that mentioned either Plaintiff (i.e., "Nike"), or Plaintiff's goods or services (i.e., "Air Jordan" or "Converse"), in any of the three confusion questions, including obvious misspellings. Table 22 below presents the results of this analysis for the Test and Control Groups.

9.3.   As Table 22 shows, 74.1% (169 out of 228) of Test Group respondents indicated that Plaintiff is the source of Defendant's Vault NFT, is connected/affiliated with that source, and/or needed to give permission/approval to Defendant's Vault NFT. In the Control Group, 70.9% (161 out of 227) of respondents indicated that Plaintiff is the source of Defendant's Vault NFT, is connected/affiliated with that source, and/or needed to give permission/approval to Defendant's Vault NFT.

**Table 22.** Results for Q6/Q9/Q12: Percentage and Number of Respondents Who Believed Plaintiff Was the Company or Brand Offering the Product or Service on the Website They Were Just Shown, or Had a Business Affiliation or Connection or Needed to Give Permission or Approval to the Company or Brand Offering the Product or Service on the Website They Were Just Shown (Total N=455).

| | Percent and Number Mentioning Plaintiff or Plaintiff's Goods or Services | |
|---|---|---|
| **Test Group** | Plaintiff mentions (i.e., Nike) | 71.5% (163/228) |
| | Plaintiff's goods/services mentions (e.g., Air Jordan/Converse) | 19.3% (44/227) |
| | Plaintiff and Plaintiff's goods/services mentions (Nike and/or Air Jordan/Converse) | 74.1% (169/228) |
| **Control Group** | Plaintiff mentions (i.e., Nike) | 67.4% (153/227) |
| | Plaintiff's goods/services mentions (e.g., Air Jordan/Converse) | 23.3% (53/227) |
| | Plaintiff and Plaintiff's goods/services mentions (Nike and/or Air Jordan/Converse) | 70.9% (161/227) |

9.4.    Following standard practice in Eveready surveys, I subtracted the confusion rate in the Control Group from the confusion rate in the Test Group to arrive at a "net confusion rate" that captures confusion with Plaintiff caused specifically by Defendant's use of Plaintiff's marks on Defendant's Vault NFTs. As Table 23 shows, that net confusion rate is 3.2%.

**Table 23.** Results for Q6/Q9/Q12: Percentage and Number of Respondents Who Believed Plaintiff Was the Company or Brand Offering the Product or Service on the Website They Were Just Shown, or Had a Business Affiliation or Connection or Needed to Give Permission or Approval to the Company or Brand Offering the Product or Service on the Website They Were Just Shown (Total N=455).

| | | Percent and Number Mentioning Plaintiff or Plaintiff's Goods or Services |
|---|---|---|
| **Test** | Plaintiff and Plaintiff's goods/services mentions (Nike and/or Air Jordan/Converse) | 74.1% (169/228) |
| **Control** | Plaintiff and Plaintiff's goods/services mentions (Nike and/or Air Jordan/Converse) | 70.9% (161/227) |
| **Net (Test – Control)** | 3.2% | |

9.5.   By way of summary, this result (3.2% net confusion) falls far below any reasonable threshold for determining that a likelihood of confusion exists.[114] Based on this result, it is my considered scientific opinion that Defendant's use of Plaintiff's marks on its Vault NFTs <u>does not</u> cause relevant consumers to be confused and believe that Defendant's Vault NFTs are offered by, affiliated/connected with, or needed permission/approval from Plaintiff.

## 10.  Other Information/Materials Reviewed

10.1.  In preparing this Rebuttal Report, I reviewed:

---

[114] Matthew G. Ezell & AnnaBelle Sartore, "Survey Percentages in Lanham Act Matters" in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, 317-334 (Shari S. Diamond & Jerre B. Swann, eds., 2022).

10.1.1. Expert Report of Dr. Itamar Simonson

10.1.2. Plaintiff's First Amended Complaint

10.1.3. Defendant's Answer to Plaintiff's First Amended Complaint

10.1.4. Other materials as cited throughout this report.

10.2. This report is based on information currently available to me, and I reserve the right to amend or supplement this report and my opinions when and if additional information or documents are made available to me.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief, this 2nd day of June 2023.

David T. Neal, Ph.D.