UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
                                                    :
NIKE, INC.,                                         :
                                                    :
                          Plaintiff,                :
                                                    :
               v.                                   :       No. 22 CV 983 (VEC) (SN)
                                                    :
STOCKX LLC,                                         :
                                                    :
                          Defendant.                :
                                                    :
                                                    :
----------------------------------------------------------------x


**DEFENDANT STOCKX LLC'S MEMORANDUM OF LAW IN OPPOSITION TO
NIKE, INC.'S MOTION TO EXCLUDE THE EXPERT TESTIMONY OF
<u>SARAH BUTLER, ROBERT VIGIL, AND DEJONGH WELLS</u>**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. ii

PRELIMINARY STATEMENT ...........................................................................................1

ARGUMENT ...........................................................................................................................3

I.    Sarah Butler's Testimony That StockX's Advertising Did Not Drive Purchase Intent Is Relevant and Reliable. ..........................................................................................................3

    A.    Consumer Perceptions of StockX's Advertising Claims Are Relevant. .....................3

    B.    Butler's Survey Was Methodologically Sound and Her Results Are Reliable. ..........5

II.    Dr. Robert Vigil's Apportionment Opinions Are Admissible. .........................................10

    A.    Vigil's Use of Butler's Survey Results Is Reliable. ..................................................11

    B.    Vigil's Reliance on GOAT Data Is Appropriate. ......................................................15

    C.    Vigil's "Testimony on 'Other Considerations'" Is Appropriate Rebuttal. ...............16

III.    DeJongh "Dee" Wells' Testimony About Sneakerheads and the Sneaker Industry, Based on His Four Decades of Experience, Is Reliable and Relevant. .......................................17

    A.    Wells Has Over Four Decades of Experience with Sneakerheads. ..........................18

    B.    Wells' Definition of Sneakerheads and Opinions on Sneakerhead Sophistication Are Relevant and Reliable. ......................................................................20

    C.    Wells' Opinions Concerning Sneaker Counterfeiting and StockX's Efforts Are Relevant to Nike's Counterfeiting Claim and Allegations of Willfulness. ...................................................................................................................22

    D.    Wells' Opinions on Why Sneakerheads Purchase Sneakers and How Vault NFTs Serve Sneakerheads Are Relevant to Nike's Trademark Claims. .................23

    E.    Wells' Opinions on How Sneakerheads Perceive the Market Are Relevant to Nike's False Advertising Claim and Reliably Grounded in Experience. .................24

CONCLUSION.......................................................................................................................26

# TABLE OF AUTHORITIES

## Cases

*Apotex, Inc. v. Acorda Therapeutics, Inc.*,
   823 F.3d 51 (2d Cir. 2016) ............................................................................ 1, 25

*Apple v. Atl. Yards Dev. Co.*,
   2015 WL 11182422 (E.D.N.Y. Mar. 31, 2015) ...................................................... 14

*Burndy Corp. v. Teledyne Indus., Inc.*,
   748 F.2d 767 (2d Cir. 1984) ................................................................................. 4

*Capri Sun GmbH v. Am. Bev. Corp.*,
   595 F. Supp. 3d 83 (S.D.N.Y. 2022) ........................................................ 10, 12, 13

*Castrol Inc. v. Pennzoil Co.*,
   987 F.2d 939 (3d Cir. 1993) ................................................................................. 4

*Church & Dwight Co. v. S.C. Johnson & Son, Inc.*,
   873 F. Supp. 893 (D.N.J. 1994) ........................................................................... 12

*Church & Dwight Co. v. SPD Swiss Precision Diag. GmbH*,
   2018 WL 4253181 (S.D.N.Y. Sep. 5, 2018)....................................................... 4, 12

*CJ Prods. LLC v. Snuggly Plushez LLC*,
   809 F. Supp. 2d 127 (E.D.N.Y. 2011) ................................................................... 5

*Clark v. Travelers Cos., Inc.*,
   2020 WL 473616 (E.D.N.Y. Jan. 29, 2020) ................................................... 21, 22

*Denimafia Inc. v. New Balance Athletic Shoe, Inc.*,
   2014 WL 814532 (S.D.N.Y. Mar. 3, 2014)........................................................... 12

*Dependable Sales and Serv., Inc. v. TrueCar, Inc.*,
   311 F. Supp. 3d 653 (S.D.N.Y. 2018) ................................................................. 17

*Derienzo v. Trek Bicycle Corp.*,
   376 F. Supp. 2d 537 (S.D.N.Y. 2005) ................................................................. 20

*Diesel S.p.A. v. Diesel Power Gear, LLC*,
   2022 WL 956223 (S.D.N.Y. Mar. 30, 2022)........................................................ 24

*Fendi Adele S.R.L. v. Filene's Basement, Inc.*,
   696 F. Supp. 2d 368 (S.D.N.Y. 2010) ................................................................. 23

*Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc.*,
   507 F. App'x 26 (2d Cir. 2013) ........................................................................... 22

*Gap, Inc. v. G.A.P. Adventures Inc.*,
   2011 WL 2946384 (S.D.N.Y. June 24, 2011) ........................................................ 12

*GeigTech E. Bay LLC, v. Lutron Elecs. Co.*,
   2023 WL 6614486 (S.D.N.Y. Sept. 20, 2023)........................................................ 13

*Gucci Am., Inc. v. Guess?, Inc.*,
   831 F. Supp. 2d 723 (S.D.N.Y. 2011),
   *on recons. in part*, 2011 WL 6326032 (S.D.N.Y. 2011) ...................................... 7, 9

*Hamilton Int'l Ltd. v. Vortic LLC*,
   13 F.4th 264 (2d Cir. 2021) ................................................................................ 20

*In re Elysium Health-ChromaDex Litig.*,
   2022 WL 421135 (S.D.N.Y. Feb. 11, 2022).......................................................... 6, 7

*In re Fosamax Prods. Liab. Litig.*,
   645 F. Supp. 2d 164 (S.D.N.Y. 2009) .................................................................. 17

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*,
   2008 WL 1971538 (S.D.N.Y. May 7, 2008) ......................................................... 20

*In re Pfizer Inc. Sec. Litig.*,
   819 F.3d 642 (2d Cir. 2016) ................................................................................. 5

*Info. Clearing House, Inc. v. Find Mag.*,
   492 F. Supp. 147 (S.D.N.Y. 1980) ....................................................................... 24

*Joffe v. King & Spalding LLP*,
   2019 WL 4673554 (S.D.N.Y. Sep. 24, 2019)........................................................ 16

*Kurin, Inc. v. Magnolia Med. Techs., Inc.*,
   473 F. Supp. 3d 1117 (S.D. Cal. Jul. 20, 2020) ................................................... 25

*Lee Valley Tools, Ltd. v. Industrial Blade Co.*,
   288 F.R.D. 254 (W.D.N.Y. 2013).......................................................................... 15

*Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chem. Indus.*,
   2015 WL 5459662 (S.D.N.Y. Sept. 16, 2015)....................................................... 16

*Medisim Ltd. v. BestMed LLC*,
   861 F. Supp. 2d 158 (S.D.N.Y. 2012),
   *on recons. in part*, 2012 WL 1450420 (S.D.N.Y. Apr. 23, 2012) ............................. 6

*Nabisco v. Warner-Lambert Co.*,
   32 F.Supp.2d 690 (S.D.N.Y. 1999) ........................................................................ 7

*New York City Transit Auth. v. Express Scripts, Inc.*,
  588 F. Supp. 3d 424 (S.D.N.Y. 2022) ........................................................ 11

*Oracle Am., Inc. v. Google Inc.*,
  2012 WL 4017808 (N.D. Cal. Apr. 10, 2012) ........................................ 15

*Polaroid Corp. v. Polarad Elecs. Corp.*,
  287 F.2d 492  (2d Cir. 1961) ...................................................................... 20

*Price v. L'Oréal USA, Inc.*,
  2020 WL 4937464 (S.D.N.Y. Aug. 24, 2020) ................................... 24, 25

*R.F.M.A.S., Inc. v. So*,
  748 F. Supp. 2d 244 (S.D.N.Y. 2010) ...................................................... 11

*Reed Const. Data Inc. v. McGraw-Hill Cos., Inc.*,
  49 F. Supp. 3d 385 (S.D.N.Y. 2014) ........................................................... 5

*River Light V, L.P. v. Tanaka*,
  2018 WL 5778234 (S.D. Fla. Nov. 2, 2018) ............................................... 5

*Schering Corp. v. Pfizer Inc.*,
  189 F.3d 218 (2d Cir. 1999) ...................................................................... 10

*Scott v. Chipotle Mex. Grill, Inc.*,
  315 F.R.D. 33 (S.D.N.Y. 2016) ........................................................... 18, 23

*SR Intern. Bus. Ins. Co., Ltd. v. World Trade Center Props., LLC*,
  467 F.3d 107 (2d Cir. 2006) ............................................................... 18, 22

*THOIP v. Walt Disney Co.*,
  690 F. Supp. 2d 218 (S.D.N.Y. 2010) ........................................................ 9

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
  497 F.3d 144 (2d Cir. 2007) ............................................................ 4, 9, 25

*U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers Loc. Union No. 3, AFL-CIO*,
  313 F. Supp. 2d 213 (S.D.N.Y. 2004) ...................................................... 15

*U.S. v. Castillo*,
  924 F.2d 1227 (2d Cir. 1991) .................................................................... 20

*Universal City Studios, Inc. v. Nintendo Co.*,
  746 F.2d 112 (2d Cir. 1984) ................................................................. 6, 13

*Victoria's Secret Stores Brand Mgmt., Inc. v. Sexy Hair Concepts, LLC*,
  2009 WL 959775 (S.D.N.Y. April 8, 2009) .............................................. 10

iv

*Vital Pharms. v. PhD Mktg., Inc.*,
    2022 WL 2952495 (C.D. Cal. July 26, 2022)........................................................ 12

**Other Authorities**

Shari Seidman Diamond, *Control Foundations: Rationales and Approaches*, in *Trademark and Deceptive Advertising Surveys* (ABA, 2d ed. 2022)................................................. 8

Shari Seidman Diamond, *Reference Guide on Survey Research* (3d ed. 2011) .......................... 12

**Treatises**

6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition (5th ed. 2018).......... 7

Defendant StockX LLC ("StockX") respectfully submits this memorandum of law in opposition to Plaintiff Nike, Inc.'s ("Nike") motion to exclude the testimony of StockX's proffered experts, Sarah Butler, Robert Vigil, and DeJongh Wells.

## PRELIMINARY STATEMENT

Nike's motion to preclude should be denied in its entirety. StockX's experts offer testimony relevant to the parties' claims and defenses, and used reliable methodology.

Sarah Butler conducted a consumer perception survey showing that StockX's advertising claims had no impact on past or prospective StockX consumers' purchasing intent. Although Nike asserts Butler's survey is irrelevant, Nike's request for disgorgement of StockX's profits requires establishing what revenues were caused by the allegedly false claims. Butler's survey showing that StockX customers were equally likely to use the platform without the challenged claims is relevant to that issue. Her survey results are also relevant to liability, as the Second Circuit has made clear that false advertising plaintiffs must prove materiality, meaning that the claims were "likely to influence purchasing decisions." *Apotex, Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 63 (2d Cir. 2016). Nike's minor disagreements with Butler's survey methodology, do not rise to the level of making her survey unreliable under *Daubert*.

StockX's damages expert, Dr. Robert Vigil, offers a series of analyses showing that StockX has little to no profits attributable to the advertising claims at issue. First, Nike challenges Dr. Vigil's reliance on Butler's survey to apportion revenues. Nike's critiques fail to acknowledge that Butler's survey looked at exactly the relevant question for apportionment: whether consumers who have used, or would be likely to use, the StockX platform would change their purchasing behavior based on the advertising claims. Because the advertising claims Butler surveyed had no statistically significant impact on StockX consumers' purchase intent, Dr. Vigil reliably opines that the vast majority of StockX's revenues cannot be said to have been caused by

1

its advertising.  This is exactly the kind of relevant, reliable evidence (based on an accepted scientific methodology) that a party can present to a jury under Rule 702.  Second, Dr. Vigil analyzed data from StockX and one of its main competitors, GOAT, which StockX has used to inform its Board of Directors about the competitive landscape.  Dr. Vigil's analysis, again based on sound scientific analysis, shows that StockX's removal of the challenged advertising did not affect sales patterns on StockX versus a competitor, further demonstrating that the advertising at issue was not material.  Finally, Dr. Vigil draws on his extensive background in economics to describe other factors that influence consumer behavior that were not considered at all by Nike's damages expert in evaluating at-issue revenues.

Nike seeks to exclude DeJongh "Dee" Wells, who has more than four decades of experience in the sneaker industry as an academic, author, speaker, and adviser to major sneaker industry players, including Nike itself.  Wells' testimony is relevant to all of Nike's claims.  He can explain to the jury the world of "sneakerheads" – sophisticated consumers with a passion for sneaker culture who are a core demographic of StockX users, and a target demographic for StockX's Vault NFTs, which enable faster and cheaper trading of collectible sneakers.  Drawing on his extensive knowledge of the industry and his reliable collection of information from relevant consumers, Wells explains how StockX's Vault NFTs offer a solution to storage and shipping costs that are a problem for sneakerheads who buy and sell collectible sneakers like commodities.  Wells also explains the sophistication of sneakerheads, a key likelihood-of-confusion factor in evaluating Nike's trademark claims, and testimony relevant to Nike's counterfeiting and false advertising claims.  Wells provides the jury with relevant context about the resale market for collectible sneakers, based on his unique and detailed knowledge of this market, including how Nike's intentional decisions – creating artificial scarcity for desirable

products – contribute to counterfeiting, which StockX devotes enormous resources to combat. This testimony is relevant to disprove Nike's allegations of willfulness.  As to false advertising, which includes allegations about StockX's use of "authentication," Wells' decades of experience dealing with the resale marketplace for sneakers allow him to explain how sneakerheads are aware of the possibility of counterfeits when buying resold shoes, and (consistent with Butler's survey results) would not base purchasing decisions on secondary market authentication claims like StockX's.  Courts in this District admit this type of testimony from experts with extensive experience in fields – like the sneaker resale industry – not commonly understood by lay jurors.

## ARGUMENT

**I.    Sarah Butler's Testimony That StockX's Advertising Did Not Drive Purchase Intent Is Relevant and Reliable.**

### A.    Consumer Perceptions of StockX's Advertising Claims Are Relevant.

Sarah Butler conducted a consumer perception survey showing that consumers' intent to use StockX's marketplace *does not change* when the claims Nike has alleged were false are removed.  *See* Butler Rep.[1] pp. 5-7.  Her survey is relevant to materiality and causation, key elements of Nike's false advertising claim at both the liability and damages stages.  Nike's arguments – that Butler's survey is irrelevant because Nike will argue that StockX's claims are literally false and material as a matter of law – improperly ask the Court to exclude evidence legally relevant to those claims and StockX's defenses before any decision on their merits.

Butler's survey compared consumers' interest levels in shopping on StockX after viewing either the claims at issue or a different set of claims with Nike's challenged language removed.  Her survey showed that StockX's advertising claims, in their full context, had ***no impact*** on consumers' purchasing decisions.  A statistically equivalent number of respondents were likely

---

[1] ECF No. 194, Duvdevani Decl. Ex. 15 ("Butler Rep.").

to use StockX to purchase sneakers when its webpages included the claims at issue, as when the webpages did not.  Butler Rep. ¶ 43; Butler Tr.[2] 58:23-59:1; 62:19-63:3; 83:9-14.

Nike's arguments on Butler's relevance to StockX's *liability* ignores that Butler conducted her survey in response to Nike's *damages* theory – namely, Nike's assumption that every Nike sneaker transaction on StockX is subject to disgorgement.  But even if Nike "establishes liability for false advertising," it "will be entitled ***only*** to such damages as were ***caused by*** the violation."  *Church & Dwight Co. v. SPD Swiss Precision Diag. GmbH*, 2018 WL 4253181, at *3 (S.D.N.Y. Sep. 5, 2018) (quoting *Burndy Corp. v. Teledyne Indus., Inc.*, 748 F.2d 767, 771 (2d Cir. 1984)) (emphasis added).  Butler's survey addresses causation: if consumers were equally likely to use StockX without the advertising, StockX's revenues did not result from those claims.  Butler's relevance to damages is sufficient on its own to admit her testimony.

Nike's attacks on Butler's relevance to liability for false advertising misunderstand the law, and do not provide any basis to exclude Butler's testimony.  Nike's falsity argument proceeds by taking each at-issue claim completely out of context, which the Second Circuit has held is improper: "a district court evaluating whether an advertisement is literally false '***must*** analyze the message conveyed ***in full context***.'"  *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007) (emphasis added) (quoting *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 946 (3d Cir. 1993)).  All of Nike's arguments address StockX's claims in isolation, without considering how consumers actually saw them – unlike Butler's survey, which showed consumers StockX's advertising in their context on StockX's website.  Butler Rep. ¶¶ 30-34.  In that proper context, StockX's advertising was not literally false; it conveyed the true message that every product offered on StockX's platform underwent an authentication inspection.

---

[2] Decl. of Christopher S. Ford ("Ford Decl."), Ex. A, Transcript of the Deposition of Sarah Butler ("Butler Tr.").

Nike next asserts that Butler's survey is irrelevant because StockX's advertising could be material as a matter of law. But the two cases Nike cites on materiality are not *Daubert* cases, and both discuss the importance of considering relevant evidence and a full evidentiary record. *See* ECF No. 193, p. 8 n.5 ("Nike Br."), *citing CJ Prods. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 148 (E.D.N.Y. 2011) (on preliminary injunction, evaluating "authentic" claim and finding defendant offered inadequate evidence); *River Light V, L.P. v. Tanaka*, 2018 WL 5778234, at *6 (S.D. Fla. Nov. 2, 2018) (at summary judgment, noting defendant "has not cited to anything in the record to support her assertion"). Unlike those cases, StockX *does have evidence* that its advertising was not material to rebut any presumption of materiality: Butler's survey shows that the advertising did not affect consumer purchase intent *at all*. *See Reed Const. Data Inc. v. McGraw-Hill Cos., Inc.*, 49 F. Supp. 3d 385, 418-19 (S.D.N.Y. 2014) (granting summary judgment for defendant on false advertising because "even if a presumption of materiality applied," the defendant rebutted the presumption with evidence the claims were not "material to consumers' purchasing decisions"). Butler's survey will be relevant evidence for StockX to rebut Nike's theory of materiality,[3] and the Second Circuit has held that it would be an abuse of discretion to exclude an expert's testimony as "unhelpful to the jury" before resolution of a party's merits arguments. *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 661 (2d Cir. 2016).

### B. Butler's Survey Was Methodologically Sound and Her Results Are Reliable.

1. Butler's Universe of Past and Prospective StockX Customers Is Reliable.

Every one of Butler's survey respondents was a past or prospective StockX customer

---

[3] In passing, Nike references a third-party study StockX commissioned, which Nike misleadingly asserts showed that ▓▓ of respondents ▓▓▓▓▓▓▓▓ Nike Br. p. 2; Duvdevani Decl. Ex. 7 p. 14. Nike fails to mention that the survey in question allowed consumers to choose multiple "most important" concepts, and that authentication ranked ▓▓ among U.S. respondents, demonstrating just how many factors go into StockX consumers' purchasing decisions other than authentication. *See id.* Even more importantly, the survey in question did not test *any* of StockX's advertising claims that are at issue here.

who would consider buying sneakers on a resale marketplace.  Butler Rep. ¶ 22.  Butler's stimulus showed respondents a variety of the challenged advertising claims, including alongside a Nike sneaker on StockX's website.  *Id.* ¶ 34.  Past and prospective customers is the well-established appropriate universe for a false advertising survey.  *See Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984) ("To be probative and meaningful . . . surveys . . . must rely on potential consumers of the products in question.") (citation omitted); *In re Elysium Health-ChromaDex Litig.*, 2022 WL 421135, at *4 (S.D.N.Y. Feb. 11, 2022) (admitting in part false advertising survey of past and prospective purchasers; noting that a challenge to the universe "presents the paradigmatic jury issue").  Butler's survey universe was appropriate to understand the effect of the alleged false advertising on the relevant consumer population.

Nike's criticisms of Butler's universe are contradictory: first arguing the survey is "problematic" that "respondents had to have previously purchased or would be likely to purchase sneakers from StockX" because of possible "pre-disposition of purchase interest," but then arguing it is unreliable because it "did not narrow respondents to actual purchasers," even though past purchasers *necessarily* have the pre-disposition Nike earlier argued to be a flaw.  *See and compare* Nike Br. pp. 11, 18.  Nike's criticisms ignore Butler's data, which isolated respondents with a past familiarity with StockX and found *no impact*.  Butler Rep. ¶ 42.  Even if Nike were right that past familiarity might have an effect, random test and control sorting solved the issue: it would be equally likely to help Nike in the test cell as to help StockX in the control cell.  Butler Tr. 93:1-8; *see Medisim Ltd. v. BestMed LLC*, 861 F. Supp. 2d 158, 178 n.149 (S.D.N.Y. 2012), *on recons. in part*, 2012 WL 1450420 (S.D.N.Y. Apr. 23, 2012) ("The use of a control group is the gold standard for eliminating survey responses due to . . . pre-existing beliefs.").

2.    Butler Used an Appropriate and Reliable Survey Control.

Butler followed reliable survey methodology, showing test respondents StockX webpages

containing the alleged false advertising and control respondents the same pages with each at-issue claim changed to an uncontested claim or removed.  Nike criticizes just one of the control changes Butler made: changing "authenticated" to "inspected."  Nike Br. p. 13.  This change was consistent with proper control design: it replaced a challenged word with a similar word Nike does not allege is false.  "The general principle for choosing an appropriate control is easily stated: It should share as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed."  6 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 32:187 (5th ed. 2018); *see In re Elysium*, 2022 WL 421135, at *12 ("[T]he control thus properly put before the respondents an innocuous message."); *Nabisco v. Warner-Lambert Co.*, 32 F.Supp.2d 690, 700 (S.D.N.Y. 1999) (control should be "non-infringing" and "similar to the [claims] at issue"); *see also Gucci Am., Inc. v. Guess?, Inc.*, 831 F. Supp. 2d 723, 740 (S.D.N.Y. 2011), *on recons. in part*, 2011 WL 6326032 (S.D.N.Y. 2011) ("[W]hile the fact that a survey used a control that could have been 'stronger' or 'better' may mean it is entitled to less weight, it does not mean that the survey does not provide relevant information.").

Nike's complaint that some respondents may have considered "authenticated" and "inspected" to be synonyms only demonstrates the suitability of Butler's control.  Nowhere does Nike argue that StockX's advertising would be false if "inspected" had been used instead of "authenticated."  The fact that Butler's control term was similar to her test term without being allegedly untrue makes it ideal, not improper.  "A proper control should be as similar to the experimental stimulus as possible, because if there are multiple differences between them, it may be impossible to determine which of those differences caused any disparity between the respondents' reactions to them."  *In re Elysium*, 2022 WL 421135, at *13.

Nike's argument that Butler's control was improper because the results of her test and control group were "similar" fares no better.  Nike Br. p. 13.  On its face, Nike's argument would require exclusion of any survey with a low net result (which, in Lanham Act cases, are favorable to a defendant).  Nike cites no authority suggesting that a purchase intent survey showing that many respondents intend to purchase a product is inherently flawed (and what authority it does cite comes from the inapposite context of trademark infringement surveys not intended to measure purchase intent).  Indeed, such results are consistent with a conclusion that the variable being tested simply *has no effect* on purchasing intent because other factors are more important.  For example, a survey that showed wealthy car enthusiasts a Ferrari with a spoiler (test cell) or without (control cell) could very well result in high purchase intent in both cells, proving that the spoiler was not material to purchase decisions and that other factors drove consumer behavior.  All of the complaints Nike directs at the control are characteristics of potential respondents that were equally likely to be sorted into the test cell.  *See Shari Seidman Diamond, Control Foundations: Rationales and Approaches*, in *Trademark and Deceptive Advertising Surveys* 254-255 (ABA, 2d ed. 2022) ("A control group design that includes an appropriate control or controls is the best way to ensure that noise from preexisting beliefs, yea-saying and guessing (both random and biased) cannot explain away or undermine evidence of confusion or deception reflected in the responses of survey participants.").

       3.      Butler's Stimuli Reliably Replicated the Context of StockX's Advertising.

Butler's survey depicts actual StockX webpages, with the sole addition in one place of at-issue language that no longer appears on StockX's website.  Where Butler added that language, she did so by using the language exactly as it previously appeared on the site.  Butler Tr. 183:23-185:1.  This is entirely appropriate; it would be a departure from marketplace reality to construct fake stimuli that isolated the tested claims from their real-world context. *See THOIP v. Walt*

8

*Disney Co.*, 690 F. Supp. 2d 218, 231 (S.D.N.Y. 2010) (failure to approximate market conditions, or removal of labels present in the marketplace, can be grounds for exclusion).

Butler's decision to show consumers the full StockX's webpages *on which the challenged advertising claims appeared* was appropriate. Nike argues that Butler erred by showing her respondents too many webpages, but in doing so ignores the Second Circuit's instruction that advertising claims must be considered in their "***full context***." *Time Warner*, 497 F.3d at 158. That requires considering the claim "in its entirety" rather than "engag[ing] in disputatious dissection" of the statements. *Id.* StockX will establish at trial that its advertising was accurate, made clear to consumers what its authentication process involved, and guaranteed consumers a refund if an error was made. Nike's false advertising theory cannot be proven by dissecting StockX's claims into phrases isolated from the context in which consumers saw them. Nike's assertion that Butler's survey created "information overload" only demonstrates the flaw in Nike's own theory: if consumers were unlikely to pay attention to the challenged advertising claims as they appeared on StockX's websites in Butler's survey, consumers would also be unlikely to have paid attention to those claims in the real world. Butler's survey appropriately showed respondents more than one claim and webpage at once in order to test the claims at issue in context. *See Gucci*, 831 F. Supp. 2d at 740 (noting approval of a survey that tested more than ten trade dress elements at once).

Finally, Nike challenges Butler's survey based on the time respondents took to complete the survey. *See* Nike Mot. p. 16. Nike provides no data to support its assertions, and Butler's data shows that respondents took a reasonable amount of time to review five webpages and answer two questions: the average response time was over 11 minutes, and 132 respondents took more than 10 minutes. *See* Butler Rep. Ex. G. Moreover, the time a respondent spent answering

the survey had no impact on the results.  Ford Decl. Ex. B, Butler Decl. ¶ 4.  Courts in this

Circuit decline to exclude surveys based on time spent viewing stimuli because "[i]n real life, the

length and depth of a customer's engagement with a product she encounters varies by customer."

*Capri Sun GmbH v. Am. Bev. Corp.*, 595 F. Supp. 3d 83, 126 (S.D.N.Y. 2022).

Nike alleged flaws in Butler's survey methodology accordingly do not merit exclusion.[4]

## II.     **Dr. Robert Vigil's Apportionment Opinions Are Admissible.**

Nike seeks to exclude Vigil's opinion that "very few, if any, of StockX's trades are

attributable to the alleged false claims."  ECF No. 194, Duvdevani Decl. Ex. 1 ("Vigil Am.

Rebuttal") ¶ 10, § II.B.4.  In support of that opinion, Vigil relied on (*i*) the conclusion from

Butler's survey that the allegedly false claims "do not influence respondents' purchase interest,"

Butler Rep. ¶ 10; Vigil Am. Rebuttal ¶¶ 70-71; (*ii*) an analysis of Butler's survey data showing

that "the maximum percentage of respondents for whom the alleged false claims may have had

some impact on [purchase intent] . . . ranges from approximately 0.8 percent to 3.5 percent," *id.*

¶¶ 72-74; and (*iii*) a regression analysis of StockX and GOAT sales and transactions data

showing "no statistically significant change between StockX's and GOAT's relative sales and

transactions before and after" StockX removed the at-issue claims, *id.* ¶¶ 75-77.

Nike also seeks to exclude Vigil's opinions that Nike's damages expert (*i*) ignores factors

other than StockX's advertising that may have contributed to StockX's popularity; and (*ii*)

improperly assumed that all StockX users believed StockX eliminated the possibility of receiving

counterfeit products, despite evidence of repeat purchases by StockX buyers who returned

---

[4] At most, all of Nike's arguments go to weight.  *See Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 227 (2d Cir. 1999) (Sotomayor, J.) ("[E]rrors in [survey] methodology thus properly go only to the weight of the evidence."); *Victoria's Secret Stores Brand Mgmt., Inc. v. Sexy Hair Concepts, LLC*, 2009 WL 959775, at *6 n.3 (S.D.N.Y. April 8, 2009) ("[A]ssertions of methodological errors in a survey 'bear exclusively on the weight to be given the survey rather than bearing on an admissibility determination under Fed. R. Evid. 403.'").

suspected counterfeits and evidence suggesting StockX customers understood StockX's ability to authenticate products to be imperfect. *See id.* ¶ 9, § II.B.3; Nike Br. p. 20, 25.[5]

Nike's sole basis for exclusion is reliability. Nike Br. p. 17. Nike does not challenge the methodology Vigil used in his analyses, and asserts only "'minor flaws' and alleged weaknesses" that "go to the weight to be accorded to [the expert's] testimony rather than admissibility.'" *New York City Transit Auth. v. Express Scripts, Inc.*, 588 F. Supp. 3d 424, 446 (S.D.N.Y. 2022) (quoting *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 252 (S.D.N.Y. 2010). Nike's criticisms do not withstand analysis, and none support exclusion.

### A.    Vigil's Use of Butler's Survey Results Is Reliable.

In support of his opinion that "very few, if any, of StockX's trades are attributable to the alleged false claims," Vigil relied on results from Butler's survey that "suggest that the allegedly false advertising claims had very little impact on the likelihood that consumers would use StockX to purchase Nike sneakers." Vigil Am. Rebuttal ¶ 70 (citing Butler Rep. ¶ 10). Vigil also performed his own quantitative analysis of the survey data from which he identified that, at most, the challenged claims may have affected the purchase intent of 0.8 to 3.5 percent of StockX customers. Vigil made that determination by calculating the proportions of test and control group respondents likely to purchase sneakers on StockX who identified authentication as among the reasons they were likely to use StockX. *See* Vigil Am. Rebuttal ¶¶ 71-74.

Nike does not challenge Vigil's methodology. Nike instead asserts that Butler's survey is not a "'fair proxy' for the process [Vigil] claims to be analyzing" because (*i*) Butler did not restrict survey participants to "actual purchasers of [Nike branded goods on StockX's platform];" and (ii) Vigil "fail[ed] to confirm that the results of his calculations are statistically significant."

---

[5] These opinions respond to Hansen (*see* section II.B.3). Nike inaccurately asserts they relate to Vigil's opinion (in his section II.B.4) that "very few, if any" trades are attributable to the alleged false claims. *See* Nike Br. p. 20.

Nike Br. pp. 17-18.  Neither criticism warrants exclusion.

        1.      Butler's Respondent Pool Was Appropriate for Vigil's Analysis.

       Butler's survey of both actual prior and likely future StockX purchasers is consistent with

ordinary survey procedures that are routinely upheld in this Circuit and elsewhere.  For Lanham

Act surveys, "the relevant population . . . may include all prospective and past purchasers."

Shari Seidman Diamond, *Reference Guide on Survey Research* 376 (3d ed. 2011).  Courts in the

Second Circuit have thus routinely admitted both (i) surveys of potential purchasers; and (ii)

surveys of both prospective and actual purchasers.  *See, e.g.*, *Capri Sun*, 595 F. Supp. 3d at 124;

*Gap, Inc. v. G.A.P. Adventures Inc.*, 2011 WL 2946384, at *8 (S.D.N.Y. June 24, 2011);

*Denimafia Inc. v. New Balance Athletic Shoe, Inc.*, 2014 WL 814532, at *21 (S.D.N.Y. Mar. 3,

2014); *see also Church & Dwight Co. v. S.C. Johnson & Son, Inc.*, 873 F. Supp. 893, 907 (D.N.J.

1994) (holding that both surveys of actual purchasers and surveys of actual and prospective

purchasers "examined a proper universe").

       Nike's attempted reliance on *Vital Pharms. v. PhD Mktg., Inc.*, 2022 WL 2952495 (C.D.

Cal. July 26, 2022) and *Church & Dwight Co. v. SPD Swiss Precision Diagnostics GmbH*, 2018

WL 4253181 (S.D.N.Y. Sept. 5, 2018) is inapposite.  *See* Nike Br. p. 18.  In the latter case, the

problem was that the survey measured likelihood of deception, rather than the effect of the false

advertising on purchase intent.  *See SPD Swiss Precision,* 2018 WL 4253181. at *8-9.  The

court's observation that actual purchasers might have fallen within the subset of potential

purchasers deceived by the advertising does not suggest that a proper survey measuring purchase

intent, like Butler's, must be limited to actual prior purchasers.  To the extent *Vital* suggests

survey participants should be limited to actual past purchasers, that is not the law of this Circuit.

In *Universal City Studios*, for example, the Second Circuit held that a survey limited to

"individuals who had already purchased or leased [the product at issue] rather than those who

were contemplating a purchase or lease" was improper.  *Universal City Studios*, 746 F.2d at 118.

Here, it was especially appropriate for Butler to include both prior purchasers and prospective purchasers in the survey.  Nike's damages expert assumed all U.S. sales of Nike sneakers on StockX in the Relevant Period were disgorgeable.  Those sales included both repeat purchases by buyers who had previously bought sneakers on StockX and first-time purchases by buyers who had not.  To the extent those groups' purchasing decisions might have been affected differently by the advertising at issue, excluding one of them would have biased Butler's results.  By including **both** those who had previously purchased sneakers on StockX and those who had not, Butler matched the characteristics of her survey pool to the characteristics of the pool of people who actually made the purchases Nike alleges are at issue.  (And, as noted above, Nike earlier argued the exact opposite of what it asserts with respect to Vigil: that Butler should have *excluded* all prior purchasers of Nike sneakers on StockX.  *See* Nike Br. pp. 10-11.)

To the extent Nike intends to suggest that Butler's survey should have been limited to purchasers of Nike products rather than sneakers generally, that is not correct.[6]  Surveys should address the *product* at issue, not the brand in question.  "The appropriate universe for a customer survey is the universe of potential customers, not just those consumers who are specifically interested in the precise product offered by plaintiff."  *GeigTech E. Bay LLC, v. Lutron Elecs. Co.*, 2023 WL 6614486, at *14, *17 (S.D.N.Y. Sept. 20, 2023) (upholding survey where plaintiff failed to show that a broader universe would "differ[] in its responses[] from potential purchasers of plaintiff's products"); *see also Capri Sun*, 595 F. Supp. 3d at 123-24.

### 2.    Vigil's Opinions Account for Statistical Significance.

Nike's suggestion that Vigil's opinions do not consider statistical significance is false.

---

[6] Indeed, Nike's own survey expert used a pool of respondents who "own and expect to purchase sneakers," and not only respondents who own or expect to purchase *Nike* sneakers.  ECF No. 201, Am. Ford Decl. Ex. L ¶ 18.

*See* Nike Br. p. 18. Vigil's opinion that "very few, if any, of StockX's trades of Nike and Jordan branded sneakers are attributable to the alleged false claims," Vigil Am. Rebuttal ¶ 70, follows directly from Butler's survey result that "[a] ***statistically equivalent*** number of respondents [in the test and control groups] indicated that they are likely to purchase a pair of sneakers from StockX," Butler Rep. ¶ 10 (emphasis added). As Butler explained, her results are statistically significant. *Id.* at ¶ 39 ("When I compare the average purchase interest of the Test Group to that of the Control Group, I find there is ***no statistically significant difference***.") (emphasis added).

Vigil's analysis of the "maximum percentage of respondents for whom the alleged false claims may have had some impact on respondents' being likely to use the StockX platform" also does not ignore statistical significance. Vigil Am. Rebuttal ¶¶ 10, 74. Because Butler's survey showed that StockX's advertising had no statistically significant effect on purchase likelihood, there is no basis to attribute ***any*** profits to the at-issue claims. Applying statistical significance in the ordinary fashion, Butler's survey shows that no attributable profits exist. Vigil reasonably could have left it at that. Instead – conservatively acknowledging that there could be some effect not large enough to be statistically significant – he quantified what Butler's results might show if they were treated as statistically significant, even though they are not.

Nike's attempted reliance on *Apple v. Atl. Yards Dev. Co.* is misplaced. There, the court excluded an expert's estimates of the average hours worked in five different trades that had been calculated from survey samples ranging in size from eight to 38 participants. 2015 WL 11182422, at *9-10 (E.D.N.Y. Mar. 31, 2015). The court's finding that the expert "relie[d] on exceedingly small numbers of . . . respondents . . . without considering whether the results generated from those tiny samples are statistically significant" does not apply here. *Id.* Butler conducted a much larger survey, with more than ten times as many participants, and analyzed the

statistical significance of her results.  *See* Butler Rep. ¶¶ 10, 20, 39, 43.  Butler's pool of 409

respondents was a sufficient sample to evaluate whether a statistically significant difference

existed.  Butler Tr. 124:21-128:14; *see also U.S. Info. Sys., Inc. v. Int'l Bhd. of Elec. Workers

Loc. Union No. 3, AFL-CIO*, 313 F. Supp. 2d 213, 232 (S.D.N.Y. 2004) (a "small sample size

goes to the weight rather than to the reliability (and admissibility) of a study") (collecting cases).

### B.      Vigil's Reliance on GOAT Data Is Appropriate.

As additional support for his opinion that "very few, if any, of StockX's trades are

attributable to the alleged false claims," Vigil performed a regression analysis that shows there

was "no statistically significant change between StockX's and GOAT's relative sales and

transactions before and after" StockX removed the allegedly false advertising claims from its

Website.  *See* Vigil Am. Rebuttal ¶¶ 70, 75-77.  Here, again, Nike does not challenge Vigil's

methodology, but asserts that this analysis should be excluded because Vigil did not verify "how

StockX obtained the GOAT data, how it was prepared, or who prepared it."  Nike Br. p. 19.

Nike's challenge is at best premature.  StockX will lay the foundation for the GOAT

data's admission at trial.  Because the Court has not determined the data is inadmissible, it

should not exclude Vigil's analyses.  *See Oracle Am., Inc. v. Google Inc.*, 2012 WL 4017808, at

*4 (N.D. Cal. Apr. 10, 2012) (denying motion to exclude without prejudice to "re-raise this

issue" if the party "fail[s] to lay the necessary foundation for [the expert's] testimony at trial").

Nike's assertion that Vigil "merely assumed that StockX used this 'type of information'

in the past," Nike Br. p. 19, is wrong.  Vigil considered a StockX Board presentation with a

"Competitive Update" analyzing this sales data from StockX and GOAT.  *See* Ford Decl. Ex. C,

STX0090109 at 129; Vigil Am. Rebuttal Ex. 2.  In *Lee Valley Tools, Ltd. v. Industrial Blade Co.*,

the court declined to exclude an expert who relied on data similarly "compiled and relied upon . .

. in the ordinary course of business."  288 F.R.D. 254, 267 (W.D.N.Y. 2013) (collecting cases).

### C.      Vigil's "Testimony on 'Other Considerations'" Is Appropriate Rebuttal.

Nike seeks to exclude as "Testimony On 'Other Considerations'" a section of Vigil's report in which he rebuts opinions proffered by Nike's damages expert, Hansen, by describing (i) a number of "factors that contributed to the popularity of the [StockX] platform" that Hansen ignored; and (ii) items of evidence "of repeat purchases made by StockX buyers who received counterfeit goods" and "suggesting a substantial fraction of StockX customers viewed StockX's ability to authenticate products to be imperfect" – that contradict Hansen's implicit assumption "that all StockX buyers believed that StockX's verification process would eliminate the possibility of receiving counterfeit products."  Vigil Am. Rebuttal ¶ 58, § II.B.3.

Nike's assertion that these opinions should be excluded because Dr. Vigil "did not quantify the number of sales due to these 'other considerations,'" Nike Br. p. 20, misses the point.  "A rebuttal expert, by nature, criticizes the methodology and/or opinions of another. There is no requirement that a rebuttal expert himself offer a competing analysis; his opinions may properly concern criticizing that presented by another party."  *Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chem. Indus.*, 2015 WL 5459662, at *12 (S.D.N.Y. Sept. 16, 2015). Vigil was therefore "under no obligation to create models or methods of his own." *Joffe v. King & Spalding LLP*, 2019 WL 4673554, at *14 (S.D.N.Y. Sep. 24, 2019).

Vigil's opinions are relevant rebuttal opinions, reliably based on his extensive experience as an economist and a damages expert (qualifications Nike does not challenge).  Vigil points out, for example, that Hansen's assumption "that all U.S. trades of Nike sneakers on the StockX platform were driven by the allegedly false claims regarding StockX's authentication process" ignores that "there are a number of considerations that factor into the consumer purchase decision making process, such as speed of delivery, availability of scarce or unique products, price transparency, value for the price, and customer experience;" "StockX is particularly valued

for providing consumers with access to unique and hard-to find items, an easy-to-use platform, and excellent customer service;" and "survey evidence suggests that authentication may not constitute the primary factor driving purchases on the platform for all consumers." Vigil Am. Rebuttal ¶¶ 59-61.  Those are all relevant factors that Vigil explains Hansen wrongly failed to consider in his analysis of profits subject to disgorgement.  *See, e.g.*, *Dependable Sales and Serv., Inc. v. TrueCar, Inc.*, 311 F. Supp. 3d 653, 659-62 (S.D.N.Y. 2018) (excluding damages expert who attributed 100% of sales to false advertising of one feature without weighing other advertised features, accounting for "the possibility that a consumer might have been influenced by external considerations in deciding to purchase," or considering a consumer survey that found "several other factors were identified by a meaningful percentage of respondents").

Nike's assertion that "Vigil's testimony on this point does not convey opinions based on his knowledge and expertise," Nike Br. p. 20, is incorrect.  Vigil relied on his expertise and experience as an economist to point out key omissions in Hansen's analysis.  His opinions are not excludable because they describe facts and evidence Hansen failed to consider in addition to the analytical shortcomings in Hansen's opinions.  Expert testimony is permissible where it "draw[s] inferences that would not be apparent without the benefit of experience or specialized knowledge."  *In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009).

III.    **DeJongh "Dee" Wells' Testimony About Sneakerheads and the Sneaker Industry, Based on His Four Decades of Experience, Is Reliable and Relevant.**

StockX's expert DeJongh "Dee" Wells has decades of experience with the sneaker industry and sneakerheads that serve as a reliable basis for each of his opinions, which are relevant to the claims and defenses in this case.  Sneakerheads are StockX's core customer demographic; it will be critical for the jury to understand both their demographic characteristics and the realities of the sneaker resale industry when it evaluates Nike's Lanham Act claims.

"The test for reliability of expert testimony is flexible, especially in cases where the expert's knowledge is non-scientific and based on experience." *Scott v. Chipotle Mex. Grill, Inc.*, 315 F.R.D. 33, 49 (S.D.N.Y. 2016). In such cases, the basis for testimony is "practical experience rather than scientific analysis," *id.* at 43 and "the method is the application of experience to facts." *Id.* at 50; *see also SR Intern. Bus. Ins. Co., Ltd. v. World Trade Center Props., LLC*, 467 F.3d 107, 132 (2d Cir. 2006) (affirming admission of industry expert with decades of practical experience and "familiar[ity] with practices in the industry," even absent a scientific study).

Nike, which previously hired Wells to advise its Converse brand about marketing to sneakerheads, now seeks to cast aside all of Wells' opinions as unreliable. *See* Nike Br. p. 21 n.9; *see also* Duvdevani Decl. Ex. 17 ("Wells Rep.") ¶ 12. The opinions Nike challenges are all grounded in Wells' extensive experience, however, so his testimony should not be excluded.

### A.    Wells Has Over Four Decades of Experience with Sneakerheads.

Wells does not merely understand sneakerhead culture – he has helped shape it. *See* Wells Rep. ¶¶ 14-38, § II. Wells himself has been a sneakerhead and active collector for over four decades, *id.* ¶ 17, Wells Tr. 16:2-14,[7] and he is a leader within the sneaker industry:

- He co-founded *Sole Collector Magazine*, a "platform for Sneakerheads to connect, share their collections, and stay up to date on sneaker news and releases." Wells Rep. ¶ 19.

- He created *Obsessive Sneaker Disorder*, "the longest-running sneaker culture talk show and podcast," through which he has interviewed celebrity sneakerheads. *Id.* ¶ 20.

- He created and runs *SOLEcial Studies*, "workshops intended to teach people about the footwear business," that cover topics including sneaker design and manufacturing; the role sneakers play in culture; and the impact of counterfeits in the market. *Id.* ¶ 24-26.

- He has helped curate museum exhibitions on sneaker culture at Brooklyn Museum, Bata Shoe Museum, and Mana Contemporary Museum. *Id.* ¶ 30; Wells Tr. 12:14-13:1.

- He actively participates in sneaker-related online discussion forums and social media

---

[7] Ford Decl. Ex. D, Transcript of the Deposition of DeJongh Wells (Aug. 30, 2023).

groups with thousands of members, and spends more than ten hours a week reviewing those sources and engaging with posts. Wells Rep. ¶ 32; Wells Tr. 97:12-19.

- He has helped create in-person "sneaker cons," where "[s]neakerheads and brands gather to display, view, and trade rare sneakers," and meet in person to discuss topics such as "how to keep track of [their] collections," and the issue of counterfeiting in the industry. Wells Rep. ¶ 35; Wells Tr. 85:1-21, 89:15-90:5, 122:3-11.

Beyond this extensive experience as a thought leader, Wells has practical experience working for major brands including Nike, adidas, New Balance, and Saucony. Wells has consulted on the design and manufacture of sneakers. Wells Tr. 48:13-49:25, 52:8-22. He has worked as a marketing consultant, because he is "in the know of what consumers are looking for and what they need." *Id*. at 68:13-23. Wells' wealth of knowledge is amplified by courses he has taken to study "marketing strategies and what motivates consumers," *id*. at 54:2-9, as well as articles and blog posts addressing consumer perception that he has authored, *id*. at 54:10-17.

Wells' prior work with Nike is particularly informative. Because Wells understands the pulse of the sneakerhead community, Nike engaged him to help revamp the Converse brand and provide "feedback on who their end consumer is, *who the sneakerheads are*, [and whether the Converse sneaker] would resonate with general consumers as well as sneakerheads." *Id*. at 47:18-48:12, 55:3-12 (emphasis added). Wells also worked with Nike to create "Niketown" events, through which Nike released highly limited quantities of sneakers inspired by certain cities. Wells Rep. ¶ 22; Wells Tr. 44:14-45:1. These events provided Wells with practical insight into how demand is impacted by scarcity, one of the drivers of sneaker counterfeiting on which Wells seeks to opine. *Id*. at 78:5-19; 79:15-80:17; Wells Rep. ¶ 12(d).

Wells' extensive experience allows him to speak about the traits and expectations of sneakerheads, sneakerhead culture, and the sneaker market, including drivers of counterfeiting, with expertise far beyond that of an ordinary person. Courts in this district have admitted "less traditional" expert testimony where the expert "has extensive experience and expertise beyond

19

that of an ordinary person," particularly regarding a niche population or industry like sneakerheads and the sneaker industry. *See, e.g., Derienzo v. Trek Bicycle Corp.*, 376 F. Supp. 2d 537, 562-63 (S.D.N.Y. 2005) (admitting testimony from cycling expert with "less traditional" expertise on "the areas of the history of cycling, cycling trends and habits, and cycling safety"). Wells is the embodiment of such an expert. Nike's attempts to cast aside Wells' testimony as "truisms" only admits that Wells' testimony is accurate: he can educate jurors about the specialized market in which StockX operates so that they can evaluate StockX's intent in launching Vault NFTs; whether StockX could have known products on its platform were counterfeits; and the context in which StockX's advertising claims were made.[8] *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 2008 WL 1971538, at *6-7 (S.D.N.Y. May 7, 2008) (admitting testimony where expert applied "extensive experience" to analyze facts).

### B. Wells' Definition of Sneakerheads and Opinions on Sneakerhead Sophistication Are Relevant and Reliable.

Wells seeks to opine that sneakerheads are "sophisticated consumers" with a deep passion for "buying, collecting, trading, and/or learning about sneakers," Wells Rep. ¶¶ 12(a), 12(g). The sophistication of sneakerheads – a substantial portion of StockX's customers – is a relevant factor in assessing trademark infringement. *See Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961) ("sophistication of the consumers" is a factor to consider when analyzing likelihood of confusion – the test for infringement); *see also Hamilton Int'l Ltd. v. Vortic LLC*, 13 F.4th 264, 271 (2d Cir. 2021) (watches incorporating components bearing plaintiff's trademark did not constitute infringement in part because the consumer base was

---

[8] Nike's attempt to cast Wells' opinions as a "mix of banal truisms obvious to a lay juror" is distinguishable from the case on which Nike relies – *U.S. v. Castillo*, *see* Nike Br. p. 22. In *Castillo*, the court found that "New York jurors [], flush with daily news of the latest drug bust," did not need expert testimony on issues such as how drug dealers used guns – including that to use a gun they would "put their hand on the handle." 924 F.2d 1227, 1231-32 (2d Cir. 1991). Lay jurors are not "flush with daily news" on the niche sneaker resale industry or sneakerhead culture, and Wells' opinions are far from banal – they are nuanced opinions informed by decades of experience.

"highly sophisticated" such that "potential customers 'would be particularly attuned to the disclosure provided and would almost certainly seek out easily accessible information about [the product]'" (citation omitted)).  Wells can explain the context with which sneakerheads approached StockX's Vault NFTs and accompanying information and disclosures.

Nike's contention that this is irrelevant because sneakerheads are not a substantial portion of StockX consumers is simply wrong.[9]  *See* Nike Br. pp. 22, 24-25; *see also* Ford Decl. Ex. K, STX0021868 at 873 ("The [StockX] brand personality is aligned with 'sneakerhead.'").  Wells testified that StockX is "made for sneakerheads," and "is very popular in the sneakerhead community."  Wells Tr. 67:12-14, 69:15-16.  This ██████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████[10]  Nike cannot credibly contend StockX – a secondary marketplace – does not have a substantial sneakerhead following.

Wells' definition of sneakerheads and opinions as to sneakerhead sophistication are also reliable.  His opinions are based on decades of sneaker industry experience – including engagement by brands, *such as Nike*, to specifically advise on who sneakerheads are and what they want, as well as his decades of engagement with sneakerheads at trade shows, online, and for his magazine and podcast.  *See Clark v. Travelers Cos., Inc.*, 2020 WL 473616, at *5 (E.D.N.Y. Jan. 29, 2020) (permitting marine surveyor's testimony based on "professional experience").  Wells' definition is also consistent with the evidence in this case, ███████████ ██████████████████    *Compare* Wells Rep. ¶ 12(a), *with* Ford Decl. Ex. E, NIKE0036670 at 673

---

[9] Ford Decl. Ex. F, Josh Luber, *Sneakerhead Survey: Initial Results*, StockX (Jul. 11, 2014); *id.* Ex. H, Kori Hale, *Sneakerheads Are Helping StockX Pursue a $2.5 Billion Valuation*, Forbes (Dec. 15, 2020); *id.* Ex G, Dan Hyman, *A Nasdaq for Sneakerheads? StockX Aims to Tame 'Chaos' of Luxury Market*, NY Times (Jul. 6, 2018).
[10] ██████████████████    Nike's other litigation filings, which admit that Nike products are "coveted by sneakerheads throughout the world," Ford Decl. Ex. I, Compl. ¶ 1, *Nike, Inc. v. By KIY LLC* (S.D.N.Y. Nov. 30, 2022) (emphasis added), and that "[s]neakerheads buy rare shoes via . . . online auction sites such as eBay [and] other online storefronts."  *Id.* Ex. J, Compl. ¶ 12, *Nike, Inc. v. Ho* (D. Or. Apr. 28, 2014).

(███████████████████████████████████).

Nike's criticism of Wells' inability to categorize hypothetical people as sneakerheads based on piecemeal information should also be disregarded. *See* Nike Br. p. 23. Much of Wells' definition (███████) depends upon a passion for sneakers that may not be immediately identifiable. *See* Wells Tr. 62:21-66:11. Wells' opinions are not focused on hypotheticals, but describe the reality of how sneakerheads behave. *See Clark*, 2020 WL 473616, at *5 ("It is axiomatic that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.") (citation omitted). To the extent Nike seeks to argue that there are inconsistencies in Wells' opinions, such arguments go at most to weight. *See SR Intern. Bus. Ins. Co., Ltd.,* 467 F.3d at 134 ("gaps or inconsistencies" went "to the weight of the evidence").

### C.    Wells' Opinions Concerning Sneaker Counterfeiting and StockX's Efforts Are Relevant to Nike's Counterfeiting Claim and Allegations of Willfulness.

Wells' opinions that "certain industry factors have led to the presence of a large number of counterfeits in the resale sneaker market," and that resale verification services "have improved the resale experience" provide relevant context for the market in which StockX operates and the challenges with which StockX must contend, and are highly probative of why StockX should not be found to be a willful counterfeiter. Wells Rep. ¶ 12(f), (h); *see Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc.*, 507 F. App'x 26, 31 (2d Cir. 2013) (willfulness requires showing either actual awareness, reckless disregard, or willful blindness). Wells explains how: (1) brands' intentional release of scarce sneakers incentivizes counterfeiters, Wells Rep. ¶ 12(d); (2) e-commerce generally has increased consumer access to goods, but can also make it easier for counterfeiters, *id.* ¶ 12(e); and (3) the quality of genuine Nike sneakers has decreased while the quality of counterfeits has increased, making counterfeit detection more challenging, *id.* ¶ 12(f). Wells also explains why platforms with verification services, like StockX, are superior to an

unpoliced marketplace. *Id*. ¶ 12(h). The realities of sneaker resale and counterfeit sneakers that are "virtually indistinguishable from authentic ones," *id.* ¶ 92, are relevant to whether StockX could have known that Nike shoes sold by third parties on its platform were not genuine. *See Fendi Adele S.R.L. v. Filene's Basement, Inc.*, 696 F. Supp. 2d 368, 393-94 (S.D.N.Y. 2010) (denying summary judgment on willfulness and noting relevance of testimony that "we believed that [products] were genuine, in part because we believed that they were high quality").

**D.    Wells' Opinions on Why Sneakerheads Purchase Sneakers and How Vault NFTs Serve Sneakerheads Are Relevant to Nike's Trademark Claims.**

Wells opines on how Vault NFTs offer sneakerheads "many benefits relative to traditional sneaker collecting and trading" by providing context on the evolution of sneakerhead culture and reasons sneakerheads purchase sneakers. *See* Wells Rep. ¶¶ 12(b)-(c), 12(i), 111, §§ III.B, IV, VIII.C. Nike moves to preclude these opinions on the grounds that they are irrelevant and Wells possesses only "superficial knowledge" of NFTs. Nike Br. p. 22.

To reach relevant opinions, an expert may "lay a foundation" and provide context. *Scott*, 315 F.R.D. at 46 (permitting testimony on "industry norms" as foundation for opinions on "historical success and growth"). Wells' discussion of the evolution of sneakerhead culture and the reasons sneakerheads may purchase sneakers, Wells Rep. §§ III.B-IV, lays a foundation for his opinion that "Vault NFTs address a number of challenges associated with collecting and trading physical sneakers," *id*. ¶¶ 112-114. Wells explains that Vault NFTs are "an innovative way" to provide a more efficient trading experience that address challenges like storage and shipping costs. *Id.* ¶¶ 111-114. These opinions are relevant to whether or not StockX created Vault NFTs in bad faith, one of the factors courts consider in assessing likelihood of confusion. "Bad faith concerns whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any likely confusion between the two companies'

products." *Diesel S.p.A. v. Diesel Power Gear, LLC*, 2022 WL 956223, at *12 (S.D.N.Y. Mar. 30, 2022). Wells' opinions contextualize StockX's decision to meet a market need for improved trading and will help the fact finder determine whether StockX acted in good faith.[11]

Wells does not need technical NFT knowledge to opine on the practical realities of how Vault NFTs benefit sneakerheads. Wells understands correctly that "a Vault NFT is . . . tied to an actual physical pair of sneakers [] in a storage facility that StockX controls." Wells Tr. 58:4-8.; *see also* Wells Rep. ¶ 111. As a sneakerhead actively participating in the industry, Wells Rep. ¶¶ 14-38, Wells can rely on his "own experience" in the field to evaluate the Vault NFTs. *See Price v. L'Oréal USA, Inc.*, 2020 WL 4937464, at *3 (S.D.N.Y. Aug. 24, 2020) (permitting testimony based on expert's extensive experience).

### E.    Wells' Opinions on How Sneakerheads Perceive the Market Are Relevant to Nike's False Advertising Claim and Reliably Grounded in Experience.

Nike also challenges the relevance and reliability of Wells' opinions on sneakerhead perceptions. *See* Wells Rep. ¶ 12(f). As to relevance, Nike argues that Wells' opinions on sneakerhead expectations in the market are irrelevant to Nike's false advertising claims because Wells does not possess certain knowledge such as "the volume of fake 'Nike' shoes sold on StockX, StockX's false statements, and StockX's authentication process." Nike Br. p. 22. This argument again misses the purpose of Wells' testimony. Wells opines that sneakerheads are skeptical of secondary market authentication claims, and would not take such claims literally. Wells Rep. ¶ 12(f); Wells Tr. 102:2-11. Despite Nike's arguments to the contrary, these opinions are plainly disclosed in Wells' report, Wells Rep. ¶ 12(f), § VI, and are relevant to

---

[11] Wells' opinions are also relevant to Nike's claims that the Vault NFTs have diluted or tarnished the Nike brand. *See* ECF No. 39, First. Am. Compl. ¶¶ 114, 140-49; *see also Info. Clearing House, Inc. v. Find Mag.*, 492 F. Supp. 147, 162 (S.D.N.Y. 1980) (rejecting dilution by tarnishment claim because "[p]laintiff's denigration of the quality of defendants' magazine [did] not accord with the facts" and finding defendant's product was instead "pleasing").

Nike's false advertising claims because if StockX's advertising "is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false." *Time Warner*, 497 F.3d at 158. Wells' opinions also help explain why StockX's authentication-related advertising would not have been material to sneakerheads' purchasing decisions. *See Apotex*, 823 F.3d at 63 (materiality requires the deception be "likely to influence purchasing decisions").

Wells' consumer perception opinions are reliably rooted in his unparalleled practical experience. *See Price*, 2020 WL 4937464 at *3 (admitting consumer perception testimony based on extensive advertising experience; excluding only where expert "did not claim to have any experience from which he [was opining]" and based opinions on Google searches and "a review of emails and testimony"). Wells has not merely reviewed public sources or record evidence. He has decades of direct engagement with sneakerheads and, critically, practical engagements as a marketing consultant to Nike and others on sneakerheads and their perceptions of the market. As Wells testified when asked about the basis for his opinions on sneakerhead perception:

> How much time do we have this afternoon? [I]t goes back to podcasting. It goes back to my writing, the people that I talk to in real life on message boards, LinkedIn, Twitter, Instagram. [] I am in the community, of the community, and we're talking about this all the time. I'm reading articles about this. I'm reading posts and threads about this . . . consumers are [] very aware that at any point in time they could end up with a product that is not real. Wells Tr. 131:11-132:4.

This experience is a sufficient foundation for Wells' opinions, and the *Kurin* case on which Nike relies is distinguishable on its facts. *Compare Price*, 2020 WL 4937464 at *3 (years of advertising experience formed sound basis for consumer perception opinions); *with Kurin, Inc. v. Magnolia Med. Techs., Inc.*, 473 F. Supp. 3d 1117, 1141 (S.D. Cal. Jul. 20, 2020) (expert excluded where he sought to opine on whether claims were false or misleading but had "no experience in market research or marketing," and only "infrequently interact[ed] with the purchasers"). Wells' opinions are accordingly relevant, reliable, and admissible.

## CONCLUSION

For the foregoing reasons, Nike's motion to exclude should be denied in its entirety.

Dated:          New York, New York
                November 3, 2023

                                    By: /s/ *Megan K. Bannigan*
                                    DEBEVOISE & PLIMPTON LLP
                                    Megan K. Bannigan (mkbannigan@debevoise.com)
                                    David H. Bernstein (dhbernstein@debevoise.com)
                                    Jyotin Hamid (jhamid@debevoise.com)
                                    Carl Riehl (criehl@debevoise.com)
                                    Justin C. Ferrone (jferrone@debevoise.com)
                                    Kathryn C. Saba (ksaba@debevoise.com)
                                    66 Hudson Boulevard
                                    New York, New York 10001
                                    (212) 909-6000

                                    Christopher S. Ford (csford@debevoise.com)
                                    650 California Street
                                    San Francisco, California 94108
                                    (415) 738-5700

                                    KILPATRICK TOWNSEND & STOCKTON LLP
                                    Robert N. Potter (rpotter@kilpatricktownsend.com)
                                    Briggs Wright (briggs.wright@kilpatricktownsend.com)
                                    1114 Avenue of the Americas
                                    New York, New York 10036
                                    (212) 775-8700

                                    MORGANROTH & MORGANROTH PLLC
                                    Jeffrey B. Morganroth (jmorganroth@morganrothlaw.com)
                                    344 N. Old Woodward Ave., #200
                                    Birmingham, MI 48075
                                    (248) 864-4000

                                    *Attorneys for Defendant StockX LLC*