UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
:
NIKE, INC., :
:
                Plaintiff, :
:
     v. :      No. 22 CV 983 (VEC) (SN)
:
STOCKX LLC, :
:
                Defendant. :
:
:
---------------------------------------------------------------x

**DEFENDANT STOCKX LLC'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION TO PRECLUDE THE TESTIMONY OF JOHN HANSEN, JEFFERY STEC, KARI KAMMEL, STEVEN MCNEW, AND ITAMAR SIMONSON**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ 2

ARGUMENT ..................................................................................................................... 1

    I.    John Hansen's Testimony Should Be Precluded. ................................................... 1

    II.    Dr. Jeffery Stec's Testimony Should Be Precluded ............................................... 3

    III.    Kari Kammel's Testimony Should Be Precluded. .................................................. 5

        A.    Kammel Does Not Offer Opinions Relevant to Counterfeiting.................. 5

        B.    Kammel Does Not Offer Reliable Opinions Relevant to False Advertising. ........................................................................................................ 7

        C.    Kammel's Testimony Is Unfairly Prejudicial. ............................................ 9

        D.    Kammel Improperly Offers Fact Testimony ............................................... 9

    IV.    Steven McNew's Testimony Should be Precluded ............................................... 10

    V.    Itamar Simonson's Survey and Marketing Opinions Should Be Precluded. ........ 12

CONCLUSION .................................................................................................................. 14

# TABLE OF AUTHORITIES

**Cases**

*Adkins v. Morgan Stanley*,
307 F.R.D. 119 (S.D.N.Y. 2015) (Caproni, J.),
*aff'd*, 656 F.App'x 555 (2d Cir. 2016).................................................................................. 12

*Algarin v. N.Y.C. Dep't of Corr.*,
460 F. Supp. 2d 469 (S.D.N.Y. 2006).................................................................................... 11

*AU New Haven, LLC v. YKK Corp.*,
2019 WL 1254763 (S.D.N.Y. Mar. 19, 2019) ......................................................................... 6

*BBK Tobacco & Foods, LLP v. Galaxy VI Corp.*,
408 F. Supp. 3d 508 (S.D.N.Y. 2019)...................................................................................... 5

*Burberry Ltd. v. Designers Imports, Inc.*,
 2010 WL 199906 (S.D.N.Y. Jan. 19, 2010) ........................................................................ 6, 7

*Danone, US, LLC v. Chobani, LLC*,
362 F. Supp. 3d 109 (S.D.N.Y. 2019)...................................................................................... 8

*Dependable Sales & Serv., Inc. v. TrueCar, Inc.*,
311 F. Supp. 3d 653 (S.D.N.Y. 2018)...................................................................................... 2

*Doe v. Lima*,
2020 WL 728813 (S.D.N.Y. Feb. 13, 2020)............................................................................ 9

*Ebron v. United States*,
2008 WL 4298515 (S.D.N.Y. Sept. 17, 2008)......................................................................... 5

*Edmondson v. RCI Hosp. Holdings, Inc.*,
2020 WL 1503452 (S.D.N.Y. Mar. 30, 2020) (Caproni, J.).................................................. 13

*Fantasia Distrib., Inc. v. Cool Clouds Distrib., Inc.*,
2023 WL 6136628 (E.D.N.Y. Sept. 20, 2023) ........................................................................ 3

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)................................................................................................................. 3

*Ideavillage Prods. Corp. v. Aarhus,*
2019 WL 2290514 (S.D.N.Y. May 7, 2019) ........................................................................... 7

*In re AXA Equitable Life Ins. Co. COI Litig.*,
595 F. Supp. 3d 196 (S.D.N.Y. 2022)...................................................................................... 9

*In Re Elysium Health ChromaDex Litig.*,
2022 WL 421135 (S.D.N.Y. Feb. 11, 2022) .................................................................... 2

*In re Terrorist Attacks on Sept. 11, 2001*,
2023 WL 3116763 (S.D.N.Y. Apr. 27, 2023) .................................................................. 8

*Jack Daniel's Props., Inc. v. VIP Prods. LLC*,
599 U.S. 140 (2023) ...................................................................................................... 12

*Kargo Glob., Inc. v. Advance Mag. Publ'rs, Inc.*,
2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007) ................................................................ 13

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
209 F. Supp. 3d 612 (S.D.N.Y. 2016) ............................................................................ 4

*MyPlayCity, Inc. v. Conduit Ltd.*,
2013 WL 4105698 (S.D.N.Y. Aug. 12, 2013),
*vacated and remanded*, 589 F. App'x 559 (2d Cir. 2014) ............................................. 2

*N. Am. Olive Oil Ass'n v. Kangadis Food Inc.*,
962 F. Supp. 2d 514 (S.D.N.Y. 2013) ............................................................................ 7

*Nimely v. City of N.Y.*,
414 F.3d 381 (2d Cir. 2005) ........................................................................................... 4

*Polymer Tech. Corp. v. Mimran*,
975 F.2d 58 (2d Cir. 1992) ........................................................................................... 12

*Red Hawk, LLC v. Colorforms Brand LLC*,
638 F. Supp. 3d 375 (S.D.N.Y.) ..................................................................................... 9

*Rexall Sundown, Inc. v. Perrigo Co.*,
707 F. Supp. 2d 357 (E.D.N.Y. 2010) ........................................................................... 3

*Sec. & Exch. Comm'n v. Ripple Labs, Inc.*,
2023 WL 5670711 (S.D.N.Y. Mar. 6, 2023) ............................................................... 10

*TrafficSchool.com, Inc. v. Edriver Inc.*,
653 F.3d 820 (9th Cir. 2011) ......................................................................................... 1

*United States v. Mejia*,
545 F.3d 179 (2d Cir. 2008) .................................................................................... 5, 10

*Whalen v. CSX Transp., Inc.*,
2016 WL 5723877 (S.D.N.Y. Sept. 29, 2016) ............................................................... 9

**Statutes**

15 U.S.C. § 1117 ................................................................................................................... 1

**Other Authorities**

Restatement (Third) of Restitution and Unjust Enrichment § 51 .................................................... 1

**ARGUMENT**

I. **John Hansen's Testimony Should Be Precluded.**

Nike does not dispute that: (*i*) disgorgement under the Lanham Act is limited to "ill-gotten" profits that would not exist but for the allegedly false advertising; and (*ii*) Hansen did not limit his disgorgement computation to such ill-gotten profits. *See* StockX Mem.[1] pp. 3–4.

Nike's argument that it "is not Nike's burden to prove" ill-gotten sales, Nike Br.[2] p. 2, is incorrect, and contradicts this Court's Order that Nike must "show that the StockX sales were ill-gotten." ECF No. 116, Order p. 2.[3] Nike purports to rely on the "plain language" of Section 35(a) of the Lanham Act, Nike Br. p. 2, but ignores that Section 35(a) damages are "subject to the principles of equity" and "shall constitute compensation and not a penalty." 15 U.S.C. § 1117(a). Nike offers no response to StockX's showing that, under the equitable principles applicable to unjust enrichment, plaintiffs must "show a causal connection" between the alleged wrongdoing and the profits allegedly subject to disgorgement, and Hansen did nothing to establish causation. *See* StockX Mem. pp. 4–5 (quoting Restatement (Third) of Restitution and Unjust Enrichment § 51, cmt. f).

Nike also fails to address *TrafficSchool.com, Inc. v. Edriver Inc.*, 653 F.3d 820 (9th Cir. 2011), a Lanham Act false advertising case that is on all fours. There, as here, the plaintiff's claim was solely that "defendant[s] advertised a different (and allegedly better) product than they

---

[1] ECF No. 190, StockX Mem. of Law in Supp. of Mot. to Preclude Testimony ("StockX Mem.").
[2] ECF No. 211, Nike Br. In Opp. ("Nike Br.").
[3] Nike's assertion that StockX "mischaracterizes" this Court's prior order and "takes it out of context," Nike Br. p. 3, is incorrect. When the Court ruled that "to prevail on its false advertising claim and be awarded unjust enrichment profits, Nike does not need to establish that StockX's sales diverted sales from Nike – it will be sufficient to show that the StockX sales were ill-gotten," Order, ECF No. 116, p. 2, it stated both what Nike does *not* have to show—its own lost sales; and what Nike *does* have to show—that the StockX sales included in the unjust enrichment award "were ill-gotten." That the Court addressed only unjust enrichment, and not the other "distinct rationales for profits disgorgement," Nike Br. p. 3, is irrelevant. Unjust enrichment is the only "category of damages claimed" in Nike's initial disclosures as to which Hansen is opining. *See* Decl. of Christopher S. Ford ("Ford Decl."), Ex. A, Nike's Fourth Am. Init. Disclosures pp. 5-6.

1

delivered." *Id.* at 831.  Noting that the "Lanham Act allows an award of profits only to the extent the award 'shall constitute compensation and not a penalty,'" the court held there was "no way to determine with any degree of certainty what award would be compensatory" because the plaintiffs—▇▇▇▇▇▇—"provided no evidence [of causation or evidence] quantifying the extent of any . . . harm they suffered." *Id.* (internal quotation marks omitted).[4]

Nike's assertion that there is a "near-consensus view" in the Second Circuit that false advertising plaintiffs seeking disgorgement do not have to prove causation is false.[5]  The decision Nike quotes for that proposition is a trademark infringement case that was subsequently vacated by the Second Circuit.  *See* Nike Br. p. 3 (quoting *MyPlayCity, Inc. v. Conduit Ltd.*, 2013 WL 4105698, at *3 (S.D.N.Y. Aug. 12, 2013), *vacated and remanded*, 589 F. App'x 559 (2d Cir. 2014)).  Contrary to Nike's position, StockX provided Southern District of New York precedents in which courts **have** excluded false advertising plaintiffs' experts who failed to consider or establish causation.  *See* StockX Mem. p. 6.  Nike's attempt to distinguish those cases as lost profits cases, Nike Br. p. 3 n.4, is inaccurate.  In both *Dependable Sales & Serv., Inc. v. TrueCar, Inc.*, and *In Re Elysium Health-ChromaDex Litig.*, the experts purported to calculate both lost profits **and** disgorgement.  *See Dependable Sales*, 311 F. Supp. 3d 653, 657 (S.D.N.Y. 2018); *Elysium Health*, 2022 WL 421135, at *15–16 (S.D.N.Y. Feb. 11, 2022).  Nike, by contrast, relies primarily on cases that are not false advertising cases, and the one false advertising case Nike cites is inapposite.  In *Rexall Sundown, Inc. v. Perrigo Co.*, the court held

---

[4] The overwhelming majority of the ▇▇▇▇▇▇ of sales included in Hansen's disgorgement computation are of shoes that Nike does not allege were counterfeit.  Nike's assertion in footnote 5 of its brief that StockX's "100% Authentic" claim was "literally false" with respect to those shoes is unsupported by any evidence.  The vast majority of those shoes were, in fact, authentic, and Nike has not argued otherwise at any point during discovery.  The only allegedly false claims with respect to those shoes were about the overall efficacy of StockX's authentication process.
[5] Hansen's statements that StockX bears the burden of proof are incorrect and improper legal opinions. *See* ECF No. 207, Am. Ford Decl. Ex. A ¶¶ 17, 46, 58, 65, 66, 71; ECF No. 209, Corr. Duvdevani Decl. Ex. 2 ¶¶ 20, 34; ECF No. 207, Am. Ford Decl. Ex. B ¶¶ 1, 24, 28, 30.

2

that causation could be "presumed" because the at-issue advertising was a comparison to plaintiff's product. 707 F. Supp. 2d 357, at 362 (E.D.N.Y. 2010). But StockX's advertising was not comparative. Neither Nike nor Hansen argues that causation can be presumed here; nor do they offer any other evidence of causation.

Nike's assertion that Hansen's opinions about harm to Nike are "supported by record evidence" is incorrect. Nike cites five paragraphs of Hansen's report, but when he was asked about those paragraphs at his deposition, Hansen confirmed that "███████████ ███████████████████████████████████████████████████" StockX Mem. pp. 6-7. This █████████████████ does not merely go to weight. "Expert opinions based on insufficient facts or data, or on unsupported suppositions [are] not acceptable." *Fantasia Distrib., Inc. v. Cool Clouds Distrib., Inc.*, 2023 WL 6136628, at *4 (E.D.N.Y. Sept. 20, 2023); *see generally Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("Nothing … requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). Hansen applied the wrong legal standard to disgorgement and offered ██████ █████████████████, making his opinions irrelevant and unreliable.[6]

## II.     Dr. Jeffery Stec's Testimony Should Be Precluded.

Nike's Opposition confirms StockX's position that there is no reliable basis for Stec's opinion that 200,000 pairs of shoes were "likely sold" on StockX when the same shoe was simultaneously available from Nike. StockX Mem. pp. 7–8. Indeed, Nike side-steps Stec's own acknowledgement that his work "does not show that there was even a single instance of a Nike shoe sold on StockX at a time when the same shoe was available in the same size on Nike.com,"

---

[6] To the extent Nike suggests StockX does not seek to exclude Hansen's opinions about the revenues and profits StockX generated and earned on trades of Nike shoes, Nike Br. p. 2 n.3, that is incorrect. Those opinions should be excluded because Hansen formed them under the incorrect legal standard described above.

Stec Tr.[7] 249:22-250:16,[8] by arguing that Stec was not "trying to assess actual sales but rather availability for purchase," Nike Br. p. 6.  But Stec does not say merely that some styles of shoes were simultaneously *available* on StockX and Nike; he tallies up sales data to assert that 200,000 pairs of shoes "were *likely sold* [on StockX] when these products were available for sale by Nike."  Stec Rep.[9] p. 18 (emphasis added).  Nike's assertion that this opinion is not "an attempt 'to fill in the gap created by Nike's failure to produce any actual evidence of lost sales,'" Nike Br. p. 6 (quoting StockX Mem. p. 7), is belied by its claim that Stec "rebuts Vigil's opinion . . . that it is highly unlikely StockX diverted sales from Nike." *Id.* at 5.

Nike does not establish that the 200,000 shoes opinion is reliable, and cannot dispute that "the vast majority of the 200,000 sales are of styles with more sizes available on StockX than on Nike.com," or that tens of thousands of those sales were "styles that were available in only one or two sizes on Nike.com, but in sixteen to twenty-five sizes on StockX."  StockX Mem. p. 8. Stec presented no reliable evidence that *any* shoe was sold on StockX when *the same shoe* was available from Nike—much less that it is "likely" there were 200,000 such sales.  Stec's 200,000 shoes opinion should be excluded because he "has failed entirely to show a 'sufficiently rigorous analytical connection between [his qualitative] methodology and [his] conclusion.'"  *See LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 647 (S.D.N.Y. 2016) (quoting *Nimely v. City of N.Y.*, 414 F.3d 381, 396 (2d Cir. 2005)).

---

[7] ECF No. 207, Am. Ford Decl. Ex. E ("Stec Tr.").
[8] Nike's bald assertion that "Stec's analysis of the evidence is mathematically sound," Nike Br. p. 6, cannot be reconciled with Stec's own testimony that he has not shown "even a single instance" of a shoe sold on StockX that was simultaneously available from Nike in the same size, Stec Tr. 249:22-250:16.  That Stec affirmed this "when he responded to the question" asking about it, Nike Br. p. 6, is irrelevant.  After Dr. Stec gave an evasive answer to the question, "[T]he work you did does not show that there was even a single instance of a Nike shoe sold on StockX at a time when the same shoe was available in the same size on Nike.com, right?," he was asked "And so your study did not show definitively that there was such a sale, right?" He responded, "So, again, I wasn't asked to look at this, but ***I don't believe that at least I'm aware of data that could provide an answer to that particular question***." Stec. Tr. 249:22-250:16 (emphasis added).
[9] ECF No. 207, Am. Ford Decl. Ex. D ("Stec Rep.").

Although Nike also purports to "proffer[] [Stec] to rebut Vigil and Tucker's opinions on competition," Nike Br. pp. 4-5, and he uses economic jargon, Stec does not present any analysis beyond the fatally flawed 200,000 shoes opinion. Stec offers nothing to show that a resold shoe on StockX competes with a brand-new shoe from Nike, or ███████████████████████

███████████████████████████████████████████████████████████████

███████ Carpini Tr.[10] at 244. The rest of Stec's 'opinions' are mere "factual testimony" that should also be excluded. *See United States v. Mejia*, 545 F.3d 179, 196 (2d Cir. 2008).

### III. Kari Kammel's Testimony Should Be Precluded.

#### A. Kammel Does Not Offer Opinions Relevant to Counterfeiting.

Nike concedes that Kammel's opinions are irrelevant to counterfeiting liability, arguing only that her opinions relate to willfulness and enhanced statutory damages. *See* Nike Br. p. 7.

Nike's theory of willfulness is that StockX acted with "reckless disregard."[11] Accordingly, Nike must show that StockX "recklessly disregarded evidence of counterfeiting that was available to it." *BBK Tobacco & Foods, LLP v. Galaxy VI Corp.*, 408 F. Supp. 3d 508, 529 (S.D.N.Y. 2019). Kammel's testimony and disclosed opinions are irrelevant to that inquiry.

Kammel testified she is "not giving an opinion on whether [StockX is] trying or not" to stop the sale of counterfeits, so she cannot opine about StockX's intent. Kammel Tr.[12] 195:3-14; *see Ebron v. United States*, 2008 WL 4298515, at *4 (S.D.N.Y. Sept. 17, 2008) (excluding expert who "stated that he would offer no other opinion"). Further, she did nothing to evaluate or analyze the information available to StockX at the time of sale of the alleged counterfeits. Kammel Tr. 41:20-23; 46:21-23; 52:13-16. Sections II-VII of Kammel's Report (for which Nike

---

[10] Ford Decl. Ex. C ("Carpini Tr.").
[11] Nike does not argue StockX acted with willful blindness. *See* Nike Br., p. 7.
[12] Ford Decl. Ex. B ("Kammel Tr.").

offers no particularized arguments as to relevance), *see* Nike Br. pp. 7–8— will not aid the trier of fact in evaluating reckless disregard:

- Opinions on counterfeiting and its harms generally are untethered to StockX or the facts of this case. *See* Kammel Rep.[13] §§ II-III. They cannot be relevant to whether StockX disregarded available information.

- Opinions on IP rights holders' (including Nike's) brand protection and authentication measures, Kammel Rep. §§ IV-VI, do not relate to information available to StockX, which did not have access to IP rights holders' technologies, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* Kammel Rep., pp. 25, 35; Kammel Tr. 257:19-258:07. These have no bearing on whether StockX disregarded *available* information.

- Opinions concerning StockX's website relate to information available to consumers, not information available to StockX. *See* Kammel Rep. § VII. Explaining what *consumers* knew will not aid in determining whether *StockX* disregarded available information.

Kammel's opinions should be excluded because they are all irrelevant to the legal theory Nike articulates. *AU New Haven, LLC v. YKK Corp.*, 2019 WL 1254763, at *12 (S.D.N.Y. Mar. 19, 2019) (excluding irrelevant portions of expert testimony that would not assist the trier of fact).

Although Nike contends Kammel opines on industry standards, *see* Nike Br. p. 8, she does not provide *any* opinions on standards for *an online resale marketplace*, like StockX. Kammel concedes that "standards for selling products that one would find in a brick and mortar setting simply have not existed online to date." Kammel Rep. p. 8; *see also id*. at pp. 10–11 (noting DHS e-commerce recommendations without providing industry standards for resale marketplaces); p. 20 (citing authentication standards without explaining how they apply to online resale marketplaces). Even if Kammel had provided such opinions, Nike fails to cite cases that show that industry standards are the benchmark for measuring reckless disregard. *See, e.g.*, *Burberry Ltd. v. Designers Imports, Inc.*, 2010 WL 199906, at *9 (S.D.N.Y. Jan. 19, 2010) (assessing defendant's knowledge in light of settlement agreement requiring defendant to refrain

---

[13] ECF No. 207, Am. Ford Decl. Ex. F ("Kammel Rep.").

from such activity); *Ideavillage Prods. Corp. v. Aarhus,* 2019 WL 2290514, at *7 (S.D.N.Y. May 7, 2019) (finding defendant acted willfully by virtue of its default).

Nike's attempts to fit Kammel's opinions into the counterfeiting statutory damages factors are unavailing. Factor five (willfulness) is addressed above; Nike also contends that Kammel is relevant to factor two (plaintiff's lost revenues) and factor six (defendant's cooperation in providing financial records). *See* Nike Br. p. 8. On revenues, Nike claims Kammel will testify that counterfeiters can be "unseen competitors" to Nike. *See* Nike Br. p. 8. But Kammel did nothing to evaluate Nike or StockX's financials, *see* Kammel Rep. p. 13, Kammel Rebuttal,[14] pp. 2–3; *Burberry*, 2010 WL 199906 (considering defendant's revenues specifically), and Nike's 30(b)(6) witness testified that Nike **has no evidence of lost revenues due to StockX's conduct**. Carpini Tr. 240:21-241:02; 244:09-15; 246:10-23. Nike's argument that Kammel's opinions relate to cooperation, *see* Nike Br. p. 8, misses the point: factor six assesses "cooperat[ion] in providing *financial* records" to value infringing material. *Burberry*, 2010 WL 199906 at *10 (emphasis added). Kammel does not address this issue at all.

B.  **Kammel Does Not Offer Reliable Opinions Relevant to False Advertising.**

Kammel's opinions are irrelevant to false advertising because they do not account for a reasonable ordinary consumer's understanding of the advertising claim. *N. Am. Olive Oil Ass'n v. Kangadis Food Inc.,* 962 F. Supp. 2d 514, 520 (S.D.N.Y. 2013) (evaluating consumer understanding is required even where literal falsity is alleged). Kammel purports to define "authentication" without evidence that *any* consumers share her understanding. Relying on that definition, Kammel seeks to opine that (1) StockX's allegedly false authenticity claims create a "*perception* of legitimacy," and (2) that perception causes harm "when consumers who *believe*

---

[14] ECF No. 207, Am. Ford. Decl. Ex. G ("Kammel Rebuttal").

they bought genuine Nike products but instead received a counterfeit and *believe* it is a quality issue instead." Kammel Rep. pp. 39–40 (emphasis added). Kammel does not point to **any** evidence that this ever happened, and her speculative opinion is based on an irrelevant theory of falsity – namely, how Kammel, an academic who does not study consumer perception, understands the term "authentication." *See Danone, US, LLC v. Chobani, LLC*, 362 F. Supp. 3d 109, 118–19 (S.D.N.Y. 2019) (noting that what matters is how the "audience would recognize the claim" and finding claim not literally false based on results of a consumer survey).

Kammel's opinions are also unreliable. Nike claims that Kammel's opinion that consumers perceive legitimacy is not about "consumer perception." Nike Br. p. 10. But this defies logic, and Kammel should not be allowed to offer this opinion without any relevant experience, research, or survey. Kammel's "authenticity" opinions also are unreliable because they rely exclusively on a single document—ISO 22383. *See* Kammel Rep. pp. 21–24. Not only does Kammel misconstrue this document,[15] she offers no explanation as to how it alone reliably conveys consumers' understanding of "authentication." *In re Terrorist Attacks on Sept. 11, 2001*, 2023 WL 3116763, at *4 (S.D.N.Y. Apr. 27, 2023) (excluding expert's testimony where he "merely repeat[ed] information" he "read or heard").[16]

---

[15] Kammel also substantively changed her definition of "authentication" in testimony. Although Nike attempts to mischaracterize Kammel's shift as a typo of the word "covert," *see* Nike Br. p. 12, it was much more substantial. Kammel wrote that *all* of the six tools she identified "*must* be authenticated in order to truly verify whether a product is genuine and authorized." Kammel Rep. p. 22 (emphasis added). She later testified that authentication does *not* require all six tools. Kammel Tr. 231:23-235:3. This is a substantive change. The standard articulated in her Report for authentication was one that even Nike could not meet. *Sec. & Exch. Comm'n v. Lek Sec. Corp.*, 370 F. Supp. 3d 384, 416 (S.D.N.Y. 2019), *on reconsid. in part*, 2019 WL 2114067 (S.D.N.Y. May 8, 2019) (excluding expert entirely as unreliable in part because expert "contradict[ed] himself").

[16] Nike's citation to *ARMOUR Cap. Mgmt. LP v. SS&C Techs., Inc*., Nike Br. p. 11, is inapposite, as that case involved an expert applying his technical expertise to analyze ISO Technical Report 19759 and assess industry standards concerning the "highly technical nature of software purchasing and implementation arrangements" – unlike Kammel, who uses the ISO to provide an otherwise unsupported definition of a single term. *See* 2020 WL 64297 at *8 (D. Conn. Jan. 5, 2020). Further, the *ARMOUR* court ultimately excluded much of the expert's testimony, which "exceed[ed] the bounds of proper expert testimony" and failed to communicate "a technical opinion within the proper scope of [the expert's] expertise." *Id*.

### C. Kammel's Testimony Is Unfairly Prejudicial.

Kammel's testimony on general harms stemming from counterfeiting is unfairly prejudicial. *See* StockX Mem. pp. 9–10; Kammel Rep. §§ II-III. Nike's attempt to cast this information as a "Rule 702 reliable basis" for Kammel's opinions that StockX has harmed Nike, *see* Nike Br. p. 7, only underscores the problem: third parties' bad acts and related harm cannot be the "basis" for a conclusion that StockX is liable, or that Nike has been harmed. *See Doe v. Lima*, 2020 WL 728813, at *8 (S.D.N.Y. Feb. 13, 2020) (excluding under Rule 403, evidence of prior acts that would "unfairly prejudice" defendant).

### D. Kammel Improperly Offers Fact Testimony.

The opinions Kammel seeks to offer in rebuttal to StockX expert Dr. Catherine Tucker should also be excluded. Kammel's critique amounts to nothing more than disagreement with Tucker's characterization of the facts. *See* Nike Br. p. 13. An expert may not "usurp[ ] . . . the role of the jury in applying th[e] law to the facts before it" *Red Hawk, LLC v. Colorforms Brand LLC*, 638 F. Supp. 3d 375, 380 (S.D.N.Y.), or otherwise "regurgitate[ ] what a party has told h[er]," *Whalen v. CSX Transp., Inc.*, 2016 WL 5723877, at *9 (S.D.N.Y. Sept. 29, 2016). Although Nike contends that Kammel opines on industry best practices, *see* Nike Br. p. 13 (citing Kammel Rep. § V), Section V of Kammel's report does not contain any such opinions.

Kammel's testimony on Nike's investigation into counterfeits should be excluded.[17] Kammel has no relevant personal knowledge, and improperly provides only a factual summary of Nike's previously undisclosed[18] investigation conducted after fact discovery closed. *See*

---

[17] Nike misinterprets StockX's argument to exclude Kammel's testimony as a motion *in limine*. As StockX explained in its opening brief, StockX seeks to exclude Kammel's purported expert testimony on this issue as it is, in fact, factual testimony based on information Nike failed to disclose during fact discovery that Kammel simply restates without applying any relevant expertise or offering any expert opinion. *See* StockX Mem. p. 14, n.13.

[18] Nike's attempt to distinguish *In re AXA Equitable Life Ins. Co. COI Litig.*, 595 F. Supp. 3d 196 (S.D.N.Y. 2022), on the ground that there documents were withheld misconstrues the crux of that case. *See* Nike Br. p. 15, n. 25. There the primary issue was that an important fact – "the fact of the meeting with DFS" was not disclosed. *In re*

9

*Mejia*, 545 F.3d at 196 (excluding expert testimony that "involved purely factual matters," including where the expert "simply summarized the results of [an] investigation").

### IV.      Steven McNew's Testimony Should be Precluded.

Nike describes four opinions McNew offers, Nike Br. pp. 16–17, but none are reliable methodology. All of McNew's opinions relate to the design of NFT products and StockX's Vault NFTs specifically. But McNew seeks to offer these "Product Design" opinions without any experience or articulated standards.[19] McNew also seeks to opine on how Vault NFTs were "perceived" by "customers," but has no reliable basis to offer these "Consumer Perception" opinions without having surveyed or spoken to a single consumer. StockX Mem. pp. 17–18.

*First*, McNew seeks to offer a litany of opinions about what consumers "understood" or "believed" or "perceived" about StockX's Vault NFTs. McNew Rep.[20] pp. 25, 30, 42, 49-50, 51. As even the cases Nike cites hold, reliable expert testimony on consumer perception must be grounded in some experience with consumers and their perceptions. McNew has none, and Nike only asserts that McNew's experience with NFTs generally can somehow provide a reliable basis for his Consumer Perception opinions. But courts reject that argument, in the cryptocurrency space and elsewhere, because familiarity with a product is not familiarity with consumers' beliefs. *See, e.g.*, *Sec. & Exch. Comm'n v. Ripple Labs, Inc.*, 2023 WL 5670711, at *5 (S.D.N.Y. Mar. 6, 2023) (excluding testimony on cryptocurrency purchasers' perceptions from expert who relied only on personal experience with cryptocurrencies and a review of the record).

---

*AXA*, 595 F. Supp. 3d at 251–52. Here, StockX Interrogatory No. 23 asked Nike to "Identify each and every Alleged Counterfeit by its StockX order number and purchaser, that forms the basis for Nike's [Counterfeiting Claim]." Ford Decl. Ex. D, StockX's Fourth Set of Interrogatories. Nike never before identified these products.
[19] Nike incorrectly asserts that StockX is not seeking to preclude McNew's opinions about benefits that NFT products commonly offer, and whether the design of the Vault NFTs made pretextual use of the blockchain. Both of these opinions are plainly "Product Design" opinions for which McNew has no reliable basis, as explained in StockX's opening brief. *See* StockX Mem. pp.15, 18-19 (discussing how McNew "did no specific analysis to support any of these opinions or define the purported industry standards he was evaluating").
[20] ECF No. 207, Am. Ford Decl. Ex. I ("McNew Rep.").

McNew did not conduct any survey or study anyone else's survey; he did not speak to a single consumer; and he has no experience with NFTs linked to physical goods (like the Vault NFTs) to understand why consumers might purchase them. *See* Nike Br. pp 16-18. Nike does not cite *any* case where an expert has been permitted to testify about consumer perception or purchaser motivation without a foundation in survey evidence or experience with the relevant consumer population.[21] McNew has *never* conducted consumer perception research, and reached his Consumer Perception opinions without considering any evidence of what Vault NFT customers saw. McNew Tr.[22] 82:1-5; 204:19-25; McNew Rep. App'x A.

McNew should not be permitted to offer assertions about consumer perception of the Vault NFT prices that have no foundation in reliable evidence or experience. McNew's proffered "comparative price analysis" is not a reliable basis for his conclusions about how consumers perceived the Vault NFTs. StockX Mem. p. 19. Nike does not address the issues StockX raised in its opening brief, instead arguing that McNew seeks to opine about the reasons for the price difference he observed. Nike Br. p. 18. That contradicts McNew's expressed opinions in his report, *see* McNew Rep. pp. 25, 30, 49-51; and Nike offers no basis for the reliability of McNew's *methodology* in reaching his opinions. *See* StockX Mem. pp. 19-20; *Algarin v. N.Y.C. Dep't of Corr.*, 460 F. Supp. 2d 469, 477 (S.D.N.Y. 2006) (excluding expert conclusions that were "not the product of the application of any analytic method").

*Second*, McNew seeks to offer a variety of "Product Design" opinions about NFTs and how StockX's Vault NFTs were designed and implemented. Nike offers nothing in response to

---

[21] In the cases Nike does cite, admitted experts considered published studies, or had extensive experience with marketing and consumer purchasing decisions, or both. *See Canon U.S.A., Inc. v. F&E Trading LLC*, 2023 WL 5152448, at *3 (E.D.N.Y. June 6, 2023) (expert "reviewed studies relating to consumer behavior and applied those to this case"); *Price v. L'Oreal USA, Inc.*, 2020 WL 4937464, at *3 (S.D.N.Y. Aug. 24, 2020) (expert with "fifty years of experience in advertising . . . reviewed thousands of proprietary quantitative studies providing insights into consumers' understanding and beliefs" and "attended at least 3,500 focus group sessions" with relevant consumers).
[22] ECF No. 207, Am. Ford Decl. Ex. K ("McNew Tr.").

11

StockX's authority showing that experts must have reliable benchmarks to support their opinions (and McNew offers none). *See* StockX Mem. pp. 18–19. Nike argues McNew analyzed record evidence and reached opinions about what NFT projects allegedly should do. *See* Nike Br. pp.18–19.[23] But Nike ignores the crucial middle step: a reliable *methodology* connecting fact to opinion. *See, e.g.*, *Adkins v. Morgan Stanley*, 307 F.R.D. 119, 149 (S.D.N.Y. 2015) (Caproni, J.), *aff'd*, 656 F.App'x 555 (2d Cir. 2016) (excluding expert who "conducted neither a scientific study nor a qualitative comparison with meaningful benchmarks").[24]

## V. Itamar Simonson's Survey and Marketing Opinions Should Be Precluded.

Simonson's *Eveready*-style survey is unreliable because he cannot distinguish between consumers who were confused as to the source of the Vault NFTs – believing they were offered by Nike and not StockX – and consumers who accurately said Nike made the shoe that StockX resold via a Vault NFT. *See Polymer Tech. Corp. v. Mimran*, 975 F.2d 58, 61 (2d Cir. 1992) ("[T]rademark law does not reach the sale of genuine goods bearing a true mark even though the sale is not authorized by the mark owner."). Nike fails to explain how Simonson's survey can reliably separate source confusion from confusion about the law. *See Jack Daniel's Props., Inc. v. VIP Prods. LLC*, 599 U.S. 140, 163–64 (2023) (Sotomayor, J., concurring) (warning against accepting a plaintiff's survey evidence that treats "misunderstanding of the legal framework as evidence of consumer confusion").

Nike's response identifies *no* case in which a court accepted an *Eveready*-style survey in

---

[23] Nike suggests that McNew's opinions would help jurors "see StockX's deceptive marketing" of the Vault NFTs and harm to Nike. Nike Br. p.18. But McNew offered no testimony about harm to Nike, and Nike has not stated a false advertising claim relating to the Vault NFTs. *See* ECF No. 39, First Amen. Compl. ¶¶ 122–63.
[24] Nor is Nike's argument consistent with McNew's testimony that he "didn't evaluate deeply any other NFT platforms or projects." McNew Tr. 220:3–4; *see Donnelly v. Ford Motor Co.*, 80 F. Supp. 2d 45, 50 (E.D.N.Y. 1999) (excluding expert who "d[id] not identify any specific technique or method that he used, and cites no industry standards, surveys, or studies upon which he relied").

12

the resale context. Nike asserts that Simonson is evaluating only the "prominence" of Nike's marks. Nike Br. p. 24. But Simonson testified that he is "offering an opinion . . . as to whether StockX's Vault NFTs are likely to cause confusion with Nike" that is "based on the surveys that [he] fielded in this case." Simonson Tr.[25] 53:14–23. Nike also asserts that StockX's use of an NFT makes this case somehow different, but there is no dispute that the only Nike products at issue are resold shoes, and that Simonson did not explain that fact to his survey participants, even though he previously opined that *no survey* could provide reliable evidence of confusion in a resale market without doing so. See ECF No. 207, Am. Ford Decl. Ex. S at *7, n.4.

Simonson's testimony is also unreliable because he showed the wrong universe an artificial stimulus, asked respondents leading questions that meaningfully differed between his test and control, and then chose to selectively ignore some of his data, artificially inflating his net confusion figure.[26] Simonson Tr. 163:24–164:3, 95:7–8; 179:8–13. These flaws do not merely go to weight, as Nike argues: taken together, they render Simonson's conclusions unreliable. *See, e.g.*, *Edmondson v. RCI Hosp. Holdings, Inc.*, 2020 WL 1503452, at *7 (S.D.N.Y. Mar. 30, 2020) (Caproni, J.) (Rules 702 and 403 "require the court to look at the cumulative effect of all of the flaws in a survey in determining its admissibility" (internal quotation marks omitted)); *Kargo Glob., Inc. v. Advance Mag. Publ'rs, Inc.*, 2007 WL 2258688, at *11 (S.D.N.Y. Aug. 6, 2007) (survey that was "leading" and used "unrepresentative stimuli" excluded as unreliable).[27]

---

[25] Ford Decl. Ex. E ("Simonson Tr.").

[26] Despite having been previously excluded for cherry-picking data, Simonson's analysis ignored a portion of his results, which would have dropped his net confusion rate to just 8.7%, not the 16.5% he reported. StockX Mem. p. 24, n.6; Simonson Rep. ¶ 69.

[27] Simonson's proffered marketing opinions should also be excluded as irrelevant. Nike asserts that these opinions relate to consumer perception and harm to Nike, but Simonson testified that he did not consider how his marketing opinions relate to confusion or any damages issues. Simonson Tr. 40:20-24; 41:4-19; 42:22-43:1. Nike also did not respond to StockX's argument that Simonson's brand extension opinion impermissibly offers a legal conclusion – whether StockX needed Nike's approval to offer Vault NFTs – not expert testimony. *See* StockX Mem. p. 25; *In re Navidea Biopharm. Litig.*, 2022 WL 16633587, at *6 (S.D.N.Y. Nov. 9, 2022) (Caproni, J.) ("[A]n expert may not give testimony stating ultimate legal conclusions based on [the] facts." (internal quotation marks omitted)).

13

## CONCLUSION

The Court should exclude John Hansen, Jeffery Stec, Kari Kammel, and Steven McNew in full, and exclude Itamar Simonson's surveys and marketing opinions.

Dated:     November 17, 2023
           New York, New York

                                    By: /s/ *Megan K. Bannigan*
                                    DEBEVOISE & PLIMPTON LLP
                                    Megan K. Bannigan (mkbannigan@debevoise.com)
                                    David H. Bernstein (dhbernstein@debevoise.com)
                                    Jyotin Hamid (jhamid@debevoise.com)
                                    Carl Riehl (criehl@debevoise.com)
                                    Justin C. Ferrone (jferrone@debevoise.com)
                                    Kathryn C. Saba (ksaba@debevoise.com)
                                    66 Hudson Boulevard
                                    New York, New York 10001
                                    (212) 909-6000

                                    Christopher S. Ford (csford@debevoise.com)
                                    650 California Street
                                    San Francisco, California 94108
                                    (415) 738-5700

                                    KILPATRICK TOWNSEND & STOCKTON LLP
                                    Robert N. Potter (rpotter@kilpatricktownsend.com)
                                    Briggs Wright (briggs.wright@kilpatricktownsend.com)
                                    1114 Avenue of the Americas
                                    New York, New York 10036
                                    (212) 775-8700

                                    MORGANROTH & MORGANROTH PLLC
                                    Jeffrey B. Morganroth (jmorganroth@morganrothlaw.com)
                                    344 N. Old Woodward Ave., #200
                                    Birmingham, MI 48075
                                    (248) 864-4000

                                    *Attorneys for Defendant StockX LLC*