# EXHIBIT E

Page 1

```
 1         UNITED STATES DISTRICT COURT
 2      FOR THE SOUTHERN DISTRICT OF NEW YORK
 3                   ---oOo---
 4
 5   NIKE, INC.,
 6             Plaintiff,
 7      vs.              CASE NO. 1:22-CV-00983-VEC
 8   STOCKX LLC,
 9             Defendant.
     _____
10
11
12     VIDEOTAPED DEPOSITION OF ITAMAR SIMONSON, Ph.D
13             San Francisco, California
14              Tuesday, July 25, 2023
15
16
17
18
19
20
21
22
23   Stenographically Reported by:  Ashley Soevyn,
     CSR No. 12019
24   Job No. 6001088
25   Pages 1 - 284
```

```
 1            UNITED STATES DISTRICT COURT
 2        FOR THE SOUTHERN DISTRICT OF NEW YORK
 3                      ---oOo---
 4
 5   NIKE, INC.,
 6                Plaintiff,
 7      vs.                CASE NO. 1:22-CV-00983-VEC
 8   STOCKX LLC,
 9                Defendant.
   _____
10
11
12
13
14
15                Videotaped Deposition of
16   ITAMAR SIMONSON, PH.D., taken on behalf of the
17   Defendant StockX, LLC,, Pursuant to Notice, at the
18   offices of Debevoise & Plimpton, 650 California
19   Street, San Francisco, California beginning at
20   9:07 a.m. and ending at 5:10 p.m. on Tuesday, July
21   25, 2023, before me, ASHLEY SOEVYN, Certified
22   Shorthand Reporter No. 12019.
23
24
25
```

                                                              Page 3

1   A P P E A R A N C E S:
2   FOR THE PLAINTIFF NIKE INC.:
3           DLA PIPER
4           BY:  TAMAR Y. DUVDEVANI
5           BY:  MARC E. MILLER
6           Attorneys at Law
7           1251 Avenue of the Americas, 27th Floor
8           New York, New York 10020
9           tamar.duvdevani@dlapiper.com
10          marc.miller@dlapiper.com
11          (212) 335-4500
12
13  FOR THE DEFENDANT STOCKX LLC:
14          DEBEVOISE & PLIMPTON, LLP
15          BY:  CHRISTOPHER S. FORD
16          Attorney at Law
17          650 California Street
18          San Francisco, California 94108
19          csford@debevoise.com
20          (415) 738-5705
21  Also Present:
22  Abigail Liles, law clerk, Debevoise & Plimpton
23  Chester Dubov, summer associate, Debevoise &
24  Plimpton
25  Peter Yaroshuk, Videographer

1              names."
2              I'm not sure that captures everything,
3    but that's one definition.
4         Q    Are there other aspects to the definition
5    of a brand extension that aren't included in that
6    paragraph 7?
7              MS. DUVDEVANI:  Objection.
8              THE WITNESS:  You know, there -- you --
9    you open a marketing textbook, you open a branding
10   textbook, you'll find different definitions.  I
11   don't think there is one -- one definition that
12   everyone agrees on.
13   BY MR. FORD:
14        Q    And your opinion is that the Vault NFTs
15   in this case constituted a brand extension of the
16   Nike brand; is that right?
17        A    Yes.  As far as Nike is concerned.  It
18   might have been brand extension for other brands as
19   well.
20        Q    Is whether the Vault NFTs are or are not
21   a brand extension relevant to consumers' likelihood
22   of confusion in this case?
23        A    I don't -- I haven't thought about that.
24   I don't know that it is.
25        Q    In addition in your first rebuttal

Page 41

1  report, you mention risk of harm.  For example, in
2  paragraph 11, right?
3       A    Right.
4       Q    You write:
5            (As read):
6                 "StockX's unauthorized use of Nike's
7                 brand to experiment with a new product
8                 category presented exactly such a risk
9                 of unarmed harm to Nike's brand and its
10                good will."
11           Correct?
12      A    Right.
13      Q    In this report or otherwise, do you have
14 any other evidence that there was, in fact, harm to
15 Nike as a result of StockX's Vault NFTs?
16      A    I was --
17           MS. DUVDEVANI:  Objection.
18           THE WITNESS:  Yeah.  I -- I was not asked
19 to opine to quantify any damages to Nike.
20           Having said that, the mere fact that Nike
21 is losing control of its brand, that's harm.  At
22 least, potential harm.  Let's -- and it's not --
23 it's easy -- let me put it this way:  It's easy to
24 think about scenarios whereby Nike's brand would
25 be -- would have been damaged -- and again, I'm not

Page 42

1   opining on specific damages -- we're talking about a
2   new category and new idea that StockX came up with.
3               And we know that initially, the prices
4   that people paid for those shoes, Nike shoes, were
5   extremely high.  Now, suppose that a customer
6   purchased an overpriced, let's call it Nike shoe,
7   and that -- that person has a press conference and
8   nowadays with social media, it's very easy to say,
9   "I trusted Nike, and I was willing to go along with
10  this seemingly attractive offer of StockX to invest
11  in Nike -- in a NFT tied to a Nike shoe because I'm
12  a great believer in Nike.  It turns out I lost
13  $5,000," or whatever.
14              I don't think it's the kind of
15  association that Nike would like to have.
16  BY MR. FORD:
17       Q    Does Nike have the right to set prices
18  for its shoes on the secondary market?
19              MS. DUVDEVANI:  Objection.
20              THE WITNESS:  I -- I don't think so.
21  BY MR. FORD:
22       Q    So you're not offering an opinion on
23  whether there was, in fact, actual harm to Nike in
24  this case, correct?
25       A    As I said, I'm not the damages person

1    here.  Didn't quantify, didn't offer.  I'm saying
2    the mere fact that you lose control over your brand,
3    especially in the context of such a risky novel
4    category, where the rules are not set yet, and hard
5    to predict what will happen.  We know that NFTs have
6    been on the decline.  They may go back up.  So there
7    is real risk here.  And if -- if I'm the brand
8    owner, I don't want to be at the mercy of someone
9    else who is using my product in the context of this
10   novel, perhaps untested, business idea.
11          Q    You call this a novel business idea.  But
12   elsewhere in your first rebuttal report -- I believe
13   it's your first rebuttal report.  Yes.
14               Paragraph 6 on page 2, you note that Nike
15   had also entered the NFT space, correct?
16          A    Yes.
17          Q    And so it's your understanding that Nike
18   also sells NFTs to consumers?
19          A    Yes.  Nike decided for itself to sell
20   sneakers as NFT.  Obviously, Nike does not need to
21   make a big deal out of authenti -- authentication,
22   given it is the -- the company that makes those
23   shoes, and they can -- if they say 100 percent
24   authentic, they can -- they can say it with
25   100 percent certainty.

Page 53

1  of confusion?
2      A   It's confusion.  The -- the relevant
3  measure of confusion in the context of this case.
4  As I explained earlier, we talked about the fact
5  that in this somewhat unusual case, we have both the
6  junior mark, StockX, and the senior mark, Nike on
7  the same page.  Both in the test and the control,
8  they appear in every page.  It's unusual.  And that
9  is the -- the -- if you will, just -- if you --
10 that -- that's a big component of the confusion
11 here.  But I think the impact of the prominence on
12 the mistaken belief that the offer is made by Nike
13 is another component of confusion.
14     Q   Are you offering an opinion in this case
15 as to whether StockX's Vault NFTs are likely to
16 cause confusion with Nike?
17     A   I -- yeah, I do offer the opinion that
18 the StockX NFT causes -- likely and does create
19 confusion with Nike as to the belief that Nike makes
20 the offer.
21     Q   And that opinion is based on the surveys
22 that you fielded in this case; is that right?
23     A   Yes.  And I think it was replicated,
24 especially by Dr. Neal.  So he got -- if you look
25 at -- while, you know, I understand that he -- he

Page 95

1  opportunity to see the image, that's what you do.  I
2  thought that was a good way of -- of doing it.  And
3  I don't -- can't think of any re -- any bias or any
4  issue that would arise because the respondents in
5  both groups, the test and control, in both surveys,
6  were shown a markup-like product line.  Nothing.
7           Yeah, it was not something that
8  respondents saw in reality.  But if someone can tell
9  me, "Okay, here is how it affected results," sure,
10 let's look at the results.
11      Q   And -- and --
12      A   I don't think there is any -- I -- I
13 looked at the reports of Klein and -- and Neal, and
14 they tried to make something out of that, especially
15 Neal, I think.  But I forget now which fatal flaw
16 number it was.  But out there somewhere between --
17      Q   One and nine.
18      A   -- between one -- one and nine, they
19 said, "Ah, well, it's not a reality."  Okay.  How
20 did that affect the results?  Did it affect the
21 likelihood that people would say -- would be more
22 likely to say Nike versus StockX just because I
23 showed a lineup of products sold on StockX?
24           It would -- if you look at the title:
25           (As read):

Page 163

1   and were part of the data that you relied on in this
2   opinion -- or in your opinion did not select
3   number 2, investing in NFT?
4        A    I -- I don't recall.
5        Q    So you -- you represented that you
6   reviewed Dr. Neal's expert report in this case --
7   right? -- his rebuttal expert report.
8        A    I did.
9        Q    And do you recall that Dr. Neal
10  calculated, based on your data, that 52.2 percent of
11  your respondents did not select number 2?
12       A    Yes.
13       Q    Do you have any reason to disagree or
14  contest Dr. Neal's findings there?
15       A    No.
16       Q    Okay.  You didn't ask your respondents
17  anything specific to buying collectible sneakers in
18  particular, correct?
19            MS. DUVDEVANI:  Objection.
20            THE WITNESS:  I -- I did not --
21  BY MR. FORD:
22       Q    Let -- let me withdraw, and I'll ask the
23  question a different way.
24            Based on your screening questions, are
25  you able to determine whether any of your survey

Page 164

1  respondents was specifically interested in buying
2  collectible sneakers?
3        A    Not -- not with the certainty.  As I
4  said, I'm looking for all kinds of indicators that
5  make it more likely.  And I explain in my reports
6  why defining it narrowly based on purchases of NFTs
7  tied to sneakers was a mistake.  And you -- I'm sure
8  you read all the problems that arose.
9             And I did not even talk about the fact
10  that I think Dr. Neal found extremely high
11  percentage of people who said that they purchased
12  NFT and that they collect sneakers.  I mean, in any
13  case -- and -- and the fact that he, in his survey,
14  I think, something like 7 percent said that they
15  either purchased NFTs linked to sneakers or expect
16  to.  So if -- if I'm 7 percent, yet he's concerned
17  about the fact that, in my survey, 52 percent said
18  they didn't -- I mean, I -- anyway.  It's going
19  beyond your question.
20             But, yeah.  That's -- that's -- you're
21  right.  You -- it's not easy to define here the
22  exact universe.  And I think, as I explained in my
23  reports, realistically, consumers even who are
24  inclined to start collecting sneakers or invest in
25  something like these NFTs, they might know right

Page 179

1   BY MR. FORD:
2        Q    Okay.  The -- your conclusion that the
3   data here was not -- just going to make sure
4   "informative" was the word that you used.  Did you
5   reach that conclusion before looking at the
6   responses that your respondents gave?
7        A    Yes.
8        Q    Did you, in fact, look at any of the
9   responses that your respondents gave?
10       A    I -- I don't recall specifically that --
11  I -- I -- I probably did.  But I -- I don't remember
12  exactly what I looked at and whether any conclusions
13  or any findings seemed relevant.
14       Q    Did reviewing the data in any way affect
15  the opinions that you're offering in this case?
16       A    Absolutely not.
17       Q    Great.
18            Who coded your data?
19       A    There -- there is a firm working with
20  Target Research Group.  These are people who
21  specialize in coding.  And they are blind to both
22  the purpose of the survey and the identity of its
23  sponsor.  They just look at the responses and code
24  the verbatims.
25       Q    Did you personally review their coding?

*** ERRATA SHEET ***

CASE: NIKE V. STOCKX

DATE OF DEPOSITION: JULY 25, 2023

WITNESS: ITAMAR SIMONSON

| PAGE | LINE | FROM | TO | REASON |
|---|---|---|---|---|
| 17 | 16 | that | that it's | TE |
| 18 | 13 | ever-ready | Eveready | " |
| 19 | 4 | say | saying | TE |
| 20 | 9 | question | shoe | Accuracy |
| 22 | 22 | shoe | product | Accuracy |
| 23 | 9 | that the | the | TE |
| 26 | 15 | he | she | " |
| 33 | 15 | from | for | " |
| 38 | 3 | Resell | Resale | " |
| 42 | 4-5 | those shoes, Nike shoes, were extremely high | those NFTs tied to shoes, Nike shoes, were extremely high. | Accuracy |
| 44 | 3 | artifact | RTFKT | TE |
| 46 | 16 | can | can't | " |
| 47 | 5 | be the vaulting club | that be, the vaulting club? | " |
| 52 | 6 | to | to the | " |
| 54 | 7 | than as | as | " |
| 57 | 7 | Only | Only? | " |
| 57 | 21 | I'm | I'm also | " |
| 63 | 8 | appears | appear | " |
| 66 | 3 | Heinz | Hunt's | " |
| 66 | 4 | companies | company | " |
| 67 | 1 | the | a | " |

1

| PAGE | LINE | FROM | TO | REASON |
|---|---|---|---|---|
| 67 | 4 | what I just | or | " |
| 70 | 15 | Nike | Stockx | " |
| 84 | 13 | the position | deposition | " |
| 85 | 17 | South and | South | " |
| 90 | 18 | is | if | " |
| 92 | 25 | questions, when | questions when | " |
| 94 | 5 | to | them to | " |
| 95 | 6 | markup-like | mock-up | " |
| 101 | 23 | double | Nobel | " |
| 103 | 13 | expended | expanded | " |
| 112 | 6 | product | products | " |
| 113 | 23 | want | wanted | " |
| 114 | 2 | focus | focus on | " |
| 115 | 19 | products | products | " |
| 124 | 14 | their | the | " |
| 141 | 11 | you call it infringement | what you call infringement | " |
| 147 | 2 | made | showed | " |
| 152 | 12 | have used | use | " |
| 164 | 3 | with the | with | " |
| 164 | 16 | I'm | it's | " |
| 164 | 23 | who | those who | " |
| 164 | 125 | know | not know | " |
| 166 | 15 | options | auctions | " |
| 170 | 15 | hooka | Hoka | " |
| 172 | 24 | is as | as | " |
| 173 | 1 | comparative | compared | " |
| 181 | 13 | have | had | " |
| 183 | 21 | generic | general | " |

2

| PAGE | LINE | FROM | TO | REASON |
|------|------|------|-----|--------|
| 202 | 10 | that | is that | " |
| 206 | 21 | ranked orders, | rank ordered | " |
| 211 | 25 | criteria"? | criterion"? | " |
| 212 | 20 | criteria | criterion | " |
| 213 | 6 | in | on | " |
| 213 | 6 | criteria | criterion | " |
| 216 | 15 | there's | they're | " |
| 226 | 21 | futures | future | " |
| 231 | 25 | certainty | uncertainty | " |
| 243 | 16 | if there others | if others | " |
| 246 | 1 | deals | deal | " |
| 248 | 3 | go from as | go as | " |
| 260 | 10 | "Mary Kay" | "Mary Kay" in | " |
| 260 | 17 | of issue | an issue | " |
| 262 | 23 | it's a | it's | " |
| 270 | 1 | that that | that | " |
| 274 | 4 | Wall v. | moldy | " |
| 275 | 22 | or | about | " |
| 278 | 1 | in court | in part | " |

\* TE – Transcription error

I attest that all of the above is true.

Date: 8/21/2023

*I. Simonson*

Itamar Simonson, Ph.D.

3