UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 07/10/2024

-------------------------------------------------------------X
                                              :

NIKE, INC.,

                                 Plaintiff,    :

                                             :         22-CV-0983 (VEC)

                  -against-        :

                                             :     OPINION & ORDER

STOCKX LLC,

                                 :

                                Defendant.  :
-------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

      Nike, Inc. ("Nike") claims that online reseller StockX, LLC ("StockX") used Nike trademarks on StockX non-fungible tokens ("NFTs") without Nike's consent and sold counterfeit Nike sneakers despite guaranteeing that all products sold by StockX were authentic. *See* Am. Compl., Dkt. 39.  On October 13, 2023, the parties filed *Daubert* motions to exclude the testimony of eight experts.  StockX Mot., Dkt. 189; Nike Mot., Dkt. 192.

      For the following reasons, the Court: (1) DENIES Nike's motion to exclude the testimony of expert Sarah Butler; (2) GRANTS in part and DENIES in part Nike's motion to exclude the testimony of Robert Vigil; (3) DENIES Nike's motion to exclude the testimony of DeJongh Wells; (4) GRANTS in part and DENIES in part StockX's motion to exclude the testimony of Kari Kammel; (5) GRANTS in part and DENIES in part StockX's motion to exclude the testimony of John Hansen; (6) DENIES StockX's motion to exclude the testimony of Jeffrey Stec; (7) GRANTS in part and DENIES in part StockX's motion to exclude the testimony of Steven McNew; and (8) DENIES StockX's motion to exclude the testimony of Itamar Simonson.

## BACKGROUND

### I.      Factual Background

The Court assumes the parties' familiarity with the history of this dispute.  Briefly, as relevant to these motions, Nike is a leading sportswear company that derives a large share of its business from the sale of Nike-branded sneakers; at least some series of Nike sneakers (*e.g.*, Air Jordans) are collectors' items.  *See, e.g.*, Am. Compl. ¶¶ 29–31.  Because such series are frequently released in quantities less than the demand, a robust secondary market for Nike products has developed.  *See id.* ¶ 55.  StockX is a leading online resale platform, and Nike brands are the most traded brands on StockX.  *Id.* ¶¶ 3–4, 55.

Unlike some other major resellers like eBay, StockX acts as an active intermediary.  Am. Compl. ¶ 49.  Prior to listing a product for sale on its website, StockX takes physical possession of that item and purportedly vets it through "a proprietary, multi-step authentication process."  Am. Answer, Dkt. 41 ¶ 49; Am. Compl. ¶ 3.  According to StockX, no item is listed for sale unless it passes that test, a fact that, prior to the filing of this complaint, StockX touted on its website in support of its guarantee that all listed goods were "100% Verified Authentic."  Am. Answer at 3; Am. Compl. ¶ 51.  Nike claims that, despite those efforts, StockX sold a number of Nike-branded shoes that were counterfeits.  Am. Compl. ¶ 12.

In early 2022, StockX introduced Vault NFTs, which featured Nike's trademarks and provided the holder ownership of an associated physical item.  *Id.* ¶¶ 56, 76.  Many of the physical items were Nike sneakers.  *Id.* ¶ 76.  Around the same time, Nike began releasing its own NFTs.  *Id.* ¶¶ 45–46.  As with the physical sneakers, StockX claimed that its NFTs were "100% Authentic."  *Id.* ¶ 78.  StockX did not obtain Nike's permission to feature its trademarks on StockX's NFTs.  *Id.* ¶ 115.  The parties dispute whether the StockX NFTs were separate,

virtual products that conveyed benefits beyond access to the physical good or merely receipts that allowed an NFT holder to claim ownership of the underlying good without taking physical possession. *Id.* ¶ 6; Am. Answer at 5.

Nike sued StockX for violations of the Lanham Act, including trademark infringement, false designation of origin and unfair competition, counterfeiting, false advertising, and trademark dilution, as well as injury to business reputation and dilution under New York state law, and common law trademark infringement and unfair competition. *See generally* Am. Compl.

The parties have experts on liability and damages. Nike moved to exclude the testimony of three StockX experts: Sarah Butler, Robert Vigil, and DeJongh Wells. *See* Nike Mot. StockX moved to exclude the testimony of all five of Nike's experts: John Hansen, Jeffrey Stec, Kari Kammel, Steven McNew, and Itamar Simonson. *See* StockX Mot.; Nike Opp., Dkt. 211 at 1 (noting that StockX moved to exclude all Nike experts).

## DISCUSSION

### I.    Legal Standard

Federal Rule of Evidence 702 governs expert testimony. It provides that a person "qualified as an expert by knowledge, skill, experience, training, or education" may offer opinion testimony if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions . . . ." *Nimely v. City of New York,* 414 F.3d 381, 395 (2d Cir. 2005).  The proffering party bears the burden of establishing admissibility under Rule 702 by showing that (1) the expert is qualified; (2) the proposed opinion is based on reliable data and methodology; and (3) the proposed testimony would be helpful to the trier of fact.  *See id*. at 396.  The district court serves as the "ultimate gatekeeper" against unreliable expert testimony.  *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (internal quotation marks omitted).

The first threshold question is whether the "proffered expert testimony is relevant." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002).  An expert's opinion is relevant if it will "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a).  Proffered testimony is not helpful to the jury if it "usurps either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it." *Nimely*, 414 F.3d at 397 (cleaned up).  An expert's opinion will be precluded if it "undertakes to tell the jury what result to reach" and "attempts to substitute the expert's judgment for the jury's." *Id.* (quotation omitted).

"Next, the district court must determine 'whether the proffered testimony has a sufficiently reliable foundation to permit it to be considered.'" *Amorgianos*, 303 F.3d at 265 (quoting *Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 184 (2d Cir. 2001)).  The Court considers, *inter alia*, whether (1) "the testimony is grounded on sufficient facts or data;" (2) "the testimony is the product of reliable principles and methods;" and (3) the witness has applied the principles and methods reliably to the facts of the case. *See id.* (cleaned up).  "[I]t is critical that an expert's analysis be reliable at every step." *Id.* at 267.  The Supreme Court has cautioned, however, that even if an expert's analysis is flawed, "[v]igorous cross-examination,

4

presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 596 (1993).

## II.     Nike's Motion to Exclude Butler's Testimony Is Denied

Sarah Butler surveyed consumers to test the effects of StockX's statements regarding authenticity ("Authenticity Statements") on consumer purchasing decision to rebut the findings of Nike's expert, John Hansen.[1]   Butler Rep., Dkt. 194-15 ¶¶ 9–10.  Butler surveyed individuals who had purchased sneakers from StockX since 2020 or otherwise indicated that they would consider purchasing sneakers from StockX in the next year.  *Id*. ¶ 10.  The test group was presented five pages from StockX's website featuring the Authenticity Statements, and the control group was presented with similar webpages that featured versions of those statements that omitted references to "authentication" or substituted them with references to "inspection." *Id*. ¶ 35.  Butler found that there was no statistically significant difference in the two groups' self-reported likelihood of purchasing shoes on StockX and offers testimony tending to establish that the Authenticity Statements were not material to consumers' purchasing decision.  *Id*. ¶ 43.

Nike advances five arguments for the exclusion of Butler's testimony.  Nike argues that her testimony is irrelevant because StockX's Authenticity Statements are literally false and, therefore, are material as a matter of law.  Nike Mem., Dkt. 193 at 5.  Nike further argues that, even if her testimony is relevant, the survey is unreliable because its results were tainted by a biased population, an improper control, "too many information-rich stimuli," and a failure accurately to replicate purchasing conditions.  *Id*. at 6.  Although legitimate fodder for cross-examination, none of these arguments, together or alone, warrants exclusion.

---

[1]      Nike does not challenge Butler's qualifications.

**A.  Relevance**

A plaintiff may establish a false advertising claim by demonstrating that a "challenged advertisement is literally false, *i.e.*, false on its face." *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 112 (2d Cir. 2010) (quotation omitted).  If an advertisement is literally false and concerns "an inherent or material quality of the product," "consumer deception is presumed, and the court may grant relief without reference to an advertisement's actual impact on the buying public." *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153, 153 n.3 (2d Cir. 2007) (cleaned up). Accordingly, Nike argues that because the record evidence shows that StockX sold counterfeits, the Authenticity Statements were literally false.  Butler's survey showing the impact of those statements on consumers' purchasing decisions is, therefore, irrelevant.  *See* Nike Mem. at 6–9.

But before the Court can determine whether StockX's advertisements are literally false, it "must analyze the message conveyed in full context" of those statements.  *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 67 (2d Cir. 2016) (quotation omitted).  StockX disputes Nike's claim that the Authenticity Statements were literally false.  *See* StockX Opp., Dkt. 209 at 24–25. Although Nike advances persuasive arguments as to why the Authenticity Statements were literally false, that determination is premature when the Court does not have the full context of those statements.[2]  Thus, because materiality and falsity remain live issues at this stage of litigation, at least for now, Butler's testimony may be relevant.

---

[2]      None of the many cases Nike cites in support of its argument on materiality suggests that the Court may decide, on a *Daubert* motion, that the challenged statements are literally false.  Most of those cases were decided on a full record at summary judgment or after trial.  *See, e.g.*, *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51 (2d Cir. 2016) (upholding dismissal of false advertising claims on summary judgment); *Chanel, Inc. v. WGACA, LLC*, 2022 WL 902931 (S.D.N.Y. Mar. 28, 2022) (summary judgment); *C=Holdings B.V. v. Asiarim Corp.*, 992 F. Supp. 2d 223 (S.D.N.Y. 2013) (bench trial); *Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48 (2d Cir. 2016) (bench trial).

        *Chanel Inc. v. RealReal, Inc.*, 449 F. Supp. 3d 422 (S.D.N.Y. 2020), was decided at the motion to dismiss stage, when the court was required to construe all the facts alleged in the complaint as true.  Other cases were decided on a motion for a preliminary injunction, for which the plaintiff was only required to demonstrate a

## B.  Reliability

It is black letter law that errors in survey methodology "properly go only to the weight of the evidence — subject, of course, to Rule 403's more general prohibition against evidence that is less probative than prejudicial or confusing." *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 228 (2d Cir. 1999) (Sotomayor, J.).  To the extent Butler's testimony will be relevant to the trier of fact, Nike's critiques of  Butler's methodology go to weight, not admissibility.  Nike has not established that her survey is so flawed as to warrant exclusion under Rule 403.

### 1.  Survey Population

Nike first argues that survey respondents were predisposed to purchase from StockX because they demonstrated familiarity with StockX and had likely already seen the Authenticity Statements.  Nike Mem. at 10.

As a general matter, "questions regarding the appropriate universe to be surveyed go[] to the weight of the evidence and not to its admissibility."[3]  *In re Elysium Health-ChromaDex Litig.*, 2022 WL 421135, at *7 (S.D.N.Y. Feb. 11, 2022) (collecting cases).  Courts in this district frequently admit surveys aimed at false advertisement claims that include past purchasers.  For example, in *POM Wonderful LLC v. Organic Juice USA, Inc.*, 769 F. Supp. 2d 188 (S.D.N.Y. 2011), the court admitted surveys designed to test false advertising claims regarding the production of pomegranate juice; the surveys were administered to individuals "who had

---

likelihood of success on the merits.  *See, e.g.*, *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 151 (2d Cir. 2007) (noting that the defendant "did not deny that the [advertisements] were facially false"); *CJ Prods. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127 (E.D.N.Y. 2011).

[3]      *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112 (2d Cir. 1984), is not to the contrary.  The Second Circuit excluded a "badly flawed" survey that asked leading questions and surveyed only past purchasers instead of prospective purchasers.  *Id*. at 118.  Butler, in contrast, included prospective customers in her survey. Butler Rep., Dkt. 194-15 ¶ 10.

purchased pomegranate juice in the past year or would consider purchasing it."  *Id*. at 197

(internal quotation omitted) (collecting cases).

    While Butler took the additional step of limiting the universe to individuals who had

previously purchased, or were likely to purchase, from a specific website, this alleged flaw,

through perhaps fertile ground for cross-examination, is "not so egregious or clear cut" as to

warrant exclusion.  *Playtex Prods., Inc. v. Procter & Gamble Co.*, 2003 WL 21242769, at *2

(S.D.N.Y. May 28, 2003) (admitting survey over objection that it should have been limited to

purchasers of a specific brand).

### 2. Demand Effects

    Nike argues that Butler's survey was tainted with demand effects that "'cued'

respondents that StockX was the survey's sponsor" and that "the correct answer" was to indicate

a likelihood to purchase from StockX.  Nike Mem. at 11.  "Suggestive questions render a survey

unreliable by creating 'demand effects' or 'cues' from which a respondent can infer the purpose

of the survey and identify the 'correct' answers."  *Capri Sun GmbH v. Am. Beverage Corp.*, 595

F. Supp. 3d 83, 128 (S.D.N.Y. Mar. 31, 2022).  Nike points to two sources of potential demand

effects: a screener question measuring current or past interest in purchasing from StockX and the

inclusion of StockX webpages with "overwhelmingly positive content."  Nike Mem. at 11.

    Butler asked Respondents which third-party online marketplaces they had previously

used, or would use, to purchase sneakers.  *See* Butler Rep. Ex. 4 ("Butler Survey"), Dkt. 194-15

at 3.  StockX was just one option in a list of fifteen resellers, the order of which was randomized.

*See id*.  Nothing in that question makes StockX "so prominent as to reveal the survey's purpose

to respondents."  *Capri Sun*, 595 F. Supp. 3d at 129.  And while respondents were displayed

pictures of the StockX website featuring the StockX name, consumer surveys in false advertising

cases commonly display the challenged advertisement.  *See, e.g.*, *POM Wonderful*, 769 F. Supp. 2d at 197–200 (admitting expert survey including image and video of advertisement).

### 3. Control

Next, Nike claims that Butler's test, the actual Authenticity Statements, were not sufficiently distinct from her control, a version of the Authenticity Statements that substituted "authentication" for "inspection."  Nike Mem. at 12–14.  Nike argues that the control's inefficacy is demonstrated by the lack of a statistically significant difference in likelihood to purchase between the control and test groups, and points to a handful of individuals in the control group who said they were likely to buy from StockX because of its authentication process.  *Id*.

Butler's control, although perhaps not ideal, is not so inappropriate as to warrant exclusion.  As an initial matter, the fact that the survey suggested that the Authentic Statements are not statistically significant does not necessarily mean that the survey is flawed.  An obvious alternate explanation for that result is that StockX is right, and the Authenticity Statements were not significant to purchasers.[4]

The thrust of Nike's claim is that the Authenticity Statements are misleading; it does not challenge StockX's claims about its inspection processes.  Nike's own complaint treats "authentication" and "inspection" differently.  Despite excerpting portions of StockX's website stating that the products are inspected, Nike focuses almost exclusively on StockX's claims regarding authenticity.  *See* Am. Compl. ¶ 51.  Nike's argument stretches the definitions of

---

[4]   Nike similarly argues that Butler's faulty survey design created "ceiling effects," or observed similarities in the tested variable in both the control and tests group resulting from the presence of a different, uncontrolled variable.  Nike Mem., Dkt. 193 at 12.  The mere fact that the control and test groups reported similar likelihood to purchase from StockX does not warrant exclusion.  Nike's arguments that Butler's selection process tainted the results with ceiling effects are properly directed toward the weight, not the admissibility, of the evidence.

"authentication" and "inspection" past plausibility.  The common usage of those words makes

clear that "authentication" involves a guarantee that the product is genuine; inspection does not.

Merriam-Webster defines "authentication" as "an act, process, or method of showing something

. . . to be real, true, or genuine."[5]  Inspection, by contrast, is defined as "the act of inspecting,"

which is "to view closely in critical appraisal."[6]  The fact that some respondents in the control

group mentioned authenticity may be attributable to numerous factors — including their own

experience with StockX — but it does not render the study so flawed as to be inadmissible.[7]  *See*

Butler Rep. ¶ 42.

### 4. Stimuli

Finally, Nike argues that the survey failed accurately to simulate marketplace conditions

and improperly tested all of the disputed statements simultaneously.  Nike Mem. at 14–15.

Nike's arguments fail because courts do not require experts to replicate exactly real-world

purchasing conditions; rather, to be admissible, surveys need only "roughly simulat[e]

marketplace conditions."  *Capri Sun*, 595 F. Supp. 3d at 126 (quotation omitted).

Nike argues that the stimuli departed from real-world conditions in two ways.  First,

Butler showed respondents a version of the StockX homepage that superimposed the "Buy and

Sell Authentic Sneakers" banner that previously existed on the StockX homepage onto a more

---

[5]     Merriam-Webster also defines "authentication" as "the act or process of authenticating something," and further defines "authenticate" as "to prove or serve to prove to be real, true, or genuine."  *See Authentication*, Merriam-Webster, https://www.merriam-webster.com/dictionary/authentication (last visited July 2, 2024); *Authenticate*, Merriam-Webster, https://www.merriam-webster.com/dictionary/authenticate (last visited July 2, 2024).

[6]     *See Inspection*, Merriam-Webster, https://www.merriam-webster.com/dictionary/inspection (last visited July 2, 2024); *Inspecting*, Merriam-Webster, https://www.merriam-webster.com/dictionary/inspecting (last visited July 2, 2024).

[7]     Of course, a survey respondent could have easily reached the conclusion that the "inspection" process was designed to weed out counterfeit products.  That is an obvious ground for cross-examination but not exclusion.

recent version of that page.  Nike Mem. at 14–15.  Nike does not explain how the minor differences in the layout of products and third-party advertisements, which have no significant effect on the content or display of the Authenticity Statements, render the survey results unreliable, let alone less probative than prejudicial.

Second, Nike complains that there is no evidence that StockX users viewed all five webpages in the presented order, before making their purchasing decisions.  *Id*. at 14.  While the results of Butler's survey may have been made stronger by testing each individual statement in order to determine if any "combination of elements gave rise to" the alleged confusion or infringement, that "does not mean that the survey does not provide relevant information."[8] *Gucci Am., Inc. v. Guess?, Inc.*, 831 F. Supp. 2d 723, 740 (S.D.N.Y. 2011).

Nike further claims that testing all the challenged statements at once overwhelmed respondents, and that respondents were only required to view the pages for a minimum of ten seconds.  Nike Mem. at 15.  "In real life, the length and depth of a customer's engagement with a product she encounters varies by customer," and, frequently, consumers interact with products "for a short time only before forming judgments about them."[9] *Capri Sun*, 595 F. Supp. 3d at 126–27.  Nike has not established that Butler's approach so markedly deviated from real world conditions that it cannot address any methodological flaws on cross-examination.

For all these reasons, Nike's motion to exclude Butler's testimony and the survey on which it is based is DENIED.

---

[8]       *Jackpocket, Inc. v. Lottomatrix NY LLC*, 645 F. Supp. 3d 185 (S.D.N.Y. 2022), on which Nike relies, is distinguishable.  *See* Nike Mem. at 11.  The *Jackpocket* court noted that "the display of full webpages" did not "mirror the marketplace reality" that consumers experience in conducting an internet search.  *See id*. at 264.  Here, in contrast, Butler showed survey respondents webpages from the same website on which consumers are alleged to have viewed false advertisements before purchasing sneakers.

[9]       Even assuming that viewing time was relevant, the survey results do not vary significantly based on the length of time that respondents viewed the stimuli.  *See* Butler Decl., Dkt. 210-2 ¶ 4.

III.    **Nike's Motion to Exclude Vigil's Testimony Is Denied in Part**

Robert Vigil is an economist who opines on damages and rebuts the opinion of Nike's damages expert, John Hansen.[10]  Vigil Am. Rebuttal Rep., Dkt. 194-1 ¶¶ 1–4.  Vigil opines that "very few, if any" purchases of Nike sneakers on StockX are attributable to the Authenticity Statements.  *Id*. ¶ 10.  He further opines that consumer purchasing decisions were driven by "other variables . . . such as speed of delivery, availability of scarce or unique products, price transparency, value for the price, and customer experience."  Vigil Rep., Dkt. 194-19 ¶ 9.  Vigil also criticizes the opinion of Nike's expert, John Hansen, for ignoring the influences of these factors on consumer demand.  Vigil Am. Rebuttal Rep. ¶ 60.

Vigil bases his analyses on, *inter alia*, his review of StockX's financial statements, the Butler survey, and a comparison of sales data from StockX and GOAT, another online reseller. *Id*. ¶¶ 2–3, 10; *see also* Vigil Rep. Ex. 2 (listing sources).  Nike argues that Vigil's testimony is unreliable because he improperly extrapolated the results from the Butler survey to a population other than the one surveyed and failed to confirm the reliability of the GOAT sales data.[11]  Nike Mem. at 17–19.  Nike further argues that Vigil's testimony regarding other factors driving consumer demand of Nike shoes on StockX is entirely speculative.  *Id*. at 20.

A.  **Butler Survey**

Vigil builds on the results of  Butler's survey, which was administered to past and prospective purchasers of StockX sneakers, to opine that the vast majority of past purchasers were not substantially influenced by the Authenticity Statements; his opinion will be used to support StockX's argument that, even if it is liable to Nike, very little, if any, of its profits are

---

[10]       Nike does not challenge Vigil's qualifications.

[11]       Nike also moves to exclude Vigil's testimony on the grounds that Butler's survey is flawed, an argument that the Court rejects for the reasons discussed in Section II.

subject to disgorgement.  *See* Vigil Am. Rebuttal Rep. ¶ 74.  Nike argues that Vigil's

extrapolation is unreliable as Butler did not extrapolate her results to any other population.  *See*

Nike Reply, Dkt. 223 at 6–7; Butler Dep., Dkt. 194-22 at 126–27.

      As a general matter, courts are skeptical of using consumer surveys to measure lost

profits due to false advertising.  *See Church & Dwight Co., Inc. v. SPD Swiss Precision*

*Diagnostics GMBH*, 2018 WL 4253181, at *8–9 (S.D.N.Y. Sept. 5, 2018) (Nathan, J.) (declining

to use consumer confusion survey administered to prospective and actual purchasers to measure

damages).  But courts have utilized "survey results to measure damages causation in the absence

of another reasonable estimate," particularly in the disgorgement context where the defendant

bears the burden of arguing for deductions.  *Id*. at *9.  At this stage of litigation, where no other

reliable measure of damages has been established and Nike continues to pursue disgorgement,

the Court declines to exclude Vigil's testimony.[12]  *See Joffe v. King & Spalding LLP*, 2019 WL

4673554, at *14 (S.D.N.Y. Sept. 24, 2019) ("In the same way that the best available car in a lot

could still be a lemon, a damages estimate can be the best available — yet inaccurate or biased

nevertheless.").  Furthermore, the Butler survey measures both prospective and actual

purchasers; although Butler's results may not be a perfect proxy for actual deception, that

argument goes to weight, not admissibility.[13]  *See In re Elysium Health-ChromaDex Litig.*, 2022

WL 421135, at *7 (noting that an argument regarding the appropriate universe of respondents

"presents a paradigmatic jury issue").

---

[12]      Nike may re-raise this motion prior to trial if other, more reliable measures of damages are established.

[13]      Nike relies on *Vital Pharmaceuticals v. PhD Marketing, Inc.*, 2022 WL 2952495 (C.D. Cal. July 26, 2022), a nonbinding, out-of-circuit case.  Nike Mem. at 18.  While that case found unpersuasive a consumer confusion survey that "did not narrow respondents to actual purchasers," the *Vital Pharmaceuticals* court did not exclude the survey or expert testimony.  2022 WL 2952495, at *7.

### B.  GOAT Data

Vigil compares the sales of StockX and GOAT before and after StockX removed the Authenticity Statements from its website to argue that, because StockX's sales remained in line with GOAT's sales, the Authenticity Statements did not drive sales.  Vigil Am. Rebuttal Rep. ¶ 76.  Vigil did not independently ascertain the reliability of the data regarding GOAT's sales. Nike argues that this failure renders the portions of his opinion based on the GOAT data unreliable.  Nike Mem. at 18.

Courts have interpreted Federal Rule of Civil Procedure 702 to require an assessment of the reliability of the "underlying data employed by the expert."  *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 304 (S.D.N.Y. 2015).  Typically, however, arguments regarding the underlying data go to the weight of the testimony unless the data is "so unrealistic and contradictory as to suggest bad faith."  *Id*. at 306 (quotation omitted); *see also Arista Recs. LLC v. Lime Group LLC*, 2011 WL 1674796, at *7 (S.D.N.Y. 2011) ("Arguments about the assumptions and data underlying an expert's testimony go to the weight, rather than the admissibility, of that testimony.").  "An expert opinion is not *per se* unreliable because it relies upon some unverified or inaccurate information provided by the expert's client."  *Lee Valley Tools, Ltd. v. Indus. Blade Co.*, 288 F.R.D. 254, 267 (W.D.N.Y. 2013) (collecting cases).

Nike's concerns regarding the data's reliability are entirely speculative; it does not identify "what, if any, information provided to the expert[] was inaccurate."  *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 269 (S.D.N.Y. 2010) (excluding testimony "riddled with logical errors" but noting that whether a party provided its expert with inaccurate data is ground for cross-examination).  Vigil sufficiently details his methodology to allow "counsel and the jury to test

[his] conclusions." *Id*. If Vigil fails to establish an adequate foundation for his testimony at trial, Nike may renew its motion.

### C. Influence of Other Considerations

Vigil's affirmative opinion that consumers' decisions to purchase from StockX were driven by factors other than the Authenticity Statements, including "speed of delivery, scarcity of the product, [and] value for the price," is unreliable. Vigil Rep. ¶ 90; *see also id*. ¶ 9. He criticizes Nike's expert, John Hansen, for failing to consider those factors in evaluating the degree to which the Authenticity Statements influenced consumers' purchasing decisions. Vigil. Am. Rebuttal Rep. ¶ 60. Vigil bases these opinions on the results of surveys evaluating the "top purchase drivers for consumers deciding which sneaker . . . to purchase." Vigil Rep. ¶ 90 n.273 (cleaned up); *see also* Vigil Am. Rebuttal Rep. ¶ 61 ("survey evidence suggests that authentication may not constitute the primary factor driving purchases on the platform for all consumers").

Nike argues that these opinions are unreliable because Vigil failed to quantify the influence of these factors on consumer purchasing decisions or base his opinion on any methodology, and instead offers only a factual narrative of StockX's features. *See* Nike Reply at 8. Although Nike moved to exclude Vigil's opinions in both his initial report and rebuttal report, *see* Nike Mem. at 20 (citing Vigil Rep. ¶ 9), StockX opposes the motion only as to Vigil's rebuttal opinion, *see* StockX Opp. at 2, 10, 16–17. Accordingly, Nike's unopposed motion to exclude Vigil's affirmative opinion regarding other factors that drive a consumer's decision to purchase on StockX contained in his initial report is GRANTED.

The Court finds, however, that Vigil's opinion is appropriate rebuttal testimony. As an initial matter, an expert need not quantify the degree to which any particular factor contributed to

the relevant effect, "so long as he applied some of his own analysis." *Arista Recs.*, 2011 WL 1674796, at *10. This is particularly true on rebuttal, where an expert may merely criticize the opinions presented by the opposing party and need not develop any methodologies of his own. *See CapriSun*, 595 F. Supp. 3d at 140 ("At bottom, a rebuttal expert need not proffer a methodology or model, but only critique the opposing expert's."). Vigil analyzed the results of empirical surveys to develop a list of factors that drive consumer purchasing decisions and uses that analysis to critique Hansen's analysis; he is not required to do more.

Accordingly, Nike's motion to exclude Vigil's rebuttal testimony is DENIED; its unopposed motion to exclude Vigil's affirmative testimony regarding the influence of other factors on purchasing decisions is GRANTED.

### IV.    Nike's Motion to Exclude Wells' Testimony Is Denied

DeJongh Wells is a self-professed "sneakerhead," who opines on sneakerhead culture and explains how sneakerheads view the Vault NFTs and navigate the secondary market. Wells Rep., Dkt. 194-20 ¶¶ 10–12. Wells also opines about the practices of the sneakerhead community and states that StockX has improved the experience of collecting sneakers, including by verifying sneakers and providing the Vault NFTs as an alternative to physically holding sneakers. *See id.* ¶ 12. Wells bases his testimony on his own experience and his conversations with others. *See, e.g.*, *id.* ¶¶ 13, 84. Nike moves to exclude Wells' testimony because it is irrelevant, addresses topics that are not properly the subject of expert testimony, and is not based on any reliable methodology.[14]   *See* Nike Mem. at 21–25.

Nike argues that Wells' opinions regarding the history of sneakerhead culture and sneakerheads' motivations are "a mix of banal truisms obvious to a lay juror." *Id.* at 22. The

---

[14]    Nike does not challenge Wells' qualifications as a sneaker expert. Nike Reply, Dkt. 224 at 9 n.8.

Court finds, however, that Wells' opinions regarding sneakerhead culture and purchasing tendencies are relevant to show the degree of sophistication of the sneakerhead community.[15] *See Johnson & Johnson v. Smithkline Beecham Corp.*, 960 F.2d 294, 298 (2d Cir. 1992) (listing "the sophistication of the advertising audience" as a relevant factor in evaluating whether implied falsehoods misled consumers). Wells provides detailed and relevant background about, *inter alia*, the evolution of sneakerheads' perceptions of the sneaker market in the face of rising counterfeiting and the likelihood that sneakerheads trust resellers representations that their goods are in fact authentic. *See, e.g.*, Wells Rep. ¶ 103. This is relevant testimony to contextualize the manner in which members of the sneakerhead subculture approach their purchasing decisions. *See, e.g.*, *Derienzo v. Trek Bicycle Corp.*, 376 F. Supp. 2d 537, 564 (S.D.N.Y. 2005) (permitting testimony from avid bicycler regarding the history of bicycle frames as part of testimony regarding the normal use of bicycles during cliff jumps); *Capri Sun*, 595 F. Supp. 3d at 136–37 (permitting expert testimony on product history to establish consumer perception of product). Similarly, Wells' opinions that sneakerheads credit the Authenticity Statements as improving the resale experience are relevant to the sophistication of at least this subset of StockX's consumers and how likely they are to be deceived by any falsehoods.[16] *See, e.g.*, Wells Rep. ¶¶ 101–07.

Wells' methodology is also reliable. Wells bases his testimony on his vast experience with the sneakerhead community, including his discussions with other sneakerheads over the

---

[15]     In light of the fact that Nike acknowledges that at least some of the Nike-branded sneakers purchased on StockX were purchased by avid sneaker collectors, its argument that it is unclear whether StockX's customers consisted of sneakerheads rings entirely hollow. *See* Nike Mem. at 2 (discussing sneaker purchases by Roy Kim).

         To the extent that Nike establishes at summary judgment that the Authenticity Statements are literally false, Nike may re-raise its *Daubert* motion to exclude Wells' testimony at trial.

[16]     The Court disagrees with Nike that Wells opines "that StockX can effectively authenticate." Nike Mem. at 24. Rather, Wells opines that the Authenticity Statements have improved certain consumers' experiences and perceptions of the purchasing process, regardless of whether they are in fact purchasing authentic sneakers. *See* Wells Rep., Dkt. 194-20 ¶ 103 (noting that some sneakerheads are skeptical of the Authenticity Statements).

years.  *See, e.g.*, *id.* ¶¶ 101, 103.  In light of the "liberal standard of admissibility for expert

opinions," *Nimely*, 414 F.3d at 395, courts frequently admit experts whose testimony is based on

their "background and experience," *Derienzo*, 376 F. Supp. 2d at 563; *see also SR Int'l Bus. Ins.*

*Co., Ltd. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 132 (2d Cir. 2006) (affirming

admission of expert testimony based on practical experience).  Especially when considering

testimony regarding consumer perception, courts have clearly held that "expert reports . . .  need

not be based on scientific survey, but that experts may testify based on their own experience."

*Price v. L'Oréal USA, Inc.*, 2020 WL 4937464, at *5 (S.D.N.Y. Aug. 24, 2020) (collecting

cases).

Nike also argues that, even if Wells' methodology is broadly reliable, his methodology is

deficient as to certain opinions.  The fact that Wells acknowledges that there are other

permissible definitions of "sneakerhead" and that the group is heterogeneous[17] is not a fatal flaw

such that the Court could conclude Wells "lacks good grounds for his . . . conclusions."

*Amorgianos*, 303 F.3d at 267 (internal quotation omitted); *see also* Wells Dep. Tr., Dkt. 194-23

at 61:18-22.  And although Wells is unfamiliar with the more technical aspects of owning a

Vault NFT, he offers only a narrow opinion regarding the benefits of an NFT based on the

challenges that he and other sneakerheads have navigated in their own collections.  *See, e.g.*,

Wells Rep. ¶¶ 111–14.  To the extent that Nike believes that Wells' definition of a sneakerhead

and his opinions regarding sneakerheads' beliefs are unreliable, none of the alleged

methodological flaws is so egregious that it cannot be adequately addressed on cross-

examination.

---

[17]     Nike attempts to exclude Wells' opinion because it is inconsistent based on his acknowledgement that
different subgroups of sneakerheads view the Authenticity Statements differently are wholly unpersuasive.  *See* Nike
Mem. at 23–24.  That said, it certainly may be fertile ground for cross-examination.

## V.      StockX's Motion to Exclude Kammel's Testimony Is Granted in Part

Kari Kammel leads the Anti-Counterfeiting and Product Protection Center at Michigan State University.[18]   *See* Kammel Rep., Dkt. 201-6 at 1.  Kammel opines on the rise of counterfeiting generally and on platforms like StockX, as well as what constitutes authentication. *See, e.g.*, *id*. at 2, 21, 39.  StockX moves to exclude these opinions as irrelevant, unreliable, and prejudicial.  *See* StockX Mem., Dkt. 190 at 8.   StockX also moves to exclude Kammel's discussion of certain Nike sneakers that Nike identified as counterfeit but failed to disclose to StockX.  *See id*. at 14–15.  In addition, Kammel offers opinions rebutting StockX's expert Catherine Tucker, *see* Kammel Rebuttal Rep., Dkt. 201-7; StockX argues that Kammel is not qualified to render those opinions, *see* StockX Mem. at 13–14.

For the following reasons, the Court holds that Kammel's discussion of counterfeiting must be limited to the dispute at issue and that Kammel may not testify about the previously undisclosed counterfeit shoes; the balance of her opinion is admissible.

### A.  Counterfeiting Generally

Kammel opines extensively on the global rise of counterfeiting and the resulting social harms.  For example, Kammel explains that counterfeiting can be tied to terrorist activity, Kammel Rep. at 5, and results in lost jobs and tax revenue, *id*. at 17.  She also highlights Congressional efforts to protect consumers from counterfeit products.  *Id*. at 10.  Nike argues that these opinions are important to contextualize the alleged counterfeiting enabled by StockX, including the fact that a counterfeiting operation based in China sold over 1800 products on StockX.  *See* Nike Opp. at 9.  Even assuming that Kammel could reliably connect these global forces to the parties in this case, the jury does not need a primer on the complex global

---

[18]      StockX does not challenge Kammel's qualifications to opine on authenticity and counterfeiting.

economics and geopolitics of counterfeiting to understand the relatively narrow set of facts in dispute.  Nor is this testimony necessary to establish a factual basis for her opinion.

Furthermore, the lay public, particularly in New York, does not need expert testimony to understand that luxury goods face high demand or that counterfeiting is on the rise.  The Second Circuit has made clear that district courts should exclude expert testimony within the jury's ken, including matters that are frequently in the news.  *See United States v. Castillo*, 924 F.2d 1227, 1233 (2d Cir. 1991) (excluding testimony regarding the basic mechanics of drug dealing because jurors were already "flush with daily news of the latest drug bust").  The proliferation of fake luxury items is a heavily reported topic.  *See, e.g.*, Kammel Rep. at 14 n.44 (citing a *Washington Post* article discussing online counterfeiting of Nikes).  For example, in the same month that the parties filed their *Daubert* motions, more than $1 billion worth of counterfeit luxury apparel, including sneakers, were confiscated in Manhattan in a high-profile seizure.[19]

Accordingly, Kammel's opinions on the harms and drivers of counterfeiting generally that are severed from the facts at issue are excluded as irrelevant, and because any minimal relevance is outweighed by the risk of wasting the jury's time.  *See* Fed. R. Evid. 403.  This includes sections II.B–D, II.E(1)–(3), III.A, and III.D–E.[20]

### B.  Counterfeiting Specific to Nike

Kammel may, however, opine about how StockX's authentication practices may make it vulnerable to counterfeiters and the types of harms that companies like Nike experience from counterfeiting.  *See* Kammel Rep., Section VII.  Although Kammel does not tie this harm

---

[19]     *See NYC Raids Net Knockoff Bags, Apparel, Said to Be Worth $1B if Items Had Been Real*, AP News (Nov. 16, 2023, at 11:31 A.M.), https://apnews.com/article/counterfeit-handbags-largest-seizure-new-york-f7889a9bcb38c139d2e8efe6d5aa3d26 ("Counterfeit luxury goods have been a staple of the underground New York City shopping experience for generations . . . .").

[20]     The Court finds that the balance of Kammel's introductory sections is appropriate foundation for her subsequent opinions regarding the specific dispute in this case.

specifically to StockX's conduct in that same section, her opinions are relevant inasmuch that they provide a foundation for her subsequent opinions that StockX's conduct has inflicted similar harms on Nike.

Although StockX argues that Kammel's opinion that StockX has harmed Nike is speculative, *see* StockX Mem. at 11, the Court finds that it is supported by a sufficiently reliable methodology. Kammel bases her opinion that the types of policies implemented by StockX harm Nike on a review of the discovery in this matter, discussions with Nike's Vice President for Brand Protection and Digital IP, her own experience, and materials from trade associations. *See, e.g.*, Kammel Rep. at 14–15, 26–27. That is enough; StockX is free to challenge Kammel's methodology and to argue that her "conclusions are unacceptably impressionistic" on cross-examination. *Capri Sun*, 595 F. Supp. 3d at 132 (admitting expert opinion on consumer perception based on application of statutory factors and academic literature).

### C. Authentication

Kammel's opinions on what constitutes authentication are reliable and relevant to StockX's state of mind. Kammel bases her definition on the International Organization for Standardization ("ISO"), a sufficiently reliable source.[21] *See, e.g.*, Kammel Rep. at 21; *ARMOUR Cap. Mgmt. LP v. SS&C Techs., Inc.*, 2020 WL 64297, at *9 (D. Conn. Jan. 5, 2020) (permitting expert testimony regarding ISO report). Kammel provides a detailed overview of

---

[21] StockX attempts to characterize Kammel's definition of authentic as inconsistent because it is unclear how many of the six listed methods must be used to authenticate a product and because she acknowledged a typo in her report. StockX Mem., Dkt. 190 at 12. Reading Kammel's report as a whole, however, she clearly opines that holders of intellectual property may choose only some methods to authenticate their products. *See, e.g.*, Kammel Rep., Dkt. 201-6 at 21 ("For example, an IP rights holder may be using four separate technologies . . . .").

That Kammel did not consider additional definitions, including those proffered by her research center, is appropriate grounds for cross-examination but not for exclusion. *See* StockX Mem. at 12 n.10; *In re Mirena IUD Prods. Liability Litig.*, 169 F. Supp. 3d 396, 427 (S.D.N.Y. 2016) ("[E]xperts' failure to confront alleged conflicting statements . . . does not warrant exclusion under *Daubert*.").

how terms like "authentic" and "authentication" are understood within the industry, and her

testimony is relevant to whether the Authenticity Statements were literally false and whether

StockX acted willfully.[22]  *See, e.g.*, Kammel Rep. at 20–24; *see also Merck Eprova AG v. Gnosis*

*S.p.A.*, 901 F. Supp. 2d 436, 452 (S.D.N.Y. 2012), *aff'd*, 760 F.3d 247 (2d Cir. 2014) (noting that

consistency with industry usage is relevant to determine whether an advertisement is literally

false).

      In support of her opinion, Kammel draws on industry standards for both brick and mortar

and online markets.  *See* Kammel Rep. at 8–11.  StockX argues that Kammel should have relied

only on industry standards for authentication specific to the online resale marketplace.[23]  StockX

Reply, Dkt. 223 at 6.  The entire focus of Kammel's report, however, is the resale marketplace;

as Kammel explains, sellers directly connected to the supply chain can ascertain the product's

source, making authentication most relevant for the resale marketplace.  *See* Kammel Rep. at 37.

Accordingly, the Court finds that Kammel's discussion of industry standards for authentication

in physical and online markets is relevant.

---

[22]     StockX argues that Kammel's testimony is not relevant to its state of mind because she does not demonstrate that StockX actually knew about the industry standards referenced in her report.  *See* StockX Reply, Dkt. 223 at 5–6.  That is not strictly necessary.  If Nike can demonstrate that StockX was willfully blind, it may prove that StockX acted willfully such that enhanced statutory damages are appropriate.  *See Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 110 (2d Cir. 2010) ("[W]illful blindness is equivalent to actual knowledge for purposes of the Lanham Act." (quotation omitted)).  Although StockX puts great stock in the fact that Nike's opposition brief to its *Daubert* motion notes that "[w]illful counterfeiting can be established by a defendant's reckless disregard," Nike is free to pursue alternative theories.  Nike Opp. at 7 n.10; *see also* StockX Reply at 5 n.11.

     The fact that Kammel acknowledged that she, like any expert, cannot testify as to a party's state of mind does not undercut the relevance of her testimony to StockX's *mens rea*.  *See* StockX Reply at 5; *In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) ("Inferences about the intent or motive of parties or others lie outside the bounds of expert testimony.").

[23]     StockX also notes that Kammel opines that "[w]ith some rare exceptions, standards for selling products that one would find in a brick and mortar setting simply have not existed online to date."  Kammel Rep. at 8; *see also* StockX Reply at 6.  It is not obvious whether Kammel is opining that few standards exist, or that such standards exist, but most online stores have not embraced them.  In either case, she does not opine that there are *no* industry standards applicable to the online resale marketplace.  Nor is it intuitively obvious why there would be a different standard applicable to an online reseller like StockX that takes physical possession of the product being sold and a brick and mortar seller.

### D.  Rebuttal Testimony

Kammel rebuts the opinions of StockX's expert Catherine Tucker, an economist who opines about the economics of "platform markets" like StockX.  *See* Kammel Rebuttal Rep. at 22–25.  Tucker discusses "coring," which she defines as "the ability of two-sided platforms, in general, and marketplaces, in particular, to actively manage and maintain buyer and seller interactions to ensure their quality."  Tucker Rep., Dkt. 207-17 ¶ 13.  StockX argues that Kammel's rebuttal testimony should be excluded because she is not qualified to opine on platform economics.  StockX Mem. at 13.

Kammel's rebuttal is directed to Tucker's factual assumptions regarding consumer behavior, however, not her economic theory.  *See* Kammel Rebuttal Rep. at 22–25.  StockX does not dispute that Kammel is qualified to opine on how consumers approach the risks of encountering counterfeits in the market.  Because Kammel "has educational experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent."  *Arista Recs.*, 2011 WL 1674796, at *3 (internal quotation omitted).  Kammel does not, as StockX argues, usurp the role of the jury by merely applying the law to the facts, *see* StockX Reply at 9, but rather applies her review of the literature, discovery, and experience to critique Tucker's factual assumption — a quintessential rebuttal, *see* Kammel Rebuttal Rep. at 22–25.

Kammel's rebuttal testimony is also sufficiently reliable.  She bases her opinions on her review of the discovery in this matter, her own experience, and credible academic sources, including a report from the Department of Homeland Security.  *See, e.g.*, Kammel Rebuttal Rep.

at 16–17.  On rebuttal, Kammel is not required to expound her own competing methodology; she

may focus her testimony on critiquing StockX's witness.  *See CapriSun*, 595 F. Supp. 3d at 140.

### E.  New Factual Testimony

As part of her rebuttal testimony, Kammel relies briefly on statements made by Nike

employee Joe Pallet that identify certain Nike sneakers sold by StockX as counterfeit.  Kammel

Rebuttal Rep. at 14–16.  StockX seeks to exclude that testimony because Nike did not identify

those sneakers as counterfeit during discovery.  StockX Mem. at 14.  StockX sent Nike an

interrogatory requiring Nike to "[i]dentify each and every Alleged Counterfeit . . . that forms the

basis for Nike's [Counterfeiting Claim]."  *See* Second Ford Decl., Dkt. 233-4 at 6.  Pallet's

identification of additional counterfeit shoes was directly responsive to the interrogatory and

should have been disclosed.

In light of that fact, and because Kammel relies on Pallet's testimony only in brief, the

Court grants StockX's *Daubert* motion to exclude that portion of Kammel's testimony.  The

Court will not rule at this time, however, as to whether Pallet's fact testimony that identifies the

additional sneakers as counterfeit is admissible at trial, separate from Kammel's testimony.

The Court pauses to reiterate its prior admonition to both parties that it expects the

experienced and competent attorneys that are appearing in this case to behave professionally and

collegially.  Order, Dkt. 171 at 6.  Nike offers no excuse for its failure to respond to StockX's

clearly relevant interrogatory.  Nor does StockX explain its failure to raise this issue prior to the

filing of *Daubert* motions pursuant to Rule 4(F) of the Undersigned's Individual Practices.  The

Court expects both parties to adhere to the Undersigned's Orders and Individual Practices and to

work together professionally going forward.

## VI.    StockX's Motion to Exclude Hansen's Testimony Is Granted in Part

StockX also moves to exclude the testimony of Nike's damages expert John Hansen, a forensic accountant who seeks to quantify a potential disgorgement award.[24]  StockX Mem. at 3. StockX argues that Hansen's opinion is unreliable because his calculations are based on StockX's profits from all of its sales of Nike sneakers, not just sales attributable to the allegedly false advertisements.  *See id*.  StockX further argues that Hansen's opinions regarding the harm suffered by Nike "are unsupported speculation."  *Id*. at 4.

### A.  Calculation of a Disgorgement Award

StockX is correct that, as a threshold matter, Nike must demonstrate "'economic or reputational injury' proximately caused by the alleged false advertisement" to establish a false advertising claim.  *Souza v. Exotic Island Enters.*, 68 F.4th 99, 119 (2d Cir. 2023) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014)).  Once that is established, however, the Court may "award a defendant's full profits," not just those directly tied to the violation.[25]  *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 262 (2d Cir. 2014);[26]

---

[24]    StockX's does not challenge Hansen's qualifications.

[25]    StockX blatantly mischaracterizes Magistrate Judge Netburn's order resolving a discovery dispute in support of its assertion that Nike must further prove that any profits to be disgorged are traceable to the violation. *See* StockX Mem. at 3 (citing Order, Dkt. 116 at 2).  In that Order, Magistrate Judge Netburn observed only that it was sufficient for Nike "to show that the StockX sales were ill-gotten" to succeed on "its false advertising claim and be awarded unjust enrichment profits," and Nike need not specifically demonstrate that StockX diverted Nike's sales in order to establish the requisite causal nexus.  Order, Dkt. 116 at 2.  Regardless of whether Nike indicated its intent to seek a disgorgement award in its initial disclosures, *see* StockX Reply at 1 n.3, Hansen's opinion is expressly directed to the calculation of a disgorgement award, *see* Hansen Am. Rep., Dkt. 201–1 ¶ 7.

[26]    At least one court in this Circuit has noted that "it is unclear whether . . . *Merck*'s holdings remain good law" following the Supreme Court's decision in *Romag Fasteners, Inc. v. Fossil, Inc.*, 590 U.S. 212 (2020).  *Safety Nat'l Casualty Corp. v. Floor and Decor Outlets of Am., Inc.*, 2022 WL 1720433, at *6 n.2 (E.D.N.Y. May 27, 2022).  The Second Circuit in *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247 (2d Cir. 2014), noted that under then-existing precedent, "a finding of defendant's willful deceptiveness is a prerequisite for awarding profits."  *Id*. at 261 (quotation omitted).  The Supreme Court in *Romag Fasteners*, however, made clear that the Lanham Act did not require "a showing of willfulness to win a defendant's profits" in cases proceeding under § 1125(a), *id*. at 215, while reiterating "that a trademark defendant's mental state is a highly important consideration in determining whether an award of profits is appropriate," *id*. at 219.  This Court need not, at this time, determine the exact showing required

*see also In re Elysium Health-ChromaDex Litig.*, 2022 WL 421135, at *20 n.6 ("[A] Lanham Act plaintiff has no entitlement to disgorgement if it cannot independently demonstrate causation and injury . . . ."). Accordingly, if Nike succeeds on its false advertising claim, and makes the requisite showing that disgorgement is appropriate, then Nike may seek a disgorgement award of StockX's full profits from the sale of Nike shoes — not just those directly traceable to the alleged violation.[27]

## B. Harm to Nike

Finally, StockX asserts that Hansen's affirmative opinion that StockX directly harmed Nike is unreliable because he did not trace the purported harm to a particular sneaker trade. *See* StockX Mem. at 6–7; *see also* Hansen Am. Rep., Dkt. 201-1 ¶¶ 50–54. The Court agrees that Hansen's opinion regarding harm to Nike rests on insufficiently reliable methodology. That portion of Hansen's analysis merely regurgitates the factual evidence in this case and Nike's arguments without applying any expert methodology. Nor is it integral to his analysis, as Hansen does not seek to quantify damages traceable to actual harm. *See* Hansen Am. Rep. ¶ 16. Accordingly, the content of that portion of his opinion is properly presented by lay witnesses and

---

to warrant a full disgorgement of profits following *Romag Fasteners*. Suffice it to say an award of profits remains an available remedy, as to which willfulness remains a relevant consideration. *See id.*

[27] In support of its argument that enhanced damages constituting disgorgement of all of a defendant's profit requires a showing of direct causation, StockX relies on several cases that involved the calculation of different categories of damages, including disgorgement of plaintiff's lost profits. *See Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics GmbH*, 2018 WL 4253181, at *12 (S.D.N.Y. Sept. 5, 2018) (declining to award disgorgement of full profits because such an award would constitute "impermissible over-compensation"); *Dependable Sales and Serv., Inc. v. TrueCar, Inc.*, 311 F. Supp. 3d 653, 657 (S.D.N.Y. 2018) (excluding an expert quantifying actual damages).

The *Dependable Sales and Service, Inc. v. TrueCar, Inc.* court observed the basic proposition that a plaintiff bringing a false advertising claim must "demonstrate an injury proximately caused by the defendant." 394 F. Supp. 3d 368, 375 (S.D.N.Y. 2019). Because the plaintiff had entirely "fail[ed] to come forward with evidence of injury," disgorgement was unavailable as a remedy, *id.* at 371, as a contrary ruling would "expand the category of eligible plaintiffs" and run afoul of the applicable standing requirements, *id.* at 375. *See also Merck Eprova AG*, 760 F.3d at 259 (noting that in non-comparative false advertising cases, where injury is not presumed, "some indication of actual injury and causation" is "necessary in order to ensure that a plaintiff's injury is not speculative").

documentary evidence, and the inferences to be drawn from that evidence can be argued by

Nike's lawyers.  *See Nimely*, 414 F.3d at 398 (excluding expert testimony based on testimony of

fact witnesses that "may improperly bolster the account given by the fact witnesses"); *In re*

*Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004) (excluding expert's

factual narrative that would "serve only to buttress plaintiffs' theory of the case").  For these

reasons, Section IV.A of Hansen's First Amended Report is excluded.

### VII.    StockX's Motion to Exclude Stec's Testimony Is Denied

Jeffrey Stec is an economist who seeks to rebut the damages testimony of StockX's

experts Tucker and Vigil.[28]  StockX seeks to exclude Stec's opinion that, in the year prior to his

opinion, StockX sold "at least 200,000 shoes . . . that were simultaneously offered by Nike for

retail sale," Stec Rep., Dkt. 201-4 at 13, and that those shoes "were likely sold when these

products were available by Nike," *id*. at 18.  *See also* StockX Mem. at 7.  Stec bases his analysis,

in part, on an evaluation of the shoes available on both companies' websites between June 1,

2023, and June 2, 2023, through which he found that approximately 70% of shoes listed for sale

on Nike's website were available for sale on StockX in "the same styles and at least one

overlapping size . . . ."  Stec Rep. at 11.  StockX argues that this conclusion is unreliable because

Stec failed to establish that, of the 200,000 referenced shoes, the same model and size were

available from both Nike and StockX, and because he did not trace his analysis to actual sales.

*See* StockX Mem. at 7–8.

The fact that Stec did not trace his analysis to specific sales does not render his testimony

irrelevant or inadmissible.  His finding that the same shoes were available for sale on both

---

[28]      StockX does not challenge Stec's qualifications.

websites is relevant because it tends to establish that StockX could have diverted sales from Nike.

To the extent that size is a factor,[29] Stec did measure the number of shoes that had the same style and size listed on both websites for a sample of the shoes he analyzed. *See* Stec Rep. at 11. StockX is free to argue that Stec's methodology did not sufficiently take size into account on cross-examination, but it has not established that any such flaw "is large enough that the expert lacks good grounds for his . . . conclusions." *Amorgianos*, 303 F.3d at 267 (quotation omitted).

Finally, StockX asserts that Stec's opinion is impermissible fact testimony. StockX Reply at 5. The factual discussion in Stec's opinion is a necessary and permissible exposition to his admissible rebuttal testimony regarding damages. Furthermore, Stec analyzed a large volume of data and applied his statistical expertise to reach his conclusion. *See, e.g.*, Stec Rep. at 11. Accordingly, StockX's objection is not well founded.

**VIII.   StockX's Motion to Exclude McNew's Testimony Is Granted in Part**

Steven McNew is a senior director at FTI Consulting Technology LLC. McNew Rep., Dkt. 207-9 at 1. McNew studied blockchain and cryptocurrency at MIT and has extensive experience in the cryptocurrency sphere. *See id.* He explains the basic structure of blockchain technology and NFTs and opines that, while the Vault NFTs were marketed and understood by consumers to be NFTs, they were not true NFTs. *See id.* at 45, 62. McNew further opines that the Vault NFTs were poorly designed and compares the prices of the Vault NFTs to the underlying shoe to argue that consumers believed the Vault NFTs carried additional benefits.

---

[29]     StockX's own expert asserts that demand is driven, at least in part, by sneakerheads who never actually wear the shoes they collect. *See* Wells Rep. ¶ 111.

*See id.* at 24–25, 62.  StockX argues that McNew is not qualified[30] to conduct a pricing analysis, and that all of his opinions are unreliable.  *See* StockX Mem. at 15, 19–20.

## A.  NFT Industry Standards

McNew offers extensive and relevant testimony explaining the nature of an NFT, industry standards for NFT design, and whether the Vault NFTs aligned with those standards. StockX argues that this testimony is inadmissible because McNew offers no methodology for those opinions.  *See* StockX Mem. at 17.

The technology underlying NFTs is plainly beyond the ken of the average juror, and is, therefore, an appropriate subject matter for expert testimony.  *United States v. Chastain*, 2023 WL 2966643, at *9 (S.D.N.Y. Apr. 17, 2023) (admitting "general testimony about" cryptocurrency and "common practices with respect to such technologies").  Although McNew does not tie the entirety of his opinions to specific methods or industry standards,[31] he grounds his opinions regarding industry standards in an historical analysis of NFT trends.  *See, e.g.*, McNew Rep. at 5 (discussing features of the Bored Ape Yacht Club NFTs, a market leader in the NFT sphere).  McNew's opinions are further informed by his extensive experience, and "Rule 702 itself provides that the court may admit evidence that will assist the jury based on the witness's specialized knowledge."  *United States v. Romano*, 794 F.3d 317, 333 (2d Cir. 2015) (admitting expert testimony although expert failed clearly to describe his methods).[32]

---

[30]    StockX does not challenge McNew's qualifications to opine on blockchain technology and NFTs.

[31]    The lack of engagement with industry standards may be explained in part by the fact that the blockchain industry and any applicable standards are relatively nascent; McNew notes that aspects of this industry are "far from standardized."  McNew Rep., Dkt. 207-9 at 8 n.26; *see also Davis v. Carroll*, 937 F. Supp. 2d 390, 413 (S.D.N.Y. 2013) (noting that the role of a district court in acting as a gatekeeper of expert testimony is particularly important "where a field is characterized by established standard for arriving at expert conclusions and a proposed expert fails to engage with those standards").

[32]    *SEC v. Ripple Labs, Inc.*, 2023 WL 5670711 (S.D.N.Y. Mar. 6, 2023), on which StockX relies, is distinguishable because the expert in that case failed adequately to establish how his experience as an investor

In short, StockX's motion is denied because McNew's opinion is not so "speculative or conjectural or based on assumptions that are so unrealistic and contradictory" that any methodological flaws cannot be adequately addressed on cross-examination. *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009) (cleaned up).

## B.  Pricing Analysis

McNew compares the highest sale prices of Vault NFTs and the underlying physical shoe traded on the StockX marketplace.  *See* McNew Rep. at 50.  McNew attempts to value the benefits conferred by the Vault NFT, beyond access to the physical shoe, by subtracting the price of the underlying shoe from the price of the NFT and valuing each price at "the highest sale" between January 18, 2022, and February 2, 2022.  McNew Rep. at 50.  McNew opines that, based on the observed price differential, "StockX customers and StockX employees clearly perceived the Vault NFT as independent and distinct from the underlying physical item."  *Id*. at 51.

Nike argues McNew's methodology was sufficient because he was not required to perform a formal valuation of the NFT.[33]  *See* Nike Opp. at 18.  While McNew was not required to perform a formal valuation of the NFT as a whole, McNew was required to formulate his comparative valuation using a reliable methodology, which he failed to do.  McNew offers no explanation for his choice of methodology, nor does he explain why subtracting the price maxima on possibly different dates is a reliable method of valuing the benefits of the Vault NFTs beyond providing access to the physical shoe.  Tellingly, McNew has never used this approach

---

provided a sufficient basis to opine on others' purchasing behaviors.  *See id*. at *5; *see also* StockX Mem. at 17.  McNew, in contrast, has broad experience helping businesses manage their digital assets — experience that directly drives his opinions about how StockX managed the Vault NFTs.  *See* McNew Rep. at 1.

[33]      Curiously, Nike argues that McNew opines on the reasons for the price premium and "did not perform an expert analysis of the price gap between Vault NFTs and the associated shoe."  *See* Nike Opp., Dkt. 211 at 18.  In fact, McNew quantifies the pricing differential in detail.  *See, e.g.*, McNew Rep. at 50.

before, nor does he claim that it is otherwise an accepted method of comparative valuation.  *See*

McNew Dep. Tr., Dkt. 207-11 at 306:2–8.  Nor does McNew apply any expert methodology to

explain the differential; instead, he simply regurgitates internal StockX discussions and repeats

his opinion that it was "illogical" for consumers to pay a premium for storing their sneakers with

StockX.  *Id*. at 284:1–12.  Because McNew's comparative valuation is based on a method that is

"simply inadequate to support the conclusions reached," it is excluded.  *Amorgianos*, 303 F.3d at

266.

Nike is free to establish the existence of the price premium on the NFTs through

documentary evidence, and to make basic logical arguments regarding the reasons for the price

premium through its lawyers.  *See* McNew Rep. at 50–51 (discussing StockX internal documents

regarding the price difference between Vault NFT and physical shoes).  It may not, however,

shoehorn that in through an expert who applies no expert methodology.

### C.  Consumer Perception of Vault NFTs

McNew opines, in substance, that the Vault NFTs were marketed as traditional NFTs,

and that is how consumers perceived them.  *See, e.g.*, McNew Rep. at 62.  McNew bases his

opinion regarding consumer's perception of the Vault NFT on StockX documents, including

internal materials, and social media posts, including Discord threads.  *See, e.g.*, *id*. at 32–40.

StockX seeks to exclude this testimony because it is not based on a reliable methodology.  *See*

StockX Mem. at 16–17.

Because McNew's opinion regarding consumer perception addresses matters not beyond

the ken of a lay juror, it is excluded.  McNew applies no expert methodology to his interpretation

of the various documents on which he relies, which speak for themselves.  For example, in

support of his opinion that "[s]ocial media posts about the Vault NFTs indicate that consumers

believed the Vault NFTs to be as StockX advertised, *i.e.*, NFTs," McNew cites a Discord post

stating "the vault are nfts."  McNew Rep. at 38.  That assertion "is either apparent from the face

of the documents or it is not."  *GeigTech E. Bay LLC v. Lutron Elecs. Co., Inc.*, 2023 WL

6614486, at *25 (S.D.N.Y. Sept. 20, 2023) (excluding expert testimony about consumer

perception because the expert merely "regurgitate[d] the contents of online social media posts"

and internal emails).  Nike can establish the same point through lay witnesses; it is "grist for the

summation mill, with no need for any 'expert' intermediation."  *Id.*

### IX.     StockX's Motion to Exclude Simonson's Testimony Is Denied

Itamar Simonson is a marketing professor at the Stanford Graduate School of Business.[34]

Simonson Rep., Dkt. 201-12 ¶ 1.  Simonson designed two surveys based on a variation of the

*Eveready* format[35] that sought to measure whether consumers understood the Vault NFTs to be

sold or endorsed by Nike.  *Id.* ¶¶ 14, 16.  StockX seeks to exclude his testimony because those

surveys were allegedly based on a flawed methodology.  *See* StockX Mem. at 20–24.  StockX

also seeks to exclude Simonson's rebuttal opinion that the Vault NFTs are an unauthorized Nike

brand extension as irrelevant and prejudicial.  *See id.* at 24–25.

#### A.  Methodology

StockX advances a number of arguments why Simonson's methodology is sufficiently

flawed as to warrant exclusion.  None of them is availing.

First, StockX argues that Simonson's results overrepresent consumer confusion because

his methodology is not adaptable to the resale context where resellers may use the original

---

[34]     StockX does not challenge Simonson's qualifications.

[35]     In a classic *Eveready* study, "respondents see only the allegedly infringing product, trademark, or trade dress and are tested as to whether they, by themselves, connect or confuse the alleged infringer with the senior product, mark, or trade dress."  *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 121 (S.D.N.Y. 2022).

producer's trademark to describe the product being resold.  *See* StockX Mem. at 20–21.

Resellers do not, however, have *carte blanche* to use another company's trademarks, and Nike

disputes that StockX's use of Nike trademarks on the Vault NFTs was legally permissible.  *See*

*Coty Inc. v. Cosmopolitan Cosm. Inc.*, 432 F. Supp. 3d 345, 349 (S.D.N.Y. 2020) (discussing the

first sale doctrine and its exceptions).

      As the Court has not yet ruled on this legal issue, it will not exclude Simonson's

testimony based on this objection.  But even if the Court agreed with StockX and found that

Simonson failed to account for the fact that consumers may not be able accurately to identify a

seller when presented with more than one trademark, or that the inclusion of more than one

trademark may be permissible, that would not be grounds for exclusion.[36]  Simonson explicitly

took into account the fact that consumers may associate "both the Nike name and the StockX

platform's name . . . with a featured Nike shoe that is offered as an NFT on the StockX

marketplace" when interpreting the results.[37]  Simonson Rep. ¶ 35; *see also id*. ¶¶ 30–31.

      Second, StockX argues that Simonson failed to survey the appropriate universe of

respondents.  *See* StockX Mem. at 23.  During his deposition, Simonson stated that the

appropriate survey population was individuals "more likely" to consider buying a StockX NFT,

especially NFTs related to sneakers.  Simonson Dep. Tr., Dkt. 207-14 at 72:5–25.  Simonson

surveyed individuals who, *inter alia*, (1) owned or expected to purchase sneakers; (2) were

---

[36]     StockX relies on Justice Sotomayor's concurrence in *Jack Daniel's Properties, Inc. v. VIP Products LLC*, 599 U.S. 140 (2023), which addresses only the proper weight to be assigned to consumer confusion surveys that "mak[e] consumers think about complex legal questions."  *Id*. at 164 (Sotomayor J., concurring); *see also* StockX Mem. at 21–22.  Similarly, *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 340 F. Supp. 2d 415 (S.D.N.Y. 2004), *aff'd in part*, 454 F.3d 108 (2d Cir. 2006), noted only that a survey should not directly "ask respondents for a legal conclusion," which Simonson's survey did not.  *Id*. at 445.

[37]     StockX's argument that Simonson previously testified that this was not a reliable methodology is grounds for cross-examination, not exclusion.  *See* StockX Reply at 13; *see also Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 368 n.15 (S.D.N.Y. 2023) (noting that expert's inconsistent statements is appropriate for cross-examination and go to the weight of the evidence).

looking for new investment or collection opportunities; (3) were interested in investing in NFTs, buying collectibles, or investing in cryptocurrency; and (4) previously purchased new products from online resale marketplaces. *See* Simonson Rep. Ex. D at 2–3 (listing survey questions); Simonson Rep. ¶ 18. StockX argues that this is in an overbroad sample. *See* StockX Mem. at 23. The Court finds, however, that Simonson sufficiently approximated the appropriate population such that, even if it is ultimately overinclusive, the survey offers substantially probative evidence that is not unduly prejudicial. *See In re Elysium Health-ChromaDex Litig.*, 2022 WL 421135, at \*15 (S.D.N.Y. 2022) (arguments that "the universe of respondents was overinclusive . . . go to weight . . . .").

Third, StockX seeks to exclude Simonson's testimony because he used leading questions. *See* StockX Mem. at 23. Simonson first used the term "products" when referring to a list that include pictures of four shoes (including one Nike shoe), a watch, a trading card, and an action figure. *See* Simonson Rep. ¶ 50. Simon again used the terms "product" when asking the test group to describe which company offered the depicted "product / NFT," which featured the Nike shoe included in the prior list. *Id*. at ¶ 56. StockX argues that this primed respondents to respond that Nike offered the shoe. *See* StockX Mem. at 21, 23. StockX cites no authority for their argument that this was, in fact, leading, and the Court is highly skeptical that the use of the "product" primed respondents to state that Nike produced the depicted NFT. To the extent that it did, StockX fails to establish why that renders the survey "so flawed as to be completely unhelpful to the trier of fact." *In re Elysium Health-ChromaDex Litig.*, 2022 WL 421135, at \*15 (quotation omitted).

Fourth, StockX argues in a conclusory manner that Simonson impermissibly used "a fictitious product lineup." StockX Mem. at 23. Simonson was not required to use an actual

product lineup; consumer surveys are admissible as long as they "roughly simulat[e] marketplace conditions." *Capri Sun*, 595 F. Supp. 3d at 126. The Court finds that any deviations from StockX's actual website are not so egregious as to warrant exclusion.

Fifth, StockX argues that Simonson improperly ignored data. *See* StockX Mem. at 24. StockX relies primarily on the fact that, when deposed, Simonson noted that he was not certain whether he reviewed certain data before determining that it was not informative as well as a footnote citation[38] to the opinion of StockX's rebuttal witness David Neal that Simonson improperly relied only on responses regarding source in measuring confusion. *See* StockX Mem. at 24, 24 n.26. Specifically, Neal opines that Simonson should have incorporated into his analysis responses to questions measuring whether consumers believed that the seller was affiliated with or had permission from another brand. Neal Rebuttal, Dkt. 201-20 at 32–33. Simonson's opinion about source confusion is only one portion of his consumer confusion analysis; he also analyzed the responses to the affiliation and permission questions. *See, e.g.*, Simonson Rep. ¶¶ 82, 86. StockX is free to argue on cross-examination, and through its rebuttal witness, that Simonson did not sufficiently rely on those responses in formulating his opinion.

In sum, none of the alleged errors, together or alone, is so egregious as to render Simonson's opinion more prejudicial than probative, and all can be adequately addressed through cross-examination and the presentation of rebuttal witnesses. *See* Fed. R. Evid. 403; *POM Wonderful LLC*, 769 F. Supp. 2d at 197 (noting that "errors in a survey's methodology usually go to the weight accorded to its conclusions rather than its admissibility").

---

[38] Although the Court analyzes this argument on its merit, it notes that arguments made by way of footnotes are generally deemed waived. *See City of Syracuse v. Onondaga Cnty.*, 464 F.3d 297, 308 (2d Cir. 2006) (finding argument made "only in a heading and footnote" was waived).

**B. Brand Extension**

StockX also seeks to exclude Simonson's testimony that the Vault NFTs represent an "unauthorized extension of the Nike Brand into [a] new category." Simonson Rebuttal, Dkt. 201-13 ¶ 3. StockX argues that this testimony is irrelevant and prejudicial because it puts forth "an alternative theory of liability that is not part of any of Nike's claims," and further inadmissible because it proffers a legal conclusion. StockX Mem. at 25.

Simonson offered this testimony as a rebuttal to the opinion of StockX's expert Scott Kominers that the Vault NFTs are not "'digital brand' NFTs" that serve "as a springboard for establishing a broader product . . . brand," and that to the extent that the Vault NFTs do have a digital brand, "the digital brand is unambiguously that of StockX alone." Kominers Rep., Dkt. 214-6 ¶ 9. Simonson's brand extension opinion "is clearly relevant as it directly rebuts" Kominers' opinion. *Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 381 (S.D.N.Y. 2023). The Court further finds that Simonson's brand extension opinion is not prejudicial; regardless of whether Nike asserts a brand extension theory of liability,[39] StockX has placed the digital branding at issue through Kominers' testimony.

Finally, StockX argues that Simonson's opinion improperly embraces the ultimate legal issue of whether StockX needed Nike's permission to sell the Vault NFTs. *See* StockX Reply at 25. That is not accurate. Simonson merely states that Nike did not authorize the Vault NFTs and when brand extensions are controlled by other companies without authorization, the owner loses control of the brand. *See, e.g.*, Simonson Rep. ¶ 9. Simonson does not purport to opine as to whether such authorization was legally required.

---

[39]     Even absent Kominers' testimony, Simonson's brand extension testimony would be relevant to Nike's theory that it was harmed by shoddily designed NFTs that consumers associated with its brand. *See* Nike Opp., Dkt. 211 at 25.

## CONCLUSION

For the foregoing reasons, the parties' *Daubert* motions are GRANTED in part and DENIED in part. Nike's motion to exclude: (1) Butler's testimony is DENIED; (2) Vigil's testimony is GRANTED in part and DENIED in part; and (3) Wells' testimony is DENIED. StockX's motion to exclude: (1) Kammel's testimony is GRANTED in part and DENIED in part; (2) Hansen's testimony is GRANTED in part and DENIED in part; (3) Stec's testimony is DENIED; (4) McNew's testimony is GRANTED in part and DENIED in part; and (5) Simonson's testimony is DENIED.

Pursuant to the Court's Order at Dkt. 187, any motions for summary judgment are due **August 8, 2024**. Responses are due **September 5, 2024**, and replies are due **September 19, 2024**.

The Clerk of Court is respectfully directed to terminate the open motions at Dkts. 189 and 192.


**SO ORDERED.**

**Date:  July 10, 2024**                                        **VALERIE CAPRONI**
**       New York, New York**                          **United States District Judge**

37