UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NIKE, INC.,

                          Plaintiff,

              v.                                          No. 22 CV 983 (VEC) (SN)

STOCKX LLC,

                          Defendant.


**DEFENDANT STOCKX LLC'S MEMORANDUM OF LAW IN SUPPORT OF**
**ITS MOTION FOR PARTIAL SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................................... ii

PRELIMINARY STATEMENT ....................................................................................... 1

FACTUAL BACKGROUND ........................................................................................... 3

    I.    Nike and StockX Participate in Distinct Markets. ................................................ 3

    II.   StockX's Online Resale Marketplace. .................................................................. 4

    III.  The Development of StockX's Authentication Process to Combat the Prevalence of
           Counterfeit Sneakers ............................................................................................ 6

    IV.  StockX's Survey of the Effect of the Challenged Claims on Purchasing Intent. ............... 8

    V.   Other Resale Platforms' Authentication Efforts .................................................... 9

ARGUMENT ................................................................................................................... 9

    I.    Legal Standard. ..................................................................................................... 9

    II.   StockX Is Entitled to Partial Summary Judgment Because Its Authentication Process
           Claims Were True. ............................................................................................... 10

           A.    The Authentication Process Claims Were Not Literally False. ................................ 12

           B.    The Authentication Process Claims Were Not Impliedly False. .............................. 15

    III.  There Is No Evidence StockX's Challenged Claims Were Material to Consumers. ......... 16

           A.    Materiality Cannot Be Presumed Under Second Circuit Law. ............................... 17

           B.    StockX's Challenged Claims Were Not Material. ................................................. 17

    IV.  None of StockX's Advertising Caused Any Injury to Nike. .................................... 21

           A.    Nike is not entitled to a presumption of injury. ................................................... 22

           B.    Nike cannot prove actual injury. ........................................................................ 23

CONCLUSION ............................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*AM Gen. LLC v. Activision Blizzard, Inc.*,
450 F. Supp. 3d 467 (S.D.N.Y. 2020)........................................................................ 12

*Apotex Inc. v. Acorda Therapeutics, Inc.*,
823 F.3d 51 (2d Cir. 2016)............................................................................... 16, 17

*Apotex Inc. v. Acorda Therapeutics, Inc.*,
No. 11-8803, 2014 WL 5462547 (S.D.N.Y. Oct. 23, 2014),
aff'd, 823 F.3d 51 (2d Cir. 2016) ................................................................... passim

*Avis Rent A Car Sys., Inc. v. Hertz Corp.*,
782 F.2d 381 (2d Cir. 1986)............................................................................... 11

*Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*,
843 F.3d 48 (2d Cir. 2016)................................................................................. passim

*CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*,
735 F.3d 114 (2d Cir. 2013)................................................................................. 10

*CJ Prod. LLC v. Snuggly Plushez LLC*,
809 F. Supp. 2d 127 (E.D.N.Y. 2011) .................................................................. 17

*Coppola v. Bear Stearns & Co.*,
499 F.3d 144 (2d Cir. 2007)................................................................................... 9

*Dependable Sales & Service, Inc. v. TrueCar, Inc.*,
394 F. Supp. 3d 368 (S.D.N.Y. 2019)......................................................... 21, 23, 25

*Enzymotec Ltd. v. NBTY, Inc.*,
754 F. Supp. 2d 527 (E.D.N.Y. 2010) .................................................................. 22

*Fischer v. Forrest*,
286 F. Supp. 3d 590 (S.D.N.Y. 2018), *aff'd*, 968 F.3d 216 (2d Cir. 2020) ................................ 13

*Gameologist Grp., LLC v. Sci. Games Int'l, Inc.*,
838 F. Supp. 2d 141 (S.D.N.Y. 2011),
*aff'd*, 508 F. App'x 31 (2d Cir. 2013)................................................................... 11

*Holcomb v. Iona Coll.*,
521 F.3d 130 (2d Cir. 2008)................................................................................... 9

*Johnson & Johnson v. Carter-Wallace, Inc.*,
631 F.2d 186 (2d Cir. 1980)................................................................................. 22

*Johnson & Johnson Vision Care, Inc. v. Ciba Vision Corp.*,
348 F. Supp. 2d 165 (S.D.N.Y. 2004)......................................................... 15

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014)..................................................................... 21

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574 (1986).................................................................... 10

*McNeilab, Inc. v. Am. Home Prods. Corp.*,
848 F.2d 34 (2d Cir. 1988)........................................................... 22

*Medisim Ltd. v. BestMed LLC*,
910 F. Supp. 2d 591 (S.D.N.Y. 2012)................................................ 17

*Nat'l Basketball Ass'n v. Motorola, Inc.*,
105 F.3d 841 (2d Cir. 1997).......................................................... 16

*Ortho Pharm. Corp. v. Cosprophar, Inc.*,
32 F.3d 690 (2d Cir. 1994)........................................................... 22

*PDK Labs, Inc. v. Friedlander*,
103 F.3d 1105 (2d Cir. 1997)......................................................... 23

*Reed Const. Data Inc. v. McGraw-Hill Cos., Inc.*,
49 F. Supp. 3d 385 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir. 2016)....................... passim

*Res. Devs., Inc. v. Statue of Liberty-Ellis Island Found., Inc.*,
926 F.2d 134 (2d Cir. 1991)........................................................... 16

*Rexall Sundown, Inc. v. Perrigo Co.*,
651 F. Supp. 2d 9 (E.D.N.Y. 2009) ............................................. 14, 15, 16

*River Light V, L.P. v. Tanaka*,
No. 17-22843, 2018 WL 5778234 (S.D. Fla. Nov. 2, 2018) ........................... 17

*Rosenshine v. A. Meshi Cosms. Indus. Ltd.*,
No. 18-3572, 2023 WL 6516994 (E.D.N.Y. Oct. 4, 2023)............................. 16

*Salahuddin v. Goord*,
467 F.3d 263 (2d Cir. 2006)........................................................... 10

*SourceOne Dental, Inc. v. Patterson Cos., Inc.*,
328 F. Supp. 3d 53 (E.D.N.Y. 2018) ............................................. 18, 19

*Souza v. Exotic Island Enters., Inc.*,
68 F. 4th 99 (2d Cir. 2023) ........................................................... 24

**Statutes**

Fed. R. Civ. P. 56 .................................................................................................................... 9

Defendant StockX LLC ("StockX") respectfully submits this memorandum of law in support of its motion for partial summary judgment dismissing the false advertising claim of Plaintiff Nike, Inc. ("Nike") from this case.

## PRELIMINARY STATEMENT

StockX is a resale marketplace, founded in 2015 to create a safe and efficient outlet for consumers to trade sneakers and other collectibles – "a stock market for things." The resale market is separate and distinct from the "primary market," in which consumers buy sneakers directly from manufacturers, like Nike. When manufacturers create artificial scarcity by selling far fewer products than necessary to meet consumer demand, or releasing products in limited windows or geographies, resale marketplaces help consumers access those in-demand goods.

Historically, the resale experience was unfortunately largely unmonitored. Resale marketplaces that came before StockX, like Craigslist, offered consumers little protection against fraud by buyers or sellers, who might deliver the wrong item or fail to pay. They also utilized features, like separate listing pages for each seller's products, that were difficult and cumbersome to use. A consumer searching for a particular sneaker on eBay might be confronted with hundreds of different listings, unclear photos taken by each seller, and no sense of what price is fair.

StockX improved the resale experience by providing consumers with a number of key innovations. StockX's platform has streamlined product pages, where buyers and sellers interested in a particular product can find the most competitive bid and offer prices on a single page, along with clear product photos and extensive historical pricing data. In addition to this simplified user experience, consumers buy or sell products knowing that StockX will verify payment and physically inspect every item sold, such that consumers can trust that StockX

stands behind every product they receive.  StockX has always guaranteed to its customers that if they do not get the product they intended to purchase, StockX will provide a full refund.

Following StockX's lead, a newer group of online resale marketplaces have entered the market, offering streamlined product pages, inspections of resold products, and authenticity guarantees.  StockX competes with these other resale marketplaces, as well as older resale marketplaces that offer consumers fewer protections.  StockX believes that consumers using online resale marketplaces benefit from having an intermediary working to protect every transaction.  StockX's advertising and website have long provided consumers with extensive, detailed information on StockX's process and what consumers can expect when buying and selling on StockX.  As part of that advertising, StockX has also told consumers that its process of inspecting products is robust, but not flawless, and if StockX makes a mistake, including in failing to catch a counterfeit product, StockX has always guaranteed customers they can return their product to StockX for a full refund, even though StockX just operates the platform and was not the original seller of the product.  While several competing resale marketplaces offer similar authenticity guarantees, others offer consumers less protection – or none at all.  This notwithstanding, Nike has alleged that StockX, particularly, is somehow falsely advertising or misrepresenting the services it offers to consumers who use its platform.

Nike's false advertising claim in this case challenges numerous claims StockX has made about its resale platform (the "Challenged Claims").  The Challenged Claims fall into two categories: (1) StockX's descriptions of its process for authenticating products (the "Authentication Process Claims"); and (2) StockX's longstanding guarantee that products on its platform will be authentic, or StockX will provide a full refund (the "Authenticity Claims").

Nike's claim fails, in whole or in part, for three independent reasons. *First*, Nike has no evidence to establish that StockX's Authentication Process Claims were false. The undisputed record establishes StockX accurately described how it examined the products sold through its platform, and these claims should be removed from the case for this reason alone. *Second*, there is no evidence that *any* of StockX's Challenged Claims were material to consumers. To the contrary, StockX's survey shows that consumers' intent to use the platform was unchanged when the Challenged Claims were removed, and Nike cannot point to any record evidence rebutting this fact. *Third*, Nike has no evidence that it was actually, or even likely, injured by *any* of StockX's Challenged Claims. None of the Challenged Claims made comparative claims about shoes Nike was selling. And Nike's corporate representative ██████████████████████

████████████████████████████████████████████████████

Nike's false advertising claim should accordingly be dismissed.

## FACTUAL BACKGROUND

### I.   Nike and StockX Participate in Distinct Markets.

Sneakers are embedded in fashion and popular culture, with ever-growing appeal and popularity. 56.1 ¶¶ 391, 405.[1] Consumers purchase sneakers for many different reasons: to collect, display, or wear them; to serve as an investment; or to emulate or remember a person or movement. 56.1 ¶ 407. Brands, like Nike, often release sneakers as "limited releases" or "drops" of scarce quantities of a particular sneaker that fuel consumer demand and hype. 56.1 ¶¶ 391–95, 400–02. Increased consumer demand (driven in part by business models built on scarcity), brand marketing, and the greater accessibility of products on the Internet have contributed to the rise in sneaker popularity. 56.1 ¶¶ 396–97, 403–04. Alongside that rising

---

[1]   Citations to "56.1" refer to the Parties' Consolidated 56.1 filed pursuant to the Court's October 31, 2024 Order (Dkt. No. 293).

popularity, the "sneakerhead" emerged: a consumer "with a deep passion for buying, collecting, trading, and/or learning about sneakers." 56.1 ¶¶ 405–08.

With growing hype and demand for sneakers, a thriving sneaker resale (or "secondary") market has developed. 56.1 ¶¶ 397, 403–14, 477–87, 458–66. This booming industry is comprised of resale marketplaces "that enable[] sales of product after the first sale to . . . match supply and demand." 56.1 ¶ 399. This resale market has been fueled by easy, online access to sneakers and is worth billions of dollars. 56.1 ¶¶ 483–87. The resale market has demonstrated continued growth: it grew 100% from 2020 to 2022 and was "likely growing 30% to 40% [year over year] in 2022." 56.1 ¶ 483.

StockX is one of many online resale marketplaces where consumers can buy, sell, and trade sneakers. 56.1 ¶¶ 415, 477. Others include eBay, Facebook Marketplace, Flight Club, GOAT, Stadium Goods, The RealReal, Tradesy, thredUP, Depop, Poshmark, Grailed, Bump, Instagram, RIF LA, and Sole Supremacy. 56.1 ¶¶ 478–82.

Nike ███████████████████████████████████████████████████ and has never offered a resale platform to consumers. 56.1 ¶¶ 667–676, 681.

## II.    StockX's Online Resale Marketplace.

Founded in 2016, StockX originated from a "sneakerhead data company" called Campless, that provided resale data for individuals investing in sneakers. 56.1 ¶¶ 409–14. Building off Campless' data-driven insight into the volatility of sneaker prices, StockX treated sneakers as akin to stocks, providing consumers with resale data and the infrastructure for trading pursuant to a bid-ask model. 56.1 ¶ 416. With data transparency, StockX sought to democratize access to formerly elusive products and provide consumers with insight into products' true value. *Id.*

Since its inception, StockX has been popular among "sneakerheads" and sneaker collectors looking to acquire elusive, high-end sneakers. 56.1 ¶¶ 417–18. StockX appeals to those consumers with a host of valuable features that enhance consumers' online resale experience. 56.1 ¶¶ 420–22, 471–76. These features include:

- Providing a wide range of sneakers and apparel, including unique, hard-to-find products. 56.1 ¶¶ 458–466, 467–470, 472–73.

- Hosting a "user-friendly" interface. 56.1 ¶¶ 429–30, 466, 475, 629.

- Consolidating all information and trading options for a given product on a single product page, making it easier for consumers to search and see all current bids and asks for each product, as compared to resale platforms with multiple seller-specific listing pages for the same product. 56.1 ¶ 429.

- Providing detailed historical price data for items sold on its platform so that consumers can easily understand trends and the current market value of products. 56.1 ¶¶ 426–28.

- Using a "bid or buy pricing mechanism in which sellers post asking prices and buyers may submit bids or buy from the lowest asking price." 56.1 ¶¶ 430, 476 *see also* 56.1 ¶¶ 449–51 (StockX customer stating he uses StockX over other resale platforms because he "prefer[s] the buying experience" of StockX, it is "cheaper to buy on StockX relative to . . . other platforms," StockX has a better "app experience," and StockX allows him to "set a bid price" that the seller can choose to match).

- Providing personalized customer support. 56.1 ¶¶ 431, 452–55, 476; *see also* 56.1 ¶ 453 (StockX customer explaining StockX's customer service is better than GOAT's "by a mile"); 56.1 ¶ 452 (StockX customer explaining another benefit of using StockX is the responsive customer support).

- Working to ensure "that only reliable buyers and sellers use the platform" by suspending the accounts of "sellers who repeatedly do not complete sales or send in items that fail verification." 56.1 ¶ 432; *see also* 56.1 ¶¶ 433–440.

- Taking various fraud-prevention measures, including an anti-fraud vendor that monitors seller profiles and behavior patterns for potential fraudulent activity, and other vendors who help ensure the platform has secure logins and payment processing. 56.1 ¶¶ 432–40.

Roy Kim – a StockX customer not employed by either party who testified in this case – testified that he uses StockX because of the competitive prices of products on the StockX platform, discounts StockX provides, the superiority of StockX's customer service to that of other resale

marketplaces, and the enhanced buying experience created through the bidding model StockX embraces.  *See* 56.1 ¶¶ 447–456.  Even after receiving some of the alleged counterfeits at issue in this case (and receiving requested refunds for those products), Mr. Kim continued to purchase substantial numbers of sneakers from StockX's platform.  56.1 ¶ 457.

### III.    The Development of StockX's Authentication Process to Combat the Prevalence of Counterfeit Sneakers.

Increased demand for sneakers has been accompanied by an increase in counterfeits. 56.1 ¶¶ 488–91.  The quality of counterfeits has also improved, making them difficult to detect. 56.1 ¶¶ 492–97.  Despite that difficulty, working to stop counterfeit sales benefits consumers. *See* 56.1 ¶ 503 (agreeing that "if there's an opportunity for someone to remove a potential counterfeit good from the stream of commerce," that act is beneficial).

StockX keenly recognizes the challenges associated with detecting counterfeits, and has never shied away from them.  56.1 ¶¶ 420–21.  StockX proactively subjects all products sold through its platform to a detailed, multi-step examination.  56.1 ¶¶ 522, 543–53.  For each pair of sneakers, trained authenticators apply StockX's standards to various aspects of the shoes to assess whether they are in new, unworn condition; have no serious manufacturing defects; and appear to be genuine.  *See* 56.1 ¶¶ 523–29.

StockX subjected every pair of sneakers sold through its platform to its authentication process.  56.1 ¶ 522.  When a buyer purchases a pair of sneakers, the seller must first send the sneakers to StockX.  *See id.*  Only after the sneakers are inspected and determined to meet StockX's authentication standards are they sent to the buyer.  *See* 56.1 ¶ 530.

As of 2022, approximately 35 million products had gone through StockX's authentication process; between 2016 and 2022, StockX authenticators failed and rejected over $400 million worth of products.  *See* 56.1 ¶¶ 533, 535; *see also* 56.1 ¶¶ 543, 536–39.  StockX also has

procedures to make buyers whole if StockX determines they received a counterfeit product –
including paying full refunds (even though StockX was not the seller).  56.1 ¶¶ 441–46.

StockX has accurately, and proudly, communicated these efforts to consumers.  56.1
¶¶ 576–78.  Nike challenges the following Authentication Process Claims that StockX has made:

- "Every item sold goes through our proprietary multi-step verification process with our team of expert authenticators"

- "StockX[] [has a] "multi-step verification process"

- StockX's authentication process uses "100+ data points"

- StockX's authentication process is "proprietary"

- StockX's authentication process uses "Advanced Technology"

- StockX's authentication process uses "Quality Assurance"

- "StockX has a 99.96% authentication accuracy rate"

- "Authenticators maintain a 99.96% accuracy rate."

Nike also challenges the following Authenticity Claims:

- "100% Verified Authentic"

- "Verified Authentic"

- StockX "authenticators are better equipped than anyone to ensure a product's authenticity"

- "Guaranteed Authenticity" as related to products sold on the StockX platform

- "Always Authentic, Never Fake."

- "Guaranteed Authenticity. Every item. Every time. Shop on StockX with complete confidence knowing every purchase is 100% Verified Authentic."

- "A final check in our authentication practice, our QA experts ensure nothing slips through the cracks."

- "We Authenticate Every Item. Every Time."

- "Shop on StockX with complete confidence knowing every purchase is Verified Authentic."

56.1 ¶¶ 576–77.

## IV.   StockX's Survey of the Effect of the Challenged Claims on Purchasing Intent.

StockX's survey expert showed that the Challenged Claims do not influence consumer purchasing decisions. Sarah Butler conducted a survey evaluating consumers' intent to shop on StockX. 56.1 ¶ 614. Ms. Butler's respondents were a relevant and targeted demographic: they had purchased sneakers from StockX at least once since 2020, or would consider purchasing sneakers from StockX in the next year. 56.1 ¶ 615. Ms. Butler showed respondents in her test group the Challenged Claims as consumers would have seen them in the marketplace. 56.1 ¶ 616. She showed her control group the same webpages, but with the Challenged Claims replaced with language Nike does not claim would be false. 56.1 ¶ 617.

The results of Ms. Butler's survey were unequivocal: there was *no statistically significant change* in consumers' intent to purchase products on StockX's marketplace when the Challenged Claims were removed. 56.1 ¶¶ 618–24. A statistically equivalent number of respondents were likely to use StockX to purchase sneakers when its webpages did not include the Challenged Claims as when the webpages did. 56.1 ¶ 621.

When asked to explain what was motivating their intent to purchase from StockX, respondents provided a variety of responses unrelated to StockX's claims, and unrelated to authentication or authenticity in general. 56.1 ¶¶ 624–31. Responses included StockX's "well-organized" and "user-friendly" interface; the wide range of sneakers and apparel available on StockX; the "really cool" look of the website, its ease of use, and "better price[s]." 56.1 ¶¶ 624–30. While some respondents did mention authentication guarantees or "trusting the site," this was true of responses in both the control group and the test group. 56.1 ¶ 631. This suggests

that any value consumers place in StockX's authentication process is not based on StockX's particular advertising claims at issue, but rather that StockX physically inspects every item sold on its platform (a process Nike does not challenge or seek to halt in this case).  *See* 56.1 ¶ 522.

## V.    Other Resale Platforms' Authentication Efforts.

Ms. Butler's results are buttressed by the fact that StockX's Challenged Claims are by no means unique, and therefore do not differentiate StockX from its competitors in the resale market in a manner that might give StockX a competitive advantage.  *See* 56.1 ¶¶ 504–21.  Other online resale marketplaces similarly authenticate products and advertise those efforts to consumers.  *See Id.*  eBay provides an "*Authenticity Guarantee*," stating:  "Your item is carefully inspected inside and out *to make sure it's authentic* and matches the listing."  56.1 ¶ 516 (emphasis added).  GOAT offers an "Assurance of Authenticity."  56.1 ¶ 507.  Flight Club states that all of its inventory is "*guaranteed authentic*."  56.1 ¶ 515 (emphasis added).  TheRealReal proclaims it "*Authenticate[s] Every Item*," and has "*the most rigorous authentication process* in the marketplace."  56.1 ¶ 517 (emphasis added).

## ARGUMENT

## I.    Legal Standard.

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Material facts are those which 'might affect the outcome of the suit under the governing law,' and a dispute is 'genuine' if 'the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party.'"  *Coppola v. Bear Stearns & Co.*, 499 F.3d 144, 148 (2d Cir. 2007) (citation omitted).  The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citation omitted).  If the moving party does so, "the burden shifts

to the nonmovant to point to record evidence creating a genuine issue of material fact." *Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006). The non-moving party must show more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[W]hen the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," and then "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact . . . to avoid summary judgment." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013).

To succeed on its Lanham Act false advertising claim, Nike has the burden to prove that (1) StockX's statements were false, either literally or impliedly; (2) StockX's statements were material to consumers; (3) StockX placed its statement in interstate commerce (which is not in dispute); and (4) StockX's statements were the cause of actual or likely injury to Nike, either by direct diversion of sales or by a lessening of goodwill associated with its products. *See Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 65 (2d Cir. 2016).

## II.    StockX Is Entitled to Partial Summary Judgment Because Its Authentication Process Claims Were True.

Nike's false advertising claims based on the Authentication Process Claims fail because Nike cannot establish falsity. "To prevail on a [false advertising] claim, the plaintiff must 'show[] that the challenged advertisement is false and misleading, not merely that it is unsubstantiated by acceptable tests or other proof.'" *Apotex Inc. v. Acorda Therapeutics, Inc.*, No. 11-8803, 2014 WL 5462547, at 2 (S.D.N.Y. Oct. 23, 2014), *aff'd*, 823 F.3d 51 (2d Cir. 2016). A plaintiff must establish that the challenged advertisement is either "literally false" or

"impliedly false." *Id.* (granting defendant summary judgment on Lanham Act false advertising claims where plaintiff failed to establish literal or implied falsity).

To establish literal falsity, Nike must prove the claim is "false on its face . . . [or], when 'considered in context, the words or images . . . necessarily imply a false message.'" *Reed Const. Data Inc. v. McGraw-Hill Cos., Inc.*, 49 F. Supp. 3d 385, 411–13 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir. 2016) (plaintiffs "failed to put forward any evidence" that claims were literally false in context; granting defendant summary judgment). A literally false claim must be unambiguous, not "susceptible to more than one reasonable interpretation." *Apotex Inc.*, 2014 WL 5462547, at 2, 9 (internal quotation omitted) (message could not be literally false if it "could be reasonably interpreted in a number of alternative ways"). The advertisement must be read "in its entirety and not ... [] in disputatious dissection. The entire mosaic should be viewed rather than each tile separately." *Avis Rent A Car Sys., Inc. v. Hertz Corp.*, 782 F.2d 381, 385 (2d Cir. 1986) (internal quotations omitted).

To establish implied falsity, Nike must show the challenged statement is "likely to mislead or confuse consumers," and must put forth "[e]xtrinsic evidence" of consumer perception, "ordinarily [] in the form of consumer surveys." *Apotex Inc.*, 2014 WL 5462547 at 2–3, 10 (granting defendant summary judgment where plaintiffs "provided no extrinsic evidence of consumer confusion" to support implied falsity); *see also Gameologist Grp., LLC v. Sci. Games Int'l, Inc.*, 838 F. Supp. 2d 141, 165 (S.D.N.Y. 2011), *aff'd*, 508 F. App'x 31 (2d Cir. 2013) ("[A] plaintiff must produce some extrinsic evidence of such consumer deception or confusion, even at the summary judgment stage."). Extrinsic evidence must show that a

"substantial number of consumers were, in fact, confused by the allegedly misleading statement." *Reed Const. Data Inc.*, 49 F. Supp. 3d at 416.[2]

Nike has failed to establish that any of the Authentication Process Claims were literally or impliedly false. Each of these claims was, in fact, true. As a result, Nike's claims based on the Authentication Process Claims should be dismissed. *See AM Gen. LLC v. Activision Blizzard, Inc.*, 450 F. Supp. 3d 467, 487 (S.D.N.Y. 2020) (granting defendant summary judgment where "none of the advertisements complained of by [p]laintiffs . . . contain[ed] a literally or impliedly false statement").

### A. The Authentication Process Claims Were Not Literally False.

There is no evidence in the record from which a reasonable juror could conclude the Authentication Process Claims were literally false. 56.1 ¶¶ 579–92. *See Reed Const. Data Inc.*, 49 F. Supp. 3d at 417 (granting defendant summary judgment on false advertising claims that no reasonable juror could conclude were literally false); *see also Apotex Inc.*, 2014 WL 5462547 at 7 ("Plaintiffs' evidence merely shows the challenged statements to be 'unsubstantiated by acceptable tests or other proof. . . . Plaintiffs cannot prove falsity by such evidence alone.'").

*StockX has a "proprietary" authentication process to inspect every item sold through its platform.* StockX has always been dedicated to combatting counterfeiting and developed its own authentication process. The process is "proprietary" because it is StockX's "own work product," consisting of a unique combination of steps that StockX itself selected. 56.1 ¶¶ 540–

---

[2]    Only in the rare instances in which the plaintiff has established the defendant's intent "to deceive the public through deliberate conduct of an egregious nature" have courts applied a rebuttable presumption of confusion. *See Church & Dwight Co., Inc.*, 843 F.3d at 65 (internal quotations omitted).

42, 546–47.[3] Even if there is a dispute as to the results of any particular inspection, it is

undisputed that every product went through the process, as the Authentication Process Claims

state. *See Fischer v. Forrest*, 286 F. Supp. 3d 590, 618 (S.D.N.Y. 2018), *aff'd*, 968 F.3d 216 (2d

Cir. 2020) (granting defendant summary judgment on literal falsity because "come out with our

own" does not "unavoidably signify that the product offered by [licensee] was created in the first

instance by [licensee]").

   ***StockX's authentication process is "multi-step," consisting of "100+ data points."*** As

illustrated by the company's "Sneaker Authentication Standard Operating Procedure," (the

"SOP"), StockX authenticators take many steps to examine products sold through the platform.



*See* 56.1 ¶¶ 543–53.

*See* 56.1 ¶ 545.

*See* 56.1 ¶¶ 547–53, 549

542

   ***StockX's authentication process incorporates "advanced technology."*** For example,

StockX uses proprietary software ▮▮▮▮▮▮▮▮▮▮▮▮ *See* 56.1 ¶ 556.

StockX also leverages machine learning and artificial intelligence to enhance and support its

---

3  Nike has alleged that StockX's authentication process is not "proprietary" because "the
process itself is openly displayed in a video found on StockX's website." 56.1 ¶ 540. While
some parts of the process are disclosed and described to the public, StockX does not reveal
many of the details of its process. 56.1 ¶ 542.

authentication process. 56.1 ¶¶ 554–59; *see also* 56.1 ¶¶ 555 ███████████████████████

████████████████████████████████████████ 554 (use of AI).

**StockX relies on its "expert authenticators."** All StockX authenticators undergo an

extensive training program. *See* 56.1 ¶¶ 560–65. ████████████████████████████

███████████████████████████ *See* 56.1 ¶ 561. ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ *See* Rule 56.1, ¶¶ 562–64.

**StockX's authentication process includes quality assurance.** StockX's quality control

team ███████████████████████████ *See* 56.1 ¶¶ 566–67. StockX employs both Quality

Assurance and Authentication Quality Assurance ("AQA") specialists. *See* 56.1 ¶ 568. ████

████████████████████████████████████████████████

████████████████████████ *See* 56.1 ¶ 569. ████████████████████

████████████████████████████████████████

████████████████ 56.1 ¶¶ 570–71.

**StockX had a "99.96% authentication accuracy rate."** As StockX explained on its

website, this figure is a true "measurement of the accuracy of [StockX's] platform's product

authentication process based on weighted return data compared to total authentications." 56.1

¶¶ 572, 574–75 (explaining that "We have a 99.96% Accuracy Rate; only 0.04% of the products

we pass are later determined to have been passed in error"). The weighted return data included

products that were passed in error for any reason (like wrong size or color); StockX's accuracy

rate as to authenticity alone is higher (using StockX's available data). 56.1 ¶ 573. Nike has no

evidence that this claim is false in the context of StockX's consumer-facing explanation of how

the accuracy rate was calculated. 56.1 ¶¶ 587–92. *See Rexall Sundown, Inc. v. Perrigo Co.*, 651

F. Supp. 2d 9, 34 (E.D.N.Y. 2009) (granting summary judgment on literal falsity, finding "No. 1 Dr. Recommended Joint Care Brand" was literally true as explained).

To the extent Nike argues that the Authentication Process Claims are subject to alternative interpretations than those set forth above, any such argument would illustrate that the claims are "susceptible to more than one reasonable interpretation" and therefore cannot be literally false. *See Apotex Inc.*, 2014 WL 5462547 at 2, 8.

### B.    The Authentication Process Claims Were Not Impliedly False.

Nike cannot succeed by claiming that StockX's Authentication Process Claims were impliedly false because Nike has not provided any evidence (1) that consumers understood the statements to convey a misleading message, *see* 56.1 ¶¶ 579–92, or (2) that StockX possessed any deliberate, egregious intent to deceive consumers. *See Apotex Inc.*, 2014 WL 5462547 at 3, 10 (defendants were entitled to summary judgment because (1) the challenged advertisement could not be literally false and (2) plaintiffs "provided no extrinsic evidence of consumer confusion" to prove implied falsity); *see also Rexall Sundown, Inc.*, 651 F. Supp. 2d at 36 ("Courts routinely grant summary judgment in a defendant's favor on implied falsity claims when such extrinsic evidence, usually in the form of a consumer survey, is lacking.") (collecting cases).

Not only did Nike not conduct a consumer survey—the "ordinary" method of showing consumer confusion, *Reed Const. Data Inc.*, 49 F. Supp. 3d at 416—it also failed to elicit any evidence of any kind as to how consumers perceived the Authentication Process Claims. 56.1 ¶¶ 610, 579–92. *See Johnson & Johnson Vision Care, Inc. v. Ciba Vision Corp.*, 348 F. Supp. 2d 165, 184 (S.D.N.Y. 2004) (granting judgment for defendant "as Plaintiff has neither introduced the requisite extrinsic evidence of consumer reaction showing that [defendant's] promotional

materials tend to mislead or confuse the target audience . . . nor adequately demonstrated that [defendant] has intentionally tried to deceive the public").

Nor has Nike put forward *any* evidence that StockX "intended to deceive the public through deliberate conduct of an egregious nature," a stringent showing mandatory absent extrinsic evidence. *Church & Dwight*, 843 F.3d at 65 (internal quotations omitted). Nike cannot rely on mere "conclusory statement[s]" or "speculation and conjecture" to show intentional deception. *Rexall Sundown, Inc.*, 651 F. Supp. 2d at 38 (granting defendant summary judgment; a "conclusory statement is insufficient to support a finding of intentional deception necessary to circumvent the requirement of extrinsic evidence that the statements are false or misleading"); *Res. Devs., Inc. v. Statue of Liberty-Ellis Island Found., Inc.*, 926 F.2d 134, 141 (2d Cir. 1991) ("We have not hesitated to affirm a summary judgment when the only proof proffered in opposition amounts to nothing more than speculation and conjecture.").

## III.    There Is No Evidence StockX's Challenged Claims Were Material to Consumers.

Nike's entire false advertising claim also fails, separately and independently, because Nike has not offered any evidence "showing that the specific misrepresentation[s] . . . w[ere] likely to influence consumers' purchasing decisions." *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 68 (2d Cir. 2016). Nike has no evidence that the alleged inaccuracies in *any* of StockX's Challenged Claims were "material in that [they were] likely to influence purchasing decisions." *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir. 1997); *Apotex Inc.*, 823 F.3d at 67 (affirming summary judgment for defendant where plaintiff provided "no record evidence" that the alleged inaccuracies in defendant's advertising were "likely to influence consumers' purchasing decisions"); *Rosenshine v. A. Meshi Cosms. Indus. Ltd.*, No. 18-3572, 2023 WL 6516994, at 8 (E.D.N.Y. Oct. 4, 2023) (same).

## A.    Materiality Cannot Be Presumed Under Second Circuit Law.

To the extent Nike argues it is entitled to a presumption of materiality for certain
Challenged Claims, that argument fails as a matter of law.  This Court, in a decision affirmed by
the Second Circuit, considered and dismissed the argument that plaintiffs are not required to
show materiality for false statements concerning an inherent quality of the product at issue,
holding that "although at least part of [Plaintiff's] campaign focused on the quality of the
[products] qua [products], the Court *must also ask whether these campaigns materially
influenced consumers' purchasing decisions*."  *Reed Const. Data Inc.*, 49 F. Supp. 3d at 418
(emphasis added), *aff'd*, 638 F. App'x 43 (2d Cir. 2016); *see also Church & Dwight Co.*, 843
F.3d at 70 n.11 (holding that the Second Circuit's decision in *Apotex* "settled the materiality
standard in this Circuit, explaining that the standard is whether the deception is 'likely to
influence purchasing decisions'").  The cases Nike has referenced in seeking to claim a
presumption of materiality either predate *Apotex* or are from out-of-circuit district courts not
bound by the holding in *Apotex*.  *Cf. CJ Prod. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127
(E.D.N.Y. 2011) (pre-*Apotex*); *River Light V, L.P. v. Tanaka*, No. 17-22843, 2018 WL 5778234,
at 6 (S.D. Fla. Nov. 2, 2018) (out of Circuit).

## B.    StockX's Challenged Claims Were Not Material.

Nike has no evidence to establish materiality because the Challenged Claims, in proper
context, did not influence consumers' choice to use StockX.  56.1 ¶¶ 593–613.  Nike did not
submit any consumer perception survey to assess the materiality of the Challenged Claims.  56.1
¶¶ 610–13.  Nike has not elicited the testimony of *any* consumer who purchased Nike products
on StockX because of StockX's advertising claims.  56.1 ¶¶ 448, 610–13.  That is fatal to Nike's
claim.  *See Medisim Ltd. v. BestMed LLC*, 910 F. Supp. 591, 618 (S.D.N.Y. 2012) (granting
defendant summary judgment on false advertising claim where plaintiff "offered no evidence"

that consumers are more likely to purchase products with the false advertising than without and "failed to provide evidence that [plaintiff's] statement is false in a way that is likely to influence consumer behavior"); *SourceOne Dental, Inc. v. Patterson Cos., Inc.*, 328 F. Supp. 3d 53, 65 (E.D.N.Y. 2018) (granting summary judgment to plaintiff on defendants' false advertising counterclaim where defendants only provided evidence that consumers found lower price savings to be "important," but otherwise failed to demonstrate that plaintiff's "specific percentage-savings claims (rather than significant, if lesser savings) were material to those [consumers'] decisions").

Despite having the burden of proof, Nike has no survey or consumer perception testimony of its own, and questioning Sarah Butler's survey methodology alone cannot prove materiality. *See, e.g.*, *SourceOne Dental, Inc.* 328 F. Supp. 3d at 65 (at summary judgment, a false advertising plaintiff is typically "required to introduce some form of evidence – usually, although not necessarily, survey evidence or expert testimony based on it – to raise a factual question as to whether the differential between advertised and actual [information] was material in this market"). Ms. Butler's survey shows that, even if Nike were able to prove that some or all of the Challenged Claims were false, none were material. 56.1 ¶¶ 614–31. *See Reed Const. Data Inc.*, 638 F. App'x at 45 (affirming summary judgment for defendant on false advertising claim where certain statements were "literally false" and others "arguably misleading" but "none of the statements, individually or in the aggregate, was material"). Consumers purchased on StockX for many reasons having nothing to do with StockX's advertising claims. 56.1 ¶¶ 625–30. Ms. Butler's survey evaluated how likely actual and prospective StockX customers were to use the StockX platform with, and without, the Challenged Claims; her results establish that "the allegedly false Authentication Statements do not have a material impact on consumers'

likelihood of using the website to purchase a pair of sneakers" on StockX, and that the statements at issue were not material to consumer purchasing decisions. *See* 56.1 ¶ 621 ("A statistically equivalent number of respondents indicated that they are likely to use StockX to purchase sneakers when its webpages included Authentication Statements as compared to the number who would purchase when shown the same pages without the Authentication Statements (i.e., those shown webpages with the statements removed or replaced by "inspected")").

When asked by Ms. Butler what *was* driving their purchasing intent, consumers reported multiple other factors, including "the organization and/or layout of the website, the variety of products offered, price, past experience with StockX, and perceived product quality." 56.1 ¶ 626. Ms. Butler's results are consistent with other expert testimony and pre-litigation evidence in the record.[4] Dr. Robert Vigil compared StockX's financial performance to its competitor GOAT before and after StockX used the Challenged Claims on its website, and found that StockX's removal of the Challenged Claims did not substantially affect StockX's financial performance relative to GOAT. *See* 56.1 ¶¶ 632–35. Were those claims material to consumers, StockX should have lost market share to its key competitor—but it did not. *See SourceOne Dental, Inc.,* 328 F. Supp. 3d at 64–5 (holding that materiality assesses "whether consumers would have made different purchasing decisions but for the false advertisement" and granting summary judgment where claimant failed to provide sufficient evidence of customers "switching to a new distributor").

---

4

[redacted]

This conclusion is buttressed further by an actual StockX customer who provided testimony in this case, Roy Kim.  Mr. Kim testified that, prior to receiving allegedly counterfeit shoes, the reasons he used StockX instead of competing platforms like eBay or GOAT were completely unrelated to StockX's advertising claims.  Mr. Kim testified StockX was the "main platform" he used because "StockX offered the best prices" and "discounts on shipping."  56.1 ¶ 449.  More specifically, he used StockX "so much more" than other resale platforms because he "prefer[s] the buying experience" of StockX, that it is "cheaper to buy on StockX relative to . . . other platforms," that StockX has a better "app experience," that StockX allows him to "set a bid price" that the seller can choose to match, that the "customer experience" on StockX is "more responsive than both eBay and GOAT," and that StockX makes returns "easy."  56.1 ¶¶ 448–55.  This aligns with other potential StockX customers' responses to Ms. Butler's survey.  See 56.1 ¶¶ 626–30.

Mr. Kim also explained that resale consumers were unlikely to consider the Challenged Claims material because "[a]s sneaker heads, we're conditioned to think that any shoe[] . . . could be fake that comes through these platforms."  56.1 ¶ 502 (explaining that "as a sneaker reseller, we can never be a hundred percent sure of the authenticity of the shoe"); see also 56.1 ¶¶ 498–501.[5]  If the relevant consumer population was already likely to look skeptically at StockX's advertising claims, to the extent they considered them at all, it is not surprising that none of the record evidence demonstrates those claims were material.  See Reed Const. Data Inc., 49 F. Supp. 3d at 418 (affirming summary judgment where "no reasonable jury could

---

[5]    Mr. Kim's purchasing behavior after StockX removed virtually all of the Challenged Claims—and after Mr. Kim received allegedly counterfeit shoes from StockX—underscores that he did not consider StockX's advertising to be material.  After returning his purchases to StockX for a full refund, Mr. Kim continued to visit StockX's platform "[d]aily," testifying that he "currently make[s] purchases through StockX," and that over 90% of his ongoing purchases on StockX continue to be Nike shoes.  56.1 ¶ 457.

conclude that any false or misleading statements were material to consumers' purchasing decisions").

## IV.    None of StockX's Advertising Caused Any Injury to Nike.

All of Nike's false advertising claims should also be dismissed for the independent reason that Nike cannot prove injury, a required element of Lanham Act false advertising claims. *See, e.g.*, *Church & Dwight*, 843 F.3d at 65.

"To invoke the Lanham Act's cause of action for false advertising, a plaintiff must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 140 (2014). In the Second Circuit, although "a presumption of injury may arise when an advertisement makes false claims about a direct competitor," where "a misleading advertisement does not make comparative claims about a direct competitor, a plaintiff must demonstrate actual injury and causation." *Dependable Sales & Service, Inc. v. TrueCar, Inc.*, 394 F. Supp. 3d 368, 374 (S.D.N.Y. 2019); *see also, e.g.*, *id.* at 345–48 (collecting cases).

Nike will not be able to establish a presumption of injury because none of StockX's allegedly false claims was a comparative claim that was presumptively more likely to injure Nike than the multiple other resale platforms that compete with StockX. 56.1 ¶¶ 665–66. Nor will Nike be able to prove actual injury or causation. Nike's Rule 30(b)(6) corporate representative, Barbara Delli Carpini, ███████████████████████████████████████████ ███████████████████████████████████ as the Supreme Court's decision in *Lexmark* requires. 56.1 ¶¶ 654–61.

A.    **Nike Is Not Entitled to a Presumption of Injury.**

Second Circuit courts have "expressly disfavored presumptions of harm in cases where … the defendant's advertisements make no direct reference to any competitor's products." *Ortho Pharm. Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 696 (2d Cir. 1994); *see also McNeilab, Inc. v. Am. Home Prods. Corp.*, 848 F.2d 34, 38 (2d Cir. 1988); *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 190 (2d Cir. 1980).  As the court explained in *McNeilab, Inc.*, while "[a] misleading comparison to a specific competing product necessarily diminishes that product's value in the minds of the consumer," a claim that "makes no direct reference to any competitor's product" does not support a presumption because any potential injury "accrues equally to all competitors; none is more likely to suffer from the offending [claims] than any other."  848 F.2d at 38.

StockX has multiple competitors in the sneaker resale market.  *See supra* at p. 4.  Nike is not one of them.  56.1 ¶¶ 667–86.  Nor does Nike view StockX as a competitor.  56.1 ¶¶ 677–78, 680, 682, 686.  Ms. Carpini testified on behalf of Nike that Nike's competitors are "Adidas, Puma, Under Armour[], [and] a number of sporting good[s] companies," but she did not name StockX (or any other resale market).  56.1 ¶¶ 680, 686 (listing similar direct competitors).

StockX's argument is not premised on the issue of competition, though.  Rather, Nike is not entitled to a presumption of injury—regardless of whether Nike and StockX compete—because none of the Challenged Claims was a comparative claim.  In *Enzymotec Ltd. v. NBTY, Inc.*, for example, the court granted the defendant summary judgment notwithstanding the existence of a triable issue of fact as to whether the parties were in direct competition, noting that the presumption of injury requires "direct competition ***coupled with*** a false advertising claim based on ***comparative advertising***," and finding that the case did not involve comparative claims and the plaintiff had not submitted "'specific evidence that the defendant's advertising causes

22

direct harm to the product in which the plaintiff claims a pecuniary interest.'" 754 F. Supp. 2d

527, 545–47 (E.D.N.Y. 2010) (emphases added) (quoting *PDK Labs, Inc. v. Friedlander*, 103

F.3d 1105, 1112–13 (2d Cir. 1997)).

None of the Challenged Claims made comparisons to products Nike was selling when

StockX made the claims. 56.1 ¶¶ 576–77, 665–66. The Authentication Process Claims did not

make any reference to Nike or its products. 56.1 ¶¶ 577, 665–66. While StockX made the

Authenticity Claims about specific pairs of shoes being sold on its platform, the claims did not

compare StockX to Nike or refer to any specific pair of shoes Nike was selling. *Id.* There is thus

no basis to presume they were more likely to cause injury to Nike than to StockX's competitors

in the resale market. Even if there were any evidence that the Challenged Claims increased

StockX's sales (which there is not), there would be no reason to presume those increased sales

came at the expense of Nike rather than GOAT or StockX's other resale market competitors,

who would have been more likely than Nike to make those sales if StockX had not made them.

The court's reasoning in *Dependable Sales & Service, Inc.* 377 F. Supp. 3d at 349, applies

equally here:

> In the market of any . . . plaintiff-dealer, there are multiple dealerships, and
> multiple third-party marketing platforms that exist online and offline. A sale made
> through TrueCar is not necessarily a sale lost by a plaintiff dealership, as opposed
> to some other competing dealership in the same market. Here, because TrueCar
> and the plaintiffs are "not obviously in direct competition" and TrueCar's
> advertisements make "no direct reference" to the plaintiff dealerships, there is no
> presumption of harm to the plaintiffs.

**B.    Nike Cannot Prove Actual Injury.**

Nike's testimony through its Rule 30(b)(6) corporate representative establishes that ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Ms. Carpini testified on behalf of Nike with respect to "all harm

to Nike stemming from Nike's causes of action in this case." 56.1 ¶ 655. Her testimony

established that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



other than ██████████

and ████████████████████

56.1 ¶ 656.  Nike is ███████████████

████████████████████████

56.1 ¶ 659.  Nor is Nike "███████████

████████████████████████."  56.1 ¶ 658.

Nike's assertions of injury thus consist entirely of speculation about how Nike could theoretically be harmed generally by counterfeit Nike sneakers.  Nike has not introduced any evidence showing that such harm actually occurred or was proximately caused by StockX's advertising.  56.1 ¶¶ 636–53.  Nike's speculation that it could be harmed if StockX ██

████████████████████" and "███████████

████████████████████" 56.1 ¶ 661, are insufficient to meet Nike's burden of proof.  Ms. Carpini ███████████████████████

████████████  56.1 ¶ 656 ("██████████

████████████████████████

████████████████████.").

Such generic and unspecific opinions are insufficient to establish injury under the Lanham Act.  In *Souza v. Exotic Island Enters., Inc.*, for example, the Second Circuit held that the plaintiffs' claims "that they may have lost out on work opportunities … would likely satisfy *Lexmark's* requirements, ***if only there were any evidence that such an injury actually occurred in this case*.*"  68 F. 4th 99, 119–20 (2d Cir. 2023).  But the Second Circuit upheld summary judgment for the defendant because "there is no evidence that anything of the sort actually

happened." *Id.* at 119–20. The court in *Dependable Sales & Serv., Inc.*, similarly granted summary judgment to the defendant on injury causation where "[n]one of the four witnesses described an incident where they knew of an actual sale lost to a TrueCar-affiliated dealership . . . [or] evidence of harm to the business reputation of their respective dealerships." 377 F. Supp. 3d at 353. The court found that "the testimony offered by plaintiffs describes witnesses' perceptions of the ads' falseness and why the false statements ***could be*** material to consumers' buying choices, but they do not identify discernable injury to the dealerships linked to TrueCar's advertisements." *Id.* (emphasis added).

Because Nike cannot establish either actual injury or entitlement to a presumption of injury as required under the Lanham Act, its false advertising claims should be dismissed.

## CONCLUSION

For the foregoing reasons, this Court should grant StockX's motion and dismiss Nike's false advertising claim in its entirety.

Dated:      New York, New York
            August 8, 2024

By: /s/ *Megan K. Bannigan*
DEBEVOISE & PLIMPTON LLP
Megan K. Bannigan (mkbannigan@debevoise.com)
David H. Bernstein (dhbernstein@debevoise.com)
Jyotin Hamid (jhamid@debevoise.com)
Carl Riehl (criehl@debevoise.com)
Kathryn C. Saba (ksaba@debevoise.com)
66 Hudson Boulevard
New York, New York 10001
(212) 909-6000

Christopher S. Ford (csford@debevoise.com)
DEBEVOISE & PLIMPTON LLP
650 California Street
San Francisco, California 94108
(415) 738-5700

KILPATRICK TOWNSEND & STOCKTON LLP

Robert N. Potter (rpotter@kilpatricktownsend.com)
Briggs Wright (briggs.wright@kilpatricktownsend.com)
1114 Avenue of the Americas
New York, New York 10036
(212) 775-8700

MORGANROTH & MORGANROTH PLLC
Jeffrey B. Morganroth (jmorganroth@morganrothlaw.com)
344 N. Old Woodward Ave., #200
Birmingham, MI 48075
(248) 864-4000

*Attorneys for Defendant StockX LLC*