**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NIKE, INC.,<br><br>                    Plaintiff,<br><br>    v.<br><br>STOCKX LLC,<br><br>                    Defendant. | Case No. 22-CV-983 (VEC) |

**PLAINTIFF NIKE, INC. AND DEFENDANT STOCKX LLC'S CONSOLIDATED 56.1
STATEMENT OF MATERIAL FACTS**

**TABLE OF CONTENTS**

**Page**

I.  Nike's Rule 56.1 Statement of Material Facts and StockX's Responses ................................... 1

II.  StockX's Rule 56.1 Counterstatement of Material Facts and Nike's Responses .................. 237

III.  StockX's Rule 56.1 Statement of Material Facts and Nike's Responses ............................ 335

IV.  Nike's Rule 56.1 Counterstatement of Material Facts and StockX's Responses ................ 519

<u>**PLAINTIFF NIKE, INC.'S RULE 56.1 STATEMENT OF MATERIAL FACTS,
DEFENDANT STOCKX LLC'S RESPONSES AND COUNTERSTATEMENT, AND
NIKE'S RESPONSES TO STOCKX'S COUNTERSTATEMENT**</u>

**A.    NIKE'S RULE 56.1 STATEMENT OF MATERIAL FACTS AND STOCKX'S
RESPONSES.**

Pursuant to Local Rule 56.1 and this Court's Individual Practices, Plaintiff Nike, Inc.

("Nike") submits, in support of its Motion for Partial Summary Judgment, a statement of material

facts:

**I.    Nike and Its Famous Brands**

1.    Nike's principal business activity is the design, development, and worldwide

marketing and selling of athletic footwear, apparel, equipment, accessories, and services.

Duvdevani Decl. ¶ 2, Ex. 1 at p. 1. (Nike, Inc., Form 10-K for the fiscal year ended May 31, 2023).

    a.    <u>Response</u>: Undisputed that Nike's principal business activity is the design,
        development, and worldwide marketing and selling of athletic footwear, apparel,
        equipment, accessories, and services in the primary market for those goods and
        services.  However, StockX disputes that Nike participates in the secondary market
        for athletic footwear, apparel, equipment, accessories, and services.  Ford. Decl.
        Opp. Mot. Summ. J. Ex. ("Opp. DX") 1, Dep. Tr. of Ron Faris ("Faris Tr.") 14:22–
        15:2; 200:15–201:5; 267:6–267:19; Opp. DX 2, Dep. Tr. of Heather Paulson
        ("Paulson Tr.") 263:11–17; 221:16–222:17.

2.    Nike designs, develops, markets, and sells its goods and services under the NIKE

and JORDAN brands, among others.  Duvdevani Decl. ¶ 2, Ex. 1 at p. 1. (Nike, Inc., Form 10-K

for the fiscal year ended May 31, 2023).

a. <u>Response</u>: Undisputed that Nike designs, develops, markets, and sells its goods and services under the NIKE and JORDAN brands, among others, in the primary market. However, StockX disputes that Nike offers any goods or services under the NIKE and JORDAN brands in the secondary market.   Opp. DX 1, Faris Tr. 14:22–15:2; 200:15–201:5; 267:6–267:19; Opp. DX 2, Paulson Tr. 263:11–17; 221:16–222:17.

3.    Nike believes that its intellectual property rights are important to its brand, its success, and its competitive position.  Duvdevani Decl. ¶ 2, Ex. 1 at p. 5. (Nike, Inc., Form 10-K for the fiscal year ended May 31, 2023).  Nike strategically pursues available protections of these rights and vigorously protects them against third-party theft and infringement.  *Id*.

a. <u>Response</u>: Undisputed.

4.    Nike considers its NIKE word and Swoosh design trademarks to be among its most valuable assets and Nike has registered these trademarks in over 190 jurisdictions worldwide. Duvdevani Decl. ¶ 2, Ex. 1 at p. 5. (Nike, Inc., Form 10-K for the fiscal year ended May 31, 2023).

a. <u>Response</u>: Undisputed.

5.    Nike's "iconic brands have worldwide recognition."  Duvdevani Decl. ¶ 2, Ex. 1 at p. 13. (Nike, Inc., Form 10-K for the fiscal year ended May 31, 2023).

a. <u>Response</u>: Undisputed.

6.    Nike has grown its brand into one of the most recognizable in the world, recently ranked as the 9th best global brand and valued at $53.773 billion by Interbrand in 2023, growing from 10th best global brand and valued at $50.289 billion by Interbrand in 2022.  Duvdevani Decl. ¶ 3, Ex. 2 at NIKE0069757; *id.* ¶ 4, Ex. 3 at p. 80-81.

a. <u>Response</u>: Undisputed.

7.      Nike spent approximately $4.060 billion, $3.8 billion, and $3.114 billion dollars on advertising and promoting its brands in the years ending in May 31, 2023, 2022, and 2021, respectively.  Duvdevani Decl. ¶ 2, Ex. 1 at p. 62) (Nike, Inc., Form 10-K for the fiscal year ended May 31, 2023).

    a.      <u>Response</u>: Undisputed.

8.      From at least 2020 until 2022, JORDAN and NIKE brands ranked either first or first and second, in total sneaker sales on StockX.  Duvdevani Decl. ¶ 5, Ex. 4 (NIKE0000379 - "Big Facts: Current Culture Index 2022," StockX Annual Report (2022): <u>https://stockx.com/about/sx-market-insights/current-culture-index-22/</u>; (Jordan Brand ranked 1 and Nike ranked 2 in top brands for sneaker total trades); Duvdevani Decl. ¶ 6, Ex. 5 (Big Facts: Current Culture Index 2021," StockX Annual Report (2021), <u>https://stockx.com/news/current-culture-index-2021/</u> (Jordan and Nike ranked 1 and 2, respectively)); *see also* Dkt. 39 ("FAC") ¶ 55; Dkt. 41 ("StockX Answer") ¶ 55 (admitting that "the Jordan, Nike, and Converse brands were among the top five trading footwear brands by volume on StockX's platform in 2021 and otherwise refer to the contents of StockX's most recent annual report, which speak for themselves."). In 2019, Jordan brand had the largest StockX Sneaker Market share and Nike had the third largest. Duvdevani Decl. ¶ 7, Ex. 6 ("StockX Snapshot: The State of Resale;" (Jan. 17, 2020), <u>https://stockx.com/news/state-of-resale/.</u>)

    a.      <u>Response</u>: Undisputed.

9.      StockX's "Editorial Director" stated that Nike's JORDAN brand is "[t]he most celebrated brand in footwear history."  Duvdevani Decl. ¶ 8, Ex. 7 at NIKE0065790.  (Pete Forester, "Top Jordan Collaborations on StockX," StockX (Nov. 12, 2021): <u>https://stockx.com/news/top-jordan-collaborations-on-stockx/</u>).

    a.    <u>Response</u>: Undisputed that Duvdevani Decl. Suppt. Mot. Summ. J. (ECF No. 261) Ex. ("PX") 7, contains the quoted text and was authored by StockX's Editorial Director as of November 12, 2021.  However, StockX disputes that Mr. Forester is currently employed as StockX's Editorial Director.  *See* Opp. DX 3, Pete Forester, LinkedIn,  https://www.linkedin.com/in/pete-forester/ (stating Mr. Forester left StockX in June 2022).

10.    A StockX "Sneaker Contributor" stated that the JORDAN Brand is "[o]ne of the most successful sportswear franchises of all time[.]"  Duvdevani Decl. ¶ 9, Ex. 8 at NIKE0065796 (Chris Danforth, "Best Air Jordans of 2020," StockX, The Magazine (Dec. 17, 2020): https://stockx.com/news/en-gb/best-jordans-of-2020).  The same StockX "Sneaker Contributor" further stated that "[f]or many, sneaker culture starts and ends with Air Jordan."  *Id.*

    a.    <u>Response</u>: Undisputed.

11.    StockX's "Content Coordinator" stated: "There is a reason why we can't go into a room without seeing a Swoosh on someone's feet.  Nike is the beating heart of the sneaker industry.  They have created trends and industry standards with a relentless pursuit of new and innovative performance technology."  Duvdevani Decl. ¶ 10, Ex. 9 at NIKE0065834 (Morgan Baylis, "The Best Nike Shoes for Men in 2020," StockX (Feb. 28, 2020): https://stockx.com/news/the-best-nike-shoes-for-men/).

    a.    <u>Response</u>: Undisputed PX 9 contains the quoted text and was authored by StockX's Content Coordinator as of February 28, 2020.  However, StockX disputes that Mr. Baylis is currently employed as StockX's Content Coordinator.  *See* Opp. DX 4, Morgan Baylis, LinkedIn, https://www.linkedin.com/in/morgan-baylis/ (stating Mr. Baylis left StockX in November 2022).

## II.    Nike's Asserted Trademarks On This Motion

12.    Nike owns exclusive right, title, and interest in and to the following trademarks registered on the Principal Register of the United States Patent and Trademark Office (collectively, the "Nike Marks"):

| Reg. No. | Title | Trademark Design | Reg. Date | Class – Goods | Support |
|---|---|---|---|---|---|
| 1,370,283 | AIR JORDAN | AIR JORDAN<br><br>(word mark) | 11/12/1985 | 25- Clothing, footwear | Duvdevani Decl. ¶ 11, Ex. 10. (NIKE00071 45) |
| 3,725,535 | Air Jordan & Wings Design*[1] |  | 12/15/2009 | 25- Clothing, footwear, headgear | Duvdevani Decl. ¶ 12, Ex. 11. (NIKE00071 67) |
| 3,627,820 | JUMPMAN | JUMPMAN<br><br>(word mark) | 9/11/2007 | 25- Clothing, footwear, headgear | Duvdevani Decl. ¶ 13, Ex. 12. (NIKE00258 09) |
| 1,558,100 | JumpMan Design |  | 9/26/1989 | 25- Clothing, Footwear | Duvdevani Decl. ¶ 14, Ex. 13. (NIKE00071 65) |
| 1,742,019 | JumpMan Design |  | 12/22/1992 | 25- Clothing, footwear, headgear<br><br>18- Leather and imitations of leather | Duvdevani Decl. ¶ 15, Ex. 14. (NIKE00071 66) |
| 978,952 | NIKE | NIKE<br><br>(word mark) | 2/19/1974 | 25- Clothing, footwear, headgear | Duvdevani Decl. ¶ 16, Ex. 15. (NIKE00071 30) |
| 1,214,930 | NIKE | NIKE | 11/2/1982 | 25- Footwear | Duvdevani Decl. ¶ 17, Ex. 16. |

---

[1] * indicates unofficial, descriptive title.

| Reg. No. | Title | Trademark Design | Reg. Date | Class – Goods | Support |
|---|---|---|---|---|---|
| | | (word mark) | | | (NIKE00071 52) |
| 1,325,938 | NIKE & Swoosh Design* | **NIKE** | 3/19/1985 | 25- Footwear | Duvdevani Decl. ¶ 18, Ex. 17. (NIKE00071 25) |
| 977,190 | Swoosh Design | | 1/22/1974 | 25- Footwear | Duvdevani Decl. ¶ 19, Ex. 18 (NIKE00071 11) |
| 1,323,343 | Swoosh Design | | 3/5/1985 | 25- Footwear | Duvdevani Decl. ¶ 20, Ex. 19 (NIKE00071 13-14) |

a.    Response: Undisputed.

13.    The above U.S. registrations for the Nike Marks are valid, subsisting, unrevoked, uncancelled, and in full force and effect.  Duvdevani Decl. ¶¶ 11-20, Exs. 10-19 (NIKE0007145 (Reg. No. 1,370,283 (AIR JORDAN word mark)); NIKE0007167 (Reg. No. 3,725,535 (Air Jordan & Wings Design mark)); NIKE0025809 (Cert. Reg. No. 3,627,820 (JUMPMAN word mark)); NIKE0007165 (Reg. No. 1,558,100 (JumpMan Design mark)); NIKE0007166 (Reg. No. 1,742,019 (JumpMan Design mark)); NIKE0007130 (Reg. No. 978,952 (NIKE word mark)); NIKE0007152 (Reg. No. 1,214,930 (NIKE word mark)); NIKE0007111 (Reg. No. 977,190 (Swoosh Design mark)); NIKE0007113-4 (Reg. No. 1,323,343 (Swoosh Design mark)); NIKE0007125-26 (Cert. Reg. No. 1,325,938 (NIKE & Swoosh Design mark)); Duvdevani Decl. ¶¶ 21-30, Ex. 20-29.

a.    Response: Undisputed.

14.    Each of the below identified Nike Marks is incontestable.  Duvdevani Decl. ¶¶ 31-40, Exs. 30-39.

    a.    AIR JORDAN, Reg. No. 1,370,283.  Duvdevani Decl. ¶ 31, Ex. 30 (NIKE0016943 (Reg. No. 1,370,283 (AIR JORDAN word mark) 4/13/1992 Notice of Receipt/Acceptance Sec. 8 & 15).

    b.     (Air Jordan & Wings Design), Reg. No. 3,725,535. Duvdevani Decl. ¶ 32, Ex. 31. (NIKE0018147 (Reg. No. 3,725,535 (Air Jordan & Wings Design mark) 2/22/2016 Email Notice of Acceptance + 12/15/2015 Combined Decl. Sec. 8 & 15)).

    c.    JUMPMAN, Reg. No. 3,627,820.  Duvdevani Decl. ¶ 33, Ex. 32. (NIKE0025748 (Reg. No. 3,627,820 (JUMPMAN word mark) 6/8/2015 Email Notice of Acceptance + 5/20/2015 Combined Decl. Sec. 8 & 15)).

    d.     (JumpMan Design mark), Reg. No. 1,558,100.  Duvdevani Decl. ¶ 34, Ex. 33. (NIKE0025036 (Reg. No. 1,558,100 (JumpMan Design mark) 5/28/1996 Sec. 8 & 15 Receipt/Acceptance))

    e.     (JumpMan Design mark) Reg. No. 1,742,019.  Duvdevani Decl. ¶ 35, Ex. 34 (NIKE0014657 (Reg. No. 1,742,019 (JumpMan Design mark) 6/29/1999 Sec. 8 & 15 Receipt/Acceptance))

f.    NIKE, Reg. No. 978,952.  Duvdevani Decl. ¶ 36, Ex. 35 (NIKE0020106-110 ((Reg. No. 978,952 (NIKE word mark) 11/25/2003 Combined Decl. Sec. 8 & 9) NIKE0019997-0020001 (Reg. No. 978,952 4/16/1974 Combined Sec. 8 & 15 Decl.))

g.    NIKE, Reg. No. 1,214,930. Duvdevani Decl. ¶ 37, Ex. 36 (NIKE0009035 (Reg. No. 1,214,930 (NIKE word mark) 11/5/1987 Combined Sec. 8 & 15 Affidavit + 6/17/1988 Receipt/Acceptance)).



h.    (NIKE Swoosh Design mark), Reg. No. 1,325,938.  Duvdevani Decl. ¶ 38, Ex. 37 (NIKE0013298 (Reg. No. 1,325,938 (Swoosh Design mark) 10/24/1990 Sec. 8 & 15 Receipt/Acceptance)).



i.    (Swoosh Design mark) Reg. No. 977,190.  Duvdevani Decl. ¶ 39, Ex. 38 (NIKE0021544, TSDR File Jacket showing Sec. 8 & 15 affidavit was filed on May 19, 1981.))



j.    (Swoosh Design mark) Reg. No. 1,323,343.  Duvdevani Decl. ¶ 40, Ex. 39 (NIKE0011345-47 (Reg. No. 1,323,343 (Swoosh Design mark) 3/5/1990 Combined Sec. 8 & 15 Affidavit + 5/23/1990 Receipt/Acceptance)).

i.  <u>Response</u>: Undisputed.

## III.    **Nike's Brand Protection Efforts and Proprietary Technology**

15.    To protect its brand and consumers from counterfeit "Nike"-branded goods, Nike has invested substantial resources into combatting the manufacture, distribution, and sale of counterfeit goods in both physical and digital markets.  As part of those efforts, Nike has built a robust global brand protection department and developed proprietary tools and technologies to aid in its fight against those trading in counterfeit "Nike" goods.  Duvdevani Decl. ¶ 41, Ex. 40, Jan. 10, 2023 Videotaped Deposition of Barbara Delli Carpini ("Delli Carpini Tr.") at 25:06-26:20; August 8, 2024 Declaration of Joe Pallett ("Pallett Decl.") ¶ 5.

a.  <u>Response</u>: Undisputed that Joe Pallett declared that Nike "aggressively works to keep the market clear of counterfeit 'Nike' goods," Pallett Decl. ¶ 5, and that Barbara Delli Carpini testified that Nike ████████████████████████ ████████████████████████████████████████ ██████████████████████████████████ PX 40 at 25:06–26:20.  However, StockX disputes that "Nike has invested substantial resources into combatting the manufacture, distribution, and sale of counterfeit goods in both physical and digital markets," and that Nike has "built a robust global brand protection department and developed proprietary tools and technologies to aid in its fight against those trading in counterfeit 'Nike' goods," as Nike's broad, unqualified assertions of fact as set forth in Paragraph 15 are unsupported by the cited evidence, which says nothing of the resources Nike has invested beyond ████████████████████ and says nothing of the <u>multiple</u> "proprietary tools and technologies" that Nike purportedly has developed to aid in its fight

against counterfeits. To the extent Nike is referring to its ████████████

███████████████████████████████████████████████████████████████

████████████. For instance, in the context of this case, ███████████████

███████████████████████████████████████████████████████████████

████████████ Opp. DX 5, NIKE0025918; Opp. DX 6, NIKE0039044; Opp. DX 7,

Dep. Tr. of Barbara Delli Carpini Tr. ("Delli Carpini Tr.") 196:3–4. ████

███████████████████████████████████████████████████████████████

███████████████████████ Opp. DX 5, NIKE0025918. Nike itself admits that

███████████████████████████████████████████████████████████████

████████████████████ Nike Mot. Summ. J. (ECF No. 259) ("Nike Mot.") at 3;

Opp. DX 8, Dep. Tr. of Laura Rizza ("Rizza Tr.") 113:23–114:12 (explaining that

Nike's spreadsheet ████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████. Further, ████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████ Opp. DX 9, Dep. Tr. of Joe Pallet ("Pallett Tr.") 16:17–

17:08 (Nike ██████████████████████████████████████████████████

███████ Mr. Pallett, Nike's Director, Brand Protection, Authentication and

Innovation, testified that █████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████ Opp. DX 9, Pallett Tr. 165:6–18. For

example, Mr. Pallett testified that █████████████████████████████

███████████████████████████████████████████████████████████████

 Opp. DX 9, Pallett Tr. 165:19–167:23.

Opp. DX 9, Pallett Tr. 167:14–172:20.

Opp. DX 9, Pallett Tr. 134:6–15 (testifying that the

; Opp. DX 10, NIKE0037982 (

. These issues included

" Opp. DX 10, NIKE0037982; Opp. DX 11, NIKE0037984; Opp. DX 12, NIKE0037849; Opp. DX 13, NIKE0037856; Opp. DX 14, NIKE0038038; Opp. DX 15, NIKE0038039.

16.    Nike's Brand Protection department's chief objective is to combat counterfeiting of Nike goods around the world in both the physical and digital markets. Ex. 40, Delli Carpini Tr. at 25:06-10; 28:13-15.

a.    Response: Undisputed.

17.    Nike's Brand Protection department is currently led by Barbara Delli Carpini, Vice President for Global Brand Protection and Digital IP Enforcement. Ex. 40, Delli Carpini Tr. at 21:19-21. Ms. Delli Carpini has nearly two decades of brand protection experience and has served in various roles within Nike's Brand Protection department since 2005. *Id.* 22:3-4.

a.    Response: Undisputed.

18.    Joe Pallett, Nike's Director, Brand Protection, Authentication and Innovation, currently oversees the development and application of tools Nike uses to authenticate genuine Nike goods and identify counterfeits.    Duvdevani Decl. ¶ 42, Ex. 41, Feb. 8, 2023 Videotaped Deposition of Joe Pallett ("Pallett Tr.") at 44:09-13; 92:14-19.    Mr. Pallett has nearly a decade of brand protection experience and has served in various roles within Nike's Brand Protection department since 2015.  *Id.* at 38:3-39:3.

a.    <u>Response</u>: Undisputed.

19.    Nike maintains strict quality control standards for products bearing the Nike Marks. Genuine Nike products bearing the Nike Marks are inspected and approved by Nike prior to distribution and sale.  Pallett Decl. ¶ 3.

a.    <u>Response</u>: Undisputed that "genuine Nike products bearing the Nike Marks are inspected and approved by Nike prior to distribution and sale."  However, StockX disputes that Nike maintains strict quality control standards for products bearing the Nike Marks.  Nike acknowledges that Nike shoes can be defective, ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ Opp. DX 7, Delli Carpini Tr. at 149:8–24; *see also* Opp. DX 66, "What Is Nike's Return Policy, https://www.nike.com/help/a/returns-policy (including a section entitled "What about defective or flawed items?" and noting "If it's been less than 60 days since your purchase, simply <u>return</u> the item.  If it's been more than 60 days and your item is potentially defective or flawed, please see our <u>warranty information</u> for additional details").  In addition, consumers have reported issues with authentic

Nike products including "mismatched logos, missing (or bolded) patterns, misshapen heels and more." Opp. DX 16, Evan Malachosky, Gear Patrol, "Why Nike's Quality Control is Suddenly Under Scrutiny", "https://www.gearpatrol.com/style/shoes-boots/a43364644/nike-quality-control-stockx-fakes/; Opp. DX 17, Expert Report of DeJong Wells (May 5, 2023) ("Wells Rep.") ¶ 95. Anecdotal evidence posted by consumers on forums for sneakerheads highlight other manufacturing issues with Nike products, such as the soles of Nike sneakers separating from the uppers over time, even with minimal use. Opp. DX 17, Wells Rep. ¶ 94. StockX authenticators have observed defects in Nike products. Opp. DX 18, Dep. Tr. of John Lopez ("Lopez Tr.") 284:15–24.

20.    Nike also maintains strict control over the use of the Nike Marks in connection with its products. Nike carefully determines how many products are released, where the products are released, when the products are released, and how the products are released. Pallett Decl. ¶ 4.

a.    <u>Response</u>: Undisputed that Nike generally determines how many products it releases, where the products are released, when the products are released, and how the products are released. However, to the extent that it suggests that Nike plays no role in leaked products and that genuine Nike footwear is not sold prior to the release dates determined by Nike, StockX disputes that Nike effectively maintains strict control over where products using Nike's Marks are released, when they are released, and how they are released. Nike's witness testified that ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮ Opp. DX 19, Dep. Tr. of Mike Child ("Child Tr.") 145:9–12; Opp. DX 20, Dep. Tr. of Jeffrey Stec ("Stec Tr.") 259:15–260:2 (acknowledging that "one way"

someone could obtain a genuine Nike shoe pre-release is to "[get] that shoe from Nike or from somebody who got it from Nike"); 260:4–7 (agreeing that "Nike sometimes gives away promotional samples before the release date"). Nike's economic expert, Dr. Stec, testified to the various ways in which Nike may not have control over whether shoes become available in the market pre-release, including if shoes are stolen, if Nike loses control over some inventory of its products, or if authorized resellers give away shoes prior to the release date. Opp. DX 20, Stec Tr. 261:9–262:23. Some authorized Nike retailers will sell Nike products before the Nike official release date. Opp. DX 18, Lopez Tr. 129:16–17. In addition, different geographies may launch Nike products on different days such that it is possible to buy a product in one region before it becomes available in another region. Opp. DX 2, Paulson Tr. 190:8–15. Nike is aware that ███████████ ████████████████████████████████████████ Opp. DX 21, NIKE0036670 at 733 (listing ████████████████████████ ██████████████████████████████████████████ ██████████

21.    Nike engages █████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████ Ex. 40, Delli Carpini Tr. 33:17-38:05.

a.    <u>Response</u>: Undisputed.

22.    Nike works with ██████████████████████████████████

████████████████████████ among others.  Ex. 40, Delli Carpini Tr. 34:14-

35:06.

    a.    <u>Response</u>: Undisputed that Nike works with █████████████████

████████████████████████ However, StockX disputes

Nike's assertion that it works with "other" █████████████████ which is

not supported by the cited evidence.

23.    Nike's Brand Protection department also works alongside █████████

████████████████████████████████████████████████ Ex.

40, Delli Carpini Tr. at 30:12-19.

    a.    <u>Response</u>: Undisputed.

## IV.  Nike's Proprietary Anticounterfeiting Technology

24.    Mr. Pallett is intimately familiar with Nike's anti-counterfeiting technology,

including… ████████████████████████████████████████████████

████████████████████████████████████ (March 24, 2023 Decl.

of J. Pallett) (Dkt. No. 150-5 at ¶ 3).

    a.    <u>Response</u>: Undisputed that Mr. Pallett is familiar with ██████████

████████████████████████████████████████

████████████████████████ However, StockX disputes that the

cited evidence supports Mr. Pallett's familiarity with any additional anti-

counterfeiting technology.

25.    To authenticate Nike and Jordan shoes, Nike uses █████████████

██████ (March 24, 2023 Decl. of J. Pallett) (Dkt. No. 150-5 at ¶ 6).

a.    <u>Response</u>:  Undisputed that Nike uses ███ to attempt to authenticate Nike and

Jordan shoes.  However, StockX disputes that ████████████████████

██████████████████    For instance, in the context of this case, ███

████████████████████████████████████

██████████    Opp. DX 5, NIKE0025918; Opp. DX 6, NIKE0039044; Opp.

DX 7, Delli Carpini Tr. 196:3–4. ████████████

████████████████████████████████  Opp. DX 5,

NIKE0025918.  Nike itself admits that ████████████████████

███████████████████████  Nike Mot. at 3; Opp.

DX 8, Rizza Tr. 113:23–114:12 (explaining that Nike's spreadsheet ████

████████████████████████████████████

████████████████████████████████████

██████████  Further, ████████████████████████

████████████████████████████████████

███████  Opp. DX 9, Pallett Tr. 16:17–17:8 ██████████████

████████████████  Mr. Pallett, Nike's Director, Brand

Protection, Authentication and Innovation, testified that ██████████████

████████████████████████████████████

████████████████████████████  Opp. DX 9,

Pallett Tr. 165:5–18.  For example, Mr. Pallett testified that ████████████

████████████████████████████████████

████████████████████████  Opp. DX 9, Pallett

Tr. 165:19–167:23. ██████████████

16

████████████████████████████████████████████████

████████████████████████████████████████ Opp. DX

9, Pallett Tr. 167:14–172:20. ████████████████████

████████████████████████ Opp. DX 9, Pallett Tr. 134:6–15 (testifying that

████████████████████████████████████████████████

████████████ ); Opp. DX 10, NIKE0037982 (████████████

████████████████████████████████████████. ████████

████████████████████████████████████████████████

████████████████████████████ Opp. DX 10, NIKE0037982; Opp.

DX 11, NIKE0037984; Opp. DX 12, NIKE0037849; Opp. DX 13, NIKE0037856;

Opp. DX 14, NIKE0038038; Opp. DX 15, NIKE0038039.

26.    Nike ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ (March 24, 2023 Decl. of J. Pallett) (Dkt. No. 150-5 at ¶

6).

a.    <u>Response</u>: Undisputed that Nike did ████████████████████

████████████████████████████████████████

████████████████████████ However, StockX disputes that Nike ████████

████████████████████████████████ because that assertion

is contradicted by evidence in the record.  Mr. Pallett testified that he ████████

████████████████████████████████████████████████

████████████████████████████████████████ Opp. DX 9, Pallett Tr.

277:15–280:16.  Nike Brand Protection internal documents show that ███████████

████████████████████████████████████████████████████████████

Opp. DX 22, NIKE0081473 at 492 ███████████████████████████████████

███████████████████, at  494 ████████████████████████████████████

███████████████████████████████████, and at 505 (noting ████████

███████████████████████████████████████████.

27.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ (March

24, 2023 Decl. of J. Pallett) (Dkt. No. 150-5 at ¶ 7).

a.    <u>Response</u>:  Undisputed  that ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ because  that  broad  assertion  is

contradicted  by  evidence  in  the  record.  Mr. Pallett  testified  that ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████ Opp. DX 9, Pallett Tr. 165:6–18. ████████████████████████

████████████████████████████████████ Opp. DX 9, Pallett Tr.

16:17–17:8 (Nike ██████████████████████████████████████████████

███████ For example, Mr. Pallett testified that ███████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████ Opp. DX 9, Pallett Tr. 165:19–

167:23. ████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████ Opp. DX 9, Pallett

Tr. 167:14–172:20.

28.     "At the highest level, ████████████████████████████

████████████████████████████████████████████████

████████████████████████████ (March 24, 2023 Decl. of J. Pallett) (Dkt.

No. 150-5 at ¶ 8).

    a.     <u>Response</u>: Undisputed.

29.     ████████████████████████████████████████

████████████████████████████ (March 24, 2023 Decl. of J. Pallett) (Dkt. No.

150-5 at ¶ 8).

    a.     <u>Response</u>: Undisputed that Mr. Pallet's March 24, 2023 Declaration contains the

quoted text.    However, StockX disputes Mr. Pallet's statement because it is

contradicted by evidence in the record showing that █████████████████████

██████████████████████    For instance, in the context of this case, ████

████████████████████████████████████████████

██████████████████    Opp. DX 5, NIKE0025918; Opp. DX 6, NIKE0039044;

Opp. DX 7, Delli Carpini Tr. 196:3–4.    ████████████████

████████████████████████████████████████████

Opp. DX 5, NIKE0025918.    Nike itself admits that ████████████████

████████████████████████████████████    Nike Mot. at

3; Opp. DX 8, Rizza Tr. 113:23–114:12 (explaining that Nike's spreadsheet ███

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████     Further,     ██████████████████████████████

███████████████████████████████████████████████████

██████.  Opp. DX 9, Pallett Tr. 16:17–17:8 (Nike must ██████████████

███████████████████████████████.     Mr. Pallett, Nike's Director, Brand

Protection, Authentication and Innovation, testified that ██████████████

███████████████████████████████████████████████████

████████████████████████████████████████     Opp. DX 9,

Pallett Tr. 165:5–18.  For example, Mr. Pallett testified that █████████████

███████████████████████████████████████████████████

██████████████████████████████████████     Opp. DX 9, Pallett

Tr. 165:19–167:23.  ███████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████     Opp. DX

9, Pallett Tr. 167:14–172:20.  █████████████████████████████

█████████████████████     Opp. DX 9, Pallett Tr. 134:6–15 (testifying that

the ████████████████████████████████████████████████

████████████;  Opp. DX 10, NIKE0037982 ██████████████████████

███████████████████████████████████████     █████████

███████████████████████████████████████████████████

██████████████████████████     Opp. DX 10, NIKE0037982; Opp.

DX 11, NIKE0037984; Opp. DX 12, NIKE0037849; Opp. DX 13, NIKE0037856;

Opp. DX 14, NIKE0038038; Opp. DX 15, NIKE0038039.

30.



(March 24, 2023 Decl. of J. Pallett) (Dkt. No. 150-5 at ¶

8).

     a.    <u>Response</u>: Undisputed.

    31.    Nike also

(March 24, 2023 Decl. of J. Pallett) (Dkt. No. 150-5 at ¶¶ 10, 12).

     a.    <u>Response</u>: Undisputed.

    32.    In July 2019,

Duvdevani Decl. 145, Ex. 144.  However, Nike's manufacturing

processes, standards, and policies are kept highly confidential.  StockX does not have access to,

nor is it authorized to access, those processes or Nike's proprietary authentication tools. Pallett

Decl. ¶ 7.

a.    <u>Response</u>: Undisputed that "Nike's manufacturing processes, standards, and policies are kept highly confidential" and "StockX does not have access to, nor is it authorized to access, those processes or Nike's proprietary authentication tools." However, StockX disputes Nike's characterization of, and inferences purportedly drawn from PX 144, which are contradicted by record evidence. Specifically, StockX disputes that ████████████████████████████████████ ████████████████████████████████████████ Opp. DX 23, STX0773022 (March 2018 email where ████████████████ ████████████████████████████████████████ ████████████; Opp. DX 2, Paulson Tr. 77:20–78:23; ████████████ ████████████████████████ PX 144 (showing emails from May 2019 where StockX ████████████████████████████████████. StockX further disputes Nike's characterization of ████████████████████ ████████████████████████████████ Nike's head of brand protection in North America, Joe Pallett, described ████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ Opp. DX 9, Pallett Tr. 131:25–132:13. ████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████ Opp. DX 24, NIKE0035611 at 645; Opp. DX 9, Pallett Tr. 134:6–15. ████████████████████ Nike also visited multiple StockX authentication centers. Opp. DX 25, NIKE0035739 (January 2019 visit to London); Opp. DX 26,

NIKE0037536 (February 2019 visit to Detroit); Opp. DX 27, NIKE0035903 (February 2019 visit to Detroit); Opp. DX 28, NIKE0036138, Opp. DX 29, NIKE0038001 (June 2019 visit to Detroit). Nike visited StockX's authentication center  Opp. DX 26, NIKE0037536 at 539. Nike's goal with the visit to the StockX Detroit facilities was to ███████████████████████████████████████ ███████████████████████" Opp. DX 30, NIKE0037499 at 502.

33.    Professor Kari Kammel was retained on behalf of Nike as an industry expert on trademark counterfeiting and brand protection. August 6, 2024 Declaration of K. Kammel ("Kammel Decl.") ¶ 2, Ex. A ("Kammel Opening Report").

   a.    <u>Response</u>: Undisputed.

34.    Ms. Kammel opined in her May 5, 2023 expert report that "Nike's brand protection efforts" are "one of the most comprehensive and holistic global brand protection teams in the field." Kammel Opening Report at p. 24. She further opined that "Nike incorporates industry best practices in brand protection and anti-counterfeiting efforts including both a proactive and reactive approach, while working both in physical and online marketplaces." *Id.*

   a.    <u>Response</u>: Undisputed that Ms. Kammel offered the quoted opinion in her May 5,
        2023 expert report. However, StockX disputes the substance of Ms. Kammel's
        opinion because it is contradicted by evidence on the record: ████████████

███████████████████████████████████████████ which StockX

contends is an industry best practice in brand protection and anti-counterfeiting efforts.  Opp. DX 9, Pallett Tr. at 143:16–144:12.

35.  Ms. Kammel opined that "[o]nly those authorized by Nike can authenticate Nike products.  Even if someone outside of Nike is aware of a physical difference with a counterfeit, they would still not be able to authenticate a Nike product." Kammel Opening Report at p. 25.

a.  <u>Response</u>: Undisputed that Ms. Kammel offered the quoted opinion in her May 5, 2023 expert report.  However, StockX disputes that "only those authorized by Nike can authenticate Nike products.  Even if someone outside of Nike is aware of a physical difference with a counterfeit, they would still not be able to authenticate a Nike product" because this opinion is unsupported and contradicted by evidence in the record.

b.  First, Ms. Kammel's opinion is contradicted by materials she relied on in forming her opinion which state that individuals other than the IP rights holder can authenticate products: (1) the International Organization for Standardization ("ISO") Standard 22383:2020 she relied on states "overt authentication" can also be done by "informed inspectors, such as consumers, store clerks and check-out staff", Opp. DX 31, ISO Standard 22383:2020, 4.3.5.2 Overt category; (2)  Ms. Kammel's 2022 INFORM Consumers Act article states a "third party seller" can "authenticate [a] genuine product", Opp. DX 32, Kari Kammel, A-CAPP Center Report, "INFORM Consumers Introduction into the America Competes Act", Feb. 11, 2022, at 2; and (3) a Center for Anti-Counterfeiting and Product Protection ("A-CAPP") article Ms. Kammel considered in connection with her report states that

"consumers make an effort to protect themselves against deception and financial loss through their own process of product authentication." Opp. DX 33, Zoltan-Levente Fejas and Jeremy Wilson, Center for Anti-Counterfeiting and Product Protection, "The Use of Cues in the Consumer Product Authentication Process", 2013, at 2. *See also* Opp. DX 34, Expert Report of Kari Kammel (May 5, 2023) ("Kammel Rep.") at 21. Ms. Kammel discussed her affiliation to A-CAPP and role as Assistant Director of the Center at length during her deposition, particularly in describing her experience with brand protection efforts, and testified that at her deposition, she was "acting as an expert witness based on [her] position at A-CAPP." Opp. DX 35, Dep. Tr. of Kari Kammel ("Kammel Tr."), 16:15–19; 17:8–15; 18:20–25; 21:18–23; 55:2–60:13. As the Court noted in its Daubert Opinion, these "additional definitions" of authentication are "appropriate grounds for cross-examination" of Ms. Kammel. Daubert Opinion (ECF No. 250) ("Daubert Op.") at 21 n. 21.

c.    Second, there is evidence in the record showing that Nike recognizes that StockX is able to successfully authenticate Nike products. In 2020, Nike employees contacted StockX employees regarding a pair of Nike Air Jordan 11 Retro Jubilee 25th Anniversary sneakers that were available on StockX's website in a size not produced by Nike. Opp. DX 36, NIKE0029089. In a letter dated December 28, 2020, Nike wrote to StockX that it attempted to purchase the Air Jordan 11 product, but "the transaction was rejected after the item failed to pass StockX's authentication check." Opp. DX 36, NIKE0029089. In the same letter, Nike said StockX and Nike were "aligned on ensuring consumers only receive authentic

product." Opp. DX 36, NIKE0029089. Nike and StockX employees exchanged emails about the product and Brian Fogarty, VP Global Litigation and Investigations at Nike, wrote, "[w]e appreciate that StockX takes this issue seriously and promptly acted to remove the product." Opp. DX 37, NIKE0030428.

d.    Third, there is evidence in the record that Nike's ███████████████████

███████████████████████ For instance, in the context of this case, ████

████████████████████████████████████████████

████████████████ Opp. DX 5, NIKE0025918; Opp. DX 6, NIKE0039044;

Opp. DX 7, Delli Carpini Tr. 196:3–4. ██████████████████████

██████████████████████████████████████████████

Opp. DX 5, NIKE0025918. Nike itself admits ████████████████████

████████████████████████████████████ Nike Mot. at

3; Opp. DX 8, Rizza Tr. 113:23–114:12 (explaining that Nike's spreadsheet ████

███████████████████████████████████████████

███████████████████████████████████████████

████████████ Further, ████████████████████████

██████████████████████████████████████████████

████ Opp. DX 9, Pallett Tr. 16:17–17:8 (Nike must █████████████

████████████████████████ Mr. Pallett, Nike's Director, Brand

Protection, Authentication and Innovation, testified that ████████████████

███████████████████████████████████████████

██████████████████████████████ Opp. DX 9,

Pallett Tr. 165:5–18. For example, Mr. Pallett testified that ████████████



Opp. DX 9, Pallett Tr. 165:19–167:23. ▮▮▮▮▮▮▮▮▮▮

Opp. DX 9, Pallett Tr. 167:14–172:20. ▮▮▮▮▮▮▮▮▮

. Opp. DX 9, Pallett Tr. 134:6–15 (testifying that ▮▮▮▮▮▮▮▮

▮▮▮▮▮ Opp. DX 10, NIKE0037982 (▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮ Opp. DX 10, NIKE0037982; Opp. DX 11, NIKE0037984; Opp. DX 12, NIKE0037849; Opp. DX 13, NIKE0037856; Opp. DX 14, NIKE0038038; Opp. DX 15, NIKE0038039.

e.    Fourth, Nike representatives have stated to StockX customers that Nike cannot tell if Nike-branded products sold on StockX are authentic or not. *See, e.g.*, Opp. DX 38, NIKE0039100 ("We can not tell if a product is counterfeit do we have a service to confirm authenticity StockX is also not included to our authorized retailer… We can not tell if a product is counterfeit specially if it was purchase from other store which is not listed to our authorized retailer. There is a chance the the shoe is fake due to the difference on the letters however we are unable to 100% guarantee."); Opp. DX 38, NIKE0039100 ("There is no specific way to tell you if the product is authentic or not item purchased in StockX."); Opp. DX 39, NIKE0039094 ("The

item bought from StockX, we can not confirm if it is a genuine Nike product.").



Opp. DX 21, NIKE0036670 at 704 (identifying the

" Opp. DX 21, NIKE0036670 at 694.

## V.   StockX

36.   StockX LLC is organized as a Michigan LLC with its principal place of business located at 1046 Woodward Avenue, Detroit, Michigan 48226.  StockX maintains various offices and/or facilities located in New York, California, and Oregon, including a store and drop-off facility located at 237 Lafayette Street, New York, New York 10012.  (FAC ¶ 17; StockX Answer ¶ 17.)

a.   <u>Response</u>: Undisputed.

37.   StockX owns and operates StockX.com (the "StockX Website") and StockX mobile application (the "StockX App"), where StockX conducts its online commercial activities. (FAC ¶ 18; StockX Answer ¶ 18).

a.   <u>Response</u>: Undisputed.

### A.   StockX's Business Model

38.   StockX provides an online platform for the resale of sneakers, apparel, electronics, collectibles, trading cards and accessories.  (FAC ¶ 48, StockX Answer ¶ 48).

a.   <u>Response</u>: Undisputed.

28

39.    StockX is an online global platform that provides access to items of current culture, included coveted sneakers, apparel collectible, trading cards, and accessories, among other products, by connecting individual buyers and sellers from around the world.  (StockX Answer at p. 2).

a.    <u>Response</u>: Undisputed.

40.    StockX is a secondary market platform through which products including sneakers, apparel, luxury handbags, electronics, and other collectible goods are resold. (StockX Answer ¶ 3).

a.    <u>Response</u>: Undisputed.

41.    While StockX users can buy and sell goods from each other, they can also buy goods directly from StockX in limited circumstances.  (StockX Answer ¶ 8.)

a.    <u>Response</u>: Undisputed, but noting this appears in StockX's Answer ¶ 48, not ¶ 8.

42.    StockX is not an authorized distributor of Nike goods.  (StockX Answer ¶ 48).

a.    <u>Response</u>: Undisputed that StockX is not an authorized distributor of Nike goods. However, StockX disputes that Paragraph 42 sets out a material fact to any claims or defenses in this case because StockX is a resale marketplace, and Nike's authorization is unnecessary for the resale of Nike sneakers.  Ford. Decl. Suppt. Mot. Summ. J. (ECF No. 257) Ex. ("DX") 15, Erin Griffith, The New York Times, "Buy Low Tops, Sell High-Tops: StockX Sneaker Exchange Is Worth $1 Billion," June    27,    2019,    https://www.nytimes.com/2019/06/26/technology/trading-sneakers-stockx.html; DX 14, NIKE0035800 at 804 ("Detroit-based mobile marketplace matches buyers and sellers of sneakers (deadstock only), streetwear, handbags and watches").

29

43.    For the sale of shoes on StockX's online platform, the seller ships the goods to StockX, StockX authenticates the goods using a proprietary, multi-step authentication process, StockX ships the goods to the buyer, and StockX pays the seller less a transaction fee.  (FAC ¶ 49; StockX Answer ¶ 49).

    a.    <u>Response</u>: Undisputed.

**B.    StockX's "Authentication" Process**

44.    Unlike most online marketplaces, which do not authenticate goods sold on their platforms, StockX uses a proprietary, multi-step authentication process for every product sold on its platform.  This process ensures that items traded on StockX conform to the product condition standards advertised by StockX, and that the products offered for sale are what they claim to be, and are not counterfeit, defective, or used—meaning StockX's customers can trust that transactions made through StockX are safe. (Dkt. No. 21 at 2).

    a.    <u>Response</u>: Undisputed.  However, StockX disputes the inference that no other online marketplaces take steps to verify the authenticity of products sold on their platforms.  For example, eBay, Flight Club, the RealReal, Stadium Goods, and GOAT have taken various measures to verify the authenticity of sneakers and other products sold through their platforms to make resale transactions safer and more secure.  Opp. DX 17, Wells Rep. ¶ 105 (discussing GOAT use of machine learning to identify potential counterfeits); Opp. DX 40, Expert Report of Catherine Tucker (May 5, 2023) ("Tucker Rep.") ¶¶, 27, 37, 46–47 (discussing eBay, GOAT, Flight Club, and Stadium Goods as platforms that offer authentication services); DX 55, STX0805901 (eBay explaining its authentication process); DX 56, STX0805880 (Flight Club explaining that all inventory is "Guaranteed Authentic"), DX 57, STX0805882 (Flight Club explaining that all shoes sold on its platform are

"authenticated" and "verified"); DX 58, The RealReal, "We Authenticate Every Item," https://promotion.therealreal.com/therealreal-experts/#; DX 59, STX0805899 (in response to an FAQ: "How do I know if the Items are real," GOAT explains that it offers an "Assurance of Authenticity"); DX 60, GOAT, "Assurance of Authenticity," https://www.goat.com/verification ("Our resale products and our trusted partners are verified or vetted by a variety of means, such as digital authentication, in-hand verification, and/or machine learning technology."); DX 61, ZDNet, "GOAT Uses Machine Learning, Computer Vision to Verify Your Top Dollar Sneakers Are Authentic," August 19, 2018, https://www.zdnet.com/article/goat-uses-machine-learning-computer-vision-to-verify-your-top-dollar-sneakers-are-authentic/ ("[W]hen that shoe is purchased, the seller ships it to us to verify. And we verify that product the same day using our sophisticated machine learning and computer vision, and our industry knowledge. And release the funds to the seller. And then we ship that product to the buyer to purchase."); DX 62, Niche Pursuits, "Is Flight Club legit? Get all the info to help you decide," November 2, 2022, https://www.nichepursuits.com/is-flight-club-legit ("Flight Club sells new products sourced through retail channels and second-market goods using the consignment model. Sellers send in their shoes, and Flight Club verifies the sneakers before marketing them online or in one of three stores."); DX 63, Stadium Goods, "Is Stadium Goods Legit?," December 20, 2022, https://www.stadiumgoods.com/en-us/article/is-stadium-goods-legit ("Stadium Goods is the only aftermarket that pre-authenticates its entire inventory.").

45.     While StockX's authentication process is critically important, it does not come without costs.  Upon each sale, the seller ships the product to one of StockX's eleven authentication centers around the world; StockX performs its multi-step authentication process; and StockX then ships the product to the buyer and ensures that the seller is paid.  (Dkt. No. 21 at 2).

a.     <u>Response</u>: Undisputed that Paragraph 45 is accurate as of March 31, 2022.

46.     In June 2022, StockX published "Big Facts: Verified Authentic" which stated that "[j]ust over 35 million products have gone through StockX's authentication process, and the team has grown to include more than 300 authenticators worldwide." Duvdevani Decl. ¶ 43, Ex. 42 at NIKE0006778.

a.     <u>Response</u>: Undisputed that a nearly identical (and immaterially different) version of the quoted text appears in StockX's "Big Facts: Verified Authentic" publication, which was released in June 2022, and states that "[j]ust over 35 million products have gone through StockX's "authentication process" (which StockX now refers to as its "verification process," and which is referred to herein as "StockX's Process"), and the team has grown to include more than 300 authenticators *around the world*." PX 42 at NIKE0006778.

47.     From June 2020 to June 2022, StockX increased its operations from 6 authentication centers to 12 authentication centers.  Duvdevani Decl. ¶ 44, Ex. 43 at STX0018012.

a.     <u>Response</u>: Undisputed.

48.     By 2023, StockX employed more than 1,500 employees working in 14 authentication centers around the world and, on average, 1,000,000 products went through StockX's Process each month.  Duvdevani Decl. ¶ 44, Ex. 44 at NIKE0064442-44.

a.     <u>Response</u>: Undisputed.

49.     Nike is not affiliated with, nor does it endorse, sponsor or approve of StockX's "authentication" process. Pallett Decl. ¶ 7.

a.  <u>Response</u>: Undisputed that Mr. Pallet's August 8, 2024 declaration contains this statement.   However, StockX disputes ███████████████████████████████ ████████████████████████████████████████████████████ ███████████████

b.  Between 2017 and 2019, Nike ████████████████████████████████ ████████████████████████████████████████████████████ ███████████████ Opp. DX 2, Paulson Tr. 77:20–78:23; 83:10–14; Opp. DX 25, NIKE0035739.

c.  ████████████████████████████████████████████████████ ███████████████ For example, on September 12, 2018, Nike asked to meet with StockX's team in Detroit because they were a "huge fan of what [StockX was] building" and wanted StockX's thoughts on some of Nike's efforts around authentication.  Opp. DX 41, NIKE0038174.  In addition, in October 2018, following a visit to StockX and tour of its authentication center in Detroit, Nike employees remarked that the "tour of Detroit was incredible" and that "it [was] exciting to see what [StockX was] doing there."  Opp. DX 42, NIKE0037191.

d.  Further, in December 2020, when StockX stopped an inauthentic Nike product from reaching the market, Nike and StockX employees exchanged emails about the product and Brian Fogarty, VP Global Litigation and Investigations at Nike, wrote, "[w]e appreciate that StockX takes this issue seriously and promptly acted to remove the product."  Opp. DX 37, NIKE0030428.

e.    In 2021, a Nike employee, Joe Pallett, introduced StockX to agents at the Department of Homeland Security so that StockX could learn more about the "IPR Center's E-Commerce Working Group" and "how StockX may fit in it."  Opp. DX 43, NIKE0030430.

f.    As recently as 2022, Nike representatives have recommended StockX as a platform to purchase Nike products from.  *See, e.g.*, Opp. DX 39, NIKE0039094 ("I think that StockX is a good place to buy this product"); Opp. DX 38, NIKE0039100 ("Unfortunately, [this product] is no longer available. . . . however you can find some that are selling original products!  I think that StockX is a good place to buy this product"); Opp. DX 44, NIKE0039092 ("Stockx is not one of our currently listed authorized retailers but it does not mean that the product they have is not authentic. We have other Jordans that are coming up.  I am no longer able to[] [see] that style on the link as it is no longer available but the style number of the shoes you wanted is DC7294-200 which is the same as what you see on Stockx.")

50.    On October 18, 2021, a StockX customer service representative responded to a consumer stating: "I am reviewing your case and what you mention, I understand that you feel frustrated with the decision of our authenticators. However, I assure you that our team is trained extensively and directly from the brands to spot any irregularities in the items we receive." Duvdevani Decl. ¶ 46, Ex. 45 at STX0783979-980.

a.    <u>Response</u>: Undisputed that a StockX customer service representative offered the quoted statement on October 18, 2021.  However, StockX disputes Nike's characterization of, and any inferences purportedly drawn from, PX 45 as misleading and irrelevant insofar as nothing in PX 45 indicates that the customer

service complaint at issue related to a Nike product and nothing in PX 45 indicates the customer service representative statement's concerning training pertained to training on how to spot inauthentic products; the only Nike product referenced in PX 45 was a prior product that was rejected "because the wrong size was sent." PX45 at STX0783980; *see also id.* at STX0783975 ("THIS IS THE SECOND TIME I GET REJECTED FOR SELLING SOMETHING THAT'S NOT FAKE, THE FIRST WAS A PAIR OF NIKE SHOES FOR WOMEN, I CAN PROVIDE A RECIEPT FOR IT TOO.").  StockX further disputes that this statement by a single employee is sufficient to establish all underlying facts set forth in Paragraph 50, at all times and for all purposes in this litigation, including as to any belief or understanding held by StockX.

b.     StockX further disputes Paragraph 50 because StockX's Authentication Webpage clarifies that "StockX Verified is our own designation and not endorsed by any brands sold on StockX."   DX 77, NIKE0040098; *see also* Opp. DX 45, NIKE0040010 at 011 (September 2022 StockX Help Center page states "StockX is not affiliated with any of the brands we sell on the Platform.  StockX Verified is our own designation and not endorsed by any brands sold on StockX."); Opp. DX 46, NIKE0041144 at 145 (November 10, 2022 StockX tweet stating same).

51.     StockX's guarantee is that it "verif[ies] every single item" and that "you are going to get an item that is exactly as expected" including "that this item would be a legitimate item from the manufacturer." Duvdevani Decl. ¶ 47 Ex. 46 June 29, 2023, Videotaped Deposition of Brock Huber ("Huber June Tr.") at 14:1-10.

a.    <u>Response</u>: Undisputed that Mr. Huber offered the quoted testimony; however, StockX disputes Nike's characterization of the quoted testimony as misleading because Nike omits additional context necessary to understand the quoted testimony. Mr. Huber was responding to questions about StockX authenticators reinspecting items and suspecting they were not authentic, and Mr. Huber was explaining other elements StockX's Process looks at besides the item "potentially being inauthentic." PX 46 at 12:15–13:25. As Mr. Huber testifies, StockX's "guarantee" is "if we mess up, we make a mistake, we will make it right. And we stand by our work and get in touch with the customer service, if it's suspected to be inauthentic, if it's the wrong size, if it is used, we give you your money back." Opp. DX 47, Dep. Tr. of Brock Huber on June 29, 2023 ("Huber June Tr.") 88:15–20. This guarantee is also reflected in StockX's advertising which has provided, since at least October 2018, that a buyer could return an item if it "receive[d] an item that it believe[d] to be counterfeit." Opp. DX 49, Dep. Tr. of John L. Hansen ("Hansen Tr.") 55:1–61:14; DX 39, Hansen Dep. Ex. 6.

b.    StockX further disputes Paragraph 50 because StockX's Authentication Webpage clarifies that "StockX Verified is our own designation and not endorsed by any brands sold on StockX." DX 77, NIKE0040098; *see also* Opp. DX 45, NIKE0040010 at 011 (September 2022 StockX Help Center page states "StockX is not affiliated with any of the brands we sell on the Platform. StockX Verified is our own designation and not endorsed by any brands sold on StockX."); Opp. DX 46, NIKE0041144 at 145 (November 10, 2022 StockX tweet stating same).

52.     StockX authenticators use StockX's ███████████████████████████

███████████████████████████████ when authenticating a Nike or Jordan

branded pair of shoes. Duvdevani Decl. ¶ 48 Ex. 47; Duvdevani Decl. ¶ 49, Ex. 48, Feb. 23, 2023

Videotaped Deposition of John Lopez ("Lopez Tr.") at 132:13-22, 135:20-136:05, 174:11-15.

    a.     <u>Response</u>: Undisputed that StockX authenticators use StockX's ████████

███████████████ when authenticating a Nike or Jordan branded pair of sneakers.

However, StockX disputes any inference that it uses only the ████████

██████████████████, to the exclusion of other resources. In addition to the ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████ Opp. DX 18, Lopez Tr. 199:6–199:11; *see also* 204:10–

205:25; 208:1–209:05; 214:08–24. StockX also:

    b.     Employs a quality control team that ████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████" Opp.

DX 18, Lopez Tr. 122:4–7.

    c.     Employs Quality Assurance and Authentication Quality Assurance ("AQA")

specialists to assist in instances in which a product issue is flagged. Opp. DX 48,

Dep. Tr. of Brock Huber on February 22, 2023 ("Huber Feb. Tr.") 21:11–22:24.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ Opp. DX 48, Huber Feb. Tr. 21:11–22:24.

████████████████████████████████████████████

Opp. DX 48, Huber Feb. Tr. 21:11–22:24.

d.    Has AQA specialists ███████████████████████

████████████████████████████████████████████

Opp. DX 18, Lopez Tr. 26:17–27:4.

e.    Uses proprietary authentication software and techniques, including a Machine

Learning Model which ███████████████████████

██████████. DX 110, STX0023851 at 856.  ████████████

████████████████████████ DX 110, STX0023851 at 856. ████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████ DX 110, STX0023851 at 857.

53.    StockX does not determine "whether something is considered counterfeit or not."

Ex. 46, Huber June Tr. at 10:6-16.

a.    <u>Response</u>: Disputed because Paragraph 53 misstates Mr. Huber's testimony, that

StockX "[d]oesn't make definitive legal determinations as to whether something is

counterfeit or not," but instead looks for "suspicious attributes" of items

[p]otentially being inauthentic."  PX 46 at 10:14–16; 13:18–25.  As part of its

Process, if StockX believes that an item is counterfeit, it rejects that item.  DX 79,

NIKE0005910 at 911; Opp. DX 48, Huber Feb. Tr. 25:14–23 (explaining that "if

an item has characteristics that might make [StockX's] authentication team

suspicious, we will not allow it to trade"); Opp. DX 48, Huber Feb. Tr. 245:10—19

(explaining that StockX will correct for any potential areas of disappointment found during the authentication process "before the buyer takes receipt of the product").

54. ███████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████ Ex. 48, Lopez Tr. at 178:10-179:1.

a.    <u>Response</u>: Undisputed that Mr. Lopez offered the quoted testimony. However, StockX disputes Paragraph 54 because it omits additional context necessary to understand the testimony. ██████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████ Opp. DX 18, Lopez Tr. 179:2–6.

55.    It takes a StockX authentication, on average, ████████████████ to review a particular product. Duvdevani Decl. ¶ 50, Ex. 49, Feb. 22, 2023 Videotaped Deposition of Brock Huber ("Huber Feb. Tr.") at 66:24-67:1.

a.    <u>Response</u>: Undisputed that Mr. Huber offered the quoted testimony. However, StockX disputes Nike's characterization of the quoted testimony because Paragraph 55 omits additional context necessary to understand the quoted testimony. The "average" time to review a particular product will vary, and the "average" time ██████████████████████████████████████████" *See* DX 75, STX0752605 at 606; Opp. DX 18, Lopez Tr. 119:25–120:7 (The amount of time it takes StockX authenticators to ████████████████ and verify a product varies). Further, StockX disputes the implication that a visual inspection is the only component of StockX's Process. ████████████████████



███████ Opp. DX 47, Huber June Tr. 42:2–46:3; 60:15–19 (StockX monitors seller details and activity to ensure StockX identifies fraudulent sellers and bans them from selling on its platform). StockX's fraud team investigates other indicators for possible fraud ███████

███████ Opp. DX 50, STX0108368-369 ███████

███████ StockX also provides "detailed data about historical prices and live bids and asks for items on the platform" which "helps ensure that neither buyers nor sellers trade at an unfair price on the platform, and it further discourages the sale of counterfeits by drawing attention to prices that are too low to be credible." Opp. DX 40, Tucker Rep. ¶¶ 9, 44–45. StockX employs a quality control team that ███████

███████

███████" Opp. DX 18, Lopez Tr. 122:4–7. StockX Quality Assurance and AQA specialists to assist in instances in which a product issue is flagged. Opp. DX 48, Huber Feb. Tr. 21:11–22:24. ███

███████

███████

███████ Opp. DX 48, Huber Feb. Tr. 21:11–22:24. The AQA specialists ███████.

Opp. DX 48, Huber Feb. Tr. 21:11-22:24. StockX AQA specialists ███████

███████

███████ Opp. DX 18, Lopez Tr. 26:17-27:4. StockX also uses

proprietary authentication software and techniques, including a Machine Learning

Model ███████████████████████████████████████████████

██ .  DX 110, STX0023851 at 856.  █████████████████████████

███████████████████████  DX 110, STX0023851 at 856.  █████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████  DX 110, STX0023851 at 857.  StockX also has "policies in

place that punish and ban sellers who attempt to not uphold their end of the sales

contract:  either not shipping it to us, shipping the wrong item, shipping the wrong

size, shipping it used, shipping without accessories, shipping it with a missing or

damaged box, shipping a product that has significant variances, so as to raise

suspicion of our authentication process. . . . by punishing these sellers through

penalty fees, through outright banning, it has become a less -- we have become a

less desirable avenue."  Opp. DX 48, Huber Feb. Tr. 136:20–137:6; Opp. DX 40,

Tucker Rep. ¶ 42 (StockX works to ensure "that only reliable buyers and sellers use

the platform" by suspending the accounts of "sellers who repeatedly do not

complete sales or send in items that fail verification.").

56. █████████████████████████████████████████████

█████████████████████████  Ex. 46, Huber June Tr. 70:2-12.

a.  <u>Response</u>:  Undisputed that Mr. Huber offered the quoted testimony.  However,

StockX disputes Nike's characterization of the quoted testimony because Paragraph

56 omits additional context necessary to understand the quoted testimony.  Mr.

Huber testified that the ███████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████ PX 46 at 70:05–8.  StockX

takes many steps to audit and quality check its Process, such as:

b.     Employing a quality control team that ████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████ Opp.

DX 18, Lopez Tr. 122:4–7.

c.     Employing Quality Assurance and AQA specialists to assist in instances in which

a product issue is flagged.  Opp. DX 48, Huber Feb. Tr. 21:11–22:24.  ████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████ Opp. DX 48, Huber Feb. Tr. 21:11–22:24.  ███

███████████████████████████████████████████ Opp.

DX 48, Huber Feb. Tr. 21:11–22:24.

d.     Having AQA specialists conduct an additional round of review and make the final

determination as to whether a product passes StockX's Process.  Opp. DX 18,

Lopez Tr. 26:17-27:4.

**C.     StockX's Authenticity Advertising Claims**

57.     As of the date Nike filed this action on May 25, 2022, StockX product description

pages included the statement "100% authentic." (StockX Answer ¶ 78.)

a.     <u>Response</u>: Undisputed that the quoted text appeared on StockX product description

pages.  However, StockX disputes that the quoted text appeared without relevant

context, including a direct link to the StockX Authentication webpage, located at

https://stockx.com/about/authentication.  *See* Nike's Rule 56.1 Statement (ECF No.

260) ("Pls. 56.1"), ¶ 58.

58.    Between at least November 2017 and May 2022, product pages for Nike or Jordan

shoes sold on StockX stated "100% Authentic."  Duvdevani Decl. ¶ 51, Ex. 50 (Internet Archive

collection of screenshots of Nike and Jordan brand shoes bearing "100% Authentic" claim);

Duvdevani Decl. ¶ 52, Ex. 51 (NIKE0000016); *id.* ¶ 53, Ex. 52 at NIKE0039888-98,

NIKE0039924-25, NIKE0039936-37. Between at least February 2021 and August 2022, clicking

on the "100% Authentic" button brought the user to StockX Authentication webpage, located at

https://stockx.com/about/authentication.  Duvdevani Decl. ¶ 54 Ex. 53 at StockX's First

Supplemental Objections and Responses to Plaintiff's Interrogatory No. 20; Duvdevani Decl. ¶ 51,

Ex. 50.



Duvdevani Decl. ¶ 53, Ex. 52 (excerpt of NIKE0039888).

a.    <u>Response</u>: Undisputed that between November 2017 and May 2022, product pages

for Nike or Jordan shoes sold on StockX included the quoted text and that those

pages linked to the StockX Authentication webpage, located at

https://stockx.com/about/authentiction, which provided additional context about StockX's Process, such as the expandable FAQs and "StockX Authentication: By the Numbers" statistics.  *See, e.g.*, PX 50, Part 1, pp. 39–40, 45–46.  The "Can I return my item after I've received it?" option under the <u>FAQs</u> linked to a description of StockX's return policy, which provided steps a buyer could take if it "received an item that it believes to be a counterfeit."  *See* DX 39 at 2.





59.    StockX used the advertising claim "100% Verified Authentic" on its website from at least 2018 through August 2022.  Duvdevani Decl. ¶ 54 Ex. 53 at StockX's First Supplemental Objections and Responses to Plaintiff's Interrogatory No. 20; *id.* ¶ 55, Ex. 54 at NIKE0006786; *id.* ¶ 56, Ex. 55 at NIKE0000281; *id.* ¶ 57, Ex. 56 at NIKE0000170.

    a.    <u>Response</u>: Undisputed that the quoted text appeared on StockX's website from 2018 through August 2022.  However, StockX disputes that the quoted text represents the entirety of the StockX website or appeared without relevant context. The quoted text appeared alongside additional statements, including:

    b.    "Over the years, [StockX's] team members have authenticated tens of millions worth of products at a **99.96% accuracy rate**," explained as the "measurement of the accuracy of [StockX's] platform's product authentication process based on

weighted return data compared to total authentications."  PX 54 at NIKE0006788

(emphasis added).



c.    "FAQs" which included a section on "Can I return my item after I've received it?"

that linked to a description of StockX's return policy.  StockX's return policy

provided steps a buyer could take if it "**received an item that it believes to be**

**counterfeit**."  *See* DX 39 at 2 (emphasis added).

d.    Extensive process-oriented statements which explain that every item goes through

StockX's Process: "**Trust the Process**" in large font; an explanation of StockX's

"**rigorous, multi-step verification procedure**" and use of "100+ data point" and

"machine learning"; pictures and videos of authenticators visually inspecting

products.   *See*  PX  54  at  NIKE0006786  (StockX  Authentication  Webpage)

(emphasis added); PX 55 at NIKE0000281 (StockX Authentication Webpage); PX

50 Part 1 at 37–51 (StockX Authentication Webpage).

## Trust The Process

Our global team of expert authenticators uses a rigorous, multi-step verification procedure that includes the following checkpoints:





**Condition**

We only allow deadstock on our marketplace. That means every item bought or sold must be brand new and never worn.



**Construction**

With checklists of 100+ data points, our authenticators are better equipped than anyone to ensure a product's authenticity.



**Packaging**

Equally important as the product itself, our team ensures packaging meets the highest quality standards to deliver a brand new product.



**Accessories**

From the full list of accessories to all the additional add-ons, rest assured that your purchase on StockX will match any retail purchase experience.



**Advanced Technology**

We use machine learning to aid our authenticators in catching every minor detail.



**Quality Assurance**

A final check in our authentication practice, our QA experts ensure nothing slips through the cracks.



60.     The advertising claim "Always Authentic, Never Fake" appeared on StockX's website from at least July 2, 2018 through August 30, 2022. Duvdevani ¶ 54, Ex. 53 at StockX's First Supplemental Objections and Responses to Plaintiff's Interrogatory No. 20; *id.* ¶ 53 Ex. 52 at NIKE0039855-56.

      a.    <u>Response</u>: Undisputed that the quoted text appeared on StockX's website from at least July 2, 2018 through August 30, 2022.  However, StockX disputes that the quoted text represents the entirety of the StockX website or appeared without relevant context.  The quoted text appeared in a StockX Magazine article which contained various other advertising claims, including:

     b.     "As a result of our authentication process, **less than .3% of customers are ever unhappy with their products**"; and

     c.     Extensive process-oriented statements which explain that every item goes through StockX's Process: "**Every item bought and sold on StockX goes through a rigorous authentication process**."   PX 52 at NIKE0039855–856 (emphasis added).

+ We perform a 2-stage process for identifying fakes

+ Step 1: Verification

   + During the verification process, we verify everything about the product.

   + We verify product accuracy: does the product match the invoice

   + We verify size: You might think this is a simple, but we have to check this every time.

   + We verify color: You need to be able to flex in the right colorway.

   + We verify condition: we evaluate deadstock quality and check for any and all product defects

+ Step 2 is Authentication: A multi-point inspection across the entire product making sure the buyer gets the authentic product, never fake.

   + We verify and perform a detailed review of the packaging: are the boxes undamaged; do they match the product; is the packaging legit

   + We verify and perform a detailed review of all product materials: are all the materials used in the product real. All leather, no pleather, never fake.

   + We verity and perform a detailed review of product construction: do all seams, stitching, glueing, and other construction details correspond to the product

+ As a result of our authentication process, less than .3% of customers are ever unhappy with their products

     61.     On or about July 2, 2018, StockX posted an article about its Authentication process titled "StockX. Always Authentic. Never Fake." on its website at https://stockx.com/news/always-authentic-never-fake.   Duvdevani Decl. ¶ 53 Ex. 52 at NIKE0039855-56; *id.* ¶ 54, Ex. 53 at

StockX's First Supplemental Objections and Responses to Plaintiff's Interrogatory 20.  This article stated: "Now with StockX, you're guaranteed that the goods you purchase are 100% verified authentic, never fake."  Duvdevani Decl. ¶ 53 Ex. 52 at NIKE0039855.

    a.    <u>Response</u>: Undisputed that on or about July 2, 2018, StockX posted an article about its Process titled "StockX.  Always Authentic. Never Fake".  However, StockX disputes that this statement represents the entirety of the StockX Magazine article on which it appeared or that it appeared without relevant context.  The StockX Magazine article also contained various other statements, including:

    b.    "As a result of our authentication process, **less than .3% of customers are ever unhappy with their products**"; and

    c.    Extensive process-oriented statements which explain that every item goes through StockX's Process: "**Every item bought and sold on StockX goes through a rigorous authentication process**".  PX 52 at NIKE0039855-56 (emphasis added).

62.    Between at least "late 2020" and August 2022, StockX used the phrase "Guaranteed Authenticity" in connection with products sold on the StockX platform.  Duvdevani Decl. ¶ 54, Ex. 53 at StockX's First Supplemental Objections and Responses to Plaintiff's Interrogatory No. 20; Duvdevani Decl. ¶ 51, Ex. 50.

    a.    <u>Response</u>: Undisputed that between late 2020 and August 2022, StockX used the quoted text on its Authentication webpage, located at https://stockx.com/about/authentication.  However, StockX disputes that the quoted text represents the entirety of the StockX Authentication webpage or appeared with relevant context.  StockX's Authentication webpage included many other statements, including:

b.    "Over the years, [StockX's] team members have authenticated tens of millions worth of products at a **99.96% accuracy rate**" explained as the "measurement of the accuracy of [StockX's] platform's product authentication process based on weighted return data compared to total authentications."  PX 54 at NIKE0006788 (emphasis added).



c.    "FAQs" included "Can I return my item after I've received it?" linked to a description of StockX's return policy.  StockX's return policy provided steps a buyer could take if it "**received an item that it believes to be counterfeit**."  *See* DX 39 at 2 (emphasis added).

d.    Extensive process-oriented statements which explain that every item goes through StockX's Process: "**Trust the Process**" in large font; an explanation of StockX's "**rigorous, multi-step verification procedure**" and use of "100+ data point" and "machine learning"; pictures and videos of authenticators visually inspecting products.  *See* PX 54 at NIKE0006786 (StockX Authentication Webpage) (emphasis added); PX 55 at NIKE0000281 (StockX Authentication Webpage); PX 50 Part 1 at 37–51  (StockX Authentication Webpage).

## Trust The Process

Our global team of expert authenticators uses a rigorous, multi-step verification procedure that includes the following checkpoints:





**Condition**

We only allow deadstock on our marketplace. That means every item bought or sold must be brand new and never worn.



**Accessories**

From the full list of accessories to all the additional add-ons, rest assured that your purchase on StockX will match any retail purchase experience.



**Construction**

With checklists of 100+ data points, our authenticators are better equipped than anyone to ensure a product's authenticity.



**Advanced Technology**

We use machine learning to aid our authenticators in catching every minor detail.



**Packaging**

Equally important as the product itself, our team ensures packaging meets the highest quality standards to deliver a brand new product.



**Quality Assurance**

A final check in our authentication practice, our QA experts ensure nothing slips through the cracks.



63.    Between at least February 2021 and August 2022, StockX's website featured an Authentication webpage, located at https://stockx.com/about/authentication, that stated "Guaranteed Authenticity. Every item. Every time. Shop on StockX with complete confidence knowing every purchase is 100% Verified Authentic." Duvdevani Decl. ¶ 54, Ex. 53 at StockX's First Supplemental Objections and Responses to Plaintiff's Interrogatory No. 20; *id.* ¶ 55, Ex. 54 at NIKE0006786 (excerpted below); *id.* ¶ 56, Ex. 55 at NIKE0000281.



a.      Response: Undisputed that between at least February 2021 and August 2022,

        StockX's website featured an Authentication webpage, located at

        https://stockx.com/about/authentication, that included the quoted text.  However,

        StockX disputes that the quoted text (or the selected screenshot from PX 54)

        represents the entirety of the StockX Authentication webpage or appeared without

        relevant context.   StockX's Authentication webpage included many other

        statements, including:

b.      "Over the years, [StockX's] team members have authenticated tens of millions

        worth of products at a **99.96% accuracy rate**" explained as the "measurement of

        the accuracy of [StockX's] platform's product authentication process based on

        weighted return data compared to total authentications."  PX 54 at NIKE0006788

        (emphasis added).



c.      "FAQs" included "Can I return my item after I've received it?" linked to a

description of StockX's return policy.  StockX's return policy provided steps a

buyer could take if it "**received an item that it believes to be counterfeit**."  *See*

DX 39 at 2.

d.      Extensive process-oriented statements which explain that every item goes through

StockX's Process: "**Trust the Process**" in large font; an explanation of StockX's

"**rigorous, multi-step verification procedure**" and use of "100+ data point" and

"machine learning"; pictures and videos of authenticators visually inspecting

products.  *See* PX 54 at NIKE0006786 (StockX Authentication Webpage); PX 55

at NIKE0000281 (StockX Authentication Webpage); PX 50 Part 1 at 37–51

(StockX Authentication Webpage).

# Trust The Process

Our global team of expert authenticators uses a rigorous, multi-step verification procedure that includes the following checkpoints:



 **Condition**
We only allow deadstock on our marketplace. That means every item bought or sold must be brand new and never worn.

 **Construction**
With checklists of 100+ data points, our authenticators are better equipped than anyone to ensure a product's authenticity.

 **Packaging**
Equally important as the product itself, our team ensures packaging meets the highest quality standards to deliver a brand new product.

 **Accessories**
From the full list of accessories to all the additional add-ons, rest assured that your purchase on StockX will match any retail purchase experience.

 **Advanced Technology**
We use machine learning to aid our authenticators in catching every minor detail.

 **Quality Assurance**
A final check in our authentication practice, our QA experts ensure nothing slips through the cracks.



64.     The advertising claim "A final check in our authentication practice, our QA experts ensure nothing slips through the cracks." appeared on the StockX Authentication page from at least February 2021 through August or September 2022.  Duvdevani Decl. ¶ 54, Ex. 53 at StockX's First Supplemental Objections and Responses to Plaintiff's Interrogatory No. 20; Duvdevani Decl. ¶ 51, Ex. 50.

a.    <u>Response</u>: Undisputed that from February 2021 through August or September 2022, the quoted text appeared on the StockX Authentication webpage, located at https://stockx.com/about/authentication.    However, StockX disputes that the quoted text represents the entirety of the StockX Authentication webpage or

appeared without relevant context.   StockX's Authentication webpage included many other statements, including:

b.      "Over the years, [StockX's] team members have authenticated tens of millions worth of products at a **99.96% accuracy rate**" explained as the "measurement of the accuracy of [StockX's] platform's product authentication process based on weighted return data compared to total authentications."   *See* PX 54 at NIKE0006788 (emphasis added).



c.      "FAQs" included "Can I return my item after I've received it?" linked to a description of StockX's return policy.   StockX's return policy provided steps a buyer could take if it "**received an item that it believes to be counterfeit**."   *See* ECF No. 257, Ex. 39 (emphasis added).

d.      Extensive process-oriented statements which explain that every item goes through StockX's Process: "**Trust the Process**" in large font; an explanation of StockX's "**rigorous, multi-step verification procedure**" and use of "100+ data point" and "machine learning"; pictures and videos of authenticators visually inspecting products.   *See* PX 54 at NIKE0006786 (StockX Authentication Webpage)

(emphasis added); PX 55 at NIKE0000281 (StockX Authentication Webpage); PX

50 Part 1 at 37–51 (StockX Authentication Webpage).



## Trust The Process

Our global team of expert authenticators uses a rigorous, multi-step verification procedure that includes the following checkpoints:

 **Condition**
We only allow deadstock on our marketplace. That means every item bought or sold must be brand new and never worn.

 **Construction**
With checklists of 100+ data points, our authenticators are better equipped than anyone to ensure a product's authenticity.

 **Packaging**
Equally important as the product itself, our team ensures packaging meets the highest quality standards to deliver a brand new product.

 **Accessories**
From the full list of accessories to all the additional add-ons, rest assured that your purchase on StockX will match any retail purchase experience.

 **Advanced Technology**
We use machine learning to aid our authenticators in catching every minor detail.

**Quality Assurance**
A final check in our authentication practice, our QA experts ensure nothing slips through the cracks.



65.    StockX's advertising claims that products sold on its platform are "100%

Authentic," "100% Verified Authentic," "Guaranteed Authentic" "Always Verified Authentic."

"Guaranteed Authenticity. Every item. Every time." and "Always Authentic.  Never Fake."

(collectively, the "Authenticity Claims") were used in commerce on StockX's website.  Duvdevani

Decl. ¶ 54, Ex. 53 at StockX's First Supplemental Objections and Responses to Plaintiff's

Interrogatory No. 20; Duvdevani Decl. ¶ 51, Ex. 50; *see also* StockX Answer, affirmative defenses

¶ 13 (discussing "StockX's '100% Verified Authentic' and '100% Authentic' claims").

a.  <u>Response</u>:  Undisputed  that  "100%  Authentic,"  "100%  Verified  Authentic,"
"Always Verified Authentic," "Guaranteed Authenticity.  Every item. Every time,"
and "Always Authentic.  Never Fake," were used—within context (*see* StockX's
Responses to Paragraphs 57-64)—on StockX's website, in commerce; however,
StockX  disputes  that  the  cited  evidence  supports  Nike's  assertions  as  to  the
statements "Guaranteed Authentic" and "Always Verified Authentic."

## 1.    *StockX's Post-Litigation Changes to its Authenticity Advertising Claims and Communications to Consumers*

66.    In or around November 2022, StockX posted on the StockX Instagram account:
"Verification  is  the  new  authentication,  but  our  comprehensive  approach  remains
unchanged…product authenticity remains core to our analysis." Duvdevani Decl. ¶ 58, Ex. 57 at
NIKE0041163.

a.  <u>Response</u>: Undisputed that PX 57 contains the quoted text, and that StockX posted
this statement on the StockX Twitter account on November 10, 2022.  However,
StockX  disputes  Nike's  characterization  of,  and  inferences  purportedly  drawn
from,  PX  57  as  misleading  because  Paragraph  66  omits  additional  context
necessary to understand the quoted language.  Specifically, PX 57 states in addition
to the quoted language: "While product authenticity remains core to our analysis,
our verification process is a better reflection of our broader value proposition that
we provide customers by reviewing all products sold on StockX.  We look at a
range of indicators before sending a product onto a buyer and there are a number
of reasons why a product may fail to meet our elevated standard of excellence,
including  incorrect  size,  missing  accessories,  a  damaged  box,  a  manufacturer
defect, if it shows signs of previous wear, and of course, if the item is fake.  Since

our inception, StockX authenticators have reviewed more than 35 million products and we continue to invest in new technologies to use alongside human inspection and refine our policies to best serve the customer."  PX 57.

67.    On November 11, 2022, the official StockX twitter accounted tweeted: "You may have noticed we updated the name of our verification process, but the work our team does every day to meet our elevated standard of excellence has not changed." Duvdevani Decl. ¶ 59, Ex. 58 at NIKE0041099.

a.    <u>Response:</u> Undisputed that StockX posted a Tweet including the quoted text; however, StockX disputes Nike's characterization of, and inferences purportedly drawn from, PX 58 as misleading because Paragraph 67 omits additional context necessary to understand the quoted text.  Specifically, PX 58 states in addition to the quoted language: "Verification is the new authentication, but our comprehensive approach remains unchanged.  While product authenticity remains core to our analysis, our verification process is a better reflection of our broader value proposition that we provide customers by reviewing all products sold on StockX.  We look at a range of indicators before sending a product onto a buyer and there are a number of reasons why a product may fail to meet our elevated standard of excellence, including incorrect size, missing accessories, a damaged box, a manufacturer defect, if it shows signs of previous wear, and of course, if the item is fake.  Since our inception, StockX authenticators have reviewed more than 35 million products and we continue to invest in new technologies to use alongside human inspection and refine our policies to best serve the customer."  PX 58.  The Twitter post referenced in Paragraph 67 also includes a graphic titled "Reasons

Products are Rejected by StockX: (Last 12 Months)," stating that 24% of products are rejected due to "manufacturing defects," 20% due to "damaged box[es]," 16% due to "used product[s]," 14% due to "fake product[s]," 11% due to "wrong size[es]," 11% due to "wrong product[s]," and 4% due to "other reasons."  PX 58; *see also* Opp. DX 51, NIKE0041164 (showing the full Tweet, rather than a cutoff version).

68.     On November 11, 2022, Scott Cutler, CEO of StockX, re-tweeted a post from the StockX official twitter account regarding the updated name of StockX's "verification" process and tweeted himself: "Since 2016, we've invested countless resources in our comprehensive approach to ensuring product authenticity for every single customer." Duvdevani Decl. ¶ 60, Ex. 59 at NIKE0041095.

a.     <u>Response</u>: Undisputed that Mr. Cutler's November 11, 2022 re-tweet contained the quoted text; however, StockX disputes that the quoted text comprises the entirety of the content visible in connection with this retweet.  The retweet also includes a comment that Mr. Cutler posted on November 11, 2022, stating that "[StockX's] verification process is a better reflection of [StockX's] broader value proposition that [StockX] provide[s] customers by reviewing all products sold on StockX."  PX 59 at NIKE0041095.

69.     On May 11, 2022, a StockX customer reached out to StockX customer service related to Case Number: CAS-1349271-Q1X7F4 stating: "NIKE IS SAYING YOUR SELLING FAKES. HOW DO I KNOW THE SHOES I PURCHASED ARE AUTHENTIC?" Duvdevani Decl. ¶ 61, Ex. 60 at STX0779941.

i.   <u>Response</u>: Undisputed that StockX received the email referenced in Paragraph 69 and that PX 60 includes the quoted text.  However, StockX disputes that Nike has provided any evidence that any Nike product purchased via StockX by the customer that received the referenced email was inauthentic.  Further, the customer that sent the referenced email never stated that he believed the shoes he received were not authentic, never asked to return the shoes, and never asked for a refund for the shoes.  PX 60.

a.   On May 11, 2022, a StockX customer representative responded to the StockX customer related to Case Number: CAS-1349271-Q1X7F4 stating: "I understand Nike is saying our shoes are fake and you would like to know if the shoes you purchased are authentic, I really understand your position, I am a buyer as well and I know this can cause some concerns…I can confirm that at StockX, we are committed to providing customers with authentic, quality items that align with our condition standards. Our authentication team members receive consistent training to ensure they remain experts in the field…The shoes that our buyer received it's 100% legit! […] Rest assured your the shoes that you bought are 100 percent authentic." Duvdevani Decl. ¶ 61, Ex. 60 at STX0779943-45.

i.  <u>Response</u>: Undisputed that a StockX customer service representative sent the email referenced in Paragraph 69(a) and that PX 60 contains the quoted text.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, PX 60, as misleading because Paragraph 69(a) omits additional context necessary to understand the quoted text.  Specifically, PX 60 states in addition to the quoted text, "As part of our verification process, each item that passes through our facility receives a thorough inspection prior to being sent on to the Buyer.  In instances where the item does not quite meet our quality standards whether that be for manufacturing defects, deemed as worn or inauthentic, etc.  We will first attempt to link the Buyer with a new, comparable Seller when possible, and issue a full refund for the order when it is not…. I would like to inform you that we take customer protection extremely seriously, and we've invested millions to fight the proliferation of counterfeit products that virtually every global marketplace faces today.  Nike's latest filing is not only baseless but also is curious given that their own brand protection team has communicated confidence in our authentication program, and that hundreds of Nike employees including current senior executives use StockX to buy and sell products.  This latest tactic amounts to nothing more than a panicked and desperate attempt to resuscitate its losing legal case

against our innovative Vault NFT program that revolutionizes the way that consumers can buy, store, and sell collectibles safely, efficiently, and sustainably.  Nike's challenge has no merit and clearly demonstrates their lack of understanding of the modern marketplace.  StockX boasts a group of more than 300 authenticators across 11 authentication locations who have a 99.95 percent accuracy rate.  StockX currently has international offices in London, UK, in Eindhoven, the Netherlands, and has authentication facilities in Detroit's Corktown neighborhood. … Moonachie, NJ, and Tempe, AZ. … With over 1,000 employees and six authentication centers, operating in almost 200 countries, If StockX is unable to match you with a new Seller as a result of your purchase failing verification, you will be refunded your full purchase price."  PX 60 at STX0779943–45.  StockX further disputes that Nike has provided any evidence that any Nike product purchased via StockX by the customer that received the referenced email was inauthentic.  Further, the customer that sent the referenced email never stated that he believed the shoes he received were not authentic, never asked to return the shoes, and never asked for a refund for the shoes.  PX 60.

70.     On May 11, 2022, a StockX customer service representative responded to a consumer stating: "I understand your concerns regarding the authenticity of your items following the recent claims by Nike.  Our team in CS generally does not discuss legal matters.  However

please let me reassure you that each item that passes through our facility receives a thorough inspection prior to being sent to the Buyer. Our skilled authenticators receive consistent training to ensure that the item is authentic and without our condition guidelines as part of the verification process. Our global team of expert authenticators uses a rigorous, multi-step verification procedure that each buyer receives a purchase that is 100% Verified Authentic." Duvdevani Decl. ¶ 62, Ex. 61 at STX0220179.

      i.   <u>Response</u>: StockX disputes that Paragraph 70 accurately quotes the text from PX 61. StockX further disputes Nike's characterization of, and inferences purportedly drawn from, PX 61, as misleading because Paragraph 70 omits additional context necessary to understand the quoted text. Specifically, PX 61 states in addition to the quoted text: "In instances where an item may not meet our quality standards, we will link the Buyer with a new, comparable Seller when possible, and issue a full refund when it is not. We are committed to providing a safe, authentic marketplace to trade current culture." PX 61. StockX further disputes that Nike has provided any evidence that any Nike product purchased via StockX by the customer that received the referenced email was inauthentic.

    a.   On May 19, 2022, a StockX customer service representative responded to the same consumer stating: "Circling back on the verification of your purchase concern. Our team in CS generally does not discuss legal matters; however, we strongly emphasize that each item that passes through our facilities goes through a thorough

inspection that consists of a rigorous, multi-step verification procedure that ensures the item is authentic and within our condition guidelines to be sent to the buyer. If an item does not pass our verification process, it is not sent to the buyer and as a result of your purchase failing verification, you will be refunded your full purchase price. Since you have received all the orders you are requesting a refund from, this means they have indeed passed the verification process and are indeed considered 100% Verified Authentic." Duvdevani Decl. ¶ 62, Ex. 61 at STX0220187.

    i.   <u>Response</u>: Undisputed that a StockX customer service representative sent the email referenced in Paragraph 70(a) and that PX 61 contains the quoted text. However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, PX 61, as misleading because Nike has not provided any evidence that any Nike product purchased via StockX by the customer that received the referenced email was inauthentic. Nike has not provided any evidence that product purchased via StockX by the customer that received the referenced email was inauthentic.

71.    On May 11, 2022, a StockX customer service representative responded to a consumer stating: "I understand your concerns regarding the authenticity of your recent purchase following the recent claims by Nike. Our team in CS generally does not discuss legal matters. Please know, that each item that passes through our facility receives a thorough inspection prior to being sent to the Buyer. Our skilled authenticators receive consistent training to ensure that the item is authentic and within our condition guidelines as part of the verification process." Duvdevani Decl. ¶ 63, Ex. 62 at STX0220248.

a.  <u>Response</u>: Undisputed that a StockX customer service representative sent the email referenced in Paragraph 70(a) and that PX 61 contains the quoted text.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, PX 61 as misleading because Nike has not provided any evidence that any Nike product purchased via StockX by the customer that received the referenced email was inauthentic.

72.     On May 11, 2022, a StockX customer service representative responded to a consumer stating: "Please know, each item that passes through our facility receives a thorough inspection prior to being sent to the Buyer. Our skilled authenticators receive consistent training to ensure that the item is authentic and within our condition guidelines as part of the verification process. In instances where an item may not meet our quality standards - whether that be for manufacturing defects, deemed as worn or inauthentic, etc. - we will link the Buyer with a new, comparable Seller when possible, and issue a full refund when it is not. We are committed to providing a safe, authentic marketplace to trade current culture. We stand firm in our process and the ability of our authentication team members to identify any concerns in the quality of items as they are received. As StockX strives to uphold a safe and reliable experience for both Buyers and Sellers, it is important for both sides to follow through with order so as to maintain marketplace integrity. When you purchase an item either via a Bid or Buy Now, you are signaling your intent to proceed with the purchase. We value our customers and we are committed to providing a safe, authentic marketplace to trade current culture." Duvdevani Decl. ¶ 64, Ex. 63 at STX0220359.

a.  <u>Response</u>: Undisputed that a StockX customer service representative sent the email referenced in Paragraph 72 and that PX 63 contains the quoted text.  However,

StockX disputes that Nike has provided any evidence that any Nike product purchased via StockX by the customer that received the referenced email was inauthentic.

73.    On May 23, 2022, a StockX customer service representative responded to a consumer stating: "I understand your concerns regarding the authenticity of the item you purchased, following the recent claims made by Nike…Before StockX, authentication wasn't widely offered by secondary marketplaces and as a result, consumers didn't have much trust in the resale industry.  That lack of trust is what inspired our co-founders to build the platform and establish a job function focused on Authentication.  Authentication has always been at the core of our experience and has long set the industry standard.   Please know, each item that passes through our facility receives a thorough inspection prior to being sent to the Buyer.  Our skilled authenticators receive consistent training to ensure that the item is authentic and within our condition guidelines as part of the verification process…We are committed to providing a safe, authentic marketplace to trade current culture.  We stand firm in our process and the ability of our authentication team members to identify any concerns in the quality of items as they are received." Duvdevani Decl. ¶ 65, Ex. 64 at STX0223754.

   a.    <u>Response</u>: Undisputed that a StockX customer service representative sent the email referenced in Paragraph 73 and that PX 64 contains the quoted text.  However, StockX disputes that Nike has provided any evidence that any Nike product purchased via StockX by the customer that received the referenced email was inauthentic.

### 2.    *Authentication Is StockX's Core Value Proposition*

74.    StockX's "authentication and verification process" is "one of the key reasons why you would transact on StockX." "It is very important to the experience that every item that

transacts on [StockX's platform go through our authentication and verification process…[a]nd that is the main – one of the key reasons why you would transact on StockX." Ex. 49, Huber Feb. Tr. 244:6-245:24.

    a.    <u>Response</u>: Undisputed that PX 49 contains the quoted text. However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, PX 49, as misleading because Paragraph 74 omits additional context necessary to understand the quoted text. Specifically, PX 49 states, "It is very important to the experience that every item that transacts on [the StockX] platform go through [StockX's] authentication and verification process to correct for the potential areas of disappointment for a buyer: wrong size, wrong color, wrong product, missing accessories, damaged, manufacturing defect, other variances. And [StockX] correct[s] for those before the buyer takes receipt of the product. And that is one of the main -- one of the key reasons why you would transact on StockX as opposed to in person at your local mall parking lot or on another platform that does not have the same commitment to authentication and verification." PX 49 at 244:06–245:24.

75.    StockX, from its inception, set out to solve a prevalent problem within the sneaker community: "counterfeits" and was designed to "stop fakes from getting in the hands of [its] customers" Duvdevani Decl. ¶ 66, Ex. 65 at NIKE0038956.

    a.    <u>Response</u>: Undisputed that PX 65 contains the quoted text and that StockX was created to reduce the risks inherent in resale marketplaces, including counterfeits. Opp. DX 52, https://stockx.com/about/stockx-brand-protection-customer-trust-report-highlights-companys-anti-counterfeiting-investments-efforts-to-stop-bad-actors/ (Since its inception, StockX "has been anchored by a robust verification

program designed to fight fraud, curb counterfeiters, and deliver a consistent customer experience").

76. "One of the reasons StockX is a safe place to buy is also [its] claim to fame: [its] authentication process." Duvdevani Decl. ¶ 67, Ex. 66 at NIKE0038794.

    a. <u>Response</u>: Undisputed – StockX is a safe place to buy and one of the reasons for that is StockX's Process and accompanying Buyer Promise.

77. "[R]esale on StockX is different. By adding an authentication layer on top of the normal transactional relationship, StockX changed the game. And by standing between buyer and seller and authenticating every item sold on [its] marketplace, we moved past the old world where getting fake sneakers was a common occurrence, and entered a new world where authenticity was central to the shopping experience." Duvdevani Decl. ¶ 67, Ex. 66 at NIKE0038794.

    a. <u>Response</u>: Undisputed that PX 66 contains the quoted text. However, StockX disputes Nike's characterization of, and inferences purportedly drawn from PX 66 as misleading because Paragraph 77 omits additional context necessary to understand the quoted language. Specifically, PX 66 also states, "Note that only a fraction of our review process involves fake goods. It also includes more general errors, like when a product is the wrong size or an accessory is missing. Our authenticators make sure there are no manufacturing defects; they ensure that the packaging isn't damaged and all accessories are included; and they verify that the product is the right size. All this adds up to an incredibly high-quality control standard. And if you receive an item that doesn't meet our high standard of quality and accuracy, you needn't worry: we have your back. We stand behind every order, and if a mistake is made, our world-class customer service team will be there to

resolve the issue and get you the right product.  So whatever the circumstance, you can have peace of mind that StockX is safe.  This is a massive improvement when you consider the broader context of sneaker-fraud history.  StockX launched in 2016 with the goal of bringing trust and transparency to a chaotic and opaque sneaker resale market.  Back then, buying sneakers was a risky proposition: scams were commonplace, fakes were ubiquitous, and buyers had little protection from fraudulent sales.  In 2020, analysts estimated that the counterfeit sneaker market alone was worth 8450 million.  The proliferation of fake sneakers has become commonplace and widespread."  PX 66 at NIKE0038794.

78.    An article published July 2, 2018 in "The Magazine" on StockX's website titled "StockX: Always Authentic, Never Fake?" states: "Before StockX, how did you know your shoes weren't fake? You didn't have much assurance that the sneakers you bought online were authentic. Maybe you could squint at the product photo, or read the seller's review, but you were really only armed with a hope and a prayer.  Now with StockX, you're guaranteed that the goods you purchase are 100% verified authentic, never fake.  Every item bought and sold on StockX goes through a rigorous authentication process, putting the hammer down on scammers and bootleggers.  It's tough work, but we're up to the task." Duvdevani Decl. ¶ 53, Ex. 52 at NIKE0039855.

a.    <u>Response</u>: Undisputed that PX 52 contains the quoted text.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from PX 52 as misleading because Paragraph 78 omits additional context necessary to understand the quoted language.  Specifically, PX 52 also states:

b.    "+ Step 1: <u>Verification</u>:

c.    + During the verification process, we verify everything about the product.

d.    + We verify product accuracy: does the product match the invoice

e.    + We verify size: You might think this is a simple, but we have to check this every time.

f.    + We verify color: You need to be able to flex in the right colorway.

g.    + We verify condition: we evaluate deadstock quality and check for any and all product defects

h.    + Step 2 is Authentication: A multi-point inspection across the entire product making sure the buyer gets the authentic product, never fake.

i.    + We verify and perform a detailed review of the packaging: are the boxes undamaged; do they match the product; is the packaging legit

j.    + We verify and perform a detailed review of all product materials: are all the materials used in the product real. All leather, no pleather, never fake.

k.    + We verity and perform a detailed review of product construction: do all seams, stitching, glueing, and other construction details correspond to the product

l.    + [As a] result of our authentication process, less than .3% of customers are ever unhappy with their products."  PX 52 at NIKE0039855–856.

79.    An article published July 2, 2018 in "The Magazine" on StockX's website titled "StockX: Always Authentic, Never Fake?" states: "Every product passes every single step in the authentication process before they reach the seller: always authentic, never fake.  Why do we do this? Why do we invest so much time and energy to train authenticators, and test and re-test every conceivable detail of every product? Simple: because it's what we do." Duvdevani Decl. ¶ 53, Ex. 52 at NIKE0039855.

a.  <u>Response</u>: Undisputed that PX 52 contains the quoted text.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from PX 52 as misleading because Paragraph 78 omits additional context necessary to understand the quoted language.  *See* StockX's Response to Pls. 56.1 ¶ 78 (providing additional context from the same referenced article).

80.  On June 6, 2022, StockX released as "Statement on Authentication Program," which stated that "[a]uthentication is core to our history at StockX." Duvdevani Decl. ¶ 68, Ex. 67 at NIKE0006783.

a.  <u>Response</u>: Undisputed that on June 6, 2022, StockX released a "Statement on Authentication," that PX 67 contains the quoted text, and that StockX's authentication process is core to its history; however, StockX disputes Nike's characterization of, and inferences purportedly drawn from PX 67 as misleading because StockX's authentication process consists of far more than assessing whether a product is genuine, and instead is a comprehensive process designed to evaluate whether a product meets StockX's rigorous standards.  Opp. DX 48, Huber Feb. Tr. 60:15–20, 133:10–135:24 (StockX physically inspects every product sold on its platform); Opp. DX 18, Lopez Tr. 122:1-7 (StockX employs a quality control team that ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████; Opp. DX 48 Huber Feb. Tr. 21:11–22:24 (StockX employs Quality Assurance and AQA specialists to assist in instances in which a product issue is flagged); Opp. DX 48, Huber Feb. Tr. 21:11–22:24 ███ ████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████); Opp. DX 18, Lopez Tr. 26:17–27:4 (AQA

specialists ████████████████████████████████████████████████████

██████████████████████████████████████████ DX  110,

STX0023851 at 856 (StockX uses proprietary authentication software and

techniques, including a Machine Learning Model ████████████████████████

████████████████████████████████ Opp. DX 40, Tucker Rep. ¶ 42

(StockX works to ensure "that only reliable buyers and sellers use the platform" by

suspending the accounts of "sellers who repeatedly do not complete sales or send

in items that fail verification.").

81.    StockX's  internal  documents  ███████████████████████████████

██████████ Duvdevani Decl. ¶ 69, Ex. 68 at STX0020185 (describing StockX's business model,

█████████████████████████████████████████████████

a.    <u>Response</u>: Disputed.  Undisputed that PX 68 states ██████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████ ████

██████████████████████████

82.     Jacob Fenton, StockX's Vice President Customer Experience, testified that StockX "literally exist[s] to combat counterfeits."  Duvdevani Decl. ¶ 70, Ex. 69, Dec. 2, 2022 Videotaped Deposition of Jacob Fenton ("Fenton Tr.") at 91:15-25.

   a.    <u>Response</u>: Undisputed that Mr. Fenton offered the quoted testimony.  However, Defendant disputes Nike's characterization of, and inferences purportedly drawn from, Mr. Fenton's testimony as misleading because Paragraph 82 omits additional context necessary to understand the quoted testimony.  Specifically, Mr. Fenton testified, "We've rejected hundreds of millions of dollars of items because we literally exist to combat counterfeits and to simplify the experience for customers trying to get what they want."  PX 69 at 91:15-25.

83.     StockX's "authentication centers" are a "competitive advantage."  Duvdevani Decl. ¶ 71, Ex. 70 at STX0016797.

   a.    <u>Response:</u> Undisputed that PX 70 contains the quoted text and that StockX's authentication centers provide it with a competitive advantage against resale platforms that do not physically inspect every product that passes through their platforms, as StockX does.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, PX 70 as misleading because Paragraph 83 omits context necessary to understand why StockX's authentication centers and comprehensive Process are a competitive advantage.  StockX's Process consists of far more than reviewing a product to determine if it is genuine, *see* response to Paragraph 80 *supra*.

84.     ████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████ Duvdevani Decl. ¶ 72, Ex. 71 at STX0018465.

a.    <u>Response</u>: Undisputed that PX 71 contains the quoted text.  However, StockX

disputes Nike's characterization of, and inferences purportedly drawn from, PX 71

as misleading because Paragraph 84 omits additional context necessary to

understand the quoted language.  Specifically, Paragraph 84 implies that

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████. PX 71, STX0018453 at 465.

85.    "The driver of the [StockX] model since day one has consisted of two sided trade

with authentication in the middle." Duvdevani Decl. ¶ 73, Ex. 72 at STX0020523.

a.    <u>Response</u>: Undisputed.

### *3.    StockX knows that Nike and Jordan shoes are targeted by Counterfeiters*

86.    ████████████████████████████████████████████

████████████████████████████████████ Ex. 69, Fenton Tr. at 92:2-17; Duvdevani Decl. ¶ 44,

Ex. 43 at STX0018011.

a.    <u>Response</u>: Disputed because PX 43 instead states that ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████

█████████ *See* PX 69 at 92:2-17; PX 43 at STX0018011.

87.    In June 2022, StockX published "Big Facts: Verified Authentic" which stated that in "[t]he last 12 months: June 1, 2021 to May 31, 2022," "the most attempted fakes" in the sneakers category were (1) Jordan 1 Retro High Dark Mocha, (2) Jordan 1 High OG SP Fragment x Travis Scott, and (3) Jordan 1 Low Fragment x Travis Scott. Duvdevani Decl. ¶ 43, Ex. 42 at NIKE0006781.

    a.   <u>Response</u>: Undisputed that in 2022 StockX published "Big Facts: Verified Authentic," and that the document stated that the Nike products identified in Paragraph 87 were the most attempted fakes in the sneaker category. However, StockX disputes Nike's characterization of, and purported inferences from, PX 42 because it omits context necessary to understand the quoted text. StockX identified the "Jordan 1 Retro High Dark Mocha," "Jordan 1 High OG SP Fragment x Travis Scott," and "Jordan 1 Low Fragment x Travis Scott," as "Fakes Busted" between "June 1, 2021 to May 31, 2022" – meaning StockX identified these products based on its success in identifying and stopping fake versions of the identified Nike products from reaching consumers through its Process, "combin[ing] human identification, expert knowledge, and cutting-edge AI technology." PX 42, NIKE006776 at 780-81.

88.    On June 10, 2022, StockX posted on the StockX twitter account that "[a]ccording to our Authentication team, scammers tend to focus on hyped collabs and colorways" and posted a graphic that depicted the "Most Commonly Attempted Sneaker Fakes (Over the Last 12 Months)" that included (1) Jordan 1 Retro High Dark Mocha, (2) Jordan 1 High OG SP Fragment

x Travis Scott, and (3) Jordan 1 Low Fragment x Travis Scott. Duvdevani Decl. ¶ 74, Ex. 73 at NIKE00389434.

        a.    <u>Response</u>: Undisputed that on June 10, 2022 StockX posted a tweet containing the quoted text, and that the document stated that the Nike products identified in Paragraph 88 were the "Most Commonly Attempted Sneaker Fakes (Over the Last 12 Months)." However, StockX disputes Nike's characterization of, and purported inferences drawn from PX 73 because it omits context necessary to understand the quoted text. StockX identified the "Jordan 1 Retro High Dark Mocha," "Jordan 1 High OG SP Fragment x Travis Scott," and "Jordan 1 Low Fragment x Travis Scott," as the "Most Commonly Attempted Sneaker Fakes" – meaning StockX identified these products based on its success in identifying and stopping fake versions of the identified Nike products from reaching consumers through StockX's Process. PX 73, NIKE0038943 at 944.

89.    During his deposition, Mr. LaMagna, StockX's expert on anticounterfeiting programs agreed that "Nike's products, I think are attractive to counterfeiters. They are highly desirable." Duvdevani Decl. ¶ 75, Ex. 74, Aug. 24, 2023 Videotaped Deposition of Richard LaMagna ("LaMagna Tr.") at 152:13-153:20.

        a.    <u>Response</u>: Undisputed that Mr. LaMagna offered the quoted testimony. However, Stock disputes Nike's characterization of, and inferences purportedly drawn from the quoted testimony as misleading because Paragraph 89 omits additional context necessary to understand the quoted testimony, including Mr. LaMagna's testimony that Nike products are attractive to counterfeiters because "this whole notion of a limited supply, limited editions of shoes that become collectors' items or at least

very sought after, very desirable to the point where people will pay way above market value.  And that, I think, acts as a magnet to counterfeiters because the profits are so good, so high."  PX 74 at 152:17–153:02.  Mr. LaMagna further testified that "because StockX does so much to eliminate counterfeits, it's less attractive to counterfeiters."  PX 74 at 153:10–20.

### 4. StockX knows that it "authenticates" and ships inauthentic goods to consumers

90.    ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ Ex.

69, Fenton Tr. 90:15-91:08; Duvdevani Decl. 44, Ex. 43 at STX0018010.

a.    <u>Response</u>: Undisputed that PX 43 states, ██████████████████

██████████████ █ ████████████████████████████████

██████████████████████  PX 43; Opp. DX 49, Hansen Tr. 55:1–61:14;

DX 39 ("[StockX] will refund all fees and costs paid by the buyer for the [suspected inauthentic] item (including shipping and handling)"); DX 37 ("The StockX Buyer Promise solidifies this mission by providing support for Buyers should we make a mistake (e.g. we ship you the wrong order, we incorrectly verify an item)").  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from PX 69 and 43, as misleading to the extent they suggest that the products or data discussed were limited to StockX's verification of sneakers, that these documents establish anything more than that StockX determined upon further review that the products did not meet StockX's standards, or that StockX had any knowledge that a product sold on its platform did not meet StockX's standards when StockX sent that product to the consumer.  *See* Opp. DX 18, Lopez

Tr.  244:4-25 ( ███████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████  DX 79 at

911; Opp. DX 48, Huber Feb. Tr. 25:14–23 (explaining that "if an item has

characteristics that might make [StockX's] authentication team suspicious, we will

not allow it to trade"); 245:10-17 (explaining that StockX will correct for any

potential areas of disappointment found during the authentication process "before

the buyer takes receipt of the product").

91.    ████████████████████████████████████████████████

████████ Duvdevani Decl. ¶ 76, Ex. 75 at STX0019984.

a.    Response: Undisputed that PX 75 states ███████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████  PX 43; Opp. DX 49, Hansen Tr. 55:1-61:14; DX 39 ("[StockX]

will refund all fees and costs paid by the buyer for the [suspected inauthentic] item

(including shipping and handling)"); DX 37 ("The StockX Buyer Promise solidifies

this mission by providing support for Buyers should we make a mistake (e.g. we

ship you the wrong order, we incorrectly verify an item)").  However, StockX

disputes Nike's characterization of, and inferences purportedly drawn from, PX 75

as misleading to the extent they suggest that the products or data discussed were

limited to StockX's verification of sneakers, that this document establishes

anything more than that StockX determined upon further review that the products

did not meet StockX's standards, or that StockX had any knowledge that a product

sold on its platform did not meet StockX's standards when StockX sent that product to the consumer. *See* Opp. DX 18, Lopez Tr. 244:4-25 

DX 79, NIKE0005910 at 911; Opp. DX 48, Huber Feb. Tr. 25:14–23 (explaining that "if an item has characteristics that might make [StockX's] authentication team suspicious, we will not allow it to trade"); 245:10-17 (explaining that StockX will correct for any potential areas of disappointment found during the authentication process "before the buyer takes receipt of the product").

92.    StockX's authentication accuracy rate, including the 99.95% which appeared on the StockX website,

Ex. 49, Huber Feb. Tr. 246:2-22; Duvdevani Decl. ¶ 69, Ex. 68 at STX0020185.

a.    Response: Undisputed that PX 49 and PX 68 contain the quoted text. However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, PX 49 and 68 as misleading because Paragraph 92 omits context necessary to understand the quoted text and how this measurement is conveyed to consumers, including that StockX discloses to consumers on its website that this "accuracy

rate" is a "measurement of the accuracy of StockX's product authentication process based on weighted return data compared to total authentications."   DX 82, NIKE0006776 at 780-81; DX 112, NIKE0038955 at 958.

93.    Mr. Fenton testified that "counterfeits are very good, so it's very possible that some people would not know." Ex. 69, Fenton Tr. 143:2-8.

a.    <u>Response</u>: Undisputed that Mr. Fenton offered the quoted testimony.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, the quoted testimony as misleading because Paragraph 93 omits necessary context to understand the quoted testimony, including Mr. Fenton's additional testimony that, "if there's no mention of dissatisfaction or a problem and [StockX has] invested millions of dollars into the people, processes, and technology to perform this service, and [StockX does not] hear from customers, [StockX] would have no reason to suspect that there was a problem" and "if a customer got something that they had concerns about, they would be able to reach out to [StockX] and [StockX] would make it right.  Opp. DX 53, Dep. Tr. of Jacob Fenton ("Fenton Tr.") 142:5–20.   StockX further disputes Nike's characterization of the quoted testimony as misleading because StockX discloses to consumers on its website that the "99.96%" "accuracy rate" of StockX's Process is a "measurement of the accuracy of StockX's product authentication process based on weighted return data compared to total authentications."   DX 82, NIKE0006776 at 780–781; DX 112, NIKE0038955 at 958.

**5.** *StockX Authenticators Cannot Determine whether "Defects" Are Attributable to Nike*

94.    On June 24, 2022, StockX stated in the "Help Center" of the StockX website: "During our verification process, discrepancies are initially noted by our authenticators.  From there, your item is sent to our Quality Assurance group who takes a second look.  QA performs their own review of the item, determines if the product meets the standards that StockX and the manufacturer has set, and makes a final decision." Duvdevani Decl. ¶ 77, Ex. 76 at NIKE0038993.

a.    <u>Response</u>: Undisputed that PX 76 contains the quoted text.

95.    In June 2022, StockX published "Big Facts: Verified Authentic" which stated: "Authentication is about more than just stopping fakes.  Over the last 12 months, the presence of manufacturing defects was the top reason products were rejected during StockX's authentication process." Duvdevani Decl. ¶ 43, Ex. 42 at NIKE0006779.

a.    <u>Response</u>: Undisputed that PX 42 contains the quoted text.

96.    StockX's ███████████████████████████████████████████

████████████████████████ Duvdevani Decl. ¶ 78, Ex. 77.

a.    <u>Response</u>: Undisputed.

97.    Mr. Lopez testified that a "████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████ Ex. 48, Lopez Tr. 112:1-11.

a.    <u>Response</u>: Undisputed that PX 48 contains the quoted testimony.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, the quoted testimony as misleading because record evidence demonstrates that Nike sells sneakers with defects.  Nike acknowledges that Nike shoes can be defective,

and ████████████████████████████████ Opp. DX

7, Delli Carpini Tr. at 149:8–24. ████████████████

████████████████████████ Opp. DX 7,

Delli Carpini Tr. at 149:8–24; *see also* Opp. DX 66, "What Is Nike's Return Policy,

https://www.nike.com/help/a/returns-policy (including a section entitled "What

about defective or flawed items?" and noting "If it's been less than 60 days since

your purchase, simply return the item. If it's been more than 60 days and your item

is potentially defective or flawed, please see our warranty information for

additional details"). In addition, consumers have reported issues with authentic

Nike products including "mismatched logos, missing (or bolded) patterns,

misshapen heels and more." https://www.gearpatrol.com/style/shoes-

boots/a43364644/nike-quality-control-stockx-fakes/; *see* Opp. DX 17, Wells Rep.

¶ 95. Anecdotal evidence posted by consumers on forums for sneakerheads

highlight other manufacturing issues with Nike products, such as the soles of Nike

sneakers separating from the uppers over time, even with minimal use. *See* Opp.

DX 17, Wells Rep. ¶ 94. StockX authenticators have observed defects in Nike

products. *See* Opp. DX 18, Lopez Tr. 284:15–284:24.

98.    Mr. Lopez testified that examples of "manufacturing issues" would be a noticeable

glue stain on a sneaker," "a stitching defect," or "heavy creasing." █████████████

████████████████████████████████████████████████████████

████████████████████████████████ Ex. 48, Lopez Tr.

113:09-23.

a.    Response: Undisputed that Mr. Lopez offered the quoted testimony.

99.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████ Ex. 48, Lopez

Tr. 114:2-7.

    a.    <u>Response</u>: Undisputed that PX 48 contains the quoted testimony; however, StockX

disputes Nike's characterization of, and inferences purportedly drawn from, the

quoted testimony as misleading because record evidence demonstrates that Nike

itself sells Nike sneakers with defects.  Nike acknowledges that Nike shoes can be

defective, ████████████████████████████████████████████████████

Opp. DX 7, Delli Carpini Tr. at 149:8–24.  ████████████████████████

████████████████████████████████████████████████████

Opp. DX 7, Delli Carpini Tr. at 149:8–24; *see also* Opp. DX 66, "What Is Nike's

Return Policy,  https://www.nike.com/help/a/returns-policy (including a section

entitled "What about defective or flawed items?" and noting "If it's been less than

60 days since your purchase, simply <u>return</u> the item.  If it's been more than 60 days

and your item is potentially defective or flawed, please see our <u>warranty</u>

<u>information</u> for additional details")..  In addition, consumers have reported issues

with authentic Nike products including "mismatched logos, missing (or bolded)

patterns, misshapen heels and more."   https://www.gearpatrol.com/style/shoes-

boots/a43364644/nike-quality-control-stockx-fakes/; *see* Opp. DX 17, Wells Rep.

¶ 95.  Anecdotal evidence posted by consumers on forums for sneakerheads

highlight other manufacturing issues with Nike products, such as the soles of Nike

sneakers separating from the uppers over time, even with minimal use.  *See* Opp.

DX 17, Wells Rep. ¶ 94.  StockX authenticators have observed defects in Nike

products.  *See* Opp. DX 18, Lopez Tr. 284:15–284:24.

> **6.      *StockX Refuses to Accept Returns of Suspected Counterfeit Goods and Instead Attributes Concerns to Nike Manufacturing Defects and Encourages Buyers to Resell Those Goods***

100.    A StockX PowerPoint, entitled ███████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████ DLA Decl. ¶ 79, Ex. 78

STX0020225 at 227.

a.      <u>Response</u>: Undisputed that PX 78 contains the quoted text.  However, StockX

dispute Nike's characterization of, and inferences purportedly drawn from, PX 78

as misleading because while StockX does not offer a return policy for buyer's

remorse, StockX always has provided consumers with the opportunity to return

products that are later determined should not have passed StockX's Process – today,

referred to as the Buyers Promise.  Opp. DX 49, Hansen Tr. 55:1–61:14; DX 39,

Hansen Dep. Ex. 6 ("[StockX] will refund all fees and costs paid by the buyer for

the [suspected inauthentic] item (including shipping and handling)"); DX 37,

StockX,      "What      is      the      StockX      Buyer      Promise?"

https://stockx.com/help/articles/What-is-the-StockX-Buyer-Promise ("The StockX

Buyer Promise solidifies this mission by providing support for Buyers should we

make a mistake (e.g. we ship you the wrong order, we incorrectly verify an item).").

As the cited document acknowledges, "StockX IS different from a traditional e-

commerce company," PX 78, STX0020225 at STX0020227, and because StockX

is not the actual seller of the products on its platform, StockX does not accept

buyer's remorse returns, Opp. DX 53, Fenton Tr. 96:2–9 (testifying that StockX as

a marketplace does not have the ability to "program[m]atically" accept returns when a customer "do[es]n't like" their purchase). However, as the cited document illustrates, ████████████████████████████████████████████

████████████████████████████████████████ *See* PX 78, STX0020225 at

230 ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████

b.    Further, where consumers have concerns about products they received, but those products passed StockX's initial authentication, StockX authenticators further review the products to determine if there are further reasons to suspect they are inauthentic. Opp. DX 18, Lopez Tr. 252:3–253:24, 261:18–262:9 (finding no reasons to suspect these products were counterfeit based on the images submitted).

101.    A StockX PowerPoint, entitled ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████ Duvdevani Decl. ¶ 79, Ex. 78 at

STX0020231.

a.    <u>Response</u>: Undisputed that PX 78 contains the quoted text in Paragraph 101. However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, PX 78 as misleading because the quoted text is included in the context of a presentation on returns of products for reasons other than authentication issues. Opp. DX 53, Fenton Tr. 100:22–101:2 ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████ While StockX

does not offer a return policy for buyer's remorse (because StockX is not the seller),

StockX always has provided consumers with the opportunity to return products that

are later determined should not have passed StockX's Process – today, referred to

as the Buyers Promise – and StockX does not allow buyers to resell items

reasonably believed to be counterfeit.  Opp. DX 49, Hansen Tr. 55:1-61:14; DX 39,

Hansen Dep. Ex. 6 ("[StockX] will refund all fees and costs paid by the buyer for

the [suspected inauthentic] item (including shipping and handling). In no event may

a buyer resell any item (on StockX or elsewhere) that is reasonably believed to be

counterfeit."); DX 37, StockX, "What is the StockX Buyer Promise?"

https://stockx.com/help/articles/What-is-the-StockX-Buyer-Promise ("The StockX

Buyer Promise solidifies this mission by providing support for Buyers should we

make a mistake (e.g. we ship you the wrong order, we incorrectly verify an item).").

b.    Further, where consumers have concerns about products they received, but those

products passed StockX's initial authentication, StockX authenticators further

review the products to determine if there are further reasons to suspect they are

inauthentic.  Opp. DX 18, Lopez Tr. 252:13-16, 252:20-253:24, 261:18-262:9

(finding no reasons to suspect these products were counterfeit based on the images

submitted).

102.   A StockX internal policy audit noted that ██████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████ Duvdevani Decl. ¶ 80, Ex. 79 at STX0021484.

a.  <u>Response</u>: Undisputed that PX 79 contains the quoted text in Paragraph 102. However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, PX 79 as misleading because the quoted text pertains to returns of products for reasons other than authentication issues.  *See* PX 79 at STX0021486 ██████████████████████████████████████ Opp. DX 53, Fenton Tr. 108:5-109:3 ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████

b.  StockX further disputes that it encourages the resale of suspected fake products. Opp. DX 47, Huber June Tr. 56:12-18 (testifying that if a shoe is returned to StockX, and StockX determines the shoe is inauthentic, that item is not resold); Opp. DX 49, Hansen Tr. 55:1-61:14; DX 39, Hansen Dep. Ex. 6 ("In no event may a buyer resell any item (on StockX or elsewhere) that is reasonably believed to be counterfeit.")

c.  Further, where consumers have concerns about products they received, but those products passed StockX's initial authentication, StockX authenticators further review the products to determine if there are further reasons to suspect they are inauthentic.  Opp. DX 18, Lopez Tr. 252:13-16, 252:20-253:24, 261:18-262:9 (finding no reasons to suspect these products were counterfeit based on the images submitted).

103.  A StockX document titled ██████████████████████ with the effective date August 2019 and a revision date of June 2022 states: ██████████████

██████████████████████████████████████████████

████████████████████████████████████ Duvdevani Decl. ¶ 81, Ex.

80 at STX0774265.

a.  <u>Response</u>: Undisputed that PX 80 contains the quoted text.  However, StockX

disputes Nike's characterization of, and inferences purportedly drawn from PX 80

as misleading because while StockX does not offer a return policy for buyer's

remorse, StockX always has provided consumers with the opportunity to return

products that are later determined should not have passed StockX's Process – today,

referred to as the Buyers Promise.  Opp. DX 49, Hansen Tr. 55:1-61:14; DX 39,

Hansen Dep. Ex. 6 ("[StockX] will refund all fees and costs paid by the buyer for

the [suspected inauthentic] item (including shipping and handling)"); DX 37,

StockX,       "What       is       the       StockX       Buyer       Promise?"

https://stockx.com/help/articles/What-is-the-StockX-Buyer-Promise ("The StockX

Buyer Promise solidifies this mission by providing support for Buyers should we

make a mistake (e.g. we ship you the wrong order, we incorrectly verify an item).").

b.  Further, where consumers have concerns about products they received, but those

products passed StockX's initial authentication, StockX authenticators further

review the products to determine if there are further reasons to suspect they are

inauthentic.  Opp. DX 18, Lopez Tr. 252:13-16, 252:20-253:24, 261:18-262:9

(finding no reasons to suspect these products were counterfeit based on the images

submitted).

104.  On October 5, 2021, a consumer contacted StockX customer service and stated:

"HI, I RECEIVED THESE DUNKS, AND THEY'RE EITHER FAKE OR DEFECTIVE." On

October 8, 2021, a StockX customer service representative responded: "After having a couple of our senior authenticators review the photos you have provided it has been communicated that the pair you received is within the production standards for a pair of Nike Dunk Low Championship Red (2021)…If you are uninterested in keeping what you have received we would suggest reselling this pair on StockX, since they would pass verification once again." Duvdevani Decl. ¶ 82, Ex. 81 at STX0775180, STX0775192.

a.  <u>Response</u>: Undisputed that StockX customer service received and sent the emails referenced in Paragraph 104 and that PX 81 includes the quoted text. However, StockX disputes Nike's characterization of, and inferences purportedly drawn from PX 81 as misleading because Paragraph 104 omits additional context necessary to understand the exhibit, including that:

b.  The customer initially emailed StockX on October 5, 2021 stating in part, "I RECEIVED THESE DUNKS, AND THEY'RE EITHER FAKE OR DEFECTIVE. I DOUBT NIKE WOULD MANUFACTURE THEM SO POORLY." PX 81, STX0775180 at 180.

c.  The same day, a StockX customer service representative responded, requesting further information from the customer, to include:"- Photo(s) of the issue to which you're referring[;]- Photo of the StockX verification tag still attached to your item[;] - Photo of the QR code on the back of the tag [;] - Email address associated with your StockX account[;] - Order # if applicable[; and] – Description of your case." PX 81, STX0775180 at 181–82. The customer service representative informed the consumer, that StockX would "follow up [] after reviewing [the] images, typically within 24 hours." PX 81, STX0775180 at 182.

d.      Later the same day, a second StockX customer service representative followed up asking for further information.  Specifically, he asked for: "Any specific flaws you have noticed (Send More Photos)[;] Shoebox Label[;] Sizing Tags (In both shoes)[;] Left and Right sides of the sneakers[; and] Outsoles of the sneakers."  PX 81, STX0775180 at 182–83.

e.      After the customer provided further images, the customer service representative responded as follows: "I am going to reach out to our Senior Authenticators for further insight on this review.  They will reach back out to me within 1-2 business days as they review the images.  I will follow up with you after I receive clarification on this review."  PX 81, STX0775180 at 185–86.

f.      Only after all of these photographs had been received and examined by the StockX senior authenticators did the customer service representative reply, "After having a couple of our senior authenticators review the photos you have provided it has been communicated that the pair you have received is within the production standards for a pair of Nike Dunk Low Championship Red (2021), and we are not seeing anything out of the ordinary for this pair."  PX 81, STX0775180 at 192.

g.      StockX further disputes that Nike has provided any evidence that any Nike product purchased via StockX by the customer that sent the referenced email was inauthentic.

105.    On April 8, 2022, a consumer contacted StockX customer service and stated: "THIS SHOE HAS QUALITY ISSUES WHICH SCREAM FAKE….IT IS NOT NIKES AUTHENTIC WORLD RENOWNDED ZOOMX.  On April 12, 2022, a StockX customer service representative responded: "We had a couple of our senior authenticators look at your photos, and we see this item

would be acceptable per our deadstock condition standards and from retail shop or manufacturer. Please remember that the item is produced on a large scale and will feature natural manufacturer differences and variance. When we inspect every item, we look for two things: 1. The items is authentic. 2. The item is in a condition that would be accepted at a retail location. The good news is that we are a marketplace, and not a store, so you can resell them on StockX if you are truly unsatisfied with you purchase!" Duvdevani Decl. ¶ 83, Ex. 82 at STX0777390, STX0777402.

a.  <u>Response:</u> Undisputed that StockX customer service received and sent the emails referenced in Paragraph 105 and that PX 82 includes the quoted text. However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, PX 82 because Paragraph 105 omits additional context necessary to understand the exhibit, including that:

b.  A StockX customer service representative responded to the customer on the same day as they sent their initial inquiry requesting further information from the customer, to include: "- Photo(s) of the issue to which you're referring[;]- Photo of the StockX verification tag still attached to your item[;]- Photo of the QR code on the back of the tag[;]- Email address associated with your StockX account[;] - Order # if applicable[; and] - Description of your case." PX 82, STX0777390 at 391. The customer service representative informed the consumer, that StockX would "follow up [] after reviewing [the] images, typically within 24 hours." PX 82, STX0777390 at 391.

c.  After the customer sent several photos of the shoes in question, a second StockX customer service representative responded, requesting additional photos of the following aspects of the shoes:  "Closer shot of shoe box label[;] Shoe size tag[;]

Outsoles (bottoms) of the shoes[; and] Side profile shots of both shoes (each side)." PX 82, STX0777390 at 392-93.

d.   Only after the additional photographs had been provided by the customer and reviewed by StockX did the customer service representative respond: "We had a couple of our senior authenticators look at your photos, and we see that this item would be acceptable per our deadstock condition standards and from retail shop or manufacturer."  PX 82, STX0777390 at 402.

e.   StockX further disputes that Nike has provided any evidence that any Nike product purchased via StockX by the customer that sent the referenced email was inauthentic.

106.   On April 18, 2022, a consumer contacted StockX customer service and stated: "I RECEIVED MY NIKE DUNK PANDAS TODAY I'M CONCERNED WITH THE AUTHENTICITY AND QUALITY OF THE PRODUCT." On April 22, 2022, a StockX customer representative responded: "Thispair [sic] has passed the manufacturer's quality check and therefore our Authentic team is to honor their products in the condition as they were released in unless something uncommon is found. While I understand you are not completely satisfied with this purchase, please remember that these have been manufactured in a factory, and as a result may feature natural flaws due to mass production….If you do not wish to keep the item, I do recommend relisting it on our website!" Duvdevani Decl. ¶ 84, Ex. 83 at STX0777764, STX0777769-70.

a.   Response: Undisputed that StockX received and sent the emails referenced in Paragraph 106 and that PX 83 includes the quoted text.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from PX 83 as

misleading because Paragraph 106 omits additional context necessary to understand the exhibit.

b.    Specifically, a StockX customer service representative responded to the customer on the same day as they sent their initial inquiry requesting further information from the customer, to include: "- Photo(s) of the issue to which you're referring[;] - Photo of the StockX verification tag still attached to your item[;]- Photo of the QR code on the back of the tag[;] - Email address associated with your StockX account[;] - Order # if applicable[; and]- Description of your case." PX, STX0777764 at 765. The customer service representative informed the consumer, that StockX would "follow up [] after reviewing [the] images, typically within 24 hours." PX 83, STX0777764 at 765.

c.    Later on the same day, a second StockX customer service representative followed up with the customer, explaining that "[t]he pilling in the seams and the leftover glue residue are common manufacturing defects that are found in most, if not all, Nike Dunk releases. Prior to shipping them to you, the shoes [are verified] in person with our experts. Since you are questioning your item, I can have our Sr. Authentication team can review your purchase. At this time, if you could please reply to this email with clear pictures of the following: - Shoebox label[;] - Sizing tag inside of both shoes[; and] - Left and right shoe outsoles" PX 83, STX0777764 at 767-68.

d.    Only after the photographs had been provided by the customer and reviewed by StockX did the customer service representative respond: "Our Sr. Authentication team has reached back out to me regarding the concerns you are having with your

shoes.  After reviewing your images, it was brought to my attention that there were no red flags found and these shoes look to be deadstock!"  PX 83, STX0777764 at 769.

e.    StockX further disputes that Nike has provided any evidence that any Nike product purchased via StockX by the customer that sent the referenced email was inauthentic.

107.    On March 20, 2022, a consumer contacted StockX customer service and stated: "HELLO, I THINK I HAVE RECEIVED A COUNTERFEIT SHOE OR PAIR OF NIKE DUNK LOW CHAMPIONSHIP COURT PURPLE." On March 21, 2022, a StockX customer representative responded: "We do always try to provide you with a pair that is up to your expectations but we do have to work with items that are cleared for retail release by the manufacturer.  With that being said, the reason this pair is acceptable per our deadstock condition standards is that Nike released these with the concerns you have pointed out." Duvdevani Decl. ¶ 85, Ex. 84 at STX0774927, STX0774944.

a.    Response: Undisputed that StockX received and sent the emails referenced in Paragraph 107 and that PX 84 includes the quoted text.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, Ex. 84 as misleading because Paragraph 107 omits additional context necessary to understand the quoted text.  Specifically, the StockX customer representative also stated, "If you would rather return what you have received our team can review this pair along with the photos you have provided us and determine if this item should have passed our deadstock condition standards.  If the item would pass again if resold we will return it back to you so you can sell the item if you would like.  If

the item does not meet our Deadstock standards we will provide you with a full refund." PX 84, STX0774927 at 945. StockX further disputes that Nike has provided any evidence that any Nike product purchased via StockX by the customer that sent the referenced email was inauthentic.

108.    On April 5, 2022, a consumer contacted StockX customer service and stated: "MY ITEM RECEIVED ISN'T AUTHENTIC." On April 7, 2022, a StockX customer representative responded: "While I understand that you are not completely satisfied with this purchase, we, unfortunately, do not have control over the manufacturer's production standards and must work with products that they have cleared for release…If you do not wish to keep them, you are always welcome to relist them back on StockX for sale." Duvdevani Decl. ¶ 86, Ex. 85 at STX0777119, STX0777124.

a.    Response: Undisputed that a StockX customer service representative sent the email referenced in Paragraph 108 and that PX 85 includes the quoted text. However, StockX disputes Nike's characterization of, and inferences purportedly drawn from PX 85 as misleading because Paragraph 108 omits additional context necessary to understand the exhibit.

b.    Specifically, a StockX customer service representative responded to the customer on the same day as they sent their initial inquiry requesting further information from the customer, to include: "- Photo(s) of the issue to which you're referring[;] - Photo of the StockX verification tag still attached to your item[;] - Photo of the QR code on the back of the tag[;] - Email address associated with your StockX account[;] - Order # if applicable[; and] - Description of your case." PX 85 at STX0777120. The customer service representative informed the consumer, that

StockX would "follow up [] after reviewing [the] images, typically within 24 hours."  PX 85, STX0777119 at 120.

c.    The customer responded stating, "My issue at hand is these toddler sneakers aren't authentic In any way I can clearly see glue stains and the sole isn't like mines… There are visible glue stains all around the shoe indicating that they aren't authentic."  PX 85, STX0777119 at 121.

d.    A second StockX customer service representative responded to the customer the same day and requested additional photographs of the shoes in question, to include: "Box label," "Size tags," and "Outsoles of the sneakers."  PX 85, STX0777119 at 122.

e.    The customer responded, "I think I was just alarmed hence the shoes doesn't have the same insole and has an abundance of visible glue."  PX 85, STX0777119 at 123.

f.    The customer service representative responded, "for starters, I can tell you that PS sizes do not have to same insoles as adults. . . . I just received word from our senior authenticator that these shoes are indeed authentic.  No red flags or anything out of the ordinary was found on these shoes.  The shoe build, material quality, appearance of the box, size label, and overall composition of the shoes all check out with real pairs."  PX 85, STX0777119 at 124.

g.    The customer responded, "Ok thank you so much."  PX 85, STX0777119 at 125.

h.    StockX further disputes that Nike has provided any evidence that any Nike product purchased via StockX by the customer that sent the referenced email was inauthentic.

109.    On May 20, 2022, a consumer service representative responded to a customer service contact regarding CRM: 07210003898 stating: "I do understand you may not fully agree with the results however I am customer service so I am sadly unable to overturn the decision! As a product specialist here at StockX and a sneaker enthusiast, I can assure you that these are very very typical Nike quality, especially for dunks! I also kindly recommend checking out Nike Dunk quality on Youtube or different sources as well!; […] The good news is that we are a marketplace, and not a store, so you can resell them on StockX if you are truly unsatisfied with your purchase! We would suggest doing so at a price you are comfortable with and with the verification tag still attached if that is how you decide to move forward." Duvdevani Decl. ¶ 87, Ex. 86 at STX0220611.

    a.    On May 20, 2022, the consumer responded to the StockX customer service representative regarding CRM: 07210003898 stating: "There is no way I would resell someone else defective, counterfeit sneakers and the fact that you suggested that is absurd." Duvdevani Decl. ¶ 87, Ex. 86 at STX0220611.

    b.    On May 21, 2022, a StockX customer service representative responded to the consumer regarding CRM: 07210003898 stating: "I'm sorry you don't agree with our team on this matter but the shoes were verified when they were initially authenticated and reviewed again with the pictures that you provided.  As stated, mass produced shoes will normally have common issues with excessive glue stains or stitching variances.  This is directly from being manufactured on a massive scale. As my colleague stated, if you do not wish to keep them, you are always welcome to re-list them back on StockX for sale." Duvdevani Decl. ¶ 87, Ex. 86 at STX0220611.

    i.   <u>Response</u>: Undisputed that StockX customer service received and sent the emails referenced in Paragraph 109 and that PX 86 includes the quoted text.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, PX 86 as misleading because Paragraph 109 omits additional context necessary to understand the exhibit.

    ii.   Specifically, when the customer reached out with photos of the product, the StockX customer service representative wrote: "We completely understand how important it is to make sure you receive the proper product in the proper condition.  The good news is we had our verification team look at your photos, and we see that this item would be acceptable per our deadstock conditions and from a retail shop or manufacturer."  Opp. DX 54, STX0220605.

    iii.   StockX further disputes that Nike has provided any evidence that any Nike product purchased via StockX by the customer that sent the referenced email was inauthentic.

110.    On May 22, 2022, a StockX customer service representative responded to the consumer regarding CRM: 07210003898 stating: "We are not the manufacturers of these shoes. Nike and their Quality Control department passed these shoes to be sold on the retail level. Meaning that these shoes passed their Quality Control standards. We unfortunately do not have control over the manufacturer's production or quality control standards and must work with

products that they have cleared for release. As me and my colleague have stated, which was information provided by the Verification team, that this item would be acceptable per our deadstock conditions and from a retail shop or manufacturer. Since they passed these shoes to be sold on the retail level. If you do not wish to keep them, you are always welcome to re-list them back on StockX for sale." Duvdevani Decl. ¶ 88, Ex. 87 at STX0220624.

    a.    The consumer replied to the customer service representative regarding CRM: 07210003898 stating: "I'm not asking you to be the manufacturer of the shoes. What I am asking is for you to all to the right thing. I do not care if Nike did authorize you to sell the shoes." Duvdevani Decl. ¶ 88, Ex. 87 at STX0220624.

i.   <u>Response</u>: Undisputed that StockX received and sent the emails referenced in Paragraph 110 and that PX 87 includes the quoted text, all pertaining to the same order number (CRM: 07210003898) discussed in Paragraph 109.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, PX 87 as misleading because Paragraph 110 omits additional context necessary to understand the exhibit.

ii.   Specifically, when the customer reached out with photos of the product, the StockX customer service representative wrote: "We completely understand how important it is to make sure you receive the proper product in the proper condition.  The good news is we had our verification team look at your photos, and we see that this item would be acceptable per our deadstock conditions and from a retail shop or manufacturer."  Opp. DX 54, STX0220605.

iii.  StockX further disputes that Nike has provided any evidence that any Nike product purchased via StockX by the customer that sent the referenced email was inauthentic.

111.   On February 28, 2022, a consumer contacted StockX customer support stating: "I RECEIVED MY ORDER AND AFTER REVIEWING I AM NOT CERTAIN THAT THE SHOE I RECEIVED IS 100% AUTHENTIC.THE TOE BOX PERFORATIONS/HOLES LOOK OUT OF PLACE AND DO NOT ALIGN AS THEY SHOULD. AS WELL AS THE BOTTOM OF

THE SOLE DOES HAVE THE SAME MARKINGS AS THE PAIRS THAT I HAVE RECEIVED DIRECTLY FROM NIKE."   On March 8, 2022, a StockX customer service representative responded: "Our Sr. Authenticator has completed the review of the authenticity of the sneakers received through order 33651404. After review, it was concluded that your Pine Green Black Jordan 1sneakers are 100% authentic as previously verified. It was related that the overall construction of your sneakers including the toe box perforation alignments, all points featured on the sneaker box label, and the details of the size tags within the sneakers all check out as legit! With these being Jordan 1 sneakers, the stitching that covers the point near the start of the swoosh(towards the back) was confirmed to be genuine and cleared by the manufacturer for sale through authorized retail sources. Peace of mind may be found in knowing that you may resell this pair on our platform…" Duvdevani Decl. ¶ 89, Ex. 88 at STX0802167, STX0802187-88.

    a.    <u>Response</u>: Undisputed that StockX received and sent the emails referenced in Paragraph 111 and that PX 88 includes the quoted text.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, PX 88 as misleading because Paragraph 111 omits additional context necessary to understand the exhibit.

    b.    Specifically, a StockX customer service representative responded to the customer requesting photos, to include:  "Any specific flaws you have noticed[;] Box label[;] Size tag[;] Left and right sides of the sneakers[;] Outsoles of the sneakers[; and] The StockX verification tag attached to your item with a clear photo of the QR code on the back of the tag."  PX 88, STX0802167 at 169.

    c.    The customer provided photos, and the customer service representative responded requesting additional photos.  PX 88, STX0802167 at 170-71.

d.    Only after the photographs had been provided by the customer and reviewed by StockX did the customer service representative respond that the shoes were "legit." PX 88, STX0802167 at 187-88.

e.    StockX further disputes that Nike has any evidence that any Nike product purchased via StockX by the customer that sent the referenced email was inauthentic.

### 7.    *StockX Affords Power Sellers More "Leniency" in the Number of Failed Authentications*

112.    On November 30, 2022, Russell Amidon was the Senior Director of Account Management, StockX. Duvdevani Decl. ¶ 90, Ex. 89, Nov. 30, 2022 Videotaped Deposition of Russell Amidon ("Amidon Tr.") at 9:14-20.

a.    <u>Response</u>: Undisputed.

113.    Mr. Amidon testified that StockX incentivizes sellers "to seller more" on the StockX platform and provides benefits to sellers based on the number of transactions he or she has conducted through the StockX platform.  Ex. 89, Amidon Tr. at 13:4-9;13:19-14:05.

a.    <u>Response</u>: Undisputed that Mr. Amidon testified that StockX incentivizes sellers to "sell more."   However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, the quoted testimony as misleading because Paragraph 113 omits important additional testimony necessary for understanding the quoted testimony.  Mr. Amidon testified that "it's fair to say that sellers are incentivized to sell more, but [StockX] do[es] have a cap of where [a seller] can receive a break." PX 89 at 13:08-10.  Mr. Amidon further testified that StockX incentivizes sellers not "just based on the number of transactions," but also on "behavior-based bonuses" related to "doing things as a seller that would benefit the buyer," such as

shipping products more quickly. PX 89 at 12:1-13:3. StockX further disputes Nike's characterization of the quoted language as misleading because StockX treats all sellers the same when it comes to selling items that StockX determines to be inauthentic, and "suspend[s] any seller immediately if any seller sends an item that we determine that may or may not be inauthentic." PX 89 at 42:05–07.

114. The StockX  Duvdevani Decl. ¶ 71, Ex. 70 at STX0016748.

    a.   <u>Response</u>: Undisputed that PX 70 contains the quoted text.

115.

Ex. 89, Amidon Tr. 15:20-16:7.

    a.   <u>Response</u>: Undisputed.

116. A StockX document titled

Duvdevani Decl. ¶ 92, Ex. 91 at STX0061166.

    a.   <u>Response</u>: Undisputed that PX 91 contains the quoted text. However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, PX 91 as misleading because Paragraph 116 omits additional context needed to understand the quoted text. First, PX 91 is an internal, working document with live comments and questions, demonstrating it is not reflective of StockX's official and/or final

policy.  The quoted text is ███████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████  PX 91,

STX0061163 at 166.  Further, there are many reasons for a product to fail

authentication other than a determination that it is counterfeit, including having

defects, being the wrong size, or missing accessories.  Opp. DX 48, Huber Feb. Tr.

245:12–19; DX 82, NIKE0006776 at 779–80.  ███████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████  Opp. DX 55,

Dep. Tr. of Russ Amidon ("Amidon Tr.") 47:20–49:8.  ███████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████  Opp. DX 55, Amidon Tr. 48:18-49:3.

However, StockX treats all sellers, including high-volume sellers, the same where

a product is determined to be counterfeit and will suspend that seller immediately.

Opp. DX 55, Amidon Tr. 42:5–7 (StockX's policy is to "suspend[] any seller

immediately if any seller sends an item that we determine that may or may not be

inauthentic."); 44:4–45:8 (StockX also suspends high-volume sellers if they send

an item StockX determines could be inauthentic).

117.  A StockX document titled ███████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████ Duvdevani Decl. ¶

92, Ex. 91 at STX0061166.

    a. <u>Response</u>: Undisputed that PX 91 contains the quoted text.  However, StockX

disputes Nike's characterization of, and inferences purportedly drawn from, PX 91

as misleading because Paragraph 117 omits additional context needed to understand

the quoted text.  First, PX 91 is an internal, working document with live comments

and questions, demonstrating it is not reflective of StockX's official and/or final

policy.  The quoted text is ████████████████████████████

████████████████████████████████████████

██████████████████████████████████ PX 91,

STX0061163 at 166.  Further, there are many reasons for a product to fail

authentication other than a determination that it is counterfeit, including having

defects, being the wrong size, or missing accessories.  Opp. DX 48, Huber Feb. Tr.

245:12–19; DX 82, NIKE0006776 at 779–80. ██████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ Opp. DX 55,

Amidon Tr. 47:20–49:8. ██████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████ Opp. DX 55, Amidon Tr. 48:18-49:3.  However, StockX treats all sellers,

including high-volume sellers, the same where a product is determined to be

counterfeit and will suspend that seller immediately.  Opp. DX 55, Amidon Tr. 42:5–7 (StockX's policy is to "suspend[] any seller immediately if any seller sends an item that we determine that may or may not be inauthentic."); 44:4–45:8 (StockX also suspends high-volume sellers if they send an item StockX determines could be inauthentic).

118.    Mr. Amidon testified that ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████ Ex. 89, Amidon Tr. 40:12-41:24; Duvdevani Decl. ¶ 93, Ex. 92 at STX0143917.

a.    <u>Response</u>: Undisputed that Mr. Amidon offered the quoted testimony.  However, StockX disputes Nike's characterization of, and inferences purportedly draw from the quoted testimony as misleading because Paragraph 118 omits additional context needed to understand the quoted testimony.  There are many reasons for a product to fail authentication other than a determination that it is counterfeit, including product defects, being the wrong size, or missing accessories.  Opp. DX 48, Huber Feb. Tr. 245:12–19; DX 82, NIKE0006776 at 779.  Even if StockX provides some leniency to high volume sellers for authentication fails based on issues other than whether the product is genuine, it treats all sellers the same where a product is determined to be counterfeit.  Opp. DX 55, Amidon Tr. 42:5–7 (StockX's policy is to "suspend[] any seller immediately if any seller sends an item that we determine that may or may not be inauthentic.").

119.    Catherine Tucker, an expert witness for StockX, opined that "[b]ecause marketplaces are in the business of facilitating transactions, a key to their success is that

interactions that occur through them are positive for both buyers and sellers. Interactions that are negative for either side deter users from joining or continuing to use the platform." Duvdevani Decl. ¶ 94, Ex. 93 at ¶ 23 ("Tucker Report").

    a.    <u>Response</u>: Undisputed that Dr. Catherine Tucker offered the quoted statement as an opinion in this case. However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, PX 93 as misleading because an incentive to ensure positive interactions does not equate to the conclusion that StockX grants power sellers leniency as to counterfeit products prior to suspension. *See* Nike's Mem. of Law, ECF No. 259, p. 24. StockX treats all sellers the same where a product is determined to be counterfeit. Opp. DX 55, Amidon Tr. 42:5–7 (StockX's policy is to "suspend[] any seller immediately if any seller sends an item that we determine that may or may not be inauthentic."). Dr. Tucker, further opined that StockX "discourages the sale of counterfeits" on its platform by, for example, "drawing attention to prices that are too low to be credible" and "has an incentive to generate and preserve trust on its platform and would risk the success of its business if it did not take steps to prevent the sale of counterfeit items, which could lead to an erosion of buyers' trust." Opp. DX 40, Tucker Rep. ¶ 9; *see also* ¶¶ 25–32 (discussing how StockX would risk its business if it did not take meaningful steps to prevent counterfeits); ¶ 45 (discussing how StockX's price data allows consumers to look out for counterfeits).

    **8.**    ***StockX Allows Sellers to Remain Anonymous and Does Not Investigate the Source of Seller's Products.***

120.    StockX does not require "proof of purchase as a Seller." Duvdevani Decl. ¶ 95, Ex. 94 at NIKE0005896.

a.     <u>Response</u>: Undisputed that PX 94 contains the quoted text.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, PX 94 as misleading because Paragraph 120 omits additional context needed to understand the quoted testimony.  PX 94 states, "Since the StockX verification process evaluates the condition of the item, its container and its accessories, StockX can't accept proof of purchase as a way to expedite the verification process."  Further, even without proof of purchase, StockX goes to extensive lengths to ensure that products sold on its platform were acquired through authorized channels, including:

b.     Physically inspecting every product sold on its platform.  Opp. DX 48, Huber Feb. Tr. 60:15–20, 133:10–134:12; DX 14, NIKE0035800 at 804 ("Sellers hold inventory and ship to StockX only when sold; StockX verifies authenticity then ships to buyer for 9.5% commission").

c.     Providing "detailed data about historical prices and live bids and asks for items on the platform" which "helps ensure that neither buyers nor sellers trade at an unfair price on the platform, and [] further discourages the sale of counterfeits by drawing attention to prices that are too low to be credible."  Opp. DX 40, Tucker Rep. ¶ 9.

d.     Employing a quality control team that ███████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ Opp. DX 18, Lopez Tr. 122:4–7.

e.     Employing Quality Assurance and AQA specialists to assist in instances in which a product issue is flagged.  Opp. DX 48, Huber Feb. Tr. 21:11–22:24. ████████ ████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████ Opp. DX 48 Huber Feb. Tr. 21:11–22:24. ███

████████████████████████████████████████ Opp.

DX 48, Huber Feb. Tr.  21:11–22:24.

f.    Having AQA specialists ████████████████████████████

███████████████████████████████████████ Opp. DX 18,

Lopez Tr. 26:17–27:4.

g.    Using proprietary authentication software and technologies including a Machine

Learning Model, ████████████████████████████████████

██████████████ DX 110, STX0023851 at 856. ████████████████

███████████████████████████████ DX 110, STX0023851 at 856. ████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████ DX 110, STX0023851 at 857.

h.    Employing "security and fraud systems, powered by [] world class partners,"

including AuthO, Riskified, and Braintree, that "have [customers'] personal

information covered 24/7." *See* DX 19, NIKE0005790 at 791; DX 32,

NIKE0038817 at 818 (StockX's August 30, 2022 "How it Works" page); DX 33,

NIKE0040114 at 115 (StockX's October 04, 2022 "How it Works" page stating the

same).  Auth0 is a provider of secure logins and account authentication services,

Riskified is a provider of fraud management software for eCommerce, and

Braintree is a provider of secure payment processing solutions.  Opp. DX 40,

Tucker Rep. ¶ 43.

i.    Using an anti-fraud vendor to monitor seller details and activity, and to detect suspected fraudulent activity.  Opp. DX 47, Huber June Tr. 45:10-20.

j.    Employing a fraud team that ███████████████████████████████ ██████████████████████████████████████████████ Opp. DX 47, Huber June Tr. 42:2-46:3; 60:15-19.   StockX's fraud team investigates other indicators for possible fraud ████████████████████████████████ ██████████████████████████████ Opp. DX 50, STX0108368-369 ████████ ███████████████████████████████

k.    Implementing a policy to "suspend any seller immediately" if a seller sends an item that StockX determines may be inauthentic.  Opp. DX 55, Amidon Tr. 42:5-7.

l.    StockX further disputes Nike's characterization of the quoted testimony as misleading because Paragraph 120 omits additional context needed to understand the quoted testimony.  As StockX expert Dr. Tucker explained, "[f]ull control over the provenance of the products sold would require a resale marketplace to either produce the products or purchase them from the manufacturer, changing resale marketplaces' business model completely.  As a result, resale marketplaces with authentication services and third-party sellers would not be able to exist anymore." Opp. DX 56, Expert Rebuttal Rep. of Catherine Tucker ("Tucker Rebuttal Rep.") ¶ 31.

121.    Mr. Amidon testified that he does not ask where power sellers get their inventory "because it doesn't matter to [StockX] where their source" as StockX relies on its authentication process to identify counterfeits. Ex. 89, Amidon Tr. 31:20-32:4.

a.    <u>Response</u>: Undisputed that Mr. Amidon offered the quoted testimony.

122.    Mr. Amidon testified that power sellers "source their product from anywhere they can get the product from…the goal is always to – to sell more, but I can't say with certainty where exactly their inventory comes from." Ex. 89, Amidon Tr. 26:22-27:14.

    a.    <u>Response</u>: Undisputed that Mr. Amidon offered the quoted testimony.

123.    Mr. Amidon admitted that he doesn't "know with a hundred percent certainty where a seller gets their product from."  Ex. 89, Amidon Tr. 28:05-18.

    a.    <u>Response</u>: Undisputed that Mr. Amidon offered the quoted testimony.

124.    Mr. Lopez admitted that "StockX does receive pairs – pairs before they are released by Nike.com" and he "cannot say where they are coming from" nor does he "know how sellers on StockX's platform obtain pairs of Nike shoes before they are released by Nike through the Nike.com website or the sneakers app." Ex. 48, Lopez Tr. 130:8-131:1.

    a.    <u>Response</u>: Undisputed that Mr. Lopez offered the quoted testimony.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, Paragraph 124 as misleading because Paragraph 124 omits context necessary to understand the quoted testimony.  Mr. Lopez also testified that "Sometimes [brick-and-mortar] retailers will release product before or after a Nike official [online] release date," which would allow consumers to obtain and sell Nike shoes on StockX before they are released online.  Opp. DX 18, Lopez Tr. 129:6–130:10. In addition, Mr. Lopez testified that different regions have "different release dates," so whether something happens before a sneaker is "released to the marketplace" "depends on what region those sneakers are released in."  Opp. DX 18, Lopez Tr. 128:9–21.  Further, Nike's witness testified that ███████████████ ████████████████████████████████████████ Opp. DX

19, Child Tr. 145:9–12; Opp. DX 20, Stec Tr. 259:15–260:2 (acknowledging that "one way" someone could obtain a genuine Nike shoe pre-release is to "[get] that shoe from Nike or from somebody who got it from Nike"); 260:4–7 (agreeing that "Nike sometimes gives away promotional samples before the release date"). Nike's economic expert, Dr. Stec, testified to the various ways in which Nike may not have control over whether shoes become available in the market pre-release, including when shoes are stolen, Nike loses control over some inventory of its products, or authorized resellers give away shoes prior to the release date. Opp. DX 20, Stec Tr. 261:9–262:23.

125.    Professor Kammel opined that "StockX's website and model for selling products, particularly shoes, creates a conducive environment for bad actors to sell counterfeit products. StockX's main sales model runs by taking orders from consumers of postings by anonymous third-party seller, 'authenticating' the products at 'authentication centers', and then shipping the products directly to the consumer. StockX completely shields the identity of the sellers from consumers so consumers know only that they are buying from StockX; the sellers are anonymous to the consumer, there is no seller rating system, no space for feedback from buyers and StockX does not have a refund policy." Kammel Opening Report at 26.

a.    <u>Response</u>: Undisputed that Ms. Kammel offered the quoted opinion. However, StockX disputes the substance of Ms. Kammel's opinion, which is unsupported by evidence and contradicted by evidence in the record, including the opinions and testimony of StockX's expert witness Dr. Catherine Tucker.

b.    StockX has a refund policy for products determined to be inauthentic. Since at least October 2018 StockX's Terms and Conditions have provided that a buyer could

return an item if it "receive[d] an item that it believe[d] to be counterfeit."  Opp.

DX 49, Hansen Tr. 55:1–61:14; DX 39, Hansen Dep. Ex. 6.  And in 2022, StockX

formalized its policy with the Buyer Promise, which covers buyers within a certain

timeframe of receiving an item if they believe StockX made a mistake with their

order, including incorrectly verifying the product.  DX 37, StockX, "What is the

StockX  Buyer  Promise?"  https://stockx.com/help/articles/What-is-the-StockX-

Buyer-Promise ("The StockX Buyer Promise solidifies this mission by providing

support for Buyers should we make a mistake (e.g. we ship you the wrong order,

we incorrectly verify an item).").

c.      Sellers are anonymous only to buyers—not to StockX.  Opp. DX 47, Huber June

Tr. 45:2–13.  StockX collects information on every seller, actively vets them, and

uses seller data to detect potentially fraudulent activity.  DX 110, STX0023851 at

856 ██████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████; Opp. DX 47, Huber June Tr. 42:2-46:3; 60:15-19 (StockX

monitors seller details and activity to ensure StockX identifies fraudulent sellers

and bans them from selling on its platform).

d.      Ms. Kammel ignores the limitations of ratings and reviews.  Opp. DX 56, Tucker

Rebuttal Rep. ¶¶ 62–63.  In particular, ratings can be "noisy," meaning it is hard

for consumers to "judge the quality of their purchase, [and] when buyers

misunderstand the review process and provide irrelevant information, or when

buyers have idiosyncratic tastes and experiences."  Opp. DX 40, Tucker Rep. ¶ 36.

In addition, ratings can be biased because where "providing feedback is optional—as is the case on eBay—ratings will only reflect the experience of a select sample of respondents."  Opp. DX 40, Tucker Rep. ¶ 36. Finally "[r]atings may also be distorted by seller manipulation.  For instance, Fakespot, a fraudulent review detection service, found that 42% of the 720 million Amazon reviews written in 2020 were not genuine. . . . The harm of fake positive reviews can be exacerbated by herding behavior, in which positive fake reviews attract disproportionately more positive reviews and negative experiences go unreported."  Opp. DX 40, Tucker Rep. ¶ 36.

e.    Ms. Kammel ignores that StockX does numerous things to make the platform not conducive to bad actors, including: providing "detailed data about historical prices and live bids and asks for items on the platform," which "helps ensure that neither buyers nor sellers trade at an unfair price on the platform, and [] further discourages the sale of counterfeits by drawing attention to prices that are too low to be credible,"  Opp. DX 40, Tucker Rep. ¶ 9; manually inspecting every product sold on its platform; screening sellers (who are not anonymous to StockX); suspending sellers if they provide a product deemed inauthentic; warning potential bad actors of these procedures; and providing a Buyer Promise that StockX will refund a buyer if an item inadvertently passes its Process but is deemed inauthentic.  Opp. DX 56, Tucker Rebuttal Rep. ¶¶ 64–68.

126.    Professor Kammel opined that "StockX even uses its own professional, high-resolution stock images of Nike products regardless of the identity of the seller or what the seller's product looks like, creating the impression to the consumer that is buying the genuine product seen

in the stock image. This significantly differs from other platforms where the seller posts its own image of the product it is offering for sale." Kammel Opening Report at 26-27.

    a.    <u>Response</u>: Undisputed that Ms. Kammel offered the quoted opinion.  However, StockX disputes the substance of Ms. Kammel's opinion, which is unsupported by evidence and contradicted by evidence in the record, including the opinions and testimony of StockX's expert witness Dr. Catherine Tucker.

    b.    Ms. Kammel cites no literature, research, or studies showing how consumers perceive StockX's representations, and she did not "conduct any study in this case of what messages, if any, consumers took away from the language on StockX's website."  Opp. DX 35, Kammel Tr. 92:12–93:9; 191:23–192:5.  As the Court noted, "StockX is free to challenge Kammel's methodology and to argue that her 'conclusions are unacceptably impressionistic' on cross-examination."  ECF No. 250 at 21.

    c.    Ms. Kammel's own report states that on other e-commerce platforms "sellers . . . use photographs that are copyrighted images taken from the brand."  Opp. DX 34, Kammel Rep. at 9–10.  Therefore, allowing a seller to post its own image would not help ameliorate concerns regarding "creating the impression to the consumer that it is buying a genuine product."  Opp. DX 34, Kammel Rep. at 27.

    d.    Dr. Tucker confirmed this fact, opining that Ms. Kammel's opinion was unsupported because "images provided by sellers can be prone to manipulation", and "[b]uyers on resale marketplaces like eBay often turn to online forums to discuss whether seller photos can be trusted and to report instances of sellers using inaccurate photos.  In addition to repurposing stock images from a brand, sellers

may deceive potential customers by doctoring photographs. Generative artificial intelligence also poses a risk to resale marketplaces where sellers have greater control over listings, as it can be used to generate realistic images." Opp. DX 56, Tucker Rebuttal Rep. ¶ 72.

127.    Professor Kammel opined that "StockX is attractive for counterfeiters, for many reasons, including its protection and shielding of sellers, lack of vetting of sellers and their product provenance." Kammel Opening Report at 27.

a.    <u>Response</u>: Undisputed that Ms. Kammel offered the quoted opinion. However, StockX disputes the substance of Ms. Kammel's opinion, which is unsupported by evidence and contradicted by evidence in the record, including the opinions and testimony of StockX's expert witness Dr. Catherine Tucker.

b.    Rather than shield sellers, StockX "suspend[s] any seller immediately if any seller sends an item that [StockX] determine[s] that may or may not be inauthentic." Opp. DX 55, Amidon Tr. at 42:5–7. StockX takes numerous additional steps to make its platform unattractive to counterfeiters, including:

c.    Physically inspecting every product sold on its platform. Opp. DX 48, Huber Feb. Tr. 60:15–20, 133:10–134:12; DX 14, NIKE0035800 at 804 ("Sellers hold inventory and ship to StockX only when sold; StockX verifies authenticity then ships to buyer for 9.5% commission").

d.    Providing "detailed data about historical prices and live bids and asks for items on the platform" which "helps ensure that neither buyers nor sellers trade at an unfair price on the platform, and [] further discourages the sale of counterfeits by drawing attention to prices that are too low to be credible." Opp. DX 40, Tucker Rep. ¶ 9.

e.  Employing a quality control team that ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

Opp. DX 18, Lopez Tr. 122:4-7.

f.  Employing Quality Assurance and AQA specialists to assist in instances in which

a product issue is flagged.  Opp. DX 48, Huber Feb. Tr. 21:11–22:24.  ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████ Opp. DX 48, Huber Feb. Tr. 21:11–22:24.  The

AQA specialists ████████████████████████████████████████  Opp.

DX 48, Huber Feb. Tr.  21:11–22:24.

g.  Having AQA specialists ████████████████████████████████████

████████████████████████████████████████  Opp. DX 18,

Lopez Tr. 26:17–27:4.

h.  Using proprietary authentication software and technologies including a Machine

Learning Model, ████████████████████████████████████████████

██████████████ DX 110, STX0023851 at 856.  ██████████████████

██████████████████████████████ DX 110, STX0023851 at 856.  ████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████ DX 110, STX0023851 at 857.

i.  Employing "security and fraud systems, powered by [] world class partners,"

including AuthO, Riskified, and Braintree, that "have [customers] personal

information covered 24/7." *See* DX 19, NIKE0005790 at 791; DX 32, NIKE0038817 at 818 (StockX's August 30, 2022 "How it Works" page); DX 33, NIKE0040114 at 115 (StockX's October 04, 2022 "How it Works" page stating the same). Auth0 is a provider of secure logins and account authentication services, Riskified is a provider of fraud management software for eCommerce, and Braintree is a provider of secure payment processing solutions. Opp. DX 40, Tucker Rep. ¶ 43.

j.  Using an anti-fraud vendor to monitor seller details and activity, and to detect suspected fraudulent activity. Opp. DX 47, Huber June Tr. 45:10–20.

k.  Employing a fraud team that █████████████████████████████████████ ███████████████████████████████████████████████████ Opp. DX 47, Huber June Tr. 42:2–46:3; 60:15–19. StockX's fraud team investigates other indicators for possible fraud ██████████████████████████████████ ████████████████████████████ Opp. DX 50, STX0108368–369 ████████████ ██████████████████████

l.  Further, as Dr. Tucker opined, Ms. Kammel's report ignores that "[f]ull control over the provenance of the products sold would require a resale marketplace to either produce the products or purchase them from the manufacturer, changing resale marketplaces' business model completely. As a result, resale marketplaces with authentication services and third-party sellers would not be able to exist anymore." Opp. DX 56, Tucker Rebuttal Rep. ¶ 31.

128.    Professor Kammel opined that "[o]ne of the factors of transparency for a platform, among others, is collecting and disclosing information about the seller and information about the product." Kammel Decl. ¶ 2, Ex. B ("Kammel Rebuttal Report") at 16.

a.    <u>Response</u>: Undisputed that Ms. Kammel offered the quoted opinion.

129.    Professor Kammel opined that "StockX is not transparent—it does not share with buyers who the seller is, photographs of their actual products for sale, the provenance of their products (including place of purchase, country of origin, etc.), or allow a place where sellers can be rated so consumers can see what other consumers' buying experience has been." Kammel Rebuttal Report at 17.

a.    <u>Response</u>: Undisputed that Ms. Kammel offered the quoted opinion.  However, StockX disputes the substance of Ms. Kammel's opinion, which is unsupported by evidence and contradicted by evidence in the record, including the opinions and testimony of StockX's expert witness Dr. Catherine Tucker.

b.    StockX collects information on every seller, actively vets them, and uses seller data to detect <u>potentially</u> fraudulent activity.  DX 110, STX0023851 at 856 ███

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

Opp. DX 47, Huber June Tr. 42:2–46:3; 60:15–19 (StockX monitors seller details and activity to ensure StockX identifies fraudulent sellers and bans them from selling on its platform).

c.    Ms. Kammel ignores the risks associated with allowing sellers to use "photographs of the actual products for sale."  Ms. Kammel's own report states that on other e-

commerce platforms "sellers . . . use photographs that are copyrighted images taken from the brand." Opp. DX 34, Kammel Rep. at 9–10. Dr. Tucker relatedly opined that Ms. Kammel's opinion was unsupported because "images provided by sellers can be prone to manipulation," and "[b]uyers on resale marketplaces like eBay often turn to online forums to discuss whether seller photos can be trusted and to report instances of sellers using inaccurate photos. In addition to repurposing stock images from a brand, sellers may deceive potential customers by doctoring photographs. Generative artificial intelligence also poses a risk to resale marketplaces where sellers have greater control over listings, as it can be used to generate realistic images." Opp. DX 56, Tucker Rebuttal Rep. ¶ 72.

d.   Ms. Kammel ignores that "[f]ull control over the provenance of the products sold would require a resale marketplace to either produce the products or purchase them from the manufacturer, changing resale marketplaces' business model completely. As a result, resale marketplaces with authentication services and third-party sellers would not be able to exist anymore." Opp. DX 56, Tucker Rebuttal Rep. ¶ 31.

e.   Ms. Kammel ignores the limitations of ratings and reviews. Opp. DX 56, Tucker Rebuttal Rep. ¶¶ 62–63. In particular, ratings can be "noisy", meaning it is hard for consumers to "judge the quality of their purchase, [and] when buyers misunderstand the review process and provide irrelevant information, or when buyers have idiosyncratic tastes and experiences." Opp. DX 40, Tucker Rep. ¶ 36. In addition, ratings can be biased because where "providing feedback is optional— as is the case on eBay—ratings will only reflect the experience of a select sample of respondents." Opp. DX 40, Tucker Rep. ¶ 36. Finally "[r]atings may also be

distorted by seller manipulation.  For instance, Fakespot, a fraudulent review

detection service, found that 42% of the 720 million Amazon reviews written in

2020 were not genuine. . . . The harm of fake positive reviews can be exacerbated

by herding behavior, in which positive fake reviews attract disproportionately more

positive reviews and negative experiences go unreported."  Opp. DX 40, Tucker

Rep. ¶ 36.

### 9.    *StockX Often Returns Suspected Counterfeits to the Seller and informs Sellers why their product failed authentication*

130.    ████████████████████████████████████████████

████████████████████████████████████████" Ex. 49, Huber Feb Tr. 23:23-24:4.

a.    <u>Response</u>: Undisputed that Mr. Huber offered the quoted testimony.  However,

StockX disputes Nike's characterization of, and inferences purportedly drawn

from, the quoted testimony as misleading because Paragraph 130 omits context

necessary to understand the quoted testimony.  Mr. Huber testified that ███████

████████████████████████████████████████████

████████████  Opp. DX 48, Huber Feb. Tr. 24:2–20.  ███████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████  PX. 96 at STX0069543 ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████

b.  Where StockX confirms an item as inauthentic, it destroys the item and does not return the item to the seller, or take it into inventory.  Opp. DX 47, Huber June Tr. 56:9-18 (where StockX "got an item that was suspected to be inauthentic, [StockX] would not take it into inventory.  [It] would, of course, make the buyer whole, but those items would not go into a pool that could potentially be resold. And they ultimately get – get destroyed.").

c.  StockX has updated its policy to provide that "StockX has no obligation to return items that do not conform to the description (including, but not limited to, if the item is not new and unworn, is not the size stated, or does not include the original box), or are counterfeit (in which case, StockX may turn those items over to the proper authorities) at your expense."  Opp. DX 57, https://stockx.com/help/en-GB/articles/what-happens-when-a-seller-breaks-the-rules.

131.  StockX publicly stated on its website that "[i]f an item is unable to successfully complete verification, [StockX] will return the item to the shipping address listed on the Seller's StockX account." Duvdevani Decl. ¶ 96, Ex. 95 at NIKE0005905.

a.  <u>Response</u>: Undisputed that PX 95 contains the quoted text.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, PX 95 as misleading because Paragraph 131 omits context necessary to understand the quoted testimony.  Mr. Huber testified that ███████████████████████ ███████████████████████████████████ Opp. DX 48, Huber Feb. Tr. 24:2–20. ████████████ ████████████████████████████████████ ████████████████████████████████████

████████████████████████████████████████    PX. 96 at

STX0069543 ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

b.    Where StockX confirms an item as inauthentic, it destroys the item and does not

return the item to the seller, or take it into inventory.  Opp. DX 47, Huber June Tr.

56:9-18 (where StockX "got an item that was suspected to be inauthentic, [it] would

not take it into inventory.  [StockX] would, of course, make the buyer whole, but

those items would not go into a pool that could potentially be resold.  And they

ultimately get – get destroyed.")

c.    StockX has updated its policy to provide that "StockX has no obligation to return

items that do not conform to the description (including, without limitation, that the

item is not new and unworn, is not the correct identified size, or does not include

the original box), or are counterfeit (in which case, StockX may turn those items

over to the proper authorities) at your cost."  Opp. DX 57,

https://stockx.com/help/en-GB/articles/what-happens-when-a-seller-breaks-the-

rules.

132.    StockX's internal ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████    Duvdevani Decl.

¶ 97, Ex. 96 at STX0069542.

a.    <u>Response</u>: Undisputed that PX 96 contains the quoted text.  However, StockX

disputes Nike's characterization of, and inferences purportedly drawn from, PX 96

as misleading because Paragraph 132 omits context necessary to understand the quoted testimony.  PX 96 is an internal working document and is insufficient to establish StockX's policies at all times and for all purposes in this litigation.

b.    Mr. Huber testified that ███████████████████████████████████

███████████████████████████████ Huber Feb. Tr. 24:2–20. ███████████



c.    Where StockX confirms an item as inauthentic, it destroys the item and does not return the item to the seller, or take it into inventory.  Opp. DX 47, Huber June Tr. 56:9-18 (where StockX "got an item that was suspected to be inauthentic, [it] would not take it into inventory.  [It] would, of course, make the buyer whole, but those items would not go into a pool that could potentially be resold. And they ultimately get – get destroyed.")

d.    StockX has updated its policy to provide that "StockX has no obligation to return items that do not conform to the description (including, without limitation, that the item is not new and unworn, is not the correct identified size, or does not include the original box), or are counterfeit (in which case, StockX may turn those items over to the proper authorities) at your cost."  Opp. DX 58, "What Does the

Verification Process Entail for Sellers?" https://stockx.com/help/articles/what-does-the-verification-process-entail-for-sellers.

133.    StockX publicly stated that "[t]he reason an item fails verification will be clearly communicated to you as a Seller via email." Duvdevani Decl. ¶ 98, Ex. 97 at NIKE0040017.

a.    <u>Response</u>: Undisputed that PX 97 contained the quoted text. However, StockX disputes Nike's characterizations of, and inferences purportedly drawn from, PX 97 as misleading because Paragraph 133 omits context necessary to understand the quoted text. PX 97 pertains to items "that have been previously purchased on the site" and provides that when an item fails authentication it is "often" because "[t]he item shows clear signs of wear/damage that were not present during its initial verification," or because "[t]he box has incurred more damage than is acceptable during the time it was in the Buyer's possession." In addition, Brock Huber, StockX's then Vice President, Corporate Development and Strategy, offered testimony explaining that StockX provides "some level of detail" when an item fails authentication, such as stating there was a "[v]ariation in materials," but does not provide anything "too specific" because "[t]he main takeaway when that happens is that the item is not eligible to transact on our [StockX]." Opp. DX 48, Huber Feb. Tr. 23:5–17.

134.    A StockX document titled ███████████████████████ with the effective date August 2019 and a revision date of June 2022 states: "███████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

Duvdevani Decl. ¶ 81, Ex. 80 at STX0774274.

a.    <u>Response</u>: Undisputed that PX 80 contains the quoted text. However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, PX 80 as misleading because Paragraph134 omits context necessary to understand the quoted text. Brock Huber, StockX's then Vice President, Corporate Development and Strategy, offered testimony explaining that StockX provides "some level of detail" when an item fails authentication, such as stating there was a "[v]ariation in materials," but does not provide anything "too specific" because "[t]he main takeaway when that happens is that the item is not eligible to transact on [StockX]." Opp. DX 48, Huber Feb. Tr. 23:5–17.

135.    On March 22, 2023, support@stockx.com sent an email to a StockX seller stating: "The reason why we are unable to sell this item is because the item you sent does not meet with brand standard. The tongue font and midsole font are different, back heel font is different as well. Therefore since this is your 33 times verification fail *(sic)*. Unfortunately, we can not waive your penalty fee at this time." Duvdevani Decl. ¶ 99, Ex. 98 at STX0205937.

a.    <u>Response</u>: Undisputed that PX 98 contains the quoted text. However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, PX 98 as misleading because Paragraph 135 omits context necessary to understand the quoted text. The StockX customer service representative also states: "StockX is unique in that we only accept new, so we must be very stringent during our verification process. While there is a bit of leeway for common manufacturing variances, the item received was not within our accepted standards." PX 98 at STX0205937. In addition, the seller who received PX 98 indicated that the sneakers at issue were bought "from a retailer." *Id.*

136.    On March 18, 2022, support@stockx.com sent an email to a StockX Seller with the subject line "Re: General Selling CRM:01370003350" stating: "I appreciate you taking the time to follow up with us to gain clarity on your verification results for order #34632205.  I'll be more than glad to assist you.  I understand that you shipped the Jordan 11 Retro Cool Grey (2021) to us with the best intentions to complete the sale.  Looking at this order I can see that this product is unable to be sent to the buyer due to inconsistencies in the construction of the shoe and its box." Duvdevani Decl. ¶ 100, Ex. 99 at STX0204960.

a.    On March 18, 2022, the StockX seller responded to the email chain with the subject line "Re: General Selling CRM:01370003350" stating: "I'm just looking for clear verification so I can educate My team to better serve the sneaker community?" PX 99 at STX0204960.

b.    On March 18, 2022, support@stockx.com responded to the email chain with the subject line "Re: General Selling CRM:01370003350" stating: "Thank you for reaching back out to us.  I'm afraid to inform you that after inspecting your item, our authenticators determined that your pair of Jordan 11 Retro Cool Grey (2021) is not authentic." PX 99 at STX0204960.

c.    On March 18, 2022, the StockX seller responded to the email chain with the subject line "Re: General Selling CRM:01370003350" stating: "Ok if possible can your team educate us by sending a few pictures to pint out what you see so I can educate my team on what to look for. We definitely only want authentic shoes so for education purposes please and thanks." PX 99 at STX0204960.

d.    On March 19, 2022, support@stockx.com responded to the email chain with the subject line "Re: General Selling CRM:01370003350" stating: "Thanks for

reaching back out to us. I can definitely provide you with the pictures our authenticators provided me (please see the images attached). Based on their notes. The main reason for this failed authentication is because the label and box are off, the midsole is too hard and the build and material of the sneakers are off as well. Hope this information was helpful. Please don't hesitate to reach back out to us if you have any other questions or concerns. We're always glad to help. Thank you for being the best part of the StockX family!" PX 99 at STX0204960.

   i. <u>Response</u>: Undisputed that PX 99 contained the quoted language.

137. On April 13, 2022, support@stockx.com responded to a customer support request regarding a seller's "recent sale for the Jordan 1 Retro High Toyko Bio Hack (SIZE: 11.5)," stating: "During the authentication process, our team discovered manufacturing variance on the medial wing of the shoes. The brown part of the wing has a variance that could not come out. I have attached photos taken by our authentication team of the errors found with your order." Duvdevani Decl. ¶ 101, Ex. 100 at STX0211768.

  a. <u>Response</u>: Undisputed that PX 100 contains the quoted text. However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, PX 100 as misleading because Paragraph 137 omits context necessary to understand the quoted text. In PX 100, StockX customer support states, "[i]n the future, we would recommend taking photos of your item in very bright lighting so you will be able to catch any imperfections with your merchandise prior to shipping the item out to us. This may help to avoid this situation from ever occurring again." PX 100.

138. Professor Kammel opined that "[c]ounterfeiters will evolve on StockX's platform to be able to pass 'authentication' and are highly adaptable. The counterfeiter quickly ingests

information as to why a posting is taken down or a product is not sold, is rejected or is returned and they alter their activities or their product." Kammel Rebuttal Report at 9-10.

    a.    <u>Response</u>: Undisputed that Ms. Kammel offered the quoted opinion. However, StockX disputes Nike characterization of, and the inferences purportedly drawn from, Ms. Kammel's opinion as misleading because Paragraph 138 omits necessary context to understand the implications of Ms. Kammel's opinion. StockX "suspend[s] any seller immediately" if a seller sends an item that StockX determines may be inauthentic. Opp. DX 55, Amidon Tr. 42:5–7. In addition, StockX is highly adaptable, and uses a wide variety of techniques to stop counterfeits from being sold on its platform, including:

    b.    Physically inspecting every product sold on its platform. Opp. DX 48, Huber Feb. Tr. 60:15-20, 133:10-134:12; DX 14, NIKE0035800 at 804 ("Sellers hold inventory and ship to StockX only when sold; StockX verifies authenticity then ships to buyer for 9.5% commission").

    c.    Creating proprietary ███████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████ DX 76, Opp. DX 18, Lopez Tr. 214:14-24; *see, e.g.,* ████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████



139.    Professor Kammel opined that StockX's practice of telling "sellers that failed authentication/verification…exactly what features were incorrect and why they were incorrect" is "a reckless practice when it comes to counterfeiting." Kammel Rebuttal Report at 10.

  a.    <u>Response</u>: Undisputed that Ms. Kammel offered the quoted opinion.  However, StockX disputes Paragraph 139 to the extent that it sets forth a legal opinion. StockX further disputes Ms. Kammel's opinion as unsupported by evidence and conflicted by record evidence.  StockX did not tell sellers "exactly what features were incorrect and why they were incorrect."  StockX provides "some level of detail," such as stating there was a "[v]ariation in materials," but does not provide anything "too specific" because "[t]he main takeaway when that happens is that the item is not eligible to transact on [StockX's] platform."  Opp. DX 48, Huber Feb. Tr. 23:5–17.

140.    Professor Kammel opined that "those in the field of brand protection and anti-counterfeiting are acutely aware of the fact that counterfeiters are always improving and using entrepreneurial ways to pass off counterfeit product, they also know that anti-counterfeiting efforts

should not necessarily be made public for the exact reasons we see here—the counterfeiter taking and using the information to improve." Kammel Rebuttal Report at 10.

    a.    <u>Response</u>: Undisputed that Ms. Kammel offered the quoted testimony.  However, StockX disputes the substance of Ms. Kammel's opinion as unsupported by any record evidence that StockX provided information that allowed a counterfeiter to improve.  StockX did not make anti-counterfeiting efforts public;  StockX provides "some level of detail," such as stating there was a "[v]ariation in materials", but does not provide anything "too specific" because "[t]he main takeaway when that happens is that the item is not eligible to transact on [StockX's] platform."  Opp. DX 48, Huber Feb. Tr. 23:5–17.   StockX's Process, as Nike recognizes, is "proprietary." Pls. 56.1 ¶ 44 ("Unlike most online marketplaces, which do not authenticate goods sold on their platforms, StockX uses a proprietary, multi-step authentication process for every product sold on its platform.").

141.    Professor Kammel opined that "[w]hen StockX notifies a seller of exactly why their particular product was rejected (based on what features of the product seemed off), if that seller is a counterfeiter, they will take the information back and make their own 'process improvements' in order to better mimic the genuine product." Kammel Rebuttal Report at 10.

    a.    <u>Response</u>: Undisputed that Ms. Kammel offered the quoted opinion.  However, StockX disputes the substance of Ms. Kammel's opinion as unsupported by any record evidence that StockX "notifie[d] a seller of exactly why their particular product was rejected."  StockX did not notify sellers "of exactly why their particular product was rejected."  StockX provides "some level of detail," such as stating there was a "[v]ariation in materials," but does not provide anything "too specific"

because "[t]he main takeaway when that happens is that the item is not eligible to transact on [StockX's] platform."  Opp. DX 48, Huber Feb. Tr. 23:5–17.

**D.    StockX Offered For Sale, Sold, and Distributed Counterfeit "Nike" Shoes**

142.    Each pair of shoes shown in Appendix A was offered for sale by StockX.  Duvdevani ¶¶ 102-106, Exs. 101-105; Pallett Decl. ¶¶ 8-10, 12, Exs. 1-6, 8-9.

a.    <u>Response</u>: Disputed.  StockX disputes that each and every pair of shoes shown in Appendix A was offered for sale by StockX.  StockX disputes Nike's characterization, and any purported inferences drawn from, the statement that "[e]ach pair of shoes shown in Appendix A was offered for sale by StockX" as misleading because the shoes were sold by third-party sellers, and inspected and verified for sale by StockX; StockX was not the seller.  *See* DX 80, https://stockx.com/about/selling/;  DX 15;  DX 14 ("Detroit-based mobile marketplace matches buyers and sellers of sneakers (deadstock only), streetwear, handbags and watches").  In addition, multiple shoes listed in Appendix A lack StockX tags, receipts, or order numbers and raise a dispute as to their origin or chain of custody.  *See e.g.*, ECF No. 260-1, Appendix A, Pair Nos. 7, 8, 28.  StockX has further doubts about the credibility of Nike's allegations in Appendix A because Nike used photographs of the *same* shoe to depict purportedly unique pairs of counterfeit shoes.  *Cf.* ECF No. 260-1, Appendix A, Pair Nos. 8, 11; *see also* "Pair 4" and "Pair 8" in PX 107 (containing identical images).  Furthermore, Nike has not established the chain of custody for 40 shoes that Nike alleges were purchased by Mr. Malekzadeh and examined by Nike ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ and fails to cite to any record evidence establishing this chain of custody.  ECF No. 260-1, Appendix A, Pairs 38-77.  Mr. Malekzadeh, who

founded the sneaker resale business Zadeh Kicks, is currently facing criminal indictment for a series of fraud-related charges connected to that business. Opp. DX 59, Dep. Tr. of Michael Malekzadeh ("Malekzadeh Tr.") 17:15–19; Opp. DX 60, Matt Halfhill, "The Rise and Multi-Million Dollar Fall of Zadeh Kicks," Nice Kicks, April 12, 2024, https://www.nicekicks.com/the-rise-fall-and-implosion-of-zadeh-kicks-and-why-it-matters-beyond-the-sneaker-world/ ("Zadeh Kicks Founder Michael Malekzadeh and CFO Bethany Mockerman were indicted for wire fraud, conspiracy to commit bank fraud, and money laundering" on July 29, 2022). Mr. Malekzadeh asserted his Fifth Amendment rights when asked about the sneakers at issue, and did not testify that any of them were, in fact, purchased on StockX. Opp. DX 59, Malekzadeh Tr. 17:13–200:24. After Mr. Malekzadeh filed a petition to dissolve his Zadeh Kicks business in May 2022, the business entered receivership and the receiver has reported that Mr. Malekzadeh did not maintain records documenting the chain of custody of his inventory or keep track of how sneakers were procured. Opp. DX 61, Receiver's Initial Inventory and Report, 22 CV 16510, 5 (Oreg. Cir. Ct. July 13, 2022); Opp. DX 59, Malekzadeh Tr. 17:15-19. StockX has had no opportunity to review the alleged counterfeits to determine whether they were, in fact, purchased on StockX's platform, and the limited evidence Nike produced in this litigation does not allow StockX to determine that the sneakers were sold on its platform.

143.    Each pair of shoes shown in Appendix A was shipped by StockX to the person identified in the column titled "Purchaser." Duvdevani ¶ 103, Ex. 102, *id* ¶ 105, Ex. 104; *id.* ¶ 106, Ex. 105, Pallett Decl. ¶¶ 8-10, 12, Exs. 1, 3, 5, 8.

a. <u>Response</u>: Disputed. Defendant disputes that each and every one of the order numbers shown in Appendix A was shipped by StockX to the person identified in the column titled "Purchaser." Multiple shoes listed in Appendix A lack StockX tags, receipts, or order numbers and raise a dispute as to their origin or chain of custody. *See e.g.*, ECF No. 260-1, Appendix A, Pair Nos. 7, 8, 28. StockX has further doubts about the credibility of Nike's allegations in Appendix A because Nike used photographs of the *same* shoe to depict purportedly unique pairs of counterfeit shoes. *Cf.* ECF No. 260-1, Appendix A, Pair Nos. 8, 11; *see also* "Pair 4" and "Pair 8" in PX 108 (containing identical images). Furthermore, Nike has not established the chain of custody for 40 shoes that Nike alleges were purchased by Mr. Malekzadeh and examined by Nike ██████████████████████ ██████████████████████ and fails to cite to any record evidence establishing this chain of custody. ECF No. 260-1, Appendix A, Pairs 38-77. Mr. Malekzadeh, who founded the sneaker resale business Zadeh Kicks, is currently facing criminal indictment for a series of fraud-related charges connected to that business. Opp. DX 59, Malekzadeh Tr. 17:15–19; Opp. DX 60, Matt Halfhill, "The Rise and Multi-Million Dollar Fall of Zadeh Kicks," Nice Kicks, April 12, 2024, https://www.nicekicks.com/the-rise-fall-and-implosion-of-zadeh-kicks-and-why-it-matters-beyond-the-sneaker-world/ ("Zadeh Kicks Founder Michael Malekzadeh and CFO Bethany Mockerman were indicted for wire fraud, conspiracy to commit bank fraud, and money laundering" on July 29, 2022). Mr. Malekzadeh asserted his Fifth Amendment rights when asked about the sneakers at issue, and did not testify that any of them were, in fact, purchased on StockX. Opp.

DX 59, Malekzadeh Tr. 17:13–200:24.  After Mr. Malekzadeh filed a petition to dissolve his Zadeh Kicks business in May 2022, the business entered receivership and the receiver has reported that Mr. Malekzadeh did not maintain records documenting the chain of custody of his inventory or keep track of how sneakers were procured.  Opp. DX 61, Receiver's Initial Inventory and Report, 22 CV 16510, 5 (Oreg. Cir. Ct. July 13, 2022); Malekzadeh Tr. 17:15–19.  StockX has had no opportunity to review the alleged counterfeits to determine whether they were, in fact, purchased on StockX's platform, and the limited evidence Nike produced in this litigation does not allow StockX to determine that the sneakers were sold on its platform.

144.    Each pair of shoes shown in Appendix A has affixed at least one trademark detailed in *supra* Section II. Duvdevani ¶ 102, Ex. 101, *id* ¶ 104, Ex. 103; Pallett Decl. ¶¶ 8-10, 12, Exs. 1-6, 8-9.

    a.    <u>Response</u>:  Undisputed that the images used to represent each pair of shoes in Appendix A has affixed at least one trademark detailed in *supra* Section II. However, StockX disputes the credibility and accuracy of these images, as Nike used photographs of the *same* shoe to depict purportedly unique pairs of counterfeit shoes.  *Cf.* ECF No. 260-1, Appendix A, Pair Nos. 8, 11; *see also* "Pair 4" and "Pair 8" in PX 107 (containing identical images).

145.    The shoe shown in the "Shoe Picture" and "Shoe Description" columns of Appendix A correspond to the order number identified in the "StockX Order #" for every pair of shoes shown in Appendix A. Duvdevani ¶¶ 102-106, Exs. 101-105; Pallett Decl. ¶¶ 8-10, 12, Exs. 1-6, 8-9.

a.    <u>Response</u>: Disputed.  StockX disputes that the shoe shown in the "Shoe Picture" and the "Shoe Description" columns correspond to the order number identified in the "StockX Order #" for every pair of shoes shown because there are clear errors in these columns.  The "Shoe Picture" depicted for "Pair 8" is the same "Shoe Picture" for the shoe depicted for "Pair 11," despite the shoes being purportedly distinct pairs of shoes.  *Cf.* ECF No. 260-1, Appendix A, Pair Nos. 8, 11; *see also* "Pair 4" and "Pair 8" in PX 107 (containing identical images).

146.    The information shown in the "StockX Description of Condition" column of Appendix A quotes the information on the StockX Receipt corresponding to the Shoe Description and Order Number for every pair of shoes shown in Appendix A. Duvdevani ¶ 103, Ex. 102, *id* ¶ 105, Ex. 104; Pallett Decl. ¶¶ 8-10, 12, Exs. 1-6, 8-9.

a.    <u>Response</u>: Disputed.  StockX disputes that the information shown in the "StockX Description of Condition" column of Appendix A quotes the information on the StockX receipt corresponding to the Shoe Description and Order Number for every pair of shoes shown in Appendix A.  Not every pair of shoes shown in Appendix A has a StockX receipt, and thus the information in the "StockX Description of Condition" column sometimes quotes information from a source other than a StockX receipt.  *See* ECF No. 260-1, Appendix A, Pair Nos. 7, 8, 28 (stating "No Receipt.")

147.    For every pair of shoes shown in Appendix A, Nike determined that the pair of shoes corresponding to the "Shoe Description" and "StockX Order #" from the corresponding row were counterfeit.  Duvdevani ¶¶ 102-109, Exs. 101-108; Ex. 46, Pallett Tr. 277:3-18, 299:25-300:18, 306:12-316:25; Duvdevani ¶ 110, Ex. 109, February 1, 2023, Videotaped Deposition

transcript of Laura Rizza, ("Rizza Tr.") at 171:13-174:08, 175:24-177:1, 189:10-15; Pallett Decl. ¶¶ 8-13, Exs. 1-10.

a.  <u>Response</u>: Disputed.  StockX disputes that for every pair of shoes shown in Appendix A, Nike determined that the pair of shoes corresponding to the "Shoe Description" and "StockX Order #" from the corresponding row were counterfeit because there are clear errors in these columns and multiple shoes are missing StockX receipts or order numbers.  *See* ECF No. 260-1, Appendix A, Pair Nos. 7, 8, 28 (stating "No Receipt"); *Cf.* ECF No. 260-1, Appendix A, Pair Nos. 8, 11; *see also* "Pair 4" and "Pair 8" in PX 107 (containing identical images).  Further, ███████

██████████████████████████████████████████████████

████████ StockX further disputes ██████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████ Opp. DX 5, NIKE0025918; Opp. DX 6, NIKE0039044; Opp. DX 7, Delli Carpini Tr. 196:3–4; *see also* Nike Mot. at 3 (explaining ████████████

██████████████████████████████████████████ Opp. DX 8, Rizza Tr. 113:23–114:12 (explaining that Nike's spreadsheet ███████████████

██████████████████████████████████████████████████

████████████████████████████████████).

148.  Certain of the shoes identified in Appendix A were re-inspected by StockX after Nike determined that the shoes were counterfeit. Duvdevani ¶ 111, Ex. 110 at STX0806024; Ex. 46, Ex. 46, Huber June Tr. 9:4-10:4.

     a.     <u>Response</u>: Undisputed that 33 sneakers purchased by Roy Kim were re-inspected by StockX.  However, StockX otherwise disputes Paragraph 148 because the term "certain" is undefined, vague, and unclear.

149.    For the pairs of shoes where the ████████████████████████ ████ StockX authenticators reinspected the shoes, and determined that the shoes were not fit to transact on StockX platform because they were not authentic. Ex. 46, Huber June Tr. 9:4-22; Duvdevani ¶ 111, Ex. 110 (STX0806024).

     a.     <u>Response</u>: Undisputed that for the 33 pairs of shoes where ████████████ ████████████████████████ StockX authenticators inspected the shoes and determined that the shoes were not fit to transact on StockX's platform. PX 46 at 9:04–21.  However, StockX disputes that the cited testimony supports that StockX authenticators determined that the shoes were not fit to transact on StockX's platform "because they were not authentic."  In the cited testimony, Mr. Huber only testified that StockX authenticators "concluded that these items were not fit to transact on our platform."  PX 46 at 9:04–21.

     ***1.    Purchase of Confirmed Counterfeits to Nike Investigators***

        i.    **Purchases by** ████████████

150.    On January 27, 2022, ████████████████████, at the direction of Nike, purchased one pair of Jordan 1 Retro High White University Blue Black shoes in US Mens size 8.5 (style 555088-134), associated with StockX order number 32950992-32850751.  Duvdevani Decl. ¶ 146, Ex. 145; Pallett Decl. ¶ 8, Ex. 1 (corresponding to Pair 1 in Appendix A).

     a.     <u>Response</u>: Undisputed that a buyer purchased one pair of Jordan 1 Retro High White University Blue Black shoes in US Mens size 8.5 (style 555088-134), associated with StockX order number 32950992-32850751.  However, StockX

disputes ¶ 8 in Mr. Pallett's declaration insofar as it seeks to establish that this purchase was made by ███████████████, at the direction of Nike, or on January 27, 2022, because this statement conflicts with the record evidence, which records different purchase order dates for this order and states this purchase was made by Nike—████████████—investigators. *See* "Date of Purchase" column for Row 113 (TP # 112) in Opp. DX 6, NIKE0039044 (stating this order was made on January 21, 2022, and not January 27, 2022); *see also* Pallett Decl. Ex. 1 (stating this shoe was purchased by an individual named █████████); *see* DX 116, Nike's Suppl. Responses and Objections to StockX's Third Set of Interrogatories (stating this purchase was made by "Nike's investigators" and not by ███████ ███████ at the direction of Nike).   Further, Mr. Pallett, Nike's Director of Brand Protection, Authentication and Innovation, is not a ████████ employee and cannot establish the facts set forth in Paragraph 150, which go beyond the fact that Nike provided █████████████ with directions.

151.     The shoe depicted in NIKE00058573 was purchased from StockX.com in connection with StockX order number 32950992-32850751.  Duvdevani Decl. ¶ 146, Ex. 145; Pallett Decl. ¶ 8, Exs. 1-2 (corresponding to Pair 1 in Appendix A).

a.     Response: Disputed.  No document bearing the control number NIKE00058573 has been produced in this litigation.  Assuming Nike intended to refer to NIKE0005857 (Pallett Decl. Ex. 2) instead, StockX disputes ¶ 8 in Mr. Pallett's declaration insofar as it seeks to establish that the shoe depicted in Pallett Decl. Ex. 2 was purchased on StockX.com or is associated with StockX order number 32950992-32850751. Nike does not point to any record evidence for this assertion, the shoe pictured does

not have a StockX tag, and Nike did not produce any evidence to establish a connection between the shoe depicted in Pallett Decl. Ex. 2 and StockX order number 32950992-32850751.  For example, ███████████████████████

████████████████████████████████████

*See* Opp. DX 6, NIKE0039044.  StockX accordingly cannot discern whether the shoe depicted in Pallett Decl. Ex. 2 was purchased on StockX's platform in connection with StockX order number 32950992-32850751.  StockX further disputes that Mr. Pallett, who is not mentioned on PX 145, can establish the facts set forth in Paragraph 151, which go beyond that fact that Nike provided ████████ ███████ with directions.  In addition, StockX disputes Nike's characterization, and any purported inferences drawn from, the statement that "the shoe depicted in NIKE00058573 was purchased from StockX.com" as misleading because the shoe was sold by a third-party seller, and inspected and verified for sale by StockX; StockX was not the seller.  *See* DX 80, https://stockx.com/about/selling/; DX 15; DX 14 ("Detroit-based mobile marketplace matches buyers and sellers of sneakers (deadstock only), streetwear, handbags and watches").

152.    On January 28, 2022, ████████████████ at the direction of Nike, purchased one pair of Jordan 1 Retro High White University Blue Black shoes in U.S. Men's size 8 (style 555088-134), associated with StockX order number 32985400-32885159.  Duvdevani Decl. ¶ 147, Ex. 146; Pallett Decl. ¶ 9, Ex. 3 (corresponding to Pair 2 in Appendix A).

    a.    <u>Response</u>: Undisputed that a buyer purchased one pair of Jordan 1 Retro High White University Blue Black shoes in U.S. Men's size 8 (style 555088-134), associated with StockX order number 32985400-32885159.  However, StockX

disputes ¶ 9 in Mr. Pallett's declaration insofar as it seeks to establish that this purchase was made by ▮▮▮▮▮▮▮▮▮ at the direction of Nike, because this assertion conflicts with the record evidence, which states that Nike investigators or an individual named ▮▮▮▮▮▮▮ made this purchase. *See* Pallett Decl. Ex. 3 (stating the shoe was purchased by an individual named ▮▮▮▮▮▮▮); Nike's Suppl. Responses and Objections to StockX's Third Set of Interrogatories (stating this purchase was made by "Nike's investigators" and not by ▮▮▮▮▮▮▮ at the direction of Nike). *See* DX 116. Further, Mr. Pallett, Nike's Director of Brand Protection, Authentication and Innovation, is not a ▮▮▮▮▮ employee and cannot establish the facts set forth in Paragraph 152, which go beyond the fact that Nike provided ▮▮▮▮▮▮▮▮▮ with directions.

153. The shoe depicted in NIKE0005873 was purchased from StockX.com in connection with StockX order number 32985400-32885159. Duvdevani Decl. ¶ 147, Ex. 146; Pallett Decl. ¶ 9, Exs. 3-4 (corresponding to Pair 2 in Appendix A).

    a. <u>Response</u>: Disputed. StockX disputes ¶ 9 in Mr. Pallett's declaration insofar as it seeks to establish that the shoe depicted in NIKE0005873 (Pallett Decl. Ex. 4) was purchased on StockX.com or is associated with StockX order number 32985400-32885159 because Nike does not point to any record evidence for this assertion, the shoe pictured does not have a StockX tag, and Nike did not produce any evidence to establish a connection between the shoe depicted in Pallett Decl. Ex. 4 and StockX order number 32985400-32885159. For example, ▮▮▮▮▮▮▮

██. *See* Opp. DX 6, NIKE0039044.  StockX accordingly cannot discern whether the shoe depicted in Pallett Decl. Ex. 4 was purchased on StockX.com in connection with StockX order number 32985400-32885159.  StockX further disputes that Mr. Pallett, who is not mentioned on PX 147, can establish the facts set forth in Paragraph 153.  In addition, StockX disputes Nike's characterization, and any purported inferences drawn from, the statement that "[t]he shoe depicted in NIKE0005873 was purchased from StockX.com" as misleading because StockX was not the seller of the shoe, and the shoe was sold by a third-party seller on StockX's platform.  *See* DX 80, https://stockx.com/about/selling/; DX 15; DX 14 ("Detroit-based mobile marketplace matches buyers and sellers of sneakers (deadstock only), streetwear, handbags and watches").  Further, Mr. Pallett, Nike's Director of Brand Protection, Authentication and Innovation, is not a ██████ employee and cannot establish the facts set forth in Paragraph 153, which go beyond the fact that Nike provided ██████████ with directions.

154.    On January 28, 2022, ████████████ at the direction of Nike, purchased one pair of Jordan 1 Retro High OG Patent Bred shoes in U.S. Men's size 9 (style 555088-063), associated with StockX order number 32986461-32886220.  Duvdevani Decl. ¶ 148, Ex. 147; Pallett Decl. ¶ 10, Exs. 5-6 (corresponding to Pair 3 in Appendix A).

a.    <u>Response</u>: Undisputed that a buyer purchased one pair of Jordan 1 Patent Bred shoes in U.S. Men's size 9 (style 555088-063), associated with StockX order number 32986461-32886220.  However, StockX disputes ¶ 10 in Mr. Pallett's declaration insofar as it seeks to establish that this purchase was made by ██████ ██████████ at the direction of Nike, because this assertion conflicts with the

record evidence, which states this purchase was made by Nike investigators or an individual named ███████████ *See* Pallett Decl. Ex. 5 (stating that the shoe was purchased by an individual named "███████████; *see also* DX 116, Nike's Suppl. Responses and Objections to StockX's Third Set of Interrogatories (stating this purchase was made by "Nike's investigators" and not by ███████████ at the direction of Nike). Further, Mr. Pallett, Nike's Director of Brand Protection, Authentication and Innovation, is not a ██████ employee and cannot establish the facts set forth in Paragraph 154, which go beyond the fact that Nike provided ███████████ with directions.

155.   After receiving Pairs 1-3, ███████████ retained custody of the shoes until a member of Nike's Brand Protection Team sent them on April 19, 2022 from Nike European Headquarters to Nike World Headquarters in Beaverton, Oregon. Pallett Decl. ¶ 11, Ex. 7 (Pairs 1-3 in Appendix A).

a.   <u>Response</u>: Disputed. StockX disputes ¶ 11 in Mr. Pallett's declaration insofar as it seeks to establish that ███████████ retained custody of the shoes until a member of Nike's Brand Protection Team sent them on April 19, 2022 from Nike European Headquarters to Nike World Headquarters in Beaverton, Oregon, because the record evidence Mr. Pallett cites does not establish this fact, nor does Nike cite to any other evidence in support of this statement. Pallett Decl. Ex. 7 only states that a DHL shipment was made from Hilversum, Netherlands, on April 19, 2022, but otherwise does not identify the receiver's address, chain of custody, or any details on what this shipment contained. Further, Mr. Pallett, Nike's Director

of Brand Protection, Authentication and Innovation, is not a ▇▇▇▇ employee

and cannot establish the facts set forth in Paragraph 155.

156.    Mr. Pallett reviewed Pairs 1-3 ▇▇▇▇▇ and determined they were counterfeit.
Duvdevani Decl. ¶ 107, Ex. 106; Ex. 41, Pallett Tr. 277:3-18; 299:25-300:18.

a.    <u>Response</u>: Undisputed that Mr. Pallett reviewed Pairs 1-3 ▇▇▇▇  However,

StockX disputes the characterization that these shoes were conclusively counterfeit

as the record demonstrates ▇▇▇▇▇▇▇▇▇▇▇

▇▇▇    Nike has ▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇ Opp. DX 5, NIKE0025918; Opp.

DX 6, NIKE0039044; Opp. DX 7, Delli Carpini Tr. 196:3–4.  Nike's own witness

testified ▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇ Nike Mot. at 3; Opp. DX 8, Rizza Tr.

113:23–114:12 (explaining that Nike's spreadsheet ▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇

157.    On February 8, 2023, Mr. Pallett testified that he ▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇ Ex. 41, Pallett Tr. 277:19-24; 279:16-

281:06.

a.    <u>Response</u>: Undisputed that Mr. Pallett offered the quoted testimony. However,

StockX disputes Nike's characterization of, and inferences purportedly drawn

from, Mr. Pallet's testimony as misleading because Nike omits Mr. Pallett's testimony on ████████████████████████ PX 41 at 279:23–280:17. Mr. Pallett testified that he ████████████████████████ ████████████████████████ PX 41 at 280:05–16.

ii.    **Purchase by** ████████████████

158.    On December 9, 2021, ████████████████ at the direction of Nike, purchased one pair of Jordan 1 Retro High OG Patent Bred shoes in U.S. Men's size 12 (style 555088-063), associated with StockX order number 30695056-30594815. Duvdevani Decl. ¶ 149, Ex. 148; Pallett Decl. ¶ 12, Exs. 8-9. (corresponding to Pair 4 in Appendix A).

a.    <u>Response</u>: Undisputed that a buyer purchased one pair of Jordan 1 Retro High OG Patent Bred shoes in U.S. Men's size 12 (style 555088-063), associated with StockX order number 30695056-30594815. However, StockX disputes ¶ 12 in Mr. Pallett's declaration insofar as it seeks to establish that this purchase was made by ████████████████ at the direction of Nike, based on the cited evidence. PX 148 and Pallett Decl. Ex. 8 redact all information related to the purchaser of the shoe, and Nike cites to no evidence explaining whether the purchaser is connected to ████████████ or Nike. In addition, Mr. Pallett, Nike's Director of Brand Protection, Authentication and Innovation, is not an ████████ employee and cannot establish the facts set forth in Paragraph 158, which go beyond the fact that Nike provided ████████████ with directions. Furthermore, Nike's response to StockX's Interrogatory No. 20 states this purchase was made by "Nike's investigators" and not by ████████████ at the direction of Nike.

*See* DX 116 Nike's Suppl. Responses and Objections to StockX's Third Set of Interrogatories.

b.  In addition, Nike's assertion that Mr. Pallett relied on 
*see* Pls. 56.1 ¶ 26.

159.  On December 23, 2021, ███████████ received the shoes associated with StockX order number 30695056-30594815.  Pallett Decl. ¶ 13, Ex. 10 (corresponding to Pair 4 in Appendix A).

a.  <u>Response</u>: Undisputed that an individual named ███████████ received a "NIKE Jordan1 Retro High OG Bred Patent" associated with order number 30695056-30594815 on December 23, 2021.  However, StockX disputes ¶ 13 in Mr. Pallett's declaration insofar as it seeks to establish tha███████████ received this shoe because the cited evidence does not support this assertion.  Pallett Decl. Ex. 10 does not identify any particular individual as an ███████████," nor does it provide context on ███████ s identity or potential connection to ███████.

b.  In addition, Mr. Pallett, Nike's Director of Brand Protection, Authentication and Innovation, is not an ███████ employee and cannot establish the facts set forth in Paragraph 159, which go beyond the fact that Nike provided ███████ ███████ with directions.

160.    On January 13, 2022, ███████████████ at the direction of Nike, shipped Pair 4, the shoes associated with StockX order number 30695056-30594815, via UPS to Nike World Headquarters in Beaverton, Oregon.  Pallett Decl. ¶ 13, Ex. 10 (corresponding to Pair 4 in Appendix A).

      a.    <u>Response</u>: Undisputed that an individual named ███████████ released from her custody a "NIKE Jordan1 Retro High OG Bred Patent" associated with order number 30695056-30594815 on January 13, 2022.  However, StockX disputes ¶ 13 in Mr. Pallett's declaration insofar as it seeks to establish that ███████ ███████ at the direction of Nike, shipped this shoe to Nike World Headquarters in Beaverton, Oregon because the cited evidence does not support this assertion.  Paragraph 13 of Mr. Pallett's declaration does not state that ███████████ shipped Pair 4 *at Nike's direction.*  In addition, Pallett Decl. Ex. 10, the support to which Mr. Pallett cites for Paragraph 13 of his declaration, does not state the shoe was shipped to Nike World Headquarters, nor include a receiver's address at all.  Pallett Decl. Ex. 10 also does not identify any particular individual as an ███████████ nor does it provide context on ███████ identity or potential connection to ███████ In addition, Mr. Pallett, Nike's Director of Brand Protection, Authentication and Innovation, is not an ███████ employee and cannot establish the facts set forth in Paragraph 160, which go beyond the fact that Nike provided ███████████████ with directions.

161.    Mr. Pallett reviewed Pair 4 ███████ and determined it was counterfeit. Duvdevani Decl. ¶ 107, Ex. 106; Ex. 41, Pallett Tr. 277:3-18; 299:25-300:18.

a.    <u>Response</u>: Undisputed.

**2.    *Confirmed Counterfeits Sold to Roy Kim***

162.    Between March and July 2022, StockX customer Roy Kim, a sneaker collector and reseller, purchased 62 pairs of Nike-branded shoes on StockX's platform.  Duvdevani Decl. ¶ 112, Ex. 111, February 8, 2023, Videotaped Deposition Transcript of Roy Ikhyun Kim ("Kim Tr.") at 23:06-24, 33:24-63:2.

a.    <u>Response</u>: Undisputed that Roy Kim is a sneaker collector and reseller.  However, StockX disputes that Roy Kim purchased 62 pairs of Nike-branded shoes on StockX's platform between March and July 2022 because record evidence shows that he purchased ███ total Nike-branded shoes on StockX's platform during this time period.  Opp. DX 62, STX0774240.

163.    StockX "authenticated" each pair of those shoes, verified to Mr. Kim that they were "100% Authentic," and shipped them to Mr. Kim's California address.  Ex. 111, Kim Tr. 33:24-63; Duvdevani Decl. ¶ 106, Ex. 105 (StockX's 2d Suppl, Responses and Objections to Nike's Second Set of RFA Nos. 88-284) (corresponding to Pairs 5-37 in Appendix A).

a.    <u>Response</u>:  Disputed.  StockX does not dispute that StockX passed 62 pairs of shoes through StockX's Process and shipped them to Mr. Kim's California address.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, PX 111 and PX 105 as misleading because Mr. Kim's testimony and StockX's admissions regarding any "100% Authentic" language were not in the context of StockX's pre-sale advertising language, but in the context of emails or receipts StockX sent to consumers after they made purchasing decisions on the StockX platform.  Mr. Kim testified that for certain shoes he purchased on StockX's platform, the order confirmation emails he received after he made his purchase on

the StockX platform described the shoe's condition as "New, 100% Authentic." PX 111 at 33:24–36:12.  StockX also only admitted that certain receipts related to Mr. Kim's purchases contained the phrase "Condition New; 100% authentic," but did not otherwise admit to any representations made to Mr. Kim prior to the shoe sales.  PX 105 Nos. 88–284.  StockX further disputes Nike's characterization of, and inferences purportedly drawn from, Nike's statement that "StockX 'authenticated' each pair of shoes" to the extent that Nike intends to use the word "authenticate" to mean anything beyond StockX's Process, during which StockX authenticators review products to determine whether they meet StockX's standards for sale or possess any indicia of counterfeit.  *See* DX 75, STX0752605.

164.    Mr. Kim testified that he stored Pairs 5-37 in his garage after receiving them from StockX. Ex. 111, Kim Tr. 85:11-13.

   a.    <u>Response</u>: Undisputed that Mr. Kim offered the summarized testimony.

165.    On July 5, 2022, Mr. Kim, using the handle "sneakerstrut" posted on Instagram: "I bought about 62 pairs of Uni/Mocha/Hyper Royals through StockX over the last month. Of those, 36 have failed authentication at CheckCheck and LegitCheck app…This means that StockX's authentication on these pairs is only 42% accurate – 58% of pairs they are selling will be marked as 'not legit' consistently by other sources.'" Duvdevani Decl. ¶ 113, Ex. 112 at NIKE0036330-333; Ex. 111, Kim Tr. 75:21-76:2, 77:3-21, 78:1-82:13.



Roy Kim (@sneakerstrut), INSTAGRAM, https://www.instagram.com/p/CfprXUSpU-r/ (last visited August 8, 2024).

a.  <u>Response</u>: Undisputed that Mr. Kim created an Instagram post with the quoted language. However, StockX disputes the accuracy of the data in Mr. Kim's post. Between March and July 2022, Mr. Kim purchased ███ pairs of Nike-branded shoes on StockX's platform. Opp. DX 62, STX0774240. Furthermore, Nike only alleges 33 (and not 36) of these purchases are counterfeit in its motion. Nike Mot. at 6, 16.

166. Prior to posting on Instagram, Mr. Kim attempted to reach StockX's customer service team three times regarding his order and received no response. Ex. 111, Kim Tr. 29:17-30:07; Ex. 89, Amidon Tr. 79:10-82:20.

a.    <u>Response</u>: Disputed. Nike's assertion that Mr. Kim attempted to reach StockX's customer service team three times without receiving a response prior to posting on Instagram is unsupported by the record cited. Mr. Kim testified that he reached out to StockX's customer service twice, once via email chat and once via the messaging platform Discord, prior to posting on Instagram. PX 11 at 29:17-30:07.

167.    On July 7, 2022, Mr. Amidon sent an email to Mr. Kim stating "We saw your post…" Duvdevani Decl. ¶ 114, Ex. 113 at STX0772942; Ex. 89, Amidon Tr. 87:07-88:25.

a.    <u>Response</u>: Undisputed that Mr. Amidon sent an email to Mr. Kim beginning with the phrase, "We saw your post…" However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, PX 89 as misleading because Nike intentionally omits Mr. Amidon's complete sentence, which explains that StockX was not aware of Mr. Kim's prior inquiries to customer service, and that StockX reached out in order to resolve his concerns. Mr. Amidon wrote to Mr. Kim, "We saw your post and didn't see any inquiries sent to customers service about the issue, so I wanted to reach out and help." PX 89 at STX0772944.

168.    Mr. Amidon testified that he called Mr. Kim and "spoke to [Mr. Kim] about [Mr. Kim's] Instagram post and introduced who [he] was…and offered to assist in what [Mr. Kim] would like to proceed next with, and [they] discussed returning the shoes for further inspection." Ex. 89, Amidon Tr. 88:15-25.

a.    <u>Response</u>: Undisputed that Mr. Amidon provided the summarized and quoted testimony.

169.    On July 10, 2022, counsel for Nike became aware of Mr. Kim's July 5, 2022 Instagram post and contacted Mr. Kim.  Duvdevani Decl. ¶ 115, Ex. 114 at NIKE0029032; *id.* at Ex. 111, Kim Tr. 82:22-83:12.

    a.    <u>Response</u>: Undisputed that counsel for Nike contacted Mr. Kim regarding his Instagram post on July 10, 2022.  However, StockX disputes that counsel for Nike became aware of Mr. Kim's post on July 10, 2022 because the cited evidence does not support this assertion.

170.    On July 22, 2022, Mr. Pallett traveled with a member of Nike's outside counsel team to Mr. Kim's California residence to conduct an in-person review of some of the pairs of "Nike" shoes that Mr. Kim had purchased on StockX and suspected to be fake.  (Dkt. 195, Oct. 12, 2023 Pallett Decl. at ¶¶ 2, 4); Ex. 111, Kim Tr. 83:12-85:09; Ex. 41, Pallet Tr. 306:12-316:25.

    a.    <u>Response</u>: Undisputed.

171.    As part of Mr. Pallett's review, he ███████ to determine that Pairs 5-37 in Appendix A were counterfeit. (Dkt. 195, Oct. 12, 2023 Pallett Decl. at ¶ 5); Duvdevani Decl. ¶ 108, Ex. 107 (NIKE0029087); Ex. 41, Pallet Tr. 306:12-316:25.

    a.    <u>Response</u>:  Undisputed that Mr. Pallett ███████ and undisputed that 33 pairs of Nike sneakers Mr. Kim purchased (which StockX had an opportunity to re-review) were counterfeit.  However, StockX disputes that the specific pairs identified in Appendix A, as "Pairs 5-37" are unique pairs of sneakers.  *Cf.* "Pair 4" and "Pair 8" in PX 107 (containing identical images for purportedly unique shoes); *see also* ECF No. 260-1, Appendix A, Pair Nos. 8, 11 (containing identical images).  Further, StockX disputes that ████████████████████ ██████████  For instance, in the context of this case, ████████████

███████████████████████████████████████████

████████  Opp. DX 5, NIKE0025918; Opp. DX 6, NIKE0039044; Opp. DX 7,

Delli Carpini Tr. 196:3-4. ██████████████████████████████████

███████████████████████████████████████  Opp. DX 5,

NIKE0025918.  Nike itself admits ██████████████████████████

███████████████████████████████████  Nike Mot. at 3; Opp.

DX 8, Rizza Tr. 113:23–114:12 (explaining that Nike's spreadsheet ███████

███████████████████████████████████████████

███████████████████████████████████████████

████████████).  Further, █████████████████████████████████

███████████████████████████████████████████

██████.  Opp. DX 9, Pallett Tr. 16:17–17:8 (Nike must ██████████████

██████████████████████████  Mr. Pallett, Nike's Director, Brand

Protection, Authentication and Innovation, testified that ███████████████

███████████████████████████████████████████

██████████████████████████████.  Opp. DX 9,

Pallett Tr. 165:6–18.  For example, Mr. Pallett testified that ████████████

███████████████████████████████████████████

███████████████████████████████  Opp. DX 9, Pallett

Tr. 165:19–167:23. ████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████  Opp. DX

9, Pallett Tr. 167:14–172:20. ████████████████████████████



Opp. DX 10, NIKE0037982; Opp. DX 11, NIKE0037984; Opp. DX 12, NIKE0037849; Opp. DX 13, NIKE0037856; Opp. DX 14, NIKE0038038; Opp. DX 15, NIKE0038039.

172.    On completing his review of Mr. Kim's shoes, Mr. Pallett left Mr. Kim's residence and did not remove from Mr. Kim's residence Pairs 5-37 or any of the shoes that Mr. Pallett had inspected.  (Dkt. 195, Oct. 12, 2023 Pallett Decl. at ¶ 5); Ex. 41, Pallet Tr. 306:12-316:25.

    a.    Response: Disputed.  Nike's assertion that Mr. Pallett left Mr. Kim's residence and did not remove from Mr. Kim's residence Pairs 5-37 or any of the shoes that Mr. Pallett had inspected is unsupported by the record cited.  To the extent Nike intended to rely instead on ¶ 6 of Dkt. 195, Oct. 12, 2023 Pallett Decl., undisputed that Mr. Pallett left Mr. Kim's residence and did not remove from Mr. Kim's residence Pairs 5-37 or any of the shoes that Mr. Pallett had inspected.

173.    On July 25, 2023, Mr. Kim returned 33 pairs of shoes to StockX using shipping labels StockX had provided.  Ex. 111, Kim Tr. 85:11-23.

    a.    Response: Undisputed.

174.    On July 25, 2022, Nike sent a letter to StockX advising that Nike had reviewed Mr. Kim's shoes and determined that at least 38 "Nike" shoes that StockX sold to Mr. Kim were counterfeit.  Nike relayed its understanding that Mr. Kim was shipping the shoes back to StockX

and demanded that it preserve "all evidence relating to the shoes once they are received by StockX," including any reauthentication of the shoes. Duvdevani Decl. ¶ 116, Ex. 115 (July 25, 2022 Duvdevani Ltr.).

    a.    <u>Response</u>: Undisputed that on July 25, 2022, Nike sent a letter to StockX advising that Nike had reviewed shoes in Mr. Kim's custody and determined that 38 pairs of shoes in total were counterfeit. However, StockX disputes that Nike was able to conclude that these shoes were sold by StockX, and StockX disputes Nike's characterization of its letter as misleading to the extent that it suggests Nike believed there were potentially more counterfeit shoes sold by StockX in Mr. Kim's possession. The letter stated that Nike had determined there were 38 counterfeit pairs in total, and not "at least" 38 counterfeit pairs. Furthermore, as Nike admits in its partial motion for summary judgment, "5 of these 38 counterfeit pairs" did not have StockX "Verified Authentic" tags affixed to the footwear and/or receipts in the box. Nike Mot. at 6. Accordingly, Mr. Pallett testified that for shoes he examined in Mr. Kim's possession that were "missing a StockX tag or [] receipt," he did not know whether or how Nike was able to conclude that the shoes were sold by StockX. Opp. DX 9, Pallett Tr. 315:4–18.

### 3. *"Authentication" and "Re-Authentication" of Roy Kim Shoes by StockX*

175. Prior to their shipment to Roy Kim, on June 30, 2022, a StockX authenticator, Raymond Jones, authenticated the pair of "Air Jordan 1 Retro High White University Blue Black" shoes associated with Order Number 388136988 ("Pair 14"). Duvdevani Decl. ¶ 111, Ex. 110 (STX0806024 at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Row 22); *id.* ¶¶ 117-118, Exs. 116-117 (STX0806022-STX0806023); Ex. 46, Huber June Tr. 72:21-80:25 (corresponding to Pair 14 in Appendix A).

a.    <u>Response</u>: Disputed that prior to their shipment to Roy Kim, on June 30, 2022, a
StockX authenticator, Raymond Jones authenticated the pair of "Air Jordan 1 Retro
High White University Blue Black" shoes associated with Order Number
388136988, because this order number does not appear in STX0806024 (and is not
listed in Appendix A to Nike's Motion).  To the extent that Nike meant to describe
Order Number "38813688" and not "388136988," undisputed that Raymond Jones,
a former StockX authenticator, reviewed a pair of "Air Jordan 1 Retro High White
University Blue Black" shoes associated with Order Number 38813688 and passed
it through StockX's Process prior to it being shipped to Roy Kim.  However,
StockX disputes Nike's characterization of, and inferences purportedly drawn
from, Nike's determinations regarding the shoe associated with Order Number
388136988, because Nike's documentation of its counterfeiting investigation
contains discrepancies regarding this order number.  For example, while Nike
alleges it reviewed this shoe in Mr. Kim's possession, Mr. Kim never returned this
shoe for reinspection to StockX.  *See* PX 105 at Second Supplemental Response
No. 144 (denying that "that the goods purchased by Mr. Kim in StockX Order
Number 38913929-38813688 were returned to StockX or are currently in StockX's
possession").  StockX further disputes that Mr. Jones is currently a StockX
authenticator, as his employment with StockX has since been terminated.  Opp. DX
47, Huber June Tr. 21:21–22:5.  StockX further disputes Nike's characterization of,
and inferences purportedly drawn from, Nike's statement that "StockX
'authenticated' each pair of shoes" to the extent that Nike intends to use the word
"authenticate" to mean anything beyond StockX's Process, during which StockX

authenticators review products to determine whether they meet StockX's standards for sale or possess any indicia of counterfeit. *See* DX 75, STX0752605.

176.    A video ███ ██████████████████████████████████████

██████████ Duvdevani Decl. ¶ 111, Ex. 110 (STX0806024 at ████████████████████

██████ Row 22); *id.* ¶¶ 117-118, Exs. 116-117 (STX0806022-STX0806023); Ex. 46, Huber June

Tr. 72:21-80:25 (Pair 14 in Appendix A).

a.    <u>Response:</u> ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ PX 46 at 72:21-80:25.

StockX disputes further Nike's characterization of, and inferences purportedly drawn from, Nike's determinations regarding the shoe associated with Order Number 388136988, because Nike's documentation of its counterfeiting investigation contains discrepancies regarding this order number.  For example, while Nike alleges it reviewed this shoe in Mr. Kim's possession, Mr. Kim never returned this shoe for reinspection to StockX.  *See* PX 105 at Second Supplemental Response No. 144 (denying that "that the goods purchased by Mr. Kim in StockX Order Number 38913929-38813688 were returned to StockX or are currently in StockX's possession.").

b.    StockX further disputes the implication that a visual inspection is the only component of StockX's Process.  ██ ███████████████████████████████████ ████████████████████████████████ Opp. DX 47, Huber June Tr. 42:2–46:3; 60:15–19 (StockX monitors seller details and activity to ensure StockX identifies fraudulent sellers and bans them from selling on its platform).  StockX's fraud team investigates other indicators for possible fraud ███████████████████████████████████ ████████████ Opp. DX 50, STX0108368-369 ████████████████ ████████████████  StockX also provides "detailed data about historical prices and live bids and asks for items on the platform" which "helps ensure that neither buyers nor sellers trade at an unfair price on the platform, and it further discourages the sale of counterfeits by drawing attention to prices that are too low to be credible."  Opp. DX 40, Tucker Rep. ¶ 9, 44–45.  StockX employs a quality control team that ██████████████████████████████ ████████████████████████████████ ████████████████████████ Opp. DX 18, Lopez Tr. 122:4–7.  StockX Quality Assurance and AQA specialists to assist in instances in which a product issue is flagged.  Opp. DX 48, Huber Feb. Tr. 21:11–22:24.  ████ ████████████████████████████████ ████████████████████████████████ ████████████████████ Opp. DX 48, Huber Feb. Tr. 21:11–22:24. The AQA specialists ██████████████████████████████ Opp. DX 48, Huber Feb. Tr. 21:11-22:24.  StockX AQA specialists ████████

███████████████████████████████████████████

████████████████████ Opp. DX 18, Lopez Tr. 26:17-27:4. StockX also uses

proprietary authentication software and techniques, including a Machine Learning

Model ██████████████████████████████████████████

██████ DX 110, STX0023851 at 856. ██████████████████████

████████████████████████ DX 110, STX0023851 at 856. █████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████ DX 110, STX0023851 at 857. StockX also has "policies in

place that punish and ban sellers who attempt to not uphold their end of the sales

contract: either not shipping it to us, shipping the wrong item, shipping the wrong

size, shipping it used, shipping without accessories, shipping it with a missing or

damaged box, shipping a product that has significant variances, so as to raise

suspicion of our authentication process. . . . by punishing these sellers through

penalty fees, through outright banning, it has become a less -- we have become a

less desirable avenue." Opp. DX 48, Huber Feb. Tr. 136:20–137:6; Opp. DX 40,

Tucker Rep. ¶ 42 (StockX works to ensure "that only reliable buyers and sellers use

the platform" by suspending the accounts of "sellers who repeatedly do not

complete sales or send in items that fail verification.").

177.    Prior to their shipment to Roy Kim, on June 2, 2022, a StockX authenticator, Taji

Graves, authenticated the pair of "Air Jordan 1 Retro High White University Blue Black" shoes

associated with Order Number 37757871 ("Pair 16"). Duvdevani Decl. ¶ 111, Ex. 110

(STX0806024 at ███████████; *id.* ¶¶ 119-120, Exs. 118-119 (STX0806003-STX0806004);

Ex. 46, Huber June Tr. 81:3-82:18 (corresponding to Pair 16 in Appendix A).

    a.    <u>Response</u>: Undisputed that a StockX authenticator named Taji Graves reviewed a

          pair of "Air Jordan 1 Retro High White University Blue Black" shoes associated

          with Order Number 37757871 and passed the shoe through StockX's Process prior

          to it being shipped to Roy Kim.  StockX further disputes Nike's characterization

          of, and inferences purportedly drawn from, Nike's statement that "StockX

          'authenticated' each pair of shoes" to the extent that Nike intends to use the word

          "authenticate" to mean anything beyond StockX's Process, during which StockX

          authenticators review products to determine whether they meet StockX's standards

          for sale or possess any indicia of counterfeit.  *See* DX 75, STX0752605.

    178.    ████████████████████████████████████

████████████████████ Duvdevani Decl. ¶ 111, Ex. 110 (STX0806024 at ███████████

*id.* ¶¶ 119-120, Exs. 118-119 (STX0806003-STX0806004); Ex. 46, Huber June Tr. 81:3-82:18

(corresponding to Pair 16 in Appendix A).

    a.    <u>Response</u>: Disputed. ████████████████████████

          ██████████████████████████████████████

          ██████████████████████████████████████

          ██████████████████████████████████████

          ██████████████████████████████████████

          ██████████████████████████████████████

          ████████████████████████ *See* PX 46 at 81:3-82:18.  As Mr. Huber

          testified, ██████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████    Opp. DX 47, Huber June Tr. 72:21-80:25.

b.    StockX further disputes the implication that a visual inspection is the only

component of StockX's Process.  ████████████████████████████

████████████████████████████████████████ Opp.

DX 47, Huber June Tr. 42:2–46:3; 60:15–19 (StockX monitors seller details and

activity to ensure StockX identifies fraudulent sellers and bans them from selling

on its platform).  StockX's fraud team investigates other indicators for possible

fraud ████████████████████████████████████

███████████    Opp. DX 50, STX0108368-369 ██████████

████████████    StockX also provides "detailed data about historical

prices and live bids and asks for items on the platform" which "helps ensure that

neither buyers nor sellers trade at an unfair price on the platform, and it further

discourages the sale of counterfeits by drawing attention to prices that are too low

to be credible."  Opp. DX 40, Tucker Rep. ¶ 9, 44–45.  StockX employs a quality

control team that ███████████████████████████

███████████████████████████████████████████

████████████████████████    Opp. DX 18, Lopez Tr.

122:4–7.  StockX Quality Assurance and AQA specialists to assist in instances in

which a product issue is flagged.  Opp. DX 48, Huber Feb. Tr. 21:11–22:24.  ███

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████ Opp. DX 48, Huber Feb. Tr. 21:11–22:24.

The AQA specialists ██████████████████████████████████████████

Opp. DX 48, Huber Feb. Tr. 21:11-22:24. ████████████████████████████

████████████████████████████████████████████████████████

████████████████████ Opp. DX 18, Lopez Tr. 26:17-27:4.  StockX also uses

proprietary authentication software and techniques, including a Machine Learning

Model ████████████████████████████████████████████████████████

████ DX 110, STX0023851 at 856. ████████████████████████████

████████████████████████ DX 110, STX0023851 at 856. ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ DX 110, STX0023851 at 857.  StockX also has "policies in

place that punish and ban sellers who attempt to not uphold their end of the sales

contract:  either not shipping it to us, shipping the wrong item, shipping the wrong

size, shipping it used, shipping without accessories, shipping it with a missing or

damaged box, shipping a product that has significant variances, so as to raise

suspicion of our authentication process. . . . by punishing these sellers through

penalty fees, through outright banning, it has become a less -- we have become a

less desirable avenue."  Opp. DX 48, Huber Feb. Tr. 136:20–137:6 ; Opp. DX 40,

Tucker Rep. ¶ 42 (StockX works to ensure "that only reliable buyers and sellers use

the platform" by suspending the accounts of "sellers who repeatedly do not

complete sales or send in items that fail verification.").

179.    Prior to being shipped to Roy Kim, on June 1, 2022, a StockX authenticator, Raymond Jones, authenticated the pair of "Air Jordan 1 Retro High Dark Mocha" shoes associated with Order Number 37757834 ("Pair 19").  Duvdevani Decl. ¶ 111, Ex. 110 (STX0806024 at ███████████████████████████████████████████ *id.* ¶¶ 121-122, Exs. 120-121 (STX0806001- STX0806002); Ex. 46, Huber June Tr. 82:20-84:24 (corresponding to Pair 19 in Appendix A)

a.    <u>Response</u>: Undisputed that Raymond Jones, a former StockX authenticator, reviewed a pair of "Air Jordan 1 Retro High White University Blue Black" shoes associated with Order Number 37757834 and passed it through StockX's Process prior to it being shipped to Roy Kim.  However, StockX disputes that Mr. Jones is currently a StockX authenticator, as his employment with StockX has since been terminated.  Opp. DX 47, Huber June Tr. 21:21-22:5.  StockX further disputes Nike's characterization of, and inferences purportedly drawn from, Nike's statement that "StockX 'authenticated' each pair of shoes" to the extent that Nike intends to use the word "authenticate" to mean anything beyond StockX's Process, during which StockX authenticators review products to determine whether they meet StockX's standards for sale or possess any indicia of counterfeit.  *See* DX 75, STX0752605.

180.    ███████████████████████████████████████████████████████

████████ Duvdevani Decl. ¶ 111, Ex. 110 (STX0806024 at ████████████████████

██████ *id.* ¶¶ 121-122, Exs. 120-121 (STX0806001- STX0806002); Ex. 46, Huber June Tr. 82:20-84:24 (corresponding to Pair 19 in Appendix A)

a.    <u>Response</u>: Disputed. ████████████████████████████████

████████████████████████████████████████████████████████████



See PX 46, Huber June Tr. 82:20-84:24.

b.     StockX further disputes the implication that a visual inspection is the only component of StockX's Process. ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒ ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒ Opp. DX 47, Huber June Tr. 42:2–46:3; 60:15–19 (StockX monitors seller details and activity to ensure StockX identifies fraudulent sellers and bans them from selling on its platform).  StockX's fraud team investigates other indicators for possible fraud ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒ ▒▒▒▒▒▒▒ Opp. DX 50, STX0108368-369 ▒▒▒▒▒▒▒ ▒▒▒▒▒ StockX also provides "detailed data about historical prices and live bids and asks for items on the platform" which "helps ensure that neither buyers nor sellers trade at an unfair price on the platform, and it further discourages the sale of counterfeits by drawing attention to prices that are too low to be credible."  Opp. DX 40, Tucker Rep. ¶ 9, 44–45.  StockX employs a quality control team that ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒ ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒ ▒▒▒▒▒▒▒▒▒▒▒▒▒ Opp. DX 18, Lopez Tr. 122:4–7.  StockX Quality Assurance and AQA specialists to assist in instances in which a product issue is flagged.  Opp. DX 48, Huber Feb. Tr. 21:11–22:24.  ▒▒

██████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████ Opp. DX 48, Huber Feb. Tr. 21:11–22:24.

The AQA specialists ███████████████████████████████████

Opp. DX 48, Huber Feb. Tr. 21:11-22:24.    StockX AQA specialists ████████

██████████████████████████████████████████

████████████████████ Opp. DX 18, Lopez Tr. 26:17-27:4.    StockX also uses

proprietary authentication software and techniques, including a Machine Learning

Model ████████████████████████████████████████████

████  DX 110, STX0023851 at 856. ████████████████████████

███████████████████████████ DX 110, STX0023851 at 856. ████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████ DX 110, STX0023851 at 857.  StockX also has "policies in

place that punish and ban sellers who attempt to not uphold their end of the sales

contract: either not shipping it to us, shipping the wrong item, shipping the wrong

size, shipping it used, shipping without accessories, shipping it with a missing or

damaged box, shipping a product that has significant variances, so as to raise

suspicion of our authentication process. . . . by punishing these sellers through

penalty fees, through outright banning, it has become a less -- we have become a

less desirable avenue."  Opp. DX 48, Huber Feb. Tr. 136:20–137:6; Opp. DX 40,

Tucker Rep. ¶ 42 (StockX works to ensure "that only reliable buyers and sellers use

the platform" by suspending the accounts of "sellers who repeatedly do not complete sales or send in items that fail verification.").

181.    Prior to being shipped to Roy Kim, on June 7, 2022, a StockX authenticator, Raymond Jones, authenticated the pair of "Air Jordan 1 Retro High Dark Mocha" shoes associated with Order Number 37822201 ("Pair 21").  Duvdevani Decl. ¶ 111, Ex. 110 (STX0806024 at ███████████████████████████ ███████ *id.* ¶¶ 123-124, Exs. 122-123 (STX0806015, STX0806016); Ex. 46, Huber June Tr. 85:1-86:25 (corresponding to Pair 21 in Appendix A).

a.    Response: Undisputed that Raymond Jones, a former StockX authenticator, reviewed a pair of "Air Jordan 1 Retro High Dark Mocha" shoes associated with Order Number 37822201 and passed it through StockX's Process prior to it being shipped to Roy Kim.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, Nike's determinations regarding the shoe associated with Order Number 37822201, because Nike's documentation of its counterfeiting investigation contains discrepancies regarding this order number. While Nike alleges it reviewed this shoe in Mr. Kim's possession, Mr. Kim never returned this shoe for reinspection to StockX.  *See* PX 105 at Second Supplemental Response No. 186 (denying that "that the goods purchased by Mr. Kim in StockX Order Number 37922442-37822201 were returned to StockX or are currently in StockX's possession.").  StockX further disputes that Mr. Jones is currently a StockX authenticator, as his employment with StockX has since been terminated. Opp. DX 47, Huber June Tr. 21:21-22:5.  StockX further disputes Nike's characterization of, and inferences purportedly drawn from, Nike's statement that "StockX 'authenticated' each pair of shoes" to the extent that Nike intends to use

the word "authenticate" to mean anything beyond StockX's Process, during which StockX authenticators review products to determine whether they meet StockX's standards for sale or possess any indicia of counterfeit.  *See* DX 75, STX0752605.

182.    █████████████████████████████████████████

████████ Duvdevani Decl. ¶ 111, Ex. 110 (STX0806024 at ██████████████

███████ Row 15); *id.* ¶¶ 123-124, Exs. 122-123 (STX0806015, STX0806016); Ex. 46, Huber June

Tr. 85:1-86:25 (corresponding to Pair 21 in Appendix A).

    a.    <u>Response</u>: Disputed.  ██████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████ *See* PX 46 at 85:1–86:25.

    b.    StockX further disputes the implication that a visual inspection is the only component of StockX's Process.    ████████████████████████████

████████████████████████████████████████ Opp.

DX 47, Huber June Tr. 42:2–46:3; 60:15–19 (StockX monitors seller details and activity to ensure StockX identifies fraudulent sellers and bans them from selling on its platform).  StockX's fraud team investigates other indicators for possible fraud ████████████████████████████████████████

████████████████ Opp.  DX 50, STX0108368-369 ████████████████

████████████████ StockX also provides "detailed data about historical prices and live bids and asks for items on the platform" which "helps ensure that

neither buyers nor sellers trade at an unfair price on the platform, and it further discourages the sale of counterfeits by drawing attention to prices that are too low to be credible."  Opp. DX 40, Tucker Rep. ¶ 9, 44–45.  StockX employs a quality control team that █████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████  Opp. DX 18, Lopez Tr. 122:4–7.  StockX Quality Assurance and AQA specialists to assist in instances in which a product issue is flagged.  Opp. DX 48, Huber Feb. Tr. 21:11–22:24.  ████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████  Opp. DX 48, Huber Feb. Tr. 21:11–22:24.  The AQA specialists ██████████████████████████████████████████████

Opp. DX 48, Huber Feb. Tr. 21:11-22:24.  StockX AQA specialists ████████████

████████████████████████████████████████████████████████████████████

████████████████████████  Opp. DX 18, Lopez Tr. 26:17-27:4.  StockX also uses proprietary authentication software and techniques, including a Machine Learning Model ██ ███████████████████████████████████████████████████████████

██  DX 110, STX0023851 at 856.  ████████████████████████████████████████

████████████████████████████  DX 110, STX0023851 at 856.  ███████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████  DX 110, STX0023851 at 857.  StockX also has "policies in place that punish and ban sellers who attempt to not uphold their end of the sales

contract:  either not shipping it to us, shipping the wrong item, shipping the wrong

size, shipping it used, shipping without accessories, shipping it with a missing or

damaged box, shipping a product that has significant variances, so as to raise

suspicion of our authentication process. . . . by punishing these sellers through

penalty fees, through outright banning, it has become a less -- we have become a

less desirable avenue."  Opp. DX 48, Huber Feb. Tr. 136:20–137:6; Opp. DX 40,

Tucker Rep. ¶ 42 (StockX works to ensure "that only reliable buyers and sellers use

the platform" by suspending the accounts of "sellers who repeatedly do not

complete sales or send in items that fail verification.").

183.    Raymond Jones, who had worked for StockX for about two years, was the sole

authenticator terminated in connection with the Roy Kim investigation.  Ex. 46, Huber June Tr.

43:14-44:18, 47:25-48:16.

    a.    Response: Undisputed.

184.    Abe Zurita, former manager of StockX's authentication center in Tempe, Arizona

was tasked with reinspecting the items that had been returned by Mr. Kim.  Ex. 46, Huber June Tr.

6:3-7:24; Duvdevani Decl. ¶ 111, Ex. 110 (STX0806024).

    a.    Response: Undisputed.

185.    StockX admits that all 33 items included in the document produced as STX0806024

("Tempe Returns Spreadsheet") were items sent to Mr. Kim.  Ex. 46, Huber June Tr. 7:19-22;

Duvdevani Decl. ¶ 111, Ex. 110 (STX0806024).

    a.    Response: Undisputed.

186.    StockX admits that all 33 items in the Tempe Returns Spreadsheet "made their way

through the ordinary course of business at StockX.  A seller was paired with a buyer.  The buyer

in this case being Roy Kim.  The items were shipped from the seller to one of [StockX's] authentication centers, passed through [StockX's] proprietary verification process and were ultimately shipped out to this buyer [Mr. Kim]." Ex. 46, Huber June Tr. 7:23-8:06; Duvdevani Decl. ¶ 111, Ex. 110 (STX0806024).

      a.   <u>Response</u>: Undisputed.

187.    StockX admits that the shoes in the Tempe Returns Spreadsheet were shipped to Roy Kim and returned by Roy Kim." Ex. 46, Huber June Tr. 8:11-15; Duvdevani Decl. ¶ 111, Ex. 110 (STX0806024).

      a.   <u>Response</u>: Undisputed.

188.    StockX admits that Mr. Zurita and Mr. Lopez each independently "concluded that [the items in Tab 1 of the Tempe Returns Spreadsheet] were not fit to transact on the [StockX] platform" Because they were "suspected to be inauthentic" upon re-inspection of the returned pairs. Ex. 46, Huber June Tr. 9:4-10:4, 28:20-29:05; Duvdevani Decl. ¶ 111, Ex. 110 (STX0806024).

      a.   <u>Response</u>: Undisputed.

189.    StockX admits that "Nike sent [StockX] a letter saying these [pairs in the Tempe Returns Spreadsheet] are bad.  So if there was a pattern here or something that showed up a lot, this was probably the one place [StockX] could say with complete certainty that these RFID codes are bad and not just suspicious."  Ex. 46, Huber June Tr. 29:24-36:1; Duvdevani Decl. ¶ 111, Ex. 110 (STX0806024).

      a.   <u>Response</u>: Disputed.  While Mr. Huber offered the quoted testimony, StockX disputes that Nike sent StockX a letter saying that the "pairs in the Tempe Returns Spreadsheet" are "bad" because this assertion is contradicted by the record

evidence. In the letter Nike sent to StockX, Nike generally stated that "38 are . . . counterfeit," but otherwise did not identify which pairs or order numbers Nike determined to be counterfeit and sold by StockX. Nike now only alleges 33 pairs are counterfeit, and several of these pairs are missing order numbers or receipts. *See e.g.*, ECF No. 260-1, Appendix A, Pair Nos. 7, 8, 28. Accordingly, StockX cannot determine whether the pairs Nike determined to be counterfeit when it sent StockX the letter are the same as the pairs Mr. Kim returned to StockX.

190. Mr. Amidon testified that after StockX received and reviewed the returned pairs from Mr. Kim, Mr. Amidon "called to tell [Mr. Kim] they were items that indeed should not have passed [StockX's] authentication process and apologized for the inconvenience, told [Mr. Kim] that [StockX] would be refunding him for the product and [Mr. Amidon] did offer [Mr. Kim] to come visit [StockX] in Detroit because [Mr. Kim] appeared to be a long-time customer…[Mr. Amidon] told [Mr. Kim] that [the shoes] were at a minimum a defect...a manufacturing defect and that [the pairs] possibly could have been inauthentic" based on what Mr. Amidon was told by StockX's authentication team. Ex. 89, Amidon Tr. 89:14-90:11.

a.    Response: Undisputed that Mr. Amidon offered the quoted testimony.

191. Mr. Amidon admitted that he had given "Roy Kim a $500 code" and "for a future purchase and to apologize for the convenience [*sic*]." Ex. 89, Amidon Tr. 90:23-91:3; Duvdevani Decl. ¶ 114, Ex. 113 at STX0772942.

a.    Response: Undisputed that Mr. Amidon offered the quoted testimony.

### 4.    *Zadeh Communications with StockX*

192. Zadeh Kicks LLC was a Eugene, Oregon-based sneaker resale business that was founded in 2013 by Michael Malekzadeh and dissolved in 2022. Duvdevani Decl. ¶ 125, Ex. 124 (NIKE0025865).

a.    <u>Response</u>: Undisputed.

193.    A StockX PowerPoint slide deck, entitled ███████████████████

████████████████████████████████████████████████████████████

███████████ Duvdevani Decl. ¶ 126, Ex. 125 at STX0099160.

a.    <u>Response</u>: Disputed.  Nike incorrectly cites the text and quoted percentage in this

StockX PowerPoint slide deck.  The cited slide states: ████████████████

████████████████████████████████████████████████████████████

████████████████████████    *See* PX 125 at STX0099160(emphasis

added).

194.    On July 15, 2020, Mr. Malekzadeh emailed Mr. Amidon and An Do, StockX's

Knowledge Manager at the time, with the subject ██████████████ and ████████████

████████████████████████████████████████████████ Pallett Decl.

¶¶ 14, Ex. 11.

i. <u>Response</u>: Undisputed that Mr. Malekzadeh emailed Mr. Amidon and An Do with the subject █████████████████

████████████████████████

However, StockX disputes that the shoes possessed a genuine StockX authentication tag and disputes the credibility of Mr. Malekzadeh's allegations.  Mr. Malekzadeh, founder of Zadeh Kicks, is currently facing criminal indictment for a series of fraud-related charges connected to that business.  Opp. DX 59, Malekzadeh Tr. 17:15–19; Opp. DX 60, Matt Halfhill, "The Rise and Multi-Million Dollar Fall of Zadeh Kicks," Nice Kicks, April 12, 2024, https://www.nicekicks.com/the-rise-fall-and-implosion-of-zadeh-kicks-and-why-it-matters-beyond-the-sneaker-world/ ("Zadeh Kicks Founder Michael Malekzadeh and CFO Bethany Mockerman were indicted for wire fraud, conspiracy to commit bank fraud, and money laundering" on July 29, 2022).  Mr. Malekzadeh asserted his Fifth Amendment rights when asked about sneakers he purchased on StockX.  Opp. DX 59, Malekzadeh Tr. 17:13–200:24.  To the extent Nike intends to rely on this communication to establish the shoe pictured is counterfeit, StockX disputes Nike's characterization of, and any inferences purportedly drawn from, ████████████████

█████ between Mr. Malekzadeh and StockX because Nike failed to produce any evidence regarding these █████ determinations

during discovery, which closed on March 21, 2023, and StockX

accordingly has no record evidence upon which to assess the

accuracy or credibility of these allegations.  *See* ECF 250

(excluding Kari Kammel's expert opinions introducing these

factual allegations in part because "Pallet's identification of

additional counterfeit shoes was directly responsive to the

interrogatory and should have been disclosed" during discovery).

a.    On August 11, 2020, An Do responded to Mr. Malekzadeh's email subject ███████

        ████████████████████████████████████████████████

        ████████████████████████████████████████████████

        ███████████████████████████████████████ Pallett Decl.

¶¶ 14, Ex. 11 at ZK_NIKE_004353.

i.   <u>Response</u>: Undisputed that An Do responded to Mr. Malekzadeh's email with the quoted language.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, this email as misleading because Nike omits additional discussion between StockX and Mr. Malekzadeh regarding this issue. Consistent with StockX's Buyer Promise and return policy, Mr. Amidon offered a complete return and refund to Mr. Malekzadeh for this shoe.  Pallett Decl. Ex. 11, ZK_NIKE_004353 ████████ ████████  In addition, to the extent Nike intends to rely on this communication to establish the shoe pictured is counterfeit, StockX disputes Nike's characterization of, and any inferences purportedly drawn from, Nike's ████████████████████ ████████ between Mr. Malekzadeh and StockX because Nike failed to produce any evidence regarding these scans or determinations during discovery, which closed on March 21, 2023, and StockX accordingly has no record evidence upon which to assess the accuracy or credibility of these allegations.  *See* ECF 250 (excluding Kari Kammel's expert opinions introducing these factual allegations in part because "Pallet's identification of additional counterfeit shoes was directly responsive to the interrogatory and should have been disclosed" during discovery).

b.   On May 31, 2023, Mr. Pallett reviewed the images produced by Mr. Malekzadeh and determined, ████████████████ that the shoes depicted in the images on

ZK_NIKE_004308 and ZK_NIKE_004312 are counterfeit.  Pallett Decl. ¶ 14-15, Ex. 11.

i. <u>Response</u>:  Disputed.  StockX disputes Nike's characterization of, and any inferences purportedly drawn from, Mr. Pallett's s███████ ███████ depicted in the cited email discussion between Mr. Malekzadeh and StockX because Nike failed to produce any evidence regarding these ██████ determinations during discovery, which closed on March 21, 2023, and StockX accordingly has no record evidence upon which to assess the accuracy or credibility of these allegations.  *See* ECF 250 (excluding Kari Kammel's expert opinions introducing these factual allegations in part because "Pallet's identification of additional counterfeit shoes was directly responsive to the interrogatory and should have been disclosed" during discovery).  StockX further disputes ███████████ ██████████████████████████████████ ███████████████████████████████ For instance, in the context of this case, ████████████████████ ████████████████████████████████ Opp. DX 5, NIKE0025918; Opp. DX 6, NIKE0039044; Opp. DX 7, Delli Carpini Tr. 196:3-4.  ██████████████████ ████████████████████████ Opp. DX 5, NIKE0025918.  Nike itself admits that ███████████████████ ██████████████████ Nike Mot. at 3; Opp. DX 8, Rizza Tr. 113:23–114:12 (explaining that Nike's

spreadsheet 

. Further,

. Opp. DX 9, Pallett Tr. 16:17–17:8 (Nike must

Mr.

Pallett, Nike's Director, Brand Protection, Authentication and

Innovation, testified that

Opp. DX 9, Pallett Tr. 165:5–18.  For example, Mr.

Pallett testified that

Opp. DX 9,

Pallett Tr. 165:19–167:23.

Mr. Pallett further testified that

Opp. DX 9,

Pallett Tr. 167:14–172:20.

Opp. DX 9,

Pallett Tr. 134:6-15 (testifying that

 Opp. DX 10, NIKE0037982; Opp. DX 11,

NIKE0037984; Opp. DX 12, NIKE0037849; Opp. DX 13,

NIKE0037856; Opp. DX 14, NIKE0038038; Opp. DX 15,

NIKE0038039.

195.    On January 4, 2021, Mr. Malekzadeh emailed Mr. Amidon and Mr. Lopez with the

subject ███████████████████████████████████████████

███████████████ Pallett Decl. ¶ 14, Ex. 12.

i. <u>Response</u>: Disputed.  StockX does not dispute that on January 4, 2021, Mr. Malekzadeh emailed Mr. Amidon and Mr. Lopez with the subject ██████  However, StockX disputes that the shoe was an "Air Jordan 1 Mocha" or bears a StockX authentication tag. *See* Pallett Decl. Ex. 12 at ZK_NIKE_007857 (describing the shoe as an Air Jordan 1 Retro High OG on the shoebox and otherwise not containing images of a StockX tag).  StockX also disputes the credibility of Mr. Malekzadeh's allegations.  Mr. Malekzadeh, founder of Zadeh Kicks, is currently facing criminal indictment for a series of fraud-related charges connected to that business.  Opp. DX 59, Malekzadeh Tr. 17:15–19; Opp. DX 60, Matt Halfhill, "The Rise and Multi-Million Dollar Fall of Zadeh Kicks," Nice Kicks, April 12, 2024, https://www.nicekicks.com/the-rise-fall-and-implosion-of-zadeh-kicks-and-why-it-matters-beyond-the-sneaker-world/ ("Zadeh Kicks Founder Michael Malekzadeh and CFO Bethany Mockerman were indicted for wire fraud, conspiracy to commit bank fraud, and money laundering" on July 29, 2022).  Mr. Malekzadeh asserted his Fifth Amendment rights when asked about sneakers he purchased on StockX.  Opp. DX 59, Malekzadeh Tr. 17:13–200:24.  To the extent Nike intends to rely on this communication to establish the shoe pictured is counterfeit, StockX disputes Nike's characterization of, and any inferences purportedly drawn from, Nike's ███████████ depicted in

email discussions between Mr. Malekzadeh and StockX because Nike failed to produce any evidence regarding these ██████ determinations during discovery, which closed on March 21, 2023, and StockX accordingly has no record evidence upon which to assess the accuracy or credibility of these allegations.  *See* ECF 250 (excluding Kari Kammel's expert opinions introducing these factual allegations in part because "Pallet's identification of additional counterfeit shoes was directly responsive to the interrogatory and should have been disclosed" during discovery).

a.  On January 4, 2021, Mr. Lopez responded to Mr. Malekzadeh's email subject ████████████████████████████████████ Pallett Decl. ¶ 14, Ex. 12 at ZK_NIKE_007853.

i.  <u>Response</u>: Undisputed that Mr. Lopez responded to Mr.

Malekzadeh's email with the quoted language.  However, StockX

disputes Nike's characterization of, and inferences purportedly

drawn from, this email as misleading because Nike omits

additional email discussions between StockX and Mr. Malekzadeh

regarding this issue.  Following Mr. Malekzadeh's complaint, Mr.

Amidon offered a complete return and refund to Mr. Malekzadeh

for this shoe.  Pallett Decl. Ex. 12, ZK_NIKE_007865 ███

████████████████████.  In addition, to the extent Nike

intends to rely on this communication to establish the shoe pictured

is counterfeit, StockX disputes Nike's characterization of, and any

inferences purportedly drawn from, Nike's ████████████████

depicted in email discussions between Mr. Malekzadeh and

StockX because Nike failed to produce any evidence regarding

these ██████ determinations during discovery, which closed on

March 21, 2023, and StockX accordingly has no record evidence

upon which to assess the accuracy or credibility of these

allegations.  *See* ECF 250 (excluding Kari Kammel's expert

opinions introducing these factual allegations in part because

"Pallet's identification of additional counterfeit shoes was directly

responsive to the interrogatory and should have been disclosed"

during discovery).

b.    On January 4, 2021, Mr. Malekzadeh responded to Mr. Lopez on Mr. Malekzadeh's

email subject ███████ stating: ████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████ Pallett Decl. ¶ 14, Ex. 12 at Ex. ZK_NIKE_007865.

i.   <u>Response</u>: Undisputed that Mr. Malekzadeh responded to Mr.

Lopez with the quoted language.  However, StockX disputes

Nike's characterization of, and any inferences purportedly drawn

from, this email as misleading because Nike omits additional email

traffic between StockX and Mr. Malekzadeh regarding this issue.

Following Mr. Malekzadeh's complaint, Mr. Amidon offered a

complete return and refund to Mr. Malekzadeh for this shoe.

Pallett Decl. Ex. 12, ZK_NIKE_007865 ███████████████

████████   StockX also disputes the credibility of Mr.

Malekzadeh's allegations.  Mr. Malekzadeh, founder of Zadeh

Kicks, is currently facing criminal indictment for a series of fraud-

related charges connected to that business.  Opp. DX 59,

Malekzadeh Tr. 17:15–19; Opp. DX 60, Matt Halfhill, "The Rise

and Multi-Million Dollar Fall of Zadeh Kicks," Nice Kicks, April

12, 2024, https://www.nicekicks.com/the-rise-fall-and-implosion-

of-zadeh-kicks-and-why-it-matters-beyond-the-sneaker-world/

("Zadeh Kicks Founder Michael Malekzadeh and CFO Bethany

Mockerman were indicted for wire fraud, conspiracy to commit

bank fraud, and money laundering" on July 29, 2022).  Mr.

Malekzadeh asserted his Fifth Amendment rights when asked

about sneakers he purchased on StockX.  Opp. DX 59, Malekzadeh

Tr. 17:13–200:24.  In addition, to the extent Nike intends to rely on

this communication to establish the shoe pictured is counterfeit,

StockX disputes Nike's characterization of, and any inferences purportedly drawn from, Nike's ███████████ depicted in email discussions between Mr. Malekzadeh and StockX because Nike failed to produce any evidence regarding these █████ determinations during discovery, which closed on March 21, 2023, and StockX accordingly has no record evidence upon which to assess the accuracy or credibility of these allegations. *See* ECF 250 (excluding Kari Kammel's expert opinions introducing these factual allegations in part because "Pallet's identification of additional counterfeit shoes was directly responsive to the interrogatory and should have been disclosed" during discovery)

c.  On May 31, 2023, Mr. Pallett reviewed the images produced by Mr. Malekzadeh as ZK_NIKE_007854 and ZK_NIKE_007856, and determined, ████████ that the shoes depicted in the images are counterfeit. Pallett Decl. ¶¶ 14-15, Ex. 12.

i. <u>Response</u>: Disputed.  StockX disputes Nike's characterization of, and any inferences purportedly drawn from, Mr. Pallett's ███████ ███████ depicted in the cited email discussions between Mr. Malekzadeh and StockX because Nike failed to produce any evidence regarding these ██████ determinations during discovery, which closed on March 21, 2023, and StockX accordingly has no record evidence upon which to assess the accuracy or credibility of these allegations.  *See* ECF 250 (excluding Kari Kammel's expert opinions introducing these factual allegations in part because "Pallet's identification of additional counterfeit shoes was directly responsive to the interrogatory and should have been disclosed" during discovery).  StockX further disputes ████████████ █████████████████████████████████████████ █████████████████████████████ For instance, in the context of this case, ███████████████████████████ ████████████████████████████████████████████ Opp. DX 5, NIKE0025918; Opp. DX 6, NIKE0039044; Opp. DX 7, Delli Carpini Tr. 196:3-4. ████████████████████████ ███████████████████████████████████ █████████████████████ Opp. DX 5, NIKE0025918.  Nike itself admits that ████████████████████████████ ██████████████████████████████. Nike Mot. at 3; Opp. DX 8, Rizza Tr. 113:23–114:12 (explaining that Nike's

186

███████████████████████████████████

███████████████████████████████████

████████████████████████████ Further,

███████████████████████████████████

███████████████████████████████████

████████ Opp. DX 9, Pallett Tr. 16:17–17:8 ████████

██████████████████████████████. Mr.

Pallett, Nike's Director, Brand Protection, Authentication and

Innovation, testified that ████████████████████

██████████████████████████████

███████████████████████████████████

████████ Opp. DX 9, Pallett Tr. 165:5–18.  For example, Mr.

Pallett testified that ███████████████████████

███████████████████████████████████

██████████████████████████████ Opp. DX 9,

Pallett Tr. 165:19–167:23.  ████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████████ Opp. DX 9,

Pallett Tr. 167:14–172:20.  ████████████████

██████████████████████████████ Opp. DX 9,

Pallett Tr. 134:6-15 (testifying that ████████████████

███████████████████████████████

 Opp. DX 10, NIKE0037982 (

███████████████████████████████████████████████████

█████████████████████████████ Opp. DX 10, NIKE0037982; Opp. DX 11, NIKE0037984; Opp. DX 12, NIKE0037849; Opp. DX 13, NIKE0037856; Opp. DX 14, NIKE0038038; Opp. DX 15, NIKE0038039.

196.    On October 16, 2020, Mr. Malekzadeh emailed Mr. Amidon and An Do with the subject ████████████ stating: "██████████████████████████████ Pallett Decl. ¶ 14, Ex. 13.

i.   Response: Undisputed that Mr. Malekzadeh emailed Mr. Amidon
     and An Do with the quoted text and attaching photographs of a pair
     of "Nike SB Dunk Low Ben & Jerry's Chunky Dunky" shoes.
     However, StockX disputes whether the StockX tag pictured is
     genuine and the credibility of Mr. Malekzadeh's allegations.  Mr.
     Malekzadeh, founder of Zadeh Kicks, is currently facing criminal
     indictment for a series of fraud-related charges connected to that
     business.  Opp. DX 59, Malekzadeh Tr. 17:15–19; Opp. DX 60,
     Matt Halfhill, "The Rise and Multi-Million Dollar Fall of Zadeh
     Kicks," Nice Kicks, April 12, 2024,
     https://www.nicekicks.com/the-rise-fall-and-implosion-of-zadeh-
     kicks-and-why-it-matters-beyond-the-sneaker-world/  ("Zadeh
     Kicks Founder Michael Malekzadeh and CFO Bethany
     Mockerman were indicted for wire fraud, conspiracy to commit
     bank fraud, and money laundering" on July 29, 2022).  Mr.
     Malekzadeh asserted his Fifth Amendment rights when asked
     about sneakers he purchased on StockX.  Opp. DX 59, Malekzadeh
     Tr. 17:13–200:24.  To the extent Nike intends to rely on this
     communication to establish the shoe pictured is counterfeit,
     StockX disputes Nike's characterization of, and any inferences
     purportedly drawn from, Nike's ███████████████depicted in
     email discussions between Mr. Malekzadeh and StockX because
     Nike failed to produce any evidence regarding these ██████

189

determinations during discovery, which closed on March 21, 2023, and StockX accordingly has no record evidence upon which to assess the accuracy or credibility of these allegations. *See* ECF 250 (excluding Kari Kammel's expert opinions introducing these factual allegations in part because "Pallet's identification of additional counterfeit shoes was directly responsive to the interrogatory and should have been disclosed" during discovery)..

a.   On October 19, 2020, Mr. Amidon responded to Mr. Malekzadeh's email subject ██████████████ stating: "██████████████████████████ ███████████████████████████████ ██████████████████ Pallett Decl. ¶ 14, Ex. 13 at ZK_NIKE_004672.

i. <u>Response</u>: Undisputed that Mr. Amidon responded to Mr. Malekzadeh's email with the quoted text.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, this email as misleading because Nike omits context necessary to understand the quoted text.  Following Mr. Malekzadeh's complaint, Mr. Amidon offered a complete return and refund to Mr. Malekzadeh for this shoe, and explained ███ ████████████████████████████████████████████ Pallett Decl. Ex. 13 at ZK_NIKE_004672.  StockX also disputes the credibility of Mr. Malekzadeh's allegations.  Mr. Malekzadeh, founder of Zadeh Kicks, is currently facing criminal indictment for a series of fraud-related charges connected to that business.  Opp. DX 59, Malekzadeh Tr. 17:15–19; Opp. DX 60, Matt Halfhill, "The Rise and Multi-Million Dollar Fall of Zadeh Kicks," Nice Kicks, April 12, 2024, https://www.nicekicks.com/the-rise-fall-and-implosion-of-zadeh-kicks-and-why-it-matters-beyond-the-sneaker-world/ ("Zadeh Kicks Founder Michael Malekzadeh and CFO Bethany Mockerman were indicted for wire fraud, conspiracy to commit bank fraud, and money laundering" on July 29, 2022).  Mr. Malekzadeh asserted his Fifth Amendment rights when asked about sneakers he purchased on StockX.  Opp. DX 59, Malekzadeh Tr. 17:13–200:24.  In addition, to the extent Nike intends to rely on this communication to establish the shoe pictured is counterfeit,

StockX disputes Nike's characterization of, and any inferences purportedly drawn from, Nike's ██████████ depicted in email discussions between Mr. Malekzadeh and StockX because Nike failed to produce any evidence regarding these ███████ determinations during discovery, which closed on March 21, 2023, and StockX accordingly has no record evidence upon which to assess the accuracy or credibility of these allegations. *See* ECF 250 (excluding Kari Kammel's expert opinions introducing these factual allegations in part because "Pallet's identification of additional counterfeit shoes was directly responsive to the interrogatory and should have been disclosed" during discovery).

b.   On May 31, 2023, Mr. Pallett reviewed the images produced by Mr. Malekzadeh as ZK_NIKE_004665 and determined, ██████████ that the shoes depicted in the images are counterfeit. Pallett Decl. ¶¶ 14-15, Ex. 13.

i. <u>Response</u>: Disputed.  StockX disputes Nike's characterization of, and any inferences purportedly drawn from, Mr. Pallett's ███████ ███████ depicted in the cited email discussions between Mr. Malekzadeh and StockX because Nike failed to produce any evidence regarding these ███████ determinations during discovery, which closed on March 21, 2023, and StockX accordingly has no record evidence upon which to assess the accuracy or credibility of these allegations.  *See* ECF 250 (excluding Kari Kammel's expert opinions introducing these factual allegations in part because "Pallet's identification of additional counterfeit shoes was directly responsive to the interrogatory and should have been disclosed" during discovery).  StockX further disputes ███████ ██████████████████████████████████████████ ████████████████████████████ For instance, in the context of this case, ████████████████████████ ███████████████████████████████████████████

Opp. DX 5, NIKE0025918; Opp. DX 6, NIKE0039044; Opp. DX 7, Delli Carpini Tr. 196:3-4. ████████████████████ ███████████████████████████ ████████████████████ Opp. DX 5, NIKE0025918.  Nike itself admits t███████████████████████████████ ████████████████████████████████. Nike Mot. at 3; Opp. DX 8, Rizza Tr. 113:23–114:12 (explaining that Nike's

spreadsheet ███████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████ Further,

████████████████████████████████████████

████████████████████████████████████████

██████████████. Opp. DX 9, Pallett Tr. 16:17–17:8 ████████

███████████████████████████████████████████ Mr.

Pallett, Nike's Director, Brand Protection, Authentication and

Innovation, testified that ██████████████████████████████

██████████████████████████████████

████████████████████████████████████████

██████████ Opp. DX 9, Pallett Tr. 165:06–18.  For example, Mr.

Pallett testified that ██████████████████████████████

████████████████████████████████████████

█████████████████████████████████████ Opp. DX 9,

Pallett Tr. 165:19–167:23.  ██████████████████████

████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████ Opp. DX 9,

Pallett Tr. 167:14–172:20.  ██████████████████████

█████████████████████████████████████ Opp. DX 9,

Pallett Tr. 134:6-15 (testifying that ███████████████████████

████████████████████████████████████████



; Opp. DX 10, NIKE0037982

Opp. DX 10, NIKE0037982; Opp. DX 11, NIKE0037984; Opp. DX 12, NIKE0037849; Opp. DX 13, NIKE0037856; Opp. DX 14, NIKE0038038; Opp. DX 15, NIKE0038039.

### 5. *Confirmed Counterfeits Sold to Zadeh*

197. The StockX order numbers associated with Pairs 38-77 in Appendix A were purchased by the following accounts known to be associated with Zadeh Kicks LLC and/or Michael Malekzadeh: ▬ (Duvdevani Decl. ¶ 127, Ex. 126 (ZK_NIKE_004355, ZK_NIKE_004357)), ▬ (*id.* ¶ 128, Ex. 127 (ZK_NIKE_007980, ZK_NIKE_007981)), ▬ (*id.* ¶ 129, Ex. 128 (ZK_NIKE_009134, ZK_NIKE_009135)), ▬ (*id.* ¶ 130, Ex. 129 (ZK_NIKE_009134, ZK_NIKE_009137)) and ▬ *d.* ¶ 131, Ex. 130 (ZK_NIKE_009759, ZK_NIKE_009760)). Duvdevani Decl. ¶ 125, Ex. 124 (NIKE0025865)).

a. <u>Response</u>: Disputed. StockX disputes that the "StockX order numbers associated with Pairs 38-77 in Appendix A" were purchased by the enumerated accounts associated with Zadeh Kicks LLC and/or Michael Malekzadeh: ▬ because Nike has not established the chain of custody for these shoes, and fails to cite to any record evidence establishing this chain of custody. ECF No. 260-1, Appendix A, Pairs 38-77. Mr. Malekzadeh, who founded the sneaker resale

business Zadeh Kicks, is currently facing criminal indictment for a series of fraud-related charges connected to that business.  Opp. DX 59, Malekzadeh Tr. 17:15–19; Opp. DX 60, Matt Halfhill, "The Rise and Multi-Million Dollar Fall of Zadeh Kicks," Nice Kicks, April 12, 2024, https://www.nicekicks.com/the-rise-fall-and-implosion-of-zadeh-kicks-and-why-it-matters-beyond-the-sneaker-world/ ("Zadeh Kicks Founder Michael Malekzadeh and CFO Bethany Mockerman were indicted for wire fraud, conspiracy to commit bank fraud, and money laundering" on July 29, 2022).  Mr. Malekzadeh asserted his Fifth Amendment rights when asked about the sneakers at issue, and did not testify that any of them were, in fact, purchased on StockX.  Opp. DX 59, Malekzadeh Tr. 17:13–200:24.  After Mr. Malekzadeh filed a petition to dissolve his Zadeh Kicks business in May 2022, the business entered receivership and the receiver has reported that Mr. Malekzadeh did not maintain records documenting the chain of custody of his inventory or keep track of how sneakers were procured.  Opp. DX 61, Receiver's Initial Inventory and Report, 22 CV 16510, 5 (Oreg. Cir. Ct. July 13, 2022); Opp. DX 59, Malekzadeh Tr. 17:15–19.  StockX has had no opportunity to review the alleged counterfeits to determine whether they were, in fact, purchased on StockX's platform, and the limited evidence Nike produced in this litigation does not allow StockX to determine that the sneakers were sold on its platform.

198.    ███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████    Duvdevani Decl. ¶ 132, Ex. 131 (STX0774239).

a.    <u>Response</u>: Disputed.   StockX disputes that the cited evidence supports Nike's

assertion that ██████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████  Nike has

cited no other evidence to support this statement.  Further, StockX disputes Nike's

characterizations of, and inferences purportedly drawn from, PX 131 as misleading

because ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████  *See* Opp. DX 63, STX0774284.

199.    The StockX order numbers associated with Pairs 38-77 were sent to an address

located at ███████████████████████████████  and the business address for Zadeh Kicks LLC.

Duvdevani Decl. ¶ 105, Ex. 104 (NIKE0039513, NIKE0039469, NIKE0039437, NIKE0039514,

NIKE0039496, NIKE0039457, NIKE0039530, NIKE0039192, NIKE0039226, NIKE0039395,

NIKE0039312, NIKE0039390, NIKE0039313, NIKE0039332, NIKE0039148, NIKE0039382,

NIKE0039141, NIKE0039127, NIKE0039217, NIKE0039236, NIKE0039195, NIKE0039365,

NIKE0039340, NIKE0039122, NIKE0039201, NIKE0039240, NIKE0039314, NIKE0039248,

NIKE0039319, NIKE0039356, NIKE0039252, NIKE0039253, NIKE0039413, NIKE0039268,

NIKE0039297, NIKE0039302, NIKE0039174, NIKE0039288, NIKE0039389, NIKE0039179);

*id.* ¶ 106, Ex. 105 (StockX Second Suppl. Responses to RFA Nos. 291, 296, 301, 306, 311, 316, 321, 326, 331, 336, 341, 346, 351, 356, 361, 366, 371, 376, 381, 386, 391, 396, 401, 406, 411, 416, 421, 426, 431, 436, 441, 446, 451, 456, 461, 466, 471, 476, 481, 486); *id.* ¶ 125, Ex. 124 (NIKE0025865).

a.    <u>Response</u>:  Undisputed that the order numbers Nike lists for "Pairs 38-77" in Appendix A were sent to an address located at ████████████████

████ and the business address for Zadeh Kicks LLC.  However, StockX disputes whether Nike examined these specific orders, and chain of custody of these shoes. For example, Nike states "Pair 42" has an Order Number of "30895923-30795682" and has a receipt pictured in PX 104, NIKE0039496.  ECF No. 260-1, Appendix A, Pair No. 42.  However, PX 104, NIKE0039496 pictures two receipts for two shoes of the same model with different order numbers:  one with order number "29715257-29615016" and the other with order number "30895923-30795682." PX 104, NIKE0039496.  ████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████    In addition, Mr. Malekzadeh, who founded the sneaker resale business Zadeh Kicks, is currently facing criminal indictment for a series of fraud-related charges connected to that business.  Opp. DX 59, Malekzadeh Tr. 17:15–19; Opp. DX 60, Matt Halfhill, "The Rise and Multi-Million Dollar Fall of Zadeh Kicks," Nice Kicks, April 12, 2024, https://www.nicekicks.com/the-rise-fall-and-implosion-of-zadeh-kicks-and-why-it-matters-beyond-the-sneaker-world/ ("Zadeh Kicks Founder Michael

Malekzadeh and CFO Bethany Mockerman were indicted for wire fraud, conspiracy to commit bank fraud, and money laundering" on July 29, 2022). Mr. Malekzadeh asserted his Fifth Amendment rights when asked about the sneakers at issue, and did not testify that any of them were, in fact, purchased on StockX. Opp. DX 59, Malekzadeh Tr. 17:1–-200:24. After Mr. Malekzadeh filed a petition to dissolve his Zadeh Kicks business in May 2022, the business entered receivership and the receiver has reported that Mr. Malekzadeh did not maintain records documenting the chain of custody of his inventory or keep track of how sneakers were procured. Opp. DX 61, Receiver's Initial Inventory and Report, 22 CV 16510, 5 (Oreg. Cir. Ct. July 13, 2022); Opp. DX 59, Malekzadeh Tr. 17:15–19. StockX has had no opportunity to review the alleged counterfeits to determine whether they were, in fact, purchased on StockX's platform, and the limited evidence Nike produced in this litigation does not allow StockX to determine that the sneakers were sold on its platform

200. During a May 26, 2022 ████████████████████████████ ████████████ Ms. Laura Rizza, a Nike Brand Protection Coordinator at the time, determined that Pairs 38-44 were counterfeit "Nike and Jordan-Branded" shoes ████████ Ex. 109, Rizza Tr. 171:13-174:08; Duvdevani Decl. ¶ 109, Ex. 108 (NIKE0039436) (Pairs 38-44 in Appendix A).

a.    <u>Response</u>: Disputed. StockX disputes the accuracy and conclusiveness of Ms. Laura Rizza's determinations that Pairs 38-44 were counterfeit "Nike and Jordan-Branded" shoes ████████████████████████████████ ██████████████████████████████ Ms. Rizza testified that for some shoes she examined and documented in PX 108, "[t]here was no receipt

of any kind." Opp. DX 8, Rizza Tr. 183:10-22. Further, certain shoeboxes Ms. Rizza examined contained multiple StockX receipts, which raises questions of whether StockX actually sold the shoes in these shoeboxes. Nike states "Pair 42" has an Order Number of "30895923-30795682" and has a receipt pictured in Opp. DX 64, NIKE0039496. ECF No. 260-1, Appendix A, Pair No. 42. ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████ Opp. DX 64, NIKE0039496. ██

████████████████████████████████████████

████████████████████████████████████████

██████████ *See* PX 108 at Tab "Identified July 22, 2022", Rows 56, 125.

b.    StockX also disputes that ████████████████████████████████

████████████ For instance, in the context of this case, ████████████

████████████████████████████████████████

██████████ Opp. DX 5, NIKE0025918; Opp. DX 6, NIKE0039044; Opp. DX 7, Delli Carpini Tr. 196:3-4. ████████████████████████████████

████████████████████████████████████ Opp. DX 5, NIKE0025918. Nike itself admits ████████████████████████

████████████████████████████████. Nike Mot. at 3; Opp. DX 8, Rizza Tr. 113:23–114:12 (explaining that Nike's spreadsheet ██████

████████████████████████████████████████

████████████████████████████████████████

██████████ Further, ████████████████████████████████

█████████████████████████████████████████████

███████  Opp. DX 9, Pallett Tr. 16:17–17:8  (████████████████████████

███████████████████████  Mr. Pallett, Nike's Director, Brand

Protection, Authentication and Innovation, testified that ████████████████

█████████████████████████████████████████████

███████████████████████████████████  Opp. DX 9,

Pallett Tr. 165:5–18.  For example, Mr. Pallett testified that ████████████

█████████████████████████████████████████████

████████████████████████████████  Opp. DX 9, Pallett

Tr. 165:19–167:23. █████████████████████  Mr. Pallett further testified

that ████████████████████████████████████████████

███████████████████████████████████  Opp. DX

9, Pallett Tr. 167:14–172:20. ██████████████████████

██████████████████████  Opp. DX 9, Pallett Tr. 134:6-15 (testifying that

█████████████████████████████████████████████

████████████████; Opp. DX 10, NIKE0037982 ████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████" Opp. DX 10, NIKE0037982; Opp.

DX 11, NIKE0037984; Opp. DX 12, NIKE0037849; Opp. DX 13, NIKE0037856;

Opp. DX 14, NIKE0038038; Opp. DX 15, NIKE0038039.

201.   On July 22, 2022, Ms. Rizza, ████████████████████████████

█████████████████████████████████████  determined that Pairs 45-77

were counterfeit "Nike and Jordan-Branded" shoes ██████████ Ex. 109, Rizza Tr. 175:24-177:1,

189:10-15); Duvdevani Decl. ¶ 109, Ex. 108 (NIKE0039436) (Pairs 45-77 in Appendix A).

    a.    <u>Response</u>: Disputed.  StockX disputes the accuracy and conclusiveness of Ms.

    Laura Rizza's determinations that Pairs 38-44 were counterfeit "Nike and Jordan-

    Branded" shoes ██████████ ████████████████████████████

    ████████████████████████████████████ Ms. Rizza testified that

    for some shoes she examined and documented in PX 108, "[t]here was no receipt

    of any kind," again raising the question of whether StockX actually sold these

    shoes.  Opp. DX 8, Rizza Tr. 183:10-22.  Further, certain shoeboxes Ms. Rizza

    examined contained multiple StockX receipts.  For example, Nike states "Pair 42"

    has an Order Number of "30895923-30795682" and has a receipt pictured in

    NIKE0039496.    ECF No. 260-1, Appendix A, Pair No. 42.    ██████

    ████████████████████████████████████████████████

    ████████████████████████████████████████████████

    ████████████████████  ████████████████  ██████

    ████████████████████████████████████████████████

    ████████████████████████████████████████████████

    *See* PX 108 at Tab "Identified July 22, 2022", Rows 56, 125.  StockX also disputes

    that ████████████████████████████████ For instance, in

    the context of this case, ██████████████████████████████

    ████████████████████████████ Opp. DX 5, NIKE0025918;

    Opp. DX 6, NIKE0039044; Opp. DX 7, Delli Carpini Tr. 196:3-4. ██████████

    ████████████████████████████████████████████████

████████████████████    Opp. DX 5, NIKE0025918.  Nike itself ████████

█████████████████ ████████████████████████████

████████████████    Nike  Mot.  at 3; Opp.  DX 8, Rizza Tr. 113:23–114:12

(explaining  that  Nike's  spreadsheet ████████████████████████

████████████████████████████████████████████

██████████████████████████    Further, ██████████████

████████████████ ████████████████████████

███████████████████████    Opp. DX 9, Pallett Tr. 16:17–17:8

██████████████████████████████████    Mr.

Pallett, Nike's Director, Brand Protection, Authentication and Innovation, testified

that ████████████████████████████████████████

████████████████████████████████████████████

██████████████    Opp. DX  9, Pallett Tr.165:5–18.   For example, Mr. Pallett

testified that ████████████████████████████████████

████████████████████████████████████████████

██████████    Opp. DX 9, Pallett Tr. 165:19–167:23. ██████████

████████    Mr. Pallett further testified that ████████████████

████████████████████████████████████████████

██████████████.  Opp. DX 9, Pallett Tr. 167:14–172:20. ██████████

████████████████████████████████████████    Opp. DX

9, Pallett Tr. 134:6-15 (testifying that ██████████████████

████████████████████████████████████    Opp.  DX  10,

NIKE0037982 (████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████ Opp. DX 10, NIKE0037982; Opp. DX 11, NIKE0037984; Opp. DX 12,

NIKE0037849; Opp. DX 13, NIKE0037856; Opp. DX 14, NIKE0038038; Opp.

DX 15, NIKE0038039.

202.    Ms. Rizza identified a StockX receipt inside each shoebox for Pairs 38-77. Ex. 109,

Rizza Tr. 183:10-184:3; Duvdevani Decl. ¶ 109, Ex. 108 (NIKE0039436).

a.    <u>Response</u>: Disputed.    StockX disputes that Ms. Rizza was able to accurately

identify one StockX receipt for every shoe listed in Pairs 38-77 because this is

contradicted by the record.  Ms. Rizza testified that for some shoes she examined

and documented in PX 108, "[t]here was no receipt of any kind."  Opp. DX 8, Rizza

Tr. 183:10-22.  Further, certain shoeboxes contained multiple StockX receipts.  For

example, Nike states "Pair 42" has an Order Number of "30895923-30795682" and

has a receipt pictured in NIKE0039496.  ECF No. 260-1, Appendix A, Pair No. 42.

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████ Rows 56, 125.

StockX also disputes that Nike has established the chain of custody for these shoes.

*See* ECF No. 260-1, Appendix A, Pairs 38-77.  Mr. Malekzadeh, who founded the

sneaker resale business Zadeh Kicks, is currently facing criminal indictment for a

series of fraud-related charges connected to that business. Opp. DX 59, Malekzadeh Tr. 17:15–19; Opp. DX 60, Matt Halfhill, "The Rise and Multi-Million Dollar Fall of Zadeh Kicks," Nice Kicks, April 12, 2024, https://www.nicekicks.com/the-rise-fall-and-implosion-of-zadeh-kicks-and-why-it-matters-beyond-the-sneaker-world/ ("Zadeh Kicks Founder Michael Malekzadeh and CFO Bethany Mockerman were indicted for wire fraud, conspiracy to commit bank fraud, and money laundering" on July 29, 2022). Mr. Malekzadeh asserted his Fifth Amendment rights when asked about the sneakers at issue, and did not testify that any of them were, in fact, purchased on StockX. Opp. DX 59, Malekzadeh Tr. 17:13–200:24. After Mr. Malekzadeh filed a petition to dissolve his Zadeh Kicks business in May 2022, the business entered receivership and the receiver has reported that Mr. Malekzadeh did not maintain records documenting the chain of custody of his inventory or keep track of how sneakers were procured. Opp. DX 61, Receiver's Initial Inventory and Report, 22 CV 16510, 5 (Oreg. Cir. Ct. July 13, 2022); Opp. DX 59, Malekzadeh Tr. 17:15–19. StockX has had no opportunity to review the alleged counterfeits to determine whether they were, in fact, purchased on StockX's platform, and the limited evidence Nike produced in this litigation does not allow StockX to determine that the sneakers were sold on its platform.

### 6.   *Fraud Ring Operating on StockX's Platform*

203.   StockX admitted that ██████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████████ Ex. 46, Huber June Tr. 42:2-43:13.

a.    Response: Undisputed.

204.    StockX testified that it did not believe "that more product [from this group of bad actors] went through [StockX's] process and made it through" because "[StockX] didn't have any other buyers who complained about the products that they received."  Ex. 46, Huber June Tr. 43:14-44:18.

a.    Response: Disputed.  StockX disputes Nike's characterization of, and inferences purportedly drawn from, Mr. Huber's testimony as misleading because Paragraph 210 omits additional context needed to understand Mr. Huber's testimony.  Mr. Huber testified that StockX did not "believe there [was] any reason to suggest that more bad product went through our process and made it through" and "[i]t's also important to realize a lot of these bad actors will ship good product in an effort to have positive account attributes in order to trick the StockX verification process and our fraud team."  PX 46 at 43:14–44:18.  When asked why he did not believe more product went through StockX's Process, Mr. Huber responded, "we have a lot of good faith in our verification process, that our authentication team, you know, when following our operating procedures and inspecting these like Abe and John did, would reject these items.  *And* we don't—we didn't have any other buyers who complained about the products that they received, and no reinspections were—were necessary."  PX 46 at 43:14–44:18 (emphasis added).

205.    Prior to being removed from the StockX platform, the "bad actor group," identified as sellers of some of the Roy Kim orders from StockX, completed 1807 sales.  Ex. 46, Huber June Tr. 42:2-43:13; Duvdevani Decl. ¶ 133, Ex. 132 (STX0806056); *id.* ¶ 111, Ex. 110 (STX0806024).

a.    Response: Undisputed.

206.    The majority of email addresses associated with the "bad actor group" have

█████████████████████████████████████████████████████████████

*Compare* Duvdevani Decl. ¶ 133, Ex. 132 (STX0806056) *with* Duvdevani Decl. ¶¶ 134-135, Ex.

133-134 (https://www.tencent.com/en-us/business.html, https://mail.163.com/ ).

a.    <u>Response</u>: Undisputed.

207.    The email accounts associated with sellers of counterfeit footwear returned to

StockX by Roy Kim but who were not identified by StockX to be a part of the "bad actor group,"

were StockX "power buyers." Duvdevani Decl. ¶ 111, Ex. 110 (STX0806024); *id.* ¶ 136, Ex. 135

(STX0169627).

a.    <u>Response</u>: Disputed because this statement is not supported by the cited documents.

Neither PX 110 nor PX 135 mention "power buyers."

**E.    Nike Put StockX on Notice of Counterfeiting on StockX's Website**

208.    On December 14, 2020, a Nike employee discovered a StockX listing for an Air

Jordan 11 Retro Jubilee 25th Anniversary in a size Men's 13.5. Duvdevani Decl. ¶ 137, Ex. 136 at

NIKE0036554.

a.    <u>Response</u>: Undisputed.

209.    Nike was able to determine that listing was counterfeit as the Jordan 11 Retro

Jubilee 25th Anniversary was never manufactured in a size Men's 13.5. Duvdevani Decl. ¶ 137,

Ex. 136 at NIKE0036554.

a.    <u>Response</u>: Undisputed.

210.    On December 28, 2020, Mr. Pallett sent correspondence to StockX regarding the

counterfeit pair of Nike-branded shoes offered for sale on StockX's platform. *See* Duvdevani Decl.

¶¶ 138-140, Exs. 137-139 (STX0773067, STX0773072, NIKE0029089).

a.      Response: Disputed that StockX "offered for sale" counterfeit Nike-branded shoes, as StockX was not the seller of these shoes. [citation showing SX is a marketplace]. StockX further disputes Nike's characterization of, and inferences purportedly drawn from, PXs. 137–139 as misleading because Paragraph 210 omits additional context needed to understand PXs. 137–139.  On December 28, 2020, Nike wrote to StockX that it attempted to purchase the Air Jordan 11 product, but StockX had already rejected the transaction "after the item failed to pass StockX's authentication check" and StockX and Nike were "aligned on ensuring consumers only receive authentic product."  PX 139.  On December 28, 2020, Greg Schwartz from StockX responded confirming that the counterfeit Nike product was removed from the StockX platform and no orders of this product were ever delivered to any customers.  PX 138.  Mr. Schwartz further wrote: "We had a good conversation with Brian [Fogarty] back in 2019 about potential areas of collaboration.  It would be great to revisit this dialog and explore ways that we could work together given our shared focus on combating counterfeit products in the market."  PX 138.  In reply, Brian Fogarty, VP of Global Litigation and Investigations at Nike, wrote "[w]e appreciate that StockX takes this issue seriously and promptly acted to remove the product . . . . we believe there is and will continue to be a clear distinction between the 'good' actors and 'bad' actors in the meantime."  PX 138.

211.    In its correspondence, Nike sought additional information from StockX regarding the seller behind the counterfeit listing "to prevent that person or entity from attempting additional sales of counterfeit products."  Duvdevani Decl. ¶ 138, Ex. 137 (STX0773067).

a.      Response: Undisputed.

212.    StockX would not provide information regarding the seller of the "non-authentic sneakers" absent a subpoena or search warrant.  Duvdevani Decl. ¶ 139, Ex. 138 at STX0773072.

    a.    <u>Response</u>: Disputed that StockX refused to provide information about the seller absent a subpoena or search warrant.  In PX 138, StockX legal counsel, Maureen Lesko, emailed Nike: "We are happy to provide the seller's information to the local authorities should a report be filed regarding the non-authentic sneakers."  Ms. Lesko clarified that, pursuant to StockX's privacy policy, StockX is "unfortunately not permitted to provide a customer's information to a third party without their express consent or as part of an investigation (via subpoena or search warrant).  If you have filed a report with the local authorities please feel free to give them my contact information below so that we can assist in this investigation in every way possible."  PX 138.  Nike responded, "Thanks, Maureen. Appreciate the response. We will get back to you when we have more to share." PX 138.

## VI.    StockX's False Advertising and Sale of Counterfeit "Nike" Shoes Harms Nike

213.    Dr. Jeffrey Stec was retained on behalf of Nike as an economic expert.  August 6, 2024 Declaration of Jeffery Stec ("Stec Decl.") ¶ 2, Ex. A ("Stec Report") at 1.

    a.    <u>Response</u>: Undisputed.

214.    Dr. Stec opined that "Nike and StockX offer the same Nike shoes.  A consumer seeking to purchase a new pair of Nike shoes can do so either directly through Nike or through the StockX platform because StockX purportedly guarantees or verifies that every Nike shoe sold on its platform is new, unworn, and authentic."  As shown in his report, "many lines of Nike shoes are concurrently available for sale through both Nike and StockX." Stec Report at 9.

    a.    <u>Response</u>: Undisputed that Dr. Stec offered the quoted opinions.  However, StockX disputes the substance of Dr. Stec's opinion as unsupported by evidence, and

contradicted by record evidence.  Dr. Stec's analysis was based on availability of shoes on the Nike website on June 1st, 2023 and the availability of the same styles of shoes on the StockX website on June 1st and 2nd, 2023 only, Opp. DX 65, Expert Report of Jeffrey Stec ("Stec Rep.") at 11, and thus does not support the broad statements that "Nike and StockX offer the same shoes" or "many lines of Nike shoes are concurrently available for sale through both Nike and StockX."  Further, Dr. Stec's analysis of overlapping shoe styles on both Nike's and StockX's websites indicates that 8 of these 71 styles only had two or fewer sizes concurrently available on Nike and StockX, and in some instances, such as with style DZ5485-031, the single shoe size available concurrently on both websites was a men's size 17.  Opp. DX 65, Stec Rep. Ex. 4.2.  At his deposition, Dr. Stec admitted that his study "does not show that there was even a single instance of a Nike shoe sold on StockX at a time when the same shoe was available in the same size on Nike.com," Opp. DX 20, Stec Tr. 249:22–250:16.  StockX further disputes Nike's characterization of, and inferences purportedly drawn from, the statement "Nike and StockX offer the same Nike shoes" as misleading, as StockX sells many rare, limited-edition sneakers which are not available for purchase on Nike's website.  Opp. DX 40, Tucker Rep. ¶ 18; DX 44, STX0021868 at STX0021918 ██████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████

215.    Dr. Stec opined that "[b]ased on the list of 102 styles and makes of the best-selling Nike shoes that were identified on Nike's website as of June 1, 2023, [he] was able to identify that

71 of those shoes, or 69.9%, could also be found available for sale on StockX's website as of June 2, 2023. These products included the same styles and at least one overlapping size that was also sold on Nike.com." Stec Report at 11.

a.    Response: Disputed.  Paragraph 215 misstates Dr. Stec's report, as the percentage stated on page 11 of Dr. Stec's report was 69.6%.  StockX further disputes the inferences purportedly drawn from the statement "71 of those shoes, or 69.6%, could also be found available for sale on StockX's website as of June 2, 2023," including that anyone could purchase any size and colorway of these 71 shoes either on Nike or StockX's website on June 2, 2023.  Dr. Stec's analysis indicates that 8 of these 71 styles only had two or fewer sizes concurrently available on Nike and StockX, and in some instances, such as with style DZ5485-031, the single shoe size available concurrently on both websites was a men's size 17.  Opp. DX 65, Stec Rep. Ex. 4.2.  At his deposition, Dr. Stec admitted that his study "does not show that there was even a single instance of a Nike shoe sold on StockX at a time when the same shoe was available in the same size on Nike.com." Opp. DX 20, Stec Tr. 249:22–250:16.

216.    Dr. Stec opined that "[t]he decision by StockX to list and offer Nike products for sale on its website creates competitive pressure on the same Nike products sold directly by Nike. Based on [his] review of these products [he had] identified that many of the Nike products were available for sale on the StockX platform at prices below the retail price – StockX even has a flag 'Price Currently Below Retail' to help its buyers notice those items more easily both when they are searching on StockX and when they open a specific item's listing." Stec Report at 13.

a.    <u>Response</u>: Undisputed that Dr. Stec provided the quoted opinion.  However, StockX disputes the inferences purportedly drawn from the statement "[t]he decision by StockX to list and offer Nike products for sale on its website creates competitive pressure on the same Nike products sold directly by Nike," including that StockX lists items for sale or sells items directly, and that any such decision from StockX exerts competitive pressure on Nike.  StockX is a resale marketplace that connects individual buyers and sellers looking to trade products.  DX 15, Erin Griffith, The New York Times, "Buy Low Tops, Sell High-Tops: StockX Sneaker Exchange Is Worth $1 Billion," June 27, 2019, https://www.nytimes.com/2019/06/26/technology/trading-sneakers-stockx.html; DX 14, NIKE0035800 at 804 ("Detroit-based mobile marketplace matches buyers and sellers of sneakers (deadstock only), streetwear, handbags and watches").  StockX further disputes Dr. Stec's opinion as unsupported by record evidence.  At his deposition, Dr. Stec admitted that his study "does not show that there was even a single instance of a Nike shoe sold on StockX at a time when the same shoe was available in the same size on Nike.com."  Opp. DX 20, Stec Tr. 249:22–250:16.

217.    Dr. Stec opined that "[a] consumer interested in buying [certain Nike] products could purchase the products now through StockX's pre-release listing and not directly through Nike. This once again puts competitive pressure on Nike and on the sale of its to-be-released products." Stec Report at 15.

a.    <u>Response</u>: Undisputed that Dr. Stec provided the quoted opinion.  However, StockX disputes the inferences purportedly drawn from the statements "[t]his once again puts competitive pressure on Nike and on the sale of its to-be-released

products," including that any consumer choosing to purchase a Nike shoe listed for sale on StockX's website pre-release could purchase the same shoe just as easily from Nike's website.  Nike uses scarcity as a marketing device, and more recently, has begun selling limited-release shoes exclusively through a lottery system only accessible in its SNKRS app.  Opp. DX 17, Wells Rep. ¶¶ 72–75.  Mike Child, Nike's Director of Digital Goods Strategy and corporate representative, testified that he purchased a pair of sneakers on StockX because he "attempted to" purchase them from Nike, but "didn't win the draw."  Opp. DX 19, Child Tr. 243:8–22. Heather Paulson, Nike's VP of Connected Marketplace and corporate representative, testified that Nike █████████████████████████████████ ███████████████████████████████████████████ Opp. DX 2, Paulson Tr. 208:24–209:4.  ███████████████████████████████████████████

███████████████████████████ Opp. DX 2, Paulson Tr. 209:5–09 ███████ ██████████████████████████████████████████████████

████ ).  Further, when consumers turn to the resale market to purchase these limited release sneakers, they must do so "often at prices much higher than the original retail price,"  Opp. DX 17, Wells Rep. ¶ 76, and Nike has offered no evidence that any pre-release sneakers were available from both Nike and StockX, *for the same price*.  StockX further disputes Dr. Stec's opinion as contradicted by record evidence.  At his deposition, Dr. Stec admitted that his study "does not show that there was even a single instance of a Nike shoe sold on StockX at a time when the same shoe was available in the same size on Nike.com."  Opp. DX 20, Stec Tr. 249:22–250:16.

213

218.    Dr. Stec opined that "[a] consumer seeking to purchase new Nike shoes can do so either directly through Nike (or its authorized retail partners) or through the StockX platform…StockX is in the market selling new Nike products to consumers which Nike also currently sells directly to consumers" Stec Report at 16-17. "[T]he availability of the same Nike products as it is offering on its own platform on the StockX platform, often at prices below retail, ensures that consumers can substitute StockX purchases for Nike purchases of many of the same items…[it] is incorrect to conclude just because Nike is in the 'primary' market and StockX is in a 'secondary' market, the parties do not complete." Stec Report at 17-18.

a.    Response: Undisputed that Dr. Stec offered the quoted opinion.  However, StockX disputes the inferences purportedly drawn from the statement "[a] consumer seeking to purchase new Nike shoes can do so either directly through Nike (or its authorized retail partners) or through the StockX platform," including that a consumer can purchase any Nike shoe either on StockX's platform or from Nike. Nike uses scarcity as a marketing device, and more recently, has begun selling limited-release shoes exclusively through a lottery system only accessible in its SNKRS app.  Opp. DX 17, Wells Rep. ¶¶ 72–75.  Mike Child, Nike's Director of Digital Goods Strategy and corporate representative, testified that he purchased a pair of sneakers on StockX because he "attempted to" purchase them from Nike, but "didn't win the draw."  Opp. DX 19, Child Tr. 243:8–22.  Heather Paulson, Nike's VP of Connected Marketplace and corporate representative, testified that Nike ███████████████████████████████████████████

████████████████████████████ Opp. DX 2, Paulson Tr. 208:24–209:4.

████████████████████████████████████████████

████████████████████.  Opp. DX 2, Paulson Tr. 209:5–9 ████████████

████████████████████████████████████████████████

StockX further disputes the inferences purportedly drawn from the statements "StockX is in the market selling new Nike products to consumers which Nike also currently sells to consumers" and "the availability of the same Nike products as it is offering on its own platform on the StockX platform, often at prices below retail, ensures that consumers can substitute StockX purchases for Nike purchases of many of the same items," including that that Nike and StockX offer for sale the same shoes, in the same sizes and colorways at the same time, such that a consumer could choose to purchase either on StockX or Nike.  Dr. Stec's analysis was based on availability of shoes on the Nike website on June 1st, 2023 and the availability of the same styles of shoes on the StockX website on June 1st and 2nd, 2023, Opp. DX 65, Stec Rep. at 11, and thus does not support Nike's broad statements in Paragraph 218.  StockX further disputes Dr. Stec's opinion as unsupported by record evidence.  At his deposition, Dr. Stec admitted that his study "does not show that there was even a single instance of a Nike shoe sold on StockX at a time when the same shoe was available in the same size on Nike.com," Opp. DX 20, Stec Tr. 249:22–250:16.

219.   As part of Nike's efforts to protect consumers and maintain control over its brand, reputation, and the goodwill it has spent decades building with its consumers, Nike aggressively works to keep the market clear of counterfeit goods. Pallett Decl. at ¶ 5.

    a.    <u>Response</u>: Undisputed.

220.    Nike also works hard to ensure that its genuine products are high quality.  When fakes are permitted to infiltrate the market, Nike loses control of the manufacturing process and its ability to maintain strict quality control.  Fakes undermine consumer confidence in the quality of genuine Nike products, erode the consumer experience, and damage the brand, reputation, and goodwill Nike has spent decades building.  Pallett Decl. at ¶ 6.

   a.    <u>Response</u>: Undisputed that fakes are generally a problem, but disputed that the 34 counterfeits at issue in this action caused any harm to Nike, as Nike has no evidence that any consumer has purchased poor quality, counterfeit Nike product on StockX's platform, believed that Nike was the source of that poor quality product, and subsequently believed that Nike products are low quality because of that. Disputed that Nike "works hard" to "ensure" its genuine products are high quality. Nike has admitted that products which it sells or offers for sale have manufacturing defects.  Opp. DX 7, Delli Carpini Tr. 149:21-24 ███████████

   ████████████████████████████████████████████  ████████

   ████████████████████████████████████████████

   ████████████████; *see also* Opp. DX 66, "What Is Nike's Return Policy, <u>https://www.nike.com/help/a/returns-policy</u> (including a section entitled "What about defective or flawed items?" and noting "If it's been less than 60 days since your purchase, simply <u>return</u> the item.  If it's been more than 60 days and your item is potentially defective or flawed, please see our <u>warranty information</u> for additional details"); Opp. DX 66, Nike, "What is Nike's Return Policy?" https://www.nike.com/help/a/returns-policy (Nike consumers can "return defective or faulty products with a valid proof of purchase within two years of the online or

in-store purchase date"). ████████████████████████████████████

████████████████████████████████████████ Opp. DX 7, Delli Carpini Tr. 149:8–

24; Opp. DX 18, Lopez Tr. 235:15–236:21.  StockX's expert witness, DeJongh

Wells, opined that "the perceived quality of Nike's sneakers has reportedly

decreased in the past two decades, despite regular price increases."  Opp. DX 17,

Wells Rep. ¶ 94; Opp. DX 67, The Campanile, "The Decline of Nike in Sneaker

Culture," April 25, 2014, https://thecampanile.org/2014/04/25/the-decline-of-nike-

in-sneaker-culture ("In the past decade, Nike has been forced to compensate for an

influx in consumers in the sneaker community, specifically in the Jordan line,

resulting in less exclusive releases and also poorer quality in the construction and

material of shoes. […] As well as skimping on the quality of their shoes, Nike is

also increasing the prices."); Opp. DX 68, Kicks 1-2, "Nike's Ongoing Struggle

With        Quality        Control        Issues,"        February        14,

2016,https://kicksonetwo.rossdwyer.com/2016/02/14/nikes-ongoing-struggle-

with-quality-control-issues ("[Y]esterday's release of the OG 'White Cement'

Jordan IV's ran into some troubles.  Several pairs were shipped either scratched or

with black or blue glue stains[.]").  One article detailed how Nike's authentic

products have even had issues with "mismatched logos, missing (or bolded)

patterns, misshapen heels and more," which are traits that might otherwise have

been used to identify a counterfeit shoe.  Opp. DX 16, Gear Patrol, "Why Nike's

Quality    Control    is    Suddenly    Under    Scrutiny,"    March    20,    2023,

www.gearpatrol.com/style/shoes-boots/a43364644/nike-quality-control-stockx-

fakes ("Has Nike's quality control gotten worse? There's certainly a big uptick of

anecdotal reports pointing out botched products. A bevy of recent Tweets call out
mismatched logos, missing (or bolded) patterns, misshapen heels and more."); Opp.
DX 22, NIKE0081473 at 492 (█████████████████████████████████

████████████████████████████d"), at NIKE0081494

███████████████████████████████████████████

████████████ and at NIKE0081505 (noting for ███████████████████

████████████████████ StockX further disputes that Nike has
provided any evidence to support its broad statement that "[f]akes undermine
consumer confidence in the quality of genuine Nike products, erode the consumer
experience, and damage the brand, reputation, and goodwill Nike has spent decades
building."  The quality of fakes has significantly improved.  Opp. DX 17, Wells
Rep. ¶ 92.

221.    Consumers who mistakenly believe that counterfeit "Nike" products he or she
purchased originated from Nike will come to believe that Nike offers low-quality products.
Inferior quality products will result in increased skepticism and hesitance in consumers presented
with genuine Nike products, resulting in a loss or undermining of Nike's reputation and goodwill.
Ex. 40, Delli Carpini Tr. 31:11-32:25, 239:11-240:14, 262:19-265:13.

   a.    <u>Response</u>: Disputed, because Nike's statements that inferior quality products "will
         result in creased skepticism and hesitance," which will in turn "result[] in a loss of
         undermining of Nike's reputation and goodwill," are unsupported by any evidence
         in the record.  ████████████████████████████████████

         ███████████████████████████  ███████████████████

         ████████████████████████████████████████████

Barbara Delli Carpini, Nike's corporate representative on ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████ Opp. DX

7, Delli Carpini Tr. 261:19–262:13; 270:23–271:4.  Ms. Delli Carpini testified that

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████ Opp. DX 7, Delli Carpini Tr. 241:14–23 ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████, 261:19–262:4 ███████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████ Ms. Delli Carpini testified that ████████████████████

████████████████████████████████████████████████████████

██████████████████████ Opp. DX 7, Delli Carpini Tr. 247:25–248:8.

222.    Professor Kammel opined that "Nike must spend and has expended a huge amount

of resources to combat counterfeiting, ████████████████████████████████

████████████████████████████████████████████ Kammel Opening

Report at 15.

a.    <u>Response</u>: Disputed.  Paragraph 222 misstates Ms. Kammel's report.  The actual quote from the Kammel report reads, "Nike must spend and has expended a huge amount of resources to combat counterfeiting, which has exponentially ████

████████████████████████████████████████████████

████████████████████  Opp. DX 34, Kammel Rep. at 15 (emphasis added).

StockX further disputes Kammel's opinion as unsupported by record evidence.  Ms. Kammel's opinion relies on testimony from Nike employee Ms. Delli Carpini, which ███████████████████████████████████████████████

and a purported February 2, 2023 call with Ms. Delli Carpini.  Ms. Kammel ████

████████████████████████████████████  that Nike must spend "a huge amount of resources to combat counterfeiting," or that the amount of resources expended to combat counterfeiting have ████████████████

█████████████████

223.    Professor Kammel opined that "StockX's business model, which fosters the sale of counterfeit goods under the illusion of guaranteed authenticity, harms Nike because it allows the 'unseen competitor,' or the counterfeiter into a supposedly safe online marketplace." Kammel Rebuttal Report at § I.A.1.

a.    <u>Response</u>: Undisputed that Ms. Kammel offered the quoted opinion.  However, StockX disputes the statement "StockX's business model … harms Nike" as unsupported by record evidence.  ████████████████████████████

████████████████████████████  Barbara Delli Carpini, Nike's corporate representative on ████████████████████████

████████████████████████████████████████████████



Opp. DX 7, Delli Carpini Tr. 261:19–262:13; 270:23–271:4.  Ms. Delli Carpini testified that

Opp. DX 7, Delli Carpini Tr. 241:14–23

261:19–262:4

Ms. Delli Carpini testified that

Opp. DX 7, Delli Carpini Tr. 247:25–248:8.

b.    StockX further disputes the statement that "StockX's business model … fosters the sale of counterfeit goods under the illusion of guaranteed authenticity."  StockX has invested hundreds of millions of dollars in the development and execution of StockX's Process.  Opp. DX 48, Huber Feb. Tr. 133:10–134:3.  StockX relies on various features and technologies to increase trust and accountability on its platform.  Opp. DX 40, Tucker Rep. ¶¶ 39–40.  StockX employees physically inspect and verify every product sold on StockX before any transaction can be

completed.    Opp. DX 48 Huber Feb. Tr. 60:15–20, 133:10–134:12; DX 14, NIKE0035800 at 804 ("Sellers hold inventory and ship to StockX only when sold; StockX verifies authenticity then ships to buyer for 9.5% commission").    "[E]very item that transacts on [the StockX] platform go[es] through [StockX's] authentication and verification process to correct for the potential areas of disappointment for a buyer: wrong size, wrong color, wrong product, missing accessories, damaged, manufacturing defect, other variances."    Opp. DX 48, Huber Feb. Tr. 245:12–19.    StockX explains on its website that it remains "one of the few marketplaces committed to physically reviewing 100% of the items that pass through [its] platform."    DX 77, NIKE0040098 at 101.    As of May 31, 2022, approximately 35 million products had gone through StockX's Process.    DX 82, NIKE0006776 at 778.    In 2022, StockX rejected over 330,000 products worth approximately $100 million before they reached buyers as part of its Process.    DX 83, StockX, "Big Facts: Current Culture Index 2023," Aug. 6, 2024, https://stockx.com/about/sx-market-insights/big-facts-current-culture-index-2023/ (The "[c]ombined value of the 330,000+ products StockX rejected in 2022 for failure to meet verification standards" was approximately $100 million); *see also* DX 82, NIKE0006776 at 779-780.    In 2023 alone, StockX rejected more than 325,000 products, collectively valued at more than $80 million, that did not meet its authentication standards.    DX 84, https://stockx.com/about/zh-tw/sx-market-insights/big-facts-current-culture-index-2024/.

224.    Professor Kammel opined that "[w]ith StockX's ease of access to consumers, little proactive vetting, use of stock photos, and high profit returns, the 'unseen competitor' can sell

more covertly and therefore reduces the penetration of the authentic, [Nike] brand product in the marketplace." Kammel Rebuttal Report at § I.A.1. (internal quotations omitted).

a. <u>Response</u>: Undisputed that Ms. Kammel offered the quoted opinion. However, StockX disputes the inferences purportedly drawn from the statement that StockX's platform allows "the 'unseen competitor'" to "sell more covertly" or "reduces the penetration of the authentic, [Nike] brand product in the marketplace" as misleading, in that it ignores the existence of StockX's authentication process. StockX has invested hundreds of millions of dollars to the development and execution of its authentication process. Opp. DX 48, Huber Feb. Tr. 133:10–134:3. StockX relies on various features and technologies to increase trust and accountability on its platform. Opp. DX 40, Tucker Rep. ¶¶ 39–40. StockX employees physically inspect and verify every product sold on StockX before any transaction can be completed. Opp. DX 48, Huber Feb. Tr. 60:15–20, 133:10–134:12; DX 14, NIKE0035800 at NIKE0035804 ("Sellers hold inventory and ship to StockX only when sold; StockX verifies authenticity then ships to buyer for 9.5% commission"). "[E]very item that transacts on [the StockX] platform go[es] through [StockX's] authentication and verification process to correct for the potential areas of disappointment for a buyer: wrong size, wrong color, wrong product, missing accessories, damaged, manufacturing defect, other variances." Opp. DX 48, Huber Feb. Tr. 245:12–19. StockX explains on its website that it remains "one of the few marketplaces committed to physically reviewing 100% of the items that pass through [its] platform." DX 77, NIKE0040098 at NIKE0040101. As of May 31, 2022, approximately 35 million products had gone

through StockX's authentication process.  DX 82, NIKE0006776 at NIKE0006778.

In 2022, StockX rejected over 330,000 products worth approximately $100 million

before they reached buyers as part of its authentication process.  DX 83, StockX,

"Big Facts: Current Culture Index 2023," https://stockx.com/about/sx-market-

insights/big-facts-current-culture-index-2023/ (The "[c]ombined value of the

330,000+ products StockX rejected in 2022 for failure to meet verification

standards" was approximately $100 million); *see also* DX 82, NIKE0006776 at

NIKE0006779-780.  In 2023 alone, StockX rejected more than 325,000 products,

collectively valued at more than $80 million, that did not meet its authentication

standards.   DX 84, StockX, "Big Facts: Current Culture Index 2024,"

https://stockx.com/about/zh-tw/sx-market-insights/big-facts-current-culture-

index-2024/.

225.    During his deposition, Mr. LaMagna agreed that "the Internet made counterfeit

investigations" into counterfeit sellers "more difficult and costly." Ex. 74, LaMagna Tr. 145:2-6.

a.    <u>Response</u>: Undisputed that Mr. LaMagna offered the summarized testimony.

226.    Ms. Delli Carpini testified as Nike's 30(b)(6) corporate designee that

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████ Ex.

40, Delli Carpini Tr. 239:11-23.

a.    <u>Response</u>: Undisputed that Ms. Delli Carpini provided the quoted testimony.

However, StockX disputes the inferences purportedly drawn from Ms. Delli

Carpini's quoted testimony, including that ███████████████████████ ████████████████████████████ which is contradicted by evidence in the record.

Barbara Delli Carpini, Nike's corporate representative on ██████████████ ████████████████████████ testified that ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████ Opp.

DX 7, Delli Carpini Tr. 241:14–23 ██████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

261:19–262:4 ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████. Ms. Delli Carpini

testified that ████████████████████████████████████████

████████████████████████████████████████████ Opp.

DX 7, Delli Carpini Tr. 247:25–248:8.

b.    StockX further disputes this statement because, in stark contrast to the 34 counterfeits Nike identified after two years of discovery, StockX rejects hundreds of thousands of potentially counterfeit products worth millions of dollars every year.    DX 83, StockX, "Big Facts: Current Culture Index 2023," https://stockx.com/about/sx-market-insights/big-facts-current-culture-index-2023/ (The "[c]ombined value of the 330,000+ products StockX rejected in 2022 for failure to meet verification standards" was approximately $100 million); *see also*

DX 82, NIKE0006776 at NIKE0006779-780; DX 84, StockX, "Big Facts: Current Culture Index 2024," https://stockx.com/about/zh-tw/sx-market-insights/big-facts-current-culture-index-2024/ (In 2023 alone StockX rejected more than 325,000 products, collectively valued at more than $80 million, that did not meet its authentication standards.).

227.    During his deposition, Mr. LaMagna agreed that "the sale of counterfeits can harm the reputation of the IP rights holder." Ex. 74, LaMagna Tr. 145:07-14.

a.    <u>Response</u>: Undisputed that Mr. LaMagna offered the summarized testimony.

228.    Ms. Delli Carpini testified as Nike's 30(b)(6) corporate designee that ██

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ Ex. 40, Delli Carpini Tr. at 241:25-242:13.

a.    <u>Response</u>: Undisputed that Ms. Delli Carpini provided the quoted testimony. However StockX disputes that the quoted testimony supports Nike's statement that



████ ██████ ████████ Barbara Delli Carpini, Nike's corporate representative on ████

Opp. DX 7, Ex. Delli Carpini Tr. 261:19–262:13; 270:23–271:4. Ms. Delli Carpini

testified that 

Opp. DX 7, Delli Carpini Tr. 241:14–23

, 261:19–262:4

Ms. Delli Carpini testified that

Opp. DX 7, Delli Carpini Tr. 247:25–248:8.

b.    StockX further disputes this statement because, in stark contrast to the 34 counterfeits Nike identified after two years of discovery, StockX rejects hundreds of thousands of potentially counterfeit products worth millions of dollars every year.    DX 83, StockX, "Big Facts: Current Culture Index 2023," https://stockx.com/about/sx-market-insights/big-facts-current-culture-index-2023/ (The "[c]ombined value of the 330,000+ products StockX rejected in 2022 for failure to meet verification standards" was approximately $100 million); *see also* DX 82, NIKE0006776 at NIKE0006779-780; DX 84, Stockx, "Big Facts: Current Culture Index 2024," https://stockx.com/about/zh-tw/sx-market-insights/big-facts-current-culture-index-2024/ (In 2023 alone StockX rejected more than 325,000

products, collectively valued at more than $80 million, that did not meet its authentication standards).

229.    During his deposition, Mr. LaMagna agreed that "when counterfeit Nike shoes are sold Nike is a victim of that crime." Ex. 74, LaMagna Tr. 185:25-186:05.

a.    <u>Response</u>: Undisputed that Mr. LaMagna offered the summarized testimony.

230.    Counterfeit Nike and Jordan products may be physically harmful to consumers as counterfeit "Nike" product ███████████████████████████████████████████

██████████████████████████████████ Ex. 40, Delli Carpini Tr. 264:10-17.

a.    <u>Response</u>: Undisputed that Ms. Delli Carpini provided the quoted testimony. However, StockX disputes that the quoted testimony supports Nike's statement that

███████████████████████████████████████████████████████

StockX further disputes the inferences purportedly drawn from Nike's statement that ███████████████████████████████████████████████

██████████████████████ as unsupported by any specific evidence in the record. Barbara Delli Carpini, Nike's corporate representative on ███████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████ Opp. DX 7, Delli Carpini Tr. 241:14–23 █████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████ 261:19–262:4 ██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

██████████████████████████████████

████████    Opp. DX 7, Delli Carpini Tr. 247:25–248:8.

b.    StockX further disputes this statement because, in stark contrast to the 34 counterfeits Nike identified after two years of discovery, StockX rejects hundreds of thousands of potentially counterfeit products worth millions of dollars every year.    DX 83, StockX, "Big Facts: Current Culture Index 2023," https://stockx.com/about/sx-market-insights/big-facts-current-culture-index-2023/ (The "[c]ombined value of the 330,000+ products StockX rejected in 2022 for failure to meet verification standards" was approximately $100 million); *see also* DX 82, NIKE0006776 at NIKE0006779-780; DX 84, StockX, "Big Facts: Current Culture Index 2024," https://stockx.com/about/zh-tw/sx-market-insights/big-facts-current-culture-index-2024/ (In 2023 alone StockX rejected more than 325,000 products, collectively valued at more than $80 million, that did not meet its authentication standards).

231.    Mr. LaMagna testified that "[c]onsumers certainly can be harmed if they purchased counterfeit goods, inauthentic goods." Ex. 74, LaMagna Tr. 142:2-15.

a.    Response: Undisputed that Mr. LaMagna provided the quoted testimony.

**A.    Customers have reached out to Nike to return faulty "Nike" shoes they had been guaranteed by StockX were authentic**

232.    On December 19, 2021, an individual contacted Nike customer support through Nike's customer service web chat inquiring whether "specific warranty for Nike Air products."

The individual stated that "I have the air zoom type menta shoes and one of the bubbles have burst" and represented he had purchased the product via StockX. The individual asked the representative "[i]s there anything I can do via Nike though however given that it is a Nike product?" Duvdevani Decl. ¶ 141, Ex. 140 at Row 27 (NIKE0039092).

    a.    <u>Response</u>: Undisputed that Nike received and sent the emails referenced in ¶ 232 and that PX 140 includes the quoted text. However, StockX disputes any inference purportedly drawn from PX 140 that any Nike product purportedly purchased via StockX by the customer that sent the referenced email was inauthentic. Nike has not put forth any evidence that the shoe in question in the customer support exchange described in ¶ 232 is a counterfeit shoe, as opposed to a genuine Nike shoe. Nike has not put forth any evidence that it reviewed, inspected, or authenticated the shoes discussed in PX 140. Nike has also failed to put forth evidence confirming that the individual contacting Nike in PX 140 is an actual StockX consumer who purchased the shoe in question on StockX's platform.

233.    On December 12, 2021, an individual contacted Nike customer support through Nike's customer service web chat regarding "a pair of Nike adapt shoes and on the right shoes the minus button is not properly working." After being informed that Nike could not because the shoes had not been purchased from a Nike store, the individual asked: "So if I purchase the shoes from StockX who authenticates them, you do not stand behind your product period?" Duvdevani Decl. ¶ 141, Ex. 140 at Row 28 (NIKE0039092).

    a.    <u>Response</u>: Undisputed that Nike received and sent the emails referenced in ¶ 233 and that PX 140 includes the quoted text. However, StockX disputes any inference purportedly drawn from PX 140 that any Nike product purportedly purchased via

StockX by the customer that sent the referenced email was inauthentic. Nike has not put forth any evidence that the shoe in question in the customer support exchange described in ¶ 233 is a counterfeit shoe, as opposed to a genuine Nike shoe. Nike has not put forth any evidence that it reviewed, inspected, or authenticated the shoes discussed in PX 140. Nike has also failed to put forth evidence confirming that the individual contacting Nike in PX 140 is an actual StockX consumer who purchased the shoe in question on StockX's platform. StockX further disputes Nike's characterization of, and inferences purportedly drawn from PX 140 because ¶ 233 omits additional context necessary to understand the exhibit. Specifically, the Nike customer service agent explains that Nike is not able to process returns or exchanges on any products which were not purchased through a physical Nike store or Nike app directly, including any purchases made by Nike's authorized retailers. The customer service agent writes, "Nike can only help purchases that were made in the store or In the Nike.com page," and "since they are our retailers we have the policies[sic] that they would be the ones in charge of their sales." PX 140 at Row 28.

234. On November 30, 2021, an individual contacted Nike customer support through Nike's customer service web chat inquiring: "I have a pair of Jordan 11 IE Low purchased 21/6 and they are already ripped and coming a part. I would like to return them for a new pair or something of equal value […] Can i still return a faulty product if I bought Nikes from StockX?" Duvdevani Decl. ¶ 141, Ex. 140 at Row 31 (NIKE0039092).

    a.   <u>Response</u>: Undisputed that Nike received and sent the emails referenced in Paragraph 234 and that PX 140 includes the quoted text. However, StockX disputes

any inference purportedly drawn from PX 140 that any Nike product purportedly purchased via StockX by the customer that sent the referenced email was inauthentic.  Nike has not put forth any evidence that the shoe in question in the customer support exchange described in Paragraph 234 is a counterfeit shoe, as opposed to a genuine Nike shoe.  Nike has not put forth any evidence that it reviewed, inspected, or authenticated the shoes discussed in PX 140.  Nike has also failed to put forth evidence confirming that the individual contacting Nike in PX 140 is an actual StockX consumer who purchased the shoe in question on StockX's platform.

235.    On May 5, 2021, an individual contacted Nike customer support through Nike's customer service web chat inquiring: "Hi! I have a question about a shoes I have I got a pair of nike dunk but for the logo on the sole it does not have the registered symbol and I am wondering if that affects the authenticity of the shoes i got it from stockx and they told me 'Sneakers are created on a larger scale and produced in major quantities where some variances may occur'" Duvdevani Decl. ¶ 141, Ex. 140 at Row 60 (NIKE0039092).

a.    <u>Response</u>: Undisputed that Nike received the email referenced in Paragraph 235 and that PX 140 includes the quoted text.  However, Defendant disputes any inference purportedly drawn from PX 140 that any Nike product purportedly purchased via StockX by the customer that sent the referenced email was inauthentic.  Nike has not put forth any evidence that the shoe in question in the customer support exchange described in ¶ 235 is a counterfeit shoe, as opposed to a genuine Nike shoe.  Nike has not put forth any evidence that it reviewed, inspected, or authenticated the shoes discussed in PX 140.  Nike has also failed to

put forth evidence confirming that the individual contacting Nike in PX 140 is an actual StockX consumer who purchased the shoe in question on StockX's platform, or that the statement this individual has attributed to StockX was actually relayed to her by StockX.

236.    On April 16, 2021, an individual contacted Nike customer support through Nike's customer service web chat inquiring: "Hi I purchased a pair of Nike Pegasus Turbo 2 shoes from one of your verified sellers (StockX). Within a few wears of the shoes the outer mesh has begun detaching from the outer sole. With each wear this is getting worse. I have tried to contact StockX who have not been able to help replace this product as it was not discovered as faulty within 3 working days of delivery. I can share proof of purchase from StockX. The quality of the shoes is unacceptable I would like to request a replacement." Duvdevani Decl. ¶ 141, Ex. 140 at Row 69 (NIKE0039092)

    a.    <u>Response</u>: Undisputed that Nike received and sent the emails referenced in Paragraph 236 and that PX 140 includes the quoted text.  However, Defendant disputes any inference purportedly drawn from PX 140 that any Nike product purchased via StockX by the customer that sent the referenced email was inauthentic.  Nike has not put forth any evidence that the shoe in question in the customer support exchange described in Paragraph 236 is a counterfeit shoe, as opposed to a genuine Nike shoe.  Nike has not put forth any evidence that it reviewed, inspected, or authenticated the shoes discussed in PX 140.  Nike has also failed to put forth evidence confirming that the individual contacting Nike in PX 140 is an actual StockX consumer who purchased the shoe in question on StockX's platform.  StockX further disputes Nike's characterization of, and inferences

purportedly drawn from, PX 140 as misleading because ¶ 236 omits additional context necessary to understand the exhibit.  Specifically, Nike's customer service representatives told this individual that the product in question was a Nike product, and that StockX was an authorized reseller of Nike goods.  The customer service representative writes, "I am sorry you are having this issue with your Nike product and this is not what you should supposed to experience."  PX 140 at Row 69.  Later in the thread, the individual writes, "[StockX] is a verified re-seller of Nike, which a colleague of yours has confirmed in a previous chat."  The individual then pastes the text from the previous chat with another customer service representative, which states, "[s]ince the item has been purchased through one of our authorised retailers, we highly suggest for you to have it coordinated with them directly as they have a different set of inventory and policies for returns that you can always check through:                https://help.stockx.com/s/article/Are-returns-or-exchanges-allowed?language=en_US."    PX 140 at Row 69.    The customer service representative then writes, "we did check again and it appears that stockx is not an authorized Nike reseller. For the meantime the best option is to contact them to get this item returned for refund."  Finally, Nike's customer service representative informs the individual that Nike "can take over in setting up this claim for you however [they are] unable to guarantee the approval."  PX 140 at Row 69.

237.    On January 26, 2022, an individual contacted Nike customer support through Nike's customer service web chat inquiring: "Hello, I bought a new Romaleo 4 product from StockX. The Swoosh part is a little peeled off, but StockX said it could be a problem during the

manufacturing process and it was impossible to handle. is not it really a bad product?" Duvdevani Decl. ¶ 142, Ex. 141 at Row 26 (NIKE0039101)

    a.    <u>Response</u>: Undisputed that Nike received and sent the emails referenced in Paragraph 237 and that PX 141 includes the quoted text. However, StockX disputes any inference purportedly drawn from PX 141 that any Nike product purportedly purchased via StockX by the customer that sent the referenced email was inauthentic. Nike has not put forth any evidence that the shoe in question in the customer support exchange described in Paragraph 237 is a counterfeit shoe, as opposed to a genuine Nike shoe. Nike has not put forth any evidence that it reviewed, inspected, or authenticated the shoes discussed in PX 141. Nike has also failed to put forth evidence confirming that the individual contacting Nike in PX 141 is an actual StockX consumer who purchased the shoe in question on StockX's platform, or that the statement this individual has attributed to StockX was actually relayed to her by StockX. StockX further disputes Nike's characterization of, and inferences purportedly drawn from, PX 141 because Paragraph 237 omits additional context necessary to understand the exhibit. Specifically, Nike's customer service representative appears to have told this individual that StockX is a verified reseller of Nike products. Nike's customer service representative writes "[g]ood thing about purchasing an item on an authorized retailer is that we stand behind our products. If in case you will encounter problems with the item, you can definitely contact us, and we will be more than happy to help assist you further . . . [p]lease check first with the place of purchase for their assistance. If they do not honor the item, you may contact our Corporate team at . . . between 7am – 4pm PT

Monday-Friday . . . or visit this link to file a claim: https://help-us.nikeinc.com/app/claims/returnguidelines/."  PX 141.

238.    On March 3, 2022, an individual contacted Nike customer support through Nike's customer service web chat seeking assistance regarding "a pair of air max 720 which have a popped air unit" that he represented had been purchased on StockX. During the course of the interaction, the customer service representative advised the individual that "StockX is not authorize retailer of Nike that is why we are unable to process your complaint."  The individual stated that they had "contacted stockx already they told me to contact the manufacturer of the product" and "this is still a Nike product with an issue it should not matter where it was purchased from I have proof of purchase the whole point of stockx is to be authentic." After being informed that Nike could not assist as StockX is not an authorized retailer, the individual stated "Okay so I have a faulty Nike product with no way to receive any help?" and further stated "But I have a pair of Nike shoes with proof of purchase yet you can not help me…Why on earth would I purchase anything from yous?" Duvdevani Decl. ¶ 143, Ex. 142 at Row 37 (NIKE0039100).

a.    Response: Undisputed that Nike received and sent the emails referenced in Paragraph 238 and that PX 142 includes the quoted text.  However, StockX disputes any inference purportedly drawn from PX 142 that any Nike product purportedly purchased via StockX by the customer that sent the referenced email was inauthentic.  Nike has not put forth any evidence that the shoe in question in the customer support exchange described in Paragraph 238 is a counterfeit shoe, as opposed to a genuine Nike shoe.  Nike has not put forth any evidence that it reviewed, inspected, or authenticated the shoes discussed in PX 142.  Nike has also failed to put forth evidence confirming that the individual contacting Nike in PX

142 is an actual StockX consumer who purchased the shoe in question on StockX's platform. StockX further disputes Nike's characterization of, and inferences purportedly drawn from PX 142 because Paragraph 238 omits additional context necessary to understand the exhibit. Specifically, Nike's customer service representative tells the individual "[t]here is no specific way to tell you if the product is authentic or not item purchased in StockX," even though the individual offered to "send . . . photos of the shoe." PX 142.

## B.     STOCKX RULE 56.1 COUNTERSTATEMENT OF MATERIAL FACTS AND NIKE'S RESPONSES.[2]

**VII.    StockX is committed to fighting the proliferation of counterfeits and has invested significant resources to building its authentication program.**

239.    A press release entitled "StockX Brand Protection & Customer Trust Report Highlights Company's Anti-Counterfeiting Investments, Efforts to Stop Bad Actors," stated that "[s]ince its inception, the StockX platform has been anchored by a robust verification program designed to fight fraud, curb counterfeiters, and deliver a consistent customer experience." Opp. DX 52, https://stockx.com/about/stockx-brand-protection-customer-trust-report-highlights-companys-anti-counterfeiting-investments-efforts-to-stop-bad-actors/.

**Nike, Inc's Response: Disputed.**

Nike does not dispute that StockX's "StockX Brand Protection & Customer Trust Report Highlights Company's Anti-Counterfeiting Investments, Efforts to Stop Bad Actors," published in April 2024, states that "[s]ince its inception, the StockX platform has been anchored by a robust verification program designed to fight fraud, curb counterfeiters, and deliver a consistent customer experience" but disputes that the characterization of StockX's program and the relevance of its

---

[2] Nike does not respond below to StockX's headings included in its Rule 56.1 Counter-Statement because such headings are not statements of fact requiring a response.

discussion which addresses post-litigation changes to StockX's advertising. Only after the filing of this action, StockX changed the name of its "authentication" process to verification but reassured consumers that its "comprehensive approach remains unchanged…product authenticity remains core to [its] analysis." Dkt. 261-60, Duvdevani Ex. 57 at NIKE0041163. Nike disputes that StockX's verification was designed to curb counterfeiters and deliver a consistent customer experience. StockX created a system wherein *inter alia* those who sell more get more lenient treatment from StockX (Dkt. 261-97—261-98, Exs. 91-92), informs sellers of the reasons why a product failed authentication and returns that product to the attempted counterfeit (Dkt. 261-103, Duvdevani Ex. 97; Dkt. 261-86, Duvdevani Ex. 80; Dkt. 261-105, Duvdevani Ex. 99) which enables sellers to "better mimic the genuine product" (Kammel Rebuttal Rep. at 10), and which passed an unknown amount of counterfeits, including at least 77 confirmed counterfeit pairs to three parties (*see* Dkt. 264-1, App'x A).

240.    StockX has invested hundreds of millions of dollars in developing and implementing its Process. Opp. DX 53, Fenton Tr. 142:5–9; Opp. DX 48, Huber Feb. Tr. 133:15–23; Opp. DX 69, STX0774394 (showing financial data from Q1 2020-Q3 2022); Opp. DX 24, NIKE0035611 at 643 (noting that StockX "invest[s] heavily in authentication").

**Nike, Inc's Response: Disputed.**

Nike does not dispute that two StockX witnesses testified that StockX invested "millions" in its authentication process but StockX does not cite to nor provide any underlying records or financials to corroborate their testimony nor support the proposition that millions of dollars have been invested to develop and execute its authentication process nor is it possible to discern what expenses are attributable to such based on the financials cited by StockX. Nike further disputes StockX's characterization to the extent it implies that StockX's investment has been effective in

"authenticating" products.  *See* Dkt. 261-46, Ex. 46, June Huber Tr. 10:6-16 (testifying that StockX does not determine "whether something is considered counterfeit or not."); Dkt. 261-48, Ex. 48, Lopez Tr. 178:18-179:1 ███████████████████████████████████████████

███████████████████████████████████████████████████████

██████████

241.    In 2021, StockX had 3.8M active buyers in Q1, and 4.3M active buyers in Q2.  Opp. DX 70, STX0024322 at 343.

**Nike, Inc's Response: Undisputed.**

242.    Since 2016, StockX has prevented $80 million in sneakers from being sold because StockX believed the products might be counterfeit.  Opp. DX 52, https://stockx.com/about/stockx-brand-protection-customer-trust-report-highlights-companys-anti-counterfeiting-investments-efforts-to-stop-bad-actors/.

**Nike, Inc's Response: Disputed.**

While Nike does not dispute that StockX purports to have prevented "$80 million" in sneakers from being sold that StockX believed may be counterfeit, Nike disputes the accuracy of such characterization.  StockX has not produced any underlying records or documents supporting its calculation of the value of the items rejected from its platform, evidencing how that number is calculated, or detailing what products are included in that calculation.  Further, StockX's inspection, verification, and authentication is inherently flawed in design and in StockX's authenticators' execution thereof. *See* Dkt. 261-48, Ex. 48, Lopez Tr. 178:18-179:1 ██████████

███████████████████████████████████████████████████████

██████████████████████████████████ As a result, although StockX claims to have prevented "80 million" in counterfeits, its inability to determine a product's

authenticity makes StockX likewise unable to determine whether those "80 million" in rejected products were genuine or authentic. *See* Dkt. 261-46, Ex. 46, June Huber Tr. 10:6-16 (testifying that StockX does not determine "whether something is considered counterfeit or not.").

243.    Between July 2020 and November 2022, StockX inspected 28.7 million products, including 17.8 million Nike products through StockX's Process, and rejected over 1 million products.  Opp. DX 63, STX0774284.

**Nike, Inc's Response: Undisputed.**

244.    Between July 2020 and November 2022, StockX inspected ██████ Jordan products through StockX's Process.  Of those products, ██████ failed StockX's Process because they did not meet StockX's standards.   Of those failures, ██████████████

███████████████████████████████████████

████████████████████████ Opp. DX 63, STX0774284.

**Nike, Inc's Response: Disputed.**

Nike does not dispute that STX0774284 purports to show products that failed StockX's authentication process, including "Jordan" products, however, Nike disputes StockX's characterization of those products and the accuracy of the spreadsheet.  StockX has not provided any corroborating testimony or evidence that explains what data is included in this spreadsheet or what products were included in its calculation.  Further, the spreadsheet categories label the reasons for ████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████ Dkt. 261-47, Duvdevani Ex. 48, Lopez Tr. at 178:10-179:1, ████████████

██████████████████████████ *Id.* at 114:2-7.  As such, Nike disputes the

accuracy of the number of authentication failures StockX claims are attributable to ███████ ████████████████████████████████████████  ████████████████████████████ is not evident on the face of the document and StockX has cited no evidence to support what ██████ in this spreadsheet constitutes.

245.    Between July 2020 and November 2022, StockX inspected ████████ Nike products through StockX's Process.  Of those products, ████████ failed StockX's Process because they did not meet StockX's standards.    Of those failures, █████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████ Opp. DX 63, STX0774284.

**Nike, Inc's Response: Disputed.**

Nike does not dispute that STX0774284 purports to show products that failed StockX's authentication process, including "Jordan" products, however, Nike disputes StockX's characterization of those products and the accuracy of the spreadsheet.  StockX has not provided any corroborating testimony or evidence that explains what data is included in this spreadsheet or what products were included in its calculation.  Further, the spreadsheet categories label the reasons for ████████████████████████████████████████████████ ████████████ █████████████████████████████████████ ████████████████████████████████████████████████████ █████████ Dkt. 261-47, Duvdevani Ex. 48, Lopez Tr. at 178:10-179:1, ████████████████ ████████████████████████████ *Id.* at 114:2-7.  As such, Nike disputes the accuracy of the number of authentication failures StockX claims are attributable to ███████ ████████████████████████████████████ Further, what constitutes ████████ is not

evident on the face of the document and StockX has cited no evidence to support what ████ in

this spreadsheet constitutes.

246.    ████████████████████████████████████    █████████

████████

**Nike, Inc's Response: Disputed.**

████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████    Sept.

Duvdevani Decl. ¶ 2, Ex. 149, Fenton Tr. 89:7-10; *id.* ¶ 3, Ex. 150, Huber 56:1-11.

247.    ████████████████████████████████████

████████████████████████████    Opp.  DX  71,

STX0774239.

**Nike, Inc's Response: Disputed.**

Nike disputes StockX's characterization of STX0774239 which ███████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████████████    Dkt.  261-47,

Duvdevani Ex. 48, Lopez Tr. at 178:10-179:1, ████████████  ignores the countless returns

that StockX did not accept related to consumer authenticity concerns. *See* Dkts. 261-87 – 261-94,

Duvdevani, Exs. 81-88; Dkts. 273-114 – 273-117.

248.    StockX consumer Roy Kim testified that StockX is "generally . . . responsive to any issues that [he has] as a buyer or a seller within 24 hours."  Opp. DX 73, Dep. Tr. of Roy Kim ("Kim Tr.") at 31:3–6.

**Nike, Inc's Response: Disputed.**

Nike disputes StockX's characterization of Mr. Kim's testimony which reads in its entirety: "[StockX's] customer service is generally pretty good just not in this particular case. Generally, they are responsive to any issues that I have as a buyer or a seller within 24 hours. In this case I didn't hear back them from" when discussing his treatment on StockX after becoming a power buyer and after receiving a large number of counterfeits from StockX.  Dkt. 271-73, Kim Tr. 30:25–31:7.  Mr. Kim also testified that as a buyer he was "told that [power buyers] get a dedicated customer support rep for [their] issues." Dkt. 261-120, Ex. 111, Kim Tr. 27:1-4.  However, Mr. Kim also testified that after purchasing a large number of counterfeits, he reached out to StockX customer service multiple times and received no response. Dkt. 261-120, Ex. 111, Kim Tr. 29:17-30:7.  Numerous consumers have similarly complained to StockX's customer service regarding its lack of responsiveness. Dkt. 273-27, Ex. 26, STX0229771 ("Ive received no response from this company, I[]m going to go ahead and report this and make a claim with my credit card company"); Dkt. 273-28, Ex. 27, STX0236761 ("Hello this is terrible communication when it was time to take my money it was okay now there is a problem…I have had no response on over 8 days"); Dkt. 273-29, Ex. 28, STX0238363 ("It has been 4 days since I had a response from you, what is happening? I[]m very upset at this lack of service as it[]s been two weeks since I contacted the company about this issue as well…"); Dkt. 273-30, Ex. 29, STX0260868 ("Is someone going to respond???? As buyers, we have done everything we are supposed to do. These shoes need to be returned, and I[]m awaiting a response. My 15-year-old daughter, with our permission, purchased

these shoes with all of her Christmas money, and she received completely unacceptable condition shoes."); Dkt. 273-31, Ex. 30, STX0265816, ("This is now over 3 working days that I have had no response. I want my money back."); Dkt. 273-32, Ex. 31, STX0266198 ("Hi can you advise what is happening. Iv had no response."); Dkt. 273-33, Ex. 32, STX0268448 (I am having horrible issues with the order above. PLEASE someone email me back! I have sent 10 emails with no response!").

249.    StockX's expert Dr. Catherine Tucker is a distinguished MIT professor who specializes in the design and economics of online marketplaces.  Opp. DX 40, Tucker Rep. ¶¶ 1– 2.

**Nike, Inc's Response: Disputed.**

Nike disputes StockX's characterization of Dr. Tucker's background. Her report speaks for itself and states she is "the Sloan Distinguished Professor of Management Science at MIT Sloan" and her "academic specialty lies in studying the evolution of business models in the digital areas."

250.    Dr. Tucker opined that "StockX, like other similar platforms, has an incentive to ensure trust on its platform.  StockX would risk the success of its business if it meaningfully tolerated sale of counterfeit items, which could lead to an erosion of trust on its platform."    Opp. DX 40, Tucker Rep. ¶ 32; *see generally id.* at ¶¶ 25–45.

**Nike, Inc's Response: Disputed.**

Nike does not dispute that Dr. Tucker offered an opinion that "StockX, like other similar platforms, has an incentive to ensure trust on its platform.  StockX would risk the success of its business if it meaningfully tolerated sale of counterfeit items, which could lead to an erosion of trust on its platform" but disputes the veracity of such opinion.  As Ms. Kammel opined, based on her review of StockX's business practices, which includes more lax standards for power sellers and ██████████████████████████████████████████████████████████████████████

██████████ StockX's "priority appears to be getting new sellers and keeping sellers satisfied. This behavior by third-party platforms happens often, as [the Department of Homeland Security] notes that platforms often allow sales by third parties without the adequate scrutiny of sellers *in order to increase profits*, which is exactly what we see in this case." Kammel Rebuttal at 24-25 (citing https://www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goods-report_01.pdf. ("DHS Report")). StockX's own internal analysis reflects that ████████

████████████████████████████████████████████████████

██████████████████ Sept. Duvdevani Decl. ¶ 4, Ex. 151 (STX0058180) at STX0058183. StockX acknowledges that "[e]ach transaction has two customers" – the seller and the buyer. *Id.* at STX0058185. ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████ *Id.* at STX0058192. ████████████████████████████

██████████████████ *Id.* at STX0058199. Nike also objects to the extent StockX relies on Ms. Tucker's opinion to suggest that StockX always acts in furtherance of its "incentives." StockX has admitted liability for counterfeiting ████████████████████████

██████████████████ Dkt. 261-43, Ex. 43 at STX0018010.

251.    In addition, Dr. Tucker opined that seller reviews and individualized product photos can be of limited value, subject to falsification, bias, and noise. Opp. DX 40, Tucker Rep. ¶¶ 36–37; Opp. DX 56 Tucker Rebuttal Rep. ¶¶ 51–57.

**Nike, Inc's Response: Disputed.**

Nike does not dispute that Dr. Tucker offered an opinion regarding seller reviews and individualized product photos but disputes the veracity of such opinion. As Ms. Kammel opined,

StockX's lack of necessary transparency to the consumer, including details regarding who the seller is, photographs of the actual products for sale, the provenance of their products, or ability to rate sellers, is one of the reasons that counterfeits are successful. Kammel Rebuttal at 16-17.

**VIII. Between 2018 and 2019, Nike ███████████████████████ ████████████████████████ toured StockX's authentication centers, yet never raised any issues with StockX's Process.**



252.    In March 2018, Nike ██████████████████████████ █████████████████████████████ Opp. DX 23, STX0773022.

**Nike, Inc's Response: Disputed. This statement is not material.**

Nike disputes StockX's characterization of this document. Prior to this communication, Nike and StockX ████████████████████████████ ████████████████   ████████████████ Sept. Duvdevani Decl. ¶ 5, Ex. 152 (STX0773023). However, after leadership changes, ██████████████████ ██████████████████████████ Dkt. 271-23. After which, Nike ████████████████████████████████████████████ ███ Sept. Duvdevani Decl.¶ 6, Ex. 153 (STX0773068). Nike objects to the relevance of this document which relates to an abandoned project proposal with no relation to any of the issues in this case, is misleading, and therefore more prejudicial than it is probative. Fed. R. Evid. 401, 403.

253.    On September 12, 2018, Nike employee Isaiah Steinfeld informed StockX's then CEO Josh Luber that he was "a huge fan of what [StockX was] building," and explained that he was "██████████████████████████████████████ ████████████████████ Opp. DX 41, NIKE0038174 at 176. Steinfeld also stated, "If you have time in the next couple of weeks I'd love to come to Detroit and meet with everyone. Let me know what makes sense for timing, look forward to meeting." Opp. DX 41, NIKE0038174 at 176.

**<u>Nike, Inc's Response: Disputed. This statement is not material.</u>**

Nike disputes StockX's characterization of NIKE0038174.  Mr. Steinfeld was an employee of Nike's Valiant Labs, an innovation accelerator within Nike that looks for new business opportunities. Sept. Duvdevani Decl. ¶ 7, Ex. 154, Paulson Tr. 76:13-17.  While Mr. Steinfeld was

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ Sept.

Duvdevani Decl.¶ 8, Ex. 155, Pallett Tr. 136:8-139:20. ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████ *Id.*  StockX relies on this statement to suggest that StockX

█████████████████████████████████████████████████ Dkt. 268 at 7.  This is not supported by the document or other record evidence.  Nike, therefore, objects to the cited evidence as inadmissible as proof for this statement because it is irrelevant, misleading, and more prejudicial than it is probative.  Fed. R. Evid. 401, 403.

254.    Nike employees, including Steinfeld, visited StockX's team and authentication center in Detroit in October 2018.  Opp. DX 41, NIKE0038174; Opp. DX 42, NIKE0037191.

**<u>Nike, Inc's Response: Undisputed. This statement is not material.</u>**

255.    Following the October 2018 visit, Nike said the "tour of Detroit was incredible" and that "it [was] exciting to see what [StockX was] doing there."  Opp. DX 42, NIKE0037191.

**<u>Nike, Inc's Response: Disputed. This statement is not material.</u>**

Nike disputes StockX's characterization of NIKE0037191 which reflects the opinion of two Nike employees and does not purport to speak on behalf of Nike.  Dkt. 271-42. Further, Nike disputes StockX's characterization of the content of NIKE0037191 which speaks for itself and

reads in its entirety: "Also, Bruce's tour of Detroit was incredible, you have a beautiful city and it's exciting to see what you are all doing there." *Id.* at NIKE0037191.  Nike disputes this fact to the extent it implies that Nike employees were referencing a tour of a StockX facility rather than the city of Detroit. *Id., but see* Dkt. 268 at 7 ▮▮▮▮▮▮▮▮▮▮▮ Nike visited StockX authentication centers to see StockX's Process in action, reporting that what they saw was 'incredible' and 'exciting to see.'").  StockX relies on this statement to suggest that ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Dkt. 268 at 7.  However,

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮ Sept. Duvdevani Decl. ¶ 8, Ex. 155, Pallett Tr. 136:8-139:20. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*

Nike, therefore, objects to the cited evidence as inadmissible as proof for this statement because it is irrelevant, misleading, and more prejudicial than it is probative.  Fed. R. Evid. 401, 403.

256.    In 2018, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ Opp. DX 2, Paulson Tr. 77:20-78:23; 83:10-14; Opp. DX 24, NIKE0035611 (Nike presentation on ▮▮▮▮); *see also* Opp. DX 26, NIKE0037536 at 537 (Nike employee Callista Michael-Rill stating, ▮▮▮▮▮▮▮▮▮▮▮▮).

**<u>Nike, Inc's Response: Disputed.</u>**

Nike disputes StockX's characterization ▮▮▮▮▮▮▮▮▮▮ Nike does not dispute that it ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮ Sept. Duvdevani Decl.¶ 7, Ex. 154, Paulson Tr. 262:22-

267:11; *see also id.* ¶ 8, Ex. 155, Pallett Tr. 136:8-139:20.  Additionally, ███████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████  Sept. Duvdevani Decl. ¶ 8, Ex.

155, Pallett Tr. 136:8-139:20.  Nike also disputes StockX's characterization of NIKE0037536 as

evidence that ████████████████████████  Dkt. 271-26.  That email is an internal

communication between Nike employees and contains no StockX employees. *Id.*  StockX relies

on this statement to suggest that ████████████████████████████████

████████████████████  Dkt. 268 at 7.  This is not supported by NIKE0035611,

NIKE0037536, the cited testimony, or other record evidence.  Nike, therefore, objects to the cited

evidence as inadmissible as proof for this statement because they are irrelevant, misleading, and

more prejudicial than probative.  Fed. R. Evid. 401, 403.

257.    Nike's head of brand protection in North America, Joe Pallett, confirmed his

understanding of ████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████  Opp. DX 9, Pallett Tr. 131:25-132:13.

**Nike, Inc's Response: Disputed.**

Nike disputes StockX's characterization of Mr. Pallett's testimony.  Mr. Pallett's testimony

speaks for itself and reads in its entirety: ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████  Dkt. 271-9 at Pallet Tr. 131:25-132:13.  Mr. Pallett testified that he

was not personally involved ████████████████████████████████  and therefore

he does not have personal knowledge sufficient to testify on this subject pursuant to Fed. R. Evidence 602.   StockX relies on this statement to suggest that ███████████████████ ████████████████████████████████████████ Dkt. 268 at 7.   However, StockX ███████████████████████████████████████████████████████████ ██████████████████████ Sept. Duvdevani Decl.¶ 8, Ex. 155, Pallett Tr. 136:8-139:20. ████████████████████████████████████████████████████████ ███████████████████████████████ *Id.*  Nike, therefore, objects to the cited document as inadmissible as proof for this statement because it is irrelevant, misleading, and more prejudicial than it is probative.  Fed. R. Evid. 401, 403.

258.    Valiant Labs is Nike's internal incubation arm focused on building businesses that serve   consumers   in   new   and   unimagined   ways.    Opp.   DX   84, https://www.crunchbase.com/organization/nike-valiant-labs/org_similarity_overview.

**Nike, Inc's Response: Undisputed. This statement is not material.**

StockX relies on this statement to suggest that StockX ████████████████████ ███████████████████████ Dkt. 268 at 7.  However, StockX participated only in ██████████████████████████████████████████████████████████ ███████████████████ Sept. Duvdevani Decl. ¶ 8, Ex. 155, Pallett Tr. 136:8-139:20. ██████████ ████████████████████████████████████████████████████████████ ██████████████████████████████ *Id.*  Nike, therefore, objects to the cited document as inadmissible as proof for this statement because it is irrelevant, misleading, and more prejudicial than it is probative.  Fed. R. Evid. 401, 403.

259.    According to a Nike ██████████████████ presentation, one of the benefits to Nike of ████████████████████████████████████████ ███████████████████████ Opp. DX 21, NIKE0036670 at 695.

**Nike, Inc's Response: Disputed. This statement is not material.**

Nike disputes StockX's characterization of NIKE0036670 which was pertained to a discussion of a ████████████████████████████████████████ ████████████████████████ Sept. Duvdevani Decl. ¶ 8, Ex. 155, Pallett Tr. 136:8-139:20. However, ████████████████████████████████████████

████████████████████████████████████████

████████ *Id.*  Nike further disputes StockX's implication that ████████ ████████████████ ████████████████ as no testimony or evidence has been set forth to establish the meaning of ████████████████ as used in NIKE0036670.  Nike, therefore, objects to the cited document as inadmissible as proof for because it is irrelevant, misleading, and more prejudicial than it is probative.  Fed. R. Evid. 401, 403.

260.    When asked why Nike ████████████████████████ Nike's Vice President of Connected Marketplace Heather Paulson stated, ████████████████████████

████████████████████████████████████████

████████████████████████████ Opp. DX 2, Paulson Tr. 80:17–25; 82:8–15.

**Nike, Inc's Response: Disputed. This statement is not material.**

Nike disputes StockX's characterization of Ms. Paulson's testimony which related to

████████████████████████████████████████

████████████████ Dkt. 271-2 at 82:8–15; Sept. Duvdevani Decl. ¶ 8, Ex. 155, Pallett Tr. 136:8-

139:20.  However, ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████  Sept. Duvdevani Decl. ¶ 8, Ex. 155, Pallett Tr. 136:8-139:20.  StockX relies on this

statement to suggest that StockX ████████████████████████████████████

████████████  Dkt. 268 at 7.  This is not supported by the cited testimony or other record evidence.

Nike, therefore, objects to the cited evidence as inadmissible as proof for this statement because it

is irrelevant, misleading, and more prejudicial than probative.  Fed. R. Evid. 401, 403.

261.    Before ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████  Opp.

DX 85, NIKE0035751 at 752, 754.

**<u>Nike, Inc's Response: Disputed. This statement is not material.</u>**

Nike  disputes  that  StockX's  ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████  Dkt. 271-89 at NIKE0037584.

Nike also clarifies that ██████████████████████████████████████

████████████████████████████████████████████  Dkt. 271-2 at 82:8–15;

Sept.  Duvdevani  Decl.  ¶ 8,  Ex.  155  (Pallett  Tr.  136:8-139:20).   However,  ████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████ *Id.* StockX relies on this

statement to suggest that ████████ ████████████████████████████████

███████████ Dkt. 268 at 7. This is not supported by NIKE0035751 or other record evidence.

Nike, therefore, objects to NIKE0035751 as inadmissible as evidence of this statement because it

is irrelevant, misleading, and more prejudicial than probative. Fed. R. Evid. 401, 403.

262.    In January 2019, in response to StockX's listed ████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████ Opp. DX 85,

NIKE0035751.

**<u>Nike, Inc's Response: Disputed. This statement is not material.</u>**

Nike disputes that StockX's ██████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████ Dkt. 271-89 at NIKE0037584. Nike also clarifies that ████████

██████████████████████████████████████████████████████████

██████████████████ Dkt. 271-2 at 82:8–15; Sept. Duvdevani Decl. ¶ 8, Ex. 155,

Pallett Tr. 136:8-139:20. However, ████████████████████████████████

██████████████████████████████████████████████████████████

███████████████ *Id.* StockX relies on this statement to suggest that ████████ ████████

██████████████████████████████████████████ Dkt. 268 at 7. This is not

supported by NIKE0035751 or other record evidence. Nike, therefore, objects to NIKE0035751

as inadmissible as proof for this statement because it is irrelevant, misleading, and more prejudicial than probative.  Fed. R. Evid. 401, 403.

263.    StockX also communicated that it would like a ███████████████

████████████████████████████████████████████████████████████

███████████████████████████████████ Opp. DX 85, NIKE0035751 at 752.

**<u>Nike, Inc's Response: Disputed. This statement is not material.</u>**

Nike disputes that StockX's ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████ Dkt. 271-89 at NIKE0037584.  Nike also clarifies that ████████

████████████████████████████████████████████████████████████

████████████████ Dkt. 271-2 at 82:8–15; Sept. Duvdevani Decl. ¶ 8, Ex. 155, Pallett Tr. 136:8-139:20.  However, ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████ *Id.* StockX relies on this statement to suggest that ███████ ████████

████████████████████████████████████ Dkt. 268 at 7.  This is not supported by NIKE0035751 or other record evidence.  Nike, therefore, objects to NIKE0035751 as inadmissible as proof for this statement because it is irrelevant, misleading, and more prejudicial than probative.  Fed. R. Evid. 401, 403.

264.    When developing ██████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████    Opp. DX 24, NIKE0035611 at 643.

**Nike, Inc's Response: Disputed. This statement is not material.**

Nike disputes StockX's characterization of NIKE0035611. Dkt. 271-24.  Specifically, that

section relates to ████████████████████ and in response to ██████████████

████████████████████████████ described ████████████████████

████████████████████████████████████████████████████████

███████████████████████████████ *Id.* at NIKE0035643.  Nike also clarifies that

████████████████████████████████████████████████████████

██████████████████████████████ Dkt. 271-2 at 82:8–15; Sept. Duvdevani Decl. ¶ 8, Ex.

155, Pallett Tr. 136:8-139:20.  However, ████████████████████████

████████████████████████████████████████████████████████

██████████████████████ *Id.*  StockX relies on this statement to suggest that ████████

████████████████████████████████ Dkt. 268 at 7.  This

is not supported by NIKE0035611or other record evidence.   Nike, therefore, objects to

NIKE0035611 as inadmissible as proof for this statement because it is irrelevant, misleading, and

more prejudicial than probative.  Fed. R. Evid. 401, 403.

265.    When developing ██████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ Opp. DX 86, NIKE0036135.  Greg Schwartz,

StockX President and COO, responded, ██████████████████████  ██████████████

████████████████████████████████████████████████████████████

██████ *Id*.

**Nike, Inc's Response: Disputed. This statement is not material.**

      Nike disputes that this exchange is reflective ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████ Dkt. 271-89 at

NIKE0037584.  Nike also clarifies that ████████████████████████████

████████████████████████████████████████████████ Dkt. 271-2 at

82:8–15; Sept. Duvdevani Decl. ¶ 8, Ex. 155, Pallett Tr. 136:8-139:20.  However, ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████. StockX relies on this

statement to suggest that StockX ████████████████████████████████████

██████████ Dkt. 268 at 7.  This is not supported by NIKE0037584 or other record evidence.

Nike, therefore, objects to NIKE0037584 as inadmissible as proof for this statement because it is

irrelevant, misleading, and more prejudicial than probative.  Fed. R. Evid. 401, 403.

      266.    In January 2019, Nike employees traveled to London and visited StockX's

authentication center in London to "████████████████████████████████████."

Opp. DX 25, NIKE0035739 at 740.

**Nike, Inc's Response: Undisputed. This statement is not material.**

      267.    During the January 2019 trip to London, Nike requested to meet with StockX

████████████████████████████████████████████████████████████

Opp. DX 87, NIKE0037473.

**Nike, Inc's Response: Disputed. This statement is not material.**

Nike disputes StockX's characterization that "Nike" requested to meet with StockX

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████. Dkt. 271-87. Nike also clarifies that the

████████████████████████████████████████████████████████████

█████████████████████████████ Dkt. 271-2 at 82:8–15; Sept. Duvdevani Decl. ¶ 8, Ex. 155,

Pallett Tr. 136:8-139:20.  However, █████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████ *Id.*  StockX relies on this statement to suggest that StockX ███████

████████████████████████████████████████ Dkt. 268 at 7.  This is not

supported by NIKE0037473 or record evidence.  Nike, therefore, objects to NIKE0037473 as

inadmissible as proof for this statement because it is irrelevant, misleading, and more prejudicial

than probative.  Fed. R. Evid. 401, 403.

268.    Following Nike's January 2019 London visit, Nike thanked StockX for "making

[their] London visit happen," and stated that the "London visit was very helpful."  Opp. DX 27,

NIKE0035903 at 907.

**Nike, Inc's Response: Disputed. This statement is not material.**

Nike disputes StockX's characterization that "Nike" thanked StockX.  Rather, a few

employees associated with Valiant Labs stated that they found a visit to StockX's London facility

████████████████████████████████████████████████████████████

██████████████ Dkt. 271-27.  Nike also clarifies that ██████████████████████████████

████████████████████████████████████████████████████████. Dkt. 271-

2 at 82:8–15; Sept. Duvdevani Decl. ¶ 8, Ex. 155, Pallett Tr. 136:8-139:20.  However, ████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ *Id.* StockX relies

on this statement ███████████████ ██████████████████████████████

█████████████████ Dkt. 268 at 7.  This is not supported by NIKE0035903 or record

evidence.  Nike, therefore, objects to NIKE0035903 as inadmissible as proof for this statement

because it is irrelevant, misleading, and more prejudicial than probative.  Fed. R. Evid. 401, 403.

269.    In February 2019, ██████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████    Opp. DX 27, NIKE0035903 at 904; Opp. DX 88, NIKE0035910.

**Nike, Inc's Response: Disputed. This statement is not material.**

Nike does not dispute that ████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████ Dkt. 271-83.  Rather, ████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████ *Id.* at ¶ 8.  Further, it was communicated █████████

████████████████████████████████████████████████████████████████████████████

██████████ Dkt. 271-27 at NIKE0035904.  Nike also clarifies that ████████████

████████████████████████████████████████████████████████████████████████████

██████████ Dkt. 271-2 at 82:8–15; Sept. Duvdevani Decl. ¶ 8, Ex. 155, Pallett Tr. 136:8-139:20.

However, ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

█████████ *Id.*  StockX relies on this statement to suggest that ██████ ████████████

█████████████████████████████████████ Dkt. 268 at 7.  This is not supported by NIKE0035903, NIKE0035910, or other record evidence.  Nike, therefore, objects to NIKE0035903 and NIKE0035910 as inadmissible as proof for this statement because it is irrelevant, misleading, and more prejudicial than probative.  Fed. R. Evid. 401, 403.

270.    Later in February 2019, ████████████████████████████████████

█████████████ Nike employees again visited StockX's authentication center in Detroit, Michigan.  Opp. DX 26, NIKE0037536; Opp. DX 27, NIKE0035903 at 905.

**Nike, Inc's Response: Undisputed. This statement is not material.**

271.    StockX proposed an agenda for Nike's Detroit visit, ███████████████

██████████████████████████████████████████████████████████████

██████████████████ Opp. DX 27, NIKE0035903 at 905.

**Nike, Inc's Response: Disputed. This statement is not material.**

Nike disputes StockX's characterization of ████████████████████████████

██████████████████████████████████████████████████████████████

██ Dkt. 271-2 at 82:8–15; Sept. Duvdevani Decl. ¶ 8, Ex. 155, Pallett Tr. 136:8-139:20.

However, ███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████ *Id.*  StockX relies on this statement to suggest that StockX ██████████

██████████████████████████████████████ Dkt. 268 at 7.  This is not supported by NIKE0035903 or other record evidence.  Nike, therefore, objects to NIKE0035903 as inadmissible as proof for this statement because it is irrelevant, misleading, and more prejudicial than probative.  Fed. R. Evid. 401, 403.

272.    Nike visited StockX's authentication center to ███████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ Opp. DX

26, NIKE0037536 at 539.

**Nike, Inc's Response: Disputed. This statement is not material.**

Nike disputes StockX's characterization of the purpose of Valiant Labs' visit to StockX,

████████████████████████████████████████████████████████████████████

███████████████████████████████████████ Dkt. 271-26 at NIKE0037536. ████████

████████████████████████████████████████████████████████████████████

████████████████████████████████ Dkt. 271-2 at 82:8–15; Sept. Duvdevani Decl. ¶ 8, Ex. 155,

Pallett Tr. 136:8-139:20.  However, ██████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████ *Id.*  StockX relies on this statement to suggest that ██████████████

████████████████████████████████████████ Dkt. 268 at 7.  This is not

supported by NIKE0037536 or other record evidence.  Nike, therefore, objects to NIKE0037536

as inadmissible as proof for this statement because it is irrelevant, misleading, and more prejudicial

than probative.  Fed. R. Evid. 401, 403.

273.    In June 2019, Nike employees visited StockX in Detroit a third time, and

██████████████████████████████████████████████████████████ Opp. DX 28,

NIKE0036138 at 139, Opp. DX 29, NIKE0038001.

**Nike, Inc's Response: Disputed. This statement is not material.**

Nike disputes StockX's characterization of Valiant Labs' June 2019 visit ███████

███████████████████████████████████████████████████

█████████████████████████████████████████ Dkt. 271-28 at NIKE0036139.

Nike also clarifies that █████████████████████████████████████████████

█████████████████████████████████████████ Dkt. 271-2 at 82:8–15; Sept.

Duvdevani Decl. ¶ 8, Ex. 155, Pallett Tr. 136:8-139:20.  However, ███████████

███████████████████████████████████████████████████

███████████████████████████████████████████ *Id.*  StockX relies on this

statement to suggest ███████████████████████████████████████████████

█████████ Dkt. 268 at 7.  This is not supported by NIKE0036138, NIKE0038001, or other

record evidence.  Nike, therefore, objects to NIKE0036138 and NIKE0038001 as inadmissible as

proof for this statement because it is irrelevant, misleading, and more prejudicial than probative.

Fed. R. Evid. 401, 403.

274.    Nike has produced no evidence that it ever raised any concerns with StockX

regarding its authentication centers, Process, or facilities during any of its visits in 2018 and 2019

or afterwards, prior to this lawsuit.

**Nike, Inc's Response: Disputed. This statement is not material.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge

Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence

and for these reasons, should be disregarded. *Perez v. de la Cruz,* No. 09-CV-264, 2013 WL

2641432 at *7-8 (S.D.N.Y. June 12, 2013) (finding defendants "failed to meet their initial Rule 56

burden" where defendants' "counsel merely asserts, in conclusory fashion, in a series of

paragraphs in a Rule 56.1 Statement that there is no evidence to support plaintiff's various factual

contentions...In neither this document nor in a separate declaration does counsel proffer what the facts are, much less cite to any pertinent evidence.").

275.    StockX and Nike ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ Opp. DX 89, NIKE0037582.

**Nike, Inc's Response: Disputed. This statement is not material**

Nike does not dispute that ████████████████████████████████

████████████████ on April 17, 2019.  However, Nike disputes StockX's characterization of

████████████████████████████████████████████████████████████

████████████ Dkt. 271-26 at NIKE0037536. ██████████████████████

████████████████████████████████████████████████████ Dkt.

271-2 at 82:8–15; Sept. Duvdevani Decl. ¶ 8, Ex. 155, Pallett Tr. 136:8-139:20.  However, the

████████████████████████████████████████████████████████████

████████████████████████████████████████ *Id.*  StockX

relies on this statement to suggest that ██████ ████████████████████

████████████████████████ Dkt. 268 at 7.  This is not supported by NIKE0037582 or other

record evidence.  Nike, therefore, objects to NIKE0037582 as inadmissible as proof for this

statement because it is irrelevant, misleading, and more prejudicial than probative.  Fed. R. Evid.

401, 403.

276.    Nike ██████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████ Opp. DX 24, NIKE0035611

at 645; Opp. DX 9, Pallett Tr. 134:6-15.

**Nike, Inc's Response: Disputed. This statement is not material.**

Nike does not dispute that ████████████████████████████████

████████████████ However, Nike disputes StockX's characterization of ████████

█████████████████████████   ████████████████████████████████

███████████████████████████████████████████████████ Dkt.

271-2 at 82:8–15; Sept. Duvdevani Decl. ¶ 8, Ex. 155, Pallett Tr. 136:8-139:20.  However, ██

██████████████████████████████████████████████████████

██████████████████████████████████████████████ *Id.*

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████ Sept. Duvdevani Decl. ¶ 9, Ex. 156

(NIKE0037181).  ███████████████████████████████ Dkt. 271-

24 at NIKE0035632.  Mr. Pallett testified that ███████████████████████████

████████ Pallet Tr. 134:8.  StockX relies on this statement to suggest that █████████

███████████████████████████████████████ Dkt. 268 at 7.  This is not

supported by NIKE0035611, Mr. Pallett's testimony or other record evidence.  Nike, therefore,

objects to NIKE0035611 as inadmissible as proof for this statement because it is irrelevant,

misleading, and more prejudicial than probative.  Fed. R. Evid. 401, 403.

277.    StockX ████████████████████████████████████████

██████████████████████████████████████████████ Opp. DX 90, NIKE0037911;

Opp. DX 91, NIKE0037917.

**Nike, Inc's Response: Disputed. This statement is not material.**

Nike does not dispute that ████████████████████████████████████ ███ but disputes StockX's characterization. ████████████████████████████ ████████████████████████████████████████████████████████. Dkt. 271-2 at 82:8–15; Sept. Duvdevani Decl. ¶ 8, Ex. 155, Pallett Tr. 136:8-139:20.  However, ████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ *Id.* ████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████ Duvdevani Decl. ¶ 9, Ex. 156 (NIKE0037181); Dkt. 271-89 at NIKE0037585.  StockX relies on this statement to suggest that ██████████████████████████████████████ ██████████████████████████ Dkt. 268 at 7.  This is not supported by NIKE0037911, NIKE0037917 or other record evidence.  Nike, therefore, objects to NIKE0037911 and NIKE0037917 as inadmissible as proof for this statement because it is irrelevant, misleading, and more prejudicial than probative.  Fed. R. Evid. 401, 403.

278.    ████████████████████████████████████████████████ Opp. DX 2, Paulson Tr. 77:20-78:23; 83:10-14; Opp. DX 9, Pallett Tr. 134:6–135:23.

**Nike, Inc's Response: Disputed. This statement is not material.**

Nike disputes that ██████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ Mr. Pallett, who had primary responsibility from Nike's brand protection team ████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████. Sept. Duvdevani Decl.

¶ 8, Ex. 155, Pallett Tr. 138:15-17, 154:17-155:5.  Mr. Pallett also testified that ████████████

█████████████████████████████████ *Id.,* Pallett Tr. 137:14-139:20.  Further, ████

███████████████████████████████████████████████████ As Mr.

Pallett testified, ███████████████████████████████████████████████

████████████ Sept. Duvdevani Decl. ¶ 8, Ex. 155, Pallett Tr. 136:3-16. ████████████

███████████████████████████████████████████████████

██████████████████████████████. *Id.; see* Sept. Duvdevani Decl. ¶ 10, Ex. 157

(NIKE0037734); *id.* ¶ 11, Ex. 158 (NIKE0036212).  Further, Ms. Paulson testified that she was

███████████████████████████████████████████████████

███████████████████ Sept. Duvdevani Decl. ¶ 7, Ex. 154, Paulson Tr. 78:23-79:3.  Ms.

Paulson also testified that the █████████████████████████████████████████

█████████████████████████ *Id.* at Ex. 154, Paulson Tr. 84:2-10.  StockX relies on

this statement to suggest that ███████████████████████████████████

███████████████ Dkt. 268 at 7.  This is not supported by the cited testimony or other record

evidence.  Nike, therefore, objects to the cited evidence as inadmissible as proof for the statement

because it is irrelevant, misleading, and more prejudicial than probative.  Fed. R. Evid. 401, 403.

279.  █████████████████████████████████████████████

███████████████████████████ Opp. DX 10, NIKE0037982; Opp. DX 11,

NIKE0037984;  Opp.  DX  12,  NIKE0037849;  Opp.  DX  13,  NIKE0037856;  Opp.  DX  14,

NIKE0038038; Opp. DX 15, NIKE0038039.

**Nike, Inc's Response: Disputed. This statement is not material.**

Nike does not dispute that StockX employees expresses "████████████████ ████████████████████████████████ However, Nike disputes StockX's characterization of this email as suggesting that ██████████████████████████████ ████████████████████████████████████████████ ██████████████████████████ Dkt. 271-2 at 82:8–15; Sept. Duvdevani Decl. ¶ 8, Ex. 155, Pallett Tr. 136:8-139:20. ████████████ ████████████████████████████████████████████ ████████████████████ *Id.* ████████████████████████████████████████ Dkt. 271-11 at NIKE0037984. Rather, ████████████████████████████████████████ ███████████████ *Id.* Nike does not dispute that ████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████ Dkt. 271-89 at NIKE0037585. StockX relies on this statement to suggest that StockX ██████████████████████████████████████ Dkt. 268 at 7. This is not supported by NIKE0037982, NIKE0037984, NIKE0037849, NIKE0037856, NIKE0038038, NIKE0038039, or other record evidence. Nike, therefore, objects to NIKE0037982, NIKE0037984, NIKE0037849, NIKE0037856, NIKE0038038, and NIKE0038039 as inadmissible as proof for this statement because it is irrelevant, misleading, and more prejudicial than probative. Fed. R. Evid. 401, 403.

280.    Nike ultimately ████████████████████████████████████ ███████████████ Opp. DX 2, Paulson Tr. 84:24-85:21.

**Nike, Inc's Response: Disputed. This statement is not material.**

Nike does not dispute that ████████████████████ but disputes StockX's characterization of Ms. Paulson's testimony. Ms. Paulson's testimony, speaks for itself and reads in its entirety: ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

Sept. Duvdevani Decl. ¶ 7, Ex. 154, Paulson Tr. 85:19-86:2. StockX relies on this statement to suggest that StockX ████████████████████████████████ Dkt. 268 at 7. This is not supported by Ms. Paulson's testimony or other record evidence. Nike, therefore, objects to Mr. Paulson's testimony as inadmissible as proof for this statement because it is irrelevant, misleading, and more prejudicial than probative. Fed. R. Evid. 401, 403.

281.    Nike has never offered a digital resale platform that would allow consumers to buy and sell previously owned Nike shoes. Opp. DX 2, Paulson Tr. 263:11-17; Opp. DX 1, Faris Tr. 200:15-201:5; 267:6-19.

**Nike, Inc's Response: Undisputed.  This statement is not material.**

**IX.    When Nike Reported a Potential Counterfeit to StockX, StockX Was Immediately Responsive and Already Had Stopped the Sale of the Identified Product Prior to Receipt of Nike's Communication.**

282.    In 2020, Nike employees contacted StockX employees regarding a pair of Nike Air Jordan 11 Retro Jubilee 25th Anniversary sneakers that were available on StockX's website in a size not produced by Nike. Opp. DX 36, NIKE0029089.

**Nike, Inc's Response: Undisputed.**

StockX relies on the statement to support the proposition that "Nike praised StockX as a 'good actor' and thanked StockX for taking the issue seriously." Dkt. 268 at 6. Nike objects to StockX's reliance on NIKE0029089 to state that "Nike praised StockX as a 'good actor'," which

mischaracterizes the document.  NIKE0029089 is inadmissible as evidence of this statement because it is irrelevant, misleading, and more prejudicial than probative.  Fed. R. Evid. 401, 403.

283.    In a letter dated December 28, 2020, Nike wrote to StockX that it attempted to purchase the Air Jordan 11 product, but "the transaction was rejected after the item failed to pass StockX's authentication check."  Opp. DX 36, NIKE0029089.

**Nike, Inc's Response: Undisputed.**

StockX relies on the statement to support the proposition that "Nike praised StockX as a 'good actor' and thanked StockX for taking the issue seriously."  Dkt. 268 at 6.  Nike objects to StockX's reliance on NIKE0029089 to state that "Nike praised StockX as a 'good actor'," which mischaracterizes the document.  NIKE0029089 is inadmissible as evidence of this statement because it is irrelevant, misleading, and more prejudicial than probative.  Fed. R. Evid. 401, 403.

284.    In the same letter, Nike said StockX and Nike were "aligned on ensuring consumers only receive authentic product."  Opp. DX 36, NIKE0029089.

**Nike, Inc's Response: Disputed.**

Nike does not dispute that NIKE0029089 is a correspondence sent to StockX regarding a counterfeit pair of Air Jordan 11 Retro Jubilee 25th Anniversary offered for sale on StockX's platform, however, Nike disputes Stockx's characterization of the correspondence which speaks for itself and reads in its entirety: "Nike Brand Protection and StockX are aligned on ensuring our consumers only receive authentic product. To further safeguard the marketplace from counterfeit product, we write today to request your assistance in identifying the seller who advertised the counterfeit AJ 11 Jubilee. We intend to use this information to prevent that person or entity from attempting additional sales of counterfeit Nike product. Only by removing bad actors from the marketplace can we limit illegal sales that are damaged to both our companies' relationship with

consumers." Ultimately, StockX declined to cooperate with Nike to assist in an investigation of the counterfeit seller absent a subpoena or search warrant. Dkt. 261-147 at STX0773072. StockX relies on the statement to support the proposition that "Nike praised StockX as a 'good actor' and thanked StockX for taking the issue seriously." Dkt. 268 at 6. Nike objects to StockX's reliance on NIKE0029089 to state that "Nike praised StockX as a 'good actor'," which mischaracterizes the document. NIKE0029089 is inadmissible as evidence of this statement because it is irrelevant, misleading, and more prejudicial than probative. Fed. R. Evid. 401, 403.

285.    Nike and StockX employees exchanged emails about the product and Brian Fogarty, VP Global Litigation and Investigations at Nike, wrote, "[w]e appreciate that StockX takes this issue seriously and promptly acted to remove the product. . . . we believe there is and will continue to be a clear distinction between the 'good' actors and 'bad' actors in the meantime." Opp. DX 37, NIKE0030428.

**Nike, Inc's Response: Disputed.**

Nike disputes StockX's characterization of Mr. Fogarty's email which speaks for itself and reads in its entirety: "We appreciate that StockX takes this issue seriously and promptly acted to remove the product. As we closely watch law and legislation around secondary liability for digital marketplaces evolve (proposed amendments to the Lanham Act, for example), we believe there is and will continue to be a distinction between the 'good' actors and the 'bad actors' in the meantime." Dkt. 271-37 at NIKE0030428. StockX relies on the statement to support the proposition that "Nike praised StockX as a 'good actor' and thanked StockX for taking the issue seriously." Dkt. 268 at 6. Nike objects to StockX's reliance on NIKE0030428 to state that "Nike praised StockX as a 'good actor'," which mischaracterizes the document. NIKE0030428 is

inadmissible as evidence of this statement because it is irrelevant, misleading, and more prejudicial than probative.  Fed. R. Evid. 401, 403.

286.    In the same email chain, Greg Schwartz from StockX writes, "We had a good conversation with Brian [Fogarty] back in 2019 about potential areas of collaboration.  It would be great to revisit this dialog and explore ways that we could work together given our shared focus on combating counterfeit products in the market."  Opp. DX 37, NIKE0030428.

**Nike, Inc's Response: Undisputed. This statement is not material.**

StockX relies on the statement to support the proposition that "Nike praised StockX as a 'good actor' and thanked StockX for taking the issue seriously."  Dkt. 268 at 6.  Nike objects to StockX's reliance on NIKE0030428 to state that "Nike praised StockX as a 'good actor'," which mischaracterizes the document.  NIKE0030428 is inadmissible as evidence of this statement because it is irrelevant, misleading, and more prejudicial than probative.  Fed. R. Evid. 401, 403.

**X.    Nike Recommended StockX as a Member of the Department of Homeland Security's E-Commerce Working Group.**

287.    In 2021, a Nike employee, Joe Pallett, introduced StockX to agents at the Department of Homeland Security ("DHS") so that StockX could learn more about the "IPR Center's E-Commerce Working Group" and "how StockX may fit in it."  Opp. DX 43, NIKE0030430 at 431.

**Nike, Inc's Response: Disputed. This statement is not material.**

Nike disputes StockX's characterization of Mr. Pallett's introduction which speaks for itself and reads in entirety: "In that vein, I'd like to introduce you to StockX' COO Greg Schwartz, cc'd here. Greg is interested in learning more about the program and how StockX may fit in."  Dkt. 271-43 at NIKE0030431.  Nike disputes this statement to the extent that StockX uses it as evidence that Nike endorsed or otherwise expressed confidence in StockX's authentication process, which

it did not.  StockX's involvement, or lack thereof, in the IPR's Center's E-Commerce Working Group has no bearing Nike's discovery of confirmed counterfeits sold by StockX during this litigation.  Dkt. 260-1, App'x A.  Nike, therefore, objects to NIKE0030431 as inadmissible as proof for this statement because it is irrelevant, misleading, and more prejudicial than probative. Fed. R. Evid. 401, 403.  Further, StockX has provided no evidence or testimony to establish that StockX joined the IPR Center's E-Commerce Working Group.

288.    The IPR Center, DHS's National Intellectual Property Rights Coordination Center, initiated its E-Commerce Initiative "to combat the growing issue of the sale and distribution of counterfeit and dangerous goods on the internet through online sales platforms, illicit websites, social media and the Dark Web."    Opp. DX 92, "IPU E-Commerce, " https://www.iprcenter.gov/file-repository/ipu-e-commerce.pdf/view.

**Nike, Inc's Response: Undisputed. This statement is not material.**

This statement is not material nor has StockX provided no evidence or testimony to establish that StockX joined the IPR Center's E-Commerce Working Group.

289.    The E-Commerce Working Group was established in 2017 to "foster and encourage the flow of actionable data and information between online platforms and relevant third-party intermediaries."    Opp. DX 93, "A Time for Action," https://www.iprcenter.gov/file-repository/steve-francis-bpp-vol5-no1-policy-update-mar-2020.pdf.

**Nike, Inc's Response: Undisputed. This statement is not material.**

This statement is not material nor has StockX provided no evidence or testimony to establish that StockX joined the IPR Center's E-Commerce Working Group.

XI.    **Nike** ████████████████████████████████████████
████████████████████████████████

290.    Nike ████████████████████████████████████████████████

████████████████████████████████████████████ Opp. DX 72

NIKE0039827 at 828 (Q2 2020 Nike report identifying ████████████████

██████████████████████; Opp. DX 99, NIKE0039821 at 822 (Q3 2020 Nike

report identifying ███████████████████████████████████████████████

████████████████████████████

**<u>Nike, Inc's Response: Disputed.  This statement is not material.</u>**

Nike disputes StockX's characterization of Nike's quarterly ██████████████

████████  which reports generally on ██████████████████████████████████

████████████████████████████████████████████ Rather,

the reports include ███████████████████████████████████████████████

████████ *See* Dkt. 271-72 at NIKE0039827-29; Dkt. 271-99 at NIKE0039821-23. ████████

███████████████████████████████████████████ *Id.*  As Ms.

Delli-Carpini testified, ██████████████████████████████████████████████

████████████████████████████████████████ Sept. Duvdevani Decl.

¶ 12, Ex. 159, Delli-Carpini 221:11-223:15, 228:4-23.    Nike further disputes StockX's

characterization of ██████ ████████ ████████ ████████ ████████ ████ ████ as

comparable resale platforms.  Unlike StockX, these platforms do not take possession of purported

"Nike" goods and "authenticate" them prior to shipment to users.  *See* Kammel Rebuttal at n.105.

Further, unlike StockX, ██████ provides a review or rating system.  *Id.*

**XII.    Nike expert admitted that his study does not show there was a single instance of a Nike shoe sold on StockX when it was also available on Nike.**

291.    At his deposition, Dr. Stec admitted that his study "does not show that there was even a single instance of a Nike shoe sold on StockX at a time when the same shoe was available in the same size on Nike.com." Opp. DX 20, Stec Tr. 249:22–250:16.

**Nike, Inc's Response: Disputed.**

Nike disputes StockX's characterization of Dr. Stec's testimony.  Dr. Stec testified that he did not endeavor to "identify even a single sale of a Nike shoe that definitely occurred at the same time that shoe was available in the same size on Nike.com." Dkt. 271-20, Stec Tr. 249:6-11. What Dr. Stec "endeavored to do in [his] analysis is show that if you're a consumer in the marketplace and you're interested in this particular shoe where you can buy it." *Id.* at 249:10-21.  Further, Dr Stec testified that he didn't have and didn't believe that StockX "produced the exact date of each of their sales for each of these shoes" and so couldn't perform that analysis and was not aware of data that could provide an answer to that particular issue. *Id.* 250:4-10.  As part of his expert report, Dr. Stec analyzed a list of 102 styles and makes of the best-selling shoes that were identified on Nike's Website as of June 1, 2023, and identified that 71 of those shoes, or 69.6% could also be found for sale on StockX's website as of June 2, 2023.  Dkt. 261-1, Ex. A to the Declaration of Dr. Stec (Stec Rep.) at 11.  These products included the same styles and at least one overlapping size that was also sold on Nike.com.  *Id.*

**XIII.    ██   StockX's authentication training documents and ███████████████
███████████████████████████████████████████**

292.    ████   StockX ██████ training guides explain how visual cues can be used during their respective authentication processes, and describe how counterfeit and authentic Nike products may differ in color, structure, and quality of the sneaker box.  Opp. DX 94, STX0058611 at 612–623; Opp. DX 22, NIKE0081473 at 491–494.

**<u>Nike, Inc's Response: Disputed.</u>**

Nike does not dispute that StockX's training guide includes visual comparisons purporting to aid in authentication, but which cannot actually be used to determine whether a Nike shoe is authentic. Dkt. 271-94; *see also* Kammel Rebuttal at 20-21 ("only the IP Rights holder" can actually authenticate, or prove that a product is real."); Dkt. 261-48, Ex. 48, Lopez Tr. 178:18-179:1 ███████████████████████████████████████████

███████████████████████████████████████. ██████████

██████████████████████████████████████████████

██████████████████████ *See* Sept. Duvdevani Decl. ¶ 8, Ex. 155, Pallett Tr. 16:2-16;

Dkt. 150-5 (March 24, 2023 Declaration of J. Pallett). █████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████ Dkt. 150-5 ¶ 6. ████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████ *Id.* ¶ 10.  NIKE0081473 is a file with the name ████████ ████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████ *Id.* ¶ 11. ███████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████ *Id.* at ¶¶ 12-13.

293.   █████████ and StockX authentication guides use visual comparisons to illustrate what an authentic Nike sneaker box may look like compared to an inauthentic Nike sneaker box. Opp. DX 94, STX0058611 at 612; DX 106, STX0069511 at 512; Opp. DX 22, NIKE0081473 at 491–94.

**Nike, Inc's Response: Disputed.**

Nike does not dispute that StockX's training guide includes visual comparisons purporting to aid in authentication but which cannot actually be used to determine whether a Nike shoe is authentic. Dkt. 271-94; *see also* Kammel Rebuttal at 20-21 ("only the IP Rights holder" can actually authenticate, or prove that a product is real."); Dkt. 261-48, Ex. 48, Lopez Tr. 178:18-179:1 ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████ *See* Sept. Duvdevani Decl. ¶ 8, Ex. 155, Pallett Tr. 16:2-16; Dkt. 150-5 (March 24, 2023 Declaration of J. Pallett). ██████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ " Dkt. 150-5 ¶ 6. ██████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████     *Id.* ¶ 10.  NIKE0081473 is a file with the name ███████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████     *Id.* ¶ 11. ███████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████     *Id.* at ¶¶ 12-13.

    294.    ████████████    StockX authentication guides highlight that ████████████

███████████████████████████████    DX 106, STX0069511 at 513; DX 75

STX0752605 at 615; Opp. DX 22, NIKE0081473 at 494.

**<u>Nike, Inc's Response: Disputed.</u>**

    Nike does not dispute that StockX's training guide includes visual comparisons purporting

to aid in authentication but which cannot actually be used to determine whether a Nike shoe is

authentic. Dkt. 271-94; *see also* Kammel Rebuttal at 20-21 ("only the IP Rights holder" can

actually authenticate, or prove that a product is real."); Dkt. 261-48, Ex. 48, Lopez Tr. 178:18-

179:1 ████████████████████████████████████████████

███████████████████████████████████████    Nike disputes

that ████████████, such as Dkt. 271-22 (NIKE0081473), ████████████

████████████    *See* Sept. Duvdevani Decl. ¶ 8, Ex. 155, Pallett Tr. 16:2-16;

Dkt. 150-5 (March 24, 2023 Declaration of J. Pallett). ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████ Dkt. 150-5 ¶ 6. ████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████ *Id.* ¶ 10.  NIKE0081473 is a file with the name ██████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████ *Id.* at ¶¶ 12-13.

**XIV.   Authentic Nike products sometimes possess manufacturing variances and visual defects.**

295.    Nike acknowledges that Nike shoes can be defective, ████████████████████

████████████████████████████████████████ Opp. DX 7, Delli Carpini Tr. 149:3–11, 149:21–24.

**<u>Nike, Inc's Response: Disputed. This statement is not material.</u>**

Nike disputes StockX's characterization of Ms. Delli-Carpini's testimony which speaks for itself and reads in its entirety: ███████████████████████████████████████

███████████████████████████████████████

Dkt. 271-7 at 149:21–24. ████████████████████████████████

██████████████████████████████ Dkt. 273-57, Ex. 56, Lopez Tr. 114:2-7.  StockX

relies on this statement to suggest that StockX rejects defective shoes that Nike finds fit for sale.

(Dkt. 268 at 6). This is not supported by Ms. Delli-Carpini's testimony or other record evidence.

StockX has not cited to nor provided any record support that B-grade product contains visual

manufacturing defects of the type StockX claims to be attributable to Nike in numerous consumer

communications, ████████████████████████████████████████████ Dkt.

273-57, Ex. 56, Lopez Tr. 114:2-7; *see also* Dkt. 261-89, Ex. 83 at STX0777767 (StockX customer

service representative responding to customer's authenticity concern and stating: "I'm very sorry

to hear that you have concerns with your purchase. Our verification teamtakes the authentication

process very seriously and inspects each item to ensure that it is 100% authentic. The pilling in the

seams and the leftover glue residue are common manufacturing defects that are found in most, if

not all, Nike Dunk releases."); Dkt. 261-90, Ex. 84 at STX0774944 (StockX customer service

representative responding to customer's authenticity concern and stating: "We do always try to

provide you with a pair that is up to your expectations but we do have to work with items that are

cleared for retail release by the manufacturer. With that being said, the reason why this pair is

acceptable per our deadstock condition standards is that Nike released these with the concerns you

have pointed out."); Dkt. 261-91, Ex. 85 at STX0777124 (StockX customer service representative

responding to customer's authenticity concern and stating: "While I understand that you are not

completely satisfied with this purchase, we, unfortunately, do not have control over the

manufacturer's production standards and must work with products that they have cleared for

release.Glue, stitching, and slight paint variances are common in these mass-produced shoes.");

Dkt. 261-92, Ex. 86 at STX0220611 (StockX customer service representative responding to customer's authenticity concern and stating: "As a product specialists here at StockX and a sneaker enthusiast, I can assure you that these are very very typical Nike quality, especially for dunks."); *Id.* (StockX customer service representative responding to customer's authenticity concern and stating: "As stated mass produced shoes will normally have common issues with excessive glue stains or stitching variances. This is directly from being manufactured on a massive scale."); Dkt. 261-93, Ex. 87 at STX0220624 (StockX customer service representative responding to customer's authenticity concern and stating: "We are not the manufacturers of these shoes. Nike and their Quality Control department passed these shoes to be sold on the retail level. Meaning that these shoes passed their Quality Control standards. We unfortunately do not have control over the manufacturer's production or quality control standards and must work with products that they have cleared for release."). Further, there is evidence that, contrary to its representation, when StockX offers for sale purportedly "B-grade" products, it identifies them as such. *See* Sept. Duvdevani Decl. ¶ 41, Ex. 188 (https://stockx.com/help/articles/What-kinds-of-sneakers-are-sold-on-StockX). Nike, therefore, objects to Mr. Delli-Carpini's testimony as inadmissible as proof for this statement because it is irrelevant, misleading, and more prejudicial than probative. Fed. R. Evid. 401, 403.

296.  ████████████████████████████████████████████

████████████████████████  Opp. DX 7, Delli Carpini Tr. 149:21–24.

**Nike, Inc's Response: Disputed. This statement is not material.**

Nike disputes StockX's characterization of Ms. Delli-Carpini's testimony which speaks for itself and reads in its entirety: ████████████████████████

████████████████████████████████████████████████

Dkt. 271-7 at 149:21–24. ███████████████████████████████████████████

████████████████████████. Dkt. 273-57, Ex. 56, Lopez Tr. 114:2-7.  StockX relies on this

statement to suggest that StockX rejects defective shoes that Nike finds fit for sale. (Dkt. 268 at

6). This is not supported by Ms. Delli-Carpini's testimony or other record evidence.  StockX has

not cited to nor provided any record support that B-grade product contains visual manufacturing

defects of the type StockX claims to be attributable to Nike in numerous consumer

communications, ██████████████████████████████████████. Dkt.

273-57, Ex. 56, Lopez Tr. 114:2-7*; see also* Dkt. 261-89, Ex. 83 at STX0777767 (StockX customer

service representative responding to customer's authenticity concern and stating: "I'm very sorry

to hear that you have concerns with your purchase. Our verification teamtakes the authentication

process very seriously and inspects each item to ensure that it is 100% authentic. The pilling in the

seams and the leftover glue residue are common manufacturing defects that are found in most, if

not all, Nike Dunk releases."); Dkt. 261-90, Ex. 84 at STX0774944 (StockX customer service

representative responding to customer's authenticity concern and stating: "We do always try to

provide you with a pair that is up to your expectations but we do have to work with items that are

cleared for retail release by the manufacturer. With that being said, the reason why this pair is

acceptable per our deadstock condition standards is that Nike released these with the concerns you

have pointed out."); Dkt. 261-91, Ex. 85 at STX0777124 (StockX customer service representative

responding to customer's authenticity concern and stating: "While I understand that you are not

completely satisfied with this purchase, we, unfortunately, do not have control over the

manufacturer's production standards and must work with products that they have cleared for

release.Glue, stitching, and slight paint variances are common in these mass-produced shoes.");

Dkt. 261-92, Ex. 86 at STX0220611 (StockX customer service representative responding to

customer's authenticity concern and stating: "As a product specialists here at StockX and a sneaker enthusiast, I can assure you that these are very very typical Nike quality, especially for dunks."); *Id.* (StockX customer service representative responding to customer's authenticity concern and stating: "As stated mass produced shoes will normally have common issues with excessive glue stains or stitching variances. This is directly from being manufactured on a massive scale."); Dkt. 261-93, Ex. 87 at STX0220624 (StockX customer service representative responding to customer's authenticity concern and stating: "We are not the manufacturers of these shoes. Nike and their Quality Control department passed these shoes to be sold on the retail level.  Meaning that these shoes passed their Quality Control standards. We unfortunately do not have control over the manufacturer's production or quality control standards and must work with products that they have cleared for release.").  Further, there is evidence that, contrary to its representation, when StockX offers for sale purportedly "B-grade" products, it identifies them as such. *See* Sept. Duvdevani Decl. ¶ 41, Ex. 188 (https://stockx.com/help/articles/What-kinds-of-sneakers-are-sold-on-StockX).  Nike, therefore, objects to Mr. Delli-Carpini's testimony as inadmissible as proof for this statement because it is irrelevant, misleading, and more prejudicial than probative.  Fed. R. Evid. 401, 403.

297.    Nike has a return policy for its customers who receive defective or faulty products. Opp. DX 66, "What Is Nike's Return Policy,  https://www.nike.com/help/a/returns-policy (including a section entitled "What about defective or flawed items?" and noting "If it's been less than 60 days since your purchase, simply return the item.  If it's been more than 60 days and your item is potentially defective or flawed, please see our warranty information for additional details").

**Nike, Inc's Response: Undisputed. This statement is not material.**

298.    Nike consumers can "return defective or faulty products with a valid proof of purchase within two years of the online or in-store purchase date."  Opp. DX 95, "What is Nike's Return Policy?" https://www.nike.com/si/help/a/returns-policy-eu.

**Nike, Inc's Response: Undisputed. This statement is not material.**

Nike does not dispute that its European Return Policy included the following statement: "We stand behind our shoes and gear. That's why you can return defective or faulty products with a valid proof of purchase within two years of the online or in-store purchase date." Dkt. 271-95. However, Nike's European Return Policy is inadmissible because it is irrelevant to this action. Fed. R. Evid. 401.

299.    Nike does not replace "flawed [Nike] shoe components" such as "shoelaces, charms, insoles, and spikes."    Opp. DX 96, "Do Nike Shoes Have a Warranty?" https://www.nike.com/help/a/shoe-warranty.

**Nike, Inc's Response: Undisputed. This statement is not material.**

300.    According to sneaker expert and StockX expert witness DeJongh Wells, "over the past 25 years . . . the perceived quality of Nike's sneakers has reportedly decreased."  Opp. DX 17, Wells Rep. ¶ 91.

**Nike, Inc's Response: Disputed. This statement is not material.**

Mr. Wells testified, in reference to the decrease in the perceived quality of Nike's sneakers, that he perceived that "[t]he lines between sneakers that were released say, in the Eighties and Nineties is very different than the quality of sneakers that are released today.  Prime example, Nike Air Force 1, which is one of them most popular-selling sneakers worn by Moses Malone 1982, that sneaker used to be made of tumbled leather.  That sneaker now in 2023 is no longer made of tumbled leather.  It's synthetic material.  So the quality is going down while the price has gone

up." Sept. Duvdevani Decl. ¶ 13, Ex. 160, Wells Tr. 119:13-120:9.  Mr. Wells opinion as to the quality of Nike's sneakers was limited to a "decrease in quality materials." *Id.* at 121:15-16. Further, Mr. Wells' report bases his opinion on publicly available statements assumes for the purpose of his analysis that the information is accurate, without any personal knowledge, scientific approach or reliable principles to guide his analysis, making his opinion inadmissible as improper and unreliable in violation of Fed. R. Evid. 403, 602, and 702.

301.    Consumers have reported issues with authentic Nike products including "mismatched logos, missing (or bolded) patterns, misshapen heels and more."  Opp. DX 16, https://www.gearpatrol.com/style/shoes-boots/a43364644/nike-quality-control-stockx-fakes/; *see* Opp. DX 17, Wells Rep. ¶ 95.

**Nike, Inc's Response: Disputed. This statement is not material.**

Nike disputes that the cited evidence supports the proposition that consumers have broadly reported issues with authentic Nike products.  The article in Gear Patrol is limited to a discussion of a single sneaker release and contains no evidence that the shoes depicted are "authentic." Dkt. 271-16.  Nike objects to the article as inadmissible hearsay not within an exception.  Fed. R. Evid. 802.  Wells' reliance on the same is unreliable for the same reasons.  Fed. R. Evid. 403, 702.

302.    Anecdotal evidence posted by consumers on forums for sneakerheads highlights other manufacturing issues with Nike products, such as the soles of Nike sneakers separating from the uppers over time, even with minimal use.  Opp. DX 17, Wells Rep. ¶ 94.

**Nike, Inc's Response: Disputed. This statement is not material.**

Nike does not dispute that Wells opines that "[a]necdotal evidence posted by consumers on forums for sneakerheads highlights other manufacturing issues with Nike products," however Nike disputes the veracity of such a conclusion given that the anecdotal evidence in question is

two isolated comments, from unverified sources. Fed. R. Evid. 403, 702. Unauthenticated internet comments are not reliable because they are hearsay not within an exception and are incapable of being authenticated or even demonstrating that they were made by real individuals—much less that they were made by "consumers." *United States v. Browne*, 834 F.3d 403, 412 (3d Cir. 2016) ("The authentication of social media evidence in particular presents some special challenges because of the great ease with which a social media account may be falsified or a legitimate account may be accessed by an impostor."); *MGA Ent. Inc. v. Harris,* No. 2:20-cv-11548, 2022 WL 4596697, at *5 (C.D. Cal. July 29, 2022) (finding unauthenticated social media comments inadmissible "because she cannot even demonstrate that these commenters are real people."); *Icon Enters. Int'l v. Am. Prods. Co.*, No. 04-cv-1240, 2004 WL 5644805, *33 (C.D. Ca., Oct. 7, 2004) (holding that internet chat room comments "by unknown and unknowable users" were irrelevant).

303.    StockX authenticators have observed defects in Nike products. Opp. DX 18, Lopez Tr. 284:12–24.

**Nike, Inc's Response: Disputed.**

Nike disputes StockX's characterization of Mr. Lopez's testimony which specifically relates to a communication from Mr. Malekzadeh regarding what he suspected was a counterfeit shoe. Mr. Lopez testified that although he told Mr. Malekzadeh that a shoe had "Normal Nike defects. Mass produced shoe," he did not consider the issue a manufacturing defect and he could not determine where the product came from or where it was produced. Sept. Duvdevani Decl. ¶ 14, Ex. 161, Lopez Tr. 284:15-285:23. ██████████████████████████ ████████████████████████████████████ Dkt. 273-57, Ex. 56, Lopez Tr. 114:2-7.

304. ████████████████████████████████████████████████

████████████████ Opp. DX 18, Lopez Tr. at 264:24–265:3.

**Nike, Inc's Response: Disputed.**

Nike disputes StockX's characterization of Mr. Lopez's testimony. █████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████ Dkt. 273-57, Ex. 56, Lopez

Tr. 264:24-265:10. ██████████████████████████████████████████

███████████████████████████████████████████████ *Id.* at 113:9-13.

████████████████████████████████████████████████████████████

██████████████████ Dkt. 273-57, Ex. 56, Lopez Tr. 114:2-7.

305. StockX authenticators have observed material defects (such as cuts, tears, and creasing), as well as construction defects (such as loose threads and stitching variances) in Nike products. Opp. DX 97, STX0190116 at 118–119 (StockX "Types of Defect" Guide on Air Jordan 4).

**Nike, Inc's Response: Disputed.**

Nike disputes that StockX has identified material defects or construction defects in Nike products ██████████████████████████████████████████████████

███████████████ Dkt. 273-57, Ex. 56, Lopez Tr. 114:2-7. ████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████ *Id.* at

113:15-23.

**XV.    The technology Nike uses to authentic products is flawed.**

306.    In the context of this case, ███████████████████████████████

████████████████████████████████████████ Opp. DX 5, NIKE0025918; Opp. DX 6,

NIKE0039044; Opp. DX 7, Delli Carpini Tr. 195:23–196:8.

**Nike, Inc's Response: Disputed.**

Nike disputes StockX's characterization of the initial investigation of certain suspected

counterfeits.  Mr. Pallett testified that ████████████████████████████████████

████████████████████████████████████. Sept. Duvdevani Decl. ¶ 8, Ex. 155,

266:19-267:2.   However, ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████. *Id.* at 274:2-23; Dkt. 271-6. ████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ Sept.

Duvdevani Decl. ¶ 8, Ex. 155, Pallett Tr.268:25-269:7.  StockX relies on this statement to suggest

that the cited "████████████████████████████████████████

████████████████ Dkt. 268 at 12 n.15.  This is not supported by the cited documents,

testimony, or other record evidence.  Nike, therefore, objects to the cited evidence as inadmissible

as proof for the statement because it is irrelevant, misleading, and more prejudicial than probative.

Fed. R. Evid. 401, 403.

307.    ████████████████████████████████████████

████████████████████████ Opp. DX 5, NIKE0025918 ████████████

████████████████

**Nike, Inc's Response: Disputed.**

Nike disputes StockX's characterization of the initial investigation of certain suspected counterfeits. Mr. Pallett testified that ███████████████████████████████████████████

██████████████████████████████████████████. Sept. Duvdevani Decl. ¶ 8, Ex. 155, Pallett Tr. 266:19-267:2. However, ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████. *Id.* at 274:2-23; Dkt. 271-6.

████████████████████████████████████████████████████████████████████

████████████████████████████ Sept. Duvdevani Decl. ¶ 8, Ex. 155, Pallett Tr. 272:23-273:6. ████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ *Id.* at 268:25-269:7. ████████████████████████████████████████████████████████

████████████████ tion. *Id.* 273:11-18. ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████ *Id.* at 274:2-23. The Nike Brand Protection team identified three pairs ████████████████████████████████████████ as counterfeit and that determination has never changed. *See* Dkt. 260-1, App'x A at Pairs 1-3. StockX relies on this statement to suggest that the cited ██████████████████████████████████████████████████

████████████████████████ Dkt. 268 at 12 n.15. This is not supported by the cited document or other record evidence. Nike, therefore, objects to the cited evidence as inadmissible as proof for the statement because it is irrelevant, misleading, and more prejudicial than probative. Fed. R. Evid. 401, 403.

308.    Nike itself admits that ███████████████████████████

███████████████████████████ Nike Mot. at 3; Opp. DX 8, Rizza Tr. 113:23–114:12

(explaining that Nike's spreadsheet ███████████████████████████

███████████████████████████████████████████████

███████████████

**Nike, Inc's Response: Disputed.**

Nike does not dispute that ███████████████████████████

███████████████████████████ Further, Nike disputes StockX's characterization of Ms.

Rizza's testimony.  Nike has consistently maintained that Nike can determine ████████

███████████████████████████. Sept. Duvdevani Decl. ¶ 8, Ex.

155, Pallett Tr. 230:5-9.  Ms. Rizza's testimony related to the spreadsheet ████████

███████████████████████████████████████████████

███████████████████████. *Id.* at 274:2-23; Dkt.

271-6.  StockX relies on this statement to suggest that the cited ████████████

███████████████████████████ Dkt. 268 at 12 n.15.  This

is not supported by the cited testimony or other record evidence.  Nike, therefore, objects to the

cited evidence as inadmissible as proof for the statement because it is irrelevant, misleading, and

more prejudicial than probative.  Fed. R. Evid. 401, 403.

309.    ███████████████████████████████████████

███████████████████████████ Opp. DX 9, Pallett Tr. 16:17–

17:8 ███████████████████████████████████

**Nike, Inc's Response: Disputed.  This statement is not material.**

Nike does not dispute that ███████████████████████████

████████████████████████████████████████    ████████████████

████████████████████████████████████████████████████████

Sept. Duvdevani Decl. ¶ 8, Ex. 155, Pallet Tr. 167:24-169:22.  As the confirmed counterfeit goods

that StockX distributed and Nike discovered in this case ████████████████, *see* Dkt.

260-1, this statement has no relevance.  StockX relies on this statement to suggest that the cited

████████████████████████████████████████████████████████

██████    Dkt. 268 at 12 n.15.  This is not supported by the cited testimony or other record evidence.

Nike, therefore, objects to the cited evidence as inadmissible as proof for the statement because it

is irrelevant, misleading, and more prejudicial than probative.  Fed. R. Evid. 401, 403.

310.    Mr. Pallett, Nike's Director, Brand Protection, Authentication and Innovation,

testified that ████████████████████████████████████████

████████████████████████████████████████████████████████

Opp. DX 9, Pallett Tr. 165:5–18.

**Nike, Inc's Response: Disputed.  This statement is not material.**

Nike disputes StockX's characterization of Mr. Pallett's testimony.  Mr. Pallett testified

that ████████████████████████████████████████████████

██████████████████████████████.  Dkt. 271-9, Pallett Tr. 165:9-13.

"Nike By You" is Nike's sneaker customization service which allows consumers to make one-of-

a-kind shoes.  *See* Sept. Duvdevani Decl. ¶ 15, Ex. 162 ([https://www.nike.com/help/a/what-is-nike-by-you](https://www.nike.com/help/a/what-is-nike-by-you).)

████████████████████.  Dkt. 271-9, Pallett Tr. 165:7-167:13. However, Mr. Pallett also testified

that ████████████████████████████████████████████████

███████████████████████████. *Id.*, Pallett Tr. 165:7-168:23.  Further, this statement is not material as StockX does not offer for sale Nike By You custom products on its website.  *See* Sept. Duvdevani Decl. ¶ 16, Ex. 163 (STX0265095) ("StockX does not accept custom designs"); *id.* ¶ 17, Ex. 164 https://stockx.com/search?s=%22nike+by+you%22.    StockX relies on this statement to suggest that the cited "██████████████████████████████ ████████████████████████████ Dkt. 268 at 12 n.15.  This is not supported by the cited testimony or other record evidence.  Nike, therefore, objects to the cited evidence as inadmissible as proof for the statement because it is irrelevant, misleading, and more prejudicial than probative.  Fed. R. Evid. 401, 403.

311.    Mr. Pallett testified that ████████████████████████████ ████████████████████████████████████████████████ ████  Opp. DX 9, Pallett Tr. 165:19–167:23.

**Nike, Inc's Response: Undisputed. This statement is not material.**

This statement is not material as StockX does not offer for sale Nike By You custom products on its website.  *See* Sept. Duvdevani Decl. ¶ 16, Ex. 163 (STX0265095) ("StockX does not accept custom designs"); *id.* ¶ 17, Ex. 164 (https://stockx.com/search?s=%22nike+by+you%22.)  StockX relies on this statement to suggest that the cited ████████████████████████ ████████████████████ Dkt. 268 at 12 n.15.  This is not supported by the cited testimony or other record evidence.  Nike, therefore, objects to the cited evidence as inadmissible as proof for the statement because it is irrelevant, misleading, and more prejudicial than probative.  Fed. R. Evid. 401, 403.

312. ███████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████ Opp. DX 9,

Pallett Tr. 167:14–172:23.

**<u>Nike, Inc's Response: Disputed. This statement is not material.</u>**

Nike disputes StockX's characterization of Mr. Pallett's testimony. "Nike By You" is

Nike's sneaker customization service which allows consumers to make one-of-a-kind shoes. *See*

Sept. Duvdevani Decl. ¶ 15, Ex. 162 (https://www.nike.com/help/a/what-is-nike-by-you.)

████████████████████████████████████████████████████████

██████████ Dkt. 271-9, Pallett Tr. 165:7-167:13. However, Mr. Pallett also testified that ████

████████████████████████████████████████████████████████

███████████████ *Id.*, Pallett Tr. 165:7-168:23. Further, this statement is not

material as StockX does not offer for sale Nike By You custom products on its website. *See* Sept.

Duvdevani Decl. ¶ 16, Ex. 163 (STX0265095) ("StockX does not accept custom designs"); *id.* ¶

17, Ex. 164 https://stockx.com/search?s=%22nike+by+you%22.  StockX relies on this statement

to suggest that the cited ███████████████████████████████████████

███████████████ Dkt. 268 at 12 n.15. This is not supported by the cited

testimony or other record evidence. Nike, therefore, objects to the cited evidence as inadmissible

as proof for the statement because it is irrelevant, misleading, and more prejudicial than probative.

Fed. R. Evid. 401, 403.

313. ███████████████████████████████████████████

████ Opp. DX 9, Pallett Tr. 134:6–15 ████████████████████████

██████████████████████████████████ Opp. DX 10, NIKE0037982 (StockX

employees emailing Nike regarding ████████████████████████████

**Nike, Inc's Response: Disputed.**

Nike disputes that StockX ████████████████████ The cited emails relate

to █████████████████████████████████████████████████████

████████████████████ Dkt. 271-2 at 82:8–15; Sept. Duvdevani Decl. ¶ 8, Ex. 155,

Pallett Tr. 136:8-139:20. However, ███████████████████████████

████████████████████████████████████████████████████████

████████████████████ *Id.* ██████████████████████████

████████████████████████████████████████████████████████

██████████ *Id.; see* Sept. Duvdevani Decl. ¶ 10, Ex. 157 (NIKE0037734); *id.* ¶ 11, Ex. 158

(NIKE0036212).   Mr. Pallett, who had primary responsibility from brand protection, ██████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████ Sept. Duvdevani Decl. ¶ 8, Ex. 155, Pallett Tr. 138:15-17, 154:17-155:5.   Nike

disputes that ████████████████████████████████████████

██████████████.   Instead, StockX cites only to documents and communications related

to ████████████████████████ *Id.* Further, Mr. Pallett testified that ██████ is

100 percent effective at identifying a counterfeit. *Id.* at 230:5-9.   StockX relies on this statement

to suggest that the cited "████████████████████████████████

████████████████████ Dkt. 268 at 12 n.15.   This is not supported by the cited

document, testimony, or other record evidence.   Nike, therefore, objects to the cited evidence as

inadmissible as proof for the statement because it is irrelevant, misleading, and more prejudicial than probative.  Fed. R. Evid. 401, 403.

314.  ████████████████████████████████████████

████████████████████████████████████ Opp. DX 10, NIKE0037982; Opp. DX 11, NIKE0037984; Opp. DX 12, NIKE0037849; Opp. DX 13, NIKE0037856 at 858; Opp. DX 14, NIKE0038038; Opp. DX 15, NIKE0038039.

**Nike, Inc's Response: Disputed. This statement is not material.**

Nike disputes that ████████████████ and StockX provides no evidence in support of this statement.  *See* Sept. Duvdevani Decl. ¶ 8, Ex. 155, Pallet Tr. 230:5-9 (Mr. Pallett testifying that ██████ is 100 percent effective at identifying a counterfeit).  Instead, StockX cites only to documents and communications related to ████████████████████████████

████████████████████████████████████████████

████████████████████ Dkt. 271-2 at 82:8–15; Sept. Duvdevani Decl. ¶ 8, Ex. 155, Pallett Tr. 136:8-139:20.  However, ████████████████████████████████

████████████████████████████████████████████

████████████████████ *Id.* ████████████████████████

████████████████████████████████████████████

██████████ *Id.; see* Sept. Duvdevani Decl. ¶ 10, Ex. 157 (NIKE0037734); *id.* ¶ 11, Ex. 158 (NIKE0036212).  Mr. Pallett, who had primary responsibility from brand protection, in the development of ████████████████████████████████████████

████████████████████████████████████████████ Sept. Duvdevani Decl. ¶ 8, Ex. 155, Pallett Tr. 138:15-17, 154:17-155:5.  Mr. Pallett also testified that ████████████████████████████████████████ *Id.* (Pallett Tr. 137:14-

139:20).  StockX relies on this statement to suggest that the cited █████████████████████████ ██████████████████████████████████████ Dkt. 268 at 12 n.15.  This

is not supported by the cited documents or other record evidence.  Nike, therefore, objects to the

cited evidence as inadmissible as proof for the statement because it is irrelevant, misleading, and

more prejudicial than probative.  Fed. R. Evid. 401, 403.

315.    Yet Nike witness, Laura, Rizza testified that ███████████████████████████

████████████████████████████ Opp. DX 8, Rizza Tr. 25:15–26:11 ████████

███████████████████████████████████████████████████████

**Nike, Inc's Response: Undisputed.**

**XVI.** ███████████████████████████████████████████████
█████████████████████████**.**

316.    An April 2019 internal Nike presentation entitled ███████████████

███████████████ showed that Nike █████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████ Opp. DX 14, NIKE0035800 at

825; Opp. DX 2, Paulson Tr. 222:19–223:1 (in discussing this presentation, stating Nike ████

███████████████████████████████████████████████████

██████████████; 257:22–258:09 (explaining that Nike decided ████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

**Nike, Inc's Response: Disputed. This statement is not material.**

Nike disputes StockX's characterization of the ██████████████████████

████████████████ Dkt. 257-14.  Nike does not dispute that in April 2019 it engaged

in preliminary discussions ████████████████████████████████████████████

████████████████████████████████████████████ *Id.;* Sept. Duvdevani

Decl. ¶ 7, Ex. 154, Paulson Tr. 263:11-17.  However, this presentation relates to ████████

████████████████████████████████████████████████████

████████████████████████████████████ While Nike hypothesized ████████

████████████████████████████████████████████████████

████████, this analysis has no connection to ████████████████████████

████████████████ which can accurately identify a counterfeit Nike with 100 percent accuracy.

Sept. Duvdevani Decl. ¶ 8, Ex. 155, Pallett Tr. 136:8-139:20.  StockX relies on this statement to

suggest that ████████████████████████████████████████████████

████████████████████████████████████████████ Dkt.

268 at 12 n.15.  This is not supported by the cited document, testimony, or other record evidence.

Nike, therefore, objects to the cited evidence as inadmissible as proof for the statement because it

is irrelevant, misleading, and more prejudicial than probative.  Fed. R. Evid. 401, 403.

## XVII. Nike Has Produced No Evidence to Establish What Consumers Understood the Authenticity Claims to Mean or That the Authenticity Claims Were False or Misleading.

317.    Nike has produced no evidence to establish whether consumers saw the statement

"100% Authentic" on StockX's product description pages.  Pls. 56.1 ¶¶ 57–58.

## Nike, Inc's Response: Disputed.

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge

Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence

and for these reasons, should be disregarded. *Perez* , 2013 WL 2641432 at *7-8.

Nike disputes that the record does not establish whether consumers saw the statement

"100% Authentic" on StockX's product description pages.  StockX has admitted that "100%

Authentic" appeared on the StockX website between November 2017 and May 2022, product

pages for Nike or Jordan shoes sold on StockX.  *See* ¶ 58.a.  Further, multiple consumers have written to StockX mentioning the product description on the website as "100% Authentic." *See, e.g.*, Sept. Duvdevani Decl. ¶ 18, Ex. 165 (STX0254533) (This product was advertised at the time of purchase and is still currently advertised with the following description and condition: […] Condition: 100% Authentic and **New and Unworn.** (I have added evidence of this as advertised on your Website/App to this email/letter); Dkt. 273-87 ("I think it[]s an issue in the sneaker community when an item is advertised as 100% authentic"); Sept. Duvdevani Decl. ¶ 19, Ex. 166 (STX0235251) ("The shoe IS FAKE and you claim to sell 100% authentic shoes."); Duvdevani Decl. ¶ 20, Ex. 167 (STX0268661) ("The description of the shoe compared to the product received is nothing as described this is false advertisement of the product that the consumer believes we[]re purchasing. The shoe itself is clearly a FAKE!!"); *Id.* ¶ 21, Ex. 168 (STX0268976) ("you[]ve taken money from me and in return have given me a fake item which was listed to be 100% authentic"); *Id.* ¶ 22, Ex. 169 (STX0783588) ("I PURCHASED NEW 100% AUTHENTIC. I DID NOT PRUCHASE "DAMAGED BOX". I RECEIVED THE SHOES TODAY AND THE QUALITY IS AWFUL."); *Id.* ¶ 23, Ex. 170 (STX0802104) ("RECENTLY PURCHASED A SHOE AND TODAY WHEN I OPENED THE BOX THE SHOE WAS DAMAGED [..] I BELIEVE THE SHOE ITSELF IS NOT 100% AUTHENTIC").  The media also covered StockX's removal of "100% Authentic" from the product description page.  *See, e.g.*, Duvdevani Decl. ¶ 24, Ex. 171 (NIKE0041154)

318.    Nike has produced no evidence to establish what consumers understand the statement "100% Authentic" to mean in the context in which it was used by StockX.  Pls. 56.1 ¶¶ 57–58.

**Nike, Inc's Response: Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded. *Perez*, 2013 WL 2641432 at \*7-8.

Nike disputes that the record does not establish consumers understood the statement "100% Authentic" on StockX's product description pages. StockX has admitted that "100% Authentic" appeared on the StockX website between November 2017 and May 2022, product pages for Nike or Jordan shoes sold on StockX. *See* ¶ 58.a. Further, multiple consumers have written to StockX mentioning the product description on the website as "100% Authentic." *See, e.g.*, Sept. Duvdevani Decl. ¶ 18, Ex. 165 (STX0254533) (This product was advertised at the time of purchase and is still currently advertised with the following description and condition: […] Condition: 100% Authentic and **New and Unworn.** (I have added evidence of this as advertised on your Website/App to this email/letter); Dkt. 273-87 ("I think it[]s an issue in the sneaker community when an item is advertised as 100% authentic"); Sept. Duvdevani Decl. ¶ 19, Ex. 166 (STX0235251) ("The shoe IS FAKE and you claim to sell 100% authentic shoes."); Duvdevani Decl. ¶ 20, Ex. 167 (STX0268661) ("The description of the shoe compared to the product received is nothing as described this is false advertisement of the product that the consumer believes we[]re purchasing. The shoe itself is clearly a FAKE!!"); *Id.* ¶ 21, Ex. 168 (STX0268976) ("you[]ve taken money from me and in return have given me a fake item which was listed to be 100% authentic"); *Id.* ¶ 22, Ex. 169 (STX0783588) ("I PURCHASED NEW 100% AUTHENTIC. I DID NOT PRUCHASE "DAMAGED BOX". I RECEIVED THE SHOES TODAY AND THE QUALITY IS AWFUL."); *Id.* ¶ 23, Ex. 170 (STX0802104) ("RECENTLY PURCHASED A SHOE AND TODAY WHEN I OPENED THE BOX THE SHOE WAS DAMAGED [..] I BELIEVE THE SHOE ITSELF IS NOT 100% AUTHENTIC"). The media also covered StockX's removal of

"100% Authentic" from the product description page. *See, e.g.*, Sept. Duvdevani Decl. ¶ 24, Ex. 171 (NIKE0041154).

319.    Nike has produced no evidence to establish whether consumers saw the statement "100% Verified Authentic" on StockX's website.  Pls. 56.1 ¶ 59.

**Nike, Inc's Response: Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded. *Perez*, 2013 WL 2641432 at *7-8.

Nike disputes that the record does not establish consumers saw the statement  "100% Verified Authentic" on StockX's website.  Customers have written to StockX regarding the "100% Verified Authentic" statement on its website.  *See, e.g.*, Dkt. 237-15 ("While I appreciate you being please and getting back to me quickly, it is nothing short of a disgrace what StockX are trying to get away with here. A company which I would […] like to point out promise the following to all customers. [] Guaranteed Authenticity. [] *Every item. Every time. Shop on StockX with complete confidence knowing every purchase is 100% Verified Authentic."*); Sept. Duvdevani Decl. ¶ 25, Ex. 172 (STX0270653) ("I did not request or pay for any pair of inauthentic Jordan Ones. As shown on their website StockX guarantees '100% verified authentic, never fake' That guarantee was not met").

320.    Nike has produced no evidence to establish what consumers understand the statement "100% Verified Authentic" to mean in the context in which it was used by StockX.  Pls. 56.1 ¶ 59.

**Nike, Inc's Response: Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded. *Perez*, 2013 WL 2641432 at *7-8.

Nike disputes that the record does not establish how customers understood the statement "100% Verified Authentic" on StockX's website.  Customers have written to StockX regarding the "100% Verified Authentic" statement on its website.  *See, e.g.*, Dkt. 237-15 ("While I appreciate you being please and getting back to me quickly, it is nothing short of a disgrace what StockX are trying to get away with here. A company which I would […] like to point out promise the following to all customers. [] Guaranteed Authenticity. [] *Every item. Every time. Shop on StockX with complete confidence knowing every purchase is 100% Verified Authentic."*); Sept. Duvdevani Decl. ¶ 25, Ex. 172 (STX0270653) ("I did not request or pay for any pair of inauthentic Jordan Ones. As shown on their website StockX guarantees '100% verified authentic, never fake' That guarantee was not met").

321.    Nike has produced no evidence to establish whether consumers saw the statement "Always Authentic, Never Fake" on StockX's website.  Pls. 56.1 ¶¶ 60–61.

**Nike, Inc's Response: Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded. *Perez*, 2013 WL 2641432 at *7-8.

StockX does not dispute that "Always Authentic, Never Fake" appeared on its website from at least July 2, 2018 through August 30, 2022.  *See* ¶¶ 60–61.  Further, as StockX is the only party that can provide data on the number of visitors to the webpage featuring "Always Authentic, Never Fake," StockX cannot point to the absence of evidence it withheld to support a proposition

that evidence does not exist.  Customers have written to StockX regarding the "Always Authentic, Never Fake" statement on its website.  *See, e.g.*, Sept. Duvdevani Decl. ¶ 25, Ex. 172 (STX0270653) ("I did not request or pay for any pair of inauthentic Jordan Ones. As shown on their website StockX guarantees '100% verified authentic, never fake' That guarantee was not met").

322.  Nike has produced no evidence to establish what consumers understand the statement "Always Authentic, Never Fake" to mean in the context in which it was used by StockX. Pls. 56.1 ¶¶ 60–61.

**Nike, Inc's Response: Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded. *Perez*, 2013 WL 2641432 at *7-8.

Nike disputes that the record does not establish how customers understood the statement "Always Authentic, Never Fake" on StockX's website.  Customers have written to StockX regarding the "Always Authentic, Never Fake" statement on its website.  *See, e.g.,* Sept. Duvdevani Decl. ¶ 25, Ex. 172 (STX0270653) ("I did not request or pay for any pair of inauthentic Jordan Ones. As shown on their website StockX guarantees '100% verified authentic, never fake' That guarantee was not met").

323.  Nike has produced no evidence to establish whether consumers saw the statement phrase "Guaranteed Authenticity" on StockX's website.  Pls. 56.1 ¶¶ ¶ 62.

**Nike, Inc's Response: Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded. *Perez*, 2013 WL 2641432 at *7-8.

Nike disputes that there is no record evidence to establish whether consumers saw the statement: "Guaranteed Authenticity" on StockX's website.  *See, e.g.*, Dkt. 237-15 ("While I appreciate you being please and getting back to me quickly, it is nothing short of a disgrace what StockX are trying to get away with here. A company which I would […] like to point out promise the following to all customers. [] Guaranteed Authenticity. [] *Every item. Every time. Shop on StockX with complete confidence knowing every purchase is 100% Verified Authentic."*).

324.    Nike has produced no evidence to establish what consumers understand the statement phrase "Guaranteed Authenticity" to mean in the context in which it was used by StockX.  Pls. 56.1 ¶ 62.

**<u>Nike, Inc's Response: Disputed.</u>**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded. *Perez*, 2013 WL 2641432 at *7-8.

Nike disputes that there is no evidence in the record establishing what consumers understood the statement "Guaranteed Authenticity" to mean. *See, e.g.*, Sept. Duvdevani Decl. ¶ 26, Ex. 173 (STX0213775) ("I paid for a real authentic guaranteed pair of shoes and they are NOT!!); *Id.* ¶ 27, Ex. 174 (STX0220717) ("StockX guarantees that each product is authentic and meets their standards, yet the item is clearly fake."); *id.* ¶ 25, Ex. 172 (STX0270653) ("As shown on their website StockX guarantees '100% verified authentic, never fake' That guarantee was not

met."); *id.* ¶ 28, Ex. 175 (STX0782855) ("ORDER [] IS COUNTERFEIT […] YOU GUARANTEE THE SHOES TO BE AUTHENIC AND VERIFIED.").

325.    Nike has produced no evidence to establish whether consumers saw the statement phrase "Guaranteed Authenticity.  Every item.  Every time.  Shop on StockX with complete confidence knowing every purchase is 100% Verified Authentic." on StockX's website.  Pls. 56.1 ¶ 63.

**Nike, Inc's Response: Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded. *Perez*, 2013 WL 2641432 at *7-8.

Nike disputes that there is no record evidence to establish whether consumers saw the statement: "Guaranteed Authenticity" on StockX's website. *See, e.g.*, Dkt. 237-15 ("While I appreciate you being please and getting back to me quickly, it is nothing short of a disgrace what StockX are trying to get away with here. A company which I would […] like to point out promise the following to all customers. [] Guaranteed Authenticity. [] *Every item. Every time. Shop on StockX with complete confidence knowing every purchase is 100% Verified Authentic."*).

326.    Nike has produced no evidence to establish what consumers understand the statement phrase "Guaranteed Authenticity.  Every item. Every time. Shop on StockX with complete confidence knowing every purchase is 100% Verified Authentic." to mean in the context in which it was used by StockX.  Pls. 56.1 ¶ 63.

**Nike, Inc's Response: Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded. *Perez*, 2013 WL 2641432 at *7-8.

Nike disputes that there is no record evidence to establish whether consumers saw the statement: "Guaranteed Authenticity" on StockX's website. *See, e.g.*, Dkt. 237-15 ("While I appreciate you being please and getting back to me quickly, it is nothing short of a disgrace what StockX are trying to get away with here. A company which I would […] like to point out promise the following to all customers. [] Guaranteed Authenticity. [] *Every item. Every time. Shop on StockX with complete confidence knowing every purchase is 100% Verified Authentic."*); *See* Sept. Duvdevani Decl. ¶ 25, Ex. 172 (STX0270653) ("As shown on their website StockX guarantees '100% verified authentic, never fake" That guarantee was not met."); *id.* ("I did not request or pay for any pair of inauthentic Jordan Ones. As shown on their website StockX guarantees '100% verified authentic, never fake' That guarantee was not met").

## XVIII. StockX Has Produced Evidence to Establish What Consumers Understood the Authenticity Claims to Mean.

327.     StockX's sneakerhead expert, Mr. DeJongh Wells, testified that StockX consumers understood StockX's "100 percent" advertising language to mean not that StockX only sells authentic, non-counterfeit products but rather that "if these sneakers are fake, I'm going to get my money back. . . . [T]hat language is that StockX does lay eyes/hands on each product that goes through their market, through their website."  Opp. DX 98, Dep. Tr. of DeJongh Wells ("Wells Tr."), 108:15–109:4; *see also* 99:8–21 (StockX's authenticity guarantee means "verified, looked at by someone, all of the sneakers that go through [the StockX] platform").

**Nike, Inc's Response: Disputed.  This statement is not material.**

Nike does not dispute that Mr. Wells offered an opinion about how StockX consumers understood StockX's "100 percent" advertising but disputes the veracity of that opinion.  Mr. Wells also testified that "[t]here is a possibility that a [StockX] customer, be it general consumer or sneakerhead" does not know its possible that they could buy counterfeits on StockX.  Dkt. 273-8, Ex. 7, Wells Tr. 133:5-20.  Mr. Wells also testified that when he comes to skepticism regarding the accuracy of an authenticity guarantee, he "can't speak for every thousands, millions of sneakerheads, but [he] know[s] [he] would always be mindful." Dkt. 237-8 at 102:14-23. Mr. Wells has not conducted a survey or other study to determine what StockX consumers understood 100 percent to mean and thus it is an improper expert opinion unsupported by the facts.  *See* Wells Rpt.; Fed. R. Evid. 403, 702.

## XIX.  StockX's Advertising Explicitly Disclaims that StockX is "Not Endorsed By Any Brands Sold On StockX."

328.    StockX's Authentication Webpage states that "StockX Verified is our own designation and not endorsed by any brands sold on StockX."  DX 77, NIKE0040098; *see also* Opp. DX 45, NIKE0040010 at 011 (September 2022 StockX Help Center page states "StockX is not affiliated with any of the brands we sell on the Platform.  StockX Verified is our own designation and not endorsed by any brands sold on StockX."); Opp. DX 46, NIKE0041144 at 145 (November 10, 2022 StockX tweet stating same).

**<u>Nike, Inc's Response: Disputed. This statement is not material.</u>**

Nike does not dispute that StockX's current website includes the language: "StockX Verified is our own designation and not endorsed by any brands sold on StockX."  However, StockX added this language to its website after this lawsuit was initiated, *see* Dkt. 261-57, Ex. 54, and it is thus immaterial and irrelevant to Nike's claims. Fed. R. Evidence 401, 403.

**XX.    StockX did not have knowledge that any of the alleged counterfeits were counterfeit prior to their sales.**

329.    The four allegedly counterfeit shoes that Nike directly purchased on StockX's platform were sold on StockX between December 2021 and January 2022.  Nike First Amended Complaint ("FAC"), ECF No. 39, ¶ 107.

**Nike, Inc's Response: Undisputed.**

330.    Nike contends that the remaining allegedly counterfeit shoes purchased by third-parties Roy Kim and Michael Malekzadeh were sold on StockX's platform prior to July 1, 2022.  DX 116, Nike's Suppl. Responses and Objections to StockX's Third Set of Interrogatories, Nike Response to Rog No. 20; Opp. DX 62, STX0774240 (spreadsheet of Roy Kim orders with respective order dates).

**Nike, Inc's Response: Undisputed.**

331.    Nike has provided no evidence that it put StockX on notice that the allegedly counterfeit shoes at issue in this case were suspected to be counterfeit, prior to their sales.

**Nike, Inc's Response: Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded. *Perez*, 2013 WL 2641432 at *7-8.  Nike disputes that StockX was not on notice that it was potentially offering for sale counterfeits on its website.  As early as December 2020, Nike put StockX on notice that it was offering for sale counterfeit Nike products. *See* Dkts. 261-146 – 261-149, Exs. 137-139.

332.    Nike has provided no evidence that it informed StockX that it had purchased four allegedly counterfeit shoes on StockX's platform between December 2021 and January 2022, prior to Nike's filing of its First Amended Complaint on May 25, 2022.  FAC, ECF No. 39.

**Nike, Inc's Response: Disptued.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded. *Perez*, 2013 WL 2641432 at *7-8.

333.    Nike has provided no evidence that it informed StockX that third party customers, Roy Kim and Michael Malekzadeh, had bought allegedly counterfeit Nike shoes on StockX's platform until September 19, 2022, when it responded to StockX's discovery requests.  DX 116, Nike's Suppl. Responses and Objections to StockX's Third Set of Interrogatories, Nike Response to Rog No. 20.

**Nike, Inc's Response: Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded. *Perez*, 2013 WL 2641432 at *7-8.

Nike disputes that StockX was not informed about the existence of counterfeits from third party customers, Roy Kim and Michael Malekzadeh, prior to September 19, 2022.  On July 25, 2022, Nike sent StockX a letter informing StockX that Nike had reviewed third party Mr. Kim's shoes and determined at least 38 "Nike" shoes that StockX sold to Mr. Kim were counterfeit.  Dkt. 261-124, Ex. 115.  Regardless, StockX knew that Mr. Kim and Mr. Malekzadeh had received suspected counterfeit products prior to being informed by Nike. *See* Dkt. 261-120; Dkt. 261-142; Dkt. 262-11 – 262-13.

334.    Nike has provided no evidence that it sent StockX any cease-and-desist letters regarding the alleged counterfeits at issue in this case.

**Nike, Inc's Response: Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded. *Perez*, 2013 WL 2641432 at *7-8.

335.    Nike has provided no evidence that StockX has ever failed to act in response to a notification from Nike of a potential counterfeit on the StockX platform.

**Nike, Inc's Response: Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded. *Perez*, 2013 WL 2641432 at *7-8.

In December 2020, ███████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████  Dkt. 2610

147, Ex. 138 at STX0773072.

336.    All of the allegedly counterfeit shoes were manually inspected by StockX authenticators prior to their sales.  Opp. DX 47, Huber June Tr. 7:23–8:6.

**Nike, Inc's Response: Undisputed.**

337.    The StockX authenticators that manually inspected each of the allegedly counterfeit shoes did not identify any reason to reject the products, and allowed them to pass StockX's Process. Opp. DX 47, Huber June Tr. 7:23–8:6.

**Nike, Inc's Response: Undisputed.**

338.    For the allegedly counterfeit shoes at issue in this case, there is no evidence in the record that StockX concluded that any of the third-party sellers were suspicious prior to, or at, the time the disputed products were sold.

**Nike, Inc's Response: Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded. *Perez*, 2013 WL 2641432 at *7-8.

Nike disputes that there is no evidence that StockX was unaware that any third-party sellers were suspicious prior to the sale of the alleged counterfeits.   Prior to the sales to Roy Kim, StockX

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████  Dkt. 261-46, June Huber Tr. 42:13-16.  ██████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████  *Id.*

at 42:17-24.  Further, StockX is the sole party in possession of documents related to seller histories and has refused to produce such information and StockX cannot withhold responsive information and then rely on its absence as evidence.

## XXI.  StockX suspended all sellers connected to the fraud ring associated with Roy Kim's shoes.

339.    By monitoring seller details and activity, StockX has successfully identified fraudulent sellers and banned them from selling on its platform.  Opp. DX 47, Huber June Tr. 45:2–46:3, 60:11–18.

**Nike, Inc's Response: Disputed.**

StockX has provided only one example of StockX's successful identification a fraud ring; a group of bad actors that had been operating on its platform for an unknown period of time prior to the Roy Kim incidence and had completed 1807 sales on the StockX platform prior to being

caught. Dkt. 257-36, Ex. 36, June Huber Tr. 42:2-43:13; Dkt. 261-119, Ex. 110; Dkt. 261-141, Ex.

141.  As Mr. Huber testified as StockX's 30(b)(6) corporate designee, ████████████████

████████████████████████████████████████████████████████████████

████████████████████  Dkt. 273-12, Ex. 11, June Huber Tr. 35:21-23. ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████. *Id.*

at 60:6-23.  Further, StockX was aware that the Jordan 1 Retro High Dark Mocha was the most

commonly attempted sneaker fake prior yet incorrectly "authenticated" and sold a large number

of this colorway, which were later confirmed to be counterfeit, to purchaser Roy Kim.  *Compare*

Dkt. 261-79, Ex. 73, NIKE0038943 *with* Dkt. 260-1, Appendix A at Pairs 5-37.  Additionally,

StockX's returns records show ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████  *See, e.g.*, Dkt. 261-140, Ex. 131 at Rows 156, 172, 290, 313, 314 ██████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████

     340.    Sellers are only anonymous to buyers, not to StockX.  StockX collects information

on every seller, actively vets them, and uses seller data to detect potentially fraudulent activity.

Opp. DX 47, Huber June Tr. 45:2–13.

**Nike, Inc's Response: Disputed.**

Nike does not dispute that Mr. Huber testified that at some point in time StockX had a fraud team, however StockX has not provided any admissible evidence that corroborates Mr. Huber's testimony or shows how StockX has detected potentially fraudulent activity in its business. In fact, Nike disputes that StockX's anti-fraud measures are effective given that StockX inspected and "authenticated" confirmed counterfeit shoes and distributed them to buyers and, that a "fraud ring" of bad actors sold confirmed counterfeit shoes through StockX and completed over 1800 sales through the StockX platform before StockX noticed. *See* Dkt. 261-43, Ex. 43, STX0018010 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛); Dkt. 257-36, Ex. 36, June Huber Tr. 42:2-43:13; Dkt. 261-141, Ex. 132, STX0806056; Dkt. 261-119, Ex. 110, STX0806024.

341.    Through its post-sale investigations, StockX's fraud team discovered a ring of fraudulent sellers on StockX's platform that were connected to the sale of some shoes to Roy Kim. Opp. DX 47, Huber June Tr. 45:2–46:3, 60:15–18.

**Nike, Inc's Response: Disputed.**

Nike disputes that StockX's fraud team identified the fraud ring based on ordinary post-sale investigations. Mr. Huber testified as StockX's 30(b)(6) corporate designee, ⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛ Dkt. 273-12, Ex. 11, June Huber Tr. 35:21-23. He also testified that before Mr. Kim complained, StockX had ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ ⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

*Id*. at 42:02-46:03.

342.    StockX suspended all suspected fraudulent sellers connected to this fraud ring. Opp. DX 47, Huber June Tr. 45:2–46:3, 60:15–18.

**Nike, Inc's Response: Disputed.**

Although StockX may have banned the sellers after receiving Nike's letter connected to "the fraud ring," ███████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████. Dkt. 273-12, Ex. 11, June Huber Tr. at 60:6-23.

343.    StockX also ████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████ Huber June Tr. at 21:21-22:5.

**Nike, Inc's Response: Disputed.**

Nike disputes that ████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████ Dkt. 261-46, Ex. 46, Huber June Tr. 70:2-12. Mr. Huber ██████████████████████████████. Huber June Tr. at 21:21-22:5.

344.    StockX determined that at least one authenticator, Raymond Jones, was not following StockX's protocols.  Huber June Tr. at 21:21-22:5.

**Nike, Inc's Response: Disputed.**

Nike does not dispute that StockX determined that only Mr. Jones did not ███████████

████████████████████████ pursuant to the Roy Kim investigation ████████████████

███████████████████████████████████████████████. Huber June

Tr. at 21:21-22:5; Dkt. 261-119, Ex. 110.

345.    StockX terminated Raymond Jones's employment following this internal review.

Huber June Tr. at 21:21-22:5.

**Nike, Inc's Response: Disputed.**

Nike does not dispute that StockX terminated only Mr. Jones pursuant to the Roy Kim

investigation ████████████████████████████████████████

█████████████████████. Huber June Tr. at 21:21-22:5; Dkt. 261-119, Ex. 110.

**XXII.  Nike representatives have expressed awareness of StockX's return policy, encouraged consumers to use StockX to purchase Nike products, and conceded that Nike cannot tell if Nike products sold on StockX are authentic or not.**

346.    As recently as 2022, Nike representatives were aware of StockX's return policy,

and have encouraged StockX customers who have reached out to Nike regarding a potentially

inauthentic product to contact StockX for a return.  Opp. DX 39, NIKE0039094 ("If you feel the

product is fake, I highly suggest to contact StockX to check on it or proceed with their return

option"; *id.* (Nike representative "would highly suggest" the customer "work with StockX for

returning this product").

**Nike, Inc's Response: Disputed.**

Nike disputes StockX's characterization of customer communications wherein a Nike

customer service employee instructed a customer to seek a return from StockX as evidence that

Nike representatives were aware of the existence of a StockX return policy.  It is not.  Customer

services employees instructed customers to attempt to return footwear to the website where they

purchased from, in this case StockX, as Nike is unable to assist with a return not purchased through

Nike or an authorized Nike retailer. *See, e.g.*, Dkt. 261-151, Ex. 142 at Row 27 ("As I have

checked, StockX is no authorize retailer therefore we highly recommend to you contact directly

StockX to return it directly. I understand, ███████ however StockX is not authorize retailer of Nike. Therefore we are unable to process your complaint request. There is no specific way to tell you if the product is authentic or not item purchased in StockX. Please be advised that products purchased from a non-authorize retailer or auction sites are at your own risk. Even if you have a Proof of purchase, StockX is not authorize retailer of Nike that is why we are unable to process your complaint."); *id.* at Row 27 ("I totally understand that ███████ for this one I do recommend for you to contact StockX about this matter to check for options. As I checked here ███████ StockX is not listed as one of our authorised retailers, as much as we wanted to, the best option to have this sorted is contacting them."); *id.* at Row 28 ("Ok so If you purchase the shoes from StockX they should be the ones who will be the ones to help you with that issue"); Dkt. 261-149, Ex. 140 at Row 64 ("Since it was purchased in StockX, please contact them directly so that they can check on their return policy applicable for you and for swift resolution.").

347.    As recently as 2022, Nike representatives have recommended StockX as a platform to purchase Nike products from.  Opp. DX 39, NIKE0039094; Opp. DX 38, NIKE0039100; Opp. DX 44, NIKE0039092.

**Nike, Inc's Response: Disputed. This statement is not material.**

Nike disputes StockX's characterization of three of Nike's customer service communications as evidence that Nike "recommended" StockX as a platform.  Rather, Nike customer service employees frequently represented that StockX was not an authorized retailer. *See, e.g.,* Dkt. 261-149, Ex. 140 at Row 53 ("It looks like StockX and GOAT both have the pair but I can not recommend them as they are not authorized retailers so we can not guarantee you will be getting a legitimate product"); *id.* at Row 33 ("We do not recommend other third party

sites"); Dkt. 261-151, Ex. 142 at Row 26 ("I recommend getting the item on our authorize retailers such as JD Sports").

348.    On March 24, 2022, a Nike representative wrote to a consumer: "Unfortunately, [this product] is no longer available. . . . however you can find some that are selling original products!  I think that StockX is a good place to buy this product."  Opp. DX 38, NIKE0039100.

**Nike, Inc's Response: Disputed. This statement is not material.**

Nike disputes StockX's characterization of this conversation between a Nike customer service employee and a Nike customer.  The communication relates to a UK purchaser inquiring whether there are "any good sites or sites to avoid" and to which a Nike customer service employee responded "You can check customers review online and see if they are selling fakes.  A lot of sites do it, however you can find some that are selling original products! I think StockX is a good place to buy this product."  Nike disputes StockX's implication that this statement is an endorsement of StockX's authentication process.  The employee's personal opinion has no bearing on Nike's discovery of counterfeit products on the StockX website.  *See* Dkt. 260-1, App'x A.

349.    On November 27, 2021, a Nike representative wrote to a consumer: "Stockx is not one of our currently listed authorized retailers but it does not mean that the product they have is not authentic.  We have other Jordans that are coming up.  I am no longer able to[] [see] that style on the link as it is no longer available but the style number of the shoes you wanted is DC7294-200 which is the same as what you see on Stockx."  Opp. DX 44, NIKE0039092.

**Nike, Inc's Response: Disputed. This statement is not material.**

Nike disputes StockX's characterization of this conversation between a Nike customer service employee and a Nike customer.  A single Nike customer service employee stated: "The best way to get updated for restocks is to download the SNKRS App and bookmark Nike SNKRS

online or re-visit Nike.com." The customer inquired about stockx.com, which "is the only website I found…" selling the shoes and to which the Nike customer service employee responded "Stockx is not one of our currently listed authorized retailers but it does not mean that the product they have is not authentic." Dkt. 261-149, Ex. 140 at Row 32. Nike disputes StockX's implication that this statement is an endorsement of StockX's authentication process. The employee's personal opinion has no bearing on Nike's discovery of counterfeit products on the StockX website. *See* Dkt. 260-1, App'x A.

350.    Nike representatives have recommended customers return Nike-branded products to StockX for adjudication if the customer suspects the shoe is inauthentic. Opp. DX 38, NIKE0039100 ("If you feel the product is fake, I highly suggest to contact StockX to check on it or proceed with their return option. . . . I highly suggest to contact StockX or proceed with their return option."); Opp. DX 83, NIKE0040126 ("I would highly suggest to work with StockX for returning this product.").

**Nike, Inc's Response: Disputed.**

Nike disputes StockX's characterization of customer communications wherein a Nike customer service employee instructed a customer to seek a return from StockX as evidence that Nike representatives in any way endorsed or acknowledged StockX's ability to authenticate product or as evidence that Nike representatives were aware of the existence of a StockX return policy. It is not. Customer services employees instructed customers to attempt to return footwear to the website where they purchased from, in this case StockX, as Nike is unable to assist with a return not purchased through Nike or an authorized Nike retailer. *See, e.g.*, Ex. 142 at Row 27 ("As I have checked, StockX is no authorize retailer therefore we highly recommend to you contact directly StockX to return it directly. I understand, ███████ however StockX is not authorize

retailer of Nike. Therefore we are unable to process your complaint request. There is no specific way to tell you if the product is authentic or not item purchased in StockX. Please be advised that products purchased from a non-authorize retailer or auction sites are at your own risk. Even if you have a Proof of purchase, StockX is not authorize retailer of Nike that is why we are unable to process your complaint."); *id.* at Row 28 ("Ok so If you purchase the shoes from StockX they should be the ones who will be the ones to help you with that issue"); Dkt. 261-149, Ex. 140 at Row 64 ("Since it was purchased in StockX, please contact them directly so that they can check on their return policy applicable for you and for swift resolution.").

351. On April 26, 2022, a Nike representative wrote to a consumer: "If you feel the product is fake, I highly suggest to contact StockX to check on it or proceed with their return option. . . . I highly suggest to contact StockX or proceed with their return option." Opp. DX 38, NIKE0039100.

**Nike, Inc's Response: Disputed.**

Nike disputes StockX's characterization of customer communications wherein a Nike customer service employee instructed a customer to seek a return from StockX as evidence that Nike representatives in any way endorsed or acknowledged StockX's ability to authenticate product or as evidence that Nike representatives were aware of the existence of a StockX return policy. It is not. Customer services representatives instructed customers to return footwear to the website where they purchased from, in this case StockX, as Nike is unable to assist with a return not purchased through Nike or an authorized Nike retailer. *See, e.g.*, Ex. 142 at Row 27 ("As I have checked, StockX is no authorize retailer therefore we highly recommend to you contact directly StockX to return it directly. I understand, ███████ however StockX is not authorize retailer of Nike. Therefore we are unable to process your complaint request. There is no specific

way to tell you if the product is authentic or not item purchased in StockX. Please be advised that products purchased from a non-authorize retailer or auction sites are at your own risk. Even if you have a Proof of purchase, StockX is not authorize retailer of Nike that is why we are unable to process your complaint.").

352.    On April 26, 2022, a Nike representative wrote to a consumer: "I would highly suggest to work with StockX for returning this product."  Opp. DX 83, NIKE0040126.

**Nike, Inc's Response: Disputed.**

Nike disputes StockX's characterization of customer communications wherein a Nike customer service employee instructed a customer to seek a return from StockX as evidence that Nike representatives in any way endorsed or acknowledged StockX's return policy or as evidence that Nike representatives were aware of the existence of a StockX return policy.  It is not. Customer services employees instructed customers to return footwear to the website where they purchased from, in this case StockX, as Nike is unable to assist with a return not purchased through Nike or an authorized Nike retailer. *See, e.g.*, Ex. 142 at Row 27 ("As I have checked, StockX is no authorize retailer therefore we highly recommend to you contact directly StockX to return it directly. I understand, ███████ however StockX is not authorize retailer of Nike. Therefore we are unable to process your complaint request. There is no specific way to tell you if the product is authentic or not item purchased in StockX. Please be advised that products purchased from a non-authorize retailer or auction sites are at your own risk. Even if you have a Proof of purchase, StockX is not authorize retailer of Nike that is why we are unable to process your complaint.").

353.    Nike representatives have stated to StockX customers that Nike cannot tell if Nike-branded products sold on StockX are authentic or not.  Opp. DX 38, NIKE0039100; Opp. DX 39, NIKE0039094.

**Nike, Inc's Response: Disputed. This statement is not material.**

Nike disputes StockX's characterization of customer communications wherein Nike customer service employees informed customers that Nike does not offer authentication services or confirm the authenticity of products not purchased from non-authorized Nike resellers via Nike's customer service channel. *See, e.g.*, Ex. 142 at Row 38 ("As I have checked, StockX is no authorize retailer therefore we highly recommend to you contact directly StockX to return it directly. I understand, ▮▮▮▮ however StockX is not authorize retailer of Nike. Therefore we are unable to process your complaint request. There is no specific way to tell you if the product is authentic or not item purchased in StockX. Please be advised that products purchased from a non-authorize retailer or auction sites are at your own risk. Even if you have a Proof of purchase, StockX is not authorize retailer of Nike that is why we are unable to process your complaint. The best thing that we can do is to contact directly StockX to complaint directly"). Nike disputes StockX's implication that Nike is not able to ascertain the authenticity of products purchased on StockX as Nike is able to identify with 100 percent certainty whether "Nike" products sold on StockX are counterfeit. Sept. Duvdevani Decl. ¶ 8, Ex. 155, Pallet Tr. 230:5-9. As Mr. Pallett testified, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*, Pallett Tr. 124:5-13, 198:20-200:13, 275:20-276:3. Unlike Nike Brand Protection, which is the only Nike team authorized ▮▮▮▮▮▮▮▮ determine whether shoes are counterfeit, Nike's customer service employees do not ▮▮▮▮▮▮▮

354.    On April 26, 2022, a Nike representative wrote to a consumer: "We can not tell if a product is counterfeit do we have a service to confirm authenticity StockX is also not included to our authorized retailer. . . . We can not tell if a product is counterfeit specially if it was purchase

from other store which is not listed to our authorized retailer.  There is a chance the the shoe is fake due to the difference on the letters however we are unable to 100% guarantee." Opp. DX 38, NIKE0039100.

**Nike, Inc's Response: Disputed. This statement is not material.**

Nike disputes StockX's characterization of customer communications wherein a Nike customer service employee informed customer that Nike does not offer authentication services or confirm the authenticity of products not purchased from non-authorized Nike resellers via Nike's customer service channel.  *See* Ex. 142 at Row 24 ("We can not tell if a product is counterfeit do we have a service to confirm authenticity StockX is also not included to our authorized retailer. If you feel the product is fake, I highly suggest to contact StockX to check on it or proceed with their return option. I hear you. We can not tell if a product is counterfeit specially if it was purchase from other store which is not listed to our authorized retailer. There is a chance the the shoe is fake due to the difference on the letters however we are unable to 100% guarantee. I highly suggest to contact StockX or proceed with their return option.").  Nike disputes StockX's implication that Nike is not able to ascertain the authenticity of products purchased on StockX as Nike is able to identify with 100 percent certainty whether "Nike" products sold on StockX are counterfeit. Sept. Duvdevani Decl. ¶ 8, Ex. 155, Pallet Tr. 230:5-9.  As Mr. Pallett testified, ██████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ *Id.*, Pallett Tr. 124:5-13, 198:20-200:13, 275:20-276:3.  Unlike Nike Brand Protection, which is the only Nike team authorized ████████████ determine whether shoes are counterfeit, Nike's customer service employees do not ████████████.

319

355.    On March 3, 2022, a Nike representative wrote to a consumer: "There is no specific way to tell you if the product is authentic or not item purchased in StockX."  Opp. DX 38, NIKE0039100.

**Nike, Inc's Response: Disputed. This statement is not material.**

Nike disputes StockX's characterization of customer communications wherein a Nike customer service employee informed customer that Nike does not offer authentication services or confirm the authenticity of products not purchased from non-authorized Nike resellers via Nike's customer service channel.  *See* Ex. 142 at Row 37 ("As I have checked, StockX is no authorize retailer therefore we highly recommend to you contact directly StockX to return it directly. I understand, ████████ however StockX is not authorize retailer of Nike. Therefore we are unable to process your complaint request. There is no specific way to tell you if the product is authentic or not item purchased in StockX. Please be advised that products purchased from a non-authorize retailer or auction sites are at your own risk. Even if you have a Proof of purchase, StockX is not authorize retailer of Nike that is why we are unable to process your complaint. The best thing that we can do is to contact directly StockX to complaint directly.").  Nike disputes StockX's implication that Nike is not able to ascertain the authenticity of products purchased on StockX as Nike is able to identify with 100 percent certainty whether "Nike" products sold on StockX are counterfeit. Sept. Duvdevani Decl. ¶ 8, Ex. 155, Pallet Tr. 230:5-9.  As Mr. Pallett testified, ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████  *Id.*, Pallett Tr. 124:5-13, 198:20-200:13, 275:20-276:3.  Unlike Nike Brand Protection, which is the only Nike team authorized ██████████ and determine whether shoes are counterfeit, Nike's customer service employees do not ██████████████

356.    On April 13, 2022, a Nike representative wrote to a consumer: "The item bought from StockX, we can not confirm if it is a genuine Nike product."  Opp. DX 39, NIKE0039094.

**Nike, Inc's Response: Disputed. This statement is not material.**

Nike disputes StockX's characterization of a snippet of a customer communication wherein a customer service employee informed customer that Nike does not offer authentication services or confirm the authenticity of products not purchased from non-authorized Nike resellers via Nike's customer service channel.  Nike disputes StockX's implication that Nike is not able to ascertain the authenticity of products purchased on StockX as Nike is able to identify with 100 percent certainty whether "Nike" products sold on StockX are counterfeit. Sept. Duvdevani Decl. ¶ 8, Ex. 155, Pallet Tr. 230:5-9.  As Mr. Pallett testified, ████████████████████████ ███████████████████████████████████████████████████████████████████████ ████████████████████████████ *Id.,* Pallett Tr. 124:5-13, 198:20- 200:13, 275:20-276:3.  Unlike Nike Brand Protection, which is the only Nike team authorized to ███████ and determine whether shoes are counterfeit, Nike's customer service employees do not ████████████████████

357.    Nike does not give consumers a way to authenticate products in the resale market. Opp. DX 7, Delli Carpini Tr. 167:20–168:24; Opp. DX 38, NIKE0039100 (Nike representative stating: "We can not tell if a product is counterfeit specially if it was purchase from other store which is not listed to our authorized retailer"); Opp. DX 38, NIKE0039100 (Nike representative stating, "There is no specific way to tell you if the product is authentic or not item purchased in StockX"); Opp. DX 39, NIKE0039094 (Nike representative stating "The item bought from StockX, we can not confirm if it is a genuine Nike product.").

**Nike, Inc's Response: Undisputed.**

**XXIII. StockX accepted returns from and issued refunds to all third-party customers who requested returns and are alleged to have received counterfeit shoes in this action.**

C.  *Michael Malekzadeh's Purchases*

358.    Michael Malekzadeh founded the resale business Zadeh Kicks in 2013.  Opp. DX 60, Matt Halfhill, "The Rise and Multi-Million Dollar Fall of Zadeh Kicks," Nice Kicks, April 12, 2024,    https://www.nicekicks.com/the-rise-fall-and-implosion-of-zadeh-kicks-and-why-it-matters-beyond-the-sneaker-world/.

**Nike, Inc's Response: Undisputed.**

359.    "Zadeh Kicks sold highly sought-after, limited-edition sneakers from the likes of Jordan, Nike, and Yeezy, but had no direct relationship with these brands—or any others.  To obtain the shoes—as described on zadehkicks.com before the site was taken offline—Zadeh Kicks would purchase the products from independent retailers and suppliers."  Opp. DX 60, Matt Halfhill, "The Rise and Multi-Million Dollar Fall of Zadeh Kicks," Nice Kicks, April 12, 2024, https://www.nicekicks.com/the-rise-fall-and-implosion-of-zadeh-kicks-and-why-it-matters-beyond-the-sneaker-world/.

**Nike, Inc's Response: Undisputed.**

360.    Zadeh Kicks grew rapidly, "climbing to $2M in sales by 2015, $6M in monthly sales in 2017, and eventually ranking in the top 1% of all Shopify Merchants by 2020.  In 2021, they recorded over 84,500 sales with estimates of pre-orders to be worth more than $100,000,000."  Opp. DX 60, Matt Halfhill, "The Rise and Multi-Million Dollar Fall of Zadeh Kicks," Nice Kicks, April 12, 2024, https://www.nicekicks.com/the-rise-fall-and-implosion-of-zadeh-kicks-and-why-it-matters-beyond-the-sneaker-world/.

**Nike, Inc's Response: Undisputed.**

361.    On July 29, 2022, Mr. Malekzadeh was "indicted for wire fraud, conspiracy to commit bank fraud, and money laundering" in connection with his operation of Zadeh Kicks.  Opp. DX 60, Matt Halfhill, "The Rise and Multi-Million Dollar Fall of Zadeh Kicks," Nice Kicks, April 12, 2024, https://www.nicekicks.com/the-rise-fall-and-implosion-of-zadeh-kicks-and-why-it-matters-beyond-the-sneaker-world/.

**Nike, Inc's Response: Undisputed.**

362.    In May 2022, Mr. Malekzadeh filed a petition to dissolve Zadeh Kicks, which has been in receivership since that time.  Opp. DX 59, Malekzadeh Tr. 111:2–10, 177:22–178:3; Opp. DX 60, Matt Halfhill, "The Rise and Multi-Million Dollar Fall of Zadeh Kicks," Nice Kicks, April 12, 2024, https://www.nicekicks.com/the-rise-fall-and-implosion-of-zadeh-kicks-and-why-it-matters-beyond-the-sneaker-world/.

**Nike, Inc's Response: Undisputed.**

363.    Mr. Malekzadeh did not maintain records documenting the chain of custody of his inventory or keep track of how sneakers were procured.  Opp. DX 61, Receiver's Initial Inventory and Report, 22 CV 16510, at p. 5 (Oreg. Cir. Ct. July 13, 2022) ("Zadeh Kicks did not have a comprehensive inventory system housing the inventory, nor did it have sophisticated procurement, order processing, fulfillment or shipping procedures.").

**Nike, Inc's Response: Disputed. This statement is not material.**

Nike disputes that Mr. Malekzadeh maintained no records documenting the chain of custody of his inventory.  Mr. Malekzadeh routinely set aside pairs he suspected were counterfeit, storing them with the StockX tag and receipt in the box as they had been received. *See* Sept. Duvdevani Decl. ¶ 29, Ex. 176 (ZK_NIKE_008156); *id.* ¶ 34, Ex. 181 (ZK_NIKE_008157); *see also id.* ¶ 35, Ex. 182, Rizza Tr. 183:2-184:3 (Ms. Rizza testifying that ███████████████

████████████████████████████████████████

████████████████████████████    Further, Nike disputes that this statement has any

bearing on this case, as StockX has admitted that the alleged counterfeits originated with StockX.

*See generally* Dkt. 260-1, App'x A.

364.    Nike's witnesses (and StockX's) testified that StockX's tags are counterfeited and

put on shoes not sold on StockX.  Opp. DX 9, Pallett Tr. 181:15–182:11; Opp. DX 47, Huber June

Tr. 19:7–12.

**<u>Nike, Inc's Response: Disputed. This statement is not material.</u>**

Nike does not dispute that StockX tags may be counterfeited but, as StockX has admitted

that the alleged counterfeits originated with StockX, this statement has no bearing on the case. *See*

*generally* Dkt. 260-1, App'x A; Fed. R. Evid. 401, 403.

365.    StockX employees had raised significant concerns about Mr. Malekzadeh's returns,

observing that he may have been trying to return to StockX shoes that had not been purchased on

StockX.  Opp. DX 55, Amidon Tr. 108:2–9 ("I believe this was around the time where we learned

that his business was in receivership where it seemed like his business was no longer operating.

And we saw a lot of inbound packages from his accounts and they were sent back.  And it appears

we did not know specifically why.  And it was not clear if they were from us or not because there

were a lot of items that did not have tags or invoices.").

**<u>Nike, Inc's Response: Disputed. This statement is not material.</u>**

Nike does not dispute the existence of internal StockX emails regarding the large number

of returns but disputes that this has any bearing on this case, as StockX has admitted that the alleged

counterfeits originated with StockX. *See generally* Dkt. 260-1, App'x A; Fed. R. Evid. 401, 403.

366.    Nike has provided no evidence that Mr. Malekzadeh expressed any concerns regarding most shoes alleged to be counterfeit in this action.

**Nike, Inc's Response: Disputed. This statement is not material.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded. *Perez*, 2013 WL 2641432 at *7-8.

367.    The Receiver Report describing Zadeh Kicks' warehouse stated: "I have a high degree of confidence in the authenticity of the sneaker inventory based on multiple inspections of the inventory by experts and law enforcement agencies."). Opp. DX 77, Decl. of David P. Stapleton in Support of Receiver's Motion for Order Approving Liquidation Plans, 22 CV 16510, ¶¶ 3, 10 (Oreg. Cir. Ct. Nov. 4, 2022)

**Nike, Inc's Response: Undisputed. This statement is not material.**

368.    Mr. Malekzadeh invoked his Fifth Amendment rights when asked about the sneakers at issue, and when asked about StockX tags and receipts. Opp. DX 59, Malekzadeh Tr. 47:17–24 (StockX tags); 55:5–15, 61:23–62:19, 75:23–76:6 (sneakers at issue); 77:15–78:3, 81:11–17, 106:12–22, 109:15–18, 113:4–8 (StockX receipts).

**Nike, Inc's Response: Disputed. This statement is not material.**

Nike objects to this statement to the extent it implies that Mr. Malekzadeh was being untruthful, dishonest, or as an admission of guilt. Fed. R. Evid. 404.

369.    Where Michael Malekzadeh expressed concerns regarding the authenticity of any shoe alleged to be counterfeit in this action, StockX accepted a return. Opp. DX 78, ZK_NIKE_004353; Pallett Decl. Ex. 12, ZK_NIKE_007865; Opp. DX 79, ZK_NIKE_004711.

**Nike, Inc's Response: Disputed.**

Although StockX eventually accepted Mr. Malekzadeh's returns, StockX first disputed there was any issue and pushed back against Mr. Malekzadeh's concerns. Only after prodding by Mr. Malekzadeh, did StockX agree to send a return label. ██████████████

████████████████████████████████████████████████████

Mr. Malekzadeh received special treatment when it came to returns as compared to StockX's normal return procedures. *See* Sept. Duvdevani Decl. ¶ 14, Ex. 161, Lopez Tr. 270:3-23 (testifying that Mr. Malekzadeh was the only StockX consumer he directly communicated with about suspected fakes and that it was not surprising "because of the volume that Mr. Malekzadeh purchased from [StockX].")

370. For the shoe alleged to be counterfeit in footnote 96 of Kari Kammel's expert rebuttal report, Michael Malekzadeh raised a question as to the authenticity of the shoe to StockX due to purported physical flaws in the shoe and shoebox. Opp. DX 78, ZK_NIKE_004353.

**Nike, Inc's Response: Disputed.**

Nike disputes StockX's characterization of Mr. Malekzadeh email which speaks for itself and states in its entirety: ██████████████████████

████████████████████████████████████████████████████

Dkt. 271-78. On May 31, 2023, Mr. Pallett reviewed the images produced by Mr. Malekzadeh and determined, ████  ████  ████  ████ that the shoes depicted in the images on ZK_NIKE_004308 and ZK_NIKE_004312 and referenced in footnote 96 of Kari Kammel's expert rebuttal report are counterfeit. Pallett Decl. ¶ 14-15, Ex. 11.

371. StockX reviewed the issue and determined that the shoes were genuine. Opp. DX 78, ZK_NIKE_004353.

**Nike, Inc's Response: Disputed.**

Nike disputes StockX's characterization of the shoes as "genuine" as StockX has admitted that it cannot make such a determination. Dkt. 261-46, Ex. 46, June Huber Tr. 10:6-16 (testifying that StockX does not determine "whether something is considered counterfeit or not."); Dkt. 261-48, Ex. 48, Lopez Tr. 178:18-179:1 (███████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████  Nike does not dispute that StockX responded to Mr. Malekzadeh's concerns stating: "█████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████  Dkt. 271-78. On May 31, 2023, Mr. Pallett reviewed the images produced by Mr. Malekzadeh and determined, ████████████████, that the shoes depicted in the images on ZK_NIKE_004308 and ZK_NIKE_004312 and referenced in footnote 96 of Kari Kammel's expert rebuttal report are counterfeit. Pallett Decl. ¶ 14-15, Ex. 11.

372.    StockX nonetheless offered a return for this shoe. Opp. DX 78, ZK_NIKE_004353.

**Nike, Inc's Response: Disputed.**

Nike disputes StockX's characterization of this return and disputes the implication that this return is representative of the average StockX experience. Although StockX eventually offered Mr. Malekzadeh a return, StockX first disputed there was any issue and pushed back against Mr. Malekzadeh's concerns. Dkt. 271-78. Further, StockX has not provided any evidence supporting whether or not this order was actually returned. ███████████████████████████

██████████████████████████████████████████████████████  Mr. Malekzadeh received special treatment when it came to returns as compared to StockX's normal return procedures. *See* Sept. Duvdevani Decl. ¶ 14, Ex. 161, Lopez Tr. 270:3-23 (testifying that Mr. Malekzadeh was the only StockX consumer he directly communicated with about suspected fakes

and that it was not surprising "because of the volume that Mr. Malekzadeh purchased from [StockX].") On May 31, 2023, Mr. Pallett reviewed the images produced by Mr. Malekzadeh and determined, ███████████████, that the shoes depicted in the images on ZK_NIKE_004308 and ZK_NIKE_004312 and referenced in footnote 96 of Kari Kammel's expert rebuttal report are counterfeit.  Pallett Decl. ¶ 14-15, Ex. 11.

373.    For the shoe alleged to be counterfeit in footnote 97 of Kari Kammel's expert rebuttal report, Michael Malekzadeh raised a question as to the authenticity of the shoe to StockX due to purported physical flaws in the shoe.  Pallett Decl. Ex. 12, ZK_NIKE_007865.

**Nike, Inc's Response: Disputed.**

Nike disputes StockX's characterization of Mr. Malekzadeh email which speaks for itself and states in its entirety: ███████ ██████ ██████ ██████ ███ ███ Dkt. 262-12 at ZK_NIKE_007875. On May 31, 2023, Mr. Pallett reviewed the images produced by Mr. Malekzadeh as ZK_NIKE_007854 and ZK_NIKE_007856, and determined, ███████, that the shoes depicted in the images and referenced in footnote 97 of Kari Kammel's expert rebuttal report are counterfeit. Pallett Decl. ¶¶ 14-15, Ex. 12.

374.    StockX reviewed the issue and determined that the shoes were genuine.  Pallett Decl. Ex. 12, ZK_NIKE_007865.

**Nike, Inc's Response: Disputed.**

Nike disputes StockX's characterization of the shoes as "genuine" as StockX has admitted that it cannot make such a determination. Dkt. 261-46, Ex. 46, June Huber Tr. 10:6-16 (testifying that StockX does not determine "whether something is considered counterfeit or not."); Dkt. 261-48, Ex. 48, Lopez Tr. 178:18-179:1 ████████████████████████████████████

████████████████████████████████████████████

███████████    Nike does not dispute that StockX responded to Mr. Malekzadeh's concerns stating: ██████████████████████████" Dkt. 271-78. On May 31, 2023, Mr. Pallett reviewed the images produced by Mr. Malekzadeh as ZK_NIKE_007854 and ZK_NIKE_007856, and determined, █████████████, that the shoes depicted in the images and referenced in footnote 97 of Kari Kammel's expert rebuttal report are counterfeit. Pallett Decl. ¶¶ 14-15, Ex. 12.

375.    StockX nonetheless offered a return to Malekzadeh for this shoe. Pallett Decl. Ex. 12, ZK_NIKE_007865.

**Nike, Inc's Response: Disputed.**

Nike disputes StockX's characterization of this return and disputes that it is representative of the average StockX experience. Although StockX eventually offered Mr. Malekzadeh a return, StockX first disputed there was any issue and pushed back against Mr. Malekzadeh's concerns. Dkt. 262-12. Further, StockX has not provided any evidence supporting whether or not this order was actually returned. ███████████████████████████████████████████ ████████████████████████████ Mr. Malekzadeh received special treatment when it came to returns as compared to StockX's normal return procedures. *See* Sept. Duvdevani Decl. ¶ 14, Ex. 161, Lopez Tr. 270:3-23 (testifying that Mr. Malekzadeh was the only StockX consumer he directly communicated with about suspected fakes and that it was not surprising "because of the volume that Mr. Malekzadeh purchased from [StockX].") On May 31, 2023, Mr. Pallett reviewed the images produced by Mr. Malekzadeh as ZK_NIKE_007854 and ZK_NIKE_007856, and determined, ██████████ that the shoes depicted in the images and referenced in footnote 97 of Kari Kammel's expert rebuttal report are counterfeit. Pallett Decl. ¶¶ 14-15, Ex. 12.

376.    For the shoe alleged to be counterfeit in footnote 98 of Kari Kammel's expert rebuttal report, Michael Malekzadeh raised a question as to the authenticity of the shoe to StockX due to physical flaws in the shoe.  Opp. DX 79, ZK_NIKE_004711.

**Nike, Inc's Response: Disputed.**

Nike disputes StockX's characterization of Mr. Malekzadeh email which speaks for itself and states in its entirety: ███████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████ Dkt. 271-79. On May 31, 2023, Mr. Pallett reviewed the images produced by Mr. Malekzadeh as ZK_NIKE_004665 and determined, ███████████, that the shoes depicted in the images and referenced in footnote 98 of Kari Kammel's expert rebuttal report are counterfeit. Pallett Decl. ¶¶ 14-15, Ex. 13.

377.    StockX reviewed the issue and determined that the shoes were genuine.  Opp. DX 79, ZK_NIKE_004711.

**Nike, Inc's Response: Disputed.**

Nike disputes StockX's characterization of the shoes as "genuine" as StockX has admitted that it cannot make such a determination.  Dkt. 261-46, Ex. 46, June Huber Tr. 10:6-16 (testifying that StockX does not determine "whether something is considered counterfeit or not."); Dkt. 261-48, Ex. 48, Lopez Tr. 178:18-179:1 █████████████████████████

████████████████████████████████████████████████

████████████████ Nike does not dispute that StockX responded to Mr. Malekzadeh's concerns stating: ████████████████████████████████████████

███████████████████████████████████████████████ Dkt. 271-79.

On May 31, 2023, Mr. Pallett reviewed the images produced by Mr. Malekzadeh as ZK_NIKE_004665 and determined, ███████, that the shoes depicted in the images and referenced in footnote 98 of Kari Kammel's expert rebuttal report are counterfeit. Pallett Decl. ¶¶ 14-15, Ex. 13.

378.    StockX nonetheless offered a return to Malekzadeh for this shoe.  Opp. DX 79, ZK_NIKE_004711.

**Nike, Inc's Response: Disputed.**

Nike disputes StockX's characterization of this return and disputes that it is representative of the average StockX experience. Although StockX eventually offered Mr. Malekzadeh a return, StockX first disputed there was any issue and pushed back against Mr. Malekzadeh's concerns. Dkt. 271-79.  Further, StockX has not provided any evidence supporting whether or not this order was actually returned. ████████████████████████████████████ ████████████████████████████, Mr. Malekzadeh received special treatment when it came to returns as compared to StockX's normal return procedures.  *See* Sept. Duvdevani Decl. ¶ 14, Ex. 161, Lopez Tr. 270:3-23 (testifying that Mr. Malekzadeh was the only StockX consumer he directly communicated with about suspected fakes and that it was not surprising "because of the volume that Mr. Malekzadeh purchased from [StockX].")  On May 31, 2023, Mr. Pallett reviewed the images produced by Mr. Malekzadeh as ZK_NIKE_004665 and determined, ████ ████, that the shoes depicted in the images and referenced in footnote 98 of Kari Kammel's expert rebuttal report are counterfeit. Pallett Decl. ¶¶ 14-15, Ex. 13.

**D.**    *Roy Kim's Purchases*

379.    Roy Kim is a StockX customer who has purchased thousands of products on StockX's marketplace.  Opp. DX 73, Kim Tr. 102:4–12; Opp. DX 74, STX0806024 (spreadsheet showing Mr. Kim's StockX order history of ████ orders).

**Nike, Inc's Response: Undisputed.**

380.    On July 5, 2022, Roy Kim publicly posted on Instagram that he had purchased allegedly counterfeit Nike shoes on StockX's platform.  Opp. DX 75, NIKE0036330 at 333.

**Nike, Inc's Response: Undisputed.**

381.    On July 7, 2022, Russ Amidon (StockX) reached out to Roy and offered him the opportunity to return his shoes to StockX.  Opp. DX 76, STX0772968 at 971.

**Nike, Inc's Response: Undisputed.**

382.    On July 27, 2022, Roy Kim returned 33 pairs of sneakers to StockX.  Opp. DX 76, STX0772968; Opp. DX 74, STX0806024 (spreadsheet showing Mr. Kim's returns to StockX).

**Nike, Inc's Response: Undisputed.**

383.    StockX's authenticators reviewed the returned shoes and determined they did not meet StockX's standards and should not have passed authentication.  Opp. DX 47, Huber June Tr. 9:14–10:4.

**Nike, Inc's Response: Undisputed.**

384.    StockX refunded Roy Kim in full for the shoes he returned to StockX.  Opp. DX 76, STX0772968.

**Nike, Inc's Response: Undisputed. This statement is not material.**

385.    Roy Kim testified that "[p]rior to becoming a power buyer," he did not recall "ever hav[ing] any issues with any product" that he received from StockX.  Opp. DX 73, Kim Tr. 27:20–23.

**Nike, Inc's Response: Undisputed. This statement is not material.**

386. Roy Kim testified that "[a]fter becoming a power buyer," other than the shoes he purchased from StockX that are at issue in this case, he did not "have issues with any other products [he] received from StockX." Opp. DX 73, Kim Tr. 27:20–30:22.

**Nike, Inc's Response: Undisputed. This statement is not material.**

**XXIV. Three of Nike's test purchases were made and inspected outside of the United States.**

387. Pair No. 1, associated with Order Number 32950992-32850751, was purchased in euros. ECF No. 260-1, Appendix A, Pair No. 1; Opp. DX 80, NIKE0025897.

**Nike, Inc's Response: Disputed.**

Pair No. 1 was shipped by StockX to the purchaser with a receipt showing a purchase price in dollars, not euros. Dkt. 262-1. Further, Pair No. 1 was purchased from StockX's U.S. website. Sept. Duvdevani Decl. ¶ 38, Ex. 185 (NIKE0025901) (showing purchase from StockX.com).

388. Pair No. 2, associated with Order Number 32985400-32885159, was purchased in euros. ECF No. 260-1, Appendix A, Pair No. 2; Opp. DX 81, NIKE0040533.

**Nike, Inc's Response: Disputed.**

Pair No. 2 was shipped by StockX to the purchaser with a receipt showing a purchase price in dollars, not euros. Dkt. 262-3. Further, Pair No. 2 was purchased from StockX's U.S. website. Sept. Duvdevani Decl. ¶ 39, Ex. 186 (NIKE0025910) (showing purchase from StockX.com)..

389. Pair No. 3, associated with Order Number 32986461-32886220, was purchased in euros. ECF No. 260-1, Appendix A, Pair No. 3; Opp. DX 82, NIKE0040571.

**Nike, Inc's Response: Disputed.**

Pair No. 3 was shipped by StockX to the purchaser with a receipt showing a purchase price in dollars, not euros. Dkt. 262-5. Further, Pair No. 3 was purchased from StockX's U.S. website. Sept. Duvdevani Decl. 40, Ex. 187 (NIKE0025913) (showing purchase from StockX.com).

390.    Pair Nos. 1, 2, and 3 were shipped to a purchaser in the Netherlands, where Nike held and inspected them.  ECF No. 260-1, Appendix A, Pair Nos. 1, 2, 3; Opp. DX 9, Pallett Tr. 24:19-25:23 (the test purchases "were being held in the Netherlands" and inspected by a Nike employee based "in the Netherlands"); 269:11–24 (the "products were purchased for delivery in Europe" and "delivered to the Netherlands").

**Nike, Inc's Response: Disputed.**

It is undisputed that Pair Nos. 1, 2, and 3 were shipped to a purchaser in the Netherlands but Nike disputes where the orders were shipped from. StockX, the sole party in possession of such information and has not proffered evidence to establish where the Pairs were shipped from or to establish that they were not shipped from the U.S.

**DEFENDANT STOCKX LLC'S RULE 56.1 STATEMENT OF MATERIAL FACTS, PLAINTIFF NIKE, INC.'S RESPONSES AND COUNTERSTATEMENT, AND STOCKX'S RESPONSES TO NIKE'S COUNTERSTATEMENT[3]**

**A.    STOCKX'S RULE 56.1 STATEMENT OF MATERIAL FACTS AND NIKE'S RESPONSES.**

**XXV.  The History of the Resale Market for Sneakers.**

      **A.    The Impact of Limited Releases by Manufacturers on the Resale Market**

    391.    Nike is the world's largest sneaker brand.  Ex. 1, Expert Report of DeJong Wells (May 5, 2023) ("Wells Rep.") ¶ 6; Ex. 2 Dep. Tr. of Heather Paulson ("Ex. 2, Paulson Tr.") 130:25–131:12 (stating that Nike is the largest apparel and sneaker brand); Ex. 3, Dep. Tr. of Mike Child ("Child Tr.") 44:21-25 (Nike has "dominated" the sale of physical sneakers); Ex. 4, Bloomberg, "Phil Knight & family," https://www.bloomberg.com/billionaires/profiles/philip-h-knight ("Knight is the founder and largest shareholder of Nike, the world's biggest maker of athletic shoes and sports apparel.  The Beaverton, Oregon-based company operates more than 1,000 stores and had revenue of $51.2 billion in the year to May 2023."); Ex. 5, Andy Polk, FDRA, "Athletic Footwear Market Dominated by Asia-Pacific With 42% Share," https://fdra.org/latest-news/athletic-footwear-market-dominated-by-asia-pacific-with-42-share ("Nike is by far the world's largest athletic shoe manufacture [sic], with an estimated market share of about 50%.").

*Nike, Inc.'s Response:* **Disputed.**

    Nike does not dispute that it is the world's largest athletic footwear brand, but Nike clarifies that its business activities also include athletic apparel, equipment, accessories, and services.  Dkt. 261-1, Ex. 1 at p. 1. (Nike, Inc., Form 10-K for the fiscal year ended May 31, 2023).

---

[3]  StockX's responses to Nike's Local Civil Rule 56.1 Counterstatement begin on page 519 of this document.

392.    Nike releases sneakers in limited quantities, as limited releases.  Ex. 1, Wells Rep.

¶ 72; Ex. 11, Dep. Tr. of Ron Faris ("Faris Tr.") 179:5–180:7 (explaining that 

); Ex. 2, Paulson Tr. 208:13–209:9 (explaining that

*Nike, Inc.'s Response:* **Disputed. This statement is not material.**

Nike does not dispute that it releases certain styles of footwear in limited quantities, but

Nike disputes that Nike only sells limited quantities as limited releases.  Nike sells footwear in a

variety of quantities based on a number of factors and many of Nike's best-selling silhouettes and

styles are frequently available for purchase through Nike or its authorized retailers, for example,

the Nike Air Force 1 '07 Style: CW2288-111.  Dkt. 261-1, Ex. A to the Declaration of Dr. Stec

("Stec Rep.") at 10-12; September 5, 2024 Declaration of Tamar Y. Duvdevani ("Sept. Duvdevani

Decl.") ¶ 2, Ex. 1, Faris Tr. 179:5-181:10; Dkt. 257-2, Ex. 2 Paulson Tr. 208:3-209:9; Dkt. 257-1,

Ex. 1 ("Wells Rep.") ¶ 72.

393.    Nike's limited release sneakers are typically available for only a limited time and

in limited quantity.  Ex. 1, Wells Rep. ¶¶ 69–70, 72, 75; Ex. 6, Bria Sanford, The Famuan, "It's

All  About  the  Shoes  as  Nike  Releases  Draw  Crowds,"  March  30,  2018,

https://www.thefamuanonline.com/2018/03/30/its-all-about-the-shoes-as-nike-releases-draw-

crowds/; Ex. 7, Queue-it, "What are Sneaker Raffles, How do They Work & Why do Retailers Use

Them," February 23, 2023, https://queue-it.com/blog/sneaker-raffles/.

*Nike, Inc.'s Response*: **Disputed. This statement is not material.**

Nike does not dispute that it releases certain styles of footwear in limited quantities that often sell out quickly, but Nike disputes that it only makes limited-release sneakers available for a limited time.  *See* Sept. Duvdevani Decl. ¶ 3, Ex. 2 (https://www.nike.com/help/a/launch-tips).

394.    Nike uses limited release sneakers to drive scarcity and therefore demand.  Ex. 1, Wells Rep. ¶ 75; Ex. 2, Paulson Tr. 208:13–209:9 (Nike "███████████████████████ ██████").

**Nike, Inc.'s Response: Disputed. This statement is not material.**

Nike does not dispute that sells footwear in a variety of quantities based on a number of factors, including ███████████, but Nike disputes that ████████████████ are the only considerations when determining quantity of a given footwear release.  Stec Rep. at 10-12; Sept. Duvdevani Decl. ¶ 2, Ex. 1, Faris Tr. 179:5-181:10.

395.    A March 2021 internal Nike document titled "Nike Digital Sneakers" stated that "███████████████████████."  Ex. 8, NIKE0026069 at 083.

**Nike, Inc.'s Response: Disputed. This statement is not material.**

Nike does not dispute that NIKE0026069 at 083 states "████████████████████ █████," however, Nike disputes the accuracy of such statement in isolation.  Specifically, the entire sentence in context provides that "████████████████████████████ ████████████████████████████████████████████."  Dkt. 257-8, Ex. 8, NIKE0026069 at 083.

396.    Because limited release sneakers are more likely to retain value, they also provide excellent investment opportunities for consumers to buy and hold or to immediately sell for a profit.  Ex. 1, Wells Rep. ¶¶ 69-70; Ex. 9, NIKE0027914 (Equity Research Report on "Sneakers As An Alternative Asset Class, Part III" dated May 24, 2022); Ex. 10, HuffPost Life, "Investing

In Sneakers Can Be A Better Investment Than Gold. Here's How," October 29, 2018,
https://www.huffpost.com/entry/sneakers-good-investment_n_5bd1f5ebe4b0d38b588143ee.

**Nike, Inc.'s Response:  Disputed. This statement is not material.**

Nike does not dispute that some of its sneakers increase in value over time.  However, the documents relied upon by StockX do not confirm that limited release sneakers "provide an excellent investment opportunity."  *See* Dkt. 257-9, Ex. 9 (not related to limited edition sneakers). Nike objects to this statement as inadmissible because Mr. Wells offered his personal opinion that sneakers "may provide attractive investment opportunities for purchasers," Wells Rep. ¶ 69, but his experience does not cover investment and he did not perform any survey or study of relevant purchasers in this case.  His opinion is not a scientific or reliable source of how relevant consumers may perceive limited release sneakers from StockX in violation of Federal Rule of Evidence 702. *See, e.g.*, Ex. 1; *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 638-39 (S.D.N.Y. 2016) (witness who qualified as an expert in certain areas of fashion history and intellectual property law was not qualified to opine on consumers' perceptions given that, inter alia, "he did not conduct a marketing analysis or a . . . survey.").  Nike further disputes that all consumers view sneakers as an investment opportunity.  Consumers utilize resale marketplaces for a variety of reasons including, for example, to buy products like apparel and shoes to use and wear, curate a unique style and to save money on practical items.  Dkt. 257-14, Ex. 14 NIKE0035800 at NIKE0035809.

397.    The limited nature of sneaker releases by brands has contributed to an active resale market where popular sneaker models are traded.  Ex. 1, Wells Rep. ¶ 76; Ex. 2, Paulson Tr. 208:24-209:4 (testifying that Nike ███████████████████████████████████████████
██████████████████████████████████

***Nike, Inc.'s Response:*** **Disputed.  This statement is not material.**

While the limited nature of certain footwear releases may contribute to an active resale market, Nike disputes that it is the sole or even a driving factor driving the resale marketplace. Consumers utilize resale marketplaces for a variety of reasons. Dkt. 257-14, Ex. 14 NIKE0035800 at NIKE0035809.  Additionally, the advent of online secondary and resale marketplaces itself "boosted demand and encourage more people to enter the resell market as sellers."  Sept. Duvdevani Decl. ¶ 4, Ex. 3 ([https://www.soleretriever.com/news/articles/is-sneaker-reselling-still-profitable](https://www.soleretriever.com/news/articles/is-sneaker-reselling-still-profitable).)  The footwear resale market is also driven by the rise of social media and influencer marketing and brand reputation, not scarcity alone. *Id.*

398.    Heather Paulson is Nike's Vice President of Connected Marketplace.  Ex. 2, Paulson Tr. 36:3–14.

***Nike, Inc.'s Response:*** **Disputed. This statement is not material.**

Heather Paulson was Nike's Vice President of Connected Marketplace on the date of her January 6, 2023 Videotaped Deposition, but her title is currently Vice President Business Transformation and Portfolio (September 2023-present).  Sept. Duvdevani Decl. ¶ 5, Ex. 4 (LinkedIn profile of Ms. Paulson)

399.    Ms. Paulson testified that resale marketplaces "enable[] sales of product after the first sale to . . . match supply and demand."  Ex. 2, Paulson Tr. 46:15-18.

***Nike, Inc.'s Response:*** **Disputed. This statement is not material.**

Nike disputes that Ms. Paulson testified regarding what constitutes a "resale marketplace." Rather, Ms. Paulson testified that she would define secondary marketplaces as "a marketplace that enables sales of product after first sale."  Dkt. 257-2, Ex. 2, Paulson Tr. 46:15-18.

400.    Ms. Paulson testified that ███████████████████████████

██████████████████████████████.” Ex. 2, Paulson Tr.

48:10-14.

*Nike, Inc.'s Response:* **Disputed. This statement is not material.**

Nike does not dispute that Ms. Paulson's testimony includes ████████████

██████████████████████████████████████████████

Dkt. 257-2, Ex. 2, Paulson Tr. 48:10-14.  However, Nike disputes the accuracy of the statement in

isolation as Ms. Paulson provided this testimony r in the context of her role in 2015 as the leader

of North America Analytics, when Nike ████████████████████████████

██████████████████████████████████████████████

█████████████████████████.  Dkt. 257-2, Paulson Tr. 47:8-48:25.

401.    Ms. Paulson testified that Nike ██████████████████████.  Ex.

2, Paulson Tr. 208:24-209:9.

*Nike, Inc.'s Response:* **Undisputed. This statement is not material.**

Nike does not dispute that Ms. Paulson testified that ████████████████

██████████████████.”

402.    Consumers buy Nike products from the resale market because ████████

██████████████████████ Ex. 11, Faris Tr. 178:23-179:4.

*Nike, Inc.'s Response:* **Disputed.**

Nike does not dispute that Mr. Faris testified that some consumers may buy sold out Nike

products on the secondary market, Dkt. 257-11, Ex. 11, Faris Tr. 178:23-179:4, but states that

consumers buy a variety of products from the secondary market for a variety of different reasons.

Sept. Duvdevani Decl. ¶ 6, Ex. 5, STX0091819 at 841 ████████████████████

Consumers also buy from StockX products that Nike has not yet released to the market or are simultaneously available for sale directly from Nike and Nike retailers. Stec Rep. § V.A.2.b.

### The Impact of the Internet on the Resale Market

403.    The resale market for sneakers was transformed by the Internet.  Ex. 1, Wells Rep. ¶¶ 50–56, 80; Ex. 12, Release, "The History of Sneaker Reselling and the Current State of the Game," December 2, 2020, https://releaserecovery.com/the-history-of-sneaker-reselling-and-the-current-state-of-the-game/e ("A sneaker reseller is simply a person who purchases limited edition pairs of deadstock sneakers and sells them for a profit to another consumer. [. . .]  In the early 2000's resellers began to use the internet to their advantage.  Forums such as 'Nike Talk' as well as many others became a platform for resellers and consumers alike, to buy, sell, trade, and verify authenticity of their products."); *see also* Ex. 13, NIKE0036631 at 634 (showing the increasing prominence of the secondary market alongside the increasing prominence of "digital" platforms).

*Nike, Inc.'s Response:* **Undisputed.  This statement is not material.**

404.    Online forums and resale marketplaces, like eBay, allowed consumers to conveniently buy, sell, trade, and learn about sneakers online. Ex. 1, Wells Rep. ¶¶ 79–82; Ex. 12, Release, "The History of Sneaker Reselling and the Current State of the Game," December 2, 2020,    https://releaserecovery.com/2020/12/02/the-history-of-sneaker-reselling-and-the-current-state-of-the-game ("A sneaker reseller is simply a person who purchases limited edition pairs of deadstock sneakers and sells them for a profit to another consumer. [. . .] In the early 2000's resellers began to use the internet to their advantage.  Forums such as 'Nike Talk' as well as many others became a platform for resellers and consumers alike, to buy, sell, trade, and verify authenticity of their products.").

*Nike, Inc.'s Response*: **Undisputed. This statement is not material.**

*Sneakerheads' Engagement with the Resale Market*

405.    Sneakers are embedded in fashion and popular culture, and are worn both by celebrities in various fields as well as sneaker enthusiasts, also called "Sneakerheads."  Ex. 1, Wells Rep. ¶¶ 1–3, 42–56.

*Nike, Inc.'s Response:* **Disputed. This statement is not material.**

Nike does not dispute that footwear is embedded in fashion and popular culture and that celebrities wear sneakers.  However, Nike disputes that the sole purchasers of sneakers are celebrities and sneaker "enthusiasts."  Rather, a wide variety of persons purchase sneakers. *See* Dkt. 257-11, Ex. 11, Faris Tr. 263:14-25 (describing actual consumers for high-heat Nike shoes as ▮▮▮▮▮▮▮▮▮▮ *see also* Dkt. 261-77, Ex. 71 at STX0018475. Further, Nike does not dispute that sneaker collectors, persons who collect and trade sneakers as a hobby, and persons knowledgeable about sneaker history may refer to themselves or be colloquially referred to as "sneakerheads" but disputes that all sneaker enthusiasts would be classified as "sneakerheads." *See* Sept. Duvdevani Decl. ¶ 7, Ex. 6 ([https://www.dictionary.com/browse/sneakerhead](https://www.dictionary.com/browse/sneakerhead)); *id.* ¶ 8, Ex. 7, Wells Tr. 72:33-73:14.  Mr. Wells' report bases his opinion the meaning of sneakerheads on publicly available statements from the platforms and assumes for the purpose of his analysis that the information is accurate, without any scientific approach or reliable principles to guide his analysis, making his opinion inadmissible as improper and unreliable in violation of Fed. R. Evid. 403 and 702.  Sept. Duvdevani Decl. ¶ 8, Ex. 7, Wells Tr. 121:16-122:11.

406.    "Sneakerheads" are "people who are more passionate about sneakers and sneaker culture."  Ex. 11, Faris Tr.  263:9–11; Ex. 1, Wells Rep. ¶¶ 39–41, 96 (the "sneakerhead" is a "sophisticated sneaker consumer" "with a deep passion for buying, collecting, trading, and/or learning about sneakers").

***Nike, Inc.'s Response:*** **Disputed. This statement is not material.**

Mr. Faris did not define "sneakerheads," he described a market segment as "more sneakerhead, people who are passionate about sneakers and sneaker culture." Dkt. 257-11, Ex. 11, Faris Tr. 263:5-11. Nike also does not dispute that Mr. Wells opined that a "Sneakerhead is a person who has a deep passion for buying, collecting, trading, and/or learning about sneakers." Wells Rep. ¶ 39. However, Nike disputes that this is a universally accepted definition. Mr. Wells himself testified that there is not a standard or singular definition of sneakerhead and "it's really up to the person how they want to define a sneakerhead and what is a sneakerhead or not." Sept. Duvdevani Decl. ¶ 8, Ex. 7, Wells Tr. 61:8-22. Nike does not dispute that Wells opined in his report that "sneakerheads tend to be sophisticated consumers" that "usually are deeply passionate about sneakers and carefully consider each sneaker purchase." Wells Rep. ¶ 96. StockX has cited no documentation or other evidence supporting that all sneakerheads are sophisticated sneaker consumers or otherwise qualified to opine concerning the beliefs or characteristics of "sneakerheads" as a class of purchaser. Fed. R. Evid. 702; LVL XIII Brands, Inc., 209 F. Supp. 3d at 638-39. Regardless, this statement is not material, as StockX has not offered any information indicating the number of sneakerheads that purchase from StockX. StockX has conceded that a significant number of average purchasers shop from StockX. Sept. Duvdevani Decl. ¶ 6, Ex. 5, STX0091819 at 841 (⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛). Ordinary consumers purchase products from StockX. Id. ¶ 9, Ex. 8, STX0226300 (complaint from mother who purchased purportedly genuine Nike sneakers on StockX as a "gift for [her] son" that "broke in the middle of a [track] race"). Mr. Wells' report bases his opinion on the definition of sneakerheads on publicly available statements from the platforms and assumes for the purpose of his analysis that the information is accurate,

without any scientific approach or reliable principles to guide his analysis, making his opinion inadmissible as improper and unreliable in violation of Fed. R. Evid. 403 and 702. Duvdevani Decl. ¶ 8, Ex. 7, Wells Tr. 121:16-122:11; see also LVL XIII Brands, Inc., 209 F. Supp. 3d at 638-39.

407.    Sneakerheads may purchase sneakers to collect, display, or wear them; as an investment; or to emulate or remember a person or movement. Ex. 1, Wells Rep. ¶¶ 56–70.

***Nike, Inc.'s Response:* Disputed. This statement is not material.**

Nike does not dispute that sneaker purchasers may purchase sneakers for a variety of reasons including to collect, display, or wear them. However, Nike disputes that this characterization is applicable to any and all sneakerheads as Mr. Wells himself testified that there is not a standard or singular definition of sneaker and "it's really up to the person how they want to define a sneakerhead and what is a sneakerhead or not." Sept. Duvdevani Decl. ¶ 8, Ex. 7, Wells Tr. 61:8-22. Regardless, this statement is not material, as StockX has not offered any information indicating the number of sneakerheads that purchase from StockX. StockX has conceded that a significant number of average purchasers shop on StockX. *Id.* ¶ 6, Ex. 5, STX0091819 at 841

( █████████████████████████████████████████████████████████

████████████████████████); *see also id.* ¶ 9, Ex. 8, STX0226300 (complaint from mother who purchased purportedly genuine Nike sneakers on StockX as a "gift for [her] son" that "broke in the middle of a [track] race"). Mr. Wells' report bases his opinion on the purchasing goals of "sneakerheads" is based on publicly available statements from the platforms and assumes for the purpose of his analysis that the information is accurate, without any scientific approach or reliable principles to guide his analysis, making his opinion inadmissible as improper and unreliable in

violation of Fed. R. Evid. 403 and 702.  Sept. Duvdevani Decl. ¶ 8, Ex. 7, Wells Tr. 121:16-122:11;

*LVL XIII Brands, Inc*., 209 F. Supp. 3d. at 638-39.

408.    An April 2019 internal Nike document titled "███████████████████████████

███████████ listed "Sneakerhead Steve" as a primary consumer profile in the resale market.  Ex.

14, NIKE0035800 at 808.

**Nike, Inc.'s Response: Disputed. This statement is not material.**

While it is not disputed that Nike produced a document entitled ██████████████████████

████████████████ and dated April 2019, Nike disputes StockX's characterization of the

document and clarifies that the document includes several consumer profiles of secondary market

consumers meant to illustrate typical secondary market consumers including sneakerheads,

resellers, and fashionistas. Dkt 257-14, Ex. 14, NIKE0035800 at 808.

## B.    StockX's Online Resale Marketplace

### *Understanding What StockX Is*

409.    StockX is a resale marketplace that connects individual buyers and sellers looking

to trade sneakers they already own.  Ex. 15, Erin Griffith, The New York Times, "Buy Low Tops,

Sell High-Tops: StockX Sneaker Exchange Is Worth $1 Billion," June 27, 2019,

https://www.nytimes.com/2019/06/26/technology/trading-sneakers-stockx.html;          Ex.       14,

NIKE0035800Ex. 14, Ex. 14, NIKE0035800 at 804 ("Detroit-based mobile marketplace matches

buyers and sellers of sneakers (deadstock only), streetwear, handbags and watches").

**Nike, Inc.'s Response: Disputed.**

Nike disputes that StockX's marketplace is limited to connecting individual buyers and

sellers looking to trade sneakers they already own.  StockX does not require buyers and sellers to

be individuals.  In fact, many StockX buyers and sellers are businesses or groups of individuals

working together, including the "fraud ring" of "bad actors" that were operating in coordination

on StockX's platform to sell counterfeit goods.  *See, e.g.*, Dkt. 261-36, Ex. 36, June Huber Tr. 42:2-44:18 (testifying regarding fraud ring operating on the StockX platform); Dkt. 261-133, Ex. 124 (NIKE0025865) (Zadeh Kicks LLC, an Oregon-based sneaker resale business and one of StockX's largest customers); Dkt. 261-124 (STX0099158) at STX0099160 (███████████████ ████████████████████████████████████████████████████████████████████████ ██████████████████████████). StockX also does not require sellers to "trade" only sneakers that they already own.  In fact, StockX does not require sellers to provide any proof that they actually own or possess the item in question before sale and often times sellers enter transactions on StockX without already owning a shoe.  Sept. Duvdevani Decl. ¶ 10, Ex. 9, STX0169276 (█████████████████████████████████████████████████████ ████████████████████); *id.* ¶ 11, Ex. 10 ([https://stockx.com/about/selling/](https://stockx.com/about/selling/)) ("No Approval Needed! Sign Up & Sell…All you have to do is select a payout method and currency from our available options").  Nike further disputes that StockX's sales are limited to connecting individual buyers and sellers looking to trade sneakers they already own because ███████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ Sept. Duvdevani Decl. ¶ 12, Ex. 11, June Huber Tr. 53:25-57:17.

410.    StockX grew out of a company called Campless, a "sneakerhead data company" that tracked sneaker resale data including average price, volume, and volatility data.  Ex. 16, StockX, "Campless," https://stockx.com/news/campless/; *see also* Ex. 9, NIKE0027914 at 938.

***Nike, Inc.'s Response:* Undisputed. This statement is not material.**

411.    Campless allowed users to "rank sneakers by price or volume, track the value of [their] collection, or just learn more about [their] favorite sneakers." Ex. 16, StockX, "Campless," https://stockx.com/news/campless/.

***Nike, Inc.'s Response:*** **Undisputed.  This statement is not material.**

412.    In  2015  and  2016, 

Ex. 2, Paulson Tr. 49:2-10; 51:4-19; *see also* Ex. 17, STX0773031 (███████████████████████).

***Nike, Inc.'s Response:*** **Disputed.  This statement is not material.**

Nike disputes StockX's characterization of Ms. Paulson's testimony.  Ms. Paulson testified that  Dkt. 257-2, Ex. 2, Paulson Tr. 52:23-53:3.  Ms. Paulson testified that ███ ████████████████████████████████████████████████ *Id.* at 51:4-9.

413.    Nike  received  ████████████████████████████████████ ████████████████████████████████████████████." Ex. 2, Paulson Tr. 52:23-53:3; 54:4-13.

***Nike, Inc.'s Response:*** **Disputed. This statement is not material.**

Nike disputes StockX's characterization of Ms. Paulson's testimony. Ms. Paulson testified that ████████████████████████████████████████████████ Dkt. 257-2, Ex. 2, Paulson Tr. 52:23-53:3. Ms. Paulson did not testify that Nike ████████████. *Id.* (emphasis added).

414.    StockX officially launched on February 8, 2016.  Ex. 18, StockX, "Five Years of StockX," February 8, 2021, https://stockx.com/news/five-year-timeline/.

*Nike, Inc.'s Response:* **Undisputed.**

415.    Since its launch, StockX has provided consumers with a marketplace for "current culture" that allows its customers to "[b]uy and sell the hottest sneakers, apparel, electronics, collectibles, trading cards and accessories."  Ex. 19, NIKE0005790 at 791; Ex. 20, NIKE0000170; *see also* Ex. 21, Expert Report of Catherine Tucker (July 11, 2023) ("Tucker Rep.") ¶ 11.

*Nike, Inc.'s Response:* **Disputed.**

Nike does not dispute that StockX's website states as follows: "The Current Culture Marketplace" and "StockX's mission is to provide access to the world's most coveted items in the smartest way possible. Buy and sell the hottest sneakers, apparel, electronics, collectibles, trading cards and accessories.  Dkt. 257-19, Ex. 19, NIKE0005790 at 791.  However, Nike disputes that StockX described itself as a marketplace for "current culture" since its launch.  StockX was originally launched as a "stock market for things" and a "live digital marketplace for buying and selling limited edition sneakers."  Dkt. 257-9, Ex. 9 at NIKE0027938-39.  "When StockX launched in 2016, [it] set out to solve a prevalent problem within the sneaker community: counterfeits." Dkt. 257-112, Ex. 112. In her report, Dr. Tucker states that StockX was developed as an online marketplace for high-end sneakers and "[o]ver time, the StockX marketplace has expanded to facilitate the trade of other luxury items, including apparel, trading cards, accessories such as handbags and watches, and various other collectibles." Dkt. 257-21, Ex. 21 at ¶ 11.

416.    StockX has been described in the press as an "elegant solution" to the challenges associated with tracking resale sneaker values because StockX treats sneakers as akin to stocks, providing consumers with historical pricing data and the infrastructure for trading pursuant to a

bid/ask model, and democratizing access to formerly elusive products.  Ex. 22, Dan Hyman, The New York Times, "A Nasdaq for Sneakerheads? StockX Aims to Tame 'Chaos' of Luxury Market," July 6, 2018, https://www.nytimes.com/2018/07/06/business/smallbusiness/stockx-sneakerheads-luxury-goods.html.

***Nike, Inc.'s Response:* Disputed.**

Nike disputes that StockX has been described in the press as an "elegant solution" because of its business model.  The sole support for this fact, a single NYTimes article, states "So Mr. Luber, the company's chief executive, and his co-founders, including Dan Gilbert, the billionaire founder of Quicken Loans, came up *with what they believe* to be an elegant solution to determine the value of high-end goods: Treat them as if they were stocks."  Dkt. 257-22, Ex. 22.  (emphasis added).  StockX has provided no other evidence that the press has described StockX as an "elegant solution" to the challenges in the resale marketplace.

### *Consumer Engagement with StockX*

417.    StockX is popular with sneaker collectors looking to acquire high-end sneakers that are otherwise difficult to find or acquire.  Ex. 21, Tucker Rep. ¶ 18.

***Nike, Inc.'s Response*: Disputed. This statement is not material.**

Nike does not dispute that some individuals may acquire sneakers as part of a collection, among other reasons.  StockX offers a number of sneakers that are not difficult to find or acquire, and instead are some of Nike's best-sellers. Stec Rep. § V.2.a.; *see also* Sept. Duvdevani Decl. ¶ 13, Ex. 12 (https://www.gq.com/story/brick-flipping-sneaker-resale) ("Increasingly, brick flipping is becoming the sneaker resale norm. On resale site StockX, for instance, bricks are right up there on the best-seller list, beside some of the most popular and talked-about shoes of the moment. The best-selling Nike on StockX—in fact, the number one best-seller over the past 12 months and the

number one best-seller of all time—is the white Air Force 1. You can walk into any Foot Locker in the country and buy a pair in your size—and yet the shoe was bought and sold on the platform over 40,000 times over the past year. Its average sale price hovers around $100: just about retail.”). Nike disputes that StockX is popular with “sneaker collectors” as StockX has produced no demographic breakdowns, consumer surveys, or other evidentiary support detailing whether and how many of StockX’s customers identify as “sneaker collectors.”  Regardless, this statement is not material, as StockX has not offered any information indicating the number of so-called sneaker collectors that purchase from StockX.  StockX has conceded that a significant number of average purchasers shop on StockX.  *Id.* ¶ 6, Ex. 5, STX0091819 at 841 (█████████████████ ████████████████████████████████████████████████████ ); *see also id.* ¶ 9, Ex. 9, STX0226300 (complaint from mother who purchased purportedly genuine Nike sneakers on StockX as a “gift for [her] son” that “broke in the middle of a [track] race”). Ms. Tucker’s report bases her opinions on publicly available statements from the platforms and assumes for the purpose of her analysis that the information is accurate, without any scientific approach or reliable principles to guide her analysis, making her opinion inadmissible as improper and unreliable in violation of Fed. R. Evid. 403 and 702.  Sept. Duvdevani Decl. ¶ 14, Ex. 13, Tucker Tr. 132:22-24, 146:12-14, 152:24-25, 179:12-20, 180:16-25; Dkt. 257-21, Ex. 21 (“Tucker Rep.”) ¶ 47.

 418. In particular, StockX is popular with “sneakerheads.”  Ex. 1, Wells Rep. ¶ 104; *see also* Ex. 14, NIKE003580 at 808 (listing “Sneakerhead Steve” as a primary consumer profile of secondary market consumers and describing him as using StockX); *id*. at 810 ████████████ ██████████████████ ”); *id*. at 841 (██████████████████████ ████████████ ).

***Nike, Inc.'s Response:*** **Disputed. This statement is not material.**

Nike does not dispute that "sneakerheads" shop on StockX is popular with "sneakerheads" but StockX has failed to produced demographic breakdowns, consumer surveys, or other evidentiary support detailing whether and how many of StockX's customers identify as "sneakerheads." Regardless, this statement is not material, as StockX has not offered any information indicating the number of sneakerheads that purchase from StockX. StockX has conceded that a significant number of average purchasers shop on StockX. Sept. Duvdevani Decl. ¶ 6, Ex. 5, STX0091819 at 841 (████████████████████████████████████████ ████████████████████████████████████████); *see also id.* ¶ 9, Ex. 8, STX0226300 (complaint from mother who purchased purportedly genuine Nike sneakers on StockX as a "gift for [her] son" that "broke in the middle of a [track] race"). In his report, Mr. Wells opined, based on his personal experience, that "Sneakerheads faced high risks of buying counterfeit sneakers on early online resale platforms like eBay. As a result, Sneakerheads turned to newer and more trustworthy online platforms that emerged to fill the need from consumers. Those include StockX and GOAT, which started offering consumers an extra layer of inspection through verification services…" Wells Rep. ¶ 104. The cited Nike document does not support the proposition that StockX is popular with Sneakerheads as it ███████████████████████████████████████ ████████████████████████████████ and does not provide general support from which to conclude that StockX is currently or has been popular with "sneakerheads." Dkt. 257-14, Ex. 14 NIKE0035800 at NIKE0035837.

419.   An April 2019 internal Nike document titled "███████████████████████████ ████████████" listed "StockX" and "GOAT" as the apps/websites used by "Sneakerhead Steve." Ex. 14, NIKE0035800 at 808.

***Nike, Inc.'s Response:*** **Disputed. This statement is not material.**

Nike disputes StockX's characterization of the document which includes "StockX' and "GOAT" as exemplary apps/websites that may be used by a consumer profile called "Sneakerhead Steve." Dkt. 257-14, Ex. 14, NIKE0035800 at 808. The consumer profiles of secondary marketplaces included in the April 2019 internal Nike document titled "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ does not provide general support from which to conclude that all sneakerheads use StockX and GOAT. *Id.* at NIKE0035837. StockX offers no survey data or other study to suggest that the 2018 results were still applicable during the relevant period at issue in this case.

        **C.**     **StockX's Value Proposition for Consumers.**

420. StockX not only connected buyers and sellers, but provided a new and innovative service to consumers because StockX also inspected the products sellers sold on its marketplace. Ex. 23, Dep. Tr. of Brock Huber on February 22, 2023 ("Feb. Huber Tr.") 17:20:18-21 (prior to StockX's creation, people who wanted to purchase hard-to-get sneakers had to connect personally with sellers through "private messages" and "send a money order to a stranger on the Internet and hope the product [they] were going to receive . . . was what was promised").

***Nike, Inc.'s Response:*** **Disputed.**

Nike does not dispute that StockX sits in the middle of every transaction on the StockX platform. Dkt. 261-72, Ex. 69, Fenton Tr. 144:12-16. Nike disputes StockX's characterization of Mr. Huber's testimony which speaks for itself. Mr. Huber, as StockX's 30(b)(6) corporate designee, testified that "[t]he radical difference with StockX is that we first organized that purchasing experience, and then injected our verification process in the middle." Dkt. 257-23, Ex. 23, Dep. Tr. of Brock Huber on February 22, 2023 ("Feb. Huber Tr.") at 17:20:18-21.

421.    StockX has invested substantial resources in making trust the core of its brand identity.  Ex. 21, Tucker Rep. ¶¶ 39–40; Ex. 23, Feb. Huber Tr. 22 133:10–134:3 (StockX has "invested hundreds of millions of dollars to the development and execution of [its] proprietary authentication and verification process" and "due to the experience [StockX] provided, [it has] lifted the level of competition around [it]").

***Nike, Inc.'s Response:* Disputed.**

Nike does not dispute that Mr. Huber testified as StockX's corporate designee that StockX "invested hundreds of millions of dollars to the development and execution of [its] proprietary authentication and verification process" and "due to the experience [StockX] provided, [it has] lifted the level of competition around [it]."  Dkt. 257-23, Ex. 23, Feb. Huber Tr., 133:10–134:3.  StockX states that trust *in authentication* is the is core of StockX's brand identity. *See* Dkt. 261-49, Ex. 49, Feb. Huber Tr. 244:6-245:24 (StockX's "authentication and verification process" is "one of the key reasons why you would transaction on StockX"); Dkt. 261-68, Ex. 65 (from its inception, StockX set out to solve a prevalent problem within the sneaker community: counterfeits and was destined to "stop fakes from getting in the hands of [its] customers); Dkt. 261-70, Ex. 67 ("[a]uthentication is core to our history at StockX"); Dkt. 261-71, Ex. 68 ("Authenticity is at the core of the [StockX] experience").  StockX cites to and has provided no underlying records or financials to support the proposition that millions of dollars have been invested to develop and execute its authentication process nor is it possible to discern what expenses are attributable to such based on the financials StockX has produced in this litigation.  Ms. Tucker's report bases her opinions on publicly available statements from the platforms and assumes for the purpose of her analysis that the information is accurate, without any scientific approach or reliable principles to guide her analysis, making her opinion inadmissible as improper and unreliable in violation of

Fed. R. Evid. 403 and 702.  Sept. Duvdevani Decl. ¶ 14, Ex. 13, Tucker Tr. 132:22-24, 146:12-14, 152:24-25, 179:12-20, 180:16-25; Tucker Rep. ¶ 47.

422.    StockX relies on various features and technologies to increase trust and accountability on its platform.  Ex. 21, Tucker Rep. ¶¶ 39–40.

***Nike, Inc.'s Response:* Disputed.**

Nike does not dispute that StockX uses language on its website, including the statements identified in the Tucker Report at paragraphs 39-40 to encourage consumers to trust StockX and its authentication process that every single product purchased from its website is "100% Authentic."  Nike disputes that those features or technology increase trust and accountability on StockX's platform.  *See, e.g.*, Sept. Duvdevani Decl. ¶ 15, Ex. 14 (STX0273234); Dkt. 261-43, Ex. 43 (STX0018010); *see also* Dkt. 261-41, Ex. 41, Pallett Tr. 277:19-24, 279:16-300:18.  Ms. Kammel opines that "[w]hile consumers have been reliant on StockX's 'authentication' and 'verification' label, they have but their trust in something that StockX cannot actually deliver" as "StockX cannot authenticate, or prove that a product is genuine, only the IP rights holder can do that." Kammel Rebuttal at 20-21. As StockX cannot determine whether a product is genuine, Dkt. 261-46, Ex. 46, June Huber Tr. 10:6-16 (testifying that StockX does not determine "whether something is considered counterfeit or not."), which is "the premise of their entire trust relationship with the consumer," Nike disputes that StockX's "various features and technologies" actually increase trust and accountability, and StockX has proffered no evidence in support thereof. Tucker's report bases her opinions on publicly available statements from the platforms and assumes for the purpose of her analysis that the information is accurate, without any scientific approach or reliable principles to guide her analysis, making her opinion inadmissible as improper

and unreliable in violation of Fed. R. Evid. 403 and 702.  Sept. Duvdevani Decl. ¶ 14, Ex. 13, Tucker Tr. 132:22-24, 146:12-14, 152:24-25, 179:12-20, 180:16-25; Tucker Rep. ¶ 47.

423.    StockX uses "digital technologies to make it easier for buyers and sellers to trade" and its platform reduces "the search, information, and transaction costs, which these buyers and sellers would otherwise experience."  Ex. 24, Dep. Tr. of Catherine Tucker 87:14-88:14.

*Nike, Inc.'s Response:* **Disputed.**

Nike does not dispute that Dr. Tucker opines that "StockX—like other online resale marketplaces—creates value by using digital technologies to make it easier for buyers and sellers to trade."  Tucker Rep. at ¶ 9.a.  However, Nike disputes that StockX in all instances makes it easier for buyers and sellers as compared to other shopping experiences and StockX has offered no support for such a proposition. Ms. Tucker's report bases her opinions on publicly available statements from the platforms and assumes for the purpose of her analysis that the information is accurate, without any scientific approach or reliable principles to guide her analysis, making her opinion inadmissible as improper and unreliable in violation of Fed. R. Evid. 403 and 702.  Sept. Duvdevani Decl. ¶ 14, Ex. 13, Tucker Tr. 132:22-24, 146:12-14, 152:24-25, 179:12-20, 180:16-25; Tucker Rep. ¶ 47.

### *StockX Has an Extensive Process for Physical Inspection of Products*

424.    StockX employees physically inspect and verify every product sold on StockX before any transaction can be completed.  Ex. 23, Feb. Huber Tr. 60:15-20, 133:10-134:12; Ex. 14, NIKE0035800 at 804 ("Sellers hold inventory and ship to StockX only when sold; StockX verifies authenticity then ships to buyer for 9.5% commission").

*Nike, Inc.'s Response:* **Disputed.**

Nike does not dispute that StockX claims to physically inspect, verify, and authenticate every product sold on StockX before any transaction can be completed.  However, StockX admits that it cannot determine whether a Nike shoe is genuine or counterfeit.  Dkt. 261-46, Ex. 46, June Huber Tr. at 10:6-16 (testifying that StockX does not determine "whether something is considered counterfeit or not.").  Further, StockX's inspection, verification, and authentication is inherently flawed in design and in StockX's authenticators' execution thereof.  *See* Dkt. 261-48, Ex. 48 Lopez Tr. 178:18-179:1 (█████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████); 257-75, Ex. 75; Dkts. 261-125–132, Exs. 116-123 (videos of StockX authentications).

425.    "[E]very item that transacts on [the StockX] platform go[es] through [StockX's] authentication and verification process to correct for the potential areas of disappointment for a buyer: wrong size, wrong color, wrong product, missing accessories, damaged, manufacturing defect, other variances."  Ex. 23, Huber Tr. 245:1-19.

*Nike, Inc.'s Response:* **Disputed.**

Nike does not dispute that StockX claims that its authentication and verification process corrects for wrong size, wrong color, wrong product, missing accessories, damaged, manufacturing defect, other variances, etc.  But Nike disputes that StockX's characterization insofar as it omits that StockX represented to consumers that its verification and authentication process ensures that every item purchased from its platform is "100% Verified Authentic."  *See* Dkt. 261-57, Ex. 54.  However, StockX's inspection, verification, and authentication is inherently flawed in design and StockX's own documents reveal that StockX "authenticated" confirmed counterfeits and distributed them to buyers.  *See* Dkt. 261-48, Ex. 48, Lopez Tr. 178:18-179:1

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████; Dkt. 257-
75, Ex. 75 ████████████████████████); Dkt. 261-43, Ex. 43, STX0018010 (███████
██████████████████████████████████); Dkt. 261-46, Ex. 46, June Huber Tr. at
10:6-16 (testifying that StockX does not determine "whether something is considered counterfeit
or not."). StockX's authentication and verification also does not effectively screen for wrong size,
wrong color, wrong product, etc., as numerous StockX customers have contacted StockX customer
service calling attention to such errors. *See, e.g.*, Sept. Duvdevani Decl. ¶ 16, Ex. 15, STX0203963
("You did not send a wrong size you sent the wrong shoe and not even the shoe it was supposed
to be your verifying process is bullshit and fake…you claim to verify shoes you sent the wrong
shoe a woman[]s shoe not even the one I ordered complete fraud); *id.* ¶ 17, Ex. 16, STX0205582
("I was sent the wrong shoe for the second time"); *id.* ¶ 18, Ex. 17, STX0210074 (I[]ve tried to
send you a couple emails…I receive the wrong shoe. Not just wrong color way."); *id.* ¶ 19, Ex. 18,
STX0233453 ("these shoes I have received are very very used. The stench from the shoes are just
repulsive. I[]m still trying to process how this stuff works. I don[]t get how these would pass the
authentication center, especially them being the completely wrong shoe."); *id.* ¶ 20, Ex. 19,
STX0234753 ("your website expressly states "*Every item goes through our proprietary multi-step
verification process with our team of expert authenticators",* yet StockX has failed to deliver.
Consumers pay a further charge on top of the purchase price of the goods, especially for this
process. Therefore, in circumstances where StockX purports to deliver high quality products and
represent brand names such as Nike. Jordan etc., for a premium price, it is unacceptable for a
mistake to occur from the outset."); *id.* ¶ 21, Ex. 20, STX0239445 ("As you could tell they sent
the wrong shoe with the correct recite [*sic*] of the actual shoe I was suppose to receive"); *id.* ¶ 22,
Ex. 21, STX0248063 ("The wrong shoe was sent over. I ordered the Nike Waffle Off-White Black

but received the Nike Off-White Vapor Street Black Laser Fuchsia."); *id.* ¶ 23, Ex. 22, STX0260749 ("this is another picture of proof that they sent me the wrong shoe"); *id.* ¶ 24, Ex. 23, STX0268120 ("I[]ve reached out twice now, this being the third regarding the wrong color way arriving after I purchased a different color way").

### StockX Increases Fairness and Efficiency by Providing Historical Pricing Data

426.    StockX offers "detailed, otherwise difficult to obtain information like sales history, [and] average sales price for every model of sneaker." Ex. 25, Dep. Tr. of DeJongh Wells 112:12-16; *see also* Ex. 14, NIKE0035800 at 804 (noting StockX "[u]sers access significant data, e.g. 52-week high, price volatility, sneaker collection valuation (gamification of data)").

*Nike, Inc.'s Response:* **Undisputed. This statement is not material.**

427.    Each product listing includes historical price data, as well as the 12-month trade range, all-time trade range, price volatility, number of sales, price premium, and average sale price. Ex. 21, Tucker Rep. ¶¶ 19; 44-45; Ex. 1; *see, e.g.*, Ex. 26, NIKE0038834 at 836 (showing data on the product description page of the Nike Blazer Low Sacai KAWS Neptune Blue).

*Nike, Inc.'s Response:* **Undisputed.  This statement is not material.**

428.    This data provides consumers and resellers with insight into what is a fair or market price for a product. Ex. 1, Wells Rep. ¶ 110; Ex. 27, Jacob Gallagher, The Wall Street Journal, "This Website is the Stock Market for Nikes and Rolexes," November 26, 2018, www.wsj.com/articles/this-website-is-the-stock-market-for-nikes-and-rolexes-1543251772    (A sneaker seller interviewed for the article claimed, "everyone looks at StockX and takes it as the market price"); Ex. 28, Jessica Testa, The New York Times, "Sneaker Sellers Wrestle With Price Spikes    After    Virgil    Abloh's    Death,"    December    16,    2021, https://www.nytimes.com/2021/12/16/style/sneakers-price-spikes-virgilabloh.html (The owner of a resale sneaker store in Seattle asserted that "when people come in now to sell shoes, we look at

StockX as the price reference, and we've upped our offers to reflect the market."); Ex. 29, Sneaker Jagers, "How StockX Became the Biggest Sneaker Marketplace," September 30, 2021, https://www.sneakerjagers.com/en/n/how-stockx-became-the-biggest-sneaker-marketplace/27074 ("[StockX] ensures that prices remain somewhat in check. When buying a sneaker, you can get insight into the rises and falls of the prices. In this way, the company remains transparent about the prices and you get insight into the market value of your pair.").

*Nike, Inc.'s Response:* **Disputed.**

Although Nike does not dispute that StockX includes certain pricing data for product listings, Nike disputes that doing so provides consumers and resellers what is a fair or market price for the product. The market price for Nike sneakers is set by Nike in the first instance and available for clear viewing on Nike.com. *See, e.g.*, Sept. Duvdevani Decl. ¶ 25, Ex. 24, NIKE0000443. Mr. Wells testified that "StockX's prices aren't always the lowest" and when looking for pricing information, sneakerheads are "looking at multiple websites. They may look at StockX. They may look at GOAT. They may look at eBay. And they are going to do a lot of scouring, as they call it, across these other platforms as well." *Id.* ¶ 8, Ex, 7, Wells Tr. 114:16-25. Dr. Stec opined that StockX's practice of acting as the "Stock market for things," where users can track shoe collections like asset portfolio essentially creates a stock market-like ecosystem which has changed how consumers think of consumer goods and contributed to the rise of reseller for profit, including encouraging the use of bot software, to drive demand for specific sneakers to the StockX marketplace which artificially increases the price. Stec Rep. 18-23.

**StockX Offers Consumers Many User-Friendly Features**

429.    StockX consolidates all information and trading options for a given product on a single product page, making it easier for consumers to search relative to resale platforms with seller-specific listings for the same product. Ex. 21, Tucker Rep. ¶ 19; Ex. 1, Wells Rep. ¶ 108

("[S]ellers do not have to post photos of the sneakers, write product descriptions, or negotiate with prospective buyers.  Buyers can see the current price of a given shoe model on a unique page and do not need to browse multiple listings from various sellers.").

*Nike, Inc.'s Response:* **Disputed.**

Nike does not dispute that StockX consolidates information for a given product on single product page but clarifies that this feature makes it easier for counterfeiters and other bad actors to operate on StockX's platform.  As Ms. Kammel opined, StockX's single product page "does not share with buyers who the seller is, photographs of the actual products for sale, the provenance of their products (including place of purchase, country of origin, etc.), or allow a place where sellers can be rated so consumers can see what other consumers' buying experience has been." Dkt. 263-2, Kammel Decl. ¶ 2, Ex. B ("Kammel Rebuttal") at 17. ███████████████

████████████████████████████████████████████████

███████████████████████ Sept. Duvdevani Decl. ¶ 127XX, Ex. XX 126 (STX0103338 at 339, 342).  Ms. Kammel explained that this "lack of necessary transparency to the consumer...is one of the reasons counterfeiters are successful." *Id.*  Ms. Tucker's report bases her opinions on publicly available statements from the platforms and assumes for the purpose of her analysis that the information is accurate, without any scientific approach or reliable principles to guide her analysis, making her opinion inadmissible as improper and unreliable in violation of Fed. R. Evid. 403 and 702.  Sept. Duvdevani Decl. ¶ 14, Ex. 13, Tucker Tr. 132:22-24, 146:12-14, 152:24-25, 179:12-20, 180:16-25, Tucker Rep. ¶ 47.

430.    StockX uses a "bid or buy pricing mechanism in which sellers post asking prices and buyers may submit bids or buy from the lowest asking price."  Ex. 21, Tucker Rep. ¶ 19; Ex. 31, StockX, "Buying," https://stockx.com/about/buying ("Buy Now at the lowest Ask, or place a

lower Bid at the price you want to pay.  We will send you immediate updates as prices move on

your Bids.  Bids can be renewed or let go when they're about to expire, and you'll be notified

ahead of time.").

***Nike, Inc.'s Response:* Undisputed.  This statement is not material.**

431.    StockX provides personalized customer support.  Ex. 32, NIKE0038817 at 818

(StockX's August 30, 2022 "How it Works" page states, "Thanks to our Help Center, Chatbot, and

dedicated global-support staff, you can be sure that we are always available to answer any and

every question regarding our marketplace.").

***Nike, Inc.'s Response:* Disputed.**

Nike does not dispute that StockX publicly claims it offers "personalized customer

support" but disputes the meaning and accuracy of StockX's characterization.  Consumers have

been frustrated by StockX's lack of customer support or service.  For example, Mr. Kim testified

that after his purchase of "Nike"-branded sneakers he believed to be fake, he reached out to StockX

customer service and received no response. Dkt. 261-120, Ex. 111, Kim Tr. 29:17-30:7.  Another

consumer reached out to StockX and said "[d]ue to no response I am guessing this issue isn't

resolved and I will be stuck with a FAKE pair of sneakers even though I paid stockx to verify

authenticity before receiving." Sept. Duvdevani Decl. 26, Ex. 25, STX0224673. Other customers

have also complained of StockX's non-responsiveness. *Id.*   ¶ 27, Ex. 26, STX0229771 ("Ive

received no response from this company, I[]m going to go ahead and report this and make a claim

with my credit card company"); *id.* ¶ 28, Ex. 27, STX0236761 ("Hello this is terrible

communication when it was time to take my money it was okay no there is a problem…I have had

no response on over 8 days"); *id.* ¶ 29, Ex. 28, STX0238363 ("It has been 4 days since I had a

response from you, what is happening? I[]m very upset at this lack of service as it[]s been two

weeks since I contacted the company about this issue as well…"); *id.* ¶ 30, Ex. 29, STX0260868 ("Is someone going to respond???? As buyers, we have done everything we are supposed to do. These shoes need to be returned, and I[]m awaiting a response. My 15-year-old daughter, with our permission, purchased these shoes with all of her Christmas money, and she received completely unacceptable condition shoes."); *id.* ¶ 31, Ex. 30, STX0265816, ("This is now over 3 working days that I have had no response. I want my money back."); *id.* ¶ 32, Ex. 31,  STX0266198 ("Hi can you advise what is happening. Iv had no response."); *id*. ¶ 32, Ex. 31, STX0268448 (I am having horrible issues with the order above. PLEASE someone email me back! I have sent 10 emails with no response!").

### StockX Implements Security and Anti-Fraud Programs

432.    StockX has "policies in place that punish and ban sellers who attempt to not uphold their end of the sales contract:  either not shipping it to us, shipping the wrong item, shipping the wrong size, shipping it used, shipping without accessories, shipping it with a missing or damaged box, shipping a product that has significant variances, so as to raise suspicion of our authentication process. . . .  by punishing these sellers through penalty fees, through outright banning, it has become a less -- we have become a less desirable avenue."  Ex. 23, Feb. Huber Tr. 136:20–137:6 ; Ex. 21, Tucker Rep. ¶ 42 (StockX works to ensure "that only reliable buyers and sellers use the platform" by suspending the accounts of "sellers who repeatedly do not complete sales or send in items that fail verification.").

*Nike, Inc.'s Response:* **Disputed.**

Nike does not dispute that StockX claims to have policies in place to punish and bad sellers, but disputes that StockX enforces such policies. ███████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████ Sept. Duvdevani

Decl. ¶ 34, Ex. 33, STX0133185. ███████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████ Dkt. 261-85, Ex. 79,

STX0021481 at 497; *see also* Sept. Duvdevani Decl. ¶ 35, Ex. 34, STX0143893. ████████████

███████████████████████████████████ Dkt. 261-85, Ex.

79 at STX0021496.  Ms. Kammel opined that these types of practices "by third-party platforms

happens often, as DHS notes that platforms often allow sales by third parties without adequate

scrutiny of sellers *in order to increase profits*, which is exactly what we see in this case." Kammel

Rebuttal at 25 (citing DHS Report); Sept. Duvdevani Decl. ¶ 36, Ex. 35, ZK_NIKE_004180

(responding to Mr. Malekzadeh's concerns about a suspected inauthentic "Nike" shoe with "jw bc

the seller on this one is a good one"); *id.* ¶ 37, Ex. 36, ZK_NIKE_004716 (responding to Mr.

Malekzadeh's concerns about a suspected inauthentic "Nike" shoe with "good seller"); *id.* ¶ 38,

Ex. 37, ZK_NIKE_009357 (same). Ms. Tucker's report bases her opinions on publicly available

statements from the platforms and assumes for the purpose of her analysis that the information is

accurate, without any scientific approach or reliable principles to guide her analysis, making her

opinion i inadmissible as improper and unreliable in violation of Fed. R. Evid. 403 and 702.  Sept.

Duvdevani Decl. ¶ 14, Ex. 13, Tucker Tr. 132:22-24, 146:12-14; 152:24-25, 179:12-20, 180:16-

25, Tucker Rep. ¶ 47.

433.    StockX's May 10, 2022 "How it Works" page states "Preserving the integrity of

our marketplace means staying a step ahead.  Our security and fraud systems, powered by our

world class partners, have your personal information covered 24/7" and lists "Auth0", "Riskified"

and "Braintree" as partners.  *See also* Ex. 19, NIKE0005790 at 791; Ex. 32, NIKE0038817 at 818

(StockX's August 30, 2022 "How it Works" page); Ex. 33, NIKE0040114 at 115 (StockX's October 04, 2022 "How it Works" page stating the same).

***Nike, Inc.'s Response:*** **Disputed.  This statement is not material.**

Nike does not dispute that the words above appear in the May 10, 2022 appear in StockX's "How It Works" page.  Each of these security and fraud systems are focused on securing privacy, user accounts, personally identifiable information, banking and financial information, ensuring the integrity of payment processing on the site, and general ecommerce fraud. *See* Tucker Rep. at ¶ 43.  StockX has provided no evidence or support that Auth0, Riskified, and/or Braintree assist with StockX's detection of counterfeits or to prevent bad actors from selling counterfeit shoes through StockX's platform.  Nike disputes that StockX's anti-fraud measures are effective given that StockX inspected and "authenticated" confirmed counterfeit shoes and distributed them to buyers and, that a "fraud ring" of bad actors sold confirmed counterfeit shoes through StockX and completed over 1800 sales through the StockX platform before StockX noticed. *See* Dkt. 261-43, Ex. 43, STX0018010 (███████████████████████████████); Dkt. 257-36, Ex. 36, June Huber Tr. 42:2-43:13; Dkt. 261-141, Ex. 132, STX0806056; Dkt. 261-119, Ex. 110, STX0806024.

434.    StockX uses Auth0, a provider of secure logins and account authentication services, Riskified, a provider of fraud management software for eCommerce, and Braintree, a provider of secure payment processing solutions.  Ex. 21, Tucker Rep. ¶ 43.

***Nike, Inc.'s Response:*** **Undisputed.  This statement is not material.**

435.    StockX uses an anti-fraud vendor to monitor seller details and activity, and to detect suspected fraudulent activity.  Ex. 36, Dep. Tr. of Brock Huber on June 29, 2023 ("June Huber Tr.") 45:10-20.

*Nike, Inc.'s Response:* **Disputed.**

Nike does not dispute that Mr. Huber testified that at some point in time StockX used an anti-fraud vendor, however StockX has not provided any admissible evidence that corroborates Mr. Huber's testimony or shows how StockX has used this supposed anti-fraud vendor in its business. In fact, Nike disputes that StockX's anti-fraud measures are effective given that StockX inspected and "authenticated" confirmed counterfeit shoes and distributed them to buyers and, that a "fraud ring" of bad actors sold confirmed counterfeit shoes through StockX and completed over 1800 sales through the StockX platform before StockX noticed. *See* Dkt. 261-43, Ex. 43, STX0018010 (████████████████████████████████); Dkt. 257-36, Ex. 36, June Huber Tr. 42:2-43:13; Dkt. 261-141, Ex. 132, STX0806056; Dkt. 261-119, Ex. 110 STX0806024.

436.    StockX has a fraud team that uses seller data, and data provided by its anti-fraud vendor, to investigate and suspend suspected fraudulent sellers. Ex. 36, June Huber Tr. 42:02-46:03; 60:15-19.

*Nike, Inc.'s Response:* **Disputed.**

Nike does not dispute that Mr. Huber testified that at some point in time StockX had a fraud team, however StockX has not provided any admissible evidence that corroborates Mr. Huber's testimony or shows how StockX has used this supposed anti-fraud vendor in its business. In fact, Nike disputes that StockX's anti-fraud measures are effective given that StockX inspected and "authenticated" confirmed counterfeit shoes and distributed them to buyers and, that a "fraud ring" of bad actors sold confirmed counterfeit shoes through StockX and completed over 1800 sales through the StockX platform before StockX noticed. *See* Dkt. 261-43, Ex. 43, STX0018010

(███████████████████████████████████████); Dkt. 257-36, Ex. 36, June

Huber Tr. 42:2-43:13; Dkt. 261-141, Ex. 132, STX0806056; Dkt. 261-119, Ex. 110, STX0806024.

      437.    StockX's fraud team investigates other indicators for possible fraud based on seller

activity, such as ████████████████████████ Ex. 34, STX0108368-

369 (███████████████████████████).

*Nike, Inc.'s Response:* **Disputed.**

      Nike does not dispute that Mr. Huber testified that at some point in time StockX had a

fraud team, however StockX has not provided any admissible evidence that corroborates Mr.

Huber's testimony or shows how StockX has used this supposed anti-fraud vendor in its business.

In fact, Nike disputes that StockX's anti-fraud measures are effective given that StockX inspected

and "authenticated" confirmed counterfeit shoes and distributed them to buyers and, that a "fraud

ring" of bad actors sold confirmed counterfeit shoes through StockX and completed over 1800

sales through the StockX platform before StockX noticed. *See* Dkt. 261-43, Ex. 43, STX0018010

(███████████████████████████████████████); Dkt. 257-36, Ex. 36, June

Huber Tr. 42:2-43:13; Dkt. 261-141, Ex. 132, STX0806056; Dkt. 261-119, Ex. 110, STX0806024.

      438.    StockX's policy is to "suspend any seller immediately" if a seller sends an item that

StockX determines may be inauthentic.  Ex. 35, Dep. Tr. of Russ Amidon 42:05-07.

*Nike, Inc.'s Response:* **Disputed.**

      Nike disputes that StockX suspends any seller immediately if a seller sends an item that

StockX determines may be inauthentic.  ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████ Sept. Duvdevani Decl. ¶ 34, Ex.

33, STX0133185. ██████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████ Dkt. 261-85, Ex. 79 at STX0021497;

*see also* Sept. Duvdevani Decl. ¶ 35, Ex. 34, STX0143893. ████████████████

████████████████████████████████ Dkt. 261-85, Ex. 79. at STX0021496.

Further, StockX regularly waives the penalty fee for sellers who fail to meet StockX's

authentication standards, including those who attempt to pass fakes. *See* Sept. Duvdevani Decl.¶

39, Ex. 38, STX0214114 (StockX customer representative stating: "Our team did discover that

your sneakers arrived to use with too many variances in materials and construction when compared

to authorized, retail items. Specifically, there were issues with the label and build of the sneaker.

Because of this, we could not allow it to pass. We do state in our FAQ that we do penalize seller

with a $15 penalty fee and account suspension for failing to complete a sale.  However, we decided

against enforcing those penalties as your account in good standing with us."); *id.*¶ 40, Ex. 39,

STX0218814 (StockX customer representative stating: "Because we appreciate your business we

are making a one-time exception to waive the penalty fee. We have issued a full refund for the

penalty fee that was incurred."); *id.* ¶ 41, Ex. 40, STX0226823 (StockX customer representative

stating: "I have successfully refunded the penalty fee that was charged to you for the verification

fail"); *id.* ¶ 42, Ex. 41, STX0248547 ("Since this is your first verification failure, we have waived

our usual penalization for the failure of the sale.");  *id.* ¶ 43,., Ex. 42, STX0253663 (StockX

customer representative stating: "Due to your Seller history, I will be happy to make an exception

and refund this fee."); *id.* ¶ 44, Ex. 43, STX0260897 (StockX customer representative stating "As

an exception and appreciation for your business with us, I would be glad to refund your penalty

fee."); *id.*¶ 45, Ex. 44, STX0269068 (StockX customer representative stating: "First off, I know

you are a phenomenal Seller through us. I am happy to assist with these automatically processed penalty fees…"); *id.* ¶ 12, Ex. 11, June Huber Tr. 58:17-60:10 (███████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████)

439.    Following the sale of products to an end consumer, StockX continues to investigate potential fraudulent activity in order to remove fraudulent sellers from its platform.  Ex. 36, June Huber Tr. 42:02-46:03.

*Nike, Inc.'s Response:* **Disputed.**

Nike does not dispute that Mr. Huber testified as StockX's 30(b)(6) corporate designee to one investigation related to the sellers of inauthentic products to Roy Kim but Nike disputes the general proposition that "StockX continues to investigation potential fraudulent activity" following the sale of products to an end consumer.  Dkt. 257-36, Ex. 36, June Huber Tr. 42:02-46:03.  Mr. Huber's testimony was limited to the Roy Kim incident.  He testified that ███████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ *Id*. at 42:02-46:03. StockX has provided no evidence that it has continued to investigate following the sale of products to any other end consumer or regularly conducts such types of investigations.

440.    By monitoring seller details and activity, StockX has successfully identified fraudulent sellers and banned them from selling on its platform.  Ex. 36, June Huber Tr. 42:02-46:03; 60:15-19.

*Nike, Inc.'s Response:* **Disputed.**

StockX has provided only one example of StockX's successful identification a fraud ring; a group of bad actors that had been operating on its platform for an unknown period of time prior to the Roy Kim incidence and had completed 1807 sales on the StockX platform prior to being caught. Dkt. 257-36, Ex. 36, June Huber Tr. 42:2-43:13; Dkt. 261-119, Ex. 110; Dkt 261-141, Ex. 141.   As Mr. Huber testified as StockX's 30(b)(6) corporate designee, the advantage of this investigation was that ██████████████████████████████████████ ██████████████████████████ Sept. Duvdevani Decl. ¶ 12, Ex. 11, June Huber Tr. 35:21-23. Although StockX may have banned the sellers after receiving Nike's letter connected to "the fraud ring," other sellers confirmed to have sold Mr. Kim a fake product were not banned from the platform because "there wasn't anything that looked like egregious, intentional abuse of the platform" despite the fact that they had sold a counterfeit good that had incorrectly been verified as "authentic" by StockX. *Id.* at 60:6-23.   Further, StockX was aware that the Jordan 1 Retro High Dark Mocha was the most commonly attempted sneaker fake prior yet incorrectly "authenticated" and sold a large number of this colorway, which were later confirmed to be counterfeit, to purchaser Roy Kim. *Compare* Dkt. 261-79, Ex. 73, NIKE0038943 *with* Dkt. 260-1, Appendix A at Pairs 5-37.

### The StockX Return Policy and Buyer Promise

441.    StockX offers a Buyer Promise which covers buyers within a certain timeframe of receiving an item if they believe StockX made a mistake with their order, including incorrectly verifying the product.   Ex. 21, Tucker Rep. ¶ 41; Ex. 37, StockX, "What is the StockX Buyer Promise?"  https://stockx.com/help/articles/What-is-the-StockX-Buyer-Promise  ("The StockX Buyer Promise solidifies this mission by providing support for Buyers should we make a mistake (e.g. we ship you the wrong order, we incorrectly verify an item).").

*Nike, Inc.'s Response:* **Disputed.**

Nike does not dispute that StockX currently offers a Buyer Promise but disputes that StockX offered a "Buyer Promise" prior to the initiation of this lawsuit. *See* Kammel Rebuttal at 25-27 (citing Sept. Duvdevani Decl. ¶ 46, Ex. 45, NIKE0042394 (screenshot of https://stockx.com/help/articles/What-Is-the-StockX-Return-Policy showing that the "Buyer Promise" was added to the page on or around October 18, 2022; *see also id.* ¶ 47, Ex. 46, TWITTER, @StockX (Nov. 9, 2022), https://twitter.com/stockx/status/1590468671377354752 (earliest found reference to "Buyer Promise" on StockX's twitter account); Dkt. 261-85, Ex. 79 at STX0021484 (███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████).

442.    Before the StockX Buyer Promise was formalized in 2022, StockX's Terms and Conditions provided that a buyer could return an item if it "receive[d] an item that it believe[d] to be counterfeit." Ex. 38, Dep. Tr. of John L. Hansen 55:1-61:14; Ex. 39, Hansen Dep. Ex. 6.

***Nike, Inc.'s Response:* Disputed.**

Nike does not dispute that StockX's Terms and Conditions stated "If a buyer received an item that it believes to be counterfeit, the buyer must notify StockX in writing within 3 days after receiving the item, and we will commence an investigation into the item. The buyer shall cooperate with us in the investigation and final disposition of the item, including providing photographs and other evidence of the item, providing the item to law enforcement, destroying the item or delivering the item back to us, at our direction. If we elect to have the buyer destroy the item, the buyer shall provide reasonable proof of destruction to us. We will refund all fees and costs paid by the buyer for the item (including shipping and handling.) In no event may a buyer resell any item (on StockX or elsewhere) that is reasonably believed to be counterfeit" prior to 2022. Dkt. 257-39, Ex. 39.

However, StockX's internal policies conflicted with its consumer-facing Terms and Conditions because it did not allow for returns. *See, e.g.*, Dkt. 261-85, Ex. 79 at STX0021484 (███████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████). Nike also disputes StockX's characterization as the entirety of the policy includes: "If a buyer receives an item that it believes to be counterfeit, the buyer must notify StockX in writing within 3 days after receiving the item, and we will commence an investigation into the item." Dkt. 257-39. StockX has not provided evidence that it will accept any return that is suspected as inauthentic by a consumer, rather, StockX continues to mandate returns must comply with its standards which are admittedly faulty at detecting counterfeits. Dkt. 261-46, Ex. 46, June Huber Tr. at 10:6-16.

443.    StockX explains on its website that "should [StockX] make a mistake (e.g. [StockX] ship[s] [a customer] the wrong order, [StockX] incorrectly verif[ies] an item)," customers can "submit a Buyer Promise Support Request form within ten days of receiving [the] item" and StockX will "work expeditiously to resolve the issue." Ex. 40, NIKE0081418 at 419.

*Nike, Inc.'s Response:* **Disputed.**

Nike does not dispute that, at least as of April 17, 2023, StockX's "What is the StockX Buyer Promise?" webpage includes a 10-day window after receiving an item for customers to alert StockX of a perceived incorrect verification. However, this has not always been StockX's policy. StockX launched an earlier version of its Buyer Promise after the filing of this litigation, which originally included a 3-day window to raise concerns. Sept. Duvdevani Decl. ¶ 49, Ex. 48, NIKE0042397. Additionally, StockX's internal policies conflicted with its consumer-facing Terms and Conditions because it did not allow for returns. Dkt. 261-85, Ex. 79 at STX0021484

(██████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████); *see also* Dkt, 261-87, Ex. 81 at STX0775192 (encouraging customer to resell suspected counterfeits on StockX); Dkt. 261-88, Ex. 82, at STX0777402 (same); Dkt. 261-89, Ex. 83 at STX0777769-70 (same); Dkt. 261-91, Ex. 85 atSTX0777124 (same); Dkt. 261-92, Ex. 86 at STX0220611 (same); Dkt. 261-93, Ex. 87 at STX0220624 (same); Dkt. 261-94, Ex. 88 at STX0802187-88 (same).

444.    StockX's policy provides, and always has provided, that if a customer has an "issue" with an order they placed on StockX, they can reach out to customer service, after which StockX will "initiate a review," ask for photographs of the product, and potentially "ask the buyer to send it back" for an inspection.  Ex. 36, June Huber Tr. 8:15-24.

***Nike, Inc.'s Response:* Disputed.**

Nike disputes that StockX has always provided a return policy, including for "Nike" sneakers perceived to be inauthentic by buyers.  StockX's internal communications show customer service representatives routinely told consumers to resell products suspected to be counterfeit on the StockX platform: Dkt, 261-87, Ex. 81 at STX0775192 (encouraging customer to resell suspected counterfeits on StockX); Dkt. 261-88, Ex. 82, at STX0777402 (same); Dkt. 261-89, Ex. 83 at STX0777769-70 (same); Dkt. 261-91, Ex. 85 atSTX0777124 (same); Dkt. 261-92, Ex. 86 at STX0220611 (same); Dkt. 261-93, Ex. 87 at STX0220624 (same); Dkt. 261-94, Ex. 88 at STX0802187-88 (same). ████████████████████

████████████ *See* Dkt. 261-84, Ex. 78 at STX0020227 █████████████████

████████████████████████████████████████████████

████████████████████); *id.* at STX0020231 ████████████████████



Dkt. 261-86, Ex. 80 at STX0774265.

); Dkt. 261-85, Ex. 79 at STX0021484 (

).

445.    If StockX validates the issue, StockX "take[s] that item back as a return" and refunds the customer in full.  Ex. 23, Feb. Huber Tr. 246:8-11; *see also* Ex. 41, Depo Tr. of Yasir Malik 42:21-43:5.

***Nike, Inc.'s Response:* Disputed.**

Nike disputes that StockX takes the item back as a return and refunds the customer in full when it validates an issue.  StockX's customer communications include examples showing partial refunds, discount codes, and returns for re-authentication when the customer complains of a product being counterfeit. Sept. Duvdevani Decl. ¶ 50, Ex. 49, STX0208221; *id.* ¶ 51, Ex. 50, STX0227488; *id.* ¶ 52, Ex. 51, STX0251071; *id.* ¶ 53, Ex. 52, STX0268088; *id.* ¶ 54, Ex. 53 at STX0776134-37 (offering either a discount code or a return); *id.* ¶ 55. Ex. 54, STX0788156 (offering a $20 discount for fake shoes that fell apart); *id.* ¶ 56, Ex. 55 at STX0788810 (offering a partial refund no return required).

*Id.* ¶ 56, Ex. 55, Lopez Tr. 190:4-8.  Yet, StockX made numerous return determinations based solely on photographs and refused sneakers that customers believed to be inauthentic without undergoing a re-authentication. *See, e.g.*, *id.* ¶ 58, Ex, 57, STX0545514;

*id.* ¶ 57, Ex. 56, Lopez Tr. 250:12-265:11. 

*Id.* ¶ 57, Ex. 56, Lopez Tr. 262:4-263:14.

*Id.*

446.    If a shoe is returned to StockX, and StockX determines the shoe is inauthentic, that item is not resold.  Ex. 36, June Huber Tr. 56:12-18.

*Nike, Inc.'s Response:* **Disputed.**

Nike disputes StockX's characterization of Mr. Huber's testimony as StockX's 30(b)(6) corporate designee, which reads in its entirety: "If [StockX] got an item that was suspected to be inauthentic, [StockX] would not take it into inventory."  Sept. Duvdevani Decl. ¶ 11, Ex. 10, June Huber Tr. 56:12-18.  Nike disputes that StockX "determines the shoe is inauthentic" upon return as StockX admits that it does not make a determination of whether "something is considered counterfeit or not." *Id.* at 56:12-18.

*Id.* ¶ 57, Ex. 56, Lopez Tr. 262:4-263:14.

StockX's resell-not-refund policy also makes it highly likely that StockX encouraged consumers to resell likely counterfeits on StockX in lieu of a refund.  Dkt, 261-87, Ex. 81 at STX0775192 (encouraging customer to resell suspected counterfeits on StockX); Dkt. 261-88, Ex. 82, at STX0777402 (same); Dkt. 261-89, Ex. 83 at STX0777769-70 (same); Dkt. 261-91, Ex. 85 at STX0777124 (same); Dkt.

261-92, Ex. 86 at STX0220611 (same); Dkt. 261-93, Ex. 87 at STX0220624 (same); Dkt. 261-94, Ex. 88 at STX0802187-88 (same).

### *Consumers and Nike Employees Value Many Aspects of StockX's Resale Platform*

447.   Roy Kim, a StockX customer not employed by either party who testified in this case, purchased thousands of products on StockX's marketplace.  Ex. 42, Depo. Tr. of Roy Ikhyun Kim ("Kim Tr.") 102:4-12.

*Nike, Inc.'s Response:* **Undisputed.**

448.   Mr. Kim testified that "all things considered, if it's the same price I would prefer to buy on StockX" because he "prefer[s] the buying experience on StockX."  Ex. 42, Kim Tr. 105:4-25.

*Nike, Inc.'s Response:* **Disputed.**

Nike disputes StockX's characterization of and selective omissions from Mr. Kim's testimony which speaks for itself and reads: "I prefer the buying experience and it's actually cheaper to buy on StockX relative to the other platforms that they have on the market" because "[i]f the price was appropriate, I would buy from any source with an authentication component to it.  But all things considered, if it's the same price I would prefer to buy on StockX."  Dkt. 257-42, Ex. 42, Kim Tr. 105:4-22.

449.   Mr. Kim testified that StockX was the "main resell platform" he used primarily because "StockX offered the best prices" and "discounts on shipping."  Ex. 42, Kim Tr. 25:23-26:5.

*Nike, Inc.'s Response:* **Disputed.**

Nike disputes StockX's characterization of Mr. Kim's testimony which speaks for itself and states that StockX was the main resell platform he used "most frequently before July 2022"

because "StockX offered the best prices" and as a "power buyer, I've had discounts on shipping so it made no sense economically to purchase through" other platforms. Dkt. 257-42, Ex. 42, Kim Tr. 25:23-26:5.

450.    Mr. Kim testified that he uses StockX "so much more" than other resale platforms because he "prefer[s] the buying experience" of StockX, that it is "cheaper to buy on StockX relative to . . . other platforms." Ex. 42, Kim Tr. 105:4-8.

*Nike, Inc.'s Response:* **Disputed.**

Nike disputes StockX's characterization of Mr. Kim's testimony which speaks for itself and reads: "I prefer the buying experience and it's actually cheaper to buy on StockX relative to the other platforms that they have on the market" because "[i]f the price was appropriate, I would buy from any source with an authentication component to it. But all things considered, if it's the same price I would prefer to buy on StockX." Dkt. 257-42, Ex. 42 Kim Tr. 105:4-22.

451.    Mr. Kim testified that he prefers StockX's "app experience," that StockX allows him to "set a bid price" that the seller can choose to match "which a lot of other platforms do not allow." Ex. 42, Kim Tr. 106:1-7.

*Nike, Inc.'s Response:* **Undisputed. This statement is not material.**

452.    Mr. Kim testified that he prefers the buying experience on StockX for several reasons, including the "customer experience [he has] had at StockX" and the fact that "when [he's] had issues[, StockX] has generally been more responsive than both eBay and GOAT." Ex. 42, Kim Tr. 106:1-11.

*Nike, Inc.'s Response:* **Disputed.**

Nike does not dispute that Mr. Kim testified that his general experience with StockX customer service has been more responsive than eBay and GOAT but disputes that this is typical

of Mr. Kim's or even the average consumer's customer service experience with StockX.  Mr. Kim testified that as a power buyer he was "told that [power buyers] get a dedicated customer support rep for [their] issues." Dkt. 261-120, Ex. 111, Kim Tr. 27:1-4.  Mr. Kim also testified that after receiving a batch of fake shoes from StockX, he attempted to contact StockX to return the fake products multiple times with no response. *Id.* at 29:17-30:7.  It was only after Mr. Kim's Instagram post showcasing the large number of fakes he had received went "viral" that StockX reached out to him. *Id.* at Kim Tr. 30:6-15.  Because Mr. Kim was a power buyer, Nike disputes this statement to the extent that StockX states or implies that Mr. Kim's experience is representative of all StockX customers, which it was not.  Dkt. 261-85, Ex. 79 at STX0021484 ██████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████

453.    Mr. Kim testified that StockX's customer service is better than GOAT's "by a mile." Ex. 42, Kim Tr. 113:4-25

***Nike, Inc.'s Response:*** **Disputed.  This statement is not material.**

Nike disputes StockX's characterization of Mr. Kim's testimony which speaks for itself and elaborates on his opinion that customer service at StockX is better than GOAT because "GOAT will sometimes not respond to tickets for weeks.  I've had issues where I've taken two or three weeks of continuously emailing them to resolve an issue."  Dkt. 257-42, Ex. 42, Kim Tr. 113:16-19.  However, Mr. Kim also testified that, unlike StockX, he has never suspected he purchased inauthentic sneakers from GOAT. *Id.* at 115:16-18. Further, Mr. Kim also testified that after receiving a batch of fake shoes from StockX, he attempted to contact StockX to return the

fake products multiple times with no response. *Id.* at 29:17-30:7.  It was only after Mr. Kim's Instagram post showcasing the large number of fakes he had received went "viral" that StockX reached out to him. *Id.* at Kim Tr. 30:6-15

454.    Mr. Kim testified that eBay's customer service was "very, very difficult" compared to StockX's.  Kim Tr. 115:2-12.

**Nike, Inc.'s Response: Disputed.  This statement is not material.**

Nike disputes StockX's characterization of Mr. Kim's testimony which speaks for itself and explains that "[t]he only time [he] had to reach out to eBay was when there's a billing issue, but not anything related to shoes or the orders" and that customer service at eBay was "very, very difficult" because "[t]here isn't a direct line you can really reach out to. [He] had to dig around to find emails for people to make it happen." Dkt. 257-42, Ex. 42, Kim Tr. 115:3-12.

455.    Mr. Kim testified that StockX made returns "easy."  Ex. 42, Kim Tr. 31:13–23.

**Nike, Inc.'s Response: Disputed.**

Nike disputes StockX's characterization of and selective omissions from Mr. Kim's testimony which speaks for itself and, refers to Mr. Kim's experience with the several dozen counterfeit Nike shoes that partially form the basis of Nike's counterfeiting claim.  He testified that "once [StockX] received the shoes and verified that, you know, they were fake, it was easy for me to return. They sent me a bunch of shipping label and I sent the shoes back with them." Dkt. 257-42, Ex. 42, Kim Tr. 31:13-23.  By the point StockX "verified" that the shoes were fake, Nike had already alerted StockX to the fact that it had identified Mr. Kim's sneakers as counterfeit. Dkt. 261-124, Ex. 115.  Nike disputes this statement to the extent that it implies that persons other than Mr. Kim believe that StockX makes returns easy.  Dkt. 261-85, Ex. 79 at STX0021484

███████████████████████████████████████

███████████████████████████████████████

████████████████████████

456.    Mr. Kim testified that he "would only purchase collectable sneakers through a channel that would provide some sort of authentication."  Ex. 42, Kim Tr. 106:12-17.

*Nike, Inc.'s Response:* **Undisputed.**

457.    Even after receiving some of the alleged counterfeits at issue in this case (and receiving a refund from StockX for those products), Mr. Kim continued to visit StockX's platform "[d]aily," testifying that he "currently make[s] purchases through StockX," and that over 90% of his ongoing purchases on StockX continue to be Nike shoes.  Ex. 42, Kim Tr. 102:20-21; 157:1-23.

*Nike, Inc.'s Response:* **Undisputed.  This statement is not material.**

458.    As of December 9, 2022, Mike Child was Nike's Director of Digital Goods Strategy.  Ex. 3, Child Tr. 15:25-16:1.

*Nike, Inc.'s Response:* **Undisputed.  This statement is not material.**

459.    Mr. Child testified that he has bought roughly 10 to 20 pairs of sneakers on StockX. Ex. 3, Child Tr. 242:10-15.

*Nike, Inc.'s Response:* **Undisputed.  This statement is not material.**

460.    Mr. Child testified that he has been happy with his purchases from StockX.  Ex. 3, Child Tr. 244:12-15.

*Nike, Inc.'s Response:* **Undisputed.  This statement is not material.**

461.    Mr. Child testified that he had most recently purchased a pair of Nike sneakers on StockX because he tried to purchase them via Nike but was unable to do so.  Ex. 3, Child Tr. 243:2-22.

*Nike, Inc.'s Response:* **Undisputed.  This statement is not material.**

462.    Mr. Child testified that he has also bought Nike sneakers on StockX that were unavailable via Nike because they had been released four to five years prior.  Ex. 3, Child Tr. 245:6-15.

*Nike, Inc.'s Response:* **Undisputed. This statement is not material.**

463.    Heather Paulson, Nike's Vice President of Connected Marketplace, testified that she has purchased multiple pairs of Nike sneakers on StockX.  Ex. 2, Paulson Tr. 282:11-283:18.

*Nike, Inc.'s Response:* **Undisputed. This statement is not material.**

464.    Ms. Paulson testified that she was satisfied by her purchases from StockX.  Ex. 2, Paulson Tr. 284:11-13.

*Nike, Inc.'s Response:* **Disputed.  This statement is not material.**

Nike disputes that characterization of Ms. Paulson's testimony which speaks for itself and reads: "Um, I like the AWOKs.  Yeah."  Dkt. 257-2, Ex. 2, Paulson Tr. 284:11-13.

465.    When asked why she had purchased a pair of sneakers from StockX rather than from Nike, Ms. Paulson stated that the sneakers ███████████████████  And to be honest, I didn't even try in the initial sale and then saw them around and decided I liked them, so hunted them down."  Ex. 2, Paulson Tr. 284:14-22.

*Nike, Inc.'s Response:* **Undisputed.  This statement is not material.**

466.    When asked why she had purchased a pair of Jordan sneakers from StockX rather than from Nike, Ms. Paulson stated that the sneakers "were out of stock on Nike."  Ex. 2, Paulson Tr. 284:24-285:3.

*Nike, Inc.'s Response:* **Undisputed.  This statement is not material.**

████████████████████████████████████████████████
█████████████████████

467.    ████████████████████████████████████

████████████████████████████████████████████. Ex. 43, STX0018453 at 465.    ██████████████████████████████████████████

████████████████████████████████████████████████

██████████████████ Ex. 43, STX0018453 at 465.

*Nike, Inc.'s Response:* **Disputed.**

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████. Dkt. 257-43, Ex. 43, STX0018453 at 465.

468.    An April 2019 internal Nike document titled ████████████████████

████████████ stated ██████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████  Ex. 14, NIKE0035800 at 42.

*Nike, Inc.'s Response:* **Undisputed.  This statement is not material.**

469.    An April 2019 internal Nike document titled ██████████████████

████████████ reported ██████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████  ██████████████████████

██████████████████████████████████████████████████████████

██  ██████████████████████████████████████████████████████

██████████████████████████████████████████████████████  Ex.

14, NIKE0035800 at 843.

*Nike, Inc.'s Response:* **Undisputed.**

470.    The "heat" of a product means how covetable the product is.  Ex. 2, Paulson Tr. 47:20-23.

*Nike, Inc.'s Response:* **Undisputed.**

████████████████████████████████████████████

471.    ██████████████████████████████████████████████████

██████████████████████████████████████████████████████  Ex.

44, STX0021868 at STX0021916.

*Nike, Inc.'s Response:* **Undisputed. This statement is not material.**

472.    ██████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████  Ex. 44, STX0021868 at STX0021918.

*Nike, Inc.'s Response:* **Disputed.**

████████████████████████████████████████████████

████████████████████████████ Dkt. 257-44, Ex. 44, STX0021868 at STX0021918. ██

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████ *Id.*

473.    ██████████████████████████████████████

██████████████████ Ex. 44, STX0021868 at STX0021918.

*Nike, Inc.'s Response:* **Disputed.**

████████████████████████████████████████████████

██████████████████████████████████ Dkt. 257-44, Ex. 44,

STX0021868 at STX0021918. ██████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████ *Id.*

474.    ██████████████████████████████████████

██████████████████████████████████ Ex. 44, STX0021868 at

STX0021918.

*Nike, Inc.'s Response:* **Disputed.**

████████████████████████████████████████████████

█████████████████████████████████████████████ Dkt.

257-44, Ex. 44, STX0021868 at STX0021918. ███████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████ *Id.*

475.  ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████ Ex. 44, STX0021868 at STX0021922.

*Nike, Inc.'s Response:* **Disputed.**

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████ Dkt. 257-44, Ex. 44, STX0021868 at STX0021922. █████

████████████████████████████████████████████████████████████████

███  ██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ *Id.*

476.  ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████ Ex. 44, STX0021868 at STX0021926.

*Nike, Inc.'s Response:* **Disputed.**

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████ Dkt. 257-44, Ex. 44, STX0021868 at STX0021926. ██

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████    *Id.*

**B.    StockX Competes with Other Resale Marketplaces.**

477.    StockX is one of many resale marketplaces for sneakers.  Ex. 1, Wells Rep. ¶¶ 76–77, 79-82; Ex. 14, NIKE0035800 at 803 (noting "secondary marketplaces are big + growing").

*Nike, Inc.'s Response:* **Undisputed.**

478.    Other resale marketplaces include eBay, Facebook Marketplace, Flight Club, GOAT, Stadium Goods, The RealReal, Tradesy, thredUP, Depop, Poshmark, Grailed, Bump, Instagram, Etsy, RIF LA, Sole Supremacy, and local shops.  Ex. 14, NIKE0035800 at 804, 842 (April 2019 internal Nike document titled "████████████████████████████████" listing resale marketplaces StockX, GOAT, Flight Club, Stadium Goods, local shops, Instagram, eBay, Facebook Marketplace, Grailed, and Bump); Ex. 1, Wells Rep. ¶ 69 (listing resale marketplaces eBay, Etsy, and StockX); Ex. 9, NIKE0027914 at 926–936 (Equity Research Report on "Sneakers As An Alternative Asset Class, Part III" dated May 24, 2022, listing resale marketplaces RIF LA, Sole Supremacy, Grailed, eBay, Stadium Goods, StockX, GOAT, Flight Club, The RealReal, Tradesy, thredUP, Depop, and Poshmark); Ex. 2, Paulson Tr. 183:10-17, 184:7-15.

*Nike, Inc.'s Response:* **Undisputed.**

479.    An April 2019 internal Nike document titled "██████████████████████████ ████████████" described ████████████████████████████████████████████. Ex. 14, NIKE0035800 at 804.

**Nike, Inc.'s Response: Undisputed.**

480.     An April 2019 internal Nike document titled "███████████████████████████████████████████████████████████████████████████████Ex. 14, NIKE0035800 at 804.

*Nike, Inc.'s Response:* **Undisputed.**

481.     In an Equity Research Report on "Sneakers As An Alternative Asset Class, Part III" dated May 24, 2022, Cowen stated the "major U.S. players in sneaker resale" are StockX, GOAT, Stadium Goods, and Flight Club.  This resale market is "fueling greater interest in the category which is a positive for Nike, [and] Jordan."  Ex. 9, NIKE0027914 at 935.

*Nike, Inc.'s Response:* **Disputed.**

Nike disputes StockX's characterization of Equity Research Report on "Sneakers As An Alternative Asset Class, Part III" dated May 24, 2022 which speaks for itself and reads in its entirety: "To recap, the major U.S. players in sneaker resale are StockX, GOAT, Stadium Goods (FTCH, Oliver Chen, and John Blacledge) and Flight Club and they maintain sophisticated, multi-step authentication systems to ensure that products are authentic and unworn. The trust in the market is critical to the overall user experience…This is in stark contrast to other resale markets that are marketplaces of used apparel, accessories and other categories. The key driving forces to this market are: 1) the weekly sneaker drops by the primary brands – Nike's weekly drops of new issues or re-releases; 2) community; 3) repeat purchase; and 4) digital.  The growing community of users is fueling greater interest in the category which is a positive for Nike, Jordan, Yeezy, and increasingly New Balance, Vans, Puma, Under Armour and others could be longer-term beneficiaries of the market's growth." Dkt. 257-9, Ex. 9 at NIKE0027935.

482.     In an Equity Research Report on "Sneakers As An Alternative Asset Class, Part III" dated May 24, 2022, Cowen reported on a survey it conducted which asked consumers "When

Shopping for Apparel, Footwear, Or Accessories Second Hand, Which Platform Did You Use?" Depending on the age group, between 9 and 27% of respondents answered "StockX", with the remaining respondents answering "The RealReal," "GOAT," "thredUP," "Poshmark," and "Other." Ex. 9, NIKE0027914 at 928.

*Nike, Inc.'s Response:* **Undisputed.**

483.    In an Equity Research Report on "Sneakers As An Alternative Asset Class, Part III" dated May 24, 2022, Cowen predicted that the sneaker resale market was "likely growing 30% to 40% [year over year] in 2022" on top of an approximately 100% growth from 2020 to 2022. Ex. 9, NIKE0027914 at 916.

*Nike, Inc.'s Response:* **Disputed.**

Nike disputes StockX's characterization of Equity Research Report on "Sneakers As An Alternative Asset Class, Part III" dated May 24, 2022 which speaks for itself and reads in its entirety: "We surveyed 2,500 consumers to analyze growth in sneaker resale and NFT engagement along with demographics of NFT owners and traders. Our data suggests sneaker resale (which is dominated by Nike, Jordan Brand and Yeezy) is likely growing 30% to 40% y/y on top of ~100% growth since 2020." Dkt. 257-9, Ex. 9 at NIKE0027916.

484.    An April 2019 internal Nike document titled "  " stated that

Ex. 14, NIKE0035800 at 803.

*Nike, Inc.'s Response:* **Undisputed.**

485.    An April 2019 internal Nike document titled "

" stated that Nike products                 U.S. sneaker resale market. Ex. 14, NIKE0035800 at 803.

*Nike, Inc.'s Response:* **Disputed.**

Nike disputes StockX's characterization of the April 2019 internal Nike document titled

███████████████████████████" which states that the "estimated US Nike

Resale Market Size" is "$██." Dkt. 257-14, Ex. 14 at NIKE0035803.

486.    In 2020, StockX estimated that the global secondary sneaker market was a $6

billion industry and the primary sneaker market was a $100 billion industry.  Ex. 45, StockX,

"StockX Snapshot: The State of Resale," https://stockx.com/news/state-of-resale.

*Nike, Inc.'s Response:* **Undisputed.**

487.    In an Equity Research Report on "Sneakers As An Alternative Asset Class, Part

III" dated May 24, 2022, Cowen stated that "Nike, Air Jordan, and Yeezy" account for 80–90% of

the sneaker resale market.  Ex. 9, NIKE0027914 at 930.

*Nike, Inc.'s Response:* **Undisputed.**

**B.    Counterfeit Sneakers and the Resale Market.**

*Counterfeits Are Pervasive in the Sneaker Industry*

488.    Footwear is the most counterfeited product in the world.  Ex. 1, Wells Rep. ¶ 100;

Ex. 46, NIKE0035759 at 760 (March 2019 internal Nike document stating "Shoes are the most

counterfeited category, with Nike being the most counterfeited brand."); Ex. 48, STX0805953

(December 2022 Economist article explaining that the "quality of counterfeit consumer goods have

never been greater" with the biggest category being "footwear").

*Nike, Inc.'s Response:* **Undisputed.**

489.    Increased demand for sneakers has been accompanied by an increase in the

pervasiveness of counterfeit products.  Ex. 1, Wells Rep. ¶¶ 83–90.

*Nike, Inc.'s Response:* **Disputed.**

Nike disputes that the increased demand for sneakers has led to the rise of counterfeits. As Ms. Kammel opined, "[w]hile the popularity of any product, particularly a high-demand product with limited availability, may drive legitimate business, an IP right holder's success is not the cause for criminal activity. To the contrary, the IP rights holder is the legal *victim* of criminal counterfeiting, not the cause of it." Kammel Rebuttal at 5.

490.    An April 2019 internal Nike document titled █████████████████████ ██████████" stated that Nike is the "#1 most counterfeited brand." Ex. 14, NIKE0035800 at 860; *see also* Ex. 47, Dep. Tr. of Joe Pallett ("Pallett Tr.") 160:16-22 (agreeing that "Nike is the most counterfeited brand"); Ex. 2, Paulson Tr. 130:4-131:2 (confirming it is accurate that at least within some point of reference Nike is the most counterfeited brand because they are the largest brand).

*Nike, Inc.'s Response:* **Undisputed.**

491.    An April 2019 internal Nike document titled "███████████████████████ ██████████" stated that the "Estimated Counterfeit Nike Market Size" is "███." Ex. 14, NIKE0035800 at 815.

*Nike, Inc.'s Response:* **Undisputed.**

### *The Quality of Counterfeits Has Increased Significantly*

492.    Over the past 25 years, the perceived quality of counterfeit sneakers has increased. Ex. 1, Wells Rep. ¶¶ 91-93, 100; Ex. 48, STX0805953 (Economist article explaining that the "quality of counterfeit consumer goods have never been greater" with the biggest category being "footwear"); Ex. 42, Kim Tr, 116:9-24 (testifying that he has noticed replicas "absolutely" becoming better quality over the past year and some shoes are now "indistinguishable").

*Nike, Inc.'s Response:* **Undisputed.**

493.    As of February 8, 2023, Joe Pallett was Nike's Director of Authentication and Innovation. Ex. 47, Pallett Tr. 43:4-6.

*Nike, Inc.'s Response:* **Undisputed**

494.    Mr. Pallett testified that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 47, Pallett

Tr. 280:2-17; *see also* Ex. 49, NIKE0025932 (March 2022 email from Nike employee Edgar

Chadwick to Pallett noting "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮.").

*Nike, Inc.'s Response:* **Disputed.**

Nike disputes that Nike brand protection "▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮" Mr. Pallett testified that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Sept. Duvdevani

Decl. ¶ 59, Ex. 58 Pallett Tr. 278:19-280:17. ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" *Id.* Mr. Pallett

also testified that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" *Id.* at 279:5-22.

495.    Nike expert John Hansen explained that there is an "increasing quality of

counterfeit 'Nike' shoes found in the market." Ex. 50, First Am. Expert Rep. of John L. Hansen ¶

40.

*Nike, Inc.'s Response:* **Undisputed.**

496.    The best counterfeit sneakers are virtually indistinguishable from authentic ones.

Ex. 1, Wells Rep. ¶ 92; Ex. 47, Pallett Tr. 172:15-20 ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Ex. 51, The Fashion Law,

"Nowadays, Counterfeit Goods are 'Almost Identical' to the Real Thing," May 24, 2018, www.thefashionlaw.com/counterfeit-goods-are-almost-identical-the-the-real-thing ("It is becoming increasing difficult – even for experts – to distinguish between authentic goods and counterfeit ones."); Ex. 52, Nicholas Schmidle, "Inside the Knockoff-Tennis-Shoe Factory," The New York Times, August 19, 2010, https://www.nytimes.com/2010/08/22/magazine/22fake-t html.

***Nike, Inc.'s Response:* Disputed.**

Nike disputes that the "best" counterfeit sneakers are virtually indistinguishable from authentic ones. While some footwear may appear almost identical in appearance, the quality and performance of counterfeit footwear is distinguishable from authentic Nike footwear as counterfeits have an unknown origin, unregulated materials, and unknown safety standards for manufacturing. *See* Dkt. 263-1, Kammel Decl. ¶ 2, Ex. A ("Kammel Rep.") § III.A; Dkt. 261-40, Ex. 40, Delli-Carpini Tr. 31:11-32:25, 239:11-240:14, 262:19-265:13.

497.    An April 2019 internal Nike document titled ███████████████████

███████ stated a ████████████████████████████████

███████████████████ Ex. 14, NIKE0035800 at 825.



***Nike, Inc.'s Response:*  Disputed. This statement is not material.**

Nike disputes StockX's characterization of the April 2019 internal Nike document titled ███████████████████████████ which relates to a conceptual pitch considering ███████████████████████ Dkt. 257-14, Ex. 14, NIKE0035800 at 822.  This statement is not material, as the project had no relationship to Nike's Brand Protection team or Nike's Brand Protection technology, ███████ which Nike's Brand Protection team is able

to use to verify a product as a "100 percent authentication." Sept. Duvdevani Decl. ¶ 59, Ex. 58, Pallet Tr. 153:17-155:16

### *Resale Consumers Are Aware of Counterfeits*

498.    An April 2019 internal Nike document titled ███████████████████████████

███████████ stated that █████████████████████████████████████████████████

Ex. 14, NIKE0035800 at 802.

**Nike, Inc.'s Response: Disputed.**

Nike disputes StockX's characterization of the April 2019 internal Nike document titled

██████████████████████████" which reads in full context: ███████████████████

██████████████████████████████████ including ████████████████████████████

██████████████████████████████████ Dkt. 257-14, Ex. 14 at

NIKE0035802.

499.    It is well known in the sneakerhead community that even experts may have a difficult time distinguishing authentic sneakers from very well made counterfeit ones, making it easier to sell counterfeits.  Ex. 1, Wells Rep. ¶ 92.

**Nike, Inc.'s Response: Disputed.**

Nike does not dispute that Mr. Wells testified in his report that "[b]ecause the quality of some counterfeits is so high, it is well-known in the Sneakerhead community that even experts may have a difficult time distinguishing authentic sneakers from very well-made counterfeit ones, making it easier to sell counterfeits." Wells Rep. at ¶ 92.  Mr. Wells also testified that "[b]y having this verified process in place, [StockX] gives me and sneakerheads the – the feeling, the comfort of somebody's at least looking and touch these sneakers." Sept. Duvdevani Decl. ¶ 8, Ex. 7, Wells Tr. 126:2-11.  Nike disputes that sneakerheads are a significant portion of StockX's customers.  *Id.*

¶ 6, Ex. 5, STX0091819 at 841 ██████████████████████████

██████████████████████████████████ Ordinary consumers purchase

products from StockX.  *Id.* ¶ 9, Ex. 8, STX0226300 (complaint from mother who purchased

purportedly genuine Nike sneakers on StockX as a "gift for [her] son" that "broke in the middle of

a [track] race").  Nike also disputes that Mr. Wells is qualified to opine concerning beliefs of

"sneakerheads" without conducting any scientific or reliable methodology such as a survey to test

such beliefs.  As such, Mr. Wells is not qualified to opine concerning what is "well known in the

sneakerhead community," and thereby offers an improper expert opinion that is unsupported by

sufficient facts or data, and is not derived from a scientific or otherwise reliable method or process,

making his opinion more prejudicial than it is probative.  Fed. R. Evid. 403, 702; *LVL XIII Brands,*

*Inc.*, 209 F. Supp. 3d at 638-39.

500.    The issue of counterfeits is commonly discussed in the sneakerhead community,

such as in online forums like NikeTalk.  Ex. 1, Wells Rep. ¶ 101; Ex. 53, NikeTalk, "The Official

Real vs Fake Comparison Thread," July 23, 2020, https://niketalk.com/threads/theofficial-real-vs-

fake-comparison-thread.690734.

***Nike, Inc.'s Response:* Disputed.**

Nike does not dispute that Mr. Wells opined that "[t]he issue of counterfeits is also

commonly discussed in the Sneakerhead communities of which [he is] a part," including the

example of several pinned threads on the NikeTalk forum.  Wells Rep.  ¶ 101.  However, Nike

disputes that the isolated examples provided by Mr. Wells and based only on the online

communities he participates is representative of the entirety of the sneakerhead community or

evidences how commonly the issue is discussed. As such, Mr. Wells offers an improper expert

opinion that is unsupported by sufficient facts or data, and is not derived from a scientific or

otherwise reliable method or process, making his opinion more prejudicial than it is probative. Fed. R. Evid. 403, 702; *LVL XIII Brands, Inc.*, 209 F. Supp. 3d at 638-39.  Instead, Mr. Wells opinion appears to be informed by reading unidentified comments, with no information concerning whether the individuals meet his definition of "sneakerhead."  Nike disputes that sneakerheads are a significant portion of StockX's customers.  Sept. Duvdevani Decl. ¶ 6, Ex. 5, STX0091819 at 841 ███████████████████████████████████████████████

███████████████████████████  Ordinary consumers purchase products from StockX.  *Id.* ¶ 9, Ex. 8, STX0226300 (complaint from mother who purchased purportedly genuine Nike sneakers on StockX as a "gift for [her] son" that "broke in the middle of a [track] race").

501.    Sneakerheads are aware that counterfeit sneakers are common.  Ex. 1, Wells Rep. ¶¶ 100–103.

*Nike, Inc.'s Response:* **Disputed.**

Nike does not dispute that Mr. Wells opined in his report that "[s]neakerheads are generally aware that counterfeit sneakers are common" and testified that his opinion was based on his experience in sneaker culture.  Sept. Duvdevani Decl. ¶ 8, Ex. 7, Wells Tr. 89:18-90:5.  However, during his deposition, Mr. Wells explained that sneakerheads may differ in how common they think counterfeit is which directly contradicts any conclusion that all sneakerheads are aware that counterfeit sneakers are common.  *Id.* at 88:4-9.  Further, Mr. Wells testified that sneakerhead perceive counterfeits are more common when purchases from certain source rather than others, for example, he "believe[s] that there's more counterfeit fake sneakers on eBay than there are on StockX" because of "[StockX's] verification program. *Id.* at 91:4-93:14.  Mr. Wells also testified that "[t]here is a possibility that a [StockX] customer, be it general consumer or sneakerhead" does not know its possible that they could buy counterfeits on StockX. *Id.* at 133:5-20.  Mr. Wells has

not conducted a survey or other study to determine what "sneakerheads" believe.  *See* Wells Rep.

Ex. 1. As such, Mr. Wells offers an improper expert opinion that is unsupported by sufficient facts

or data, and is not derived from a scientific or otherwise reliable method or process, making his

opinion more prejudicial than it is probative.  Fed. R. Evid. 403, 702; *LVL XIII Brands,* 209 F.

Supp. 3d at 638-39 (witness who qualified as an expert in certain areas of fashion history and

intellectual property law was not qualified to opine on consumers' perceptions given that, inter

alia, "he did not conduct a marketing analysis or a . . . survey.").  Instead, Mr. Wells opinion

appears to be informed by reading unidentified comments, with no information concerning

whether the individuals meet his definition of "sneakerhead."  Nike disputes that sneakerheads are

a significant portion of StockX's customers.  Sept. Duvdevani Decl. ¶ 6, Ex. 5, STX0091819 at

841 ███████████████████████████████████████████████████████████

███████████████████████████  Ordinary consumers purchase products from StockX.  *Id.* ¶ 9,

Ex. 8, STX0226300 (complaint from mother who purchased purportedly genuine Nike sneakers

on StockX as a "gift for [her] son" that "broke in the middle of a [track] race").

502.    StockX consumer Roy Kim stated "[a]s sneaker heads, we're conditioned to think

that any shoe[] . . . could be fake that comes through these platforms."  Ex. 42, Kim Tr, 106:20-

25; 115:20-22; 109:20-110:02 (explaining that "as a sneaker reseller, we can never be a hundred

percent sure of the authenticity of the shoe").

***Nike, Inc.'s Response:*** **Disputed.**

Nike disputes StockX's characterization of Mr. Kim's testimony which speaks for itself

and explains when asked whether he suspected he had ever purchased inauthentic sneakers from

GOAT, "[a]s sneaker heads, we're conditioned to think that any shoes is likely – it could be fake

that comes through these platforms. But I've not got any definitive feelings about GOAT selling

fakes, no." Dkt. 257-42, Ex. 42, Kim Tr. 115:20-22.  Further, Mr. Kim, a reseller himself, testified that "as a sneaker reseller, we can never be a hundred percent sure of the authenticity of the shoe. Only Nike can really – only Nike really can give that determination." *Id*. at 109:20-110:04.  Nike objects to the statement to the extent StockX relies on it to contend that all "sneakerheads" share Mr. Kim's personal beliefs.  Fed. R. Evid. 701.  Nike disputes that sneakerheads are a significant portion of StockX's customers.  Sept. Duvdevani Decl. ¶ 6, Ex. 5, STX0091819 at 841 ███████

████████████████████████████████████████████████████████████████████████████████

████████████████    Ordinary consumers purchase products from StockX.  *Id.* ¶ 9, Ex. 8, STX0226300 (complaint from mother who purchased purportedly genuine Nike sneakers on StockX as a "gift for [her] son" that "broke in the middle of a [track] race").

503.    Despite that difficulty, working to stop counterfeit sales benefits consumers.  Ex. 30, Dep. Tr. of Kari Kammel 215:21-216:13 (agreeing that "if there's an opportunity for someone to remove a potential counterfeit good from the stream of commerce," that act is beneficial).

*Nike, Inc.'s Response:* **Disputed.**

Nike disputes StockX's characterization of Ms. Kammel's testimony which speaks for itself and reads in its entirety: "if there's any opportunity for someone to remove a potential counterfeit good from the stream of commerce, whether that's someone enforcing on Canal Street, or a brand owner submitting for a notice and take down or a law enforcement agent following up, yes, the goal of all brand protection and anti-counterfeiting is to remove counterfeit – counterfeit listings or counterfeit products, depending on whether it's brick and mortar or any e-commerce." Sept. Duvdevani Decl. ¶ 48, Ex. 47, Kammel Tr. 215:21-216:13.  Nike disputes that this fact is material as StockX's Accused Advertising does not merely state that StockX "works to stop counterfeiting."  Nike disputes that StockX's authentication efforts are effective. ███████

███████████████████████████████████████ *See* Dkt. 261-43, Ex. 43, STX0018010

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████ Dkt. 261-49,

Ex. 49, Huber Feb. Tr. 22:23-24:4 ████████████████████████████████

█████████████████████████████████████ Dkt. 261-101, Ex.

95 at STX0069542 (StockX consumer facing policy that "[i]f an item is unable to successfully

complete verification, [StockX] will return the item to the shipping address listed on the Seller's

StockX account.").  Rather, StockX's resell-not-refund policy also makes it highly likely that

consumers were encouraged to resell likely counterfeits on StockX in lieu of a refund. Dkt, 261-

87, Ex. 81 at STX0775192 (encouraging customer to resell suspected counterfeits on StockX);

Dkt. 261-88, Ex. 82, at STX0777402 (same); Dkt. 261-89, Ex. 83 at STX0777769-70 (same); Dkt.

261-91, Ex. 85 atSTX0777124 (same); Dkt. 261-92, Ex. 86 at STX0220611 (same); Dkt. 261-93,

Ex. 87 at STX0220624 (same); Dkt. 261-94, Ex. 88 at STX0802187-88 (same).

## C.    StockX and Competing Resale Marketplaces' Offerings of Authentication Services.

504.    Some resale marketplaces take steps to verify the authenticity of products sold on

their platforms.  Ex. 21, Tucker Rep. ¶¶ 27; 46-50; Ex. 1, Wells Rep. ¶ 105.

*Nike, Inc.'s Response:* **Disputed. This statement is not material.**

Nike does not dispute that some resale marketplaces, at some point in time, have language

on their website purporting to represent that they take steps to verify the authenticity of products

sold on their platforms but disputes that any are able to "verify the authenticity of products" as

"only the IP Rights holder" can actually authenticate or prove that a product is genuine.  Kammel

Rebuttal at 20-21. Nike disputes that this fact is material as StockX' Accused Advertising does not

merely state that StockX "takes steps to verify the authenticity of products."  Nike disputes that

StockX's authentication efforts are effective.  ███████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████  StockX's resell-not-

refund policy also makes it highly likely that consumers were encouraged to resell likely

counterfeits on StockX in lieu of a refund.  Dkt, 261-87, Ex. 81 at STX0775192 (encouraging

customer to resell suspected counterfeits on StockX); Dkt. 261-88, Ex. 82, at STX0777402 (same);

Dkt. 261-89, Ex. 83 at STX0777769-70 (same); Dkt. 261-91, Ex. 85 atSTX0777124 (same); Dkt.

261-92, Ex. 86 at STX0220611 (same); Dkt. 261-93, Ex. 87 at STX0220624 (same); Dkt. 261-94,

Ex. 88 at STX0802187-88 (same). Ms. Tucker's report bases her opinions on publicly available

statements from the platforms and assumes for the purpose of her analysis that the information is

accurate, without any scientific approach or reliable principles to guide her analysis, making her

opinion inadmissible as improper and unreliable in violation of Fed. R. Evid. 403 and 702.  Sept.

Duvdevani Decl. ¶ 14, Ex. 13, Tucker Tr. 132:22-24, 146:12-14, 152:24-25, 179:12-20; 180:16-

25, Tucker Rep. ¶ 47.

 505. eBay, Flight Club, the RealReal, Stadium Goods, and GOAT have taken various

measures to verify the authenticity of sneakers and other products sold through their platforms to

make resale transactions safer and more secure.  Ex. 1, Wells Rep. ¶ 105 (discussing GOAT);

Tucker Rep. ¶¶ 37; 46-47 (discussing eBay, GOAT, Flight Club, and Stadium Goods); eBay (Ex.

55, STX0805901); Flight Club (Ex. 56, STX0805880, Ex. 57, STX0805882); Ex. 58, The

RealReal, "We Authenticate Every Item," https://promotion.therealreal.com/therealreal-experts/#.

***Nike, Inc.'s Response***: **Disputed. This statement is not material.**

 Nike does not dispute that eBay, Flight Club, the RealReal, Stadium Goods, and GOAT

have had language on their website, at some point in time, that they take steps to verify the

authenticity of products sold on their platforms but disputes that any are able to "verify the authenticity of products" as Nike objects to the extent that the statement implies that efforts by third parties are relevant to the facts or issues in this case, as neither StockX, Mr. Wells, or Ms. Tucker have offered information concerning the effectiveness of the third-party platforms identified in the statement.  Mr. Wells' and Ms. Butler's reports base their opinion on publicly available statements from the platforms and assumes for the purpose of their analysis that the information is accurate, without any scientific approach or reliable principles to guide their analysis, making their opinions inadmissible as improper and unreliable in violation of Fed. R. Evid. 403 and 702.  Sept. Duvdevani Decl. ¶ 8, Ex. 7 Wells Tr. 121:16-122:11; *id.* ¶ 14, Ex. 13, Tucker Tr. 132:22-24, 146:12-14, 152:24-25, 179:12-20, 180:16-25.

506.    GOAT is "an online platform specializing in the resale of sneakers, streetwear, and luxury apparel."  Ex. 21, Tucker Rep. ¶ 46; Ex. 14, NIKE0035800 at 804 (explaining that GOAT (now merged with Flight Club) is a marketplace that matches buyers and sellers of new and used sneakers).

***Nike, Inc.'s Response:* Undisputed. This statement is not material.**

507.    GOAT "verifies the products traded on its platform after a purchase has taken place and relies on both a team of experts and technologies like digital authentication and machine learning to issue an 'Assurance of Authenticity' to buyers."  Ex. 21, Tucker Rep. ¶ 46; Ex. 59, STX0805899 (in response to an FAQ: "How do I know if the Items are real," GOAT explains that it offers an "Assurance of Authenticity"); Ex. 60, GOAT, "Assurance of Authenticity," https://www.goat.com/verification ("Our resale products and our trusted partners are verified or vetted by a variety of means, such as digital authentication, in-hand verification, and/or machine learning technology."); Ex. 61, ZDNet, "GOAT Uses Machine Learning, Computer Vision to

Verify Your Top Dollar Sneakers Are Authentic," August 19, 2018, https://www.zdnet.com/article/goat-uses-machine-learning-computer-vision-to-verify-your-top-dollar-sneakers-are-authentic/ ("[W]hen that shoe is purchased, the seller ships it to us to verify. And we verify that product the same day using our sophisticated machine learning and computer vision, and our industry knowledge. And release the funds to the seller. And then we ship that product to the buyer to purchase.").

*Nike, Inc.'s Response:* **Disputed. This statement is not material.**

Nike does not dispute that GOAT, at some point in time, stated on its website that it ""verifies the products traded on its platform after a purchase has taken place and relies on both a team of experts and technologies like digital authentication and machine learning to issue an 'Assurance of Authenticity' to buyers" but disputes that GOAT is able to "verify the authenticity of products" as "only the IP Rights holder" can actually authenticate, or prove that a product is genuine. Kammel Rebuttal at 20-21. Neither StockX nor Ms. Tucker have offered any information concerning the effectiveness of GOAT's authentication practices. Ms. Tucker's report bases her opinions on publicly available statements from the platforms and assumes for the purpose of her analysis that the information is accurate, without any scientific approach or reliable principles to guide her analysis, making her opinion inadmissible as improper and unreliable in violation of Fed. R. Evid. 403 and 702. Sept. Duvdevani Decl. ¶ 14, Ex. 13, Tucker Tr. 132:22-24, 146:12-14, 152:24-25, 179:12-20, 180:16-25; Tucker Rep. ¶ 46.

508. Flight Club and Stadium Goods are also competitor resale markets. Ex. 21, Tucker Rep. ¶ 47; Ex. 14, NIKE0035800 at 804 (listing Flight Club and Stadium Goods as resale markets).

*Nike, Inc.'s Response:* **Undisputed. This statement is not material.**

509.    Flight Club and Stadium Goods "follow a consignment model where product authentication happens before products are listed for sale."  Ex. 21, Tucker Rep. ¶ 47; Ex. 62, Niche Pursuits, "Is Flight Club legit? Get all the info to help you decide," November 2, 2022, https://www.nichepursuits.com/is-flight-club-legit ("Flight Club sells new products sourced through retail channels and second-market goods using the consignment model. Sellers send in their shoes, and Flight Club verifies the sneakers before marketing them online or in one of three stores."); Ex. 63, Stadium Goods, "Is Stadium Goods Legit?," December 20, 2022, https://www.stadiumgoods.com/en-us/article/is-stadium-goods-legit ("Stadium Goods is the only aftermarket that pre-authenticates its entire inventory.").

***Nike, Inc.'s Response:* Disputed. This statement is not material.**

Nike does not dispute that Flight Club and Stadium Goods stated on their websites, at some point in time, that they "follow a consignment model where product authentication happens before products are listed for sale" but disputes that Flight Club or Stadium Goods are able to "authenticat[e]" as "only the IP Rights holder" can actually authenticate, or prove that a product is genuine. Kammel Rebuttal at 20-21.  Neither StockX nor Ms. Tucker have offered any information concerning the effectiveness of Flight Club or Stadium Goods' authentication practices.  Ms. Tucker's report bases her opinions on publicly available statements from the platforms and assumes for the purpose of her analysis that the information is accurate, without any scientific approach or reliable principles to guide her analysis, making her opinion inadmissible as improper and unreliable in violation of Fed. R. Evid. 403 and 702.  Sept. Duvdevani Decl. ¶ 14, Ex. 13, Tucker Tr. 132:22-24, 146:12-14, 152:24-25, 179:12-20, 180:16-25; Tucker Rep. ¶ 47.

510.    Stadium Goods verification process relies predominantly on in-person inspections of sneakers by trained staff, but it also relies on "a variety of technical methods to ensure [the] inventory's authenticity." Ex. 21, Tucker Rep. ¶ 47; Ex. 64, STX0805884.

**Nike, Inc.'s Response:** **Disputed. This statement is not material.**

Nike does not dispute that Stadium Goods, at some point in time, stated on website that it relies on a variety of technology methods but disputes that Stadium Goods is able to "ensure inventory's authenticity" as "only the IP Rights holder" can actually authenticate, or prove that a product is genuine. Kammel Rebuttal at 20-21. Neither StockX nor Ms. Tucker have offered any information concerning the effectiveness of Stadium Goods' authentication practices.    Ms. Tucker's report bases her opinions on publicly available statements from the platforms and assumes for the purpose of her analysis that the information is accurate, without any scientific approach or reliable principles to guide her analysis, making her opinion inadmissible as improper and unreliable in violation of Fed. R. Evid. 403 and 702.  Sept. Duvdevani Decl. ¶ 14, Ex. 13, Tucker Tr. 132:22-24, 146:12-14, 152:24-25, 179:12-20, 180:16-25; Tucker Rep. ¶ 47.

511.    Stadium Goods has stated that it has "a proprietary 10-point verification system to ensure all items are authentic, while also examining the wear and condition."   Ex. 65, STX0805883.

**Nike, Inc.'s Response:** **Disputed. This statement is not material.**

Nike does not dispute that Stadium Goods stated on its website, at some point in time, that it has "a proprietary 10-point verification system to ensure all items are authentic, while also examining the wear and condition."  Nike disputes that Stadium Goods is able to "ensure all items are authentic" as "only the IP Rights holder" can actually authenticate, or prove that a product is genuine. Kammel Rebuttal at 20-21. StockX has not offered any information concerning the

effectiveness of Stadium Goods' authentication practices.  Fed. R. Evid. 403.  Nike also objects to Ex. 65 (Dkt 257-65) as hearsay not within an exception that is incapable of being offered in an admissible form at trial.  Fed. R. Evid. 802.  The attached screenshot can only be authenticated by StockX, it cannot be offered for the truth of the matter asserted without a person with knowledge of the statement or otherwise falling into another hearsay exception.  *Id.*

512.    Stadium Goods claims to have the "most thorough inspection process in the business."    Ex.    66,    Stadium    Goods,    "Authenticity,"    Aug.    5,    2024, https://www.stadiumgoods.com/en-us/authenticity.

***Nike, Inc.'s Response:* Disputed. This statement is not material.**

Nike does not dispute that Stadium Goods stated on its website, at some point in time, that it had the "most thorough inspection process in the business" but disputes that Stadium Goods is able to verify the authenticity of products using this "inspection process" as "only the IP Rights holder" can actually authenticate, or prove that a product is genuine. Kammel Rebuttal at 20-21. StockX has not offered any information concerning the effectiveness of Stadium Goods' authentication practices.  Fed. R. Evid. 403.  Nike also objects to Ex. 66 (Dkt 257-66) as hearsay not within an exception that is incapable of being offered in an admissible form at trial.  Fed. R. Evid. 802.  The attached screenshot can only be authenticated by StockX, it cannot be offered for the truth of the matter asserted without a person with knowledge of the statement or otherwise falling into a hearsay exception.  *Id.*

513.    On Flight Club, all shoes are authenticated and verified by a team of trained specialists.  Ex. 21, Tucker Rep. ¶ 47; Ex. 57, STX0805882 ("All shoes are authenticated and verified to be as described by our team of trained specialists").

***Nike, Inc.'s Response:* Disputed. This statement is not material.**

Nike does not dispute that Flight Club stated on its website, at some point in time, that it authenticated and verified products sold on their platforms but disputes that Flight Club are able to verify the authenticity of products as "only the IP Rights holder" can actually authenticate, or prove that a product is genuine. Kammel Rebuttal at 20-21. Neither StockX nor Ms. Tucker have offered any information concerning the effectiveness of Flight Club's authentication practices. Ms. Tucker's report bases her opinions on publicly available statements from the platforms and assumes for the purpose of her analysis that the information is accurate, without any scientific approach or reliable principles to guide her analysis, making her opinion inadmissible as improper and unreliable in violation of Fed. R. Evid. 403 and 702. Sept. Duvdevani Decl. ¶ 14, Ex. 13, Tucker Tr. 132:22-24, 146:12-14, 152:24-25, 179:12-20, 180:16-25; Tucker Rep. ¶ 47. Nike also objects to Ex. 57 (Dkt 257-57) as hearsay not within an exception that is incapable of being offered in an admissible form at trial. Fed. R. Evid. 802. The attached screenshot can only be authenticated by StockX, it cannot be offered for the truth of the matter asserted without a person with knowledge of the statement or otherwise falling into a hearsay exception. *Id.*

514.    Many online platforms and marketplaces offer an authenticity guarantee with their authentication services, including Amazon (Ex. 69, STX0805863 at 877 ("[O]ur A-to-Z guarantee ensures customers can get a full refund for any item . . . If we identify that a customer purchased a counterfeit from Amazon or from a third-party seller, Amazon proactively contacts the customer, informs them that they purchased a counterfeit product, and fully refunds their purchase"); *see also* Ex. 67, STX0805859, Ex. 68, STX0805862); Flight Club (Ex. 56, STX0805880, Ex. 57, STX0805882); Stadium Goods (Ex. 65, STX0805883, Ex. 64, STX0805884); Sole Supremacy (Ex. 70, STX0805890, *see* Ex. 71, STX0805891), Project Blitz (Ex. 72, STX0805892), Index (Ex. 73, STX0805896), GOAT (Ex. 59, STX0805899), eBay (Ex. 55, STX0805901); Ex. 58, The

RealReal       (The       RealReal,       "We       Authenticate       Every       Item,"
https://promotion.therealreal.com/therealreal-experts/#).

***Nike, Inc.'s Response:*** **Disputed. This statement is not material.**

Nike does not dispute that other online platforms and marketplaces have, at some point in time, had language on their website regarding an "authenticity guarantee" but disputes that any are able to verify the authenticity of products as "only the IP Rights holder" can actually authenticate, or prove that a product is genuine. Kammel Rebuttal at 20-21. StockX has not offered any information concerning the effectiveness of Amazon's, Flight Club's, Stadium Goods', Sole Supremacy's, Index's, GOAT's, eBay's, or TheRealReal's authentication practices. Fed. R. Evid. 403. Nike also objects to Exhibits 55-59, 64-73 (Dkts 257-55-257-59, 257-64-257-73) as hearsay not within an exception that is incapable of being offered in an admissible form at trial. Fed. R. Evid. 802. The attached screenshots can only be authenticated by StockX, they cannot be offered for the truth of the matter asserted without a person with knowledge of the statement or otherwise falling into a hearsay exception. *Id.*

515.    Flight Club has stated that all of its inventory is "guaranteed authentic." Ex. 56, STX0805880 at 882.

***Nike, Inc.'s Response:*** **Disputed. This statement is not material.**

Nike does not dispute that Flight Club stated on its website that all of its inventory is "guaranteed authentic" but disputes that Flight Club is able to guarantee authenticity as "only the IP Rights holder" can actually authenticate, or prove that a product is genuine. Kammel Rebuttal at 20-21. StockX has not offered any information concerning the effectiveness of Flight Clubs' authentication practices. Fed. R. Evid. 403. Nike also objects to Ex. 56 (Dkt. 257-56) as hearsay not within an exception that is incapable of being offered in an admissible form at trial. Fed. R.

Evid. 802. The attached screenshots can only be authenticated by StockX, it cannot be offered for the truth of the matter asserted without a person with knowledge of the statement or otherwise falling into a hearsay exception. *Id.*

516. eBay provides an "Authenticity Guarantee," stating: "Your item is carefully inspected inside and out to make sure it's authentic and matches the listing." Ex. 54, eBay, https://pages.ebay.com/authenticity-guarantee/.

**Nike, Inc.'s Response: Disputed. This statement is not material.**

Nike does not dispute that eBay has stated on its website at some point in time that it provides an "Authenticity Guarantee" but disputes that eBay is able to guarantee authenticity as "only the IP Rights holder" can actually authenticate, or prove that a product is genuine. Kammel Rebuttal at 20-21. StockX has not offered any information concerning the effectiveness of eBay's authentication practices. Fed. R. Evid. 403. Nike also objects to Ex. 54 (Dkt. 257-54) as hearsay not within an exception that is incapable of being offered in an admissible form at trial. Fed. R. Evid. 802. The attached screenshot can only be authenticated by StockX, it cannot be offered for the truth of the matter asserted without a person with knowledge of the statement or otherwise falling into a hearsay exception. *Id.*

517. TheRealReal states it "[a]uthenticate[s] [e]very [i]tem," and has "the most rigorous authentication process in the marketplace." Ex. 58, The RealReal, "We Authenticate Every Item," https://promotion.therealreal.com/therealreal-experts/#.

**Nike, Inc.'s Response: Disputed. This statement is not material.**

Nike does not dispute that TheRealReal states on its website that it "authenticate[s] [e]very [item]" and has "the most rigorous authentication process in the marketplace" but disputes that TheRealReal is able to guarantee authenticity as "only the IP Rights holder" can actually

authenticate, or prove that a product is genuine. Kammel Rebuttal at 20-21. StockX has not offered any information concerning the effectiveness of TheRealReal's authentication practices. Fed. R. Evid. 403. Nike also objects to Ex. 58 (Dkt. 257-58) as hearsay not within an exception that is incapable of being offered in an admissible form at trial. Fed. R. Evid. 802. The attached screenshot can only be authenticated by StockX, it cannot be offered for the truth of the matter asserted without a person with knowledge of the statement otherwise falling into a hearsay exception. *Id.*

518.    Stadium Goods has stated that "all Stadium Goods merchandise is authentic, guaranteed" and "100% Authentic. Guaranteed." Ex. 65, STX0805883; *see* Ex. 64, STX0805884; Ex. 66, Stadium Goods, "Authenticity," Aug. 5, 2024, https://www.stadiumgoods.com/en-us/authenticity ("Our business is built on trust, and every item we sell is guaranteed authentic.").

*Nike, Inc.'s Response:* **Disputed. This statement is not material.**

Nike does not dispute that, at some point in time, the words Stadium Goods "all Stadium Goods merchandise is authentic, guaranteed" and "100% Authentic. Guaranteed" have appeared on the Stadium Goods website but disputes that Stadium Goods is able to guarantee authenticity as "only the IP Rights holder" can actually authenticate, or prove that a product is genuine. Kammel Rebuttal at 20-21. StockX has not offered any information concerning the effectiveness of Stadium Goods' authentication practices. Fed. R. Evid. 403. Nike also objects to Exhibits 64-66 (Dkts. 257-64-257-66) as hearsay not within an exception that is incapable of being offered in an admissible form at trial. Fed. R. Evid. 802. The attached screenshots can only be authenticated by StockX, they cannot be offered for the truth of the matter asserted without a person with knowledge of the statement or otherwise falling into a hearsay exception. *Id.*

519.    Sole Supremacy states that "[a]ll shoes are guaranteed to be 100% authentic."  Ex. 70, STX0805890; Ex. 74, Sole Supremacy, "FAQ," https://www.solesupremacy.com/pages/faq.

***Nike, Inc.'s Response:* Disputed. This statement is not material.**

Nike does not dispute that, at some point in time, the words "100% authentic" appear on the Sole Supremacy website but disputes that Sole Supremacy is able to guarantee authenticity as "only the IP Rights holder" can actually authenticate, or prove that a product is genuine. Kammel Rebuttal at 20-21. StockX has not offered any information concerning the effectiveness of Sole Supremacy's authentication practices.  Fed. R. Evid. 403.  Nike also objects to Exhibits 70 and 74 (Dkts. 257-70, 257-74) as hearsay not within an exception that is incapable of being offered in an admissible form at trial.  Fed. R. Evid. 802.  The attached screenshots can only be authenticated by StockX, they cannot be offered for the truth of the matter asserted without a person with knowledge of the statement or otherwise falling into a hearsay exception.  *Id.*

520.    Project Blitz has stated that "every item sold in the Project BLITZ boutique is 100% authentic and is on hand in our inventory."  Ex. 72, STX0805892.

***Nike, Inc.'s Response:* Disputed. This statement is not material.**

Nike does not dispute that Project BLITZ, at some point in time, stated on its website that that products sold in its boutique are "100% authentic" but disputes that Project BLITZ is able to guarantee authenticity as "only the IP Rights holder" can actually authenticate, or prove that a product is genuine. Kammel Rebuttal at 20-21. StockX has not offered any information concerning the effectiveness of Project BLITZ's authentication practices.  Fed. R. Evid. 403.   Nike also objects to Ex. 72 (Dkt. 257-72) as hearsay not within an exception that is incapable of being offered in an admissible form at trial.  Fed. R. Evid. 802.   The attached screenshots can only be

authenticated by StockX, it cannot be offered for the truth of the matter asserted without a person with knowledge of the statement or otherwise falling into a hearsay exception. *Id.*

521.    Index has stated "we guarantee that all shoes are authentic." Ex. 73.

***Nike, Inc.'s Response:* Disputed. This statement is not material.**

Nike does not dispute that Index stated on its website that it guaranteed the authenticity of shoes it sold but disputes that Index is able to guarantee authenticity as "only the IP Rights holder" can actually authenticate, or prove that a product is genuine. Kammel Rebuttal at 20-21. StockX has not offered any information concerning the effectiveness of Index's authentication practices. Fed. R. Evid. 403. Nike also objects to Ex. 73 (Dkt. 257-73) as hearsay not within an exception that is incapable of being offered in an admissible form at trial. Fed. R. Evid. 802. The attached screenshots can only be authenticated by StockX, it cannot be offered for the truth of the matter asserted without a person with knowledge of the statement or otherwise falling into a hearsay exception. *Id.*

**D.    StockX's Authentication Process.**

522.    StockX has an authentication process through which every item sold through the StockX platform is physically inspected. Ex. 23, Feb. Huber Tr. 21:3-4 ("We authenticate, verify every single item that's sold on the platform"); Ex. 23, Feb. Huber Tr. 101:10-16. ("[B]ecause we verify every single transaction that sells on our platform, we actually had to ship that item twice. We ship it from -- the seller ships it to us, and we provide a label. And after it has passed our verification process, we ship it to the buyer. And that is another label that we provide and we have to pay for"); Ex. 36, June Huber Tr. 28:4-6 █████████████████████████████████

████████████████████████████████ Ex. 75, STX0752605-642 ██████████

████████████████████████████████████████████

████████████████████████████████ Ex. 76, Dep. Tr. of John Lopez

("Lopez Tr.") 136:2-51 ████████████████████████████████████

████████████████████████████████████████████████████████████

████████ Ex. 76, Lopez Tr. 158:1-160:6 ██████████████████████

████████████████████████ Ex. 76, Lopez Tr. 166:4-24 █████████

████████████████████████████████

***Nike, Inc.'s Response:* Disputed.**

      Nike does not dispute that StockX has an verification process but disputes that any physical inspection by StockX can determine whether the product is authentic.  As Ms. Kammel opined, "StockX cannot guarantee that the consumer's purchases are authentic and no one at StockX can actually authenticate other IP rights holders' products." Kammel Rep. at 29.  ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ Sept.

Duvdevani Decl. ¶ 57, Ex. 56, Lopez Tr. 178:18-179:1.  ████████████████████

████████████████████████████ Dkt. 261-43, Ex. 43, STX0018010 ████████████

███████████████████████████████████████████████

      523.    StockX's authentication process reviews products to determine whether they show indicia of counterfeits.  Ex. 23, Feb. Huber Tr. 23:23-24:20 (explaining that the authentication process looks at whether an item "potentially may be inauthentic" and, if it is, it is "not welcomed to be transacted in our platform"); Ex. 75, STX0752605 at 612 ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████

***Nike, Inc.'s Response:* Disputed.**

Nike does not dispute that StockX's verification process attempts to identify █████ ████████████████████████████ which could raise suspicions about obvious counterfeits but disputes that this is a basis for determining whether a product is authentic. Ms. Kammel opined that "[w]hile overt differences in quality or poor copying can allow a non-IP rights holder to see an obvious counterfeit, it is not the basis for authentication, nor can any platform claim to do this with 100% accuracy as StockX does." Kammel Rebuttal at 21. As StockX does not have access to Nike's proprietary brand protection technology, it is not able to identify all indicia of counterfeiting. Dkt. 262, Pallet Decl.¶ 7. ████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ Consumers have complained that purportedly genuine Nike sneakers purchased on StockX bear obvious signs that the sneakers are in fact counterfeit. Dkt. 261-94, Ex. 88 at STX0802167, STX0802187-88; Dkt. 261-95, Ex. 89, Amidon Tr. 89:14-90:11 (testifying that items sold to Mr. Kim "should not have passed [StockX's] authentication process."); Dkt. 262-12, Ex. 12 at ZK_NIKE_007865 (Mr. Malekzadeh responded to Mr. Lopez on Mr. Malekzadeh's email subject █████ stating: █████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████

524.    StockX's authentication process also examines sneakers for issues other than whether the product is authentic. Ex. 76, Lopez Tr. 160:02-06.

***Nike, Inc.'s Response:*** **Disputed.**

Nike does not dispute that StockX's "authentication" process purports to examine sneakers for issues including whether the product is brand new, free of defects, that the accessories are included, and making sure the box is not damaged but disputes that StockX process accurately detects these issues. ████████████████████████████████

████████████████ Sept. Duvdevani Decl. ¶ 57, Ex. 56, Lopez Tr. 114:2-7.

525.    Items sold on StockX, with the exception of refurbished watches and electronics, must be in deadstock condition.  Ex. 77, NIKE0040098 at 099; Ex. 75, STX0752605 at 615, 623-624, 629-630, 635, 640-641 ████████████████████████

***Nike, Inc.'s Response:* Disputed.**

Nike does not dispute that StockX claims that items sold on its platform must be in "deadstock" condition but disputes that StockX accurately screens for used shoes.  Numerous consumers have complained about the receipt of shoes that appear "worn" ████████████

███████████████████████████████████████████████████

██████ Dkt. 261-81, Ex. 75 at STX0019984. StockX also claims that "[i]n certain situations, StockX provides buyers with the opportunity to accept a product with a slightly damaged box." Dkt. 257-82, Ex. 82 at NIKE0006780.

526.    Deadstock means the item is "new and unworn at the time of sale."  Ex. 78, NIKE0081426 at 127.

***Nike, Inc.'s Response:* Undisputed.**

527.    Deadstock sneakers "must include the original box, the box lid, and the box label indicating the shoe size."  Ex. 78, NIKE0081426 at 127.

***Nike, Inc.'s Response:* Undisputed.**

528.     A sneaker might "fail" to meet StockX's standards for reasons such as the shoe being used, being defective, missing accessories, or the box being damaged.  Ex. 76, Lopez Tr. at 160:02-06.

*Nike, Inc.'s Response:* **Disputed.**

Nike does not dispute that a sneaker may be "failed" by a StockX authenticator for multiple reasons, including being used, defective, missing accessories, or damaged box but disputes that this list is exclusive.  Authenticators may also fail items for reason "fake," "wrong product," "wrong size," "smell," and others. Dkt. 261-43, Ex. 43.

529.     If a StockX authenticator determines the product does not meet StockX's standards, the shoe is not sold to the end consumer.  Ex. 79, NIKE0005910 at 911; Ex. 23, Feb. Huber Tr. 25:14–23 (explaining that "if an item has characteristics that might make [StockX's] authentication team suspicious, we will not allow it to trade"); 245:10-17 (Feb. 22, 2023) (explaining that StockX will correct for any potential areas of disappointment found during the authentication process "before the buyer takes receipt of the product").

*Nike, Inc.'s Response:* **Disputed.**

Nike disputes that if a StockX authenticator determines a product does not meet StockX's standards, it is not sold to the end consumer.  StockX's inspection, verification, and authentication is inherently flawed in design ████████████████████████████████████████ ████████████████████████████████ *See* Dkt. 261-48, Ex. 48, Lopez Tr. 178:18-179:1 ███████████████████████████████████████████ ███████████████████████████████████████████; Dkt. 257-75, Ex. 75 ██████████████████████████ Dkt. 261-43, Ex. 43 STX0018010 ████████████████████████████████████████; Dkt. 261-46, Ex. 46, June

Huber Tr. at 10:6-16 (testifying that StockX does not determine "whether something is considered counterfeit or not."). ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████ Dkt. 261-85, Ex. 79 at STX0021485.

530.    If the sneakers meet StockX's standards, they are then sent to the buyer.  Ex. 21, Tucker Rep. ¶ 40; Ex. 1, Wells Rep. ¶ 106; Ex. 80, StockX, "Selling," Aug. 7, 2024, https://stockx.com/about/selling.

***Nike, Inc.'s Response:* Disputed.**

Nike does not dispute that StockX claims that it sends buyers only shoes that meet its standards.  However, StockX sends buyers shoes that are counterfeit or otherwise do not meet its standards. StockX's inspection, verification, and authentication is inherently flawed in design and

████████████████████████████████████████████████████████████████

*See* Dkt. 261-48, Ex. 48, Lopez Tr. 178:18-179:1 (testifying that an authenticator following all

████████████████████████████████████████████████████████████

████████████████████████ Dkt. 257-75, Ex. 75 ████████████████████████

Dkt. 261-43, Ex. 43 STX0018010 ██████████████████████████████████

███████ Dkt. 261-46, Ex. 46, June Huber Tr. at 10:6-16 (testifying that StockX does not determine "whether something is considered counterfeit or not."). █████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████ Dkt. 261-81, Ex. 75.

531.    StockX explains on its website that it remains "one of the few marketplaces committed to physically reviewing 100% of the items that pass through our platform."  Ex. 77, NIKE0040098 at 101.

*Nike, Inc.'s Response:* **Undisputed.  This statement is not material.**

532.    As of 2022, StockX had 11 physical authentication centers globally.  Ex. 81, NIKE0038783 at 786; Ex. 82, NIKE0006776 at 778.

*Nike, Inc.'s Response:* **Disputed.**

Nike does not dispute that StockX advertises that it has 11 physical authentication centers globally but disputes that their characterization as "authentication" centers as "only the IP Rights holder" can actually authenticate, or prove that a product is genuine. Kammel Rebuttal at 20-21. As StockX does not have access to Nike's proprietary brand protection technology, it is not able to identify all indicia of counterfeiting.  Dkt. 262, Pallet Decl.¶ 7.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Consumers have complained that purportedly genuine Nike sneakers purchased on StockX bear obvious signs that the sneakers are in fact counterfeit.  Dkt. 261-94, Ex. 88 at STX0802167, STX0802187-88; Dkt. 261-95, Ex. 89, Amidon Tr. 89:14-90:11 (testifying that items sold to Mr. Kim "should not have passed [StockX's] authentication process.").

533.    As of May 31, 2022, approximately 35 million products had gone through StockX's verification process.  Ex. 82, NIKE0006776 at 778.

*Nike, Inc.'s Response:* **Undisputed. This statement is not material.**

534.    Between June 1, 2021 and May 31, 2022, an average of one million products went through StockX's verification process.  Ex. 82, NIKE0006776 at 780.

*Nike, Inc.'s Response:* **Undisputed.  This statement is not material.**

535.    Between 2016 and 2022, an average of over one million products per year were physically inspected by StockX authenticators as part of the verification process before they reached buyers.  Ex. 82, NIKE0006776 at NIKE0006780.

*Nike, Inc.'s Response:* **Undisputed.  This statement is not material.**

536.    Between June 1, 2021 and May 31, 2022, StockX rejected products during its verification process for reasons including:  products having manufacturing defects, products being the wrong size, products being the wrong color, and products having damaged boxes.  Ex. 82, NIKE0006776 at 779.

*Nike, Inc.'s Response:* **Disputed.**

Nike does not dispute that StockX advertised that it rejected products for reasons including manufacturing defects, products being the wrong size, products being the wrong color, and products having damaged boxes but disputes that these are the only reason that StockX rejected products.  StockX also advertised that it rejected "fake product[s]" and "used product[s]" between June 1, 2021 to May 31, 2022. Dkt. 257-82, Ex. 82 at NIKE0006779-780.

537.    In 2022, StockX rejected over 330,000 products worth approximately $100 million before they reached buyers as part of its verification process.  Ex. 83, StockX, "Big Facts: Current Culture Index 2023," Aug. 6, 2024, https://stockx.com/about/sx-market-insights/big-facts-current-culture-index-2023/ (The "[c]ombined value of the 330,000+ products StockX rejected in 2022 for failure to meet verification standards" was approximately $100 million); *see also* Ex. 82, NIKE0006776 at 779-780.

*Nike, Inc.'s Response:* **Undisputed.  This statement is not material.**

538.    In 2023 alone StockX rejected more than 325,000 products, collectively valued at more than $80 million, that did not meet its authentication standards.    Ex. 84, https://stockx.com/about/zh-tw/sx-market-insights/big-facts-current-culture-index-2024/.

***Nike, Inc.'s Response:*** **Disputed.**

Nike does not dispute that StockX advertises that it has "2023 alone StockX rejected more than 325,000 products, collectively valued at more than $80 million, that did not meet its authentication standards" However, Nike disputes that StockX's authentication process is effective at identifying counterfeits.  Ms. Kammel opined that "[w]hile overt differences in quality or poor copying can allow a non-IP rights holder to see an obvious counterfeit, it is not the basis for authentication, nor can any platform claim to do this with 100% accuracy as StockX does." Kammel Rebuttal at 21.  As StockX does not have access to Nike's proprietary brand protection technology, it is not able to identify all indicia of counterfeiting.  Dkt. 262, Pallet Decl. ¶ 7.  █████

██████████████████████████████████████████████████████████████████████

STX0018010 ████████████████████████████████████████████████████████████

████████████████████████  Consumers have complained that purportedly genuine Nike sneakers purchased on StockX bear obvious signs that the sneakers are in fact counterfeit.  Dkt. 261-94, Ex. 88 at STX0802167, STX0802187-88; Dkt. 261-95, Ex. 89, Amidon Tr. 89:14-90:11 (testifying that items sold to Mr. Kim "should not have passed [StockX's] authentication process.").

539.    StockX has been called "one of the most reliable authenticators in the aftermarket game."  Ex. 9, NIKE0027914 at NIKE0027939 ("Complex Media describes StockX as 'one of the most reliable authenticators in the aftermarket game' with press reports in the past indicating with

press reports in the past indicating its 'fake rate' (% of goods that are non-authentic) as low as 2%").

*Nike, Inc.'s Response:* **Disputed.**

Nike does not dispute that a single publication described StockX as "one of the most reliable authenticators in the aftermarket game" but disputes the accuracy of such characterization.  StockX admits that it cannot determine whether a Nike shoe is genuine or counterfeit.  Dkt. 261-46, Ex. 46, June Huber Tr. at 10:6-16 (testifying that StockX does not determine "whether something is considered counterfeit or not.").  Further, StockX's inspection, verification, and authentication is inherently flawed in design and in StockX's authenticators' execution thereof.   *See* Dkt. 261-48, Ex. 48, Lopez Tr. 178:18-179:1 ███████████

███████████████████████████████████████████████████████████

███████████████████████████████████.  StockX has not offered any information from which the other platforms can be measured on the strength or weakness of their authentication practices, as compared to StockX.  Fed. R. Evid. 403.  Nike also objects to Ex. 9 (Dkt. 257-9) as hearsay not within an exception that is incapable of being offered in an admissible form at trial.  Fed. R. Evid. 802.  The attached screenshot can only be authenticated by StockX, it cannot be offered for the truth of the matter asserted without a person with knowledge of the statement otherwise falling into a hearsay exception.  *Id.*

### StockX's Authentication Process Is Proprietary

540.     Nike has argued that StockX's process is not "proprietary" because "the process itself is openly displayed in a video found on StockX's website."  First Amended Complaint ¶ 51.

*Nike, Inc.'s Response:* **Undisputed.**

541.     When asked what it means that StockX's verification process is "proprietary," Jacob Fenton, Vice President of Customer Experience and Insights at StockX, stated that

"proprietary" in this context means that "[i]t's our own work product." Ex. 86, Dep. Tr. of Jacob
Fenton ("Fenton Tr.") 10:9-11; 155:4-155:8.

***Nike, Inc.'s Response:*** **Undisputed.**

542. StockX does not disclose all aspects of its verification process to the public. Ex.
87, STX0058773 at 775.

***Nike, Inc.'s Response:*** **Disputed.**

Nike disputes StockX's ███████████████████████████████████

███████████████████████████████████████████████████████████████

████████ Portions of StockX's authentication process are made available in videos posted to the
StockX website. *See, e.g.*, Dkt. 261-57, Ex. 54; Sept. Duvdevani Decl.¶ 60, Ex. 59
(NIKE0005840). Further, ██████████████████████████████████████

█████████████████████████████████████████████ Dkt. 257-87, Ex. 87
at STX0058775. ███████████████████████████████████████

████████ *See,* *e.g.,* Sept. Duvdevani Decl. ¶ 61, Ex. 60*,*
https://www.reddit.com/r/stockx/comments/11n8v6e/stockx_authenticity/ (determining whether
Nike sneakers are "fake" a StockX authenticator involves "[m]ostly smell and how they look under
a black light.). StockX also has disclosed the use of black lights to its consumers. *See id*. ¶ 62,
Ex. 61, STX0248653 (StockX customer service representative stating: "As previously explained,
when items go through the verification process items are reviewed under different lighting which
includes but is not limited to black UV lighting. When items are viewed under UV lighting it shows
things that may not be visible to the naked eye. The photos our team provided you regarding the
verification results under special UV lighting…")

***StockX's Authentication Process Is Documented, and Evaluates Over 100 Elements***

543. ████████████████████████████████████

████████████████████████████████████████████████

████████ Ex. 75, STX0752605-642.

***Nike, Inc.'s Response:* Undisputed.**

544. ████████████████████████████████████

███████████████████████████████████. Ex. 75, STX0752605-642.

***Nike, Inc.'s Response:* Disputed.**

Nike disputes that ████████████████████████████████

████████████████████████████████████████████████

Although some steps refer to looking/examine the product or packaging to determine its

authenticity, Ms. Kammel opined that "[w]ithin these steps, the term 'authentic' or 'inauthentic'

was usually to describe damage, whether a product was clean, matching, the correct size, missing

parts, or just whether it looks okay. Two of the steps (one for each shoe) are a 'Look Smell Feel'

test, which is a comparison and overt test to see if it is obviously counterfeit." Kammel Report at

33-34. ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ Dkt. 261-48, Ex. 48, Lopez Tr. 178:18-179:1. StockX does not

have access to Nike's proprietary brand protection technology, it is not able to identify all indicia

of counterfeiting. Dkt. 262, Pallet Decl.¶ 7.

545. ████████████████████████████████████

██████████████████████████████████████ Ex. 75,

STX0752605-642.

***Nike, Inc.'s Response:* Disputed.**

Nike disputes that ███████████████████████████████████

███████████████████████████████████████████████████████

████████████ Although some steps refer to looking/examine the product or packaging to determine its authenticity, Ms. Kammel opined that "[w]ithin these steps, the term 'authentic' or 'inauthentic' was usually to describe damage, whether a product was clean, matching, the correct size, missing parts, or just whether it looks okay.  Two of the steps (one for each shoe) are a 'Look Smell Feel' test, which is a comparison and overt test to see if it is obviously counterfeit."  Kammel Report at 33-34. ███████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████ Dkt. 261-48, Ex. 48, Lopez Tr. 178:18-179:1.  StockX does not have access to Nike's proprietary brand protection technology, and it is not able to accurately identify indicia of counterfeiting.  Dkt. 262, Pallet Decl. ¶ 7.

546. ████████████████████████████████████████████████

███████████████████████████████████████████████████

██████ Ex. 76, Lopez Tr. 214:08-24.

*Nike, Inc.'s Response:* **Disputed.**

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████ StockX has no knowledge of Nike's manufacturing practices. *See* Dkt. 261-48, Ex. 48, Lopez Tr. 114:2-7. ███████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████ Dkt. 261-48, Ex. 48, Lopez Tr. 178:18-

179:1.  StockX does not have access to Nike's proprietary brand protection technology, and it is not able to accurately identify indicia of counterfeiting.  Dkt. 262, Pallet Decl. ¶ 7.

547.  ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

***Nike, Inc.'s Response:* Disputed.**

████████████████████████████████████████████████████

████████████████████████  Ms. Kammel opined that "[w]hile overt differences in quality or poor copying can allow a non-IP rights holder to see an obvious counterfeit, it is not the basis for authentication, not can any platform claim to do this with 100% accuracy as StockX does." Kammel Rebuttal at 21.  StockX does not have access to Nike's proprietary brand protection technology, and it is not able to accurately identify indicia of counterfeiting.  Dkt. 262, Pallet Decl. ¶ 7. ████████████████████████████████████████████████  Dkt. 261-43, Ex.

43, STX0018010 ███████████████████████████████████████████████████

████████████████████████. Consumers have complained that purportedly genuine Nike

sneakers purchased on StockX bear obvious signs that the sneakers are in fact counterfeit. Dkt.

261-94, Ex. 88 at STX0802187-88; Dkt. 261-95, Ex. 89, Amidon Tr. 89:14-90:11 (testifying that

items sold to Mr. Kim "should not have passed [StockX's] authentication process.").

      548. ███████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████ Ex. 76, Lopez Tr. 199:6-

199:11; *see also* 204:10-205:25; 208:1-209:05.

*Nike, Inc.'s Response:* **Disputed.**

      Nike disputes StockX's characterization of Mr. Lopez's testimony as evidence that

supplemental authentication guides help ensure authentication standards are met. Mr. Lopez

testified that StockX's standard "includes everything from the shoe being authentic to the shoe

passing [StockX's] standard." Mr. Lopez also testified that these supplemental guides do not help

███████████████████████████████████████████████████████████

Sept. Duvdevani Decl. ¶ 57, Ex. 56, Lopez. Tr. 199:12-18.

      549. ███████████████████████████████████████████

███████████████████████████████████████ Ex. 106, STX0069511 ███████

██████████████████████████ Ex. 107, STX0058670 ████████████████████ Ex.

108, STX0058653 █████████████████████████████████

*Nike, Inc.'s Response:* **Disputed.**

███████████████████████████████████████████████████████████

███████████████████████████████. Ms. Kammel opined that "[w]hile overt differences in

quality or poor copying can allow a non-IP rights holder to see an obvious counterfeit, it is not the basis for authentication, nor can any platform claim to do this with 100% accuracy as StockX does." Kammel Rebuttal at 21. StockX does not have access to Nike's proprietary brand protection technology, and it is not able to accurately identify indicia of counterfeiting. Dkt. 262, Pallet Decl. ¶ 7. ████████████████████████████████ Dkt. 261-43, Ex. 43, STX0018010 ████████████

████████████████████ Consumers have complained that purportedly genuine Nike sneakers purchased on StockX bear obvious signs that the sneakers are in fact counterfeit. Dkt. 261-94, Ex. 88 at STX0802187-88; Dkt. 261-95, Ex. 89, Amidon Tr. 89:14-90:11 (testifying that items sold to Mr. Kim "should not have passed [StockX's] authentication process.").

550. ██████████████████████████████████ ████████████████████████ Ex. 106, STX0069511; Ex. 107, STX0058670; Ex. 108, STX0058653.

*Nike, Inc.'s Response:* **Disputed.**

████████████████████████████████████████

████████████████████████████████████████

As Professor Kammel opined, "StockX cannot authenticate Nike shoes looking at these lists of side-by-side comparisons, as only Nike or someone authorized by Nike can authenticate a Nike product." Kammel Report at 34. Professor Kammel explained that "[w]hat StockX ignores is the difference between being able to tell a fake or counterfeit using their human senses and looking at overt tells on a product and being able to authenticate a genuine product knowing a brand's technologies or elements....While StockX could verify a quality standard that they may have,

authentication is not a quality issue, but goes to whether a product is genuine. StockX cannot authenticate a Nike product" *Id.* at 35.

551.    T█████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████ Ex. 106, STX0069511 at 512, 513, 522.

*Nike, Inc.'s Response:* **Disputed.**

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ As Professor Kammel opined, "StockX cannot authenticate Nike shoes looking at these lists of side-by-side comparisons, as only Nike or someone authorized by Nike can authenticate a Nike product." Kammel Report at 34.  Professor Kammel explained that "[w]hat StockX ignores is the difference between being able to tell a fake or counterfeit using their human senses and looking at overt tells on a product and being able to authenticate a genuine product knowing a brand's technologies or elements….While StockX could verify a quality standard that they may have, authentication is not a quality issue, but goes to whether a product is genuine. StockX cannot authenticate a Nike product" *Id.* at 35.

552.    █████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████ Ex. 107, STX0058670-693.

*Nike, Inc.'s Response:* **Disputed.**

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████ As Professor Kammel opined, "StockX cannot authenticate Nike shoes looking at these lists of side-by-side comparisons, as only Nike or someone authorized by Nike can authenticate a Nike product." Kammel Report at 34. Professor Kammel explained that "[w]hat StockX ignores is the difference between being able to tell a fake or counterfeit using their human senses and looking at overt tells on a product and being able to authenticate a genuine product knowing a brand's technologies or elements….While StockX could verify a quality standard that they may have, authentication is not a quality issue, but goes to whether a product is genuine. StockX cannot authenticate a Nike product" *Id.* at 35.

553.  ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████ Ex. 108, STX0058653-668.

*Nike, Inc.'s Response:* **Disputed.**

426

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████  As Professor Kammel opined, "StockX cannot authenticate Nike shoes looking at these lists of side-by-side comparisons, as only Nike or someone authorized by Nike can authenticate a Nike product." Kammel Report at 34.  Professor Kammel explained that "[w]hat StockX ignores is the difference between being able to tell a fake or counterfeit using their human senses and looking at overt tells on a product and being able to authenticate a genuine product knowing a brand's technologies or elements….While StockX could verify a quality standard that they may have, authentication is not a quality issue, but goes to whether a product is genuine. StockX cannot authenticate a Nike product" *Id.* at 35.

### StockX's Authentication Process Uses Advanced Technology

554.  ███████████████████████████████████████

███████████████████████  Ex. 109, STX0038806 at 823; *see* Ex. 110, STX0023851 at 857; Ex. 111, STX0016991.

***Nike, Inc.'s Response:* Undisputed.**

555.  StockX uses proprietary authentication software and techniques, █████████

███████████████████████████████████████████

████████████  Ex. 110, STX0023851 at 856.

***Nike, Inc.'s Response:* Disputed.**

Nike disputes StockX's characterization of its "authentication" software as proprietary. Nike disputes that StockX's authentication process is effective at identifying counterfeits.  Ms. Kammel opined that "[w]hile overt differences in quality or poor copying can allow a non-IP rights holder to see an obvious counterfeit, it is not the basis for authentication, nor can any platform

claim to do this with 100% accuracy as StockX does."  Kammel Rebuttal at 21.  As StockX does

not have access to Nike's proprietary brand protection technology, it is not able to identify all

indicia of counterfeiting.  Dkt. 262, Pallet Decl.¶ 7.  ████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████  StockX has cited no

evidence to support that its software is "proprietary."

556.    ████████████████████████████████████████████

STX0023851 at 856.

*Nike, Inc.'s Response:* **Undisputed**

557.    ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████  Ex. 110, STX0023851 at 857.

*Nike, Inc.'s Response:* **Disputed.**

████████████████████████████████████████████████████████

████████████████████████████████████████████████████  Mr. Lopez testified that

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████  Sept. Duvdevani Decl. ¶ 57, Ex. 56,

Lopez Tr. 107:9-108:3.  ████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████  *Id.* at 108:4-10.  ████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████  *Id.* at 110:10-24.  Additionally,

as only the IP Rights holder" can actually authenticate, or prove that a product is genuine, Nike

disputes that StockX's Machine Learning Model can assist in the "authentication" of product.

Kammel Rebuttal at 20-21. As StockX does not have access to Nike's proprietary brand protection

technology, it is not able to identify all indicia of counterfeiting. Dkt. 262, Pallet Decl.¶ 7. ███

██████████████████████████████████████████████████ Dkt. 261-43, Ex. 43,

STX0018010 ████████████████████████████████████████████

███████████████████████

558. ███████████████████████████████████████████████

██████ Ex. 110, STX0023851 at 856.

*Nike, Inc.'s Response:* **Disputed.**

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████ Sept. Duvdevani Decl. ¶ 57, Ex. 56, Lopez Tr. 107:9-108:3. Mr. Lopez testified that

███████████████████████████████████████████████

███████████████████████████████████████████████

███████ *Id.* at 108:4-10. ███████████████████

███████████████████████████████████████████████

████████ *Id.* at 110:10-24. Additionally, Nike disputes that StockX can authenticate

Nike footwear and ████████████████████████████████████

███████ *See* Kammel Rebuttal at 20-21; Dkt. 262, Pallet Decl.¶ 7 (StockX does not have access to

Nike's proprietary technology); Dkt. 261-43, Ex. 43, STX0018010 ███████████████
████████████████████████████████████████████████

559.    StockX explains on its website that it "leverage[s] machine learning to assess product risk." Ex. 77, NIKE0040098 at 099.

*Nike, Inc.'s Response:* **Disputed.**

Nike disputes StockX's characterization of the description of "Advanced Technology" on its website which speaks for itself and reads in its entirety: "We leverage machine learning to assess product risk and ever-evolving embedded technologies within the products to enhance our verification efforts." Dkt. 257-77, Ex. 77, NIKE0040099. ██████████████████████
████████████████████████████████████ *See* Sept. Duvdevani Decl. ¶ 57, Ex. 56, Lopez Tr. 107:9-110:24; Dkt. 257-110, Ex. 110, STX0023851 at 857. Additionally, Nike disputes that StockX can accurately "assess product risk" as it cannot authenticate Nike footwear and ██████████████████████████████████ *See* Kammel Rebuttal at 20-21, Dkt. 262, Pallet Decl.¶ 7 (StockX does not have access to Nike's proprietary technology); Dkt. 261-43, Ex. 43, STX0018010 ████████████████████
████████████████████████████████████

*StockX's Authenticators Receive Months of Training*

560.    ██████████████████████████████████████████████████
██████████████████████████████ Ex. 14, NIKE0035800 at 816 (An April 2019 internal Nike document titled "Secondary Marketplaces Opportunity Evaluation" stated ██████████████████████████; *see also* Ex. 75, STX0752605-642 (StockX's quality standards and customer expectations); Ex. 87, STX0058773 at 774.

*Nike, Inc.'s Response:* **Disputed.**

Nike disputes that every StockX authenticator has been trained for 90 days on how to verify sneakers. ████████████████████████████████████████

████ Sept. Duvdevani Decl. ¶ 57, Ex. 56, Lopez Tr. 40:25-41:2. ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ *Id.* at 62:8-11. Further, disputes that StockX can "authenticate" Nike footwear and ████████████████████████████████

████████████████████ *See* Kammel Rebuttal at 20-21, Dkt. 262, Pallet Decl.¶ 7 (StockX does not have access to Nike's proprietary technology); Dkt. 261-43, Ex. 43, STX0018010 ██████

████████████████████████████████████████████████

    561. ████████████████████████████████████████

████████████████████████████████ Ex. 76, Lopez Tr. 39:13-40:2.

***Nike, Inc.'s Response:* Disputed.**

████████████████████████████████████████████████

████████ but disputes that StockX can "authenticate" Nike footwear and ██████████

████████████████████████████████ *See* Kammel Rebuttal at 20-21, Dkt. 262, Pallet Decl.¶ 7 (StockX does not have access to Nike's proprietary technology); Dkt. 261-43, Ex. 43, STX0018010 ████████████████████████████████████

████████████████████

    562. ████████████████████████████████████████

████████████████ Ex. 76, Lopez Tr. 26:03-10; 210:11-210:15.

***Nike, Inc.'s Response:* Disputed.**

Nike disputes StockX's characterization of Mr. Lopez's testimony, which speaks for itself,

and reads: ██████████████████████████████████████████ Dkt. 257-

76, Ex. 76, Lopez Tr. 26:03-10. ████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████ *Id.* at 25:25-26:10.  Further, Nike disputes that StockX can

"authenticate" Nike footwear and the evidence demonstrates that StockX routinely incorrectly

authenticates "fakes." *See* Kammel Rebuttal at 20-21, Dkt. 262, Pallet Decl.¶ 7 (StockX does not

have access to Nike's proprietary technology); Dkt. 261-43, Ex. 43, STX0018010 ████████

██████████████████████████████████████████

563.  ████████████████████████████████████████████████

████████████████████ Ex. 76, Lopez Tr. 211:08-16.

*Nike, Inc.'s Response:* **Disputed.**

████████████████████████████████████████████████████████████

██████████████████████ but disputes that StockX can accurately characterize "risk" of any given

shoe being counterfeit. Nike StockX can "authenticate" Nike footwear ████████████████

████████████████████████████████████████ *See* Kammel Rebuttal at 20-

21, Dkt. 262, Pallet Decl.¶ 7 (StockX does not have access to Nike's proprietary technology); Dkt.

261-43, Ex. 43, STX0018010 ████████████████████████████████████████

████████████████████████████████

564.  ████████████████████████████████████████████████

████████████████████████ Ex. 76, Lopez Tr. 26:03-10; 210:11-210:15.

*Nike, Inc.'s Response:* **Disputed.**

███████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ Sept. Duvdevani Decl. ¶ 63, Ex. 62,

STX0070403 at 405. Additionally, Nike disputes that StockX can authenticate Nike footwear and

███████████████████████████████████████ *See* Kammel

Rebuttal at 20-21, Dkt. 262, Pallet Decl.¶ 7 (StockX does not have access to Nike's proprietary

technology); Dkt. 261-43, Ex. 43, STX0018010 █████████████████████████

██████████████████████████

565.    In August 2022, StockX had over 300 authenticators globally who were trained to

inspect products for compliance with StockX's standards.  Ex. 81, NIKE0038783 at 786.

**Nike, Inc.'s Response: Disputed.**

Nike does not dispute that StockX claims that the StockX team includes more than "300

authenticators globally." Dkt. 257-81, Ex. 81 at NIKE0038786.  However, Nike disputes that

StockX can authenticate Nike footwear █████████████████████████████

██████████████ *See* Kammel Rebuttal at 20-21, Dkt. 262, Pallet Decl.¶ 7 (StockX

does not have access to Nike's proprietary technology); Dkt. 261-43, Ex. 43, STX0018010

███████████████████████████████████████████

██████████████

### *StockX's Quality Control for its Authentication Process*

566.    █████████████████████████████████████████

██████████████ Ex. 76 Lopez Tr. 121:18-25.

***Nike, Inc.'s Response:* Disputed.**

████████████████████████████████████████████ but Nike

disputes that StockX can authenticate Nike footwear ████████████████████

████████████████████████ *See* Kammel Rebuttal at 20-21, Dkt. 262, Pallet Decl.¶

7 (StockX does not have access to Nike's proprietary technology); Dkt. 261-43, Ex. 43,

STX0018010 ████████████████████████████████████████

████████████████████

    567.  ████████████████████████████████

████████████████████████████████████████████████████

Ex. 76, Lopez Tr. 122:04-07.

***Nike, Inc.'s Response:* Disputed.**

████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

        Sept. Duvdevani Decl. ¶ 64, Ex. 63, STX0191602 at 603. ██████████

████████████████████████████████████████ because  StockX  cannot

authenticate  Nike  footwear ████████████████████████████████████

██████████████ *See* Kammel Rebuttal at 20-21, Pallet Decl.¶ 7 (StockX does not have access

to Nike's proprietary technology); Dkt. 261-43, Ex. 43, STX0018010 ███████████████
███████████████████████████████████████████████████

568.    StockX employs Quality Assurance and Authentication Quality Assurance ("AQA") specialists to assist in instances in which a product issue is flagged.  Ex. 23, Feb. Huber Tr. 21:11-22:24.

*Nike, Inc.'s Response:* **Disputed.**

Nike does not dispute that Mr. Huber testified that StockX's "Quality Assurance" and "Quality Assurance Specialists" assist in certain instances but disputes that StockX's Quality Assurance and Authentication Quality Assurance specialists can authenticate Nike footwear and ████████████████████████████████████████████████ *See* Kammel Rebuttal at 20-21, Pallet Decl.¶ 7 (StockX does not have access to Nike's proprietary technology); Dkt. 261-43, Ex. 43, STX0018010 ██████████████████████████
████████████████████████████

569.    ████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████   Ex. 23, Feb. Huber Tr. 21:11-22:24.

*Nike, Inc.'s Response:* **Disputed.**

Nike does not dispute that Mr. Huber testified that StockX's "Quality Assurance" team ████████████████████████ but disputes that StockX's Quality Assurance team can authenticate Nike footwear ████████████████████████████████████
███████████████   *See* Kammel Rebuttal at 20-21, Pallet Decl.¶ 7 (StockX does not have access to Nike's proprietary technology); Dkt. 261-43, Ex. 43, STX0018010 ██████████████████
████████████████████████████████████████

570. ███████████████████████████████████████████

Ex. 23, Feb. Huber Tr. 21:11-22:24.

***Nike, Inc.'s Response:*** **Disputed.**

Nike does not dispute that ██████████████████████████

███████████████████████████████████████ can authenticate

Nike footwear ████████████████████████

███████ *See* Kammel Rebuttal at 20-21, Pallet Decl.¶ 7 (StockX does not have access to Nike's

proprietary technology); Dkt. 261-43, Ex. 43, STX0018010 ███████████████

████████████████████████████

571. ███████████████████████████████████████████

████████████████████████████████████ Ex. 76, Lopez Tr.

26:17-27:4.

***Nike, Inc.'s Response:*** **Disputed.**

████████████████████████████████████████████

████████████████████████████ STX0803958. █████████

████████████████████████████████████████████ Dkt.

257-76, Ex. 76, Lopez Tr. 27:5-7. Nike disputes that that AQA specialists can accurately verify

Nike products. Ms. Kammel opined that "[w]hile overt differences in quality or poor copying can

allow a non-IP rights holder to see an obvious counterfeit, it is not the basis for authentication, nor

can any platform claim to do this with 100% accuracy as StockX does." Kammel Rebuttal at 21.

As StockX does not have access to Nike's proprietary brand protection technology, it is not able

to identify all indicia of counterfeiting. Pallet Decl.¶ 7 (StockX does not have access to Nike's

proprietary technology); Dkt. 261-43, Ex. 43, STX0018010 ███████████████████

███████████████████████

### *StockX's 99.96% Accuracy Rate Measured Based on Return Data*

572.    In 2022, StockX advertised that it has a "99.96%" authentication "accuracy rate" which it defined as a "measurement of the accuracy of StockX's product authentication process based on weighted return data compared to total authentications."  Ex. 82, NIKE0006776 at 780-781; Ex. 112, NIKE0038955 at 958.

***Nike, Inc.'s Response:* Disputed.**

Nike does not dispute that in fine print StockX defined "Authentication Accuracy Rate: A measurement of the accuracy of StockX's product authentication process based on weighted return data compared to total authentications" but disputes that this language was included with each instance of advertising containing the claim that "StockX has a 99.96% authentication accuracy rate."  *See, e.g.*, Dkt. 257-112, Ex. 112 at NIKE0038958.

573.    The "99.96% authentication accuracy rate" was calculated based on StockX's weighted return data compared to total authentications.  Ex. 113, STX0018010 ████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████ Ex. 86, Fenton Tr. 83:2-8 (StockX's authentication rate is "calculated as a percentage of customers that reach out to StockX claiming that they have received something that is not in line with their – with what they expected to get, and that we were essentially wrong, and we fixed it for them"); Ex. 86, Fenton Tr. 87:13-87:15 (StockX has "a 99.96

accuracy rate, only .04 percent of the products we pass are later determined to have been missed –

passed an error, last 12 months.").

***Nike, Inc.'s Response:*** **Disputed.**

Nike does not dispute that StockX purported "Authentication Accuracy Rate" is a

calculation of weighted return data but disputes this represents the true accuracy of StockX's

authentication rate. StockX did not have a widely known return policy and routinely rejected

returns of products, even where customers complained that they suspected they had received an

inauthentic product.  *See* Dkt. 261-84–261-94, Exs. 78-88.

574.    The June 22, 2022 Wayback Machine capture of the June 21, 2022 article titled

"True to You, True to Us" shows the statement "StockX has a 99.96% authentication accuracy

rate," which hyperlinks to a StockX webpage about authentication (the "StockX Authentication

Webpage").  Ex. 114, Elhadji Mare, StockX, "True to You, True to Us," June 21, 2022,

https://web.archive.org/web/20220622214117/https://stockx.com/news/true-to-you-true-to-us-

sxd22/; *see* Ex. 112, NIKE0038955.

***Nike, Inc.'s Response:*** **Undisputed.**

575.    The StockX Authentication Webpage as it appeared on June 26, 2022 defines

"99.96% accuracy rate" as a "measurement of the accuracy of StockX's product authentication

process based on weighted return data compared to total authentications."   Ex. 115,

https://web.archive.org/web/20220626083404/ https://stockx.com/about/authentication/.

***Nike, Inc.'s Response:*** **Disputed.**

Nike disputes that "99.96% accuracy rate" is defined as a "measurement of the accuracy

of StockX's product authentication process based on weighted return data compared to total

authentications."   Rather, in fine print, StockX includes a definition for "Definitions:

Authentication Accuracy Rate: A measurement of the accuracy of StockX's product authentication process based on weighted return data compared to total authentications."  Separately, StockX states that "Authenticators maintain a 99.96% accuracy rate" and "Over the years, our team members have authenticated tens of millions of products at a 99.96% accuracy rate." Dkt. 257-11, Ex. 11.  The snippet below accurately reproduces the portion containing this language StockX's Authentication Webpage as it appeared on June 26, 2022 from Dkt. 257-11 with a red box added to indicate the definition of "Authentication Accuracy Rate" in fine print.



### E.    StockX's Advertising Claims.

576.    Nike has challenged a number of StockX's statements explaining its verification process (the "Verification Process Statements").  These Verification Process Statements include:

- "Every item sold goes through our proprietary multi-step verification process with our team of expert authenticators";

- StockX's "multi-step verification process";

- StockX's authentication process uses "100+ data points";

- StockX's "proprietary" authentication process;

- StockX's authentication process uses "Advanced Technology";

- StockX's authentication process uses "Quality Assurance";

- "StockX has a 99.96% authentication accuracy rate"; and

- "Authenticators maintain a 99.96% accuracy rate".

Nike's Supplemental Responses to StockX's Third Set of Interrogatories, Interrogatory Response No. 22 (Apr. 17, 2023).

***Nike, Inc.'s Response:* Disputed.**

Nike does not dispute that it is challenging *inter alia* the above statements but disputes the characterization of the above statements as "Verification Process Statements." Nike's Response to Interrogatory No. 22 does not identify or classify any claims as "Verification Process Statements." Dkt. 257-116, Ex. 116.

577. Nike has also challenged a number of StockX's statements referring to authenticity (the "Authenticity Claims"). These Authenticity Claims include:

- "100% Verified Authentic"

- "Verified Authentic"

- StockX "authenticators are better equipped than anyone to ensure a product's authenticity"

- "Guaranteed Authenticity" as related to products sold on the StockX platform

- "Always Authentic, Never Fake."

- "Guaranteed Authenticity. Every item. Every time. Shop on StockX with complete confidence knowing every purchase is 100% Verified Authentic."

- "A final check in our authentication practice, our QA experts ensure nothing slips through the cracks."

- "We Authenticate Every Item. Every Time."

- "Shop on StockX with complete confidence knowing every purchase is Verified Authentic."

Nike's Supplemental Responses to StockX's Third Set of Interrogatories, Interrogatory Response No. 22 (Apr. 17, 2023).

***Nike, Inc.'s Response:* Disputed.**

Nike does not dispute that it is challenging *inter alia* the above statements but disputes the characterization of the above statements as "Authenticity Claims." Nike's Response to Interrogatory No. 22 does not identify or classify any claims as "Authenticity Claims." Dkt. 257-116, Ex. 116.

578.    As of September 2022, StockX discontinued all advertising claims containing the word "authentic" and now uses the term "verified" instead. Ex. 117, StockX's First Supplemental Responses to Nike's Third Set of Interrogatories, Interrogatory No. 20.

***Nike, Inc.'s Response*: Disputed**.

While Nike does not dispute that StockX has replaced many of its advertising claims with "verified," Nike disputes that this represents a discontinuation of the authentication claims. StockX has issued several public statements since it adopted the "verification language" that continue to use "authentication," "authenticity," or otherwise indicate that "verification" and "authentication" should be understood to have the same meaning by consumers. For example: "Verification is the new authentication, but our comprehensive approach remains unchanged…product authenticity remains core to our analysis." Dkt. 261-60–261-62, Exs. 57-59.

441

**F.      Nike Has Produced No Evidence to Establish What Consumers Understood the Verification Process Statements to Mean or That the Verification Process Statements Were False or Misleading.**

579.     Nike has produced no evidence to establish whether consumers saw the statement "Every item sold goes through our proprietary multi-step verification process with our team of expert authenticators" on the "How it Works" page on StockX's website.  Ex. 19, NIKE0005790.

*Nike, Inc.'s Response*: **Disputed.**

This is improper and contravenes the Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. and for these reasons, should be disregarded.  *Perez v. de la Cruz*, No. 09-CV-264, 2013 WL 2641432 at *7-8 (S.D.N.Y. June 12, 2013) (finding defendants "failed to meet their initial Rule 56 burden" where defendants' "counsel merely asserts, in conclusory fashion, in a series of paragraphs in a Rule 56.1 Statement that there is no evidence to support plaintiff's various factual contentions...In neither this document nor in a separate declaration does counsel proffer what the facts are, much less cite to any pertinent evidence.").  Nike disputes StockX's characterization of the record to construe a screenshot of the "How it Works" page as support that Nike has produced no evidence to establish consumers saw the statement "Every item sold goes through our proprietary multi-step verification process with our team of expert authenticators" on its website.  Further, as StockX is the only party that can provide data on the number of visitors to its "How it Works" webpage, StockX cannot point to the absence of evidence it withheld to support a proposition that evidence does not exist.

Nike disputes that there is no evidence establishing that consumers saw the statement: "Every item sold goes through our proprietary multi-step verification process with our team of expert authenticators."  For example, a communication from a customer to StockX states: "Further, your website expressly states '*Every item sold goes through our proprietary multi-step verification process with our team of expert authenticators*', yet StockX has failed to deliver.  Consumers pay

a further charge on top of the purchase price of the goods, especially for this process. Therefore, in circumstances where StockX purports to deliver high quality products and represent brand names such as Nike, Jordans etc., for a premium price, it is unacceptable for a mistake to occur from the outset." Sept. Duvdevani Decl. ¶ 20, Ex. 19, STX0234753 (emphasis in original). Another customer wrote to support@stockx.com stating: "While I appreciate you being pleasant and getting back to me quickly, it is nothing short of a disgrace what StockX are trying to get away with here. A company which I would […] like to point out promise the follow to all customers. [] **Guaranteed Authenticity** [] *Every item. Every time. Shop on StockX with complete confidence knowing every purchase is 100% Verified Authentic.* [] [] **Trust the process.** [] *Our global team of expert authenticators uses a rigorous, multi-step verification procedure the includes the following checkpoints.* **Construction** [] *With checklists of 100+ data points, our authenticators are better equipped that anyone to ensure a product[]s authenticity.* [] **Quality assurance.** [] *A final check in our authentication practice, our QA experts ensure nothing slips through the cracks.* This makes a complete mockery of the StockX promises and authentication process…" *Id.* ¶ 15, Ex. 14, STX0273234. Ms. Butler testified that she included the "How it Works" page in her survey because it was one of the pages "that a consumer can reasonably interact with when looking to purchase a particular pair of sneakers." *Id.* ¶ 65, Ex. 64, Butler Tr. 201:15-202:5.

580.    Nike has produced no evidence to establish what consumers understand the statement "Every item sold goes through our proprietary multi-step verification process with our team of expert authenticators" to mean in the context in which it was used by StockX. Ex. 19, NIKE0005790 (StockX's "How it Works" page).

***Nike, Inc.'s Response*: Disputed.**

This is improper and contravenes the Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. and for these reasons, should be disregarded.  *Perez*, 2013 WL 2641432 at *7-8.  Nike disputes StockX's characterization of the record to construe a screenshot of the "How it Works" page as support that Nike has produced no evidence to establish consumers understood the statement "Every item sold goes through our proprietary multi-step verification process with our team of expert authenticators" on its website.

Nike disputes that there is no evidence establishing that consumers understood the statement: "Every item sold goes through our proprietary multi-step verification process with our team of expert authenticators."  For example, a communication from a customer to StockX states: "Further, your website expressly states "*Every item sold goes through our proprietary multi-step verification process with our team of expert authenticators*", yet StockX has failed to deliver. Consumers pay a further charge on top of the purchase price of the goods, especially for this process.  Therefore, in circumstances where StockX purports to deliver high quality products and represent brand names such as Nike, Jordans etc., for a premium price, it is unacceptable for a mistake to occur from the outset." Sept. Duvdevani Decl. ¶ 20, Ex. 19, STX0234753 .  Another customer wrote to support@stockx.com stating: "While I appreciate you being pleasant and getting back to me quickly, it is nothing short of a disgrace what StockX are trying to get away with here. A company which I would […] like to point out promise the follow to all customers. [] **Guaranteed Authenticity** [] *Every item. Every time. Shop on StockX with complete confidence knowing every purchase is 100% Verified Authentic.* [] [] **Trust the process.** [] *Our global team of expert authenticators uses a rigorous, multi-step verification procedure the includes the following checkpoints.* **Construction** [] *With checklists of 100+ data points, our authenticators are better equipped that anyone to ensure a product[]s authenticity.* [] **Quality assurance.** [] *A*

*final check in our authentication practice, our QA experts ensure nothing slips through the cracks.*
This makes a complete mockery of the StockX promises and authentication process…" *Id.* ¶ 15,
Ex. 14, STX0273234.

581. Nike has produced no evidence to establish whether consumers saw the statement
"With checklists of 100+ data points, our authenticators are better equipped than anyone to ensure
a product's authenticity" on the "Authentication" page on StockX's website. Ex. 118,
NIKE0000281.

***Nike, Inc.'s Response*: Disputed.**

This is improper and contravenes the Local Civil Rule 56.1 and Judge Caproni's Individual
Practices in Civil Cases 4.G.ii.a. and for these reasons, should be disregarded. *Perez*, 2013 WL
2641432 at *7-8. Nike disputes StockX's characterization of the record to construe a screenshot
of the "Authentication" page as support that Nike has produced no evidence to establish consumers
saw the statement "With checklists of 100+ data points, our authenticators are better equipped than
anyone to ensure a product's authenticity" on its website. Further, as StockX is the only party that
can provide data on the number of visitors to its "Authentication" webpage, StockX cannot point
to the absence of evidence it withheld to support a proposition that no evidence exists.

Nike disputes that there is no evidence establishing that consumers saw the statement:
"With checklists of 100+ data points, our authenticators are better equipped than anyone to ensure
a product's authenticity." For example, Ms. Butler testified that she included the "Authentication"
page in her survey because it was one of the pages "that a consumer can reasonably interact with
when looking to purchase a particular pair of sneakers." Sept. Duvdevani Decl. ¶ 65, Ex. 64, Butler
Tr. 201:15-202:5. StockX consumer representatives also frequently reference the use of a "100

point data checklist" as part of the authentication process when responding to customer complaints. *See, e.g.*, *id.*.¶¶ 66-68, Exs. 65-67.

582.    Nike has produced no evidence to establish what consumers understand the statement "With checklists of 100+ data points, our authenticators are better equipped than anyone to ensure a product's authenticity" to mean in the context in which it was used by StockX.  Ex. 118, NIKE0000281 (StockX's "Authentication" page).

*Nike, Inc.'s Response:* **Disputed.**

This is improper and contravenes the Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. and for these reasons, should be disregarded.  *Perez*, 2013 WL 2641432 at *7-8.  Nike disputes StockX's characterization of the record to construe a screenshot of the "Authentication" page as support that Nike has produced no evidence to establish consumers understood the statement "With checklists of 100+ data points, our authenticators are better equipped than anyone to ensure a product's authenticity" on its website.

Nike disputes that there is no evidence establishing that consumers understood the statement: "Every item sold goes through our proprietary multi-step verification process with our team of expert authenticators."  *See, e.g.*, Sept. Duvdevani Decl. ¶ 15, Ex. 14, STX0273234.

583.    Nike has produced no evidence to establish whether consumers saw the statement "Advanced Technology[:] We use machine learning to aid our authenticators in catching every minor detail" on the "Authentication" page on StockX's website.  Ex. 118, NIKE0000281.

*Nike, Inc.'s Response:* **Disputed.**

This is improper and contravenes the Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. and for these reasons, should be disregarded.  *Perez*, 2013 WL 2641432 at *7-8.  Nike disputes StockX's characterization of the record to construe a screenshot

of the "Authentication" page as support that Nike has produced no evidence to establish consumers saw the statement "Advanced Technology[:]  We use machine learning to aid our authenticators in catching every minor detail" on its website.  Further, as StockX is the only party that can provide data on the number of visitors to its "Authentication" webpage, StockX cannot point to the absence of evidence it withheld to support a proposition that no evidence exists.

Nike disputes that there is no evidence establishing that consumers saw the statement: "Advanced Technology[:] We use machine learning to aid our authenticators in catching every minor detail."  For example, Ms. Butler testified that she included the "Authentication" page in her survey because it was one of the pages "that a consumer can reasonably interact with when looking to purchase a particular pair of sneakers." Sept. Duvdevani Decl. ¶ 65, Ex. 64, Butler Tr. 201:15-202:5.  StockX consumer representatives also frequently reference the use of "machine learning to aid [StockX's] authenticators in catching every minor detail" when responding to customer complaints. *See, e.g.*, *id.* ¶¶ 65-70, Exs. 65-69.

584.    Nike has produced no evidence to establish what consumers understand the statement "Advanced Technology[:] We use machine learning to aid our authenticators in catching every minor detail" to mean in the context in which it was used by StockX.  Ex. 118, NIKE0000281 (StockX's "Authentication" page).

*Nike, Inc.'s Response:* **Disputed.**

This is improper and contravenes the Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. and for these reasons, should be disregarded.  *Perez*, 2013 WL 2641432 at *7-8.  Nike disputes StockX's characterization of the record to construe a screenshot of the "Authentication" page as support that Nike has produced no evidence to establish consumers

understood the statement "Advanced Technology[:] We use machine learning to aid our authenticators in catching every minor detail" on its website.

Nike disputes that there is no evidence establishing that consumers understood the statement: "Advanced Technology[:] We use machine learning to aid our authenticators in catching every minor detail." *See, e.g.*, Sept Duvdevani Decl. ¶ 71, Ex. 70, STX0780499.

585.    Nike has produced no evidence to establish whether consumers saw the statement "Quality Assurance[:] A final check in our authentication practice our QA experts ensure nothing slips through the cracks" on the "Authentication" page on StockX's website.    Ex. 118, NIKE0000281.

***Nike, Inc.'s Response:*** **Disputed.**

This is improper and contravenes the Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. and for these reasons, should be disregarded.  *Perez*, 2013 WL 2641432 at *7-8.  Nike disputes StockX's characterization of the record to construe a screenshot of the "Authentication" page as support that Nike has produced no evidence to establish consumers saw the statement "Quality Assurance[:] A final check in our authentication practice our QA experts ensure nothing slips through the cracks" on its website.  Further, as StockX is the only party that can provide data on the number of visitors to its "Authentication" webpage, StockX cannot point to the absence of evidence it withheld to support a proposition that evidence does not exist.

Nike disputes that there is no evidence establishing that consumers saw the statement: "Quality Assurance[:] A final check in our authentication practice our QA experts ensure nothing slips through the cracks."  For example, a customer wrote to support@stockx.com stating: "While I appreciate you being pleasant and getting back to me quickly, it is nothing short of a disgrace

what StockX are trying to get away with here. A company which I would […] like to point out promise the follow to all customers. [] **Guaranteed Authenticity** [] *Every item. Every time. Shop on StockX with complete confidence knowing every purchase is 100% Verified Authentic.* [] [] **Trust the process.** [] *Our global team of expert authenticators uses a rigorous, multi-step verification procedure the includes the following checkpoints.* **Construction** [] *With checklists of 100+ data points, our authenticators are better equipped that anyone to ensure a product*[]*s authenticity.* [] **Quality assurance.** [] *A final check in our authentication practice, our QA experts ensure nothing slips through the cracks.* This makes a complete mockery of the StockX promises and authentication process…" Sept. Duvdevani Decl. ¶ 15, Ex. 14, STX0273234.  Further, StockX customer service representatives reference the claim that as a "final check-in [StockX's] authentication practice, [StockX's] QA experts ensure nothing slips through the cracks." *See, e.g.*, *id.* ¶ 72, Ex. 71, STX0220978.  Ms. Butler testified that she included the "Authentication" page in her survey because it was one of the pages "that a consumer can reasonably interact with when looking to purchase a particular pair of sneakers."  *id.* ¶ 65, Ex. 64, Butler Tr. 201:15-202:5.

586.    Nike has produced no evidence to establish what consumers understand the statement "Quality Assurance[:] A final check in our authentication practice our QA experts ensure nothing slips through the cracks" to mean in the context in which it was used by StockX.  Ex. 118, NIKE0000281 (StockX's "Authentication" page).

***Nike, Inc.'s Response:* Disputed.**

This is improper and contravenes the Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. and for these reasons, should be disregarded.  *Perez*, 2013 WL 2641432 at *7-8.  Nike disputes StockX's characterization of the record to construe a screenshot of the "Authentication" page as support that Nike has produced no evidence to establish consumers

saw the statement "Quality Assurance[:] A final check in our authentication practice our QA experts ensure nothing slips through the cracks" on its website.

Nike disputes that there is no evidence establishing that consumers understand the statement: "Quality Assurance[:] A final check in our authentication practice our QA experts ensure nothing slips through the cracks." For example, a customer wrote to support@stockx.com stating: "While I appreciate you being pleasant and getting back to me quickly, it is nothing short of a disgrace what StockX are trying to get away with here. A company which I would […] like to point out promise the follow to all customers. [] **Guaranteed Authenticity** [] *Every item. Every time. Shop on StockX with complete confidence knowing every purchase is 100% Verified Authentic.* [] [] **Trust the process.** [] *Our global team of expert authenticators uses a rigorous, multi-step verification procedure the includes the following checkpoints.* **Construction** [] *With checklists of 100+ data points, our authenticators are better equipped that anyone to ensure a product*[]*s authenticity.* [] **Quality assurance.** [] *A final check in our authentication practice, our QA experts ensure nothing slips through the cracks.* This makes a complete mockery of the StockX promises and authentication process…" Sept. Duvdevani Decl. ¶ 15, Ex. 14, STX0273234. Further, StockX customer service representatives reference the claim that as a "final check-in [StockX's] authentication practice, [StockX's] QA experts ensure nothing slips through the cracks." *See, e.g.*, *id.* ¶ 72, Ex. 71, STX0220978.

587.    Nike has produced no evidence to establish whether consumers saw the statement "As StockX has a 99.96% accuracy rate, customers can have faith that the items they purchase are authenticated by people deeply rooted in the communities that amplify these products" in the June 21, 2022 blog post published on StockX's website. Ex. 112, NIKE0038955.

*Nike, Inc.'s Response:* **Disputed.**

This is improper and contravenes the Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. and for these reasons, should be disregarded. *Perez*, 2013 WL 2641432 at *7-8. Nike disputes StockX's characterization of the record to construe a screenshot of the blog post "True to You, True to Us" page as support that Nike has produced no evidence to establish consumers saw the statement "As StockX has a 99.96% accuracy rate, customers can have faith that the items they purchase are authenticated by people deeply rooted in the communities that amplify these products" on its website. Further, as StockX is the only party that can provide data on the number of visitors to its blog post "True to You, True to Us" webpage, StockX cannot point to the absence of evidence it withheld to support a proposition that evidence does not exist.

Nike disputes that there is no evidence establishing that consumers saw the statement: "As StockX has a 99.96% accuracy rate, customers can have faith that the items they purchase are authenticated by people deeply rooted in the communities that amplify these products." The "True to You, True to Us" blog post was a part of StockX's "StockX Day 2022" campaign, a campaign which garnered at least 554,000 visitors to the "StockX Day" landing page. Sept. Duvdevani Decl. ¶ 73, Ex. 72, STX0290347 at 357.

588. Nike has produced no evidence to establish what consumers understand the statement "As StockX has a 99.96% accuracy rate, customers can have faith that the items they purchase are authenticated by people deeply rooted in the communities that amplify these products" to mean in the context in which it was used by StockX. Ex. 112, NIKE0038955.

*Nike, Inc.'s Response:* **Disputed.**

This is improper and contravenes the Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. and for these reasons, should be disregarded. *Perez*, 2013 WL

2641432 at *7-8.  Nike disputes StockX's characterization of the record to construe a screenshot of the blog post "True to You, True to Us" page as support that Nike has produced no evidence to establish consumers understood the statement "As StockX has a 99.96% accuracy rate, customers can have faith that the items they purchase are authenticated by people deeply rooted in the communities that amplify these products" on its website.

Nike disputes that there is no evidence establishing that consumers understood the statement: "As StockX has a 99.96% accuracy rate, customers can have faith that the items they purchase are authenticated by people deeply rooted in the communities that amplify these products."  The "True to You, True to Us" blog post was a part of StockX's "StockX Day 2022" campaign, a campaign which garnered at least 554,000 visitors to the "StockX Day" landing page. Sept. Duvdevani Decl. ¶ 73, Ex. 72, STX0290347 at 357.

589.    Nike has produced no evidence to establish whether consumers saw the statement "Authenticators maintain a 99.96% accuracy rate (Last 12 Months)" on the "Big Facts: Verified Authentic" page on StockX's website.  Ex. 82, NIKE0006776.

***Nike, Inc.'s Response:* Disputed.**

This is improper and contravenes the Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. and for these reasons, should be disregarded.  *Perez*, 2013 WL 2641432 at *7-8.  Nike disputes StockX's characterization of the record to construe a screenshot of the "Big Facts: Verified Authentic" page as support that Nike has produced no evidence to establish consumers saw the statement "Authenticators maintain a 99.96% accuracy rate (Last 12 Months)" on its website.  Further, as StockX is the only party that can provide data on the number of visitors to its "Big Facts: Verified Authentic" page, StockX cannot point to the absence of evidence it withheld to support a proposition that evidence does not exist.

Nike disputes that there is no evidence establishing that consumers saw the statement: "Authenticators maintain a 99.96% accuracy rate (Last 12 Months)." For example, the article was planned as a part of StockX Day 2022 as "[a] piece centered around Authentication." Sept. Duvdevani Decl. ¶ 74, Ex. 73, STX0173220 at 263. StockX also tweeted a link to the Big Facts: Verified Authentic" report from its twitter account twice. Dkt. 261-79, Ex. 73, NIKE0038943; Sept. Duvdevani Decl. ¶ 75, Ex. 74, NIKE038994. StockX customer service representatives also directed customers to the Big Facts: Verified Authentic page. *See, e.g*, *id.* ¶ 76, Ex. 75, STX0786035.

590.    Nike has produced no evidence to establish what consumers understand the statement "Authenticators maintain a 99.96% accuracy rate (Last 12 Months)" to mean in the context in which it was used by StockX. Ex. 82, NIKE0006776 at 780 ("Big Facts: Verified Authentic" page).

**Nike, Inc.'s Response: Disputed.**

This is improper and contravenes the Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. and for these reasons, should be disregarded. *Perez*, 2013 WL 2641432 at *7-8. Nike disputes StockX's characterization of the record to construe a screenshot of the "Big Facts: Verified Authentic" page as support that Nike has produced no evidence to establish consumers understood the statement "Authenticators maintain a 99.96% accuracy rate (Last 12 Months)" on its website.

Nike disputes that there is no evidence establishing that consumers understood the statement: "Authenticators maintain a 99.96% accuracy rate (Last 12 Months)." For example, an article explained that "StockX's checks are quite thorough. StockX verifies over a million different items every year. The company's detection rate for counterfeit goods remains at 99.96 percent

despite its massive magnitude." Sept. Duvdevani Decl. ¶ 77, Ex. 76, https://www.33rdsquare.com/is-stockx-legit. Another article, discussing the "Big Facts: Verified Authentic" page explained that "StockX's authenticators boast a 99.96% authentication rate." *Id.* ¶ 78, Ex. 77 https://www.dmarge.com/how-to-spot-fake-sneakers/.

591.    Nike has produced no evidence to establish whether consumers saw the statement "Over the years, our team members have authenticated tens of millions of products at a 99.95% accuracy rate" on the "Authentication" page on StockX's website.  Ex. 118, NIKE0000281.

***Nike, Inc.'s Response:* Disputed.**

This is improper and contravenes the Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. and for these reasons, should be disregarded.  *Perez*, 2013 WL 2641432 at *7-8.  Nike disputes StockX's characterization of the record to construe a screenshot of the "Big Facts: Verified Authentic" page as support that Nike has produced no evidence to establish consumers saw the statement "Over the years, our team members have authenticated tens of millions of products at a 99.95% accuracy rate" on its website.  Further, as StockX is the only party that can provide data on the number of visitors to its "Authentication" page, StockX cannot point to the absence of evidence it withheld to support a proposition that evidence does not exist.

Nike disputes that there is no evidence establishing that consumers saw the statement: "Over the years, our team members have authenticated tens of millions of products at a 99.95% accuracy rate."  For example, press articles specifically reference StockX's 99.95% accuracy rate. *See* Sept. Duvdevani Decl. ¶ 78, Ex. 78, https://techcrunch.com/2021/04/05/stockx-ec1-authentication/ ("StockX verifies the authenticity of each item before it's sold. All of the characteristics about the item (condition, packaging and so forth) are verified by a team of experts on staff and the company boasts a 99.95% accuracy rate with millions of items having already

been checked by its team.") (including link to StockX's Authentication page); *id.* ("Despite being at a 99.95% success rate now according to StockX's estimates, fakes have made it through in the past and .05% still do now."); *id.* ¶ 80, Ex. 79, https://www.forbes.com/sites/tiffanylung/2020/11/30/disrupting-the-sneaker-scalping-game-in-asia-as-told-by-stockx-ceo-scott-cutler/ ("Thousands of sneakers cross StockX authenticators' desks daily and is cleared with 99.95% accuracy under its proprietary technology and standards, ensuring incoming products are processed and shipped out within the same day.") StockX's "General Talking Points" includes "StockX has a 99.95% accuracy rate, which is a number we are deeply proud of." Dkt. 257-87, Ex. 87.    StockX customer service representatives also communicated the 99.95% accuracy rate to consumers. *See* Sept. Duvdevani Decl. ¶ 81, Ex. 80, STX0779941 ("StockX boasts a group of more than 300 authenticators across 11 authentication locations who have a 99.95% accuracy rate."); *id.* ¶ 82, Ex. 80, STX0232287 ("StockX boasts a group of more than 300 authenticators across 11 authentication locations who have a 99.95 percent accuracy rate.").    StockX posted to the official StockX X account that "We are laser-focused on protecting the integrity of our marketplace and take pride in our 99.95% accuracy rate. We know scammers continue to up their game, but so do we." on June 24, 2021 and received 73 likes. *Id.* ¶ 83, Ex. 82, https://x.com/stockx/status/1408215581971603461.    Ms. Butler testified that she included the "Authentication" page in her survey because it was one of the pages "that a consumer can reasonably interact with when looking to purchase a particular pair of sneakers." *Id.* ¶ 65, Ex. 64, Butler Tr. 201:15-202:5.

592.    Nike has produced no evidence to establish what consumers understand the statement "Over the years, our team members have authenticated tens of millions of products at a

99.95% accuracy rate" to mean in the context in which it was used by StockX.  Ex. 118, NIKE0000281 (StockX's "Authentication" page).

***Nike, Inc.'s Response:*** **Disputed.**

This is improper and contravenes the Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. and for these reasons, should be disregarded.  *Perez*, 2013 WL 2641432 at *7-8.  Nike disputes StockX's characterization of the record to construe a screenshot StockX's "Authentication" page as support that Nike has produced no evidence to establish consumers understood the statement "Over the years, our team members have authenticated tens of millions of products at a 99.95% accuracy rate" on its website.

Nike disputes that there is no evidence establishing that consumers understood the statement: "Over the years, our team members have authenticated tens of millions of products at a 99.95% accuracy rate."   For examples press articles specifically reference StockX's 99.95% accuracy rate.  *See* Sept. Duvdevani Decl. ¶ 79, Ex. 78, https://techcrunch.com/2021/04/05/stockx-ec1-authentication/   ("StockX verifies the authenticity of each item before it's sold. All of the characteristics about the item (condition, packaging and so forth) are verified by a team of experts on staff and the company boasts a 99.95% accuracy rate with millions of items having already been checked by its team.") (including link to StockX's Authentication page); *id.* ("Despite being at a 99.95% success rate now according to StockX's estimates, fakes have made it through in the past and .05% still do now."); *id.* ¶ 80, Ex. 79, https://www.forbes.com/sites/tiffanylung/2020/11/30/disrupting-the-sneaker-scalping-game-in-asia-as-told-by-stockx-ceo-scott-cutler/   ("Thousands of sneakers cross StockX authenticators' desks daily and is cleared with 99.95% accuracy under its proprietary technology and standards, ensuring incoming products are processed and shipped out within the same day.").  StockX's

"General Talking Points" includes "StockX has a 99.95% accuracy rate, which is a number we are deeply proud of." Dkt. 257-87, Ex. 87.    StockX customer service representatives also communicated the 99.95% accuracy rate to consumers. *See* Sept. Duvdevani Decl. ¶ 81, Ex. 80, STX0779941 ("StockX boasts a group of more than 300 authenticators across 11 authentication locations who have a 99.95% accuracy rate."); *id.* ¶ 82, Ex. 81, STX0232287 ("StockX boasts a group of more than 300 authenticators across 11 authentication locations who have a 99.95 percent accuracy rate.").

### G.    Nike Has Not Produced Evidence That the Advertising Claims Were Material to Consumers Purchasing Decisions.

593.    Nike has produced no evidence to establish whether the presence of the statement "100% Verified Authentic" was material to consumer purchasing decisions.

*Nike, Inc.'s Response:* **Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded.  *Perez*, 2013 WL 2641432 at *7-8.  Further, the assertion that Nike has not established that the presence of "100% Verified Authentic" was material to consumer purchasing decisions is a legal conclusion, to which no response is required. *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 394, 398 (S.D.N.Y. 2015), *aff'd*, 945 F.3d 83 (2d Cir. 2019) ("*Tartikov*") ("the Court can also disregard legal conclusions or unsubstantiated opinions in a Local Rule 56.1 statement."); *see also PharmacyChecker.com v. Nat'l Ass'n of Boards of Pharmacy,* No. 19-CV-7577 (KMK), 2023 WL 2973038, at *2 (S.D.N.Y. Mar. 28, 2023) ("*PharmacyChecker.com*") (collecting cases) ("The Court can also disregard legal conclusions or unsubstantiated opinions in a Local Rule 56.1 statement.").

Nike disputes that the record does not contain evidence that the statement "100% Verified Authentic" was material to consumer purchasing decisions. ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ Dkt. 257-44, Ex. 44, STX0021868 at 897. ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ Sept. Duvdevani Decl. ¶ 84, Ex. 83, STX0096562 at 581-582. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ Dkt. 261-77, Ex. 71 at STX0018465.  Mr. Fenton testified that authentication is "how we, you know, grew our reputation in the community and it's very important to us.  It's a key part of our – our offering and we take it very seriously." Sept. Duvdevani Decl. ¶ 86, Ex. 85, Fenton Tr. 82:4-15; *see also id.* Fenton Tr. 144:6-16 ████████

████████████████████████████████████████████████

████████████████████

594.    Nike has produced no evidence to establish whether the presence of the statement "Verified Authentic" was material to consumer purchasing decisions.

***Nike, Inc.'s Response:* Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence

and for these reasons, should be disregarded.  *Perez*, 2013 WL 2641432 at *7-8.  Further, the assertion that Nike has not established that the presence of "Verified Authentic" was material to consumer purchasing decisions is a legal conclusion, to which no response is required.  *Tartikov*, 138 F. Supp. 3d at 394, 398; *see also PharmacyChecker.com*, 2023 WL 2973038, at *2.

Nike disputes that the record does not contain evidence that the statement "Verified Authentic" was material to consumer purchasing decisions.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Sept. Duvdevani Decl. ¶ 84, Ex. 83, STX0096562 at 581-582.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Dkt. 261-77, Ex. 71 at STX0018465.  Mr. Fenton testified that authentication is "how we, you know, grew our reputation in the community and it's very important to us.  It's a key part of our – our offering and we take it very seriously." Sept. Duvdevani Decl. ¶ 86, Ex. 85, Fenton Tr. 82:4-15; *see also id.* Fenton Tr. 144:6-16 ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮

595.    Nike has produced no evidence to establish whether the presence of the statement "Guaranteed Authenticity. Every Item. Every Time. Shop on StockX with complete confidence every purchase is 100% Verified Authentic" was material to consumer purchasing decisions.

*Nike, Inc.'s Response:* **Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded.  *Perez*, 2013 WL 2641432 at *7-8.  Further, the assertion that Nike has not established that the presence of "Guaranteed Authenticity. Every Item. Every Time. Shop on StockX with complete confidence every purchase is 100% Verified Authentic" was material to consumer purchasing decisions is a legal conclusion, to which no response is required.  *Tartikov*, 138 F. Supp. 3d at 394, 398; *see also PharmacyChecker.com*, 2023 WL 2973038, at *2.

596.    Nike disputes that the record does not contain evidence that the statement "Guaranteed Authenticity. Every Item. Every Time. Shop on StockX with complete confidence every purchase is 100% Verified Authentic" was material to consumer purchasing decisions.  A customer wrote to support@stockx.com stating: "While I appreciate you being pleasant and getting back to me quickly, it is nothing short of a disgrace what StockX are trying to get away with here. A company which I would […] like to point out promise the follow to all customers. [] **Guaranteed Authenticity** [] *Every item. Every time. Shop on StockX with complete confidence knowing every purchase is 100% Verified Authentic.* [] [] **Trust the process.** [] *Our global team of expert authenticators uses a rigorous, multi-step verification procedure the includes the following checkpoints.* **Construction** [] *With checklists of 100+ data points, our authenticators are better equipped that anyone to ensure a product[]s authenticity.* [] **Quality assurance.** [] *A*

*final check in our authentication practice, our QA experts ensure nothing slips through the cracks.* This makes a complete mockery of the StockX promises and authentication process…"  Sept. Duvdevani Decl. ¶ 15, Ex. 14, STX0273234. ███████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████

██████████████████████████  Sept. Duvdevani Decl. ¶ 84, Ex. 83, STX0096562 at 581-582. ████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████  Dkt. 261-77, Ex. 71 at STX0018465.  Mr. Fenton testified that authentication is "how we, you know, grew our reputation in the community and it's very important to us.  It's a key part of our – our offering and we take it very seriously."  Sept. Duvdevani Decl. ¶ 86, Ex. 85, Fenton Tr. 82:4-15; *see also id.* Fenton Tr. 144:6-16 ███████████

███████████████████████████████████████████████████████████████

████████  Nike has produced no evidence to establish whether the presence of the statement "We Authenticate Every Item. Every Time" was material to consumer purchasing decisions.

**Nike, Inc.'s Response: Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence

and for these reasons, should be disregarded.  *Perez*, 2013 WL 2641432 at \*7-8.  Further, the assertion that Nike has not established that the presence of "We Authenticate Every Item. Every Time" was material to consumer purchasing decisions is a legal conclusion, to which no response is required. *Tartikov*, 138 F. Supp. 3d at 394, 398; *see also PharmacyChecker.com*, 2023 WL 2973038, at \*2.

Nike disputes that the record does not contain evidence that the statement "We Authenticate Every Item. Every Time" was material to consumer purchasing decisions.  A customer wrote to support@stockx.com stating: "While I appreciate you being pleasant and getting back to me quickly, it is nothing short of a disgrace what StockX are trying to get away with here. A company which I would […] like to point out promise the follow to all customers. [] **Guaranteed Authenticity** [] *Every item. Every time. Shop on StockX with complete confidence knowing every purchase is 100% Verified Authentic.* [] [] **Trust the process.** [] *Our global team of expert authenticators uses a rigorous, multi-step verification procedure the includes the following checkpoints.* **Construction** [] *With checklists of 100+ data points, our authenticators are better equipped that anyone to ensure a product[]s authenticity.* [] **Quality assurance.** [] *A final check in our authentication practice, our QA experts ensure nothing slips through the cracks.* This makes a complete mockery of the StockX promises and authentication process…"  Sept. Duvdevani Decl. ¶ 15, Ex. 14, STX0273234.

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████ Sept. Duvdevani Decl. ¶ 84, Ex. 83, STX0096562 at 581-582. ███████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████ Dkt. 261-77, Ex. 71 at STX0018465.  Mr. Fenton testified that

authentication is "how we, you know, grew our reputation in the community and it's very

important to us.  It's a key part of our – our offering and we take it very seriously."  Sept.

Duvdevani Decl. ¶ 86, Ex. 85, Fenton Tr. 82:4-15; *see also id.* Fenton Tr. 144:6-16 ████████

███████████████████████████████████████████████

███████

597.    Nike has produced no evidence to establish whether the presence of the statement

"Always Authentic. Never Fake" was material to consumer purchasing decisions.

*Nike, Inc.'s Response:* **Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge

Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence

and for these reasons, should be disregarded.  *Perez*, 2013 WL 2641432 at *7-8.  Further, the

assertion that Nike has not established that the presence of "Always Authentic. Never Fake" was

material to consumer purchasing decisions is a legal conclusion, to which no response is required.

*Tartikov*, 138 F. Supp. 3d at 394, 398; *see also PharmacyChecker.com*, 2023 WL 2973038, at *2.

Nike disputes that the record does not contain evidence that the statement was material to

consumer purchasing decisions "Always Authentic. Never Fake." ████████████████

███████████████████████████████████████████████



Dkt. 257-44, Ex. 44, STX0021868 at 897.

*Id.* at 898.

Sept. Duvdevani Decl. ¶ 84, Ex. 83, STX0096562 at 581-582.

Dkt. 261-77, Ex. 71 at STX0018465.  Mr. Fenton testified that authentication is "how we, you know, grew our reputation in the community and it's very important to us.  It's a key part of our – our offering and we take it very seriously."  Sept. Duvdevani Decl. ¶ 86, Ex. 85, Fenton Tr. 82:4-15; *see also id.* Fenton Tr. 144:6-16

598.    Nike has produced no evidence to establish whether the presence of the statement "Every item sold goes through our proprietary multi-step verification process with our team of expert authenticators" was material to consumer purchasing decisions.

***Nike, Inc.'s Response:* Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded.  *Perez*, 2013 WL 2641432 at *7-8.  Further, the assertion that Nike has not established that the presence of "Every item sold goes through our

proprietary multi-step verification process with our team of expert authenticators" was material to

consumer purchasing decisions is a legal conclusion, to which no response is required. *Tartikov*,

138 F. Supp. 3d at 394, 398; *see also PharmacyChecker.com*, 2023 WL 2973038, at *2.



Sept. Duvdevani Decl.

¶ 84, Ex. 83, STX0096562 at 581-582.

Dkt. 261-77,

Ex. 71 at STX0018465. Mr. Fenton testified that authentication is "how we, you know, grew our

reputation in the community and it's very important to us. It's a key part of our – our offering and

we take it very seriously." Sept.Duvdevani Decl. ¶ 86, Ex. 85, Fenton Tr. 82:4-15; *see also id.*

Fenton Tr. 144:6-16

599.    Nike has produced no evidence to establish whether the presence of the statement

"With checklists of 100+ data points, our authenticators are better equipped than anyone to ensure

a product's authenticity" was material to consumer purchasing decisions.

***Nike, Inc.'s Response:*** **Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded. *Perez*, 2013 WL 2641432 at *7-8. Further, the assertion that Nike has not established that the presence of "With checklists of 100+ data points, our authenticators are better equipped than anyone to ensure a product's authenticity" was material to consumer purchasing decisions is a legal conclusion, to which no response is required. *Tartikov*, 138 F. Supp. 3d at 394, 398; *see also PharmacyChecker.com*, 2023 WL 2973038, at *2.

Nike disputes that the record does not contain evidence that the statement "With checklists of 100+ data points, our authenticators are better equipped than anyone to ensure a product's authenticity." was material to consumer purchasing decisions. ██████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████ Sept. Duvdevani Decl. ¶ 84, Ex. 83, STX0096562 at 581-582. ████████████████████████

████████████████████████████████████████████████

██████████████████████████ Dkt. 261-77, Ex. 71 at STX0018465. Mr. Fenton testified that authentication is "how we, you know, grew our reputation in the community and it's very important to us. It's a key part of our – our offering and we take it very seriously."

Sept. Duvdevani Decl. ¶ 86, Ex. 85, Fenton Tr. 82:4-15; *see also id.* Fenton Tr. 144:6-16 ██████

████████████████████████████████████████████████████████████

████████████

600.    Nike has produced no evidence to establish whether the presence of the statement "Advanced Technology: We use machine learning to aid our authenticators in catching every minor detail" was material to consumer purchasing decisions.

*Nike, Inc.'s Response:*

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded.  *Perez*, 2013 WL 2641432 at *7-8.  Further, the assertion that Nike has not established that the presence of "Advanced Technology: We use machine learning to aid our authenticators in catching every minor detail" was material to consumer purchasing decisions is a legal conclusion, to which no response is required. *Tartikov*, 138 F. Supp. 3d at 394, 398; *see also PharmacyChecker.com*, 2023 WL 2973038, at *2.

Nike disputes that the record does not contain evidence that the statement "Advanced Technology: We use machine learning to aid our authenticators in catching every minor detail." was material to consumer purchasing decisions.  ████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████ *Id.* at 898. ████████████████

████████████████████████████████████████████████████████████

[REDACTED]

Sept. Duvdevani Decl. ¶ 84, Ex. 83, STX0096562 at 581-582. [REDACTED]

[REDACTED]

[REDACTED]

Dkt. 261-77, Ex. 71 at STX0018465. Mr. Fenton testified that authentication is "how we, you know, grew our reputation in the community and it's very important to us. It's a key part of our – our offering and we take it very seriously." Sept. Duvdevani Decl. ¶ 86, Ex. 85, Fenton Tr. 82:4-15; *see also id.* Fenton Tr. 144:6-16 [REDACTED]

[REDACTED]

[REDACTED]

601. Nike has produced no evidence to establish whether the presence of the statement "Quality Assurance: A final check in our authentication practice, our QA experts ensure nothing slips through the cracks" was material to consumer purchasing decisions.

*Nike, Inc.'s Response:* **Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded. *Perez*, 2013 WL 2641432 at *7-8. Further, the assertion that Nike has not established that the presence of "Quality Assurance: A final check in our authentication practice, our QA experts ensure nothing slips through the cracks" was material to consumer purchasing decisions is a legal conclusion, to which no response is required. *Tartikov*, 138 F. Supp. 3d at 394, 398; *see also PharmacyChecker.com*, 2023 WL 2973038, at *2.

Nike disputes that the record does not contain evidence that the statement "Quality Assurance: A final check in our authentication practice, our QA experts ensure nothing slips

through the cracks." was material to consumer purchasing decisions. ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████ Sept. Duvdevani Decl. ¶ 84, Ex. 83, STX0096562

at 581-582. ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████ Dkt. 261-77, Ex. 71 at

STX0018465. Mr. Fenton testified that authentication is "how we, you know, grew our reputation

in the community and it's very important to us. It's a key part of our – our offering and we take it

very seriously." Sept. Duvdevani Decl. ¶ 86, Ex. 85, Fenton Tr. 82:4-15; *see also id.* Fenton Tr.

144:6-16 (████████████████████████████████████████████████████████

██████████████████████████████

  602.   Nike has produced no evidence to establish whether the presence of the statement

"As StockX has a 99.96% accuracy rate, customers can have faith that the items they purchase are

authenticated by people deeply rooted in the communities that amplify these products" was

material to consumer purchasing decisions.

*Nike, Inc.'s Response:* **Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded.  *Perez*, 2013 WL 2641432 at *7-8.  Further, the assertion that Nike has not established that the presence of "As StockX has a 99.96% accuracy rate, customers can have faith that the items they purchase are authenticated by people deeply rooted in the communities that amplify these products" was material to consumer purchasing decisions is a legal conclusion, to which no response is required.  *Tartikov*, 138 F. Supp. 3d at 394, 398; *see also PharmacyChecker.com*, 2023 WL 2973038, at *2.

Nike disputes that the record does not contain evidence that the statement "As StockX has a 99.96% accuracy rate, customers can have faith that the items they purchase are authenticated by people deeply rooted in the communities that amplify these products" was material to consumer purchasing decisions.  ███████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████ Sept. Duvdevani Decl. ¶ 84, Ex. 83, STX0096562 at 581-582. ████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████ Dkt. 261-77, Ex. 71 at STX0018465.  Mr. Fenton testified that

authentication is "how we, you know, grew our reputation in the community and it's very important to us. It's a key part of our – our offering and we take it very seriously." Sept. Duvdevani Decl. ¶ 86, Ex. 85, Fenton Tr. 82:4-15; *see also id.* Fenton Tr. 144:6-16 ███████

███████

603.    Nike has produced no evidence to establish whether the presence of the statement "Authenticators maintain a 99.96% accuracy rate (Last 12 Months)" was material to consumer purchasing decisions.

***Nike, Inc.'s Response:* Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded. *Perez*, 2013 WL 2641432 at *7-8. Further, the assertion that Nike has not established that the presence of "Authenticators maintain a 99.96% accuracy rate (Last 12 Months)" was material to consumer purchasing decisions is a legal conclusion, to which no response is required. *Tartikov*, 138 F. Supp. 3d at 394, 398; *see also PharmacyChecker.com*, 2023 WL 2973038, at *2.

Nike disputes that the record does not contain evidence that the statement "Authenticators maintain a 99.96% accuracy rate (Last 12 Months)" was material to consumer purchasing decisions. ███████

███████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████ Sept. Duvdevani

Decl. ¶ 84, Ex. 83, STX0096562 at 581-582. █████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

Dkt. 261-77, Ex. 71 at STX0018465.  Mr. Fenton testified that authentication is "how we, you

know, grew our reputation in the community and it's very important to us.  It's a key part of our –

our offering and we take it very seriously."  Sept. Duvdevani Decl. ¶ 86, Ex. 85, Fenton Tr. 82:4-

15; *see also id.* Fenton Tr. 144:6-16 █████████████████████████████████

██████████████████████████████████████.

604.    Nike has produced no evidence to establish whether the presence of the statement

"Over the years, our team members have authenticated tens of millions of products at a 99.95%

accuracy rate" was material to consumer purchasing decisions.

***Nike, Inc.'s Response:*** **Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge

Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence

and for these reasons, should be disregarded.  *Perez*, 2013 WL 2641432 at *7-8.  Further, the

assertion that Nike has not established that the presence of "Over the years, our team members

have authenticated tens of millions of products at a 99.95% accuracy rate" was material to

consumer purchasing decisions is a legal conclusion, to which no response is required.  *Tartikov*,

138 F. Supp. 3d at 394, 398; *see also PharmacyChecker.com*, 2023 WL 2973038, at *2.

Nike disputes that the record does not contain evidence that the statement "Over the years, our team members have authenticated tens of millions of products at a 99.95% accuracy rate" was material to consumer purchasing decisions. ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ Sept. Duvdevani Decl. ¶ 84, Ex. 83, STX0096562 at 581-582. ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ Dkt. 261-77, Ex. 71 at STX0018465.  Mr. Fenton testified that authentication is "how we, you know, grew our reputation in the community and it's very important to us.  It's a key part of our – our offering and we take it very seriously."  Sept. Duvdevani Decl. ¶ 86, Ex. 85, Fenton Tr. 82:4-15; *see also id.* Fenton Tr. 144:6-16 ████████

████████████████████████████████████████████████████████

████████

605.    Nike has produced no evidence to establish whether the presence of the statement "Always Verified Authentic" was material to consumer purchasing decisions.

***Nike, Inc.'s Response:*** **Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded. *Perez*, 2013 WL 2641432 at *7-8. Further, the assertion that Nike has not established that the presence of "Always Verified Authentic" was material to consumer purchasing decisions is a legal conclusion, to which no response is required. *Tartikov*, 138 F. Supp. 3d at 394, 398; *see also PharmacyChecker.com*, 2023 WL 2973038, at *2.

Nike disputes that the record does not contain evidence that the statement "Always Verified Authentic" was material to consumer purchasing decisions. ██████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████. Sept. Duvdevani Decl. ¶ 84, Ex. 83, STX0096562 at 581-582. ███████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████ Dkt. 261-77, Ex. 71 at STX0018465. Mr. Fenton testified that authentication is "how we, you know, grew our reputation in the community and it's very important to us. It's a key part of our – our offering and we take it very seriously." Sept. Duvdevani Decl. ¶ 86, Ex. 85, Fenton Tr. 82:4-15; *see also id.* Fenton Tr. 144:6-16 ████████

██████████████████████████████████████████████

████████████

606.    Nike has produced no evidence to establish whether the presence of the statement "100% Authentic" was material to consumer purchasing decisions.

***Nike, Inc.'s Response:*** **Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded.  *Perez*, 2013 WL 2641432 at *7-8.  Further, the assertion that Nike has not established that the presence of "100% Authentic" was material to consumer purchasing decisions is a legal conclusion, to which no response is required. *Tartikov*, 138 F. Supp. 3d at 394, 398; *see also PharmacyChecker.com*, 2023 WL 2973038, at *2.

Nike disputes that the record does not contain evidence that the statement "100% Authentic" was material to consumer purchasing decisions.  *See, e.g.*, Sept. Duvdevani Decl. ¶ 87, Ex. 86, STX0225298 ("I think it[]s an issue in the sneaker community when an item is advertised as 100% authentic and in this one shoe in not."); *id.* ¶ 88, Ex. 87, STX0247779 (I paid 140[] to receive an original pair of Nike Air Force, not a copy/replica!!! If you think you can advertise 100% original certified sneakers (that you said that you even verified and authenticated, that['] s incredible!!!) and then sell me replicas/fake copies, you are not gonna have be as a customer ever again!!"); *id.* ¶ 89, Ex. 88, STX0264147 ("These are not common manufacturing variances. These shoes are fakes, I have knowledge on shoes and know 100% that these are fakes….StockX claims to sell authentic shoes but these are not. False advertising and selling replicas is a crime.").

██████████████████████████████████████████████

██████████████████████████████████████████████



Sept. Duvdevani Decl. ¶ 84, Ex. 83, STX0096562 at 581-582.

Dkt. 261-77, Ex. 71 at STX0018465.  Mr. Fenton testified that authentication is "how we, you know, grew our reputation in the community and it's very important to us.  It's a key part of our – our offering and we take it very seriously."  Sept. Duvdevani Decl. ¶ 86, Ex. 85, Fenton Tr. 82:4-15; *see also id.* Fenton Tr. 144:6-16

607.    Nike has produced no evidence to establish whether the presence of the statement "Buy & Sell Authentic Sneakers" was material to consumer purchasing decisions.

***Nike, Inc.'s Response:* Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded.  *Perez*, 2013 WL 2641432 at *7-8.  Further, the assertion that Nike has not established that the presence of "Buy & Sell Authentic Sneakers" was material to consumer purchasing decisions is a legal conclusion, to which no response is required. *Tartikov*, 138 F. Supp. 3d at 394, 398; *see also PharmacyChecker.com*, 2023 WL 2973038, at *2.

Nike disputes that the record does not contain evidence that the statement "Buy & Sell Authentic Sneakers" was material to consumer purchasing decisions. ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████ Sept. Duvdevani Decl. ¶ 84, Ex. 83, STX0096562 at 581-582. ████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████ Dkt. 261-77, Ex. 71 at STX0018465.  Mr. Fenton testified that authentication is "how we, you know, grew our reputation in the community and it's very important to us.  It's a key part of our – our offering and we take it very seriously."  Sept. Duvdevani Decl. ¶ 86, Ex. 85, Fenton Tr. 82:4-15; *see also id.* Fenton Tr. 144:6-16 ████████████████████████████████████████

██████████████████████████

608.    Nike has produced no evidence to establish whether the presence of the statement "Buy Authentic. Be Authentic" was material to consumer purchasing decisions.

***Nike, Inc.'s Response:*** **Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence

and for these reasons, should be disregarded. *Perez*, 2013 WL 2641432 at *7-8. Further, the assertion that Nike has not established that the presence of "Buy Authentic. Be Authentic" was material to consumer purchasing decisions is a legal conclusion, to which no response is required. *Tartikov*, 138 F. Supp. 3d at 394, 398; *see also PharmacyChecker.com*, 2023 WL 2973038, at *2.

Nike disputes that the record does not contain evidence that the statement "Buy Authentic. Be Authentic" was material to consumer purchasing decisions. ███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████ Sept. Duvdevani Decl. ¶ 84, Ex. 83, STX0096562 at 581-582. ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████ Dkt. 261-77, Ex. 71 at STX0018465. Mr. Fenton testified that authentication is "how we, you know, grew our reputation in the community and it's very important to us. It's a key part of our – our offering and we take it very seriously." Sept. Duvdevani Decl. ¶ 86, Ex. 85, Fenton Tr. 82:4-15; *see also id.* Fenton Tr. 144:6-16 ██████████

████████████████████████████████████████████████████████████

████████████.

609.    Nike has produced no evidence to establish whether the presence of the statement "On StockX, every sneaker you want is always available and authentic" was material to consumer purchasing decisions.

***Nike, Inc.'s Response:* Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded. *Perez*, 2013 WL 2641432 at *7-8. Further, the assertion that Nike has not established that the presence of "On StockX, every sneaker you want is always available and authentic" was material to consumer purchasing decisions is a legal conclusion, to which no response is required. *Tartikov*, 138 F. Supp. 3d at 394, 398; *see also PharmacyChecker.com*, 2023 WL 2973038, at *2.

Nike disputes that the record does not contain evidence that the statement "On StockX, every sneaker you want is always available and authentic" was material to consumer purchasing decisions. ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████ Sept. Duvdevani

Decl. ¶ 84, Ex. 83, STX0096562 at 581-582. ████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

Dkt. 261-77, Ex. 71 at STX0018465.  Mr. Fenton testified that authentication is "how we, you know, grew our reputation in the community and it's very important to us.  It's a key part of our – our offering and we take it very seriously."  Sept. Duvdevani Decl. ¶ 86, Ex. 85, Fenton Tr. 82:4-15; *see also id.* Fenton Tr. 144:6-16 ████████████████████████████

████████████████████████████████

610.    Nike has not submitted a survey in connection with its false advertising claim in the present case.

***Nike, Inc.'s Response:* Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded. *Perez*, 2013 WL 2641432 at *7-8.

Nike does not dispute that it did not submit an affirmative false advertising survey in connection with the false advertising claim in the present case.  However, Nike disputes that no surveys were submitted in connection with its false advertising claim. *See, e.g.,* Dkt. 261-77.

611.    Nike has not identified any survey or other evidence reflecting what message(s), if any, consumers received from any advertising claim made by StockX.

***Nike, Inc.'s Response:* Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded. *Perez*, 2013 WL 2641432 at *7-8.  During discovery, StockX did not serve any interrogatory asking Nike to identify any survey or other evidence reflecting what message(s), if any, consumers received from any advertising claim made by

StockX.  See Dkt. 257-116, Ex. 116; *see also* Sept. Duvdevani Decl. ¶ 90, Ex. 89, Nike's Amended

Responses &Objection's to StockX's Fourth Set of Interrogatories.  The assertion that Nike has

not identified any survey or other evidence reflecting what message(s), if any, consumers received

from any advertising claim is a legal conclusion, to which no response is required.  *Tartikov*, 138

F. Supp. 3d at 394, 398; *see also PharmacyChecker.com*, 2023 WL 2973038, at *2.

Nike disputes that there is no record evidence reflecting what message(s), if any, consumers

received from any advertising claim made by StockX.  For example, Mr. Wells testified that his

understanding of "the StockX authenticity guarantee" was that "every sneaker that goes through

their marketplace, their platform, is 100 percent authentic verified." Sept. Duvdevani Decl. ¶ 8,

Ex. 7, Wells Tr. 99:24-100:5.  Mr. Wells further testified that he is "familiar with" the phrase "100

percent authentic" as "[i]t's prominently written on [StockX's] website" and that the StockX

authenticity guarantee refers to StockX's "100 percent authentic program." *Id.* at 100:10-17.

612.    Nike has not identified any survey or other evidence reflecting that any advertising

claim made by StockX misled or had a tendency to mislead consumers, or in fact did mislead any

consumer.

***Nike, Inc.'s Response:* Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge

Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence

and for these reasons, should be disregarded.  *Perez*, 2013 WL 2641432 at *7-8.  During discovery,

StockX did not serve any interrogatory asking Nike to identify any survey or other evidence

reflecting that any advertising claim made by StockX misled or had a tendency to mislead

consumers, or in fact did mislead any consumer.  *See* Dkt. 257-116, Ex. 116; *see also* Sept.

Duvdevani Decl. ¶ 90, Ex. 89, Nike's Amended Responses &Objection's to StockX's Fourth Set

of Interrogatories.   The assertion that Nike has not identified any survey or other evidence reflecting that any advertising claim made by StockX misled or had a tendency to mislead consumers, or in fact did mislead any consumer, is a legal conclusion to which no response is required.   *Tartikov*, 138 F. Supp. 3d at 394, 398; *see also PharmacyChecker.com*, 2023 WL 2973038, at *2.

Nike disputes that there is no record evidence reflecting that any advertising claim made by StockX misled or had a tendency to mislead consumers, or in fact did mislead any consumer. For example, Mr. Wells testified that of the sneakerheads who are discussing the purchase of counterfeit sneakers on StockX, "[t]hey were surprised that the sneakers that they received they believe were fake." Sept. Duvdevani Decl. ¶ 8, Ex. 7, Wells Tr. 107:6-18.   Further, several consumer complaints to StockX reference the disputed advertising claims. *See, e.g., id.* ¶ 91, Ex. 90, STX0204526 ("If an item is advertised as brand new I expect to receive a brand new item in original packaging that feels, looks, and smells brand new"); *id.* ¶ 92, Ex. 91, STX0205474 ("A $30 dollar discount doesn['']t eliminate the fact that I did not receive the top-quality shoes that that StockX advertised, and I paid for. That doesn['']t remove the flaw."); *id.* ¶ 93, Ex. 92, STX0217609 ("The advertisement said I was receiving a New shoe not a new shoe with defects"); *id.* ¶ 94, Ex. 93, STX0224522 ("This shoe was not advertised as used or defect but new, authentic, and pristine condition, that is not what I received and that is not fair to the customer"); *id.* ¶ 87, Ex. 86, STX0225298 ("I think it[]s an issue in the sneaker community when an item is advertised as 100% authentic and in this one shoe in not."); *id.* ¶ 9, Ex. 8, STX0226300 ("The track shoe was a gift for my son and he was so excited to get this particular shoe because of all the [] quality [] of the shoe that was advertised or promoted."); *id.* ¶ 88, Ex. 87, STX0247779 (I paid 140[] to receive an original pair of Nike Air Force, not a copy/replica!!! If you think you can advertise 100% original

certified sneakers (that you said that you even verified and authenticated, that['s] incredible!!!) and then sell me replicas/fake copies, you are not gonna have be as a customer ever again!!"); *id.* ¶ 95, Ex. 94, STX0260748 ("The website is false advertising! I ordered these sneakers in a different color. They shouldn[']t have been sent to me if the shoe didn[']t match the description in my order when in the verifying process."); *id.* ¶ 89, Ex. 88, STX0264147 ("These are not common manufacturing variances. These shoes are fakes, I have knowledge on shoes and know 100% that these are fakes….StockX claims to sell authentic shoes but these are not. False advertising and selling replicas is a crime."); *id.* ¶ 96, Ex. 95, STX0265575 ("I was so excited to receive my package and everything isn[']t even there on the website it says Unopened, Unworn, Original packaging I just feel like this is a case of false advertising and false authenticity"); *id.* ¶ 97, Ex. 96, STX0268661 ("The description of the shoe compared to the product received is nothing as described this is false advertisement of the product that the consumer believes we[']re purchase. The shoe itself is clearly a FAKE!!").

613.    Nike has not identified any survey or other evidence reflecting that any advertising claim made by StockX was material to any consumer's purchasing decisions.

***Nike, Inc.'s Response:*** **Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded. *Perez*, 2013 WL 2641432 at *7-8. During discovery, StockX did not serve any interrogatory asking Nike to identify any survey or other evidence reflecting that any advertising claim made by StockX was material to any consumer's purchasing decisions. *See* Sept. Duvdevani Decl. ¶ 90, Ex. 89, Nike's Amended Responses &Objection's to StockX's Fourth Set of Interrogatories.  The assertion that Nike has not identified any survey or

other evidence reflecting that any advertising claim made by StockX was material to any consumer's purchasing decisions is a legal conclusion to which no response is required. *Tartikov*, 138 F. Supp. 3d at 394, 398; *see also PharmacyChecker.com*, 2023 WL 2973038, at *2.

Nike disputes that the record does not contain evidence that the StockX's advertising claims were material to consumer purchasing decisions. ████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████ Sept. Duvdevani Decl. ¶ 84, Ex. 83, STX0096562 at 581-582. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████ Dkt. 261-77, Ex. 71 at STX0018465.  Mr. Fenton testified that authentication is "how we, you know, grew our reputation in the community and it's very important to us.  It's a key part of our – our offering and we take it very seriously." Sept. Duvdevani Decl. ¶ 86, Ex. 85, Fenton Tr. 82:4-15; *see also id.* Fenton Tr. 144:6-16 ████████████

████████████████████████████████████████████████████████████

████████████

614.    StockX expert Sarah Butler conducted a purchase intent survey focusing on challenged statements on StockX's website.  Ex. 119, Expert Rebuttal Report of Sarah Butler (June 2, 2023) ("Butler Rep.") ¶¶ 9, 10.

*Nike, Inc.'s Response:* **Disputed.**

Nike disputes StockX's characterization of Ms. Butler's survey as a purchase intent survey focusing on challenged statements on StockX's website. Ms. Butler's rebuttal report was aimed at responding to the portion of Mr. Hansen's report that "assum[ed] that StockX advertising claims about its authentication were false." Sept. Duvdevani Decl. ¶ 65, Ex. 64, Butler Tr. 50:24-51:15. Further, Nike objects to StockX's use of Ms. Butler's damages rebuttal survey as part of its case in chief, for the reasons set forth in Nike's Opposition Brief § IV.B.1.

615.    Ms. Butler surveyed consumers that had purchased sneakers from StockX since 2020, or indicated that they would consider purchasing sneakers from StockX in the next year. Ex. 119, Butler Rep. ¶ 10.

*Nike, Inc.'s Response:* **Disputed.**

Nike disputes that Ms. Butler surveyed consumers that had purchased sneakers from StockX since 2020 or indicated that they would consider purchasing sneakers.  Ms. Butler survey included 409 customers who identified that they did purchase since 2020 "and/or" would consider purchasing a pair of sneakers from StockX.  *See* Sept. Duvdevani Decl. ¶ 98, Ex. 97, Ex. D to Butler Survey at S12.  Nike disputes that StockX (or Ms. Butler) can identify any survey respondents who were actual purchasers of sneakers from StockX.  Further, Nike objects to StockX's use of Ms. Butler's damages rebuttal survey as part of its case in chief, for the reasons set forth in Nike's Opposition Brief § IV.B.1.

616.    Ms. Butler showed her test group the challenged claims as consumers would have seen them in the marketplace.  Ex. 119, Butler Rep. ¶¶ 30-34.

***Nike, Inc.'s Response:* Disputed.**

Nike disputes that Ms. Butler tested that challenged claims as they would have been seen in the marketplace.  Ms. Butler's survey included truncated and non-interactive versions of five StockX webpages.  Ms. Butler did not review any evidence that consumers view the pages in the selected order that they were shown by Ms. Butler.  Sept. Duvdevani Decl. ¶ 65, Ex. 64, Butler Tr. 203:6-21.  Further, the first webpage in Butler's test group contained a version of the StockX homepage that was created for her survey and never existed on StockX's Website.  *Id.* ¶ 99, Ex. 98, Butler Report Ex. F; *id.* ¶ 65, Ex. 64, Butler Tr. 183:20-187:14.  Further, Nike objects to StockX's use of Ms. Butler's damages rebuttal survey as part of its case in chief, for the reasons set forth in Nike's Opposition Brief § IV.B.1.

617.    Ms. Butler showed her control group the same webpages, but with the specific claims at issue replaced with unobjectionable language.  Ex. 119, Butler Rep. ¶ 35.

***Nike, Inc.'s Response:* Disputed.**

Nike does not dispute that Butler replaced the term "authentication" with "inspection" in her control group but disputes that this language is "unobjectionable."  StockX has identified no record citation or evidence for the proposition that "inspection" is "unobjectionable language."  Indeed, Nike objected to the replacement of "authentication" with "inspection" as part of its Motion to Exclude certain StockX experts including Ms. Butler.  *See* Dkt. 193 at § IV.A.2.b.  Further, Nike objects to StockX's use of Ms. Butler's damages rebuttal survey as part of its case in chief, for the reasons set forth in Nike's Opposition Brief § IV.B.1.

618.     A total of 22.3% of respondents in the test group of Ms. Butler's survey noted that the StockX site was trustworthy, offered authentic products, or provided a guarantee.  Ex. 119, Butler Rep. ¶¶ 10, 41.

*Nike, Inc.'s Response:* **Undisputed.**

Further, Nike objects to StockX's use of Ms. Butler's damages rebuttal survey as part of its case in chief, for the reasons set forth in Nike's Opposition Brief § IV.B.1.

619.     A total of 20.7% of respondents in the control group of Ms. Butler's survey noted that the StockX site was trustworthy, offered authentic or "inspected" products, or provided a guarantee.  Ex. 119, Butler Rep. ¶¶ 10, 41.

*Nike, Inc.'s Response:* **Undisputed.**

Further, Nike objects to StockX's use of Ms. Butler's damages rebuttal survey as part of its case in chief, for the reasons set forth in Nike's Opposition Brief § IV.B.1.

620.     Based on the results of her survey, Ms. Butler concluded that "[a] statistically equivalent number of respondents indicated that they are likely to purchase a pair of sneakers from StockX when the pages included statements related to 'authentication' (Test Group) as compared to pages describing 'inspection' (Control Group))."  Ex. 119, Butler Rep. ¶ 10.

*Nike, Inc.'s Response:* **Disputed.**

Nike does not dispute that Ms. Butler opined that "[a] statistically equivalent number of respondents indicated that they are likely to purchase a pair of sneakers from StockX when the pages included statements related to 'authentication' (Test Group) as compared to pages describing 'inspection' (Control Group))" but disputes that conclusion and the weight that should be accorded to Ms. Butler's survey and conclusions for the reasons set forth in its Motion to Exclude Ms. Buter. *See* Dkt. 193 at § IV.A.2.b.  As Mr. Simonson opined in his rebuttal to Ms. Butler's report "there

is no effective, unbiased methodology that is capable of testing simultaneously the impact of all of these claims on the likelihood of making a purchase on the StockX website" for a variety of reasons.  Sept. Duvdevani Decl. ¶ 100, Ex. 99 ("Simonson Second Rebuttal") ¶¶ 11-13, 51-61.  Further, Nike objects to StockX's use of Ms. Butler's damages rebuttal survey as part of its case in chief, for the reasons set forth in Nike's Opposition Brief § IV.B.1.

621.    The results from Ms. Butler's survey establish that the allegedly false Authentication Statements do not have a material impact on consumers' likelihood of using the website to purchase a pair of sneakers.  Ex. 119, Butler Rep. ¶ 43 ("A statistically equivalent number of respondents indicated that they are likely to use StockX to purchase sneakers when its webpages included Authentication Statements as compared to the number who would purchase when shown the same pages without the Authentication Statements (i.e., those shown webpages with the statements removed or replaced by "inspected")).

***Nike, Inc.'s Response:* Disputed.**

The assertion that the results of Ms. Butler's survey establish that the allegedly false Authentication Statements do not have a material impact on consumers' likely of using the website to purchase a pair of sneakers is a legal conclusion to which no response is required.  Nike disputes StockX's characterization that Ms. Butler's survey establishes that the Authentication Statements do not have a material impact on consumers' likelihood of using the website to purchase a pair of sneakers.  *Tartikov*, 138 F. Supp. 3d at 394, 398; *see also PharmacyChecker.com*, 2023 WL 2973038, at *2.

Nike disputes that conclusion and the weight that should be accorded to Ms. Butler's survey and conclusion for the reasons set forth in its Motion to Exclude Ms. Buter. *See* Dkt. 193 at § IV.A.2.b.  Further, Nike objects to StockX's use of Ms. Butler's damages rebuttal survey as part

of its case in chief, for the reasons set forth in Nike's Opposition Brief § IV.B.1.  As Mr. Simonson opined in his rebuttal to Ms. Butler's report "there is no effective, unbiased methodology that is capable of testing simultaneously the impact of all of these claims on the likelihood of making a purchase on the StockX website" for a variety of reasons. Simonson Second Rebuttal ¶¶ 11-13, 51-61.

622.    Ms. Butler testified that there was no statistically significant difference between the distribution of responses between the two survey populations.  Ex. 120, Dep. Tr. of Sarah Butler ("Butler Tr.") 125:9-126:5.

*Nike, Inc.'s Response:* **Disputed.**

Nike does not dispute that Ms. Butler testified that "the 409 respondents [surveyed] are certainly a sufficient sample size to allow [her] to assess whether there is a statistically significant difference between the two groups."  However, Nike disputes that conclusion and the weight that should be accorded to Ms. Butler's survey and conclusion for the reasons set forth in its Motion to Exclude Ms. Butler.  *See* Dkt. 193 at § IV.A.2.b.  Further, Nike objects to StockX's use of Ms. Butler's damages rebuttal survey as part of its case in chief, for the reasons set forth in Nike's Opposition Brief § IV.B.1.  As Mr. Simonson opined in his rebuttal to Ms. Butler's report "there is no effective, unbiased methodology that is capable of testing simultaneously the impact of all of these claims on the likelihood of making a purchase on the StockX website" for a variety of reasons. Simonson Second Rebuttal ¶¶ 11-13, 51-61.

623.    Ms. Butler concluded that her survey results established that "the allegedly false Authentication Statements do not have a material impact on consumers' likelihood of using the website to purchase a pair of sneakers" on StockX.  Ex. 119, Butler Rep. ¶ 43.

*Nike, Inc.'s Response:* **Disputed.**

Nike does not dispute that Ms. Butler testified that "the 409 respondents [surveyed] are certainly a sufficient sample size to allow [her] to assess whether there is a statistically significant difference between the two groups."  However, Nike disputes that any general conclusion can be drawn from this as Ms. Butler testified that she had "not extrapolated with a confidence interval around the results here to some other population. The study is designed to evaluate whether there is a statistically significant difference between the two groups that are being measured" and she had not calculated a confidential interval to extrapolate "to some broader population." Sept. Duvdevani Decl. ¶ 65, Ex. 64, Butler Tr. 126:6-127:11. Nike also disputes that conclusion and the weight that should be accorded to Ms. Butler's survey and conclusion for the reasons set forth in its Motion to Exclude Ms. Butler. *See* Dkt. 193 at § IV.A.2.b.  As Mr. Simonson opined in his rebuttal to Ms. Butler's report "there is no effective, unbiased methodology that is capable of testing simultaneously the impact of all of these claims on the likelihood of making a purchase on the StockX website" for a variety of reasons. Simonson Second Rebuttal ¶¶ 11-13, 51-61.

624.    Ms. Butler testified that her survey results showed the advertising claims had no impact on consumer purchasing behavior or consumers' willingness to purchase a pair of sneakers on the StockX platform.  Ex. 120, Butler Tr. 58:23-59:1; 62:19-63:3; 83:9-14.

*Nike, Inc.'s Response:* **Disputed.**

Nike does not dispute that Ms. Butler testified that "the 409 respondents [surveyed] are certainly a sufficient sample size to allow [her] to assess whether there is a statistically significant difference between the two groups."  However, Nike disputes that any general conclusion can be drawn from this as Ms. Butler testified that she had "not extrapolated with a confidence interval around the results here to some other population. The study is designed to evaluate whether there is a statistically significant difference between the two groups that are being measured" and she

had not calculated a confidential interval to extrapolate "to some broader population." Sept. Duvdevani Decl. ¶ 65, Ex. 64, Butler Tr. 126:6-127:11. Nike also disputes that conclusion and the weight that should be accorded to Ms. Butler's survey and conclusion for the reasons set forth in its Motion to Exclude Ms. Butler. *See* Dkt. 193 at § IV.A.2.b. As Mr. Simonson opined in his rebuttal to Ms. Butler's report "there is no effective, unbiased methodology that is capable of testing simultaneously the impact of all of these claims on the likelihood of making a purchase on the StockX website" for a variety of reasons. Simonson Second Rebuttal ¶¶ 11-13, 51-61.

625.    Ms. Butler asked survey respondents to explain why they would be likely (or unlikely) to use the StockX website to purchase a pair of sneakers. Ex. 119, Butler Rep. ¶ 40.

**Nike, Inc.'s Response: Undisputed. This statement is not material.**

Further, Nike objects to StockX's use of Ms. Butler's damages rebuttal survey as part of its case in chief, for the reasons set forth in Nike's Opposition Brief § IV.B.1.

626.    Ms. Butler reported that respondents' interest in purchasing on the StockX website was due to a variety of reasons, including "the organization and/or layout of the website, the variety of products offered, price, past experience with StockX, and perceived product quality." Ex. 119, Butler Rep. ¶¶ 10, 40.

**Nike, Inc.'s Response: Undisputed. This statement is not material.**

Further, Nike objects to StockX's use of Ms. Butler's damages rebuttal survey as part of its case in chief, for the reasons set forth in Nike's Opposition Brief § IV.B.1.

627.    One respondent answered that they were "Extremely Likely" to purchase sneakers from the StockX website because "I have used StockX in the past and had a good experience. They also have a very wide variety of sneakers and apparel that I am interested in." Ex. 119, Butler Rep. ¶ 40.

***Nike, Inc.'s Response:*** **Undisputed.  This statement is not material.**

Further, Nike objects to StockX's use of Ms. Butler's damages rebuttal survey as part of its case in chief, for the reasons set forth in Nike's Opposition Brief § IV.B.1.

628.    One respondent answered that they were "Extremely Likely" to purchase sneakers from the StockX website because "This website looks really cool."  Ex. 119, Butler Rep. ¶ 40.

***Nike, Inc.'s Response:*** **Undisputed.  This statement is not material.**

Further, Nike objects to StockX's use of Ms. Butler's damages rebuttal survey as part of its case in chief, for the reasons set forth in Nike's Opposition Brief § IV.B.1.

629.    One respondent answered that they were likely to purchase sneakers from the StockX website because they "liked the interface of the website it was easy to look for information and really well-organized also it seems really user-friendly. Also, I liked how easily I can buy and sell a product here."  Ex. 119, Butler Rep. ¶ 40.

***Nike, Inc.'s Response:*** **Undisputed.  This statement is not material.**

Further, Nike objects to StockX's use of Ms. Butler's damages rebuttal survey as part of its case in chief, for the reasons set forth in Nike's Opposition Brief § IV.B.1.

630.    One respondent answered that they were likely to purchase sneakers from the StockX website because "Being able to bid means i might get a better price."  Ex. 119, Butler Rep. ¶ 40.

***Nike, Inc.'s Response:*** **Undisputed.  This statement is not material.**

Further, Nike objects to StockX's use of Ms. Butler's damages rebuttal survey as part of its case in chief, for the reasons set forth in Nike's Opposition Brief § IV.B.1.

631.    Respondents in both the control and test group answered that authentication guarantees or "trusting the site" motivated their intent to purchase from the StockX platform.  Ex. 119, Butler Rep. ¶ 41.

**Nike, Inc.'s Response: Undisputed.  This statement is not material.**

Further, Nike objects to StockX's use of Ms. Butler's damages rebuttal survey as part of its case in chief, for the reasons set forth in Nike's Opposition Brief § IV.B.1.

632.    StockX's expert, Dr. Robert Vigil, analyzed data comparing weekly sales and transactions on StockX and competitor resale marketplace GOAT.  Ex. 121, Expert Rebuttal Report of Robert L. Vigil (June 2, 2023) ("Vigil Rebuttal Rep.") ¶ 72.

**Nike, Inc.'s Response: Disputed.**

Nike does not dispute that Dr. Vigil purported to analyze data comparing weekly sales and transactions on StockX and GOAT but disputes the accuracy of such data.  Dr. Vigil testified that that he did not know how StockX obtained the GOAT data, how it was prepared, or who prepared it.  Sept. Duvdevani Decl. ¶ 101, Ex. 100, Vigil Tr. 229:4-233:22. Nike disputes the weight that should be accorded to Dr. Vigil's analysis for the reasons set forth in its Motion to Partially Exclude Dr. Vigil. *See* Dkt. 193 at § IV.B.2.  Further, Nike objects to StockX's use of Dr. Vigil's rebuttal opinion as part of its case in chief.  *Cf.* Nike's Opposition Brief § IV.B.1.  This statement is not material.

633.    Dr. Vigil compared the data over the period June 2022 to April 2023.  Ex. 121, Vigil Rebuttal Rep. ¶ 73.

**Nike, Inc.'s Response: Disputed.**

Nike does not dispute that Dr. Vigil purported to analyze data comparing weekly sales and transactions on StockX and GOAT but disputes the accuracy of such data.  Dr. Vigil testified that

that he did not know how StockX obtained the GOAT data, how it was prepared, or who prepared it. Sept. Duvdevani Decl. ¶ 101, Ex. 100, Vigil Tr. 229:4-233:22. Nike disputes the weight that should be accorded to Dr. Vigil's analysis for the reasons set forth in its Motion to Partially Exclude Dr. Vigil. *See* Dkt. 193 at § IV.B.2. Further, Nike objects to StockX's use of Dr. Vigil's rebuttal opinion as part of its case in chief. *Cf.* Nike's Opposition Brief § IV.B.1.

634. StockX removed the advertising claims challenged by Nike from its website in September and October 2022. Ex. 121, Vigil Rebuttal Rep. ¶ 72.

*Nike, Inc.'s Response:* **Disputed.**

Nike disputes that all challenged advertising claims were removed from the StockX website by October 2022. For example, in December 2022, the "verification" page still made reference to StockX's "Authentication Centers." *See* Sept. Duvdevani Decl. ¶ 102, Ex. 101, https://web.archive.org/web/20221202064850/https://stockx.com/about/verification/. Further, Nike objects to StockX's use of Dr. Vigil's rebuttal opinion as part of its case in chief. *Cf.* Nike's Opposition Brief § IV.B.1.

635. Dr. Vigil determined that there was no statistically significant change between StockX's and GOAT's relative sales and transactions before and after November 2022, when the advertising claims challenged by Nike were removed from StockX's website. Ex. 121, Vigil Rebuttal Rep. ¶¶ 73, 76-77.

*Nike, Inc.'s Response:* **Disputed.**

Nike does not dispute that Dr. Vigil opined that his "analysis of the data suggests that there has been no statistically significant change between StockX's and GOAT's relative sales and transactions before or after November 2022." Dkt. 257-121 at ¶ 73. However, Nike disputes the reliability of such data as Dr. Vigil testified that that he did not know how StockX obtained the

GOAT data, how it was prepared, or who prepared it. Sept. Duvdevani Decl. ¶ 101, Ex. 100. Vigil

Tr. 229:4-233:22. Nike disputes the weight that should be accorded to Dr. Vigil's analysis for the

reasons set forth in its Motion to Partially Exclude Dr. Vigil. *See* Dkt. 193 at § IV.B.2.  Further,

Nike objects to StockX's use of Dr. Vigil's rebuttal opinion as part of its case in chief.  *Cf.* Nike's

Opposition Brief § IV.B.1.

**H.**    **There Is No Evidence in the Record of Harm to Nike from StockX's Advertising Claims.**

636.    Nike has produced no evidence to establish whether the presence of the statement

"100% Verified Authentic" on StockX's website created actual or likely injury to Nike.

*Nike, Inc.'s Response:* **Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge

Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence

and for these reasons, should be disregarded.  *Perez*, 2013 WL 2641432 at *7-8.  Further, the

assertion that Nike has not established that the presence of "100% Verified Authentic" on StockX's

website created actual or likely injury to Nike" is a legal conclusion, to which no response is

required.  *Tartikov*, 138 F. Supp. 3d at 394, 398; *see also PharmacyChecker.com*, 2023 WL

2973038, at *2.

Nike disputes that there is no record evidence that establishes the presence of "100%

Verified Authentic" on StockX's website actually or likely injured Nike. *See, e.g.*, Stec Rep.,

Kammel Rep., Kammel Rebuttal, Dkt. 262, Pallet Decl. ¶¶ 5-6, Dkt. 261-40, Ex. 40, Delli-Carpini

Tr. 239:11-23, 241:25-242:13, 264:10-17; Dkts. 261-149–261-151, Exs. 140-142..

637.    Nike has produced no evidence to establish whether the presence of the statement

"Verified Authentic" on StockX's website created actual or likely injury to Nike.

*Nike, Inc.'s Response:* **Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded. *Perez*, 2013 WL 2641432 at *7-8. Further, the assertion that Nike has not established that the presence of "Verified Authentic" on StockX's website created actual or likely injury to Nike" is a legal conclusion, to which no response is required. *Tartikov*, 138 F. Supp. 3d at 394, 398; *see also PharmacyChecker.com*, 2023 WL 2973038, at *2.

Nike disputes that there is no record evidence that establishes the presence of "Verified Authentic" on StockX's website actually or likely injured Nike. *See, e.g.*, Stec Rep., Kammel Rep., Kammel Rebuttal, Dkt. 262, Pallet Decl. ¶¶ 5-6, Dkt. 261-40, Ex. 40, Delli-Carpini Tr. 239:11-23, 241:25-242:13, 264:10-17; Dkt. 261 – 149-151, *id.* ¶¶ 141-143, Exs. 140-142.

638.    Nike has produced no evidence to establish whether the presence of the statement "Guaranteed Authenticity. Every Item. Every Time. Shop on StockX with complete confidence every purchase is 100% Verified Authentic" on StockX's website created actual or likely injury to Nike.

***Nike, Inc.'s Response:* Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded. *Perez*, 2013 WL 2641432 at *7-8. Further, the assertion that Nike has not established that the presence of "Guaranteed Authenticity. Every Item. Every Time. Shop on StockX with complete confidence every purchase is 100% Verified Authentic" on StockX's website created actual or likely injury to Nike" is a legal conclusion, to which no response is required. *Tartikov*, 138 F. Supp. 3d at 394, 398.

Nike disputes that there is no record evidence that establishes the presence of "Guaranteed Authenticity. Every Item. Every Time. Shop on StockX with complete confidence every purchase is 100% Verified Authentic" on StockX's website actually or likely injured Nike. *See, e.g.*, Stec Rep., Kammel Rep., Kammel Rebuttal, Dkt. 262, Pallet Decl. ¶¶ 5-6; Dkt. 261-40, Ex. 40, Delli-Carpini Tr. 239:11-23, 241:25-242:13, 264:10-17; Dkt. 261 – 149-151, *id.* ¶¶ 141-143, Exs. 140-142.

639.    Nike has produced no evidence to establish whether the presence of the statement "We Authenticate Every Item. Every Time" on StockX's website created actual or likely injury to Nike.

***Nike, Inc.'s Response:* Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded.  *Perez*, 2013 WL 2641432 at *7-8.  Further, the assertion that Nike has not established that the presence of "We Authenticate Every Item. Every Time" on StockX's website created actual or likely injury to Nike" is a legal conclusion, to which no response is required.  *Tartikov*, 138 F. Supp. 3d at 394, 398; *see also PharmacyChecker.com*, 2023 WL 2973038, at *2.

Nike disputes that there is no record evidence that establishes the presence of "We Authenticate Every Item. Every Time" on StockX's website actually or likely injured Nike. *See, e.g.*, Stec Rep., Kammel Rep., Kammel Rebuttal, Dkt. 262, Pallet Decl. ¶¶ 5-6, Dkt. 261-40, Ex. 40, Delli-Carpini Tr. 239:11-23, 241:25-242:13, 264:10-17; Dkt. 261 – 149-151, *id.* ¶¶ 141-143, Exs. 140-142.

640.    Nike has produced no evidence to establish whether the presence of the statement "Always Authentic. Never Fake "on StockX's website created actual or likely injury to Nike.

***Nike, Inc.'s Response:* Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded.  *Perez*, 2013 WL 2641432 at *7-8.  Further, the assertion that Nike has not established that the presence of "Always Authentic. Never Fake" on StockX's website created actual or likely injury to Nike" is a legal conclusion, to which no response is required.  *Tartikov*, 138 F. Supp. 3d at 394, 398; *see also PharmacyChecker.com*, 2023 WL 2973038, at *2.

Nike disputes that there is no record evidence that establishes the presence of "Always Authentic. Never Fake" on StockX's website actually or likely injured Nike. *See, e.g.*, Stec Rep., Kammel Rep., Kammel Rebuttal, Dkt. 262, Pallet Decl. ¶¶ 5-6, Dkt. 261-40, Ex. 40, Delli-Carpini Tr. 239:11-23, 241:25-242:13, 264:10-17; Dkt. 261 – 149-151, *id.* ¶¶ 141-143, Exs. 140-142.

641.    Nike has produced no evidence to establish whether the presence of the statement "Every item sold goes through our proprietary multi-step verification process with our team of expert authenticators" on StockX's website created actual or likely injury to Nike.

***Nike, Inc.'s Response:* Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded.  *Perez*, 2013 WL 2641432 at *7-8.  Further, the assertion that Nike has not established that the presence of "Every item sold goes through our proprietary multi-step verification process with our team of expert authenticators" on StockX's

website created actual or likely injury to Nike" is a legal conclusion, to which no response is required. *Tartikov*, 138 F. Supp. 3d at 394, 398; *see also PharmacyChecker.com*, 2023 WL 2973038, at *2.

Nike disputes that there is no record evidence that establishes the presence of "Every item sold goes through our proprietary multi-step verification process with our team of expert authenticators" on StockX's website actually or likely injured Nike. *See, e.g.*, Stec Rep., Kammel Rep., Kammel Rebuttal, Dkt. 262, Pallet Decl. ¶¶ 5-6, Dkt. 261-40, Ex. 40, Delli-Carpini Tr. 239:11-23, 241:25-242:13, 264:10-17; Dkt. 261 – 149-151, *id.* ¶¶ 141-143, Exs. 140-142.

642.    Nike has produced no evidence to establish whether the presence of the statement "With checklists of 100+ data points, our authenticators are better equipped than anyone to ensure a product's authenticity" on StockX's website created actual or likely injury to Nike.

***Nike, Inc.'s Response:*** **Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded. *Perez*, 2013 WL 2641432 at *7-8. Further, the assertion that Nike has not established that the presence of "With checklists of 100+ data points, our authenticators are better equipped than anyone to ensure a product's authenticity" on StockX's website created actual or likely injury to Nike" is a legal conclusion, to which no response is required. *Tartikov*, 138 F. Supp. 3d at 394, 398; *see also PharmacyChecker.com*, 2023 WL 2973038, at *2.

Nike disputes that there is no record evidence that establishes the presence of "With checklists of 100+ data points, our authenticators are better equipped than anyone to ensure a product's authenticity" on StockX's website actually or likely injured Nike. *See, e.g.*, Stec Rep.,

Kammel Rep., Kammel Rebuttal, Dkt. 262, Pallet Decl. ¶¶ 5-6, Dkt. 261-40, Ex. 40, Delli-Carpini

Tr. 239:11-23, 241:25-242:13, 264:10-17; Dkt. 261 – 149-151, *id.* ¶¶ 141-143, Exs. 140-142.

643.    Nike has produced no evidence to establish whether the presence of the statement

"Advanced Technology" on StockX's website created actual or likely injury to Nike.

*Nike, Inc.'s Response:* **Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge

Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence

and for these reasons, should be disregarded.  *Perez*, 2013 WL 2641432 at *7-8.  Further, the

assertion that Nike has not established that the presence of "Advanced Technology" on StockX's

website created actual or likely injury to Nike" is a legal conclusion, to which no response is

required.  *Tartikov*, 138 F. Supp. 3d at 394, 398; *see also PharmacyChecker.com*, 2023 WL

2973038, at *2.

Nike disputes that there is no record evidence that establishes the presence of "Advanced

Technology" on StockX's website actually or likely injured Nike. *See, e.g.*, Stec Rep., Kammel

Rep., Kammel Rebuttal, Dkt. 262, Pallet Decl. ¶¶ 5-6, Dkt. 261-40, Ex. 40, Delli-Carpini Tr.

239:11-23, 241:25-242:13, 264:10-17; Dkt. 261 – 149-151, *id.* ¶¶ 141-143, Exs. 140-142.

644.    Nike has produced no evidence to establish whether the presence of the statement

"Quality Assurance" on StockX's website created actual or likely injury to Nike.

*Nike, Inc.'s Response:* **Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge

Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence

and for these reasons, should be disregarded.  *Perez*, 2013 WL 2641432 at *7-8.  Further, the

assertion that Nike has not established that the presence of "Quality Assurance" on StockX's

website created actual or likely injury to Nike" is a legal conclusion, to which no response is required. *Tartikov*, 138 F. Supp. 3d at 394, 398; *see also PharmacyChecker.com*, 2023 WL 2973038, at *2.

Nike disputes that there is no record evidence that establishes the presence of "Quality Assurance" on StockX's website actually or likely injured Nike. *See, e.g.*, Stec Rep., Kammel Rep., Kammel Rebuttal, Dkt. 262, Pallet Decl. ¶¶ 5-6, Dkt. 261-40, Ex. 40, Delli-Carpini Tr. 239:11-23, 241:25-242:13, 264:10-17; Dkt. 261 – 149-151, *id.* ¶¶ 141-143, Exs. 140-142.

645.    Nike has produced no evidence to establish whether the presence of the statement "StockX has a 99.96% accuracy rate" on StockX's website created actual or likely injury to Nike. *Nike, Inc.'s Response:* **Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded. *Perez*, 2013 WL 2641432 at *7-8. Further, the assertion that Nike has not established that the presence of "StockX has a 99.96% accuracy rate" on StockX's website created actual or likely injury to Nike" is a legal conclusion, to which no response is required. *Tartikov*, 138 F. Supp. 3d at 394, 398; *see also PharmacyChecker.com*, 2023 WL 2973038, at *2.

Nike disputes that there is no record evidence that establishes the presence of "StockX has a 99.96% accuracy rate" on StockX's website actually or likely injured Nike. *See, e.g.*, Stec Rep., Kammel Rep., Kammel Rebuttal, Dkt. 262, Pallet Decl. ¶¶ 5-6, Dkt. 261-40, Ex. 40, Delli-Carpini Tr. 239:11-23, 241:25-242:13, 264:10-17; Dkt. 261 – 149-151, *id.* ¶¶ 141-143, Exs. 140-142.

646.    Nike has produced no evidence to establish whether the presence of the statement "Authenticators maintain a 99.96% accuracy rate" on StockX's website created actual or likely injury to Nike.

***Nike, Inc.'s Response:*** **Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded.  *Perez*, 2013 WL 2641432 at *7-8.  Further, the assertion that Nike has not established that the presence of "Authenticators maintain a 99.96% accuracy rate" on StockX's website created actual or likely injury to Nike" is a legal conclusion, to which no response is required.  *Tartikov*, 138 F. Supp. 3d at 394, 398; *see also PharmacyChecker.com*, 2023 WL 2973038, at *2.

Nike disputes that there is no record evidence that establishes the presence of "Authenticators maintain a 99.96% accuracy rate" on StockX's website actually or likely injured Nike.  *See, e.g.*, Stec Rep., Kammel Rep., Kammel Rebuttal, Dkt. 262, Pallet Decl. ¶¶ 5-6, Dkt. 261-40, Ex. 40, Delli-Carpini Tr. 239:11-23, 241:25-242:13, 264:10-17; Dkt. 261 – 149-151, *id.* ¶¶ 141-143, Exs. 140-142.

647.    Nike has produced no evidence to establish whether the presence of the statement "Over the years, our team members have authenticated tens of millions of products at a 99.95% accuracy rate" on StockX's website created actual or likely injury to Nike.

***Nike, Inc.'s Response:*** **Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded.  *Perez*, 2013 WL 2641432 at *7-8.  Further, the

assertion that Nike has not established that the presence of "Over the years, our team members have authenticated tens of millions of products at a 99.95% accuracy rate" on StockX's website created actual or likely injury to Nike" is a legal conclusion, to which no response is required. *Tartikov*, 138 F. Supp. 3d at 394, 398; *see also PharmacyChecker.com*, 2023 WL 2973038, at *2.

Nike disputes that there is no record evidence that establishes the presence of "Over the years, our team members have authenticated tens of millions of products at a 99.95% accuracy rate" on StockX's website actually or likely injured Nike. *See, e.g.*, Stec Rep., Kammel Rep., Kammel Rebuttal, Dkt. 262, Pallet Decl. ¶¶ 5-6, Dkt. 261-40, Ex. 40, Delli-Carpini Tr. 239:11-23, 241:25-242:13, 264:10-17; Dkt. 261 – 149-151, *id.* ¶¶ 141-143, Exs. 140-142.

648.    Nike has produced no evidence to establish whether the presence of the statement "A final check in our authentication practice, our QA experts ensure nothing slips through the cracks" on StockX's website created actual or likely injury to Nike.

***Nike, Inc.'s Response:* Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded.  *Perez*, 2013 WL 2641432 at *7-8.  Further, the assertion that Nike has not established that the presence of "A final check in our authentication practice, our QA experts ensure nothing slips through the cracks" on StockX's website created actual or likely injury to Nike" is a legal conclusion, to which no response is required.  *Tartikov*, 138 F. Supp. 3d at 394, 398; *see also PharmacyChecker.com*, 2023 WL 2973038, at *2.

Nike disputes that there is no record evidence that establishes the presence of "A final check in our authentication practice, our QA experts ensure nothing slips through the cracks" on StockX's website actually or likely injured Nike. *See, e.g.*, Stec Rep., Kammel Rep., Kammel

Rebuttal, Dkt. 262, Pallet Decl. ¶¶ 5-6, Dkt. 261-40, Ex. 40, Delli-Carpini Tr. 239:11-23, 241:25-242:13, 264:10-17; Dkt. 261 – 149-151, *id.* ¶¶ 141-143, Exs. 140-142.

649.    Nike has produced no evidence to establish whether the presence of the statement "Always Verified Authentic" on StockX's website created actual or likely injury to Nike.

***Nike, Inc.'s Response:* Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded. *Perez*, 2013 WL 2641432 at *7-8. Further, the assertion that Nike has not established that the presence of "Always Verified Authentic" on StockX's website created actual or likely injury to Nike" is a legal conclusion, to which no response is required. *Tartikov*, 138 F. Supp. 3d at 394, 398; *see also PharmacyChecker.com*, 2023 WL 2973038, at *2.

Nike disputes that there is no record evidence that establishes the presence of "Always Verified Authentic" on StockX's website actually or likely injured Nike. *See, e.g.*, Stec Rep., Kammel Rep., Kammel Rebuttal, Dkt. 262, Pallet Decl. ¶¶ 5-6, Dkt. 261-40, Ex. 40, Delli-Carpini Tr. 239:11-23, 241:25-242:13, 264:10-17; Dkt. 261 – 149-151, *id.* ¶¶ 141-143, Exs. 140-142.

650.    Nike has produced no evidence to establish whether the presence of the statement "100% Authentic" on StockX's website created actual or likely injury to Nike.

***Nike, Inc.'s Response:* Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded. *Perez*, 2013 WL 2641432 at *7-8. Further, the assertion that Nike has not established that the presence of "100% Authentic" on StockX's website

created actual or likely injury to Nike" is a legal conclusion, to which no response is required. *Tartikov*, 138 F. Supp. 3d at 394, 398; *see also PharmacyChecker.com*, 2023 WL 2973038, at *2.

Nike disputes that there is no record evidence that establishes the presence of "100% Authentic" on StockX's website actually or likely injured Nike.  *See, e.g.*, Stec Rep., Kammel Rep., Kammel Rebuttal, Dkt. 262, Pallet Decl. ¶¶ 5-6, Dkt. 261-40, Ex. 40, Delli-Carpini Tr. 239:11-23, 241:25-242:13, 264:10-17; Dkt. 261 – 149-151, *id.* ¶¶ 141-143, Exs. 140-142.

651.    Nike has produced no evidence to establish whether the presence of the statement "Buy & Sell Authentic Sneakers" on StockX's website created actual or likely injury to Nike.

***Nike, Inc.'s Response:* Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded.  *Perez*, 2013 WL 2641432 at *7-8.  Further, the assertion that Nike has not established that the presence of "Buy & Sell Authentic Sneakers" on StockX's website created actual or likely injury to Nike" is a legal conclusion, to which no response is required.  *Tartikov*, 138 F. Supp. 3d at 394, 398; *see also PharmacyChecker.com*, 2023 WL 2973038, at *2.

Nike disputes that there is no record evidence that establishes the presence of "Buy & Sell Authentic Sneakers" on StockX's website actually or likely injured Nike. *See, e.g.*, Stec Rep., Kammel Rep., Kammel Rebuttal, Dkt. 262, Pallet Decl. ¶¶ 5-6, Dkt. 261-40, Ex. 40, Delli-Carpini Tr. 239:11-23, 241:25-242:13, 264:10-17; Dkt. 261 – 149-151, *id.* ¶¶ 141-143, Exs. 140-142.

652.    Nike has produced no evidence to establish whether the presence of the statement "Buy Authentic. Be Authentic" on StockX's website created actual or likely injury to Nike.

***Nike, Inc.'s Response:* Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded.  *Perez*, 2013 WL 2641432 at *7-8.  Further, the assertion that Nike has not established that the presence of "Buy Authentic. Be Authentic" on StockX's website created actual or likely injury to Nike" is a legal conclusion, to which no response is required.  *Tartikov*, 138 F. Supp. 3d at 394, 398; *see also PharmacyChecker.com*, 2023 WL 2973038, at *2.

Nike disputes that there is no record evidence that establishes the presence of "Buy Authentic. Be Authentic" on StockX's website actually or likely injured Nike.  *See, e.g.*, Stec Rep., Kammel Rep., Kammel Rebuttal, Dkt. 262, Pallet Decl. ¶¶ 5-6, Dkt. 261-40, Ex. 40, Delli-Carpini Tr. 239:11-23, 241:25-242:13, 264:10-17; Dkt. 261 – 149-151, *id.* ¶¶ 141-143, Exs. 140-142.

653.    Nike has produced no evidence to establish whether the presence of the statement "On StockX, every sneaker you want is always available and authentic" on StockX's website created actual or likely injury to Nike.

***Nike, Inc.'s Response:*** **Disputed.**

Nike disputes this "fact" as improper as it contravenes Local Civil Rule 56.1 and Judge Caproni's Individual Practices in Civil Cases 4.G.ii.a. as it does not cite to *any* record evidence and for these reasons, should be disregarded.  *Perez*, 2013 WL 2641432 at *7-8.  Further, the assertion that Nike has not established that the presence of "On StockX, every sneaker you want is always available and authentic" on StockX's website created actual or likely injury to Nike" is a legal conclusion, to which no response is required.  *Tartikov*, 138 F. Supp. 3d at 394, 398; *see also PharmacyChecker.com*, 2023 WL 2973038, at *2.

Nike disputes that there is no record evidence that establishes the presence of "On StockX, every sneaker you want is always available and authentic" on StockX's website actually or likely injured Nike. *See, e.g.*, Stec Rep., Kammel Rep., Kammel Rebuttal, Dkt. 262, Pallet Decl. ¶¶ 5-6, Dkt. 261-40, Ex. 40, Delli-Carpini Tr. 239:11-23, 241:25-242:13, 264:10-17; Dkt. 261 – 149-151, *id.* ¶¶ 141-143, Exs. 140-142.

654.    Barbara Delli Carpini, Nike's Vice President of Brand Protection and Digital IP Enforcement, testified as Nike's Rule 30(b)(6) corporate representative.  Ex. 122, Dep. Tr. of Barbara Delli Carpini ("Carpini Tr.") 21:15-21; Ex. 123, Nike's Responses and Objections to StockX's 30(b)(6) Deposition Notice (November 29, 2022).

***Nike, Inc.'s Response:* Undisputed.  This statement is not material.**

655.    Ms. Carpini testified on behalf of Nike with respect to "all harm to Nike stemming from Nike's causes of action in this case."  Ex. 122, Carpini Tr. 21:2-7.

***Nike, Inc.'s Response:* Disputed.**

Nike disputes StockX's characterization of the scope of Ms. Delli-Carpini's designation.  Ms. Delli-Carpini was designated as Nike's 30(b)(6) corporate designee on the topic of "all harm to Nike stemming from Nike's Sixth and Seventh causes of action."  Dkt. 257-123, Ex. 123 Nike's Responses and Objections to StockX's 30(b)(6) Deposition Notice.

656.    Ms. Carpini testified that Nike does not have ███████████████████████ ██████████████████████████████████████████████ by StockX, ███████ ████████████████████████████████████████████████████

Ex. 122, Carpini Tr. 261:19-262:13; 270:23-271:4.

***Nike, Inc.'s Response:* Disputed.**

Nike disputes StockX's characterization of Ms. Delli-Carpini's testimony. Ms. Delli-Carpini testified that Nike is specifically harmed by the sale of counterfeits on StockX's website

because "Nike is always harmed by the sale of counterfeit products." Dkt. 261-40, Ex. 40, Delli-Carpini Tr. 239:24-240:5.  Ms. Delli-Carpini also testified that "Nike gets harmed by counterfeit being sold in the marketplace because consumers would believe that those are genuine while they could be harming consumers along with take away sales from Nike as well." *Id.* at 240:6-14.  Ms. Delli-Carpini further testified that Nike is harmed from StockX's false advertising claim because

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████ *Id.* at. 241:14-242:13.  Nike objects to the extent StockX implies that Nike or Ms. Delli-Carpini had access to all information or facts bearing on harm or injury to Nike.  Under the terms of the protective order, Ms. Delli-Carpini is not entitled to review many of StockX's documents.

657.    Ms. Carpini testified that ████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

██████████████████████████████████████████

***Nike, Inc.'s Response:*** **Disputed.**

Nike disputes the characterization of Ms. Delli-Carpini's testimony.  Although Ms. Delli-Carpini testified that ████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████ Rather, there are examples of such instances in the record. *See, e.g.*, Dkt. 261-149–261-151, Exs. 140-142. Nike objects to the extent StockX implies that Nike or Ms. Delli-Carpini had access to all information or facts bearing on harm or injury to Nike. Under the terms of the protective order, Ms. Delli-Carpini is not entitled to review many of StockX's documents.

658. Ms. Carpini testified that ███████████████████████ ███████████████████████████████████████████████ Ex. 122, Carpini Tr. 247:25-248:8.

*Nike, Inc.'s Response:* **Disputed.**

Nike disputes the characterization of Ms. Delli-Carpini's testimony. Although Ms. Delli-Carpini testified that ██████████████████████████ ████████████████████████████████████████████t. Rather, there are examples of such instances in the record. *See, e.g.*, Dkt. 261-149–261-151, Exs. 140-142. Nike objects to the extent StockX implies that Nike or Ms. Delli-Carpini had access to all information or facts bearing on harm or injury to Nike. Under the terms of the protective order, Ms. Delli-Carpini is not entitled to review many of StockX's documents.

659. Ms. Carpini testified that Nike is not ████████████ ███████████████████████████████████████████ ██████ Ex. 122, Carpini Tr. 246:14-23.

*Nike, Inc.'s Response:* **Disputed.**

Nike disputes the characterization of Ms. Delli-Carpini's testimony. Although Ms. Delli-Carpini testified ███████████████████████████████

███████████████████████████████████████████████████████████

████████    Rather, as Dr. Stec opined, "based on [StockX's] sales information, and the products that [he has] identified, it appears that, as of June 2, 2023, StockX has sold at least 200,000 shoes within the last twelve months alone that were simultaneously offered by Nike for retail sale on Nike.com." *See* Stec Rep. at 10-13.  Nike objects to the extent StockX implies that Nike or Ms. Delli-Carpini had access to all information or facts bearing on harm or injury to Nike.  Under the terms of the protective order, Ms. Delli-Carpini is not entitled to review many of StockX's documents.

660.    Ms. Carpini testified that ████████████████████████████████

████████████████████████████████████████ Ex. 122, Carpini Tr. 261:19-262:13; 270:23-271:4.

***Nike, Inc.'s Response:* Disputed.**

Nike disputes the characterization of Ms. Delli-Carpini's testimony.  Ms. Delli-Carpini testified that ████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████ Further, Ms. Delli-Carpini explained ██████████████████████████

███████████████████████ Dkt. 261-40, Ex. 40, Delli-Carpini Tr. 241:14-21. Dr. Stec later opined, "based on [StockX's] sales information, and the products that [he has] identified, it appears that, as of June 2, 2023, StockX has sold at least 200,000 shoes within the last twelve months alone that were simultaneously offered by Nike for retail sale on Nike.com." *See* Stec Rpt. at 10-13.  Nike objects to the extent StockX implies that Nike or Ms. Delli-Carpini had access to all information or facts bearing on harm or injury to Nike.  Under the terms of the protective order, Ms. Delli-Carpini is not entitled to review many of StockX's documents.

661.   Ms. Carpini testified that ███████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████ Ex. 122, Carpini Tr. 241:25-242:25.

***Nike, Inc.'s Response:* Disputed.**

Nike disputes StockX's characterization of Ms. Delli-Carpini's testimony. Although Ms.

Delli-Carpini testified ██████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████t.  StockX has received countless customer complaints about "Nike"

products underperforming. *See* Sept. Duvdevani Decl.¶ 103, Ex. 102, STX0205470 (customer

writing to StockX customer support: "Thank you for reaching out to me. I am very dissatisfied

with the fact that a defective pair of shoes was both authenticated by your team and then shipped

to me."); *id.* ¶ 104, Ex. 103, STX0208222 (customer writing to StockX customer support: "I

definitely want to return the shoe because these are extremely poor quality…There is no way that

someone at stock X approved this shoe after seeing what it looked like"); *id.* ¶ 105, Ex. 104,

STX0249738 (customer writing to StockX customer support: "You basically told me you can[]t

do anything for me and expect me to keep a defective shoe that can hurt my son[s] feet or relist

the item (so you can make even more money when it[]s sold) have it be someone else[]s

problem."); *id.* ¶ 105, Ex. 104, STX0221098 (customer writing to StockX customer support: "I[]m

sorry you[]ve may have not understood the issue. The air bubble has popped on one of the shoes.

This is defective product quality and is within Nike[]s two year warranty: we have had them only

two months. I have enquired with Nike and they are instructing us to contact the place of purchase

– StockX…"); *id.* ¶ 106, Ex. 105, STX0224271 (customer writing to StockX customer support:

"These shoes are falling apart. The perforations aren't perforated completely, stitches are coming loose, fabric seams coming loose, Styrofoam hanging out everywhere that's not even cut cleanly."); *id.* ¶ 108, Ex. 107, STX0257787 (customer writing to StockX customer support: "Obviously your company doesn[]t thoroughly inspect YOUR products your selling before placing your label on them and shipping them out. The sneakers are clearly defective to be coming apart at the seams in less the two weeks."). Nike objects to the extent StockX implies that Nike or Ms. Delli-Carpini had access to all information or facts bearing on harm or injury to Nike. Under the terms of the protective order, Ms. Delli-Carpini is not entitled to review many of StockX's documents.

662.    Publicly available Nike communications with investors and analyst reports covering the company do not mention any harm to Nike's sales, reputation, brand, or business caused by StockX. Ex. 124, Expert Report of Robert L. Vigil (May 5, 2023) ("Vigil Affirmative Rep.") ¶ 54; Exs. 3A, 3B.

***Nike, Inc.'s Response:*** **Disputed.**

Nike disputes that publicly available documents do not make reference to the type of harm caused by StockX. For example, in Nike's yearly annual investor report between 2020 and 2022, Nike states "We periodically discover counterfeit reproductions of our products or products that otherwise infringe our intellectual property rights. If we are unsuccessful in enforcing our intellectual property rights, continued sales of these products could adversely affect our sales and our brand and could result in a shift of consumer preference away from our products" Sept. Duvdevani Decl. ¶ 109, Ex. 108, 2020 Annual Report and Notice of Annual Meeting at 97. (https://s1.q4cdn.com/806093406/files/doc_financials/2020/ar/363224(1)_16_Nike-Inc_Combo_WR_R2.pdf); *id.* ¶ 110, Ex. 109, 2021 Annual Report and Notice of Annual Meeting

at 98 (same) (https://s1.q4cdn.com/806093406/files/doc_financials/2021/ar/386273(1)_20_Nike-Inc_Combo_WR.pdf); ¶ 111, Ex. 110, 2022 Annual Report and Notice of Annual Meeting at 95 (same).

(https://s1.q4cdn.com/806093406/files/doc_financials/2022/NikeInc_2022_Annual_Report.pdf)

663.    Nike's investor calls over the period 2020 to 2022 do not mention any harm to Nike's sales, reputation, brand, or business caused by StockX.  Ex. 124, Vigil Affirmative Rep. ¶ 55; Exs. 3A, 3B.

***Nike, Inc.'s Response:*** **Undisputed. This statement is not material.**

664.    Analyst reports' discussions of Nike's business do not mention lost sales due to StockX's advertising claims or provide any evidence of a decline or harm to Nike's brand value caused by StockX.  Ex. 124, Vigil Affirmative Rep. ¶ 56; Exs. 4A, 4B, 4C.

***Nike, Inc.'s Response:*** **Undisputed.  This statement is not material.**

**I.    The Advertising Claims Are Not Comparative.**

665.    None of the advertising claims identified by Nike mention Nike by name.  Nike's Supplemental Responses to StockX's Third Set of Interrogatories, Interrogatory Response No. 22 (Apr. 17, 2023).

***Nike, Inc.'s Response:*** **Disputed.**

Nike disputes this "fact" as an improper legal conclusion, to which no response is required. *See PharmacyChecker.com,* 2023 WL 2973038, at *2 (collecting cases) ("The Court can also disregard legal conclusions or unsubstantiated opinions in a Local Rule 56.1 statement.").  Nike disputes StockX's characterization of the record to construe an Interrogatory Response stating the alleged advertising claims as evidence of the context of the claims' use.

Notwithstanding, Nike disputes StockX's characterization of the advertising claims at issue as several of the claims relate to Nike products sold on the StockX platform, including Nike products. Dkt. 257-117, Ex. 117 at Interrogatory Response No. 22.

666.    None of the advertising claims identified by Nike compare StockX's business and/or products to Nike's business and/or products.  Nike's Supplemental Responses to StockX's Third Set of Interrogatories, Interrogatory Response No. 22 (Apr. 17, 2023).

*Nike, Inc.'s Response:* **Disputed.**

Nike disputes this "fact" as an improper legal conclusion, to which no response is required. *See PharmacyChecker.com,* 2023 WL 2973038, at *2 (collecting cases) ("The Court can also disregard legal conclusions or unsubstantiated opinions in a Local Rule 56.1 statement."). Nike disputes StockX's characterization of the record to construe an Interrogatory Response stating the alleged advertising claims as evidence of the context of the claims' use.

Notwithstanding, Nike disputes StockX's characterization of the advertising claims at issue as several of the claims relate to products sold on the StockX platform, including Nike products. Dkt. 257-117, Ex. 117 at Interrogatory Response No. 22.

**J.    Nike Does Not Participate in the Resale Market for Sneakers.**

667.    Ron Faris, Nike's Vice President and General Manager of Nike Virtual Studios, testified as Nike's Rule 30(b)(6) corporate representative.  Ex. 11, Faris Tr. 17:15-19; Ex. 123, Nike's Responses and Objections to StockX's 30(b)(6) Deposition Notice (November 29, 2022).

*Nike, Inc.'s Response:* **Disputed. This statement is not material.**

Nike does not dispute that Mr. Faris testified as Nike's Rule 30(b)(6) corporate representative but clarifies that he was designated as a corporate designee on certain topics only. *See* Dkt 257-123, Ex. 123, Nike's Responses to StockX 30(b)(6) Deposition.

668.   Mr. Faris testified on behalf of Nike with respect to "[h]ow, if at all, Nike has participated and/or currently participates in the secondary market for physical sneakers." Ex. 11, Faris Tr. 14:22-15:2.

*Nike, Inc.'s Response:* **Undisputed.  This statement is not material.**

669.   Mr. Faris testified that Nike does not participate in the resale market or in the resale of Nike shoes.  Ex. 11, Faris Tr. 200:15-201:5.

*Nike, Inc.'s Response:* **Undisputed.  This statement is not material.**

670.   Ms. Faris testified that Nike has never offered a sneaker resale platform or sneaker resale services to consumers.  Ex. 11, Faris Tr. 267:6-267:19.

*Nike, Inc.'s Response:* **Undisputed.  This statement is not material.**

671.   Ms. Paulson, Nike's Vice President of Connected Marketplace, testified that Nike

███████████████████████████████████████████████████████

Ex. 2, Paulson Tr. 263:11-17.

*Nike, Inc.'s Response:* **Undisputed.  This statement is not material.**

672.   ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████   Ex. 2, Paulson Tr. 221:16-222:17.

*Nike, Inc.'s Response:* **Undisputed.  This statement is not material.**

673.   An April 2019 internal Nike document titled ████████████████████

██████████ stated that ████████████████████████████████████

████████████████████████   Ex. 14, NIKE0035800 at 812.

*Nike, Inc.'s Response:* **Undisputed.  This statement is not material.**

674.    The internal Nike document titled ███████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████ Ex. 14, NIKE0035800 at 812.

*Nike, Inc.'s Response:* **Undisputed.  This statement is not material.**

675.    The internal Nike document titled ███████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ Ex. 14, NIKE0035800 at 812.

*Nike, Inc.'s Response:* **Undisputed.  This statement is not material.**

676.    The internal Nike document titled ███████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ Ex. 14, NIKE0035800 at 812.

*Nike, Inc.'s Response:* **Undisputed.  This statement is not material.**

677.    When asked about Nike's competitors, Ms. Paulson testified that she understood "competitors . . . to mean adidas" and other "brands and franchises that [Nike] considered to be competitors."  Ex. 2, Paulson Tr. 50:19-51:21.

*Nike, Inc.'s Response:* **Undisputed.  This statement is not material.**

678.    When asked whether Nike considers StockX to be a competitor, Ms. Paulson testified "[p]robably not."  Ex. 2, Paulson Tr. 181:24-25.

*Nike, Inc.'s Response:* **Disputed.**

Nike does not dispute that Ms. Paulson testified that she thought StockX was "[p]robably not" a competitor to Nike.  However, Nike and StockX do compete as StockX offers products for sale at the same time they are simultaneously for sale directly from Nike or Nike's authorized retailers.  *See generally* Stec Rep.

679.    Ms. Carpini testified that Nike does not participate in the resale market or in the resale of Nike shoes.  Ex. 122, Carpini Tr. 229:6-12, 244:16-25.

*Nike, Inc.'s Response:* **Undisputed.  This statement is not material.**

680.    Ms. Carpini testified that Nike considers its core competitors to be other brands: "Adidas, Puma, Under Armour[] [and] a number of sporting good[s] companies out there."  Ex. 122, Carpini Tr. 244:9-15.

*Nike, Inc.'s Response:* **Disputed. This statement is not material.**

Nike does not dispute that Ms. Delli-Carpini testified that she thought StockX was "[p]robably not" a competitor to Nike.  However, Nike and StockX do compete as StockX offers product for sale at the same time they are simultaneously for sale directly from Nike or Nike's authorized retailers. *See generally* Stec Rep.

681.    A May 2019 internal Nike document titled ███████████████████

█████████████████████████████████████████████████████████

███████    Ex. 13, NIKE0036631 at NIKE0036638.

*Nike, Inc.'s Response:* **Undisputed.  This statement is not material.**

682.    Ms. Carpini testified that Nike does not consider StockX a primary competitor.  Ex. 122, Carpini Tr. 244:13-15 (listing Nike's core competitors and failing to list StockX).

*Nike, Inc.'s Response:* **Disputed. This statement is not material.**

Nike disputes StockX's characterization of Ms. Delli-Carpini's testimony which listed Nike core competitors but did not explicitly state that Nike does not consider StockX a "primary competitor." Dkt. 257-122, Ex. 122 Delli-Carpini Tr. 244:13-15.  However, Nike disputes that Nike and StockX are not competitors as StockX offers product for sale at the same time they are simultaneously for sale directly from Nike or Nike's authorized retailers. *See generally* Stec Rep.

683.    Melanie Harris, Nike's Vice President of Strategy and Development, testified as Nike's Rule 30(b)(6) corporate representative.  Ex. 125, Dep. Tr. of Melanie Harris ("Harris Tr.") 97:19-21; Ex. 123, Nike's Responses and Objections to StockX's 30(b)(6) Deposition Notice (November 29, 2022).

***Nike, Inc.'s Response:*** **Undisputed.  This statement is not material.**

684.    Ms. Harris testified that Nike does not participate ████████████████████ in the resale market or in the resale of Nike shoes.  Ex. 125, Harris Tr. 175:4-6.

***Nike, Inc.'s Response:*** **Undisputed.  This statement is not material.**

685.    Ms. Harris testified that ███████████████████████████████ ███████████████████████████████ Ex. 125, Harris Tr. 142:23-143:13.

***Nike, Inc.'s Response:*** **Undisputed.  This statement is not material.**

686.    Nike's SEC filings do not identify StockX, GOAT, or any other resale marketplace platform as a direct competitor.  Ex. 126, Nike 2022 10-K, at pp. 5; 11; Vigil Affirmative Report ¶ 53, n. 156 (citing SNEAKER WARS: NKE Dominating Web Data, Lowering Ests. Due to Macro Uncertainty, Jefferies, March 16, 2022 ("Nike doesn't directly compete with StockX.")).

***Nike, Inc.'s Response:*** **Undisputed.  This statement is not material.**

## A. NIKE'S RULE 56.1 COUNTERSTATEMENT OF MATERIAL FACTS AND STOCKX'S RESPONSES.

### A. StockX's False Claims

687. Nike identified the following claims in response to StockX's Interrogatory No. 22 which asked Nike to "[i]dentify each and every statement by StockX that forms the basis for Your Seventh Cause of Action for False Advertising (15 U.S.C. § 1125(a)(1)(B)) in the Amended Complaint":

- "100% Verified Authentic";

- "Verified Authentic";

- "Every item sold goes through our proprietary multi-step verification process with our team of expert authenticators";

- StockX's authentication process uses "100+ data points";

- StockX "authenticators are better equipped than anyone to ensure a product's authenticity";

- "StockX's "multi-step verification process";

- StockX's "proprietary" authentication process;

- "Guaranteed Authenticity" as related to products sold on the StockX platform;

- StockX's authentication process uses "Advanced Technology";

- StockX's authentication process uses "Quality Assurance";

- "StockX has a 99.96% authentication accuracy rate.";

- "Authenticators maintain a 99.96% accuracy rate";

- "Always Authentic, Never Fake.";

- "Always Verified Authentic";

- "Guaranteed Authenticity. Every item. Every time. Shop on StockX with complete confidence knowing every purchase is 100% Verified Authentic.";

- "A final check in our authentication practice, our QA experts ensure nothing slips through the cracks.";

- "We Authenticate Every Item.  Every Time.";

- "Shop on StockX with complete confidence knowing every purchase is Verified Authentic.";

- "100% Authentic";

- "Buy & Sell Authentic Sneakers";

- "Buy authentic. Be authentic."; and

- "On StockX, every sneaker you want is always available and authentic."

*See* Dkt. 257-116, Ex. 116 at Response to Interrogatory No. 22.

a.    StockX Response:  Undisputed that Nike identified the claims listed in Paragraph 297 in response to StockX's Interrogatory No. 22, which asked Nike to "[i]dentify each and every statement by StockX that forms the basis for Your Seventh Cause of Action for False Advertising (15 U.S.C. § 1125(a)(1)(B)) in the Amended Complaint.  However, StockX disputes that each of these statements is a StockX advertising claim because Nike has not put forth evidence demonstrating StockX's use of the following statements in its advertising:

i.    "Always Verified Authentic";

ii.    "Buy & Sell Authentic Sneakers"; and

iii.    "On StockX, every sneaker you want is always available and authentic."

688.    All of the Accused Advertising claims, with the exception of the "proprietary" claim, appeared together on a version of StockX's "Authentication" page and located at https://stockx.com/about/authentication. *See* Dkt. 261-58, Ex. 55  (showing Accused Advertising claims in full context including *inter alia* "With checklists of 100+ data points, our authenticators are better equipped than anyone to ensure a product's authenticity"; "Advanced Technology: We use machine learning to aid our authenticators in catching every minor detail," and "Quality

Assurance: A final check in our authentication practice, our QA experts ensure nothing slips through the cracks") ,

    a. <u>StockX Response</u>:  Undisputed that the process-oriented claims "With checklists of 100+ data points, our authenticators are better equipped than anyone to ensure a product's authenticity," "Advanced Technology: We use machine learning to aid our authenticators in catching every minor detail," and "Quality Assurance: A final check in our authentication practice, our QA experts ensure nothing slips through the cracks" appeared together on a version of StockX's "Authentication" page about StockX's Process.  However, StockX disputes that all of the Accused Advertising claims appeared together on a version of StockX's "Authentication" page about StockX's Process.  The claim "Always Authentic, Never Fake," does not appear on StockX's "Authentication" page. *See* ECF 260 ¶¶ 60–61 (explaining that "Always Authentic, Never Fake" appeared in an article on StockX's website).

    b. StockX further disputes that the quoted text represents the entirety of the StockX website or appeared without relevant context.  The quoted text consists of excerpts from StockX's process-oriented claims that appeared on a webpage describing StockX's Process, which included additional statements highlighting the accuracy and process-oriented nature of StockX's claims, such as:

        i. "Over the years, [StockX's] team members have authenticated tens of millions of products at a **99.95% accuracy rate**," explained as the "measurement of the accuracy of [StockX's] platform's product

authentication process based on weighted return data compared to total authentications." *See* PX 55, NIKE0000281 at 284 (emphasis added).4

    ii.   "FAQs" including a section on "Are returns and exchanges allowed," PX 55, NIKE0000281 at 285, that linked to a description of StockX's return policy. StockX's return policy provided steps a buyer could take if it "**received an item that it believes to be counterfeit**." *See* DX 39 at 2 (emphasis added).

    iii.   Extensive process-oriented statements, providing information on StockX's Process and highlighting the process-oriented nature of the disputed advertising, including an explanation of StockX's "**rigorous, multi-step verification procedure,**" use of "machine learning," and pictures and videos of authenticators visually inspecting products. *See* PX 55, NIKE0000281 (emphasis added).

689.    All of the Accused Advertising claims, with the exception of the "proprietary" claim, appeared together on a version of StockX's "Authentication" page and located at https://stockx.com/about/authentication. *See* Dkt. 261-57, Ex. 54 (showing Accused Advertising claims in full context including *inter alia* "With checklists of 100+ data points, our authenticators are better equipped than anyone to ensure a product's authenticity"; "Advanced Technology: We use machine learning to aid our authenticators in catching every minor detail," and "Quality

---

4    References to "PX" refer to Duvdevani Decl. Mot. Summ. J. Exhibits (ECF 261). References to "DX" refer to Exhibits to the Ford Decl. Mot. Summ. J. Exhibits (ECF 257). References to "Opp. PX" refer to Duvdevani Decl. Opp. Mot. Summ. J. Exhibits (ECF 273). References to "Opp. DX" refer to Ford Decl. Opp. Mot. Summ. J. Exhibits (ECF 271). References to "Reply DX" refer to Saba Decl. Reply Exhibits.

Assurance: A final check in our authentication practice, our QA experts ensure nothing slips through the cracks"), *id.* ¶ 51, Ex. 50 at 36-51 (same). *See* excerpts of Dkt. 261-50, Ex. 54 below:





a.  <u>StockX Response</u>:  Undisputed that the process-oriented claims "With checklists of 100+ data points, our authenticators are better equipped than anyone to ensure a product's authenticity"; "Advanced Technology: We use machine learning to aid our authenticators in catching every minor detail," and "Quality Assurance: A final check in our authentication practice, our QA experts ensure nothing slips through the cracks" appeared together on a version of StockX's "Authentication" page about StockX's Process.  However, StockX disputes that all of the Accused Advertising claims appeared together on a version of StockX's "Authentication" page about StockX's Process.  The claim "Always Authentic, Never Fake," does not appear on StockX's "Authentication" page.  *See* ECF 260 ¶¶ 60–61 (explaining that "Always Authentic, Never Fake" appeared in an article on StockX's website).

b.  StockX further disputes that the quoted text represents the entirety of the StockX website or appeared without relevant context.  The quoted text consists of excerpts

from StockX's process-oriented claims that appeared on a webpage describing StockX's Process, which included additional statements highlighting the accuracy and process-oriented nature of StockX's claims, such as:

i.    "Over the years, [StockX's] team members have authenticated tens of millions of products at a **99.96% accuracy rate**," explained as the "measurement of the accuracy of [StockX's] platform's product authentication process based on weighted return data compared to total authentications." *See* PX 54, NIKE0006785 at 788 (emphasis added); *see also* PX 50 at 39.

ii.   "FAQs" including a section on "Can I return by item after I've received it?", PX 54, NIKE0006785 at 789; PX 50 at 40, that linked to a description of StockX's return policy.  StockX's return policy provided steps a buyer could take if it "**received an item that it believes to be counterfeit**." *See* DX 39 at 2 (emphasis added).

iii.  Extensive process-oriented statements, providing information on StockX's Process and highlighting the process-oriented nature of the disputed advertising, including an explanation of StockX's "**rigorous, multi-step verification procedure,**" use of "machine learning," and pictures and videos of authenticators visually inspecting products.  *See* PX 55, NIKE0000281 (emphasis added).

690.    StockX's advertises its authentication process as "proprietary" on StockX's "How it Works" page and located at https://stockx.com/about/how-it-works/ and is included in the

following sentence: "Every item sold goes through our proprietary multi-step verification process with our team of expert authenticators."  Dkt. 257-32, Ex. 32.

    a.  <u>StockX Response</u>:  Undisputed that the quoted text appeared on StockX's "How it Works" page.

691. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████ Sept. Duvdevani Decl. ¶ 112, Ex. 111 (STX0021182 at 186).

    a.  <u>StockX Response</u>:  Undisputed that Opp. PX 111 contains the quoted text. However, StockX disputes that Opp. PX 111 was "dated October 2022."  Opp. PX 111 was dated "October 2020."  STX0021182.  StockX further disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 111 as misleading because Paragraph 301 omits additional context necessary to understand the exhibit.  Opp. PX 111 also states that the ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████ Opp. PX 111, STX0021182 at 186 (emphasis added).  ██████

████████████████████████████████████████████

██████████████████████████████████ Opp. PX 85, Fenton Tr. 103:18–24.

692. ███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

██████████ Sept. Duvdevani Decl. ¶ 112, Ex. 111 (STX0021182 at 185).

a. <u>StockX Response</u>:    Undisputed that Opp. PX 111 contains the quoted text. However, StockX disputes that Opp. PX 111 is "dated October 2022."  Opp. PX 111 is dated "October 2020."  STX0021182.  StockX further disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 111 as misleading because Paragraph 302 omits additional context necessary to understand the exhibit.  Opp. PX 111 also states that ████████████████

███████████████████████████████████████

████████ █ ████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████ Opp. PX 111, STX0021182 at 185.

693. Jacob Fenton, StockX's Vice President Customer Experience, testified that

███████████████████████████████████████

███████████████████████████████████████

526

████████████████████████████████████████ Sept. Duvdevani Decl. ¶ 86, Ex. 85,

Fenton Tr. 104:2-18 (reviewing *id.* ¶ 112, Ex. 111 (STX0021182 at 186)).

      a.  <u>StockX Response</u>:  Disputed.  StockX disputes that Jacob Fenton offered the quoted

testimony.  ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████ Opp. PX 85, Fenton Tr.

104:2–18 (emphasis added).  StockX further disputes Nike's characterization of,

and inferences purportedly drawn from, the quoted testimony as misleading

because Paragraph 303 omits additional context necessary to understand the

testimony.  Mr. Fenton testified that this version of the StockX Authentication page

was not the same mockup that launched.  Opp. PX 85, Fenton Tr. 103:18–24.

Further, StockX disputes any inferences regarding the materiality of StockX's

advertising claims, as StockX's Process consists of far more than determining

whether a product is suspected to be inauthentic.  "[E]very item that transacts on

[the StockX] platform go[es] through [StockX's] authentication and verification

process to correct for the potential areas of disappointment for a buyer:  wrong size,

wrong color, wrong product, missing accessories, damaged, manufacturing defect,

other variances."  DX 23, Huber Feb. Tr. 245:12–19.

   694.  Mr. Fenton testified ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████ Sept. Duvdevani Decl. ¶ 86, Ex.

85, Fenton Tr. 104:22-105:6 (reviewing *id.* ¶ 112, Ex. 111 (STX0021182 at 186)).

    a.  <u>StockX Response</u>:  Undisputed that Mr. Fenton offered the quoted testimony.
However, StockX disputes Nike's characterization of, and inferences purportedly
drawn from, the quoted testimony as misleading because Paragraph 304 omits
additional context necessary to understand the testimony. ████████████████

████████████████████████████████████████████████

████████ Opp. PX 85, Fenton Tr. 103:18–24.  Further, StockX disputes any
inferences regarding the materiality of StockX's advertising claims, as StockX's
Process consists of far more than determining whether a product is suspected to be
inauthentic.  "[E]very item that transacts on [the StockX] platform go[es] through
[StockX's] authentication and verification process to correct for the potential areas
of disappointment for a buyer:  wrong size, wrong color, wrong product, missing
accessories, damaged, manufacturing defect, other variances."  DX 23, Huber Feb.
Tr. 245:12–19.

    695.  "100% Authentic" claim appeared on every product page in close association with
a stock image of the particular product until May 2022 and clicking on the "100%" authentic button
on the product page brought the user to the StockX Authentication webpage, located at
https://stockx.com/about/authentication.  Dkt. 261-50, Ex. 50 (Internet Archive collection of
screenshots of Nike and Jordan brand shoes bearing "100% Authentic" claim); Dkt. 261-53, Ex.
51 (NIKE0000016); Dkt. 261-54, Ex. 52 at NIKE0039888-98; NIKE0039924-25, NIKE0039936-
37.

a. <u>StockX Response</u>:  Undisputed that until May 2022, product pages for Nike or Jordan shoes sold on StockX's platform included the quoted text and that those pages linked to the StockX Authentication webpage, located at https://stockx.com/about/authentiction, which provided additional context about StockX's Process, such as the expandable FAQs and "StockX Authentication: By the Numbers" statistics.  *See, e.g.*, PX 50 at 39–40, 45–46.  The "Can I return my item after I've received it?" option under the FAQs also linked to a description of StockX's return policy, which provided steps a buyer could take if it "received an item that it believes to be a counterfeit."  *See* DX 39 at 2.

696.     Mr. Fenton testified that StockX has "a 99.96 accuracy rate, only .04 percent of the products we pass are later determined to have been missed – passed an error, last 12 months." and based only on products that make it back to StockX after a customer complains.  Dkt. 257-86, Ex. 86, Fenton Tr. 87:4-87:18; *id.* 83:2-8 (StockX's authentication rate is "calculated as a percentage of customers that reach out to StockX claiming that they have received something that is not in line with their – with what they expected to get, and that we were essentially wrong, and we fixed it for them"); *id.* Fenton Tr. 87:13-87:15 (StockX has "a 99.96 accuracy rate, only .04 percent of the products we pass are later determined to have been missed – passed an error, last 12 months.").

a. <u>StockX Response</u>:  Undisputed.

697.     StockX states that "Authenticators maintain a 99.96% accuracy rate" and "Over the years, our team members have authenticated tens of millions of products at a 99.96% accuracy rate" on its Authentication" "page. Dkt. 257-11, Ex. 11.  The snippet below accurately reproduces the portion containing this language StockX's Authentication Webpage as it appeared on June 26,

2022 from Dkt. 257-11 with a red box added to indicate the definition of "Authentication Accuracy Rate" in fine print.



a.  <u>StockX Response</u>:  Undisputed that StockX stated that "Authenticators maintain a 99.96% accuracy rate," which it defined as a "measurement of the accuracy of StockX's product authentication process based on weighted return data compared to total authentications," and that StockX stated "Over the years, our team members have authenticated tens of millions of products at a 99.96% accuracy rate" on its Authentication webpage about StockX's Process.  DX 115 at 5; *see also* DX 82, NIKE0006776 at 780–81; DX 112, NIKE0038955 at 958.   However, StockX disputes that Nike's screenshot, reduced in size from the actual webpage such that the text is illegible, accurately reproduces how consumers saw the language as it appeared on June 26, 2022.  This language was legible to consumers on the website. StockX further disputes that the quoted text represents the entirety of the StockX website or appeared without relevant context.  The quoted text consists of excerpts from StockX's process-oriented claims that appeared on a webpage describing StockX's Process, which included additional statements highlighting the accuracy and process-oriented nature of StockX's claims, such as:

i.   "FAQs" including "Can I return my item after I've received it?", DX 115 at 6, that linked to a description of StockX's return policy.  StockX's return policy provided steps a buyer could take if it "**received an item that it believes to be counterfeit**."  *See* DX 39 at 2 (emphasis added).

ii.  Extensive process-oriented statements, providing information on StockX's Process and highlighting the process-oriented nature of the disputed advertising, including an explanation of StockX's "**rigorous, multi-step verification procedure,**" use of "machine learning," and pictures and videos of authenticators visually inspecting products.  *See* PX 55 at NIKE0000281 (emphasis added).

698.   StockX's "99.96%" accuracy rate appeared on the "Authentication" page from June 2022 to August 2022 before it was replaced by a similar accuracy rate: "99.95%."  *See* Dkt. 261-58, Ex. 55 at NIKE0000284.

a.   <u>StockX Response</u>:  Undisputed that StockX's "99.96%" accuracy rate, defined as a "measurement of the accuracy of StockX's product authentication process based on weighted return data compared to total authentications," appeared on the StockX's "Authentication" page about its Process from June 2022 to August 2022.  However, StockX disputes that this claim was permanently replaced by a similar accuracy rate, "99.95%", in August 2022.  *See* PX 58, NIKE0000281 at 284 (January 19, 2022 capture of StockX's Authentication webpage showing "99.95%").  The "99.95%" accuracy rate was added to the Authentication webpage based on 2021 data.  That rate was changed back to "99.96%" starting in June 2022 based on updated data.  *See* PX 54, NIKE0006785 at 788; PX 58, NIKE0000281 at 284.

699.    StockX customer service representatives rejected returns when customers raised concerns about authenticity and advised the customer to resell the products on StockX.  *See e.g.,* Sept. Duvdevani Decl. ¶ 113, Ex. 112, STX0203943 (StockX customer service representative refusing return request and stating: "The good news is that the selling side of our platform would allow you to resell this item if you no longer wish to keep it."); *id.* ¶ 114, Ex. 113, STX0204072 (StockX customer service representative refusing return request and stating: "I understand this may not be the resolution you were looking for however, the good news is that we are a live marketplace so we encourage you to resell them on StockX if you no longer wish to keep them! In some instances you may be able to turn over a greater profit than your original purchase price!"); *id.* ¶ 115, Ex. 114, STX0207683 (same); *id.* ¶ 116, Ex. 115, (STX0209127) (StockX customer service representative refusing return request and stating: "you can always resell them on StockX if you are truly unsatisfied with your purchase!").

    a.  <u>StockX Response</u>:  Undisputed that Opp. PXs 112–15 contains the selected quotes. However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PXs 112–15 as misleading because Paragraph 309 omits additional context necessary to understand the exhibits.

    b.  First, Nike has produced no evidence that the products at issue in Opp. PXs 112–15 were inauthentic or that StockX encouraged any buyers to resell products that it believed to be inauthentic.

    c.  Second, StockX did accept returns for at least one of the consumers identified. Reply DX 1, STX0209132 (showing StockX *did* accept the return from the consumer in Opp. PX 115).

    d. Third, Nike omits that in each of these instances, when the consumer contacted StockX, StockX responded promptly, had the consumer submit additional information about the product (including pictures), and StockX's senior authenticators completed a secondary review of the product to confirm that it met StockX's standards. *See* Opp. PX 112, STX0203943 (StockX had its "Senior Authenticators" review the product and determine the item does meet StockX's "standards for deadstock conditioning"); Opp. PX 113, STX0204072 (StockX had "Senior Authenticators" complete a "secondary review" to determine the shoes were within StockX's "guidelines"); Opp. PX 114, STX0207683 (StockX had the authentication team complete "further review" to determine the shoes do "meet [StockX's] deadstock conditions); Opp. PX 115, STX0209127 (StockX had its "senior verification team" review the product to ensure it met StockX's Process standards, and the team determined that the item was "acceptable per [StockX's] deadstock conditions").

700.    A 2020 StockX document titled "Voice of the Customer Readout" includes comments regarding "Returns/cancellation" and includes comments from StockX customers regarding StockX's lack of return policy. Sept. Duvdevani Decl. ¶ 117, Ex. 116, STX0021192 at 10 ("I believe, as do many others, that I have received inauthentic product from StockX and not being able to return them makes things very difficult and exacerbates the issue"); *Id.* ("Offer a return policy…").

    a. <u>StockX Response</u>:  Undisputed that Opp. PX 116 contains the selected quotes. However, StockX disputes Nike's characterization of, and inferences purportedly

drawn from, Opp. PX 116 as misleading because Paragraph 310 omits additional context necessary to understand the exhibit.

b.  Comments from StockX customers in Opp. PX 116 indicate that consumers were discussing StockX's return policy for buyer's remorse (e.g., purchasing the wrong size, color, etc.), not the return policy for receiving suspected inauthentic items. *See* Opp. PX 116, STX0021192 at 201 (discussing that they understand the policy on returns, but "with the way today's sneakers are made sizing is tough," but they "don't want to be bothered in to being a seller to recoup their purchase this is only reason I couldn't give a 10 BC everything else of the process is great!!").

c.  StockX always has provided consumers with the opportunity to return products that are later determined should not have passed StockX's Process – today, referred to as the Buyers Promise.  Opp. DX 49, Hansen Tr. 55:1–61:14; DX 39, Hansen Dep. Ex. 6 ("[StockX] will refund all fees and costs paid by the buyer for the [suspected inauthentic] item (including shipping and handling)"); DX 37, StockX, "What is the StockX Buyer Promise?" https://stockx.com/help/articles/What-is-the-StockX-Buyer-Promise ("The StockX Buyer Promise solidifies this mission by providing support for Buyers should we make a mistake (e.g. we ship you the wrong order, we incorrectly verify an item).").  As StockX's documents acknowledge, "StockX IS different from a traditional e-commerce company," PX 78, STX0020225 at 227, and because StockX is not the actual seller of the products on its platform, StockX does not accept buyer's remorse returns, Opp. DX 53, Fenton Tr. 96:2–9 (testifying that StockX as a marketplace does not have the ability to "program[m]atically" accept returns when a customer "do[es]n't like" their purchase).  ████████████

███████████████████████████████████████████████

███████████████████████████████████████ *See* PX 78,

STX0020225 at 230 ██████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

d.  StockX further disputes that the comment of one consumer that they "received

inauthentic product" and thought they were unable to return it is representative of

the understanding of all, or even a large portion of, StockX's consumers.  As Opp.

PX 116 illustrates, consumers were also discussing that StockX did not have a

return policy for buyer's remorse.  *See, e.g.*, Opp. PX 116, STX0021192 at 201 ("I

understand your policy on returns but with the way today's sneakers are made

sizing is tough…"; "Returns somehow One of the shoes I bought was a bit tight and

now I can't do anything about it because if I sell, I won't make back the money I

paid for it").

e.  Further, where consumers have concerns about products they received, but those

products passed StockX's initial authentication, StockX authenticators further

review the products to determine if there are further reasons to suspect they are

inauthentic.  Opp. DX 18, Lopez Tr. 252:3–253:24, 261:18–262:9 ████████████

███████████████████████████████████████████████

701.  ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████ Dkt. 261-85, Ex. 79, STX0021484.

    a.  <u>StockX Response</u>:  Undisputed that PX 79 contains the quoted text.  However,

StockX disputes Nike's characterization of, and inferences purportedly drawn

from, PX 79 as misleading because the quoted text pertains to ████████████

████████████████████████████████  *See* PX 79, STX0021481 at 486

████████████████████████████████████ Opp. DX

53, Fenton Tr. 108:5–109:3 ████████████████

████████████████████████████████

████████████████████████████████

████████████████████████ While StockX does not offer

a return policy for buyer's remorse (because StockX is not the seller), StockX

always has provided consumers with the opportunity to return products that are later

determined should not have passed StockX's Process – today, referred to as the

Buyers Promise – and StockX does not allow buyers to resell items reasonably

believed to be counterfeit.  Opp. DX 49, Hansen Tr. 55:1–61:14; DX 39, Hansen

Dep. Ex. 6 ("[StockX] will refund all fees and costs paid by the buyer for the

[suspected inauthentic] item (including shipping and handling).  In no event may a

buyer resell any item (on StockX or elsewhere) that is reasonably believed to be

counterfeit.");  DX 37, StockX, "What is the StockX Buyer Promise?"

https://stockx.com/help/articles/What-is-the-StockX-Buyer-Promise ("The StockX

Buyer Promise solidifies this mission by providing support for Buyers should we

make a mistake (e.g. we ship you the wrong order, we incorrectly verify an item).");

Opp. DX 47, Huber June Tr. 56:12–18 (testifying that if a shoe is returned to StockX, and StockX determines the shoe is inauthentic, that item is not resold); Opp. DX 49, Hansen Tr. 55:1–61:14; DX 39, Hansen Dep. Ex. 6 ("In no event may a buyer resell any item (on StockX or elsewhere) that is reasonably believed to be counterfeit.")

702.    A review on reviews.io of StockX states: "I have spent hundreds of $$ with StockX. I received defective sneakers and let them know immediately. I opened a case and two weeks later no answer???" Sept, Duvdevani Decl. ¶ 118, Ex. 117, NIKE0000092 at 95.

    a.    <u>StockX Response</u>:    Undisputed that Opp. PX 117 contains the quoted text. However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 117 as misleading because the quoted review is not from a confirmed StockX consumer, a confirmed StockX consumer who purchased a Nike product on StockX's platform, or a confirmed StockX consumer who purchased a Nike produce on StockX's platform, received a "defective" product, and received no response from StockX customer service.  In fact, reviews.io has a "Verified Reviewer" or "Verified Buyer" banner for what it calls "Genuine customers", and the review in Opp. PX 117 does not have this banner.  *See* Reply DX 2, REVIEWS.IO, "For Consumers FAQ," Sep. 13, 2024, https://support.reviews.io/en/articles/9184808-for-consumers-faq (explaining that "Genuine customers are invited to write a review via email or SMS invitation by a business after a transaction, and any review written as a result of this invitation will appear on our website showing the 'Verified Buyer' banner.").

b.  StockX further disputes Nike's characterization of Opp. PX 117 because Paragraph 312 because omits context necessary to understand the import of Nike's statement. Opp. PX 117 includes reviews which report a positive experience with StockX.  *See* Opp. PX 117, NIKE0000092 at 102 ("No complaints at all.  Would definitely order from them again."); *id.* at 108 ("They have refunded me and given me a gift certificate for compensation.  They have written to me to clarify and went above and beyond to rectify the problem."); *id.* at 116 ("Ordered foamposite "swoosh all over" . . . Shoes are in new, excellent shape . . . Was very happy with my order. Thanks [S]tockX."); *id.* at 120 ("Brand new, excellent condition.  No complaints. Two thumbs up!").

c.  Opp. PX 117 also includes reviews which report that StockX refunded the consumer.  *See* Opp. PX 117, NIKE0000092 at 108 ("They have refunded me and given me a gift certificate for compensation.  They have written to me to clarify and went above and beyond to rectify the problem."); *id.* at 100 ("At least they gave me a refund, thought I was going to go through a lot more trouble.").

d.  Opp. PX 117 also includes reviews which report that StockX does have a return policy, but that the consumer was not able to get a refund because they failed to report the complaint within the return policy, or to keep on the tags as required by the return policy.  *See* Opp. PX 117, NIKE0000092 at 098 ("3 day return policy . . . I called 5 days after . . . received no refund."); *id.* at 112–13 (discussing taking "photos required for the return," but noting it got denied because the tag was "tampered with."); *id.* at 117 ("[S]ince the tag was taken off, they won't refund me anything.").

703.    A review on reviews.io of StockX states: "They sell fake Jordan's from Hong Kong and they do not take returns or refunds under any circumstances." Sept, Duvdevani Decl. ¶ 118, Ex. 117, NIKE0000092 at 99.

    a.  <u>StockX Response</u>:    Undisputed that Opp. PX 117 contains the quoted text. However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 117 as misleading because the review is not from a confirmed StockX consumer, a confirmed StockX consumer who purchased a Nike product on StockX's platform, or a confirmed StockX consumer who purchased a Nike product on StockX's platform, received a "defective" product, and received no response from StockX customer service.    The review is from an anonymous individual identified only by their first name, "Donna."

    b.  StockX further disputes Nike's characterization of Opp. PX 117 because Paragraph 313 because omits context necessary to understand the import of Nike's statement. Opp. PX 117 includes reviews which report a positive experience with StockX.  *See* Opp. PX 117, NIKE0000092 at 102 ("No complaints at all.  Would definitely order from them again."); *id.* at 208 ("They have refunded me and given me a gift certificate for compensation.  They have written to me to clarify and went above and beyond to rectify the problem."); *id.* at 116 ("Ordered foamposite "swoosh all over" . . . Shoes are in new, excellent shape . . . Was very happy with my order. Thanks Stock[X]."); *id.* at 120 ("Brand new, excellent condition.  No complaints. Two thumbs up!").

    c.  Opp. PX 117 also includes reviews which report that StockX refunded the consumer.  *See* Opp. PX 117, NIKE0000092 at 108 ("They have refunded me and

given me a gift certificate for compensation.  They have written to me to clarify and went above and beyond to rectify the problem."); *id.* at 100 ("At least they gave me a refund, thought I was going to go through a lot more trouble.").

    d.   Opp. PX 117 also includes reviews which report that StockX does have a return policy, but that the consumer was not able to get a refund because they failed to report the complaint within the return policy, or to keep on the tags as required by the return policy. *See* Opp. PX 117, NIKE0000092 at 098 ("3 day return policy . . . I called 5 days after . . . received no refund."); *id.* at 112–13 (discussing taking "photos required for the return," but noting it got denied because the tag was "tampered with."); *id.* at 117 ("[S]ince the tag was taken off, they won't refund me anything.").

704.    A review on reviews.io of StockX states: "I bought trainers on the site and they arrived damaged You can not return them but you can sell them for a lower price. Nobody answers your emails and I couldn't find a contact number." Sept, Duvdevani Decl. ¶ 118, Ex. 117, NIKE0000092 at 103.

    a.   <u>StockX Response</u>:   Undisputed that Opp. PX 117 contains the quoted text. However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 117 as misleading because the review is not from a confirmed StockX consumer, a confirmed StockX consumer who purchased a Nike product on StockX's platform, or a confirmed StockX consumer who purchased a Nike product on StockX's platform, received a "defective" product, and received no response from StockX customer service.  The review is from an "Anonymous" individual with no name.  In fact, reviews.io has a "Verified Reviewer" or "Verified

Buyer" banner for what it calls "Genuine customers", and the review in PX 117 does not have this banner. *See* Reply DX 2, REVIEWS.IO, "For Consumers FAQ," Sep. 13, 2024, https://support.reviews.io/en/articles/9184808-for-consumers-faq (explaining that "Genuine customers are invited to write a review via email or SMS invitation by a business after a transaction, and any review written as a result of this invitation will appear on our website showing the 'Verified Buyer' banner.").

b. StockX further disputes Nike's characterization of Opp. PX 117 because Paragraph 314 omits context necessary to understand the import of Nike's statement. Opp. PX 117 includes reviews which report a positive experience with StockX. *See* Opp. PX 117, NIKE0000092 at 102 ("No complaints at all. Would definitely order from them again."); *id.* at 108 ("They have refunded me and given me a gift certificate for compensation. They have written to me to clarify and went above and beyond to rectify the problem."); *id.* at 116 ("Ordered foamposite "swoosh all over" . . . Shoes are in new, excellent shape . . . Was very happy with my order. Thanks Stock[X]."); *id.* at 120 ("Brand new, excellent condition. No complaints. Two thumbs up!").

c. Opp. PX 117 also includes reviews which report that StockX refunded the consumer. *See* Opp. PX 117, NIKE0000092 at 108 ("They have refunded me and given me a gift certificate for compensation. They have written to me to clarify and went above and beyond to rectify the problem."); *id.* at 100 ("At least they gave me a refund, thought I was going to go through a lot more trouble.").

d. Opp. PX 117 also includes reviews which report that StockX does have a return policy, but that the consumer was not able to get a refund because they failed to

report the complaint within the return policy, or to keep on the tags as required by the return policy.  *See* Opp. PX 117, NIKE0000092 at 098 ("3 day return policy . . . I called 5 days after . . . received no refund."); *id.* at 112–13 (discussing taking "photos required for the return," but noting it got denied because the tag was "tampered with."); *id.* at 117 ("[S]ince the tag was taken off, they won't refund me anything.").

705.    On April 25, 2022, Tim O'Malley, StockX's Vice President, Product Management sent an email to Jacob Fenton and Chance Kelch with the subject: ███████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████ Sept, Duvdevani Decl. ¶ 119, Ex. 118(STX0097403).

    a.    <u>StockX Response</u>:  Undisputed that Opp. PX 118 contains the quoted language. However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 118 as misleading because StockX's advertising does not communicate that *every* product is flagged for quality assurance, just that it is a "final check" in StockX's Process.  *See* DX 115 4.  As Mr. Fenton testified, StockX's process-oriented advertising on quality assurance is true, and Mr. O'Malley, in his email to Mr. Fenton, was merely commenting on ████████████

██████████████████████████████████████

█████████████████████████ Reply DX 3, Fenton Tr. 158:2–159:7.

706.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████" Dkt. 271-76, Ex. 76,

Lopez Tr. 26:17-27:7.

     a.  <u>StockX Response</u>:  Undisputed that Mr. Lopez offered the quoted testimony. However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, the quoted testimony as misleading because Paragraph 316 omits additional context necessary to understand the quoted testimony.  ████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████" DX

76, Lopez Tr. 26:17–27:4 (emphasis added).  ███████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████ Reply DX 4, Lopez Tr. 145:12–19. ███████████████

████████████████████████████████████████████

████████████████████████████████████████ Reply

DX 4, Lopez Tr. 172:4–21.

     b.  StockX further disputes Paragraph 316 because it omits additional context that

████████████████████████████████████████████

█████████████████████████ DX 76, Lopez Tr. 121:18–25. ████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████ DX 76, Lopez Tr. 122:4–7.

707.  S███████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████ Sept. Duvdevani Decl.¶ 64, Ex. 63, STX0191602 at 603.

a.  <u>StockX Response</u>:  Undisputed.

708.  ██████████████████████████████████████████████

███████████████████ Dkt. 271-76, Ex. 76, Lopez Tr. 26:17-27:7.

a.  <u>StockX Response</u>:  ██████████████████████████████

█████████████████████████████████████ DX 76, Lopez

Tr. 27:5–7 (emphasis added).  However, StockX disputes Nike's characterization

of, and inferences purportedly drawn from, the quoted testimony as misleading

because Paragraph 318 omits additional context necessary to understand the quoted

testimony.  ████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████ DX 76, Lopez Tr. 26:17–27:4.  ████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████ Reply DX 4, Lopez Tr. 145:12–19. █████████████████

███████████████████████████████████████████████

████████████████████████████████████████ Reply

DX 4, Lopez Tr. 172:4–21.

    b.   StockX further disputes Paragraph 318 because it omits additional context that

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

709.   ███████████████████████████████████████ Dkt. 257-110, Ex. 110 at

██████████████████████████████████████████████

856.

    a.   <u>StockX Response</u>:  Undisputed that DX 110 contains the quoted text.  However,

StockX disputes that Nike's characterization of, and inferences purportedly drawn

from, the quoted text as misleading because Paragraph 319 omits additional context

necessary to understand the quoted text and specifically, ████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████  DX 110, STX9923851 at 856.  ████████████████

████████████████████████

i.  ████████████████████████████████████

████████████████████████████████████

████████████████████████████

■  ████████████████████████████████████

████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████

■  ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

■  ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████



710. ██ ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████ Dkt. 261-75, Ex. 70, STX0016703 at 797.

a. <u>StockX Response</u>:  Undisputed that PX 70 contains the quoted text.  However, StockX disputes that Nike's characterization of, and inferences purportedly drawn from, the quoted text as misleading because Paragraph 320 omits additional context necessary to understand the quoted text and specifically, ███████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████

i. ███████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

██ ███████████████████████████████████████

██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

iv. 



711. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ Sept. Duvdevani Decl. ¶ 120, Ex. 119, STX019287 (email) & STX0192491 (attach).

a.  <u>StockX Response</u>:  Undisputed that Reply DX 7, STX0192490, the document
StockX believes Nike is referring to as "STX0192491" which was not included as
an exhibit to Nike's Counterstatement, contains the quoted language.  However,
StockX disputes Nike's characterization of, and inferences purportedly drawn from
Reply DX 7, STX0192490 and, Opp. PX 119, STX019[4]287, as misleading
because Paragraph 321 omits additional context necessary to understand the quoted
text and specifically, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮

b.  First, Opp. PX 119 actually states that ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

██████████████████████████████████████ Opp. PX 119, STX0192487 at

488 (emphasis added).

c.  Second, Reply DX 7, STX0192490 ████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████

d.  ███████████████████████████████████████

  █  ████████████████████████████████████

    ████████████████████████████████████

    ████████████████████████

  █  ████████████████████████████████████

    ████████████████████████████████████

    ██████████████

 ████████████████████████████████████

    ████████████████████████████████████

    ███████████████████████████

  █  ████████████████████████████████████

    ████████████████████████████████████

    ████████████████████████

  █  ████████████████████████████████████

    ████████████████████████████████████



████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

712.    ██████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████  Sept. Duvdevani Decl. ¶ 57, Ex. 56, Lopez Tr. 170:1-23, 173:5-

13.

     a.  <u>StockX Response</u>:  Disputed.  StockX disputes that Mr. Lopez offered the quoted

testimony.  In response to the question  ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████  Opp. PX 56, Lopez Tr. 170:14–23.

     b.  StockX also disputes any inference that  ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ DX 23, Huber Feb.

Tr. 245:12–19.

713.    StockX has not produced any evidence to regarding any patents, trademarks, copyrights, or other intellectual property protection in its multi-step verification process. *See generally* Dkt. 256 at ¶¶ 150-152; Sept. Duvdevani Decl. ¶ 121, Ex. 120, StockX's Response to Request for Production No. 192 (seeking "Documents sufficient to show any substantiation of or support for any of the Advertising Claims.").

   a.  <u>StockX Response</u>:  Disputed.  StockX disputes that it has not produced any evidence of any patents, trademarks, copyrights, or other intellectual property protection in its multi-step verification process.  StockX submitted a provisional patent with the United States Patent Office ("USPTO") for "machine learning techniques for object authentication" on May 3, 2021, and this patent was first published to the public on November 3, 2022.  *See* Reply DX 5, U.S. Patent No. 12, 052,230 B2 (issued July 30, 2024).   On July 30, 2024, the USPTO issued StockX a patent for "machine learning techniques for object authentication."  *Id.*

   ████████████████████████████████████

   ██████████████████████  *See, e.g.*, Reply DX 6, STX0160709 at 710

   ████████████████████████████████████

   ████████████████████████████████████

   ████████████████████████████████████

   ████████████████

   b.  StockX further disputes Paragraph 323 because Nike has conceded that StockX's Process is proprietary.  ECF 260, ¶ 43 ("StockX authenticates the goods using a

proprietary, multi-step authentication process); ¶ 44 ("Unlike most online marketplaces, which do not authenticate goods sold on their platforms, StockX uses a proprietary, multi-step authentication process for every product sold on its platform."). Further, evidence in the record demonstrates that the Process is proprietary. *See* DX 87, STX0058773 at 775 ████████████████████████

████████████████████████████████████████

██████████████████████████████████

714.     A reddit user describing StockX's authentication process for Nike shoes as "[m]ostly smell and how they look under a black light." Sept. Duvdevani Decl. ¶ 61, Ex. 60 (https://www.reddit.com/r/Sneakers/comments/v7vbz6/comment/ibn9ypa/)

    a.  <u>StockX Response</u>:  Undisputed that Opp. PX 60 contains the quoted text.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 60 as misleading because Paragraph 324 omits additional context needed to understand the quoted text.  In Opp. PX 60, a Reddit user asked "what determined a jordan 1 as fake in the process," in a Reddit forum about sneakers, "r/Sneakers," to which another anonymous Reddit user, "grapeallday," responded: "Box is crap/ has stamps. Can't get the pink paper correct on Travis 1's. The way the sole lights up under a blacklight on a travis 1. Mostly smell and how they look under a black light."

    b.  StockX further disputes that Opp. PX 60 supports Nike's assertion that "StockX has repeatedly shared significant portions of its process with the public . . . and other portions of its 'proprietary' process are well-known online," ECF 270 at 19 (citing this paragraph in support of its quoted assertion), as Nike has produced no

evidence that Reddit user "grapeallday" worked at StockX, had access to any proprietary information about StockX's Process, or was otherwise sharing proprietary information about StockX's Process.

715.    StockX customer service representative responded to a customer stating: "As previously explained, when items go through the verification process items are reviewed under different lighting which includes but is not limited to black UV lighting.  When items are viewed under UV lighting it shows things that may not be visible to the naked eye.  The photos our team provided you regarding the verification results under special UV lighting…"  Sept. Duvdevani Decl. ¶ 62, Ex. 61 (STX0248653).

　　　　a.  <u>StockX Response</u>:  Undisputed that Opp. PX 61 contains the quoted text.  However, StockX disputes that Opp. PX 61 supports Nike's assertion that "StockX has repeatedly shared significant portions of its process with the public . . . and other portions of its 'proprietary' process are well-known online," ECF 270 at 19 (citing this paragraph in support of its quoted assertion), because Nike has produced no evidence that the StockX customer service representative had access to proprietary information about StockX's Process or was otherwise sharing proprietary information about StockX's Process.

716.    StockX customer service representative responded to a customer stating: "When an item goes through our 2 step verification there are several things our authentication looks for. Items are reviewed under different lighting which includes but is not limited to black UV lighting." Sept. Duvdevani Decl. ¶ 122, Ex. 121 (STX0248646).

　　　　a.  <u>StockX Response</u>:  Undisputed that Opp. PX 121 contains the quoted text.  However, StockX disputes that Opp. PX 121 supports Nike's assertion that

"StockX has repeatedly shared significant portions of its process with the public . . . and other portions of its 'proprietary' process are well-known online," ECF 270 at 19 (citing this paragraph in support of its quoted assertion), because Nike has submitted no evidence that the StockX customer service representative had access to proprietary information about StockX's Process, or was sharing proprietary information about StockX's Process.  StockX further disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 121 as misleading because Opp. PX 121 is duplicative of Opp. PX 61.  Both exhibits are from the same correspondence involving the same customer, █████████

717.    Portions of StockX's authentication process are made available in videos posted to the StockX website. *See, e.g.*, Dkt. 261-57, Ex. 54; Sept. Duvdevani Decl.¶ 60, Ex. 59 (NIKE0005840).

a.    <u>StockX Response</u>: Undisputed that Opp. PX 59 is a video of a StockX authenticator sharing discrete, general aspects of StockX's Process.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 59 as misleading because Paragraph 327 omits additional context necessary to understand Opp. PX 59.  Opp. PX 59 also shows that the StockX authenticator states "**we cannot share everything that goes into authentication,** but here is an overview." (at 0:20–24) (emphasis added).  The StockX authenticator goes on to share discrete, general aspects of the process such as "the smell of the shoe (at 0:48–51), and "make sure it's the right size" (at 1:22–24).

b.    Undisputed that PX 54 is a version of StockX's Authentication Webpage that shows a screenshot of an embedded video clip under the statement, "Our authenticators

share a deep love and knowledge for the products and culture around out marketplace," PX 54, NIKE0006785 at 788, but disputed that this embedded video shows that "Portions of StockX's authentication process are made available in videos posted to the StockX website," or that PX 54 supports Nike's assertion that "StockX has repeatedly shared significant portions of its process with the public . . . and other portions of its 'proprietary' process are well-known online," ECF 270 at 19 (citing this paragraph in support of its quoted assertion).

718.    Other purported authentication services use a "smell" test as part of their process. *See, e.g.*,  https://www.youtube.com/watch?v=IiIPkJ-yEx8.

    a.  <u>StockX Response</u>:  Undisputed that the cited video shows individuals smelling sneakers as part of their examination of those sneakers.  Disputed that this fact is material or that this video supports Nike's assertion that "StockX has repeatedly shared significant portions of its process with the public . . . and other portions of its 'proprietary' process are well-known online," ECF 270 at 19 (citing this paragraph in support of its quoted assertion).

*A.  Authenticity is a "Core" Value Proposition for StockX and Its Consumers.*

719.    ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████ Dkt. 257-44, Ex. 44, STX0021868 at 897.

    a.  <u>StockX Response</u>:  Undisputed that the cited document states that ███████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████

b.  StockX further disputes the implication that ████████████████████████

or that DX 44 supports Nike's assertion that "StockX repeatedly admitted that the

Accused Advertising is extremely important to consumers that buy goods on its

platform."  ECF 270 at 4 (citing this paragraph in support of its quoted assertion).

Nike provides no evidence that ████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████

c.  Nike has presented no evidence of ██████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████  DX 23, Huber Feb. Tr.

245:12–19 ("[E]very item that transacts on [the StockX] platform go[es] through

[StockX's] authentication and verification process to correct for the potential areas

of disappointment for a buyer:  wrong size, wrong color, wrong product, missing accessories, damages, manufacturing defect, other variances.").

d.  Nike provides no evidence that ██████████████████

██████████████████████████

██████████████████ Opp. DX 48, Huber Feb. Tr. 60:15–20, 133:10–135:24 (StockX physically inspects every product sold on its platform); Opp. DX 18, Lopez Tr. 122:1–7 ██████████████

██████████████████████

██████████████████; Opp. DX 48, Huber Feb. Tr. 21:11–22:24 (StockX employs Quality Assurance and AQA specialists to assist in instances in which a product issue is flagged); Opp. DX 48, Huber Feb. Tr. 21:11–22:24 ██

██████████████████████

██████████████████████

██████████████ Opp. DX 18, Lopez Tr. 26:17–27:4 ██

██████████████████████

██████████████ DX 110, STX0023851 at 856 (StockX uses proprietary authentication software and techniques, including a Machine Learning Model ██████████

██████████████ Opp. DX 40, Tucker Rep. ¶ 42 (StockX works to ensure "that only reliable buyers and sellers use the platform" by

suspending the accounts of "sellers who repeatedly do not complete sales or send in items that fail verification.").

720. ███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████ Dkt. 257-44, Ex. 44, STX0021868 at 898.

a. StockX Response:   Undisputed that the cited document states that 90% of respondents who indicated that they typically spend $250 or more on sneakers ███████████████████████████████████████ DX 44, STX0021868 at 898.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, DX 44 as misleading because Paragraph 330 omits additional context necessary to understand the exhibit.  Specifically, ████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

*Id.*

b.  StockX further disputes the implication that ██████████████████████ or that DX 44 supports Nike's assertion that "StockX repeatedly admitted that the Accused Advertising is extremely important to consumers that buy goods on its platform."  ECF 270 at 4 (citing this paragraph in support of its quoted assertion). Nike provides no evidence that ████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████



c. Nike has presented no evidence of ███████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████ DX 23, Huber Feb. Tr.

245:12–19 ("[E]very item that transacts on [the StockX] platform go[es] through

[StockX's] authentication and verification process to correct for the potential areas

of disappointment for a buyer:  wrong size, wrong color, wrong product, missing

accessories, damages, manufacturing defect, other variances."  Nike provides no

evidence that █████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████ Opp. DX 48, Huber Feb. Tr. 60:15–20, 133:10–135:24 (StockX

physically inspects every product sold on its platform); Opp. DX 18, Lopez Tr.

122:1–7 █████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████ Opp. DX 48, Huber Feb. Tr. 21:11–22:24 (StockX employs Quality

Assurance and AQA specialists to assist in instances in which a product issue is

flagged); Opp. DX 48, Huber Feb. Tr. 21:11–22:24 (█████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████ Opp. DX 18, Lopez Tr. 26:17–27:4 ████████

████████████████████████████████████████████

████████████████████ ; DX 110, STX0023851 at 856 (StockX uses

proprietary authentication software and techniques, including a Machine Learning

Model ████████████████████████████████████

████ Opp. DX 40, Tucker Rep. ¶ 42 (StockX works to ensure "that only reliable

buyers and sellers use the platform" by suspending the accounts of "sellers who

repeatedly do not complete sales or send in items that fail verification.").

721. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████ Sept. Duvdevani Decl. ¶

84, Ex. 83, STX0096562 at 581.

    a.  <u>StockX Response</u>: Undisputed that Opp. PX 83 states that ████████

████████████████████████████████████████████

████████████████████████████ Opp. PX

83, STX0096562 at 581.  However, StockX disputes Nike's characterization of,

and inferences purportedly drawn from, Opp. PX 83 as misleading because

Paragraph 331 omits additional context necessary to understand the exhibit. ██

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████    *Id.*

b.  StockX further disputes the implication that ████████████████████████

or that PX 83 supports Nike's assertion that "StockX repeatedly admitted that the

Accused Advertising is extremely important to consumers that buy goods on its

platform."  ECF 270 at 4 (citing this paragraph in support of its quoted assertion).

Nike provides no evidence that ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████

c.  Further, Nike has presented no evidence of ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████    DX

23, Huber Feb. Tr. 245:12–19 ("[E]very item that transacts on [the StockX]

platform go[es] through [StockX's] authentication and verification process to

correct for the potential areas of disappointment for a buyer:  wrong size, wrong

color, wrong product, missing accessories, damages, manufacturing defect, other

variances."  Nike provides no evidence that ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████    Opp. DX 48, Huber Feb. Tr.

60:15–20, 133:10–135:24 (StockX physically inspects every product sold on its platform); Opp. DX 18, Lopez Tr. 122:1–7 

Opp. DX 48, Huber Feb. Tr. 21:11–22:24 (StockX employs Quality Assurance and AQA specialists to assist in instances in which a product issue is flagged); Opp. DX 48, Huber Feb. Tr. 21:11–22:24

Opp. DX 18, Lopez Tr. 26:17–27:4

DX 110, STX0023851 at 856 (StockX uses proprietary authentication software and techniques,

; Opp. DX 40, Tucker Rep. ¶ 42 (StockX works to ensure "that only reliable buyers and sellers use the platform" by suspending the accounts of "sellers who repeatedly do not complete sales or send in items that fail verification.").

722.

Sept. Duvdevani Decl. ¶ 84, Ex. 83, STX0096562 at 582.

a.  <u>StockX Response</u>:  Undisputed that Opp. PX 83 states tha ███████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████.

Opp.  PX  83,  STX0096562  at  582.    However,  StockX  disputes  Nike's

characterization  of,  and  inferences  purportedly  drawn  from,  Opp.  PX  83  as

misleading  because  Paragraph  332  omits  additional  context  necessary  to

understand  the  exhibit.    Specifically, ██████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████

b.  StockX further disputes the implication that ██████████████████████

or that PX 83 supports Nike's assertion that "StockX repeatedly admitted that the

Accused Advertising is extremely important to consumers that buy goods on its platform." ECF 270 at 4 (citing this paragraph in support of its quoted assertion). Nike provides no evidence that ███████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████

723.  ███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████  Dkt. 261-77, Ex. 71 at STX0018465 (emphasis in original).

    a.  <u>StockX Response</u>:  Undisputed that PX 71 includes the quoted text.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, PX 71 as misleading because Paragraph 333 omits additional context necessary to understand the exhibit.  Specifically, ████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

b.  StockX further disputes the implication that ████████████████████

███████████████████████ proves the materiality of StockX's

advertising claims or that PX 71 supports Nike's assertion that "StockX repeatedly

admitted that the Accused Advertising is extremely important to consumers that

buy goods on its platform."  ECF 270 at 4 (citing this paragraph in support of its

quoted assertion).  Nike provides no evidence that ████████████████████

███████████████████████████████████████████████

███████████████████████ does not imply or demonstrate that the

specific advertising claims at issue impacted consumer purchasing decisions or

were otherwise material.    Further, Nike has presented no evidence of ████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████

724.  ████████████████████████████████████████████████

██████████████████████████████ Dkt. 261-71, Ex. 68 at STX0020185.

a.  <u>StockX Response</u>:  Undisputed that PX 68 contains the quoted text.  However,

StockX disputes Nike's characterization of, and inferences purportedly drawn

from, PX 68 as misleading because Nike omits context necessary to understand PX

68.  ████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████ DX 23, Huber Feb. Tr. 244:12–19 ("[E]very item that transacts on [the StockX] platform go[es] through [StockX's] authentication and verification process to correct for the potential areas of disappointment for a buyer: wrong size, wrong color, wrong product, missing accessories, damages, manufacturing defect, other variances."); Opp. DX 48, Huber Feb. Tr. 60:15–20, 133:10–135:24 (StockX physically inspects every product sold on its platform); Opp. DX 18, Lopez Tr. 122:1–7 ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████ Opp. DX 48, Huber Feb. Tr. 21:11–22:24 (StockX employs Quality Assurance and AQA specialists to assist in instances in which a product issue is flagged); Opp. DX 48, Huber Feb. Tr. 21:11–22:24 ███

████████████████████████████████████████

████████████████████████████████████████

████████████████████████ Opp. DX 18, Lopez Tr. 26:17–27:4 ███

████████████████████████████████████████

████████████████████████████ DX 110, STX0023851 at 856 (StockX uses proprietary authentication software and techniques, including a Machine Learning Model ████████████████████

██████████████████████████ Opp. DX 40, Tucker Rep. ¶ 42 (StockX works to ensure "that only reliable buyers and sellers use the platform" by suspending the accounts of "sellers who repeatedly do not complete sales or send in items that fail verification.").

b. StockX also disputes that the information in Paragraph 334 is material because it does not address whether the alleged falsity in StockX's actual advertising claims influenced consumers' decisions to use StockX's platform.

725. ██████████████████████████████████████

██████████████████████████████████████████"

Sept. Duvdevani Decl. ¶ 86, Ex. 85, Fenton Tr. 144:12-145:2.

a. <u>StockX Response</u>: Undisputed that Opp. PX 85 contains the quoted text. However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 85 as misleading because Paragraph 335 omits additional context necessary to understand the exhibit. Specifically, Mr. Fenton testified that ██

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████ Opp. PX 85, Fenton Tr. 145:1–16.

b. StockX further disputes Nike's characterization of, and inferences purportedly drawn from Opp. PX 85, as misleading because Opp. PX 85 does not support Nike's assertion that "StockX repeatedly admitted that the Accused Advertising is extremely important to consumers that buy goods on its platform." ECF 270 at 4 (citing this paragraph in support of its quoted assertion). ██████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████     Opp. PX 85, Fenton Tr. 145:1–16.

Nike does not dispute that every item sold on StockX is inspected according to

StockX's Process.  That a customer cares that products she purchases pass through

StockX's Process does not prove whether the alleged falsity in StockX's actual

advertising claims influenced consumers' decisions to use StockX's platform.

StockX further disputes Nike's characterization of, and inferences purportedly

drawn from Opp. PX 85, as misleading because StockX's Process consists of far

more than assessing whether a product is genuine, and is a comprehensive process

designed to evaluate whether a product meets StockX's rigorous standards.  Opp.

DX 48, Huber Feb. Tr. 60:15–20, 133:10–135:24 (StockX physically inspects every

product sold on its platform); Opp. DX 18, Lopez Tr. 122:1–7 ████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████     Opp. DX 48, Huber Feb. Tr.

21:11–22:24 (StockX employs Quality Assurance and AQA specialists to assist in

instances in which a product issue is flagged); Opp. DX 48, Huber Feb. Tr. 21:11–

22:24 ████████████████████████

██████████████████████████████████████████████

██████████████████████████████     ; Opp. DX 18, Lopez Tr. 26:17–27:4

██████████████████████████████████████████████

████████████████████████████████████████████     DX

110, STX0023851 at 856 (StockX uses proprietary authentication software and techniques, including a Machine Learning Model ███████████████████ ███████████████████████; Opp. DX 40, Tucker Rep. ¶ 42 (StockX works to ensure "that only reliable buyers and sellers use the platform" by suspending the accounts of "sellers who repeatedly do not complete sales or send in items that fail verification.").

726.  ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ Sept. Duvdevani Decl. ¶ 123, Ex. 122 (STX0026903 at 928).

a. <u>StockX Response</u>:  Undisputed that Opp. PX 122 contains the quoted text. However, StockX disputes Nike's characterization of, and inferences purportedly drawn from Opp. PX 122 as misleading because Opp. PX 122 does not support Nike's assertion that "StockX repeatedly admitted that the Accused Advertising is extremely important to consumers that buy goods on its platform."  ECF 270 at 4 (citing this paragraph in support of its quoted assertion).  The above-quoted text in Opp. PX 122 does not discuss the advertising claims at issue or concern whether the alleged falsity in StockX's actual advertising claims influenced consumers' decisions to use StockX's platform.  StockX's Process includes far more than determining whether the product at issue is genuine.  DX 23, Huber Feb. Tr. 244:12–19 ("[E]very item that transacts on [the StockX] platform go[es] through [StockX's] authentication and verification process to correct for the potential areas of disappointment for a buyer:  wrong size, wrong color, wrong product, missing

accessories, damages, manufacturing defect, other variances."); Opp. DX 48, Huber Feb. Tr. 60:15–20, 133:10–135:24 (StockX physically inspects every product sold on its platform); Opp. DX 18, Lopez Tr. 122:1–7 ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████; Opp. DX 48, Huber Feb. Tr. 21:11–22:24 (StockX employs Quality Assurance and AQA specialists to assist in instances in which a product issue is flagged); Opp. DX 48, Huber Feb. Tr. 21:11– 22:24 (████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████; Opp. DX 18, Lopez Tr. 26:17–27:4

████████████████████████████████████████████████████████

██████████████████████████████████████████████████ DX 110, STX0023851 at 856 (StockX uses proprietary authentication software and techniques, including a Machine Learning Model ████████████████

████████████████████ Opp. DX 40, Tucker Rep. ¶ 42 (StockX works to ensure "that only reliable buyers and sellers use the platform" by suspending the accounts of "sellers who repeatedly do not complete sales or send in items that fail verification.").  StockX accordingly disputes the implication that this out-of-context statement proves that any of the advertising claims at issue are material.

727.    ████████████████████████████████████████████████████

███████████████████████████ Sept. Duvdevani Decl. 124, Ex. 123 (STX0041362).

a. <u>StockX Response</u>:    Undisputed that Opp. PX 123 contains the quoted text. However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 123 (which is an internal document discussing the safe treatment of "Hazmat items" such a Lithium-Ion batteries) as misleading because Opp. PX 123 does not support Nike's assertion that "StockX repeatedly admitted that the Accused Advertising is extremely important to consumers that buy goods on its platform."   ECF 270 at 4 (citing this paragraph in support of its quoted assertion).  Opp. PX 123 does not discuss the advertising claims at issue or concern whether the alleged falsity in StockX's actual advertising claims influenced consumers' decisions to use StockX's platform.   StockX's Process includes far more than determining whether the product at issue is genuine.  DX 23, Huber Feb. Tr. 244:12–19 ("[E]very item that transacts on [the StockX] platform go[es] through [StockX's] authentication and verification process to correct for the potential areas of disappointment for a buyer:  wrong size, wrong color, wrong product, missing accessories, damages, manufacturing defect, other variances."); Opp. DX 48, Huber Feb. Tr. 60:15–20, 133:10–135:24 (StockX physically inspects every product sold on its platform); Opp. DX 18, Lopez Tr. 122:1–7 ███████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████; Opp. DX 48, Huber Feb. Tr. 21:11–22:24 (StockX employs Quality Assurance and AQA specialists to assist in instances in which a product issue is flagged); Opp. DX 48, Huber Feb. Tr. 21:11–22:24 ███████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████ Opp.

DX 18, Lopez Tr. 26:17–27:4 (███████████████████████████████

███████████████████████████████████████████████

████████████████ DX 110, STX0023851 at 856 (StockX uses proprietary

authentication software and techniques, including a Machine Learning Model

███████████████████████████████████████████████;

Opp. DX 40, Tucker Rep. ¶ 42 (StockX works to ensure "that only reliable buyers

and sellers use the platform" by suspending the accounts of "sellers who repeatedly

do not complete sales or send in items that fail verification.").  StockX accordingly

disputes the implication that this out-of-context statement proves that any of the

advertising claims at issue are material.

728.    ████████████████████████████████████████

█████████████████████████████████████ Sept. Duvdevani

Decl. ¶ 124, Ex. 123 (STX0092546 at 58).

    a.  <u>StockX Response</u>:  Disputed.  StockX disputes that Opp. PX 123 contains the

quoted text.  Undisputed that STX0092546, which is not included in Opp. PX 123,

contains the quoted text.  StockX further disputes Nike's characterization of, and

inferences purportedly drawn from, this quotation as misleading because Opp. PX

123 does not support Nike's assertion that "StockX repeatedly admitted that the

Accused Advertising is extremely important to consumers that buy goods on its

platform."  ECF 270 at 4 (citing this paragraph in support of its quoted assertion).

The above-quoted text in STX0092546 does not discuss the advertising claims at

issue or concern whether the alleged falsity in StockX's actual advertising claims influenced consumers' decisions to use StockX's platform. StockX's Process includes far more than determining whether the product at issue is genuine. DX 23, Huber Feb. Tr. 244:12–19 ("[E]very item that transacts on [the StockX] platform go[es] through [StockX's] authentication and verification process to correct for the potential areas of disappointment for a buyer: wrong size, wrong color, wrong product, missing accessories, damages, manufacturing defect, other variances."); Opp. DX 48, Huber Feb. Tr. 60:15–20, 133:10–135:24 (StockX physically inspects every product sold on its platform); Opp. DX 18, Lopez Tr. 122:1–7 (██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████; Opp. DX 48, Huber Feb. Tr. 21:11–22:24 (StockX employs Quality Assurance and AQA specialists to assist in instances in which a product issue is flagged); Opp. DX 48, Huber Feb. Tr. 21:11–22:24 (t████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████; Opp. DX 18, Lopez Tr. 26:17–27:4 (████████████████

████████████████████████████████████████████████

████████████████████████; DX 110, STX0023851 at 856 (StockX uses proprietary authentication software and techniques, including a Machine Learning Model ████████████████████████████████████████████████

██████; Opp. DX 40, Tucker Rep. ¶ 42 (StockX works to ensure "that only reliable

buyers and sellers use the platform" by suspending the accounts of "sellers who repeatedly do not complete sales or send in items that fail verification."). StockX accordingly disputes the implication that this out-of-context statement proves that any of the advertising claims at issue are material.

729.    On May 19, 2022, a StockX customer service representative responded to a consumer complaint stating: "Before StockX, authentication wasn't widely offered by secondary marketplaces and as a result, consumers didn't have much trust in the resale industry. That lack of trust is what inspired our co-founders to build the platform and establish a job function focused on authentication. Authentication has always been at the core of our experience and has long set the industry standard." Sept. Duvdevani Decl. ¶ 85, Ex. 84 STX0781129 at 132.

     a.    <u>StockX Response</u>: Undisputed that a StockX customer service representative sent the response referenced in Paragraph 339 and that Opp. PX 84 includes the quoted text. However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 84 as misleading because Paragraph 339 omits additional context necessary to understand the exhibit.

     b.    In addition to the quoted text, the StockX customer service representative stated, "Our authentication team members receive consistent training to ensure they remain experts in the field. In addition to this, we have a team of subject matter experts with knowledge of specific products that identify and track critical issues and information at the product and brand level. We also have an internal team that is dedicated to managing our proprietary information and ensuring the latest information and industry trends are accounted for in our systems. As part of our verification process, each item that passes through our facility receives a thorough

inspection prior to being sent on to the Buyer.  In instances where the item does not quite meet our quality standards - whether that be for manufacturing defects, deemed as worn or inauthentic, etc. - we will first attempt to link the Buyer with a new, comparable Seller when possible, and issue a full refund for the order when it is not.  We value our customers and we are committed to providing a safe, authentic marketplace to trade current culture."  Opp. PX 84 at 132.  The StockX customer service representative also stated, "If you ever receive an item that you don't believe to be 100% authentic or appears to have any damages or manufacturing defects, you are more than welcome to reach out to us. However, in order for your item to be eligible for a product complaint, we must be contacted within three days of receiving the item."  Opp. PX 84 at 134.  StockX further disputes that Nike has provided any evidence that any Nike product purchased via StockX by the customer that received the referenced email was inauthentic.

c.    StockX further disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 84 as misleading because StockX's Process includes far more than determining whether the product at issue is genuine.  DX 23, Huber Feb. Tr. 244:12–19 ("[E]very item that transacts on [the StockX] platform go[es] through [StockX's] authentication and verification process to correct for the potential areas of disappointment for a buyer:  wrong size, wrong color, wrong product, missing accessories, damages, manufacturing defect, other variances."); Opp. DX 48, Huber Feb. Tr. 60:15–20, 133:10–135:24 (StockX physically inspects every product sold on its platform); Opp. DX 18, Lopez Tr. 122:1–7 (█████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████ Opp. DX 48, Huber Feb. Tr.

21:11–22:24 (StockX employs Quality Assurance and AQA specialists to assist in

instances in which a product issue is flagged); Opp. DX 48, Huber Feb. Tr. 21:11–

22:24 (██████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████ Opp. DX 18, Lopez Tr. 26:17–27:4

(██████████████████████████████████████████████████

███████████████████████████████████████████████; DX

110, STX0023851 at 856 (StockX uses proprietary authentication software and

techniques, including a Machine Learning Model ██████████████████████

████████████████████████████; Opp. DX 40, Tucker Rep. ¶ 42

(StockX works to ensure "that only reliable buyers and sellers use the platform" by

suspending the accounts of "sellers who repeatedly do not complete sales or send

in items that fail verification."). StockX accordingly disputes the implication that

this out-of-context statement proves that any of the advertising claims at issue are

material.

730.    Mr. Fenton testified that "Authentication is at the core of the experience" means

"that it's been a value proposition of [StockX's] since its inception to – to do the very best [StockX]

can to ensure that customers get exactly what they want on the secondary market.  And that how

[StockX] grew [its] reputation in the community and it's very important to [StockX].  It's a key

part of [StockX's] offering and [StockX] take[s] it very seriously."  Sept. Duvdevani Decl. ¶ 86,

Ex. 85, Fenton Tr. 82:4-15 (reviewing *id.* ¶ 112, Ex. 111 at STX0020185).

a. <u>StockX Response</u>:  Undisputed that Mr. Fenton provided the quoted testimony. However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 85 as misleading because the above-quoted testimony did not relate to any of the advertising claims at issue.  In addition, StockX's Process includes far more than determining whether the product at issue is genuine.  DX 23, Huber Feb. Tr. 244:12–19 ("[E]very item that transacts on [the StockX] platform go[es] through [StockX's] authentication and verification process to correct for the potential areas of disappointment for a buyer:  wrong size, wrong color, wrong product, missing accessories, damages, manufacturing defect, other variances."); Opp. DX 48, Huber Feb. Tr. 60:15–20, 133:10–135:24 (StockX physically inspects every product sold on its platform); Opp. DX 18, Lopez Tr. 122:1–7 ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████; Opp. DX 48, Huber Feb. Tr. 21:11–22:24 (StockX employs Quality Assurance and AQA specialists to assist in instances in which a product issue is flagged); Opp. DX 48, Huber Feb. Tr. 21:11–22:24 (████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████; Opp. DX 18, Lopez Tr. 26:17–27:4 (████████████

████████████████████████████████████████████████

██████████████████████████; DX 110, STX0023851 at 856 (StockX uses proprietary authentication software and techniques, including a Machine Learning

Model █████████████████████████████████████

██████ Opp. DX 40, Tucker Rep. ¶ 42 (StockX works to ensure "that only reliable buyers and sellers use the platform" by suspending the accounts of "sellers who repeatedly do not complete sales or send in items that fail verification."). StockX accordingly disputes the implication that this out-of-context statement proves that any of the advertising claims at issue are material.

731. Mr. Fenton testified that "StockX set the industry standard" means "before [StockX] there wasn't a concept of sneaker authenticators. [StockX] set that industry standard." Sept. Duvdevani Decl. ¶ 86, Ex. 85, Fenton Tr. 82:16-21 (reviewing *id.* ¶ 112, Ex. 111 at STX0020185).

    a. <u>StockX Response</u>: Undisputed that Mr. Fenton provided the quoted testimony. However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 85 as misleading because the above-quoted testimony not relate to any of the advertising claims at issue. StockX disputes the implication that this out-of-context statement proves that any of the advertising claims at issue are material. The fact that StockX has authenticators that verify each shoe sold on the platform does not imply or demonstrate that any of the specific advertising claims at issue are material to consumers. StockX's Process consists of far more than assessing whether a product is genuine, as it instead is a comprehensive process designed to evaluate whether a product meets StockX's rigorous standards. Opp. DX 48, Huber Feb. Tr. 60:15–20, 133:10–135:24 (StockX physically inspects every product sold on its platform); Opp. DX 18, Lopez Tr. 122:1–7 (██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ Opp. DX 48, Huber Feb. Tr.

21:11–22:24 (StockX employs Quality Assurance and AQA specialists to assist in

instances in which a product issue is flagged); Opp. DX 48, Huber Feb. Tr. 21:11–

22:24 (████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ Opp. DX 18, Lopez Tr. 26:17–27:4

████████████████████████████████████████████████████████

████████████████████████████████████████████; DX

110, STX0023851 at 856 (StockX uses proprietary authentication software and

techniques, including a Machine Learning Model ████████████████████

████████████████████████████████; Opp. DX 40, Tucker Rep. ¶ 42

(StockX works to ensure "that only reliable buyers and sellers use the platform" by

suspending the accounts of "sellers who repeatedly do not complete sales or send

in items that fail verification.").

732.    One respondent to Ms. Butler's survey answered that they were likely to purchase

sneakers from the StockX website because "The authenticity is guaranteed, the most wanted pairs

are in this platform, negotiate is so easy and I'm protected as buyer. Purchase sneakers here will

satisfactory for me." Sept. Duvdevani Decl. ¶ 125, Ex. 124, Ex. G to Butler Report.

     a.  <u>StockX Response</u>:  Undisputed that a respondent to Ms. Butler's survey provided

        the quoted response.  However, StockX disputes Nike's characterization of, and

        inferences purportedly drawn from, Opp. PX 124, as misleading because Paragraph

342 omits additional context necessary to understand the results of Ms. Butler's survey.

b.  Ms. Butler conducted a purchase intent survey focusing on challenged statements on StockX's website.  DX 119, Butler Rep. ¶¶ 9, 10.  Ms. Butler surveyed consumers that had purchased sneakers from StockX since 2020 or indicated that they would consider purchasing sneakers from StockX in the next year.  *Id.* ¶ 10.  Ms. Butler showed her control group the same webpages, but with the specific claims at issue replaced with unobjectionable language.  *Id.* ¶ 35.  A total of 22.3% of respondents in the test group of Ms. Butler's survey noted that the StockX site was trustworthy, offered authentic products, or provided a guarantee, whereas a total of 20.7% of respondents in the control group of Ms. Butler's survey noted that the StockX site was trustworthy, offered authentic or "inspected" products, or provided a guarantee.  *Id.* ¶¶ 10, 41.  Based on the results of her survey, Ms. Butler concluded that "[a] statistically equivalent number of respondents indicated that they are likely to purchase a pair of sneakers from StockX when the pages included statements related to 'authentication' (Test Group) as compared to pages describing 'inspection' (Control Group))."  *Id.* ¶ 10.  Ms. Butler testified that her survey results showed the advertising claims had no impact on consumer purchasing behavior or consumers' willingness to purchase a pair of sneakers on the StockX platform.  Reply DX 9, Butler Tr. 58:23–59:1, 62:19–63:3, 83:9–14.

c.  The fact that a handful of respondents in both the test and control groups mentioned authenticity does not change the fact that the results of the survey as a whole establish that the allegedly false Authentication Statements do not have a material

impact on consumers' likelihood of using the website to purchase a pair of sneakers. DX 119, Butler Rep. ¶ 10.  Indeed, many respondents to the survey in both the test and control groups answered that they were likely to purchase sneakers from the StockX website for reasons that had nothing to do with the claims at issue.  *Id.* at ¶¶ 10, 40. These reasons include:

 i. The site layout and design (e.g., "I liked the interface of the website it was easy to look for information and really well-organized also it seems really user-friendly." Opp. PX 124 at BW16; "I love the site layout." *Id.* at BW73; "Very stylish website design." *Id.* at BW389; "I like the design of the website." *Id.* at 391);

 ii. Ease of use (e.g., "Ease of navigation with clear well detailed contents and information." *Id.* at BW322; "It seems easy to navigate and I would find what I am looking for quickly." *Id.* at BW337);

 iii. Good prices (e.g., "nice selection variety andd good prices." *Id.* at BW34; "Very nice stuff and great price" *Id.* at BW285);

 iv. Good customer service (e.g., "Because i love how stockx deals with customers." *Id.* at BW58); ". . .their customer service is top-tier fr." *Id.* at BW410);

 v. Fast delivery (e.g., "I've already used it they have a good delivery time and their prices are always good." *Id.* at BW373);

 vi. The variety of products available (e.g., "It has a huge variety of sneakers." *Id.* at BW59; "I love the selection of shoes. . ." *Id.* at BW132; "They have a large selection." *Id.* at BW315);

vii.   The bid-ask system (e.g., "Being able to bid means i might get a better price." *Id.* at BW35; "I like their website format and the fact you can not only just buy them with the specific price but u can also bid them making it more of a deal." *Id.* at BW252; "Due to the auction mechanism, the market price is transparent and fair. . ." *Id.* at BW282);

viii.   The inclusion of past price data (e.g., "I like the prices and how how the sales values are tracked over time." *Id.* at BW83; "Gives lots of details and price history of all products." *Id.* at BW256; "I like that it shows the price over time." *Id.* at BW284);

ix.   And a combination of the above (e.g., "[StockX] has a lot of variety in options.  I saw a ton of different brands that I would be interested in and the prices were great.  I liked how clear and easy to use the website is, including the fees charged, and the process for bidding and purchasing." *Id.* at BW145; "I believe the likelihood of me using this website to purchase a pair of sneakers would be 7 on the 7-point scale due to the user-friendly interface, the wide selection of products and styles, the competitive pricing, and the convenient shipping." *Id.* at BW173; "Easy to find desired products, good pricing, variety of products and variety of size." *Id.* at 185).

733.   One respondent to Ms. Butler's survey answered that they were likely to purchase sneakers from the StockX website because "Seems very trustworthy with the number of authenticators that it has. Some of the pages are cluttered with too many product options." Sept. Duvdevani Decl. ¶ 125, Ex. 124, Ex. G to Butler Report.

a. <u>StockX Response</u>:  Undisputed that a respondent to Ms. Butler's survey provided the quoted response.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 124, as misleading because Paragraph 343 omits additional context necessary to understand the results of Ms. Butler's survey.

b. Ms. Butler conducted a purchase intent survey focusing on challenged statements on StockX's website.  DX 119, Butler Rep. ¶¶ 9, 10.  Ms. Butler surveyed consumers that had purchased sneakers from StockX since 2020 or indicated that they would consider purchasing sneakers from StockX in the next year.  *Id.* ¶ 10.  Ms. Butler showed her control group the same webpages, but with the specific claims at issue replaced with unobjectionable language.  *Id.* ¶ 35.  A total of 22.3% of respondents in the test group of Ms. Butler's survey noted that the StockX site was trustworthy, offered authentic products, or provided a guarantee, whereas a total of 20.7% of respondents in the control group of Ms. Butler's survey noted that the StockX site was trustworthy, offered authentic or "inspected" products, or provided a guarantee.  *Id.* ¶¶ 10, 41.  Based on the results of her survey, Ms. Butler concluded that "[a] statistically equivalent number of respondents indicated that they are likely to purchase a pair of sneakers from StockX when the pages included statements related to 'authentication' (Test Group) as compared to pages describing 'inspection' (Control Group))."  *Id.* ¶ 10.  Ms. Butler testified that her survey results showed the advertising claims had no impact on consumer purchasing behavior or consumers' willingness to purchase a pair of sneakers on the StockX platform. Reply DX 9, Butler Tr. 58:23–59:1, 62:19–63:3, 83:9–14.

c. The fact that a handful of respondents in both the test and control groups mentioned authenticity does not change the fact that the results of the survey as a whole establish that the allegedly false Authentication Statements do not have a material impact on consumers' likelihood of using the website to purchase a pair of sneakers. DX 119, Butler Rep. ¶ 10. Indeed, many respondents to the survey in both the test and control groups answered that they were likely to purchase sneakers from the StockX website for reasons that had nothing to do with the claims at issue. *Id.* at ¶¶ 10, 40; *see supra* ¶ 342.

734. One respondent to Ms. Butler's survey answered that they were likely to purchase sneakers from the StockX website because "I love the authenticity guarantee. Then the market price graph is phenomenal. I've never seen it. I'm sure it's been used before but new to me and highly helpful information." Sept. Duvdevani Decl. ¶ 125, Ex. 124, Ex. G to Butler Report.

a. <u>StockX Response</u>: Undisputed that a respondent to Ms. Butler's survey provided the quoted response. However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 124, as misleading because Paragraph 344 omits additional context necessary to understand the results of Ms. Butler's survey.

b. Ms. Butler conducted a purchase intent survey focusing on challenged statements on StockX's website. DX 119, Butler Rep. ¶¶ 9, 10. Ms. Butler surveyed consumers that had purchased sneakers from StockX since 2020 or indicated that they would consider purchasing sneakers from StockX in the next year. *Id.* ¶ 10. Ms. Butler showed her control group the same webpages, but with the specific claims at issue replaced with unobjectionable language. *Id.* ¶ 35. A total of 22.3%

of respondents in the test group of Ms. Butler's survey noted that the StockX site was trustworthy, offered authentic products, or provided a guarantee, whereas a total of 20.7% of respondents in the control group of Ms. Butler's survey noted that the StockX site was trustworthy, offered authentic or "inspected" products, or provided a guarantee. *Id.* ¶¶ 10, 41. Based on the results of her survey, Ms. Butler concluded that "[a] statistically equivalent number of respondents indicated that they are likely to purchase a pair of sneakers from StockX when the pages included statements related to 'authentication' (Test Group) as compared to pages describing 'inspection' (Control Group))." *Id.* ¶ 10. Ms. Butler testified that her survey results showed the advertising claims had no impact on consumer purchasing behavior or consumers' willingness to purchase a pair of sneakers on the StockX platform. Reply DX 9, Butler Tr. 58:23–59:1, 62:19–63:3, 83:9–14.

c.  The fact that a handful of respondents in both the test and control groups mentioned authenticity does not change the fact that the results of the survey as a whole establish that the allegedly false Authentication Statements do not have a material impact on consumers' likelihood of using the website to purchase a pair of sneakers. DX 119, Butler Rep. ¶ 10. Indeed, many respondents to the survey in both the test and control groups answered that they were likely to purchase sneakers from the StockX website for reasons that had nothing to do with the claims at issue. *Id.* at ¶¶ 10, 40; *see supra* ¶ 342.

735.  One respondent to Ms. Butler's survey answered that they were likely to purchase sneakers from the StockX website because "It is reassuring to see a wide variety of items in stock

and they are authenticated by the vendor." Sept. Duvdevani Decl. ¶ 125, Ex. 124, Ex. G to Butler Report.

    a.  <u>StockX Response</u>:  Undisputed that a respondent to Ms. Butler's survey provided the quoted response.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 124, as misleading because Paragraph 345 omits additional context necessary to understand the results of Ms. Butler's survey.

    b.  Ms. Butler conducted a purchase intent survey focusing on challenged statements on StockX's website.  DX 119, Butler Rep. ¶¶ 9, 10.  Ms. Butler surveyed consumers that had purchased sneakers from StockX since 2020 or indicated that they would consider purchasing sneakers from StockX in the next year.  *Id.* ¶ 10.  Ms. Butler showed her control group the same webpages, but with the specific claims at issue replaced with unobjectionable language.  *Id.* ¶ 35.  A total of 22.3% of respondents in the test group of Ms. Butler's survey noted that the StockX site was trustworthy, offered authentic products, or provided a guarantee, whereas a total of 20.7% of respondents in the control group of Ms. Butler's survey noted that the StockX site was trustworthy, offered authentic or "inspected" products, or provided a guarantee.  *Id.* ¶¶ 10, 41.  Based on the results of her survey, Ms. Butler concluded that "[a] statistically equivalent number of respondents indicated that they are likely to purchase a pair of sneakers from StockX when the pages included statements related to 'authentication' (Test Group) as compared to pages describing 'inspection' (Control Group))."  *Id.* ¶ 10.  Ms. Butler testified that her survey results showed the advertising claims had no impact on consumer purchasing behavior or

589

consumers' willingness to purchase a pair of sneakers on the StockX platform. Reply DX 9, Butler Tr. 58:23–59:1, 62:19–63:3, 83:9–14.

c.   The fact that a handful of respondents in both the test and control groups mentioned authenticity does not change the fact that the results of the survey as a whole establish that the allegedly false Authentication Statements do not have a material impact on consumers' likelihood of using the website to purchase a pair of sneakers. DX 119, Butler Rep. ¶ 10.  Indeed, many respondents to the survey in both the test and control groups answered that they were likely to purchase sneakers from the StockX website for reasons that had nothing to do with the claims at issue.  *Id.* at ¶¶ 10, 40; *see supra* ¶ 342.

736.   One respondent to Ms. Butler's survey answered that they were likely to purchase sneakers from the StockX website because "They offer limited/hard to find sneakers that I'm interested in buying. I also like that I can trust I'm getting real shoes with Stockx."  Sept. Duvdevani Decl. ¶ 125, Ex. 124, Ex. G to Butler Report.

a.   StockX Response:  Undisputed that a respondent to Ms. Butler's survey provided the quoted response.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 124, as misleading because Paragraph 346 omits additional context necessary to understand the results of Ms. Butler's survey.

b.   Ms. Butler conducted a purchase intent survey focusing on challenged statements on StockX's website.   DX 119, Butler Rep. ¶¶ 9, 10.   Ms. Butler surveyed consumers that had purchased sneakers from StockX since 2020 or indicated that they would consider purchasing sneakers from StockX in the next year.  *Id.* ¶ 10.

Ms. Butler showed her control group the same webpages, but with the specific claims at issue replaced with unobjectionable language. *Id.* ¶ 35. A total of 22.3% of respondents in the test group of Ms. Butler's survey noted that the StockX site was trustworthy, offered authentic products, or provided a guarantee, whereas a total of 20.7% of respondents in the control group of Ms. Butler's survey noted that the StockX site was trustworthy, offered authentic or "inspected" products, or provided a guarantee. *Id.* ¶¶ 10, 41. Based on the results of her survey, Ms. Butler concluded that "[a] statistically equivalent number of respondents indicated that they are likely to purchase a pair of sneakers from StockX when the pages included statements related to 'authentication' (Test Group) as compared to pages describing 'inspection' (Control Group))." *Id.* ¶ 10. Ms. Butler testified that her survey results showed the advertising claims had no impact on consumer purchasing behavior or consumers' willingness to purchase a pair of sneakers on the StockX platform. Reply DX 9, Butler Tr. 58:23–59:1, 62:19–63:3, 83:9–14.

c.  The fact that a handful of respondents in both the test and control groups mentioned authenticity does not change the fact that the results of the survey as a whole establish that the allegedly false Authentication Statements do not have a material impact on consumers' likelihood of using the website to purchase a pair of sneakers. *Id.* ¶ 10. Indeed, many respondents to the survey in both the test and control groups answered that they were likely to purchase sneakers from the StockX website for reasons that had nothing to do with the claims at issue. *Id.* at ¶¶ 10, 40; *see supra* ¶ 342.

737.    One respondent to Ms. Butler's survey answered that they were likely to purchase sneakers from the StockX website because "Because I believe that they are authentic and I can buy at a good price."  Sept. Duvdevani Decl. ¶ 125, Ex. 124, Ex. G to Butler Report.

a.  <u>StockX Response</u>:  Undisputed that a respondent to Ms. Butler's survey provided the quoted response.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 124, as misleading because Paragraph 347 omits additional context necessary to understand the results of Ms. Butler's survey.

b.  Ms. Butler conducted a purchase intent survey focusing on challenged statements on StockX's website.  DX 119, Butler Rep. ¶¶ 9, 10.  Ms. Butler surveyed consumers that had purchased sneakers from StockX since 2020 or indicated that they would consider purchasing sneakers from StockX in the next year.  *Id.* ¶ 10.  Ms. Butler showed her control group the same webpages, but with the specific claims at issue replaced with unobjectionable language.  *Id.* ¶ 35.  A total of 22.3% of respondents in the test group of Ms. Butler's survey noted that the StockX site was trustworthy, offered authentic products, or provided a guarantee, whereas a total of 20.7% of respondents in the control group of Ms. Butler's survey noted that the StockX site was trustworthy, offered authentic or "inspected" products, or provided a guarantee.  *Id.* ¶¶ 10, 41.  Based on the results of her survey, Ms. Butler concluded that "[a] statistically equivalent number of respondents indicated that they are likely to purchase a pair of sneakers from StockX when the pages included statements related to 'authentication' (Test Group) as compared to pages describing 'inspection' (Control Group))."  *Id.* ¶ 10.  Ms. Butler testified that her survey results

showed the advertising claims had no impact on consumer purchasing behavior or consumers' willingness to purchase a pair of sneakers on the StockX platform. Reply DX 9, Butler Tr. 58:23–59:1, 62:19–63:3, 83:9–14.

c.  The fact that a handful of respondents in both the test and control groups mentioned authenticity does not change the fact that the results of the survey as a whole establish that the allegedly false Authentication Statements do not have a material impact on consumers' likelihood of using the website to purchase a pair of sneakers. DX 119, Butler Rep. ¶ 10.  Indeed, many respondents to the survey in both the test and control groups answered that they were likely to purchase sneakers from the StockX website for reasons that had nothing to do with the claims at issue.  *Id.* at ¶¶ 10, 40; *see supra* ¶ 342.

738.  One respondent to Ms. Butler's survey answered that they were likely to purchase sneakers from the StockX website because "The likelihood of using this site is good because the shoes are authentic."  Sept. Duvdevani Decl. ¶ 125, Ex. 124, Ex. G to Butler Report.

a.  StockX Response:  Undisputed that a respondent to Ms. Butler's survey provided the quoted response.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 124, as misleading because Paragraph 348 omits additional context necessary to understand the results of Ms. Butler's survey.

b.  Ms. Butler conducted a purchase intent survey focusing on challenged statements on StockX's website.  DX 119, Butler Rep. ¶¶ 9, 10.  Ms. Butler surveyed consumers that had purchased sneakers from StockX since 2020 or indicated that they would consider purchasing sneakers from StockX in the next year.  *Id.* ¶ 10.

Ms. Butler showed her control group the same webpages, but with the specific claims at issue replaced with unobjectionable language. *Id.* ¶ 35. A total of 22.3% of respondents in the test group of Ms. Butler's survey noted that the StockX site was trustworthy, offered authentic products, or provided a guarantee, whereas a total of 20.7% of respondents in the control group of Ms. Butler's survey noted that the StockX site was trustworthy, offered authentic or "inspected" products, or provided a guarantee. *Id.* ¶¶ 10, 41. Based on the results of her survey, Ms. Butler concluded that "[a] statistically equivalent number of respondents indicated that they are likely to purchase a pair of sneakers from StockX when the pages included statements related to 'authentication' (Test Group) as compared to pages describing 'inspection' (Control Group))." *Id.* ¶ 10. Ms. Butler testified that her survey results showed the advertising claims had no impact on consumer purchasing behavior or consumers' willingness to purchase a pair of sneakers on the StockX platform. Reply DX 9, Butler Tr. 58:23–59:1, 62:19–63:3, 83:9–14.

c. The fact that a handful of respondents in both the test and control groups mentioned authenticity does not change the fact that the results of the survey as a whole establish that the allegedly false Authentication Statements do not have a material impact on consumers' likelihood of using the website to purchase a pair of sneakers. DX 119, Butler Rep. ¶ 10. Indeed, many respondents to the survey in both the test and control groups answered that they were likely to purchase sneakers from the StockX website for reasons that had nothing to do with the claims at issue. *Id.* at ¶¶ 10, 40; *see supra* ¶ 342.

739.    One respondent to Ms. Butler's survey answered that they were likely to purchase sneakers from the StockX website because "Because StockX is a reliable site due to all the authentication processes." Sept. Duvdevani Decl. ¶ 125, Ex. 124, Ex. G to Butler Report.

a.    <u>StockX Response</u>:  Undisputed that a respondent to Ms. Butler's survey provided the quoted response.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 124, as misleading because Paragraph 349 omits additional context necessary to understand the results of Ms. Butler's survey.

b.    Ms. Butler conducted a purchase intent survey focusing on challenged statements on StockX's website.  DX 119, Butler Rep. ¶¶ 9, 10.  Ms. Butler surveyed consumers that had purchased sneakers from StockX since 2020 or indicated that they would consider purchasing sneakers from StockX in the next year.  *Id.* ¶ 10. Ms. Butler showed her control group the same webpages, but with the specific claims at issue replaced with unobjectionable language.  *Id.* ¶ 35.  A total of 22.3% of respondents in the test group of Ms. Butler's survey noted that the StockX site was trustworthy, offered authentic products, or provided a guarantee, whereas a total of 20.7% of respondents in the control group of Ms. Butler's survey noted that the StockX site was trustworthy, offered authentic or "inspected" products, or provided a guarantee.  *Id.* ¶¶ 10, 41.  Based on the results of her survey, Ms. Butler concluded that "[a] statistically equivalent number of respondents indicated that they are likely to purchase a pair of sneakers from StockX when the pages included statements related to 'authentication' (Test Group) as compared to pages describing 'inspection' (Control Group))."  *Id.* ¶ 10.  Ms. Butler testified that her survey results

showed the advertising claims had no impact on consumer purchasing behavior or consumers' willingness to purchase a pair of sneakers on the StockX platform. Reply DX 9, Butler Tr. 58:23–59:1, 62:19–63:3, 83:9–14.

c.   The fact that a handful of respondents in both the test and control groups mentioned authenticity does not change the fact that the results of the survey as a whole establish that the allegedly false Authentication Statements do not have a material impact on consumers' likelihood of using the website to purchase a pair of sneakers. DX 119, Butler Rep. ¶ 10.  Indeed, many respondents to the survey in both the test and control groups answered that they were likely to purchase sneakers from the StockX website for reasons that had nothing to do with the claims at issue.  *Id.* at ¶¶ 10, 40; *see supra* ¶ 342.

740.   One respondent to Ms. Butler's survey answered that they were likely to purchase sneakers from the StockX website because "Because the shoes are authentic and real."  Sept. Duvdevani Decl. ¶ 125, Ex. 124, Ex. G to Butler Report.

a.   <u>StockX Response</u>:  Undisputed that a respondent to Ms. Butler's survey provided the quoted response.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 124, as misleading because Paragraph 350 omits additional context necessary to understand the results of Ms. Butler's survey.

b.   Ms. Butler conducted a purchase intent survey focusing on challenged statements on StockX's website.  DX 119, Butler Rep. ¶¶ 9, 10.  Ms. Butler surveyed consumers that had purchased sneakers from StockX since 2020 or indicated that they would consider purchasing sneakers from StockX in the next year.  *Id.* ¶ 10.

Ms. Butler showed her control group the same webpages, but with the specific claims at issue replaced with unobjectionable language. *Id.* ¶ 35. A total of 22.3% of respondents in the test group of Ms. Butler's survey noted that the StockX site was trustworthy, offered authentic products, or provided a guarantee, whereas a total of 20.7% of respondents in the control group of Ms. Butler's survey noted that the StockX site was trustworthy, offered authentic or "inspected" products, or provided a guarantee. *Id.* ¶¶ 10, 41. Based on the results of her survey, Ms. Butler concluded that "[a] statistically equivalent number of respondents indicated that they are likely to purchase a pair of sneakers from StockX when the pages included statements related to 'authentication' (Test Group) as compared to pages describing 'inspection' (Control Group))." *Id.* ¶ 10. Ms. Butler testified that her survey results showed the advertising claims had no impact on consumer purchasing behavior or consumers' willingness to purchase a pair of sneakers on the StockX platform. Reply DX 9, Butler Tr. 58:23–59:1, 62:19–63:3, 83:9–14.

c.  The fact that a handful of respondents in both the test and control groups mentioned authenticity does not change the fact that the results of the survey as a whole establish that the allegedly false Authentication Statements do not have a material impact on consumers' likelihood of using the website to purchase a pair of sneakers. DX 119, Butler Rep. ¶ 10. Indeed, many respondents to the survey in both the test and control groups answered that they were likely to purchase sneakers from the StockX website for reasons that had nothing to do with the claims at issue. *Id.* at ¶¶ 10, 40; *see supra* ¶ 342.

741.    One respondent to Ms. Butler's survey answered that they were likely to purchase sneakers from the StockX website because "Everything on the website is organized in a way where you can easily find what you want. I also like that they guarantee authenticity so you don't have to worry about buying fake products."  Sept. Duvdevani Decl. ¶ 125, Ex. 124, Ex. G to Butler Report.

a.    <u>StockX Response</u>:  Undisputed that a respondent to Ms. Butler's survey provided the quoted response.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 124, as misleading because Paragraph 351 omits additional context necessary to understand the results of Ms. Butler's survey.

b.    Ms. Butler conducted a purchase intent survey focusing on challenged statements on StockX's website.  DX 119, Butler Rep. ¶¶ 9, 10.  Ms. Butler surveyed consumers that had purchased sneakers from StockX since 2020 or indicated that they would consider purchasing sneakers from StockX in the next year.  *Id.* ¶ 10. Ms. Butler showed her control group the same webpages, but with the specific claims at issue replaced with unobjectionable language.  *Id.* ¶ 35.  A total of 22.3% of respondents in the test group of Ms. Butler's survey noted that the StockX site was trustworthy, offered authentic products, or provided a guarantee, whereas a total of 20.7% of respondents in the control group of Ms. Butler's survey noted that the StockX site was trustworthy, offered authentic or "inspected" products, or provided a guarantee.  *Id.* ¶¶ 10, 41.  Based on the results of her survey, Ms. Butler concluded that "[a] statistically equivalent number of respondents indicated that they are likely to purchase a pair of sneakers from StockX when the pages included

statements related to 'authentication' (Test Group) as compared to pages describing 'inspection' (Control Group))." *Id.* ¶ 10.  Ms. Butler testified that her survey results showed the advertising claims had no impact on consumer purchasing behavior or consumers' willingness to purchase a pair of sneakers on the StockX platform. Reply DX 9, Butler Tr. 58:23–59:1, 62:19–63:3, 83:9–14.

    c.    The fact that a handful of respondents in both the test and control groups mentioned authenticity does not change the fact that the results of the survey as a whole establish that the allegedly false Authentication Statements do not have a material impact on consumers' likelihood of using the website to purchase a pair of sneakers. DX 119, Butler Rep. ¶ 10.  Indeed, many respondents to the survey in both the test and control groups answered that they were likely to purchase sneakers from the StockX website for reasons that had nothing to do with the claims at issue.  *Id.* at ¶¶ 10, 40; *see supra* ¶ 342.

742.    One respondent to Ms. Butler's survey answered that they were likely to purchase sneakers from the StockX website because "I like the fact that they're authentic and the actual verification is authentic on the site."  Sept. Duvdevani Decl. ¶ 125, Ex. 124, Ex. G to Butler Report.

    a.    <u>StockX Response</u>:  Undisputed that a respondent to Ms. Butler's survey provided the quoted response.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 124, as misleading because Paragraph 352 omits additional context necessary to understand the results of Ms. Butler's survey.

    b.    Ms. Butler conducted a purchase intent survey focusing on challenged statements on StockX's website.  Opp. PX 124, Butler Rep. ¶¶ 9, 10.  Ms. Butler surveyed

consumers that had purchased sneakers from StockX since 2020 or indicated that they would consider purchasing sneakers from StockX in the next year. *Id.* ¶ 10. Ms. Butler showed her control group the same webpages, but with the specific claims at issue replaced with unobjectionable language. *Id.* ¶ 35. A total of 22.3% of respondents in the test group of Ms. Butler's survey noted that the StockX site was trustworthy, offered authentic products, or provided a guarantee, whereas a total of 20.7% of respondents in the control group of Ms. Butler's survey noted that the StockX site was trustworthy, offered authentic or "inspected" products, or provided a guarantee. *Id.* ¶¶ 10, 41. Based on the results of her survey, Ms. Butler concluded that "[a] statistically equivalent number of respondents indicated that they are likely to purchase a pair of sneakers from StockX when the pages included statements related to 'authentication' (Test Group) as compared to pages describing 'inspection' (Control Group))." *Id.* ¶ 10. Ms. Butler testified that her survey results showed the advertising claims had no impact on consumer purchasing behavior or consumers' willingness to purchase a pair of sneakers on the StockX platform. Reply DX 9, Butler Tr. 58:23–59:1, 62:19–63:3, 83:9–14.

c.  The fact that a handful of respondents in both the test and control groups mentioned authenticity does not change the fact that the results of the survey as a whole establish that the allegedly false Authentication Statements do not have a material impact on consumers' likelihood of using the website to purchase a pair of sneakers. DX 119, Butler Rep. ¶ 10. Indeed, many respondents to the survey in both the test and control groups answered that they were likely to purchase sneakers from the

StockX website for reasons that had nothing to do with the claims at issue. *Id.* at ¶¶ 10, 40; *see supra* ¶ 342.

743.   One respondent to Ms. Butler's survey answered that they were likely to purchase sneakers from the StockX website because "i like that they verify aithenticity [sic] for added peace of mind." Sept. Duvdevani Decl. ¶ 125, Ex. 124, Ex. G to Butler Report.

    a.   <u>StockX Response</u>:   Undisputed that a respondent to Ms. Butler's survey provided the quoted response.   However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 124, as misleading because Paragraph 353 omits additional context necessary to understand the results of Ms. Butler's survey.

    b.   Ms. Butler conducted a purchase intent survey focusing on challenged statements on StockX's website.   DX 119, Butler Rep. ¶¶ 9, 10.   Ms. Butler surveyed consumers that had purchased sneakers from StockX since 2020 or indicated that they would consider purchasing sneakers from StockX in the next year. *Id.* ¶ 10. Ms. Butler showed her control group the same webpages, but with the specific claims at issue replaced with unobjectionable language. *Id.* ¶ 35.   A total of 22.3% of respondents in the test group of Ms. Butler's survey noted that the StockX site was trustworthy, offered authentic products, or provided a guarantee, whereas a total of 20.7% of respondents in the control group of Ms. Butler's survey noted that the StockX site was trustworthy, offered authentic or "inspected" products, or provided a guarantee. *Id.* ¶¶ 10, 41.   Based on the results of her survey, Ms. Butler concluded that "[a] statistically equivalent number of respondents indicated that they are likely to purchase a pair of sneakers from StockX when the pages included

statements related to 'authentication' (Test Group) as compared to pages describing 'inspection' (Control Group))." *Id.* ¶ 10.  Ms. Butler testified that her survey results showed the advertising claims had no impact on consumer purchasing behavior or consumers' willingness to purchase a pair of sneakers on the StockX platform. Reply DX 9, Butler Tr. 58:23–59:1, 62:19–63:3, 83:9–14.

    c.    The fact that a handful of respondents in both the test and control groups mentioned authenticity does not change the fact that the results of the survey as a whole establish that the allegedly false Authentication Statements do not have a material impact on consumers' likelihood of using the website to purchase a pair of sneakers. DX 119, Butler Rep. ¶ 10.  Indeed, many respondents to the survey in both the test and control groups answered that they were likely to purchase sneakers from the StockX website for reasons that had nothing to do with the claims at issue.  *Id.* at ¶¶ 10, 40; *see supra* ¶ 342.

744.    One respondent to Ms. Butler's survey answered that they were likely to purchase sneakers from the StockX website because "I love buying from this site because I can trust everything is legit and not fake. Also it's simple to use."  Sept. Duvdevani Decl. ¶ 125, Ex. 124. Ex. G to Butler Report.

    a.    <u>StockX Response</u>:  Undisputed that a respondent to Ms. Butler's survey provided the quoted response.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 124, as misleading because Paragraph 354 omits additional context necessary to understand the results of Ms. Butler's survey.

b. Ms. Butler conducted a purchase intent survey focusing on challenged statements on StockX's website. DX 119, Butler Rep. ¶¶ 9, 10. Ms. Butler surveyed consumers that had purchased sneakers from StockX since 2020 or indicated that they would consider purchasing sneakers from StockX in the next year. *Id.* ¶ 10. Ms. Butler showed her control group the same webpages, but with the specific claims at issue replaced with unobjectionable language. *Id.* ¶ 35. A total of 22.3% of respondents in the test group of Ms. Butler's survey noted that the StockX site was trustworthy, offered authentic products, or provided a guarantee, whereas a total of 20.7% of respondents in the control group of Ms. Butler's survey noted that the StockX site was trustworthy, offered authentic or "inspected" products, or provided a guarantee. *Id.* ¶¶ 10, 41. Based on the results of her survey, Ms. Butler concluded that "[a] statistically equivalent number of respondents indicated that they are likely to purchase a pair of sneakers from StockX when the pages included statements related to 'authentication' (Test Group) as compared to pages describing 'inspection' (Control Group))." *Id.* ¶ 10. Ms. Butler testified that her survey results showed the advertising claims had no impact on consumer purchasing behavior or consumers' willingness to purchase a pair of sneakers on the StockX platform. Reply DX 9, Butler Tr. 58:23–59:1, 62:19–63:3, 83:9–14.

c. The fact that a handful of respondents in both the test and control groups mentioned authenticity does not change the fact that the results of the survey as a whole establish that the allegedly false Authentication Statements do not have a material impact on consumers' likelihood of using the website to purchase a pair of sneakers. DX 119, Butler Rep. ¶ 10. Indeed, many respondents to the survey in both the test

and control groups answered that they were likely to purchase sneakers from the StockX website for reasons that had nothing to do with the claims at issue. *Id.* at ¶¶ 10, 40; *see supra* ¶ 342.

745.    One respondent to Ms. Butler's survey answered that they were likely to purchase sneakers from the StockX website because "Big selection and authentic guarentee [sic]." Sept. Duvdevani Decl. ¶ 125, Ex. 124, Ex. G to Butler Report.

    a.   <u>StockX Response</u>:  Undisputed that a respondent to Ms. Butler's survey provided the quoted response.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 124, as misleading because Paragraph 355 omits additional context necessary to understand the results of Ms. Butler's survey.

    b.   Ms. Butler conducted a purchase intent survey focusing on challenged statements on StockX's website.  DX 119, Butler Rep. ¶¶ 9, 10.  Ms. Butler surveyed consumers that had purchased sneakers from StockX since 2020 or indicated that they would consider purchasing sneakers from StockX in the next year. *Id.* ¶ 10. Ms. Butler showed her control group the same webpages, but with the specific claims at issue replaced with unobjectionable language. *Id.* ¶ 35.  A total of 22.3% of respondents in the test group of Ms. Butler's survey noted that the StockX site was trustworthy, offered authentic products, or provided a guarantee, whereas a total of 20.7% of respondents in the control group of Ms. Butler's survey noted that the StockX site was trustworthy, offered authentic or "inspected" products, or provided a guarantee. *Id.* ¶¶ 10, 41.  Based on the results of her survey, Ms. Butler concluded that "[a] statistically equivalent number of respondents indicated that

they are likely to purchase a pair of sneakers from StockX when the pages included statements related to 'authentication' (Test Group) as compared to pages describing 'inspection' (Control Group))." *Id.* ¶ 10.  Ms. Butler testified that her survey results showed the advertising claims had no impact on consumer purchasing behavior or consumers' willingness to purchase a pair of sneakers on the StockX platform. Reply DX 9, Butler Tr. 58:23–59:1, 62:19–63:3, 83:9–14.

c.  The fact that a handful of respondents in both the test and control groups mentioned authenticity does not change the fact that the results of the survey as a whole establish that the allegedly false Authentication Statements do not have a material impact on consumers' likelihood of using the website to purchase a pair of sneakers. DX 119, Butler Rep. ¶ 10.  Indeed, many respondents to the survey in both the test and control groups answered that they were likely to purchase sneakers from the StockX website for reasons that had nothing to do with the claims at issue.  *Id.* at ¶¶ 10, 40; *see supra* ¶ 342.

746.  Mr. Kim testified that "[if] the price was appropriate, [h]e would buy from any source with an authentication component to it." Dkt. 257-42, Ex. 42 at 105:17-22.

a.  <u>StockX Response</u>: Undisputed that DX 42 contains the quoted text.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, DX 42 as misleading because Paragraph 356 omits additional context necessary to understand Mr. Kim's testimony.  Specifically, Mr. Kim stated, "[i]f the price was appropriate, I would buy from any source with an authentication component to it.  But all things considered, if it's the same price I would prefer to buy on StockX. . . . . I prefer the app experience.  I prefer the fact that I can set a

bid price, which is the price I'd want to pay, and then the seller can choose to match it, which a lot of other platforms do not allow.  And generally speaking, the customer experience I've had at StockX when I've had issues has been more responsive than both eBay and GOAT."  DX 42 at 105:17–106:11.

b.  Nike has provided no evidence as to what Mr. Kim meant by "an authentication component" in this context.  Nike has presented no evidence that Mr. Kim was not referring to the fact that all products sold on the platform go through StockX's Process, and that StockX will make a buyer whole if it makes a mistake.  Indeed, the fact that Mr. Kim continued to use StockX even after receiving some of the alleged counterfeits at issue in this case (and receiving a refund from StockX for those products) supports this interpretation: Mr. Kim stated that he continued to visit StockX's platform "[d]aily," testifying that he "currently make[s] purchases through StockX," and that over 90% of his ongoing purchases on StockX continue to be Nike shoes.  DX 42 at 102:20–21; 157:1–23.

*C.  Nike and StockX are Obvious Competitors.*

747.    StockX advertises on its "Authentication Page" that StockX "only allow[s] deadstock on [its] marketplace.  That means every item bought or sold must be brand new and never worn."  Dkt. 261-58, Ex. 55 at NIKE0000281.

a.  <u>StockX Response</u>:  Undisputed.

748.    Exhibit 7 to the Report of Dr. Stec shows the results of a Google search for "Nike Air Force 1 '07" conducted on May 24, 2023.  Stec. Rep., Ex. 7.

a.  <u>StockX Response</u>:  Undisputed as to the accuracy of Nike's statement.  However, StockX disputes the materiality of the information in Paragraph 358 and any

broader assertions that the parties compete, particularly given that Nike has conceded that "[t]his case does not involve comparative advertising," ECF 270 at 25, n. 20.

749.    As part of his expert report, Dr. Stec analyzed a list of 102 styles and makes of the best-selling shoes that were identified on Nike's Website as of June 1, 2023, and identified that 71 of those shoes, or 69.6% could also be found for sale on StockX's website as of June 2, 2023.  Stec Rep. at 11.  These products included the same styles and at least one overlapping size that was also sold on Nike.com.  *Id.*

   a.  StockX Response:  Undisputed that Dr. Stec offered the cited analysis.  However, StockX disputes Nike's characterization of, and the inferences purportedly drawn from, the statement "71 of those shoes, or 69.6% could also be found for sale on StockX's website as of June 2, 2023," including that anyone could purchase any size and colorway of these 71 shoes either on Nike or StockX's website on June 2, 2023, that Nike and StockX compete for sales of Nike shoes.  Dr. Stec's analysis indicates that 8 of these 71 styles only had two or fewer sizes concurrently available on Nike and StockX, and in some instances, such as with style DZ5485-031, the single shoe size available concurrently on both websites was a men's size 17.  Opp. DX 65, Stec Rep. Ex. 4.2.  At his deposition, Dr. Stec admitted that his study "does not show that there was even a single instance of a Nike shoe sold on StockX at a time when the same shoe was available in the same size on Nike.com."  Opp. DX 20, Stec Tr. 249:22–250:16.

   b.  StockX also disputes the materiality of the information in Paragraph 359 and any broader assertions that the parties compete, particularly given that Nike has

conceded that "[t]his case does not involve comparative advertising," ECF 270 at 25, n. 20.

750.    Dr. Stec analyzed StockX reported sales for each style it carries and of the product he identified as best-selling Nike makes and models, StockX has sold at least 200,000 shoes within the last twelve months alone that were simultaneously offered by Nike for retail sale on Nike.com. Stec Rep. at 13.

    a.  <u>StockX Response</u>: Disputed.  Paragraph 360 mischaracterizes Dr. Stec's report and findings, as Dr. Stec's report did not establish that "StockX has sold at least 200,000 shoes within the last twelve months alone that were simultaneously offered by Nike for retail sale on Nike.com."  Dr. Stec's analysis was based on availability of shoes on the Nike website on June 1, 2023 and the availability of the same styles of shoes on the StockX website on June 1 and June 2, 2023.  Opp. DX 65, Stec Rep. at 11. Dr. Stec did not establish that these 71 styles of shoes concurrently available during a two-day period were concurrently available for the entirety of the last twelve months at the time of his analysis.  The 200,000 shoe figure, which Dr. Stec reached using historical sales figures on the StockX website, does not indicate sales of sneakers which were available in the same style, size, and colorway, and for a similar price, on both the StockX and Nike websites at the time of sale.  Opp. DX 65, Stec Rep. at 18 ("StockX has sold more than 200,000 units of these styles in the last twelve months alone, which were *likely* sold when these products were available for sale by Nike.") (emphasis added).

    b.  StockX further disputes Nike's characterization of, and the inferences purportedly drawn from, the statement "of the product [Stec] identified as best-selling Nike

makes and models, StockX has sold at least 200,000 shoes within the last twelve months alone that were simultaneously offered by Nike for retail sale on Nike.com," including that the 200,000 shoes figure represents sales of shoes concurrently available for purchase on both StockX and Nike's websites at the time of sale, or that the 200,000 shoes figure represents 200,000 lost sales to Nike.  Dr. Stec's analysis indicates that 8 of the 71 styles Dr. Stec identified only had two or fewer sizes concurrently available on Nike and StockX during the period of June 1 and June 2, 2023, and in some instances, such as with style DZ5485-031, the single shoe size available concurrently on both websites was a men's size 17.  Opp. DX 65, Stec Rep. Ex. 4.2.  At his deposition, Dr. Stec admitted that his study "does not show that there was even a single instance of a Nike shoe sold on StockX at a time when the same shoe was available in the same size on Nike.com."  Opp. DX 20, Stec Tr. 249:22–250:16.

    c. StockX also disputes the materiality of the information in Paragraph 360 and any broader assertions that the parties compete, particularly given that Nike has conceded that "[t]his case does not involve comparative advertising," ECF 270 at 25, n. 20.

751. Dr. Stec identified that "many of the Nike products were available for sale on the StockX platform at prices below the retail price—StockX even has a flag "Price Currently Below Retail" to help its buyers notice those items more easily both when they are searching on StockX and when they open a specific item's listing." Stec Rep. at 13.

    a. <u>StockX Response</u>:  Undisputed that Dr. Stec provided the quoted opinion.  However, StockX disputes Nike's characterization of, and inferences purportedly

drawn from, Dr. Stec's report (Opp. DX 65), including that "hundreds of styles of Nike, Jordan, and Converse" are available for sale on either Nike and StockX, in the same sizes and colorways at the same time, such that a consumer could choose to purchase either on StockX or Nike. Dr. Stec's analysis was based on availability of shoes on the Nike website on June 1, 2023 and the availability of the same styles of shoes on the StockX website on June 1 and June 2, 2023. Opp. DX 65, Stec Rep. at 11. StockX further disputes Nike's characterization of, and inferences purportedly drawn from, Dr. Stec's report, including that Nike competes with StockX for sales of Nike shoes, or that Nike has lost sales due to the Verification Process Statements or Authenticity Claims. At his deposition, Dr. Stec admitted that his study "does not show that there was even a single instance of a Nike shoe sold on StockX at a time when the same shoe was available in the same size on Nike.com." Opp. DX 20, Stec Tr. 249:22–250:16.

b. StockX also disputes the materiality of the information in Paragraph 361 and any broader assertions that the parties compete, particularly given that Nike has conceded that "[t]his case does not involve comparative advertising," ECF 270 at 25, n. 20.

752. Dr. Stec identified that "[a]ccording to the listings on StockX, there are hundreds of styles of Nike, Jordan, and Converse shoes that are being offered below their retail price." Stec Rep.at 13.

a. <u>StockX Response</u>: Undisputed that Dr. Stec provided the quoted opinion. However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, Dr. Stec's report (Opp. DX 65), including that "hundreds of styles of

Nike, Jordan, and Converse" are available for sale on either Nike and StockX, in the same sizes and colorways at the same time, such that a consumer could choose to purchase either on StockX or Nike. Dr. Stec's analysis was based on availability of shoes on the Nike website on June 1, 2023 and the availability of the same styles of shoes on the StockX website on June 1 and June 2, 2023. Opp. DX 65, Stec Rep. at 11. StockX further disputes Nike's characterization of, and inferences purportedly drawn from, Dr. Stec's report, including that Nike competes with StockX for sales of Nike shoes, or that Nike has lost sales due to the Verification Process Statements or Authenticity Claims. At his deposition, Dr. Stec admitted that his study "does not show that there was even a single instance of a Nike shoe sold on StockX at a time when the same shoe was available in the same size on Nike.com." Opp. DX 20, Stec Tr. 249:22–250:16.

b. StockX also disputes the materiality of the information in Paragraph 362 and any broader assertions that the parties compete, particularly given that Nike has conceded that "[t]his case does not involve comparative advertising," ECF 270 at 25, n. 20.

753. Dr. Stec stated in his expert report that, based on his research, on June 1, 2023 "StockX listed and [was] selling 15 of the 16 Nike Shoes that Nike announced as an upcoming drop but had not yet launched as of June 1, 2023" and these "'pre-release' shoes included Nike and Jordan brand shoes." Stec Rep.at 13-14.

a. StockX Response: Undisputed that Dr. Stec provided the quoted opinion. However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, Dr. Stec's report (Opp. DX 65), including that any consumer choosing

to purchase a Nike shoe listed for sale on StockX's website pre-release could purchase the same shoe just as easily from Nike's website. Nike severely and intentionally limits supply of new and limited-edition sneakers to Nike customers. Nike uses scarcity as marketing device, and sells limited-release shoes exclusively through a lottery system only accessible in its SNKRS app. Opp. DX 17, Wells Rep. ¶¶ 72–75. Mike Child, Nike's Director of Digital Goods Strategy and corporate representative, testified that he purchased a pair of sneakers on StockX because he "attempted to" purchase them from Nike, but "didn't win the draw." Opp. DX 19, Child Tr. 243:8–22. Heather Paulson, Nike's VP of Connected Marketplace and corporate representative, testified that Nike " ███████████████

██████████████████████████████████████████████████

████████ Opp. DX 2, Paulson Tr. 208:24–209:4. ██████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████ Further, when consumers turn to the resale market to purchase these limited release sneakers, they must do so "often at prices much higher than the original retail price," Opp. DX 17, Wells Rep. ¶ 76, and Nike has offered no evidence that any pre-release sneakers were available from both Nike and StockX, *for the same price*.

b. StockX further disputes Nike characterization of, and inferences purportedly drawn from, Dr. Stec's report, including that StockX lists items for sale or sells items directly, and that any such decision from StockX exerts competitive pressure on Nike. StockX is a resale marketplace that connects individual buyers and sellers

looking to trade products. DX 15, Erin Griffith, *Buy Low Tops, Sell High-Tops: StockX Sneaker Exchange Is Worth $1 Billion*, The New York Times (June 27, 2019), https://www.nytimes.com/2019/06/26/technology/trading-sneakers-stockx.html; DX 14, NIKE0035800 at 804 ("Detroit-based mobile marketplace matches buyers and sellers of sneakers (deadstock only), streetwear, handbags and watches"). StockX further disputes Dr. Stec's opinion as unsupported by record evidence. At his deposition, Dr. Stec admitted that his study "does not show that there was even a single instance of a Nike shoe sold on StockX at a time when the same shoe was available in the same size on Nike.com." Opp. DX 20, Stec Tr. 249:22–250:16.

c. StockX further disputes any inference that pre-release sneakers offered on StockX must have been obtained illegally, as Paragraph 363 omits context necessary to understand this issue. Nike's witness testified that ███████████ ███████████████████████████████████████████████████ Opp. DX 19, Child Tr. 145:9–12; Opp. DX 20, Stec Tr. 259:15–260:2 (acknowledging that "one way" someone could obtain a genuine Nike shoe pre-release is to "[get] that shoe from Nike or from somebody who got it from Nike"); 260:4–7 (agreeing that "Nike sometimes gives away promotional samples before the release date"). Nike's economic expert, Dr. Stec, testified to the various ways in which Nike may not have control over whether shoes become available in the market pre-release, including if shoes are stolen, if Nike loses control over some inventory of its products, or if authorized resellers give away shoes prior to the release date. Opp. DX 20, Stec Tr. 261:9–262:23. Some authorized Nike retailers will sell Nike

products before the Nike official release date. Opp. DX 18, Lopez Tr. 129:16–17. In addition, different geographies may launch Nike products on different days such that it is possible to buy a product in one region before it becomes available in another region. Opp. DX 2, Paulson Tr. 190:8–15. ███████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

████████████.

d.  StockX also disputes the materiality of the information in Paragraph 358 and any broader assertions that the parties compete, particularly given that Nike has conceded that "[t]his case does not involve comparative advertising," ECF 270 at 25, n. 20.

754.  Dr. Stec stated in his expert report that "[a] consumer interest in buying [pre-release] products could purchase the products now through StockX's pre-release listing and not directly through Nike." Stec Rep.at 14.

a.  StockX Response:  Undisputed that the quoted text appears on page 15 (rather than page 14) of Dr. Stec's expert report. Opp. DX 65, Stec Rep. at 15. However, StockX disputes Nike's characterization of, and inferences purportedly drawn from Paragraph 364 as misleading because Paragraph 364 inaccurately suggests that a consumer choosing to purchase a Nike shoe listed for sale on StockX's website pre-release could purchase the same shoe just as easily from Nike's website. Nike severely and intentionally limits supply of new and limited-edition sneakers to Nike customers. Nike uses scarcity as a marketing device, and sells limited-release shoes

exclusively through a lottery system only accessible in its SNKRS app. Opp. DX 17, Wells Rep. ¶¶ 72–75. Mike Child, Nike's Director of Digital Goods Strategy and corporate representative, testified that he purchased a pair of sneakers on StockX because he "attempted to" purchase them from Nike, but "didn't win the draw." Opp. DX 19, Child Tr. 243:8–22. Heather Paulson, Nike's VP of Connected Marketplace and corporate representative, testified that Nike ███████

███████████████████████████████████████████

███████████ Opp. DX 2, Paulson Tr. 208:24–209:4. ██████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████ Further, when consumers turn to the resale market to purchase these limited release sneakers, they must do so "often at prices much higher than the original retail price," Opp. DX 17, Wells Rep. ¶ 76, and Nike has offered no evidence that any pre-release sneakers were available from both Nike and StockX, *for the same price*. Opp. DX 17, Wells Rep. ¶ 77 (explaining that "limited-release sneakers hold value as investments far beyond the amounts at which they retail when bought directly from brands or authorized sellers").

b.  StockX further disputes any inference that pre-release sneakers offered on StockX must have been obtained illegally, as Paragraph 364 omits context necessary to understand this issue. Nike's witnesses testified ███████████████

████████████████████████████████████████ Opp. DX 19, Child Tr. 145:9–12; Opp. DX 20, Stec Tr. 259:15–260:2 (acknowledging

that "one way" someone could obtain a genuine Nike shoe pre-release is to "[get] that shoe from Nike or from somebody who got it from Nike"); 260:4–7 (agreeing that "Nike sometimes gives away promotional samples before the release date"). Nike's economic expert, Dr. Stec, testified to the various ways in which Nike may not have control over whether shoes become available in the market pre-release, including if shoes are stolen, if Nike loses control over some inventory of its products, or if authorized resellers give away shoes prior to the release date. Opp. DX 20, Stec Tr. 261:9–262:23. Some authorized Nike retailers will sell Nike products before the Nike official release date. Opp. DX 18, Lopez Tr. 129:16–17. In addition, different geographies may launch Nike products on different days such that it is possible to buy a product in one region before it becomes available in another region. Opp. DX 2, Paulson Tr. 190:8–15. ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████.

    c.  StockX also disputes the materiality of information in Paragraph 364 and any broader assertions that the parties compete, particularly given that Nike has conceded that "[t]his case does not involve comparative advertising," ECF 270 at 25, n. 20.

755.  Dr. Stec stated in his expert report that "[i]n the present case, Nike and StockX offer the same Nike shoes. A consumer seeking to purchase a new pair of Nike shoes can do so either through Nike or through the StockX platform because StockX purportedly guarantees or verified

that every Nike shoe sold on its platform is new, unworn, and authentic…In the case of Nike and StockX, the parties offer for sale the same products.  For that reason, demand for Nike shoes is likely to be substitutable between Nike and StockX."  Stec Rep.at 9-10.

    a.  <u>StockX Response</u>:  Undisputed that Dr. Stec offered the quoted opinions.  However, StockX disputes the substance of Dr. Stec's opinion as unsupported by evidence and contradicted by record evidence.  Dr. Stec's analysis was based on availability of shoes on the Nike website on June 1, 2023 and the availability of the same styles of shoes on the StockX website on June 1 and June 2, 2023 only, Opp. DX 65, Stec Rep. at 11, and thus does not support the broad statements that "Nike and StockX offer the same shoes" or "many lines of Nike shoes are concurrently available for sale through both Nike and StockX."  Further, Dr. Stec's analysis of overlapping shoe styles on both Nike's and StockX's websites indicates that 8 of these 71 styles only had two or fewer sizes concurrently available on Nike and StockX, and in some instances, such as with style DZ5485-031, the single shoe size available concurrently on both websites was a men's size 17.  Opp. DX 65, Stec Rep. Ex. 4.2.  At his deposition, Dr. Stec admitted that his study "does not show that there was even a single instance of a Nike shoe sold on StockX at a time when the same shoe was available in the same size on Nike.com."  Opp. DX 20, Stec Tr. 249:22–250:16.  StockX further disputes Nike's characterization of, and inferences purportedly drawn from, the statement "Nike and StockX offer the same Nike shoes" as misleading, as StockX sells many rare, limited-edition sneakers which are not available for purchase on Nike's website.  Opp. DX 40, Tucker Rep. ¶ 18; DX 44, STX0021868 at 918 (█████████████████

███████████████████████████████████████████████████

████████████████████████████████████

b. StockX also disputes the materiality of the information in Paragraph 365 and any broader assertions that the parties compete, particularly given that Nike has conceded that "[t]his case does not involve comparative advertising," ECF 270 at 25, n. 20.

756. ███████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████ Sept. Duvdevani Decl. ¶ 126, Ex. 125, STX0015569 at 570.

a. <u>StockX Response</u>:  Undisputed that Opp. PX 125 contains the quoted language. However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 125 because Paragraph 366 omits additional context necessary to understand the exhibit.  Specifically, █████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████ Opp. PX 125, STX0015569 at 570. ███████████████████████████████████████████████

███████ Opp. PX 125, STX0015569 at 570.

b. StockX further disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 125, including that any consumer choosing to purchase a Nike shoe listed for sale on StockX's website pre-release could purchase the same

shoe just as easily from Nike's website.  Nike severely and intentionally limits supply of new and limited-edition sneakers to Nike customers.  Nike uses scarcity as marketing device, and sells limited-release shoes exclusively through a lottery system only accessible in its SNKRS app.  Opp. DX 17, Wells Rep. ¶¶ 72–75.  Mike Child, Nike's Director of Digital Goods Strategy and corporate representative, testified that he purchased a pair of sneakers on StockX because he "attempted to" purchase them from Nike, but "didn't win the draw."  Opp. DX 19, Child Tr. 243:8–22.  Heather Paulson, Nike's VP of Connected Marketplace and corporate representative, testified that Nike ████████████████████████████████████ ███████████████████████████████████████ Opp. DX 2, Paulson Tr. 208:24–209:4. ████████████████████████████████ ████████████████████████  █████████████████████████████████████ ████████████████████████████████████ ████ Further, when consumers turn to the resale market to purchase these limited release sneakers, they must do so "often at prices much higher than the original retail price," Opp. DX 17, Wells Rep. ¶ 76, and Nike has offered no evidence that any pre-release sneakers were available from both Nike and StockX, *for the same price*.  Opp. DX 17, Wells Rep. ¶ 77 (explaining that "limited-release sneakers hold value as investments far beyond the amounts at which they retail when bought directly from brands or authorized sellers").

c.  StockX further disputes any inference that pre-release sneakers offered on StockX must have been obtained illegally, as Paragraph 366 omits context necessary to understand this issue.  Nike's witness testified that ███████████████████

████████████████████████████████████ Opp.

DX 19, Child Tr. 145:9–12; Opp. DX 20, Stec Tr. 259:15–260:2 (acknowledging

that "one way" someone could obtain a genuine Nike shoe pre-release is to "[get]

that shoe from Nike or from somebody who got it from Nike"); 260:4–7 (agreeing

that "Nike sometimes gives away promotional samples before the release date").

Nike's economic expert, Dr. Stec, testified to the various ways in which Nike may

not have control over whether shoes become available in the market pre-release,

including if shoes are stolen, if Nike loses control over some inventory of its

products, or if authorized resellers give away shoes prior to the release date.  Opp.

DX 20, Stec Tr. 261:9–262:23.   Some authorized Nike retailers will sell Nike

products before the Nike official release date.  Opp. DX 18, Lopez Tr. 129:16–17.

In addition, different geographies may launch Nike products on different days such

that it is possible to buy a product in one region before it becomes available in

another region.  Opp. DX 2, Paulson Tr. 190:8–15.  ████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████

d.  StockX also disputes the materiality of information in Paragraph 366 and any

broader assertions that the parties compete, particularly given that Nike has

conceded that "[t]his case does not involve comparative advertising," ECF 270 at

25, n. 20.

757.    StockX's "How it Works" page advertises the following: "Whether it's pre-release, regionally limited, or 'sold out' – our millions of customers from over 200+ countries allow you to easily secure those hard-to-find, coveted items."  Dkt. 257-32, Ex. 32 at NIKE0038818.

a.  <u>StockX</u> Response:  Undisputed that DX 32 contains the quoted language and that StockX makes it easier for consumers to secure sneakers that are otherwise difficult to obtain.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, DX 32, including that any consumer choosing to purchase a Nike shoe listed for sale on StockX's website pre-release could purchase the same shoe just as easily from Nike's website.  Nike severely and intentionally limits supply of new and limited-edition sneakers to Nike customers.  Nike uses scarcity as marketing device, sells limited-release shoes exclusively through a lottery system only accessible in its SNKRS app.  Opp. DX 17, Wells Rep. ¶¶ 72–75.  Mike Child, Nike's Director of Digital Goods Strategy and corporate representative, testified that he purchased a pair of sneakers on StockX because he "attempted to" purchase them from Nike, but "didn't win the draw."  Opp. DX 19, Child Tr. 243:8–22.  Heather Paulson, Nike's VP of Connected Marketplace and corporate representative, testified that Nike ███████████████████████████████████ ███████████████████████████████████████ Opp. DX 2, Paulson Tr. 208:24–209:4.  ██████████████████████████ ████████████████████  ██████████████████████ ███████████████████████████████████████████ Further, when consumers turn to the resale market to purchase these limited release sneakers, they must do so "often at prices much higher than the original

retail price," Opp. DX 17, Wells Rep. ¶ 76, and Nike has offered no evidence that any pre-release sneakers were available from both Nike and StockX, *for the same price*. Opp. DX 17, Wells Rep. ¶ 77 (explaining that "limited-release sneakers hold value as investments far beyond the amounts at which they retail when bought directly from brands or authorized sellers").

b. StockX also disputes that materiality of any inference that the parties compete, particularly given that Nike has conceded that "[t]his case does not involve comparative advertising," ECF 270 at 25, n. 20.

758. StockX states the following on its "Authentication Page:" "rest assured that your purchase on StockX will match any retail purchase experience." Dkt. 261-58, Ex. 55 at NIKE0000282.

a. <u>StockX Response</u>: Undisputed that StockX's Authentication Page includes the quoted language. PX 55, NIKE00000281 at 282. However, StockX disputes Nike's characterization of, and any inferences purportedly drawn from, the quoted language as misleading because Paragraph 368 omits relevant context necessary to understand the quoted text. Specifically, this text appeared as part of a statement referring to StockX consumers receiving products they purchase from the platform alongside all accessories and add-ons that originally came with the product: "Accessories: From the full list of accessories to all the additional add-ons, **rest assured that your purchase on StockX will match any retail purchase experience.**" PX 55, NIKE00000281 at 282; *see also* Reply DX 8, Huber Feb. Tr. 17:20–19:16 (explaining that, prior to StockX, it was very difficult to buy and sell limited edition sneakers "in a safe way," describing the process as "send[ing] a

money order to a stranger on the Internet and . . . . hop[ing] the product you were going to receive . . . . was what was promised.").  In light of this relevant context, StockX admits that it does work to ensure consumers receive the accessories and add-ons that come with their purchases.

b.  StockX also disputes the materiality of any inference that the parties compete, particularly given that Nike has conceded that "[t]his case does not involve comparative advertising," ECF 270 at 25, n. 20.

759.   A December 2020 StockX PowerPoint presentation, titled "Marketplace Magic," describes StockX "Single Product Page" as follows: "No more scrolling through listings; A single product page simplifies that 'listing' experience for Sellers and provides Buyers a 'standard' ecommerce product page" and "No more scrolling for listings, delivering a marketplace model in a standard e-commerce environment." Sept. Duvdevani Decl. ¶ 127, Ex. 126 (STX0103338 at 339, 342).

a.  StockX Response:  Undisputed that Opp. PX 126 contains the quoted language and that StockX provides streamlined product pages to try and enhance the consumer experience.  However, StockX disputes Nike's characterization of, and inferences drawn from, Opp. PX 126, including that StockX uses a single product page to conceal the fact that it is a secondary marketplace.  Opp. PX 126 explains that the single product page also includes elements such as "[h]istorical pricing data" and "live bid/ask data," which show StockX's "bid/ask pricing model," and clearly indicate that the products offered are being resold.  Opp. PX 126, STX0103338 at 339.

b.  StockX further disputes Nike's characterization of, and inferences drawn from, Opp. PX 126, including that StockX's use of a single product page suggests Nike and StockX compete for sales of Nike sneakers.  Many of the products offered for sale on the StockX platform are rare, limited-edition sneakers which are not available for purchase on Nike's website.  Opp. DX 40, Tucker Rep. ¶ 18; DX 44, STX0021868 at 918 ██████████████

████████████████████████████████████

███████████████████████  In addition, Nike severely and intentionally limits supply of new and limited-edition sneakers to Nike customers.  Nike uses scarcity as marketing device, and sells limited-release shoes exclusively through a lottery system only accessible in its SNKRS app.  Opp. DX 17, Wells Rep. ¶¶ 72–75.  Mike Child, Nike's Director of Digital Goods Strategy and corporate representative, testified that he purchased a pair of sneakers on StockX because he "attempted to" purchase them from Nike, but "didn't win the draw."  Opp. DX 19, Child Tr. 243:8–22.  Heather Paulson, Nike's VP of Connected Marketplace and corporate representative, testified that Nike ████

████████████████████████████████████

█████████████  Opp. DX 2, Paulson Tr. 208:24–209:4.  ███████████

████████████████████████████████████

████████████████████████████████████

███████████████████████  Further, when consumers turn to the resale market to purchase these limited release sneakers, they must do so "often at prices much higher than the original retail price," Opp. DX 17, Wells Rep.

¶ 76, and Nike has offered no evidence that any pre-release sneakers were available from both Nike and StockX, *for the same price*.  Nike does not have evidence of a single consumer who had the choice to purchase the same style, size, and colorway of a sneaker on both StockX and Nike, and chose to purchase on StockX.  At his deposition, Dr. Stec admitted that his study "does not show that there was even a single instance of a Nike shoe sold on StockX at a time when the same shoe was available in the same size on Nike.com."  Opp. DX 20, Stec Tr. 249:22–250:16.

c.  StockX also disputes the materiality of any inference that the parties compete, particularly given that Nike has conceded that "[t]his case does not involve comparative advertising," ECF 270 at 25, n. 20.

760.  ███████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████. Sept. Duvdevani Decl. ¶ 128, Ex. 127, STX0286400 at 6591.

a.  <u>StockX Response</u>:    Undisputed that Opp. PX 127 contains the referenced comparison.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 127, including that StockX considers Nike and other primary retailers to be competitors.  Opp. PX 127 states ████████████████

████████████████████████████████ Opp. PX 127, STX0286400 at 591.  ████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████ In his report, Dr. Robert Vigil opined that Nike and StockX do not compete directly.  DX 124, Vigil Rep. at § III.D.

b.  StockX further disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 127, including that overlapping styles of Nike sneakers are available for sale on either Nike and StockX, in the same sizes and colorways at the same time, such that a consumer could choose to purchase either on StockX or Nike.  StockX sells many rare, limited-edition sneakers which are not available for purchase on Nike's website.  Opp. DX 40, Tucker Rep. ¶ 18; DX 44, STX0021868 at 918 █████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████ Nike severely and intentionally limits supply of new and limited-edition sneakers to Nike customers.  Nike uses scarcity as marketing device, and sells limited-release shoes exclusively through a lottery system only accessible in its SNKRS app.  Opp. DX 17, Wells Rep. ¶¶ 72–75.  Mike Child, Nike's Director of Digital Goods Strategy and corporate representative, testified that he purchased a pair of sneakers on StockX because he "attempted to" purchase them from Nike, but "didn't win the draw."  Opp. DX 19, Child Tr. 243:8–22.  Heather Paulson, Nike's VP of Connected Marketplace and corporate representative, testified that Nike ███████████████████████

███████████████████████████████████████████████████

Opp. DX 2, Paulson Tr. 208:24–209:4. ████████████████████

█████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████ Further, when consumers turn to the resale market to purchase these limited release sneakers, they must do so "often at prices much higher than the original retail price," Opp. DX 17, Wells Rep. ¶ 76, and Nike has offered no evidence that any pre-release sneakers were available from both Nike and StockX, *for the same price*.  Nike also has not offered evidence that *any* Nike sneaker was available from both Nike and StockX, in the same style, size, and colorway, at the time of purchase.  At his deposition, Dr. Stec admitted that his study "does not show that there was even a single instance of a Nike shoe sold on StockX at a time when the same shoe was available in the same size on Nike.com." Opp. DX 20, Stec Tr. 249:22–250:16.

   c.  StockX also disputes the materiality of the information in Paragraph 370 and any broader assertions that the parties compete, particularly given that Nike has conceded that "[t]his case does not involve comparative advertising," ECF 270 at 25, n. 20.

761.  ███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████ Sept. Duvdevani Decl. ¶ 129, Ex. 128, STX0591192 at 221.

   a.  <u>StockX Response</u>:    Undisputed that Opp. PX 128 contains the referenced comparison.  However, StockX disputes Nike's characterization of, and inferences

purportedly drawn from, Opp. PX 128, including that StockX considers Nike and
other primary retailers to be competitors.  Opp. PX 128 states that ▮▮▮▮▮▮▮



In his report, Dr. Robert Vigil opined that Nike and StockX do not
compete directly.  DX 124, Vigil Rep. at § III.D.

b.   StockX further disputes Nike's characterization of, and inferences  purportedly
drawn from, Opp. PX 128, including that overlapping styles of Nike sneakers are
available for sale on either Nike and StockX, in the same sizes and colorways at the
same time, such that a consumer could choose to purchase either on StockX or
Nike.  StockX sells many rare, limited-edition sneakers which are not available for
purchase on Nike's website.  Opp. DX 40, Tucker Rep. ¶ 18; DX 44, STX0021868
at 918 ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮ Nike severely and intentionally
limits supply of new and limited-edition sneakers to Nike customers.  Nike uses
scarcity as marketing device, and sells limited-release shoes exclusively through a

lottery system only accessible in its SNKRS app.  Opp. DX 17, Wells Rep. ¶¶ 72–

75.  Mike Child, Nike's Director of Digital Goods Strategy and corporate

representative, testified that he purchased a pair of sneakers on StockX because he

"attempted to" purchase them from Nike, but "didn't win the draw."  Opp. DX 19,

Child Tr. 243:8–22.  Heather Paulson, Nike's VP of Connected Marketplace and

corporate representative, testified that Nike ████████████████████████

████████████████████████████████████████████████████████

Opp. DX 2, Paulson Tr. 208:24–209:4.  ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████  Further, when consumers turn to the resale market

to purchase these limited release sneakers, they must do so "often at prices much

higher than the original retail price," Opp. DX 17, Wells Rep. ¶ 76, and Nike has

offered no evidence that any pre-release sneakers were available from both Nike

and StockX, *for the same price*.  Nike has also not offered evidence that *any* Nike

sneaker was available from both Nike and StockX, in the same style, size, and

colorway, at the time of purchase.  At his deposition, Dr. Stec admitted that his

study "does not show that there was even a single instance of a Nike shoe sold on

StockX at a time when the same shoe was available in the same size on Nike.com."

Opp. DX 20, Stec Tr. 249:22–250:16.

c.  StockX also disputes the materiality of the information in Paragraph 371 and any

broader assertions that the parties compete, particularly given that Nike has

conceded that "[t]his case does not involve comparative advertising," ECF 270 at 25, n. 20.

762.    A ███████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████ Sept. Duvdevani Decl. ¶ 130, Ex. 129, STX0050518 at 531.

a.  <u>StockX Response</u>:    Undisputed that Opp. PX 129 contains the referenced comparison.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 129, including that StockX considers Nike and other primary retailers to be competitors.  Opp. PX 129 states that ███████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

In his report, Dr. Robert Vigil opined that Nike and StockX do not compete directly. DX 124, Vigil Rep. at § III.D.

b.   StockX further disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 129, including that overlapping styles of Nike sneakers are

available for sale on either Nike and StockX, in the same sizes and colorways at the same time, such that a consumer could choose to purchase either on StockX or Nike. StockX sells many rare, limited-edition sneakers which are not available for purchase on Nike's website. Opp. DX 40, Tucker Rep. ¶ 18; DX 44, STX0021868 at 918 ██████████████████████████████

██████████████████████████████████████████

████████████████████████ Nike severely and intentionally limits supply of new and limited-edition sneakers to Nike customers. Nike uses scarcity as marketing device, and sells limited-release shoes exclusively through a lottery system only accessible in its SNKRS app. Opp. DX 17, Wells Rep. ¶¶ 72–75. Mike Child, Nike's Director of Digital Goods Strategy and corporate representative, testified that he purchased a pair of sneakers on StockX because he "attempted to" purchase them from Nike, but "didn't win the draw." Opp. DX 19, Child Tr. 243:8–22. Heather Paulson, Nike's VP of Connected Marketplace and corporate representative, testified that Nike ███████████████████

███████████████████████████████████████████

Opp. DX 2, Paulson Tr. 208:24–209:4. ██████████████████████

████████████████████████████████. ████████████████

██████████████████████████████████████████

████████████████████ Further, when consumers turn to the resale market to purchase these limited release sneakers, they must do so "often at prices much higher than the original retail price," Opp. DX 17, Wells Rep. ¶ 76, and Nike has offered no evidence that any pre-release sneakers were available from both Nike

and StockX, *for the same price*.  Nike has also not offered evidence that *any* Nike sneaker was available from both Nike and StockX, in the same style, size, and colorway, at the time of purchase.  At his deposition, Dr. Stec admitted that his study "does not show that there was even a single instance of a Nike shoe sold on StockX at a time when the same shoe was available in the same size on Nike.com." Opp. DX 20, Stec Tr. 249:22–250:16.

    c.    StockX also disputes the materiality of the information in Paragraph 370 and any broader assertions that the parties compete, particularly given that Nike has conceded that "[t]his case does not involve comparative advertising," ECF 270 at 25, n. 20.

763.     ███████████████████████████████████████████

███████████████████████████████████████████████

███████ Sept. Duvdevani Decl. ¶ 131, Ex. 130, STX0061163 at 165.

    a.    <u>StockX Response</u>:  Undisputed that Opp. PX 130 includes the referenced language. However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, including that StockX considers Nike and other primary retailers to be competitors.  Opp. PX 130 discusses █ ██████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████  In his report, Dr. Robert Vigil opined that

Nike and StockX do not compete directly.  DX 124, Vigil Rep. at § III.D.

b.  StockX further disputes Nike's characterization of, and inferences purportedly

drawn from, Opp. PX 130, including that overlapping styles of Nike sneakers are

available for sale on either Nike and StockX, in the same sizes and colorways at the

same time, such that a consumer could choose to purchase either on StockX or

Nike.  StockX sells many rare, limited-edition sneakers which are not available for

purchase on Nike's website.  Opp. DX 40, Tucker Rep. ¶ 18; DX 44, STX0021868

at 918 (█████████████████████████████████████

███████████████████████████████████████████

████████████████████████).  Nike severely and intentionally

limits supply of new and limited-edition sneakers to Nike customers.  Nike uses

scarcity as marketing device, and sells limited-release shoes exclusively through a

lottery system only accessible in its SNKRS app.  Opp. DX 17, Wells Rep. ¶¶ 72–

75.    Mike Child, Nike's Director of Digital Goods Strategy and corporate

representative, testified that he purchased a pair of sneakers on StockX because he

"attempted to" purchase them from Nike, but "didn't win the draw."  Opp. DX 19,

Child Tr. 243:8–22.  Heather Paulson, Nike's VP of Connected Marketplace and

corporate representative, testified that Nike "██████████████████████████

████████████████████████████████████████████

Opp. DX 2, Paulson Tr. 208:24–209:4.  ███████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████ Further, when consumers turn to the resale market to purchase these limited release sneakers, they must do so "often at prices much higher than the original retail price," Opp. DX 17, Wells Rep. ¶ 76, and Nike has offered no evidence that any pre-release sneakers were available from both Nike and StockX, *for the same price*.  Nike has also not offered evidence that *any* Nike sneaker was available from both Nike and StockX, in the same style, size, and colorway, at the time of purchase.  At his deposition, Dr. Stec admitted that his study "does not show that there was even a single instance of a Nike shoe sold on StockX at a time when the same shoe was available in the same size on Nike.com." Opp. DX 20, Stec Tr. 249:22–250:16.

c.  StockX also disputes the materiality of the information in Paragraph 373 and any broader assertions that the parties compete, particularly given that Nike has conceded that "[t]his case does not involve comparative advertising," ECF 270 at 25, n. 20.

764.  ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████ Sept. Duvdevani Decl. ¶ 132, Ex. 131, STX0061163 at 165.STX0100697 at 747-752.

a.  <u>StockX Response</u>:  Undisputed that Opp. PX 131 includes the quoted language. However, StockX disputes Nike's characterization of, and inferences drawn from, Opp. PX 131, including that StockX considers Nike and other primary retailers to be  competitors.  ████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████ In his report, Dr. Robert Vigil opined that

Nike and StockX do not compete directly.  DX 124, Vigil Rep. at § III.D.  Opp. PX

131 ████████████████████████

███████████████████████████████████ Opp. PX 131,

STX0100697  at  734–736 ████████ ████████ ████████ ████████ ██ ██████

███████████████

b.   StockX further disputes Nike's characterization of, and inferences purportedly

drawn from, Opp. PX 131, including that overlapping styles of Nike sneakers are

available for sale on either Nike and StockX, in the same sizes and colorways at the

same time, such that a consumer could choose to purchase either on StockX or

Nike.  StockX sells many rare, limited-edition sneakers which are not available for

purchase on Nike's website.  Opp. DX 40, Tucker Rep. ¶ 18; DX 44, STX0021868

at  918 ████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████ Nike severely and intentionally

limits supply of new and limited-edition sneakers to Nike customers.  Nike uses

scarcity as marketing device, and sells  limited-release shoes exclusively through a

lottery system only accessible in its SNKRS app. Opp. DX 17, Wells Rep. ¶¶ 72–

75.   Mike  Child,  Nike's  Director  of  Digital  Goods  Strategy  and  corporate

representative, testified that he purchased a pair of sneakers on StockX because he

"attempted to" purchase them from Nike, but "didn't win the draw." Opp. DX 19,

Child Tr. 243:8–22.  Heather Paulson, Nike's VP of Connected Marketplace and

corporate representative, testified that Nike 

Opp. DX 2, Paulson Tr. 208:24–209:4.

. Further, when consumers turn to the resale market to purchase these limited release sneakers, they must do so "often at prices much higher than the original retail price," Opp. DX 17, Wells Rep. ¶ 76, and Nike has offered no evidence that any pre-release sneakers were available from both Nike and StockX, **for the same price**. Nike has also not offered evidence that *any* Nike sneaker was available from both Nike and StockX, in the same style, size, and colorway, at the time of purchase. At his deposition, Dr. Stec admitted that his study "does not show that there was even a single instance of a Nike shoe sold on StockX at a time when the same shoe was available in the same size on Nike.com." Opp. DX 20, Stec Tr. 249:22–250:16.

    c.    StockX also disputes the materiality of the information in Paragraph 374 and any broader assertions that the parties compete, particularly given that Nike has conceded that "[t]his case does not involve comparative advertising," ECF 270 at 25, n. 20.

### D. Nike is Harmed by StockX's Accused Advertising.

765.    Dr. Stec stated in his expert report that "[e]ven though StockX is a reseller of products, it still acts like a retailer of new and unused products…StockX offers for sale new,

unused Nike goods to the public, while Nike offers for sale the same new and unused Nike goods." Stec Rep. 15-16.

  a.  <u>StockX Response</u>: Undisputed that Dr. Stec offered the quoted opinion. However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, the statement quoted statement as misleading because it inaccurately suggests that StockX lists items for sale or sells items directly, and that any such decision from StockX exerts competitive pressure on Nike. StockX is a resale marketplace that connects individual buyers and sellers looking to trade products. DX 15, Erin Griffith, *Buy Low Tops, Sell High-Tops: StockX Sneaker Exchange Is Worth $1 Billion*, The New York Times (June 27, 2019), https://www.nytimes.com/2019/06/26/technology/trading-sneakersstockx.html; DX 14, NIKE0035800 at 804 ("Detroit-based mobile marketplace matches buyers and sellers of sneakers (deadstock only), streetwear, handbags and watches"). StockX further disputes Dr. Stec's opinion as unsupported by record evidence. At his deposition, Dr. Stec admitted that his study "does not show that there was even a single instance of a Nike shoe sold on StockX at a time when the same shoe was available in the same size on Nike.com." Opp. DX 20, Stec Tr. 249:22–250:16.

  b.  StockX further disputes Nike's characterization of, and inferences purportedly drawn from, the statement "Nike offers for sale the same new and unused Nike goods [as StockX]" as misleading, as StockX sells many rare, limited-edition sneakers which are not available for purchase on Nike's website. Opp. DX40, Tucker Rep. ¶ 18; DX 44, STX0021868 at 918 ███████████

████████████████████████████████████

████████████████████████████████████

    c. StockX also disputes the materiality of the information in Paragraph 375 and any broader assertions that the parties compete, particularly given that Nike has conceded that "[t]his case does not involve comparative advertising," ECF 270 at 25, n. 20.

766. Russell Amidon, StockX's Senior Director of Account Management, testified that "[w]hen [StockX] think[s] a big release is happening on [its] site, [StockX] do[es] like to communicate to [its] sellers that it's coming up," for example "a sneaker release could result in a lot of orders, [StockX] potentially might do a promotion which would give sellers a lesser fee for that particular item so [StockX] would let them know, if you are able to get this product when it releases, [StockX] will be doing a promotion on that product. So that seller then becomes aware that if I sell that item on StockX, I know that there will be potentially a lot of buyers, and I can sell it on [StockX's] platform.  Sept. Duvdevani Decl. ¶ 133, Ex. 132, Amidon Tr. 9:14-20; 33:24-34:12.

    a. <u>StockX Response</u>:  Undisputed that Mr. Amidon provided the quoted testimony. However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 132, including that any consumer choosing to purchase a Nike shoe listed for sale on StockX's website pre-release could purchase the same shoe just as easily from Nike's website.  Nike severely and intentionally limits supply of new and limited-edition sneakers to Nike customers.  Nike uses scarcity as marketing device, and sells limited-release shoes exclusively through a lottery system only accessible in its SNKRS app.  Opp. DX 17, Wells Rep. ¶¶ 72–75.  Mike

Child, Nike's Director of Digital Goods Strategy and corporate representative, testified that he purchased a pair of sneakers on StockX because he "attempted to" purchase them from Nike, but "didn't win the draw." Opp. DX 19, Child Tr. 243:8–22. Heather Paulson, Nike's VP of Connected Marketplace and corporate representative, testified that Nike ███████████████████████████████████████████████ ████████████████████████████████████████" Opp. DX 2, Paulson Tr. 208:24–209:4. █ ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████ Further, when consumers turn to the resale market to purchase these limited release sneakers, they must do so "often at prices much higher than the original retail price," Opp. DX 17, Wells Rep. ¶ 76, and Nike has offered no evidence that any pre-release sneakers were available from both Nike and StockX, *for the same price*.

b. StockX also disputes the materiality of the information in Paragraph 376 and any broader assertions that the parties compete, particularly given that Nike has conceded that "[t]his case does not involve comparative advertising," ECF 270 at 25, n. 20.

767. ████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ Sept. Duvdevani Decl. ¶ 133, Ex. 132, Amidon Tr. 68:8-69:3.

a. <u>StockX Response</u>:    Undisputed that Mr. Amidon provided the quoted and summarized testimony.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 132 as misleading, including because it omits Nike's role in allowing pre-release sneakers to enter the market prior to launch.  Nike's witness testified that ███████████████████████████████ ████████████████████████████████████ Opp. DX 19, Child Tr. 145:9–12; Opp. DX 20, Stec Tr. 259:15–260:2 (acknowledging that "one way" someone could obtain a genuine Nike shoe pre-release is to "[get] that shoe from Nike or from somebody who got it from Nike"); 260:4–7 (agreeing that "Nike sometimes gives away promotional samples before the release date").  Nike's economic expert, Dr. Stec, testified to the various ways in which Nike may not have control over whether shoes become available in the market pre-release, including if shoes are stolen, if Nike loses control over some inventory of its products, or if authorized resellers give away shoes prior to the release date.  Opp. DX 20, Stec Tr. 261:9–262:23.  Some authorized Nike retailers will sell Nike products before the Nike official release date.  Opp. DX 18, Lopez Tr. 129:16–17.  In addition, different geographies may launch Nike products on different days such that it is possible to buy a product in one region before it becomes available in another region.  Opp. DX 2, Paulson Tr. 190:8–15. ████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ████████████

b.    StockX further disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 132, including that any consumer choosing to purchase a Nike shoe listed for sale on StockX's website pre-release could purchase the same shoe just as easily from Nike's website. Nike severely and intentionally limits supply of new and limited-edition sneakers to Nike customers. Nike uses scarcity as marketing device, and sells limited-release shoes exclusively through a lottery system only accessible in its SNKRS app. Opp. DX 17, Wells Rep. ¶¶ 72–75. Mike Child, Nike's Director of Digital Goods Strategy and corporate representative, testified that he purchased a pair of sneakers on StockX because he "attempted to" purchase them from Nike, but "didn't win the draw." Opp. DX 19, Child Tr. 243:8–22. Heather Paulson, Nike's VP of Connected Marketplace and corporate representative, testified that Nike ██ ████████████████████████████████████████
████████████████████████████████████████████████████" Opp. DX 2, Paulson Tr. 208:24–209:4. ████████████████████████████████████████
███████████████████████████ Opp. DX 2, Paulson Tr. 209:5–9 █████████████
████████████████████████████████████████████████████
██████████ Further, when consumers turn to the resale market to purchase these limited release sneakers, they must do so "often at prices much higher than the original retail price," Opp. DX 17, Wells Rep. ¶ 76, and Nike has offered no evidence that any pre-release sneakers were available from both Nike and StockX, ***for the same price***.

c.    StockX also disputes the materiality of the information in Paragraph 377 and any broader assertions that the parties compete, particularly given that Nike has

conceded that "[t]his case does not involve comparative advertising," ECF 270 at 25, n. 20.

768.    Mr. Lopez testified that footwear release dates vary in different geographies, allowing StockX to offer pre-release sneakers before they are available in the U.S. through Nike.com and "StockX does receive pairs – pairs before they are released on Nike.com." Sept. Duvdevani Decl. ¶ 57, Ex. 56, Lopez 128:5-130:14.

    a.  <u>StockX Response</u>:  Undisputed that Mr. Lopez provided the quoted testimony and testified that footwear release dates vary in different geographies.  However, StockX disputes that Mr. Lopez's cited testimony supports Nike's assertion that Mr. Lopez testified that Nike's varying release dates "allow[] StockX to offer pre-release sneakers before they are available in the U.S. through Nike.com." ████

████████████████████████████████████

████████████████████████████████████

████████ Opp. PX 56, Lopez Tr. 128:5–130:14. ████████

████████████████████████████████████

████████████████ Opp. PX 56, Lopez Tr. 128:5–130:14. ███

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

Opp. PX 56, Lopez Tr. 128:5–130:14.  Mr. Lopez did not testify about pre-release sneakers being offered for sale on StockX's platform.

b.   StockX further disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 56, including that any consumer choosing to purchase a Nike shoe listed for sale on StockX's website pre-release could purchase the same shoe just as easily from Nike's website.  Nike severely and intentionally limits supply of new and limited-edition sneakers to Nike customers.   Nike uses scarcity as marketing device, and sells limited-release shoes exclusively through a lottery system only accessible in its SNKRS app.  Opp. DX 17, Wells Rep. ¶¶ 72–75.  Mike Child, Nike's Director of Digital Goods Strategy and corporate representative, testified that he purchased a pair of sneakers on StockX because he "attempted to" purchase them from Nike, but "didn't win the draw."  Opp. DX 19, Child Tr. 243:8–22.   Heather Paulson, Nike's VP of Connected Marketplace and corporate representative, testified that Nike ████████████████████████████████████████ ████████████████████████████████████████  Opp. DX 2, Paulson Tr. 208:24–209:4.  ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████  Further, when consumers turn to the resale market to purchase these limited release sneakers, they must do so "often at prices much higher than the original retail price," Opp. DX 17, Wells Rep. ¶ 76, and Nike has offered no evidence that any pre-release sneakers were available from both Nike and StockX, *for the same price*.

     c.  StockX also disputes the materiality of the information in Paragraph 378 and any broader assertions that the parties compete, particularly given that Nike has conceded that "[t]his case does not involve comparative advertising," ECF 270 at 25, n. 20.

769.  Prior to September 2022, every StockX purchase was delivered with a green StockX authentication tag attached. *See* Dkt. 257-75, Ex. 75 at STX0752639.

     a.  <u>StockX Response</u>:  Undisputed.  However, StockX disputes the materiality of the information in Paragraph 379.

770.  Prior to September 2022, the green StockX authentication tag read "Always verified authentic." Sept. Duvdevani Decl. ¶ 86, Ex. 85, Fenton Tr. 110:6-21.

     a.  <u>StockX Response</u>:  Undisputed.  However, StockX disputes the materiality of the information in Paragraph 380, particularly given that consumers would not receive and review StockX authentication tags until after purchase.

771.  Prior to September 2022, after purchasing an item, buyers received an email informing them that their "Order Shipped to StockX" and stating that "Once we make sure it's 100% authentic, we will send it your way." Sept. Duvdevani Decl. ¶ 134, Ex. 133, (STX0017024 at 093)

     a.  <u>StockX Response</u>:  Undisputed.  However, StockX disputes the materiality of the information in Paragraph 381, given Nike's concession that consumers did not receive the referenced emails until "after purchasing an item."

772.  Prior to September 2022, after purchasing an item, buyers received an email informing them that their "Order Verified and Shipped" and stating that "Your StockX purchase has officially passed verification..." Sept. Duvdevani Decl. ¶ 134, Ex. 133, (STX0017024 at 094)

a. <u>StockX Response</u>:  Undisputed.  However, StockX disputes the materiality of the information in Paragraph 382, given Nike's concession that consumers did not receive the referenced emails until "after purchasing an item."

773.    A StockX customer wrote to StockX customer support stating: "The track shoe was a gift for my son and he was so excited to get this particular shoe because of all the [] quality [] of the shoe that was advertised or promoted…Now at a track meet my son using the shoe purchased from StockX broke in the middle of a race.  I honestly think it[]s unfair that because it[]s passed the 3 days or it doesn[]t have the StockX verification tag on, it[]s not exchangeable.  I have done research with Nike and was advised that Nikes policy is refundable up to 2 years. I[]m not saying they will refund me but they will refund the purchase StockX if the shoe is returned back to Nike" Sept. Duvdevani Decl. ¶ 9, Ex. 8, STX0226300.

a. <u>StockX Response</u>:  Undisputed that a StockX customer service representative received the email referenced in Paragraph 383 and that Opp. PX 8 includes the quoted text.  However, StockX disputes Nike's characterization of, and inferences purportedly drawn from, Opp. PX 8 as misleading because Paragraph 383 omits additional context necessary to understand the exhibit.  Specifically, a StockX customer service representative wrote to the StockX customer: "once a product arrives at StockX from the seller, our dedicated verification team begins a thorough inspection, making sure that it meets our condition guidelines.  They receive constant training and industry updates to remain experts.  Only after being verified will the product be sent to you. . . . However, due to our policy, once the verification tag has been removed, the item no longer eligible to be investigated because the order is now voided.  If there is a problem with an item you received, you must

645

contact us in writing within 3 business days of receiving it.  Unfortunately, we are not [sic] outside of that timeframe for review . . . it states on the verification tag not to remove it to help prevent situations like this from happening."  Opp. PX 8, STX0226300.  StockX further disputes that Nike has provided any evidence that any Nike product purchased via StockX by the customer that sent the referenced email was inauthentic.

774.    On May 11, 2022, a StockX customer service representative responded to a StockX customer stating: "Nike's latest filing is not only baseless but also is curious given that their own brand protection team has communicated confidence in [StockX's] authentication program, and that hundreds of Nike employees including current senior executives use StockX to buy and sell products.  This latest tactic amounts to nothing more than a panicked and desperate attempt to resuscitate its losing legal case against our innovative Vault NFT program that revolutionizes the way consumers can buy, store, and sell collectibles safely, efficiently, and sustainably.  Nike's challenge has no merit and clearly demonstrates their lack of understanding of the modern marketplace….Rest assured your the shoes that you bought are 100 percent authentic."  Sept. Duvdevani Decl. ¶ 81, Ex. 80 (STX0779941 at 944).

a.  StockX Response:  Undisputed that a StockX customer service representative sent the email referenced in Paragraph 384 and that Opp. PX 80 includes the quoted text.  However, StockX disputes Nike's characterizations of, and inferences purportedly drawn from, the quoted statement as misleading because Nike has provided no evidence that any Nike product purchased via StockX by the customer that received the referenced email was inauthentic.  Further, the customer that received the referenced email never stated that he believed the shoes he received

were not authentic, never asked to return a shoe order, and never asked for a refund

for a shoe order.  Opp. PX 80, STX0779941 at 944.

### E.  Butler's Disclosure

775.    On May 5, 2023, StockX made its affirmative expert disclosure which did not

include Ms. Butler but included Mr. Wells.  Sept. Duvdevani Decl. ¶ 135, Ex. 134.

   a.  <u>StockX Response</u>:  Undisputed.

776.    One June 2, 2023, StockX disclosed its rebuttal experts including Ms. Butler.  Sept.

Duvdevani Decl. ¶ 136, Ex. 135

   a.  <u>StockX Response</u>:  Undisputed.

777.    Ms. Butler described her rebuttal expert report assignment was "[t]o inform a

response to Mr. Hansen's report…" Butler. Rep.  at ¶ 9.

   a.  <u>StockX Response</u>:  Undisputed that Ms. Butler's report included the quoted text.

   However, StockX's disputes Nike's characterization of, and inferences drawn from,

   the quoted text as misleading as Paragraph 387 omits context necessary to

   understand the quoted text.  Ms. Butler's report also states she "was asked by

   counsel for [StockX] to determine the extent to which, if at all, [the Authentication

   Statements] found on StockX's website during the relevant time period influence

   consumers' decisions to use the site to purchase sneakers."  DX 119, Butler. Rep.

   ¶ 9.  Ms. Butler further testified that it was "[her] understanding . . . that [her report

   could] potentially inform a response to Mr. Hansen's report."  Reply DX 9, Butler

   Tr. 54:17–22.  She later stated that "[her] understanding [was that an assessment

   of the extent to which these authentication statements may impact consumer

   behavior is a relevant piece of evidence that may also be used to inform a response

   to [Mr. Hansen's] opinions," and that she "underst[ood] that the evidence or a

survey testing or understanding the extent to which the authentication statements have an impact on consumer behavior can potentially be used to inform a response to Mr. Hansen's report."  Reply DX 9, Butler Tr. 55:7–18, 66:21–67:1.  StockX disputes that just because Ms. Butler's report provides evidence that may be used to respond to Mr. Hansen's report, that use is the only probative use of her testimony.  Ms. Butler's survey is evidence rebutting Nike's arguments that the advertising claims at issue are material, and Ms. Butler has testified multiple times that her survey evaluates the materiality of the statements at issue to consumers. Reply DX 9, Butler Tr. 29:7–10, 30:4–7, 51:19–52:1, 54:12–14, 55:24–56:5, 56:17–22, 58:8–11, 58:19–59:1, 59:11–15, 66:21–67:1, 67:23–68:8, 73:15–21, 86:18–22, 87:2–4.  Further, this Court has already declined to exclude Ms. Butler and stated that Ms. Butler's testimony is relevant to the issue of materiality.  *See* ECF 250 at 6 ("[B]ecause materiality and falsity remain live issues at this stage of litigation, at least for now, Butler's testimony may be relevant.").

778.    Ms. Butler purports to measure the Accused Advertising's impact on consumer purchasing, showed respondents StockX's Authentication Page and How it Works Page, amongst other webpages, and asked how likely they were to use the StockX website to purchase sneakers and why.  Butler Rep. ¶¶ 9, 30, 35

    a.  <u>StockX Response</u>:  Undisputed.

*F.    StockX's Prominent Use of the Nike Brand & Nike Imagery*

779.    ███████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████  Sept.

Duvdevani Decl. ¶ 137, Ex. 136 STX0023684 at 772.

      a.  <u>StockX Response</u>:  Undisputed that a StockX PowerPoint presentation includes the above-quoted text.  However, StockX disputes that Opp. PX 136 supports Nike's assertion that "[t]he only company that relies on Nike's brand more than StockX to sell footwear is Nike."  ECF 270 at 27 (citing this paragraph in support of its quoted assertion).

780.    News and Editorials from StockX in "The Magazine" frequently feature Nike shoes and the majority of recent articles as of September 5, 2024 featuring Nike footwear. Sept. Duvdevani Decl. ¶ 138, Ex. 137 (StockX – "The Stock Market of Things" - News and More)

      a.  <u>StockX Response</u>:  Disputed.  StockX disputes that the cited evidence supports the statement that "'The Magazine' ***frequently*** feature[s] Nike shoes and the ***majority*** of recent articles as of September 5, 2024 [feature] Nike footwear."  (emphasis added).  News and Editorials on StockX's website also include buyer guides for products from other brands, for example articles on Uggs, Vans, and Yeezy slides, as well as articles on designers and apparel including "Women Designers to Watch in 2023," and "Outerwear Anyone Would Love."  *See e.g.*, Reply DX 10, StockX, "UGG: They Buyer's Guide," https://stockx.com/news/ugg-the-buyers-guide/; Reply DX 11, StockX, "The Buyer's Guide: Vans," https://stockx.com/news/the-buyers-guide-vans/; Reply DX 12, StockX, "The Buyer's Guide: Yeezy Slides," https://stockx.com/news/the-buyers-guide-yeezy-slides/;  Reply DX 13, StockX, "Women Designers to Watch in 2023," https://stockx.com/news/women-designers-to-watch-in-2023/;  Reply DX 14, StockX, "Outerwear Anyone Would Love," https://stockx.com/news/outerwear-anyone-would-love/.  Nike has put forth no evidence that the majority of articles on StockX's website feature Nike footwear.

StockX further disputes that Opp. PX 137 supports Nike's assertion that "[t]he only company that relies on Nike's brand more than StockX to sell footwear is Nike." ECF 270 at 27 (citing this paragraph in support of its quoted assertion).

781.    Eight out of nine of the initial launch of StockX "Vault NFTs" featured Nike products. Sept. Duvdevani Decl. ¶ 139, Ex. 138 (NIKE0000055 at 56)

    a.    <u>StockX Response</u>:  Undisputed that eight out of nine of the initial launch of StockX "Vault NFTs" featured Nike products.  However, StockX disputes that Opp. PX 138 supports Nike's assertion that "[t]he only company that relies on Nike's brand more than StockX to sell footwear is Nike."  ECF 270 at 27 (citing this paragraph in support of its quoted assertion).

782.    On March 23, 2022, the banner on the StockX homepage featured two "Nike Drake NOCTA Hot Step Air Terra" shoes.  Sept. Duvdevani Decl. ¶ 140, Ex. 139 (NIKE0003528).

    a.    <u>StockX Response</u>:  Undisputed that this banner appeared on the StockX homepage on March 23, 2022.  However, StockX disputes that Opp. PX 139 supports Nike's assertion that "[t]he only company that relies on Nike's brand more than StockX to sell footwear is Nike."  ECF 270 at 27 (citing this paragraph in support of its quoted assertion).

783.    On March 24, 2022, the banner on the StockX homepage featured an "Air Jordan 6 Mint Foam." Sept. Duvdevani Decl. ¶ 141, Ex. 140 (NIKE0003476).

    a.    <u>StockX Response</u>:  Undisputed that this banner appeared on the StockX homepage on March 24, 2022.  However, StockX disputes that Opp. PX 140 supports Nike's assertion that "[t]he only company that relies on Nike's brand more than StockX to

sell footwear is Nike." ECF 270 at 27 (citing this paragraph in support of its quoted assertion).

784.    On March 25, 2022, the banner on the StockX homepage featured a StockX promotion for Nike Air Max shoes.  Sept. Duvdevani Decl. ¶ 142, Ex. 141 (NIKE0003473).

    a.    <u>StockX Response</u>:  Undisputed that this banner appeared on the StockX homepage on March 25, 2022.  However, StockX disputes that Opp. PX 141 supports Nike's assertion that "[t]he only company that relies on Nike's brand more than StockX to sell footwear is Nike."  ECF 270 at 27 (citing this paragraph in support of its quoted assertion).

785.    On April 10, 2022, the banner on the StockX homepage featured an "Air Jordan 5 Jade." Sept. Duvdevani Decl. ¶ 143, Ex. 142 (NIKE0003550).

    a.    <u>StockX Response</u>:  Undisputed that this banner appeared on the StockX homepage on April 10, 2022.  However, StockX disputes that Opp. PX 142 supports Nike's assertion that "[t]he only company that relies on Nike's brand more than StockX to sell footwear is Nike."  ECF 270 at 27 (citing this paragraph in support of its quoted assertion).

786.    On February 21, 2022, the banner on the StockX official twitter account appeared as below and included two Nike shoes.  Sept. Duvdevani Decl. ¶ 144, Ex. 143.



     a.   <u>StockX Response</u>:  Undisputed that on February 21, 2022, the banner on the StockX

official twitter account appeared as above and included two Nike shoes.  However,

StockX disputes that Opp. PX 143 supports Nike's assertion that "[t]he only

company that relies on Nike's brand more than StockX to sell footwear is Nike."

ECF 270 at 27 (citing this paragraph in support of its quoted assertion).

787.   StockX has used "Advanced Technology" to describe its authentication process

since February 2021. Dkt. 261-56, Ex. 53 (StockX's First Supplemental Response to Nike

Interrogatory No. 20.)

     a.   <u>StockX Response</u>:  Undisputed.

Dated:    November 5, 2024
            New York, NY

                  By: <u>/s/   Megan K. Bannigan</u>
                  DEBEVOISE & PLIMPTON LLP
                  Megan K. Bannigan (mkbannigan@debevoise.com)
                  David H. Bernstein (dhbernstein@debevoise.com)
                  Jyotin Hamid (jhamid@debevoise.com)
                  Christopher S. Ford (csford@debevoise.com)

Kathryn C. Saba (ksaba@debevoise.com)
66 Hudson Boulevard
New York, New York 10001
(212) 909-6000

KILPATRICK TOWNSEND & STOCKTON LLP
Robert N. Potter (rpotter@kilpatricktownsend.com)
Briggs Wright (briggs.wright@kilpatricktownsend.com)
1114 Avenue of the Americas
New York, New York 10036
(212) 775-8700

MORGANROTH & MORGANROTH PLLC
Jeffrey B. Morganroth (jmorganroth@morganrothlaw.com)
344 N. Old Woodward Ave., #200
Birmingham, MI 48075
(248) 864-4000

*Attorneys for StockX LLC*


By:  _/s/    Tamar Y. Duvdevani_

DLA PIPER LLP (US)

Tamar Y. Duvdevani
Marc E. Miller
Jane W. Wise
Joshua Schwartzman
Jared Greenfield
Gabrielle Chasin Velkes
1251 Avenue of The Americas, 27th Fl.
New York, NY 10020
Telephone: (212) 335-4500
Facsimile: (212) 335-4501

*Attorneys for Plaintiff Nike, Inc.*