# EXHIBIT 50

**Nike, Inc.**

**v.**

**StockX LLC**

**Case No. 1:22-cv-000983-VEC**

**First Amended Expert Report of John L. Hansen**

**TM Financial Forensics, LLC**
**May 30, 2023**



John L. Hansen

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

I.    INTRODUCTION.......................................................................................... 2

  A.   TM Financial Forensics, an HKA Company / Qualifications............................. 2

  B.   Retention, Assignment, and Assumptions ........................................................ 4

  C.   Information Considered ................................................................................... 5

II.   SUMMARY OF OPINIONS ....................................................................... 6

III.  BACKGROUND ......................................................................................... 7

  A.   Nike, Inc.......................................................................................................... 7

  1.   Nike's Trademarks .......................................................................................... 8

  B.   StockX LLC ................................................................................................... 10

  C.   StockX Authentication Claims and False Advertising ..................................... 13

  D.   StockX Sales of Nike and Jordan Branded Products ....................................... 18

IV.   OPINIONS ................................................................................................. 20

  A.   Disgorging StockX's Profits ........................................................................... 21

  B.   StockX Revenue............................................................................................. 25

  C.   StockX Deductible Costs ............................................................................... 28

  1.   StockX Cost of Revenues .............................................................................. 29

  2.   Indirect Costs ................................................................................................ 30

  a.   StockX Contribution Margin – 1 .................................................................... 31

  b.   StockX Contribution Margin – 2 .................................................................... 33

  c.   Other StockX Operating Expenses ................................................................. 34

  D.   Summary of StockX Gross Profits.................................................................. 35

  E.   Other Deductions ........................................................................................... 35

  F.   Counterfeit Damages ..................................................................................... 35

  G.   Pre-Judgment Interest .................................................................................... 37

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

## I.    **INTRODUCTION**

1.   I submitted the Expert Report of John L. Hansen dated May 5, 2023.  On May 23, 2023, StockX produced documents bearing bates numbers STX0806027 through STX0806052. StockX represented these documents "contain StockX's audited financial statement for 2022, as well as updated information reflecting the results of this audit that supersedes information previously produced at STX0774394."[1]  STX0774394 is StockX's quarterly profit and loss statements for each of its operating entities, both individually and as a consolidated entity, from Q1 2020 through Q3 2022.  One of the newly produced documents, STX0806052, is an updated version of StockX's quarterly profit and loss statements for each of its operating entities, both individually and as a consolidated entity, from Q1 2021 through Q4 2022, which reflects changes to certain of the financial data for the overlapping period reported in STX0774394.

2.   I submit this First Amended Expert Report to update the calculations in my May 5, 2023 Expert Report to incorporate the newly produced StockX financial data noted above. Accompanying this First Amended Expert Report are updated Attachments, updated to incorporate the newly produced StockX financial data.  The Attachments that have been updated are referenced throughout this First Amended Expert Report and attached to this report bearing a ".**U**" designation.  Also accompanying this report is a redline comparison between my May 5, 2023 Expert Report and this First Amended Expert Report to identify the minor changes to my calculations caused by incorporation of the newly produced StockX financial data.

### A.    **TM Financial Forensics, an HKA Company / Qualifications**

3.   TM Financial Forensics, an HKA Company ("TMF-HKA") is a business, economic, financial, and damages consulting company that provides services to business entities, individuals, and counsel.  TM Financial Forensics, LLC was acquired by HKA on November 4, 2022, and I am a Partner at TMF-HKA and a leader of the intellectual property practice for the Americas.  Previously, I was a Vice President and founding member of TM Financial Forensics, LLC in the San Francisco Bay Area offices.  I am

---

[1] StockX Production Letter, May 23, 2023.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

also a Certified Public Accountant licensed in the State of California, Certified in Financial Forensics, a Certified Licensing Professional, and a Chartered Global Management Accountant.  Before founding TMF on January 5, 2010, I was a Director in the San Francisco office of Navigant Consulting, Inc.   Before joining Navigant Consulting, Inc. in 2004, I was a Vice President in the San Francisco office of Tucker Alan Inc. ("Tucker Alan") and one of the leaders of Tucker Alan's national intellectual property practice.  Prior to joining Tucker Alan in August 1994, I was employed by Peterson Consulting, where I provided consulting to clients on a variety of regulatory and commercial matters.  I graduated with honors from Santa Clara University in 1989 with a Bachelor of Science in Commerce, major in finance and minor in economics, and currently serve on the Advisory Board for the Leavey School of Business at Santa Clara University.

4.      I am experienced in the financial, economic, and accounting matters relating to the scope of our work, analysis, and study on this matter.  I have consulted on numerous Lanham Act matters, including trademark infringement and false advertising cases, as well as intellectual property infringement, breach of contract, valuation, and licensing-related matters.  I have prepared and analyzed hundreds of claims for lost profits, defendant's profits, reasonable royalties, increased costs, and other financial and economic impacts. I have also presented and lectured on intellectual property valuation, licensing, and economic damages, including to Santa Clara University School of Law, Stanford University, The McCarthy Institute (University of San Francisco), the Licensing Executives Society and the Rocky Mountain Intellectual Property & Technology Institute, as examples.

5.      My curriculum vitae, including publications during the last ten years, is included as **Attachment 1** to this Report.  A list of cases in which I have testified as an expert witness at trial, arbitration, and/or deposition during the last four years is included as **Attachment 2.U** to this Report.  My hourly billing rate on this matter is $650.

6.      TMF's compensation is not dependent on the outcome of this matter.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

## B.    Retention, Assignment, and Assumptions

7.    TMF was retained by counsel for Nike, Inc. ("Nike") to evaluate financial and economic issues as well as to assess disgorgement of StockX's profits related to the false advertising claims Nike has asserted against StockX under the Lanham Act under 15 U.S.C. § 1125(a)(1)(B).[2]  For purposes of this Report, I have assumed that StockX is found liable for false advertising.

8.    I understand that Nike has alleged that StockX has made several false and misleading statements[3], including but not limited to claims that the Nike/Jordan branded goods sold on StockX's platform:

- Are "100% Verified Authentic"[4];

- "100% Authentic"[5];

- Go through a "proprietary multi-step verification process with a team of expert authenticators"[6];

- Use "100+ data points"[7];

- Are authenticated by "authenticators [that] are better equipped than anyone to ensure a product's authenticity"[8];

- Have "Guaranteed Authenticity. Every item. Every time"[9]; and

- Have an authentication accuracy rate of "99.95%."[10]

---

[2] *Nike, Inc. v. StockX LLC*, First Amended Complaint, No. 22-cv-983, Dkt. 39, (S.D.N.Y. May 25, 2022) ("Complaint"): p. 67-68.  I understand that Nike does not intended to seek to recover monetary damages in connection with its claims of: (1) trademark infringement under 15 U.S.C. § 1114; (2) false designation of origin / unfair competition under 15 U.S.C. § 1125(a); (3) trademark dilution under 15 U.S.C. § 1125(c); (4) injury to business reputation and dilution, New York general business law § 360-1; and (5) common law trademark infringement and unfair competition asserted in its Complaint.
[3] "Authentication – StockX": NIKE0006785-790 (at 788); "Authentication – StockX": NIKE0038783-788 (at 784); "Big Facts: Verified Authentic – StockX": NIKE0006776-781 (at 777).
[4] Complaint p. 19-21, 67-68, "Authentication – StockX": NIKE0006785-790 (at 786).
[5] Complaint pp. 6, 38; NIKE0000016.
[6] Complaint p. 19, 67-68.
[7] Complaint p. 19, "Authentication – StockX": NIKE0006785-790 (at 786).
[8] Complaint p. 19.
[9] Complaint p. 20-21, "Authentication – StockX": NIKE0006785-790 (at 786).
[10] Complaint p. 20-21.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

9.    For purposes of this Report, I assume that the period for which Nike is entitled to StockX's profits for the above false advertising statements begins as early as January 1, 2020 and ends September 30, 2022 (the "Relevant Period").  Should the finder of fact determine that the Relevant Period is different, I reserve the right to update the calculations set forth below using the methodology set forth herein.

10.   I understand that Nike may choose to elect statutory damages in connection with its claim for counterfeiting under 15 U.S.C. § 1114 asserted in the Complaint.[11]  I have also been asked to calculate potential statutory damages related to Nike's claim that StockX has acquired, offered for sale, sold, and shipped directly to consumers shoes bearing counterfeit Nike trademarks and is therefore liable for counterfeiting under the Lanham Act, 15 U.S.C. § 1114.

### C.    Information Considered

11.   **Attachment 3.U** to this Report contains a list of various documents, data, and other information considered in forming my opinions in this matter.  I have also considered the applicable legal and accounting principles supporting a disgorgement award.  Select pages of the documents and information listed in **Attachment 3.U** may be used as exhibits to summarize or support my opinions.  Additionally, I may prepare graphical or illustrative exhibits to use at trial based on the documents and information relied upon and my analysis of those documents and information.  I have also had a discussion with Barbara Delli Carpini (Nike VP of Global Brand Protection and Digital IP Enforcement).

12.   The opinions in this Report are based on currently available information.  If representatives of Nike, StockX, third parties, and/or experts retained on behalf of the StockX present additional information, then my opinions and conclusions may be supplemented, amended, or revised.

13.   I expect to offer testimony at trial regarding the opinions described within this Report.  I may also be asked to testify in response to any rebuttal testimony offered by StockX, including the methodology for calculating damages used by StockX's damages expert.

---

[11] Complaint pp. 66-67; 15 U.S.C. § 1117(c).

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

14. TMF received and executed a copy of the protective order in this matter. Some of the documents considered have been designated as "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY," or "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY" pursuant to the protective order. Accordingly, I understand that portions of this Report and Attachments may be designated as "HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY."

## II.    SUMMARY OF OPINIONS

15. I have been asked by counsel for Nike to evaluate financial and economic issues as well as to assess disgorgement of StockX's profits related to the false advertising claims Nike has asserted against StockX under the Lanham Act under 15 U.S.C. § 1125(a)(1)(B).

16. As discussed in detail below, StockX's business is centered around authentication, and StockX used its authentication service to gain a competitive advantage in the marketplace. Assuming that StockX's advertising claims about its authentication were false, and StockX authenticated and facilitated the sale of counterfeit Nike/Jordan-branded sneakers, my analysis indicates that StockX has benefitted by earning ill-gotten profits derived from falsely and/or misleadingly claiming that every "Nike" and "Jordan" brand good sold on its platform was "100% Authentic." Additionally, based on the documents and testimony discussed below, StockX's false advertising claims directly harm Nike's valuable brands and the significant goodwill Nike has amassed in those brands. While I have not quantified Nike's reputational injury, the evidence indicates that StockX's false advertising impacts Nike's business.

17. As described in **Section IV.B** below, StockX generated ███████████ in revenue from trades of Nike and Jordan branded sneakers where at least one side of the trade included a U.S. individual.[12] I understand that after identifying the ████████ of revenue at issue, the burden shifts to StockX to prove claimed elements of costs or other deductions. Nonetheless, in **Section IV.C.1**, I deducted ███████ of StockX "cost of revenues" to calculate gross profits related to StockX's falsely advertised sales

---

[12] I reserve the right to supplement my opinion should StockX present a different calculation of revenues attributable to its false advertising.

of "100% Authentic" Nike and Jordan-branded sneakers.  I recognize that indirect costs might be deductible, but only where they are actually implicated by the production and sale of the products at issue, and that the defendant must demonstrate a direct and valid nexus between each claimed overhead expense category and the accused sales.  In **Section IV.C.2**, I address certain of StockX's indirect operating expenses.

18.    A summarized in **Table 1** below, after deducting StockX's cost of revenues from revenue, StockX generated ▮▮▮▮▮▮▮ in gross profit over the Relevant Period from facilitating resale trades of Nike and Jordan branded sneakers where at least one side of the trade included a U.S. individual.

19.    I have also been asked to calculate Nike's potential statutory damages pursuant to 15 U.S.C. § 1117(c) related to the counterfeiting claim Nike has asserted against StockX under certain scenarios, which are set forth in **Section IV.F**.

## III.    <u>BACKGROUND</u>

### A.    Nike, Inc.

20.    Nike was incorporated in 1967 under the laws of Oregon.[14]  Nike designs, develops, markets and sells high-quality footwear, apparel, equipment and accessory products.[15]  Nike's footwear and apparel are primarily designed for specific athletic use, and it designs products specifically for the Jordan Brand and Converse.[16]  Nike also sells performance equipment and accessories, including bags, socks, sport balls, protective equipment, and

---

[13] **Attachment 5.U**.
[14] Nike, Inc., Form 10-K for the fiscal year ended May 31, 2022, p. 1.
[15] Nike, Inc., Form 10-K for the fiscal year ended May 31, 2022, p. 1.
[16] Nike, Inc., Form 10-K for the fiscal year ended May 31, 2022, p. 1.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

other equipment designed for sports activities.[17]  Nike sells its products through Nike-owned retail stores and digital platforms, as well as through independent distributors and licensees.[18]

21.    Nike Direct operations sells goods through Nike's "digital commerce operations and retail stores" competing with "multi-brand retailers, which sell [Nike] products through their digital platforms and physical stores, and with digital commerce platforms."[19]  Nike identifies "shifts in the ways in which consumers shop, and the continued proliferation of digital commerce" as constituting a "risk factor" implicating its business.[20]

22.    Nike's "iconic brands have worldwide recognition" and its "success depends on [its] ability to maintain and enhance [its] brand image and reputation."[21]  For Nike's fiscal year 2022 alone it spent approximately $3.8 billion dollars on advertising and promoting its brands.[22]

### 1.    Nike's Trademarks

23.    Through decades of significant marketing, advertising and investment, Nike and its brands have achieved recognition throughout the United States.  Since inception in 1967, Nike has grown its brand into one of the most recognizable in the world, recently ranked as the 10th best global brand by Interbrand.[23]

24.    Nike is the owner of the right, title and interest in numerous trademarks, including the iconic trademarks in **Table 2** below, which Nike asserted in connection with its counterfeiting claim.

---

[17] Nike, Inc., Form 10-K for the fiscal year ended May 31, 2022, p. 1.
[18] Nike, Inc., Form 10-K for the fiscal year ended May 31, 2022, pp. 1-2.
[19] Nike, Inc., Form 10-K for the fiscal year ended May 31, 2022, p. 11.
[20] Nike, Inc., Form 10-K for the fiscal year ended May 31, 2022, p. 11.
[21] Nike, Inc., Form 10-K for the fiscal year ended May 31, 2022, p. 13.
[22] Nike, Inc., Form 10-K for the fiscal year ended May 31, 2022, p. 34.
[23] "Interbrand launches Best Global Brands 2022, INTERBRAND (Nov. 3, 2022)":
https://interbrand.com/newsroom/interbrand-launches-best-global-brands-2022/.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

Table 2: Nike Asserted Marks

| Reg. No. | Title | Trademark Design | Reg. Date | Classes |
|---|---|---|---|---|
| 1,370,283[24] | AIR JORDAN | AIR JORDAN (word mark) | 11/12/1985 | 25 – Clothing, footwear |
| 3,725,535[25] | Air Jordan & Wings Design[26] |  | 12/15/2009 | 25 – Clothing, footwear, headgear |
| 3,627,820[27] | JUMPMAN | JUMPMAN (word mark) | 5/26/2009 | 25 – Clothing, footwear, headgear |
| 1,558,100[28] | JumpMan Design |  | 9/26/1989 | 25 – Clothing, footwear |
| 978,952[29] | NIKE | NIKE (word mark) | 2/19/1974 | 25– Clothing, footwear, headgear |
| 1,214,930[30] | NIKE | NIKE (word mark) | 11/2/1982 | 25– Footwear |
| 1,325,938[31] | NIKE & Swoosh Design[32] |  | 3/19/1985 | 25 – Footwear |
| 977,190[33] | Swoosh Design |  | 1/22/1974 | 25 – Footwear |
| 1,323,343[34] | Swoosh Design |  | 3/5/1985 | 25 – Footwear |

---

[24] AIR JORDAN, Registration No. 1,370,283.
[25] AIR JORDAN & Wings Design, Registration No. 3,725,535.
[26] The mark consists of a stylized AIR JORDAN & Wings Design.  No "Title" on U.S. Patent and Trademark Office registration.  "Unofficial descriptive title" used by Nike in its Complaint.  Complaint: p. 12.
[27] JUMPMAN, Registration No. 3,627,820.
[28] JUMPMAN DESIGN, Registration No. 1,558,100.
[29] NIKE, Registration No. 978,952.
[30] NIKE, Registration No. 1,214,930.
[31] NIKE & Swoosh Design, Registration No. 1,325,938.
[32] The mark consists of a stylized NIKE & Swoosh Design.  No "Title" on U.S. Patent and Trademark Office registration.  "Unofficial descriptive title" used by Nike in its Complaint. Complaint: p. 13.
[33] Swoosh Design, Registration No. 977,190.
[34] Swoosh Design, Registration No. 1,323,343.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

### B.    StockX LLC

25.    StockX was incorporated in 2015 and is headquartered in Detroit, Michigan.[35]  StockX operates as a live, online marketplace where buyers and resellers can make anonymous offers to buy and sell a variety of sneakers, apparel, electronics, collectibles, trading cards, and accessories (the "StockX Platform").[36]  I understand that StockX is shorthand for "Stock Market of Things."[37]

26.    <u>StockX's Resale Platform</u>: StockX's resale platform is accessed through the StockX website and StockX mobile app.[38]  StockX claims that it only allows deadstock, or items that are authentic, new, and unworn at the time of sale, on its platform.[39]  StockX does not sell goods directly to consumers, instead, StockX facilitates "trades" made by consumers that buy and sell goods from each other on StockX's Platform.[40]  Product prices on StockX's Platform are set by bids and asks from the buyers and sellers, and the transaction is initiated when a buyer's bid matches with a seller's ask for a given product.[41]  StockX's product categories include: sneakers, apparel and accessories, collectibles, and electronics.[42]

27.    StockX acts as an intermediary for each transaction that takes place on its resale platform and earns revenue by charging fees to buyers and sellers.[43]  Typically, the seller ships an item to StockX, StockX receives and purportedly verifies the item's authenticity, StockX then ships the item to the buyer with a StockX-branded verification badge, and StockX

---

[35] *StockX,* CRUNCHBASE, https://www.crunchbase.com/organization/stockx (last visited May 5, 2023); *StockX LLC,* BLOOMBERG, https://www.bloomberg.com/profile/company/1786Z:SW(last visited May 5, 2023).

[36] *The Current Culture Marketplace,* STOCKX, https://stockx.com/about/how-it-works/ (last visited May 5, 2023).

[37] Deposition of Brock Huber (StockX VP of Corporate and Strategic Development), February 22, 2023: p. 54:4-15.

[38] *The Current Culture Marketplace,* STOCKX, https://stockx.com/about/how-it-works/ (last visited May 5, 2023); Complaint: ¶48.

[39] *Every item is StockX Verified,* STOCKX, https://stockx.com/about/verification/ (last visited May 5, 2023); *What is the condition of items sold on StockX?,* STOCKX, https://stockx.com/help/articles/Are-shoes-sold-on-StockX-considered-deadstock (last visited May 5, 2023).

[40] StockX Inc. Consolidated Financial Statements for Years Ended December 31, 2019 and 2020: STX0774286 – 308 (at 293); Deposition of Brock Huber (StockX VP of Corporate and Strategic Development), February 22, 2023: pp. 107:9-108:4.

[41] StockX Inc. Consolidated Financial Statements for Years Ended December 31, 2020 and 2021: STX0774309 – 336 (at 315).

[42] StockX Inc. May 2022 Board Meeting: STX0594887 - 073 (at 929).

[43] *How do I sell on StockX?,* STOCKX, https://stockx.com/help/articles/How-do-I-sell-on-StockX (last visited May 5, 2023); StockX Inc. Consuming & Trading: STX0020523 – 534 (at 523).

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

pays the seller (less its transaction fees).[44]  StockX's transaction fees, charged to the buyers and resellers of goods that utilize its resale platform, are attributed to StockX services rendered in facilitating the transaction, shipping the products, and authenticating the goods sold.[45]

28.    StockX's "core audience is…for sneakers"[46] and its U.S. consumers are evenly balanced between men and women and range in age from 18 to 54.[47]  Many StockX consumers are "sneakerheads" – those who are passionate about sneakers and sneaker culture and shop the limited-edition sneakers available on StockX's Platform.[48]

29.    Product "authentication" is one of the most important drivers of sales on StockX's Platform.  For example, in an internal Consuming and Trading report, StockX wrote: "The driver of the model since day one has consisted of two sided trade with authentication in the middle."[49]  StockX's CEO, Scott Cutler, has also stated "the authentication process stands in the middle of every transaction for us.  It results in an end buyer's high degree of trust in us as a brand to authenticate the products that are sold on our market."[50]  StockX understands that consumers "depend on StockX to ensure that every product they get is

---

[44] StockX Inc. Consuming & Trading: STX0020523 – 534 (at 523); *What kinds of sneakers are sold on StockX?,* STOCKX, https://stockx.com/help/articles/What-kinds-of-sneakers-are-sold-on-StockX (last visited May 5, 2023).
[45] StockX Inc. Consolidated Financial Statements for Years Ended December 31, 2019 and 2020: STX0774286 – 308 (at 295); StockX Inc. Consolidated Financial Statements for Years Ended December 31, 2020 and 2021: STX0774309 – 336 (at 316).
[46] Deposition of Jacob Fenton (StockX VP of Customer Experience and Insights), December 2, 2022: pp. 43:10-44:3.
[47] *See* STX0091819 – 911 at (at 886) (describing StockX's core audience).
[48] *Sneakerheads Are Helping StockX Pursue A $2.5 Billion Valuation,* FORBES (Dec. 15, 2020), https://www.forbes.com/sites/korihale/2020/12/15/sneakerheads-are-helping-stockx-pursue-a-25-billion-valuation/?sh=46eff5272255; Khadeeja Safdar, *StockX, Hub for Sneakerheads, Is Latest $1 Billion Unicorn,* WALL ST. J. (June 26, 2019), https://www.wsj.com/articles/stockx-hub-for-sneakerheads-is-latest-1-billion-unicorn-11561571959. This overlaps with the customers of Nike sneakers, who are "the general mass[es]," typically ranging from age 18 to 34, are geographically diverse, and skews male. Deposition of Ron Faris (Nike VP and GM of Nike Virtual Studios), December 7, 2022: pp. 263:14- 264:16. Nike "high heat" products target "more sneakerhead, people who are more passionate about sneakers and sneaker culture." Deposition of Ron Faris (Nike VP and GM of Nike Virtual Studios), December 7, 2022: pp. 263:2-13.
[49] "Consuming and Trading: STX0020523 (at 523).
[50] Marc Bain, *For StockX, selling sneakers is just the beginning,* QUARTZ (May 8, 2021), https://qz.com/2005457/for-stockx-selling-jordans-is-just-the-beginning; *StockX Launches Vault NFTs,* STOCKX (Jan. 18, 2022), https://stockx.com/about/stockx-launches-vault-nfts/ ("our marketplace is centered on authenticity, liquidity, and market visibility with pricing based solely on supply and demand.")

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

authentic."[51]  StockX internal email correspondence further indicates that its "entire brand is built on authenticity/authentication."[52]

30.    Consumer trust (i.e., the belief that they are buying authentic goods) is identified as an important attribute for consumers in the resale market.  A StockX Global Segmentation Study states that "When buying, <u>trust</u> dominates as the most important attribute on platforms.  Buyers emphasize trust, authentication & fair deal as most important."[53]  The study commissioned by StockX shows that in the U.S., 61% of survey respondents said that "Knowing the good is certified as authentic" is "most important to you when choosing an online reselling platform to buy goods" and 65% of survey respondents said that having "trustworthy buyers/sellers" is "most important to you when choosing an online platform to <u>sell</u> goods."[54]

31.    During the Relevant Period, StockX did not have a publicized return policy for accepting returns for products purchased on its platform.[55]  In fact, StockX's policy for its custom service team's handling of return requests was to encourage users to resell products on its platform, including when customers seek to return items because they believe the items are fake.[56]

---

[51] StockX eLT Meeting Presentation: STX0039423-473 (at 440).

[52] StockX internal email correspondence from Will Rodriguz, November 3, 2021: STX0039585-592 (at 586).

[53] Deposition of Jacob Fenton (StockX VP of Customer Experience and Insights), December 2, 2022: pp. 58:4-60:17; Fenton Ex. 6, StockX Decode_M Segment Results Presentation: STX0018453-499 (at 465-466); See also, StockX 5 Year Energy Merchandising Plan, March 16, 2022: STX0090493-677 (at 503, 505) ("StockX is starting point for all hard to find items of our core customer base and recognized as the trusted brand." "We aspire to be the trusted, global platform for consuming and trading Current Culture.")

[54] Deposition of Jacob Fenton (StockX VP of Customer Experience and Insights), December 2, 2022: pp. 58:4-60:17; Fenton Ex. 6, StockX Decode_M Segment Results Presentation: STX0018453-499 (at 465-466).

[55] Fenton Ex. 16: STX0021481-498 (at 484) ("All sales are final. StockX does not allow for returns, exchanges, or cancellations"); Fenton Ex. 14: StockX Returns & Cancellations Presentation, February 2021: STX0020225-268 (at 227, 231) ("We all know that StockX does not offer, at least programmatically, a way to meet key standard customer expectations as it relates to returns and exchanges"); StockX Business Requirements Document Returns & Cancellations Policy, February 2021, STX0091556-567 at 556 ("Users who request returns are directed to resell the item back on the platform"); Appeals and Process Improvements: STX0061163-172 (at 165) (describing customer service interactions with failed sales: "Depends on the issue, but for fakes for example … there's no real process to handle the interaction with the customer – Sometimes it gets handled based on how the seller responds → if the seller gets really angry than you will typically will make an exception for the customer").

[56] "Users who request returns are directed to resell the item back on the platform – Only after multiple requests and loud complaints do CS agents initiate a return.": StockX Business Requirements Document Returns & Cancellations Policy, February 2021: STX0091556-567 (at 557); Additionally, Mr. Roy Kim, a third party consumer and sneaker

---

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

### C.    StockX Authentication Claims and False Advertising

32.    During the Relevant Period, StockX purported to authenticate every item sold through its proprietary multi-step verification process.[57]  StockX claimed to use a "proprietary, multi-step authentication process for every product sold on its platform."[58]  StockX represented that "this process ensures that items traded on StockX conform to the product descriptions and condition standards advertised by StockX, and that the products offered for sale are what they claim to be, and are not counterfeit, defective, or used—meaning StockX's customers can trust that transactions made through StockX are safe."[59]  StockX claimed to have "authenticated tens of millions of products since its formation, combining its authentication team's expert knowledge with AI-enhanced technology to allow global customers to trade with confidence."[60]  I understand a StockX authenticator spends, on average, 90 seconds reviewing a particular product.[61]  StockX has five authentication centers located in the United States, as well as authentication centers in United Kingdom, the Netherlands, Canada, Mexico City, Hong Kong, Australia, Japan and South Korea.[62]

33.    Over the Relevant Period, in connection with StockX's authentication process, StockX made a number of additional marketing claims designed to inform consumers that items bought on StockX are "Guaranteed Authentic" because all products are "100% Verified Authentic."[63]    Additionally, StockX product pages, including those where the Nike/Jordan branded goods sold on the StockX Platform, each advertise the fact that the

---

collector testified about his experience trying to get a return though "official channels" but not getting anyone at StockX's attention until he posted about the number of counterfeit items on social media.  According to Mr. Kim, he was aware that in the past, "StockX had suggested that if, as a buyer, when we're unhappy with the authenticity or if we believe the shoes would be inauthentic, to sell them back through the platform". Deposition of Roy Kim (Third Party Consumer and Sneaker Collector), February 8, 2023: pp. 67:19-70:15, 71:12-74:2.

[57] *The Current Culture Marketplace,* STOCKX, https://stockx.com/about/how-it-works/ (last visited May 5, 2023); Deposition of Brock Huber (StockX VP of Corporate and Strategic Development), February 22, 2023: pp. 20:24-21:4.

[58] StockX Answer to Complaint, March 31, 2022: ¶2.

[59] StockX Answer to Complaint, March 31, 2022: ¶2.

[60] StockX Answer to Complaint, March 31, 2022: ¶2.

[61] Deposition of Brock Huber (StockX VP of Corporate and Strategic Development), February 22, 2023: pp. 66:24-67:1.

[62] StockX Inc. Consolidated Financial Statements for Years Ended December 31, 2020 and 2021: STX0774309 – 336 (at 315); https://stockx.com/help/articles/where-is-StockX-located

[63] Authentication – StockX: NIKE0006785-790 (at 786).

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

product offered for sale is "100% Authentic."[64]   After the filing of this lawsuit, StockX introduced a number of variations of promises regarding the authenticity of the products it sells, including "Verified Authentic" and "We Authenticate Every Item. Every Time." These promises and guarantees of authenticity were made in connection with the sale of the Nike/Jordan branded goods.  I understand that StockX is not an authorized distributor of Nike products.[65]

34.    StockX touts its authentication process, telling consumers to "[t]rust The Process" that it has built through a team of "expert authenticators" that use "a rigorous, multi-step verification procedure."[66]   StockX assures consumers that its "authenticators are better equipped than anyone to ensure a product's authenticity."[67]   StockX further states that "we use machine learning to aid our authenticators in catching every minor detail" and quality assurance to conduct a "final check in our authentication practice…[to] ensure nothing slips through the cracks."[68]

35.    StockX differentiates itself from other competitors in the secondary market by "invent[ing] an entirely new job category of authenticator."[69]   In an article titled "StockX. Always Authentic, Never Fake," StockX queries: "Before StockX, how did you know you know your shoes weren't fake?  You didn't have much assurance that the sneakers you bought online were authentic."[70]   But StockX promises that while "[o]utside of StockX, the sneaker reseal market is far from safe. . . . resale on StockX is different."[71] StockX explained:

> *By adding an authentication layer on top of the normal transactional relationship, StockX changed the game.  And by standing between buyer and seller and authenticating every item sold on our marketplace, we moved past the old world where*

---

[64] For example, *see* Stock Historical Web Archives: NIKE0039854-40006; StockX Product Page for Jordan 1 Retro High OG:STX0484545.
[65] Complaint: ¶48.
[66] Authentication – StockX: NIKE0006785-790 (at 786); *see also Every item is StockX Verified,* STOCKX, https://stockx.com/about/verification/ (last visited May 5, 2023).
[67] Authentication – StockX: NIKE0006785-790 (at 786).
[68] Authentication – StockX: NIKE0006785-790 (at 786-787).
[69] Fenton Ex. 11: STX0020185-188 (at 186).
[70] Stock Historical Web Archives: NIKE0039854-40006 (at 855)
[71] Is StockX Legit The Answer Is Yes – StockX News: NIKE0038792-798 (at 794).

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

*getting fake sneakers was a common occurrence, and entered a*
*new world where authenticity was central to the shopping*
*experience.[72]*

36.    StockX's go to market strategy involves heavily marketing its authentication process,
which it believes provides StockX a competitive advantage.[73]   Given the prevalence of
counterfeit sneakers in the secondary marketplace, StockX used its claimed guarantee of
product authenticity to gain a competitive advantage in the marketplace.[74]

37.    I understand, however, that discovery in this case has revealed that StockX has
"authenticated" and sold at least 90 confirmed counterfeit pairs of "Nike" branded
shoes.[75]   In one example, I understand that a third party consumer and sneaker collector
named Roy Kim purchased sixty-two pairs of "Nike" shoes from the StockX Platform
between March and July 2022 and that Nike confirmed that thirty-eight of those sixty-

---

[72] Is StockX Legit The Answer Is Yes – StockX News: NIKE0038792-798 (at 794).

[73] StockX ML & Authentication Presentation: STX0023881-887 (at 882) ("Authentication enables key parts of the
StockX Model"); Fenton Ex. 11: STX0020185-188 (at 185-186) ("Authentication is at the core of the experience
and StockX set the industry standard. … StockX invented an entirely new job category of authenticator; they are
armed with a robust database of proprietary information to effectively assess the legitimacy of each product.");
StockX Creative Brief: STX069905-907 at (905-906) (describing the goal of redesigning its "Authentication
Landing Page" as providing StockX's customers "a sense of assurance in the authenticity of the products traded on
StockX and feel a level of confidence in StockX's authentication process that separates StockX from the rest of the
authenticated luxury competitive landscape."); Deposition of Jacob Fenton (StockX VP of Customer Experience and
Insights), December 2, 2022: pp.105:20-106:25 (describing benefits of purchasing on StockX over Facebook
Marketplace, Instagram, and eBay because products on StockX "have been verified against, you know,
manufacturing defects, making sure they have all the right accessories, the right sizes, things of that nature.");
Fenton Exhibit 15: StockX Brand Page Copy & Design Review, October 2020: STX021182-188 (at 186) (stating
that a goal of StockX's "Authentication Page" is to "Differentiate our authentication from the competition.");
StockX Q3 Global All Hands September 2021 Presentation: STX0016703-869 (at 797) ("Our Authentication
Centers Are a Competitive Advantage"); "Taking Stock Of StockX: Deep Dive Into The Sneaker Resale Market
Leader", Wells Fargo, January 27, 2020: p. 2 ("The authentication aspect is key, as the fear of spending hundreds of
dollars on a counterfeit pair of sneakers has been a key hurdle for potential buyers to overcome.".

[74] Expert Report of Kari Kammel, May 5, 2023 ("Kammel Report"): p. 14 (discussing the prevalence of counterfeit
sneakers and the impact on the footwear industry); Praveena Somasundaram, *As counterfeits rise, sneaker
authenticators sniff out real from fake*, Wash. Post (Sept. 30, 2022),
https://www.washingtonpost.com/business/2022/09/30/sneaker-authentication-ebay-stockx-nike/ ("Resale
companies including eBay, StockX and GOAT have turned to sneaker authenticators to protect their trade,
promising patrons that sneakers resold on their sites are certified."); Is StockX Legit The Answer Is Yes – StockX
News: NIKE0038792-798 (at 794) ("In 2020, analysts estimated that the counterfeit sneaker market alone was worth
$450 million.  The proliferation of fake sneakers has become commonplace and widespread.")

[75] Nike's Supplemental Response to StockX's Third Set of Interrogatories, (No. 20), April 17, 2023; NIKE0029087;
NIKE0039436, NIKE0081471.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

two pairs are counterfeit.[76]  I further understand that StockX did not produce information from which one could identify the exact number of additional counterfeit "Nike" goods that StockX has "authenticated" and sold to consumers over the Relevant Period. [77]

38.    However, evidence indicates that StockX has "authenticated" and sold hundreds of additional counterfeit "Nike" shoes during the Relevant Period.  For example, StockX's own internal documents reveal that StockX is aware that hundreds of counterfeit product is sold to customers each year, even while StockX was representing to the public that products sold on StockX's Platform were "100% Authentic."[78]  StockX claims to have a 99.95% to 99.96% accuracy rate.[79]  Based on this representation, if approximately 0.04% (100.00% - 99.96%) of StockX trades during the Relevant Period were "passed in error" then an estimate of the number of Jordan and Nike branded sneakers authenticated in error during the Relevant Period is approximately ██████████████████ x 0.04%).[81]

39.    StockX's authentication accuracy rates are derived from products returned to StockX that it reauthenticates and determines to be inauthentic.[82]  In other words, if customers do not

---

[76] Deposition of Roy Kim (Third Party Consumer and Sneaker Collector), February 8, 2023: pp. 28:5-30:18, 63:19-67:12; Deposition of Russell Amidon (StockX Senior Director of VIP Relations), November 30, 2022: pp. 83:19-91:12; Order Dkt. 171 (order compelling production of documents concerning StockX's previously withheld "conclusions that StockX's authenticators reached upon review of Mr. Kim's returned shoes."); Brendan Dunne, *Nike v. StockX Lawsuit: How One Buyer got 38 Fake Pairs of Sneakers*, COMPLEX (Mar. 21, 2023), https://www.complex.com/sneakers/stockx-fake-sneakers-nike-lawsuit-38-pairs.

[77] StockX's First Supplemental Objections and Responses to Plaintiff's Third Set of Interrogatories at Interrogatory, March 21, 2023: pp. 25-26, citing to STX0774284. The amount of counterfeit "Nike" goods that StockX has "authenticated" and sold to consumers over the Relevant Period cannot be determined from this document.

[78] Fenton Ex. 12, StockX Document "Authentication Project / Metrics/Data": STX0018010-814 (identifying number of "Fakes passed by mistake in 2021"); Deposition of Jacob Fenton (StockX VP of Customer Experience and Insights), December 2, 2022: pp.  90:15-91:8 (describing Fenton Exhibit 12 which identifies "TRUE MISS" OR "Fake Returns Accepted" as items that passed StockX authentication, were returned by the customer, and were determined by StockX that it should not have passed authentication "Because it was counterfeit").

[79] Fenton Ex. 11: STX0020185-188 (at 185); Fenton Ex. 12, StockX Document "Authentication Project / Metrics/Data": STX0018010-814 (at 010).

[80] **Attachment 6.U**.

[81] Fenton Ex. 12, StockX Document "Authentication Project / Metrics/Data": STX0018010-814 (at 010).  This document separately indicates that ".01% of the products we pass are later determined to have been counterfeit." Based on this representation, if approximately 0.01% of StockX trades during the Relevant Period were counterfeit, then an estimate of the number of counterfeit Jordan and Nike branded sneakers authenticated in error during the Relevant Period is approximately ██████████████████ x 0.01%).

[82] Deposition of Jacob Fenton (StockX VP of Customer Experience and Insights), December 2, 2022: pp. 82:16-83:20 (explaining that StockX's "accuracy rate of 99.95%" is "calculated as a percentage of customers that reach out to StockX claiming that they have received something that is not in line…with what they expected to get, and that we were essentially wrong, and we fixed it for them"); Fenton Ex. 11: STX0020185-188 (at 185) (discussing

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

know they purchased counterfeit sneakers, or suspected or knew it but did not return the sneakers to StockX, those would not be accounted for in StockX's accuracy rate. As a result, StockX's own assessment of the number of fakes that pass through its platform is likely understated.

40.    For example, although StockX claims to have industry leading authenticators, an unknown number of counterfeit products escape detection. I understand from Kari Kammel, Nike's trademark counterfeiting expert, that only the brand owner or those authorized by the brand owner can authenticate a genuine trademark and products – and that general inspection by a consumer or an e-commerce site may be able to identify an obvious counterfeit because of overt differences, but that does not equate to authentication.[83]    StockX knows authenticators let counterfeits pass through its authentication process.[84] Given the increasing quality of counterfeit "Nike" shoes found in the market, and StockX's repeated guarantees and assurances that every good sold on the StockX Platform is "100% Authentic" during the Relevant Period, there are potentially significant additional consumers who purchased counterfeit "Nike" shoes from the StockX Platform during the Relevant Period.[85]

41.    As addressed above, during the Relevant Period, StockX did not have a publicized return policy for accepting returns for products purchased on its platform. StockX's lack of a

---

StockX's claimed "accuracy rate of 99.95%"); Appeals and Process Improvements: STX0061163-172 (at 166) (discussing re-authentication process where customer believes the product is fake).

[83] Kammel Report: pp. 23-24.

[84] Fenton Ex. 12, StockX Document "Authentication Project / Metrics/Data": STX0018010-814 (identifying number of "Fakes passed by mistake in 2021"); Deposition of Jacob Fenton (StockX VP of Customer Experience and Insights), December 2, 2022: pp. 90:15-91:8 (describing Fenton Exhibit 12 which identifies "TRUE MISS" OR "Fake Returns Accepted" as items that passed StockX authentication, were returned by the customer, and were determined by StockX that it should not have passed authentication "Because it was counterfeit"); Mr. Fenton further stated that there may be "bad employees" who need to be fired based on authentication errors made. Deposition of Jacob Fenton (StockX VP of Customer Experience and Insights), December 2, 2022: p. 141:10-21.

[85] Kammel Report: pp. 12, 14-15 (discussing that most consumers cannot tell whether a product is counterfeit or not, unless the quality difference is obvious. For "high heat" products, the counterfeits are often high quality and consumers can be misled); Discussion with Barbara Delli Carpini (Nike VP of Global Brand Protection and Digital IP Enforcement); *What is driving the proliferation of counterfeit sneakers?,* The Economist, https://www.economist.com/films/2022/12/08/what-is-driving-the-proliferation-of-counterfeit-sneakers ("The quantity and quality of counterfeit consumer goods have never been greater. The biggest category is footwear, accounting for a fifth of the value of all counterfeit goods."); *7 Myths About Counterfeit Products, Debunked,* NY Times, https://www.nytimes.com/wirecutter/blog/myths-about-counterfeit-products-debunked/. (explaining that "[t]he quality of counterfeit products has greatly improved from what they used to be") (internal quotations omitted).

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

return policy reduces the likelihood that StockX will learn that a product is counterfeit.[86] Therefore, StockX's estimate of its accuracy rate (ranging between 99.95% to 99.96% during the Relevant Period) is likely to be overstated as it fails to account for attempted returns StockX refused to accept and any fake sneakers that were resold through the platform at StockX's direction.  Additionally, setting aside the return policy, StockX's accuracy percentage based on returns inherently assumes that the purchasing consumer is sophisticated enough to recognize that the product returned is not authentic.  Although a sneaker collector (i.e., "sneakerhead") may be able to identify flaws in the product they receive or know to check authentication apps to attempt to independently validate the authenticity of products purchased, many consumers depend on StockX to authenticate the sneakers.[87]  As a result, it is not possible to determine with certainty StockX's true accuracy rate.

### D. StockX Sales of Nike and Jordan Branded Products

42.    Nike products, including sneakers, make up a significant portion of StockX resales.  For example, StockX identified the three "2022's winning sneakers" as: Jordan 11 Retro Cherry (2022) for most trades on release week, Nike Dunk Low for top traded silhouette, and Nike Air Force 1 Low Off-White Brooklyn for highest price premium.[88]  Similarly, in 2021, Air Jordan and Nike were the top traded brands on StockX's platform.[89]  Among the five top traded silhouettes of 2021, there were 4 Nike sneakers: Nike's Air Jordan 1,

---

[86] Kammel Report: p. 9 (["While some platforms make efforts to fend off counterfeiting activity, the majority of efforts are reactive and do nothing to proactively disrupt the sale before it occurs, relying only on complaints by brand owners and occasionally by consumers after the sale of the counterfeit products has occurred.  Sellers of counterfeits are aware of this—as is any brand owner who has worked in brand protection—counterfeiters will sell their products where the barrier to market entry is low and enforcement is inadequate and non-preventive by platforms."].

[87] Kammel Report: p. 12 (discussing the lack of transparency for online marketplaces, including the problem that "upon receipt of the products, most consumers cannot tell whether a product is counterfeit or not, unless the quality difference is obvious or if there are some differences from the authentic product that they can tell upon their inspection."); Mr. Fenton admitted it is fair to say "some customers wouldn't know the difference between a genuine product and a counterfeit product".  Deposition of Jacob Fenton (StockX VP of Customer Experience and Insights), December 2, 2022: pp.  83:21-84:7, 140:5-143:8; StockX's internal presentation also states that "buyers depend on StockX to ensure that every product they get is authentic" StockX eLT Meeting Presentation: STX0039423-473 (at 440).

[88] *Big Facts Current Culture Index 2023*, STOCKX (Jan. 2023), https://stockx.com/about/sx-market-insights/big-facts-current-culture-index-2023/

[89] *Big Facts Current Culture Index 2022*, STOCKX (Jan. 2022), https://stockx.com/about/sx-market-insights/current-culture-index-22/

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

Nike Dunk, Air Force 1, and Air Jordan 4.[90]  Additionally, Nike and Jordan branded sneakers sell at the highest average premium above retail price on StockX's platform.[91]

43. StockX also promotes pre-releases of Nike and Air Jordan sneakers on its website.[92]  This means that consumers could bid on Nike sneakers on StockX's platform before Nike releases the sneaker to the general public.  StockX also touts its platform as providing "never out of stock" Nike sneakers around holiday time that "often aren't stocked on the shelves of traditional retailers" due to "supply chain challenges" or selling out.[93]

44. Overall, as summarized in **Table 3** below, approximately ▮▮▮ StockX's total company revenue is earned in connection with the resale of Nike and Jordan branded products.  Further, approximately ▮▮▮ StockX's total company revenue is earned in connection with the resale of Nike and Jordan branded sneakers limited to those trades where at least one side of the trade originated in the United States.



---

[90] *Big Facts Current Culture Index 2022*, STOCKX (Jan. 2022), https://stockx.com/about/sx-market-insights/current-culture-index-22/

[91] Felix Richter, Outside the Box: The Booming Secondary Sneaker Market, STATISTA (Mar. 2, 2021), https://www.statista.com/chart/24313/stockx-gross-merchandise-volume/.

[92] STOCKX, https://stockx.com/nike/release-date (last visited May 5, 2023); STOCKX, https://stockx.com/retro-jordans/release-date (last visited May 5, 2023).

[93] *StockX Reports Record-Breaking Visitors and Trades on Black Friday Powering a Blockbuster Cyber Weekend*, STOCKX (Nov. 30, 2021), https://stockx.com/about/stockx-cyber-weekend-2021/

[94] **Attachment 4.**U.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

## IV.    OPINIONS

45.    In this matter, I understand that Nike is seeking to recover StockX's profits as provided in 15 U.S.C. § 1117 under its false advertising cause of action.  I understand that the Lanham Act governs the award of monetary relief for false advertising.[95]  15 U.S.C. § 1117(a) states: "the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action… In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed."[96]

46.    As described in detail below, StockX generated ███████████ in revenue from trades of Nike and Jordan branded sneakers where at least one side of the trade included a U.S. individual.[97]  I understand that after identifying the ██████████ of revenue at issue, the burden shifts to StockX to prove claimed elements of costs or other deductions.  Nonetheless, for the purposes of my analysis, I deducted ██████████ of StockX "cost of revenues" to calculate gross profits related to StockX's falsely advertised sales of "100% Authentic" Nike/Jordan-branded goods.  After deducting StockX's cost of revenues from revenue, StockX generated ███████████ in gross profit over the Relevant Period from facilitating resale trades of Nike and Jordan branded sneakers where at least one side of the trade included a U.S. individual.

47.    I understand that StockX may claim that some or all categories of indirect or overhead expenses should also be deducted from revenue to calculate disgorgement.  While I reserve the right to supplement my opinion after reviewing the analysis and justification for any additional cost deductions StockX asserts, I believe it is inappropriate to deduct many of StockX's overhead expense categories, some of which are identified below.

---

[95] I understand false advertising is an actionable civil claim under Section 43(a) of the Lanham Act (15 U.S. Code § 1125); 15 U.S. Code § 1117.
[96] 15 U.S.C. § 1117(a).
[97] I reserve the right to supplement my opinion should StockX present a different calculation of revenues attributable to its false advertising.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

### A. Disgorging StockX's Profits

48. I understand that in a false advertising case, disgorgement of profits may be based on any one of the following rationales: (1) deterrence of future unlawful conduct; (2) prevention of the wrongdoer's unjust enrichment; or (3) compensation to Plaintiff for harm suffered as a result of the false advertising.[98]

49. I understand that disgorgement of a defendant's full profits is an appropriate remedy to protect the public at large, even in the absence of a plaintiff's cognizable injury.[99] I further understand from counsel that the parties may dispute whether and when StockX stopped making false and misleading statements. As addressed above, StockX's business is built around product authentication. Through StockX's advertising statements about authentication, StockX marketed itself as an alternative to other "retailers" that may have sold out of Nike sneakers, promising consumers that the Nike products purchased through StockX would be genuine, authentic Nike shoes.[100] During the Relevant Period, StockX gained a leading market position in the secondary market.[101]

50. Assuming that StockX's advertising claims about its authentication were false, and StockX authenticated and facilitated the sale of counterfeit Nike/Jordan-branded

---

[98] *E. Mishan & Sons, Inc. v. Novel Brands LLC,* No. 18-cv-2932, 2020 WL 9815178 at *3 (S.D.N.Y. Feb. 13, 2020), report and recommendation adopted, 2022 WL 407393 (S.D.N.Y. Feb. 10, 2022).

[99] *Dependable Sales & Serv., Inc. v. TrueCar, Inc.*, 377 F. Supp. 3d 337, 342 (S.D.N.Y. 2019), on *reconsideration,* 394 F. Supp. 3d 368 (S.D.N.Y. 2019) (citing *George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1537 (2d Cir. 1992) and *W.E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 664.) ["In W.E. Bassett Co. v. Revlon, Inc., 435 F.2d 656, 664 (2d Cir. 1970), plaintiff did not establish at trial that the defendant's trademark infringement resulted in lost sales or injury to good will. Despite no showing of injury, the district court ordered a partial accounting of defendant's profits based on the conclusion that defendant deliberately and fraudulently infringed the plaintiff's mark…The Second Circuit affirmed the remedy but modified it to direct an accounting of all profits, explaining that 'a full accounting is proper as a deterrent' and that 'the only way the courts can fashion a strong enough deterrent is to see to it that a company found guilty of willful infringement shall lose all its profits from its use of the infringing mark.'
In George Basch, the Second Circuit summarized W.E. Bassett as ordering an accounting of full profits to advance deterrence 'solely because' the defendant acted deliberately and fraudulently."]; *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 262 (2d Cir. 2014). ["Our precedent permits a district court to award a defendant's full profits based solely on deterrence."].

[100] How it Works – StockX: NIKE0038817-821 (at 818) ("Whether it's pre-release, regionally limited, or 'sold out' – our millions of customers from over 200 countries allow you to easily secure those hard-to-find, coveted items").

[101] StockX May 2021 Meeting: STX0020994 - 1141 (at 005-007); Taking Stock Of StockX: "Deep Dive Into The Sneaker Resale Market Leader", Wells Fargo, January 27, 2020: p. 1-2; Sneakers as an Alternate Asset Class, Part III, Cowen, May 24, 2022: p. 22.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

sneakers, StockX's false advertising claims directly harm Nike's valuable brands and the significant goodwill Nike has amassed in those brands.[102]

51.    For example, StockX's sale of counterfeit "Nike" products places products into the marketplace bearing Nike's name and brands that are not Nike's products.  None of these products were manufactured by Nike or subjected to Nike's quality control and production standards.  I understand that counterfeiters make counterfeit shoes with low quality, and often harmful materials which may be hazardous to consumers and likely to underperform.[103]  As addressed above, some consumers who are sold counterfeit "Nike" shoes may never learn that their shoes are counterfeit.  Nevertheless, when inferior counterfeit goods perform poorly, the consumer may associate that poor performance with Nike.[104]

52.    These experiences with counterfeit Nike products reflect poorly on Nike and are likely to result in lost sneaker sales to Nike.[105]  I understand that when a customer believes that it has received a poor quality product, the reputational injury is likely to impact the customer's perception about Nike as a brand, and therefore the injury is not isolated to one product or even product category.[106]  For example, Ms. Delli Carpini explained, ███

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

---

[102] Deposition of Barbara Delli Carpini (Nike VP of Global Brand Protection and Digital IP Enforcement), January 10, 2023: pp. 30:10-33:6, 239:7-271:4 (discussing the harm Nike experiences, both financially and to its reputation, through the sale of counterfeits); Kammel Report: pp. 13-15 (e.g. "Trademark counterfeiting harms an IP rights holder in several ways by (1) hurting its reputation in the marketplace and destroying consumers' trust in the brand, (2) taking sales and profits of genuine product away and diverting them to the counterfeiter, and (3) taking resources to combat the theft of its marks.").

[103] Kammel Report: pp. 13, 16; Deposition of Barbara Delli Carpini (Nike VP of Global Brand Protection and Digital IP Enforcement), January 10, 2023: pp. 31:11-32:9, 239:7-245:24, 264:10-265:12.

[104] Kammel Report: p. 13, 15 (describing that when a consumer "purchases a product online that they believe to be genuine and then is disappointed or harmed by a counterfeit product, they may often: (1) believe that the brand's quality is lessened; (2) lose their brand loyalty; and/or (3) complain in an online space about the brand"); Deposition of Barbara Delli Carpini (Nike VP of Global Brand Protection and Digital IP Enforcement), January 10, 2023: pp. 32:2-17, 239:7-245:24, 264:10-265:12.

[105] *Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, 176 F. Supp. 3d 137, 162 (E.D.N.Y. 2016) (finding consumers who purchased counterfeit products believing them to be authentic represent lost sales to the brand) (*Clear Channel Outdoor, Inc. v. City of New York* , 594 F.3d 94, 111 (2d Cir.2010)); Kammel Report: pp.13-17; Deposition of Barbara Delli Carpini (Nike VP of Global Brand Protection and Digital IP Enforcement), January 10, 2023: pp.  31:11-33:6, 239:7-245:24, 264:10-265:12.

[106] Kammel Report: pp. 13, 15.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

███████████████████████████████████████████████

███ [107] I further understand that ████████████████████████

██████████████████████████████████ [108] While such reputational injury

is difficult to quantify, it impacts Nike's business.

53. Consumers have contacted Nike questioning the quality of the guaranteed authentic "Nike" sneakers purchased from StockX.[109] These complaints suggest that StockX's guarantee that consumers will receive a "100% Verified Authentic" good creates confusion that Nike is associated with the authenticity claim and the counterfeit goods.

54. Furthermore, Nike expends considerable resources combatting counterfeits, ████████ ███████████████████████████ [110] For example, Nike has a

---

[107] *See* Deposition of Barbara Delli Carpini (Nike VP of Global Brand Protection and Digital IP Enforcement), January 10, 2023: p. 242:6-13, *see also* p. 264:10-17 ██████████████████████████

[108] Kammel Report: pp.14-15.

[109] *See, for example,* complaints to Nike's counterfeit@Nike.com email account: NIKE0041218-220 ("I purchased a pair of the new Oski SB Dunks for my son on stockx for about $200 and I fear they are fake. Out of the box they looked ok. After 3 times of wearing them they are falling apart in ways that I have not experienced dunks falling apart."); NIKE0041221-226 ("Hello, I purchased a pair of shoes from StockX and I was having some concern of their authenticity. When the shoes arrived I noticed there was extra material left on the shoe from the production process. I'm not a "collector" by any means but I've purchased probably 15 pairs of AJ1 over the years and I've never seen that type of workmanship come from Nike. I wear all the shoes I buy so I wore them for a week or so- no more than 2 and they seem to be breaking down pretty quick. If they are fake they look really close but some of the stitching looks sloppier and the leather at the front seems off. Any response or information would be appreciated."); NIKE0041233 ("I bought a pair of what I believe is fake Nike AF1 JESTERS XX. The product code is AO1220-102. I bought them off of a site called 'stockx' and though stockx is supposed to verify authenticity before sending them off to me I believe that somehow this pair of fakes managed to get past them. I have reached out to them with an email displaying my concerns on the state of the shoe and how there are some details that seem off to me about the shoe. They are adamant that the pair that I have received is not a pair of fakes. To add to that, StockX also has a no-return policy which means that even if they were fakes they would refuse to take them back... obviously this is problematic of a company and my bank would go right ahead with issuing a chargeback on StockX."); NIKE0041262-265 ("Hey i need help , My name is Manuel Mejia and i recently bought some Jordan's from StockX . I bought a pair of Black Ice 6 Rings and Jordan Dmp 6's. Stock x has told me that the issue that i have with the sneaker are manufacture issues and it's okay but i have a gut feeling that it's not . The Jordan 6's get sticky on the sneaker , the height was different , one is more lopsided then the other. There was Glue on the Shoelace and the gold chain to the dog tags never came along with it . The Black Ice 6 rings the jordan symbols are all messed up ."); NIKE0041300-302 ("I ordered sneakers from stockx and they are fake. It's 2 completely different shoes. The stitching on the shoes are wrong the Jordan sign is mad big. The sneakers are very wide. They told me the only way to get my money back is if I resell the sneakers on their website which is ridiculous because they want me to resell fake sneakers."); NIKE0041350-357 ("I have purchase a pair of Jordan 11 cool Gray from StockX quality of the shoes are questionable and I emailed them about it and was told that Nike allowed this Quality of product to be released.")

[110] Kammel Report: pp. 15, 24-26; Discussion with Barbara Delli Carpini (Nike VP of Global Brand Protection and Digital IP Enforcement).

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

brand protection team, █████████████████████ dedicated to anticounterfeiting activities.[111]  I understand from Barbara Delli Carpini that ███████



[112]  Therefore, StockX

██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████[113]

55.    Assuming that StockX's advertising claims about its authentication were false, and StockX authenticated and facilitated the sale of counterfeit Nike/Jordan-branded sneakers, my analysis indicates that StockX has benefitted by earning ill-gotten profits derived from falsely and/or misleadingly claiming that every "Nike" or "Jordan" good sold on its platform was "100% Authentic."

56.    If StockX is permitted to retain its profits, it would be unjustly enriched regardless of whether StockX's false advertising diverted sales from Nike and its authorized retailers to StockX.[114]  Representing that it verifies the authenticity of all Nike/Jordan-branded sneakers on the StockX Platform, StockX holds itself out as similar to Nike or a Nike authorized distributor by representing that it sells genuine Nike sneakers.  Further, I understand that the Court in this case has held that to "be awarded unjust enrichment profits, Nike does not need to establish that StockX's sales diverted sales from Nike – it will be sufficient to show that the StockX sales were ill-gotten."[115]

---

[111] ; Deposition of Barbara Delli Carpini (Nike VP of Global Brand Protection and Digital IP Enforcement), January 10, 2023: pp. 25:3-13; 26:15-20, 30:12-19.
[112] Deposition of Barbara Delli Carpini (Nike VP of Global Brand Protection and Digital IP Enforcement), January 10, 2023: pp. 221:24-223:19. Discussion with Barbara Delli Carpini (Nike VP of Global Brand Protection and Digital IP Enforcement).
[113] Discussion with Barbara Delli Carpini (Nike VP of Global Brand Protection and Digital IP Enforcement); Deposition of Barbara Delli Carpini (Nike VP of Global Brand Protection and Digital IP Enforcement), January 10, 2023: pp. 221:11-15, 228:4-229:3.
[114] *See Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 124 (9th Cir. 1968).
[115] *Nike, Inc. v. StockX, LLC*, No. 22-cv-00983, 2023 WL 144718, at *1 (S.D.N.Y. Jan. 9, 2023).

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

57.    While I believe that StockX's news releases and other internal documents indicate that potential consumers were purchasing Nike/Jordan branded sneakers from StockX instead of purchasing directly from Nike or its authorized retailers (*e.g.*, through StockX tracking Nike upcoming sneaker releases and offering a platform where consumers could guarantee themselves a sneaker instead of going to retailers[116]), in my opinion, it would be difficult, if not impossible, to determine the portion of StockX's revenues that result in losses to Nike under this rationale.

### B.    StockX Revenue

58.    As required under 15 U.S.C. § 1117(a), Nike is "required to prove defendant's sales only." StockX provided documents related to revenue earned on resales of Nike and Jordan branded products on its resale platform.[117]   These revenue amounts are summarized in the following section of this Report.

59.    I understand StockX revenues consist of Buyer Fees, Buyer Shipping Revenue, All-in Ask Surplus, Seller Fees, Seller Shipping Revenue, Inventory Sales, Payment Processing, and Penalty Fees.[118]

60.    StockX produced a spreadsheet titled "StockX Revenue from Jordan Brand, Nike, and Nike Vault NFTs Booked to the U.S. Operating Entity."[119]   The "Lead" tab of this spreadsheet includes a quarterly summary of closed trades and revenues earned by StockX from resales of Nike, Jordan, and Nike Vault NFT products for the period Q1 2020 through Q3 2022.[120]   The data provided by StockX includes a distinction between "trades that include a U.S. individual" and "trades between 2 non-U.S. persons."   **Table 4** below

---

[116] StockX advertises its ability to allow consumers to "easily secure those hard-to-find coveted items" including "pre-release" products. *See* How it Works – StockX: NIKE0038817-821 (at 818).  StockX also lists Nike and Jordan products on its website in advance of their release, directing customers to StockX's platform instead of Nike. https://stockx.com/nike/release-date; https://stockx.com/retro-jordans/release-date.  *See also*, Kammel Report: p. 15.
[117] See, for example, STX0774395: StockX Identified Closed Trades and Revenues from Sales of Nike and Jordan Brand Products.
[118] See, for example, StockX September 2021 Board Meeting: STX0583757-897 (at 822); STX0041077 at tab "Traditional"; Deposition of Brock Huber (StockX VP of Corporate and Strategic Development), February 22, 2023: p. 41:15-24.
[119] STX0774395: StockX Identified Closed Trades and Revenues from Sales of Nike and Jordan Brand Products.
[120] STX0774395: StockX Identified Closed Trades and Revenues from Sales of Nike and Jordan Brand Products at tab "Lead".

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

summarizes the revenue from all Jordan Brand and Nike products that included a U.S. individual on an annual basis.[121]



61.   The sales data produced by StockX (summarized in **Table 4** above) contains sales of products across all StockX verticals for which Nike and Jordan branded products are resold.   Specifically, these sales include Nike and Jordan branded: sneakers, apparel, accessories, collectibles, trading cards, and "other."[123]   I understand that Nike claims StockX has made false advertising statements in connection with the sale of Nike and Jordan brand sneakers, including that the Nike/Jordan products sold on the StockX Platform are "100% Authentic," "100% Verified Authentic," or "Verified Authentic," when the sneakers were in fact counterfeit.   I am not currently aware of documented instances of counterfeit goods where StockX has made these types of statements in connection with products in the other verticals (*e.g.*, apparel, accessories, collectibles, trading cards, and other).   Therefore, for purposes of this analysis, I have limited identification and quantification of StockX's relevant revenues under 15 U.S.C. § 1117(a) to Nike and Jordan brand sneaker revenues.

62.   Additionally, I understand Nike disgorging StockX profits may be limited to transactions where at least one side of the trade (*i.e.*, the buyer or the seller) originated in the United

---

[121] I have excluded StockX's identified revenue from Nike Vault NFT's as I understand that Nike is not pursuing monetary relief in connection with its claims for trademark infringement and dilution in this case.
[122] **Attachment 7**; *see also*, STX0774395: StockX Identified Closed Trades and Revenues from Sales of Nike and Jordan Brand Products.
[123] STX0774395: StockX Identified Closed Trades and Revenues from Sales of Nike and Jordan Brand Products at tab "nike_rev_data_q1'20_q3'22".

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

States. I have further limited identification and quantification of StockX's relevant revenues for profit disgorgement under 15 U.S.C. § 1117(a) to account for only those trades that include a U.S. individual as identified by StockX.[124]

63. I understand that StockX also earns All-In-Ask Surplus Fees, but these fees are not tracked at a transactional level. In analyzing its alleged profits, StockX allocated these fees to revenue on a percentage of Gross Merchandise Value ("GMV") basis.[125] Consistent with StockX's All-in-Ask revenue allocation, I have allocated a portion of StockX's Global All-in-Ask revenue to Jordan and Nike sneaker revenues based on the GMV from trades of Jordan and Nike sneakers where one side of the trade originated in the United States as a percentage of StockX's Global GMV.[126]

64. **Table 5** below summarizes StockX's relevant revenues for profit disgorgement under 15 U.S.C. § 1117(a), which contains StockX's revenue earned on facilitating resale trades of Nike and Jordan branded sneakers where at least one side of the trade included a U.S. individual, including allocated All-in-Ask revenue.



---

[124] STX0774395: StockX Identified Closed Trades and Revenues from Sales of Nike and Jordan Brand Products at tab "nike_rev_data_q1'20_q3'22". I understand that this "at least 1 side U.S." identifier is based on the buyer and/or seller's billing address. Deposition of Brock Huber (StockX VP of Corporate and Strategic Development), February 22, 2023: p. 105:8-20.
[125] STX0774395: StockX Identified Closed Trades and Revenues from Sales of Nike and Jordan Brand Products at tabs "Lead", "AIA" and "AIA PIVOT."
[126] **Attachment 7**.
[127] **Attachment 7**.
[128] There is no reported Global All-In-Ask Revenue in StockX financials in 2020. For purposes of this analysis, I have assumed no All-In-Ask revenue was earned in 2020. STX0774395: StockX Identified Closed Trades and Revenues from Sales of Nike and Jordan Brand Products at tab "AIA PIVOT."

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

### C.    StockX Deductible Costs

65.    As required under 15 U.S.C. § 1117(a), StockX is responsible for proving "all elements of cost or deduction claimed" from accused revenue.[129]  To determine StockX's profits, deductible costs must be subtracted from StockX's revenue from the sale of accused products.  In trademark infringement and false advertising matters, I understand that defendants "must show a 'sufficient nexus between each expense claimed and the sales of the unlawful goods' before it may deduct any indirect expenses from its profits."[130]  I further understand the Second Circuit has held that generally "'[o]verhead' which does not assist in the production of the infringement should not be credited to the infringer; that which does, should be; it is a question of fact in all cases."[131]  I understand the court "must first 'determine what overhead expense categories ... are actually implicated by the production of the infringing product', a process that requires a determination whether there is 'a sufficient nexus ... between a category of overhead and the production or sale of the infringing product.'"[132]  The second step is to determine "a fair, accurate, and practical method of allocating the implicated overhead to the infringement."[133]

66.    Although I understand proving deductible costs is StockX's responsibility, I have accounted for StockX's cost of revenues in my analysis.  My analysis of StockX's cost of

---

[129] 15 U.S.C. § 1117(a).

[130] *Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, 642 F.Supp.2d 276 (S.D.N.Y. 2009).

[131] *Hamil America Inc. v. GFI*, 193 F.3d 92 (1999)

[132] *Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, 642 F.Supp.2d 276 (S.D.N.Y. 2009); *Hamil America Inc. v. GFI*, 193 F.3d 92 (2d Cir. 1999).  I understand this Court has further instructed that the "Defendant has the burden of proving by a preponderance of the evidence any costs or expenses to be deducted from its gross revenue. You may not deduct the costs of goods sold and other direct costs associated with those goods because defendant can point to no evidence in the record which would differentiate the costs of assertedly infringing goods from those that are not asserted to be infringing. Also, defendant must demonstrate a sufficient connection between each claimed overhead expense and the sale of infringing products in order to deduct the expense from its gross revenues for infringing sales. An item of overhead may be deducted if, but only if you find that the entirety of the overhead expense is attributable to the infringing goods. If defendant fails to establish any expense by a preponderance of the evidence, you should not deduct that expense from the gross revenues." In this instance "overhead" was defined as "the ongoing costs to operate a business other than the cost of goods sold and other direct costs associated with those goods. Overhead includes items such as rent, utilities and support staff salaries. If defendant has proven that an overhead expense applies exclusively to the infringing goods, then you may deduct it from gross revenues attributable to the infringing goods. If defendant has not so proven, then you may not deduct it from gross revenues attributable to the infringing goods." *Lexington Furniture Industries, Inc. v. Lexington Company*, AB, 2022 WL 13848274, at *7 (S.D.N.Y Oct. 24, 2022)

[133] *Hamil America Inc. v. GFI*, 193 F.3d 92 (2d Cir. 1999); *Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, 642 F.Supp.2d 276 (S.D.N.Y. 2009).

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

revenues is based on analysis of StockX's financial documents, business presentations, the nature of the costs incurred, and the deposition testimony of Mr. Brock Huber, StockX's VP of Corporate and Strategic Development. If StockX provides additional information about its costs, or asserts that additional costs are properly deductible, I reserve the right respond to such information and assertions.

67. I understand StockX does not track costs at a brand or product level.[134] In this matter, StockX has produced quarterly profit and loss statements for each of its operating entities, both individually and as a consolidated entity, from Q1 2020 through Q3 2022.[135] **Attachment 8.U** summarizes StockX's total consolidated quarterly operating financial results from Q1 2020 through Q3 2022. In the section below, I describe the cost of revenues that facilitated the resale of the Nike and Jordan branded sneaker products at issue, as well as the method of assigning these costs to StockX's revenue earned on resale trades of Nike and Jordan branded sneakers where at least one side of the trade included a U.S. individual.

### 1. StockX Cost of Revenues

68. The StockX quarterly operating entity profit and loss statements contain a line item for "Cost of Revenues" which are deducted to arrive at gross profit.[136] I understand that StockX's cost of revenues includes at least the following types of costs: (1) Shipping Expense (net of rebates); (2) Payment Processing Expense; (3) Cost of Inventory; (4) Shipping Supplies; (5) Web Hosting; and (5) Inventory and Transactional Losses.[137] These cost of revenues are direct costs that assisted in earning the resale revenue for the Nike and Jordan branded sneaker products at issue.

---

[134] STX0774395: StockX Identified Closed Trades and Revenues from Sales of Nike and Jordan Brand Products at tab "Lead"; Deposition of Brock Huber (StockX VP of Corporate and Strategic Development), February 22, 2023: p. 128:1-13.

[135] StockX Operating Entity 2020 Quarterly P&L's: STX0774394; StockX Operating Entity 2021-2022 Quarterly P&L's: STX0806052.

[136] StockX Operating Entity 2020 Quarterly P&L's: STX0774394; StockX Operating Entity 2021-2022 Quarterly P&L's: STX0806052.

[137] See, for example, StockX September 2021 Board Meeting: STX0583757-897 (at 825); StockX November 2021 Board Meeting: STX0594173-465 at (203-206); StockX February 2022 Board Meeting: STX0090109-240 (at 151 – 155); Deposition of Brock Huber (StockX VP of Corporate and Strategic Development), February 22, 2023: pp. 44:17 - 45:6.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

69. I understand that StockX allocates costs on a per-trade basis (as opposed to a percentage of revenue).[138] For purposes of this analysis, I have utilized StockX's per-trade allocation methodology and calculated cost of revenues on a per-trade basis.[139] As summarized on **Attachment 8.U**, StockX's total consolidated cost of revenues ranged from ███████ ███████ per-trade between Q1 2020 and Q1 2022.[140]

70. On **Attachment 6.U**, StockX cost of revenues have been calculated on a quarterly, per-trade basis for StockX's revenue earned on resale trades of Nike and Jordan branded sneakers where at least one side of the trade included a U.S. individual. **Table 6** below summarizes StockX's gross profit earned on StockX's revenue from resale trades of Nike and Jordan branded sneakers where at least one side of the trade included a U.S. individual.



### 2. Indirect Costs

71. As addressed above, I understand that StockX may claim that additional indirect or overhead costs should be deducted from its gross profit. I further understand that StockX has the burden to justify any such deductions. I recognize that indirect costs might be

---

[138] STX0774285: StockX Revenue & Operating Losses from Jordan Brand, Nike, and Nike Vault NFTs at tabs "Summary" and "Global P&L"; Deposition of Brock Huber (StockX VP of Corporate and Strategic Development), February 22, 2023: pp. 128:1-13, 131:23 – 133:8.

[139] To calculate cost of revenues on a per-trade basis, I rely on quarterly revenue reported in StockX's total consolidated quarterly profit and loss statements from Q1 2020 through Q3 2022. StockX Operating Entity 2020 Quarterly P&L's: STX0774394; StockX Operating Entity 2021-2022 Quarterly P&L's: STX0806052. I rely on data for StockX global closed trades for Q1 - Q2 2020 from StockX May 2021 Meeting: STX0020994 - 1141 (at 1138); and global closed trades for Q3 2020 - Q1 2022 from STX0774285: StockX Revenue & Operating Losses from Jordan Brand, Nike, and Nike Vault NFTs at tab "Global P&L"

[140] Total global trades were not available to calculate StockX total consolidated cost of revenue per-trade for Q2-Q3 2022. Therefore, I have held Q1 2022 cost of revenues per trade constant for Q2-Q3 2022. **Attachment 6.U, Attachment 8.U**.

[141] **Attachment 5.U**.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

deductible, but only where they are actually implicated by the production and sale of the products at issue, and that the defendant must demonstrate a direct and valid nexus between each claimed overhead expense category and the accused sales. Therefore, I understand it is StockX's burden to separately establish a valid nexus between each operating expense line item and the StockX revenues presented in **Table 5** above in order to deduct the operating expense to calculate StockX's profits relevant to disgorgement for false advertising in this case. I reserve the right to supplement my opinion upon review of StockX's analysis and justification for any such deductions.

72.   As stated above, on **Attachment 8.U** I have summarized StockX's total consolidated quarterly operating financial results from Q1 2020 through Q3 2022. The StockX total consolidated quarterly profit and loss statements contain operating expenses by department and include line items for up to 48 operating expense categories incurred during each quarter. I understand StockX's may assert that all of the operating expense department categories are properly deductible to calculate profits relevant to disgorgement for false advertising in this case.[142]

73.   In the sections below, I describe StockX's "Contribution Margin – 1" and "Contribution Margin – 2" profit levels and the costs deducted in calculating these margins, as well as address certain of StockX's other operating expenses.[143]

### a. StockX Contribution Margin – 1

74.   In the normal course of operating its business, StockX presents quarterly financial operating results to its board of directors. In StockX's internal board meeting presentations, StockX analyzes and presents a level of profitability which it identifies as "Contribution Margin – 1."[144]   According to Mr. Huber, "Contribution margin is a measure of the unit economics of a transaction. To get there, you would take revenue,

---

[142] STX0774285: StockX Revenue & Operating Losses from Jordan Brand, Nike, and Nike Vault NFTs; Deposition of Brock Huber (StockX VP of Corporate and Strategic Development), February 22, 2023: pp. 128, 131:7-133:8.
[143] StockX cost of revenues are subtracted from revenue to calculate gross profit. Additional StockX operating expenses are subtracted from gross profit to calculate StockX's Contribution Margin – 1 and Contribution Margin – 2 profit levels.
[144] See, for example, StockX September 2021 Board Meeting: STX0583757-897 (at 818); StockX November 2021 Board Meeting: STX0594173-465 at (205); StockX February 2022 Board Meeting: STX0090109-240 (at 153).

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

subtract cost of revenue, and any other variable expenses and variable marketing expenses that would have been directly attributed to that transaction in order for it to be closed or completed."[145] Mr. Huber further explained, "contribution margin would have the burden of variable and fixed customer service and authentication costs; and depending on which view of contribution margin, the marketing costs associated with driving that transaction as well."[146]

75.     As stated above, on **Attachment 8.U** I have summarized StockX's total consolidated quarterly operating financial results from Q1 2020 through Q3 2022.  The StockX total consolidated quarterly profit and loss statements contain operating expenses by department and include line items corresponding to each of the expense items deducted by StockX to calculate Contribution Margin – 1.  Based on Mr. Huber's testimony and StockX's internal board meeting presentations, I understand the following line items on StockX's total consolidated quarterly profit and loss statements would be deducted to determine Contribution Margin – 1: (1) Cost of Revenues; (2) Authentication; (3) VAT Tax; (4) Chargebacks & Refunds; (5) Customs & Duties; (6) Fixed Customer Service; (7) Tax; and (8) Variable Customer Service.[147]

76.     I understand that StockX uses Contribution Margin – 1 to "get a view of the health of our per-trade economics."[148]  With respect to Contribution Margin – 1, Mr. Huber testified, "When a transaction is completed, does the -- do the expenses associated with actually delivering that transaction leave us with money or with a loss?"[149]  Mr. Huber further described that StockX uses Contribution Margin – 1 "to manage the business, to make it more likely that you would eventually have a profit. ████████████████████████████ ████████████████████████████ we use per-unit economics to show that the

---

[145] Deposition of Brock Huber (StockX VP of Corporate and Strategic Development), February 22, 2023: p. 89:2 - 9.

[146] Deposition of Brock Huber (StockX VP of Corporate and Strategic Development), February 22, 2023: pp. 89:22 – 90:3.

[147] See, for example, StockX September 2021 Board Meeting: STX0583757-897 (at 818); StockX November 2021 Board Meeting: STX0594173-465 at (205); StockX February 2022 Board Meeting: STX0090109-240 (at 153); Deposition of Brock Huber (StockX VP of Corporate and Strategic Development), February 22, 2023: pp. 89:22-90:3, 93:21-94:9.

[148] Deposition of Brock Huber (StockX VP of Corporate and Strategic Development), February 22, 2023: p. 95:11-16.

[149] Deposition of Brock Huber (StockX VP of Corporate and Strategic Development), February 22, 2023: p. 95:18-20.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

business has strength, 

■■■■■■■■"[150]

### b. StockX Contribution Margin – 2

77.     Similar to Contribution Margin – 1, in the normal course of operating its business, StockX analyzes and presents to its board of directors a level of profitability identified as "Contribution Margin – 2."[151]  I understand from Mr. Huber that the difference between Contribution Margin – 1 and Contribution Margin – 2 is that "Contribution Margin – 2 includes the burden of the 'Variable Marketing Expenses' associated with the transactions for that period."[152]

78.     As stated above, on **Attachment 8.U** I have summarized StockX's total consolidated quarterly operating financial results from Q1 2020 through Q3 2022.  The StockX total consolidated quarterly profit and loss statements contain operating expenses by department and include line items corresponding to each of the expense items deducted to calculate Contribution Margin – 2.  Based on Mr. Huber's testimony and StockX's internal board meeting presentations, I understand the following line items on StockX's total consolidated quarterly profit and loss statements would be deducted to determine Contribution Margin – 2: (1) All expenses deducted in arriving at Contribution Margin – 1; and (2) all Marketing expenses.[153]  However, Mr. Huber stated that the 'Variable Marketing Expenses' deducted to arrive at Contribution Margin – 2 should "not include the actual comp and benefits of the marketing team themselves."[154]

---

[150] Deposition of Brock Huber (StockX VP of Corporate and Strategic Development), February 22, 2023: p. 96: 7-11.
[151] See, for example, StockX September 2021 Board Meeting: STX0583757-897 (at 818); StockX November 2021 Board Meeting: STX0594173-465 at (205); StockX February 2022 Board Meeting: STX0090109-240 (at 153).
[152] Deposition of Brock Huber (StockX VP of Corporate and Strategic Development), February 22, 2023: p. 97:10-15.
[153] See, for example, StockX September 2021 Board Meeting: STX0583757-897 (at 818); StockX November 2021 Board Meeting: STX0594173-465 at (205); StockX February 2022 Board Meeting: STX0090109-240 (at 153); Mr. Huber stated, "the primary line item would be Buyer Marketing."  Deposition of Brock Huber (StockX VP of Corporate and Strategic Development), February 22, 2023: pp. 89:22-90:3, 97:7-98:23.
[154] Deposition of Brock Huber (StockX VP of Corporate and Strategic Development), February 22, 2023: pp. 97:21-98:4.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

### c. Other StockX Operating Expenses

79. As summarized on **Attachment 8.U**, StockX incurs costs across a variety of other operating expense departments beyond those specifically deducted in calculating Contribution Margin – 1 and Contribution Margin – 2. I understand that StockX may claim that the below operating expense line items, among others, are deductible costs. These costs, however, would not be deductible, in whole or in part, for the following reasons:

- Finance Expenses: Includes costs related to a potential IPO, additional IPO-related costs captured in "Internal Audit", "Legal" and "Tax" expense line items – not related to authentication.[155]

- Legal Expenses: Includes items such as advising internal executives on risks associated with business plans, IPO consideration and defending against litigation – including paying StockX's lawyers for this lawsuit.[156]

- Communications Expenses: Includes expenses associated with a team that crafts PR strategy and narrative, including related to this lawsuit.[157]

- Supply Acquisition Expenses: Includes finding and increasing StockX's supply of goods on the platform, and is primarily focused on categories other than sneakers.[158]

- Facilities: Includes the rent or ownership expenses for the corporate headquarters, authentication facilities, office space, retail stores, and other associated real estate – including utility costs.[159]

---

[155] Deposition of Brock Huber (StockX VP of Corporate and Strategic Development), February 22, 2023: pp. 77:22-78:12.

[156] Deposition of Brock Huber (StockX VP of Corporate and Strategic Development), February 22, 2023: pp. 80:11-81:22.

[157] Deposition of Brock Huber (StockX VP of Corporate and Strategic Development), February 22, 2023: p. 74:4-13.

[158] Deposition of Brock Huber (StockX VP of Corporate and Strategic Development), February 22, 2023: pp. 84:15-86:18.

[159] Deposition of Brock Huber (StockX VP of Corporate and Strategic Development), February 22, 2023: p. 77:2-21.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

80.   **Attachment 8.U** summarizes the dollar amounts StockX incurred related to each of these cost categories, as well as other cost categories, from Q1 2020 through Q3 2022.

### D.    Summary of StockX Gross Profits

81.   After deducting the cost of revenues that are reasonably implicated in facilitating the resale of Nike and Jordan branded sneakers where at least one side of the trade included a U.S. individual, StockX earned gross profits of approximately ▮▮▮▮▮▮▮ on sales of these products between Q1 2020 and Q3 2022.



### E.    Other Deductions

82.   If StockX claims any other deductions from accused revenue are proper, I reserve the right respond to such positions.

### F.    Counterfeit Damages

83.   I understand that Nike is electing to recover statutory damages on its claim for counterfeiting under 15 U.S.C. § 1114.[161]  Section 1117(c) of the Lanham Act provides that "[i]n a case involving the use of a counterfeit mark…plaintiff may elect, at any time before final judgment is rendered by the trial court, to recover, instead of actual damages and profits…an award of statutory damages…in the amount of (1) not less than $1,000 or more than $200,000 per counterfeit mark per type of goods or services offered for sale, or distributed, as the court considers just; or (2) if the court finds that the use of the counterfeit mark was willful, not more than $2,000,000 per counterfeit mark per type of

---

[160] **Attachment 5.U**.
[161] 15 U.S.C. § 1117(c).

goods or services sold, offered for sale, or distributed, as the court considers just." I understand that in the Second Circuit, the Court may consider a set of equitable factors in determining an appropriate statutory award.[162]

84.   As identified above, I understand Nike asserts that StockX has used nine counterfeit Nike trademarks in connection with footwear it "authenticated" and sold on its platform. I have been asked to calculate potential statutory damage amounts below.

85.   As summarized in **Table 8** below, if the finder of fact determines that StockX's use of nine counterfeit Nike trademarks was willful, I understand Nike is entitled to recover a maximum award of $18 million dollars in statutory damages, in addition to the disgorgement of StockX's profits for StockX's false advertising, as the fact finder deems just.

**Table 8: Summary of Statutory Damages**
**Willful Counterfeiting**

| A | B | C = A x B |
|---|---|---|
| No. of Nike Marks Counterfeited | Statutory Damages per Counterfeit Mark | Statutory Damages |
| 9 | $2,000,000 | $18,000,000 |

86.   As summarized in **Table 9** below, if the finder of fact does not determine that StockX's use of nine counterfeit Nike trademarks was willful, I understand Nike is entitled to recover a maximum award of $1.8 million dollars in statutory damages, in addition to the disgorgement of StockX's profits for StockX's false advertising, as the fact finder deems just.

**Table 9: Summary of Statutory Damages**
**Non-Willful Counterfeiting**

| A | B | C = A x B |
|---|---|---|
| No. of Nike Marks Counterfeited | Statutory Damages per Counterfeit Mark | Statutory Damages |
| 9 | $200,000 | $1,800,000 |

---

[162] *All-Star Marketing Group, LLC v. Media Brands Co., Ltd.*, 775 F.Supp.2d 613, 622 (2011)

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

### G.     Pre-Judgment Interest

87.   I understand that Nike may be entitled to pre-judgment interest.  Accordingly, I may be
      asked to provide opinions related to pre-judgment interest as directed by the Court.  For
      example, I may provide opinions as to the appropriate interest rate and methodology used
      to calculate pre-judgment interest.  I reserve the right to provide such opinions before or
      at trial, as necessary.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY



Attachment 1

# John L. Hansen, CPA, CFF, CLP, CGMA

**TM Financial Forensics, LLC**
An HKA Company
3595 Mt. Diablo Blvd, Suite 250
Lafayette, CA 94549

Direct: 415.692.6373
Mobile: 415.465.2325
JHansen@TMFin.com

**Professional History**

- **HKA** (2022 – present) - Partner
- **TM Financial Forensics, LLC** (2010 – 2022) – Vice President
- **Navigant Consulting** (2004 – 2010) – Director
- **TUCKER ALAN INC.** (1994 – 2004) – Vice President
- **Peterson Consulting** (1989 - 1994) – Executive Consultant

**Education**

- Santa Clara University, Bachelor of Science in Commerce, Degree in Finance and a minor in Economics 1989 – Cum Laude
- Beta Gamma Sigma
- Financial Executives Institute's Top Finance Student Scholarship

**Professional Associations and Certifications**

- Advisory Board, Leavey School of Business, Santa Clara University (2016 – present)
- Certified Public Accountant, State of California, License No. 94883
- Certified in Financial Forensics
- Certified Licensing Professional
- Chartered Global Management Accountant

Mr. Hansen is a Partner with over 30 years of experience providing business, financial and damages consulting to individuals, business entities and counsel. Mr. Hansen is a Certified Public Accountant licensed in the State of California, Certified in Financial Forensics, a Certified Licensing Professional and a Chartered Global Management Accountant. Mr. Hansen focuses on commercial damages, intellectual property, class action, forensic accounting, and valuation matters. Mr. Hansen has analyzed and addressed claims for lost profits, price erosion, reasonable royalties, unjust enrichment, increased costs and diminution of asset and business value in a variety of circumstances and industries. He has also assisted clients with the valuation and licensing of intellectual property. Mr. Hansen has testified as an expert on damages and economic issues in deposition, trial and arbitration in State Courts, Federal Courts and in the International Trade Commission.

## PROFESSIONAL EXPERIENCE

### Intellectual Property

Analyzed the financial and economic impacts due to alleged intellectual property infringement and misappropriation including patents, trademarks, copyrights, trade secrets, trade dress and rights of publicity. Evaluated the appropriate measure of damages including lost profits, price erosion, reasonable royalties, and disgorgement of defendants' gains.

Evaluated and prepared claims for lost profits related to lost sales, price erosion and convoyed sales, as well as unjust enrichment. Evaluated and analyzed market size and potential, market share, head-start periods, competition, product features and functionality, available alternatives, customer demand, historical and projected sales, ability to achieve projected sales, company and product profitability, nature of costs, cost allocations and product pricing issues. Analyzed manufacturing capacity, sales and distribution channels and capacity, customer relationships and capital expenditures required to bring products to market.

Determined and evaluated reasonable royalties and the hypothetical negotiation of license agreements. Analyzed cost saving and enhanced earnings related to licensing technology, licensing history, comparable license agreements, design-around considerations, apportionment of profits, appropriate royalty base and avoided product development costs. Analyzed industry standards, patent pools and establishing royalty rates for standard essential patents. Investigated licensing and royalty disputes, including the level of reported sales and underpayment of royalties, guaranteed minimums, deductions from revenue and efforts to commercialize patent portfolios.

**John L. Hansen, CPA, CFF, CLP, CGMA**                    **Attachment 1**

Patent analyses have related to a variety of industries and products, including:

- 3D Graphic Accelerators
- Agricultural Equipment
- Athletic Shoe Cushioning
- Automotive Diagnostic Equipment
- Business Intelligence Software
- Bus Ramps
- Casino Gaming
- Chemical Vapor Deposition
- Composite Materials
- Computer Audio Chips and Cards
- CPU Utilization Management
- Dental Equipment
- Digital Film
- Digital Rights Management Technology
- Disk Drives and Storage Products
- DRAM
- E-Commerce
- Educational Toys
- Electronics
- FEP Cable Insulation
- Flash Memory
- Game Consoles
- Garage Door Openers
- GPS Chip Sets
- Hard Drive Partitioning
- In-Line Skates
- Light-Emitting Diodes
- Liquid Crystal Displays
- Medical Devices
- MLC Flash Memory
- MOSFETs
- Notebook Computer Security
- Optical Networking
- Perfect Silicon
- PET Oxygen Barrier Bottles
- Pharmaceutical Products
- Photonic Integrated Circuits
- Plug-N-Play Functionality
- Polyisoprene Condoms
- Power Management ICs
- Printers
- Radiotherapy Equipment
- Sales Configuration Software
- Semiconductors
- Set Top Boxes
- Smartphones
- Software
- Sub-Surface Laser Marking
- Tablets
- Telecommunications Equipment
- Tire Sealants
- Trampoline Enclosures
- Ultrasound Equipment
- VCRs
- Video Games
- Video Teleconferencing
- Voice Recognition Software
- Wafer Marking Systems
- Water Purification
- Web Conferencing
- Wi-Fi Functionality
- Wi-Fi Hotspots

Copyright and trade secret analyses have related to a variety of industries and products, including:

- Architectural Designs
- Antennas
- Athletic Shoe Cushioning
- ATVs
- Deodorant
- Dolls
- Educational Programs
- Electronics
- Graphical Flight Simulators
- Insurance Brokerages
- Lab Chip Technology
- Music Royalties
- Oncology Test Equipment
- Operating Systems
- Personal Digital Assistants
- Portable Media Players
- Software Installations
- SRAM
- Treatment Planning Software
- Videos
- Web Conferencing
- Web Portals

**John L. Hansen, CPA, CFF, CLP, CGMA**                                    **Attachment 1**

Analyzed lost profits, disgorgement of defendants' gains, royalties and corrective advertising related to alleged trademark infringement, false designation of origin, trademark dilution, false advertising and unfair competition claims. Determined revenue related to the alleged use of trademarks. Analyzed deductible expenses, cost allocations and the apportionment of profit attributable to factors other than the challenged conduct. Analyzed trademark license agreements and franchise agreements, as well as determined royalties for trademarks.

Trademark and false advertising analyses have related to a variety of industries and products, including:

- Athletic Shoes
- Banking/Remittance Services
- Bottled Juice and Water
- Cellular Communications
- Cookie Sticks
- Cookware
- Custom Printing
- Department Stores
- Diesel Engines
- E-Commerce
- Electronics/Power Supplies
- Employee Staffing
- Frozen Foods
- Furniture Retailers
- Hair Care
- Health and Beauty Products
- Kombucha
- Leadership Training
- Legal Services
- Licensed Merchandise
- Nutrition Bars
- Off-Road Vehicles
- Online Shopping Apps
- Professional Sports Franchises
- Semiconductors
- Software
- Solar Panels
- Sports Memorabilia
- Virtual Reality
- Watercraft

Analyzed the value of intellectual property related to its transfer, licensing, and disposition. Consulted with clients regarding factors influencing licensing opportunities and potential royalty rates, licensing strategy and licensing positions. Assisted with settlement and licensing negotiations.

Assisted clients with Section 337 investigations in the United States International Trade Commission. Analyzed domestic industry issues, including the investment in plant and equipment, employment of labor and capital, and efforts to commercialize and exploit the articles covered by the subject patents. Evaluated the commercial success of articles covered by the subject patents and analyzed the impact of an exclusion order extending to downstream products. Addressed remedy issues, such as bonding and inventory levels.

Analyzed the commercial success of products covered by patents in matters pending before the Patent Trial and Appeal Board.

**John L. Hansen, CPA, CFF, CLP, CGMA**                                          **Attachment 1**

**Commercial Damages, Valuation and Forensic Accounting**

Analyzed the operations, financial condition and profitability of businesses under a variety of circumstances, including breach of contract, bankruptcy and insolvency, business interruption, lender liability, defective product, merger and acquisition, business and asset valuation and fraud investigations.

Prepared and analyzed numerous damage studies including analyses of lost profits, lost value and increased costs. Analyzed actual and projected revenues, market share, competition, industry and market conditions, cost of goods sold, the nature of costs and cost allocations, as examples. Analyses have related to a variety of industries and products, including:

- Aloe Vera
- Apparel
- ATVs
- Biotechnology
- Commercial and Retail Developments
- Computer Assembly
- Computer Resellers
- Concessions and Souvenirs
- Dental Anesthetic
- Deodorant
- Flash Memory
- Footwear
- GPS Chipset Development
- Hospitality
- Internet of Things Software
- IT Outsourcing
- Luxury Branded Products
- MoCA Technology
- OLED Panels
- Online Advertising
- Power Generation
- Printers
- Printing Equipment
- Real Estate
- Restaurants
- Retail Merchandising
- Satellite Television
- Semiconductor Manufacturing
- Software Installations
- Sports Agents
- Telecommunication Equipment
- Video Teleconferencing

Prepared and analyzed numerous valuations of businesses and business interests, solvency, financial condition, the viability of continuing operations, company capital structure, trend and ratio analysis, cost of capital and discount rates. Analyzed comparable companies and transactions, discounted cash flows and valuation multiples. Valuation analyses have related to a variety of industries and businesses, including:

- Ambulance Services
- Aquaculture
- Chemical Manufacturing
- Database Software
- Diamond Coated Capsules
- Diesel Engine Technology
- Flash Memory
- Food Processing
- Furniture Retailer
- Health and Beauty Products
- High Capacity Disk Drives
- Independent Power Producers
- Mineral Water and Juice Bottling
- Pharmaceutical Products
- Professional Sports Promotion
- Public Utilities
- Refrigerated Bars
- Semiconductor Manufacturing
- Sporting Goods Retail Outlets
- Surgical and Diagnostic Centers
- Television Programming
- Tire and Retread Operations
- Transpacific Shipping
- Tug Boat Operations
- VOIP Equipment
- Web Conferencing

Investigated the comingling of personal and business funds and assets, the personal use of business funds and the business purpose of expenditures. Analyzed alleged fraudulent conveyances and preferences and investigated and documented indicia of fraud. Analyzed the flow of funds and assets between entities and performed detailed tracing of transactions and documentation of their accounting treatment.

**John L. Hansen, CPA, CFF, CLP, CGMA**                                    **Attachment 1**

**Class Action, Unfair Competition and Antitrust**

Created and analyzed databases to identify potential class members, dissimilarities among potential class members and evaluation of class representatives. Analyzed if damages may be calculated on a class-wide basis and evaluated potential class damages. Analyzed product pricing, cost of goods sold and cost allocations, valuation, and the financial impact of alleged wrongful conduct on consumers. Consulted on projects involving a variety of industries and circumstances, including:

- Automobile Replacement Parts
- CD and DVD Distribution
- Dental Supplies
- Sporting Event Promotion
- LCD Panels
- Extended Warranty Coverage
- Student Tuition and Fees

- Privacy/Online Advertising
- Professional Athletes
- Professional Sports Leagues
- State Employee Compensation
- Theater Gift Certificates
- Kombucha

**Insurance and Environmental**

Accumulated, analyzed and allocated costs related to environmental investigation and remediation efforts. Analyzed the nature and classification of expenditures, documented expenses and associated proof of payment, and evaluated continuing operational costs. Analyzed damages related to loss of use and business interruption related to environmental contamination. Consulted on environmental projects involving various industries, including:

- Cement Manufacturing
- Electronics
- Gun Ranges
- Lead Shields

- Lock and Keyset Manufacturing
- Port Facilities
- Refineries
- Semiconductor Manufacturing

**Construction and Utility**

Analyzed the impact of delays, disruption and acceleration and the associated costs on construction projects. Investigation, identification and documentation of factors contributing to project schedule impacts and associated costs. Analyzed project accounting and cost documents including contractor bids, budgets, production and productivity, general and administrative and jobsite overhead cost pools and allocations, equipment utilization and rates, materials, labor and changed work. Assessed the financial condition and capitalization of construction contractors. Analyzed working capital, cash flow, operations of related companies, customers and industry conditions. Consulted on construction and utility projects, including:

- Airports
- Apartment Buildings
- Coal-Fired Cogeneration Plant
- Electric Transmission Facilities
- High-Rise Condominiums
- Highways and Roads
- Hotels

- Manufacturing Facilities
- Pipelines
- Port Facilities and Container Cranes
- Pumped Storage Hydroelectric Plant
- Telecommunication Facilities
- Waste Water Treatment Plant
- Wind Farms

Analyzed utility ratemaking and cost of providing service. Analyzed regulatory policies and the resulting contracts with qualifying facilities in California. Reviewed the development of California's standard offer power purchase contracts. Evaluated ratepayer impact of long term fixed price contracts and the impact of transmission constraints on a utility's ability to accept qualifying facility power. Analyzed project viability for alternative energy projects related to the specifics of each project.

**John L. Hansen, CPA, CFF, CLP, CGMA**                                      **Attachment 1**

**Labor and Employment**

Analysis and assessment of class certification and/or damages related to:

- Company Uniform Policy
- Employee Misclassification
- Expense Reimbursement
- Minimum Wage Violations
- Off-the-Clock Work
- Sales Commission Chargebacks
- Standby Pay
- Unpaid Meal and Rest Breaks

Assisted with analysis of class certification issues and identifying potential class members. Developed models to determine risk exposure and potential damages based on numerous factors, such as employee location, job title and activities performed. Evaluated employee activity based on available company data including computer, phone, card swipe, punch card, payroll and employee schedule data. Analyzed economic offsets to potential damages, including incentive compensation plan payments.

Analyzed and prepared numerous claims related to breach of contract, labor termination, discrimination, personal injury and wrongful death. These engagements have included economic studies of compensation, fringe benefits, retirement and pension plans, stock options, personal consumption, appropriate period of loss, wage escalation and discount rates. Analyzed replacement compensation, including independent consulting ventures and the value of small businesses.

Analyses have related to a variety of industries, including:

- Accounting
- Apparel Retail Sales
- Call Centers
- Commercial Fishing
- Computer Hardware
- Construction
- Consumer Goods
- Healthcare
- Investment Management
- Manufactured Homes
- Oil Refining
- Package Delivery
- Paper Products
- Parking Facilities
- Pharmaceuticals
- Produce Packing
- Real Estate Development
- Semiconductors
- Software
- Telecommunications
- Timeshare Sales
- Television Programming
- Transportation
- Video Game Development
- Wine and Spirits
- Wireless Communications

Performed numerous analyses of labor and related costs and employee cost allocations on commercial damage, construction, business interruption, valuation and increased cost claims, including analysis of labor burdens, benefit costs, salary and compensation plans.

**John L. Hansen, CPA, CFF, CLP, CGMA**                    **Attachment 1**

**TESTIMONY**

Testimony in deposition or trial in United States District Court:

- Central District of California
- Eastern District of California
- Northern District of California
- Southern District of California
- District of Delaware
- Northern District of Illinois
- District of Massachusetts
- Eastern District of Michigan
- District of Minnesota
- Western District of Missouri
- District of Nevada
- District of New Jersey
- Southern District of New York
- Middle District of North Carolina
- Western District of Pennsylvania
- Eastern District of Texas
- Western District of Texas
- Western District of Washington

Testimony in United States International Trade Commission

Testimony in deposition or trial in Superior Court of the State of California:

- County of Alameda
- County of Los Angeles
- County of Marin
- County of Orange
- County of San Francisco
- County of San Mateo
- County of Santa Clara

Testimony in deposition or trial in State Court:

- Circuit Court of Cook County, Illinois
- Court of Chancery of the State of Delaware
- Superior Court of the State of Arizona in and for the County of Maricopa
- District Court of Collin County, Texas

Declarations and deposition testimony in matters before the Patent Trial and Appeal Board

Testimony in Arbitrations, participation in Mediations and assisted with settlement negotiations


**SELECTED SPEAKING ENGAGEMENTS**

- Continuing Legal Education: Damages (1996)
- Continuing Legal Education: Understanding And Using Financial Information (1997)
- Stanford University: Financial And Ratio Analysis (1997)
- Stanford University: Financial Statement Analysis Case Study (1998)
- Maritime Industry Personal Injury Damages (1998)

**John L. Hansen, CPA, CFF, CLP, CGMA**                                    **Attachment 1**

- Intellectual Property Section of the Sacramento County Bar: Intellectual Property Damages Update (1999)
- Intellectual Property Section of the Bar Association of San Francisco: Intellectual Property Damages (1999)
- Continuing Legal Education: Accounting And Financial Issues For Lawyers (2001)
- University of California, Hastings College of the Law: Patent Damages (2002)
- Licensing Executives Society Annual Meeting – Chicago: An Update On Patent Damages (2002)
- Stanford University: Financial Statement And Ratio Analysis (2002)
- Santa Clara University School of Law: Patent Damages (2005)
- Licensing Executives Society – Dallas: Recent Developments In Patent Damages (2005)
- Continuing Legal Education, Morgan, Lewis & Bockius LLP: Recent Developments In Patent Damages (2005)
- Santa Clara University School of Law: Intellectual Property Litigation – Damages (2006)
- Continuing Legal Education, McDermott Will & Emery: Presenting Patent Damages / Trial Case Study (2006)
- Santa Clara University School of Law: Patent Infringement Damages (2007)
- Santa Clara University School of Law: Intellectual Property Litigation – Patent Damages Case Study (2007)
- 5th Annual Rocky Mountain Intellectual Property & Technology Institute – Denver: Emerging Patent Valuation and Damages Issues (2007)
- Santa Clara University School of Law: Patent Infringement Damages (2008)
- Continuing Legal Education, McDermott Will & Emery: Section 337 Investigations in the ITC – Role of the Financial/Economic Expert (2008)
- Santa Clara University School of Law: Patent Infringement Damages (2009)
- 7th Annual Rocky Mountain Intellectual Property & Technology Institute – Denver: Damages (2009)
- Stanford University: Fundamentals and Analysis of Construction Accounting and Finance (2010)
- San Mateo County Bar Association: Accounting Principles and Tips for Business Lawyers and Litigators (2010)
- Stanford University: Valuing Intellectual Property and Intangible Assets (2011)
- The Federal Bar Association – San Diego: Patent Damages Law: Life After Lucent, ResQNet and UNILOC (2012)
- Continuing Legal Education, Morgan, Lewis & Bockius LLP: Selecting, Retaining and Working with Experts (2013)
- CalCPA Forensic Services Section: Innovatio IP Ventures Patent Litigation and the Potential Relevance to Non-FRAND Damages Calculations (2014)
- The McCarthy Institute and Hanson Bridgett: New Paradigms in Patent Monetization and Damages (2015)
- Golden Gate University School of Law: Patent Damages (2015)
- Stanford Law School: IP litigation, Patent Damages (2015)
- SFIPLA: Recent Developments in Patent Damages (2015)
- The Bar Association of San Francisco: IP BYTES: Hot Topics in Trademark, Disgorgement of Defendants' Profits (2015)

**John L. Hansen, CPA, CFF, CLP, CGMA**                                        **Attachment 1**

- Golden Gate University School of Law: Patent Damages (April 2016)
- Golden Gate University School of Law: Patent Damages (September 2016)
- Stanford University: CEE 244 Accounting, Finance & Valuation for Engineers and Constructors / Revenue Recognition, Equipment Costs and Fixed Asset Accounting (November 2018)
- University of California, Hastings College of the Law: Patent Damages (November 2018)
- Stanford University, Saudi Industrial Development Fund Business Management Program: Valuation of Companies and Assets (August 2019)
- University of California, Hastings College of the Law: Patent Law (Law 505), Patent Damages (November 2019)
- University of California, Hastings College of the Law: Patent Damages (November 2020)
- Golden Gate University School of Law: Patent Damages (April 2021)
- Santa Clara University, Business Law: Intellectual Property Damages (November 2021)
- University of California, Hastings College of the Law: Patent Damages (November 2021)
- USC Gould School of Law 2023 Intellectual Property Institute: Apportionment in Patent Damages (March 2023)

**PUBLICATIONS**

Hansen, John L., "Appendix A, Damages," <u>Maritime Personal Injury Defense</u>, March 1999, pp. 127-137 (by James R. Walsh and Robert A. Bleicher)

**John L. Hansen, CPA, CFF, CLP, CGMA**
**Testimony**                                                    Attachment 2.U

| | |
|---|---|
| Alacritech, Inc. v. _Intel Corporation_, et al.  United States District Court for the Eastern District of Texas | Deposition: May 2023 |
| Gabriela Zamora, Sami Hartman, individually an on behalf of all others similarly situated v. _GT's Living Foods, LLC_  Superior Court of the State of California, for the County of Los Angeles | Deposition: March 2023 |
| Oxygenator Water Technologies, Inc. v. _Tennant Company_  United States District Court for the District of Minnesota | Deposition: March 2023 |
| _In re University of Southern California Tuition and Fees COVID-19 Refund Litigation_  United States District Court for the Central District of California | Deposition: February 2023 |
| Mondis Technology Ltd. v. _LG Electronics, Inc. and LG Electronics U.S.A., Inc._  United States District Court for the District of New Jersey | Trial: February 2023<br>Trial: April 2019<br>Hearing: March 2019<br>Deposition: April 2018 |
| Ahern Rentals, Inc. v. _EquipmentShare.com Inc, et al._  United States District Court for the Western District of Missouri (Federal MDL); District Court of Collin County, Texas (Texas MDL) | Deposition: November 2022 |
| ImmerVision, Inc. v. _LG Electronics U.S.A., Inc. and LG Electronics, Inc._  United States District Court for the District of Delaware | Deposition: June 2022 |
| Ahern Rentals, Inc. _v. EquipmentShare.com Inc. and Deral Bonner, et al._  Superior Court of the State of Arizona in and for the County of Maricopa | Deposition: June 2022 |
| Tortilla Factory, LLC v. _GT's Living Foods, LLC_  United States District Court for the Central District of California | Trial: June 2022<br>Deposition: September 2019<br>Deposition: May 2019 |
| Palantir Technologies Inc. v. _Marc L. Abramowitz_  United States District Court for the Northern District of California | Deposition: May 2022 |
| Pegasystems Inc., Plaintiff/Counterclaim Defendant v. _Appian Corporation, Defendant/Counterclaim Plaintiff_ and Business Process Management, Inc., Defendant  United States District Court for the District of Massachusetts | Deposition: April 2022 |

**John L. Hansen, CPA, CFF, CLP, CGMA**
**Testimony**                                                      Attachment 2.U

| | |
|---|---|
| Uptown Newport Jamboree, LLC, Plaintiff and Cross-Defendant v. *Newport Fab, LLC d/b/a Jazz Semiconductor, Defendant and Cross-Complainant*  Superior Court of the State of California, for the County of Orange | Deposition: February 2022 |
| *Chemours Company FC, LLC* v. Daikin Industries, Ltd. and Daikin America, Inc.  United States District Court for the District of Delaware | Deposition: January 2022 |
| Branch Banking and Trust Company v. *Hitachi Vantara Corporation*  United States District Court for the Middle District of North Carolina | Deposition: January 2022 |
| Asetek Danmark A/S, Plaintiff and Counter-Defendant v. *CoolIT Systems, Inc., Defendant and Counter-Claimant*  United States District Court for the Northern District of California | Deposition: January 2022 |
| Thomas A. Shields, et al. v. *Fédération Internationale de Natation (FINA)*  United States District Court for the Northern District of California | Deposition: September 2021 |
| Total Recall Technologies *v. Palmer Luckey and Facebook Technologies, LLC (f/n/a Oculus VR, LLC)*  United States District Court for the Central District of California | Deposition: August 2021 Deposition: November 2020 |
| Delaney Sharpe, et al., on Behalf of Themselves and all Others Similarly Situated v. *GTs Living Foods, LLC*  United States District Court for the Central District of California | Deposition: July 2021 |
| AdTrader, Inc., et al. v. *Google LLC*  United States District Court for the Northern District of California | Deposition: July 2021 |
| Ahern Rentals, Inc. *v. EquipmentShare.com Inc. and Christina Gutierrez, et al.*  Superior Court of the State of Arizona in and for the County of Maricopa | Deposition: February 2021 |
| *Freedom Debt Relief, LLC* v. Accredited Debt Relief, LLC and Accredited Debt Relief, LLC v. *Freedom Debt Relief, LLC*  Superior Court of the State of California, County of San Mateo | Deposition: August 2020 |
| Realtime Adaptive Streaming LLC v. *Google LLC and YouTube, LLC*  United States District Court for the Central District of California | Deposition: October 2019 |

**John L. Hansen, CPA, CFF, CLP, CGMA**
**Testimony**                                                    Attachment 2.U

| | |
|---|---|
| Harold H. Robinson v. *Jennifer M. Johnson, SilverBelt Investments, LLC and SilverBelt Holdings, LLC*  Superior Court of the State of California, County of San Francisco | Deposition: September 2019 |
| GearSource Holdings, LLC v. *Google LLC*  United States District Court for the Northern District of California | Deposition: June 2019 |
| *Ezaki Glico Kabushiki Kaisha and Ezaki Glico USA Corporation* v. Lotte International America Corp. and Lotte Confectionary Co. Ltd. United States District Court for the District of New Jersey | Deposition: May 2019 |
| SIMO Holdings Inc. v. *Hong Kong uCloudlink Network Technology Limited and uCloudlink (America), Ltd.*  United States District Court for the Southern District of New York | Trial: May 2019 Deposition: February 2019 |
| Daikin Industries Ltd. and Daikin America, Inc. v. *The Chemours Company FC, LLC*  United States Patent and Trademark Office, before the Patent Trial and Appeal Board, Cases: IPR2018-00992 and IPR2018-00993 | Deposition: April 2019 |
| DealDash Oyj and DealDash Inc. v. *ContextLogic Inc. d/b/a Wish* United States District Court for the Northern District of California | Deposition: April 2019 |
| Blue Spike LLC, Blue Spike International Ltd., and Wistaria Trading Ltd. v. *VIZIO, Inc.*  United States District Court for the Southern District of California | Deposition: April 2019 |

\* *Italics* denote client.
\*\* Mr. Hansen is a licensed CPA in California only.  Neither Mr. Hansen nor TM Financial Forensics, LLC, an HKA Company, provide audit or attest services, in this or any other state.

**Documents Considered**                                    Attachment 3.U

| Beginning Bates | | Ending Bates |
|---|---|---|
| NIKE0000016 | - | NIKE0000017 |
| NIKE0000281 | - | NIKE0000287 |
| NIKE0001145 | - | NIKE0001194 |
| NIKE0006776 | - | NIKE0006781 |
| NIKE0006785 | - | NIKE0006793 |
| NIKE0029087 | - | NIKE0029087 |
| NIKE0038783 | - | NIKE0038788 |
| NIKE0038792 | - | NIKE0038798 |
| NIKE0038817 | - | NIKE0038821 |
| NIKE0038955 | - | NIKE0038959 |
| NIKE0039436 | - | NIKE0039436 |
| NIKE0039854 | - | NIKE0040006 |
| NIKE0041218 | - | NIKE0041226 |
| NIKE0041233 | - | NIKE0041233 |
| NIKE0041262 | - | NIKE0041265 |
| NIKE0041300 | - | NIKE0041302 |
| NIKE0041350 | - | NIKE0041357 |
| NIKE0042395 | - | NIKE0042397 |
| NIKE0081471 | - | NIKE0081471 |
| STX0014863 | - | STX0014921 |
| STX0016703 | - | STX0016869 |
| STX0017326 | - | STX0017371 |
| STX0018010 | - | STX0018014 |
| STX0018453 | - | STX0018499 |
| STX0018799 | - | STX0018840 |
| STX0020185 | - | STX0020188 |
| STX0020225 | - | STX0020268 |
| STX0020523 | - | STX0020534 |
| STX0020994 | - | STX0021141 |
| STX0021182 | - | STX0021188 |
| STX0021364 | - | STX0021364 |
| STX0021481 | - | STX0021498 |
| STX0022678 | - | STX0022691 |
| STX0023881 | - | STX0023887 |
| STX0038743 | - | STX0038751 |
| STX0039423 | - | STX0039473 |
| STX0039585 | - | STX0039592 |
| STX0040174 | - | STX0040191 |
| STX0040474 | - | STX0040478 |
| STX0040935 | - | STX0040937 |
| STX0041076 | - | STX0041077 |
| STX0042659 | - | STX0042663 |
| STX0055272 | - | STX0055276 |
| STX0056718 | - | STX0056718 |
| STX0061163 | - | STX0061172 |

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

Documents Considered

Attachment 3.U

| Beginning Bates | | Ending Bates |
|---|---|---|
| STX0085640 | - | STX0085641 |
| STX0085644 | - | STX0085646 |
| STX0090109 | - | STX0090240 |
| STX0090493 | - | STX0090677 |
| STX0091556 | - | STX0091567 |
| STX0091819 | - | STX0091911 |
| STX0098851 | - | STX0098876 |
| STX0125881 | - | STX0125932 |
| STX0130531 | - | STX0130572 |
| STX0169544 | - | STX0169546 |
| STX0191602 | - | STX0191604 |
| STX0202142 | - | STX0202143 |
| STX0232285 | - | STX0232286 |
| STX0484545 | - | STX0484545 |
| STX0583757 | - | STX0583897 |
| STX0589430 | - | STX0589458 |
| STX0592628 | - | STX0592636 |
| STX0594173 | - | STX0594465 |
| STX0594887 | - | STX0595073 |
| STX0680795 | - | STX0680837 |
| STX0699905 | - | STX0699907 |
| STX0752605 | - | STX0752642 |
| STX0774239 | - | STX0774239 |
| STX0774265 | - | STX0774281 |
| STX0774283 | - | STX0774336 |
| STX0774394 | - | STX0774395 |
| STX0806027 | - | STX0806052 |

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

Documents Considered                                                    Attachment 3.U

| Legal Filings | Date |
|---|---|
| • StockX LLC's Answer to Complaint | 3/31/2022 |
| • Nike Inc. v. StockX LLC, No. 1:22-cv-00983-VEC, Civil Case Management Plan and Scheduling Order Dkt. 25 | 4/11/2022 |
| • Plaintiff Nike, Inc.'s First Set of Request for Production of Documents and Things to Defendant StockX LLC | 4/19/2022 |
| • Plaintiff Nike, Inc.'s First Set of Requests for Admission to Defendant StockX LLC | 4/29/2022 |
| • Defendant's Objections and Responses to Plaintiff's First Set of Interrogatories | 5/18/2022 |
| • Defendant's Objections and Responses to Plaintiff's First Set of Requests for Production | 5/19/2022 |
| • Nike Inc. v. StockX LLC, No. 1:22-cv-00983-VEC, First Amended Complaint | 5/25/2022 |
| • Defendant StockX LLC's Responses and Objections to Plaintiff Nike, Inc.'s First Set of Requests for Admission | 5/31/2022 |
| • Answer to First Amended Complaint Dkt. 41, and Exhibits | 6/6/2022 |
| • Plaintiff Nike, Inc.'s Second Set of Interrogatories to Defendant StockX LLC | 6/16/2022 |
| • Plaintiff Nike, Inc.'s Second Set of Requests for Production of Documents and Things to Defendant StockX LLC | 6/16/2022 |
| • Defendant's Objections and Responses to Plaintiff's Second Set of Interrogatories | 7/18/2022 |
| • Defendant's Objections and Responses to Plaintiff's Second Set of Requests for Production | 7/18/2022 |
| • Plaintiff Nike, Inc.'s Third Set of Requests for Production of Documents and Things to Defendant StockX LLC | 7/25/2022 |
| • Defendant's Third Set of Requests for Production | 8/19/2022 |
| • Defendant's First Supplemental Objections and Responses to Plaintiff's Third Set of Interrogatories | 3/21/2023 |
| • Plaintiff Nike Inc.'s Supplemental Responses and Objections to Defendant StockX LLC's Third Set of Interrogatories | 4/17/2023 |
| • Nike Inc. v. StockX LLC, No. 1:22-cv-00983-VEC, Order, Dkt 171 | 4/26/2023 |

| Expert Reports | Date |
|---|---|
| • Expert Report of Kari Kammel, and Exhibits | 5/5/2023 |

| Depositions | Date |
|---|---|
| • Deposition of Russell Amidon (Senior Director of VIP Relations, StockX) and Exhibits | 11/30/2022 |
| • Deposition of Jacob Fenton (Vice President of Customer Experience and Insights, StockX) and Exhibits | 12/2/2022 |
| • Deposition of Ron Faris (Vice President and General Manager of Nike Virtual Studios, Nike) and Exhibits | 12/7/2022 |
| • Deposition of Heather Paulson (Vice President of Connected Marketplace, Nike) and Exhibits | 1/6/2023 |
| • Deposition of Barbara Delli Carpini (Vice President for Global Brand Protection and Digital IP Enforcement, Nike) and Exhibits | 1/10/2023 |
| • Deposition of Laura Rizza (Former Nike Brand Protection Coordinator) and Exhibits | 2/1/2023 |
| • Deposition of Joe Pallett (Director of Authentication and Innovation, Nike) and Exhibits | 2/8/2023 |
| • Deposition of Roy Ikhyun Kim (Third Party Consumer and Sneaker Collector) and Exhibits | 2/8/2023 |
| • Deposition of Brock Huber (Vice President of Corporate and Strategic Development, StockX) and Exhibits | 2/22/2023 |

| Case Law | Date |
|---|---|
| • *Maier Brewing Co. v. Fleischmann Distilling Corp.* , (9th Cir. 1968) | 2/21/1968 |
| • *Hamil America Inc. v. GFI* , (1999) | 9/29/1999 |
| • *All-Star Marketing Group, LLC v. Media Brands Co., Ltd.* , (2011) | 1/3/2011 |
| • *Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.* , (2012) | 4/2/2012 |
| • *Merck Eprova AG v. Gnosis S.p.A* ., (S.D.N.Y. 2012) | 9/30/2012 |
| • *Merck Eprova AG v. Gnosis S.p.A* ., (2d Cir. 2014) | 7/29/2014 |
| • *Innovation Ventures, LLC v. Ultimate One Distrib. Corp.* , (E.D.N.Y. 2016) | 3/31/2016 |
| • *Dependable Sales & Serv., Inc. v. TrueCar, Inc* ., (S.D.N.Y. 2019) | 3/27/2019 |
| • *E. Mishan & Sons, Inc. v. Novel Brands LLC* , (S.D.N.Y. Feb. 13, 2020) | 2/13/2020 |
| • *Nike, Inc. v. StockX, LLC,* (S.D.N.Y. Jan. 9, 2023) | 1/9/2023 |

| Financials | Date |
|---|---|
| • Nike, Inc., Form 10-K for the fiscal year ended May 31, 2022 | 5/31/2022 |

| Legal Code | Date |
|---|---|
| • 15 U.S.C. § 1114 | |
| • 15 U.S.C. § 1117 (a) | |
| • 15 U.S.C. § 1117 (c) | |
| • 15 U.S.C. § 1125 | |

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

**Trademarks** | **Date**
--- | ---
- United States Patent and Trademark Office Registration No. 977,190: Swoosh Design. | 1/22/1974
- United States Patent and Trademark Office Registration No. 978,952: NIKE. | 2/19/1974
- United States Patent and Trademark Office Registration No. 1,214,930: NIKE. | 11/2/1982
- United States Patent and Trademark Office Registration No. 1,323,343: Swoosh Design. | 3/5/1985
- United States Patent and Trademark Office Registration No. 1,325,938: NIKE. & Swoosh Design | 3/19/1985
- United States Patent and Trademark Office Registration No. 1,370,283: AIR JORDAN | 11/12/1985
- United States Patent and Trademark Office Registration No. 1,558,100: JUMPMAN Design. | 9/26/1989
- United States Patent and Trademark Office Registration No. 3,627,820: JUMPMAN | 5/26/2009
- United States Patent and Trademark Office Registration No. 3,725,535: AIR JORDAN & Wings Design | 12/15/2009

**Analyst Reports** | **Date**
--- | ---
- "Taking Stock of StockX: Deep Dive Into The Sneaker Resale Market Leader", Wells Fargo | 1/27/2020
- "Sneaker as an Alternate Asset Class, Part III", Cowen | 5/24/2022

**Other** | **Date**
--- | ---
- StockX Production Letter | 5/23/2023

**Websites** | **Date**
--- | ---
- https://interbrand.com/newsroom/interbrand-launches-best-global-brands-2022/
- https://qz.com/2005457/for-stockx-selling-jordans-is-just-the-beginning
- https://stockx.com/about/authentication/
- https://stockx.com/about/how-it-works/
- https://stockx.com/about/stockx-cyber-weekend-2021/
- https://stockx.com/about/stockx-launches-vault-nfts/
- https://stockx.com/about/sx-market-insights/big-facts-current-culture-index-2023/
- https://stockx.com/about/sx-market-insights/current-culture-index-22/
- https://stockx.com/about/verification/
- https://stockx.com/help/articles/Are-shoes-sold-on-StockX-considered-deadstock
- https://stockx.com/help/articles/How-do-I-sell-on-StockX
- https://stockx.com/help/articles/What-kinds-of-sneakers-are-sold-on-StockX.
- https://stockx.com/help/articles/where-is-StockX-located
- https://stockx.com/nike/release-date
- https://stockx.com/retro-jordans/release-date
- https://www.bloomberg.com/profile/company/1786Z:SW
- https://www.complex.com/sneakers/stockx-fake-sneakers-nike-lawsuit-38-pairs
- https://www.crunchbase.com/organization/stockx
- https://www.economist.com/films/2022/12/08/what-is-driving-the-proliferation-of-counterfeit-sneakers
- https://www.forbes.com/sites/korihale/2020/12/15/sneakerheads-are-helping-stockx-pursue-a-25-billion-valuation/?sh=46eff5272255
- https://www.nytimes.com/wirecutter/blog/myths-about-counterfeit-products-debunked/
- https://www.statista.com/chart/24313/stockx-gross-merchandise-volume/
- https://www.washingtonpost.com/business/2022/09/30/sneaker-authentication-ebay-stockx-nike/
- https://www.wsj.com/articles/stockx-hub-for-sneakerheads-is-latest-1-billion-unicorn-11561571959

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY



HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY



HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY



HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY



HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY





HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY