# EXHIBIT 121

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| NIKE, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | |
| | § | Case No.  1:22-CV-000983-VEC |
| | § | |
| STOCKX LLC, | § | |
| | § | |
| Defendant. | § | |
| | § | |
| | § | |
| | § | |

**REBUTTAL EXPERT REPORT OF ROBERT L. VIGIL, Ph.D.**

**June 2, 2023**

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

## TABLE OF CONTENTS

I.   INTRODUCTION ......................................................................................................1

     A.   Assignment .....................................................................................................1

     B.   Summary of Conclusions ...............................................................................2

     C.   Evidence Considered ......................................................................................6

II.  REBUTTAL OF HANSEN REPORT ...................................................................6

     A.   Harm to Nike ..................................................................................................6

          1.   Overview of Hansen opinions...............................................................6

          2.   Mr. Hansen provided no evidence of actual harm to Nike as a result of the alleged false claims ................................................................................8

               a.   Mr. Hansen provided no evidence of widespread counterfeits being traded on the StockX platform ...............................................8

               b.   Mr. Hansen failed to distinguish between harm to Nike from counterfeits, in general, and harm from counterfeits traded on StockX's platform .......12

               c.   Mr. Hansen provided no evidence that Nike lost sales as a result of the alleged false advertising by StockX .........................................17

     B.   Disgorgement of StockX's Profits.................................................................19

          1.   Overview of Hansen opinions...............................................................19

          2.   Mr. Hansen's estimate of StockX's profits from U.S. trades of Nike and Jordan sneakers is grossly overstated .........................................................23

               a.   Mr. Hansen's estimate of StockX's profits does not account for the variable portion of operating expenses included in the calculation of CM1 and CM2 ...................................................................................25

               b.   Mr. Hansen's estimate of StockX's profits does not account for other operating expenses that StockX would not have incurred absent the Nike and Jordan at-issue trades .......................................................33

          3.   Mr. Hansen failed to show that any of StockX's trades were enabled by the alleged false claims ...........................................................................39

               a.   Mr. Hansen overstates the importance of StockX's allegedly false claims regarding its authentication process in the purchase decision ..................40

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

    b.    Mr. Hansen incorrectly attributes all of the value of StockX's authentication process to the alleged false claims regarding the process's ability to identify counterfeit products ......................................................42

    c.    Mr. Hansen failed to account for the implication of repeat trades by buyers who received a counterfeit product............................................................44

    d.    Mr. Hansen provided no evidence that StockX buyers believed that its verification process would eliminate the possibility of receiving counterfeit products ...................................................................................45

4.    Evidence suggests that very little, if any, of StockX's trades are attributable to the alleged false claims ...................................................................................47

    a.    Survey evidence.................................................................................47

    b.    Evidence from StockX/GOAT transaction data ........................................51

5.    Summary.............................................................................................................54

    a.    Accounting for variable operating expenses included in the calculation of CM1 and CM2 ...........................................................................55

    b.    Accounting for other operating costs that StockX would not have incurred, absent the Nike and Jordan sneaker trades which Mr. Hansen assumes were all attributable to the alleged false claims.........................................55

    c.    Accounting for the maximum portion of Nike/Jordan trades for which the alleged false claims may have affected the buyer's decision to use the StockX platform...........................................................................56

C.    Mr. Hansen's statutory damages for counterfeiting are overstated ............................57

**III.  CONCLUSION ....................................................................................................................59**

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

## I.    Introduction

### A.    Assignment

1.      I have been retained by Debevoise & Plimpton LLP on behalf of its client, StockX LLC ("StockX"), in the above captioned matter. On May 5, 2023, I submitted an expert report on behalf of StockX that examined the extent to which Nike, Inc. ("Nike") has suffered harm due to StockX's alleged false advertising and the extent to which StockX has profited from its alleged false advertising.[1] In the current report, I have been asked to provide my expert opinion on the reports submitted by Mr. John L. Hansen on behalf of Nike.[2]

2.      My resume is attached as Exhibit 1. It describes all of my testimony, publications, and speeches to date. My previous report submitted in this matter details my qualifications and compensation.[3]

3.      This report is based on the information that was available to me as of the date of this report. I understand that discovery in this case is ongoing. Accordingly, I reserve the right to revise, supplement, or expand my opinions before trial, if necessary and allowed, based on review and analysis of information provided to me subsequent to the disclosure of this report.

---

[1]    Expert Report of Robert L. Vigil, Ph.D., *Nike, Inc. v. StockX LLC*, United States District Court for the Southern District of New York, Case 1:22-cv-00983-VEC, May 5, 2023 ("Vigil Affirmative Report").

[2]    Mr. Hansen submitted two reports in this matter. On May 5, 2023, Mr. Hansen submitted his original Expert Report and on May 30, 2023, Mr. Hansen submitted his First Amended Expert Report, which included updated calculations based on newly produced StockX financial data. Expert Report of John L. Hansen, *Nike, Inc. v. StockX LLC*, United States District Court for the Southern District of New York, Case 1:22-cv-00983-VEC, May 5, 2023 ("Hansen Report"); First Amended Expert Report of John L. Hansen, *Nike, Inc. v. StockX LLC*, United States District Court for the Southern District of New York, Case 1:22-cv-00983-VEC, May 30, 2023 ("Amended Hansen Report").

[3]    *See* Vigil Affirmative Report, Sections I.C-I.D.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

**B.    Summary of Conclusions**

4.      Mr. Hansen offers three types of opinions in this case. First, he provides an opinion that Nike has been harmed by StockX's alleged false advertising claims and by counterfeit sneakers that he claims were traded on the StockX platform. According to Mr. Hansen, this harm included damage to Nike's brands, reputation, and goodwill, and theoretical lost sales to Nike of Nike and Jordan branded sneakers.[4] These opinions are unfounded, as Mr. Hansen has provided no evidence of actual harm to Nike as a result of the alleged false claims or counterfeit products allegedly traded on the StockX platform. Among other things:

- *Mr. Hansen provided no evidence of widespread counterfeits being traded on the StockX platform.*

- *Mr. Hansen failed to distinguish between harm to Nike from counterfeits, in general, and harm from the specific counterfeits alleged to have been traded on StockX's platform, and failed to provide any evidence of harm that resulted from the alleged counterfeits at issue in this case.*

- *Mr. Hansen provided no evidence that Nike lost sales or suffered reputational harm as a result of the alleged false advertising by StockX.*

5.      Mr. Hansen also offers an opinion regarding the amount of StockX's profits related to the alleged false advertising claims that should be disgorged.[5] Mr. Hansen calculates StockX's gross profits from facilitating the sale of Nike and Jordan branded sneakers over the at-issue period to be ███████[6] These profits are vastly overstated. Among other things:

---

[4]      Hansen Report, ¶¶ 48-50, 55.
[5]      Hansen Report, ¶ 13; Amended Hansen Report, ¶ 15.
[6]      Amended Hansen Report, ¶¶ 18, 70, Table 6.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

- *Mr. Hansen's estimate of StockX's profits does not account for the variable portion of operating expenses included in the calculation of StockX's contribution margins.*

- *Mr. Hansen's estimate of StockX's profits does not account for other operating expenses that StockX would not have incurred absent the Nike and Jordan at-issue trades.*

- *Mr. Hansen failed to show that any of StockX's trades were enabled by the alleged false claims.*

6.      In his disgorgement analysis, Mr. Hansen assumes that all U.S. trades of Nike and Jordan sneakers on StockX over the at-issue period are attributable to the alleged false claims.[7] Mr. Hansen's unsupported assumption overstates the importance of StockX's advertisements about its verification process in driving demand for purchases on the StockX platform, and ignores a variety of other factors that contributed to the popularity of the platform. Mr. Hansen also assumes, without basis, that all StockX buyers believed that StockX's verification process would eliminate the possibility of receiving counterfeit products, despite evidence of repeat purchases made by StockX buyers who received counterfeit goods, and evidence suggesting a substantial fraction of StockX customers viewed StockX's ability to authenticate products to be imperfect.

7.      Contrary to Mr. Hansen's opinions and unsupported assumptions, evidence suggests that very few, if any, of StockX's trades are attributable to the alleged false claims. Among other things, evidence from Ms. Butler's survey testing the extent to which consumer purchasing interest was related to the allegedly false advertising claims suggests that the maximum percentage of respondents for whom the alleged false claims may have had some impact on

_____

[7]      Hansen Report, ¶¶ 58-59.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

respondents' being likely to use the StockX platform ranges from approximately 0.8 percent to 3.5 percent, depending on the subset of respondents considered for analysis. This is consistent with evidence comparing StockX and GOAT sale and transaction data which show that, after the change in StockX's advertising language in late 2022, there was little, if any, impact on StockX's relative marketplace performance.

8.    Correcting just a subset of the flaws in Mr. Hansen's disgorgement analysis suggests considerably lower StockX profits may potentially be attributable to the alleged false claims, if any. Below, I summarize the impact on Mr. Hansen's ▮▮▮▮▮▮▮ gross profit estimate after I account for some of the flaws discussed in this report. As described in detail, below:

- *Accounting for the variable operating expenses included in StockX's contribution margins reduces Mr. Hansen's gross profit estimate from ▮▮▮▮▮▮ to ▮▮▮▮▮▮.*

- *Accounting for other operating costs that StockX would not have incurred, absent the Nike and Jordan sneaker trades which Mr. Hansen assumes were all attributable to the alleged false claims <u>and</u> the variable operating expenses included in StockX's contribution margins suggests that StockX incurred **losses of** ▮▮▮▮▮▮ from facilitating the trades at issue.*

- *Accounting for the maximum portion of Nike/Jordan trades for which the alleged false claims may have affected the buyer's decision to use the StockX platform suggests that, at most, only ▮▮▮▮▮ **to** ▮▮▮▮▮ of Mr. Hansen's ▮▮▮▮▮ U.S. Nike and Jordan sneaker <u>gross profit</u> could be attributable to the alleged false claims.*

- *Accounting for the variable operating expenses included in the calculation of StockX contribution margins associated with U.S. trades of Nike and Jordan sneakers <u>and</u> the maximum portion of Nike/Jordan trades for which the alleged false claims may have affected the buyer's decision to use the StockX platform results in at-issue profits of, at most, ▮▮▮▮▮ **to** ▮▮▮ ▮▮▮▮.*

4

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

- *Accordingly, based on the foregoing analysis, properly accounting for the trades attributable to the claims at issue and related costs under multiple scenarios yields the conclusion that StockX earned little, if any, profit attributable to the alleged false advertising, consistent with the conclusions I set forth in my opening report that* ███████████████████ ███████████

9.      The third type of opinion that Mr. Hansen offers relates to Nike's potential statutory damages related to counterfeiting claims Nike has asserted against StockX.[8] Specifically, Mr. Hansen calculates potential statutory damages for "nine counterfeit Nike trademarks in connection with" Nike products sold on StockX's platform.[9] When calculating Nike's potential statutory damages, Mr. Hansen reports damages solely based on the maximum statutory damages per counterfeit mark, which he calculates to be (at most) $18 million if counterfeiting is found to be willful, and (at most) $1.8 million if counterfeiting is found to be non-willful.[10] Mr. Hansen offers no analysis to establish that the maximum statutory damages are appropriate or likely, and accordingly his opinion is based solely on arithmetic. I understand that StockX's position is that the number of counterfeit marks at issue is at most six, instead of nine. Assuming the Court finds there were only six counterfeit marks, statutory damages would at most range between $6,000 and $12 million if counterfeiting is found to be willful, and between $6,000 and $1.2 million if counterfeiting is found to be non-willful.

---

[8]      Hansen Report, ¶ 17.
[9]      Hansen Report, ¶¶ 83-84.
[10]     Hansen Report, ¶¶ 83-84.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

### C.    Evidence Considered

10.    In undertaking my analysis, I have considered information from a variety of sources, each of which has been identified in Exhibit 2.[11] On June 1, 2023, I also had a conversation with StockX personnel.[12] In addition, I have relied upon my professional judgment and expertise, gathered from many years of conducting economic analyses and calculating damages.

## II.    Rebuttal of Hansen Report

### A.    Harm to Nike

#### 1.    Overview of Hansen opinions

11.    Mr. Hansen claims that "StockX's false advertising claims directly harm Nike's valuable brands and the significant goodwill Nike has amassed in those brands."[13] According to Mr. Hansen, "counterfeiters make counterfeit shoes with low quality" that are "likely to underperform" and "when inferior counterfeit goods perform poorly, the consumer may associate that poor performance with Nike" which is "likely to result in lost sneaker sales to Nike."[14] Mr. Hansen cites to no evidence to establish either of these general statements as a factual matter. Mr.

 that "█████████████████████████████████████████

███████████████████████████████████████████████████████████

---

[11]    Throughout this report, I have cited specific documents as support of various facts or opinions. These citations are not intended to represent all of the evidence that supports these facts and opinions, but are intended to be illustrative of the types of evidence that I have reviewed.

[12]    The following StockX's employees participated in the call ("Conversation with StockX personnel"): Mr. Brock Huber (StockX's Vice President of Corporate Strategy and Strategic Development), Mr. Russ Amidon (Senior Director of Account Management), and Mr. Alan McGrath (Senior Director of Analytics). Mr. Kevin Adams (Deputy General Counsel) and outside Counsel were also present on the call but did not provide information during the conversation.

[13]    Hansen Report, ¶ 48.

[14]    Hansen Report, ¶¶ 49-50.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

████████████████████████████████████████████████████████

████████ [15] Aside from the speculation of Nike's own witnesses, Mr. Hansen similarly cites no

evidence of consumer perception to establish this claim.

12.      Mr. Hansen claims that "StockX's news releases and other internal documents

indicate that potential consumers were purchasing Nike/Jordan branded sneakers from StockX

instead of purchasing directly from Nike or its authorized retailers."[16] Mr. Hansen provides no

evidence analyzing actual consumer behavior that would support or establish this hypothesis. In

addition, he did not identify any evidence that the shoes at issue were available for purchase from

Nike or an authorized retailer at the time any transaction was made on StockX, nor did he identify

any specific Nike sales that were lost due to StockX's alleged false advertising and acknowledged

that, in his opinion, "it would be difficult, if not impossible, to determine the portion of StockX's

revenues that result in losses to Nike under this rationale."[17]

13.      Finally, Mr. Hansen asserts that "StockX's guarantee that consumers will receive a

'100% Verified Authentic' good creates confusion that Nike is associated with the authenticity

claim and the counterfeit goods."[18] Mr. Hansen appears to base this claim on evidence that a small

number of consumers who have purchased Nike sneakers on StockX contacted Nike questioning

the quality of those sneakers.[19] Mr. Hansen cites no evidence to establish the existence of the

"confusion" that he asserts exists among consumers as to whether "Nike is associated" with

---

[15]      Hansen Report, ¶ 50.
[16]      Hansen Report, ¶ 55.
[17]      Hansen Report, ¶ 55.
[18]      Hansen Report, ¶ 51.
[19]      Hansen Report, ¶ 51.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

StockX's marketing. To the contrary, in the handful of examples provided by Mr. Hansen, consumers generally did not appear to associate the quality issues with the products in question being authentic Nike goods, but rather expressed a belief that the perceived quality issues with the shoes was evidence that they were "fake."[20]

### 2. Mr. Hansen provided no evidence of actual harm to Nike as a result of the alleged false claims

#### a. Mr. Hansen provided no evidence of widespread counterfeits being traded on the StockX platform

14.     Mr. Hansen's assessment of the harm to Nike resulting from StockX's allegedly false advertising rests on the assumption that "StockX authenticated and facilitated the sale of counterfeit Nike/Jordan-branded sneakers."[21] As an economic matter, the extent of harm to Nike from the trade of counterfeits on StockX's platform depends upon the extent to which counterfeits are being traded on the platform. In this case, Mr. Hansen fails to provide any evidence of any widespread trade of counterfeit Nike/Jordan sneakers on the StockX platform.

15.     Mr. Hansen points to "90 confirmed counterfeit pairs of 'Nike' branded shoes" sold on the StockX platform.[22] I understand that this number is overstated as Nike has informed the Court that there are fewer than 80 allegedly counterfeit shoes at issue in this litigation: "StockX recently 'authenticated' and sold to consumers almost 80 counterfeit 'Nike' shoes."[23] Mr. Hansen

---

[20]     Hansen Report, footnote 108.
[21]     Hansen Report, ¶ 53.
[22]     Hansen Report, ¶ 35. Mr. Hansen also states that "StockX did not produce information from which one could identify the exact number of additional counterfeit 'Nike' goods that StockX has 'authenticated' and sold to consumers over the Relevant Period."
[23]     Nike's Letter Re: *Nike, Inc. v. StockX LLC*, Case No. 1:22-cv-00983-VEC (S.D.N.Y.), ECF 080, December

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

does not provide any explanation for why his count of the allegedly counterfeited shoes at issue is greater than what Nike previously represented to the Court in this case. Further, these numbers represent an insignificant fraction of all Nike and Jordan sneakers traded on the StockX platform. Mr. Hansen determined that there were approximately ███████ of Nike and Jordan sneakers on StockX in the U.S. over the Q1 2020 to Q3 2022 period.[24] As such, regardless of whether the figure in question is "at least 90" or "almost 80," these allegedly "confirmed" counterfeit pairs of Nike sneakers represent less than ██████ of the total Nike and Jordan sneaker sales on the StockX platform over this period.[25] This miniscule percentage does not demonstrate widespread trades of counterfeit Nike and Jordan sneakers on the StockX platform.

16.     In discussing the number of counterfeit products being traded on the StockX platform, Mr. Hansen also suggests that the number of counterfeit Nike and Jordan sneakers could be as high as ████ He bases this estimate on the volume of trades over the at-issue period and StockX's publicly reported accuracy rate of 99.95 percent to 99.96 percent.[26] As discussed in my Affirmative Report, StockX rejects products for many reasons, including if they appear to have been worn or are missing accessories, and the buyers can request to return the product if they believe StockX made an error on any of these dimensions.[27] Thus, StockX's reported accuracy rate of 99.95 percent to 99.6 percent reflects StockX's errors with respect to several issues completely

---

12, 2022, at p. 1. I understand that while the exact number of alleged counterfeits is uncertain, Nike's letter claims that there are "78 fake shoes," which suggests that the number of counterfeit pairs of Nike shoes sold on the platform might be closer to 78.

[24]     Hansen Report, Attachment 6.

[25]     The calculations are as follows: █████████████████████████████████████

[26]     Hansen Report, ¶ 36.

[27]     Vigil Affirmative Report, ¶¶ 69, 71, 85.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

unrelated to whether the product is believed to be counterfeit. It, therefore, cannot be used to estimate the number of potentially counterfeit shoes.[28]

17.    Mr. Hansen even acknowledges this significant flaw in his own calculations, but only does so in a footnote. In that footnote, Mr. Hansen explains that only 0.01 percent of the products that were passed to buyers were "later determined to have been counterfeit"[29] – that is, the accuracy rate with respect to "counterfeits" is actually 99.99 percent.[30] Despite acknowledging this discrepancy, Mr. Hansen nevertheless misleadingly chooses to base his calculations on StockX's overall reported verification accuracy rate of 99.96 percent. As a result, Mr. Hansen's ████ estimate of the number of Nike and Jordan branded sneakers that were "authenticated in error" and passed on to buyers is overstated and does not represent the potential number of counterfeit Nike sneakers that were traded on the StockX platform.[31] If Mr. Hansen had instead performed his calculations based on his interpretation of the document discussed in his footnote, the number of potentially counterfeit shoes would be reduced by a factor of four, to ████.[32] Mr. Hansen does not, however, offer any evidence to establish the existence of these allegedly

---

[28]    *See, e.g.*, Fenton Deposition, Exhibit 12 (STX0018010-014), at 010.

[29]    I understand from Counsel that StockX did not "later determine[]" even these shoes to be counterfeit, because it does not make a legal determination as to whether shoes are actually counterfeit. Rather, it determines based on its own standards whether a shoe is likely to be authentic or not.

[30]    Hansen Report, ¶ 36, footnote 80; Fenton Deposition, Exhibit 12 (STX0018010-014), at 010. I understand that StockX does not determine, with certainty, that any of the products sold on its platform are, in fact, counterfeit. I have been informed that StockX's decision to accept a return for a suspected counterfeit is not an admission that the product is, in fact, a counterfeit. Rather, it is a determination by StockX that the product is suspected of possibly being counterfeit. Conversation with StockX personnel.

[31]    Mr. Hansen's second, footnoted estimate of the number of Nike and Jordan branded sneakers that were "authenticated in error" and passed on to buyers based on 99.99 percent accuracy rate is only ████ pairs. Hansen Report, ¶ 36, footnote 80.

[32]    Hansen Report, ¶ 36, footnote 80.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

counterfeit products, instead relying on Nike's statements regarding the number of shoes at issue as discussed above.

18.    Mr. Hansen also argues that "StockX's own assessment of the number of fakes that pass through its platform is likely understated" based on the unsupported theory that there may be customers who "do not know they purchased counterfeit sneakers."[33]  Mr. Hansen does not provide any evidence that such potential consumers exist. Accordingly, it is unclear how Mr. Hansen could reliably conclude that StockX's accuracy rates with respect to potentially counterfeit shoes are "likely" understated.

19.    Given the millions of Nike and Jordan sneaker trades on the StockX platform, even assuming Mr. Hansen's contentions are true, the "hundreds" of alleged sales of counterfeit products that Mr. Hansen claims were traded do not represent a meaningful proportion of StockX's trades. For example, Mr. Hansen cites to one StockX document in support of his claim that "hundreds" of counterfeit products were "'authenticated' and sold" on the StockX platform.[34] Even assuming Mr. Hansen's interpretation of this document is correct, the document suggests that, in 2021, only 484 pairs of shoes were returned to and accepted by StockX as potentially counterfeit shoes.[35] According to Mr. Hansen's analysis, in that same year, StockX facilitated approximately

---

[33]    Hansen Report, ¶ 37.
[34]    Hansen Report, ¶ 36, footnote 80, citing Fenton Deposition, Exhibit 12 (STX0018010-814).
[35]    Hansen Report, ¶ 36, footnote 77. *See also,* Deposition of Jacob Fenton, December 2, 2022, at pp. 90-91; Fenton Deposition, Exhibit 12 (STX0018010-814), at 010. The 484 total returns accepted include 376 "Fake Returns Accepted (taken into FAKE iv)" and 108 "Fake Returns Accepted (taken into DS inv)."

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

██████ closed trades.[36] If taken as true, these numbers suggest that less than ████ percent of all products traded on StockX were potentially counterfeit.[37]

> **b.    Mr. Hansen failed to distinguish between harm to Nike from counterfeits, in general, and harm from counterfeits traded on StockX's platform**

20.    While Mr. Hansen claims that the sale of counterfeit goods on StockX's platform (or the sale of counterfeit goods more generally) could, ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ Similarly, as discussed in my Affirmative Report, Ms. Barbara Delli Carpini, Nike's Vice President of Brand Protection and IP enforcement and Rule 30(b)(6) witness on the topic of ████████████████████████

████████████████████████████████████████

████████████████████████ [39] Therefore, any references in Mr. Hansen's report to Ms. Delli Carpini's testimony ████████████████████████████████

████████████████████████████████

21.    Additionally, while Nike may, in theory, be harmed by sales of counterfeits generally, Mr. Hansen has ████████████████████████████████

████████████████████████████ I understand that StockX is not accused of

---

[36]    *See* Hansen Report, Attachment 8.
[37]    *See* Hansen Report, Attachment 8. Calculated as ████████████████████
[38]    *See* Hansen Report, ¶ 50.
[39]    *See, e.g.*, Vigil Affirmative Report, ¶¶ 36-37.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

making or selling counterfeit shoes itself, and that Nike has acknowledged that it is one of the most counterfeited brands in the world.[40] One internal Nike analysis shows that ████████████

██████████████████████████████████████████████████████████

████████████████████████████ Mr. Hansen failed to establish how or why the alleged sale of a handful of counterfeit shoes on StockX by third parties in particular, caused harm to Nike beyond the broader counterfeiting problem Nike faces globally. Absent such evidence, Mr. Hansen does not have a basis to establish that any harm Nike suffered occurred because of StockX's activity, as opposed to the activity of unrelated third parties.

22.    Furthermore, Mr. Hansen does not establish that the alleged harm he identifies – █

██████████████████████████████████████████████████████████

████████████████████████████ I understand that counterfeits can range in quality and, as a result, the likelihood and/or degree of harm from counterfeiting can vary. Many counterfeit products are of very high quality.[42] Mr. Joe Pallett, Nike's Director of Authentication and

---

[40]    Deposition of Joe Pallett, February 8, 2023 ("Pallett Deposition"), at p. 160, Exhibit 7 (NIKE0035610-650), at 620. *See also,* Expert Report of Kari Kammel, *Nike, Inc. v. StockX LLC*, United States District Court for the Southern District of New York, Case 1:22-cv-00983-VEC, May 5, 2023 ("Kammel Report"), at p. 14.

[41]    Hansen Report, ¶ 36; Pallett Deposition, Exhibit 7 (NIKE0035610-650), at 615.

[42]    For example, a New York Times article explains that some counterfeit goods, such as so-called "superfakes," are made using high-quality materials and craftsmanship, making them almost indistinguishable from original goods. Wang, A., "Inside the Delirious Rise of 'Superfake' Handbags," The New York Times, May 5, 2023, available at https://www.nytimes.com/2023/05/04/magazine/celine-chanel-gucci-superfake-handbags.html?searchResultPosition=1, accessed May 15, 2023 ("As for how the superfakes are achieving their unprecedented verisimilitude, [intellectual property lawyer Harley] Lewin, who has observed their factories from the inside, says it's simply a combination of skillful artisanship and high-quality raw materials. Some superfake manufacturers travel to Italy to source from the same leather markets that the brands do; others buy the real bags to examine every stitch."). Similarly, an Engadget

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

Innovation and Rule 30(b)(6) witness on the topic of Nike's process for obtaining and identifying the allegedly counterfeit product that form the basis of Nike's cause of action, testified that ██

██████████████████████████████████████████████████████

████████████████████████[43] Mr. Pallett further testified that ████████████

█████████████████████████████    ████████████████████████████

██████████████████████████████████████████████████████

███████████████████████    ██

23.    If a buyer never discovers they purchased a counterfeit product (*e.g.*, because the counterfeit is of high quality and performs as expected), then this counterfeit product is unlikely to cause the negative change in perception or reputational injury to the brand that is the basis for ███████████████████████████████████████████████    While Mr. Hansen acknowledges that some consumers "who are sold counterfeit 'Nike' shoes may never learn that

---

article reports that counterfeit products are also sometimes made in the same factories that make authentic products using the same materials. Cooper, D., "Alibaba Founder: Fake Goods Can Be Better Than the Real Deal," Engadget, June 15, 2016, available at https://www.engadget.com/2016-06-15-jack-ma-alibaba-discusses-counterfeit-goods.html, accessed May 18, 2023 ("[P]irated devices are often made in the same factories and on the same lines, that the real gear uses. For instance, a third-party facility might have a contract to produce 30,000 sets of high-end headphones or microSD cards. But once the run is complete, it could be possible to rush out a further 10,000 with leftover parts and some cunning alterations to the name – Boots by Drew or SpanDisc"). Even the Plaintiff's own counterfeiting expert, Ms. Kari Kammel, notes that "dangerous or substandard materials are not requirements for a product to be counterfeit. In some cases, the counterfeit product is almost indistinguishable from the genuine product, since it can be copied with precision." Kammel Report, at p. 6. In her report, Ms. Kammel further explains that "[c]ounterfeit products may appear to be identical copies or replications of the genuine product, and some may even use materials identical or similar to the genuine product" or "may even be packaged inside of genuine packaging." Kammel Report, at pp. 2-3.

43    Pallett Deposition, at p. 174.
44    Pallett Deposition, at p. 280.
45    Hansen Report, ¶¶ 49-50.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

their shoes are counterfeit,"[46] he does not explain how Nike would be harmed by those sales – particularly if they did not learn their shoes were counterfeit because they were "high quality." As a result, not all counterfeit goods may be expected to cause the same (or any) harm to the brands that Mr. Hansen alleges Nike has suffered as a result of all counterfeit trades on the StockX platform. Mr. Hansen fails to account for this fact in any way in his analysis of potential harm.

24.    Nike's own expert witness on the topic of counterfeiting similarly undermines Mr. Hansen's speculative theory of harm. According to Ms. Kammel, the ████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████ "[47] As I describe in my initial report, limited edition or "iconic" Nike products are the Nike products typically traded on StockX.[48] ████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Again, Mr. Hansen fails to account for Ms. Kammel's opinions in any way in his analysis of potential harm.

25.    Mr. Hansen also fails to account for the record evidence regarding consumer perception of potentially counterfeit products. If a counterfeit is a low-quality product, the amount of harm to the brand from that counterfeit depends on whether the buyer believes the poor-quality

---

[46]    Hansen Report, ¶ 49.
[47]    Kammel Report, at p. 15 (emphasis added).
[48]    *See* Vigil Affirmative Report, ¶¶ 39, 41, 50-51.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

counterfeit is actually a genuine branded product, *i.e.*, whether the buyer associates the low-quality counterfeit product with Nike. If a consumer who purchased a counterfeit Nike pair of sneakers knows or suspects they purchased a counterfeit (*i.e.*, they believe it *did not* come from Nike and is not a genuine Nike product), it is unclear how or why Nike would be harmed even if the product underperformed in some way. Mr. Hansen cited several examples of customer complaints that he claims suggest "confusion that Nike is associated with … counterfeit goods."[49] However, in all six examples, the buyer clearly believed or suspected that the shoes were not authentic Nike sneakers, which would suggest they continued to hold Nike in high regard.[50]

26.    For example, one customer emailed Nike saying they purchased a pair of Nike Dunk sneakers from StockX that they "fear they are fake" because "after 3 times of wearing them they are falling apart in ways that I have not experienced dunks falling apart."[51] This customer viewed the fact that the product was "falling apart" as an indicator that the product was fake because it did not meet the quality standards the customer expected from Nike. Other customer contacts with Nike show similar views, suggesting that consumers generally do not associate poor quality Nike counterfeits with Nike.[52] Rather than Nike being harmed, one would expect that

---

[49]    Hansen Report, ¶ 51, footnote 108.
[50]    Hansen Report, footnote 108; NIKE0041218-220; NIKE0041221-226; NIKE0041233; NIKE0041262-265; NIKE0041300-302; and NIKE0041350-357.
[51]    NIKE0041218-220, at 218; Hansen Report, at footnote 108.
[52]    *See, e.g.,* NIKE0041233 ("I bought a pair of what I believe is fake Nike AF1 JESTERS XX … there are some details that seem off to me about the shoe."); NIKE0041262-265, at 262 ("[I] recently bought some Jordan's from StockX ... Stock x has told me that the issue that i have with the sneaker are manufacture issues and it's okay but i have a gut feeling that it's not . The Jordan 6's get sticky on the sneaker , the height was different , one is more lopsided then the other. There was glue on the Shoelace and the gold chain to the dog tags never came along with it. The Black Ice 6 rings the jordan symbols are all messed up."); NIKE0041300-302, at 300 ("I ordered sneakers from stockx and they are fake. It's 2 completely

16

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

StockX's reputation (or any other secondary platform where the product was purchased) would be harmed.[53] Notably, I understand that Nike has refused to assist consumers who allege to have received counterfeit Nike products.[54] Nike has made clear to those consumers that Nike only assists law enforcement agencies with product authentication, and will not assist individual consumers.[55]

> **c.    Mr. Hansen provided no evidence that Nike lost sales as a result of the alleged false advertising by StockX**

27.     Although Mr. Hansen opines that Nike should be entitled to disgorge all profits from Nike/Jordan branded sneakers due to StockX's allegedly false advertising claims, Mr. Hansen fails to provide any evidence of sales that Nike lost as a result of StockX's alleged sale of counterfeit Nike sneakers, or to establish that customer purchasing decisions were impacted in any way by the allegedly false advertising claims. And while it is theoretically possible that some sales of counterfeit products by brands in general may lead to lost sales to the brand, this is generally not true with Nike products that were traded on StockX's platform.[56] As I describe in my initial report, StockX and Nike are not typically direct competitors.[57] While Nike operates in the primary marketplace, StockX generally operates in the secondary marketplace.[58] Nike witnesses have

---

different shoes. The stitching on the shoes are wrong the Jordan sign is mad big. The sneakers are very wide."); NIKE0041350-357, at 350 ("I have purchase[d] a pair of Jordan 11 cool Gray from StockX quality of the shoes are   questionable and I emailed them about it and was told that Nike allowed this Quality of product to be released.").

[53]     *See, e.g.*, Vigil Affirmative Report, Section IV.B.2.

[54]     *See, e.g.,* NIKE0041004 ("Thank you for reaching out. … We can however only assist law enforcement agencies with product authentication."); NIKE0041171 ("Thank you for reaching out. … We can however only assist law enforcement agencies with product authentication.").

[55]     *See, e.g.,* NIKE0041004, NIKE0041171.

[56]     *See, e.g.*, Vigil Affirmative Report, ¶ 26.

[57]     Vigil Affirmative Report, Section III.D.1.

[58]     Vigil Affirmative Report, ¶ 39.

17

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

testified that StockX is not among Nike's competitors.[59] While it is true that some shoes available

for purchase on the StockX platform may simultaneously be available for purchase directly from

Nike or its authorized retailers, I understand that many "high heat" products are sold out at Nike

and its retailers after being released in scarce quantities during limited "drops."[60] As many of the

products traded on the StockX platform are not readily available in the primary marketplace, sales

of these products on StockX are not generally diverting sales from brands like Nike.[61] This is true

regardless of whether the product traded on StockX is genuine or counterfeit, and Nike has not

provided evidence to the contrary. In fact, I understand that the alleged counterfeits Nike has

identified in this litigation were limited-release shoes that were largely or entirely sold by Nike

only during brief release windows, and accordingly would almost certainly not have been available

---

[59]    Nike's corporate witness ██████████████████████████████████████████
██████████████████████████████████████████████████████████ *See*
Deposition of Ron Faris, December 7, 2022 ("Faris Deposition"), at pp. 200-201 (testifying that ███████
███████████████████████████████████████████████████ . *See also* Deposition of Barbara
Delli Carpini, January 10, 2023 ("Carpini Deposition"), at p. 244 ("Adidas, Pumas[,] Under Armour[,] a
number of sporting good[s] companies out there are. . . main Nike competitor[s]" and "███████████
███████").

[60]    Conversation with StockX personnel.

[61]    *See, e.g.*, Vigil Affirmative Report, Section III.D.1.b. Sales of Nike products sold on StockX are also
unlikely to divert sales from Nike because StockX and Nike generally have different customer bases. Mr.
Hansen asserts that the customer bases of Nike and StockX overlap, because StockX's customers are men
and women from 18-54 years, and Nike's customers are "the general mass[es]" which includes this
demographic. *See* Hansen Report, ¶ 26, footnote 47. However, the testimony of Mr. Ron Faris, the Vice
President and General Manager of Nike Virtual Studios (and the same source that Mr. Hansen cites to
support his claim), makes clear that ████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

directly from Nike or its authorized retailers at the time they were available on StockX's platform.[62] Accordingly, Mr. Hansen fails to provide any evidence that StockX's alleged false advertising caused any sales to be diverted to StockX that (but for the advertising) would have gone instead to Nike.

### B.    Disgorgement of StockX's Profits

#### 1.    Overview of Hansen opinions

28.    Part of Mr. Hansen's assignment was "to assess disgorgement of StockX's profits related to the false advertising claims" that Nike has asserted against StockX.[63] Mr. Hansen claims that "StockX has benefitted by earning ill-gotten profits derived from falsely and/or misleadingly claiming that every 'Nike' and 'Jordan' good sold on its platform was '100% Authentic.'"[64] The starting point for Mr. Hansen's disgorgement analysis is all "revenue from trades of Nike and Jordan branded sneakers where at least one side of the trade included a U.S. individual"[65] over the

---

[62]    I understand from Counsel that the specific models of the alleged counterfeit shoes Nike has identified through discovery in this case are: Nike SB Dunk Low Ben & Jerry's Chunky Dunky (CU3244-100), Nike SB Dunk Low Grateful Dead Bears Opti Yellow (CJ5378-700), Nike SB Dunk Low What The Paul (CZ2239-600), Jordan 1 Low Fragment x Travis Scott (DM7866-140), Jordan 1 Retro High Dark Mocha (555088-105), Jordan 1 Retro High Dark Mocha (575441-105), Jordan 1 Retro High Hyper Royal Smoke Grey (555088-402), Jordan 1 Retro High Hyper Royal Smoke Grey (575441-402), Jordan 1 Retro High OG Patent Bred (555088-063), Jordan 1 Retro High Shadow 2.0 (555088-035), Jordan 1 Retro High White University Blue Black (555088-134), Jordan 2 Retro Low SP Off-White White Red (DJ4375-106), Jordan 4 Retro Shimmer (DJ0675-200), Jordan 4 Retro University Blue (CT8527-400), Jordan 4 Retro White Oreo (CT8527-100), Jordan 6 Retro Travis Scott British Khaki (DH0690-200), Jordan 11 Retro Cool Grey (CT8012-005), Jordan 11 Retro Jubilee 25th Anniversary (CT8012-011), Jordan 13 Retro Black Hyper Royal (414571-040), and the Jordan 13 Retro Obsidian Powder Blue White (414571-144).  I understand these shoes generally were available from Nike only during brief release windows based on my conversation with Mr. Brock Huber. Conversation with StockX personnel.

[63]    Hansen Report, ¶ 13.

[64]    Hansen Report, ¶¶ 14, 53.

[65]    Hansen Report, ¶ 15.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

period of Q1 2020 to Q3 2022 (the "Relevant Period").[66] This revenue includes "Buyer Fees, Buyer Shipping Revenue, All-in-Ask Surplus, Seller Fees, Seller Shipping Revenue, Inventory Sales, Payment Processing, and Penalty Fees."[67] According to Mr. Hansen's calculations, the total at-issue revenue from U.S. trades of Nike and Jordan branded sneakers for the purposes of estimating profit disgorgement over the at-issue period is ███████████[68]

29.    Although Mr. Hansen asserts that it is StockX's responsibility as a Defendant in this case to prove any deductible costs associated with at-issue revenues, Mr. Hansen nevertheless purports to calculate StockX's gross profits due to the alleged false claims by deducting what he believes to be StockX's cost of revenues from the identified at-issue revenues.[69] For each at-issue quarter over the period Q1 2020 to Q3 2022, Mr. Hansen relies on StockX's quarterly profit and loss statements to calculate cost of revenues on a per-trade basis and then multiplies these values by the number of trades of at-issue products to obtain an estimate of the cost of revenues associated with the trades of Nike and Jordan branded sneakers.[70] StockX's cost of revenues notably include only the direct costs that StockX incurred as a result of facilitating resales of Nike and Jordan

---

[66]    Hansen Report, ¶¶ 7, 15, 58

[67]    Hansen Report, ¶ 57.

[68]    Amended Hansen Report, ¶ 17, Table 5. To estimate StockX's relevant revenues, Mr. Hansen begins by adding all StockX's reported revenues from the sale of Nike and Jordan branded sneakers where at least one side of the trade originated in the U.S. As revenue from All-in-Ask Surplus Fees is not reported on a transactional level, Mr. Hansen includes the relevant portion of All-In-Ask Surplus Fees by allocating the revenue from these fees on a percentage of Gross Merchandise Value ("GMV") basis. *See* Amended Hansen Report, ¶¶ 60-63.

[69]    Amended Hansen Report, ¶¶ 66, 68-70.

[70]    According to the Amended Hansen Report, "StockX does not track costs at a brand or product level" and "allocates costs on a per-trade basis (as opposed to a percentage of revenue)." Amended Hansen Report, ¶¶ 67, 69. Mr. Hansen has also noted that "[t]otal global trades were not available to calculate StockX total consolidated cost of revenue per-trade for Q2-Q3 2022," and thus he "held Q1 2022 cost of revenues per trade constant for Q2-Q3 2022." Amended Hansen Report, ¶ 69, footnote 139.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

branded sneakers.[71] Based on those assumptions, Mr. Hansen estimates the cost of revenues

associated with the at-issue trades of Nike and Jordan branded sneakers to be ███████.[72]

Accordingly, he calculates StockX's gross profits from facilitating the sale of Nike and Jordan

branded sneakers over the at-issue period to be ██████████, or approximately ██████████ of

StockX's at-issue revenues.[73]

30.    Figure 1 below is an excerpt from the Amended Hansen Report, summarizing Mr.

Hansen's calculations of StockX's gross profit earned on StockX's revenue from resale trades of

Nike and Jordan branded sneakers where at least one side of the trade included a U.S. individual.[74]



[71]    Amended Hansen Report, ¶ 68 ("StockX's cost of revenues includes at least the following types of costs:
(1) Shipping Expense (net of rebates); (2) Payment Processing Expense; (3) Cost of Inventory; (4) Shipping
Supplies; (5) Web Hosting; and (5) [*sic*] Inventory and Transactional Losses.").
[72]    Amended Hansen Report, ¶¶ 17, 69, Table 6.
[73]    Amended Hansen Report, ¶¶ 18, 70, Table 6.
[74]    I understand that since Mr. Hansen's original report was submitted on May 5, 2023, StockX has produced
its audited financial statements for 2021 and 2022. *See* STX0806052, STX0806027-051. Mr. Hansen
updated his calculations to reflect the results of the audit in his First Amended Expert Report, which was
submitted on May 30, 2023. Amended Hansen Report, ¶¶ 1-2. I, therefore, report Mr. Hansen's updated
figures.
[75]    Amended Hansen Report, Table 6.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

31.    Although Mr. Hansen acknowledges that "additional indirect or overhead costs … might be deductible," he states that StockX bears the burden to "justify any such deductions" and does not exclude any additional costs from his estimate of StockX's gross profit.[76] He does, however, describe and summarize certain operating costs included by StockX in the calculation of the company's "Contribution Margin – 1" and "Contribution Margin – 2."[77] As stated in the Hansen Report, "Contribution Margin – 1" ("CM1") and "Contribution Margin – 2" ("CM2") are calculated by StockX in the normal course of business and include expenses that reflect operating expenses that "would have been directly attributed to [the] transaction in order for it to be closed or completed."[78]

32.    Based on Mr. Hansen's understanding of the evidence produced in the case and available financial data, the expenses that appear under the following line items are deducted to calculate CM1: "(1) Cost of Revenues; (2) Authentication; (3) VAT Tax; (4) Chargebacks & Refunds; (5) Customs & Duties; (6) Fixed Customer Service; (7) Tax; and (8) Variable Customer Service."[79] Mr. Hansen states that the difference between CM1 and CM2 is that CM2 "includes the burden of the 'Variable Marketing Expenses' associated with the transactions for that period."[80] According to Mr. Hansen, the expenses that would be deducted to calculate CM2 include: "(1) All expenses deducted in arriving at Contribution Margin – 1; and (2) all Marketing expenses."[81]

---

[76]    Amended Hansen Report, ¶¶ 71-79.
[77]    Hansen Report, ¶¶ 71-76, Attachment 8; Amended Hansen Report, ¶¶ 73-78, Attachment 8.U.
[78]    Hansen Report, ¶¶ 72, 75; Amended Hansen Report, ¶¶ 74, 77.
[79]    Hansen Report, ¶ 73; Amended Hansen Report, ¶ 75.
[80]    Hansen Report, ¶ 75; Amended Hansen Report, ¶ 77.
[81]    Hansen Report, ¶ 76; Amended Hansen Report, ¶ 78.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

33.     Mr. Hansen also describes other operating expenses that are incurred by StockX besides those that are included for the purposes of calculating CM1 and CM2.[82] According to the Hansen Report, these expenses include "Finance Expenses," "Legal Expenses," "Communication Expenses," "Supply Acquisition Expenses," and expenses related to "Facilities."[83] Mr. Hansen opines that some of these costs (in whole or in part) would not be deductible because these categories of expenses include costs such as those related to a potential IPO, legal costs related to this lawsuit, PR team costs related to this lawsuit, costs associated with expansion of supply of goods on the platform, as well as rent and other real estate costs.[84] With respect to the latter category, Mr. Hansen opines that "rent or ownership expenses for … authentication facilities" should be excluded from the calculation of at-issue profits.[85]

### 2.     Mr. Hansen's estimate of StockX's profits from U.S. trades of Nike and Jordan sneakers is grossly overstated

34.     As discussed above, Mr. Hansen's estimate of StockX's profits from the allegedly false claims ▮▮▮▮▮▮▮▮ merely identifies StockX's gross profit earned as a result of facilitating trades of Nike and Jordan sneakers on StockX's platform involving at least one U.S. individual. Accordingly, Mr. Hansen's profit estimate only accounts for cost of revenues and does not account for any other costs that StockX incurred in order to facilitate U.S. trades of Nike and Jordan sneakers over the at-issue period.[86] While Mr. Hansen acknowledges that other costs

---

[82]     Hansen Report, ¶ 77; Amended Hansen Report, ¶ 79.
[83]     Hansen Report, ¶ 77. *See also*, Amended Hansen Report, ¶ 79.
[84]     Hansen Report, ¶ 77; Amended Hansen Report, ¶ 79.
[85]     Hansen Report, ¶ 77; Amended Hansen Report, ¶ 79.
[86]     Hansen Report, ¶¶ 68-69. *See also*, Amended Hansen Report, ¶¶ 70-71.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

besides cost of revenues "might be deductible" and even discusses these other operating expenses that are included in StockX's calculation of CM1 and CM2, he does not adjust his calculations of StockX's at-issue profits to account for these costs. Mr. Hansen's estimate of StockX's at-issue profits is accordingly substantially overstated.

35.     Mr. Hansen's assertion that StockX made profits of ▮▮▮▮▮ on the at-issue Nike and Jordan trades ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ On closer analysis, the reason for that discrepancy is that Mr. Hansen's calculations of StockX's profits omit two categories of costs – certain variable costs and certain "fixed" costs – ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. This is both because of the costs associated with *each* trade on the StockX marketplace, as well as the costs associated with the *overall volume* of trades on the StockX marketplace that Mr. Hansen asserts would not have occurred but for the allegedly false advertising.

36.     First, as I explain below, a substantial share of the operating expenses included in the calculation of CM1 and CM2 "are actually implicated by the production and sale of the products at issue" and, as a result, there is "a direct and valid nexus" between these costs and the sale of the at-issue products.[88] The evidence shows that a substantial share of these operating expenses enabled the facilitation of the U.S. trades involving Nike and Jordan sneakers and would

---

[87]     *See, e.g.*, STX0806053, at tab 'Non-GAAP P&L.'
[88]     Hansen Report, ¶ 69.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

not have been incurred but for the trades at issue. These costs clearly fluctuate over time to accommodate changes in the volume of trades that StockX facilitates. As a result, most of these costs should be subtracted when calculating StockX's at-issue profits.

37.     Second, if one assumes, as Mr. Hansen does, that StockX would not have made any of the U.S. trades of Nike and Jordan sneakers but for the allegedly false claims, the overall trading volume on the StockX platform would have been considerably smaller. As such, in addition to a large share of the operating costs included in the calculation of CM1 and CM2, StockX would not have incurred other operating costs as well (*i.e.*, other operating costs were directly attributable to facilitating the trades at issue). As described below, some of the operating costs that StockX treats as "fixed" for shorter time horizons and smaller volume changes would not have been incurred by StockX had StockX not made the substantial volume of Nike/Jordan trades that Mr. Hansen asserts were caused by the alleged false claims. Subtracting these costs results in an even lower estimate of StockX's at-issue profits.

          **a.     Mr. Hansen's estimate of StockX's profits does not account for the variable portion of operating expenses included in the calculation of CM1 and CM2**

38.     According to Brock Huber, StockX's Vice President of Corporate Strategy and Strategic Development, StockX's *contribution margins* that are reported in StockX's Board Presentations provide "a measure of the unit economics of a transaction [and are calculated by taking] revenue, subtract[ing] cost of revenue, and any other variable expenses and variable marketing expenses that would have been directly attributed to that transaction in order for it to be

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

closed or completed."[89] Specifically, StockX calculates CM1 by subtracting the following expenses from StockX's revenue: (1) cost of revenue, (2) operations costs, (3) customer support costs, (4) customs and duties, (5) VAT taxes, and (6) chargebacks and refunds.[90] StockX calculates CM2 by subtracting "the variable marketing expenses that went into delivering those transactions," in addition to all of the expenses subtracted in calculating CM1.[91] The marketing expenses included in the calculation of CM2 include, among others, "performance marketing, affiliate spend, buyer discount, and other promotions."[92]

39.    In his calculation of StockX's at-issue profits, Mr. Hansen appears to subtract StockX's cost of revenues from StockX's revenues because they are expenses directly associated with the trades of the at-issue products.[93] In other words, Mr. Hansen appears to acknowledge that any costs implicated by the activity at issue should be deducted when calculating at-issue profits.[94] As I illustrate below, the majority of the operating costs included in the calculation of CM1 and CM2 also are costs that have been incurred in order to facilitate the sale of the at-issue products and, as a result, should also have been subtracted when calculating the at-issue profits.

---

[89]    Deposition of Brock Huber, February 22, 2023 ("Huber Deposition"), at p. 89.

[90]    Huber Deposition, at pp. 93-94. *See also*, STX0583757-897, at 818, 826.

[91]    Huber Deposition, at pp. 97-98. Throughout, I refer to operations expenses, customer support expenses, customs and duties expenses, VAT taxes, and chargebacks and refunds together as "operating expenses included in the calculation of CM1." I refer to operations expenses, customer support expenses, customs and duties expenses, VAT taxes, chargebacks and refunds, and marketing expenses together as "operating expenses included in the calculation of CM2."

[92]    Huber Deposition, at pp. 97-98.

[93]    Hansen Report, ¶¶ 66-68. Mr. Hansen states that "[t]hese cost of revenues are direct costs that assisted in earning the resale revenue for the Nike and Jordan branded sneaker products at issue." *See* Hansen Report, ¶ 66. *See also*, Huber Deposition, at p. 45 ("the variable costs and some of the fixed costs associated with literally delivering on the transaction are what would be included in Costs of Revenue.").

[94]    Hansen Report, ¶ 63.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

40.    Mr. Huber testified that "the lion's share" of "operations" costs included in the calculation of CM1 and CM2 include costs related to StockX's verification process and "some of the costs potentially from the transportation team that is facilitating the strategies and plans around delivering an item to our authentication center to be verified."[95] According to Mr. Huber, these are the costs incurred by StockX to "deliver [the] authentication service as it relates … directly to transactions."[96] I understand from my conversation with StockX personnel that such costs as hourly wages paid to temporary employees responsible for verifying the purchases would be variable expenses included in "operations" costs.[97]

41.    Similarly, I understand that such costs as temporary labor costs which are tied to StockX's trades are variable expenses that would be included in "customer service" costs that are part of the calculation of CM1 and CM2.[98] As well, I understand that buyer discounts and media costs (*e.g.*, Google Ads) are included in "marketing costs" for the purposes of calculating CM2 and vary directly with closed trades.[99] For example, fewer trades imply fewer buyer discounts will need to be honored.

42.    I understand that in addition to the variable costs that vary with the volume of trades, some "fixed" costs are also included in the calculation of CM1 and CM2.[100] Further, I understand that while these "fixed" costs may not vary on a "one-for-one" basis with smaller

---

[95]    Huber Deposition, at p. 94.
[96]    Huber Deposition, at p. 95.
[97]    Conversation with StockX personnel.
[98]    Conversation with StockX personnel.
[99]    Conversation with StockX personnel.
[100]    Conversation with StockX personnel. *See also*, Huber Deposition, at pp. 89-90.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

changes in the volume of trades, they can and do vary with larger changes in trading volumes.[101] Below, I independently analyze the extent to which these operating costs included in CM1 and CM2 have historically varied with the volume of trades.

43.    Analysis of StockX's data suggests that the costs included in the calculation of CM1 and CM2 are strongly correlated with trading volume. As shown in Exhibit 8, analyses of StockX's total operating expenses included in the calculation of CM1 and CM2 and trades indicate that these operating costs and trades tend to fluctuate together – meaning as trades increase or decrease, these operating costs increase or decrease in a similar manner.[102] For example, the correlation coefficient between total operating expenses included in the calculation of CM1 and trades is ███ and the correlation coefficient between total operating expenses included in the calculation of CM2 and trades is ███.[103] For comparison, the correlation coefficient between total expenses included in the calculation of cost of revenues and trades is ███[104]

44.    The relationship between the costs included in CM1 and CM2 and trades also can be seen in Figures 2 through 4, below. These figures plot StockX's global costs included in the calculation of CM1 and CM2 and trades to examine the degree to which they fluctuate together. As these figures confirm, there appears to be a strong association between StockX's costs included in the calculation of StockX's contribution margins and StockX's trading volume.

---

[101]    For example, one example of a "fixed" cost that would be included in the calculation of CM1 and CM2 is the salaries of certain employees. Conversation with StockX personnel.
[102]    *See* Exhibit 8.
[103]    Exhibit 8.
[104]    Exhibit 8.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**



---

[105]    This figure plots the total number of trades (in millions) completed on StockX's platform and StockX's cost of revenue (in millions of dollars) associated with these trades. *See* STX0806053, at tab 'Non-GAAP P&L.'

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**



---

[106]    This figure plots the total number of trades (in millions) completed on StockX's platform and StockX's operating costs included in the calculation of CM1 (in millions of dollars) associated with these trades. Note that operating costs included in CM1 exclude cost of revenue. *See* STX0806053, at tab 'CM.'

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**



45.    I also performed a regression analysis to determine the portion of StockX operating expenses included in the calculation of CM1 and CM2 that should be considered variable based on their historical relationship with StockX's trading volume. To perform this analysis, I requested that StockX provide me with detailed data that show operating expenses included in the calculation

---

[107]    This figure plots the total number of trades (in millions) completed on StockX's platform and StockX's operating costs included in the calculation of CM2 (in millions of dollars) associated with these trades. Note that operating costs included in CM2 exclude cost of revenue. *See* STX0806053, at tab 'CM.'

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

of CM1 and CM2 over the period Q1 2019 to Q4 2022.[108] My analysis of these data shows that for

each additional trade, StockX incurred an additional ▮▮▮ in operating expenses included in CM1

and an additional ▮▮▮ in operating expenses included in CM2.[109]

46.    To estimate the operating expenses that StockX incurred in order to facilitate the

at-issue trades, I rely on the per-trade estimates of variable operating expenses included in the

calculation of CM1 and CM2 that result from my regression analysis.[110] I multiply these per-trade

variable operating expenses included in StockX's contribution margins by the number of at-issue

Nike and Jordan trades from Q1 2020 through Q3 2022 to estimate the variable operating expenses

that StockX incurred as a result of facilitating the at-issue trades over this period.[111] Subtracting

just these estimated variable operating expenses associated with at-issue trades of Nike and Jordan

sneakers from Mr. Hansen's gross profit estimate reduces potentially at-issue profits to

approximately ▮▮▮▮▮[112] Hence, correcting Mr. Hansen's estimate of StockX's at-issue

profits just to account for exclusion of the variable portions of operating expenses included in the

---

[108]    *See* STX0806053, at tab 'CM.' Note that StockX's Board Presentations present per-trade estimates of operations and other costs included in the calculation of CM1 and CM2 for at least some of the quarters during the at-issue period. *See, e.g.*, STX0020994-1141, at 1056 (Q1 2021); STX0582189-2329, at 2250 (Q2 2021); STX0275792-6081, at 5824 (Q3 2021); STX0090109-240, at 153 (Q4 2021); STX0594173-465, at 213 (Q1-Q2 2021); STX0040174-191, at 176 (Q1-Q3 2022). I requested additional data from StockX showing this information for the full period of Q1 2019 through Q4 2022 in order to complete an analysis covering the at-issue period.

[109]    Exhibit 4C. Note that StockX's total operating expenses included in the calculation of CM1 over the 2019 to 2022 period were ▮▮▮▮▮▮▮▮▮▮ *See* Exhibit 4B. Thus, my regression analysis suggests that approximately ▮▮▮▮▮▮ of the costs included in the calculation of CM1 appear to be variable. Similarly, StockX's total operating expenses included in the calculation of CM2 over the 2019 to 2020 period were ▮▮▮▮▮▮▮ ▮▮▮ *See* Exhibit 4B. Thus, my regression analysis also suggests that approximately ▮▮▮ of the costs included in the calculation of CM2 appear to vary with trades.

[110]    *See* Exhibit 4D.

[111]    *See* Exhibit 4D.

[112]    Exhibit 4A.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

calculation of CM1 and CM2 reduces his at-issue profit estimate by ████████ (relative to his gross profit estimate).[113]

> **b.      Mr. Hansen's estimate of StockX's profits does not account for other operating expenses that StockX would not have incurred absent the Nike and Jordan at-issue trades**

47.      Mr. Hansen appears to assume that all of the at-issue Nike and Jordan sneaker trades were driven by the alleged false claims. Thus, Mr. Hansen effectively assumes that *no* Nike and Jordan sneaker trades would have taken place on StockX's platform, but for StockX's alleged false claims at issue. This implies that StockX's overall trading volume would have been about ██ ████████████████ less, absent the alleged false claims.[114] With such a substantial reduction in trading volume, it is clear that, in addition to the variable operating expenses included in the calculation of StockX's contribution margins, some of the operating costs that StockX normally considers fixed for shorter time horizons and/or smaller volume changes would not have been incurred by StockX had it not facilitated the Nike/Jordan trades Mr. Hansen claims were enabled by the alleged false claims.[115]

48.      The economic textbook definition of a fixed cost (sometimes called overhead cost) is "[a]ny cost that does not depend on the firms' level of output. These costs are incurred even if

---

[113]    *See* Exhibit 4A. Note that in addition to correcting Mr. Hansen's gross profit estimate by subtracting the variable portions of operating expenses included in the calculation of CM1 and CM2, I also rely on updated StockX data to update Mr. Hansen's calculations of cost of revenue associated with Nike and Jordan at-issue trades. *See* Exhibits 4B, 4E.

[114]    *See* Exhibit 5B.

[115]    I understand that certain expenses identified as "fixed" in StockX's financials are included in the calculation of CM1 and CM2, whereas other "fixed" operating expenses are excluded from the calculation of CM1 and CM2. *See, e.g.*, STX0806053; Conversation with StockX personnel.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

the firm is producing nothing."[116] In contrast, a variable cost is defined as a cost that "depends on the level of production chosen."[117] Importantly, whether a cost is fixed depends on the period of time over which it is being analyzed. That is, a firm may not be able to avoid or change a certain cost over a short time horizon, rendering that particular cost "fixed" in the short-run. However, the firm can "expand, contract, or exit the industry" in the long-run. Therefore, it is often said in economics that "[t]here are no fixed costs in the long run."[118] For example, while a firm may not be able to avoid payments on a long-term office lease in a short period of time, given enough time, it may be able to do so by making arrangements to sublease its office space. As economists emphasize, the "long run will be how long it would take the firm to change" the specific "fixed" expense one is considering.[119] Over time, a firm can and will customarily adjust many, if not all, of its overhead costs to the level necessary to support its operations.

49.     Whether a firm treats a cost as "fixed" or variable also depends on the volume changes it is experiencing.[120] A firm may choose not to change certain costs for relatively small changes in volume.[121] For example, a firm may only undertake certain efforts or make certain investments when volumes reach some minimum threshold (*i.e.*, hiring additional employees or building a larger facility may only make sense once the company is reasonably confident that their business can support those costs). Likewise, the firm may only undertake certain actions that would

---

[116]     Case, K.E., R.C. Fair, and S.M. Oster, *Principles of Economics*, Eleventh Edition, Pearson, 2014, at p. 168.
[117]     Case, K.E., R.C. Fair, and S.M. Oster, *Principles of Economics*, Eleventh Edition, Pearson, 2014, at p. 168.
[118]     Case, K.E., R.C. Fair, and S.M. Oster, *Principles of Economics*, Eleventh Edition, Pearson, 2014, at p. 168.
[119]     Varian, H.R., *Intermediate Microeconomics: A Modern Approach*, Eighth Edition, W.W. Norton & Company, Inc., 2010, at p. 387.
[120]     This is consistent with how StockX treats costs. Conversation with StockX personnel.
[121]     *See, e.g.*, Varian, H.R., *Intermediate Microeconomics: A Modern Approach*, Eighth Edition, W.W. Norton & Company, Inc., 2010, at pp. 387-388.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

result in costs being lower if volumes fall by some minimum threshold (*i.e.*, laying off workers or sub-leasing space in the facility may only make sense if business falls by some minimum amount).[122] Hence, for smaller changes in volumes, costs may be considered "fixed," but for larger volume changes they may be considered "variable."[123]

50.    In its detailed financials, StockX has identified certain operating expenses as "fixed" in the short-run for the quarterly fluctuations in volume that it normally experiences.[124] These "fixed" costs are excluded from the calculation of CM1 and CM2.[125] Evidence suggests, however, that over a longer time period and for larger changes in volumes, these costs do vary with trading volume. As Exhibit 5C shows, these "fixed" operating costs grew by about ██ ███ over the 2019 to 2022 period, during which StockX experienced a growth in trading volume of approximately ██████  and a revenue growth of about ████████ [126] The correlation coefficient between StockX's trades and these "fixed" operating expenses over this period is ███ [127] The strong correlation between the level of StockX's business activity and these "fixed" operating costs, during such a period of high growth, suggests that a large portion of the "fixed" operating costs were, in fact, variable over that time period, and grew to accommodate the substantial increase in trades (*i.e.*, StockX's platform's size).

---

[122]    Conversation with StockX personnel.
[123]    Conversation with StockX personnel.
[124]    STX0806053, at tab 'Non-GAAP P&L.'
[125]    *See* STX0806053.
[126]    *See* Exhibit 5C.
[127]    *See* Exhibit 8.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

51.     This can be seen in Figure 5, below. Though changes in StockX's "fixed" operating costs tend to lag changes in trades by approximately two quarters, this figure suggests that costs that StockX considers "fixed" in the short run for smaller volume changes grew in response to growth in trading volume from 2019 to 2022. This illustrates that, over a longer time horizon and/or for greater volume changes, costs sometimes considered "fixed" can and do become variable.[128]

---

[128]     Note that while I do not include "fixed" operating costs included in the calculation of CM1 and CM2 in this analysis, I understand that those costs would similarly vary to a certain extent with larger changes in trading volumes and/or over longer time horizon. Conversation with StockX personnel.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**



52.     From this, it is reasonable to conclude that StockX's "fixed" operating expenses would have been considerably smaller than those StockX actually incurred if it were not able to make any of the Nike and Jordan sneaker trades on the StockX platform that Mr. Hansen assumes were enabled by the alleged false claims. To determine what portion of these "fixed" operating costs likely facilitated the Nike/Jordan trades at issue, I compared the size of StockX's platform in

---

129     This figure plots the total number of trades (in millions) completed on StockX's platform and StockX's "fixed" operating costs excluded from the calculation of CM2 (in millions of dollars) associated with these trades. *See* STX0806053, at tab 'Non-GAAP P&L.'

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

2019 with the size of the platform related to the Nike/Jordan trades at issue. As Exhibit 5B shows, the gross merchandise value ("GMV"), trades, and revenue of the at-issue products in 2021 exceeded those for the entire platform in 2019 by approximately ███████████.[130] This suggests that the "fixed" operating costs associated with the U.S. trades of Nike and Jordan sneakers in 2021 were at least as high as those observed for all of StockX in 2019.[131]

53.    Hence, I conclude that the level of these operating costs required to support the volume of Nike and Jordan sneaker trades that involved at least one U.S. individual in 2021 are approximately the same as the level of the costs observed in 2019 for the *entire* StockX platform.[132] Further, by using the ratio of the growth in these expenses over the 2019 to 2022 period to the growth in trades over the same period, I estimate the level of these costs associated with at-issue products in 2020 and 2022.[133] This analysis suggests that, in order to accommodate the substantial increase in trades of the Nike and Jordan sneaker trades at issue during the Relevant Period, StockX

---

[130]    Based on Exhibit 5B, the GMV of at-issue products in 2021 is approximately ███████ higher than GMV of all products traded on StockX in 2019 ██████████████████ the trades of at-issue products in 2021 are approximately ████████████ higher than trades of all products on StockX in 2019 ██████████ the total revenue of at-issue products in 2021 is approximately ████████ higher than StockX's total revenue in 2019

[131]    As explained in Exhibit 5D, the total fixed costs for 2021 are estimated as 2019 whole year fixed costs divided into four equal quarterly values.

[132]    *See* Exhibit 5D.

[133]    *See* Exhibit 5D. The ratio of growth in these expenses to the growth in trades over the 2019 to 2022 period is 135.1 percent. I apply this ratio to growth in at-issue trades from 2020 to 2021 and Q1-Q3 2021 to Q1-Q3 2022 to estimate growth in expenses. From 2020 to 2021, trades of the at-issue products grew ████████, and I estimate that expenses grew by ███████████ From Q1-Q3 2021 to Q1-Q3 2022, trades of the at-issue products grew ██████████ and I estimate that expenses grew by ██ ████████████ I estimate 2021 at-issue expenses to be 2019 total StockX expenses, ████████ in each quarter. To calculate the 2020 expenses, I reduce ████████████ by the 2020 to 2021 growth rate ████████ to get ████████████ in expenses per quarter. To calculate the Q1-Q3 2022 expenses, I increase ████████████ by the Q1-Q3 2021 to Q1-Q3 2022 growth rate ████████ to get ███████████████ in expenses per quarter.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

incurred additional operating costs of ███████████.[134] StockX would not have incurred these

costs absent the trades that Mr. Hansen asserts were made possible by the alleged false claims.

54.    Subtracting these costs from Mr. Hansen's ████████ gross profit estimate,

together with the variable operating expenses included in the calculation of CM1 and CM2

discussed above, results in an at-issue loss of ██████████.[135] I accordingly conclude that –

consistent with the fact that ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████    Mr. Hansen asserts were attributable to the allegedly false advertising

during the Relevant Period.

### 3.    Mr. Hansen failed to show that any of StockX's trades were enabled by the alleged false claims

55.    In his analysis, Mr. Hansen assumes that all profits received by StockX as a result

of facilitating Nike and Jordan sneaker trades are attributable to the alleged false claims.[136]

However, Mr. Hansen provides no evidence that all purchases of Nike and Jordan sneakers on the

StockX platform were driven by the claims at issue. As I explain below, Mr. Hansen's unsupported

assumption overstates the importance of StockX's advertisements about its authentication process

in driving demand for purchases on the StockX platform, and ignores a variety of other factors that

---

134    Exhibit 5D.
135    Exhibit 5A. Note that in addition to correcting Mr. Hansen's gross profit estimate by subtracting (1) the
variable portions of operating expenses included in the calculation of CM1 and CM2 and (2) other
operating expenses excluded from the calculation of CM2, I also rely on updated StockX data to update Mr.
Hansen's calculations of cost of revenue associated with Nike and Jordan at-issue trades.
136    Hansen Report, ¶¶ 58, 59.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

contributed to the popularity of the platform. Mr. Hansen also assumes, without basis, that all StockX buyers believed that StockX's verification process would eliminate the possibility of receiving counterfeit products, despite evidence of repeat purchases made by StockX buyers who received counterfeit goods, or evidence suggesting a substantial fraction of StockX customers viewed StockX's ability to authenticate products to be imperfect.

> a. **Mr. Hansen overstates the importance of StockX's allegedly false claims regarding its authentication process in the purchase decision**

56.    Mr. Hansen overestimates the role of StockX's alleged false advertising claims regarding its authentication process in driving the demand for purchases on the StockX platform. Mr. Hansen incorrectly assumes that all U.S. trades of Nike sneakers on the StockX platform were driven by the allegedly false claims regarding StockX's authentication process, despite abundant evidence that suggests otherwise.

57.    As discussed in the Vigil Affirmative Report, there are a number of considerations that factor into the consumer purchase decision making process, such as speed of delivery, availability of scarce or unique products, price transparency, value for the price, and customer experience.[137] Evidence produced in this case suggests that StockX is best known for some of these platform attributes.[138] For example, StockX is particularly valued for providing consumers with

---

[137]    *See* Vigil Affirmative Report, ¶¶ 9, 89-95.
[138]    *See* Vigil Affirmative Report, ¶¶ 89-95.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

access to unique and hard-to find items, an easy-to-use platform, and excellent customer service.[139] Mr. Hansen ignores all these other factors that can and likely did impact consumer demand.

58.     While the existence of a product authentication service is one factor that may drive consumer purchase decisions of sneakers and other such current culture items,[140] survey evidence suggests that authentication may not constitute the primary factor driving purchases on the platform for all consumers.[141] Regardless, as I understand it, it is only the alleged false claims regarding authentication of the Nike and Jordan sneakers that are at issue in this case. As I explain below, evidence suggests that very few, if any, of StockX's trades are likely attributable to these allegedly false claims.

---

[139]    *See* Vigil Affirmative Report, ¶¶ 92, 95.

[140]    The findings of a 2020 survey of U.S. consumers suggest that "[e]asy-to-use," "[m]ake money selling," and "[g]reat customer service" are among the most appealing features of the StockX platform. Specifically, the findings of this survey suggest that 35 percent of StockX customers selected "[e]asy-to-use" among the top five most appealing features of the platform, 31 percent selected "[m]ake money selling," and 29 percent chose "[g]reat customer service." "Authentic product (not fake)" ranked fourth in the list of top five most appealing features identified by StockX customers. *See* STX0092496-544, at 535. *See also,* Vigil Affirmative Report, ¶ 95.

[141]    Specifically, the findings of a November 2019 survey of U.S. consumers suggest that only 48 percent of StockX customers consider authenticity as "[v]ery important," while 37 percent of StockX customers indicated that authenticity is only "[s]omewhat important" and 16 percent of StockX customers indicated that authenticity is either "[n]ot very important" or "[n]ot at all important." STX0021868-951, at 897. *See also*, STX0021868-951, at 894. Similarly, the findings of a November 2020 survey of U.S. consumers suggest that for only 51 percent of StockX customers authenticity is "[v]ery [i]mportant" and therefore constitutes a top purchase driver. STX0092496-544, at 515. *See also*, STX0092496-544, at 513. In fact, the same survey suggests that only 28 percent of StockX customers selected "[a]uthentic products (not fake)" among the "top-five things that are most appealing … about StockX." STX0092496-544, at 535. Further, in a survey of StockX's existing and prospective customers in November and December 2021, only 61 percent of U.S. respondents agreed that "[k]nowing the good is certified as authentic" is most important "when choosing an online reselling platform to buy goods." STX0091819-911, at 825, 877. Thus, the survey findings suggest that for a substantial fraction of StockX customers the existence of a product authentication service may not constitute the primary factor driving consumers towards the platform.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

> **b.    Mr. Hansen incorrectly attributes all of the value of StockX's authentication process to the alleged false claims regarding the process's ability to identify counterfeit products**

59.    In his calculation of allegedly ill-gotten StockX's profits, Mr. Hansen appears to assume that all of StockX's profits were the result of StockX's alleged false claims regarding how its authentication process is able to identify counterfeit products. Mr. Hansen attributes no separate value to StockX's authentication process apart from the alleged false claims. That is, Mr. Hansen assumes that there was no value to consumers from StockX performing any additional steps in its verification process that do not relate to product authenticity, such as performing quality control checks.

60.    Verifying whether a product appears to be authentic is only one aspect of StockX's verification and quality control process.[142] As explained on StockX's website, StockX authenticators carry out multi-step inspections that go beyond evaluating authenticity, as they confirm if the product matches the purchase order (*e.g.*, they are of the correct size, color, and are the product ordered) and verify that, among other things, the product appears to be brand new, has all the add-on accessories that it is expected to have, and has no apparent manufacturing defects.[143] Although Mr. Hansen asserts without evidence that these additional checks beyond authenticity have no value to consumers, survey research suggests that a substantial proportion of StockX customers in fact believe that the item being "brand new" is a "[v]ery important" purchase driver.[144]

---

[142]    "Verification," StockX, available at https://stockx.com/about/verification/, accessed May 17, 2023. *See also,* Vigil Affirmative Report, ¶¶ 17, 69.

[143]    "Verification," StockX, available at https://stockx.com/about/verification/, accessed May 17, 2023; Huber Deposition, at pp. 22, 244-245. *See also,* Vigil Affirmative Report, ¶¶ 17, 69.

[144]    STX0092496-544, at 515.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

61.     In his deposition testimony, StockX's Vice President of Corporate and Strategic Development and StockX's Rule 30(b)(6) designee, Mr. Brock Huber, described the uncertainties associated with the resale purchase experience prior to the creation of secondary platforms like StockX.[145] According to Mr. Huber, once a payment was sent, a buyer had to "hope" they "were going to receive [the] product" and that the product they "were going to receive" "was what was promised."[146] By introducing its verification process, StockX "organized" the resale "purchasing experience," and provided a more "frictionless" experience to its customers.[147] Hence, even beyond issues relating to product authenticity, StockX's verification process improves the consumer shopping experience by reducing uncertainty that was previously commonplace in secondary marketplace transactions.

62.     By attributing no value to other aspects of StockX's authentication process besides whether StockX was accurate in identifying counterfeit products, Mr. Hansen has overstated the portion of the at issue trades that were purportedly enabled by StockX's claims at issue. This, in turn, causes him to overstate the profits from the at issue trades that were enabled by the allegedly false claims, and renders his conclusions regarding StockX's profits attributable to the alleged false advertising unreliable.

---

[145]    Huber Deposition, at pp. 18-20.
[146]    Huber Deposition, at p. 18.
[147]    Huber Deposition, at pp. 19, 54.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

> **c.** **Mr. Hansen failed to account for the implication of repeat trades by buyers who received a counterfeit product**

63.    As stated above, Mr. Hansen asserts that profit from all trades of Nike and Jordan sneakers that involved at least one U.S. individual is relevant to profit disgorgement under 15 U.S.C. § 1117(a).[148] Thus, Mr. Hansen assumes that all such trades took place as a result of the alleged false claims. However, as the record has made clear in this case and as Mr. Hansen himself has acknowledged, some customers erroneously received products from StockX that they were able to return to StockX later because they suspected those products were counterfeit and received a full refund from StockX (rather than the product seller).[149] To the extent these consumers made additional purchases on StockX following the receipt of potentially inauthentic goods over the at-issue period, or to the extent buyers were aware of publicized reports around potentially inauthentic goods having been received by buyers on the StockX platform prior to making their purchases, any revenue received by StockX from facilitating such trades cannot be attributable to the alleged false claims. The reality that StockX customers continued to use the platform even after becoming aware that they could receive a product StockX could later acknowledge was likely counterfeit disproves Hansen's foundational assumption regarding StockX's attributable trades.[150]

---

[148]    Hansen Report, ¶¶ 58-62; U.S. Code Title 15, Commerce and Trade, § 1117 (a) "Profits, Damages and Costs; Attorney Fees," at pp. 1133-1134.

[149]    *See, e.g.*, Fenton Deposition, Exhibit 12 (STX0018010-014), at 010; Hansen Report, ¶¶ 35-36.

[150]    I understand that over the at-issue period approximately 52 percent of buyers who received a product that they later returned because they suspected it was inauthentic have made additional purchases after receiving such potentially inauthentic goods. This rate is roughly consistent with the overall return rate for all StockX customers (which is estimated at 40 percent to 50 percent). Conversation with StockX personnel.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

64.     For example, Mr. Roy Kim, a sneaker collector who has purchased approximately 5,000 pairs of shoes from StockX and spent "over a million dollars" on purchases from this platform, testified that he continued to use StockX after an incident where he had purchased sneakers from StockX that Nike alleges were counterfeits and were returned to StockX for a refund.[151] Based on his testimony, Mr. Kim has purchased "[o]ver a thousand" pairs of sneakers on StockX, with "[n]inety percent plus" of them being Nike, even *after* his purchase and return of counterfeit sneakers.[152] This means that Mr. Kim continued to buy products on StockX despite knowing the probability of receiving an authentic product was not 100 percent. Further, Mr. Kim testified that he has had a better customer service experience with StockX, compared to GOAT and eBay, pointing to the importance of factors other than authenticity and the alleged false claims in shaping consumers' behavior.[153]

> **d.     Mr. Hansen provided no evidence that StockX buyers believed that its verification process would eliminate the possibility of receiving counterfeit products**

65.     Although Mr. Hansen claims that StockX's allegedly false claims have resulted in millions of dollars in profits to StockX, he fails to present any evidence corroborating Nike's assertion that all Nike and Jordan sneaker buyers on StockX's platform necessarily interpreted the

---

151     Deposition of Roy Kim, February 8, 2023 ("Kim Deposition"), at pp. 23-31, 157. *See also,* Vigil Affirmative Report, ¶ 88. I understand from Mr. Kim's testimony that after questioning the authenticity of a batch of sneakers that he had purchased on StockX, he used CheckCheck and Legit Check apps to verify their authenticity. *See* Kim Deposition, at p. 29. Once these authentication apps flagged a large number of his recently bought sneakers as potentially counterfeit, Mr. Kim contacted StockX to initiate their return *See* Kim Deposition, at p. 29. Mr. Kim testified that he also had the same products inspected by Nike's representatives before returning them to StockX. *See* Kim Deposition, at pp. 83-85.
152     Kim Deposition, at p. 157.
153     Kim Deposition, at pp. 113, 115.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

alleged false claims to mean there was no chance of receiving counterfeit products. That is, Mr. Hansen simply assumes, without basis, that each consumer who purchased a Nike or Jordan pair of sneakers over the at-issue period understood StockX's allegedly false claims to mean that StockX's verification process would eliminate the possibility of receiving a counterfeit product.

66.     Mr. Hansen's unsupported assumption runs contrary to the evidence produced in this case. First, according to a 2020 StockX survey of U.S. consumers, only 46 percent of StockX customers indicated that the platform performs "[v]ery well" on "[a]uthentic products (not fake)."[154] In addition, the results of the 2019 survey suggest that GOAT—StockX's "major competitor"—outperformed StockX on certain attributes that included "authenticity."[155] Further, StockX's longstanding return policy for items that were incorrectly verified (currently called the "Buyer Promise") is that StockX will fully refund buyers if they receive a product that is not what the buyer expected to receive (*e.g.,* because the product is of the wrong size, has a defect, or does not appear to be genuine).[156] The existence of this policy would similarly be expected to alert potential StockX buyers to the possibility of errors during StockX's verification process. Although

---

[154]     STX0092496-544, at 534. Similarly, the results of the 2019 survey suggest that only 43 percent of StockX customers indicated that StockX did "Very well" on the "Authenticity" front. STX0092496-544, at 533.

[155]     *See* STX0021868-951, at 872, 911.

[156]     Vigil Affirmative Report, ¶ 85. *See also,* "What Is the StockX Return Policy?" October 24, 2022, available at https://web.archive.org/web/20221024162628/https://stockx.com/help/articles/What-is-the-StockX-Return-Policy, accessed May 19, 2023 ("While we cannot accept returns or exchanges, every purchase on StockX is backed by our Buyer Promise. Should we make a mistake (e.g. we ship you the wrong order, we incorrectly verify an item), we'll make it right."); "What Is the StockX Buyer Promise?" StockX, April 17, 2023 available at https://stockx.com/help/articles/What-is-The-StockX-Buyer-Promise, accessed April 18, 2023 ("The StockX Buyer Promise solidifies this mission by providing support for Buyers should we make a mistake (e.g. we ship you the wrong order, we incorrectly verify an item). In the unlikely event that this happens with your order, please submit a Buyer Promise Support Request form within ten days of receiving your item and we will work expeditiously to resolve the issue.").

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

Mr. Hansen asserts that "StockX did not have a publicized return policy for accepting returns for products purchased on its platform," I understand that StockX's Terms and Conditions specified that StockX would investigate all purchases that were suspected to be inauthentic and would refund the buyer should the investigation confirm that StockX made a mistake.[157] These survey findings and disclaimers cast doubt on Mr. Hansen's unsubstantiated assertion that all of StockX's Nike and Jordan sneaker buyers necessarily expected to receive "100% Authentic" products. Instead, such evidence is indicative of a consumer base who may not expect a platform with a perfect verification system, but one where buyers are made whole should mistakes occur.[158]

### 4. Evidence suggests that very little, if any, of StockX's trades are attributable to the alleged false claims

#### a. Survey evidence

67. Based on the evidence produced in the case, it appears that very few, if any, of StockX's trades of Nike and Jordan branded sneakers are attributable to the alleged false claims.

---

[157] Hansen Report, ¶ 39. *See, e.g.*, NIKE0000253-275, at 254 ("If a buyer receives an item that it believes to be counterfeit, the buyer must notify StockX in writing within 3 days after receiving the item, and we will commence an investigation into the item. The buyer shall cooperate with us in the investigation and final disposition of the item, including providing photographs and other evidence of the item, providing the item to law enforcement, destroying the item, or delivering the item back to us, at our direction. If we elect to have the buyer destroy the item, the buyer shall provide reasonable proof of destruction to us. We will refund all fees and costs paid by the buyer for the item (including shipping and handling). In no event may a buyer resell any item (on StockX or elsewhere) that is reasonably believed to be counterfeit."). *See also*, STX0021481-498, at 486 ("If a buyer receives an item that it believes to be counterfeit, the buyer must notify StockX in writing within 3 days after receiving the item, and StockX will commence an investigation into the item."); STX0061163-172, at 163-164 ("The customer service team supports issues with item condition (damage, scuffs, box damage, questionable authenticity)... Customers have three days after receipt to contact the customer service team via online live chat or through email... Depending on the issue and severity, Customer Service offers escalating solutions [such as]... a return and/or refund" and "[i]f there has been a StockX mistake, the team is quick to offer compensation to make things right.").

[158] *See* Vigil Affirmative Report, ¶ 88.

47

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

In particular, I understand that the results of a study conducted by StockX's survey expert, Ms. Sarah Butler, suggest that the allegedly false advertising claims had very little impact on the likelihood that consumers would use StockX to purchase Nike sneakers.[159] I understand that Ms. Butler conducted a survey of actual and potential StockX sneaker buyers to determine the impact of the alleged false claims on the likelihood of customers to use StockX's website to purchase a pair of sneakers.[160] Survey respondents were put in either a test group (where respondents were shown StockX's webpages that included the at-issue claims) or a control group (where respondents were shown the same StockX's webpages but without the at-issue claims).[161]

68.    After reviewing StockX's home page, a webpage explaining how StockX works, a webpage discussing StockX's verification process, a StockX sneakers page, and a product page for Nike Dunk Low sneakers, respondents were asked to state their likelihood of using the StockX's website to purchase a pair of sneakers.[162] As the only difference between the survey stimuli shown to the two groups of respondents was the presence or absence of at-issue claims, Ms. Butler was able to compare the survey responses between the test and control groups to determine the impact of the at-issue claims on the stated likelihood of purchase.[163] Among all

---

[159]    Expert Rebuttal Report of Sarah Butler, *Nike, Inc. v. StockX LLC*, United States District Court for the Southern District of New York, Case 1:22-cv-00983-VEC, June 2, 2023 ("Butler Report"), ¶ 10.
[160]    Butler Report, ¶ 18.
[161]    Butler Report, ¶¶ 24-25.
[162]    Butler Report, ¶ 26.
[163]    Butler Report, ¶ 29.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

respondents, Ms. Butler's findings suggest that the presence of the at-issue claims did not increase the average purchase likelihood.[164]

69.     I understand that respondents in Ms. Butler's survey were also asked to provide a reason for their stated likelihood of purchase.[165] Based on her review of open-ended responses, Ms. Butler concludes that the presence of at-issue claims did not meaningfully impact respondents' interest in using StockX.[166] In addition, Ms. Butler's analysis of the open-ended responses suggests that, among all respondents who were likely to use the website to purchase sneakers (*i.e.*, respondents whose likelihood of purchase was 5, 6, or 7), 23.5 percent in the test group and 21.9 percent in the control group mentioned StockX's verification process as being among the reasons for their score.[167] This means that only a small fraction of the 23.5 percent of respondents in the test group who mentioned StockX's verification process as being among the reasons for their purchase likelihood score attributed the score to the alleged false claims as opposed to other aspects of StockX's verification process. In other words, at most, 1.6 percent of respondents who indicated they were likely to use the version of StockX's website that contained the alleged false claims attributed their likely use of the website to the alleged false claims (calculated as 23.5 percent minus 21.9 percent).

---

[164]    More precisely, the difference in the observed average purchase likelihood between the test and control groups was not statistically significant, indicating that, on average, respondents in the test and control groups reported an equally high likelihood of purchase. Further, Ms. Butler's findings appear to be robust to the exclusion of past StockX and other third-party site purchasers, respondents who indicated they have or would consider purchasing from a fake site, and respondents who were aware of the lawsuit involving StockX. Butler Report, ¶ 39, Exhibit H.

[165]    Butler Report, ¶¶ 26, 40.

[166]    Butler Report, ¶ 41.

[167]    Butler Report, ¶ 41, footnote 56.

49

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

70.    Ms. Butler's findings regarding the reasons for respondents' stated likelihood of purchase appear to be robust to the exclusion of respondents who indicated they have or would consider purchasing from a fake site and respondents who were aware of the StockX lawsuit.[168] Specifically, among respondents that did not select the fake website, thegrid.com, and whose likelihood of purchase was 5, 6, or 7, 25.2 percent in the test group and 21.6 percent in the control group mentioned StockX's verification process as being among the reasons for their score (net difference of 3.5 percent).[169] In addition, among respondents that were not aware of the StockX litigation and whose likelihood of purchase was 5, 6, or 7, 23.7 percent in the test group and 22.9 percent in the control group mentioned StockX's verification process as being among the reasons for their score (net difference of 0.8 percent).[170] This suggests that, at most, 0.8 percent to 3.5 percent of respondents who indicated they were likely to use the version of StockX's website that contained the alleged false claims attributed their likely use of the website to the alleged false claims.

71.    Thus, Ms. Butler's findings suggest that the maximum percentage of respondents for whom the alleged false claims may have had some impact on respondents' being likely to use the StockX platform (*i.e.*, respondents whose likelihood of purchase was 5, 6, or 7) ranges from approximately 0.8 percent to 3.5 percent, depending on the subset of respondents considered for

---

[168]    Ms. Butler's findings also appear to be robust to the exclusion of respondents that used StockX or another third-party site in the past. Among respondents that did not previously purchase from StockX and whose likelihood of purchase was 5, 6, or 7, 24.1 percent in the test group and 22.2 percent in the control group mentioned StockX's verification process as being among the reasons for their score (net difference of 1.9 percent). Butler Report, Exhibit H.

[169]    Butler Report, Exhibit H.

[170]    Butler Report, Exhibit H.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

analysis. These results from Ms. Butler's survey suggest that, at most, only ███████ to ███ of Mr. Hansen's ██████████ U.S. Nike and Jordan sneaker gross profit could be attributable to the alleged false claims, a ██████ to ███████ reduction from Mr. Hansen's ██████████ gross profit estimate.[171] Deducting the variable operating expenses included in the calculation of CM2 associated with U.S. trades of Nike and Jordan sneakers from Mr. Hansen's at-issue gross profit estimate and applying the estimated share of profits attributable to the alleged false claims results in at-issue profits of only ██████ to ███████, a ███████████ reduction from Mr. Hansen's ██████████ gross profit estimate.[172]

### b.    Evidence from StockX/GOAT transaction data

72.    Data comparing weekly sales and transactions on the StockX and GOAT platforms similarly suggest that a change in StockX's disclaimers has had little, if any, difference on the platform's marketplace performance. As mentioned in my Affirmative Report, GOAT is one of StockX's closest competitors.[173] Publicly available data suggest that on or sometime prior to May 28, 2022, GOAT changed the description of its verification process from "Authenticity Guarantee" to "Assurance of Authenticity."[174] I also understand from Counsel that StockX changed the

---

[171]    Exhibit 6.

[172]    Exhibit 7. Note that this adjustment also corrects Mr. Hansen's calculations of cost of revenue based on updated StockX data.

[173]    *See* Vigil Affirmative Report, ¶¶ 53, 77, 95.

[174]    "Authenticity Guarantee," GOAT, December 3, 2021, available at https://web.archive.org/web/20211203145948/https://www.goat.com/verification, accessed May 29, 2023; "Assurance of Authenticity," GOAT, May 28, 2022, available at https://web.archive.org/web/20220528135222/https://www.goat.com/verification, accessed May 29, 2023; "Assurance of Authenticity," GOAT, available at https://www.goat.com/verification, accessed May 29, 2023.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

description of its verification process to remove the allegedly false claims over the period of September 2022 to October 2022. Thus, the comparison of sales and transactions between the two platforms around the period of September 2022 to October 2022 can shed light on the potential impact that a change in the allegedly false claims might have had on StockX's performance.

73.    Over the period June 2022 to August 2022 (*i.e.*, prior to the removal of the at-issue language from StockX's website), StockX's and GOAT's sales and transactions appear to have experienced similar trends.[175] To the extent a change in the at-issue claims would have considerably reduced StockX's sneaker trading volume, as Mr. Hansen's asserts it would, one would expect to see a substantial reduction in StockX's observed sales and transactions relative to GOAT in or around November 2022 (as GOAT's disclaimers appear to have remained unchanged after May 28, 2022).[176] In contrast to Mr. Hansen's claims, my analysis of the data suggests that there has been no statistically significant change between StockX's and GOAT's relative sales and transactions before and after November 2022.[177] This can also be seen graphically in Figure 6, below.

---

[175]    *See* Exhibits 9A, 9D.

[176]    I understand that in 2022 approximately 32 percent of total trades on StockX were made by first-time buyers. Conversation with StockX personnel.

[177]    I conducted a difference-in-difference regression based on weekly StockX and GOAT sales (transactions) data to determine if there has been a change in StockX's and GOAT's relative sales (transactions) in or after November 2022. As Exhibit 10B illustrates, while the estimated coefficient on the interaction terms between StockX (a dummy that equals 1 for a StockX observation and 0 otherwise) and an indicator variable that equals 1 starting in November 2022 is negative, it is not statistically significant. Similarly, as a robustness check, I conducted a difference-in-difference regression measuring the impact of a change in disclaimers on StockX's and GOAT's relative sales and transactions in or after September 2022. The results of this analysis suggest that there has been no statistically significant impact on StockX's and GOAT's relative sales and transactions. *See* Exhibit 10A.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**



74.     If Mr. Hansen's claim that all of StockX's Nike and Jordan at-issue trades were because of the alleged false claims, one would expect StockX's sales to decline significantly – by up to ███████ – in or around November 2022 (as illustrated by a dashed green line in Figure 7).[179] Yet, the actual StockX's sales and transactions in or around November 2022 do not appear to be anywhere near the levels expected under Mr. Hansen's but-for world assumption (as illustrated by the solid green line in Figure 7).[180]

---

[178]     *See* Exhibit 9A.
[179]     Exhibit 9B.
[180]     Exhibit 9B.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**



### 5.    Summary

75.    Correcting just a subset of the flaws in Mr. Hansen's disgorgement analysis suggests considerably lower StockX profits are attributable to the alleged false claims, if any. As noted above, Mr. Hansen calculates StockX's gross profits from facilitating the sale of Nike and Jordan branded sneakers involving at least one U.S. individual over the at-issue period to be ███████ .[182] Below, I summarize the impact on Mr. Hansen's profit estimate after I account for a) variable operating expenses included in CM1 and CM2, b) other operating costs that StockX would not have incurred absent the Nike and Jordan sneaker trades which Mr. Hansen assumes were all

---

[181]    Exhibit 9B.
[182]    Amended Hansen Report, ¶¶ 18, 70, Table 6.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

attributable to the alleged false claims, and c) the maximum portion of Nike/Jordan trades for which the alleged false claims may have affected the buyer's decision to use the StockX platform.

> **a.** **Accounting for variable operating expenses included in the calculation of CM1 and CM2**

76.    Even though Mr. Hansen acknowledges that other costs besides cost of revenues, such as operating expenses that are included in the calculation of CM1 and CM2, "might be deductible" from his estimate of StockX's profit, Mr. Hansen does not adjust his calculations of StockX at-issue profits to account for these costs. As discussed above, my analysis of StockX data suggests that the operating costs included in the calculation of StockX's contribution margins are largely variable. Adjusting Mr. Hansen's estimated at-issue profit by deducting the variable portion of these expenses reduces Mr. Hansen's ███████ gross profit estimate by ███ to ███████.[183]

> **b.** **Accounting for other operating costs that StockX would not have incurred, absent the Nike and Jordan sneaker trades which Mr. Hansen assumes were all attributable to the alleged false claims**

77.    As discussed above, if one assumes, as Mr. Hansen does, that all profits from U.S. trades of Nike and Jordan sneakers were attributable to the alleged false claims, then StockX's trading volume would have been much lower in the but-for world. Had StockX not made the Nike/Jordan trades Mr. Hansen claims were enabled by the alleged false claims, some of the

---

[183]    Exhibits 3, 4A.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

operating costs that StockX considers "fixed" for shorter time horizons and smaller volume changes would not have been incurred.

78.    Specifically, my analysis suggests that, in order to accommodate the substantial increase in trades related to the Nike and Jordan sneaker trades at issue, StockX incurred additional operating costs of ███████████, which StockX would not have incurred absent the trades that Mr. Hansen asserts were made possible by the alleged false claims.[184] Subtracting these costs from Mr. Hansen's ███████████ gross profit estimate, together with the variable operating expenses included in the calculation of CM1 and CM2 discussed above, results in an at-issue loss of ███████ ███████ i.e., an approximately ███████████ reduction from Mr. Hansen's gross profit estimate).[185]

c.    **Accounting for the maximum portion of Nike/Jordan trades for which the alleged false claims may have affected the buyer's decision to use the StockX platform**

79.    As described above, Mr. Hansen effectively attributes all profits received by StockX as a result of facilitating U.S. Nike and Jordan sneaker trades to the alleged false claims. However, as I discuss, evidence produced in this case indicates that factors other than authentication, in general, and the alleged false claims related to authentication, likely played a role in driving StockX's Nike and Jordan sneaker trades. This suggests that a portion of StockX's profits (if any) from such trades can be attributed to factors *other* than the alleged false claims (*i.e.,*

---

[184]    Exhibit 5A.
[185]    Exhibits 3, 5A.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

only a portion of profits *can* be attributed to the alleged false claims). In fact, as the evidence suggests, very little of StockX's profits, if any, likely were received due to the alleged false claims.

80.     As discussed above, Ms. Butler's survey findings suggest that the maximum percentage of respondents for whom the alleged false claims may have had some impact on respondents' being likely to use the StockX platform (*i.e.*, respondents whose likelihood of purchase was 5, 6, or 7) ranges from approximately ████████ to ████████, depending on the subset of respondents considered for analysis. These results suggest that, at most, only ████████ to ████████ of Mr. Hansen's ████████ U.S. Nike and Jordan sneaker gross profit is attributable to the alleged false claims, a ████████ to ████████ reduction from Mr. Hansen's ████████ gross profit estimate.[186]

81.     Deducting the variable operating expenses included in the calculation of CM1 and CM2 associated with U.S. trades of Nike and Jordan sneakers from Mr. Hansen's at-issue gross profit estimate and applying the estimated share of profits attributable to the alleged false claims results in at-issue profits of only ████████ to ████████, a ████████ to ████████ reduction from Mr. Hansen's ████████ gross profit estimate.[187]

## C.     Mr. Hansen's statutory damages for counterfeiting are overstated

82.     Mr. Hansen also purports to "calculate Nike's potential statutory damages … related to the counterfeiting claim Nike has asserted against StockX."[188] Specifically, Mr. Hansen

---

[186]     Exhibits 3, 6.
[187]     Exhibits 3, 7.
[188]     Hansen Report, ¶ 17.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

calculates potential statutory damages for "nine counterfeit Nike trademarks in connection with" Nike products sold on StockX's platform under two assumptions: (i) willful counterfeiting by StockX and (ii) non-willful counterfeiting by StockX.[189] When calculating Nike's potential statutory damages, Mr. Hansen reports damages based on the maximum statutory damages per counterfeit mark specified in Section 1117(c) of the Lanham Act.[190] According to Mr. Hansen, Nike's statutory damages are (at most) $18 million if counterfeiting is found to be willful, and (at most) $1.8 million if counterfeiting is found to be non-willful.[191]

      83.    I understand that StockX's position is that the number of counterfeit marks at issue is six instead of nine.[192] I have been asked to calculate potential statutory damages under this alternative scenario. I understand that the statutory damages for use of counterfeit marks are "not less than $1,000 or more than $200,000 per counterfeit mark."[193] I also understand that if the court finds that the use of the counterfeit mark was willful, the statutory damages are "not more than $2,000,000 per counterfeit mark."[194] Thus, the minimum statutory damages in this case would be $6,000.[195] Nike's maximum potential statutory damages under the assumption that StockX has

---

[189]    Hansen Report, ¶¶ 82-84.
[190]    Hansen Report, ¶ 81.
[191]    Hansen Report, ¶¶ 83-84
[192]    I understand from Counsel that Nike identified nine trademarks that they claimed were contained within allegedly infringing products at issue in the First Amended Complaint. However, I understand from Counsel that two of the marks at issue protect the identical NIKE word mark, two protect the Swoosh design mark, and one covers the combination of the NIKE word mark and Swoosh design mark. Eliminating these duplicate marks reduces the number of at-issue trademarks to six, even assuming Nike establishes that every mark it identified is present on one counterfeit product.
[193]    U.S. Code Title 15, Commerce and Trade, § 1117 (c) "Statutory Damages for Use of Counterfeit Marks," at p. 1134.
[194]    U.S. Code Title 15, Commerce and Trade, § 1117 (c) "Statutory Damages for Use of Counterfeit Marks," at p. 1134.
[195]    Calculated as $1,000 per mark × 6 marks = $6,000.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

used six counterfeit Nike trademarks in connection with sneakers that were sold on its platform would range between \$1,200,000 and \$12,000,000.[196] I understand that Courts calculate an appropriate amount of damages within the statutory range (*i.e.*, between \$6,000 and \$1,200,000 if counterfeiting was non-willful, or between \$6,000 and \$12,000,000 if counterfeiting was willful) given the facts of each case.

## III.    Conclusion

84.    My analysis may change before trial if additional information from any of the parties-in-suit or their experts becomes available. I, therefore, reserve the right to supplement my report accordingly.

_____

Robert L. Vigil, Ph.D.

---

[196]    Total maximum statutory damages are calculated by multiplying the number of at-issue marks by the maximum statutory damages per mark, depending on whether counterfeiting was willful or not. U.S. Code Title 15, Commerce and Trade, § 1117 (c) "Statutory Damages for Use of Counterfeit Marks," at p. 1134.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

**EXHIBIT 1**
**ROBERT L. VIGIL, PH.D., CLP**
**Principal**

Phone: 202 530 3996                                                                   800 17th Street, NW
Fax: 202 530 0436                                                                                     Suite 400
robert.vigil@analysisgroup.com                                             Washington, DC 20006

Dr. Vigil specializes in the application of economics and finance to complex commercial litigation matters. His work includes the estimation of damages and unjust enrichment in intellectual property (IP), breach of contract, and false advertising cases; the evaluation of patented drug products' commercial success in connection with generic manufacturers' Abbreviated New Drug Application submissions to obtain early market entry; and the analysis of issues related to the granting of permanent injunctions, such as irreparable harm and causal nexus. Dr. Vigil has also analyzed issues related to domestic industry, remedy, and bonding on cases before the International Trade Commission.

Dr. Vigil has served as an expert witness on litigation matters in a variety of industries, including pharmaceuticals, medical devices, consumer products, telecommunications, computer hardware and software, and electronics. In non-litigation matters, he has assisted clients in valuing IP for sale or license; identifying and evaluating potential partners for licensing, acquisition, or divestiture of assets; and analyzing the impact of generic entry on prices and market shares of brand name pharmaceutical products.

Dr. Vigil is a member of the American Economic Association, the American Marketing Association, and the Licensing Executives Society, and is a frequent speaker on issues related to IP, valuation, and damages assessment. He has also taught courses in microeconomics and econometrics at the University of Maryland.

## EDUCATION

1998          Ph.D., economics, University of Maryland
              *Specialization: applied microeconomics, econometrics*

1990          B.A., economics (*summa cum laude*), Pepperdine University

## CERTIFICATIONS

2008          Certified Licensing Professional (CLP), Licensing Executive Society

## PROFESSIONAL EXPERIENCE

1998–Present   Analysis Group, Inc.

1998           Penta Advisory Services LLC

1997           Hickling Lewis Brod, Inc

1995–1997      Department of Economics, University of Maryland
               *Instructor and Research Assistant*

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

*Robert L. Vigil, Ph.D., page 2 of 17*

## EXPERT TESTIMONY

- ***Pedro Martin and Magala Martin v. Wave Neuroscience, Inc.***
  *JAMS Reference # 1200059206*
  Breach of Contract: deposition testimony and expert report regarding the amount of royalties that should have been paid to Wave Neuroscience, Inc. under certain assumptions, issues related to whether and when the Martins "recovered" their initial investment, and the extent of lost profit damages suffered by the Martins due to Wave Neuroscience, Inc.'s alleged breach of contract.

- ***Proslide Technology Inc. v. Whitewater West Industries, Ltd.***
  *US District Court, Middle District of Florida, Orlando Division (Case No. 6:20-cv-02189-CEM-DCI)*
  Patent Infringement: deposition testimony and expert report regarding the reasonable royalty damages related to the alleged infringement of patents involving water slide technologies and the total profits related to the article of manufacture involving design patents involving water slide features.

- ***Advanced Magnesium Alloys Corporation d/b/a AMACOR v. Alain Dery, Alliance Magnesium Inc., and Wogen Resources America, LLC***
  *US District Court, Southern District of Indiana (Case No. 1:20-cv-02247-RLY-MJD)*
  Breach and Aiding and Abetting of Breach of Fiduciary Duties and Trade Secret Misappropriation: deposition testimony and expert report regarding the monetary relief related to Defendants' actions.

- ***JF Enterprises, Inc. v. King & Spalding, LLP, David J. Farber, Esq., and Seth H. Lundy, Esq.***
  *Superior Court for the District of Columbia, Civil Division (Case No. 2022 CA 001071 M)*
  Legal Malpractice: expert report regarding the damages associated with advice allegedly given related to the diabetic footwear market.

- ***C.H., et al. v. United States***
  *US District Court, District of Maryland (Case No. 8:20-cv-03249-TDC-TJS)*
  Medical Negligence/Lack of Informed Consent: expert report regarding the present value of C.H.'s alleged loss of earning capacity and potential future life care expenses.

- ***Advantest America, Inc., et al. v. Samer Kabbani, et al., et al.***
  *JAMS Reference # 1200057839*
  Breach and Aiding and Abetting of Breach of Fiduciary Duties, Breach and Aiding and Abetting of Breach of Duty of Loyalty, Breach of and Interference with Contract(s), and Unjust Enrichment: deposition testimony and expert report regarding the damages suffered by Claimants and unjust enrichment received by Respondents.

- ***Close It! Title Services, Inc., et al. v. Michael S. Nadel, et al.***
  *Superior Court for the District of Columbia, Civil Division (Case No. 2018-CA-005391B)*
  Tortious Interference With Business Relations: deposition testimony and expert report regarding the damages related to Defendants' alleged tortious interference involving public statements allegedly made by Michael S. Nadel.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

*Robert L. Vigil, Ph.D., page 3 of 17*

- **Open Text Corporation and Open Text, Inc. v. SAS C6**
  *Commonwealth of Massachusetts, Superior Court Department of the Trial Court, Suffolk, SS. (Case No. 2084-CV-02578-BLS1)*
  Breach of Contract and Breach of Covenant of Good Faith and Fair Dealing: expert report regarding the damages related to the alleged breach of contract and breach of the implied covenant of good faith and fair dealing by SAS C6.

- **GalaxE.Solutions, Inc. v. Suresh Pande**
  *US District Court, Southern District of New York (Case No. 1:19-cv-04784)*
  Trade Secret Misappropriation and Breach of Contract: expert report regarding the damages related to the alleged misappropriation of trade secrets related to GalaxE's IT business and the breach of a confidentiality agreement between the parties.

- **Chewy, Inc. v. International Business Machines Corporation**
  *US District Court, Southern District of New York (Case No. 1:21-cv-01319-JSR)*
  Patent Infringement: deposition testimony and expert report regarding the reasonable royalty damages related to the alleged infringement of patents involving features and functionalities related to Chewy's website and mobile applications.

- **RFCyber Corp. v. Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.**
  *US District Court, Eastern District of Texas, Marshall Division (Case No. 2:20-cv-00335-JRG)*
  Patent Infringement: deposition testimony and expert report regarding the reasonable royalty damages related to the alleged infringement of patents related to providing, personalizing, and funding of a secure e-purse for conducting e- and m-commerce.

- **TIGI Linea Corp., f/k/a TIGI Linea, L.P. v. Professional Products Group, LLC**
  *US District Court, Eastern District of Texas, Sherman Division (Lead Case No. 4:19-cv-00840; Consolidated Case No. 4:20-cv-87)*
  Fraud, Aiding and Abetting Breach of Fiduciary Duty; Conspiracy, Breach of Contract: deposition testimony and expert report regarding lost profits due to alleged breach of contract and fraudulent conduct, and disgorgement of profits from alleged fraud, aiding and abetting breach of fiduciary duty, and conspiracy.

- **Edwards Lifesciences Corporation et al. v. Meril Life Sciences Pvt. Ltd. and Meril, Inc.**
  *US District Court, Northern District of California, Oakland Division (Case No. 4:19-cv-06593-HSG)*
  Trademark Infringement and Unfair Competition: deposition testimony and expert report regarding the damages related to the alleged trademark infringement and allegedly false and misleading statements regarding a transcatheter heart valve product.

- **L.H. et al. v. United States**
  *US District Court, Southern District of Florida (Case No. 2:19-cv-14449-KMM)*
  Medical Malpractice/Negligence: deposition testimony and expert report regarding the present value of L.H.'s alleged loss of earning capacity and potential future life care expenses.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

*Robert L. Vigil, Ph.D., page 4 of 17*

- **_Uniloc 2017 LLC v. Samsung Electronics America, Inc. and Samsung Electronics Co., Ltd._**
  *US District Court, Eastern District of Texas (Case No. 2:18-cv-00508-JRG)*
  Patent Infringement: deposition testimony and expert report regarding the reasonable royalty damages related to the alleged infringement of a patent related to anti-theft protection for a radiotelephony device.

- **_Uniloc 2017 LLC v. Samsung Electronics America, Inc. and Samsung Electronics Co., Ltd._**
  *US District Court, Eastern District of Texas (Case No. 2:18-cv-00506-JRG)*
  Patent Infringement: deposition testimony and expert report regarding the reasonable royalty damages related to the alleged infringement of a patent related to decoding and displaying the important region of video content where there is a discrepancy in the source and display format's aspect ratios.

- **_Adapt Pharma Operations Limited, et al. v. Teva Pharmaceuticals USA, Inc. et al._**
  *US District Court, District of New Jersey (Case No. 16-7721 (JLL) (JAD)*
  Patent Infringement: deposition and trial testimony regarding the commercial success of an invention directed to single-use, pre-primed devices adapted for nasal delivery of naloxone; formulations for intranasal administration of naloxone; and methods of treating opioid overdose and symptoms by nasally administering naloxone using those methods and devices to a patient in need thereof a therapeutically effective amount of an opioid antagonist, wherein the therapeutically effective amount is equivalent to about 2 mg to about 12 mg of naloxone hydrochloride.

- **_IQE plc v. Solar Junction Corporation_**
  *London Court of International Arbitration (Arbitration No. 183861)*
  Trade Secret Misappropriation, Breach of Contract: arbitration testimony and expert report regarding the actual harm, unjust enrichment, and reasonable royalty damages relating to the trade secret misappropriation and breach of contract involving technology used to manufacture semiconductors for solar cells.

- **_In re: Premera Blue Cross Customer Data Security Breach Litigation_**
  *US District Court, District of Oregon (Case No. 3:15-md-2633-SI)*
  Class action: declaration regarding the value to the class members of the injunctive relief agreed to in the settlement agreement and the value to the class members of the additional data security practices implemented from 2015 to 2018.

- **_Uniloc USA, Inc., Uniloc Luxembourg, S.A., and Uniloc 2017 LLC v. Samsung Electronics America, Inc. and Samsung Electronics Co., Ltd._**
  *US District Court, Eastern District of Texas (Case No. 2:18-cv-00044-JRG-RSP)*
  Patent Infringement: deposition testimony and expert report regarding the reasonable royalty damages related to the alleged infringement of a patent related to the HSUPA portion of the HSPA and HSPA+ wireless communication standards.

- **_Uniloc USA, Inc., Uniloc Luxembourg, S.A., and Uniloc 2017 LLC v. Samsung Electronics America, Inc. and Samsung Electronics Co., Ltd._**
  *US District Court, Eastern District of Texas (Case No. 2:18-cv-00042-JRG-RSP)*
  Patent Infringement: deposition testimony and expert report regarding the reasonable royalty damages

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

related to the alleged infringement of a patent related to the LTE standard.

- ***Ethicon LLC, Ethicon Endo-Surgery, Inc., and Ethicon US LLC v. Intuitive Surgical, Inc., Intuitive Surgical Operations, Inc., and Intuitive Surgical Holdings, LLC***
  *US District Court, District of Delaware (Case No. 1:17-cv-871-LPS-CJB)*
  Patent Infringement: expert report regarding the lost profits and reasonable royalty damages related to the alleged infringement of patents related to stapling and surgical technologies.

- ***Uniloc USA, Inc., et al. v. Samsung Electronics America, Inc., et al.***
  *US District Court, Eastern District of Texas (Case No. 2:17-cv-00651-JRG)*
  Patent Infringement: deposition testimony and expert report regarding the reasonable royalty damages related to the alleged infringement of a patent related to a step counter that more accurately calculates the calorie expenditure of someone walking.

- ***ADP, LLC v John Halpin***
  *US District Court, District of New Jersey (Case No. 2:16-cv-01111)*
  Breach of Contract, Breach of Duty of Loyalty, Unfair Competition: deposition testimony and expert report regarding revenue and profit projections and present value calculations for certain ADP clients for the specified period beyond that at which these clients terminated business with ADP.

- ***ADP, LLC v Jordan Lynch***
  *US District Court, District of New Jersey (Case No. 2:16-cv-01053)*
  Breach of Contract, Breach of Duty of Loyalty, Unfair Competition: deposition testimony and expert report regarding revenue and profit projections and present value calculations for certain ADP clients for the specified period beyond that at which these clients terminated business with ADP.

- ***ADP, LLC v Jessica Trohaugh***
  *US District Court, District of New Jersey (Case No. 2:17-cv-00284-CCC-JBC)*
  Breach of Contract, Breach of Duty of Loyalty, Unfair Competition: deposition testimony and expert report regarding revenue and profit projections and present value calculations for certain ADP clients for the specified period beyond that at which these clients terminated business with ADP.

- ***Legal Technology Group, Inc. v. Rajiv Mukerji and HBR Consulting LLC***
  *US District Court, District of Columbia (Case No. 1:17-CV-631)*
  Breach of Contract, Tortious Interference: deposition testimony and expert report regarding the lost profits damages related to lost contracts and a diminished head start period.

- ***Whitewater West Industries, Ltd. v. Richard Alleshouse, Yong Yeh, and Pacific Surf Designs, Inc.***
  *US District Court, Southern District of California (Case No. 3:17-CV-00501-DMS-NLS)*
  Breach of Contract, Intentional Interference with Contract, Violation of Cal. Bus. & Prof. § 17200, *et seq.*: deposition and trial testimony and expert report regarding the reasonable royalty damages related to water ride attractions and nozzle systems used in water ride attractions.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

*Robert L. Vigil, Ph.D., page 6 of 17*

- ▪ ***Whitewater West Industries, Ltd. v. Pacific Surf Designs, Inc.***
  *US District Court, Southern District of California (Case No. 3:17-CV-01118-WQH-BGS)*
  Patent Infringement: deposition and trial testimony and expert report regarding the reasonable
  royalty damages related to the alleged infringement of a patent related to a simulated wave water ride
  attraction having one or more flexible nozzle covers for ensuring the safety of riders and lowering
  the risk of interference with the ride operation.

- ▪ ***Cipla Ltd., v. Sunovion Pharmaceuticals Inc.***
  *US District Court, District of Delaware (Case No. 1:15-CV-00424-LPS)*
  Patent Infringement: deposition testimony and expert report regarding the reasonable royalty damages
  involving a patent related to a method of making optically pure (R) and (S) salbutamol.

- ▪ ***Sabre GLBL, Inc., v. Melody Shan, aka Shan Melody Xiaoyun***
  *JAMS Reference # 1310022477*
  Trade Secret Misappropriation/Confidential Information, Tortious Interference, Raiding, Breach of
  Contract, Unfair Competition, and Breach of Duty of Loyalty: arbitration testimony and expert report
  regarding the head-start damages related to various causes of action involving companies providing
  software technology products and solutions to airlines, airports, hoteliers, and other travel suppliers.

- ▪ ***EHS Lens Philippines, Inc. v. Essilor International, et al.***
  *US District Court, Eastern District of Virginia (Case No. 3:16-CV-563-JAG)*
  Patent Infringement: expert report regarding the reasonable royalty damages involving a patent
  related to backside progressive lenses with correction for eye astigmatism.

- ▪ ***Heraeus Medical GmbH v. Esschem, Inc.***
  *US District Court, Eastern District of Pennsylvania (Case No. 2:14-CV-05169-CMR)*
  Trade Secret Misappropriation: deposition testimony and expert report regarding the damages related
  to the alleged misappropriation of trade secrets related to aspects of copolymers used in the
  manufacture of bone cement.

- ▪ ***The Medicines Company v. Biogen MA Inc.***
  *US District Court, District of New Jersey (Case No. 2:15-CV-07031-MCA-LDW)*
  Breach of Contract: deposition testimony and expert report regarding the alleged failure to pay
  royalties under a license agreement and the alleged breach of good faith and fair dealing under a
  license agreement.

- ▪ ***Flowrider Surf, Ltd. and Surf Waves, Ltd. v. Pacific Surf Designs, Inc.***
  *US District Court, Southern District of California (Case No. 3:15-CV-01879-AJB-BLM)*
  Patent Infringement: expert report regarding the lost profits damages related to the alleged
  infringement of a patent related to a simulated wave water ride attraction having one or more flexible
  nozzle covers for ensuring the safety of riders and lowering the risk of interference with the ride
  operation.

- ▪ ***Casper Sleep, Inc. v. Jack Mitcham and Mattress Nerd LLC***
  *US District Court, Southern District of New York (Case No. 1:16-CV-03224-JSR)*
  Lanham Act and Section 349 of the New York General Business Law: expert report regarding the
  impact of alleged misconduct by Jack Mitcham and Mattress Nerd LLC on consumer behavior and
  the monetary relief that may be owed to Casper.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

- **Centrak, Inc. v. Sonitor Technologies, Inc.**
  *US District Court, District of Delaware (Case No. 1:14-CV-00183-RGA)*
  Patent Infringement: deposition testimony and expert report regarding the reasonable royalty damages involving a patent related to real time location systems used in hospitals and other health care environments.

- **Mobile Telecommunications Technologies, LLC v. Samsung Electronics Co., Ltd., et al.**
  *US District Court, Eastern District of Texas, Marshall Division (Case No. 2:15-CV-00183-JRG-RSP)*
  Patent Infringement: deposition testimony and expert report regarding the reasonable royalty damages involving patents related to functionalities used in smartphones, tablets, TVs, laptops, washers, dryers, and other consumer electronics products.

- **DR Distributors, LLC and CB Distributors, Inc. v. 21 Century Smoking, Inc. and Brent Duke** *US District Court, Northern District of Illinois (Case No. 3:12-CV-50324)*
  Trademark Infringement: deposition testimony and expert report regarding the market penetration of trademarks related to certain brands of electronic cigarettes.

- **Brian Friedman v. Five Guys Enterprises, LLC**
  *Circuit Court for Fairfax County Virginia, Civil Division (Case No. 2014-12272)*
  Tortious Interference: deposition and trial testimony and expert report regarding the lost profits damages resulting from the tortious interference involving four Five Guys franchises.

- **Mobile Telecommunications Technologies, LLC v. Amazon.com, Inc.**
  *US District Court, Eastern District of Texas, Marshall Division (Case No. 2:13-CV-00883-JRG-RSP)*
  Patent Infringement: deposition testimony and expert report regarding the reasonable royalty damages involving patents related to functionalities used in smartphones and tablets.

- **Mobile Telecommunications Technologies, LLC v. Samsung Telecommunications America, LLC**
  *US District Court, Eastern District of Texas, Marshall Division (Case No. 2:13-CV-259-JRG-RSP)*
  Patent Infringement: deposition and trial testimony and expert report regarding the reasonable royalty damages involving patents related to functionalities used in smartphones and tablets.

- **US Ethernet Innovations, LLC v. Acer, Inc., et al.**
  *US District Court, Northern District of California, Oakland Division (Case Nos. 4:10-CV-03724 (CW)(LB) and 4:10-CV-05254 (CW)(LB))*
  Patent Infringement: expert report regarding the reasonable royalty damages involving patents covering certain Ethernet controller chipsets.

- **E.J. Brooks Company d/b/a TydenBrooks v. Cambridge Security Seals, et al.**
  *US District Court, Southern District of New York (Case No. 12-CIV-2937 (KMK))*
  Trade Secret Misappropriation, False Advertising, Unfair and Deceptive Business Practices, Unfair Competition, and Unjust Enrichment: deposition and trial testimony and expert report regarding the lost profits damages and disgorgement of unjust gains from alleged violations of the Lanham Act and New York statutory and common law.

- **Alpine Armoring Inc. v. Streit Manufacturing, Inc., et al.**
  *US District Court, Eastern District of Virginia (Case No. 1:14-CV-00197 (AJT/IDD))*

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

*Robert L. Vigil, Ph.D., page 8 of 17*

Breach of Contract and Tortious Interference: deposition testimony and expert report regarding the lost profits damages resulting from the breach of an exclusive marketing agreement and customer supply agreement, and tortious interference with existing business relationships.

- ***Federal Trade Commission v. I Works, Inc., et al.***
  *US District Court, District of Nevada (Case No. 2:10-CV-2203-MMD-GWF)*
  Violations of Federal Trade Commission Act, Electronic Fund Transfer Act, and Regulation E: deposition testimony and expert report regarding economic analysis of factors that may be relevant to liability and equitable relief.

- ***AbbVie Inc. and Wisconsin Alumni Research Foundation v. Hospira, Inc.***
  *US District Court, District of Delaware (Case No. 11-648-GMS)*
  Patent Infringement: deposition testimony and expert report regarding the commercial success of an invention that covers the use of paricalcitol to treat patients with renal osteodystrophy while avoiding hyperphosphatemia, and an invention directed to pharmaceutical formulations for vitamin D derivatives, such as paricalcitol, that are soluble and have self-preservative effectiveness against microorganisms.

- ***Rockwell Automation, Inc. and Rockwell Automation Technologies, Inc. v. WAGO Corporation and WAGO Kontakttechnik GmbH & Co. KG***
  *US District Court, Western District of Wisconsin (Case No. 10-CV-718)*
  Patent Infringement: trial and deposition testimony and expert report regarding the damages-related issues related to industrial controllers.

- ***Newire, Inc. v. Southwire Company***
  *Chancery Court for the State of Tennessee, 18th Judicial District (Case No. 2011C-21)*
  Breach of Contract: trial and deposition testimony and expert report regarding the lost royalties resulting from failure to use best efforts to commercialize and maximize revenues derived from the use of patented wiring technology.

- ***McLane Foodservice, Inc. v. Ready Pac Produce, Inc. and Tanimura & Antle, Inc.***
  *US District Court, District of New Jersey (Case No. 10-06076 (RMB) (JS))*
  Breach of Contract and Breach of Warranties: expert report regarding the lost profits damages resulting from the presence of produce contaminated with Escherichia coli 0157:H7 bacteria in the Taco Bell supply chain and in meals served at certain Taco Bell restaurants.

- ***Astellas US LLC and Astellas Pharma Inc. v. Nycomed U.S., Inc.***
  *US District Court, District of New Jersey (Case No. 10-5599 (WJM/MF))*
  Patent Infringement: deposition testimony and expert report regarding the commercial success of an invention that covers the use of a product for the treatment of atopic dermatitis.

- ***Model Model Hair Fashion Inc. v. Beauty Plus Trading Co., et al.***
  *US District Court, District of New Jersey (Case No. 09-4856 (ES))*
  Trademark Infringement: expert report regarding the market penetration of trademarks related to wigs, hair weaves, and pony tail products, and unjust enrichment and reasonable royalty damages resulting from the infringement of the MODEL MODEL trademark.

- ***Stryker Spine v. Surgical Orthomedics, Inc., et al.***

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

*American Arbitration Association (Case No. 18-193-Y-01337-09 01)*
Breach of Contract, Trade Secret Misappropriation, and Unfair Competition: arbitration and deposition testimony and expert report regarding the lost profits damages resulting from the breach of non-compete and confidentiality agreements related to sale of spinal implant products.

- ***Stryker Orthopaedics v. Scott Nizolek***
  *US District Court, District of New Jersey (Case No. 09-3469 (WJM)(MF))*
  Breach of Contract: deposition testimony and expert report regarding the lost profits damages resulting from breach of non-compete and confidentiality agreements related to the sale of hip and knee implants.

- ***In the Matter of Certain Ground Fault Circuit Interrupters and Products Containing Same***
  *US International Trade Commission (Investigation No. 337-TA-739)*
  Patent Infringement: trial and deposition testimony and expert report regarding the scope of an exclusion order and the appropriate amount of bond in section 337 case involving ground fault circuit interrupter technology.

- ***British Telecommunications plc, et al. v. Haier America Trading, L.L.C., et al.***
  *US District Court, Southern District of New York (Case No. 09-CV 7114 WGY)*
  Patent Infringement: deposition testimony and expert report regarding the reasonable royalty damages related to digital television sets, digital TV/DVD combination products, DVD players, and Blu-ray disc players using MPEG-2 and ATSC technology.

- ***Oberon Company v. Paulson Manufacturing Corp.***
  *US District Court, District of Massachusetts (Case No. 06-11210 WGY)*
  Patent Infringement, False Advertising, and Unfair Competition: expert report regarding the lost profits and reasonable royalty damages related to electric arc face shield products.

- ***BestSweet, Inc. v. NTI Holdings Corp.***
  *US District Court, Eastern District of Virginia, Alexandria Division (Case No. 1:09-CV-942 (LO/TCB)*
  Patent Infringement, Trade Secret Misappropriation, and Breach of Contract: expert report regarding the reasonable royalty damages, unjust enrichment, and lost royalties related to soft-chew nutraceuticals.

- ***Herman Minkin and H&M Aeronaut Tool Co., Inc. v. Gibbons P.C.***
  *US District Court, District of New Jersey (Case No. 2:08-CV-02451-WJM-CCC)*
  Legal Malpractice: expert report regarding the lost profits related to extended reach pliers.

- ***Pegasus Imaging Corporation v. Allscripts Healthcare Solutions, Inc. and Allscripts, LLC***
  *US District Court, Middle District of Florida (Case No. 8:08-CV-1770-T-30 EAJ)*
  Breach of Contract, Copyright Infringement, Trade Secret Misappropriation, Unfair Trade Practices, and Lanham Act Violation: arbitration and deposition testimony and expert report regarding the lost licensing fees and unjust enrichment related to barcoding software.

- ***Asymmetrx, Inc. and President and Fellows of Harvard College v. Dako Denmark A/S and Dako North America, Inc.***
  *US District Court, District of Massachusetts (Case No. 1:09-CV-10396)*

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

*Robert L. Vigil, Ph.D., page 10 of 17*

Patent Infringement: expert report regarding the lost profits and reasonable royalty damages involving patents covering prostate cancer diagnostic test.

- ***Ultratech International, Inc. and Aqua-Leisure Industries, Inc. v. Swimways Corporation***
  *US District Court, Middle District of Florida, Jacksonville Division (Case No. 3:05-CV-00134-HLA-MCR)*
  Patent Infringement: expert report regarding the reasonable royalty damages involving patents covering pop-up pools.

- ***Taltwell, LLC v. Zonet USA Corp.***
  *US District Court, Eastern District of Virginia, Alexandria Division (Case No. 3:07-CV-00543-REP)*
  Patent Infringement: expert report regarding the reasonable royalty damages involving patents covering fax/modems and adapter cards.

- ***Nissim Corp. v. Time Warner Inc. et al.***
  *US District Court, Southern District of Florida (Case No. 07-20624-CIV-Cooke/Brown)*
  Patent Infringement: expert report regarding the reasonable royalty damages involving patents covering seamless play and user operation control capabilities contained within DVDs.

- ***Newspring Industrial Corporation v. Empire Industrial Corporation et al.***
  *US District Court, District of New Jersey (Case No. 04-3435 (FSH)(PS))*
  Patent Infringement: expert report regarding the reasonable royalty damages involving patents covering the design of plastic containers and the technology related to a sealing device embodied in plastic containers.

- ***Aastra Technologies Limited, et al. v. CD Connect, Inc., et al.***
  *US District Court, Eastern District of Texas (Case No. 4:03CV343)*
  Trade Secret Misappropriation: expert report regarding the lost profits and unjust enrichment damages resulting from the use of trade secrets related to customer contacts, contract expiration dates, and pricing information.

- ***Cook Biotech Incorporated, et al. v. Acell, Incorporated, et al.***
  *US District Court, Northern District of Indiana (Case No. 4:03CV0046(AS))*
  Breach of Contract: expert report regarding the underpayment of royalties to inventors of extracellular matrix materials technology from Purdue Research Foundation.

- ***Intelli-Check, Inc. v. Tricom Card Technologies, Inc., et al.***
  *US District Court, Eastern District of New York (Case No. 03-3706 LDW ETB)*
  Patent Infringement: expert report regarding the reasonable royalty damages involving patents covering age verification and document authentication device and software.

- ***High Concrete Structures, Inc. v. New Enterprise Stone & Lime Co., Inc., et al.***
  *US District Court, Eastern District of Pennsylvania (Case No. 02-CV-86)*
  Patent Infringement: expert report regarding the reasonable royalty damages involving patent covering tilt frame device for transporting large precast concrete structures.

- ***Medtronic Sofamor Danek, Inc., et al. v. Osteotech***
  *US District Court, Western Division of Tennessee (Case No. 99-2656-GV)*

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

*Robert L. Vigil, Ph.D., page 11 of 17*

Patent Infringement: affidavit involving discovery-related issues in case involving patents covering the instruments and method of inserting a spinal inter-body fusion device.

## SELECTED CONSULTING EXPERIENCE (LITIGATION)

- <u>False Advertising</u>: lost profits related to false advertising in the medical apparel industry.

- <u>Patent Infringement</u>: reasonable royalty damages in a case involving patents directed to light-emitting diodes.

- <u>Patent Infringement</u>: analysis of patent pool compliance with fair, reasonable, and non-discriminatory (FRAND) commitments and determination of FRAND-compliant royalties involving patents directed to the transmission and storage of digital audio files.

- <u>Patent Infringement</u>: reasonable royalty damages in a case involving patents related to a process for producing semiconductor epitaxial films.

- <u>Patent Infringement</u>: reasonable royalty damages in a case involving patents related to components of hard disk drives.

- <u>False Advertising</u>: lost profits resulting from false advertising of products in the cosmetics industry.

- <u>Patent Infringement</u>: reasonable royalty damages in a case involving patents related to electrochemoluminescent detection technology used in immunoassay test equipment and assays.

- <u>Patent Infringement</u>: regression analysis related to the value of increased processor speed in smartphones and tablet devices.

- <u>Patent Infringement</u>: analysis of conjoint and usage surveys related to the market value of certain smartphone and tablet features contained in Google Play Books, Google Play Music, and Google Play Movies functionalities.

- <u>Patent Infringement</u>: reasonable royalty damages in a case involving patents related to perfluorelastomeric seals used in semiconductor fabrication applications.

- <u>Trademark Infringement/False Advertising</u>: lost profits and disgorgement related to trademark infringement and false advertising involving products in the sports apparel industry.

- <u>Patent Infringement</u>: analysis of a conjoint survey related to the market value of certain smartphone and tablet features contained in Google's cloud messaging service.

- <u>Patent Infringement</u>: analysis of a conjoint survey related to the market value of certain smartphone and tablet features.

- <u>Patent Infringement</u>: reasonable royalty damages in a case involving telecommunications network technology.

- <u>False Advertising</u>: lost profits related to false advertising in the food industry.

- <u>Patent Infringement</u>: commercial success involving patents directed to the treatment of menorrhagia.

- <u>Patent Infringement</u>: preliminary injunctive relief involving patents directed to dietary calcium

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

*Robert L. Vigil, Ph.D., page 12 of 17*

supplements.

- <u>Trademark Infringement/False Advertising</u>: lost profits from trademark infringement and false advertising in the health supplement industry.

- <u>Patent Infringement</u>: reasonable royalty and prejudgment interest involving patents directed to automotive engines.

- <u>Patent Infringement</u>: reasonable royalty and prejudgment interest involving patents directed to automotive navigation systems.

- <u>Patent Infringement</u>: lost profits, reasonable royalty, and prejudgment interest involving patents directed to DNA amplification and sequencing technology.

- <u>Patent Infringement</u>: reasonable royalty and prejudgment interest involving patents directed to power management, bus configuration, and card slot technology in laptops and desktops.

- <u>Patent Infringement and Breach of Contract</u>: lost profits, lost royalties, reasonable royalty, and commercial success involving a patent and contract directed to software and hardware products, and technologies that provide connectivity and centralized management of IT infrastructure through KVM switches.

- <u>Patent Infringement</u>: commercial success involving a patent directed to the treatment of dermatological disorders.

- <u>Trade Secret Misappropriation</u>: unjust enrichment involving the misappropriation of trade secrets directed to aramid fiber production.

- <u>Patent Infringement</u>: reasonable royalty and prejudgment interest involving a patent directed to rental matching systems over the internet.

- <u>Patent Infringement</u>: reasonable royalty and prejudgment interest involving a patent directed to hard disk drive technology.

- <u>Patent Infringement</u>: commercial success covering a patent directed to the treatment of spasticity.

- <u>Patent Infringement</u>: commercial success covering patents directed to the treatment of HDL cholesterol and hypertriglyceridemia.

- <u>Patent Infringement</u>: reasonable royalty and prejudgment interest involving a patent directed to hemophilia treatment.

- <u>Patent Infringement</u>: reasonable royalty and prejudgment interest involving a patent directed to a type of debit card program.

- <u>Patent Infringement</u>: reasonable royalty and prejudgment interest involving a patent directed to genetically modified corn.

- <u>Patent Infringement</u>: commercial success covering a patent directed to the treatment of depression, anxiety, and pain.

- <u>Patent Infringement</u>: reasonable royalty involving a patent directed to a method for a health care provider and a patient to communicate automatically and electronically with each other over the internet.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

*Robert L. Vigil, Ph.D., page 13 of 17*

- <u>Misappropriation of Trade Secrets</u>: unjust enrichment involving the misappropriation of trade secrets directed to loss prevention systems.

- <u>Patent Infringement</u>: reasonable royalty and prejudgment interest involving a patent directed to automotive entertainment systems.

- <u>Patent Infringement</u>: lost profits, reasonable royalty, and prejudgment interest involving a patent directed to hip implant technology.

- <u>Trade Secret Misappropriation</u>: reasonable royalty involving misappropriation of trade secrets directed to fingerprint identification technology.

- <u>Patent Infringement</u>: commercial success of valacyclovir hydrochloride.

- <u>Patent Infringement</u>: reasonable royalty and prejudgment interest involving a patent directed to implantable tissue expanders.

- <u>Patent Infringement</u>: reasonable royalty and prejudgment interest involving a patent directed to a process for aging aluminum lithium alloys used for space shuttle external tanks.

- <u>Patent Infringement</u>: reasonable royalty and prejudgment interest involving patents directed to cores, intermediate layers, and covers of golf balls.

- <u>Patent Infringement</u>: domestic industry, scope of exclusion order, and appropriate amount of bond to be set for products covered by an exclusion order during the Presidential review period in a Section 337 case involving NAND and NOR flash memory products.

- <u>Patent Infringement</u>: commercial success covering a patent directed to the active ingredient of an anti-infective drug.

- <u>Patent Infringement</u>: lost profits and prejudgment interest involving a patent directed to AC to DC power converter circuits used for backlights.

- <u>Breach of Contract</u>: analysis of damages arising from claims of fraud and breach of contract in a case involving a pharmaceutical product.

- <u>Patent Infringement</u>: reasonable royalty involving patents directed to genetically modified corn seed.

- <u>Patent Infringement</u>: lost profits, reasonable royalty, and prejudgment interest involving patents directed to a system and method for distributing lottery tickets.

- <u>Patent Infringement</u>: commercial success covering a patent directed to the active ingredient of an anti-infective drug (levofloxacin).

- <u>Trade Secret Misappropriation</u>: damages and profits associated with trade secrets directed to a luxury hotel and automotive partnership.

- <u>Patent Infringement</u>: commercial success involving a patent directed to the treatment of ulcerative colitis.

- <u>Patent Infringement</u>: reasonable royalty and prejudgment interest involving a patent directed to audio playback for portable electronic devices.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

*Robert L. Vigil, Ph.D., page 14 of 17*

- <u>Patent Infringement</u>: lost profits, reasonable royalty, and prejudgment interest involving a patent directed to snap-fit external fixation systems.

- <u>Breach of Contract</u>: damages and profits associated with alleged contractual breaches, tortious interference, and intentional negligent representations involving spinal implants.

- <u>Breach of Contract</u>: lost profits associated with alleged contractual breach and tortious interference, as well as irreparable harm inquiry, involving a strategic alliance to provide electronic chemicals, gases, and services to the semiconductor industry.

- <u>Patent Infringement</u>: lost profits, price erosion, reasonable royalty, and prejudgment interest involving a patent directed to mass spectrometer ionization sources.

- <u>Patent Infringement</u>: lost profits, reasonable royalty, price erosion, and prejudgment interest involving a patent directed to porcine vaccine (PRRS) products.

- <u>Patent Infringement</u>: reasonable royalty involving patents covering computer video and audio software.

- <u>Breach of Contract</u>: damages and profits associated with alleged breach of contract and various tort claims involving electrochemoluminescent detection technology used in immunoassay and DNA probe assay kits.

- <u>Patent Infringement</u>: lost profits, reasonable royalty, and prejudgment interest involving patents covering the instruments and method of inserting a spinal inter-body fusion device.

- <u>Patent Infringement</u>: lost profits, reasonable royalty, and prejudgment interest involving a patent directed to a device and method for optically detecting particles in fluid.

- <u>Patent Infringement</u>: measure and amount of prejudgment interest in a patent infringement, fraud, and unjust enrichment case covering prenatal vitamin formulations.

- <u>Patent Infringement:</u> reasonable royalty and prejudgment interest covering patents directed to telecommunications technology (ATM over SONET networks).

- <u>Patent Infringement</u>: lost profits, reasonable royalty, and prejudgment interest involving a patent directed to zipper closure mechanisms for home storage bags.

- <u>Patent Infringement</u>: lost profits, reasonable royalty, and prejudgment interest covering a patent directed to digital time stamping.

- <u>Patent Infringement</u>: reasonable royalty covering a patent directed to semi-synthetic processes for manufacturing an anti-cancer drug.

- <u>Patent Infringement</u>: lost profits and prejudgment interest involving patents directed to spinal implant devices.

- <u>Patent Infringement</u>: reasonable royalty and prejudgment interest involving a patent directed to data sorting software.

**SELECTED CONSULTING EXPERIENCE (NON-LITIGATION)**

- Valuation of a patent related to semiconductor technology.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

*Robert L. Vigil, Ph.D., page 15 of 17*

- Valuation of a patent related to telecommunications technology.

- Valuation of a patent related to smartphone and tablet feature.

- Valuation of patent related to a pharmaceutical drug to treat cardiac disease.

- Valuation of patent related to a pharmaceutical drug to treat mental illness.

- Valuation of patent related to ophthalmic digital surfacing machines.

- Valuation of a patent related to a drug delivery system used in topical non-steroidal anti-inflammatory drugs (NSAIDs).

- Valuation of clinical trial data and patent applications related to pain management pharmaceutical therapy.

- Valuation and licensing patents of high-index optical lens technology.

- Valuation and licensing of remote patient-monitoring technology.

- Valuation and licensing of consumer product technology (portable heat-generating device).

- Valuation and licensing of entertainment services technology (internet gaming).

- Valuation and licensing of consumer electronics technology (home networking device).

- Econometric demand analysis and demand and cost forecasts of ADA and SRP paratransit services in a five-county region in Pennsylvania.

- Economic impact study to evaluate direct, indirect, and induced effects of aviation activity.

- Economic model and simulation software used to forecast trip demand and cost conditions for demand response service in New York under a variety of policy scenarios.

- Economic impact study to evaluate direct, indirect, and induced effects of transit operations on the regional economy.

## ARTICLES AND PUBLICATIONS

"Preliminary Injunctive Relief in Patent Cases: Repairing Irreparable Harm," (with John Jarosz and Jorge Contreras), in *Texas Intellectual Property Law Journal* (Vol. 31 No. 1, Fall 2022).

"Prejudgment Interest: W.D. Texas Got It Right In the VSLI v. Intel Patent Suit," with John Jarosz and Joseph Maloney, *les Nouvelles*, Vol. LVII No. 3 (September 2022)

"Academia in Court: How Marketing Scholarship Informs the Law," with David Reibstein, Christopher Borek, and Suneal Bedi (2021), Impact at JMR, *Journal of Marketing Research* (July 2022)

"Determining the Price for One When All You Have is the Price for Many," with Xiao Zhang, QuickRead, National Association of Certified Valuators and Analysts (June 2022)

"Apportioning Value In Patent Portfolio License and Sale Agreements," with Xiao Zhang, *les Nouvelles*, Vol. LV No. 4 (December 2020)

"Patent Damages in US Courts: Overview of Current State of Play," with John Jarosz, Justin McLean,

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

and Carla Mulhern, *IAM Yearbook 2019: Building IP Value in the 21st Century* (2018)

"Introduction to Lost Profits," with John Jarosz and Michael Chapman, chapter in *Lost Profits Damages: Principles, Methods, and Applications* (2017)

"Assessing Commercial Success at the U.S. Patent Trial and Appeal Board," with John Jarosz, *International In-house Counsel Journal*, Vol. 8, No. 32 (2015)

"Intellectual Property/Software," chapter in *Litigation Support Report Writing* (2003)

"Demographic Trends in US Cities," with Harry Kelejian and Dennis Robinson, chapter in *Contemporary Issues in Urban and Regional Economics* (2005)

"Patent Damages," *IP Litigator*, Vol. 7, No. 1 (January 2001)

## PRESENTATIONS AND SPEAKING ENGAGEMENTS

"Calculating Intellectual Property Damages: Guidelines, Trends and Analysis," The Knowledge Group webinar (July 2018)

"Intellectual Property Valuation: What's In and Out in 2018," The Knowledge Group webinar (February 2018)

"Advanced Topics and Current Issues in Patent Damages," 2017 Patent Damages Symposium, Licensing Executives Society (February 2017)

"Licensing IP and Technology: Advancing the Concepts in 2016," The Knowledge Group webinar (March 2016)

"Changes in the Patent Landscape," International Intellectual Property Law Association Annual Congress, Dubai, UAE (January 2015)

"Patent Damages, the New 'Economic Realism' and Early Case Assessments," Hamilton, Brook, Smith & Reynolds seminar (January 2014)"Recent Federal Circuit Decisions and their Impact on IP Damages," Government Intellectual Property Law Association (April 2011)

"Overview of IP Damages in Cases Involving the U.S. Government," Government Intellectual Property Law Association (February 2011)

"False Patent Marking in the Wake of the *Forrest Group* Decision," Law Seminars International (May 2010)

"IP Damages & Injunctions," Houston Intellectual Property Law Association (August 2009)

"An Overview of IP Damages & Injunctions," San Diego Intellectual Property Law Association (April 2008)

"IP Damages, Injunctions & Recent Damages Decisions," Wisconsin Intellectual Property Law Association (February 2008)

"An Overview of IP Damages & Injunctions," Silicon Valley Intellectual Property Law Association (January 2008)

"An Overview of IP Damages & Injunctions," Rochester Intellectual Property Law Association (January

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

*Robert L. Vigil, Ph.D., page 17 of 17*

2008)

"An Overview of IP Damages & Injunctions," Pittsburgh Intellectual Property Law Association (January 2008)

"An Overview of IP Damages & Injunctions," New Jersey Intellectual Property Law Association (November 2007)

"Advanced Intellectual Property Valuation," Professional Development Series, Licensing Executives Society (June 2007)

"Risks, Rewards & Resources: Evaluating the Forces of Change in Licensing Transactions," Licensing Executives Society Winter Meeting (February 2007)

"Advanced Valuation Skills," Professional Development Series, Licensing Executives Society (November 2006)

"Implementing Valuation Methods: Discounted Cash Flow, Monte Carlo Simulation and Real Options," Licensing Executives Society Annual Meeting (September 2006)

"Intellectual Property Valuation," Intermediate Intellectual Asset Management, Professional Development Series, Licensing Executives Society (July 2006)

"Implementing Valuation Methods: Discounted Cash Flow, Monte Carlo Simulation and Real Options," Licensing Executives Society Annual Meeting (October 2005)

"Factors Affecting Royalties," with Carla Mulhern, Licensing Executives Society Annual Meeting (October 2005)

"Implementing Valuation Methods: Discounted Cash Flow, Monte Carlo Simulation and Real Options," Licensing Executives Society Annual Meeting (October 2004)

"Valuing Intellectual Property: Determining the Appropriate Royalty Rate," American Intellectual Property Law Association Spring Meeting (April 2002)

"Monte Carlo Simulation: Advantages over Traditional DCF," Licensing Executives Society Winter Meeting (February 2002)

"Industry Royalty Rates and Profitability: An Empirical Test of the 25% Rule," with Carla Mulhern and John Jarosz, Licensing Executives Society Annual Meeting (October 2001)

"Spatial Econometric Analysis of Budget Spillovers and Fiscal Policy Interdependence," University of Maryland Public Finance Seminar (1998)

**PROFESSIONAL AFFILIATIONS**

American Economic Association (AEA)

American Marketing Association (AMA)

Licensing Executives Society (LES)

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

**EXHIBIT 2**

**MATERIALS CONSIDERED**

| Bates Ranges | | |
|---|---|---|
| NIKE0000253 | – | NIKE0000275 |
| NIKE0041004 | | |
| NIKE0041171 | | |
| NIKE0041218 | – | NIKE0041226 |
| NIKE0041233 | | |
| NIKE0041262 | – | NIKE0041265 |
| NIKE0041300 | – | NIKE0041302 |
| NIKE0041350 | – | NIKE0041357 |
| STX0020994 | – | STX0021141 |
| STX0021481 | – | STX0021498 |
| STX0021868 | – | STX0021951 |
| STX0040174 | – | STX0040191 |
| STX0061163 | – | STX0061172 |
| STX0090109 | – | STX0090240 |
| STX0091819 | – | STX0091911 |
| STX0092496 | – | STX0092544 |
| STX0275792 | – | STX0276081 |
| STX0582189 | – | STX0582329 |
| STX0583757 | – | STX0583897 |
| STX0594173 | – | STX0594465 |
| STX0774395 | | |
| STX0806027 | – | STX0806054 |

<u>Case Materials and Legal Documents</u>:

Expert Rebuttal Report of Sarah Butler, *Nike, Inc. v. StockX LLC*, United States District Court for the Southern District of New York, Case 1:22-cv-00983-VEC, June 2, 2023, and Supporting Materials.

Expert Report of Catherine Tucker, *Nike, Inc. v. StockX LLC*, United States District Court for the Southern District of New York, Case 1:22-cv-00983-VEC, May 5, 2023.

Expert Report of Dejongh "Dee" Wells, *Nike, Inc. v. StockX LLC*, United States District Court for the Southern District of New York, Case 1:22-cv-00983-VEC, May 5, 2023.

Expert Report of Dr. Itamar Simonson, *Nike, Inc. v. StockX LLC*, United States District Court for the Southern District of New York, Case 1:22-cv-00983-VEC, May 5, 2023.

Expert Report of John L. Hansen, *Nike, Inc. v. StockX LLC*, United States District Court for the Southern District of New York, Case 1:22-cv-00983-VEC, May 5, 2023, and Supporting Materials.

Expert Report of Kari Kammel, *Nike, Inc. v. StockX LLC*, United States District Court for the Southern District of New York, Case 1:22-cv-00983-VEC, May 5, 2023, and Supporting Materials.

Expert Report of Robert L. Vigil, Ph.D., *Nike, Inc. v. StockX LLC*, United States District Court for the Southern District of New York, Case 1:22-cv-00983-VEC, May 5, 2023, and Supporting Materials.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

**EXHIBIT 2**

**MATERIALS CONSIDERED**


Case Materials and Legal Documents (continued):

Expert Report of Steven S. McNew, *Nike, Inc. v. StockX LLC*, United States District Court for the Southern District of New York, Case 1:22-cv-00983-VEC, May 5, 2023, and Supporting Materials.

First Amended Expert Report of John L. Hansen, *Nike, Inc. v. StockX LLC*, United States District Court for the Southern District of New York, Case 1:22-cv-00983-VEC, May 30, 2023, and Supporting Materials.

Nike's Letter Re: *Nike, Inc. v. StockX LLC*, Case No. 1:22-cv-00983-VEC (S.D.N.Y.), ECF 080, December 12, 2022.


Depositions:

Deposition of Barbara Delli Carpini, January 10, 2023.

Deposition of Brock Huber, February 22, 2023.

Deposition of Jacob Fenton and Exhibits, December 2, 2022.

Deposition of Joe Pallett and Exhibits, February 8, 2023.

Deposition of Ron Faris, December 7, 2022.

Deposition of Roy Kim, February 8, 2023.


Articles, Books, and Publications:

Case, K.E., R.C. Fair, and S.M. Oster, *Principles of Economics*, Eleventh Edition, Pearson, 2014.

Varian, H.R., *Intermediate Microeconomics: A Modern Approach*, Eighth Edition, W.W. Norton & Company, Inc., 2010.


U.S. Code

U.S. Code Title 15, Commerce and Trade, § 1117.


Websites:

"Assurance of Authenticity," GOAT, available at https://www.goat.com/verification, accessed May 29, 2023.

"Assurance of Authenticity," GOAT, May 28, 2022, available at https://web.archive.org/web/20220528135222/https://www.goat.com/verification, accessed May 29, 2023.

"Authenticity Guarantee," GOAT, December 3, 2021, available at https://web.archive.org/web/20211203145948/https://www.goat.com/verification, accessed May 29, 2023.

Cooper, D., "Alibaba Founder: Fake Goods Can Be Better Than the Real Deal," Engadget, June 15, 2016, available at https://www.engadget.com/2016-06-15-jack-ma-alibaba-discusses-counterfeit-goods.html, accessed May 18, 2023.

"Verification," StockX, available at https://stockx.com/about/verification/, accessed May 17, 2023.

Wang, A., "Inside the Delirious Rise of 'Superfake' Handbags," The New York Times, May 5, 2023, available at https://www.nytimes.com/2023/05/04/magazine/celine-chanel-gucci-superfake-handbags.html?searchResultPosition=1, accessed May 15, 2023.

"What Is the StockX Buyer Promise?" StockX, April 17, 2023, available at https://stockx.com/help/articles/What-is-The-StockX-Buyer-Promise, accessed April 18, 2023.

**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**

**EXHIBIT 2**

**MATERIALS CONSIDERED**


<u>Websites (continued)</u>:
"What Is the StockX Return Policy?" October 24, 2022, available at
    https://web.archive.org/web/20221024162628/https://stockx.com/help/articles/What-is-the-StockX-
    Return-Policy, accessed May 19, 2023.

<u>Other Materials</u>:
Conversation with StockX personnel on June 1, 2023.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**



**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**



**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**



**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



**HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY**



HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

