UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NIKE, INC.,

                Plaintiff,

        v.

STOCKX LLC,

                Defendant.

No. 22 CV 983 (VEC) (SN)

**ORAL ARGUMENT
REQUESTED**

**DEFENDANT STOCKX LLC'S MEMORANDUM OF LAW IN OPPOSITION
TO NIKE, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT .........................................................................................1

FACTUAL BACKGROUND ..............................................................................................4

I.    StockX's Resale Platform Is Built to Fight Counterfeiting. ...................................4

II.   StockX's Advertising Accurately Conveyed, and Explained, its "Guarantee" that Products Would Be "100% Authentic" or StockX Would Provide a Refund. ...................7

ARGUMENT ......................................................................................................................9

I.    After Two Years of Discovery, Nike Identified Only a Handful of Counterfeit Sneakers, Out of Tens of Millions of Nike Sneakers Sold on StockX's Platform. .............................9

    A.   Malekzadeh Did Not Confirm He Purchased the Sneakers at Issue on StockX's Platform, and Nike Cannot Otherwise Prove Chain of Custody .............10

    B.   Three of Nike's Test Purchases Have No Connection to U.S. Commerce. ..............11

II.   StockX Epitomizes Good Faith, and the Record Cannot Support a Finding that StockX Is a Willful Counterfeiter as a Matter of Law. ........................................................12

    A.   StockX Did Not Have Actual Knowledge That Any Products Were Counterfeit Before They Were Sent to Buyers. ........................................................13

    B.   StockX Did Not Recklessly Disregard the Possibility of Counterfeiting. ...............14

III.  StockX Accurately Conveyed Its Authenticity Guarantee to Consumers. .......................17

    A.   StockX's Authenticity Claims Were Not Literally False. ........................................17

    B.   The Only Record Evidence Regarding Materiality Shows the Authenticity Claims Did Not Influence Consumers' Purchasing Decisions. ...............................21

    C.   Even if Nike Were Entitled to a Presumption of Materiality, StockX Has Rebutted That Presumption with Extensive Record Evidence. ...............................24

    D.   There Is No Evidence Nike Was Injured by StockX's Advertising. ........................25

    E.   No Evidence Demonstrates Willful Falsity. ............................................................30

CONCLUSION...................................................................................................................30

# TABLE OF AUTHORITIES

## Cases

*4 Pillar Dynasty LLC v. New York & Co., Inc.*, 933 F.3d 202 (2d Cir. 2019)............................. 13

*Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412 (2023) ...................................... 11, 12

*AL Infinity, LLC v. Crown Cell, Inc.*, 2023 WL 5097979 (S.D.N.Y. Aug. 9, 2023) .............. 15, 17

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................................. 9

*Apotex Inc. v. Acorda Therapeutics, Inc.*, 2014 WL 5462547 (S.D.N.Y. Oct. 23, 2014), *aff'd*, 823 F.3d 51 (2d Cir. 2016) ....................................................................................................... 18

*Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51 (2d Cir. 2016).................................. 17, 22

*Avis Rent A Car System, Inc. v. Hertz Corp.*, 782 F.2d 381 (2d Cir. 1986)................................. 18

*BBK Tobacco & Foods, LLP v. Galaxy VI Corp.,* 408 F. Supp. 3d 508 (S.D.N.Y. 2019)........... 13

*Beastie Boys v. Monster Energy Co.*, 66 F. Supp. 3d 424 (S.D.N.Y. 2014)................................. 13

*BeautyBank, Inc. v. Harvey Prince, LLP*, 2013 WL 11327097 (S.D.N.Y. Mar. 29, 2013).... 27, 28

*C=Holdings B.V. v. Asiarim Corp.*, 992 F. Supp. 2d 223 (S.D.N.Y. 2013) ................................. 21

*Chanel, Inc. v. RealReal, Inc.*, 449 F. Supp. 3d 422 (S.D.N.Y. 2020) ........................................ 21

*Chanel, Inc. v. WGACA, LLC*, 2022 WL 902931 (S.D.N.Y. Mar. 28, 2022).............................. 12

*Chrome Hearts LLC v. Controse Inc.*, 2023 WL 5049198 (S.D.N.Y. Aug. 8, 2023) ........... 14, 30

*Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48 (2d Cir. 2016) ................................................................................................................................... 18, 22, 26

*CJ Prod. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127 (E.D.N.Y. 2011)......................... 24

*Close-Up Int'l, Inc. v. Berov*, 382 F. App'x 113 (2d Cir. 2010).................................................. 13

*Dependable Sales & Serv., Inc. v. TrueCar, Inc.*, 377 F. Supp. 3d 337 (S.D.N.Y. 2019), *on recons.*, 394 F. Supp. 3d 368 (S.D.N.Y. 2019) ...................................................................... 23

*Disney Enters., Inc. v. Sarelli*, 322 F. Supp. 3d 413 (S.D.N.Y. 2018) ........................................ 13

*Gucci Am., Inc. v. Guess?, Inc.*, 843 F. Supp. 2d 412 (S.D.N.Y. 2012)....................................... 27

*Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104 (2d Cir. 2000)........................... 27

*Iacovacci v. Brevet Holdings, LLC*, 2023 WL 2631966 (S.D.N.Y. Mar. 24, 202)........................ 6

*Innovation Ventures, LLC v. Ultimate One Distrib. Corp.,* 176 F. Supp. 3d 137 (E.D.N.Y. 2016) ........................................................................................................................................... 27

*Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186 (2d Cir. 1980)................................. 26

*Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Mgmt., Inc.*, 628 F. Supp. 2d 312 (E.D.N.Y. 2009)........................................................................................................................ 13

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) ............................ 26

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ............................ 9

*Medisim Ltd. v. BestMed LLC*, 910 F. Supp. 2d 591 (S.D.N.Y. 2012)........................................ 23

*Merck Eprova AG v. Brookstone Pharms., LLC*, 920 F. Supp. 2d 404 (S.D.N.Y. 2013)............. 29

*Merck Eprova AG v. Gnosis S.P.A.*, 2011 WL 1142929 (S.D.N.Y. Mar. 17, 2011) .............. 19, 20

*Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247 (2d Cir. 2014) ................................................ 30

*Microsoft Corp. v. My Choice Software, LLC,* 2017 WL 5643210 (C.D. Cal. Oct. 10, 2017) .... 21

*Motorola, Inc. v. Abeckaser*, 2009 WL 962809 (E.D.N.Y. Apr. 8, 2009)................................... 10

*N. Am. Olive Oil Ass'n v. Kangadis Food Inc.*, 962 F. Supp. 2d 514 (S.D.N.Y. 2013)............... 20

*Ortho Pharm. Corp. v. Cosprophar, Inc.*, 32 F.3d 690 (2d Cir. 1994)........................................ 27

*Reckitt Benckiser v. Motomco Ltd.*, 760 F.Supp.2d 446 (S.D.N.Y. 2011) ............................ 29, 30

*Reed Const. Data Inc. v. McGraw-Hill Cos., Inc.*, 49 F. Supp. 3d 385 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir. 2016) ........................................................................................... 18, 22, 24

*Rexall Sundown, Inc. v. Perrigo Co.*, 651 F. Supp. 2d 9 (E.D.N.Y. 2009) ........................ 8, 18, 19

*River Light V, L.P. v. Tanaka*, 2018 WL 5778234 (S.D. Fla. Nov. 2, 2018) .............................. 21

*Rosenshine v. A. Meshi Cosms. Indus. Ltd.,* 2023 WL 6516994 (E.D.N.Y. Oct. 4, 2023)..... 22, 23

*SimplexGrinnell LP v. Integrated Sys. & Power, Inc.*, 642 F. Supp. 2d 167 (S.D.N.Y. 2009) .... 30

*SourceOne Dental, Inc. v. Patterson Cos., Inc.,* 328 F. Supp. 3d 53 (E.D.N.Y. 2018).......... 22, 23

*Souza v. Exotic Island Enterprises*, 68 F.4th 99 (2d Cir. 2023) ................................................. 27

*Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93 (2d Cir. 2010) ......................................................... 13

*Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144 (2d Cir. 2007) .................................. 27

**Other Authorities**

*Guarantee*, Merriam-Webster (Aug. 21, 2024), https://www.merriam-
    webster.com/dictionary/guarantee ........................................................................... 8


**Treatises**

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*,
    § 27:42 (5th ed. 2019) ........................................................................................... 26

Defendant StockX LLC ("StockX") respectfully submits this memorandum of law in opposition to Plaintiff Nike, Inc.'s ("Nike's") motion for partial summary judgment.[1]

## PRELIMINARY STATEMENT

StockX is a resale marketplace founded on the core principles of trust and transparency. Unlike most other resale marketplaces, StockX reduces the risks inherent in resale by inspecting every item sold on its platform. Since its founding in 2016, StockX has invested hundreds of millions of dollars into a process for inspecting and verifying every product sold on its platform. StockX has inspected more than 55 million products, blocking millions that failed to meet StockX's standards, including more than one million suspected counterfeit sneakers.

Historically, manufacturers and resale platforms did little to proactively protect resale consumers. While manufacturers like Nike focus on creating scarcity and resale demand for their products, they offer no way for consumers to determine whether resold products are authentic. Some resale platforms used seller policies to attempt to deter fraudulent listings, like eBay (which Nike's current CEO led until 2015), but no platforms—before StockX—took proactive steps to physically inspect each product before it was sent to a buyer.

StockX changed the resale market with an innovative guarantee, the first of its kind: StockX inspects every product sold on its platform, to check that it is the right product and appears both unused and authentic, and if StockX doesn't get it right, rather than leave consumers with no protection (like Nike),[2] StockX sends a replacement or a full refund to the consumer out of its own pocket (even though the seller, not StockX, made the original sale).

---

[1] Citations to "56.1" refer to the Parties' Consolidated 56.1 filed pursuant to the Court's October 31, 2024 Order (Dkt. No. 293). Citations to "Def. MSJ" refer to ECF No. 255. Citations to "Pls. MSJ" refer to ECF No. 259.

[2] When consumers have reached out to Nike with questions about the authenticity of sneakers they purchased on StockX or other resale platforms, Nike has uniformly refused to help, telling consumers Nike was not able to authenticate products purchased on StockX or other resale platforms. *See, e.g.*, 56.1 ¶¶ 353–57. Nike did not tell these consumers, as it has asserted in this litigation, ████████████████████████████ ██████████████████████████████████████████ 56.1 ¶ 315.

StockX has invested hundreds of millions of dollars into its process, which it used to call authentication and now calls verification (the "Process").  StockX has hundreds of trained employees handling inspections using ███████████████████████████

Despite its success, StockX (and consumers) know StockX's Process is not flawless.  No process could be, because (as consumers also know) manufacturers like Nike offer no way of definitively identifying counterfeits, and only recently began adding technological solutions into their products.  Of the tens of millions of StockX customers who have traded on the platform without issue (like the Nike employees who testified they had no complaints after buying multiple pairs of Nikes on StockX), only a tiny fraction—a few hundred over the years—have required refunds because they received possibly fake shoes.  That includes the two StockX buyers Nike has identified in this case, who received refunds from StockX for the small number of shoes they received in error out of the tens of thousands they purchased on StockX without incident—including after their returns.  Even the counterfeits Nike alleges in this case represent just 0.0004% of the 17.8 million Nike sneakers StockX inspected during the relevant period.

StockX has made enormous strides in protecting resale consumers from counterfeits, which Nike appropriately has applauded.  In 2019, ███████████████████████████ ████████████████████████████████████████████████████.  Nike praised StockX as a "good actor" and introduced StockX to the leaders of the Department of Homeland Security's brand protection task force.  Even after getting a behind-the-scenes look at StockX's Process, Nike never raised concerns about StockX's platform, Process, or advertising claims (which were the same in 2019, ██████████████████████, as when Nike filed its lawsuit).  It was only when StockX introduced an innovative NFT trading program, making fair use of Nike's trademarks in connection with a new way to resell shoes quickly and efficiently,

that Nike changed course and sued StockX, alleging counterfeiting and false advertising.

Nike's motion for summary judgment (the "Motion") relies on a distorted, incomplete version of the record. Extensive disputes of material fact preclude the sweeping relief Nike seeks. StockX acknowledges that a small number of counterfeits were sold by bad actors on StockX's platform.[3] But Nike strains credulity when it claims StockX is a willful counterfeiter, ignoring that ███████████████████████████████████████ ████████████ as well as the undisputed record evidence that StockX makes extensive efforts to stop counterfeits from reaching consumers in the resale marketplace where Nike offers consumers no protections at all, nor any foolproof way to detect counterfeits.

StockX never knowingly or intentionally sent a consumer a counterfeit shoe and Nike cannot establish that StockX is a willful counterfeiter as a matter of law. To the contrary, StockX is an exemplar of a good faith actor, going above and beyond to voluntarily absorb the loss associated with any counterfeit products any third party sells on its platform.

Nike's attacks on StockX's advertising are similarly without merit, taking selective quotations out of context and ignoring the extensive record evidence confirming consumers accurately understood StockX's claims—including that StockX's advertising claims were similar or identical to claims made by StockX's competitors in the resale market like eBay (which advertises an "Authenticity Guarantee") and GOAT (which provides consumers an "Assurance of Authenticity"). StockX's advertising claims explaining its Process and its associated guarantee were not false, let alone willfully false. StockX's customers understand that there are inherent risks with purchasing goods from third-party sellers but have appreciated the protections

---

[3]    The 77 shoes Nike asserts, though many have evidentiary issues, ██████████████████████████████ *See* 56.1 ¶ 290 ████████████████████████████████████████████

offered by StockX's Process and Buyer Promise guarantee. StockX always truthfully informed consumers that it inspected every item, every time; guaranteed those items would be authentic; and if StockX was unable to detect a fake shoe or made a mistake, StockX would make consumers whole. Nike has no evidence that StockX has failed to live up to that guarantee.

**FACTUAL BACKGROUND**

**I.     StockX's Resale Platform Is Built to Fight Counterfeiting.**

Founded in 2016, StockX is a resale marketplace through which consumers can trade products, including sneakers. 56.1 ¶ 414. StockX is particularly popular among "sneakerheads," consumers who are knowledgeable and passionate about sneakers. 56.1 ¶ 418. These consumers value StockX for many reasons, including its wide selection of hard-to-find products; its "user-friendly" interface and overall excellent buying experience; streamlined product pages with information about each product consolidated on one page (rather than individual product listings like those on eBay or Craigslist); bid-ask trading model; competitive discounts; and personalized customer service. 56.1 ¶¶ 417, 426–431. Roy Kim, a StockX customer who testified in this case, chooses StockX over its competitors based on its competitive prices, discounts, superior customer service, and enhanced buying experience. 56.1 ¶¶ 447–456. Even after receiving some of the alleged counterfeits at issue in this case (and receiving refunds for those products), Mr. Kim continues to use StockX to buy thousands of Nike sneakers and visits StockX's platform daily. 56.1 ¶ 457. Mr. Kim had no issues with any of his purchases on StockX before—or after—the shoes Nike identifies. 56.1 ¶¶ 385–86.

StockX was founded with the goal of fighting fraud in the resale market. 56.1 ¶ 239. For too long, resale consumers had few protections: manufacturers like Nike do not offer resale services ██████████████████████████████████████████ ████████████████████ and do not give consumers a way to authenticate resold products. 56.1 ¶¶

281, 357, 485, 667–486.  StockX devotes enormous resources to protecting consumers and stopping the sale of counterfeit goods.  56.1 ¶¶ 240, 421.

Although StockX offers a platform to facilitate trades between third parties, StockX inspects every product sold on its platform to determine whether it appears to be unused and genuine.  56.1 ¶¶ 424–425.  StockX's Process is guided by machine learning technology, an ██████████████████████████████████████████████████████ ██████████████████████████████████████████████ employees who undergo months of training before being allowed to inspect products (and who are supervised by even more experienced quality assurance personnel), and a fraud detection team monitoring bad actors around the world and working to identify activity on StockX using sophisticated software tools.  56.1 ¶¶ 292–94, 543–471;.  When StockX identifies a suspected counterfeit product, it not only stops that product from reaching consumers, but also immediately suspends the seller so StockX can further investigate.  56.1 ¶¶ 339–42, 436–440.  And StockX holds its employees accountable if a product did not meet customer expectations—up to and including termination of employees or leaders who fail to maintain the highest standards of customer care.  56.1 ¶¶ 175, 179, 181, 183, 343–45.

StockX has invested hundreds of millions of dollars in developing and implementing its Process.  56.1 ¶¶ 240, 421.  StockX has hundreds of trained employees working to inspect products, and still more employees devoted to improving StockX's Process by learning about the resale market and counterfeiters' activities.  56.1 ¶¶ 48, 546–57 .  To date, StockX has inspected tens of millions of products, helping protect consumers: since 2016, StockX prevented $80 million in suspected counterfeit sneakers from being sold.  56.1 ¶¶ 242–45.  Nike's Motion tries to make much of ten instances where StockX employees believed certain shoes were genuine but

defective Nike products, which Nike has admitted it sells to consumers.  *See* 56.1 ¶¶ 104-11, 194–96; ECF No. 257-7 at 149:8–24 ███████████████████████ ECF No. 257-66 (Nike's return policy for "defective or flawed" Nike products).  None of those ten shoes are alleged to be counterfeits in Nike's Motion,[4] and in any event those few examples are dwarfed by the hundreds of returns StockX accepted each year.  *See* ECF No. 257-113.  Indeed, during the relevant period (July 2020 to November 2022), StockX inspected 28.7 million products, including 17.8 million Nike products, and rejected over 1 million.  56.1 ¶¶ 243–45.  Most had problems unrelated to authenticity—wear and tear, or visible defects, like ███████████████ ████████████; about 93,000 were rejected because StockX believed they were not genuine.  56.1 ¶¶ 243–45, 295–305.

When brands (including Nike) report counterfeiting to StockX, StockX acts.  In 2019, when Nike reported one counterfeit, StockX quickly responded—in fact, StockX had already rejected the product.  Nike praised StockX as a "good actor" and thanked StockX for taking the issue seriously.  56.1 ¶¶ 282–86.  In 2020, Nike's Brand Protection Director sent a letter to StockX's CEO saying that "Nike Brand Protection and StockX are aligned on ensuring our customers only receive authentic product."  56.1 ¶ 284.  Nike's interactions with StockX were positive enough that Nike introduced StockX to the Department of Homeland Security's E-Commerce Working Group—a task force to help stop counterfeiting.  56.1 ¶¶ 287–89.

Nike also ████████████████████████████████████ ███████████████████████████████████████████

---

[4]    Nike's evidence of ███████ of these shoes was not identified during discovery and cannot be relied upon at summary judgment.  *See Iacovacci v. Brevet Holdings, LLC*, 2023 WL 2631966, at *5 (S.D.N.Y. Mar. 24, 2023) (at summary judgment, declining to rely on evidence that was withheld during discovery; "[b]ecause the [document] was not produced during discovery, Defendants were deprived of the opportunity to discover, take depositions, and respond"), *recons. denied*, 2023 WL 4118086 (S.D.N.Y. June 22, 2023) (citation omitted).
[5]    Nike's corporate representative Ms. Delli Carpini testified that Nike sells ███████████████ ██████████████████████████████████ 56.1 ¶¶ 295–96.

████████████████████████████████████████████████████████

████████████████████████████████ 56.1 ¶¶ 252–80. ████████████████

Nike visited StockX authentication centers to see StockX's Process in action, reporting that what

they saw was "incredible" and "exciting to see."  56.1 ¶ 255.  ████████████████████

████████████████████████████████████████████████████████

████████████████████████████ 56.1 ¶ 259.

Nike employees also repeatedly recommended StockX to consumers.  56.1 ¶¶ 347–49.

As late as 2022—after this lawsuit began—Nike's customer service identified StockX as a "good

place" to buy Nikes.  56.1 ¶ 348 ("Unfortunately, [this product] is no longer available,"

"however you can find some that are selling original products! I think that ***StockX is a good***

***place*** to buy this product"); 56.1 ¶ 349 (recommending StockX as a place to purchase a shoe

style not available through a Nike store).

## II.    StockX's Advertising Accurately Conveyed, and Explained, its "Guarantee" that Products Would Be "100% Authentic" or StockX Would Provide a Refund.

StockX appreciates that no process is perfect.  ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████ 56.1 ¶¶ 306–14.  But StockX's

goal is to protect consumers and to ensure to the best of StockX's ability that consumers only

receive "100% Authentic" products on StockX's platform.  56.1 ¶¶ 74–85, 424–25, 441–46.  So,

if StockX makes a mistake, StockX "Guaranteed" that StockX itself would provide a full refund

(even when it was not the seller).  56.1 ¶¶ 441–46.

StockX has long disclosed to consumers that its Process is not perfect.  StockX explained

that it only allows "100% Authentic" products on its platform and "Guaranteed Authenticity"—if

StockX determines a product a consumer received was not "100% Authentic", StockX accepts a

return and refunds that consumer.  56.1 ¶¶ 246–47, 441–46.  In fact, StockX accepts returns where there is *any* mistake in authentication (like the wrong color or size).  56.1 ¶¶ 441, 443.  In 2021, based on actual returns data from customers, StockX calculated that its Process worked 99.96% of the time.  56.1 ¶ 573.  StockX's advertising communicated to consumers both the 99.96% authentication rate and how it was calculated.  56.1 ¶¶ 59–64, 572–75.  StockX also detailed the steps involved in its Process and told consumers that brand owners were not involved in its Process.  56.1 ¶¶ 59–64, 328.  StockX's policy and practice are consistent with the plain-English meaning of a guarantee: "an assurance of the quality of . . . a product offered for sale often with a promise of reimbursement."[6]

The Authenticity Claims[7] appeared either on, or with direct links to, StockX's "Authentication" page, *see* Pls. MSJ at 15–16, which contained statements including:

- StockX has "authenticated tens of millions worth of products at a **99.96% accuracy rate**,"[8] which StockX explained was the "measurement of the accuracy of [StockX's] platform's product authentication process based on weighted return data compared to total authentications."

- "FAQs" such as "Can I return my item after I've received it?" linked to a description of StockX's return policy.  That policy provided steps a buyer could take if it "**received an item that it believes to be counterfeit**."  *See* 56.1 ¶ 441–46.

- Extensive process-oriented statements which explain that every item goes through StockX's Process: "**Trust the Process**" in large font; an explanation of StockX's "**rigorous, multi-step verification procedure**" and use of "100+ data points" and "machine learning"; and pictures and videos of authenticators visually inspecting products.[9]

Nike has submitted no consumer perception survey, nor the testimony of any consumers,

---

[6]  *Guarantee*, Merriam-Webster (Aug. 21, 2024), https://www.merriam-webster.com/dictionary/guarantee.

[7]  "Authenticity Claims" has the same meaning as in StockX's brief in support of its motion for partial summary judgment, Pls. MSJ at 7.

[8]  Nike does not acknowledge that StockX provides an express explanation of how the rate is calculated, meaning it was accurate in context.  *See Rexall Sundown, Inc. v. Perrigo Co.*, 651 F. Supp. 2d 9, 34 (E.D.N.Y. 2009) ("No. 1 Dr. Recommended Joint Care Brand" was literally true because explanatory note clarified that the claim referred to the number one ranking brand for a specific supplement, not all types of joint care).

[9]  *See* 56.1 ¶¶ 59–64.

about what they understood StockX's advertising to mean, or whether StockX's advertising was material to purchasing decisions. 56.1 ¶¶ 317–26, 593–613. By contrast, StockX has submitted a consumer perception survey that shows the Authenticity Claims, when seen in their full context, were *not* material: consumers' intent to use the StockX platform did not change when the advertising claims Nike challenges were removed. 56.1 ¶¶ 614–31.

Nike also has no evidence it was harmed by StockX's advertising. 56.1 ¶¶ 220–23, 226, 228, 230, 636–53. Nike's corporate representative testified that █████████████████████████ ████. 56.1 ¶¶ 654–61. That is unsurprising, as StockX's advertising was not comparative, 56.1 ¶¶ 665–66, and Nike offers neither a resale marketplace nor any authentication solution for consumers. 56.1 ¶¶ 316, 357, 667–86.

## ARGUMENT

Judgment as a matter of law is appropriate where "the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). Where the record "taken as a whole" could "lead a rational trier of fact to find for the non-moving party," a genuine dispute of material fact exists. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "[A]ll evidence must be construed in the light most favorable to the party opposing summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 273 fn. 2 (1986).

I.    **After Two Years of Discovery, Nike Identified Only a Handful of Counterfeit Sneakers, Out of Tens of Millions of Nike Sneakers Sold on StockX's Platform.**

Nike claims to have identified 77 counterfeits (though that number steadily decreased during this litigation[10]) out of the tens of millions of Nike shoes sold on StockX. StockX acknowledges that Mr. Kim returned 33 pairs of shoes to StockX in July 2022, was refunded for

---

[10]    In response to StockX's interrogatory asking Nike to identify alleged counterfeits, Nike identified documents that in total contained 101 products. Nike (without explanation) later reduced the number to 78. *See* ECF No. 80, 12/12/22 Letter to Judge Netburn. Nike now (again without explanation) alleges only 77. Pls. MSJ at 13.

them, and StockX concluded those shoes were not authentic upon re-inspection.[11]  56.1 ¶¶ 149, 185–90.  StockX also acknowledges that, in late 2021, Nike purchased one additional pair of sneakers on the StockX platform in the U.S. that Nike later determined was counterfeit.  56.1 ¶¶ 158–61.  StockX does not oppose Nike's Motion solely insofar as it asks the Court to adjudicate liability alone for counterfeiting for this handful of products.  StockX opposes Nike's Motion, however, to the extent it reaches beyond these 34 shoes to include products purchased by Michael Malekzadeh, or outside the U.S.  Nike has repeatedly shifted its position as to which shoes it considers counterfeits, and there are disputes about the specific number of counterfeits Nike can prove were sold on StockX beyond those 34 pairs.  The Court need not adjudicate the specific number of counterfeit products at this stage, however, and issues of damages (which are not at issue here and are not based solely on the number of counterfeit products) cannot be resolved at this stage given the significant disputes of fact.[12]

## A.    Malekzadeh Did Not Confirm He Purchased the Sneakers at Issue on StockX's Platform, and Nike Cannot Otherwise Prove Chain of Custody.

Nike claims that 40 pairs of shoes purchased by Mr. Malekzadeh—who founded the now-bankrupt resale business Zadeh Kicks, and is facing fraud-related criminal charges connected to that business—are also counterfeit.  56.1 ¶¶ 197, 358–60.  But these shoes were never in Nike's possession and their connection to StockX is disputed.  56.1 ¶¶ 197–202, 363–67.  Mr. Malekzadeh did not maintain records documenting the chain of custody of his inventory, nor did he keep track of how he procured sneakers.  56.1 ¶ 363 ("Zadeh Kicks did not have a comprehensive inventory system housing the inventory, nor did it have sophisticated

---

[11]    Because of flaws in Nike's documentation (*e.g.*, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮), the 33 shoes Mr. Kim returned may not be those Nike identified. 56.1 ¶¶ 171, 174–76, 181, 189.

[12]    Nike admits its Motion does not turn on the number of counterfeits.  Pls. MSJ at 13; *see, e.g.*, *Motorola, Inc. v. Abeckaser*, 2009 WL 962809, at *9 (E.D.N.Y. Apr. 8, 2009) (denying plaintiff's motion for summary judgment for statutory damages in part because issues of fact existed that precluded a determination about "how many counterfeit goods were sold").

procurement, order processing, fulfillment or shipping procedures.").

Mr. Malekzadeh asserted his Fifth Amendment rights and did not testify that any of the sneakers Nike identified were, in fact, purchased on StockX. 56.1 ¶ 368. StockX has had no opportunity to review the sneakers to determine whether they were, in fact, purchased on StockX's platform, and the limited evidence Nike produced ████████████████████ ████████) does not allow StockX to determine whether the sneakers were sold on its platform. 56.1 ¶¶ 197–202.[13] Nike accordingly lacks undisputed evidence that these sneakers, ██████████ █████████████████████████████████████████████████████, were in fact sold on StockX.[14] For these alleged counterfeits—████████████████████ █████████████████████████████████████—genuine disputes of fact exist that preclude summary judgment.

### B.     Three of Nike's Test Purchases Have No Connection to U.S. Commerce.

Nike has not established a connection to interstate commerce for three of its four test purchases in late 2021. ECF No. 260-1, Appendix A, Pair Nos. 1–3; *see Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 418 (2023) ("[P]laintiffs must establish that 'the *conduct relevant to the statute's focus* occurred in the United States.'"). These purchases were made in euros and shipped to a purchaser in the Netherlands. *See* 56.1 ¶¶ 387–90. Nike has no evidence tying these three sneakers to U.S. commerce, so imposing liability would be an "(impermissible)

---

[13]   Several of the pairs Nike has identified do not have any StockX tags, and Nike associated one pair with two different receipts. 56.1 ¶¶ 200–02. Nike's investigator wrote that there was no StockX tag present for one pair associated with a photo showing a StockX tag. 56.1 ¶¶ 197, 199, 202. These inconsistencies call into question whether Nike accurately documented its investigation.

[14]   While Nike points to StockX tags on some sneakers, that is not conclusive. Nike's witnesses (and StockX's) testified that StockX's tags are counterfeited and put on shoes not sold on StockX. 56.1 ¶ 364. StockX employees notably raised concerns about Mr. Malekzadeh's returns, observing that he may have been trying to return to StockX shoes that had not been purchased on StockX. 56.1 ¶ 365.

foreign application of" the Lanham Act.  *Abitron*, 600 U.S. at 418.[15]

## II.    StockX Epitomizes Good Faith, and the Record Cannot Support a Finding that StockX Is a Willful Counterfeiter as a Matter of Law.

Nike's Motion seeks to turn the Lanham Act—and sound public policy—on its head. According to Nike, a platform like StockX that invests hundreds of millions of dollars in trying to *stop* counterfeiting—and blocks over a million suspected counterfeits—should incur *greater* liability if a tiny number of counterfeits evade detection.  56.1 ¶¶ 239–40, 242–45, 421, 536–39. The record shows that StockX was not willful: it works extensively to stop counterfeits and protect consumers, 56.1 ¶¶ 424–25, 432–46, 522–71, such that if summary judgment is appropriate at all, it should be granted in StockX's favor, not Nike's.[16]  StockX *never* knowingly sent a counterfeit shoe to a consumer, and Nike has no evidence showing otherwise.  56.1 ¶¶ 329–38.  Nike cannot prove willfulness as a matter of law, and StockX will prove at trial that it is the opposite of a willful counterfeiter.

To prove willfulness, Nike must establish that StockX was actually aware of the infringing activity, or acted with either reckless disregard or willful blindness.[17]  *4 Pillar Dynasty*

---

[15]    Nike initially determined ██████████████████████████████████████████████████████ ███████████████████████████████████████ 56.1 ¶¶ 306–07 (███████████████████████████████ █████████████████).  This and other evidence casts substantial doubt on Nike's ability to conclusively determine █████████████████████ 56.1 ¶¶ 306–15.

████████████████████ 56.1 ¶ 316.  At the time, Nike had been ████████████████████████ ██████████████████████████████████████████████████████████████████████ 56.1 ¶ 316. Nike's reference to *Chanel, Inc. v. WGACA, LLC* for the proposition that "[e]vidence that there are discrepancies between a company's internal product-identification information and the actual characteristics of the contested goods is sufficient to establish a prima facie case of counterfeiting" is accordingly inapposite here, where there are disputes of fact ███████████████████████████████████████████████ ██████████████████████████████ 2022 WL 902931, at *16 (S.D.N.Y. Mar. 28, 2022).

[16]    Appreciating that willfulness is an intensely factual inquiry and that "summary judgment is not a tool well suited to determining willfulness," *Disney Enters., Inc. v. Sarelli*, 322 F. Supp. 3d 413, 444 (S.D.N.Y. 2018), and given the number of relevant expert witnesses as to whom the Court identified issues going to the appropriate weight of their testimony, StockX did not itself move for summary judgment on willfulness.

[17]    Nike does not argue that StockX was willfully blind – nor could it, given that StockX inspects all products through its extensive Process.  56.1 ¶¶ 424–25; 522–71.

*LLC v. New York & Co., Inc.*, 933 F.3d 202, 209–10 (2d Cir. 2019).  Willfulness is rarely amenable to resolution as a matter of law: "summary judgment is not a tool well suited to determining willfulness, especially when it turns on '[d]eterminations of credibility,' which 'are within the province of the jury.'"  *Disney Enters.*, 322 F. Supp. 3d at 444 (*quoting Close-Up Int'l, Inc. v. Berov*, 382 F. App'x 113, 117 (2d Cir. 2010)).

### A. StockX Did Not Have Actual Knowledge That Any Products Were Counterfeit Before They Were Sent to Buyers.

Nike's arguments that StockX was generally aware that counterfeit Nike goods were sold on its platform and therefore is liable for willful counterfeiting misstate the law.  The standard is *actual awareness* of the *specific conduct* at issue.  *See BBK Tobacco & Foods, LLP v. Galaxy VI Corp.*, 408 F. Supp. 3d 508, 522 (S.D.N.Y. 2019) (explaining that one way to establish willfulness is to show that the defendant "was *actually aware of the infringing activity*" (emphasis added)); *cf. Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 107 (2d Cir. 2010) (assessing the requisite knowledge for contributory liability—a more permissive standard—and affirming that eBay's "general knowledge as to counterfeiting on its website" was insufficient to clear even that lower bar).  The lone case Nike cites underscores this distinction.  In *Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Mgmt., Inc.*, the defendant not only *had knowledge* of the specific counterfeits at issue but was *intentionally directing* the counterfeiting, including detailing in writing how the counterfeit should mimic the genuine goods.  628 F. Supp. 2d 312, 323 (E.D.N.Y. 2009).  Nike has no remotely analogous evidence here: StockX works to stop counterfeits, not create them.  *See Beastie Boys v. Monster Energy Co.*, 66 F. Supp. 3d 424, 440 (S.D.N.Y. 2014) ("[I]nfringement is not willful where a party []reasonably and in good faith believes that its conduct is innocent").

13

**B.      StockX Did Not Recklessly Disregard the Possibility of Counterfeiting.**

Nike's alternative argument, that StockX acted with reckless disregard of counterfeiting, is belied by the record and fails as a matter of law.  To establish reckless disregard, Nike must prove that StockX "recklessly disregarded evidence of counterfeiting that was available to it on or before" the goods were sold.  *BBK Tobacco,* 408 F. Supp. 3d at 529 (denying plaintiff's motion for summary judgment).

### 1.   *StockX's platform and Process are designed to stop fraud and counterfeits.*

Nike asserts (without undisputed evidence to establish) that StockX's platform design, along with StockX's Process, created a "safe haven" for counterfeiters.  Not only are each of these points disputed, but Nike also fails to account for any of the voluminous record evidence that StockX is *stopping* counterfeits.  *See* 56.1 ¶¶ 242–45, 536–39; *see also Chrome Hearts LLC v. Controse Inc.,* 2023 WL 5049198 at *22 (S.D.N.Y. Aug. 8, 2023) (at summary judgment, holding plaintiff's theory was speculative and defendant was not willful).

Nike's repeated assertions about the anonymity of sellers are a red herring.  Sellers are anonymous to buyers, but not to StockX.  StockX collects extensive information about every seller, actively vets them, and has an anti-fraud team that uses seller data to detect potentially fraudulent activity.  56.1 ¶¶ 125–26, 339–42.  For the products at issue in this case, StockX did not believe any of the sellers were suspicious before the products were sold.  56.1 ¶ 338; *see Tiffany,* 600 F.3d at 110, n.17 (affirming bench trial finding eBay was not willful because it "did not ignore the information it was given about counterfeit sales on its website").[18]

---

[18]    After some of the products at issue were sent to Mr. Kim—prior to Nike sending any notice to StockX—the StockX anti-fraud team began actively investigating sellers connected to those sales because of suspicious activity that StockX's anti-fraud team detected.  56.1 ¶ 341.  Following an investigation, StockX concluded that many of these sellers were connected to a foreign fraud ring and immediately suspended the sellers.  56.1 ¶ 342.  StockX's unilateral and unsolicited actions to identify, investigate, and ban these bad actors show that StockX is not willfully allowing counterfeits on its platform.

Nike's attempt to characterize the imperfection of StockX's efforts as reckless disregard for counterfeiting is misplaced. Nike praised StockX for its efforts barely a year before bringing this lawsuit, telling StockX in writing that its work was "aligned" with Nike's own Brand Protection team. Even if StockX's Process is not flawless, Nike does not—and cannot—allege that StockX *disregarded* evidence of counterfeiting. To the contrary, StockX acted to block shoes or accept returns before even being contacted by Nike about counterfeits, and never failed to act in response to notice from Nike. *See AL Infinity, LLC v. Crown Cell, Inc.*, 2023 WL 5097979, at *10 (S.D.N.Y. Aug. 9, 2023) (granting defendants' motion for summary judgment as to willfulness in part because defendants "immediately removed the [accused] items for sale").

Nike also entirely fails to address the opinions of StockX's expert Dr. Catherine Tucker, an MIT professor who specializes in online marketplaces. 56.1 ¶ 249. Dr. Tucker offers several opinions that create clear disputes of fact as to Nike's arguments. For example, while Nike asserts that the absence of seller reviews and individual product photographs on StockX somehow make StockX reckless, Dr. Tucker explains that the features Nike identifies are often of limited value, and are subject to falsification, bias, and noise. 56.1 ¶¶ 125, 129, 251. Dr. Tucker opines that StockX is incentivized to stop the sale of counterfeit products because tolerance for the sale of counterfeit goods would threaten the overall success of the platform. 56.1 ¶¶ 119, 250. In other words, willful counterfeiting would not be consistent with StockX's business interests. These competing assertions of fact must be weighed by a jury.

        2.   <u>StockX has never encouraged the sale of counterfeit products—it suspends sellers of counterfeits and accepts returns if an error is made.</u>

Nike's assertions that StockX "encourages the resale of suspected fake products on the platform" is incorrect and contradicted by record evidence. StockX never encouraged the resale of a product StockX believed was counterfeit. Nike takes out of context those few circumstances

in which consumers raised concerns about products that had passed StockX's Process, and for which further review led StockX to confirm its belief the products were authentic. 56.1 ¶¶ 100–03 (StockX had no reason to suspect products were counterfeit). Nike's examples of apparent buyer's remorse do not establish that StockX *ever* believed a product to be counterfeit yet encouraged a consumer to resell it. 56.1 ¶¶ 100–03. That StockX may sometimes encourage consumers to resell products that consumers no longer want, or that may have manufacturing defects, does not establish that StockX was a willful counterfeiter.

StockX suspends sellers determined to have sold a counterfeit product. 56.1 ¶¶ 120, 116–19, 438. Nike's assertion that StockX grants "'power sellers' more leniency in the number of 'failed' authentications before suspensions from the platform" ignores that not all failed authentications are due to concerns about counterfeiting. A product could fail StockX's Process for many reasons, including that the product was previously worn, or was the wrong size (in fact, most products that fail the Process do so for reasons other than possible counterfeiting). 56.1 ¶¶ 116–18, 425, 432, 536. Although StockX is more lenient for issues that do not involve authenticity (like sending a size 10 instead of a size 10.5), StockX does not tolerate the sale of counterfeits, and its policy is to suspend any seller of suspected fake products immediately. 56.1 ¶¶ 113, 116–18, 438. Nike has no evidence to the contrary.

Nike's assertion that StockX "instructs customer service to make returns nearly impossible" is contradicted by the record. Because StockX is a trading platform, it is not the seller of products and does not accept "buyer's remorse" returns. 56.1 ¶¶ 100, 103. However, StockX always has accepted returns where consumers did not get the product they were expecting, including because the delivered product was inauthentic. 56.1 ¶¶ 100, 103, 441–45. The record evidence in this case shows that StockX has accepted hundreds of those returns for

Nike products over the years.  56.1 ¶ 247.  Indeed, the only testimony in the record regarding

StockX's customer service comes from Mr. Kim, who noted that StockX's customer service is

better than competitors "by a mile," 56.1 ¶ 453, and generally "responsive to any issues that [he

has] as a buyer or a seller within 24 hours."   56.1 ¶ 248.  Nike's speculation to the contrary is

unfounded—and certainly not undisputed.

In sum, StockX's extensive Process, prompt actions to remove suspected counterfeit

activity from its platform, refund policy for suspected counterfeits, and continued cooperation

with Nike and other brand owners, comprehensively "rebut any suggestions that [StockX's]

conduct was willful." *AL Infinity, LLC*, 2023 WL 5097979, at *10.  At the very least, a jury

must weigh these competing facts, and Nike's motion should be denied.

### III.    StockX Accurately Conveyed Its Authenticity Guarantee to Consumers.

#### A.    StockX's Authenticity Claims Were Not Literally False.

Nike's Motion should be denied because a reasonable juror could determine that the

Authenticity Claims, when considered in context as required by Second Circuit authority, mean

that StockX guaranteed that it inspected every product on its platform, believed 100% were

authentic, and guaranteed a refund if a customer did not receive an authentic product.  Those

claims were true.  As the record demonstrates, StockX inspected every product sold on its

platform, 56.1 ¶¶ 424–25; did not ship any product that StockX believed was not authentic; and

refunded any customer who StockX (or Nike) determined received a counterfeit product. 56.1 ¶¶

329–38; 369–78, 379–84.

To establish falsity, a necessary element of its false advertising claim, Nike contends that

the Authenticity Claims are "literally false"—meaning Nike must prove they are ***unambiguously***

false claims.  *Apotex Inc. v. Acorda Therapeutics, Inc*., 823 F.3d 51, 63 (2d Cir. 2016) ("[O]nly

an *unambiguous* message can be literally false; if the language or graphic is susceptible to more

than one reasonable interpretation, the advertisement cannot be literally false" (internal citation omitted, emphasis in original)).[19]  Nike's argument, however, does not consider the entire message conveyed by any of StockX's advertising; rather, Nike argues that select words are unambiguous when considered on their own, entirely out of context.  But that is insufficient as a matter of law, as the Second Circuit has repeatedly held: "Fundamental to any task of interpretation is the principle that text must yield to context . . . *a court must 'consider the advertisement in its entirety and not . . . engage in disputatious dissection*.  The entire mosaic should be viewed rather than each tile separately." *Avis Rent A Car System, Inc. v. Hertz Corp.*, 782 F.2d 381, 385–86 (2d Cir. 1986) (emphasis added); *see also Reed Const. Data Inc. v. McGraw-Hill Cos., Inc.*, 49 F. Supp. 3d 385, 411–13 (S.D.N.Y. 2014), *aff'd*, 638 F. App'x 43 (2d Cir. 2016); *Rexall*, 651 F. Supp. 2d at 34 (explanatory note must be considered because the Second Circuit has made clear an advertisement must be analyzed in its full context).

Nike's falsity arguments are premised on the very type of "dissection" the Second Circuit long has prohibited.  In *Avis*, the Second Circuit held that the district court committed clear error by ignoring context and finding the claim "Hertz has more new cars than Avis has cars" was literally false when considered standing alone.  782 F.2d at 385–86.  Whether the claim was accurate depended on whether it referred to rental fleets or total fleets, and the Second Circuit in reversing noted the failure to assess relevant context in the advertisements.  *Id.*

To argue the Authenticity Claims are unambiguous, Nike selects six phrases, presents

---

[19]   Nike does not argue that the Authenticity Claims are impliedly false or misleading, nor could it.  Nike has failed to: (1) conduct a consumer survey, the "ordinar[y]" form of showing consumer confusion, *Apotex Inc. v. Acorda Therapeutics, Inc.*, 2014 WL 5462547, at *2–3 (S.D.N.Y. Oct. 23, 2014), *aff'd*, 823 F.3d 51 (2d Cir. 2016); (2) elicit any evidence that a single consumer, much less a "substantial number of consumers were, in fact, confused by" the Authenticity Claims, *Reed Const.*, 49 F. Supp. 3d at 412, 416; or (3) make the stringent showing, absent this evidence, that StockX intended "to deceive the public through deliberate conduct of an egregious nature," *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 65 (2d Cir. 2016) (internal quotations omitted).

them in isolation,[20] and asserts they unambiguously promise counterfeits are never sold on StockX's platform. When viewed within the entire mosaic of StockX's advertising, however, as required by the Second Circuit, the Authenticity Claims do not convey the message Nike asserts. Context makes this clear. StockX's landing pages and platform *expressly* acknowledged that inauthentic products are occasionally sold on StockX's platform. *See, e.g.*, ECF No. 261-50 at 45; ECF No. 261-57 at NIKE0006788; ECF No. 261-58 at NIKE0000284 (StockX has "a **99.96% accuracy rate**");[21] ECF No. 257-39 (steps a buyer should take if it "**receives an item that it believes to be counterfeit**"). Considering the whole of StockX's advertising in context, it would be entirely reasonable for a juror to conclude that StockX's Authenticity Claims accurately communicate that StockX (1) inspects every product traded through the platform; (2) allows only products StockX believes are "100% Authentic" to trade; and (3) "guarantees" consumers a refund if a product is not in fact authentic. *See Rexall,* 651 F. Supp. 2d at 34 (finding claims of "No. 1 Dr. Recommended Joint Care Brand" and "clinically tested" were at least ambiguous because the "explanatory note" and "context in which [they are] used" demonstrate there were multiple reasonable interpretations).

This obvious meaning of the Authenticity Claims is supported by the record evidence. In contrast to the absence of *any* evidence consumers understood StockX's advertising as Nike alleges, 56.1 ¶¶ 317–26, 610–13, both expert and lay witness testimony support StockX's interpretation. *See Merck Eprova AG v. Gnosis S.P.A.*, 2011 WL 1142929, at *3 (S.D.N.Y. Mar. 17, 2011) (denying summary judgment on literal falsity where evidence of the "scientific community['s]" alternative understanding created a dispute of material fact); *N. Am. Olive Oil*

---

[20]    Nike not only divorces the Authenticity Claims from the broader context (and sometimes even the full sentence) in which they appeared, it selectively includes other out-of-context phrases and cropped screenshots from StockX webpages in its motion and 56.1 statement. *See* Pls. MSJ at 16; 56.1 ¶¶ 58, 63.

[21]    In 2022, StockX stated this rate was "99.95%" based on 2021 data. ECF No. 261-58 at NIKE0000284.

*Ass'n v. Kangadis Food Inc.*, 962 F. Supp. 2d 514, 520 (S.D.N.Y. 2013) (examining "ordinary

consumer['s]" understanding to determine it was "far from clear" a claim was literally false).

StockX's sneakerhead expert, Mr. DeJongh Wells, opined based on his deep experience

in this community that StockX consumers would ___**not**___ have understood the Authenticity Claims to

mean that "StockX only sells authentic, non-counterfeit products."  Rather, his opinions confirm

that StockX consumers understood StockX to be promising that "if these sneakers are fake, I'm

going to get my money back. . . . that language is that StockX does lay eyes/hands on each

product that goes through their market, through their website."  56.1 ¶ 327 (StockX's

authenticity guarantee means "verified, looked at by someone, all of the sneakers that go through

[the StockX] platform").  Mr. Kim similarly testified that sneakerheads like himself are

"conditioned to think that any shoe[] . . . could be fake that comes through these platforms."

56.1 ¶ 502 (resellers "can never be a hundred percent sure of the authenticity of the shoe").  Just

as the Second Circuit considered how potential car renters would view the advertisement in *Avis*,

here the relevant question is how sneakerheads—potential customers of resold Nike and Jordan

products on StockX, who understand the risks of shopping in the resale market—view the

Authenticity Claims.  *See* 782 F.2d at 385–86.  It is "inappropriate on summary judgment" for

Nike to "ask[] the Court to weigh [this] evidence [of alternative consumer interpretations] and/or

make a credibility assessment."  *Merck Eprova AG*, 2011 WL 1142929, at *3.

The cases Nike cites are inapposite.  In the only decision decided on summary judgment

that Nike cites, *River Light V, L.P. v. Tanaka*, the Southern District of Florida considered a

defendant who knowingly sold counterfeit products in counterfeit packaging and advertised them

on eBay with **only** the phrases "Guaranteed Authentic" and "100% Guaranteed Authentic"—

providing none of the detailed explanatory context that StockX provided, and which the Second

Circuit requires this Court to consider.  2018 WL 5778234, at *3, 6 (S.D. Fla. Nov. 2, 2018).

The facts of *C=Holdings B.V. v. Asiarim Corp.*, decided after a bench trial, are even farther

afield from this case: *C=Holdings* involved a dispute over the use of a mark after a license

agreement expired; there was no advertising at issue, and thus no context for the Court to

consider.  992 F. Supp. 2d 223, 241–24 (S.D.N.Y. 2013).  Finally, both *Microsoft Corp. v. My

Choice Software, LLC*, 2017 WL 5643210 (C.D. Cal. Oct. 10, 2017) and *Chanel, Inc. v.

RealReal, Inc.*, 449 F. Supp. 3d 422 (S.D.N.Y. 2020), involved motions to dismiss: the courts

held that plaintiffs had sufficiently *pleaded* false advertising, not that they had established

*liability*.  In *Chanel*, the court specifically acknowledged the absence of context while

considering the motion to dismiss: "The RealReal does not point out where on its website or

advertising it acknowledges the existence, or even the possibility, of counterfeit products in its

marketplace."  449 F. Supp. 3d at 444–45.  StockX has produced extensive record evidence

showing how its advertising repeatedly acknowledged that counterfeit products could be present

on its marketplace.[22]  Nike cannot establish that StockX's claims were literally false as a matter

of law.

> ### B.    The Only Record Evidence Regarding Materiality Shows the Authenticity Claims Did Not Influence Consumers' Purchasing Decisions.

Nike's Motion independently fails because Nike has not established materiality as a

matter of law (as StockX established as an independent reason to grant its cross-motion for

summary judgment).  In the Second Circuit, materiality "requires that the allegedly false or

misleading representation involved an inherent or material quality of the product [ ] – *i.e., that*

---

[22] *See, e.g.*, ECF No. 261, Ex. 50 part 1 at 45; Ex. 54 at NIKE0006788; Ex. 55 at NIKE0000284 (StockX has "a 99.96% accuracy rate"); *id.* (StockX "compiled data from every fake product in the history of StockX"); *id.* Ex. 50 part 1 at 45; Ex. 54 at NIKE0006788 ("[StockX] Authenticators have stopped more than $60M worth of fake sneakers from trading."); ECF No. 257, Ex. 39 (steps a buyer should take if they "receive[] an item that it believes to be counterfeit").

***the representation was likely to influence purchasing decisions***." *Apotex*, 823 F.3d at 63, n.8 (internal quotation marks and citation omitted) (collecting cases that stand for the proposition that materiality is about whether the deception influenced purchasing decisions) (emphasis added). Nike has not met this burden.

Nike asserts that it does not need to show the statements were likely to influence purchasing decisions because the statements concern authenticity. This argument, however, is at odds with the settled Second Circuit standard. It is not enough for Nike to merely assert that the Authenticity Claims "misrepresent[] an inherent quality or characteristic of a product"—Nike must ***also*** prove the statements "[were] likely to influence purchasing decisions." *See Reed Const.,* 49 F. Supp. 3d at 417–18, aff'd, 638 F. App'x 43 (2d Cir. 2016). In *Reed Construction*, the Court considered and explicitly rejected the very argument Nike makes here—that the materiality prong of a false advertising claim was automatically satisfied if a statement "misrepresents an inherent quality or characteristic of a product." *Id.* at 417–19. Instead, the court granted summary judgment for the defendant because the "plaintiff ***must also*** prove that the . . . statement is likely to influence purchasing decisions." *Id.* at 429 (emphasis added); *see also Church & Dwight*, 843 F.3d at 70 n.11 ("[*Apotex*] recently settled the materiality standard in this Circuit, explaining that the standard is whether the deception is ''likely to influence purchasing decisions.'"); *Rosenshine v. A. Meshi Cosms. Indus. Ltd.*, 2023 WL 6516994, at *8 (E.D.N.Y. Oct. 4, 2023) ("Plaintiffs bear the burden of showing that 'the allegedly false or misleading representation . . . was likely to influence purchasing decisions.'") (*citing Apotex*); *SourceOne Dental, Inc. v. Patterson Cos., Inc.*, 328 F. Supp. 3d 53, 62 (E.D.N.Y. 2018) ("The Second Circuit has defined materiality as 'likely to influence purchasing decisions.'") (*citing Apotex*). Nike's reliance on cases that either predate *Apotex* (*Merck Eprova* (S.D.N.Y. 2011);

*Snuggly Plushez* (E.D.N.Y. 2011)); hail from out of circuit (*River Light* (S.D. Fla. 2018)); or

both (*Pom Wonderful* (C.D. Cal. 2008)) ignore current Second Circuit law that Nike's burden

cannot be carried solely by reference to StockX's claims.

No evidence shows the Authenticity Claims were likely to impact consumer purchasing

decisions.  Nike has no consumer perception or purchase intent survey.  56.1 ¶¶ 610–13.  Nike

has no testimony from even a single consumer that has purchased a Nike product from StockX

because of the Authenticity Claims.  *Id.*  Absent such evidence, Nike cannot establish materiality

as a matter of law.  *See Medisim Ltd. v. BestMed LLC*, 910 F. Supp. 2d 591, 618 (S.D.N.Y. 2012)

(granting defendant summary judgment where plaintiff "offered no evidence" and "failed to

provide evidence that [defendant's] statement is false in a way that is likely to influence

consumer behavior").  This alone is enough to defeat Nike's Motion as to the false advertising

claims.  *See Apotex*, 823 F.3d at 68 (granting summary judgment for defendant because plaintiff

had produced only "generalized evidence that [defendant's] increased sales . . . stemmed from its

advertisement efforts," but no evidence the claim was likely to influence consumers' purchasing

decisions); *SourceOne Dental*, 2018 WL 3863440 at *2 (movant had "not met their burden

because they did not produce any evidence to show that the misrepresentation was likely to

affect consumers' behavior."); *Rosenshine*, 2023 WL 6516994 at *8 (granting summary

judgment for defendant where "there [wa]s no record evidence that [allegedly false statement]

would dissuade consumers from purchasing" the product); *Dependable Sales & Serv., Inc. v.*

*TrueCar, Inc.*, 377 F. Supp. 3d 337, 354 (S.D.N.Y. 2019), *on recons.,* 394 F. Supp. 3d 368

(S.D.N.Y. 2019) (denying summary judgment on materiality because movant did not "cite

evidence to support [] its description of consumer behavior").

**C.    Even if Nike Were Entitled to a Presumption of Materiality, StockX Has Rebutted That Presumption with Extensive Record Evidence.**

Even if Nike were entitled to a presumption of materiality (which it is not), StockX has rebutted that presumption with evidence that precludes a finding of materiality as a matter of law.  Courts in this Circuit regularly allow parties to produce rebuttal evidence in the (different) cases where a presumption applies.  *See, e.g.*, *Reed Const.,* 49 F. Supp. 3d 385 at 418–19, *aff'd,* 638 F. App'x 43 (granting defendant summary judgment and noting that "even if a presumption of materiality applied," defendant had rebutted the presumption).[23]  Even though StockX is not required to disprove materiality (as Nike has not met its burden), StockX has proactively presented evidence that the Authenticity Claims were not likely to influence consumer purchasing decisions.

    1.    *A consumer perception survey, along with lay and expert witness testimony, establish that the Authenticity Claims were not material to consumers.*

As detailed in StockX's opening brief, the results of Sarah Butler's consumer intent survey showed that "the allegedly false Authentication Statements do not have a material impact on consumers' likelihood of using the website to purchase" on StockX.  56.1 ¶ 623.  The results of Ms. Butler's survey are complemented by the testimony of actual StockX customers.  Nike's own employees testified that they purchased sneakers on StockX because the shoes in question were not available from Nike, rather than because of any StockX advertising claims.  56.1 ¶¶ 458–66.  Mr. Kim testified that his reasons for using StockX were that StockX offered better prices, better discounts, a better buying experience, a better app experience, greater

---

[23]    The cases that Nike cites are not to the contrary.  In *Snuggly Plushez,* for instance, the court considered evidence submitted by defendant to rebut a presumption of materiality.  *See CJ Prod. LLC v. Snuggly Plushez LLC,* 809 F. Supp. 2d 127, 148 (E.D.N.Y. 2011) (allowing the defendant to present evidence of how the public understood the term "authentic" before deciding the issue of materiality).  In *River Light,* the Southern District of Florida court observed that the defendant had failed to present any evidence to rebut plaintiff's presumption of materiality.  *See River Light,* 2018 WL 5778234, at *6.

responsiveness, and easier returns.  56.1 ¶¶ 447–55.  Actual and likely StockX customers gave similar reasons for their interest in the platform in responding to Ms. Butler's survey.  *See* 56.1 ¶¶ 626–30.  Mr. Kim's testimony further disproves that the Authenticity Claims are material to StockX's customers because he stated outright that he is aware the shoes he purchases may not be genuine but continues to purchase from StockX regardless.  56.1 ¶ 502; *see also* 56.1 ¶¶ 498–501.  Mr. Wells, an expert in the sneakerheads that make up StockX's target market, offered a similar opinion.  *See* 56.1 ¶ 501.

### 2. *Identical advertising claims made by StockX's competitors further rebut materiality because StockX's claims did not distinguish it in the market.*

Nike ignores the competitive context in which StockX operates.  StockX competes with resale marketplaces like GOAT, Flight Club, and eBay that make similar or *identical* claims about authenticity.  56.1 ¶¶ 504–21.  In determining whether the Authenticity Claims are material, the question is whether the claims are likely to influence consumers to purchase what StockX is selling—namely, StockX's marketplace and the services StockX provides.  Viewed in this context, StockX's Authenticity Claims cannot be material to consumer purchasing decisions because they do not distinguish StockX from its competitors, who make the very same claims.

Ample evidence shows the claims were not material, well beyond what demonstrates a dispute of material fact.  Nike is accordingly not entitled to summary judgment on this issue.

### D.    There Is No Evidence Nike Was Injured by StockX's Advertising.

Nike's motion independently fails because there is no evidence the Authenticity Claims caused Nike injury.  Nike offers only speculation about generalized harms from counterfeiting (for example, some people might have received poor quality counterfeit Nikes, or people might have purchased directly from Nike if they had not bought counterfeits on StockX).  Nike has no evidence these harms actually occurred.  56.1 ¶¶ 636–64.  Nike asserts the wrong legal standard,

presents no evidence of injury causation even under that standard, and does not meet the Second Circuit's well-established, narrow criteria for applying a presumption of injury.

*1. Nike must prove actual injury.*

Nike's argument that it need only show 'likely' injury is foreclosed by the Supreme Court's ruling in *Lexmark Int'l, Inc. v. Static Control Components, Inc.* that a Lanham Act false advertising plaintiff must prove ***actual*** injury: the plaintiff "cannot obtain relief without *evidence of injury* proximately caused by [defendant's] alleged misrepresentations," and "must plead (and ultimately prove) an injury to a commercial interest in sales or business reputation proximately caused by the defendant's misrepresentations."  572 U.S. 118, 129, 140 (2014) (emphasis in original).  "[A] plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that that occurs when deception of consumers causes them to withhold trade from the plaintiff."  *Id.* at 133.  Nike's assertion that it must prove only "a reasonable basis for the belief that the plaintiff is likely to be damaged as a result of the false advertising," Pls. MSJ at 19, is based on precisely the literal reading of the statute that the Supreme Court rejected in *Lexmark*.  Even before *Lexmark*, courts only applied the "likely to be damaged" standard to claims for injunctive relief, while requiring proof of actual injury to establish entitlement to damages.  *See, e.g.*, *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 188 (2d Cir. 1980); J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition*, § 27:42 (5th ed. 2019) (collecting cases).

*Church & Dwight*, on which Nike relies, is not good law on this point.  843 F.3d 48. *Church & Dwight* applied the pre-*Lexmark* standard (in a case involving only injunctive relief) without even mentioning *Lexmark*.  *Id.* at 72.  Last year, in *Souza v. Exotic Island Enterprises*, the Second Circuit noted that it had not yet addressed *Lexmark* head on and, as a matter of first impression, held that under *Lexmark*, "although [plaintiff's] injury may be presumed from a

26

direct competitor's false comparative advertising claim, *in all other cases, a plaintiff must present some affirmative indication of actual injury and causation*." 68 F.4th 99, 119 (2d Cir. 2023) (internal quotation marks and citations omitted; emphasis added). As Nike does not argue this case involves a direct competitor's false comparative advertising claim, Nike must prove actual injury and causation.[24]

> 2. <u>There is no evidence that the Authenticity Claims caused Nike any injury.</u>

Nike has not proven causation even under the lower standard it asserts. There is no evidence the Authenticity Claims caused Nike any actual, or even likely, injury.

*First*, there is no evidence the Authenticity Claims caused Nike to lose sales. ███████

███████████████████ and its corporate representative testified ███████████

█████████████████████████████████████████████████████

*See* Def. MSJ at 23–24; 56.1 ¶ 659. Nor has Nike introduced any evidence that the Authenticity Claims *likely* caused Nike to lose sales. Nike asserts that "StockX's false advertising harms Nike when it loses sales to StockX's falsely advertised sales of counterfeits," Pls. MSJ at 21, but Nike has *no evidence* suggesting that any such lost sales either occurred or were likely.[25] Nike's reliance on its expert Dr. Stec ignores his admission that his work "does not show that there was even a single instance of a Nike shoe sold on StockX at a time when the same shoe was available

---

[24] Nike's invocation of the "likely to be damaged" standard is a red herring in any event. Even before *Lexmark*, proof of actual injury was required when – as here – the false advertising alleged did not include comparative claims. *See, e.g.*, *BeautyBank, Inc. v. Harvey Prince, LLP*, 2013 WL 11327097, at *18 (S.D.N.Y. Mar. 29, 2013) ("When an allegedly false advertisement does not employ a negative comparison, 'some indication of actual injury and causation' is necessary") (quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 162 (2d Cir. 2007)); *Ortho Pharm. Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 694–95 (2d Cir. 1994).

[25] None of the cases Nike cites support its theory in any event. The court in *Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, 176 F. Supp. 3d 137 (E.D.N.Y. 2016) did *not* find that sales of counterfeit products necessarily cause lost sales to the brand. That case was decided on its facts, including "evidence of [the plaintiff's] *uniquely dominant share* of the energy-shot market…." *Id.* at 162 (emphasis added). Unlike here, where there are multiple resellers of Nike sneakers, there were no sellers other than the plaintiff. The other cases on which Nike relies, *Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*, 219 F.3d 104, 107–08 (2d Cir. 2000) and *Gucci Am., Inc. v. Guess?, Inc.*, 843 F. Supp. 2d 412, 418 (S.D.N.Y. 2012), address harm from post-sale trademark confusion, and do not say or suggest that false advertising necessarily causes lost sales.

in the same size on Nike.com," 56.1 ¶¶ 214–15, 291, much less a likelihood Nike would have made any of StockX's sales but for the Authenticity Claims. This Court acknowledged that Dr. Stec's work "tends to establish that StockX ***could have*** diverted sales from Nike" (Dkt. No. 250 at 17–28) (emphasis added), but that is not enough to meet Nike's burden. Rather, as in *BeautyBank*, that some sneakers could be purchased from either party does not satisfy Nike's burden to "demonstrat[e] concrete harm caused to it by Defendants' representations." 2013 WL 11327097, at *18 (plaintiff's claim that it sold "identical goods via common marketing channels" was insufficient to prove defendant's advertising caused it injury).

*Second*, there is no evidence the Authenticity Claims caused Nike reputational harm. The harm Nike asserts is that, "when a StockX purchaser is guaranteed that a fake 'Nike' product is authentic, any poor performance or low quality by the counterfeit footwear is attributed to Nike." Pls. MSJ at 20. Nike would only suffer such harm if it could prove that StockX customers in fact (*i*) received low-quality counterfeit Nikes; (*ii*) were unhappy with the shoes' quality relative to what they expect from Nike; and (*iii*) nevertheless continued to believe the shoes were Nikes. Nike has no evidence that ever actually happened or was likely to occur. 56.1 ¶¶ 636–64.

Nike has submitted no evidence to establish that even a single StockX customer had a more negative view of Nike because of the Authenticity Claims. Nike's examples of complaints to Nike do not even involve counterfeits. Nike provides seven examples of complaints about "low quality 'Nike' footwear purchased from StockX," *see* Pls. MSJ at 21; 56.1 ¶¶ 232–38, but Nike does not allege that those shoes were counterfeits. 56.1 ¶¶ 232–38. Consumer dissatisfaction with the quality of authentic Nike shoes cannot be attributed to StockX's advertising. Complaints by customers about possible counterfeits, *see* Pls. MSJ at 21; 56.1 ¶¶ 104–11, 194–96, cannot evidence reputational harm to Nike. A consumer who believed a shoe

was counterfeit did not necessarily believe the quality of the shoe was attributable to Nike.

Even if there **were** evidence of harm to Nike's reputation, Nike still has no evidence of proximate causation. The Authenticity Claims do not mention Nike, 56.1 ¶¶ 665–66, and Nike has no evidence to prove that fewer counterfeit Nikes would have been sold on StockX if StockX had not made the Authenticity Claims. Nike speculates that buyers may have been more likely to believe they would not receive counterfeit goods because of the Authenticity Claims, Pls. MSJ at 9, but offers no proof that the Authenticity Claims were the proximate cause of any change in buyer expectations or beliefs. To the contrary, Roy Kim's testimony makes it clear that resale customers are "conditioned to think that any shoes . . . could be fake that comes through these platforms" regardless of StockX's advertising. *See* 56.1 ¶ 502; *see also* 56.1 ¶ 501 ("Sneakerheads are generally aware that counterfeit sneakers are common.").

### 3. *Nike Is Not Entitled to a Presumption of Injury.*

Nike's assertion of a presumption based on "obvious competition" between Nike and StockX misrepresents the law. No such presumption exists in the Second Circuit. Although the court in *Merck Eprova AG v. Brookstone Pharms., LLC*, 920 F. Supp. 2d 404, 417 (S.D.N.Y. 2013) stated summarily that "injury may be presumed when the plaintiff is an obvious competitor **with respect to the misrepresented product**" (emphasis added), that court's citation to *Reckitt Benckiser v. Motomco Ltd.*, 760 F. Supp. 2d 446, 453 (S.D.N.Y. 2011), shows it was applying the presumption that can arise for *comparative* advertising statements. In *Reckitt Benckiser*, the parties were "obvious competitors with respect to each other's allegedly misrepresented products **and** the allegedly false statements were made in the context of advertising campaigns directly referencing, and indeed aimed at, the opposing manufacturer's products." *Id.* (emphasis added). The court made clear that a presumption only arises "when a plaintiff demonstrates the literal falsity of a defendant's comparative advertisement mentioning

29

the plaintiffs [sic] product by name." *Id.; see also SimplexGrinnell LP v. Integrated Sys. & Power, Inc.*, 642 F. Supp. 2d 167, 204 (S.D.N.Y. 2009) (applying a presumption because "SimplexGrinnel and ISPI are obvious competitors … ***and*** ISPI repeatedly coupled its advertisements … with [comparative] statements" (emphasis added)).

Even if a presumption did exist, Nike has not proven it is in "obvious competition" with StockX. Not one Nike witness testified that Nike and StockX compete—to the contrary, Nike's corporate representative did not name StockX (or any other resale marketplace) as being among Nike's competitors in her sworn testimony. 56.1 ¶ 680; *see also* 56.1 ¶¶ 677–78, 686. At a minimum, there is a genuine dispute of fact that precludes summary judgment on this issue.

### E.    No Evidence Demonstrates Willful Falsity.

Nike's argument that StockX has willfully engaged in false advertising is bereft of any support. StockX truthfully guaranteed consumers that they would receive a "100% Authentic" product or StockX would provide a refund. 56.1 ¶¶ 424–25, 441–46. StockX fulfilled that promise. For false advertising, "[u]nder any theory, a finding of defendant's willful deceptiveness is a prerequisite for awarding profits." *See Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 262 (2d Cir. 2014). For all the reasons set forth above, Nike's theory that StockX willfully falsely advertised is "entirely speculative," contradicted by clear record evidence, and fails as a matter of law. *Chrome Hearts*, 2023 WL 5049198, at *19.

### CONCLUSION

For the foregoing reasons, Nike's motion should be granted in part, solely as to liability for counterfeiting as to 33 of Mr. Kim's purchases and 1 Nike purchase; denied as to counterfeiting damages, including both the number of counterfeits and as to willfulness; and denied as to false advertising liability and willfulness.

Dated:        New York, New York

September 5, 2024

By: /s/ *Megan K. Bannigan*
DEBEVOISE & PLIMPTON LLP
Megan K. Bannigan (mkbannigan@debevoise.com)
David H. Bernstein (dhbernstein@debevoise.com)
Jyotin Hamid (jhamid@debevoise.com)
Christopher S. Ford (csford@debevoise.com)
Carl Riehl (criehl@debevoise.com)
Kathryn C. Saba (ksaba@debevoise.com)
66 Hudson Boulevard
New York, New York 10001
(212) 909-6000

KILPATRICK TOWNSEND & STOCKTON LLP
Robert N. Potter (rpotter@kilpatricktownsend.com)
Briggs Wright (briggs.wright@kilpatricktownsend.com)
1114 Avenue of the Americas
New York, New York 10036
(212) 775-8700

MORGANROTH & MORGANROTH PLLC
Jeffrey B. Morganroth (jmorganroth@morganrothlaw.com)
344 N. Old Woodward Ave., #200
Birmingham, MI 48075
(248) 864-4000

*Attorneys for Defendant StockX LLC*