# EXHIBIT 20

Page 1

1        JEFFERY A. STEC, PH.D. - JULY 13, 2023
2           IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF NEW YORK
3
4

   NIKE, INC.,                        )
5                                     )
                    Plaintiff,        )
6                                     )
               -vs-                   )   No. 1:22-cv-00983-VEC
7                                     )
   STOCKX LLC,                        )
8                                     )
                    Defendant.        )
9
10
11        Video-recorded deposition of JEFFERY A. STEC,
12   PH.D., taken before TRACY L. BLASZAK, CSR, CRR, and
13   Notary Public, pursuant to the Federal Rules of Civil
14   Procedure for the United States District Courts
15   pertaining to the taking of depositions, at Suite 900,
16   444 West Lake Street, in the City of Chicago, Cook
17   County, Illinois at 9:02 a.m. on the 13th day of July,
18   A.D., 2023.
19
20
21
22
23
24
25

Page 2

```
 1          JEFFERY A. STEC, PH.D. - JULY 13, 2023
 2            There were present at the taking of this
 3    deposition the following counsel:
 4
              DLA PIPER by
 5            MR. JOSHUA SCHWARTZMAN
              MS. TAMAR Y. DUVDEVANI
 6            1251 Avenue of the Americas
              New York, New York 10020
 7            (212) 335-4500
              joshua.schwartzman@dlapiper.com
 8            tamar.duvdevani@dlapiper.com
 9                on behalf of the Plaintiff;
10
              DEBEVOISE & PLIMPTON LLP by
11            MR. CARL RIEHL
              MS. CLARA CORREA
12            66 Hudson Boulevard
              New York, New York 10001
13            (212) 909-6000
              criehl@debevoise.com
14            ccorrea@debevoise.com
15                on behalf of the Defendant;
16
              ALSO PRESENT:  Mr. Robert Zellner
17                           Legal Videographer.
18
                              - - - - -
19
20
21
22
23
24
25
```

1          JEFFERY A. STEC, PH.D. - JULY 13, 2023

2          But at the end of the day if you're a consumer,

3     you want to buy this shoe, you Google it, find out to

4     where it is, you can go to either StockX or Nike to buy

5     it.

6     Q    Dr. Stec, are you able to identify even a single

7     sale of a Nike shoe on StockX that definitely occurred

8     at the same time that shoe was available in the same

9     size on Nike.com?

10    A    That's not something that I endeavored to do in

11    this analysis.  What I endeavored to do in this analysis

12    is show that if you're a consumer in the marketplace and

13    you're interested in this particular shoe where can you

14    go to buy it.

15          Now, I was focused, obviously, on Nike and

16    StockX.  I'm not suggesting you couldn't go to Foot

17    Locker or Dick's or wherever and not buy the shoe there.

18    But if you're just simply looking at these two

19    companies, you could buy the shoes that I have listed

20    there at least in the sizes that I have listed there

21    from either company.

22    Q    And it's not only that you weren't endeavoring

23    to do that, but, in fact, the work you did does not show

24    that there was even a single instance of a Nike shoe

25    sold on StockX at a time when the same shoe was

Page 250

1              JEFFERY A. STEC, PH.D. - JULY 13, 2023

2       available in the same size on Nike.com, right?

3                MR. SCHWARTZMAN:  Objection.

4                THE WITNESS:  So I don't have and I don't

5       believe StockX produced the exact date of each of their

6       sales for each of these shoes.  So I don't have that

7       information.

8                If StockX has that information, I'm happy to

9       consider it.  But at this point that information, as far

10      as I know, doesn't exist.

11      BY MR. RIEHL:

12         Q    And so your study did not show definitively that

13      there was such a sale, right?

14         A    So, again, I wasn't asked to look at this, but I

15      don't believe that at least I'm aware of data that could

16      provide an answer to that particular question.

17         Q    And your data does not provide an answer to that

18      particular question, right, and your study does not

19      provide an answer to that question, right?

20                MR. SCHWARTZMAN:  Objection.

21                THE WITNESS:  Again, that's not something that

22      I was endeavoring to do.  I tried to explain both in my

23      report and today what I was endeavoring to do.

24                And it's clear to me that if you're a Nike

25      consumer and you'd like to buy a particular style of

Page 259

1          JEFFERY A. STEC, PH.D. - JULY 13, 2023

2      Q    I'm not offering a characterization.  But I am

3  asking you, is it your understanding that a seller on

4  StockX must have physical possession of the shoe at the

5  time they offer it for sale on StockX?

6      A    So I don't recall and I'm not sure that this was

7  disclosed by StockX about the timing or the requirements

8  on timing when a transaction is consummated.

9          I could imagine that the business could be

10  adversely affected if sellers aren't providing buyers in

11  a timely fashion the price or, I'm sorry, the product

12  that they purchased.

13          But I'm not aware of the lag that StockX may

14  allow in that regard.

15      Q    If someone has a particular style of Nike shoe

16  before Nike releases that shoe and it's a genuine Nike

17  shoe, they must have gotten that shoe from Nike or from

18  somebody who got it from Nike, right?

19          MR. SCHWARTZMAN:  Objection.

20          THE WITNESS:  I think that's maybe one way they

21  could have acquired the shoe.  There may be other ways.

22  BY MR. RIEHL:

23      Q    How else?

24      A    I don't know.  That's not something I've thought

25  about.  That could be one certainly way what you

Page 260

1           JEFFERY A. STEC, PH.D. - JULY 13, 2023

2    suggested, but there could be other ways.

3    BY MR. RIEHL:

4        Q   Nike sometimes gives away promotional samples

5    before the release date, right?

6               MR. SCHWARTZMAN:  Objection.

7               THE WITNESS:  That's true, I believe, yes.

8    BY MR. RIEHL:

9        Q   And that's typically a pretty small number of

10   shoes relative to the launch size, right?

11              MR. SCHWARTZMAN:  Objection.

12              THE WITNESS:  I can't say one way or the other.

13   That would be a small number of shoes.  Now that I've

14   thought about it a little bit more, I guess there are

15   ways, other ways that those shoes could be acquired.

16   They could be stolen, for example.

17              So Nike hasn't released the shoe yet but its

18   manufacturer had someone manufacture the shoe and

19   ultimately however it happened a large proportion of the

20   shoes or a large number of shoes had been stolen, and

21   that might be another way that you could access those

22   shoes before the launch.

23   BY MR. RIEHL:

24       Q   And the usual definition of a release of a

25   product is the first time that product goes on sale,

Page 261

1              JEFFERY A. STEC, PH.D. - JULY 13, 2023

2    right?

3              MR. SCHWARTZMAN:  Objection.

4              THE WITNESS:  That seems reasonable.  Could

5    there be other situations where a release might be

6    defined differently, I guess it's possible, but that

7    would be a general understanding I would have.

8    BY MR. RIEHL:

9       Q    Nike could make the choice not to give away any

10   shoes of a particular style prerelease, right?

11             MR. SCHWARTZMAN:  Object to form.

12             THE WITNESS:  To the extent Nike has control

13   over that, that's something that Nike could do.  If Nike

14   doesn't have control over some number of shoes or loses

15   control over some number of shoes, then I guess that's

16   another possible way those shoes could hit the market.

17   BY MR. RIEHL:

18      Q    How might Nike not have control over that?

19      A    Well, it has shoes that are stolen, for example.

20   So it manufactures the shoes, it provides the shoes to

21   perhaps a retailer or something or maybe it's even

22   warehoused at Nike and those shoes are stolen.

23      Q    Are there any other ways Nike could not have

24   control over it?

25      A    Again, this isn't something I've tried to

Page 262

1        JEFFERY A. STEC, PH.D. - JULY 13, 2023

2   exhaustively think about.  It's an example of how like

3   Nike could lose control of some inventory of shoes.  I'm

4   thinking that it's likely something that they try to

5   avoid, but my understanding is that shoes are stolen,

6   that happens.

7        Q    To the extent that resales of shoes that Nike

8   gives away prerelease puts competitive pressure on Nike,

9   Nike could reduce that pressure by not giving away

10  shoes, right?

11            MR. SCHWARTZMAN:  Objection.

12            THE WITNESS:  So Nike may have agreements with

13  whomever are receiving these shoes to not release these

14  shoes or not to give these shoes away, perhaps by some

15  date or perhaps at all.  I don't know.

16            So Nike may already have those types of

17  processes in place.  And for whatever reason those

18  processes weren't observed.

19            I'm not sure that that would be a choice that

20  Nike would have.  It would seem that the counterparty

21  might be the one that's making the choice to do

22  something that isn't allowed, at least in a potential

23  agreement it has with Nike.

24  BY MR. RIEHL:

25       Q    And you don't know whether or not Nike has those