# EXHIBIT 34

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

EXPERT WITNESS REPORT OF KARI KAMMEL

In the Matter of Nike, Inc. v. StockX LLC

Case No. 1:22-cv-000983-VEC (S.D.N.Y.)

May 5, 2023

_____

Kari Kammel

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

I.    BACKGROUND AND EXPERIENCE                                                                 1

II.   The Problem of Trademark Counterfeiting                                                   2

  A.   What is Trademark Counterfeiting                                                          2

  B.   Counterfeiting in the Footwear Industry                                                  3

  C.   Counterfeiting Occurs Primarily Because Bad Actors Want to Make Maximum Profit
       from Consumers                                                                            3

  D.   Who Are Counterfeiters?                                                                   5

  E.   The Counterfeit Supply Chain                                                              6

    1.   Manufacturing of Counterfeit Products                                                   6

    2.   Manufacturing of Counterfeit Shoes                                                      7

    3.   Distribution and Shipping to the U.S.                                                   7

    4.   Online Distribution and Sale of Counterfeit Products                                    8

      a.   Details and Vetting of Third-Party Sellers                                            9

      b.   Details and Vetting of the Products Sold                                             10

        (1)  Platforms Joining the Supply Chain with Inspection, "Verification",
             "Authentication", Warehousing, or Shipping of Products                             10

      c.   Lack of Appropriate Post-Sale Policies that Address Counterfeits                     11

      d.   Lack of Transparency with the Consumers regarding Risk and Awareness of
           Counterfeits                                                                         12

III.  The Harm Caused by Counterfeits to IP Rights Holders, Consumers, and Society             13

  A.   Harm to IP Rights Holders by the Purchase and Sale of Counterfeit                        13

  B.   Harm Caused to the Footwear Industry                                                     14

  C.   Harm Caused to Nike                                                                      14

  D.   Harm to Consumers by the Purchase of Counterfeit Products                                16

  E.   Harm to Society by the Sale of Counterfeit Products                                      17

IV.   Measures IP Rights Holders Take to Protect Their Brands                                   17

  A.   Proactive Measures                                                                       18

  B.   Reactive Measures                                                                        19

  C.   Market Monitoring of Both Legitimate and Illicit Supply Chains and Products             19

  D.   Brand Protection Technologies to Protect Authentic Product                               20

    1.   Types of Technologies- Understanding Brand Protection Technologies                     20

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

V.    Authentication of Product                                                         21

  A.    Definition of Authentication of Trademarked Product                       21

  B.    Authorized Authenticators                                                 22

  C.    What Authentication is Not                                                23

VI.   Nike's Brand Protection Efforts                                                    24

  A.    Measures Nike Takes to Protect Its Brand                                  24

  B.    Nike's Use of Brand Protection Technologies & Authentication of Products  25

  C.    Challenges Faced by Nike in its Brand Protection and Anti-Counterfeiting Efforts    26

VII.  Stock X's Website Relating to Authentication and Trademark Counterfeits            26

  A.    StockX's "Authentication" Guarantee, "Authentication", "Authentication Process," or Verification Process    28

  B.    The "Authentication", or "Verification" Process is Actually a Comparison Process Looking at Conditions or "Quality" to Find Obvious Counterfeit    29

    1.    A "Science" that is "almost 100% Accurate"                           30

    2.    External Descriptions of the Process: Focus on Quality               30

  C.    StockX "Authenticators" and StockX's Internal Standard Operating Procedure ("SOP") on Authentication    32

    1.    "Authenticators"                                                     32

    2.    Internal StockX SOP for Authenticating                               33

  D.    Lack of Consumer Options to Return a Counterfeit Item and Protecting the Sellers    36

  E.    Types of Product or Sellers on StockX that Encourage Counterfeiters       37

    1.    New Sellers Selling High AOV Items                                   37

    2.    Pre-Release Sales of Nike Sneakers                                   38

  F.    Conclusion on StockX's Website and "Authentication"                       39

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

## I.      BACKGROUND AND EXPERIENCE

I am currently the director of the Center for Anti-Counterfeiting & Product Protection (A-CAPP Center) at Michigan State University, and a senior academic outreach specialist.  I have worked at the A-CAPP Center since April of 2015.  I am also an adjunct professor of law at Michigan State University College of Law, where I teach Trademark Counterfeiting Law, Food Counterfeiting Law, and International Intellectual Property; and I am an adjunct professor in the School of Criminal Justice at Michigan State University, where I teach Legislative and Policy Responses to Cybercrime. Prior to coming to MSU, I was the deputy executive director of the International Human Rights Law Institute at DePaul University; and the deputy chief of party of the International Human Rights Law Institute in Iraq of DePaul University. My curriculum vitae is attached to this report.

I hold a bachelor's degree in Near Eastern languages and civilizations from The University of Chicago, a master's in political science from The American University in Cairo, and a Juris Doctor from DePaul University College of Law, with a certificate in international and comparative law.  I have been an academic for the entirety of my career since graduating from law school.

As part of my current work and career, I have become very knowledgeable about the problem of trademark counterfeiting in the United States and globally.  I am a legal scholar on issues pertaining to trademark counterfeiting, particularly in regard to the sale of counterfeit products in e-commerce as well as international issues stemming from counterfeiting.  Also, as a senior academic outreach specialist at the A-CAPP Center, I have engaged with over 500 organizations that are stakeholders within the field of anti-counterfeiting or brand protection, including but not limited to intellectual property (IP) rights holders (or brand owners), government and law enforcement, e-commerce platforms, law firms, investigators, anti-counterfeiting technology providers or vendors, and other academics.  This report is based on my experience as an academic at the A-CAPP Center, both my research and outreach.  I am knowledgeable on the facts contained in this report.

I have previously been asked to testify as an expert witness on cases involving trademark counterfeiting.  In 2021, I was invited twice to testify as an expert on the sale of counterfeits by third-party sellers on e-commerce platforms based on my research and publications.  I testified in May of 2021 before the House Judiciary Committee, Subcommittee on Courts, Intellectual Property, and the Internet on *The SHOP SAFE Act:*

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

*Stemming the Rising Tide of Unsafe Counterfeit Products Online.*[1]  I later testified before the Senate Judiciary Committee in November of 2021 on *Cleaning Up Online Marketplaces: Protecting Against Stolen, Counterfeit, and Unsafe Goods.*[2]

I am being compensated at the rate of $500 per hour for my time in preparing this report and for my testimony.  My compensation is not dependent in any way on the outcome of this matter.

The opinions I set forth in this report are based on the currently available information provided to me.  In the event that Nike or Nike's representatives, StockX, StockX-retained experts, and/or other third-parties present additional information, I reserve the right to supplement, amend, or revise the opinions and conclusions contained herein to account for such.

## II.    THE PROBLEM OF TRADEMARK COUNTERFEITING

### A.    What is Trademark Counterfeiting

Trademark counterfeiting is a pervasive, global, growing problem that causes harm to IP rights holders, consumers, and societies.

Trademark counterfeiting occurs when a party creates a "reproduction, counterfeit, copy, or colorable imitation of a registered mark," that can be applied to "labels, signs, prints, packages, wrappers, receptacles or advertisements," and "such use is likely to cause confusion, or to cause mistake, or to deceive."[3]  "Counterfeit" is defined as a "spurious mark which is identical with, or substantially indistinguishable from, a registered mark."[4]  A counterfeit product or a counterfeit package refers to a product or package that has an unauthorized or spurious trademark on it.[5]  Counterfeit products may appear to be identical copies or replications of the genuine product, and some may even use materials identical or similar to the genuine product, which makes it difficult for the average person

---

[1] House Judiciary Committee, Subcommittee on Courts, Intellectual Property, and the Internet on *The SHOP SAFE Act: Stemming the Rising Tide of Unsafe Counterfeit Products Online,* Testimony of Kari Kammel, https://www.congress.gov/117/chrg/CHRG-117hhrg45396/CHRG-117hhrg45396.pdf.

[2] Senate Judiciary Committee in November of 2021 on *Cleaning Up Online Marketplaces: Protecting Against Stolen, Counterfeit, and Unsafe Goods, Testimony of Kari Kammel,* https://www.judiciary.senate.gov/meetings/cleaning-up-online-marketplaces-protecting-against-stolen-counterfeit-and-unsafe-goods.

[3] Lanham Act, 15 U.S.C. § 1114(1).

[4] Lanham Act, 15 U.S.C. § 1127.

[5] The Lanham Act notes that a trademark counterfeit is a "spurious mark which is identical with, or substantially indistinguishable from, a registered trademark."  Lanham Act § 45, 15 U.S.C. § 1127 (1998). Additionally, the Trademark Counterfeiting Act notes for a trademark to be counterfeit it must be "spurious." 18 U.S.C. § 2320(d)(1)(a).  A mark is "spurious" if it is "not genuine or authentic."  Joint Statement on Trademark Counterfeiting Legislation, 130 Cong. Rec. H12076, H12078 (daily ed. Oct. 10, 1984).

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

to distinguish between the genuine and counterfeit product.  On the other hand, counterfeit products may at times be more easily distinguished from a genuine product because of substandard or poor-quality materials, spelling errors, mistakes, smells, colors, or other distinctions that might be visible to someone studying the product.  Counterfeit products may even be packaged inside of genuine packaging that counterfeiters could acquire to deceive the consumer or others in the supply chain.

### B.    Counterfeiting in the Footwear Industry

The counterfeit footwear industry follows many of the general trends described above in how the illicit supply chain operates in the online space.  Many bad actors play a role in the illicit flow of counterfeit footwear from manufacturers to online e-commerce platforms to consumers.  Counterfeiters in this industry, like other industries, rely on well-known brands, their reputation, and the demand for their products.

"Sneakerheads," who wear or collect shoes as a hobby and are willing to financially invest in them, are an ideal target market for counterfeiters.  Because the market for these shoes differs from a regular distribution of a shoe that is commonly sold in a store, with a demand far greater than the supply, counterfeiters see this space as highly lucrative.[6]

### C.    Counterfeiting Occurs Primarily Because Bad Actors Want to Make Maximum Profit from Consumers

Trademark counterfeiting occurs for a variety of reasons, but primarily, bad actors want to make as much profit as possible from consumers using the goodwill, name and reputation of the IP rights holder.  Counterfeiters have a strong financial motivation given that trademark counterfeiting is one of the most lucrative, profit-motivated illicit activities in the world.  Worldwide estimates of counterfeiting profits from Global Financial Integrity name counterfeiting as the largest criminal enterprise in the world, approximately $923 billion to $1.13 trillion a year—a higher amount than either drugs ($426-652 billion) or human trafficking ($150.2 billion).[7]

---

[6] Counterfeiting is the most lucrative illicit global crime.  *See infra* note 7.  Additionally, shoes are the most counterfeited category of good globally.  Additionally, for several years, footwear has been the most highly counterfeited goods globally according to the OECD based on seizure data.  *See* OECD/EUIPO, *Trends in Trade in Counterfeit and Pirated Goods, Illicit Trade* (2019) at 31-32, https://www.oecd-ilibrary.org/deliver/g2g9f533-en.pdf?itemId=%2Fcontent%2Fpublication%2Fg2g9f533-en&mimeType=pdf. . at 31-32 (examining years 2013-2016); *see also* OECD/EUIPO, *Global Trade in Fakes: A Worrying Threat, Illicit Trade*(2021) at 22, https://www.oecd-ilibrary.org/deliver/74c81154-en.pdf?itemId=%2Fcontent%2Fpublication%2F74c81154-en&mimeType=pdf.  IPR CENTER, *Tracing the Counterfeit Shoe Market* (Feb. 10, 2022), https://www.ice.gov/factsheets/counterfeit-shoe-market.

[7] Channing May, Transnational Crime and the Developing World,  GLOBAL FINANCIAL INTEGRITY (March 2017), https://gfintegrity.org/wp-content/uploads/2017/03/Transnational_Crime-final.pdf.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

Additionally, counterfeiting is one of the lower risk profit motivated crimes. Trademark counterfeiters' investment into the manufacturing of the counterfeits is significantly lower than any legitimate IP rights holder since they have no laws to abide by, no manufacturing standards, labor standards, quality control, interest in protecting the reputation of the IP rights holder, nor interest in consumer safety. Because of this, they can move quickly, going to marketplaces where they find the least amount of detection and enforcement of rights, which is currently in the online space. Counterfeiters are constantly shifting their strategies, selling techniques, advertisements and anything they can do to avoid detection, creating an environment where IP rights holders are attempting to thwart their efforts online, called the "whack a mole" approach.[8]

Trademark counterfeiting occurs throughout the world, and most countries can be identified as either a "provenance economy," "transit economy," or "destination economy," or a combination of these three types of economies.[9] At its base, counterfeiting follows supply and demand. If there is a demand for a branded product, counterfeits will appear in this space, often very quickly, sometimes even before a product is launched by the IP rights holder. If there is no demand for a branded product, counterfeiters will not waste time entering that market. IP enforcement in many countries is weak, fueled or exacerbated by weak rule of law, corruption, a lack of resources, or indifference.

China is well-known as one of the largest countries of the provenance of counterfeit products,[10] and U.S. government seizure data shows that much of the counterfeit product that enters the U.S. comes from China.[11] While China has shifted its enforcement efforts over the past few years, many IP rights holders still struggle with enforcement there.

While the phenomenon of counterfeiting has been around for a very long time, the sale of products and services online has recently exploded, and exponentially so during the

---

[8] Kammel, House Testimony, *supra* note 1, at 8; Kari Kammel, Jay Kennedy, Daniel Cermak & Minelli Manoukian, *Responsibility for the sale of trademark counterfeits online: Striking a balance in secondary liability while protecting consumer*s, 49 AIPLA Q.J. 254 (2021) (citing Daniel C.K. Chow, A*libaba, Amazon, and Counterfeiting in the Age of the Internet*, 40 NW. J. Int'l L. & Bus. 157, 161 (2020)).

[9] These terms describe whether counterfeiting originates in the country (provenance economy), transits through the country for sale in another (transit economy),or is sold to consumers of that country (destination economy). OECD/EUIPO, Mapping the Real Routes of Trade in Fake Goods (2017), at 22, https://www.oecd-ilibrary.org/mapping-the-real-routes-of-trade-in-fake-goods_5jftc969rs9p.pdf?itemId=%2Fcontent%2Fpublication%2F9789264278349-en&mimeType=pdf. Regarding footwear, 92% of seized counterfeit footwear has provenance in China and Hong Kong. *See* OECD/EUIPO, Global Trade in Fakes (2021), at 38.

[10] OECD, Mapping the Real Routes of Trade in Fake Goods, at 23; OECD, Trends in the Trade of Counterfeit and Pirated Goods, at 40.

[11] Seizures from China and Hong Kong constituted 51% of all seizures in 2021 and 69% in 2020. U.S. Customs and Border Protection, *FY 2021: Intellectual Property Seizure Statistics*, (Sept. 29, 2022), https://www.cbp.gov/document/annual-report/fy-2021-ipr-seizure-statistics.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

COVID-19 pandemic,[12] due to a variety of factors, including the global disruption of supply chains which caused shortages in many legitimate products, global stay home orders, and other shifts in everyday patterns of consumption.  Online marketplaces of many different kinds have found business models that can get products to consumers all over the world quickly in ways that never occurred before, and consumers can shop anywhere they are located with a smartphone or computer.

While online marketplaces benefit consumers and legitimate businesses seeking to expand their consumer base, there is a flip side to this success—counterfeiters can now reach large parts of these consumer bases with ease.[13]

On the Internet, the counterfeiters have found a perfect space to sell, often anonymously or disguised, from anywhere they have an internet connection, and with copyrighted images often taken from the IP rights holders or products that are never vetted or authenticated by the brand.[14]

Another major driver of counterfeit sales online is social media and social media videos that are very difficult to monitor and are used primarily to catch consumer attention to certain products.

### D.    Who Are Counterfeiters?

In the field of anti-counterfeiting and brand protection, it is well-known that bad actors are primarily responsible for counterfeiting.  An A-CAPP Center report, the Center's Product Counterfeiting Database, which examines U.S. based counterfeiting schemes, showed that many bad actors who manufacture and sell counterfeit products are part of organized criminal activity, or other types of criminal activity, and even in some cases terrorism.[15]

---

[12] E-commerce sales increased from $491.8 billion in 2019 to $ 707.6 billion in 2020, the first year of the pandemic. *See* U.S. CENSUS BUREAU, *Annual Retail Trade Survey (ARTS) Tables: 2021* (Dec. 15, 2022), https://www.census.gov/data/tables/2021/econ/arts/supplemental-ecommerce.html.

[13] *See* John H. Zacharia & Kari Kammel, *Congress's Proposed E-Commerce Legislation for Regulation of Third-Party Sellers: Why It's Needed and How Congress Should Make It Better*, 21 U.C. Davis Bus. L. J. 92 94(2021).

[14] *See generally,* Matthew Winterroth, *Professional Pointer*: *Copyright Against Counterfeiters-An Effective Tool for Brand Protection*, 7 THE BRAND PROTECTION PROFESSIONAL 3 (Sept. 2022), https://bpp.msu.edu/magazine/professional-pointer-september2022/.

[15] Jay Kennedy, *A-CAPP Center Product Counterfeiting Database: Insights Into Converging Crimes*, A-CAPP CENTER (2019), at preface, https://a-capp.msu.edu/article/a-capp-center-product-counterfeiting-database-insights-into-converging-crimes/ (including individuals with prior criminal histories being charged with drug-related crimes, history of fraud, white-collar crime, or occupational offending, intellectual property crimes or counterfeiting, property crimes, and crimes against a person, including assault with a deadly weapon and attempted homicide.  Concurrently charged offenses included: white-collar and occupational offenses, including money laundering, tax evasion, and fraud; intellectual property and counterfeiting offenses; drug offenses, including illegal drug trafficking; and property crimes, including trafficking in stolen goods.  There were a few individuals connected to terrorist activities, providing material support (weapons) for terrorism, and the financing of terrorism and terrorist organizations.).

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

Other organizations such as INTERPOL also confirm the confluence of criminal activity with counterfeiting.[16]

Additionally, many types of illicit trade often overlap with the trade in counterfeit products, such as weapons trafficking or drug trafficking, often involving some of the same bad actors and sometimes the same trade routes.[17]  While there are some small individual exceptions, in my experience in the field, they generally fall into these categories of individuals or organizations illegally looking to generate revenue.

### E.    The Counterfeit Supply Chain

Counterfeit product manufacturers, distributors and sellers attempt to take advantage of all nodes within a legitimate supply chain and will create their own illicit supply chain and/or steal or enter the legitimate supply chain to get their products to consumers.

### 1.    Manufacturing of Counterfeit Products

Manufacturing of counterfeits can take place in almost any country in the world depending on a product line or industry, but often factories producing counterfeit product will be set up near a legitimate factory, or in an area where labor is cheap.

While any legitimate product must go through many levels of quality control up to the standards of the individual company, whether it be ethical sourcing of materials, quality and design of manufacturing, or a variety of industry standards or regulations designed to protect consumers, counterfeit products do not because there is no one regulating those who are manufacturing them.  Counterfeiters abide by no safety standards in the manufacturing of their products, or for their employees; chemicals and materials used are often filthy, hazardous, or dangerous.

That said, dangerous or substandard materials are not requirements for a product to be counterfeit.  In some cases, the counterfeit product is almost indistinguishable from the genuine product, since it can be copied with precision.

---

[16] *See* INTERPOL, *Illicit Goods: The Issues*,  https://www.interpol.int/en/Crimes/Illicit-goods/Illicit-goods-the-issues (*last accessed* May 4, 2023) (noting the "clear link between illicit trade and other types of crime, such as human trafficking, drug trafficking, corruption, bribery and money laundering.").

[17] *See generally A-CAPP Center Report, Illicit Trade: Exploring the Interconnection of Illicit Trade in Firearms, Tobacco, and Counterfeit Products, at* 4-11(eds. Kari Kammel & Chandler Wirostek 2022), https://a-capp.msu.edu/wp-content/uploads/2022/11/IllcitTrade-ACAPP-Paper.pdf.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

### 2.    Manufacturing of Counterfeit Shoes

In the footwear industry, many counterfeit shoes are manufactured in China and are shipped worldwide.  There are entire cities in China dedicated to the manufacture and distribution of counterfeits.  There are also some areas that have factories where legitimate authentic shoes are manufactured or used to be manufactured.

For counterfeit footwear, many counterfeit manufacturers follow similar patterns as they do for other industries, both for brick-and-mortar sales and online sales.  For example, if counterfeiters can get access to an authentic pair of shoes either before the shoe is launched or after it is launched, they will attempt to reverse engineer it and produce the counterfeit.

For example, the city of Putian in China's Fujian province is known for its counterfeit shoe production and market.[18]  Some of the counterfeit shoes from this region are so good that they are virtually undetectable to someone trying to authenticate them who does not work for the brand.  For example, in one description of footwear that can come from the Putian area, the writer notes:

> Everyone who has bought shoes at online stores must have done these things: After receiving the shoes, the first thing is to smell it. Well, no bad smell is detected. Then compare every detail of the shoes you've received with that on its official website, including its logo, embroidery, and alignment. You would probably be sure that it's 100% authentic.  However, it is probably a pair of brand shoes made in Putian. You may not even know where Putian is, but you must have heard of fake sneakers from Putian."[19]

IP rights holders in the footwear industry spend resources and time trying to combat counterfeits, particularly those coming from China.

### 3.    Distribution and Shipping to the U.S.

Distribution of counterfeit footwear from China to global locations and in particular to the U.S. most likely occurs in one of several ways: sent from China in mislabeled containers to

---

[18] IPR CENTER, *Tracing the Counterfeit Shoe Market* (Feb. 10, 2022),,
https://www.ice.gov/factsheets/counterfeit-shoe-market; Alice, China Sourcing Tips: The Secret of Fake Sneakers Workshop Capital —- Putian (Apr. 28, 2021),https://mysourcify.com/the-secret-of-fake-sneakers-workshop-capital-putian.

[19] Alice, *China Sourcing Tips: The Secret of Fake Sneakers Workshop Capital —- Putian* (Apr. 28, 2021),https://mysourcify.com/the-secret-of-fake-sneakers-workshop-capital-putian.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

the U.S. for distribution,[20] or in other ways to try to deceive the U.S. Customs and Border Patrol ("CBP"); sent directly to U.S. consumers from China via purchases online; or integrated in some way with an e-commerce provider, through their warehousing or other types of inspection.  In all cases, it is incredibly difficult for brand owners and authorities to trace counterfeit product back to counterfeiters,[21] particularly if the product was sold online or if it has already made it to the consumer.

### 4.      Online Distribution and Sale of Counterfeit Products

Counterfeiters distribute and sell their products online, primarily because this is the most effective sales channel for them and there are very few barriers to their entry into the market.[22]  Online marketplaces utilized by counterfeiters offer some combination of allowing third-party sellers to sell product, store, ship, deliver, or other action in the supply chain that ends with the consumer.

E-commerce and social media platforms have created the perfect environment for counterfeiters, since these platforms usually prioritize the speed of getting product to consumers, satisfaction of sellers, and profit for the platform, instead of safety and protection of consumers and their purchases.[23]  With some rare exceptions, standards for selling products that one would find in a brick and mortar setting simply have not existed online to date.

Even if an IP rights owner does not intend to sell online or on a specific marketplace, it can often find that its products and/or counterfeit versions of its products are being sold on an online marketplace.

---

[20] IPR CENTER, *Tracing the Counterfeit Shoe Market* (Feb. 10, 2022), https://www.ice.gov/factsheets/counterfeit-shoe-market.

[21] *Id.*

[22] Off. Of Strategy, Pol'y, and Plans, U.S. Dep't of Homland Sec., Combating Trafficling in Counterfeit and Pirated Goods 4 (Jan. 24, 2020), https://www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goods-report_01.pdf [hereinafter Combatting Trafficking] (noting the OECD, US GAO, and the US Department of Commerce all observed the increasing issue of counterfeits sold on e-commerce); *see also* Kari Kammel, Jay Kennedy, Daniel Cermak, and Minelli Manoukian, *Responsibility for the sale of trademark counterfeits online: Striking a balance in secondary liability while protecting consumers*, 49 AIPLA Q.J. 201-258 (2021) (noting "Third-party e-commerce platforms foster an air of legitimacy, shielding––albeit possibly unintentionally––counterfeit goods from consumer scrutiny and punitive action," *citing* Jay P. Kennedy, *Counterfeit Products Online*, in The Palgrave Handbook of International Cybercrime and Cyberdeviance  at 7, 14 (T. Holt & A. Bossler eds., 2019); Kari P. Kammel, *Examining Trademark Counterfeiting Legislation, Free Trade Zones, Corruption and Culture in the Context of Illicit Trade: The United States and United Arab Emirates*, 28 MICH. STATE INT'L L. REV. 209, 231 (2020).

[23] *See generally,* Department of Homeland Security , *Combating Trafficking in Counterfeit and Pirated Goods* (Jan. 24, 2020), at 20-21, https://www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goods-report_01.pdf.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

While some platforms make efforts to fend off counterfeiting activity, the majority of efforts are reactive and do nothing to proactively disrupt the sale before it occurs, relying only on complaints by brand owners and occasionally by consumers after the sale of the counterfeit products has occurred.  Sellers of counterfeits are aware of this—as is any brand owner who has worked in brand protection—counterfeiters will sell their products where the barrier to market entry is low and enforcement is inadequate and non-preventive by platforms.  On the Internet, particularly where third-party sellers are allowed, the meeting in time and place between the counterfeiter's product listing and the consumer is entirely controlled by the e-commerce platform.[24]  Because of this, it is near impossible for IP rights holders to take proactive approaches to prevent postings on platforms, as they can only see postings through online monitoring services or consumer complaints after the postings are live.



Figure 1, Demonstrating the opportunity structure (meeting in time and place) for the sale of counterfeit products online showing that the platforms are in the best place to protect and disrupt the sale.[25]

In my experience, platforms do not adequately address several areas that create this environment ripe for counterfeit sales, including the following:

### a.    Details and Vetting of Third-Party Sellers

In online marketplaces that allow for third-party sellers (sellers who are not the IP rights holder or its authorized distributors),[26] un-vetted third-party sellers can sell products often with no verifiable provenance and send them directly to consumers.

Many e-commerce platforms do not require sellers to provide contact details or go through any pre-screening.  Because of this, many of these sellers disguise or fabricate their identity

---

[24] *See generally* Kammel, et al, *supra* note 8.

[25] Kammel et al, *supra* note 8 at 228 (Figure 5).

[26] Zacharia & Kammel, *supra note* 13, at 96.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

or store identity, use photographs that are copyrighted images taken from the brand, and also create fake reviews of the product. Furthermore, they may have multiple storefronts and if they are ever flagged for the sale of counterfeit and shut down, they simply open a new storefront or shift activity to an undetected storefront. When a consumer or marketplace goes to follow up, they often disappear.[27]

Despite what many online platforms claim, the protection of anonymity of sellers often trumps the protection afforded to the consumers to purchase a genuine product.

Because of the egregiousness of this practice,[28] Congress proposed several pieces of legislation to address this—one of which was recently passed in December of 2022—the INFORM Consumers Act, requiring vetting of sellers and display of their information if they sell a certain number of products on a given online marketplace.[29]

### b.    Details and Vetting of the Products Sold

In addition to not vetting sellers, many online marketplaces do not vet or trace products through the supply chain to the point of sale to the consumer. This provides another major gap of which counterfeit sellers take advantage.[30]

Demand for products by consumers often outweighs the supply for a variety of reasons, such as supply chain shortages or delays or high demand for a new product. Third-party sellers often fill these gaps in the supply with no question from the platforms as to how they acquired their product.

In a legitimate supply chain, many details about the movement of products through the supply chain would be present, such as sellers' names, contact information, distributor information, country of manufacture,[31] or other information about the provenance and details of the product, but we do not see this practice in online marketplaces.

### (1)    Platforms Joining the Supply Chain with Inspection, "Verification", "Authentication", Warehousing, or Shipping of Products

---

[27] *Id.* at 98.

[28] Combating Trafficking in Counterfeit and Pirated Goods, at 25 (discussing recommendations including: Significantly Enhanced Vetting of Third-Party Sellers & Limitations on High Risk Products.

[29] Integrity, Notification, and Fairness in Online Retail Marketplaces for Consumers Act ("INFORM Consumers Act"), Consolidated Appropriations Act of 2023, H.R. 2617, 117th Cong. Div. BB, Title III, § 301 (2022), https://www.govinfo.gov/content/pkg/BILLS-117hr2617enr/pdf/BILLS-117hr2617enr.pdf ("INFORM Consumers Act").

[30] *See generally* Zacharia & Kammel, *supra* note 13, at 104-106 (discussing the lack of vetting and recommendations from DHS and the executive branch).

[31] *See* Combating Trafficking in Counterfeit and Pirated Goods, at 39-40.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

Some online marketplaces claim to never inspect the product and are merely providing a selling space where they claim they are not part of a supply chain, while others actively join the supply chain.  For example, a platform that acts as an intermediary through shipping, attempted "verification," "authentication," or warehousing items.  Thus, they move from simply providing a space for others to sell to becoming an active part of the sale of counterfeit products because they possess the products and then ship them to the consumer.

When a platform takes on any part of storing, warehousing, shipping, inspecting, or attempting to authenticate product with third-party sellers, they also increase the risk of commingling counterfeit product with legitimate product and thus not being able to control whether counterfeit product makes it to the consumer or not.[32]

E-Commerce platforms usually do not track the supply chain or provenance of the products in the same way that a traditional supply chain would.  They simply do not require this information from their sellers, because this is not required by law.[33]  This, as well as the practice of not vetting sellers, was addressed as a problem by the Department of Homeland Security in its recommendations for "Significantly Enhanced Vetting of Third-Party Sellers" and "Limitations on High Risk Products."[34]

> c.    **Lack of Appropriate Post-Sale Policies that Address**

**Counterfeits**

Because there is a lack of appropriate post-sale policies and actions by online marketplaces, the Department of Homeland Security recommended the online marketplaces institute a series of post-discovery actions once a counterfeit is detected,

---

[32] *See* Zacharia & Kammel, *supra* note 13, at 104 (discussing the U.S. Department of Homeland Security (DHS) Report, Combating Trafficking in Counterfeit and Pirated Goods, at 24, https://www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goods-report_01.pdf

[33] For example, on eBay.com, a seller is required to list: Brand, US Shoe Size, Style, Color, Department, Type. Other categories that are optional are: Trending, Style Code, Product Line, UK Shoe Size, Model, Country/Region of Manufacture,  Shoe Width, Shoe Shaft Style, Character, Theme, Release Year, Upper Material, Vintage, Features, Silhouette, Patter, Performance/Activity, Year Manufactured, Insole Material, Outsole Material, Lining Material, Closure, Cleat Type, Occasion, Season, Signed, Pronation, California Prop 65 Warning, Unit Quantity, Unit Type, MPN.  Point of provenance is not included.

[34] Combating Trafficking in Counterfeit and Pirated Goods, at 25 (discussing recommendations including: Significantly Enhanced Vetting of Third-Party Sellers & Limitations on High Risk Products and noting:
> "Platforms can also place other types of restrictions on third-party sellers before certain high-risk categories of goods may be sold. For example, some platforms require prior approval for items such as automotive parts, jewelry, art, food, computers, sports collectibles, DVDs, and watches that are particularly prone to counterfeiting."

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

including offers of full refunds to consumers, contacting the IP rights holder and notifying law enforcement.[35]

> **d.** **Lack of Transparency with the Consumers regarding Risk and Awareness of Counterfeits**

Online marketplaces can give a perception of legitimacy to the consumer through claims that the products being sold on their sites are authentic, have been authenticated or verified, or by claims that they have large numbers of takedowns of counterfeit postings (but usually with no detail on the ratio of takedown to remaining, how those were taken down, or how long they were listed before takedown).[36]

In an online marketplace, consumers can not physically inspect the products prior to purchase, but simply look at a photo of what the seller or the online platform claims is the product.  A consumer does not know what they are actually going to receive until the product shows up on their doorstep.  Furthermore, upon receipt of the products, most consumers cannot tell whether a product is counterfeit or not, unless the quality difference is obvious or if there are some differences from the authentic product that they can tell upon their inspection.

Even then, if a consumer suspects a product to be a counterfeit, many platforms have not taken consumer reports of counterfeiting seriously or developed substantive reporting mechanisms for consumers to notify them that they have a suspected counterfeit product.[37]

Few platforms make it easy for consumers to report suspected counterfeit, instead lumping suspected counterfeit under general product dissatisfaction, problems with quality of the product, the product not being as described and other typical complaints about genuine product, despite the knowledge that trademark counterfeiting is a massive problem and is criminalized in the U.S. under federal law and the laws of all fifty states.[38]  Many consumers believe that the platforms, particularly those based in the U.S. are safe places in which to

---

[35] *Id.*, at 25  (including: " (1) notification to any buyer(s) likely to have purchased the goods in question with the offer of a full refund; (2) notification to implicated rights holders, with details of the infringing goods, and information as to any remaining stock of the counterfeit and pirated goods held in warehouses; (3) implementation of practices that result in the removal of counterfeit and pirated goods within the platform's effective control and in a manner that prevents such goods from reentering the U.S. or being diverted to other markets; and (4) immediate engagement with law enforcement to provide intelligence and to determine further courses of action").

[36] *See e.g.,* Kammel, et al, *supra* note 8, at 228.

[37] *See* House Judiciary Committee, Subcommittee on Courts, Intellectual Property, and the Internet on The SHOP SAFE Act: Stemming the Rising Tide of Unsafe Counterfeit Products Online, Testimony of Kari Kammel, at 14, https://www.congress.gov/117/chrg/CHRG-117hhrg45396/CHRG-117hhrg45396.pdf. .

[38] *See* Kari Kammel, Brandon Sullivan & Lorryn Young, *The Crime of Product Counterfeiting: A Legal Analysis of the Usage of State-Level Statutes*, 18 CHI-KENT J. INTELL. PROP. 125-152 (2018) (with an analysis of the legislation of the fifty states pertaining to criminal trademark counterfeiting).

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

buy authentic products,[39] until they realize they have purchased what appears to be a counterfeit product.

## III.    THE HARM CAUSED BY COUNTERFEITS TO IP RIGHTS HOLDERS, CONSUMERS, AND SOCIETY

The sale of counterfeit products is detrimental to the IP rights holder, the consumer, and even society.

### A.    Harm to IP Rights Holders by the Purchase and Sale of Counterfeit

Trademark counterfeiting harms an IP rights holder in several ways by (1) hurting its reputation in the marketplace and destroying consumers' trust in the brand, (2) taking sales and profits of genuine product away and diverting them to the counterfeiter, and (3) taking resources to combat the theft of its marks.[40]

When a consumer purchases a product online that they believe to be genuine and then is disappointed or harmed by a counterfeit product, they may often: (1) believe that the brand's quality is lessened; (2) lose their brand loyalty; and/or (3) complain in an online space about the brand.[41]

Additionally, A-CAPP Center research has called trademark counterfeiters "unseen competitors" to the brand owner because when counterfeiters flood "the market with counterfeits, the unseen competitor reduces the penetration of the authentic, brand product in the marketplace."[42]  Often brands find out about counterfeits being sold online because its sales team will complain about competition in the marketplace, or a flood of products in the online marketplaces, when the brand knows that there are not that many of its products available.

The sale of products in online marketplaces has created an entirely new and huge space that IP rights holders now must expend massive amounts of resources to monitor, do test purchases, submit notice and takedown requests, and/or engage in other enforcement measures.  Additionally, monitoring is more challenging for the IP rights holders because of

---

[39] *See* Zacharia & Kammel, *supra* note 13, at 96; *see also* Kammel, Senate Judiciary Testimony, *supra* note 2,, at p. 4-5, https://www.judiciary.senate.gov/imo/media/doc/Kammel%20testimony.pdf..

[40] Rod Kinghorn & Jeremy Wilson, *Brand Protection as a Total Business Solution*, A-CAPP Center Report (2014), https://a-capp.msu.edu/article/brand-protection-as-a-total-business-solution/.

[41] Kammel, House judiciary testimony at 1; Kammel, et al, *supra* note 8, at 252 (*citing See* Stefanie Wood Ellis, *Brand Protection in the Digital World*, World Trademark Rev. (Apr. 23, 2020), https://www.worldtrademarkreview.com/anti-counterfeiting/brand-protection-in-the-digital-world (describing how counterfeit products can negatively affect a brand when an inferior product is thought to be the real product, and the lower quality is now associated with the brand or when an unsafe counterfeit hurts individuals)).

[42] Kinghorn & Wilson, *supra* note 40.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

the way that most online marketplaces are designed.  An entire industry has sprung up to help IP rights holders monitor online marketplaces for counterfeit products.

### B. Harm Caused to the Footwear Industry

The footwear industry has been harmed by the sale of counterfeit products in all the factors noted above.  The footwear industry in particular is set to make US$86.58 billion in revenue in 2023, most of which is generated in the U.S.[43]  New, limited edition drops often sell out in minutes.[44]  Because of this, footwear is one of the most highly counterfeited industries according to the OECD.[45]  In online marketplaces, brand owners in the footwear industry have similar challenges to other industries, with difficulties enforcing their trademarks on platforms with long delays in responding to enforcement requests, challenges to their take down notices and a significant expenditure of resources to curb the sale of counterfeit products.[46]

### C. Harm Caused to Nike

Nike is one of the most counterfeited footwear brands.[47]  Nike sells its product at Nike.com, certain authorized platforms around the world, and through authorized retailers.[48]  However, Nike footwear and apparel are often counterfeited—███████████████████

---

[43] STATISTICA, Sneakers-Worldwide Insight, https://www.statista.com/outlook/cmo/footwear/sneakers/worldwide (*last accessed* May 4, 2023).

[44] Praveena Somasundaram, *As counterfeits rise, sneaker authenticators sniff out real from fake*, WASH POST (Sep. 30, 2022), https://www.washingtonpost.com/business/2022/09/30/sneaker-authentication-ebay-stockx-nike/ ("Somasundaram").

[45] OECD, Trends in Trade in Counterfeit and Pirated Goods, 43 (2019).

[46] "Apparel and footwear brands are spending millions to identify and police malpractices via e-commerce and social media platforms," said Steve Lamar, president and CEO of the American Apparel & Footwear Association. "Detection processes include waiting days and months for the removal of the illicit products. Every day it takes to remove a counterfeit product, an illicit seller, a fraudulent ad, or a fake website is another day that unsuspecting American consumers are able to be duped into buying unsafe counterfeit products that could bring harm to themselves and their families. Despite increased awareness, the explosion of e-commerce has enabled counterfeiting to grow exponentially and occur on a grander scale, at a significant cost to American Apparel & Footwear Association members, the U.S. economy, the health of U.S. citizens, American jobs, and more. It is well past time for Congress to take action by passing the SHOP SAFE Act and the INFORM Consumers Act to protect American families from un-vetted sellers and counterfeit products. Regardless of where a platform is headquartered, counterfeits promoted and sold on those platforms have a very real impact on Americans so the U.S. government should hold these platforms accountable." AMERICAN APPAREL & FOOTWEAR ASSOCIATION, *Press Release: AAFA Details the Costly and Corrosive Impact of Counterfeits Trafficked Across Platforms, Including Shopee and Meta* (Oct. 10, 2022), https://www.aafaglobal.org/AAFA/AAFA_News/2022_Press_Releases/AAFA_Details_Costly_Corrosive_Impact_Counterfeits_Trafficked_Across_Platforms.aspx?WebsiteKey=49c45f4d-69b3-4c66-823a-6d285960fed2. (statement of AAFA President Steven Lamar).

[47] FIGHT FOOTWEAR FAKES, *Protecting Footwear IP Globally*, https://www.fightfootwearfakes.com/ (*last accessed* May 4,, 2023).

[48] Call with Barbara Delli Carpini, Vice President, Brand Protection and Digital IP, Global, Nike (Feb. 2, 2023) ("Delli Carpini").

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

[49] Counterfeit "Nike" products are █████████

██████████ [50] █████████

██████████

██████████

██████████

█████████.[52]

Harm to Nike from counterfeits ████████████

██████████

█████████[53]

Nike ████████████

█████.[54]

██████████

█████.[55]

██████████

██████.[56]

Additionally, Nike ████████████

██████████

██████████

██████████

█████.[59]

Nike must ████████████

██████████

█████.[60]

---

[49] Delli Carpini, *supra* note 48.
[50] *Id.*
[51] *Id.*
[52] *Id.*
[53] *Id.; see also* Delli Carpini Depo Tr., 31: 11-33:6, 239:11-244:8; 261:9-265:15.
[54] Delli Carpini, *supra* note 48; *see also* Delli Carpini Depo Tr., 31: 11-33:6, 239:11-244:8; 261:9-265:15.
[55] Delli Carpini, *supra* note 48; *see also* Delli Carpini Depo Tr., 31: 11-25, 239: 11-240:14.
[56] Delli Carpini, *supra* note 48; *see also* Delli Carpini Depo Tr., 31: 11-25, 239: 11-240:14.
[57] Delli Carpini, *supra* note 48; *see also* Delli Carpini Depo Tr., 31: 11-25, 239: 11-240:14.
[58] *Id.*
[59] *Id.*
[60] *Id.*

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

### D.    Harm to Consumers by the Purchase of Counterfeit Products

Consumers are harmed by the purchase and use of counterfeit products in a variety of ways, and any harm to consumers also harms the brand as well.  First, when a consumer purchases counterfeit products, the counterfeit may actually injure them depending on the product and the poor quality of the counterfeit.[61]  Counterfeit products do not have quality testing, are not constructed out of safe, regulated materials, and are not manufactured in safe, regulated workspaces.[62]  Counterfeit products are sometimes made with harmful chemicals that are banned in the U.S. and can actually cause physical harm.[63]

Additionally, when consumers unknowingly buy a deceptive counterfeit product, they are spending their money on a product that they believe to be genuine and worth the money spent.  But instead, consumers are buying something that is not genuine and not what they think they are receiving.  In some cases, consumer dollars are unknowingly used to fund other types of criminal activity, such as organized criminal activity or even terrorism,[64] instead of supporting their favorite brand.

Consumers in the footwear industry are harmed in several ways when they purchase counterfeit products, particularly deceptive counterfeits.  Whether a "sneakerhead" or a regular consumer such as a parent purchases counterfeit sneakers, they have been defrauded of their money and tricked into thinking they are buying a genuine pair of shoes. Many consumers will purchase counterfeit shoes and not even know it.

In many cases, when consumers purchase counterfeit footwear online, it is very difficult for them to get their money back.  Consumers struggle to report it to the online marketplace because of poor reporting mechanisms on the platform (as opposed to just general dissatisfaction with a purchased product or seller interaction) or lack of reporting mechanisms.[65]  The recently passed legislation, INFORM Consumers Act, seeks to address

---

[61] *See e.g.,* Zacharia & Kammel, *supra* note 13, at 96-102 (discussing several strict liability cases brought by those injured or killed by fake products purchased by consumers from third-party sellers online); *see also* ICE, *Counterfeit Goods: A Danger to Public Safety* (Aug. 4, 2022), https://www.ice.gov/features/dangers-counterfeit-items

[62] UNODC, *Focus On: The Illicit Trafficking of Counterfeit Goods and Organized Crime* (Nov. 14, 2013),at 4, https://www.unodc.org/documents/counterfeit/FocusSheet/Counterfeit_focussheet_EN_HIRES.pdf ; DHS, 2020 Report, *supra* note 22, at 13, 19. *See also* Delli Carpini Depo Tr., 31:11-25.

[63] AMERICAN APPAREL & FOOTWEAR ASSOCIATION, *Press Release: Fashion Industry Study Reveals Dangerous Chemicals, Heavy Metals in Counterfeit Products* (Mar. 23, 2022), https://www.aafaglobal.org/AAFA/AAFA_News/2022_Press_Releases/Fashion_Industry_Study_Reveals_Dangerous_Chemicals_Heavy_Metals_Counterfeits.aspx.

[64] *See Kennedy, supra* note 17.

[65] *See e.g.,* Amazon.com reporting mechanism for consumers includes: Product damaged, but shipping box OK; Missing or broken parts; Inaccurate website description; Product and shipping box both damaged; Wrong item was sent; Item arrived too late; Received extra item I didn't buy (no refund needed); Didn't approve

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

this gap by requiring platforms to have a reporting mechanism for consumers for suspicious activity.[66]

They are left with a counterfeit product of which they do not know the origin, the quality, the materials, the conditions under which they were made, or safety standards.

### E.    Harm to Society by the Sale of Counterfeit Products

Although the sale of counterfeit products obviously and directly harms IP rights holders and consumers, the sale of counterfeit products also harms society.  Economies are impacted by the large number of counterfeit sales where their legitimate businesses are losing revenue, the government may lose legitimate tax revenue, and legitimate jobs are lost.  On the employment side, counterfeiters do not abide by labor laws or other employment standards and often hold people, including children, in slave-like working conditions. Additionally, failure to protect intellectual property harms innovation in a society and pulls the reward of the IP rights holder's efforts and gives it to the counterfeiter.

## IV.    MEASURES IP RIGHTS HOLDERS TAKE TO PROTECT THEIR BRANDS

Protecting a brand or trademarks has become very challenging for IP rights holders since the explosion of sales of products on online platforms.[67]  While challenges existed in the brick-and-mortar space prior to online sales, they were more limited by location, by the

---

purchase; Item defective or doesn't work; No longer needed; Bought by mistake; Better price available. *Amazon.com last visited* April 26, 2023. *See also Etsy.com* where consumer options are: My order hasn't arrived; An item arrived damaged; An item is different from what I expected; I need to change or update my order; I want to message the seller about something else. *See Etsy.com (last visited* April 26, 2023).

[66] Integrity, Notification, and Fairness in Online Retail Marketplaces for Consumers Act ("INFORM Consumers Act"), Consolidated Appropriations Act of 2023, H.R. 2617, 117th Cong. Div. BB, Title III, § 301 (2022), https://www.govinfo.gov/content/pkg/BILLS-117hr2617enr/pdf/BILLS-117hr2617enr.pdf ("INFORM Consumers Act"), noting in section 3:

> REPORTING MECHANISM.—An online marketplace shall disclose to consumers in a clear and conspicuous manner on the product listing of any high-volume third party seller a reporting mechanism that allows for electronic and telephonic reporting of suspicious marketplace activity to the online marketplace.

*Id.* at Title II, § 301, at Sec. 3.

[67] Presidential Memorandum, Memorandum on Stopping Counterfeit Trafficking on E-Commerce Platforms Through Fines and Civil Penalties (Oct. 13, 2020), at Sec. 1,, *available at* https://trumpwhitehouse.archives.gov/presidential-actions/memorandum-stopping-counterfeit-trafficking-e-commerce-platforms-fines-civil-penalties/ (noting: "Trafficking in counterfeit goods infringes on the intellectual property rights of American companies, undermines their competitiveness, and harms American workers. Counterfeit trafficking also poses significant health and safety threats to online consumers. E-commerce platforms serve as key contributors to counterfeit trafficking by acting as intermediaries and providing marketplaces that match up buyers and sellers."); *see also* Kammel, et al, *supra* note 9, at 254 (*citing* Daniel C.K. Chow, *Alibaba, Amazon, and Counterfeiting in the Age of the Internet*, 40 NW. J. INT'L L. & BUS. 157, 161 (2020).

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

type of consumer purchasing them, and often involved protection to the legitimate supply chain.  In the online space, the potential for counterfeit products to be sold is nearly endless, reaching anywhere a consumer has access to buying a product online.

IP rights holders, or brand owners, often take extensive[68] efforts globally to prevent counterfeit products or packaging from being sold in the marketplace and protect their brands, their products, their marks and their consumers.  A brand owner's brand protection program often looks different from company to company and sometimes from brand to brand, or even product to product.  However, it usually entails at least two main avenues of efforts: proactive measures and reactive measures.[69]  In order to be as successful as possible in preventing counterfeit products from being sold in the marketplace, it is recommended that brand owners pursue both avenues.

Proactive measures usually entail many efforts designed to protect the product from being counterfeited in the first place, such as: trademark registration and recordation with customs agencies and the use of various technologies.

Reactive measures can include enforcement both online and in the brick and mortar environments, which can entail everything from investigations to test buys online and in person, to market monitoring online and in person, civil suits, or referrals for criminal prosecution.

### A.    Proactive Measures

The proactive approach involves the steps and actions an IP rights holder takes before the counterfeit product has been offered to sale or purchased.  These strategies can include everything from trademark registration and recordation to technologies placed in or on genuine products and/or packaging to consumer education.  They can also include activities such as customs training to prevent counterfeit products from entering the marketplace.

An IP rights holder working with U.S. CBP is an important proactive measure to prevent counterfeits from entering the U.S.  Sometimes to avoid customs or long shipping times, for example from China, a manufacturer might still ship to a U.S. based distributor who is selling to U.S. consumers on a platform.  While some products that are shipped in small parcels are being seized by U.S. CBP, the sheer number of small parcels makes it almost

---

[68] Kammel House Judiciary Testimony, *supra* note 8, at 7-8.
[69] Kinghorn and Wilson, *Anti-Counterfeit Strategy for Brand Owners*, *supra* note 40; *see also* Rod Kinghorn & Jeremy Wilson, *Brand Protection as a Total Business Solution* (2014), https://a-capp.msu.edu/article/brand-protection-as-a-total-business-solution/ (*last accessed* May 4, 2023).

impossible for them to be seized and contained at the U.S. borders—one of the reasons why this becomes very challenging for IP rights holders to enforce in the online space.

For example, nearly $96.7 million of footwear was seized by U.S. CBP in 2021, up from $63.1 million in the previous year.[70]

### B.    Reactive Measures

With retail products, the reactive approach to addressing counterfeit products involves actions taken by the IP rights holder once a counterfeit product has been offered for sale to consumers or purchased by consumers, whether in a brick-and-mortar or online environment.  Reactive strategies are always necessary and involve everything from civil legal action to referring for criminal prosecution, from raids of flea markets or other brick and mortar selling spaces to notice and take down procedures.

In the online space, reactive measures become a necessity as proactive measures are significantly more challenging to implement for IP rights holders.  Because IP rights holders have no visibility on the back end of online platforms to see who they allow to sell or what they allow to be sold, they must monitor individual postings across what is now thousands of e-commerce platforms and social media platforms–referred to as online market monitoring.  An entire industry has sprung up that performs online market monitoring for these companies to search for thousands of suspicious postings.  IP rights holders must then often do 'test buys' from the suspicious postings to receive the product that was listed as if they were a consumer and then use their own proprietary authentication to determine whether the product is authentic or counterfeit.

### C.    Market Monitoring of Both Legitimate and Illicit Supply Chains and Products

Additionally, brand owners must monitor essentially two types of supply chains and types of products: 1) their own legitimate supply chain and genuine products, and 2) illicit supply chains and counterfeit or other unauthorized products.  The monitoring of their legitimate supply chain and their legitimate product involves supply chain security and security for genuine product and packaging, often in the form of brand protection technologies (discussed below) and authenticating genuine product and packaging to ensure it is not counterfeit.  On the other side with the illicit supply chain, brand owners often find counterfeit product in a variety of places that are not in their legitimate supply chain, such as other illicit marketplaces, both brick and mortar and online and also in legitimate stores or marketplaces that have not sourced their products from places in the legitimate supply

---

[70] Somasundaram, *supra* note 44.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

chain.  While measures for dealing with both of these issues are often different, they tend to overlap as well.

### D.    Brand Protection Technologies to Protect Authentic Product

Most IP rights holders use some type of brand protection technology on the product or the packaging that has their trademark on it to help protect their genuine products, to prevent tampering of genuine products and packaging, or to track and trace genuine products. Additionally, IP rights holders use a type of technology to monitor and search online for counterfeit postings of their product.

### 1.    Types of Technologies- Understanding Brand Protection Technologies

In the brand protection space, there are three main purposes why IP rights holders purchase, acquire or design technologies to protect genuine products.  Those purposes include: 1) anti-counterfeiting, 2) anti-tampering, and 3) track and trace. Anti-counterfeiting technology efforts are IP rights holders' efforts to prevent their genuine products and packaging from being counterfeited, or as mentioned above the unauthorized use of the mark on a product or packaging.[71]

Technology categories that are used in these three types of brand protection technologies are: 1) overt,[72] 2) semi-covert, 3) covert,[73] 4) forensic,[74] and 5) digital.  There is also a sixth element, which is not technology, but human experience.[75]

For many IP rights holders, a successful technology solution to protecting their genuine products and packaging includes a) multiple layers of technology, b) a holistic approach that can involve non-technological efforts, such as human expertise, c) a cost-effective approach, and d) adjustments based on metrics.[76]

---

[71] A-CAPP CENTER, *Brand Protection Professional Certificate,* ACAPP010: Identifying Anti-Counterfeiting Tactics and Technologies,  https://a-capp.msu.edu/bp-certificate/.

[72] ISO 22383:2020(E) International Standard: Security and resilience—Authenticity, integrity and trust for products and documents—Guidelines for the selection and performance evaluation of authentication solutions for material goods ("ISO 22383") (Sept. 2020), at 4.3.5.2 (discussing overt authentication, which can be directly performed by using the human senses).

[73] *Id.* at 4.3.5.3 (discussing covert authentication, which is not instantly recognizable or interpretable by human senses requiring tools or specialized knowledge).

[74] *Id.* at 4.3.5.4 (discussing forensic authentication such as taggants or fingerprints).

[75] *See e.g., id.*, at 4.3.4.3. (discussing human senses for inspection of the material good).

[76] *See e.g. id.* at vi (discussing "[authentication] solutions are designed to provide reliable evidence, making it easier to assess whether material goods are authentic and have not been counterfeited [. . .]). *Id.* *See also* Sec. 4.1 (discussing "When selecting an authentication solution, the organization should consider the technical, logistical and financial criteria [. . .] [and] a creation process must be followed by an inspection process.)." *Id.*  Additionally ISO 22383 mentions:

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

## V.    AUTHENTICATION OF PRODUCT

For both anti-counterfeiting and track and trace technologies that are employed by IP rights holders, the main goal is to be able to protect and track authorized, genuine product or packaging that bears the genuine trademark of a brand, through the process of authentication.  IP rights holders must do this to prevent theft of genuine products often from their legitimate supply chain or the entering of counterfeit products into the legitimate or illicit supply chain or secondary market.

### A.    Definition of Authentication of Trademarked Product

Authentication is the act by which the IP rights holder verifies whether a product or package bearing their trademark is genuine and authorized.[77]  Genuine product or packaging means that the product and/or packaging is genuine, has genuine and authorized trademarks on it and is authorized by the IP rights holder.  When an IP right holder authenticates the product or packaging, they will use a variety of factors in order to determine authenticity.  These factors can range from human authentication to a series of technologies that are typically not known to the public.[78]

IP right holders use a variety of techniques and technologies for their authentication of product or packaging, including overt, covert, semi-covert, forensic and digital technologies.  Because of the need to protect how they authenticate from counterfeiters, most IP rights holders will keep some of these authentication technologies available only in house and unavailable to the public or others in their supply chain but may make some of the technologies or authentication methods public.  For example, an IP rights holder may be using four separate technologies–two on a product and two on the packaging.  They may keep three of these technologies and their ability to authenticate internal to their company, and perhaps have another one that the general public can see-usually something overt.

---

"The verification processes of authentication elements deployed in these solutions require the ability to read, capture and sometimes perform sampling using human senses or tools.  These tools will either offer a local on-the-spot response or will call, in real-time, into a secure information system, or possibly re-channel the date, sample or material good towards a structure offering expert analysis for an offline diagnoses.)" *Id.* at Sec. 4.1

[77] *Id.* at Sec. 4.1
[78] *See supra* notes 73-77 (discussing different types of authentication and technologies).

21

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY



Authenticating:

However, authenticating only one of the six does NOT mean that the product is authentic. All must be authenticated in order to truly verify whether a product is genuine and authorized.

An overt authentication technology is usually visible to the naked eye by someone like a consumer or reseller.  IP rights holders will often share some of those overt features with customers or other organizations publicly to be able see some of the obvious features. While this might help them to see some obvious difference in the marks or product or packaging, it does not mean that the consumers are authenticating the product or packaging, but they might be able to identify counterfeit.

### B.      Authorized Authenticators

Only the IP rights holder and those authorized by the IP right holder are capable of authenticating product or packaging.[79]  Sometimes IP rights holders give an individual or organization a device or the actual technology to authenticate a particular product or package. These authorized individuals or organizations could be employees of the IP rights holder's company, a private investigator, or even a national customs agency.[80] For example,

---

[79] *See* ISO 22383, *supra* note 72 (discussing the issuing of this standard was to help prevent fraud and counterfeiting and was for" rights owners, institutions, and governmental regulators" to be able to use authentication solutions to fit their particular needs), at v.  *See also* ISO 22383 stating: "Knowledge about the authentication solution is made available only to a restrict group of people that need to know.  This will usually include all those people who are professionally required to inspect the material good, and thus excludes those in the general audience. [. . .] the security of an authentication solution can be substantially increased by restricting the availability of knowledge." *Id.* at Sec. 4.3.2.3 Restricted Audience.
Additionally, in discussing types of knowledge for authentication, the ISO standard notes that "the rights holder can control the target audience of this knowledge, in particular for material good-specific knowledge." *Id.* at Sec. 4.3.2.1.
[80] *See e.g.,* ISO 22383, *supra* note 72, at Annex B (Control means access table) (providing "a tool for rights holders to define their anti-counterfeiting strategy in relation to the inspection of authentication elements. Combinations of technologies can be used to have a high level of protection, but the different layers of authentication elements should not be accessible and controlled by all types of inspector.  The rights owners have therefore to define who will have access to what."). *See id.* at Table B.1.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

in the U.S., IP rights holders will often give a device or devices to the U.S. CBP for the use of one of their technologies in anti-counterfeiting or track and trace efforts.  Often this device is accompanied by a training provided to the IP rights holder to the U.S. CBP to teach how to authenticate product or packaging being shipped into the U.S.  If U.S. CBP seizes a suspect shipment or container that they think might contain counterfeit products, they will use that IP rights holder's technology to authenticate and then reach out to the IP rights holder for further verification and authentication.



### C.    What Authentication is Not

While many may assume that any individual who is trying to figure out whether a product is counterfeit or genuine can authenticate, that is not the case.  As mentioned above, only IP rights holders or those they authorize will be given access to all the tools necessary to

Table B.1 — Control means access

| Inspector authentication element | End user | Distribution and supplying networks | Supervisory authority | Personnel given clearance by the rights holder | Accredited/notified laboratory |
|---|---|---|---|---|---|
| **Overt**<br>Verifiable independently by purely human input | | | | | |
| **Covert**<br>Requires a technical tool | | | | | |
| **Forensic analysis**<br>Requires testing by a laboratory | | | | | |

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

authenticate.  General inspection by one unqualified, unauthorized or without access to the brand's full authentication layers does not constitute authentication of a product.[81]

While only the brand owner or those authorized by the brand owner can authenticate a genuine trademark and products, many others will often claim to be able to authenticate a trademark or product.  General inspection by a consumer or an e-commerce site may be able to identify an obvious counterfeit because of overt differences, but that does not equate to authentication.  While an individual who looks at 50 different points on a product in comparison to a suspected counterfeit may in some instances be able to determine if it is counterfeit, that does not rise to the level of authentication.

## VI.    NIKE'S BRAND PROTECTION EFFORTS

After reviewing Nike's brand protection efforts, in my opinion, it has one of the most comprehensive and holistic global brand protection teams in the field.

### A.    Measures Nike Takes to Protect Its Brand

In my opinion, Nike incorporates industry best practices in brand protection and anti-counterfeiting efforts including both a proactive and reactive approach, ███████████
████████████████.[82]  Nike engages with stakeholders globally ████
████████████████[83]  Nike ███████████████
████████████████████████████
████████████████████████
██████[84]

████████████████████████████
████████████████████████
████████████████     ██████████
████████████████████████
██████████.[86]

---

[81] ISO Standard 22383, *supra* note 74 ("Without the knowledge that a certain authentication solution has been applied to the material good in question, an inspector cannot inspect the associated authentication element. Without knowledge of the appropriate inspection procedure, an inspector cannot adequately perform the authentication."). *Id.* at Sec. 4.3.2.1.

[82] Delli Carpini, *supra* note 48. *See also* Delli Carpini Depo Tr., 25:5-10, 42:25-43:5.

[83] Delli Carpini, *supra* note 48. *See also* Delli Carpini Depo Tr.,  30:10-31:10, 33:21-34:5, 53:6-25, 55:16-20; Pallet Depo Tr., 189:16-190:10, 245:16-248:8, 252:21-253:10; Rizza Depo Tr. 11:20-24, 21:21-23:1.

[84] Delli Carpini, *supra* note 48. *See also* Delli Carpini Depo Tr., 28:13-29:7.

[85] Delli Carpini, *supra* note 48. *See also* Pallett Depo Tr. 189:16-190:10; Rizza Tr. 37:3-15,

[86] Delli Carpini, *supra* note 48. *See also* Delli Carpini Depo Tr. 228:4-23..

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

The Nike brand protection team



.[88]  Additionally, Nike

.[89]

### B. Nike's Use of Brand Protection Technologies & Authentication of Products

Like many brands who have a strong brand protection program, Nike uses an anti-counterfeiting and brand protection technology to protect its products, such as footwear and packaging.[90]

For example, Nike uses its proprietary software



.[92]

Only those authorized by Nike can authenticate Nike products.  Even if someone outside of Nike is aware of a physical difference with a counterfeit, they would still not be able to authenticate a Nike product.[93]  In regard to Nike's technology,

[87] Delli Carpini, *supra* note 48. *See also* Delli Carpini Depo Tr., 60:15-23, 160:15-161:21; Pallett Depo Tr. 185:5-187:9.

[88] Delli Carpini, supra note 48.*; see also* NIKE0039827, NIKE0039821, NIKE0039841, NIKE0039847, NIKE0039833

[89] Delli Carpini, supra note 48. *See* Delli Carpini Depo Tr. 33:15-35:6, 215:18-216:8, 221:3-10; Rizza Depo Tr., 96:21-24,

[90] Delli Carpini, *supra* note 48. *See* Delli Carpini Depo Tr., 56:4-61:8; Pallet Depo Tr., 51:12-25, 58:12-63:21,

[91] Delli Carpini, *supra* note 48. *See* Delli Carpini Depo Tr., 56:4-61:8; Pallet Depo Tr., 51:12-25, 58:12-63:21,

[92] Delli Carpini, *supra* note 48. *See* Delli Carpini Depo Tr., 56:4-61:8; Pallet Depo Tr., 51:12-25, 58:12-63:21,

[93] Delli Carpini, *supra* note 48.

[94] Delli Carpini, *supra* note 48. *See also* Pallett Depo Tr., 245:16-250:5, 251:16-260:21.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY



.[96]

**C.      Challenges Faced by Nike in its Brand Protection and Anti-Counterfeiting Efforts**

Nike deals with 

[100]

In online anti-counterfeiting efforts, Nike

[101]

## VII.    STOCK X'S WEBSITE RELATING TO AUTHENTICATION AND TRADEMARK COUNTERFEITS

StockX is an e-commerce platform that sells shoes, apparel, collectibles, and a few other categories of products.[102]  StockX's website and model for selling products, particularly shoes, creates a conducive environment for bad actors to sell counterfeit products. StockX's main sales model runs by taking orders from consumers of postings by anonymous third-party sellers, "authenticating" the products at "authentication centers", and then shipping the products directly to the consumer.   StockX completely shields the identity of the sellers from consumers so consumers know only that they are buying from StockX; the sellers are anonymous to the consumer, there is no seller rating system, no space for feedback from buyers and StockX does not have a refund policy.[103]  StockX even

---

[95] Delli Carpini, *supra* note 48; NIKE0080203; Rizza Depo Tr., 22:18-24:14 (testifying regarding ⬛⬛⬛⬛⬛⬛⬛ ); NIKE0080274; Pallett Depo Tr., 245:20-249:21; 255:11-257:11 (discussing ⬛⬛⬛⬛⬛⬛ ").

[96] Delli Carpini, *supra* note 48. *See also* Pallett Depo Tr., 245:16-250:5, 251:16-260:21

[97] Delli Carpini, *supra* note 48

[98] *Id*

[99] *Id.*

[100] *Id.*

[101] Delli Carpini, *supra* note 48. *See also* Delli Carpini Depo Tr., 221:24-228:23.

[102] NIKE0033817-21("How it Works").

[103] NIKE0040103; STX0021481 ("Policy Audit Framework Working Doc", noting "Sellers on StockX are anonymous. Buyers may not request their product come from a specific seller or region.") at 21483, 214941. *See also* StockX FAQ: "How do I sell on StockX?", *https://stockx.com/help/articles/How-do-I-sell-on-StockX*, (*last accessed* May 4, 2023) (noting:

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

uses its own professional, high-resolution stock images of Nike products regardless of the identity of the seller or what the seller's products look like, creating the impression to the consumer that it is buying the genuine product seen in the stock image.[104]  This significantly differs from other platforms where the seller posts its own image of the product it is offering for sale.  Because StockX heavily promotes a large volume of high heat shoes,[105] many of which are rare, have limited amounts and sizes and are significantly more expensive than the average shoes, there is greater potential for counterfeiters to make extremely large profits, even if some products are flagged as counterfeit.  For example, if a counterfeit pair of high heat sneakers costs $10-15 to create and can be sold for $600, it is worth it for the counterfeiter to keep trying to sell even if a few postings are taken down.

StockX, like some other platforms, touts that it catches thousands of fakes per month.[106]  What this obviously means is that StockX is heavily utilized by counterfeiters, who are undeterred by whatever "authentication" method that StockX claims to use.  StockX is attractive for counterfeiters, for many reasons, including its protection and shielding of sellers, lack of vetting of sellers and their product provenance, public statements that everything is guaranteed authentic, lack of a return policy, and the high prices paid by consumers for supposedly genuine high heat products.

---

"StockX is a marketplace where Buyers and Sellers can make anonymous offers on a wide variety of current culture items such as sneakers, streetwear, electronics and collectibles, based both on the item's current valuation on the site, but also how much you're willing to sell it for. StockX's anonymous nature aims to make buying and selling a hassle-free experience: Buyers see the lowest available sale price, and Sellers see the highest available buying offer." *Id.*

[104] NIKE0038817 (stating: "No BS: No chargebacks, no taking photos, no writing catchy descriptions, and no dealing with rogue buyers or sellers. We handle everything to make sure you can buy and sell with complete confidence"); SᴛᴏᴄᴋX, *Selling on StockX*, https://stockx.com/about/selling/ (*last accessed* May 4, 2023) (Selling on StockX: "Sell Quick with Zero BS: Just search for your product and set your price. You won't need to take product pictures, share personal information, or negotiate with potential Buyers.").

[105] *See e.g.,* NIKE0038817 ("The Current Culture Marketplace", noting: "Global Access: Whether it's pre-release, regionally limited, or "sold out" – our millions of customers from over 200 countries allow you to easily secure those hard-to-find, coveted items."); SᴛᴏᴄᴋX, *The Current Culture Marketplace,* https://stockx.com/about/how-it-works/ (*last accessed* May 4, 2023) (same); SᴛᴏᴄᴋX, *Releases: Nike* https://stockx.com/new-releases/nike *(last accessed* May 4, 2022) (listing Nike brand sneaker release dates and allowing consumers to bid on Nike products that have not yet been released); SᴛᴏᴄᴋX, *Releases: Air Jordan*(https://stockx.com/new-releases/retro-jordans) (*last accessed* May 4, 2023) (listing Jordan brand sneaker release dates and allowing consumers to bid on Jordan products that have not yet been released) .

[106] NIKE00400101; Fenton Depo Tr., 91:10-92:17 (noting the volume of fakes attempted to be passed through StockX).

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

A.    StockX's "Authentication" Guarantee, "Authentication", "Authentication Process," or Verification Process

StockX has historically used several claims on its website around consumer trust and "authentication" of the products sold on its platform and highlights its "Guaranteed Authentic" claim by stating that it has a "99.96% authentication accuracy rate."[107]

StockX historically used the term "authentication" throughout its website.[108] StockX also uses the term "authenticators" to describe employees who work in their "authentication centers" reviewing product. StockX has even claimed to have invented the job "sneaker authenticator."[109]

For example:

- On one page discussing the StockX verification process, the headline reads "Guaranteed Authenticity. Every item. Every time. Shop on StockX with complete confidence knowing every purchase is 100% Verified Authentic."[110] Here is a clear example of StockX's interchangeable using both terms together.
- In another piece in *The Magazine,* Kevin Kosanovich, the author, notes that there is a 2-stage process for identifying fakes: "Step 1: Verification" and "Step 2: Authentication", which is one of the only places where this is separated.[111]
- Under the June 6, 2022, StockX Statement on Authentication Program, StockX notes "Authentication is core to our history at StockX, and one of the many reasons the company was founded. While counterfeiting is rampant through other third-party marketplaces, StockX revolutionized the industry by creating a process in which 100% of products on its platform are authenticated by trained human authenticators before they are sent to the buyer."[112]

---

[107] NIKE0038958; *see also* 30(b)(6) Depo Tr., 244:14-24 (discussing importance of authentication to consumers).

[108] Around November 10, 2022, StockX renamed its "Authentication" process and started using the term "Verification" in place of "Authentication." @StockX, Twitter (Nov. 10, 2022, 8:45 PM), https://twitter.com/stockx/status/1590883295931543554. However, even after this supposed change, StockX still uses the term "Authentication" throughout its website and advertising, and often just uses "Verification" and "Authentication" interchangeably.

[109] STX0020185 (noting: "Authentication is at the core of the experience and StockX set the industry standard"); STX0020186 (noting: "StockX invented an entirely new job category of authenticator"); Fenton Depo Tr., 81:21-84:13;
Chris Danforth, *Sneaker Authentication: Here's how StockX Made it a Career Path,* High Snobiety (2020), https://www.highsnobiety.com/p/stockx-authentication/ .

[110] NIKE0006785; *but see* Fenton Depo Tr., 140:5-143:8 (discussing fakes passed by StockX).

[111] NIKE0039854-55.

[112] NIKE0006783.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

StockX historically called this the Authentication Process, and even though it has recently renamed the process to call it the Verification Process, StockX has used those terms interchangeably.[113]  Even StockX's change to "Verification Process" seems to try to keep the perceived legitimacy of authentication to the consumer and the "same process," but it is attempting to call it something different:

- "When asked by Retail Dive to confirm if products sold on StockX are still authenticated, the company reiterated its public statement, which says the "*comprehensive approach remains unchanged*."[114]
- On StockX's tweet about the change, it also noted, "While product authenticity remains core to our analysis, our verification process is a better reflection of our broader value proposition that we provide our customers by reviewing all products on StockX."[115]

However, StockX cannot guarantee that the consumer's purchases are authentic and no one at StockX can actually authenticate other IP rights holders' products.

## B.    The "Authentication", or "Verification" Process is Actually a Comparison Process Looking at Conditions or "Quality" to Find Obvious Counterfeit

The "Buying Guide" on StockX's website claims consumers can buy with confidence because every item purchased on its platform is "StockX Verified" and under "Trust the Process."[116]  Although in trying to decipher what the process is, there are differing definitions, with none of them being an actual authentication process.  StockX uses what is essentially quality control and overt comparisons and calls it authentication, even though its "authenticators" are not qualified or authorized by the rights holder to actually authenticate genuine products.

---

[113] *See* Dani James, *StockX removes 'Verified Authentic' tag,* RETAILDIVE.COM (Nov. 14, 2022), https://www.retaildive.com/news/stockx-removes-verified-authentic-sneaker-tags/636472/ (discussing StockX's statement on Twitter that "verification is the new authentication."); *see also The Internet is in a Frenzy Over StockX Authentication Language Change,* SNEAKERFREAKER.COM, https://www.sneakerfreaker.com/news/stockx-authentication-verified-language-change-nike-twitter-breaking (*last accessed* May 4, 2023) (discussing the change and showing side by side examples of images of shoes before and after the change).
[114] James, *supra* note 113 (emphasis added).
[115] NIKE0041095.
[116] NIKE0040099, NIKE0040100; NIKE0006780.

29

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

1.    A "Science" that is "almost 100% Accurate"

StockX claims it took it over six years to "perfect the science of authentication."[117]  But StockX's "science" is limited to essentially human inspection of quality, something that by its nature will be fraught with error.  Even if technologies such as artificial intelligence and machine learning could be applied to StockX's process, error will still exist, since StockX does not have the correct information, nor the ability to authenticate.

StockX also claims on its website to have "nearly eliminated the once-common risk to buyers of purchasing counterfeit goods."[118]  This is an incredible claim to anyone working in the field of anti-counterfeiting and brand protection, since this is near-impossible, with the exception of products being sold directly from the brand manufacturer, because of the issues identified here of lack of knowledge of provenance of the products and inability to authenticate.

2.    External Descriptions of the Process: Focus on Quality

In many locations on the website, the StockX "process,"[119] describes what is essentially quality control in multiple pages across its website, noting:

- On the Help Center page, under "What is the StockX verification process?" which notes that it takes into account issues, such as: "the condition of the item, any variations it might display against our internal standards, the state of its container and whether or not it contains all necessary accessories."[120]
- However, under "Step 2", noting visual inspections of quality. [121]
- Then on June 8, 2022, StockX posted an article entitled, "Is StockX Legit?"[122] Here it discusses the "authentication process" as the reason why it is a "safe place to buy."[123] It notes quality issues again, and only a fraction of the review process "involves fake goods.  It includes more general errors [including. . . ] wrong size, or an accessory missing, [. . .] manufacturing defects, [. . .] packaging, [. . .]accessories

---

[117] NIKE0038795 (noted twice on this page).

[118] NIKE0038792.

[119] Whether described as "authentication process", "verification process", or "standards" used by StockX.

[120] NIKE0040107.

[121] NIKE0039854-55.

[122] NIKE0038793.

[123] NIKE0038793.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

are all included; and they verify that the product is the right size.  All of this adds up to an incredibly high-quality control standard."[124]

- The website also notes to buyers, "Part of the value when you buy or sell on Stock X is our verification process performed at Authentication Centers. StockX maintains rigorous internal guidelines to ensure that everything on the site meets our standards."[125]

- The "Guaranteed Authenticity" page notes that "[Stock X's] global team of experts uses a rigorous, multi-step verification process," which includes inspecting items such as 'condition', 'construction' 'packaging', and 'accessories, and 'advanced technology.'[126]

- StockX also discusses "quality" or "quality assurance" in several locations and seems to intermix whether a genuine product is damaged, incorrect item, or incorrect size, yellowing, aging (i.e. meeting StockX's standards), or whether it is a genuine product (i.e. not counterfeit).[127]

- In another location entitled "Quality Control," they note that "authentication is about more than just stopping fakes."[128]

- The website also notes that it has a StockX database of every product that has been verified and includes elements that do not meet StockX's standards.[129]

- Later after changing their process name from "authentication" to "verification", StockX notes on November 17, 2022:

  > While product authenticity remains core to our analysis, our **verification process** is a better reflection of our broader value proposition that we provide customers by reviewing all products sold on Stock X.  We look at a range of indicators before sending a product to a Buyer and there are a number of reasons why a product may fail to meet our elevated standard of excellence, including incorrect size, missing accessories, a damaged box, a manufacture defect, if it shows signs of previous wear, and of course, if it fake.[130]

- On one page of their website, StockX says:

---

[124] NIKE0038793.

[125] NIKE0005854 (StockX Help Center, How does verification help me as a Buyer or Sellers? 4/8/22).

[126] NIKE0006785-86.

[127] NIKE0038794.

[128] NIKE0006679 (listing all other reasons for rejecting goods, including manufacturing defects, damaged box, wrong product, fake product, wrong size and other reasons).

[129] NIKE006780 (noting "StockX's proprietary database includes billions of brand and product-specific data points").

[130] NIKE0042400 (emphasis original).

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

"Verification is the new authentication, but our comprehensive approach remains unchanged. While product authenticity remains core to our analysis, our verification process is a better reflection of our broader value proposition that we provide customers by reviewing all products sold on StockX.

We look at a range of indicators before sending a product onto a buyer and there are a number of reasons why a product mail fail to meet our elevated standard of excellence, including incorrect size, missing accessories, a damaged box, a manufacturer defect, if it shows signs of previous wear, and of course, if the item is fake."[131]

StockX's repeated descriptions of a quality control checklist on its website in multiple locations, which describe its "process," have nothing to do with whether a product is authentic.  In fact, StockX "authenticators" do not have knowledge of the IP rights holders' methodology for authenticating any branded products.

### C.    StockX "Authenticators" and StockX's Internal Standard Operating Procedure ("SOP") on Authentication

#### 1.    "Authenticators"

StockX names its employees and centers as "authenticators" and "authentication centers", even though these individuals cannot authenticate any product.  Instead, StockX and its "authenticators" are describing quality control, or exclusion of overt counterfeit products.

On StockX's *The Magazine* page, entitled *True to You, True to Us,* StockX discusses several of its "authenticators" from the Detroit ops section, noting that both "authenticators" got their experience "authenticating" because they were "in the sneaker game for years" and "knew what to look for."[132]

The article further states, "When it comes to authenticating goods in the day-today, authenticators utilize their years of knowledge and experience with products and put them into practice [. . .] details including the box, the make and model of the product, and the extra accessories that come with, all must be intact to pass authentication on StockX."[133]

---

[131] NIKE0041163.
[132] NIKE0038957-58.
[133] NIKE0038958.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

Under "Big Facts: Verified Authentic" on its website, StockX describes the global growth of its "authentication" process with new "authentication centers" staffed with over 300 "authenticators."[134]  Additionally, several of the new "authentication centers" are in global areas that are in the top 25 provenance countries for counterfeit products globally.[135]  Notably, Hong Kong is the top provenance economy for counterfeit footwear and the OECD economists calculate that in 2017-2019 the relative likelihood of footwear coming from Hong Kong to be counterfeit was 1, while mainland China was 0.8674.[136]  Additionally, StockX is aware that it has sellers located in China.[137]

StockX "authenticators" even have videos on Youtube.com showing how they "authenticate" sneakers.  In the video "Verifying the 990 V3 Joe Freshgoods 'Outside Clothes' | Details Authenticated | StockX," which is on the StockX website and on YouTube, one of StockX's "authenticators" shows how a counterfeit product is compared to a genuine product by using overt features.[138]

## 2.   Internal StockX SOP for Authenticating

The StockX "████████████████████████████████████████████
██████████████████████████████████████[139]  Many procedures relate to safety of the authenticator and quality or damage to the item.  But some refer to looking/examining the product or packaging and determining if it is authentic.

Within these steps, the term "authentic" or "inauthentic" was usually to describe damage, whether a product was clean, matching, the correct size, missing any parts, or just whether it looks ok.[140]  Two of the steps (one for each shoe) are a "Look Smell Feel" test, which is a

---

[134] NIKE0006678; NIKE0006679.

[135] STOCKX, *Where is StockX Located* (Apr. 19, 2023), https://stockx.com/help/articles/where-is-StockX-located. US CBP noted that in 2021, 26.5% of IP seizures at the US border were from Hong Kong. *See* IP Seizures, *supra* note 11. *See also* OECD/EUIPO, Global Trade in Fakes (2021) (noting that Hong Kong, China, Korea are top provenance economies for counterfeit footwear).

[136] OECD/EUIPO, at Table 4.11. Relative likelihood of an economy to be a source of fake footwear, GTRIC-e world for footwear

[137] STX0040554 (Seller Levels & Incentive Program – 2021); STX0040571 ████ of sellers, a total of ████, based in Asia/Pacific region); Amidon Depo Tr., 17:5-18:16 (discussing power sellers and some in Asia-Pacific region); *see also* StockX, *Why is my item shipping from Hong Kong?* (Sept. 27, 2022), https://stockx.com/help/articles/Why-is-my-item-shipping-from-Hong-Kong.

[138] StockX, *Verifying the 990 V3 Freshgoods ""Outside Clothes" | Details Authenticated | StockX,* YOUTUBE (2022), https://www.youtube.com/watch?v=SLIi0-CNlRk.

[139] STX0069525; *see also* Lopez Depo Tr., 132:13-179:6 (testifying to StockX Sneaker Authentication SOP).

[140] STX0069525, "(Step ██ Inspect tissue paper for authenticity and damage"); *Id.* "Step 37a Visual inspection of authenticity and quality of sneaker's entire outside surface area.. (areas mentioned have to do

33

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

comparison and overt test to see if it is obviously counterfeit.[141]  Similarly, in a Washington
Post article, a StockX authenticator says it is a "human" process with more than 25
elements, and things such as "smell" can be a giveaway.[142]  While smell may be something
that could be a giveaway for obvious counterfeits, it cannot be used by StockX to
authenticate.



However, StockX cannot authenticate Nike shoes ███████████████████
███████████ as only Nike or someone authorized by Nike can authenticate Nike product.
StockX tells its consumers and the general public about ways that its "authenticators" can
see more than the average consumer.

---

with the shoe needing to be cleaned or dirty); *Id.* "Step ██ Place underneath blacklight to check for
inauthentic UV stamps or markings")

[141] STX0069525 ("Step ████████" "Look  Smell  Feel").

[142] NIKE0006780 (noting "Human Expertise", "Touch and smell can be critical components when
determining authenticity."); *see also* Somasundaram, The author notes:

> But for Mupas, who examines hundreds of shoes each day as a trained sneaker
> authenticator for the online marketplace StockX, the smell is a giveaway: real Chunky
> Dunkys give off the scent of animal fur. The fakes smell like factory glue."  …… "For
> StockX's human authenticators, the process involves more than 25 elements, starting
> with the shoe box. Even the box paper, which buyers tend to discard, can say something
> about the shoes inside, Mupas said.  "There's some things that we can point out
> immediately that to a regular person that's not an authenticator, they wouldn't be able to
> see it," Mupas said, adding that authenticators have to understand every brand and
> sneaker style available on the StockX platform. *Id.*

[143] STX0058611, (Nike Dunk Low Retro White Black Fake Breakdown 2021); STX0058653 (Jordan One High
OG SP fragment design X Travis Scott (fakes));  STX0058670 (Nike SB Dunk Low What The Paul-Fake
Comparison); STX0773118 Spring/Summer 2019 Supreme X Nike Swoosh Sweater Authentication Guide;
STX00774018 (Various Nike Dunk/SB Dunk Fake Comparisons); STX0773972 Spring/Summer 2014
Supreme X Nike 'Foamposite' Basketball Jersey Authentication Guide; STX0773834  Nike Sportswear (Fake
Comparison); STX0773129 Nike Apparel (Fake Comparison).

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

While the "authenticator" may know more than the average consumer, since they look at thousands of shoes and receive some training by StockX, it still does not mean that they can actually authenticate genuine products.

Furthermore, no IP rights holder openly talks about how it actually authenticates its product, as counterfeiters pick up on this almost immediately and change their tactics.  This knowledge of technologies whether overt, or covert, are kept in house and usually only rest with a few departments and investigators.  StockX's "authenticators" do not have access to these technologies, and therefore, they cannot authenticate.

Even individuals who work in the field of brand protection can usually tell when some products or packaging are suspicious or seem to be counterfeit, particularly with a side-by-side comparison.  Some products are very obviously counterfeit with overt mistakes on the product.

What StockX ignores is the difference between someone being able to tell a fake or counterfeit using their human senses and looking at overt tells on a product and being able to authenticate a genuine product knowing a brand's technologies or elements.  StockX's "authentication" or "verification" process is the variety of a "general inspection" of one who does not have access to the brand's technologies or authentication tools.

Additionally, if the statistics on the StockX website are true, it notes that 300 authenticators will authenticate more than 1 million products every month.[144]  That would be approximately 3,333 products per employee, averaging approximately 111 per day if they worked every day, or approximately 166 products per day if they worked 5 days a week.  This would equate to around 20 products per hour, or one product every 3 minutes.[145]  It would be nearly impossible to authenticate a product at this speed, and no authenticators work 24/hours per day, 7 days per week.

Authentication can only be done by the IP rights holder or one who is authorized by the brand owner.  While StockX could verify a quality standard that they may have, authentication is not a quality issue, but goes to whether a product is genuine.  StockX cannot authenticate a Nike product.

---

[144] NIKE0006776.
[145] 30(b)(6) Depo Tr., 66:24-67:1 (testimony that it takes on average, ████████ to authenticate a product).

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

**D.     Lack of Consumer Options to Return a Counterfeit Item and Protecting the Sellers**

StockX also does not provide clear avenues to protect a consumer if a counterfeit pair of sneakers makes it through their verification process.  StockX's process focuses on making it easy to sell so the seller does not have to deal with complaints from the buyer.[146]  Additionally, the sellers appear anonymous to the buyer and do not have a space for buyers to leave reviews.

However, despite this, StockX claims to "stand[s] behind every order, and if a mistake is made, our world-class customer service team will be there to resolve the issue and get you the right product."[147]  This is highly problematic that there is not a full immediate refund for a counterfeit product, but a forcing of the consumer to continue to use the StockX site even though StockX has already allowed the sale of a suspected counterfeit product that failed to be detected by its process.

There is no clear answer on what a consumer can do if they get a suspected counterfeit on the StockX website.  Consumers have no clear direction.  StockX also even admits many consumers would not be able to tell if a shoe is counterfeit.[148]  In fact, it appears that there is no immediate recourse if a consumer buys a counterfeit pair of shoes.

In one case, a user on Instagram had three messages to StockX about counterfeit products (suspecting at least 36 out of 62 that he had purchased were counterfeit) that had gone unanswered until he posted it publicly on Instagram.[149]  StockX eventually responded with a request for the user to send the suspected shoes back for reevaluation.[150]  Additionally, the StockX team seems to not be concerned about suspending the seller(s) of the potential counterfeits or discovering where they came from in order to prevent additional sales of

---

[146] NIKE0005853 (noting that "the verification process marks the end of your transaction with the Buyer, getting you paid and leaving the customer service aspects of the transaction to us so you can get back to selling!).

[147] NIKE0038794.

[148] Fenton Depo Tr., 83:21-84:7 (noting not all consumers would be able to identify counterfeit product and know to complain).

[149] STX0774246-47; *see also* Kim Depo Tr., at 28:4-30:18 (purchase of suspected fakes from StockX); 69:22-74:19 (Instagram posts after not being able to get through official StockX channels); 77:3-82:14 (details of Instagram post); 86:18-92:13 (details of Roy Kim phone call with R. Amidon about return of suspected counterfeits).

[150] STX0774247; *see also* Amidon Depo Tr., 87:22-91:11 (Roy Kim returns); 83:11-24 (conversation with Roy Kim).  I understand that Nike's Brand Protection team inspected these suspected shoes and confirmed that 38 of the 62 pairs are counterfeit.  *See* Pallett Depo Tr., 30:4-15; 306:21-317:10; NIKE0029087; Roy Kim Depo Transcript, 83:13-85:9; s*ee also also* Brendan Dunne, *Nike v. StockX Lawsuit: How One Buyer Got 38 Fake Paris of Sneakers,* COMPLEX (Mar. 21, 2023), https://www.complex.com/sneakers/stockx-fake-sneakers-nike-lawsuit-38-pairs.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

counterfeit.[151]  Consumers on StockX's platform, including even the user mentioned here, would not have been able to find out who sold them the counterfeit products.

Unlike almost any legitimate supply chain of brick-and-mortar stores, where consumer protection is paramount and the ability to find a seller or the source of the products that are purchased is possible, StockX creates a barrier for the consumer to find the seller of the product.  The only alternative that is given is to resell the item to another consumer, which StockX discusses in its internal memo, in the section entitled, ██████████████████████ ███████, which states:


[152]

Given that StockX knows that counterfeits get through their verification process, it makes it almost impossible for a buyer to return a counterfeit, but instead encourage buyers to *put it back into the stream of commerce* on their platform.  Additionally, those who do resell do not even know the origin of their product, since the identity of the seller has been shielded from them during the purchasing process.

### E.    Types of Product or Sellers on StockX that Encourage Counterfeiters

#### 1.    New Sellers Selling High AOV Items

For a counterfeit seller, entering the online market is an attractive and easy way to start selling "counterfeit" in a few clicks with few barriers.  Counterfeiters will most likely attempt to sell higher priced items because their expected profit will be greater.  StockX's internal documents ██████████:



---

[151] *Id.*

[152] STX0020231.  Later in this document, it is recommended to allow returns for eligible purchases. STX0020245. Interestingly, ███████████████████████████████████ ██████" which as stated above is a high potential area for counterfeits.  STX0020260; *see also* STX0021484 (noting: "All sales are final. StockX does not allow for returns, exchanges, or cancellations").

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY



████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████

████████████████.[153]

StockX employees note that ████████████████████████████████

████████████████████,[154] and they suggest that ██████████████████████

████████████████████████████.[155]  Another StockX employee

notes that this ████████████████████████████████████████████████████

████████████████████████████.[156]  StockX even notes via Twitter that its three most highly

"faked sneakers" are three pairs of high value Nike shoes.[157]


Additionally, StockX internal documents show ██████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████.[158]  Interestingly enough, in this case,

the buyer sent the QA team enough pictures for them to note that the product and

packaging were not authentic without even doing a side by side physical comparison of the

shoe.

## 2.    Pre-Release Sales of Nike Sneakers

StockX tracks the release of Nike's shoes and offers pre-sales, in other words, StockX

accepts bids for a product before it is even released to the market by the brand.[159]  This

gives a signal to counterfeiters that they can sell these sought-after products because there

is a demand for them if they can acquire counterfeits that appear to be genuine.  This

particular practice does not even take into account whether sellers physically have the

sneakers at the time (which they should not if it is before the release), and where the

sellers are purchasing the sneakers from (no proof of purchase is required), and how they

---

[153] STX0047457 (Email from Emile Bautista).

[154] STX0047457-58; *see also*  Amidon Depo Tr., 74:3-22 (discussing high value items more likely to be counterfeit).

[155] STX0047461-62.

[156] STX0047463.

[157] NIKE0038943.

[158] STX0070403.

[159] *See e.g.,* STOCKX, *Air Jordan Release Dates* (Aug. 2, 2022), https://stockx.com/news/air-jordan-release-dates/ (noting Air Jordan release dates); STOCKX, *Nike,* https://stockx.com/nike/release-date (*last accessed* May 4, 2023) (actively selling Nike shoes that have not yet been released and will not be for weeks); NIKE0038818 ("Global Access "Whether it's pre-release, regionally limited, or "sold out" – our millions of customers from over 200 countries allow you to easily secure those hard-to-find, coveted items."); *see also* Amidon Depo Tr. at 32:21-34:16 (discussing pre-release product); *see infra* Section D.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

acquired them.  In fact, they even have created authentication procedures for shoes that they receive from sellers before they are released by Nike.[160]

Particularly with new drops, they are offered for sale in a limited time frame, sell out fairly quickly and are offered for sale only through Nike[161].  This practice is setting up StockX for a higher likelihood that bad actors will take advantage of this because the demand will far outweigh the supply.  Additionally, with this particular practice, Stock X "authenticators" will not have had time to be trained on common features of counterfeits for those particular sneaker lines before they are sold, which is the only way StockX attempts to remove counterfeit product in the first place.

This offering of pre-sale shoes for sale before their launch date encourages counterfeiters to amp up production to meet the launch simultaneously—with no requirement as to the provenance of the shoes[162] and even allows sales without the product in the possession of the seller.[163]  This causes harm to Nike, particularly because it is creating an environment where Nike is now competing against the sale of counterfeit products.[164]

### F.    Conclusion on StockX's Website and "Authentication"

In my opinion, StockX has created a business model that encourages counterfeiters to sell their products on their platform anonymously to consumers without an easy way for them to report suspected counterfeit, even if some counterfeits have been discovered by StockX. Counterfeiters are not deterred by Stock X's system for detecting obvious counterfeit or quality issues, and indeed the numbers of counterfeits that are touted by StockX shows this. Additionally, because StockX cannot authenticate the products that are sold, there is no way to confirm how many hundreds of thousands of counterfeits that StockX might sell to consumers who assume they are buying authentic product, as was seen in the example where one consumer purchases were over 50% counterfeit.[165]  Because of the perception of legitimacy and language on the website that creates that perception (*i.e. "trust us"*) that StockX gives to its consumers that they can guarantee the authenticity of the products sold on their platform, Stock X's sale of Nike products threatens Nike's reputation, market and

---

[160] Lopez Depo Tr., 126:1-132:9 (discussing authentication of pre-release product that was received from sellers).

[161] Delli Carpini, *supra* note 48.- *See also* Delli Carpini Depo Tr., 51:9-52:3; Pallett Depo Tr., 80:14-81:5.

[162] *See e.g.,* Amidon Depo Tr. at 26:22-28:18, and 30:11-32:4 (discussing that StockX does not know sourcing of products from power sellers).

[163] STOCKX, *Can I sell an item I don't have yet?* (Mar. 30, 2023), https://stockx.com/help/articles/Can-I-sell-an-item-I-dont-have-yet (discouraging but allowing sellers to sell products they do not yet have).

[164] Delli Carpini, *supra* note 48

[165] *See supra* notes 149-150.

HIGHLY CONFIDENTIAL –
OUTSIDE COUNSEL'S EYES ONLY

its consumers.  Nike must then attempt to protect and repair its reputation from consumers who believe they bought genuine Nike products but instead received a counterfeit and believe it is a quality issue instead; lose consumers; and compete in the marketplace with counterfeiters.

# KARI KAMMEL

**619 S. Rogers Street, Mason, MI 48854▪ (773) 715-8169 ▪ kkammel@msu.edu**

## EXPERIENCE

*Center for Anti-Counterfeiting & Product Protection, Michigan State University*                    April 2015-present

**Director,** July 2022-present
- Direct and provide strategic leadership to advance and implement the center's research, outreach and education programs
- Responsible for securing funding and managing the self-supporting Center's fiscal health
- Maintain Relevance to University: Align actively align the goals of the Center to College and University priorities as outlined in their respective strategic plans.
- Broaden and strengthen the Center's interdisciplinary connections by overseeing and mentoring diverse staff and faculty and organizing and guiding interdisciplinary research teams
- Working extensively with industry and external Partners by managing and maintaining an active industry advisory board, developing key internal and external partnerships, and regularly engaging in local, national, and international outreach activities.
- Foster an inclusive working environment for staff and students
- Conduct and publish legal research pertaining to the problem of trademark counterfeiting

**Assistant Director, Education & Outreach; Senior Academic Specialist-Outreach** (2015-2022)
- Research and publication on legal issues pertaining to intellectual property law, focusing on trademark counterfeiting issues; legal issues in the Middle East on intellectual property; intersection with human rights and illicit trade
- Testified before Senate Judiciary Committee on Cleaning Up Online Marketplaces: Protecting Against Stolen, Counterfeit, and Unsafe Goods, (November 2021)
- Testified before House Judiciary Committee, Sub-Committee on Internet, Court and Intellectual Property on Secondary Liability for Trademark Counterfeiting (May 2021)
- Promoted to Senior Outreach Specialist (July 2021)
- Manage Center outreach and education projects, including the conferences in person and online), designing content, recruitment of speakers and resulting publications, as well as managing reporting out on other projects
- Direct outreach and collaboration with over 500 industry, government, and law enforcement partners
- Direct, design, facilitate and implement executive education programming for the center, including seminars, webinars, customized training, and self-guided training; responsible for creating and managing the Professional Certificate for Brand Protection, a 17-course full online, self-guided program, launched in 2017
- Run student intern/extern program working with undergrad, graduate, and law students from multiple disciplines approximately 15 students per semester

**Adjunct Law Professor,** *Michigan State University College of Law,* April 2018-present (Counterfeit Food Law in Global Food Law Program, International Intellectual Property, Trademark Counterfeiting Law)

**Legal Consultant/Expert Witness,** October 2011-present (issues involving the trademark counterfeiting law or culture, Middle East, mental health, honor crimes, Middle East cultural issues pertaining to the law)

**Middle East Program Manager/Academic Specialist-Outreach,** Visiting International Professional Program, Michigan State University                    April 2012-April 2015
- Directed, planned, designed, implemented, and lead projects and training programs on all disciplines available at MSU for Middle East Programs; provide customized training programs for clients

- Lead needs assessments for clients and end of program reporting
- Created, maintained, and expanded relationships with subject matter experts for training at MSU, the Greater Lansing Area, State of Michigan, and the broader U.S.
- Collaborated with units on campus and off campus; worked with media and public relations to promote programming; worked closely with government officials, university leadership and staff in the Middle East
- Practiced entrepreneurial approaches to programs, including create new style of programs, new planning tools, new monitoring and evaluation tools; new delivery methods

**Deputy Chief of Party**, *International Human Rights Law Institute, DePaul University* Iraq                Jan-October 2011

- Supervised, implemented, executed and responsible for over $12 million in Department of State, DRL grants, which included designing training programs (adult education), conferences, and other activities on conflict resolution, mentoring, rule of law and experiential education
- Managed and oversaw the day-to-day office and financial operations and administrative activities
- Restructured office, facilitated the workflow, supervised in-country staff of more than 70; created professional development program for staff from diverse cultural, ethnic, socioeconomic, and educational backgrounds
- Oversaw production and submission of Department of State required reporting and any internal and external reports, status updates, program summaries and related requests
- Collaborated with off campus partners, government agencies; interacted with media and high-level delegations
- Monitored budget and spend rate against planned activities; Managed in-country program finances related to the project
- Ensured that all project activities were within the scope of the projects/grant and in compliance with university policies and procedures and grantor regulations and requirements
- Interacted regularly with government agencies, local Iraqi press and higher-level delegations
- Successfully used technology for trainings, meetings, remote office and staff work, and online collaboration

**Director of Reconciliation***, International Human Rights Law Institute, DePaul University* Iraq 2010-2011

- Directed and managed program activities on a $4.7 million DRL grant, including trainings (adult education), courses conferences, creation of libraries, and Centers for Human Rights and Reconciliation
- Created, directed and ran first national moot court competition (Jessup) with 22 law schools in Iraq (2010) (won Schneebaum Award for Best National Administrator)
- Managed and trained project staff and consultants; created and oversaw programming, project design and management; maintained working relationships with partner institutions throughout country
- Oversaw the development of the production of publications, training materials, legal education materials, law library renovations and improved legal education capacity building activities
- Created, implemented and directed participatory education programs

**Deputy Executive Director**, *International Human Rights Law Institute, DePaul University* Chicago, IL 2008-2010

- Directed, organized, and supervised over 100 law students, including organizations, activities, student-run journal, symposium, and human rights clinic
- Supervised adult learning program for international and local fellows and volunteers for research and projects
- Supervised and organized research and capacity building project on women's rights and legal issues in Egypt; and indigenous women's rights in Mexico.
- Organized, ran and participated in conferences, including conference involving heads of state (Somalia)

- Developed new projects, including grant applications and expanding the educational component of the institute
- Managed public awareness campaign, business development, staff development, office management

**Adjunct Law Professor,** *DePaul University College of Law,* Spring 2009, Spring 2010
- Course: International Human Rights Law Colloquium, focusing on human rights, rule of law, organized crime and trafficking

## ADDITIONAL WORK EXPERIENCE
- **Adjunct Instructor, Paralegal Program,** *Lansing Community College*, 2014-2019
- **Of Counsel,** *Loberg Stevens,* Chicago, Illinois 2009-2010
- **Legal Instructor on Iraq,** *Civilian Police International,* Virginia, August 2009
- **Legal Researcher,** DePaul University, 2006-2008
- **Summer Law Clerk**, *Illinois State's Attorney's Office,* Narcotics Bureau, Chicago, Il 2006
- **High School Teacher**, *Misr Language Schools,* Cairo, Egypt, 2003-2004
- **Graduate Researcher**, *Professor Nadia Farah, Political Science Dept., AUC* 2003
- **Immigration Paralegal**, *Law Firm of Robert Perkins and Associates,* Chicago, Il 2002
- **Litigation Paralegal**, *Law Firm of Elaine Siegel & Associates,* Chicago, Illinois, 2001-02
- **Legal Researcher**, *The Office of the Prosecuting Attorney,* Jackson, Michigan, Summer 2000

## MEMBERSHIPS
- Bar Admission: Illinois (inactive); Bar Admission Michigan (inactive)
- International Trademark Association Member (INTA), Committee on Anti-Counterfeiting; Project Lead on Proceeds of Counterfeiting

## LANGUAGES
- Arabic (Conversational)

## EDUCATION

J.D., **DePaul University College of Law**, Chicago, Illinois, May 2008
*Awards and Honors*
- *Cum Laude,* International and Comparative Law Certificate; Law Merit Scholarship (2005-2008); Dean's List (2005, 2006); Sullivan Fellow, *International Human Rights Law Institute* (2007-2008); Health Law Fellow, *Health Law Institute* (2007-2008); CALI Award (Top Grade): International Criminal Law (Proc.), Public International Law; Women's Law Caucus McGullicuddy Scholarship (2006); Senior Text Editor, *DePaul Journal of Health Care Law* (2007-2008); Staff Writer (2006-2007)

M.A., **The American University in Cairo (AUC)**, Cairo, Egypt, February 2005
- *Cum Laude,* Political Science, specialization in International Human Rights Law; Thesis: *Law 96 of 1992: An Analysis of the Agrarian Counter-Reform Law within the International Legal Human Rights Framework & Its Effects on Human Rights in Egypt*

A.B. with Honors, **The University of Chicago**, Chicago, Illinois, June 2001
- *Departmental Honors,* Near Eastern Languages & Civilizations; Honors Thesis: *Ancient Egyptian Magic in Coptic Egypt;* Dean's List 2001; Foreign Language Acquisition Grant 1999

Summer Arabic Program, **The American University in Cairo,** Cairo, Egypt, Summer 1999

Continuing Studies, Arabic, **DePaul University**, Chicago, Illinois 2009

## CONGRESSIONAL TESTIMONY

- *Cleaning Up Online Marketplaces: Protecting Against Stolen, Counterfeit, and Unsafe Goods*, November 2, 2021, Congress of the United States, Senate, Committee on the Judiciary, Full Committee https://www.judiciary.senate.gov/meetings/cleaning-up-online-marketplaces-protecting-against-stolen-counterfeit-and-unsafe-goods
- *The SHOP SAFE Act: Stemming the Rising Tide of Unsafe Counterfeit Products Online*, May 27, 2021, Congress of the United States, House of Representatives, Committee on the Judiciary, Sub-Committee on Courts, Intellectual Property, and the Internet https://judiciary.house.gov/calendar/eventsingle.aspx?EventID=4567

## AWARDS

- **A-CAPP Center, Most Influential Research Center on Illicit Trade and Counterfeits**, USA-IT, November 2022
- **MSU-CIBER Grant fund for Curriculum Development,** Internationalization of content for the A-CAPP Center Brand Protection Professional Certificate, $15,000
- **MSU-CIBER Grant fund for Professional Development,** *What Emerging SMEs need to know about Counterfeiting and Brand Protection: Right-Sizing Your Approach,* NASBITE Conference, Annapolis, MD, March 2020, $1100
- **A-CAPP Center, Outstanding Staff Member Award,** October 2018
- **MSU-CIBER Grant fund for Presenting,** *Why Educating About Product Counterfeiting is Important,* NASBITE Conference, Baltimore, MD March 2018, $1500
- **2011 Steven Schneebaum Award, Outstanding National Administrators,** 2011 Jessup International Law Moot Court Competition, with Rokosh Abdullah and Bakhcha Omar, Iraq National Administrators

## PUBLICATIONS (*indicates lead author)

- *Trademark Counterfeiting Enforcement Beyond Borders: The Complexities of Enforcing Trademark Rights Extraterritorially in a Global Marketplace with Territorial-Based Enforcement,* with Matthew Azim-Kramer, Daniel Duquet, Lillie Patterson, 33 FORDHAM INTELLECTUAL PROPERTY, MEDIA & ENTERTAINMENT L. J., 595-634(Spring 2023)
- *Survey & Legal Analysis of Select Global Trademark Anti-Counterfeiting Statutes & Evidence of Prosecutions*, 27 MARQUETTE UNIVERSITY INTELLECTUAL PROPERTY AND INNOVATION LAW REVIEW 45-72 (SPRING 2023)
- *Why Criminalize Counterfeiting if You're Not Going to Prosecute,* Brand Protection Professional (March 2022) (co-author Lillie Patterson & Chandler Wirostek)
- *INFORM Consumers Introduction into the America COMPETES Act: How potential changes could create too many loopholes for it to be useful or effective*, A-CAPP Center Paper (2022)
- *Revisiting the SHOP SAFE Act After Markup*, A-CAPP Center Paper (2021)
- *Responsibility for the sale of trademark counterfeits online: Striking a balance in secondary liability while protecting consumers*\* (co-authors, Jay Kennedy, Daniel Cermak, and Minelli Manoukian) 49 AIPLA Q.J. 201-258 (2021)
- *TaylorMade GC Bill Reimus, on Running an In-House Legal Department* (co-author Pervin R. Taleyarkhan) ABA Landslide (March 2021)
- *Congress's Proposed E-Commerce Legislation for Regulation of Third-Party Sellers: Why It's Needed and How Congress Should Make It Better*, 21 U.C. DAVIS BUS. L.J. 91 (2020) (co-author John Zacharia)
- *How Congress Proposes to Protection Consumers from Online Counterfeits: The Good, The Bad, and The Ugly*, No. 3 *Brand Protection Professional* (September 2020) (co-author John H. Zacharia)
- *Examining Trademark Counterfeiting Legislation, Free Trade Zones, Corruption and Culture in the Context of Illicit Trade: The United States and United Arab Emirates*\*, 28 MICH. STATE INT'L L. REV. 210-235 (2020)
- *IP Rights in the Middle East: Cultural Complexities behind Legal Enforcement*\*, 12:4 Landslide (ABA, March/April 2020)
- *Counterfeiting in a Time of Crisis*\*, 5:2 THE BRAND PROTECTION PROFESSIONAL (JUNE 2020) (co-author Joseph Longo)
- *The Crime of Product Counterfeiting: A Legal Analysis of the Usage of State-Level Statutes*\*, 18 CHI-KENT J. INTELL. PROP. 125-152 (co-authors Brandon Sullivan & Lorryn Young)
- *Using State-Level Anti-Counterfeiting Statutes: Evidence from New York*\* (co-authors Brandon Sullivan & Lorryn Young), 3:1

---

THE BRAND PROTECTION PROFESSIONAL 22-23 (March 2018)

- *The Need for a Holistic Approach to Trademark Counterfeiting for the Legal Field,*∗ Vol. 29, No. II, MICH. INT'L LAWYER 3-4 (Summer 2017), available at http://connect.michbar.org/internationallaw/newsletter
- *Product Counterfeiting Legislation in the United States: A Review of Characteristics, Remedies, and Penalties,* 106 J. CRIM. R. & CRIMINOLOGY 521-564 (Summer 2016) (co-authors Jeremy M. Wilson, Brandon A. Sullivan, Travis Johnson, Roy Fenoff)
- *U.S. Product Counterfeiting Legislation: A Look at the Variation in State Laws Governing Trademark Infringement Counterfeiting Law,* 2:1 THE BRAND PROTECTION PROFESSIONAL (March 2017) (co-authors Jeremy M. Wilson, Brandon A. Sullivan, Travis Johnson, Roy Fenoff)
- *An Analysis of Human Trafficking for Sexual Exploitation in Vietnam and Comprehensive Approach to Combating the Problem, in* UC DAVIS J. INT'L L & POL'Y (Summer 2010) (co-authors Elisabeth Ward, Heather Lehman, & Charles Tucker)
- *Transitional Justice in Iraq: Rebuilding the Mental Health System*∗, in* DEPAUL JOURNAL OF HEALTH CARE LAW, Iraq War Issue (Summer 2008)
- *The Universality of Women's Rights Enshrined in the CEDAW: How Ratification by the United States will Influence Women's Rights in Iraq*∗, in* DEPAUL WOMEN'S LAW CAUCUS JOURNAL (Spring 2006)
- *The Cost of Virginity: Virginity Tests and Hymen Reconstruction*∗, in* 2 DEPAUL HEALTH LAW INSTITUTE NEWSLETTER 3 (Jan/Feb 2006)

## CURRENT RESEARCH

- Analysis of Counterfeiting in Free Trade Zones- Unregulated Space, Should WIPO be more effective?
- Analysis of state specialist anti-counterfeiting statutes in the context of US IP enforcement
- Liability for Social Media Influencers Promotion of Counterfeit Goods (with John Zacharia & Saleem Alhabash)
- Geographical Indications and Counterfeits
- Review of e-commerce and anti-counterfeiting laws in North African and the Middle East
- Case Study of Counterfeits in Michigan: Three Steps Any State Needs to Take to Combating Trademark Counterfeiting

## EXTERNAL WRITINGS

- Request for Comment on Secondary Trademark Infringement Liability in the E-Commerce Setting, USPTO (with Jay Kennedy)(January 2021)
- Amicus Brief- *Nike v. Wu,* 20-602, On Appeal from the United States District Court For the Southern District of New York, No. 1:13-cv-08012-CM-DCF, before the Second Circuit, filed June 5, 2020 (led team on behalf of A-CAPP Center)
- Request for Comment on Intellectual Property Protection for Artificial Intelligence Innovation, USPTO, 84 Federal Register 58141 (with Jay Kennedy, Jeff Rojek)(June 2020)

## PRESS MENTIONS

- IP Literature Watch, January 2023 (mentioning Survey & Legal Analysis of Select Global Trademark Anti-Counterfeiting Statutes & Evidence of Prosecutions Article & Trademark Counterfeiting Enforcement Beyond Borders: The Complexities of Enforcing Trademark Rights Extraterritorially in a Global Marketplace with Territorial-Based Enforcement, *available at* https://media.crai.com/wp-content/uploads/2023/01/26124544/IP-Literature-Watch-January-2023.pdf

## INTERVIEWS

- Multnomah County Prosecutors Are Charging Fentanyl Dealers With Counterfeiting a Big Pharma Trademark, March 29, 2023, available at https://www.wweek.com/news/2023/03/29/multnomah-county-prosecutors-are-charging-fentanyl-dealers-with-counterfeiting-a-big-pharma-trademark/
- Inside Higher Ed, Fake College Prompts Scrutiny, January 24, 2023, available at https://www.insidehighered.com/news/2023/01/24/bogus-college-website-draws-warning-north-carolina-ag
- Reshoring Institute, The Frictionless Supply Chain Podcast: Kari Kammel, July 12, 2022, available at https://www.youtube.com/watch?v=OkbWi5F_fEQ

- WLNS News, How to Avoid Counterfeit Goods in Michigan, July 19, 2022, available at https://www.wlns.com/news/how-to-avoid-counterfeit-goods-in-michigan/
- A-CAPP Center Brand Protection Stories Podcast, *On a global journey from rule of law to brand protection* (with Leah Evert Burks), August 2022
- PMI Podcast Series, *Free Zones,* forthcoming with Hugo Morán and Hernán Albamonte (2022)
- Fake Pharma Websites Bring Fentanyl Right to Your Laptop, April 6, 2022, *Inside Sources,* https://insidesources.com/fake-pharma-websites-bring-fentanyl-right-to-your-laptop/?utm_source=rss&utm_medium=rss&utm_campaign=fake-pharma-websites-bring-fentanyl-right-to-your-laptop
- Worrying levels of risky chemicals in counterfeit clothing, report reveals, as Senate progresses bill, March 30, 2022, *World Trademark Review,* https://www.worldtrademarkreview.com/anti-counterfeiting/worrying-levels-of-risky-chemicals-in-counterfeit-clothing-report-reveals-senate-progresses-bill
- Brands Intellectual Property News (Spanish), A-Capp: Cooperación y capacitación son claves para combatir las falsificaciones en América Latina,  November 29, 2021, available at https://www.brandsprotectionnews.com/a-capp-cooperacion-y-capacitacion-son-claves-para-combatir-las-falsificaciones-en-latam/
- IP Updates, LEGO Internal Podcast (2021)
- *Inflation, Surplus Relief Funds and Unsavory Actors Rising?,* State of the State Podcast, IPPSR, MSU, Interviewed by Matt Grossmann, Arnold Weinfeld & Charles Ballard, June 18, 2021, http://ippsr.msu.edu/public-policy/michigan-wonk-blog/inflation-surplus-relief-funds-and-unsavory-actors-rising
- College of Social Science News, *How COVID-19 is boosting counterfeit markets, and how you can avoid them* (jointly with Jeff Rojek & Jay Kennedy, April 2020)
- E-commerce caselaw and counterfeits, CNN, *Fake and Dangerous Kids Products are Turning Up for Sale on Amazon,* December 20, 2019, https://www.cnn.com/2019/12/20/tech/amazon-fake-kids-products/index.html
- A-CAPP Educational Outreach Efforts, MICHIGAN BUSINESS NETWORK, November 12, 2019, http://www.michiganbusinessnetwork.com/blog/kari-kammel-a-capps-educational-outreach-efforts
- Professional Pointers Column: Looking to States' Laws: Interview with A-CAPP Center Assistant Director Kari Kammel by BPP Managing Editor Leah Evert-Burks, Vol. 4, No. 2 BPP June 2019
- Protect Your Beauty Brand, Part I, by GLOBAL COSMETICS INDUSTRY, July 9, 2019, https://www.gcimagazine.com/business/management/regulation/podcast-Protect-Your-Beauty-Brand----Part-1--511843181.html

**FOR CREDIT COURSES TAUGHT**
- International Intellectual Property, 2020, 2021, 2022 (MSU College of Law)
- Trademark Counterfeiting, 2021, 2023 (MSU College of Law)
- Food Law: Preventing Fakes and Counterfeits, 2018, 2019, 2020, 2021, 2022, 2023 (MSU College of Law)
- International Human Rights Law Colloquium (2009, 2010), DePaul College of Law

**CURRICULUM DESIGN**
- Trademark Counterfeiting (MSU Law) (for credit)
- Food Law: Preventing Fakes and Counterfeits (MSU Law) (for credit)
- Introduction to Brand Protection (non-credit)
- Brand Protection Professional Certificate- 17 Short Courses, online, self-guided, ran project, authored, edited, managed supplemental SMES (non-credit)
- Advanced and Applied Brand Protection: Building and Sustaining Brand Protection Teams, Risk Assessment and Supply Chain (supervised project and course instructor) (2018-2019)
- Risk Assessment for Counterfeit Products Executive Education (2016)(non-credit)
- Investigations for Counterfeit Products (2016) (non-credit)

- Brand Protection in China Executive Education (2016, 2017, 2020) (non-credit)
- International Human Rights Law Colloquium (2009, 2010) (for credit)

**PRESENTATIONS**
- Washington Foreign Press Center World IP Day Presentation at the Intellectual Property Rights Center (HSI/FBI); A-CAPP Center Briefing (virtual), April 20, 2023
- Intellectual Property Law Spring Seminar 2023, Protecting Brands in the Real World, March 2, 2023, East Lansing, MI
- USPTO/U.S. State Dept. MEPI, Intellectual Property Rights Workshop for Moroccan Judges & Prosecutors, Feb. 6-8, 2023, Marrakech, Morocco, *Rule of Law and IPR Prosecutions*
- Moderator: Smart Shopping Sensitization-Public and Private Approaches to Educating the Public on the Dangers of Counterfeit, Anti-Counterfeiting public awareness campaigns, USPTO and URSB (virtual) November 2022
- Judge & Presenter, 2022 Bring Down Counterfeiting Hackathon, https://bring-down-counterfeiting-2022.devpost.com/ October 2022
- Private Sector Associations Meeting on Intellectual Property Enforcement organized by the World Intellectual Property Organization (WIPO), Geneva and online, *Presentation on A-CAPP Center,* October 3, 2022
- Panelist, INTERPOL's IP Crime Conference, Women in IP (Panelist), Korea, September 2022
- Keynote Speaker, South Africa-University of Pretoria, Keynote at Conference on Consumer protection law in the 21st century: Moving to a new Pangaea or a continental drift? September 2022
- UK Intellectual Property Office, Trade Mark Infringement and Social Media Symposium. The event, funded by the British Academy and the Northumbria University, Northumbria University, Newcastle, June 2022
- INTERPOL- 11th Regional Intellectual Property (IP) Crime Conference, Middle East and North Africa, IP Protection in the Digital Age, *New Tools,* May 2022
- USA-IT Michigan, Illicit Trade in Tobacco Products: Convergence with Crime, May 2022
- International Trademark Association (INTA), Moderator/Panel Author, *How to Approach Anticounterfeiting in 2022,* May 2022
- International Trademark Association (INTA), Anti-Counterfeiting Workshop, Government Moderator, April 2022
- International Anti-Counterfeiting Association (IACC) Annual Conference, *Success in Fighting Counterfeits on E-commerce with Marketsafe & MSU Licensing,* April 2022
- Toy Association, *Updates in E-Commerce,* April 2022
- Academic Hot Topics with Saleem Alhabash, *A-CAPP Center Webinar, Moderator,* March 2022
- Connecting Research to Policy, *Leveraging Policy Relevant Projects,* IPPSR/MSU, Panelist, March 2022
- Thriving as an Academic Specialist, *Strategies for Professional Growth as an Academic Specialist,* Panelist MSU Campus, February 2022
- MSU College of Law, Litigation Writing Seminar, *Challenges in Non-Traditional Research,* Panelist, February 2022
- Ference & Associates, *Anti-Counterfeiting in 2022 Webinar,* Panelist, February 2022
- AASA, *Brand Protection Updates,* January 2022
- Toy Association, *Secondary Liability for Trademark Counterfeiting,* December 2021
- AGA-Africa (Attorney General Alliance) Webinar, *Illicit Consumer Goods & Counterfeit Goods,* November 2021
- *Shopping Online? All that Glitters is not Gold:* Coffee with the Profs, MSU Alumni Association (October 2021)
- LEGO, Government & Public Affairs, Internal Podcast, *Current State of Legislation for Anti-Counterfeiting on E-Commerce* (November 2021)
- INTA, *Legislative Update (US),* for Anti-Counterfeiting Committee at Annual Meeting, November 2021

- *Amplifying your Research: Strategies and Resources for Informing Policy*", co-hosted by IPPSR and University Outreach and Engagement at MSU (panelist) (October 2021)
- A Brand's New World: Latin American: *Free Trade Zones & Brand Protection* (June 2021)
- Women in International Trade Webinar, NASBITE, *Protecting Your Brand from Counterfeiting* (January 2021)
- ICLA Winter Symposium, *Brand Protection on Campuses* (February 2021)
- A-CAPP Center Executive Education Seminar, *Brand Protection China: Where to Start & Specific Tools to Protect Your Brand in China* (moderator December 2020)
- A Brand's New World 2, A-CAPP Center online conference, *Hot Topics on Brand Protection in China* (Moderator) (December 2020)
- A Brand's New World2, A-CAPP Center online conference, *Exploring Free Trade Zones Globally: How Counterfeiters Take Advantage of this Trade Facilitator* (Moderator) (December 2020)
- Automotive Aftermarket Suppliers Association (AASA), *Presentation on A-CAPP Center* (jointly with Jeff Rojek, November 2020)
- College of Social Science, *Shopping Safe and Smart Online: A Chat With MSU Experts on Fake Products* (with Jeff Rojek & Jay Kennedy, November 2020)
- International Anti-Counterfeiting Coalition, *IACC Marketsafe Webinar* (with Jay Kennedy, September 2020)
- A Brand's New World, A-CAPP Center online conference, *Consumers and Counterfeit* (Moderator) (July 2020)
- ABA-IP, *Countering the Counterfeiters* (moderator and panel designer)(June 2020)
- NASBITE, *Brand Protection for SMEs* (with Jay Kennedy)(June 2020)
- Nike, IP Global Legal Team, *Brand Protection Perspectives* (with Jay Kennedy) (September 2019)
- Pharma Anti-Counterfeiting and Brand Protection, *Brand Protection Tool Kit*, Philadelphia (March 2019)
- MSU A-CAPP Center World IP Day (Moderator 2019)
- American Bar Association, Fashion Law Subcommittee, Holistic approach to trademark counterfeiting and the usage of state-level statutes (March 2019)
- Exploring the Impact of Illicit Trade: The Case of Product Counterfeiting, Symposium, Trafficking in Illicit Markets and the Many Different Exchanges, Michigan State University College of Law International Law Review Symposium (February 2019)
- Understanding Consumer Attitudes About IP and the Appeal of Counterfeits, USPTO Global Academy, IP and Consumer Behaviors (November 2018)
- 2018 A-CAPP Center, Brand Protection Strategy Summit, *Data Analytics Strategy Session* (moderator)
- MSU A-CAPP Center World IP Day (Moderator 2018)
- Making it in Michigan, Global Food Law Primer, MSU Product Center (2018)
- NASBITE, Brand Protection for SMEs (February 2018)
- Introduction to Anti-Counterfeiting:
  - School of Packaging, Michigan State University, Guest Speaker (2017, 2018, 2019, 2020)
  - School of Criminal Justice, Michigan State University, Guest Speaker (2019, 2020, 2022)
  - Michigan State University College of Law, Guest Speaker, Intellectual Property Law Society (2019)
- MSU School of Packaging, Brand Protection and Packaging Executive Session (November 2016 with Rod Kinghorn)
- 2016 MSU A-CAPP Center Brand Protection Strategy Summit, *State Anti-Counterfeiting Cases*
- 2016 MSU A-CAPP Center Brand Protection Strategy Summit, *Training for Brand Protection* (jointly with Mike DeStefano)
- Inter-College Collaboration Initiative (Broad and A-CAPP Center), *Product Protection Collaboration Roundtable* (2016 jointly with A-CAPP Center staff)
- Broad College of Business MSU, *Product Counterfeiting Roundtable 2* (jointly with A-CAPP Center staff 2016)
- 2015 MSU A-CAPP Center Brand Protection Strategy Summit, *Emerging Areas of Research* (jointly with Brandon Sullivan)
- 2015 MSU A-CAPP Center Brand Protection Strategy Summit, *Workforce Training and Recruitment*

---

**UNIVERSITY SERVICE**

- Academic Specialist Advisory Committee
    - University Chair 2018-2019
    - Vice-chair 2017-2018
    - Chair, Sub-Committee on Promotion 2020-present, DEI inclusion
    - Member 2016-present
    - Special Committee on Promotion 2021-22
- 2017-2018, A-CAPP Center Director Search Committee, Diversity representative
- 2016 A-CAPP Center Search Committee, Administrative Assistant
- 2017 A-CAPP Center Search Committee, Administrative Assistant
- 2019-2020 A-CAPP Center Search Committee, Communications Coordinator
- A-CAPP Center, Board Committees: Education (chair), Outreach (member) (2016-2018)
- A-CAPP Center Strategic Planning 2017, 2019, 2022

## Kari Kammel Materials Considered

### Production Documents

NIKE0005853

NIKE0006770

NIKE0006776

NIKE0006782

NIKE0006785

NIKE0036330

NIKE0038783

NIKE0038792

NIKE0038817

NIKE0038943

NIKE0038955

NIKE0039821

NIKE0039827

NIKE0039833

NIKE0039841

NIKE0039847

NIKE0039854

NIKE0040098

NIKE0040106

NIKE0041095

NIKE0041163

NIKE0042399

NIKE0080203

NIKE0080274

STX0014863

STX0020185

STX0020225

STX0021481

STX0039423

STX0040554

STX0046323

STX0047457

STX0058611

STX0058653

STX0058670

STX0069525

STX0070403

STX0087957

STX0088473

STX0773118

STX0773129

STX0773834

STX0773972

STX0774018

STX0774244

**<u>Depositions</u>**

January 10, 2023 Videotaped Deposition of Barbara Delli Carpini

February 1, 2023 Videotaped Deposition of Laura Rizza

February 8, 2023 Videotaped Deposition of Joe Pallett

December 2, 2022 Videotaped Deposition of Jacob Fenton

November 30, 2022 Videotaped Deposition of Russ Amidon

February 23, 2023 Videotaped Deposition of John Lopez

February 8, 2023 Videotaped Deposition of Roy Kim

Februrary 22, 2023 Videotaped Deposition of Brock Huber, StockX's 30(b)(6) Designee

**Articles and Web Sources**

- @StockX, TWITTER (Nov. 10, 2022, 8:45 PM), https://twitter.com/stockx/status/1590883295931543554.
- *A-CAPP Center Report, Illicit Trade: Exploring the Interconnection of Illicit Trade in Firearms, Tobacco, and Counterfeit Products* (eds. Kari Kammel & Chandler Wirostek 2022), https://a-capp.msu.edu/wp-content/uploads/2022/11/IllcitTrade-ACAPP-Paper.pdf.
- A-CAPP CENTER, *Brand Protection Professional Certificate,* ACAPP010: Identifying Anti-Counterfeiting Tactics and Technologies, https://a-capp.msu.edu/bp-certificate/.
- Alice, *China Sourcing Tips: The Secret of Fake Sneakers Workshop Capital —- Putian (*Apr. 28, 2021),https://mysourcify.com/the-secret-of-fake-sneakers-workshop-capital-putian.
- AMERICAN APPAREL & FOOTWEAR ASSOCIATION, *Press Release: AAFA Details the Costly and Corrosive Impact of Counterfeits Trafficked Across Platforms, Including Shopee and Meta* (Oct. 10, 2022), https://www.aafaglobal.org/AAFA/AAFA_News/2022_Press_Releases/AAFA_Details_Costly_Corrosive_Impact_Counterfeits_Trafficked_Across_Platforms.aspx?WebsiteKey=49c45f4d-69b3-4c66-823a-6d285960fed2.
- AMERICAN APPAREL & FOOTWEAR ASSOCIATION, *Press Release: Fashion Industry Study Reveals Dangerous Chemicals, Heavy Metals in Counterfeit Products* (Mar. 23, 2022), https://www.aafaglobal.org/AAFA/AAFA_News/2022_Press_Releases/Fashion_Industry_Study_Reveals_Dangerous_Chemicals_Heavy_Metals_Counterfeits.aspx.
- Brendan Dunne, *Nike v. StockX Lawsuit: How One Buyer Got 38 Fake Paris of Sneakers,* COMPLEX (Mar. 21, 2023), https://www.complex.com/sneakers/stockx-fake-sneakers-nike-lawsuit-38-pairs.
- Channing May, Transnational Crime and the Developing World, GLOBAL FINANCIAL INTEGRITY (March 2017), https://gfintegrity.org/wp-content/uploads/2017/03/Transnational_Crime-final.pdf.
- Chris Danforth, *Sneaker Authentication: Here's how StockX Made it a Career Path,* HIGH SNOBIETY (2020), https://www.highsnobiety.com/p/stockx-authentication/.
- Consolidated Appropriations Act of 2023, H.R. 2617, 117th Cong. Div. BB, Title III, § 301 (2022) https://www.govinfo.gov/content/pkg/BILLS-117hr2617enr/pdf/BILLS-117hr2617enr.pdf
- Dani James, *StockX removes 'Verified Authentic' tag,* RETAILDIVE.COM (Nov. 14, 2022), https://www.retaildive.com/news/stockx-removes-verified-authentic-sneaker-tags/636472/

- Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods* (Jan. 24, 2020), https://www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goods-report_01.pdf.
- FIGHT FOOTWEAR FAKES, *Protecting Footwear IP Globally*, https://www.fightfootwearfakes.com/
- House Judiciary Committee, Subcommittee on Courts, Intellectual Property, and the Internet on The SHOP SAFE Act: Stemming the Rising Tide of Unsafe Counterfeit Products Online, Testimony of Kari Kammel, https://www.congress.gov/117/chrg/CHRG-117hhrg45396/CHRG-117hhrg45396.pdf
- ICE, *Counterfeit Goods: A Danger to Public Safety* (Aug. 4, 2022), https://www.ice.gov/features/dangers-counterfeit-items
- Integrity, Notification, and Fairness in Online Retail Marketplaces for Consumers Act,
- Consolidated Appropriations Act of 2023, H.R. 2617, 117th Cong. Div. BB, Title III, § 301 (2022), https://www.govinfo.gov/content/pkg/BILLS-117hr2617enr/pdf/BILLS-117hr2617enr.pdf
- INTERPOL, *Illicit Goods: The Issues*, https://www.interpol.int/en/Crimes/Illicit-goods/Illicit-goods-the-issues
- IPR CENTER, Tracing the Counterfeit Shoe Market (Feb. 10, 2022), https://www.ice.gov/factsheets/counterfeit-shoe-market.
- ISO 22383:2020(E) International Standard: Security and resilience—Authenticity, integrity and trust for products and documents—Guidelines for the selection and performance evaluation of authentication solutions for material goods (Sept. 2020)
- Jay Kennedy, *A-CAPP Center Product Counterfeiting Database: Insights Into Converging Crimes*, A-CAPP CENTER (2019), https://a-capp.msu.edu/article/a-capp-center-product-counterfeiting-database-insights-into-converging-crimes/.
- John H. Zacharia & Kari Kammel, *Congress's Proposed E-Commerce Legislation for Regulation of Third-Party Sellers: Why It's Needed and How Congress Should Make It Better*, 21 U.C. Davis Bus. L. J. 92 (2021)
- Joint Statement on Trademark Counterfeiting Legislation, 130 Cong. Rec. H12076, H12078 (daily ed. Oct. 10, 1984)
- Kari P. Kammel, *Examining Trademark Counterfeiting Legislation, Free Trade Zones, Corruption and Culture in the Context of Illicit Trade: The United States and United Arab Emirates*, 28 MICH. STATE INT'L L. REV. 209 (2020).
- Kari Kammel, Brandon Sullivan & Lorryn Young, *The Crime of Product Counterfeiting: A Legal Analysis of the Usage of State-Level Statutes*, 18 CHI-KENT J. INTELL. PROP. 125-152 (2018)
- Kari Kammel, Jay Kennedy, Daniel Cermak & Minelli Manoukian, *Responsibility for the sale of trademark counterfeits online: Striking a balance in secondary liability while protecting consumers*, 49 AIPLA Q.J. 254 (2021)

- Matthew Winterroth, *Professional Pointer*: *Copyright Against Counterfeiters-An Effective Tool for Brand Protection*, 7 THE BRAND PROTECTION PROFESSIONAL 3 (Sept. 2022), https://bpp.msu.edu/magazine/professional-pointer-september2022/.
- OECD/EUIPO, Global Trade in Fakes: A Worrying Threat, Illicit Trade (2021), https://www.oecd-ilibrary.org/deliver/74c81154-en.pdf?itemId=%2Fcontent%2Fpublication%2F74c81154-en&mimeType=pdf.
- OECD/EUIPO, Trends in Trade in Counterfeit and Pirated Goods, Illicit Trade (2019), https://www.oecd-ilibrary.org/deliver/g2g9f533-en.pdf?itemId=%2Fcontent%2Fpublication%2Fg2g9f533-en&mimeType=pdf.
- OECD/EUIPO, Mapping the Real Routes of Trade in Fake Goods (2017), https://www.oecd-ilibrary.org/mapping-the-real-routes-of-trade-in-fake-goods_5jftc969rs9p.pdf?itemId=%2Fcontent%2Fpublication%2F9789264278349-en&mimeType=pdf
- Off. Of Strategy, Pol'y, and Plans, U.S. Dep't of Homeland Sec., Combating Trafficking in Counterfeit and Pirated (Jan. 24, 2020), https://www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goods-report_01.pdf
- Praveena Somasundaram, *As counterfeits rise, sneaker authenticators sniff out real from fake*, WASH POST (Sep. 30, 2022), https://www.washingtonpost.com/business/2022/09/30/sneaker-authentication-ebay-stockx-nike/
- Presidential Memorandum, Memorandum on Stopping Counterfeit Trafficking on E-Commerce Platforms Through Fines and Civil Penalties, Oct. 13, 2020 https://trumpwhitehouse.archives.gov/presidential-actions/memorandum-stopping-counterfeit-trafficking-e-commerce-platforms-fines-civil-penalties/
- Rod Kinghorn & Jeremy Wilson, *Brand Protection as a Total Business Solution*, A-CAPP Center Report (2014), https://a-capp.msu.edu/article/brand-protection-as-a-total-business-solution/
- STATISTICA, Sneakers-Worldwide Insight, https://www.statista.com/outlook/cmo/footwear/sneakers/worldwide.
- Stefanie Wood Ellis, *Brand Protection in the Digital World*, World Trademark Rev. (Apr. 23, 2020), https://www.worldtrademarkreview.com/anti-counterfeiting/brand-protection-in-the-digital-world
- STOCKX, *The Current Culture Marketplace,* https://stockx.com/about/how-it-works/
- STOCKX, *How do I sell on StockX?* (Mar. 30, 2022), https://stockx.com/help/articles/How-do-I-sell-on-StockX
- STOCKX, *Releases: Nike* https://stockx.com/new-releases/nike.
- STOCKX, *Selling on StockX*, https://stockx.com/about/selling/.
- STOCKX, *Can I sell an item I don't have yet?* (Mar. 30, 2023), https://stockx.com/help/articles/Can-I-sell-an-item-I-dont-have-yet

- STOCKX, *Releases: Air Jordan,* (https://stockx.com/new-releases/retro-jordans)
- StockX, *Verifying the 990 V3 Freshgoods "Outside Clothes" | Details Authenticated | StockX,* YOUTUBE (2022), https://www.youtube.com/watch?v=SLIi0-CNlRk.
- STOCKX, *Where is StockX Located* (Apr. 19, 2023), https://stockx.com/help/articles/where-is-StockX-located.
- STOCKX, *Why is my item shipping from Hong Kong?* (Sept. 27, 2022), https://stockx.com/help/articles/Why-is-my-item-shipping-from-Hong-Kong.
- *The Internet is in a Frenzy Over StockX Authentication Language Change*, SNEAKERFREAKER.COM, https://www.sneakerfreaker.com/news/stockx-authentication-verified-language-change-nike-twitter-breaking.
- U.S. CENSUS BUREAU, *Annual Retail Trade Survey (ARTS) Tables: 2021* (Dec. 15, 2022), https://www.census.gov/data/tables/2021/econ/arts/supplemental-ecommerce.html.
- U.S. Customs and Border Protection, *FY 2021: Intellectual Property Seizure Statistics*, (Sept. 29, 2022), https://www.cbp.gov/document/annual-report/fy-2021-ipr-seizure-statistics.
- U.S. Senate Committee on the Judiciary, *Cleaning Up Online Marketplaces: Protecting Against Stolen, Conterfeit, and Unsafe Goods, Testimony of Kari Kammel,* https://www.judiciary.senate.gov/meetings/cleaning-up-online-marketplaces-protecting-against-stolen-counterfeit-and-unsafe-goods
- UNODC, *Focus On: The Illicit Trafficking of Counterfeit Goods and Organized Crime* (Nov. 14, 2013), https://www.unodc.org/documents/counterfeit/FocusSheet/Counterfeit_focussheet_EN_H IRES.pdf
- Zones, Corruption and Culture in the Context of Illicit Trade: The United States and United Arab Emirates, 28 MICH. STATE INT'L L. REV. 209 (2020)

**Pleadings**

- Dkt 1 – Complaint
- Dkt 21 – StockX's Answer
- Dkt 31 - Notice of Motion to Amend Complaint
- Dkt 32 – Memorandum of Law in Support of Motion for Leave to File First Amended Complaint
- Dkt 33 – Declaration of Tamar Duvdevani in Support of Motion for Leave to File First Amended Complaint and Exhibits A and B thereto.
- Dkt 39 – First Amended Complaint
- Dkt 41 – StockX's Answer to First Amended Complaint

**<u>Other</u>**

- February 2, 2023 Call with Barbara Delli Carpini, Vice President, Brand Protection and Digital IP, Global, Nike