# EXHIBIT 47

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF NEW YORK

-ooOoo-

| | |
|---|---|
| NIKE, INC., | : |
| Plaintiff, | : |
| vs. | : No. 1:22-cv-00983-VEC |
| STOCKX LLC, | : |
| Defendant. | : |
| ____________________________ | : |

DEPOSITION OF BROCK HUBER
TAKEN THROUGH
ADVANCED REPORTING SOLUTIONS, a Veritext company

Taken on Thursday, June 29, 2023
9:30 a.m. to 12:38 p.m.

At HYATT CENTRIC PARK CITY
3551 North Escala Court
Park City, Utah 84098

Reported by: Abigail D.W. Johnson, RPR, CRR, CRC

A P P E A R A N C E S

For the Plaintiff:

Tamar Y. Duvdevani
Marc E. Miller
DLA PIPER
1251 Avenue of the Americas
New York, New York 10020-1104
Tamar.duvdevani@dlapiper.com
Marc.miller@dlapiper.com
(212) 335-4799

For the Defendant:

Christopher S. Ford
DEBEVOISE & PLIMPTON LLP
650 California Street
San Francisco, California 94108
Csford@debevoise.com
(415) 738-5705

For StockX:

Kevin Adams
Deputy General Counsel
StockX

Also Present: McKayla Largin (videographer)

-ooOoo-

THE WITNESS: It looks different printed out.

(Exhibit No. 2 was marked for identification.)

BY MS. DUVDEVANI:

Q. Mr. Huber, the court reporter has handed you a document that has been designated as Exhibit 2. I note that you just said it looks a little different. I assume you mean from you viewing the same documents online.

A. Yes, that's right.

Q. Okay. We are certainly going to get into details about Exhibit 2. What I'd like you to do first and foremost, and feel free to leaf through it to make sure it's everything that you recognize, is just very, very generally describe what Exhibit 2 is.

A. Okay. This looks like the same document that I reviewed on a computer. It's an Excel spreadsheet. It features four tabs put together at kind of different times, in some cases with different purposes, in response to an incident regarding one of our buyers, Mr. Roy Kim, who alleged to have received some items that he suspected were inauthentic.

Q. Okay. And what -- starting with the first tab -- and let me also just note for the record that

Exhibit 2 was designated by StockX as having a Bates stamp of STX0806024, even though it's not on the printout. That is how it was produced.

You mentioned that there are several tabs. Starting with the first tab, which I believe is just the first two pages of the printout, can you generally describe what this first tab of Exhibit 2 contains in terms of content?

A. Yes. So this spreadsheet was primarily, but not entirely, created by Abe Zurita, who manages -- or at the time was managing our Tempe, Arizona, authentication center. And he was asked to receive and reinspect some items that had made their way to an end buyer.

And this initial sheet, this first tab here, these first two pages, are primarily the work product of that assignment that was given to him with a few exceptions.

Q. You stated products made their way to an end buyer. Was that end buyer Roy Kim?

A. Yes, I believe all 33 items listed here were items received by Roy Kim.

Q. Okay. And when you say "made their way to Roy Kim," how did they make their way to Roy Kim?

A. They made their way through the ordinary

course of business at StockX. A seller was paired with a buyer. The buyer in this case being Roy Kim. The items were shipped from the seller to one of our authentication centers, passed through our proprietary verification process and were ultimately shipped out to this buyer.

Q. Okay. And you stated in connection with your testimony regarding Abe Zurita -- is that his last name?

A. Mm-hmm.

Q. That the products that appear -- strike that -- the order numbers associated with the products that were shipped to Roy Kim were returned by Roy Kim; is that correct?

A. Yes. That is correct. That is our policy and has always been our policy. If an end buyer has an issue with an order, they reach out to our customer service. They suspect something they received is inauthentic. We will initiate a review, which typically starts with receiving some pictures of the items in question. And after that photographic review, if we continue to have doubts with the order, we will ask the buyer to send it back to us for an inspection, like the one that Abe did here.

Q. Okay. So it's your testimony that Abe

reinspected all of the products associated with the order numbers on the first tab of Exhibit 2; is that correct?

A. So -- so both Abe, which you can see in Column I, reauthenticated these, as well as John Lopez, who coincidentally was out at that facility for the week, but that was just luck -- as luck would have it, he was there.

Q. And when you say "John Lopez," is that referring to the name "Johnny" in exhibit --

A. That is Johnny --

Q. -- in Column J?

A. -- Yes.

Q. And did Abe and Mr. Lopez reach a determination as to whether or not the product shipped to Roy Kim and returned that appears in Exhibit 2 were authentic?

MR. FORD: Objection to the form of the question.

THE WITNESS: They -- they concluded that these items were not fit to transact on our platform.

BY MS. DUVDEVANI:

Q. Did they conclude that these items were not fit to transact on your platform because they were not authentic?

MR. FORD: The same objection.

THE WITNESS: They concluded that they were not fit to transact because they were suspected to be inauthentic.

BY MS. DUVDEVANI:

Q. Okay. Was there no definitive determination by either Abe or Mr. Lopez regarding the authenticity of the products associated with the order numbers listed in Exhibit 2?

MR. FORD: The same objection.

Sorry. Go ahead.

THE WITNESS: I would say there was a definitive determination that they weren't fit to transact. But we don't make definitive legal determinations as to whether something is considered counterfeit or not.

BY MS. DUVDEVANI:

Q. Putting a legal determination aside, did StockX reach any conclusions upon the return of the products listed in Exhibit 2 as to whether or not they were fake?

MR. FORD: Objection to the form of the question.

THE WITNESS: They -- again, we concluded that they were not fit to transact on our platform. We

Q. Okay. Am I correct that one element of StockX's proprietary verification process is whether the item is authentic?

A. So our -- our guarantee that we've always had is that we verify every single item. And we guarantee that you are going to get an item that is exactly as expected. It's what you wanted. It's the right size. It is the right colorway. It's in brand new condition. It has the accessories. And that this item would be a legitimate item from the manufacturer.



Page 19

Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400



 [redacted]

Q. Okay. Instead of going through name by name, let me ask you: Generally of all of the individuals [redacted] do you have any information available regarding their employment history or status with StockX?

A. So generally speaking, you know, as we have been through in previous sessions, our verification process is human-powered. And so it's going to have a potential for mistakes to be made. And we don't have, with our authentication team members, a one-strike policy. If you pass -- if you make one mistake, whether it's the wrong size, pass on something that on closer inspection we may suspect is inauthentic, we don't just immediately terminate those folks. We continue to educate them. We work on improving their performance.

So your name [redacted] would not be grounds for -- for immediate dismissal. I can share that I believe -- I would have to cross-reference with this other sheet, there's an order, too, that is currently blank here, that were verified by a gentleman

named Raymond Jones, who shows up in other tabs, that, as part of our investigation into this transaction and this incident, was terminated due to not following our standard operating procedures as he verified some of the items that appear on this list.

Page 29





Page 31





Page 33



Page 34



Page 35



Page 36



Page 42



Q. Okay. Other than Roy Kim, was any other StockX consumer shipped product from this group of bad actors?

A. We don't believe there is any reason to suggest that more bad product went through our process and made it through.

It's also important to realize a lot of these bad actors will ship good product in an effort to have positive account attributes in order to trick the StockX verification process and our fraud team.

Q. Why don't you have any reason to suggest that more bad product went through and made it through?

A. We have a lot of good faith in our verification process, that our authentication team, you know, when following our operating procedures and inspecting these like Abe and John did, would reject these items.

And we don't -- we didn't have any other buyers who complained about the products that they received, and no reinspections were -- were necessary.

Q. Okay. So 33 of these clearly did not get caught and made it to a customer.

So are you saying that you don't have any reason to suspect that additional product made it through simply because you didn't receive any other complaints from consumers?

A. That is a data point, we did not receive any complaints from consumers. But the other items went through our verification process, which we stand by. And I think that it is important to note, while 33 is a totally dissatisfactory number, you know, Roy Kim, as an individual, made 2,300-plus orders with StockX that he has never had an issue before. And he continues to shop with us, even after this incident, because he knows, you know, the quality of our program.

And so again, I think, it's probably important to know with this investigation that, you know, our -- the way our platform works, the buyer and seller are anonymous to each other, but they -- neither of them are anonymous to us in any way.

[redacted]

Q. Sounds like it's a good time for a break then.

A. Yeah, let's do it.

Q. Okay.

VIDEOGRAPHER: We are off the record. The time is 10:30.

(Recess was taken.)

VIDEOGRAPHER: We are back on the record. The time is 10:50.

Counsel may proceed.

BY MS. DUVDEVANI:

Q. Okay. What did you do to prepare for today's deposition?

A. I spent some time with Abe Zurita. I spent some time with John Lopez, with Mark Porteous. And Jennifer from Mark Porteous' team and asked them questions, given their varied involvement in the preparation of these materials, and just asked them to recall what they could about the -- the time about a year ago.

Q. Okay. Did you do anything else?

A. I prepared with the legal advisors as well.

Q. When did that preparation take place?

A. The last week or so.

Q. For how long did you -- are you saying that you met with your legal counsel to prepare for today?

A. Certainly, they guided the sessions, and they asked the questions as well where we were --

MR. FORD: Just yes or no.

BY MS. DUVDEVANI:

Q. Just yes or no. I don't want to know exactly what you talked about.

A. Sure. Yes.

Q. How many sessions were there?

A. Four or five sessions.

Q. Okay. I know that this was a slightly longer break than usual, did that preparation continue during the break just now?

A. We were trying to get the answers to some of the questions you asked us to look into --

Q. Okay.

A. -- on the break.

Q. Okay. Were you able to?

A. Yes.

Q. Okay. What did you find out during the break?

A. Raymond Jones worked for us about two

years.

Q. Two years?

A. Two years.

Q. As an authenticator?

A. As an authenticator.

Q. Do you know when he was terminated?

A. I don't know the exact date, but it would have been the summer of last year.

Q. Okay.

A. He was the only one, like I said earlier, that was terminated in connection with our Roy Kim investigation, but about half the folks that are on this list are no longer with the company. I tried to memorize them all. It was a little too hard. And then Abe has been with us for five years, as I said before earlier.

Q. Okay. And do you know if any of the other authenticators, who are no longer with the company, were terminated, or you don't know that?

A. They were not terminated in conjunction with this at all. I don't know the reasons for their exits.

Q. Do you know if they were terminated for other errors made in authentication?

A. I don't know. The other thing that I

wouldn't punish the seller for that, because they behaved appropriately.

There is a potential for any technology company for there to be a bug, an order for some reason doesn't work. And so basically just -- in areas where a transaction is unsuccessful, but the seller behaved appropriately, we could potentially end up with inventory.

Q. Okay. Does StockX ever get inventory from products that are returned by consumers?

A. Yes. And it would, again, vary based on why it was returned. If we got an item that was suspected to be inauthentic, we would not take it into inventory.

We would, of course, make the buyer whole, but those items would not go into a pool that could potentially be resold. And they ultimately get -- get destroyed.

The other place we could have inventory is if we have an agreement with a brand, again, it's not going to be necessarily ours, but we have custody over it, and it could be parked at one of our facilities. And when it's sold, we could fulfill those items on behalf of the brand, and it could come out of an inventory account.

[redacted]

Q. Okay. What happened to the other sellers that sold Roy Kim a fake product --

A. So --

Q. -- [redacted]

A. So everybody that Mark and team were able, in their analysis, to determine was part of this bad actor group, that seemed to be emanating from a small number of unique devices, was banned.

Q. Anybody else?

A. No. I think outside of the folks who are connected to the fraud ring, there wasn't anything that looked like egregious, intentional abuse of the platform.

Q. Are you aware, looking at the [redacted]

A. I'm not positive.

Q. Okay.

MS. DUVDEVANI: Let's take another break.

VIDEOGRAPHER: We are off the record. The time is 11:37.

(Recess was taken.)

VIDEOGRAPHER: We are back on the record. The time is 11:34.

BY MS. DUVDEVANI:

Q. After Copy of Referenced Social Media, there was another tab provided in this document called, "Copy of Entire Trade History." Don't worry, I'm not going to go through the whole thing.

A. Let's do it.

Q. Okay. Okay.

MS. DUVDEVANI: All right. Let's go off the record for a few minutes while we set up the record.

VIDEOGRAPHER: Off the record. The time is 11:37 [sic].

(Recess was taken.)

VIDEOGRAPHER: Going back on the record. The time is 11:26.

BY MS. DUVDEVANI:

Q. Okay. Mr. Huber, there is now a screen in front of you containing some videos that were produced by StockX. I'll represent that those videos were also produced along with a corresponding page that appears to be a screenshot of each video.

So what I'm going to do is just for ease of reference is mark the screenshot of the video, and then we will watch the corresponding video. Make sense?

A. Yes.

Q. So the first one.

(Exhibit No. 3 was marked for identification.)

BY MS. DUVDEVANI:

Q. The court reporter has just handed you a very blurry image designated as Exhibit 3 containing

the Bates stamp STX0806022, which corresponds with a video that's been Bates-stamped as STX0806023.

So let me know if you can locate the video with that Bates stamp on the laptop in front of you.

A. I have located it.

Q. Okay.

MR. FORD: And just for the record, we are marking as Exhibit 3, both the image ending in 022 and the video file ending in 023 as the exhibit?

MS. DUVDEVANI: I think that is the most practical way to do it, since we can't stick a sticker on the video, yes.

MR. FORD: Okay.

MS. DUVDEVANI: So thank you for your clarification, Mr. Ford.

BY MS. DUVDEVANI:

Q. All right. Let's go ahead and press play on the count of 3, ready? 1, 2, 3. And then we will watch it one time through and then I might ask questions about it as we go.

[Video played.]

THE WITNESS: It's over.

BY MS. DUVDEVANI:

Page 74



Page 75

Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400

Page 76

Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400

Page 77

Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400



Page 78

Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400



Page 79

Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400



Page 80

Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400



Q. All right. Let's go to the next one. I will tell you what the next one is in a second.

(Exhibit No. 4 was marked for identification.)

BY MS. DUVDEVANI:

Q. All right. The court reporter has just designated as Exhibit 4 a screenshot of a video containing Bates stamp STX0806003. The associated video is designated as STX0806004.

And that is the one that we are going to watch next. So let's do our same on the count of three.

A. Okay.

Q. Let me know when you have it.

A. I am ready.

Q. Okay. 1, 2, 3.

[Video played.]

THE WITNESS: It's over.

BY MS. DUVDEVANI:

[redacted]

Q. Okay. Okay. Let's go to the next one.

(Exhibit No. 5 was marked for identification.)

BY MS. DUVDEVANI:

Q. Okay. The court reporter has just handed you a screenshot that's been marked as Exhibit 5 containing the Bates stamp STX0806001. There is an

associated video that will also be designated as Exhibit 5 that's been Bates-stamped as STX0806002.

We are just getting that one opened. And once again, we'll -- we'll watch on my three.

A. All right.

Q. Okay.

A. Yep.

Q. 1, 2, 3.

[Video played.]

THE WITNESS: It's done.

BY MS. DUVDEVANI:

Page 84

//

Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400

(Exhibit No. 6 was marked
for identification.)

BY MS. DUVDEVANI:

Q. And the court reporter has handed you another document that's been designated as Exhibit 6, containing the Bates stamp STX0806015. That's associated with a video STX0806016.

And on my three, again. 1, 2, 3.

[Video played.]

THE WITNESS: It's done.

BY MS. DUVDEVANI:

Q. Okay. So the next video that we are going to watch, unless Mr. Miller is about to give me another folder, all I have is a document that says "File Provided Natively."



Q. Okay. All right. And then the last video that I want to watch today, I do not have an associated