# EXHIBIT 56

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

NIKE, INC.,                          Case No. 1:22-cv-000983-VEC

        Plaintiff,

   v.

STOCKX LLC,

        Defendant.

**EXPERT REBUTTAL REPORT OF CATHERINE TUCKER**

**JUNE 2, 2023**

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

## TABLE OF CONTENTS

I.    Introduction, assignment and conclusions ...........................................................................1

    A.    Introduction..........................................................................................................1

    B.    Assignment ...........................................................................................................4

    C.    Summary of conclusions.......................................................................................4

II.    The standard of authentication set by the Kammel Report would lead to the disappearance of valuable resale marketplaces, driving consumers to unregulated secondary marketplaces ........................................................................6

    A.    Traditional businesses control; platforms enable...........................................6

          1.    The difference between traditional businesses' value creation and resale marketplaces ......................................................................... 6

          2.    Enabling, rather than controlling, creates a need to build and maintain trust, and successful marketplaces—including StockX—invest considerable resources in doing so ......................................... 9

    B.    The Kammel Report presents no evidence that resale marketplaces could meet its standard, which would leave consumers with fewer protections...........................................................................................................14

    C.    Platforms create value despite reduced control, including through authentication services..................................................................................18

          1.    Closing resale marketplaces would destroy value .......................................... 18

          2.    Even imperfect authentication services provide value to customers, especially when supported by return policies in cases where the authentication process erred.............................................. 21

III.    The Kammel Report ignores the value of StockX's coring features and proposes changes that would not improve the buyer and seller experience ........................22

    A.    Coring features: active and indirect trust-building measures .....................................22

          1.    Active trust-building ........................................................................................ 23

          2.    Indirect trust-building ...................................................................................... 25

          3.    A platform's choice of trust-building measures is case-specific ................... 29

          4.    The Kammel Report ignores the limitations of ratings and reviews ............................................................................................................. 30

    B.    The Kammel Report ignores the value created by StockX's coring features............................................................................................................31

          1.    The Kammel Report ignores the active trust-building measures in which StockX has invested .......................................................................... 31

          2.    Successful resale marketplaces are using similar measures to StockX............................................................................................................. 33

    C.    The Kammel Report ignores the benefits of standardization.......................................35

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

IV.   The pricing analysis in the McNew Report is uninformative and overstates the difference between the prices of Vault NFTs and corresponding physical shoes.................................................................................................................36

    A.   The pricing analysis relies on an incorrect benchmark.................................37

    B.   The methodology used in the McNew Report is unreliable and biased in a way that overstates the difference between Vault NFT and physical shoe prices ......................................................................................38

        1.   The methodology used in the McNew Report lacks support and is not robust.............................................................................................. 38

        2.   The methodology used in the McNew Report is not appropriate for comparing the prices of products exhibiting different time trends, overestimating the difference between Vault NFT and physical shoe prices ..................................................................... 39

        3.   The methodology used in the McNew Report is not appropriate for comparing the prices of products with different price volatility, further overestimating the difference in Vault NFT and physical shoe prices................................................................ 40

        4.   The methodology used in the McNew Report gives equal importance to Vault NFTs traded few times compared to those traded over a hundred times............................................................ 46

    C.   By focusing on a short period after the release of the Vault NFTs, the McNew Report further overstates the difference between the price of Vault NFTs and physical shoes and improperly compares new products with established products .............................................................47

        1.   The McNew Report ignores that the prices of Vault NFTs converged to the prices of physical shoes after a short period, further overstating the difference in prices ...................................... 47

        2.   The evolution of Vault NFT prices is similar to that of many other novel products subject to irrational exuberance by first-time users, making a comparison with established products inadequate ........................................................................................ 47

APPENDIX A – PRIOR TESTIMONY...................................................................A-1

APPENDIX B – MATERIALS CONSIDERED.........................................................B-1

APPENDIX C – ADDITIONAL ANALYSES............................................................C-1

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

# I.    INTRODUCTION, ASSIGNMENT AND CONCLUSIONS

## A.    Introduction

1.      On May 5, 2023, I submitted an opening expert report in this matter ("Opening Report").[1] My qualifications, experience, and compensation, including a copy of my curriculum vitae, and allegations and background are outlined in my Opening Report. A list of my prior testimony is attached as Appendix A to this report.

2.      On May 5, 2023, Professor Kari Kammel and Mr. Steven S. McNew submitted expert reports on behalf of Nike ("Kammel Report" and "McNew Report").

3.      The Kammel Report includes the following opinions:

    a.   "E-commerce and social media platforms have created the perfect environment for counterfeiters, since these platforms usually prioritize the speed of getting product to consumers, satisfaction of sellers, and profit for the platform, instead of safety and protection of consumers and their purchases. With some rare exceptions, standards for selling products that one would find in a brick and mortar setting simply have not existed online to date."[2]

    b.   Online platforms create an "environment ripe for counterfeit sales,"[3] because:

        i.   "In online marketplaces that allow for third-party sellers (sellers who are not the IP rights holder or its authorized distributors), un-vetted third-party sellers can sell products often with no verifiable provenance and send them directly to consumers."[4]

        ii.   "In a legitimate supply chain, many details about the movement of products through the supply chain would be present …, but we do not see

---

[1]   Expert Report of Catherine Tucker, *Nike, Inc. v. StockX LLC*, No. 1:22-cv-000983-VEC, May 5, 2023 ("Tucker Opening Report").

[2]   Expert Report of Kari Kammel, *Nike, Inc. v. StockX LLC*, No: 1:22-cv-000983-VEC, May 5, 2023 ("Kammel Report"), p. 8.

[3]   Kammel Report, p. 9.

[4]   Kammel Report, p. 9.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

this practice in online marketplaces."[5]; "E-Commerce platforms usually do not track the supply chain or provenance of the products in the same way that a traditional supply chain would."[6]

c.  "StockX is attractive for counterfeiters, for many reasons"[7], including that:

    i.  "StockX completely shields the identity of the sellers from consumers so consumers know only that they are buying from StockX; the sellers are anonymous to the consumer, there is no seller rating system, no space for feedback from buyers and StockX does not have a refund policy."[8]

    ii.  "StockX's website and model for selling products, particularly shoes, creates a conducive environment for bad actors to sell counterfeit products."; "StockX even uses its own professional, high-resolution stock images of Nike products regardless of the identity of the seller or what the seller's products look like, creating the impression to the consumer that it is buying the genuine product seen in the stock image."[9]

d.  "While online marketplaces benefit consumers and legitimate businesses seeking to expand their consumer base, … counterfeiters can now reach large parts of these consumer bases with ease."[10]

e.  "[Some online marketplaces] move from simply providing a space for others to sell to becoming an active part of the sale of counterfeit products"; "When a platform takes on any part of storing, warehousing, shipping, inspecting, or

---

[5]  Kammel Report, p. 10 ("In a legitimate supply chain, many details about the movement of products through the supply chain would be present, such as sellers' names, contact information, distributor information, country of manufacture, or other information about the provenance and details of the product, but we do not see this practice in online marketplaces.").

[6]  Kammel Report, p. 11.

[7]  Kammel Report, p. 27.

[8]  Kammel Report, p. 26.

[9]  Kammel Report, pp. 26–27.

[10]  Kammel Report, p. 5 ("While online marketplaces benefit consumers and legitimate businesses seeking to expand their consumer base, there is a flip side to this success—counterfeiters can now reach large parts of these consumer bases with ease.").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

attempting to authenticate product with third-party sellers, they also increase the risk of commingling counterfeit product with legitimate product."[11]

    f.   "Only the IP rights holder and those authorized by the IP right holder are capable of authenticating product or packaging."[12]

4.    The McNew Report compares the price of the Nike Vault NFTs to the price of the corresponding pair of physical Nike shoes on the StockX platform, with the goal of establishing whether "additional value or perceived product or service were associated with the Vault NFT beyond the claim to the physical product."[13] The McNew Report includes the following opinions:

    a.   "If no additional value or perceived product or service were associated with the Vault NFT beyond the claim to the physical product, then one would expect the Nike Vault NFTs to sell at similar prices to the associated physical non-NFT shoes."[14]

    b.   "[T]he price paid for the Vault NFT was materially higher than the price paid for the associated physical pair of shoes."[15] As a result, "StockX customers and StockX employees clearly perceived the Vault NFT as independent and distinct from the underlying physical item."[16]

---

[11]  Kammel Report, p. 11 ("Some online marketplaces claim to never inspect the product and are merely providing a selling space where they claim they are not part of a supply chain, while others actively join the supply chain. For example, a platform that acts as an intermediary through shipping, attempted 'verification,' 'authentication,' or warehousing items. Thus, they move from simply providing a space for others to sell to becoming an active part of the sale of counterfeit products because they possess the products and then ship them to the consumer. When a platform takes on any part of storing, warehousing, shipping, inspecting, or attempting to authenticate product with third-party sellers, they also increase the risk of commingling counterfeit product with legitimate product and thus not being able to control whether counterfeit product makes it to the consumer or not.").

[12]  Kammel Report, p. 22.

[13]  Expert Report of Steven S. McNew, *Nike, Inc. v. StockX LLC*, No. 1:22-cv-000983-VEC, May 5, 2023 ("McNew Report"), p. 49 ("We performed a comparative price analysis to see if the Nike Vault NFTs traded at the same price as the associated non-NFT physical shoes on the StockX marketplace. If no additional value or perceived product or service were associated with the Vault NFT beyond the claim to the physical product, then one would expect the Nike Vault NFTs to sell at similar prices to the associated physical non-NFT shoes.").

[14]  McNew Report, p. 49.

[15]  McNew Report, p. 50.

[16]  McNew Report, p. 51.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

### B.   Assignment

5.   I have been asked by counsel to respond to the opinions of Professor Kammel and Mr. McNew summarized in Section I.A and, specifically, to:

    a.   Analyze how the standard of authentication set by the Kammel Report would be expected to affect resale marketplaces;

    b.   Analyze the criticisms made by the Kammel Report of StockX's features and evaluate the changes it proposes; and

    c.   Evaluate the pricing analyses from the McNew Report and related conclusions.

### C.   Summary of conclusions

6.   Based on my expertise in economics and my analysis of relevant documents in this case, I have reached the following opinions:

    a.   The Kammel Report builds upon a misunderstanding of the economic incentives of resale marketplaces and sets standards of authentication that cannot be met by resale marketplaces.

        i.   The Kammel Report criticizes online resale marketplaces because they do not have the same authentication standards as "traditional supply chain[s]." However, unlike traditional supply chains or their components, online marketplaces create value by enabling transactions, and therefore need to give up some control to sellers. To create value, marketplaces need to build trust, and successful marketplaces—including StockX—invest considerable resources in building and maintaining trust. The Kammel Report ignores these incentives and presents opinions that do not account for StockX's business model. See Section II.A.

        ii.   The Kammel Report advocates for online resale marketplaces to have the same standards as traditional supply chains and proposes a definition of authentication that is so narrow that it would be a large challenge for resale marketplaces to meet this standard. The lack of attainability of such

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

a standard is shown by Nike's abandonment of its initiatives to build its own resale marketplace. See Section II.B.

    iii. Satisfying the requirements for control that the Kammel Report appears to propose would eliminate most, if not all, resale marketplaces, eliminating the value they provide for their users. In its criticism of online marketplaces that provide authentication services, the Kammel Report does not address or account for the value these services provide to consumers, and fails to consider whether the alternative—a secondary market without authentication—would be better for consumers. Regressing to secondary markets with no authentication would reduce protection for consumers, which would increase the opportunities for counterfeiters. See Section II.C.

b. The Kammel Report suggests that some features, like the use of seller ratings and reviews, would foster a more trustworthy user experience on StockX. The Kammel Report ignores the limitations of ratings and reviews. The Kammel Report also ignores how standardized listings and photographs can improve user experience and ignores the value of the active trust building measures that StockX and similar platforms already have implemented. I discuss this in Section III.

c. The McNew Report's methodology for comparing the highest prices of Vault NFTs and physical goods is uninformative, does not recognize price dynamics over time, ignores the value created by the reduction in transaction costs that were offered by Vault NFTs, and relies on an incorrect benchmark. The conclusions derived from these analyses are therefore unreliable and not appropriate to determine whether StockX customers perceived that additional value was associated with the Vault NFT beyond the claim to the physical product.

    i. The McNew Report compares the price of the Vault NFTs to the price of the associated physical shoes—an unsupported and incorrect benchmark to substantiate McNew's conclusions regarding consumer perception. See Section IV.A.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

    ii.   By relying on the highest price reached by the Vault NFTs, the analysis only considers the price that one individual, the highest paying, was prepared to pay, disregarding all other prices fetched by Vault NFTs and providing an incomplete and biased view of customers' valuations of the two products. This bias is exacerbated by the high volatility of Vault NFT prices relative to the prices of physical shoes around the time the Vault NFTs were launched, and the fact that Vault NFT prices decreased over time. See Section IV.B.

    iii.   The McNew Report ignores relevant dynamics of Vault NFT prices over time. These dynamics are similar to the price evolution of many other novel technologies. See Section IV.C.

7.      In forming my opinions for this report, I have relied on my experience, the sources listed in Appendix C to my Opening Report, and the sources listed in Appendix B to this report. If additional relevant information is made available to me, I may adjust or supplement my opinions.

## II.    THE STANDARD OF AUTHENTICATION SET BY THE KAMMEL REPORT WOULD LEAD TO THE DISAPPEARANCE OF VALUABLE RESALE MARKETPLACES, DRIVING CONSUMERS TO UNREGULATED SECONDARY MARKETPLACES

8.      This section sets forth the critiques of the Kammel Report and explains why the Kammel Report builds upon a misunderstanding of the economic incentives of resale marketplaces and sets authentication standards that cannot be met by resale marketplaces. Regressing to secondary markets with no authentication would reduce protection for consumers, which would increase the opportunities for counterfeiters.

### A.    Traditional businesses control; platforms enable

#### *1.    The difference between traditional businesses' value creation and resale marketplaces*

9.      Economists have generally used the framework of vertical relationships to understand value generation for traditional businesses. Companies that control several stages of

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

their supply chain are said to be "vertically integrated." Nike's business model is partially integrated. Nike designs, directs the manufacturing of, and markets sneakers and other sports apparel.[17] It sells both through its own stores and website and through authorized resellers, in a rough 40/60 split.[18] Economists typically analyze such businesses as creating value through being able to control their supply chain, and coordinate the experience of the end customer.[19] Some firms also have more complex vertical structures where they do not sell to their end customers and instead rely on authorized retailers to intermediate. However, these structures are typically characterized by contracting, which means the firm can retain some control over how its products are distributed to the end customers.

10.     Marketplaces create value in a different way than traditional businesses engaged in the manufacturing and retailing of goods.[20] As explained in Section IV of my Opening Report, marketplaces create value by connecting buyers and sellers of a product,[21] not by providing the product themselves as traditional businesses would. Airbnb is not a hotel chain like Hilton; fitness platform ClassPass is not a gym chain like Planet Fitness; and car rental platform Getaround is not like Hertz.

11.     While Nike creates value by designing, directing the manufacturing of, and distributing sneakers and other products to consumers, StockX is a marketplace for items like

---

[17] Nike, Inc., Form 10-K, filed July 21, 2022, p. 1 ("Our principal business activity is the design, development and worldwide marketing and selling of athletic footwear, apparel, equipment, accessories and services.").

[18] Nike, Inc., Form 10-K, filed July 21, 2022, p. 32. In its fiscal year 2022, Nike's total brand revenue was approximately $44.4 billion, reflecting sales to wholesale customers and through NIKE Direct, among which approximately $25.6 billion (or 58%) was from sales to wholesale customers, and the remaining $18.7 billion (or 42%) was sold through NIKE Direct.

[19] Belleflamme, Paul and Nicolas Neysen, *Platform Strategies: A Guidebook for Entrepreneurs in the Platform Economy*, London, Routledge, 2023 ("Platform Strategies"), p. 48 ("From a traditional value chain perspective, value is created by the firm that owns the manufacturing or assembling process of a product or service. Through the successive operations (sourcing, design, build, distribution, etc.), the value grows incrementally along the chain, which is controlled by the firm. The fact that the outcome matches the initial value proposition is the entire responsibility of the firm. In other words, even if the firm relies on subcontractors and partners, it has full ownership over the offering that is delivered to the clients and over its ability to capture value by setting a price that makes the business profitable.").

[20] Platform Strategies, 2023, p. 48 ("Platforms fundamentally differ from pipelines in the way they create value.").

[21] See also Evans, David and Richard Schmalensee, *Matchmakers: The New Economics of Multisided Platforms*, Boston, Harvard Business Review Press, 2016 ("Matchmakers"), p. 35 ("these platforms are selling connections.").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

sneakers, and therefore creates value by helping buyers and sellers of these items connect and transact.[22]

12.      Marketplaces, in particular resale marketplaces, face different challenges than traditional vertically integrated businesses.[23] A resale marketplace does not sell product and has no supply chain; rather, it makes it easier for third-party sellers to sell products they have procured. As a result, sellers on the resale marketplace have some control over the product sold and the resale marketplace has less control than a brand selling through its own stores or through authorized retailers. In *Platform Strategies: A Guidebook for Entrepreneurs in the Platform Economy*, Professor Paul Belleflamme and Dr. Nicolas Neysen highlight similar challenges surrounding platforms more broadly, stating that "Because platforms do not control transactions but simply enable them, they co-create value with their users."[24] Because platforms operate differently from traditional businesses, they need to allow their users to control some aspects of the transaction, rather than controlling nearly every aspect of the service provision for their customers themselves.[25] For example, while hotels control how rooms and facilities are furnished and cleaned, Airbnb does not. Hosts decide what amenities to provide, and how to decorate and clean the rooms.

13.      As a result, expecting the business models to operate similarly is unreasonable, and comparisons of the two types of business models would need to account for the different

---

[22]   Tucker Opening Report, ¶ 14.

[23]   See Tucker Opening Report, ¶ 15 ("In some cases, the marketplaces mostly involve sellers that sell their own goods or services; for example, farmers through farmers markets, developers through Apple's App Store, and hosts through Airbnb. In other cases, the marketplaces focus on facilitating the resale of goods, such as art auction houses like Christie's and Sotheby's, Poshmark, Depop, or eBay. Those marketplaces are called resale, or secondary, marketplaces. A marketplace may cater to both types of sellers.").

[24]   Platform Strategies, 2023, p. 49, p. 2 ("A platform is an entity that brings together economic agents with complementary needs and facilitates interaction among them.").

[25]   Belleflamme, Paul and Martin Peitz, *The Economics of Platforms*, Cambridge, UK, Cambridge University Press, 2021 ("The Economics of Platforms"), p. 110 ("When a firm is organized as a platform, it makes it possible for sellers (or service providers) and buyers (or customers) to interact directly; it therefore leaves the residual control rights over the provision of the service (or the sale of the product) to independent professionals. In contrast, when a firm is vertically integrated or when it operates as a reseller, it keeps the residual control rights for itself."). See also Matchmakers, 2016, p. 104 ("A fundamental choice for some businesses is whether to be single-sided or to be a matchmaker, and thereby give up some control to other members of the ecosystem.").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

ways traditional businesses and marketplaces create value. This is a critical flaw in the approach of the Kammel Report.

> 2. *Enabling, rather than controlling, creates a need to build and maintain trust, and successful marketplaces—including StockX—invest considerable resources in doing so*
>
>> a. *StockX, like other resale marketplaces, has an incentive to protect buyers to ensure trust on the platform*

14.     As explained in Section V of my Opening Report, a key to the success of a marketplace like StockX is that interactions that occur on the platform are positive for both buyers and sellers. Because platforms have to give up some control due to their business model, it is critical for them to find other mechanisms to build trust that transactions on the platform will be safe and positive for all users.

15.     The Kammel Report ignores that prioritizing speed and seller satisfaction over safety and consumer protection would generally not be in the long-term interest of online resale marketplaces like StockX, and would be inconsistent with an objective to maximize long-term profitability. Doing so would result in negative interactions for buyers, who would stop using the platform. For instance, by prioritizing speed of getting a product to a customer over authenticating the product, a buyer may unwittingly purchase counterfeits, causing them to stop using the platform and discourage other potential buyers from using the platform. Having fewer buyers would make the platform less attractive to sellers, and the platform could unravel.[26]

16.     Therefore, online resale marketplaces would risk the success of their business if they did not take steps to prevent the sale of counterfeit items, among other negative experiences. There are multiple examples of resale marketplaces and other types of online platforms failing due to negative experiences of users, including eBay's failure in China.[27] This is why successful marketplaces devote considerable resources to "actively manage and maintain buyer and seller interactions to ensure their quality," which I call "coring."[28]

---

[26]   Tucker Opening Report, Section V.B.1.

[27]   Tucker Opening Report, ¶¶ 29–30.

[28]   Tucker Opening Report, ¶ 23.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

> b. *Coring efforts evolve due to competition, learning, and new technologies*

17.     Coring efforts are a key way in which platforms compete[29] and may evolve through competition, learning, and new technologies. The evolution of resale marketplaces for sneakers provides an example of how coring evolves as a result of these factors. Early iterations of sneaker resale marketplaces were unsophisticated, with large frictions between buyers and sellers. Options for buying were decentralized—spread across forums, online auction sites like eBay, and peer-to-peer resellers—each with limited product offerings.[30] Many buyers and sellers were dissatisfied with their experience.[31] The quality of resale marketplaces' products was also uncertain. John McPheters, former co-CEO of the resale marketplace Stadium Goods, noted, "If you go back five or 10 years, people didn't really trust what they were buying from an aftermarket. Transactions were messy and there wasn't a clean experience."[32]

18.     Over time, resale marketplaces innovated to reduce those frictions. Professionalized online resale marketplaces such as Stadium Goods, Grailed, GOAT, KLEKT, and StockX were founded to provide a "cleaner experience," "a more formalized process and a

---

[29]    Tucker, Catherine, "How Platforms Create Value Through Coring and Implications for Market Definition," *CPI Antitrust Chronicle*, Vol. 2, No. 2, 2022, pp. 16–19, p. 18 ("Coring needs evolve as platforms compete, learn about what works, observe their competitors, and monitor evolving interactions on their platform. Continuous coring is particularly critical when a platform is facing competition.").

[30]    Expert Report of DeJongh "Dee" Wells, *Nike, Inc. v. StockX LLC*, No. 1:22-cv-000983-VEC, May 5, 2023 ("Wells Report"), Section V.C ("The resale market for sneakers was transformed by the Internet. When access to the Internet broadened, some Sneakerheads began trading shoes online through forums such as NikeTalk and online marketplace eBay, often at prices higher than the original retail price.").

[31]    High Snobiety, "Special Report: This Is What the Future of Sneaker Reselling Looks Like," 2019, https://www.highsnobiety.com/p/sneaker-reselling-future/ ("We've come a long way since the early days of trading rare and limited sneakers and streetwear on forums, through online auction sites such as eBay, and peer-to-peer transactions via decentralized social media groups, all of which often left shoppers frustrated by the user experience and small inventory."); Complex, "The Rise of the Reseller," November 20, 2019, https://www.complex.com/sneakers/2019/11/rise-of-the-sneaker-reseller-in-the-2010s ("'There was typically a lot of friction around selling in traditional consignment shops and online platforms,' says Cohen. 'As platforms like GOAT become global channels, resellers now have a larger global audience to sell their product to, and consumers can easily access the database of sneakers right at their fingertips.' 'It was a lot of having to dig. There was a lot of discovery, compared to now,' says Yu-Ming Wu, founder of Sneaker News and Sneaker Con[.]").

[32]    High Snobiety, "Special Report: This Is What the Future of Sneaker Reselling Looks Like," 2019, https://www.highsnobiety.com/p/sneaker-reselling-future/.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

plethora of choice" with the goal of favoring "customer loyalty."[33] The emergence of multiple sophisticated resale marketplaces coupled with an increased demand from consumers for sneakers forced these platforms to compete, evolve, and innovate to win business from sneaker buyers and sellers.[34]

19.    One of the ways StockX has innovated in the sneaker resale space is through the development of its verification services, a key part of StockX's strategy and business model since their launch in 2016.[35] While customers do not inspect goods in person before making a purchase on StockX, every product sold through StockX undergoes an in-person verification by a team of trained industry experts.[36] Users perceived the value in buying verified items from StockX, and as such, were willing to pay a premium for the platform's quality products.[37] These efforts ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████ Joe Pallett, Nike's Brand Protection Director of Authentication and Innovation, ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████[39] As

---

[33]  High Snobiety, "Special Report: This Is What the Future of Sneaker Reselling Looks Like," 2019, https://www.highsnobiety.com/p/sneaker-reselling-future/ ("With the sites taking a percentage of every sale, customer loyalty has become a priority.").

[34]  Glossy, "The Resale Companies Set to Edge Out the Competition in 2020," December 30, 2019, https://www.glossy.co/fashion/the-resale-companies-set-to-edge-out-the-competition-in-2020 ("Now that these platforms are no longer a niche area, resellers will need to be innovative and evolve their business models in order to compete in 2020.").

[35]  StockX, "StockX Statement on Authentication Program," June 6, 2022, https://stockx.com/about/stockx-statement-on-authentication-program, ("Authentication is core to our history at StockX, and one of the many reasons the company was founded.").

[36]  StockX, "What is the StockX Verification Process?," October 4, 2022, https://stockx.com/help/articles/What-is-the-StockX-verification-process ("Items are verified on-site at one of our Authentication Centers by staff who receive constant training in order to remain industry experts.").

[37]  Launched, "How StockX Won Over Sneakerheads," February 23, 2022, https://readlaunched.substack.com/p/-launched-how-stockx-won-over-sneakerheads ("The famous 'green tag,' signifying authentication by StockX, became a status symbol for legit items."); Nike, "Email From Nike Introducing StockX to Counterfeiting Working Group," January 22, 2021, NIKE0035529–530 at 530 ("[StockX's] reputation for authenticating product creates very high resale prices.").

[38]  Nike, "Nike Legit Presentation," February 2019, NIKE0035611–650 at 632–633.

[39]  Nike, ███████████████████████████████████ January 22, 2021, NIKE0035529–530 at 530 ███████

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

described in more detail in Section II.B, ███████████████████████████████████████
███████████

20.    Other sneaker resale marketplaces realized the value of these services, and began investing in their own authentication services.[40] For example, in 2020, eBay started partnering with Sneaker Con, the organizer of large sneaker conventions, to provide authentication services.[41] A year later, it acquired an authentication business to "continue to transform eBay and bring a higher level of trust and confidence to every transaction."[42] Similarly, in 2021, Poshmark acquired Suede One, a platform specializing in the virtual authentication of sneakers, to bolster its "Posh Protect" and "Posh Authenticate" services.[43]

21.    Such coring efforts are not specific to resale marketplaces for sneakers. High-end auction houses such as Christie's and Sotheby's also have invested in authentication efforts, starting with dedicated teams of in-house specialists.[44] Sotheby's also invested in authentication technology to detect high-level art forgeries with its acquisition of Orion Analytical—a materials

███████████████████████████████████████████████████████████████████

---

[40]    Deposition of Brock Huber 30(b)(6), *Nike, Inc. v. StockX LLC*, No. 1:22-cv-000983-VEC, February 22, 2023 ("Huber 30(b)(6) Deposition"), 135:22–136:2 ("And we have made it more difficult for potential sellers of items that may appear to be inauthentic to sell those on our platform. And because of the offering we had, other marketplaces felt competitive pressure to also create these types of services for their customers.").

[41]    Sneaker Con, "About," https://sneakercon.com/about ("Sneaker Con is the world's premier sneaker show, providing a huge space for vendors and attendees to buy, sell, and trade some of the most sought-after footwear in the game. … October 2020: Sneaker Con establishes partnership with eBay to provide authentication services globally in furtherance of eBay's Authenticity Guaranteed.").

[42]    eBay, "eBay Acquires Sneaker Con Authentication Business," November 29, 2021, https://www.ebayinc.com/stories/news/ebay-acquires-sneaker-con-authentication-business.

[43]    Poshmark, "Poshmark, Inc. Acquires Suede One, A Leading Platform For Virtual Authentication of Sneakers," October 13, 2021, https://newsroom.poshmark.com/2021/10/13/poshmark-inc-acquires-suede-one-a-leading-platform-for-virtual-authentication-of-sneakers ("Suede One's virtual authentication capabilities will complement Posh Protect, … and Posh Authenticate.").

[44]    Christie's, "Buying at Christie's," https://www.christies.com/buying-services/buying-guide ("Every item we sell is meticulously researched by our world-class specialists, so when the sale approaches, you can bid confidently … Our specialists evaluate each item to ensure objects purchased through Christie's are authentic."); Sotheby's, "Why Buy With Sotheby's?," September 29, 2022, https://help.sothebys.com/en/support/solutions/articles/44002297454-why-buy-with-sotheby-s- ("Our reputation for trust and authenticity is backed by our unparalleled global network of specialists spanning 40 countries and 44 departments.").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

analysis firm specializing in the identification of forged artwork based on scientific techniques such as analytical chemistry—and creation of a Department of Science Research.[45]

22.     While the Kammel Report argues that online marketplaces that provide authentication services become "an active part of the sale of counterfeit products" and "increase the risk of commingling counterfeit product with legitimate product,"[46] resale marketplaces with robust authentication services achieve the opposite. They reduce the risk of a counterfeit item reaching a buyer as compared to marketplaces with no such services, and play an active role in preventing the sale of counterfeit products. In fact, online marketplace involvement in detection efforts has been described a "best practice" for stopping the spread of counterfeits. In a white paper cited in the Kammel Report, the Department of Homeland Security advises that, "[f]oremost among [] best practices is the idea that e-commerce platforms, online third-party marketplaces, and other third-party intermediaries . . . must take a more active role in monitoring, detecting, and preventing trafficking in counterfeit and pirated goods."[47] Aligning with these best practices, many online marketplaces have been investing in authentication services to combat counterfeiting and solve for a previous lack of trust by consumers in resale marketplaces, which was in part due to the presence of counterfeits.

---

[45]  CB Insights, "Orion Analytical," https://www.cbinsights.com/company/orion-analytical ("Orion Analytical is a materials analysis and consulting firm that analyzes the chemical and structural composition of disputed artworks for clients around the world, including private collectors, museums, galleries, and the FBI."); The Analytical Scientist, "Bringing Light to the Darkness," August 11, 2017, https://theanalyticalscientist.com/techniques-tools/bringing-light-to-the-darkness ("This systematic use of particle, elemental, and molecular analyses provides information on different physical, optical, and chemical features of materials. Used in combination, these analyses allow [Orion] to identify hundreds of thousands of materials, from an ancient pigment or alloy, to natural fibers, to modern synthetic polymers."); Sotheby's, "A Year of Scientific Research at Sotheby's," December 4, 2017, https://www.sothebys.com/en/articles/a-year-of-scientific-research-at-sothebys ("One year ago, Sotheby's acquired Orion Analytical, the leading materials analysis and consulting firm in the art world, and hired its founder, Jamie Martin, to establish a Department of Scientific Research.").

[46]  Kammel Report, p. 11 ("Some online marketplaces claim to never inspect the product and are merely providing a selling space where they claim they are not part of a supply chain, while others actively join the supply chain. For example, a platform that acts as an intermediary through shipping, attempted 'verification,' 'authentication,' or warehousing items. Thus, they move from simply providing a space for others to sell to becoming an active part of the sale of counterfeit products because they possess the products and then ship them to the consumer.").

[47]  Kammel Report, p. 8, Footnote 22; Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods*, January 24, 2020, https://www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goods-report_01.pdf, p. 6.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

**B.**     **The Kammel Report presents no evidence that resale marketplaces could meet its standard, which would leave consumers with fewer protections**

23.     The Kammel Report defines authentication as "the act by which the IP rights holder verifies whether a product or package bearing their trademark is genuine and authorized."[48] As a result, according to the Kammel Report, "[o]nly the IP rights holder and those authorized by the IP right holder are capable of authenticating product or packaging."[49] The Kammel Report provides no support for portraying its narrow definition as standard.

24.     The Kammel Report advocates for online resale marketplaces to have the same standards as traditional supply chains.[50] It criticizes online resale marketplaces for not knowing as many details about the products being sold on them as in a "legitimate supply chain"[51] and for "usually … not track[ing] the supply chain or provenance of the products in the same way that a traditional supply chain would."[52] In addition, the Kammel Report argues that only intellectual property owners and "authorized authenticators" like brand employees, private investigators, and government agencies can authenticate a product,[53] and criticizes efforts that are not equivalent to authentication by IP rights holders.[54] The Kammel Report presents no evidence that resale

---

[48]   Kammel Report, p. 21.

[49]   Kammel Report, p. 22.

[50]   Kammel Report, p. 11 ("E-Commerce platforms usually do not track the supply chain or provenance of the products in the same way that a traditional supply chain would. They simply do not require this information from their sellers, because this is not required by law.").

[51]   Kammel Report, p. 10 ("In a legitimate supply chain, many details about the movement of products through the supply chain would be present, such as sellers' names, contact information, distributor information, country of manufacture, or other information about the provenance and details of the product, but we do not see this practice in online marketplaces.").

[52]   Kammel Report, p. 11.

[53]   Kammel Report, p. 22 ("Only the IP rights holder and those authorized by the IP right holder are capable of authenticating product or packaging. Sometimes IP rights holders give an individual or organization a device or the actual technology to authenticate a particular product of package. These authorized individuals or organizations could be employees of the IP rights holder's company, a private investigator, or even a national customs agency.").

[54]   Kammel Report, p. 24 ("While only the brand owner or those authorized by the brand owner can authenticate a genuine trademark and products, many others will often claim to be able to authenticate a trademark or product. General inspection by a consumer or an e-commerce site may be able to identify an obvious counterfeit because of overt differences, but that does not equate to authentication.").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

marketplaces could meet its standard, and does not acknowledge that Nike is not willing to provide resale marketplaces with resources to improve authentication standards.[55]

25.     The definition proposed by the Kammel Report is so narrow that it would be a large challenge for resale marketplaces with a need for authentication to meet it.[56] An implication of the Kammel Report's definition of authentication is that if, hypothetically, an IP holder no longer existed no authentication would be possible. For instance, it is not clear how Christie's and Sotheby's, which sell antique paintings and game-worn sneakers,[57] would be able to satisfy this requirement. Applying the Kammel Report's proposed definition, no auction house could authenticate artwork by non-living artists, and no seller could authenticate products made by a manufacturer that is no longer in business. This would be unworkable and lead to negative consequences for consumers, who would be deprived of expert assistance in authenticating products.

26.     Another implication is that resale marketplaces would need to be authorized and/or provided by the brand. However, the Kammel Report does not provide any evidence to

---

[55]   Huber 30(b)(6) Deposition, 237:2–238:22 ("Q: When have you tried to make those offers to brands? ████ ████ I personally have had phone calls with Nike in the past where topics came up, and Nike showed zero interest. … in having a partnership with respect to our authentication process, and Nike has not shown interest."); Deposition of Joe Pallett, *Nike, Inc. v. StockX LLC*, No. 1:22-cv-000983-VEC, February 8, 2023 ("Pallett Deposition"), 143:16–144:12 ████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████

[56]   Expert Rebuttal Report of Richard LaMagna, *Nike, Inc. v. StockX LLC*, No. 1:22-cv-000983-VEC, June 2, 2023 ("LaMagna Report"), ¶¶ 45-47.

[57]   See, for example, Christie's, "About Us," https://www.christies.com/about-us/welcome-to-christies#About-Us ("Christie's auctions span more than 80 art and luxury categories, at price points ranging from $200 to over $100 million. Christie's has sold 8 of the 10 most important single-owner collections in history, including the Paul G. Allen Collection – the most valuable collection ever offered at auction (November 2022). In recent years, Christie's has achieved the world record price for an artwork at auction (Leonardo da Vinci's *Salvator Mundi*, 2017), for a 20th century artwork (Andy Warhol's *Shot Sage Blue Marilyn*, 2022) and for a work by a living artist (Jeff Koons' *Rabbit*, 2019)."); Christie's, "Christie's to Auction Michael Jordan Game-Worn, Dual-Signed and Photo-Matched Air Jordan 'He's Got Game' XIIIs," November 16, 2021, https://www.christies.com/about-us/press-archive/details?PressReleaseID 10292 ("Christie's New York will offer A Pair of Michael Jordan Game-Worn & Signed Air Jordan XIII 'He's Got Game' Sneakers (Estimate: $300,000-500,000) as a leading highlight of the upcoming Handbags x Hype: The Luxury Remix, an online-only sale open from November 24-December 9.").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

establish that brands perform authentication in partnership with resale marketplaces or launch their own versions of resale marketplaces with authentication.

27.    On the contrary, evidence suggests that brands, ████████████ may not be able to—or in some cases may not be willing to—perform such authentications. For example,

█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████ █

28.    Between 2017 and 2018, ██████████████████████████



---

[58]   Nike, ███████████████████████████ April 2019, NIKE0036670–733 at 681 ████████████████████████████████████████; Deposition of Heather Paulson 30(b)(6), *Nike, Inc. v. StockX LLC*, No. 1:22-cv-000983-VEC, January 6, 2023 ("Paulson 30(b)(6) Deposition"), 252:22–253:5 ██████████████████████████████████ ██████████████████████████████████████████████ ████

[59]   Paulson 30(b)(6) Deposition, 77:23–78:4 ████████████████████████ ████████████████████████████████████████████████ ███████████████████████████

[60]   Paulson 30(b)(6) Deposition, 82:8–82:23 ████████████ See also Nike, "Nike ████ Presentation," February 2019, NIKE0035611–650 at 633.

[61]   Paulson 30(b)(6) Deposition, 85:10–85:21 ("Q: And so the Legit authentication solution was essentially to enable anyone to check the authenticity of a Nike product? A: That was the vision. Q: Did the vision succeed? A: The program has been shut down … shortly after the pilot with StockX terminated.").

[62]   Pallett Deposition, 131:16–21 ("Q: What was your role? A: I was brought on late in the project to see how it could potentially be utilized in partnership with StockX and if I had any concerns about what the goals of the Legit Project were."); 142:18–143:4 ("Q: What were your concerns? A: My concerns were surrounding the importance of keeping how we authenticate product as confidential as possible. Q: What do you mean by that?

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY



29.    In 2019,

30.    Another issue

---

[63] Paulson 30(b)(6) Deposition, 216:24–217:6 ("Q:

[64] Nike also refers

[65] Nike,                                                        May 2019, NIKE0036631–667 at 654

[66] Nike,                                                        April 2019, NIKE0036670–733 at 730

[67] Nike,                                                        April 2019, NIKE0036670–733 at 687

[68] Paulson 30(b)(6) Deposition, 268:2–21

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

31.     If a resale market is not provided by the brand, the Kammel Report's definition of authentication further implies that resale markets in which third-party sellers sell authenticated products cannot exist. As explained in Section II.A, by their nature, resale marketplaces relinquish some control to their third-party sellers compared to traditional, integrated businesses. Full control over the provenance of the products sold would require a resale marketplace to either produce the products or purchase them from the manufacturer, changing resale marketplaces' business model completely. As a result, resale marketplaces with authentication services and third-party sellers would not be able to exist anymore—a point that the Kammel Report ignores.

32.     Therefore, the Kammel Report fails to show that its standard for authentication is economically feasible for resale marketplaces and it ignores the lack of attainability of such a standard as shown by the failure of Nike's own initiatives in the secondary market.

### C.    Platforms create value despite reduced control, including through authentication services

#### 1.    Closing resale marketplaces would destroy value

33.     The Kammel Report describes online marketplaces that provide authentication services as being "an active part of the sale of counterfeit products" and alleges that they "increase the risk of commingling counterfeit product with legitimate product."[69] However, the Kammel Report does not address or account for the value to consumers from these services, and fails to consider whether the alternative it appears to propose—a secondary market without authentication —would be better for consumers. Regressing to secondary markets with no authentication would reduce protection for consumers, which would increase the opportunities for counterfeiters.

34.     Both integrated businesses and platform business models create value for consumers, but they have different advantages and disadvantages. In particular, despite losing

---

[69]    Kammel Report, p. 11 ("Some online marketplaces claim to never inspect the product and are merely providing a selling space where they claim they are not part of a supply chain, while others actively join the supply chain. For example, a platform that acts as an intermediary through shipping, attempted 'verification,' 'authentication,' or warehousing items. Thus, they move from simply providing a space for others to sell to becoming an active part of the sale of counterfeit products because they possess the products and then ship them to the consumer.").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

some control, platforms create value in ways that integrated businesses cannot[70] and can be more beneficial in some circumstances. For instance, economists have recognized that platforms can eliminate traditional gatekeepers,[71] unlock new sources of supply,[72] and lower transaction costs.[73] In addition, they are better at adapting to changing market conditions.[74]

35.    Resale marketplaces are not new, and their existence long predates the Internet. Before the digital age, consumers could find items to purchase in the classified ads section of newspapers or purchase high-end items at auction houses such as Christie's and Sotheby's, among many others. Digital technologies allowed for the development of online resale marketplaces, which have made transactions of items or services easier and more accessible. The value offered by online resale marketplaces as compared to pre-existing alternatives is evident in many contexts, including in the context of short-term residential lodging with Airbnb, app stores with Apple's App Store, and resale with eBay and Poshmark.[75] In 2022, Airbnb was used to book nearly 400 million nights and experiences. In 2008, Apple opened its ecosystem to third-party developers, allowing developers to distribute their apps to users worldwide. Over the last

---

[70]   Platform Strategies, 2023, p. 49 ("In comparison with the manager of an integrated business (a pipeline), you, as a platform operator, will necessarily lose some degree of control over value creation. However, by selecting wisely the users and leveraging the power of cross-side network effects, you can count on extra value, which you could not have generated on your own as a pipeline manager.").

[71]   Parker, Geoffrey G., Marshall W. Van Alstyne, and Sangeet Paul Choudary, *Platform Revolution: How Networked Markets Are Transforming the Economy and How to Make Them Work for You*, New York, W. W. Norton & Company, 2016 ("Platform Revolution"), pp. 18–19 ("Platforms beat pipelines because platforms scale more efficiently by eliminating gatekeepers ... The platform system can grow to scale more rapidly and efficiently because the traditional gatekeepers—editors—are replaced by market signals provided.").

[72]   Platform Revolution, 2016, p. 19 ("Platforms beat pipelines because platforms unlock new sources of value creation and supply... In platform markets, the nature of supply changes. Supply now unlocks spare capacity and harnesses contributions from the community which used to be only a source of demand.").

[73]   Platform Revolution, 2016, p. 21 ("The effort necessary to individually verify credit- and trustworthiness is an example of the high transaction costs that used to prevent exchange. By providing default insurance contracts and reputation systems to encourage good behavior, platforms dramatically lower transaction costs and create new markets as new producers start producing for the first time.").

[74]   The Economics of Platforms, 2021, p. 111 ("The enabling mode (platform) fares better in terms of motivation (inducing professionals to exert efforts) and adaptation (letting professionals adjust their actions according to their private information). The controlling mode (vertical integration, resell) fares better in terms of coordination (internalizing externalities across professionals, goods and services).").

[75]   Tucker Opening Report, Section IV.A.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

15 years, the App Store has facilitated 370 billion downloads and processed more than $320 billion in developer earnings.[76]

36.     By removing geographic barriers to trade, online marketplaces like eBay and Poshmark help products reach consumers who value them most, making the platform valuable to buyers and, in turn, more valuable to sellers.[77] By promoting the efficient allocation of goods and resources, resale marketplaces can reduce waste. They also have increased access to the marketplace for both buyers and sellers. In the context of sneaker resale, as explained by sneaker industry expert DeJongh "Dee" Wells, online resale marketplaces have transformed the resale market, making it more "democratized" and "open." Before the Internet, sneaker buyers had to be close to sneaker retail locations and it was costly to obtain information on sneaker releases and to travel to obtain sneakers. As a result, "individuals who lived far from physical marketplaces had little to no access to sneakers." Now, "online resale marketplaces g[i]ve anyone access to the rarest models of sneakers."[78]

37.     Satisfying the Kammel Report's requirements for control would eliminate most, if not all, resale marketplaces. As a result, the value that such platforms create for their users would be destroyed.

---

[76]  Caminade, Juliette and Jonathan Borck, *The Continued Growth and Resilience of Apple's App Store Ecosystem*, Analysis Group, May 2023, https://www.apple.com/newsroom/pdfs/the-continued-growth-and-resilience-of-apples-app-store-ecosystem.pdf ("Users have downloaded apps more than 370 billion times and developers have earned more than $320 billion in earnings directly on the App Store since its launch.").

[77]  Sharma, Akshita et al., "Relationship Between Customer Satisfaction and Loyalty," *Social Science Research Network*, 2020, p. 9 ("Once the customer is satisfied they would return for repeat future purchases and eventually become loyal, and a loyal customer will always spread positive word of mouth which leads to increase in both sales and profitability as loyal customer will bring new customers to the firm."); Lendle, Andreas, Marcelo Olarreaga, Simon Schropp, and Pierre-Louis Vézina, "There Goes Gravity: eBay and the Death of Distance," *The Economic Journal*, Vol. 126, No. 591, 2016, pp. 406–441, pp. 432–433 ("[W]e estimate a distance effect on trade flows that is about 65% smaller on eBay [relative to total trade data collected from national customs offices] … this difference in distance effects is most-likely due to online technologies that reduce information frictions associated with geographic distance.").

[78]  Wells Report, Section V.C.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

> 2.     *Even imperfect authentication services provide value to customers, especially when supported by return policies in cases where the authentication process erred*

38.     While the Kammel Report describes online marketplaces that provide authentication services as "increas[ing] the risk of commingling counterfeit product with legitimate product" and "becoming an active part of the sale of counterfeit products"[79] it also criticizes platforms that do not make proactive efforts to screen counterfeits.[80] While the Kammel Report's ultimate position on whether resale markets should provide authentication services remains unclear, it is clear that shutting down authentication services could result in harm to consumers, downgraded experiences on resale marketplaces, and an increase in the sale of counterfeits—the opposite of the desired outcome.

39.     As described in Section II.A.2, StockX and multiple other resale marketplaces have invested in technology to screen and verify items that are sold through their platforms. While not perfect, these tools aim to improve the quality of items sold on the platform and reduce the incidence of counterfeits.[81] Platforms use these tools to compete with others, as a way of differentiating themselves from more unregulated platforms such as Craigslist.

40.     My own research has shown that attempts to regulate platforms because they fail to attain a perceived ideal can lead to counterproductive outcomes, where the closure of a platform can lead users to migrate to alternatives where there is less of a coring incentive.[82] For

---

[79]   Kammel Report, p. 11 ("Some online marketplaces claim to never inspect the product and are merely providing a selling space where they claim they are not part of a supply chain, while others actively join the supply chain. For example, a platform that acts as an intermediary through shipping, attempted 'verification,' 'authentication,' or warehousing items. Thus, they move from simply providing a space for others to sell to becoming an active part of the sale of counterfeit products because they possess the products and then ship them to the consumer. When a platform takes on any part of storing, warehousing, shipping, inspecting, or attempting to authenticate product with third-party sellers, they also increase the risk of commingling counterfeit product with legitimate product and thus not being able to control whether counterfeit product makes it to the consumer or not.").

[80]   Kammel Report, p. 9 ("While some platforms make efforts to fend off counterfeiting activity, the majority of efforts are reactive and do nothing to proactively disrupt the sale before it occurs, relying only on complaints by brand owners and occasionally by consumers after the sale of the counterfeit products has occurred.").

[81]   LaMagna Report, ¶ 84.

[82]   Agarwal, Saharsh, Uttara Ananthakrishnan, and Catherine Tucker, "Deplatforming and the Control of Misinformation: Evidence from Parler," *Social Science Research Network*, 2023, p. 1 ("While it is reasonable to expect that deplatforming can mitigate the diffusion of harmful content, it can also potentially intensify the problem and transfer it elsewhere."); p. 19 ("We find that after the deplatforming, a section of the Parler users migrated to Telegram, and these users were active till at least six months later (when our data ends). … Those

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

example, the shutdown of platforms such as StockX could lead their users to transact in decentralized ways through messenger services such as WhatsApp or through less regulated websites such as Craigslist that use few, if any, coring activities.[83] As a result, welfare for both consumers and brands would decrease, returning the resale market to its early days of poor quality, distrust, inconvenience, and user dissatisfaction. Consumers would be worse off due to the reduction in options for trade as well as the inability to differentiate between legitimate resellers and bad actors.

## III.    THE KAMMEL REPORT IGNORES THE VALUE OF STOCKX'S CORING FEATURES AND PROPOSES CHANGES THAT WOULD NOT IMPROVE THE BUYER AND SELLER EXPERIENCE

41.    This section explains why the Kammel Report's suggestion that the lack of use of seller ratings and reviews is a flaw in StockX is misplaced and ignores the economic literature on the flaws of ratings and reviews. The section also explains that the Kammel Report ignores the value of the active trust-building measures that StockX and similar platforms have already implemented. Last, this section explains why standardized listings and photographs can improve user experience, rather than detract from it as the Kammel Report suggests.

### A.    Coring features: active and indirect trust-building measures

42.    As explained in Section V.B.1 of my Opening Report, in online marketplaces, buyers and sellers that match on the platform typically do not know one another, may be anonymous, and cannot inspect the product they want to buy. Both sides possess private information, such as the seller's knowledge of the quality of the product sold or the buyer's willingness to engage in opportunistic behavior. Private information creates the need for the platform to devise features to resolve problems arising from the information asymmetry and create trust.

---

who migrated to Telegram saw an increase in exposure to questionable media sources, partisan content, and websites dealing with unregulated financial activities.").

[83]    Tucker Opening Report, ¶ 28.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

43.     Over time, platforms have developed various coring tools, including some to create trust. Economists have categorized trust-building features into "active trust-building," where the platform takes measures to build trust itself, and "indirect trust-building," through which platforms provide users with tools that allow them to build trust on their own.[84] In the context of marketplaces, either active or indirect trust-building can serve the purpose of resolving the issue of opportunistic behavior and private information. However, these tools work in different ways and have different advantages and drawbacks. As a result, platforms need to evaluate which mechanisms work best for the circumstances of their users.

### 1.     Active trust-building

44.     Active trust-building includes measures undertaken by the platform itself, such as screening and certification of products or participants on the platform. The objective of screening is to keep bad actors and low-quality products off the platform from the outset and thereby ensure a minimum quality standard.[85]

### a.     Advantages of active trust-building measures

45.     Active coring measures to build trust are key when transactions involve perceived risk. For example, platforms that facilitate risky transactions, such as peer-to-peer loans, or where personal safety and property are at risk, such as short-term rentals or rides, use more

---

[84]    Platform Strategies, 2023, pp. 201–202 ("Inefficiencies due to opportunistic behaviors and high information costs represent obstacles to the smooth and optimal progress of a transaction between parties. At the same time, this is exactly where market intermediaries like platforms should see an opportunity to fix the problem by creating a trusted environment. Various mechanisms exist and have already demonstrated their importance and effectiveness. We separate these mechanisms according to whether the platform takes active measures to build trust itself or provides users with tools that allow them to build trust on their own.").

[85]    Platform Strategies, 2023, p. 202 ("The objective is to ensure a minimum quality standard for the services provided on the platform. How? By operating a selection ex ante to keep lower-quality providers off and by exerting controls ex post to expel worse-performing producers.").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

extensive checks on buyers and sellers.[86] For example, Lyft requires potential drivers to undergo criminal background and driving history checks.[87]

46.     Platforms can also engage in active trust-building by issuing warranties, guarantees, or insurance. Such tools can assure users that if they have a bad experience, they will be supported or compensated.[88] For example, Airbnb insures hosts against liability in the event a guest is injured or for property damage caused by a guest.[89]

47.     As summarized by Belleflamme and Neysen in *Platform Strategies*, by engaging in active trust-building, a platform can "become the bearer of the collective reputation of the sellers that it takes on board," with the result that "buyers do not really have to trust each seller separately; they can simply trust the platform because they realize that the platform has much more to lose from a stain on its reputation than any separate seller does."[90]

### b.     Drawbacks of active trust-building measures

48.     Active trust-building also has drawbacks. It can be cost-intensive and requires organizational structures in place to support it. For instance, if a platform were to perform background checks on the users providing or purchasing services, the platform would need to collect the relevant information and partner with a background check company, such as Checkr, which is costly.[91] The platform may also need to update the background checks at regular

---

[86]   Einav, Liran, Chiara Farronato, and Jonathan Levin, "Peer-to-Peer Markets," *Annual Review of Economics*, Vol. 8, 2016, pp. 615–635, p. 621 ("In markets where the stakes to individual transactions are higher, or where personal safety is a concern, reputation mechanisms have become increasingly sophisticated. Prosper, for instance, collects and posts credit bureau information about potential borrowers, and Airbnb verifies the true identity of both buyers and sellers.").

[87]   Lyft, "Learn What You Need to Drive With Lyft," https://www.lyft.com/driver-application-requirements.

[88]   Platform Strategies, 2023, p. 203 ("Another traditional way to reassure customers in transactions fraught with asymmetric information problems is to offer them warranties, guarantees, or insurances. The objective is to convince customers that quality will be preserved in any circumstances because the product will be repaired (warranty) or replaced (guarantee) in case of failure or breakdown, or because the buyer will be compensated if some specific event occurs (insurance).").

[89]   Airbnb, "Host Liability Insurance," https://www.airbnb.com/help/article/937; Airbnb, "Host Damage Protection," https://www.airbnb.com/help/article/279.

[90]   Platform Strategies, 2023, pp. 203–204.

[91]   Checkr, "Background Checks for the Gig Economy," https://checkr.com/use-cases/gig-marketplace ("Checkr powers 95% of the gig economy, helping gig and marketplace companies scale their businesses quickly without

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

intervals, adding to the costs.[92] In settings where the quality of interactions can change or is more qualitative and subjective, active trust-building mechanisms may not work well. For instance, a driver on a rideshare platform may have no concerning driving history when they start to offer rides for the platform, but their driving habits may deteriorate over time or in non-observable ways that a driving history check would not reflect.

### 2. Indirect trust-building

49.     By contrast, indirect trust-building measures, like ratings and reviews, provide and maintain an infrastructure that platform users can use to build trust among themselves.

#### a. Advantages of indirect trust-building measures

50.     Trust-building measures based on ratings and reviews can be effective in some settings. An example is when the information asymmetries cannot easily be resolved by the platform itself because it would not be able to evaluate the quality of a transaction. For instance, a rider using a rideshare platform can better evaluate the cleanliness of a car and the friendliness of a driver than the platform itself. In such context, a rating system allows for more continuous quality monitoring and also provides incentives for drivers to keep their car clean and be friendly.

#### b. Drawbacks of indirect trust-building measures

51.     However, as explained in Section V.B.2 of my Opening Report, indirect trust-building measures may also suffer from limitations.

52.     First, there may be too few ratings and reviews to be informative. As providing feedback is costly for users in terms of time and effort, it can take time to build a reputation for a

---

sacrificing trust and safety."); Checkr, "Pricing," https://checkr.com/pricing (Checkr offers multiple products starting at rates between $29.99 - $79.99 per check.).

92    See, for example, Uber, "Why is Uber Running Another Background Check Report?," https://help.uber.com/driving-and-delivering/article/why-is-uber-running-another-background-check-report?nodeId 4c538b1d-7626-4cdc-9274-68a3fd74e006 ("To maintain safety standards, Uber reruns your background check annually at a minimum (in some cities, more frequently). This is required to retain access to the Uber app. Uber may also request additional background checks during the term of your relationship with Uber.").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

new platform, particularly for occasional sellers or if the platform has few buyers.[93] Conversely, a large number of reviews can make it challenging for users to know which ones are the most useful.[94]

53.     Second, ratings and reviews can be prone to manipulation, such as with fake reviews or reviews by users who have not purchased the product.[95] As explained in Section V.B.2 of my Opening Report, Fakespot, a fraudulent review detection service, found that more than 40% of the 720 million Amazon reviews written in 2020 were not genuine.[96] Review brokers offer fake reviews to app developers looking to boost their visibility in the Apple and Google app stores.[97]

54.     Third, ratings and reviews can be noisy. Buyers may misunderstand the ratings or review process and provide irrelevant information. They may also have idiosyncratic tastes and experiences.[98] As such, ratings or reviews may not be representative of the typical buyer's experience depending on how, when, or where the ratings or reviews are collected. For instance,

---

[93]  The Economics of Platforms, 2021, p. 49 ("Given the number of sellers, the more buyers that are active on the platform, the more precise is the information on any seller, since the average valuation tends to converge on the true valuation.").

[94]  Jabr, Wael and Mohammad Saifur Rahman, "Online Reviews and Information Overload: The Role of Selective, Parsimonious, and Concordant Top Reviews," *MIS Quarterly*, Vol. 46, No. 3, 2022, pp. 1517–1550, p. 1517 ("Online review hosting platforms are well-recognized as information-rich environments where crowd-sourced reviews help reduce the uncertainty surrounding prospective purchases, thus reaffirming the utility of information. … The wealth of available information, however, can be taxing and may overload subsequent customers[.]").

[95]  Anderson, Eric T. and Duncan I. Simester, "Reviews Without a Purchase: Low Ratings, Loyal Customers, and Deception," *Journal of Marketing Research*, Vol. 51, No. 3, 2014, pp. 249–269, p. 249 ("[A]pproximately 5% of the product reviews are written by customers for whom we can find no record of ever purchasing the item. These reviews are significantly more negative on average than the other 95% of reviews, for which there are records that the customer previously purchased the item.").

[96]  Stieb, Matt, "Amazon's War on Fake Reviews," *Intelligencer*, July 26, 2022, https://nymag.com/intelligencer/2022/07/amazon-fake-reviews-can-they-be-stopped.html ("According to the fraudulent-review-detection service Fakespot, around 42 percent of 720 million Amazon reviews assessed in 2020 were bogus.").

[97]  Yahoo! Finance, "Revealed: Apple App store and Google Play Flooded With Fake Reviews," March 8, 2023, https://uk.finance.yahoo.com/news/apple-app-store-google-play-flooded-with-fake-reviews-000126788.html ("Review broker services for apps offer bulk downloads, reviews or upvotes to help push apps up the rankings. … One fake review broker site, reviewlancer, claims to have sold nearly 53,000 reviews and exchanged more than 130,000 reviews between apps.").

[98]  The Economics of Platforms, 2021, p. 54 ("[T]his applies to product ratings on Amazon. Here, some reviewers do not base their rating on the quality and characteristics of the product they bought but on such factors as Amazon's delivery service, which can be considered orthogonal to the product sold by Amazon.").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

a 2020 study by Zervas, Proserpio, and Byers demonstrates that the same properties received different ratings when listed on Airbnb compared to TripAdvisor, which the authors interpret as reflecting bias.[99]

55.    Fourth, ratings and reviews may have little value when buyers cannot easily judge the quality of their experience or the product they bought. For example, lay persons may not be able to evaluate the accuracy of a medical assessment,[100] the purity grade of a diamond, or the condition of a pre-owned car.[101]

56.    Fifth, ratings and reviews may be biased. Because it is voluntary to submit reviews, few customers typically do.[102] Those who do tend to be different from those who do not—a phenomenon that economists call "sample selection." As a result, ratings and reviews may not be representative of the typical user's perception of their experience.[103] For example,

---

[99]    Zervas, Georgios, Davide Prosperio, and John W. Byers, "A First Look at Online Reputation on Airbnb, Where Every Stay is Above Average," *Marketing Letters*, Vol. 32, 2021, pp. 1–16, pp. 9–10 ("We present the distributions of ratings for cross-listed properties. … As was the case in our previous platform-wide analysis, we again observe that even cross-listed properties are rated higher on Airbnb than on TripAdvisor."); p. 13 ("While review and booking platforms strive to maintain unbiased ratings, our results provide strong evidence suggesting that achieving this goal is hard.").

[100]    Arrow, Kenneth J., "Uncertainty and the Welfare Economics of Medical Care," *The American Economic Review*, Vol. 53, No. 5, 1963, pp. 941–973, p. 951 ("Uncertainty as to the quality of the product is perhaps more intense here than in any other important commodity. Recovery from disease is as unpredictable as is its incidence. In most commodities, the possibility of learning from one's own experience or that of others is strong because there is an adequate number of trials. In the case of severe illness, that is, in general, not true; … Further, there is a special quality to the uncertainty; it is different on the two sides of the transaction. Because medical knowledge is so complicated, the information possessed by the physician as to the consequences and possibilities of treatment is necessarily very much greater than that of the patient, or at least so it is believed by both parties.").

[101]    Tucker Opening Report, ¶¶ 57–58.

[102]    Eric T. Anderson and Duncan I. Simester, "Reviews Without a Purchase: Low Ratings, Loyal Customers, and Deception," *Journal of Marketing Research*, Vol. 51, No. 3, 2014, pp. 249–269, p. 251 ("Very few customers write reviews. They are written by approximately 1.5% of the firm's customers.").

[103]    Fradkin, Andrey and David Holtz, "Do Incentives to Review Help the Market? Evidence from a Field Experiment on Airbnb," *Marketing Science*, 2023, pp. 1–13, p. 1 ("A major imperfection present in many reputation systems is that, because online reputation is a public good, not all buyers leave reviews, and the subset who do are self-selected. … [I]f reviews are more likely to be submitted after a positive experience than a negative one, future buyers may overestimate the quality of sellers."); Fradkin, Andrey, Elena Grewal, David Holtz, and Matthew Pearson, "Bias and Reciprocity in Online Reviews: Evidence From Field Experiments on Airbnb" presented at EC '15: Proceedings of the Sixteenth ACM Conference on Economics and Computation (Cambridge, MA, July 15, 2015), p. 28 ("Based on our results, the most important bias to tackle in review systems is sorting into reviewing."); Nosko, Chris and Steven Tadelis, "The Limits of Reputation in Platform Markets: An Empirical Analysis and Field Experiment," *NBER Working Paper*, 2015, pp. 1–36, p. 1 ("Furthermore, if some buyers leave the platform after a disappointing transaction without leaving feedback then the platform's reputation mechanism will be positively biased and therefore less effective.").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

economic research has shown that non-reviewers are more likely to have had negative experiences than reviewers, which distorts the accuracy of ratings.[104] Dissatisfied buyers may choose not to leave feedback for fear of retaliation from sellers,[105] or leave positive public reviews despite having a negative experience.[106]

57.    eBay's challenges with its review system show that the informativeness of indirect trust-building measures is sensitive to how they are designed and managed by the platform. As explained in Section V.B.2.b of my Opening Report, in its earlier days, eBay allowed buyers to rate sellers and sellers to rate buyers bilaterally and the feedback was immediately observable on each user's feedback profile.[107] However, when buyers submitted negative ratings, sellers would often retaliate with negative ratings for the buyers, which led to

---

[104]    Chris Nosko and Steven Tadelis, "The Limits of Reputation in Platform Markets: An Empirical Analysis and Field Experiment," *NBER Working Paper*, 2015, pp. 1–36, p. 9 ("Out of over 44 million transactions completed in October of 2011 on eBay's U.S. marketplace, only 0.39% had negative feedback, while at the same time, over 1% had an actual dispute ticket opened, a step that takes substantially more effort on a buyer's part than leaving negative feedback. Furthermore, over 3.3% of messages from buyers to sellers post the transaction include language that imply a bad buyer experience. … This indicates that there are a substantial number of transactions that went badly for which negative feedback was not left."); Andrey Fradkin, Elena Grewal, David Holtz, and Matthew Pearson, "Bias and Reciprocity in Online Reviews: Evidence From Field Experiments on Airbnb," July 15, 2015, p. 28 ("These biases leads to cases when negative experiences are not reported in review text on the website. If the three biases were eliminated, then an additional 20% of negative experiences would be documented in reviews on the website.").

[105]    Chris Nosko and Steven Tadelis, "The Limits of Reputation in Platform Markets: An Empirical Analysis and Field Experiment," *NBER Working Paper*, 2015, pp. 1–36, pp. 10–11 ("Anecdotal evidence shows that sellers sometimes react badly to negative feedback, harassing buyers in an attempt to get them to change it. If it is more costly to leave negative rather than positive feedback then the feedback system will be biased.").

[106]    Andrey Fradkin, Elena Grewal, David Holtz, and Matthew Pearson, "Bias and Reciprocity in Online Reviews: Evidence From Field Experiments on Airbnb," July 15, 2015, p. 3 ("We show that this misrepresentation does occur in the data. For example, 6% of guests who anonymously answered that they would not recommend their host nonetheless submitted a public review with a five star rating."); p. 20 ("Reviewers leave conflicting private and public feedback even when there is no possibility of retaliation. In the simultaneous reveal treatment, guests who do not recommend a listing fail to leave negative text 33% of the time and leave four or five star ratings 20% of the time. Similarly, hosts do not leave negative text in 29% of cases when they do not recommend the guest.").

[107]    Klein, Tobias J., Christian Lambertz, and Konrad O. Stahl, "Market Transparency, Adverse Selection, and Moral Hazard," *Journal of Political Economy*, Vol. 124, No. 6, 2016, pp. 1677–1713, p. 1681 ("In February 1996, just a few months after the first auction had taken place on its website, eBay introduced its feedback mechanism. In its earliest form, the system allowed any eBay user to leave feedback on the performance of any other user independently of any transaction, in the form of a 'positive,' 'neutral,' or 'negative' rating, possibly accompanied by a textual comment. This feedback was immediately observable on his or her feedback profile page, together with all ratings and comments that a user had ever received by other users.").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

fewer buyers leaving negative reviews.[108] This issue is often cited as the reason for eBay to switch from a two-sided to a one-sided reputation system in 2007.[109]

### 3. A platform's choice of trust-building measures is case-specific

58.　　The decision by a platform to rely on trust-building features—using one or multiple active trust-building tools, one or multiple indirect trust-building tools, or a combination of active and indirect trust-building tools—is case-specific. It depends on which information asymmetries the platform is trying to address, and which mechanisms can better solve them. Characteristics of the platform, such as its business model, cost structure, product make-up, and experience in the market can also inform this decision.

59.　　For example, a nascent start-up may find it challenging to establish an informative rating system due to the limited amount of feedback available. It may find that screening participants helps establish a trustworthy reputation, despite being more costly. A larger and well-established platform may face different considerations. Platforms enabling transactions for products costly or challenging to evaluate by consumers or products with objective characteristics—such as whether a painting is an authentic Picasso or whether a restaurant complies with health and sanitation codes—may rely more on active trust-building features. Platforms enabling recurring transactions or transactions for products with more subjective qualities—such as whether the food of a restaurant is good and whether the service is attentive—may be better served by rating systems.

60.　　In some cases, platforms may rely on both active and indirect trust-building tools. For instance, to limit the effect of reviews by non-customers, Amazon tags a product review as a "Verified Purchase" when it can verify that the reviewer purchased the product on

---

[108]　Tadelis, Steven, "Reputation and Feedback Systems in Online Platform Markets," *Annual Review of Economics*, Vol. 8, 2016, pp. 321–340, p. 329 ("[S]ellers' negative feedback scores were primarily retaliatory, which in turn made it painful for buyers to leave negative feedback … This fear of retaliation was most likely a central reason almost all buyers left positive feedback on eBay[.]").

[109]　Steven Tadelis, "Reputation and Feedback Systems in Online Platform Markets," *Annual Review of Economics*, Vol. 8, 2016, pp. 321–340, p. 329 ("This fear of retaliation was most likely a central reason almost all buyers left positive feedback on eBay, which in turn caused eBay to switch from the two-sided reputation system to a one-sided reputation system."); p. 333 ("As described earlier, retaliation on eBay may cause this user-generated feedback to be biased, as buyers will refrain from leaving negative feedback. A growing literature has shown that user-generated feedback mechanisms are often biased and can be prone to influence by sellers.").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Amazon.com.[110] In doing so, Amazon combines the indirect mechanism of reviews with the active mechanism of verifying who provided those reviews. In some cases, one type of tool may be sufficient. For instance, Christie's and Sotheby's authenticate items and provide warranties, without relying on ratings and reviews.[111]

61.     In addition, because the way trust-building mechanisms work can be sensitive to their design and implementation, platforms may use the same trust-building tools with different effectiveness and results.

### 4.     The Kammel Report ignores the limitations of ratings and reviews

62.     The Kammel Report states, "StockX completely shields the identity of the sellers from consumers so consumers know only that they are buying from StockX; the sellers are anonymous to the consumer, there is no seller rating system, no space for feedback from buyers."[112] However, the Kammel Report provides no evidence that the types of indirect trust-building measures that it seems to propose would provide incremental value to StockX's existing active trust-building features.

63.     As explained in Section III.A.2.b, ratings and reviews can be uninformative when they provide a noisy or inaccurate evaluation of the transaction. As the Kammel Report acknowledges, "most consumers cannot tell whether a product is counterfeit or not, unless the quality difference is obvious or if there are some differences from the authentic product that they can tell upon their inspection."[113] However, the Kammel Report provides no explanations of how

---

[110]   Amazon, "Amazon Verified Purchase Reviews," https://www.amazon.com/gp/help/customer/display html?nodeId G75XTB7MBMBTXP6W. "Verified Purchase" reviews have been demonstrated to have higher ratings than non-verified reviews. See Eric T. Anderson and Duncan I. Simester, "Reviews Without a Purchase: Low Ratings, Loyal Customers, and Deception," *Journal of Marketing Research*, Vol. 51, No. 3, 2014, pp. 249–269, pp. 250–251 ("We are also able to replicate the low rating effect using a sample of reviews from Amazon.com. … The reviews without the Amazon Verified Purchase tag exhibit the same low rating effect as the reviews from the apparel retailer that we study.").

[111]   Christie's, "Terms & Conditions," https://onlineonly.christies.com/terms-and-conditions/120; Sotheby's, "Buy Now Marketplace Conditions of Business for Buyers," https://www.sothebys.com/en/marketplacebuyerterms.

[112]   Kammel Report, p. 26.

[113]   Kammel Report, p. 12 ("Furthermore, upon receipt of the products, most consumers cannot tell whether a product is counterfeit or not, unless the quality difference is obvious or if there are some differences from the authentic product that they can tell upon their inspection.").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

buyers providing ratings would be able to provide a more accurate assessment of the authenticity of their purchase than a trained professional who verifies the item on behalf of StockX. The Kammel Report also does not evaluate what incremental value to the verification process the ratings system would provide.

**B.    The Kammel Report ignores the value created by StockX's coring features**

64.    While the Kammel Report criticizes multiple features of StockX, such as the anonymity of sellers and buyers to each other, the absence of ratings and reviews, and the use of standardized stock images, it ignores StockX's use of active trust-building measures, which are similar to those used by many successful resale marketplaces.

*1.    The Kammel Report ignores the active trust-building measures in which StockX has invested*

65.    The Kammel Report criticizes online resale marketplaces on the grounds that they "usually prioritize the speed of getting product to customers, satisfaction of sellers, and profit for the platform, instead of safety and protection of customers and their purchases."[114] The Kammel Report offers no analysis or data to support its characterization of what is "usual" among resale marketplaces. While this criticism may apply to some online resale marketplaces, online resale platforms vary in how they operate, and some of StockX's most distinctive platform policies were designed to protect consumers. The Kammel Report ignores that StockX relies on multiple active trust-building measures.

66.    For instance, unlike many other resale marketplaces, StockX manually inspects every product sold on its platform through its verification process, mentioned in Section II.A.2.b and described in Section V.B.2.c of my Opening Report.[115] This verification process is costly and increases the time it takes for buyers to receive their purchases, because each product needs

---

[114]    Kammel Report, p. 8.

[115]    StockX, "The Current Culture Marketplace," https://stockx.com/about/how-it-works ("Every item sold goes through our proprietary multi-step verification process with our team of expert authenticators.").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

to be sent to a StockX Authentication Center, be verified, and shipped again.[116] The verification process has allowed StockX to remove hundreds of thousands of defective or potentially counterfeit products from the marketplace, without a buyer having to receive and report them after the fact.[117]

67.    StockX also screens sellers. The Kammel Report ignores that while buyers and sellers are anonymous to each other, they are not anonymous to StockX. StockX investigates and takes actions against sellers who violate the platform's rules. For instance, StockX suspends sellers if they provide an item deemed inauthentic.[118] ███████████████████████████████
████████████████████████████████████████████████████████ [119] Potential bad actors are warned of these procedures in StockX's terms and conditions.[120]

68.    Another active trust-building measure used by StockX is its "Buyer Promise," a customer guarantee. Through this policy, buyers can return an item and request additional

---

[116] StockX, "What Does the Verification Process Entail for Buyers?," May 13, 2022, https://stockx.com/help/articles/What-does-the-verification-process-entail-for-Buyers ("Once an item has arrived at a StockX Authentication Center, StockX agents will evaluate it to see if it meets our internal quality standards before we send it to you.").

[117] StockX, "Every Item is StockX Verified," https://stockx.com/about/verification ("Our efforts have led to rejecting over 1.4 million items valued over $400 million."). See also Huber 30(b)(6) Deposition, 134:13–135:7 ("Q: What's your factual basis to testify under oath that you've made it more difficult for bad actors to exist when you've offered bad actors a platform with which to sell counterfeit products? A: Well, I think that the way you said that was, if not completely opposite of the truth, pretty close. Q: How so? Let me ask you this, Mr. Huber: Your – your authenticators claim to stop thousands of fake products from getting to consumers a month; correct? A: That is correct. Q: And does that also mean that – A: Well, I'm sorry. Let me – let me pause. Q: Okay. A: Our authenticators stop thousands of products that do not meet our verification standard from reaching end buyers." Objection omitted).

[118] Deposition of Russell Amidon, *Nike, Inc. v. StockX LLC*, No. 1:22-cv-000983-VEC, November 30, 2022 ("Amidon Deposition"), 44:17–45:5 ("Q: Is that including instances where a product fails verification due to the fact that it's not genuine? A: From my understanding, we actually do suspend when we believe an item is inauthentic or not genuine, so in this, for that reason code, I do not believe we do not penalize and educate any more. Q: What do you mean by 'any more'? A: I don't want to speculate on why this was – why Rami sent that in that chat during that time window, but from my understanding, we do ban sellers at any level if they do send in an item we believe is not genuine or inauthentic." Objection omitted.).

[119] Amidon Deposition, 49:23–50:6 ███████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
█████████████████████

[120] StockX, "StockX Terms and Conditions of Use," March 23, 2022, https://stockx.com/terms ("If a seller provides a counterfeit item or attempts to defraud any buyer or StockX, StockX reserves the right to do any or all of the following, in its sole discretion: (i) remove any or all of seller's listings from the Services; … (viii) temporarily or permanently suspend seller's account.").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

evaluation if they suspect receiving a counterfeit item.[121] If StockX finds that an item is inauthentic, it refunds the buyer or matches the buyer with an alternative seller,[122] in addition to suspending the seller of the suspected counterfeit item.[123] Through this feature, StockX promises to resolve issues, should they occur.

### 2. *Successful resale marketplaces are using similar measures to StockX*

69.    The benefits of active coring tools similar to the ones that StockX uses have been recognized and used by many other marketplaces for high-value items and collectibles. For instance, as explained in my Opening Report and in Section II.A.2.b of this report, eBay has evolved from indirect trust-building through its initial ratings and review system to more active trust-building measures. In 2017, eBay started to provide authentication services for luxury items, citing the desire "to boost customer confidence in selling and shopping for an amazing selection of designer merchandise."[124] In addition, nearly all purchases on eBay, including but not limited to purchases of luxury items, are protected by eBay's "Money Back Guarantee"

---

[121]    StockX, "What is the StockX Buyer Promise?," April 17, 2023, https://stockx.com/help/articles/What-is-the-StockX-Buyer-Promise; See also Amidon Deposition, 83:11–24 ("Q: Further down, in the recap of the meeting, it says, 'We aligned on contacting the buyer to inquire – to inquiry about the following,' with your name. Do you see that? A: Yes. Q: Do you know what that means? A: I do. Q: What does that mean? A: I contacted over the phone and spoke to Roy Kim. And because my role is working with customers, I tried to help resolve his inquiry, so we requested, or I requested that the sneakers be returned for additional evaluation and he agreed to return them and I believe he did return all 36.").

[122]    StockX, "StockX Terms and Conditions of Use," March 23, 2022, https://stockx.com/terms ("If a buyer receives an item that it believes to be counterfeit, the buyer must notify StockX in writing within 3 days after receiving the item, and we will commence an investigation into the item. … We will refund all fees and costs paid by the buyer for the item (including shipping and handling)."); Amidon Deposition, 63:4–14 ("Q: And when you say, 'end up honoring a sale when they sell it again,' what does that mean? A: From my understanding, what happens is when an item fails for authentication with a defect, that buyer will not receive the item, so either we match them with a new seller, or we refund that buyer their – their payment. Honoring a sale would mean we're going to honor their sale and not send that to the buyer. So, in that situation, a buyer was refunded or got their apparel from another seller or – and the seller was paid out.").

[123]    Amidon Deposition, 41:18–42:7 ("Q: Okay. But other reasons that a shoe might fail verification is because it's determined to be fake, right? A: One reason code for why an item may not pass verification is if our Authentication team believes the item is not genuine, correct. ████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████").

[124]    PRNewswire, "Launch of eBay Authenticate Boosts Shopper Confidence for Luxury Handbag Purchases," October 16, 2017, https://www.prnewswire.com/news-releases/launch-of-ebay-authenticate-boosts-shopper-confidence-for-luxury-handbag-purchases-300536921.html.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

policy.[125] Under this policy, buyers who receive a product inferior to what was advertised are entitled to a refund upon return of the product, regardless of whether the seller offers returns.[126]

70.    GOAT, an online platform specializing in the resale of sneakers, streetwear, and luxury apparel, operates a similar system to StockX of verifying the products traded on its platform and issuing an "Assurance of Authenticity" to buyers.[127] Other StockX competitors such as Flight Club and Stadium Goods follow a consignment model where product authentication happens before products are listed for sale.[128] Chrono24, a digital marketplace for both new and used watches, provides a binding Authenticity Guarantee and evaluates listings prior to their publication on the platform.[129]

71.    The extensive use of active trust-building measures by other resale marketplaces shows that these tools have been found to be effective and to benefit users.

---

[125]    eBay, "eBay Money Back Guarantee Policy," https://www.ebay.com/help/policies/ebay-money-back-guarantee-policy/ebay-money-back-guarantee-policy?id 4210 ("eBay Money Back Guarantee means buyers can get their money back if an item didn't arrive, is faulty or damaged, or doesn't match the listing.").

[126]    eBay, "eBay Money Back Guarantee Policy," https://www.ebay.com/help/policies/ebay-money-back-guarantee-policy/ebay-money-back-guarantee-policy?id 4210 ("eBay Money Back Guarantee means buyers can get their money back if an item didn't arrive, is faulty or damaged, or doesn't match the listing. For all the details of how eBay Money Back Guarantee works – what's covered, what's excluded, and what buyers and sellers need to do – please read our full policy.").

[127]    GOAT, "What is the Assurance of Authenticity?," 2023, https://support.goat.com/hc/en-us/articles/115004608127-What-is-the-Assurance-of-Authenticity- ("Additionally, our resale products and our trusted partners are verified or vetted by a variety of means, such as digital authentication, in-hand verification, and/or machine learning technology."); ZDNet, "GOAT Uses Machine Learning, Computer Vision to Verify Your Top Dollar Sneakers Are Authentic," August 19, 2018, https://www.zdnet.com/article/goat-uses-machine-learning-computer-vision-to-verify-your-top-dollar-sneakers-are-authentic ("[W]hen that shoe is purchased, the seller ships it to us to verify. And we verify that product the same day using our sophisticated machine learning and computer vision, and our industry knowledge. And release the funds to the seller. And then we ship that product to the buyer to purchase.").

[128]    Niche Pursuits, "Is Flight Club Legit? Get All the Info to Help You Decide," November 2, 2022, https://www.nichepursuits.com/is-flight-club-legit ("Flight Club sells new products sourced through retail channels and second-market goods using the consignment model. Sellers send in their shoes, and Flight Club verifies the sneakers before marketing them online or in one of three stores."); Stadium Goods, "Is Stadium Goods Legit?," December 20, 2022, https://www.stadiumgoods.com/en-us/article/is-stadium-goods-legit ("Stadium Goods is the only aftermarket that pre-authenticates its entire inventory.").

[129]    Chrono24, "Chrono24 - Guarantee of Authenticity," https://www.chrono24.com/info/guarantee-of-authenticity.htm ("The following Guarantee of Authenticity only applies to watches purchased from professional dealers on this platform. Private sellers are not subject to the Guarantee of Authenticity."); Chrono24, "Discover the Safest Path to Your Dream Watch," https://www.chrono24.com/about-us htm ("Each private seller listing must pass an inspection before we publish it on our platform. As part of the inspection, the seller must provide proof of ownership in the form of two photographs of the watch set to specific times."); ("Our 40-person quality & security team works hard to detect suspicious listings and address issues before they arise, allowing you to focus on what's most important – finding the right watch!").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

### C.    The Kammel Report ignores the benefits of standardization

72.    The Kammel Report also criticizes the use of stock images instead of photographs of the specific items sold that are provided by each seller.[130] However, images provided by sellers can be prone to manipulation, which the Kammel Report also acknowledges.[131] Buyers on resale marketplaces like eBay often turn to online forums to discuss whether seller photos can be trusted and to report instances of sellers using inaccurate photos.[132] In addition to repurposing stock images from a brand, sellers may deceive potential customers by doctoring photographs. Generative artificial intelligence also poses a risk to resale marketplaces where sellers have greater control over listings, as it can be used to generate realistic images.[133]

73.    As explained in my Opening Report, lowering frictions—including search costs—contributes to a positive user experience and attracts both buyers and sellers to the platform. By consolidating all product information, including a standardized photograph, and all trading options for a given product on a single product page, StockX's vision was to make it easier to find and compare all listings of the product consumers are trying to buy. For platforms that sell standardized products, such as a limited number of branded items, a single product page reduces search costs for buyers trying to find the best offer relative to resale marketplaces with seller-

---

[130]    Kammel Report, pp. 26–27 ("StockX even uses its own professional, high-resolution stock images of Nike products regardless of the identity of the seller or what the seller's products look like, creating the impression to the consumer that it is buying the genuine product seen in the stock image.").

[131]    Kammel Report, pp. 9–10 ("Many e-commerce platforms do not require sellers to provide contact details or go through any pre-screening. Because of this, many of these sellers disguise or fabricate their identity or store identity, use photographs that are copyrighted images taken from the brand, and also create fake reviews of the product.").

[132]    See, for example, NikeTalk, "Real/Fake Air Jordan 1 Retro High OG Obsidian," November 12, 2021, https://niketalk.com/threads/real-fake-air-jordan-1-retro-high-og-obsidian.693845 ("I ended up winning an auction on these, but I'm dating [sic] if their [sic] real or fake ones due to the seller providing sketchy photos of the shoes w/o tags or certain angles of the box. Could anyone help me out so I don't waste $300 of my money on a fake?"); Reddit, "Buyer Beware With eBay Authenticity Guarantee," 2022, https://www.reddit.com/r/Sneakers/comments/uigurk/buyer_beware_with_ebay_authenticity_guarantee ("[T]he seller used photos of a deadstock pair. It's not even the same pair listed/photoed [sic]. Bait and switch.").

[133]    KPMG, *Generative AI Models – The Risks and Potential Rewards in Business*, April 2023, https://assets.kpmg.com/content/dam/kpmg/xx/pdf/2023/04/generative-ai-models-the-risks-and-potential-rewards-in-business.pdf ("Generative AI can — and has — been used to create deepfake images and videos (when visual content is altered to make it seem that someone said or did something they didn't do or say). These images and videos often look extremely realistic and lack forensic traces left behind in edited digital media, making them difficult for humans or even machines to detect.").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

specific listings for the same product. StockX highlights the convenience of a single product page in its promotional marketing.[134]

74.    The standardization of product listings makes it easier for sellers—including small sellers—to sell their sneakers because they do not need to spend time taking photos and creating customized listings, as illustrated by DeJongh "Dee" Wells' "straightforward and convenient" experience selling two pairs of shoes on the platform.[135] Sellers are typically the harder group to attract on resale marketplaces.[136] Making it easy for sellers to set up a listing is one way in which StockX can attract more sellers to the platform, which benefits both sellers and buyers and helps solve the "chicken and egg" problem that platforms face.

75.    In addition, StockX's standardized product pages also provide detailed historical price information for each product, which helps buyers not overpay and sellers not undersell—a point highlighted by StockX in its promotional marketing.[137]

## IV.    THE PRICING ANALYSIS IN THE MCNEW REPORT IS UNINFORMATIVE AND OVERSTATES THE DIFFERENCE BETWEEN THE PRICES OF VAULT NFTS AND CORRESPONDING PHYSICAL SHOES

76.    This section explains why the McNew Report's methodology for comparing the highest prices of NFTs and physical goods is uninformative and does not support the opinions McNew reaches. In addition to ignoring most of the data and the importance of recognizing price

---

[134]    StockX, "Buying," https://stockx.com/about/buying ([audio] at 0:10 – 0:21 "Andre goes to StockX.com where he finds the one page for the Adidas Yeezy 350 Zebra he's looking for. Not browsing through thousands of listings like you know who. Because everything happens on this one page.").

[135]    Wells Report, p. 49.

[136]    Platform Chronicles, "The Chicken-and-Egg Problem of Marketplaces," October 19, 2021, https://platformchronicles.substack.com/p/the-chicken-and-egg-problem-of-marketplaces ("For a marketplace, we've talked about how to attract one side without the other. But how to decide which side to focus on first? The usual advice is, all else equal, to focus on building the supply side first. In most cases, suppliers are fewer in number than buyers, and they are more willing to try things out in the hope of obtaining new customers."); Stripe, "Andrew Chen on Marketplaces," https://stripe.com/guides/atlas/andrew-chen-marketplaces ("I think almost all the best marketplace companies end up being supply constrained as opposed to demand constrained."); ("So with consumer-oriented startups, start with supply, and then demand. Then double down to focus on supply, supply, supply.").

[137]    StockX, "Buying," https://stockx.com/about/buying ([audio] at 0:19 – 0:29 "Because everything happens on this one page, Andre can quickly see the price history on every pair that's ever been sold in every size and in one convenient place.").

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

dynamics over time, the McNew report also ignores the value created by the reduction in transaction costs offered by the Vault NFT and relies on an incorrect benchmark.[138]

### A.    The pricing analysis relies on an incorrect benchmark

77.     Rather than evaluating the value of the "claim to the physical product" and comparing it to the price of the Vault NFTs, the McNew Report compares the price of the Vault NFTs to the price of the associated physical shoes—an unsupported and incorrect benchmark to reach conclusions about consumer perception of the Vault NFT offering.

78.     The McNew Report does not explain or justify why it equates the value of the Vault NFT representing a claim to the physical product to be the same as the price of the physical shoe. Using this benchmark, the McNew Report does not consider the value of the inherent benefits provided by Vault NFTs as claim tickets tradeable on StockX's platform and assumes that any deviation from the price of physical shoes is evidence that "StockX customers and StockX employees clearly perceived the Vault NFT as independent and distinct from the underlying physical item."[139]

79.     As explained in Section VI.B of my Opening Report, aside from the value of the underlying physical sneakers, Vault NFTs provide value to consumers by reducing various types of frictions associated with the trade of physical products. Vault NFTs allow customers to buy and resell products almost immediately, bypassing physical trade and its associated costs, both in terms of money and time. In addition, Vault NFTs reduce both information costs—bypassing the need for re-verification—and costs related to storage logistics and safety. For example, compared to its physical equivalent, trading a Vault NFT on StockX entails much lower fees, and it can be traded faster, as delays related to shipping and verification are eliminated. In addition, StockX's storage services provide the potential for a cheaper and more convenient option for owners to manage and safely store their collections. As a result, sneaker traders can perceive additional value in a Vault NFT that is distinct from, but complementary to the physical shoe. Differences in prices between Vault NFT and the physical shoes may reflect these efficiencies and services, a

---

[138]  McNew Report, p. 49.

[139]  McNew Report, p. 51.

point ignored by the McNew Report, which assumes that all perceived difference in prices should be attributed to the NFT itself.

### B. The methodology used in the McNew Report is unreliable and biased in a way that overstates the difference between Vault NFT and physical shoe prices

#### 1. The methodology used in the McNew Report lacks support and is not robust

80.     To measure the price difference between Vault NFTs and physical shoes, the McNew Report compares the highest transaction price observed for each Vault NFT between January 18, 2022, and February 2, 2022, to the highest transaction price for the corresponding physical sneakers in the same period. The McNew Report does not justify its choice of limiting its analysis to the highest prices, and why doing so would be appropriate to evaluate the price of Vault NFTs and Nike sneakers. Further, its methodology is not robust and results can be driven by outliers or chance.

81.     By relying on the highest price reached by the Vault NFTs, the analysis does not capture the price that customers on StockX were willing to pay for the Vault NFTs in general. It captures the price that one individual, the highest paying, was prepared to pay. By doing so, the analysis ignores all other prices fetched by Vault NFTs. For instance, there were 117 transactions of the KAWS sacai Nike Blazer Low Blue Vault NFT between January 18 and February 2, 2022 at prevailing market prices, that is, after StockX released Vault NFTs at their introductory prices.[140] Rather than considering the prices at which the Vault NFTs were transacted in all of those 117 instances, the analysis only relies on the price of a single transaction, ignoring the information provided by 116 additional transactions.

82.     Comparing the maximum of two different data samples is not a robust methodology to compare the data samples in general and it can lead to results that are misleading and caused by chance. Consider a hypothetical example of two persons playing darts, throwing three darts in five rounds. Knowing that the first player hit the bullseye once but the second did not is not enough to conclude that the first player is more talented than the second one. For

---

[140]   See Exhibit 5; For a discussion of StockX's initial release prices, see Tucker Opening Report, ¶¶ 76, 78.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

instance, hitting the bullseye once may have been due to sheer luck and that that player may have missed the board all other 14 times. For this reason, economists typically consider the average of a sample when trying to capture the central tendency or expected value of a distribution. If a data sample contains outliers, economists would also often consider removing them as they can skew the average and distort analyses.

> 2. *The methodology used in the McNew Report is not appropriate for comparing the prices of products exhibiting different time trends, overestimating the difference between Vault NFT and physical shoe prices*

83.     The methodology used in the McNew Report is not appropriate for comparing the prices of products exhibiting different time trends.

84.     As explained in my Opening Report, the initial price spike that followed the introduction of the Vault NFTs gave way to a drop in prices.[141] That drop occurred after the first day of release and was marked during the days following the initial release. This price dynamic was common to all Vault NFTs considered in the McNew Report's analysis that were released in more than three units.[142] The McNew Report ignores the marked decline in Vault NFT prices during the time period it analyzes. Because its methodology only considers the highest price, the McNew Report overstates and misrepresents the typical difference between Vault NFT and physical sneaker prices during that period, meaning that the comparisons it relies on are based on cherry-picked datapoints.

85.     Exhibit 1 shows that the drop of Vault NFT prices began shortly after the initial release day, both when evaluated at the maximum and at the average. For instance, the highest price of KAWS sacai Nike Blazer Low Blue Vault NFTs dropped from $3,995 to $699 between January 18 and February 2, while the average price dropped from $1,145 to $683. Similarly, the highest price of the Nike Dunk Low Retro White Black Vault NFT dropped from $3,500 to $670, while the average price dropped from $1,513 to $645. During the same time period, the prices of the physical shoes for both models were much more stable.

---

[141]   Tucker Opening Report, ¶ 80.

[142]   Tucker Opening Report, Exhibit 3.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

**Exhibit 1: The Daily Maximum and Average Price of Selected Sneaker Models and Associated Vault NFTs on January 18 and February 2, 2022[143]**

| | Vault NFT | | Physical Sneaker | |
|---|---|---|---|---|
| | January 18, 2022 | February 2, 2022 | January 18, 2022 | February 2, 2022 |
| **Product Name** | *Maximum* | | | |
| Air Jordan 4 Retro White Oreo | $2,600 | $855 | $602 | $639 |
| Nike Dunk Low Retro White Black | $3,500 | $670 | $818 | $336 |
| KAWS sacai Nike Blazer Low Blue | $3,995 | $699 | $194 | $188 |
| | *Average* | | | |
| Air Jordan 4 Retro White Oreo | $1,433 | $839 | $462 | $481 |
| Nike Dunk Low Retro White Black | $1,513 | $645 | $282 | $267 |
| KAWS sacai Nike Blazer Low Blue | $1,145 | $683 | $165 | $164 |

Notes:
[1] The Vault NFT transactions sample includes peer-to-peer transactions and releases by StockX that were sold at the prevailing market price rather than the initial release price.
[2] The Gross Monetary Value of each transaction is used to measure its price.
[3] January 18, 2022 is the release date for all three models. February 2, 2022 is the day prior to Nike filing its complaint. For Nike Dunk Low Retro White Black, we consider transactions made on February 1 instead of February 2 because there were no Vault NFT transactions on February 2.

86.    By relying on the maximum price of the Vault NFTs observed on the day of release, the McNew Report does not account for the subsequent decrease in prices, although both the maximum and the average prices dropped after that date. As an alternative to using the maximum price, comparing the average price over the time period would have captured some of the price drops for Vault NFTs. However, it would not be an adequate methodology when comparing prices affected by different trends over time, as it disregards the cause of the underlying trend.

> *3.    The methodology used in the McNew Report is not appropriate for comparing the prices of products with different price volatility, further overestimating the difference in Vault NFT and physical shoe prices*

87.    The methodology used in the McNew Report is not appropriate for comparing the prices of products with different price volatility. Because the price of Vault NFTs was more volatile than the price of physical shoes during the time period analyzed, especially close to their

---

[143]    StockX, "Vault NFT Data," STX0806025; StockX, "Physical Data," STX0806026. See StockX, "Vault Drop 1 Pricing," January 11, 2022, STX0121216 for initial prices.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

release, comparing the highest transaction prices will further overestimate the difference in Vault NFT and physical shoe prices.

88.     The price volatility of Vault NFTs was much larger than the price volatility of the corresponding physical sneakers in the first few days following the release of Vault NFTs. In particular, the highest Vault NFT prices were much higher than the average Vault NFT prices. This volatility, which as I explain in my Opening Report, is to be expected at the launch of a new offering based on a nascent technology that has not yet been tested.[144] Due to the high volatility of Vault NFT prices, by selecting the highest price as a point of comparison, the McNew Report's analysis further exaggerates typical price differences between Vault NFTs and their physical equivalents.

89.     Exhibit 2 shows the daily maximum, average, and minimum price for the KAWS sacai Nike Blazer Low Blue Vault NFT and the corresponding physical sneakers on StockX during the time period analyzed in the McNew Report. The analysis presented in the McNew Report considers the highest Vault NFT transaction price across the time period, which occurred on January 18. The highest Vault NFT transaction price for this model was $3,995, 3.5 times more than the corresponding average price on that day, $1,145.[145] This discrepancy reveals that most Vault NFT transactions for this model were made much below its highest price on its first day. As a result, comparing maximum prices instead of averages overstates the typical price premium of Vault NFTs over physical sneakers. While the highest price of the Vault NFT of that model is more than 20 times the highest price of the physical shoe on that day, which was $194, the average price of the Vault NFT, $1,145, is only 6.9 times the average price of the physical shoe, which was $165.[146] This pattern is not unique to the KAWS sacai Nike Blazer Low Blue and can be observed for other sneaker models, such as the Nike Dunk Low Retro White Black and the Air Jordan 4 Retro White Oreo, as shown in Exhibit 3 and Exhibit 4.

---

[144]   Tucker Opening Report, ¶ 82.

[145]   3.5  $3,995/$1,145.

[146]   20.6  $3,995/$194 and 6.9  $1,145/$165.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

**Exhibit 2: Daily Average, Maximum, and Minimum Transaction Price KAWS sacai Nike Blazer Low Blue Sneakers[147]**



**Daily Transaction Counts**

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Vault NFT | 34 | 55 | 7 | 2 | 2 | 0 | 1 | 3 | 3 | 3 | 3 | 0 | 0 | 0 | 2 | 2 |
| Physical | 25 | 21 | 12 | 17 | 14 | 16 | 23 | 20 | 10 | 19 | 11 | 15 | 22 | 13 | 14 | 25 |

**Notes:**

[1] The Vault NFT transactions sample includes peer-to-peer transactions and releases by StockX that were sold at the prevailing market price rather than the initial release price.

[2] This chart shows the daily average, maximum and minimum price of physical sneaker and Vault NFT transactions, using the variable for Gross Monetary Value. "Physical Sneakers (on StockX)" refers to the average price of the associated physical sneaker on StockX.

---

[147] StockX, "Vault NFT Data," STX0806025; StockX, "Physical Data," STX0806026. See StockX, "Vault Drop 1 Pricing," January 11, 2022, STX0121216 for initial prices.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

**Exhibit 3: Daily Average, Maximum, and Minimum Transaction Price**
**Nike Dunk Low Retro White Black Sneakers[148]**



**Daily Transaction Counts**

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Vault NFT | 37 | 57 | 11 | 2 | 4 | 1 | 1 | 1 | 6 | 3 | 2 | 1 | 1 | 2 | 2 | 0 |
| Physical | 240 | 211 | 213 | 239 | 196 | 244 | 279 | 252 | 336 | 313 | 360 | 374 | 304 | 277 | 288 | 626 |

**Notes:**
[1] The Vault NFT transactions sample includes peer-to-peer transactions and releases by StockX that were sold at the prevailing market price rather than the initial release price.
[2] This chart shows the daily average, maximum and minimum price of physical sneaker and Vault NFT transactions, using the variable for Gross Monetary Value. "Physical Sneakers (on StockX)" refers to the average price of the associated physical sneaker on StockX.

---

[148]  StockX, "Vault NFT Data," STX0806025; StockX, "Physical Data," STX0806026. See StockX, "Vault Drop 1 Pricing," January 11, 2022, STX0121216 for initial prices.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

**Exhibit 4: Daily Average, Maximum, and Minimum Transaction Price**
**Air Jordan 4 Retro White Oreo Sneakers[149]**



**Daily Transaction Counts**

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Vault NFT | 34 | 62 | 4 | 7 | 5 | 2 | 3 | 1 | 5 | 3 | 3 | 1 | 1 | 2 | 1 | 2 |
| Physical | 37 | 32 | 29 | 44 | 35 | 45 | 24 | 36 | 54 | 37 | 36 | 39 | 30 | 29 | 23 | 26 |

**Notes:**
[1] The Vault NFT transactions sample includes peer-to-peer transactions and releases by StockX that were sold at the prevailing market price rather than the initial release price.
[2] This chart shows the daily average, maximum and minimum price of physical sneaker and Vault NFT transactions, using the variable for Gross Monetary Value. "Physical Sneakers (on StockX)" refers to the average price of the associated physical sneaker on StockX.

90.     Exhibit 5 replicates the McNew analysis to calculate the difference between the Vault NFT price and the physical shoe price using StockX's internal transaction data.[150] In addition to using only the highest prices, I calculate the differences in minimum prices, and differences in average prices calculated over different time spans. I find that the difference in

---

[149]  StockX, "Vault NFT Data," STX0806025; StockX, "Physical Data," STX0806026. See StockX, "Vault Drop 1 Pricing," January 11, 2022, STX0121216 for initial prices.

[150]  McNew Report, p. 50. It appears that the McNew Report used price data from the StockX website for physical sales, while I rely on internal StockX data. The analyses are robust regardless of which dataset is used.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

maximum prices is larger, often by an order of magnitude, than differences in minimum or average prices for all eight Vault NFTs considered. For instance, looking at the KAWS sacai Nike Blazer Low Blue, the difference between the maximum Vault NFT prices and physical shoes on StockX was about $3,750. However, that is nearly six times greater than the difference between the average prices during the whole period, which was about $650.[151] Excluding the first day of trading—the day with the most outliers, the difference in average prices is lower, at $508. The difference between the minimum price is the smallest, at $96.

91.     Similarly, looking at the Nike Dunk Low Retro White Black, the difference between the maximum Vault NFT prices and physical shoes on StockX was $2,600. However, that is more than three times greater than the difference between the average prices during the whole period, which was about $800.[152] Excluding the first day of trading, the difference in average prices is lower, at around $600. The difference between the minimum price is the smallest, at $100. These results highlight that the methodology of the McNew Report is biased and exaggerates the price premium of Vault NFTs.

**Exhibit 5: The Difference Between Vault NFT and Physical Shoe Prices Using Maximum, Minimum, and Averages[153]**

| | | Difference Between Vault NFT Prices and Physical Shoe Prices Based On | | | | |
|---|---|---|---|---|---|---|
| Product Name | Count of Vault NFT Transactions | Maximum | Minimum | Average on Day 1 | Average Excluding Day 1 | Average Overall |
| Jordan 1 Retro High OG Patent Bred | 226 | $460 | $211 | $462 | $281 | $375 |
| Air Jordan 4 Retro White Oreo | 136 | $1,924 | $180 | $971 | $440 | $573 |
| Nike Dunk Low Retro White Black | 131 | $2,600 | $100 | $1,231 | $588 | $773 |
| KAWS sacai Nike Blazer Low Blue | 117 | $3,765 | $96 | $980 | $508 | $646 |
| Women's Nike Air VaporMax 2019 Cactus Plant Flea Marke | 3 | $1,001 | $1,347 | $1,150 | $1,265 | $1,231 |
| Nike SB Dunk Low Ben & Jerry's Chunky Dunky | 3 | $2,821 | $2,050 | - | $2,412 | $2,423 |
| Women's Exclusive Air Jordan 3 Retro A Ma Maniere | 2 | $3,917 | $429 | $2,179 | - | $2,186 |
| Nike Dunk Low Off-White Lot 50 | 2 | $5,880 | $4,366 | $3,897 | $6,455 | $5,203 |

**Notes:**
[1] The Vault NFT transactions sample includes peer-to-peer transactions and releases by StockX that were sold at the prevailing market price rather than the initial release price.
[2] The Gross Monetary Value of each transaction is used to measure its price.
[3] Day 1 is the release date, which is January 18, 2022 for each shoe model except the Jordan 1s, for which the release date is January 26, 2022. Maximum, Minimum, and Average (Overall) are calculated using the period between the release date and February 2, 2022, the day prior to Nike filing its complaint.

---

[151]  5.8  $3,765/$646.

[152]  3.4  $2,600/$773.

[153]  StockX, "Vault NFT Data," STX0806025; StockX, "Physical Data," STX0806026. See StockX, "Vault Drop 1 Pricing," January 11, 2022, STX0121216 for initial prices.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

92.     As explained in my Opening Report, StockX released the Vault NFT linked to the Jordan 1 Retro High OG Patent Bred on January 26, 2022, eight days after the first Vault NFTs. For this Vault NFT, initial prices were not as variable as for other Vault NFTs linked to Nike sneakers and were not as high compared to the physical shoes, which would be consistent with consumers having learnt more about Vault NFTs. This Vault NFT is also the one with the smallest difference between Vault NFT and physical shoe prices, and for which the choice of methodology makes the least difference.

4.     *The methodology used in the McNew Report gives equal importance to Vault NFTs traded few times compared to those traded over a hundred times*

93.     The analysis in the McNew Report considers eight Vault NFTs. Four of those had three or fewer transactions at prevailing market prices between January 18 and February 2, while the others were traded more than 100 times.[154] The former include the Nike Dunk Low Off-White Lot 50 and the Women's Exclusive Air Jordan 3 Retro A Ma Maniere, two Vault NFTs which, according to the analysis in the McNew Report, displayed the highest discrepancy between the Vault NFT price and the price of the physical shoe.

94.     The reason those four Vault NFTs had so few transactions is that they were released in limited numbers. A single Vault NFT was released for each of the Nike Dunk Low Off-White Lot 50 and the Women's Exclusive Air Jordan 3 Retro A Ma Maniere, and three Vault NFTs were released for the other two.[155]

95.     The analysis in the McNew Report gives the same weight to the Vault NFTs that had three transactions or fewer as to those with 100 or more transactions. However, the prices of Vault NFTs released in limited examples and traded only a handful of times are more likely to be affected by idiosyncratic factors, making their comparison to physical shoes an unreliable metric to measure the additional value provided by Vault NFTs compared to physical shoes in general.

96.     As a result, the analyses presented in the McNew Report are misleading.

---

[154]   See Exhibit 5.

[155]   See Tucker Opening Report, Exhibit D1.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

**C.    By focusing on a short period after the release of the Vault NFTs, the McNew Report further overstates the difference between the price of Vault NFTs and physical shoes and improperly compares new products with established products**

   1.    *The McNew Report ignores that the prices of Vault NFTs converged to the prices of physical shoes after a short period, further overstating the difference in prices*

97.    The price analysis in the McNew Report only considers transactions made between January 18 and February 2, the period between the release of the first seven Nike Vault NFTs and the day prior to Nike filing its complaint. It ignores Vault NFT transactions that happened in subsequent weeks and months, disregarding the marked drop in Vault NFT transaction prices and convergence towards the price of physical shoes. By ignoring the decline in Vault NFT prices over time, the McNew Report overstates and misrepresents the typical difference between Vault NFT and physical sneaker prices.

98.    As explained in my Opening Report, the initial price spike that followed the introduction of the Vault NFTs gave way to a drop in prices within a matter of weeks, after which the prices stabilized and converged to a level close to the price of physical shoes. By May 2022, the price of the few Vault NFTs traded on a peer-to-peer basis was, on average, 7% higher than the physical shoes traded on StockX.[156] Such convergence does not appear consistent with the argument in the McNew Report that "StockX customers … clearly perceived the Vault NFT as independent and distinct from the underlying physical item."[157]

   2.    *The evolution of Vault NFT prices is similar to that of many other novel products subject to irrational exuberance by first-time users, making a comparison with established products inadequate*

99.    The McNew Report compares the prices of Vault NFTs, a novel product, right after their introduction to the public and for a short period of time thereafter, to the prices of Nike sneakers, which were established and well-known products. Such a comparison is inadequate to assess whether "additional value or perceived product or service were associated

---

[156]    Tucker Opening Report, ¶¶ 80–81.

[157]    McNew Report, p. 51.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

with the Vault NFT beyond the claim to the physical product,"[158] as other, unrelated factors may be at play and drive the price of a novel product beyond its fundamentals.

100.    As explained in Section VII.B of my Opening Report, high initial prices followed by a price decline for trades—otherwise known as bubbles—are not unusual in contexts where traders are uncertain about the true value of the underlying technology. The price dynamics observed for StockX's Vault NFTs are not unlike the ones seen for a range of offerings linked to other new technologies since the nineteenth century. The causes for these bubbles have been studied by economists in the past decades. In the case of Vault NFTs, the uncertainty regarding the valuation of the new offering, the underlying technology, and the expected adoption rate of the new vault service may have caused high initial demand. For many new products, including StockX's Vault NFTs, however, initial uncertainty and price volatility tend to correct once investors better understand the product and its value. Price analyses should account for such dynamics.

101.    As explained in Section VII.B of my Opening Report, understanding purchase intents in the earliest day of a novel product may be challenging and can be driven by multiple factors, that can be untethered from a product's underlying value. As a result, a comparison of the Vault NFT prices during a short period after their initial release, while uncertainty may have been high, to the price of established and well-understood products is not appropriate, as it may be limited by short-term factors specific to Vault NFTs and not the physical shoe prices. A more appropriate comparison would compare prices once short-term factors resolve and the prices converge.

---

[158]   McNew Report, p. 49.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

_____

Catherine Tucker, Ph.D.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

**APPENDIX A – PRIOR TESTIMONY**

1. In Re: College Athlete NIL Litigation, Case No. 4:20-cv-03919 CW, United States District Court for the Northern District of California. Deposition (2023)

2. In Re: Lyft Rideshare Cases, Case No. CJC-20-005061, Superior Court of the State of California County of San Francisco. Deposition (2023)

3. In Re: Google Play Store Antitrust Litigation, MDL No.: 3:21-md-2981, United States District Court for the Northern District of California. Deposition (2023)

4. United States of America et al. v. United Health Group Incorporated et al., Case No. 1:22-cv-00481, In the United States District Court for the District of Columbia Court. Deposition and Trial (2022).

5. United States of America, et al., v. Google LLC, Case No.: 1:20-cv-03010-APM, and State of Colorado, et al., v. Google LLC, Case No.: 1:20-cv-03715-APM, In the United States District Court for the District of Columbia. Deposition (2022).

6. Atlantic Recording Corporation, Laface Records LLC, Sony Music Entertainment, UMG Recordings, Inc., Warner Bros. Records Inc., Arista Music, Arista Records LLC, Bad Boy Records LLC, Capitol Records, LLC, Elektra Entertainment Group Inc., Roc-A-Fella Records, LLC, Sony Music Entertainment US Latin LLC, Zomba Recording LLC, v. Spinrilla, LLC and Jeffery Dylan Copeland, Civil Action No. 1:17-cv-00431, United States District Court for the Northern District of Georgia Atlanta Division. Deposition (2022).

7. Broadcast Music, Inc. v. North American Concert Promoters Association., 18 Civ. 8749, Related to United States v. Broadcast Music, Inc., 64 Civ. 3787, United States District Court Southern District of New York. Deposition and Trial (2022).

8. In Re: Marriott International Customer Data Breach Litigation, MDL No.: 19-md-2879, United States District Court for the District of Maryland. Deposition (2021) and Hearing (2022).

9. Cox Automotive, Inc.; Autotrader.com, Inc.; Dealer Dot Com, Inc.; Dealertrack, Inc.; Homenet, Inc.; Kelley Blue Book Co., Inc.; Vauto, Inc.; Vinsolutions, Inc.; and Xtime, Inc., v. The Reynolds and Reynolds Company, AAA Case No. 01-19-0000-4548, American Arbitration Association. Deposition (2021).

10. dotStrategy, Co., Individually and On Behalf of All Other Similarly Situated, v. Facebook, Inc., Case No. 20-cv-00170-WHA, United States District Court for the Northern District of California. Deposition (2021).

11. Deborah Louise Douez, v. Facebook, Inc., Case No. VLC-S-S-122316, Supreme Court of British Columbia, Vancouver Registry. Cross Examination (2021).

12. Sean Rad, Plaintiff/Counterclaim-Defendant, Paul Cafardo, Gareth Johnson, Alexa Mateen,

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Justin Mateen, and Ryan Ogle, Plaintiffs, v. IAC/InteractiveCorp, Match Group, Inc., and Match Group, LLC, Defendants/Counterclaim-Plaintiffs. Index No. 654038/2018, Supreme Court of the State of New York, County of New York. Deposition and Trial (2021).

13. TravelPass Group, LLC, Partner Fusion, Inc., Reservation Counter, LLC, v. Caesars Entertainment Corporation, Choice Hotels International, Inc., Hilton Domestic Operating Company Inc., Hyatt Hotels Corporation, Marriott International, Inc., Red Roof Inns, Inc., Six Continents Hotels, Inc., Wyndham Hotel Group, LLC., Case No. 5:18-cv-152-RWS-CMC, United States District Court, Eastern District of Texas, Texarkana Division. Deposition and Trial (2021).

14. DZ Reserve, and Cain Maxwell (d/b/a Max Martialis) individually and on behalf of others similarly situated v. Facebook, Inc., Case No. 3:18-cv-04978, United States District Court, Northern District of California. Deposition (2021).

15. Integritymessageboard.com. LLC, v. Facebook, Inc., Case No. 4:18-cv-05286-PJH, United States District Court, Northern District of California. Deposition (2021).

16. In re: Blue Cross Blue Shield Antitrust Litigation (MDL No. 2406), Master File No. 2:13-CV-20000-RDP, United States District Court, Northern District of Alabama, Southern Division. Deposition (2021).

17. In Re: Glumetza Antitrust Litigation, Case No. 3:19-cv-05822-WHA, United States District Court for the Northern District of California. Deposition (2020).

18. In re Determination of Rates and Terms for Digital Performance of Sound Recordings and Making of Ephemeral Copies to Facilitate those Performances (Web V), CaseNo. 19-CRB-0005-WR (2021-2025), United States Copyright Royalty Judges, Washington, D.C. Deposition and Hearing (2020).

19. Stephen Adkins, et al., v. Facebook, Inc., Case No. 18-CV-05982-WHA, United States District Court, Northern District of California. Deposition (2019).

20. DealDash OYJ and DealDash Inc, Plaintiffs vs, Contextlogic Inc. d/b/a Wish, Defendant, Case No. 18-cv-02353-MMC, District Court of Northern California. Deposition (2019).

21. In Re Disposable Contact Lens Antitrust Litigation. No. 3:15-md-2626-J-20JRK United States District Court, Middle District of Florida, Jacksonville Division. Deposition (2018, 2020).

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

## APPENDIX B – MATERIALS CONSIDERED

### Legal Documents

Deposition of Brock Huber 30(b)(6), *Nike, Inc. v. StockX LLC*, No. 1:22-cv-000983-VEC, February 22, 2023.

Deposition of Heather Paulson 30(b)(6), *Nike, Inc. v. StockX LLC*, No. 1:22-cv-000983-VEC, January 6, 2023.

Deposition of Joe Pallett, *Nike, Inc. v. StockX LLC*, No. 1:22-cv-000983-VEC, February 8, 2023.

Deposition of Roy Ikhyun Kim, *Nike, Inc. v. StockX LLC*, No. 1:22-cv-000983-VEC, February 8, 2023.

Deposition of Russell Amidon, *Nike, Inc. v. StockX LLC*, No. 1:22-cv-000983-VEC, November 30, 2022.

Expert Rebuttal Report of Richard LaMagna, *Nike, Inc. v. StockX LLC*, No. 1:22-cv-000983-VEC, June 2, 2023.

Expert Report of Catherine Tucker, *Nike, Inc. v. StockX LLC*, No. 1:22-cv-000983-VEC, May 5, 2023.

Expert Report of DeJongh "Dee" Wells, *Nike, Inc. v. StockX LLC*, No. 1:22-cv-000983-VEC, May 5, 2023.

Expert Report of Kari Kammel, *Nike, Inc. v. StockX LLC*, No: 1:22-cv-000983-VEC, May 5, 2023.

Expert Report of Steven S. McNew, *Nike, Inc. v. StockX LLC*, No. 1:22-cv-000983-VEC, May 5, 2023.

### Bates-Stamped Documents

"Valiant Labs Product Authentication Document," NIKE0035919.

Nike, "Email From Nike Introducing StockX to Counterfeiting Working Group," January 22, 2021, NIKE0035529–530.

Nike, "Nike Legit Presentation," February 2019, NIKE0035611–650.

Nike, "Secondary Marketplaces Opportunity Evaluation Presentation," May 2019, NIKE0036631–667.

Nike, "Secondary Marketplaces Opportunity Evaluation Presentation," April 2019, NIKE0036670–733.

StockX, "Physical Data," STX0806026.

StockX, "Vault Drop 1 Pricing," January 11, 2022, STX0121216.

StockX, "Vault NFT Data," STX0806025.

### Financial Documents

Nike, Inc., Form 10-K, filed July 21, 2022.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

## Academic Papers

Agarwal, Saharsh, Uttara Ananthakrishnan, and Catherine Tucker, "Deplatforming and the Control of Misinformation: Evidence from Parler," *Social Science Research Network*, 2023.

Anderson, Eric T., and Duncan I. Simester, "Reviews Without a Purchase: Low Ratings, Loyal Customers, and Deception," *Journal of Marketing Research*, Vol. 51, No. 3, 2014, pp. 249–269.

Aral, Sinan, "The Problem With Online Ratings," *MIT Sloan Management Review*, Vol. 55, No. 2, 2014, pp. 46–52.

Arrow, Kenneth J., "Uncertainty and the Welfare Economics of Medical Care," *The American Economic Review*, Vol. 53, No. 5, 1963, pp. 941–973.

Einav, Liran, Chiara Farronato, and Jonathan Levin, "Peer-to-Peer Markets," *Annual Review of Economics*, Vol. 8, 2016, pp. 615–635.

Fradkin, Andrey, Elena Grewal, David Holtz, and Matthew Pearson, "Bias and Reciprocity in Online Reviews: Evidence From Field Experiments on Airbnb" presented at EC '15: Proceedings of the Sixteenth ACM Conference on Economics and Computation (Cambridge, MA, July 15, 2015).

Fradkin, Andrey, and David Holtz, "Do Incentives to Review Help the Market? Evidence from a Field Experiment on Airbnb," *Marketing Science*, 2023, pp. 1–13.

Jabr, Wael, and Mohammad Saifur Rahman, "Online Reviews and Information Overload: The Role of Selective, Parsimonious, and Concordant Top Reviews," *MIS Quarterly*, Vol. 46, No. 3, 2022, pp. 1517–1550.

Klein, Tobias J., Christian Lambertz, and Konrad O. Stahl, "Market Transparency, Adverse Selection, and Moral Hazard," *Journal of Political Economy*, Vol. 124, No. 6, 2016, pp. 1677–1713.

Lendle, Andreas, Marcelo Olarreaga, Simon Schropp, and Pierre-Louis Vézina, "There Goes Gravity: eBay and the Death of Distance," *The Economic Journal*, Vol. 126, No. 591, 2016, pp. 406–441.

Nosko, Chris, and Steven Tadelis, "The Limits of Reputation in Platform Markets: An Empirical Analysis and Field Experiment," *NBER Working Paper*, 2015, pp. 1–36.

Sharma, Akshita, Jatin Gupta, Lovika Gera, Mehul Sati, and Shikha Sharma, "Relationship Between Customer Satisfaction and Loyalty," *Social Science Research Network*, 2020.

Tadelis, Steven, "Reputation and Feedback Systems in Online Platform Markets," *Annual Review of Economics*, Vol. 8, 2016, pp. 321–340.

Tucker, Catherine, "How Platforms Create Value Through Coring and Implications for Market Definition," *CPI Antitrust Chronicle*, Vol. 2, No. 2, 2022, pp. 16–19.

Zervas, Georgios, Davide Proserpio, and John W. Byers, "A First Look at Online Reputation on Airbnb, Where Every Stay is Above Average," *Marketing Letters*, Vol. 32, 2021, pp. 1–16.

## Books

Belleflamme, Paul, and Nicolas Neysen, *Platform Strategies: A Guidebook for Entrepreneurs in the Platform Economy*, London, Routledge, 2023.

Belleflamme, Paul, and Martin Peitz, *The Economics of Platforms*, Cambridge, UK, Cambridge University Press, 2021.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

Evans, David, and Richard Schmalensee, *Matchmakers: The New Economics of Multisided Platforms*, Boston, Harvard Business Review Press, 2016.

Parker, Geoffrey G., Marshall W. Van Alstyne, and Sangeet Paul Choudary, *Platform Revolution: How Networked Markets Are Transforming the Economy and How to Make Them Work for You*, New York, W. W. Norton & Company, 2016.


**Public Documents**

Airbnb, "Host Damage Protection," https://www.airbnb.com/help/article/279.

Airbnb, "Host Liability Insurance," https://www.airbnb.com/help/article/937.

Amazon, "Amazon Verified Purchase Reviews," https://www.amazon.com/gp/help/customer/display.html?nodeId=G75XTB7MBMBTXP6W.

Caminade, Juliette, and Jonathan Borck, *The Continued Growth and Resilience of Apple's App Store Ecosystem*, Analysis Group, May 2023, https://www.apple.com/newsroom/pdfs/the-continued-growth-and-resilience-of-apples-app-store-ecosystem.pdf.

CB Insights, "Orion Analytical," https://www.cbinsights.com/company/orion-analytical.

Checkr, "Background Checks for the Gig Economy," https://checkr.com/use-cases/gig-marketplace.

Checkr, "Pricing," https://checkr.com/pricing.

Christie's, "About Us," https://www.christies.com/about-us/welcome-to-christies#About-Us.

Christie's, "Buying at Christie's," https://www.christies.com/buying-services/buying-guide.

Christie's, "Christie's to Auction Michael Jordan Game-Worn, Dual-Signed and Photo-Matched Air Jordan 'He's Got Game' XIIIs," November 16, 2021, https://www.christies.com/about-us/press-archive/details?PressReleaseID=10292

Christie's, "Terms & Conditions," https://onlineonly.christies.com/terms-and-conditions/120.

Chrono24, "Chrono24 - Guarantee of Authenticity," https://www.chrono24.com/info/guarantee-of-authenticity.htm.

Chrono24, "Discover the Safest Path to Your Dream Watch," https://www.chrono24.com/about-us.htm.

Complex, "The Rise of the Reseller," November 20, 2019, https://www.complex.com/sneakers/2019/11/rise-of-the-sneaker-reseller-in-the-2010s.

Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods*, January 24, 2020, https://www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goods-report_01.pdf.

eBay, "eBay Acquires Sneaker Con Authentication Business," November 29, 2021, https://www.ebayinc.com/stories/news/ebay-acquires-sneaker-con-authentication-business.

eBay, "eBay Money Back Guarantee Policy," https://www.ebay.com/help/policies/ebay-money-back-guarantee-policy/ebay-money-back-guarantee-policy?id=4210.

Glossy, "The Resale Companies Set to Edge Out the Competition in 2020," December 30, 2019, https://www.glossy.co/fashion/the-resale-companies-set-to-edge-out-the-competition-in-2020.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

GOAT, "What is the Assurance of Authenticity?," 2023, https://support.goat.com/hc/en-us/articles/115004608127-What-is-the-Assurance-of-Authenticity-.

High Snobiety, "Special Report: This Is What the Future of Sneaker Reselling Looks Like," 2019, https://www.highsnobiety.com/p/sneaker-reselling-future/.

KPMG, *Generative AI Models – The Risks and Potential Rewards in Business*, April 2023, https://assets.kpmg.com/content/dam/kpmg/xx/pdf/2023/04/generative-ai-models-the-risks-and-potential-rewards-in-business.pdf.

Launched, "How StockX Won Over Sneakerheads," February 23, 2022, https://readlaunched.substack.com/p/-launched-how-stockx-won-over-sneakerheads.

Lyft, "Learn What You Need to Drive With Lyft," https://www.lyft.com/driver-application-requirements.

Niche Pursuits, "Is Flight Club Legit? Get All the Info to Help You Decide," November 2, 2022, https://www.nichepursuits.com/is-flight-club-legit.

NikeTalk, "Real/Fake Air Jordan 1 Retro High OG Obsidian," November 12, 2021, https://niketalk.com/threads/real-fake-air-jordan-1-retro-high-og-obsidian.693845.

Platform Chronicles, "The Chicken-and-Egg Problem of Marketplaces," October 19, 2021, https://platformchronicles.substack.com/p/the-chicken-and-egg-problem-of-marketplaces.

Poshmark, "Poshmark, Inc. Acquires Suede One, A Leading Platform For Virtual Authentication of Sneakers," October 13, 2021, https://newsroom.poshmark.com/2021/10/13/poshmark-inc-acquires-suede-one-a-leading-platform-for-virtual-authentication-of-sneakers.

PRNewswire, "Launch of eBay Authenticate Boosts Shopper Confidence for Luxury Handbag Purchases," October 16, 2017, https://www.prnewswire.com/news-releases/launch-of-ebay-authenticate-boosts-shopper-confidence-for-luxury-handbag-purchases-300536921.html.

Reddit, "Buyer Beware With eBay Authenticity Guarantee," 2022, https://www.reddit.com/r/Sneakers/comments/uigurk/buyer_beware_with_ebay_authenticity_guarantee.

Sneaker Con, "About," https://sneakercon.com/about.

Sotheby's, "Buy Now Marketplace Conditions of Business for Buyers," https://www.sothebys.com/en/marketplacebuyerterms.

Sotheby's, "Why Buy With Sotheby's?," September 29, 2022, https://help.sothebys.com/en/support/solutions/articles/44002297454-why-buy-with-sotheby-s-.

Sotheby's, "A Year of Scientific Research at Sotheby's," December 4, 2017, https://www.sothebys.com/en/articles/a-year-of-scientific-research-at-sothebys.

Stadium Goods, "Is Stadium Goods Legit?," December 20, 2022, https://www.stadiumgoods.com/en-us/article/is-stadium-goods-legit.

Stieb, Matt, "Amazon's War on Fake Reviews," *Intelligencer*, July 26, 2022, https://nymag.com/intelligencer/2022/07/amazon-fake-reviews-can-they-be-stopped.html.

StockX, "Buying," https://stockx.com/about/buying.

StockX, "The Current Culture Marketplace," https://stockx.com/about/how-it-works.

StockX, "Every Item is StockX Verified," https://stockx.com/about/verification.

StockX, "StockX Statement on Authentication Program," June 6, 2022, https://stockx.com/about/stockx-statement-on-authentication-program.

StockX, "StockX Terms and Conditions of Use," March 23, 2022, https://stockx.com/terms.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

StockX, "What Does the Verification Process Entail for Buyers?," May 13, 2022,
    https://stockx.com/help/articles/What-does-the-verification-process-entail-for-Buyers.
StockX, "What is the StockX Buyer Promise?," April 17, 2023,
    https://stockx.com/help/articles/What-is-the-StockX-Buyer-Promise.
StockX, "What is the StockX Verification Process?," October 4, 2022,
    https://stockx.com/help/articles/What-is-the-StockX-verification-process.
Stripe, "Andrew Chen on Marketplaces," https://stripe.com/guides/atlas/andrew-chen-
    marketplaces.
Swanson, Ana, "How A.I. and DNA Are Unlocking the Mysteries of Global Supply Chains,"
    *The New York Times*, April 7, 2023,
    https://www.nytimes.com/2023/04/07/business/economy/ai-tech-dna-supply-chain.html.
The Analytical Scientist, "Bringing Light to the Darkness," August 11, 2017,
    https://theanalyticalscientist.com/techniques-tools/bringing-light-to-the-darkness.
The Coca Cola Company, "Coca-Cola System," investors.coca-colacompany.com/about/coca-
    cola-system.
Uber, "Driver Screening," https://www.uber.com/us/en/ride/safety/driver-screening.
Uber, "Why is Uber Running Another Background Check Report?,"
    https://help.uber.com/driving-and-delivering/article/why-is-uber-running-another-
    background-check-report?nodeId=4c538b1d-7626-4cdc-9274-68a3fd74e006.
Yahoo! Finance, "Revealed: Apple App store and Google Play Flooded With Fake Reviews,"
    March 8, 2023, https://uk.finance.yahoo.com/news/apple-app-store-google-play-flooded-
    with-fake-reviews-000126788.html.
ZDNet, "GOAT Uses Machine Learning, Computer Vision to Verify Your Top Dollar Sneakers
    Are Authentic," August 19, 2018, https://www.zdnet.com/article/goat-uses-machine-
    learning-computer-vision-to-verify-your-top-dollar-sneakers-are-authentic.

HIGHLY CONFIDENTIAL – OUTSIDE COUNSEL'S EYES ONLY

## APPENDIX C – ADDITIONAL ANALYSES

### Exhibit C1: Daily Average, Maximum, and Minimum Transaction Price
### Jordan 1 Retro High OG Patent Bred[159]



**Daily Transaction Counts**

| | 01/26 | 01/27 | 01/28 | 01/29 | 01/30 | 01/31 | 02/01 | 02/02 |
|---|---|---|---|---|---|---|---|---|
| Vault NFT | 118 | 20 | 62 | 10 | 4 | 3 | 3 | 6 |
| Physical | 519 | 645 | 735 | 706 | 419 | 415 | 452 | 284 |

**Notes:**
[1] The Vault NFT transactions sample includes peer-to-peer transactions and releases by StockX that were sold at the prevailing market price rather than the initial release price.
[2] This chart shows the daily average, maximum and minimum price of physical sneaker and Vault NFT transactions, using the variable for Gross Monetary Value. "Physical Sneakers (on StockX)" refers to the average price of the associated physical sneaker on StockX.

---

[159] StockX, "Vault NFT Data," STX0806025; StockX, "Physical Data," STX0806026. The initial release price for Vault NFTs linked to the Air Jordan 1 sneakers is inferred based on their uniform price of $300 sold by StockX on the first day of release.