# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

NIKE, INC.,

                    Plaintiff,

    v.

STOCKX LLC,

                    Defendant.

Civil Action No.: 1:22-cv-00983-VEC

**ORAL ARGUMENT REQUESTED**

# NIKE, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

# <u>TABLE OF CONTENTS</u>

I.      PRELIMINARY STATEMENT ................................................................................... 1

II.     FACTUAL BACKGROUND....................................................................................... 2

    A.    Nike, Its Famous Brands, and its Brand Protection Efforts................................... 2

    B.    StockX's Business Model and Authenticity Claims............................................. 4

    C.    StockX Offered For Sale, Sold, and Distributed Counterfeit "Nike" Footwear................ 5

        1.    StockX Sold Counterfeit "Nike" Footwear to Nike's Investigators ............................. 5

        2.    StockX Sold Counterfeit "Nike" Footwear to Roy Kim........................................... 5

        3.    StockX Sold Counterfeit "Nike" Footwear to Zadeh Kicks ........................................ 7

    D.    StockX Knew Its Authenticity Claims Were False................................................ 7

    E.    StockX's False Advertising and Counterfeiting Harm Nike ............................... 9

III.    LEGAL STANDARD................................................................................................. 11

IV.     StockX is Liable For Counterfeiting....................................................................... 11

    A.    The Nike Marks are Valid and Protectable......................................................... 12

    B.    StockX Offered for Sale, Sold and/or Distributed Counterfeit Goods bearing the Nike Marks.................................................................................................................... 12

V.      StockX is Liable For False Advertising .................................................................. 14

    A.    StockX's Authenticity Claims Are Literally False. ........................................... 14

    B.    StockX's Literally False Authenticity Claims Are Material............................... 17

    C.    StockX's False Advertising Causes Nike Actual Or Likely Injury. .................. 19

VI.     STOCKX'S CONDUCT Is WILLFUL ................................................................... 22

    A.    StockX's Counterfeiting is Willful. .................................................................... 22

    B.    StockX's False Advertising Was Willful............................................................ 24

VII.    CONCLUSION.......................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Adelphia Supply*,
  2019 WL 5696148 (E.D.N.Y. Sept. 30, 2019) .......................................................................13

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)............................................................................................................11

*Apotex Inc. v. Acorda Therapeutics, Inc.*,
  823 F.3d 51 (2d Cir. 2016)........................................................................14, 15, 17, 19

*BBK Tobacco & Foods, LLP v. Galaxy VI Corp.*,
  408 F. Supp. 3d 508 (S.D.N.Y. 2019)................................................................................12

*BeautyBank, Inc. v. Harvey Prince, LLP*,
  2013 WL 11327097 (S.D.N.Y. Mar. 29, 2013) ...............................................................19

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.*,
  627 F. Supp. 2d 384 (D.N.J. 2009) ..................................................................................15

*C=Holdings B.V. v. Asiarim Corp.*,
  992 F. Supp. 2d 223 (S.D.N.Y. 2013)......................................................................11, 14, 16

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)............................................................................................................11

*Chanel, Inc. v. Gardner*,
  2010 WL 11713301 (S.D.N.Y. Apr. 6, 2010), *report and recommendation
  adopted*, 2011 WL 204911 (S.D.N.Y. Jan. 21, 2011)..............................................22

*Chanel, Inc. v. RealReal, Inc.*,
  449 F. Supp. 3d 422 (S.D.N.Y. 2020)......................................................12, 13, 16, 21

*Chanel, Inc. v. Richardson*,
  2018 WL 6097865 (S.D.N.Y. Nov. 20, 2018) .................................................................13

*Chanel, Inc. v. WGACA, LLC*,
  2022 WL 902931 (S.D.N.Y. Mar. 28. 2022) ................................................. *passim*

*Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*,
  843 F.3d 48 (2d Cir. 2016).........................................................................................14, 19

*CJ Prod. LLC v. Snuggly Plushez LLC*,
  809 F. Supp. 2d 127 (E.D.N.Y. 2011) ..............................................................................18

*Colgate-Palmolive Co. v. J.M.D. All-Star Import and Export Inc.*,
   486 F.Supp.2d 286 (S.D.N.Y. 2007)............................................................................11

*El Greco Leather Prods. Co. v. Shoe World, Inc.*,
   806 F.2d 392 (2d Cir. 1986).......................................................................................13

*Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc*.,
   507 F. App'x 26 (2d Cir. 2013) .........................................................................22, 23, 24

*Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*,
   689 F. Supp. 2d 585 (S.D.N.Y. 2010), *amended on reconsideration* (Mar. 23,
   2010) ......................................................................................................................22

*Fendi Adele S.R.L. v. Filene's Basement, Inc.*,
   696 F. Supp. 2d 368 (S.D.N.Y. 2010)........................................................................12

*Gristede's Foods, Inc. v. Unkechauge Nation*,
   2008 WL 3334032 (E.D.N.Y. Aug. 8, 2008)................................................................15

*Gucci Am., Inc. v. Duty Free Apparel, Ltd.*,
   286 F. Supp. 2d 284 (S.D.N.Y. 2003).........................................................................11

*Gucci Am., Inc. v. Exclusive Imports Int'l*,
   2007 WL 840128 (S.D.N.Y. Mar. 19, 2007), *vacated on other grounds*,
   2007 WL 2892668 (S.D.N.Y. Oct. 2, 2007) ................................................................13

*Gucci Am., Inc. v. Guess?, Inc.*,
   843 F. Supp. 2d 412 (S.D.N.Y. 2012)........................................................................21

*Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*,
   219 F.3d 104 (2d Cir. 2000).......................................................................................21

*Hertz Corp. v. Avis, Inc.*,
   867 F. Supp. 208 (S.D.N.Y. 1994) .............................................................................15

*Imig, Inc. v. Electrolux Home Care Prod., Ltd.*,
   2008 WL 905898 (E.D.N.Y. Mar. 31, 2008) ...............................................................25

*Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*,
   176 F. Supp. 3d 137 (E.D.N.Y. 2016) ....................................................................21, 22

*Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.*,
   80 F.3d 749 (2d Cir. 1996).........................................................................................23

*Island Software & Computer Serv., Inc. v. Microsoft Corp.*,
   413 F.3d 257 (2d Cir. 2005).......................................................................................22

*John Wiley & Sons, Inc. v. Book Dog Books, LLC*,
    327 F. Supp. 3d 606 (S.D.N.Y. 2018)........................................................23

*Johnson & Johnson v. Carter-Wallace, Inc.*,
    631 F.2d 186 (2d Cir. 1980)..................................................................19

*JR Tobacco of Am., Inc. v. Davidoff of Geneva (CT), Inc.*,
    957 F. Supp. 426 (S.D.N.Y. 1997) ....................................................15, 16

*Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Mgmt., Inc.*,
    628 F. Supp. 2d 312 (E.D.N.Y. 2009) ....................................................23

*Merck Eprova AG v. Brookstone Pharms., LLC*,
    920 F. Supp. 2d 404 (S.D.N.Y. 2013)........................................14, 20, 25

*Merck Eprova AG v. Gnosis S.P.A.*,
    2011 WL 1142929 (S.D.N.Y. Mar. 17, 2011) .........................................17

*Merck Eprova AG v. Gnosis S.p.A.*,
    760 F.3d 247 (2d Cir. 2014)..................................................................17

*Microsoft Corp. v. My Choice Software, LLC*,
    2017 WL 5643210 (C.D. Cal. Oct. 10, 2017)..........................................16

*Motorola, Inc. v. Abeckaser*,
    2009 WL 962809 (E.D.N.Y. Apr. 8, 2009) .............................................24

*Mylan Pharms., Inc. v. Proctor & Gamble Co.*,
    443 F. Supp. 2d 453 (S.D.N.Y. 2006)....................................................17

*Nat'l Basketball Ass'n v. Motorola, Inc.*,
    105 F.3d 841 (2d Cir. 1997)..................................................................17

*Nike, Inc. v. StockX LLC*,
    2024 WL 3361411 (S.D.N.Y. July 10, 2024) (Caproni, J.).......................14

*Ortho Pharm. Corp. v. Cosprophar, Inc.*,
    32 F.3d 690 (2d Cir. 1994)...................................................................19

*Pedinol Pharmacal, Inc. v. Rising Pharms., Inc.*,
    570 F. Supp. 2d 498 (E.D.N.Y. 2008) ...................................................25

*Pom Wonderful LLC. v. Purely Juice, Inc.*,
    2008 WL 4222045 (C.D. Cal. July 17, 2008)..........................................18

*Reckitt Benckiser Inc. v. Motomco Ltd.*,
    760 F. Supp. 2d 446 (S.D.N.Y. 2011)....................................................20

*River Light V, L.P. v. Tan*
  2018 WL 5778234 (S.D. Fla. Nov. 2, 2018).............................................................16, 18, 19

*S.C. Johnson & Son, Inc. v. Clorox Co.*,
  241 F.3d 232 (2d Cir. 2001).....................................................................................17

*S.C. Johnson & Son, Inc. v. Clorox Co.*,
  930 F. Supp. 753 (E.D.N.Y. 1996) ...........................................................................17

*SimplexGrinnell LP v. Integrated Sys. & Power, Inc.*,
  642 F. Supp. 2d 167 (S.D.N.Y. 2009), *modified on reconsideration on other*
  *grounds,* 642 F. Supp. 2d 206 (S.D.N.Y. 2009) ......................................................20

*Souza v. Exotic Island Enterprises, Inc.*,
  68 F.4th 99 (2d Cir. 2023) ........................................................................................21

*Spin Master Ltd. v. Alan Yuan's Store*,
  325 F. Supp. 3d 413 (S.D.N.Y. 2018)..................................................................11, 12

*Tiffany (NJ) Inc. v. eBay Inc.*,
  600 F.3d 93 (2d Cir. 2010).............................................................................. *passim*

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
  497 F.3d 144 (2d Cir. 2007)............................................................................14, 17, 19

*Unlimited Cellular, Inc. v. Red Points Sols. SL*,
  677 F. Supp. 3d 186 (S.D.N.Y. 2023).......................................................................18

**Statutes**

15 U.S.C. § 1114(1)(a).................................................................................................11, 13

15 U.S.C. § 1115 ............................................................................................................12

15 U.S.C. § 1125(a)(1)..................................................................................................14

## I.    PRELIMINARY STATEMENT

StockX's false advertising is insidious.  Through its Authenticity Claims (defined on page 4 and including "100% Authentic" and "Always Authentic. Never Fake."), crisp stock images of Nike goods, and an anonymous seller base with no rating system, StockX conditioned consumers to have "complete confidence" shopping on its platform.  At each step of the purchasing journey, StockX promised that the items it distributes are guaranteed authentic, every time.  StockX drilled this message into consumers through its Authenticity Claims and their surrounding context.  Turns out, StockX's "authentication" process is merely performative, designed to instill consumer trust in its false authenticity guarantee to gain a competitive advantage.  The truth is that it peddled counterfeit "Nike" goods and lied to consumers about it.  For years.

Nike moves for partial summary judgment on StockX's willful counterfeiting and false advertising.  These issues are ripe for summary adjudication because StockX admits the predicate facts establishing these claims.  StockX admits that it received, examined, advertised as "100% Authentic," and distributed counterfeit "Nike" footwear.  StockX admits that its "authenticators" do not—and cannot—determine whether "Nike" branded footwear is genuine or counterfeit. StockX admits that it knew that its Authenticity Claims were false; yet StockX continued to promote them over and over because it also knew that its authenticity guarantee is "core" to its business model and consumer experience.  StockX's internal communications freely discuss distributing hundreds of counterfeit goods to consumers (StockX calls them "true misses" and "mistakes").  StockX cannot dispute Nike's identification of at least 77 pairs of counterfeit "Nike" footwear discovered during this litigation alone, including over three dozen counterfeits sold to a single customer.  Nike discovered only the tip of the iceberg, given that StockX also admits that a fraud ring trafficking in counterfeits closed over 1,800 sales on its platform before being caught.

There is also no genuine dispute that StockX's false Authenticity Claims are the cause of

"actual or likely injury" to Nike.  The Second Circuit is clear that to establish injury for false advertising, the Lanham Act demands only proof providing a reasonable basis for the belief that Nike is likely to be damaged as a result of StockX's false advertising.  As a matter of common sense, and supported by record evidence detailed below, StockX's false claims of guaranteed authentic Nike footwear is likely to harm Nike, and Nike establishes this on dual fronts.  First, StockX simultaneously offers dozens of the same exact shoes that Nike offers, and StockX falsely guarantees that those shoes are "100% Authentic," which "tends to establish that StockX could have diverted sales from Nike," as this Court noted.  Second, when StockX falsely guarantees that counterfeit "Nike" shoes are "100% Authentic," Nike is harmed when the consumer *blames Nike* for the counterfeit's poor performance and/or low quality.

StockX compounded this harm by building a global safe haven for counterfeiters to sell unknown numbers of fake "Nike" footwear, often the hottest Nike styles, for hundreds, sometimes thousands, of dollars a pair.  And, worse, when consumers complained to StockX about a suspected fake shoe (*i.e.,* one that was falling apart), StockX gaslit consumers by telling them that the poor-quality fake was merely defective genuine footwear authorized by Nike, even though StockX had zero basis to make those statements.  As detailed below, the evidence supporting StockX's willful counterfeiting and false advertising is overwhelming, and Nike's motion should be granted.

## II.    FACTUAL BACKGROUND

### A.    Nike, Its Famous Brands, and its Brand Protection Efforts

Nike designs, develops, markets, and sells high-quality footwear, apparel, equipment and accessory products under the Nike and Jordan brands.  SMF ¶¶ 1-2.  Nike owns incontestable registrations for the trademarks set forth in Exs. 10-19 to the August 8, 2024 Duvdevani Declaration that are asserted on this Motion, including for its famous NIKE, SWOOSH, and AIR JORDAN marks ("Nike Marks").  SMF ¶¶ 12-14.  The Nike Marks are among the most valuable

and recognized in the world.  SMF ¶¶ 3-6.  Each year, Nike spends billions of dollars to promote its valuable brands.  SMF ¶ 7.  StockX recognizes Nike's success, and Nike footwear is among the most popular goods sold on StockX. SMF ¶¶ 8-11.

To protect its brands and its consumers, Nike is deeply invested in combatting the manufacturing and trade of counterfeit goods.  SMF ¶¶ 3, 15-23.  Nike built a robust Brand Protection department and developed proprietary technologies to aid in the fight against counterfeiting.  SMF ¶ 15.  Nike Brand Protection is led by individuals with extensive experience in anti-counterfeiting, particularly as it pertains to the distribution of counterfeit Nike goods.  SMF ¶¶ 16-18, 34.  They coordinate ██████████████████████████████████████ ████████████████████████████████████████████████████████████  SMF ¶¶ 21-22.

Nike uses a sophisticated anti-counterfeiting ████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████  SMF ¶¶ 24-25, 35.  ████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████  SMF ¶ 31.  ████████████ ████████████████████████████████████████████████████████ ████████  SMF ¶ 27.  ████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████  SMF ¶¶ 28-31.[1]

---

[1] ████████████████████████████████████████████████████████ ████████████████.  SMF ¶ 26.

**B.     StockX's Business Model and Authenticity Claims**

StockX is an online secondary market platform through which products, especially footwear, are bought and sold.  SMF ¶¶ 38-41.  It is not an authorized Nike distributor and primarily operates as an active intermediary, facilitating each trade of "Nike" branded goods on its platform, taking possession of each good so that its "authenticators" may determine that each one is "100% Authentic" before shipping it to the buyer, and collecting a fee from seller and buyer.  SMF ¶¶ 42-44, 57.  StockX's business model and "core value proposition" is built around its advertising claims that every product sold on its platform is guaranteed to be 100% authentic.  SMF ¶¶ 74-85.  The following StockX advertising claims are the subject of this Motion: **"100% Authentic," "100% Verified Authentic," "Guaranteed Authentic" "Always Verified Authentic." "Guaranteed Authenticity. Every item. Every time."** and **"Always Authentic. Never Fake."** (the "Authenticity Claims").[2]  "100% Authentic" appeared on all StockX product landing pages as a hyperlink, and the remaining claims appeared on the "Authenticity" landing page which was linked to product landing pages via the 100% Authentic button.  SMF ¶¶ 57-58.  StockX used most of the Authenticity Claims in connection with goods bearing the Nike Marks from at least 2017 to 2022.  SMF ¶¶ 58-65.

According to StockX, the authentication promise it conveyed through the Authenticity Claims is "central to the shopping experience," "████████████████" and "one of the key reasons why you would transact on StockX."  SMF ¶¶ 74, 77, 81.  ████████████████ ████████████████████████  SMF ¶ 84 (emphasis in original).  While StockX swapped out "Authentication" for "Verification" in its marketing after this lawsuit was

---

[2] To narrow undisputed issues remaining for trial, Nike moves for summary judgment on a subset of StockX's false advertising claims, all of which essentially make the same claim and are all false for the same reasons.  (*See* Dkt. No. 39 at ¶¶ 3, 11, 50-51, 54, 110-111, 172-173; (*see also* Duvdevani Decl. ¶ 55, Ex. 54.).

filed, it continues to tout that its "approach remains unchanged" and "product authenticity remains core to [its] analysis." SMF ¶¶ 66-73.

StockX's Authenticity Claims are false for a straightforward reason: StockX cannot guarantee authenticity, and, indeed, sold fake "Nike" products containing counterfeit Nike Marks.

### C. StockX Offered For Sale, Sold, and Distributed Counterfeit "Nike" Footwear

#### 1. *StockX Sold Counterfeit "Nike" Footwear to Nike's Investigators[3]*

In December 2021 and January 2022, Nike's investigators purchased four pairs of "Nike" "Air Jordan 1" footwear of various styles and sizes bearing the Nike Marks from StockX.  SMF ¶¶ 150-154, 158-159, App'x A at Pairs 1-4.  ██████ Nike Brand Protection determined that these pairs are counterfeit.  SMF ¶¶ 155-157, 160-161, App'x A at Pairs 1-4.

#### 2. *StockX Sold Counterfeit "Nike" Footwear to Roy Kim*

Between March and July 2022, Roy Kim, an avid sneaker collector and reseller, purchased 62 pairs of "Nike" footwear on StockX.  SMF ¶¶ 162.  StockX advertised the footwear using the Authenticity Claims, "authenticated" them, and shipped them to Mr. Kim with tags and receipts stating "100% Authentic."  SMF ¶ 163.  Mr. Kim suspected that certain of the pairs were fake and contacted StockX customer service three times, but each time received no response.  SMF ¶ 166. Fed up with StockX's refusal to engage, Mr. Kim posted on Instagram his belief that StockX had sold him over $10,000 worth of counterfeit "Nike" footwear.  SMF ¶ 165.  His post went viral, leading both StockX and Nike to contact Mr. Kim.  SMF ¶¶ 167-169.  StockX Senior Director of Account Management, Russell Amidon, emailed Mr. Kim offering to assist him to return the pairs for "reverification" and inviting him on a free trip to Detroit.  SMF ¶ 168.  Nike contacted Mr.

---

[3] StockX was on notice from Nike that it was listing counterfeit "Nike"-branded products for sale.  SMF ¶¶ 208-212. Nike sent a letter to StockX informing them of the counterfeit listing and seeking information regarding the seller; StockX refused to provide additional information absent a subpoena or search warrant.  *Id.*

Kim to ask if he would permit Nike Brand Protection to review the suspected fakes.  SMF ¶ 169.
Mr. Kim agreed to Nike's request, and on July 22, 2022, Joe Pallet, Nike's Director of Brand
Protection, Authentication and Innovation, traveled to Mr. Kim's home to review 42 the 62 "Nike"
pairs that Mr. Kim had purchased on StockX and suspected were fake (Mr. Kim did not provide
the other 20 pairs to Nike).  SMF ¶ 170.

Mr. Pallett reviewed the footwear ██████████ and determined that 38 of the 42 pairs are
counterfeit.  SMF ¶ 170, App'x A at Pairs 5-37.  All but 5 of these 38 counterfeit pairs still had
StockX "Verified Authentic" tags affixed to the footwear and/or receipts in the box.  SMF ¶ 170,
App'x A at Pairs 5-37.  After Mr. Pallett completed his review, Mr. Kim returned the fake footwear
to StockX for a very necessary refund.  SMF ¶ 172-173.  Once StockX received the fake footwear,[4]
its senior level authenticators reinspected them; StockX does not deny that they are all counterfeit
despite passing authentication.  SMF ¶¶ 54, 184, 188.  StockX even told Mr. Kim that the footwear
"should not have passed [StockX's] authentication process," and that "they were at a minimum a
defect . . . a manufacturing defect and that they possibly could have been inauthentic."  SMF ¶
190.  Nike later learned through compelled discovery (Dkt. No. 171) that StockX had determined
that the fake footwear was part of a pattern of illicit activity on its platform.  SMF ¶¶ 203-204.  A
group of StockX sellers, using email addresses on Chinese domains, and whom StockX knew were
"linked to bad actor[s]," operated as a "fraud ring," completing over 1,800 sales on StockX,
including most of the 33 counterfeit "Nike" pairs that Mr. Kim purchased on StockX (one pair
came from a "power seller").[5]  SMF ¶¶ 203-207.

---

[4] Although Mr. Kim testified that he returned all 38 pairs, StockX maintains that it received only 33.  SMF ¶ 185-187.
[5] StockX did not believe that the fraud ring sold any additional fakes through StockX apart from those pairs to Mr.
Kim, despite their 1807 consummated sales.  This belief is based exclusively on StockX's assertion that there were no
"other buyers who complained about the products they received."  SMF ¶ 204.  StockX placed the onus on the duped
and potentially unsophisticated consumers to self-identify counterfeits.  SMF ¶ 93.

### 3.    StockX Sold Counterfeit "Nike" Footwear to Zadeh Kicks

Zadeh Kicks LLC ("Zadeh") is a now-defunct entity that sold sought-after Nike footwear. SMF ¶ 192.  Zadeh sourced thousands of products from StockX and was its biggest "power buyer" for years.  SMF ¶ 193.  As a StockX VIP, Zadeh owner Michael Malekzadeh had routine communications with Mr. Amidon and StockX's authentication team.  SMF ¶¶ 193-196.  Mr. Malekzadeh repeatedly alerted StockX to "Nike" footwear that he believed to be counterfeit.  SMF ¶¶ 194-196.  StockX often pushed back, blindly claiming that what Mr. Malekzadeh believed to be counterfeit "tells" were simply indicators of defective product Nike sold.  *Id.*

In May and July 2022 Nike Brand Protection inspected "Nike" footwear Zadeh purchased from StockX and, ██████████ determined 55 pairs were counterfeit.  SMF ¶¶ 197, 199-202, App'x A at Pairs 39-77.  In addition, StockX documents confirm that it "authenticated" and later issued refunds for at least 34 other pairs of Nike- and Jordan-branded footwear that it had sold to Zadeh Kicks and which Zadeh Kicks later returned to StockX as "fake."  SMF ¶ 198.

### D.    StockX Knew Its Authenticity Claims Were False.

Despite using the Authenticity Claims for years, StockX knew that its authentication process was flawed and that its authenticators made mistakes.  SMF ¶¶ 51, 54, 90-92, 99.  This is no surprise: StockX's "comprehensive" ████ authentication process takes, on average, ████ ████ for an authenticator to complete.  SMF ¶¶ 52, 55.  From June 2020 to June 2022, StockX doubled its authentication centers from 6 to 12.  SMF ¶ 47.  By 2023, it employed more than 300 authenticators in 14 authentication centers around the world and, on average, 1,000,000 products went through StockX authentication *each month*.  SMF ¶¶ 45-48.  StockX's quality control is poor:

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

SMF ¶¶ 56, 176.

StockX's pre-lawsuit internal documents admit to the sale of hundreds of fake products. SMF ¶¶ 90-91.  A StockX employee testified that an authenticator, following every step of the process, cannot determine whether a shoe was manufactured in a Nike facility.  SMF ¶¶ 52, 54. StockX knew that Nike products are frequently targeted by counterfeiters and that fakes are prevalent on its platform.  SMF ¶¶ 86-89.  StockX nevertheless continued to transact in Nike footwear using the Authentication Claims, even though it knew that counterfeit "Nike" goods routinely pass through its platform and that its authenticators cannot determine whether a product is a genuine Nike.

To make matters worse, StockX's policy does 

SMF ¶ 101.  And rather than accept returns, StockX's policy encourages reselling suspected fakes on its platform, rather than returning the footwear:

SMF ¶ 102.  Communications show that StockX routinely followed this policy.  SMF ¶¶ 104-111.

Sellers on StockX are anonymous, and StockX, not the seller, creates uniform product pages using stock images.  SMF ¶¶ 125-126.  StockX both ignores and hides from its buyers important information that could reveal that sellers are using the platform to sell fakes.  SMF ¶¶ 120-126, 128-129.  StockX makes no effort to determine if the products offered on the StockX platform were acquired through authorized channels.  SMF ¶¶ 120-124 (sellers "source their product from anywhere they can get the product from…the goal is always to – to sell more, but I can't say with certainty where exactly their inventory comes from.")  StockX enables these sellers to maximize sales because sellers generate fees for StockX.  SMF ¶ 43.  As a result, while average

StockX buyers face considerable obstacles to return footwear, ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████   SMF ¶¶ 116 (emphasis added); *see* also SMF ¶ 119.  In fact, the more sales made on StockX, the more "leniency" StockX gives sellers to keep using the platform, even for attempting to sell fakes.  SMF ¶¶ 113, 114-115, 117-118.  When StockX suspects a product is fake, it "often" returns it to the seller and has even informed the seller why their product failed authentication. SMF ¶¶ 130-137.

As noted, rather than identify or reject a product as counterfeit, StockX blames the manufacturer, *i.e.,* Nike, for approving a "defective" product for retail.  SMF ¶¶ 94-95, 104-111, 194-196.  StockX created a "General Defect Guide" filled with purported defects.  SMF ¶¶ 96-97.  But StockX does not know whether such flaws are truly manufacturing defects.  SMF ¶¶ 98-99.  StockX has no insight into Nike's manufacturing process or standards.  SMF ¶ 32.  StockX effectively operates as a safe haven for counterfeiters to target consumers behind the smoke screen of StockX's "guaranteed authenticity" and stock images. SMF ¶¶ 125-129, 138-141.  Yet, StockX neglected to implement basic industry measures to protect against rising surge of counterfeits infiltrating the secondary market, and instead capitalized on the opportunity.  *Id.*

### E.    StockX's False Advertising and Counterfeiting Harm Nike

Nike spends enormous resources to maintain control over its brand, reputation, and the valuable goodwill.  SMF ¶¶ 15, 222.  As part of its efforts, Nike aggressively works to protect its brand against those who try to capitalize on Nike's success by offering fakes.  SMF ¶ 219.  Nike also works to ensure that its genuine products are of the highest quality; when fakes enter the marketplace, Nike loses control over its brand, reputation, and its ability to maintain strict quality control.  SMF ¶ 220.  Counterfeits undermine consumer confidence in the quality of genuine Nike

products, erode the consumer experience, and damage Nike's goodwill and reputation.  SMF ¶¶ 220-221.

StockX's false advertising severely harms Nike in a way that is related to—but distinct from—the extreme harm caused by counterfeiting alone.  StockX drills its Authenticity Claims into consumers at every step of the purchasing journey.  SMF ¶¶ 57-65.  As a result, when a consumer receives a counterfeit from StockX, that consumer has been conditioned by StockX to believe that the product is genuine.  SMF ¶¶ 74-85.  Many counterfeit products are shoddy, may fall apart, degrade more quickly than authentic Nike footwear and may even cause physical injury.  SMF ¶¶ 228, 230-231.  When a StockX customer has a bad experience with Nike-branded footwear, they are likely to improperly attribute that negative experience to Nike.  SMF ¶¶ 220-230.  This loss of consumer trust in Nike's brand reputation likely results in (1) lost sales, (2) negative consumer feedback to Nike and through social media platforms, and (3) harm to Nike's business partners and/or affiliates.  SMF ¶¶ 219-238.

Nike confirmed that StockX falsely told consumers that a counterfeit is really genuine but poorly manufactured Nike footwear.  SMF ¶ 194-196.  For example, Mr. Pallet ███████████ from Zadeh-StockX communications about suspected fakes that StockX claimed were Nike defects and deviations.[6]  *Id.*  Three of those "defective" pairs were counterfeit.  *Id.*

StockX's Authenticity Claims also create likely economic injury to Nike because StockX makes them to offer for sale the same "Nike" footwear simultaneously offered for sale by Nike.

---

[6] Nike does not support its counterfeiting claim with the footwear referenced in the Zadeh communications, which is why they were not included in its response to StockX Interrogatory No. 23 to "Identify each and every Alleged Counterfeit by its StockX order number and purchaser, that forms the basis for Nike's Sixth Cause of Action in the First Amended Complaint."  Nike's response included only Bates Ranges containing order number and purchaser information related to physical footwear examined by Nike Brand Protection.  Duvdevani Decl. ¶ 91, Ex. 90. Mr. Pallett's analysis ███████████████████ was disclosed to StockX in June 2023 and StockX even asked Ms. Kammel about it at her deposition, but sought no additional discovery related to it.  *Id.* ¶ 144, Ex. 143 at 33:23-49:4.

The fact that the same "Nike" footwear is available for sale through both StockX and Nike "tends to establish that StockX could have diverted sales from Nike." (Dkt. No. 250 at 27-28.)

## III.  LEGAL STANDARD

Summary judgment should be granted where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). "[T]he mere existence of *some* alleged factual dispute" will not defeat summary judgment; the requirement is that there be "no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-248 (1986) (emphasis original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

## IV.  STOCKX IS LIABLE FOR COUNTERFEITING

To prevail on Lanham Act counterfeiting, Nike "must demonstrate (1) that it has a valid mark that is entitled to protection under the Act and (2) that [StockX's] actions are likely to cause confusion as to the origin of the mark." *Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003). "Because the Lanham Act is a strict liability statute, a registrant need not prove knowledge or intent in order to establish liability." *Spin Master Ltd. v. Alan Yuan's Store,* 325 F. Supp. 3d 413, 421 (S.D.N.Y. 2018).

"Where counterfeit marks are involved, it is not necessary to perform the step-by-step examination of each *Polaroid* factor because counterfeit marks are inherently confusing." *Chanel, Inc. v. WGACA, LLC*, 2022 WL 902931, at *16 (S.D.N.Y. Mar. 28. 2022) (int. cit. omitted). Because of the inherent confusion created by counterfeits, "consumer confusion is presumed." *C=Holdings B.V. v. Asiarim Corp.*, 992 F. Supp. 2d 223, 241 (S.D.N.Y. 2013) (citation omitted); *Colgate-Palmolive Co. v. J.M.D. All-Star Import and Export Inc.*, 486 F.Supp.2d 286, 289 (S.D.N.Y. 2007) (same). "[T]o find a likelihood of confusion, a court need only determine that the items are counterfeit and defendant sold or offered those items for sale." *WGACA* 2022 WL

902931, at *16.  Distribution of counterfeit goods also creates liability under the Lanham Act.  15 U.S.C. § 1114(1)(a).  There is no genuine dispute that (1) the Nike Marks are valid and protectable, and (2) StockX offered for sale, distributed, and sold counterfeit "Nike"-branded footwear.

### A.    The Nike Marks are Valid and Protectable.

The Nike Marks are registered, incontestable, and entitled to a presumption of protectability.  *BBK Tobacco & Foods, LLP v. Galaxy VI Corp*., 408 F. Supp. 3d 508, 520 (S.D.N.Y. 2019); *Spin Master Ltd.*, 325 F. Supp. 3d at 421 (same).  All of the Nike Marks are incontestable, which constitutes conclusive evidence of (1) the validity of the Marks, (2) Nike's ownership of the Marks, and of (3) Nike's exclusive right to use the Marks in commerce.  15 U.S.C. § 1115; SMF ¶¶ 12-14.  There is no dispute, or record evidence, to rebut the presumption that Nike's Marks are valid, nor has StockX asserted invalidity.  *See Fendi Adele S.R.L. v. Filene's Basement, Inc.,* 696 F. Supp. 2d 368, 383 (S.D.N.Y. 2010).

### B.    StockX Offered for Sale, Sold and/or Distributed Counterfeit Goods bearing the Nike Marks.

"Second-hand retailers, like [StockX], can be held liable for trademark infringement based on their sale of counterfeit goods because such sales constitute improper use of marks." *WGACA, LLC*, 2022 WL 902931, at *15 (citing *Chanel, Inc. v. RealReal, Inc.*, 449 F. Supp. 3d 422, 441 (S.D.N.Y. 2020).  This is true even if StockX is "involved neither in the manufacture nor the affixing of [Nike's] trademark to [any counterfeits], its sale of the [counterfeits] [is] sufficient 'use' for it to be liable for the results of such infringement.'" *Id*. at *15 (citation omitted)).  StockX, just like both *Chanel* defendants, adopted a "business model in which [it] controls a secondary market for trademarked . . . goods, and by curating the products offered through that market and defining the terms on which customers can purchase those products, [StockX] reaps substantial benefit." *Chanel, Inc,* 449 F. Supp. 3d at 441.  As a result, StockX "must bear the corresponding

burden of the potential liability stemming from its sale, offering for sale, distribution, [and] advertising of the goods in the market it has created." *Id.*

StockX cannot dispute that it advertised, offered, sold, and/or distributed, counterfeit "Nike" footwear.  StockX admits that it advertised, offered for sale on its platform, received, inspected, labeled as "100% Authentic," and then shipped at least 77 pairs[7] of "Nike" counterfeit footwear to Nike investigators, Mr. Kim, and Mr. Malekzadeh.[8]  SMF ¶¶ 142-149, App'x A. StockX's "sale of counterfeit goods is sufficient use to establish liability." *Chanel, Inc. v. Richardson,* 2018 WL 6097865, at *3 (S.D.N.Y. Nov. 20, 2018) (citing *El Greco Leather Prods. Co. v. Shoe World, Inc.,* 806 F.2d 392, 396 (2d Cir. 1986)).[9]

While even one pair would have been enough to establish counterfeiting liability, Nike has established beyond a reasonable dispute that at least 77 pairs of the alleged counterfeit footwear sold by StockX and collectively bearing all Nike Marks are counterfeit, and Nike is thus entitled to summary judgment on its counterfeiting claim.  The only issue that should remain for the next steps in the litigation is the calculation of Nike's damages.

---

[7] Nike uncovered other counterfeit footwear sold by StockX, but to avoid an extraneous chain of custody argument over some pairs, Nike supports this motion only with the pairs that StockX admits it sold or to which there can be no dispute as to chain of custody.  SMF ¶¶ 142-149, App'x A.

[8] There is no real dispute that these 77 pairs are counterfeit.  SMF ¶¶ 142-149, App'x A.  Not only has StockX admitted to selling most of them, Nike ▮▮▮▮▮▮▮ to make each counterfeit determination.  "Evidence that there are discrepancies between a company's internal product-identification information and the actual characteristics of the contested goods is sufficient to establish a prima facie case that the goods were not manufactured by the trademark holder and thus are counterfeit."  *WGACA, LLC*, 2022 WL 902931, at *16 (evidence of serial numbers that did not match sufficient to demonstrate counterfeit); *Gucci Am., Inc. v. Exclusive Imports Int'l*, 2007 WL 840128, at *5 (S.D.N.Y. Mar. 19, 2007), *vacated on other grounds*, 2007 WL 2892668 (S.D.N.Y. Oct. 2, 2007) ("Because Gucci records identifying information about each genuine watch that it produces and sells, these discrepancies are very strong indicators that the watches are counterfeit.").

[9] Any attempt by StockX to argue that it is immune from liability under *Tiffany (NJ) Inc. v. eBay Inc.,* 600 F.3d 93, 109 (2d Cir. 2010) and its progeny would fail for the same reasons it failed as a matter of law in *RealReal*.  *Chanel, Inc.* 449 F. Supp. 3d at 441).  StockX's active role constitutes "use in commerce" and, therefore, counterfeiting liability.  *Id.* (The Real Real's business model is "materially different than those of eBay such that The RealReal can be held liable for direct infringement"); *El Greco Leather Prods. Co.*, 806 F.2d at 396; *see also Abbott Labs. v. Adelphia Supply*, 2019 WL 5696148, at *7 (E.D.N.Y. Sept. 30, 2019) ("[L]iability may be premised on the 'the sale, offering for sale, distribution, or advertising of any goods or services.'" (quoting 15 U.S.C. § 1114(1)(a))).  Not only does StockX's role as intermediary and "authenticator" of products on its platform create liability, StockX reaps significant benefits from the sale of products on its platform, including products that are fake.  SMF ¶¶ 43-45.

## V.    STOCKX IS LIABLE FOR FALSE ADVERTISING

The Lanham Act prohibits the use of "false or misleading description of fact" in promotional statements that "misrepresents the nature, characteristics, [or] qualities" of products or services.  15 U.S.C. § 1125(a)(1).  This Circuit recognizes literally false claims (*i.e.*, false on their face) and impliedly false claims, that, "while not literally false, is nevertheless likely to mislead or confuse consumers."  *Tiffany (NJ) Inc.*, 600 F.3d at 112 (internal quotations omitted).

To prevail on its claim for Section 43(a) false advertising, Nike must establish "that the challenged message is: (1) either literally or impliedly false, (2) material, (3) placed in interstate commerce,[10] and (4) the cause of actual or likely injury to the plaintiff."  *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 65 (2d Cir. 2016); *Merck Eprova AG v. Brookstone Pharms., LLC*, 920 F. Supp. 2d 404, 416 (S.D.N.Y. 2013).  If "literal falsity is proved, there is no requirement of extrinsic evidence showing consumer deception."  *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 68 (2d Cir. 2016).  Moreover, "[i]f an advertisement is literally false and concerns 'an inherent or material quality of the product,' 'consumer deception is presumed, and the court may grant relief without reference to an advertisement's actual impact on the buying public.'  *Nike, Inc. v. StockX LLC*, 2024 WL 3361411, at *3 (S.D.N.Y. July 10, 2024) (Caproni, J.) ("Daubert Order") (quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153, 153 n.3 (2d Cir. 2007) (cleaned up)).

### A.    StockX's Authenticity Claims Are Literally False.

For literal falsity, Nike must show that the Authenticity Claims are facially or explicitly false.[11]  *Merck Eprova AG v. Brookstone Pharms., LLC*, 920 F. Supp. 2d 404, 417 (S.D.N.Y.

---

[10] It is undisputed that StockX's Authenticity Claims were made in interstate commerce on the stockx.com website.  *See C=Holdings B.V.*, 992 F. Supp. 2d at 243.  SMF ¶ 65.

[11] Literally false claims also include advertising that is "false by necessary implication," meaning that the advertisement's 'words or images, considered in context, necessarily and unambiguously imply a false message.'"  *Church & Dwight*, 843 F.3d at 65 (quoting *Time Warner Cable, Inc.*, 497 F.3d at 158).

2013).  "The Court may determine, based on its own review of an advertisement, that a literally true or a literally false message is conveyed or not conveyed," and "may rely on its own common sense and logic in interpreting the message of the advertisement."  *Hertz Corp. v. Avis, Inc.*, 867 F. Supp. 208, 212 (S.D.N.Y. 1994).  While a court should "analyze the message conveyed in full context," that full context is the overall message conveyed by the document containing the advertisement, *not* aspects like "external marketing documents" or "sophistication of the advertising audience."  *Apotex Inc.,* 823 F.3d at 68; *JR Tobacco of Am., Inc. v. Davidoff of Geneva (CT), Inc.*, 957 F. Supp. 426, 432 (S.D.N.Y. 1997); *Gristede's Foods, Inc. v. Unkechauge Nation*, 2008 WL 3334032, at *5 (E.D.N.Y. Aug. 8, 2008) (noting Second Circuit precedent that context is the "entire" advertisement but not its "the larger political and social context"); *Bracco Diagnostics, Inc. v. Amersham Health, Inc*., 627 F. Supp. 2d 384, 465 (D.N.J. 2009) ("audience sophistication is irrelevant" to literal falsity).  A court should reject a defendant's urging to "embrac[e] as much context as it would require to disclaim the common meaning of the words used in their advertisements."  *JR Tobacco of Am., Inc.,*957 F. Supp. at 432 ("I decline to consider as much context as counterclaim defendants urge. Instead, each challenged portion of [the] advertisement will be scrutinized within a meaningful and reasonable context, including not only the entire sentence of each portion of challenged text but also the entire text and overall message of the brochure.").

StockX's Authenticity Claims are unambiguous statements of fact about the most inherent, material quality of a Nike-branded product—its authenticity.  *Infra* at § V.B.  The "100% Authentic" claim appeared as a button on every StockX product landing page, directly below the Nike product name and above the product stock image.  SMF ¶ 57-58.  That button hyperlinked to the StockX "Authentication" landing page and to the remaining Authenticity Claims.  SMF ¶¶ 58-

60, 62-64.   There was nothing on these landing pages – or anywhere else on the StockX platform

for that matter – to suggest an alternative message for the Authenticity Claims other than their

plain, common-sense meaning: StockX only sells authentic, non-counterfeit products.[12]  *Id*.   In

fact, the Authenticity Claims' full context only reinforce their literal message.   The Authentication

page was reached by clicking on the "100% Authentic" claim, contained the remaining

Authenticity Claims, *and* told consumers to "[s]hop on StockX with complete confidence," and

that a "final check" in the "authentication process" ensures "nothing slips through the cracks."

SMF ¶¶ SMF ¶¶ 58-60, 62-64.

StockX's Authenticity Claims are demonstrably false: Nike's investigation and StockX's

own internal documents and sworn testimony prove that StockX cannot guarantee authenticity and

has "passed" and distributed counterfeit "Nike"-branded footwear, including at least 33 pairs to

one customer in two months.   SMF ¶¶ 53-54, 90-92, 162-163, App'x A.   "It is well established

that the promotion of counterfeit goods on the Internet may give rise to false advertising liability

under the Lanham Act."   *C=Holdings B.V.*, 992 F. Supp. 2d at 242–43 (citing *Tiffany (NJ) Inc.*,

600 F.3d at 113); *River Light V, L.P. v. Tan aka*, 2018 WL 5778234, at *6 (S.D. Fla. Nov. 2, 2018)

(eBay seller's claims that counterfeit product was "Guaranteed Authentic" and "100% Guaranteed

Authentic" literally false); *Microsoft Corp. v. My Choice Software, LLC,* 2017 WL 5643210, at *5

(C.D. Cal. Oct. 10, 2017) (sufficiently plead claim for "false statement of fact by advertising

counterfeit software as '100% Genuine'").   Even where some products are genuine, the claims are

nonetheless false.   *See WGACA, LLC,* 2022 WL 902931, at *16; *Chanel, Inc.,* 449 F. Supp. 3d at

444  ("representation that all the products [defendant] offers have been authenticated and are 100%

the real thing" states plausible claim for false advertising where 7 counterfeits alleged to have been

---

[12] This Court and Judge Broderick adopt the Miriam Webster definition of authenticate: "to prove or serve to prove to be real, true, or genuine."   Daubert Opinion at *5, fns. 5-6; *Chanel, Inc.,* 449 F. Supp. 3d at 444, fn. 21.

sold through the platform); *see also Tiffany (NJ) Inc.,* 600 F.3d at 114 ("The law prohibits an advertisement that implies that all of the goods offered on a defendant's website are genuine when in fact, as here, a sizeable proportion of them are not.").[13]

In sum, StockX's Authenticity Claims, made from at least 2017 to 2022, are literally false as a matter of law, and "there is no requirement of extrinsic evidence showing consumer deception." *Apotex Inc.,* 823 F.3d at 68.

### B. StockX's Literally False Authenticity Claims Are Material.

"Falsity alone does not make a false advertising claim viable; '[u]nder either theory, the plaintiff must also demonstrate that the false or misleading representation involved an inherent or material quality of the product.'" *Apotex,* 823 F.3d at 63 (quoiting *Time Warner,* 497 F.3d at 153 n.3.). Such a requirement is "essentially one of materiality," defined as "likely to influence purchasing decisions." *Apotex*, 823 F.3d at 63 (quoting *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 238 (2d Cir. 2001) (quoting *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir. 1997))); *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 255 (2d Cir. 2014).[14]

"[T]he very nature of what a manufacturer is selling is an inherent quality of that product." *Merck Eprova AG v. Gnosis S.P.A.,* 2011 WL 1142929, at * 4 (S.D.N.Y. Mar. 17, 2011). StockX's

---

[13] To the extent StockX attempts to substantiate its Authenticity Claims by pointing to its 99.95% accuracy rate, this figure—which is merely another advertising claim, and not evidence of substantiation—itself utterly lacks substantiation. The 99.95% figure is based purely on those goods that a sufficiently sophisticated StockX consumer suspects are fakes, and who is also sufficiently determined to hound StockX customer service to demand a refund. SMF ¶¶ 92, 100-103. StockX completely disregards the possibility that unsuspecting consumers received counterfeit goods and, just like StockX, did not know the goods were fake. SMF ¶ 93. The figure also disregards all those consumers who complained they purchased fake goods but StockX failed to respond to their inquiries or refused to accept the return, like those transactions where StockX claimed that the footwear was not fake but just shoddy Nike products. SMF ¶¶ 104-111. StockX has no idea how many fake products it distributes to unsuspecting consumers. SMF ¶¶ 92, 100-111. *cf, S.C. Johnson & Son, Inc. v. Clorox Co.*, 930 F. Supp. 753, 782–83 (E.D.N.Y. 1996) ("The Court concludes that SCJ has demonstrated, by the preponderance of the evidence, that it is likely to succeed on the merits of its claim that the Commercial's advertising claims that 'Combat SuperBait kills up to 98%' of consumers' roaches, and RAID Max Plus kills 'no more than 60%,' are unsubstantiated, and therefore literally false.").

[14] "The plaintiff does not need to demonstrate that the defendant's representations actually affected consumer behavior, but rather only that they were likely to have done so." *Mylan Pharms., Inc. v. Proctor & Gamble Co.,* 443 F. Supp. 2d 453, 463 (S.D.N.Y. 2006).

Authenticity Claims concern a product's most inherent quality: that all Nike-branded footwear sold on StockX is *actually* authentic Nike footwear.  This makes the Authenticity Claims material as a matter of law.  *See Unlimited Cellular, Inc. v. Red Points Sols. SL,* 677 F. Supp. 3d 186, 202 (S.D.N.Y. 2023) ("[T] he alleged misrepresentations concern exactly this capacity to differentiate a real product from a fake one. Therefore, Plaintiff's allegations satisfy the materiality requirement."); *Pom Wonderful LLC. v. Purely Juice, Inc.,* 2008 WL 4222045, at *11 (C.D. Cal. July 17, 2008) (where plaintiff marketed as "100% pomegranate juice" a product that "purports to contain 100% pomegranate juice" but did not court held that claim "pertained to the very nature of its juice product [and] establishes its materiality.").  In *CJ Prod. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 148 (E.D.N.Y. 2011), plaintiff's false advertising involved the use of the slogan "As Seen On TV."  The claim was material because As Seen On TV "pertain[s] to an inherent feature of the product." *Id*.  ("[t]he phrase signifies a specific product—the 'Pillow Pet'— with which the consumer is likely familiar by virtue of plaintiffs' extensive television advertising and jingle.  The misuse of the 'As Seen On TV' slogan thus would likely affect on a consumer's purchasing decision, in that the consumer would believe the product to be the 'Pillow Pet' it associates with extensive television marketing.")  The court also addressed defendant's use of "authentic" and held that "false statements regarding the provenance of the product and its connection to the plaintiffs' advertising efforts will influence the decision of customers to buy the product, and they are thus material." *Id*.

Moreover, in *River Light V, L.P.*, 2018 WL 5778234, at *6 (defendants "falsely advertised her products as 'Guaranteed Authentic' Tory Burch items." *Id.*  In granting summary judgment, the court held that defendant's "deception is material in that it concerns an inherent quality or characteristic of her offerings and there can be no dispute that her statements influenced the

18

purchasing decisions of her customers." *Id*. at *6.  The court also noted that, like here, the "price range" suggested to buyers her goods were authentic, and that, like here, her "'guarantee' that the items were authentic falsely assured consumers of the quality and craftsmanship of her goods and thereby bolstered consumer confidence." *Id*.[15] SMF ¶ 63.

In sum, StockX's Authenticity Claims are both literally false and material.  This means that consumer deception is presumed, and the Court may grant relief without reference to the impact of the Authenticity Claims on the buying public.[16]  *Apotex Inc.,* 823 F.3d at 63 (citing *Time Warner Cable, Inc.,* 497 F.3d at 153).

### C.    StockX's False Advertising Causes Nike Actual Or Likely Injury.

There is no genuine dispute that StockX's false Authenticity Claims are "the cause of actual or likely injury to [Nike]." *Church & Dwight,* 843 F.3d at 65.  To establish injury for "the liability stage, the Lanham Act 'demands only proof providing a reasonable basis for the belief that the plaintiff is likely to be damaged as a result of the false advertising.'" *Id.* at 72 (quoting *Johnson & Johnson v. Carter–Wallace, Inc.*, 631 F.2d 186, 190 (2d Cir. 1980)); *Ortho Pharm. Corp. v. Cosprophar, Inc.,* 32 F.3d 690, 694 (2d Cir. 1994); *BeautyBank, Inc. v. Harvey Prince, LLP*, 2013 WL 11327097, at *18 (S.D.N.Y. Mar. 29, 2013) (as it is "virtually impossible" to prove actual diversion of sales or lost goodwill, plaintiff need only "show some indication of actual injury and causation enough to ensure [that the] plaintiff's injury [is] not speculative.").

As a threshold issue, the parties simultaneously offer for sale on their websites not just

---

[15] StockX knows that its Authenticity Claims are not only material—they are *essential* to their sale of highly desirable Nike and/or Jordan product.  SMF ¶¶ 8-11, 74-85.  StockX itself recognizes, both in internal studies, testimony, and public communications, the centrality of authenticity to its mission, to its consumers, and to StockX's value.  SMF ¶¶ 74-85.  StockX's Authenticity Claims are indisputably material to consumer purchasing decisions.  SMF ¶ 74-85.  No survey can change this fact.

[16] To the extent the Court finds that the Authenticity Claims are literally false and material, it should disregard the Butler Report as irrelevant.  Daubert at 6. ("[B]ecause materiality and falsity remain live issues at this stage of litigation, at least for now, Butler's testimony may be relevant.").

footwear, but dozens of the same exact styles of "new" and "authentic" Nike products.  SMF ¶¶

213-218.   This obvious competition affords Nike a presumption of harm.  *Merck Eprova AG v.*

*Brookstone Pharms*., LLC, 920 F. Supp. 2d 404, 417 (S.D.N.Y. 2013); *see also SimplexGrinnell*

*LP v. Integrated Sys. & Power, Inc.,* 642 F. Supp. 2d 167, 204 (S.D.N.Y. 2009) (where ISPI falsely

advertised ability to program SimplexGrinnell's fire panels, injury presumed as "SimplexGrinnell

and ISPI are obvious competitors in the market for service of Simplex fire alarm systems"),

*modified on reconsideration on other grounds,* 642 F. Supp. 2d 206 (S.D.N.Y. 2009).  This Court

recognized that the same "Nike" footwear available for sale through both StockX and Nike retail

outlets "tends to establish that StockX could have diverted sales from Nike."  (Dkt. No. 250 at 27-

28.)  As economist Dr. Stec explained, "the availability of the same Nike products as it is offering

on its own platform on the StockX platform, often at prices below retail, ensures that consumers

can substitute StockX purchases for Nike purchases of many of the same items…[it] is incorrect

to conclude just because Nike is in the 'primary' market and StockX is in a 'secondary' market,

the parties do not complete."  SMF ¶ 218.  As Nike and StockX are "obvious competitors" in the

market for "Nike"-branded footwear, injury must be presumed.  *Merck Eprova AG.,* 920 F. Supp.

2d at 417; *see Reckitt Benckiser Inc. v. Motomco Ltd.,* 760 F. Supp. 2d 446, 453 (S.D.N.Y. 2011).

Even absent a presumption, Nike easily meets this standard.  In addition to the parties'

competition (SMF ¶¶ 213-218), StockX's false advertising also causes significant reputational

harm to Nike.  SMF ¶¶ 219-238.  As Ms. Delli Carpini, Nike's VP, Global Brand Protection

testified, ███████████████████████████████████████████████████████

███████████████████████████████████████████  SMF ¶ 221; *See*

*WGACA, LLC*, , 2022 WL 902931, at *19 (WGACA summary judgment denied where Chanel

testified that "WGACA's false advertisements cause reputational harm to Chanel due to the risk

that a consumer buys a CHANEL-branded item from WGACA and 'has an experience ... with a quality of product that is not up to the standard of Chanel,' which damages what that customer (who could be a current or potential future Chanel customer) thinks of Chanel and its products."). And the evidence here goes far beyond that in *Chanel*, as (1) consumers have contacted Nike to return low quality "Nike" footwear purchased from StockX that it guaranteed were authentic, and (2) customers who raise concerns to StockX that the "Nike"-branded footwear they purchased is counterfeit are told that any issues are attributable to *Nike's* lack of quality control.  SMF ¶¶ 104-111, 232-238.   Nike also confirmed that StockX incorrectly represented counterfeit "Nike" footwear as authentic but "defective."  SMF ¶¶ 194-196.  *WGACA, LLC*, 2022 WL 902931, at *19; *see also Chanel, Inc.,* 449 F. Supp. 3d at 445 (plausible basis of claim was that defendant "falsely suggests to consumers that all of the Chanel products it offers for sale are genuine.  If this representation is not true, however, Chanel faces direct injury to its trademarks and possible diversion of sales based on The RealReal's circulation of counterfeit Chanel products.").

Finally, StockX's false advertising harms Nike when it loses sales to StockX's falsely advertised sales of counterfeits.  SMF ¶¶ 213-218, 223-224; *see also Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, 176 F. Supp. 3d 137, 162 (E.D.N.Y. 2016) (finding "no genuine factual dispute" that the sales of counterfeit products consumers represent lost sales to the brand); s*ee also Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.,* 219 F.3d 104, 107-08 (2d Cir. 2000). ("[T]he public may be deceived in the resale market if it requires expertise to distinguish between an original and a knockoff.  Finally, the purchaser of an original is harmed by the widespread existence of knockoffs because the high value of originals, which derives in part from their scarcity, is lessened."); *Gucci Am., Inc. v. Guess?, Inc.,* 843 F. Supp. 2d 412, 418 (S.D.N.Y. 2012). *Compare Souza v. Exotic Island Enterprises, Inc.,* 68 F.4th 99, 120 (2d Cir. 2023) (models

presented no evidence at all to support "actual or likely 'economic or reputational' injury" for false advertising from use of their pictures in defendant's social media posts).

In sum, Nike is entitled to summary judgment on false advertising for the Authenticity Claims because there is no genuine issue of material fact that they are literally false, material to consumer purchasing decisions, and cause harm to Nike.

## VI.    STOCKX'S CONDUCT IS WILLFUL

"To prove [Lanham Act] willfulness, a 'plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of reckless disregard or willful blindness.'"  *Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc.*, 507 F. App'x 26, 31 (2d Cir. 2013) (quoting *Island Software & Computer Serv., Inc. v. Microsoft Corp.,* 413 F.3d 257, 263 (2d Cir. 2005)).  "Reckless disregard for the possibility of infringement may be found when the infringer should have known—for instance, by virtue of his occupation—that the particular acts would constitute infringement."  *Innovation Ventures,* 176 F. Supp. 3d at 164 (internal quotations omitted).  "[W]illful blindness means that a defendant knew it might be selling infringing goods but nevertheless 'intentionally shielded itself from discovering' the truth," *Fendi Adele, S.R.L*, 507 F. App'x at 31 (quoting *Tiffany (NJ) Inc. v. eBay Inc.,* 600 F.3d 93, 109 (2d Cir. 2010)), and can be "proven on summary judgment; a finding of actual knowledge is not required." *Id.*; *see also Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.,* 689 F. Supp. 2d 585, 600 (S.D.N.Y. 2010), *amended on reconsideration* (Mar. 23, 2010) (summary judgment on willfulness appropriate where no "probative evidence raising a genuine issue of material fact.").

### A.    StockX's Counterfeiting is Willful.

StockX's counterfeiting is willful if it "knowingly engages in" or "recklessly disregards the possibility" of infringement.  *Chanel, Inc. v. Gardner,* 2010 WL 11713301, at *5 (S.D.N.Y. Apr. 6, 2010), *report and recommendation adopted*, 2011 WL 204911 (S.D.N.Y. Jan. 21, 2011).

"[W]illful blindness means that a defendant knew it might be selling infringing goods but nevertheless 'intentionally shielded itself from discovering' the truth." *Fendi Adele, S.R.L,* 507 F. App'x at 31. Courts have found willfulness where a defendant "failed to adequately inquire about the authenticity and original sources of the goods they purchased." *Id.*; *John Wiley & Sons, Inc. v. Book Dog Books, LLC,* 327 F. Supp. 3d 606, 627 (S.D.N.Y. 2018) (counterfeiting willful where *inter alia* "Defendants were aware that they continued to source from counterfeit suppliers" and "even after implementing basic [anti-counterfeiting] procedures, Defendants failed to ascertain where their suppliers sourced their books.").[17]

The evidence here overwhelmingly shows that StockX knew that counterfeit "Nike" footwear was sold on its platform. SMF ¶¶ 90-91, 198. Nike, StockX Power Buyers, customers, and the filing of this lawsuit each alerted StockX to the continued sale of counterfeits on its platform. SMF ¶¶ 104-111, 162-167, 193-196, 208-212. Nevertheless, StockX disregarded these complaints and continued to sell counterfeit "Nike" footwear, including dozens of pairs that StockX offered, distributed, and sold ***after*** the filing of this lawsuit. SMF ¶¶ 170-171, 198, App'x A at Pairs 5-37. This alone is sufficient to render StockX's counterfeiting willful. *See Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Star Mark Mgmt., Inc.*, 628 F. Supp. 2d 312, 324 (E.D.N.Y. 2009). Regardless, StockX ***at best*** recklessly disregarded that it was not only "authenticating" and selling fake "Nike" footwear, but that it created a counterfeiters' haven. SMF ¶¶ 125-129, 138-141. "StockX's website and model for selling products, particularly shoes, creates a conducive environment for bad actors to sell counterfeit products" and "is attractive for counterfeiters, for many reasons, including its protection and shielding of sellers, lack of vetting of sellers and their product provenance." SMF ¶ 127. StockX allows sellers to remain anonymous and required very

---

[17] Willfulness may also be found where there is no change in the behavior after a lawsuit is initiated. *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.*, 80 F.3d 749, 754 (2d Cir. 1996).

little information for a counterfeiter to start making sales on its platform.  SMF ¶¶ 120-126. ███

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ SMF ¶¶ 113-119.

StockX even provides sellers whose footwear failed authentication with details about why the product failed, providing a roadmap for counterfeiters on what "tells" StockX is looking for and how to correct for failures in the future.  SMF ¶¶ 133-137.  This is "a reckless practice when it comes to counterfeiting."  SMF ¶ 139.  StockX created an authentication system that it knew was faulty and did not stop fakes.  SMF ¶¶ 53-54, 90-93 99.  It relied only on its faulty authentication process and did not otherwise vet the provenance of footwear sold on its platform.  SMF ¶¶ 120-124.  A StockX authenticator following all ██████████████████████████████████████

███████████████████████████████████████████ SMF ¶¶ 52, 55.  StockX videos of its authenticators at work speak volumes about its faulty authentication process.  SMF ¶¶ 176, 178, 180, 182.  StockX expects its customers to report the sale of counterfeits, yet at the same time admits that the average consumers may not be able to discern whether footwear is counterfeit.  SMF ¶ 93.  Even where a buyer is sophisticated enough to notice something, StockX instructs customer service to make returns nearly impossible, and, ***incredibly***, encourages the resale of suspected fake items on the platform.  SMF ¶¶ 100-111.  StockX's business model does not shield it from willfulness; rather, this conduct establishes willfulness.

In sum, "no reasonable juror could conclude that [StockX] did not at the very least recklessly disregard the possibility that the goods were counterfeit." *Motorola, Inc. v. Abeckaser*, 2009 WL 962809, at *8 (E.D.N.Y. Apr. 8, 2009).

### B.    StockX's False Advertising Was Willful

False advertising is willful where the advertiser knew, or reasonably should have known, the challenged advertising was false or misleading. *Fendi Adeles, S.R.L.*, 507 F. App'x. at 26;

*Merck Eprova AG v. Brookstone Pharms., LLC*, 920 F. Supp. 2d 404, 433 (S.D.N.Y. 2013) (willfulness "demonstrated by Acella's deliberate deception"); *Imig, Inc. v. Electrolux Home Care Prod., Ltd.,* 2008 WL 905898, at *20 (E.D.N.Y. Mar. 31, 2008) (willful false advertising where "claims in the advertisements were knowingly false.")

StockX's Authenticity Claims were knowingly false.  At all relevant times, StockX knew or should have known that it was distributing counterfeit "Nike" footwear.  SMF ¶ 90-91, 125-129, 138-141, 198.  It knew that an authenticator could not determine whether "Nike"-branded footwear was made in a Nike manufacturing facility.  SMF ¶ 54.  It knew or should have known that at least some of its employees barely examined products before "passing" them.  SMF ¶¶ 55, 176, 178, 180, 182.  It knew that it had no idea what percentage of fakes were making it through authentication and into consumers' hands. SMF ¶¶ 92, 100-111.  It knew that Nike used proprietary technology to determine the provenance of a product and that it did not have access to that technology.  SMF ¶ 32.

Despite this knowledge, StockX continued to use the Authenticity Claims, even after Nike placed it on notice. SMF ¶¶ 57-73.  This displays an intent to deceive, or at the least, a reckless disregard for the utter, brazen falsity of its advertising.  *See Pedinol Pharmacal, Inc. v. Rising Pharms., Inc.,* 570 F. Supp. 2d 498, 503 (E.D.N.Y. 2008).  To this day, while StockX appears to have shifted away from the Authenticity Claims, its false message remains the same: "product authenticity remains core to [its] analysis."  SMF ¶¶ 66-68.

## VII.    CONCLUSION

For the foregoing reasons, the Court should grant Nike's Motion.

Date: August 8, 2024                    By:  _/s/ Tamar Y. Duvdevani_

                                        **DLA PIPER LLP (US)**

                                        Tamar Y. Duvdevani
                                        Marc E. Miller
                                        Joshua Schwartzman
                                        Jared Greenfield
                                        Gabrielle Chasin Velkes
                                        1251 Avenue of The Americas, 27th Fl.
                                        New York, NY 10020
                                        Telephone: (212) 335-4500
                                        Facsimile: (212) 335-4501

                                        _Attorneys for Plaintiff Nike, Inc._