# Exhibit 46

*Redacted Public Version*

```
                                                              Page 1

            UNITED STATES DISTRICT COURT

         FOR THE NORTHERN DISTRICT OF NEW YORK

                       -ooOoo-

    NIKE, INC.,                    :

              Plaintiff,           :

    vs.                            : No. 1:22-cv-00983-VEC

    STOCKX LLC,                    :

              Defendant.           :

    _____ :


               DEPOSITION OF BROCK HUBER
                    TAKEN THROUGH
     ADVANCED REPORTING SOLUTIONS, a Veritext company




           Taken on Thursday, June 29, 2023
              9:30 a.m. to 12:38 p.m.

              At HYATT CENTRIC PARK CITY
              3551 North Escala Court
                Park City, Utah 84098




    Reported by:  Abigail D.W. Johnson, RPR, CRR, CRC
```

Page 2

1  A P P E A R A N C E S
2
   For the Plaintiff:
3
           Tamar Y. Duvdevani
4      Marc E. Miller
       DLA PIPER
5      1251 Avenue of the Americas
       New York, New York 10020-1104
6      Tamar.duvdevani@dlapiper.com
       Marc.miller@dlapiper.com
7      (212) 335-4799
8
   For the Defendant:
9
           Christopher S. Ford
10     DEBEVOISE & PLIMPTON LLP
       650 California Street
11     San Francisco, California 94108
       Csford@debevoise.com
12     (415) 738-5705
13
   For StockX:
14
           Kevin Adams
15     Deputy General Counsel
       StockX
16
17 Also Present: McKayla Largin (videographer)
18                 -ooOoo-
19
20
21
22
23
24
25

Page 3

1            I N D E X
2  EXAMINATIONS                              PAGE
3  Examination By Ms. Duvdevani........................... 5
4  Examination By Mr. Ford...............................95
5
6            E X H I B I T S
7  EXHIBIT NO.       DESCRIPTION             PAGE
8  Exhibit 1  Deposition Notice......................... 5
9  Exhibit 2  Worksheet printout........................ 6
10 Exhibit 3  Screenshot and video ..................... 72
           [STX0806022 and STX0806023]
11
   Exhibit 4  Screenshot and video ..................... 81
12         [STX0806003 and STX0806004]
13 Exhibit 5  Screenshot and video ..................... 82
           [STX0806001 and STX0806002]
14
   Exhibit 6  Screenshot and video ..................... 85
15         [STX0806015 and STX0806016]
16 Exhibit 7  Screenshot and video ..................... 87
           [STX0805999 and STX0806000]
17
   Exhibit 8  Place holder and video ................... 89
18         [STX0806021]
19                  -o0o-
20
21
22
23
24
25

Page 4

1  June 29, 2023                9:26 a.m.
2            P R O C E E D I N G S
3                  -o0o-
4        VIDEOGRAPHER:  Good morning.  We are going
5  on the record at 9:26 a.m. on June 29th, 2023.  This is
6  the media deposition of the 30(b)(6) witness of Brock
7  Huber in the matter of Nike, Inc. versus StockX, LLC.
8  Case No. 1:22-cv-00983-VEC.
9        This deposition is held at the Hyatt in
10 Park City, Utah.  My name is McKayla Largin.  I am the
11 videographer, and Abby Johnson is the court reporter.
12       Will all counsel state who they represent
13 for the record?
14       MS. DUVDEVANI:  Good morning.  Tamar
15 Duvdevani, DLA Piper, on behalf of Plaintiff, Nike,
16 Inc.  I am joined by my partner, Mark Miller, also of
17 DLA Piper.
18       MR. FORD:  Good morning.  Christopher Ford,
19 Debevoise & Plimpton for StockX, LLC.  I am joined by
20 in-house counsel for StockX, Kevin Adams.
21 Thereupon --
22            BROCK HUBER,
23   was called as a witness, and having been first duly
24   sworn to tell the truth, the whole truth, and nothing
25       but the truth, testified as follows:

Page 5

1            EXAMINATION
2  BY MS. DUVDEVANI:
3     Q.   Good morning, Mr. Huber.
4     A.   Good morning.
5     Q.   I'm just going to first mark the deposition
6  notice that brings us all back together today.
7          (Exhibit No. 1 was marked
8           for identification.)
9  BY MS. DUVDEVANI:
10    Q.   Mr. Huber, the court reporter has just
11 handed you a document that's been designated as
12 Exhibit 1.  It is Plaintiff Nike, Inc.'s Amended
13 Deposition Notice of Rule 30(b)(6) Deposition to
14 StockX, LLC.
15       On page 6 and page 7, there are a list of
16 deposition topics, which I can represent your counsel
17 objected to some of them.
18       But do you understand that you are the
19 designated witness to testify today pursuant to this
20 amended notice?
21    A.   Yes, I do.
22    Q.   Okay.
23       MS. DUVDEVANI:  This is the big --
24       MR. FORD:  You are just doing it at once?
25       MS. DUVDEVANI:  Might as well.

Page 6

1          THE WITNESS:  It looks different printed
2 out.
3          (Exhibit No. 2 was marked
4              for identification.)
5 BY MS. DUVDEVANI:
6    Q.   Mr. Huber, the court reporter has handed
7 you a document that has been designated as Exhibit 2.
8 I note that you just said it looks a little different.
9 I assume you mean from you viewing the same documents
10 online.
11    A.   Yes, that's right.
12    Q.   Okay.  We are certainly going to get into
13 details about Exhibit 2.  What I'd like you to do first
14 and foremost, and feel free to leaf through it to make
15 sure it's everything that you recognize, is just very,
16 very generally describe what Exhibit 2 is.
17    A.   Okay.  This looks like the same document
18 that I reviewed on a computer.  It's an Excel
19 spreadsheet.  It features four tabs put together at
20 kind of different times, in some cases with different
21 purposes, in response to an incident regarding one of
22 our buyers, Mr. Roy Kim, who alleged to have received
23 some items that he suspected were inauthentic.
24    Q.   Okay.  And what -- starting with the first
25 tab -- and let me also just note for the record that

Page 7

1 Exhibit 2 was designated by StockX as having a Bates
2 stamp of STX0806024, even though it's not on the
3 printout.  That is how it was produced.
4          You mentioned that there are several tabs.
5 Starting with the first tab, which I believe is just
6 the first two pages of the printout, can you generally
7 describe what this first tab of Exhibit 2 contains in
8 terms of content?
9    A.   Yes.  So this spreadsheet was primarily,
10 but not entirely, created by Abe Zurita, who manages --
11 or at the time was managing our Tempe, Arizona,
12 authentication center.  And he was asked to receive and
13 reinspect some items that had made their way to an end
14 buyer.
15          And this initial sheet, this first tab
16 here, these first two pages, are primarily the work
17 product of that assignment that was given to him with a
18 few exceptions.
19    Q.   You stated products made their way to an
20 end buyer.  Was that end buyer Roy Kim?
21    A.   Yes, I believe all 33 items listed here
22 were items received by Roy Kim.
23    Q.   Okay.  And when you say "made their way to
24 Roy Kim," how did they make their way to Roy Kim?
25    A.   They made their way through the ordinary

Page 8

1 course of business at StockX.  A seller was paired with
2 a buyer.  The buyer in this case being Roy Kim.  The
3 items were shipped from the seller to one of our
4 authentication centers, passed through our proprietary
5 verification process and were ultimately shipped out to
6 this buyer.
7    Q.   Okay.  And you stated in connection with
8 your testimony regarding Abe Zurita -- is that his last
9 name?
10    A.   Mm-hmm.
11    Q.   That the products that appear -- strike
12 that -- the order numbers associated with the products
13 that were shipped to Roy Kim were returned by Roy Kim;
14 is that correct?
15    A.   Yes.  That is correct.  That is our policy
16 and has always been our policy.  If an end buyer has an
17 issue with an order, they reach out to our customer
18 service.  They suspect something they received is
19 inauthentic.  We will initiate a review, which
20 typically starts with receiving some pictures of the
21 items in question.  And after that photographic review,
22 if we continue to have doubts with the order, we will
23 ask the buyer to send it back to us for an inspection,
24 like the one that Abe did here.
25    Q.   Okay.  So it's your testimony that Abe

Page 9

1 reinspected all of the products associated with the
2 order numbers on the first tab of Exhibit 2; is that
3 correct?
4    A.   So -- so both Abe, which you can see in
5 Column I, reauthenticated these, as well as John Lopez,
6 who coincidentally was out at that facility for the
7 week, but that was just luck -- as luck would have it,
8 he was there.
9    Q.   And when you say "John Lopez," is that
10 referring to the name "Johnny" in exhibit --
11    A.   That is Johnny --
12    Q.   -- in Column J?
13    A.   -- Yes.
14    Q.   And did Abe and Mr. Lopez reach a
15 determination as to whether or not the product shipped
16 to Roy Kim and returned that appears in Exhibit 2 were
17 authentic?
18          MR. FORD:  Objection to the form of the
19 question.
20          THE WITNESS:  They -- they concluded that
21 these items were not fit to transact on our platform.
22 BY MS. DUVDEVANI:
23    Q.   Did they conclude that these items were not
24 fit to transact on your platform because they were not
25 authentic?

3 (Pages 6 - 9)

|  |  |
|---|---|
| Page 10 | Page 12 |
| 1  MR. FORD: The same objection.<br>2  THE WITNESS: They concluded that they were<br>3  not fit to transact because they were suspected to be<br>4  inauthentic.<br>5  BY MS. DUVDEVANI:<br>6  Q. Okay. Was there no definitive<br>7  determination by either Abe or Mr. Lopez regarding the<br>8  authenticity of the products associated with the order<br>9  numbers listed in Exhibit 2?<br>10  MR. FORD: The same objection.<br>11  Sorry. Go ahead.<br>12  THE WITNESS: I would say there was a<br>13  definitive determination that they weren't fit to<br>14  transact. But we don't make definitive legal<br>15  determinations as to whether something is considered<br>16  counterfeit or not.<br>17  BY MS. DUVDEVANI:<br>18  Q. Putting a legal determination aside, did<br>19  StockX reach any conclusions upon the return of the<br>20  products listed in Exhibit 2 as to whether or not they<br>21  were fake?<br>22  MR. FORD: Objection to the form of the<br>23  question.<br>24  THE WITNESS: They -- again, we concluded<br>25  that they were not fit to transact on our platform. We | 1  summarized, in relatively short form here, the issues<br>2  that they found upon reinspecting these items that made<br>3  them come to the conclusion that these were not fit to<br>4  transact on our platform.<br>5  Q. I understand your testimony that your<br>6  employees determined that the products were not fit to<br>7  be -- to transact on your platform. It sounds like<br>8  your testimony is that StockX could not determine, one<br>9  way or another, whether or not the products were<br>10  genuine.<br>11  Is that your testimony?<br>12  MR. FORD: Objection to the form of the<br>13  question as to the characterization.<br>14  You can answer.<br>15  THE WITNESS: No. I think -- again, the<br>16  point of our proprietary verification process is to<br>17  determine if an item meets our standard, and if we want<br>18  to have that item to be eligible to transact on the<br>19  platform.<br>20  And so upon reinspection, the determination<br>21  was that these items did not meet our standard.<br>22  BY MS. DUVDEVANI:<br>23  Q. And that StockX was suspicious that they<br>24  were fake; correct?<br>25  MR. FORD: Objection to the form of the |
| Page 11 | Page 13 |
| 1  concluded that the buyer was entitled to a refund. And<br>2  we had some suspicions that these items could<br>3  potentially be inauthentic.<br>4  BY MS. DUVDEVANI:<br>5  Q. Is it your testimony that the StockX<br>6  employees, who re-authenticated these products, just<br>7  could just not tell whether or not these products were<br>8  authentic?<br>9  A. Again, I think, you know, it's important to<br>10  always go back to the fact that this is our proprietary<br>11  verification process, the standards that we created.<br>12  And so it was very definitive that these did not meet<br>13  our standards.<br>14  Q. Was it definitive whether or not the<br>15  products were genuine Nike products?<br>16  A. I think we suspected they were inauthentic,<br>17  and that made us definitively say they could not be<br>18  transacted on our platform.<br>19  Q. And we'll go through them one by one, but<br>20  generally speaking, what were your suspicions based on?<br>21  A. So with the creation of this sheet and<br>22  having talked to Abe and John both, they were simply<br>23  given instruction to review these and say, "Hey, take<br>24  another look. We are getting a return from a buyer."<br>25  And I believe if we look at Column R, they | 1  question.<br>2  THE WITNESS: Yes, I believe both of these<br>3  authenticators suspected these items were not<br>4  authentic.<br>5  BY MS. DUVDEVANI:<br>6  Q. What does the word "suspicious" mean when<br>7  you are using it in the context that you're testifying<br>8  today?<br>9  A. Are you asking when I say it or where it<br>10  appears in the sheet?<br>11  Q. Are those two different definitions?<br>12  A. Yeah, the context would be a bit different.<br>13  Q. Okay. Let's start with your testimony.<br>14  A. So when I say "suspicious," I mean there<br>15  are some issues, some -- it could be manufacturing<br>16  defects. It could be some issues with the color. It<br>17  could be some issues with the material, the shape.<br>18  And you know, with items that are created<br>19  and scaled, there's going to be some variation. And so<br>20  there may be some tells that create suspicion. And we<br>21  say, "We are not sure about this. As a result, it may<br>22  not meet our standard." And we may fail it due to<br>23  those suspicious attributes.<br>24  Q. Suspicious of what?<br>25  A. Potentially being inauthentic. |

Page 14

1  Q. Okay. Am I correct that one element of
2  StockX's proprietary verification process is whether
3  the item is authentic?
4  A. So our -- our guarantee that we've always
5  had is that we verify every single item. And we
6  guarantee that you are going to get an item that is
7  exactly as expected. It's what you wanted. It's the
8  right size. It is the right colorway. It's in brand
9  new condition. It has the accessories. And that this
10 item would be a legitimate item from the manufacturer.



Page 15

Page 16

Page 17

5 (Pages 14 - 17)

Page 26

20  Q.  What -- what qualifies Abe to
21  reauthenticate, reexamine, reverify, whatever word you
22  want to use,
23  what are his qualifications to do that?
24  A.  Abe is a -- Abe is a big time sneaker-head.
25  Abe -- I did not study this to get ready, but I'm

Page 27

1  pretty sure -- I've known Abe for a while now.  Abe
2  worked at a Foot Locker, which is an authorized Nike
3  retailer for many years.  And he opened his own store
4  in the Phoenix, Arizona, area, where he was basically
5  facilitating aftermarket resale trades.  And people
6  come in and sell shoes directly to him.  He would keep
7  them on the shelf, sell them to the next folks.  He did
8  that for a number of years.
9       And then he joined StockX as an entry level
10 authenticator.  You know, he helped create some of the
11 propriety process that we have, and he built up that
12 knowledge base over time.  Advanced through the
13 authentication levels and ultimately had been promoted
14 to authentication management.
15      So he has got a long and storied history
16 before StockX, and he has certainly been through and
17 helped to create our proprietary process for a number
18 of years.
19 Q.  And what does his review of the shoes that
20 he reexamines involve?

Page 28

Page 29

8 (Pages 26 - 29)







```
11        Would you agree with me that Roy Kim
12   returned more than 33 sneakers?
13        A.   No.  He returned 33 sneakers.
14        Q.   Okay.  Continuing on, just let's get
15   through this, this first tab, and then we can take a
16   little break.
```

11 (Pages 38 - 41)

Page 42

[redacted]

Page 43

[redacted]

14  Q.  Okay.  Other than Roy Kim, was any other
15  StockX consumer shipped product from this group of bad
16  actors?
17  A.  We don't believe there is any reason to
18  suggest that more bad product went through our process
19  and made it through.
20      It's also important to realize a lot of
21  these bad actors will ship good product in an effort to
22  have positive account attributes in order to trick the
23  StockX verification process and our fraud team.
24  Q.  Why don't you have any reason to suggest
25  that more bad product went through and made it through?

Page 44

1  A.  We have a lot of good faith in our
2  verification process, that our authentication team, you
3  know, when following our operating procedures and
4  inspecting these like Abe and John did, would reject
5  these items.
6      And we don't -- we didn't have any other
7  buyers who complained about the products that they
8  received, and no reinspections were -- were necessary.
9  Q.  Okay.  So 33 of these clearly did not get
10  caught and made it to a customer.
11      So are you saying that you don't have any
12  reason to suspect that additional product made it
13  through simply because you didn't receive any other
14  complaints from consumers?
15  A.  That is a data point, we did not receive
16  any complaints from consumers.  But the other items
17  went through our verification process, which we stand
18  by.  And I think that it is important to note, while 33
19  is a totally dissatisfactory number, you know, Roy Kim,
20  as an individual, made 2,300-plus orders with StockX
21  that he has never had an issue before.  And he
22  continues to shop with us, even after this incident,
23  because he knows, you know, the quality of our program.

Page 45

[redacted] And so
5  again, I think, it's probably important to know with
6  this investigation that, you know, our -- the way our
7  platform works, the buyer and seller are anonymous to
8  each other, but they -- neither of them are anonymous
9  to us in any way.
10      And so part of the process and, you know,

| Page 46 | Page 48 |
|---|---|
| [redacted] | 1  years. |
|  | 2      Q.  Two years? |
|  | 3      A.  Two years. |
| 4      Q.  Sounds like it's a good time for a break | 4      Q.  As an authenticator? |
| 5  then. | 5      A.  As an authenticator. |
| 6      A.  Yeah, let's do it. | 6      Q.  Do you know when he was terminated? |
| 7      Q.  Okay. | 7      A.  I don't know the exact date, but it would |
| 8          VIDEOGRAPHER:  We are off the record.  The | 8  have been the summer of last year. |
| 9  time is 10:30. | 9      Q.  Okay. |
| 10         (Recess was taken.) | 10     A.  He was the only one, like I said earlier, |
| 11         VIDEOGRAPHER:  We are back on the record. | 11 that was terminated in connection with our Roy Kim |
| 12 The time is 10:50. | 12 investigation, but about half the folks that are on |
| 13         Counsel may proceed. | 13 this list are no longer with the company.  I tried to |
| 14 BY MS. DUVDEVANI: | 14 memorize them all.  It was a little too hard.  And then |
| 15     Q.  Okay.  What did you do to prepare for | 15 Abe has been with us for five years, as I said before |
| 16 today's deposition? | 16 earlier. |
| 17     A.  I spent some time with Abe Zurita.  I spent | 17     Q.  Okay.  And do you know if any of the other |
| 18 some time with John Lopez, with Mark Porteous.  And | 18 authenticators, who are no longer with the company, |
| 19 Jennifer from Mark Porteous' team and asked them | 19 were terminated, or you don't know that? |
| 20 questions, given their varied involvement in the | 20     A.  They were not terminated in conjunction |
| 21 preparation of these materials, and just asked them to | 21 with this at all.  I don't know the reasons for their |
| 22 recall what they could about the -- the time about a | 22 exits. |
| 23 year ago. | 23     Q.  Do you know if they were terminated for |
| 24     Q.  Okay.  Did you do anything else? | 24 other errors made in authentication? |
| 25     A.  I prepared with the legal advisors as well. | 25     A.  I don't know.  The other thing that I |

| Page 47 | Page 49 |
|---|---|
| 1      Q.  When did that preparation take place? | 1  checked, this person who is still investigating, was |
| 2      A.  The last week or so. | 2  ultimately deemed not to be part of the group that we |
| 3      Q.  For how long did you -- are you saying that | 3  had kind of made a circle around. |
| 4  you met with your legal counsel to prepare for today? | [redacted] |
| 5      A.  Certainly, they guided the sessions, and |  |
| 6  they asked the questions as well where we were -- |  |
| 7          MR. FORD:  Just yes or no. |  |
| 8  BY MS. DUVDEVANI: |  |
| 9      Q.  Just yes or no.  I don't want to know |  |
| 10 exactly what you talked about. |  |
| 11     A.  Sure.  Yes. |  |
| 12     Q.  How many sessions were there? |  |
| 13     A.  Four or five sessions. |  |
| 14     Q.  Okay.  I know that this was a slightly |  |
| 15 longer break than usual, did that preparation continue |  |
| 16 during the break just now? |  |
| 17     A.  We were trying to get the answers to some |  |
| 18 of the questions you asked us to look into -- |  |
| 19     Q.  Okay. |  |
| 20     A.  -- on the break. |  |
| 21     Q.  Okay.  Were you able to? |  |
| 22     A.  Yes. |  |
| 23     Q.  Okay.  What did you find out during the |  |
| 24 break? |  |
| 25     A.  Raymond Jones worked for us about two |  |

Page 70

[lines 1-12 redacted]

13  Q.  Okay.
14      MS. DUVDEVANI:  Let's take another break.
15      VIDEOGRAPHER:  We are off the record.  The
16  time is 11:37.
17      (Recess was taken.)
18      VIDEOGRAPHER:  We are back on the record.
19  The time is 11:34.
20  BY MS. DUVDEVANI:
21  Q.  After Copy of Referenced Social Media,
22  there was another tab provided in this document called,
23  "Copy of Entire Trade History."  Don't worry, I'm not
24  going to go through the whole thing.
25  A.  Let's do it.

Page 71

1  Q.  Well, that will exceed my three-hour
2  negotiated time limit.

[remaining lines redacted]

Page 72

1  Q.  Okay.  Okay.
2      MS. DUVDEVANI:  All right.  Let's go off
3  the record for a few minutes while we set up the
4  record.
5      VIDEOGRAPHER:  Off the record.  The time is
6  11:37 [sic].
7      (Recess was taken.)
8      VIDEOGRAPHER:  Going back on the record.
9  The time is 11:26.
10 BY MS. DUVDEVANI:
11 Q.  Okay.  Mr. Huber, there is now a screen in
12 front of you containing some videos that were produced
13 by StockX.  I'll represent that those videos were also
14 produced along with a corresponding page that appears
15 to be a screenshot of each video.
16     So what I'm going to do is just for ease of
17 reference is mark the screenshot of the video, and then
18 we will watch the corresponding video.  Make sense?
19 A.  Yes.
20 Q.  So the first one.
21     (Exhibit No. 3 was marked
22      for identification.)
23 BY MS. DUVDEVANI:
24 Q.  The court reporter has just handed you a
25 very blurry image designated as Exhibit 3 containing

Page 73

1  the Bates stamp STX0806022, which corresponds with a
2  video that's been Bates-stamped as STX0806023.
3      So let me know if you can locate the video
4  with that Bates stamp on the laptop in front of you.
5  A.  I have located it.
6  Q.  Okay.
7      MR. FORD:  And just for the record, we are
8  marking as Exhibit 3, both the image ending in 022 and
9  the video file ending in 023 as the exhibit?
10     MS. DUVDEVANI:  I think that is the most
11 practical way to do it, since we can't stick a sticker
12 on the video, yes.
13     MR. FORD:  Okay.
14     MS. DUVDEVANI:  So thank you for your
15 clarification, Mr. Ford.
16 BY MS. DUVDEVANI:
17 Q.  All right.  Let's go ahead and press play
18 on the count of 3, ready?  1, 2, 3.  And then we will
19 watch it one time through and then I might ask
20 questions about it as we go.
21     [Video played.]
22     THE WITNESS:  It's over.
23 BY MS. DUVDEVANI:
24  [redacted]

19 (Pages 70 - 73)





Page 81

1   Q.   All right.  Let's go to the next one.  I
2   will tell you what the next one is in a second.
3           (Exhibit No. 4 was marked
4             for identification.)
5   BY MS. DUVDEVANI:
6   Q.   All right.  The court reporter has just
7   designated as Exhibit 4 a screenshot of a video
8   containing Bates stamp STX0806003.  The associated
9   video is designated as STX0806004.
10          And that is the one that we are going to
11  watch next.  So let's do our same on the count of
12  three.
13  A.   Okay.
14  Q.   Let me know when you have it.
15  A.   I am ready.
16  Q.   Okay.  1, 2, 3.
17          [Video played.]
18          THE WITNESS:  It's over.
19  BY MS. DUVDEVANI:

21 (Pages 78 - 81)

Page 82

19  Q.   Okay.  Okay.  Let's go to the next one.
20       (Exhibit No. 5 was marked
21        for identification.)
22  BY MS. DUVDEVANI:
23  Q.   Okay.  The court reporter has just handed
24  you a screenshot that's been marked as Exhibit 5
25  containing the Bates stamp STX0806001.  There is an

Page 83

1  associated video that will also be designated as
2  Exhibit 5 that's been Bates-stamped as STX0806002.
3       We are just getting that one opened.  And
4  once again, we'll -- we'll watch on my three.
5  A.   All right.
6  Q.   Okay.
7  A.   Yep.
8  Q.   1, 2, 3.
9       [Video played.]
10      THE WITNESS:  It's done.
11 BY MS. DUVDEVANI:

Page 84

25  //

Page 85

1       (Exhibit No. 6 was marked
2        for identification.)
3  BY MS. DUVDEVANI:
4  Q.   And the court reporter has handed you
5  another document that's been designated as Exhibit 6,
6  containing the Bates stamp STX0806015.  That's
7  associated with a video STX0806016.
8       And on my three, again.  1, 2, 3.
9       [Video played.]
10      THE WITNESS:  It's done.
11 BY MS. DUVDEVANI:

22 (Pages 82 - 85)

Page 86

[redacted]

22  Q.  Okay.  So the next video that we are going
23  to watch, unless Mr. Miller is about to give me another
24  folder, all I have is a document that says "File
25  Provided Natively."

Page 87

1       So I think we are going to get the
2  screenshot folder right now, and we are.  Okay.
3          (Exhibit No. 7 was marked
4           for identification.)
5  BY MS. DUVDEVANI:
6  Q.  All right.  So the court reporter has just
7  handed you a screenshot designated as Exhibit 7
8  containing the Bates stamp STX0805999, that's
9  associated with the video containing Bates stamp
10 STX0806000.
11 A.  I've got it.
12 Q.  Okay.  All right.  So on my three again.
13 1, 2, 3.
14       [Video played.]
15       THE WITNESS:  It's done.
16 BY MS. DUVDEVANI:

[redacted]

Page 88

[redacted]

24  Q.  Okay.  All right.  And then the last video
25  that I want to watch today, I do not have an associated

Page 89

1  screenshot.  It goes with order No. 38023249.
2       Do we know which video it is?  It's video
3  STX0806021.  So on my list, that's the second to last
4  one.
5  A.  Yep, I will pull that up.
6       MR. FORD:  Just for the record, we are
7  going to mark that as the next exhibit?
8       MS. DUVDEVANI:  Yeah.  So that video will
9  be Exhibit 8, but there was no accompanying --
10      MR. FORD:  Screenshot?
11      MS. DUVDEVANI:  -- screenshot that was
12 produced along with that video for some reason.
13      So on three, one more time.  1, 2, 3.
14      [Video played.]
15        (Exhibit No. 8 was marked
16          for identification.)
17      THE WITNESS:  It's done.
18 BY MS. DUVDEVANI:

[redacted]

23 (Pages 86 - 89)

Page 98

1      REPORTER'S CERTIFICATE
2  STATE OF UTAH     )
                    )
3  COUNTY OF SALT LAKE )
4          I, ABIGAIL D.W. JOHNSON, a Certified
5  Shorthand Reporter and Registered Professional
6  Reporter, hereby certify:
7          THAT the foregoing proceedings were
8  taken before me at the time and place therein set
9  forth, at which time the witness was placed under oath
10 to tell the truth, the whole truth, and nothing but the
11 truth; that the proceedings were taken down by me in
12 shorthand and thereafter my notes were transcribed
13 through computer-aided transcription; and the foregoing
14 transcript constitutes a full, true, and accurate
15 record of such testimony adduced and oral proceedings
16 had, and of the whole thereof.
17         I FURTHER CERTIFY that I am not a
18 relative or employee of any attorney of the parties,
19 nor do I have a financial interest in the action.
20      ( ) Review and signature was requested.
21      ( ) Review and signature was waived.
22      (X) Review and signature was not requested.
23      I have subscribed my name on this
24 6th day of Jul     *Abigail D.W. Johnson*

25      _____
         ABIGAIL D.W. JOHNSON, RPR, CRR, CRC

26 (Page 98)