# Exhibit 89

*Redacted Public Version*

HIGHLY CONFIDENTIAL

```
                                                    Page 1

 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF NEW YORK

 3

 4   NIKE, INC.,

 5                     Plaintiff,

 6            vs.                    Case No. 22-CV-983 (VEC)

 7   STOCKX, LLC,

 8                     Defendant.

 9   _____

10                 *** HIGHLY CONFIDENTIAL ***

11

12            The Videotaped Deposition of RUSSELL AMIDON,

13            Taken at 28 West Adams Avenue, Suite 1500,

14            Detroit, Michigan,

15            Commencing at 10:06 a.m.,

16            Wednesday, November 30, 2022,

17            Before Stenographic Shorthand Reporter,

18            Lori Ann Baldwin, CSR-5207, RPR, CRR.

19

20

21

22

23

24

25
```

HIGHLY CONFIDENTIAL

Page 2

1 APPEARANCES:
2
3 TAMAR Y. DUVDEVANI
4 GABRIELLE VELKES
5 DLA Piper LLP (US)
6 1251 Avenue of the Americas
7 New York, New York 10020-1104
8 212.335.4799
9 tamar.duvdevani@dlapiper.com
10 gabrielle.velkes@us.dlapiper.com
11     Appearing on behalf of Plaintiff.
12
13 CHRISTOPHER S. FORD
14 Debevoise & Plimpton LLP
15 650 California Street
16 San Francisco, California 94108
17 415.738.5705
18 csford@debevoise.com
19     Appearing on behalf of Defendant.
20
21
22
23
24
25 APPEARANCES (Continued)...

Page 3

1 APPEARANCES (Continued):
2
3 MEGAN K. BANNIGAN
4 CATHERINE WALSH
5 Debevoise & Plimpton LLP
6 919 Third Avenue
7 New York, New York 10022
8 212.909.6127
9 mkbannigan@debevoise.com
10 cwalsh@debevoise.com
11     Appearing on behalf of Defendant.
12
13 ALSO PRESENT:
14 Laura Lewis - In-house Counsel for StockX, LLC
15 Shannon Egan - In-house Counsel for StockX, LLC
16 Justin Dloski - Videographer
17
18
19
20
21
22
23
24
25

Page 4

1       TABLE OF CONTENTS
2
3 WITNESS                    PAGE
4 RUSSELL AMIDON
5
6 EXAMINATION BY:
7 TAMAR Y. DUVDEVANI          7
8
9       EXHIBITS
10
11 EXHIBIT                   PAGE
12 (Exhibits to be forwarded.)
13
14 DEPOSITION EXHIBIT 1       38
15 STX0143893-STX0143925
16 DEPOSITION EXHIBIT 2       54
17 STX0031295-STX0031299
18 DEPOSITION EXHIBIT 3       59
19 STX0054591-STX0054593
20 DEPOSITION EXHIBIT 4       64
21 STX0069394-STX0069397
22 DEPOSITION EXHIBIT 5       72
23 STX0096035-STX0096037
24 DEPOSITION EXHIBIT 6       77
25 STX0177837-STX0177838

Page 5

1 DEPOSITION EXHIBIT 7       79
2 STX0772981-STX0772985
3 DEPOSITION EXHIBIT 8       87
4 STX00772942-STX0072945
5 DEPOSITION EXHIBIT 9       91
6 ZK_NIKE_000812-ZK_NIKE_000813
7 DEPOSITION EXHIBIT 10      93
8 ZK_NIKE_007784-ZZ_NIKE_007793
9 DEPOSITION EXHIBIT 11      96
10 ZK_NIKE_007957-ZK_NIKE_007958
11 DEPOSITION EXHIBIT 12      98
12 ZK_NIKE_009294
13 DEPOSITION EXHIBIT 13      100
14 ZK_NIKE_009651-ZK_NIKE_009660
15 DEPOSITION EXHIBIT 14      102
16 ZK_NIKE_010032
17 DEPOSITION EXHIBIT 15      102
18 ZK_NIKE_010428-ZK_NIKE_010428
19 DEPOSITION EXHIBIT 16      103
20 ZK_NIKE_011512-ZK_NIKE_011515
21 DEPOSITION EXHIBIT 17      106
22 STX0178024-STX0178025
23
24
25

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL

Page 6

1 Detroit, Michigan
2 Wednesday, November 30, 2022
3 10:06 a.m.
4
5           VIDEO TECHNICIAN:  We are on the record at
6 10:06 on November 30th, 2022.  This is the video
7 recorded deposition of Russ Amidon in the matter of
8 Nike versus StockX filed in the Southern District of
9 New York, case 22-cv-00983.
10          We are located at 28 West Adams Avenue,
11 Detroit, Michigan.  My name is Justin Dloski from
12 Veritext.
13          Counsel may now introduce themselves for
14 the record then the reporter will swear in the
15 witness.
16          MS. DUVDEVANI:  Tamar Duvdevani, DLA Piper
17 on behalf of Nike, Inc.
18          MS. VELKES:  Gabrielle Velkes, DLA Piper on
19 behalf of Nike, Inc.
20          MR. FORD:  Christopher Ford, Debevoise &
21 Plimpton, on behalf of StockX.  I'm going by my
22 colleagues, Megan Bannigan and Catherine Walsh, also
23 from Debevoise, as well as Stock house -- StockX's
24 in-house counsel, Laura Lewis and Shannon Egan.
25          RUSSELL AMIDON,

Page 7

1      Was thereupon called as a witness herein, and after
2      having first been duly sworn to testify to the truth,
3      the whole truth and nothing but the truth, was
4      examined and testified as follows:
5                EXAMINATION
6 BY MS. DUVDEVANI:
7 Q.  Okay.  All right.  Good morning, Mr. Amidon.
8 A.  Good morning.
9 Q.  As you've just heard, my name is Tamar Duvdevani.  I'm
10    counsel for Nike, Inc.
11        Have you ever been deposed before?
12 A.  I have not.
13 Q.  When did you begin working at StockX?
14 A.  In March 2016.
15 Q.  And what was your title when you began working at
16    StockX in March 2016?
17 A.  I was our Director of Customer Experience.
18 Q.  Okay.  What does that job entail?
19 A.  At that time, it was strictly our Customer Service
20    Teams.  I would respond to any inbound inquiry.  So I
21    was the only Customer Service team member at the time.
22 Q.  How many Customer Service team members are there
23    today?
24 A.  I'm not sure.
25 Q.  More than ten?

Page 8

1 A.  Oh, yeah.  Yeah.  A few hundred.
2 Q.  A few hundred.  Okay.  Since you've never been deposed
3    before, let me give you some ground rules, although
4    I'm sure that your counsel filled you in.
5        For the sake of the transcript and the
6    court reporter, let's try not to talk over each other.
7    I will try not to interrupt you.  You try not to
8    interrupt me.
9        To the extent a question is pending, I
10    would not take a break until the answer is provided,
11    however, today is your day, so if you do need to take
12    a break, just say so and we can go ahead and take
13    however many breaks you want, even though we want to
14    get out of here relatively early today.
15        Did you meet with your counsel before
16    coming here to prepare for today's deposition?
17 A.  Yes.
18 Q.  How many times?
19 A.  Two times.
20 Q.  When was that?
21 A.  One yesterday and one last week.
22 Q.  Okay.  Back to -- one other thing.  You might hear
23    your lawyer say "objection" or "objection to form."
24    That doesn't mean that you don't answer the question.
25    The only time you should not answer the question is if

Page 9

1    your counsel tells you not to answer a question based
2    on privilege.  Got it?
3 A.  Got it.
4 Q.  Okay.  All right.  So 2016, was that when -- did
5    you -- did you begin working at StockX when it was
6    founded?
7 A.  I did not.
8 Q.  Okay.  How long had it been in existence at the time
9    you began working for the company?
10 A.  I believe we launched StockX a -- a month or two
11    before.
12 Q.  Okay.  Is your title the same today as it was in 2016?
13 A.  It is not.
14 Q.  Okay.  Can you take me through your employment history
15    at StockX?
16 A.  Sure.  From 2016 to 2018, I led our Customer Service
17    team, my title was Director of Customer Experience.
18        In 2018, transitioned to Senior Director of
19    VIP Relations, and -- from 2018 to 2020.  And 2020 to
20    present, it is Senior Director of Account Management.
21 Q.  What were your duties and responsibilities in your
22    position as Senior Director of VIP Relations from 2018
23    to 2020?
24 A.  Sure.  I had a few different roles, one of which was
25    starting to communicate with what we call power buyers

3 (Pages 6 - 9)

HIGHLY CONFIDENTIAL

Page 10

1    or power sellers, people who bought or sold more than
2    our average customer at that time.
3            And then I also helped with more of our
4    celebrity or VIP customers who were just buying on our
5    platform and offered them a -- a contact at the -- at
6    the company.
7  Q.  Anything else?
8  A.  Not during that time, no.
9  Q.  And you said you had a new title in 2020 through
10    present as Senior Director of Account Management, is
11    that right?
12  A.  Correct.  I believe it was 2020, yeah.
13  Q.  Okay.  And what were your -- what are your duties and
14    responsibilities in connection with your current
15    title?
16  A.  It's similar to my 2020 -- my 2018 to 2020 role,
17    but without the celebrity VIP account management.  So
18    it's more my team focuses on power sellers and
19    supporting them in their business inventory and so we
20    have a global team of about 20 that are account
21    managers.
22  Q.  So that means right now you have approximately 20
23    people reporting to you, is that right?
24  A.  Approximately, yeah.
25  Q.  Okay.  And from 2018 to 2020, did you also have direct

Page 11

1    reports?
2  A.  I had only a couple, maybe one to three at the time.
3  Q.  Okay.  How come you no longer handle celebrity account
4    management in your new title?
5  A.  It moved back to marketing and to have a more
6    specialized role as we -- as we scaled.
7  Q.  What does that mean?
8  A.  It just means I didn't also do -- I don't do that
9    anymore, and so my focus is more on just sellers and
10    not any longer supporting a VIP customer.
11  Q.  Sellers, or buyers as well?
12  A.  Today, it's just sellers.  Just sellers today.
13  Q.  And when was it sellers and buyers?
14  A.  From 2018 to -- 2018 to -- to -- 2018 to present as in
15    there is a few buyers that we maybe still talk to, but
16    not -- it's very much focused on sellers.
17  Q.  Why is that?
18  A.  We -- as we have scaled, we started to provide more
19    incentives and more tooling to sellers and buyers
20    are -- we really don't have a lot to offer them in
21    terms of incentives or discounts.  So there wasn't a
22    whole lot we could -- could do for them from a
23    account management perspective.
24  Q.  Okay.  Can you explain to me in as much detail as
25    possible what you mean by "incentives" to sellers?

Page 12

1  A.  Sure.  So we incentivize our sellers to, if they sell
2    more on our platform, we provide fee breaks to them
3    because we believe that it's a customer retention
4    loyalty program, so we offer them a few different
5    things; one is our volume program where the more you,
6    essentially, the more you sell, the lower seller fee
7    you can receive.
8            And two is a rather new bonus within the
9    last year-and-a-half where you can receive additional
10    fee breaks by behavioral bonuses, so doing things as a
11    seller that would benefit the buyer.
12  Q.  Such as what?
13  A.  We have two bonuses; one of which is if you fulfill a
14    higher percentage of the orders that you were, that
15    you committed to selling, so what we call a
16    fulfillment bonus, we'll give you a -- a one percent
17    break the next month.  So that's one of them.  So that
18    means the more orders you fulfill, that you said you
19    would fulfill, the buyers will receive that product,
20    so that's the incentive for one bonus.
21            The second bonus is a ship speed bonus, so
22    from the moment your sale was made, we want you to
23    ship it as quickly as possible so the buyer will
24    receive the item as quickly as possible, so we measure
25    how quickly they ship their items in a month and the

Page 13

1    following month, if they hit that target, we will give
2    you an additional one percent off your -- your seller
3    fee.
4  Q.  Okay.  So fair to say that sellers are incentivized to
5    sell as much as possible on the StockX platform, is
6    that fair?
7            MR. FORD:  Objection to the form.
8  A.  I think it's fair to say that sellers are incentivized
9    to sell more, but we do have a cap of where you can
10    receive a break.
11  BY MS. DUVDEVANI:
12  Q.  What does that mean?
13  A.  It means that there's only, there's a ceiling in -- of
14    how much fees you can have break -- have a break on
15    your account.
16  Q.  And what's the ceiling?
17  A.  The lowest sell fee you can achieve is a six percent
18    seller fee.
19  Q.  Can you elaborate a bit about that in terms of numbers
20    and how that works?
21            MR. FORD:  Objection to the form.
22  A.  So any seller has the opportunity to move their seller
23    fee by selling more or behaving with those
24    behavior-based bonuses to go from ten percent seller
25    fee down to six percent seller fee.  And we have that

4 (Pages 10 - 13)

HIGHLY CONFIDENTIAL

Page 14

1 based on our seller level, so if you are a brand new
2 seller and never sold anything today, you are
3 considered a Level 1 at a 10 percent rate and you have
4 all quarter to potentially reach that Level 5 status
5 which is 250 sales in a quarter.
6         But once you've reached Level 5, there's no
7 additional bonus.  So you -- you can get to 5, and
8 once you get both bonuses, that's your cap
9 essentially.
10 BY MS. DUVDEVANI:
11 Q.   You mentioned tooling as well, is that right, do I
12 remember that correctly?
13 A.   That is correct.
14 Q.   Okay.  What does tooling mean?
15 A.   We have a few products that sellers can use to more
16 efficiently manage their seller inventory.  So one of
17 which is something called StockX Pro where, if you are
18 interested in using that tool, we can send you an
19 invitation link.  It's just a URL to an adjacent site
20 of ours.
21         And then the second one is a recently
22 acquired tool called "Scout."  And any seller can go
23 and use that.  And it's essentially the same thing,
24 a -- almost like a record keeping of your sales and
25 the location of where you sold it, but it can sync to

Page 15

1 StockX and have your items listed on our platform.
2 Q.   What do you mean by location of where you sold?
3 A.   So in Scout, if you sold your item on StockX, for
4 example, it would record that it was sold to StockX
5 for that price and all the details.  But if you
6 decided to sell it elsewhere, either another
7 marketplace or offline or at a -- to another person,
8 an individual, you can -- you can record where that
9 sale happened just for your records for -- for tax
10 purposes or reporting.
11 Q.   What type of products do power sellers sell on the
12 platform?
13         MR. FORD:  Objection to form.
14 A.   We have, I believe, six different verticals and they
15 sell all, they can sell up to any and all products on
16 our site.
17 BY MS. DUVDEVANI:
18 Q.   I understand that they can sell any products on your
19 site.
20         My question is what products do power
21 sellers actually sell on your site?
22         MR. FORD:  Object to the form.
23 A.   I would say the majority of the pow -- our existing
24 power sellers sell mostly sneakers, apparel, and
25 collectibles, while we also have electronics and

Page 16

1 handbags and other things, but those would be the --
2 the main three.
3 BY MS. DUVDEVANI:
4 Q.   And of those main three, do you know which are the
5 highest volume products that are sold by power
6 sellers?
7 A.   Sneakers.
8         MR. FORD:  Sorry.  Objection to the form.
9 Just give me a second.
10 BY MS. DUVDEVANI:
11 Q.   Okay.  Any particular type of sneakers?
12 A.   Any -- all brands really.  It's hard to say.
13 Q.   What's the highest selling brand of sneakers on
14 StockX?
15         MR. FORD:  Object to the form.
16 A.   I'm really not sure.  I'm not sure.
17 BY MS. DUVDEVANI:
18 Q.   Who would know the answer to that?
19 A.   It would be our -- probably our BI team, essentially
20 our Data Analytics team.
21 Q.   Are there documents that reflect the highest selling
22 categories of products and brands of products on
23 StockX?
24         MR. FORD:  Objection to the form.
25 A.   I'm not sure.

Page 17

1 BY MS. DUVDEVANI:
2 Q.   Okay.  You mentioned Level 5 sellers.  Is that
3 synonymous with power seller?
4 A.   Yes.
5 Q.   How many Level 5 sellers does StockX have at any given
6 time?
7 A.   I think it's a -- we have quarterly resets, so I -- I
8 need, like, a specific time frame or if it's right
9 now, I can answer that.
10 Q.   Let's start with right now.
11 A.   We have approximately ███ global sellers.
12 Q.   You have ███ Level 5 sellers that you also call
13 power sellers, is that fair?
14         MR. FORD:  Objection to the form.
15 A.   That's fair.
16 BY MS. DUVDEVANI:
17 Q.   Okay.  And those ███ sellers are all over the world,
18 is that right?
19         MR. FORD:  Objection to the form.
20 A.   Yes.
21 BY MS. DUVDEVANI:
22 Q.   Are most of them in the United States?
23         MR. FORD:  Objection to the form.
24 A.   I would say -- I'm not sure of the exact breakdown,
25 but it's -- it's pretty balanced globally.

5 (Pages 14 - 17)

HIGHLY CONFIDENTIAL

Page 26

1    learn and hopefully correct that mistake or, you know,
2    determine whether the claim was real.
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
15 BY MS. DUVDEVANI:
16 Q.  Okay.  Who would know then, if not you?
17        MR. FORD:  Objection to the form.
18 A.  I'm not sure, but, like I said prior, our Operations
19    team is the team who -- that is dedicated to our
20    authentication.
21 BY MS. DUVDEVANI:
22 Q.  You mentioned power seller inventory.  Do you know
23    where power sellers get their inventory?
24        MR. FORD:  Objection to the form.
25 A.  I know that they source their product from anywhere

Page 27

1    they can get the product from.  I think that we, as I
2    mentioned before, the goal is always to -- to sell
3    more, but I can't say with certainty where exactly
4    their inventory comes from.
5  BY MS. DUVDEVANI:
6  Q.  And is that a correct statement for every single power
7    seller you've ever dealt with, you don't know where
8    they get any of their inventory?
9        MR. FORD:  Objection to form.
10 A.  I -- I can't -- I can't say with certainty that
11    they're from, you know, I have suspicion by seeing
12    what products that they sell where they get it from,
13    but I can't with certainty say that I know their
14    source of inventory.
15 BY MS. DUVDEVANI:
16 Q.  What are your suspicions?
17 A.  Just that if I see them selling a particular brand or
18    a particular item, I might come to the conclusion that
19    they got it from a particular site or -- or a
20    particular -- yeah, a particular website or brand or
21    something.
22 Q.  And why is that?
23        MR. FORD:  Objection to form.
24 A.  If I see where their -- the products that they're
25    selling and I see maybe a pattern of brand or style, I

Page 28

1    can at least come to a -- I can guess where they maybe
2    have got that product, just because not every site
3    would carry that product.
4  BY MS. DUVDEVANI:
5  Q.  Can you give me an example?
6  A.  Sure.  If someone's selling only Adidas Yeezy
7    products --
8        THE REPORTER:  Adidas?
9        THE WITNESS:  Sorry.  Adidas Yeezy
10    products.
11        THE REPORTER:  Thank you.
12        THE WITNESS:  Y-E-E-Z-Y.
13 A.  -- I can come to the conclusion that they got it from,
14    you know, a Yeezy supply or Adidas, at least I can
15    guess where they're sourcing their products from.
16        But again, I don't know with a hundred
17    percent certainty where a seller gets their product
18    from.
19 BY MS. DUVDEVANI:
20 Q.  Do you have power sellers that have a high volume of
21    Nike and Jordan-branded inventory?
22        MR. FORD:  Objection to form.
23 A.  Yeah, I think so.
24 BY MS. DUVDEVANI:
25 Q.  You think so or you know so?

Page 29

1  A.  I know so, yeah, sorry.
2  Q.  How many power sellers have high volumes of Nike or
3    Jordan-branded product?
4        MR. FORD:  Objection to form.
5  A.  I can't really say off the top of my mind.
6  BY MS. DUVDEVANI:
7  Q.  More than one?
8  A.  Yes.
9  Q.  More than five?
10 A.  Yes.
11 Q.  More than ten?
12 A.  Yes.
13 Q.  More than twenty?
14 A.  Yes.
15 Q.  More than fifty?
16 A.  Yes.
17 Q.  More than a thousand?
18 A.  I'm not sure at that point.
19 Q.  Somewhere between fifty and a thousand?
20 A.  Generally speaking, I think that's my best accurate
21    guess without looking, yeah.
22 Q.  Without looking at what?
23 A.  If -- if I -- if I were to request it or our data team
24    were to provide it, but I wouldn't be able to know by
25    just recollection.

8 (Pages 26 - 29)

HIGHLY CONFIDENTIAL

Page 30

1 Q. What type of request would you make of your data team
2   for that information?
3 A. I would request, you know, what our, if I had to, or
4   what our, what brands are our sellers selling and what
5   inventory that they have currently listed.
6 Q. And your data team would be able to provide that
7   information to you?
8 A. Mm-hmm.
9 Q. That's a yes?
10 A. Yes.
11 Q. Okay. For the power sellers between fifty and a
12   thousand that we just talked about that have a high
13   volume of Nike and Jordan products, using the word
14   that you used before, do you have suspicions as to
15   where they got their products?
16       MR. FORD: Objection to form.
17 A. I think I'd like to clarify that number.
18 BY MS. DUVDEVANI:
19 Q. Sure.
20 A. I don't know, I just really don't know how many. I
21   just know that a lot of sellers do sell Nike and
22   Jordan products. I just don't know the number.
23       I'm sorry, what was your question? Can you
24   repeat it?
25 Q. You mentioned that you have suspicions as to where

Page 31

1   some of your power sellers get their products. I was
2   asking about your suspicions regarding the power
3   sellers that have high volumes of Nike and Jordan
4   products.
5       MR. FORD: Objection to form.
6 A. And what's the question?
7 BY MS. DUVDEVANI:
8 Q. The question is: Do you have suspicions as to where
9   any of those power sellers obtained their products?
10       MR. FORD: Objection to form.
11 A. I really don't know. I think "suspicion" may be the
12   wrong word because I, my team, personally, we have an
13   Authentication team that we are confident in, that
14   that is where we -- we don't ask where sellers get
15   their inventory, so we don't, it is not a talking
16   point or something that my team focuses on because we
17   know that every product will get checked anyway before
18   it gets sent to the buyer.
19 BY MS. DUVDEVANI:
20 Q. Why don't you ask your power sellers where they get
21   their inventory?
22       MR. FORD: Objection to form.
23 A. It's similar to what I -- I just said, I think,
24   because we have an authentication service that looks
25   at every item before it gets to a buyer. We really

Page 32

1   don't focus on it, that being, where their source is
2   because it doesn't matter to us where their source is
3   because we have that authentication process that we
4   are confident in.
5 BY MS. DUVDEVANI:
6 Q. How much do you know about the authentication process?
7       MR. FORD: Objection to form.
8 A. Very little. My job is really just to create the
9   customer experience for our sellers.
10 BY MS. DUVDEVANI:
11 Q. Okay. What is a -- strike that.
12       I understand that StockX has pre-release
13   for certain products, is that right?
14       MR. FORD: Objection to the form.
15 A. Can you potentially clarify?
16 BY MS. DUVDEVANI:
17 Q. Sure.
18 A. Yeah.
19 Q. Well, do you know what I mean by "pre-release"?
20 A. No.
21 Q. Okay. Does StockX offer for sale products that have
22   yet to be released by the brand?
23       MR. FORD: Objection to form.
24 A. From my understanding, our Catalogue team adds
25   products to the site. I don't know when and why they

Page 33

1   add a product when a release is scheduled.
2 BY MS. DUVDEVANI:
3 Q. Are you ever involved in trying to locate high heat or
4   pre-release products from power sellers?
5       MR. FORD: Objection to the form.
6 A. Can you repeat the question?
7 BY MS. DUVDEVANI:
8 Q. Sure. Are you ever involved in trying to locate or
9   source high heat or pre-release products that StockX
10   wants to sell to consumers?
11       MR. FORD: Objection to the form.
12 A. I do not locate pre-release or high heat items before
13   release day.
14 BY MS. DUVDEVANI:
15 Q. What about after release day?
16       MR. FORD: Same objection.
17 A. When we think a big release is happening on our site,
18   we do like to communicate to our sellers that it's
19   coming up and it will be -- we would -- and would we
20   offer them any assistance in helping them with their
21   inventory that we want them to sell it on our site,
22   obviously, but I do not seek out particular inventory.
23 BY MS. DUVDEVANI:
24 Q. When you say that you do like to communicate to your
25   sellers that it's coming up and you'd offer them any

9 (Pages 30 - 33)

HIGHLY CONFIDENTIAL

Page 38

1    VIDEO TECHNICIAN: We are going off the
2  record, 10:54.
3    (Off the record at 10:54 a.m.)
4    (Back on the record at 11:08 a.m.)
5    VIDEO TECHNICIAN: Back on the record,
6  11:08.
7    MARKED FOR IDENTIFICATION:
8    DEPOSITION EXHIBIT 1
9    STX0143893-STX0143925
10    11:08 a.m.
11  BY MS. DUVDEVANI:
12  Q.  All right, Mr. Amidon.  The court reporter has just
13    handed you a document that's been designated as
14    Exhibit 1.  Just for your own edification, when you
15    see STX with a number at the bottom, that means that
16    StockX produced this document.
17  A.  Okay.
18  Q.  You can take a look through any documents that I give
19    you to make sure you know what you are looking at
20    before I ask you any questions about it.
21  A.  Okay.
22  Q.  You're good?
23  A.  I'm good.
24  Q.  Do you know who Rami Odeh is?  O-D-E-H?
25  A.  I do.

Page 39

1  Q.  Who is that?
2  A.  He works on our Quality Assurance team that is under
3    our Operations team.

11  BY MS. DUVDEVANI:
12  Q.  Okay.  Do you know who Marcus Moore is?
13  A.  I don't.
14  Q.  If you can turn to the page that's Bates stamped
15    STXO143896.  Going up to the next page, 97, do you see
16    where Rami sends a screenshot image?
17  A.  Oh, yeah.  Yes.
18  Q.  If we could just look at the larger version of that,
19    which is towards the back at 143917.
20  A.  Yes.
21  Q.  Do you see that?
22  A.  I do.
23  Q.  Have you seen this document before?
24    MR. FORD: Objection to the form.
25  A.  Yes.

Page 40

1  BY MS. DUVDEVANI:
2  Q.  When was the last time you saw this document?
3  A.  I don't recall.
4  Q.  Did you see this -- strike that.
5    What is this document?

Page 41

HIGHLY CONFIDENTIAL



Veritext Legal Solutions

212-267-6868                www.veritext.com                516-608-2400

HIGHLY CONFIDENTIAL



Page 78

Page 79

7   Q.  Do you have any recollection of what happened after
8      that email communication?
9   A.  I do not.
10        MARKED FOR IDENTIFICATION:
11        DEPOSITION EXHIBIT 7
12        STX0772981-STX0772985
13        12:49 p.m.
14  BY MS. DUVDEVANI:
15  Q.  Mr. Amidon, the court reporter has just handed you a
16      document designated as Exhibit 7.  Take a look.
17  A.  Okay.
18  Q.  Who is Alana Meeks?
19  A.  I do not know her, but I believe she's on our Social
20      Media team.
21  Q.  Okay.  So you see on the second-to-last page of this
22      email, Alana sends an email regarding an Instagram
23      post, right?
24  A.  I do.
25  Q.  Okay.  And she writes, "Among other things, the user,

Page 80

1      who also goes by 'Roy,' has stated to have reached out
2      to support channels but has been met with silence."
3        Do you see that?
4   A.  I do.
5   Q.  Okay.  And then if you look above, Jacob adds a few
6      more people to the email chain.  And among other
7      things, Jacob writes, "Andy, is it true that we
8      haven't responded to this CS contacts?"
9   A.  I do.
10  Q.  What does "CS" mean?
11  A.  Customer Service.
12  Q.  So what is this asking?  That nobody responded to Roy?
13        MR. FORD:  Objection to form.
14  BY MS. DUVDEVANI:
15  Q.  I'll strike that.
16        Is -- as far as you understand, is Jacob
17      asking Andy whether it is true that StockX has not
18      responded to Roy's reach-out via Customer Service?
19        MR. FORD:  Objection to form.
20  A.  It appears that he as -- is asking Andy if it is true
21      that Roy's claim that he has been met with silence is
22      true.
23  BY MS. DUVDEVANI:
24  Q.  Okay.  And then if you look at the page 772983, you
25      see that you are added, "Power buyer out of

Page 81

1      California, so adding Russ for awareness."  Do you see
2      that?
3   A.  I do.
4   Q.  And then looking up further in the email, there's a
5      response from Sean McCartney.  Who is Shawn McCartney?
6   A.  He is our leader of Operations -- he leads our
7      Operations team.  I don't know his title off the top
8      of my head.
9   Q.  And who is Beth Ann Calhoun?
10  A.  She is one of the leaders in Customer Service.

22  BY MS. DUVDEVANI:
23  Q.  Do I need to ask Beth Ann Calhoun what she meant here,
24      or is there someone else that you think would know the
25      answer to my question?

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL

Page 82

1          MR. FORD:  Objection to form.
2  A.  Since Beth Ann Calhoun is the leader in Customer
3      Service, I would imagine she would know that answer.
4  BY MS. DUVDEVANI:
5  Q.  Do you know what it means by "cases," when she says,
6      "I have found three cases"?
7          MR. FORD:  Objection to form.
8  A.  I do.  One case is a ticket submitted by a customer to
9      our Customer Service team.
10 BY MS. DUVDEVANI:
11 Q.  And "teammates," does that mean Customer Service
12     teammates?
13         MR. FORD:  Objection to form.
14 A.  I'm not sure, but I would imagine so.
15 BY MS. DUVDEVANI:
16 Q.  Okay.  And "sitting in queue without answer," does
17     that mean StockX has yet to respond to the ticket?
18         MR. FORD:  Objection to form.
19 A.  I'm not sure, but I would imagine that's what it
20     means.
21 BY MS. DUVDEVANI:
22 Q.  And looking at the page 772982, there is an email from
23     Derrick Register from 5:46 p.m. on July 7th.  Do you
24     see that?
25 A.  Yes.

Page 83

1  Q.  Okay.  So, he says, "team, please see the notes from
2      the meeting earlier on the path forward."  And you are
3      listed as an attendee of that meeting.
4          Do you recall that meeting?
5  A.  I do not.
6  Q.  You don't recall having a meeting in July of this
7      year?
8          MR. FORD:  Objection to form.
9  A.  I do not.
10 BY MS. DUVDEVANI:
11 Q.  Further down, in the recap of the meeting, it says,
12     "We aligned on contacting the buyer to inquire -- to
13     inquiry about the following," with your name.
14         Do you see that?
15 A.  Yes.
16 Q.  Do you know what that means?
17 A.  I do.
18 Q.  What does that mean?
19 A.  I contacted over the phone and spoke to Roy Kim.  And
20     because my role is working with customers, I tried to
21     help resolve his inquiry, so we requested, or I
22     requested that the sneakers be returned for additional
23     evaluation and he agreed to return them and I believe
24     he did return all 36.
25 Q.  Okay.  And underneath your name, there is another

Page 84

1      bullet point that says, "Removing the social media
2      post.  The request was made verbally only."
3          What does that mean?
4  A.  He made a public post about his inquiry, and I don't
5      remember asking him to remove it.  But I think that's
6      what Derrick is referring to, is that there was a post
7      about it on Instagram.
8  Q.  And the request was made verbally only, but you are
9      saying you don't remember?
10 A.  I don't remember.
11 Q.  Okay.  It also says, "removal of the social media post
12     is also pending."  Do you see that?
13 A.  Yeah.
14 Q.  This doesn't refresh your recollection at all about
15     asking Roy Kim to remove his post?
16 A.  It does not.
17 Q.  Is there a reason that you are aware of that that
18     would be written in these notes, were it not true?
19         MR. FORD:  Objection to form.
20 A.  I am not sure.
21 BY MS. DUVDEVANI:
22 Q.  Underneath it, it says, "Requested that all 36
23     sneakers be returned to Tempe for additional
24     evaluation."  Do you see that?
25 A.  Yes.

Page 85

1  Q.  What's that mean?
2  A.  Because Roy -- Roy's post suggested that 36 items he
3      received, he would like to be returned, so I asked him
4      if he would like to return them to our nearest
5      location, which was Tempe.
6  Q.  Okay.  And then it says, "Customer agreed to return
7      some of the sneakers but not all."  Do you see that?
8  A.  Yes.
9  Q.  And what does that mean?
10 A.  I do remember him stating that he would like to re --
11     send back some of the sneakers but not all.  But I
12     believe he did send all 36 back at a later date.
13 Q.  Okay.  So you do remember the portion of the
14     conversation regarding returning 36 sneakers, right?
15 A.  I do.
16 Q.  But you just don't remember asking Roy Kim to remove
17     his social media post?
18 A.  I don't remember that part.
19         MR. FORD:  Objection to form.
20 BY MS. DUVDEVANI:
21 Q.  Even though it's also written in these notes, right?
22 A.  Correct.
23 Q.  Okay.  And then looking at the first page of this
24     email, you see how there are suddenly a -- a lot of
25     names at the top of this email, a lot of CCs, right?

22 (Pages 82 - 85)

HIGHLY CONFIDENTIAL

Page 86

1  A.  Yeah.
2  Q.  Who is Mark Porteus?  I don't know if I'm saying that
3      right.
4  A.  He's a team member on our Market Integrity team.
5  Q.  Okay.  Do you know why all of these individuals were
6      suddenly copied on this email?
7          MR. FORD:  Objection to form.
8  A.  I don't.
9  BY MS. DUVDEVANI:
10 Q.  Do you know why it was redacted for privilege?
11         MR. FORD:  I'm going to direct the witness
12     not to answer.
13 BY MS. DUVDEVANI:
14 Q.  Do you know if any of the individuals listed at the
15     top of STX0772981 are attorneys?
16 A.  There are a few names I do not recognize, so I'm not
17     sure.
18 Q.  Do you have any recollection of previously being
19     alerted if a StockX customer is posting on social
20     media about being sold fake pairs of shoes?
21         MR. FORD:  Objection to form.
22 A.  Sorry, can you repeat the question?
23 BY MS. DUVDEVANI:
24 Q.  Do you have any recollection of being alerted if a
25     StockX customer is posting on social media about being

Page 87

1      sold fake pairs of shoes other than Roy Kim?
2          MR. FORD:  Objection to form.
3  A.  I don't remember specific instances.
4  BY MS. DUVDEVANI:
5  Q.  Is this the only one you remember?
6  A.  This is the only one I remember.
7          MARKED FOR IDENTIFICATION:
8          DEPOSITION EXHIBIT 8
9          STX00772942-STX0072945
10         1:03 p.m.
11 MS. DUVDEVANI:
12 Q.  Mr. Amidon, the court reporter just handed you a
13     document that's been designated as Exhibit 8.
14 A.  Okay.
15 Q.  Do you recognize this document?
16 A.  I do.
17 Q.  When was the last time you saw this document?
18 A.  Yesterday.
19 Q.  Okay.  On page 772944 you send an email to Roy on
20     July 7th, 2022.  Do you see that?
21 A.  I do.
22 Q.  And you write, "Hey Roy, we saw your post and didn't
23     see any inquiries sent to Customer Service about the
24     issue.  So I wanted to reach out and help."
25         Do you see that?

Page 88

1  A.  I do.
2  Q.  But was that true?
3          MR. FORD:  Objection to form.
4  A.  I'm not sure if it was true.
5  BY MS. DUVDEVANI:
6  Q.  And the last email that we just looked at, Mr. Amidon,
7      it said on July 6th that your Customer Service
8      representatives located three cases that have yet to
9      be answered, right?
10         MR. FORD:  Objection to form.
11 A.  If I recall, it just said that there were three cases,
12     but I don't, I didn't know what the other part of that
13     meant.
14 BY MS. DUVDEVANI:
15 Q.  Okay.  Did you then call Roy Kim when he gave you his
16     number?
17 A.  I did.
18 Q.  And what did you say to him and what did he say to
19     you?
20         MR. FORD:  Objection to form.
21 A.  I spoke to him about his Instagram post and introduced
22     who I was, this is the first time I spoke to him, and
23     offered to assist in what he would like to proceed
24     next with, and we discussed returning the shoes for
25     further inspection.

Page 89

1  BY MS. DUVDEVANI:
2  Q.  Anything else you remember about that conversation?
3  A.  I remember him being very pleasant and said that he
4      would -- would like to send some sneakers back and
5      would get back to me with how many labels he would
6      need because he would prefer to send them in bigger
7      boxes then -- rather than individual labels.
8  Q.  How many times have you spoken on the phone to
9      Roy Kim?
10 A.  I believe twice.
11 Q.  Okay.  So was that the first time that we just went
12     over?
13 A.  Yes.
14 Q.  What was the second time?
15 A.  The second time was after we received the items back,
16     I called him to tell them they were items that indeed
17     should not have passed our authentication process and
18     apologized for the inconvenience, told him that we
19     would be refunding him for the product and I did offer
20     him to come visit us in Detroit because he appeared to
21     be a long-time customer.
22 Q.  When you told him that indeed they should not have
23     passed authentication, did you mean they were fake?
24         MR. FORD:  Objection to form.
25 A.  I told him that they were at minimum a defect, and

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL

Page 90

when I say "defect," I mean a -- a manufacturing defect and that they possibly could have been inauthentic and that was what I was told by our Authentication team.
BY MS. DUVDEVANI:
Q. Sorry. What were you told by your Authentication team?
A. My Authentication team told me that they were, at minimum, defective, which is a manufacturing defect, and that it was possible that they were inauthentic, but we should not have passed them along to the buyer.
Q. So your Authentication team did not know if they were fake or if they were a defect, is that right?
MR. FORD: Objection to form.
A. I'm not, as I mentioned before, I'm not the expert, so I was just relaying information.
BY MS. DUVDEVANI:
Q. But that's what you were told by your Authentication team?
MR. FORD: Objection to form.
A. Yes.
BY MS. DUVDEVANI:
Q. And I see that you, on the first page of the email, gave him, gave Roy Kim a $500 code, is that right?
A. Yes.

Page 91

Q. And what does that mean?
A. That was a discount code to use for a future purchase and to apologize for the convenience.
MR. FORD: Objection to form.
BY MS. DUVDEVANI:
Q. The inconvenience of being sold fake pairs of shoes?
A. From my perspective, and what my job is, the inconvenience of potentially not responding to him, or -- and having him deal with the situation where he did not receive a good customer experience, so that is why I made the decision to -- to do that.
Q. Okay.
MARKED FOR IDENTIFICATION:
DEPOSITION EXHIBIT 9
ZK_NIKE_000812-ZK_NIKE_000813
1:11 p.m.
BY MS. DUVDEVANI:
Q. Mr. Amidon, the court reporter has just handed you an exhibit designated -- strike that -- a document designated as Exhibit 9. Do you see that?
A. Yes.
Q. Okay. On the first page of the document, Michael writes to you a number, do you see that, 734, et cetera? Do you know what that number is?
A. That is a order number.

Page 92

Q. What are you able to do with that order number?
A. I'm able to open it in our order management system and see more details into the order.
Q. What kind of details can you see?
A. I can see who the buyer is, who the seller is, and what the price was paid for it and breakdown of the -- if there is any authentication failure, it would be listed in that order.
Q. Does it also list the name of the authenticator?
A. I'm not sure.
Q. Are there any images of products in connection with the order number?
MR. FORD: Objection to form.
A. I think it depends on the order, but not every order.
BY MS. DUVDEVANI:
Q. Do you know what orders would have imagery?
A. From my experience, typically, there are photos when an item fails verification, so the documentation is on the order, so it would be a unsuccessful order where there would be photos, from my experience.
Q. What about videos? Were there ever any videos?
A. I personally have not seen any videos.
Q. Okay. So you write to Michael, "This shouldn't have been sent to you. This is one hundred percent fake and was supposed to be sent back to the seller once we

Page 93

suspended and charged him. Our system looks like it generated your label instead."
What -- can you explain what happened here?
A. Sure. The item "Failed verification for the Reason Code: Fake," and it appears to be a logistical glitch or error, and instead of sending the product back to the seller, it was incorrectly sent to the buyer, in this case is Malekzadeh, and -- so it did not pass our verification and was more of a logistical error.
Q. Do you know how Malekzadeh knew how to inquire about this order?
MR. FORD: Objection to form.
A. I do not.
MARKED FOR IDENTIFICATION:
DEPOSITION EXHIBIT 10
ZK_NIKE_007784-ZZ_NIKE_007793
1:16 p.m.
BY MS. DUVDEVANI:
Q. Mr. Amidon, the court reporter has just handed you a document designated as Exhibit 10.
A. Okay.
Q. The email that Michael sends you that you can see on the first page of the exhibit, are those numbers also purchase order numbers?
A. They are.

HIGHLY CONFIDENTIAL

Page 114

```
1              CERTIFICATE
2
3  STATE OF MICHIGAN
4  COUNTY OF OAKLAND
5           LORI ANN BALDWIN, a Notary Public in and
6  for the above county and state, do hereby certify that
7  this Videotaped deposition was taken before me at the
8  time and place hereinbefore set forth; that the
9  witness was by me first duly sworn to testify to the
10 truth; that this is a true, full and correct
11 transcript of my stenographic notes so taken to the
12 best of my skill and ability; and that I am not
13 related, nor of counsel to either party, nor
14 interested in the event of this cause.
15
16
17
18
19    Lori Baldwin
20    _____
21    Lori Ann Baldwin, CSR-5207, RPR, CRR
22    Notary Public
23    Oakland County, Michigan
24    My commission expires:  December 21, 2025
25
```

Page 115

```
1
2        ERRATA SHEET
         VERITEXT/NEW YORK REPORTING, LLC
3
   CASE NAME:  Nike, Inc. v. Stockx, LLC
4  DATE OF DEPOSITION:  November 30, 2022
   WITNESS' NAME: Russell Amidon
5
   PAGE/LINE(s)/   CHANGE      REASON
6  ____/____/_____/_____
7  ____/____/_____/_____
8  ____/____/_____/_____
9  ____/____/_____/_____
10 ____/____/_____/_____
11 ____/____/_____/_____
12 ____/____/_____/_____
13 ____/____/_____/_____
14 ____/____/_____/_____
15 ____/____/_____/_____
16 ____/____/_____/_____
17 ____/____/_____/_____
18 ____/____/_____/_____
19
20    _____
      RUSSELL AMIDON
21
   Subscribed and Sworn To
22 Before Me This_____Day
   of_____, 20 .
23
   _____
24   Notary Public
25 My Commission Expires_____
```

| **Deposition Date:** 11/30/2022<br>**Deponent:** **Russell Amidon – Errata Sheet**<br>**Case Name:** *Nike, Inc. v. StockX LLC*, No. 22 CV 983 (VC) (SN) | | | |
|---|---|---|---|
| **Page(s): Line(s)** | **Now Reads** | **Should Read** | **Reason** |
| 18:21-22 | Brian Faulk (ph) | Bryan Fok | Typographical Error |
| 18:22 | Dyki (ph) | Daiki Ebi | Typographical Error |
| 89:7 | boxes then -- rather than individual labels. | boxes **than** -- rather than individual labels. | Transcription Error |
| 105:5 | item's are passing | **items** are passing | Transcription Error |
| 106:5 | but I'm not sure that would happen. | but I'm not sure **when** that would happen. | Transcription Error/Clarification |
| Passim | StockX, LLC | StockX LLC | Typographical Error |

I, Russell Amidon, do hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition taken on November 30, 2022; that I have made such corrections as appear noted herein; and that my testimony as contained herein, as corrected, is true and correct.

DATED this  4th  day of January, 2023.

DocuSigned by:

*Russ Amidon*
_____
961221EF9B2B4B9...

Russell Amidon

1