# Exhibit 143

*Redacted Public Version*

Page 1

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

NIKE, INC.                          )
                                    )
         Plaintiff,                 )
                                    )
vs.                                 ) No.
                                    ) 1:22-cv-00983-VEC
STOCKX LLC,                         )
                                    )
         Defendants.                )

         The videotaped deposition of
                KARI KAMMEL
taken before JO ANN LOSOYA, CSR, RPR, CRR, pursuant
to the provisions to the taking of depositions at
444 West Lake Street, Chicago, Illinois commencing
at 9:45 a.m. on July 18, 2023.

Page 2

 1  PRESENT:
 2
        DLA PIPER LLP
 3      TAMAR DUVDEVANI
        MARC MILLER
 4      1251 Avenue of the Americas
        New York, New York 10020
 5      tamar.duvdevani@dlapiper.com
        marc.miller@dlapiper.com
 6         Appeared on behalf of Plaintiff.
 7
        DEBEVOISE & PLIMPTON LLP
 8      MEGAN K. BANNIGAN
        KATHRYN SABA
 9      919 Third Avenue
        New York, New York 10022
10      mkbannigan@debevoise.com
        ksaba@debevoise.com
11         Appeared on behalf of Defendants.
12  ALSO PRESENT:
13      KIM VAN VOORHIS,
        Nike, Inc.
14
15  VIDEOGRAPHER: Milo Savich
16  STENOGRAPHICALLY REPORTED BY:
        JO ANN LOSOYA, CSR, RPR, CRR
17      LICENSE #:  084-002437
18
19
20
21
22
23
24
25

Page 4

 1              INDEX OF EXHIBITS
 2   EXHIBIT       DESCRIPTION          PAGE
 3   Exhibit 1  Expert Witness Report of Kari    5
 4       Kammel
 5   Exhibit 2  Rebuttal Expert Witness Report   5
 6       of Kari Kammel
 7   Exhibit 3  Expert Report of Robert L      140
 8       Vigil, Ph.D.
 9   Exhibit 4  Kari Kammel testimony before    148
10       the US Senate Judiciary
11       Committee for the hearing on
12       cleaning up online marketplaces
13   Exhibit 5  Nike Brand Protection          240
14       PowerPoint
15   Exhibit 6  Expert rebuttal report of      265
16       Richard Lamagna
17   Exhibit 7  StockX policy, STX0021481      307
18
19
20
21
22
23
24
25

Page 3

 1              EXAMINATION
 2   Witness                   Page    Line
 3   KARI KAMMEL
 4    By Ms. Bannigan            7      6
 5    By Ms. Duvdevani         300     15
 6    By Ms. Bannigan          310      5
 7
 8           ***************
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 5

 1           (Deposition Exhibit 1 was marked
 2           for identification.)
 3           (Deposition Exhibit 2 was marked
 4           for identification.)
 5       THE VIDEOGRAPHER:  Good morning.  We are
 6   going on the record at 9:45 a.m. on July 18, 2023.
 7           Please note that the microphones are
 8   sensitive and may pick up whispering and private
 9   conversation.  Please mute your phones at this time.
10           Audio and video recording will
11   continue to take place unless all parties agree to
12   go off the record.
13           This is Media Unit No. 1 of the
14   video-recorded deposition of Kari Kammel taken by
15   counsel for defendant in the matter of Nike, Inc.,
16   versus StockX LLC.  This case is filed in the United
17   States District Court for the Southern District of
18   New York.  The Case Number is 1:22-cv-00983-VEC.
19   The location of this deposition is DLA Piper LLP,
20   444 West Lake Street, Suite 900, Chicago,
21   Illinois 60606.
22           My name is Milo Savich representing
23   Veritext and I am the videographer.  The court
24   reporter is JoAnn Losoya also from Veritext.
25           I am not authorized to administer an

2 (Pages 2 - 5)

Page 6

1  oath, I am not related to any party in this action,
2  nor am I financially interested in the outcome.
3       If there are any objections to the
4  proceeding, please state them at the time of your
5  appearance.
6       Counsel and all present, including
7  those participating remotely, will now please state
8  their appearances and affiliations for the record,
9  beginning with the noticing attorney.
10      MS. BANNIGAN:  Good morning.  Megan
11 Bannigan from Debevoise & Plimpton representing,
12 Defendant, StockX.  With me is my colleague from
13 Debevoise & Plimpton Kathryn Saba.
14      MS. DUVDEVANI:  Good morning.  Tamar
15 Duvdevani, DLA Piper, on behalf of Nike, Inc.  I'm
16 joined by my partner Marc Miller of my firm and by
17 Kim Van Voorhis, in-house counsel at Nike.
18      I'll note right now that it's
19 possible that Ms. Bannigan will be showing the
20 witness documents that have been designated as the
21 highest level of confidentiality that Kim cannot see
22 in which case she will simply step out of the room.
23      (Witness sworn at 9:48 a.m.)
24
25

Page 7

1  WHEREUPON:
2       KARI KAMMEL,
3  called as a witness herein, having been first duly
4  sworn, was examined and testified as follows:
5       E X A M I N A T I O N
6  BY MS. BANNIGAN:
7  Q.   Please state your name for the record.
8  A.   Kari Kammel.
9  Q.   Are you represented by DLA Piper for the
10 purposes of today's deposition?
11 A.   Yes.
12 Q.   And is there any reason why you can't
13 testify completely and truthfully today?
14 A.   No.
15 Q.   Are you taking any medication or
16 suffering from any medical or other physical
17 condition that would prevent you from testifying
18 completely and truthfully?
19 A.   No.
20 Q.   Those are all just standard deposition
21 questions.
22      Have you ever been deposed before?
23 A.   Yes.
24 Q.   How many times?
25 A.   Twice.

Page 8

1  Q.   And what were the circumstances of those
2  depositions -- withdraw that.
3       What were the cases in which you were
4  deposed?
5  A.   So they were two immigration cases that
6  were involving asylum and withholding and removal.
7  Q.   About how long ago were those
8  depositions?
9  A.   I don't remember the exact dates but one
10 of them was probably about eight or nine years ago
11 and the second one was probably about four or five
12 years ago.
13 Q.   Okay.  So I take it you're aware of the
14 rules of the deposition.  But I'll go over them
15 quickly just to make sure we understand each other.
16      So your testimony today is under
17 oath.  It's being taken down by a stenographer.  It
18 is being videoed and it may be read or played at
19 trial or used for other purposes relating to this
20 lawsuit.
21      Any questions about that?
22 A.   No.
23 Q.   Okay.  You're required, as I know you're
24 aware, to give truthful answers to my questions and
25 complete answers.

Page 9

1       Any issues with that?
2  A.   No.
3  Q.   Because the court reporter is taking down
4  your testimony, it's important that all of my
5  questions and your answers are verbalized.  So
6  please always give a spoken answer.  And I'll try my
7  best not to talk over you, you try your best not to
8  talk over me, and we'll work together for the
9  stenographer.
10      Does that work for you?
11 A.   Yes.
12 Q.   We can take regular breaks during the
13 deposition.  If at any time you need to take a
14 break, just let me know.  I'm happy to accommodate
15 that.  I just ask that you not request a break while
16 a question is pending, or I might have a couple of
17 questions and a certain line of questioning to
18 finish up and then I have no problem taking a break.
19 Okay.
20      If you don't understand a question I
21 ask, please just tell me and we'll see what we can
22 do.  Okay?
23 A.   Okay.
24 Q.   Thank you.
25      Have you ever served as an expert

3 (Pages 6 - 9)

Page 30

1  that you discussed with Barbara, in which case you
2  can certainly answer those questions.
3  BY MS. BANNIGAN:
4      Q.  Did you discuss any legal strategy with
5  Ms. Delli Carpini on this call?
6      A.  No, I did not.
7      Q.  Was the entire call purely to learn facts
8  to help you in writing your report?
9      A.  Yes.  That's correct.
10     Q.  Okay.  What did you discuss with
11 Ms. Delli Carpini?
12     A.  What I discussed is outlined in my
13 report, which is questions about their brand
14 protection strategies.
15     Q.  Did you take any notes when you were on
16 the call?
17     A.  I did not.
18     Q.  How did you recall all the information
19 that you state in the report that you learned from
20 the call without taking notes?
21     A.  I wrote that directly into the report.
22     Q.  As you were speaking to Ms. Delli
23 Carpini?
24     A.  Yes, that's correct.
25     Q.  Did you make edits to that section at any

Page 31

1  point?
2      A.  Perhaps grammatical ones but not
3  substantive ones.
4      Q.  The cites -- the information that cite
5  the call with Ms. Delli Carpini was -- that portion
6  of your report was written in real time while you
7  were on the call with her?
8      A.  Yes, that's correct.
9      Q.  Did you confirm with anyone at Nike that
10 your recollections from this call were correct?
11     A.  I did not specifically, no.
12     Q.  Were there any facts that you learned on
13 that call that you did not add to your report?
14     A.  No.
15     Q.  So everything that Ms. Delli Carpini told
16 you, you input into this report?
17     A.  Yes, that's correct.
18     Q.  Let's look at Page 15 of your report.
19         In the last paragraph on this page,
20 you say "
21 
22 
23 
24 
25 

Page 32

1      A.  Yes, that's correct.
2      Q.  Is it accurate to conclude that you
3  
4  
5      A.  Yes, that's correct.
6      Q.  Do you know what Ms. Delli Carpini's
7  basis for asserting that
8  
9  
10     A.  Can you repeat the question?
11     Q.  That was a bad question.  Thank you.
12         Do you know what Ms. Delli Carpini's
13 basis for asserting these facts were?
14     A.  I believe her basis was her experience in
15 her role at Nike.
16     Q.  Did you ask her for any underlying facts?
17     A.  I did not.
18     Q.  Did Ms. Delli Carpini tell you that
19 
20 
21 
22     A.  So she told me what is in this sentence
23 which is that
24 
25 

Page 33

1  
2      Q.  You also mentioned that you reviewed
3  Ms. Delli Carpini's videotaped deposition, correct?
4      A.  No, I reviewed her deposition transcript.
5      Q.  Okay.  And did you review the entire
6  transcript or just portions?
7      A.  I did review the entire transcript.
8      Q.  Did you ask her any questions about her
9  deposition testimony?
10     A.  No, I did not.
11     Q.  Did you confirm any of the things that
12 Ms. Delli Carpini told you with any other sources?
13         MS. DUVDEVANI:  Objection.
14 BY THE WITNESS:
15     A.  No.
16         MS. DUVDEVANI:  Go ahead.
17 BY THE WITNESS:
18     A.  No, I did not.
19         MS. BANNIGAN:  What's the basis of your
20 objection?
21         MS. DUVDEVANI:  Vague.
22 BY MS. BANNIGAN:
23     Q.  Let's look at Exhibit 2 of your report,
24 your rebuttal report.
25         Here on the last page, flipping to

9 (Pages 30 - 33)

|  | Page 34 |
|---|---|
| 1 | the last page, you mention that you had two |
| 2 | conversations with Mr. Pallett from Nike, one on |
| 3 | May 31, 2023, and one on June 1, 2023; is that |
| 4 | accurate? |
| 5 | A.   Yes. |
| 6 | Q.   Are the dates of those calls correct? |
| 7 | A.   Yes. |
| 8 | Q.   Did you request to speak with |
| 9 | Mr. Pallett? |
| 10 | A.   Yes. |
| 11 | Q.   Why? |
| 12 | A.   I did not request him specifically but I |
| 13 | asked to speak to someone about authentication. |
| 14 | Q.   Had you ever spoken to Mr. Pallett other |
| 15 | than these two calls? |
| 16 | A.   No. |
| 17 | Q.   You mentioned earlier that you had |
| 18 | conversations with Nike about your report, you |
| 19 | thought that was in between the affirmative report |
| 20 | and the rebuttal report.  Are these the |
| 21 | conversations you are referring to or are there |
| 22 | other conversations? |
| 23 | A.   No, these are the ones I was referring |
| 24 | to. |
| 25 | Q.   Okay.  Other than these two |

Page 35
1  conversations, did you have any conversations with
2  anyone from Nike about the substance in your report?
3      A.   No.
4      Q.   Let's start with the May 31 call.
5           Who was on that call?
6      A.   So I believe it was Joe Pallett and Kim
7  and Marc and Tamar and Gabby.
8      Q.   How long was the call?
9      A.   Again, I believe it was probably about
10 30 minutes.
11     Q.   Do you recall --
12     A.   Sorry.
13     Q.   Do you recall how long it was?
14     A.   I don't know exactly.  It was probably
15 around 30 minutes.
16     Q.   What did you discuss on the call?
17     A.   I don't remember exactly for this but I
18 did reference it in my report, in my rebuttal
19 report.
20     Q.   Let's look at, to make it easier for you,
21 Footnote 95 of your rebuttal report, Exhibit 2.
22          Does this help refresh your
23 recollection of what you discussed with Mr. Pallett
24 on May 31?
25     A.   Yes, that's correct.  We had talked

Page 36
1  about -- we had spoken about the Zadeh Kicks
2  organization, or case, and some of the shoes that
3  were involved in that.
4      Q.   Why did you speak with Mr. Pallett about
5  the Zadeh Kicks case or shoes?
6      A.   So that was to know if Nike had confirmed
7  that any shoes that were sold by StockX were
8  counterfeit and not authentic.
9      Q.   When you say "to know if Nike had
10 confirmed that any shoes that were sold by StockX
11 were counterfeit and not authentic," any shoes that
12 were sold to Zadeh or any shoes at all or what
13 exactly do you mean by that?
14     A.   I believe I had asked a general question
15 and these were some of the examples that they
16 shared.
17     Q.   When you say reviewed the set of emails
18 and images, how did you get the set of emails and
19 images?
20     A.   I got those from the Nike lawyers.
21     Q.   Prior to your call with Mr. Pallett?
22     A.   I believe I received them either during
23 the call or after the call.
24     Q.   Okay.  And did you -- so what did you
25 learn from Mr. Pallett?

Page 37
1      A.   The details of which are outlined in this
2  section.
3      Q.   What did you learn specifically about
4  whether if Nike had confirmed that any shoes were
5  sold by StockX that were counterfeit and not
6  authentic?
7      A.   That they had confirmed that some of --
8  some of the shoes that were supposedly genuine but
9  described as being defective Nike products were
10 indeed counterfeit.
11     Q.   Prior to this time, were you aware of any
12 other allegations that Nike had allegedly discovered
13 counterfeit shoes being sold at Nike?
14          MS. DUVDEVANI:  Objection.
15          MS. BANNIGAN:  Excuse me.  Obviously that
16 was wrong.  Withdraw that question.
17 BY MS. BANNIGAN:
18     Q.   Prior to this time, were you aware of any
19 other allegations that Nike had allegedly discovered
20 counterfeit shoes being sold through StockX?
21     A.   So, yes, in the documents that I reviewed
22 for my initial report.
23     Q.   Okay.  So what was the purpose of going
24 back to Mr. Pallett here?
25     A.   To ask if there were any specific ones

|  | Page 38 |  | Page 40 |
|---|---|---|---|
| 1 | that I could review and learn about. | 1 | Q. Or work? |
| 2 | Q. Were you looking for a certain scenario | 2 | A. So no, but he did tell me that Nike's |
| 3 | of how counterfeits were identified? Were you | 3 | manufacturing policies are confidential. |
| 4 | looking for any counterfeit that was identified? | 4 | Q. So he didn't tell you what the |
| 5 | Like what? You know, help me understand what you | 5 | manufacturing policies were because they're |
| 6 | were looking for here. | 6 | confidential? |
| 7 | A. So in this -- so in this conversation, I | 7 | A. Correct. |
| 8 | was interested in manufacturing defects. | 8 | Q. Was there certain information that you |
| 9 | Specifically, if you will note on Page 13, there | 9 | were looking for that he didn't tell you because the |
| 10 | were a lot of examples that I had read in emails | 10 | information was confidential? |
| 11 | about StockX employees responding to consumer | 11 | A. No. |
| 12 | complaints of potential fake or counterfeit shoes, | 12 | Q. How did it come up that the |
| 13 | and the responses in many of these cases that I saw | 13 | manufacturing -- withdraw. |
| 14 | over and over again was that there were manufacturer | 14 | What was the import of the statement |
| 15 | flaws, they were quality issues by Nike, | 15 | that the manufacturing policies are confidential? |
| 16 | imperfections, manufacturing variances, those type | 16 | A. So the important part about that |
| 17 | of things. | 17 | statement is as I was reviewing the emails by |
| 18 | So I did want to ask him as well | 18 | StockX, the employees were stating as if it was well |
| 19 | about whether this was standard for these shoes, are | 19 | known that Nike had these manufacturing defects and |
| 20 | there manufacturing variances for these shoes, and | 20 | this was something that was well known. So if |
| 21 | he confirmed that, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | 21 | manufacturing policies are not public, that leads me |
|  | ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | 22 | to think that they were -- they were just stating |
|  | ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | 23 | something that they have nothing -- nothing to back |
|  | ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | 24 | up on, to back up what they're saying to their |
| 25 | Q. Mr. Pallett's statement was there were | 25 | consumers when they're complaining about counterfeit |

|  | Page 39 |  | Page 41 |
|---|---|---|---|
| 1 | ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | 1 | goods. |
|  | ▓▓▓▓▓ | 2 | Q. Okay. So back to -- you mentioned that |
| 3 | MS. DUVDEVANI: Objection. | 3 | Mr. Pallett told you about shoes that he had |
| 4 | BY THE WITNESS: | 4 | attempted to authenticate and determined were |
| 5 | A. So there were three shoes on here, ▓▓▓ | 5 | counterfeit; is that correct? |
|  | ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | 6 | A. Yes, I believe it was -- it was him or |
| 7 | Q. Got it. | 7 | someone from his team. |
| 8 | A. So he claimed that Nike does not have | 8 | Q. Okay. And do you know the circumstances |
| 9 | ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | 9 | under which he or someone from his team |
| 10 | Q. Did he mention ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | 10 | authenticated those shoes? |
|  | ▓▓▓▓▓▓▓▓▓▓▓▓▓ | 11 | A. Yes. So, I reference that on Page 16. |
| 12 | A. No. | 12 | So it's my understanding that they ▓▓▓▓▓▓ |
| 13 | Q. Did you ask if there had ever been any | 13 | ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ |
| 14 | quality issues with the shoes? | 14 | were able to use their proprietary system in order |
| 15 | A. I asked about these specific shoes, and | 15 | to determine that those shoes were indeed |
| 16 | he had told me ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ | 16 | counterfeit. |
|  | ▓▓▓▓▓ | 17 | Q. Did you request that Mr. Pallett or his |
| 18 | Q. Okay. Spanning the entire time of their | 18 | team conduct this analysis? |
| 19 | release? | 19 | A. No. |
| 20 | A. Yes. | 20 | Q. Do you know when the analysis occurred? |
| 21 | Q. Did he show you -- withdraw. | 21 | And by "analysis," I mean, the authentication |
| 22 | Did he provide you any documentation | 22 | process that Mr. Pallett or his team conducted. |
| 23 | or any other information about what the basis of his | 23 | A. No, I don't know exactly. |
| 24 | statements ▓▓▓▓▓▓▓▓▓▓ was? | 24 | Q. To confirm, you don't know who conducted |
| 25 | A. No. | 25 | the authentication, correct? |

11 (Pages 38 - 41)

|  | Page 42 |  | Page 44 |
|---|---|---|---|
| 1 | A. That's correct. | 1 | Panda, and Christmas releases that I mentioned a few |
| 2 | Q. Do you know what was done to determine | 2 | minutes ago. |
| 3 | whether these shoes were counterfeit? | 3 | Q. Can you explain this to me. Nike |
| 4 | A. My understanding from Joe Pallett was | 4 | authenticated these shoes and determined they were |
| 5 | that they used the Nike proprietary system in order | 5 | fake? I want to make sure I understand your |
| 6 | to determine that. | 6 | testimony. |
| 7 | Q. What is that? What was done exactly? | 7 | A. No. My apologies. My apologies. Those |
| 8 | A. So my understanding of the Nike | 8 | were ones -- let me go back to my report here. |
| 9 | authentication system is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | 9 | So those were ones that StockX had |
| 10 | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | 10 | claimed that there were manufacturing variances on, |
| 11 | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. | 11 | and those were the ones that Joe Pallett ▮▮ |
| 12 | Q. So your understanding is that somebody | 12 | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| 13 | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ | 13 | ▮▮▮▮▮▮▮▮▮▮. |
| 14 | ▮▮▮▮▮▮▮▮▮▮ make the determination as to whether | 14 | Q. Are you aware of whether he attempted to |
| 15 | the shoes were counterfeit? | 15 | authenticate any of those shoes in this context? |
| 16 | A. Yes. | 16 | A. I'm not aware of that, no. |
| 17 | Q. Did Nike make a counterfeiting | 17 | Q. Did you ask him if he attempted to |
| 18 | determination solely based o▮▮▮▮▮▮▮▮▮▮▮▮ to | 18 | authenticate any other shoes that were returned or |
| 19 | your knowledge? | 19 | asked to be returned to StockX? |
| 20 | A. Yes, with their ▮▮▮▮▮▮▮▮▮▮▮▮ | 20 | A. I did not ask him that. |
| 21 | ▮▮▮▮▮▮ | 21 | Would it be possible to take a rest |
| 22 | Q. Do you know whether Mr. Pallett or his | 22 | room break? |
| 23 | team attempted to authenticate any other shoes as | 23 | Q. Yeah, actually, give me just a couple of |
| 24 | part of this analysis? | 24 | minutes and we'll finish this line of thinking and |
| 25 | A. The ones that I refer to on Page 16. | 25 | that will be a good time for a break. |

|  | Page 43 |  | Page 45 |
|---|---|---|---|
| 1 | Q. Other than the shoes that you referred to | 1 | Are you aware of any Nike testimony |
| 2 | on Page 16, those are three shoes, the Cactus Jack | 2 | offered in this case that there have been, in fact, |
| 3 | Air Max 270, the Air Jordan 1 Mocha, and the Chunky | 3 | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| 4 | Dunky; correct? | 4 | ▮▮▮▮▮▮▮▮▮▮▮ |
| 5 | A. That's correct. | 5 | A. I'm not aware of any. No. |
| 6 | Q. Other than those three, are you aware of | 6 | Q. And would that contradict what |
| 7 | any other shoes that consumers had raised to StockX | 7 | Mr. Pallett told you? |
| 8 | as potentially counterfeit that Mr. Pallett or his | 8 | A. No. Not that I believe. |
| 9 | team attempted to authenticate to determine whether | 9 | Q. Why not? |
| 10 | they were counterfeit or not? | 10 | A. If I understand your question correctly, |
| 11 | A. Yes. I do believe there was a set of | 11 | you're asking if I know of any other Nike testimony |
| 12 | counterfeits from a power buyer that they were able | 12 | that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. So I |
| 13 | to review some of those and confirm. I think around | 13 | have not read any, and in my conversation with him, |
| 14 | half of them were -- were indeed counterfeit. | 14 | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| 15 | Q. Are those the Roy Kim shoes that you are | 15 | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| 16 | referring to? | 16 | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| 17 | A. Yes. | 17 | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. |
| 18 | Q. Other than the three shoes identified on | 18 | Q. What was -- why did you have another call |
| 19 | Page 16, and the Roy Kim shoes, are you aware of | 19 | with Mr. Pallett the next day? |
| 20 | whether Mr. Pallett or his team attempted to | 20 | A. So the call on the second day on June 1st |
| 21 | authenticate any other shoes under this scenario? | 21 | of 2023, that I reference in Footnote 99, was about |
| 22 | A. Not that I recall, but I will add the | 22 | that confirmation that they were able to use their |
| 23 | shoes on Page 14 as well. | 23 | proprietary system to confirm that those indeed were |
| 24 | Q. What are the shoes on Page 14? | 24 | counterfeit products. |
| 25 | A. Those are the Nike Dunks, the Nike Dunk | 25 | Q. Is that something you asked him to |

|  | Page 46 |
|---|---|
| 1 | confirm on May 31 and then he confirmed it on |
| 2 | June 1st? What exactly do you mean by that? |
| 3 | A. Yes. I believe so. I don't think he had |
| 4 | the answer on May 31 so he had to go back and... |
| 5 | Q. Did you go and ask him on May 31 to see |
| 6 | whether any of these shoes were counterfeit, he did |
| 7 | that, and then came back to you on June 1st? |
| 8 | A. I believe so, yes. |
| 9 | Q. Okay. Or is that -- do you know when he |
| 10 | conducted the analysis? Was that something before |
| 11 | you talked to him? Like what were the |
| 12 | circumstances? Because I think that's a little |
| 13 | contrary to what you just said and I just want to -- |
| 14 | maybe I'm misunderstanding it. |
| 15 | I thought you had testified earlier |
| 16 | that you didn't know when he did the analysis or why |
| 17 | he did the analysis but when you were on the phone |
| 18 | with him, he told you about it. |
| 19 | MS. DUVDEVANI: Objection. |
| 20 | BY THE WITNESS: |
| 21 | A. So I don't know when -- exactly when he |
| 22 | conducted the analysis. |
| 23 | Q. Right. |
| 24 | A. And I don't know who on the Nike team |
| 25 | conducted the analysis. |

|  | Page 47 |
|---|---|
| 1 | Q. Got it. |
| 2 | A. But he confirmed that information with me |
| 3 | on June 1st. |
| 4 | Q. Did he talk to you about it on May 31 as |
| 5 | well? |
| 6 | A. Generally speaking, yes, and said he |
| 7 | needed to confirm. |
| 8 | Q. So he said I think that there might be |
| 9 | counterfeits on May 31 but I'll confirm with you and |
| 10 | get back to you? I'm just trying to understand |
| 11 | whether this is something you asked him to do or how |
| 12 | it came up. |
| 13 | A. So the questions about some of these |
| 14 | shoes including the Chunky Dunky, as you can see in |
| 15 | Footnote 95, came up in the conversation on May 31. |
| 16 | So, he, during that conversation, explained that |
| 17 | three of the Nike products that the consumer at the |
| 18 | time believed were fake were determined to be |
| 19 | counterfeits. So I believe I asked for confirmation |
| 20 | on that, and he came back the next day and told me |
| 21 | that indeed they had used -- they had used a |
| 22 | proprietary system to confirm that. |
| 23 | Q. I see. |
| 24 | What did you mean when you said "I |
| 25 | asked him to confirm that"? |

|  | Page 48 |
|---|---|
| 1 | A. To confirm the determination of |
| 2 | counterfeits. |
| 3 | Q. Do you mean like how did you make that |
| 4 | determination? |
| 5 | A. Correct. |
| 6 | Q. And he said, I don't know, let me check |
| 7 | and get back to you? |
| 8 | A. I don't know if he said I don't know, but |
| 9 | he said I'd like to follow up tomorrow. |
| 10 | Q. Understood. |
| 11 | Do you know who he talked to, to |
| 12 | confirm that information? |
| 13 | A. I don't. |
| 14 | Q. On the May 31 or June 1st calls, did you |
| 15 | take any notes? |
| 16 | A. Only those that are directly in my |
| 17 | rebuttal report. |
| 18 | Q. So did anyone else take notes that you |
| 19 | used at any point? |
| 20 | A. No. |
| 21 | Q. Did you discuss any legal strategy on |
| 22 | either of these calls? |
| 23 | A. No. |
| 24 | Q. Did you discuss any facts that are not |
| 25 | included in the report? |

|  | Page 49 |
|---|---|
| 1 | A. No. |
| 2 | Q. So on both of these calls, everything |
| 3 | that Mr. Pallett told you, you put into your report? |
| 4 | A. Yes. |
| 5 | MS. BANNIGAN: Okay. Let's take a break. |
| 6 | Sorry about that timing. |
| 7 | THE VIDEOGRAPHER: The time is 10:41 a.m. |
| 8 | This is the end of Media Unit 1 and we're going off |
| 9 | the video record. |
| 10 | (Whereupon, a break in the |
| 11 | proceedings was taken.) |
| 12 | THE VIDEOGRAPHER: The time is 10:55 a.m. |
| 13 | This is the beginning of Media Unit 2, and we are |
| 14 | back on the video record. |
| 15 | BY MS. BANNIGAN: |
| 16 | Q. Going back to Exhibit 1 -- your CV that's |
| 17 | attached to Exhibit 1, please. It appears just |
| 18 | after Page 40 of your report. |
| 19 | Is this an accurate depiction of your |
| 20 | background? |
| 21 | A. Yes. |
| 22 | Q. Is there anything that's missing on here |
| 23 | or anything that's occurred since June 2 that you |
| 24 | would add to it? |
| 25 | A. I believe I had one conference speaking |

Page 310

1  MS. DUVDEVANI: I have no further
2  questions.
3  MS. BANNIGAN: I have just a few.
4  E X A M I N A T I O N
5  BY MS. BANNIGAN:
6  Q.  Looking at this exhibit, what is it,
7  looking at Exhibit 7, do you know who wrote this
8  document?
9  A.  I don't.  I don't have the name exactly,
10 but I know it was someone within StockX that was
11 looking -- looking to deal with some of the
12 requirements and different things that are mentioned
13 here throughout the document.
14 Q.  And when you received this document in
15 part of preparation for your report, did you ask any
16 questions about it?
17 A.  Not specifically.
18 Q.  Do you know if it was used by StockX ever
19 in any capacity?
20 A.  I don't have that information one way or
21 the other.
22 Q.  At the top of the first page, it says,
23 "If you are making any further edits, please comment
24 or slack me as I'm working in the confluent doc that
25 we will present."

Page 311

1         Do you have any understanding who
2  wrote that?
3  A.  I don't, minus the initials that are on
4  the page.
5  Q.  Do you know if this document was edited
6  after this current draft?
7  A.  I don't.
8  MS. BANNIGAN: I have no further
9  questions.
10 THE VIDEOGRAPHER: The time is 7:31 p.m.
11 This is the end of Media Unit 9, and it is also the
12 end of the deposition.  We're going off the video
13 record.  Thank you.
14         (Off the record at 7:31 p.m.)

Page 312

1  REPORTER CERTIFICATE
2
3         I, JO ANN LOSOYA, a Certified Shorthand
4  Reporter within and for the State of Illinois, do
5  hereby certify:
6         That previous to the commencement
7  of the examination of the witness, the witness was
8  duly sworn to testify the whole truth concerning the
9  matters herein; That the foregoing deposition
10 transcript was reported stenographically by me, and
11 the foregoing constitutes a true record of the
12 testimony given and the proceedings had; That the
13 said deposition was taken before me at the time and
14 place specified; That I am not a relative or
15 employee or attorney or counsel, nor a relative or
16 employee of such attorney or counsel for any of the
17 parties hereto, nor interested directly or
18 indirectly in the outcome of this action.
19        IN WITNESS WHEREOF, I do hereunto set my
20 hand this day, July 21, 2023.
21
22        *[signature]*
        JO ANN LOSOYA, CSR, RPR, CRR
23      C.S.R. 84-002437

Page 313

1  Tamar Dudevani, Esq.
2  tamar.duvdevani@dlapiper.com
3       July 21, 2023.
4  RE: Nike, Inc. v. Stockx, LLC
5     7/18/2023, Kari Kammel (#6001080)
6     The above-referenced transcript is available for
7  review.
8     Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 cs-ny@veritext.com.
16
17   Return completed errata within 30 days from
18 receipt of testimony.
19    If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22        Yours,
23        Veritext Legal Solutions