## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

NIKE, INC.,

                    Plaintiff,

          v.

STOCKX LLC,

                    Defendant.

Civil Action No.: 1:22-cv-00983-VEC

**ORAL ARGUMENT REQUESTED**

## NIKE, INC.'S OPPOSITION TO STOCKX'S MOTION FOR
## PARTIAL SUMMARY JUDGMENT

## <u>TABLE OF CONTENTS</u>

I.   Counterstatement of Facts..................................................................................... 3

  A.   StockX's False Authentication Advertising Claims ......................................... 3

  B.   Authenticity Is A "Core" Value Proposition For StockX And Its Consumers. ................. 4

  C.   Nike and StockX Are Obvious Competitors..................................................... 6

  D.   StockX's Accused Advertising Harms Nike In At Least Two Ways. ................ 8

II.  Legal Standard ...................................................................................................... 10

III. StockX is Liable For False Advertising And Its Motion Should be Denied .................. 11

  A.   StockX's Authentication Process Claims Are Literally False. ......................... 11

    1.   *The Authentication Process Claims Are Literally False By Necessary Implication.* ... 11

    2.   *Several of the Authentication Process Claims Are Facially Literally False.* .............. 14

  B.   StockX's Accused Advertising Is Indisputably Material To Consumers. ........................ 19

    1.   *The Court Should Not Consider Butler's Damages Rebuttal Survey In Connection with StockX's Case-In-Chief.* ....................................................................................... 22

  C.   The Accused Statements Caused Nike Likely—and Actual—Injury. ............................. 24

IV.  Conclusion ............................................................................................................. 30

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Apotex Inc. v. Acorda Therapeutics, Inc.*,
  2014 WL 5462547 (S.D.N.Y. Oct. 23, 2014) ........................................................................10

*Apotex Inc. v. Acorda Therapeutics, Inc.,* 823 F.3d 51, 63 (2d Cir. 2016) ...................................21

*Au New Haven LLC v. YKK Corp.*,
  2019 WL 1437516 (S.D.N.Y. Mar. 31, 2019) ................................................................10, 22

*Avis Rent A Car System, Inc. v. Hertz Corp.*,
  782 F.2d 381 (2d Cir. 1986)..........................................................................................14

*BeautyBank, Inc. v. Harvey Prince, LLP*,
  2013 WL 11327097 (S.D.N.Y. Mar. 29, 2013) .............................................................16, 26

*Big Vision Priv. Ltd. v. E.I. DuPont De Nemours & Co.*,
  1 F. Supp. 3d 224 (S.D.N.Y. 2014) .................................................................................19

*C=Holdings B.V. v. Asiarim Corp.*,
  992 F. Supp. 2d 223 (S.D.N.Y. 2013).........................................................................13, 20

*Chanel, Inc. v. RealReal, Inc.*,
  449 F. Supp. 3d at 445 ...........................................................................................13, 17, 28

*Chanel, Inc. v. WGACA, LLC*,
  2022 WL 902931 (S.D.N.Y. Mar. 28, 2022) .................................................................29, 30

*Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*,
  843 F.3d 48 (2d Cir. 2016)......................................................................... *passim*

*CJ Prod. LLC v. Snuggly Plushez LLC*,
  809 F. Supp. 2d 127 (E.D.N.Y. 2011) .........................................................................20, 21

*Coca-Cola Co. v. Tropicana Prod., Inc.*,
  690 F.2d 312 (2d Cir. 1982)........................................................................................26, 29

*Dependable Sales & Serv., Inc. v. TrueCar, Inc.*,
  394 F. Supp. 3d 368 (S.D.N.Y. 2019)......................................................................25, 26, 28

*Fischer v. Forrest*.
  286 F. Supp. 3d 590 (S.D.N.Y. 2018)..............................................................................18

*Hertz Corp. v. Avis, Inc.*,
  867 F. Supp. 208 (S.D.N.Y. 1994) .................................................................................11

*Imig, Inc. v. Electrolux Home Care Prod., Ltd.*,
  2007 WL 900310 (E.D.N.Y. Mar. 22, 2007) ........................................................17

*Insurant Agency Corp. v. Hanover Ins. Co.*,
  2018 WL 3979589 (S.D.N.Y. Aug. 20, 2018) ......................................................22

*Int'l Code Council, Inc. v. UpCodes Inc.*,
  43 F.4th 46 (2d Cir. 2022) ...................................................................................19

*Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc.*,
  478 F. Supp. 2d 340 (E.D.N.Y. 2007) .................................................................24

*Johnson & Johnson-Merck Consumer Pharms. Co. v. Procter & Gamble Co.*,
  285 F. Supp. 2d 389 (S.D.N.Y.)............................................................................13

*JR Tobacco of Am., Inc. v. Davidoff of Geneva (CT), Inc.*,
  957 F. Supp. 426 (S.D.N.Y. 1997) .................................................................13, 17

*K&N Eng'g, Inc. v. Spectre Performance*,
  2011 WL 13131157 (C.D. Cal. May 12, 2011) ...................................................24

*Kerzer v. Kingly Mfg.*,
  156 F.3d 396 (2d Cir. 1998)..................................................................................10

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014)...............................................................................................30

*Merck Eprova AG v. Brookstone Pharms.*,
  *LLC*, 920 F. Supp. 2d 404 (S.D.N.Y. 2013) ...........................................25, 26, 28

*Merck Eprova AG v. Gnosis Bioresearch S.A.*,
  760 F.3d 247 (2d Cir. 2014)...........................................................................25, 28

*Merck Eprova AG v. Gnosis S.P.A.*,
  2011 WL 1142929 (S.D.N.Y. Mar. 17, 2011) ....................................................20

*MSP Recovery Claims, Series LLC v. AIG Prop. Cas. Co.*,
  2021 WL 3371621 (S.D.N.Y. Aug. 2, 2021).........................................................3

*Nat'l Basketball Ass'n v. Motorola, Inc.*,
  105 F.3d 841 (2d Cir.1997)...................................................................................21

*In re Navidea Biopharmaceuticals Lit.*,
  2022 WL 16833587 (S.D.N.Y. Nov. 9, 2022).....................................................23

*Nike, Inc. v. StockX LLC*,
  2024 WL 3361411 (S.D.N.Y. July 10, 2024) ......................................................21

*Ohio State Troopers Ass'n, Inc. v. Point Blank Enterprises, Inc.*,
   2020 WL 1666763 (S.D. Fl. 2020) .................................................................24

*Osmose, Inc. v. Viance, LLC*,
   612 F.3d 1298 (11th Cir. 2010) .....................................................................21

*Playtex Prod., LLC v. Munchkin, Inc.*,
   2016 WL 1276450 (S.D.N.Y. Mar. 29, 2016) ..............................................11, 21

*POM Wonderful LLC v. Purely Juice, Inc.*,
   2008 WL 4222045 (C.D. Cal. July 17, 2008) ................................................20

*Reckitt Benckiser Inc. v. Motomco Ltd.*,
   760 F. Supp. 2d 446 (S.D.N.Y. 2011)...........................................................11, 26

*Reed Construction Data Inc. v. McGraw-Hill Companies., Inc.*,
   49 F. Supp. 3d 385 (S.D.N.Y. 2014).............................................................21, 22

*Rexall Sundown, Inc. v. Perrigo Co.*,
   651 F. Supp. 2d 9 (E.D.N.Y. 2009) ..............................................................14

*River Light V, L.P. v. Tanaka*,
   2018 WL 5778234 (S.D. Fla. Nov. 2, 2018)..................................................20

*Rosenshine v. A. Meshi Cosmetics Indus. Ltd.*
   2023 WL 6516994 (S.D.N.Y. Oct. 3, 2023) .................................................21

*S.C. Johnson & Son, Inc. v. Clorox Co.*,
   241 F.3d 232 (2d Cir. 2001)..........................................................................20

*S.C. Johnson & Son, Inc. v. Clorox Co.*,
   930 F. Supp. 753 (E.D.N.Y. 1996) ...............................................................15

*SimplexGrinnell LP v. Integrated Sys. & Power, Inc.*,
   642 F. Supp. 2d 167 (S.D.N.Y. 2009)...........................................................25

*Skillz Platform, Inc. v. Papaya Gaming, Ltd.*,
   2024 WL 3526853 (S.D.N.Y. Jul. 23, 2024) ................................................21

*SourceOne Dental, Inc. v. Patterson Companies, Inc.*,
   328 F. Supp. 3d 53 (E.D.N.Y. 2018) ............................................................21

*Souza v. Exotic Island Enterprises, Inc.*,
   68 F.4th 99 (2d Cir. 2023) ..............................................................24, 26, 30

*Sublime Prod., Inc. v. Gerber Prod., Inc.*,
   579 F. Supp. 248 (S.D.N.Y. 1984) ...............................................................28, 29

iv

*Tiffany (NJ) Inc. v. eBay, Inc.*,
    2010 WL 3733894 (S.D.N.Y. Sept. 13, 2010) .......................................................................11

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
    497 F.3d 144 (2d Cir. 2007) .................................................................................... *passim*

*Unlimited Cellular, Inc. v. Red Points Sols. SL*,
    677 F. Supp. 3d 186 (S.D.N.Y. 2023) ..............................................................................18, 20

**Other Authorities**

FED. R. CIV. P. 26(a)(2)(D)(ii) ...........................................................................................23

FED. R. CIV. P. 56(a) ...........................................................................................................10

Since its inception, StockX consistently and prominently advertised that every single pair of Nike footwear sold on its platform was guaranteed 100% authentic, a promise StockX said it could make due to its unparalleled ability to "authenticate" every pair through its top-secret, high-tech processes and its "expert" "authenticators," a job category it touts inventing.  It called authentication the "core" value proposition for consumers and their experiences on the StockX platform. ████████████████████████████████████████████ ████████████████████████████████ It repeated its authentication claim at every step of the consumer purchasing journey.  It placed "100% Authentic" buttons on every product landing page on its website, which linked to its "Authentication Page" replete with statements about its sale of guaranteed authentic goods and its ability to authenticate those goods.  The claims appeared over and over again—on StockX's website, in its social media posts, on its blog, in its press releases and publications, through interviews and other comments to the media, in e-mails sent to consumers, on purchase receipts, and on the green "Verified Authentic" tags affixed to each Nike shoe that StockX shipped to a consumer.  StockX's authentication proclamations were ubiquitous.  To StockX and its consumers, StockX's authentication claim was essential.

Turns out, it was also false, as evidenced by admissions that StockX cannot determine whether goods are genuine or counterfeit, lacks knowledge of how many counterfeit goods its "expert authenticators" passed on to consumers, as well as indisputable evidence of StockX's authentication and distribution of counterfeit "Nike" footwear.

Caught making literally false claims, StockX now runs away from the years it spent emphasizing the importance of its ability to authenticate Nike footwear.  It moves for summary judgment on false advertising liability on seventeen of the twenty-two authentication-related claims that Nike challenges as false (although it only argues that a subset of those are truthful).  Its

newfangled story for the Court is that these seventeen claims, some of which are true, are immaterial to consumer purchasing decisions.  To do so, StockX misconstrues the law and ignores the record, both of which amply demonstrate the literal falsity and materiality of its claims that the products it sells are 100% authentic and never fake, every time.

On "actual or likely" harm, another required element for false advertising liability, StockX engages in further legal and factual contortions.  StockX bifurcates the marketplace into the "primary" and "secondary" channels, arguing that it cannot compete with Nike because it is a secondary marketplace while Nike is a primary retailer, and ergo, Nike has not suffered likely harm proximate to the false advertising.  This bifurcation is illusory and cannot obscure the fact that the parties are obvious competitors: StockX offers for sale dozens of Nike styles it claims are "100% Authentic" and brand new that are simultaneously offered for sale on Nike.com.  StockX offers some of these styles at a lower price-point than Nike and its retail partners, and even offers for sale Nike shoes that Nike has not yet released.  This competition between the parties, acknowledged by StockX in its own internal reports, presumes actual injury.  And, if that were not sufficient for Nike to make its *prima facie* case on likely injury, Nike's evidence of diverted sales and reputational harm stemming from StockX's false claims, while ignored by StockX, present additional harms warranting denial of StockX's Motion.

The Lanham Act's false advertising provisions, like the rest of the Act, were enacted to protect consumers from deceptive behavior.  Downplaying the promise it made to consumers *ad nauseum*, StockX works hard in its Motion to create a mythology where the deceptive nature of its advertising can be defended by pretending that its authentication claims are immaterial, taking phrases out of context and downplaying the significance of others, all while ignoring the severe harm that its conduct has caused.  Not only is Nike uniquely injured by StockX's false

advertising, StockX's consumers, who are also Nike consumers, deserve better. As discussed further herein, StockX's arguments on falsity, materiality, and likely harm all fail, and StockX's Motion should be denied.

# I.    COUNTERSTATEMENT OF FACTS

## A.    StockX's False Authentication Advertising Claims

StockX moves on seventeen of the twenty-two accused advertising claims. (Dkt. 255 at 7; Consolidated Rule 56.1 Statement of Fact ("SMF") ¶ 687.) StockX omits from its Motion two of the claims it used most prominently, "Always Verified Authentic" and "100% Authentic," both addressed in Nike's Motion.[1] (Dkt. 259; Dkt. 39 ¶¶ 12-13, 51-54, 109, 172-174; Dkt. 255 at 7; SMF ¶ 687.) StockX's Motion divides the seventeen claims into two categories: (1) "Authenticity"; and (2) "Authentication Process" claims (together, the "Accused Advertising").[2] (Dkt. 255 at 7.)

StockX's bifurcation of the Accused Advertising into claims of authentication versus claims about the process of authentication is a false construct. Each claim makes the same promise to consumers: that StockX, with its "authentication process," "authenticates" every product sold on its platform and guarantees each is authentic. This is all the more evident when viewed in the required context: all of the Accused Advertising claims but one[3] are published together on StockX's "Authentication Page" and reinforce each other. (SMF ¶¶ 688-689.) StockX

---

[1] StockX also did not move on "Buy & Sell Authentic Sneakers," "Buy Authentic. Be Authentic," and "On StockX, every sneaker you want is always available and authentic." StockX cannot move on these claims in its reply, at least three claims necessarily survive StockX's Motion. *See MSP Recovery Claims, Series LLC v. AIG Prop. Cas. Co.*, 2021 WL 3371621, at *2 (S.D.N.Y. Aug. 2, 2021) (declining to hear arguments raised first in reply as "[i]t is well settled in the Second Circuit" that a party may not do so).

[2] For example, StockX calls "Guaranteed Authenticity" an Authenticity claim and "Authenticators maintain a 99.96% accuracy rate" an Authentication Process claim. (Dkt. 255 at 7.) StockX moves on falsity only for the Authentication Process claims and moves on materiality and injury for both categories. (*Id.* at 10-16.)

[3] StockX plucks the word "proprietary" from its "How it Works" page, where it is used to describe StockX's authentication process. (SMF ¶ 690.).

intentionally published the claims together on its "Authentication Page[4]" ████████████████████

████████████████████████████████████████████████████████████ (*Id.* ¶¶ 691,

693.)  StockX used the claims on this Authentication Page to convey its value proposition to

consumers: shop with us and we guarantee that you will receive 100% authentic product.  (*See id.*

¶¶ 688-689, 693.)  StockX reinforced this message with the "100% Authentic" claim (absent from

its Motion), which appeared prominently as a "button" on every product landing page immediately

below the product name and above the product image.  (*Id.* ¶ 695.)  Consumers that clicked on

"100% Authentic" were hyperlinked to StockX's Authentication Page.  (*Id.* ¶ 695.)  StockX used

its "How it Works" page, that contains the "proprietary" claim, to educate consumers on the

benefits of its platform, including "[a]ccess to [a]uthentic products."  (*Id.* ¶ 692.)

### B.    Authenticity Is A "Core" Value Proposition For StockX And Its Consumers.

StockX repeatedly admitted that the Accused Advertising is extremely important to

consumers that buy goods on its platform.  (SMF ¶¶ 719-746.)  StockX's documents and surveys

speak for themselves and demonstrate the importance of authenticity and authentication to its

consumers.  (*Id.* ¶¶ 719-723, 732-745.)  A StockX November 2019 "US Brand Perception Study"

found that ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

(*Id.* ¶ 719.)  Among those consumers who typically spend $250 or more on sneakers, ████████

████████████████████████████████████████████ (*Id.* ¶ 720.)  The

November 2020 version again found that authenticity was an important purchase driver for StockX

consumers, with authenticity ranking as ██████████████████████████████

██████████ (*Id.* ¶¶ 721-722.)  In February 2022, contemporaneous with Nike filing this lawsuit

---

[4] StockX's "Authentication Page," refers to *stockx.com/about/authentication* depicted in Dkt. 261-57. (SMF ¶¶ 688-689.)

(but before it amended its complaint to add false advertising), StockX again conducted a survey revealing that ███████████████████████████████████████████████████ when selecting an online platform to buy goods.  (*Id.* ¶ 723.)

Just like the surveys StockX conducted outside the litigation context, StockX survey expert Sarah Butler found that authenticity was a likely purchase driver for consumers.  (*Id.* ¶ 618.)  Ms. Butler designed and conducted a survey that StockX intends to proffer as rebuttal to Nike's damages expert's opinion.  (*Id.* ¶ 777.)  Her survey, purporting to measure the Accused Advertising's impact on consumer purchasing, showed respondents StockX's Authentication Page and How it Works Page, amongst others, and asked how likely they were to use StockX to purchase sneakers and why.  (*Id.* ¶ 778.)  Of the respondents that saw the Accused Advertising and were likely to use StockX, nearly a quarter of them (23.5%) indicated that their interest was due to authentication, guarantees, or trusting StockX.  (*Id.* ¶ 618.)[5]

Other StockX documents and testimony reiterate the importance of authenticity to consumers and describe authenticity as ████████████████████████ painting a starkly different picture than StockX's Motion.  (*Id.* ¶¶ 724-725.)  Far from immaterial, StockX credits its authentication process ████████████████████████████████████ (*id.* ¶ 726), describes authentication as █████████████████████████ (*id.* ¶ 727) and one of StockX's █████████████████████████ (*Id.* ¶ 728; *see also id.* ¶¶ 730-731.)  Indeed, StockX boasts that it "invented an entirely new job category of authenticator" and touts that "[b]efore StockX, authentication wasn't widely offered by secondary marketplaces and as a result,

---

[5] A similar percentage of Butler's control indicated that their interest was due to authentication/inspection, guarantees, or trusting StockX.  (SMF ¶ 619.)  Butler concludes this shows that the claims do not impact purchasing decision, (*Id.* ¶ 620), a point which Nike disputes, but this does not impact the finding that they are likely purchase drivers.

consumers didn't have much trust in the resale industry." (*Id.* ¶¶ 724, 729.) According to StockX, when it comes to authentication, StockX "set the industry standard." (*Id.* ¶ 724.)

Despite all of this evidence to the contrary, StockX now, for this lawsuit, claims its authentication claims are immaterial, and points only to Ms. Butler's rebuttal opinion and testimony from Roy Kim to claim that "[c]onsumers purchased on StockX for many reasons having nothing to do with StockX's advertising claims." (Dkt. 255 at 18.) StockX misses the point. As discussed below, it is irrelevant to false advertising liability that consumers also may have purchased goods for other reasons, so long as the challenged claims are a "likely" reason. The law does not require the challenged claim to be the exclusive reason consumers are likely to purchase. *See infra* § III.B. Moreover, StockX omits Mr. Kim's adjacent testimony that he considers "authentication" key to selecting a collectible sneaker platform. (SMF ¶ 746.) StockX also states, with no evidentiary support, that the Accused Advertising provides StockX no competitive advantage because other reselling platforms make similar promises. (Dkt. 255 at 9.) To the contrary, StockX's documents ███████████████████████████████████████ ███████████████████████ that other platforms have attempted to mimic StockX's authentication-centered business model only shows the centrality of authenticity claims to consumers in the secondary marketplace. (SMF ¶¶ 726-728.) It is also irrelevant whether these claims provide StockX a competitive advantage against third parties—what matters is that StockX's false claims unfairly provided StockX a competitive advantage in its competition with ***Nike***. *See infra* §§ I.D, III.C.

## C.    Nike and StockX Are Obvious Competitors.

Just like the misleading bifurcation of the Accused Advertising, StockX's division of the relevant market into "secondary" and "primary" markets is a false construct, and at odds with StockX's documents. (Dkt. 255 at 3-4.) Using professional stock imagery on uniform landing

pages, StockX advertises the sale of genuine Nike products that are "brand new and never worn." (SMF ¶¶ 429, 747.)  StockX offers for sale dozens of styles of "100% Authentic" brand new Nike footwear that are simultaneously for sale on Nike.com.  (*Id.* ¶¶ 749, 765.)  Thus, when a consumer shops online for Nike footwear, and even for a specific Nike style, they have the option to purchase footwear from Nike or from StockX.  (*Id.* ¶¶ 749-755.)  StockX even offers some of these styles at a lower price-point than Nike and its retail partners.  (*Id.* ¶¶ 751-752.)  For example, a consumer searching on Google.com for a "Nike Air Force 1 '07'" will see results for Nike.com, Nike's retail partners, StockX.com, eBay and Amazon, with StockX showing the product as in-stock and ready for sale, often below the current Nike retail price.  (*Id.* ¶ 748.)  In some cases, StockX even offers for sale Nike shoes that Nike has not yet even released, *i.e.*, "pre-release" shoes.  (*Id.* ¶¶ 753-754.)  By offering and advertising Nike pre-release shoes, StockX drives consumers to its platform and, again, profits from sales that Nike has not yet made.  (*Id.* ¶¶ 753-756; *id.* ¶ 757 (StockX allows customers to "easily secure those hard-to find, coveted items" including "pre-release."))  This direct substitutability of product offerings confirms competition between the parties.  (*Id.* ¶¶ 755, 756.)  StockX did not proffer evidence that any other platform has anywhere near the level of "authentic" and "new" Nike footwear overlap that exists between StockX and Nike.[6]

StockX's marketing and business model also belie its claim that it does not compete with the primary retail market.  StockX tells consumers that its platform "will match any retail purchase experience."  (*Id.* ¶ 758.)  StockX explains that its use of a "single product page" "provides [b]uyers a 'standard' ecommerce page" so consumers can "buy with confidence."  (*Id.* ¶ 759; *see also id.* ¶ 429.)  The product page alleviates the need to "scroll[] for listings," like consumers do on other

---

[6] StockX also identifies authenticity-related claims on other platforms but offers no evidence that such claims are true or false.  (Dkt. 255 at 9.)  Other platforms copying StockX's false advertising is only relevant, if at all, to show that by standardizing the use of false claims, StockX compounded the harm to Nike.

resale platforms, "delivering a marketplace model in a standard e-commerce environment." (*Id.*) Indeed, although StockX claims that other resale platforms are its competitors, Dkt. 255 at 9,

██████████████████████████████████████████████████████████████████

██████████████████████████████████ (*Id.* ¶ 760 ██████████████████████████████████

████████████████████████████; *id.* ¶¶ 761-762 (same); *id.* ¶¶ 763-764.)   There is also no record evidence indicating that other secondary marketplaces sell shoes at the same time they are available from Nike or at the same volume as StockX.  To the contrary, StockX's internal analyses emphasize that StockX has the majority market share.  (*See id.* ¶ 761.)

**D.**    **StockX's Accused Advertising Harms Nike In At Least Two Ways.**

First, StockX's falsely advertised sale of "100% Authentic" or "100% Verified Authentic" Nike shoes at the same time the same shoes are sold directly from Nike exerts competitive pressure on Nike, and strongly indicates that StockX diverts sales from Nike.  (SMF ¶¶ 747, 755, 765; Dkt. 250 at 27-28.).  As explained *supra* § I.C, StockX sells purportedly "authentic" and "new" Nike shoes—both pre-release shoes and shoes that are available from Nike at the same time, including at prices below retail.  By positioning itself as a direct substitute for Nike through its advertising, StockX likely diverts sales from Nike and its retail partners.  (SMF ¶ 754 ("A consumer interested in buying these products could purchase the products now through StockX's pre-release listing and not directly through Nike."); *id.* at ¶ 749 (identifying 71 Nike styles available from both Nike and StockX); *id.* ¶¶ 766-767 (Mr. Amidon identifying high heat and presale sellers and promoting them to consumers); *id.* ¶ 768 (Mr. Lopez explaining that footwear release dates vary in different geographies, allowing StockX to offer pre-release sneakers before they are available in the U.S. through Nike.com, and admitting pre-release sneakers come through StockX authentication centers before they are available through Nike.))

Second, StockX's sale of quantities of counterfeit "Nike" shoes that it falsely advertised as

"100% Authentic" causes Nike severe reputational harm. Nike expends significant resources to maintain control over its brand, reputation, and its valuable goodwill and protect against the sale of counterfeit "Nike" products. (SMF at ¶¶ 219-222). Counterfeit trafficking causes Nike harm because Nike loses control over its brand, reputation, and its ability to maintain strict quality control and very likely a sale of genuine Nike shoes. (SMF ¶ 220.) But StockX's false advertising severely harms Nike in a way that is related to—but distinct from—the harm caused by counterfeiting alone.

StockX drilled its Advertising Claims into consumers at every step of the purchasing journey, and even after the purchase was complete. (SMF ¶¶ 57-65,769-772.) Consumers shop on StockX because they want authentic Nike goods and StockX has conditioned consumers to trust StockX; these are not Canal Street purchasers looking to buy a fake. (SMF ¶¶ 74-85,699.) As a result, StockX consumers have been conditioned by StockX to believe that products they receive are genuine, even when they purchase a counterfeit from StockX that "slipped through the [very large] cracks." (SMF ¶¶ 74-85, 699.)

Many counterfeit products are shoddy, may fall apart, degrade more quickly than authentic Nike footwear, and may even cause physical injury. (SMF ¶¶ 228, 230-231.) When a StockX consumer has a bad experience with counterfeit "Nike" footwear that StockX guaranteed was authentic, that consumer improperly attributes their negative experience to Nike. (*Id.* ¶¶ 220-230.) This loss of consumer trust in Nike's brand likely results in (1) lost sales, (2) negative consumer feedback to Nike and through social media platforms, and (3) harm to Nike's business partners and/or affiliates. (*Id.* ¶¶ 219-238.) Compounding this injury, StockX's "refund" policy made returns exceptionally difficult, and instead encouraged complaining customers to resell the

suspected counterfeit products purchased on StockX to other consumers on StockX.[7]  (*Id.* ¶¶ 100-111, 699, 701.)  This resell-not-refund policy earned StockX fees twice on the same suspected counterfeit footwear, as the aggrieved customer must pay fees to StockX first as a buyer and then as a seller.  (*See, e.g.*, SMF ¶ 699.)  Amongst all the other entities against whom StockX claims to compete, the reputational harm caused by StockX's false advertising of Nike footwear is unique to Nike.

## II.    LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  "On a motion for summary judgment, the moving party has the burden of showing the absence of a genuine issue of material fact, and the district court's task is limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them."  *Kerzer v. Kingly Mfg*., 156 F.3d 396, 400 (2d Cir. 1998).  Given the body of evidence supporting Nike's false advertising claims, StockX fails to carry its burden, particularly when the law is properly applied to the facts here.

To prevail on its case-in-chief, Nike must establish the elements for false advertising liability discussed in *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH,* 843 F.3d 48, 65 (2d Cir. 2016).  (Dkt. 255 at 10.)[8]  But this is ***StockX's*** Motion, which means that so long as Nike makes out a *prima facie* case with evidence supporting all five elements, then StockX's Motion must be denied.  *See Au New Haven LLC v. YKK Corp.*, 2019 WL 1437516, at *19 (S.D.N.Y. Mar. 31, 2019).  Nike presents evidence in opposition that not only makes out a *prima*

---

[7] StockX's repeated reference to its return policy is revisionist history.  Dkt. 255 at 2.  While StockX added a new "Buyer Promise" after this lawsuit, its documents show that it did not allow for returns, exchanges, or cancellations, which resulted in consumer frustration with their inability to return products, including suspected counterfeits.  (SMF ¶¶ 104-111, 699-700, 702-704.)

[8] StockX concedes that the third element, interstate commerce, is satisfied.  (Dkt. 255 at 10.)

*facie* case sufficient to defeat StockX's Motion but conclusively establishes StockX's false advertising liability, even though that is not Nike's burden here. Moreover, "to survive [StockX's] motion for summary judgment, [Nike] need not prove that challenged promotional statements *are* false," only that "a reasonable juror *could* reach that conclusion." *Apotex Inc. v. Acorda Therapeutics, In*c., 2014 WL 5462547, at *4 (S.D.N.Y. Oct. 23, 2014), *aff'd,* 823 F.3d 51 (2d Cir. 2016).

## III.    STOCKX IS LIABLE FOR FALSE ADVERTISING AND ITS MOTION SHOULD BE DENIED

### A.    StockX's Authentication Process Claims Are Literally False.

StockX argues that the Authentication Process claims (but not the Authenticity Claims) are truthful. (Dkt. 255 at 10-16.) Because the record establishes that the Authentication Process claims are literally false, this argument fails. *See infra* §§ III.A.1-2.

#### 1.    *The Authentication Process Claims Are Literally False By Necessary Implication.*

To be literally false, an advertisement can be "false on its face" or false by necessary implication. *Playtex Prod., LLC v. Munchkin, Inc.*, 2016 WL 1276450, at *4 (S.D.N.Y. Mar. 29, 2016) (citing *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 (2d Cir. 2007)). A literally false claim "is best supported by comparing the statement itself with the reality it purports to describe." *Reckitt Benckiser Inc. v. Motomco Ltd.*, 760 F. Supp. 2d 446, 454 (S.D.N.Y. 2011). The "false by necessary implication" doctrine "allows a court to conclude that, while no individual statement in an advertisement is false, taken as a whole, the advertisement necessarily implies a falsehood." *Tiffany (NJ) Inc. v. eBay, Inc*., 2010 WL 3733894, at *3 (S.D.N.Y. Sept. 13, 2010); *see also Church & Dwight*, 843 F.3d at 65 (citing *Time Warner Cable, Inc.,* 497 F.3d at 153). Thus, even where "no combination of words" on the page is untrue, a message can be "literally false" if the clear meaning of the statement, considered in context, is false. *Reckitt Benckiser*, 760

11

F. Supp. 2d at 454.  The Court "may rely on its own common sense and logic" in making this determination.  *Hertz Corp. v. Avis, Inc.*, 867 F. Supp. 208, 212 (S.D.N.Y. 1994).

Viewed in their required context, Dkt. 259 at 14-16, the Authentication Process claims are literally false, given StockX's sales of counterfeit "Nike" shoes and inability to authenticate Nike shoes.  (SMF ¶¶ 142-147.)  All but one of the claims[9] appeared on the Authentication Page, (SMF ¶¶ 688-689), prominently titled "Guaranteed Authenticity." and instructing consumers to shop "with complete confidence knowing every purchase is 100% Verified Authentic."



This webpage also contains all of the Authenticity claims, which StockX intentionally used to convey the unambiguous meaning that its authentication process guarantees product authenticity. (*id.* ¶¶ 688-689, 691, 693-694.)  The language directly surrounding each claim further reinforces the message.  For example, the "Quality Assurance" claim, in context, tells consumers that they will never receive a fake good because the "QA experts" ensure it as a final authentication check:



---

[9] Those claims are: "100% Verified Authentic: Every item goes through our proprietary multi-step verification process with our team of expert authenticators," "Our global team of expert authenticators uses a rigorous, multi-step verification procedure," "With Checklists of 100+ data points, our authenticators are better equipped than anyone to ensure a product's authenticity," "Advanced Technology: We use machine learning to aid our authenticators in catching every minor detail," "Quality Assurance: A final check in our authentication, our QA experts ensure nothing slips through the cracks."  (SMF ¶¶ 688-689.)

In addition, the "Advanced Technology" claim is supported by a statement that machine learning "aid[s] our authenticators in catching every minor detail." (SMF ¶¶ 688-689.) StockX assures customers that, because of its Authentication Process claims, "every purchase is 100% Verified Authentic. Every item. Every time." (SMF ¶¶ 688-689; *but see* Dkt. 255 at 2 (referring to its inspection process as "robust but not flawless")). In context, the Authentication Process claims unambiguously communicate that StockX's authentication process is flawless, enabling it to guarantee authenticity. (SMF ¶¶ 688-689.) Because StockX admits its authentication process cannot determine authenticity, the claims are literally false. *Chanel, Inc. v. RealReal, Inc.* is instructive on this point:

> The RealReal has 'worked tirelessly' to cultivate consumer trust and confidence in its business model by advertising that it has 'developed the most rigorous authentication process in the marketplace,' a key selling point in the luxury consignment space. In this context, The RealReal's statement 'we ensure that every item on The RealReal is 100% the real thing,' is an unambiguous representation of fact that all of the products advertised and sold by The RealReal are 100% authentic. . . . In addition, The RealReal holds itself out as employing sophisticated and extensive authentication safeguards, stating, among other things, that it employs "over 100 brand authenticators ... many of [whom] join The RealReal from the luxury brands themselves," with "every member of [the] authentication team ... receiv[ing] thorough training on all categories of products they authenticate.

449 F. Supp. 3d 422, 443–44 (S.D.N.Y. 2020) (internal citations omitted); (SMF ¶¶ 53-54.) Just as in *Chanel*, because StockX cannot determine authenticity,[10] its Authentication Process claims are literally false. *Id.*; *see also JR Tobacco of Am., Inc. v. Davidoff of Geneva (CT), Inc.*, 957 F. Supp. 426, 433 (S.D.N.Y. 1997) ("The context of these statements, the entire brochure together with its photos, does nothing to change this message, and, in fact, reinforces it."); *Johnson & Johnson-Merck Consumer Pharms. Co. v. Procter & Gamble Co.*, 285 F. Supp. 2d 389, 393 (S.D.N.Y.), *aff'd*, 90 F. App'x 8 (2d Cir. 2003) (P&G claim for Prilosec OTC "One pill. 24 Hours.

---

[10] As set forth in Nike's opening papers, there is no genuine dispute that the "Authenticity Claims" are literally false. (*See* Dkt. 259 at 14-17; *see also* SMF ¶¶ 142-147.)

Zero Heartburn" literally false by necessary implication where the pill took five hours to activate, noting that the claim "does not equal "One pill. Wait 5 hours. Only then Zero Heartburn for the next 24 hours."); *C=Holdings B.V. v. Asiarim Corp.*, 992 F. Supp. 2d 223, 243 (S.D.N.Y. 2013) (promotion of another party's goods on its website conveyed the "unambiguous message…that Asiarim offered for sale authentic [] products" when it did not, noting that the fact that they may have once been authentic to be irrelevant).

### 2. *Several of the Authentication Process Claims Are Facially Literally False.*

StockX improperly urges the Court to examine the Authentication Process claims out of context and find that they are "truthful." (Dkt. 255 at 10-16 (citing *Avis Rent A Car System, Inc. v. Hertz Corp.*, 782 F.2d 381, 385 (2d Cir. 1986).) As noted above, even if these claims were not literally false by necessary implication, several of them are also literally false on their face.

### a.    The "99.96% Accuracy" Claim Is Literally False.

The Authentication Page contained a claim that StockX "team members have authenticated tens of millions of products at a 99.96% accuracy rate."[11] This claim is literally false and lacks substantiation. (SMF ¶¶ 572-575.)[12] As StockX admits, this claim is based only on "weighted *return* data compared to total authentications." (SMF at ¶ 573 (emphasis added)). StockX internal communications explain further that the "99.6% Accuracy rate" is based on the statement that

---

[11] StockX relies on *Rexall Sundown, Inc. v. Perrigo Co.*, 651 F. Supp. 2d 9 (E.D.N.Y. 2009) to support its claim that "in the context of StockX's consumer facing explanation of how the accuracy rate was calculated" the 99.6% claim is not false. (Dkt. 255 at 14.) In *Rexall*, the advertising at issue was "always accompanied by the explanation that the 'No. 1' ranking is based on the recommendation of 'physicians who recommend a branded glucosamine/ chondroitin or glucosamine supplement.'" 651 F. Supp. 2d at 34. Unlike, *Rexall*, however, StockX did not disclose to consumers how it calculated that percentage other than to call it an "accuracy rate." (SMF ¶¶ 587-592.) In some, but not all, advertisements featuring the 99.6% claim, StockX used imperceptibly small font to state that its "Authentication Accuracy Rate" was based on "weighted return data compared to total authentications" but did not offer any explanation of what that statement means, nor did it call attention the "99.6%" claim with respect to that clarification. (*Id.* ¶ 697.)

[12] StockX's "99.96%" accuracy rate appeared on the "Authentication" page from June 2022 to August 2022 before it was replaced by a similar accuracy rate: "99.95%." *See* Dkt. 261-58 at NIKE0000284 ("our team members have authenticated tens of millions of products at a 99.95% accuracy rate.")

".04% of the products we pass are later determined to have been passed in error." (SMF ¶ 696.) In turn, products are only "determined to have been […] passed in error" if they are successfully returned to StockX by consumers. (*Id*.) In other words, to reach this number, StockX only counts products that sufficiently sophisticated StockX consumers suspects are fakes, and who are also sufficiently determined to chase StockX for a refund. (*Id.* ¶¶ 696-697.) That return rate is stifled by the difficulty StockX customers experience when attempting to return an item. (SMF ¶¶ 92, 100-103, 699-700, 702-704.)

This calculation completely disregards the prospect of unsuspecting consumers receiving counterfeit goods but, just like StockX's "experts," not realizing that the goods were fake. (SMF ¶ 93.) It likewise disregards products that were not accepted as a return. (SMF ¶¶ 92, 100-103, 699-700, 702-704.) And StockX *admits* that some consumers "wouldn't know the difference between a genuine product and a counterfeit product." (SMF ¶¶ 93, 492.) Moreover, StockX's "Knowledge Manager" for sneakers admitted that the 99.96% figure was not a calculation of "authentication" success, but rather is something very different: a percentage of successful deliveries where a consumer did not complain. (SMF ¶ 696.) A "complaint rate" is not an "authentication accuracy rate." The figure also disregards all those consumers who complained to StockX, but StockX failed to respond to their inquiries or refused to accept the return. (SMF ¶¶ 104-111,, 699-704.) StockX has no idea how many fake products it distributes to unsuspecting consumers and therefore cannot measure its accuracy rate. (SMF ¶¶ 92, 100-111, 699-704.) StockX's 99.96% rate of "*authentication accuracy*" conveys that StockX's authentication was nearly flawless when StockX does not—and cannot—know how many fake products it has distributed into the market. This claim is thus false on its face. *Cf. S.C. Johnson & Son, Inc. v. Clorox Co.*, 930 F. Supp. 753, 782–83 (E.D.N.Y. 1996) ("SCJ has demonstrated, by the

preponderance of the evidence, that it is likely to succeed on the merits of its claim that the []
claims that 'Combat SuperBait kills up to 98%' of consumers' roaches, and RAID Max Plus kills
'no more than 60%,' are unsubstantiated, and therefore literally false.").[13]

### b.    The "Quality Assurance" Claim Is Literally False.

StockX admits that it used the advertising claim "Quality Assurance[:] A final check in our
authentication practice our QA experts ensure nothing slips through the cracks."  (Dkt. 261-57.)
StockX argues that this claim is true because its "quality control team audits the authentication
process ███" and ████████████████████████████████████████ (Dkt. 255 at
13-14.)  StockX has not, and cannot, offer support for this proposition.  To the contrary, StockX
VP, Product Management Tim O'Malley ████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████ (SMF ¶ 705.) ████████████████
████████████████████████████ (*Id.* ¶¶ 706-708.)  StockX's
claim that QA experts "ensure nothing slips through the cracks," is also literally false given that
numerous counterfeits have "slipped through" to consumers, including dozens of counterfeits to
just two StockX customers.  (SMF ¶¶ 162-174, 192-202.)

### c.    The "100+ Data Points" Claim Is Literally False.

StockX claims that its authentication process uses "100+ data points" and that "[w]ith
checklists of 100+ data points, [its] authenticators are better equipped than anyone to ensure a
product's authenticity."  (SMF ¶¶ 688-689.)  StockX does not cite any evidence to support its claim

---

[13] StockX cannot point to its "Buyer Promise" to prevent a finding of literal falsity.  The Buyer Promise was only
published after this lawsuit was filed; at times prior the only mention of returns anywhere on the StockX website was
buried deep in its terms and conditions, allowed only three days from receipt to raise an issue, and was not widely
known by consumers. (SMF ¶¶ 700-704); *BeautyBank, Inc. v. Harvey Prince*, *LLP* 2013 WL 11327097, at *18
(S.D.N.Y. Mar. 29, 2013) ("Defendants argue that they do not engage in false advertising because they offer a liberal
return policy and a 100% satisfaction guarantee. Defendants cite no legal authority for the proposition that the
existence of such a policy provides a defense to a false advertising claim.") (internal quotations omitted).

that its checklists of "100+ data points" better equips StockX authenticators than *anyone*—presumably including the rightsholder—to ensure authenticity. (*See* SMF ¶¶ 543-553.) Nor could it. (SMF ¶¶ 25-32.)

StockX claims to substantiate the "100+ data points" claim through its Sneaker Authentication Standard Operating Procedure ("SOP"). (SMF ¶ 545.) Yet in communications to potential partners, ███████████████████████████████████████████████████

████████████████████████████████ (*Id.* ¶¶ 709-711); *Chanel, Inc. v. RealReal, Inc*., 449 F. Supp. 3d at 445 (finding "noteworthy the contrast between The RealReal's customer-facing advertisements and its shareholder disclosures" as it "paints a much different picture from that conveyed to consumers" and "undermines the Lanham Act's goal" of protecting persons engaged in commerce).

Moreover, StockX admitted that certain steps within the SOP are not related to authentication at all. (SMF ¶ 712.) For example, ███████████████████████████████

█████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████████

███████████████████████████ (SMF ¶ 545.) █████████████████████████████

██████████████████████████████ StockX has failed to point to record evidence that every pair that is authenticated has such a 100+ data point checklist. (Dkt. 255 at 13.) StockX's claim that it utilizes a "100+ data point" checklist to ensure a product's authenticity is thus facially false. *Time Warner Cable, Inc.,* 497 F.3d at 158; *Imig, Inc. v. Electrolux Home Care Prod*., *Ltd*., 2007 WL 900310, at *14 (E.D.N.Y. Mar. 22, 2007) (sufficient evidence to support literally falsity at summary judgment); *JR Tobacco,* 957 F. Supp. at 435 (finding statement literally false where "JR has not taken the steps that are represented by the brochure").

**d.    The "Advanced Technology" Claims Are Literally False.**

Since February 2021, StockX advertised that its authentication process uses "Advanced Technology." (Dkt. 255 at 7; SMF ¶ 787.)  StockX claims that its use of "Advanced Technology," specifically "machine learning," aided StockX "authenticators in catching every minor detail." (SMF ¶¶ 688-689.)  StockX has not proffered evidence to support its claim that machine learning or any "advanced technology," is used to assist authenticators in the actual authentication review process, let alone advanced technology that accurately authenticates. (*Id.* ¶¶ 554-559); *Unlimited Cellular, Inc. v. Red Points Sols. SL,* 677 F. Supp. 3d 186, 202 (S.D.N.Y. 2023) ("[D]espite the claim in Defendants' advertisements that Defendants' software detects and automatically removes counterfeit products…Defendants' software is unable to reliably distinguish between authentic and counterfeit product listings" and the "advertisements…encourage consumers to believe that their services reliably flag and remove only fraudulent product listings from e-commerce platforms."). To the contrary, videos of StockX authenticators examining shoes do not reveal any use of advanced technology. (SMF ¶¶ 176, 178, 180, 182.)  This claim is thus also literally false.

**e.    The "Proprietary" Claim Is Literally False.**

Finally, StockX's use of "propriety" is literally false.  StockX uses "proprietary," plucked out of context in StockX's Motion, on its "How It Works" page, which states "every item sold goes through [its] proprietary multi-step verification process with our team of expert authenticators." (SMF ¶ 690.)[14]  StockX's process is not proprietary, which, according to Miriam Webster, means "used, made, or marketed by one having the exclusive legal right."

---

[14] StockX ignores important context of the decision in *Fischer v. Forrest*. 286 F. Supp. 3d 590, 617 (S.D.N.Y. 2018), *aff'd*, 968 F.3d 216 (2d Cir. 2020).  It compares plaintiff's claim "come out with our own" phrase as an analogous proprietary claim, but the full advertising claim stated, "For years we have promoted the use of a natural product to harvest honey but an unreliable supply of such a product has forced us to come out with our own." *Id.* The court found that plaintiff even offered "alternative interpretations of th[e] phrase" which compelled its finding on literal falsity. *Id. Fisher's* "come out with our own" has nothing to do with StockX's claim that its authentication process is proprietary.

(https://www.merriam-webster.com/dictionary/proprietary.)  StockX has no patents, trademarks, copyrights, or other intellectual property that would signify an "exclusive legal right" in its multi-step verification process.  (SMF ¶ 713.)  The steps it employs to authenticate, *e.g.*, putting a product under a blacklight, sniffing a product, and looking at a label is not protectable.  (SMF ¶¶ 176, 178, 180, 182, 714-718.)  Nor can StockX rely on trade secret protection.  *See Big Vision Priv. Ltd. v. E.I. DuPont De Nemours & Co.,* 1 F. Supp. 3d 224, 272 (S.D.N.Y. 2014) ("the secrecy of the trade secret is of utmost importance, and the evidence shows that the alleged trade secret was publicly known and not secret.").  Here, StockX has repeatedly shared significant portions of its process with the public, including on videos on social media and the StockX website, and other portions of its "proprietary" process are well-known online.  (SMF ¶¶ 714-718.)

In sum, even if the Court were to pluck StockX's Authentication Process claims out of context, cast the consumer reality aside, and look at them as StockX urges, they are literally false and StockX's argument that they are true fails.

**B.    StockX's Accused Advertising Is Indisputably Material To Consumers.**

To establish StockX's liability for false advertising, Nike must show "materiality," that the Accused Advertising "involved an inherent or material quality of the product."  *Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 56 (2d Cir. 2022) (quoting *Apotex Inc. v. Acorda Therapeutics, Inc.,* 823 F.3d 51, 63 (2d Cir. 2016) (quoting *Time Warner Inc.,* 497 F.3d at 153 n.3.)).  The Second Circuit's most recent decision on this explains, in line with past precedent, that where a false claim involves an "inherent quality or characteristic," it is likely to influence purchasing decisions.  *Id*. n.10 ("The materiality inquiry . . . analyzes whether . . . the statements' literal falsity[] related to an inherent quality of the product, *such that* they would influence consumers' purchasing decisions.") (emphasis added.)  The Circuit also previously noted that its "'post-*NBA* cases do not mention this 'likely to influence purchasing decision' feature of the standard; they focus instead

on the 'inherent quality or characteristic' descriptor." *Church & Dwight*, 843 F.3d at 70 n.10 (citing *Merck Eprova AG v. Gnosis Bioresearch S.A.*, 760 F.3d 247, 255 (2d Cir. 2014); *Time Warner Cable*, *Inc.*, 497 F.3d at 153 n.3; *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 238 (2d Cir. 2001)).

There is no quality more inherent to a branded good—and to a consumer's decision to purchase that good—than its authenticity, which is why courts routinely hold that advertising claims that guarantee authenticity influence purchasing decisions and thus are material. *See, e.g.*, *Unlimited Cellular*, 677 F. Supp. 3d at 202 ("[T]he alleged misrepresentations concern exactly this capacity to differentiate a real product from a fake one. Therefore, Plaintiff's allegations satisfy the materiality requirement."); *CJ Prod. LLC v. Snuggly Plushez LLC,* 809 F. Supp. 2d 127, 148 (E.D.N.Y. 2011) ("false statements regarding the provenance of the product … will influence the decision of customers to buy the product, and they are thus material."); *Merck Eprova AG v. Gnosis S.P.A.,* 2011 WL 1142929, at * 4 (S.D.N.Y. Mar. 17, 2011) ("[T]he very nature of what a manufacturer is selling is an inherent quality of that product."); *River Light V, L.P. v. Tanaka*, 2018 WL 5778234, at *6 (S.D. Fla. Nov. 2, 2018) ("Guaranteed Authentic" material as it "concerns an inherent quality or characteristic of her offerings and there can be no dispute that her statements influenced the purchasing decisions of her customers. [Defendant] sold her products within the same price range as genuine Tory Burch items, suggesting to buyers her goods were authentic. Her 'guarantee' that the items were authentic falsely assured consumers of the quality and craftsmanship of her goods and thereby bolstered consumer confidence."); *see also*, *C=Holdings*, 992 F. Supp. 2d at 243 ("[defendant]'s falsehood was material, going to the very nature of the products [defendant] purported to sell."); *POM Wonderful LLC v. Purely Juice, Inc.*, 2008 WL 4222045, at *11 (C.D. Cal. July 17, 2008), *aff'd*, 362 F. App'x 577 (9th Cir. 2009) (That the "false

advertising pertained to the very nature of its juice product establishes its materiality.").

Materiality is not, as StockX contends, an element with two sub-requirements of "inherent quality" and "likely to influence purchasing decisions." Dkt. 255 at 16.[15] For this argument, StockX ignores nearly every relevant decision in this Circuit but two: *Apotex,* 823 F.3d at 63 (which it claims somehow changed the materiality standard); and *Reed Construction Data Inc. v. McGraw-Hill Companies., Inc.*, 49 F. Supp. 3d 385, 418 (S.D.N.Y. 2014) (a non-binding outlier). *Apotex* preceded both *Church & Dwight* and *Upcodes* and explains in line with both later decisions that "materiality [] requires that the allegedly false or misleading representation involved an inherent or material quality of the product—*i.e.,* that the representation was likely to influence purchasing decisions." *Apotex*, 823 F.3d at 68 (citing *Nat'l Basketball Ass'n v. Motorola, Inc.,* 105 F.3d 841, 855 (2d Cir.1997).)[16] StockX also relies on the district court's reasoning in *Reed*, even though not one single court in this Circuit, in the decade since the decision, has followed this non-binding and outlier decision's reasoning. 49 F. Supp. 3d at 418. In addition, *Reed's* facts are

---

[15] StockX also argues that regardless of literal or implied falsity, "likely" impact on consumer purchasing decisions cannot be presumed. (Dkt. 255 at 16-17.) This conflates the different elements of proof between literally false and impliedly false claims. As this Court has recognized, "[i]f an advertisement is literally false and concerns 'an inherent or material quality of the product,' consumer deception is presumed, and the court may grant relief without reference to an advertisement's actual impact on the buying public." *Nike, Inc. v. StockX LLC,* 2024 WL 3361411, at *3 (S.D.N.Y. July 10, 2024) (Caproni, J.) (quoting *Time Warner Cable, Inc.,* 497 F.3d at 153, 153 n.3 (cleaned up)).

[16] Cases pre- and post-*Apotex* show that false claims are material when they involve an inherent characteristic. *Playtex Prod., LLC v. Munchkin, Inc.,*, 2016 WL 1276450, at *9 (S.D.N.Y. Mar. 29, 2016) (finding materiality where the plaintiff false advertised an inherent characteristic of its product "obviously in the hope that the advertisements would encourage consumers to purchase" its goods); *Rosenshine v. A. Meshi Cosmetics Indus. Ltd.* 2023 WL 6516994, at *8 (S.D.N.Y. Oct. 3, 2023) (relying on *Upcodes* and *Apotex*; explaining that on summary judgment plaintiff must show "materiality, *i.e.*, "that the false or misleading representation involved an inherent or material quality of the product. Put differently, Plaintiffs bear the burden of showing that the allegedly false or misleading representation ... was likely to influence purchasing decisions.") (citations omitted); *Skillz Platform, Inc. v. Papaya Gaming, Ltd.*, 2024 WL 3526853, at *2 (S.D.N.Y. Jul. 23, 2024) (same); *see SourceOne Dental, Inc. v. Patterson Companies, Inc.*, 328 F. Supp. 3d 53, 62 (E.D.N.Y. 2018) ("claimant must show that the false representation involved an inherent or material quality of the product—***that is***, a claimant must show that the false statement was material.) (emphasis added); *CJ Prod.*, 809 F. Supp. 2d at 148 (finding literally false "As Seen on TV" claim material because it "pertain[s] to an inherent feature of the product" and false statements related to an inherent feature would "likely affect [] a consumer's purchasing decision"); *accord Osmose, Inc. v. Viance, LLC*, 612 F.3d 1298, 1319 (11th Cir. 2010) (materiality "self-evident" where literally false statements of efficacy of timber products misrepresented inherent quality or characteristic).

wholly distinguishable.  There, the court found that none of the statements were material because the record was bereft of any such materiality evidence, and instead, showed that only one customer relied on the misrepresentations while others *explicitly testified* that the misrepresentations were immaterial to their purchasing decisions.  *Id.*  Here, numerous StockX surveys (including its own expert's rebuttal survey), documents, and testimony demonstrate that StockX's advertising claims are likely to influence consumer purchasing decisions.  *See supra* § I.B.  Thus, even applying StockX's badly contorted legal argument and/or *Reed*'s outlier reasoning to the record here, materiality is amply established beyond any genuine dispute.[17]

As Nike has established that the Accused Advertising is material, it has certainly established a *prima facie* case sufficient to defeat StockX's Motion on this issue.  *See Au New Haven LLC v. YKK Corp.*, 2019 WL 1437516, at *19 (S.D.N.Y. Mar. 31, 2019) (defendant's summary judgment denied as claim concerned "YKK's very right to sell the zippers" and thus "involved an inherent or material quality of the product."); *Insurant Agency Corp. v. Hanover Ins. Co.*, 2018 WL 3979589, at *6 (S.D.N.Y. Aug. 20, 2018) (statement involving an inherent quality or characteristic of lease guaranty "clearly" material).

### 1. The Court Should Not Consider Butler's Damages Rebuttal Survey In Connection with StockX's Case-In-Chief.

Although Ms. Butler's rebuttal survey shows that StockX's Advertising Claims are likely to impact consumer purchasing decisions, StockX cannot use her rebuttal survey and opinion to argue that the Advertising Claims are not material—an element of liability.  This is because StockX proffered Ms. Butler as rebuttal to Nike's *damages* expert John Hansen, who assumed StockX was

---

[17] StockX also cites *Reed* for its claim that Nike is seeking a presumption of materiality. (Dkt. 255 at 16-17.)  There, the court explained that in *implied falsity* claims, not relevant here, materiality would be presumed if the deception was willful. *Reed Constr. Data,* 49 F. Supp. 3d at 408, 418-19.  Here, Nike *establishes* materiality of StockX's literally false claims and does not seek a presumption.

liable for false advertising for his opinions.  StockX moves for summary judgment on false advertising *liability*; its Motion does not concern damages and does not raise arguments on whether Nike is entitled to disgorge StockX's profits or any other theory of damages.  (Dkt. 254.)

If StockX intended to proffer a so-called "materiality" survey, it knew or should have known it was required to disclose such a materiality survey with its affirmative expert disclosures. On March 20, 2023, StockX sought and received an extension of the expert disclosure deadline to submit "affirmative" expert disclosures "to mount a defense to Nike's claims," to be followed by rebuttal expert disclosures.  (Dkts. 138, 147.)  On May 5, 2023, StockX made its affirmative expert disclosures, including disclosures supposedly related to materiality issues through Mr. DeJongh Wells, for example.  (SMF ¶ 775.)  On June 2, 2023, StockX disclosed Ms. Butler in rebuttal to Mr. Hansen's affirmative damages opinion.  (SMF ¶¶ 776-777.)[18]

StockX cannot now rely on Ms. Butler's rebuttal survey and opinion to prove that its literally false advertising was immaterial and, thus, that it is not liable for false advertising.  (Dkt. 255 at 18-20.)  A rebuttal expert can only "contradict or rebut evidence on the same subject matter identified by another party."  FED. R. CIV. P. 26(a)(2)(D)(ii).  As this Court held, rebuttal experts "may not testify as part of a party's case-in-chief, and cannot testify unless and until the testimony they were designated to rebut is given at trial."  *In re Navidea Biopharmaceuticals Lit.*, 2022 WL 16833587, at *13 n.21 (S.D.N.Y. Nov. 9, 2022) (Caproni, J.)  Indeed, Ms. Butler was recently precluded from offering a materiality opinion in a false advertising case when she performed a nearly identical survey as rebuttal to a damages expert's affirmative opinions:

> One area where Defendant may not use Butler's opinions, however, is on the issue of materiality.  Use of Butler on that topic would take

---

[18] Because Butler's Rebuttal Report stated it responds to Nike's damages expert, Nike did not move to exclude Ms. Butler on this basis in the parties' *Daubert* submissions.  Of course, had StockX disclosed that it intended to use the Butler Rebuttal Report in support of a liability issue in its case-in-chief, Nike could have moved on this specific issue. Instead, Nike argued, *inter alia*, that materiality surveys of any kind were irrelevant here.  (Dkt. 193 at 6-9.)

> her outside of the subject matter of Sharp's opinions [the damages
> expert] and turn her into a belatedly-disclosed affirmative expert.

*Ohio State Troopers Ass'n, Inc. v. Point Blank Enterprises, Inc.*, 2020 WL 1666763, at *10 (S.D.

Fl. 2020); *accord K&N Eng'g, Inc. v. Spectre Performance*, 2011 WL 13131157, at *11 (C.D. Cal.

May 12, 2011) ("causation" survey in false advertising case limited to "damages apportionment"

and not liability "because the survey was not disclosed by the initial expert deadline.").  Just as in

*Ohio State Troopers*, StockX's use of Butler's survey and opinions on materiality would take her

outside of the subject matter of Mr. Hansen's damages opinions and is thus improper.  As such,

the Court should not consider Ms. Butler's opinions (the sole evidence it presented other than a

cherry-picked Roy Kim statement[19]) in its materiality arguments on this Motion.

### C.    The Accused Statements Caused Nike Likely—and Actual—Injury.

As addressed in Nike's opening brief, there is no material dispute that the Advertising

Claims cause "actual or likely injury to [Nike]."  *Church & Dwight,* 843 F.3d at 65; *Souza v. Exotic*

*Island Enterprises, Inc.*, 68 F.4th 99, 118 (2d Cir. 2023) (same); (Dkt. 259 at 19-22.)  It is hard to

imagine a case where the economic and reputational harm is more obvious than a brand competing

with a company selling counterfeit versions of that brand's products while promising consumers

that it only sells authentic products.  StockX offers for sale new Nike-branded sneakers, which

StockX falsely and repeatedly contends are always authentic.  (SMF ¶¶ 213-18.)  When consumers

reach out to StockX about the shoddy (and likely fake) Nike products they receive, StockX tells

them it is Nike's fault for producing bad quality footwear, (*id.* ¶¶ 104-11), and StockX consumers

reach out to Nike to complain.  (*Id.* ¶¶ 232-38.)  All the while, StockX competes with Nike for

sales of athletic footwear generally, Nike footwear more specifically, and even dozens of the exact

---

[19] StockX presents no evidence that Mr. Kim's experience is representative of all consumers, and likewise should not be considered.  *See Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc*., 478 F. Supp. 2d 340, 370–71 (E.D.N.Y. 2007).  In fact, StockX's consumers run the gamut from resellers to "track" moms.  (SMF ¶ 773.)

same Nike styles for sale on Nike.com at the exact same time.  (*Id.* ¶¶ 213-18, 747-757.)  There is no record evidence showing that any other platform in the secondary market offers close to the volume of Nike styles, colorways, or sizes as StockX.  In fact, StockX places itself ahead of other platforms (including Nike retailer Foot Locker) in website visits.  (*See e.g.,* SMF ¶ 760.)  As a result, Nike and StockX are "obvious" competitors and Nike is entitled to a presumption of actual injury.  *Merck Eprova AG v. Brookstone Pharms.*, LLC, 920 F. Supp. 2d 404, 417 (S.D.N.Y. 2013); *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 259-61 (2d Cir. 2014) (applying presumption of actual injury); *Dependable Sales & Serv., Inc. v. TrueCar, Inc.*, 394 F. Supp. 3d 368, 373 (S.D.N.Y. 2019) ("*Dependable Sales*") ("the Second Circuit approved the application of a presumption of injury where the plaintiff and defendant were "obviously in direct competition."); *SimplexGrinnell LP v. Integrated Sys. & Power, Inc.*, 642 F. Supp. 2d 167, 204 (S.D.N.Y. 2009), modified on reconsideration, 642 F. Supp. 2d 206 (S.D.N.Y. 2009) ("presumption of injury is proper 'when the defendant has explicitly compared its product to the plaintiff's or the plaintiff is an obvious competitor with respect to the misrepresented product.'") (citation omitted).

Although StockX initially recites the correct standard for injury as requiring a plaintiff to show that the false statements "were the cause of actual or likely injury to Nike, either by direct diversion of sales or be a lessening of goodwill associated with its products," (Dkt. 255 at 10), its analysis drops the word "likely" and ignores Nike's evidence on likely diversion of sales and reputational damage.[20]  (Dkt. 255 at 20-21.)  Just as StockX stated on page 10 of its brief, binding precedent is clear that Nike's burden is to show "actual *or likely* injury" to establish false advertising liability.  *Church & Dwight Co.*, 843 F.3d at 65 (emphasis added).  Both *Souza v.*

---

[20] StockX wastes page space discussing inapplicable cases concerning comparative advertising.  (Dkt. 255 at 21-22.)  This case does not involve comparative advertising.  It involves literally false claims made by StockX in connection with its sale and offering for sale of directly competing Nike sneakers.

*Exotic Island Enterprises, Inc.* and *Dependable Sales & Serv., Inc. v. TrueCar, Inc.*, on which StockX relies, quote *Church & Dwight's* recitation of the actual or likely injury standard. *Souza*, 68 F.4th at 118; *Dependable Sales*, 394 F. Supp. 3d at 374. Nor is Nike required to identify *actual* lost sales to demonstrate actual or likely injury, rendering StockX's arguments regarding Nike testimony meaningless. (Dkt. 255 at 23-24); *Time Warner Cable, Inc.*, 497 F.3d at 161 (because "[i]t is virtually impossible" to show lost sales, plaintiff only needs to show that the injury is not speculative.); *BeautyBank*, 2013 WL 11327097, at *18 (same standard at summary judgment). StockX also ignores the presumption arising where parties compete for the sale of the same products, in this case new, supposedly authentic Nike sneakers. *Merck Eprova*, 920 F. Supp. 2d at 417 ("injury may be presumed when the plaintiff is an obvious competitor with respect to the misrepresented product."); *Reckitt*, 760 F. Supp. 2d at 453 (same).

Nike offers indisputable evidence that consumers are presented with a choice to buy the same, new Nike sneakers from either StockX or Nike at the same time, which this Court has already stated "tends to establish that StockX could have diverted sales from Nike." (SMF ¶ 214; Dkt. 250 at 27-28.) StockX tries to side-step this issue by saying that Nike does not view StockX as a competitor. (Dkt. 250 at 22.) StockX misses the point. Although Nike does not dispute that it does not operate in the secondary marketplace, StockX *does* compete in the primary marketplace. *See Coca-Cola Co. v. Tropicana Prod., Inc.*, 690 F.2d 312, 317 (2d Cir. 1982) (competition shown where companies are "competing for the same consumer dollars."); (SMF ¶ 473 (referring to StockX as an "online retailer")). Unlike Nike's other primary market competitors, however, Nike must compete with StockX for sales of Nike sneakers, not just other brands. (SMF ¶¶ 214, 748-755.) It defies credulity to suggest that where StockX and Nike each sell "new" and "authentic" Nike-brand sneakers at the same time, they are not obvious competitors, competing for the "same

consumer dollars." Moreover, StockX distanced itself from platforms like eBay to create a "retail experience" where consumers can go to one landing page and look at one stock image of a "new" and "authentic" Nike shoe offering a full size run, including Nike's most popular styles. (SMF ¶¶ 215-216, 759-760.) The only company that relies on Nike's brand more than StockX to sell footwear is Nike. (SMF ¶¶ 779-786.)

*Dependable Sales* does not come to StockX's aid and rather supports Nike. There, in a decision StockX avoids by citing only to a subsequent order on a motion for reconsideration, the district court found that the parties were not competitors because "Plaintiffs sell new cars directly to consumers through brick-and-mortar dealerships, while TrueCar does not sell cars at all." *Dependable Sales,* 377 F. Supp. 3d 337, 341 (S.D.N.Y.). In *Dependable Sales* the plaintiff was a collection of new car dealerships and the defendant was a "lead generator" that operated an online platform that places consumers in contact with car dealerships. *Id.* The district court held that no presumption of injury arises because the parties were neither competitors nor were the advertisements comparative. *Id.* at 346-349 (finding that plaintiff's admission that the parties compete, without more, is "insufficient to permit a reasonable finder of fact to conclude that TrueCar was a direct competitor of the plaintiff dealers, such that plaintiffs are not required to demonstrate injury and causation under *Lexmark* and Second Circuit precedent.") Under the *Dependable Sales* analysis, which was not impacted by the reconsideration decision cited by StockX, Nike and StockX are competitors and a presumption would apply: not only do StockX documents ███████████████████ StockX and Nike both offer for sale directly to consumers new Nike-branded footwear on their internet platforms. 377 F. Supp. 3d at 341.

StockX relies only on the subsequent decision in *Dependable Sales,* but that decision related to the question of what injury plaintiff was required to show "for the disgorgement of profits

from a defendant shown to have willfully violated the Lanham Act." *Dependable Sales & Serv., Inc. v. TrueCar, Inc.*, 394 F. Supp. 3d 368, 371 (S.D.N.Y. 2019).[21]  Neither Nike nor StockX's moving papers address disgorgement; StockX moves only on liability and the word "disgorgement" does not appear even once in its brief.  Dkts. 254-55.

Even without the benefit of a presumption, Nike offers compelling evidence of its actual injury.  StockX tracks Nike "drops" and offers Nike sneakers before Nike officially releases them, and over 70 of Nike's best-selling sneakers at the same time they are available for sale from Nike.com.  (SMF ¶¶ 749, 753-754.)  StockX sometimes offers Nike's most popular shoes at a price under current retail.  (*Id.* ¶ 752.)  StockX even has a flag 'Price Currently Below Retail' to help its buyers notice those items more easily.  (*Id.* ¶ 751.)  The obvious economic principle that all things being equal, consumers will choose to pay less for the same product likewise supports the financial injury posed to Nike from StockX's conduct, beyond the presumption of actual injury borne from the parties' obvious competition.  (*See* SMF ¶¶ 751-755, 765); *see Chanel, Inc.,* 449 F. Supp. 3d at 445 (describing direct injury to Chanel if The RealReal's authenticity guarantee was inaccurate through lost sales and injury to its brands); *Sublime Prod., Inc. v. Gerber Prod., Inc.*, 579 F. Supp. 248, 250 (S.D.N.Y. 1984) (offering the same goods at a lower price creates a "substantial likelihood that business will be diverted").  That principle is upheld here where consumers can purchase presale Nike sneakers and new Nike sneakers at below retail price from StockX at the same time they are available directly from Nike.  (*See* SMF ¶¶ 751-755, 765); *Merck*, 920 F. Supp. 2d at 416 (recognizing that "direct diversion of sales" demonstrates injury).  As Dr. Stec explained, "[a] consumer interested in buying [certain genuine Nike] products could purchase the products now through StockX's pre-release listing and not directly through Nike.  This once again puts

---

[21] Notably, the Circuit has held that disgorgement is appropriate for deterrence even when actual lost profits are not established.  *Merck Eprova*, 760 F.3d at 261-62 ("disgorged profits may be awarded in the interests of deterrence.").

competitive pressure on Nike and on the sale of its to-be-released products." (SMF ¶ 217.) In such situations, Nike and StockX directly compete for "the same consumer dollars." *Coca-Cola*, 690 F.2d at 317. Every StockX pre-release sale or below retail bestseller diverts sales from Nike to StockX. (SMF ¶¶ 751-755, 765, 214-18); *Sublime*, 579 F. Supp. at 250.

Separate from Nike's actual competitive injury, StockX's false claims caused reputational harm to Nike. (SMF ¶¶ 219-238; Dkt. 259 at 20-21.) Nike's VP of Global Brand Protection, Ms. Delli-Carpini, provided ample testimony of the likely reputational harm posed by StockX's false advertising, and is more than sufficient to defeat StockX's motion.[22] (SMF ¶ 221); *See Chanel, Inc. v. WGACA, LLC*, 2022 WL 902931, at *19 (S.D.N.Y. Mar. 28, 2022). StockX's argument that Ms. Delli-Carpini ███████████████████████████████ (Dkt. 255 at 24) incorrectly heightens Nike's burden, and, overall, the facts concerning actual reputational harm are overwhelming. StockX does not acknowledge in its motion that consumers have attempted to return low quality, purportedly genuine "Nike" footwear purchased on StockX, have raised concerns about their suspicions that the Nike branded footwear they purchased on StockX is in fact counterfeit, and have contacted Nike to complaint about Nike sneakers purchased on StockX that turn out to be counterfeit. (SMF ¶¶ 69, 104-111, 232-238.) For example, when questioned by a consumer who referenced Nike's counterfeiting claim, StockX responded by reiterating various false Advertising Claims, calling Nike's amended complaint its "latest tactic" that "amounts to nothing more than a panicked and desperate attempt to resuscitate its losing case against our innovative Vault NFT program," (SMF ¶ 774) (stating that "Nike's challenge has no

---

[22] StockX asks the Court to read one question from Ms. Delli-Carpini's testimony in isolation and ignore her remaining testimony concerning the harm to Nike and its reputation caused by StockX's false advertising. (Dkt. 255 at 23.) In fact, Ms. Delli-Carpini provided StockX with ample testimony concerning the reputational harm caused by StockX's false advertising. (SMF ¶¶ 221, 226, 228, 230.) Separately, under the protective order in this case, Ms. Delli-Carpini is not entitled to review many of StockX's documents. Nike's corporate designee cannot be expected to identify facts (*e.g.*, misled consumers) supporting harms which are shielded from her in discovery.

merit" and insisting that the customer could "[r]est assured your the [sic] shoes that you bought are 100 percent authentic.")). StockX also blames *Nike* for its purported lack of quality control as a reason that a product does not live up to consumer expectations. (SMF ¶¶ 104-111, 232-238.) StockX routinely made those claims in full awareness that it had no knowledge of Nike's quality control measures, further demonstrating its willful disregard for Nike's reputation.[23] (SMF ¶¶ 96-99.) Nike confirmed that StockX incorrectly represented counterfeit "Nike" footwear as authentic but "defective." (SMF ¶¶ 194-196.)

As a direct result of StockX's failure to authenticate "Every Item. Every Time" despite its promises to do so, Nike is placed in the untenable position of answering customer's concerns and frustrations for non-genuine products Nike either never manufactured or never authorized for sale, and having consumers believe that Nike simply makes shoddy footwear. This is precisely the sort of reputational injury for which the Lanham Act creates a remedy. *See WGACA, LLC*, 2022 WL 902931, at *19; *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014) (the Lanham Act creates a remedy for injury to "commercial interest in reputation or sales.").

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny StockX's motion in its entirety.

---

[23] *Souza v. Exotic Island Enterprises, Inc.* is inapposite. 68 F.4th 99 (2d Cir. 2023). Plaintiffs claimed false advertising injury based on (1) lost modeling opportunities due to association with a gentleman's club, and (2) lost revenues from Defendants' unauthorized use of their images. *Id.* at 119. The Court found on the former that "[plaintiffs'] association with a strip club was *potentially* devastating to their careers" was speculative and bereft of evidence that any future employers had actually seen the posts or expert testimony that, e.g., "illustrat[es] the effect of this kind of R-rated association on a typical model's career" that could permit a "reasonable juror to find that the posts proximately caused actual or likely 'economic or reputational' injury here." *Id.* at 119-20 (emphasis original). On the latter, the Court astutely noted that any lost revenue was a trademark infringement or theft of services injury, *not* harm sounding in false advertising. *Id.* at 119. Ms. Delli-Carpini's testimony is bolstered by Ms. Kammel's expert testimony and by many consumer communications complaining about "Nike"-branded footwear sold on StockX that was likely fake or was actually determined to be fake. (SMF ¶¶ 104-111, 194-196.) This type of reputational harm to Nike is based on far more than *Souza* and flows from StockX's false authentication claims. (*id.* ¶¶ 104-111, 194-196, 232-238.)

Date: September 5, 2024                    By:   _/s/ Tamar Y. Duvdevani_

                                           **DLA PIPER LLP (US)**

                                           Tamar Y. Duvdevani
                                           Marc E. Miller
                                           Joshua Schwartzman
                                           Jared Greenfield
                                           Gabrielle Chasin Velkes
                                           1251 Avenue of The Americas, 27th Fl.
                                           New York, NY 10020
                                           Telephone: (212) 335-4500
                                           Facsimile: (212) 335-4501

                                           *Attorneys for Plaintiff Nike, Inc.*