# Exhibit 47

*Redacted Public Version*

Page 1

1

2                    UNITED STATES DISTRICT COURT

              FOR THE SOUTHERN DISTRICT OF NEW YORK

3

4      NIKE, INC.                        )
                                         )
5                   Plaintiff,           )
                                         )
6      vs.                               ) No.
                                         ) 1:22-cv-00983-VEC
7      STOCKX LLC,                       )
                                         )
8              Defendants.               )

9

10                 The videotaped deposition of

11                        KARI KAMMEL

12     taken before JO ANN LOSOYA, CSR, RPR, CRR, pursuant

13     to the provisions to the taking of depositions at

14     444 West Lake Street, Chicago, Illinois commencing

15     at 9:45 a.m. on July 18, 2023.

16

17

18

19

20

21

22

23

24

25

Page 2

```
1   PRESENT:
2
3       DLA PIPER LLP
        TAMAR DUVDEVANI
        MARC MILLER
4       1251 Avenue of the Americas
        New York, New York 10020
5       tamar.duvdevani@dlapiper.com
        marc.miller@dlapiper.com
6           Appeared on behalf of Plaintiff.
7
        DEBEVOISE & PLIMPTON LLP
8       MEGAN K. BANNIGAN
        KATHRYN SABA
9       919 Third Avenue
        New York, New York 10022
10      mkbannigan@debevoise.com
        ksaba@debevoise.com
11          Appeared on behalf of Defendants.
12  ALSO PRESENT:
13      KIM VAN VOORHIS,
        Nike, Inc.
14
15  VIDEOGRAPHER: Milo Savich
16  STENOGRAPHICALLY REPORTED BY:
        JO ANN LOSOYA, CSR, RPR, CRR
17  LICENSE #:  084-002437
18
19
20
21
22
23
24
25
```

Page 3

```
1               EXAMINATION
2   Witness                  Page   Line
3   KARI KAMMEL
4    By Ms. Bannigan              7    6
5    By Ms. Duvdevani          300   15
6    By Ms. Bannigan           310    5
7
8            ***************
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1                INDEX OF EXHIBITS
2   EXHIBIT        DESCRIPTION         PAGE
3   Exhibit 1  Expert Witness Report of Kari     5
4       Kammel
5   Exhibit 2  Rebuttal Expert Witness Report    5
6       of Kari Kammel
7   Exhibit 3  Expert Report of Robert L       140
8       Vigil, Ph.D.
9   Exhibit 4  Kari Kammel testimony before    148
10      the US Senate Judiciary
11      Committee for the hearing on
12      cleaning up online marketplaces
13  Exhibit 5  Nike Brand Protection           240
14      PowerPoint
15  Exhibit 6  Expert rebuttal report of       265
16      Richard Lamagna
17  Exhibit 7  StockX policy, STX0021481       307
18
19
20
21
22
23
24
25
```

Page 5

```
1            (Deposition Exhibit 1 was marked
2        for identification.)
3            (Deposition Exhibit 2 was marked
4        for identification.)
5            THE VIDEOGRAPHER:  Good morning.  We are
6    going on the record at 9:45 a.m. on July 18, 2023.
7            Please note that the microphones are
8    sensitive and may pick up whispering and private
9    conversation.  Please mute your phones at this time.
10           Audio and video recording will
11   continue to take place unless all parties agree to
12   go off the record.
13           This is Media Unit No. 1 of the
14   video-recorded deposition of Kari Kammel taken by
15   counsel for defendant in the matter of Nike, Inc.,
16   versus StockX LLC.  This case is filed in the United
17   States District Court for the Southern District of
18   New York.  The Case Number is 1:22-cv-00983-VEC.
19   The location of this deposition is DLA PIPER LLP,
20   444 West Lake Street, Suite 900, Chicago,
21   Illinois 60606.
22           My name is Milo Savich representing
23   Veritext and I am the videographer.  The court
24   reporter is JoAnn Losoya also from Veritext.
25           I am not authorized to administer an
```

2 (Pages 2 - 5)



Page 30

1  that you discussed with Barbara, in which case you
2  can certainly answer those questions.
3  BY MS. BANNIGAN:
4      Q.   Did you discuss any legal strategy with
5  Ms. Delli Carpini on this call?
6      A.   No, I did not.
7      Q.   Was the entire call purely to learn facts
8  to help you in writing your report?
9      A.   Yes.  That's correct.
10     Q.   Okay.  What did you discuss with
11  Ms. Delli Carpini?
12     A.   What I discussed is outlined in my
13  report, which is questions about their brand
14  protection strategies.
15     Q.   Did you take any notes when you were on
16  the call?
17     A.   I did not.
18     Q.   How did you recall all the information
19  that you state in the report that you learned from
20  the call without taking notes?
21     A.   I wrote that directly into the report.
22     Q.   As you were speaking to Ms. Delli
23  Carpini?
24     A.   Yes, that's correct.
25     Q.   Did you make edits to that section at any

Page 31

1  point?
2      A.   Perhaps grammatical ones but not
3  substantive ones.
4      Q.   The cites -- the information that cite
5  the call with Ms. Delli Carpini was -- that portion
6  of your report was written in real time while you
7  were on the call with her?
8      A.   Yes, that's correct.
9      Q.   Did you confirm with anyone at Nike that
10  your recollections from this call were correct?
11     A.   I did not specifically, no.
12     Q.   Were there any facts that you learned on
13  that call that you did not add to your report?
14     A.   No.
15     Q.   So everything that Ms. Delli Carpini told
16  you, you input into this report?
17     A.   Yes, that's correct.
18     Q.   Let's look at Page 15 of your report.
19          In the last paragraph on this page,
20  you say
is
25  that correct?

Page 32

1      A.   Yes, that's correct.
2      Q.
es, that's correct.
6      Q.   Do you know what Ms. Delli Carpini's
7  basis for asserting that
10     A.   Can you repeat the question?
11     Q.   That was a bad question.  Thank you.
12          Do you know what Ms. Delli Carpini's
13  basis for asserting these facts were?
14     A.   I believe her basis was her experience in
15  her role at Nike.
16     Q.   Did you ask her for any underlying facts?
17     A.   I did not.
18     Q.   Did Ms. Delli Carpini tell you that
19
22     A.   So she told me what is in this sentence
23  which is that the

Page 33

1
2      Q.   You also mentioned that you reviewed
3  Ms. Delli Carpini's videotaped deposition, correct?
4      A.   No, I reviewed her deposition transcript.
5      Q.   Okay.  And did you review the entire
6  transcript or just portions?
7      A.   I did review the entire transcript.
8      Q.   Did you ask her any questions about her
9  deposition testimony?
10     A.   No, I did not.
11     Q.   Did you confirm any of the things that
12  Ms. Delli Carpini told you with any other sources?
13          MS. DUVDEVANI:  Objection.
14  BY THE WITNESS:
15     A.   No.
16          MS. DUVDEVANI:  Go ahead.
17  BY THE WITNESS:
18     A.   No, I did not.
19          MS. BANNIGAN:  What's the basis of your
20  objection?
21          MS. DUVDEVANI:  Vague.
22  BY MS. BANNIGAN:
23     Q.   Let's look at Exhibit 2 of your report,
24  your rebuttal report.
25          Here on the last page, flipping to

9 (Pages 30 - 33)

Page 214

1  statements about, you know, how -- you mentioned --
2  I asked you is it right that there would be more
3  counterfeit sold through the platform without these
4  activities to catch counterfeits, and you mentioned
5  that you would have to see and look at a platform
6  that's specifically doing that and look how their
7  sales process and how their vetting process is in
8  order to make an opinion on that, correct?
9      A.  Yes, that's what I said.
10     Q.  Is that something you looked at in the
11 case of StockX?
12         MS. DUVDEVANI:  Objection.
13 BY THE WITNESS:
14     A.  So can you ask specifically what it is
15 that I looked at in the case of StockX?
16     Q.  Did you look at whether StockX was, in
17 fact, stopping certain counterfeit sales before they
18 reached consumers?
19     A.  So what I looked at was their claims of
20 authentication and authentication manuals, videos of
21 the authentication process, videos of the
22 authentication process that were on YouTube and what
23 that looks like and/or what an authenticator does.
24         I looked at several of the
25 authentication manuals when I was -- when I was

Page 215

1  looking through that, and again, none of those are
2  actually authentication, because the brand is the
3  only one that can authenticate a product that is
4  produced by them.
5      Q.  Generally speaking, if counterfeiters
6  inundate platforms and some counterfeits still get
7  through the platform, does that necessarily mean
8  that the platform's anti-counterfeiting measures are
9  not beneficial in any way?
10     A.  So I don't know if I can speak to that
11 general statement.
12         Again, it would depend on the
13 platform, it would depend on what they're selling,
14 it would depend on, you know, what efforts they've
15 decided to pursue in response to
16 anti-counterfeiting.  A lot of -- a lot of factors
17 in there that would have to be considered.
18     Q.  So you can't say that stopping some
19 counterfeits is beneficial, correct?
20     A.  No.  I don't believe that's what I said.
21     Q.  Let me ask you then.  Can you say -- is
22 stopping counterfeits, regardless of the amount you
23 stop, beneficial?
24         MS. DUVDEVANI:  Objection.
25

Page 216

1  BY THE WITNESS:
2      A.  So my entire life's work is around right
3  now anti-counterfeiting.  So if there's any -- if
4  there's any opportunity for someone to remove a
5  potential counterfeit good from the stream of
6  commerce, whether that's someone enforcing on Canal
7  Street, or a brand owner submitting for a notice and
8  take down or a law enforcement agent following up,
9  yes, the goal of all of brand protection and
10 anti-counterfeiting is to remove counterfeit --
11 counterfeit listings or counterfeit products,
12 depending on whether it's brick and mortar or any
13 e-commerce.
14     Q.  If a platform's anti-counterfeiting
15 measures still inadvertently allow some counterfeits
16 through, does that necessarily mean that the
17 platform is not trying to prevent the sale of
18 counterfeits?
19         MS. DUVDEVANI:  Objection.
20 BY THE WITNESS:
21     A.  Again, I can't speak to whether a
22 platform is trying or not.
23     Q.  You can't speak to whether the platform
24 is not trying or not?
25     A.  Correct.

Page 217

1      Q.  Would you agree that no
2  anti-counterfeiting program is perfect?
3      A.  Specifically what do you mean by perfect?
4      Q.  Would you agree that no
5  anti-counterfeiting program is able to eliminate the
6  threat of counterfeits?
7      A.  Correct.  So no -- I would agree with
8  that no anti-counterfeiting program is able
9  to -- and if you are talking in the context of
10 platforms, is able to entirely -- entirely eliminate
11 counterfeiting, which is why e-commerce platforms
12 that allow third party sellers are so risky because
13 of that and also why it was surprising for me that
14 StockX had claimed to essentially make sure almost
15 100 percent of their products were authentic and
16 they essentially eliminated counterfeiting in their
17 marketplace.
18     Q.  Do you know of any platforms that aren't
19 inundated with counterfeits?
20         MS. DUVDEVANI:  Objection.
21 BY THE WITNESS:
22     A.  Again, I haven't spoken to other
23 platforms specifically on levels of inundation by
24 similar sellers.  We know that counterfeiting is
25 increasing exponentially, particularly since the

55 (Pages 214 - 217)



Page 238

1    MS. DUVDEVANI:  Are you almost at a good
2  breaking point?
3    MS. BANNIGAN:  I have a couple of more
4  questions on this one and then we can break.
5    MS. DUVDEVANI:  Okay.
6  BY MS. BANNIGAN:
7    Q.  Okay.  So, looking -- I'm going to look
8  at the language next to the hexagon and maybe
9  this -- maybe or -- I don't know actually.  Let me
10  just ask my question.
11    You say, "authenticating.  However,
12  authenticating only one of the six does not mean
13  that the product is authentic.  All must be
14  authenticated in order to truly verify whether a
15  product is genuine or authorized."
16    And so by that, did you mean all that
17  the brand chooses to use must be authenticated?
18  Because I'll confess I read that to mean all six of
19  these need to be used when I first -- when I read
20  that.
21    A.  It's all that the brand chooses to
22  authenticate or chooses to put into their program.
23  So I had put on the next page, on page 23, this is
24  just a sample from the ISO report about control.
25  Control means access, but what -- what different

Page 239

1  technologies are used.  So here they give a couple
2  of examples of overt, covert, and forensic analysis.
3    So if a brand was to choose those
4  three authentication elements or whatever the
5  technologies are that with those authentication
6  elements, even if someone could use a covert tool
7  such as, for example, US Customs and say we got a
8  flag on this covert tool, you would still need to
9  use all of the elements that the brand has
10  determined need to be used in order to authenticate
11  the good.
12    Q.  Okay.  Did you take these graphics from
13  somewhere, this hexagon graphic?  Where did it come
14  from?
15    A.  No, I created it.
16    Q.  You created it for this report?
17    A.  Correct.
18    MS. BANNIGAN:  Okay.  We can take a break
19  now if that works for you?
20    MS. DUVDEVANI:  Yep.
21    THE VIDEOGRAPHER:  The time is 4:58 p.m.
22  This is the end of Media Unit 6 and we're going off
23  the video record.
24    (Whereupon, a break in the
25    proceedings was taken.)

Page 240

1    (Deposition Exhibit 5 was marked
2    for identification.)
3    THE VIDEOGRAPHER:  The time is 5:19 p.m.
4  This is the beginning of Media Unit 7 and we're back
5  on the video record.
6  BY MS. BANNIGAN:
7    Q.  Looking back at Exhibit 1, your
8  affirmative report, page 35, Paragraph 4, you say
9  "what StockX ignores is the difference between
10  someone being able to tell a fake or counterfeit
11  using their human senses and looking at overt tells
12  on a product and being able to authenticate a
13  genuine product knowing a brand's technologies or
14  elements."
15    Is it your opinion that StockX visual
16  authentication guides are not helpful in determining
17  whether Nike shoes are counterfeit?
22    Q.  Okay.  Can they be used to help identify
23  whether a product is counterfeit?
24    A.  So not with 100 percent certainty, but
25  again, we've talked a lot about obvious suspected

Page 241

1  counterfeits when products are -- have -- are poorly
2  constructed or have other major overt things that
3  the average person can use their senses to say this
4  is a highly suspected counterfeit.
5    Q.  Okay.  I handed you what has been marked
6  as Exhibit 5, which is a deck --              Have you
8  seen this before?
9    A.  I don't believe I have.  You said CVP?
10    Q.
11    A.  Where do you see that, the          part?
12    MS. BANNIGAN:  Is that part of the
13  metadata?  I can check.
14  BY MS. BANNIGAN:
15    Q.
20    Q.  Correct.
21    A.  Ah, okay.
22    Q.  In forming your opinions, did you request
23  documentations from Nike as to how they authenticate
24  products?
25    A.  I had a general conversation with them

61 (Pages 238 - 241)



Page 262

1 ▮▮▮▮▮▮▮▮▮▮
2 ▮▮▮▮▮
3        MS. DUVDEVANI:  Objection.
4  BY THE WITNESS:
5        A.   No.
6 ▮▮▮▮▮▮▮▮▮
7 ▮▮▮▮▮▮▮▮▮▮
8
9 ▮▮▮▮▮▮▮
10        MS. DUVDEVANI:  Objection.
11  BY THE WITNESS:
12        A.   I did not review any information
13  regarding that.
14 ▮▮▮▮▮▮▮▮
15 ▮▮▮▮▮▮▮
16 ▮▮▮▮▮
17
18        A.   I did not review any information about
19  that.
20 ▮▮▮▮▮▮▮
21 ▮▮▮▮▮▮▮
22 ▮▮▮▮▮▮
23 ▮▮▮▮▮

Page 263

1        MS. DUVDEVANI:  Objection.
2  BY THE WITNESS:
3        A.   Could you state that again?
4        Q.   Yeah. ▮▮▮▮▮▮▮
5 ▮▮▮▮▮▮▮
6
7        MS. DUVDEVANI:  Objection.
8  BY THE WITNESS:
9        A.   So, if a brand determines that they don't
10  want details of their authentication program to go
11  outside of the brand or to only limit it to a
12  certain number of people, then that's their business
13  decision and also their decision around
14  anti-counterfeiting.
15        So, I mean, you could say that about
16  anything that a company or a brand would hold that
17  they feel is too much of a risk to share with others
18  outside of their organization.
19 ▮▮▮▮▮▮▮
20        MS. DUVDEVANI:  Objection, asked and
21  answered.
22  BY THE WITNESS:
23 ▮▮▮▮▮▮▮

Page 264

1 ▮▮▮▮▮▮▮
2 ▮▮▮▮▮
3        MS. DUVDEVANI:  Objection.
4  BY THE WITNESS:
5 ▮▮▮▮▮▮▮▮
6 ▮▮▮▮▮▮▮▮
7 ▮▮▮▮▮▮▮▮
8 ▮▮▮▮▮▮▮▮
9 ▮▮▮▮▮▮▮▮
10 ▮▮▮▮▮▮▮▮
11 ▮▮▮▮▮
12        Q.   Have you ever -- have you reviewed the
13  rebuttal -- withdraw that.
14        I believe you testified earlier that
15  you reviewed the rebuttal expert report of Rich
16  Lamagna that was submitted by StockX in this case?
17        A.   Yes, that's correct.
18        Q.   When did you review it?
19        A.   Probably within a couple of days of it
20  being submitted initially.
21        Q.   Have you been asked to respond to
22  anything written in Mr. Lamagna report?
23        A.   You're referring to here today have I
24  been asked to respond to anything?
25        Q.   At any point.

Page 265

1        A.   No.  I mean, I read through it and read
2  through some points that I disagree with, but --
3        Q.   Did you review any new materials in
4  connection with reviewing Mr. Lamagna's report?
5        A.   I believe I did read some of the links
6  that he had included in citations and footnotes.
7        Q.   Do you remember which links?
8        A.   I would to have his report in front of me
9  to be able to look at it.
10        Q.   I can give you his report.  We're going
11  to mark as Deposition Exhibit 6 the expert rebuttal
12  report of Richard Lamagna dated June 2nd, 2023.
13        (Deposition Exhibit 6 was marked
14        for identification.)
15        THE WITNESS:  Could you repeat the
16  question?
17  BY MS. BANNIGAN:
18        Q.   You mentioned that you looked at some of
19  the links when you were reviewing his report and I
20  asked you what links.
21        A.   Okay.  So I specifically looked at
22  footnote 33.  The links that were located there.
23        Q.   Anything else?  You can take a sip of
24  water.  I didn't mean to interrupt you.  I'm sorry.
25        A.   So I also looked at 46, 47, 48.

67 (Pages 262 - 265)

| Page 310 |
|---|

1    MS. DUVDEVANI:  I have no further
2  questions.
3    MS. BANNIGAN:  I have just a few.
4    E X A M I N A T I O N
5  BY MS. BANNIGAN:
6    Q.   Looking at this exhibit, what is it, 7,
7  looking at Exhibit 7, do you know who wrote this
8  document?
9    A.   I don't.  I don't have the name exactly,
10  but I know it was someone within StockX that was
11  looking -- looking to deal with some of the
12  requirements and different things that are mentioned
13  here throughout the document.
14    Q.   And when you received this document in
15  part of preparation for your report, did you ask any
16  questions about it?
17    A.   Not specifically.
18    Q.   Do you know if it was used by StockX ever
19  in any capacity?
20    A.   I don't have that information one way or
21  the other.
22    Q.   At the top of the first page, it says,
23  "If you are making any further edits, please comment
24  or slack me as I'm working in the confluent doc that
25  we will present."

| Page 311 |
|---|

1    Do you have any understanding who
2  wrote that?
3    A.   I don't, minus the initials that are on
4  the page.
5    Q.   Do you know if this document was edited
6  after this current draft?
7    A.   I don't.
8    MS. BANNIGAN:  I have no further
9  questions.
10    THE VIDEOGRAPHER:  The time is 7:31 p.m.
11  This is the end of Media Unit 9, and it is also the
12  end of the deposition.  We're going off the video
13  record.  Thank you.
14    (Off the record at 7:31 p.m.)

| Page 312 |
|---|

1    REPORTER CERTIFICATE
2
3    I, JO ANN LOSOYA, a Certified Shorthand
4  Reporter within and for the State of Illinois, do
5  hereby certify:
6    That previous to the commencement
7  of the examination of the witness, the witness was
8  duly sworn to testify the whole truth concerning the
9  matters herein; That the foregoing deposition
10  transcript was reported stenographically by me, and
11  the foregoing constitutes a true record of the
12  testimony given and the proceedings had; That the
13  said deposition was taken before me at the time and
14  place specified; That I am not a relative or
15  employee or attorney or counsel, nor a relative or
16  employee of such attorney or counsel for any of the
17  parties hereto, nor interested directly or
18  indirectly in the outcome of this action.
19    IN WITNESS WHEREOF, I do hereunto set my
20  hand this day, July 21, 2023.
21
22
23    JO ANN LOSOYA, CSR, RPR, CRR
    C.S.R. 84-002437
24
25

| Page 313 |
|---|

1  Tamar Dudevani, Esq.
2  tamar.duvdevani@dlapiper.com
3    July 21, 2023.
4  RE: Nike, Inc. v. Stockx, LLC
5    7/18/2023, Kari Kammel (#6001080)
6    The above-referenced transcript is available for
7  review.
8    Within the applicable timeframe, the witness should
9  read the testimony to verify its accuracy. If there are
10  any changes, the witness should note those with the
11  reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13  Deponent and Errata and return to the deposing attorney.
14  Copies should be sent to all counsel, and to Veritext at
15  cs-ny@veritext.com.
16
17   Return completed errata within 30 days from
18  receipt of testimony.
19   If the witness fails to do so within the time
20  allotted, the transcript may be used as if signed.
21
22    Yours,
23    Veritext Legal Solutions
24
25

79 (Pages 310 - 313)