# Exhibit 64

Page 1

1              UNITED STATES DISTRICT COURT
2          FOR THE SOUTHERN DISTRICT OF NEW YORK
3                       ---oOo---
4
5    NIKE, INC.,
6              Plaintiff,
7       vs.                CASE NO. 1:22-CV-00983-VEC
8    STOCKX LLC,
9              Defendant.

10
11
12        VIDEOTAPED DEPOSITION OF SARAH BUTLER
13             San Francisco, California
14             Tuesday, August 15, 2023
15
16
17
18
19
20
21
22
23   Stenographically Reported by:  Ashley Soevyn,
     CSR No. 12019
24   Job No. 5968272
25   Pages 1 - 224

Page 2

1  UNITED STATES DISTRICT COURT
2  FOR THE SOUTHERN DISTRICT OF NEW YORK
3         ---oOo---
4
5  NIKE, INC.,
6      Plaintiff,
7   vs.        CASE NO. 1:22-CV-00983-VEC
8  STOCKX, LLC,
9      Defendant.
   _____
10
11
12
13
14
15      Videotaped Deposition of
16  SARAH BUTLER, taken on behalf of the Plaintiff Nike,
17  Inc., Pursuant to Notice, at the offices of DLA
18  Piper, 555 Mission Street, San Francisco, California
19  beginning at 8:56 a.m. and ending at 4:51 p.m. on
20  Tuesday, August 15, 2023, before me, ASHLEY SOEVYN,
21  Certified Shorthand Reporter No. 12019.
22
23
24
25

Page 3

1  A P P E A R A N C E S:
2
3  FOR THE PLAINTIFF NIKE INC.:
4      DLA PIPER
5      BY: MARC E. MILLER
6      BY: GABRIELLE VELKES
7      Attorneys at Law
8      1251 Avenue of the Americas, 27th Floor
9      New York, New York 10020
10     marc.miller@dlapiper.com
11     gabrielle.velkes@dlapiper.com
12     (212) 335-4500
13
14 FOR THE DEFENDANT STOCKX LLC:
15     DEBEVOISE & PLIMPTON, LLP
16     BY: CHRISTOPHER S. FORD
17     BY: MAI-LEE PICARD
18     Attorneys at Law
19     650 California Street
20     San Francisco, California 94108
21     csford@debevoise.com
22     mpicard@debevoise.com
23     (415) 738-5705
24 Also Present:
25 Cassie Leet, the Videographer

Page 4

1        INDEX TO EXAMINATION
2  WITNESS: SARAH BUTLER
3
4
5  EXAMINATION BY:              PAGE
6  MR. MILLER                    7
7  MR. FORD                    220

Page 5

1        INDEX TO EXHIBITS
2         SARAH BUTLER
3         NIKE V. STOCKX
4      Tuesday, August 15, 2023
5      Ashley Soevyn, CSR No. 12019
6  EXHIBIT NO.    DESCRIPTION       PAGES
7  Exhibit 1   Expert Rebuttal Report of Sarah   18
              Butler
8
   Exhibit 2   Expert Report of John L. Hansen   81
9
   Exhibit 3   Plaintiff Nike Inc's            157
10             Supplemental Responses and
               Objections to Defendant StockX
11             LLC's Third Set of
               Interrogatories
12
   Exhibit 4   Document titled "Buy & Sell      185
13             Authentic Sneakers"
14 Exhibit 5   Document Bates No. NIKE281 -     191
               NIKE287
15

Page 6

1  DEPOSITION PROCEEDINGS
2  August 15, 2023
3  -- --0o0---
4
5  THE VIDEOGRAPHER: Going on the record at
6  8:56 a.m. on August 15th, 2023.
7  Please note that the microphones are
8  sensitive and may pick up whispering and private
9  conversations. Audio and video recording will
10 continue to take place unless all parties agree to
11 go off the record.
12 This is Media Unit 1 of the video-recorded
13 deposition of Sarah Butler. Taken by counsel for
14 plaintiff in matter of Nike Inc., versus StockX
15 Inc., filed in the United States District Court for
16 Southern District of New York, Case No.
17 1:22-CV-00983-VEC.
18 The location of this deposition is 555
19 Mission Street, Suite 2400, San Francisco,
20 California 94105.
21 My name is Cassia Leet, representing
22 Veritext Legal Solutions and I'm the videographer.
23 The court reporter is Ashley Soevyn from
24 the firm Veritext Legal Solutions.
25 I'm not related to any party in this

Page 7

1  action nor am I financially interested in the
2  outcome. Would counsel and all present please state
3  your appearances and affiliations for the record,
4  beginning with the noticing attorney?
5  MR. MILLER: Good morning. Marc Miller
6  from DLA Piper, on behalf of Plaintiff Nike Inc.,
7  and I'm joined by my colleague Gabrielle Velkes.
8  MR. FORD: Good morning. Chris Ford,
9  Debevoise & Plimpton, on behalf of StockX. I'm
10 joined by my colleague Mai-Lee Picard.
11 THE VIDEOGRAPHER: Thank you. Will the
12 court reporter please swear in the witness.
13 THE REPORTER: Ma'am, can I please have
14 you raise your right hand? Do you solemnly state
15 that the testimony you are about to give in this
16 deposition will be the truth, the whole truth and
17 nothing but the truth?
18
19 THE WITNESS: I do.
20 THE STENOGRAPHIC REPORTER: Great. Thank
21 you.
22 EXAMINATION
23 BY MR. MILLER:
24 Q  Good morning, Ms. Butler.
25 A  Good morning.

Page 8

1  Q  How are you today?
2  A  I'm doing well. Thank you.
3  Q  Good. Ms. Butler, are you represented
4  today?
5  A  I have counsel here, yes.
6  Q  Okay. And that's Counsel sitting next to
7  you?
8  A  That's correct.
9  Q  Okay. Did you do anything to prepare for
10 today's deposition?
11 A  Yes.
12 Q  What did you do to prepare for today's
13 deposition?
14 A  I met with counsel who is here today,
15 briefly yesterday. I reviewed my report. I
16 reviewed the exhibits to my report. I reviewed the
17 portion of Dr. Simonson's report that is responsive
18 to my report. And I reviewed the portions of
19 Mr. Hansen's report that I cite in my report.
20 Q  You said you met yesterday briefly with
21 counsel?
22 A  Yes.
23 Q  Is that with Mr. Ford?
24 A  Yes.
25 Q  Anyone else?

Page 9

1  A  Mai-Lee as well.
2  Q  And for how long did you meet yesterday?
3  A  Just maybe around three hours.
4  Q  Other than yesterday's three-hour
5  meeting, did you have any other meetings with
6  counsel to prepare for today's deposition?
7  A  No.
8  Q  Any phone calls?
9  A  No.
10 Q  You've been deposed before, correct?
11 A  Yes.
12 Q  About how many times have you been
13 deposed?
14 A  Probably over 100.
15 Q  Okay. And you've testify at trial
16 before, correct?
17 A  Yes.
18 Q  How many times?
19 A  At trial, probably, maybe 15 or so times.
20 Q  In the matters for which you've been
21 designated as an expert, has a court ever found you
22 not qualified to serve as an expert report?
23 A  No.
24 Q  For the matters in which you've been
25 designated as an expert has the court ever found

3 (Pages 6 - 9)

Page 50

1  A  No. I mean, the survey in this matter
2 was certainly pretested, or piloted. But there
3 weren't separate surveys that I piloted.
4  Q  And who did pretesting of the survey that
5 you designed?
6  A  So it's described in the body of the
7 report. We fielded the initial set of data,
8 examined the results, and then continued to rollout
9 the survey.
10  Q  And the pretesting was then rolled into
11 the complete survey?
12  A  That's right. There were no changes
13 made. So the data are all included.
14  Q  And other than the survey that you
15 designed and implemented in this case, did you
16 conduct any other consumer research as part of your
17 engagement here?
18  A  I mean, other than the kind of background
19 research that's articulated as part of the report,
20 no.
21  Q  Did you conduct any consumer interviews?
22  A  Aside from the survey of over 400 people,
23 no. I did not conduct any consumer interviews.
24  Q  How would you describe your assignment in
25 this engagement?

Page 51

1  A  Well, I think as I articulate in
2 paragraphs eight and nine, I was asked to respond to
3 a portion of Mr. Hansen's report where I believe
4 he -- I quoted in paragraph 8, he asserts, quote,
5 assuming that StockX advertising claims about it's
6 authentication were false and StockX authenticated
7 and facilitated the sale of counterfeit Nike
8 Jordan-branded sneakers, my analysis indicates that
9 StockX has benefited by earning ill-gotten profits
10 derived from falsely and/or misleadingly claiming
11 that every Nike and Jordan-brand good sold on its
12 platform was 100 percent authentic.
13  Q  So you were asked to respond to that
14 portion of Mr. Hansen's opinion?
15  A  That's correct.
16  Q  And are you offering an expert opinion
17 that responds to that portion of Mr. Hansen's
18 report?
19  A  Well, I think as I articulate in
20 paragraph 9, I was asked by counsel to determine
21 whether these allegedly false statements would
22 influence or have an impact on consumers' decisions
23 to purchase sneakers -- or use the StockX platform
24 to purchase sneakers. And I understand that that
25 analysis or the analysis I conducted is in part a

Page 52

1 response to Mr. Hansen's report.
2  Q  So are you offering an opinion that
3 responds to Mr. Hansen's opinion?
4  A  I am offering an opinion that is
5 responsive to Mr. Hansen's report in which he makes
6 an assessment that the false and misleading claims
7 had a particular impact on consumer behavior or
8 purchasing intentions.
9  Q  And where in Mr. Hansen's opinion does he
10 opine on consumer behavior and purchasing
11 intentions?
12  A  Well, I think he is suggesting or
13 indicating that the sales of the particular goods
14 are due to the claims -- here he cites a specific
15 claim, 100 percent authentic.
16  Q  I'm not sure that I'm following your
17 answer. Where in Mr. Hansen's opinion is he opining
18 on consumer behavior and purchasing intention?
19     MR. FORD: I will just object to this to
20 the extent you have not provided Ms. Butler with the
21 entirety of Mr. Hansen's opinion.
22     THE WITNESS: Yeah, so I was going to
23 say, I certainly cite the paragraphs in his report
24 that are cited in paragraph 8, but if you would like
25 to provide me with his report, I can take a look at

Page 53

1 it.
2     MR. MILLER: Chris, just for the record.
3 Limit your objections to the form. No speaking
4 objections that coach your witness. She's a pretty
5 experienced deposition and testifier and doesn't
6 need your coaching. Okay?
7     MR. FORD: I certainly don't believe that
8 Ms. Butler requires coaching.
9     MR. MILLER: I agree, so limit your
10 objections to form.
11 BY MR. MILLER:
12  Q  So going back to my question, without
13 seeing Mr. Hansen's full report you would not be
14 able to point me to what you believe Mr. Hansen was
15 opining on consumer behavior and purchasing
16 intensions?
17     MR. FORD: Object to the form of the
18 question.
19     THE WITNESS: Well, I think -- again,
20 without seeing the full report --
21  Q  Uh-huh.
22  A  I think that Mr. Hansen's -- as I've
23 articulated in paragraph 8, is asserting that sales
24 are due to or derived from a false or misleading
25 allegation. So...

```
                                                    Page 126                                                    Page 128
 1  even at sample sizes of 50.  So certainly 409, two      1       A   So the survey was designed -- or the
 2  hundred in each group, is a sufficient amount of        2   sample was selected using what we call click
 3  data to evaluate whether there is a statistically       3   balancing.
 4  significant difference between the distribution of      4       Q   Okay.  What is click balancing?
 5  responses between the two populations.                  5       A   So click balancing means that the
 6       Q   Did you consider any factors about the         6   invitations to the survey are sent to a random
 7  population to which you are trying to extrapolate       7   sample of U.S. adults, 18 years and older, whose
 8  when deciding that 409 respondents were a sufficient    8   demographic characteristics broadly reflect the
 9  population for this study?                              9   demographic characteristic of the U.S. population.
10       A   So if I'm understanding your question, I     10       Q   Okay.  Anything else besides the click
11  have not extrapolated with a confidence interval      11   balancing?
12  around the results here to some other population.     12       A   Well, then certainly we ask a series of
13  The study is designed to evaluate whether there is a  13   screening questions to ensure that respondents are
14  statistically significant difference between the two  14   qualified.
15  groups that are being measured.  And we have          15       Q   Okay.  And, so, I believe you said this
16  sufficient amounts of data to allow us to evaluate    16   earlier, the relevant population that you intended
17  whether the variation between the purchase intention  17   to sample from was U.S. consumers that were 18 years
18  between these two groups is statistically             18   of age or older, who have purchased a pair of
19  significantly different.                              19   sneakers from StockX since 2020, or who are likely
20       Q   Okay.  When you say you "have not            20   do so in the next year; is that right?
21  extrapolated with a confidence interval around        21       A   Not quite.  No.  So respondents needed to
22  results here to some other population," what do you   22   indicate -- if you look at again, Exhibit D.
23  mean?                                                 23       Q   So before you move onto Exhibit D?
24       A   Well, you're using the word extrapolation    24       A   Sure.
25  which to me means I have a point estimate here        25       Q   I was reading from paragraph 18 of your

                                                    Page 127                                                    Page 129
 1  around which I've created some confidence interval     1   report.  So is there something that I misstated
 2  because I'm extrapolating it to some broader           2   there?
 3  population.  That's not a calculation I have as part   3       A   Oh.  So, no.  But I think the population
 4  of this report.                                        4   includes individuals who have also purchased from
 5       Q   Okay.  So the results of your study, you     5   other online -- third-party online websites.
 6  are not extrapolating them to apply to some broader    6       Q   That's not what it says here in paragraph
 7  population; is that right?                             7   18; does it?
 8       A   I have not performed a statistical            8       A   No, it doesn't include that it's possible
 9  extrapolation with a confidence interval.  Again,      9   that respondents also purchased from other
10  the word extrapolation to me means a very particular 10   third-party online websites, but that's certainly
11  thing.                                                11   clear from the screening questions that are
12       Q   Okay.                                        12   described -- if you go to paragraph 22 to qualify --
13       A   So that's not an estimate.  That's part      13   sorry.  Third sentence, starting:
14  of my report.                                         14           (As read):
15       Q   Uh-huh.                                      15              "To qualify for the survey, respondents
16       A   Do I think these results are applicable     16              needed to currently reside in the
17  to a consumer population?  Of course, I mean, that's 17              United States and be 18 years or older.
18  purpose of having a sufficient sample size, random   18              Respondents also had to indicate they
19  assignment across a broad array of demographic       19              have purchased a pair of sneakers from
20  characteristics that allow you to test whether or    20              a third-party online marketplace, e.g.,
21  not these authentication statements would have       21              Ebay or GOAT since 2020, or are likely
22  impact on consumer behavior or not.                   22              to do so within the next year.
23       Q   Okay.  What did you do in this case to      23              Respondents also had to specifically
24  identify the sample of the relevant population that  24              indicate that they had or would
25  you wanted to test?                                  25              consider purchasing a pair of sneakers
```

|  |  |
|---|---|
| Page 182 | Page 184 |

Page 182
1  indicates "Every item. Every time." Certainly on
2  page 8 we have, "we authenticate, we authenticate,
3  and you get paid." I think that's correct.
4      Q    Okay. So is it fair to say that you
5  didn't test this verbatim advertising claim in this
6  survey?
7      A    That is fair to say that we did not test
8  the exact statement, "We authenticate. Every item.
9  Every time." There is certainly a number of
10 iterations of we authenticate that I tested.
11     Q    Okay. How about the following bullet:
12        (As read):
13            "Shop on StockX with complete
14            confidence knowing that every purchase
15            is verified authentic, period."
16        Where does that appear on Exhibit F?
17     A    I don't believe that exact statement is
18 included in the test. Again, certainly there is a
19 number of references to verified authentic, but the
20 portion of this statement, "Shop on StockX with
21 complete confidence," I don't believe that was part
22 of the -- that verbatim statement was part of the
23 test.
24     Q    Okay. How about the next one,
25 "100 percent authentic"?

Page 183
1      A    Sure. That's on page 23. Page 12. Page
2  7. I think that's correct.
3      Q    And the next one, "Buy and sell authentic
4  sneakers"?
5      A    That's on page three, at the very top.
6      Q    Okay. Anywhere else?
7      A    No, I believe that's -- that's where it
8  appears at the top banner on the homepage.
9      Q    Again, I'm going to skip the following
10 one, "Buy authentic, be authentic" which you said
11 you didn't test that verbatim claim.
12     A    That's correct.
13     Q    Last one, "On StockX, comma, every
14 sneaker you want is always available and authentic"?
15     A    Yes. That's on page 20.
16     Q    Anywhere else?
17     A    I don't believe so.
18     Q    So turning to page 3 of Exhibit F.
19     A    Okay.
20     Q    You titled this one on page 2 as "The
21 Homepage," right?
22     A    Yes.
23     Q    Where did you get this stimulus from?
24     A    So the banner, I believe, is from the
25 Wayback Machine, and then the pages themselves are,

Page 184
1  I think, a more recent version of products that are
2  for sale.
3      Q    So if I'm understanding you correctly,
4  you took a Wayback Machine capture and then spliced
5  it together with more a recent capture of the StockX
6  homepage?
7      A    That's correct. In terms of the Wayback
8  image that was available associated with this
9  particular banner, the image was really poor. It
10 wasn't constructed. So we couldn't see the graphics
11 associated with it. So here we used a kind of more
12 recent image.
13     Q    So you created a stimulus that wasn't
14 actually used in the real world; is that correct?
15     A    So it's a stimulus, I think, that
16 certainly depicts how the -- this particular banner
17 appeared in the context of the StockX homepage. But
18 the products that are included as part of the
19 homepage, I think, are more recent products for
20 sale.
21     Q    Okay. And, so no consumer in the real
22 world saw this stimulus, correct?
23     A    That particular banner with these
24 particular products for sale? Not that I'm aware
25 of, but again, my understanding is that this banner

Page 185
1  appeared in this particular way on the homepage.
2         MR. MILLER: Can we mark that Exhibit 4.
3         THE STENOGRAPHIC REPORTER: Exhibit 4.
4         (Exhibit 4 marked for identification.)
5  BY MR. MILLER:
6      Q    Okay. So for this particular stimulus at
7  page 16, footnote 39 of your report.
8      A    Yes.
9      Q    You provided a URL for the Wayback
10 Machine, correct?
11     A    I believe so, yes.
12         Sorry. It's okay to look at the record
13 now.
14     Q    Yes.
15     A    Which page.
16     Q    Page 16, footnote 39.
17     A    Okay.
18     Q    Okay. The Exhibit 4 you've been handed
19 by the court reporter is a printout of that URL
20 that's referenced in your report, at exhibit -- I'm
21 sorry. At page 16, footnote 39.
22         Does that look accurate to you?
23     A    It may. I would have to go back and look
24 at it. I mean, certainly there is at least one of
25 the images that looks like it's unavailable.

Page 186

1  Q   Okay.
2  A   I believe when we looked at it maybe
3 there were more unavailable images.
4  Q   Okay.  Does this -- so this printout is,
5 at Exhibit 4, doesn't look like what you're
6 recalling seeing when you went to that same URL?
7  A   I don't want to represent that I recall
8 exactly what it looked like.  I certainly see here
9 there is an image that's missing.  I believe my
10 recollection was that there were more images that
11 were missing.
12  Q   And, so, the fact that there were images
13 missing from Wayback Machine capture at this URL was
14 reason why you spliced in a lower portion of the
15 StockX homepage from a more recent time; is that
16 fair?
17  A   Rather than guess or kind of create
18 images that we weren't able to identify?  Yes, we
19 added the homepage, or the banner that's at issue
20 here, in the exact same way it appeared to a more
21 recent version of the StockX page.
22  Q   Okay.  And why did you want to test this
23 particular banner?
24  A   So my understanding was it was a banner
25 that -- or a header that appeared on the homepage

Page 187

1 and it includes the buy and sell authentic sneakers
2 at the top of the page.  And that was one of the
3 statements Nike has claimed to be at issue in
4 interrogatory 22.
5  Q   Okay.  The stimulus that the respondents
6 saw for the StockX homepage that we see here in
7 Exhibit F, this is not -- the StockX homepage as it
8 exists today does not look like this, right?
9  A   My understanding is it does not, that it
10 includes buy and sell authentic sneakers at the top
11 of it.  That's correct.
12  Q   Do you know when that header was removed
13 by StockX?
14  A   I don't, no.
15  Q   Okay.  Do you know whether -- do you know
16 whether consumers -- actually, strike that.
17      As part of the design of your survey, you
18 required each respondent to spend a minimum of ten
19 seconds looking at this stimulus, correct?
20  A   Looking at each of the pages.  That's
21 correct, yes.
22  Q   And when you say "each of the pages,"
23 you're referring to the web pages --
24  A   That's --
25  Q   -- correct --

Page 188

1  A   Correct.  The --
2  Q   -- so that would be --
3  A   -- five pages.
4  Q   So with respect to homepage, that would
5 be contents that appears on page three, of Exhibit
6 5, four, and five, correct?
7  A   It is the content that appears across
8 those PDF pages, yes.  But it's not shown as
9 separate pages.  It's shown as a website would, so
10 you scroll up and down.
11  Q   Okay.  What was the -- what was the
12 reason for you selecting ten seconds as the minimum
13 of time that a respondent had to spend reviewing
14 each of the web pages in the stimuli?
15  A   So we certainly want a minimum delay.
16 Respondents could look at a page as long as they
17 wanted, and of course, when they are asked the
18 questions -- or the question as to their purchasing
19 intention, they are provided with all of the pages.
20 So ten seconds seemed like an appropriate minimum.
21 But respondents could certainly look at the pages
22 for longer than that.  And, of course, when they're
23 answering the question as to their likelihood of
24 purchasing, they are shown the thumbnails of each of
25 the pages and as well, they can click and open any

Page 189

1 of those pages to review them again.
2  Q   Did you track in your data whether any of
3 the respondents clicked on those thumbnails when
4 they were answering a question about purchase
5 interest?
6  A   So I believe we printed out the data.
7 I'm not sure if the data map is here.  But I believe
8 those data are recorded.
9  Q   Okay.
10  A   Sorry.  It looks like these are data but
11 maybe not the data map.  So I can't quite tell from
12 what you've printed out, but it should be in the
13 data.
14  Q   Okay.  Is a minimum of ten seconds delay
15 on each page of the stimuli a standard number that
16 you use in most surveys that you design?
17  A   No.  I mean, in some surveys I don't
18 require a minimum at all.  In this circumstance, I
19 wanted to be sure that at a minimum respondents were
20 examining each of the pages for at least ten
21 seconds.  Again, they certainly could take as much
22 time as they wanted and they had the ability to
23 review the pages when answering the question.
24      MR. MILLER:  We've been going about an
25 hour.  Let's just take a quick five-minute break off

48 (Pages 186 - 189)

Page 198

1 issue.
2  Q    What do you understand the word "inspect"
3 to mean as you used it in your survey?
4  A    So it is a word that is a substitute for
5 the words that Nike has alleged to be at issue, that
6 have a relate -- that have some relationship to
7 evaluating the products.  But of course, if you're
8 asking what the word, say, "authentic" means, the
9 way to go about evaluating that is to ask consumers
10 who purchase these kinds of products what that word
11 or that term means.
12  Q    What is basis for your opinion that the
13 word "inspect" is a substitute for the word
14 "authentic"?
15  A    I'm not saying it's a substitute for the
16 word authentic in consumers' minds.  What I'm saying
17 is it's an appropriate control here, so we can use
18 it as a substitute.  We're swapping out, obviously,
19 the language that Nike has alleged to be at issue
20 for a control.  Which is a word that makes sense
21 within the context of the stimuli we're testing, but
22 is not a word that I understand Nike has nor does it
23 appear anywhere in interrogatory 22, is a word that
24 Nike has accused as being false or misleading.
25  Q    What is the basis for your opinion that

Page 199

1 word "inspect" is an appropriate control to use in
2 the survey that you designed and implemented?
3  A    Because it is a word that makes sense
4 within the context of the stimuli I am testing, and
5 it is not a word that is part of the statements that
6 Nike has alleged to be infringing -- not infringing,
7 sorry.  It's not a word in and of itself that Nike
8 has alleged to be false or misleading.
9  Q    Did you consider using any other words
10 beyond inspect for your control?
11  A    I may have, but I don't recall any other
12 specific words.  No.
13  Q    Did you -- did you test any other words
14 other than implement as a control?
15        MR. FORD:  I think you misspoke there.
16 Object to form.
17        THE WITNESS:  I didn't use word
18 "implement," I used inspect.  I think you said
19 implement.
20        But no, I didn't pretest or evaluate a
21 whole set of other words.  Again, inspect or
22 inspected or inspectors, again, is not a word in and
23 of itself I understand Nike to be claiming as false
24 or misleading.  And it makes sense within context of
25 the pages being tested.  So it's an appropriate

Page 200

1 control.
2 BY MR. MILLER:
3  Q    Does your survey provide any information
4 about how the respondents understood or interpreted
5 the term "inspect"?
6  A    Again, the survey is not designed to
7 evaluate consumers' understandings of authentic, nor
8 is it designed to evaluate their perceptions or
9 understandings of the word "inspect."
10  Q    So you're not offering an opinion on how
11 respondents interpreted the word "inspect," correct?
12  A    I am not offering a specific opinion as
13 to how consumers interpret the word "authentic."  I
14 have not seen any data to demonstrate that, nor am I
15 offering an opinion as to how consumers understand
16 the word "inspect."
17  Q    Looking back at figure 11 in your report,
18 there were certain statements or advertising claims
19 that you removed entirely, correct?
20  A    I believe there is only one, yes.  That's
21 correct.
22  Q    Why did you decide to remove that entire
23 statement as opposed to replacing some of the words
24 or altering the statement in some way?
25  A    I think the one that is removed contained

Page 201

1 a number of the statements -- or the number of
2 pieces that Nike had claimed to be at issue.  So
3 that particular statement, which is, quote,
4 construction with checklist of 100-plus data points
5 are authenticators are better equipped than anyone
6 to ensure a products' authenticity.
7        So I understand the 100-plus data points
8 is at issue.  So I think removing that and then, to
9 ensure a products' inspection.  It didn't seem to
10 make a lot of sense.  So we just decided to
11 conservatively remove the whole statement.
12  Q    Going back to Exhibit F, the stimuli that
13 you used in the test and the control groups?
14  A    Yes.
15  Q    Why did you select these five web pages
16 from the StockX website?
17  A    Sure.  So if you look in my report, but I
18 think as I -- if I can find the paragraph.  But as I
19 articulate, these are pages that a consumer can
20 reasonably interact with when looking to purchase a
21 particular pair of sneakers.  So they see the
22 homepage, they see project array page, as well as a
23 specific products page.  They also see two pages
24 which include kind of detail about StockX's process.
25        And, so the combination of the five pages

51 (Pages 198 - 201)

Page 202

1  represent pages consumers might see.  There are also
2  pages about the process and they include a whole
3  range of the different statements or variations of
4  statements that Nike has claimed to be false or
5  misleading.
6     Q    And why did you put these five web pages
7  in the particular order that you did in the survey?
8     A    So the homepage comes first, because
9  that's generally a kind of reasonable way that
10 consumers start looking at the site.  And the pages
11 then are the next -- sorry.  The next two pages are
12 obviously the pages about how the process works, as
13 if somebody were learning about how to purchase or
14 how the process works on the page.
15          And then they are shown an array of
16 products and then a specific product.  Again, of
17 course, all of these pages are available when the
18 respondent is answering the question in whatever
19 form they want to look at them.
20    Q    What is the basis for the testimony you
21 just gave that a user visiting the homepage first is
22 generally a kind of reasonable way that they start
23 looking at the website?
24    A    So, over 20 years of doing consumer
25 research, many consumers start by looking at a

Page 203

1  homepage of a site that they might use to purchase a
2  product.
3     Q    Did you review any documents or data from
4  StockX that would support your belief that most
5  consumers start by visiting the StockX.com homepage?
6     A    I don't think I offered an opinion that
7  StockX's consumers necessarily start at StockX's
8  homepage.  Certainly the order in which these pages
9  are shown to respondents is held constant between
10 the test and the control.  And the pages display a
11 range of the statements Nike has alleged to be at
12 issue, held constant between the test and the
13 control and respondents can look at any of the pages
14 when answering the question that they are
15 particularly interested in.
16    Q    Did you look at any StockX documents that
17 would provide any information about how consumers
18 view these pages, if they view them at all?
19    A    So if your question is simply do I have
20 some data as to the rate at which people view
21 particular pages within StockX?  No.  Again, for the
22 purpose of my survey, I'm using these different
23 pages to evaluate Nike's claim, or perhaps more
24 specifically, Mr. Hansen's claim, that the types of
25 allegedly false or misleading statements have

Page 204

1  driven, or have caused all consumers to purchase
2  products.  So I'm evaluating whether or not these
3  statements within the context which they occur on
4  the website would have an effect on consumers'
5  purchasing behavior.
6     Q    If you could turn to Exhibit D to your
7  report please.
8     A    Okay.
9     Q    And, so, question two in your survey,
10 this asks respondents to rank how likely they
11 would -- how likely they would be to use the StockX
12 website to purchase a pair of sneakers, correct?
13    A    That's correct.
14    Q    And for that you use the seven-point
15 scale --
16    A    That's correct.
17    Q    -- that's shown at the top of page 13,
18 right?
19    A    Sorry.  Yes, that's correct.
20    Q    Why did you decide to use a question like
21 question two for this survey?
22    A    So Likert scales, of which this is, are
23 well-researched, well-used in survey research and
24 psychological research as a means by which to
25 evaluate a whole series of behaviors or questions.

Page 205

1  So they are well-founded.  It allows me to look at a
2  distribution across a range of data as opposed to
3  asking a question of -- as opposed to let's say,
4  asking a binary question.  So those are probably the
5  primary reasons.
6     Q    And question three, the respondents were
7  asked after question two, and this is an open-ended
8  question, right?
9     A    That's correct.
10    Q    And they were asked to explain what makes
11 you say that your likelihood of using this website
12 to purchase a pair of sneakers would be, and then it
13 fills in the ranking that they applied, correct.
14    A    That's correct.
15    Q    What is an open-ended question?
16    A    An open-ended question is a question that
17 does not provide respondents with a set of response
18 options.  It requires them to provide some kind of
19 narrative or verbatim response.
20    Q    And why did you decide to include an
21 open-ended question in your survey?
22    A    So open-ended questions provide a set of
23 data that can be used to evaluate respondents'
24 thinking or reasoning behind a prior answer.  I
25 mean, depending on the context, open-ended questions

Page 222

1    I, SARAH BUTLER, do hereby declare under
2 penalty of perjury that I have read the foregoing
3 transcript; that I have made any corrections as
4 appear noted, in ink, initialed by me, or attached
5 hereto; that my testimony as contained herein, as
6 corrected, is true and correct.
7    EXECUTED this_____ day
8 of_____,
9 20____, at_____, _____.
         (City)          (State)
10
11
12
   _____
13 SARAH BUTLER
14
15
16
17
18
19
20
21
22
23
24
25

Page 223

1    I, the undersigned, a Certified Shorthand
2 Reporter of the State of California, do hereby
3 certify:
4    That the foregoing proceedings were taken
5 before me at the time and place herein set forth;
6 that any witnesses in the foregoing proceedings,
7 prior to testifying, were duly sworn; that a record
8 of the proceedings was made by me using machine
9 shorthand, which was thereafter transcribed under my
10 direction; further, that the foregoing is a true
11 record of the testimony given.
12    I further certify I am neither financially
13 interested in the action nor a relative or employee
14 of any attorney or party to this action.
15    IN WITNESS WHEREOF, I have this August 18,
16 2023 subscribed my name.
17
18
19
20
   _____
21 ASHLEY SOEVYN
   CSR No. 12019
22
23
24
25

Page 224

1    * * *ERRATA SHEET* * *
2 NAME OF CASE:  NIKE V. STOCKX
3 DATE OF DEPOSITION:  8-15-23
4 NAME OF WITNESS:  SARAH BUTLER
5 Reason codes:
6    1. To clarify the record.
      2. To conform to the facts.
7    3. To correct transcription errors.
8 Page ____ Line ____ Reason____
   From _____ to_____
9
10 Page ____ Line ____ Reason____
   From _____ to_____
11
12 Page ____ Line ____ Reason____
   From _____ to_____
13
14 Page ____ Line ____ Reason____
   From _____ to_____
15
16 Page ____ Line ____ Reason____
   From _____ to_____
17
18 Page ____ Line ____ Reason____
   From _____ to_____
19
20 Page ____ Line ____ Reason____
   From _____ to_____
21
22
23    _____
      SARAH BUTLER
24
25