UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NIKE, INC., <br><br> Plaintiff, <br><br> v. <br><br> STOCKX LLC, <br><br> Defendant. | Civil Action No.: 1:22-cv-00983-VEC <br><br> **ORAL ARGUMENT REQUESTED** |

**NIKE, INC.'S REPLY IN SUPPORT OF ITS MOTION
FOR PARTIAL SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

I. Introduction ................................................................................................................ 1

II. Argument ................................................................................................................... 1

   A. StockX Admitted Counterfeiting Liability. ....................................................... 1

      1. *Nike met its burden to show chain of custody of the disputed counterfeit products.* ...... 2

      2. *Pairs 1-3 are within the Lanham Act's territorial scope.* ............................................. 3

   B. StockX is Liable for False Advertising. ............................................................. 4

      1. *StockX's Authenticity Claims are literally false.* ............................................................ 4

      2. *StockX's Authenticity Claims are material.* .................................................................... 5

      3. *StockX's false Authenticity Claims cause likely and actual injury to Nike.* .................... 7

   C. StockX's Conduct is Willful. ............................................................................... 9

III. CONCLUSION ........................................................................................................ 10

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abitron Austria GmbH v. Hetronic Int'l, Inc.*,
   600 U.S. 412 (2023).................................................................................................................3

*Apotex Inc. v. Acorda Therapeutics, Inc.*,
   823 F.3d 51 (2d Cir. 2016).....................................................................................................5, 6

*Chanel, Inc. v. Gardner*,
   2010 WL 11713301 (S.D.N.Y. Apr. 6, 2010)...........................................................................9

*Chloe v. DesignerImports.com USA, Inc.*,
   2009 WL 1227927 (S.D.N.Y. Apr. 30, 2009)...........................................................................3

*Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH*,
   843 F.3d 48 (2d Cir. 2016).......................................................................................................8

*Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*,
   689 F. Supp. 2d 585 (S.D.N.Y. 2010), *amended* (Mar. 23, 2010)............................................9

*Gucci America, Inc. v. Duty Free Apparel, Ltd.*,
   286 F. Supp. 2d 284 (S.D.N.Y. 2003).......................................................................................3

*Hertz Corp. v. Avis, Inc.*,
   867 F. Supp. 208 (S.D.N.Y. 1994) ...........................................................................................4

*Hetronic Int'l, Inc. v. Hetronic Germany GmBH*,
   99 F.4th 1150 (10th Cir. 2024) .................................................................................................3

*Int'l Code Council, Inc. v. UpCodes Inc.*,
   43 F.4th 46 (2d Cir. 2022) ................................................................................................4, 6, 7

*Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc.*,
   478 F. Supp. 2d 340 (E.D.N.Y. 2007) ......................................................................................7

*Leatherman Tool Grp., Inc. v. Coast Cutlery Co.*,
   823 F. Supp. 2d 1150 (D. Or. 2011) .........................................................................................6

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 129 (2014)...........................................................................................................8

*Merck Eprova AG v. Brookstone Pharms., LLC*,
   920 F. Supp. 2d 404 (S.D.N.Y. 2013).......................................................................................8

*Merck Eprova AG v. Gnosis S.p.A.*,
   760 F.3d 247 (2d Cir. 2014)......................................................................................................8

*In re Navidea Biopharmaceuticals Lit.*,
   2022 WL 16833587 (S.D.N.Y. Nov. 9, 2022).........................................................................7

*Newborn Bros. Co. v. Albion Eng'g Co.*,
   481 F. Supp. 3d 312 (D.N.J. 2020)..........................................................................................7

*Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n*,
   2020 WL 4699043 (S.D.N.Y. Aug. 12, 2020).........................................................................2

*Rosenshine v. A. Meshi Cosms. Indus. Ltd.*,
   2023 WL 6516994 (E.D.N.Y. Oct. 4, 2023).............................................................................6

*Souza v. Exotic Island Enterprises, Inc.*,
   68 F.4th 99 (2d Cir. 2023) .......................................................................................................8

*Unicorn Crowdfunding, Inc. v. New St. Enter., Inc.*,
   507 F. Supp. 3d 547 (S.D.N.Y. 2020).....................................................................................7

*Unlimited Cellular, Inc. v. Red Points Sols. SL*,
   677 F. Supp. 3d 186 (S.D.N.Y. 2023).....................................................................................5

*Windward Bora LLC v. Lungen*,
   2023 WL 9100340 (S.D.N.Y. Aug. 29, 2023).........................................................................2

**Statutes**

15 U.S.C. § 1125(a)(1)(B) ...............................................................................................................8

**Other Authorities**

Fed. R. Evid. 404 ............................................................................................................................2

iii

I.  **INTRODUCTION**

StockX's Opposition made ruling on Nike's Motion considerably easier. StockX concedes liability for counterfeiting with respect to 34 pairs of "Nike" and "Jordan" branded footwear sold on and distributed by StockX. Dkt. 268 at 10. That concession also establishes the falsity of StockX's Authenticity Claims,[1] as StockX cannot credibly assert that, *inter alia*, its "100% Authentic" claim is true while also admitting that it sold counterfeit footwear.

StockX's argument that Nike *merely* discovered 77 physical counterfeit pairs (which it liberally construes as a "handful") does nothing to avoid judgment in Nike's favor on counterfeiting and false advertising and is appalling coming from a platform that promises consumers to shop with "complete confidence" "every time" and that "nothing slips through the cracks." Dkt. 268 at 9; Consolidated Rule 56.1 Statement ("SMF") ¶ 64. The record establishes that these fake pairs, all of which Nike physically inspected, are far from the complete story. As Nike explained in opening, although its Motion focuses on these 77 pairs, Dkt. 259 at 10, n.6, discovery revealed far more counterfeits sold on the StockX platform, including by a fraud ring that got away with selling over 1800 products before it was stopped, and that StockX has no idea how many counterfeit "Nike" shoes it "authenticated" and shipped to consumers. SMF ¶¶ 90-91, 203-207. Despite StockX's efforts to downplay the seriousness of its deeply flawed authentication and deceptive advertising practices, its reckless disregard of the obvious risk that it sold—and even encouraged the resale of—suspected counterfeits paints a clear picture of willful counterfeiting and false advertising.

II.  **ARGUMENT**

  A.   **StockX Admitted Counterfeiting Liability.**

---

[1] The defined term "Authenticity Claims" has the same meaning as Nike's Motion. Dkt. 255 at 4.

1

StockX does not dispute the validity of Nike's trademarks. Dkt. 268 at 9-12; SMF ¶¶ 12-14. Nor does it dispute that the 77 counterfeit pairs bearing those marks asserted in Nike's Motion are likely to cause confusion or that it offered for sale, "authenticated," and distributed the 77 counterfeit pairs bearing those marks to consumers—and concedes liability for 34 of the pairs and, thus, nine of the asserted registered marks. *Id.*, Dkt. 268 at 9-12. As StockX failed to raise any arguments on these points, judgment should be entered for counterfeiting on nine of the asserted registered marks.[2] *Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n*, 2020 WL 4699043, at *4 (S.D.N.Y. Aug. 12, 2020), *aff'd*, 2021 WL 4515256 (2d Cir. Oct. 4, 2021) (collecting cases). StockX raises two arguments concerning the remaining counterfeits (which include one additional registration): (1) Nike cannot show a perfect chain of custody for 40 of the admitted counterfeits, and (2) that 3 fake pairs "have no connection to U.S. commerce." Both arguments fail.

***1. Nike met its burden to show chain of custody of the disputed counterfeit products.***

Nike produced[3] receipts showing that Pairs 38-77 were purchased from StockX ("Zadeh Pairs"). Dkt. 260-1 ¶¶ 38-77 (StockX's Responses to Nike's Requests for Admission concerning these shoes). StockX admits that each of the Zadeh Pairs had a genuine StockX receipt in the box containing corresponding information to the Zadeh Pair in that box. *Id.*; Response to SOF ¶ 363. For example, Pair 38 is a counterfeit Jordan 11 Retro Cool Grey (2021), U.S. Men's Size 9.5, whose box contained a genuine StockX receipt that corresponds to that Jordan 11 Retro Cool Grey (2021), U.S. Men's Size 9.5. Dkt. 260-1 ¶ 38; Dkt. 261-114 at Supp. Resps. 288-89. Nike's Appendix likewise identifies the chain of custody evidence for the Zadeh Pairs.

---

[2] StockX also does not raise any of its affirmative defenses with respect to counterfeiting or false advertising in Nike's Motion, and therefore waives them. *Windward Bora LLC v. Lungen*, 2023 WL 9100340, at *3 (S.D.N.Y. Aug. 29, 2023), *R&R adopted*, 2023 WL 8600699 (S.D.N.Y. Dec. 12, 2023).

[3] StockX relies on certain criminal allegations against Mr. Malekzadeh and his invocation of the Fifth Amendment to suggest that evidence is unreliable or tainted. Fed. R. Evid. 404 prohibits such an inference.

"[S]ummary judgment on liability on trademark infringement claims based on evidence of counterfeit merchandise is appropriate where the nonmoving party fails to offer any evidence contradicting the moving party's factual accounting of the chain of custody." *Chloe v. DesignerImports.com USA, Inc.*, 2009 WL 1227927, at *7 (S.D.N.Y. Apr. 30, 2009). Such is the case here, with StockX claiming only that "Mr. Malekzadeh did not maintain records documenting the chain of custody of his inventory, nor did he keep track of how he procured sneakers." Dkt. 268 at 10-11. StockX cannot explain why shoes found with StockX receipts in the box, often bearing a StockX tag, and in the custody of its largest buyer is somehow insufficient to establish chain of custody. *See generally* Dkt. 268; SMF ¶¶ 197-202. It does not dispute Ms. Rizza's testimony that she identified those receipts and photographed them. SMF ¶¶ 200-202; Response to SMF ¶ 363. Instead, it hypothesizes that the StockX tags on the Zadeh Pairs could have been counterfeit. Dkt. 268 at 11 n.14. This speculation does not raise a triable issue over these indisputably counterfeit goods. *Gucci America, Inc. v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 289 (S.D.N.Y. 2003).

### 2. Pairs 1-3 are within the Lanham Act's territorial scope.

StockX's argument that Pairs 1-3 have no connection to U.S. commerce is immaterial and factually incorrect. *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, held that "if *all* the conduct" was extraterritorial, then "there would be no domestic conduct that could be relevant to any focus." 600 U.S. 412, 443 (2023) (emphasis added). On remand, the Tenth Circuit found that the conduct at issue involved a "foreign entity" making "foreign sales to foreign customers." *Hetronic Int'l, Inc. v. Hetronic Germany GmbH*, 99 F.4th 1150, 1157, 1166 (10th Cir. 2024). That is not the case here, where Pairs 1-3 were sold by StockX LLC, a U.S. company, purchased from StockX's U.S. website, shipped from StockX with receipts in U.S. dollars, ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉. Dkt. 261-1; Dkts. 271-80–271-82; Dkts. 262-1, 262-3, 262-5. The

3

tether to U.S. commerce for Pairs 1-3 is thus more than secure.[4]

### B.  StockX is Liable for False Advertising.

#### 1.  *StockX's Authenticity Claims are literally false.*

Nike established in its Motion that StockX's Authenticity Claims are literally false. Dkt. 259 at 14-17; Dkt. 270 at 11-19. StockX bludgeoned consumers with unambiguous claims that every product sold on StockX was "100% Authentic," "100% Verified Authentic," "Guaranteed Authentic," "Always Verified Authentic." "Guaranteed Authenticity. Every item. Every time.[5]" and "Always Authentic. Never Fake." SMF ¶¶ 57-65. As an admitted distributor of fake "Nike" goods, StockX cannot dispute that its Authenticity Claims are literally false. StockX thus tries to inject ambiguity into its unambiguous Authenticity Claims, claiming that they could mean that StockX "believed" the inspected products were 100% authentic, and "guaranteed a refund if a customer did not receive an authentic product." Dkt. 268 at 17. The Court should "rely on its own common sense and logic," to interpret the Authenticity Claims and reject StockX's effort to create ambiguity. *Hertz Corp. v. Avis, Inc.*, 867 F. Supp. 208, 212 (S.D.N.Y. 1994); Dkt. 268 at 17, 19.

Moreover, while StockX pays lip service to the requirement that the claims be read in context,[6] Dkt. 259 at 14-15; Dkt. 270 at 11-14; Dkt. 268 at 18, it ignores that context in favor of injecting new words into the advertising and inventing a fictional refund policy.[7] Dkt. 268 at 17-

---

[4] Even if Pairs 1-3 are not part of the full tally of counterfeits for liability, they nevertheless evidence willfulness.

[5] StockX cannot rely on the dictionary definition of "guarantee" as the Second Circuit expressly disapproved of this approach. *See Int'l Code Council, Inc. v. UpCodes Inc.*, 43 F.4th 46, 62 (2d Cir. 2022) ("*ICC*") (the phrase "always up-to-date" could not be broken into "always" and "up-to-date" because the "treatment of a specific word is of little help unless that word is used in a sufficiently similar context"). Defining "guarantee" alone sheds no light on StockX's specific use which guaranteed *authenticity* of "Every item. Every time." SMF ¶ 63; Dkt. 268 at 8 n.6.

[6] Contrary to StockX's claims that Nike "selects six phrases, presents them in isolation, and asserts they unambiguously promise counterfeits are never sold on StockX's platform," Dkt. 268 at 19, Nike identified the specific claims and attached full page screenshots for context. SMF ¶¶ 57-65, Duvdevani Exs. 50-52, 54-56.

[7] StockX relies on three screenshots to argue that "it would be entirely reasonable for a juror to conclude that StockX's Authenticity Claims accurately communicate that StockX (1) inspects every product traded through the platform; (2) allows only products StockX believes are "100% Authentic" to trade; and (3) "guarantees" consumers a refund if a product is not in fact authentic." Dkt. 268 at 19. StockX ignores that each of those has a FAQ admitting StockX does

4

19; SMF ¶¶ 100-102.  None of the Authenticity Claims state that "StockX *believes*" the product is authentic, SMF ¶¶ 57-65, and the only reference to a "return policy" on the Authentication Page states "Due to the anonymous nature of our live marketplace, we are unable to offer return, exchanges…"  Dkt. 261-50 at 46.  The Authenticity Claims unambiguously state StockX's false promise—consumers can "Shop on StockX with complete confidence knowing every purchase is 100% Verified Authentic." "Every item. Every time."  Dkt. 270 at 11-14.  In relevant context, Dkt. 259 at 14-15, these claims are literally false, as StockX admits that its authenticators cannot determine authenticity and it sold fake goods.  SMF ¶¶ 688-689.

### 2.     **StockX's Authenticity Claims are material.**

A claim is material when it "involved an inherent or material quality of the product."  Dkt. 270 at 19 (quoting *ICC*, 43 F.4th at 56 (quoting *Apotex Inc. v. Acorda Therapeutics, Inc.,* 823 F.3d 51, 63 (2d Cir. 2016) (quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.,* 497 F.3d 144, 153 n.3. (2d Cir. 2007))); Dkt. 255 at 17-18.  There is no genuine dispute that Authenticity Claims concern a product's "inherent or material quality."  *See, e.g.*, *Unlimited Cellular*, *Inc. v. Red Points Sols. SL*, 677 F. Supp. 3d 186, 202 (S.D.N.Y. 2023) ("materiality" alleged where "misrepresentations concern exactly this capacity to differentiate a real product from a fake one"); Dkt. 270 at 20-22.  So, StockX relies on a flawed legal argument that "inherent quality or characteristic" and "likely to influence purchasing decisions" are distinct sub-elements of materiality.  *Compare* Dkt. 255 at 16, *with* Dkt. 268 at 22; Dkt. 270 at 20-22.  They are not. Where a claim relates to a product's inherent quality, it *is* material, as the most recent Circuit decision, ignored by StockX, clearly

---

not offer returns.  Dkt. 261-50 at 46; Dkt. 261-57 at NIKE0006789; Dkt. 261-58 at NIKE0000285.  StockX's Terms & Conditions are not advertising and are not part of the context of the advertising.  And, StockX routinely refused to issue refunds for suspected counterfeits.  SMF ¶¶ 104-111.  None of the screenshots suggest to consumers that StockX only permits sales of products "StockX believe are" authentic.  COF ¶¶ 688-689.

5

states. *ICC*, 43 F.4th at 64 n.10.[8]

Regardless, StockX's convoluted argument that authenticity is not likely to influence purchasing is neither credible nor factually supported. Dkt. 268 at 22-25. Other than in briefing to this Court, StockX maintains to this day[9] that authenticity is a core value proposition, SMF ¶¶ 719-746; Dkt. 270 at 4-6, which is why StockX plastered its false claims on every product landing page, its Authenticity Page, on its blog and on social media. SMF ¶¶ 54-65. Desperate to refute the obvious proposition that authenticity is material, StockX relies on incomplete and/or inadmissible evidence. Dkt. 268 at 24-25. First, StockX improperly relies on Sarah Butler, an expert disclosed by StockX to rebut damage opinions offered by Nike's expert John Hansen. *Infra* II.B.2. Far from showing that authenticity is immaterial, Ms. Butler's report shows that authenticity is a likely purchase driver for consumers: nearly a quarter of respondents indicated that their interest in StockX was due to authentication, guarantees, or trusting StockX. *Id.* ¶¶ 616-618; *see also Leatherman Tool Grp., Inc. v. Coast Cutlery Co.,* 823 F. Supp. 2d 1150, 1156 (D. Or. 2011) (materiality supported in part by survey showing 17% of respondents "greatly influenced" by inherent qualities – type of steel and hardness - of knife product). StockX also relies on Mr. Kim's testimony but omits his adjacent testimony that "authentication" is key to selecting a collectible sneaker platform. SMF ¶ 746. Indeed, StockX's non-litigation surveys show that its customers care deeply about "knowing the good is certified as authentic." Dkt. 261-77 at STX0018465. StockX's arguments are indicative of its legal error that Nike must establish

---

[8] StockX misleadingly quotes *Rosenshine v. A. Meshi Cosms. Indus. Ltd.*, 2023 WL 6516994, at *8 (E.D.N.Y. Oct. 4, 2023) to suggest plaintiff must separately show that the representation "was likely to influence purchasing decisions." Dkt. 268 at 22-23. *Rosenshine* states: "to maintain a claim for false advertising, in addition to falsity, the plaintiff must also plausibly allege materiality, i.e., 'that the false or misleading representation involved an inherent or material quality of the product.'" (quoting *ICC*, 43 F.4th at 56 (quoting *Apotex*, 823 F.3d at 63)).

[9] Just this week, StockX's CEO, in an interview regarding StockX's recent partnership with Walmart, stated that when looking at what it takes to deliver a marketplace experience for collectibles like sneakers, "one of the most important things is your ability to actually verify the product that's being delivered to the consumers." *See* https://www.cnbc.com/video/2024/09/16/stockx-ceo-scott-cutler-talks-walmart-partnership.html.

that the Authenticity Claims are the *only* driver of purchasing decisions, as opposed to one likely driver. *See ICC*, 43 F.4th at 56; *Newborn Bros. Co. v. Albion Eng'g Co.,* 481 F. Supp. 3d 312, 358 (D.N.J. 2020). This is not the standard and StockX's arguments fail. Dkt. 259 at 17-19.[10]

In addition, StockX's claim that it "proactively presented evidence" that the Authenticity Claims were not likely to influence purchasing is incorrect.[11] Dkt. 268 at 24. StockX's "proactive" evidence comes in the form of its rebuttal expert's opinion to Nike's damages expert. SMF ¶¶ 776-777. StockX cannot convert its rebuttal damages survey into an affirmative materiality opinion. Dkt. 270 at 22-24; SMF ¶¶ 776-778. Nike's Motion seeks judgment on liability and does not rely on Mr. Hansen's opinions; rebuttal experts "may not testify as part of a party's case-in-chief, and cannot testify unless and until the testimony they were designated to rebut is given at trial." *In re Navidea Biopharmaceuticals Lit.*, 2022 WL 16833587, at *13 n.21 (S.D.N.Y. Nov. 9, 2022). The Court should not consider Ms. Butler's opinions in connection with Nike's Motion.

Next, StockX's argument that third-party platforms also make authenticity claims (Dkt. 268 at 25) is irrelevant to the materiality analysis, and only underscores the importance of authenticity to consumers. StockX does not offer evidence that would allow the Court to evaluate the impact of the third-party advertising, including whether the third parties have effective authentication practices, or whether the advertising claims are even true. SMF ¶¶ 504-521.[12]

### 3. *StockX's false Authenticity Claims cause likely and actual injury to Nike.*

StockX recites the wrong injury standard for false advertising (Dkt. 268 at 26), ignoring

---

[10] StockX improperly relies on "sneakerhead" expert, DeJongh Wells, and Mr. Kim's personal opinions as representative of consumers. Dkt. 268 at 25. It presents no evidence that "sneakerheads" or Mr. Kim's experience are representative, and therefore should not be considered. *See Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc.*, 478 F. Supp. 2d 340, 370-71 (E.D.N.Y. 2007); SMF ¶¶ 406, 773 (StockX consumers consist of ordinary consumers, including "track" moms.)
[11] StockX also refers to Ms. Butler's survey as a "consumer perception survey," which Ms. Butler admitted it was not.
[12] Moreover, StockX's arguments concerning third-party advertising is inadmissible hearsay and has no bearing here. SMF ¶¶ 510-521; *Unicorn Crowdfunding, Inc. v. New St. Enter., Inc.*, 507 F. Supp. 3d 547, 571 (S.D.N.Y. 2020).

that *likely* injury is sufficient at the liability stage. *Church & Dwight Co. v. SPD Swiss Precision Diagnostics, GmBH,* 843 F.3d 48, 65 (2d Cir. 2016); *Souza v. Exotic Island Enterprises, Inc.*, 68 F.4th 99, 118 (2d Cir. 2023); (Dkt. 259 at 19-22.). StockX grossly misreads *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, claiming that the Supreme Court held that "plaintiff must prove ***actual*** injury" and, in so doing, overruled the *Church & Dwight's* "actual or likely" standard.[13] Dkt. 268 at 26-27. *Lexmark* found that cognizable injuries are those that "show economic or reputational injury flowing *directly* from the deception wrought by the defendant's advertising," the very injuries that Nike established. 572 U.S. 118 129, 133, 140 (2014); Dkt. 270 at 24-30.

In fact, in *Souza*, the Circuit considered *Lexmark's* impact on its holdings, concluding that "far from undermining our precedent, *Lexmark* reinforces it." 68 F.4th at 119; *cf.* 15 U.S.C. § 1125(a)(1)(B).[14] *Lexmark*—a case about non-competitor standing—confirms that actual or likely injury must be "a commercial interest in reputation or sales" that falls within the "zone of interest" to trigger the Act's protection. 572 U.S. at 131-32. Nike has no standing issue in asserting that StockX's claims cause it harm, and, indeed, as an "obvious" StockX competitor, Nike is both entitled to a presumption of actual injury and has adduced evidence of actual injury. Dkt. 259 at 19-22; Dkt. 270 at 24-30; *Merck Eprova AG v. Brookstone Pharms.*, *LLC*, 920 F. Supp. 2d 404, 417 (S.D.N.Y. 2013); *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 259-61 (2d Cir. 2014). Nike also more than met its "likely" injury burden by offering actual evidence of injury, including: (1) diverted sales where "[a] consumer interested in buying [certain genuine Nike] products could purchase the products now through StockX's pre-release listing and not directly through Nike,"

---

[13] StockX argues that regardless of the appropriate standard, the "likely to be damaged" standard is limited to claims for injunctive relief. Dkt. 268 at 26. Although StockX is wrong, this issue is irrelevant because Nike only seeks summary judgment on *liability*. Dkt. 254; *Souza*, 68 F.4th at 118.

[14] StockX's claim that the Second Circuit's decision in *Church & Dwight* is "not good law" is remarkable given that *Souza* (a post-*Lexmark* decision) *relies* on *Church & Dwight* for the injury standard.

(Dkt. 270 at 28-29; Dkt. 259 at 21-22) and (2) significant reputational injury.  Dkt. 259 at 20-21; Dkt. 270 at 29-30.  Nike's reputation faces obvious injury when consumers seek to return low quality, purportedly genuine "Nike" footwear purchased on StockX, raise concerns about likely counterfeit "Nike" branded footwear purchased on StockX, and contact Nike to complain about Nike sneakers purchased on StockX that turn out to be counterfeit.  SMF ¶¶ 69, 104-111, 232-238.  StockX compounds this injury by blaming Nike for fakes under the guise of "manufacturing errors."  Dkt. 259 at 20-21; Dkt. 270 at 29-30.  In sum, summary judgment is warranted on Nike's false advertising claim.

        **C.**      **StockX's Conduct is Willful.**

Via at least its reckless disregard or willful blindness, StockX's conduct is willful.  Dkt. 259 at 22-25.  It knew that it sold hundreds of counterfeits before Nike filed this action and it admits liability for counterfeiting for at least 34 counterfeits.  SMF ¶¶ 90-91, ¶¶ 104-111, 162-167, 193-196, 208-212; Dkt. 268 at 10.  This alone renders StockX's counterfeiting willful.  *See Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, 689 F. Supp. 2d 585, 600 (S.D.N.Y. 2010), *amended* (Mar. 23, 2010); Dkt. 255 at 22-23.  Ample undisputed record evidence supports that StockX "recklessly disregards the possibility" that it routinely sells counterfeits.  *Chanel, Inc. v. Gardner,* 2010 WL 11713301, at *5 (S.D.N.Y. Apr. 6, 2010), *R&R adopted*, 2011 WL 204911 (S.D.N.Y. Jan. 21, 2011).  StockX's argument that it "Epitomizes Good Faith" is deeply undermined by its reference to hundreds of admitted counterfeits as a "tiny number."  SMF ¶¶ 90-91, 203-206; Dkt. 268 at 10.  StockX's policies and practices foster counterfeiting.  Despite its protestations, it had no return policy prior to the commencement of this litigation, SMF ¶¶ 100-103, and encouraged dissatisfied buyers to resell the products on StockX (incurring an additional seller fee).  SMF ¶¶ 104-111, 699.  StockX wears no halo and is no hero: the products it did reject

as fakes were returned to the counterfeiters to try again, and StockX repeatedly encouraged customers to sell those suspected fakes back on StockX rather than accepting returns. SMF ¶¶ 100-111, 116, 118, 130-141. StockX cannot plausibly argue that it did not recklessly disregard the possibility that doing so encouraged the further sale of fakes.

StockX is built to obscure counterfeiters' identities and does not attempt to obtain information about where sellers obtain product. SMF ¶¶ 120-129. It prioritizes seller relationships so much that its practices include sending the seller back footwear that it identifies as fake and divulging why it did, teaching counterfeiters how to improve their efforts. SMF ¶¶ 116-118; Dkt. 261-85 ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬. StockX also fails to enforce its so-called policy of immediately suspending for attempting to sell inauthentic product, SMF ¶ 438, and instead ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ *Id.*

StockX's Authenticity Claims were likewise knowingly false, as it admitted its authenticators cannot determine if a product is authentic. SMF ¶¶ 54, 57-65, 97-99. StockX also admits that it knew it was passing counterfeit footwear, SMF ¶¶ 90-91, 125-129, 138-141, 198, and had no idea what percentage of fakes were making it through authentication and into consumers' hands. SMF ¶¶ 92, 100-111. StockX's admitted counterfeiting and false advertising is admittedly willful as well.

### III.   CONCLUSION

For the foregoing reasons, the Court should grant Nike's Motion.

10

| | |
|---|---|
| Date: September 19, 2024 | By: /s/ *Tamar Y. Duvdevani* |

**DLA PIPER LLP (US)**

Tamar Y. Duvdevani
Marc E. Miller
Jane W. Wise
Joshua Schwartzman
Jared Greenfield
Gabrielle Chasin Velkes
1251 Avenue of The Americas, 27th Fl.
New York, NY 10020
Telephone: (212) 335-4500
Facsimile: (212) 335-4501

*Attorneys for Plaintiff Nike, Inc.*