P34FnikA

```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    NIKE, INC.,

 4                    Plaintiff,

 5              v.                            22 Civ. 983 (VEC)

 6    STOCKX, LLC,
                                             Conference
 7
                    Defendant.
 8
      ------------------------------x
 9                                           New York, N.Y.
                                             March 4, 2025
10                                           10:30 a.m.

11    Before:

12                    HON. VALERIE E. CAPRONI,

13                                           District Judge

14                            APPEARANCES

15
      DLA PIPER US, LLP (NY)
16         Attorneys for Plaintiff
      BY:  TAMAR DUVDEVANI
17         MARC MILLER
           JOSH SCHWARTZMAN
18         JANE WISE
           GABRIELLE VELKES
19         -and-
           KIM VANVOORHIS, Nike in-house counsel
20

21    DEBEVOISE & PLIMPTON
           Attorneys for Defendant
22    BY:  MEGAN BANNIGAN
           CHRIS FORD
23         KATHERINE SABA
           ABIGAIL LILES
24

25
```

P34FnikA

1              (Case called; appearances noted)

2              THE COURT:  Okay.  Here's what I'm going to do.  I'm

3      going to start with some very specific questions, and I want

4      very specific answers.  Then I'll tell you what my, sort of,

5      10,000-foot issue with the case is, and then I'm going to give

6      you the floor.

7              I'm not controlling your argument, but I just want to

8      make sure that we're all on the same page.

9              So let me start with Nike.  So, Nike is seeking

10     summary judgment as to false advertising claims with respect to

11     the authenticity claims only; correct?

12             MS. DUVDEVANI:  A subset of them, your Honor; that's

13     correct.

14             THE COURT:  Okay.  And your theory of falsity is

15     predicated solely on literal falsely; correct?

16             MS. DUVDEVANI:  For the purposes of this summary

17     judgment motion, yes, your Honor.

18             THE COURT:  Okay.  And your theory of materiality is

19     that you're entitled to a presumption of materiality because

20     the authenticity claims involve an inherent or material quality

21     of StockX's product; is that correct?

22             MS. DUVDEVANI:  That is not correct, your Honor.

23             We do not believe that we're afforded a presumption.

24             THE COURT:  Okay.  So was there evidence that you gave

25     me?  What are you relying on?  The complaints?

P34FnikA

1            MS. DUVDEVANI:  Yes, your Honor.

2            So, essentially, there is evidence, and there is also

3    the law that we're relying on.

4            We do believe that the Second Circuit is clear that

5    when a false advertisement pertains to inherent quality or

6    characteristics of a product -- here, the authenticity or

7    providence of a Nike shoe -- that that is sufficient to

8    establish that that would be material, i.e., likely to

9    influence the purchasing public.

10           However, we have also put before the Court a plethora

11   of evidence establishing that those claims, indeed, is likely

12   to influence the purchasing public in the form of StockX's own

13   internal surveys commissioned before this lawsuit ever began.

14           THE COURT:  Got it.  I got it.

15           MS. DUVDEVANI:  Okay.

16           THE COURT:  All right.  StockX, you're seeking summary

17   judgment as to both the authenticity claims and authentication

18   process claims; correct?

19           MS. BANNIGAN:  For slightly different reasons, but

20   yes, your Honor.

21           THE COURT:  Understood.

22           You argue that authentication process claims are

23   neither literally false nor impliedly false; correct?

24           MS. BANNIGAN:  Yes, your Honor.

25           THE COURT:  Your claim that the authentication process

P34FnikA

1    claims are not impliedly false rely, in part, on the fact that

2    Nike has hot presented extrinsic evidence that consumers

3    actually understood the statements to convey a misleading

4    message, and Nike does not have evidence that StockX

5    deliberately and egregiously intended to deceive the consumers;

6    is that correct?

7          MS. BANNIGAN:  As to implied falsity, Yes, your Honor.

8          THE COURT:  Correct.

9          And you argue that neither set of claims are material

10   because Nike has no evidence that the claims were likely to

11   influence purchasing decisions and because you have an expert

12   who says they're not material; correct?

13         MS. BANNIGAN:  That's part of the reason, yes.

14         We believe Nike hasn't presented evidence.  We have

15   the expert testimony.  We have expert testimony from Ms. Butler

16   and Dr. Vigil, and customer testimony, your Honor.

17         THE COURT:  Okay.  All right.  Thank you.

18         Let me just start with what my 10,000-foot problem is.

19         The parties have separated the claims into

20   authentication claims and process claims, but I'm supposed to

21   look at this as a whole, and a lot of times, those two

22   statements are right together.  So, I'm having real

23   difficulties with the way you have teed this up for decision at

24   the summary judgment revel.  Because a reasonable juror could

25   see this very different from how you guys are separating it.

P34FnikA

1    So that's my 10,000-foot observation.

2           So, who moved first?  I don't know.  You both moved.

3    Who wants to argue first?

4           Nike, it's your product, and you've got all these Nike

5    shoes, so I feel like you get to talk first.

6           MS. DUVDEVANI:  Thank you, your Honor.

7           They're actually not Nike shoes, which is part of the

8    problem.

9           THE COURT:  They're just boxes?

10          Oh, they're fake Nike shoes.

11          MS. DUVDEVANI:  Yes.

12          Should I take the podium?

13          THE COURT:  Please.

14          MS. DUVDEVANI:  So I think that I appreciate what the

15   Court just noted regarding this dissection of the claims, and I

16   do want to clarify that when Nike moved for summary judgment,

17   it moved on some very specific claims that it has accused of

18   false advertising: 100 percent authentic; one hundred percent

19   verified authentic; guaranteed authenticity, every item every

20   time; always verified authentic, and; always authentic, never

21   fake.

22          And I think a good place to stat, your Honor --

23          THE COURT:  I'm sorry, but aren't those going to squ-

24   -- is it necessarily, if the jury is trying to figure that out,

25   they're going to be looking at their process?

P34FnikA

1          MS. DUVDEVANI:  Yes, your Honor.

2          THE COURT:  Okay.

3          MS. DUVDEVANI:  And the reason I think that it would

4     be a good place to start is, I think that the Gestalt of your

5     question is an issue of context, that all of these claims,

6     essentially, appeared together, so how are we supposed to look

7     at them?

8          And I think there's been a few disputes between the

9     parties -- both factually and legally -- not surprisingly, and

10    one of the disputes when it relates to falsity relates to what

11    is the proper context when you're looking at a claim.  And this

12    is not the first case that you have multiple claims on the same

13    page together and multiple claims asserted.

14          I did have, to the extent the Court thinks it's

15    helpful, some blow-ups at the context that we're looking at, so

16    if I may.

17          THE COURT:  Sure.  A little hard to look at on the

18    single page.

19          MS. DUVDEVANI:  Yeah.

20          So, look, Nike's position is that context is not just

21    one word; it's not just one claim, but it is the entirety of

22    the advertisement.  And as the Court says in *J.R.*, you can't

23    have so much context that it completely swallows up the

24    message.  It needs to be reasonable.  The Court in that case,

25    as well as *Apotex*, has pointed out, for example, that the

P34FnikA

1    sophistication of the consumer is not the proper context, which

2    is something that StockX has tried to argue with their Wells

3    expert.

4            So let's talk about context.  First and foremost, you

5    are a StockX consumer.  You go on to the StockX website.

6    You're looking for a pair of, perhaps, Nike Panda Dunks.  This

7    is the landing page that you see.  And you have the name, Nike

8    Dunk Low, the beautiful stock image of a Nike Dunk, and then

9    right above it, you have a button that says, one hundred

10   percent authentic.  This is what the consumer sees.

11           Now, if the consumer is curious what one hundred

12   percent authentic means, because it's not plain and unambiguous

13   -- which Nike believes that it is -- it leads to that and can

14   then click on that hyperlink, and it takes you to the StockX

15   authenticity page where they explain all about what one hundred

16   percent authentic means.

17           And this is the context of that page.  And as you can

18   see, almost all the rest of the claims that we've moved on,

19   and, indeed, all of what StockX has called the process claims

20   that they have moved on appear on this page providing context

21   for one another, essentially.  And you see it says, guaranteed

22   authenticity, every item, every time.  Shop on StockX with

23   complete confidence, knowing every purchase is one hundred

24   percent verified authentic.

25           And as you go down the page, you can see some of the

P34FnikA

 1    other claims at issue.  For example, a final check in our

 2    authentication practice, our QA experts ensure that nothing

 3    slips through the cracks.

 4          And you can go further down, and I will point out that

 5    the one context that seems to be very important for StockX is

 6    the context related to this, how they've calculated

 7    99.96 percent, which I'll be happy to talk about momentarily.

 8    That is this -- I had to take a magnifying glass out -- tiny

 9    little smallest font possible that talks about weighted return

10    data.

11          If you click on big facts here, which is StockX

12    authentication by the numbers, it then takes you to the big

13    facts page that talks about all the things that StockX does to

14    stop counterfeits and ensure that your product is one hundred

15    percent authentic.  And you see here, it says, always verified

16    authentic since 2016.  That's the banner.

17          You also see that -- it was hard to capture in the

18    exhibit, but there was this kind of animated graphic on the top

19    of the landing page that I just showed you that also rotates

20    and says, always verified authentic.

21          And finally, there is an article that you can get to

22    by navigating the StockX website that has the title: StockX

23    always authentic, never fake, which is that last claim that

24    Nike has moved on.  And you can see in the parties' lengthy

25    statement of facts we thought you'd come out and yell at us

P34FnikA

1    about --

2              THE COURT:  Consider yourself yelled at.

3              MS. DUVDEVANI:  -- that you know, there's a lot of

4    fighting over this context.

5              We wanted to give the Court the whole context.  This

6    is the context of the article.  I believe that StockX points

7    out, as evidence that this is ambiguous down here where it

8    says, as a result of our authentication process, less than

9    point-three percent of customers are ever unhappy.  I don't

10   really know what that has to do with authentication, but that's

11   something that they've pointed out.

12             So this is the context of the claims.  Now, I don't

13   think that the Court has a problem with being able to determine

14   that one hundred percent authentic, always authentic,

15   guaranteed authenticity, in the context of these claims, is

16   still literally false, because the Court, using its reasonable,

17   practical behind -- as its permitted to do under the law -- can

18   look at this and say that it presents a clear and unambiguous

19   message that when you receive a pair of Jordan One Retro High

20   Bred patent leather shoes from StockX with a receipt that says,

21   new one hundred percent authentic and even a green StockX tag

22   on it that says, always verified authentic, after this context,

23   that that consumer is going to believe that that they have a

24   one hundred percent authentic Nike shoe that they're holding in

25   their hands.  In fact, this is a counterfeit.  This is one of

P34FnikA

the four counterfeits that Nike found StockX selling that

started this whole adventure, your Honor.

We don't think that there's any reasonable dispute

that these claims are literally false. We don't think that

they are not plain and unambiguous. We believe that StockX's

arguments as to why a consumer might believe that this means,

no, no, no; this says that we do our best to make it right, and

if we slip up, we give you a refund. That is --

THE COURT: Or, we try really hard, and we're really

pretty good at this.

MS. DUVDEVANI: Exactly.

And that doesn't show anywhere.

And in fact, your Honor, one -- again, going back to

the context of the authenticity landing pages, the only thing

that this page says regarding refunds is, can I return my item

after I've received it? Due to the anonymous nature of our

market, we are unavailable to offer returns or exchanges.

And when you look through the StockX documents that we

provided to the Court, you see that is absolutely true. They

make is almost impossible for consumers to get refunds of

their products, even when they complain that those products are

counterfeit.

That brings me to that 99.96 claim, which we believe

is also -- even though we didn't move on it, StockX did, and we

also believe, just like we have the burden not to establish

P34FnikA

1  beyond a reasonable doubt that that was false but that we've

2  established a *prima facie* case that it's literally false, and

3  we believe we have, because when you look at that

4  substantiation, this is what StockX says.  StockX says,

5  essentially, that 99.96 percent accuracy rate is really just a

6  rate of refunds.  So a consumer has to be smarter than all of

7  their expert authenticators, receive this fairly

8  realistic-looking Nike shoe; believe that something's wrong

9  with it; chase StockX over and over, and over again, just like

10 Mr. Kim did, three different times before he never got a

11 response, so he just created a viral post that went viral, in

12 part, as a result of this litigation; then get StockX to

13 respond to you; send them pictures; get them to agree with you

14 that there might be a problem; get them to agree to have you

15 send them back, and; then you get a refund.  That's the

16 nominator.  That is the amount of consumers that get through to

17 StockX divided by all of the products they've ever sold in that

18 year.  That's how they come up with a 99.96 percent guarantee,

19 and we believe that that is a literally false claim.

20         Just to take another example, and this does go -- I

21 know there's been a lot of sealing in this case, so I don't --

22         THE COURT:  There's been a lot of --

23         MS. DUVDEVANI:  Sealing.

24         There's a lot of confidential information.  I do want

25 to take about one aspect of it.

P34FnikA

1          THE COURT:  Check with your adversary to see if this

2    is under seal.  If the case goes to trial, it's all going to be

3    out.

4          MS. DUVDEVANI:  Okay.

5          (Counsel conferred)

6          MS. DUVDEVANI:  Your Honor, another claim that they

7    moved on in terms of the authentication process claims that

8    they argue that Nike hasn't met its burden on is the 100-plus

9    data points.  And you'll see in the documents that there's

10   fights of, we have evidence that there's only 20 -- and they

11   told internally, or there's 75 or 57, and their argument is,

12   essentially, there's a hundred plus data points -- even

13   assuming that they are right that you can count to one hundred

14   or one hundred plus, when you look at their standard operating

15   procedures for authentication, I just want to take the Court

16   through some those of those one hundred-plus data points to

17   snow, again, that Nike's established a prima facie case that

18   these claims are literally false.

19         Here's step 1: grab one speaker box from

20   authentication rack and place on workstation.  That is not a

21   data point.  Step 8, here's another one: remove sneakers from

22   sneaker box and place sneakers, outsole down on workstation.

23   Step 9, if sneaker box is not already closed, close sneaker

24   box.  That's step 9 data point.  Step 10, grab sneaker box and

25   place under black light.  Step 13, place sneaker box back on to

P34FnikA

```
1    workstation.  Step 15, open speaker box.  Step 19 --

2              THE COURT:  They're doing a lot of opening and closing

3    of the sneaker box.

4              MS. DUVDEVANI:  They do, and each one is, apparently,

5    its separate data point.  And that's my problem, your Honor.

6              I'll stop there, before I get --

7              THE COURT:  I think you made your point now.

8              MS. DUVDEVANI:  So, you know, I won't want to waste

9    the Court's time today, but if you look in our briefing over

10   and over again at these claims, they all suffer these similar

11   infirmities, that when you really take a close look, there is a

12   lot of literal falsity there, and we would say that for the

13   claims we moved on.  It's just unequivocal.  You see it in the

14   case law.

15             I have yet to see a case from this district or this

16   circuit or any other circuit where authenticity is determined

17   not to be literally false when counterfeits are being sold by a

18   party, which moves me into materiality, and it's the same

19   argument there.

20             I don't know of a single case, whether it's, *you know,*

21   *Chanel v. The RealReal* -- even though it was a Rule 12 motion

22   -- or the other cases that we've cited in our briefing where a

23   claim about what a consumer is getting, the actual providence

24   or the nature of a good isn't found to be material.

25             And as I noted to the Court, we don't think about it
```

P34FnikA

1    in terms of a presumption.  Nike has never argued that if you

2    prove literal falsity and you've proven inherent quality or

3    characteristics, that equals a presumption.  Those two elements

4    of materiality and literal falsity equals a presumption that

5    you don't need a consumer deception survey like you would in

6    the cases of implied falsity claims.

7              And it just so happens that every case I've seen that

8    involves an inherent quality or characteristic of a product

9    does find it to be material, but I don't really think it says,

10   as a matter of law, which is why I say that it's not a

11   presumption.  But you see this, time and time again, where

12   those are the sorts of claims where they are found to be

13   material, even without more evidence.

14             You know, *Merck Eprova v. Gnosis S.P.A.* notes the very

15   nature of what a manufacturer is selling is an inherent quality

16   of that product.  *Pom Wonderful v. Purely Juice*, out of the

17   Central District of California, same thing, advertising that

18   something was one hundred percent pomegranate juice when it

19   wasn't was material.

20             *CJ Products v. Snuggly Plushez*, the As Seen On TV

21   snuggly pillow case, out of the Eastern District of New York,

22   just the fact that it said, As Seen On TV showed that that was

23   a material claim consumers thought it was something they saw on

24   TV, when it wasn't.

25             Same thing with the *Merck* case, *Merck v. Brookstone*

P34FnikA

*Pharmaceutical*, where the Court really makes an interesting

point in that case, Judge Sullivan notes that Acella's practice

of changing its labels to reflect those of Metafolin-containing

products reveals that Acella believed or at least consumer

perception was a fundamental characteristic of the product as

well.

And that's the point.  I think that the case law gets

a little bit confused with the word "inherent" as part of

something, but when you really look at the cases in the case

law, it means something that's essential, the heart of the

product.

You see that in the NBA case, which was a Second

Circuit case, but I really liked the way Judge Preska described

it at the district court level when she said, look, the heart

and soul of this score output technology is accurate scores.

Whether or not they come from the arena or whether it's

somebody sitting at home in front of a computer, that's just

minutia.  And you see that in a lot of different cases making

that differentiation when it comes to materiality.

Same thing with the *Medisim* case that StockX cites,

although StockX cites it for a proposition that, actually, it

doesn't say.  StockX claims that *Medisim* holds that a consumer

perception survey or consumer testimony is required to show

materiality.  I do want to note, that case does not say that.

No case says that.  It says you need some evidence of likely

P34FnikA

 1    materiality; right?

 2            Now, *Medisim*, again, that was a case that was,

 3    essentially, mainly a patent case, but the allegedly-false

 4    advertising claim there was, rapidly tracks heat flow for

 5    thermometers.  But if you're a mother that has a kid with a kid

 6    that has a fever, you want to know if your thermometer

 7    accurately tell the temperature, not accurately tracks heat

 8    flow.

 9            As you look through these cases, you see that's the

10    real meaning of materiality.  Now, whether or not StockX is

11    right under *Reed*, that Judge Oetken -- he bifurcated the

12    standard to say, likely to influence is the second part of

13    inherent quality or characteristic.  We haven't seen another

14    case in the circuit do that, either before or after *Reed*, but

15    presupposing that they're correct that we would need to show

16    additional evidence, we have done that in spades, your Honor.

17            There are consumers, after consumers, after consumers

18    that are complaining about receiving fake products.  If they

19    didn't care about the fact that a product was authentic or not

20    authentic, they wouldn't be complaining.  As I noted at the

21    beginning of the day, StockX has its own internal surveys.

22    They like to do surveys, even before this lawsuit was filed,

23    and all of them, one after the other, point out how very

24    material and how very important these authentication claims are

25    to their consumer.

P34FnikA

```
 1              We even see it in the case of Mr. Kim.  StockX points

 2     to his deposition testimony that he doesn't care.  The next

 3     paragraph said that he does care about authentication.

 4              And frankly, even though we don't think that

 5     Ms. Butler is properly before the Court as a rebuttal damages

 6     expert, even her survey notes a fairly significant percentage

 7     of consumers who care about whether the shoe is authentic, and

 8     of course they do.

 9              A shoe that costs $628.44 is a shoe that a consumer is

10     going to care if it's authentic or not, which is why StockX

11     also says over, and over, and over again in its internal

12     materials and to consumers that authenticity is its core value

13     proposition to consumers.  It is the reason they were founded

14     in the first place.  So for them to now disclaim it and say,

15     consumers don't really care about whether or not the $628

16     Jordan they buy is actually a Jordan, I don't think,

17     respectfully, it has much credibility.

18              Turning briefly to injury, there is some presumption

19     when it comes to injury.  The Court has made clear that where

20     parties are obvious competitors, injury can be presumed.  This

21     is another fight that the parties have, where StockX's position

22     is, because Nike is a primary retailer and they operate on the

23     secondary market that there's no competitive injury.  We

24     respectfully disagree with that.  We believe that our expert,

25     Dr. Stec, that the Court cited in the *Daubert* motion, showed
```

P34FnikA

that at any given time, there are dozens of the same -- not just shoes, but the exact same Nike shoes and Nike shoe styles being sold on both websites at the exact same time.

You see in *Dependable Auto Sales*, which StockX tried to use to support their position, that you needed comparative advertising to have that type of presumption, but StockX ignored the original decision that was handed down in that case. That was a decision on reconsideration on a damages issue for trial.

That initial decision pointed out, like all the cases in the circuit point out, that you can get a presumption either if there is comparative advertising or if you can establish obvious competition. We believe that we've established obvious competition for the reason that in *Dependable Sales*, there was no obvious competition. There, it was a lead-generating service versus a bunch of car dealers. Here, you have two parties that sell, supposedly, brand new one hundred percent authentic Nike shoes on the internet to consumers.

To make matters worse, your Honor, sometimes those shoes offered for StockX under retail price, and they even have a button touting that sometimes it's under retail price. Sometimes they offer Nike shoes before even Nike has released those shoes.

They intentionally use beautiful stock imagery, as I pointed out to the Court earlier, and, of course, they also say

P34FnikA

1    that each shoe is one hundred percent authentic, so when a

2    consumer has a choice, who is not going to chose the one that's

3    the cheaper version of the exact same shoe?

4         We've also pointed out reputational harm, and this is

5    something that was picked up in the *Chanel* case as well -- and

6    the case where, I believe, the judgment was just handed down

7    yesterday on liability for false advertising by the Court --

8    *Chanel* did not move on summary judgment, but defendant did, and

9    when the Court denied it, he said that the brand manager for

10   *Chanel* pointing out that when someone is told that something is

11   an authentic *Chanel* bag and it falls apart, that is going to

12   have reputational harm on the company.

13        And that's the exact same situation that we have here.

14   We have evidence is -- there's -- the evidence in the report is

15   replete with StockX consumers complaining both to StockX and to

16   Nike about bad quality Nike shoes that we were assured from

17   StockX were real.

18        We even have that tied in a bow. I don't know if you

19   want me to talk about the Joe Pallet evidence that you did not

20   want Ms. Kammel to testify on but you left open for trial, if I

21   could touch on that momentarily.

22        THE COURT: Sure. I want you to wrap up, though, in

23   the next five.

24        MS. DUVDEVANI: Sure; that's fine.

25        I know your Court saw fit to exclude that from *Daubert*

P34FnikA

1    and from Ms. Kammel's testimony, and I appreciate that.  I will

2    just briefly say that the reason that we didn't talk about

3    those shoes in our interrogatory response that StockX pointed

4    out is because for our interrogatory response on what we base

5    our counterfeiting count on we were really trying to avoid

6    evidentiary issues, so we only based it on a physical pairs of

7    Nike shoes that we had.

8         However, as you know from the evidence and the sealed

9    evidence in particular, Nike does not need a physical pair of

10   shoes to determine the authenticity of a product.  So when it

11   came to our harm argument, which really was more of an expert

12   argument, what Mr Pallet, the head of brand protection at Nike,

13   did is what he did previously and what he was deposed

14   extensively on already, previously.

15        He looked at the images that Mr. Malekzadeh, a StockX

16   power buyer, had.  He scanned the QR code.  He was able to

17   determine, through Nike's proprietary technology, that three

18   pairs of those imaged shoes were counterfeit.  But there were

19   the emails of this StockX consumer saying, this is falling

20   apart.  There's a problem with these shoes.  These shoes are

21   off.

22        And again, if we want to talk about context, from the

23   time he bought them from the time he was complaining, StockX

24   was telling him, no, no, no.  No red flags.  These are one

25   hundred percent authentic shoes.  You have nothing to worry

P34FnikA

1    about.

2            So to wrap up, your Honor, we do believe that Nike has

3    established what it needed on its own summary judgment motion

4    to have the Court grant on the claims that we moved on.  We

5    also believe that we've made at least a *prima facie* case on the

6    claims that StockX has moved on.

7            And unless the Court has any questions, I'll thank you

8    for your time.

9            THE COURT:  I just have one.

10           If I don't accept your literal falsity argument, if

11   I'm persuaded that there's just enough going on that a

12   reasonable consumer could see it as StockX wants them to see

13   it, am I correct that there's no evidence in the record of a

14   consumer survey or something else to show that a substantial

15   number of consumers were misled?

16           MS. DUVDEVANI:  Not that we put in, your Honor, but we

17   do believe that we don't need it under the case law, and we

18   believe there is plenty evidence -- which is why we moved on

19   wilfulness on false advertising -- that StockX intentionally

20   deceived consumers with these claims.  That is sufficient for

21   us to be granted summary judgment or to win at trial on implied

22   falsity as well.

23           THE COURT:  All right.  Thank you.

24           MS. DUVDEVANI:  Thank you, your Honor.

25           Ms. Bannigan.

P34FnikA

```
 1              MS. BANNIGAN:  Yes, your Honor.

 2              Thank you.

 3              So we do tend to agree with your Honor that there are

 4      a lot of issues in this case.  We also apologize for the number

 5      of exhibits that we have provided to the Court.  What we have

 6      tried to do with our summary judgment motion, recognizing that

 7      this case is going to trial one way or the other -- there's the

 8      whole NFT issue.  There's other advertising claims neither

 9      party moved on.

10              THE COURT:  I thought the NFT thing had fallen away.

11              MS. BANNIGAN:  Unfortunately not, your Honor.

12              THE COURT:  Literally, it's still in the case?

13              MS. BANNIGAN:  It's still in the case; yes, your

14      Honor.

15              THE COURT:  Is that right?

16              MS. DUVDEVANI:  It is, technically.

17              THE COURT:  Who cares about NFTs anymore?

18              That was so 2020.

19              MS. DUVDEVANI:  This is an ongoing conversation, your

20      Honor.

21              THE COURT:  Okay.

22              MS. BANNIGAN:  I don't think I've been part of that,

23      but, yes.

24              Anyway, we know this is a case that's going to trial.

25      We don't need to talk abut NFTs, but we did look for discrete
```

P34FnikA

```
 1    issues and discrete claims where we thought -- our strong view

 2    is, there are no genuine issues of material fact when you look

 3    at these claims.  A lot of our arguments do overlap, so I'll

 4    attempt to address both of them now.

 5          Ms. Duvdevani and I agree on the standard for literal

 6    falsity, which is that the claim must be unambiguous; there

 7    must be only one meaning and one reasonable interpretation, so

 8    no juror can look at these claims and have any other

 9    interpretation.

10          Nike, of course, argues that the interpretation of the

11    authenticity claims, some of which we've seen on the

12    demonstrative -- I will say, I'm not sure if it's my eyes,

13    because I couldn't really see them up close on the

14    demonstrative, but it does show the text of the whole website.

15    They have argued that there's one meaning and that StockX only

16    sells authentic non-counterfeit products.  And to succeed on

17    this claim, obviously, the idea is that no reasonable juror

18    could see otherwise.  We just don't believe that that's the

19    case.

20          When you look at the context here, and the context is

21    not just the authenticity page; the context is not just the

22    pages where you go and buy the product.  We agree context is

23    not everything.  There has to be a limit to what the context

24    is, but it's certainly the entire website here.

25          THE COURT:  Is it really?  Really?
```

P34FnikA

1          So a consumer goes to the first page, the lovely first

2     page with the stock photo of the zebra or the panada -- or

3     whatever the hell it's called -- shoe, and it says, guaranteed

4     authentic Nike shoe, are we really saying that consumers have

5     to click on hyperlinks to know what a hundred percent authentic

6     means?

7          MS. BANNIGAN:  So, I don't think that the zebra shoe

8     is the homepage of the webpage.  That's -- my understanding is,

9     that's where you would go if you're looking for whatever the

10     shoe is called.

11          THE COURT:  What's the name of the shoe?  It's some

12     kind of an animal; right?

13          MS. DUVDEVANI:  It's a Panada Dunk, your Honor.

14          THE COURT:  Panada.

15          MS. BANNIGAN:  Thank you, your Honor.

16          THE COURT:  Panda what?

17          MS. DUVDEVANI:  It's because it's black and white.

18     It's a Nike Dunk that's been called the Panda Dunk.

19          THE COURT:  I wear Adidas.

20          MS. BANNIGAN:  So do I, your Honor.

21          You won't be surprised.

22          THE COURT:  And, to be clear, I've just realized after

23     this case, I've looked at it and I thought:  This isn't even an

24     authentic Adidas shoe.  I look at the picture of Stan Smith,

25     and it's really bad.  But I didn't buy it from StockX, to be

P34FnikA

1     clear; it's not a StockX shoe.

2            Like, one hundred percent, so if I knew what a Panada

3     Dunk shoe was and I was looking for it, and I went either just

4     to my Google search and did -- because I had heard of StockX

5     and I knew that it was a cheaper way of buying authentic

6     shoes -- and I do StockX Panada Dunk, isn't it going to take me

7     to the page that was blown up?

8            MS. BANNIGAN:  I think there are different pages

9     that -- thank you, Gabby -- that you might get to from a Google

10    search.

11           But the context here is that you're going to a resale

12    marketplace.  If you've heard of StockX, you know that it is a

13    resale marketplace.

14           THE COURT:  Understood.

15           MS. BANNIGAN:  StockX is not actually selling you the

16    shoe.  StockX is providing this platform to connect you with a

17    seller.  You don't know who the seller is.  StockX has worked

18    very hard to make it a safe marketplace it entered,

19    specifically, to make this safe because it's sneakerheads, and

20    they care very much about it being authentic.  It's something

21    that StockX cares very much about.

22           THE COURT:  But other people buy on StockX, too; it's

23    not just sneakerheads.  It's parents whose kid wants a Panada

24    Dunk and the side size is not available in the local Nike

25    store.

P34FnikA

1            MS. BANNIGAN:  So, it was founded for sneakerhead s,

2      but yes, it would not be a fair statement to say it is only

3      sneakerheads -- although I do think the definition of

4      sneakerhead is fluid, but -- everybody who goes to the StockX

5      website knows they are going to a resale marketplace.

6            And there is context on this website that tells you

7      that what StockX is saying is not that there is no possibly,

8      ever that a counterfeit can get through.  What StockX is saying

9      is that their standard is one hundred percent authenticity.

10     They are guaranteeing you to meet that standard.  They put all

11     of these processes in place to attempt meet that standard, and

12     they will make it right if they don't.

13            THE COURT:  Okay, but --

14            MS. BANNIGAN:  It's a standard guarantee.

15            Excuse me, your Honor.

16            THE COURT:  Sorry.

17            Guaranteed tends to mean, like, if you've got

18     something that that's not it, you can return it.

19            MS. BANNIGAN:  Yes.

20            THE COURT:  But you do not make it easy to return,

21     suggesting that the one hundred percent guaranteed authentic

22     means something else than, we really try hard, and if we mess

23     up, we'll give you your money back, or not; I'm not even sure

24     if it's a money-back guarantee.

25            MS. BANNIGAN:  It's a money-back guarantee, and, in

P34FnikA

1    fact, it comes out of StockX's own pocket, and so they don't

2    get that money back from the seller.  StockX takes the hit.

3    And they've done it -- I think the data in the motion shows in

4    2021 alone, there is at least 10,000 returns.

5          And so I don't agree with the characterization that

6    StockX doesn't make it easy to return something.  StockX has

7    always been clear, and you just need to look at the numbers of

8    people who have returned.  Even with these advertising claims,

9    they saw the advertising claims.  They reached out to StockX to

10   get a refund, and at least 10,000 times, in 2021 alone, those

11   refunds were given.

12         And so really, Nike has pointed to ten emails -- it

13   might be ten; it might be 11, something like that --

14         THE COURT:  Well, first they had to open the email, so

15   that was one step; right?

16         MS. BANNIGAN:  I do have a dispute between steps and

17   data points, but I'll get to that point, your Honor.  I think

18   there was a disagreement there on what was actually said.

19         But, you know, as to Mr. Kim, who is the customer at

20   issue here with the 34 counterfeits, he himself has said, one

21   of the reasons I shop on StockX is because their customer

22   service is so good.

23         Now, of course, there is an unfortunate situation

24   where he sent the email regarding these shoes and it was

25   misfiled and the customer service was not so good, but his

P34FnikA

1    testimony in the face of this is, StockX has great customer

2    service.

3           Now, there are different ways you can think about this

4    context.  So, one, you go to this website and you know that it

5    is a resale marketplace.  Everybody knows you cannot be a

6    hundred percent sure of what you're getting, but StockX is a

7    great place because it looks at it and it tries.

8           THE COURT:  I'm not sure that I agree with you that

9    everybody knows that it can't be one hundred percent authentic,

10   because the buyer doesn't know what's going on behind the

11   curtain.  For all they know, there's some kind of a deal

12   between StockX and Nike and that Nike has licensed you, or

13   whatever the secret sauce, to make sure you know the difference

14   between a really good counterfeit and an authentic shoe.  So

15   the notion that everybody knows, I'm not sure analysis right.

16          MS. BANNIGAN:  Well, let's look at what they do know

17   and what they see and think about whether it's reasonable that

18   a juror could have this interpretation, because I do believe

19   when you look at this evidence it is certainly something that,

20   at the very least, could have two different interpretations,

21   which means it is not literally false.

22          So at first, it's a resale marketplace.  Obviously,

23   I've said that over and over again.  StockX's website includes

24   a detailed description of the significant counterfeit problem

25   it's trying to solve and the process that it implements to

P34FnikA

solve it.  That, of course, is a major reason why StockX was

found.  The website goes on to explain this process, including

that there are human authenticators that are hired by StockX --

not by Nike or by any other brand, but by StockX -- that

individually look at each pair of shoes that come through their

system.

It's perfectly reasonable that at least one juror

could look at this process and understand that it's not

foolproof; it is a human process.  But the website also

includes note, for instance, that -- I know it's contested,

but -- the 99.95 or 99.96 percent, the accuracy rate for

StockX says that this was calculated by the number of shoes

that were returned.  So, right off the bat, it is openly

admitting that it is wrong sometimes and not one hundred

percent of the shoes that customers get are authentic.

But those shoes are one hundred percent guaranteed.

And StockX's website also includes a link to terms and

conditions on every page, including on all of these pages that

are up on those demonstratives, and the terms and conditions

specifically say what steps a buyer should take if a buyer

receives an item it believes to be counterfeit.

Now, Ms. Duvdevani bought up the *Chanel v. RealReal*

case.  That was a motion to dismiss opinion by Judge Broderick

where Judge Broderick found that these claims should survive.

So it's a very different posture here, of course, but one of

P34FnikA

the things that Judge Broderick found in that opinion was that

terms of service are a relevant place for a resale marketplace

to disclose the existence or even the possibility of

counterfeit products in its marketplace.  And in that case, the

RealReal did not have any of this disclosed in its terms of

service, and so that counts it against the RealReal.

Now, of course, that was a motion to dismiss, but here

it's the complete opposite.  We have the terms of service, and

the terms of service have always disclosed what a buyer should

do if they receive a counterfeit.  Those are plain statements

that appear on StockX's website, and they contradict the notion

that no consumer would see this and believe that StockX could

ever make a mistake and that something that's coming through a

resale marketplace from third parties could not possibly be

counterfeit.

And so it's in this context that it's possible that

consumers did interpret the claim as the guarantee, and StockX

feels very strongly that they meant the guarantee.  They stood

by the guarantee, and that's all of the extrinsic evidence.

That's not part of the context, but if you look at the

extrinsic evidence, it fortifies the fact that consumers did,

in fact, understand what StockX meant by it, which was that

these are one hundred percent guaranteed.

And so you have the return data, and so if consumers

thought they were just out of luck and there was nothing they

P34FnikA

```
 1    could do, why is it that tens of thousands of consumers are
 2    actually returning these things and StockX is taking them back?
 3             There's also the evidence with Roy Kim, himself, and
 4    Roy Kim testified that he understands that there could be
 5    counterfeit that he receives.  He's a very frequent buyer from
 6    StockX.  He's purchased hundreds of shoes, I believe, since
 7    this incident happened, and what he testified in his deposition
 8    is that when he received this particular batch of shoes, he
 9    went and he checked them with third-party authentication --
10    there's other third-party authentication services out there; I
11    think one is called CheckCheck.
12             Obviously, he wouldn't have done that if he thought
13    that there's no way that there could possibly be counterfeits
14    passing through.  The advertising claims were there on the page
15    when he bought these shoes, yet he's still checking them,
16    because that is the context of a third-party marketplace.
17             And so they're right that there was no blanket return
18    policy.  There's no buyer remorse return policy.  There
19    actually is one now, but there wasn't at the time, so if you
20    don't like it, there has to be a problem, but there is a return
21    policy, and there's a lot of data and a lot of evidence showing
22    that StockX accepted these returns and consumers knew about it.
23             And in fact, even in some of the emails that Nike
24    points to that says consumers were so unhappy and there's been
25    reputational injury, they mention the claims and they say, and
```

P34FnikA

```
1    I want a refund.  Plaintiff's exhibit 174 or plaintiff's
2    exhibit 168:  You said these were going to be one hundred
3    percent authentic and I don't think they are; I want a refund.
4    Like, that is exactly the point of what StockX was trying to
5    get across.  They have a standard of a hundred percent
6    authenticity.  It is very important to them.  Very doing very
7    good things in trying to make this marketplace safer, but they
8    will make it right when they confirm that they make a mistake.
9             I'll move on to materiality, unless your Honor has any
10   other questions on -- actually, let me just talk for a second
11   about the process claims, which are in here as well, since
12   we're doing the literal falsity.
13            StockX moved on a discrete set of claims --
14            THE COURT:  Correct.
15            MS. BANNIGAN:  -- that we believe just -- there's no
16   way that they could be literally false, that there's only --
17   one, they're true, and, two, to the extent -- they're certainly
18   not literally false, and so the claims are proprietary.  The
19   evidence is undisputed that we have our own system.  We even
20   have a patent on our system, which is in the statement of
21   facts.  We don't understand how Nike disputes that our system
22   is proprietary.
23            The multistep and one hundred-plus data points, what
24   StockX has said is that there are one hundred-plus data points
25   that they look at, and that is absolutely true if you look at
```

P34FnikA

1    the evidence we cited.  We didn't say that there are one

2    hundred steps.  We are not counting, open a box, close a box.

3    There are one hundred-plus data points that they look at, and

4    that is in the 56.1 statement in paragraphs 543 to 5533 as well

5    as several key exhibits that are cited there.

6              We were surprised to get pushback on this one, because

7    it is very clear in the record.

8              Same with advanced technology --

9              THE COURT:  But you didn't move on literal truth.

10             MS. BANNIGAN:  We moved that StockX -- excuse me.

11             THE COURT:  You didn't cross-move.

12             MS. BANNIGAN:  Our motion is that these claims are not

13   false, so they are not literally false and they are not

14   impliedly false.  We argue they're true, so they can't be

15   literally false.

16             THE COURT:  Okay.  Go ahead.

17             MS. BANNIGAN:  Again, this was our attempt to -- we

18   thought we were helping everybody out by trying to limit some

19   of what we would talk to at trial.  Maybe it's that everything

20   needs to go to the jury, but we do think these are pretty

21   uncontroversial.  And to the extent that Nike's claiming they

22   have some kind of different meaning, that means they also would

23   not literally be false, because literally false means there can

24   only be one unambiguous meaning. and so none of these are

25   literally false.

P34FnikA

 1          Same with advanced technology, expert authenticators,

 2   quality assurance, I don't need to run through this.  Our

 3   evidence is clear in our brief.  It points to our 56.1

 4   statement that there is evidence to back all of this up.

 5          I will address the 99.96 percent authentication

 6   accuracy rate.  Here, StockX tells consumers that the rate is

 7   based on weighted return data compared to total

 8   authentications.  That is disclosed; it is not literally false.

 9   That is disclosed.

10          THE COURT:  It's sort of inscrutable, though.

11          MS. BANNIGAN:  But it's on the website.  And it is

12   hard to see in this exhibit and in some of the way it's been

13   copied and pasted into the exhibits, but it's on there.  It's

14   on the website.

15          THE COURT:  A copy and paste problem?

16          MS. BANNIGAN:  I didn't mean copy and paste.  I mean,

17   some of the exhibits -- I have looked -- that Nike has put in,

18   it is very hard to read.  It's not hard to read when you're on

19   the actual website looking at it.

20          THE COURT:  Okay.

21          MS. BANNIGAN:  So we do believe that that is at least

22   one easy way, if we're going to narrow any claims for trial

23   that it's those specific process-related claims.

24          We understand that there are questions of fact with

25   respect to the authenticity claims, and, you know, I know that

P34FnikA

Nike has said that no case has found these claims not to be

literally false, but there's actually no case like this that

has found on summary judgment that these claims are literally

false.

For example, in the *What Goes Around Comes Around*

case, my team has been referring to that as WAGACA.  I don't

know what the correct interpretation is or the pronunciation,

like, they didn't move on -- it was the same type of claims at

issue, one hundred percent authentic, guaranteed authenticity.

Nobody moved on summary judgment, because there's clear

questions of fact that a jury needs to debate about what

consumers on a resale marketplace understand those claims to

be.

In terms of materiality --

THE COURT:  I'm also going to ask you to finish up in

about the next five minutes.

MS. BANNIGAN:  Okay.  I'll address materiality and

injury as quickly as I can, your Honor.  In terms of

materiality, it sounds like we're on the same page, that

there's no presumption that Nike is entitled to, but the

question is, what does inherent quality mean, and is it purely

enough just to say this is about an inherent quality and that

means it's material.

What the cases have clearly said is that's not enough.

It's not necessarily a two-step inquiry that you have to have

P34FnikA

1    an inherent quality and you have that show that it's likely to

2    impact purchasing decisions, but there has to be something more

3    than just an inherent quality.  That's what the *Reed*

4    *Construction* case -- that's the only case.  It's a district

5    court case in the Southern District of New York. It's the only

6    case that has addressed this exact question with, is inherent

7    quality enough, or do you need show something more.

8            There, that case was about -- the Court said, this

9    does go to quality, but it's still not material because there's

10   no evidence that has been presented in the record that it's

11   likely to influence purchasing decisions.

12           And that's actually the same in all of the cases that

13   Ms. Duvdevani pointed out.  There was evidence in there.  It

14   wasn't just, this is strict liability; this is about

15   authenticity, so it's obviously material.  What the court is

16   saying in these cases is, there has to be an analysis.  Why is

17   it likely to impact purchasing decisions?  There has to be

18   something more here.

19           The *Church and Dwight* case, for instance, the Court

20   says, likely to influence purchasing decisions and then says,

21   well, there were lost sales, so if there's lost sales, clearly,

22   somebody cares about this.

23           The theme through all of this is that there's

24   evidence.  We don't believe Nike has put in any evidence of

25   this, and even if they did, we have put forth

counterevidence -- well, maybe there's not a presumption. If

there was, we have rebutted that presumption. Essentially,

what they're asking for is a presumption because they're

saying, well, it's about quality. This is what the product is;

therefore it's material.

But here, like your Honor pointed out, we have

Ms. Butler's purchase intent survey where she did a survey, one

with the claims, one without the claims, and found there is no

statistical difference between who is purchasing on the

website.

We have Dr. Vigil's analysis, where he looks at both

StockX and GOAT -- GOAT is a competitor resale marketplace --

and says, since StockX has taken down these claims, is there

any statistical difference between the sales and whether GOAT

is getting more of the market share? The answer is no.

And then, of course, there is the consumer, the one

customer to testify here, who actually received the

counterfeits at issue, Mr. Kim. And he's saying I purchase on

StockX because of the customer service, because of the layout,

because of the -- there's a host of reasons. And there's just

not enough to show -- he does mention, I only purchase on

resale platforms that have authentication. That means the

process; that doesn't show anything about these specific claims

being material. And what we, in fact, have showed is that

purchasing doesn't change if the claims are not there.

P34FnikA

1          I'll move over to injury, by your Honor's request that

2    I finish up.  On injury, there is just not the support in the

3    cases for this notion that Nike is entitled to a presumption of

4    injury, simply because the parties are competitors.

5          THE COURT:  You agree you're competitors.

6          MS. BANNIGAN:  Absolutely not, your Honor.

7          I think that's a huge -- my next sentence was going to

8    be, there's a huge question of fact as to whether these parties

9    are competitors, but that's not something that your Honor has

10   to reach here, because if you look at what the cases actually

11   say, going to *Merck Eprova* case and then looking through

12   *Lexmark* and the more recent *Souza* case, the cases are clear

13   that the presumption exists if you're dealing with direct

14   comparative advertising, and that's where I'm saying my

15   competitor's products aren't as good as mine; I'm particularly

16   calling out the competitor.  And what the cases say is, there's

17   obvious injury when you have comparative advertising, because

18   you're calling them out and saying their product is not as

19   good.  That makes sense.

20         *Merck Eprova* said, well, let's look at this.  Is it

21   always the case that it has to be comparative advertising?

22   There might be other situations in which it applies.  And here,

23   the situation that we have is, this is a two-player market;

24   it's only me and you.  And so when I'm saying this claim,

25   obviously, it's directly impacting you, because you're the only

P34FnikA

competitor it possibly could impact.  Two-player markets are like comparative advertising, and so that should count here. It's the same reasoning.

And so as the *Lexmark* case says, there has to be actual injury.  The court considered -- this is the Supreme Court -- the Court considered -- the Lanham Act says likely injury; that's not enough.  There has to be an actual injury.

*Souza* is the Second Circuit case.  It's the first case that specifically says, we haven't addressed whether *Lexmark* applies in this context or how we deal with Lexmark in this context and whether -- how it compares to our past precedent in the circuit.  It looks at the *Merck Eprova* case and says, this is call consistent with what we've ruled before.  To the extent there is comparative advertising, you're dealing with two people, there is a presumption; but when there is not a presumption, when it is not comparative advertising or a two-player market, there has to be actual evidence of injury. And that's a direct quote, actual evidence, and that is not what we have here.

We have evidence of possible diverted sales.  As your Honor said, there could have been sales diverted.  There is no evidence that any sales were diverted.  Nike has not claimed lost profits in this case.  There is absolutely no evidence. It could have.  There is evidence that it could have put in through an expert.  The possibility of lost sales is not

P34FnikA

1    enough, and that's the same with the possibility of

2    reputational harm.

3         I want to remind the Court that what *Lexmark* says is

4    that the injury has to flow directly from the advertising.  And

5    so, even if it is the case that consumers are mad because they

6    have gotten a counterfeit -- which I am not conceding to, but

7    let's assume for the sake of this argument -- there is nothing

8    to say this flows directly from the advertising.

9         And Ms. Butler's survey shows that it doesn't.  The

10   consumer testimony shows that it doesn't.  There is just

11   nothing to tie these specific advertising claims to actual

12   injury here, which is what you need to do for false

13   advertising.

14        THE COURT:  Thank you.

15        MS. BANNIGAN:  Thank you, your Honor.

16        THE COURT:  A very short rebuttal.

17        MS. DUVDEVANI:  I'm going to stay right here, your

18   Honor.

19        THE COURT:  Even better.

20        MS. DUVDEVANI:  Super short.

21        Really quickly, most of Ms. Bannigan's argument on

22   materiality related to consumer sophistication, that is not --

23   on falsity, rather, that is not supposed to be considered.  She

24   talked a lot about who the consumers are, what the consumers

25   would consume.  *JR Tobacco v. Davidoff* says that the court is

P34FnikA

1   not supposed to consider the sophistication of the advertising

2   audience, and to reach the delicate balance between the literal

3   text and the context of an advertisement, counter-claim

4   defendants urge embracing as much context as it would require

5   to disclaim the common meaning of the words used in their

6   advertisements, one hundred percent authentic here, and that's

7   what StockX is improperly trying to do now.

8          In terms of evidence of materiality, StockX doesn't

9   like our evidence of materiality. That doesn't mean it doesn't

10  count. There is not a single case that shows that you need the

11  evidence they're pointing to: consumer testimony and surveys.

12         *Medisim* had does not say that, and as noted we have

13  StockX's own admissions, their own internal surveys, their own

14  consumer complaints, and even their own expert, Ms. Butler,

15  determined that it was important. There is no case law that

16  says it has to be the only driving force that it's a likely

17  influencer of purchasing decisions.

18         Finally, on injury -- and I'll make this very brief --

19  respectfully, I do not agree with Ms. Bannigan's interpretation

20  of the case law. *Lexmark*, a Supreme Court case about standing,

21  has not changed the fact that it is actual or likely injury in

22  order to get past the liability phase of a false advertising

23  claim.

24         And in *Souza*, which also says, likely injury, in other

25  words, it can't be speculative. There, there were models that

1    alleged that being shown on a strip club advertisement was

2    potentially detrimental to their careers.  They had nothing to

3    back that up.  For all they knew, that was useful to their

4    careers.  There was just no evidence one way or another.

5        That is not what we have here, your Honor.  We have

6    plenty of evidence showing injury.

7        Thank you.

8        MS. BANNIGAN:  Can I be very, very brief, your Honor?

9        THE COURT:  Yes.

10       MS. BANNIGAN:  Thank you.

11       On the point of literal falsity about sophistication,

12   we are not using customer testimony as part of the context.

13   What we're saying with the customer testimony is that it

14   reaffirms that when you look at the context that is on the

15   actual website, this is how consumers view the website.  And so

16   we're not in a disagreement about the law.

17       But, if you look at the *Avis v. Hertz* case, for

18   instance, there, the court evaluated the context and says that,

19   well, consumer perception actually fortifies that understanding

20   of the context.  And so that's what we're talking about here,

21   and the consumer perception certainly does fortify that

22   context.

23       On materiality, just a quick note about the litigation

24   surveys.  Similar to our argument on injury, we have to keep in

25   mind that you have to look at, it's whether the claims, the

P34FnikA

1     advertising claims were material to purchasing decisions.

2     Surveys that do not show consumers the advertising claims do

3     not tell whether the advertising claims are material.

4           And so that's the issue with the emails that we're

5     pointing to, with the surveys that we're pointing to.  They may

6     be talking about the process and the fact that StockX has this

7     process is a very different question, but whether the specific

8     authenticity claims that Nike has moved on are material or have

9     caused injury, that is the question here.  And there's is no

10    evidence in this record that any of this is flowing from the

11    advertising claims.

12          THE COURT:  All right.  We're going to take a

13    ten-minute break.  Don't go far.

14          MS. BANNIGAN:  Thank you, your Honor.

15          (Recess)

16          THE COURT:  Okay, ladies and gentlemen.  I am now

17    ready to rule on the parties' cross-motions for partial summary

18    judgment.  Nike's motion is granted to the extent it seeks a

19    judgment that StockX is liable for distributing counterfeit

20    goods with respect to the four pairs of shoes it sold to Nike's

21    investigators and the 33 pairs of shoes it sold to Roy Kim.

22    Nike's motion is denied in all other respects, and StockX's

23    motion is denied in its entirety.

24          Summary judgment is appropriate when "the movant shows

25    that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." Fed. R.
Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317,
322 (1986).  "Summary judgment should be denied where there are
genuine issues of material fact 'that properly can be resolved
only by a finder of fact because they may reasonably be
resolved in favor of either party.'" *Davis-Garett v. Urb.
Outfitters, Inc.*, 921 F.3d 30, 45 (2d Cir. 2019) (quoting
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).
Courts must "construe the facts in the light most favorable to
the nonmoving party and resolve all ambiguities and draw all
reasonable inferences against the movant." *Delaney v. Bank of
Am. Corp.*, 766 F.3d 163, 167 (2d Cir. 2014).

I will first address Nike's claim that StockX
distributed counterfeit goods in violation of the Lanham Act.
To establish liability on this claim, Nike "must demonstrate
(1) that it has a valid mark that is entitled to protection
under the Act and (2) that defendants' actions are likely to
cause confusion as to the origin of the mark." *Gucci Am., Inc.
v. Duty Free Apparel, Ltd.*, 286 F. Supp. 2d 284, 287 (S.D.N.Y.
2003).  Because the parties do not dispute the validity of
Nike's marks, *see 56.1 Statement*, ¶¶ 12-14, Nike is entitled to
a presumption that StockX's actions were likely to cause
confusion, so long as StockX did, in fact, distribute
counterfeits.  *See Spin Master Ltd. v. Alan Yuan's Store*, 325
F. Supp. 3d 413, 421 (S.D.N.Y. 2018).

P34FnikA

1    StockX does not dispute that it distributed

2    counterfeit shoes to Roy Kim and to Nike's investigators in the

3    United States.  *See StockX Opp.*, Dkt. 296, at 9-10.  There is

4    no question of fact that StockX is liable under the Lanham Act

5    with respect to those 34 pairs of shoes.

6    StockX argues that it cannot be held liable for

7    distributing the three Test Purchase Shoes shipped to, and

8    inspected in, the Netherlands because those sales were not

9    sufficiently connected to U.S. commerce.  That's *id.* at 11-12.

10   The Supreme Court recently clarified that liability under the

11   Lanham Act can arise only where "the conduct relevant to the

12   statute's focus occurred in the United States," although this

13   standard may be met "even if other conduct occurred abroad."

14   *Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 419

15   (2023).

16   The Second Circuit has not yet applied Abitron, but

17   when it has applied the "relevant to the statute's focus" test

18   in other contexts, it has explained that "the focus of a

19   statute is on the object of its solicitude, which can include

20   the conduct it seeks to regulate, as well as the parties and

21   interests it seeks to protect or vindicate."  *United States v.*

22   *Napout*, 963 F.3d 163, 178 (2d Cir. 2020).  Here, the conduct

23   the Lanham Act seeks to regulate (the sale and distribution of

24   counterfeit goods) and the party whose interests it seeks to

25   protect (Nike, as the trademark holder) are both based in the

United States.  *See* 56.1, ¶¶ 13, 36, 155.

The ultimate destination of the shoes is unrelated either to StockX's conduct or Nike's interest in having its marks protected.  Accordingly, StockX is also liable under the Lanham Act for the three pairs of test purchase shoes that were shipped to the Netherlands.  StockX's liability as to the shoes its distributed to Michael Malekzadeh is less clear, although certain facts are undisputed.  It's undisputed, for example, that when Nike's brand protection specialist examined the Zadeh Kicks facility, she identified and photographed 40 shoeboxes containing shoes with corresponding StockX receipts.  56.1, ¶¶ 200-02.  Using Dolos (Nike's internal verification system), she later determined those shoes to be counterfeit.  *56.1 Statement*, ¶¶ 200-01.

Moreover, StockX has not refuted that the receipts in each shoebox reflected actual StockX purchases known to have been made by Mr. Malekzadeh and shipped to his business address.  *56.1 Statement*, 197, 199.

Nevertheless, there is evidence that creates questions of fact as to whether the shoes are counterfeit and whether they are attributable to StockX.  Neither StockX nor any other third-party has corroborated Nike's conclusion that the Malekzadeh shoes were counterfeit.  That is relevant because there is some evidence that Dolos may not always be an accurate means of identifying counterfeits, including documented

incidents in which shoes determined to be counterfeit using
Dolos were later found to be genuine after an in-person review.
See *56.1 Statement*, ¶ 15 (StockX's Response).

Moreover, even assuming the Malekzadeh shoes were
counterfeit, there are facts from which a reasonable jury could
conclude that the shoes Nike discovered at the Zadeh Kicks
facility may not have actually been purchased on StockX.  As
noted by the receiver appointed to oversee the dissolution of
Mr. Malekzadeh's business, "Zadeh Kicks did not have a
comprehensive system housing the inventory, nor did it have
sophisticated procurement, order processing, fulfillment or
shipping procedures."  *56.1 Statement*, ¶ 363.  Because Zadeh
Kicks sold tens of thousands of shoes annually, *56.1 Statement*,
¶ 360, it is possible that Mr. Malekzadeh (intentionally or
carelessly) mixed or matched different versions of the same
shoes with receipts.  A jury may deem that possibility
sufficiently likely to conclude Nike has not proven by a
preponderance of the evidence that StockX sold the shoes.

Drawing all reasonable inferences in favor of StockX
as the nonmovants, the Court concludes that the question of
whether the Malekzadeh Shoes were counterfeit and whether they
were purchased on StockX must be resolved by a jury.

In addition to liability, Nike seeks summary judgment
as to its claim that StockX's counterfeiting was willful.
"Summary judgment is not a tool well suited to determining

P34FnikA

willfulness, especially when it turns on determinations of

credibility, which are within the province of the jury."

*Disney Enterprises, Inc. v. Sarelli*, 322 F. Supp. 3d 413, 444

(S.D.N.Y. 2018).

Nike's argument turns entirely on the notion that

StockX purposefully ignored warnings that it distributed

counterfeits and failed to correct the structural elements of

its website that may have been attractive to counterfeiters.

StockX maintains that it made extensive efforts to root out

counterfeits, including adopting authentication protocols and

suspending known sellers of counterfeits.  The question of

willfulness will require a factfinder to weigh the competing

evidence and assess the genuineness of StockX's efforts to

address counterfeiting.

Only the jury can make such subjective determinations.

Accordingly, Nike's motion for summary judgment as to whether

StockX was a willful counterfeiter is denied.

I will now address the false advertising claims.  "To

prevail on a Lanham Act false advertising claim, a plaintiff

must establish that the challenged message is (1) either

literally or impliedly false, (2) material, (3) placed in

interstate commerce, and (4) the cause of actual or likely

injury to the plaintiff."  *Church & Dwight Co. v. SPD Swiss*

*Precision Diagnostics*, 843 F.3d 48, 65 (2d Cir. 2016).  The

parties agree that the Challenged Claims were placed in

interstate commerce.  I will discuss the other elements in
turn, starting with falsity.

Nike proceeds exclusively on a theory of literal
falsity.  "To establish literal falsity, a plaintiff must show
that the advertisement either makes an express statement that
is false or a statement that is false by necessary implication,
meaning that the advertisement's words or images, considered in
context, necessarily and unambiguously imply a false message."
*Church & Dwight*, 843 F.3d at 65.  "Only an unambiguous message
can be literally false; if the language or graphic is
susceptible to more than one reasonable interpretation, the
advertisement cannot be literally false."  *Apotex Inc. v.
Acorda Therapeutics, Inc.*, 823 F.3d 51, 63 (2d Cir. 2016).
Additionally, courts must "consider the advertisement in its
entirety and not engage in disputatious dissection.  The entire
mosaic should be viewed rather than each tile separately."
*S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 238 (2d
Cir. 2001).

Both parties have engaged in the type of "disputatious
dissection" against which the Second Circuit has warned.  Nike
seeks summary judgment only with respect to the so-called
authenticity claims.  StockX argues that the falsity of the
authenticity claims must be decided by a jury, but it moves
affirmatively on falsity grounds with respect to the so-called
authentication process claims.

P34FnikA

As best as I can discern, the authenticity claims are assertions that StockX only sells authentic products, while the authentication process claims are assertions that StockX has a process for verifying the authenticity of its goods. But the line between the two categories is blurry, because many claims in one category appear side-by-side with claims from the other category. That makes it difficult, if not impossible, to interpret the two categories of claims separately.

To ensure the challenged statements are considered in their full context, I will analyze the ads without reference to the party-created categories.

Nike contends that the ads promise not merely that StockX's authentication process is very effective, but that it's perfect at eliminating counterfeits. There are facts that support Nike's argument. During the relevant time period, every page for every item sold on StockX contained a logo indicating that the relevant product was "100 percent Authentic." *56.1 Statement*, ¶¶ 57-58. That logo then hyperlinked to a webpage that told customers, among other things, to "shop on StockX with complete confidence knowing that every purchase is 100 percent verified authentic," that its quality assurance process guarantees "nothing slips through the cracks," and that its authenticators will catch "every minor detail." *56.1 Statement*, ¶¶ 58, 577, 583. Because a jury could find that those assertions, on their face, falsely

P34FnikA

promise a flawless authentication process, the Court concludes,
as a matter of law, that Nike's proposed interpretation is
reasonable.

StockX, not surprisingly, urges an alternative
interpretation.  It argues that the advertisements can be read
only to communicate that StockX believed, based on its
verification and inspection process, that every item sold on
its site was authentic, not necessarily that every product was
actually non-counterfeit.  This interpretation is far less
intuitive than Nike's, but StockX presents barely enough
evidence to raise a triable issue of fact whether it is a
reasonable interpretation of the advertisements.

The most powerful piece of evidence supporting
StockX's position is that the hyperlinked webpage on which most
of the challenged claims appear represents that StockX's
"authenticators maintain a 99.96 percent accuracy rate." *56.1
Statement*, ¶ 576.  A reasonable juror might see that as
communicating that the authentication process is good but not
flawless, but that is, by no means, foregone conclusion.  A
reasonable juror could also conclude that a customer would
assume that "accuracy" is different from authenticity, given
that StockX touts its process as 99.96% accurate but its
products as 100% authentic.

Customers with a great deal of spare time and an
intense interest in parsing advertisement copy can navigate to

an entirely separate webpage, scroll to the bottom, and squint

through the fine print for an explanation of how the 99.96%

statistic is calculated, but a reasonable juror could also

conclude that would just muddy the waters further.  That page

of explanation notes that the accuracy rate is not a measure of

accuracy at all, but rather a calculation of "weighted return

data compared to total authentications."  *56.1* ¶ 575.  Whether

a reasonable person would see and understand that disclaimer -

and whether it acts as a disclaimer at all - is a question for

the jury to decide.

StockX also introduces an expert report from a

so-called "sneakerhead," who opines that sneaker collectors

would understand the ads to mean only that StockX's shoes are

"verified, looked at by someone," not that they are always

authentic.  *56.1* ¶ 327.  The persuasiveness of this report is

debatable at best, as it is unclear that a juror would find

that the average StockX customer is a "sneakerhead," or that

input from a "sneakerhead" is needed to understand the

straightforward language of the ads.  Nevertheless, it will be

up to a jury, not this Court, to decide what weight -- if any

-- to give to his testimony.

In short, Nike's proposed interpretation of the ads as

promising a flawless authentication process is reasonable.  It

may, in fact, be the only reasonable interpretation of the ads,

but that's a question for the jury.  The jury may accept or

P34FnikA

reject StockX's argument that a reasonable person could

understand its ads to say that StockX's authentication process

exists and is effective but not flawless.  I note that if the

jury does find that a reasonable person might adopt StockX's

interpretation, that would then mean that the ads are subject

to at least two reasonable interpretations (the one put forth

by Nike, which the Court has deemed reasonable as a matter of

law and the one put forth by StockX).  In that case, Nike's

literal falsity argument would fail, and Nike would be required

to show "extrinsic evidence of consumer confusion" or "evidence

of the defendant's deliberate deception" to prevail on its

false advertising claim.  *Int'l Code Council, Inc. v. UpCodes*

*Inc.*, 43 F.4th 46, 57 (2d Cir. 2022).

        Because Nike has evidence of neither, a finding by the

jury that a reasonable person could adopt StockX's

interpretation of the ads would mean that Nike has failed to

carry its burden as to falsity, which would mandate a verdict

for StockX on that claim.  *See Johnson & Johnson Vision Care,*

*Inc. v. Ciba Vision Corp.*, 348 F. Supp. 2d 165, 184 (S.D.N.Y.

2004).

        In addition to falsity, Nike must demonstrate that

StockX's advertising "relates to the inherent qualities or

characteristics of the goods or services in question." *Classic*

*Liquor Importers, Ltd. v. Spirits Int'l B.V.*, 201 F. Supp. 3d

428, 450 (S.D.N.Y. 2016).  This requirement is "essentially one

P34FnikA

of materiality." *Nat'l Basketball Assoc. v. Motorola, Inc.*,
105 F.3d 841, 855 (2d Cir. 1997).

Nike argues that because StockX misrepresented the
"inherent quality" of its products by falsely asserting that it
sells only authentic shoes, that the statements are material.
In *Apotex, Inc. v. Acorda Therapeutics, Inc.*, the Second
Circuit held that its precedents "define materiality as 'likely
to influence purchasing decisions.'" 823 F.3d 51, 63 (2d Cir.
2016). The plaintiff-appellant in that case -- like Nike here
-- contended that because it had shown literal falsity,
"consumer deception is presumed, and the court may grant relief
without reference to the advertisement's actual impact on the
buying public." *Id.* at 67. The Court rejected that position,
reasoning that it "conflates falsity with materiality. Once
literal falsity is proved, there is no requirement of extrinsic
evidence showing consumer deception. But [the plaintiff] is
not thereby relieved of the burden of showing materiality,
which requires that the allegedly false or misleading
representation involved an inherent or material quality of the
product -- *i.e.*, that the representation was likely to
influence purchasing decisions. *Id.* at 67-68.

Accordingly, Nike must demonstrate some probability
that the ads affected consumers' purchasing decisions. While
the Court thinks it's likely that Nike's arguments will be
persuasive to a jury, there are questions of fact that preclude

P34FnikA

1    the Court from granting summary judgment.

2            Nike, for its part, points to communications from

3    StockX customers, who cited language in StockX's advertisement

4    regarding authenticity when complaining to StockX about

5    receiving allegedly counterfeit shoes.  See *56.1 Statement* at

6    606 (Nike's Response).  It also cites an internal "US Brand

7    Perception Survey" by StockX, which found that 85 percent of

8    its customers rank authenticity as "very important" or

9    "somewhat important," suggesting that promises about

10   authenticity are likely to affect consumer behavior.  Plus,

11   common sense would argue that users of StockX, unlike shoppers

12   on Canal Street, are buying Nike shoes because they want Nike

13   shoes, not shoes that look like Nikes.

14           StockX, meanwhile, points to a "purchase intent

15   survey" prepared by Sarah Butler, a market research specialist

16   retained by StockX in connection with this litigation, who

17   found that the so-called authenticity claims did not affect

18   buyers' self-reported purchasing intentions.  *See Expert*

19   *Rebuttal Report of Sarah Butler*, StockX Ex. 119, Dkt. 257-119.

20   Although the Court is skeptical, a jury could buy her

21   testimony.

22           In all events, the conflicting evidence makes it

23   inappropriate to resolve the question of materiality on summary

24   judgment.

25           Nike must also show that it was injured by StockX's

P34FnikA

false advertising, meaning it must provide "a reasonable basis
for the belief that it is likely to be damaged as a result of
the false advertising." *Church & Dwight*, 843 F.3d at 72.  One
way Nike can satisfy its burden of proof is by proving that
Nike and StockX are "competitors in a relevant market" and by
proving that there is "a logical causal connection between the
alleged false advertising and its own sales position." *Id.* at
71.

Nike and StockX are competitors in the sneaker market.
Nike's economic expert, Dr. Jeffrey Stec, found that, between
June 2022 and June 2023, StockX sold "at least 200,000 shoes
that were simultaneously offered by Nike for retail sale," and
that those shoes "were likely sold when these products were
available for sale by Nike." *Expert Report of Jeffrey Stec*,
Dkt. 309-A, at 13, 18.

StockX makes two arguments why it and Nike are not
direct competitors, neither of which is persuasive.  First, it
notes that Nike did not list StockX as an example of a direct
competitor in its SEC filings, and its witnesses did not name
StockX when asked to identify their competitors during
depositions.  *56.1 Statement*, ¶¶ 677-78, 680, 686.  But that
merely shows that Nike has multiple competitors; it does not
show that StockX is not one of them.  Second, StockX notes that
it is engaged only in the resale market, and Nike is not in
that market.  That distinction makes no difference, given that

P34FnikA

StockX offered products identical to Nike's and advertised them as "new, unworn, and authentic." *56.1 Statement* at 214. In so doing, it placed StockX "obviously in competition" with Nike as a seller of new Nike products. *Ortho Pharm. Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 694 (2d Cir. 1994).

Because Nike and StockX are direct competitors, Nike's required showing for materiality is the same as it is required showing for injury. *See Church & Dwight*, 843 F.3d at 70-71 ("While the materiality of the falsity and the likelihood of injury to the plaintiff resulting from the defendant's falsity are separate essential elements, in many cases the evidence and the findings by the court that a plaintiff has been injured or is likely to suffer injury will satisfy the materiality standard, especially where the defendant and plaintiff are competitors in the same market and the falsity of the defendant's advertising is likely to lead consumers to prefer the defendant's product over the plaintiff's"). For the same reasons that the Court cannot resolve materiality on summary judgment, it also cannot resolve injury.

Finally, Nike asks the Court to conclude that StockX's false advertising was willful. Because the Court cannot conclude that StockX engaged in false advertising, it cannot make a determination as to willfulness. In any event, as noted previously, willfulness is generally not appropriately resolved on summary judgment.

P34FnikA

1          So, the parties are ordered to meet and confer

2    regarding trial.  Not later than March 14, 2025, they must

3    submit a joint letter telling the Court how long the expected

4    trial will be and providing three mutually-convenient dates for

5    trial between June 15 and November 15, but not during the last

6    week of August or the first four weeks of September.

7          They must also indicate whether they would like a

8    renewed referral to their assigned magistrate judge to try to

9    resolve the case.

10          And with that, anything further from Nike,

11    Ms. Duvdevani?

12          MS. DUVDEVANI:  No.

13          Thank you very much, your Honor, for your attention to

14    this matter.  I know it was a lot.  Appreciate it.

15          THE COURT:  It was a long 56.1 statement.  It may win

16    the prize of the longest 56.1 statement in the history of the

17    Western World.

18          MS. DUVDEVANI:  I can't disagree, your Honor, and I

19    apologize for that.

20          THE COURT:  Quite all right.  Anything further from

21    StockX, Ms. Bannigan?

22          MS. BANNIGAN:  No, your Honor.

23          Thank you very much.

24          THE COURT:  All right.  Thank you, all.

25          (Adjourned)